IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
LEMON BAY PARTNERS, LLP,                    :
                                            :
                 Plaintiff,                 :
                                            :
          --against --                      :        No.
                                            :
BRUCE L. HAMMONDS, KENNETH                  :
A. VECCHIONE,  RICHARD K. STRUTHERS,        :
JOHN R. COCHRAN, III, and LANCE L.          :
WEAVER,                                     :
                                            :        DERIVATIVE COMPLAINT
                 Defendants,                :
                                            :
          --and--                           :
                                            :
MBNA CORP.,                                 :        JURY TRIAL DEMANDED
                                            :
                 Nominal Defendant.         :
                                            :
-------------------------------------------------------------x
```

Plaintiff, by its attorneys, submits this shareholder's derivative complaint against the

defendants named herein. The allegations are asserted on information and belief, except as to

those matters which relate to plaintiff and its own acts, which are asserted on personal

knowledge.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal

defendant MBNA Corp. ("MBNA" or the "Company") against its top executive officers to

recover damages inflicted upon MBNA by their actions in connection with an asserted scheme to

mislead the investing public through misrepresentations and omissions of material fact. On or

about May 5, 2005, MBNA shareholder James M. Baker brought a class action lawsuit against

1

MBNA and defendants Hammonds, Vecchione, Struthers, Cochran, Weaver and others alleging violations of the Securities Exchange Act of 1934. Specifically, the Class Action Complaint alleges that the Company failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:

(a)    The Company had been experiencing unexpectedly high payment volumes from U.S. credit card customers during Q1 2005, reducing managed loans in the quarter more than in prior years, and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1 2005 from $33.8 billion reported at the end of Q1 2004;

(b)    Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(c)    MBNA was suffering from an unseasonably sharp contraction in loans during Q1 2005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Ql 2004;

(d)    The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(e)    MBNA was experiencing higher-than-expected delinquencies during Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f)    The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

(g) Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in 4Q 2004;

(h) Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i) Due to the increase in pre-pays, the interest-only securitization strip securities were overvalued on the Company's books; and

(j) The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

2.     The shareholder Class Action Complaint alleges that as a result of the defendants' false statements, MBNA's stock traded at artificially high prices during the period January 20, 2005 through April 21, 2005 (the "Class Period"). During the Class Period defendants also caused the Company repurchase $250 million worth of its own stock which supported the stock's high price. Defendants also used the Company's purported stellar performance to justify the payment of millions of dollars in bonuses to themselves in January 2005.

3.     The Class Action Complaint further alleges that on April 21, 2005, defendants shocked the market by disclosing MBNA had earned only $0.02 cents per share in 1Q 2005 – a 94% decline from the $0.59 per share it reported in Q4 2004-- and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate. Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and

3

reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of \$23.11 on April 20, 2005 to below \$19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume.    MBNA's market capitalization declined by over \$5.8 billion in one trading session.

4.    The Class Action Complaint charges that while MBNA's market price remained at an artificially high level due to defendants' misrepresentations and omissions, defendants took advantage of the price inflation and sold over \$75 million worth of their own MBNA stock.

5.    As further set forth below, at all times relevant hereto, defendants Hammonds, Vecchione, Struthers, Cochran, and Weaver were among the highest ranking executives of MBNA.    Individually and jointly, they were and are in a position to control the affairs of MBNA, including the dissemination of materially false and misleading public statements as charged in the Class Action Complaint.

6.    As a consequence of this asserted wrongdoing, MBNA stands to lose many millions of dollars in damages in the class action.    Additionally, upon revelation of the omitted material facts, MBNA shares dropped considerably, and the Company thereby lost over \$5.8 billion in market value. MBNA will additionally suffer damages through payment of millions of dollars in attorneys' fees and expenses in connection with defending the securities fraud charges set forth in the Class Action Complaint.    It would be unfair and inequitable for the shareholders of MBNA to bear the direct or indirect burden to pay these damages caused by the individual defendants, and therefore plaintiff seeks to require the individual defendants to make recompense to the Company.

4

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See Musick, Peeler & Garrnett v. Employers Insurance of Wausau*, 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the Federal contribution claim alleged herein. This Court also has subject matter jurisdiction over the pendant state law claims asserted herein pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). A number of the wrongful acts and practices contained of herein occurred in this District.

9. In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to

distribute the false and misleading statements complained of herein.

## PARTIES

10.    Plaintiff Lemon Bay Partners LLP, is a Florida limited liability partnership and is an MBNA shareholder. Plaintiff held its MBNA shares before MBNA suffered all or most of the damages alleged herein.

11.    Defendant Bruce L. Hammonds ("Hammonds") is Chief Executive Officer ("CEO"), President and a director of MBNA. Prior to assuming these positions on December 30, 2003, Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA. Hammonds has been a director of MBNA since 1986. During the Class Period, Hammonds sold more than $9 million worth of his MBNA stock.

12.    Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Vecchione has been a director of MBNA America since January 2005 and also serves as CFO of MBNA Delaware. Vecchione is responsible for accounting, corporate and strategic planning, treasury and financial operations, business analysis (including M&A analysis), financial planning, and investor relations. During the Class Period, Vecchione sold more than $2.6 million worth of his MBNA stock.

13.    Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America. Struthers is also a director and serves as Chief Loan Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada. In addition, Struthers is a director and serves as Chairman and Chief Executive Officer of MBNA Delaware. Struthers is responsible for international operations, consumer finance, business lending, and MBNA America's American Express credit card program. During the Class Period, Struthers sold more

than $12 million worth of his MBNA stock.

14.     Defendant John R. Cochran, III ("Cochran") was the Chief Operating Officer of MBNA and is the Chairman, Chief Executive Officer and President of MBNA America. Cochran previously served as the Chief Operating Officer and Chief Marketing Officer of MBNA America. Cochran has been a director of MBNA America since 1986. During the Class Period, Cochran sold more than $14 million worth of his MBNA stock.

15.     Defendant Lance L. Weaver ("Weaver") was Vice Chairman of MBNA and MBNA America. Weaver is also a director of MBNA America. Weaver is responsible for MBNA America's U.S. credit card business, including business development, marketing, sales, customer satisfaction, U.S. regional operations, credit, customer assistance and fraud. Weaver also serves as a board member and former chairman of Mastercard International Inc. Weaver has been a director of MBNA America since 1993. During the Class Period, Weaver sold more than $10 million worth of his MBNA stock.

16.     The individuals named as defendants in ¶¶ 11-15 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MBNA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these Individual Defendants knew that the adverse facts specified herein, as alleged in the Class Action Complaint, had not been disclosed to and were

being concealed from the public and that the positive representations being made were materially false and misleading. The Class Action Complaint alleges that the Individual Defendants are liable under the federal securities laws for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.     Nominal defendant MBNA is a bank holding company and the parent of MBNA America Bank, N.A., a national bank. MBNA America has two principal subsidiaries: MBNA Europe Bank Limited and MBNA Canada Bank, fully chartered banks that issue credit cards in the United Kingdom, Ireland, Spain, and Canada. The Company is headquartered at 1100 North King Street, Wilmington, Delaware and has over 1.277 billion shares of common stock issued and outstanding. The Company's shares trade on the New York Stock Exchange under the ticker symbol "KRB."

## THE SCHEME ASSERTED IN THE SECURITIES CLASS ACTION

18.     The allegations in this section summarize the essential allegations of the complaint (the "Class Action Complaint") in Baker v. MBNA Corp. et al., U.S. District Court for the District of Delaware Docket No. 1:05-CV-00272-GMS (the "Class Action").

19.     The Class Period in the Class Action begins on January 20, 2005. On that date, defendants issued a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.59 Per Common Share - Announces New $2 billion Common Stock Repurchase Program." In the press release and the earnings conference which followed it the next morning, defendants announced that MBNA had reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. Defendants also reported a 9% rise in 4Q

2004 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the

4Q 2004 delinquency rate declined to 4.13% of loans outstanding from 4.39% in 4Q 2003, that

loans grew 3% to $121.6 billion, that the Company was raising its dividend by over 17%, and

that its Board had approved a buyback of up to $2 billion in stock (or 6% of the outstanding

shares), indicating defendants felt MBNA's stock was under-priced. The January 20, 2005 press

release stated in part as follows:

> MBNA Corporation announced today that net income for the fourth
> quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%,
> compared with $703.5 million or $.54 per common share for the fourth quarter of
> 2003. For the full year, net income rose to $2.68 billion or $2.05 per common
> share, an increase of 15% compared to $2.34 billion or
> $1.79 per common share for 2003.
>
> * * *
>
> In addition, MBNA 's Board of Directors has approved an increase of 17% in the
> quarterly dividend rate to $.14 per common share, which will increase the annual
> rate to $.56 per common share. MBNA has increased the dividend every year
> since it became a public company. The cash dividend is payable April 1, 2005 to
> stockholders of record as of March 15, 2005.
>
> MBNA's Board of Directors has also approved a share repurchase
> program and authorized the repurchase of up to $2 billion of common stock over
> the next 2 years. Stock repurchases will be done selectively based on capital
> levels, asset growth levels, and share performance. The program reflects the
> corporation's commitment to return excess capital to stockholders while balancing
> the important objectives of asset growth and maintaining a strong balance sheet.
> This repurchase program will be in addition to the corporation's existing share
> repurchase program which utilizes share repurchases to offset the impact of stock-
> based compensation programs.
>
> MBNA announced that it will take a one-time restructuring charge in the first
> quarter of 2005. This restructuring charge is a result of the initiation of a
> voluntary early retirement program and a voluntary employee severance program.
> During the last several years, the corporation has taken steps to reduce its
> expenses through reduced hiring and other programs. Despite these efforts,
> MBNA remains staffed, particularly in management positions, at a level higher
> than anticipated business needs require. The company believes the voluntary
> early retirement and severance programs will assist the corporation in achieving
> staffing levels that meet expected future business needs and make MBNA more

efficient.

> The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006. Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities. The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation.

> "The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives."

20.     On January 21, 2005, defendants Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history. Defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package. According to defendants, the program would result in a 1Q '05 charge of $300 million to $350 million but was expected to save $150 million in 2005 and even more in 2006.

21.     On the conference call, defendants stated in substance that MBNA would increase earnings by increasing its profit margins. The Company stated that intended to accomplish this by lowering reliance on the less profitable no-interest card offerings:

> Now, we have been running off our zero rate loans, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. If you add that back in, our growth rate would have been 5 percent. The last numbers I saw for the industry through November was 2.5 percent, so we grew at about twice the industry, which is what we normally do.

* * *

The fact that we're running off zero loans means that we don't have to re-price as many of our existing customers on the back end . . . .

22.     On the conference call, defendants also predicted that that the Company's

delinquency and loss rates would decrease:

Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and as we look out, it would seem to us that delinquency and losses should continue to decrease.

23.     Concerning the Company's purported growth, defendants said:

We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

* * *

Our 2005 EPS is $2.36, a 10% increase over 2004. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.

Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset

quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.

And we feel confident that we will continue to deliver consistent, profitable growth well into the future. Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

24.    Specifically describing during the conference call how the Company would increase earnings by decreasing its reliance on no-interest loans, defendants stated that MBNA was "moving away from zero [percentage rate promotions] and focusing on replacing these programs with rewards programs. It's better long term profitability, and it's better for the customer." Defendants added that the Company's outstanding zero percent loans would decrease throughout 2004.

25.    Following the MBNA earnings announcement and conference call, the New York Times reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial."

26.    MBNA's reported 4Q 2004 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for 4Q 2004 but guiding expectations down, saying that its own 2005 earnings could be at the low end of Wall Street expectations. Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves. Shares in Citigroup dropped $0.27 to close at $47.77.

27.    MBNA's report also came a day after competitor Capital One Financial Corp.

announced that its 4Q earnings had fallen 27% to $ 195 million, falling short of Wall Street expectations.

28.    Based upon defendants' promises that MBNA's delinquency and losses rates were improving, the Company's extraordinary 4Q 2004 results, and defendants' projections for increased earnings, MBNA's stock price closed up $0.24 to $27.44 on the NYSE.

29.    Between January 21, 2005 and February 3, 2005, certain of the Individual Defendants sold almost $76 million worth of the Company's stock into the market:

30.    On February 9, 2005, defendants appeared at a Credit Suisse First Boston ("CSFB") investor conference to discuss the Company's Q4 2004 results and future expectations. As they had during the January 21, 2005 earnings conference, defendants continued to project significant earnings growth, exceeding even the rate at which MBNA's outstanding loans were growing, due to increased return on managed assets, or "ROMA."

31.    On April 13, 2005, defendants announced a $750 million offering of notes collateralized by the Company's credit card accounts receivable. The offering was to close on April 20, 2005.

32.    According to the Class Action Complaint, the statements referenced above in ¶¶ 18-31 were each materially false and misleading when made because defendants failed to disclose and/or misrepresented the following adverse facts, which were known to defendants, or recklessly disregarded by them, at all relevant times:

   (a)    The Company had been experiencing unexpectedly high payment volumes from
          U.S. credit card customers during Q1 2005, reducing managed loans in the
          quarter more than in prior years, and causing loan receivables to decrease by $2

   (b)    Of the pre-pays, the higher interest rate borrowers were prepaying more than the

lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

c)     MBNA was suffering from an unseasonably sharp contraction in loans during Q12005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Ql 2004;

(d)    The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(e)    MBNA was experiencing higher-than-expected delinquencies during Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f)    The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

(g)    Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in Q4 2004;

(h)    Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i)    Due to the increase in pre-pays, the interest-only securitization strip securities were overvalued on the Company's books; and

(j)    The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on

January 21, 2005.

33.    The Class Action Complaint alleges that, on April 21, 2005, MBNA shocked the market, issuing a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the Previously Announced Restructuring Plan." The press release disclosed in relevant part that the Company's net income for 1Q '05 was a paltry $0.02 per share, down from $0.40 per share in the year-earlier period.

34.    The Company attributed the earnings debacle to higher-than-expected restructuring costs of $767.6 million– double what defendants had projected– and higher-than-anticipated payment volumes from U.S. credit card customers.

35.    On this shocking news the Company's stock price plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization lost over $5.8 billion in one trading session.

36.    The Class Action Complaint alleges that as a result of defendants' intentional misstatements and omissions, the market price of MBNA shares was artificially inflated from January 20, 2005 through April 21, 2005, inclusive (the "Class Period"). According to the Class Action Complaint all persons who purchased the stock during the Class Period were damaged by paying an artificially high price for MBNA stock, which lost its value as a direct and proximate result of the release of MBNA's 1Q '05 results at the end of the Class Period.

### DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

37.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company as a result of the breaches of fiduciary duty and other violations of law by the defendants.

38.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

39.    As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board of Directors to institute this action.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  There is reasonable doubt that the Board can fairly address whether suit should be brought on behalf of the Company.

40.    The Board of Directors has already pre-judged the merits of this action.  Having reached its conclusions, no demand need be made on the Board as it will not likely reconsider.

41.    Nor could the Board assert the allegations herein.  Alleged as they are, they will be inconsistent with the stance to be taken by the Company in its defense to the Class Action.  This is an irreconcilable conflict of interest which aligns the Board members with the Individual Defendants, and precludes them from vigorously asserting the rights of the Company against the Individual Defendants.  Such redress can only be obtained through the vehicle of a shareholder's derivative suit, and demand upon the Board is and shall be futile.

42.    In addition to the above at least five MBNA directors (out of a total of ten) have relationships and dealings with MBNA or its accountants which call into question their ability independently to address and prosecute the claims asserted herein:

(a)    Director William B. Milstead was a partner at Ernst & Young, LLP for 19 years, and has continued to recommend that Ernst & Young be retained as MBNA's auditor, which brings Ernst & Young millions of dollars every year in fees.  A vigorous and independent investigation may not only reflect badly on Ernst & Young's professional conduct regarding the relevant accounting matters in suit, but might also lead to the conclusion that claims should be

asserted against Ernst & Young.  Given his professional affiliations and background, there is reasonable doubt as to director Milstead's independence;

(b)     Director Bruce L. Hammonds, a defendant herein, is named as a primary defendant in the pending securities class action, and is alleged to have received proceeds from stock sales at prices inflated by fraud totaling $9 million.  Plainly, Hammonds, MBNA's President and CEO, cannot be considered independent;

(c)     Director Benjamin R. Civiletti also cannot be considered independent as to any action that might be brought against defendant Hammonds or against director Randolph L. Lerner, MBNA's largest beneficial shareholder, and the Board's Chairman.     Defendant Hammonds and director Lerner direct and control legal business provided to Venable, LLP, a law firm in which Civiletti is a partner.  In addition, Mr. Civiletti, son, is a full-time employee of MBNA, and a subordinate to defendant Hammonds and director Lerner.  These relationship taint director Civiletti's ability to independently evaluate the claims set forth herein;

(d)     Director Randolph Lerner is MBNA's Chairman and largest shareholder. Due to various intertwining business and personal relationship between Lerner, his family, and MBNA, MBNA does not consider Lerner to be an independent director, and he could not independently consider any claims that may be lodged against any members of MBNA's management;

(e)     Director James H. Berick is an attorney and an advisor to director Lerner, and Lerner family interests.  His son is a partner at a law firm which receives legal business from MBNA, from Lerner, and from Lerner family business interests.  These relationships create a reasonable doubt that Berick could consider the assertion or prosecution of the claims asserted herein with an independent mind;

(f)     The MBNA Directors participated in, approved and/or permitted the wrongs

alleged herein to have occurred and are, therefore, not disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(g)     The MBNA Directors had a responsibility and obligation to assure that all press releases and filings of SEC reports, including all financial reports, were accurate and that all internal controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

(h)     The acts complained of constitute violations of state law and the fiduciary duties owed by MBNA's officers and directors, and are incapable of ratification;

(i)     MBNA has been and will continue to be exposed to significant losses due to the wrongdoing complained herein; yet, the MBNA Directors have not filed any lawsuits against themselves or other who were responsible for that wrongful conduct, nor have they attempted to recover any part of the damages MBNA suffered and will suffer thereby or any of the illegal profits received by the insider seller Defendants;

(j)     If the MBNA Directors were to bring this derivative action, they would thereby likely expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities laws or such derivative action. Such admissions would impair the Company's and their defense of the Class Actions, and their defense in a derivative action and greatly increase the probability of their personal liability in the Class Actions or a derivative action in an amount likely to be in excess of any insurance coverage to the Directors; and

(k)     The Directors are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the

Directors initiated action against any of the other Directors named herein. Therefore, the MBNA board, and any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

### FIRST CAUSE OF ACTION

#### (Against the Individual Defendants for Contribution
#### Pursuant to Sections 10(b) and 21D of the Exchange Act)

43.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

44.    Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial information and projections.

45.    These Individual Defendants have been sued in the Class Action alleging that these Individual Defendants caused the Company to issue false financial statements as alleged at ¶¶ 18-31, supra, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

46.    It is alleged in the Class Action that these Individual Defendants acted with scienter in that these Individual Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.    These Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding MBNA, their control over MBNA and its public

communications, their inside knowledge of its financial results, and/or their associations with the Company which made them privy to confidential proprietary information concerning MBNA, were active and culpable participants in (and carried out) the fraudulent scheme alleged herein. These Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.    The ongoing alleged fraudulent scheme alleged in the Class Action could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these Individual Defendants.

47.    During the Class Period, it is alleged in the Class Action that the Individual Defendants caused MBNA to carry out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (I) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MBNA securities; and (iii) cause plaintiff and other members of the Class to purchase MBNA stock at artificially inflated prices.

48.    As alleged in the Class Action, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MBNA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.    These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

49.    In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of

affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

50.    It is alleged in the Class Action that these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of MBNA as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBNA's value and future profitability. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBNA and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein at ¶¶ 18-31, supra, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBNA securities during the Class Period.

51.    As alleged in the Class Action, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the

market price of MBNA's securities was artificially inflated during the Class Period. Unaware of the fact that the market price of MBNA's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, Class members acquired MBNA securities during the Class Period at artificially high prices and were damaged thereby.

52.    As alleged in the Class Action, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true. Had the Class members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of MBNA, which were not disclosed by these defendants, plaintiff Baker and other members of the Class would not have purchased or otherwise acquired their MBNA securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

53.    As alleged in the Class Action, by virtue of the foregoing, these Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

54.    It is further alleged in the Class Action that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these Individual Defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the federal securities laws.

55.    If the Company is deemed to have violated the federal securities laws, and incurs

damages therefor, these Individual Defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## SECOND CAUSE OF ACTION

### (Against all Individual Defendants for Breach of Fiduciary Duty)

56.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

57.     The Individual Defendants owed and owe MBNA fiduciary obligations.    By reason of their fiduciary relationships, the Individual Defendants owed and owe MBNA the highest obligations of good faith, fair dealing, loyalty and due care.

58.     The Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

59.     Each of the Defendants had actual or constructive knowledge that they had caused MBNA to improperly misrepresent the business and prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment.    Moreover, the Individual Defendants are asserted to have engaged in the actions alleged in the Class Action, which would be a breach of their duty to conduct the business of the Company only through lawful and proper means.

60.     As a direct and proximate result of the Defendants' misconduct, MBNA has suffered and will continue to suffer significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against All Individual Defendants for Breach of Fiduciary Duty, Unjust Enrichment, and Abuse of Control)

61.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

62.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MBNA, for which they are legally responsible. Moreover, defendants sold shares during the Class Period while in possession of material, non-public information, and are required to disgorge to the Company all profits received thereby.

63.    As a direct and proximate result of the Defendants' abuse of control, MBNA has sustained significant damages, and Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against All Individual Defendants for Breach of Fiduciary Duty Through Mismanagement)

64.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

65.    By their actions alleged herein, the Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MBNA in a manner consistent with the operations of a publicly held corporation.

66.    As a direct and proximate result of the Individual Defendants' gross mismanagement, MBNA has sustained significant damages arising out of the alleged material misstatements to the investing public and damages to the Company arising from the pendency of the Class Action. The Individual Defendants are liable to the Company for all damages flowing

therefrom, including the obligations for common law contribution.

## JURY DEMAND

67.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Against the Individual Defendants for contribution pursuant to Sections 10(b) and 21(D) of the Exchange Act;

B.    Against all of the Individual Defendants for the damages sustained by MBNA as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

C.    Equitable and/or injunctive relief as permitted by law;

D.    Restitution and disgorgement of profits;

E.    Attorneys fees and costs; and

F.    Any such other and further relief as may be just and proper.


Dated: May 25, 2005                              CHIMICLES & TIKELLIS LLP

                                                 Pamela S. Tikellis (#2172)
                                                 Robert J. Kriner, Jr. (#2546)
                                                 A. Zachary Naylor (#4439)
                                                 Robert R. Davis (#4536)
                                                 One Rodney Square
                                                 P.O. Box 1035
                                                 Wilmington, DE 19899
                                                 Telephone: (302) 656-2500
                                                 Facsimile: (302) 656-9053

OF COUNSEL:

PASKOWITZ & ASSOCIATES
60 East 42nd Street, 46th Floor
New York, NY 10165
(212) 685-0969 (tel.)
(212) 685-2306 (fax)

LAW OFFICES OF CHRISTOPHER J. GRAY, P.C.
Chistopher J. Gray
460 Park Avenue
21st Floor
New York, NY 10022
(212) 838-3221 (tel.)
(212) 937-3139 (fax)

ROY JACOBS & ASSOCIATES
Roy L. Jacobs
60 East 42nd Street, 46th Floor
New York, NY 10165
(212) 867-1156 (tel.)
(212) 504-8343 (fax)

## VERIFICATION

Robert Garfield, being duly sworn, Declares under penalty of perjury this 24th day of May 2005, as follows:

I am the general partner of Lemon Bay Partners, LLP, the plaintiff in this derivative action brought for the benefit of MBNA Corp. I have read the foregoing Complaint and belief that the allegations are true. Lemon Bay Partners, LLP has continuously owned the shares of MBNA Corp. during the relevant period referenced in the Complaint.

Robert Garfield