UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

-------------------------------------------------------x

| | |
|---|---|
| IN RE MBNA CORPORATION DERIVATIVEAND CLASS LITIGATION | Lead Case No. 1:05-cv-00327-GMS |
| This Document Relates To: | JURY TRIAL DEMANDED |
| ALL ACTIONS. | CLASS AND DERIVATIVE ACTION |

-------------------------------------------------------x

## CONSOLIDATED AMENDED SHAREHOLDERS' CLASS AND DERIVATIVE COMPLAINT

Plaintiffs, by their attorneys, submit this shareholders' derivative and class complaint against the defendants named herein. The allegations are asserted on information and belief, except as to those matters which relate to plaintiffs and their own acts, which are asserted on personal knowledge.

### NATURE OF THE ACTION

1.    Plaintiffs herein are longtime shareholders of nominal defendant MBNA Corporation ("MBNA" or "the Company"). They bring this action to remedy harm done to both MBNA and its shareholders. This harm was caused by the actions of MBNA's top officers and directors, which resulted in a diminution of the Company's value, numerous securities fraud class action lawsuits being asserted against the Company, and an eventual merger agreement with Bank of America Corporation ("Bank of America" or "BAC") which provided MBNA shareholders with no true acquisition premium, but which enormously enriched MBNA's key insiders. In order to secure this disadvantageous agreement, defendant Bruce Hammonds, MBNA's Chief Executive Officer, who stood the most to gain personally from a merger, falsely denied to a national business publication that MBNA had decided that it was for sale, even though MBNA was at that very time engaged in active efforts to sell the Company. This deception depressed the stock price, allowing Hammonds to quickly orchestrate a "sweetheart"

merger deal with Bank of America which contained onerous provisions guaranteed to scare off other bidders who might not be so solicitous of Hammonds' personal ambitions. The merger agreement reflected an unfair and unduly low price for MBNA's shares. Based on industry valuation comparisons, MBNA was worth billions of dollars more in value at the time of the merger vote, but its shareholders were deprived of this value by reason of the misconduct alleged herein.

2.     There was no doubt that MBNA was in fact for sale, and the MBNA's top executives (the "Insider Defendants") were desperate to find a buyer for the Company. Indeed, defendant Hammonds had a clear agenda. He wanted to find a strategic buyer for the Company which would accede to his conditions that: (i) the acquirer would buy MBNA; (ii) the acquirer would accede to the payment of enormous sums to the Insider Defendants and the vesting of MBNA options in connection with the transaction; (iii) Hammonds himself would be kept on at the new Company in an executive position of influence; (iv) Hammond's close friends would be offered employment in the new entity; and (v) the liability arising out of the Securities Class Action, wherein Hammonds and the other Insider Defendants were personally named as defendants would be in effect made to go away, by the extraction of broad indemnification from the strategic acquirer. In trade for these essentials, Hammonds was willing to give the acquirer a "show-stopper" in the form of an option to purchase almost 20 percent of MBNA at a price so attractive that no other suitor would consider challenging the acquirer's proposed deal. Thus Hammonds sacrificed the interests of the public shareholders to achieve his own agenda and that of his close colleagues, although the eventual transaction cost the public shareholders *billions* of dollars in lost consideration.

3.     To effect a sale of the Company, Hammonds had MBNA retain Joseph Perella, a noted investment banker and agreed to pay him $40 million, in addition to the mammoth fees already being paid to UBS Inc. as MBNA's investment advisor. Perella was retained to do one thing: find a buyer. The initial suitor, Wachovia Inc. determined not to make a bid for MBNA. After these negotiations proved unsuccessful, MBNA was *desperate* for a new buyer. Perella

came up with BAC. The actual transaction between MBNA and BAC was negotiated between defendant Hammonds and defendant Lewis (BAC's President and CEO) over a 2 hour dinner at an exclusive club in Wilmington, Delaware. The members of the MBNA Board of Directors (hereinafter, "the Director Defendants") approved the deal shortly thereafter, without bothering to fully inform themselves of its implications, or potential alternatives.

4.    The MBNA Board had no role in the negotiation of the transaction. Rather, the Board approved a transaction which was solely negotiated by MBNA's conflicted CEO, and which contains material payments and benefits to that CEO and the other Insider Defendants which are not being received by MBNA's public shareholders. The consideration and approval of the transaction is not entitled to any presumption of business judgment since it was effected by a conflicted fiduciary who was primarily working for his own account and that of his colleagues and ratified by the MBNA Board which acted quickly on incomplete information, and could not have made the decisions it did in good faith.

5.    To top this all off, MBNA's shareholders were induced to approve the merger (which they did by vote held on November 2, 2005) by means of a deceptive Proxy Statement, which concealed Hammonds' misconduct and other materials facts. MBNA's Board of Directors, which was controlled by Hammonds, failed in their duty to obtain the highest merger value for MBNA by refusing to shop the Company, and instead leaping into a merger agreement with Bank of America which contained a "stock option agreement" (similar to a "poison pill") which was guaranteed to make a higher bid for MBNA by another bidder prohibitively expensive. Thus, Bank of America was crowned the winning bidder without the MBNA Board ever having conducted the requisite auction designed to maximize shareholder value. The MBNA directors, including Hammonds, were joined in certain of this misconduct by top executives of Bank of America. The personal benefits accruing to Hammonds from this transaction include tens of millions of dollars of cash "retention" payments over the next two years, a lucrative new job with Bank of America, and other valuable benefits. Although the MBNA Board was keenly aware that Hammonds was engaged in a self-dealing negotiation with Bank of America which involved an

3

acute conflict of interest, it never appointed a Special Committee of independent directors to negotiate with Bank of America or to consider the merger from a perspective independent of that presented by Hammonds. They approved this important transaction within approximately one day of learning of its proposed terms. The merger did not reflect either fair dealing or fair price, and thus does not meet the standard of "entire fairness" which is expected of corporate fiduciaries negotiating an important deal in such circumstances.

6.      Some of the claims asserted herein are brought derivatively pursuant to Fed. R. Civ. P. 23.1. These claims are pursued both on behalf of MBNA and its putative successor-in-interest, Bank of America, pursuant to Fed. R. Civ. P. 8(e)(2). The derivative claims may be pursued by Plaintiffs without the necessity of making a demand on the Boards of either MBNA or Bank of America, as such a demand would be futile. Indeed, Bank of America's Board of Directors, by means of the merger agreement between the companies, has obligated itself to defend and respond to any claims against Hammonds and the other MBNA officers and directors, and its members therefore have robbed themselves of the discretion to pursue the claims stated herein, obviating the need to make a futile demand upon them to bring such claims.

7.      This action is also brought as a class action against certain officers and directors of MBNA ("the MBNA Individual Defendants") for breaches of fiduciary duty that directly hurt MBNA shareholders on behalf of two classes:

(a)      The first class (the "Holder Class") consists of all shareholders who held the shares of MBNA on January 19, 2005, prior to the commencement of the Class Period in the related securities fraud class action cases, and who continued to hold the stock through at least April 22, 2005, and were damaged thereby; and

(b)      The second class (the "Merger Class") consists of all MBNA shareholders whose MBNA shares will be exchanged for Bank of America shares by reason of the merger that was accomplished by means of a deceptive proxy statement, at an unfair price, and without an auction designed to elicit a bid at full value. Such actions are alleged to have furthered the

4

personal interests of MBNA's key executives, with the acquiescence of a Board of Directors which failed in its duty to act with complete loyalty, with due care and in good faith.

## SUMMARY OF THE ACTION

8.     In the wake of the passage of the Sarbanes-Oxley Act of 2002, which tightened standards for corporate governance, MBNA and its Board came under a blistering attack for a pervasive pattern of excessive compensation awarded to its executives, a history of nepotism, and a cozy relationship between its executives and its purportedly independent directors. Under such pressure, MBNA undertook some measures to remedy these abuses, which resulted in cuts to the its traditionally overly generous compensation packages. This left MBNA's top executives keenly interested in novel ways of boosting their compensation. As detailed herein, they turned to deceptive misstatements to the public designed to inflate the stock price. After certain insiders materially benefited from this scheme, it collapsed. These insiders next engineered a merger that was unfair to shareholders, but exceedingly generous to Hammonds and other key executives.

9.     The aforementioned scheme hatched by the MBNA insiders to inflate the stock began to unravel on April 21, 2005 when an adverse and unexpected announcement caused MBNA shares to drop precipitously on extraordinary trading of over 51 million shares. On or about May 5, 2005, MBNA shareholder James M. Baker brought a securities class action complaint against MBNA and defendants Hammonds, Vecchione, Struthers, Cochran, Weaver, Krulak, Rhodes and Scheflen (all MBNA insiders, hereinafter referred to as the "MBNA Insider Defendants") alleging violations of the Securities Exchange Act of 1934 (the "Securities Class Action Complaint"). Specifically, the Securities Class Action Complaint, which was later joined by other similar complaints, alleges that the MBNA Insider Defendants failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them during the period January 20, 2005 through April 21, 2005 (the "Securities Action Class Period"):

(a)     The Company had been experiencing unexpectedly high payment volumes from U.S. credit card customers during Q1 2005, reducing managed loans in the quarter more

than in prior years, and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1 2005 from $33.8 billion reported at the end of Q1 2004;

(b)     Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a greater adverse impact on the Company's yield on managed loans;

(c)     MBNA was suffering from an unseasonably sharp contraction in loans during Q1 2005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1 2004;

(d)     The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(e)     MBNA was experiencing higher-than-expected delinquencies during Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f)     The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

(g)     Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in 4Q 2004;

(h)     Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i)     Due to the increase in pre-pays, the interest-only securitization strip securities were overvalued on the Company's books; and

(j)     The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

10.     The Securities Class Action Complaint alleges that as a result of the MBNA Insider Defendants' false statements and omissions, MBNA's stock traded at artificially high prices. During the Securities Class Period the MBNA Insider Defendants also caused the Company to repurchase $250 million worth of its own stock which supported the stock's high price. Those defendants also used the Company's purportedly stellar performance to justify the payment of millions of dollars in bonuses to themselves in January 2005. Indeed, although MBNA's stock price was basically stagnant throughout 2004, Hammonds was handed a paycheck at the end of the year worth over $9 million, including salary, bonus, and restricted shares.

11.     The Securities Class Action Complaint further alleges that on April 21, 2005, the MBNA Insider Defendants' shocked the market by disclosing MBNA had earned only $0.02 cents per share in 1Q 2005 – a 94% decline from the $0.59 per share it reported in Q4 2004-- and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate. Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume.  MBNA's market capitalization declined by over **$5.8 billion** in one trading session.

12.     The Securities Class Action Complaint charges that while MBNA's market price remained at an artificially high level due to the MBNA Insider Defendants' misrepresentations and omissions, those defendants took advantage of the price inflation and sold over **$75 million** worth of their own MBNA stock. Defendant Hammonds sold over $9 million worth of MBNA stock in January 2005 alone.

13.     As further set forth below, at all times relevant hereto, defendants Hammonds, Vecchione, Struthers, Cochran, Weaver, Krulak, Rhodes and Scheflen were among the highest ranking executives of MBNA.   Individually and jointly, they were in a position to control the

7

affairs of MBNA, including the dissemination of materially false and misleading public statements as charged in the Class Action Complaint.

14. As a consequence of this asserted wrongdoing, MBNA and successor-in-interest Bank of America stand to lose many millions of dollars relating to the class action, including defense costs, and potential payment made in settlement, or as a consequences of an adverse jury verdict. Additionally, upon revelation of the omitted material facts, MBNA shares dropped considerably, and the Company thereby lost over $5.8 billion in market value. This drop, and the concomitant risk of liability, deprived the MBNA shareholders of the premium bid for the Company that could have been obtained had the fiduciary breaches not occurred. It would be unfair and inequitable for the shareholders of MBNA to bear the direct or indirect burden to pay these damages caused by the MBNA Insider Defendants and the MBNA Individual Defendants, and therefore plaintiff seeks to require the Defendants to make recompense to the Company, or its successor in interest.[1]

15. In the spring of 2005, MBNA's shares price was languishing at about $20 per share, and shareholder dissatisfaction was growing. In early June 2005, MBNA's Board of Directors determined that MBNA was for sale, and directed management to attempt to arrange a transaction. When reporters for *Business Week* asked Hammonds whether MBNA was a takeover candidate for an article in its June 20, 2005 edition (which came out on June 13, 2005), Hammonds denied that MBNA was for sale. This was at a time when merger talks had been commenced with at least one potential merger partner, and MBNA had a list of several others it intended to approach. Hammonds' statement had the purpose and effect of artificially deflating MBNA's stock price, and helping Hammonds arrange a merger at a price which would help Hammonds (and his fellow top executives personally) arrange for cozy "retention" or severance

---

[1] The MBNA Insider Defendants consist of those defendants herein who also were officers of MBNA or its affiliates or subsidiaries. The MBNA Individual Defendants are defined herein as all individual defendants associated with MBNA, inclusive of corporate insiders. All defendants herein are members of one or both of these groups, with the exception of defendant Lewis, who is CEO of Bank of America.

deals with an acquirer who was not pressed hard in negotiations to pay full price. In sum, Hammonds and the other insiders were satisfied so long as they got what they personally desired.

16.    On June 30, 2005, it was announced that Bank of America would acquire all of the outstanding shares of MBNA in a stock and cash transaction. No special committee negotiated this deal, which was put together in a hurry by MBNA management, with much effort devoted to what MBNA insiders would receive post-merger. In addition, MBNA granted Bank of America an "option" to acquire almost 250 million MBNA shares at a $1.3 billion discount to the merger price upon the occurrence of certain events, *including a third party bidder making a higher offer for MBNA's shares!* This unlawful agreement had the purpose and effect of ensuring that no auction of the Company would ever take place, and no bidder could prevail who might not be as solicitous as Bank of America of the pecuniary needs of MBNA's overcompensated insiders.

17.    On November 3, 2005 MBNA's shareholders approved the merger between MBNA and Bank of America. Pending routine regulatory approvals, the merger is expected to be completed on January 1, 2006. According to the Merger Agreement, each share of MBNA will be exchanged for 0.5009 shares of Bank America stock and $4.125 in cash. The transaction was worth approximately $26.50 per share to MBNA shareholders as of July 1, 2005. On January 19, 2005 MBNA stock closed at $26.88 per share. On April 21, 2005, MBNA stock closed at $19.16 per share. On June 29, 2005, the day before the announcement of the Merger, MBNA stock closed at $21.07. Clearly, the wrongdoing of the MBNA Individual Defendants has deprived long-term holders of any true premium for their shares, a detriment not equally shared by all shareholders, as the MBNA Insider Defendants stand to receive benefits from the Merger that are not available to ordinary public shareholders.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 (federal question jurisdiction) insofar as this action arises under both Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), pursuant to which there is a

private right of action for contribution, and Section 21D of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act. Prior to Congress having enacted an express provision for contribution under Section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See Musick, Peeler & Garrnett v. Employers Insurance of Wausau*, 508 U.S. 286 (1993). Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the Federal contribution claim alleged herein. This Court also has subject matter jurisdiction over the pendant state law claims asserted herein pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). A number of the wrongful acts and practices contained of herein occurred in this District.

20.    In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mail, interstate wire and telephone facilities, the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

## THE PARTIES

21.    Plaintiff, Lemon Bay Partners LLP ("Lemon Bay"), is a Florida limited liability partnership and is an MBNA shareholder. Lemon Bay held its MBNA shares before MBNA suffered the damages alleged herein, and continues to hold shares. Plaintiff Donald Benoit likewise held his MBNA shares before MBNA suffered the damages alleged herein, and continues to hold shares. Upon the imminent close of the merger, Lemon Bay and Benoit will become shareholders of Bank of America.

10

22.    Defendant Bruce L. Hammonds ("Hammonds") is Chief Executive Officer ("CEO"), President and a director of MBNA. Prior to assuming these positions on December 30, 2003, Defendant Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA. Defendant Hammonds has been a director of MBNA since 1986. Because of Defendant Hammonds' position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, Defendant Hammonds sold approximately 350,000 MBNA shares for proceeds of more than $9 million. Following the completion of the Merger on January 1, 2006, Defendant Hammonds will be CEO and President of Bank of America Card Services and will join Bank of America's Risk and Capital Committee. Upon completion of the merger on January 1, 2006, Defendant Hammonds will receive over $23 million under his retention agreement with Bank of America.

23.    Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Defendant Vecchione has been a director of MBNA America since January 2005 and also serves as CFO of MBNA Delaware. Defendant Vecchione is responsible for accounting, corporate and strategic planning, treasury and financial operations, business analysis (including M&A analysis), financial planning, and investor relations. Because of Defendant Vecchionne's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, Defendant Vecchione sold more than 100,000 MBNA shares for proceeds of over $2.6 million. Upon completion of the merger on January 1, 2006, Defendant Vecchione will receive $5.8 million cash severance.

11

24.    Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America. Defendant Struthers is also a director and serves as Chief Loan Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada. In addition, Defendant Struthers is a director and serves as Chairman and Chief Executive Officer of MBNA Delaware. Defendant Struthers is responsible for international operations, consumer finance, business lending, and MBNA America's American Express credit card program. Because of Defendant Struthers' position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, Defendant Struthers sold more than 450,000 MBNA shares for proceeds of over $12 million. Upon completion of the merger on January 1, 2006, Defendant Struthers will receive over $17 million under his retention agreement with Bank of America.

25.    Defendant John R. Cochran, III ("Cochran") was the Chief Operating Officer of MBNA and is the Chairman, Chief Executive Officer and President of MBNA America. Cochran previously served as the Chief Operating Officer and Chief Marketing Officer of MBNA America.    Defendant Cochran has been a director of MBNA America since 1986. Because of Defendant Cochran's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. In 2005, Defendant Cochran sold more than 500,000 MBNA shares for proceeds of $14 million. Upon completion of the merger on January 1, 2006, Defendant Cochran will receive $22.7 million under his retention agreement with Bank of America.

26.    Defendant Lance L. Weaver ("Weaver") was Vice Chairman of MBNA and MBNA America. Weaver is also a director of MBNA America. Defendant Weaver is responsible for MBNA America's U.S. credit card business, including business development, marketing, sales, customer satisfaction, U.S. regional operations, credit, customer assistance and fraud. Defendant Weaver also serves as a board member and former chairman of Mastercard International Inc.  Defendant Weaver has been a director of MBNA America since 1993. Because of Defendant Weaver's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  In 2005, Defendant Weaver sold more than 370,000 MBNA shares for proceeds of $10 million.  Upon completion of the merger on January 1, 2006, Defendant Weaver will receive over $17 million under his retention agreement with Bank of America.

27.    Defendant Charles C. Krulak ("Krulak") is, and at all times relevant hereto was, Vice Chairman of MBNA and of the Bank. Because of Defendant Krulak's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  In 2005, Defendant Krulak sold almost 500,000 MBNA shares for proceeds of over $13 million.  For each of the executives of MBNA who has not entered into a retention agreement, assuming that the merger is completed on January 1, 2006 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance that would be payable to the such executives as a group (including Krulak) is $31.3 million.

13

28.    Defendant Michael G. Rhodes ("Rhodes") is, and at all times relevant hereto was, Group Executive for the U.S. Credit Card Business Development division of MBNA. Because of Defendant Rhodes's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. In 2005, Defendant Rhodes sold over 400,000 MBNA shares proceeds of over $10 million. For each of the executives of MBNA who has not entered into a retention agreement, assuming that the merger is completed on January 1, 2006 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance that would be payable to the such executives as a group (including Rhodes) is $31.3 million.

29.    Defendant John W. Seheflen ("Seheflen") is, and at all times relevant hereto was, Vice Chairman of MBNA America and Secretary of MBNA and the Bank. Because of Defendant Scheflen's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. In 2005, Defendant Scheflen sold over 125,000 MBNA shares for proceeds of almost $3.4 million. For each of the executives of MBNA who has not entered into a retention agreement, assuming that the merger is completed on January 1, 2006 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance that would be payable to the such executives as a group is $31.3 million. The Defendants named in Paragraphs 22-29 herein constitute the "Insider Defendants."

30.    Defendant Randolph D. Lerner ("Lerner") is, and at all times relevant hereto was, Chairman of the Board and a director of MBNA. Because of Defendant Lerner's position, he knew adverse non-public information about the business of MBNA, as well as its finances,

markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him.

31.    Defendant James H. Berick ("Berick") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Berick's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

32.    Defendant Mary M. Boies ("Boies") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Boies' position, she knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.

33.    Defendant Benjamin R. Civiletti ("Civiletti") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Civiletti's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

34.    Defendant William L. Jews ("Jews") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Jews' position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections

15

with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

35.    Defendant Stuart L. Markowitz ("Markowitz") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Markowitz's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

36.    Defendant William B. Milstead ("Milstead") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Milstead's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

37.    Defendant Thomas G. Murdough ("Murdough") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Murdough's position, he knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

38.    Defendant Laura S. Unger ("Unger") is, and at all times relevant hereto was, a director of MBNA. Because of Defendant Unger's position, she knew adverse non-public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections

16

with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. The Defendants named in Paragraphs 30-38 herein constitute the "Director Defendants." These Director Defendants, together with the Insider Defendants, constitute the "MBNA Individual Defendants."

39.     Defendant Kenneth D. Lewis ("Lewis") is Chairman, Chief Executive Officer and President of Bank of America. Defendant Lewis has served as Chief Executive Officer since April 2001, President since July 2004 and Chairman since February 2005. He previously served as Chairman from April 2001 to April 2004 and President from January 1999 to April 2004. Defendant Lewis also served as Chief Operating Officer from October 1999 to April 2001. Defendant Lewis also serves as Chairman, Chief Executive Officer, President and a director of Bank of America, N.A. He has been a director of the Corporation since 1999 and is a member of the executive committee.

40.     The MBNA Individual Defendants because of their positions with the Company possessed the power and authority to control the contents of MBNA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

41.     The Insider Defendants, because of their positions and access to material non-public information available to them but not to the public, knew or improperly failed to determine that the adverse facts specified herein, as alleged in the Securities Class Action Complaint, had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading. The Securities Class Action Complaint alleges that the Insider Defendants are liable under the federal securities laws for the false statements pleaded therein, as those statements were each "group-published" information, the result of the collective actions of the Insider Defendants.

42.    Defendant Lewis, because of his position with Bank of America, possessed the power and authority to control the contents of Bank of America and MBNA Joint Proxy Statement dated September 19, 2005 (the "Joint Proxy"). As reflected in the allegations set forth below, Defendant Lewis aided and abetted certain of the Insider Defendants in their breach of their duty of candor to fully disclose all material facts in the Joint Proxy.

43.    Nominal defendant MBNA is a bank holding company and the parent of MBNA America Bank, N.A., a national bank. MBNA America has two principal subsidiaries: MBNA Europe Bank Limited and MBNA Canada Bank, fully chartered banks that issue credit cards in the United Kingdom, Ireland, Spain, and Canada. The Company is headquartered at 1100 North King Street, Wilmington, Delaware and has over 1.277 billion shares of common stock issued and outstanding. The Company's shares trade on the New York Stock Exchange under the ticker symbol "KRB."

44.    Nominal defendant Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services. Bank of America serves more than 38 million consumer and small business relationships with more than 5,800 retail banking offices, more than 16,700 ATMs and online banking with more than 14 million active users. Bank of America is the No. 1 overall Small Business Administration (SBA) lender in the United States and the No. 1 SBA lender to minority-owned small businesses. It serves clients in 150 countries and has relationships with 97 percent of the U.S. Fortune 500 companies and 79 percent of the Global Fortune 500.    Bank of America is headquartered at 100 North Tryon Street, Charlotte, NC 28255.  Bank of America shares trade on the New York Stock Exchange under the ticker symbol "BAC."  Upon the imminent close of the Merger, any derivative claims asserted on behalf of MBNA devolve by operation of law upon Bank of America, and the claims stated herein are therefore also derivatively on its behalf under Fed. R. Civ. P. 8(e)(2) which permits

claims to be stated "hypothetically" assuming the occurrence of future events. *See Langer v. Monarch Life Ins. Co.,* 966 F.2d 786 (3d Cir. 1992).

## DUTIES OF THE MBNA INDIVIDUAL DEFENDANTS

45.    As detailed herein, each of the MBNA Individual Defendants owed MBNA and its shareholders fiduciary duties, including the duties of loyalty, good faith, and candor and due care.

46.    To discharge their legal duties, the MBNA Individual Defendants were required to exercise reasonable and prudent supervision over, and keep themselves informed of policies, practices, public statements, controls and financial affairs, which included, *inter alia*, taking necessary steps to ensure that adequate policies and reporting systems existed at MBNA and functioned properly to ensure that relevant rules and regulations under which MBNA operated were followed.  Specifically, the MBNA Individual Defendants were required, among other things, to:

(a)    in good faith, manage, conduct, supervise, and direct the business and affairs of MBNA carefully and prudently, and in accordance with applicable the law;

(b)    neither violate nor intentionally or recklessly permit any officer, director, or employee of MBNA to violate applicable federal and state laws, rules and regulations, or any Company rule or regulation;

(c)    ensure MBNA had in place reasonable, adequate and effective systems and controls regarding critical business functions;

(d)    remain informed as to the status of MBNA operations, and, upon receipt of notice or information of improper practices or actions, to make a reasonable inquiry in connection therewith, and to take steps reasonably necessary to correct such conditions or practices, and make such disclosures as are necessary to comply with applicable federal and state laws;

(e)    supervise the preparation, filing, and/or dissemination of any Securities and Exchange Commission ("SEC") filings, press releases, audits, reports, or other information

19

required by law, and to examine and evaluate any audits or other financial information concerning the financial condition of MBNA and to cause them to obey and comply with, and not violate the federal or state securities laws;

        (f)     refrain from misusing inside information for personal profit; and

        (g)     insure that disclosures by the Company to the investing public were accurate and complete.

47.     During the relevant period, the MBNA Audit Committee was composed of defendants Berick, Jews, Markowitz, Milstead, Murdough, and Unger. The Audit Committee was charged with the oversight of MBNA management and was responsible to insure that MBNA management caused the Company to comply with applicable laws and regulations and that the Company's disclosures were accurate and complete. The Audit Committee failed to properly monitor and oversee the functions and acts of MBNA management, recklessly disregarded adverse information available to it, as reflected in the allegations set forth below, and as such these Defendants breached their fiduciary duties owed to MBNA and its shareholders.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION OF THE MBNA INSIDER DEFENDANTS

48.     In committing the wrongful acts alleged herein, the MBNA Insider Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the MBNA Insider Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

49.     During all times relevant hereto, the MBNA Insider Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the MBNA Insider Defendants' executive positions at MBNA and the profits, power and prestige that the MBNA

Insider Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of MBNA, regarding the MBNA Insider Defendants' management of MBNA's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the MBNA Insider Defendants collectively and individually took the actions set forth herein.

50.    The MBNA Insider Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least January 2005 and continuing thereafter. During this time the MBNA Insider Defendants caused the Company to conceal the true fact that MBNA was misrepresenting its financial results. In addition, defendants also made other specific, false statements about MBNA's financial performance and future business prospects, as alleged herein.

51.    The purpose and effect of the MBNA Insider Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the MBNA Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of MBNA common stock so they could: (i) dispose of over $75.9 million of their personally held stock; and (ii) protect and enhance their executive positions and the substantial compensation and prestige they obtained as a result thereof.

52.    The MBNA Insider Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the MBNA Insider Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

53.     Each of the MBNA Insider Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each MBNA Insider Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE MBNA INSIDER DEFENDANTS' EXCESSIVE COMPENSATION

54.     Having been run by a closely knit group of officers and directors, MBNA's executives grew all too accustomed over the years to receiving absurd levels of executive compensation.  During 2001 to 2003, the Company's top five most highly paid officers alone received well over $60 million in cash compensation – not counting the tens of thousands of stock options and shares of restricted stock they also received:

| Defendant | Salary | Bonus | Total Cash Compensation |
|---|---|---|---|
| Hammonds | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Cochran | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Weaver | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Struthers | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Vecchione | | | |
| 2003 | $1.6 M | $1.4 M | $2.7 M |
| 2002 | $1.5 M | $1.6 M | $3.1 M |
| 2001 | not disclosed | not disclosed | not disclosed |

55.     As reported by the *Philadelphia Inquirer* on April 25, 2005, it had become an old joke in Wilmington that the "initials in MBNA, the credit-card lender once known as Maryland Bank, National Association, also stood for 'Mothers, Brothers, Nephews and Aunts.'"  In fact,

under founder Charles M. Cawley ("Cawley"), MBNA had developed a "penchant" for hiring via friendship, blood and marriage – including Cawley's own relatives and in-laws. MBNA's most recent proxy statement filed with the SEC on March 15, 2005 reveals the names and cash compensation of 15 employees who are related to senior managers Cawley hired.

56.    The Company's Board lacked independence as well.  In early 2004, the Board consisted of the following nine directors:

*James H. Berick, Esq.*: Retired Partner, Squire, Sanders & Dempsey L.L.P. (successor to Berick, Pearlman & Mills Co., L.P.A., of which Mr. Berick was Chairman from July 1986 until January 2000), a law firm which received substantial compensation for legal services provided to the Company. Berick's son is a partner at Squire, Sanders & Dempsey. Berick has ties to the Lerner family going back decades. He was Al Lerner's college roommate and is godfather to Randolph Lerner, who became MBNA's Chairman after his father's death. A member of MBNA's Board since 1991, he was the Lerner family's lawyer and he still provides advice to the Lerner family. He is also a director of the Town and Country Trust, a real estate investment trust with longstanding ties to the Lerner family.

*Benjamin R. Civiletti, Esq.*: Chairman, Venable LLP, a law firm which has received substantial compensation for legal services provided to the Company. One of Civiletti's sons, also a lawyer, is employed in MBNA's legal department.

**Bruce L. Hammonds**: President and CEO of MBNA.

**William L. Jews**.

**Randolph D. Lerner, Esq.**: Owner of the Cleveland Browns football team. In 1999, the Board approved a 10-year marketing agreement with the Cleveland Browns football team, then owned by Al Lerner and now owned by Randolph D. Lerner, MBNA's Chairman.

**Stuart L. Markowitz, M.D.**

**William B. Milstead**: Retired Partner, Ernst & Young LLP, the Company's certified public accountant. Milstead served as the coordinating partner for MBNA at the time of its initial public offering in 1991.

**Norma Lerner**: Widow of Company co-founder Al Lerner.

**Michael Rosenthal**: Professor of English at New York's Columbia University, Al Lerner's alma mater.

57.    James Berick was Chairman of MBNA's Compensation Committee, which decided on the pay for Lerner and co-founder Cawley. Cawley, who retired in December 2003,

received total compensation of $45.5 million in 2003, *putting him at the top of the U.S. list for CEO pay*, according to a 2004 survey by *Bloomberg News*.

58.    MBNA came under intense pressure from shareholders in advance of the May 2004 annual meeting of shareholders who argued that the directors had become too cozy with the executives they were supposed to watch over.  Preceding the Company's annual meeting of shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence.  As a result, Norma Lerner and Michael Rosenthal were removed from the Company's Board.

59.    As a result of the lack of independence on the MBNA Board, MBNA's executives had become accustomed to receiving excessive compensation.  In fact, the Company now admits it had previously followed what it describes as "a *policy* of providing high levels of compensation."  Following the shareholder-led shakeup of the MBNA Board in 2004, the Compensation Committee finally conceded to making significant reductions in executive compensation.

60.    By early 2005 the Compensation Committee had approved reductions of salaries, bonuses and equity awards which resulted in a 34% reduction in total direct compensation for MBNA's CEO, defendant Hammonds, and a combined 37% reduction in total direct compensation for defendants Hammonds, Cochran, Struthers, Weaver and Vecchione, the Company's five most highly compensated executive officers.

61.    *As a result of these cuts, at the beginning of the Relevant Period the Company's senior executives faced massive reductions in the level of compensation to which they had grown accustomed to receiving*.  At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which will expire if not exercised by the expiration date.  The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price.  Some of these stock options would have expired in 2005 if not exercised.  The Insider

24

Defendants knew the value of these options and shares would rapidly decline if they disclosed the true status of the Company's operations and business environment.

62.    Moreover, despite the attempt to better align MBNA's executive compensation with shareholder interests, the Company's executive compensation program for 2004 still utilized "short term corporate performance" as a primary metric in determining annual compensation to senior executives.  As a result of the Insider Defendants' concealment of the Company's true operating and financial status, for 2004 the Compensation Committee determined that the Company had "substantially achieved its net income goal and achieved its performance objectives for new accounts, managed credit losses and operating efficiency," but that it "did not achieve its goal for growth in managed loans or net interest margin."  Nonetheless, the Compensation Committee determined that the Company's "overall results for 2004 were strong and the [Company] had a number of significant achievements in 2004 that the Committee and management believe position the [Company] well for the future."  As a result, in January 2005 the Compensation Committee awarded a performance bonus to defendant Hammonds equal to 90% of his 2004 salary (as reduced in August 2004) and awarded bonuses to defendants Cochran, Weaver, Struthers and Vecchione equal to 80% of their 2004 salaries (as reduced in August 2004).  Based on the Company's purportedly stellar performance, the Compensation Committee bequeathed the Company's top five highest-paid executives alone over $200 million worth of performance bonuses and restricted stock awards (which vest 20% per year over five years and require no payment to exercise):

| Defendant | 2004 Bonus | Value of Restricted Shares Upon Grant | Total 2004 Incentive Compensation Award |
|---|---|---|---|
| Hammonds | $1.083 million | $1.083 million | $2.17 million |
| Cochran | $943,000 | $943,000 | $1.89 million |
| Weaver | $1.962 million | $1.962 million | $3.92 million |
| Struthers | $1.962 million | $1.962 million | $3.92 million |
| Vecchione | $1.569 million | $1.569 million | $3.14 million |

## THE SCHEME ASSERTED IN THE SECURITIES CLASS ACTION

63.    The allegations in this section summarize the essential allegations of the complaint (the "Securities Class Action Complaint") in *Baker v. MBNA Corp, et al.*, U.S. District Court for the District of Delaware, Docket No. 1:05-CV-00272-GMS (the "Securities Class Action").

64.    The Class Period in the Securities Class Action begins on January 20, 2005. On that date, MBNA issued a press release entitled "MBNA Reports Fourth Quarter Earnings of \$.59 per Common Share - Increases Dividend 17% to \$.59 Per Common Share - Announces New \$2 billion Common Stock Repurchase Program." In the press release and the earnings conference which followed it the next morning, the Individual Defendants caused or allowed MBNA to announce that the Company had reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. The release also reported a 9% rise in 4Q 2004 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the 4Q 2004 delinquency rate declined to 4.13% of loans outstanding from 4.39% in 4Q 2003, that loans grew 3% to \$121.6 billion, that the Company was raising its dividend by over 17%, and that its Board had approved a buyback of up to \$2 billion in stock (or 6% of the outstanding shares), indicating defendants felt MBNA's stock was under-priced. The January 20, 2005 press release stated in part as follows:

> MBNA Corporation announced today that net income for the fourth quarter of 2004 was \$768.9 million or \$.59 per common share, an increase of 9%, compared with \$703.5 million or \$.54 per common share for the fourth quarter of 2003. For the full year, net income rose to \$2.68 billion or \$2.05 per common share, an increase of 15% compared to \$2.34 billion or \$1.79 per common share for 2003.
>
> *    *    *
>
> In addition, MBNA 's Board of Directors has approved an increase of 17% in the quarterly dividend rate to \$.l4 per common share, which will increase the annual rate to \$.56 per common share. MBNA has increased the dividend every year since it became a public company. The cash dividend is payable April 1, 2005 to stockholders of record as of March 15, 2005.
>
> MBNA's Board of Directors has also approved a share repurchase program and authorized the repurchase of up to \$2 billion of common stock over

the next 2 years. Stock repurchases will be done selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which utilizes share repurchases to offset the impact of stock-based compensation programs.

MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.

The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006. Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities. The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation.

"The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives."

65.     On January 21, 2005, defendants Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history. These executives explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package. According to these executives, the program would result in a 1Q 2005 charge of $300 million to $350 million but was expected to save $150 million in 2005 and even more in 2006.

27

66.    On the conference call, these executives stated in substance that MBNA would increase earnings by increasing its profit margins. The Company stated that intended to accomplish this by lowering reliance on the less profitable no-interest card offerings:

> Now, we have been running off our zero rate loans, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. If you add that back in, our growth rate would have been 5 percent. The last numbers I saw for the industry through November was 2.5 percent, so we grew at about twice the industry, which is what we normally do.

* * *

> The fact that we're running off zero loans means that we don't have to re-price as many of our existing customers on the back end ....

67.    On the conference call, these executives also predicted that that the Company's delinquency and loss rates would decrease:

> Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and as we look out, it would seem to us that delinquency and losses should continue to decrease.

68.    Concerning the Company's purported growth, these executives said:

> We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

> As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

* * *

> Our 2005 EPS is $2.36, a 10% increase over 2004. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.

> Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And

28

lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.

And we feel confident that we will continue to deliver consistent, profitable growth well into the future. Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

69.    Specifically describing during the conference call how the Company would increase earnings by decreasing its reliance on no-interest loans, these executives stated that MBNA was "moving away from zero [percentage rate promotions] and focusing on replacing these programs with rewards programs. It's better long term profitability, and it's better for the customer." These executives added that the Company's outstanding zero percent loans would decrease throughout 2004.

70.    Following the MBNA earnings announcement and conference call, the New York Times reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial."

71.    MBNA's reported 4Q 2004 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for 4Q 2004 but guiding expectations down, saying that its own 2005 earnings could be at the low end of Wall Street expectations. Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves. Shares in Citigroup dropped $0.27 to close at $47.77.

72.    MBNA's report also came a day after competitor Capital One Financial Corp. announced that its 4Q earnings had fallen 27% to $ 195 million, falling short of Wall Street expectations.

73.    Based upon defendants' promises that MBNA's delinquency and losses rates were improving, the Company's extraordinary 4Q 2004 results, and the aforementioned executives' projections for increased earnings, MBNA's stock price closed up $0.24 to $27.44 on the NYSE.

74.    Between January 21, 2005 and February 3, 2005, certain of the Insider Defendants sold almost $76 million worth of the Company's stock into the market.

75.    On February 9, 2005, defendants Vecchione and Rhodes appeared at a Credit Suisse First Boston ("CSFB") investor conference to discuss the Company's Q4 2004 results and future expectations. As they had during the January 21, 2005 earnings conference, defendants Vecchione and Rhodes continued to project significant earnings growth, exceeding even the rate at which MBNA's outstanding loans were growing, due to increased return on managed assets, or "ROMA."

76.    On April 13, 2005, the MBNA Individual Defendants caused or allowed the Company to issue a press release announcing a $750 million offering of notes collateralized by the Company's credit card accounts receivable.  The offering was to close on April 20, 2005.

77.    According to the Class Action Complaint, the statements referenced above were each materially false and misleading when made because the Insider Defendants failed to disclose and/or misrepresented the following adverse facts, which were known to the Insider Defendants, or recklessly disregarded by them, at all relevant times:

        (a)    The Company had been experiencing unexpectedly high payment volumes from U.S. credit card customers during Q1 2005, reducing managed loans in the quarter more than in prior years, and causing loan receivables to decrease by $2 billion to $3 1.8 billion during Q1 2005 from $33.8 billion reported at the end of Q1 2004;

(b)     Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(c)     MBNA was suffering from an unseasonably sharp contraction in loans during Q12005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Ql 2004;

(d)     The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(e)     MBNA was experiencing higher-than-expected delinquencies during Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f)     The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

(g)     Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in Q4 2004;

(h)     Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i)     Due to the increase in pre-pays, the interest-only securitization strip securities were overvalued on the Company's books; and

(j)     The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

78.     The Class Action Complaint alleges that, on April 21, 2005, MBNA shocked the market, issuing a press release entitled "MBNA Reports Earnings Per Common Share of $.02,

Including the Impact of the Previously Announced Restructuring Plan." The press release disclosed in relevant part that the Company's net income for 1Q '05 was a paltry $0.02 per share, down from $0.40 per share in the year-earlier period.

79.    The Company attributed the earnings debacle to higher-than-expected restructuring costs of $767.6 million– double what defendants had projected– and higher-than-anticipated payment volumes from U.S. credit card customers.

80.    On this shocking news the Company's stock price plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization dropped over **$5.8 billion** in one trading session.

81.    The Class Action Complaint alleges that as a result of the Insider Defendants' intentional misstatements and omissions, the market price of MBNA shares was artificially inflated from January 20, 2005 through April 21, 2005, inclusive (the "Class Period"). According to the Class Action Complaint all persons who purchased the stock during the Class Period were damaged by paying an artificially high price for MBNA stock, which lost its value as a direct and proximate result of the release of MBNA's 1Q '05 results at the end of the Class Period.

### ILLEGAL INSIDER SELLING

82.    While in possession of the undisclosed material adverse information, the below listed "Insider Selling Defendants" sold the following shares of MBNA stock:

| NAME | DATE | SHARES | | PRICE | PROCEEDS |
|------|------|--------|---|-------|----------|
| Bruce L. Hammonds | 1/27/2005 | **351,409** | $ | 26.51 | **$ 9,315,044.35** |
| Kenneth A. Vecchione | 1/25/2005 | 79,829 | $ | 26.70 | $ 2,131,434.30 |
| | 1/25/2005 | 20,633 | $ | 26.80 | $    552,964.40 |
| | | **100,462** | | | **$ 2,684,398.70** |
| Richard K. Struthers | 2/3/2005 | **457,464** | $ | 26.84 | **$12,277,922.04** |
| Charles C. Krulak | 2/1/2005 | 224,754 | $ | 26.75 | $ 6,012,169.50 |
| | 2/1/2005 | 50,217 | $ | 27.00 | $ 1,355,859.00 |
| | 1/31/2005 | 92,483 | $ | 26.50 | $ 2,450,799.50 |

|                      | 1/25/2005              | 130,000<br>**497,454**        | $        | 26.61          | $3,459,547.00<br>**$13,278,375.00**                         |
|----------------------|------------------------|-------------------------------|----------|----------------|------------------------------------------------------------|
| John R. Cochran, III | 1/27/2005<br>1/27/2005 | 398,150<br>133,009<br>**531,159** | $<br>$ | 26.51<br>26.55 | $10,554,040.76<br>$3,531,388.95<br>**$14,085,429.71**      |
| Michael G. Rhodes    | 1/25/2005              | **406,040**                   | $        | 26.76          | **$10,865,346.17**                                         |
| Lance L. Weaver      | 1/25/2005              | **376,835**                   | $        | 26.76          | **$10,085,574.26**                                         |
| John W. Scheflen     | 1/25/2005              | **125,810**                   | $        | 26.85          | **$3,377,998.50**                                          |
| **TOTAL**            |                        | **2,846,633**                 |          |                | **$75,970,088.73**                                         |

## THE MERGER

### A.   Background of the Merger

83.    According to the Joint Proxy, in early June 2005, the MBNA Board met with MBNA management and the Company's outside advisors, including representatives of UBS and Wachtell, Lipton, Rosen & Katz, to discuss MBNA's recent financial performance and prospects, consolidation activity in the credit card industry and the general environment, long-term trends and other developments in the markets in which MBNA conducts business. Possible strategic alternatives were summarized, including hypothetical scenarios involving a business combination.

84.    Unbeknownst to the investing public, MBNA was in fact for sale, and the Insider Defendants were desperate to find a buyer for the Company. Indeed, defendant Hammonds had a clear agenda. He wanted to find a strategic buyer for the Company which would accede to his conditions that: (i) the acquirer would buy MBNA; (ii) the acquirer would accede the to the payment of enormous sums and the vesting of MBNA options in connection with the transaction; (iii) Hammonds himself would be kept on at  the new Company in an executive position of influence; (iv) Hammond's close friends would be offered employment in the new entity; and (v) the liability arising out of the Securities Class Action, wherein Hammonds and the other Insider Defendants were personally named as defendants would be in effect made to go away, by the extraction of broad indemnification from the strategic acquirer. In trade for these essentials,

33

Hammonds was willing to give the acquirer a "show-stopper" in the form of an option to purchase almost 20 percent of MBNA at a price so attractive that no other suitor would consider challenging the acquirer's proposed deal. Thus Hammonds sacrificed the interests of the public shareholders to achieve his own agenda and that of his close colleagues, although the eventual transaction cost the public shareholders *billions* of dollars in lost consideration on the transaction.

85.     The MBNA Director Defendants were conducting a sale of MBNA without taking the appropriate steps to maximize shareholder value. Accordingly, the MBNA Board is not entitled to any presumption of business judgment, because its actions demonstrate that it was beholden to defendant Hammonds and the other insiders; that it did not exercise independent business judgment over the transaction, and did not fairly consider in a timely manner all information reasonably available; that it did not act in good faith in approving a Merger which did not give full value to the public shareholders; and that it failed to properly auction the Company.

86.     Shortly thereafter, representatives of MBNA purportedly contacted a major financial institution identified at the MBNA board meeting as potentially having the greatest interest in a possible transaction, which was likely Wachovia. As a result of these discussions, MBNA management concluded that it was not likely that a transaction could be negotiated with this financial institution. Subsequently, during the week of June 20, representatives of MBNA contacted the management of Bank of America to gauge the level of Bank of America's interest in a possible transaction with MBNA. Very shortly thereafter, Hammonds and Lewis shook hands on a merger agreement. The merger price did not reflect MBNA's true value for numerous reasons, including the fact that Hammonds had deflated the stock by falsely denying MBNA was for sale. Despite the ongoing efforts to sell MBNA that commenced at the beginning of June, on June 13, 2005 an article entitled *"One Tough Card Game; MBNA's stock is down 25% this year, and it's suddenly a takeover candidate"* authored by Amy Barrett and Mike McNamee was

34

published in *Business Week's* June 20, 2005 edition wherein Defendant Hammonds was quoted as saying *"[t]here's no 'For Sale' sign on MBNA's Wilmington (Del.) headquarters."*

87.    Pursuant to the merger agreement, MBNA agreed to "no shop" provisions which limited MBNA's ability to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company. In addition, MBNA granted to Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement at a low price, amounting to a discount of approximately $1.3 billion. These "show stopper" provisions were designed to prevent the emergence of any potential new bidder who might have an interest in acquiring all or a significant part of MBNA from considering or proposing such an acquisition.

88.    On June 29, 2005, the Bank of America Board held a special meeting and approved the merger agreement, the stock option agreement and the transactions contemplated by the merger agreement. The MBNA Board met in the afternoon of June 29, 2005 and unanimously approved and adopted the merger agreement and the stock option agreement. The proposed merger was jointly announced by Bank of America and MBNA on the morning of June 30, 2005, prior to the opening of U.S. financial markets.

89.    The merger negotiations were fatally infected by unfair dealing. Hammonds negotiated the deal himself over a two hour dinner with defendant Lewis, even though he and Lewis had not previously met. Despite Hammonds' conflict of interest in negotiating for both himself and MBNA, no Special Committee was appointed to negotiate or carefully vet the transaction. To ensure no challenge to his sweetheart compensation deal with Bank of America, Hammonds agreed to the unlawful no-shop agreement and lock-up option granted to Bank of America, and the supine MBNA Board promptly rubber-stamped these actions. These provisions acted as a complete "show-stopper" and prevented a full and fair auction for MBNA. The MBNA Board also stood mute when Hammonds artificially depressed the stock's price by falsely denying that MBNA was for sale, while simultaneously working feverishly to attract a bidder that was to his liking. The MBNA Board then acquiesced in a Joint Proxy that, as described

35

below, fell woefully short of full disclosure. Thus, in this merger transaction, the MBNA Board failed to act in good faith, with full knowledge and with due care to ensure entire fairness, to fairly auction the Company to the highest bidder without favoritism, and to fully inform shareholder voters of all pertinent facts.

**B.      The MBNA Individual Defendants Agree to Sell the Company in Exchange for Indemnification and Personal Benefits**

90.      The MBNA Individual Defendants knew that the only way they could escape liability for the damage they, and the former directors and officers of the Company, to whom they remain loyal, inflicted upon MBNA's shareholders during the Class Period was to sell the Company, thereby attempting to pull the rug out from beneath this shareholder derivative action.

91.      On June 30, 2005, Bank of America issued a press release announcing Bank of America's plans to acquire MBNA. On July 5, 2005, *bizjournals.com* issued a press release entitled, "MBNA Chief to Gain Up to $125M from BofA Deal." The press release provided in relevant part:

> *Bruce Hammonds, chief executive of MBNA Corp., will be entitled to more than $125 million if the credit-card company is bought by Bank of America Corp., the Wall Street Journal reports, citing MBNA regulatory filings and a compensation expert.*

92.      For years, MBNA doled out large amounts of restricted stock to its top executives, including Defendant Hammonds, who was part of the management team that founded the company in the 1980s. The stock awards had a 10-year vesting period and contained a clause to permit immediate vesting in the event of a change of control.

93.      Since becoming CEO at the end of 2003, Defendant Hammonds has reduced the granting of restricted stock and options. Last year, he collected total cash compensation of $3.5 million, including $2.5 million in salary and a $1 million bonus. That was down from $4.6 million in 2003, the newspaper says.

94.      According to newspaper accounts, the merger deal was put together in two hours. Clearly, by agreeing to this transaction, the MBNA Individual Defendants were attempting to

insulate themselves from liability in the ongoing federal securities class actions against MBNA and current shareholder derivative litigation, including this action. In order to escape personal liability for their actions and those of their fellow Defendants, the MBNA Individual Defendants negotiated the sale of MBNA to Bank of America on unfair terms to the shareholders, and got Bank of America's agreement to help them defend themselves against the pending accusations. In addition, upon completion of the merger on January 1, 2006, Defendants Cochran, Hammonds, Struthers, Vecchione and Weaver, respectively, will receive approximately $22.7 million, $23 million, $17 million, $5.8 million and $17 million pursuant to their retention agreements with Bank of America.

95.    The MBNA Insider Defendants structured the entire sale process to ensure that they would (i) obtain indemnification for their prior misdeeds; (ii) retain their positions with the surviving Company and the benefits flowing therefrom; and (iii) personally benefit as a result of the transaction. In exchange for the aforementioned direct and collateral benefits, the MBNA Individual Defendants agreed to sell MBNA via an unfair process and at an unfair price.

## INJURY TO MBNA'S SHAREHOLDERS

96.    As a result of the anticipated Merger, the MBNA shareholders will have their shares exchanged for shares of Bank America stock and cash. For those shareholders who will be exchanged out, the consideration in to be received in the Merger is inadequate and unfair because:

(a)    As result of the MBNA Individual Defendants' wrongdoing as alleged, the consideration to be received in the Merger will be far lower than it would have been had these Defendants done their jobs and had the wrongs alleged not occurred. The value to be received in the merger is far below industry valuation standards as measured by such ratios as trailing 12 months price/earnings and price/sales. While the deal, as of November 17, 2005, provides MBNA shareholders with a price/earnings ratio of 15.8, this is well blow the average industry figure of 17.8; similarly, the industry average price/sales ratio is 4.0, while the merger sets a value on MBNA 15% lower, at 3.4 times sales. These deviations cost MBNA shareholders

37

*billions* of dollars in value, even before consideration of a merger premium, which would ordinarily result in a takeover price exceeding industry average figures;

(b)    In that regard, the rise in the MBNA share price as a result of the announcement of the Merger does not compensate the MBNA shareholders for the damage done to them as a result of the wrongdoing by the MBNA Individual Defendants. Indeed, as a result of the wrongdoing alleged herein the MBNA share price declined dramatically from January 19, 2005 to June 29, 2005, and has only recovered (following the Merger announcement) to share price levels which are slightly below those which existed on January 19, 2005;

(c)    Some of the Insider Defendants will potentially profit from the Merger in ways that other MBNA shareholders will not. Defendants Hammonds, Cochran, Weaver, Struthers, and Vecchione will benefit from change of control severance agreements and retention agreements they each signed with Bank of America.

(d)    Under the terms of the change of control severance agreements, if an executive's employment is terminated under certain conditions, the executive will be entitled to receive, among other things:

(i)    the executive's accrued salary;

(ii)    a pro rata portion of the executive's bonus;

(iii)    a lump sum cash payment equal to three times (one and one-half times for Mr. Vecchione) the sum of the highest annual salary paid to the executive since three years prior to the change of control and the higher of the most recent bonus or the average bonus in the prior three years paid to the executive prior to the change of control;

(iv)    for a period of up to three years (two years for Mr. Vecchione) after the date of termination, certain medical, life insurance and other welfare benefits;

(v)    relocation expenses to the United States if the executive is based overseas;

(vi)    In the event that the payments received by any executive in connection with a change of control are subject to the excise tax imposed upon certain change of

38

control payments under federal tax laws, the agreements provide for an additional "gross-up" payment sufficient to restore the executive to the same after-tax position he would have been in if the excise tax had not been imposed; and

(vii)    Upon a change of control, the executives would receive full vesting of all outstanding stock options and restricted stock awards in accordance with policies adopted pursuant to the 1997 Long Term Incentive Plan. In addition, if an executive's employment is terminated at any time following a change of control, or within 12 months prior to a change of control and in connection with a change of control, and such termination is by the Corporation (or its successor) other than for "cause" or by the executive for "good reason" or by the executive (except for Mr. Vecchione) for any reason in the 30-day period beginning one year after a change of control, then the executive will receive a benefit under the Supplemental Executive Retirement Plan.

(e)    Pursuant to retention agreements, effective on consummation of the merger, with certain of such executives (including Defendants Cochran, Hammonds, Struthers and Weaver) that replace the change of control agreements (or in the case of one other executive officer, coverage under the MBNA change of control severance pay plan). Assuming that the merger is completed on January 1, 2006, the amount (based upon recent base salaries and recent bonus amounts but excluding income, employment and excise tax gross ups and interest) that would be payable under the retention agreements to each of Defendants Cochran, Hammonds, Struthers and Weaver and one other executive officer, including the estimated total gross incremental cost to Bank of America of the applicable aircraft benefit, respectively, is approximately $22.7 million, $23 million, $17 million, $17 million and $784,615. For each of the executives of MBNA who has not entered into a retention agreement, assuming that the merger is completed on January 1, 2006 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance (based upon recent base salaries and recent bonus amounts but excluding excise tax gross-ups) that would be payable to

Defendant Vecchione and the remaining such executives as a group, is approximately $5.8 million and $31.3 million.

97.    MBNA shareholders have also been injured by the MBNA Insider Defendants' breaches of their fiduciary duty and breach of their duty of candor as to those MBNA shareholders who held shares as of January 19, 2005 and suffered diminution in the value of their shares as a result of the breaches of fiduciary duty alleged herein.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

98.    Plaintiffs bring this action derivatively in the right and for the benefit of MBNA and its putative successor-in-interest, Bank of America, to redress injuries suffered and to be suffered as a result of the breaches of fiduciary duty and other violations of law by the MBNA Individual Defendants. Upon completion of the Merger, on or about January 1, 2006, MBNA's derivative claims will pass by operation of law to Bank of America, the surviving corporation in the merger transaction, and are thus asserted herein also asserted derivatively on behalf of Bank of America under Fed. R. Civ. P. 8 (e)(2).

### A.    Demand Upon the Board of Directors of MBNA is Futile

99.    Plaintiffs will adequately and fairly represent the interests of MBNA and its shareholders in enforcing and prosecuting its rights.

100.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the MBNA's Board of Directors to institute this action.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  There is reasonable doubt that the Board can fairly address whether suit should be brought on behalf of MBNA.

101.    The MBNA Board of Directors has already pre-judged the merits of this action. In SEC forms, such as quarterly reports on Form 10-Q, the MBNA Directors stated that the Company denies that the insider defendants committed any wrongdoing.  Having reached its conclusions, no demand need be made on the Board as it will not likely reconsider.

102.    Nor could the MBNA Board assert the allegations herein.  Alleged as they are, they will be inconsistent with the stance to be taken by MBNA in its defense to the Securities Class Action.  This is an irreconcilable conflict of interest which aligns the MBNA Board members with the Securities Class Action Defendants, and precludes them from vigorously asserting the MBNA's rights against these Defendants.  Such redress can only be obtained through the vehicle of a shareholder's derivative suit, and demand upon the Board is and shall be futile.

103.    In addition to the above at least five MBNA directors (out of a total of ten) have relationships and dealings with MBNA or its accountants which call into question their ability independently to address and prosecute the claims asserted herein:

(a)    Defendant director Hammonds is named as a primary defendant in the pending securities class action, and is alleged to have received proceeds from stock sales at prices inflated by fraud totaling $9 million.  Plainly, Hammonds, MBNA's President and CEO, cannot be considered independent.   The principal professional occupation of defendant Hammonds is his employment with MBNA, pursuant to which he received and continues to receive substantial monetary compensations and other benefits as MBNA's President and CEO.  Specifically, for FY:04, MBNA paid defendant Hammonds $9,165,947 in salary, bonus and other compensation.  Accordingly, defendant Hammonds lacks independence from defendants Milstead, Berick, Boies, Civiletti, Jews and Markowitz, defendants who are not disinterested and/or independent and who exert influence over defendant Hammonds' compensation by virtue of their positions as members of the Compensation Committee.  The Compensation Committee reviews and approves corporate goals and objectives relevant to the CEO's compensation, evaluates the CEO's performance in light of those goals and objectives, and either as a committee or together with the other independent directors (as directed by the Board), determines and approves the CEO's compensation based on this evaluation.  This lack of independence rendered defendant Hammonds incapable of impartially considering a demand to commence and vigorously prosecute this action;

41

(b)     Defendant director Lerner is MBNA's Chairman and largest shareholder. Due to various intertwining business and personal relationship between Lerner, his family, and MBNA, MBNA does not consider Lerner to be an independent director, and he could not independently consider any claims that may be lodged against any members of MBNA's management. The principal professional occupation of defendant Lerner is his employment with MBNA, pursuant to which he received and continues to receive substantial monetary compensations and other benefits as MBNA's Chairman of the Board. Specifically, for FY:04, MBNA paid defendant Lerner $500,000 in salary. Accordingly, defendant Lerner lacks independence from defendants Milstead, Berick, Boies, Civiletti, Jews and Markowitz, defendants who are not disinterested and/or independent and who exert influence over defendant Lerner's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee makes recommendations to the Board with respect to non-CEO compensation, incentive-compensation plans and equity-based plans. This lack of independence rendered defendant Lerner incapable of impartially considering a demand to commence and vigorously prosecute this action;

(c)     Defendant director Civiletti also cannot be considered independent as to any action that might be brought against defendants Hammonds and Lerner. Defendants Hammonds and Lerner direct and control legal business provided to Venable, LLP, a law firm in which Civiletti is a partner. In addition, defendant Civiletti's son, is a full-time employee of MBNA, and a subordinate to defendants Hammonds and Lerner. These relationship taint defendant Civiletti's ability to independently evaluate the claims set forth herein;

(d)     Defendant director Berick is an attorney and an advisor to defendant Lerner, and Lerner family interests. His son is a partner at a law firm which receives legal business from MBNA, from Lerner, and from Lerner family business interests. These relationships create a reasonable doubt that defendant Berick could consider the assertion or prosecution of the claims asserted herein with an independent mind;

42

(e)    According to MBNA's Proxy Statement filed with the SEC on or about March 15, 2005, non-employee directors on the Board each receive an annual retainer of $70,000. Further each Audit Committee member receives $15,000 annually, each Compensation Committee and Governance Committee member receives $5,000 annually and each Committee Chairperson receives $15,000 annually. Non-employee directors are paid $1,500 for each Board, committee or subcommittee meeting attended.    Defendants Berick and Civiletti receive an additional $8,000 retainer for serving on the MBNA Europe Audit Committee as well as $2,000 for each MBNA Europe Board or committee meeting held outside of the United States. Each non-employee director also annually receives 5,000 options to purchase MBNA stock that is exercisable immediately. Accordingly, defendants Berick, Boies, Civiletti, Jews, Markowitz, Milstead and Unger were incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in safeguarding their substantial compensation;

(f)    According to MBNA's public website, defendants Jews, Berick, Markowitz, Milstead and Unger were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible by its own charter for assisting the Board's oversight of: (i) the integrity of the Company's and the Bank's financial statements; (ii) the Company's and the Bank's compliance with legal and regulatory requirements; and (iii) the performance of the Company's and the Bank's internal audit function and independent auditors. Specifically, the Audit Committee is responsible for reviewing with management the annual audited financial statements and quarterly financial statements and other financial reporting matters, including: significant transactions which are not a normal part of the Company's operations; any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; any major issues as to the adequacy of the corporation's internal controls; any special steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting; and disclosures made to the

43

Committee by the Corporation's CEO and CFO during their quarterly certification process about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the corporation's internal controls. The Audit Committee is further responsible for discussing MBNA's earnings press releases, as well as the types of financial information and earnings guidance (if any) provided to analysts and rating agencies. Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in the improper statements described herein.    By such actions, defendants    Jews, Berick, Markowitz, Milstead and Unger breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them would have been futile;

        (g)    Defendant director Milstead was a partner at Ernst & Young, LLP for 19 years, and has continued to recommend that Ernst & Young be retained as MBNA's auditor, which brings Ernst & Young millions of dollars every year in fees. A vigorous and independent investigation may not only reflect badly on Ernst & Young's professional conduct regarding the relevant accounting matters in suit, but might also lead to the conclusion that claims should be asserted against Ernst & Young. Given his professional affiliations and background, there is reasonable doubt as to defendant Milstead's independence.    Defendant Milstead, by his specialized financial expertise, was in a unique position to understand the business of MBNA, as well as its finances, markets and present and future business prospects. Nonetheless, defendant Milstead breached his duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him would have been futile;

        (h)    Defendant director Unger, by her specialized financial expertise, was in a unique position to understand the business of MBNA, as well as its finances, markets and present and future business prospects. Specifically, defendant Unger is an expert in securities regulation and a former Acting Chairman of the SEC. Defendant Unger served as the Commissioner of the SEC between 1997 and 2002. Defendant Unger, because of her unique qualifications, had a

44

heightened duty to insure the accuracy and fairness of MBNA's financials. Nonetheless, defendant Unger breached her duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of her duties, any demand upon her would have been futile;

        (i)     The entire MBNA Board and senior management participated in many of wrongs complained of herein. MBNA's directors are not disinterested or independent due to the following: defendants Hammonds, Berick, Boies, Civiletti, Jews, Lerner, Markowitz, Milstead and Unger served on the MBNA Board during the Class Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to MBNA and its shareholders in that they failed to prevent and correct the improper financials. Thus, the MBNA Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected MBNA to millions of dollars in liability for possible violations of applicable securities laws;

        (j)     The MBNA Directors had a responsibility and obligation to assure that all press releases and filings of SEC reports, including all financial reports, were accurate and that all internal controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

        (k)     The acts complained of constitute violations of state law and the fiduciary duties owed by MBNA's officers and directors, and are incapable of ratification;

        (l)     The members of the MBNA Audit Committee abdicated their non-discretionary function to oversee and monitor management's operation of the Company, by being uninterested and uninformed of the wrongdoing occurring, and as such, any direction to institute suit against defendant Hammonds or the officer defendants would expose their own wrongdoing. As such they are hopelessly conflicted and thus reasonable doubt exists as to their independence.

(m)    MBNA has been and will continue to be exposed to significant losses due to the wrongdoing complained herein; yet, the MBNA Directors have not filed any lawsuits against themselves or other who were responsible for that wrongful conduct, nor have they attempted to recover any part of the damages MBNA suffered and will suffer thereby or any of the illegal profits received by the insider seller Defendants;

(n)    If the MBNA Directors were to bring this derivative action, they would thereby likely expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities laws or such derivative action. Such admissions would impair the Company's and their defense of the Class Actions, and their defense in a derivative action and greatly increase the probability of their personal liability in the Class Actions or a derivative action in an amount likely to be in excess of any insurance coverage to the Directors; and

(o)    The Directors are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Directors initiated action against any of the other Directors named herein. Therefore, the MBNA board, and any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

**B.    Demand Upon the Board of Directors of Bank of America is Futile**

104.    Upon completion of the Merger between MBNA and Bank of America, on or about January 1, 2006, MBNA's derivative claims will pass by operation of law to Bank of America, the surviving corporation.

105.    As a result of the facts set forth herein, plaintiff has not made any demand on the Bank of America's Board to institute this action, and need not do so in the future. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. There is reasonable doubt

that the Board of Bank of America can fairly address whether suit should be brought on behalf of Bank of America and MBNA.

106.    The Bank of America Board of Directors has already pre-judged the merits of this action. Having reached its conclusions, no demand need be made on the Board as it will not likely reconsider.

107.    Nor could the Bank of America Board assert the allegations herein. Bank of America has agreed to indemnify and hold harmless each present and former director, officer and employee of MBNA from liability and exculpation for matters arising at or prior to the completion of the merger to the fullest extent provided by applicable law, the MBNA articles of incorporation and the MBNA bylaws. Bank of America also has agreed that it will maintain in place existing indemnification and exculpation rights in favor of MBNA directors, officers and employees for six years after the merger and that it will maintain MBNA's current policy of directors' and officers' liability insurance coverage, or an equivalent replacement policy for the benefit of MBNA directors and officers, for six years following completion of the merger, except that Bank of America is not required to incur annual premium expense greater than 250% of MBNA's current annual directors' and officers' liability insurance premium. In addition, Bank of America's Board, via the Merger Agreement, has agreed to "cooperate" with the defendants named herein and "use their best efforts" to "defend" against and defeat the claims set forth herein. They thus cannot possibly independently review a demand to prosecute such claims, as they have pledged themselves to oppose them.

## CLASS ACTION ALLEGATIONS

108.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of:

(a)    all persons who held the common stock of MBNA on January 19, 2005 and continued to hold the stock through April 22, 2005, and who continued to hold the stock through at least April 22, 2005, and were damaged thereby (the "Holder Class"). Excluded from the Holder Class are defendants and members of their immediate families; and

47

(b)     all MBNA shareholders who will have their shares exchanged in the Merger and will suffer damages as a result of the wrongs alleged herein and the unfair and inadequate MBNA merger price (the "Merger Class"). Excluded from the Merger Class are defendants and members of their immediate families.

109.    The members of the Classes are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. MBNA has approximately 1,277,700,000 shares of stock outstanding, owned by thousands of persons.

110.    There are questions of law and fact common to the members of the Classes, which predominate over questions which may affect individual class members. The questions of law and fact common to the members of the Classes which predominate over any questions which may affect individual Class members include:

(a)     Whether defendants breached their fiduciary duties to the Classes;

(b)     Whether defendants violated their duties of candor, loyalty, good faith, due care, and entire fairness;

(c)     Whether class members were damaged; and

(d)     The appropriate measure of damages.

111.    Plaintiffs' claims are typical of those of the Classes because Plaintiffs and the Classes sustained damages from defendants' wrongful conduct.

112.    Plaintiffs will adequately protect the interests of the Classes and has retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Classes

113.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as individual damages may be relatively small for most members of the Class, the burden and expense of prosecuting a litigation of this nature makes it unlikely that members of the Class would prosecute individual actions. Plaintiff anticipates no difficulty in the management of this

48

action as a class action. Further, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying results, which may establish incompatible standards of conduct for defendants.

## FIRST CAUSE OF ACTION

### (Against all Insider Defendants for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

114.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein.

115.    The Insider Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial information and projections.

116.    These Defendants have been sued in the Securities Class Action alleging that they caused the Company to issue false financial statements as alleged at ¶¶ 63-82 *supra*, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

117.    It is alleged in the Securities Class Action that these Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.    These Defendants, by virtue of their receipt of information reflecting the true facts regarding MBNA, their control over MBNA and its public communications, their inside knowledge of its financial results, and/or their associations with the Company which made them privy to confidential proprietary information concerning MBNA, were active and culpable participants in (and carried out) the fraudulent scheme alleged herein.    These Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.    The ongoing alleged fraudulent scheme

49

alleged in the Class Action could not have been perpetrated over a substantial period of time without the knowledge and complicity of the personnel at the highest level of the Company, including these Defendants.

118.    During the Class Period, it is alleged in the Securities Class Action that these Defendants caused MBNA to carry out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MBNA securities; and (iii) cause plaintiff and other members of the Class to purchase MBNA stock at artificially inflated prices.

119.    As alleged in the Class Action, these defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MBNA securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

120.    In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

121.    It is alleged in the Securities Class Action that these Defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of

interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of MBNA as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBNA's value and future profitability. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBNA and its business, operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein at ¶¶ 63-82, *supra*, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBNA securities during the Class Period.

122.    As alleged in the Securities Class Action, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBNA's securities was artificially inflated during the Class Period. Unaware of the fact that the market price of MBNA's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, Class members acquired MBNA securities during the Class Period at artificially high prices and were damaged thereby.

123.    As alleged in the Securities Class Action, at the time of said misrepresentations and omissions, the Class members were unaware of their falsity, and believed them to be true. Had the Class members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of MBNA, which were not disclosed by these defendants, plaintiff Baker and other members of the Class would not have purchased or otherwise acquired their MBNA securities during the Class Period, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

124.   As alleged in the Class Action, by virtue of the foregoing, these Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5.

125.   It is further alleged in the Securities Class Action that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these Defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the federal securities laws.

126.   If the Company is deemed to have violated the federal securities laws, and incurs damages therefore, these Defendants are liable to the Company or its successor in interest for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## SECOND CAUSE OF ACTION

### (Against all Insider Defendants for Breach of Fiduciary Duty)

127.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein.

128.   The Defendants named in this Cause of Action owed and owe MBNA fiduciary obligations. By reason of their fiduciary relationships, these Defendants owed and owe MBNA the highest obligations of good faith, fair dealing, loyalty and due care.

129.   These Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

130.   Each of these Defendants had actual or constructive knowledge that they had caused MBNA to improperly misrepresent the business and prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment. Moreover, these Defendants are asserted to have engaged in the actions alleged in the Securities Class Action, which would be a breach of their duty to conduct the business of the Company only through lawful and proper means.

131.    As a result of the wrongs allegedly committed herein the Company has been seriously damaged.

132.    As a direct and proximate result of these Defendants' misconduct, MBNA has suffered and will continue to suffer significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company, or its successor in interest.

### THIRD CAUSE OF ACTION

### (Against all MBNA Individual Defendants for Breach of Fiduciary Duty)

133.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein..

134.    The MBNA Individual Defendants owed and owe MBNA fiduciary obligations. By reason of their fiduciary relationships, the MBNA Individual Defendants owed and owe MBNA the highest obligations of good faith, fair dealing, loyalty and due care.

135.    These Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

136.    Each of these Defendants had actual or constructive knowledge that they had either caused MBNA to improperly misrepresent the business and prospects of the Company, or breached their duties of oversight in failing to be informed and active in the ultimate management of the Company. These actions could not have been a good faith exercise of prudent business judgment, or fiduciary oversight.

137.    In addition, these Defendants approved and caused or permitted MBNA to re-purchase approximately $250,000,000 of its shares on the open market, at allegedly inflated prices, causing substantial damage to MBNA for overpaying for its shares.

138.    As a result of the wrongs allegedly committed herein the Company has been seriously damaged.

139.    As a direct and proximate result of the MBNA Individual Defendants' misconduct, MBNA has suffered and will continue to suffer significant damages. As a result of

the misconduct alleged herein, these Defendants are liable to the Company, or its successor in interest.

## FOURTH CAUSE OF ACTION

### (Against All MBNA Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling, Unjust Enrichment, and Abuse of Control)

140.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein.

141.    The MBNA Insider Selling Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MBNA, for which they are legally responsible. Moreover, many of these Defendants sold shares during the Class Period while in possession of material, non-public information, and are required to disgorge to the Company all profits received thereby.

142.    The aforementioned information was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the insider selling defendants used for their own benefit when they sold MBNA common stock.

143.    At the time of their stock sales, the MBNA Insider Selling Defendants knew that MBNA 's revenues were materially overstated. The insider selling defendants' sales of MBNA common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

144.    Since the use of the MBNA's proprietary information for their own gain constitutes a breach of the insider selling defendants' fiduciary duties, MBNA, and upon the completion of the merger Bank of America, is entitled to the imposition of a constructive trust on any profits the insider selling defendants obtained thereby.

145.    By their wrongful acts and omissions, the MBNA Insider Selling Defendants were unjustly enriched at the expense of and to the detriment of MBNA.

146.    Plaintiffs, as shareholders and representatives of MBNA, seek restitution from the MBNA Insider Selling Defendants, and each of them, and seek an order of this court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

147.    The MBNA Insider Selling Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MBNA, for which they are legally responsible. As a direct and proximate result of the MBNA Insider Selling Defendants' abuse of control, MBNA has sustained significant damages.

148.    As a direct and proximate result of the MBNA Individual Defendants' abuse of control, MBNA has sustained significant damages, and Defendants are liable to the Company, or its successor in interest.

## FIFTH CAUSE OF ACTION

### (Against All MBNA Individual Defendants for Breach of Fiduciary Duty Through Gross Mismanagement)

149.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein.

150.    By their actions alleged herein, the Defendants named in this Cause of Action, either directly or through aiding and abetting others, or through their gross inattention to their duties, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MBNA in a manner consistent with the operations of a publicly held corporation.

151.    As a direct and proximate result of the MBNA Individual Defendants' gross mismanagement, MBNA has sustained significant damages arising out of the alleged material misstatements to the investing public and damages to the Company arising from the pendency of the Class Action. The MBNA Individual Defendants are liable to the Company for all damages flowing there from, including the obligations for common law contribution.

55

## SIXTH CAUSE OF ACTION

**(Against All MBNA Individual Defendants for Waste and Dissipation of Corporate Assets)**

152.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein.

153.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, these defendants have caused MBNA to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

154.    As a result of the waste and/ or dissipation of corporate assets, the MBNA Individual Defendants are liable to the Company, or its successor in interest.

## SEVENTH CAUSE OF ACTION

**(Holder Class Action Against All MBNA Insider Defendants for Damages Resulting From Breaches of Fiduciary Duty)**

155.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein.

156.    This Count is brought for breach of fiduciary duty on behalf of Plaintiffs and the Holder Class members.

157.    The MBNA Insider Defendants owed and owe the MBNA shareholders the highest obligations of good faith, fair dealing, loyalty and due care.

158.    The Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

159.    Each of the Defendants had actual or constructive knowledge that they had either caused MBNA to improperly misrepresent the business and prospects of the Company, or breached their duties of oversight in failing to be informed and active in the ultimate management of the Company. These actions could not have been a good faith exercise of prudent business judgment. As a result, the market price of the MBNA shares held by the Class declined, and the Class members have been damaged as a result of these wrongs.

56

160.    As a direct and proximate result of the Defendants' misconduct, the Holder Class has suffered significant damages.

161.    As a result of the misconduct alleged herein, the MBNA Insider Defendants are liable to the Holder Class for substantial damages.

## EIGHTH CAUSE OF ACTION

### (Holder Class Action Against All MBNA Individual Defendants for Damages)

162.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein.

163.    This Count for breach of fiduciary duty on behalf of the Holder Class.

164.    The MBNA Individual Defendants owed and owe the MBNA shareholders the highest obligations of good faith, candor, fair dealing, loyalty and due care.

165.    These Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

166.    Each of the MBNA Individual Defendants had actual or constructive knowledge that they had either caused MBNA to improperly misrepresent the business and prospects of the Company, or breaches their duties of oversight in failing to be informed and active in the ultimate management of the Company.  These actions could not have been a good faith exercise of prudent business judgment.  As a result, the market price of the MBNA shares held by the class declined, and they have been damaged as a result of these wrongs.

167.    As a direct and proximate result of the MBNA Individual Defendants' misconduct, the Holder Class has suffered significant damages, which damages are not compensated by the Merger consideration.

168.    As a result of the misconduct alleged herein, these Defendants are liable to the Holder Class for substantial damages.

## NINTH CAUSE OF ACTION

### (Class Action Against The MBNA Director Defendants for Breaches of Fiduciary Duty in Connection With the Merger)

169.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein. This Ninth Cause of Action is brought on behalf of the Merger Class, and is asserted against the members of the MBNA Board ("the MBNA Director Defendants"), with the exception of Defendant Murdough.

170.    The MBNA Director Defendants named herein owed and owe the MBNA shareholders the highest obligations of good faith, fair dealing, loyalty and due care. The MBNA Director Defendants breached their duty of entire fairness by agreeing to sell MBNA at a potentially unfair price and to the detriment of the Company's shareholders, in exchange for indemnification and personal benefit.

171.    In early June 2005, As the MBNA stock was declining and the Company and the MBNA Individual Defendant were facing ruinous liability, the MBNA Director Defendants decided to sell the Company. Hence, in less than a month after possible strategic alternatives were discussed at an MBNA meeting, including hypothetical scenarios involving a business combination, MBNA and Bank of America announced their merger. The Board did not conduct public market testing or adequately attempt to solicit all possible any other bids. Instead during the same week that MBNA was making vigorous efforts to sell itself, and Bank of America were negotiating the merger deal, Defendant Hammonds was publicly declaring announcing that the Company was not for sale. Additional bids were further discouraged by the no-shop provision contained in the merger agreement and the stock option agreement signed by MBNA, which was designed to make any competing bid financially ruinous for the bidder.

172.    The MBNA Director Defendants acted as they did in the face of blatant self-dealing by and on behalf of the MBNA Insider Defendants. While shareholders were getting shortchanged, pursuant to their retention agreements with Bank of America, Defendants Cochran, Hammonds, Struthers, Vecchione and Weaver negotiated to receive respectively, approximately $22.7 million, $23 million, $17 million, $5.8 million and $17 million upon

consummation of the merger. Moreover, Bank of America has agreed to indemnify and hold harmless each present and former director, officer and employee of MBNA from liability and exculpation for matters arising at or prior to the completion of the merger, and to cooperate with them, defend them, and respond to claims asserted against them.

173.    A well-settled concept of corporate law is that a fiduciary is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the shareholders. This is founded on the belief that a fiduciary cannot be expected to exercise his or her independent business judgment without being influenced by the personal benefits resulting from the transaction. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

174.    Particularly, when a fiduciary stands on both sides of a transaction, he or she is required to demonstrate his or her outmost good faith and most scrupulous inherent fairness of the bargain. Because certain MBNA Insider Defendants' business judgment in this merger transaction was clearly colored by their self-interest, the merger transaction does not withstand entire fairness review. All MBNA Director Defendants acted in bad faith in permitting and acquiescing in a self-dealing transaction that benefited privileged insiders the detriment of the MBNA shareholders.

175.    As a result of the misconduct alleged herein, these Defendants are liable to the Class for damages.

<u>**TENTH CAUSE OF ACTION**</u>

**(Class Action Against MBNA Director Defendants for Violation of Their Revlon Duties)**

176.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein. This Tenth Cause of Action is brought on behalf of the Merger Class, and is asserted against the members of the Director Defendants, with the exception of Defendant Murdough.

177.    The Director Defendants owed and owe the MBNA shareholders the highest obligations of good faith, fair dealing, loyalty and due care.

178.    When a board is on the verge of selling, breaking up or transferring control of the corporation, directors have a duty to maximize shareholder value. Such actions as the Board must take are often referred to as "Revlon Duties" after a well-known fiduciary law case which first established these principles in Delaware. Such "Revlon Duties" are consistent with Maryland fiduciary jurisprudence.

179.    When Revlon Duties arise, the board has a duty to maximize immediate shareholder value and obligation to auction the company fairly. A change of control represents the last chance for shareholders to obtain a control premium for their shares. Revlon Duties greatly diminish the risk that directors will engage in self-interested transactions at the expense of shareholders.

180.    The Director Defendants breached their Revlon Duties in the following ways: by failing to conduct a public market test and to auction the Company fairly; by agreeing to a "no shop" provision in the merger agreement which prohibited MBNA to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company; and by granting Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement at a substantial discount;.

181.    In addition, despite the fact that the merger negotiations were ongoing since early June 2005 on June 13, 2005 in a *Business Week* article authored by Amy Barrett and Mike McNamee and entitled *One Tough Card Game; MBNA's stock is down 25% this year, as it's suddenly a takeover candidate*, Defendant Hammonds was quoted as saying: *"[t]here's no 'For Sale' sign on MBNA's Wilmington (Del.) headquarters*." This statement was totally false and misleading and in derogation of Hammonds' duty of candor and his Revlon duties. In truth and in fact, during this time, MBNA and its advisors were engaged in energetic efforts to sell the Company. Hammonds' false statement had the affect of artificially depressing the price of MBNA's stock, and thus facilitating a merger with Bank of America at a price which was palatable to Hammonds (who stood to gain very handsomely from such a merger) and Bank of America, but provided MBNA shareholders with less than fair value for their shares. The

MBNA Director Defendants were aware of Hammonds' statement to *Business Week*, or recklessly disregarded its false and damaging nature. This is additional proof that the MBNA Director Defendants, under the control of Hammonds, disregarded their duty to get the highest price from all possible bidders for MBNA once they determined the Company was sale, and thereafter controlled the sale to a "chosen bidder," and made it impossible for any other bidder to emerge.

182.    The proposed merger was jointly announced by Bank of America and MBNA on the morning of June 30, 2005, prior to the opening of U.S. financial markets. According to the Joint Proxy and newspaper accounts, MBNA's merger was negotiated and completed in less than a month, which clearly is not enough time to seek, facilitate and negotiate competing third-party proposals to acquire all or a significant part of the Company. Indeed, the deal with Bank of America was struck in the course of a two hour dinner attended by defendants Hammonds and Lewis.

183.    Further, without fully considering all options and offers available, MBNA's Board agreed to a "no shop provision" in the merger agreement. Pursuant to that provision, MBNA agreed not to initiate, solicit, encourage or facilitate any inquiries or proposals for any "Alternative Proposal" or participate in any discussions or negotiations, or enter into any agreement, regarding any "Alternative Transaction." MBNA also agreed to notify Bank of America promptly to notify Bank of America promptly (but in no event later than 24 hours) after it receives any Alternative Proposal, or any material change to any Alternative Proposal, or any request for nonpublic information relating to MBNA or any of its subsidiaries, and to provide Bank of America with relevant information regarding the Alternative Proposal or request; to keep Bank of America fully informed, on a current basis, of any material changes in the status and any material changes in the terms of any such Alternative Proposal; and to cease any existing discussions or negotiations with any persons with respect to any Alternative Proposal, and to use reasonable best efforts to cause all persons other than Bank of America who have been furnished with confidential information in connection with an Alternative Proposal within the 12 months

prior to the date of the merger agreement to return or destroy such information. In addition, under the terms of the stock option granted by MBNA to Bank of America, Bank of America may purchase up to 249,764,005 shares of MBNA common stock, not to exceed 19.9% of MBNAS common stock outstanding, at an exercise price of $21.30 per share. The stock option agreement acted as a "show stopper" making any alternative acquisition or other business combination of MBNA by third party in practical terms impossible.

184.    Under applicable principles of corporation law, no shop and other related agreements are permitted, but only where their adoption is untainted by director interest or other breaches of fiduciary duty. Such options can entice other bidders to enter a contest for control of the corporation, creating an auction for the company and maximizing shareholder profit. However, while those lock-ups which draw bidders into the battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholder's detriment. The no-shop provision, like the lock-up provision, while not *per se* illegal, is impermissible under the well-known "*Unocal*" standards (which are consistent with Maryland fiduciary jurisprudence) when a board's primary duty becomes that of an auctioneer responsible for selling the company to the highest bidder. In the instant case, MBNA directors breached their Revlon Duties by failing to conduct public market testing and entertain other bids. Instead, the MBNA Board approached Bank of America about a possible merger, rushed into signing the merger agreement containing the no-shop provision and stock option agreement, thus effectively ending any possibility of third parties proposing an alternative transaction to the merger, including one that might be more favorable to the MBNA stockholders.

185.    As a result of the misconduct alleged herein, these Defendants are liable to the Merger Class for substantial damages.

## ELEVENTH CAUSE OF ACTION

### (For Proxy Disclosure Violations Arising From a Breach of the Fiduciary Duty of Full Disclosure Against all MBNA Director Defendants and against Defendant Lewis for Aiding and Abetting Such a Breach)

186.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as if though fully set forth herein. This Eleventh Cause of Action is brought on behalf of the Merger Class, and is asserted against the MBNA Director Defendants (with the exception of Defendant Murdough), the MBNA Insider Defendants, and defendant Kenneth Lewis as an aider and abettor.

187.    The Defendants named herein failed to fully disclose all material information in the Joint Proxy.

188.    More specifically, the Joint Proxy failed to fully disclose all facts regarding:

(a)    **UBS Accretion/Dilution Analysis.** Given that an estimated 85% of the total merger consideration is payable in shares of Bank of America common stock, additional information disclosing the circumstances under which merger could be dilutive to MBNA stockholders, and extending the pro forma merger analysis to 2008 was omitted from the Joint Proxy.

(b)    **Fairness Opinion Using Best Available Projections.** Full disclosure regarding fairness opinion using the best available projections was omitted from the Joint Proxy. Bank of America failed to obtain and fully disclose an updated fairness opinion using the "best currently available estimates" of Bank of America's future financial performance, including its latest internal projections, as UBS did with MBNA.

(c)    **Dilutive Impact of Option Exercise.** The Joint Proxy fails to fully disclose dilutive impact on an EPS basis to existing MBNA stockholders arising from the potential exercise of the option issued by MBNA to Bank of America, including the net impact on MBNA's estimated EPS of the $1.4078 billion in profit potentially available to Bank of America thereunder.

63

(d)    **Effect of Change in Dividend Policy.**  The Joint Proxy fails to fully disclose impact on accretion/dilution analysis of any foreseeable changes to Bank of America's dividend policy.  MBNA stockholders were not provided with the net accretive/dilutive impact on EPS of an elimination of the Bank of America dividend relative to MBNA's standalone estimated EPS in calendar years 2006 and 2007 and 2008.

(e)    **MBNA's Efforts to Maximize Shareholder Value.**  Each of "the most promising potential partners" were not identified and there was no disclosure as to all communications MBNA or its advisors had with those institutions, including any communications with the companies identified as comparable to Bank of America.  There is no disclosure as to the identity of the "major financial institution" contacted by MBNA in mid-June 2005 or the reasons for MBNA's conclusion "that it was not likely that a transaction could be negotiated with this financial institution at a level of consideration that would be satisfactory to MBNA."

(f)    **Effect of Failure to Repurchase.**  The Joint Proxy omits any disclosure as to the dilutive impact on an EPS basis to MBNA stockholders if Bank of America fails to execute the repurchase of 51,000,000 shares, or fails to obtain the assumed funding rate of 2.5%.

(g)    **Basis for Assumed Discount and Growth Rates.**  The basis for using discount rates in the range of 9.0% to 11.0%, and an asset growth rate of 5.0%, in the present value analysis of Bank of America's discounted cash flows was omitted from the Joint Proxy.  Also, with respect to the present value analysis of MBNA's discounted cash flows, the basis for using discount rates in the range of 13.0% to 15.0%, an EPS growth rate of 10%, and asset growth rates of 9.4% for 2005 and 2006 and 8.0% per annum thereafter was omitted as well.  There is no explanation for the reasons for the different assumed discount and growth rates for both companies and the basis for the difference in assumed ratio of equity to assets for both companies (4.25% for MBA versus 7.0% for Bank of America).

(h)    **Potential UBS Conflicts.**  The aggregate amount of compensation received by UBS and its affiliates from the "various debt and equity financings for Bank of

America" and "bank financings for MBNA" was not fully disclosed in the Joint Proxy. Also, all positions held for their own account by UBS or its affiliates in the securities of the merger parties were not fully disclosed.

(i)    **Potential Value of Derivative Claims.**    The maximum aggregate damages recoverable by MBNA based on the derivative claims being asserted on its behalf, and EPS impact of same were not disclosed in the Joint Proxy.

(j)    **Hammonds' Misconduct.**    The Joint Proxy fails to disclose and discuss Hammonds' misstatements regarding whether MBNA was for sale, and the deleterious affect these statements had on MBNA's stock price, and its ability to obtain a higher bid.

189.    Accordingly, based on the foregoing, each of the Defendants named herein breached their fiduciary duty of full disclosure and complete candor by failing to fully and fairly disclose all material information in the Joint Proxy. By failing to insist upon the full disclosure of all material facts required to be stated in the Joint Proxy, and by approving a Joint Proxy he knew or recklessly disregarding to be incomplete and misleading, Defendant Lewis aided and abetted these Defendants in their breach of fiduciary duty of full disclosure and complete candor.

190.    As a result of the misconduct alleged herein, these Defendants are liable to the Merger Class for substantial damages.

## JURY DEMAND

191.    Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Against the MBNA Individual Defendants for contribution to MBNA or its successor in interest pursuant to Sections 10(b) and 21(D) of the Exchange Act;

B.    Against all of the MBNA Individual Defendants for the damages sustained by MBNA, or its successor in interest,  as a result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

C.  Equitable and/or injunctive relief as permitted by law;

D.  Restitution and disgorgement of profits;

E.  Damages to the Classes for the wrongs committed, including punitive damages, if permitted;

F.  Attorneys' fees and costs; and

G.  Any such other and further relief as may be just and proper.

Dated: November ___, 2005

**CHIMICLES & TIKELLIS, LLP**

By: _____

Pamela S. Tikellis (#2172)
Robert J. Kriner (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)
One Rodney Square
P. O. Box 1035
Wilmington, DE 19899
302-656-2500
302-656-9053 (Fax)

ATTORNEYS FOR PLAINTIFFS

**OF COUNSEL:**

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz
Edina Begic
60 East 42nd Street, 46th Floor
New York, NY 10165
(212) 685-0969 (tel.)
(212) 685-2306 (fax)

--and--

**ROBBINS UMEDA & FINK, LLP**
Brian J. Robbins
Jeffrey P. Fink
610 West Ash Street, Suite 1800
San Diego, CA 92101

(619) 525-3990 (tel.)
(619) 525-3991 (fax)

**Co-Lead Counsel for Plaintiffs**

**ROY JACOBS & ASSOCIATES**
Roy L. Jacobs
60 East 42nd Street, 46th Floor
New York, NY 10165
(212) 867-1156 (tel.)
(212) 504-8343 (fax)

**LAW OFFICES OF CHRISTOPHER J. GRAY, P.C.**
Christopher J. Gray
460 Park Avenue
21st Floor
New York, NY 10022
(212) 838-3221 (tel.)
(212) 937-3139 (fax)

**BALLON STOLL BADER & NADLER, LLP**
Irving Bizar
1450 Broadway
New York, NY, USA 10018
(212) 575-7900 (tel.)
(212) 764-5060 (fax)