**1**

Westlaw.

Not Reported in A.2d                                                                          Page 1
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.
In re COMPUCOM SYSTEMS, INC. STOCKHOLDERS
LITIGATION
**No. Civ.A. 499-N.**

Submitted June 1, 2005.
Decided Sept. 29, 2005.

R. Bruce McNew, Taylor & McNew LLP, Greenville,
Delaware; Carmella P. Keener, Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, Delaware; for the Plaintiff.

Darren J. Robbins, Randall J. Baron, A. Rick Atwood, Jr.,
Shaun L. Grove, Lerach Coughlin Stoia Geller Rudman &
Robbins LLP, San Diego, California; Samuel H. Rudman,
David A. Rosenfeld,, Lerach Coughlin Stoia Geller Rudman
& Robbins LLP, Melville, New York, for the Plaintiff.

Wolf Popper LLP; Marc A. Topaz, Schiffrin & Barroway,
LLP, Radnor, Pennsylvania, for the Plaintiff's Executive
Committee Members.

Bruce L. Silverstein, Martin S. Lessner, Young Conaway
Stargatt & Taylor LLP, Wilmington, Delaware, for
Defendants Coleman, Smith, Musser, Johnson and
CompuCom Systems, Inc.

Richard M. Donaldson, Montgomery, McCracken, Walker
& Rhoads, LLP, Wilmington, Delaware; William F. Drake,
Jr., Charles B. Casper, Montgomery, McCracken, Walker &
Rhoads, LLP, Philadelphia, Pennsylvania, for Defendants
Emmi, Ford, Harper, Loewenberg, Paoni, and Patrone.

Alan J. Stone, Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, for Defendant Safeguard Scientifics,
Inc.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.

I.

*1 Former minority shareholders of a Delaware corporation
bring this purported class action suit against the company,
its directors, and the controlling shareholder alleging a
breach of fiduciary duty in connection with the sale of the
company to a third party on terms that treated all
stockholders equally. The complaint alleges that, when the
defendant directors sold the company, they were dominated
and controlled by the majority shareholder and improperly
agreed to sell the company for an inadequate price in order
to satisfy the majority shareholder's pressing need for cash.

The defendants have moved to dismiss the complaint for
failure to state a claim upon which relief can be granted, in
accordance with Rule 12(b)(6) of the Court of Chancery
Rules. The issue presented is whether the complaint
adequately alleges facts which, if true, would overcome the
business judgment rule presumption that the directors acted
in good faith and after a careful investigation when they
voted to authorize the transaction. [FN1] The court finds
that the well-pleaded allegations of fact found in the
complaint, if true, could not support a reasonable inference
that the board breached its fiduciary duties. Therefore, the
defendants' motion to dismiss will be granted.

> FN1. The facts recited in this opinion are taken
> from the well-pleaded allegations of the complaint,
> unless otherwise noted, and are presumed to be true
> for the purpose of this motion.

II.

The plaintiff brings this purported class action against
CompuCom, its former board of directors, and
CompuCom's former controlling shareholder, Safeguard
Scientifics, Inc., alleging breach of fiduciary duty in
connection with the sale of CompuCom to Platinum Equity
Capital Partners, L.P. Specifically, the plaintiff alleges that
the CompuCom board of directors failed to comply with its
fiduciary duties when it structured a sale of the company to
Platinum [FN2] under terms that are alleged to have
improperly favored Safeguard, the majority shareholder, to
the detriment of the minority shareholders. The plaintiff also
alleges that the defendants sought to discourage CompuCom
shareholders from pursuing their statutory right to an
appraisal by disseminating a materially false and misleading
proxy statement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                 Page 2
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

FN2. Prior to the acquisition, CompuCom and
Platinum were unaffiliated third parties.

A. *The Parties*

CompuCom is a Delaware corporation with its principal
executive offices located in Dallas, Texas. CompuCom is
regarded as a leading IT service provider and has been
profitable since its formation in 1987. CompuCom's
controlling shareholder, Safeguard, is a corporation duly
existing and organized under the laws of the
Commonwealth of Pennsylvania, having its principal
executive offices in Wayne, Pennsylvania. At the time of
the disputed transaction, Safeguard owned approximately
48% of CompuCom's common stock and 100% of
CompuCom's preferred stock. Due to a super voting
provision in the preferred stock agreement, Safeguard held
51% of the voting rights of CompuCom's stock entitled to
vote on the acquisition and 58% of the voting rights with
respect to the election of CompuCom's directors.

The plaintiff in Civil Action No. 499-N, Central Laborer's
Pension Fund, is a trust fund created to provide retirement
and other benefits for approximately 14,000 active and
inactive union laborers and their beneficiaries. The Pension
Fund was a beneficial owner of over 72,000 shares of
CompuCom stock.

B. *The Sale Of CompuCom*

*2 The complaint alleges that the CompuCom board, acting
at the behest of Safeguard, timed and structured the sale of
CompuCom to benefit Safeguard, a company that was in
serious need of cash. According to the complaint, Warren V.
Musser, Safeguard's founder and former CEO, personally
invested and caused Safeguard to invest millions of dollars
in risky Internet and technology companies. When the
Internet bubble burst, the value of Safeguard's and Musser's
investments in those companies plummeted, leaving Musser
in dire straits. Making matters worse, in September 2000,
Safeguard guaranteed Musser's margin loans on the failing
investments. In May 2001, when Musser was unable to pay
back the margin loans, Safeguard bailed him out, loaning
him $26.5 million. On January 1, 2003, this loan became
payable, but Musser did not have sufficient assets to satisfy

the outstanding balance due. [FN3] Thus, allegedly to end
the embarrassment of being unable to collect on a loan
against its founder and former CEO, coupled with the need
for cash to fund its operating costs and ongoing corporate
transactions, [FN4] Safeguard began liquidating investment
assets in companies in which Musser also invested, which
included CompuCom, at "fire sale" prices. [FN5] This
provided the impetus for the sale of CompuCom.

FN3. Pl.'s Second Am. Class Action Compl.
("Compl.") ¶ 48. "Safeguard's loans to Musser bear
interest at a default annual rate of 9% and became
payable on January 1, 2003.... According to
Safeguard's March 2004 Annual Report to
Shareholders, based on the information then
available to Safeguard, Safeguard has concluded
that Musser may not have sufficient personal assets
to satisfy the outstanding balance due under the
loan when the loan became full recourse against
Mr. Musser on April 30, 2006."

FN4. Due to Musser's failed investment strategies
at Safeguard, the value of Safeguard's assets fell
from approximately $1.65 billion on December 31,
2000 to $836 million on December 31, 2003. Its
shareholders' equity fell from $904.4 million on
December 31, 2000 to $236.2 million on December
31, 2003.

FN5. Compl. ¶ 49. In May 2003, Safeguard sold its
interest in Pac-West Telecom and collected
approximately $1 million from Musser, who also
owned an interest in Pac-West, which was applied
towards the unpaid balance of Musser's loan.
Additionally, in April 2004, Safeguard received a
total of $4.5 million in net cash proceeds from
Musser as a result of the sale of Safeguard's and
Musser's interest in Sanchez Computer Associates.

On August 1, 2002, the CompuCom board organized a
Special Committee comprised of four purportedly
independent directors, Richard F. Ford, Edwin L. Harper,
Anthony J. Paoni, and Edward N. Patrone, to sell
Safeguard's shares of CompuCom, or, in the alternative, put
CompuCom up for sale. The Special Committee was

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

Page 3

charged with evaluating indications of interest received from potential acquirers, reviewing CompuCom's strategic alternatives, and making recommendations to the full board of directors. In connection with this sale process, the Special Committee retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. as its financial advisor to render a fairness opinion to the Special Committee on any proposed transaction. In addition, the Special Committee independently selected and retained legal and financial advisors to assist the committee in considering strategic alternatives available to CompuCom. The company retained Broadview International LLC to act as the financial adviser to the full board. After over 18 months of exploring various strategic alternatives, the Special Committee had not located a suitable deal.

The complaint does not discuss the committee's efforts over those 18 months and does not allege any specific defect in the sale process pursued by the Special Committee. In fact, the complaint makes no allegations at all about any deficiencies in the actions of the Special Committee in the sale of CompuCom. Instead, the complaint focuses on attacking the independence of the committee members.

In February of 2004, the CompuCom board added two members, Michael J. Emmi and John D. Loewenberg, to the Special Committee. At this time, negotiations with Platinum were underway. On March 24, 2004, Platinum proposed to pay $5 per share in cash to the non-Safeguard common stockholders, $4.50 in cash for the shares of CompuCom common stock held by Safeguard, and $8 million for the shares of CompuCom preferred stock, all of which was held by Safeguard. This offer was rejected by Safeguard and the Special Committee. Then, on May 27, 2004, CompuCom and Platinum entered into an Agreement and Plan of Merger (the "Merger Agreement") which provided that each outstanding share of CompuCom's common stock, in a non-discriminatory manner, would be converted into the right to receive $4.60 in cash, and each outstanding share of CompuCom's preferred stock would be converted into the right to receive the par value of the preferred ($15 million in the aggregate), plus accrued and unpaid dividends. The total consideration for the transaction was valued at $254 million, of which Safeguard received approximately $128 million.

*3 Houlihan Lokey and Broadview made formal presentations to the Special Committee and the CompuCom board stating their opinion that the proposed merger consideration of $4.60 in cash for the common stock was fair to CompuCom's public stockholders. [FN6] Houlihan Lokey's and Broadview's fairness opinions were supported by a number of financial analyses that were disclosed in the proxy statement distributed to CompuCom's stockholders in connection with the merger. After reviewing the terms of the Merger Agreement and Houlihan Lokey's fairness opinion, the Special Committee unanimously resolved to recommend the Merger Agreement to the full board. Thereafter, in reliance on the Special Committee's recommendation and Broadview's fairness opinion, the board unanimously approved the Merger Agreement.

FN6. Compl. ¶ 77.

The complaint attacks the adequacy of the acquisition price. First, the plaintiff alleges that the deal provided no premium to the public shareholders for their shares of common stock. Indeed, the price of $4.60 in cash per common share paid by Platinum represented a discount to CompuCom's closing price of $4.84 on May 27, 2004, the day before the proposed acquisition was announced. [FN7] As negotiations were in progress, however, the public trading price for CompuCom's shares ranged from as low as $4.16 to as high as $5.99. [FN8] Second, the plaintiff points to CompuCom's profitability at the time of the acquisition, alleging that CompuCom had more than $264 million in current assets, including cash, cash equivalents, and inventory, and approximately $400 million in total assets on its balance sheet. According to the complaint, "the Company has been profitable each of its seventeen years of operation." [FN9] Lastly, the plaintiff alleges that the unfair terms of the acquisition raised the "ire of the investment community." [FN10] To support this contention, the plaintiff cites to news articles in which portfolio managers called the acquisition an "unappealing proposition ... at a price for a stock that's extremely undervalued" and a deal "so out of whack that it fails to pass the smell test." [FN11]

FN7. Compl. ¶ 75.

FN8. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

Page 4

FN9. Compl. ¶ 2.

FN10. Compl. ¶ 80.

FN11. Compl. ¶¶ 80-84.

Although the complaint attacks the adequacy of the deal price, it does not claim that the Merger Agreement contained strong lock-ups or other deal protection provisions that prevented the emergence of a competing bid. [FN12] Indeed, the complaint refers to the fact that, although Safeguard agreed to vote in favor of the merger, its obligation to do so was conditioned on the approval of its own stockholders. From this allegation, it is obvious that any superior competing proposal could have succeeded. Nonetheless, the complaint fails to allege that any higher or better alternative to the Platinum proposal ever emerged.

> FN12. The Platinum/CompuCom Merger Agreement contained a break-up fee in which CompuCom agreed to pay a termination fee of $8.88 million to Platinum if the CompuCom board of directors canceled the sale of CompuCom, or, in the alternative, CompuCom was to pay Platinum's fees and expenses incurred in the transaction up to $4 million if the merger was terminated because either CompuCom's or Safeguard's shareholders did not approve the merger. The Merger Agreement also contained a "No Solicitation" provision prohibiting any CompuCom employee, director, officer, accountant, lawyer or other representative from engaging in discussions with any third party concerning the sale of CompuCom to an alternative purchaser--including potential alternative purchasers who express an interest in making a superior offer to Platinum's--until and unless a third party's interest is reduced to a written proposal, communicated to Platinum, and Platinum is given two days to meet or exceed the proposal.

On July 15, 2004, the company issued a definitive proxy statement that solicited its shareholders' approval of the merger. Then, on August 19, 2004, several weeks after the filing of the amended complaint in this action, the defendants issued a supplement to the proxy statement and postponed the shareholder meeting and vote. The proxy supplement was issued to "avoid any argument that the proxy statement should have included factual information on the issues identified by the plaintiffs." [FN13] The proxy supplement provided additional disclosures about, among other things, the relationship between Safeguard and CompuCom's Special Committee members and information regarding the board's efforts to find alternative value-maximizing transactions. Thereafter, on September 9, 2004, the company issued a press release announcing the merger had been approved by the company's stockholders.

FN13. Compl. ¶ 8.

*C. The Individual Defendants*

**\*4** Before the transaction at issue, CompuCom had an 11-member board of directors consisting of defendants J. Edward Coleman, Anthony L. Craig, Michael J. Emmi, Richard F. Ford, Edwin L. Harper, Delbert W. Johnson, John D. Loewenberg, Warren V. Musser, Anthony J. Paoni, Edward N. Patrone, and M. Lazane Smith. The complaint alleges that,

> Safeguard has used its voting power to pack CompuCom's 11 member Board of Directors, and the so called "Special Committee," that ostensibly was created to evaluate the Proposed Acquisition on behalf of the minority shareholders of CompuCom, with individuals dominated and controlled by Safeguard. [FN14]

FN14. Compl. ¶ 2.

The plaintiff contends that the CompuCom board and the Special Committee were beholden to Safeguard, and thus dominated and controlled by it, based on numerous connections between the individual defendant directors and Safeguard. [FN15] The complaint makes specific factual allegations that at least a majority of its 11 directors served as directors and/or officers of Safeguard, had other substantial associations with Safeguard's affiliates and/or subsidiaries, and/or previously served on multiple Safeguard portfolio company boards in which Safeguard held large equity interests.

FN15. Compl. ¶ 45.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

First, as to the five non-Special Committee director defendants, Coleman, Smith, Musser, Craig, and Johnson, the plaintiff alleges that they were dominated and controlled by Safeguard because they were placed on the CompuCom board through Safeguard's voting power. In addition, Coleman and Smith obtained a new employment agreement and other monetary benefits as a result of the acquisition. [FN16] Musser was the founder and former chairman of Safeguard, and Craig was the current president, chief executive officer, and director of Safeguard. Johnson served as an executive of Safeguard for 30 years and as a director emeritus of Safeguard and was chairman of the board and chief executive officer of Pioneer Metal Finishing, a former division of Safeguard.

> FN16. Coleman received over $5 million and Smith received over $2 million as a result of the acquisition.

Second, as to the six Special Committee members, the plaintiff contends that, while the members were not at the time employed by Safeguard, they were sufficiently connected to Safeguard to make them beholden to Safeguard. Specifically, the plaintiff alleges that between May 1993 and April 2000, Special Committee directors Paoni, Patrone, Ford, Emmi, and Loewenberg purchased, or were given the opportunity to purchase, shares in the initial public offerings of several Safeguard portfolio companies. [FN17] These IPO allocation benefits allegedly enabled the directors to receive profitable financial opportunities through their association with Safeguard. Additionally, Harper was an employee of Fortis, Inc., which had a business relationship with DocuCorp, a company in which Safeguard formerly held a significant equity interest. Paoni held outside directorships with two portfolio companies of Safeguard, Arista Knowledge Systems, Inc., and e-Certify, and was vice chairman of DiamondCluster International, Inc., a company previously taken public by Safeguard. Emmi served on the Safeguard board of directors from 1998 to 2002 and was a director of Metallurg, Inc., a majority-owned subsidiary of Safeguard. Loewenberg is alleged to have served as an advisor to Safeguard through an independent consulting firm, JDL Enterprises, where is the managing partner. Moreover, Loewenberg previously served on boards of directors of several companies in which Safeguard at one time owned substantial equity interests. [FN18]

> FN17. Compl. ¶ 8. These companies included: Artemis International Solutions Corporation, Cambridge Technology Partners, Inc., Coherent Communications Systems Corporation, Chroma Vision Medical Systems Inc., DocuCorp, DTP, eMerge Interactive, Inc., Internet Capital Group, Inc., OAO Technology Solutions, Inc., Pac-West Telecom, Inc., Sanchez, and USDATA Corporation.

> FN18. Loewenberg was a director of DocuCorp International, Inc., Diamond Technology Partners, Inc., and Sanchez Computer Associates, companies in which Safeguard formerly maintained significant equity positions.

III.

**\*5** The standard for dismissal pursuant to <u>Court of Chancery Rule 12(b)(6)</u> for failure to state a claim upon which relief can be granted is well established. A motion to dismiss will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading. [FN19] That determination is generally limited to the factual allegations contained in the complaint. In considering this motion, the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. [FN20] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true. [FN21] However, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences. [FN22]

> FN19. *Kohls v. Kenetech Corp., 791 A.2d 763, 767 (Del. Ch.2000).*

> FN20. *Growhow v. Perot, 539 A.2d 180, 188 n.6 (Del.1988).*

> FN21. *Id.*

> FN22. *In re Lukens Inc. Shareholders Litig., 757*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

A.2d 720, 727 (Del. Ch.1999).

IV.

The court begins its analysis with the presumption of the business judgment rule. At the core of Delaware corporate law is the presumption that, in making a business decision, the directors of a corporation act on an informed basis, in good faith, and in the honest belief that the action taken is in the best interest of the company. [FN23] "Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption." [FN24] In this way, the business judgment rule serves to promote the role of the board, and not the court, as the ultimate manager of the business and affairs of the corporation. [FN25]

> FN23. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).
>
> FN24. *Id.*
>
> FN25. 8 *Del. C.* § 141(a).

When a board of directors determines to put the corporation up for sale, its responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders. [FN26] Thus, when the CompuCom board, at the suggestion of Safeguard, undertook to find a buyer for the whole enterprise, the CompuCom board and the Special Committee were charged with getting the maximum value reasonably attainable for the stockholders. "This obligation is a contextually-specific application of the director's duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow to fulfill its [*Revlon* ] duties." [FN27] Rather, the court must take into account the relevant circumstances to determine whether the CompuCom board and the Special Committee acted faithfully and with due diligence. If the court concludes that the facts do not support an inference of disloyalty or lack of due care, the board's actions are entitled to the protections of the business judgment rule.

> FN26. *McMillan v. Intercargo Corp.,* 768 A.2d 492, 502 (Del.2000) (citing *Revlon, Inc. v. MacAndrews & Forbes Holding, Inc.,* 506 A.2d

173, 182 (Del.1986)).

> FN27. *Id.*

The plaintiff asserts that it has pleaded facts sufficient to rebut the presumption of the business judgment rule, and that this court should refuse dismissal at this stage of the proceedings. The court disagrees. Taking the plaintiff's allegations as true, the plaintiff has not alleged sufficient facts to support a reasonable inference that the CompuCom board and the Special Committee were dominated and controlled by Safeguard. Similarly, the plaintiff's factual allegations contained in the complaint do not overcome the presumption that the CompuCom board acted on an informed basis, in good faith, and in an honest belief that the Platinum transaction was in the best interest of CompuCom and all its shareholders.

A. *Sale Of CompuCom*

*6 The plaintiff's factual allegations that the defendant directors breached their fiduciary duties in the sale of CompuCom are threefold: (1) that the board orchestrated a "fire sale" in order to address Safeguard's desperate need for cash; (2) that the board, at the behest of Safeguard, refused to accept less consideration for Safeguard's controlling shares than was to be paid for the shares owned by the public stockholders; and (3) that the $4.60 sale price was inadequate.

Generally speaking, a controlling shareholder has the right to sell his control share without regard to the interests of any minority shareholder, so long as the transaction is undertaken in good faith. [FN28] The same has long been true as a general proposition when a parent chooses to negotiate for the sale of a subsidiary corporation to an independent third party. The reasons for the law's tolerance of such sales is clear--as the owner of a majority share, the controlling shareholder's interest in maximizing value is directly aligned with that of the minority.

> FN28. *See Harris v. Carter,* 582 A.2d 222, 234 (Del. Ch.1990) (stating that "it is [a] principle [of Delaware law] that a shareholder has a right to sell his or her stock and in the ordinary case owes no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

duty in that connection to other shareholders when acting in good faith").

In *McMullin v. Beran,* the Delaware Supreme Court held that in the context of such a transaction, the board of the subsidiary corporation cannot entirely abdicate its responsibilities to its minority shareholders. [FN29] It cannot, as the board did in that case, simply leave everything to the management of a different corporation. [FN30] As discussed in *McMullin,* the Chemical board delegated full control of the sales process to the controlling shareholder, ARCO. ARCO hired an investment bank, solicited bids, and reviewed and rejected bids. The Chemical board permitted ARCO to *unilaterally* initiate, structure, and negotiate the merger agreement without establishing any procedural safeguards to protect the interests of the Chemical minority shareholders. [FN31] The Chemical board also did not conduct a critical assessment of the third party transaction, nor did it make an independent determination as to whether the transaction maximized value for all shareholders. [FN32]

FN29. 765 A.2d 910, 919 (Del.2000).

FN30. *See In re Siliconix Inc.,* 2001 Del. Ch. LEXIS 83, at *29-30 (Del. Ch. June 19, 2001). *McMullin* teaches, *inter alia,* that in the context of a merger of a subsidiary with a third party (thereby effecting a complete sale of the subsidiary) where the controlling shareholder wants the merger to occur and the minority shareholders are powerless to prevent it: (i) the directors of the subsidiary have an 'affirmative duty to protect those minority shareholders' interests;' (ii) the board cannot 'abdicate [its] duty by leaving it to the shareholders alone' to determine how to respond; and (iii) the board has a duty to assist the minority shareholders by ascertaining the subsidiary's value as a going concern so that the shareholders may be better able to assess the acquiring party's offer and, thus, to assist in determining whether to pursue appraisal rights.

FN31. *McMullin,* 768 A.2d at 921 (emphasis added).

FN32. *Id.* at 920.

Such neglect is inconsistent, the Supreme Court explained, with the important bonds of fiduciary duty that tie directors to those who rely on them for protection from potentially overbearing controllers. When faced with such a transaction, therefore, this court has a duty to test the actions of the board against the business judgment rule. The business judgment rule's presumption may be rebutted by an allegation of a breach of the duty of due care, as when a board is rushed or uninformed. More important for the instant case, however, the presumption that the board acted in good faith can be rebutted if the court finds that the plaintiff has alleged sufficient facts that, if true, permit a reasonable inference that (1) the board was dominated by the controlling shareholder, and (2) this domination led the board to accommodate the controller rather than act in the best interest of all the subsidiary's shareholders. The latter test may be met, for example, by precisely the kind of allegation made in *McMullin*--that the subsidiary board allowed the parent to independently negotiate a deal uniquely advantageous to itself, without regard to conflicting the interests of the subsidiary's minority shareholders. [FN33]

FN33. *Id.*

*7 Unlike *McMullin,* the complaint itself reveals that the board of CompuCom undertook its fiduciary duty of care with all the seriousness and diligence that was required. The CompuCom board formed a Special Committee of outside directors to negotiate the sale with Platinum. [FN34] This Special Committee evaluated indications of interest received from potential acquirers, reviewed CompuCom's strategic alternatives, negotiated the deal with Platinum, and made recommendations to the full CompuCom board. All this was done with the aid of independently selected and retained legal and financial advisors. The CompuCom board reasonably relied on Houlihan Lokey's and Broadview's fairness opinions, which concluded that the $4.60 in cash consideration for CompuCom common stock was fair to the CompuCom public stockholders. These fairness opinions were supported by a number of financial analyses.

FN34. *Id.* at n.48 The Supreme Court in *McMullin*

Not Reported in A.2d                                                           Page 8
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
(Cite as: 2005 WL 2481325 (Del.Ch.))

criticizes the board for not involving the company's Special Committee in the sale process when it states, "[t]he Board failed, however, to authorize the Special Committee to protect and enhance the interests of the Company and its public shareholders in connection with the subsequent sale of the Company to Lyondell.... The Board's failure to empower the Special Committee to actively participate in the sale of the Company is inexplicable."

Moreover, the CompuCom board did not hastily approve a transaction about which it was not fully informed. In *McMullin,* the board met once to consider the transaction. [FN35] Here, by contrast, the plaintiff itself concedes that the sale of CompuCom was the culmination of a multi-year process, beginning in 2002 and coming to agreement in 2004, in which the Special Committee explored various strategic alternatives to maximize stockholder value. [FN36] Thus, the plaintiff's claim that the CompuCom board orchestrated a "fire sale" and rashly sold CompuCom for a discounted price rings particularly hollow. [FN37]

> FN35. *Id.* at 922.

> FN36. Compl. ¶ 58.

> FN37. Compl. ¶ 49. The plaintiff also claims that the board breached its fiduciary duties by agreeing to equal consideration amongst the common stockholders. Specifically, the complaint alleges that
> Safeguard originally agreed to structure the transaction in such a way that it received less per-share consideration than CompuCom's non-Safeguard shareholders (with those non-Safeguard shareholders to receive at least $5 per share for their CompuCom stock), but through its control of the special committee, Safeguard was able to obtain a larger share of the total merger consideration, ultimately getting the same $4.60 per share as the Company's non-Safeguard shareholders. Compl. ¶ 60.
> This claim, that the minority shareholders were entitled to more per share consideration than

Safeguard, the controlling shareholder, is not supported by Delaware law. *Mendel v. Caroll,* 651 A.2d 297, 305 (Del. Ch.1994) ( "The law has acknowledged ... the legitimacy of the acceptance by controlling shareholders of a control premium.); c.f. *Paramount Communications v. QVC Network,* 637 A.2d 34, 45 (Del.1994) (*Revlon* requires an auction because "an asset belonging to public stockholders [a control premium] is being sold and may never be available again.").

Nor can the court infer that the price of the challenged merger was so inadequate as to overcome the business judgment rule. It is not enough to argue that the financial press published objections to the adequacy of the $4.60 price. [FN38] Nor is the fact that the final price per share was below the market price on the day of sale enough to rebut the business judgment presumption. As the plaintiff concedes in its complaint, the public trading price for CompuCom's shares ranged from as low as $4.16 (9.6% below the offer price) to as high as $5.99 (30.2% above the offer price) during the period that negotiations were underway with Platinum. Simply put, the mere fact that the deal price was 24 cents below a market price buffeted by the force of entirely predictable volatility does not state a claim for breach of fiduciary duty. Moreover, if the plaintiff was dissatisfied with the price, it could have exercised its appraisal remedy.

> FN38. To support this allegation, the plaintiff points to the market price of CompuCom prior to the announcement of the transaction and news articles in the *Wall Street Journal* in which portfolio managers called the acquisition an "unappealing proposition ... at a price for a stock that's extremely undervalued." Compl. ¶ 80.

Lastly, the plaintiff does not contend that the Merger Agreement contained any strong lock-ups or other deal protection measures that would unduly impede a bidder willing to pay a higher price from coming forward. [FN39] The plaintiff also does not allege that a better offer was available. Not surprisingly, after several years of actively seeking to sell the company, no higher bid emerged. Stated briefly, the well-pleaded allegations do not support a

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

Page 9

reasonable inference that the CompuCom directors were inadequately informed, acted irrationally, or did not fulfill their obligation to seek the best value reasonably available to the stockholders. [FN40]

> FN39. Compl. ¶¶ 64-65; *See Paramount,* 637 A.2d at 49.

> FN40. The court notes that the CompuCom Restated Certificate of Incorporation contains an exculpatory provision pursuant to Section 102(b)(7). The complaint does not contest the existence or authenticity of CompuCom's 102(b)(7) provision. As to the plaintiff's duty of care claim, the plaintiff does not allege conduct on the part of the Special Committee members that could be viewed as rising to the level of gross negligence or bad faith. *See In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 289 (Del. 2003).

**\*8** Because the plaintiff has not alleged sufficient facts to show that the CompuCom board neglected its duty of care in the sale transaction, the plaintiff must alternatively show that the Compucom board was dominated and controlled by Safeguard to such an extent as to overcome the business judgment presumption. A party alleging domination and control of a company's board of directors bears the burden of proving such control by showing a lack of independence on the part of the directors. [FN41] In assessing director independence, the court is called upon to apply a subjective "actual person" standard, instead of an objective "reasonable director" standard in making its determination. [FN42] An independent director is one whose decision "is based on the corporate merits of the subject before the board rather than extraneous considerations or influence," [FN43] while a director who is not independent is "dominated or otherwise controlled by an individual or entity interested in the transaction." [FN44] Control over individual directors is established by facts demonstrating that "through personal or other relationships the directors are beholden to the controlling person" [FN45] or so under their influence that "their discretion would be sterilized." [FN46]

> FN41. *Odyssey Partners, L.P. v. Fleming Co.,* 735 A.2d 386, 407 (Del. Ch.1999).

> FN42. *Orman v. Cullman,* 794 A.2d 5, 24 (Del. Ch.2002); *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1167 (Del.1995).

> FN43. *Aronson,* 473 A.2d at 816.

> FN44. *In re Maxxam, Inc.,* 659 A.2d 760, 773 (Del. Ch.1995).

> FN45. *Aronson,* 473 A.2d at 815.

> FN46. *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993).

Based on the aforementioned standard and the main factual allegations in the plaintiff's complaint, the court cannot reasonably infer that the Special Committee directors were improperly influenced or controlled by Safeguard. First, as to the alleged IPO allocation benefits, the complaint does not explain why having received these benefits in years past would constitute a disabling conflict for the members of the Special Committee. The complaint does not address how much the IPO opportunities were worth, why the members of the Special Committee received them, and which (if any) of the members of the Special Committee actually invested in the IPOs. The complaint simply does not allege that these IPO allocation benefits were material to the directors. Moreover, the complaint does not allege that Safeguard *gave* the members of the Special Committee the IPO opportunities. Instead, the complaint simply repeats the words of the proxy supplement and then alleges that the Special Committee members were able to purchase shares in these IPOs "through their relationship with Safeguard." [FN47] This bare allegation, without more, is insufficient to reasonably infer that the Special Committee lacked independence from Safeguard. [FN48]

> FN47. Compl. ¶¶ 8, 88.

> FN48. One can certainly imagine a situation where receiving the current opportunity to invest in an IPO would be sufficient to prove, or at least raise a reasonable inference of, a lack of independence. For example, a complaint alleging that the opportunity was extremely valuable, or that the director was in desperate need of cash, or some

Westlaw.

Not Reported in A.2d                                              Page 10
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

combination of the two.

Second, as to the directors' connections to Safeguard, it is significant that, at the time the sale to Platinum was negotiated, none of the members of the Special Committee had employment relationships with CompuCom, Safeguard, or Platinum. [FN49] The plaintiff does not allege that any of the Special Committee board members received special benefits as a result of the transaction or were given improper incentives to favor Safeguard. Instead, the plaintiff claims that the Special Committee lacked independence because a majority of the Special Committee members served as directors and executives in companies in which Safeguard *formerly* held an equity interest.

> FN49. The plaintiff quotes *McMullin* as controlling precedent; however, *McMullin* found that 8 of the 12 Chemical directors were not independent because 6 of the Chemical directors were currently employed by ARCO, to wit, ARCO's chief financial officer and executive vice-president, another ARCO executive vice-president, and 4 senior vice-presidents of ARCO. The remaining 2 directors were alleged to have prior affiliations with ARCO as officers of other ARCO subsidiaries. Unlike *McMullin,* the complaint here does not allege that any of the Special Committee members were employed by Safeguard when the Platinum transaction was consummated.

**\*9** The court recognizes that under certain circumstances, professional, financial, and personal relationships of directors may preclude a finding of independence. [FN50] However, the plaintiff's factual allegations do not meet the relevant standard. [FN51] According to *Tremont,* "the independence or not of the member of a special committee is a question of fact that turns not simply upon formality but upon the reality of the interests and incentives affecting the independent directors." [FN52] Here, the plaintiff does not allege that these former business relationships were material to the directors or that Safeguard has or ever had an ability to influence or exert any control over these directors. [FN53] "Our cases have determined that personal friendships, without more; *outside business relationships,* without more ... are each insufficient to raise a reasonable

doubt of a director's ability to exercise independent business judgment." [FN54] Thus, the court cannot infer that Safeguard had the ability to influence and impair the business judgment of these directors because they formerly served as outside directors for companies in which Safeguard held an equity interest.

> FN50. See *Krasner v. Moffet,* 826 A.2d 277, 283 (Del.2003) (finding that at the pleading stage, the plaintiff's allegations that two directors were interested when they "received substantial income from other entities within the interlocking directorates of Freeport-McMoRan companies and arguably had an interest in appeasing the MOXY and FSC insiders who also served" with them "on the boards of other Freeport companies" was sufficient to sustain an inference of interestedness).

> FN51. *Beam v. Stewart,* 845 A.2d 1040, 1052 (Del.2004). (stating that "to create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that ... the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director"). Although *Beam* involved a review of the sufficiency of the plaintiff's allegations under Rule 23.1, the Supreme Court's interpretation of the type of relationship required to rebut the presumptive independence of an outside director provides insight in the context of this dismissal motion brought pursuant to Rule 12(b)(6).

> FN52. *Kahn v. Tremont,* 1992 Del. Ch. LEXIS 165, 1992 WL 205637 \*3 (Del. Ch. Aug. 21, 1992), *rev'd on other grounds,* 694 A.2d 422 (Del.1997).

> FN53. *Official Comm. Of Unsecured Creditors of Integrated Health Servs. v. Elkins,* Del. Ch. C.A. No. 20228, Noble, V.C. (Aug. 24, 2004) ("General allegations of domination over a Board are simply not sufficient under Delaware law to state a tradition duty of loyalty claim.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 11
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

> FN54. *Cal. Pub. Employee's Ret. Sys. v. Coulter,*
> 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002)
> (emphasis added).

The plaintiff makes additional allegations about Emmi and
Loewenberg, the directors added to the Special Committee
in 2004. In particular, Emmi was a non-management
director of Mettlurg, Inc., which was a majority-owned
subsidiary of Safeguard, and he was also a former director
of Safeguard from 1999 to 2002. Loewenberg served as an
advisor to Safeguard through an independent consulting
firm, JDL Enterprises, of which he was the managing
partner.

The allegation that Emmi was a director of another
majority-owned subsidiary of Safeguard does not support an
inference that he was dominated and controlled by
Safeguard in the transaction to sell CompuCom. The
complaint does not allege that Emmi received material
compensation for serving as a director, that Emmi felt
beholden to Safeguard, or that Emmi was conflicted in his
loyalties with respect to the challenged board action. [FN55]
In addition, the fact that Emmi was a former
non-management Safeguard director does not mean he could
not assert independent judgment in this transaction.
Therefore, the court concludes that the plaintiff's allegations
are insufficient to rebut Emmi's presumptive independence
from Safeguard.

> FN55. *Litt v. Wycoff,* 2003 WL 1794724, at *4
> (Del. Ch. Mar. 28, 2003).

The complaint does not allege sufficient facts as to
Lowenberg to support an inference that he was dominated
and controlled by Safeguard. The plaintiff does not allege
what compensation Loewenberg and/or JDL Enterprises
obtained for Loewenberg's advisory services, nor does the
complaint allege that such fees constituted such a large part
of his or the firm's income so as to be material to
Loewenberg or JDL Enterprises. The plaintiff merely states
conclusory allegations which do not support a reasonable
inference that Loewenberg lacked independence.

In summary, the court finds that the factual allegations do
not suffice to rebut the business judgment rule's

presumption of director independence. The plaintiff has not
alleged facts sufficient to establish that the Special
Committee lacked the independence to consider objectively
whether the transaction was in the best interest of
CompuCom and all of its shareholders.

**\*10** Furthermore, the complaint does not contain enough
well-pleaded factual allegations to support a reasonable
inference that Safeguard's, the Special Committee's, or the
CompuCom board's interests were not aligned with the
plaintiff. The plaintiff's theory that Safeguard improperly
forced an immediate sale of CompuCom at a "fire sale
price" because of its desperate need for cash simply does not
hold water, especially since the process of finding a suitable
transaction dragged on for more than two years. Nor does
the complaint allege that Safeguard or any other holder of
CompuCom's common stock received different
consideration for its shares in the merger. The plaintiff does
not allege that Safeguard received any special benefits in the
transaction at the expense of the minority shareholders. In
other words, the plaintiff does not adequately allege that the
merger was anything other than an arms-length transaction
with an unaffiliated third party pursuant to the goal of
maximizing shareholder value by attaining the best possible
price. [FN56]

> FN56. The plaintiff just makes a blanket statement
> in the complaint that "the Acquisition is the
> product of a hopelessly flawed process that was
> designed to ensure the sale of CompuCom to one
> buyer and one buyer only, on terms preferential to
> Platinum and to subvert interests of the plaintiff
> and the other public stockholders of CompuCom."
> Compl. ¶ 73.

It appears that the plaintiff is merely expressing its
disagreement with the business judgment of the members of
the CompuCom board regarding the merits of the Merger
Agreement. This does not provide a basis for liability. Thus,
for all of the foregoing reasons, the court concludes that the
complaint does not allege sufficient facts of a violation of
the defendants' fiduciary duties to overcome the
presumption of the business judgment rule.

B. *Misleading Proxy*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                          Page 12
Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)
**(Cite as: 2005 WL 2481325 (Del.Ch.))**

Finally, the plaintiff claims that the defendants sought to discourage the CompuCom shareholders from pursuing its statutory right to an appraisal by failing to adequately disclose all material information to CompuCom's shareholders. [FN57] The operative complaint (which is the second amended complaint) contains allegations regarding the defendants' alleged failure to make adequate disclosures in the original proxy statement distributed to CompuCom's stockholders. That complaint also acknowledges that, after the filing of the first amended complaint, CompuCom issued a proxy supplement that addressed several, if not all, of the plaintiff's non-disclosure allegations, disclosing information about the Special Committee directors' ties to Safeguard and the CompuCom board's efforts to find alternative value-maximizing transactions. [FN58] What the operative complaint does not do is explain why the disclosures made in the proxy supplement are insufficient to cure the alleged disclosure violations the plaintiff previously advanced with respect to the original proxy statement. The plaintiff's brief in response to the motion to dismiss also makes little effort to argue for the continued existence of any material issue relating to the proxy materials. [FN59] Indeed, a review of the complaint and all the relevant proxy materials leads the court to conclude that the proxy supplement cured whatever well pleaded disclosure claims the plaintiff originally alleged.

> FN57. Compl. ¶ 98.

> FN58. Compl. ¶¶ 85-88.

> FN59. The plaintiff argues in its brief in opposition to the defendants' motion to dismiss that the Broadview and Houlihan Lokey fairness opinions were materially inadequate, without any specification, because they failed to adequately disclose the work performed and analysis underlying their opinions. After reviewing the proxy, the court cannot infer that the defendants did not adequately disclose the underlying analysis of their opinions.

### V.

**\*11** For the foregoing reasons, the defendants' motion to dismiss pursuant to Rule 12(b)(6) is GRANTED. IT IS SO

ORDERED.

Not Reported in A.2d, 2005 WL 2481325 (Del.Ch.)

END OF DOCUMENT

**2**

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 609374 (D.Del.)
**(Cite as: 2004 WL 609374 (D.Del.))**

c

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Stephen J. DILORENZO, derivatively on behalf of
dELiA*S Corp. and Alloy, Inc.,
Plaintiff,
v.
Christopher EDGAR, Geraldine Karestky, Stephen I. Kahn,
Evan Guillemin, dELiA*S
Corp., and Alloy, Inc., Defendants.
**No. Civ. 03-841-SLR.**

March 24, 2004.

Theodore J. Tacconelli, Ferry, Joseph & Pearce, P.A.,
Wilmington, DE, for Plaintiff.

Allen M. Terrell, Jr., Richards, Layton & Finger, Jon E.
Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington,
DE, for Defendants.

MEMORANDUM ORDER
ROBINSON, J.

*1 At Wilmington, this 24th day of March, 2004, having
reviewed the motions of defendants to dismiss (D.I.10, 13),
and the memoranda submitted therewith;

IT IS ORDERED that defendants' motions (D.I.10, 13) to
dismiss are denied for the reasons that follow:

1. Plaintiff filed this derivative action on August 27, 2003
alleging violations of § 16(b) of the Securities Exchange
Act of 1934, codified at 15 U.S.C. § 78p(b). (D.I.1) The suit
is brought on behalf of dELiA*s Corporation ("dELiA*s")
and Alloy, Inc. ("Alloy"), and seeks to recover short-swing
profits obtained by defendants Christopher Edgar, Geraldine
Karestky, Stephen Kahn and Evan Guillemin ("Former
Director defendants"). On October 16, 2003, the defendants
filed motions to dismiss pursuant to Fed.R.Civ.P. 12(b) 1
and 12(b)(6). (D.I.10, 13)

2. During the relevant time period, the Former Director
defendants were directors of dELiA*s. Kahn was the Chief
Executive Officer and Chairman of the Board. Edgar was
the Executive Vice President and Vice Chairman. Guillemin
was the Chief Financial Officer and Treasurer. On or about
May 12, 2003, the Former Director defendants purchased in
aggregate 7,297,298 shares of dELiA*s common stock at a
price of $0.37 per share for a total of $2.7 million. (D.I.1, ¶
12) Of this amount Kahn purchased 4,054,054 shares;
Karetsky purchased 2,702,703 shares; Edgar purchased
337,838 shares; and Guillemin purchased 202,703 shares.
Further, dELiA*s issued to the Former Director defendants
a total of 600,000 warrants to purchase shares at $0.37 a
share.

3. On July 30, 2003, dELiA*s entered into an agreement
with Alloy to conduct a tender offer for all of the publicly
held shares of dELiA*s. At that time, Karetsky and Kahn
entered into an agreement to support the merger and tender
their shares. Kahn, Edgar and Guillemin each received
employment agreements with Alloy upon the effective date
of the merger. (Id., ¶ 10, 15)

4. On August 6, 2003, Dodger Acquisition Corp., a direct
wholly owned subsidiary of Canal Park Trust and an
indirect wholly owned subsidiary of Alloy, commenced a
tender offer for 100% of dELiA*s shares at a price of
$.0928 per share. (Id., ¶ 25; D.I. 12, at ex. 1) Plaintiff
contends that the Former Director defendants obtained
short-swing profits in violation of § 16(b) as a result of an
August 6, 2003 tender-offer by Alloy to dELiA*s
shareholders for a cash-out merger between the
corporations.

5. During the offer period, plaintiff commenced the present
action but did not tender his shares. On September 7, 2003,
the merger closed and plaintiff, along with other
nontendering shareholders, was cashed-out and his shares
canceled. Canal Park Trust is now the sole shareholder of
dELiA*s stock. (D.I.12)

6. Plaintiff was a dELiA*s shareholder at the time of the
filing of the complaint. Plaintiff also contends that at the
time of the transaction he was an Alloy shareholder and has
maintained that interest. Plaintiff seeks a disgorgement of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 609374 (D.Del.)
**(Cite as: 2004 WL 609374 (D.Del.))**

$4,071,892 in profits received by the Former Director defendants as a result of the transaction. Plaintiff also seeks $334,800 related to the acquisition of the 600,000 warrants.

**\*2** 7. Defendants' motions to dismiss contend that plaintiff's complaint fails for a lack of standing because he is no longer a shareholder of dELiA\*s and because he failed to make demand upon the corporation's board of directors.

8. Standard of Review. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991).

9. In considering a motion to dismiss, a court may consider Securities Exchange Commission documents that are expressly relied upon in the complaint. See *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997); *Indeck Maine Energy, L.L.C. v. ISO New England Inc.*, 167 F.Supp.2d 675 (D.Del.2001). Further, on a motion to dismiss the court may take judicial notice of the contents of documents required by law to be filed, and actually filed, with federal or state officials. See *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir.2000); *Ieradi v. Myland Lab, Inc.*, 230 F.3d 594, 600 n. 3 (3d Cir.2000) (citing Fed.R.Evid. 201).

10. Standing under Section 16(b). Section 16(b) establishes strict liability for covered individuals who engage in the sale or purchase of a covered security. 15 U.S.C. § 78p(b). The right of recovery under § 16(b) is held, however, solely by the issuer of the security. *Id.* A shareholder may bring a

derivative action "in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." *Id.*

11. There are three requirements for shareholder standing to bring suit under § 16(b). See *Gollust v. Mendell*, 501 U.S. 116 (1991). First, the plaintiff must own a security within the meaning of the section. Second, the security held by the plaintiff must be a security of the issuer of the security traded by the covered individual. Third, the plaintiff must own a security of the issuer at the time the § 16(b) action is instituted. *Id.* at 123-24. Unlike a typical shareholder derivative action, there is not a requirement that the plaintiff maintain continual ownership, only that he has "some continuing financial stake in the litigation" so as to satisfy minimum standing requirements imposed by the jurisdictional limitations of Article III. See *id.* at 125.

**\*3** 12. In the present case, plaintiff's complaint alleges that he owned shares of stock issued by dELiA\*s at the time he filed the present action. Consequently, plaintiff satisfied the statutory requirements for standing at the time the suit was instituted. Defendants contend, however, that plaintiff is no longer a shareholder and lacks the requisite standing to maintain the suit. Plaintiff argues that his ownership of shares in Alloy provide a basis for his continuing financial interest in the outcome of the litigation.

13. In *Gollust,* the Supreme Court considered the effect of a stock-exchange merger upon the plaintiff's previously filed § 16(b) action. The unanimous Court concluded that although plaintiff was no longer a shareholder of the issuer, as his stock was exchanged for stock in the new corporation, he nonetheless had the minimal financial interest in the outcome of the litigation to satisfy constitutional concerns. *Id.* at 126-28. Consequently, under *Gollust,* where a plaintiff has standing at the commencement of the suit, an involuntary change in his status as a security holder resulting from a restructuring will not affect his standing to maintain the suit so long as minimal constitutional requirements are satisfied through the presence of some financial interest in the outcome of the litigation.

14. In the present case, the major distinguishing factor is the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 609374 (D.Del.)
**(Cite as: 2004 WL 609374 (D.Del.))**

form of restructuring. Instead of a stock-exchange merger, dELiA*s effectuated a cash-out merger. The court concludes that § 16(b)'s remedial purpose should not be truncated by the legal nuances of the corporate restructuring. A shareholder of a parent corporation has a financial interest, albeit tenuous, in the disgorgement of profits obtained by insiders of a corporate subsidiary. Although Congress did not provide statutory standing for such a party to institute a § 16(b) suit, [FN1] a shareholder of a parent corporation has a cognizable interest for purposes of satisfying constitutional requirements. See _Allen v. Wright,_ 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Consequently, the court concludes that plaintiff satisfies the constitutional requirements to maintain the suit.

> FN1. Where a shareholder of a parent corporation brings a suit against a subsidiary of the parent under a derivative theory, the suit is referred to as double derivative in nature. Section 16(b) suits premised upon double derivative standing have been rejected by a majority of courts. See _Lewis v. McAdam,_ 762 F.2d 800, 804 (9th Cir.1985) (concluding that standing does not exist in a cash-stock merger); _Untermeyer v. Valhil, Inc.,_ 665 F.Supp. 297, 300-01 (S.D.N.Y.1987) (concluding that standing does not exist in a cash-out merger). These cases are distinguished, however, because the Supreme Court in _Gollust_ differentiated between standing to institute suit and a sufficient interest to maintain suit. See _Gollust,_ 501 U.S. at 123-24.

15. Demand. Defendants also contend that plaintiff does not have standing for failure to satisfy Fed.R.Civ.P. 23.1's requirements for demand. It is clear, however, that Rule 23.1 does not apply to actions brought pursuant to § 16(b). For example, unlike typical derivative actions, the decision to bring a § 16(b) enforcement action does not enjoy protection of the business judgment rule. See _Cramer v. General Telephone & Elec. Corp.,_ 582 F.2d 259, 276 (3d Cir.1978). Similarly, as discussed above, there are no

requirements of continuous ownership. See _Gollust,_ 501 U.S. at 124-25.

16. Where demand would have been futile, courts have excused the requirement under § 16(b). See _Berkwich v. Mencher,_ 239 F.Supp. 792, 793-94 (S.D.N.Y.1965); _Grossman v. Young,_ 72 F.Supp. 375 (S.D.N.Y.1947). On a motion to dismiss for failure to state a claim, the court must accept as true plaintiff's allegations of demand futility. _Id._ at 380.

*4 17. In the present case, plaintiff pleads demand futility stating that he "has not made demand on dELiA*s Board of Directors because such demand would be futile in view of Alloy's acquisition of the company and defendants' control of dELiA*s Board." (D.I.1, ¶ 28) Plaintiff's allegations of control are supported by those documents submitted by defendants in support of their motion to dismiss. [FN2] (D.I.12) Further, had plaintiff made a demand, § 16(b) would preclude him from filing suit until either sixty days had passed or the board had rejected his demand. Due to the short timing of the merger, plaintiff's shares would be canceled before he would have been permitted to bring suit. The failure of the dELiA*s board to bring suit on its own behalf after becoming aware of plaintiff's suit also supports plaintiff's futility allegations. See _Berkwich,_ 239 F.Supp. at 794. Consequently, for purposes of resolving the pending motion to dismiss the court finds that plaintiff has sufficiently alleged the existence of demand futility.

> FN2. For example, the Former Director defendants represent four of the eleven members of the former dELiA*s and include three of the four former officers. (D.I. 12, ex. 2 at B-3) Collectively, the Former Director defendants owned 37.8% of the dELiA*s stock.

Not Reported in F.Supp.2d, 2004 WL 609374 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2867884 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Memorandum of Law in Support of Motion to Vacate Stay (Sep. 23, 2005)

• 2005 WL 2867883 (Trial Motion, Memorandum and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609374 (D.Del.)
**(Cite as: 2004 WL 609374 (D.Del.))**

Page 4

Affidavit) Memorandum of Law of Defendants in Opposition to Plaintiff's Motion to Vacate Stay (Sep. 19, 2005)

• 2005 WL 2603598 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Support of Motion to Vacate Stay (Aug. 22, 2005)

• 2003 WL 23472178 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Motion of Nominal Defendants dELiA*s Corp. and Alloy, Inc. to Dismiss the Complaint (Nov. 25, 2003)

• 2003 WL 23472179 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Motions to Dismiss (Nov. 10, 2003)

• 2003 WL 23472177 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of Nominal Defendants dELiA*s Corp. and Alloy, Inc. to Dismiss the Complaint (Oct. 16, 2003)

• 1:03cv00841 (Docket) (Aug. 27, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Maryland.
JOLLY ROGER FUND LP, et. al, Plaintiffs,
v.
SIZELER PROPERTY INVESTORS, INC., et al.,
Defendants.
**No. Civ. RDB 05-841.**

Nov. 3, 2005.

Glenn Edward Mintzer, H. Russell Smouse, Law Offices of
Peter G. Angelos, Baltimore, MD, for Plaintiffs.

Mark D. Gately, Mark Spencer Saudek, Hogan and Hartson
LLP, Baltimore, MD, for Defendants.

*MEMORANDUM OPINION*
BENNETT, J.

*1 Pending before the Court is the Motion to Dismiss filed
by Defendants Sizeler Property Investors ("Sizeler") and its
nine directors [FN1] ("Directors") (collectively the
"Defendants"). Defendants move to dismiss the Complaint
filed, on March 28, 2005, by Plaintiffs Jolly Roger Fund LP
and Jolly Roger Offshore Fund, Ltd., on behalf of a
proposed class of all Sizeler common stockholders,
(collectively the "Plaintiffs") based on Rule 12(b)(6) of the
Federal Rules of Civil Procedure.

> FN1. These Directors are: J. Terrell Brown;
> William G. Byrnes; Harold B. Judell; Sidney W.
> Lassen; Thomas A. Masilla Jr.; James W.
> McFarland; Richard L. Pearlstone; James Robert
> Peltier; and Theodore Strauss. (Com pl.¶¶ 10-18.)

Sizeler is a self-managed real estate investment trust
("REIT") incorporated in Maryland with its principal place
of business in Kenner, Louisiana. (Compl.¶ 9.) Sizeler,
which is publically traded on the New York Stock Exchange
("NYSE") under the symbol "SIZ", owns and manages
income-producing apartment and shopping center properties
in the southeastern United States. (Compl.¶ 9.) Plaintiffs

were holders of Sizeler common stock as of the close of
trading on March 14, 2005. [FN2] (Compl.¶ 8.) It is unclear
whether Plaintiffs were Sizeler shareholders at the time this
lawsuit was filed.

> FN2. Although Plaintiffs do not specifically allege
> in which state they reside, they allege that this
> dispute is between citizens of different states and
> that the amount in controversy exceeds $75,000.
> (Compl.¶ 5.)

Plaintiffs allege, in a one count Complaint, a direct suit
against Sizeler and its Directors for breach of their fiduciary
duties "to Sizeler's outside common shareholders." (Compl.¶
1.) Specifically, Plaintiffs allege that their stock holdings
were diluted when Defendants sold 2.69 million newly
issued Sizeler shares to four institutional investors [FN3] at
a discounted price. Defendants assert that this claim must be
dismissed, as it cannot be a direct action [FN4] by the
shareholders against the Directors, but instead must be a
derivative action [FN5] brought by the shareholders on
Sizeler's behalf. Defendants, however, contend that
Plaintiffs have failed to satisfy the legal prerequisites
necessary to pursue a derivative action and, therefore, any
derivative claim must also be dismissed.

> FN3. The institutional investors included
> TIAA-CREF Investment Management, LLC,
> Heitman Real Estate Securities, Inc., RREEF
> America, L.L.C., and Palisade Capital management
> LLC.

> FN4. "A 'direct' action is a claim asserted by a
> shareholder, individually, against a corporate
> fiduciary, such as a director, to redress an injury
> personal to the shareholder." *Paskowitz v.
> Wohlstadter, 151 Md.App. 1, 9, 822 A.2d 1272,
> 1276 (2003)* (applying Delaware law).

> FN5. "A 'derivative' action is a claim asserted by a
> shareholder plaintiff on behalf of the corporation to
> redress a wrong against the corporation." *See id.*

The issues have been fully briefed and no hearing is
necessary on this motion. *See* Local Rule 105.6

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

Page 2

(D.Md.2004). For the reasons stated below, the Defendants' Motion to Dismiss is GRANTED.

### BACKGROUND

For the purposes of this Rule 12(b)(6) motion, the Court accepts all well-pleaded allegations contained in Plaintiffs' Complaint as true and construes them in the light most favorable to the Plaintiffs. *See Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). Plaintiffs allege that Sizeler's Board of Directors implemented a plan to entrench themselves in anticipation of a proxy contest after First Union Real Estate Equity & Mortgage Investments ("First Union") [FN6] began to solicit proxies. (Compl.¶ 3.) First Union is the single largest stockholder of Sizeler, having acquired a substantial amount of its shares starting in the Fall of 2004 as detailed below. (Compl.¶ 26.) On September 8, 2004, First Union filed with the United States Securities and Exchange Commission ("SEC"), on Form 13D, a general statement of acquisition of beneficial ownership as notification that it had become a beneficial owner of 5.07% of Sizeler stock. (Compl.¶ 27.) On November 16, 2004, and December 6, 2004, First Union amended its 13D filing to disclose that it has increased its ownership interest to 7.7% and 8.46%, respectively. (Compl. ¶¶ 28 & 29.) On or about December 21, 2004, First Union notified Sizeler of its intention to nominate Michael L. Ashner and Peter Braveman, both directors and trustees of First Union, as well as Steven Zalkind to Sizeler's Board of Directors. (Compl. ¶ 30.) First Union continued to acquire additional shares of Sizeler and filed a series of amended Form 13D disclosures with the SEC. (Compl. ¶¶ 31 & 32.) In its February 23, 2005 SEC filing, First Union disclosed that it had sent a letter to Sizeler shareholders proposing a slate of directors, and indicating that if its slate was elected, it intended to have Mr. Lassen removed as Chairman and Chief Executive Officer ("CEO") of Sizeler. (Compl.¶ 33.) First Union's last amended Form 13D filing was made on March 9, 2005 and it disclosed that First Union had a 9.9% ownership interest in Sizeler. (Compl. ¶ 34.)

> FN6. In a related suit, on March 15, 2005, Sizeler and its Directors filed a Complaint in this Court against its largest shareholder, First Union. *See Sizeler Property Investors, Inc., et. al v. First*

*Union Real Estate Equity & Mortgage Investments,* RDB 05-718. In its Complaint, Sizeler asked for a declaratory judgment that, pursuant to Maryland law, Sizeler's Directors did not breach their fiduciary duties with respect to the placement of additional Sizeler shares, which was allegedly part of a longstanding corporate plan. This action, which also alleged a violation of the federal securities laws and contained a counter-claim, was resolved by the parties and an Order approving a stipulation of dismissal with prejudice was entered by this Court on September 13, 2005.

**\*2** As indicated above, *supra* at n. 1, Sizeler has nine directors. All but two of Sizeler's directors are outside directors, meaning that they are not Sizeler executives or employees. In addition to acting as directors, Mr. Lassen is Sizeler's CEO and Mr. Masilla is Sizeler's President and Chief Operating Officer. (Compl. ¶¶ 13 & 14.) On March 14, 2005, after the NYSE closed at 4:00 p.m. and without prior disclosure to the public, [FN7] Defendants entered into a transaction to sell 2.649 million shares of newly issued Sizeler common stock to four large institutional investors at $10.75 per share. (Compl.¶ 36.) Sizeler's stock closed at $12.10 that day, but the sale price used for the transaction with the institutional investors was discounted by $1.35 a share. (Compl.¶ 36.) Plaintiffs' Complaint does not specify which Directors voted in favor of this transaction. On March 15, 2005, Sizeler issued a press release announcing the sale and, on March 17, 2005, it filed an amended 10-K disclosing the transaction. (Compl.¶ 37.) On the day Sizeler announced the stock sale, First Union sent a letter to Sizeler offering to purchase all of the offered shares for $11.25 per share. (Compl.¶ 38.)

> FN7. A 10-K filed by Sizeler earlier the same day did not mention a new stock offering. (Compl.¶ 35.)

Plaintiffs allege that the Directors violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. [FN8] by violating their duty of good faith. (Compl.¶ 49.) Furthermore, Plaintiffs allege that the Directors acted in their own self-interest because the stock sale was an effort to entrench themselves as Directors in response to First Union's proxy battle.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                              Page 3
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

(Compl.¶ 50.) Plaintiffs allege that "Defendants' violations of law set forth herein adversely affected Plaintiffs and the Class' ownership interest in Sizeler by diluting the respective proportions of equity." (Compl.¶ 54.) The Complaint does not allege that Plaintiffs had a controlling interest in Sizeler that was negatively impacted by the dilution caused by the stock sale. Nor does the Complaint specifically state whether the alleged injury caused by the "dilution" was to the Class' voting rights or to the value of its Sizeler shares, or an injury for both.

> FN8. Section 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. states:
> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
> (1) In good faith;
> (2) In a manner he reasonably believes to be in the best interests of the corporation; and
> (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

### STANDARD OF REVIEW

Defendants seek to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As the legal sufficiency of the complaint is challenged under a Rule 12(b)(6) motion, the court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). A Rule 12(b)(6) motion to dismiss "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325 (4th Cir.2001). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the

claim showing that the pleader is entitled to relief." *Migdal,* 248 F.3d at 325-26; *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

**\*3** In reviewing the complaint, the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra,* 120 F.3d at 473; *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969). However, in considering a motion to dismiss, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments" nor "the legal conclusions drawn from the facts." *Eastern Shore Mkts., Inc.,* 213 F.3d at 180; *see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,* 329 F.Supp.2d 574, 578 (D.Md.2004).

### DISCUSSION

This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. As the source of this Court's jurisdiction over this case is based on diversity, the principles set forth in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) require application of the law of Maryland to questions of substantive law. [FN9] With respect to corporate governance issues, Maryland courts often look to Delaware caselaw. [FN10] Accordingly, this Court's analysis must be guided by Maryland law, but will make reference to Delaware law in the absence of applicable Maryland law.

> FN9. Sizeler is a Maryland corporation and the parties both apply Maryland law in their submissions to this Court.

> FN10. Delaware courts are frequently recognized for their expertise on corporate law issues. *See generally Werbowsky,* 362 Md. at 618, 766 A.2d at 143 (noting respect properly accorded Delaware decisions on corporate law); Lisa M. Fairfax, *Spare the Rod, Spoil the Director? Revitalizing Director's Fiduciary Duty Through Legal Liability,* 42 Hous.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 4
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

L.Rev. 393, 405 n. 63 (2005); E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004, A Retrospective on Some Key Developments,* 153 U. Pa. L.Rev. 1399, 1403 (2005); Patty M. DeGaetano, Comment, *The Shareholder Direct Access Teeter-Totter: Will Increased Shareholder Voice in the Director Nomination Process Protect Investors?,* 41 Cal. W.L.Rev. 361, 376 (2005) ( "Delaware is well known as the most important state for purposes of corporate law because not only are a majority of public companies incorporated there, other states look to Delaware corporate law for guidance.").

"The decision whether a suit is direct or derivative may be outcome-determinative." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1036 (Del.2004) (noting that the distinction between a direct suit and a derivative one is sometimes difficult, but has many legal consequences). For example, if a suit is derivative the shareholder must make demand on the company's board of directors, absent a showing of demand futility, requesting that the board pursue the suit on behalf of the company, before the shareholder is permitted to pursue the cause of action. *See id.* (discussing Delaware law); *Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (Md.2001) (recognizing demand requirement under Maryland law); Fed. R. Civ. Pro. 23.1. Even when a stockholder can properly pursue a derivative action on behalf of a corporation, any damages recovered must go to the corporation and not the stockholder plaintiff. This result is because a derivative action is brought by the shareholder *on behalf of the corporation* to redress a wrong against the corporation. *See Paskowitz v. Wohlstadter,* 151 Md.App. 1, 10, 822 A.2d 1272, 1276 (Md.Ct.Spec.App.2003) (applying Delaware law). "The defendant in a derivative action may be a corporate fiduciary, such as a director, who committed a wrong against the corporation." *Id.* In contrast, a " 'direct action' is a claim asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an injury personal to the shareholder." *Id.* Damages recovered in a direct action are payable individually to the shareholder, not to the corporation, because the claimed injury is to the shareholder, and therefore the remedy must

address this individual injury. *See id.*

**A. Whether Plaintiffs' Complaint is Properly a Direct Suit**

**\*4** The Plaintiffs assert that this action is brought directly by shareholders against Sizeler and its Directors for breach of fiduciary duty. Defendants assert that the allegations in Plaintiffs' Complaint cannot be brought as a direct claim. "Whether a claim is derivative or direct is not a function of the label the plaintiff gives it." *Paskowitz,* 151 Md.App. at 10, 822 A.2d at 1277. A court must generally look to the nature of the action, as it is stated in the complaint, to determine whether a cause of action is derivative or direct. *See id.* (internal citations omitted); *see also Tooley,* 845 A.2d at 1039. Unlike the neighboring Supreme Court of Delaware, which recently established a new test to examine this issue, the Maryland Court of Appeals has not recently had the opportunity to clearly articulate what test should be applied to determine whether a shareholder claim is direct or derivative. *But see Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (Md.1946) (discussed in detail below).

In *Tooley,* the Supreme Court of Delaware held that to determine whether a stockholder's claim is derivative or direct the "issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley,* 845 A.2d at 1033. To bring a direct suit, "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.* at 1039; *see also Tafflin v. Levitt,* 92 Md.App. 375, 381, 608 A.2d 817, 820 (Md.Ct.Spec.App.1992) (finding that individual action by depositor was not permissible where the injury was incidental and not distinct from injury to institution). To show such an injury, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* The framework outlined in *Tooley* is instructive on the issues presented to this Court.

*1. Maryland Fiduciary Duty Obligations*

The parties take opposite views on what both characterize as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 5
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

"well-settled" Maryland law outlining the fiduciary duties owed by directors of a corporation and the resulting causes of actions that can stem from a possible breach of these duties. Plaintiffs state that, under Maryland law, a director owes fiduciary duties, not only to the corporation, but also to the corporation's shareholders. As a result, Plaintiffs argue, that breaches of these fiduciary duties may result in a direct action by the corporation's shareholders. Defendants assert that, pursuant to Maryland law, a stockholder may only pursue a derivative cause of action on behalf of the corporation for breach of fiduciary duty.

As noted above, Plaintiffs allege that Defendants violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. Recently, the Maryland Court of Appeals conducted a detailed discussion of derivative shareholder actions in *Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (Md.2001). In doing so, the court explained that § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann., the very provision that Plaintiffs in this case claim was violated, acts as a check to the directors' managerial authority by requiring them to perform their duties in good faith. *Werbowsky,* 362 Md. at 598-99, 766 A.2d at 133. The court specifically stated that the directors' obligations under this provision "run[ ], however, to the corporation and *not, at least directly, to the shareholders."* *Id.* (emphasis added).

*\*5 In *Waller,* the Maryland Court of Appeals stated: "It is generally stated that directors occupy a fiduciary relation to the corporation and all its stockholders, but they are not trustees for the individual stockholders." *Waller,* 187 Md. at 194, 49 A.2d at 454. [FN11] The Court further noted that "[t]he reason for this distinction is that in law the corporation has a separate existence as a distinct person, in which all the corporate property is vested and to which the directors are responsible for a strict and faithful discharge of their duty, *but there is no legal privity or immediate connection between the directors and the individual stockholders."* *Id.* (emphasis added). The court went onto hold that "[w]here directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of

the corporate entity." *Waller,* 187 Md. at 190, 49 A.2d at 452.

> FN11. The Maryland Court of Appeals made a similar statement in *Toner v. Baltimore Envelope Co.,* 304 Md. 256, 498 A.2d 642 (Md.1985), which dealt with a dispute involving a closely held corporation, not a publicly, exchange-traded one like Sizeler. *Toner,* 304 Md. at 268, 498 A.2d at 648. Furthermore, *Toner* focused on the relationship between majority and minority shareholders, not directors and shareholders. *Toner,* 304 Md. at 273, 498 A.2d at 650.

In *Waller* the plaintiff claimed that several officers and directors were conspiring to obtain control of the company and destroy the value of his stock. In that case, the Court of Appeals held that "an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder though the injury may incidentally result in *diminishing or destroying the value of the stock."* *Waller,* 187 Md. at 189, 49 A.2d at 452 (emphasis added). This holding in *Waller* is "applicable even when the wrongful acts were done maliciously with intent to injure a particular stockholder." *Danielewicz v. Arnold,* 137 Md.App. 601, 617, 769 A.2d 274, 283 (2001). [FN12]

> FN12. *Waller* does recognize that certain types of actions may be brought by a shareholder directly. "[U]nquestionably[,] a stockholder may bring suit in his own name to recover damages for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation." *Waller,* 187 Md. at 192, 49 A.2d at 453. For example, a suit alleging corporate malfeasance that directly results in the impairment of a common stockholder's right to vote is likely a direct suit. *See e.g., Lipton v. News Intl.,* 514 A.2d 1075, 1079 (Del.1986), *overruled on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                Page 6
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

1031 (Del.2004) (explaining that the right to vote is a contractual right possessed by a shareholder); _Lapidus v. Hecht,_ 232 F.3d 679, 683 (9th Cir.2000).

Plaintiffs cite a decision issued by the United States Court of Appeals for the Second Circuit, _Strougo v. Bassini,_ 282 F.3d 162 (2d Cir.2002), which found that Maryland law recognizes fiduciary duties owed by directors, not only to the corporation, but also directly to shareholders. _Id._ at 173 (citing _Toner v. Baltimore Envelope Co.,_ 304 Md. 256, 268-69, 498 A.2d 642, 648 (Md.1985); _Waller,_ 187 Md. at 194, 49 A.2d at 454). In reaching this conclusion, however, _Strougo_ did not discuss the 2001 Maryland Court of Appeal's decision in _Werbowsky. See Werbowsky,_ 362 Md. at 598-99, 766 A.2d at 133. Instead the Second Circuit relied exclusively on _Waller_ and _Toner. See Strougo,_ 282 F.3d at 173.

2. _The Claims in Jolly Roger's Complaint_

Based on the facts presented by this case, however, this Court need not determine whether Maryland law recognizes a fiduciary duty owed by a corporation's directors directly to shareholders, nor whether shareholders are prohibited from pursuing derivative claims based on breaches of fiduciary duty. Both parties accept that directors owe fiduciary duties to the corporation. _See generally Werbowsky,_ 362 Md. at 598-99, 766 A.2d at 133 (noting that under _§ 2-405.1(a) of_ Md. Corp. & Ass'ns Code Ann. a director's obligations "run [ ], however, to the corporation and not, at least directly, to the shareholders."). Although it is difficult to discern precisely what injury Jolly Roger claims in its Complaint, what is clear is that there was an alleged injury suffered by Sizeler, the corporation, as a result of the stock issuance on March 14, 2005. The Complaint contends that the Sizeler Directors wrongfully sold the newly issued shares for a discounted price in the private sale to the four institutional investors to entrench themselves as Directors and, in some cases, officers of the company. If true, the resulting injury would clearly be one to the corporation, as it would have received inadequate consideration for its shares because of the Directors' allegedly disingenuous motive of entrenchment.

*6 The Complaint also characterizes the Plaintiffs' injury as one of dilution. The Complaint, however, does not specify whether the dilution claim relates to dilution of voting power or dilution of share value. Assuming for a moment that a reasonable inference from the Plaintiffs' Complaint is that it contains a claim for dilution of voting power and share/asset value, the Maryland Court of Special Appeals rejected the suggestion that a similar contention could support a direct suit in _Danielewicz. Danielewicz,_ 137 Md.App. at 616, 769 A.2d at 283. In _Danielewicz_ the plaintiff argued that she had a cause of action as an individual because the alleged wrongful conduct resulted in "the dilution of her majority interest" in the company. _Id._ The court rejected this position. Under _Waller_ any dilution in the price or value of the stockholders' shares is not an actionable direct injury. _See Waller,_ 187 Md. at 189, 49 A.2d at 452 (explaining that an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action).

Pre-_Tooley,_ Delaware courts determined that dilution claims were individual in nature only where a significant stockholder's interest was increased at the sole expense of the minority. _See In re Paxson Communication Corp. Shareholders Litigation,_ 2001 WL 812028, *5 (Del.Ch.2001). This holding was recognized post-_Tooley,_ in _In re J.P. Morgan Chase & Co.,_ 2005 WL 1076069 (Del.Ch. April 29, 2005), which stated "to the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares ... results from the issuance of new equity to a third party ..., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed." _Id._ at *6 (quoting _In re Paxson Communication Corp. Shareholders Litigation,_ 2001 WL 812028 at *5) (rejecting that dilution claim was direct).

Certainly not every issuance of stock by a corporation can constitute a direct claim for dilution by the corporation's stockholders. Here, the Plaintiffs' dilution claim is dependent on the alleged fiduciary duty breach to Sizeler, which claims that the Directors, to entrench themselves, accepted inadequate consideration for the shares sold to the institutional investors. Therefore, in this case, any dilution

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

claim is incidental to the alleged fiduciary duty breach to the corporation. *See Waller,* 187 Md. at 189, 49 A.2d at 452 (explaining that an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action); *Tooley,* 845 A.2d at 1039 (holding that to bring a direct suit "[t]he stockholder's claimed direct injury must be independent of *any alleged injury to the corporation"* and to show such an injury, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation."* ) (emphasis added). As a result, Defendants' Motion to Dismiss is granted to the extent that any purported direct cause of action asserted by the Plaintiffs must be dismissed with prejudice.

B. *Whether Plaintiffs May Assert a Derivative Claim*

*7 Although not addressed by either party, nowhere in Plaintiffs' Complaint does it state that Jolly Roger was a shareholder at the time the instant suit was filed. A plaintiff that ceases to be a shareholder loses standing to continue a derivative suit. *See Lewis v. Anderson,* 477 A.2d 1040, 1047 (Del.1984); *Lewis v. Ward,* 852 A.2d 896 (Del.2004). [FN13] Even though it would appear from the face of the Complaint that Plaintiff Jolly Roger cannot bring a derivative suit because it failed to state that it was a shareholder at the time the suit was filed, this Court will consider whether Plaintiffs meet the prerequisites necessary to bring a derivative suit.

> FN13. *Snyder v. Pleasant Valley Finishing Co., Inc.,* 756 F.Supp. 725, 730 (S.D.N.Y.1990) (citing *Tenney v. Rosenthal,* 6 N.Y.2d 204, 189 N.Y.S.2d 158, 163, 160 N.E.2d 463 (1959)) ("A corporation's dissolution or liquidation, without more, will not defeat a shareholder's right to prosecute an action on the corporation's behalf.... Where a plaintiff, however, voluntarily disposes of her shares, her rights as a shareholder cease, and her interest in the derivative action is terminated."); *Schilling v. Belcher,* 582 F.2d 995, 996 (5th Cir.1978) (applying federal and Florida law) ("[A] shareholder who sells his stock pending appeal of a favorable judgment in a shareholder's derivative

suit against the corporation, loses standing to further prosecute or defend the case" unless its judgment is personally in his favor.); *Heckmann v. Ahmanson,* 168 Cal.App.3d 119, 130, 214 Cal.Rptr. 177 (1985) ("Once a derivative plaintiff sells its stock, it no longer has standing to prosecute the derivative claims on behalf of the remaining shareholders.").

Both Maryland law and Rule 23.1 of the Federal Rules of Civil Procedure require that a stockholder make demand on a corporation before bringing suit. Since the cause of action belongs to the corporation in a derivative suit, "a shareholder [must] first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed." *Werbowsky,* 362 Md. at 600, 766 A.2d at 133. Rule 23.1 requires that a complaint in a derivative action "shall also allege with *particularity the efforts,* if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and *the reasons for the plaintiff's failure to obtain the action or for not making the effort."* Fed. R. Civ. Pro. 23.1 (emphasis added). Plaintiffs' Complaint does not meet these requirements, likely because Plaintiffs sought to bring a direct action.

In addition to requesting leave to re-plead its cause of action as derivative, Plaintiffs argue that demand on the corporation would have been futile. The Maryland Court of Appeals has specifically addressed the issue of demand futility in its recent opinion *Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (Md.2001). For demand to be futile, the allegations or evidence must clearly demonstrate, "in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *See Werbowsky,* 362 Md. at 620, 766 A.2d at 144. This futility exception is very limited. *See id.*

Plaintiffs contend that demand is excused under the second

Westlaw.

Slip Copy                                                                                                    Page 8
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

exception because the Directors were personally conflicted, as they want to keep their positions as directors and officers of the corporation. Plaintiffs' Complaint does not even specify which Directors voted for the challenged transaction--the stock issuance to the four institutional investors. In addition, all but two of the Directors are outside directors. The Maryland Court of Appeals specifically noted that demand will not be excused "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action." *Werbowsky,* 362 Md. at 618, 766 A.2d at 143-44. Applying this standard, the allegations in Plaintiffs' Complaint are insufficient to excuse demand. Therefore, Defendants' Motion to Dismiss is granted and any derivative claims alleged by Plaintiffs must be dismissed without prejudice.

*CONCLUSION*

**\*8** For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. A

Slip Copy, 2005 WL 2989343 (D.Md.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 917757 (Trial Pleading) Class Action Complaint (Mar. 28, 2005)

• 1:05cv00841 (Docket) (Mar. 28, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.