**6**

Westlaw.

Not Reported in A.2d                                                      Page 1
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

C

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Herbert BEHRENS and Harry Polikoff, as Trustee under the
Will of Marjorie L.
Polikoff, Plaintiffs,
v.
UNITED INVESTORS MANAGEMENT COMPANY,
Torchmark Corporation, Ronald K. Richey,
Samuel E. Upchurch, Jr., Keith A. Tucker, George A.
Russell and Melvin R.
Quinlan, Defendants.
**Civ.A. No. 12876.**

Submitted: Sept. 27, 1993.
Decided: Oct. 1, 1993.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, DE (Jill Abrams, Esquire, of
Abbey & Ellis, and William R. Weinstein, of Lowey,
Dannenberg, Bemporad & Selinger, P.C., New York City,
of counsel for plaintiffs.

Martin P. Tully, and Thomas Reed Hunt, Jr., of Morris,
Nichols, Arsht & Tunnell, Wilmington, DE, for defendants
United Investors Management Co., Torchmark Corp.,
Ronald K. Richey, Samuel E. Upchurch, Jr. and Keith A.
Tucker.

Charles F. Richards, Jr., Scott R. Haiber, Lisa A. Paolini,
and Allison L. Amorison, of Richards, Layton & Finger,
Wilmington, DE (Reggie C. Giffin, John C. Cozad, George
E. Rider, and Carl M. Bennett, of Morrison & Hecker,
Kansas City, MO, of counsel), for defendants George A.
Russell and Melvin R. Quinlan.

MEMORANDUM OPINION
ALLEN, Chancellor.

*1 Pending is an application for an order preliminarily
enjoining the taking of a vote of certain stockholders of
United Investors Management Company, a Delaware
corporation. The issue to be voted upon is whether the
public shareholders of United approve and authorize a

proposed merger between their company and a subsidiary of
Torchmark Corporation in which each share of United
non-voting stock would be converted into the right to
receive $31.25 cash. Torchmark owns approximately 85%
of the common stock of United and controls 100% of its
voting stock. [FN1] At the conclusion of the presentation of
the motion it was agreed that the vote would be taken as
scheduled at a September 29, 1993 special meeting of
United stockholders, but, if the vote were affirmative, no
implementing action would be taken until the close of
business on October 1. This stipulation afforded the court
four days to consider and decide the issues presented by the
motion.

The terms of the proposed merger were negotiated and
recommended by a Special Committee of two directors of
United, each of whom had no financial relationship with
United or with Torchmark other than that of being a United
director. In this work these directors were advised by the
investment banking firm of Goldman Sachs and the Kansas
City (Mo.) law firm Morrison & Hecker.

Plaintiffs are owners of shares of United non-voting
common stock. They brought this action on February 23,
following the February 22, 1993 announcement that
Torchmark was proposing a transaction in which the
non-voting stock of United would be eliminated from the
Company's capital structure. An Amended and
Supplemental Complaint was filed on July 28, 1993,
asserting, in general, that the Company's preliminary Proxy
Statement would violate the duty of United and its board to
disclose to plaintiffs all information in their possession
material or evaluation of the transaction and that the price
offered in the transaction is "unfair and inadequate."
Amended Cplt. ¶ 54.

On or shortly after August 27, 1993 the definitive proxy
materials were distributed to the holders of United
non-voting stock. Plaintiffs moved for a preliminary
injunction asserting that the Proxy Statement was false and
misleading. They say that they seek only a relatively short
delay in which corrective disclosures could be made.
Notably, in addressing the asserted defects of United's proxy
solicitation, plaintiffs do not claim that any material fact
relevant to United's business or its future prospects has not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                          Page 2
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

been disclosed. Rather plaintiffs focus on the process through which the Special Committee and its advisors negotiated the proposed transaction. Plaintiffs do not challenge the good faith of the Special Committee, but in their arguments on this motion, they do challenge its competence. Plaintiffs urge first, that the Proxy Statement is flawed in that it (1) fails to disclose that Goldman Sachs concluded in late August that its original June 2 opinion that the transaction proposed was fair to the public shareholders from a financial point of view continued to represent its opinion on that question and (2) thus did not disclose any of the analytical work that Goldman did to arrive at that view.

**\*2** Secondly, plaintiffs urge that the Special Committee did not inform itself concerning Torchmark's position on the dilution effect it purported to project at various price levels and did not disclose facts showing this short-coming. Since in plaintiffs' view it is possible that probing the subject of Torchmark's dilution concerns might have led the negotiations to a different and higher price, such a failure would be material to a shareholder asked now to accept or reject the proposed deal.

Before turning to an evaluation of this argument, I set forth the facts out of which this dispute arises.

I.

Torchmark is an insurance and diversified financial services holding company. Liberty National Life Insurance Company is a wholly-owned subsidiary of Torchmark and owns all the outstanding voting common stock of United Investors Management Company ("United"). Proxy Statement ("PS") at 5. United is a holding company incorporated in Delaware with three major business segments: Waddell & Reed, Inc. ("Waddell & Reed"), a mutual fund management company; United Investors Life Insurance Company ("UIL"), an insurance company; and Torch Energy Advisors Incorporated ("Torch Energy"), an oil and gas management company. [FN2]

The individual defendants in this case are the inside directors of United: Ronald K. Richey, chairman of the boards of directors of both Torchmark and United, and chief executive officer of Torchmark; Samuel E. Upchurch, Jr., a director of Torchmark and vice president, general counsel

and secretary of Torchmark and United, and former director of United from January 1989 to February 23, 1993; Keith A. Tucker, the vice chairman and a director of Torchmark and the president and chief executive officer of United. The outside directors comprising the Special Committee are also defendants: Dr. George A. Russell, president of the University of Missouri; and Melvin P. Quinlan, a retired vice president and general counsel of Northwestern Bell Telephone.

A. Origin and Purposes of United Non-voting Common Stock

Torchmark distributed approximately 15% of United's common stock as a special dividend to Torchmark common stockholders in August 1986. [FN3] That stock is non-voting and is listed and principally traded on the New York Stock Exchange. [FN4] Notwithstanding that almost seven years have elapsed, there is still significant identity of ownership of Torchmark and United shares. [FN5]

The purpose of the dividend distribution of non-voting stock was to establish United as an investment alternative distinct from Torchmark with a separate public valuation, which, it was hoped, would enhance the value of Torchmark's own common stock. [FN6] Torchmark's expectations were not fulfilled, however, as the earnings multiples for United's non-voting common were lower than those of Torchmark's common stock in the ensuing years.

B. Background of the Proposed Transaction

Since the United non-voting common stock did not provide the intended benefits to Torchmark, and the shares incurred continuing expenses relating to federal reporting requirements and separate financial statements, stock exchange listings and investor relations programs, Torchmark considered various options either to sell or reacquire the shares. [FN7]

1. Project Repo

**\*3** From July to September 1991, Torchmark senior management considered various strategic alternatives for United, including a sale of all or a portion of Torchmark's interest in United, and alternatively, the acquisition of

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
(Cite as: 1993 WL 400209 (Del.Ch.))

United's publicly held non-voting common shares. Torchmark's initial financial analysis and due diligence was complemented by Morgan Stanley's preliminary analysis, which was based primarily on public information. The valuations in connection with this first "Project Repo," as it was termed, were in the low $20.00 range. Barnett at 44. An analysis of the dilution effect on Torchmark earnings of any such program was also performed at that time.

At a September 10, 1991 regular meeting of the board of directors of United, the board began preparation to consider a merger of United with and into a subsidiary or affiliate of Torchmark, and created a special committee of outside directors to function on behalf of the public shareholders. The special committee to evaluate any Torchmark proposal and make a recommendation to the United board consisted of Dr. Richard E. Davis and Dr. George A. Russell. [FN8] That special committee then retained Morrison & Hecker as independent legal counsel. However, at an October 23, 1991 meeting of its board of directors, Torchmark decided to terminate its consideration of an acquisition of United's non-voting common stock because there had been unexplained increases in the trading volume and market price of the non-voting common. [FN9]

Between November 1991 and January 1993, Torchmark senior management considered, but did not actively pursue, the acquisition of United's publicly-held common shares. Morgan Stanley was asked periodically to update [FN10] its valuation of United, as well as a merger analysis, including a dilution [FN11] and capitalization study. Barnett at 43.

2. Project Repo Revisited

In mid-January 1993, Tucker asked Morgan Stanley again to advise Torchmark regarding a potential acquisition of the publicly-held interest in United, [FN12] and various ways of accomplishing the transaction. [FN13] On February 10, 1993, Morgan Stanley evaluated United's operating companies and in a presentation to Torchmark suggested an initial negotiation price of $32 per share, [FN14] based only on public information. Tucker disagreed with Morgan Stanley's evaluation and did not think that United's future growth prospects and earnings capacity warranted such a high price. The type of consideration to be offered was also discussed, focusing on the costs and dilutive effects of various types of securities and cash packages.

In mid-February, Torchmark itself decided to propose consideration of $30.50 in convertible debentures. [FN15] Richey, Graves and Tucker were "guided by the non-dilutive and fairness test," and used the Morgan Stanley reports to reach the $30.50 price. Morgan Stanley did not suggest a different price at that time, nor did it comment on the potential dilutive or accretive effects of the transaction. [FN16] Morgan Stanley performed both a company trading valuation and a segment trading valuation on United to determine appropriate ranges of values for the company. [FN17] Morgan Stanley then prepared the management report to Torchmark between January and May of 1993 using non-public information such as budgets and projections for United's subsidiaries, Waddell & Reed and UIL, for the May 27, 1993 presentation.

C. Appointment of the Special Committee and Communication of the Torchmark Offer

*4 In January of 1993, Richey informed Davis of Torchmark's renewed interest in pursuing a transaction to acquire United's publicly-held non-voting common stock, and that a special committee of outside directors would again be formed. Davis responded that he intended to resign from the board of United since he was resigning from all activities other than his own business interests; Davis did resign, effective January 31, 1993. Melvin R. Quinlan, agreed to serve as a director and as a member of the special committee. [FN18]

On February 17, 1993, Tucker and Upchurch met with Russell and Quinlan to advise them that Torchmark was actively considering making a proposal to acquire United's non-voting common stock, to confirm that Russell and Quinlan would constitute the special committee to evaluate the proposal, and to inform them that United's board would authorize them to retain independent counsel and financial advisors. Russell and Quinlan were also advised that Torchmark would not make any proposal to United's public shareholders without the recommendation of the special committee, and that any proposal would be contingent upon approval by a majority of United's public shareholders.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 4
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

The next day, February 18, 1993, Torchmark sent a written merger proposal to United's Board in which Torchmark would acquire all of United's publicly-held non-voting common stock in exchange for $30.50 per share face value of Torchmark debentures convertible into Torchmark common stock. [FN19] The Board then elected Quinlan as a member, formed the Special Committee comprised of Russell and Quinlan, and authorized it to retain independent legal counsel, financial and other advisors as necessary. The Special Committee again retained Morrison & Hecker. On April 14, after interviewing other candidates, the Special Committee formally retained Goldman Sachs as its financial advisor, [FN20] although that firm had been engaged in the review of the Torchmark offer and United's businesses since mid-March. On February 22, 1993, Torchmark and United publicly announced the initial $30.50 convertible debenture initial proposal. [FN21] Plaintiffs filed this suit on February 23, 1993.

On May 11, 1993, at a regularly scheduled board meeting, Tucker told Quinlan (Russell was not present) that the $30.50 consideration for United's non-voting shares would be cash rather than convertible debentures. This notice came prior to completion of the Special Committee's and Goldman Sachs's review of Torchmark's initial proposal, and the reason given was that cash would "simplify and accelerate" review of the proposal. The cash proposal was announced publicly the next day.

D. Goldman Sachs's Work

From mid-March to May 13, 1993, Goldman Sachs reviewed Torchmark's initial proposal and United's operating companies. This review included an April 19, 1993 meeting with representatives of Morgan Stanley to discuss a Morgan Stanley discounted cash flow analysis of Torch Energy which had been supplied to Goldman Sachs. The financial advisors also held meetings on April 21 and 26, 1993 with senior management of United and its principal subsidiaries.

*5 At a May 17, 1993 meeting of the Special Committee, Goldman Sachs presented its financial analysis of United, explained the activities undertaken to perform the analysis, and the values it indicated. In preparation for its presentation, Goldman Sachs performed comparable company and comparable acquisition analyses on all three of United's business segments, and additionally performed a discounted cash flow analysis for Torch Energy. Berlinski Aff. at 4. The financial advisors estimated that the segments, when taken together and when reductions for corporate overhead of United were made, produced a range of values from $29.30 to $35.37 per share. [FN22] Berlinski Aff. at 6. Goldman Sachs had also prepared a dilution analysis presented in its book at the May 17 meeting demonstrating that a price of up to $36.50 might be paid by Torchmark without incurring dilution of its per share earnings. PX 20 at T314. Since the offered price fell within the range of possible values, Goldman Sachs stated that, after following various internal procedures, it would be able to issue an opinion that the Torchmark cash proposal was fair.

Despite Goldman Sachs's view that the cash $30.50 price was fair, the Special Committee decided to reject the Torchmark cash proposal. In consultation with Goldman Sachs, the Special Committee determined that it should seek a cash price of $33.00 per share. [FN23]

E. Negotiations Between Torchmark and the Special Committee

On May 18, the Special Committee phoned Richey and Tucker with the $33.00 counter-proposal. The latter directors stated that they believed that the cash proposal price was a fair one, and suggested a meeting between Morgan Stanley and Goldman Sachs to discuss valuation methodologies and the purchase price.

Such meetings ensued on May 19 and 21, 1993, at which Goldman Sachs reiterated the Special Committee's counter-proposal of $33.00 per share, and Morgan Stanley repeated that the $30.50 offer was a fair one. After a full day of unfruitful negotiations on May 21, Torchmark authorized Morgan Stanley to increase the cash offer to $31.00 per share. Through Goldman Sachs, the Special Committee rejected the $31.00 offer and continued to press for $33.00 per share with the representatives of Morgan Stanley.

Direct price negotiations took place on Sunday, May 23, 1993 between the Special Committee and Richey and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
(Cite as: 1993 WL 400209 (Del.Ch.))

Tucker for Torchmark, at which, according to the Proxy Statement, Quinlan stressed the Special Committee's duty to achieve the "best available price from Torchmark which was also a fair price to [United's non-voting shareholders]." PS at 19. Richey noted that "it was committed to pursuing a transaction that was non-dilutive, on an earnings per share basis, to Torchmark's stockholders." *Id.* Russell did not believe the dilution issue was significant. Having witnessed the failure of a proposed transaction two years earlier, he was afraid that Torchmark would walk away from the deal and that the share price would recede.

*6 The Special Committee subsequently lowered its counter-proposal to $31.50. Richey ultimately stated that Torchmark would consider an offer at $31.25 per share if Goldman Sachs could provide a fairness opinion, and if the price were acceptable to the Special Committee. After conferring, Quinlan and Russell said that they would recommend the $31.25 proposal if Goldman Sachs would provide a favorable fairness opinion.

Dilution of its common stock was stated as a serious concern for Torchmark, and the effect of the transaction at various costs of capital and using different types of consideration was taken into account. [FN24] The Board resolution empowering the Chairman and Vice Chairman to negotiate a transaction on Torchmark's behalf expressly stated that it should be non-dilutive in the officer's good faith judgment. The initial proposal in the February 18 letter stated that "Torchmark [was] committed to pursuing a transaction that is non-dilutive to its shareholders." PX 43 at 1. The $31.25 offer ultimately proposed by Torchmark was, nevertheless, still within the non-dilutive range according to the Torchmark Board's instructions. Richey at 134. Plaintiffs fault the Special Committee for not stating during the May 23 meeting that Goldman Sachs's dilution analysis produced a maximum price of $36.50 that could be paid for United's shares without being dilutive to Torchmark's common stock, [FN25] and for not pressing the dilution issue generally. [FN26] Russell, however, states that he believed that his primary responsibility was to get a fair deal for the shareholders at the best possible price, but in all events, to accomplish the transaction. [FN27] Russell Aff. at 44.

F. The Merger Transaction and its Structure

On May 26, 1993, after conferring with legal counsel and upon the advise of Goldman Sachs that it would provide a favorable, written fairness opinion, the Special Committee unanimously agreed to recommend to the Board of United that it proceed with the proposed merger at $31.25 per share, subject to approval of the definitive merger agreement by both the Committee and the Board. PX 51 at 2-3. Goldman Sachs issued a favorable written fairness opinion as of June 2, 1993 based upon its initial analyses produced for the May 17, 1993 meeting with the Special Committee. On June 1, 1993, first the Special Committee and then the Board of United unanimously approved the merger and the merger agreement; on June 2, 1993, Torchmark's Board did as well. [FN28]

In the transaction as ultimately agreed upon, Mergerco, Torchmark's shell acquisition subsidiary would be merged with and into United, the surviving corporation, so that Torchmark will ultimately own United directly or indirectly. [FN29] The merger agreement required the approval of at least a majority of the publicly-held non-voting shares actually voted at the September 29 special meeting. Only public holders of the non-voting common stock were entitled to notice and a vote at the special September 29, 1993 meeting. [FN30]

*7 Pursuant to the stipulation at the conclusion of the hearing on this motion, a vote was taken on the merger proposal at the special shareholders meeting on September 29, 1993. It appears that 74% of the publicly-held non-voting stock eligible to vote at the meeting, approved the merger. Upon the filing of a certificate of merger with the Office of the Secretary of State of the State of Delaware, and without any action of the holders, each outstanding publicly held share (other than dissenting shares) of United will be canceled and converted into the right to receive $31.25 per share.

G. The Proxy Statement and the Goldman Sachs Fairness Opinion

Proxy statements were mailed shortly after August 27, 1993 to United's non-voting shareholders in anticipation of the

Not Reported in A.2d                                                                    Page 6
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
(Cite as: 1993 WL 400209 (Del.Ch.))

September 29, 1993 special meeting. Goldman Sachs's June 2, 1993 fairness opinion was included as Annex B. In its discussion of the opinion of the financial advisors, the proxy statement disclosed the companies considered comparable for the purposes of the June 2 opinion, and the methods of analysis used. [FN31] *The proxy statement noted that Goldman Sachs did not develop its range of suggested values based on the comparable company or comparable acquisition analysis alone, but based on all its analyses.*

Goldman Sachs's policy is to update its analyses at the time of mailing of proxy materials and to permit the distribution of its opinion only if it continues to be valid. Berlinski Aff. at 6. Goldman Sachs updated its analyses through August 26, 1993, using publicly available data, including the second quarter earnings for United which became available publicly in its June 30, 1993 10Q filing, as well as industry data. Goldman Sachs also held "follow-up" discussions with a member of United's senior management to discuss the company's business operations, financial condition and future prospects. Berlinski Aff. at 8. In doing this analytical work, Goldman Sachs altered the field of comparable companies for Waddell & Reed to include one more smaller mutual fund, and eliminate two larger funds, because of its evaluations of the effect of lower interest rates and new tax legislation. [FN32] Berlinski Aff. at 10-11.

Goldman Sachs also expanded the field of comparable companies for UIL by adding four smaller companies to the second of two groups of peer companies. [FN33] The rationale behind this change was to obtain a larger sample of smaller companies, since Goldman believed UIL was more appropriately classed with the smaller companies, due to its smaller capitalization and limited product line. Berlinski Aff. at 12. Goldman Sachs arrived at a new range of estimated values for United of $28.78 to $35.63, and determined that there had not been a material change in the value of United as a whole between June 2 and August 26, 1993. Berlinski Aff. at 15. Goldman Sachs also revisited its annualized earnings estimates for United for 1993. Simply annualizing the first two quarters' earnings would have produced an estimate in excess of its original $2.15 per share projection; but after eliminating a non-recurring gain, the revised estimate was $2.10 per share. [FN34] Berlinski

Aff. at 8. This was not considered to be a material change.

*8 This analytical work, or the confirmation of Goldman's June 2 opinion, was not referred to in the August 27 Proxy Statement.

H. Plaintiffs' Expert

In preparation for this application, plaintiffs retained Fred Shinagel, an investment banker and freelance valuation expert with expertise in the area of mergers and acquisitions and the valuation of corporate securities. [FN35] Shinagel arrived at a fairness range of $35.96 to $40.91 as a result of his analysis, and therefore concluded that the $31.25 price was unfair, and that a more appropriate value for United's shares was $38.44. Shinagel Aff. at 2, 9. Shinagel also determined that the Goldman Sachs June 2, 1993 opinion was stale and should have been updated.

Shinagel determined that the Goldman Sachs opinion was stale since it used what he considered outdated and underestimated earnings for 1993. Based on United's five year earnings history, Shinagel concluded that United historically earned 52% of its total yearly earnings in the first two quarters, and that annualized earnings for 1993 would be $2.42 per share, 13% higher than the $2.15 estimate used by Goldman Sachs. Shinagel Aff. at 3. However, defendants have pointed out that Shinagel included non-recurring items in his estimates which, when subtracted, produce a revised earnings estimate of $2.16 per share based on his calculations, substantially similar to the initial estimate used by Goldman Sachs.

More importantly, Shinagel determined that Goldman Sachs's opinion requires revision since it did not take into account an upward shift in market prices for comparable companies between May and late August 1993. Shinagel Aff. at 4. Shinagel did not himself select comparable companies upon which to perform his analysis, but rather accepted Goldman Sachs's comparable acquisition and discounted cash flow analyses set forth in the Proxy Statement. Since stock prices for the comparable companies rose between May and August to a greater extent than the rise in earnings estimates, the price earnings multiples for the peer group increased. Shinagel Aff. at 6. Shinagel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                                 Page 7
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

applied the elevated ranges of price earnings multiples to United's three segments to arrive at higher values for those businesses. This method produced a higher range of values for United's shares. Shinagel did not conduct any individual analyses of any of the comparable companies to determine whether the factors effecting price shifts for those companies would impact United's segments in the same way.

II.

The test for the issuance of a preliminary injunction is easily stated. Such an order may issue where plaintiff demonstrates a reasonable probability of success on the merits; that absent relief irreparable harm will follow; and that the harm risked by denial of the injunction outweighs the harm that might be occasioned by its issuance. *Allen v. Prime Computer, Inc.,* Del.Supr., 540 A.2d 417, 419 (1988).

Plaintiffs seek to enforce a fiduciary's duty to disclose to shareholders all facts material to their position with respect to a proposed transaction in corporate control. *Kahn v. Household Acquisition Corp.,* Del.Supr., 591 A.2d 166, 170 (1991). Facts material to a shareholder vote must satisfy the following test:

> *\*9* It must be shown that there is a *substantial likelihood* that, under all of the circumstances, the omitted fact *would have assumed actual significance* in the deliberations of a reasonable shareholder. Put another way, there must be a *substantial likelihood* that the disclosure of the omitted fact *would have been viewed by the reasonable investor as having significantly altered the* "total mix" *of information available.*

*Rosenblatt v. Getty Oil,* Del.Supr. 493 A.2d 929, 944-5, (1985) quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976). (emphasis supplied)

The judgment of materiality will always be textured and particular. In making this judgment courts are mindful that too high a threshold may inhibit shareholder access to information useful to a reasoned decision; setting the standard too low, on the other hand, risks forcing directors to "bury the shareholders in an avalanche of trivial information." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448-9 (1976).

III.

This motion does not directly challenge the fairness of the merger consideration; the complaints rather address the adequacy of the disclosures made in the Proxy Statement in two overall respects:

1. The Alleged Insufficiency of Disclosures Relating to Goldman Sachs's Fairness Opinion.

Plaintiffs do not contend that Goldman Sachs's June 2 fairness opinion is flawed or that disclosures with respect to it is inadequate. They do claim instead that since the June opinion there has been a material change in the values of United's subsidiaries and that Goldman used a different field of comparable companies for Waddell & Reed and UIL in August 1993 in order to reach its conclusion that its opinion of June 2 continued to be valid. The Proxy Statement does not disclose that Goldman Sachs reviewed its June opinion and thus does not disclose what method it may have used to conclude that it was still valid. It is this latter fact that forms the nub of plaintiffs' agreement.

Plaintiffs argue that in order to allow Goldman to stand by its June opinion, notwithstanding an intervening rise in the stock market, Goldman Sachs changed the group of comparable companies used in the comparable company analysis of the Waddell & Reed and UIL aspects of United's business. The Proxy Statement lists the companies initially used for this purpose in connection with the June opinion. Plaintiffs claim that knowledge of the somewhat different field of comparable companies employed when Goldman reviewed its opinion in August, would be material to a stockholder's decision to approve or reject the merger.

2. The Alleged Insufficiency of Disclosures Relating to Dilution.

Plaintiffs' second category of disclosure failures relates to Torchmark's concern expressed in its proposal letter and during the negotiations that the merger not have a dilutive effect on its earnings per share. It expressed the position that the price it would pay would not dilute its earnings per share. Plaintiffs contend that several supplementary disclosures are required in this convention. First, plaintiffs urge that defendants be required to disclose the analysis by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 8
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

which the $31.25 price was determined to be non-dilutive to Torchmark, including all assumptions which support this analysis. Second, plaintiffs contend that defendants should be required to disclose that the Special Committee was not fully informed as to Torchmark's dilution concerns.

**\*10** Plaintiffs argue that Torchmark's dilution analyses [FN36] must be disclosed because such information might undermine the legitimacy of dilution as a bona fide concern of Torchmark, which in turn would be pertinent, they say, to the decision to accept or reject the merger proposal as the best price available to the public shareholders. Plaintiffs also argue that the non-dilutive price, as defined by Torchmark, represents Torchmark's measure of the true value of United, and thus that information regarding Torchmark's analyses of "dilution" are relevant to stockholders determination as to whether the $31.25 offer was a fair price. For each of these reasons, plaintiffs contend that such information must be disclosed.

Plaintiffs also contend that the disclosures regarding the work of the Special Committee are misleading in that they create the impression that the Special Committee was fully informed as to Torchmark's dilution concerns. Plaintiffs argue that this impression is false, and allege that the Special Committee failed to make inquiries regarding Torchmark's dilution analyses or the discrepancies between these analyses (indicating that dilution would occur at prices below $31.00) and the Goldman Sachs dilution analysis (finding dilution to occur at $36.50). [FN37] Further, plaintiffs allege that neither Special Committee member fully understood the importance of the dilution issue. Finally, it is alleged that the Special Committee was inadequately informed about United's current operations and projected growth, and thus failed to consider these factors in evaluating Torchmark's proposal. For all these reasons, plaintiffs contend that the Proxy Statement must disclose the Special Committee's alleged lack of care.

                                   IV.

What is most notable about the claimed deficiencies of the August 27 Proxy Statement is that they do not relate directly to the value of United as a business enterprise, or to the value of the non-voting shares in particular. *There is here no claim that the financial condition or prospects of United*

*have not been fully and fairly disclosed.* The alleged defects in the Proxy Statement relate to the process by which the proposed price was reached, agreed upon and determined to be fair. While surely some elements of the process by which a proposed price is negotiated may constitute material matter necessary to be disclosed, it is, I think, nevertheless salient to note that there is here no claim that all of the financial data relating to United appropriate to be disclosed has not been disclosed.

For the reasons set forth below I conclude, in the provisional way that motions of this sort contemplate, that neither of the principal alleged non-disclosures is reasonably likely, on final hearing, to support a judgment in plaintiffs' favor.

A. Disclosures Relating to Goldman Sachs's Decision That Its June Opinion Continued to Represent Its View

There is no general obligation on the part of corporate directors to employ finance specialists in the valuation of assets or firms as part of the negotiation or approval of corporate transactions. Directors do, however, have an obligation to be informed when they exercise the powers conferred by their office. Experience establishes that quite often corporate directors endeavor to meet that obligation, in part, with the advice and guidance of special advisors, including investment bankers.

**\*11** Where the opinion of an investment banker is itself a material element in the consideration that leads a board of directors (or a committee of the board) to act, and that decision must in turn be acted upon by shareholders (as in a vote on a proposed merger or a tender offer) disclosure of that opinion may well be required under the generally followed test of materiality. How much, beyond the existence of and content of such opinion, may be necessary for the board or the company to disclose does not appear to be a question that yields a categorical answer. For public companies, the Securities Exchange Commission has endeavored to regulate this subject. *See* Instructions For Form 13E-3, 17 C.F.R. § 240.13e-3 and *Howing Co. v. Nationwide Corp.*, 826 F.2d 1470, 1476 (6th Cir.1987).

In this instance, the board of United disclosed the text of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 9
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

Goldman Sachs opinion to the Special Committee, (*See* PS Annex B) but went far beyond that. At pages 22-30 the Proxy Statement goes into a great deal of background on Goldman Sachs's activities and the analysis that supports its opinion. Plaintiff makes no claim that there is any disclosure problem with respect to the substance of the June 2, 1993 Goldman Sachs opinion.

Plaintiffs, however, claim that there was a material change in the markets between June 2 and the August 27 issuance of the Proxy Statement. As a result, say, if any holder of United non-voting common stock updates the Goldman Sachs work as described in the Proxy Statement with current price earning multiples, he or she will conclude that the price offered no longer falls within the announced range of fairness. They offer the affidavit of Mr. Shinagel (pp. 18-19 above) in support of this proposition. Plaintiffs seek to have the public shareholders know that despite what plaintiffs see as a material change, Goldman Sachs is of the view that the transaction is fair. Plaintiffs seek to have the basis on which Goldman Sachs continues to reach its opinion on fairness disclosed.

In effect plaintiffs are casting themselves as supporters of the transaction. If one accepts *arguendo* that a material market change has occurred, which is knowable from publicly available information, [FN38] and which makes the $31.25 price look less appealing, then the absence of the disclosure they seek will lead public shareholders, at the margin, to reject the deal; "corrected" disclosure (i.e., an explanation of why Goldman believes no material change in values has occurred) would tend, at the margin, to induce votes *for* the transaction. I put this unusual circumstance to the side however, although it may have relevance were one required, on this application, to evaluate competing harms. I need not evaluate the harms because I cannot conclude that disclosure of the later analytical work that Goldman performed is required to be disclosed and thus find no reasonable prospect of ultimate validation of plaintiffs' complaints.

This conclusion is required by a rather basic consideration. The disclosure obligation that our law imposes is an obligation owed by corporate directors when they authorize the corporation to solicit for proxies or otherwise seek

shareholder action (i.e., a self-tender). That obligation may be seen as a corporate obligation as well, but the primary duty is that of the directors. The duty is said to be one that requires the disclosure of all material information within the knowledge of the corporation (and thus available to the directors). *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 919 (1985). The record indicates that the information sought to be disclosed does not fall into any such category.

**\*12** When directors elect to secure the advice of professional investment advisors and when those advisors present the board with a study in support of an opinion on fairness, the background information thus acquired by the directors may be material to an evaluation of any transaction approved and thus may fall within the directors' disclosure obligation under state law. But here there is no evidence that the Special Committee was provided with the details (or even a summary) of such analytical work as Goldman did in August to assure itself that its June 2 opinion was still the opinion of the firm. It thus seems impossible to say that the Company's proxy solicitation is deficient because it fails to contain information that, so far as the record shows, neither the Company nor the directors knew.

Nor would this conclusion change if one assumes for argument sake that a director's disclosure obligation extends beyond things she knows to things she ought to have known. It is not likely that on final hearing the court will conclude that the directors were under an obligation (an aspect of their duty to act after reasonable investigation), to inquire into the analytical steps that Goldman pursued in order to assure itself that its June opinion remained its view. Despite the position taken by Mr. Shinagel, the intervening changes in relevant markets were not so great as to require diligent directors to probe and evaluate the position that those changes did not require amendment of the fairness opinion. Perhaps some set of intervening changes in public markets would be such as to require diligent directors to, in effect, say "How could it be that the deal we earlier negotiated is still fair to the minority?" In that event, the directors' duty of care would require them to inquire into the grounds of the advisor's view, and in such circumstances, then make appropriate disclosure with respect to any material facts they learn. In such a case if the board failed to

Westlaw.

Not Reported in A.2d                                                                                                          Page 10
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
(Cite as: 1993 WL 400209 (Del.Ch.))

make that inquiry, its members may have failed in the execution of their duty to make an informed judgment.

Having reviewed the affidavits of Mr. Shinagel and Mr. Berlinski, however, I cannot conclude that the inevitable market changes that to some extent always occur were so significant in this instance as to give rise to a duty of further inquiry by the board (Special Committee) upon learning or inferring that Goldman Sachs's June opinion remained that firm's view. Thus, since the record suggests that the members of the Special Committee did not know, and had no reason to inquire into, the further analytical work of Goldman Sachs, there is no obligation on United's part to disclose it.

B. Disclosures Relating to Torchmark's Dilution Position

The claim that the Proxy Statement inadequately discloses facts relevant to the way negotiation proceeded with respect to Torchmark's position that it sought only a non-dilutive transaction, cannot justify the issuance of preliminary relief. The matter that is omitted, when seen in context, would not appear to satisfy the test of materiality.

*13 The claim itself has two principal parts. The first rest on the non-disclosure of information in documents created by Torchmark (or Morgan Stanley) that constitute analyses of the prospective dilutive effect of possible prices under different financing assumptions. The second rests on the non-disclosure of the Special Committee's consideration or treatment of Torchmark's dilution statements.

(a) Torchmark dilution information

The most notable aspect of this alleged material non-disclosure is that discovery in this case has uncovered no document that would support the view that Torchmark believes it could pay more than $31.25 in this transaction without diluting its earnings. Various studies were done by Torchmark or its advisor. Some are older and out of date. The most current, by Morgan Stanley, shows that dilution was a substantial risk at prices above $30.50. Some others show dilution at prices several dollars lower. Given this fact, disclosure of these internal documents of one of the negotiating parties would tend to show only that the Special

Committee had gotten the price up to or slightly beyond what Torchmark thought was appropriate.

Plaintiffs take on the subject of materiality of Torchmark's dilution studies is that, since Torchmark did go to a price that is somewhat above $30.50, disclosure of Torchmark dilution studies that show dilution effects were possible at $30.50, may lead shareholders to conclude that dilution was a bogus issue and therefore (?) shareholders may want to reject this deal to try to get a higher price.

This line of reasoning seems to me to be a non-sequitur, but I need not decide the point on that basis. That is, I need not find that plaintiffs' argument is illogical to conclude that it is imaginary. In my opinion no reasonable public shareholder, in the circumstances, would regard these studies as having any significance to the choice to accept or reject the $31.25 proposal under the *TSC/Rosenblatt* test.

(b) The claim that the Proxy Statement inadequately describes the Special Committee's treatment of prospective dilution as a Torchmark concern.

I understand the second aspect of the "dilution" issue to constitute, in effect, an attempt to transmute a claim of Special Committee incompetence into a disclosure claim. The Proxy Statement does not disclose (1) that the Special Committee did not disclose to Torchmark (although it is disclosed in the Proxy Statement) the high ($36.50) price Goldman thought could be financed without dilution, or (2) that the Special Committee did not know the basis upon which Torchmark took the position that a price higher than $30.50 risked being dilutive of its earnings. These facts appear to be true, if by the second it is meant the Special Committee did not see or know the studies that supported Torchmark's negotiation position. Discovery shows that the Morgan Stanley study of dilution effects of a $30.50 price (considered under various financing scenarios) supports the assertion that such a price might cause a slight dilution or might cause a slight accretion of earnings. Plaintiffs fault the committee for not sharing the Goldman study and for not disclosing that it did not do so.

*14 Is the exclusion from the Proxy Statement of the fact that the Special Committee did not disclose the Goldman

Westlaw.

Not Reported in A.2d                                                                                    Page 11
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

view on dilution to Torchmark a material omission? Given the malleability of the concept of dilution; the existence of the Morgan Stanley analysis of dilution effects at a $30.50 price; the fairness of the $31.25 price in the opinion of all investment bankers; and the history of the negotiations (including the withdrawal of the earlier Project Repo) there appears at this stage to be insufficient ground for a reasonable public shareholder to conclude either (1) that disclosure of the Goldman study would likely have resulted in a different negotiated outcome or, more importantly (2) that rejection of the proposed merger now would increase rather than decrease the public shareholders' prospects of having an advantageous transaction available to them. Thus on either basis, the non-disclosure to Torchmark of the Goldman study would appear to be immaterial to a public shareholder asked to vote on the proposed transaction.

* * *

I thus conclude that plaintiffs have not shown that the August 27, 1993 Proxy Statement is deficient in any material respect. The relief plaintiffs seek is moderate: a short delay and a brief supplemental disclosure. It is, however, not the proper role of courts, with the aid of diligent attorneys, to edit or supplement proxy statements, following expensive judicial discovery, unless those disclosure documents can be shown to be materially deficient. The matters that plaintiffs seize upon in this instance, cannot, in my opinion, be said to satisfy the legal test for materiality. Therefore the motion will be denied.

> FN1. The public shareholders of United own non-voting stock, which constitutes approximately 15% of all United common stock. While the non-voting common stock has under United's certificate of incorporation no right to vote on the merger, under the terms of the agreement of the merger, the effectuation of the proposed merger is conditioned upon the affirmative vote of a majority of the holders of the United non-voting common stock present, in person or by proxy, and actually voting at the meeting.

> FN2. Torch Energy owns 24.3% of the outstanding common shares of Nuevo Energy Corporation, a publicly-traded corporation.

> FN3. As of December 31, 1992, there were 38,667,183 shares of United's common stock outstanding and 43,000,000 shares authorized. As of the record date, August 26, 1993, there were 6,486,055 publicly-held shares (i.e., shares not held by Torchmark and its subsidiaries) and 3,352 such holders of record. Torchmark and its subsidiaries owned 402,830 outstanding non-voting shares of United which were not entitled to vote at the September 29 meeting.

> FN4. Cash dividends declared on the non-voting common stock are the same as for the voting common.

> FN5. The three largest public shareholders of United stock, Nicholas Company, Inc., Franklin Resources, Inc., and College Retirement Equities Fund own an aggregate of 24.2% of the non-voting common, as well as an aggregate of 23% of Torchmark common stock.

> FN6. Torchmark's directors believed that establishing a separate value for United would boost Torchmark's common stock price since earnings multiples for asset management company stocks were significantly higher than those for insurance companies. Barnett Dep. at 19-20.

> FN7. Philip Barnett, one of Morgan Stanley's team, noted with regard to the minority interest in United: "When you have a minority situation like that, as the majority shareholder you have to be scrupulously fair to the minority. And you've got to make sure that when you make business decisions, that you are always taking into account the minority.... If in fact you are not going to get any tangible benefit for having that minority out there, then it doesn't really make business sense." Barnett at 20-21.

> FN8. Davis was an undergraduate classmate of Richey from Washburn University in the late 1940s, but the two men had not kept in touch socially over the years until Davis was asked to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                     Page 12
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

become a director of United in the 1980s. Richey was not acquainted with Russell when he was approached to become a director of United.

FN9. Richey reported at the meeting that he believed that rumors had somehow reached the market that Torchmark was interested in acquiring the minority publicly-held shares. Richey at 25. The shares were then trading as high as about $24 per share. Barnett at 12.

FN10. To update its evaluation, the team at Morgan Stanley merely "refreshed [its] earnings forecast" with information from the latest annual reports and 10Qs. Barnett at 64.

FN11. A September 1992 update showed that, on the assumptions there made, a price of $27.00 per share would have been dilutive. Richey noted that changes in interest rates, numbers of shares outstanding and projections could account for dilution at that level in 1992, and no dilution six months later at a $31.00 price. Richey at 69.

FN12. Morgan Stanley at this point developed new models from scratch to evaluate the operating companies of United. Barnett at 22.

FN13. Morgan Stanley considered a one-step merger transaction with a shareholder vote, which was ultimately adopted, as well as a tender offer followed by a short form merger once at least 6% more of the outstanding United shares were acquired, boosting Torchmark over the 90% threshold. Barnett noted that this method would have been easier for Torchmark, if not more "aggressive," but it was rejected as being less fair.

FN14. At that time, United was trading near its 52-week high. Only public information was available to Morgan Stanley since Torchmark did not want to risk leaks by seeking non-public information. Morgan Stanley had not yet done any due diligence nor had their team spoken with United's management. The range considered for

United's shares was $32.50 to $39.00. After performing due diligence and speaking with management, Morgan Stanley revised its estimates downward based on perceived future difficulties of the operating segments of United, earnings estimates from the Morgan Stanley research department, and the disproportionate impact of non-recurring items in the first quarter of 1993.

FN15. Torchmark apparently "had a price in mind that in their view reflected the full value of the company, and that was the price they were willing to pay regardless of where the stock price was." Barnett at 119. Torchmark had done its own work from an earnings dilutive standpoint which Morgan Stanley had not seen.

FN16. Morgan Stanley's team believed that this price represented a near break-even point with respect to dilution, based on the cost of financing and which type of security would ultimately be used.

FN17. A "company trading valuation" uses companies comparable to the subject company as a whole, whereas a "segment trading valuation" considers companies comparable to the subject's operating segments. United was viewed chiefly as an asset manager, so comparable asset management companies were used. Barnett at 135-36.

FN18. According to defendants, Quinlan was an attractive candidate since he was located in Omaha, convenient to Kansas City; he had been General Counsel of Northwestern Bell Telephone Company; he was retired and had the time to devote to the transaction; and he was a "quality person" who had "the negotiating abilities to serve on [the] special committee." Richey at 36. Quinlan had graduated from law school ahead of Richey at Washburn University, and the two friends had kept in touch about twice a year since the 1940s. Compensation amounted to $30,000 for serving as a director of United and $30,000 for serving as a member of the special committee. Richey at 41.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                Page 13
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
**(Cite as: 1993 WL 400209 (Del.Ch.))**

FN19. Assuming the bonds could be accurately priced, this offer represented a 16.23% premium over the closing market price of $26.875 on February 19, 1993, the last day of full trading prior to the public announcement of the proposed merger. PX 24 at 5. Morgan Stanley's Project Repo Report stated that a 15% premium would be a fair initial bid, and that of precedent transactions since January 1, 1991, only one had a market premium of less than 15%. PX 12 at T0092.

FN20. Goldman Sachs compensation will total $1,075,000: $100,000 was paid upon engagement, $400,000 became payable upon the May 17 presentation, and $575,000 became payable upon execution of the merger agreement and the delivery of the fairness opinion in connection with it.

FN21. Additionally, on February 23, Samuel E. Upchurch, Jr., a director of Torchmark and Vice President, General Counsel and Secretary of United, resigned as a director of United.

FN22. As disclosed in the Proxy Statement, Goldman Sachs determined that, per share: Waddell & Reed had a value of between $14.21 and $16.80; UIL had a value of between $9.04 and $10.34; and Torch Energy had a value of between $3.46 and $5.66.

FN23. Goldman Sachs also raised two negotiation issues with the Special Committee as early as its March 13, 1993 preliminary meeting: first, that Torchmark had stated that under no circumstances would it sell its controlling interest, and second, that the proposed transaction was public knowledge and no one had approached Goldman Sachs to express an interest in acquiring the shares. Berlinski at 24. The financial advisors also considered the benefits and drawbacks from a negotiating standpoint of asking for a higher price with the possibility that Torchmark might walk away from the deal. Berlinski at 33.

FN24. The dilution effect of a transaction is a function both of the cost of the acquisition financing and the earnings ultimately contributed by the acquisition. Thus what the future dilution effect will be is always a judgment about which reasonable minds might disagree. Morgan Stanley's Philip Barnett explained:

Dilution is based on assumptions, first of all: What the market thinks, what assumptions we use, what the assumptions our client uses.... A half a percent for Morgan Stanley, if somebody else ran the numbers using different assumptions, could easily be no dilution whatsoever or a minor pickup. There is a variation around a band....

Barnett at 59.

FN25. Plaintiffs also elicited that Russell believed that "non-dilutive" meant that Torchmark shareholders' dividends would not be reduced as a result of the transaction. Russell at 18.

FN26. Plaintiffs have made much of Russell's statement:

I never really discussed dilution because it was not, as far as I was concerned, my position to discuss what was happening to Torchmark. I was trying to look at the United Investors' minority shareholders. That was my interest. And dilutive [sic] was their interest, not mine.

Russell at 18.

FN27. Russell stated:

[W]e came down to what we thought was our responsibility: to get a transaction that was fair to the minority stockholders. And we had to, if they walked away, there wouldn't be any premium at all on the stock they had.

That was one of the worries, one of the things we had to worry about. If they walk and decide they don't want it, then the stock would probably be, would not be worth as much as it would be.

Russell at 44.

FN28. Torchmark, its acquisition subsidiary Mergerco, and United executed the merger agreement on June 2. Torchmark's July 23, 1993

Westlaw.

Not Reported in A.2d                                                                                    Page 14
Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805
(Cite as: 1993 WL 400209 (Del.Ch.))

proposal for the treatment of employee stock options was approved by the Special Committee, included in an amendment to the merger agreement, approved by the Boards of United, Torchmark and Mergerco, and elected as of August 5, 1993.

FN29. Torchmark will own approximately 18% directly and 82% through its subsidiary Liberty National.

FN30. At a special meeting on June 1, 1993, United's Board resolved to amend the corporate by-laws to provide the vote to the non-voting shareholders with regard to this transaction. PX 24 at 3.

FN31. Companies considered comparable to Waddell & Reed were: Franklin Resources, Inc.; The Dreyfus Corporation; T. Rowe Price Associates; John Nuveen & Co. Inc.; The Colonial Group, Inc. and The Pioneer Group, Inc.

FN32. Goldman Sachs jettisoned Franklin, Dreyfus, T. Rowe Price and John Nuveen, and replaced them with Eaton Vance, a smaller company.

FN33. Goldman Sachs divided companies comparable to UIL into two groups, one for larger and one for smaller companies. The selected smaller market capitalization life insurance companies included Life Partners Group, Inc., John Alden Financial Corporation, The NWNL Companies and USLIFE Corporation. To these were added Home Beneficial, Kansas City Life, Liberty Corporation and Protective Life.

FN34. Sale of certain oil and gas properties of United produced after-tax net income for United of $5.7 million. Since non-recurring items are not usually included for valuation purposes, Goldman Sachs excluded this gain. Berlinski Aff. at 7-8.

FN35. Defendants note that Shinagel: has never previously evaluated a mutual fund company or its

stock; did not evaluate the comparable companies to determine the cause of movement in their stock prices; did not consider whether comparable companies were largely owned by a single entity; and did not take into account the fluctuations in the spot market for natural gas with regard to Torch Energy. Defendants Russell and Quinlan Br. at 17-18.

FN36. Included among the dilution analyses uncovered in the discovery process that plaintiffs seek to have disclosed are those analyses prepared "in-house" by Torchmark and those prepared for Torchmark by Morgan Stanley. None show a price above $31.25 as being non-dilutive of Torchmark's earnings.

FN37. The Goldman Sachs dilution opinion is disclosed in the Proxy Statement.

FN38. Here the principal factor that plaintiffs regard as material is the flood of new money coming into mutual funds as interest rates fall. This may affect the stock value of investment advisors such as Waddell & Reed.

Not Reported in A.2d, 1993 WL 400209 (Del.Ch.), Fed. Sec. L. Rep. P 97,805

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)
**(Cite as: 2004 WL 3030005 (Del.Super.))**

Page 1

▷
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware.
Arthur E. BENNING, Sr., Barbara Lee Benning, Arthur E.
Benning, Jr. and Janessa
Dabler, Plaintiffs,
v.
WIT CAPITAL GROUP, INC., and Wit Capital
Corporation d/b/a Wit Capital,
Defendants.
**No. Civ.A.99C-06-157 MMJ.**

Submitted Aug. 16, 2004.
Decided Nov. 30, 2004.

Upon Plaintiffs' Renewed Motion for Class Certification.
Granted in Part. Denied in Part.

Jeffrey S. Goddess, Rosenthal, Monhait, Gross & Goddess,
P.A., for Plaintiffs and the Class.

Allen M. Terrell, Jr., Peter B. Ladig, Richards, Layton &
Finger, for Defendants.

MEMORANDUM OPINION
JOHNSTON, J.

*PROCEDURAL CONTEXT*
**\*1** Wit Capital Corporation, a wholly owned subsidiary of
Wit Capital Group, Inc. (collectively "Wit Capital"), is an
internet brokerage firm. Plaintiffs Arthur E. Benning, Sr.,
Barbara-Lee Benning, Arthur E. Benning, Jr. and Janessa
Dabler [FN1] were customers of Wit Capital. Plaintiffs filed
their complaint on June 16, 1999, seeking declaratory relief
and damages in connection with certain brokerage
transactions.

> FN1. Plaintiff Dabler was not a party to the Initial
> Complaint. Rather, Dabler was permitted to
> intervene as a named Plaintiff in April 2000.

On August 13, 1999, Wit Capital filed a Motion to Dismiss

or Stay the Initial Complaint on the basis that the account
agreements mandated a separate arbitration for each
customer. At the November 9, 1999 hearing, the Court
denied the motion and directed Plaintiffs to move for class
certification following receipt of Wit Capital's responses to
class certification discovery.

Plaintiffs filed a Motion for Class Certification on
December 16, 1999. The Court denied class certification.
[FN2] The Delaware Supreme Court reversed the denial and
remanded the action to this Court:

> FN2. *Benning v. Wit Capital Group, Inc.,*
> Del.Super., C.A. No. 99C-06-157, Alford, J. (Jan.
> 10, 2001).

Once the parties complete appropriate discovery, the
Superior Court should then weigh the relevant factors to
determine if Plaintiffs have met the requirements of Rule
23(b)(3) for purposes of class certification. The trial judge
should take care to consider not only whether questions of
law or fact common to the class predominate over the
questions affecting individual members, but to also give
equal weight to the question of whether or not a class
action remains the superior method for the fair and
efficient adjudication of this litigation. [FN3]

> FN3. *Benning v. Wit Capital Group, Inc.,*
> Del.Supr., No. 116, 2001 (Order) (Nov. 1, 2001).

The parties subsequently conducted additional discovery on
the issues of numerosity, [FN4] typicality [FN5] and
predominance. [FN6] Plaintiffs have requested that the
Court certify a class consisting of all persons who entered
into brokerage account agreements with Wit Capital on or
before May 20, 1999. Plaintiffs allege that there are at least
41,000 potential class members. This is the Court's
consideration of Plaintiffs' Renewed Motion for Class
Certification.

> FN4. Super. Ct. Civ. R. 23(a)(1) (whether the class
> is so numerous that joinder of all members is
> impracticable).

> FN5. Super. Ct. Civ. R. 23(a)(3) (whether the
> claims or defenses of the representative parties are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                      Page 2
Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)
**(Cite as: 2004 WL 3030005 (Del.Super.))**

typical of the claims or defenses of the class).

FN6. Super. Ct. Civ. R. 23(b)(3) (whether questions of law or fact common to the members of the class predominate over any questions affecting only individual members).

*FACTS*

Wit Capital served a niche market by offering initial public offering ("IPO") stock to small investors, who otherwise were excluded from the IPO market by brokerage firms that reserved IPO shares for their largest and most sophisticated customers. In general, when stocks are offered for the first time to the public, the demand exceeds the available shares. IPO stock is allocated to brokerage firms on a limited basis. IPO shares are a desirable investment because they offer investors the opportunity to reap exponential returns within a relatively short period of time.

The service offered by Wit Capital was distribution of its limited allocation of IPO shares. Each customer executed an account agreement with Wit Capital ("Account Agreement"). The Account Agreement required customers desiring to participate in an IPO to maintain a certain minimum account balance. The account was required to have available funds equal to or greater than the purchase price of the securities. The Account Agreement defined "Available Funds" as "the sum of money market funds and credit interest balances, plus funds receivable from settled sales, minus funds needed to pay for recent purchases and minus funds needed to pay for any open orders and any uncleared deposits." Wit Capital was required to execute IPO stock purchase orders on a first-come, first-served basis. Priority was given to customers who refrained from "flipping" their shares from previous IPOs for at least 60 days following an IPO. [FN7] Another exception to the first-come, first-served approach was to give an absolute preference to members of "affinity groups," [FN8] without regard to their "flipper" status.

FN7. On its home page, Wit Capital defined "non-flippers" as "Members who have track records for buying public offering shares and holding them for at least 60 days."

FN8. Wit Capital defined "affinity groups" as "individual investors with some preexisting relationship or affinity to the issuer, such as customers, employees or suppliers."

*PLAINTIFFS' ALLEGATIONS*

**\*2** Plaintiffs allege that Wit Capital did not allocate IPO shares to them and other purported class members on a first-come, first-served basis, for at least four different reasons:

(1) Incorrect Date for Account Balance Calculation

Plaintiffs allege that Wit Capital computed allocations for IPO orders on the wrong dates. Wit Capital allocated shares on the effective date, or trade date. Plaintiffs contend that the correct date was the settlement date, three days after the trade date. Because Wit Capital determined account balances on or before the effective date, rather than the settlement date, Wit Capital improperly rejected orders from customers whose accounts may not have been adequately funded as of the effective date for each IPO, but who subsequently could have funded or did fund their accounts for the order in question.

(2) Improper Calculation of Minimum Account Balance

The Account Agreement provided that minimum account balances may consist of cash and stock. Plaintiffs allege that Wit Capital improperly calculated the minimum account balances as though each customer had to have an all cash balance. Therefore, according to Plaintiffs, Wit Capital improperly denied IPO stock to customers who had sufficient cash and stock in their accounts.

(3) Violation of Share Limitation Policy

Wit Capital had a written policy limiting individual customers to the purchase of no more than 100 or 200 shares of any particular IPO stock if Wit Capital received fewer than the number of shares ordered by customers. Plaintiffs claim that some customers were allocated more that the proper number of shares, while other qualified customers received no IPO shares whatsoever.

(4) Disregard of Anti-Flipping Policy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                        Page 3
Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)
**(Cite as: 2004 WL 3030005 (Del.Super.))**

Wit Capital's written policy was to give preference to customers who did not sell prior IPO shares within 60 days after the initial purchase, *i.e.,* "non-flippers." Plaintiffs contend that Wit Capital disregarded this policy by denying IPO stock to customers who had been identified as "non-flippers." In the same IPO, customers identified as "flippers" were given IPO shares.

### REQUISITES TO CLASS ACTION
Delaware <u>Superior Court Civil Rule 23</u> provides in pertinent part:

(a) *Requisites to class action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class actions maintainable.* An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:

(1) The prosecution of separate actions by or against individual members of the class would create a risk of:

**\*3** (A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy....

The four issues central to Plaintiffs' Motion for Class Certification are:

(1) Whether the class is so numerous that joinder of all members is impracticable;

(2) Whether the claims of the representative parties are typical of the claims of the class;

(3) Whether questions of law or fact common to the class predominate over the questions affecting individual members; and

(4) Whether or not a class action is the superior method for the fair and efficient adjudication of this litigation.

### ANALYSIS
During oral argument on Plaintiffs' renewed motion, the Court requested additional written submissions on three issues. First, is there a cognizable cause of action for damages to those customers who were induced to hold their prior IPO stock because of Wit Capital's policy of favoring "non-flippers?" Second, should the Court certify a class limited to customers who were wrongly denied the opportunity to participate in an IPO? Third, should the Court certify subclasses within a class, identified by the type of conduct on the part of Wit Capital that proximately caused damage; and, would each subclass need a class representative and be required to meet numerosity and typicality requirements.

I. *Customers Induced To Hold By Wit Capital's "Anti-Flipping" Policy*

Plaintiffs allege that Wit Capital had a stated policy giving priority to customers who received IPO allocations and held the shares for at least 60 days. These customers were to be identified as "non-flippers." Plaintiffs assert claims for damages sustained as a result of Wit Capital's purported failure to adhere to its anti-flipping policy.

In *Manzo v. Rite Aid Corporation,* [FN9] the Court of Chancery considered whether, under Delaware law, shareholders could advance claims for investment opportunity losses--so called "holder claims." The *Rite Aid* plaintiff alleged that she would not have held her shares had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)
**(Cite as: 2004 WL 3030005 (Del.Super.))**

*Rite Aid* disclosed accurate information concerning the company's financial performance. If she had not been induced to hold stock, she would have invested elsewhere. Plaintiff sought money damages to compensate for the return she alleged would have been earned from other investments.

>          FN9. 2002 WL 31926606 (Del. Ch.), *aff'd*, 825 A.2d 239 (Del.2003).

**\*4** The *Rite Aid* Court found:

> Under this theory, the Court is asked to presume that plaintiff's investment in Rite Aid stock would have been deployed in other more successful investments.... [A]warding money damages to compensate plaintiff for the return she *could* have earned had she invested elsewhere--as she was free to do, but didn't do--amounts to speculation founded upon uncertainty. As plaintiff has failed to direct this Court to any precedent or policy to support such an award, plaintiff's assertion of "investment opportunity losses" does not, in my opinion, state a cognizable injury. [FN10]

>          FN10. *Id.*

In this case, Plaintiffs have cited *Duncan v. Theratx, Inc.,* [FN11] asserting that Delaware law permits recovery of "benefit of the bargain" damages. Plaintiffs' reliance on *Duncan* is misplaced. In that case, the Delaware Supreme Court considered a question certified to the Court by the United States Court of Appeals for the Eleventh Circuit. The question was: "What is the proper measure of damages when a defendant's contractual obligation to cause a shelf registration, under which plaintiff is entitled to trade a restricted stock, to remain in effect for a specified period of time is breached by defendant's temporary suspension of plaintiffs' ability to trade the restricted stock?" [FN12]

>          FN11. 775 A.2d 1019 (Del.2001).

>          FN12. *Id.* at 1020.

The Eleventh Circuit already had found that the company had breached the merger agreement. Therefore, the issue of liability had been resolved. The only determination before the Delaware Supreme Court was the measure of damages,

not whether the cause of action was valid under Delaware law. [FN13] Unlike the instant case, the *Duncan* shareholders were not simply induced to hold. Instead, the shareholders were prohibited from trading their shares by the temporary suspension of shelf registration. Under the narrow circumstances presented, the Delaware Supreme Court held that the shareholders were not required to show that they actually would have sold the shares during the restricted period. The Court reasoned that the company's breach amounted to a temporary conversion of the shares. [FN14]

>          FN13. *Id.* at 1021.

>          FN14. *Id.* at 1022-24 (The measure of damages was calculated as "the difference between (1) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received if they had been able to sell their shares, and (2) the average market price of the shares during a reasonable period after the restrictions were lifted.")

In contrast, Wit Capital customers were free to trade their IPO shares. As in *Rite Aid,* this Court finds that Plaintiffs' inducement to hold theory does not state a cause of action. There may be many reasons why potential class members chose not to sell IPO shares for 60 days. Any award of money damages would be too speculative and not based upon a cognizable injury.

Additionally, under Delaware law, no claim of fraud can be pursued as a class action. Individual issues of justifiable reliance predominate over questions common to members of a potential class. [FN15] The Delaware Supreme Court has ruled that there is no presumption of reliance based on a "fraud on the market" theory. [FN16] Therefore, Count III of the Complaint in its entirety cannot be pursued as part of a class action. To the extent other allegations assert reliance as an element of any cause of action, those claims are not appropriate in a class action.

>          FN15. *Rite Aid,* 2002 WL 31926606.

Westlaw.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)
**(Cite as: 2004 WL 3030005 (Del.Super.))**

---

> FN16. *See Malone v. Brincat*, 722 A.2d 5, 12-13 (Del.1998).

II. *Numerosity*

*5 Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable. There is no rigid minimum number of members requisite to class certification. Classes with as few as 40 members have been found to satisfy the numerosity requirement. [FN17] The moving party need not show the exact size of the proposed class. [FN18] The Court may make common sense assumptions. [FN19]

> FN17. *Smith v. Hercules, Inc.*, 2003 WL 1580603, at *4 (Del.Super.); *Mentis v. Delaware American Life Ins. Co.*, 2000 WL 973299, at *3 (Del.Super.); *Paine Webber R & D Partners v. Centocor, Inc.*, 1997 WL 719096, at *4 (Del.Super.); *Marhart, Inc. v. CalMat Co.*, 1992 WL 82365, 82338 (Del. Ch.).

> FN18. *Smith v. Hercules, Inc.*, 2003 WL 1580603, at *4 (Del.Super.).

> FN19. *German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537, 552 (S.D.N.Y.1995).

Wit Capital has argued that a class defined as "all Wit Capital customers who entered into a brokerage Account Agreement with Wit Capital before May 21, 1999" cannot be certified. However, Wit Capital's expert opined: "For each of these putative class members to have been affected by the alleged failure of Wit Capital to follow its allocation policies, it must be true that each of them: i) applied for IPO allocations, ii) were denied allocations, and iii) were denied allocations due to alleged violations of Wit Capital's policies." [FN20]

> FN20. Affidavit of Allan W. Kleidon at ¶ 18 (Mar. 16, 2004).

Plaintiffs' expert examined data from fourteen sample IPO allocations. [FN21] Plaintiffs either sought or received allocations of IPO stock through their brokerage accounts with Wit Capital in each of these fourteen IPOs. The number of customers requesting stock in a single allocation ranged from 2,039 to 18,226 depending upon the particular IPO. The number of customers who received stock ranged from 100 to 9,340. The customers who requested, but did not receive stock ranged from 1,539 to 16,136.

> FN21. Declaration of Keith Altman (Dec. 17, 2003).

The question is how many of the customers denied stock were deprived of the right to participate in IPOs as a result of Wit Capital's alleged wrongful conduct. A definitive determination of such numbers necessarily is inextricably intertwined with a determination of the merits of Plaintiffs' claims. Under these circumstances, the Court must examine the evidence presently available and make common sense assumptions.

Because the burden is on the party seeking class certification, [FN22] the Court reviews the facts presented in the light most favorable to the non-moving party. Wit Capital provided data for only fourteen IPOs. It is not disputed that Wit Capital offered customers the opportunity to participate in a far greater number of IPOs. For purposes of this analysis, however, the Court will only consider the fourteen sample IPOs. In 93,522 instances, customers requested but did not receive stock. Assuming that only 1% of these requests gives rise to a cognizable claim of improper denial of participation in an allocation, the proposed class would have 935 members. If these class members were to be divided into four subclasses, with each sub-class having approximately 233 members, the numerosity requirement in Rule 23(a)(1) clearly has been met.

> FN22. *Dieter v. Prime Computer, Inc.*, 681 A.2d 1068, 1071 (Del. Ch.1996).

Wit Capital has not attempted to show that the policy violations only could have affected the named Plaintiffs. Rather, Wit Capital pointed out that a large number of customers have not yet complained. Plaintiffs responded that they only became aware of the alleged wrongful conduct because three of the Plaintiffs happened to be family members and compared their Wit Capital transactions. When potential class members would not have

Westlaw.

Not Reported in A.2d                                                                    Page 6
Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)
**(Cite as: 2004 WL 3030005 (Del.Super.))**

a realistic opportunity to be aware of a cause of action as individuals, class certification is particularly warranted.

III. *Sub-Classes and Predominance*

**\*6** As noted above, Plaintiffs have asserted four theories of recovery for customers wrongfully denied allocations. (1) Wit Capital determined account balances on or before the effective date, rather than the settlement date, thus improperly rejecting orders from customers whose accounts may not have been adequately funded as of the effective date for each IPO, but who subsequently could have or did fund their accounts for the order in question. (2) Wit Capital improperly calculated the minimum account balances as though the customer had to have an all cash balance, thereby denying IPO stock to customers who had sufficient cash and stock in their accounts. (3) Contrary to its policy, Wit Capital allocated more that the proper number of shares to some customers, while other qualified customers received no IPO shares. (4) Wit Capital disregarded its preference policy by denying IPO stock to customers who had not been identified as "flippers" and, as part of the same IPO, allocating stock to customers identified as "flippers."

A single class comprised of all customers allegedly harmed as a result of all four Wit Capital practices would be problematic. Rule 23(a)(2) mandates that there must be "questions of law or fact common to the class." Rule 23(b)(3) requires that the common questions of law or fact must predominate over any questions affecting only individual members. Each of Plaintiffs' four theories of recovery involves a separate factual and legal analysis. The first issue is whether Wit Capital had the alleged duty to customers. The second issue is whether Wit Capital breached that duty. The creation of four sub-classes, according to the type of alleged wrongful conduct, ensures that the questions of law and fact common to each sub-class predominate over individual questions.

IV. *Typicality*

Rule 23(a)(3) states that the claims of the representative parties must be typical of the claims of the class. The typicality requirement must be met for each sub-class. [FN23] Plaintiffs have alleged that one or all of the

Plaintiffs were wrongfully denied IPO allocations as a result of each of the four separate theories of recovery. Therefore, Plaintiffs' claims are typical of the sub-classes. As representative parties, Plaintiffs have the ability to fairly and adequately protect the interests of the class. [FN24]

FN23. Super. Ct. Civ. R. 23(c)(4).

FN24. Rule 23(a)(4).

V. *Practicality and Superiority*

The final issue is whether a class action is the superior method for the fair and efficient adjudication of this litigation. Rule 23(b)(1) requires that the Court determine whether individual members' actions could result in inconsistent or incompatible results. The answer to this is clear. Litigation of this case will likely be protracted and complicated. Different factfinders inevitably will not reach identical results. Should individual actions be brought in different jurisdictions, it is likely that legal issues will be resolved with some degree of inconsistency.

**\*7** Wit Capital has argued that arbitration is available and required pursuant to the Account Agreement. During oral argument, the Court asked whether, as a practical matter, it would be possible for Wit Capital, an allegedly under-resourced entity, to engage in hundreds or even thousands of separate arbitration proceedings. During the hearing and as part of post-hearing written submissions, Wit Capital's response was that there was "no evidence that there could be a thousand claimants and that Plaintiffs had failed to demonstrate that there were more than a handful of potential claimants." This Court's finding of numerosity addresses Wit Capital's assertion that there are very few potential claimants.

By way of additional response, Wit Capital stated: "Wit Capital (and the customers) contractually agreed to arbitrate individual claims. Wit Capital will honor that obligation, regardless of how many individual claims may be brought." Regardless of Wit Capital's good faith intent to abide by its obligation to arbitrate, the Court finds this argument unpersuasive. The specter of numerous arbitrations, engaged in by a company in financial difficulty, is unrealistic. A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)
**(Cite as: 2004 WL 3030005 (Del.Super.))**

class action is superior to either individual arbitrations or separate trials. Further, if the Court were to deny class certification, it appears that the pursuit of individual claims is economically impractical for the individual plaintiffs.

Wit Capital has asserted that this action must fail in part because "at least in regards to the allegedly improperly allocated IPO shares, there is no allegation here that Wit Capital benefitted from its alleged mistakes.... There is no unjust enrichment to Wit Capital. Moreover, any customer who did not receive an IPO allocation also did not *pay* for one. Indeed, one could conclude that customers who did not receive an allocation--and who also therefore did not pay for one--were not harmed at all." If the Court were to accept this argument, the result would be a wrong without a remedy. There could never be a case in which a customer, wrongfully denied the opportunity to participate in an IPO, could recover. If Wit Capital has in fact breached contractual or other duties to customers and there were to be no class action, Wit Capital would not be held accountable.

### CONCLUSION

THEREFORE, the Court makes the following findings. Count III of the Amended Complaint ("holder" claims for damages sustained as a result of Wit Capital's purported failure to adhere to its anti-flipping policy) cannot be pursued as part of a class action. Any award of money damages would be too speculative and not based upon a cognizable injury. To the extent other allegations assert reliance as an element of any cause of action (such as fraud), those claims are not appropriate in a class action. Individual issues of justifiable reliance predominate over questions common to members of a potential class.

However, with respect to the Plaintiffs' remaining claims, the numerosity requirement in Rule 23(a)(1) has been met. The Court hereby certifies a class comprised of Wit Capital customers who applied for IPO allocations and were denied allocations because of alleged violations of Wit Capital's policies. Four sub-classes are hereby certified: (1) qualified customers whose accounts may not have been adequately funded as of the effective date for each IPO, but who subsequently could have or did fund their accounts for the order in question, and were denied IPO allocations because Wit Capital determined account balances on or before the

effective date, rather than the settlement date; (2) qualified customers who had sufficient cash and stock in their accounts, but were denied IPO allocations because Wit Capital improperly calculated the minimum account balances as though the customer had to have an all cash balance; (3) qualified customers who received no IPO shares because Wit Capital allocated more than the proper number of shares to other customers; and (4) qualified customers who had not been identified as "flippers," but were denied IPO allocations because Wit Capital disregarded its preference policy and, as part of the same IPO, allocated stock to customers identified as "flippers."

**\*8** The creation of four sub-classes, according to the type of wrongful conduct, ensures that the questions of law and fact common to each sub-class predominate over individual questions. Plaintiffs' claims are typical of those of members of the sub-classes. As representative parties, Plaintiffs have the ability to fairly and adequately protect the interests of the class. A class action is superior to either individual arbitrations or separate trials for the fair and efficient adjudication of this case.

Counsel are requested to contact the Court to arrange for a prompt scheduling conference to address how best to bring the remainder of this case to an orderly conclusion.

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 3030005 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**8**

Westlaw.

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889
**(Cite as: 1990 WL 212304 (Del.Ch.))**

**C**

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
John CARUANA and Loretta Caruana, Joint Tenants in
Common, Derivatively on
behalf of Interco Incorporated, a Delaware corporation,
Plaintiffs,
v.
Harvey SALIGMAN, Richard B. Loynd, R. Stuart Moore,
Charles J. Rothschild, Jr.,
Ronald L. Aylward, Donald E. Lasater, Harry M. Krogh,
Lee Lieberman, Mark H.
Lieberman, Robert H. Quenon, William E. Cornelius,
Marilyn S. Lewis, Zane E.
Barnes, Thomas H. O'Leary, Nathan S. Ancell, Stanley
Rubin, Douglas Hillman,
Edward Frey, Zachary Goldman and Londontown
Corporation, a Delaware
Corporation, Defendants,
and
Interco Incorporated, Nominal Defendant.
**Civ. A. No. 11135.**

Submitted: Sept. 17, 1990.
Decided: Dec. 21, 1990.

R. Bruce McNew, Pamela S. Tikellis, and Carolyn D. Mack
of Greenfield & Chimicles, Wilmington, for plaintiffs.

H. James Conaway, Jr., Edward B. Maxwell, 2nd, and
Bruce L. Silverstein of Young, Conaway, Stargatt & Taylor,
Wilmington, and Frank, Bernstein, Conaway & Goldman,
Baltimore, Md., for Londontown defendants.

Thomas A. Beck, and Nathan B. Ploener of Richards,
Layton & Finger, Wilmington, for Interco Director
Defendants.

Stephen E. Jenkins, and Keith R. Sattessahn of Ashby,
McKelvie & Geddes, Wilmington, for defendant Interco
Incorporated.

MEMORANDUM OPINION
CHANDLER, Vice Chancellor.

**\*1** Pending are defendants' motions to dismiss plaintiffs'
derivative action. Plaintiffs, John Caruana and Loretta
Caruana, filed the underlying derivative action on
September 29, 1989, seeking damages in connection with
the sale by Interco Incorporated ("Interco") of its then
wholly-owned subsidiary, Londontown Corporation
("Londontown"). The Interco director defendants ("director
defendants") move to dismiss the complaint pursuant to
Chancery Court Rules 23.1 and 12(b)(6). Those defendants
who comprise the group that purchased Londontown, as
well as Londontown itself, separately move pursuant to
Rules 23.1 and 12(b)(6), to dismiss the claim that they aided
and abetted the director defendants' alleged transgressions.
Defendants Zachary Goldman, Edward Frey, Douglas
Hillman and Stanley Rubin further move to dismiss
pursuant to Rules 12(b)(2), (4) and (5) on the grounds of
lack of jurisdiction over the person, insufficiency of process
and insufficiency of service of process.

I.

Interco and this Court have met before. *See City Capital
Associates, L.P. v. Interco Inc.,* Del.Ch., 551 A.2d 787,
*appeal dismissed as moot,* Del.Supr., 556 A.2d 1070 (1988).
Luckily, for the sake of brevity, the present matter concerns
only one discrete transaction. Some background,
nevertheless, is in order.

Interco, the nominal defendant, is a Delaware corporation
with its principal place of business in St. Louis, Missouri.
Interco has been engaged in four core businesses: (1)
apparel manufacturing; (2) general retail merchandising; (3)
footwear manufacturing; and (4) furniture and home
furnishings. The following individuals were members of the
board of directors of Interco at the time of the alleged
wrongs: Harvey Saligman, Harry M. Krogh, Ronald L.
Aylward, R. Stuart Moore, Mark H. Lieberman, Richard B.
Loynd, Charles J. Rothschild, Jr., Zane E. Barnes, Donald
E. Lasater, Lee M. Lieberman, Robert H. Quenon, William
E. Cornelius, Marilyn S. Lewis, Thomas H. O'Leary and
Nathan S. Ancell. The current board, at the time of the
complaint, is virtually identical except for the absence of
Krogh, Lieberman and Ancell.

Defendant Londontown is a Delaware corporation with its
principal place of business in Eldersberg, Maryland.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                          Page 2
Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889
(Cite as: 1990 WL 212304 (Del.Ch.))

Londontown manufactures under the label London Fog and was part of Interco's apparel group until its sale in the transaction now at issue. Prior to its sale in December of 1988, Londontown's common stock was owned entirely by Interco.

Interco placed Londontown for sale, according to plaintiffs, in August of 1988, as part of Interco's defensive restructuring which was allegedly in reaction to a takeover bid. The Interco board purportedly received "quite a few bids" for Londontown. One such bid, supposedly submitted as early as October 26, 1988, was from Burlington Coat Factory Warehouse Inc. ("Burlington"). Plaintiffs allege that while the terms of the Burlington bid were negotiable, the defendants completely disregarded and deliberately prevented Burlington from participating in the bidding process. Another bid was made, at a time undisclosed in the complaint, by Eldersberg Acquisition Corporation ("Eldersberg").

*2 On December 19, 1988, Interco announced that it had entered into a definitive agreement (the "Eldersberg Agreement") to sell Londontown to Eldersberg. Eldersberg, a Delaware corporation created to effectuate the purchase of Londontown, was formed by a group of Londontown executives, one of whom was an Interco director (the "Lieberman group"). The Lieberman group consisted of Edward Frey, Zachary Goldman, Douglas Hillman, Stanley Rubin as well as its namesake, former director Mark Lieberman. Under the terms of the agreement, the Lieberman group would pay $178 million for Londontown by means of a promissory note secured by a letter of credit or, at Interco's option, cash. In conjunction with the agreement, Interco announced that the proceeds would be used to pay a bank debt incurred in its restructuring plan.

Upon announcement of the Eldersberg agreement, Burlington allegedly indicated that it was willing to purchase Londontown on terms superior to those proposed by Eldersberg. The Interco board announced that it would consider a Burlington bid and, on December 27, 1988, Burlington submitted its bid of $190 million in cash. The complaint contains no other allegations describing the Burlington bid other than the purported assurance of Monroe Milstein, Burlington's chairman, that Burlington

was willing to negotiate and was equipped with assurances and approvals, from its lenders, that it could safely proceed with its offer. Plaintiffs claim that the Interco board refused to negotiate with Burlington. On December 28, 1988, Interco rejected Burlington's bid, allegedly without justification and devoid of any exigencies.

Plaintiffs make various unsubstantiated allegations concerning Interco's rejection of the Burlington bid. One such allegation is that "analysts reported that Interco's action had the appearance of favoritism towards the subsidiary management." Another is that Interco had "thwarted Burlington's every effort to submit a full detailed offer for Londontown." Notwithstanding, Burlington purportedly announced that it would persist in bidding for Londontown.

Burlington's alleged persistence, however, came to an end on December 29, 1988, when the Interco board caused Interco to complete the $178 million transaction with the Lieberman group. On that same day, Interco evidently used approximately $150 million of the net proceeds from the sale to reduce the then current portion of its long-term debt.

II.

Plaintiffs allege that the sale of Londontown, under the circumstances described, constitutes a gross waste of corporate assets, mismanagement of Interco's affairs and breaches of the fiduciary duties of care and loyalty. In addition, plaintiffs maintain that Eldersberg and each member of the Lieberman group, except Lieberman, aided and abetted the Interco directors' breach of fiduciary duties.

Plaintiffs bring these claims derivatively in the right and for the benefit of Interco to redress the purported injuries suffered by Interco. Plaintiffs have not made demand on the present Interco board, to institute this action, due to purported futility. Demand is futile according to plaintiffs because, among other things, the Interco board directly participated in wrongs alleged and because the allegations of fact preclude protection from judicial scrutiny afforded by the business judgment rule. Defendants' motion to dismiss the complaint because no demand was made and because no basis exists to excuse demand must be addressed first.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3
Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889
(Cite as: 1990 WL 212304 (Del.Ch.))

III.

*3 As shareholders of Interco, plaintiffs are not in a position to manage the business and affairs of Interco. Under Delaware law, the directors manage the business and affairs of the corporation they serve. 8 Del.C. § 141(a). Because a derivative action fetters managerial prerogative, it is regulated by Chancery Court Rule 23.1 which requires a shareholder first to demand that the directors pursue the alleged cause of action. Rule 23.1 provides in relevant part:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... [t]he complaint ... shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.

A board's decision to reject the suit is part, if applicable, of the board's business judgment and will be protected by the accompanying presumptions. Zapata Corp. v. Maldonado, Del.Supr., 430 A.2d 779, 784 (1981).

Rule 23.1 requires the complaint to allege with particularity the plaintiffs' efforts to have the directors pursue the action or the reasons for the plaintiffs' failure to do so. In the latter situation, where the plaintiff considered such a demand to be futile, he must allege with particularity why this is so. It is the adequacy of the plaintiffs' allegations of demand futility that I now consider.

In considering defendants' motion, I am limited to a consideration of the allegations of the complaint taking all well-pleaded averments as true. Aronson v. Lewis, Del.Supr., 473 A.2d 805, 815 (1984); Pogostin v. Rice, Del.Supr., 480 A.2d 619, 622 (1984). To adequately plead demand futility, plaintiffs must allege particularized facts creating a reasonable doubt as to "(i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." Grobow v. Perot, Del.Supr., 539 A.2d 180, 186 (1988); Aronson v. Lewis, supra. Failure to so plead would require dismissal of plaintiffs' putative derivative complaint. Pogostin, 480 A.2d at 627; Aronson, 473 A.2d at 818.

A. Disinterest or Independence

To succeed on the first prong of the demand futility test, plaintiffs must allege facts, with particularity, that raise a reasonable doubt as to the independence or disinterestedness of the Interco directors. It is generally understood that director independence can be challenged with alleged facts showing that the directors "were dominated or otherwise controlled by an individual or entity interested in the transaction." Grobow v. Perot, 539 A.2d at 189. The disinterest or independence prong is directed to the time the action was filed. Pogostin, 480 A.2d at 624. Plaintiffs have alleged no facts challenging director independence.

As to disinterest, "plaintiffs must plead particularized facts demonstrating either a financial interest or entrenchment." Grobow v. Perot, 539 A.2d at 188. Again, plaintiffs have alleged no facts demonstrating either a financial interest or entrenchment motive on the part of the Interco directors. Instead, plaintiffs maintain that the directors are interested because they participated in and approved the wrongs alleged and "cannot defend their actions by any alleged business judgment because each of them has acted with intentional, willful, and reckless disregard of corporate interest...." Plaintiffs' Answering Mem. at 21. Plaintiffs go on to argue that director interest is further evidenced by the fact that Interco's liability insurance would not cover an action brought by the company against its own directors and that the directors recommended a charter amendment limiting their liability. These allegations, taken together, the argument goes, raise a reasonable doubt as to director disinterest.

*4 Plaintiffs' allegation that the entire current Interco board of directors directly participated in, and approved, the wrongs alleged is legally insufficient. Mere directorial approval of a transaction is insufficient to show interestedness on the part of directors. Aronson, 473 A.2d at 817. In addition, it is well-settled that an allegation that directors approved and participated in a challenged transaction will not, in and of itself, establish demand futility. Grobow v. Perot, Del.Ch., 526 A.2d 914, 924 (1987), aff'd, Del.Supr., 539 A.2d 180 (1980); Kaufman v. Belmont, Del.Ch., 479 A.2d 282, 288 (1984).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889
**(Cite as: 1990 WL 212304 (Del.Ch.))**

Plaintiffs' argument that the directors are interested both because their liability insurance has a typical exclusion from coverage of claims brought by Interco against its directors and because the directors recommended and approved a charter amendment limiting their liability has been made before. *See Decker v. Clausen,* Del.Ch., C.A. No. 10684, Berger, V.C. (Nov. 6, 1989). Indeed, plaintiffs' present argument mirrors the argument addressed in the *Decker* opinion. In *Decker,* this Court found that argument to be nothing more than "variations on the 'directors suing themselves' and 'participating in the wrongs' refrain." *Id.,* slip op. at 6. Such allegations were found to provide no particularized facts creating a reasonable doubt that the directors are disinterested or independent. I find no reason to depart from the *Decker* holding in the present situation.

Plaintiffs' next argument is that the Interco directors are interested because the prospect is very good that they will be found liable. This argument draws on language in *Aronson* suggesting that directors may be interested for purposes of the demand requirement "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson,* 473 A.2d at 815. Since such a finding would require finding that the second prong (exercise of business judgment) of the demand futility test has been satisfied, I will address plaintiffs' argument, the question of the applicability of the business judgment rule, directly.

B. *Exercise of Business Judgment*

The second prong of the demand futility analysis requires examination of the substantive nature of the challenged transaction and the board's approval of that transaction. In other words, the analysis looks at the substance of the transaction and the process by which the board approved it. *Grobow v. Perot,* 539 A.2d at 189. The issue is whether the complaint's well-pleaded facts support a reasonable doubt that the transaction was the product of a valid exercise of business judgment. *Id.* Plaintiffs' burden, in the present situation, is particularly heavy since the transaction challenged was approved by a majority of disinterested directors. *See Grobow,* 539 A.2d at 190.

*5 Concerning the substance of the transaction, plaintiffs assert that the purchase terms were so egregious as to amount to waste by the Interco directors. The test for waste is "limited solely to discovering whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid." *Saxe v. Brady,* Del.Ch., 184 A.2d 602, 610 (1962); *Grobow v. Perot,* 539 A.2d at 189. Plaintiffs' claim can therefore be understood to assert that no person of ordinary, sound business judgment would have agreed to sell Londontown for $178 million in the face of Burlington's $190 million proposal. The $12 million difference (which amounts to less than 7% on the pretax basis) cannot be said to constitute waste under the test articulated in *Saxe v. Brady, supra.* The monetary difference is insignificant, alone, and especially in light of factors not addressed by the complaint, *i.e.,* timing, structure and certainty of financing, that could account for the board's acceptance of the lower offer. This Court has long recognized that the highest bid is not necessarily the best bid. *See, e.g., Freedman v. Restaurant Assoc. Indus., Inc.,* Del Ch., C.A. No. 9212, Allen, C., slip op. at 22 (Oct. 16, 1987). Presently, however, the complaint leaves me ill-equipped to even examine the Burlington, or for that matter any other bid. *See Stein v. Orloff,* Del.Ch., C.A. No. 7276, Hartnett, V.C., slip op. at 16-17 (May 30, 198) (the court granted a portion of defendants' motion to dismiss for failure to make presuit demand because of failure to make certain allegations creating a reasonable doubt that the board exercised its business judgment). For this reason, the plaintiffs have not alleged facts sufficient to create a reasonable doubt that the Interco board did not properly exercise its business judgment in rejecting the Burlington, or any other, bid. In other words, the Court must defer to the judgment of Interco's disinterested board.

Next and finally, plaintiffs argue that there is a reasonable doubt that the directors exercised proper business judgment with regard to procedural due care. *See Grobow,* 539 A.2d at 189; *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872-73 (1985). The gist of the allegations underlying this argument is that the director defendants did not adequately and properly consider the Burlington bid, did not scrupulously adhere to principles of fairness in conducting a

Westlaw.

Not Reported in A.2d                                                                          Page 5
Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889
**(Cite as: 1990 WL 212304 (Del.Ch.))**

sale of Londontown and favored the Lieberman group throughout the process. These allegations, as pointed out by defendants, however, are conclusory in light of the allegations that have not been made.

There are no allegations that the Interco board did not receive bids for Londontown and cooperate with interested parties. There are also no allegations that the board did not retain an investment adviser and counsel to advise it on the Londontown sale. Plaintiffs do not allege that the board was not aware of, or did not consider, the Burlington offer and any other offer. Without such particularized allegations, the complaint's process allegations are conclusory and thus fail to raise a reasonable doubt that the Interco board exercised its business judgment in conducting the sale of Londontown. *See Sumers v. Beneficial Corp.,* Del.Ch., C.A. No. 8788, Hartnett, V.C., slip op. at 9-10 (July 28, 1987).

IV.

*6 Plaintiffs' complaint is dismissed, pursuant to Chancery Court Rule 23.1, for failure to adequately plead demand futility. For this reason I need not address the alternative arguments for dismissal of the complaint.

IT IS SO ORDERED.

Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.