**9**

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2002 WL 31112340 (Del.Ch.), 28 Del. J. Corp. L. 241
**(Cite as: 2002 WL 31112340 (Del.Ch.))**

C

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.
C. Robert COATES, Plaintiff,
v.
NETRO CORPORATION, a Delaware corporation, Netro
Corporation, a California
corporation, Gideon Ben-Efraim, Richard M. Moley, Robert
J. Wynne, Robert
Robertson, Irwin Federman and Thomas R. Baruch,
Defendants.
**No. CIV.A. 19154.**

Submitted: Aug. 6, 2002.
Decided: Sept. 11, 2002.
Michael Hanrahan, Gary F. Traynor and Paul A. Fioravanti,
Jr., of Prickett, Jones & Elliott, P.A., Wilmington, for
Plaintiff.

Allen M. Terrell, Jr., Gregory P. Williams and Thad J.
Bracegirdle, of Richards, Layton & Finger, P.A.,
Wilmington, Delaware; Of Counsel: Dennis E. Glazer, John
J. Clarke, Jr., and David B. Toscano, of Davis Polk &
Wardwell, New York, New York, for Defendants.

MEMORANDUM OPINION
CHANDLER, Chancellor.

*1 This case involves a redomestication merger of a
California corporation into a Delaware corporation, and the
subsequent adoption of a poison pill rights plan. The
defendants--the board of directors and the corporation--filed
a motion to dismiss. The plaintiff shareholder alleges
various breaches of disclosure and fiduciary duties. None of
the allegations, however, state a claim upon which relief can
be granted. The plaintiff also failed to make a demand on
the board under the second count of the complaint, which is
a derivative claim. Therefore, on these grounds, I grant
defendants' motion to dismiss.

I. BACKGROUND FACTS
Netro Corporation was a California Corporation ("Netro
California"). The board of directors for Netro California

decided that redomestication to Delaware would best serve
the interests of the corporation. The board planned to
accomplish the redomestication by merging into a wholly
owned subsidiary incorporated in Delaware. The resulting
company ("Netro") is now a Delaware corporation. Netro
has about 202 shareholders, the largest of which is Telecom,
a 15% shareholder.

On April 26, 2001, the board disseminated a proxy
statement to the shareholders with a proposal outlining the
merger plan and discussing the differences between
Delaware and California corporate law. The board of
directors included a disclaimer that their recommendation
should be tempered based on the fact that Delaware law
provided more protections for the board. The board also
attached a copy of the resulting Certificate of Incorporation
("Certificate") and a copy of the by-laws that would survive
after the merger.

The annual meeting was held on May 31, 2001. The
meeting was adjourned overnight and reconvened on June 1,
2001. It is alleged that the polls were held open through
June 1, 2001. The Form 10Q filed on August 14, 2001,
stated that 50.44% [FN1] of the outstanding shares voted in
favor of the merger. After the merger, on July 19, 2001,
Netro's board of directors approved a rights plan, or "poison
pill."

> FN1. 26,283,352 shares out of 52,103,464
> outstanding shares voted in favor of the
> transaction. See Compl. ¶ 33.

The plaintiff filed this action on October 5, 2001, alleging
that the redomestication merger and the related
anti-takeover devices are invalid. The plaintiff also alleges
that the poison pill is invalid. The plaintiff is a holder of
986,500 shares of Netro common stock. The defendants
filed a motion to dismiss under Court of Chancery Rule
12(b)(6) on November 30, 2001. After briefing and oral
argument, this is the Court's decision in that motion.

II. STANDARD OF REVIEW
The standard governing a Rule 12(b)(6) motion to dismiss is
well established. A party is entitled to dismissal of the
complaint only where it is clear from its allegations that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 2002 WL 31112340 (Del.Ch.), 28 Del. J. Corp. L. 241
**(Cite as: 2002 WL 31112340 (Del.Ch.))**

plaintiff would not be entitled to relief under any set of facts that could be proven to support the claim. Moreover, the Court is required to accept all of plaintiff's factual allegations as true and give plaintiff the benefit of all inferences that may be drawn from the facts. Dismissal is appropriate under Rule 12(b)(6) only where it appears with a reasonable certainty that a plaintiff would not be entitled to the relief sought under any set of facts that could be proven to support the action.

### III. ANALYSIS

**\*2** Plaintiff alleges two causes of action in his complaint. Neither cause of action states a claim upon which relief can be granted.

*A. Count I--The Redomestication Merger and Related Anti-Takeover Devices*

Plaintiff's first count involves seven allegations of irregularities affecting his voting and contractual rights.

1.   *"[B]ecause invalid proxies were counted, the Redomestication Merger did not receive sufficient valid votes to be approved under applicable law."* [FN2]

> FN2. Compl. ¶ 48.

The final vote on the Redomestication Merger resulted in 50.44% of the shareholders voting in favor of the merger. [FN3] Plaintiff alleges that this is not enough because "[t]he error rate for proxies in an uncontested proxy count *would likely* be higher than 1%," [FN4] and "[i]t is *highly unlikely* that in a public corporation with thousands of stockholders ... there would not have been a significant number of invalid proxies submitted." [FN5] These are unsupported, conclusory allegations.

> FN3. Compl. ¶ 33.
>
> FN4. *Id.* (emphasis added).
>
> FN5. *Id.* (emphasis added).

Nothing is alleged in the complaint to show that any of the proxies were invalid; nor can any inference reasonably be drawn from the mere statement that the existence of invalid

proxies is *likely* . No effort was made by the plaintiff to challenge the vote count or to use any remedy provided by California law [FN6].

> FN6. California law governs the vote on the Redomestication Merger. The corporation was not yet a Delaware Corporation, so Delaware law does not apply.

California law states that the "report or certificate made by the inspectors of election is prima facie evidence of the facts stated therein." [FN7] The plaintiff's allegations do not overcome the presumption that the results were correct. The proper way to challenge the result was by following California law, which the plaintiff failed to do. These allegations do not support a claim upon which relief can be granted.

> FN7. CAL. CORP. CODE § 707 (Deering 2002).

2. *"[K]eeping the polls open for the purpose of sweeping the street to find sufficient votes to approve the anti-takeover merger constituted a breach of fiduciary duty by the directors."* [FN8]

> FN8. Compl. ¶ 48.

First, California law applies to this allegation, since this is about the California corporation. California law allows adjournments of meetings, allows inspectors of elections to determine when the polls should close, and suggests that this determination should be given broad latitude and reviewed only for abuse of discretion. [FN9] No violation of California corporate law was plead.

> FN9. *See Clopton v. Chandler,* 150 P. 1012 (Cal.Ct.App.1915).

Second, even if Delaware law applied, the plaintiff does not show "that the primary purpose of the board's action was to interfere with or impede exercise of the shareholder franchise." [FN10] Therefore, the adjournment receives the benefit of the business judgment presumption. Defendants' action survives under the business judgment rule, because they adjourned the meeting for just one day and received sufficient votes to approve the merger. The plaintiff's only

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 2002 WL 31112340 (Del.Ch.), 28 Del. J. Corp. L. 241
**(Cite as: 2002 WL 31112340 (Del.Ch.))**

allegation is that all of the proxies were not valid. That conclusory statement has already been dealt with and dismissed. Therefore, regardless of which law applies, there is no cognizable claim resulting from this allegation.

> FN10. *State of Wisconsin Inv. Bd. v. Peerless Sys. Corp.*, 2000 Del. Ch. LEXIS 170 at *32 (Del. Ch.).

3. *"[T]he Merger and anti-takeover certificate provisions were not validly effected in accordance with applicable law and the anti-takeover provisions were inserted into Netro's certificate in violation of law and the Merger Agreement."* [FN11]

> FN11. Compl. ¶ 48.

*3 First, the merger needed to comply with California law. There is no allegation that it did not comply with applicable California law; nor is there an allegation that the Delaware corporation did not comply with § 252 of the Delaware General Corporate Law ("DGCL"). The only allegation is that the California corporation did not follow Delaware law. It was not supposed to, thus this allegation fails to state a claim.

Second, as to the certificate amendment, the shareholders approved the proxy statement with the amended certificate of incorporation attached to the statement. When the merger was completed, the certificate matched the one attached to the proxy statement. Had it not, the plaintiff could assert a breach of the duty of disclosure. The shareholders, however, received what they voted for. There thus was no breach of the duty of disclosure.

4. *"[T]he stockholder vote on the Redomestication Merger was not fully informed because material information was misstated or withheld from the stockholders."* [FN12]

> FN12. Compl. ¶ 48.

The disclosure allegations here are several and weak. None of them constitute a claim for relief. The proxy statement has a fifteen page point-by-point comparison of Delaware and California law. That entire discussion is qualified in its entirety by reference to the actual Certificate and bylaws, which are attached to the proxy statement. Nevertheless, the plaintiff raises eight disclosure issues.

First, plaintiff says the defendants needed to include evidence, explanations, and examples to support statements about the differences between California and Delaware law, rather than merely describing those differences. That is not required. If the differences described by the defendants were incorrect, I am certain the plaintiff would raise that issue loudly and vigorously. Requiring the defendants to back up the statements with the evidence needed to win at trial would be immaterial, unnecessary and overly confusing to the shareholders.

Second, plaintiff says that defendants should have disclosed the threat they were responding to by redomesticating and adding defenses. The defendants claim there was no specific threat. The threat identified by the plaintiff, that Telecom was trying to take over Netro, is contradicted by the same Telecom SEC filings relied on by the plaintiff. Those filings expressly disclaim any intention to seek control of Netro. No threat need be disclosed if no threat exists. It was reasonable for the defendants to take Telecom at its word, so nothing existed to disclose. Therefore, this allegation fails as a matter of law.

Third, plaintiff states that the defendants did not correctly describe the significance of changing the board from two equally sized classes to three classes. Such a description would be immaterial. The alleged significance of this, according to the plaintiff, was that the change would "insure that it would take at least two proxy contests and two annual meetings in order to change a majority of the board." [FN13] That statement is true, but was also true under the makeup of the board prior to the change. Thus, there was no significant difference for the defendants to discuss.

> FN13. Compl. ¶ 20.

*4 Fourth, the plaintiff alleges that the proxy statement indicated that shareholders could call a special meeting and bring business before the meeting, but that the by-laws removed that right and only allowed the board to bring business before the meeting. That is a misreading of the by-laws. The by-law allows both the person calling the meeting and the board to bring business before the meeting.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2002 WL 31112340 (Del.Ch.), 28 Del. J. Corp. L. 241
(Cite as: 2002 WL 31112340 (Del.Ch.))

[FN14] That is not any different from the language quoted from the proxy statement. Thus, no disclosure violation occurred.

FN14. Compl. ¶ 21.

Fifth, plaintiff contends that the proxy statement is defective because it says that a few provisions--about special meetings, removal of directors, and filling of vacancies on the board--are in the bylaws when those provisions are actually in both the bylaws and the Certificate of Incorporation. Plaintiff alleges the proxy statement was "misleadingly incomplete" [FN15] because it failed to reveal that those provisions could only be amended with approval of both the board and the stockholders.

FN15. Compl. ¶ 22.

The Certificate was attached to the proxy statement. All discussions of the Certificate and the by-laws were qualified in their entirety by reference to the attached documents. The proxy statement was complete. All the necessary information was available to the shareholders, and the shareholders were directed to refer to those documents. Nothing was omitted or misrepresented and, thus, no breach of disclosure occurred.

Sixth, the plaintiff alleges that the proxy statement misled the shareholders by stating that indemnification was required under Delaware law. This is also a misreading of the proxy statement. The proxy statement lists nine bullet points correctly characterizing Delaware indemnification law. The statement that is allegedly misleading merely states that the by-laws will reflect the required aspects of Delaware law with respect to indemnification. That is a statement ensuring the shareholders that the board is complying with all requirements of Delaware law. This is not misleading, nor is it a breach of disclosure.

Seventh, plaintiff states that the defendants did not disclose their intention to adopt a poison pill. There was no evidence alleging that the defendants intended to adopt a pill at that time, but, even so, the merger had nothing to do with the poison pill. Defendants could have adopted a pill any time, either before or after the merger. No disclosure was

necessary, nor was any reason for disclosure alleged in the complaint.

Finally, plaintiff states that defendants should have described how § 203 of the DGCL would have affected Telecom, Netro's largest shareholder. This information is not material to a shareholder voting on whether to approve a redomestication merger, especially when § 203 is described in great detail in the proxy statement. Therefore, this allegation is not material and does not state a claim.

None of the above allegations, individually or collectively, state a claim for breach of the duty of disclosure. Accordingly, all of these allegations are dismissed.

5. *"[T]he defendant directors breached their fiduciary duties in approving and recommending the Redomestication Merger."* [FN16]

FN16. Compl. ¶ 48.

*5 No allegations to support this statement are developed in the complaint. A mere conclusory statement that the defendants breached their fiduciary duties is not enough to survive a motion to dismiss. The defendants, in fact, were clear in the proxy statement that a possible conflict of interest may arise from the greater protections afforded directors under Delaware law. The defendants emphasized that conflict to temper their recommendation to the shareholders. [FN17] This is the only evidence of any conflict, and it is specifically stated to warn the shareholders in evaluating the board's recommendation. Thus, no cognizable breach has been alleged.

FN17. *See* Proxy Statement p. 24.

6. *"[D]efendants are estopped from maintaining the anti-takeover provisions."* [FN18]

FN18. Compl. ¶ 48.

No explanation is made, in the complaint or in plaintiff's brief filed with the Court, for why the defendants should be estopped. The defendants never stated that they would not implement anti-takeover provisions. The anti-takeover provisions as implemented are not alleged to violate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                 Page 5
Not Reported in A.2d, 2002 WL 31112340 (Del.Ch.), 28 Del. J. Corp. L. 241
**(Cite as: 2002 WL 31112340 (Del.Ch.))**

California or Delaware law. Thus, there is no reason why defendants should be estopped from maintaining the anti-takeover provisions.

7. *"[C]ertain of the measures contained in Netro's certificate and bylaws are invalid under Delaware law."* [FN19]

> FN19. Compl. ¶ 48.

The complaint fails to allege which measures are invalid or why. All of the defensive measures adopted by the defendants are permitted under Delaware law. The measures include a classified board, § 203, limits on shareholder action, and the poison pill. These are not invalid by virtue of plaintiff alleging them to be invalid. This allegation of the complaint fails to state a claim.

All seven of the allegations in Count I of the complaint fail to state a claim upon which relief can be granted. Therefore, the motion to dismiss Count I of the complaint is granted.

*B. Count II--The Poison Pill*

The second count of the complaint alleges that the adoption of the poison pill was a breach of the defendants' fiduciary duties because it was not a reasonable response to any perceived threat. Thus, the plaintiff wants the poison pill rights plan declared invalid. [FN20] This count fails in two ways. First, it is a derivative claim and no demand was made on the Board, nor was the futility of such demand shown. Second, the count fails to state a claim upon which relief can be granted.

> FN20. Compl. ¶ 50.

1. *Plaintiff's failure to make demand.*

The complaint characterized the claim as a direct one. The distinction between derivative and direct claims can be hazy, but this claim is clearly derivative.

The standard for distinguishing direct and derivative claims was established in *Moran v. Household Int'l, Inc.* [FN21] *Moran* involved the adoption of a poison pill rights plan, and certain shareholders brought direct claims based upon

violations of their contractual rights. Then-Vice Chancellor Walsh determined that, since the shareholders suffered no distinct injury, "such an action must be brought derivatively on behalf of the corporation." [FN22]

> FN21. *See* 490 A.2d 1059 (Del. Ch.1985).

> FN22. *Id.* at 1070.

**\*6** The situation is no different here. The allegation is that the Board breached its fiduciary duties by adopting the poison pill rights plan. No distinct injury was alleged. Therefore, the claim must be brought on behalf of the corporation. Since it is a derivative claim, demand must be made on the board, or excused based upon futility. [FN23] Failure to make demand results in dismissal of the complaint. [FN24]

> FN23. *See* Court of Chancery Rule 23.1.

> FN24. *See id.*

Demand, however, may be excused if facts are alleged showing that demand would be futile. To determine "demand futility the Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN25] No facts were alleged, or can even remotely be inferred, that futility of demand was present here. Therefore, Count II is dismissed for failure to make demand upon the Board.

> FN25. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

2. *Plaintiff's failure to state a claim.*

Even if the plaintiff properly showed demand futility, the complaint still fails to state a claim upon which relief can be granted.

It is true that the adoption of a precautionary defensive measure does require the board to justify its action. [FN26] The adoption of a precautionary defensive device, however,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31112340 (Del.Ch.), 28 Del. J. Corp. L. 241
(Cite as: 2002 WL 31112340 (Del.Ch.))

Page 6

does not automatically mean that the complaint will survive a motion to dismiss. [FN27]

> FN26. *See Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1356 (Del.1985).

> FN27. *See Chrysogelos v. London,* 1992 Del. Ch. LEXIS 61 at *12-* 13 (Del. Ch.).

The complaint does not allege any legally cognizable harm to the corporation or the shareholders. The complaint only alleges the possibility that the board could later deploy the poison pill to deter an unwanted threat. That "possibility--presently abstract and divorced from any actual or threatened use against a specific, impending proposal--does not give rise to an actionable claim." [FN28] Since the plaintiff fails to allege any specific threat or show any harm by the adoption of the poison pill rights plan, Count II must be dismissed for failure to state a claim.

> FN28. *Id.* at *13.

### IV. CONCLUSION

The plaintiff fails to state any claims upon which relief can granted. As to the second count of the complaint, the plaintiff failed to make demand upon the Board or to show the futility of such a request. Therefore, I grant the defendants' motion to dismiss. [FN29]

> FN29. After the motion to dismiss was fully briefed (and on the eve of oral argument), plaintiff moved to supplement the complaint. The proposed supplemental complaint includes allegations regarding certain recent events that occurred after the present complaint was filed. It would appear that these new allegations would more properly be asserted in a new filing against defendants. Counsel, however, should advise the Court how they wish to proceed after receiving this decision.

IT IS SO ORDERED.

Not Reported in A.2d, 2002 WL 31112340 (Del.Ch.), 28 Del. J. Corp. L. 241

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10**

Westlaw.

Not Reported in A.2d                                                                                      Page 1
Not Reported in A.2d, 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
John Paul DECKER and International Apparel Associates,
Plaintiffs,
v.
A.W. CLAUSEN, et al., Defendants.
and
Bankamerica Corporation, Nominal Defendant.
William STEINER, Plaintiff,
v.
A.W. CLAUSEN, et al., Defendants.
and
Bankamerica Corporation, Nominal Defendant.
**Civ. A. Nos. 10,684, 10,685.**

Submitted: Sept. 8, 1989.
Decided: Nov. 6, 1989.
**\*\*1024** R. Bruce McNew, Pamela Tikellis, and Carolyn Mack, Greenfield & Chimicles, Wilmington, Kenneth A. Jacobsen, Greenfield & Chimicles, Haverford, Pa. and Patrick J. Grannan, Greenfield **\*\*1025** & Chimicles, Los Angeles, Cal., for plaintiffs Decker and International Apparel Associates.

Joseph A. Rosenthal, Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, of counsel: Goodkind Labaton & Rudoff, New York City, for plaintiff Steiner.

Martin P. Tully, Morris, Nichols, Arsht & Tunnell, Wilmington, for Individual defendants.

R. Franklin Balotti, Richards, Layton & Finger, Wilmington, for defendant United Education Software.

Bruce M. Stargatt, Young, Conaway, Stargatt & Taylor, Wilmington, and Jack W. Londen, Morrison & Foerster, San Francisco, Cal., for BankAmerica Corporation.

MEMORANDUM OPINION
BERGER, Vice Chancellor.

**\*1** In the spring of 1989, several derivative actions were filed by stockholders of BankAmerica Corporation ("BAC")

seeking recovery for alleged mismanagement of student loans by BAC's subsidiary, Bank of America National Trust & Savings Association (the "Bank"). Several actions were filed in various state courts in California and at least one remains pending in the Superior Court for the County of Los Angeles (the "California action"). Two Delaware actions, one brought by John Paul Decker and International Apparel Associates (collectively, "Decker") and one by William Steiner ("Steiner"), were filed at about the same time as the earliest of the California actions.

Steiner has essentially abandoned his Delaware action in favor of the California action (in which he is one of the named plaintiffs), whereas Decker, who is not a party to the California action, has been pursuing his claim in this jurisdiction. Specifically, on June 6, 1989, Decker filed an amended complaint that purports to allege three derivative causes of action against the BAC directors, one derivative cause of action against United Education & Software, Inc. ("United") and one individual cause of action against the BAC directors. This is the decision, after briefing and argument, on BAC and the defendant directors' motion to dismiss the derivative allegations in the Decker action [FN1].

**\*\*1026** The claims at issue center on the Bank's involvement in a student loan program. The Bank, allegedly, is the largest student loan lender in California and, for several years, has been acting as trustee in connection with more than $1 billion in student loans issued by California Student Loan Finance Corp. ("CSLFC"), a non-profit corporation in the business of packaging student loans as securities for sale to institutional investors. The student loans, which allegedly have a very high default rate, were guaranteed by the U.S. Department of Education. That guarantee formed a substantial part of the value of the student loans, and was effective only if the lender complied with federal regulations and procedures relating to the servicing of the loans.

The Bank used United to service the student loans and to perform the functions necessary for maintaining the federal guarantees. However, an alleged computer breakdown at United in 1987 left United unable to satisfy the federal loan servicing requirements. Both the Bank and United allegedly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

failed to rectify this problem and, as a result, the federal guarantees were withdrawn. The Bank has recognized that this series of events (which precipitated lawsuits against the Bank by other banks that had backed the student loans with letters of credit) has caused or is likely to cause substantial losses. In the fourth quarter of 1988, the Bank allegedly set aside a $98 million reserve in connection with the student loan program, and an additional undisclosed amount was reserved in the first quarter of 1989.

Based upon these facts (which are set out in greater detail in the amended complaint), Decker asserts three derivative causes of action against the BAC directors: (1) willful failure to control and manage BAC and the Bank, amounting to a fraud upon BAC and its stockholders; (2) negligent failure to exercise ordinary care; and (3) constructive fraud based upon the BAC directors' alleged concealment and misrepresentation of material facts. Decker's fourth cause of action charges that United breached its contractual obligations **1027 by failing to service the student loans properly, and that United fraudulently induced BAC and the Bank to enter into the loan servicing agreement by representing that United was ready, willing and able to service the loans when it knew that it was unable to fulfill those commitments.

*2 The amended complaint includes seven pages of reasons why Decker's failure to make presuit demand on the BAC directors would have been futile and should, therefore, be excused. Those reasons may be grouped into the following general categories: (1) the BAC directors participated in and/or approved the alleged wrongdoing; (2) the directors have taken no action in response to demands made by other stockholders, and the board's handling of other derivative claims has been inadequate; (3) the directors are actively defending law suits brought by other banks concerning the wrongs alleged in the Decker complaint; (4) the directors receive substantial salaries as directors and, thus, have benefitted from the wrongs alleged; and (5) the directors would not sue themselves.

Under Delaware law, the "demand requirement ... is a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson v.*

*Lewis,* Del.Supr., <u>473 A.2d 805, 809 (1984)</u>. It is "inextricably bound to issues of business judgment," and is "a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Id.* at 812. Demand is excused where the complaint alleges, with particularity, facts that "raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." *Grobow v. Perot,* Del.Supr., <u>539 A.2d 180, 186 (1988)</u>.

To succeed on the first prong of the demand futility test, Decker must show that the BAC directors may not have been disinterested or independent. The directors' independence could be challenged by alleging, with particularity, facts showing that they "were dominated or otherwise controlled by an individual or entity interested in the transaction." *Id.* at 189. As to disinterest, the Decker complaint must include particularized factual allegations showing entrenchment or a financial interest on the part of the BAC directors. *See id.* at 188.

None of the allegations in the amended complaint raises a reasonable doubt that the BAC directors were disinterested or independent. There is nothing in the nature of the loan servicing problems that would suggest either an entrenchment motive or any **1028 interest, in the sense of self-dealing, on the part of the directors. The amended complaint alleges that the BAC directors participated in and/or approved the alleged wrongs. However, such allegations, like the claim that demand would be futile because the directors would have to sue themselves, have been rejected consistently by our courts. *See Aronson v. Lewis,* 473 A.2d at 817; *see also Pogostin v. Rice,* Del.Supr., <u>480 A.2d 619, 625 (1984)</u>; *Good v. Getty Oil Co.,* Del.Ch., <u>514 A.2d 1104, 1107-08 (1986)</u>.

Decker's allegation that BAC's liability insurance would not cover an action brought by the company against its own directors and the allegation that the directors recommended a charter amendment limiting their liability are but variations on the "directors suing themselves" and "participating in the wrongs" refrain. They provide no particularized facts creating a reasonable doubt that the directors are disinterested or independent. The fact that they

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                 Page 3
Not Reported in A.2d, 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)

receive salaries for serving as directors, likewise, is insufficient to excuse demand. *Grobow v. Perot,* 539 A.2d at 188. Finally, the suggestion that demand is excused because the directors did not respond to another stockholder's demand or because they are defending related litigation is without merit. *See Kaplan v. Peat, Marwick, Mitchell & Co.,* Del.Supr., 540 A.2d 726, 731 n. 2 (1988); *Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1113 (D.Del.) *aff'd mem.,* 782 F.2d 1026 (3d Cir.1985).

*3 Decker seems to recognize that the list of reasons for demand futility contained in his amended complaint is insufficient. Instead, he argues that the directors are interested because the prospect is very good that they will be found liable. This argument draws on language in *Aronson* suggesting that directors may be interested for purposes of the demand requirement "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson v. Lewis,* 473 A.2d at 815. However, since a finding of director interest on this ground would require a finding that the second prong of the demand futility test had been satisfied, it seems more appropriate to address the question of the applicability of the business judgment rule directly.

To satisfy the second prong of the demand futility test, the factual allegations of the amended complaint must create a reasonable doubt that the BAC directors exercised proper business judgment. This analysis includes the question of whether the directors fulfilled their duty of procedural due care, by becoming fully informed, and their duty of substantive due care, by not engaging in, e.g., a waste **1029 of corporate assets. *See Grobow v. Perot,* 539 A.2d at 189. The amended complaint includes many allegations detailing United's failure to perform its student loan servicing tasks. It also details at least one method by which the Bank should have become aware of United's problems long before it did. As early as the spring of 1987, the Bank allegedly received monthly reports indicating that a substantial number of claims made with respect to the student loans were being denied by the agencies responsible for the federal guarantees. This high denial rate should have

alerted the Bank that United was not carrying out its loan servicing functions correctly. Other more specific aspects of United's operations also allegedly should have been known to the Bank. For example, for a five month period in 1988, more than 200,000 change-of-status notices were left unprocessed by United while that company was undergoing a computer conversion. The prompt processing of such status code changes is critical to the successful operation of the student loan program and the Bank allegedly knew of this problem or made no effort to discover it.

Whether these allegations would excuse demand if the defendants were the Bank and its directors would be a close question. The amended complaint alleges that serious problems existed with the student loan program and that the Bank either ignored those problems or was unaware of them for as much as a year. These allegations could possibly be enough to create a reasonable doubt that the directors of the Bank exercised due care in overseeing the student loan program.

That question need not be resolved, however, as neither the Bank nor the Bank's directors are defendants in this action. Rather, the defendants are the directors of the Bank's parent company, BAC. There are no allegations that the parent and subsidiary have the same or interlocking boards, and it appears from Decker's identification of the individual defendants that none of them is, in fact, a director of the Bank. Thus, it does not follow that any of the problems United was having, even if known to the Bank, were or should have been known to the directors of BAC. Under normal circumstances, a board of directors ought to be able to rely on its subsidiary's directors to oversee that subsidiary's management and attend to any problems that may arise. The amended complaint includes no factual allegations suggesting that the individual defendants here should not have relied upon the Bank's directors. Decker's conclusory allegations that the BAC directors "should have known" about problems with United and the student loans are unsupported and, therefore, do not create a reasonable doubt that the BAC **1030 directors neglected their duties or were grossly negligent in attempting to carry them out.

*4 Based upon the foregoing, I find that the amended complaint fails to allege facts which, if true, would create a

Westlaw.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

reasonable doubt as to the BAC directors' disinterest, independence or proper exercise of business judgment. Accordingly, the motion to dismiss Counts 1-4 of the amended complaint is granted. IT IS SO ORDERED.

> FN1. After this motion to dismiss had been briefed and argument had been scheduled, Steiner filed a motion to consolidate his action with Decker's and a motion to stay the consolidated actions. Both of those motions were opposed not only by defendants but also by Decker. The thrust of Steiner's argument was that, as a matter of judicial economy and comity, the same claims should not be litigated in two different jurisdictions. These, of course, are compelling considerations. However, in light of my disposition of the pending motion to dismiss all of the derivative claims in the Decker amended complaint, I conclude that the motions to consolidate and to stay are mooted.

Not Reported in A.2d, 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 11

Westlaw.

Not Reported in A.2d                                                                    Page 1
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
**(Cite as: 2000 WL 130630 (Del.Ch.))**

**H**
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.
In re FREDERICK'S OF HOLLYWOOD, INC.
Shareholders Litigation
**No. C.A. 15944.**

Jan. 31, 2000.
Norman M. Monhait, of Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, Delaware; and Goodkind,
Labaton, Rudoff & Sucharow LLP, and Law Offices of
Jeffrey S. Abraham, New York, New York; Lowey,
Dannenberg, Bemporad & Selinger, P.C., White Plains,
New York; Hanzman, Criden, Korge, Chaykin, Ponce &
Heise, P.A., Miami, Florida; Schubert & Reed, LLP, San
Francisco, California; and Cohn, Lifland, Pearlman,
Herrmann & Knopf, Saddle Brook, New Jersey; for
Shareholder Plaintiffs.

A. Gilchrist Sparks, III, Jon E. Abramczyk, and Jeffrey R.
Wolters, of Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware; for Defendants George W. Townson, Richard O.
Starbird, William J. Barrett and Merle A. Johnston.

Stephen E. Jenkins and Regina A. Iorii, of Ashby & Geddes,
Wilmington, Delaware; for Defendant Hugh V. Hunter.

*MEMORANDUM OPINION*
JACOBS, Vice Chancellor.

*1 The plaintiffs in this consolidated class action, who are
former shareholders of Frederick's of Hollywood, Inc.,
("Frederick's"), attack a cash merger whereby Knightsbridge
Capital Corp. ("Knightsbridge") acquired Frederick's on
September 29, 1997. The individual defendants, who were
the directors of Frederick's at the time of the merger (the
"Director Defendants"), are charged with having breached
their fiduciary duties of care and loyalty by failing to obtain
the highest available price for shareholders in the sale of
Frederick's, and also by misstating and omitting material
information from the Consent Solicitation Statement
("CSS") disseminated to shareholders in connection with the
merger.

The Director Defendants have moved under Court of
Chancery Rule 12(b)(6) to dismiss the amended complaint
for failure to state a claim upon which relief can be granted.
The four dismissal grounds being advanced are that: (i) the
exculpatory clause in Frederick's certificate of incorporation
bars any money damages recovery against the directors for a
breach of the duty of care; (ii) the plaintiffs have alleged no
cognizable breach of the directors' duty of loyalty and seek
no relief other than money damages; and (iii) the plaintiffs
have failed to allege any misdisclosures that are material.
Defendant Hugh H. Hunter has also moved separately for
dismissal on the independent ground that he cannot be held
liable for actions taken by the Frederick's board after he
resigned as a director. [FN1]

> FN1. Shortly after filing their complaint the
> plaintiffs moved to enjoin the merger between
> Knightsbridge and Frederick's. The Court denied
> that motion on September 29, 1997. On October
> 29, 1998, the plaintiffs filed an Amended
> Complaint, which the Knightsbridge Defendants
> moved to dismiss as to them. In a memorandum
> opinion issued on July 9, 1998, the Court granted
> that motion, leaving only the former Frederick's
> directors as parties defendant in the case.

I. BACKGROUND
The pertinent facts, as disclosed by the complaint, are as
follows:

A. The Parties

Frederick's is a Delaware corporation with its principal
executive offices located in Los Angeles, California. It
operates a nationwide mail order business and a chain of
women's intimate apparel stores in 39 states. As of
December 6, 1996, Frederick's had issued and outstanding
(a) 2,995,309 shares of Frederick's Class A stock (which
had one vote per share) that were held by approximately 500
shareholders of record, and (b) 5,903,118 shares of Class B
common stock (which were non-voting) that were held by
approximately 504 shareholders of record. Frederick's
shares were traded on the New York Stock Exchange.

The plaintiffs are a class consisting of the holders of Class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                           Page 2
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
**(Cite as: 2000 WL 130630 (Del.Ch.))**

A and/or Class B Frederick's common stock at the time of the merger. The Director Defendants are Frederick's board of directors (the "Board") at the time of the transaction. Those directors were: George W. Townson ("Townson") who was Frederick's Chairman of the Board, President and Chief Executive Officer; William J. Barrett ("Barrett") who was a Senior Vice President of Janney Montgomery Scott, Inc., Frederick's investment advisor ("JMS"); Richard O. Starbird ("Starbird"); Merle A. Johnston ("Johnston"); and Hugh V. Hunter ("Hunter") who was Co-Trustee of the Harriet R. Mellinger Trust and the Frederick N. Mellinger Trust (the "Trusts"). [FN2]

> FN2. As Co-Trustee of the Trusts, Mr. Hunter voted the Trusts' shares, which represented 41% of Frederick's Class A stock and 51% of its Class B stock.

These five directors all voted to approve the first merger agreement under which Knightsbridge would acquire Frederick's for $6 .14 cash per share. Except for Hunter (who had previously retired), these directors also voted to approve the ultimate merger agreement being challenged here, in which Knightsbridge acquired Frederick's for $7.75 per share cash.

B. Frederick's Commences an Auction

**\*2** In June 1996, Frederick's announced that it had retained JMS as its financial advisor in connection with a possible sale of Frederick's. During the next fifteen months, JMS conferred with over one hundred prospective purchasers including Knightsbridge. In April 1997, Knightsbridge proposed to purchase all of Frederick's outstanding common stock for between $6.00 and $6.25 per share, cash, in a two-step tender offer/merger transaction. That offer was conditioned upon Knightsbridge having the exclusive opportunity to conduct due diligence.

C. The $6.14 Knightsbridge Offer

On June 13, 1997, Frederick's and Knightsbridge executed an agreement whereby Knightsbridge would acquire Frederick's for $6.14 per share cash in a merger. The merger agreement permitted the Board to pursue transactions

proposed by third parties if their fiduciary obligations so required, but it prohibited Frederick's from soliciting any indications of interest by potential third party acquirors. The merger agreement also permitted Frederick's to terminate the Merger unilaterally if the Board approved a transaction with an acquiror other than Knightsbridge, but in that case Knightsbridge would be entitled to a breakup fee of $1.8 million.

The complaint alleges that Townson, who was Frederick's CEO, would receive significant sums of money under agreements he entered into with Knightsbridge in connection with the merger. Under a Termination and Release Agreement, Townson would receive $750,000 when the merger became effective; and under a Non-Competition and Consulting Agreement, Townson would receive $250,000, plus sixteen additional $100,000 quarterly payments beginning the calendar quarter after the merger effective date. The complaint further alleges that Townson would receive (in addition to the merger consideration of $6.14 per share for each of his Frederick's shares) a cash payment of $.05 for each option having an exercise price over $6.14--a payment claimed to represent value for "underwater options" that otherwise would be valueless in the merger.

The plaintiffs also allege that Barrett, as a Senior Vice President of JMS, also stood to benefit financially from the merger, in that a May 14, 1996 engagement agreement entitled JMS to an approximately $2 million fee if the merger was consummated.

Before the Board voted on that proposed merger, two directors, Sylvan Lefcoe and Morton Fields resigned on June 12, 1997 and June 13, 1997, respectively. The plaintiffs claim that the reasons for those resignations were material facts that Frederick's should have disclosed in the solicitation materials sent to shareholders. [FN3]

> FN3. The record does not disclose the reasons why those directors resigned.

The Frederick's board approved the $6.14 per share Knightsbridge offer at a special meeting held later on in the day of June 13, 1997. Thereafter, the board caused a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 3
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
**(Cite as: 2000 WL 130630 (Del.Ch.))**

Consent Solicitation Statement ("CSS") to be mailed, seeking stockholder approval of the merger. Stockholders were asked to deliver their consents no later than August 27, 1997, the expected merger closing date.

D. Frederick's Receives Other Offers

**\*3** While the $6.14 per share Knightsbridge merger proposal was pending, Milton Partners submitted, on August 21, 1997, a fully financed offer to acquire Frederick's for $7.00 per share cash. In response, and while the Board was considering that offer, Knightsbridge and the Trusts entered into an agreement (the "Stock Purchase Agreement") under which Knightsbridge obtained the right to buy the Trusts' Frederick's stock, which represented about 43% of the Class A voting shares. Importantly, the Trusts were given the right to terminate the Stock Purchase Agreement if the merger agreement was terminated in accordance with its terms.

On August 28, 1997, a second "third party" offer was submitted--this one by Veritas Capital Fund, L.P. ("Veritas")--to purchase all of Frederick's outstanding stock for $7.75 per share cash. Veritas emphasized that its offer was not binding. Later that same day, the Board responded by postponing the scheduled closing of the merger with Knightsbridge in order to evaluate the Veritas proposal. [FN4]

> FN4. The Board rejected the offer by Milton Partners, which later dropped out of the bidding contest after Veritas and Knightsbridge made higher offers.

On September 2, 1997 the Board sent Veritas a memorandum outlining certain conditions that Veritas would have to satisfy in order for the Board to consider Veritas' offer. The conditions were that Veritas deposit $2.5 million in an escrow account and also be willing to execute a merger agreement substantially identical to the Knightsbridge merger agreement.

In response to the September 2, 1997 memorandum, Veritas sent a letter to the Board requesting that Frederick's issue Veritas a "dilutive option," that would dilute

Knightsbridge's significant stock interest. Veritas also submitted to Frederick's a "marked up" merger agreement plus a $2.5 million escrow deposit.

In reaction to Veritas' offer, Knightsbridge approached the Trusts with a proposal to amend the Stock Purchase Agreement. The negotiated result was an amended stock purchase agreement (the "Supplement") that eliminated the Trusts' contractual right to terminate the Stock Purchase Agreement if the merger agreement were terminated. [FN5] The next day, Knightsbridge exercised its acquisition rights under the Agreement and Supplement, and purchased the Trusts' Frederick's stock. Knightsbridge then informed Frederick's Board that it would use its newly-acquired stock "for purposes of effecting the Merger [with Knightsbridge]" and that Knightsbridge would not "vote in favor of the bid submitted by Veritas or any other bid to acquire the Company."

> FN5. The Supplement also provided that: (I) the Trusts would sell their shares to Knightsbridge even if the merger agreement were not consummated; (ii) Knightsbridge had the right to pay for and receive the Trusts' shares before consummation of the merger; (iii) the Trusts would indemnify Frederick's in connection with the Supplement; and (iv) if Knightsbridge resold the shares acquired from the Trusts to a third party at a price above $6.90 per share before March 1, 1998, the Trusts would receive the price increase.

E. The Revised Knightsbridge Offer and Its Terms

In further response to the Veritas $7.75 per share cash proposal, Knightsbridge increased its offer to $7.75 per share, subject to four conditions, namely, that: (1) Frederick's would agree to a "no talk provision" prohibiting any Frederick's director, officer, employee or agent from negotiating with any other bidder; (2) the break-up fee would be increased from $1.8 million to $4.5 million; (3) Frederick's would grant Knightsbridge the right to appoint an "observer" who would attend all Frederick's board meetings; and (4) if Frederick's granted an option to purchase its stock to any third party, Frederick's would grant an identical option to Knightsbridge.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
(Cite as: 2000 WL 130630 (Del.Ch.))

*4 On September 8, 1997, Frederick's announced that the Board had accepted the revised Knightsbridge Offer, including these four conditions. The plaintiffs claim that by agreeing to those conditions, the Director Defendants had prematurely ended the bidding and therefore left itself unable to ascertain whether they had obtained the best value available for the shareholders.

To further strengthen its position, on September 9, 1997, Knightsbridge purchased an additional 195,000 shares of Frederick's Class A stock on the open market. That purchase gave Knightsbridge absolute voting control, even though Knightsbridge could not vote those 195,000 shares in favor of the merger because they were acquired after the record date.

In counter-response to these developments, Veritas responded on September 11, 1997 with an unsolicited $9.00 per share "non-binding offer" for all of Frederick's outstanding shares. This time the Board did not respond to Veritas' "offer;" instead, it accepted the Knightsbridge's $7.75 per share proposal. The Board allegedly did so for several reasons. First, the "no-talk" provision in the final merger agreement did not provide the Director Defendants with a "fiduciary out," and it also obligated Frederick's not to engage in any acquisition-related communications. Second, the shares Knightsbridge had acquired both in the open market and from the Trusts, represented a majority of each class of Frederick's stock, which Knightsbridge refused to vote in favor of any bid other than its own. Third, Veritas had requested a dilutive option, the legal validity of which the Board had questioned.

F. The Consent Solicitation Statement

On September 18, 1997, Frederick's issued Amendment No. 1 to the CSS, which disclosed that the consent solicitation would end on September 29, 1997, and that the merger would be consummated on that date. As explained elsewhere in more detail, the plaintiffs claim that the defendants made false disclosures and material omissions in the CSS.

The merger with Knightsbridge was consummated on September 29, 1997. This lawsuit followed.

II. CONTENTIONS

The complaint alleges two claims. The first is that the Director Defendants failed to meet the fiduciary requirement under *Revlon v. MacAndrews & Forbes Holdings, Inc.* [FN6] that in a sale of corporate control the Board must obtain the highest value reasonably available for the shareholders. [FN7] The plaintiffs claim that the Board knew or should have known that the Trusts had entered into a Stock Purchase Agreement with Knightsbridge, and that bargaining with Knightsbridge would become more difficult if Knightsbridge controlled the Trusts' stock. Despite that knowledge, the Board failed to enact defensive measures (such as a poison pill) designed to prevent Knightsbridge from gaining voting control of Frederick's. That failure, plaintiffs allege, amounted to a breach of the fiduciary duties of care and loyalty that the Board owed to Frederick's shareholders.

FN6. Del.Supr., 506 A.2d 173 (1986).

FN7. *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 48 (1994).

*5 The duty of loyalty claim is premised on the allegation that Director Defendants Townson and Barrett stood to obtain financial benefits that would not be shared by other shareholders generally. Specifically, (i) Townson would receive a cash payment for his underwater options, as well as under two highly lucrative contracts previously described, and (ii) Barrett, the Senior Vice President of JMS stood to benefit because JMS would receive a substantial fee for its services.

The plaintiffs' second claim is that the defendants misrepresented two material facts, and omitted to disclose a third material, in the CSS. Specifically, the defendants allegedly misrepresented that: (1) Frederick's, or its agent, had orally advised Veritas and Milton to submit their "best, final offer" by September 4, 1997, but in fact that never occurred, and (2) Frederick's materially overstated its reservations about accepting the Veritas Offer by reason of Veritas having requested a dilutive option. That was an overstatement, it is claimed, because the draft merger agreement submitted by Veritas left the amount of to-be-optioned shares blank, which evidenced that Veritas

Westlaw.

Not Reported in A.2d                                                    Page 5
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
(Cite as: 2000 WL 130630 (Del.Ch.))

was willing to negotiate and be flexible about the size of the option. Finally, the complaint alleges that the board improperly omitted to disclose the reasons why two Board members resigned before the vote on the $6.14 per share Knightsbridge merger proposal.

In support of the pending motion, the Director Defendants argue that the fiduciary claims must be dismissed because an award of money damages, which is the only remedy being sought here, is barred by the exculpatory clause in Frederick's certificate of incorporation; and also because the complaint does not allege any cognizable duty of loyalty claims. The Director Defendants further contend that the disclosure claims must be dismissed because as a matter of law the misstatements and the omitted disclosure were not material.

These contentions are next addressed.

### III. ANALYSIS
A motion to dismiss under Court of Chancery Rule 12(b)(6) will be granted where it is clear from the allegations of the complaint that the plaintiff would not be entitled to relief under any set of facts that could be proven to support the claim. [FN8] All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions that are unsupported by specific factual allegations will not be accepted as true. [FN9]

> FN8. In re Tri-Star Pictures, Inc. Litig., Del.Supr., 634 A.2d 319, 326 (1993); see also Loudon v. Archer-Daniels-Midland Co., Del.Supr., 700 A.2d 135, 140 (1997).

> FN9. See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc., Del.Supr., 691 A.2d 609, 613 (1996).

### A. The Revlon Claim

I first address the plaintiffs' Revlon claim, which is that the sale of Frederick's for cash was a sale of the entire company, which triggered the Board's fiduciary duty to obtain "the best value reasonably available to the stockholders," [FN10] a duty it is alleged the Board failed to satisfy. Critical to the legal sufficiency of that claim, at least in this case, is the

reason why the directors (allegedly) failed to satisfy that duty. As Vice Chancellor Lamb aptly put it, "A corporate board's failure to obtain the best value for its stockholders may be the result of illicit motivation (bad faith), personal interest divergent from shareholder (disloyalty) or a lack of due care." [FN11] Although the plaintiffs allege Revlon-based breaches of duty, and plead that they arise from violations of the board's duty of care and loyalty, I conclude that the complaint alleges only a breach of the duty of care--a claim that is not cognizable because of the exculpatory clause in Frederick's charter. Because I further find that the complaint does not adequately allege bad faith or disloyalty, dismissal of the Revlon claim is required.

> FN10. Id. at 48.

> FN11. In re Lukens, Inc. Shareholders Litig., Del. Ch., C.A. No. 16102, Lamb, V.C., Mem. Op. at 21 (Dec. 1, 1999) (citing Mills Acquisition Co. v. Macmillan, Inc., Del.Supr., 559 A.2d 1261, 1279-82 (1989).

1. The Duty of Care Claim

**6** I first consider the duty of care branch of the Revlon claim. The complaint alleges that the directors breached their duty of care by allowing one bidder (Knightsbridge) to acquire voting control and thereby circumvent the Board's ability to conduct a meaningful auction process. Plaintiffs claim that although the Board knew that Knightsbridge was seeking to buy the Trusts' stock for $6.90 per share, and that bargaining with Knightsbridge would become more difficult if Knightsbridge succeeded, the Board failed to enact defensive measures (such as a poison pill) protective of the interests of Frederick's shareholders. That failure to act, plaintiffs maintain, culminated in Knightsbridge acquiring a majority of Frederick's stock, which it was then able to use as leverage to end the auction and force a sale to itself, by refusing to vote its control shares in favor of any competing bid.

Assuming that these facts state a claim for violation of the Director Defendants' duty of care, the exculpatory clause found in Article Twelfth of Frederick's Certificate of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
**(Cite as: 2000 WL 130630 (Del.Ch.))**

Incorporation bars any recovery of money damages as a consequence of such a breach. [FN12] Article Twelfth provides:

> FN12. It is well established Delaware law that an exculpatory provision in a certificate of incorporation is authorized by 8 Del C § 102(b)(7) shields the corporation's directors against a judgment for money damages except for judgments arising out of breaches of duty of loyalty, claims for acts constituting bad faith, and claims for the receipt of improper benefits. *See In re Dataproducts Corp. Shareholders Litig.,* Del. Ch., C.A. No. 11164, V.C. Jacobs, Mem. Op. at 11 (August 22, 1991).

A director of this Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction for which the director derived an improper personal benefit.

The plaintiffs claim that the Delaware Supreme Court's decision in *Emerald Partners v. Berlin* [FN13] precludes any consideration of this § 102(b)(7) defense on a motion to dismiss, because *Emerald Partners* holds that a § 102(b)(7) charter provision is "in the nature of an affirmative defense ... [and that the Defendants] will normally bear the burden of establishing each of its elements." [FN14] Relying on this language, the plaintiffs argue that the Frederick's exculpatory provision cannot provide a basis to dismiss the complaint at the pleading stage, because the applicability of the charter provision can be determined only on a developed factual record.

> FN13. Del.Supr., 726 A.2d 1215 (1999).

> FN14. *Id.* at 1224.

The plaintiffs misread *Emerald Partners.* This Court has interpreted the above-quoted language as not precluding a Rule 12(b)(6) dismissal of claims that the directors breached their fiduciary duty of care on the basis of an exculpatory charter provision, so long as a dismissal on that ground does not prevent a plaintiff from pursuing well-pleaded claims that the directors breached their fiduciary duty of loyalty. [FN15] Under this reading of *Emerald Partners,* where a complaint alleges actionable disloyalty the burden will shift to the defendants to show the immunizing effect of the charter provision, [FN16] but where the complaint only alleges a breach of the duty of care, that claim may be dismissed at the pleading stage.

> FN15. *In re General Motors Class H Shareholders Litig.,* Del. Ch., 734 A.2d 611, 619 at n. 7 (1999); *see also In re Lukens,* C.A. No. 16102 at 25 n. 33

> FN16. *In re Lukens,* C.A. No. 16102 at 26.

**\*7** Because it is not cognizable under Article Twelfth and 8 Del C § 102(b)(7), and because I conclude that no duty of loyalty claim is pleaded, the duty of care claim will be dismissed. I turn to the duty of loyalty component of the *Revlon* claim.

2. The Duty of Loyalty Claim

The complaint alleges that the Director Defendants breached their duty of loyalty, in that two of the four directors who approved the $7.75 merger with Knightsbridge received a personal benefit from the transaction that was not enjoyed by all shareholders generally. As a consequence (plaintiffs claim), the merger was not approved by a majority of disinterested directors, for which reason the Defendant Directors must show that the merger was entirely fair. I disagree and conclude that the pleaded facts show that only one of the four directors was interested, and as a result, the merger was approved by a majority of disinterested directors. Accordingly, the duty of loyalty claim fails for lack of a valid premise.

To be sufficient to trigger entire fairness review, this complaint must allege that the sole interested director dominated or controlled the remaining directors, which the complaint here does not do. The complaint alleges that both

Westlaw.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
**(Cite as: 2000 WL 130630 (Del.Ch.))**

Townson and Barrett had conflicting self-interests at the time they voted to approve the merger, and that they received benefits not enjoyed by the remainder of the shareholders. As for Townson, the pleaded facts, if assumed to be true, would establish a disabling conflict, allegedly because the Knightsbridge transaction offered Townson a cash payment of $.05 for each of his options having an exercise price exceeding $6.14--options that would otherwise be worthless. Townson would also received substantial payments under two lucrative contracts. Under the Termination and Release Agreement, he would receive $750,000 when the merger became effective, and under the Non-Competition and Consulting Agreement, he would receive $250,000 on the merger's effective date, plus sixteen additional quarterly $100,000 payments beginning the calendar quarter following the effective date. These payments would constitute personal benefits not enjoyed by the shareholders generally, for which reason Townson would be deemed "interested" in the merger.

But, I cannot agree that the complaint states a cognizable claim that Barrett personally benefitted from the merger in a manner that was not enjoyed by the shareholders generally. Barrett was a Senior Vice President of JMS, Frederick's financial advisor. Under its engagement letter, JMS was entitled to receive an approximately $2 million fee for its services when the merger was consummated. The difficulty with this claim is that JMS would receive a fee for its services regardless of who the buyer was; moreover, the amount of the fee JMS was to receive would increase as the merger price increased. Thus, Barrett's (and JMS's) interests were completely aligned with the interests of the shareholders in obtaining the highest possible price for Frederick's shares. For these reasons, the complaint fails to state a claim that Barrett had a disabling self-interest. It follows from this that only one of Frederick's four directors voting on the Knightsbridge merger was interested.

**\*8** Because the complaint fails to allege facts that establish that the merger was not approved by a majority of disinterested directors, the breach of loyalty claims cannot survive a motion to dismiss.

B. The Disclosure Claims

Lastly, the plaintiffs claim that the Director Defendants misrepresented material facts, and also failed to disclose a material fact, in the CSS. The fiduciary duty of disclosure requires that solicitation materials disclose all information in the defendants' possession material to the transaction at issue. [FN17] The test of materiality is whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote ... [t]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [FN18]

> FN17. *Malone v. Brincat,* Del.Supr., 722 A.2d 5, 9 (1998).

> FN18. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985).

The plaintiffs first claim that the defendants misrepresented in the CSS that Frederick's agent orally advised Veritas and Milton Partners to submit their "best, final offer" by September 4, 1997. That disclosure was allegedly false because Veritas never received this advice. Assuming that the CSS falsely disclosed that the Board informed Veritas to submit its "best, final offer." I find that misstatement immaterial as a matter of law. The CSS was mailed after Veritas had increased its $7.75 offer to $9.00 and the CSS fully disclosed the $9.00 bid. With that disclosure the shareholders were told the facts that were material--all the bids that were on the table and their amounts and other terms. Whether or not Veritas was asked to submit its best and final offer at the time of its $7.75 proposal became irrelevant after Veritas had increased its bid to $9 .00--which (according to plaintiffs) was the high bid--and the shareholders were so informed.

The second disclosure claim concerns the disclosure in the CSS that the Board's reservations about accepting the Veritas Offer were based partially upon Veritas' request for a dilutive option. The plaintiffs argue that the CSS materially overstated this concern, because the draft merger agreement submitted by Veritas left blank the amount of shares subject to the dilutive option, thereby demonstrating Veritas' willingness to negotiate the terms of the option.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351
(Cite as: 2000 WL 130630 (Del.Ch.))

This argument is unpersuasive. The CSS disclosed that one of the Board's reasons for not accepting the Veritas Offer was that the Veritas Offer was conditioned on Frederick's issuing a dilutive option. The plaintiffs claim that because the number of to-be-optioned shares was left open for future negotiation, the requested dilutive option could not have been a subject of serious concern. The logic of this argument escapes me. Even if Veritas was willing to negotiate the size of the dilutive option, it does not follow that the Board had no reason to be concerned about its legality. [FN19] An option's size and its legality are two distinct issues, at least where (as here) the complaint alleges no facts that suggest a linkage.

> FN19. See *Mendel v. Carroll,* Del. Ch., 651 A.2d 297, 304-305 (1994).

*9 Finally, the plaintiffs claim that the CSS omitted to disclose a material fact, specifically, why two directors resigned before voting on the merger. I conclude that in these circumstances the reasons for the directors' resignations are immaterial. The two directors, Lefcoe and Field, resigned from the Board on June 12 and 13, 1997--three months before the Board considered the final offers for Frederick's. The complaint fails to allege facts that suggest any connection between the resignations and the merits of the Knightsbridge merger ultimately voted on. Therefore, the reasons for Lefcoe and Field's resignations are immaterial as a matter of law. Stated differently, the reasons for resignations that occurred three months earlier and in the context of an earlier proposal would have had no significance in the deliberations of a reasonable stockholder being asked to vote on a different proposal. [FN20]

> FN20. *Arnold v. Society for Savings Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1287 (1994).

### V. CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss the complaint is granted. [FN21] IT IS SO ORDERED.

> FN21. Because I have determined to dismiss the fiduciary duty and the disclosure claims, it become unnecessary to discuss Hunter's separate motion to

dismiss on the ground that he resigned before the board voted on the final Knightsbridge offer.

Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.