**12**

Not Reported in A.2d                                                                                                    Page 1
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

C

Circuit Court of Maryland,
Baltimore City, Part 20.
Gabrielle Katz HUDSON, et al., Plaintiffs,
v.
PRIME RETAIL, INC., et al., Defendants.
No. 24-C-03-5806.

April 1, 2004.
Michael A. Stodghill, Esq., Rubin & Rubin, Chartered, Rockville, Charles P. Scheeler, Esq., Piper Rudnick, LLP, Baltimore, Emily Komlossy, Esq., Goodkind, Labaton, Rudoff & Sucharow, LLP, Ft. Lauderdale, FL, Andrew J. Graham, Esq., Kramon & Graham, P.A., Baltimore.

*ORDER*
ALBERT J. MATRICCIANI, JR., Judge.

*1 Upon consideration of all defendants' motions to dismiss and plaintiffs' oppositions thereto, arguments of counsel having been heard on March 25, 2004, it is this *1st day of April, 2004,* by the Circuit Court for Baltimore City, Part 20, **ORDERED,** for the reasons set forth in the accompanying Memorandum Decision of this date, that dismissal is **GRANTED** as to each and every count of the third amended complaint, and it is further **ORDERED** that the motions to enforce the Court's bench decision are **DENIED** as moot.

*MEMORANDUM DECISION*
This purported class action litigation arises from the opposition mounted by several minority stockholders to the cash-out merger of Prime Retail, Inc. ("PRI"), a Maryland corporation, into Prime Outlets Acquisition Company, LLC, a New Jersey company affiliated with The Lightstone Group, LLC ("Lightstone"). Broadly stated, the plaintiffs [FN1] allege that in arranging and voting for the merger, various PRI directors [FN2] breached the duties they owed to the corporation and its stockholders. Plaintiffs also named Lightstone as an aiding and abetting defendant. Both Prime Retail and Lightstone have filed motions to dismiss the Third Amended Complaint under Maryland Rule 2-322(b).

> FN1. References to "plaintiffs" in this memorandum decision include Gabrielle Katz Hudson, Thomas R. Hudson, Jolly Roger Fund LP, and Jolly Roger Offshore Fund, Ltd.

> FN2. Defendant-directors are Glenn D. Reschke, Howard Amster, James R. Thompson, Gary Skoien, Kenneth A. Randall, Sharon Sharp, and Marvin S. Traub. References to "Prime Retail" include these directors, along with PRI (which no longer exists) and Prime Outlets Acquisition Company, LLC, successor in interest to PRI.

**I. Factual Background Summary and Procedural History**

The facts set forth here are as alleged in the Third Amended Complaint. [FN3] The purpose of this background statement is to provide a context for the analysis of the pending motions. The Court makes no findings of fact in this decision. *Morris v. Osmose Wood Preserving,* 99 Md.App. 646 (1994), *rev'd in part on other grounds,* 340 Md. 519 (1995). In considering the pending motions, of course, the Court assumes the truth of the well-pleaded allegations of the Third Amended Complaint, and fair inferences to be drawn therefrom, but inconsistencies and ambiguities in the complaint must be construed against the plaintiffs. *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 344-45 (2000); *Faya v. Almaraz,* 329 Md. 435, 443-44 (1993); *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 192 (1985).

> FN3. This background summary includes material from PRI's proxy statement, but only to the extent the proxy is undisputed and consistent with the well-pleaded allegations of the Third Amended Complaint.

**A. PRI and the Fortress proposal.**

PRI was a Maryland corporation that owned and operated outlet shopping centers. The company had three types of stock, Series A preferred, Series B preferred, and common stock, but due to the poor performance of its shopping centers, obligations to creditors, and lack of liquidity, the company had not paid dividends to its stockholders since January 2000. Among other financial recovery (or survival) measures, in December 2000 the company sold four of its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

Page 2

outlet centers and obtained a $90 million loan from an affiliate of Fortress Investment Group, LLC ("Fortress").

Fortress submitted an unsolicited proposal to PRI's board of directors on June 4, 2002, proposing that Fortress buy out all the company's outstanding stock for $48 million. Two days later the board appointed directors Kenneth A. Randall, Sharon Sharp, James R. Thompson, and Marvin Traub to serve on a Special Committee formed to evaluate the Fortress offer, as well as other recapitalization options. That same day the Special Committee selected Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") to serve as the Committee's financial advisor. Representatives from Houlihan Lokey, along with PRI director Howard Amster (participating in his capacity as stockholder only), met with Fortress on June 21, 2002, to discuss the proposal. Five days later Fortress increased its proposed offer to a total of $66 million.

*2 At a Special Committee meeting on August 12, 2002, Houlihan Lokey presented its assessments of PRI's financial condition and value, and an analysis of the restructuring and other strategic alternatives the company might pursue. The next day Houlihan Lokey made a presentation to the entire board on essentially the same issues. The board decided it could not accept Fortress's $66 million proposal, but the board directed Houlihan Lokey to continue negotiations with Fortress while simultaneously pursuing other recovery options.

**B. PRI's continued efforts to find an acceptable proposal.**

On August 28, 2002, the Special Committee retained Granite Partners, LLC ("Granite"), as a second financial advisor to assist with raising capital, and from September through November 2002 Granite, Houlihan Lokey, and PRI representatives compiled information packages and an offering memorandum with financial projections. Granite contacted approximately one hundred potential investors seeking capital contributions. Meanwhile, Fortress filed a disclosure with the SEC on September 26, 2002, stating that it had purchased 10% of PRI's Series A stock from Merrill Lynch. At the conclusion of Granite's search, it reported to PRI that capital investment without a change in control was not an option, but that Lightstone, among other investors, expressed strong interest in a strategic transaction with the company, conditioned upon the investor obtaining control.

After Granite narrowed the field to twenty prospective investors, thirteen of them executed confidentiality agreements and were given an offering memorandum. On November 15, 2002, those who remained interested were instructed to submit detailed proposals. PRI, with the assistance of its financial advisors, conducted presentations for four potential buyers from late November through December 4, 2002. Those efforts attracted six written expressions of interest, four buyout bids, and two bids for all or most of PRI's assets. The buyout bids ranged from $80 million to $120 million, and Houlihan Lokey went to work evaluating the various bids during the second week of December 2002.

The Special Committee, and then the full board, met with legal and financial advisors on December 13, 2002, and the board further winnowed the field to three buyout bidders, whom the board (through Houlihan Lokey) invited to submit best final bids. Those final bids came in on December 19, 2002, and they ranged from $125 million to $138.5 million. Houlihan Lokey advised the Special Committee to pursue the highest bidder, (whose identity does not appear in the record), and the Special Committee in turn made the same recommendation to the board. On December 23, 2002, the board directed PRI's management to pursue the $138.5 million bidder, and a week later PRI and the bidder entered into an exclusivity agreement giving the bidder sufficient time to complete its due diligence investigation.

At this point $138.5 million looked like the approximate merger consideration, so the next logical step was to devise a plan to allocate that sum among the various classes of stock. To that end the Special Committee directed Houlihan Lokey to seek input from Series A and Series B stockholders. Nearly 25% of PRI's Series A stock, and just over 20% of PRI's Series B stock was represented in these initial allocation discussions. Defendant Howard Amster, along with other individuals, participated as a holder of both classes of stock. The group assumed a net merger consideration of $133 million, and based on that figure a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

Page 3

subgroup of the stockholders arrived at a consensus on allocations of $18.50 per Series A share, and $10.25 per Series B share, with $10 million to be divided among holders of common stock.

*3 In mid-February, however, the bidder backed out of the deal because of information gathered during its due diligence investigation. PRI was back to square one, and the board directed Houlihan Lokey to resume courting one of the other two serious bidders.

**C. Lightstone's bid.**

On March 1, 2003, one of those bidders (whose identity is also unknown) submitted a $117.5 million buyout proposal, which the Special Committee and the board considered at meetings two days later. Upon Houlihan Lokey's advising that it could not easily assess the value of the bid because of certain features of the deal's structure, the Special Committee recommended that the board not pursue the bid exclusively, and the board accepted the recommendation. Consequently, Houlihan Lokey invited further proposals from other interested investors.

By March 13, 2003, PRI's board had three new buyout bids in hand, the highest of them being Lightstone's $121 million bid (which, after transaction costs, would net PRI $118 million). On that date, based on the Special Committee's recommendation, PRI opted to pursue the Lightstone deal exclusively, and the parties entered into an exclusivity agreement on March 19, 2003. Lightstone reduced its bid to $113 million (net $111.5 million) on April 15, 2003, based on its due diligence investigation.

On April 18, 2003, the Special Committee met for two purposes: first, to receive Houlihan Lokey's presentation on PRI's value (including a breakdown of its various stocks), and second, to consider director Michael Reschke's proposed alternative to the Lightstone deal. Director M. Reschke [FN4] proposed that PRI stay in business and not merge. His plan entailed selling PRI's majority interests in six shopping centers (some of which were performing well), selling five under-performing shopping centers, and a rights offering to stockholders. Director M. Reschke projected this would provide PRI $70 to $90 million more than the Lightstone deal. The Special Committee recommended that the board follow two parallel paths: (1) continue pursuing the Lightstone deal, and (2) further explore director M. Reschke's proposal.

> FN4. Two Reschke's served on PRI's board, Michael and Glenn, so first initials are used to distinguish between them.

Later in April 2003, Lightstone increased its bid to a figure that would net PRI $113 million. On April 29, 2003, Lightstone's president and chief executive officer David Lichtenstein met with PRI's board to discuss the proposed merger. At the same meeting director M. Reschke presented further details to the board on his alternative proposal, director Amster presented details on a possible rights offering, and director G. Reschke (with management members) presented PRI's latest five-year business plan. Regarding the five-year plan, PRI's management advised that the plan's success depended on a reversal of several lackluster trends in PRI's operations. Three directors (Amster, M. Reschke, and Skoien) expressed concerns that Lightstone's offer was too low, that a stockholder vote would be unsuccessful if based on the current allocation figures, and that the alternative proposals could be better options for PRI.

*4 These proposals and concerns were considered at a subsequent Special Committee meeting, at which it was decided that the Special Committee would meet with Mr. Lichtenstein in an effort to improve the Lightstone proposal. The Special Committee also directed its financial advisors to further evaluate director M. Reschke's alternative proposal.

Mr. Lichtenstein met with Houlihan Lokey and PRI's preferred board members prior to May 2, 2003, to discuss Lightstone's offer. Based on a total purchase price of $115 million, the preferred directors indicated their support for (or acquiescence to) an allocation of $16.04 for Series A shares, $8.93 for Series B shares, and $0.15 for shares of common stock. The preferred directors reported these figures, and Mr. Lichtenstein's unwillingness to increase the $115 million offer, to the Special Committee on May 2, 2003. The preferred directors exited that meeting and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 40-7   Filed 01/20/2006   Page 5 of 17

Westlaw.

Not Reported in A.2d                                                                                         Page 4
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

Committee considered this report and PRI's lawyers' report on the Lightstone negotiations. The Special Committee also considered its financial advisors' reports on their evaluation of director M. Reschke's alternative proposal. Later that day the board met and, based on the Special Committee's recommendations, the board decided not to pursue director M. Reschke's alternative proposal, but to persevere with the Lightstone deal.

Subsequently, Houlihan Lokey met again with preferred stockholders to discuss how Lightstone's merger consideration could be allocated among the various classes of stock. Houlihan Lokey asked the preferred stockholders to consider an allocation of $15.90 per Series A share, $8.80 per Series B share, and $0.17 per share of common stock. At a May 14, 2003 Special Committee meeting Houlihan Lokey advised the Committee of its opinion that $115 million was a fair price for PRI's stockholders generally, and Houlihan Lokey also presented its estimation of fair values for each class of stock. Houlihan Lokey specified that its valuation of each class was independent of its valuation of each other class; that is, Houlihan Lokey was not giving a fairness opinion on any particular allocation arrangement. The estimated ranges of values were $16.00 to $18.60 for Series A shares, $6.10 to $7.20 for Series B shares, and $0.13 to $0.14 for shares of common stock. Houlihan Lokey advised the Special Committee that, in its view, a cash-out merger with Lightstone would be better for PRI than continuing to operate as a stand-alone business.

Allocation was again discussed at a May 9, 2003 Special Committee meeting. Director G. Reschke told the board that the preferred directors would support an allocation of $16.25 for Series A shares, $8.66 for Series B shares, and $0.18 for shares of common stock. On June 2, 2003 the Special Committee directed Houlihan Lokey to seek other preferred stockholders' input on the allocation, and the Committee asked the preferred directors to be prepared to explain the basis for their proposal at the next Special Committee meeting.

*5 That next meeting was held on June 5, 2003. At the meeting the Special Committee informed the preferred directors that "their proposed allocation was problematic for the Special Committee because, under such proposal, the series A stockholders will receive an amount per share at the lower end of Houlihan Lokey's valuation range while the series B stockholders would receive an amount per share above Houlihan Lokey's valuation range." [FN5] The preferred directors stood their ground; they were excused from the rest of the meeting during which the Committee discussed the allocation proposals.

> FN5. September 30, 2003 Definitive Schedule 14(a) Proxy Statement at 24.

The Special Committee's deliberations continued to a June 9, 2003 meeting, at which Houlihan Lokey reported to the committee that nearly all of PRI's preferred stockholders had expressed their desire for liquidity, at a reasonable allocation. Merrill Lynch, owner of 22% of PRI's Series A stock, would not commit to a particular allocation range, but Merrill's counsel stated that $16.00 was too low. Fortress (the company that had earlier purchased 10% of PRI's Series A stock from Merrill) stated it would consider a Series A allocation between $16.00 and $20.00 per share. The Special Committee decided to recommend to the board that PRI enter into the merger agreement with Lightstone at $115 million, and that the merger consideration be allocated at $16.25 for Series A shares, $8.66 for Series B shares, and $0.18 for common stock. Included with the recommendation was an explanation that the Special Committee factored the preferred directors' preferences into the allocation decision because of the stockholders' push for liquidity. That is to say, without the preferred directors' support the merger would probably fail, and PRI would be left with no one receiving any liquidation of their shares. The board adopted the Special Committee's recommendation on June 9, 2003.

Houlihan Lokey updated its range of estimates on July 1, 2003, and based on its most recent analysis provided ranges of $16.11 to $18.61 for Series A shares, $6.15 to $7.24 for Series B shares, and $0.14 to $0.15 for shares of common stock. The Special Committee recommended to the board no changes in the allocation. PRI and Prime Outlets Acquisition Company, LLC, executed the merger agreement on July 8, 2003. Houlihan Lokey updated its fairness opinions on that date, which included no changes.

**D. Stockholder objections, and the ongoing allocation**

Case 1:05-cv-00327-GMS    Document 40-7    Filed 01/20/2006    Page 6 of 17

Westlaw.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

dialogue.

The following week PRI received objections from Merrill Lynch and Fortress, both arguing that the allocation of $16.25 for Series A shares was inadequate. PRI held a teleconference moderated by Granite on August 11, 2003, at which 50% of the Series A stock, and 47% of the Series B stock were represented. The meeting did not resolve the disagreements.

Based on information provided by Granite, the Special Committee and the board found themselves in a quandary. Fortress and Merrill both appeared to need at least $20.00 per Series A share to support the merger (which obviously would require concomitant decreases elsewhere), but ROI Capital Management, a significant holder of PRI's Series B stock, would withdraw its support if the Series B allocation dipped below $8.30. Director Amster stated he could tolerate a Series B allocation as low as $8.46, but only with significant cuts in the common stock allocation and in transaction costs to PRI's management and its financial and legal advisors. Despite repeated efforts at persuading Lightstone to increase its offer beyond $115 million, PRI simply did not have enough merger consideration to satisfy everyone's demands.

*6 PRI's financial advisors tried to iron out a solution between August 13 and August 21, 2003, but were unable to bring the different stock classes to a consensus. This was reported at an August 21, 2003 Special Committee meeting, where it was also reported that director Amster could support allocations of $18.40 for Series A shares, $8.169 for Series B shares, and $0.17 for shares of common stock, but with a $0.514 million cut in transactional fees. On the Special Committee's recommendation, the board adopted this allocation the same date.

E. The plaintiffs file suit.

Just prior to those August 21 allocation decisions, the plaintiffs filed this action on August 12, 2003, seeking to enjoin the stockholders' vote on the merger. Prime Retail and Lightstone moved to dismiss the Complaint, but before any action was taken on those motions, the plaintiffs filed their First Amended Complaint on October 8, 2003, along with motions for preliminary injunction and expedited discovery. The Court held a scheduling conference with the parties on October 20, 2003, at which plaintiffs stated their intention to convert their motion for preliminary injunction into a motion for a temporary restraining order, and at which the Court set a hearing on the motions for October 24, 2003. PRI and Lightstone moved to dismiss the First Amended Complaint on October 23, 2003. The stockholders' vote was scheduled for October 30, 2003.

At the conclusion of the October 24, 2003 hearing the Court rendered a decision from the bench. The parties dispute the legal effect of the Court's bench decision, and the Court resolves this dispute by clarifying what actually happened in section II.B., below. At this point, it suffices to say (and the parties agree) that the Court's bench decision dismissed all but one of the plaintiffs' claims. The Court reserved ruling on the motion for temporary restraining order to allow plaintiffs to conduct limited discovery. On October 27, 2003, plaintiffs deposed PRI director Kenneth A. Randall, who chaired the Special Committee, and plaintiffs withdrew their motion for a temporary restraining order a day later.

F. Merger efforts continue.

PRI's stockholders did not approve the merger on October 30, 2003. A vote to merge would have required approval of at least two-thirds of each of the two preferred classes, and more than half of the common stockholders. Only 57.96% of the Series A shares were voted for the merger (both the other classes would have approved the merger). The meeting was adjourned and rescheduled for November 4, 2003. At that meeting 63.59% of the Series A shares were voted for the merger, and the meeting was adjourned and rescheduled for November 18, 2003.

On November 13, 2003, David Lichtenstein and PRI both disclosed that Lightstone might try purchasing PRI stock. (Lichtenstein filed a disclosure with the SEC, while PRI issued a press release.) On November 18, 2003, before the stockholder vote, Lightstone contracted to purchase shares of PRI Series A stock at $22 per share from Deephaven Capital Management. The purchase contract also obligated Deephaven to vote for merger. All three classes of stockholders approved the merger later that day.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 6
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

**G. The pending motions.**

*7 Plaintiffs filed their Second Amended Complaint on December 3, 2003, and Prime Retail and Lightstone filed corresponding motions to dismiss on January 9, 2003. Before any action was taken on those motions, plaintiffs filed their Third Amended Complaint on February 4, 2004, and the defendants filed their corresponding dismissal motions on February 23, 2004. [FN6] Prime Retail's motion argues that all but one of the plaintiffs' claims are precluded by virtue of the prior bench decision, and that the entirety of the Third Amended Complaint fails to state a cause of action for which relief can be granted. Lightstone adopts Prime Retail's arguments, and also moves for dismissal arguing that the Third Amended Complaint fails to state a cause of action for aiding and abetting. The Court heard arguments of counsel on March 25, 2004.

> FN6. The defendants also filed motions to enforce the October 24 bench decision, which plaintiffs opposed, but those motions become moot upon resolution of the present motions.

**II. Analysis**

To analyze the defendants' motions it must first be determined, in procedural terms, how to treat the motions appropriately under the Maryland Rules and in the context within which they were presented to the Court. Then it is necessary to resolve the parties' dispute over the legal effect of the Court's late-October bench decision, before finally moving to the merits of the motions.

**A. Motions to dismiss--with exhibits.**

The defendants submitted motions styled "Motion to Dismiss," and all parties have presented to the Court and relied upon various documentary exhibits including Prime Retail's filings with the SEC. However, in ruling on motions to dismiss the Court may only consider matters presented within the plaintiffs' Third Amended Complaint, and the Court assumes the truth of the well-pleaded facts and inferences fairly drawn therefrom. *Bennett Heating v. NationsBank*, 342 Md. 169, 174 (1996).

Prime Retail argues, "Even on a motion to dismiss, the Court may properly consider documents integral to the complaint, relied upon in the complaint, incorporated into the complaint, or that the plaintiff had knowledge of in framing the complaint, as well as public documents filed with the SEC," citing *In re Merrill Lynch & Co.*, 273 F.Supp.2d 351, 355 (S.D.N.Y.2003). Essentially the same rule applies in Delaware. *E.g., Orman v. Cullman*, 794 A.2d 5, 15-17 (Del. Ch.2002) (Chandler, C.). Although one portion of Prime Retail's proposed rule applies in Maryland, *see* Md. R. 2-303(d) ("any written instrument that is an exhibit to a pleading is a part thereof"), the rest of the proposed rule runs counter to Maryland law. *See Muthukumarana v. Montgomery County*, 370 Md. 447, 474-75 (2002); *Hrehorovich v. Harbor Hosp.*, 93 Md.App. 772, 779-89 (1992); *see also Faya*, 329 Md. at 444 (taking judicial notice on motion to dismiss).

At the March 25 argument, however, plaintiffs' counsel joined in the defendants' position that the Court could, on a motion to dismiss, consider PRI's SEC filings as incorporated into the Third Amended Complaint. The Court accepts plaintiffs' counsel's statement as an oral amendment to the pleadings, incorporating into the complaint those documents on which it relies. *See Nichols v. Wilson*, 296 Md. 154, 156 n. 3 (1983); *RTKL Assocs, Inc. v. Four Villages Ltd. P'ship*, 95 Md.App. 135, 138 (1993); *Hoffman v. Hoffman*, 93 Md.App. 704, 709 (1992). The Court excludes from its consideration all other documents the parties submitted, and consequently will treat the pending motions as motions to dismiss.

**B. The effect of the bench decision on the Third Amended Complaint.**

*8 The plaintiffs' initial complaint did not set forth causes of action in separately numbered counts, and thus it was improper in form and not in compliance with the pleading requirements of Maryland Rule 2-303(a). [FN7] At the October 24 hearing the Court stated:

> FN7. *See* Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 178-79 (3d ed. 2003) ("When separate causes of action are not pleaded in separate counts ... the appropriate response to the pleading is a preliminary motion under Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 40-7   Filed 01/20/2006   Page 8 of 17

Westlaw.

Not Reported in A.2d                                                                                                Page 7
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

2-322(b)(2)."); Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 1.4 (2d ed. 1998) ("The failure to state separate causes of action in separate counts ... subject[s] [the complaint] to a motion to dismiss for failure to state a claim upon which relief can be granted.").

> [T]he complaint itself is not set forth in counts, at least they aren't delineated in the traditional fashion, and I am going to say that it appears to me to attempt to set forth causes of action for both a breach of fiduciary duty and a breach of, to the extent that these are different, the duty of candor with respect to the material nondisclosures, the first issue going, I suppose, to the independence of the special committee and the second going to, whether they were independent or not, whether there is sufficient material and information contained in the proxy materials to allow the shareholders in the mix of it all to make reasoned decisions about the vote that they are to undertake next Thursday.... Am I missing something?

Plaintiffs' counsel then confirmed that the Court's understanding was correct. In part because of the lack of enumerated counts, the Court rendered an ambiguous bench decision:

> [D]efendants' motion [to dismiss] ... should be denied with respect to this aspect of the complaint [i.e., the nondisclosure of allocation analysis] with, I think, leave to amend because I don't know that the complaint actually clearly sets forth the appropriate cause of action, but granted as to all other aspects and claims of material nondisclosure.

The Court's denial of the motion to dismiss the allocation nondisclosure claim, with leave to amend that claim, is inconsistent on its face. Although not articulated precisely this way from the bench, what the Court intended in that statement was to grant the motions to dismiss with leave to amend on the nondisclosure of allocation analysis count and to grant the motions to dismiss as to the remaining counts. The plaintiffs did amend their complaint, and in the Third Amended Complaint the plaintiffs have re-alleged causes of action which were dismissed at the October hearing.

Prime Retail argues that the doctrine of res judicata bars the plaintiffs from re-alleging in the Third Amended Complaint those claims which were previously dismissed. The sum total of legal authority cited by Prime Retail in support of that argument is *Poteet v. Sauter,* 136 Md.App. 383 (2001). In *Poteet,* Judge Hollander wrote for the Court of Special Appeals:

> In determining whether res judicata is applicable, a court must consider:
>   (1) whether the parties are the same as, or in privity with, the parties to the earlier dispute;
>   (2) whether the cause of action presented is identical to the one determined in the prior adjudication; and,
>   (3) whether there was a final judgment on the merits in the initial action.

*Id.* at 411. *Poteet,* like every other res judicata case reviewed by this Court, spoke in terms of "final judgments" in "initial actions" as barring relitigation in a "subsequent action." *Poteet* provides no support for the proposition that res judicata bars a plaintiff from re-alleging in an amended complaint, within a single civil action, claims which were previously disposed of on preliminary motions attacking the initial complaint.

*9 Because the bench decision left at least one claim in the case, that decision "is not a final judgment," it did not "*terminate* the action as to any of the claims or any of the parties," and it is "subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties." Md. R. 2-602(a) (emphasis added). Also, in addition to the three res judicata requirements described by Judge Hollander in *Poteet,* the doctrine presumes an additional element: two distinct lawsuits. In this case we have only one civil action, in which the Court has rendered a non-final decision on less than all the claims; res judicata has no application here.

As explained in section II.A., above, generally motions to dismiss which present additional materials not contained in the complaint require the Court to treat the motions as motions for summary judgment. All the parties assume (as did the Court, at the time), that the October 24 bench decision granted dismissal, but because the Court considered additional materials submitted by both parties, the Court was actually granting defense motions for summary judgment on all but one of the plaintiffs' claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 40-7    Filed 01/20/2006    Page 9 of 17

Westlaw.

Not Reported in A.2d                                                                                               Page 8
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

[FN8] *See, e.g., Fairfax Sav., F.S.B. v. Kris Jen Ltd. P'ship,* 338 Md. 1, 9-10 (1995); *Hrehorvich,* 93 Md.App. at 783. Therefore, the rules governing plaintiffs' latest amendments would be rules governing amendments after a court grants defense motions for partial summary judgment, not dismissal.

> FN8. Although the present motions came before the Court in the identical posture, the record has now been clarified as to which materials are being considered by the Court and which are not. See pages 13 to 14, above. Thus, the Maryland Rules compel different treatment of the pending motions.

Plaintiffs' memorandum in opposition to the defense motions posits that "dismissal is without prejudice, unless otherwise specified," citing *Williams v. Snyder,* 221 Md. 262, 267 (1960), and plaintiffs conclude that because "the Court's dismissal was unspecified," their amended pleading is proper. *Williams,* however, was a voluntary dismissal case where the Court applied the predecessor to current Rule 2-506(c). Unlike *Williams,* the plaintiffs here have not voluntarily dismissed their case. *Williams* and Rule 2-506(c) have no application here.

Plaintiffs also invoke Maryland Rule 2-341, the general rule governing amending pleadings. Under subparagraph (a) of that rule, "A party may file an amendment to a pleading at any time prior to 15 days of a scheduled trial date." Subparagraph (c) limits the scope of permissible amendments:

> An amendment may seek to (1) change the nature of the action or defense, (2) set forth a better statement of facts concerning any matter already raised in a pleading, (3) set forth transactions or events that have occurred since the filing of the pleading sought to be amended, (4) correct misnomer of a party, (5) correct misjoinder or nonjoinder of a party so long as one of the original plaintiffs and one of the original defendants remain as parties to the action, (6) add a party or parties, (7) make any other appropriate change. Amendments shall be freely allowed when justice so permits. Errors or defects in a pleading not corrected by an amendment shall be disregarded unless they affect the substantial rights of the parties.

*10 Before applying Rule 2-341 to this case, the Court must inquire whether this general rule, and not a more specific rule, controls whether plaintiffs may resubmit by amendment claims on which the Court previously granted defense motions for summary judgment. For example, had this Court actually been granting defense motions to dismiss at the October 24 hearing, then under Rule 2-322(c) the plaintiffs could not file an amended complaint on all counts because the Court did not expressly grant leave to amend any claim other the count for nondisclosure of merger allocation analysis. [FN9] Thus, in the context of a motion to dismiss, Rule 2-322(c) takes away the broad freedom to amend generally granted by Rule 2-341.

> FN9. The third sentence of Rule 2-322(c) states, "If the court orders dismissal, an amended complaint may be filed only if the court expressly grants leave to amend."

In legal terms, however, the Court granted defense motions for partial summary judgment under Rule 2-501, and that rule contains no corollary to Rule 2- 322(c)'s amendment provision. [FN10] Unlike Rule 2-322(c), Rule 2-501 on summary judgments contains no specific restriction to limit the liberal amendment provisions of Rule 2-341. Even so, under the general amendment rule a plaintiff may not re-allege the very same claims on which summary judgment has already been granted, because such an amendment does not fall within one of the seven types of amendments in Rule 2-341(c). Although amendments "shall be freely allowed when justice so permits," for the same policy reasons underlying the doctrines of res judicata, collateral estoppel, and law of the case, justice does not permit a plaintiff to beset the Court and defendants with duplicitous, meritless claims. *See generally* John A. Lynch & Richard W. Bourne, *Modern Maryland Civil Procedure* §§ 12.1--12.3 (1993 & Supp.2003).

> FN10. *But compare Davis v. DiPino,* 337 Md. 642, 648-49 (1995) (Chasanow, J.) ("When a trial court grants a motion to dismiss ... the court has the discretionary authority to grant the plaintiff leave to amend the complaint ... [but there] is no such discretionary authority to permit the amendment of the complaint subsequent to the grant of summary judgment."), *with Fairfax Sav., F.S.B.,* 338 Md. at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 40-7   Filed 01/20/2006   Page 10 of 17

Westlaw.

Not Reported in A.2d                                                                                        Page 9
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

9-10 (Rodowsky, J.) (describing without criticism trial court's grant of partial summary judgment with leave to amend); _Kee v. State Highway Admin., 313 Md. 445, 452-55, 459-60 (1988)_ (Eldridge, J.) (sanctioning filing of amended complaint after grant of partial summary judgment as proper under Rule 2-341); _Preissman v. Harmatz, 264 Md. 715, 718-20 (1972)_ (same).

To determine whether the plaintiffs' Third Amended Complaint falls within the scope of Rule 4-341(c), the Court must compare the First Amended Complaint with the Third, and to the extent that the comparison reveals that plaintiffs have re-alleged in the Third Amended Complaint causes of action on which summary judgment has already been granted for the defendants, the Court could strike those amendments on its own initiative under Rule 2-322(e) as being "improper" and "not in compliance with" Rule 2-341. The Court would then consider the defendants' motions to dismiss whatever remains after that comparison. But perhaps due to the lack of clarity in the Court's bench decision, the defendants have not moved to strike the amended complaint under Rule 2-341(a), (c), and Rule 2-322(e), and, of course, plaintiffs have not confronted such a motion. Although Rule 2-322(e) empowers the Court to strike pleadings on its own initiative, under the circumstances, here the Court declines to do so. To cleanse the record of further confusion stemming from the Court's October 24 decision, the Court will proceed to address here the viability of each of the Third Amended Complaint's counts.

### C. Third Amended Complaint.

Plaintiffs' Third Amended Complaint alleges that the director-defendants breached the duties of good faith, loyalty, and care, which they owed to the corporation and its stockholders. The plaintiffs allege that various directors' decisions were not independent, that directors were interested in transactions they were addressing, and that the directors failed to disclose material facts to the stockholders who were to vote on the merger. Before addressing each count, it will be helpful to review generally the duties imposed upon directors, and the standards by which courts review director actions.

### 1. Corporate directors' duties and the business judgment rule.

*11 In Maryland, corporate directors must perform their duties (1) in good faith, (2) in a manner [the director] reasonably believes to be in the best interests of the corporation, and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances. Md.Code Ann. Corps. & Ass'ns § 2-405.1(a) (1999). [FN11] Under section 2-405.1(c), directors who fulfill these duties enjoy the immunity from liability defined in section 5-417 of the Courts and Judicial Proceedings Article. [FN12] Maryland has codified the "business judgment rule" at section 2-405.1(e), which provides, "An act of a director of a corporation is presumed to satisfy the standards" imposed by section 2-405.1(a). In the context of mergers Delaware law imposes upon directors what have become known as "_Revlon_ duties," after _Revlon v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182, (Del.1985)_, requiring directors to try to secure the best merger terms available for stockholders. Maryland law appears to impose the same duty, _Wittman v. Crooke, 120 Md.App. 369, 376-77 (1998)_, but the business judgment rule presumes that directors satisfied this duty. [FN13] See § 2-405.1(f).

> FN11. Unless otherwise stated, all statutory citations are to the Corporations and Associations Article.
>
> FN12. Section 5-417 states, "A person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."
>
> FN13. Delaware courts reviewing certain change-in-control transactions preliminarily disregard the business judgment rule and employ a heightened level of scrutiny. See, e.g., _Orman, 794 A.2d at 20-23_. Unlike Delaware law, in Maryland the business judgment rule applies even to directors' change-in-control decisions. See Hanks, _Maryland Corporation Law_ § 6.6[b], 176.1

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

Page 10

(Supp.2003) ("[T]he decisions of the Supreme Court of Delaware in *Unocal v. Mesa Petroleum Co.*, 493 A.2d 946 (1985), and *Weinberger v. UOP, Inc.*, 457 A.2d 701 (1983), should not be applied in Maryland.").

The business judgment rule's presumption that directors fulfilled their duties does not render directors impervious to a plaintiff's claims. See *NAACP v. Golding*, 342 Md. 663, 673 (1996). Rather, the business judgment rule merely places upon plaintiffs the burden of rebutting the presumption. *Id.* To survive the motions to dismiss, therefore, the Third Amended Complaint must allege facts showing a failure of the directors to adhere to their duties.

Finally, in performing their duties directors may rely on information from (1) officers or employees of the corporation, to the extent the director reasonably believes the person is reliable and competent in the matter presented; (2) lawyers, CPAs, or other persons on matters the director reasonably believes to be within the person's professional or expert competence; and (3) a subcommittee of the board on which the director did not serve, as to a matter within the subcommittee's authority, to the extent the director reasonably believes the committee to merit confidence. Corps. & Ass'ns § 2-405.1(b).

**2. Duty of Loyalty.**

Directors' obligations to perform their duties "in good faith" and in a manner reasonably believed to be "in the best interests of the corporation" impose a duty of loyalty to the corporation. *United Wire, Metal & Machine Health & Welfare Fund v. Bd. of Sav. & Loan*, 316 Md. 236, 245 (1989); Hanks, *supra*, 6.6[c], at 177. The duty of loyalty embodies two related but distinct requirements relevant to this case: first, in exercising their judgment directors must decide matters independently, and second, directors generally may not have a material personal interest in the transaction. See *Orman*, 794 A.2d at 19-25 & n. 50; see also *Shapiro v. Greenfield*, 136 Md.App. 1, 13-15 (2000); *Wittman*, 120 Md.App. at 377-78 (1998).

*12 A director's "independent" exercise of the director's judgment "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Orman*, 794 A.2d at 24. Chancellor Chandler, of Delaware's Court of Chancery, has explained,

> Such extraneous considerations or influences may exist when the challenged director is controlled by another. To raise a question concerning the independence of a particular board member, a plaintiff asserting the control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling. The shorthand shibboleth of "dominated and controlled directors" is insufficient.

*Id.* (most internal quotation marks omitted); see also Corps. & Ass'ns § 2-401(b); *Wharton v. Fidelity-Baltimore Nat'l Bank*, 222 Md. 177, 185 (1960); *Warren v. Fitzgerald*, 189 Md. 476, 488-89 (1948); *Martin Marietta Corp. v. Bendix*, 549 F.Supp. 623, 633 n. 5 (D.Md.1982). Under Maryland law,

> [W]hen a director does not personally benefit from the transaction but, because of that director's relationship to a party interested in the transaction, it would reasonably be expected that the director's exercise of independent judgment would be compromised, that director will be deemed an interested director within the meaning of the statute.

*Shapiro*, 136 Md.App. at 24.

Related, but distinct loyalty issues arise in cases where directors stand to receive benefits from a transaction that are not generally enjoyed by the stockholders, or where a director stands on both sides of a corporate transaction. *Orman*, 794 A.2d at 23; *Shapiro*, 136 Md.App. at 15. By implication of section 2-419(a), the benefit must be "material" to the director to render the director even arguably interested in the transaction. The requirement of materiality imposes upon plaintiffs the burden of pleading facts to show that "the alleged benefit was significant enough *in the context of the director's economic circumstances*, as to have made it improbable that the director could perform [the director's] fiduciary duties to the ... shareholders without being influenced by [the] overriding personal interest." *Orman*, 794 A.2d at 23 & n. 44 (internal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 11
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
**(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))**

quotation marks omitted); *In re General Motors Class H Shareholders Litigation,* 734 A.2d 611, 617-18 (Del. Ch.1999). The duty of loyalty imposes only a general prohibition of such transactions, but section 2-419 establishes procedures by which such transactions may be validly accomplished.

Section 2-419 "provides that an interested director transaction is not void or voidable solely because of the conflict of interest and creates a 'safe harbor' for certain transactions which satisfy the statute." *Id.* at 14. Section 2-419 clearly applies to protect transactions in which directors were materially interested, and the Court of Special Appeals has held section 2-419 applicable to transactions in which extraneous forces influence a director's decision, rendering the director "non-independent." *Shapiro,* 136 Md.App. at 18-24. To qualify for the statute's protections, "an interested director could inform the shareholders or directors of [the director's] conflicting interests and give the board of directors or shareholders an opportunity to approve or ratify the transaction." [FN14] *Id.* at 15.

> FN14. Alternatively, a director who did not comply with the disclosure provisions may attempt to show that the transaction was "fair and reasonable to the corporation" under section 2-419(b)(2). *Shapiro,* 136 Md.App. at 15. The parties to this litigation have not raised that provision.

**3. Duty to disclose.**

*13 Directors also owe a duty to disclose to stockholders material information within the directors' control regarding transactions on which the stockholders will vote. Contemporary Maryland caselaw has not had occasion to develop this duty of candor, but none of the parties to this action dispute that some such duty exists under Maryland law. *See Parish v. Milk Producers Ass'n,* 250 Md. 24, 72-74 (1968); *Homer v. Crown Cork & Seal Co.,* 155 Md. 66 (1928); *Paskowitz v. Wohlstadter,* 151 Md.App. 1, 10-11 (2003) (applying Delaware law); *Wilcom v. Wilcom,* 66 Md.App. 84, 95 (1986) (assuming a duty to inform existed, no breach found). [FN15] Because of the paucity of Maryland law on the subject the parties direct the Court's attention to Delaware's well-developed corporate law, so the Court will rely primarily on that body of law to resolve the nondisclosure allegations in this action.

> FN15. The leading Maryland corporations law treatise grounds the duty of disclosure in directors' duty to act in good faith, Hanks, *supra,* § 6.6 [b], at 165, whereas Delaware law views this duty as underlying the duties of good faith, loyalty, and care, *Orman,* 794 A.2d at 41.

The current state of Delaware's disclosure requirements can be gleaned from a trio of decisions authored by the Delaware Supreme Court's Chief Justice Veasey: *Malpiede v. Townson,* 780 A.2d 1075 (Del.2001); *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135 (Del.1997); and *Arnold v. Society for Savings Bancorp, Inc.,* 650 A.2d 1270 (Del.1994). Under those decisions, information is material and must be disclosed if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Malpiede,* 780 A.2d at 1086. The disclosure duty has its limits:

> The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing.... [A] board is not required to engage in selfflagellation and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication on the matter.

*Loudon,* 700 A.2d at 143. Also, because directors' roles differ significantly from the roles of stockholders, *Werbowsky v. Collomb,* 362 Md. 581, 599 (2001), the disclosure duty does not entitle stockholders to so much information as to enable them to replicate the directors' efforts, *see In re Staples, Inc. Shareholders Litigation,* 792 A.2d 934, 953-54 (Del. Ch.2001). Rather, directors must disclose sufficient information to enable a "reasonable investor" to make an informed decision on the matter presented. *Arnold,* 650 A.2d 1277. Chief Justice Veasey has had occasion to clarify that disclosure duties do not rise and fall with the level of sophistication of the individual investors; rather, the standard remains an objective "reasonable investor" standard. *Hubbard v. Hibbard Brown*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 40-7    Filed 01/20/2006    Page 13 of 17

Westlaw.

Not Reported in A.2d                                                                                                          Page 12
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

& Co., 633 A.2d 345, 352-53 (Del.1993).

Finally, Delaware law provides plaintiffs with a useful analytical framework for pleading causes of action for nondisclosure, requiring plaintiffs to:
> (1) "allege that facts are missing from the proxy statement,"
> *14 (2) "identify those facts,"
> (3) "state why they meet the materiality standard," and
> (4) "how the omission caused injury."

Loudon, 700 A.2d at 141. This Court would add one additional pleading requirement: The plaintiff must allege that the information was known to the directors, or within the directors' control. Id. at 143.

**4. Stockholder ratification.**

As explained in section II.C.2., above, section 2-419 provides a procedure for informed stockholder ratification of interested and non-independent director transactions. In addition to that specialized statutory ratification provision, Maryland common law provides that generally directors cannot be held liable for acts which were ratified by informed stockholders. Coffman v. Md. Pub'g Co., 167 Md. 275, 289 (1934); Wittman, 120 Md.App. at 377-78. Stockholder ratification is only as good as the disclosure which preceded it, id., and such disclosures must comply with the standards described in section II.C.3., above.

**5. The allegations.**

a. **Count 1: "Improper Diversion of Merger Consideration."**

The plaintiffs entitled count 1, "Breach of Fiduciary Duty (Improper Diversion of Merger Consideration)," and the plaintiffs' memorandum in opposition to dismissal illuminates the theories underlying this count:
> [I]t is not simply attacking the allocation of merger consideration.... It challenges the manner by which the negotiations were handled by interested defendants, *not* the Special Committee, and the diversion of money from the public stockholders to executives and advisors through extremely lucrative change of control agreements and exorbitant fees to advisors.

The defendants argue that count one must be dismissed because, assuming its allegations amount to a breach of the directors' duties, PRJ's stockholders ratified the directors' actions after full disclosure.

The bulk of the facts alleged in count 1 were fully disclosed in the September 30 proxy statement. Paragraph 99 of the Third Amended Complaint contains no allegations of fact; rather, it contains only conclusory characterizations. Md. R. 2-303(b); Read Drug & Chem. Co. v. Colwill Constr. Co., 250 Md. 406, 412- 16 (1968). To the extent paragraphs 101-104 contain *facts* rather than plaintiffs' conclusory characterizations of fact, those facts were also disclosed in the proxy materials at pages 15 through 28 ("Background to the Merger"), 66 through 69 ("Interests of Certain Persons in the Merger"), and 77 ("Security Ownership of Management and Certain Beneficial Owners"). Thus, even assuming those facts were actionable, the informed stockholders' vote for the merger to which those allegations relate ratified the board's actions and extinguished the prospect of director liability for those acts. Wittman, 120 Md.App. at 377-78.

The remaining, undisclosed allegation is that, "The Deephaven transaction was improper and the Individual Defendants turned a blind eye to Lightstone's actions." [FN16] Paragraphs 71 through 81 of the Third Amended Complaint describe the Deephaven stock sale. Plaintiffs allege that Lichtenstein paid $22 per share for Deephaven's Series A stock, and the agreement also bound Deephaven to vote in favor of the merger at the stockholder's meeting. [FN17] In support of their contention that the transaction was improper, plaintiffs cite Schreiber v. Carney, 447 A.2d 17 (Del. Ch.1982) and Hewlett v. Hewlett-Packard Co., C.A. No. 19513-NC, 2002 WL 549137 (Del. Ch. Apr. 8, 2002). However, for the same reasons explained in the Chancery Court's decision in In re IXC Communications, Inc. Shareholders Litigation, C.A. No. 17324, 1999 WL 1009174 (Del. Ch. Oct. 27, 1999) (permitting acquiring corporation's purchase of a minority of target's shares, with votes, in a "side deal"), the Deephaven sale was not improper under *Schreiber*. [FN18] Despite the "discordant ring" of the term "vote-buying," Maryland stockholders have the right "to cast [their] votes, or to grant a proxy or

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

Page 13

otherwise transfer [their] right to vote, in any way [they] decide[ ] and for any reason or no reason." Hanks, *supra*, § 7.15, at 253. Lightstone purchased from Deephaven only 3.9% of PRI's Series A stock, and thus the acquiring company did not "lock up" the vote, and the transaction did not disenfranchise plaintiffs.

> FN16. Plaintiffs also alleged in paragraph 68 that the directors owed a duty "to ascertain Lightstone's intentions regarding its announcement of purchases of PRI securities," but neither plaintiffs' memorandum, nor the law, provides any support for that contention.

> FN17. Under Section 2-507(b)(3), "if a person is the record holder on the record date but subsequently transfers the stock to another person prior to the time of voting, the transferee is entitled to require the transferor to issue a proxy to the transferee." Hanks, *supra*, § 7.09, at 242. Here, according to plaintiffs' complaint, it appears that Lichtenstein declined to require Deephaven to transfer its proxy, and opted to have Deephaven vote at the meeting instead.

> FN18. Interestingly, while Maryland Rule 1-104 generally prohibits citation to unreported decisions of Maryland's appellate courts, the rule is silent on whether extra-jurisdictional unreported decisions may be cited. In *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners*, No. 2818, Sept. Term, 2002, slip op. at 45 n. 4 (Md.Ct.Spec.App. Mar. 3, 2004), Judge Moylan decided not to consider an unreported Fourth Circuit decision cited by a party because such citations are "disfavored" under the Fourth Circuit's rules. Upon reviewing Delaware's procedural rules and caselaw, it appears that Delaware courts do not disfavor, much less prohibit citation to unreported decisions, as long as counsel submits hard copies to the court. *See* Chancery Ct. R. 171(h) (this same provision appears in the rules of Delaware's Supreme Court [R. 14], Superior Court [R. 107], Court of Common Pleas [R. 107], and Family Court [R. 107], as well as the United States District Court for the District of Delaware [R. 7.1.3] ). In any event, the Court gives no weight to the unreported Delaware decisions "beyond the weight merited by the persuasive force of the reasoning employed." *Cf. E. Outdoor Adver. Co. v. Mayor of Balt.*, 128 Md.App. 494, 515 (1999) (Harrell, J.).

**b. Count 2: "Failure to Offer Fair Price."**

*15 The second count proceeds on a theory that the defendant-directors failed to offer a fair price to Series A stockholders because (1) the committee and board arrived at a merger allocation based in part on internal corporate politics rather than a purely economic analysis; (2) conflicts among board members rendered them incapable of independently exercising their judgment; (3) the directors failed to obtain the highest value reasonably available for Series A shares; (4) the merger price includes a "wrongful diversion of consideration;" and (5) the merger price is based on "an analysis of fair value that does not comply with applicable law." The facts underlying these characterizations fail to state a claim for relief. *Wittman*, 120 Md.App. at 377-78.

The proxy disclosed at least six times that Houlihan Lokey's fairness opinion did not include an opinion as to any particular allocation of the aggregate consideration among the various stock classes or series. September 30 Proxy at 6, 23, 44-45, 46-47, 49, and C-3. Nevertheless, the proxy included an allocation arrangement. Pages 18 through 28 of the proxy describe the Special Committee's ongoing dialogue among its advisors, Lightstone, the stockholders, and the board regarding an acceptable allocation. The most poignant of these discussions appears on page 24, where Houlihan Lokey reported to the Special Committee and the board that "substantially all of the series A and series B preferred stockholders ... expressed a desire for liquidity at a reasonable allocation," and the Special Committee reported to the board that it factored the preferred directors' allocation preferences into its recommendation because,

> given the size of Mr. Amster's holdings and the likely influence that a "no" vote by the preferred board representatives would have over the other preferred stockholders, it believed that the support of the preferred

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 40-7    Filed 01/20/2006    Page 15 of 17

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

Page 14

board representatives was crucial to having the transaction approved by the Company's preferred stockholders.

The proxy thus fully disclosed what did, and did not form the basis for the allocation, and, assuming plaintiffs' alleged a breach of duty, under *Wittman* the subsequent informed stockholder vote ratified this methodology. [FN19]

> FN19. If count 2 is read as a claim that the aggregate merger consideration, or the board's analysis and evaluation of the aggregate price were actionable, the same conclusion would obtain. The Court has made every effort to understand the precise nature of each count but, as Delaware's Chancellor Chandler has said, "it is not for the Court to divine the claims being made. A plaintiff must make clear to the Court the bases upon which his claims rest." *Orman,* 794 A.2d at 24 n. 47.

The first sentence of the Third Amended Complaint's paragraph 108 merely recapitulates in slightly modified language allegations contained in paragraphs 101 and 103, which the Court has already disposed of in analyzing count 1. The second sentence alleges that "a majority of the Individual Defendants" suffered from disabling conflicts of interest. Relying on Delaware law, plaintiffs' opposition memorandum erroneously stated that "while alleged breaches of the duty of care may be extinguished by a fully-informed vote, breaches of the duty of loyalty cannot." On the contrary, Maryland's Court of Special Appeals has held that stockholders can ratify alleged breaches of the duty of loyalty. *Wittman,* 120 Md.App. at 378. Therefore, the facts supporting the plaintiffs' conflict of interest claims cannot state a claim if they appear in the proxy because they were ratified. [FN20]

> FN20. The following facts were disclosed in the September 30 proxy: (1) director G. Reschke's change-in-control payments (at 66); (2) director Amster's PRI stock ownership (at 77-80); (3) director Amster's stock in Horizon Group Properties, Inc. (at 68-69); (4) director Skoien's position within PRI and Horizon, and Horizon's relationship to PRI (at 68-69); (5) director Thompson's relationship with Winston and Strawn, and that law firm's relationship to PRI (at 68); (6) director Traub's consulting arrangement with PRI (at 69); (7) details regarding Fine Furniture Direct, Inc. (at 69).

*16 The facts which the Court has not located in the proxy disclosures, which must be evaluated on the merits, are as follows:

- Amster nominated Skoien to PRI's board.
- Skoien served as an aide to director Thompson when Thompson was governor of Illinois (from 1977 through 1991), "thus Skoien and Thompson have enjoyed a relationship spanning over 24 years."
- Thompson is also a director in Prime Group Realty Trust, an entity which is affiliated with "the Reschke family."
- Thompson, as governor, appointed Skoien and Sharp to state government positions, and has had long-standing relationships spanning over twenty years with both individuals.
- Sharp served as the director of Illinois's lottery in Thompson's administration.
- Director Randall was a PRI director for more than ten years.

As to all of these facts the Court can say with certainty that, as a matter of law, they do not give rise to a reasonable expectation that these directors' independent judgment was compromised. See *Shapiro,* 136 Md.App. at 24; *cf. Orman,* 794 A.2d at 27 ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

The plaintiffs allege, in paragraph 109, that they "lost their Series A shares without the defendants discharging their duty to obtain the highest value reasonably available for those shares." The short answer to this allegation is that the directors had no such duty. The language of this allegation demonstrates a misunderstanding of the duties imposed by § 2-405.1(a). As observed in Hanks, *supra,* § 6.6[b], at 164.1, the director's duties "are directed solely at the manner, or process, by which a director makes decisions rather than at the results of those decisions." In *Wittman,* the Court of Special Appeals quoted with approval from the trial judge's decision:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 15
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

[The stockholder] argues that [the corporation] could have gotten a better deal. But that is really not a cause of action. Maybe they could have. Maybe they couldn't have. But that doesn't constitute a cause of action. That's something stockholders can decide. What would get the court to intervene would be evidence of facts of the board and/or management violating its duty of loyalty and duty of care.

*Wittman,* 120 Md.App. at 378. Here, the processes by which the directors arrived at the merger consideration and allocation were disclosed in the proxy materials, were ratified by the informed stockholders, and therefore are not actionable. *Id.* at 377-78.

Paragraph 109 included redundant allegations of a "wrongful diversion of consideration," which the Court has already dealt with, and an allegation that "the merger price is the result of ... an analysis of fair value that does not comply with applicable law." Again, where economic valuation analyses were performed, those analyses were sufficiently disclosed in the proxy materials, and the stockholders' subsequent ratification extinguished any liability arising from these facts. *Id.*

**c. Count 3: "Duty of Loyalty Resulting in Unfair Process."**

*17 Count 3 purports to allege that the directors breached their duty of loyalty based on (1) the mere occurrence of the Deephaven-Lightstone stock sale; (2) the alleged conflicts between the Special Committee and Series B-owning directors; (3) G. Reschke's change-in-control payments; (4) "the complete failure of the Special Committee to attempt to negotiate on price or the allocations demanded by Amster;" and (5) Houlihan Lokey's "success fee." As explained above, the Deephaven-Lightstone transaction was not improper, and the board informed the stockholders of the board's stock holdings and any change-in-control payments, so none of those facts can give rise to a cause of action under *Wittman.*

The plaintiffs allege a "complete failure of the Special Committee to attempt to negotiate," but the plaintiffs fail to allege well-pleaded facts supporting that conclusory characterization. The Third Amended Complaint closely tracks the chronology included in the proxy statement, and that chronology details the ongoing dialogue among the Special Committee, its advisors, and various interested parties. Notwithstanding plaintiffs' characterizations of those events, the Third Amended Complaint fails to allege supporting facts giving rise to a cause of action.

For example, paragraph 21 merely alleges that the allocations approved by the Special Committee and board coincided with the allocations proposed by director Amster, but paragraph 21 does not allege that Amster *"dictated"* the Special Committee's or the board's decisions. Nor are there any well-pleaded factual allegations of Amster's "strong-arming" other directors in paragraphs 34, 36, 40, 52, 101, and 108. In reality, as described in the proxy materials incorporated within plaintiffs' complaint, Amster played a significant role throughout the process in his capacity as an interested holder of preferred stock. September 30 proxy at 18, 21, 22, 23, 24, 25, 26, and 27. The proxy disclosed the Special Committee's belief that (1) the proposed merger presented the best route to the liquidity desired by nearly all of PRI's stockholders, and (2) without Amster's support, the merger probably would not happen. Director Amster's actions, as well as those of the Special Committee, were made plain to the stockholders, who in turn ratified those actions and extinguished any possible director liability. *Wittman,* 120 Md.App. at 377-78.

Finally, the Court need only briefly address plaintiffs' allegation regarding Houlihan Lokey's fee. Paragraph 24 alleges that PRI was to pay Houlihan Lokey $900,000 for its services, and if a merger were consummated, Houlihan would also receive approximately $2 million as a "success fee," to be paid by the acquisition company. Plaintiffs do not allege that these terms were not disclosed to the stockholders, and because they were disclosed, the informed stockholder vote ratified these acts under *Wittman.* In any event, without more these fees do not give rise to a cause of action. *Wittman,* 120 Md.App. at 378.

**d. Count 4: "Breach of Duty of Disclosure"**

*18 Plaintiffs present four nondisclosure allegations: (1) "Deephaven was paid $22 per share while the rest of the Series A stockholders received $18.40 per share; (2) the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 40-7   Filed 01/20/2006   Page 17 of 17

Westlaw.

Not Reported in A.2d                                                                                                              Page 16
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

Deephaven stock sale was not disclosed; (3) Amster's role in allocation negotiations was never disclosed; and (4) the board did not disclose that HLHZ's analysis "had virtually no relevance in the deliberations of the Special Committee or the Board."

The plaintiffs' first alleged nondisclosure simply misstates the plaintiffs' own allegations. Plaintiffs suggest in paragraphs 73, 74 and 75, 82, and 116, that as a result of the merger, Deephaven would receive $22 per Series A share, while all other Series A stockholders would receive only $18.40. That characterization of the Deephaven-Lightstone sale conflicts with the plaintiffs' own statement of the facts. Upon execution of the November 18 Deephaven-Lightstone contract, Deephaven became entitled to $22 for each share sold under that transaction; upon completion of the merger, Deephaven became entitled to $18.40 per Series A share that it then held, just like every other Series A stockholder. These were two distinct transactions. Plaintiffs' characterizations to the contrary do not qualify as well-pleaded allegations of fact, and do not state a claim upon which relief can be granted.

The second nondisclosure allegation fails because plaintiffs' never allege that information regarding the stock sale was known to or within the directors' control. *Loudon, 700 A.2d at 143*. The plaintiffs' implicitly concede this point by alleging that the directors breached their duties by not knowing about the Deephaven sale. *See* Third Amended Complaint ¶¶ 68, 100. As for the viability of that claimed duty, see footnote 16, above.

In count 3, analyzed above, plaintiffs argued that the board violated its duties by allowing director Amster to control the merger negotiations, and the Court's analysis showed that plaintiffs' conclusory characterizations did not amount to well-pleaded facts stating a cause of action. Essentially, the plaintiffs failed to plead facts (as opposed to characterizations) showing what role Amster played in addition to, or apart from, what is described in the proxy incorporated into plaintiffs' complaint. Here, count 4 alleges that the board breached its disclosure duty by failing to disclose that Amster's role in the negotiations was as described in plaintiffs' paragraph 112. However, as explained in the Court's analysis on count 3, the Third Amended Complaint fails to present well-pleaded allegations showing Amster's role (or the Special Committee's) to have been anything other than that described in the proxy on which the Complaint relies. The board fulfilled its disclosure obligations, and plaintiffs have not pleaded facts showing omission or misrepresentation.

Similarly, the plaintiffs' final nondisclosure allegation recapitulates a claim already resolved in count 2. Plaintiffs argued in count 2 that the board breached its duties by approving an allocation based in part on whether it would garner enough votes for the merger, rather than on the basis of a purely economic analysis. The Court's resolution of that count explained that the nondisclosure alleged here (i.e., that no advisor expressed a financial opinion on the relative fairness of the allocation arrangement), actually was fully disclosed in the proxy materials incorporated into the complaint. Accordingly, this part of count 4 fails to state a nondisclosure claim.

**e. Count 5: Aiding and Abetting by Lightstone and Acquisition**

*19 Pleading this aiding and abetting theory as a separate count may be improper in form. *See Manikhi, 360 Md. at 360 n. 6*. At any rate, count five fails because the underlying counts fail. *See Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc., 340 Md. 176, 200-201 (1995)*.

**III. Conclusion**

For the reasons set forth in detail above, defendants' motions to dismiss the Third Amended Complaint will be granted.

Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.