**16**

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937

**(Cite as: 2001 WL 755133 (Del.Ch.))**

**H**

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
In re: PLY GEM INDUSTRIES, INC. SHAREHOLDERS LITIGATION
**No. CIV.A. 15779-NC.**

Submitted: Dec. 28, 2000.
Decided: June 26, 2001.

Joseph A. Rosenthal, Esquire, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of counsel: Judith L. Spanier, Esquire, of Abbey, Gardy & Squitieri, LLP, New York, New York, and Stull, Stull & Brody, New York, New York, Attorneys for Plaintiffs.

A. Gilchrist Sparks, III, Esquire, Alan J. Stone, Esquire and Stephanie L. Nagel, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of counsel: Mitchell A. Lowenthal, Esquire, and Dylan D. Smith, Esquire, of Cleary, Gottlieb, Steen & Hamilton, New York, New York, Attorneys for Defendants Herbert P. Dooskin, Joseph M. Goldenberg, Albert Hersh, William Lilley III, Elihu H. Modlin, Dana R. Snyder, and Jeffrey S. Silverman.

Kevin G. Abrams, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; of counsel: John D. Donovan, Jr., Esquire, Michael P. Allen, Esquire, and Christopher G. Green, Esquire, of Ropes & Gray, Boston, Massachusetts, Attorneys for Defendant Ply Gem Industries, Inc.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

*1 Plaintiffs, former shareholders of Ply Gem Industries, Inc. ("Ply Gem" or the "Company"), bring their Consolidated Amended Class Action Complaint (the "Complaint") asserting, on behalf of themselves and their fellow former shareholders, that the merger of Ply Gem into a subsidiary of Nortek, Inc. ("Nortek"), pursuant to an agreement entered on July 24, 1997, was the product of breaches by the then-directors of Ply Gem of their fiduciary duties of loyalty and due care. Defendants have moved to dismiss. They contend that (1) Plaintiffs lack standing to

pursue their claims, which can be asserted, if at all, only in a derivative action and not through an individual action and (2) in any event, the allegations of the Complaint do not, under Court of Chancery Rule 12(b)(6), state a claim upon which relief can be granted.

I conclude that the claims which Plaintiffs seek to assert are individual in nature and that Plaintiffs have alleged sufficiently that the merger was not approved by a disinterested and independent majority of the directors. I also find that one director defendant is entitled to dismissal of all claims against him because Plaintiffs' allegations do not raise sufficient doubt as to his loyalty and because Plaintiffs' duty of care claims against him are barred by the exculpatory provision in Ply Gem's certificate of incorporation. Accordingly, I grant in part and deny in part Defendants' motion to dismiss.

I. PARTIES

Plaintiffs, Herman Smilow, Adele Brody and Andrew Klotz, allege that they were shareholders of Ply Gem at all times relevant to this action.

The individual defendants were directors of Ply Gem:

1. Defendant Jeffrey S. Silverman ("Silverman"), who owned more than one-quarter of the outstanding Ply Gem stock, was the Chief Executive Officer and Chairman of the Board, positions that he had held for more than a decade.

2. Defendant Dana R. Snyder ("Snyder") was the President and Chief Operating Officer of Ply Gem. He held approximately 6% of the Ply Gem stock. Snyder's 1996 compensation included a salary of $440,000, a bonus of $890,000, and a long-term compensation award of options. With the Nortek merger, Snyder received more than $3.6 million for all of his options.

3. Defendant Herbert P. Dooskin ("Dooskin") was Ply Gem's Executive Vice President and owned more than 3% of its stock.

4. Defendant Elihu H. Modlin ("Modlin") had been General Counsel of Ply Gem for more than three decades. He was a partner in a law firm with his son, Charles M. Modlin, who was the Secretary of Ply Gem. During 1996, Ply Gem paid

Not Reported in A.2d                                                                Page 2
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

Modlin's law firm almost one million dollars for professional services.

5. Defendant Joseph M. Goldenberg ("Goldenberg") was a co-founder of a wholly-owned subsidiary of the Company and served as a consultant to the Company, for which he was paid approximately $287,000 in 1996.

6. Defendant Albert Hersh ("Hersh") was a co-founder of the Company and provided consulting services to the Company. In 1996, he was paid approximately $90,000 for those consulting services.

*2 7. Defendant William Lilley III ("Lilley") was the President of Policy Communications, Inc., a business consulting firm, that received $25,000 from Ply Gem in 1996 for its consulting services.

Ply Gem was a manufacturer and distributor of building materials.

## II. BACKGROUND [FN1]

> FN1. The factual background is taken from the Complaint, the well-pleaded allegations of which, for present purposes, must be taken as true. *Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 612-13 (1996).

In August 1995, Ply Gem announced that it had hired an investment banking firm to explore various strategic alternatives, one of which was the sale of Ply Gem. During the next several months, Ply Gem discussed a potential acquisition with several parties. Some of these parties entered into confidentiality and standstill agreements; some also received non-public information about the Company. Nortek was one of those parties that received confidential information and entered into a standstill agreement with Ply Gem.

In February 1996, Ply Gem received an indication of interest in purchasing the Company at a price of $17 per share from an unidentified third party. Nortek at that time also raised the possibility of a merger with Ply Gem. Although Silverman and Snyder discussed a stock-for-stock merger with Nortek for several months, nothing came of the

discussions; and, in July 1996, the Ply Gem board announced that it had decided not to sell the Company but, instead, to move forward with the development of Ply Gem's business.

Silverman and Snyder, however, had not given up on finding a buyer. They even considered a recapitalization of Ply Gem that would result in the termination of Silverman's employment relationship and in the appointment of Snyder as Ply Gem's new chief executive officer.

In March 1997, Silverman, without informing the board, retained another investment banking firm to explore the possibility of a leveraged buyout of Ply Gem and to identify potential partners for Silverman if he elected to participate in such an effort. The investment banker approached six leveraged buyout firms. All six committed to a two-year standstill provision which required, at Silverman's insistence, that they would not propose to acquire Ply Gem except with Silverman's, or the Ply Gem board's, prior approval.

Silverman's employment with Ply Gem was governed by an employment contract extending to 2007. Silverman informed the potential buyout firms that he did not want to continue in his position after any buyout and that they should assume that he would receive termination compensation of $25 million, $2 million per year for a non-compete covenant spanning five years, and cancellation of his indebtedness ($17.4 million plus accrued interest) to Ply Gem. Unless these demands were met, there would be no transaction. Silverman's existing agreement with Ply Gem contained a non-compete covenant that would not survive both a change in corporate control and Silverman's termination as a result thereof.

Silverman and Snyder (who wanted to become the chief executive officer of the surviving entity) selected Hicks, Muse, Tate & Furst ("Hicks, Muse") for negotiations from among the many potential buyout firms. Hicks, Muse was discussing a price range of $17-19 per share in May 1997. One of the possibilities was that Silverman would retain an equity position in the venture. While discussions were ongoing with Hicks, Muse, Silverman and Snyder continued to discuss the possibility of a combination with Nortek,

Not Reported in A.2d                                                      Page 3
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

which was floating a price of $17 per share. Hicks, Muse, however, was prepared to offer to Silverman $10 million more than was Nortek to resolve the issues posed by Silverman's employment agreement and non-competition agreement.

*3 On or about June 10, 1997, the Ply Gem board was told about the Hicks, Muse and the Nortek expressions of interest in acquiring the Company. The board designated Silverman and Lilley to meet with and select an investment banking firm to advise the board. Silverman identified the firms to be considered, and Lilley and he chose Furman Selz & Co. ("Furman Selz").

The board, notwithstanding Silverman's extensive personal financial interest in any transaction, did not appoint a special committee. Instead, it allowed Silverman to continue as Ply Gem's negotiator with both Hicks, Muse and Nortek.

On June 16, 1997, Nortek advised Silverman that it was willing to pay $20 per share, but was not prepared to enhance its proposal to Silverman for his personal contractual requirements.

On June 20, 1997, Furman Selz met with the Ply Gem board and indicated that it would provide a favorable fairness opinion at that time on the Hicks, Muse offer of $18 per share, which, unlike the Nortek offer, also satisfied Silverman's demands. Two days later, Hicks, Muse increased its offer to $18.75 per share while Nortek remained interested at $20 per share or perhaps slightly more.

On June 24, 1997, Silverman provided Nortek with copies of the proposed agreements with Hicks, Muse, including those dealing with his personal employment arrangements. Silverman, in essence, was attempting to induce Nortek to meet his personal demands while also securing a better price for the Ply Gem shares. Silverman informed the Ply Gem board that he anticipated a proposal from Nortek at up to $21 per share in definitive form by June 25, 1997. The board, however, on June 24, 1997, chose to accept the Hicks, Muse offer (through an affiliate, Atrium Acquisition Holdings Inc.) of $18.75 per share. Later the same day, Nortek submitted an offer to purchase Ply Gem at $20.25

per share, but it withdrew that offer the next day when the Hicks, Muse agreement was announced.

On July 14, 1997, Nortek offered $19.50 per share to acquire Ply Gem. Its offer also satisfied Silverman's personal demands concerning the termination of his employment agreement, his non-competition agreement, and the forgiveness of his debt to the Company. Nortek's offer, accordingly, was $0.75 per share less than its offer of two weeks earlier, allegedly reflecting the cost to Ply Gem's shareholders of Nortek's meeting Silverman's specific demands. [FN2]

FN2. Complaint, ¶ 42.

Later in July 1997, the Ply Gem board approved a merger agreement with Nortek and terminated the Hicks, Muse agreement, paying Hicks, Muse (or its affiliate) $12 million as a termination fee and for reimbursement of its expenses. The board also received a fairness opinion from Furman Selz. Plaintiffs allege that the fairness opinion was inadequate because it failed to consider the consequences of Silverman's "side" deal.

Nortek, Ply Gem, and Silverman executed, concurrently with the merger agreement, an agreement providing for the termination of Silverman's employment, a non-competition covenant, payment to Silverman of more than $22 million (reduced by amounts paid to Silverman before his termination as a bonus for 1997) and forgiveness of Silverman's over $17 million debt to the Company, plus any accrued interest on the debt.

*4 The merger of Ply Gem with a Nortek subsidiary was consummated thereafter.

### III. THE CONTENTIONS

Plaintiffs allege that Silverman used his status as chief executive officer and director and as the principal, if not sole, negotiator to enrich himself at the expense of the other Ply Gem shareholders. They contend that Silverman's conduct tainted the merger process and denied Ply Gem's shareholders a fair price for their stock. Plaintiffs further allege that by acquiescing in Silverman's conduct, the directors breached their duties of loyalty and due care to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 4
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

Company and its shareholders. At oral argument and in correspondence following oral argument, Plaintiffs also invoked *McMullin v. Beran* [FN3] to advance the contention that the board improperly delegated responsibility for the negotiation process to Silverman.

> FN3. *McMullin v. Beran,* Del Supr., 765 A.2d 910 (2000).

In response, Defendants first argue that the claims asserted by Plaintiffs are derivative in nature. They contend that if the claims are derivative, then Plaintiffs lost standing to assert those claims when their status as shareholders of Ply Gem was terminated as a result of the merger. [FN4] Second, Defendants maintain that the merger was approved by an informed and independent board and that as a result the directors' actions are to be evaluated under the business judgment rule. The Defendants also seek to invoke an exculpatory charter provision that protects the directors from monetary liability for breaches of their duty of care. Finally, they contest Plaintiffs' characterization of *McMullin v. Beran* as establishing a prohibition against merger negotiations conducted by an interested corporate officer who has a substantial personal financial interest, independent of his interest as a shareholder, in the merger agreement. [FN5]

> FN4. *See Lewis v. Anderson,* Del.Supr., 477 A.2d 1040, 1049 (1984).

> FN5. Defendants, at p. 16, n. 6 of Defendant's Joint Brief in Support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, invite the Court to dismiss the Complaint because Plaintiffs lost standing when they tendered their shares or accepted the benefit of the cash out merger. *See Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 848 (1987). In addition to relying upon facts not alleged in the Complaint, Defendants have failed to demonstrate that those who accepted the merger benefits (under either format) did so knowingly. *See Norberg v. Security Storage Co. of Washington,* Del. Ch., C.A. No. 12885, Steele, J. (Sept. 19, 2000).

IV. ANALYSIS
A. *Applicable Standard.*

A motion to dismiss under Court of Chancery Rule 12(b)(6) requires the Court "to take the facts alleged as true and view all inferences from those facts in the light most favorable to plaintiff" and "to determine with reasonable certainty, under any set of facts that could be proved" that the Plaintiffs would not be entitled to relief. [FN6] If Defendants do not meet this rigorous standard, then the Court must deny their motion to dismiss.

> FN6. *McMullin v. Beran,* 765 A.2d at 916; *Wagner v. Selinger,* Del. Ch., C.A. No. 16740, Steele. V.C. (Jan. 18, 2000).

B. *Individual or Derivative Claims.*

The line that separates an individual action from a derivative action is sometimes difficult to discern. [FN7] When the challenged conduct is part of the merger process, characterization of the claim as derivative is fatal to the prosecution of the claim. [FN8] Here, Plaintiffs allege that Silverman manipulated the merger process to favor his own personal purposes. They assert that Silverman used his position to assure himself an extravagant personal compensation package to the detriment of the shareholders' best interests. Examples cited by Plaintiffs as evidence of Silverman's self-dealing and the unfairness of the merger process include his exercising full control over all negotiations, pursuing negotiations despite the board's decision that Ply Gem was not for sale, failing to advise the board of his efforts to negotiate a sale, and insisting that his unjustified personal demands be met as a condition to any agreement.

> FN7. *Parnes v. Bally Entertainment Corp.,* Del.Supr., 722 A.2d 1243 (1999); *Behrens v. Aerial Communications, Inc.,* Del. Ch., C .A. No. 17436, mem. op. at 8, Jacobs, V.C. (May 18, 2001); *Turner v.. Bernstein,* Del. Ch., C.A. No. 16190, mem. op. at 28, Jacobs, V.C. (Feb. 9, 1999); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* ¶ 9-2(a) at 9-4-5

Not Reported in A.2d                                                                                  Page 5
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

(2000).

FN8. *See* n. 4, *supra,* and accompanying text.

*5 Although Plaintiffs allege in conclusory fashion that the price paid to them for their shares was "unfair," [FN9] the specific factual allegation in the Complaint is that Nortek reduced its offer by $0.75 per share in order to satisfy Silverman's unjustified personal demands. [FN10]

> FN9. Complaint, ¶ 47. See *Parnes v. Bally Entertainment Corp., 722 A.2d at 1246-47,* for its discussion of "unfair" price in a similar context.

> FN10. Complaint, ¶ 42. A fundamental difficulty with Plaintiffs' case is that it is likely that some substantial payment could properly have been made to Silverman and they have not articulated clearly their split on how much was appropriate and how much was not appropriate. They rely upon the $0.75 reduction in the Nortek offer to accommodate Silverman's side deal, but it is conceivable, on further proof, that the side arrangement was reasonable and fair to the shareholders. That, however, is a question for another day because, based on the allegations of the Complaint, the Court must draw the inference in favor of Plaintiffs that Silverman was not entitled to insist upon a termination of his employment agreement on his own initiative and, further, to receive substantial payments for the termination. The record before the Court does not support any contention that Nortek (or Hicks, Muse for that matter) insisted that Silverman leave the business. If Silverman was going to exit because he wanted to exit, the basis for his right to demand termination compensation cannot be gleaned from the Complaint, and Plaintiffs have alleged that he was not entitled to such payments.

*Parnes v. Bally Entertainment Corp.* teaches that, in the merger context, the presentation of a direct claim requires that the "stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or

unfair price." [FN11] The attack on Silverman's conduct during the course of the merger negotiations, and the board's acquiescence in it, is a challenge by Plaintiffs to the fairness of the merger process. Accordingly, *Parnes* dictates that Plaintiffs' claims must be treated as individual claims and not as derivative claims. [FN12]

> FN11. *Parnes v. Bally Entertainment Corp., 722 A.2d at 1245.*

> FN12. *See also Crescent/Mach I Partners, L.P. v. Turner,* Del. Ch ., C.A. No. 17455, Steele, J. (Sept. 29, 2000); *Chaffin v. GNI Group, Inc.,* Del. Ch., C.A. No. 16211, Jacobs, V.C. (Sept. 3, 1999).

Defendants rely extensively upon *Golaine v. Edwards,* [FN13] but that case does not dictate a different result. In *Golaine,* this Court commented on *Parnes* ' analysis of what a plaintiff must allege about the merger process in order to plead an individual claim, as follows:

> FN13. *Golaine v. Edwards,* Del. Ch., C.A. No. 15404, Strine, V.C. (Dec. 21, 1999).

"It is not quite clear whether the door is open for a plaintiff to state an individual claim by alleging that the negotiation of side transactions tainted the merger negotiations by unfairly diverting merger consideration that would have otherwise gone to the target stockholders into the pockets of target company fiduciaries." [FN14]

> FN14. *Id.,* mem. op. at 15.

The *Golaine* Court then posited the following circumstances, remarkably similar to those alleged here:
1. The CEO of the target company learned that the acquirer would pay $10,000,000 more.
2. The CEO agreed to this proposal but on the condition that $2,000,000 of the additional payment would be diverted to him.
3. The final consideration was fair, but the shareholders would have received an additional $2,000,000 if the CEO had not negotiated for his own account.

The *Golaine* Court's conclusion was that, in these hypothetical circumstances, it was probable that under

Not Reported in A.2d                                                                    Page 6
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

*Parnes* the $2 million payment could be attacked individually as the product of unfair dealing that tainted the final merger terms. [FN15] The issue became whether an individual claim could exist only if the process were so unfair as to have resulted in an unfair price, or whether an individual claim could exist where the unfair process resulted in a less than the best reasonably available, but not unfair, price. *Parnes* makes clear that the test is whether the alleged breaches of fiduciary duties resulted in unfair price *and/or* unfair process. [FN16] Thus, given the disjunctive nature of the standard, it is difficult to imprint an unfair price concept on the process side of the *Parnes* evaluation. [FN17] As *Golaine* frames it, "the real question underlying the teaching of *Parnes* [is] whether the Complaint states a claim that the side transactions caused legally compensable harm to the target's stockholders by improperly diverting consideration from them to their fiduciaries." [FN18]

> FN15. *Id.*

> FN16. *Parnes v. Bally Entertainment Corp.,* 722 A.2d at 1245 (emphasis added).

> FN17. Fairness considerations of price and process are not necessarily considered separately. *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983).

> FN18. *Golaine v. Edwards,* mem. op. at 16-17. In *Golaine,* the payment to KKR of $20 million was deemed immaterial when measured against the $8.3 billion transaction. Here, the benefits flowing to Silverman, to some of which he may well have been entitled, constituted in excess of 10% of the total transactional value (i.e., approximately $37 million out of a transaction valued at roughly $275 million).

**\*6** In short, the Complaint can be read fairly to allege that, as the result of the unfair process orchestrated by Silverman, Nortek reduced the per share price that it was willing to pay to the Ply Gem shareholders in order to increase the amount that it was willing to pay Silverman on his side transaction. [FN19] *Parnes* teaches that such conduct will serve as the basis for individual or direct claims.

> FN19. Complaint, ¶ 42.

Although the Complaint may directly challenge the merger, "it does not necessarily follow that the Complaint adequately states a claim for relief" under Court of Chancery Rule 12(b)(6). [FN20] Thus, by putting fairly before the Court the contention that they are challenging the fairness of the merger price or the merger process, Plaintiffs can survive the derivative-individual obstacle yet still fail to assert a claim that would allow them to move beyond a Rule 12(b)(6) confrontation. With this in mind, I now turn to the issue of whether Plaintiffs' claims are legally sufficient.

> FN20. *Parnes v. Bally Entertainment Corp.,* 722 A.2d at 1246.

### C. *The Duty of Loyalty Claims.*

The Ply Gem directors, became obligated to seek "the best value reasonably available for all stockholders when they joined the process for a complete sale of the Company." [FN21]

> FN21. *McMullin v. Beran,* 765 A.2d at 918; *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 632 A.2d 34, 44 (1993).

Plaintiffs assert that the Ply Gem board breached its duty of loyalty to the shareholders and that, as a consequence of that breach, Silverman received the benefits of an "exorbitant" and improper "side" deal at the expense of the Ply Gem shareholders. [FN22] Because Ply Gem's directors are presumed to have exercised disinterested and independent business judgment in approving the Nortek merger, [FN23] the Plaintiffs must allege facts sufficient to overcome that presumption. As this Court has held:

> FN22. Complaint, ¶ 44.

> FN23. *Chaffin v. GNI Group,* mem. op. at 13.

"The Delaware Supreme Court broadly set forth the inquiry for questions regarding director disinterest and independence in *Aronson v. Lewis.* There, the Court held that a director is considered interested when he will receive a personal financial benefit from a transaction that

Not Reported in A.2d                                                                                      Page 7
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

is not equally shared by the stockholders or when a corporate decision will have a materially detrimental impact on a director, but not the corporation or its stockholders. Independence, the *Aronson* Court held, means that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influences. To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized." [FN24]

> FN24. *In re Western National Corp. Shareholders Litig.,* Del. Ch., C.A. No. 15927, mem. op. at 28, Chandler, C. (May 22, 2000) (footnotes omitted).

Thus, unless the Nortek merger was approved by a majority of disinterested and independent directors, the Defendants must bear the burden of proving that the transaction was entirely fair to Ply Gem's shareholders. [FN25]

> FN25. *Cinerama, Inc. v. Technicolor, Inc.,* Del. Ch., 663 A.2d 1134 (1994), *aff'd,* Del.Supr., 663 A.2d 1156 (1995).

1. *Interested in the Transaction.*

A director is considered interested in a transaction if he receives "a personal benefit from a transaction that is not equally shared by the shareholders." [FN26] Here, Plaintiffs allege, Silverman received payment for the termination of his employment contract and his non-competition agreement and the forgiveness of his debt to Ply Gem. All of these benefits were unique to him and were not shared with the other stockholders. Thus, for purposes of this motion, Silverman must be considered "interested."

> FN26. *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936 (1993); *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

**\*7** There is no allegation that any of the remaining directors obtained any improper benefit whatsoever from the merger other than from their entitlement, as shareholders, to receive the merger consideration. They received the merger consideration on the same terms as any other shareholder.

[FN27] Thus, the Complaint does not allege that any of the other six directors were "interested" in the Nortek merger transaction.

> FN27. Although Snyder received significant compensation for his options, I do not read the Complaint to allege any impropriety with respect to such payment.

2. *Independence from Silverman's Alleged Domination.*

Plaintiffs' challenge to the independence of the other directors from Silverman's domination presents a more difficult question. [FN28]

> FN28. "In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran,* 765 A.2d at 923.

The focus of Plaintiffs' attack on the loyalty of the directors is directed to Silverman's status both as the holder of 25% of the Ply Gem stock and as Ply Gem's Chairman and Chief Executive Officer. The inference, which Plaintiffs seek the Court to draw in their favor under the pleading standards of Court of Chancery Rule 12(b)(6), is that Silverman, by virtue of his position, was able to induce the directors to place Silverman's personal interests ahead of the stockholders' interests in approving the Nortek merger and the related Silverman agreement.

In *Friedman v. Beningson,* the chairman, chief executive officer and president held 36% of the outstanding stock. The Court observed that "[f]rom a practical perspective, this confluence of voting control with directorial and official decision making authority, while not itself sufficient under the cases to support a conclusion of reasonable doubt [citing *Aronson* ], is nevertheless itself quite consistent with control of the board." [FN29] That Silverman's status is consistent with an ability to override fellow director independence may well be an accurate assessment, but, as noted in *Friedman,* Silverman's status alone is not sufficient to overcome the presumption that the other directors, in fact, performed their

Not Reported in A.2d                                                                                                                    Page 8
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

duties loyally. Indeed, in *Aronson,* the Supreme Court acknowledged that a 47% shareholder would not be presumed to dominate the corporation's board of directors. [FN30]

> FN29. *Friedman v. Beningson,* Del. Ch., C.A. No. 12232, mem. op. at 10, Allen, C. (Dec. 4, 1995), *appeal refused.* Del.Supr., 676 A.2d 900 (1996) (TABLE).

> FN30. *Aronson v. Lewis,* 473 A.2d at 815.

Plaintiffs are confronted with the challenge of pleading facts that create, at a minimum, a reasonable doubt that the board members could not honestly and objectively evaluate the Nortek merger, with its related Silverman agreement, because of their relationship with Silverman. "Speculation on the motives for undertaking corporate action" will not satisfy Plaintiffs' burden. [FN31] Similarly, the mere assertion of personal or business relationships will not defeat the presumption of independence. [FN32]

> FN31. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

> FN32. *In re Walt Disney Co. Derivative Litig.,* Del. Ch., 731 A.2d 342, 355 (1998), *aff'd in part and rev'd in part sub nom. Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000); *In re Grace Energy Corp. Shareholders Litig.,* Del. Ch., C.A. No. 12464, Hartnett, V.C. (June 26, 1992).

Although Plaintiffs' allegations of lack of independence may be far from compelling, the facts alleged in the Complaint supply the Court with a basis for a reasonable doubt as to whether five of the other six directors were independent. [FN33] Although discovery and development of the factual record may well prove that the directors discharged their duties with absolute propriety and free of any control by Silverman, at this stage, "the existence of [the other directors' interests and relationships with Silverman] is enough to defeat a motion to dismiss and warrant further inquiry. [FN34]

> FN33. The Complaint does not allege how many directors voted for the merger. Plaintiffs must

allege sufficiently that the merger would not have been approved without the vote of the directors who were interested or disqualified. *See Beneville v. York,* Del. Ch., C.A. No. 17638, Strine, V.C. (July 10, 2000); *Aronson v. Lewis,* 473 A.2d at 815.

> FN34. *In re New Valley Corp. Derivative Litig.,* Del. Ch., C.A. No. 17649, mem. op. at 19-20, Chandler, C. (Jan. 11, 2001).

*8 A review of the status of each of the other directors follows.

a. *The Employee Directors.*

(i) *Dooskin.* In addition to having been a director of Ply Gem since 1986, Dooskin was also its Executive Vice President. However, his status as an officer does not necessarily support the inference that he was under the control of Silverman, and his ownership of more than 3% of the then-outstanding Ply Gem stock would suggest a high level of personal self-interest in maximizing the merger value of Ply Gem. On the other hand, not only was Silverman Dooskin's supervisor, but also he was the largest stockholder in Ply Gem. [FN35] As such, Silverman was "in a position to exercise considerable influence" [FN36] over Dooskin, and, therefore, Plaintiffs, under the pleading standards of Chancery Rule 12(b)(6), have created a reasonable doubt as to Dooskin's capacity to consider impartially the Nortek merger agreement and the related Silverman agreement.

> FN35. *See Mizel v. Connelly,* Del. Ch., C.A. No. 16638, mem. op. at 7, Strine, V.C. (July 22, 1999).

> FN36. *See Rales v. Blasband,* 634 A.2d at 937. I acknowledge that Dooskin had an employment contract extending into 2000 and that Plaintiffs do not allege that Dooskin received "substantial remuneration" for his position. *See In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 357 ("reasonable possibility that they are more ⸱ beholden to").

(ii) *Snyder.* Snyder was also both President and Chief

Westlaw.

Not Reported in A.2d                                                                                       Page 9
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

Operating Officer of Ply Gem. He had joined the Company in 1995 and had acquired approximately 6% of its common stock. In addition to a long-term compensation award consisting of options, Snyder, in 1996, received a salary of $440,000 and a bonus of $890,000. Plaintiffs allege that Snyder received substantial compensation for his services to Ply Gem, and, thus, Silverman, as with Dooskin, was "in a position to exercise considerable influence" over Snyder. Accordingly, the Complaint has raised a reasonable doubt as to Snyder's capacity to consider impartially the Nortek transaction with its benefits for Silverman. [FN37]

> FN37. But see text accompanying n. 46, *infra.* (Defendants assert that Snyder abstained from voting on the Nortek transaction.)

b. *The Outside Directors.* [FN38]

> FN38. Although three of these directors were not employees of Ply Gem, they were intimately connected to the Company. Modlin had been the Company's lawyer for years and Goldenberg and Hersh had been Company executives.

(i) *Modlin.* Modlin had been general counsel for Ply Gem for almost four decades, apparently predating Silverman's arrival. In 1996, his law firm received almost $1 million in fees from Ply Gem. That a director's law firm receives fees from the corporation does not, by itself, demonstrate a lack of independence. [FN39] However, the Complaint alleges that Modlin "was a partner in the firm of Messrs. Elihu H. Modlin and Charles M. Modlin," [FN40] from which it can be inferred that his was a small law firm. The Chancellor's analysis of a case involving comparable facts is instructive:

> FN39. See *McMillan v. Intercargo Corp.,* Del. Ch., 768 A.2d 492, 503 (2000) (as to interestedness).

> FN40. Complaint, ¶ 6.

Director Goodman is an attorney employed by a law firm, not Telxon itself. Defendants characterize him as an outside independent director, beyond the influence of Telxon's CEO. According to the complaint, Goodman's law firm, however, received nearly $1 million in 1993 for services provided to Telxon. Goodman's firm is a small

one. Realism of the kind signaled by *Rales* requires one to acknowledge the possibility that a partner at a small law firm bringing in close to $1 million in revenues from a single client in one year may be sufficiently beholden to, or at least significantly influenced by, that client as to affect the independence of his judgment.... As Myerson is Telxon's chief executive officer, he undoubtedly possesses the authority to hire and fire the corporation's legal counsel. For this reason, the pleadings raise a reasonable doubt concerning Goodman's independence in assessing the merits of a demand letter attacking the [subject] agreements. [FN41]

> FN41. *Steiner v. Myerson,* Del. Ch., C.A. No. 13139, mem. op. at 24-25, Allen, C. (July 18, 1995).

**\*9** Thus, Modlin's firm's receipt of substantial fees over a period of years for professional services raises a reasonable doubt as to the independence of his judgment. [FN42]

> FN42. See *In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 357-58 (architectural services); *but see Tabas v. Mullane,* D.N.J., 608 F.Supp. 759, 768 (1985) (legal services). Although lawyers are subject to unique and demanding professional standards, *see e.g., The Delaware Lawyers' Rules of Professional Conduct,* I am not persuaded that, for present purposes, the nature of professional fees (*e.g.,* architectural, medical, or legal) supports a differential analysis based on the specific profession.
> I also note that Modlin's son was Ply Gem's corporate secretary. Whether the position of corporate secretary carried any material benefit or whether it was simply an accommodation provided as part of his firm's legal services to Ply Gem is not clear from the Complaint. Thus, I infer nothing from the son's status. See *Chaffin v. GNI Group, Inc., supra; Mizel v. Connelly, supra.*

(ii) *Goldenberg.* Goldenberg served as a consultant to Ply Gem from 1994, after he ceased serving as its chairman. In 1996, he received consulting fees of almost $300,000. The receipt of substantial consulting fees, in the context

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                              Page 10
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

where Silverman was the largest shareholder and the chief executive officer provides a sufficient factual basis to create a reasonable doubt as to whether Goldenberg was independent of Silverman. [FN43]

> FN43. *See In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 357-58; *See Kahn v. Dairy Mart Convenience Stores, Inc.,* Del. Ch ., C.A. No. 12489, mem. op. at 14, Jacobs, V.C. (Mar. 29, 1996).

(iii) *Hersh.* Hersh, a co-founder of the corporation and a director since 1954, is alleged to have received $91,000 in consulting fees during 1996 from Ply Gem. Although the allegations against Hersh may fairly be characterized as skimpy, given my disposition as to other directors against whom the allegations are not compelling and the Chancellor's conclusion in *Friedman v. Beningson* that consulting fees of $48,000 in one year could provide the basis for the finding of impairment of ability to exercise non-conflicted business judgment, I conclude that the Complaint does state a reasonable basis to question Hersh's independence. [FN44]

> FN44. *See Friedman v. Beningson, supra.* Although the Chancellor in *In re Walt Disney Co. Derivative Litig., 731 A.2d at 360,* concluded that allegations of payment of a consulting fee of $50,000 in one year to Senator Mitchell did not justify a reasonable doubt as to his independence, the Court, in so ruling, focused on his status as "a nationally known legal and political figure," which seemingly reduced the potential that such a payment might affect his judgment.

(iv) *Lilley.* The only allegation regarding Lilley, who had been a director for less than three years, was that his firm was paid $25,000 for consulting services. In the absence of some allegation that this was material to Lilley, I am satisfied that the Plaintiffs have not stated any basis to doubt Lilley's independence.

Because, Plaintiffs have been successful in alleging the necessary factual basis for a reasonable doubt as to the disinterestedness or independence of six of the seven

directors, Defendants' Motion to Dismiss the Complaint, except as to Lilley, as to the duty of loyalty claims must be denied. This result does not reflect any judgment on the ultimate merits of these claims. It is the product solely of their status and their relationships with both the Company and Silverman. At this stage of the proceedings, the Court is required to afford Plaintiffs every reasonable inference from their well-pled factual allegations. The Court's scope of inquiry is also limited because, subject to certain exceptions not relevant here, it may not look beyond the Complaint. [FN45] For example, I cannot consider Defendants' assertions that Snyder abstained from voting on the Nortek transaction [FN46] and that the outside directors all lost their legal or consulting fees as a result of the Nortek merger. [FN47] These issues, and others, can all be addressed on a more complete factual record and must wait for another day. [FN48]

> FN45. *In re Sante Fe Pac. Corp. Litig.,* Del.Supr., 669 A.2d 59, 68 (1995).

> FN46. Affidavit of Mitchell A. Lowenthal in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("Lowenthal Aff."), Ex. A, Schedule 14D-9 at 19, 25-26.

> FN47. *See* Defendants' Joint Reply Brief in Support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, at 2 (also chastising Plaintiffs for their "apparent decision to avoid reference to publicly disclosed (but inconvenient) facts."). In addition, Defendants have apprised the Court that one of the Plaintiffs in this action filed an action in New York against Furman Selz in which he alleged that an independent Ply Gem board relied upon a fairness opinion negligently prepared by Furman Selz in approving the Nortek merger. The plaintiff in the New York proceedings suggested that the five directors (other than Silverman and Snyder) operated independently as an *ad hoc* special committee: "Lilley and the rest of the Ply Gem board (other than Silverman and Snyder who had conflicting interests) occupied a role substantially equivalent

Not Reported in A.2d                                                                    Page 11
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

to that of a special committee."
Letter from A. Gilchrist Sparks, III, Esquire, dated
Dec. 5, 2000, *quoting* at 2, Plaintiffs' Memorandum
of Law in Opposition to Defendant Furman Selz
LLC'C (sic) Motion to Dismiss or, in the
Alternative, to Stay this Action. Exhibit at p 19, as
filed in the New York proceedings.

FN48. *See McMullin v. Beran,* 765 A.2d at 924-25;
*In re Western National Corp. Shareholders Litig.,
supra.; In re New Valley Corp. Derivative Litig.,
supra; Parnes v. Bally Entertainment Corp.,* Del.
Ch., C.A. No. 15192, Chandler, C. (Feb. 20, 2001).

D. *The Duty of Care Claims.*

The breach of duty of care claims, alleged by Plaintiffs
without preciseness or enthusiasm, seem to be a
combination of two considerations: (i) that the directors
agreed to a payment to Silverman that was substantially
more than any amount to which he was entitled, and (ii) that
the directors were not appropriately involved in the
negotiations and failed to acquire adequate information
regarding the merger agreement, including the side benefits
to Silverman.

*10 Article VIII of Ply Gem's Certificate of Incorporation
provides in part:
A director of this corporation shall not be personally
liable to the corporation or its stockholders for monetary
damages for breach of fiduciary duty as a director, except
for liability (i) for any breach of the director's duty of
loyalty to the corporation or its stockholders, (ii) for acts
or omissions not in good faith or which involve
intentional misconduct or a knowing violation of law, (iii)
under Section 174 of the General Corporation Law of the
State of Delaware, or (iv) for any transaction from which
the director derived an improper personal benefit. [FN49]

FN49. Lowenthal Aff., Ex. D.

This provision, authorized by *8 Del. C. § 102(b)(7),*
generally shields directors from monetary liability for a
breach of their duty of due care. [FN50]

FN50. Section 102(b)(7), of course, does not shield

directors from personal liability for breach of their
duty of loyalty. *See, e.g., McMullin v. Beran.* 765
A.2d at 926.

Because the Section 102(b)(7) provision cannot be found in
the Complaint, there may be doubt as to whether the Court
may consider the exculpatory provision in the Certificate of
Incorporation in the context of a motion to dismiss. [FN51]
The established Chancery practice, which I will follow until
instructed otherwise, is to address the Section 102(b)(7)
defense in resolving motions to dismiss through the taking
of judicial notice of the applicable provision in the
certificate of incorporation. I do so because it promotes the
efficient allocation of the Court's and the parties' resources.
[FN52]

FN51. *Id.,* at 926; *Emerald Partners v. Berlin.*
Del.Supr., 726 A.2d 1215, 1223-24 (1999) (§
102(b)(7) provision "is in the nature of an
affirmative defense.").

FN52. *In Re Frederick's of Hollywood, Inc.
Shareholders Litigation,* Del. Ch., C.A. No. 15944,
Jacobs, V.C. (Jan. 31, 2000), *appeal pending sub
nom. Malpiede v. Townson,* Del.Supr., No. 80,
2000; *McMillan v. Intercargo Corp.,* 768 A.2d at
501 n. 40; *In Re Lukens, Inc. Shareholders Litig.,*
Del. Ch., 757 A.2d 720, 724 n. 1 & 732-34 (1999);
*see In re BHC Communications, Inc. Shareholders
Litig.,* Del. Ch., Consol. 18209, mem. op. at 15 n.
4, Lamb, V.C. (June 4, 2001).

Accordingly, because Lilley is entitled to the shield of
Section 102(b)(7) and because the Complaint fails to state a
claim as to any breach of his duty of loyalty, he is entitled to
dismissal of the action against him.

Plaintiffs' allegations of disloyalty as to the other directors,
however, have survived the motion to dismiss. "[I]f a
complaint adequately alleges... disloyalty... or if the nature
of the alleged breach of duty is unclear, the complaint will
not be dismissed on a motion made under Rule 12(b)(6) on
the basis of an exculpatory charter provision." [FN53] Thus,
I need not determine if the imprecise allegations of breaches
of the duty of care would, if they stood alone, be dismissed

Not Reported in A.2d                                                                                                    Page 12
Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

under Section 102(b)(7).

> FN53. *In re Lukens, Inc. Shareholders Litig.,* 757 A.2d at 734. "Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defenses as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness." *Sanders v. Wang,* Del. Ch., C.A. No. 16640, mem. op. at 28, Steele, V.C. (Nov. 8, 1999).

E. *Delegation of Authority to Negotiate.*

At oral argument, and in correspondence following oral argument, Plaintiffs attempted to make the claim that the directors improperly delegated to Silverman the responsibility for negotiating the merger transaction. [FN54] There is nothing inherently wrong with an interested chief executive officer negotiating a merger transaction. In most instances, the chief executive officer is the person most knowledgeable about the company, its value, and the industry in which it operates. Moreover, because Silverman was Ply Gem's largest shareholder, he also had a significant personal incentive to maximize the value of his shares. [FN55] As noted in *McMullin,* the Ply Gem board "could properly rely on the majority shareholder to conduct preliminary negotiations." [FN56] Plaintiffs, however, contend that Silverman did more than "conduct preliminary negotiations." Even if that is true, the issue becomes whether the Ply Gem board satisfied its "ultimate statutory duty and fiduciary responsibility to make an informed and independent decision" on whether to enter into the Nortek merger transaction. [FN57]

> FN54. This contention is addressed separately, not because it is not to be analyzed under the triad of the duty of care, the duty of loyalty, and the duty of good faith, but because the parties have addressed it separately.

> FN55. *McMillan v. Intercargo Corp.,* 768 A.2d at

503.

> FN56. *McMullin v. Beran,* 765 A.2d at 924.

> FN57. *Id.*

**\*11** If an informed and disinterested majority of the board had duly approved the Nortek merger and the related Silverman agreement, Silverman's interest in the transaction and his involvement in the negotiations would not have provided the basis for a challenge. Here, however, the Plaintiffs' Complaint sufficiently alleges that a majority of the board approving the merger was not independent of Silverman's domination. Thus, Plaintiffs' loyalty claims survive, not so much because negotiation authority was delegated to a conflicted officer and director, but because it is sufficiently alleged that the directors who ultimately reviewed and approved the transaction were not independent of that interested officer and director.

IV. CONCLUSION
For the foregoing reasons, Defendants' Motion to Dismiss is granted as to Lilley, but it is denied in all other respects.

An Order will be entered in accordance with this Memorandum Opinion.

ORDER
NOW, this 26th day of June, 2001, for the reasons set forth in the Court's Memorandum Opinion of this date,

IT IS HEREBY ORDERED:

1. Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint is granted, without prejudice, as to Defendant William Lilley III.

2. Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint is otherwise denied.

Not Reported in A.2d, 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# 17

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
**(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)**

▷

UNPLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
TCG SECURITIES, INC., Plaintiff,
v.
SOUTHERN UNION COMPANY, a Delaware corporation,
Frank W. Denius, Edmundo R.
Delgado, Wofford Denius, Stanley A. Milner, A.M.
Wiederkehr, Metro Mobile CTS.,
Inc., a Delaware corporation and SU Acquisition, Inc., a
Delaware corporation,
Defendants.
**CIV. A. No. 11282.**

Submitted Jan. 30, 1990.
Decided: Jan. 31, 1990.

**451 Wayne N. Elliott, Michael Hanrahan, Elizabeth M. McGeever, and Chandlee Johnson Kuhn, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiff.

Kenneth J. Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for defendant Southern Union Company and individual defendants.

R. Franklin Balotti, and Gregory V. Varallo, of Richards, Layton & Finger, Wilmington, and Fleischman and Walsh, P.C., Washington, D.C., for defendants Metro Mobile CTS, Inc. and SU Acquisition, Inc.

MEMORANDUM OPINION
CHANDLER, Vice Chancellor.

*1 Plaintiff TCG Securities, Inc. ("TCG") filed a verified complaint on December 13, 1989, seeking to enjoin consummation of a merger between defendants Southern Union Company ("Southern Union") and SU Acquisition, Inc. ("Newco"). Newco is wholly owned by defendant Metro Mobile CTS, Inc. ("Metro"). The complaint names Southern Union's directors as individual defendants. Southern Union and the individual defendants answered the complaint on January 7, 1990. Metro and Newco filed a motion to dismiss.

The parties have conducted expedited discovery, including document production and depositions. On January 19, 1990, TCG filed its opening brief in support of its motion for a preliminary injunction. Defendants' answer and TCG's reply followed thereafter. The preliminary injunction hearing was held on Tuesday, January 30, 1990. **452 The challenged merger transaction is scheduled to close on Wednesday, January 31, 1990.

For the reasons that follow the application for preliminary relief is denied.

I.

*The Parties*

Plaintiff TCG, a privately held Texas corporation wholly owned by Mr. T.C. Griffith, is a common stockholder of Southern Union. TCG presently owns about 100 shares of Southern Union common stock.

Defendant Southern Union is a Delaware corporation, primarily operated out of Texas. Southern Union has 10,148,941 shares of common stock outstanding which trade publicly on the New York Stock Exchange and are widely held. Southern Union also has 250,000 shares of 10% cumulative preferred stock (the "preferred") outstanding. This stock was registered when it was sold and is held beneficially by approximately ten entities including institutional investors, banks and insurance companies. The record suggests that the preferred is not actively traded. Among other rights, the preferred has the right to an established price upon redemption. In addition to the established price, the redeemed preferred have rights to accrued dividends.

Southern Union is engaged in various aspects of the energy business. These operations are carried out through two principal divisions. The first, Southern Union Gas Company ("Utility") is a major multi-territory distributor of natural gas in the southwest United States. The second, Southern Union Exploration Company ("SX") is involved in oil and gas exploration and production. SX's primary assets are gas reserves in New Mexico. Southern Union is also a party to numerous lawsuits related to its business operations, involving contract disputes between SX and its major gas

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
**(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)**

purchaser, Public Service of New Mexico ("PNM"). The value of this litigation to Southern Union is one of the major points of controversy in this action.

Utility and SX have performed well and are generally considered attractive operations. Southern Union as a whole, however, has a recent history of poor performance. As a result, Southern Union recently divested itself of several of its non-regulated operations that were performing inadequately. It seems that during the mid-1970's **453 Southern Union entered the real estate, savings and loan, refining and marketing businesses. In the last several years, Southern Union has reorganized to focus on its profitable energy operations.

*2 The individual defendants are Southern Union's five directors. Franklin W. Denius ("Denius") is the chairman, president and chief executive officer of Southern Union. Denius owns beneficially 390,799 (3.9%) shares of common stock. A.M. Wiederkehr ("Wiederkehr") is the president and chief operating officer of SX. Wiederkehr is beneficial owner of 16,152 shares of Southern Union common stock. The remaining directors--Wofford Denius, the son of Franklin Denius, Edmundo R. Delgado and Stanley A. Milner--each own varying amounts of Southern Union common stock. There are no allegations that any of the Southern Union directors have any interest in Metro. Thus I note that the board appears completely disinterested and independent with respect to this transaction.

*Pre-Transaction Events*

On January 3, 1989, Southern Union received an allegedly unsolicited offer from Enserch Corporation ("Enserch") for a merger in which each share of Southern Union common stock would be converted into .535 common shares of Enserch common stock. Southern Union alleges that the Enserch offer had a value of around $10.16 per share of Southern Union common stock. In the quarter prior to the Enserch offer Southern Union's common stock had been trading between $7 1/2 to $9 3/8 . While Southern Union deferred action on the Enserch offer, they issued a press release on January 12 stating that the offer had been made. A second press release was issued on January 31 stating that Shearson Lehman Hutton ("Shearson") had been retained by

Southern Union to evaluate the Enserch offer and other available alternatives including: remaining independent, effecting a corporate restructuring, initiating discussions with others, or evaluating other plans of business reorganization.

On March 16, 1989, the Southern Union board met with Shearson to review available alternatives. Shearson was authorized to explore the possible sale of all or portions of Southern Union, including SX or Utility. A press release was issued stating that Shearson was instructed to contact third parties. No decision, however, as to Southern Union's course of action seems to have been made. Shearson was under the impression that the board wanted to see what the company was worth and if there were any potential buyers. There are indications that Denius thought staying independent might be **454 the best course of action. The board was also of the view that the shareholders might be best served by a transaction that allowed them to continue as equity participants. While the board appears to have not mapped out a clear course of action, it continued to take steps necessary for a significant transaction of some type.

After and during the period that Shearson contacted third parties, Shearson sent out confidentiality/standstill agreements to interested third parties. Those parties signing the agreements were then sent a Shearson prepared confidential information memorandum containing detailed information about Southern Union. In May, 1989, Shearson and Southern Union established a data room at Southern Union's Dallas offices to provide additional information to interested parties. Some ten interested parties visited the data room. Shearson characterizes visitors to the data room as very serious potential bidders.

*3 In late April, Aaron Fleischmann, Esquire, of Fleischmann & Walsh, counsel for Metro, contacted Denius to express Metro's interest in the company. On May 11, 1989, George Lindeman ("Lindeman"), Metro's chairman and controlling shareholder, telephoned Denius about possible transactions between Metro and Southern Union. Metro signed a confidentiality/standstill agreement on May 12, thereafter receiving confidential information about Southern Union.

Case 1:05-cv-00327-GMS    Document 40-10    Filed 01/20/2006    Page 17 of 24

Westlaw.

Not Reported in A.2d                                                                                          Page 3
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)

On May 31, 1989, Lindeman and his attorney Stephen Bouchard, of Fleischmann & Walsh, met with Denius and two Shearson representatives, William Shutzer and Michael McAllister in New York City. At the dinner meeting, Shearson gave an informal presentation concerning Southern Union and its current activities. Lindeman stated that he would be willing to consider purchasing Southern Union for $13.50 per share. Lindeman also expressed reservations about placing a formal bid and entering a bidding contest. Denius and Shearson agreed to get back to Metro yet made no attempt to negotiate at that time. Shearson was authorized by Denius to contact Lindeman the next day to clarify Metro's bid and to seek additional consideration. Shearson allegedly suggested a $.375 per share increase, influencing Metro to increase its bid to $13.875. It is unclear whether any other interested party was contacted about raising their bid. Southern Union has alleged, however, that contacting Metro was logical in light of the fact that the Metro bid was the best bid to date and the only bid for all of Southern Union's assets.

On June 1, 1989, Shearson sent bid procedure letters to all parties that had shown an interest in transactions involving all or **455 some of Southern Union. Shearson's cover letter and the enclosed bidding guidelines sought offers for all outstanding Southern Union common stock or for SX. The bid procedure letter required the submission of all bids by 12:00 noon on Friday, June 16, 1989.

Southern Union's outside counsel, Carrington, Coleman, Sloman & Blumenthal sent a draft merger agreement to Metro on June 2, 1989. Draft merger contracts were allegedly sent to all interested parties at some point thereafter. Around June 5, 1989, Metro conducted due diligence and Enserch withdrew from the process. On June 8, the interested parties were contacted and informed that the bid date might be accelerated. That same day Southern Union received from Metro a mark-up of the proposed merger contract. Shearson, before the bidding closed, met with Metro to negotiate the terms of the merger contract. On June 12, all interested parties were contacted by Shearson and told to make their best offer by noon, June 13.

Shearson analyzed the bids that were received. On June 14, 1989, Southern Union's board met to consider a proposed merger agreement between Metro and Southern Union. The board approved a cash merger agreement with Metro ("original agreement"). Only board member Delgado voted against the agreement on the purported grounds that Southern Union should evaluate other alternatives. The original agreement cashed out the common stockholders at $13.80 per share and the preferred at $108 per share, which was the redemption price for the preferred under its certificate of designations. It is alleged that the parties decided to pay the preferred the $108 redemption price out of concern that the preferred might block the merger. It appears that under Southern Union's restated certificate of incorporation ("certificate") and the certificate of designation for the preferred stock, a two-thirds vote of the outstanding preferred stockholders is required before certain mergers may take effect. Southern Union's proxy statement, however, opined that a favorable vote of the preferred shareholders was not required in connection with the merger now being challenged.

*4 *The Challenged Transaction*

On July 13, 1989, Metro proposed several changes to the original agreement. The resulting agreement ("amended agreement") is the memorializing document to the present challenged transaction. Under the amended agreement, Newco, a newly formed Metro subsidiary, would be merged into Southern Union, rather than Southern Union **456 merging into Metro as originally contemplated. The amended agreement also gave Southern Union's preferred stockholders the right to "opt out" of the merger if two-thirds of the preferred stock was not voted in favor of the merger and, instead, have their stock redeemed. The preferred stock would be redeemed out of a fund to be established by Metro. The amended agreement also increased the amount of Southern Union common stock which Metro could acquire on the open market from 4.9% to 9.9%.

Southern Union sent an October 20, 1989, dated proxy statement to all Southern Union shareholders soliciting approval of the amended agreement at a special stockholders' meeting to be held on November 21, 1989. The proxy statement informs the shareholders that, absent perfection of appraisal rights, the common stock would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
**(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)**

converted into the right to receive $13.80 in cash. The preferred stock would either be converted into the right to receive $108.00 in cash or would be redeemed within 60 days after the merger for $108.00. The proxy statement goes on to state that the merger agreement requires a favorable vote of common stock but not the preferred stock. If two thirds of the preferred vote affirmatively, they will receive $108 in cash upon consummation of the merger. If the requisite affirmative vote of the preferred was not obtained then the preferred would remain outstanding, but would be redeemed for $108 within 60 days after the merger. TCG claims that the preferred had a financial incentive to not approve the merger because upon redemption the preferred are entitled to the $108 redemption price *plus* accrued dividends to the redemption date. In one scenario TCG claims that the preferred could be entitled to $113.40 per share. At the special stockholders' meeting, the common stockholders approved the amended agreement, but only 58% of the preferred voted in favor.

On January 3, 1990, Southern Union's board met to consider redeeming the outstanding preferred stock. On that same day, a notice of redemption was mailed to holders of Southern Union's preferred stock. Under Southern Union's certificate, it appears that the preferred stock ceases to be outstanding once funds necessary for redemption have been deposited and notice of redemption has been made.

II.

A plaintiff seeking preliminary injunctive relief has the burden of establishing a reasonable likelihood of success on the merits of his claims, that he will suffer irreparable harm before a final hearing **457 may be had, and that the harm to the plaintiff if injunctive relief is denied outweighs the harm to the defendants if injunctive relief is granted. *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Ch., 533 A.2d 585, 600, *aff'd,* Del.Supr., 535 A.2d 1334 (1987).

III.

*5 In addressing the merits of TCG's various substantive claims, I adopt the apparent ranking order chosen by TCG's counsel at oral argument. TCG's first claim is that defendants breached their fiduciary duty of candor by failing to fully and accurately disclose all facts germane to an evaluation of the fairness of the merger consideration.

Defendants' fiduciary obligation to disclose all material facts in an atmosphere of complete candor is well established. *Sealy Mattress Co. of N.J. v. Sealy, Inc.,* Del.Ch. 532 A.2d 1324, 1338 (1987) *citing (Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985)). The appropriate legal test as articulated in *Rosenblatt, supra,* requires disclosure of those facts that are material. A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt, supra, citing (TSC Industries, Inc. v. North-way, Inc.,* 426 U.S. 438, 449 (1979)).

TCG has subdivided its disclosure claim into two parts. The first part includes those allegations of misleading and incomplete disclosure concerning contingent assets and liabilities, *i.e.,* pending litigation. The second includes those allegations of misleading and incomplete disclosures concerning the bidding process in general and aspects of Southern Union's dealings with Metro in particular.

I understand TCG's claim involving the disclosure of Southern Union's litigation to assert that those disclosures are inadequate in detail and have been purportedly "buried" in the proxy statement. Whether the litigation was disclosed with sufficient detail must be viewed in light of the *Rosenblatt* test. To this end I find that more detailed disclosure of the litigation would not significantly alter the total mix of information as viewed by the reasonable investor.

TCG's argument that the shareholders deserved more detailed disclosure of the pending litigation because the bidders had access to such information is unpersuasive. They cite *In re Envirodyne Industries Inc.,* Del.Ch., C.A. No. 10702, Hartnett, V.C., slip op. at 8 (Ap. 20, 1989) in support of this proposition. That holding, however, is more subtle than plaintiff contends. The information at **458 issue in *Envirodyne Industries* was confidential revenue and profit breakdowns of Envirodyne's three principal divisions. The information was obviously heavily relied upon by the investment bankers and the bidders. This Court concluded that, "[s]uch divisional information is material where the offeror utilizes such information in formulating its bid."

Westlaw.

Not Reported in A.2d                                                                                      Page 5
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
**(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)**

*Envirodyne Industries,* slip op. at 8.

The present case is distinguishable from *Envirodyne.* First, information about the litigation was disclosed, albeit in an allegedly unspecific and hard to find fashion. Second, there is absolutely no evidence of record that the information was utilized in any uniform fashion by the bidders. In fact, the only information concerning any bidders treatment of the information was that Metro discounted to 20% Shearson's estimate of potential asset value of the most significant positive aspect of Southern Union's litigation. Unlike the revenue and profit breakdowns in *Envirodyne Industries,* there is no consensus as to how the litigation in the present action should be valued. While figures can be produced, whether the figures are to be placed on the asset or liability side of the ledger remains mere speculation until final judgment. Third, the very nature of pending litigation requires that an acquiree make detailed disclosures of pending litigation to potential acquirers. An acquirer of Southern Union would essentially buy Southern Union's pending litigation. The successful acquirer would be responsible for the litigation and therefore has an obvious interest in whatever pending litigation it is acquiring. This interest should not be equated in the particular circumstances here with the *Rosenblatt* test for materiality. Because of the speculative nature of Southern Union's pending litigation, and the absence of record evidence suggesting it was utilized or relied upon by bidders in formulating their offers, I conclude that a more detailed explanation of Southern Union's litigation was not required by the directors' fiduciary duty of candor.

*6 In addition to not meeting the *Rosenblatt* materiality test, defendants assert that the disclosure concerning the litigation should not be disclosed under the test for "soft information" established in *Flynn v. Bass Bros. Enterprises, Inc.,* 3rd Cir., 744 F.2d 978, 988 (1984) and followed by this Court. *In re Anderson Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 680, 692 (1986). The test in *Flynn* requires weighing the potential aid information will give a shareholder against any potential harm. Specifically, defendants cite *Shamrock Holdings, Inc. v. Polaroid Corp.,* D.Del., 709 F.Supp. 1311, 1318-1320 (1989), [FN1] **459 which applied the *Flynn* test to the question of whether

certain facts pertaining to pending litigation should be disclosed. Indeed, *Shamrock Holdings, Inc.,* stands for the proposition that in relation to unresolved litigation, no disclosure of specific estimates of probable recovery made by management and the directors, nor past negotiations concerning settlement, are required. [FN2] TCG counters in its reply brief that they do not seek specific valuations of the litigation. TCG fails, however, to inform this Court as to what information concerning the litigation, that would be material to the reasonable investor weighing his options, they do seek. In view of the tests in *Flynn* and *Rosenblatt,* I am unable to fathom what further disclosures concerning the pending litigation could be required by Delaware law.

TCG next argues that any disclosures concerning the pending litigation that were made are inadequate because they were buried in the proxy statement. TCG cites this Court's opinion in *Weingarden & Stark v. Meenan Oil Co. et al.,* Del.Ch., C.A. No. 7291 & 7310, Berger, V.C., slip op. at 9 (Sept. 10, 1984) in support of its claim that the "buried facts" doctrine should be invoked. That case stands for the proposition that disclosure is inadequate if the disclosed information is "buried" in the proxy materials. *Id.* Whether information is "buried" is the type of determination not logically susceptible to the bright line test that TCG attempts to create. [FN3] TCG urges a bright line test that would make all material disclosures contained in footnotes of proxy statements inadequate. *Weingarden* is cited in support of this proposition, but I do not read it so expansively. The case cited in *Weingarden* that found disclosure in a footnote to be inadequate is factually distinct. There, the information contained in the footnote on the next-to-last page of the prospectus radically changed information that had been disclosed in the body of the **460 prospectus with no apparent reference to the essential footnote. Even if I were to adopt TCG's proposed rule, the present disclosures would prove adequate as they are not "buried in a foonote." In fact many of the disclosures are found in the text of Southern Union's Form 10-K within the proxy statement. While the Form 10-K is an appendix to the proxy statement, Southern Union made reasonable efforts to incorporate the Form 10-K into the proxy statement. The Form 10-K is cross-referenced in several places in the text of the proxy statement where a shareholder might require

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 6
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
**(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)**

additional and more detailed information. I find the disclosures concerning Southern Union's pending litigation adequate in detail and reasonably accessible to an interested shareholder.

*7 The second part of TCG's disclosure claim involves allegations of misleading and incomplete disclosures of the bidding process and Southern Union's dealings with Metro. Swift elimination of TCG's claim that defendants' conduct violated Delaware law requiring a fair and even-handed negotiation process will facilitate discussion of the second part of TCG's disclosure claim.

In TCG's opening brief, but not in its reply brief or at oral argument, there is a claim that Southern Union violated its duties under *Revlon* in its conducting of the auction process and the subsequent agreement with Metro. See *Revlon Inc. v. MacAndrews and Forbes Holdings,* Del.Supr., 506 A.2d 173 (1986). Any discussion is unnecessary as it is clear from the record that Southern Union's disinterested board conducted a bidding process and reached a rational agreement well within its informed business judgment. See *City Capital Associates L.P. v. Interco Inc.,* Del.Ch., C.A. No. 10150, Allen, C. (Nov. 1, 1988); *In re Envirodyne Stockholders Litigation, supra.* The business judgment rule protects from substantive review analysis by a court of the wisdom of such debatable questions. See *In re J.P. Stevens & Co., Inc.,* Del.Ch., 542 A.2d 770, 783 (1988).

I understand TCG's evolving disclosure argument concerning the bidding process to be that the description of the auction process in the proxy is different from the actual process to the point of being misleading and inadequate. I do not, however, understand TCG's contention that the proxy statement is inaccurate in this respect as the proxy's recitation of the process appears consistent with the factual record. Additionally, I do not find that the proxy statement required, under the appropriate test, a description of the process in the play-by-play detail deemed necessary by TCG.

**461 Central to TCG's argument on this second part of their disclosure claim is their unsupported contention that Metro was excepted from the bidding process. In fact, the record indicates that the bidding process moved ahead at the

same time that Southern Union negotiated with Metro. TCG then argues, nevertheless, that these negotiations, occurring during the bidding, should have been disclosed. Before asking "why" in the language of the test articulated in *Rosenblatt,* it is important to remember that Delaware law does not prohibit a bidder being treated differently so long as maximum shareholder value is the goal. The board owes a duty of fairness to the shareholders, not the persons seeking to acquire the company. *In re J.P. Stevens & Co., Inc.,* 542 A.2d at 782. Play-by-play disclosure of the bidding process in the circumstance here would not alter the total mix of information made available to Southern Union's shareholders.

Finally, I rule in this same fashion concerning the miscellanious items, that are various parts of the process, that TCG claims should have been disclosed. These items concern specific aspects of the process leading up to the merger agreement as well as disclosure of the motivation [FN4] behind some of the results of the process. For example, TCG seeks disclosure of Southern Union's arrangement with Shearson, details concerning Shearson's valuation methodology and the motivation behind Southern Union's final decision as to how to deal with the preferred. The simple fact of the matter is that a reasonable line has to be drawn or else disclosures in proxy solicitations will become so detailed and voluminous that they will no longer serve their purpose. The *Rosenblatt* test works well in demarcating the appropriate line, and this proxy statement falls within it.

IV.

*8 TCG raises two related challenges to the validity of the merger. First, it argues that the merger did not receive approval from the holders of two-thirds of Southern Union's preferred stock at the November 21, 1989, special meeting. Second, it contends that Southern **462 Union's January 3, 1990, notice to redeem all of its preferred stock was legally insufficient as a means of removing the outstanding preferred stock as an obstacle to the merger.

About 250,000 shares of 10% cummulative preferred stock was issued by Southern Union in 1987. Its certificate of incorporation requires that holders of such stock, by a two-thirds vote, must approve certain defined business

Westlaw.

Not Reported in A.2d                                                                                        Page 7
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
**(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)**

consolidations or mergers. Article Fourth, paragraph 7 of Southern Union's charter provides in pertinent part that:

(7) So long as any shares of Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote at a meeting (the notice of which shall state the general character of the matters to be submitted there at), or the written consent with or without a meeting, of the holders of at least 66 2/3 percent in Stated Value of the then outstanding shares of Preferred Stock:

* * *

(d) Effect the merger or consolidation of the Corporation into or with any other corporation, or the merger of any other corporation into the Corporation, unless the corporation resulting from or surviving such merger or consolidation will upon consummation of such merger or consolidation have no class of stock and no other securities, either authorized or outstanding, ranking prior to or on a parity with the Preferred Stock, except the same number of shares (or aggregate par value or Stated Value) of stock and the same principal amount of or other securities with the same rights and preferences as the stock and other securities of the Corporation respectfully authorized and outstanding immediately preceding such merger or consolidation and unless each holder of the Preferred Stock immediately preceding such merger or consolidation shall receive or retain the same number of shares (or aggregate par value or Stated Value) of stock with the same rights and preferences of the resulting or surviving corporation.

In light of this charter provision, Southern Union and Metro decided to offer holders of Southern Union's preferred stock a two-thirds vote in connection with the merger. If that vote were obtained, the preferred stock would be converted into a right to receive $108 cash in the merger. On the other hand, if the requisite vote were not received, the preferred stock would be called for redemption, thus **463 permitting the merger to proceed without having obtained a two-thirds vote of the preferred. Because holders of only 58% of the preferred stock voted in favor of the merger, Southern Union and Metro proceeded on the second course, with Southern Union issuing on January 3, 1990, the notice of redemption to holders of its preferred stock.

TCG views Article Fourth, paragraph 7 very differently, interpreting it as requiring a two-thirds vote of all preferred stock outstanding on the date established for the stockholder vote on the proposed merger. If preferred stock is outstanding on the date the stockholders assemble to vote, the preferred stockholders must approve the proposed merger agreement by a two-thirds vote in order for the merger to proceed. In TCG's view, the charter does not permit the second alternative redemption course. According to TCG, since Southern Union's preferred stockholders had the right to vote at the November 21 special meeting, the later redemption of the preferred is of no consequence. Once having voted on the proposed merger, TCG argues, the effect of the negative preferred vote cannot be later undone through the redemption vehicle. By this interpretation, the merger cannot proceed even though Southern Union's redemption call will eliminate all of the outstanding preferred stock before the effective time of the merger.

*9 Provisions of certificates of incorporation, even if written with great care and precision, often lead to conflicting interpretations. Such is the case here. I conclude, however, that plaintiff has not demonstrated a sufficient likelihood of ultimate success on this claim to justify the preliminary relief it seeks. First, one can plausibly read the ordinary language of the charter as providing that if preferred stock is outstanding at the time certain mergers are scheduled to take effect, the holders of such stock must have been afforded an opportunity to vote with respect to such mergers, either at a meeting convened for that purpose or by written consents. On the other hand, if no preferred stock is outstanding when the proposed merger is scheduled to take effect, whether the holder of such stock has or has not assented to it is irrelevant.

TCG assails this interpretation of Article Fourth, paragraph 7 as illogical and flawed. It insists that whether the preferred stock was required to vote on the merger is a question that must be determined by looking at a singular moment in time--the October 16, 1989, record date established for the vote on the merger agreement. To conclude otherwise, TCG argues, would be "clear legal error," *citing* **464*Berlin v. Emerald Partners*, Del.Supr. 552 A.2d 482 (1989). *Berlin* concerned a particular charter provision of the May

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                        Page 8
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)

Petroleum Company that required a supermajority vote to approve a merger with any entity that held 30% or more of May's outstanding common stock. The issue was whether a 52% holder who proposed a merger with May triggered the supermajority vote requirement where the 52% holder, between the time the May board approved the merger and the date of the stockholder vote, reduced his holdings to below 30%. Looking to the language of the charter provision and its purpose, the Supreme Court held that the supermajority vote provision applied only to mergers with entities owning 30% or more of May's stock at the time of the record date for the stockholder vote. 552 A.2d at 488-89. A supermajority vote was thus not required to approve the merger.

As the *Berlin* Court recognized, the starting point for understanding the import of a charter provision is its express language. The provision in question here is unlike May Petroleum's charter provision. Article Fourth paragraph 7 conditions certain mergers between Southern Union and another entity by providing that such mergers can take effect only if, on the effective date, one of the following conditions has been satisfied: (1) No shares of cummulative preferred stock are outstanding, or (2) A supermajority of the holders of preferred stock have approved the merger through written consents or a meeting called for such a purpose. This interpretation of Southern Union's charter does not conflict with *Berlin's* holding. It is true that one must look to the record date to determine if preferred stock was outstanding and entitled to vote at the special meeting. But the more relevant question here is whether, at the moment the merger is scheduled to take effect, shares of Southern Union's preferred stock remain outstanding and, if so, whether a supermajority of such stock has voted to approve the merger. Here, Southern Union and Metro have taken the necessary steps to ensure that all of Southern Union's preferred stock is redeemed before the merger takes effect. And that is the precise contractual protection that Southern Union's charter provision is designed to afford preferred stockholders.

*10 Southern Union has the power, under its certificate of incorporation, to redeem preferred stock at any time and preferred stock that is redeemed is no longer considered outstanding for any purposes. Holders of such stock are limited to collecting the redemption price from the despositary institution holding the redemption funds. This interpretation is consistent with the underlying purpose of Southern Union's certificate, which was obviously designed to safeguard preferred stockholders from certain mergers or consolidations that might **465 affect adversely the preferred stockholders. Once the preferred has been called for redemption, however, the need for special protection disappears.

Next, TCG challenges the legal sufficiency of the January 3 notice of redemption. It contends the redemption notice is invalid because it is made contingent upon satisfaction or waiver of all conditions of the merger. Moreover, the notice fails to specify a redemption date (instead providing that redemption will occur on February 5, 1990 or the date on which the conditions to the merger are satisfied or waived) and fails to indicate that funds for the redemption have been irrevocably deposited to pay the redemption price upon surrender by the preferred holders of their share certificates.

Nonetheless, Southern Union has the right under its certificate to redeem its preferred stock and TCG has not directed me to any specific provision in the certificate that Southern Union's January 3 redemption notice arguably violates. [FN5] Southern Union and Metro have committed themselves, through the redemption notice and the merger agreement, to redeem all 250,000 shares of Southern Union preferred stock at a price of $108 per share. The merger agreement specifies the methods by which funds will be transferred in connection with the redemption *before* the effective time of the merger. [FN6] Until the funds are transferred and the other conditions satisfied, the preferred stockholders retain all the rights afforded them under Southern Union's certificate, including the right to vote upon certain mergers. On this record and for purposes of this motion, therefore, I am not persuaded that TCG has shown an ultimate likelihood of success on the merits of this claim. While TCG argues that the record at this moment and time requires me to find that the redemption has not been funded (and is therefore invalid), evidence of a funding procedure and commitment exists in the merger agreement **466 and in the record. *See* Peter H. Kelly Affidavit, ¶¶

Westlaw.

Not Reported in A.2d                                                                                                        Page 9
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)

3-5; Frank Denius Affidavit, ¶¶ 2-3. Furthermore, I consider it inappropriate to rule on an issue based on assumptions about what parties will or will not do at some future moment in time. Holders of Southern Union's preferred stock have been notified that their stock will be redeemed if certain conditions are met or waived. On this record and for purposes of this motion, I cannot find the redemption invalid simply because the conditions have not been satisfied or waived on the date of the preliminary injunction hearing. *Cf. Stroud v. Milliken Enterprises Inc., Del.Supr., 552 A.2d 476 (1989).*

*11 Accordingly, with respect to TCG's claims regarding the proxy solicitation, conduct of the auction, and validity of the merger agreement and redemption notice, I conclude that it has failed to demonstrate a sufficient likelihood of ultimate success on the merits to justify the preliminary relief it seeks.

V.

In addition to its failure to demonstrate a likelihood that it will succeed on the merits of its claims, TCG has also failed to show that the harm it will suffer if the preliminary injunction is denied outweighs the harm defendants will suffer if such an injunction is granted. *See Ivanhoe Partners v. Newmont Mining Corp., Del.Supr., 535 A.2d 1334, 1341 (1987).* This is because it is undisputed that Metro's $13.80 bid offers Southern Union stockholders a significant premium over its historical market price. It is also clear that Metro's offer is the product of an arms-length transaction. Southern Union had been "in play" for several months. Shearson had actively shopped the company, with more than a dozen entities bidding to acquire parts of Southern Union. Metro's bid, moreover, was at a far greater price than any other offer and was the only offer to acquire all of Southern Union. No other offer for Southern Union has emerged since the announcement in June 1989 of Metro's proposal. Indeed, no other potential bidder has even expressed an interest in attempting to match Metro's offer. It is also undisputed that a delay in receiving Metro's cash offer will be injurious to Southern Union stockholders because of the time value of money. Worse still, if the merger is enjoined Metro has indicated that it will "probably walk away" from the transaction. Southern Union views this

risk seriously since it is likely that its stock would free fall to as low as $7 a share if the merger does not proceed. Frank Denius Aff't. ¶ 19, PX 27.

Because the Metro offer is the only transaction available and because entry of an injunction against the merger would inevitably **467 threaten Southern Union shareholders with loss of an opportunity to cash in their investments at a substantial premium, I am satisfied that the risk of inflicting dire financial results upon the stockholders by issuance of such an injunction outweighs the harm, if any, that TCG will suffer if the relief it seeks is denied. *See In re J.P. Stevens & Co., Inc., 542 A.2d at 784; Freedman v. Restaurant Association Industries, Inc.,* Del.Ch., C.A. No. 9212, Allen, C. (Oct. 16, 1987).

IV.

For all of the above reasons, plaintiff TCG's application for a preliminary injunction in this case is denied.

> FN1. While it is true that the nature of the litigation, absent valuation estimates, was disclosed more fully in *Polaroid,* such was required in that case due to the size and stage of that litigation. This Court characterized the unliquidated asset as "potentially enormous." *Shamrock Holdings, Inc., 709 F.Supp. at 1318.* In addition the liability phase of the litigation involving several patents had already been concluded in *Polaroid's* favor. *Id., 709 F.Supp. at 1315 n. 3.* And finally, *Polaroid* itself had characterized the litigation as its single most important asset. *Id. 709 F.Supp. at 1318.* Even in light of the fact that disclosure questions must be determined on a case-by-case basis, *Flynn, 744 F.2d at 988,* I find the factual situation in *Shamrock* too disparate to be of assistance.

> FN2. TCG also seeks disclosure of recent settlement negotiations concerning Southern Union's principal litigation with PNM. Defendants have submitted an affidavit asserting that no such recent negotiations have occurred.

> FN3. Indeed, creation of such a bright line test is contrary to the stated wisdom that disclosure

Westlaw.

Not Reported in A.2d                                                                                    Page 10
Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449
**(Cite as: 1990 WL 7525 (Del.Ch.), 16 Del. J. Corp. L. 449)**

questions must be determined on a case-by-case basis, *Flynn,* 744 F.2d at 988.

FN4. The motivation behind certain actions that are disclosed to shareholders need not generally be disclosed. *Bertoglio v. Texas-International Corp., D.Del.,* 488 F.Supp. 630, 650 (1980); *Williams v. Geier,* Del.Ch., C.A. No. 8456, Berger, V.C., slip op. at 12 (May 20, 1987).

FN5. As Southern Union points out, no holder of preferred stock has objected to the redemption or the redemption notice. Since TCG owns only common stock, one might legitimately question what cognizable interest of TCG's is threatened by the redemption which would give it standing to complain. For purposes of this motion, however, I have passed over the issue by assuming the existence of such an interest.

FN6. Southern Union will be loaned $27,000,000 before consummation of the merger by SU Acquisition, the proceeds of which (together with Southern Union funds of an amount equal to accrued dividends) will be deposited with Texas Commerce Bank--Dallas N.A., for disbursement to the preferred stockholders upon surrender of their share certificates. *See* Frank Denius Aff'd, (Jan. 30, 1990).

Not Reported in A.2d, 1990 WL 7525 (Del.Ch.), Fed. Sec. L. Rep. P 94,928, 16 Del. J. Corp. L. 449

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.