# 18

Not Reported in A.2d                                                                                           Page 1
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

▷

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
In re VITALINK COMMUNICATIONS CORPORATION SHAREHOLDERS LITIGATION.
Civ. A. No. 12085.

Submitted: Sept. 16, 1991.
Decided: Nov. 8, 1991.

**\*\*1317** Joseph Rosenthal of Rosenthal, Monhait & Gross, P.A., Wilmington, Abbey & Ellis, New York City, for plaintiffs.

Steven J. Rothschild, Randolph K. Herndon, and Robert A. Glen of Skadden, Arps, Slate, Meagher & Flom, Wilmington, **\*\*1318** Bruce M. Stargatt, and Bruce L. Silverstein of Young, Conaway, Stargatt & Taylor, Wilmington, Boris Feldman of Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., for Defendants.

Gregory P. Williams, J. Michael Christopher, and Helen M. Richards of Richards, Layton & Finger, Wilmington, for Objectors.

*MEMORANDUM OPINION*
CHANDLER, Vice Chancellor.

\*1 Plaintiff, John P. McCarthy Profit Sharing Plan, was a shareholder of Vitalink Communications Corporation ("Vitalink"). On May 9, 1991, plaintiff, alleging breaches of fiduciary duties and the aiding and abetting of the breaches, instituted a class action suit on behalf of all Vitalink common stockholders who were to have their equity interests in Vitalink eliminated because of its merger with Network Systems Corporation ("NSC"). The defendants in this case are Vitalink, Leslie Denend, who was Chief Executive Officer, President and Director of the Vitalink Board of Directors (the "Board") and NSC.

Plaintiff and defendants filed a Stipulation and Agreement of Compromise, Settlement and Release (the "Settlement Agreement") with this Court on July 16, 1991. On July 18, I entered an Order (i) certifying a class of Vitalink's shareholders for the purpose of the settlement and (ii) approving the Notice of Pendency of Class Action, Class Action Determination, Proposed Settlement, Settlement Hearing and Right to Appear (the "Notice"). Pursuant to the Order, the parties mailed the Notice to the members of the class on July 29, 1991.

On September 6, 1991, Charles L. Grimes, John D. Burton, Reed Rubin, Louise I.G. Ireland, Renate Winston (as custodian for Hella Winston), William P. Wood, Jr., Louisa W. Ruby, Charles Kelly, Gadfly Foundation, Inc., Fidelity Bank (as custodian for Gordon W. Chaplin and as custodian for Susan C. Steinberg) (collectively, the "Objectors") filed an objection and a memorandum in opposition to the proposed settlement. On September 16, I held a hearing to determine whether I should approve the Settlement Agreement. This is my decision as to whether I approve the Settlement Agreement.

Part I of this Opinion gives a brief factual history. Part II delineates the class action approval standard. Part III discusses the **\*\*1319** probable validity of the claims. Part IV weighs the value of the claims against the value of the settlement. Part V discusses plaintiff's request for lawyers' fees and expenses. Finally, part VI states my conclusions.

I. FACTUAL HISTORY
Vitalink was a corporation duly organized under Delaware law with its principal offices located in Fremont, California. Vitalink was a high-technology company that designed, manufactured, marketed and supported data communications products known as wide area bridges. Vitalink experienced tremendous growth in the late 1980s. By the end of 1989, Vitalink controlled approximately 70 percent of the market and had developed close relationships with many of its 1500 customers.

In early 1990, Vitalink's competitive outlook began to deteriorate. Routers, rather than bridges, became the more desirable interconnect product for many of Vitalink's customers. Vitalink's stock "tumbled from $17 in mid-February to $11 [per share] by the end of the month." (Def. Exh. 15 at N200316.)

In February 1990, the Board engaged Kidder, Peabody & Co., Inc. ("Kidder") to assist in exploring Vitalink's

Westlaw.

Not Reported in A.2d                                                                                                  Page 2
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

financial and strategic alternatives to the industry's changes. By late April, Kidder had prepared a draft Offering Memorandum that Vitalink would have delivered to any party interested in purchasing it, if it had been finalized. In April 1990, Vitalink instructed Kidder to suspend its efforts related to the exploration of Vitalink's strategic and financial alternatives.

*2 In late October 1990, the Board hired Leslie G. Denend as its new Chief Executive Officer and President. An independent executive search firm had located Denend. Denend had no previous affiliation or financial interest with Vitalink. The Board instructed Denend to familiarize himself with Vitalink, explore the company's alternatives and report his findings.

On December 10, 1990, Denend first met with NSC. NSC is a corporation that designs, manufactures and services high performance data communications equipment which connects mainframe computers, minicomputers and workstations. At the conclusion of this meeting, Denend believed that all business combination discussions with NSC had ended and that NSC would not contact Vitalink again. (Denend Dep. at 13, 29.)

In mid January 1991, Vitalink representatives held a phone conversation with NSC about the possibilities of an original equipment **1320 manufacturer ("OEM") relationship. (Denend Dep. at 29.) The proposed relationship would attempt to maximize the value of NSC's router technology and Vitalink's distribution network.

In late January or early February 1991, Vitalink began to hold discussions with another company ("A Co."). (Denend Dep. at 34, 39.) Following this meeting with A Co., Denend held another meeting with NSC. (Denend Dep. at 30.) The topic of this meeting was NSC technology that possibly could be used in an OEM relationship. At the conclusion of this meeting, Denend believed that NSC would not make a proposal for the acquisition of or a business combination with Vitalink. (Denend Dep. at 35, 36.)

On February 12, 1991, Vitalink held a board meeting. At this meeting, the Board considered the possibility of executing change in control employment agreements (the "Control Agreements") with its key employees. (Denend Exh. 4 at V0004172.) Also, Denend summarized his view of Vitalink's business alternatives. (*Id.*)

After this board meeting, Vitalink representatives also held discussions with another company ("B Co."). In all, Vitalink held two meetings and a phone conversation with B Co. Ultimately, B Co. decided that the pursuit of a business combination with Vitalink was not in its best interests because of its goal to pursue an initial public offering. (Denend Dep. at 20.) B Co. revealed its decision to Vitalink by March 25, 1991. (Valdez Dep. at 64-65.)

On March 5, 1991, Denend signed his Control Agreement. (Denend Exh. 3.) On March 15, 1991, Vitalink met with NSC again. It was at this meeting that Vitalink and NSC decided that an OEM relationship would not be the best way to exploit their respective strengths. (Valdez Dep. at 56; Altman Dep. at 13; Def. Exh. 16 at VA0003517.) Also during March, Vitalink rehired Kidder to explore its strategic alternatives.

In this same time frame (*i.e.*, early spring 1991), Vitalink continued to discuss a possible business combination with A Co. Ultimately, A Co. desired to have a three-way combination with A Co., Vitalink and a third party ("C Co."). Denend believed that such a transaction would take about eight to twelve months to consummate. (Denend Dep. at 21.)

*3 During March and April 1991, Vitalink continued its discussions with NSC. The parties focused their attention on the possibility of a business combination and its form and structure since they had decided that an OEM relationship would not be the most valuable way to structure the relationship between the two entities. (Denend Dep. at 52-53, 58-59, 62.) At the April 9, 1991 Vitalink board **1321 meeting, the Board considered the possibility of a business combination with NSC and its probable advantages and disadvantages. (Def.Exh. 24 at VA004212.)

Between April 9 and April 23, Kidder conducted its due diligence as to a possible Vitalink/NSC business combination. On April 23, 1991, the Vitalink Board held a meeting where it determined that it was not realistic to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 40-11    Filed 01/20/2006    Page 4 of 15

Westlaw.

Not Reported in A.2d                                                                                                      Page 3
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

expect another bidder to surface given the outcome of negotiations with A Co., B Co. and C Co. (Def.Exh. 26 at VA004239.) Thus, the Board requested NSC to make a concrete bid. (*Id.* at VA004240.)

Shortly after the Board's April 23 meeting, NSC made its first bid for Vitalink. The offer was a market offer. That is, it basically was an offer to purchase Vitalink at its trading price. The bid was for $7.40 cash and $1 of NSC common stock. Also, NSC conditioned the offer on Vitalink granting NSC an option to buy 19.9% of Vitalink's common stock (the "Lockup"), Vitalink agreeing to not solicit alternative offers (the "No-Shop") and certain Vitalink officers agreeing to enter into new employment agreements with NSC. At the April 29, 1991 board meeting, the Vitalink Board rejected the offer. (Def.Exh. 25 at VA004244.)

On May 1, 1991, NSC made a second offer to buy Vitalink. NSC increased the consideration offered so as to give a small premium ($.20-$.25 per share). Again, the Board rejected NSC's offer as inadequate.

On May 1, 1991, NSC made a third offer to buy Vitalink. Pursuant to this bid, NSC offered to purchase all Vitalink common stock for $10.50 cash per share. Also, it was subject to the conditions discussed above as applying to the first offer (*i.e.*, the Lockup, No-Shop and employment agreements). On May 5 and 6, the Board met to consider this third offer. On May 6, 1991, the Board accepted NSC's offer, recommended it to Vitalink's stockholders and publicly announced the transaction. The May 6, 1991 closing trading price for Vitalink was $8.50 per share. Thus, the $10.50 offer represented approximately a 23.5% premium over Vitalink's market price.

On May 9, 1991, plaintiff filed this suit with this Court. Pursuant to the terms of the offer, NSC commenced the tender offer on May 13. On May 29-30, the parties executed the Settlement Agreement. The purported consideration given to plaintiff and the class for the execution of the Settlement Agreement was: (1) NSC extended the tender offer for ten days so that it would not close until June 20, 1991; (2) the parties amended their merger agreement so that Vitalink's reimbursement of NSC's fees and expenses was limited to \*\*1322 $1.75 million, (3) the parties amended the Lockup so as to limit the cancellation amount payable to NSC to $2,771,331 (the number of Lockup shares multiplied by $1 per share); and (4) the parties agreed to publicly announce the extension of the tender offer and the amendments to their merger agreement and the Lockup.

\*4 The tender offer expired on June 20, 1991. At the close of the tender offer, NSC owned approximately 90.7% of Vitalink. The parties consummated the merger on July 1 by performing a short form merger. *See* 8 Del.C. § 253. On July 11, 1991, NSC mailed notice to the former stockholders of Vitalink who had not tendered their shares informing them of the consummation of the merger.

As described above, the parties filed the Settlement Agreement with the Court on July 16, 1991. On July 18, I entered an Order certifying a class for the purpose of the settlement and approving the Notice to the class. Pursuant to the Order, the parties mailed the Notice to members of the class on July 29. On September 6, 1991, the Objectors filed an objection and a memorandum in opposition to the proposed settlement. Finally, on September 16, I held a hearing to determine whether I should approve the Settlement Agreement.

## II. CLASS ACTION SETTLEMENT APPROVAL STANDARD

As a general matter, Delaware courts have favored the voluntary settlement of lawsuits. *See, e.g., Nottingham Partners v. Dana,* Del.Supr., 564 A.2d 1089, 1102 (1989); *Polk v. Good,* Del.Supr., 507 A.2d 531, 535 (1986); *Rome v. Archer,* Del.Supr., 197 A.2d 49, 53 (1964); *Braun v. Fleming-Hall Tobacco Co., Inc.,* Del.Supr., 92 A.2d 302, 309-310 (1952). Further, Delaware courts have favored the settlement of class actions in particular because the settlements promote the interest of judicial economy. *See generally In re MAXXAM Group, Inc. Stockholders Litig.,* Del.Ch., C.A. No. 8636, Allen, C. (Apr. 16, 1987), slip op. at 2; *Amsellem v. Shopwell, Inc.,* Del.Ch., C.A. No. 5683, Hartnett, V.C. (Sept. 6, 1979), slip op. at 5.

As far as the standard that I must use in deciding whether to approve the settlement, this Court consistently has held that:

[a] motion of this sort requires the court to exercise a

Case 1:05-cv-00327-GMS    Document 40-11    Filed 01/20/2006    Page 5 of 15

Westlaw.

Not Reported in A.2d                                                                                       Page 4
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

judgment of its own as to the fairness and adequacy of the proposed settlement. *Polk v. Good,* Del.Supr., 507 A.2d 531 (1986); *Rome v. Archer,* Del.Supr., 197 A.2d 49 (1964). In doing so, the court acts on behalf of the absent class **1323 members and seeks to protect and advance their interests.... The burden rests upon those proposing the settlement to persuade the court that it is fair and reasonable in all of the circumstances.

*In re Amsted Industries Inc. Litig.,* Del.Ch., Cons. C.A. No. 8224, Allen, C. (Aug. 24, 1988), slip op. at 3. *Accord In re Resorts Int'l Shareholders Litig.,* Del.Supr., 570 A.2d 259, 266 (1990); *Polk,* 507 A.2d at 535; *Friedman v. Baxter Travenol Laboratories, Inc.,* Del.Ch., C.A. No. 8209, Jacobs, V.C. (Feb. 18, 1986), slip op. at 6. Indeed, the status of this suit as a non-(b)(3) class action heightens the standard even further since this type of class action affords the members no opportunity to opt out. *See In re Amsted Industries Inc. Litig., supra,* at 1.

In exercising its business judgment and applying this heightened standard, it is not necessary for the Court to decide the merits of the case. *See Barkan v. Amsted Industries, Inc.,* Del.Supr., 567 A.2d 1279, 1284 (1989); *Rome,* 197 A.2d at 53; *In re Beatrice Companies, Inc. Litig.,* Del.Ch., C.A. No. 8248, Allen, C. (Apr. 16, 1986), slip op. at 2, *aff'd,* Del.Supr., 522 A.2d 865 (1987). However, the Court must consider a number of factors. These factors include:

*5 (1) The probable validity of the claims, (2) the apparent difficulties in enforcing the claims through the courts, (3) the collectibility of any judgment recovered, (4) the delay, expense, and trouble of litigation, (5) the amount of the compromise as compared with the amount and collectibility of a judgment, and (6) the views of the parties involved, pro and con.

*Polk,* 507 A.2d at 536. *Accord In re First Boston, Inc. Shareholders Litig.,* Del.Ch., C.A. No. 10338, Allen, C. (June 7, 1990), slip op. at 1; *In re MAXXAM Group, Inc. Stockholders Litig., supra,* at 2. In this case, the parties' primary disputes rest upon factors (2) and (5): the probable validity of the claims and the amount of the compromise as compared with the probable amount of a judgment for the claims.

### III. PROBABLE VALIDITY OF THE CLAIMS

At the outset, I note that the Objectors do not claim that Vitalink's Board breached its fiduciary duty of loyalty. Further, to the extent that plaintiff's initial complaint alleged a breach of the fiduciary duty of loyalty, I firmly believe that any such loyalty claim **1324 is wholly meritless. I believe that any loyalty claim is meritless because Vitalink's Board unanimously approved the transaction, because three of Vitalink's four board members were completely disinterested (and, therefore, the entire Board is deemed "disinterested", *see Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984)) and because there is no evidence that an interested party "controlled" the actions of the Board. *See generally id.; Roberts v. General Instrument Corp.,* Del.Ch., C.A. No. 11639, Allen, C. (Aug. 13, 1990), slip op. at 17.

A. *Duty of Care*

1. Duty and Standard of Review
When the Board determined to sell Vitalink, its duty of care changed from a duty to preserve the company to a duty to attain the highest price reasonably attainable for Vitalink's stockholders under the circumstances. *See Barkan,* 567 A.2d at 1286; *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1288 (1989); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 182 (1986). Having determined the duty of the Board, I must determine the standard I would use at trial to decide whether the Board fulfilled their duty.

In each instance where the board is not predominantly self-interested or under the control or dominating influence of a person with a conflicting interest, the principal judicial inquiries relate to whether the board was adequately informed and acting in good faith. This court has been pointedly instructed, however, that "where issues of corporate control are at stake" action of even a disinterested board must meet an enhanced test before they will qualify for the deference that courts ordinarily accord to good faith business judgments. *See Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1287-88 (1989). This enhanced test requires a judicial judgment of reasonableness in the circumstances.... In such a setting, the additional level

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

of inquiry comes to this: whether the circumstances afford a disinterested and well motivated director a basis reasonably to conclude that if the transactions contemplated by the merger agreement close, they will represent the best available alternative for the corporation and its shareholders.

*6 Roberts, supra, at 17-18. Thus, the question boils down to this: did the Board have a reasonable basis to conclude that the **1325 NSC offer was the best available alternative to the corporation and its stockholders?

In this case, the Vitalink Board was considering only one offer when the members made their decision. Thus, the Board must have had a body of reliable evidence upon which to judge the adequacy of the NSC bid or must have canvassed the market to determine if it could have elicited higher bids in order to satisfy the enhanced reasonableness test described in Roberts. See Barkan, 567 A.2d at 1286-87. The Objectors claim that the Vitalink Board neither had canvassed the market to determine if it could have elicited higher bids nor had a sufficient body of reliable evidence to judge the adequacy of the bid. On the other hand, defendants argue that the Board canvassed the market and had a sufficient body of reliable evidence.

2. Canvassing the Market

From December 1990 until May 1991, Vitalink held extensive negotiations with NSC as to entering into some sort of business relationship or combination with NSC. Besides the NSC negotiations, the Board also considered whether it should conduct a public auction. However, the Board, with Kidder's advice, determined that an auction could have disastrous effects on Vitalink's competitive position. (Rein Dep. at 137-39; Valdez Dep. at 58, 173-74; Valdez Aff. ¶ 17.) The Board followed this advice even though supposedly everyone knew Vitalink was ready to make a deal. (Rein Dep. at 109.) Further, the Board considered contacting a number of technologically compatible companies but decided against it for various reasons. (See Rein Dep. at 109, 137-88; Valdez Dep. at 76.)

As stated earlier, the Board was in actual contact with A Co., B Co. and C Co. during the spring of 1991. Ultimately, Vitalink held two meetings and a phone conversation with B Co. before B Co. indicated that it was not interested in pursuing further negotiations regarding a business relationship or combination. (Denend Dep. at 20; Rein Dep. at 120-22.) Also, Vitalink held several discussions with A Co. and C Co. as to having a three-way business relationship or combination before A Co. and C Co. indicated that the entire transaction would take up to a year to complete. (Denend Dep. at 20-21.) The Board decided not to pursue a transaction with A Co. and C Co. because they believed it would be highly complex and because they believed A Co. and C Co. had to enter into a first step transaction before Vitalink could enter the picture and, until that happened, further negotiations were meaningless. (Rein **1326 Dep. at 111-18.) Kidder advised Vitalink that it was doubtful that any other company would have an interest in pursuing a business combination transaction with Vitalink given its poor competitive position. (Valdez Aff. ¶ 22; Def.Exh. 29 at VA004257-58.)

The Objectors argue and I agree that defendants' and plaintiff's briefs contain a lot of smoke and little fire. That is, defendants and plaintiff focus on the Board's considering contacting many companies. However, when the smoke clears, the Board actually held discussions only with three entities in the context of two alternative transactions (i.e., a transaction with B Co. and a three-way transaction with A Co. and C Co.) Further, I am disappointed with defendants' attempts to imply that the Board actually contacted more than these three companies when the record does not support such assertions. [FN1]

*7 The Objectors also argue that the No-Shop clause, the Lockup and the termination fee prevented Vitalink from being capable of canvassing the market. Defendants argue, and I agree, that these provisions do not, in themselves, prevent a company from canvassing the market. See generally In re Fort Howard Corp. Shareholders Litigation, Del.Ch., C.A. No. 9991, Allen, C. (Aug. 8, 1988), slip op. at 32 (where court held a lockup option and a window shopping clause did not prevent a market check), appeal denied, Del.Supr., 547 A.2d 633 (1988). The No-Shop agreement was subject to a fiduciary out clause whereby the Board could shop the company so as to comply with, among other things, their Revlon duties (i.e., duty to get the highest price reasonably attainable for shareholders.) Also, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 40-11    Filed 01/20/2006    Page 7 of 15

Westlaw.

Not Reported in A.2d                                                                                                Page 6
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

Lockup did not constitute a real impediment to an offer by a third party. (*See* Valdez Dep. at 137.) Finally, the parties ultimately agreed to limit the termination fee to $2,771,331. This amount represented $1 per share for each of the Lockup option shares. If this amount is spread across 100% of Vitalink's shares, it represents $.199 per share or a little less than 1.9% of the value of the transaction. I do not believe this possible payment prevented a canvass of the market. *See generally Roberts, supra,* at 21 (where the Court held that a 2% breakup fee was limited); *Braunschweiger v. American Home **1327 Shield Corp.,* Del.Ch., C.A. No. 10755, Allen, C. (Oct. 26, 1989), slip op. at 19 (where the Court held that a $.25 per share cancellation fee was not onerous).

Ultimately, in determining whether the Board canvassed the market, I have considered a number of factors. First, Vitalink held discussions with three companies besides NSC in the context of two transactions alternative to the NSC transaction. Although these discussions gave an indication as to the extent of the market's interest with Vitalink at any price, the discussions gave little indication as to the adequacy of the NSC bid because negotiations with these companies broke off before the parties ever discussed valuation issues. (Denend Dep. at 26-27.) Second, the discussions were somewhat contemporaneous with the NSC agreement. That is, the discussions with these three companies concluded by mid-March 1991 and were sufficiently close to the May agreement so that the timing of the discussions, in itself, did not jeopardize whatever information the discussions provided as to the adequacy of the NSC bid. Third, the Lockup option, the No-Shop clause and termination fees did not prevent, in themselves, a canvass of the market. Finally, forty-five days passed between the public announcement of the transaction and the closing of the tender offer. In this period, no bidder came forward.

The goal of the canvassing requirement is to ensure that a board has adequately informed itself as to whether it is getting the best deal reasonably possible for the shareholders. After considering the factors enumerated earlier, I am persuaded that the actions of the Board were not an effective probe of the market and did not provide the Board sufficient information to judge the adequacy of the NSC bid. The Board's actual contacts with other companies only indicated that some members of the market were unable or unwilling to enter into a transaction with Vitalink at any price. Further, I refuse to rely principally upon the market test as constituting a canvass of the market for two reasons. First, I refuse to rely on it because the term canvass connotes greater action by the Board than an implicit market test. Second, I refuse to rely principally on the implicit market test as constituting a canvass of the market because of my heavy reliance on this factor in deciding that the Board had a sufficient body of reliable evidence to judge the adequacy of the NSC bid. That is, if I also rely on it here, it will be difficult to distinguish between the two tests. Thus, I hold that the actions of the Board did not constitute a canvass of the market.

**1328 3. Body of Reliable Evidence
*8 With respect to the issue whether the Board had a sufficient body of reliable evidence upon which to judge the adequacy of NSC's bid, the first element the Board relied upon was the Kidder fairness opinion as to the proposed transaction with NSC. In deciding that the transaction would be fair to Vitalink, Kidder performed three types of valuation analyses: a discounted cash flow analysis, a comparable transaction analysis and a comparable company analysis.

The Delaware courts have affirmed the validity of the discounted cash flow method of valuation repeatedly. *See Cede & Co. v. Technicolor,* Del.Ch., C.A. No. 7129, Allen, C. (Oct. 19, 1990), slip op. at 17; *Neal v. Alabama By-Products Corp.,* Del.Ch., C.A. No. 8282, Chandler, V.C. (Aug. 1, 1990), slip op. at 21, *aff'd,* Del.Supr., 588 A.2d 255 (1991).

The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal or residual value equal to the future value, as of the end of the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value.

*Cede & Co., supra,* at 17-18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 40-11    Filed 01/20/2006    Page 8 of 15

Westlaw.

Not Reported in A.2d                                                                                                    Page 7
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

In this case, Kidder's discounted cash flow analysis valued Vitalink between $9.50 and $11.75 per share. In evaluating a discounted cash flow analysis, the quality of the projections relied upon is central to the reliability of the underlying methodology. *See Harris v. Rapid-American Corp.*, Del.Ch., C.A. No. 6462, Chandler, V.C. (Oct. 2, 1990), slip op. at 15. In preparing their analysis, Kidder relied upon information that was overly optimistic: the projected revenue growth was dependent on new product development that was no longer on schedule. (*See* Objectors' Exh. B at 6.)

The Objectors attack Kidder's discounted cash flow analysis because of its reliance on these overly optimistic projections. This attack is completely meritless. The use of the overly optimistic projections, if anything, overvalues Vitalink. Thus, since NSC's bid rests within the value range even using the overly optimistic projections, the use of this methodology is a very strong indication as to the adequacy of the NSC bid.

The Objectors also attack Kidder's discounted cash flow analysis by contending that Kidder manipulated the discount rate and the **\*\*1329** terminal multiple it used. That is, Kidder used a 14% discount rate and terminal multiples of 10, 12 and 14 in its April 1990 analysis. In its June 1990 analysis, Kidder again used a 14% discount rate and terminal multiples of 14. (Valdez Dep. Exh 2 at KP001884.) However, Kidder used terminal multiples ranging from 3-6 and discount rates from 18-22% in its May 1991 analysis. (Valdez Dep. Exh. 10 at KP000048.)

The Objectors take issue not so much with the correctness of these numbers but with the failure of the Board to question Kidder's changes. The defendants and plaintiff contend, and I agree, that the changes Kidder made were appropriate. Vitalink was a very different company in May 1991 than it was in February and April 1990. "In February of 1990 the company was growing, the company still had market share, which would be termed significant. In March 1991 the company's revenues were declining. The company's market share within the broader context of the industry was also declining." (Valdez Dep. at 19- 20.) Vitalink was a much riskier company in May 1991 than in February and April 1990. (*Id.*) Thus, Kidder's adjustments to account for these differences were appropriate.

**\*9** The failure of Vitalink's Board to question Kidder regarding the changes is irrelevant. At this juncture, the issue only is whether the Board had reliable information upon which to judge whether the NSC bid was the best offer reasonably attainable. The failure to inquire as to why Kidder made the adjustments makes no difference because, in fact, the adjustments were appropriate and the discounted cash flow analysis constituted reliable information. Further, in all likelihood, the Board thought, as I do, that the reason for the changes was obvious: the severe downturn in Vitalink's prospects.

The second valuation method Kidder used in determining the fairness of the transaction was the comparable transaction method. This method identifies transactions comparable with the one at hand and adjusts the value of those transactions to account for the differences between the companies in the prior transactions and the companies in the pending transaction.

In this case, Kidder's comparable transactions analysis valued Vitalink between $12.27 and $21.02 per share. However, Kidder downplayed the reliability of this methodology because it relied on transactions from the late 1980s where values were high and financing was readily available and because it relied on transactions for growing companies as opposed to companies like Vitalink that were declining. (Objectors' Exh. B. at 6.)

**\*\*1330** The differences in the economic condition of the takeover market between the late 1980s and present are obvious. Thus, reliance on transactions from that era clearly overvalue the Vitalink transaction. The question then becomes to what extent did the comparable transactions analysis overvalue the Vitalink transaction. However, Kidder did not indicate nor did the Board inquire as to the extent of the method's overvaluation.

The failure of the Board to inquire and of Kidder to determine the extent of the overvaluation undermines defendants' argument that the Board had sufficiently reliable information to determine the adequacy of NSC's bid. The Board or, in its stead, Kidder should have accounted fully

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d    Page 8
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

for the bid's seeming inadequacy under this analysis. Without this inquiry, a cloud of doubt as to the adequacy of NSC's bid remained on Kidder's analysis. The Board should have *fully* accounted for this cloud.

The final valuation method that Kidder used was the comparable company analysis. This Court has affirmed the general validity of this approach repeatedly. *See Harris, supra,* at 21. This method first identifies comparable publicly traded companies. *See id.* at 19-20. It then calculates the value of the company to be valued through the application of earnings and other multiples to the comparable companies and the company to be valued. *See id.*

Under the comparable company method, Kidder determined Vitalink's value to be between $7.14 and $11.49 per share. The Objectors first attack Kidder's comparable company analysis by pointing out that Salomon Brothers ("Salomon"), NSC's investment banker, failed to use this method in valuing Vitalink. However, the mere non-use by Salomon of this method is irrelevant. As noted earlier, the Delaware courts have affirmed the validity of this approach repeatedly. The failure of one investment banker to use the methodology, in itself, is not an indication that it was an unreliable method of valuing the pending transaction.

*10 The Objectors next contend that Kidder's comparable company valuation is flawed because it excluded four "upper tier" companies from its analysis and, yet, included the lower than "lower tier" companies. (*See* Valdez Exh. 10 at KP000064.) Defendants argue and I agree that the exclusion of the upper tier companies by Kidder was appropriate. Obviously, the utility of a comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison. *See Neal v. Alabama By-Products Corp.,* Del.Ch., C.A. No. 8282, Chandler, V.C. (Aug. 1, **1331 1990), slip op. at 21 n. 6, *aff'd,* Del.Supr., 588 A.2d 255 (1991); *Citron v. E.I. DuPont de Nemours & Co.,* Del.Ch., 584 A.2d 490, 510 (1990). The exclusion of noncomparable companies makes this type of valuation analysis more reliable. In this case, Vitalink clearly had become a lower tier company. Vitalink's revenues and earnings were falling quickly in late 1990 and early 1991. Further, despite Vitalink's strong customer base, its outlook was bleak. (Def. Exh. 17 at KP001708; Rein Dep. at 104.) The exclusion of the upper tier companies from its analysis made Kidder's analysis more reliable.

The Objectors contend that if Kidder properly excluded upper tier companies, it also should have excluded companies they allege to be lower than the lower tier companies. The Objectors argue that these lower than the lower tier companies were noncomparable with Vitalink because of the differences in income. (*See* Objectors' Brief at 24.) However, income is not the only factor that determines the comparability of companies. A court can consider many factors in determining the comparability of companies. Such factors include product mix, revenue, revenue and earnings growth rates, assets and geographic markets. The Objectors do not attempt to distinguish Vitalink from the lower than the lower tier companies on the basis of any factor except income. In my opinion, given the Objectors' ability to cite only differences in income and given Vitalink's bleak outlook, Kidder's inclusion of all of the lower tier companies and not the upper tier companies was appropriate.

Kidder used these three valuation methods (*i.e.,* the discounted cash flow analysis, comparable transactions analysis and comparable company analysis) as the primary basis for opining that the proposed transaction with NSC was fair to Vitalink. Despite the infirmities of its comparable transaction valuation, overall, I believe that Kidder's fairness opinion constituted reliable information upon which the Board partially could judge the adequacy of NSC's offer.

Besides Kidder's fairness opinion the Board relied on a number of other factors in deciding that NSC's bid was the best bid available. Before accepting NSC's third bid, the Board rejected two offers it thought were inadequate. Additionally, NSC conditioned its offer on the granting of the Lockup. (Def. Exh. 28 at VA004253; Altman Dep. at 44.) NSC also conditioned its offer on the execution of the Control Agreements. (Altman Dep. at 30-32.) Moreover, the Board believed that NSC's final offer was "about as close to a turned-inside-out-pocket offer [as Vitalink was] going to get." (Rein Dep. at 186.) Further, the bid represented

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                        Page 9
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

approximately a 23.5% premium over market price. Also, Kidder's preliminary analysis indicated **1332 that $10 per share represented a good price. (Valdez Dep. 124-126; Valdez Aff. ¶ 21.) Further, Vitalink had constructed Kidder's fee arrangement so that Kidder would be paid more if a third party (*i.e.,* not NSC) consummated the merger with Vitalink. Thus, Kidder's failure to get such a third party to consummate the merger is, in itself, an indication that no other bidder would have paid more than $10.50 per share. Similarly, the final factor upon which the Board relied in determining the adequacy of NSC's bid was a market test administered by the circumstances. "[W]hen it is widely known that some change of control is in the offing and no rival bids are forthcoming over an extended period of time, that fact is supportive of the board's decision to proceed." Barkan, 567 A.2d at 1287. In this case, forty-five days passed between the time the parties first publicly announced the transaction (May 6, 1991) and the closing of the tender offer (June 20, 1991) without even an inquiry from an interested acquiror. (Valdez Aff. ¶ 34.)

*11 The Objectors contend that the Board's reliance on this last factor, the implicit market test, is meritless. They argue that no potential bidder came forward because of NSC's Lockup and because of the No-Shop clause. However, Valdez testified that the Lockup "was not an insurmountable barrier for another alternative buyer to slip forward." (Valdez Dep. at 137.) Also, the No-Shop clause was subject to a fiduciary out clause. (Rein Exh. 2 at 10.) I agree with defendants' arguments that the Lockup option and the No-Shop clause were, at best, minimal impediments to an implicit market test.

In making its argument that the Board did not have a sufficient body of reliable evidence upon which to judge the adequacy of NSC's bid, the Objectors also argue that the Board breached their duty of care by failing to determine the inherent value of Vitalink before accepting the NSC offer. The Objectors contend that this ignorance resulted in the Board not having an adequate basis to determine whether NSC's bid was the best offer reasonably possible. *See generally In re Trans World Airlines, Inc. Shareholders Litig.,* C.A. No. 9844, Allen, C. (Oct. 21, 1988), slip op. at 11, 18.

In *TWA,* the special committee basically did not know that its duty was to attain the best offer reasonably possible. *See id.* at 8-9. Further, to the extent the special committee did know they had such a duty, they thought its financial advisor would fulfill it. *Id.* at 10. However, the financial advisor believed its duty was only to address the issue of the offer's fairness. *Id.* Finally, in deciding whether the offer was fair, the financial advisor relied on **1333 a number of valuation techniques that resulted in a broad range of values ($14.50 to $66.29 per share) without expressing to the committee how it used the different valuation results in concluding that the offer was fair. *Id.* at 11.

The focus of the *TWA* decision was not so much whether the special committee knew the company's inherent value per se but whether the special committee had sufficient information to satisfy its duty to attain the highest price reasonably possible for the shareholders. I realize that the Vitalink Board did not have perfect information. Nevertheless, I hold that the Vitalink Board had sufficient information so as to satisfy the concerns of the Court in *TWA.* Further, although the circumstances in which a body of reliable evidence exists is limited, *see Barkan, 567 A.2d at 1287,* I hold that this same information constituted a body of reliable evidence upon which the Vitalink Board could judge the adequacy of NSC's bid.

This body of information which I hold as sufficient to satisfy *TWA* and as constituting a body of reliable evidence consists of a number of elements. First, the parties negotiated for a number of months over the terms and structure of their relationship. Second, the Board rejected two bids before accepting NSC's third offer. Third, the Board believed that this was NSC's best offer. (Rein Dep. at 186.) Indeed, NSC conditioned its offer on the granting of the Lockup. (Def. Exh. 28 at VA004253; Altman Dep. at 44.) Also NSC conditioned its offer on the execution of the Control Agreements. (Altman Dep. at 30-32.) Fourth, the offer represented approximately a 23.5% premium over Vitalink's trading price. Fifth, Vitalink structured Kidder's fee agreement so that it had an incentive for Vitalink to consummate the transaction at the highest possible price. (*See* Def. Exh. 31 at KP000576.) These five elements afforded a reasonable basis for the Board to conclude that it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 40-11    Filed 01/20/2006    Page 11 of 15

Westlaw.

Not Reported in A.2d                                                                                                    Page 10
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

was getting NSC's best bid.

*12 In holding that the Board had a reasonable basis to conclude that NSC's last offer was the best overall offer, I rely on a number of other factors besides the factors enumerated above. First, Kidder produced a range of Vitalink's fair values ($7.14 to $21.02 per share). This range was much more limited than the range presented to the special committee in *TWA*. Second, Kidder's preliminary analysis indicated that a $10 per share price was a good price. (*See* Valdez Dep. at 124-27; Valdez Aff. ¶ 21.) Third, Kidder opined that the $10.50 price was fair. Fourth, the Vitalink Board and Kidder believed no other bidder was interested. Fifth, Vitalink structured its fee agreement with Kidder so that Kidder had an incentive to have **1334 Vitalink consummate a sale with a third party. Finally, and most importantly, no third party even inquired as to making a competing bid.

Ultimately, I believe that all of these factors combine to allay the Court's concerns in *TWA* over whether a board sufficiently knows its duty and has a sufficient basis to conclude that it has satisfied its duty. Correspondingly, I find that these factors constituted a body of reliable evidence such that the Vitalink Board could reasonably conclude that it was getting the best deal possible for Vitalink's shareholders. Thus, I conclude that the Vitalink Board satisfied its duty of care by having reliable grounds upon which to judge the adequacy of NSC's offer.

B. *Duty of Candor*

The Objectors argue that the Board failed to satisfy their duty of candor under Delaware law and their duty not to make material misrepresentations in the offering documents under federal law. In making these assertions, the Objectors first contend that the Offer to Purchase and the Schedule 14D-9 did not discuss or summarize Kidder's valuation analysis and its limitations nor did they contain a summary of the various valuation ranges that Kidder calculated. The Objectors argue that defendants subsequent inclusion of such information in the Notice of Merger was an implicit admission as to the information's materiality. The Objectors' second contention is that the Board violated its disclosure duties by failing to inform the stockholders that they were not soliciting bids from third parties. Finally, the Objectors take issue with the deletion of the sentence: "[w]e have not been represented to, and did not solicit third party indications of interest in acquiring all or any part of the Company." (Objectors' Exh. D at KP000571.) The Objectors argue that the deletion of this sentence from the Kidder opinion that Vitalink sent to its shareholders was inappropriate.

Defendants and plaintiff argue that the Objectors' contentions as to the failure to fully disclose Kidder's opinion are meritless. Defendants contend that Kidder advised the Board that the range of fair values produced by the comparable transaction analysis was overstated. Defendants argue that the analysis was misleading because it overstated Vitalink's value. Thus, defendants argue it was not material. Similarly, the Board concluded that Kidder's discounted cash flow analysis produced an overly optimistic result because Kidder based its analysis on product development that was behind schedule. **1335 Defendants argue that the analysis was misleading because it overstated Vitalink's value. Thus, defendants argue it was not material. Finally, defendants argue that the Board concluded that Kidder's comparable company analysis produced a result that only confirmed the Board's and Kidder's opinions and would not have changed the total mix of information sent to the shareholders had it been disclosed. Thus, defendants argue, it was not material.

*13 Plaintiff and defendants failed to address the Objectors second disclosure argument. However, defendants argue that the Objectors' third argument regarding the deletion of the sentence in the Kidder opinion is meritless. Defendants argue that they deleted the sentence in order to remove any suggestion that Kidder did not concur with the Board's decision not to pursue offers from third parties while negotiating with NSC. Defendants argue that the deletion was not misleading.

Before I address the specific arguments, I first must discuss the disclosure standards. Materiality exists when:

the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way there must be a substantial likelihood that the

Westlaw.

Not Reported in A.2d                                                                                                 Page 11
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.

*Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Industries Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). An entity need not disclose a financial advisor's underlying facts and analyses in every case. *See In re Dataproducts Corp. Shareholders Litig.,* Del.Ch., C.A. No. 11164, Jacobs, V.C. (Aug. 22, 1991), slip op. at 16-17. In deciding whether a court should require disclosure of this type of information, a court should weigh the potential benefits of the disclosure against its potential harm. *See Weinberger v. Rio Grande Industries Inc.,* Del.Ch., 519 A.2d 116, 126-27 (1986). Further, "[t]o be the subject of a disclosure obligation, information relating to value must be considered reliable." *Van de Walle v. Unimation, Inc.,* Del.Ch., C.A. No. 7046, Jacobs, V.C. (Mar. 6, 1991), slip op. at 37.

At the outset, I note that I do not agree with the Objectors' assertion that the subsequent disclosure of the underlying details of the Kidder opinion in the Notice of Merger acted as an implicit admission of its materiality. There are many possible reasons why the disclosure was only included in the later disclosure (*e.g.,* the **1336 Board may have not believed it was material but was overly cautious as to what disclosures to make after it had some time to think about this lawsuit). The Objectors have failed to persuade me that the subsequent disclosure was made because the Board believed it was material.

As to the Objectors' arguments regarding defendants failure to disclose Kidder's valuation techniques, analyses and limitations, I agree with defendants that the nondisclosure of Kidder's discounted cash flow analysis and range of value ($9.50 to $11.75 per share) was proper. The nondisclosure was proper because the analysis was not material. The analysis was not material because its potential benefit was, at best, minimal: to act as a mere affirmance to the shareholders of the Board's message that this was a very good deal. However, its potential harm was great. Even if the disclosure included a sentence explaining why the analysis was overly optimistic, it could have mislead shareholders into believing that a higher price was attainable. That is, because the Board did not know the extent of the overstatement and, therefore, could not have disclosed the extent of the overstatement, the shareholders could have read the disclosure and reasonably believed that even if $11.75 was not attainable, a price higher than $10.50 was reasonably attainable when all of the circumstances indicated that this was not the case. Since I believe the potential harm of the disclosure of this analysis outweighs its potential benefit, the Board did not have to disclose it. *See Weinberger,* 519 A.2d at 126-29.

*14 I also agree with defendants that disclosure of Kidder's comparable transaction analysis would have been inappropriate. Clearly, the analysis produced an unreliable range of values ($12.27 to $21.02 per share) because Kidder based its analysis on market conditions that have changed drastically. Disclosure of this analysis would have presented an enormous potential for harm to the shareholders. Even if the disclosure included a sentence why Kidder believed the analysis produced an inflated range, it could have mislead shareholders into believing that a higher price was attainable. That is, because the Board did not know the extent by which the range was inflated and, therefore, could not have disclosed it, the shareholders could have read the disclosure and reasonably believed that even if $21.02 per share was not attainable, a price higher than $10.50 per share was reasonably attainable when all of the circumstances indicated that this was not the case. Further, Kidder gave little or no weight to this analysis in its opinion. (*See* Valdez Aff. ¶ 25.) Thus, it was proper for the Board to not disclose this analysis. *See generally Van **1337 de Walle, supra,* at 37 (where court held that unreliable information cannot be the object of a disclosure obligation); *In re Genentech, Inc. Shareholders Litig.,* Del.Ch., C.A. No. 11377, Chandler, V.C. (June 6, 1990), slip op. at 19 (where court relied, in part, on the fact that the investment banker did not give any serious consideration to certain valuation ranges in determining that the company did not have to disclose them); *Weinberger,* 519 A.2d at 527-30 (where court held that the potential benefits of a disclosure must be weighed against its potential harm and where court relied, in part, on the fact that the investment banker gave little or no weight to a valuation analysis in determining that it was unreliable and did not have to be disclosed.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 12
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
**(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)**

I also agree with defendants' claim that the disclosure of the comparable company range of fair value ($7.14 to $11.49 per share) was not necessary. I am not persuaded that disclosure of this analysis would have changed the total mix of information received by the shareholders. Also, it is necessary to draw a line somewhere or else disclosures will become so voluminous that they no longer serve their purpose. *See TCG Securities, Inc. v. Southern Union Co.,* Del.Ch., C.A. No. 11282, Chandler, V.C. (Jan. 31, 1990), slip op. at 18. Thus, I hold that the comparable company analysis falls outside of this line of materiality.

As to the Objectors' second disclosure argument that the Board should have disclosed that it did not canvass the market, I hold that this disclosure was not necessary. The reason for the canvassing requirement is to ensure that a board is getting the best deal possible for the shareholders. *See Barkan,* 567 A.2d at 1287. However, a court can also be so ensured when a board has a reliable body of evidence with which to evaluate the fairness of a transaction. *See id.* I have held earlier that, even though the Vitalink Board did not canvass the market, the Board did have such a body of reliable evidence. Thus, the Board has proven that it has satisfied its duty to get the best deal reasonably possible for the shareholders. It is irrelevant by which route (*i.e.*, the canvass route or the body of reliable evidence route) the Board proved that it satisfied its duty. Therefore, I hold that the Board's non-canvassing was immaterial and did not have to be disclosed.

*15 As to the Objectors' third contention that the deletion of the sentence from the Kidder opinion sent to shareholders was inappropriate, I agree with defendants that the deletion was not improper. The deletion helps to remove any suggestion that Kidder did not agree with the Board's decision not to pursue third party offers. **1338 Further, the edited version of the opinion does not suggest or imply in any way that Kidder was requested to solicit third party offers. Thus, the deletion of the sentence was not misleading and, therefore, not improper.

C. *Aiding and Abetting Claims Against NSC*

Plaintiff's original complaint included claims against NSC for aiding and abetting the alleged wrongdoings of the Vitalink Board. The Objectors do not contend nor is there any evidence that these claims are meritorious.

IV. WEIGHING THE VALUE OF THE SETTLEMENT AGREEMENT AGAINST THE VALUE OF THE CLAIMS

The second major facet of the parties' arguments deals with the value of the Settlement Agreement as compared to the value of the claims. The Settlement Agreement between plaintiff and defendants called for: (1) NSC to extend the tender offer for ten days until June 20, 1991; (2) NSC and defendants to amend the cancellation agreement under the Lockup so as to limit the cancellation amount payable to NSC to $2,771,331 ($1 per share for each Lockup share); (3) NSC and defendants to amend the merger agreement so as to limit Vitalink's reimbursement of NSC fees and expenses to $1,750,000; and (4) NSC and defendants to publicly announce the agreements stated in (1)-(3).

The Objectors argue that the purported benefits conveyed by the Settlement Agreement are wholly illusory. They argue that the extension of the tender offer conveyed no benefit because there was no expectation that a third party offer would arise and because the Lockup option and the No-Shop acted as a severe impediment to such offers. They also argue that the amendments to the Lockup option and termination agreements were illusory because the Lockup and the No-Shop acted as a severe impediment to the amendments ever becoming operative. Further, assuming that the Lockup and No-Shop did not act as an impediment to third party offers, the Objectors argue that the amendments to the cancellation amount payable and reimbursement agreement were illusory because any potential third party offer would have come forward already and made his bid. Also, the limitations on these amendments, they argue, were illusory in themselves because the parties did not know whether they would be exceeded if they became payable.

**1339 The extension acted to enhance Vitalink's market check and to add to the Board's body of reliable evidence that this was the best deal reasonably attainable for the shareholders. As discussed earlier, the Lockup option and No-Shop acted as no real impediment to third party offers. Thus, the extension of the tender offer provided some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                                    Page 13
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)

benefit to Vitalink's shareholders.

*16 As far as the amendments to the cancellation agreement and reimbursement agreement, the Lockup and No-Shop acted as no real impediment to a third party offer. Thus, the amendments could have become operative. Further, the amendments were not illusory because the parties did not expect a third party offer to arise. That is, just because the parties did not expect a third party offer did not mean that one could not arise. Finally, just because the parties did not know whether the limitation amounts would be exceeded does not mean they could not have been exceeded. Indeed, if NSC expended more than $1,750,000 on its expenses and required more than $2,771,331 for its Lockup cancellation, it would not have been unusual. Since the extension of the tender offer period provided an enhanced market check and the amendments to the Lockup cancellation agreement and reimbursement agreement provided certainty that the total expenses of cancellation would not exceed a certain amount, the settlement provided some, albeit speculative, value to Vitalink shareholders and did not convey only illusory benefits.

The Objectors argue that the value of the settlement is minimal in comparison with the claims asserted and the claims that could be asserted. As far as the claims that could be asserted, there is no indication of their merit. As far as the claims asserted, I have found them to be very weak. Thus, I hold that the benefits conferred by the settlement, even though they are speculative, are of sufficient value for the claims covered by the Settlement Agreement.

The Objectors also argue that the record is insufficiently developed to allow me to evaluate the proposed settlement in an informed manner. *See generally In re Republic American Corp. Litigation,* Del.Ch., C.A. No. 10112, Allen, C. (June 7, 1990), slip op. at 2 (where court declined to approve or reject a settlement proposal because the record contained insufficient information). I disagree with the Objectors. I have found the record to be sufficiently developed so as to afford a reasonable basis to respond to all of the asserted claims. Since I hold that there is an adequate basis upon which I am able to determine whether the Settlement Agreement was fair and since I have found the Settlement Agreement to be fair and reasonable, I approve the Settlement Agreement.

**1340 V. PLAINTIFF'S ATTORNEYS' FEES AND EXPENSES

Plaintiff requests me to award $275,000 for its attorneys' fees and expenses. In a class action, a court should award reasonable plaintiff's attorneys' fees and expenses where the attorneys achieve benefits for the class. *See Chrysler Corp. v. Dann,* Del.Supr., 223 A.2d 384, 386 (1966). In determining the issue of the amount of fee allowances in stockholder actions, a court should consider: (1) the benefits achieved in the action; (2) whether the fee is contingent; (3) the efforts of counsel; (4) the difficulty of the litigation; and (5) the standing and ability of counsel involved. *See e.g., Sugarland Industries, Inc. v. Thomas,* Del.Supr., 420 A.2d 142, 142-50 (1980). Specifically, in evaluating fee requests where the settlement does not create a settlement fund, a court must apply a three-pronged test in evaluating the propriety of a fee request: (1) whether the claims were meritorious when plaintiff filed them; (2) whether the settlement creates a benefit to the corporation; and (3) whether plaintiff's litigation was causally related to the benefits. *See Allied Artists Pictures Corp.,* 413 A.2d at 878-80.

*17 A claim is meritorious if there is some reasonable hope for its success when plaintiff filed it. *See Chrysler Corp., 223 A.2d at 384.* The litigation is causally related to the benefit if the benefit arises after plaintiff filed the lawsuit and the defendant corporation is unable to demonstrate "that the lawsuit did not in any way cause their action." *Allied Artists Pictures Corp.,* 413 A.2d at 880.

Plaintiff argues and I agree that plaintiff's claims were meritorious when it filed them. Plaintiff reasonably believed that the claim had a good chance of success because Denend acted as negotiator for the transaction while also agreeing to work for Vitalink if NSC acquired it and because the Board had not contacted many other companies before agreeing to the transaction.

As far as the second factor, the benefits achieved from the litigation generally constitute the factor given the greatest weight in determining the fee to be awarded. *See In re Anderson Clayton Stockholders' Litig.,* Del.Ch., C.A. No.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 40-11   Filed 01/20/2006   Page 15 of 15

Westlaw.

Not Reported in A.2d                                                                                    Page 14
Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311
(Cite as: 1991 WL 238816 (Del.Ch.), 17 Del. J. Corp. L. 1311)

8387, Allen, C. (Apr. 14, 1988), slip op. at 3. In this case, the settlement called for an extension of the tender offer for ten days. This extension provided an enhanced market check. Also, the settlement called for a limitation on the amount of the reimbursement agreement and the Lockup cancellation agreement. These limitations gave potential third parties greater certainty as to how much a successful bid for Vitalink would cost. Further, the settlement called for the public announcement of these **1341 agreements. This public announcement further enhanced the market check afforded by the extension of the tender offer and the limitation of reimbursement agreement and Lockup termination agreement. Ultimately, the settlement provided speculative benefits to the class. Nonetheless, the class benefitted.

As to the third factor, there is a presumption of a causal relationship between the plaintiff's efforts and the benefits. *See In re Beatrice Companies, Inc. Litig., supra,* at 18. However, this presumption is not even necessary in this case because all agree that the benefits from the settlement were a direct result of the litigation.

Since plaintiff's attorneys have met all three prongs, I believe they are entitled to attorneys' fees. In evaluating the amount of the fee request, plaintiff relies on the contingent nature of the fee, the quality of legal services, the standing and ability of counsel and public policy considerations in arguing that I should award the entire $275,000.

Plaintiff's attorneys took this case on a contingent basis. In all fairness, the contingent nature of its fee agreement demands a higher fee for its work. *See Joseph v. Shell Oil Co.,* Del.Ch., C.A. No. 7450, Hartnett, V.C. (Apr. 19, 1985), slip op. at 14, *aff'd per curiam, Selfe v. Joseph,* Del.Supr., 501 A.2d 409 (1985).

The Objectors contend that plaintiff's attorneys failed to respond to some of its questions as to the proposed settlement. (Objectors' Brief at 39 fn. 15.) However, I believe that plaintiff's attorneys adequately responded to this claim at the settlement hearing. (*See* Squitieri at 75-76.) Thus, there is nothing that can lead me to believe that plaintiff's attorneys' services were anything but expeditious and effective.

*18 As to plaintiff's attorneys' standing and ability, I find them to be in good standing and highly experienced in shareholder class action suits. "Lastly, I am mindful of the significant institutional role of class and derivative actions in the enforcement of the fiduciary duties assumed by corporate officers and directors." *In re Anderson Clayton Stockholders' Litig., supra,* at 13.

After evaluating the contingent nature of the fee, the quality of legal services, the standing and ability of counsel, and the public policy considerations, I find $275,000 to be reasonable and award plaintiff's attorneys this amount.

VI. CONCLUSION

I find that the shareholders' due care and candor claims carry very little chance of success at trial. Further, I find that the Settlement **1342 Agreement conveyed some benefit to the shareholders. Thus, I hold that the Settlement Agreement is fair and approve it. Finally, I award $275,000 to plaintiff's attorneys for their fees and expenses.

An Order consistent with this Opinion shall be prepared and submitted by counsel for the plaintiff and defendants.

> FN1. For example, on page 35 of defendants' brief, defendants assert that Vitalink met with D Co. and refer to their brief at page 14. On page 14 in discussing Vitalink's relationship with D Co., defendants' brief refers to Rein's deposition at 143 and defendants' exhibit 24 at 4213. Both references only state that the Board considered contacting D Co. I see no authority in the record to support defendants' assertion that Vitalink held discussions with D Co. and the effort to create the impression of such discussions based on nonexistent authority is troubling to me.

Not Reported in A.2d, 1991 WL 238816 (Del.Ch.), Fed. Sec. L. Rep. P 96,585, 17 Del. J. Corp. L. 1311

END OF DOCUMENT