# EXHIBIT A



# News Release

Contact: Edward H. Murphy
Director Investor Relations
Wilmington, DE 19884
(800) 362 6255
(302) 456 8541 Fax

**MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the
Previously Announced Restructuring Plan**

**Wilmington, Delaware (4/21/05)** -- MBNA Corporation announced today that net income for the
first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million
or $.40 per common share for the first quarter of 2004. Net income in the first quarter of 2005
includes a restructuring charge of $767.6 million pre-tax. Without the restructuring charge, net
income was $514.1 million or $.40 per common share.

In addition to the restructuring charge, the Corporation's results were further impacted by
unexpectedly high payment volumes from U.S. credit card customers. The higher payments
reduced managed loans in the quarter more than in prior years. Additionally, the payment
volumes were particularly higher on accounts with higher interest rates, which adversely
impacted the Corporation's yield on managed loans.

As a result of these recent trends, in the revaluation of its interest-only strip receivable, the
Corporation projected lower excess spreads and higher payments. This reduced the interest-only
strip receivable and resulted in a net loss from securitization activity of $206.6 million. The net
loss from securitization activity is included in other operating income and caused the
Corporation's first quarter 2005 other operating income to be lower than its first quarter 2004
other operating income.

The Corporation is implementing programs to offset the higher payment rates in the U.S. Card
business. "It is a difficult environment right now. However, we've made progress on recent
product introductions, diversification strategies, and improvements in credit quality and operating
efficiency," said Bruce L. Hammonds, MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings
per share will be significantly below its 10% growth objective.

Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first
quarter of 2004. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0
billion compared to the first quarter of 2004. Total volume in the quarter rose to $49.3 billion, an
increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3
billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0
billion, which decreased by 5% from the first quarter of 2004.

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and
4.48%, respectively. Delinquency on loan receivables and managed loans was 2.93% and 4.17%,
respectively, at March 31, 2005. Based on improving asset quality trends, the provision for
possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter
of 2004.

MORE

Page 2

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%. In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.

The Corporation continued to advance its business development strategies in the first quarter, building upon the success of its customized affinity rewards programs as well as its diversification efforts. Some highlights for the quarter include:

- Signed an agreement to purchase Nexstar, a leading home financing company that gives MBNA a state of the art platform to bring its affinity partner franchise to the home equity market. Nexstar was developed by a team of mortgage lending professionals who have designed technology solutions that provide customized home equity products and a superior customer experience that are critical for affinity marketing.
- Signed a long-term affinity relationship with the American Bar Association ("ABA") and purchased the portfolio of ABA cardholders from the association's previous provider. This key signing adds to the more than 1,200 professional organizations that endorse MBNA products.
- Launched the MBNA NASCAR RacePoints VISA credit card, which allows race fans to earn points that can be redeemed for NASCAR gear, collectibles, and once-in-a-lifetime NASCAR experiences.
- Launched the National Trust credit card program. National Trust is a registered charity with 3.4 million members that works to preserve and protect the coastline, countryside, and historic buildings throughout England, Wales, and Northern Ireland.
- Increased the number of affinity groups that endorse American Express-branded cards to more than 1,500 and began marketing the new American Express-branded clear card to members of some of our College and University endorsing organizations. In addition, MBNA entered into a formal agreement to market American Express-branded credit cards to Customers in the United Kingdom.

As previously reported, MBNA Corporation has made significant progress on its plan to reduce its expense base. In connection with the restructuring plan, the Corporation will incur a charge of approximately $785 million pre-tax, $767.6 million pre-tax of which was recognized in the first quarter of 2005. The charge includes three major components – staff reductions related to voluntary early retirement and voluntary severance programs, the disposition of fixed assets relating to facilities closings, and contract terminations. Approximately 85% of the charge will result in cash expenditures.

MORE

Page 3

Approximately $500 million of the charge is related to the voluntary early retirement program and voluntary severance program announced in January 2005. The Corporation expects staff reductions from the programs to result in pre-tax expense savings of approximately $210 million in 2005 and approximately $225 million in 2006. This charge is higher than previously announced because more people than anticipated decided to take advantage of the programs' benefits. The success of this initiative will assist the Corporation in reducing its staff, particularly in management positions, to levels that meet expected future business needs and make MBNA more efficient.

Approximately $115 million of the charge is related to the disposition of fixed assets resulting from the Corporation's previously announced review of its operations. After this review, management decided to consolidate operations and close some facilities. The Corporation expects the disposition of fixed assets to result in pre-tax expense savings of approximately $15 million in 2005 and approximately $25 million in 2006.

In addition, the Corporation terminated a marketing agreement with a third party vendor that marketed the Corporation's products to endorsing organizations and terminated a limited number of other agreements. Management determined that the marketing agreement did not adequately support the Corporation's long-term objectives. Approximately $170 million of the charge is related to these contract terminations. The Corporation expects the contract terminations to result in pre-tax expense savings of approximately $25 million in 2005 and approximately $50 million in 2006.

This earnings release includes managed data. Please refer to MBNA Corporation and Subsidiaries Financial Highlights - Exhibit A for a quantitative reconciliation of reported and managed data. This earnings release includes certain financial measures excluding the restructuring charge recorded in the first quarter of 2005. Please refer to MBNA Corporation and Subsidiaries Financial Highlights - Exhibit A for a quantitative reconciliation of the reported financial measures and the financial measures excluding the charge. A business presentation that provides supplemental information regarding the first quarter of 2005 is available in the Investor Relations section of MBNA's Web site (www.mbna.com).

## About MBNA Corporation
MBNA (NYSE:KRB), the largest independent credit card lender in the world and a recognized leader in affinity marketing, is an international financial services company providing lending, deposit, and credit insurance products and services. MBNA credit cards and related products and services are endorsed by more than 5,000 organizations worldwide. For more information, visit the company's web site at www.mbna.com.

MORE

Page 4

## Cautionary Language

This report includes forward-looking statements and estimates concerning the Corporation's future performance. Such statements and estimates are subject to risks and uncertainties that may cause the Corporation's actual performance to differ materially from that set forth in such forward-looking statements and estimates.  Risks and uncertainties that may affect the Corporation's future performance are detailed in the Corporation's most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission and examples of such risks and uncertainties are set forth below. The estimates contained in this report represent the current estimates of the Corporation and the Corporation undertakes no obligation to update publicly or revise any such estimates or other forward-looking statements contained in this report.

### *Expense Savings*

The actual amount of the expense savings resulting from the restructuring is affected by the overall impact of the restructuring on the Corporation's business.  For example, as a result of existing and future staffing needs the Corporation may have to increase hiring, thereby reducing actual expense savings.  The Corporation may incur additional marketing costs as a result of the termination of the third-party marketing agreement.

### *2005 Earnings Growth Objective*

The Corporation's earnings per share is a basic measure of the Corporation's performance. Certain risks and uncertainties that may materially affect earnings per share are discussed below.

### *Competition*

Competition from other lenders could affect the Corporation's loans outstanding, Customer retention, and the rates and fees charged on the Corporation's accounts, including the ability of the Corporation to reprice existing accounts.  Competitors may offer lower rates and fees and attractive benefits and rewards. As part of its strategy for profitable growth, in 2004 the Corporation began offering fewer 0% promotional rates, which has the effect of negatively impacting loans outstanding.

### *Customer behavior*

Customer spending and repayment levels and Customer use of the Corporation's lending products over competing lending products, such as mortgage and home equity products, impact the Corporation's loans outstanding.

### *General economic conditions*

The pace and sustainability of the current economic recoveries in the U.S., Canada, and the U.K. impact loans outstanding, delinquencies and credit losses.

MORE

Page 5

*Monetary policy*

The pace and level of increases in interest rates in the U.S., Canada, and the U.K. impact the Corporation's cost of funds, net interest margin and net income.

*Expense management*

The Corporation's ability to effectively manage expenses, including operating expenses, impacts net income.

*Legal and regulatory matters*

Legislative, legal and regulatory actions could adversely affect the Corporation's interest, fee and interchange revenue and the ability of the Corporation to market its products. For example, see the following sections of the Corporation's most recent Annual Report on Form 10-K: "Legal Proceedings" (relating to foreign currency conversion fees), "Regulatory Matters – International Regulation of MBNA Europe" (relating to the activities of the Treasury Select Committee in the U.K. and the Office of Fair Trade's investigations of default charges and interchange in the U.K.) and "Regulatory Matters – MasterCard and Visa Litigation and Competition."

*Portfolio purchases and acquisitions*

The Corporation regularly purchases loan portfolios and acquires related businesses. The availability and attractiveness of such opportunities could impact loans outstanding.

*Repurchase Program*

The success of the Corporation's previously announced $2 billion share repurchase program will impact earnings per share.

*New Products and Markets*

The Corporation's performance could be affected by difficulties or delays in the development of new products or services and in the expansion into new markets.

### ###

# EXHIBIT B

MBNA Closing Prices – 1/01/2005 – 12/31/2005

| Date | Closing Price |
|---|---|
| 1/3/2005 | 28.38 |
| 1/4/2005 | 27.69 |
| 1/5/2005 | 27.60 |
| 1/6/2005 | 28.24 |
| 1/7/2005 | 28.49 |
| 1/10/2005 | 28.24 |
| 1/11/2005 | 27.95 |
| 1/12/2005 | 27.61 |
| 1/13/2005 | 27.09 |
| 1/14/2005 | 27.01 |
| 1/18/2005 | 27.37 |
| 1/19/2005 | 27.20 |
| 1/20/2005 | 27.44 |
| 1/21/2005 | 27.19 |
| 1/24/2005 | 26.85 |
| 1/25/2005 | 26.48 |
| 1/26/2005 | 26.70 |
| 1/27/2005 | 26.48 |
| 1/28/2005 | 26.30 |
| 1/31/2005 | 26.58 |
| 2/1/2005 | 26.97 |
| 2/2/2005 | 26.85 |
| 2/3/2005 | 26.77 |
| 2/4/2005 | 27.10 |
| 2/7/2005 | 26.92 |
| 2/8/2005 | 26.54 |
| 2/9/2005 | 26.53 |
| 2/10/2005 | 26.28 |
| 2/11/2005 | 26.29 |
| 2/14/2005 | 26.23 |
| 2/15/2005 | 26.13 |
| 2/16/2005 | 26.16 |
| 2/17/2005 | 25.73 |
| 2/18/2005 | 25.36 |
| 2/22/2005 | 25.06 |
| 2/23/2005 | 25.14 |
| 2/24/2005 | 25.19 |
| 2/25/2005 | 25.54 |
| 2/28/2005 | 25.37 |
| 3/1/2005 | 25.57 |
| 3/2/2005 | 25.67 |
| 3/3/2005 | 25.36 |
| 3/4/2005 | 25.75 |
| 3/7/2005 | 26.05 |
| 3/8/2005 | 26.27 |
| 3/9/2005 | 26.17 |
| 3/10/2005 | 26.28 |
| 3/11/2005 | 25.47 |
| 3/14/2005 | 25.71 |
| 3/15/2005 | 25.24 |

| | |
|---|---|
| 3/16/2005 | 24.89 |
| 3/17/2005 | 24.98 |
| 3/18/2005 | 24.70 |
| 3/21/2005 | 24.72 |
| 3/22/2005 | 24.29 |
| 3/23/2005 | 24.44 |
| 3/24/2005 | 24.60 |
| 3/28/2005 | 24.53 |
| 3/29/2005 | 24.17 |
| 3/30/2005 | 24.49 |
| 3/31/2005 | 24.55 |
| 4/1/2005 | 24.20 |
| 4/4/2005 | 24.64 |
| 4/5/2005 | 24.90 |
| 4/6/2005 | 25.05 |
| 4/7/2005 | 25.10 |
| 4/8/2005 | 24.87 |
| 4/11/2005 | 24.83 |
| 4/12/2005 | 24.97 |
| 4/13/2005 | 24.37 |
| 4/14/2005 | 23.99 |
| 4/15/2005 | 23.45 |
| 4/18/2005 | 23.45 |
| 4/19/2005 | 23.22 |
| 4/20/2005 | 23.11 |
| 4/21/2005 | 19.28 |
| 4/22/2005 | 18.45 |
| 4/25/2005 | 18.95 |
| 4/26/2005 | 18.90 |
| 4/27/2005 | 19.09 |
| 4/28/2005 | 19.54 |
| 4/29/2005 | 19.75 |
| 5/2/2005 | 19.80 |
| 5/3/2005 | 19.87 |
| 5/4/2005 | 19.97 |
| 5/5/2005 | 19.98 |
| 5/6/2005 | 19.85 |
| 5/9/2005 | 20.08 |
| 5/10/2005 | 20.12 |
| 5/11/2005 | 20.00 |
| 5/12/2005 | 19.94 |
| 5/13/2005 | 20.00 |
| 5/16/2005 | 20.50 |
| 5/17/2005 | 20.58 |
| 5/18/2005 | 20.85 |
| 5/19/2005 | 20.75 |
| 5/20/2005 | 20.74 |
| 5/23/2005 | 20.95 |
| 5/24/2005 | 20.79 |
| 5/25/2005 | 20.94 |
| 5/26/2005 | 21.20 |
| 5/27/2005 | 21.35 |
| 5/31/2005 | 21.09 |
| 6/1/2005 | 21.37 |

| | |
|---|---|
| 6/2/2005 | 21.30 |
| 6/3/2005 | 21.25 |
| 6/6/2005 | 21.39 |
| 6/7/2005 | 21.49 |
| 6/8/2005 | 21.60 |
| 6/9/2005 | 21.97 |
| 6/10/2005 | 21.60 |
| 6/13/2005 | 21.65 |
| 6/14/2005 | 21.42 |
| 6/15/2005 | 21.55 |
| 6/16/2005 | 21.46 |
| 6/17/2005 | 21.10 |
| 6/20/2005 | 21.30 |
| 6/21/2005 | 21.22 |
| 6/22/2005 | 21.22 |
| 6/23/2005 | 21.25 |
| 6/24/2005 | 21.45 |
| 6/27/2005 | 21.02 |
| 6/28/2005 | 21.30 |
| 6/29/2005 | 21.07 |
| 6/30/2005 | 26.16 |
| 7/1/2005 | 25.77 |
| 7/5/2005 | 25.53 |
| 7/6/2005 | 25.53 |
| 7/7/2005 | 25.50 |
| 7/8/2005 | 25.79 |
| 7/11/2005 | 25.71 |
| 7/12/2005 | 25.95 |
| 7/13/2005 | 26.12 |
| 7/14/2005 | 26.17 |
| 7/15/2005 | 26.22 |
| 7/18/2005 | 25.85 |
| 7/19/2005 | 25.67 |
| 7/20/2005 | 25.65 |
| 7/21/2005 | 25.58 |
| 7/22/2005 | 25.69 |
| 7/25/2005 | 25.50 |
| 7/26/2005 | 25.53 |
| 7/27/2005 | 25.37 |
| 7/28/2005 | 25.33 |
| 7/29/2005 | 25.16 |
| 8/1/2005 | 25.23 |
| 8/2/2005 | 25.32 |
| 8/3/2005 | 25.25 |
| 8/4/2005 | 25.21 |
| 8/5/2005 | 25.06 |
| 8/8/2005 | 24.91 |
| 8/9/2005 | 24.85 |
| 8/10/2005 | 24.76 |
| 8/11/2005 | 24.86 |
| 8/12/2005 | 24.77 |
| 8/15/2005 | 24.97 |
| 8/16/2005 | 25.26 |
| 8/17/2005 | 25.28 |

| | |
|---|---|
| 8/18/2005 | 25.32 |
| 8/19/2005 | 25.24 |
| 8/22/2005 | 25.29 |
| 8/23/2005 | 25.11 |
| 8/24/2005 | 24.90 |
| 8/25/2005 | 24.99 |
| 8/26/2005 | 24.88 |
| 8/29/2005 | 25.18 |
| 8/30/2005 | 25.01 |
| 8/31/2005 | 25.20 |
| 9/1/2005 | 25.27 |
| 9/2/2005 | 25.11 |
| 9/6/2005 | 25.33 |
| 9/7/2005 | 25.31 |
| 9/8/2005 | 25.03 |
| 9/9/2005 | 25.14 |
| 9/12/2005 | 25.04 |
| 9/13/2005 | 24.89 |
| 9/14/2005 | 24.88 |
| 9/15/2005 | 25.00 |
| 9/16/2005 | 25.38 |
| 9/19/2005 | 25.33 |
| 9/20/2005 | 25.09 |
| 9/21/2005 | 24.63 |
| 9/22/2005 | 24.62 |
| 9/23/2005 | 24.68 |
| 9/26/2005 | 24.55 |
| 9/27/2005 | 24.50 |
| 9/28/2005 | 24.33 |
| 9/29/2005 | 24.56 |
| 9/30/2005 | 24.64 |
| 10/3/2005 | 24.64 |
| 10/4/2005 | 24.58 |
| 10/5/2005 | 24.62 |
| 10/6/2005 | 24.74 |
| 10/7/2005 | 24.72 |
| 10/10/2005 | 24.63 |
| 10/11/2005 | 24.56 |
| 10/12/2005 | 24.50 |
| 10/13/2005 | 24.57 |
| 10/14/2005 | 24.60 |
| 10/17/2005 | 24.67 |
| 10/18/2005 | 24.50 |
| 10/19/2005 | 24.95 |
| 10/20/2005 | 24.79 |
| 10/21/2005 | 24.77 |
| 10/24/2005 | 25.40 |
| 10/25/2005 | 25.29 |
| 10/26/2005 | 25.26 |
| 10/27/2005 | 25.28 |
| 10/28/2005 | 25.67 |
| 10/31/2005 | 25.57 |
| 11/1/2005 | 25.53 |
| 11/2/2005 | 25.78 |

| | |
|---|---|
| 11/3/2005 | 25.70 |
| 11/4/2005 | 25.77 |
| 11/7/2005 | 25.90 |
| 11/8/2005 | 25.85 |
| 11/9/2005 | 25.92 |
| 11/10/2005 | 26.29 |
| 11/11/2005 | 26.35 |
| 11/14/2005 | 26.48 |
| 11/15/2005 | 26.20 |
| 11/16/2005 | 26.18 |
| 11/17/2005 | 26.39 |
| 11/18/2005 | 26.47 |
| 11/21/2005 | 26.63 |
| 11/22/2005 | 26.75 |
| 11/23/2005 | 27.10 |
| 11/25/2005 | 27.28 |
| 11/28/2005 | 27.00 |
| 11/29/2005 | 27.10 |
| 11/30/2005 | 26.77 |
| 12/1/2005 | 26.81 |
| 12/2/2005 | 27.00 |
| 12/5/2005 | 27.11 |
| 12/6/2005 | 27.13 |
| 12/7/2005 | 26.84 |
| 12/8/2005 | 26.83 |
| 12/9/2005 | 26.89 |
| 12/12/2005 | 26.88 |
| 12/13/2005 | 27.23 |
| 12/14/2005 | 27.33 |
| 12/15/2005 | 27.28 |
| 12/16/2005 | 27.52 |
| 12/19/2005 | 27.28 |
| 12/20/2005 | 27.38 |
| 12/21/2005 | 27.39 |
| 12/22/2005 | 27.52 |
| 12/23/2005 | 27.54 |
| 12/27/2005 | 27.32 |
| 12/28/2005 | 27.24 |
| 12/29/2005 | 27.21 |
| 12/30/2005 | 27.15 |

# EXHIBIT C



# FORM S−4/A

## BANK OF AMERICA CORP /DE/ − BAC

**Filed: September 19, 2005 (period: )**

Pre−effective amendment to an S−4 filing

Table of Contents

As filed with the Securities and Exchange Commission on September 19, 2005

Registration No. 333−127124

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Amendment No. 1
to
# Form S−4
REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# BANK OF AMERICA CORPORATION
*(Exact Name of Registrant as Specified in its Charter)*

| Delaware | 6021 | 56−0906609 |
|---|---|---|
| *(State or other jurisdiction of incorporation)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

Bank of America Corporate Center
100 N. Tryon Street
Charlotte, North Carolina 28255
(704) 386−5681
*(Address, including Zip Code, and Telephone Number, including Area Code, of Registrant's Principal Executive Offices)*

Timothy J. Mayopoulos, Esq.
Executive Vice President and General Counsel
Bank of America Corporation
Bank of America Corporate Center
100 N. Tryon Street
Charlotte, North Carolina 28255
(704) 386−7484
*(Name, Address, including Zip Code, and Telephone Number, including Area Code, of Agent for Service)*

*With copies to:*

| John C. Murphy, Jr., Esq. | Louis J. Freeh, Esq. | Edward D. Herlihy, Esq. |
|---|---|---|
| Cleary Gottlieb Steen & Hamilton LLP | Vice Chairman, General Counsel and Secretary | Wachtell, Lipton, Rosen & Katz |
| 2000 Pennsylvania Avenue, NW | MBNA Corporation | 51 West 52nd Street |
| Washington, DC 20006 | 1100 North King Street | New York, New York 10019 |
| (202) 974−1500 | Wilmington, Delaware 19884 | (212) 403−1000 |
| | (800) 362−6255 | |

**Approximate date of commencement of the proposed sale of the securities to the public:** As soon as practicable after this Registration Statement becomes effective and upon completion of the merger described in the enclosed document.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act of 1933, as amended, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post−effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such dates as the Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**Bank of America** ᗕᗕ                                                         mbna 

## MERGER PROPOSED — YOUR VOTE IS VERY IMPORTANT

The boards of directors of Bank of America Corporation and MBNA Corporation each have unanimously approved a merger that will create one of the top retailers of financial services in the United States.

In the merger, MBNA will merge into Bank of America. If the merger is completed, you will have a right to receive 0.5009 of a share of Bank of America common stock and $4.125 in cash for each share of MBNA common stock you hold immediately prior to the merger. The value of the merger consideration will fluctuate with the market price of Bank of America common stock. The following table shows the closing sale prices of Bank of America common stock and MBNA common stock as reported on the New York Stock Exchange on June 29, 2005, the last trading day before we announced the merger, and on September 16, 2005, the last practicable trading day before the distribution of this document. This table also shows the implied value of the merger consideration proposed for each share of MBNA common stock, which we calculated by multiplying the closing price of Bank of America common stock on those dates by 0.5009, the exchange ratio, and adding $4.125.

|  | Bank of America Common Stock | MBNA Common Stock | Implied Value per Share of MBNA Common Stock |
|---|---|---|---|
| At June 29, 2005 | $  46.91 | $  21.07 | $  27.62 |
| At September 16, 2005 | $  43.68 | $  25.38 | $  26.00 |

The market prices of both Bank of America common stock and MBNA common stock will fluctuate before the merger. You should obtain current stock price quotations for Bank of America common stock and MBNA common stock. Bank of America common stock is quoted on the NYSE under the symbol "BAC." MBNA common stock is quoted on the NYSE under the symbol "KRB."

We expect that the merger will generally be tax−free to you as to shares of Bank of America common stock you receive in the merger and generally taxable as to the cash you receive.

We cannot complete the merger unless MBNA's common stockholders approve it. MBNA will hold a special meeting of its stockholders to vote on this merger proposal at MBNA's international headquarters located at 1100 North King Street, Wilmington, Delaware, on November 3, 2005, at 10:00 a.m., local time. **Your vote is important.** Regardless of whether you plan to attend the special stockholders' meeting, please take the time to vote your shares in accordance with the instructions contained in this document. Failing to vote will have the same effect as voting against the merger. **The MBNA board of directors unanimously recommends that MBNA stockholders vote *FOR* approval of the merger.**

This document describes the special meeting, the merger, the documents related to the merger and other related matters. Please carefully read this entire document, including "Risk Factors" beginning on page 14 for a discussion of the risks relating to the proposed merger. You also can obtain information about our companies from documents that each of us has filed with the Securities and Exchange Commission.

*Bruce J. Hammonds*

Bruce Hammonds
President and Chief Executive Officer
MBNA Corporation

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the Bank of America common stock to be issued under this document or determined if this document is accurate or adequate. Any representation to the contrary is a criminal offense.**

The date of this document is September 19, 2005, and it is first being mailed or otherwise delivered to MBNA stockholders on or about September 26, 2005.

Table of Contents

# MBNA CORPORATION

**1100 North King Street**
**Wilmington, Delaware 19884**

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

MBNA Corporation will hold a special meeting of stockholders at its international headquarters located at 1100 North King Street, Wilmington, Delaware at 10:00 a.m., local time, on November 3, 2005 to consider and vote upon the following matters:

- a proposal to approve the merger of MBNA with and into Bank of America, substantially on the terms set forth in the Agreement and Plan of Merger, dated as of June 30, 2005, by and between Bank of America Corporation and MBNA Corporation, as it may be amended from time to time; and

- a proposal to approve the adjournment of the special meeting, if necessary, to solicit additional proxies, in the event that there are not sufficient votes at the time of the special meeting to approve the merger.

The MBNA board of directors has fixed the close of business on September 2, 2005 as the record date for the special meeting. Only MBNA stockholders of record at that time are entitled to notice of, and to vote at, the special meeting, or any adjournment or postponement of the special meeting. In order for the merger to be approved, the holders of at least a majority of the MBNA shares outstanding and entitled to vote thereon must vote in favor of approval of the merger.

**Regardless of whether you plan to attend the special meeting, please submit your proxy with voting instructions. Please vote as soon as possible. If you hold stock in your name as a stockholder of record, please complete, sign, date and return the accompanying proxy card in the enclosed self–addressed, stamped envelope. If you hold your stock in "street name" through a bank or broker, please direct your bank or broker to vote in accordance with the instructions you have received from your bank or broker.** This will not prevent you from voting in person, but it will help to secure a quorum and avoid added solicitation costs. Any holder of MBNA common stock who is present at the special meeting may vote in person instead of by proxy, thereby canceling any previous proxy. In any event, a proxy may be revoked in writing at any time before the special meeting in the manner described in the accompanying document.

**The MBNA board of directors has unanimously approved the merger and the merger agreement and unanimously recommends that MBNA stockholders vote "FOR" approval of the merger.**

BY ORDER OF THE BOARD OF DIRECTORS,

*Louis Freeh*

Louis J. Freeh

*Secretary*

September 19, 2005

**YOUR VOTE IS IMPORTANT. PLEASE VOTE YOUR SHARES PROMPTLY, REGARDLESS OF WHETHER YOU PLAN TO ATTEND THE SPECIAL MEETING.**

Table of Contents

## REFERENCES TO ADDITIONAL INFORMATION

This document incorporates important business and financial information about Bank of America and MBNA from documents that are not included in or delivered with this document. You can obtain documents incorporated by reference in this document, other than certain exhibits to those documents, by requesting them in writing or by telephone from the appropriate company at the following addresses:

| **Bank of America Corporation** | **MBNA Corporation** |
|---|---|
| Bank of America Corporate Center | 1100 North King Street |
| 100 N. Tryon Street | Wilmington, Delaware 19884 |
| Charlotte, North Carolina 28255 | Attention: Investor Relations |
| Attention: Investor Relations | Telephone: (800) 362−6255 |
| Telephone: (704) 386−5681 | |

*You will not be charged for any of these documents that you request. MBNA stockholders requesting documents should do so by October 27, 2005 in order to receive them before the special meeting.*

See "Where You Can Find More Information" on page 64.

# TABLE OF CONTENTS

| | Page |
|---|---|
| QUESTIONS AND ANSWERS ABOUT VOTING PROCEDURES FOR THE SPECIAL MEETING | 1 |
| SUMMARY | 3 |
| SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF BANK OF AMERICA | 8 |
| SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF MBNA | 10 |
| COMPARATIVE PER SHARE DATA | 12 |
| CAUTIONARY STATEMENT REGARDING FORWARD–LOOKING STATEMENTS | 13 |
| RISK FACTORS | 14 |
| THE MBNA SPECIAL MEETING | 17 |
| Matters to Be Considered | 17 |
| Proxies | 17 |
| Solicitation of Proxies | 18 |
| Record Date | 18 |
| Voting Rights and Vote Required | 18 |
| Recommendation of the MBNA Board of Directors | 19 |
| Attending the Meeting | 19 |
| INFORMATION ABOUT THE COMPANIES | 20 |
| THE MERGER | 21 |
| Background of the Merger | 21 |
| MBNA's Reasons for the Merger; Recommendation of the MBNA Board of Directors | 22 |
| Opinion of MBNA's Financial Advisor | 24 |
| Bank of America's Reasons for the Merger | 30 |
| Board of Directors and Management of Bank of America Following Completion of the Merger | 30 |
| Public Trading Markets | 31 |
| Bank of America's Dividend Policy | 31 |
| MBNA Stockholders Do Not Have Dissenters' Appraisal Rights in the Merger | 31 |
| Regulatory Approvals Required for the Merger | 31 |
| Litigation Relating to the Merger | 33 |
| MBNA's Directors and Officers Have Financial Interests in the Merger | 33 |
| THE MERGER AGREEMENT | 37 |
| Terms of the Merger | 37 |
| Treatment of MBNA Stock Options and Other Equity–Based Awards | 37 |
| Closing and Effective Time of the Merger | 38 |
| Board of Directors of the Surviving Corporation | 38 |
| Conversion of Shares; Exchange of Certificates | 38 |
| Representations and Warranties | 40 |
| Covenants and Agreements | 41 |
| Reasonable Best Efforts of MBNA to Obtain the Required Stockholder Vote | 42 |
| Agreement Not to Solicit Other Offers | 43 |
| Expenses and Fees | 44 |
| Employee Matters | 44 |
| Indemnification and Insurance | 44 |
| Conditions to Complete the Merger | 44 |
| Termination of the Merger Agreement | 45 |
| Amendment, Waiver and Extension of the Merger Agreement | 46 |

i

**Table of Contents**

|  | Page |
|---|---|
| Resales of Bank of America Stock by Affiliates | 46 |
| THE STOCK OPTION AGREEMENT | 47 |
| The Stock Option | 47 |
| Purpose of the Stock Option Agreement | 47 |
| Exercise; Expiration | 47 |
| Rights Under the Stock Option Agreement | 49 |
| ACCOUNTING TREATMENT | 50 |
| FEDERAL INCOME TAX CONSEQUENCES OF THE MERGER | 50 |
| Tax Consequences of the Merger Generally | 51 |
| Cash in Lieu of a Fractional Share | 52 |
| Backup Withholding | 52 |
| Reporting Requirements | 52 |
| COMPARISON OF STOCKHOLDERS' RIGHTS | 53 |
| COMPARATIVE MARKET PRICES AND DIVIDENDS | 63 |
| LEGAL MATTERS | 63 |
| EXPERTS | 64 |
| OTHER MATTERS | 64 |
| MBNA 2006 Annual Meeting Stockholder Proposals | 64 |
| WHERE YOU CAN FIND MORE INFORMATION | 64 |
| PART II — INFORMATION NOT REQUIRED IN PROSPECTUS | II−1 |

**APPENDICES:**

**APPENDIX A**

Agreement and Plan of Merger, dated as of June 30, 2005, by and between Bank of America Corporation and MBNA Corporation    A−1

**APPENDIX B**

Stock Option Agreement, dated as of June 30, 2005, by and between MBNA Corporation, as issuer, and Bank of America Corporation, as grantee    B−1

**APPENDIX C**

Opinion of UBS Securities LLC    C−1

Ex−5(a)
Ex−8(a)
Ex−8(b)
Ex−23(b)
Ex−23(c)
Ex−24(b)

ii

Table of Contents

### QUESTIONS AND ANSWERS ABOUT VOTING PROCEDURES FOR THE SPECIAL MEETING

**Q: What do I need to do now?**

A: After you have carefully read this document and have decided how you wish to vote your shares, please vote your shares promptly. If you hold stock in your name as a stockholder of record, you must complete, sign, date and mail your proxy card in the enclosed postage paid return envelope as soon as possible. If you hold your stock in "street name" through a bank or broker, you must direct your bank or broker to vote in accordance with the instructions you have received from your bank or broker. Submitting your proxy card or directing your bank or broker to vote your shares will ensure that your shares are represented and voted at the special meeting.

**Q: Why is my vote important?**

A: If you do not vote by proxy or vote in person at the special meeting, it will be more difficult for us to obtain the necessary quorum to hold our special meeting. In addition, your failure to vote, by proxy or in person, will have the same effect as a vote against the merger. The merger must be approved by the holders of a majority of the outstanding shares of MBNA common stock entitled to vote at the special meeting. **The MBNA board of directors unanimously recommends that you vote to approve the merger.**

**Q: If my shares of common stock are held in street name by my broker, will my broker automatically vote my shares for me?**

A: No. Your broker cannot vote your shares without instructions from you. You should instruct your broker as to how to vote your shares, following the directions your broker provides to you. Please check the voting form used by your broker.

**Q: What if I abstain from voting or fail to instruct my broker?**

A: If you abstain from voting, the abstention will be counted toward a quorum at the special meeting, but it will have the same effect as a vote against the merger.

**Q: Can I attend the special meeting and vote my shares in person?**

A: Yes. All stockholders, including stockholders of record and stockholders who hold their shares through banks, brokers, nominees or any other holder of record, are invited to attend the special meeting. Holders of record of MBNA common stock can vote in person at the special meeting. If you are not a stockholder of record, you must obtain a proxy, executed in your favor, from the record holder of your shares, such as a broker, bank or other nominee, to be able to vote in person at the special meeting. If you plan to attend the special meeting, you must hold your shares in your own name or have a letter from the record holder of your shares confirming your ownership and you must bring a form of personal photo identification with you in order to be admitted. We reserve the right to refuse admittance to anyone without proper proof of share ownership and without proper photo identification.

**Q: Can I change my vote?**

A: Yes. You may revoke any proxy at any time before it is voted by signing and returning a proxy card with a later date, delivering a written revocation letter to the Secretary of MBNA, or by attending the special meeting in person, notifying the Secretary and voting by ballot at the special meeting. The MBNA Secretary's mailing address is 1100 North King Street, Wilmington, Delaware 19884.

Any common stockholder entitled to vote in person at the special meeting may vote in person regardless of whether a proxy has been previously given, but the mere presence (without notifying the Secretary of MBNA) of a stockholder at the special meeting will not constitute revocation of a previously given proxy.

**Q: If I am an MBNA stockholder, should I send in my MBNA stock certificates now?**

A: No. You should **not** send in your MBNA stock certificates at this time. After the merger, Bank of America will send you instructions for exchanging MBNA stock certificates for the merger consideration. Unless MBNA stockholders specifically request to receive Bank of America stock certificates, the shares of Bank of America stock they receive in the merger will be issued in book−entry form.

1

Table of Contents

**Q: When do you expect to complete the merger?**

A:  We expect to complete the merger on or about January 1, 2006. However, we cannot assure you when or if the merger will occur. We must first obtain the approval of MBNA stockholders at the special meeting and the necessary regulatory approvals.

**Q: Whom should I call with questions?**

A:  MBNA stockholders should call Georgeson Shareholder Communications Inc., MBNA's proxy solicitor, at (866) 203–2636 with any questions about the merger and related transactions.

2

Table of Contents

## SUMMARY

**This summary highlights selected information from this document. It may not contain all of the information that is important to you. We urge you to carefully read the entire document and the other documents to which we refer in order to fully understand the merger and the related transactions. See "Where You Can Find More Information" on page 64. Each item in this summary refers to the page of this document on which that subject is discussed in more detail.**

### In the Merger, MBNA Stockholders Will Have a Right to Receive 0.5009 of a Share of Bank of America Common Stock and $4.125 in Cash per Share of MBNA Common Stock (page 37)

We are proposing the merger of MBNA with and into Bank of America. Bank of America will survive the merger. If the merger is completed, you will have a right to receive 0.5009 of a share of Bank of America common stock and $4.125 in cash for each share of MBNA common stock you hold immediately prior to the merger. Bank of America will not issue any fractional shares of Bank of America common stock in the merger. MBNA stockholders who would otherwise be entitled to a fractional share of Bank of America common stock will instead receive an additional amount in cash based on the average of the closing sale prices of Bank of America common stock on the five trading days immediately prior to the date on which the merger is completed.

*Example: If you hold 110 shares of MBNA common stock, you will have a right to receive 55 shares of Bank of America common stock, $453.75 in cash and an additional cash payment instead of the 0.099 shares of Bank of America common stock that you otherwise would have received (i.e., 110 shares x 0.5009 = 55.099 shares).*

### What Holders of MBNA Stock Options and Other Equity−Based Awards Will Receive (page 37)

When we complete the merger, MBNA stock options and restricted share units that are outstanding immediately before completing the merger will become stock options and restricted share units on shares of Bank of America common stock (except that restricted share units that vest upon a change of control will instead be converted into the right to receive the merger consideration). The number of common shares subject to such stock options and restricted share units, and the exercise price of the MBNA stock options, will be adjusted according to an award exchange ratio. The award exchange ratio will be the sum of (a) 0.5009 and (b) $4.125 divided by the average closing price of Bank of America common stock over the five trading days immediately prior to the date on which the merger is completed.

Each MBNA restricted share outstanding immediately before completing the merger will be converted upon the completion of the merger into the right to receive the merger consideration (with the same terms as the MBNA restricted shares, including transfer restrictions on the stock consideration to the extent such shares do not vest and transfer restrictions do not lapse on the change of control).

### The Merger Will Generally Be Tax−Free to MBNA Stockholders as to the Shares of Bank of America Common Stock They Receive and Taxable as to the Cash They Receive (page 51)

The merger is intended to qualify as a reorganization for U.S. federal income tax purposes, and it is a condition to our respective obligations to complete the merger that each of Bank of America and MBNA receive a legal opinion to that effect. Accordingly, the merger will generally be tax−free to you as to the shares of Bank of America common stock you receive in the merger and generally taxable as to the cash you receive in the merger. The amount of gain that you recognize in the merger will generally be limited to the lesser of the amount of gain that you realize and the amount of cash that you receive in the merger. The amount of gain that you realize is generally equal to the excess, if any, of the sum of the cash and the fair market value of the Bank of America common stock that you receive over your tax basis in the MBNA common stock you surrender in the merger.

*The federal income tax consequences described above may not apply to all holders of MBNA common stock. Your tax consequences will depend on your individual situation. Accordingly, we strongly urge you to consult your tax advisor for a full understanding of the particular tax consequences of the merger to you.*

3

Table of Contents

**Comparative Market Prices and Share Information (pages 12 and 63)**

Bank of America common stock is quoted on the NYSE under the symbol "BAC." MBNA common stock is quoted on the NYSE under the symbol "KRB." The following table shows the closing sale prices of Bank of America common stock and MBNA common stock as reported on the NYSE on June 29, 2005, the last trading day before we announced the merger, and on September 16, 2005, the last practicable trading day before the distribution of this document. This table also shows the implied value of the merger consideration proposed for each share of MBNA common stock, which we calculated by multiplying the closing price of Bank of America common stock on those dates by 0.5009, the exchange ratio, and adding $4.125, the cash portion of the merger consideration.

| | Bank of America Common Stock | MBNA Common Stock | Implied Value of One Share of MBNA Common Stock |
|---|---|---|---|
| At June 29, 2005 | $    46.91 | $    21.07 | $    27.62 |
| At September 16, 2005 | $    43.68 | $    25.38 | $    26.00 |

*The market price of Bank of America common stock and MBNA common stock will fluctuate prior to the merger. You should obtain current market quotations for the shares.*

**UBS Securities LLC Has Provided an Opinion to the MBNA Board of Directors Regarding the Merger Consideration (page 24)**

In connection with the merger, MBNA's board of directors received a written opinion from UBS Securities LLC, MBNA's financial advisor, which we refer to as UBS, as to the fairness, from a financial point of view and as of the date of the opinion, of the merger consideration. The full text of UBS' written opinion, dated June 29, 2005, is attached as Appendix C. We encourage you to read this opinion carefully in its entirety for a description of the assumptions made, procedures followed, matters considered and limitations on the review undertaken. **UBS' opinion was provided to MBNA's board of directors in its evaluation of the merger consideration, does not address any other terms or aspects of the merger and does not constitute a recommendation to any stockholder as to how to vote or act with respect to any matters relating to the merger.**

**The MBNA Board of Directors Recommends that MBNA Stockholders Vote "FOR" Approval of the Merger (page 22)**

The MBNA board of directors believes that the merger is in the best interests of MBNA and its stockholders and has unanimously approved the merger and the merger agreement. The MBNA board of directors unanimously recommends that MBNA stockholders vote "FOR" approval of the merger.

**MBNA's Directors and Officers Have Financial Interests in the Merger That Differ From Your Interests (page 33)**

MBNA's executive officers and directors have economic interests in the merger that are different from, or in addition to, their interests as MBNA stockholders. The MBNA board of directors considered these interests in its decision to approve the merger agreement. The executive officers of MBNA have change of control agreements that provide severance and other benefits in the case of qualifying terminations of employment following a change of control, including completion of the merger. In addition, the MBNA equity compensation plans provide for the vesting of stock–based awards upon completion of the merger, and the benefits of executive officers under MBNA's supplemental executive retirement plan and life insurance plan will be enhanced upon qualifying terminations of employment following completion of the merger. Bruce Hammonds, MBNA's President and Chief Executive Officer and an MBNA director, will be CEO and President of Bank of America Card Services following completion of the merger, and Frank P. Bramble, Sr., until December 2004 a Vice Chairman of MBNA and currently serving as Senior Advisor to the Chief Executive Officer of MBNA, will join the Bank of America board of directors upon completion of the merger. Executive officers and directors of MBNA have indemnification rights that will survive completion of the merger.

4

Table of Contents

### Holders of MBNA Common Stock Do Not Have Appraisal Rights (page 31)

Appraisal rights are statutory rights that enable stockholders to dissent from an extraordinary transaction, such as a merger, and to demand that the corporation pay the fair value for their shares as determined by a court in a judicial proceeding instead of receiving the consideration offered to stockholders in connection with the extraordinary transaction. Appraisal rights are not available in all circumstances, and exceptions to these rights are provided under the Maryland General Corporation Law. As a result of one of these exceptions, the holders of MBNA common stock are not entitled to appraisal rights in the merger.

### Conditions That Must Be Satisfied or Waived for the Merger to Occur (page 44)

Currently, we expect to complete the merger on or about January 1, 2006. As more fully described in this document and in the merger agreement, the completion of the merger depends on a number of conditions being satisfied or, where legally permissible, waived. These conditions include, among others, approval by MBNA stockholders, the receipt of all required regulatory approvals (such as approval by the Board of Governors of the Federal Reserve System and financial regulators in Delaware, the United Kingdom and Canada) without a condition or a restriction that would have a material adverse effect measured relative to MBNA, and the receipt of legal opinions by each company regarding the tax treatment of the merger.

We cannot be certain when, or if, the conditions to the merger will be satisfied or waived, or that the merger will be completed.

### Termination of the Merger Agreement (page 45)

We may mutually agree to terminate the merger agreement before completing the merger, even after stockholder approval, as long as the termination is approved by each of our boards of directors.

In addition, either of us may decide to terminate the merger agreement, even after stockholder approval, if a governmental entity issues a non–appealable final order prohibiting the merger, if a governmental entity which must grant a regulatory approval as a condition to the merger denies such approval of the merger and such action has become final and non–appealable, or if the other party breaches the merger agreement in a way that would entitle the party seeking to terminate the agreement not to consummate the merger, subject to the right of the breaching party to cure the breach within 45 days following written notice (unless it is not possible due to the nature or timing of the breach for the breaching party to cure the breach). Either of us may terminate the merger agreement if the merger has not been completed by June 30, 2006, unless the reason the merger has not been completed by that date is a breach of the merger agreement by the company seeking to terminate the merger agreement. If MBNA fails to obtain stockholder approval of the merger, we may not terminate the merger agreement before June 30, 2006 as long as both of us continue to make specified efforts to restructure the transaction for the purpose of re–presenting a merger proposal for approval by you. Bank of America may terminate the merger agreement if the MBNA board withdraws or adversely changes its recommendation of the merger or recommends a competing proposal to acquire MBNA.

### MBNA Granted a Stock Option to Bank of America (page 47)

To induce Bank of America to enter into the merger agreement, MBNA granted Bank of America an option to purchase up to 249,764,005 shares of MBNA common stock at a price per share of $21.30; however, in no case may Bank of America acquire more than 19.9% of the outstanding shares of MBNA common stock under this stock option agreement. Bank of America cannot exercise the option unless the merger is not completed and specified triggering events occur. These events generally relate to business combinations or acquisition transactions involving MBNA and a third party. We do not know of any event that has occurred as of the date of this document that would allow Bank of America to exercise the option. The option will expire upon completion of the merger..

The option could have the effect of discouraging a company from trying to acquire MBNA prior to completion of the merger or termination of the merger agreement. Upon the occurrence of certain triggering events, MBNA may be required to repurchase the option and any shares of MBNA common stock purchased under the option at a predetermined price, or Bank of America may choose to surrender the option to MBNA for a cash payment of $1.0559 billion. In no event will the total profit received by Bank of America with respect to this option exceed $1.4078 billion.

### The MBNA stock option agreement is attached to this document as Appendix B.

Table of Contents

**Regulatory Approvals Required for the Merger (page 31)**

We have agreed to use our reasonable best efforts to obtain all regulatory approvals required to complete the transactions contemplated by the merger agreement. These approvals include approval from the Federal Reserve Board and other federal, state and foreign regulatory authorities, including the Delaware State Bank Commissioner, the U.K. Financial Services Authority and the Canadian Office of the Superintendent of Financial Institutions. Bank of America and MBNA have completed, or will complete, the filing of applications and notifications to obtain the required regulatory approvals. In obtaining the required regulatory approvals, Bank of America is not required to agree to any restriction or condition that would have a material adverse effect on MBNA or Bank of America, measured on a scale relative to MBNA.

Although we do not know of any reason why we cannot obtain these regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them.

**Board of Directors and Management of Bank of America following Completion of the Merger (page 30)**

Upon completion of the merger, Bruce Hammonds will be CEO and President of Bank of America Card Services and will join Bank of America's Risk and Capital Committee, which will continue to be chaired by Ken Lewis, Bank of America's Chief Executive Officer. Also, following completion of the merger, Frank P. Bramble, Sr., who was until December 2004 a Vice Chairman of MBNA and who currently serves as Senior Advisor to the Chief Executive Officer of MBNA, will join the Bank of America board of directors.

**The Rights of MBNA Stockholders will be Governed by Delaware Law and by New Governing Documents after the Merger (page 53)**

The rights of MBNA stockholders will change as a result of the merger due to differences in Bank of America's and MBNA's governing documents and due to the fact that the companies are incorporated in different states (MBNA in Maryland and Bank of America in Delaware). This document contains descriptions of stockholder rights under each of the Bank of America and MBNA governing documents and applicable state law, and describes the material differences between them.

**MBNA will Hold its Special Meeting on November 3, 2005 (page 17)**

The special meeting will be held on November 3, 2005, at 10:00 a.m., local time, at MBNA's international headquarters located at 1100 North King Street, Wilmington, Delaware. At the special meeting, MBNA stockholders will be asked to:

• approve the merger; and

• approve the adjournment of the special meeting, if necessary, to solicit additional proxies, in the event that there are not sufficient votes at the time of the special meeting to approve the merger.

*Record Date.* Only holders of record at the close of business on September 2, 2005 will be entitled to vote at the special meeting. Each share of MBNA common stock is entitled to one vote. As of the record date of September 2, 2005, there were 1,259,681,391 shares of MBNA common stock entitled to vote at the special meeting.

*Required Vote.* To approve the merger, the holders of a majority of the outstanding shares of MBNA common stock entitled to vote must vote in favor of approving the merger. Because approval is based on the affirmative vote of a majority of shares outstanding, an MBNA stockholder's failure to vote or an abstention will have the same effect as a vote against the merger.

Approval of any necessary adjournment of the special meeting may be obtained by the affirmative vote of the holders of a majority of the shares present in person or by proxy, even if less than a quorum. Because approval of such adjournment is based on the affirmative vote of a majority of shares present in person or by proxy, abstentions will have the same effect as a vote against this proposal.

As of the MBNA record date, directors and executive officers of MBNA and their affiliates had the right to vote 97,084,854 shares of MBNA common stock, or 7.7% of the outstanding MBNA common stock entitled to be voted at the special meeting. At that date, directors and executive officers of Bank of America and their affiliates had the right to vote 0 shares of MBNA common stock entitled to be voted at the special meeting, or 0% of the outstanding MBNA common stock. We currently expect that each of

Table of Contents

these individuals will vote their shares of MBNA common stock in favor of the proposals to be presented at the special meeting.

## Information about the Companies (page 20)

### Bank of America Corporation

Bank of America Corporation is a Delaware corporation, a bank holding company and a financial holding company under U.S. federal law. Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk–management products and services. The company provides unmatched convenience in the United States, serving 33 million consumer relationships with more than 5,800 retail banking offices, more than 16,600 ATMs and award–winning online banking with more than 13 million active users. Bank of America is ranked the No. 1 Small Business Administration (SBA) Lender in the United States by the SBA. The company serves clients in 150 countries and has relationships with 96 percent of the U.S. Fortune 500 companies and 85 percent of the Global Fortune 500. Bank of America Corporation stock (NYSE: BAC) is listed on the New York Stock Exchange. As of June 30, 2005, Bank of America had total consolidated assets of approximately $1.25 trillion, total consolidated deposits of approximately $635 billion and total consolidated stockholders' equity of approximately $101 billion. The principal executive offices of Bank of America are located in the Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255, and its telephone number is (704) 386–5681.

### MBNA Corporation

MBNA Corporation is a Maryland corporation and a bank holding company. It is the largest independent credit card lender in the world and a recognized leader in affinity marketing, and is an international financial services company providing lending, deposit, and credit insurance products and services. MBNA credit cards and related products and services are endorsed by more than 5,000 organizations world–wide. MBNA Corporation stock (NYSE: KRB) is listed on the New York Stock Exchange. As of June 30, 2005, MBNA had total consolidated assets of approximately $63.0 billion, including total consolidated loan receivables of $32.3 billion, and total consolidated stockholders' equity of approximately $12.8 billion. The principal executive offices of MBNA are located at 1100 North King Street, Wilmington, Delaware 19884, and its telephone number is (800) 362–6255.

Table of Contents

## SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF BANK OF AMERICA

Set forth below are highlights from Bank of America's audited consolidated financial data as of and for the years ended December 31, 2000 through 2004 and Bank of America's unaudited consolidated financial data as of and for the six months ended June 30, 2004 and 2005. The results of operations for the six months ended June 30, 2005 are not necessarily indicative of the results of operations for the full year or any other interim period. Bank of America management prepared the unaudited information on the same basis as it prepared Bank of America's audited consolidated financial statements. In the opinion of Bank of America management, this information reflects all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of this data for those dates. You should read this information in conjunction with Bank of America's consolidated financial statements and related notes included in Bank of America's Form 8−K dated July 12, 2005, and Bank of America's Quarterly Report on Form 10−Q for the quarters ended March 31, 2005 and June 30, 2005, which are incorporated by reference in this document and from which this information is derived. See "Where You Can Find More Information" on page 64.

### Bank of America — Summary of Consolidated Financial Data[1]

| | Years Ended December 31, | | | | | | | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | | 2003 | | 2002 | | 2001 | | 2000 | 2005 | | 2004 |
| | (Dollars in millions, except per share information) | | | | | | | | | | | |
| **Income statement** | | | | | | | | | | | | |
| Net interest income | $ | 28,794 | $ | 21,464 | $ | 20,923 | $ | 20,290 | $ | 18,349 | $ 15,523 | $ | 13,382 |
| Noninterest income | | 20,085 | | 16,450 | | 13,580 | | 14,348 | | 14,582 | 12,514 | | 9,197 |
| Total revenue | | 48,879 | | 37,914 | | 34,503 | | 34,638 | | 32,931 | 28,037 | | 22,579 |
| Provision for credit losses | | 2,769 | | 2,839 | | 3,697 | | 4,287 | | 2,535 | 1,455 | | 1,413 |
| Gains on sales of debt securities | | 2,123 | | 941 | | 630 | | 475 | | 25 | 984 | | 1,290 |
| Noninterest expense | | 27,012 | | 20,155 | | 18,445 | | 20,709 | | 18,633 | 14,076 | | 12,658 |
| Income before income taxes | | 21,221 | | 15,861 | | 12,991 | | 10,117 | | 11,788 | 13,490 | | 9,798 |
| Income tax expense | | 7,078 | | 5,051 | | 3,742 | | 3,325 | | 4,271 | 4,499 | | 3,268 |
| Net income | | 14,143 | | 10,810 | | 9,249 | | 6,792 | | 7,517 | 8,991 | | 6,530 |
| Average common shares issued and outstanding (in thousands) | | 3,758,507 | | 2,973,407 | | 3,040,085 | | 3,189,914 | | 3,292,797 | 4,019,089 | | 3,471,516 |
| Average diluted common shares issued and outstanding (in thousands) | | 3,823,943 | | 3,030,356 | | 3,130,935 | | 3,251,308 | | 3,329,858 | 4,081,921 | | 3,531,038 |
| **Performance ratios** | | | | | | | | | | | | |
| Return on average assets | | 1.35% | | 1.44% | | 1.41% | | 1.05% | | 1.12% | 1.46% | | 1.36% |
| Return on average common stockholders' equity | | 16.83 | | 21.99 | | 19.44 | | 13.96 | | 15.96 | 18.42 | | 18.54 |
| Total equity to total assets (at period end) | | 8.97 | | 6.67 | | 7.78 | | 7.87 | | 7.45 | 8.07 | | 9.35 |
| Total average equity to total average assets | | 8.06 | | 6.57 | | 7.28 | | 7.55 | | 7.03 | 7.96 | | 7.36 |
| Dividend payout | | 45.67 | | 39.58 | | 40.07 | | 53.44 | | 45.02 | 40.53 | | 42.85 |
| **Per common share data** | | | | | | | | | | | | |
| Earnings | $ | 3.76 | $ | 3.63 | $ | 3.04 | $ | 2.13 | $ | 2.28 | $ 2.23 | $ | 1.88 |
| Diluted earnings | | 3.69 | | 3.57 | | 2.95 | | 2.09 | | 2.26 | 2.20 | | 1.85 |
| Dividends paid | | 1.70 | | 1.44 | | 1.22 | | 1.14 | | 1.03 | 0.90 | | 0.80 |
| Book value | | 24.56 | | 16.63 | | 16.75 | | 15.54 | | 14.74 | 24.96 | | 23.51 |

8

Table of Contents

| | 2004 | 2003 | 2002 | 2001 | 2000 | 2005 | 2004 |
|---|---|---|---|---|---|---|---|
| | | | Years Ended December 31, | | | Six Months Ended June 30, | |
| | | | (Dollars in millions, except per share information) | | | | |
| **Average balance sheet** | | | | | | | |
| Total loans and leases | S    472,645 | S  356,148 | S  336,819 | S  365,447 | S  392,622 | S    522,672 | S  435,618 |
| Total assets | 1,044,660 | 749,056 | 653,774 | 644,887 | 670,078 | 1,239,398 | 963,825 |
| Total deposits | 551,559 | 406,233 | 371,479 | 362,653 | 353,294 | 634,043 | 503,690 |
| Long−term debt | 93,330 | 68,432 | 66,045 | 69,622 | 70,293 | 97,244 | 87,623 |
| Common stockholders' equity | 83,953 | 49,148 | 47,552 | 48,609 | 47,057 | 98,343 | 70,787 |
| Total stockholders' equity | 84,183 | 49,204 | 47,613 | 48,678 | 47,132 | 98,614 | 70,976 |
| **Capital ratios (at period end)** | | | | | | | |
| Risk−based capital: | | | | | | | |
| Tier 1 | 8.10% | 7.85% | 8.22% | 8.30% | 7.50% | 8.06% | 8.20% |
| Total | 11.63 | 11.87 | 12.43 | 12.67 | 11.04 | 11.12 | 11.97 |
| Leverage | 5.82 | 5.73 | 6.29 | 6.55 | 6.11 | 5.59 | 5.83 |
| **Market price per share of common stock** | | | | | | | |
| Closing | S      46.99 | S    40.22 | S    34.79 | S    31.48 | S    22.94 | S      45.61 | S    42.31 |
| High closing | 47.44 | 41.77 | 38.45 | 32.50 | 29.63 | 47.08 | 42.72 |
| Low closing | 38.96 | 32.82 | 27.08 | 23.38 | 19.00 | 43.66 | 38.96 |

(1) As a result of the adoption of Statement of Financial Accounting Standards (SFAS) No. 142 "Goodwill and Other Intangible Assets" (SFAS 142) on January 1, 2002, Bank of America no longer amortizes goodwill. Goodwill amortization expense was $662 million and $635 million in 2001 and 2000, respectively.

9

Table of Contents

## SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA OF MBNA

Set forth below are highlights from MBNA's audited consolidated financial data as of and for the years ended December 31, 2000 through 2004 and MBNA's unaudited consolidated financial data as of and for the six months ended June 30, 2004 and 2005. The results of operations for the six months ended June 30, 2005 are not necessarily indicative of the results of operations for the full year or any other interim period. The unaudited information was prepared on the same basis as MBNA's audited consolidated financial statements. In the opinion of MBNA management, this information reflects all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of this data for those dates. You should read this information in conjunction with MBNA's consolidated financial statements and related notes incorporated by reference within MBNA's Annual Report on Form 10−K for the year ended December 31, 2004, and MBNA's Quarterly Report on Form 10−Q for the quarters ended March 31, 2005 and June 30, 2005, which are incorporated by reference in this document and from which this information is derived. See "Where You Can Find More Information" on page 64.

### MBNA — Summary of Consolidated Financial Data

| | Years Ended December 31, | | | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 | 2005[1] | 2004 |
| | (Dollars in millions, except per share information) | | | | | | |
| **Income statement** | | | | | | | |
| Net interest income | $ 2,537 | $ 2,350 | $ 2,074 | $ 1,658 | $ 1,395 | $ 1,320 | $ 1,262 |
| Noninterest income | 8,257 | 7,826 | 6,753 | 6,673 | 4,921 | 3,714 | 3,942 |
| Total revenue | 10,794 | 10,176 | 8,827 | 8,331 | 6,316 | 5,034 | 5,204 |
| Provision for credit losses | 1,147 | 1,393 | 1,340 | 1,141 | 547 | 460 | 616 |
| Gains on sales of debt securities | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Noninterest expense | 5,517 | 5,124 | 4,702 | 4,475 | 3,648 | 3,540 | 2,814 |
| Income before income taxes | 4,131 | 3,659 | 2,785 | 2,715 | 2,121 | 1,034 | 1,774 |
| Income tax expense | 1,454 | 1,321 | 1,019 | 1,021 | 808 | 370 | 594 |
| Net income | 2,677 | 2,338 | 1,766 | 1,694 | 1,313 | 664 | 1,180 |
| Average common shares issued and outstanding (in thousands) | 1,278 | 1,278 | 1,278 | 1,278 | 1,231 | 1,268 | 1,278 |
| Average diluted common shares issued and outstanding (in thousands) | 1,297 | 1,295 | 1,303 | 1,314 | 1,270 | 1,280 | 1,299 |
| **Performance ratios** | | | | | | | |
| Return on average assets | 4.39% | 4.16% | 3.67% | 4.16% | 3.94% | 2.18% | 3.93% |
| Return on average common stockholders' equity | 22.09 | 23.46 | 21.83 | 24.79 | 26.88 | 10.28 | 20.30 |
| Total equity to total assets (at period end) | 21.59 | 18.80 | 17.22 | 17.16 | 17.13 | 20.35 | 19.50 |
| Total average equity to total average assets | 20.23 | 18.09 | 17.22 | 17.27 | 15.28 | 21.55 | 19.69 |
| Dividend payout | 23.41 | 20.11 | 20.15 | 18.75 | 20.59 | 54.37 | 26.52 |
| **Per common share data** | | | | | | | |
| Earnings | $ 2.08 | $ 1.82 | $ 1.37 | $ 1.31 | $ 1.05 | $ 0.52 | $ 0.92 |
| Diluted earnings | 2.05 | 1.79 | 1.34 | 1.28 | 1.02 | 0.51 | 0.90 |
| Dividends paid | 0.48 | 0.36 | 0.27 | 0.24 | 0.21 | 0.28 | 0.24 |
| Book value | 10.26 | 8.53 | 6.96 | 5.94 | 5.02 | 10.03 | 9.12 |
| **Average balance sheet** | | | | | | | |
| Total loans and leases | $ 31,056 | $ 28,184 | $ 25,315 | $ 20,339 | $ 17,718 | $ 31,405 | $ 30,935 |
| Total assets | 60,953 | 56,233 | 48,154 | 40,764 | 33,299 | 61,376 | 60,418 |
| Total deposits | 31,894 | 31,881 | 28,481 | 25,148 | 20,654 | 31,081 | 31,766 |
| Long−term debt | 11,715 | 10,558 | 8,040 | 6,309 | 5,700 | 11,824 | 11,843 |
| Common stockholders' equity | 12,123 | 9,967 | 8,088 | 6,834 | 4,883 | 13,021 | 11,690 |
| Total stockholders' equity | 12,328 | 10,173 | 8,294 | 7,040 | 5,089 | 13,227 | 11,896 |

Table of Contents

| | Years Ended December 31, | | | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 | 2005[1] | 2004 |
| | (Dollars in millions, except per share information) | | | | | | |
| **Capital ratios (at period end)** | | | | | | | |
| Risk–based capital: | | | | | | | |
| Tier 1 | 21.82% | 18.47% | 15.73% | 15.99% | 14.98% | 21.15% | 19.82% |
| Total | 25.39 | 22.18 | 19.65 | 17.97 | 16.61 | 24.47 | 23.54 |
| Leverage | 22.80 | 20.52 | 18.55 | 18.12 | 17.30 | 21.98 | 20.83 |
| **Market price per share of common stock** | | | | | | | |
| Closing | $ 28.19 | $ 24.85 | $ 19.02 | $ 23.47 | $ 24.63 | $ 26.16 | $ 25.79 |
| High closing | 28.78 | 25.45 | 25.97 | 26.04 | 26.54 | 28.49 | 28.78 |
| Low closing | 22.92 | 12.15 | 13.80 | 16.70 | 13.33 | 18.45 | 23.42 |

(1)  In the first six months of 2005, MBNA recorded a restructuring charge in noninterest expense of $782 million pre–tax ($497 million net of tax) in connection with its restructuring plan. This charge has resulted in significantly higher noninterest expense and significantly lower earnings per common share, return on average assets, and return on average stockholders' equity ratios for the six months ended June 30, 2005.

11

Table of Contents

## COMPARATIVE PER SHARE DATA

The following table sets forth for Bank of America common stock and MBNA common stock certain historical, pro forma and pro forma–equivalent per share financial information. The pro forma and pro forma–equivalent per share information gives effect to the merger as if the merger had been effective on the dates presented, in the case of the book value data, and as if the merger had become effective on January 1, 2004, in the case of the net income and dividends declared data. The pro forma data in the tables assume that the merger is accounted for using the purchase method of accounting and represents a current estimate based on available information of the combined company's results of operations. The pro forma financial adjustments record the assets and liabilities of MBNA at their estimated fair values and are subject to adjustment as additional information becomes available and as additional analyses are performed. See "Accounting Treatment" on page 50. The information in the following table is based on, and should be read together with, the historical financial information that we have presented in our prior filings with the Securities and Exchange Commission, which we refer to as the SEC. See "Where You Can Find More Information" on page 64.

We anticipate that the merger will provide the combined company with financial benefits that include reduced operating expenses and revenue enhancement opportunities. The pro forma information, while helpful in illustrating the financial characteristics of the combined company under one set of assumptions, does not reflect the impact of possible revenue enhancements, expense efficiencies, asset dispositions and share repurchases, among other factors, that may result as a consequence of the merger and, accordingly, does not attempt to predict or suggest future results. It also does not necessarily reflect what the historical results of the combined company would have been had our companies been combined during these periods. The Comparative Per Share Data Table for the six months ended June 30, 2005 and the year ended December 31, 2004 combines the historical income per share data of Bank of America and subsidiaries and MBNA and subsidiaries giving effect to the merger as if the merger had become effective on January 1, 2004, using the purchase method of accounting. Upon completion of the merger, the operating results of MBNA will be reflected in the consolidated financial statements of Bank of America on a prospective basis.

|  | Bank of America Historical | MBNA Historical | Pro Forma Combined | Per Equivalent MBNA Share[1] |
|---|---|---|---|---|
| **Income from continuing operations for the twelve months ended December 31, 2004:** | | | | |
| Basic | $   3.76 | $   2.08 | $   3.75 | $   1.88 |
| Diluted | 3.69 | 2.05 | 3.69 | 1.85 |
| **Income from continuing operations for the six months ended June 30, 2005:** | | | | |
| Basic | 2.23 | 0.52 | 2.05 | 1.03 |
| Diluted | 2.20 | 0.51 | 2.02 | 1.01 |
| **Dividends Paid:** | | | | |
| For the twelve months ended December 31, 2004 | 1.70 | 0.48 | 1.70 | 0.85 |
| For the six months ended June 30, 2005 | 0.90 | 0.28 | 0.90 | 0.45 |
| **Book Value:** | | | | |
| As of December 31, 2004 | 24.56 | 10.26 | n/m(2) | n/m(2) |
| As of June 30, 2005 | 24.96 | 10.03 | 28.08 | 14.07 |

(1)  Reflects MBNA shares at the exchange ratio of 0.5009.

(2)  Book value as of December 31, 2004 is not meaningful (n/m) as purchase accounting adjustments were estimated as of June 30, 2005.

12

Table of Contents

## CAUTIONARY STATEMENT REGARDING FORWARD−LOOKING STATEMENTS

This document contains or incorporates by reference a number of forward−looking statements, including statements about the financial conditions, results of operations, earnings outlook and prospects of Bank of America, MBNA and the potential combined company and may include statements for the period following the completion of the merger. You can find many of these statements by looking for words such as "plan," "believe," "expect," "intend," "anticipate," "estimate," "project," "potential," "possible" or other similar expressions.

The forward−looking statements involve certain risks and uncertainties. The ability of either Bank of America or MBNA to predict results or the actual effects of its plans and strategies, or those of the combined company, is subject to inherent uncertainty. Factors that may cause actual results or earnings to differ materially from such forward−looking statements include, among others, the following:

  • projected business increases following process changes and other investments are lower than expected;

  • competitive pressure among financial services companies increases significantly;

  • general economic conditions are less favorable than expected;

  • political conditions including the threat of future terrorist activity and related actions by the United States abroad may adversely affect either company's businesses and economic conditions as a whole;

  • changes in the interest rate environment reduce interest margins and impact funding sources;

  • changes in foreign exchange rates increases exposure;

  • changes in market rates and prices may adversely impact the value of financial products;

  • legislation or regulatory environments, requirements or changes adversely affect businesses in which either company is engaged;

  • litigation liabilities, including costs, expenses, settlements and judgments, may adversely affect either company or its businesses;

  • completion of the merger is dependent on, among other things, receipt of stockholder and regulatory approvals, the timing of which cannot be predicted with precision and which may not be received at all;

  • the merger may be more expensive to complete than anticipated, including as a result of unexpected factors or events;

  • the integration of MBNA's business and operations with those of Bank of America may take longer than anticipated, may be more costly than anticipated and may have unanticipated adverse results relating to MBNA's or Bank of America's existing businesses;

  • the anticipated cost savings and other synergies of the merger may take longer to be realized or may not be achieved in their entirety, and attrition in key client, partner and other relationships relating to the merger may be greater than expected; and

  • decisions to downsize, sell or close units or otherwise change the business mix of either company.

Because these forward−looking statements are subject to assumptions and uncertainties, actual results may differ materially from those expressed or implied by these forward−looking statements. You are cautioned not to place undue reliance on these statements, which speak only as of the date of this document or the date of any document incorporated by reference in this document.

All subsequent written and oral forward−looking statements concerning the merger or other matters addressed in this document and attributable to Bank of America or MBNA or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this document. Except to the extent required by applicable law or regulation, Bank of America and MBNA undertake no obligation to update these forward−looking statements to reflect events or circumstances after the date of this document or to reflect the occurrence of unanticipated events.

Table of Contents

## RISK FACTORS

**Because the Market Price of Bank of America Common Stock Will Fluctuate, MBNA Stockholders Cannot Be Sure of the Value of the Merger Consideration They Will Receive.**

Upon completion of the merger, each share of MBNA common stock will be converted into merger consideration consisting of 0.5009 of a share of Bank of America common stock and $4.125 in cash. The market value of the stock portion of the merger consideration may vary from the closing price of Bank of America common stock on the date we announced the merger, on the date that this document was mailed to MBNA stockholders, on the date of the special meeting of the MBNA stockholders and on the date we complete the merger and thereafter. Any change in the market value of Bank of America common stock prior to completion of the merger will affect the value of the merger consideration that MBNA stockholders will receive upon completion of the merger. Accordingly, at the time of the special meeting, MBNA stockholders will not know or be able to calculate the market value of the merger consideration they would receive upon completion of the merger. Neither company is permitted to terminate the merger agreement or resolicit the vote of MBNA stockholders solely because of changes in the market prices of either company's stock. There will be no adjustment to the merger consideration for changes in the market price of either shares of Bank of America common stock or shares of MBNA common stock. Stock price changes may result from a variety of factors, including general market and economic conditions, changes in our respective businesses, operations and prospects, and regulatory considerations. Many of these factors are beyond our control. You should obtain current market quotations for shares of Bank of America common stock and for shares of MBNA common stock.

**We May Fail To Realize All of the Anticipated Benefits of the Merger.**

The success of the merger will depend, in part, on our ability to realize the anticipated benefits and cost savings from combining the businesses of Bank of America and MBNA. However, to realize these anticipated benefits and cost savings, we must successfully combine the businesses of Bank of America and MBNA. If we are not able to achieve these objectives, the anticipated benefits and cost savings of the merger may not be realized fully or at all or may take longer to realize than expected.

Bank of America and MBNA have operated and, until the completion of the merger, will continue to operate, independently. It is possible that the integration process could result in the loss of key employees, the disruption of each company's ongoing businesses or inconsistencies in standards, controls, procedures and policies that adversely affect our ability to maintain relationships with clients, customers, depositors and employees or to achieve the anticipated benefits of the merger. Integration efforts between the two companies will also divert management attention and resources. These integration matters could have an adverse effect on each of MBNA and Bank of America during such transition period.

**The Market Price of Bank of America Common Stock after the Merger May Be Affected by Factors Different from Those Affecting the Shares of MBNA or Bank of America Currently.**

The businesses of Bank of America and MBNA differ in important respects and, accordingly, the results of operations of the combined company and the market price of the combined company's shares of common stock may be affected by factors different from those currently affecting the independent results of operations of MBNA. For a discussion of the businesses of Bank of America and MBNA and of certain factors to consider in connection with those businesses, see the documents incorporated by reference in this document and referred to under "Where You Can Find More Information."

**The Opinion Obtained by MBNA from its Financial Advisor Will Not Reflect Changes in Circumstances between Signing the Merger Agreement and the Merger.**

MBNA has not obtained an updated opinion as of the date of this document from its financial advisor. Changes in the operations and prospects of Bank of America or MBNA, general market and economic conditions and other factors which may be beyond the control of Bank of America and MBNA, and on which the financial advisor's opinion was based, may significantly alter the value of Bank of America or MBNA or the prices of shares of Bank of America common stock or MBNA common stock by the time the merger is completed. The opinion does not speak as of the time the merger will be completed or as of any date other than the date of such opinion. Because MBNA currently does not

Table of Contents

anticipate asking its financial advisor to update its opinion, the opinion will not address the fairness of the merger consideration, from a financial point of view, at the time the merger is completed. For a description of the opinion that MBNA received from its financial advisor, please refer to "The Merger— Opinion of MBNA's Financial Advisor." For a description of the other factors considered by MBNA's board of directors in determining to approve the merger, please refer to "The Merger— MBNA's Reasons for the Merger; Recommendation of the MBNA Board of Directors."

**The Merger Agreement Limits MBNA's Ability to Pursue Alternatives to the Merger.**

The merger agreement contains "no shop" provisions that, subject to limited exceptions, limit MBNA's ability to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company. In addition, MBNA has granted to Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement. These provisions might discourage a potential competing acquiror that might have an interest in acquiring all or a significant part of MBNA from considering or proposing that acquisition even if it were prepared to pay consideration with a higher per share market price than that proposed in the merger, or might result in a potential competing acquiror proposing to pay a lower per share price to acquire MBNA than it might otherwise have proposed to pay.

**The Merger is Subject to the Receipt of Consents and Approvals from Government Entities that May Impose Conditions that Could Have an Adverse Effect on Bank of America.**

Before the merger may be completed, various approvals or consents must be obtained from the Federal Reserve Board and various domestic and foreign bank regulatory, antitrust, insurance and other authorities. These governmental entities, including the Federal Reserve Board, may impose conditions on the completion of the merger or require changes to the terms of the merger. Although Bank of America and MBNA do not currently expect that any such conditions or changes would be imposed, there can be no assurance that they will not be, and such conditions or changes could have the effect of delaying completion of the merger or imposing additional costs on or limiting the revenues of Bank of America following the merger, any of which might have a material adverse effect on Bank of America following the merger. Bank of America is not obligated to complete the merger if the regulatory approvals received in connection with the completion of the merger include any conditions or restrictions that, in the aggregate, would reasonably be expected to have a material adverse effect on MBNA or Bank of America, measured relative to MBNA, but Bank of America could choose to waive this condition.

**The 10% National Deposit Cap May Restrict the Combined Company's Ability to Make Additional Bank Acquisitions in the U.S.**

Federal banking law contains provisions that limit the ability of the Federal Reserve Board to approve an application by a bank holding company to acquire domestic banks located outside of the acquiror's home state without regard to state law if the acquisition would result in the combined company holding more than 10% of the deposits held by insured depository institutions in the United States. The combined company's home state will be North Carolina. While the percentage of the combined company's deposits will change from time to time, we expect that the combined company will hold a percentage of deposits that approaches the 10% limit. While this limit does not impede the combined company's ability to grow by attracting additional deposits from new or existing customers, by acquiring thrifts or by other transactions that do not involve the acquisition of a domestic bank located outside of North Carolina, unless it is repealed or modified, or unless a transaction can be structured appropriately to comply with its application, the national deposit cap will restrict the ability of the combined company to acquire additional domestic banks located outside of North Carolina that would result in the combined company holding deposits in excess of the 10% limit. Repeal or modification of the national deposit cap would require an act of Congress. It is the responsibility of the Federal Reserve Board as part of its application approval process to determine if an acquisition would or would not surpass the 10% national limit.

**MBNA Executive Officers and Directors Have Financial Interests in the Merger that Are Different from, or in Addition to, the Interests of MBNA Stockholders.**

Executive officers of MBNA negotiated the terms of the merger agreement with their counterparts at Bank of America, and MBNA's board of directors approved the merger agreement and unanimously

15

Table of Contents

recommended that MBNA stockholders vote to approve the merger. In considering these facts and the other information contained in this document, you should be aware that MBNA's executive officers and directors have financial interests in the merger that are different from, or in addition to, the interests of MBNA stockholders. For example, certain executive officers have entered into agreements with MBNA that may provide, among other things, non–competition payments and severance and other benefits following the merger. These and some other additional interests of MBNA directors and executive officers may create potential conflicts of interest and cause some of these persons to view the proposed transaction differently than you may view it, as a stockholder. Please see "The Merger—MBNA's Directors and Officers Have Financial Interests in the Merger" for information about these financial interests.

16

## THE MBNA SPECIAL MEETING

This section contains information about the special meeting of MBNA stockholders that has been called to consider and approve the merger.

Together with this document, we are also sending you a notice of the special meeting and a form of proxy that is solicited by the MBNA board of directors. The special meeting will be held on November 3, 2005 at 10:00 a.m., local time, at MBNA's international headquarters located at 1100 North King Street, Wilmington, Delaware.

### Matters to Be Considered

The purpose of the special meeting is to vote on a proposal for approval of the merger.

You also will be asked to vote upon a proposal to approve the adjournment of the special meeting, if necessary, to solicit additional proxies in the event that there are not sufficient votes at the time of the special meeting to approve the merger.

### Proxies

Each copy of this document mailed to holders of MBNA common stock is accompanied by a form of proxy with instructions for voting. If you hold stock in your name as a stockholder of record, you should complete and return the proxy card accompanying this document to ensure that your vote is counted at the special meeting, or at any adjournment or postponement of the special meeting, regardless of whether you plan to attend the special meeting.

If you hold your stock in "street name" through a bank or broker, you must direct your bank or broker to vote in accordance with the instructions you have received from your bank or broker.

If you hold stock in your name as a stockholder of record, you may revoke any proxy at any time before it is voted by signing and returning a proxy card with a later date, delivering a written revocation letter to MBNA's Secretary, or by attending the special meeting in person, notifying the Secretary, and voting by ballot at the special meeting.

Any stockholder entitled to vote in person at the special meeting may vote in person regardless of whether a proxy has been previously given, but the mere presence (without notifying the Secretary) of a stockholder at the special meeting will not constitute revocation of a previously given proxy.

Written notices of revocation and other communications about revoking your proxy should be addressed to:

> MBNA Corporation
> 1100 North King Street
> Wilmington, Delaware 19884
> Attention: Louis J. Freeh
>
>          Secretary

If your shares are held in "street name" by a bank or broker, you should follow the instructions of your bank or broker regarding the revocation of proxies.

All shares represented by valid proxies that we receive through this solicitation, and that are not revoked, will be voted in accordance with your instructions on the proxy card. If you make no specification on your proxy card as to how you want your shares voted before signing and returning it, your proxy will be voted "FOR" approval of the merger and "FOR" approval of the proposal to adjourn the special meeting, if necessary, to solicit additional proxies in the event that there are not sufficient votes at the time of the special meeting to approve the merger. According to the MBNA bylaws, business to be conducted at a special meeting of stockholders may only be brought before the meeting by means of MBNA's notice of the meeting. Accordingly, no matters other than the matters described in this document will be presented for action at the special meeting or at any adjournment or postponement of the special meeting.

MBNA stockholders should **not** send MBNA stock certificates with their proxy cards. After the merger is completed, holders of MBNA common stock will be mailed a transmittal form with instructions

17

Table of Contents

on how to exchange their MBNA stock certificates for Bank of America stock certificates, the cash portion of the merger consideration and cash instead of fractional Bank of America shares, if applicable.

## Solicitation of Proxies

MBNA will bear the entire cost of soliciting proxies from you. In addition to solicitation of proxies by mail, MBNA will request that banks, brokers, and other record holders send proxies and proxy material to the beneficial owners of MBNA common stock and secure their voting instructions. We will reimburse the record holders for their reasonable expenses in taking those actions. We have also made arrangements with Georgeson Shareholder Communications Inc. to assist us in soliciting proxies and have agreed to pay them $25,000 plus reasonable expenses for these services. If necessary, we may use several of our regular employees, who will not be specially compensated, to solicit proxies from MBNA stockholders, either personally or by telephone, facsimile, letter or other electronic means.

## Record Date

The close of business on September 2, 2005 has been fixed as the record date for determining the MBNA stockholders entitled to receive notice of and to vote at the special meeting. At that time, 1,259,681,391 shares of MBNA common stock were outstanding, held by approximately 2,937 holders of record.

## Voting Rights and Vote Required

The presence, in person or by properly executed proxy, of the holders of a majority of the outstanding shares of MBNA common stock entitled to vote is necessary to constitute a quorum at the special meeting. Abstentions will be counted for the purpose of determining whether a quorum is present.

Approval of the merger requires the affirmative vote of the holders of a majority of the outstanding shares of MBNA common stock entitled to vote at the special meeting. You are entitled to one vote for each share of MBNA common stock you held as of the record date. Holders of shares of MBNA preferred stock are not entitled to vote on the merger or otherwise at the special meeting.

Approval of any proposal to adjourn or postpone the meeting, if necessary, for the purpose of soliciting additional proxies may be obtained by the affirmative vote of the holders of a majority of the shares present in person or by proxy, even if less than a quorum. Because approval of such adjournments is based on the affirmative vote of a majority of shares present in person or by proxy, abstentions will have the same effect as a vote against this proposal.

Stockholders will vote at the meeting by ballot. Votes cast at the meeting, in person or by proxy, will be tallied by MBNA's transfer agent.

Because the affirmative vote of the holders of a majority of the outstanding shares of MBNA common stock entitled to vote at the special meeting is needed for us to proceed with the merger, the failure to vote by proxy or in person will have the same effect as a vote against the merger. Abstentions also will have the same effect as a vote against the merger. Accordingly, the MBNA board of directors urges MBNA stockholders to promptly vote by completing, dating, and signing the accompanying proxy card and to return it promptly in the enclosed postage-paid envelope, or, if you hold your stock in "street name" through a bank or broker, by following the voting instructions of your bank or broker.

As of the record date:

• Directors and executive officers of MBNA, and their affiliates, had the right to vote 97,084,854 shares of MBNA common stock, or 7.7% of the outstanding MBNA common stock at that date. We currently expect that each of these individuals will vote their shares of MBNA common stock in favor of the proposals to be presented at the special meeting.

• Directors and executive officers of Bank of America and their affiliates had the right to vote 0 shares of MBNA common stock, or 0% of the outstanding MBNA common stock on that date.

18

Table of Contents

**Recommendation of the MBNA Board of Directors**

The MBNA board of directors has unanimously approved the merger agreement and the transactions it contemplates, including the merger. The MBNA board of directors determined that the merger, merger agreement and the transactions contemplated by the merger agreement are advisable and in the best interests of MBNA and its stockholders and unanimously recommends that you vote "FOR" approval of the merger. See "The Merger—MBNA's Reasons for the Merger; Recommendation of the MBNA Board of Directors" on page 22 for a more detailed discussion of the MBNA board of directors' recommendation.

**Attending the Meeting**

All holders of MBNA common stock, including stockholders of record and stockholders who hold their shares through banks, brokers, nominees or any other holder of record, are invited to attend the special meeting. Stockholders of record can vote in person at the special meeting. If you are not a stockholder of record, you must obtain a proxy executed in your favor, from the record holder of your shares, such as a broker, bank or other nominee, to be able to vote in person at the special meeting. If you plan to attend the special meeting, you must hold your shares in your own name or have a letter from the record holder of your shares confirming your ownership and you must bring a form of personal photo identification with you in order to be admitted. We reserve the right to refuse admittance to anyone without proper proof of share ownership and without proper photo identification.

19

## INFORMATION ABOUT THE COMPANIES

**Bank of America Corporation**

Bank of America Corporation is a Delaware corporation, a bank holding company and a financial holding company under U.S. federal law. Bank of America is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk−management products and services. The company provides unmatched convenience in the United States, serving 33 million consumer relationships with more than 5,800 retail banking offices, more than 16,600 ATMs and award−winning online banking with more than 13 million active users. Bank of America is ranked the No. 1 Small Business Administration (SBA) Lender in the United States by the SBA. The company serves clients in 150 countries and has relationships with 96 percent of the U.S. Fortune 500 companies and 85 percent of the Global Fortune 500. Bank of America Corporation stock (NYSE: BAC) is listed on the New York Stock Exchange. As of June 30, 2005, Bank of America had total consolidated assets of approximately $1.25 trillion, total consolidated deposits of approximately $635 billion and total consolidated stockholders' equity of approximately $101 billion. The principal executive offices of Bank of America are located in the Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina 28255, and its telephone number is (704) 386−5681.

Additional information about Bank of America and its subsidiaries is included in documents incorporated by reference in this document. See "Where You Can Find More Information" on page 64.

**MBNA Corporation**

MBNA Corporation is a Maryland corporation and a bank holding company. It is the largest independent credit card lender in the world and a recognized leader in affinity marketing, and is an international financial services company providing lending, deposit, and credit insurance products and services. MBNA credit cards and related products and services are endorsed by more than 5,000 organizations world−wide. MBNA Corporation stock (NYSE: KRB) is listed on the New York Stock Exchange. As of June 30, 2005, MBNA had total consolidated assets of approximately $63.0 billion, including total consolidated loan receivables of $32.3 billion, and total consolidated stockholders' equity of approximately $12.8 billion. The principal executive offices of MBNA are located at 1100 North King Street, Wilmington, Delaware 19884, and its telephone number is (800) 362−6255.

Additional information about MBNA and its subsidiaries is included in documents incorporated by reference in this document. See "Where You Can Find More Information" on page 64.

20

Table of Contents

## THE MERGER

**Background of the Merger**

The MBNA Board of Directors has periodically met with MBNA management to discuss potential strategic directions for the company in light of the company's financial performance and market, economic, competitive, regulatory and other conditions and developments. These meetings have included a review of the company's business and the key issues and challenges faced by it, and possible strategic directions available to MBNA and the potential impact on stockholder value, including, from time to time, hypothetical acquisitions or business combinations involving various other financial institutions.

As part of its operations, Bank of America also regularly evaluates the potential acquisition of and holds discussions with various financial institutions and other businesses of a type eligible for financial holding company ownership or control.

In early June 2005, the MBNA board of directors met with MBNA management and the company's outside advisors, including representatives of UBS and Wachtell, Lipton, Rosen & Katz, to discuss MBNA's recent financial performance and prospects, consolidation activity in the credit card industry and the general environment, long−term trends and other developments in the markets in which MBNA conducts business. Possible strategic alternatives were summarized, including hypothetical scenarios involving a business combination. During the meeting, several major financial institutions were discussed as potential partners. At the meeting, the MBNA board of directors determined that a possible strategic combination could have benefits for MBNA and its stockholders if a partner were willing to reach an appropriate level of consideration to MBNA stockholders, and requested that MBNA management and representatives commence a confidential process to contact up to a small number of the most promising potential partners to determine their level of interest in a possible transaction with MBNA.

In mid−June 2005, representatives of MBNA contacted a major financial institution identified at the MBNA board meeting as potentially having the greatest interest in a possible transaction. Thereafter, discussions were held between MBNA management and representatives and the management of this financial institution. As a result of these discussions, MBNA management concluded that it was not likely that a transaction could be negotiated with this financial institution at a level of consideration that would be satisfactory to MBNA. Members of the MBNA board were apprised of the status of discussions. During the week of June 20, representatives of MBNA contacted the management of Bank of America to gauge the level of Bank of America's interest in a possible transaction with MBNA at ranges of consideration that were more likely to be satisfactory to the MBNA board of directors.

Initial discussions between Mr. Hammonds and Mr. Lewis and other members of MBNA and Bank of America management were viewed as constructive by MBNA management and resulted in Bank of America indicating that, subject to confirmatory due diligence, it would be willing to proceed based on consideration in the range of $27.50 per MBNA share. MBNA and Bank of America entered into a confidentiality agreement and, late in the week of June 20, commenced due diligence discussions and investigations. Due diligence continued over the next several days along with further discussions of the financial and other terms of a possible transaction. Early in the week of June 27, 2005, counsel to MBNA and Bank of America began discussing the terms of a potential definitive merger agreement and exchanged draft agreements. During the next several days, the final exchange ratio of 0.5009 and cash consideration amount of $4.125, as well as the terms of the merger agreement and option agreement, were negotiated and the parties continued to discuss various due diligence and business integration issues. The executive committee of the Bank of America board of directors held a special meeting on June 28, 2005 to review and discuss the potential transaction and its proposed terms.

On June 29, 2005, the Bank of America board of directors held a special meeting at which members of Bank of America senior management made various presentations about, and the board discussed, the potential strategic combination with MBNA and the proposed terms of the merger. At this meeting, the Bank of America board approved the merger agreement, the stock option agreement and the transactions contemplated by the merger agreement.

The MBNA board of directors met again in the afternoon of June 29, 2005. Mr. Hammonds summarized for the board of directors the events that had occurred since the last board meeting and the discussions with Bank of America and the other financial institution. Senior management of MBNA

Table of Contents

discussed Bank of America and described the proposed transaction with Bank of America in light of the Board's earlier discussions of MBNA's strategic alternatives, and also described the due diligence process between the two institutions and summarized the results of MBNA's due diligence on Bank of America. Following discussion among, and questions by, members of the MBNA board and the others present, MBNA's financial advisor, UBS, reviewed with the MBNA board of directors its financial analysis of the merger consideration, as more fully described below under the heading "—Opinion of MBNA's Financial Advisor," and rendered to the MBNA board of directors its opinion to the effect that, as of that date and based on and subject to various assumptions, matters considered and limitations described in the opinion, the merger consideration was fair, from a financial point of view, to the holders of MBNA common stock. The board also met with Mr. Lewis, Chief Executive Officer of Bank of America. MBNA's counsel, Wachtell, Lipton, Rosen & Katz, then discussed with the MBNA board of directors the legal principles and standards applicable to its consideration of the proposed merger, described the material terms of the merger and stock option agreements and discussed the projected timetable for the transaction, including the principal regulatory approvals that would be required. Following further discussion and questions to MBNA management and advisors, the MBNA board of directors unanimously approved and adopted the merger agreement and the stock option agreement.

Following approval by the MBNA board, the parties continued to work to finalize the last details of, and make final corrections to, the definitive agreements and disclosure schedules. The proposed merger was jointly announced by Bank of America and MBNA on the morning of June 30, 2005, prior to the opening of U.S. financial markets.

**MBNA's Reasons for the Merger; Recommendation of the MBNA Board of Directors**

The MBNA board of directors consulted with MBNA management, as well as its legal and financial advisors, in its evaluation of the merger. In reaching its conclusion to approve the merger agreement and in determining that the merger is in the best interests of MBNA and its stockholders, the MBNA board considered a number of factors, including the following:

- its understanding of MBNA's business, operations, financial condition, earnings, prospects and likely strategic alternatives, and of Bank of America's business, operations, financial condition, earnings and prospects;

- the current and prospective environment in which MBNA and Bank of America operate, including national and local economic conditions, the competitive environment for financial institutions generally, the trend toward consolidation in the financial services industry generally and the consumer finance and credit card industries in particular, and the potential effects of these factors on MBNA;

- the financial and other terms of the merger agreement;

- the value to MBNA stockholders represented by the merger consideration, including the fact that, based on the closing price of Bank of America common stock on June 28, 2005, the value of the per share merger consideration to be received by MBNA stockholders in the merger represented a premium of approximately 29% over the closing price of MBNA common stock on the NYSE on June 28, 2005;

- the reports to MBNA's board of directors concerning the operations, financial condition and prospects of Bank of America and the expected financial impact of the merger on the combined company, including pro forma assets, earnings, deposits and regulatory capital ratios;

- the potential cost saving opportunities, currently estimated to be approximately $850 million after–tax per year when fully phased in after the merger;

- the fact that the complementary nature of the respective businesses, customer bases, products and skills of MBNA and Bank of America are expected to result in opportunities to obtain further synergies as funding sources are optimized and MBNA marketing expertise is applied to a broader range of products and Bank of America's branch network is leveraged to distribute MBNA products;

- the market position of the combined company, including that it would become the largest general purpose card issuer in the United States, measured by receivables with approximately $143 billion

22