Table of Contents

in managed assets outstanding and 40 million active accounts, and the number one issuer worldwide of Visa/Mastercard credit, debit and prepaid cards, based on total volume;

- the scale, scope, strength and diversity of operations, product lines and delivery systems that could be achieved by combining MBNA and Bank of America;

- the proposed board and management arrangements of the combined company, including the fact that Frank P. Bramble, Sr., who was until December 2004 a Vice Chairman of MBNA and who currently serves as Senior Advisor to the Chief Executive Officer of MBNA, will join the Bank of America board of directors upon completion of the merger and that Mr. Hammonds will be CEO and President of Bank of America Card Services after the merger;

- the likelihood that the regulatory approvals needed to complete the transaction will be obtained;

- the MBNA board's understanding of Bank of America's prior track record and expertise in successfully integrating substantial acquisitions;

- the historical and current market prices of Bank of America common stock and MBNA common stock as well as comparative valuation analyses for the two companies;

- the financial presentation of UBS, including UBS' opinion dated June 29, 2005, to the MBNA board of directors as to the fairness, from a financial point of view and as of the date of the opinion and subject to the matters described in the opinion, of the merger consideration. See "—Opinion of MBNA's Financial Advisor";

- the terms of the stock option agreement and related provisions of the merger agreement, including provisions limiting the circumstances under which MBNA could discuss potential alternative transactions with third parties, requiring MBNA to present the merger to MBNA stockholders regardless of whether the MBNA board of directors continues to recommend the merger and giving Bank of America the right to terminate the merger agreement if the MBNA board of directors recommends another transaction or modifies its recommendation of the merger in a manner adverse to Bank of America;

- the expected tax treatment of the merger and of the receipt by MBNA stockholders of the merger consideration;

- the potential impact of the transaction on MBNA employees and other key constituencies; and

- the fact that MBNA directors and executive officers have interests in the merger that are in addition to their interests as MBNA stockholders. See "—MBNA's Directors and Officers Have Financial Interests in the Merger" on page 33.

The MBNA board of directors also considered potential risks associated with the merger in connection with its deliberations of the proposed transaction, including the possibility that the stock option agreement and portions of the merger agreement could have the effect of discouraging other parties potentially interested in a transaction with MBNA from proposing a transaction; the challenges of integrating MBNA's businesses, operations and workforce with those of Bank of America; the need to obtain MBNA stockholder and regulatory approvals in order to complete the transaction; the risks associated with achieving the anticipated cost savings and other synergies; and possible customer, partner and other relationship attrition, and resultant possible revenue loss, relating to various aspects of MBNA's business, including its card marketing agreements and particularly those with other financial institutions that might regard Bank of America as a significant competitor. The MBNA board of directors considered all these factors as a whole, and overall considered them on balance to be favorable to, and to support, its determination.

The foregoing discussion of the information and factors considered by the MBNA board of directors is not exhaustive, but includes the material factors considered by the MBNA board of directors. In view of the wide variety of factors considered by the MBNA board of directors in connection with its evaluation of the merger and the complexity of these matters, the MBNA board of directors did not consider it practical to, nor did it attempt to, quantify, rank or otherwise assign relative weights to the specific factors that it considered in reaching its decision. The MBNA board of directors evaluated the factors described above, including by asking questions of MBNA management and MBNA legal and financial advisors, and reached consensus that the merger was in the best interests of MBNA and MBNA stockholders. In

23

Table of Contents

considering the factors described above, individual members of the MBNA board of directors may have given different weights to different factors.

**The MBNA board of directors determined that the merger, the merger agreement and the transactions contemplated by the merger agreement are in the best interests of MBNA and its stockholders. Accordingly, the MBNA board of directors unanimously approved the merger and the merger agreement and unanimously recommends that MBNA stockholders vote "FOR" approval of the merger.**

**Opinion of MBNA's Financial Advisor**

On June 29, 2005, at a meeting of MBNA's board of directors held to approve the proposed merger, UBS delivered to MBNA's board an oral opinion, confirmed by delivery of a written opinion dated June 29, 2005, to the effect that, as of that date and based on and subject to various assumptions, matters considered and limitations described in its opinion, the merger consideration was fair, from a financial point of view, to the holders of MBNA common stock.

The full text of UBS' opinion describes the assumptions made, procedures followed, matters considered and limitations on the review undertaken by UBS. This opinion is attached as Appendix C and is incorporated into this document by reference. **UBS' opinion relates solely to the fairness, from a financial point of view, of the merger consideration and does not address any other terms or aspects of the merger. The opinion does not address the relative merits of the merger as compared to other business strategies or transactions that might be available with respect to MBNA or the underlying business decision of MBNA to effect the merger. The opinion does not constitute a recommendation to any stockholder as to how such stockholder should vote or act with respect to any matters relating to the merger. Holders of MBNA common stock are encouraged to read the opinion carefully in its entirety.** The following summary of UBS' opinion is qualified in its entirety by reference to the full text of its opinion.

In arriving at its opinion, UBS:

- reviewed publicly available business and historical financial information relating to MBNA and Bank of America, including publicly available financial forecasts and estimates relating to Bank of America that were reviewed and discussed with UBS by Bank of America's management;

- reviewed internal financial information and other data relating to the businesses and financial prospects of MBNA that were provided to UBS by the management of MBNA and not publicly available, including financial forecasts and estimates relating to MBNA prepared by MBNA management;

- conducted discussions with members of the senior managements of MBNA and Bank of America concerning the businesses and financial prospects of MBNA and Bank of America;

- reviewed current and historical market prices of MBNA common stock and Bank of America common stock;

- reviewed publicly available financial and stock market data with respect to companies in lines of business which UBS believed to be generally comparable to those of MBNA and Bank of America;

- compared the financial terms of the merger with publicly available financial terms of other transactions which UBS believed to be generally relevant;

- reviewed estimates prepared by the managements of MBNA and Bank of America as to the potential cost savings, revenue enhancements and other synergies anticipated to result from the merger;

- reviewed the potential pro forma financial effect of the merger, including potential cost savings, revenue enhancements and other synergies, on the estimated earnings per share of Bank of America based on financial forecasts and estimates prepared by MBNA's management and publicly available financial forecasts and estimates relating to Bank of America that were reviewed and discussed with UBS by Bank of America's management;

- reviewed a draft dated June 29, 2005 of the merger agreement; and

24

Table of Contents

• conducted other financial studies, analyses and investigations, and considered other information, as UBS deemed necessary or appropriate.

In connection with its review, with MBNA's consent, UBS did not assume any responsibility for independent verification of any of the information provided to or reviewed by UBS for the purpose of its opinion and, with MBNA's consent, relied on that information being complete and accurate in all material respects. In addition, at MBNA's direction, UBS did not make any independent evaluation or appraisal of any of the assets or liabilities, contingent or otherwise, of MBNA or Bank of America, and was not furnished with any evaluation or appraisal. With respect to the publicly available financial forecasts and estimates relating to Bank of America referred to above, UBS was advised by Bank of America's management and UBS assumed, with MBNA's consent, that they represented reasonable estimates and judgments as to the future financial performance of Bank of America. With respect to internal financial forecasts and estimates, pro forma effects and calculation of cost savings, revenue enhancements and other synergies referred to above, UBS assumed, at MBNA's direction, that they were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of MBNA as to the future financial performance of MBNA, and of the management of Bank of America, with respect to cost savings, revenue enhancements and other synergies and other matters covered thereby. In addition, UBS assumed that the future financial results and potential cost savings, revenue enhancements and other synergies reflected in such forecasts and estimates would be achieved at the times and in the amounts projected. UBS' opinion was necessarily based on economic, monetary, market and other conditions as in effect on, and information made available to UBS as of, the date of its opinion.

UBS expressed no opinion as to what the value of Bank of America common stock would be when issued in the merger or the prices at which Bank of America common stock or MBNA common stock would trade at any time. In rendering its opinion, UBS assumed, with MBNA's consent, that the merger would qualify for federal income tax purposes as a reorganization within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended, which we refer to as the Code. UBS also assumed, with MBNA's consent, that each of MBNA and Bank of America would comply with all material terms of the merger agreement and that the merger would be consummated in accordance with its terms without waiver, modification or amendment of any material term, condition or agreement. UBS further assumed, with MBNA's consent, that all governmental, regulatory or other consents and approvals necessary for the consummation of the merger would be obtained without any material adverse effect on MBNA, Bank of America or the contemplated benefits of the merger. In addition, UBS assumed, with MBNA's consent, that the final executed form of the merger agreement would not differ in any material respect from the draft of the merger agreement that UBS reviewed. MBNA imposed no other instructions or limitations on UBS with respect to the investigations made or the procedures followed by UBS in rendering its opinion.

In connection with rendering its opinion to MBNA's board of directors, UBS performed a variety of financial and comparative analyses which are summarized below. The following summary is not a complete description of all analyses performed and factors considered by UBS in connection with its opinion. The preparation of a financial opinion is a complex process involving subjective judgments and is not necessarily susceptible to partial analysis or summary description. With respect to the selected public companies analyses and the selected precedent transactions analysis summarized below, no company or transaction used as a comparison is identical to MBNA, Bank of America or the merger. These analyses necessarily involve complex considerations and judgments concerning financial and operating characteristics and other factors that could affect the public trading or acquisition values of the companies concerned.

UBS believes that its analyses and the summary below must be considered as a whole and that selecting portions of its analyses and factors or focusing on information presented in tabular format, without considering all analyses and factors or the narrative description of the analyses, could create a misleading or incomplete view of the processes underlying UBS' analyses and opinion. None of the analyses performed by UBS was assigned greater significance or reliance by UBS than any other. UBS arrived at its ultimate opinion based on the results of all analyses undertaken by it and assessed as a whole. UBS did not draw, in isolation, conclusions from or with regard to any one factor or method of analysis for purposes of its opinion.

The estimates of the future performance of MBNA and Bank of America in or underlying UBS' analyses are not necessarily indicative of future results or values, which may be significantly more or less favorable than those estimates. In performing its analyses, UBS considered industry performance, general

Table of Contents

business and economic conditions and other matters, many of which are beyond the control of MBNA and Bank of America. Estimates of the financial value of companies do not necessarily purport to be appraisals or reflect the prices at which companies actually may be sold.

The merger consideration was determined through negotiation between MBNA and Bank of America. UBS' opinion and financial analyses were only one of a number of factors considered by MBNA's board in its evaluation of the merger and should not by itself be viewed as determinative of the views of MBNA's board of directors with respect to the merger.

The following is a brief summary of the material financial analyses performed by UBS and reviewed with MBNA's board of directors in connection with its opinion relating to the proposed merger. **The financial analyses summarized below include information presented in tabular format. In order to fully understand UBS' financial analyses, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses. Considering the data below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of UBS' financial analyses.**

### MBNA Financial Analyses

*Selected Public Companies Analysis.* UBS compared selected financial and stock market data of MBNA with corresponding data of the following seven publicly traded companies in the banking and financial services industry:

- American Express Company
- Bank of America
- Capital One Financial Corporation
- Citigroup Inc.
- JPMorgan Chase & Co.
- U.S. Bancorp
- Wells Fargo & Company

UBS reviewed closing stock prices as multiples of calendar years 2005 and 2006 estimated earnings per share, commonly referred to as EPS, and book value per share and tangible book value per share as of March 31, 2005. UBS then compared these multiples derived from the selected companies with corresponding multiples implied for MBNA based both on the closing price of MBNA common stock on June 28, 2005 and the implied per share value of the merger consideration utilizing, for the stock portion of the merger consideration, the closing price of Bank of America common stock on June 28, 2005. Multiples for the selected companies were based on closing stock prices on June 28, 2005. Financial data for the selected companies were based on I/B/E/S median EPS estimates, public filings and other publicly available information. Financial data for MBNA were based on internal estimates of MBNA's management, public filings and other publicly available information. This analysis indicated the following implied high, median and low multiples for the selected companies, as compared to corresponding multiples implied for MBNA:

| Closing Stock Price as Multiples of: | Implied Multiples for Selected Companies | | | Implied Multiples for MBNA Based on Closing Stock Price on 6/28/05 | Implied Multiples for MBNA Based on Merger Consideration |
|---|---|---|---|---|---|
| | High | Median | Low | | |
| EPS | | | | | |
|    Calendar year 2005 | 17.2x | 12.1x | 10.8x | 11.2x | 14.4x |
|    Calendar year 2006 | 15.2x | 10.5x | 9.6x | 10.4x | 13.4x |
| Book Value | 4.17x | 2.24x | 1.21x | 2.14x | 2.76x |
| Tangible Book Value | 4.97x | 3.83x | 2.17x | 2.96x | 3.83x |

Table of Contents

*Selected Precedent Transactions Analysis.* UBS reviewed transaction value multiples in the following five selected transactions involving companies in the specialty financial services industry with transaction values of over $5 billion announced since January 1, 2000:

| Acquiror | Target |
|---|---|
| • Washington Mutual, Inc. | • Providian Financial Corporation |
| • HSBC Holdings plc | • Household International, Inc. |
| • General Electric Capital Corporation | • Heller Financial, Inc. |
| • Tyco International Ltd. | • CIT Group, Inc. |
| • Citigroup Inc. | • Associates First Capital Corporation |

UBS reviewed purchase prices in the selected transactions as multiples of the target companies' next 12 months EPS and book value per share and tangible book value per share as of the most recent completed accounting period prior to public announcement of the relevant transaction. UBS also reviewed the premiums paid over tangible book value as a percentage of managed receivables as of the most recent completed accounting period prior to public announcement of the relevant transaction. UBS then compared these multiples and premium percentages derived from the selected transactions with corresponding multiples and premium percentages implied in the merger for MBNA based on the implied value of the merger consideration utilizing, for the stock portion of the merger consideration, the closing price of Bank of America common stock on June 28, 2005. Multiples for the selected transactions were based on I/B/E/S median EPS estimates, public filings and other publicly available information at the time of announcement of the relevant transaction. Financial data for MBNA were based on internal estimates of MBNA's management, public filings and other publicly available information. This analysis indicated the following implied high, median and low multiples for the selected transactions, as compared to corresponding multiples implied for MBNA:

| Transaction Value as Multiples of: | Implied Multiples for Selected Transactions | | | Implied Multiples for MBNA Based on Merger Consideration |
|---|---|---|---|---|
| | High | Median | Low | |
| EPS | | | | |
|     Next 12 Months | 17.1x | 13.9x | 6.5x | 14.2x |
| Book Value | 3.01x | 1.93x | 1.53x | 2.76x |
| Tangible Book Value | 6.77x | 2.27x | 1.93x | 3.83x |
| **Premium over Tangible Book Value as Percentage of:** | | | | |
| Managed Receivables | 28.5% | 17.2% | 6.8% | 22.4% |

*Discounted Cash Flow Analysis.* UBS performed a discounted cash flow analysis of MBNA to calculate the estimated present value of the standalone cash flows that MBNA could generate over calendar years 2006 through 2010. Estimated financial data for MBNA were based on internal EPS and net income estimates of MBNA's management for calendar years 2005 and 2006 and the assumptions described below. UBS calculated a range of terminal values by applying forward net income terminal value multiples of 10.0x to 12.0x to MBNA's calendar year 2011 estimated net income. The cash flows and terminal values were then discounted to present value using discount rates ranging from 13.0% to 15.0%. For purposes of this analysis, UBS utilized the following assumptions provided to UBS by MBNA's management: a long−term EPS growth rate of 10% per annum for calendar years 2007 through 2011, a managed asset growth rate of 9.4% per annum for calendar years 2005 to 2006, decreased to 8.0% per annum thereafter, and a target tangible common equity/tangible managed assets ratio of 7.0%. This analysis indicated an implied per share equity reference range for MBNA of $20.31 to $25.48, as compared to the $27.50 per share equity value implied for MBNA in the merger based on the merger consideration utilizing, for the stock portion of the merger consideration, the closing price of Bank of America common stock on June 28, 2005.

27

Table of Contents

### Bank of America Financial Analyses

*Selected Public Companies Analysis.* UBS compared selected financial and stock market data of Bank of America with corresponding data of the following six publicly traded companies in the banking and financial services industry:

- Citigroup Inc.
- HSBC Holdings plc
- JPMorgan Chase & Co.
- U.S. Bancorp
- Wachovia Corporation
- Wells Fargo & Company

UBS reviewed closing stock prices as multiples of calendar years 2005 and 2006 estimated EPS and book value per share and tangible book value per share as of March 31, 2005. UBS then compared these multiples derived from the selected companies with corresponding multiples implied for Bank of America based on the closing price of Bank of America common stock on June 28, 2005. Multiples for the selected companies and Bank of America were based on closing stock prices on June 28, 2005. Financial data for the selected companies and Bank of America were based on I/B/E/S median EPS estimates, public filings and other publicly available information. This analysis indicated the following implied high, median and low multiples for the selected companies, as compared to corresponding multiples implied for Bank of America:

| Closing Stock Price as Multiples of: | Implied Multiples for Selected Companies | | | Implied Multiples for Bank of America Based on Closing Stock Price on 6/28/05 |
|---|---|---|---|---|
| | **High** | **Median** | **Low** | |
| EPS | | | | |
|    Calendar year 2005 | 13.5x | 12.1x | 11.2x | 11.0x |
|    Calendar year 2006 | 12.1x | 10.8x | 10.2x | 10.5x |
| Book Value | 2.81x | 2.16x | 1.21x | 1.92x |
| Tangible Book Value | 4.75x | 3.55x | 2.42x | 3.83x |

*Discounted Cash Flow Analysis.* UBS performed a discounted cash flow analysis of Bank of America to calculate the estimated present value of the standalone cash flows that Bank of America could generate over calendar years 2006 through 2010. Estimated financial data for Bank of America were based on I/B/E/S mean EPS and net income estimates for Bank of America for calendar years 2005 and 2006, the I/B/E/S mean long−term EPS growth rate for Bank of America of 9.2% per annum, assuming an EPS growth of 2.0% per annum generated through capital management activities, for subsequent calendar years and the other assumptions described below. UBS calculated a range of terminal values by applying forward net income terminal value multiples of 10.0x to 12.0x to Bank of America's calendar year 2011 estimated net income. The cash flows and terminal values were then discounted to present value using discount rates ranging from 9.0% to 11.0%. For purposes of this analysis, UBS utilized the following assumptions as discussed with and confirmed as reasonable by Bank of America's management: an asset growth rate of 5.0% per annum and a target tangible common equity/tangible assets ratio of 4.25%. This analysis indicated an implied per share equity reference range for Bank of America of $50.07 to $62.06, as compared to the closing price of Bank of America common stock on June 28, 2005 of $46.67.

### Pro Forma Merger Analysis

UBS analyzed the potential pro forma financial effect of the merger on Bank of America's estimated EPS for calendar years 2006 and 2007 after giving effect to potential cost savings, revenue enhancements and other synergies anticipated by the managements of MBNA and Bank of America to result from the merger and assuming, for purposes of such analysis, that 85% of the total merger consideration would be payable in shares of Bank of America common stock. Estimated standalone data for Bank of America were based on I/B/E/S mean EPS estimates for Bank of America for calendar years 2005 and 2006 and the I/B/E/S mean long−term EPS growth rate for Bank of America of 9.2% per annum. Estimated

28

Table of Contents

standalone data for MBNA were based on internal EPS and net income estimates of MBNA's management for calendar years 2005 and 2006 and an estimated long–term EPS growth rate of 10.0% per annum provided to UBS by MBNA's management. For purposes of this analysis, UBS utilized the following assumptions as discussed with and confirmed as reasonable by Bank of America's management:

- a closing date for the merger of December 31, 2005;

- purchased credit card receivables equal to 5.0% of managed credit card receivables and a core deposit intangible equal to 2.0% of non–time deposits, each amortized over a 10–year period on a sum–of–the–years basis;

- a pre–tax cost of funding rate of 5.0% to fund the aggregate cash portion of the merger consideration and incremental dividends and 2.5% to fund incremental share repurchases of 16,000,000 and 35,000,000 shares of Bank of America common stock in calendar years 2006 and 2007, respectively; and

- a pre–tax restructuring charge of $2.0 billion.

Based on the merger consideration and the closing price of Bank of America common stock on June 28, 2005, this analysis suggested that the merger could be dilutive to Bank of America's estimated EPS in calendar year 2006 and accretive to Bank of America's estimated EPS in calendar year 2007.

UBS also separately analyzed the potential pro forma financial effect of the merger relative to MBNA's standalone estimated EPS for calendar years 2006 and 2007 based on internal estimates of MBNA's management and utilizing the same assumptions as described above but assuming, for purposes of such analysis, that 100% of the total merger consideration would be payable in shares of Bank of America common stock. This analysis suggested that the merger could be accretive relative to MBNA's standalone estimated EPS in calendar years 2006 and 2007.

The actual results achieved by the combined company may vary from projected results and the variations may be material.

### Other Factors

In rendering its opinion, UBS also reviewed and considered other factors, including:

- forward 12 months EPS multiples for Bank of America and the selected companies referred to under "—Bank of America Financial Analyses—Selected Public Companies Analysis" over the three–year period ended June 28, 2005;

- the premiums implied for MBNA in the merger based on the merger consideration relative to the closing price of MBNA common stock on June 28, 2005, the high and low closing prices of MBNA common stock over the 52–week period ended June 28, 2005, and MBNA's managed receivables as of March 31, 2005;

- the aggregate premium implied for MBNA in the merger, based on the merger consideration relative to the closing price of MBNA common stock on June 28, 2005, as a percentage of the present value of the cost savings, revenue enhancements and other synergies anticipated by the managements of MBNA and Bank of America to result from the merger;

- the total returns on Bank of America common stock over the one–year, three–year and five–year periods ended June 28, 2005 as compared to corresponding average returns for the selected companies referred to under "—Bank of America Financial Analyses—Selected Public Companies Analysis," the Standard and Poor's 500 Stock Price Index and the BKX banking sector stock index; and

- publicly available research analysts' share price targets for MBNA.

### Miscellaneous

Under the terms of its engagement, MBNA has agreed to pay UBS for its financial advisory services in connection with the merger an aggregate fee equal to 0.11% of the total value of the merger consideration, a portion of which was payable in connection with the opinion and a significant portion of which is contingent upon the consummation of the merger. In addition, MBNA has agreed to reimburse UBS for its expenses, including fees, disbursements and other reasonable charges of counsel, and to

Table of Contents

indemnify UBS and related parties against liabilities, including liabilities under federal securities laws, relating to, or arising out of, its engagement. UBS and its affiliates in the past have provided services to MBNA and Bank of America unrelated to the proposed merger, for which services UBS and its affiliates have received compensation, including having participated in bank financings for MBNA and various equity and debt financings for Bank of America. An affiliate of UBS is currently a lender under an existing credit facility of MBNA, for which services such affiliate has received and will receive compensation. In the ordinary course of business, UBS, its successors and affiliates may hold or trade, for their own accounts and accounts of customers, securities of MBNA and Bank of America and, accordingly, may at any time hold a long or short position in such securities.

MBNA selected UBS as its financial advisor in connection with the merger because UBS is an internationally recognized investment banking firm with substantial experience in similar transactions and is familiar with MBNA and its business. UBS is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, leveraged buyouts, negotiated underwritings, competitive bids, secondary distributions of listed and unlisted securities and private placements.

**Bank of America's Reasons for the Merger**

Bank of America's reasons for entering into the merger agreement include:

- Bank of America's understanding of the current environment in the financial services business, including the current outlook for the credit card industry;
- the quality of MBNA's business, customer relationships and assets;
- the unique opportunity presented to combine MBNA's existing market position in the credit card industry, its substantial base of affinity relationships and its marketing expertise with Bank of America's national branch and ATM network, strong market presence and wide product array;
- the opportunity to enhance Bank of America's strong position in the United States financial services industry and to expand its presence in key markets outside of the United States; and
- the expected impact of the acquisition of MBNA on the diversity of Bank of America's earnings mix.

**Board of Directors and Management of Bank of America Following Completion of the Merger**

Upon completion of the merger, Mr. Hammonds, CEO and President of MBNA, will become CEO and President of Bank of America Card Services, reporting to Liam E. McGee, President of Bank of America Global Consumer and Small Business Banking. Mr. Hammonds will join Bank of America's Risk & Capital Committee, which guides the company's strategic direction. Frank P. Bramble, Sr., until December 2004 a Vice Chairman of MBNA and currently serving as Senior Advisor to the Chief Executive Officer of MBNA, will join the Bank of America board of directors upon completion of the merger.

Mr. Bramble, age 57, served as Vice Chairman of MBNA from May 2002 to December 2004. From April 1994 to May 2002, Mr. Bramble was a director of Allfirst Financial, Inc. and Allfirst Bank, and from December 1999 to May 2002, he also was Chairman of the Board. From April 1999 to December 1999, he was the Chairman of the Board and the Chief Executive Officer of the same two companies. From November 1998 until May 2002, Mr. Bramble was the Chief Executive, USA, and a director of Allied Irish Banks, p.l.c., the parent of Allfirst Financial, Inc. Mr. Bramble is currently a member of the board of directors of Constellation Energy Group, Inc.

Information about the current Bank of America directors and executive officers can be found in Bank of America's proxy statement dated March 28, 2005. Information about the current MBNA directors and executive officers can be found in MBNA's proxy statement dated March 15, 2005. Bank of America's and MBNA's Annual Reports on Form 10–K for the year ended December 31, 2004 are incorporated by reference in this document. See "Where You Can Find More Information" on page 64.

For more information see "—MBNA's Directors and Officers Have Financial Interests in the Merger" on page 33.

30

Case 1:05-cv-00327-GMS   Document 41-3   Filed 01/20/2006   Page 9 of 23

Table of Contents

**Public Trading Markets**

Bank of America common stock trades on the NYSE and on the Pacific Exchange under the symbol "BAC." Bank of America common stock is also listed on the London Stock Exchange, and certain shares are listed on the Tokyo Stock Exchange. MBNA common stock trades on the NYSE under the symbol "KRB." Upon completion of the merger, MBNA common stock will be delisted from the NYSE and deregistered under the Securities Exchange Act of 1934, as amended. The newly issued Bank of America common stock issuable pursuant to the merger agreement will be listed on the NYSE.

The shares of Bank of America common stock to be issued in connection with the merger will be freely transferable under the Securities Act of 1933, as amended, which we refer to as the Securities Act, except for shares issued to any stockholder who may be deemed to be an affiliate of MBNA, as discussed in "The Merger Agreement—Resales of Bank of America Stock by Affiliates" on page 46.

**Bank of America's Dividend Policy**

Bank of America currently pays a quarterly dividend of $0.50 per share. The Bank of America board of directors may change this dividend policy at any time, and the payment of dividends by financial holding companies is generally subject to legal and regulatory limitations.

**MBNA Stockholders Do Not Have Dissenters' Appraisal Rights in the Merger**

Appraisal rights are statutory rights that enable stockholders to dissent from an extraordinary transaction, such as a merger, and to demand that the corporation pay the fair value for their shares as determined by a court in a judicial proceeding instead of receiving the consideration offered to stockholders in connection with the extraordinary transaction. Appraisal rights are not available in all circumstances, and exceptions to these rights are provided under the Maryland General Corporation Law. As a result of one of these exceptions, the holders of MBNA common stock are not entitled to appraisal rights in the merger.

**Regulatory Approvals Required for the Merger**

We have agreed to use our reasonable best efforts to obtain all regulatory approvals required to complete the transactions contemplated by the merger agreement. These approvals include approval from the Federal Reserve Board, the Delaware State Bank Commissioner, the U.K. Financial Services Authority, the Canadian Office of the Superintendent of Financial Institutions and various other federal, state and foreign regulatory authorities. Bank of America and MBNA have completed, or will complete, the filing of applications and notifications to obtain the required regulatory approvals.

*Federal Reserve Board.* The merger is subject to approval by the Federal Reserve Board pursuant to Section 3 of the Bank Holding Company Act of 1956. On July 25, 2005, Bank of America filed the required application with the Federal Reserve Board for approval of the merger.

The Federal Reserve Board is prohibited from approving any transaction under the applicable statutes that (1) would result in a monopoly, (2) would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or (3) may have the effect in any section of the United States of substantially lessening competition, tending to create a monopoly or resulting in a restraint of trade, unless the Federal Reserve Board finds that the anti–competitive effects of the transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the communities to be served. The Federal Reserve Board may not approve an interstate acquisition without regard to state law if the applicant controls, or after completion of the acquisition the combined entity would control, more than 10 percent of the total deposits of insured depository institutions in the United States.

In addition, in reviewing a transaction under the applicable statutes, the Federal Reserve Board will consider the financial and managerial resources of the companies and their subsidiary banks and the convenience and needs of the community to be served as well as the companies' effectiveness in combating money–laundering activities. In connection with its review, the Federal Reserve Board will provide an opportunity for public comment on the application for the merger, and is authorized to hold a public meeting or other proceeding if it determines that would be appropriate.

Table of Contents

Under the Community Reinvestment Act of 1977, which we refer to as the CRA, the Federal Reserve Board must take into account the record of performance of each of Bank of America and MBNA in meeting the credit needs of the entire communities, including low– and moderate–income neighborhoods, served by the company and its subsidiaries. Each of Bank of America's and MBNA's principal depository institution has received an "outstanding" CRA rating from the United States Office of the Comptroller of the Currency, and its other depository institutions have received either an outstanding or satisfactory CRA rating.

Bank of America's right to exercise its option under the stock option agreement is also subject to the prior approval of the Federal Reserve Board, to the extent that the exercise of Bank of America's option under the stock option agreement would result in Bank of America owning more than 5% of the outstanding shares of MBNA common stock. In considering whether to approve Bank of America's right to exercise its option, including its right to purchase more than 5% of the outstanding shares of MBNA common stock, the Federal Reserve Board would generally apply the same statutory criteria it will apply to its consideration of the merger.

*Other Requisite Approvals, Notices and Consents.* The merger is also subject to the prior approval of the Delaware State Bank Commissioner. Applications or notifications may also be required to be filed with various other regulatory authorities in connection with the merger.

*Certain Foreign Approvals.* Approvals also will be required from, and notices must be submitted to, foreign bank, securities and competition regulatory authorities in connection with the merger and the change in ownership of certain businesses that are controlled by MBNA abroad. For example, Bank of America is required to obtain the prior approval of the Canadian Office of the Superintendent of Financial Institutions and the United Kingdom Financial Services Authority in connection with the merger. Approval must also be obtained from the Canadian antitrust authorities, and a filing will be made with the United Kingdom antitrust authorities. Bank of America and MBNA have filed, or will shortly file, all applications and notices required to be submitted to obtain these approvals and any other required approvals and provide these notices as well as any others that may be required to complete the merger.

*Antitrust Considerations.* At any time before or after the acquisition is completed, the Antitrust Division of the United States Department of Justice or the United States Federal Trade Commission, which we refer to as the Antitrust Division and the FTC, respectively, could take action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the acquisition or seeking divestiture of substantial assets of Bank of America or MBNA or their subsidiaries. Private parties also may seek to take legal action under the antitrust laws under some circumstances. Based upon an examination of information available relating to the businesses in which the companies are engaged, Bank of America and MBNA believe that the completion of the merger will not violate U.S. antitrust laws. However, Bank of America and MBNA can give no assurance that a challenge to the merger on antitrust grounds will not be made, or, if such a challenge is made, that Bank of America and MBNA will prevail.

In addition, the merger may be reviewed by the state attorneys general in the various states in which Bank of America and MBNA operate. Although Bank of America and MBNA believe there are substantial arguments to the contrary, these agencies may claim the authority, under the applicable state and federal antitrust laws and regulations, to investigate and/or disapprove the merger. There can be no assurance that one or more state attorneys general will not attempt to file an antitrust action to challenge the merger.

*Timing.* We cannot assure you that all of the regulatory approvals described above will be obtained, and, if obtained, we cannot assure you as to the date of any approvals or the absence of any litigation challenging such approvals. Likewise, we cannot assure you that the Antitrust Division, the FTC or any state attorney general will not attempt to challenge the merger on antitrust grounds, and, if such a challenge is made, we cannot assure you as to its result.

Pursuant to the Bank Holding Company Act, a transaction approved by the Federal Reserve Board may not be completed until 30 days after approval is received, during which time the Antitrust Division may challenge the merger on antitrust grounds. The commencement of an antitrust action would "stay"—that is, suspend—the effectiveness of an approval unless a court specifically were to order

32

Table of Contents

otherwise. With the approval of the Federal Reserve Board and the concurrence of the Antitrust Division, the waiting period may be reduced to no less than 15 days.

Bank of America and MBNA believe that the merger does not raise substantial antitrust or other significant regulatory concerns and that they will be able to obtain all requisite regulatory approvals on a timely basis without the imposition of any condition that would have a material adverse effect on Bank of America or MBNA. In connection with obtaining any required regulatory approvals, Bank of America is not required to agree to conditions or restrictions that would have a material adverse effect on either MBNA or Bank of America, measured on a scale relative to MBNA.

We are not aware of any material governmental approvals or actions that are required for completion of the merger other than those described above. It is presently contemplated that if any such additional governmental approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

## Litigation Relating to the Merger

As disclosed in MBNA's Quarterly Report on Form 10−Q for the quarter ended June 30, 2005, MBNA and certain of its officers and directors are currently defendants in several purported class action and shareholder derivative lawsuits filed in state and federal court alleging, among other things, that certain officers and directors of MBNA breached their fiduciary duties to MBNA and violated federal securities laws. Following the announcement of the merger agreement, amended complaints were filed in two of these lawsuits, each a shareholder derivative action filed in federal court, to add allegations regarding breaches of fiduciary duties in connection with entering into the merger agreement. These lawsuits seek as remedies, among other things, damages and injunctive relief relating to the merger. MBNA continues to deny the claims made in these lawsuits and intends to defend these matters vigorously.

## MBNA's Directors and Officers Have Financial Interests in the Merger

In considering the recommendation of the MBNA board of directors that you vote to approve the merger, you should be aware that some of MBNA's executive officers and directors have interests in the merger and have arrangements that are different from, or in addition to, those of MBNA's stockholders generally. The MBNA board of directors was aware of these interests and considered them, among other matters, in reaching its decisions to approve the merger agreement and to recommend that you vote in favor of approving the merger.

*Board of Directors and Management of the Combined Company.* Upon completion of the merger, Mr. Bruce L. Hammonds, CEO and President of MBNA, will become CEO and President of Bank of America Card Services, reporting to Liam E. McGee, President of Bank of America Global Consumer and Small Business Banking. Mr. Hammonds will join Bank of America's Risk & Capital Committee, which guides the company's strategic direction. Mr. Frank P. Bramble, Sr., until December 2004 a Vice Chairman of MBNA and currently serving as Senior Advisor to the Chief Executive Officer of MBNA, will join the Bank of America board of directors upon completion of the merger.

*Non−competition Agreements.* MBNA has entered into executive non−competition agreements with each of Messrs. Richard K. Struthers, Kenneth A. Vecchione, Bramble, Louis J. Freeh, Douglas R. Denton, Gregg Bacchieri and John W. Scheflen. The agreements provide that, if an executive's employment is terminated by MBNA without cause (as defined in the agreement), MBNA will continue to pay the executive's base salary for a period of 18 months in consideration for the executive complying with non−compete provisions for that period. If an executive voluntarily resigns or if the executive's employment is terminated by MBNA for cause, MBNA will have the option to commence making non−compete payments for a period of 18 months in consideration for the executive complying with non−compete provisions for that period. No payments will be made to the executive, but the executive will still be bound by the non−competition covenants, if the executive receives benefits under the Supplemental Executive Retirement Plan (as described below). Furthermore, payments made under the change of control agreements described below satisfy any payment obligations under these non−competition agreements. Additionally, each of the executives except for Messrs. Bramble and Freeh received a grant of restricted shares of MBNA's common stock for entering into the agreement. The shares would be forfeited

33

Table of Contents

if the executive competes during the non−compete period. The restrictions on the restricted shares do not lapse upon a change of control.

*Equity Compensation Awards.* The merger agreement provides that, upon completion of the merger, each MBNA stock option will be converted into a Bank of America stock option. In addition, each MBNA restricted share outstanding immediately before completing the merger will be converted upon the completion of the merger into the right to receive the merger consideration (with the same terms as the MBNA restricted shares, including transfer restrictions on stock consideration to the extent the MBNA restricted shares do not vest and transfer restrictions do not lapse on the change of control). Upon a change of control, such as completion of the merger, except for restricted shares previously granted in connection with entering into the non−competition agreements described above, all unvested stock options and shares of restricted stock will vest in full. Based on MBNA equity compensation held as of September 2, 2005 and assuming a closing date of January 1, 2006, upon completion of the merger, Messrs. Cochran, Hammonds, Struthers, Vecchione and Weaver and all other MBNA executives and directors, as a group, would vest in respect of 425,000, 425,000, 270,000, 280,000, 270,000 and 1,070,000 shares of MBNA common stock (prior to the conversion into Bank of America stock options in accordance with the merger agreement), respectively, subject to their stock options and in respect of 1,867,677, 1,924,142, 1,219,994, 351,626, 1,304,016 and 1,735,913 restricted shares of MBNA common stock (prior to the conversion into the right to receive merger consideration in accordance with the merger agreement).

*Supplemental Executive Retirement Plan.* MBNA maintains a supplemental executive retirement plan, which we refer to as the SERP, under which executive officers of MBNA and Mr. Bramble are eligible for retirement benefits, outside of a change of control situation such as the merger, if they have been employed by MBNA until age 60 with at least 10 years of service (or until age 65 if they do not have at least 10 years of service) unless the executive's employment is terminated by MBNA for cause. The amount of the non−change of control benefit under the SERP is up to 80 percent of the executive's highest average base salary for any consecutive 12−month period during the 144 months preceding retirement and is payable as a monthly benefit for life. Additional monthly benefits may be payable to the executive's surviving spouse or other beneficiary following the executive's death while in service or death after having commenced SERP retirement payments. If at any time following a change of control (such as completion of the merger) or within 12 months prior to and in connection with such event, MBNA terminates the executive's employment other than for "cause" or the executive resigns for "good reason" (as each term is defined in the SERP), or, in the case of each of Messrs. Cochran, Hammonds, Struthers, Weaver and Lerner, if the executive resigns for any reason in the 30−day period following the first anniversary of a change of control, then the SERP provides the following four enhancements to the executive's SERP retirement benefits: (i) the SERP benefit will be payable even if the executive had not yet attained age 60 with 10 years of service or age 65 at the date of termination; (ii) the percentage of base salary payable is determined under a special change of control schedule that generally provides a higher percentage for each attained age, but still subject to a maximum of 80%; (iii) for purposes of applying the special change of control benefit schedule, each of Messrs. Cochran, Hammonds, Struthers, Weaver and Lerner are deemed to have an additional five years of age at termination of employment, and each of the other executives is deemed to have an additional three years of age at termination of employment, but in no event is the executive deemed to be less than 50 years of age for such purpose; and (iv) the benefit is payable in an actuarially determined lump sum payment at termination of employment, unless the executive elects otherwise. Assuming that the merger is completed on January 1, 2006 and each of the executives experiences a qualifying termination of employment immediately thereafter, the annual amount of gross SERP payments that would be payable beginning at age 60 to Messrs. Cochran, Hammonds, Struthers, Vecchione and Weaver and the other executives as a group is $2,000,000, $2,000,000, $1,600,000, $896,000, $1,600,000 and $5,897,846, respectively. These amounts would be reduced by amounts payable under social security, the MBNA Corporate Pension Plan, and any other defined benefit pension plan.

*Supplemental Executive Insurance Plan.* MBNA maintains a supplemental executive life insurance plan. Under the plan, MBNA pays the premiums on life insurance policies maintained for the benefit of each of the SERP participants described above other than Mr. Lerner and pays the executives a gross−up amount to cover the taxes incurred by the executives as a result of the premium payment. The benefits generally terminate upon a termination of an executive's employment, but in specified cases involving a

34

Table of Contents

change of control, such as the merger, they may continue after termination. Specifically, in the event that (1) the executive's employment with MBNA is terminated at any time after a change of control either by MBNA without "cause" or by the executive for "good reason" (as each term is defined in the plan), (2) the executive's employment with MBNA is terminated before a change of control by MBNA without cause or is terminated by the executive for good reason, in either case if the change of control actually occurs, and subject to other conditions, or (3) in the case of Messrs. Cochran, Hammonds, Struthers and Weaver, the executive officer's employment with MBNA is terminated for any reason other than cause, disability or death within the 30–day period beginning one year after a change of control, MBNA will continue to make premium payments and the related tax gross–up payments following the termination of the executive's employment.

*Change of Control and Retention Agreements.* MBNA has entered into change of control agreements with each of Messrs. Cochran, Hammonds, Struthers, Vecchione, Weaver and Bramble and each of the other MBNA executive officers except for one executive officer (who is covered by a change of control severance pay plan sponsored by MBNA). The agreements provide certain payments and benefits described below if, during the three–year period following a change of control (such as completion of the merger) or within 12 months prior to and in connection with such event, MBNA terminates the executive's employment other than for "cause" or disability or the executive resigns for "good reason" (as each term is defined in the agreements). In addition, in the case of Messrs. Cochran, Hammonds, Struthers, Weaver and Lerner, the executive will become eligible for payments and benefits under the agreement if the executive resigns for any reason during the 30–day period following the first anniversary of the change of control. In the event of a qualifying termination as described above, the executive will be entitled to receive a lump sum cash severance payment equal to the sum of the executive's annual base salary (as determined under the agreement) and "highest bonus" (defined as the higher of the average annualized bonus paid to the executive during the three year period preceding the change of control or the most recent annual bonus paid to the executive following the change of control) times a multiple applicable under each agreement. The applicable multiple is three times for Messrs. Cochran, Hammonds, Struthers, Weaver and Lerner, two times for Messrs. Bramble and Bacchieri and one and one–half times for Mr. Vecchione and all other executives. Also in that case, the executive is entitled to receive a lump sum payment equal to the sum of (a) all accrued compensation obligations, including a pro–rata bonus for the year in which the termination occurs based on the highest bonus, and (b) the matching contributions the executive would have received for three years in the case of Messrs. Cochran, Hammonds, Struthers, Weaver and Lerner, or for two years in the case of all other executives, following such termination of employment under MBNA's tax–qualified 401(k) plan and non–qualified deferred compensation plan had the executive's employment not terminated. Additionally, the executive will be entitled to, for three years following the date of termination in the case of Messrs. Cochran, Hammonds, Struthers, Weaver and Lerner, and two years following the date of termination in the case of all other executives, continuation of welfare benefits, and all equity awards issued after the change of control will vest and options will remain exercisable for no less than 90 days. In addition, in the event that any of the executives becomes subject to an excise tax under Section 4999 of the Code, the agreements generally provide for an additional payment to the executive such that the executive will be placed in the same after–tax position as if no such excise tax had been imposed, unless the executive's payments exceed the limit on parachute payments by less than $50,000, in which case the executive's severance payments will be reduced to the minimum extent necessary so that no portion of the payments are subject to the excise tax.

In the event that the executive resigns for good reason or is terminated by MBNA without cause, the executive will be subject to either two–year or one–year, depending on the executive, non–competition and non–solicitation of employees covenants.

In connection with the consummation of the merger, Bank of America planned, during a transition period following the merger, to adjust the compensation and benefits of MBNA's executives to conform to the compensation and benefit programs provided by Bank of America to similarly situated employees. Such adjustments might have resulted in "good reason" as set forth in the MBNA change of control agreements, which would therefore have allowed the executives to resign at any time within three years after the merger and collect severance benefits as provided by the change of control agreements. To reduce the incentive of MBNA executives to resign so as to collect such severance benefits, to better preserve management continuity and to align the interests of the executives with Bank of America's overall business strategy, Bank of America commenced discussions with certain of the executives in August 2005 regarding

Table of Contents

retention agreements. As a result of these discussions, Bank of America has entered into retention agreements, effective on consummation of the merger, with certain of such executives (including Messrs. Cochran, Hammonds, Struthers and Weaver) that replace the change of control agreements (or in the case of one other executive officer, coverage under the MBNA change of control severance pay plan).

Each retention agreement provides for the establishment of an unfunded retention account for the executive in an amount equal to the portion of the cash severance the executive would have received under the change of control agreement if the executive had resigned for good reason immediately following the merger based on the applicable multiple of annual base salary and highest bonus. The retention account is payable to the executive in cash in two equal installments on each of the first and second anniversaries of the completion of the merger (or, if earlier, the date that the executive resigns or is terminated), with interest credited each month through the date of payment at a rate based on one year treasury bill yields; provided that if prior to the second anniversary of the merger the executive (i) is terminated for "cause" (as defined in the retention agreement), the unpaid balance of the retention account will be forfeited, or (ii) resigns without "good reason" (which is limited to a post–merger reduction in base salary or office relocation), all unpaid interest will be forfeited. MBNA currently provides its executive officers with access to aircraft for personal travel. In order to provide a transition from this current practice, the retention agreements for Messrs. Cochran, Hammonds, Struthers and Weaver also provide the executive with a specified number of hours of access to aircraft for personal travel to be used by such executive during a seven–year period. To the extent Bank of America is required to impute any income to the executive for use of aircraft in excess of any expenses paid by the executive for such use, the executive will receive a tax gross up. The aircraft benefits will continue for the stated period after termination of employment, but will cease in the event the executive is terminated for cause or violates any of the applicable post–termination covenants. Further, if during the three–year period following the merger Bank of America terminates the executive's employment without cause or the executive resigns for good reason, the executive would receive accrued obligations, matching contribution enhancements and continuation of welfare benefits substantially the same as provided under the executive's change of control agreement. The executive would not, however, have the right to receive special vesting for post–merger equity awards as otherwise provided by the change of control agreement in connection with such a termination or resignation. The retention agreements provide for gross–up payments for any excise taxes imposed under Section 4999 of the Code to the same extent provided under the change of control agreements and executives remain subject to the same post–termination covenants regarding non–competition and non–solicitation of employees as provided under the change of control agreements.

Assuming that the merger is completed on January 1, 2006, the amount (based upon recent base salaries and recent bonus amounts but excluding income, employment and excise tax gross–ups and interest) that would be payable under the retention agreements to each of Messrs. Cochran, Hammonds, Struthers and Weaver and one other executive officer, including the estimated total gross incremental cost to Bank of America of the applicable aircraft benefit, respectively, is $22,736,000, $23,016,000, $17,025,000, $17,025,000 and $784,615.

For each of the executives of MBNA who has not entered into a retention agreement, assuming that the merger is completed on January 1, 2006 and the executive experiences a qualifying termination of employment immediately thereafter, the amount of cash severance (based upon recent base salaries and recent bonus amounts but excluding excise tax gross–ups) that would be payable to Mr. Vecchione and the remaining such executives as a group, respectively, is $5,810,500 and $31,310,896.

*Protection of MBNA Directors and Officers Against Claims.* Bank of America has agreed to indemnify and hold harmless each present and former director, officer and employee of MBNA from liability and exculpation for matters arising at or prior to the completion of the merger to the fullest extent provided by applicable law, the MBNA articles of incorporation and the MBNA bylaws. Bank of America also has agreed that it will maintain in place existing indemnification and exculpation rights in favor of MBNA directors, officers and employees for six years after the merger and that it will maintain MBNA's current policy of directors' and officers' liability insurance coverage, or an equivalent replacement policy for the benefit of MBNA directors and officers, for six years following completion of the merger, except that Bank of America is not required to incur annual premium expense greater than 250% of MBNA's current annual directors' and officers' liability insurance premium.

# THE MERGER AGREEMENT

*The following describes certain aspects of the merger, including material provisions of the merger agreement. The following description of the merger agreement is subject to, and qualified in its entirety by reference to, the merger agreement, which is attached to this document as Appendix A and is incorporated by reference in this document. We urge you to read the merger agreement carefully and in its entirety, as it is the legal document governing this merger.*

## Terms of the Merger

Each of the MBNA board of directors and the Bank of America board of directors has approved the merger agreement, which provides for the merger of MBNA with and into Bank of America. Bank of America will be the surviving corporation in the merger. Each share of Bank of America common or preferred stock issued and outstanding immediately prior to completion of the merger will remain issued and outstanding as one share of common or preferred stock of Bank of America, and each share of MBNA common stock issued and outstanding immediately prior to the completion of the merger, except for specified shares of MBNA common stock held by MBNA and Bank of America, will be converted into the right to receive 0.5009 of a share of Bank of America common stock and $4.125 in cash, without interest. If the number of shares of common stock of Bank of America changes before the merger is completed because of a reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split, or other similar event, then an appropriate and proportionate adjustment will be made to the number of shares of Bank of America common stock into which each share of MBNA common stock will be converted.

Bank of America will not issue any fractional shares of Bank of America common stock in the merger. Instead, an MBNA stockholder who otherwise would have received a fraction of a share of Bank of America common stock will receive an amount in cash rounded to the nearest cent. This cash amount will be determined by multiplying the fraction of a share of Bank of America common stock to which the holder would otherwise be entitled by the average closing price of Bank of America common stock over the five trading days immediately prior to the date on which the merger is completed.

The Bank of America certificate of incorporation will be the certificate of incorporation, and the Bank of America bylaws will be the bylaws, of the combined company after completion of the merger. The merger agreement provides that Bank of America may change the structure of the merger if consented to by MBNA (but MBNA's consent cannot be unreasonably withheld or delayed). No such change will alter the amount or kind of merger consideration to be provided under the merger agreement, adversely affect the tax consequences to MBNA stockholders in the merger, or materially impede or delay completion of the merger.

## Treatment of MBNA Stock Options and Other Equity−Based Awards

Each outstanding option to acquire MBNA common stock granted under MBNA's stock incentive plans will be converted automatically at the effective time of the merger into an option to purchase Bank of America common stock and will continue to be governed by the terms of the MBNA stock plan and related grant agreements under which it was granted, except that:

- the number of shares of Bank of America common stock subject to the new Bank of America stock option will be equal to the product of the number of shares of MBNA common stock subject to the MBNA stock option and the award exchange ratio, rounded down to the nearest whole share; and

- the exercise price per share of Bank of America common stock subject to the new Bank of America stock option will be equal to the exercise price per share of MBNA common stock under the MBNA stock option divided by the award exchange ratio, rounded up to the nearest cent.

The award exchange ratio will be the sum of (a) 0.5009 and (b) $4.125 divided by the average closing price of Bank of America common stock over the five trading days immediately prior to the date on which the merger is completed.

Restricted share units in respect of MBNA common stock outstanding immediately prior to the merger will be converted automatically at the effective time of the merger into restricted share units in respect of shares of Bank of America common stock (except that restricted share units that vest upon the

37

Table of Contents

change of control will instead be converted into the right to receive the merger consideration). The number of shares of Bank of America common stock subject to each converted restricted share unit will be equal to the product of the number of shares of MBNA common stock subject to the MBNA restricted share unit and the award exchange ratio, rounded down to the nearest whole share. It is expected that there will be no restricted share units in respect of MBNA common stock outstanding immediately prior to the merger, as all restricted share units will vest immediately prior to the merger and will be converted automatically at the effective time of the merger into the right to receive the merger consideration, subject to Bank of America's right to deduct and withhold any amounts required under the Code or applicable state or local tax law when the restrictions on such rights lapse.

Each outstanding restricted share of MBNA common stock will be converted automatically at the effective time of the merger into the right to receive, on the same terms and conditions as applied to such restricted shares immediately prior to the effective time of the merger (including transfer restrictions on the stock consideration to the extent such shares do not vest and transfer restrictions do not lapse on the change of control), the merger consideration, subject to Bank of America's right to deduct and withhold any amounts required under the Code or applicable state or local tax law when the restrictions on such rights lapse.

Bank of America has agreed to reserve additional shares of Bank of America common stock to satisfy its obligations under the converted stock options and other equity−based awards and file a registration statement with the SEC on an appropriate form to the extent necessary to register Bank of America common stock subject to the converted stock options and other equity−based awards.

## Closing and Effective Time of the Merger

The merger will be completed only if all of the following occur:

- the merger is approved by MBNA stockholders;
- we obtain all required governmental and regulatory consents and approvals without a condition or restriction that would have a material adverse effect on either MBNA or Bank of America, measured on a scale relative to MBNA; and
- all other conditions to the merger discussed in this document and the merger agreement are either satisfied or waived.

The merger will become effective when articles of merger are filed with the State Department of Assessments and Taxation of the State of Maryland and a certificate of merger is filed with the Secretary of State of the State of Delaware. However, we may agree to a later time for completion of the merger and specify that time in the articles of merger and certificate of merger in accordance with Maryland and Delaware law. In the merger agreement, we have agreed to cause the completion of the merger to occur no later than the fifth business day following the satisfaction or waiver of the last of the conditions specified in the merger agreement, or on another mutually agreed date. If these conditions are satisfied or waived during the two weeks immediately prior to the end of a fiscal quarter of Bank of America, then Bank of America may postpone the closing until the first full week after the end of that quarter. It currently is anticipated that the effective time of the merger will occur prior to the end of 2005, but we cannot guarantee when or if the merger will be completed.

## Board of Directors of the Surviving Corporation

Before completion of the merger, Bank of America will take such actions as may be reasonably required to appoint Frank P. Bramble, Sr., who was until December 2004 a Vice Chairman of MBNA and who currently serves as Senior Advisor to the Chief Executive Officer of MBNA, to its board of directors upon completion of the merger and, if necessary, will increase the size of the board of directors to permit this appointment.

## Conversion of Shares; Exchange of Certificates

The conversion of MBNA common stock into the right to receive the merger consideration will occur automatically at the effective time of the merger. As soon as reasonably practicable after completion of the merger, the exchange agent will exchange certificates representing shares of MBNA common stock for

38

Table of Contents

merger consideration to be received pursuant to the terms of the merger agreement. Prior to the completion of the merger, Bank of America will select a bank or trust company subsidiary of Bank of America or another bank or trust company reasonably acceptable to MBNA to be the exchange agent, who will exchange certificates for the merger consideration and perform other duties as explained in the merger agreement.

### Letter of Transmittal

Soon after the completion of the merger, the exchange agent will mail a letter of transmittal to each holder of an MBNA common stock certificate at the effective time of the merger. This mailing will contain instructions on how to surrender MBNA common stock certificates in exchange for statements indicating book–entry ownership of Bank of America common stock and a check in the appropriate amount of the cash portion of the merger consideration. If a holder of an MBNA common stock certificate makes a special request, however, Bank of America will issue to the requesting holder a Bank of America stock certificate in lieu of book–entry shares. When you deliver your MBNA stock certificates to the exchange agent along with a properly executed letter of transmittal and any other required documents, your MBNA stock certificates will be cancelled and you will receive statements indicating book–entry ownership of Bank of America common stock, or, if requested, stock certificates representing the number of full shares of Bank of America common stock to which you are entitled under the merger agreement. You will receive payment in cash, without interest, for the cash portion of the merger consideration and additional cash payment instead of any fractional shares of Bank of America common stock that would have been otherwise issuable to you as a result of the merger.

Holders of MBNA common stock should not submit their MBNA stock certificates for exchange until they receive the transmittal instructions and a form of letter of transmittal from the exchange agent.

If a certificate for MBNA common stock has been lost, stolen or destroyed, the exchange agent will issue the consideration properly payable under the merger agreement upon receipt of appropriate evidence as to that loss, theft or destruction, appropriate evidence as to the ownership of that certificate by the claimant, and appropriate and customary indemnification.

**After completion of the merger, there will be no further transfers on the stock transfer books of MBNA, except as required to settle trades executed prior to completion of the merger.**

### Withholding

The exchange agent will be entitled to deduct and withhold from the cash consideration or cash in lieu of fractional shares payable to any MBNA stockholder the amounts it is required to deduct and withhold under any federal, state, local or foreign tax law. If the exchange agent withholds any amounts, these amounts will be treated for all purposes of the merger as having been paid to the stockholders from whom they were withheld.

### Dividends and Distributions

Until MBNA common stock certificates are surrendered for exchange, any dividends or other distributions declared after the effective time with respect to Bank of America common stock into which shares of MBNA common stock may have been converted will accrue but will not be paid. Bank of America will pay to former MBNA stockholders any unpaid dividends or other distributions, without interest, only after they have duly surrendered their MBNA stock certificates.

Prior to the effective time of the merger, MBNA and its subsidiaries may not declare or pay any dividend or distribution on its capital stock or repurchase any shares of its capital stock, other than:

• regular quarterly cash dividends at a rate not to exceed $0.14 per share of MBNA common stock with record dates and payment dates consistent with the prior year;

• dividends paid by any subsidiary of MBNA to MBNA or to any of its wholly–owned subsidiaries; and

• the acceptance of shares of MBNA common stock in payment of the exercise of a stock option or the vesting of restricted shares of MBNA common stock granted under an MBNA stock plan, in each case in accordance with past practice.

39

Table of Contents

MBNA and Bank of America have agreed to coordinate declaration of dividends so that holders of MBNA common stock will not receive two dividends, or fail to receive one dividend, for any quarter with respect to their MBNA common stock and any Bank of America common stock any holder receives in the merger.

**Representations and Warranties**

The merger agreement contains customary representations and warranties of MBNA and Bank of America relating to their respective businesses. With the exception of certain representations that must be true and correct in all material respects (or, in the case of specific representations and warranties regarding the capitalization of our companies, true and correct except to a de minimis extent), no representation or warranty will be deemed untrue or incorrect as a consequence of the existence or absence of any fact, circumstance or event unless that fact, circumstance or event, individually or when taken together with all other facts, circumstances or events, has had or is reasonably likely to have a material adverse effect on the company making the representation. In determining whether a material adverse effect has occurred or is reasonably likely, the parties will disregard any effects resulting from (1) changes in generally accepted accounting principles or regulatory accounting requirements applicable to banks or savings associations and their holding companies, or to credit card companies, generally, (2) changes in laws, rules or regulations of general applicability to banks or savings associations, and their holding companies, or to credit card companies, generally, or their interpretations by courts or governmental entities, (3) changes in global or national political conditions or in general economic or market conditions affecting banks, credit card companies, savings associations or their holding companies generally, except to the extent that such changes in general or market conditions have a materially disproportionate adverse effect on such party, or (4) completion or public disclosure of the merger. The representations and warranties in the merger agreement do not survive the effective time of the merger.

Each of Bank of America and MBNA has made representations and warranties to the other regarding, among other things:

- corporate matters, including due organization and qualification;

- capitalization;

- authority relative to execution and delivery of the merger agreement and the absence of conflicts with, or violations of, organizational documents or other obligations as a result of the merger;

- required governmental filings and consents;

- the timely filing of reports with governmental entities, and the absence of investigations by regulatory agencies;

- financial statements, internal controls and accounting;

- broker's fees payable in connection with the merger;

- the absence of material adverse changes;

- legal proceedings;

- tax matters;

- compliance with applicable laws;

- tax treatment of the merger; and

- the accuracy of information supplied for inclusion in this document and other similar documents.

In addition, MBNA has made other representations and warranties about itself to Bank of America as to:

- employee matters, including employee benefit plans;

- material contracts;

- risk management instruments and derivatives;

- investment and loan portfolios;

40

Table of Contents

- real property and intellectual property;

- environmental liabilities;

- credit card operations and securitizations;

- the inapplicability of state takeover laws; and

- the receipt of a financial advisor's opinion.

Bank of America also has made a representation and warranty to MBNA regarding the availability of cash to pay the cash portion of the merger consideration.

The representations and warranties described above and included in the merger agreement were made by each of Bank of America and MBNA to the other. These representations and warranties were made as of specific dates, may be subject to important qualifications and limitations agreed to by Bank of America and MBNA in connection with negotiating the terms of the merger agreement, and may have been included in the merger agreement for the purpose of allocating risk between Bank of America and MBNA rather than to establish matters as facts. The merger agreement is described in, and included as an appendix to, this document only to provide you with information regarding its terms and conditions, and not to provide any other factual information regarding MBNA, Bank of America or their respective businesses. Accordingly, the representations and warranties and other provisions of the merger agreement should not be read alone, but instead should be read only in conjunction with the information provided elsewhere in this document and in the documents incorporated by reference into this document. See "Where You Can Find More Information" on page 64.

## Covenants and Agreements

Each of MBNA and Bank of America has undertaken customary covenants that place restrictions on it and its subsidiaries until the effective time of the merger. In general, each of Bank of America and MBNA agreed to (1) conduct its business in the ordinary course in all material respects, (2) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships, including retaining the services of key officers and employees, and (3) take no action that is intended to or would reasonably be expected to adversely affect or materially delay its respective ability to obtain any necessary regulatory approvals, perform its covenants or complete the merger. MBNA further agrees that, with certain exceptions and except with Bank of America's prior written consent, MBNA will not, and will not permit any of its subsidiaries to, among other things, undertake the following extraordinary actions:

- incur indebtedness or in any way assume the indebtedness of another person, except in the ordinary course of business;

- adjust, split, combine or reclassify any of its capital stock;

- make, declare or pay any dividends or other distributions on any shares of its capital stock, except as set forth above in "—Conversion of Shares; Exchange of Certificates—Dividends and Distributions" (Bank of America has agreed to allow MBNA to repurchase up to a certain number of shares of MBNA common stock in connection with the issuance of shares under MBNA's stock incentive plans);

- issue shares, stock options or other equity—based awards outside the parameters set forth in the merger agreement;

- except as contemplated by the merger agreement and except as in the ordinary course of business, (1) increase wages, salaries or incentive compensation, (2) pay or provide, or increase or accelerate the accrual rate, vesting or timing or payment or funding of, any compensation or benefit to employees of MBNA and its subsidiaries, or (3) establish, adopt or become a party to any new employee benefit or compensation plan or agreement or amend any existing plan;

- other than in the ordinary course of business, sell, transfer, mortgage, encumber or otherwise dispose of any material assets or properties, or cancel, release or assign any material indebtedness;

Table of Contents

- enter into any new line of business or change in any material respect its lending, investment, underwriting, risk and asset liability management and other banking, operating, securitization and servicing policies other than as required by applicable law;

- make any material investment either by purchase of securities, capital contributions, property transfers or purchase of property or assets;

- take any action or knowingly fail to take any action reasonably likely to prevent the merger from qualifying as a reorganization for federal income tax purposes;

- amend any charter documents, take any action to exempt another person from any applicable takeover law or defensive charter or terminate, amend or waive any provisions of any confidentiality or standstill agreements in place with third parties;

- restructure or materially change its investment securities portfolio or its gap position;

- materially change MBNA's existing policies and procedures concerning credit card accounts;

- commence or settle any material claim;

- take or fail to take any action that is intended, or may be reasonably expected, to cause any of the conditions to the merger to fail to be satisfied;

- change its tax accounting or financial accounting methods, except as required by applicable law or generally accepted or regulatory accounting principles;

- file or amend any tax return other than in the ordinary course of business, make or change any material tax election or settle or compromise any material tax liability; or

- agree to take or adopt any resolutions by the board of directors in support of any of the actions prohibited by the preceding bullets.

Bank of America agrees that, except with MBNA's prior written consent, Bank of America will not, among other things, undertake the following extraordinary actions:

- amend any charter documents in a manner that would adversely affect MBNA or its stockholders or the transactions contemplated by the merger agreement;

- take any action or knowingly fail to take any action reasonably likely to prevent the merger from qualifying as a reorganization for federal income tax purposes;

- take any action that is intended, or may be reasonably expected, to result in any of the conditions to the merger failing to be satisfied;

- take any action that would reasonably be expected to prevent, materially impede or materially delay completion of the merger; or

- agree to take or adopt any resolutions by the board of directors in support of any of the actions prohibited by the preceding bullets.

The merger agreement also contains mutual covenants relating to the preparation of this document and the holding of the special meeting of MBNA stockholders, access to information of the other company and public announcements with respect to the transactions contemplated by the merger agreement.

In addition, MBNA has agreed to redeem, as of or prior to completion of the merger, all shares of its $7^{1}/2\%$ Series A Cumulative Preferred Stock and Series B Adjustable Rate Cumulative Preferred Stock.

### Reasonable Best Efforts of MBNA to Obtain the Required Stockholder Vote

MBNA has agreed to hold a meeting of its stockholders as soon as is reasonably practicable for the purpose of obtaining stockholder approval of the merger. MBNA will use its reasonable best efforts to obtain such approval. The merger agreement requires MBNA to submit the merger agreement to a stockholder vote even if its board of directors no longer recommends approval of the merger agreement.

MBNA and Bank of America have also agreed in good faith to use their reasonable best efforts to negotiate a restructuring of the merger if MBNA's stockholders do not approve the merger agreement at the special meeting and to resubmit the transaction to MBNA's stockholders for approval. However, in any

Table of Contents

restructuring neither party has any obligation to change the amount or kind of the merger consideration in a manner adverse to that party or its stockholders.

**Agreement Not to Solicit Other Offers**

MBNA also has agreed that it, its subsidiaries and their officers, directors, employees, agents and representatives will not, directly or indirectly:

- initiate, solicit, encourage or facilitate any inquiries or proposals for any "Alternative Proposal" (as defined below); or

- participate in any discussions or negotiations, or enter into any agreement, regarding any "Alternative Transaction" (as defined below).

However, prior to the special meeting, MBNA may consider and participate in discussions and negotiations with respect to a *bona fide* Alternative Proposal if (1) it has first entered into a confidentiality agreement with the party proposing the Alternative Proposal on terms comparable to the confidentiality agreement with Bank of America and (2) the MBNA board of directors determines reasonably in good faith (after consultation with outside legal counsel) that failure to take these actions would cause it to violate its fiduciary duties.

MBNA has agreed:

- to notify Bank of America promptly (but in no event later than 24 hours) after it receives any Alternative Proposal, or any material change to any Alternative Proposal, or any request for nonpublic information relating to MBNA or any of its subsidiaries, and to provide Bank of America with relevant information regarding the Alternative Proposal or request;

- to keep Bank of America fully informed, on a current basis, of any material changes in the status and any material changes in the terms of any such Alternative Proposal; and

- to cease any existing discussions or negotiations with any persons with respect to any Alternative Proposal, and to use reasonable best efforts to cause all persons other than Bank of America who have been furnished with confidential information in connection with an Alternative Proposal within the 12 months prior to the date of the merger agreement to return or destroy such information.

As used in the merger agreement, an "Alternative Proposal" means any inquiry or proposal regarding any merger, share exchange, consolidation, sale of assets, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving MBNA or any of its subsidiaries that, if completed, would constitute an Alternative Transaction.

As used in the merger agreement, "Alternative Transaction" means any of the following:

- a transaction pursuant to which any person (or group of persons) other than Bank of America or its affiliates, directly or indirectly, acquires or would acquire more than 25% of the outstanding shares of MBNA common stock or outstanding voting power or of any new series or new class of MBNA preferred stock that would be entitled to a class or series vote with respect to the merger, whether from MBNA or pursuant to a tender offer or exchange offer or otherwise;

- a merger, share exchange, consolidation or other business combination involving MBNA (other than the merger being described here);

- any transaction pursuant to which any person (or group of persons) other than Bank of America or its affiliates acquires or would acquire control of assets (including, for this purpose, the outstanding equity securities of subsidiaries of MBNA and securities of the entity surviving any merger or business combination including any of MBNA's subsidiaries) of MBNA, or any of its subsidiaries representing more than 25% of the fair market value of all the assets, net revenues or net income of MBNA and its subsidiaries, taken as a whole, immediately prior to such transaction; or

- any other consolidation, business combination, recapitalization or similar transaction involving MBNA or any of its subsidiaries, other than the transactions contemplated by the merger agreement, as a result of which the holders of shares of MBNA common stock immediately prior to the transaction do not, in the aggregate, own at least 75% of each of the outstanding shares of common stock and the outstanding voting power of the surviving or resulting entity in the

Table of Contents

transaction immediately after the completion of the transaction in substantially the same proportion as the holders held the shares of MBNA common stock immediately prior to the completion of the transaction.

## Expenses and Fees

In general, each of Bank of America and MBNA will be responsible for all expenses incurred by it in connection with the negotiation and completion of the transactions contemplated by the merger agreement. However, the costs and expenses of printing and mailing this document, and all filing and other fees paid to the SEC in connection with the merger, shall be borne equally by MBNA and Bank of America.

## Employee Matters

Bank of America has agreed that for a period of one year following the closing of the merger, with respect to the employees of MBNA and its subsidiaries at the effective time, it will provide such employees in the aggregate with employee benefits, rates of base salary or hourly wage and annual bonus opportunities that are substantially similar in the aggregate to the aggregate employee benefits, rates of base salary or hourly wage and annual bonus opportunities provided to such employees pursuant to MBNA's benefit plans as in effect immediately prior to the merger.

In addition, Bank of America has agreed, to the extent any MBNA employee becomes eligible to participate in Bank of America benefit plans following the merger:

- generally to recognize each employee's service with MBNA prior to the completion of the merger for purposes of eligibility to participate, vesting credits and, except under defined benefit pension plans, benefit accruals, in each case under the Bank of America plans to the same extent such service was recognized under comparable MBNA plans prior to completion of the merger; and

- to waive any exclusion for pre−existing conditions under any Bank of America health, dental or vision plans, to the extent such limitation would have been waived or satisfied under a corresponding MBNA plan in which such employee participated immediately prior to the effective time, and recognize any medical or health expenses incurred in the year in which the merger closes for purposes of applicable deductible and annual out−of−pocket expense requirements under any health, dental or vision plan of Bank of America.

However, Bank of America has no obligation to continue the employment of any MBNA employee for any period following the merger.

## Indemnification and Insurance

The merger agreement requires Bank of America to maintain in effect for six years after completion of the merger the current rights of MBNA directors, officers and employees to indemnification under the MBNA articles of incorporation or the MBNA bylaws or disclosed agreements of MBNA. The merger agreement also provides that, upon completion of the merger, Bank of America will indemnify and hold harmless, and provide advancement of expenses to, all past and present officers, directors and employees of MBNA and its subsidiaries in their capacities as such against all losses, claims, damages, costs, expenses, liabilities, judgments or amounts paid in settlement to the fullest extent permitted by applicable laws.

The merger agreement provides that Bank of America will maintain for a period of six years after completion of the merger MBNA's current directors' and officers' liability insurance policies, or policies of at least the same coverage and amount and containing terms and conditions that are not less advantageous than the current policy, with respect to acts or omissions occurring prior to the effective time of the merger, except that Bank of America is not required to incur annual premium expense greater than 250% of MBNA's current annual directors' and officers' liability insurance premium.

## Conditions to Complete the Merger

Our respective obligations to complete the merger are subject to the fulfillment or waiver of certain conditions, including:

- the approval of the merger by MBNA stockholders;

44

Table of Contents

- the approval of the listing of Bank of America common stock to be issued in the merger on the NYSE, subject to official notice of issuance;

- the effectiveness of the registration statement of which this document is a part with respect to the Bank of America common stock to be issued in the merger under the Securities Act and the absence of any stop order or proceedings initiated or threatened by the SEC for that purpose; and

- the absence of any law, statute, regulation, judgment, decree, injunction or other order in effect by any court or other governmental entity that prohibits completion of the transactions contemplated by the merger agreement.

Each of Bank of America's and MBNA's obligations to complete the merger is also separately subject to the satisfaction or waiver of a number of conditions including:

- the receipt by each of Bank of America and MBNA of a legal opinion with respect to certain federal income tax consequences of the merger;

- the receipt and effectiveness of all governmental and other approvals, registrations and consents, and the expiration of all related waiting periods required to complete the merger (in the case of the conditions to Bank of America's obligation to complete the merger, without any conditions or restrictions that would have a material adverse effect on either MBNA or Bank of America, measured on a scale relative to MBNA); and

- the truth and correctness of the representations and warranties of each other party in the merger agreement, subject to the materiality standard provided in the merger agreement, and the performance by each other party in all material respects of their obligations under the merger agreement and the receipt by each party of certificates from the other party to that effect.

We cannot provide assurance as to when or if all of the conditions to the merger can or will be satisfied or waived by the appropriate party. As of the date of this document, we have no reason to believe that any of these conditions will not be satisfied.

**Termination of the Merger Agreement**

The merger agreement can be terminated at any time prior to completion by mutual consent, if authorized by each of our boards of directors, or by either party in the following circumstances:

- if any of the required regulatory approvals are denied (and the denial is final and nonappealable);

- if the merger has not been completed by June 30, 2006, unless the failure to complete the merger by that date is due to the terminating party's failure to abide by the merger agreement;

- if there is a breach by the other party that would cause the failure of the closing conditions described above, unless the breach is capable of being, and is, cured within 45 days of notice of the breach; or

- if the other party has committed a substantial, bad faith breach of its obligation to use reasonable best efforts to negotiate a restructuring of the transaction and to resubmit the transaction to MBNA's stockholders for approval, if MBNA stockholders fail to approve the merger.

In addition, Bank of America may terminate the merger agreement if the MBNA Board of Directors fails to recommend that MBNA stockholders approve the merger, withdraws or modifies in a manner adverse to Bank of America, or makes public statements inconsistent with, its recommendation of the merger to stockholders, or recommends a competing merger proposal.

*Effect of Termination.* If the merger agreement is terminated, it will become void, and there will be no liability on the part of Bank of America or MBNA, except that (1) both Bank of America and MBNA will remain liable for any willful breach of the merger agreement and (2) designated provisions of the merger agreement, including the payment of fees and expenses, the confidential treatment of information and publicity restrictions, will survive the termination. In addition, if the merger agreement is terminated, the stock option agreement will remain in effect in accordance with its terms.