Table of Contents

**APPENDIX A**

AGREEMENT AND PLAN OF MERGER

by and between

MBNA CORPORATION

and

BANK OF AMERICA CORPORATION

DATED AS OF

JUNE 30, 2005

TABLE OF CONTENTS
ARTICLE I

THE MERGER

| | | |
|---|---|---|
| 1.1 | The Merger | 1 |
| 1.2 | Effective Time | 2 |
| 1.3 | Effects of the Merger | 2 |
| 1.4 | Conversion of MBNA Common Stock | 2 |
| 1.5 | Stock Options and Other Stock–Based Awards | 3 |
| 1.6 | Certificate of Incorporation of Bank of America | 5 |
| 1.7 | Bylaws of Bank of America | 5 |
| 1.8 | Tax Consequences | 5 |

ARTICLE II

DELIVERY OF MERGER CONSIDERATION

| | | |
|---|---|---|
| 2.1 | Exchange Agent | 5 |
| 2.2 | Deposit of Merger Consideration | 5 |
| 2.3 | Delivery of Merger Consideration | 6 |

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF MBNA

| | | |
|---|---|---|
| 3.1 | Corporate Organization | 8 |
| 3.2 | Capitalization | 9 |
| 3.3 | Authority; No Violation | 10 |
| 3.4 | Consents and Approvals | 11 |
| 3.5 | Reports; Regulatory Matters | 12 |
| 3.6 | Financial Statements | 13 |
| 3.7 | Broker's Fees | 15 |
| 3.8 | Absence of Certain Changes or Events | 15 |
| 3.9 | Legal Proceedings | 16 |
| 3.10 | Taxes and Tax Returns | 16 |
| 3.11 | Employee Matters | 17 |
| 3.12 | Compliance with Applicable Law | 19 |
| 3.13 | Certain Contracts | 19 |
| 3.14 | Risk Management Instruments | 20 |
| 3.15 | Investment Securities and Commodities | 20 |
| 3.16 | Loan Portfolio | 21 |
| 3.17 | Property | 21 |
| 3.18 | Intellectual Property | 22 |
| 3.19 | Environmental Liability | 22 |

A–i

**Table of Contents**

| | | |
|---|---|---|
| 3.20 | Credit Card Operations | 23 |
| 3.21 | Securitization | 24 |
| 3.22 | State Takeover Laws | 27 |
| 3.23 | Reorganization; Approvals | 28 |
| 3.24 | Opinion | 28 |
| 3.25 | MBNA Information | 28 |

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BANK OF AMERICA

| | | |
|---|---|---|
| 4.1 | Corporate Organization | 28 |
| 4.2 | Capitalization | 29 |
| 4.3 | Authority; No Violation | 30 |
| 4.4 | Consents and Approvals | 31 |
| 4.5 | Reports; Regulatory Matters | 31 |
| 4.6 | Financial Statements | 32 |
| 4.7 | Broker's Fees | 34 |
| 4.8 | Absence of Certain Changes or Events | 34 |
| 4.9 | Legal Proceedings | 34 |
| 4.10 | Taxes and Tax Returns | 34 |
| 4.11 | Compliance with Applicable Law | 35 |
| 4.12 | Reorganization; Approvals | 35 |
| 4.13 | Aggregate Cash Consideration | 35 |
| 4.14 | Bank of America Information | 35 |

ARTICLE V

COVENANTS RELATING TO CONDUCT OF BUSINESS

| | | |
|---|---|---|
| 5.1 | Conduct of Businesses Prior to the Effective Time | 35 |
| 5.2 | MBNA Forbearances | 36 |
| 5.3 | Bank of America Forbearances | 38 |

ARTICLE VI

ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| 6.1 | Regulatory Matters | 38 |
| 6.2 | Access to Information | 39 |
| 6.3 | Stockholder Approval | 40 |
| 6.4 | Affiliates | 40 |
| 6.5 | NYSE Listing | 40 |
| 6.6 | Employee Matters | 40 |
| 6.7 | Indemnification; Directors' and Officers' Insurance | 41 |
| 6.8 | Additional Agreements | 43 |
| 6.9 | Advice of Changes | 43 |
| 6.10 | Exemption from Liability Under Section 16(b) | 43 |

A–ii

**Table of Contents**

| | | |
|---|---|---|
| 6.11 | No Solicitation | 43 |
| 6.12 | Directorship | 45 |
| 6.13 | Restructuring Efforts | 45 |
| 6.14 | MBNA Cumulative Preferred Stock | 46 |
| 6.15 | Dividends | 46 |

ARTICLE VII

CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 7.1 | Conditions to Each Party's Obligation To Effect the Merger | 46 |
| 7.2 | Conditions to Obligations of Bank of America | 46 |
| 7.3 | Conditions to Obligations of MBNA | 47 |

ARTICLE VIII

TERMINATION AND AMENDMENT

| | | |
|---|---|---|
| 8.1 | Termination | 48 |
| 8.2 | Effect of Termination | 49 |
| 8.3 | Fees and Expenses | 49 |
| 8.4 | Amendment | 49 |
| 8.5 | Extension; Waiver | 50 |

ARTICLE IX

GENERAL PROVISIONS

| | | |
|---|---|---|
| 9.1 | Closing | 50 |
| 9.2 | Standard | 50 |
| 9.3 | Nonsurvival of Representations, Warranties and Agreements | 51 |
| 9.4 | Notices | 51 |
| 9.5 | Interpretation | 52 |
| 9.6 | Counterparts | 52 |
| 9.7 | Entire Agreement | 52 |
| 9.8 | Governing Law; Jurisdiction | 52 |
| 9.9 | Publicity | 52 |
| 9.10 | Assignment; Third Party Beneficiaries | 53 |
| Exhibit A — Stock Option Agreement | | |
| Exhibit B — Form of Affiliate Letter | | |

A–iii

INDEX OF DEFINED TERMS

|  | Section |
|---|---|
| Account Agreement | 3.20(h)(i) |
| Accounts | 3.20(h)(ii) |
| Adjusted Option | 1.5(a) |
| Adverse Development | 3.21(f) |
| Agreement | Preamble |
| Alternative Proposal | 6.11(a) |
| Alternative Transaction | 6.11(a) |
| Articles of Merger | 1.2 |
| Bank of America | Preamble |
| Bank of America Bylaws | 4.1(a) |
| Bank of America Capitalization Date | 4.2(a) |
| Bank of America Certificate | 4.1(a) |
| Bank of America Closing Price | 1.5(a) |
| Bank of America Common Stock | 1.4(a) |
| Bank of America Disclosure Schedule | Art. IV |
| Bank of America Preferred Stock | 4.2(a) |
| Bank of America Regulatory Agreement | 4.5(b) |
| Bank of America Requisite Regulatory Approvals | 7.2(d) |
| Bank of America Restricted Share Right | 1.5(b) |
| Bank of America RSU | 1.5(c) |
| Bank of America SEC Reports | 4.5(c) |
| Bank of America Stock Plans | 4.2(a) |
| Bank of America Subsidiary | 3.1(c) |
| BHC Act | 3.1(b) |
| Cardholder | 3.20(h)(iii) |
| Cash Consideration | 1.4(c)(ii) |
| Certificate | 1.4(d) |
| Certificate of Merger | 1.2 |
| Claim | 6.7(a) |
| Closing | 9.1 |
| Closing Date | 9.1 |
| Code | Recitals |
| Confidentiality Agreement | 6.2(b) |
| Convertible Note Agreement | 4.2(a) |
| Covered Employees | 6.6(a) |
| Credit Card | 3.20(h)(iv) |
| Credit Card Associations | 3.20(h)(v) |
| Criticized Assets | 3.16(a) |
| Derivative Transactions | 3.14(a) |
| DGCL | 1.1(a) |
| DPC Common Shares | 1.4(b) |
| Effective Time | 1.2 |
| ERISA | 3.11(a) |

Table of Contents

| | Section |
|---|---|
| Exchange Act | 3.5(c) |
| Exchange Agent | 2.1 |
| Exchange Agent Agreement | 2.1 |
| Exchange Fund | 2.2 |
| Exchange Ratio | 1.5(a) |
| FDIC | 3.1(d) |
| Federal Reserve Board | 3.4 |
| Form S−4 | 3.4 |
| FSA | 3.4 |
| GAAP | 3.1(c) |
| Governmental Entity | 3.4 |
| Indemnified Parties | 6.7(a) |
| Indenture | 3.21(o)(i) |
| Injunction | 7.1(d) |
| Insurance Amount | 6.7(c) |
| Intellectual Property | 3.18 |
| IRS | 3.10(a) |
| Leased Properties | 3.17 |
| Letter of Transmittal | 2.3(a) |
| Liens | 3.2(b) |
| Loans | 3.16(a) |
| Material Adverse Effect | 3.8(a) |
| Materially Burdensome Regulatory Condition | 6.1(b) |
| MBNA | Preamble |
| MBNA Benefit Plans | 3.11(a) |
| MBNA By−laws | 3.1(b) |
| MBNA Capitalization Date | 3.2(a) |
| MBNA Charter | 3.1(b) |
| MBNA Common Stock | 1.4(b) |
| MBNA Contract | 3.13(a) |
| MBNA Disclosure Schedule | Art. III |
| MBNA Master Trust | 3.21(o)(ii) |
| MBNA Options | 1.5(a) |
| MBNA Owner Trust | 3.21(o)(iii) |
| MBNA Preferred Stock | 3.2(a) |
| MBNA Regulatory Agreement | 3.5(b) |
| MBNA Requisite Regulatory Approvals | 7.3(d) |
| MBNA Restricted Shares | 1.5(b) |
| MBNA RSUs | 1.5(c) |
| MBNA SEC Reports | 3.5(c) |
| MBNA Securitization Documents | 3.21(o)(iv) |
| MBNA Securitization Interests | 3.21(o)(v) |
| MBNA Securitization Receivable | 3.21(o)(vi) |
| MBNA Securitization Reports | 3.21(m) |
| MBNA Securitization Transaction | 3.21(o)(vii) |
| MBNA Stock Plans | 1.5(a) |

A−v

**Table of Contents**

| | Section |
|---|---|
| MBNA Subsidiary | 3.1(c) |
| Merger | Recitals |
| Merger Consideration | 1.4(c) |
| MGCL | 1.1(a) |
| NYSE | 1.5(a) |
| OSFI | 3.4 |
| Other Regulatory Approvals | 3.4 |
| Owned Properties | 3.17 |
| Permitted Encumbrances | 3.17 |
| Policies, Practices and Procedures | 3.15(b) |
| Pooling and Servicing Agreement | 3.21(o)(viii) |
| Proxy Statement | 3.4 |
| Real Property | 3.17 |
| Regulatory Agencies | 3.5(a) |
| Retained Interest | 3.21(o)(ix) |
| Sarbanes−Oxley Act | 3.5(c) |
| SBA | 3.4 |
| SEC | 3.4 |
| Securities Act | 3.2(a) |
| Servicer Default | 3.21(o)(x) |
| Servicer Default or Termination | 3.21(g) |
| SRO | 3.4 |
| Stock Consideration | 1.4(c)(i) |
| Stock Option Agreement | Recitals |
| Subsidiary | 3.1(c) |
| Surviving Corporation | Recitals |
| Takeover Statutes | 3.22 |
| Tax(es) | 3.10(b) |
| Tax Return | 3.10(c) |
| Trust Account Common Shares | 1.4(b) |
| Voting Debt | 3.2(a) |

Table of Contents

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of June 30, 2005 (this "Agreement"), by and between MBNA CORPORATION, a Maryland corporation ("MBNA"), and BANK OF AMERICA CORPORATION, a Delaware corporation ("Bank of America").

W I T N E S S E T H:

WHEREAS, the Boards of Directors of MBNA and Bank of America have determined that it is in the best interests of their respective companies and their stockholders to consummate the strategic business combination transaction provided for in this Agreement in which MBNA will, on the terms and subject to the conditions set forth in this Agreement, merge with and into Bank of America (the "Merger"), so that Bank of America is the surviving corporation in the Merger (sometimes referred to in such capacity as the "Surviving Corporation");

WHEREAS, for federal income Tax purposes, it is intended that the Merger shall qualify as a reorganization under the provisions of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and this Agreement is intended to be and is adopted as a "plan of reorganization" for purposes of Sections 354 and 361 of the Code;

WHEREAS, as an inducement and condition to the entrance of Bank of America into this Agreement, MBNA is granting to Bank of America an option pursuant to a stock option agreement in the form set forth in Exhibit A (the "Stock Option Agreement"); and

WHEREAS, the parties desire to make certain representations, warranties and agreements in connection with the Merger and also to prescribe certain conditions to the Merger.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

ARTICLE I

The Merger

1.1    *The Merger*. (a) Subject to the terms and conditions of this Agreement, in accordance with the Delaware General Corporation Law (the "DGCL") and the Maryland General Corporation Law (the "MGCL"), at the Effective Time MBNA shall merge with and into Bank of America. Bank of America shall be the Surviving Corporation in the Merger and shall continue its corporate existence under the laws of the State of Delaware. As of the Effective Time, the separate corporate existence of MBNA shall cease.

(b)    Bank of America may at any time change the method of effecting the combination (including by providing for the merger of MBNA and a wholly owned subsidiary of

Table of Contents

Bank of America) if and to the extent requested by Bank of America and consented to by MBNA (such consent not to be unreasonably withheld or delayed); provided, however, that no such change shall (i) alter or change the amount or kind of the Merger Consideration provided for in this Agreement, (ii) adversely affect the Tax treatment of MBNA's stockholders as a result of receiving the Merger Consideration or the Tax treatment of either party pursuant to this Agreement or (iii) materially impede or delay consummation of the transactions contemplated by this Agreement.

1.2    *Effective Time*. The Merger shall become effective as set forth in the certificate of merger (the "Certificate of Merger") that shall be filed with the Secretary of State of the State of Delaware and the articles of merger (the "Articles of Merger") that shall be filed with the Maryland State Department of Assessments and Taxation on the Closing Date. The term "Effective Time" shall be the date and time when the Merger becomes effective as set forth in the Certificate of Merger and the Articles of Merger.

1.3    *Effects of the Merger*. At and after the Effective Time, the Merger shall have the effects set forth in Section 259 of the DGCL and in Section 3−114 of the MGCL.

1.4    *Conversion of MBNA Common Stock*. At the Effective Time, by virtue of the Merger and without any action on the part of Bank of America, MBNA or the holder of any of the following securities:

(a)    Each share of common stock, par value $0.01 per share, of Bank of America (the "Bank of America Common Stock") and each share of Bank of America Preferred Stock (as defined in Section 4.2(a)) issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding and shall not be affected by the Merger.

(b)    All shares of common stock, par value $0.01 per share, of MBNA issued and outstanding immediately prior to the Effective Time (the "MBNA Common Stock") that are owned by MBNA or Bank of America (other than shares of MBNA Common Stock held in trust accounts, managed accounts and the like, or otherwise held in a fiduciary or agency capacity, that are beneficially owned by third parties (any such shares, "Trust Account Common Shares") and other than shares of MBNA Common Stock held, directly or indirectly, by MBNA or Bank of America in respect of a debt previously contracted (any such shares, "DPC Common Shares")) shall be cancelled and shall cease to exist and no stock of Bank of America or other consideration shall be delivered in exchange therefor.

(c) Subject to Section 1.4(e), each share of the MBNA Common Stock, except for shares of MBNA Common Stock owned by MBNA or Bank of America (other than Trust Account Common Shares and DPC Common Shares), shall be converted, in accordance with the procedures set forth in Article II, into the right to receive, (i) 0.5009 of a share of Bank of America Common Stock (the "Stock Consideration") and (ii) an amount in cash equal to $4.125, without interest (the "Cash Consideration"). The Cash Consideration and the Stock Consideration are sometimes referred to herein collectively as the "Merger Consideration."

(d) All of the shares of MBNA Common Stock converted into the right to receive the Merger Consideration pursuant to this Article I shall no longer be outstanding and

Table of Contents

shall automatically be cancelled and shall cease to exist as of the Effective Time, and each certificate previously representing any such shares of MBNA Common Stock (each, a "Certificate") shall thereafter represent only the right to receive the Merger Consideration and/or cash in lieu of fractional shares, into which the shares of MBNA Common Stock represented by such Certificate have been converted pursuant to this Section 1.4 and Section 2.3(f), as well as any dividends to which holders of MBNA Common Stock become entitled in accordance with Section 2.3(c).

(e)    If, between the date of this Agreement and the Effective Time, the outstanding shares of Bank of America Common Stock shall have been increased, decreased, changed into or exchanged for a different number or kind of shares or securities as a result of a reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split, or other similar change in capitalization, an appropriate and proportionate adjustment shall be made to the Stock Consideration.

1.5    _Stock Options and Other Stock−Based Awards._

(a)    As of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof, each option to purchase shares of MBNA Common Stock granted to employees or directors of MBNA or any of its Subsidiaries under either of the 1991 Long Term Incentive Plan or the 1997 Long Term Incentive Compensation Plan of MBNA (collectively, the "MBNA Stock Plans") that is outstanding immediately prior to the Effective Time (collectively, the "MBNA Options") shall be converted into an option (an "Adjusted Option") to purchase, on the same terms and conditions as applied to each such MBNA Option immediately prior to the Effective Time (taking into account any accelerated vesting of such MBNA Options in accordance with the terms thereof), the number of whole shares of Bank of America Common Stock that is equal to the number of shares of MBNA Common Stock subject to such MBNA Option immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded down to the nearest whole share), at an exercise price per share of Bank of America Common Stock (rounded up to the nearest whole penny) equal to the exercise price for each such share of MBNA Common Stock subject to such MBNA Option immediately prior to the Effective Time divided by the Exchange Ratio; provided, however, that, in the case of any MBNA Option, the exercise price and the number of shares of Bank of America Common Stock subject to such option shall be determined in a manner consistent with the requirements of Section 409A of the Code; provided, further, that, in the case of any MBNA Option to which Section 421 of the Code applies as of the Effective Time (after taking into account the effect of any accelerated vesting thereof) by reason of its qualification under Section 422 of the Code, the exercise price, the number of shares of Bank of America Common Stock subject to such option and the terms and conditions of exercise of such option shall be determined in a manner consistent with the requirements of Section 424(a) of the Code.

"Exchange Ratio" shall mean the sum of (x) the Stock Consideration and (y) the quotient of the Cash Consideration divided by the Bank of America Closing Price, rounded to the nearest one ten thousandth.

"Bank of America Closing Price" shall mean the average, rounded to the nearest one ten thousandth, of the closing sale prices of Bank of America Common Stock on the New York

Table of Contents

Stock Exchange (the "NYSE") as reported by The Wall Street Journal for the five trading days immediately preceding the date of the Effective Time.

(b)    As of the Effective Time, each restricted share of MBNA Common Stock granted to any employee or director of MBNA or any of its Subsidiaries under an MBNA Stock Plan that is outstanding immediately prior to the Effective Time (collectively, the "MBNA Restricted Shares") shall, by virtue of the Merger and without any action on the part of the holder thereof, be cancelled and converted into the right to receive (the "Bank of America Restricted Share Right"), on the same terms and conditions as applied to each such MBNA Restricted Share immediately prior to the Effective Time (including, in the case of Stock Consideration received in respect of each MBNA Restricted Share, the same transfer restrictions taking into account any accelerated vesting of such MBNA Restricted Share in accordance with the terms thereof), the Merger Consideration; provided, however, that, upon the lapsing of restrictions with respect to each such Bank of America Restricted Share Right in accordance with the terms applicable to the corresponding MBNA Restricted Share immediately prior to the Effective Time, Bank of America shall be entitled to deduct and withhold such amounts as may be required to be deducted and withheld under the Code and any applicable state or local tax law with respect to the lapsing of such restrictions.

(c)    As of the Effective Time, each restricted share unit with respect to shares of MBNA Common Stock granted to any employee or director of MBNA or any of its Subsidiaries under an MBNA Stock Plan that is outstanding immediately prior to the Effective Time (collectively, the "MBNA RSUs") shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into a restricted share unit, on the same terms and conditions as applied to each such MBNA RSU immediately prior to the Effective Time (taking into account any accelerated vesting of such MBNA RSU in accordance with the terms thereof), with respect to the number of shares of Bank of America Common Stock that is equal to the number of shares of MBNA Common Stock subject to the MBNA RSU immediately prior to the Effective Time multiplied by the Exchange Ratio (rounded down to the nearest whole share) (a "Bank of America RSU"); provided, however, that, in the case of any MBNA RSU, the number of shares of Bank of America Common Stock subject to such award shall be determined in a manner consistent with the requirements of Section 409A of the Code.

(d)    As of the Effective Time, Bank of America shall assume the obligations and succeed to the rights of MBNA under the MBNA Stock Plans with respect to the Adjusted Options, the Bank of America RSUs and Bank of America Restricted Share Rights. MBNA and Bank of America agree that prior to the Effective Time each of the MBNA Stock Plans shall be amended, to the extent possible without requiring stockholder approval of such amendments, (i) if and to the extent necessary and practicable, to reflect the transactions contemplated by this Agreement, including the conversion of the MBNA Options, MBNA Restricted Shares and MBNA RSUs pursuant to paragraphs (a), (b) and (c) above and the substitution of Bank of America for MBNA thereunder to the extent appropriate to effectuate the assumption of such MBNA Stock Plans by Bank of America, (ii) to preclude any automatic or formulaic grant of options, restricted shares or other awards thereunder on or after the date hereof and (iii) to the extent requested by Bank of America in a timely manner and subject to compliance with applicable law and the terms of the plan, to terminate the MBNA Europe Share Incentive Plan effective immediately prior to the Effective Time. From and after the Effective Time, all

A-4

Table of Contents

references to MBNA (other than any references relating to a "Change in Control" of MBNA) in each MBNA Stock Plan and in each agreement evidencing any award of MBNA Options or MBNA Restricted Shares shall be deemed to refer to Bank of America, unless Bank of America determines otherwise.

(e)    Bank of America shall take all action necessary or appropriate to have available for issuance or transfer a sufficient number of shares of Bank of America Common Stock for delivery upon exercise of the Adjusted Options or settlement of the MBNA RSUs. Promptly after the Effective Time, Bank of America shall prepare and file with the SEC a post−effective amendment converting the Form S−4 to a Form S−8 (or file such other appropriate form) registering a number of shares of Bank of America Common Stock necessary to fulfill Bank of America's obligations under this paragraph (e).

1.6    *Certificate of Incorporation of Bank of America.* At the Effective Time, the Bank of America Certificate shall be the certificate of incorporation of the Surviving Corporation until thereafter amended in accordance with applicable law.

1.7    *Bylaws of Bank of America.* At the Effective Time, the Bank of America Bylaws shall be the Bylaws of the Surviving Corporation until thereafter amended in accordance with applicable law.

1.8    *Tax Consequences.* It is intended that the Merger shall constitute a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement shall constitute a "plan of reorganization" for purposes of Sections 354 and 361 of the Code.

## ARTICLE II

### Delivery of Merger Consideration

2.1    *Exchange Agent.* Prior to the Effective Time Bank of America shall appoint a bank or trust company Subsidiary of Bank of America or another bank or trust company reasonably acceptable to MBNA, or Bank of America's transfer agent, pursuant to an agreement (the "Exchange Agent Agreement") to act as exchange agent (the "Exchange Agent") hereunder.

2.2    *Deposit of Merger Consideration.* At or prior to the Effective Time, Bank of America shall deposit, or shall cause to be deposited, with the Exchange Agent (i) certificates representing the number of shares of Bank of America Common Stock sufficient to deliver, and Bank of America shall instruct the Exchange Agent to timely deliver, the aggregate Stock Consideration, and (ii) immediately available funds equal to the aggregate Cash Consideration (together with, to the extent then determinable, any cash payable in lieu of fractional shares pursuant to Section 2.3(f)) (collectively, the "Exchange Fund") and Bank of America shall instruct the Exchange Agent to timely pay the Cash Consideration, and such cash in lieu of fractional shares, in accordance with this Agreement.

Table of Contents

2.3   *Delivery of Merger Consideration.*

(a)    As soon as reasonably practicable after the Effective Time, the Exchange Agent shall mail to each holder of record of Certificate(s) which immediately prior to the Effective Time represented outstanding shares of MBNA Common Stock whose shares were converted into the right to receive the Merger Consideration pursuant to Section 1.4 and any cash in lieu of fractional shares of Bank of America Common Stock to be issued or paid in consideration therefor (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to Certificate(s) shall pass, only upon delivery of Certificate(s) (or affidavits of loss in lieu of such Certificates) to the Exchange Agent and shall be substantially in such form and have such other provisions as shall be prescribed by the Exchange Agent Agreement (the "Letter of Transmittal") and (ii) instructions for use in surrendering Certificate(s) in exchange for the Merger Consideration and any cash in lieu of fractional shares of Bank of America Common Stock to be issued or paid in consideration therefor in accordance with Section 2.3(f) upon surrender of such Certificate and any dividends or distributions to which such holder is entitled pursuant to Section 2.3(c).

(b)    Upon surrender to the Exchange Agent of its Certificate or Certificates, accompanied by a properly completed Letter of Transmittal, a holder of MBNA Common Stock will be entitled to receive promptly after the Effective Time the Merger Consideration (with the aggregate Cash Consideration paid to each such holder rounded to the nearest whole cent) and any cash in lieu of fractional shares of Bank of America Common Stock to be issued or paid in consideration therefor in respect of the shares of MBNA Common Stock represented by its Certificate or Certificates. Until so surrendered, each such Certificate shall represent after the Effective Time, for all purposes, only the right to receive the Merger Consideration and any cash in lieu of fractional shares of Bank of America Common Stock to be issued or paid in consideration therefor upon surrender of such Certificate in accordance with, and any dividends or distributions to which such holder is entitled pursuant to, this Article II.

(c)    No dividends or other distributions with respect to Bank of America Common Stock shall be paid to the holder of any unsurrendered Certificate with respect to the shares of Bank of America Common Stock represented thereby, in each case until the surrender of such Certificate in accordance with this Article II. Subject to the effect of applicable abandoned property, escheat or similar laws, following surrender of any such Certificate in accordance with this Article II, the record holder thereof shall be entitled to receive, without interest, (i) the amount of dividends or other distributions with a record date after the Effective Time theretofore payable with respect to the whole shares of Bank of America Common Stock represented by such Certificate and not paid and/or (ii) at the appropriate payment date, the amount of dividends or other distributions payable with respect to shares of Bank of America Common Stock represented by such Certificate with a record date after the Effective Time (but before such surrender date) and with a payment date subsequent to the issuance of the Bank of America Common Stock issuable with respect to such Certificate.

(d)    In the event of a transfer of ownership of a Certificate representing MBNA Common Stock that is not registered in the stock transfer records of MBNA, the proper amount of cash and/or shares of Bank of America Common Stock shall be paid or issued in exchange

A–6

Table of Contents

therefor to a person other than the person in whose name the Certificate so surrendered is registered if the Certificate formerly representing such MBNA Common Stock shall be properly endorsed or otherwise be in proper form for transfer and the person requesting such payment or issuance shall pay any transfer or other similar Taxes required by reason of the payment or issuance to a person other than the registered holder of the Certificate or establish to the satisfaction of Bank of America that the Tax has been paid or is not applicable. The Exchange Agent (or, subsequent to the first anniversary of the Effective Time, Bank of America) shall be entitled to deduct and withhold from the cash portion of the Merger Consideration and any cash in lieu of fractional shares of Bank of America Common Stock otherwise payable pursuant to this Agreement to any holder of MBNA Common Stock such amounts as the Exchange Agent or Bank of America, as the case may be, is required to deduct and withhold under the Code, or any provision of state, local or foreign Tax law, with respect to the making of such payment. To the extent the amounts are so withheld by the Exchange Agent or Bank of America, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of shares of MBNA Common Stock in respect of whom such deduction and withholding was made by the Exchange Agent or Bank of America, as the case may be.

(e)    After the Effective Time, there shall be no transfers on the stock transfer books of MBNA of the shares of MBNA Common Stock that were issued and outstanding immediately prior to the Effective Time other than to settle transfers of MBNA Common Stock that occurred prior to the Effective Time. If, after the Effective Time, Certificates representing such shares are presented for transfer to the Exchange Agent, they shall be cancelled and exchanged for the Merger Consideration and any cash in lieu of fractional shares of Bank of America Common Stock to be issued or paid in consideration therefor in accordance with the procedures set forth in this Article II.

(f)    Notwithstanding anything to the contrary contained in this Agreement, no certificates or scrip representing fractional shares of Bank of America Common Stock shall be issued upon the surrender of Certificates for exchange, no dividend or distribution with respect to Bank of America Common Stock shall be payable on or with respect to any fractional share, and such fractional share interests shall not entitle the owner thereof to vote or to any other rights of a stockholder of Bank of America. In lieu of the issuance of any such fractional share, Bank of America shall pay to each former stockholder of MBNA who otherwise would be entitled to receive such fractional share an amount in cash (rounded to the nearest cent) determined by multiplying (i) the Bank of America Closing Price by (ii) the fraction of a share (after taking into account all shares of MBNA Common Stock held by such holder at the Effective Time and rounded to the nearest thousandth when expressed in decimal form) of Bank of America Common Stock to which such holder would otherwise be entitled to receive pursuant to Section 1.4.

(g)    Any portion of the Exchange Fund that remains unclaimed by the stockholders of MBNA as of the first anniversary of the Effective Time may be paid to Bank of America. In such event, any former stockholders of MBNA who have not theretofore complied with this Article II shall thereafter look only to Bank of America with respect to the Merger Consideration, any cash in lieu of any fractional shares and any unpaid dividends and distributions on the Bank of America Common Stock deliverable in respect of each share of MBNA Common Stock such stockholder holds as determined pursuant to this Agreement, in

A-7

Table of Contents

each case, without any interest thereon. Notwithstanding the foregoing, none of Bank of America, MBNA, the Exchange Agent or any other person shall be liable to any former holder of shares of MBNA Common Stock for any amount delivered in good faith to a public official pursuant to applicable abandoned property, escheat or similar laws.

(h) In the event any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if reasonably required by Bank of America or the Exchange Agent, the posting by such person of a bond in such amount as Bank of America may determine is reasonably necessary as indemnity against any claim that may be made against it with respect to such Certificate, the Exchange Agent will issue in exchange for such lost, stolen or destroyed Certificate the Merger Consideration deliverable in respect thereof pursuant to this Agreement.

ARTICLE III

Representations and Warranties of MBNA

Except as disclosed in the disclosure schedule (the "MBNA Disclosure Schedule") delivered by MBNA to Bank of America prior to the execution of this Agreement (which schedule sets forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in this Article III, or to one or more of MBNA's covenants contained herein, provided, however, that notwithstanding anything in this Agreement to the contrary, (i) no such item is required to be set forth in such schedule as an exception to a representation or warranty if its absence would not result in the related representation or warranty being deemed untrue or incorrect under the standard established by Section 9.2, and (ii) the mere inclusion of an item in such schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect (as defined in Section 3.8) on MBNA), MBNA hereby represents and warrants to Bank of America as follows:

3.1   *Corporate Organization.*

(a) MBNA is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Maryland. MBNA has the corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary.

(b) MBNA is duly registered as a bank holding company under the Bank Holding Company Act of 1956, as amended (the "BHC Act"). True, complete and correct copies of the Charter of MBNA, as amended (the "MBNA Charter"), and the By-laws of MBNA (the "MBNA By-laws"), as in effect as of the date of this Agreement, have previously been made available to Bank of America.

A-8

**Table of Contents**

(c)   Each of MBNA's Subsidiaries (i) is duly incorporated or duly formed, as applicable to each such Subsidiary, and validly existing under the laws of its jurisdiction of organization, (ii) is duly licensed or qualified to do business and in good standing in all jurisdictions (whether federal, state, local or foreign) where its ownership or leasing of property or the conduct of its business requires it to be so licensed or qualified and (iii) has all requisite corporate power or other power and authority to own or lease its properties and assets and to carry on its business as now conducted. The articles of incorporation, by-laws and similar governing documents of each MBNA Subsidiary, copies of which have previously been made available to Bank of America, are true, complete and correct copies of such documents as of the date of this Agreement. As used in this Agreement, the word "Subsidiary", when used with respect to either party, means any bank, corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, that is consolidated with such party for financial reporting purposes under U.S. generally accepted accounting principles ("GAAP"), and the terms "MBNA Subsidiary" and "Bank of America Subsidiary" shall mean any direct or indirect Subsidiary of MBNA or Bank of America, respectively.

(d) The deposit accounts of MBNA America Bank, N.A. and MBNA America (Delaware), N.A. are insured by the Federal Deposit Insurance Corporation (the "FDIC") through the Bank Insurance Fund to the fullest extent permitted by law, and all premiums and assessments required to be paid in connection therewith have been paid when due.

(e) The minute books of MBNA and each of its Subsidiaries previously made available to Bank of America contain true, complete and correct records of all meetings and other corporate actions held or taken since December 31, 2002 of their respective stockholders and Boards of Directors (including committees of their respective Boards of Directors).

3.2   *Capitalization.* (a) The authorized capital stock of MBNA consists of 1,500,000,000 shares of MBNA Common Stock, of which, as of May 31, 2005 (the "MBNA Capitalization Date"), 1,255,095,505 shares were issued and outstanding, which includes all of the MBNA Restricted Shares outstanding as of the MBNA Capitalization Date, and 20,000,000 shares of preferred stock, par value $0.01 per share ("MBNA Preferred Stock"), of which, as of the MBNA Capitalization Date, (i) 6,000,000 shares were authorized and 4,547,882 shares were issued and outstanding as $7^{1}/2\%$ Series A Cumulative Preferred Stock and (ii) 6,000,000 shares were authorized and 4,026,000 shares were issued and outstanding as Series B Adjustable Rate Cumulative Preferred Stock. As of the MBNA Capitalization Date, no shares of MBNA Common Stock or MBNA Preferred Stock were reserved for issuance except for (x) shares of MBNA Common Stock reserved for issuance in connection with stock options under the MBNA Stock Plans to purchase 73,840,838 shares of MBNA Common Stock, (y) in connection with 94,000 shares of MBNA Common Stock issuable upon settlement of the MBNA RSUs outstanding as of the MBNA Capitalization Date and (z) shares of MBNA Common Stock reserved for issuance pursuant to the Stock Option Agreement. All of the issued and outstanding shares of MBNA Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof. As of the date of this Agreement, no bonds, debentures, notes or other indebtedness having the right to vote on any matters on which shareholders may vote ("Voting Debt") of MBNA are issued or outstanding. As of the date of this Agreement, except pursuant to this Agreement and the Stock Option Agreement,

Table of Contents

including with respect to the MBNA Stock Plans as set forth herein, MBNA does not have and is not bound by any outstanding subscriptions, options, warrants, calls, rights, commitments or agreements of any character calling for the purchase or issuance of, or the payment of any amount based on, any shares of MBNA Common Stock, MBNA Preferred Stock, Voting Debt or any other equity securities of MBNA or any securities representing the right to purchase or otherwise receive any shares of MBNA Common Stock, MBNA Preferred Stock, Voting Debt or other equity securities of MBNA. As of the date of this Agreement, there are no contractual obligations of MBNA or any of its Subsidiaries (I) to repurchase, redeem or otherwise acquire any shares of capital stock of MBNA or any equity security of MBNA or its Subsidiaries or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of MBNA or its Subsidiaries or (II) pursuant to which MBNA or any of its Subsidiaries is or could be required to register shares of MBNA capital stock or other securities under the Securities Act of 1933, as amended (the "Securities Act"). MBNA has provided Bank of America with a true, complete and correct list of the aggregate number of shares of MBNA Common Stock issuable upon the exercise of each stock option and settlement of each MBNA RSU granted under the MBNA Stock Plans that was outstanding as of the MBNA Capitalization Date and the exercise price for each such MBNA stock option. Other than the MBNA Options, MBNA Restricted Shares and MBNA RSUs, no other equity−based awards are outstanding as of the MBNA Capitalization Date. Since the MBNA Capitalization Date through the date hereof, MBNA has not (A) issued or repurchased any shares of MBNA Common Stock, MBNA Preferred Stock, Voting Debt or other equity securities of MBNA other than the issuance of shares of MBNA Common Stock in connection with the exercise of stock options to purchase MBNA Common Stock granted under the MBNA Stock Plans that were outstanding on the MBNA Capitalization D ate or (B) issued or awarded any options, restricted shares or any other equity−based awards under any of the MBNA Stock Plans.

(b) Except for any director qualifying shares, all of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of MBNA are owned by MBNA, directly or indirectly, free and clear of any material liens, pledges, charges and security interests and similar encumbrances ("Liens"), and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable (subject to 12 U.S.C. § 55) and free of preemptive rights. No such MBNA Subsidiary has or is bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such Subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such Subsidiary.

3.3    *Authority; No Violation.* (a) MBNA has full corporate power and authority to execute and deliver this Agreement and the Stock Option Agreement and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Stock Option Agreement and the consummation of the transactions contemplated hereby and thereby have been duly, validly and unanimously approved by the Board of Directors of MBNA. The Board of Directors of MBNA has determined that the Merger, on substantially the terms and conditions set forth in this Agreement, is advisable and in the best interests of MBNA and its stockholders and has directed that the Merger, on substantially the terms and conditions set forth in this Agreement, be submitted to MBNA's stockholders for consideration at a duly held meeting of such stockholders and, except for the

Table of Contents

approval of this Agreement by the affirmative vote of the holders of a majority of the outstanding shares of MBNA Common Stock entitled to vote at such meeting, no other corporate proceedings on the part of MBNA are necessary to approve this Agreement or the Stock Option Agreement or to consummate the transactions contemplated hereby or thereby. This Agreement and the Stock Option Agreement have been duly and validly executed and delivered by MBNA and (assuming due authorization, execution and delivery by Bank of America) constitute the valid and binding obligation of MBNA, enforceable against MBNA in accordance with their terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and subject to general principles of equity).

(b) Neither the execution and delivery of this Agreement or the Stock Option Agreement by MBNA nor the consummation by MBNA of the transactions contemplated hereby or thereby, nor compliance by MBNA with any of the terms or provisions of this Agreement or the Stock Option Agreement, will (i) violate any provision of the MBNA Charter or the MBNA By-laws or (ii) assuming that the consents, approvals and filings referred to in Section 3.4 are duly obtained and/or made, (A) violate any statute, code, ordinance, rule, regulation, judgment, order, writ, decree or Injunction applicable to MBNA, any of its Subsidiaries or any of their respective properties or assets or (B) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of MBNA or any of its Subsidiaries under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, MBNA Securitization Document, affinity or other partnership or joint marketing agreement, agreement, by-law, rule or regulation of any Credit Card Association, agreement with the American Express Company, other agreement or other instrument or obligation to which MBNA or any of its Subsidiaries is a party or by which any of them or any of their respective properties or assets is bound.

3.4    *Consents and Approvals*. Except for (i) the filing of applications and notices, as applicable, with the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") under the BHC Act and approval of such applications and notices, (ii) the filing of any required applications, filings or notices with the United Kingdom Financial Services Authority (the "FSA"), the Canadian Office of the Superintendent of Financial Institutions (the "OSFI") and any other foreign, federal or state banking, insurance or other regulatory or self-regulatory authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities (each a "Governmental Entity") and approval of such applications, filings and notices (the "Other Regulatory Approvals"), (iii) the filing with the Securities and Exchange Commission (the "SEC") of a Proxy Statement in definitive form relating to the meeting of MBNA's stockholders to be held in connection with this Agreement and the transactions contemplated by this Agreement (the "Proxy Statement") and of a registration statement on Form S-4 (the "Form S-4") in which the Proxy Statement will be included as a prospectus, and declaration of effectiveness of the Form S-4 and the filing and effectiveness of the registration statement contemplated by Section 1.5(e), (iv) the filing of the Certificate of Merger with the Secretary of State of the State of Delaware pursuant to the DGCL and the filing of the Articles of Merger with the Maryland State Department of Assessments and

Table of Contents

Taxation pursuant to the MGCL, (v) any notices to or filings with the Small Business Administration (the "SBA"), (vi) any consents, authorizations, approvals, filings or exemptions in connection with compliance with the rules and regulations of any applicable industry self–regulatory organization ("SRO"), and the rules of the NYSE, or that are required under consumer finance, mortgage banking and other similar laws, and (vii) such filings and approvals as are required to be made or obtained under the securities or "Blue Sky" laws of various states in connection with the issuance of the shares of Bank of America Common Stock pursuant to this Agreement and approval of listing of such Bank of America Common Stock on the NYSE, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the consummation by MBNA of the Merger and the other transactions contemplated by this Agreement or the Stock Option Agreement. No consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the execution and delivery by MBNA of this Agreement or the Stock Option Agreement.

3.5   *Reports; Regulatory Matters.*

(a) MBNA and each of its Subsidiaries have timely filed all reports, registrations and statements, together with any amendments required to be made with respect thereto, that they were required to file since January 1, 2002 with (i) the Federal Reserve Board, (ii) the FDIC, (iii) the Office of the Comptroller of the Currency, (iv) any state insurance commission or other state regulatory authority, (v) the SEC, (vi) the FSA, the OSFI and any other foreign regulatory authority and (vii) any SRO (collectively, "Regulatory Agencies") and with each other applicable Governmental Entity, and all other reports and statements required to be filed by them since January 1, 2002, including any report or statement required to be filed pursuant to the laws, rules or regulations of the United States, any state, any foreign entity, or any Regulatory Agency or Governmental Entity, and have paid all fees and assessments due and payable in connection therewith. Except for normal examinations conducted by a Regulatory Agency or Governmental Entity in the ordinary course of the business of MBNA and its Subsidiaries, no Regulatory Agency or Governmental Entity has initiated since January 1, 2002 or has pending any proceeding, enforcement action or, to the knowledge of MBNA, investigation into the business, disclosures or operations of MBNA or any of its Subsidiaries. Since January 1, 2002, no Regulatory Agency or Governmental Entity has resolved any proceeding, enforcement action or, to the knowledge of MBNA, investigation into the business, disclosures or operations of MBNA or any of its Subsidiaries. There is no unresolved violation, criticism, comment or exception by any Regulatory Agency or Governmental Entity with respect to any report or statement relating to any examinations or inspections of MBNA or any of its Subsidiaries. Since January 1, 2002, there has been no formal or informal inquiries by, or disagreements or disputes with, any Regulatory Agency or Governmental Entity with respect to the business, operations, policies or procedures of MBNA or any of its Subsidiaries (other than normal examinations conducted by a Regulatory Agency or Governmental Entity in MBNA's ordinary course of business).

(b) Neither MBNA nor any of its Subsidiaries is subject to any cease–and–desist or other order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or has been ordered to pay any civil money penalty by, or has been since January 1, 2002 a recipient of any supervisory

A–12

Table of Contents

letter from, or since January 1, 2002 has adopted any policies, procedures or board resolutions at the request or suggestion of, any Regulatory Agency or other Governmental Entity that currently restricts in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its ability to pay dividends, its credit, risk management or compliance policies, its internal controls, its management or its business (or, as applicable, its operations as a financial subsidiary of a national bank under the Gramm–Leach–Bliley Act of 1999), other than those of general application that apply to similarly situated bank holding companies or their Subsidiaries (each item in this sentence, a "MBNA Regulatory Agreement"), nor has MBNA or any of its Subsidiaries been advised since January 1, 2002 by any Regulatory Agency or other Governmental Entity that it is considering issuing, initiating, ordering, or requesting any such MBNA Regulatory Agreement. To the knowledge of MBNA there has not been any event or occurrence since January 1, 2002 that would result in a determination that either MBNA America Bank, N.A. or MBNA America (Delaware), N.A. is not "well capitalized" and "well managed" as a matter of U.S. federal banking law.

(c) MBNA has previously made available to Bank of America an accurate and complete copy of each (i) final registration statement, prospectus, report, schedule and definitive proxy statement filed with or furnished to the SEC by MBNA since January 1, 2002 pursuant to the Securities Act or the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and prior to the date of this Agreement (the "MBNA SEC Reports") and (ii) communication mailed by MBNA to its stockholders since January 1, 2002 and prior to the date of this Agreement. No such MBNA SEC Report or communication, at the time filed, furnished or communicated (and, in the case of registration statements and proxy statements, on the dates of effectiveness and the dates of the relevant meetings, respectively), contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances in which they were made, not misleading, except that information as of a later date (but before the date of this Agreement) shall be deemed to modify information as of an earlier date. As of their respective dates, all MBNA SEC Reports complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto. No executive officer of MBNA has failed in any respect to make the certifications required of him or her under Section 302 or 906 of the Sarbanes–Oxley Act of 2002 (the "Sarbanes–Oxley Act").

3.6    *Financial Statements.*

(a) The financial statements of MBNA and its Subsidiaries included (or incorporated by reference) in the MBNA SEC Reports (including the related notes, where applicable) (i) have been prepared from, and are in accordance with, the books and records of MBNA and its Subsidiaries, (ii) fairly present in all material respects the consolidated results of operations, cash flows, changes in stockholders' equity and consolidated financial position of MBNA and its Subsidiaries for the respective fiscal periods or as of the respective dates therein set forth (subject in the case of unaudited statements to recurring year–end audit adjustments normal in nature and amount), (iii) complied as to form, as of their respective dates of filing with the SEC, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, and (iv) have been prepared in accordance with GAAP consistently applied during the periods involved, except, in each case, as indicated in such statements or in the notes thereto. The books and records of MBNA and its Subsidiaries

A–13

Table of Contents

have been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements and reflect only actual transactions. Ernst & Young LLP has not resigned or been dismissed as independent public accountants of MBNA as a result of or in connection with any disagreements with MBNA on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure.

(b) Neither MBNA nor any of its Subsidiaries has any material liability of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether due or to become due), except for those liabilities that are reflected or reserved against on the consolidated balance sheet of MBNA included in its Quarterly Report on Form 10−Q for the fiscal quarter ended March 31, 2005 (including any notes thereto) and for liabilities incurred in the ordinary course of business consistent with past practice since March 31, 2005 or in connection with this Agreement and the transactions contemplated hereby.

(c) The records, systems, controls, data and information of MBNA and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of MBNA or its Subsidiaries or accountants (including all means of access thereto and therefrom), except for any non−exclusive ownership and non−direct control that would not reasonably be expected to have a material adverse effect on the system of internal accounting controls described below in this Section 3.6(c). MBNA (x) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a−15(e) of the Exchange Act) to ensure that material information relating to MBNA, including its consolidated Subsidiaries, is made known to the chief executive officer and the chief financial officer of MBNA by others within those entities, and (y) has disclosed, based on its most recent evaluation prior to the date hereof, to MBNA's outside auditors and the audit committee of MBNA's Board of Directors (i) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a−15(f) of the Exchange Act) which are reasonably likely to adversely affect MBNA's ability to record, process, summarize and report financial information and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in MBNA's internal controls over financial reporting. These disclosures were made in writing by management to MBNA's auditors and audit committee and a copy has previously been made available to Bank of America. As of the date hereof, there is no reason to believe that its outside auditors and its chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes−Oxley Act, without qualification, when next due.

(d) Since December 31, 2004, (i) through the date hereof, neither MBNA nor any of its Subsidiaries nor, to the knowledge of the officers of MBNA, any director, officer, employee, auditor, accountant or representative of MBNA or any of its Subsidiaries has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of MBNA or any of its Subsidiaries or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that MBNA or any of its Subsidiaries has engaged in questionable accounting or auditing practices, and (ii) no attorney representing MBNA or any of its Subsidiaries, whether or not employed by MBNA

Table of Contents

or any of its Subsidiaries, has reported evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by MBNA or any of its officers, directors, employees or agents to the Board of Directors of MBNA or any committee thereof or to any director or officer of MBNA.

3.7    _Broker's Fees_. Neither MBNA nor any MBNA Subsidiary nor any of their respective officers or directors has employed any broker or finder or incurred any liability for any broker's fees, commissions or finder's fees in connection with the Merger or related transactions contemplated by this Agreement, other than as set forth on Section 3.7 of the MBNA Disclosure Schedule and pursuant to letter agreements, true, complete and correct copies of which have been previously delivered to Bank of America.

3.8    _Absence of Certain Changes or Events_. (a) Since December 31, 2004, no event or events have occurred that have had or are reasonably likely to have, either individually or in the aggregate, a Material Adverse Effect on MBNA. As used in this Agreement, the term "Material Adverse Effect" means, with respect to Bank of America, MBNA or the Surviving Corporation, as the case may be, a material adverse effect on (i) the business, results of operations or financial condition of such party and its Subsidiaries taken as a whole (provided, however, that, with respect to this clause (i), Material Adverse Effect shall not be deemed to include effects to the extent resulting from (A) changes, after the date hereof, in generally accepted accounting principles or regulatory accounting requirements applicable to banks or savings associations and their holding companies, or to credit card companies, generally, (B) changes, after the date hereof, in laws, rules or regulations of general applicability to banks or savings associations and their holding companies, or to credit card companies, generally, or interpretations thereof by courts or Governmental Entities, (C) changes, after the date hereof, in global or national political conditions (including the outbreak of war or acts of terrorism) or in general economic or market conditions affecting banks, credit card companies, savings associations or their holding companies generally except to the extent that such changes in general economic or market conditions have a materially disproportionate adverse effect on such party or (D) consummation or public disclosure of this Agreement or the transactions contemplated hereby), or (ii) the ability of such party to timely consummate the transactions contemplated by this Agreement.

(b) Since December 31, 2004 through and including the date of this Agreement, MBNA and its Subsidiaries have carried on their respective businesses in all material respects in the ordinary course of business consistent with their past practice.

(c) Since December 31, 2004, neither MBNA nor any of its Subsidiaries has (i) except for (A) normal increases for employees (other than officers subject to the reporting requirements of Section 16(a) of the Exchange Act) made in the ordinary course of business consistent with past practice or (B) as required by applicable law or pre-existing contractual obligations, increased the wages, salaries, compensation, pension, or other fringe benefits or perquisites payable to any executive officer, employee, or director from the amount thereof in effect as of December 31, 2004, granted any severance or termination pay, entered into any contract to make or grant any severance or termination pay (in each case, except as required under the terms of agreements or severance plans listed on Section 3.11 of the MBNA Disclosure Schedule, as in effect as of the date hereof ), or paid any bonus other than the customary year—

A−15

end bonuses in amounts consistent with past practice, (ii) granted any options to purchase shares of MBNA Common Stock, any restricted shares of MBNA Common Stock or any right to acquire any shares of its capital stock to any executive officer, director or employee other than grants to employees (other than officers subject to the reporting requirements of Section 16(a) of the Exchange Act) made in the ordinary course of business consistent with past practice under the MBNA Stock Plans, (iii) changed any accounting methods, principles or practices of MBNA or its Subsidiaries affecting its assets, liabilities or businesses, including any reserving, renewal or residual method, practice or policy or (iv) suffered any strike, work stoppage, slow−down, or other labor disturbance.

3.9    *Legal Proceedings*. (a) Neither MBNA nor any of its Subsidiaries is a party to any, and there are no pending or, to the best of MBNA's knowledge, threatened, material legal, administrative, arbitral or other material proceedings, claims, actions or governmental or regulatory investigations of any nature against MBNA or any of its Subsidiaries. None of the proceedings, claims, actions or governmental or regulatory investigations set forth on Section 3.9 of the MBNA Disclosure Schedules would reasonably be expected to have a Material Adverse Effect on MBNA.

(b) There is no Injunction, judgment, or regulatory restriction (other than those of general application that apply to similarly situated bank holding companies or their Subsidiaries) imposed upon MBNA, any of its Subsidiaries or the assets of MBNA or any of its Subsidiaries.

3.10    *Taxes and Tax Returns*. (a) Each of MBNA and its Subsidiaries has duly and timely filed (including all applicable extensions) all material Tax Returns required to be filed by it on or prior to the date of this Agreement (all such returns being accurate and complete in all material respects), has paid all Taxes shown thereon as arising and has duly paid or made provision for the payment of all material Taxes that have been incurred or are due or claimed to be due from it by federal, state, foreign or local taxing authorities other than Taxes that are not yet delinquent or are being contested in good faith, have not been finally determined and have been adequately reserved against. The federal income Tax returns of MBNA and its Subsidiaries have been examined by the Internal Revenue Service (the "IRS") for all years to and including 2000 and any liability with respect thereto has been satisfied or any liability with respect to deficiencies asserted as a result of such examination is covered by reserves that are adequate under GAAP. There are no material disputes pending, or claims asserted, for Taxes or assessments upon MBNA or any of its Subsidiaries for which MBNA does not have reserves that are adequate under GAAP. Neither MBNA nor any of its Subsidiaries is a party to or is bound by any Tax sharing, allocation or indemnification agreement or arrangement (other than such an agreement or arrangement exclusively between or among MBNA and its Subsidiaries). Within the past five years, neither MBNA nor any of its Subsidiaries has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under Section 355(a) of the Code. Neither MBNA nor any of its Subsidiaries is required to include in income any adjustment pursuant to Section 481(a) of the Code, no such adjustment has been proposed by the IRS and no pending request for permission to change any accounting method has been submitted by MBNA or any of its Subsidiaries. Neither MBNA nor any of its Subsidiaries has participated in a "reportable transaction" within the meaning of Treasury Regulation section 1.6011−4(b)(1).

Table of Contents

(b) As used in this Agreement, the term "Tax" or "Taxes" means (i) all federal, state, local, and foreign income, excise, gross receipts, gross income, ad valorem, profits, gains, property, capital, sales, transfer, use, payroll, employment, severance, withholding, duties, intangibles, franchise, backup withholding, value added and other taxes, charges, levies or like assessments together with all penalties and additions to tax and interest thereon and (ii) any liability for Taxes described in clause (i) above under Treasury Regulation Section 1.1502−6 (or any similar provision of state, local or foreign law).

(c) As used in this Agreement, the term "Tax Return" means a report, return or other information (including any amendments) required to be supplied to a governmental entity with respect to Taxes including, where permitted or required, combined or consolidated returns for any group of entities that includes MBNA or any of its Subsidiaries.

3.11    *Employee Matters*.

(a) Section 3.11 of the MBNA Disclosure Schedule sets forth a true, complete and correct list of each "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA, and each employment, consulting, bonus, incentive or deferred compensation, vacation, stock option or other equity−based, severance, termination, retention, change of control, profit−sharing, fringe benefit or other similar plan, program, agreement or commitment for the benefit of any employee, former employee, director or former director of MBNA or any of its Subsidiaries entered into, maintained or contributed to by MBNA or any of its Subsidiaries or to which MBNA or any of its Subsidiaries is obligated to contribute (such plans, programs, agreements and commitments, herein referred to as the "MBNA Benefit Plans").

(b) With respect to each MBNA Benefit Plan, MBNA has made available to Bank of America true, complete and correct copies of the following (as applicable): (i) the written document evidencing such MBNA Benefit Plan or, with respect to any such plan that is not in writing, a written description thereof; (ii) the summary plan description; (iii) the most recent annual report, financial statement and/or actuarial report; (iv) the most recent determination letter from the IRS; (v) the most recent Form 5500 required to have been filed with the IRS, including all schedules thereto; (vi) any related trust agreements, insurance contracts or documents of any other funding arrangements; (vii) any notices to or from the IRS or any office or representative of the Department of Labor relating to any compliance issues in respect of any such MBNA Benefit Plan; and (viii) all amendments, modifications or supplements to any such document.

(c) MBNA and each of its Subsidiaries have operated and administered each MBNA Benefit Plan in compliance with all applicable laws and the terms of each such plan. The terms of each MBNA Benefit Plan are in compliance with all applicable laws. Each MBNA Benefit Plan that is intended to be "qualified" under Section 401 and/or 409 of the Code has received a favorable determination letter from the IRS to such effect and, to the knowledge of MBNA, no fact, circumstance or event has occurred or exists since the date of such determination letter that would reasonably be expected to adversely affect the qualified status of any such MBNA Benefit Plan. There are no pending or, to the knowledge of MBNA, threatened or anticipated claims by, on behalf of or against any of the MBNA Benefit Plans or any assets

A−17

Table of Contents

thereof (other than routine claims for benefits). All contributions, premiums and other payments required to be made with respect to any MBNA Benefit Plan have been made on or before their due dates under applicable law and the terms of such MBNA Benefit Plan, and with respect to any such contributions, premiums or other payments required to be made with respect to any MBNA Benefit Plan that are not yet due, to the extent required by GAAP, adequate reserves are reflected on the consolidated balance sheet of MBNA included in the Quarterly Report on Form 10−Q for the fiscal quarter ended March 31, 2005 (including any notes thereto) or liability therefor was incurred in the ordinary course of business consistent with past practice since March 31, 2005.

(d) No MBNA Benefit Plan is subject to Section 412 of the Code or Section 302 or Title IV of ERISA or is a multiemployer plan or multiple employer plan within the meaning of Sections 4001(a)(3) or 4063/4064 of ERISA, respectively. Neither MBNA nor any of its Subsidiaries has incurred, either directly or indirectly (including as a result of any indemnification or joint and several liability obligation), any liability pursuant to Title I or IV of ERISA or the penalty tax, excise tax or joint and several liability provisions of the Code relating to employee benefit plans, in each case, with respect to the MBNA Benefit Plans and no event, transaction or condition has occurred or exists that could reasonably be expected to result in any such liability to MBNA or any of its Subsidiaries.

(e) Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in conjunction with any other event, (i) result in any payment or benefit becoming due or payable, or required to be provided, to any director, employee or independent contractor of MBNA or any of its Subsidiaries, (ii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such director, employee or independent contractor, (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation or (iv) result in any amount failing to be deductible by reason of Section 280G of the Code.

(f) No payment made or to be made in respect of any employee or former employee of MBNA or any of its Subsidiaries is or will be nondeductible by reason of Section 162(m) of the Code.

(g) Neither MBNA nor any of its Subsidiaries is a party to or bound by any labor or collective bargaining agreement and there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit with respect to, or otherwise attempting to represent, any of the employees of MBNA or any of its Subsidiaries. There are no labor related controversies, strikes, slowdowns, walkouts or other work stoppages pending or, to the knowledge of MBNA, threatened and neither MBNA nor any of its Subsidiaries has experienced any such labor related controversy, strike, slowdown, walkout or other work stoppage within the past three years. Neither MBNA nor any of its Subsidiaries is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Entity relating to employees or employment practices. Each of MBNA and its Subsidiaries are in compliance with all applicable laws, statutes, orders, rules, regulations, policies or guidelines of any Governmental Entity relating to labor, employment, termination of employment or similar matters and have not engaged in any unfair labor practices or similar prohibited practices.