Table of Contents

3.12  _Compliance with Applicable Law._ (a) MBNA and each of its Subsidiaries hold all material licenses, franchises, permits and authorizations necessary for the lawful conduct of their respective businesses under and pursuant to each, and have complied in all respects with and are not in default in any material respect under any, applicable law, statute, order, rule, regulation, policy or guideline of any Governmental Entity relating to MBNA or any of its Subsidiaries. Other than as required by (and in conformity with) law, neither MBNA nor any MBNA Subsidiary acts as a fiduciary for any Person, or administers any account for which it acts as a fiduciary, including as a trustee, agent, custodian, personal representative, guardian, conservator or investment advisor.

(b) Since the enactment of the Sarbanes−Oxley Act, MBNA has been and is in compliance in all material respects with (i) the applicable provisions of the Sarbanes−Oxley Act and (ii) the applicable listing and corporate governance rules and regulations of the NYSE. Section 3.12(b) of the MBNA Disclosure Schedule sets forth, as of the date hereof, a schedule of all officers and directors of MBNA who have outstanding loans from MBNA or its Subsidiaries, and there has been no default on, or forgiveness or waiver of, in whole or in part, any such loan during the two years immediately preceding the date hereof.

3.13  _Certain Contracts._ (a) Neither MBNA nor any of its Subsidiaries is a party to or bound by any contract, arrangement, commitment or understanding (whether written or oral) (i) with respect to the employment of any directors, officers, employees or consultants, other than in the ordinary course of business consistent with past practice, (ii) which, upon execution of this Agreement or consummation or stockholder approval of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional acts or events) result in any payment or benefits (whether of severance pay or otherwise) becoming due from Bank of America, MBNA, the Surviving Corporation, or any of their respective Subsidiaries to any officer or employee of MBNA or any Subsidiary thereof, (iii) that is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S−K of the SEC) to be performed after the date of this Agreement that has not been filed or incorporated by reference in the MBNA SEC Reports filed prior to the date hereof, (iv) that materially restricts the conduct of any line of business by MBNA or, to the knowledge of MBNA, upon consummation of the Merger will materially restrict the ability of the Surviving Corporation to engage in any line of business in which a bank holding company may lawfully engage, (v) with or to a labor union or guild (including any collective bargaining agreement) or (vi) including any stock option plan, stock appreciation rights plan, restricted stock plan or stock purchase plan, any of the benefits of which will be increased, or the vesting of the benefits of which will be accelerated, by the execution of this Agreement, the occurrence of any stockholder approval or the consummation of any of the transactions contemplated by this Agreement, or the value of any of the benefits of which will be calculated on the basis of or affected by any of the transactions contemplated by this Agreement. Each contract, arrangement, commitment or understanding of the type described in this Section 3.13(a), whether or not set forth in the MBNA Disclosure Schedule, is referred to as an "MBNA Contract," and neither MBNA nor any of its Subsidiaries knows of, or has received notice of, any violation of any MBNA Contract by any of the other parties thereto.

(b) (i) Each MBNA Contract is valid and binding on MBNA or its applicable Subsidiary and is in full force and effect, (ii) MBNA and each of its Subsidiaries has in all material respects performed all obligations required to be performed by it to date under each

A−19

Table of Contents

MBNA Contract, and (iii) no event or condition exists that constitutes or, after notice or lapse of time or both, will constitute, a material default on the part of MBNA or any of its Subsidiaries under any such MBNA Contract.

3.14   *Risk Management Instruments*. (a) "Derivative Transactions" means any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction or collar transaction relating to one or more currencies, commodities, bonds, equity securities, loans, interest rates, prices, values, or other financial or non−financial assets, credit−related events or conditions or any indexes, or any other similar transaction or combination of any of these transactions, including collateralized mortgage obligations or other similar instruments or any debt or equity instruments evidencing or embedding any such types of transactions, and any related credit support, collateral or other similar arrangements related to such transactions; provided that, for the avoidance of doubt, the term "Derivative Transactions" shall not include any MBNA Stock Option.

(b) All Derivative Transactions, whether entered into for the account of MBNA or any of its Subsidiaries or for the account of a customer of MBNA or any of its Subsidiaries, were entered into in the ordinary course of business consistent with past practice and in accordance with prudent banking practice and applicable laws, rules, regulations and policies of any Regulatory Authority and in accordance with the investment, securities, commodities, risk management and other policies, practices and procedures employed by MBNA and its Subsidiaries, and with counterparties believed at the time to be financially responsible and able to understand (either alone or in consultation with their advisers) and to bear the risks of such Derivative Transactions. All of such Derivative Transactions are legal, valid and binding obligations of MBNA or one of its Subsidiaries enforceable against it in accordance with their terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and subject to general principles of equity), and are in full force and effect. MBNA and its Subsidiaries have duly performed their obligations under the Derivative Transactions to the extent that such obligations to perform have accrued and, to MBNA's knowledge, there are no breaches, violations or defaults or allegations or assertions of such by any party thereunder.

3.15   *Investment Securities and Commodities*. (a) Except as would not reasonably be expected to have a Material Adverse Effect on MBNA, each of MBNA and its Subsidiaries has good title to all securities and commodities owned by it (except those sold under repurchase agreements or held in any fiduciary or agency capacity), free and clear of any Liens, except to the extent such securities or commodities are pledged in the ordinary course of business to secure obligations of MBNA or its Subsidiaries. Such securities and commodities are valued on the books of MBNA in accordance with GAAP in all material respects.

(b) MBNA and its Subsidiaries and their respective businesses employ investment, securities, commodities, risk management and other policies, practices and procedures (the "Policies, Practices and Procedures") which MBNA believes are prudent and reasonable in the context of such businesses. Prior to the date hereof, MBNA has made available to Bank of America in writing the material Policies, Practices and Procedures.

A−20

Table of Contents

3.16 *Loan Portfolio*. (a) Section 3.16(a) of the MBNA Disclosure Schedule sets forth (i) the aggregate outstanding principal amount, as of March 31, 2005, of all loan agreements, notes or borrowing arrangements (including leases, credit enhancements, commitments, guarantees and interest−bearing assets) payable to MBNA or its Subsidiaries (collectively, "Loans"), other than "non−accrual" Loans, and (ii) the aggregate outstanding principal amount, as of March 31, 2005, of all "non−accrual" Loans. As of March 31, 2005, MBNA and its Subsidiaries, taken as a whole, did not have outstanding Loans and assets classified as "Other Real Estate Owned" with an aggregate then outstanding, fully committed principal amount in excess of that amount set forth on Section 3.16(a) of the MBNA Disclosure Schedule, net of specific reserves with respect to such Loans and assets, that were designated as of such date by MBNA as "Special Mention", "Substandard", "Doubtful", "Loss", or words of similar import ("Criticized Assets"). Section 3.16(a) of the MBNA Disclosure Schedule sets forth (A) a summary of Criticized Assets as of March 31, 2005, by category of Loan (e.g., commercial, consumer, etc.), together with the aggregate principal amount of such Loans by category and the amount of specific reserves with respect to each such category of Loans and (B) each asset of MBNA or any of its Subsidiaries that, as of March 31, 2005, is classified as "Other Real Estate Owned" and the book value thereof.

(b) Each Loan (i) is evidenced by notes, agreements or other evidences of indebtedness which are true, genuine and what they purport to be, (ii) to the extent secured, has been secured by valid liens and security interests which have been perfected and (iii) is the legal, valid and binding obligation of the obligor named therein, enforceable in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and subject to general principles of equity). All Loans originated by MBNA or its Subsidiaries, and all such Loans purchased by MBNA or its Subsidiaries, were made or purchased in accordance with customary lending standards of MBNA or its Subsidiaries, as applicable. All such Loans (and any related guarantees) and payments due thereunder are, and on the Closing Date will be, free and clear of any Lien, and MBNA or its Subsidiaries has complied in all material respects, and on the Closing Date will have complied in all material respects, with all laws and regulations relating to such Loans.

3.17 *Property*. MBNA or one of its Subsidiaries (a) has good and marketable title to all the properties and assets reflected in the latest audited balance sheet included in such MBNA SEC Reports as being owned by MBNA or one of its Subsidiaries or acquired after the date thereof (except properties sold or otherwise disposed of since the date thereof in the ordinary course of business) (the "Owned Properties"), free and clear of all Liens of any nature whatsoever, except (i) statutory Liens securing payments not yet due, (ii) Liens for real property taxes not yet due and payable, (iii) easements, rights of way, and other similar encumbrances that do not materially affect the use of the properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties and (iv) such imperfections or irregularities of title or Liens as do not materially affect the use of the properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties (collectively, "Permitted Encumbrances"), and (b) is the lessee of all leasehold estates reflected in the latest audited financial statements included in such MBNA SEC Reports or acquired after the date thereof (except for leases that have expired by their terms since the date thereof) (the "Leased Properties" and, collectively with the Owned Properties, the "Real Property"), free and

A−21

Table of Contents

clear of all Liens of any nature whatsoever, except for Permitted Encumbrances, and is in possession of the properties purported to be leased thereunder, and each such lease is valid without default thereunder by the lessee or, to MBNA's knowledge, the lessor. The Real Property is in material compliance with all applicable zoning laws and building codes, and the buildings and improvements located on the Real Property are in good operating condition and in a state of good working order, ordinary wear and tear excepted. There are no pending or, to the knowledge of MBNA, threatened condemnation proceedings against the Real Property. MBNA and its Subsidiaries are in compliance with all applicable health and safety related requirements for the Real Property, including those under the Americans with Disabilities Act of 1990 and the Occupational Health and Safety Act of 1970.

3.18 *Intellectual Property*. MBNA and each of its Subsidiaries owns, or is licensed to use (in each case, free and clear of any Liens), all Intellectual Property used in or necessary for the conduct of its business as currently conducted. The use of any Intellectual Property by MBNA and its Subsidiaries does not, to the knowledge of MBNA, infringe on or otherwise violate the rights of any person and is in accordance with any applicable license pursuant to which MBNA or any Subsidiary acquired the right to use any Intellectual Property. No person is challenging, infringing on or otherwise violating any right of MBNA or any of its Subsidiaries with respect to any Intellectual Property owned by and/or licensed to MBNA or its Subsidiaries. Neither MBNA nor any of its Subsidiaries has received any written notice of any pending claim with respect to any Intellectual Property used by MBNA and its Subsidiaries and no Intellectual Property owned and/or licensed by MBNA or its Subsidiaries is being used or enforced in a manner that would result in the abandonment, cancellation or unenforceability of such Intellectual Property. For purposes of this Agreement, "Intellectual Property" means trademarks, service marks, brand names, certification marks, trade dress and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; inventions, discoveries and ideas, whether patentable or not, in any jurisdiction; patents, applications for patents (including divisions, continuations, continuations in part and renewal applications), and any renewals, extensions or reissues thereof, in any jurisdiction; nonpublic information, trade secrets and confidential information and rights in any jurisdiction to limit the use or disclosure thereof by any person; writings and other works, whether copyrightable or not, in any jurisdiction; and registrations or applications for registration of copyrights in any jurisdiction, and any renewals or extensions thereof; and any similar intellectual property or proprietary rights.

3.19 *Environmental Liability*. There are no legal, administrative, arbitral or other proceedings, claims, actions, causes of action or notices with respect to any environmental, health or safety matters or any private or governmental environmental, health or safety investigations or remediation activities of any nature seeking to impose, or that are reasonably likely to result in, any liability or obligation of MBNA or any of its Subsidiaries arising under common law or under any local, state or federal environmental, health or safety statute, regulation or ordinance, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, pending or threatened against MBNA or any of its Subsidiaries. To the knowledge of MBNA, there is no reasonable basis for, or circumstances that are reasonably likely to give rise to, any such proceeding, claim, action, investigation or remediation by any Governmental Entity or any third party that would give rise to any liability or

A-22

Table of Contents

obligation on the part of MBNA or any of its Subsidiaries. Neither MBNA nor any of its Subsidiaries is subject to any agreement, order, judgment, decree, letter or memorandum by or with any Governmental Entity or third party imposing any liability or obligation with respect to any of the foregoing.

3.20 *Credit Card Operations*.

(a) Since January 1, 2002, all of the Accounts have been solicited, originated, maintained and serviced in compliance with all applicable policies, practices and procedures of MBNA and its Subsidiaries, all applicable legal and regulatory requirements and all applicable by—laws, rules and regulations of the relevant Credit Card Associations or the terms of the network card license arrangement with American Express Company; and none of the Accounts have been re—aged except in accordance with the re—aging policies referred to above as in effect at the time of re—aging.

(b) All Accounts are governed by Account Agreements in one of the representative forms made available to Bank of America prior to the date hereof. Since January 1, 2002, none of the terms of those Account Agreements have been waived or altered, modified or impaired (other than on a case—by—case basis consistent with MBNA's applicable policies in effect at the time and as reflected in the books and records of MBNA and its Subsidiaries), and each Account has complied with the applicable Account Agreement.

(c) All Account Agreements are valid and legally binding obligations of the obligors thereon, including any co—signer, guarantor or surety, in the full amount thereof set forth in the books and records of MBNA and its Subsidiaries, are enforceable against such obligors in accordance with their respective terms (subject to applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent transfer and other laws relating to or affecting creditors' rights generally, to general equitable principles and to the Servicemembers Civil Relief Act) and are not subject to any claim or defense by such obligors of fraud or usury against MBNA or its Subsidiaries. To MBNA's knowledge, each of the receivables relating to or arising under the Accounts arose from or in connection with a bona fide sale or loan transaction (including any amounts in respect of finance charges, annual fees and similar fees and charges assessed on the Accounts), and none of such Accounts is subject to offset, recoupment, adjustment or any other valid and cognizable claim or defense of any obligor other than as may be permitted by the Fair Credit Billing Act, as amended, and the regulations thereunder.

(d) Since January 1, 2002, all disclosures attributable to MBNA or its Subsidiaries made in connection with the opening, servicing and collection of the Accounts complied with all applicable laws and regulations at the time made.

(e) Each Account relates to the extension of credit and the advancement of money on a revolving basis and would be considered a credit or charge card account under Regulation Z of the Federal Reserve Board. No Account is secured by any collateral whatsoever, except to the extent arising in connection with Accounts under collection and except for accounts secured or partially secured by deposits at MBNA America Bank, N.A. or MBNA America (Delaware), N.A. in compliance with all legal and regulatory requirements and the bylaws, rules and regulations of the relevant Credit Card Associations, for each of which

A—23

Table of Contents

Accounts there exists a valid, binding and enforceable first priority lien on any funds in the deposit account related to such Account. The contractual and other arrangements for such secured or partially secured Accounts are not subject to any investigation, inquiry, claim, or challenge by any Regulatory Agency or other Governmental Entity. No Account may be accessed by a debit card.

(f) The interest rates, fees and charges applicable to the Accounts comply with the applicable Account Agreements and all legal and regulatory requirements and the by−laws, rules and regulations of the relevant Credit Card Associations or the terms of the network card license arrangement with American Express Company

(g) Except in connection with its partnership and co−branding marketing programs or its membership product vendors, neither MBNA nor any of its Subsidiaries has transferred, delivered or granted access to its list of Cardholders, or any part thereof, to any person engaged, directly or indirectly, in the marketing or distribution of any Credit Card or other service or product.

(h) For purposes of this Agreement, the following terms shall have the meanings assigned below:

(i) "Account Agreement" means an agreement (including related disclosure) between MBNA or one of its Subsidiaries and a person or persons under which the Accounts are established and Credit Cards are issued to or on behalf of such person or persons.

(ii) "Accounts" means all accounts under which a purchase, cash advance or credit transaction may be or has been made by a Cardholder by means of a Credit Card.

(iii) "Cardholder" means a person or persons in whose name(s) an Account has been established in connection with a Credit Card pursuant to an Account Agreement.

(iv) "Credit Card" means a card that may be used by the holder to purchase goods and services and to obtain cash advances through open−end revolving credit, commonly known as a credit or charge card.

(v) "Credit Card Associations" means VISA U.S.A., Inc., VISA International Inc. and MasterCard International Incorporated.

3.21 *Securitizations*.

(a) Each of MBNA or its applicable Subsidiary and, to the knowledge of MBNA, each other party thereto has performed in all material respects the obligations to be performed by it under each of the MBNA Securitization Documents, including the filing of any financing statements, continuation statements or amendments under the Uniform Commercial Code of each applicable jurisdiction with the appropriate filing offices.

A−24

Table of Contents

(b) Each of the MBNA Securitization Interests, each series of certificates or other securities issued by any MBNA Master Trust, each series of notes or other securities issued by any MBNA Owner Trust and each of the MBNA Securitization Documents to which MBNA, any of its Subsidiaries, MBNA Owner Trust or any MBNA Master Trust, as the case may be, is a party is in full force and effect and is a valid, binding and enforceable obligation of MBNA or such Subsidiary, MBNA Owner Trust or any MBNA Master Trust, as the case may be, and, to the knowledge of MBNA, of the other parties thereto, subject to applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent transfer and other laws affecting creditors' rights generally and to general equitable principles.

(c) True and complete copies of the MBNA Securitization Documents in full force and effect as of the date hereof have been made available to Bank of America.

(d) All MBNA Securitization Documents required to be qualified under the Trust Indenture Act of 1939, as amended, have been so qualified and neither any MBNA Master Trust nor any MBNA Owner Trust is required to be registered under the Investment Company Act of 1940, as amended, or the Financial Services and Markets Act 2000. The sale of all securities issued by any MBNA Master Trust and any MBNA Owner Trust was either duly registered under, or exempt from the registration requirements of, the Securities Act or the Financial Services and Markets Act 2000, as applicable.

(e) MBNA America Bank, N.A. is the sole owner of the Retained Interest that is the Seller Interest (as defined in the Pooling and Servicing Agreement) and any other comparable interest under any other MBNA Securitization Document and MBNA or an MBNA Subsidiary is the sole owner of all other MBNA Securitization Interests.

(f) No event or condition exists which is or with either notice or the passage of time would (A) constitute a default, event of default, early redemption event, payout event or early amortization event under any MBNA Securitization Document, (B) require any accelerated application of cash flows received in respect of the MBNA Securitization Receivables, or (C) trigger any requirement under any MBNA Securitization Document to (x) fund an increase in any spread account or similar account (other than with respect to spread accounts that have already been funded), (y) draw on any such account under the terms of any MBNA Securitization Document or (z) otherwise increase any credit enhancement required under the MBNA Securitization Documents (each, an "Adverse Development").

(g) No event or condition exists which constitutes a Servicer Default or other similar event permitting the termination of the servicer under any of the MBNA Securitization Documents (a "Servicer Default or Termination").

(h) Since January 1, 2002, on a consolidated basis, MBNA has properly accounted for the sale of the MBNA Securitization Receivables under GAAP, including Statement of Financial Accounting Standards No. 140, and including in respect of the reporting of income arising from the sale of such MBNA Securitization Receivables. Certain securitizations have been structured as financings and are not treated as a sale.

A–25

Table of Contents

(i) The consummation of the transactions contemplated hereby (including the Merger) shall not cause the occurrence of an Adverse Development or a Servicer Default or Termination.

(j) On a consolidated basis, MBNA is not required to consolidate any variable interest entity under GAAP, including FIN 46 and FIN 46R, as in effect as of the date hereof in connection with any transaction related to an MBNA Owner Trust or MBNA Master Trust.

(k) Since January 1, 2002, neither MBNA nor any of its Subsidiaries owns or has owned any security issued by an MBNA Owner Trust or MBNA Master Trust that includes an embedded derivative under GAAP.

(l) Each MBNA Subsidiary which acts as a servicer or trustee and, to the knowledge of MBNA, each other party which acts as servicer or trustee under the MBNA Securitization Documents have properly administered all accounts in accordance with the terms of the governing documents and applicable common law and the accountings for each such account are true and correct and accurately reflect the assets of such account.

(m) MBNA has previously made available to Bank of America an accurate and complete copy of each final registration statement, prospectus, prospectus supplement, report and schedule filed with or furnished to the SEC by any entity relating to any MBNA Securitization Transaction since January 1, 2002 pursuant to the Securities Act, the Exchange Act, the Investment Company Act of 1940, as amended, or the Financial Services and Markets Act 2000, as applicable, and prior to the date of this Agreement (the "MBNA Securitization Reports"). No such MBNA Securitization Report, at the time dated, filed or furnished (and, in the case of registration statements, on the dates of effectiveness), contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein not misleading. As of their respective dates, all MBNA Securitization Reports complied as to form in all material respects with the published rules and regulations of the SEC and the Financial Services Authority, as applicable, with respect thereto. All reports (including required certifications) required to be filed with the SEC or the Financial Services Authority relating to the MBNA Securitization Transactions have been filed on a timely basis.

(n) MBNA or its applicable Subsidiary has made all reasonably necessary plans and preparations in order to comply in a timely manner with all requirements of Regulation AB promulgated by the SEC.

(o) For purposes of this Agreement, the following terms shall have the meanings assigned below:

(i) "Indenture" means that certain indenture dated as of May 24, 2001, as amended, by and between MBNA Credit Card Master Note Trust and the Bank of New York as indenture trustee.

(ii) "MBNA Master Trust" means the MBNA Master Credit Card Trust II created pursuant to the Pooling and Servicing Agreement or any other trust or similar special purpose entity created to hold and securitize any

A–26

Table of Contents

receivables relating to Accounts or other receivables of MBNA or any MBNA Subsidiary.

(iii) "MBNA Owner Trust" means the MBNA Credit Card Master Note Trust and any other trust or other similar special purpose entity created to hold one or more securities issued by MBNA Master Trust and issue notes or other securities backed by such securities.

(iv) "MBNA Securitization Documents" means the Pooling and Servicing Agreement, the Indenture, each security issued by any MBNA Master Trust, each security issued by any MBNA Owner Trust, and each prospectus, offering circular, underwriting agreement and purchase agreement related to any such security and each supplement, terms or pricing agreement or derivative or other agreement relating to the foregoing and each document required to be delivered in connection therewith.

(v) "MBNA Securitization Interests" means any securities, any Retained Interest, any spread account, cash collateral account or other residual or servicing interest (in each case whether or not certificated) owned by MBNA or any Subsidiary created pursuant to any MBNA Securitization Document.

(vi) "MBNA Securitization Receivable" means a receivable related to an Account or other receivable of MBNA or any MBNA Subsidiary that MBNA or any MBNA Subsidiary has designated to an MBNA Master Trust.

(vii) "MBNA Securitization Transaction" means any transaction contemplated by the MBNA Securitization Documents.

(viii) "Pooling and Servicing Agreement" means that certain Pooling and Servicing Agreement, dated as of August 4, 1994, as amended, by and between MBNA America Bank, N.A., as seller and servicer, and The Bank of New York, as trustee.

(ix) "Retained Interest" means an interest retained by MBNA or any MBNA Subsidiary pursuant to the MBNA Securitization Documents in any MBNA Securitization Receivable.

(x) "Servicer Default" means a servicer default or similar event, as specified in the relevant Pooling and Servicing Agreement, Indenture or other MBNA Securitization Document, as the case may be.

3.22 *State Takeover Laws*. The Board of Directors of MBNA has unanimously approved this Agreement and the Stock Option Agreement and the transactions contemplated hereby and thereby as required to render inapplicable to such agreements and transactions Sections 3−601 to 3−604 and 3−701 to 3−709 of the MGCL and, to the knowledge of MBNA, any similar "moratorium," "control share," "fair price," "takeover" or "interested stockholder" law (any such laws, "Takeover Statutes").

A−27

Table of Contents

3.23 _Reorganization; Approvals_. As of the date of this Agreement, MBNA (a) is not aware of any fact or circumstance that could reasonably be expected to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code, and (b) knows of no reason why all regulatory approvals from any Governmental Entity required for the consummation of the transactions contemplated by this Agreement should not be obtained on a timely basis.

3.24 _Opinion_. Prior to the execution of this Agreement, the MBNA Board of Directors has received an opinion from UBS Securities to the effect that as of the date thereof and based upon and subject to the matters set forth therein, the Merger Consideration is fair to the stockholders of MBNA from a financial point of view. Such opinion has not been amended or rescinded as of the date of this Agreement.

3.25 _MBNA Information_. The information relating to MBNA and its Subsidiaries that is provided by MBNA or its representatives for inclusion in the Proxy Statement and the Form S–4, or in any application, notification or other document filed with any other Regulatory Agency or other Governmental Entity in connection with the transactions contemplated by this Agreement, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. The portions of the Proxy Statement relating to MBNA and other portions within the reasonable control of MBNA will comply in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder.

ARTICLE IV

Representations and Warranties of Bank of America

Except as disclosed in the disclosure schedule (the "Bank of America Disclosure Schedule") delivered by Bank of America to MBNA prior to the execution of this Agreement (which schedule sets forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in this Article IV, or to one or more of Bank of America's covenants contained herein, provided, however, that notwithstanding anything in this Agreement to the contrary, (i) no such item is required to be set forth in such schedule as an exception to a representation or warranty if its absence would not result in the related representation or warranty being deemed untrue or incorrect under the standard established by Section 9.2, and (ii) the mere inclusion of an item in such schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect on Bank of America), Bank of America hereby represents and warrants to MBNA as follows:

4.1 _Corporate Organization_. (a) Bank of America is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware. Bank of America has the corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified

A–28

Table of Contents

to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary. Bank of America is duly registered as a bank holding company under the BHC Act and is a financial holding company pursuant to Section 4(1) of the BHC Act and meets the applicable requirements for qualification as such. True, complete and correct copies of the Amended and Restated Certificate of Incorporation, as amended (the "Bank of America Certificate"), and Bylaws of Bank of America (the "Bank of America Bylaws"), as in effect as of the date of this Agreement, have previously been made available to MBNA.

(b) Each Bank of America Subsidiary (i) is duly incorporated or duly formed, as applicable to each such Subsidiary, and validly existing under the laws of its jurisdiction of organization, (ii) is duly qualified to do business and in good standing in all jurisdictions (whether federal, state, local or foreign) where its ownership or leasing of property or the conduct of its business requires it to be so qualified, and (iii) has all requisite corporate power or other power and authority to own or lease its properties and assets and to carry on its business as now conducted.

4.2 _Capitalization_. (a) The authorized capital stock of Bank of America consists of 7,500,000,000 shares of Bank of America Common Stock, of which, as of June 24, 2005 (the "Bank of America Capitalization Date"), 4,025,666,601 shares were issued and outstanding, and 100,000,000 shares of preferred stock, $0.01 par value (the "Bank of America Preferred Stock"), of which, as of the Bank of America Capitalization Date, (x) 35,045 shares were authorized and 7,739 shares were issued and outstanding as Bank of America Series B 7% Cumulative Redeemable Preferred Stock, (y) 690,000 shares were authorized and 382,450 shares were issued and outstanding as Bank of America Series VI 6.75% Perpetual Preferred Stock and (z) 805,000 shares were authorized and 700,000 shares were issued and outstanding as Bank of America Series VII 6.60% Cumulative Preferred Stock. As of the Bank of America Capitalization Date, no shares of Bank of America Common Stock were held in Bank of America's treasury. As of the Bank of America Capitalization Date, no shares of Bank of America Common Stock or Bank of America Preferred Stock were reserved for issuance, except for (i) 718,265,197 shares of Bank of America Common Stock reserved for issuance upon exercise of options issued pursuant to employee and director stock plans of Bank of America or a Subsidiary of Bank of America in effect as of the date of this Agreement (the "Bank of America Stock Plans"), (ii) 11,183,732 shares of Bank of America Common Stock reserved for issuance pursuant to Bank of America's dividend reinvestment plan and (iii) 159,954 shares of Bank of America Common Stock reserved for issuance pursuant to a convertible note agreement (the "Convertible Note Agreement"). All of the issued and outstanding shares of Bank of America Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof. As of the date of this Agreement, no Voting Debt of Bank of America is issued or outstanding. As of the Bank of America Capitalization Date, except pursuant to this Agreement, the Bank of America Stock Plans, the Convertible Note Agreement, Bank of America's dividend reinvestment plan and stock repurchase plans entered into by Bank of America from time to time, Bank of America does not have and is not bound by any outstanding subscriptions, options, warrants, calls, rights, commitments or agreements of any character calling for the purchase or issuance of any shares of Bank of America Common Stock, Bank of America Preferred Stock, Voting Debt of Bank of America or any other equity securities of Bank of America or any

Table of Contents

securities representing the right to purchase or otherwise receive any shares of Bank of America Common Stock, Bank of America Preferred Stock, Voting Debt of Bank of America or other equity securities of Bank of America. The shares of Bank of America Common Stock to be issued pursuant to the Merger will be duly authorized and validly issued and, at the Effective Time, all such shares will be fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.

(b) Except for director qualifying shares, all of the issued and outstanding shares of capital stock or other equity ownership interests of each Subsidiary of Bank of America are owned by Bank of America, directly or indirectly, free and clear of any Liens, and all of such shares or equity ownership interests are duly authorized and validly issued and are fully paid, nonassessable (subject to 12 U.S.C. § 55) and free of preemptive rights. No such Bank of America Subsidiary has or is bound by any outstanding subscriptions, options, warrants, calls, commitments or agreements of any character calling for the purchase or issuance of any shares of capital stock or any other equity security of such Subsidiary or any securities representing the right to purchase or otherwise receive any shares of capital stock or any other equity security of such Subsidiary.

4.3 _Authority; No Violation._ (a) Bank of America has full corporate power and authority to execute and deliver this Agreement and the Stock Option Agreement and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Stock Option Agreement and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved by the Board of Directors of Bank of America (by the unanimous vote of all directors present) and no other corporate proceedings on the part of Bank of America are necessary to approve this Agreement and the Stock Option Agreement or to consummate the transactions contemplated hereby or thereby. This Agreement and the Stock Option Agreement have been duly and validly executed and delivered by Bank of America and (assuming due authorization, execution and delivery by MBNA) constitute the valid and binding obligations of Bank of America, enforceable against Bank of America in accordance with their terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and subject to general principles of equity).

(b) Neither the execution and delivery of this Agreement or the Stock Option Agreement by Bank of America, nor the consummation by Bank of America of the transactions contemplated hereby or thereby, nor compliance by Bank of America with any of the terms or provisions of this Agreement or the Stock Option Agreement, will (i) violate any provision of the Bank of America Certificate or the Bank of America Bylaws, or (ii) assuming that the consents, approvals and filings referred to in Section 4.4 are duly obtained and/or made, (A) violate any statute, code, ordinance, rule, regulation, judgment, order, writ, decree or Injunction applicable to Bank of America, any of its Subsidiaries or any of their respective properties or assets or (B) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of Bank of America or any of its Subsidiaries under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license,

Table of Contents

lease, agreement or other instrument or obligation to which Bank of America or any of its Subsidiaries is a party or by which any of them or any of their respective properties or assets is bound. Neither Bank of America nor any of its Subsidiaries is a party to or bound by any contract, arrangement, commitment or understanding (whether written or oral) that, to the knowledge of Bank of America, upon consummation of the Merger will materially restrict the ability of the Surviving Corporation to engage in any line of business currently conducted by MBNA or its Subsidiaries.

4.4 *Consents and Approvals.* Except for (i) the filing of applications and notices, as applicable, with the Federal Reserve Board under the BHC Act and approval of such applications and notices, (ii) the Other Regulatory Approvals, (iii) the filing with the SEC of the Proxy Statement and the filing and declaration of effectiveness of the Form S−4 and the filing and effectiveness of the registration statement contemplated by Section 1.5(e), (iv) the filing of the Certificate of Merger with the Secretary of State of the State of Delaware pursuant to the DGCL and the filing of the Articles of Merger with the Maryland State Department of Assessments and Taxation pursuant to the MGCL, (v) any notices to or filings with the SBA, (vi) any consents, authorizations, approvals, filings or exemptions in connection with compliance with the rules and regulations of any applicable SRO, and the rules of the NYSE, or that are required under consumer finance, mortgage banking and other similar laws, and (vii) such filings and approvals as are required to be made or obtained under the securities or "Blue Sky" laws of various states in connection with the issuance of the shares of Bank of America Common Stock pursuant to this Agreement and approval of listing of such Bank of America Common Stock on the NYSE, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the consummation by Bank of America of the Merger and the other transactions contemplated by this Agreement or the Stock Option Agreement. No consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the execution and delivery by Bank of America of this Agreement and the Stock Option Agreement.

4.5 *Reports; Regulatory Matters.*

(a) Bank of America and each of its Subsidiaries have timely filed all reports, registrations and statements, together with any amendments required to be made with respect thereto, that they were required to file since January 1, 2002 with the Regulatory Agencies and each other applicable Governmental Entity, and all other reports and statements required to be filed by them since January 1, 2002, including any report or statement required to be filed pursuant to the laws, rules or regulations of the United States, any state, any foreign entity, or any Regulatory Agency, and have paid all fees and assessments due and payable in connection therewith. Except for normal examinations conducted by a Regulatory Agency or Governmental Entity in the ordinary course of the business of Bank of America and its Subsidiaries, no Regulatory Agency or Governmental Entity has initiated since January 1, 2002 or has pending any proceeding, enforcement action or, to the knowledge of Bank of America, investigation into the business, disclosures or operations of Bank of America or any of its Subsidiaries. Since January 1, 2002, no Regulatory Agency or Governmental Entity has resolved any proceeding, enforcement action or, to the knowledge of Bank of America, investigation into the business, disclosures or operations of Bank of America or any of its Subsidiaries. There is no unresolved violation, criticism, or exception by any Regulatory Agency or Governmental Entity with respect

A−31

Table of Contents

to any report or statement relating to any examinations or inspections of Bank of America or any of its Subsidiaries. Since January 1, 2002 there has been no formal or informal inquiries by, or disagreements or disputes with, any Regulatory Agency or Governmental Entity with respect to the business, operations, policies or procedures of Bank of America or any of its Subsidiaries (other than normal examinations conducted by a Regulatory Agency or Governmental Entity in Bank of America's ordinary course of business).

(b) Neither Bank of America nor any of its Subsidiaries is subject to any cease−and−desist or other order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or has been since January 1, 2002 a recipient of any supervisory letter from, or has been ordered to pay any civil money penalty by, or since January 1, 2002 has adopted any policies, procedures or board resolutions at the request or suggestion of, any Regulatory Agency or other Governmental Entity that currently restricts in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its ability to pay dividends, its credit, risk management or compliance policies, its internal controls, its management or its business, other than those of general application that apply to bank holding companies or their Subsidiaries (each, a "Bank of America Regulatory Agreement"), nor has Bank of America or any of its Subsidiaries been advised since January 1, 2002 by any Regulatory Agency or other Governmental Entity that it is considering issuing, initiating, ordering or requesting any such Bank of America Regulatory Agreement.

(c) Bank of America has previously made available to MBNA an accurate and complete copy of each (i) final registration statement, prospectus, report, schedule and definitive proxy statement filed with or furnished to the SEC by Bank of America pursuant to the Securities Act or the Exchange Act and prior to the date of this Agreement (the "Bank of America SEC Reports") and (ii) communication mailed by Bank of America to its stockholders since January 1, 2002 and prior to the date of this Agreement. No such Bank of America SEC Report or communication, at the time filed, furnished and communicated (and, in the case of registration statements and proxy statements, on the dates of effectiveness and the dates of the relevant meetings, respectively), contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances in which they were made, not misleading, except that information as of a later date (but before the date of this Agreement) shall be deemed to modify information as of an earlier date. As of their respective dates, all Bank of America SEC Reports complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto. No executive officer of Bank of America has failed in any respect to make the certifications required of him or her under Section 302 or 906 of the Sarbanes−Oxley Act.

4.6 *Financial Statements.*

(a) The financial statements of Bank of America and its Subsidiaries included (or incorporated by reference) in the Bank of America SEC Reports (including the related notes, where applicable) (i) have been prepared from, and are in accordance with, the books and records of Bank of America and its Subsidiaries; (ii) fairly present in all material respects the consolidated results of operations, cash flows, changes in stockholders' equity and consolidated

A−32

Table of Contents

financial position of Bank of America and its Subsidiaries for the respective fiscal periods or as of the respective dates therein set forth (subject in the case of unaudited statements to recurring year—end audit adjustments normal in nature and amount); (iii) complied as to form, as of their respective dates of filing with the SEC, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto; and (iv) have been prepared in accordance with GAAP consistently applied during the periods involved, except, in each case, as indicated in such statements or in the notes thereto. The books and records of Bank of America and its Subsidiaries have been, and are being, maintained in all material respects in accordance with GAAP and any other applicable legal and accounting requirements and reflect only actual transactions. PricewaterhouseCoopers LLP has not resigned or been dismissed as independent public accountants of Bank of America as a result of or in connection with any disagreements with Bank of America on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure.

(b) Neither Bank of America nor any of its Subsidiaries has any material liability of any nature whatsoever (whether absolute, accrued, contingent or otherwise and whether due or to become due), except for those liabilities that are reflected or reserved against on the consolidated balance sheet of Bank of America included in its Quarterly Report on Form 10—Q for the quarterly period ended March 31, 2005 (including any notes thereto) and for liabilities incurred in the ordinary course of business consistent with past practice since March 31, 2005 or in connection with this Agreement and the transactions contemplated hereby.

(c) The records, systems, controls, data and information of Bank of America and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of Bank of America or its Subsidiaries or accountants (including all means of access thereto and therefrom), except for any non—exclusive ownership and non—direct control that would not reasonably be expected to have a material adverse effect on the system of internal accounting controls described below in this Section 4.6(c). Bank of America (x) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a—15(e) of the Exchange Act) to ensure that material information relating to Bank of America, including its consolidated Subsidiaries, is made known to the chief executive officer and the chief financial officer of Bank of America by others within those entities, and (y) has disclosed, based on its most recent evaluation prior to the date hereof, to Bank of America's outside auditors and the audit committee of Bank of America's Board of Directors (i) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a—15(f) of the Exchange Act) which are reasonably likely to adversely affect Bank of America's ability to record, process, summarize and report financial information and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in Bank of America's internal controls over financial reporting. These disclosures were made in writing by management to Bank of America's auditors and audit committee and a copy has previously been made available to MBNA. As of the date hereof, there is no reason to believe that its outside auditors and its chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes—Oxley Act, without qualification, when next due.

A—33

Table of Contents

(d) Since December 31, 2004, (x) through the date hereof, neither Bank of America nor any of its Subsidiaries nor, to the knowledge of the officers of Bank of America, any director, officer, employee, auditor, accountant or representative of Bank of America or any of its Subsidiaries has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of Bank of America or any of its Subsidiaries or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that Bank of America or any of its Subsidiaries has engaged in questionable accounting or auditing practices, and (y) no attorney representing Bank of America or any of its Subsidiaries, whether or not employed by Bank of America or any of its Subsidiaries, has reported evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by Bank of America or any of its officers, directors, employees or agents to the Board of Directors of Bank of America or any committee thereof or to any director or officer of Bank of America.

4.7 *Broker's Fees.* Neither Bank of America nor any Bank of America Subsidiary nor any of their respective officers or directors has employed any broker or finder or incurred any liability for any broker's fees, commissions or finder's fees in connection with the Merger or related transactions contemplated by this Agreement, other than as set forth on Section 4.7 of the Bank of America Disclosure Schedule.

4.8 *Absence of Certain Changes or Events.* (a) Since December 31, 2004, no event or events have occurred that have had or are reasonably likely to have a Material Adverse Effect on Bank of America.

(b) Since December 31, 2004 through and including the date of this Agreement, Bank of America and its Subsidiaries have carried on their respective businesses in all material respects in the ordinary course of business consistent with their past practice.

4.9 *Legal Proceedings.* (a) None of Bank of America or any of its Subsidiaries is a party to any, and there are no pending or, to the best of Bank of America's knowledge, threatened, material legal, administrative, arbitral or other material proceedings, claims, actions or governmental or regulatory investigations of any nature against Bank of America or any of its Subsidiaries.

(b) There is no Injunction, judgment, or regulatory restriction (other than those of general application that apply to similarly situated bank holding companies or their Subsidiaries) imposed upon Bank of America, any of its Subsidiaries or the assets of Bank of America or any of its Subsidiaries.

4.10 *Taxes and Tax Returns.* Each of Bank of America and its Subsidiaries has duly and timely filed (including all applicable extensions) all material Tax Returns required to be filed by it on or prior to the date of this Agreement (all such returns being accurate and complete in all material respects), has paid all Taxes shown thereon as arising and has duly paid or made provision for the payment of all material Taxes that have been incurred or are due or claimed to be due from it by federal, state, foreign or local taxing authorities other than Taxes that are not yet delinquent or are being contested in good faith, have not been finally determined and have

A–34

been adequately reserved against. There are no material disputes pending, or claims asserted, for Taxes or assessments upon Bank of America or any of its Subsidiaries for which Bank of America does not have reserves that are adequate under GAAP.

4.11 *Compliance with Applicable Law.* (a) Bank of America and each of its Subsidiaries hold all material licenses, franchises, permits and authorizations necessary for the lawful conduct of their respective businesses under and pursuant to each, and have complied in all respects with and are not in default in any material respect under any, applicable law, statute, order, rule, regulation, policy or guideline of any Governmental Entity relating to Bank of America or any of its Subsidiaries.

(b) Since the enactment of the Sarbanes–Oxley Act, Bank of America has been and is in compliance in all material respects with (i) the applicable provisions of the Sarbanes–Oxley Act and (ii) the applicable listing and corporate governance rules and regulations of the NYSE.

4.12 *Reorganization; Approvals.* As of the date of this Agreement, Bank of America (a) is not aware of any fact or circumstance that could reasonably be expected to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code, and (b) knows of no reason why all regulatory approvals from any Governmental Entity required for the consummation of the transactions contemplated by this Agreement should not be obtained on a timely basis.

4.13 *Aggregate Cash Consideration.* Bank of America has available to it sufficient funds to deliver the aggregate Cash Consideration.

4.14 *Bank of America Information.* The information relating to Bank of America and its Subsidiaries that is provided by Bank of America or its representatives for inclusion in the Proxy Statement and the Form S–4, or in any application, notification or other document filed with any other Regulatory Agency or other Governmental Entity in connection with the transactions contemplated by this Agreement, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. The portions of the Proxy Statement relating to Bank of America and other portions within the reasonable control of Bank of America will comply in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder. The Form S–4 will comply in all material respects with the provisions of the Securities Act and the rules and regulations thereunder.

ARTICLE V

Covenants Relating to Conduct of Business

5.1 *Conduct of Businesses Prior to the Effective Time.* Except as expressly contemplated by or permitted by this Agreement or with the prior written consent of the other party, during the period from the date of this Agreement to the Effective Time, each of MBNA and Bank of America shall, and shall cause each of its respective Subsidiaries to, (a) conduct its business in the ordinary course in all material respects, (b) use reasonable best efforts to maintain

A–35

Table of Contents

and preserve intact its business organization and advantageous business relationships and retain the services of its key officers and key employees and (c) take no action that is intended to or would reasonably be expected to adversely affect or materially delay the ability of either MBNA or Bank of America to obtain any necessary approvals of any Regulatory Agency or other Governmental Entity required for the transactions contemplated hereby or to perform its covenants and agreements under this Agreement or to consummate the transactions contemplated hereby or thereby.

5.2 *MBNA Forbearances.* During the period from the date of this Agreement to the Effective Time, except as set forth in the MBNA Disclosure Schedule and except as expressly contemplated or permitted by this Agreement, MBNA shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Bank of America:

(a) other than in the ordinary course of business consistent with past practice, incur any indebtedness for borrowed money, assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other individual, corporation or other entity, or make any loan or advance or capital contribution to, or investment in, any person (it being understood and agreed that incurrence of indebtedness in the ordinary course of business consistent with past practice shall include the creation of deposit liabilities, purchases of Federal funds, securitizations, sales of certificates of deposit and entering into repurchase agreements);

(b) (i) adjust, split, combine or reclassify any of its capital stock;

(ii) make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock (except (A) for regular quarterly cash dividends at a rate not in excess of $0.14 per share of MBNA Common Stock with record dates and payment dates consistent with the prior year, (B) dividends paid by any of the Subsidiaries of MBNA to MBNA or to any of its wholly−owned Subsidiaries, and (C) the acceptance of shares of MBNA Common Stock in payment of the exercise price or withholding taxes incurred by any employee or director in connection with the exercise of stock options or the vesting of restricted shares of (or settlement of other equity−based awards in respect of) MBNA Common Stock granted under an MBNA Stock Plan, in each case in accordance with past practice and the terms of the applicable MBNA Stock Plan and related award agreements);

(iii) grant any stock options, restricted shares or other equity−based award with respect to shares of MBNA Common Stock under any of the MBNA Stock Plans or otherwise, or grant any individual, corporation or other entity any right to acquire any shares of its capital stock; or

(iv) issue any additional shares of capital stock or other securities except pursuant to the exercise of stock options or the settlement of other equity−

A−36

Table of Contents

based awards granted under an MBNA Stock Plan that are outstanding as of the date of this Agreement and except pursuant to the Stock Option Agreement;

(c) except as required by applicable law or the terms of any MBNA Benefit Plan as in effect on the date of this Agreement and, solely with respect to employees that are not executive officers or directors of MBNA, except for normal increases made in the ordinary course of business consistent with past practice, (i) increase the wages, salaries, or incentive compensation or incentive compensation opportunities of any employee of MBNA or any of its Subsidiaries, or, except for payments in the ordinary course of business consistent with past practice, pay or provide, or increase or accelerate the accrual rate, vesting or timing of payment or funding of, any compensation, benefits or other rights of any employee of MBNA or any of its Subsidiaries or (ii) establish, adopt, or become a party to any new employee benefit or compensation plan, program, commitment or agreement or amend any MBNA Benefit Plan;

(d) sell, transfer, mortgage, encumber or otherwise dispose of any material amount of its properties or assets to any individual, corporation or other entity other than a Subsidiary or cancel, release or assign any material amount of indebtedness to any such person or any claims held by any such person, in each case other than in the ordinary course of business consistent with past practice or pursuant to contracts in force at the date of this Agreement;

(e) enter into any new line of business or change in any material respect its lending, investment, underwriting, risk and asset liability management and other banking, operating, securitization and servicing policies, except as required by applicable law, regulation or policies imposed by any Governmental Entity;

(f) make any material investment either by purchase of stock or securities, contributions to capital, property transfers, or purchase of any property or assets of any other individual, corporation or other entity;

(g) take any action, or knowingly fail to take any action, which action or failure to act is reasonably likely to prevent the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code;

(h) amend its charter or bylaws, or otherwise take any action to exempt any person or entity (other than Bank of America or its Subsidiaries) or any action taken by any person or entity from any Takeover Statute or similarly restrictive provisions of its organizational documents or terminate, amend or waive any provisions of any confidentiality or standstill agreements in place with any third parties;

(i) other than in prior consultation with Bank of America, restructure or materially change its investment securities portfolio or its gap position, through purchases, sales or otherwise, or the manner in which the portfolio is classified or reported;

(j) change in any material respect the policies, practices and procedures governing Credit Card operations of MBNA and its Subsidiaries, including the policies, practices and procedures governing credit and collection matters, related to the solicitation, origination, maintenance and servicing of Accounts;

A–37

Table of Contents

(k) commence or settle any material claim, action or proceeding;

(l) take any action or fail to take any action that is intended or may reasonably be expected to result in any of the conditions to the Merger set forth in Article VII not being satisfied;

(m) implement or adopt any material change in its tax accounting or financial accounting principles, practices or methods, other than as may be required by applicable law, GAAP or regulatory guidelines;

(n) file or amend any Tax Return other than in the ordinary course of business, make or change any material Tax election, or settle or compromise any material Tax liability; or

(o) agree to take, make any commitment to take, or adopt any resolutions of its board of directors in support of, any of the actions prohibited by this Section 5.2.

5.3 *Bank of America Forbearances.* Except as expressly permitted by this Agreement or with the prior written consent of MBNA, during the period from the date of this Agreement to the Effective Time, Bank of America shall not, and shall not permit any of its Subsidiaries to, (a) amend, repeal or otherwise modify any provision of the Bank of America Certificate or the Bank of America Bylaws in a manner that would adversely effect MBNA, the stockholders of MBNA or the transactions contemplated by this Agreement; (b) take any action, or knowingly fail to take any action, which action or failure to act is reasonably likely to prevent the Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code; (c) take any action that is intended or may reasonably be expected to result in any of the conditions to the Merger set forth in Article VII not being satisfied; (d) take any action that would be reasonably expected to prevent, materially impede or materially delay the consummation of the transactions contemplated by this Agreement; or (e) agree to take, make any commitment to take, or adopt any resolutions of its board of directors in support of, any of the actions prohibited by this Section 5.3.

## ARTICLE VI

### Additional Agreements

6.1 *Regulatory Matters.* (a) Bank of America and MBNA shall promptly prepare and file with the SEC the Form S−4, in which the Proxy Statement will be included as a prospectus. Each of Bank of America and MBNA shall use its reasonable best efforts to have the Form S−4 declared effective under the Securities Act as promptly as practicable after such filing, and MBNA shall thereafter mail or deliver the Proxy Statement to its stockholders. Bank of America shall also use its reasonable best efforts to obtain all necessary state securities law or "Blue Sky" permits and approvals required to carry out the transactions contemplated by this Agreement, and MBNA shall furnish all information concerning MBNA and the holders of MBNA Common Stock as may be reasonably requested in connection with any such action.

Table of Contents

(b) The parties shall cooperate with each other and use their respective reasonable best efforts to promptly prepare and file all necessary documentation, to effect all applications, notices, petitions and filings, to obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties and Governmental Entities that are necessary or advisable to consummate the transactions contemplated by this Agreement (including the Merger), and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such third parties or Governmental Entities. MBNA and Bank of America shall have the right to review in advance, and, to the extent practicable, each will consult the other on, in each case subject to applicable laws relating to the confidentiality of information, all the information relating to MBNA or Bank of America, as the case may be, and any of their respective Subsidiaries, which appear in any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the transactions contemplated by this Agreement. In exercising the foregoing right, each of the parties shall act reasonably and as promptly as practicable. The parties shall consult with each other with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement and each party will keep the other apprised of the status of matters relating to completion of the transactions contemplated by this Agreement. Notwithstanding the foregoing, nothing contained herein shall be deemed to require Bank of America to take any action, or commit to take any action, or agree to any condition or restriction, in connection with obtaining the foregoing permits, consents, approvals and authorizations of third parties or Governmental Entities, that would reasonably be expected to have a material adverse effect (measured on a scale relative to MBNA) on either Bank of America or MBNA (a "Materially Burdensome Regulatory Condition").

(c) Each of Bank of America and MBNA shall, upon request, furnish to the other all information concerning itself, its Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with the Proxy Statement, the Form S−4 or any other statement, filing, notice or application made by or on behalf of Bank of America, MBNA or any of their respective Subsidiaries to any Governmental Entity in connection with the Merger and the other transactions contemplated by this Agreement.

(d) Each of Bank of America and MBNA shall promptly advise the other upon receiving any communication from any Governmental Entity the consent or approval of which is required for consummation of the transactions contemplated by this Agreement that causes such party to believe that there is a reasonable likelihood that any Bank of America Requisite Regulatory Approval or MBNA Requisite Regulatory Approval, respectively, will not be obtained or that the receipt of any such approval may be materially delayed.

6.2 *Access to Information.* (a) Upon reasonable notice and subject to applicable laws relating to the confidentiality of information, each of MBNA and Bank of America shall, and shall cause each of its Subsidiaries to, afford to the officers, employees, accountants, counsel, advisors, agents and other representatives of the other party, reasonable access, during normal business hours during the period prior to the Effective Time, to all its properties, books, contracts, commitments and records, and, during such period, such party shall, and shall cause its Subsidiaries to, make available to the other party (i) a copy of each report, schedule, registration statement and other document filed or received by it during such period

A−39

Table of Contents

pursuant to the requirements of federal securities laws or federal or state banking or insurance laws (other than reports or documents that such party is not permitted to disclose under applicable law) and (ii) all other information concerning its business, properties and personnel as the other party may reasonably request (in the case of a request by MBNA, information concerning Bank of America that is reasonably related to the prospective value of Bank of America Common Stock or to Bank of America's ability to consummate the transactions contemplated hereby). Neither MBNA nor Bank of America, nor any of their Subsidiaries, shall be required to provide access to or to disclose information where such access or disclosure would jeopardize the attorney−client privilege of such party or its Subsidiaries or contravene any law, rule, regulation, order, judgment, decree, fiduciary duty or binding agreement entered into prior to the date of this Agreement. The parties shall make appropriate substitute disclosure arrangements under circumstances in which the restrictions of the preceding sentence apply.

(b) All information and materials provided pursuant to this Agreement shall be subject to the provisions of the Confidentiality Agreement entered into between the parties as of June 24, 2005 (the "Confidentiality Agreement").

(c) No investigation by a party hereto or its representatives shall affect the representations and warranties of the other party set forth in this Agreement.

6.3    *Stockholder Approval.* MBNA shall call a meeting of its stockholders to be held as soon as reasonably practicable for the purpose of obtaining the requisite stockholder approval required in connection with the Merger, on substantially the terms and conditions set forth in this Agreement, and shall use its reasonable best efforts to cause such meeting to occur as soon as reasonably practicable. The Board of Directors of MBNA shall use its reasonable best efforts to obtain from its stockholders the stockholder vote approving the Merger, on substantially the terms and conditions set forth in this Agreement, required to consummate the transactions contemplated by this Agreement. MBNA shall submit this Agreement to its stockholders at the stockholder meeting even if its Board of Directors shall have withdrawn, modified or qualified its recommendation. The Board of Directors of MBNA has adopted resolutions approving the Merger, on substantially the terms and conditions set forth in this Agreement, and directing that the Merger, on such terms and conditions, be submitted to MBNA's stockholders for their consideration.

6.4    *Affiliates.* MBNA shall use its reasonable best efforts to cause each director, executive officer and other person who is an "affiliate" (for purposes of Rule 145 under the Securities Act) of MBNA to deliver to Bank of America, as soon as practicable after the date of this Agreement, and prior to the date of the meeting of the MBNA stockholders to be held pursuant to Section 6.3, a written agreement, in the form of Exhibit B.

6.5    *NYSE Listing.* Bank of America shall cause the shares of Bank of America Common Stock to be issued in the Merger to be approved for listing on the NYSE, subject to official notice of issuance, prior to the Effective Time.

6.6    *Employee Matters.* (a) For the one−year period following the Effective Time, Bank of America shall, or shall cause its applicable Subsidiaries to, provide to those individuals actively employed by MBNA or one of its Subsidiaries as of the Effective Time