IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
IN RE MBNA CORPORATION          :
DERIVATIVE AND CLASS            :        Lead Case No. 1:05-CV-00327-
LITIGATION                      :        GMS
                                :
_____
This Document Relates To:       :
ALL ACTIONS.                    :        CLASS AND DERIVATIVE
                                :        ACTION
-----------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
OPENING BRIEF IN SUPPORT OF THE MBNA OUTSIDE
DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036-6522
(212) 735-3000

DATED: January 20, 2006

## INDEX

CASES                                                                TAB NO.

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati,
    Inc., C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) ...................................... 1

In re Citigroup Inc. S'holders Litig.,
    C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ......................................... 2

Criden v. Steinberg,
    C.A. No. 17082, 2000 WL 354390 (D. Del. Mar. 23, 2000) ............................................. 3

In re Encore Computer Corp. S'holders Litig.,
    C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) .......................................... 4

Ercole v. Conectiv & Coventry Health Care of Del., Inc.,
    C.A. No. 03-186 GMS, 2003 WL 21104926 (D. Del. May 15, 2003) ............................... 5

In re Frederick's of Hollywood, Inc. S'holders Litig.,
    C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ........................................... 6

Freedman v. Rest. Assocs. Indus.,
    C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990) ............................................ 7

In re Freeport-McMoran Sulphur, Inc. S'holders Litig.,
    C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) ............................................. 8

Herd v. Major Realty Corp.,
    C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21,1990) ............................................ 9

Hudson v. Prime Retail, Inc.,
    C.A. No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 10

Jacobs v. Yang,
    C.A. No. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ............................................ 11

Jasinover v. Rouse Co.,
    C.A. No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) .................... 12

Jolly Roger Fund LP v. Sizeler Property Investors, Inc.,
    C.A. No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ......................... 13

i

Knox v. Rosenberg,
No. H-99-0123 (S.D. Tex. Sept. 28, 1999) ....................................................... 14

Lewis v. Leaseway Transp. Corp.,
C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ............................. 15

Litt v. Wycoff,
C.A. No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ................. 16

Manzo v. Rite Aid Corp.,
C.A. No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ............... 17

Nebenzahl v. Miller,
C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) ........................... 18

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v.
Elkins, C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........... 19

Pogostin v. Rice,
C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983) ............................. 20

Porter v. Texas Commerce Bancshares, Inc.,
C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ............................. 21

Rattner v. Bidzos,
C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................ 22

Seibert v. Harper & Row, Publishers, Inc.,
C.A. No. 6639, 1984 WL 21874 (Del. Ch. Dec. 5, 1984) ................................ 23

Sekuk Global Enters. Profit Sharing Plan v. Kevenides,
C.A. No. 24-C-03-007496, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................ 24

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999) ............................ 25

In re Walt Disney Co. Derivative Litig.,
C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ......................... 26

In re Wheelabrator Tech. Inc. S'holders Litig.,
C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ........................... 27

# TAB 1

Not Reported in A.2d
Not Reported in A.2d, 1996 WL 506906 (Del.Ch.)
(Cite as: 1996 WL 506906 (Del.Ch.))

ⱨ

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
CINCINNATI BELL CELLULAR SYSTEMS COMPANY, an Ohio corporation, Plaintiff,
v.
AMERITECH MOBILE PHONE SERVICE OF CINCINNATI, INC., a Delaware corporation, Cincinnati SMSA Limited Partnership, a Delaware limited partnership,
360 < < degrees > > > > >
Communications Company, a Delaware corporation, The Champaign Telephone Company, an Ohio corporation, Git-Cell, Inc., an Ohio corporation, and
Ameritech Mobile Communications, Inc., a Delaware corporation, Defendants.
Civ. A. No. 13389.

Submitted: April 26, 1996.
Decided: Sept. 3, 1996.

Vernon R. Proctor and John H. Newcomer, Jr. of Bayard, Handelman & Murdoch, P.A., Wilmington (James R. Adams, William D. Baskett, III, and Michael F. Haverkamp, of Frost & Jacobs, Cincinnati, Ohio; and Alan R. Bromberg and George W. Coleman of Jenkins & Gilchrist, Dallas, Texas, of counsel), for Plaintiff.

Richard L. Sutton, Paul P. Welsh, Thomas C. Grimm, Matthew B. Lehr and Maryellen Noreika of Morris, Nichols, Arsht & Tunnell, Wilmington, for Defendants Ameritech Mobile Phone Service of Cincinnati, Inc. and Ameritech Mobile Communications, Inc.

Richard D. Kirk of Morris, James, Hitchens & Williams, Wilmington, for Defendant 360 < < degrees > > Communications Company.

Thomas A. Beck of Richards, Layton & Finger, Wilmington, for Defendants Git-Cell, Inc. and The Champaign Telephone Company.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.

**\*1** Plaintiff in this lawsuit seeks judicial dissolution and ultimately the sale of a Delaware limited partnership engaged in providing cellular telephone services. The case illustrates the partnering arrangements that increasingly characterize the telecommunications industry's effort to exploit emerging technologies and to meet increasing competitive pressures. Because technology (along with competitive interests) often advances in ways unanticipated by the entities that create these partnering arrangements, this kind of litigation should not be unexpected.

In 1982, plaintiff Cincinnati Bell Cellular Systems ("Cincinnati Bell") and defendant Ameritech Mobile Phone Services of Cincinnati ("AMPS") [FN1] formed a limited partnership (the "Partnership") to "fund, establish and provide" cellular mobile services within and including the geographic area bounded by Cincinnati, Dayton and Columbus, Ohio. *See* Agreement Establishing Cincinnati SMSA Limited Partnership (the "Partnership Agreement" or "P. Agmt.") §§ 1.3, 2.5. AMPS, the Partnership's general partner, is a wholly-owned subsidiary of defendant Ameritech Mobile Communications, Inc. ("AMCI") which, in turn, is a wholly-owned subsidiary of Ameritech Corporation ("Ameritech Corp." and collectively with AMCI and AMPS, "Ameritech"). Ameritech Corp. is the regional bell company for the Columbus and Dayton markets. Cincinnati Bell, one of the Partnerships limited partners, is the regional bell company for Cincinnati. Ameritech owns 52.793% of the Partnership, 12.793% as a limited partner and 40% as the general partner. Cincinnati Bell owns a 45.067% limited partnership interest in the Partnership. Sprint Cellular Company (recently renamed as 360 < < degrees > > Communications Company), the Champaign Telephone Company and Git-Cell, the other limited partners, collectively own 2.14% of the Partnership.

FN1. In 1982, AT & T owned AMPS, formerly Advanced Mobile Phone Services. Later, however, AT & T divested itself of this subsidiary. Thus, Ameritech Corp. now owns AMPS.

In July of 1994, Cincinnati Bell filed an amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



and supplemental complaint requesting several forms of relief. [FN2] First, Cincinnati Bell requests this Court to dissolve the Partnership pursuant to 6 *Del.C.* § 17-802 and appoint a liquidating trustee to effectuate the dissolution.    Count I asks the Court to dissolve the Partnership, alleging that it is not reasonably practicable to carry on the Partnership's business for its intended purpose. Count II alleges Ameritech has breached unspecified fiduciary duties to the limited partners and committed gross negligence in managing the Partnership. Cincinnati Bell also pleads demand futility in this Count. [FN3] Count III claims that Ameritech has been involved in self-dealing, in breach of their fiduciary duties, by failing to sell the Partnership and continuing to employ AMCI as the general partner.    In Cincinnati Bell's view, a more effective manager could have produced a higher rate of return for the Partnership. [FN4]

> FN2. Cincinnati Bell filed its initial complaint on February 23, 1994.    It contained the same causes of action as the amended and supplemental complaint.

> FN3. Ameritech does not contest the futility of demand allegation.

> FN4. In addition to dissolution, damages and attorney fees, Cincinnati Bell requests this Court to order Ameritech to account to Cincinnati Bell for all transactions since the Partnership's formation and to provide Cincinnati Bell with all Partnership records. The parties did not mention the request for an accounting in the briefing on the pending motions.

Before me now are the parties' cross-motions for summary judgment.    Cincinnati Bell moves for summary judgment as to Count I's request for dissolution and Count III's claim that Ameritech breached unspecified fiduciary duties to the limited partners by failing to sell the Partnership. However, as to Count II's claim for gross negligence in managing the Partnership and Count III's self-dealing claim concerning Ameritech's duty to sell the Partnership, Cincinnati Bell argues that issues of fact exist which preclude summary judgment.    Ameritech also moves for summary judgment and does so as to each of the three counts.

*2 The parties have generated a substantial record. After carefully reviewing that record, the amended complaint and the parties' extensive briefing on the legal issues, I conclude that summary judgment should be granted on all counts of the complaint in favor of defendants and against plaintiff.

## I. SUMMARY JUDGMENT STANDARD

The Court may award summary judgment if the moving party establishes that no genuine issue of material fact exists with respect to the dispute and that he or she is entitled to judgment as a matter of law.    Ch.Ct. Rule 56(c); *Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131 (1990).    When the non-moving party has the ultimate burden of proof on its claims, this Court may grant summary judgment if the moving party can demonstrate a complete failure of proof on an essential element of a claim. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 60 (1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 316, 322- 23 (1986)).    If the moving party properly supports its motion, then the burden shifts to the non-moving party to demonstrate that material issues of fact exist so that summary judgment is inappropriate.    *State v. Regency Group, Inc.,* Del.Super., 598 A.2d 1123, 1129 (1991).

Further, the Court must assume that uncontroverted facts which are set forth in the record are true. *Tanzer v. Int'l Gen. Indus., Inc.,* Del.Ch., 402 A.2d 382 (1979).    On a cross-motion for summary judgment, the Court may imply both that the parties concede the absence of material factual disputes and acknowledge that the record is sufficient to support their motions.    *Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 100 (1992).

## II. THE UNDISPUTED FACTS

The Partnership is governed by the Partnership Agreement and the Delaware Limited Partnership Act, 6 *Del.C.* §§ 17-101--17-1109.    The Partnership Agreement allows Ameritech, as general partner, to determine if the Partnership requires additional capital to fund expansion or operations of the business. P.Agmt. § 5.    It does not limit the amount of capital that the general partner may request.    Rather, if a partner does not wish to participate in that capital call, then it may choose not to contribute.    In that case, the non-participating partner's interest in the Partnership is diluted accordingly. *Id.*

Each year since the parties formed the Partnership, Ameritech, as general partner, has required its limited partners to make capital contributions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




From 1984 through 1994, the partners contributed a total of $* [FN5] million to the Partnership. Each of the partners, including Ameritech, has participated in the capital calls. In 1995, the Partnership made its first capital distribution of $* million.

> FN5. Throughout this Opinion, an asterisk denotes proprietary information redacted by the Court with the parties' consent.

The Partnership Agreement allows a limited partner to sell its interest in the Partnership. If a limited partner wishes to sell its interest, the Partnership Agreement grants the current partners the first right of refusal to purchase that interest. P.Agmt. § 11. The Partnership Agreement also allows the limited partners to withdraw from the Partnership. In that case, the Partnership must pay the limited partner for its interest. P.Agmt. § 12.

*3 The Partnership Agreement allows the partners to dissolve the Partnership if they unanimously agree to do so. P.Agmt. § 14.1(e). Only Cincinnati Bell seeks to dissolve the Partnership. The Delaware Limited Partnership Act also provides a judicial method of dissolution should the Court of Chancery find that "it is not reasonably practicable to carry on the business in conformity with the partnership agreement." 6 Del.C. § 17-802.

The Partnership Agreement charges Ameritech, as general partner, with the following duties. First, it must act in the best interests of the Partnership. Second, the general partner must manage the Partnership, file all instruments required by law, maintain the Partnership's accounts, furnish financial statements, and develop an annual business plan. P.Agmt. § 8. Notably, however, the Partnership Agreement exculpates Ameritech from liability for loss to the Partnership or the limited partners for "any act or failure to act" unless that act or omission amounts to *willful misconduct or gross negligence*. P.Agmt. § 16.1. Further, the Partnership Agreement does not provide the limited partners with a method by which they may remove Ameritech as general managing partner of the Partnership.

The Partnership Agreement denotes the following as the Partnership's business purpose--"to fund, establish, and provide Cellular Service" in the specified geographic area. P.Agmt. § 1.3. The Partnership Agreement does not specify a certain time by which the Partnership must be profitable or any other measure of performance that, if not met, will signify that the Partnership is performing outside of its business purpose or is a basis upon which a partner may seek dissolution. However, in the event that the partners dissolve the Partnership, the Partnership Agreement requires the general partner to distribute its license to provide cellular services in the Cincinnati SMSA, as well as the assets involved in this service, to Cincinnati Bell. P.Agmt. § 14.3.

The Partnership has provided cellular services to its chosen geographic area for approximately ten years. It has increased its subscriber base from 7,692 in 1984, to over *, generating revenues of approximately $* million. The Partnership has also improved its operating cash flows. In its first five years of existence, the Partnership produced negative cash flows. In contrast, over the last five years, the Partnership has produced positive cash flows. For example, in 1994, the Partnership netted a positive cash flow of over $* million. The parties dispute whether the Partnership has performed adequately as a financial matter, especially compared to other cellular service providers. No one disputes that the Partnership made its first partnership distribution in 1995 in the amount of $* million.

In the coming years, cellular service providers will face increasing amounts and forms of competition. Cincinnati Bell appears especially concerned about competition from "personal communication service" or "PCS" providers. Analysts project that AT & T and GTE may begin providing PCS services as soon as 1997. In spite of the Partnership's less than stellar performance and the forecasted increase in competition, Cincinnati Bell's own expert projects that the business is worth $* million. [FN6]

> FN6. Cincinnati Bell's expert claims that its projection of the Partnership's worth is based on the assumption that the Partnership is managed by an entity other than Ameritech. Under Ameritech's management, Cincinnati Bell projects that the Partnership has a *zero* net present value. Ameritech, however, disputes this fact. Lehman Brothers, Ameritech's expert, values the Partnership

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 1996 WL 506906, *3 (Del.Ch.))

at $* million.

**\*4** Apparently, the cellular phone service business is not merely a complement to landline services. Instead, Cincinnati Bell has found that cellular services compete directly with landline service. Importantly, the Partnership Agreement does not contain a non-competition clause whereby the partners are limited from competing with one another.    On the contrary, the Partnership Agreement provides that the partners are permitted to resell cellular services or equipment independently from the Partnership either in or outside of the Partnership's geographic area. However, if a partner chooses to resell services or equipment, the transaction must be on an arms-length basis. P.Agmt. §§ 8, 10.

On February 8, 1996, President Clinton signed the Telecommunications Act of 1996 (the "Act") into law.    Pub.L. 104-133, 110 Stat. 56 (1996).    The Act allows greater competition in the telecommunications industry.  For example, the Act allows the regional Bell companies, including Ameritech and Cincinnati Bell, to compete with one another.    Apparently, Ameritech intends to take advantage of this new business opportunity. Ameritech issued a notification stating that Ameritech Communications, Inc. ("ACI") is AMCI's agent with respect to ordering and providing telecommunications services and facilities. Then Ameritech notified its partners, including Cincinnati Bell, that the Partnership will begin offering long distance cellular services "bundled" with local cellular services in states such as Ohio. This packaging of services allows customers to purchase cellular and landline services from one entity. Cincinnati Bell also provides long distance services with its own long distance subsidiary, Cincinnati Bell Long Distance Inc.    The bundling will allow Ameritech Corp. to compete with Cincinnati Bell's primary business, its landline services.    Therefore, ACI's plan to bundle services is particularly aggravating to Cincinnati Bell. Although Cincinnati Bell has expressed concern about the bundling, Ameritech's notification states that the profits from the arrangement will accrue to the Partnership.

### III. DISCUSSION

A. *COUNT I:  Judicial Dissolution Pursuant to 6 Del.C. § 17-802.*

In Count I of the amended complaint, Cincinnati Bell seeks dissolution of the Partnership and appointment of a liquidating trustee.    Both parties request summary judgment in their favor as to Count I pursuant to *6 Del.C.* § 17- 802.    Under this section, the Court of Chancery may dissolve a limited partnership when "it is not reasonably practicable to carry on the business in conformity with the *partnership agreement." 6 Del.C.* § 17-802 (emphasis added).

Ameritech opposes dissolution and argues that Cincinnati Bell has not provided the Court with any rationale on which the Court may dissolve the Partnership pursuant to § 17-802.    Ameritech emphasizes that the Partnership is serving its stated purpose "to fund, establish and provide Cellular Service." Ameritech notes that the Partnership Agreement does not require the Partnership to be the best in the industry or to meet any level of economic performance.  In any case, Ameritech's expert, Lehman Brothers, estimates that the business can be profitable;    their discounted cash flow analysis indicated that the business is worth $* to $* million. Further, Cincinnati Bell's own expert testified that the opportunity to carry on the Partnership's business is extremely valuable, estimating that the business is worth between $* and $* million.    In fact, all of the partners, except Cincinnati Bell, wish to carry on the business, with or without Cincinnati Bell.

**\*5** In contrast, Cincinnati Bell argues that two bases exist on which this Court may grant summary judgment in its favor on the dissolution claim. First, Cincinnati Bell argues that the Partnership has not performed adequately in the past and will fare worse with increased competition from the PCS providers.    Cincinnati Bell insists that the Partnership's purpose is to generate economic returns.    It notes that, by definition, the law presumes that Delaware partnerships are "for profit" entities, citing *6 Del.C.* § 1506 (defining "partnership" as two or more entities associated to carry on a business for profit).    In support of its argument, Cincinnati Bell claims that the present situation mirrors the situation in *PC Tower Center, Inc. v. Tower Center Dev. Assoc., L.P.,* Del.Ch., C.A. No. 10788, Chandler, V.C. (June 8, 1989) where the Court dissolved the partnership pursuant to § 17-802 based upon the finding that the partnership in question was unlikely to turn a profit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 1996 WL 506906, *5 (Del.Ch.))

at any point in the foreseeable future.

In evaluating whether to dissolve a partnership pursuant to § 17-802, courts must determine the business of the partnership and the general partners ability to achieve that purpose in conformity with the partnership agreement. *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prod., Inc.,* Del.Ch., C.A. No. 12036, Allen, C. (July 28, 1993), Mem.Op. at 2 (citing *PC Tower Center, Inc. v. Tower Center Dev. Assoc., L.P.,* Del.Ch., C.A. No. 10788, Chandler, V.C. (June 8, 1989)). In the present case, the Partnership Agreement states that the Partnership's business purpose is "to fund, establish and provide Cellular Service" in the specified geographic area. P.Agmt. § 1.3. The Partnership Agreement does not establish a time schedule by which the Partnership must be profitable or any other measure of performance. Nor does the Partnership Agreement establish required performance standards. Further, Cincinnati Bell has failed to provide any evidence suggesting that the parties were not intentionally silent on this point when they entered the Partnership Agreement.

Moreover, Cincinnati Bell has not suggested a reasonable time period which the parties surely would have specified had they considered the issue. The Court will not find an implied reasonable time period for performance of a contract where the agreement is silent on that point. *See Gluckman v. Holzman,* Del.Ch., 53 A.2d 246 (1947) (relying on the fact that the parties were intentionally silent on the time period for performance). *Cf. Bundesen v. Beck,* Del.Ch., C.A. No. 11347, Berger, V.C. (June 23, 1992) (Bundesen II), Mem.Op. at 5 (finding that if the parties did not intentionally omit a time period for performance, then the Court may add some reasonable time frame for performance to the agreement).

In spite of the fact that the Partnership appears to be operating within its stated business purpose, Cincinnati Bell believes the Court should dissolve the business because its financial position is so weak that it is impractical to carry on the business. However, the record shows that the Partnership has improved its financial position and currently has over * subscribers, generating revenues of approximately $* million. The Partnership has also improved its operating cash flows. In its first five years of existence, the Partnership produced negative cash flows. In contrast, over the last five years, the Partnership has produced positive cash flows.

**\*6** Cincinnati Bell's reliance on *PC Tower* is misplaced. In *PC Tower,* the partnership owned certain rental real estate in Dallas, Texas. The Dallas real estate market had taken such a dramatic downturn that the partnership was unable to service its debt and had gone into default on its loans. The value of the partnership's real estate had dropped to a level below that of the debt. Thus, the partnership could only be run at a loss of $6 million per year. Importantly, because the Dallas real estate market was over-developed, the partnership had no reasonable prospect of redeveloping equity in the property. Notably also, the partnership agreement stated that the business purpose was for profit. Thus, the financial situation in *PC Tower* was extremely poor, and the prospects for future recovery were dim.

In contrast, in the present case, the undisputed record demonstrates that the Partnership is currently producing returns for its investors. Perhaps the Partnership's returns are not as great as its competitors, but it is meeting its stated purpose of providing cellular services. Moreover, Cincinnati Bell admits that the business is quite valuable, believing that they could receive a healthy return on their investment if the Partnership's business were sold. In effect, Cincinnati Bell urges the Court to compare the Partnership's *ideal* degree of financial success with the *actual* figures and use this as a basis for dissolving the Partnership. Such a comparison, while perhaps demonstrating disappointing past returns, is an inappropriate basis on which to order dissolution. Although Cincinnati Bell may be disappointed in its investment, it has not demonstrated that the cellular business can no longer be sustained. *See Red Sail,* Del.Ch., C.A. No. 12036, Allen, C. (Oct. 6, 1992) Mem.Op. at 10 (noting that a "blizzard of accounting complaints ... do not make the business of the firm impracticable...."). A report by Cincinnati Bell's own expert, Joseph N. Walter, shows that the Partnership's performance--measured by number of subscribers, growth in market share, revenues and EBITDA, and reduction in the churn rate--has improved steadily from 1992 through 1994. *See* The Walter Group Report, Appendix to Ameritech's Opening Brief, Vol. II at pp. R664, R703. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




undisputed facts, therefore, fail to provide a basis upon which the Court could order dissolution of the Partnership.

In its second argument in support of its dissolution request, Cincinnati Bell posits that another purpose of the Partnership is to provide cellular services as a complementary, rather than competitive, service to its limited partners' primary business--local exchange service.   Cincinnati Bell notes that the parties did not anticipate the extent to which cellular services would compete with landline services when they entered the Partnership Agreement.    The parties have found that consumers substitute cellular service for landline services.   Thus, Cincinnati Bell finds itself in the position of funding its own competition.

**\*7** Moreover, Cincinnati Bell raises its concern over the Partnership's intention to provide bundled local and long distance cellular services.    In Cincinnati Bell's view, the bundling allows the Partnership to compete directly with Cincinnati Bell's primary business, *i.e.,* its wireline communications.   Cincinnati Bell characterizes Ameritech's bundling of services as the general partner using the Partnership to advance its own competitive position against its limited partners' primary business.    This competition, argues Cincinnati Bell, violates the Partnership Agreement, making it not reasonably practicable to carry on the Partnership.

Ameritech insists that the Partnership can, in conformity with the Partnership Agreement, compete with the limited partners' wireline services. Ameritech notes that the Partnership Agreement contains no prohibition or limitation on the Partnership's competing with wireline services. Thus, this competition may occur without violating the Partnership Agreement.   Moreover, Ameritech notes that the parties were aware at the time of entering the agreement that wireless services could compete with wireline services.    Instead of protecting itself in the Partnership Agreement, Cincinnati Bell executed the Partnership Agreement that does not contain a non-compete clause;  nor did it ever seek an amendment to the Partnership Agreement.

Considering the standard for dissolution under § 17-802, I cannot accept Cincinnati Bell's argument.

Indisputably, the Partnership Agreement does not limit the Partnership from competing with its limited partners.    In fact, the Partnership Agreement contains a section which permits competition.    It also provides that the partners may resell cellular services or equipment independently from the Partnership either in or outside of the Partnership's geographic area.    The only limitation imposed by these sections is that the transactions must be on an arms-length basis.   P.Agmt. §§ 8, 10.   When the relationship between the parties is primarily contractual in nature, Delaware courts will not reform agreements to bestow additional rights on the parties for which they did not bargain unless it is clear that, had they negotiated on that matter, they would have agreed to that point.    *See generally Katz v. Oak Indus. Inc.,* Del.Ch., 508 A.2d 873 (1986) (considering the relationship between a corporation and its debt holders as contractual in nature).   Here, it is not clear that the parties would have included a no compete provision in the agreement.

Competition between the Partnership and Cincinnati Bell is not a viable rationale for determining that the Partnership cannot be carried on in a "reasonably practicable" manner, consistent with the Partnership Agreement. [FN7] Notably, Cincinnati Bell is free to cash out its interest in the Partnership.   Thus, it need not continue to fund competition against itself. Strangely, however, while it complains about funding its own competition, Cincinnati Bell continues to hold its Partnership interest. [FN8] Absent some limitation on competition against the Partnership in the Partnership Agreement (or some indication that had the parties considered it *ex ante,* they would have included such a provision in the Partnership Agreement), the fact that Cincinnati Bell is frightened of future competition is not a basis for unilaterally dissolving a viable business at the request of one limited partner.

> FN7. This rationale for dissolution would also broaden the standard for dissolution expressed in 6 *Del.C.* § 17-802.    As mentioned later in this Opinion, it is not appropriate to broaden the dissolution standard so as to expand the Court of Chancery's power beyond what the Legislature intended.

> FN8. Notably, Cincinnati Bell and Ameritech entered discussions concerning a sale of Cincinnati

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Bell's interest in the Partnership to Ameritech in 1992. Ameritech offered a substantial amount of money for Cincinnati Bell's interest, an amount that even Cincinnati Bell's chief executive officer has characterized as a "good return all in all" considering the size of Cincinnati Bell's investment at the time. Because Cincinnati Bell's officers and directors viewed the Partnership as ultimately worth more than Ameritech's offer, they decided Cincinnati Bell should remain in the Partnership.

*8 Finally, Cincinnati Bell argues that Ameritech will compete with the Partnership itself by bundling services. Cincinnati Bell explains that ACI will place Ameritech in a conflict of interest situation because ACI will choose between selling wireline services or wireless services. If it chooses to sell wireline services, then Ameritech will receive 100% of the wholesale profit, whereas if it sells wireless service, AMCI will receive only 53% of the profit. Cincinnati Bell insists that this alleged competition is a breach of Ameritech's fiduciary duties and that the breach is a basis upon which to dissolve the Partnership.

Ameritech contends that Cincinnati Bell has no basis for asserting that Ameritech will provide cellular service within the Partnership area *other than by reselling the Partnership's services.* Section 7.1(a) of the Partnership Agreement expressly permits reselling of services and, further, authorizes Ameritech, as general partner, to cause the Partnership to enter into agreements for such services. Additionally, Ameritech argues that the profits will accrue to the Partnership itself and that providing long distance services is in the Partnership's best interest. Ameritech notes that it has not violated its duties to the Partnership at this point and that Cincinnati Bell's concerns are merely speculative. Ameritech also notes that Cincinnati Bell is free to enter into similar reselling arrangements.

Cincinnati Bell suggests that by reselling cellular services through ACI, ACI is competing with the Partnership's retail cellular service operations. Cincinnati Bell notes that the Partnership has 16 stores that sell cellular services, but these stores do not provide the "bundled" service. Thus, according to Cincinnati Bell, ACI is a subsidiary of AMCI that competes with one of the Partnership's lines of business. Even though Cincinnati Bell

acknowledges that ACI is currently selling long distance services through the Partnership, it believes that Ameritech intends to offer long distance through ACI or another subsidiary.

Cincinnati Bell's argument here is flawed because its own concessions demonstrate that Ameritech currently does not compete with the Partnership. First, by recognizing that ACI is currently selling long distance services through the Partnership, Cincinnati Bell is conceding that Ameritech is *not* competing with the Partnership currently. Whether Ameritech will compete with the Partnership in the future is unknown. Second, the fact that Ameritech plans for the profits from the bundling to accrue to the Partnership also demonstrates that Ameritech is not competing with the Partnership. Cincinnati Bell is merely speculating that Ameritech will compete with Cincinnati Bell by offering long distance through ACI in the future. This conjectural rationale is not a basis on which the Court may dissolve the Partnership *now,* especially considering that the Partnership Agreement does not proscribe competition between partners. Moreover, even if such competition were occurring today, it is not a basis for dissolution because the Partnership Agreement is intentionally silent on the risks of competition between and among partners.

*9 As more fully explained later in this Opinion, Cincinnati Bell agreed to limit Ameritech's fiduciary duties as the general partner. In Section 16.1 of the Partnership Agreement, Cincinnati Bell agreed that Ameritech would not be liable to either Cincinnati Bell or the Partnership for any breaches (fiduciary or otherwise) unless the breach involved willful misconduct or gross negligence. Ameritech believes that bundling services does not violate the Partnership Agreement. This interpretation of the Partnership Agreement appears reasonable and, at the very least, reasonable minds may disagree as to whether the bundling of services is beneficial to the Partnership. Thus, one cannot conclude as a matter of law that by bundling services, Ameritech *willfully* or in a grossly negligent manner violated its duties of loyalty to the Partnership's business. Its duties to the limited partners only go so far as the business of the Partnership itself. *See Davenport Group MG v. Strategic Investment Partners, Inc.,* Del.Ch., C.A. No. 14426, Steele, V.C. (Jan. 23, 1996), Mem.Op. at 15. In sum, because the exculpation provision in the Partnership Agreement encompasses




the allegedly self-dealing plan to bundle services, this alleged breach is not a reason for the Court to dissolve the Partnership.

Cincinnati Bell has failed to point to specific facts on which this Court may determine that the business is no longer reasonably practicable to continue. Since Cincinnati Bell has the ultimate burden of proof on its dissolution claim, and it has failed to show specific facts supporting this claim, Ameritech is entitled to summary judgment in its favor on the dissolution claim. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 60 (1991).

## B. *Counts II and III: Ameritech's Duty to Sell the Partnership Assets*

The parties agree that the Partnership's business purpose is "to fund, establish and provide" cellular mobile services within a geographic area bounded by Cincinnati, Dayton and Columbus, Ohio. The Partnership Agreement does not contain provisions authorizing the general partner or the limited partners to sell the Partnership assets as a going concern. Nevertheless, Cincinnati Bell seeks summary judgment on the claim, asserted in Counts II and III of its complaint, that Ameritech, as general partner, has a fiduciary duty to sell the Partnership's business and distribute the sale proceeds proportionately to the partners. This duty to sell the business, contends Cincinnati Bell, arises from two interconnected sources: (1) the general fiduciary duty that all general partners owe to their limited partners, *Boxer v. Husky Oil Co.,* Del.Supr., 429 A.2d 995, 997 (1981), and (2) the specific fiduciary duties of a trustee with respect to the assets of a trust, since trust law principles are applicable by analogy (argues Cincinnati Bell) to limited partnerships. Against the backdrop of these two legal frameworks, Cincinnati Bell then argues that Ameritech has a fiduciary duty to the limited partners to sell the Partnership's business because the business is worth more if sold than if it is managed by Ameritech. Cincinnati Bell believes the truth of this factual claim--that the partners' return on equity would be greater if the Partnership were liquidated immediately--is incontestably demonstrated by the record evidence.

*10 Cincinnati Bell first points to the Partnership's lackluster performance over its ten-year life. Next, Cincinnati Bell's experts testified that Ameritech's

financial forecasts for future cash flow are implausible. In fact, Cincinnati Bell's experts suggest that the net present value of the Partnership, based on Cincinnati Bell's own forecasts, is negative. Finally, Cincinnati Bell's experts testified that the Partnership can be sold today to a strategic buyer (another telecommunications company) for $700 million to $850 million, making its sale value enormously greater than its operating value.

Ameritech responds to all of these arguments but it especially attacks the claims regarding the Partnership's past and predicted future financial performance. Assembling its own financial experts, Ameritech challenges the conclusions of Cincinnati Bell's experts and, without doubt, the "battle of the experts" in this case would consume much time and effort were this issue ever tried before the Court. But I find it unnecessary to enter into the fray over the Partnership's net present value as an operating business compared to its sale value to a third party. This debate, in my opinion, obscures the essential point: Under the Partnership Agreement Ameritech, as the general partner, has no authority to sell the Partnership's business. The Partnership Agreement specifically provides that the Partnership's purpose is to fund, establish and provide cellular services in the designated geographic area. The general partner is given broad powers in furtherance of this purpose--to market, sell and maintain cellular services in the limited geographic area for which the Partnership is licensed. In a fundamental sense, selling the Partnership's business would be contrary to the Partnership's stated purpose. A forced sale by judicial decree of dissolution would end the Partnership's ability to carry out its purpose of providing cellular services in the affected region.

Cincinnati Bell notes that the Partnership Agreement, in Section 4.1, grants Ameritech the power to sell the "cellular service *system,*" as well as cellular *services* and, thus, such action is actually consistent with the Partnership Agreement's terms and conditions. *See Kansas RSA 15 Limited Partnership v. SBMS RSA, Inc.,* Del.Ch., C.A. No. 13986, Allen, C. (March 8, 1995) (refusing to grant summary judgment where similar language was in issue). Nevertheless, I find this language consistent with the purpose of funding, establishing and providing cellular services in the particular

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





geographic region. The general partners' power to market, sell, operate and maintain the cellular service system is necessary for carrying out the Partnership's business purpose-- promoting and providing cellular services to subscribers. Based on the terms of the Partnership Agreement, I conclude as a matter of law that Ameritech, as the general partner, has no authority to sell the Partnership's business.

**\*11** Nor do applicable provisions of Delaware's partnership statutes give Ameritech the right to sell the Partnership's business without the unanimous consent of all the partners. Under § 17-403(a) of the Revised Uniform Limited Partnership Act, a general partner of a limited partnership "has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners." 6 *Del.C.* § 17-403(a). A partner in a partnership without limited partners is governed by Delaware Uniform Partnership Law § 1509, which provides in pertinent part:

(c) Unless authorized by the other partners or unless they have abandoned the business, one or more but *less than all partners have no authority* to:

* * *

(2) Dispose of the good will of the business;
(3) Do any other act which would make it impossible to carry on the ordinary business of a partnership....
6 *Del.C.* § 1509(c) (emphasis added).

In the absence of language in a partnership agreement expressly empowering the general partner to sell the Partnership's business (as here), a general partner cannot sell the business without unanimous consent of all the partners. As a result, each partner, including Ameritech in this case, has a right under the applicable Partnership Law Statute (6 *Del.C.* § 1509) to withhold consent to a sale of the Partnership's business.

Cincinnati Bell dismisses the statute's unanimous consent restriction by saying the restriction cannot "supersede the unquestioned duty of a general partner to sell a business when necessary to meet [the general partner's] fiduciary obligations owed the limited partners." Cincinnati Bell urges the Court to order dissolution and sale of the Partnership because Ameritech has a fiduciary duty

to sell it and refuses to do so.

In some respects I think Cincinnati Bell's argument for dissolution and sale implicitly broadens this Court's power to decree judicial dissolution of a limited partnership as defined under § 17-802 of the Revised Uniform Limited Partnership Act. The Court of Chancery's power to order dissolution and sale, in my opinion, is a narrow and limited power. *See PC Tower,* Del.Ch., C.A. No. 10788. The Court should not enlarge the dissolution power beyond the reach intended by the Legislature when it enacted § 17-802. *Cf. Red Sail Easter Limited Partners, LP v. Radio City Music Hall Productions, Inc.,* Del.Ch., C.A. No. 12036, Allen, C. (Oct. 6, 1992) (applying *PC Tower* standard and § 17-802 standard and refusing to adopt broader dissolution principles from general partnership law).

Nevertheless, I have considered Cincinnati Bell's argument that general fiduciary duty principles, by analogy to corporation law or to trust law, *require* Ameritech to sell the Partnership to another competing telecommunications company. Fiduciary duties of care and loyalty require a sale in these circumstances, Cincinnati Bell argues, because (1) it's the prudent thing to do when an asset's operating value is *less* than its sale value; (2) the partners never expected that the Partnership's wireless phone business would compete directly against the partners' *wireline* phone business; and (3) Ameritech as general partner is competing, via the Partnership that it manages, against Cincinnati Bell's wireline business in the Cincinnati region. These developments--together with Cincinnati Bell's prediction that the level of competition threatened by the Partnership's business will increase dramatically in the future--have changed the partners' underlying business assumptions about the Partnership's business. With the Partnership poised to compete directly against the limited partners who fund it with significant capital contributions, Cincinnati Bell vigorously contends that Ameritech's refusal to sell is a violation of its fiduciary obligations to the other partners.

**\*12** Ameritech is quick to point out that the partners did foresee the competitive threat wireless services posed to wireline companies, that the Partnership Agreement itself does not proscribe competition between the Partnership and the constituent partners, that the Partnership actually

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 1996 WL 506906, *12 (Del.Ch.))

enhances each partner's competitiveness by allowing partners to "resell" and "bundle" services such as wireless plus local or long distance with wireline services, and that Ameritech's own experts demonstrate that the Partnership is more valuable if operated rather than sold now.

All of the charges and counter-charges regarding this Partnership's lackluster past performance, and the highly conjectural claims over its sale value today versus five years from now, are beside the point. Even accepting Cincinnati Bell's factual allegations about the Partnership's competition with the partners and its contention that the Partnership has a greater value if sold than if operated, Ameritech is entitled to summary judgment as a matter of law on the breach of fiduciary duty claims in Counts II and III. Corporation law is the source of most Delaware jurisprudence relating to the fiduciary duty of managers. Partnerships have much in common with the business corporation, not least of which is that the general partner exercises full managerial authority of the partnership similar to that exercised by a board of directors for a corporation. Thus, general fiduciary principles as applied in Delaware's corporation law decisions are applicable in the context of this limited partnership. *Litman v. Prudential-Bache Properties,* Del.Ch., 611 A.2d 12, 15 (1992).

A majority stockholder in a Delaware corporation owes no duty to sell its holdings in the corporation just because the sale would profit the minority. *Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 844-845 (1987) (holding that a shareholder is under no duty to sell its holdings in corporation even if it is a majority shareholder, merely because the sale would profit the minority). Similarly, directors of the corporation have no obligation to approve a sale of the company's assets, even if such a sale would be advantageous, where the directors rightfully hold a veto of such a sale as shareholders. *Thorpe v. CERBCO, Inc.,* Del.Supr., 676 A.2d 436, 437 (1996) (discussing *Thorpe v. CERBCO, Inc.,* Del.Ch., C.A. No. 11713, Allen, C. (Oct. 29, 1993), Mem.Op. at 10-11, where Chancellor Allen held that a majority stockholder's ownership of its stock includes the property right to cast the controlling vote and to veto a sale of the business, even if a sale would be in the best interests of minority stockholders).

These same principals apply in the context of this limited Partnership. Ameritech owns 52% of the Partnership. Ameritech has property rights akin to those of a majority stockholder. Cincinnati Bell, with a 45% interest, is a passive minority investor with limited liability. Cincinnati Bell has no management authority. As with a minority stockholder, Cincinnati Bell has no right to demand that the majority owner sell all the business assets just because a sale would profit Cincinnati Bell.

**\*13** Like a majority stockholder in a corporation, Ameritech is the general partner and majority Partnership owner and is entitled to exercise its veto of a sale of the Partnership's business. Exercise of its property right in this fashion does not breach Ameritech's fiduciary duty to the minority interest partners. Ameritech's responsibility is to manage the Partnership in accordance with its purpose of establishing and providing cellular services in the Cincinnati, Columbus and Dayton region. Ameritech is under no fiduciary obligation to abandon that purpose and sell the business because one limited partner--Cincinnati Bell--believes it would be in its own strategic business interest to do so. All of the partners are entitled to resell Partnership wireless services, and to bundles services (offering wireless via the Partnership with local/long distance wireline) for its own customers, thereby offsetting potential losses in the wireline business with wireless services from the Partnership. This is the purpose of the Partnership, clearly expressed in the Partnership Agreement. If the partners want to sell the Partnership's business, all of the partners must consent to such a sale. Unless it is not reasonably practicable to carry on the business in conformity with its purpose or unless all the partners agreed to a dissolution of the business, Ameritech is under a duty to carry out the Partnership's purpose as expressed in the Partnership Agreement. If a partner does not share Ameritech's vision of the Partnership's viability in the cellular market, that partner retains the right under the Partnership Agreement to cash out its interest in the Partnership or to withdraw from the Partnership. In these circumstances, therefore, I conclude that as a matter of law Ameritech is entitled to summary judgment on Cincinnati Bell's claim in Counts II and III that Ameritech has breached its fiduciary duties of care and loyalty by refusing to sell the Partnership's business. [FN9]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





FN9. I do not accept Cincinnati Bell's argument that trust law principles apply in this setting. A trustee's duty is to invest and conserve the trust assets for the benefit of the *cestui que* trust. A general partner's obligation, like that of a director, is to manage a specific business, a task that implies entrepreneurial risks. Because of the fundamental difference between the duties and functions of a trustee and a general partner in this case, I do not think trust law principles should, by analogy, be applied to Ameritech's duties as general partner of the Partnership. *Cf. Cinerama, Inc. v. Technicolor, Inc.,* Del.Ch., 663 A.2d 1134, 1148 (1994).

### C. *Counts II and III:  Cincinnati Bell's Claims of Mismanagement and Gross Negligence*

In Counts II and III of its amended and supplemental complaint, Cincinnati Bell alleges that Ameritech has breached the Partnership Agreement and has managed the Partnership in a grossly negligent manner. Cincinnati Bell has alleged numerous specific examples of Ameritech's gross mismanagement, but Cincinnati Bell insists that it is the "pattern" of conduct of Ameritech that constitutes gross mismanagement. For this pattern of mismanagement, Cincinnati Bell seeks money damages.

Before turning to the specific instances of alleged mismanagement (and the pattern of conduct of which they form constituent elements), it is useful to review the relevant terms of the Partnership Agreement concerning management and control of the Partnership. As mentioned earlier, § 1.3 of the Partnership Agreement notes the Partnership's purpose is to fund, establish and provide cellular services. In §§ 7.1 and 7.2, the Partnership Agreement sets out in broad terms the powers of a general partner:

**\*14** 7.1 *Partnership Powers.* In furtherance of the business purpose specified in Section 1.3, the Partnership, and the General Partner on behalf of the Partnership, shall be empowered to do or cause to be done any and all acts reasonably deemed by the General Partner to be necessary or appropriate in furtherance of the purposes of the Partnership or [similarly to] forebear from doing any act ... including without limitation, the power and authority:
(a) To enter into, perform and carry out contracts and agreements of every kind necessary or

incidental to the accomplishment of the Partnership's purposes, including, without limitation, contracts and agreements with the General Partner and Affiliates of the General Partner ...

\* \* \*

(c) To carry on any other activities necessary to, in connection with or incidental to any of the foregoing.
7.2 *Powers of the General Partner.* In addition to those powers vested pursuant to Section 7.1, the General Partner hereby is vested with the power to:

(a) Manage, supervise and conduct the affairs of the Partnership;
(b) Make all elections, investigations, evaluations and decisions, binding the Partnership hereby, that may be necessary or appropriate in connection with the business purposes of the Partnership ...
Importantly, § 16.1 of the Partnership Agreement confers upon Ameritech, in exercising these managerial powers, broad contractual protection for conduct in its capacity as general partner:
16.1 *Exculpation of the General Partner.* The General Partner will not be liable for any loss to the Partnership or the Limited Partners by reason of any act or failure to act unless the General Partner was guilty of willful misconduct or gross negligence.

These provisions clearly demonstrate that the parties to the Partnership Agreement contracted to broadly empower the general partner to decide how to conduct the Partnership's business, including dealing with itself. In addition, the parties expressly limited the general partner's liabilities for loss by reason of any act or failure to act unless the general partner was guilty of willful misconduct or gross negligence.

Cincinnati Bell's complaint does not charge the general partner, AMCI, with willful misconduct. Instead, Cincinnati Bell characterizes AMCI's conduct over the years as gross negligence and gross mismanagement. Under Delaware law, therefore, it is Cincinnati Bell's burden to plead and to prove that AMCI was "recklessly uninformed" or acted "outside the bounds of reason." *Tomczak v. Morton Thiokol, Inc.,* Del.Ch., C.A. No. 7861, Hartnett, V.C. (April 5, 1990), Mem.Op. at 31-32; *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Ch., 547

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d

**Page 12**

(Cite as: 1996 WL 506906, *14 (Del.Ch.))

A.2d 963, 970 (1986).

Ameritech argues that three acts of alleged gross negligence in particular are barred by the statute of limitations. I will consider these three events (hereinafter "the stale claims") at the outset, and treat the remaining nine examples of gross negligence (hereinafter "the pattern of mismanagement claims") later in this Opinion.

#### (1) The Stale Claims.

**\*15** Cincinnati Bell charges that AMCI raised prices for cellular services in order to compensate for declining revenues per customer. AMCI miscalculated the effect of the increase. The price increase resulted in customer defections and a loss of sales to new customers. AMCI eventually was forced to roll back the price increases. Ameritech disputes this claim, providing uncontradicted evidence that the price increase occurred in other AMCI managed partnerships, and not in the Ohio market. Importantly for this motion, however, is the undisputed fact that the increases occurred in *1989*, over four years before this lawsuit was filed.

Next, Cincinnati Bell accuses AMCI of gross negligence or a breach of the Partnership Agreement when it caused the Partnership to acquire certain retail store operations in 1985 and 1989 and to operate them thereafter. Cincinnati Bell also complains that in 1992 AMCI changed its marketing strategy by offering to rent cellular telephones without first doing a study or analysis to determine the effect of such a change in strategy. Cincinnati Bell's own records, however, clearly show that the rental program began in 1990.

Cincinnati Bell instituted this action on February 23, 1994. All of the above incidents of alleged gross negligence or breach of the Partnership Agreement occurred before February 23, 1991, or more than three years before Cincinnati Bell filed the complaint. Delaware's three years statute of limitation applies to claims for breach of contract and to money damage claims for breach of fiduciary duty. 10 *Del.C.* § 8106; *Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246, 250-51 (1970). Accordingly, unless the statute of limitations has been tolled in this case, Section 8106 bars these three specific claims of alleged gross negligence.

Not surprisingly, Cincinnati Bell offers five

theories for why the statute of limitations should be tolled. Of course, where a plaintiff knows or should know of a supposed wrong, the statute of limitations is not tolled. *See Kahn v. Seaboard Corp.,* Del.Ch., 625 A.2d 269, 277 (1993). Although Cincinnati Bell had contemporaneous knowledge, via its personnel monitoring the Partnership, of the incidents of which it now complains, it says it did not file the suit within the appropriate time because it relied on Ameritech's financial forecasts and was lulled into a false sense of complacency. Cincinnati Bell also characterizes AMCI's alleged wrongs as "continuing torts," for which the statute of limitations commences to run only when the tortious acts have ceased. *See Van Heest v. McNeilab, Inc.,* 624 F.Supp. 891 (D.Del.1985). Next, Cincinnati Bell contends that its cause of action against Ameritech did not accrue until some undefined moment after February 23, 1991, when Ameritech's complete "portfolio" of negligent acts amounted, in combination, to gross negligence, thereby giving rise to an actionable claim. Citing *Bovay v. H.M. Byllesby & Co.,* Del.Supr., 38 A.2d 808 (1944), Cincinnati Bell also insists that Ameritech's self-dealing equitably tolled the statute of limitations. Finally, Cincinnati Bell argues that the three year statute of limitations pursuant to Section 8106 is tolled until actual damages caused by the asserted wrongs have been found to exist.

**\*16** Based on the uncontroverted facts, Cincinnati Bell's claims of gross mismanagement arising from the 1989 price increase, the 1985 and 1989 acquisition of retail stores and the 1990 cellular phone rental program, all are barred by the three year limitations period established in Section 8106. None of the reasons offered by Cincinnati Bell for tolling the statute are persuasive. First, a statute of limitations begins running even though actual or substantial damages are inflicted at a later date. *Kaufman v. C.L. McCabe & Sons, Inc.,* Del.Supr., 603 A.2d 831, 834 (1992); *Isaacson, Stolper & Co. v. Artisan's Savings Bank,* Del.Supr., 330 A.2d 130, 132 (1974). Second, equitable tolling occurs when the plaintiff can show it was ignorant of the wrong due to the defendant's fraud or fraudulent concealment or some other circumstance justifying why plaintiff did not have reason to know of the facts constituting the alleged wrong. *Kahn v. Seaboard Corp.,* Del.Ch., 625 A.2d 269, 276 (1993). *See In re Maxxam, Inc./Federated*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





*Development Shareholders Litig.,* Del.Ch., C.A. No. 12111, Jacobs, V.C. (June 21, 1995), Mem.Op. at 13- 14; *Patterson v. Hanby,* Del.Ch., C.A. No. 6354 & 6062, Walsh, V.C. (April 24, 1985), Mem.Op. at 5-6. Cincinnati Bell cannot show that it was ignorant of the wrong because the undisputed facts show that it knew of the stale claims at the time, including the alleged self-dealing claim. *Bovay v. H.M. Byllesby & Co.,* thus does not apply. Third, Cincinnati Bell's portfolio theory, combining all of Ameritech's alleged negligent acts to make one later claim of gross negligence, is inapt here where the stale claims are actually separate claims involving discrete business decisions made by different persons. A combination of negligent acts by the same person may constitute gross negligence when the negligent acts can be viewed as cumulative with causative factors or inextricably related events leading to a particular incident or injury. In this case, the undisputed facts show that Cincinnati Bell's claims relate to the alleged negligence of separate persons, making independent business judgments, under distinct business conditions. These separable acts cannot be woven together as though they are part of an intertwined fabric constituting a monolithic course of conduct. Indeed, each incident cited by Cincinnati Bell is a free-standing event, a business judgment with its own distinct subject matter. Cincinnati Bell has taken separate business decisions involving different people separated by time and lumped them together as one actionable wrong. Cincinnati Bell's argument, however, is belied by the pleadings and by the record evidence. Accordingly, Cincinnati Bell's portfolio theory, and the continuing tort theory, are inapplicable. Finally, even Cincinnati Bell's complaint contradicts the claim that it delayed bringing this lawsuit because of its reliance on Ameritech's financial forecasts. The complaint alleges that Cincinnati Bell did not assert its *dissolution* claim earlier because of Ameritech's rosy forecasts regarding the Partnership's future profitability. No other particularized facts support Cincinnati Bell's argument that its reliance on Ameritech's financial forecasts caused it to delay filing a lawsuit concerning the stale mismanagement claims.

**\*17** The undisputed facts do not support Cincinnati Bell's contention that the statute of limitations should be tolled. Accordingly, because Cincinnati Bell knew or should have known of the stale claims

at the time of the alleged grossly negligent actions, I find that the three stale claims are barred by the statute of limitations. 10 *Del.C.* § 8106.

I turn now to the nine remaining examples of alleged gross negligence and mismanagement. Because Cincinnati Bell insists that the examples should be viewed collectively, as a pattern of mismanagement, I will treat them collectively, rather than individually.

(2) Ameritech's Alleged Pattern of Mismanagement. The complaint recites a litany of decisions by Ameritech that, in Cincinnati Bell's view, have had disastrous consequences for the Partnership. Cincinnati Bell portrays these decisions as either based on inadequate information, poor planning, self-interestedness, or disregard for the terms of the Partnership Agreement.

In early 1992, AMCI began implementation of the "D2000" initiative, which sought to reduce customer acquisition costs by cutting sales commission rates across the board. Unfortunately, D2000 had unfavorable results because competitors kept their commission rates high, thus causing the Partnership to lose many important channels of distribution to its competitors. The loss of distribution channels resulted in lower subscriber growth rates. Cincinnati Bell attacks AMCI for "inadequate investigation" of the D2000 initiative.

Cincinnati Bell also points to certain non-officer bonuses that AMCI paid in years when "revenue goals" were not achieved by the Partnership. Evidently, Ameritech rewards managers in the Ohio Partnership in whole or in part on the basis of AMCI's performance in managing all of Ameritech's Partnership ventures, not just on the basis of the Ohio Partnership's performance. In years when the Ohio Partnership performed poorly, therefore, AMCI still paid bonuses based on Ameritech's bonus "structure."

Cincinnati Bell next contends that since at least 1992 Ameritech should have made efforts to sell the Partnership, as a sale would have been instantly profitable to all the partners. This contrasts sharply, says Cincinnati Bell, with the ongoing dismal operating performance of the Partnership under AMCI. Furthermore, in light of the Partnership's allegedly poor performance,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Cincinnati Bell contends Ameritech should turn over the Partnership's management authority from AMPS and AMCI to a "competent outside manager."

Yet another decision of which Cincinnati Bell complains occurred when Ameritech prematurely caused the Partnership to begin converting from analog to digital equipment, phasing out Series I cell site equipment and upgrading it to Series II equipment. This conversion cost the Partnership about $* million in 1993, an expense that Cincinnati Bell contends the Partnership does not need to incur until 1997.

Cincinnati Bell also faults Ameritech for not having an adequate marketing plan for the Ohio Partnership. Cincinnati Bell's expert, Dr. Frederick Russ, a professor of marketing at the University of Cincinnati, testified that AMCI's Ohio market plans would not receive a passing grade in his marketing strategy class. To illustrate the deficiency, Professor Russ contends AMCI should adopt a plan that follows the general marketing plan framework suggested by Philip Kotler, an authority on marketing management. [FN10] Another instance of gross negligence, according to Cincinnati Bell, is AMCI's improper reimbursements for expenses and overhead from 1991-1994. AMCI staffs all Partnership activities and charges the Partnership with expenses and overhead. Cincinnati Bell notes that under Section 14.2 of the Partnership Agreement such expenses must be "incurred" by the general partner and that is AMPS, not AMCI. Thus, Cincinnati Bell contends these expenses and costs as allocated by AMCI were not allowed under the Partnership Agreement.

FN10. Philip Kotler is a professor at the Kellogg Graduate School of Management, Northwestern University, and author of the most widely used marketing textbook in graduate schools of business. See Ameritech's Appendix, Vol. II at 549-577.

*18 Cincinnati Bell argues that Ameritech has been grossly negligent in failing to merge or "partner" with other wireless carriers in a national consortium as a response to the advent of PCS and the efforts of AT & T and GTE to create a national wireless business composed of both cellular and PCS licenses. Finally, Cincinnati Bell claims that Ameritech's forecasts of the Partnership's cash flow, profitability and capital needs demonstrated gross

mismanagement, both because of the manner in which the forecasts were prepared and because ultimately the forecasts proved inaccurate.

The Partnership Agreement exculpates Ameritech from liability for loss to the Partnership or the limited partners for its acts or omissions unless the act or omission amounts to willful misconduct or gross negligence. Cincinnati Bell lists nine acts or omissions as examples of a pattern of gross negligence and mismanagement. Cincinnati Bell contends the evidence surrounding these acts or omissions is in dispute and, thus, summary judgment is inappropriate.

Most of the disputed evidence, however, centers around conflicting opinions by experts concerning the wisdom of a particular business strategy undertaken by AMCI on behalf of the Partnership (for example, the D2000 initiative; the switch from analog to digital equipment; the absence of a Kotler-type marketing plan; the failure to partner with other wireless carriers in a national consortium; the structure for awarding incentive bonuses). Ameritech counters each charge of mismanagement with an arsenal of statistics and expert opinion justifying the business decisions undertaken on behalf of the Partnership. None of this disputed evidence, however, is a basis for denying summary judgment because the material facts are in agreement--all of the questioned acts or decisions were business decisions undertaken in good faith by the managing partner to meet a strong competitor in the Ohio market (CCI), often on the advice of consultants and experts hired by the managing partner specifically for the purpose of making such decisions. Thus, in the D2000 initiative example, the uncontested facts reveal that Ameritech adopted it on the recommendation of qualified outside consultants and implemented the plan to the consultants' satisfaction. So even though Cincinnati Bell now points to opinions post hoc from its experts that the initiative was poorly conceived or implemented, it cannot show that Ameritech's conduct represents gross negligence. The evidence is and would be that Ameritech adopted D2000 after soliciting advice from recognized experts. As a matter of law, on those undisputed facts, I cannot conclude that Ameritech acted in a recklessly uninformed manner.

This same conclusion is inevitable with regard to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





the decisions not to join a national consortium of wireless carriers or to switch to digital equipment earlier rather than later in the Partnership's life. These are the sorts of business judgments typically made by a general partner. No evidence indicates that the general partner made these decisions without a review of the costs, advantages and disadvantages. In each instance, undisputed facts show that each suspect decision was the product of a cost benefit calculation commonplace in business entities operating in a highly competitive market.

*19 Ameritech's failure to sell the Partnership's business and to hire a competent outside manager also do not fall outside the bounds of reason. As earlier noted, Ameritech is under no duty to sell its majority interest in the Partnership, even if to do so would benefit the minority. Nor is it legally required, as the majority interest holder and as the general managing partner, to turn management of the Partnership over to an outside party. If Ameritech were legally obligated to do so, it would find itself in the dubious position of having surrendered management to another while remaining fully liable as the general partner.

Even treating all nine discrete acts or omissions as one seamless web of general partner decisions, I cannot find from the uncontradicted facts that they fall outside the bounds of reason or that they were recklessly uninformed. *See Tomczak v. Morton Thiokol, Inc.,* Del.Ch., C.A. No. 7861, Hartnett, V.C. (April 5, 1990). To the contrary, all of the acts, from forecasting cash flow and switching to digital equipment to foregoing a particular marketing plan and adopting the D2000 initiative-- reflect decisions undertaken in good faith and based on informed judgments, even if particular decisions ultimately proved mistaken or less advantageous than originally conceived.

Cincinnati Bell's claim suggests Ameritech should function as a guarantor of the Partnership's performance. But the Partnership Agreement is silent as to the performance, profitability or even an expected time for the limited partners to receive a particular return on their investments. Considering the terms of the Partnership Agreement and the absence of any disputed facts concerning the basis for Ameritech's acts on behalf of the Partnership as its general partner, I find as a matter of law that Ameritech's conduct does not rise to the level of

gross negligence or gross mismanagement. Accordingly, I grant defendants' motion for summary judgment as to the gross mismanagement and gross negligence claims of Counts II and III of plaintiff's amended and supplemental complaint.

\* \* \*

Although the above conclusions make it unnecessary to consider further issues raised by the parties, it is noteworthy that Cincinnati Bell's claim for damages under Counts II and III appears unsupportable under Delaware law. In its amended complaint, Cincinnati Bell asks the Court to award "damages for the difference between the present value of [Cincinnati Bell's] limited partnership interest and the value such interest would have had but for [Ameritech's] gross mismanagement, negligence and breach of fiduciary duties." (Amended Complaint, ¶ 31, Prayer C). [FN11] Cincinnati Bell's claim for damages is clearly derivative in nature. Damages for the general partners' breach of fiduciary duties or for gross mismanagement would fall on the Partnership and all its partners. *Litman v. Prudential-Bache Properties,* Del.Ch., 611 A.2d 12, 15 (1992). Thus, I fail to see on what basis Cincinnati Bell can assert a claim for damages based upon what Cincinnati Bell's minority interest would be worth "but for" Ameritech's alleged gross mismanagement of the Partnership's business.

FN11. It is also noteworthy that the parties have addressed the pending motions with reference to injunctive and declaratory relief being sought in connection with Counts II and III of the amended and supplemental complaint. Having carefully read the amended and supplemental complaint, I find no reference to injunctive or declaratory relief in either Count II or Count III, or the general prayers for relief.

*20 Additionally, Cincinnati Bell's damages claim appears predicated on assumptions about what the Partnership ought to be worth based on comparisons to industry averages. Cincinnati Bell's expert, for example, created a financial model for purposes of this case based on financial and operating ratios characteristic of the cellular industry. Extrapolating from that data, Cincinnati Bell's expert drew comparative conclusions about the Partnership's predicted cash distributions, data from which Cincinnati Bell ultimately derives the measure





Not Reported in A.2d
(Cite as: 1996 WL 506906, *20 (Del.Ch.))

**Page 16**

of damage to its minority interest.

Damages cannot be speculative or uncertain, *Wise v. Western Union Telegraph Co.,* Del.Super., 181 A. 302, 305-06 (1935), but must be at least based on a "reasonable estimate." *Thorpe v. CERBCO, Inc.,* Del.Ch., C.A. No. 11713, Allen, C. (Oct. 29, 1993), Mem.Op. at 10. Here, Cincinnati Bell's damage claims do not appear based on a reasonable estimate; rather, the damages are based on assumptions about industry averages and are not linked specifically to the alleged acts of gross mismanagement or gross negligence. Accordingly, summary judgment is equally appropriate with respect to Cincinnati Bell's damages claim under Counts II and III.

### IV. CONCLUSION
For the reasons set forth above, I grant summary judgment in favor of defendants and against plaintiff as to all counts of the amended and supplemental complaint. An Order has been entered in accordance with this decision.

### ORDER
For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date it is ORDERED:

1) that summary judgment is entered in favor of Defendants and against Plaintiff with respect to all claims in Counts I, II and III of the Amended and Supplemental Complaint; and

2) that the costs of this action are assessed to Plaintiff.

Not Reported in A.2d, 1996 WL 506906 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 2

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21384599 (Del.Ch.)
(Cite as: 2003 WL 21384599 (Del.Ch.))

**Page 1**

H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**In re CITIGROUP INC. SHAREHOLDERS LITIGATION**
**No. 19827.**

June 5, 2003.

Dear Counsel:

LAMB, Vice Chancellor.

*1 The court heard argument, on May 28, 2003, on the defendants' motions to dismiss the Amended Complaint. The defendants contend, among other reasons, that pleading fails to satisfy the demand requirements of Court of Chancery Rule 23.1. At the conclusion of the hearing, the court announced that the motion would be granted. This letter briefly summarizes the reasons for that decision.

For some years, this court and the Delaware Supreme Court have been urging would-be derivative plaintiffs to use the "tools at hand" before filing complaints. [FN1] The purpose of such a presuit investigation is to enable those persons to draw complaints that satisfy Rule 23.1's requirement that facts be alleged "with particularity" justifying demand excusal. [FN2] Some plaintiffs have heeded this call. [FN3] Others have not. As the Delaware Supreme Court speculated in *Rales,* the problem cases appear to result from "an unseemly race to the court house, chiefly generated by the 'first to file' custom ... permitting the winner of the race to be named lead counsel." [FN4]

FN1. *See White v. Panic,* 793 A.2d 356, 364-365 (Del. Ch.2000) and cases cited therein.

FN2. *Rales v. Blasband,* 634 A.2d 927, 934-35 n. 10 (Del.1993) (discussing the surprising disuse of the books and records provisions of 8 *Del. C.* § 220 before filing derivative complaints).

FN3. *See, e.g., In re The Walt Disney Company Derivative Litig.,* C.A. No. 15452 (Del. Ch. May

28, 2003) (sustaining amended complaint).

FN4. *Rales,* 634 A.2d at 934-35 n. 10.

The Amended Complaint that is the subject of the pending motions to dismiss clearly falls in the second category. In the summer of 2002, there were increasingly widespread reports in the press and elsewhere concerning the involvement of Citigroup, Inc., or more particularly Citibank, N.A., its wholly-owned banking subsidiary, in the Enron scandal. On July 23, 2002, the United States Senate's Permanent Subcommittee on Investigations issued a report "Concerning the Role of Financial Institutions in Enron's Collapse." This report and related hearings publicized the role Citibank played in a series of off-balance sheet financings allegedly done by Enron to hide significant indebtedness from the marketplace.

Relying extensively on information gleaned from this governmental report and some other news sources, on August 9, 2002, two plaintiffs filed derivative complaints naming 19 present and former directors of Citigroup as defendants. Those complaints described Citibank's involvement in certain of the Enron transactions and the likelihood that Citibank, and thus Citigroup, would incur substantial losses as a result. The complaints then allege, in wholly conclusory terms, that all of the 19 directors breached his or her fiduciary duties by failing to exercise reasonable control and supervision over the "officers, employees, and agents of Citigroup and its subsidiaries." [FN5] In a similarly conclusory fashion, the complaints further allege that the directors either knew about or should have known about the Enron transactions and either approved of those transactions or are liable for a "sustained and systematic failure" to supervise the activities of their corporate subordinates.

FN5. Amended Comp. at ¶ 31(b). This is obviously an attempt to assert what has become known as a *Caremark* claim. *See In re Caremark Int'l Derivative Litig.,* 698 A.2d 959 (Del. Ch.1996).

Two reasons were given for the plaintiffs' failure to make a presuit demand. They first contend that demand was excused because all but three of the current directors were named as defendants. This

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2003 WL 21384599, *1 (Del.Ch.))

Page   2

excuse is clearly insufficient. [FN6] Second they contend that demand is excused because, to the extent the director defendants were unaware of the Enron transactions, their lack of knowledge resulted from their failure to assure that the Citigroup board of directors was properly informed about the company's business activities. This is a mere conclusion that provides no framework in which to analyze the directors' alleged breach of duty. It is a patently inadequate allegation of demand excusal.

> FN6. *See Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984) (holding that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors ... ).

*2 In keeping with the "first to file" custom observed by the Supreme Court in *Rales,* the two complaints (both filed by the same Delaware lawyers) were consolidated and the lawyers involved were appointed "lead counsel." After the defendants moved to dismiss the Complaint and filed their opening brief in support of that motion, the plaintiffs filed the Amended Complaint. This new pleading both provides more detail about the Enron transactions and expands the scope of the matters alleged to include the involvement of Salomon Smith Barney ("SSB"), another Citigroup subsidiary, in the unfolding Wall Street "spinning" scandal. These latter allegations are derived from the public disclosure of a widespread practice of arranging for favored corporate executives to get more or less guaranteed profits from "hot" IPOs in return for their corporation's lucrative investment banking business. The Amended Complaint is 80 pages long and has 173 numbered paragraphs, plus subparts. Despite its length, however, the Amended Complaint does not contain any more particularized explanation of the plaintiffs' failure to make a presuit demand.

The renewed motions to dismiss will be granted because there is no basis in the well-pleaded allegations of the Amended Complaint from which the court could possibly infer that demand is excused as to a majority of Citigroup's directors. The Amended Complaint alleges the directors' culpability in the alternative: either they knew about (and condoned) the corrupt and illegal practices alleged or their failure to know was the product of a breach of the directors' duty of oversight. But it is apparent from a reading of the Amended Complaint that the plaintiffs have made no effort to obtain from Citigroup (or any other source) information that might support a claim either that the directors had actual knowledge of the allegedly illegal practices described in the Amended Complaint or that the directors either knew or should have known that there were material inadequacies in the corporation's internal controls. For these reasons, the Amended Complaint is entirely devoid of the particularized allegations of fact needed to tie at least 18 of the 19 named individuals to any of the alleged wrongdoing. [FN7]

> FN7. There are allegations that relate to Sanford J. Weill's relationship with Jack Grubman and the "spinning" scandal. Weill is Citigroup's Chairman and CEO. For the purposes of this motion, the court assumes that those allegations suffice to excuse demand on Weill. But there is no reason from the facts alleged to attribute Weill's disqualification to any other Citigroup director.

At argument, in response to questioning by the court, the plaintiffs' counsel suggested that the Amended Complaint adequately alleges a series of "red flags" that should have put the director defendants on notice of the offensive conduct or the weakness of the corporation's internal controls. Further questioning revealed, however, that these "red flags" are comprised of a series of internal corporate memoranda and e-mails disseminated at the level of Citigroup's operating subsidiaries. There is nothing in the Amended Complaint to suggest or to permit the court to infer that any of these ever came to the attention of the board of directors or any committee of the board. How, exactly, a member of the Citigroup board of directors was supposed to be put on inquiry notice by something he or she never saw or heard of is not explained. The answer to the question is obvious. "Red flags" are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer. [FN8]

> FN8. *Compare Guttman v. Huang,* 2003 WL 21058185, at *12-*13 (Del. Ch. May 5, 2003) (dismissing a *Caremark* claim because of a failure to allege that directors had knowledge of, or were on notice of, any red flags related to the company's financial controls) *with In re Abbott Lab. Derivative S'holder Litig.,* 325 F.3d 795, at 809 (7th Cir.2003)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





(applying Delaware law and finding the complaint stated a *Caremark* claim because the facts supported "a reasonable assumption that there was a 'sustained and systematic failure of the board to exercise oversight," ' because directors at Abbott "*knew* of ... violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses ....") (emphasis added).

*3 Despite its prolixity, the Amended Complaint completely fails to set forth adequate reasons why demand is excused. Perhaps the absence of particularized facts excusing demand is the product of a race to the courthouse. It is certainly a result of the plaintiffs' failure to use the "tools at hand" to learn whether Citigroup's involvement in either the Enron or the Wall Street "spinning" scandals was the result of a breach of fiduciary duty at the board level. No doubt, Citigroup has suffered substantial losses as the result of its involvement in these scandals. The fact of those losses, however, is not alone enough for a court to conclude that a majority of the corporation's board of directors is disqualified from considering a demand that Citigroup bring suit against those responsible.

For the foregoing reasons, the Amended Complaint is dismissed. In accordance with Rule 15(aaa), the dismissal will be with prejudice to the named plaintiffs. An order is enclosed.

### ORDER
NOW, THIS 5th day of June, 2003, for the reasons set forth in the court's letter opinion of this date, and in accordance with Court of Chancery Rule 15 (aaa), this consolidated civil action is DISMISSED with prejudice to the named plaintiffs.

Not Reported in A.2d, 2003 WL 21384599 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 3

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 354390 (Del.Ch.)
**(Cite as: 2000 WL 354390 (Del.Ch.))**
c

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**Michele S. CRIDEN, Plaintiff,**
v.
**Jonathan L. STEINBERG, Bruce L. Sokoloff,
Peter M. Ziemba and S. Christopher
Meigher, III, Defendants.
INDIVIDUAL INVESTOR GROUP, INC.,
Nominal Defendant.
No. 17082.**

March 23, 2000.

Pamela S. Tikellis and James C. Strum of
Chimicles & Tikellis, Wilmington, Delaware.
Attorneys for Plaintiff.

Barry M. Klayman and Todd C. Schiltz of Wolf,
Block, Schorr and Solis-Cohen, Wilmington,
Delaware. Of Counsel: Richard J. Morvillo, Luther
Zeigler and Kenneth F. Rossman of Crowell &
Moring, Washington, D.C. Attorneys for Individual
Defendants.

Kenneth J. Nachbar of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware. Attorneys for
Nominal Defendant.

MEMORANDUM OPINION

STEELE, V.C.

*1 Plaintiff files this shareholder derivative action
complaining that the board of directors of Individual
Investor Group, Inc. improperly re-priced stock
options issued under a shareholder approved plan.
Plaintiff alleges that the re-pricing constituted
corporate waste and that the directors breached their
fiduciary duty of loyalty. Defendants move to
dismiss plaintiff's claims for: (1) failure to make
pre-suit demand under Court of Chancery Rule 23.1
; and, (2) failure to state a claim upon which relief
can be granted under Court of Chancery Rule
12(b)(6).

I find it unnecessary to determine whether plaintiff
failed to make pre-suit demand under Rule 23.1.

There is no real need to examine whether demand
should have been made on the Board; and, if not,
whether the failure to do so can be excused.

Plaintiff's purported claims are for breach of the
fiduciary duty of loyalty and corporate waste.
Plaintiff's allegations of corporate waste are merely
conclusory and lack any factual basis to survive a
motion to dismiss. Because the plaintiff has failed to
make out a claim of waste and the claim of breach of
fiduciary duty rests upon an act of corporate waste,
there can be no underlying breach of the fiduciary
duty of loyalty. Therefore, I grant defendants'
motion to dismiss for failure to state a claim.

## I. BACKGROUND

### A. The Parties

The plaintiff is a shareholder of Individual Investor
Group, Inc., a Delaware corporation that provides
financial services information to both individual and
professional investors alike. The individual
defendants are members of IIG's board of directors'
[FN1] and the nominal defendant is IIG itself.

> FN1. Defendant, Jonathan L. Steinberg, is both the
> Chairman and CEO of IIG; the remaining
> defendants, Sokoloff, Ziemba, and Meigher are all
> outside non-employee directors of IIG.

### B. Nature of the Proceedings

Plaintiff filed this shareholder derivative action on
March 31, 1999, alleging that IIG's directors
committed corporate waste and breached their
fiduciary duty of loyalty when they approved the re-
pricing of stock options held by both employee and
non-employee directors of IIG. Plaintiff amended
the complaint on August 4, 1999.

Defendants moved to dismiss plaintiff's claims
under Court of Chancery Rules 23.1 and 12(b)(6).
The Court held oral argument on the motion on
February 23, 2000.

### C. Stock Option Re-pricing Decisions

On November 19, 1998, the board of directors
agreed to a resolution that would substantially
reduce the exercise price for stock options held by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 2000 WL 354390, \*1 (Del.Ch.))**

employees of IIG. [FN2] Defendant Steinberg, an employee director holding approximately 680,000 stock options, benefited from the directors' decision to re-price. [FN3] The outside directors received no benefit from this transaction.

> FN2. Under this re-pricing decision, 1,479,801 options with a weighted average exercise price of $5.34 per share were re-priced at $1.25 per share.

> FN3. The options defendant Steinberg held had an exercise price ranging from $4.9375 to $7.50. Am. Compl. ¶ 20.

Over one month after the board of directors approved a re-pricing decision that significantly impacted options held by Steinberg, the board approved re-pricing options held by non-employee directors. The remaining non-employee directors, Sokoloff, Ziemba, and Meigher received replacement options at a reduced exercise price. [FN4]

> FN4. The committee granted the non-employee directors an opportunity to exercise their options at $2.00 per share. Am. Compl. ¶ 22.

## II. CONTENTIONS
### A. Plaintiff's Contentions

**\*2** Plaintiff contends that both the November 19, 1998 and the December 23, 1998 re-pricing decisions should be treated as a singular transaction because of their proximity in time and the circumstances surrounding their approval. Furthermore, plaintiff eschews any need to plead particular facts demonstrating that the two decisions should be treated as one arguing that it is reasonable to infer, based upon the plain allegations in the amended complaint, that the decisions are, in fact, mutually dependent. The directors' decision to separate the two decisions in time in an attempt to make them distinct exhibits a breach of the "duty of good faith."

Moreover, plaintiff claims the decisions to re-price constituted corporate waste because they "resulted in a diversion of corporate assets for improper and unnecessary purposes" without any consideration flowing to IIG. [FN5] Consistent with her allegations of corporate waste, plaintiff maintains that the defendant directors breached their fiduciary

duty of loyalty to IIG because the re-priced options were unauthorized gifts granted only to benefit the defendants. [FN6]

> FN5. Am. Compl. ¶¶ 42--43.

> FN6. Am. Compl. ¶ 46.

### B. Defendants' Contentions

Defendants move to dismiss this action on all counts for (1) failure to comply with the demand requirements for shareholder derivative actions, under Court of Chancery Rule 23.1; and, (2) failure to state a claim upon which relief can be granted, under Court of Chancery Rule 12(b)(6). Defendants maintain that plaintiff offers no specific allegations of fact to support her claim and relies upon nothing more than conclusory allegations.

After contending that the two stock option re-pricing decisions should be treated as independent transactions, defendants maintain that the claims surrounding the November 19, 1998 employee stock option re-pricing decision must be dismissed because plaintiff failed to make pre-suit demand on the board and admittedly failed to plead why demand should be excused. Defendants' assert that the plaintiff fails to plead facts demonstrating that the three non-employee director majority were motivated by self-interest or lacked the independence to evaluate and approve the employee stock option re-pricing objectively.

Finally, while conceding the directors' interest in the December 23, 1998 decision, defendants assert that since plaintiff's amended complaint fails to allege facts establishing claims for corporate waste the directors could not have breached their fiduciary duty of loyalty in re-pricing their own or the employees' stock options.

## III. LEGAL STANDARD

The standard for a motion to dismiss is well-established under Delaware law: that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. [FN7] In reviewing plaintiff's complaint, I am permitted to accept all well-pleaded facts as true and must construe all reasonable inferences from the facts in a light that is most favorable to the non-movant. [FN8] Allegations that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2000 WL 354390, *2 (Del.Ch.))

are merely conclusory and lacking factual basis, however, will not survive a motion to dismiss. [FN9]

> FN7. *Lewis v. Austen,* Del. Ch., C.A. No. 12937, mem. op. at 4, Jacobs, V.C. (June 2, 1999) ("a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted.").

> FN8. *O'Reilly v. Transworld Healthcare, Inc.,* Del. Ch., C.A. No. 16507, mem. op. at 11, Steele, V.C. (August 20, 1999).

> FN9. *In re Walt Disney Co. Derivative Litig.,* Del. Ch., 731 A.2d 342, 353 (1998), *aff'd in part, rev'd in part sub nom. Brehm v. Eisner.,* Del.Supr., No. 469, 1998, 2000 WL 174619 (Feb. 9, 2000).

## IV. ANALYSIS
### A. Demand Analysis Excepted

*3 Whether or not plaintiff's amended complaint alleges sufficient facts to support allegations of director self-interest in the December 23, 1998 transaction, and lack of independence in regard to the November 19 transaction there is no real need to engage in a demand analysis. The board of directors acted according to a predetermined stock option plan, approved by the shareholders, which included the re-pricing option. The plaintiff raises no issue that the board lacked authority to re-price the options or that they implemented the re-pricing in a manner unintended or unexpected by the shareholders. [FN10]

> FN10. At oral argument, plaintiff conceded that the plan gave the directors the authority to re-price the options and carried out the re-pricing according to the plan.

Even after drawing every possible inference from the facts supporting plaintiff's contentions, the directors merely implemented a plan presumably entirely consistent with the interests of the corporation and its shareholders because the shareholders knowingly endorsed the parameters of the plan.

The focus of this case should be plaintiff's purported claims for breach of the duty of loyalty arising from acts of corporate waste. The plaintiff

alleges that the directors breached their duty of loyalty by re-pricing options in a manner which constituted corporate waste.

### B. Corporate Waste Claim

I now turn to the standard for corporate waste which is "very rarely satisfied by a shareholder plaintiff." [FN11] To support a claim, a shareholder must demonstrate that the transaction in question either served no purpose or was so completely bereft of consideration that the "transfer is in effect a gift." [FN12] In so doing, plaintiff must allege facts that, if true, establish that the defendant directors "authorize[d] an exchange that is so one sided that no business person of ordinary, sound business judgment could conclude that the corporation has received adequate consideration." [FN13]

> FN11. *Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, mem. op., at 2, Allen, C. (July 19, 1995).

> FN12. *Lewis v. Vogelstein,* Del. Ch., 699 A.2d 327, 336 (1997).

> FN13. *Glazer v. Zapata Corp.,* Del. Ch., 658 A.2d 176, 183 (1993); *see also Stein v. Orloff,* Del. Ch., C.A. No. 7276, 11 Del. J. Corp. L. 312, 319, 1985 WL 11561, *3, Hartnett, V.C. (May 30, 1985)* ("the test for finding a waste of corporate assets is whether the consideration received by the corporation was so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation paid"), *appeal refused by* Del.Supr., 504 A.2d 572 (1986); *Saxe v. Brady,* Del. Ch., 184 A.2d 602 (1962).

Defendants' motion requires that I address the sufficiency of plaintiff's pleading. In order to find that plaintiff has pleaded her claims sufficiently, I must be satisfied that the facts alleged in the amended complaint establish a complete failure of consideration. [FN14] Insufficient or inadequate consideration is difficult to demonstrate since the alleged acts "have to be so blatant that *no* ordinary business person would ever consider the transaction to be fair to the corporation." [FN15] In other words, the company would have to receive virtually nothing for what it gave.

> FN14. *See Lewis,* 699 A.2d at 338 ("The Court of Chancery has interpreted the waste standard in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




ratified option context as invoking not a proportionality or reasonableness test a la *Kerbs* but the traditional waste standard referred to in *Michelson*.").

FN15. *In Re 3Com Corp. Shareholders' Litig.*, Del. Ch., C.A. No. 16721, mem. op., at 11, Steele, V.C. (Oct. 25, 1999).

Plaintiff's allegation that the directors wasted corporate assets by authorizing the re-pricing is unaccompanied by any facts demonstrating that the corporation received nothing in kind and is merely conclusory. Plaintiff does not, for example, contend that this plan or any series of earlier plans, prohibited the re-pricing the directors implemented or even that unlike earlier plans, this re-pricing was not specifically authorized. [FN16] The re-pricing objected to here was a part of an overall plan, approved by the shareholders, to incentivize performance or encourage retention of key employees and non-employee directors. Plaintiff's only factual allegation is that the defendant directors had re-priced a substantial amount of their own options (and of an employee director to whom they were beholden) to purchase common stock without any consideration to IIG. However, their legal allegations, specifically that the re-pricing was "gross, reckless, willful and intentional" and that "no person of ordinary, sound business judgment would be expected to entertain a view that the consideration or, indeed, lack of consideration was fair," are wholly conclusory. [FN17] Here, plaintiff calls into question the defendant directors' "diversion of corporate assets for improper and unnecessary purposes" in the face of a shareholder plan authorizing a re-pricing that was carried out, concededly, according to its terms. Under these circumstances the complaint can not raise a reasonable doubt that any business person of ordinary judgment could conclude that IIG received nothing in exchange for re-pricing the director defendants' options. [FN18] Is not the only reasonable inference to be drawn from the shareholders' approval of the plan that the shareholders themselves believed the re-pricing to be an appropriate performance incentive for the corporation's managers and directors? Must I infer that the majority of shareholders who approved the plan were persons lacking "ordinary, sound business judgment?" [FN19]

FN16. *Cf. Sanders v. Wang,* Del. Ch., C.A. No. 16640, mem. op., at 25-27, Steele, V.C. (Nov. 8, 1999) (plaintiffs had sufficiently stated claim for waste to survive a motion to dismiss by pleading particularized facts that the company's board authorized the issuance of shares of Computer Associates International, Inc. common stock under the stock ownership plan ("KESOP") in an amount far exceeding the number authorized by the plan.

FN17. Am. Compl., ¶ 42.

FN18. Am. Compl., ¶ 43.

FN19. I invite the reader to review Vice Chancellor Strine's in depth analysis of the implications of shareholder pre-approval of acts alleged to constitute corporate waste in *Harbor Finance Partners v. Huizenga,* C.A. No. 14933, Strine, V.C. (Nov. 7, 1999).

**\*4** Plaintiff claims that the defendant directors' grant of stock options amounted to an unwarranted gift unsupported by any valid consideration. Plaintiff requests that this Court infer that the directors' were unjustly enriched by their re-priced options without factual support for the allegation that IIG failed to benefit from the transaction. Plaintiff has failed to allege facts that either directly, or inferentially, indicate why the shareholders, who approved the plan allowing the re-pricing, were so ill informed about the plan they approved that neither they nor any reasonable person could not believe that IIG would benefit from the re-priced options and that the re-priced options they authorized would amount to a gratuity and thus, corporate waste.

There is no legal basis for this Court to question the sufficiency of the consideration for those re-priced options or to second guess the shareholders when they adopted a plan authorizing the stock option re-pricing. To do so would be to frustrate the shareholders' authority to determine the parameters of executive compensation plans and to substitute my judgment for both their and the board's business judgment when it decided to implement the re-pricing. As our Supreme Court recently stated: "To rule otherwise would invite courts to become super-directors, measuring matters of degree in business decision making and executive compensation." [FN20] Plaintiff's allegations that IIG received no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2000 WL 354390, *4 (Del.Ch.))

consideration for the director employee and non-employee benefit from the stock option re-pricing, are nothing more than conclusory and are insufficient, as a matter of law, to meet the standard required for a claim of waste. Carrying out a predetermined stock option plan, approved by shareholders, entirely consistently with the plan can hardly be characterized as an act of a "disloyal" fiduciary. Because the plaintiff has failed to make out a claim of waste, there can be no underlying breach of the fiduciary duty of loyalty.

FN20. *Brehm v. Eisner.*, Del.Supr., No. 469, 1998, 2000 WL 174619 at *16 (Feb. 9, 2000), *aff'g in part, rev'g in part sub nom. In re Walt Disney Co. Derivative Litig.*, Del. Ch., 731 A.2d 342 (1998).

C. Allegation of Lack of Good Faith Raised at Oral Argument

Plaintiff's counsel raised for the first time at oral argument the spectre that the defendant directors either breached a fiduciary duty of "good faith" when they implemented the plan or breached an implied contractual duty of good faith which attached to the stock option plan. Quite apart from a failure to support either of these intriguing themes with facts in the pleading, the suggestions came too late for defendants to respond. Plaintiff's complaint, I understand, has already been amended once. Whether there may be a basis to assert differently styled claims now or whether the introduction of a good faith litmus test was merely to question the "good faith" of the directors' decision to separate one transaction into two, I can not tell. Plaintiff presented a copy of our Supreme Court's decision in *Brehm v. Eisner ("Disney")*, [FN21] to me just before oral argument, apparently to suggest that if I granted defendants' motion that I should do so without prejudice and allow plaintiff yet another chance to amend her complaint in the absence of a contention new facts have come to light. I have neither the authority nor the predilection to entertain a practice where I, as a trial judge, develop my own theories of possible recovery for plaintiffs or hear them for the first time from plaintiffs at oral argument, and then allow them to replead until some viable claim hits the wall and sticks. That practice would undermine our adversary system and suggests that practitioners who draft pleadings know less about the facts available to support potential causes of actions than judges who rule on motion practice

issues. I resist the temptation to dismiss without prejudice in the hope that a third complaint might finally generate a viable cause of action. Had there been such a possibility, I am sure counsel would have pleaded accordingly in their first or second attempt to state a claim. I do not share plaintiff's counsel's belief that *Disney* suggests that trial judges should treat every complaint like a Phoenix ever ready to spring to life from its ashes upon learning of its imminent demise. Motion practice is no place for trial judges to attempt to usurp the Supreme Court's role to make new law or clarify the old in a way which can resuscitate a defective complaint.

FN21. *Brehm*, supra note 20.

V. CONCLUSION

*5 Plaintiff's allegations indicating corporate waste and breach of duty of loyalty are merely conclusory and lack any factual basis to survive a motion to dismiss. Defendants' motion to dismiss for failure to state a claim, under Court of Chancery Rule 12(b)(6) is *granted.*

IT IS SO ORDERED.

Not Reported in A.2d, 2000 WL 354390 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


