IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
IN RE MBNA CORPORATION          :
DERIVATIVE AND CLASS            :      Lead Case No. 1:05-CV-00327-
LITIGATION                      :      GMS
_____
This Document Relates To:       :
ALL ACTIONS.                    :      CLASS AND DERIVATIVE
                                :      ACTION
                                :
-----------------------------------------------------x
```

## COMPENDIUM OF UNREPORTED OPINIONS TO OPENING BRIEF IN SUPPORT OF THE MBNA OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
4 Times Square
New York, New York  10036-6522
(212) 735-3000

DATED:  January 20, 2006

# INDEX

CASES                                                                                    TAB NO.

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati,
    Inc., C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) ...................................... 1

In re Citigroup Inc. S'holders Litig.,
    C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ......................................... 2

Criden v. Steinberg,
    C.A. No. 17082, 2000 WL 354390 (D. Del. Mar. 23, 2000) ............................................. 3

In re Encore Computer Corp. S'holders Litig.,
    C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) .......................................... 4

Ercole v. Conectiv & Coventry Health Care of Del., Inc.,
    C.A. No. 03-186 GMS, 2003 WL 21104926 (D. Del. May 15, 2003) .............................. 5

In re Frederick's of Hollywood, Inc. S'holders Litig.,
    C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ........................................... 6

Freedman v. Rest. Assocs. Indus.,
    C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990) ........................................... 7

In re Freeport-McMoran Sulphur, Inc. S'holders Litig.,
    C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) ............................................. 8

Herd v. Major Realty Corp.,
    C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21,1990) ........................................... 9

Hudson v. Prime Retail, Inc.,
    C.A. No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 10

Jacobs v. Yang,
    C.A. No. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ............................................. 11

Jasinover v. Rouse Co.,
    C.A. No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) .................... 12

Jolly Roger Fund LP v. Sizeler Property Investors, Inc.,
    C.A. No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ......................... 13

Knox v. Rosenberg,
    No. H-99-0123 (S.D. Tex. Sept. 28, 1999) ....................................................... 14

Lewis v. Leaseway Transp. Corp.,
    C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ............................. 15

Litt v. Wycoff,
    C.A. No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ................................. 16

Manzo v. Rite Aid Corp.,
    C.A. No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ............................... 17

Nebenzahl v. Miller,
    C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) ........................................... 18

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v.
    Elkins, C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........................... 19

Pogostin v. Rice,
    C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983) ............................................. 20

Porter v. Texas Commerce Bancshares, Inc.,
    C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ............................................ 21

Rattner v. Bidzos,
    C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................................ 22

Seibert v. Harper & Row, Publishers, Inc.,
    C.A. No. 6639, 1984 WL 21874 (Del. Ch. Dec. 5, 1984) ............................................... 23

Sekuk Global Enters. Profit Sharing Plan v. Kevenides,
    C.A. No. 24-C-03-007496, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................. 24

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
    C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999) ............................ 25

In re Walt Disney Co. Derivative Litig.,
    C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ......................................... 26

In re Wheelabrator Tech. Inc. S'holders Litig.,
    C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ........................................... 27

# TAB 4

Not Reported in A.2d

Page  1

Not Reported in A.2d, 2000 WL 823373 (Del.Ch.), 26 Del. J. Corp. L. 652
(Cite as: 2000 WL 823373 (Del.Ch.))

c

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**In re ENCORE COMPUTER CORPORATION
SHAREHOLDERS LITIGATION
No. 16044.**

June 16, 2000.

Norman M. Monhait and Carmella P. Keener,
Esquires, of Rosenthal, Monhait, Gross & Goddess,
P.A., Wilmington, Delaware; and Norman Berman
and Michael G. Lange, Esquires, of Berman,
Devalerio & Pease, LLP, Boston, Massachusetts;
and Robert I. Harwood and Jeffrey M. Haber,
Esquires, of Wechsler Harwood Halebian & Feffer
LLP, New York, New York; and Marian Rosner
and Patricia Avery, Esquires, of Wolf Popper LLP,
New York, New York; and Curtis V. Trinko and
Timothy J. McFall, Esquires, of Law Offices of
Curtis V. Trinko, LLP, New York, New York;
Attorneys for Plaintiffs.

R. Franklin Balotti, Lisa A. Schmidt and Peter B.
Ladig, Esquires, of Richards, Layton & Finger,
P.A., Wilmington, Delaware; and Richard A.
Cirillo, Debora S. Burstein and Ann M. Driscoll,
Esquires, of King & Spalding, New York, New
York; Attorneys for Defendants Gould Electronics,
Inc., Robert J. Fedor, C. David Ferguson, Thomas
N. Rich and Michael C. Veysey.

Stephen J. Balick, Esquire, of Ashby & Geddes,
Wilmington, Delaware; and Mark D. Cahill,
Esquire, of Choate, Hall & Stewart, Boston,
Massachusetts; Attorneys for Defendants Kenneth
G. Fisher and Rowland H. Thomas, Jr.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

**\*1** This consolidated class action is brought by
former shareholders of Encore Computer
Corporation, a Delaware corporation ("Encore" or
"the Company"), against Encore's former directors
and its largest stockholder, Gould Electronics, Inc.
("Gould"). The plaintiffs' claim is that the
defendants breached their duties of loyalty and
disclosure by approving two separate sales of

Encore's assets to third parties, which amounted to a
de facto liquidation of Encore. The plaintiffs
contend that the two asset sales served Gould's
interests to the exclusion of the Encore common
shareholders.

The defendants have moved to dismiss the amended
complaint under Court of Chancery Rule 12(b)(6)
for failure to state a claim upon which relief can be
granted. The basis for the dismissal motion is that
(i) the complaint does not allege any cognizable
breach of duty of loyalty claims, and (ii) the
nondisclosure allegations fail to plead facts legally
sufficient to warrant relief.

For the reasons next discussed, I find that these
arguments have merit, and thus will grant the
motion to dismiss.

I. BACKGROUND

The pertinent facts are derived from the amended
complaint and extrinsic documents properly
incorporated therein by reference. [FN1]

> FN1. The documents incorporated by reference
> include the Sun Asset Purchase Agreement, the
> Gould Agreement, the Retention Agreements, the
> Sun Proxy Statement, the third quarter 1998 Form
> 10-Q, and the Gores Group Proxy Statement.

Encore (which was not joined as a party) is a
Delaware corporation with its principal place of
business in Plantation, Florida. Before 1997, the
Company had three lines of business: (1) it
designed, manufactured, and distributed data
storage, data retrieval and sharing technologies for
mixed platform processing environments (the
"Storage Products Business"); (2) it also developed
clustering software (the "Clustering Software
Business"); and (3) it designed, manufactured,
distributed and supported scalable real-time
computer systems software used for computer
simulations (the "Real-Time Business").

Until November 24, 1997, Encore had a four
member Board of Directors that consisted of
defendants Kenneth G. Fisher ("Fisher"), Rowland
H. Thomas ("Thomas"), Robert J. Fedor ("Fedor"),
and C. David Ferguson ("Ferguson"). After
November 24, 1997, the Board was expanded to




Not Reported in A.2d
(Cite as: 2000 WL 823373, *1 (Del.Ch.))

Page   2

include two additional directors, defendants Thomas N. Rich ("Rich") and Michael C. Veysey ("Veysey").

Also named as a defendant is Encore's 48.5% stockholder, Gould, which (in turn) is a wholly owned subsidiary of Japanese Energy Group ("JEC"), a Japanese corporation. Fedor, Ferguson, Rich and Veysey are Gould's representatives on Encore's Board of Directors.

In 1989, Gould sold its computer systems business to Encore. Unable to generate enough revenue to sustain itself, Encore came to rely primarily on Gould to fund its operations. From 1989 through November 1997, Gould loaned Encore approximately $496 million. That loan was secured by a first priority security interest in Encore's assets, including its Storage Products business. As additional security for those loans, in 1991 Encore licensed to Gould substantially all of its intellectual property, including that relating to Encore's Storage Products business.

*2 During this period Gould also agreed to accept convertible preferred stock in satisfaction of approximately $420 million of secured debt that Encore owed to Gould. The preferred stock gave Gould a liquidation preference totaling approximately $420 million. Despite that debt reduction, Encore found itself unable to pay cash dividends on the preferred stock, and as a result, it issued to Gould additional preferred shares with a liquidation preference of about $41 million. By 1997, Encore had unpaid dividends arrearages to Gould that totaled $29.5 million.

In January 1997, Encore's independent auditors expressed substantial doubt about the Company's ability to continue as a going concern. At that point, Gould decided to stop providing funding to Encore. Having had no source of capital other than Gould, Encore faced bankruptcy and liquidation. An analysis prepared by Price Waterhouse showed that in a liquidation, Encore's liquidation value would be only $24.4 million. On that basis Encore's common shareholders would receive no liquidating distribution, since $24.4 million would not be nearly enough to pay off Encore's debts to Gould and to Encore's other creditors.

A. The Sun Transaction

On July 17, 1997, the Encore Board entered into an Asset Purchase Agreement with Sun Microsystems, Inc. ("Sun"), in which Sun agreed to purchase Encore's Storage Products business for $185 million (the "Sun Transaction"). Sun would pay the purchase price in two installments: $150 million at closing and the remaining $35 million in July 1998.

As part of the Sun Transaction, Encore entered into an agreement with Gould on July 16, 1997 (the "Gould Agreement"), in which Gould agreed to release its security interest in the Storage Products business and to transfer its intellectual property license in that business to Sun. Gould also agreed: (i) to convert a portion of its Encore preferred stock into Encore common stock (thereby increasing Gould's holdings to 48.5% of Encore's outstanding shares), and (ii) until November 24, 1999, to forego its right to participate in the first $30 million of any liquidating distribution by Encore to its common shareholders. Moreover, Gould agreed to (iii) guarantee Encore's contractual representations and warranties to Sun, (iv) guarantee to Sun that Encore would remain solvent for at least one year after the Sun Transaction closing, and (v) to indemnify Sun against damages if Encore became insolvent after that first year.

In return for these undertakings by Gould--without which the Sun Transaction could not take place-- Encore agreed that it would devote a portion of the proceeds from the Sun transaction: (i) to pay the principal amount and accrued interest owed on Encore's secured indebtedness to Gould (estimated at $93 million); and (ii) to redeem the Encore preferred stock held by Gould--which had a liquidation preference of over $400 million--for $60 million.

At the time the Gould Agreement was being considered, the Encore Board consisted of four directors, two of whom (Ferguson and Fedor) were officers of Gould. Ferguson and Fedor did not vote on the Gould Agreement. The remaining two directors, Fisher and Thomas, were not affiliated with Gould, and did vote to approve the Gould Agreement.

B. The Retention Agreements

*3 To retain Encore's employees through the closing of the Sun Transaction, Encore, at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




recommendation of an outside consultant, entered into Retention Agreements in May 1997 with 49 of its key employees. The outside consultant recommended this approach to give Encore's employees an incentive to remain and assist the Company in its efforts, "to seek a sale or merger of the Company, a joint venture which a strategic partner or substantial new investment in the Company." Under the Retention Agreements, Fisher and Thomas received payments of $566,525 and $398,750, respectively. Thomas also received a $50,000 bonus in November 1997. All these payments were disclosed to Encore shareholders in the Sun Proxy Statement, which is next described.

C. The Sun Proxy Statement

In November 1997, Encore distributed a proxy statement (the "Sun Proxy Statement") for the upcoming shareholders meeting at which the Sun Transaction would be voted upon. The Sun Proxy Statement disclosed the terms of the Sun Transaction and the Gould Agreement. To approve the Sun Transaction, the affirmative vote of the holders of 75% of the Encore common stock being voted (as well as a majority of all Encore's outstanding common stock) was required.

The Sun Proxy Statement disclosed that Gould had discontinued funding Encore, and that if the Sun Transaction did not close, Encore would become insolvent. The Sun Proxy Statement included Price Waterhouse's liquidation analysis, which had estimated Encore's liquidation value at $24.4 million. The Sun Proxy Statement also disclosed that if the Sun Transaction was approved, the Encore Board of Directors would consider future opportunities, such as (1) continuing the Real-Time business, (2) developing software to enable standard computer hardware units to be operated so as to create larger computer versions of the computer hardware, or (3) selling the Real-Time business. Finally, the Sun Proxy Statement disclosed the prospects for the Real-Time business, and that it was a declining business for Encore.

Importantly, the Sun Proxy Statement advised shareholders of the specific "risk factors" relating to Encore's business after the Sun Transaction as follows:
(i) the Company will be left with only the real-time business (unless and until it determines to enter the

clustering software market), resulting in a change in the Company's primary business activities from the Storage Products Business to the real-time business; (ii) there is no assurance that the real-time business will operate profitably; (iii) there can be no assurance that Encore will be able to retain employees that would be critical to a clustering software initiative; (iv) there can be no assurance that any clustering software initiative would have access to sufficient amounts of funds; (v) there can be no assurance that any clustering software initiative would be successful; and (vi) none of the alternatives available to the Company... is without substantial risk.

*4 On November 24, 1997, the Encore shareholders voted to approve the Sun Transaction, which closed shortly thereafter.

D. The Gores Transaction

Meanwhile, Encore's Real-Time business had continued to decline, and in December 1997, Encore retained McDonald & Company Securities, Inc. ("McDonald"), an investment banker, to solicit potential acquirors for that business. McDonald conducted a diligent search and contacted eight potential acquirors. After this process was completed, Encore and the Gores Technology Group (the "Gores Group") executed a letter of intent for the Gores Group to purchase Encore's Real-Time business for $5.5 million. After the Gores Group later became unwilling to pay that amount, [FN2] Encore entered into an agreement to sell the Real-Time business to the Gores Group for $3 million (the "Gores Transaction"). To enable that transaction to proceed, Gould agreed to become jointly and severally liable with Encore for Encore's indemnification obligations under the Gores Asset Purchase Agreement.

FN2. The record does not explain why the Gores Group was unwilling to pay $5.5 million for the Real-Time business.

E. The Gores Proxy Statement

In August 1998, Encore disseminated a Proxy Statement (the "Gores Proxy Statement") for the upcoming shareholder meeting to vote on the Gores Transaction. As with the earlier asset sale to Sun, the affirmative vote of the holders of 75% of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2000 WL 823373, *4 (Del.Ch.))

voting shares (plus a majority of Encore's outstanding shares) were required to approve the Gores Transaction. The Gores Proxy Statement disclosed, among other things, that the Encore directors had unanimously approved the Gores Transaction, and that if the Gores Transaction did not go forward, Encore would become insolvent and have to be liquidated. The Gores Transaction received shareholder approval and closed on December 31, 1998.

As of July 15, 1999, the date of the amended complaint, the defendants were planning to dissolve the Company at some future time, subject to shareholder approval. According to the complaint, Encore's common shareholders will receive nothing when the defendants dissolve the Company, because Gould's liquidation preference will exhaust any liquidation proceeds.

## II. THE CONTENTIONS

The plaintiffs allege four separate breach of fiduciary duty claims arising out of the Sun and the Gores Transactions which, the plaintiffs allege, amounted to a de facto liquidation of Encore. Two claims are for breach of the defendants' duty of loyalty; the remaining two claims are for breaches of their duty of disclosure.

The duty of loyalty claims challenge the Encore Board's decisions: (i) to allocate to Gould, Encore's largest creditor and stockholder, $60 million of the $185 million proceeds from the sale of Encore's Storage Technology business to Sun, and (ii) to sell the Real-Time business to the Gores Group, the claim being that there was no justification for selling the Real-Time business, which (plaintiffs contend) Encore should have continued to own and operate.

The duty of disclosure claims attack the proxy statements that were disseminated (respectively) to Encore shareholders in connection with the Sun and the Gores Transactions. The disclosure claims are that: (i) the directors of Encore concealed their plan to liquidate Encore in its entirety, and (ii) the proxy statements falsely and misleadingly held out the hope that if both transactions were approved, Encore's common stockholders would receive some of the proceeds.

*5 In support of their motion to dismiss, the defendants argue that the Sun and Gores

Transactions did not violate the Encore directors' duty of loyalty, because only disinterested board members voted on these deals. Second, the defendants contend that there was a legitimate business justification for both the Sun and Gores Transactions.

The defendants also urge the dismissal of the disclosure claims as legally unsupported. Responding to the claim that the Encore Board had a "secret" plan to liquidate, the defendants argue that the amended complaint pleads no facts supporting the conclusory allegation of a "secret" plan. Regarding the second disclosure claim--that the Sun Proxy Statement falsely promised that shareholders would receive distributions from the Sun Transaction proceeds--the defendants argue that the proxy statement made no such "promise," but, rather disclosed that a shareholder distribution was one of several possible ways in which the Sun Transaction proceeds might be used.

## III. ANALYSIS

The standard governing a Rule 12(b)(6) motion to dismiss is well-established. The motion will be granted where it is clear from the allegations of the complaint that the plaintiffs would not be entitled to relief under any set of facts that could be proven to support the claim. [FN3] All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions that are not supported by specific factual allegations will not be accepted as true. [FN4]

FN3. *In re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993); *see also Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 140 (1997).

FN4. *Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262, 1264 (1979).

### A. The Duty of Loyalty Claims

It is well-established Delaware law that the business judgement rule creates a "powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.' " [FN5] To rebut that presumption, the plaintiffs may allege facts sufficient to plead a cognizable claim for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



a breach of duty of loyalty, more specifically, that the defendants were materially interested in the transaction or failed to act independently on behalf of the corporation. [FN6]

> FN5. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 361 (1993) (citing *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971)), *see also Mills Acquisition Co. v. MacMillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 (1989).

> FN6. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

I conclude that the plaintiffs have failed to allege facts sufficient to establish that the Encore directors either had a material self-interest in, or failed to act independently with respect to, the challenged transactions. I find also that the complaint properly in fact alleges that the Sun and the Gores Transactions served legitimate business purposes. My reasons follow.

1. The Sun Transaction

As earlier stated, the Sun Transaction involved the sale of Encore's Storage Technology business to Sun for $185 million. The sale proceeds were used to pay all of Gould's secured indebtedness (approximately $95 million), and to redeem the Encore preferred shares held by Gould (approximately $60 million). The balance of the purchase price (about $30 million) was paid to Encore.

The plaintiffs' claim that the board breached its duty of loyalty by agreeing to redeem, for $60 million, Encore preferred stock that had a liquidation value of over $400 million. Plaintiffs contend that the claim must be decided under the entire fairness standard of review, because the non-Gould directors who voted to approve the sale were conflicted, their vote having been induced by the Retention Agreements. Alternatively, plaintiffs argue, even if the business judgment standard does apply, they have stated a cognizable claim because the amended complaint alleges that the redemption of the preferred was irrational and lacked any business justification.

*6 These arguments are now addressed.

The plaintiffs challenge the disinterest and independence of the Encore Board on the basis that the Gould-appointed directors were in a position to approve the Sun Transaction unilaterally. The infirmity in that argument is that the amended complaint makes no allegations which support that claim. Only the two directors who had no connection to Gould--Messrs. Fisher and Thomas--actually voted; the other two directors--Fedor and Ferguson--recused themselves. Moreover, the Sun Transaction could not be approved without the affirmative vote of the holders of at least 75% of the shares of the common stock present and voting at the meeting. Accordingly, there is no factual or legal basis to claim that the Gould-appointed directors were in a position unilaterally to approve the Sun Transaction.

The plaintiffs next claim that the two directors who did vote on the transaction, Messrs. Fisher and Thomas, had a disabling financial interest by reason of the Retention Agreements. This claim also finds no support in the amended complaint. That pleading alleges that Fisher and Thomas received $566,525 and $398,750 respectively under the Retention Agreements, and that Thomas received a $50,000 incentive bonus. But those payments alone, and without more, do not suffice legally to negate those directors' independence. According to the amended complaint, payments of a similar character were made to 49 other Encore employees, after being recommended by an independent consultant, to ensure their continued service through the closing of the Sun Transaction. The Retention Agreements did not contractually obligate Thomas or Fisher to vote as directors in any particular way. Accordingly, the Retention Agreement payments that had been independently recommended, shared by others, and made for legitimate business reasons, do not constitute a disabling financial self-interest that would taint the directors who voted in favor of the Sun Transaction. [FN7]

> FN7. *See Grobow,* 539 A.2d at 188 (where only alleged financial interest on the part of the directors is payment paid for services as directors, no cognizable financial interest exists); *see also Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985).

The Retention Agreement payments did not constitute a disabling financial interest for other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





reasons. Those payments were made months before the Board voted on the Sun Transaction and over a year before the vote on the Gores Transaction. Mr. Thomas' bonus received Board approval four months *after* the Sun deal was approved. Thus, any connection between these events is far too remote to support the inference that those payments disabled Fisher and Thomas from impartially determining whether or not the Sun Transaction served the best interest of Encore and its common stockholders. Any such inference would be especially problematic in the case of Mr. Fisher, who, after Gould, was Encore's largest single stockholder. Mr. Fisher owned 4 million shares of Encore, and had a significant self-interest in maximizing the value of that investment. If any inference is to be drawn, it is that Fisher's and the shareholders' financial interests were aligned.

Because the plaintiffs have not sufficiently pleaded facts demonstrating that Thomas or Fisher were subject to a disabling interest, the Encore Board's decision to approve the Sun Transaction is entitled to review under the business judgment rule.

*7 The plaintiffs next argue, in the alternative, that even under the business judgment standard they have stated a claim, because the complaint sufficiently alleges that the Sun Transaction lacked any valid business justification. I disagree. Without the Sun Transaction the Encore stockholders would have received nothing. That transaction enabled Encore to discharge significant amounts of debt, while still retaining $30 million for operating purposes. For that to occur, however, it was necessary for Gould to surrender several valuable assets to Sun, including Gould's security interest in the Storage Products Business assets and the Gould License that covered the intellectual property for the Storage Products Business. The consideration for Gould's cooperation was Encore's agreement for Gould to receive $60 million of the Sun Transaction proceeds, which would be used to redeem the preferred stock. Even in that connection, Gould agreed that in any liquidation it would not participate in the first $30 million of distributable assets--a significant concession because the net proceeds available after paying Gould would be $30 million.

Thus, the complaint fairly alleges that the agreed-to allocation of the Sun Transaction proceeds netted Encore $30 million that Encore would not have

otherwise received. As a consequence, the decision to approve the Sun Transaction was a rational business judgment that must be respected.

2. The Gores Transaction

The Gores transaction involved the sale of the Real-Time business to the Gores Group for $3 million. The plaintiffs challenge only the directors' decision to sell that business, claiming that the sale did not serve the Company's interests because the Real-Time business was profitable and the transaction costs exceeded the sale proceeds. Essentially, what the plaintiffs claim is that the sale of the Real-Time business benefitted only Encore's majority stockholder, Gould.

But the pleaded facts show otherwise. The amended complaint does allege that the transaction costs of the Gores Transaction exceeded the amount received from the sale of the Real-Time business, thereby leaving the Encore shareholders with nothing when the Company was dissolved. But this allegation is based upon the plaintiffs' erroneous inclusion of the estimated costs of an Encore liquidation in calculating the "transaction costs" of the Gores Transaction. Plaintiffs allege that "Encore estimated the cost for completing the Gores Transaction and dissolving the Company at approximately $10.6 million," but that misrepresents what Encore actually stated in its third quarter 1998 Form 10-Q. [FN8] That document disclosed that the amount of any possible distribution to shareholders would be the sum of (i) the Company's assets, (ii) the second payment from the Sun Transaction, and (iii) the net loss or gain from the Gores transaction, *minus* the cost of liquidating Encore. The plaintiffs' effort to treat the cost of liquidating Encore as a cost of the Gores Transaction finds no support in the Form 10Q. Nor have plaintiffs shown, as a matter of pleaded fact or logic, how it makes any sense to argue that the cost of the liquidating Encore was a cost of the Gores Transaction. Indeed, the amended complaint alleges that the Gores Transaction was completed in December 1998, before Encore was liquidated.

FN8. Because the third quarter 1998 Form 10-Q is included in and is integral to the Amended Complaint, its content may be considered on this motion to dismiss. That document stated:
If the sale of the real-time business is consummated,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d

(Cite as: 2000 WL 823373, *7 (Del.Ch.))

the assets of the Company available for distribution to shareholders on liquidation would be: (i) the Company's assets at September 27, 1998 plus any additional amounts received with regard to the second Payment [from the Sun Transaction], less its liabilities at September 27, 1998 including the $9,692,000 payable to Gould, plus or minus; ... (iii) the gain or loss from the sale of the Company's real-time computer systems business; minus (iv) costs of the liquidation and reserves for any contingent liabilities, including any pending litigation, estimated by the Company to be approximately $10,624,000, which has not been recorded on the books of the Company as of September 27, 1998.

**\*8** The plaintiffs also attack the Gores Transaction on the ground that the Real-Time business was profitable at the time it was sold, but the plaintiffs' own pleading undermines that claim. The amended complaint alleges that the 1997 sales of the Real-Time business were approximately $25 million. By 1998, that figure had dropped to $20 million, [FN9] reflecting a further decline of the Real-Time business . [FN10] Finally, the amended complaint contains no fact-specific allegations from which one could infer that the Real-Time business was profitable. All that it contains is the conclusory averment that business was "profitable," which by any pleading standard is inadequate and also contrary to the specifically pleaded facts.

FN9. Compl. ¶ 106.

FN10. Defendant's Opening Brief, Ex. B. at 5. (1998 Real-Time sales of products and services were down from $41 million in 1996, and were substantially below the peak rate in 1990 when sales of Real-Time systems totaled $133 million dn sales of services totaled $82 million).

For these reasons the Board's decision to approve the Gores Transaction must be upheld under the business judgment rule. According to the complaint, the Encore Board determined that the sale of the Real-Time business would be the best way for the Encore shareholders to realize any return on their investment. Because the Gores Transaction therefore had a rational business purpose, this claim must also be dismissed.

**B. The Disclosure Claims**

The plaintiffs next claim that the proxy statement disclosures were materially misleading in two separate respects: (1) they failed to disclose the directors' "strategy to liquidate all of Encore's assets," and (2) they made a false promise to distribute the proceeds to Encore's shareholders. Neither of these allegations states a claim upon which relief can be granted.

Directors of Delaware corporations are required, fully and fairly, to disclose all material information within the board's control when the corporation seeks shareholder action. [FN11] A fact is material only if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. [FN12] There must be a substantial likelihood that the disclosure of the omitted fact would have significantly altered the total mix of information made available. [FN13] The disclosure claims are evaluated in light of this standard.

FN11. *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 (1992).

FN12. *Loudon,* 700 A.2d at 143.

FN13. *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1056 (1996); *see also TSC Indus. Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

**1. The Undisclosed Alleged Plan to Liquidate**

The plaintiffs first claim that the defendants failed to disclose their plan to liquidate Encore in the proxy statements for the Sun and Gore Transactions. That is essentially a "fraud by hindsight" claim, based solely on the fact that after the Sun Transaction closed, Encore hired an investment banker to explore the possibility of selling the Real-Time business, and that thereafter, the Board decided to sell that business. But it does not follow from those facts that the board had always intended to liquidate the entire Company. The alleged facts are fully consistent with a much more benign scenario--that liquidation was one of several possibilities, that after the Sun Transaction the Board decided to explore that possibility, and that as a result of that exploration, the Board later decided upon that course of action. That latter scenario was disclosed in the Sun Proxy Statement:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
**(Cite as: 2000 WL 823373, \*9 (Del.Ch.))**

**\*9** As discussed below, [Encore's] Board of Directors will be considering whether Encore should (i) continue, and attempt to expand, its real-time business, (ii) attempt to develop and market clustering software for various types of computer hardware, or (iii) attempt to sell its real-time business and distribute the proceeds of sale, together with the remaining proceeds of the Sun Transaction, to its stockholders as a liquidating distribution.

Moreover, the proxy statement for the Gores Transaction disclosed that one of the items the shareholders would vote on at the meeting called to approve the Gores Transaction was:
To approve the proposed Plan of Dissolution and Liquidation (the "Plan"), pursuant to which [Encore] would be dissolved and liquidated following the consummation of the Gores Transaction.

That is, in the Gores Transaction Proxy Statement the Board was explicitly proposing a plan of liquidation and asking the shareholders to approve it. The shareholders were clearly told that liquidation was a real possibility, and they voted to authorize the directors to take that course if they so chose. Because no material fact was misdisclosed or concealed, these disclosures are not actionable.

2. The Alleged Misdisclosure that Funds Would Be Available for Distribution

Finally the plaintiffs claim that the Encore shareholders were lulled into a false sense of security, and were induced to vote for the Sun Transaction, by being led to believe (incorrectly) that Encore's remaining business would be operated profitably and provide them a return. That claim is unsupported by the proxy statements, which disclose no such promise. All those documents disclosed was the *possibility* of a future return. [FN14] The complaint also lacks any specific factual allegation to support the implicit assumption upon which this claim rests, namely, that there was *no* possibility that the shareholders would ever receive a distribution of the proceeds. For these reasons this disclosure claim must also be dismissed.

FN14. The Sun Proxy Statement disclosed that the Board would consider "whether Encore should (i) continue, and attempt to expand, its Real-Time

business, (ii) attempt to develop and market clustering software for various types of computer hardware, or (iii) attempt to sell its Real-Time business and distribute the proceeds of that sale, together with the remaining proceeds of the Sun Transaction, to its stockholders as a liquidating distribution." Defendant's Opening Brief, Ex. A at 15.

### IV. CONCLUSION

The motion to dismiss the amended complaint is granted. IT IS SO ORDERED.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 5

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 21104926 (D.Del.), 30 Employee Benefits Cas. 2841

(Cite as: 2003 WL 21104926 (D.Del.))

**H**

**Page 1**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
**Jennifer L. ERCOLE, Plaintiff**
v.
**CONECTIVE AND COVENTRY HEALTH
CARE OF DELAWARE, INC., Defendants.
No. Civ.A. 03-186 GMS.**

May 15, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

**\*1** On February 10, 2003, the plaintiff, Jennifer L. Ercole ("Ercole"), filed a complaint and a motion for a temporary restraining order ("TRO") against Coventry Health Care of Delaware, Inc. ("Coventry") and Conectiv ("Conectiv"), alleging violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* The complaint also contains a claim for breach of contract in connection with the denial of authorization for a medical procedure under Ercole's health plan. The court held a hearing on the motion for TRO on February 12, 2003. On February 13, 2003, the court denied the motion for TRO without prejudice.

Presently before the court is Coventry's motion to dismiss Ercole's breach of contract and bad faith claim on the basis that it is preempted by ERISA. For the following reasons, the court will grant this motion.

## II. BACKGROUND

Ercole is a participant in an employee welfare benefit plan called the Coventry Point of Service Plan (the "Plan"), sponsored by Conectiv. The Plan provides coverage for authorized medical services, but excludes, among other things, "experimental procedures or treatments."

In 2002, Ercole's treating oncologist, Dr. S. Eric Martin ("Dr.Martin") diagnosed her with Chronic Lymphocytic Leukemia ("CLL"). He then sought authorization from Coventry for a pre-transplant evaluation to determine whether a bone marrow transplant would be appropriate. On December 4, 2002, Coventry authorized "evaluation services for an allogenic bone marrow transplant."

Following the pre-transplant evaluation, Dr. Martin recommended that Ercole undergo an allogenic bone marrow transplant. Before she could do so, however, the Plan required her to seek pre-authorization from Coventry. Coventry denied pre-authorization for the requested transplant because it determined that the procedure was experimental and, therefore, not a covered benefit under the Plan.

Ercole appealed the denial of authorization through the internal appeals procedure provided for in the Plan. Once again, her request for authorization was denied on the basis that the procedure was experimental. Ercole then appealed to the Conectiv Benefits Committee ("the Committee"). On January 31, 2003, the Committee upheld Coventry's determination that the procedure was experimental and thus excluded under the terms of the Plan.

Having exhausted her rights of appeal under the Plan, Ercole filed the above-captioned action.

## III. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted when, accepting all well-pleaded factual allegations as true, the plaintiff is not entitled to relief as a matter of law. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997). While the court must accept the factual allegations in the complaint as true, it "need not credit a complaint's 'bald assertions' or 'legal conclusions.' " *Id.* at 1429 (citation omitted). Therefore, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996).

## IV. DISCUSSION

**\*2** Coventry contends that Ercole's common law claim for breach of contract and bad faith is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




preempted by ERISA. In response, Ercole contends
that her bad faith breach of contract claim is saved
from preemption because it concerns a "state law
regulating insurance." As such, Ercole maintains
that ERISA's Savings Clause, 29 U.S.C. §
1144(b)(2)(A), applies. [FN1] For the following
reasons, the court concludes that this claim is
preempted by ERISA.

> FN1. Section 1144(b)(2)(A) states that, "[e]xcept as
> provided in subparagraph (B), nothing in this
> subchapter shall be construed to exempt or relieve
> any person from any law of any State which
> regulates insurance, banking, or securities."

ERISA includes an express provision that preempts
state law claims for benefits. That clause provides
that:

> [e]xcept as provided in subsection (b) of this
> section, the provisions of this subchapter and
> subchapter III of this chapter shall supersede any
> and all State laws insofar as they may now or
> hereafter relate to any employee benefit plan....

29 U.S.C. § 1144(a). Additionally, courts have
recognized that ERISA's preemption clause was
drafted deliberately for broad application. *See e.g.*
*FMC Corp. v. Holliday,* 498 U.S. 52, 58 (1990)
(noting that the "preemption clause is conspicuous
for its breadth"); *Pilot Life Ins. Co. v. Dedeaux,*
481 U.S. 41, 45-46 (1987), *rev'd in part,* 123 S.Ct.
1471 (2003) (finding that "the express preemption
provisions of ERISA are deliberately expansive");
*Huss v. Green Spring Health Svcs., Inc.,* 18
F.Supp.2d 400, 403 (D.Del.1998).

The Supreme Court of the United States recently
clarified the test to determine whether a state law
may be deemed a "law which regulates insurance"
under Section 1144(b)(2)(A). *See Kentucky Assoc. of
Health Plans, Inc. v. Miller,* 123 S.Ct. 1471 (2003).
First, the state law must be "specifically directed
toward entities engaged in insurance." *Id.* at 1479.
Second, the state law must substantially affect the
risk pooling arrangement between the insurer and
the insured. *See id.*

Applying the *Miller* test to the facts presently
before the court, it is clear that the bad faith breach
of contract claim alleged in Count Two of Ercole's
complaint does not fall under a state law regulating
insurance for purposes of the Savings Clause. Count
Two alleges that Coventry acted in bad faith and in

breach of the implied duty of good faith and fair
dealing when it denied coverage for her bone
marrow transplant after having authorized pre-
transplant testing. In support of her position, Ercole
maintains that Delaware law only recognizes such a
bad faith claim based on an insurance contract. The
Supreme Court of Delaware, however, permits
claims for breach of the implied covenant of good
faith and fair dealing in the employment context as
well. [FN2] *See e.g. Schuster v. Derocili,* 775 A.2d
1029 (Del.2001). Accordingly, Count II of Ercole's
complaint fails to meet the first prong of the *Miller*
test.

> FN2. Relying on *DuPont de Nemours and Co. v.
> Pressman,* Ercole claims that an action for punitive
> damages for bad faith and breach of the covenant of
> good faith and fair dealing are permitted only under
> insurance contracts. 679 A.2d 436 (Del.1996).
> Although it is true that *Pressman* rejected a claim for
> punitive damages for breach of the covenant of good
> faith and fair dealing in the employment context, the
> unavailability of punitive damages in bad faith
> actions outside of the insurance context does not
> compel the conclusion that Ercole's claim here is one
> specifically directed to the insurance industry.
> Indeed, while Count II of Ercole's complaint seeks
> punitive damages, it also seeks other relief which is
> undeniably available outside of the insurance context.

> Additionally, in *Pilot Life,* the Supreme Court of the
> United States struck down a state law which allowed
> the recovery of punitive damages because the law
> conflicted with ERISA by allowing an additional
> ERISA remedy. In so holding, the Court noted that,
> "[t]he policy choices reflected in the inclusion of
> certain remedies and the exclusion of others under
> the federal scheme would be completely undermined
> if ERISA plan participants and beneficiaries were
> free to obtain remedies under state law that Congress
> rejected in ERISA." 481 U.S. at 54. Thus, to the
> extent Ercole seeks to save this claim by virtue of
> her request for punitive damages, this argument must
> fail.

Moreover, assuming *arguendo* that Ercole's bad
faith claim is "specifically directed to entities
engaged in insurance," her claim nevertheless fails
part two of the *Miller* test. There can be little
dispute that the Delaware state bad faith cause of
action does not substantially affect risk pooling
between insurer and insured. Rather, it simply

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in F.Supp.2d
(Cite as: 2003 WL 21104926, *2 (D.Del.))

provides extra-contractual damages not permitted by ERISA. As such, the court concludes that the Delaware bad faith statute does not spread a policyholder's risk. *See Rosenbaum v. UNUM Life Ins. Co.,* 2002 WL 1769899, *2 (E.D.Pa. July 29, 2002) (finding that Pennsylvania's bad faith in insurance claims statute did not spread a policyholder's risk); *Sprecher v. Aetna U.S. Healthcare, Inc.,* 2002 WL 1917711, * 7 (E.D.Pa. Aug. 19, 2002) (holding that, because the Pennsylvania bad faith in insurance claims statute primarily allowed tort claims for relief not provided for by ERISA, such as punitive damages, it was preempted by ERISA). Having failed both prongs of the *Miller* test, Ercole's claim for bad faith breach of contract is thus preempted.

IV. CONCLUSION

*3 For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Coventry's Motion to Dismiss Count II of the Complaint (D.I.16) is GRANTED.

Not Reported in F.Supp.2d, 2003 WL 21104926 (D.Del.), 30 Employee Benefits Cas. 2841

**Motions, Pleadings and Filings (Back to top)**

. 1:03cv00186 (Docket) (Feb. 10, 2003)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




# TAB 6

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351

**(Cite as: 2000 WL 130630 (Del.Ch.))**

Page 1

H

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**In re FREDERICK'S OF HOLLYWOOD, INC.
Shareholders Litigation
No. C.A. 15944.**

Jan. 31, 2000.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; and Goodkind, Labaton, Rudoff & Sucharow LLP, and Law Offices of Jeffrey S. Abraham, New York, New York; Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, New York; Hanzman, Criden, Korge, Chaykin, Ponce & Heise, P.A., Miami, Florida; Schubert & Reed, LLP, San Francisco, California; and Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, New Jersey; for Shareholder Plaintiffs.

A. Gilchrist Sparks, III, Jon E. Abramczyk, and Jeffrey R. Wolters, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; for Defendants George W. Townson, Richard O. Starbird, William J. Barrett and Merle A. Johnston.

Stephen E. Jenkins and Regina A. Iorii, of Ashby & Geddes, Wilmington, Delaware; for Defendant Hugh V. Hunter.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

**\*1** The plaintiffs in this consolidated class action, who are former shareholders of Frederick's of Hollywood, Inc., ("Frederick's"), attack a cash merger whereby Knightsbridge Capital Corp. ("Knightsbridge") acquired Frederick's on September 29, 1997. The individual defendants, who were the directors of Frederick's at the time of the merger (the "Director Defendants"), are charged with having breached their fiduciary duties of care and loyalty by failing to obtain the highest available price for shareholders in the sale of Frederick's, and also by misstating and omitting material information from the Consent Solicitation Statement ("CSS") disseminated to shareholders in connection with the merger.

The Director Defendants have moved under Court of Chancery Rule 12(b)(6) to dismiss the amended complaint for failure to state a claim upon which relief can be granted. The four dismissal grounds being advanced are that: (i) the exculpatory clause in Frederick's certificate of incorporation bars any money damages recovery against the directors for a breach of the duty of care; (ii) the plaintiffs have alleged no cognizable breach of the directors' duty of loyalty and seek no relief other than money damages; and (iii) the plaintiffs have failed to allege any misdisclosures that are material. Defendant Hugh H. Hunter has also moved separately for dismissal on the independent ground that he cannot be held liable for actions taken by the Frederick's board after he resigned as a director. [FN1]

> FN1. Shortly after filing their complaint the plaintiffs moved to enjoin the merger between Knightsbridge and Frederick's. The Court denied that motion on September 29, 1997. On October 29, 1998, the plaintiffs filed an Amended Complaint, which the Knightsbridge Defendants moved to dismiss as to them. In a memorandum opinion issued on July 9, 1998, the Court granted that motion, leaving only the former Frederick's directors as parties defendant in the case.

### I. BACKGROUND

The pertinent facts, as disclosed by the complaint, are as follows:

#### A. The Parties

Frederick's is a Delaware corporation with its principal executive offices located in Los Angeles, California. It operates a nationwide mail order business and a chain of women's intimate apparel stores in 39 states. As of December 6, 1996, Frederick's had issued and outstanding (a) 2,995,309 shares of Frederick's Class A stock (which had one vote per share) that were held by approximately 500 shareholders of record, and (b) 5,903,118 shares of Class B common stock (which were non-voting) that were held by approximately 504 shareholders of record. Frederick's shares were traded on the New York Stock Exchange.

The plaintiffs are a class consisting of the holders of Class A and/or Class B Frederick's common

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2000 WL 130630, *1 (Del.Ch.))

stock at the time of the merger. The Director Defendants are Frederick's board of directors (the "Board") at the time of the transaction. Those directors were: George W. Townson ("Townson") who was Frederick's Chairman of the Board, President and Chief Executive Officer; William J. Barrett ("Barrett") who was a Senior Vice President of Janney Montgomery Scott, Inc., Frederick's investment advisor ("JMS"); Richard O. Starbird ("Starbird"); Merle A. Johnston ("Johnston"); and Hugh V. Hunter ("Hunter") who was Co-Trustee of the Harriet R. Mellinger Trust and the Frederick N. Mellinger Trust (the "Trusts"). [FN2]

> FN2. As Co-Trustee of the Trusts, Mr. Hunter voted the Trusts' shares, which represented 41% of Frederick's Class A stock and 51% of its Class B stock.

These five directors all voted to approve the first merger agreement under which Knightsbridge would acquire Frederick's for $6 .14 cash per share. Except for Hunter (who had previously retired), these directors also voted to approve the ultimate merger agreement being challenged here, in which Knightsbridge acquired Frederick's for $7.75 per share cash.

B. Frederick's Commences an Auction

*2 In June 1996, Frederick's announced that it had retained JMS as its financial advisor in connection with a possible sale of Frederick's. During the next fifteen months, JMS conferred with over one hundred prospective purchasers including Knightsbridge. In April 1997, Knightsbridge proposed to purchase all of Frederick's outstanding common stock for between $6.00 and $6.25 per share, cash, in a two-step tender offer/merger transaction. That offer was conditioned upon Knightsbridge having the exclusive opportunity to conduct due diligence.

C. The $6.14 Knightsbridge Offer

On June 13, 1997, Frederick's and Knightsbridge executed an agreement whereby Knightsbridge would acquire Frederick's for $6.14 per share cash in a merger. The merger agreement permitted the Board to pursue transactions proposed by third parties if their fiduciary obligations so required, but it prohibited Frederick's from soliciting any

indications of interest by potential third party acquirors. The merger agreement also permitted Frederick's to terminate the Merger unilaterally if the Board approved a transaction with an acquiror other than Knightsbridge, but in that case Knightsbridge would be entitled to a breakup fee of $1.8 million.

The complaint alleges that Townson, who was Frederick's CEO, would receive significant sums of money under agreements he entered into with Knightsbridge in connection with the merger. Under a Termination and Release Agreement, Townson would receive $750,000 when the merger became effective; and under a Non-Competition and Consulting Agreement, Townson would receive $250,000, plus sixteen additional $100,000 quarterly payments beginning the calendar quarter after the merger effective date. The complaint further alleges that Townson would receive (in addition to the merger consideration of $6.14 per share for each of his Frederick's shares) a cash payment of $.05 for each option having an exercise price over $6.14--a payment claimed to represent value for "underwater options" that otherwise would be valueless in the merger.

The plaintiffs also allege that Barrett, as a Senior Vice President of JMS, also stood to benefit financially from the merger, in that a May 14, 1996 engagement agreement entitled JMS to an approximately $2 million fee if the merger was consummated.

Before the Board voted on that proposed merger, two directors, Sylvan Lefcoe and Morton Fields resigned on June 12, 1997 and June 13, 1997, respectively. The plaintiffs claim that the reasons for those resignations were material facts that Frederick's should have disclosed in the solicitation materials sent to shareholders. [FN3]

> FN3. The record does not disclose the reasons why those directors resigned.

The Frederick's board approved the $6.14 per share Knightsbridge offer at a special meeting held later on in the day of June 13, 1997. Thereafter, the board caused a Consent Solicitation Statement ("CSS") to be mailed, seeking stockholder approval of the merger. Stockholders were asked to deliver their consents no later than August 27, 1997, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2000 WL 130630, *2 (Del.Ch.))

expected merger closing date.

D. Frederick's Receives Other Offers

**\*3** While the $6.14 per share Knightsbridge merger proposal was pending, Milton Partners submitted, on August 21, 1997, a fully financed offer to acquire Frederick's for $7.00 per share cash. In response, and while the Board was considering that offer, Knightsbridge and the Trusts entered into an agreement (the "Stock Purchase Agreement") under which Knightsbridge obtained the right to buy the Trusts' Frederick's stock, which represented about 43% of the Class A voting shares. Importantly, the Trusts were given the right to terminate the Stock Purchase Agreement if the merger agreement was terminated in accordance with its terms.

On August 28, 1997, a second "third party" offer was submitted--this one by Veritas Capital Fund, L.P. ("Veritas")--to purchase all of Frederick's outstanding stock for $7.75 per share cash. Veritas emphasized that its offer was not binding. Later that same day, the Board responded by postponing the scheduled closing of the merger with Knightsbridge in order to evaluate the Veritas proposal. [FN4]

> FN4. The Board rejected the offer by Milton Partners, which later dropped out of the bidding contest after Veritas and Knightsbridge made higher offers.

On September 2, 1997 the Board sent Veritas a memorandum outlining certain conditions that Veritas would have to satisfy in order for the Board to consider Veritas' offer. The conditions were that Veritas deposit $2.5 million in an escrow account and also be willing to execute a merger agreement substantially identical to the Knightsbridge merger agreement.

In response to the September 2, 1997 memorandum, Veritas sent a letter to the Board requesting that Frederick's issue Veritas a "dilutive option," that would dilute Knightsbridge's significant stock interest. Veritas also submitted to Frederick's a "marked up" merger agreement plus a $2.5 million escrow deposit.

In reaction to Veritas' offer, Knightsbridge approached the Trusts with a proposal to amend the Stock Purchase Agreement. The negotiated result

was an amended stock purchase agreement (the "Supplement") that eliminated the Trusts' contractual right to terminate the Stock Purchase Agreement if the merger agreement were terminated. [FN5] The next day, Knightsbridge exercised its acquisition rights under the Agreement and Supplement, and purchased the Trusts' Frederick's stock. Knightsbridge then informed Frederick's Board that it would use its newly-acquired stock "for purposes of effecting the Merger [with Knightsbridge]" and that Knightsbridge would not "vote in favor of the bid submitted by Veritas or any other bid to acquire the Company."

> FN5. The Supplement also provided that: (I) the Trusts would sell their shares to Knightsbridge even if the merger agreement were not consummated; (ii) Knightsbridge had the right to pay for and receive the Trusts' shares before consummation of the merger; (iii) the Trusts would indemnify Frederick's in connection with the Supplement; and (iv) if Knightsbridge resold the shares acquired from the Trusts to a third party at a price above $6.90 per share before March 1, 1998, the Trusts would receive the price increase.

E. The Revised Knightsbridge Offer and Its Terms

In further response to the Veritas $7.75 per share cash proposal, Knightsbridge increased its offer to $7.75 per share, subject to four conditions, namely, that: (1) Frederick's would agree to a "no talk provision" prohibiting any Frederick's director, officer, employee or agent from negotiating with any other bidder; (2) the break-up fee would be increased from $1.8 million to $4.5 million; (3) Frederick's would grant Knightsbridge the right to appoint an "observer" who would attend all Frederick's board meetings; and (4) if Frederick's granted an option to purchase its stock to any third party, Frederick's would grant an identical option to Knightsbridge.

**\*4** On September 8, 1997, Frederick's announced that the Board had accepted the revised Knightsbridge Offer, including these four conditions. The plaintiffs claim that by agreeing to those conditions, the Director Defendants had prematurely ended the bidding and therefore left itself unable to ascertain whether they had obtained the best value available for the shareholders.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2000 WL 130630, *4 (Del.Ch.))

To further strengthen its position, on September 9, 1997, Knightsbridge purchased an additional 195,000 shares of Frederick's Class A stock on the open market. That purchase gave Knightsbridge absolute voting control, even though Knightsbridge could not vote those 195,000 shares in favor of the merger because they were acquired after the record date.

In counter-response to these developments, Veritas responded on September 11, 1997 with an unsolicited $9.00 per share "non-binding offer" for all of Frederick's outstanding shares. This time the Board did not respond to Veritas' "offer;" instead, it accepted the Knightsbridge's $7.75 per share proposal. The Board allegedly did so for several reasons. First, the "no-talk" provision in the final merger agreement did not provide the Director Defendants with a "fiduciary out," and it also obligated Frederick's not to engage in any acquisition-related communications. Second, the shares Knightsbridge had acquired both in the open market and from the Trusts, represented a majority of each class of Frederick's stock, which Knightsbridge refused to vote in favor of any bid other than its own. Third, Veritas had requested a dilutive option, the legal validity of which the Board had questioned.

F. The Consent Solicitation Statement

On September 18, 1997, Frederick's issued Amendment No. 1 to the CSS, which disclosed that the consent solicitation would end on September 29, 1997, and that the merger would be consummated on that date. As explained elsewhere in more detail, the plaintiffs claim that the defendants made false disclosures and material omissions in the CSS.

The merger with Knightsbridge was consummated on September 29, 1997. This lawsuit followed.

## II. CONTENTIONS

The complaint alleges two claims. The first is that the Director Defendants failed to meet the fiduciary requirement under *Revlon v. MacAndrews & Forbes Holdings, Inc.* [FN6] that in a sale of corporate control the Board must obtain the highest value reasonably available for the shareholders. [FN7] The plaintiffs claim that the Board knew or should have known that the Trusts had entered into a Stock Purchase Agreement with Knightsbridge, and that

bargaining with Knightsbridge would become more difficult if Knightsbridge controlled the Trusts' stock. Despite that knowledge, the Board failed to enact defensive measures (such as a poison pill) designed to prevent Knightsbridge from gaining voting control of Frederick's. That failure, plaintiffs allege, amounted to a breach of the fiduciary duties of care and loyalty that the Board owed to Frederick's shareholders.

FN6. Del.Supr., 506 A.2d 173 (1986).

FN7. *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 48 (1994).

**\*5** The duty of loyalty claim is premised on the allegation that Director Defendants Townson and Barrett stood to obtain financial benefits that would not be shared by other shareholders generally. Specifically, (i) Townson would receive a cash payment for his underwater options, as well as under two highly lucrative contracts previously described, and (ii) Barrett, the Senior Vice President of JMS stood to benefit because JMS would receive a substantial fee for its services.

The plaintiffs' second claim is that the defendants misrepresented two material facts, and omitted to disclose a third material, in the CSS. Specifically, the defendants allegedly misrepresented that: (1) Frederick's, or its agent, had orally advised Veritas and Milton to submit their "best, final offer" by September 4, 1997, but in fact that never occurred, and (2) Frederick's materially overstated its reservations about accepting the Veritas Offer by reason of Veritas having requested a dilutive option. That was an overstatement, it is claimed, because the draft merger agreement submitted by Veritas left the amount of to-be-optioned shares blank, which evidenced that Veritas was willing to negotiate and be flexible about the size of the option. Finally, the complaint alleges that the board improperly omitted to disclose the reasons why two Board members resigned before the vote on the $6.14 per share Knightsbridge merger proposal.

In support of the pending motion, the Director Defendants argue that the fiduciary claims must be dismissed because an award of money damages, which is the only remedy being sought here, is barred by the exculpatory clause in Frederick's certificate of incorporation; and also because the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2000 WL 130630, *5 (Del.Ch.))

complaint does not allege any cognizable duty of loyalty claims. The Director Defendants further contend that the disclosure claims must be dismissed because as a matter of law the misstatements and the omitted disclosure were not material.

These contentions are next addressed.

### III. ANALYSIS

A motion to dismiss under Court of Chancery Rule 12(b)(6) will be granted where it is clear from the allegations of the complaint that the plaintiff would not be entitled to relief under any set of facts that could be proven to support the claim. [FN8] All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions that are unsupported by specific factual allegations will not be accepted as true. [FN9]

> FN8. *In re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993); *see also Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 140 (1997).

> FN9. *See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996).

### A. The Revlon Claim

I first address the plaintiffs' *Revlon* claim, which is that the sale of Frederick's for cash was a sale of the entire company, which triggered the Board's fiduciary duty to obtain "the best value reasonably available to the stockholders," [FN10] a duty it is alleged the Board failed to satisfy. Critical to the legal sufficiency of that claim, at least in this case, is the reason why the directors (allegedly) failed to satisfy that duty. As Vice Chancellor Lamb aptly put it, "A corporate board's failure to obtain the best value for its stockholders may be the result of illicit motivation (bad faith), personal interest divergent from shareholder (disloyalty) or a lack of due care." [FN11] Although the plaintiffs allege *Revlon*-based breaches of duty, and plead that they arise from violations of the board's duty of care and loyalty, I conclude that the complaint alleges only a breach of the duty of care--a claim that is not cognizable because of the exculpatory clause in Frederick's charter. Because I further find that the complaint does not adequately allege bad allege bad faith or disloyalty, dismissal of the *Revlon* claim is required.

> FN10. *Id.* at 48.

> FN11. *In re Lukens, Inc. Shareholders Litig.,* Del. Ch., C.A. No. 16102, Lamb, V.C., Mem. Op. at 21 (Dec. 1, 1999) (citing *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279-82 (1989).

1. The Duty of Care Claim

**\*6** I first consider the duty of care branch of the *Revlon* claim. The complaint alleges that the directors breached their duty of care by allowing one bidder (Knightsbridge) to acquire voting control and thereby circumvent the Board's ability to conduct a meaningful auction process. Plaintiffs claim that although the Board knew that Knightsbridge was seeking to buy the Trusts' stock for $6.90 per share, and that bargaining with Knightsbridge would become more difficult if Knightsbridge succeeded, the Board failed to enact defensive measures (such as a poison pill) protective of the interests of Frederick's shareholders. That failure to act, plaintiffs maintain, culminated in Knightsbridge acquiring a majority of Frederick's stock, which it was then able to use as leverage to end the auction and force a sale to itself, by refusing to vote its control shares in favor of any competing bid.

Assuming that these facts state a claim for violation of the Director Defendants' duty of care, the exculpatory clause found in Article Twelfth of Frederick's Certificate of Incorporation bars any recovery of money damages as a consequence of such a breach. [FN12] Article Twelfth provides:

> FN12. It is well established Delaware law that an exculpatory provision in a certificate of incorporation that is authorized by 8 *Del C* § 102(b)(7) shields the corporation's directors against a judgment for money damages except for judgments arising out of breaches of duty of loyalty, claims for acts constituting bad faith, and claims for the receipt of improper benefits. *See In re Dataproducts Corp. Shareholders Litig.,* Del. Ch., C.A. No. 11164, V.C. Jacobs, Mem. Op. at 11 (August 22, 1991).

A director of this Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





the Corporation or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction for which the director derived an improper personal benefit.

The plaintiffs claim that the Delaware Supreme Court's decision in *Emerald Partners v. Berlin* [FN13] precludes any consideration of this § 102(b)(7) defense on a motion to dismiss, because *Emerald Partners* holds that a § 102(b)(7) charter provision is "in the nature of an affirmative defense … [and that the Defendants] will normally bear the burden of establishing each of its elements." [FN14] Relying on this language, the plaintiffs argue that the Frederick's exculpatory provision cannot provide a basis to dismiss the complaint at the pleading stage, because the applicability of the charter provision can be determined only on a developed factual record.

FN13. Del.Supr., 726 A.2d 1215 (1999).

FN14. *Id.* at 1224.

The plaintiffs misread *Emerald Partners*. This Court has interpreted the above-quoted language as not precluding a Rule 12(b)(6) dismissal of claims that the directors breached their fiduciary duty of care on the basis of an exculpatory charter provision, so long as a dismissal on that ground does not prevent a plaintiff from pursuing well-pleaded claims that the directors breached their fiduciary duty of loyalty. [FN15] Under this reading of *Emerald Partners,* where a complaint alleges actionable disloyalty the burden will shift to the defendants to show the immunizing effect of the charter provision, [FN16] but where the complaint only alleges a breach of the duty of care, that claim may be dismissed at the pleading stage.

FN15. *In re General Motors Class H Shareholders Litig.*, Del. Ch., 734 A.2d 611, 619 at n. 7 (1999); *see also In re Lukens,* C.A. No. 16102 at 25 n. 33

FN16. *In re Lukens,* C.A. No. 16102 at 26.

*7 Because it is not cognizable under Article Twelfth and 8 *Del C* § 102(b)(7), and because I conclude that no duty of loyalty claim is pleaded,

the duty of care claim will be dismissed. I turn to the duty of loyalty component of the *Revlon* claim.

2. The Duty of Loyalty Claim

The complaint alleges that the Director Defendants breached their duty of loyalty, in that two of the four directors who approved the $7.75 merger with Knightsbridge received a personal benefit from the transaction that was not enjoyed by all shareholders generally. As a consequence (plaintiffs claim), the merger was not approved by a majority of disinterested directors, for which reason the Defendant Directors must show that the merger was entirely fair. I disagree and conclude that the pleaded facts show that only one of the four directors was interested, and as a result, the merger was approved by a majority of disinterested directors. Accordingly, the duty of loyalty claim fails for lack of a valid premise.

To be sufficient to trigger entire fairness review, this complaint must allege that the sole interested director dominated or controlled the remaining directors, which the complaint here does not do. The complaint alleges that both Townson and Barrett had conflicting self-interests at the time they voted to approve the merger, and that they received benefits not enjoyed by the remainder of the shareholders. As for Townson, the pleaded facts, if assumed to be true, would establish a disabling conflict, allegedly because the Knightsbridge transaction offered Townson a cash payment of $.05 for each of his options having an exercise price exceeding $6.14--options that would otherwise be worthless. Townson would also received substantial payments under two lucrative contracts. Under the Termination and Release Agreement, he would receive $750,000 when the merger became effective, and under the Non-Competition and Consulting Agreement, he would receive $250,000 on the merger's effective date, plus sixteen additional quarterly $100,000 payments beginning the calendar quarter following the effective date. These payments would constitute personal benefits not enjoyed by the shareholders generally, for which reason Townson would be deemed "interested" in the merger.

But, I cannot agree that the complaint states a cognizable claim that Barrett personally benefitted from the merger in a manner that was not enjoyed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2000 WL 130630, *7 (Del.Ch.))

by the shareholders generally. Barrett was a Senior Vice President of JMS, Frederick's financial advisor. Under its engagement letter, JMS was entitled to receive an approximately $2 million fee for its services when the merger was consummated. The difficulty with this claim is that JMS would receive a fee for its services regardless of who the buyer was; moreover, the amount of the fee JMS was to receive would increase as the merger price increased. Thus, Barrett's (and JMS's) interests were completely aligned with the interests of the shareholders in obtaining the highest possible price for Frederick's shares. For these reasons, the complaint fails to state a claim that Barrett had a disabling self-interest. It follows from this that only one of Frederick's four directors voting on the Knightsbridge merger was interested.

*8 Because the complaint fails to allege facts that establish that the merger was not approved by a majority of disinterested directors, the breach of loyalty claims cannot survive a motion to dismiss.

B. The Disclosure Claims

Lastly, the plaintiffs claim that the Director Defendants misrepresented material facts, and also failed to disclose a material fact, in the CSS. The fiduciary duty of disclosure requires that solicitation materials disclose all information in the defendants' possession material to the transaction at issue. [FN17] The test of materiality is whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote ... [t]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [FN18]

> FN17. *Malone v. Brincat,* Del.Supr., 722 A.2d 5, 9 (1998).

> FN18. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985).

The plaintiffs first claim that the defendants misrepresented in the CSS that Frederick's agent orally advised Veritas and Milton Partners to submit their "best, final offer" by September 4, 1997. That disclosure was allegedly false because Veritas never received this advice. Assuming that the CSS falsely

disclosed that the Board informed Veritas to submit its "best, final offer." I find that misstatement immaterial as a matter of law. The CSS was mailed after Veritas had increased its $7.75 offer to $9.00 and the CSS fully disclosed the $9.00 bid. With that disclosure the shareholders were told the facts that were material--all the bids that were on the table and their amounts and other terms. Whether or not Veritas was asked to submit its best and final offer at the time of its $7.75 proposal became irrelevant after Veritas had increased its bid to $9 .00--which (according to plaintiffs) was the high bid--and the shareholders were so informed.

The second disclosure claim concerns the disclosure in the CSS that the Board's reservations about accepting the Veritas Offer were based partially upon Veritas' request for a dilutive option. The plaintiffs argue that the CSS materially overstated this concern, because the draft merger agreement submitted by Veritas left blank the amount of shares subject to the dilutive option, thereby demonstrating Veritas' willingness to negotiate the terms of the option.

This argument is unpersuasive. The CSS disclosed that one of the Board's reasons for not accepting the Veritas Offer was that the Veritas Offer was conditioned on Frederick's issuing a dilutive option. The plaintiffs claim that because the number of to-be-optioned shares was left open for future negotiation, the requested dilutive option could not have been a subject of serious concern. The logic of this argument escapes me. Even if Veritas was willing to negotiate the size of the dilutive option, it does not follow that the Board had no reason to be concerned about its legality. [FN19] An option's size and its legality are two distinct issues, at least where (as here) the complaint alleges no facts that suggest a linkage.

> FN19. *See Mendel v. Carroll,* Del. Ch., 651 A.2d 297, 304-305 (1994).

*9 Finally, the plaintiffs claim that the CSS omitted to disclose a material fact, specifically, why two directors resigned before voting on the merger. I conclude that in these circumstances the reasons for the directors' resignations are immaterial. The two directors, Lefcoe and Field, resigned from the Board on June 12 and 13, 1997--three months before the Board considered the final offers for Frederick's.





Not Reported in A.2d
(Cite as: 2000 WL 130630, *9 (Del.Ch.))

The complaint fails to allege facts that suggest any connection between the resignations and the merits of the Knightsbridge merger ultimately voted on. Therefore, the reasons for Lefcoe and Field's resignations are immaterial as a matter of law. Stated differently, the reasons for resignations that occurred three months earlier and in the context of an earlier proposal would have had no significance in the deliberations of a reasonable stockholder being asked to vote on a different proposal. [FN20]

> FN20. *Arnold v. Society for Savings Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1287 (1994).

### V. CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss the complaint is granted. [FN21] IT IS SO ORDERED.

> FN21. Because I have determined to dismiss the fiduciary duty and the disclosure claims, it become unnecessary to discuss Hunter's separate motion to dismiss on the ground that he resigned before the board voted on the final Knightsbridge offer.

Not Reported in A.2d, 2000 WL 130630 (Del.Ch.), 26 Del. J. Corp. L. 351

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 7

Not Reported in A.2d    **Page 1**
Not Reported in A.2d, 1990 WL 135923 (Del.Ch.), Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
(Cite as: 1990 WL 135923 (Del.Ch.), 16 Del. J. Corp. L. 1462)

**H**

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
**Glenn FREEDMAN, Harry Lewis, William Steiner, Arthur L. Monheit and Dorothy Monheit as Administrators of: the Estate of Charles Monheit, deceased and David Scheinfeld, Plaintiffs,**
v.
**RESTAURANT ASSOCIATES INDUSTRIES, INC., Martin Brody, Max Pine, Sidney Lester Klepper, Renee Brody Levow, Darwin C. Dornbush, Allan Goldring, Leonard Schecter, Morton A. Siegler, Alan Silverman, Robert Wechsler and Stephen A. Greyser, Defendants.**
**CIV. A. No. 9212.**

Submitted: Feb. 27, 1990.
Decided: Sept. 19, 1990.
Revised: Sept. 21, 1990.
**\*\*1465** Kevin Gross, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, for plaintiffs.

David C. McBride, and Bruce L. Silverstein, of Young, Conaway, Stargatt & Taylor, Wilmington, for Restaurant Associates, Industries, Inc., Martin Brody, Max Pine, Sidney Lester Klepper, Renee Brody Levow, Darwin C. Dornbush and Allan Goldring.

Edward P. Welch, and John G. Day, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for all other defendants.

Karl Savryn, of Dornbush Mensch Mandelstam & Silverman, New York City, Henry P. Wasserstein, and Jeremy A. Berman, of Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel.

MEMORANDUM OPINION

ALLEN, Chancellor.

**\*1** Pending is a motion to dismiss the second amended complaint. The action was brought as a class action seeking to enjoin or rescind a management leveraged buyout (MBO) of public shares of Restaurant Associates Industries, Inc. ("RA"). The defendants, who constitute all of the directors of the company, fall into two classes, those who apparently have no financial interest as buyers directly or indirectly in the transaction and those that have such a conflicting financial interest. The interested directors, according to the allegations of the amended complaint, held six of the eleven director positions on the RA board and controlled directly and indirectly 48% of the company's outstanding stock.

**\*\*1466** On August 25, 1987, RA's chief executive officer and other officers announced their intention to take the company private. The board of directors of the company promptly established a committee composed of independent directors [FN1] "to respond to the management group's leveraged buyout proposal." That committee seems to have gone to notable lengths to find and facilitate a higher competing offer, but it was without power to do what was required to keep the prospect of a higher deal alive. It did negotiate the original management offer from $14 per share to $16 per share and then to $18 per share before recommending the management proposal to the full board. The story of this leg of the case is laid out as it appeared on a preliminary injunction record in an opinion of October 16, 1987, denying a preliminary injunction against effectuation of the $18 MBO proposal. *See Freedman v. Restaurant Assocs. Inc.,* Del. Ch., C.A. No. 9212, Allen, C. (Oct. 16, 1987).

The company had by then, of course, signed an Agreement of Merger. However, on October 19, 1987, the New York Stock Exchange (and other exchanges around the world) experienced a severe price break. The management buyers almost immediately notified the Special Committee that they believed themselves excused from their obligations under the merger agreement because (as stated in an October 30 SEC filing) "financing for an acquisition of the Company at $18 per share could not be obtained on acceptable terms." The Special Committee then promptly renegotiated the merger agreement to $14.25 per share. On October 28, 1987, a revised merger agreement was signed.

Plaintiffs allege breaches of fiduciary duty on the part of the eleven directors in connection with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d

**Page   2**

(Cite as: 1990 WL 135923, *1 (Del.Ch.), 16 Del. J. Corp. L. 1462, **1466)

transaction, both in its pre- and post-crash phases, including allegations against the special committee for failing to shop the company.   Defendants have moved to dismiss all of their claims because they fail to state a claim upon which relief may be granted. For the reasons that follow a motion to dismiss will be granted only with respect to those allegations directed specifically at an alleged failure of the special committee to shop the company at the pre-crash stage of the transaction and with respect to any allegations of breach of fiduciary duty in connection with the special committee's recommendation and the board's approval of the management group's pre-crash offer of $18 per share.

**\*\*1467 I.**

*The parties*

\*2 Restaurant Associates owns subsidiaries which operate and manage food service facilities and newsstands in New York, New Jersey, and California.   It had more than 2,190,000 shares of Class A common and 2,930,000 shares of Class B common stock outstanding.   The stock was traded on the American Stock Exchange.

The eleven individual defendants constituted the board of directors of RA.  Plaintiffs allege that six of the individual director defendants (the "management group") were members of or "allied" with the group which proposed the management-led leveraged buyout described below.   At the time of the proposal, according to plaintiffs, the management group controlled, directly or through familial relationships, 48% of the company's common stock. [FN2] The group was comprised of six directors, including three company officers, a relative of one of those officers, the outside general counsel of RA, and an additional director. [FN3]

*Management's $14 bid*

On August 25, 1987, RA announced that the management group, led by defendants Brody and Pine, was considering the purchase \*\*1468 of RA's publicly-held stock.     On August 26, 1987, the management group announced that it intended to offer approximately $14 for each share.   At that time, plaintiffs allege, the company was poised to enjoy significantly increased future earnings.

A special committee composed of defendants

Siegler, Silverman, and Schecter was formed to respond to the leveraged buyout proposal.   These directors are not alleged to have been interested as buyers in the transaction or as co-conspirators.   The special committee retained independent legal and financial advisors.    The special committee decided not to solicit third parties to submit bids for the company because the members of the special committee felt that the company was in play as a result of the August 26, 1987 announcement.

*Soliman's $16.50 bid and the management group's $16.00 counter-offer*

On September 3, 1987, AWR Acquisition Corporation, led by Anwar S. Soliman, a California restaurateur, proposed a bid of $16.50 for each RA share, subject to financing and due diligence.   The special committee and its financial advisor soon thereafter concluded that the management group's $14 offer was inadequate.

The management group, however, *qua* shareholders, refused to negotiate or cooperate with Soliman, rejected publicly the possibility of doing any deal with him, and asserted that the management group's shares were not for sale. On September 8, 1987, the management group offered $16 per share and demanded that the special committee immediately accept the offer.   When such approval was not forthcoming by 9:00 a.m. on September 9, 1987, the management group withdrew its bid.

*Soliman's $19 offer*

Soliman increased his bid to $19 per share, again subject to financing and due diligence.   The special committee sought to encourage Mr. Soliman to pursue his proposal despite the management group's assertion that it would not sell. After consulting with its legal and financial advisors, the committee concluded that Mr. Soliman should propose that RA's board offer him the option to purchase 1,000,000 authorized but unissued shares of Class B common stock at $19.00 per share.   Further, the committee determined that if Soliman paid $19,000,000 within two days, the committee would be prepared to recommend board approval of Soliman's proposal to buy the company.   Soliman refused, however, to pay $19,000,000 without an opportunity to inspect the company's books.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d                                                                                                 **Page 3**
**(Cite as: 1990 WL 135923, \*3 (Del.Ch.), 16 Del. J. Corp. L. 1462, \*\*1469)**

\*3 \*\*1469 Soliman and the special committee then agreed in principle that the special committee would recommend that the board negotiate terms under which Soliman would pay a non-refundable $2,000,000 in exchange for an option to purchase at least 1,000,000 common stock treasury shares within ten days ("the dilution option"). The ten-day span would allow Soliman time to perform his due diligence.

The special committee then recommended the option agreement to the board. On September 9, 1987, the full board met to discuss Soliman's proposal and the special committee's recommendation. Soliman's proposal was rejected by a vote of six to five with the six management group directors voting against and the special committee and two other outside directors voting in favor of Soliman's offer.

Precluded by this board action from pursuing the Soliman alternative, the special committee recommended an improved management $18 per share offer. On September 12, 1987, the company approved a definitive merger agreement for a management buyout at $18 per share. The buyout was to be effected through a two-step process--a cash offer commencing by September 17, 1987, and then a cash-out merger. The board's decision was allegedly based upon the management group's refusal to sell its shares. The agreement was announced on September 14, 1987.

Soon after, Soliman reaffirmed his $19 per share cash offer subject as before to financing and to due diligence.

*The market crash and management's revised offer*

On October 19, 1987, the stock market dropped precipitously. Still outstanding was the $18 per share management tender offer. In response to the market crash, the management buyers repudiated the merger agreement and amended the outstanding tender offer on October 28, 1987, stating, apparently, that they could not arrange financing on acceptable terms. The special committee thereafter renegotiated the merger agreement. After consulting with its financial advisor, the special committee recommended the acceptance of a revised $14.25 offer. The independent directors apparently did not vote against the $14.25 deal. Nor did the

special committee attempt in any way to enforce the original $18 merger agreement.

On October 30, 1987, a supplement describing the amended offer was filed with the Securities & Exchange Commission. The supplement stated "that the financing for an acquisition of the company at $18 per share could not be obtained on acceptable terms ..." The revised offer provided for a tender offer to purchase for \*\*1470 cash all the outstanding Class A and Class B shares of the company for $14.25 per share, to be followed by a merger in which each remaining share of RA would be converted into $14.25 cash.

II.

*Claims against the management group*

Plaintiffs claim that the use of the controlling shareholder power constituted a breach of duty in several respects. First, they assert that that power arose in substantial part from the 1985 recapitalization that management originated and recommended. That recap, it is alleged, was justified to shareholders in part as a defensive device. The use of the enhanced management voting power to thwart opposition to management over acquisition of the company is said to be inconsistent with the use of that enhanced voting power authorized by the shareholders, and to constitute a wrong.

\*4 Second, plaintiffs claim that the members of the management group breached fiduciary duties in their shareholder capacities by refusing to sell their shares to Soliman, who was a higher bidder, and in their capacity as directors by rejecting the dilution option recommended by the special committee, and by approving the management group's $18 offer.

Plaintiffs also allege breaches of fiduciary duty in connection with the $14.25 offer by the management group and that the supplement to the offer to purchase contained materially misleading disclosures.

*Claims against the special committee*

Plaintiffs claim that the members of the special committee breached a fiduciary duty under *Revlon v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986), by failing to shop the





Case 1:05-cv-00327-GMS    Document 44-3    Filed 01/20/2006    Page 30 of 34

Not Reported in A.2d
(Cite as: 1990 WL 135923, *4 (Del.Ch.), 16 Del. J. Corp. L. 1462, **1470)

Page   4

company after the management's $14 bid was made. Plaintiffs allege that the decision not to shop the company was not a valid exercise of the business judgment because the special committee members knew that potential acquirors would form certain impressions about the availability of the company depending on whether the company announced it would be "shopped" or alternatively whether the board treated the company simply as being "in play." Plaintiffs assert that if the company had been shopped, potential acquirors would have understood that the management group was willing to sell its shares (which is, of course, inconsistent with other facts alleged, i.e., management **1471 was not willing to sell). When the company was seen as merely in play, however, according to plaintiffs, potential acquirors understood that someone had expressed interest in acquiring the company, not that the management group was willing to sell. Further, plaintiffs assert, since the management group itself expressed interest in buying the company and since the company was merely in play, potential acquirors must have assumed in the absence of the company being shopped, that the management group was not interested in selling its shares.

Finally, plaintiffs claim that the special committee members breached fiduciary duties by recommending management's $18 bid to the board, by failing to enforce the agreement under which management would pay $18 per share, and after the market drop, by recommending management's $14.25 bid.

### III.

In order to sustain a motion to dismiss a complaint for failure to state a claim, the court must conclude, with reasonable certainty, that the plaintiff cannot prevail and would not be entitled to relief sought under any set of facts that could be proven to support her claims. *Rabkin v. Phillip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985); *Harman v. Masoneilan Int'l, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982). All well-pleaded factual allegations will be accepted as true and deemed admitted, and all well-supported inferences will be construed in favor of the non-moving party. *Id.; Weinberger v. UOP, Inc.,* Del.Ch., 409 A.2d 1262, 1263-64 (1979). Mere conclusions of law and fact alone will not be accepted as true. *See, e.g., Grobow v. Perot,*

Del.Supr., 539 A.2d 180, 187 n. 6 (1988); *Kleinhandler v. Borgia,* Del.Ch., C.A. No. 8334, slip op. at 5-6, Berger, V.C. (Mar. 31, 1987); *Lewis v. Straetz,* Del.Ch., C.A. No. 7859, slip op. at 13, Hartnett, V.C. (Feb. 12, 1986).

#### 1. The recapitalization claim

*5 Whether plaintiffs' allegations concerning the 1985 recapitalization are sufficient to withstand a motion to dismiss depends on the exact nature of the claims which is not entirely evident from the face of the complaint. Two alternative interpretations of the allegations contained in the complaint seem plausible: (1) that the management group knowingly misrepresented the purposes for acquiring the 48% block of stock in the proxy statement for the recapitalization as part of a larger scheme to take the company private or (2) that, **1472 although the disclosures in the proxy statement were accurate when made, management later used the block of stock for purposes not envisioned by the shareholders or by management at the time of issuance and that use violated an implicit restriction or covenant that arose from the circumstances of the creation of the stock.

If premised on the latter, plaintiffs' allegations do not sufficiently state a claim in my opinion. A full and truthful disclosure of the purpose sought to be served by securing stockholder authorization does not, I think, implicitly limit the power authorized to that purpose. *See Berenstein v. Vestron, Inc.,* Del.Ch., C.A. No. 8404, Allen, C. (Mar. 11, 1986). Where, for example, with stockholder concurrence, stock is issued or power conferred, those acts will have consequences indefinitely. Shareholders cannot reasonably assume, absent a formal restriction of some sort, that exercise of the power conferred by that act or by ownership of that stock will never be used for a purpose different from the purpose sought to be achieved by asking for the stockholders authorization. So long as the disclosures made were full and truthful when made, the action is authorized by law, and the vote is uninfected by coercion by the fiduciary, (*see Lacos Land Co. v. Arden Group, Inc.,* Del.Ch., 517 A.2d 271 (1986)), in my opinion, the power authorized cannot be said to be subject to an implicit restriction in its future use.

If, however, the allegation is that the managing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 1990 WL 135923, *5 (Del.Ch.), 16 Del. J. Corp. L. 1462, **1472)

directors did intend to use the increased voting power that the recapitalization made possible to assist in an MBO transaction, the failure to disclose such a fact would constitute a violation of the duty of candor. In a proxy solicitation, where management chooses to disclose its motives or the purposes of a transaction, it has an obligation to disclose those purposes honestly and candidly. *See Rubenstein v. IU International Corp.,* 506 F.Supp. 311, 315 (E.D.Pa.1980). If one takes this view of the amended complaint, it will survive the motion to dismiss. According appropriate presumptions to plaintiffs' pleading, I will therefore deny the motion with respect to this claim.

*2. The claim that the special committee breached "Revlon duties" by not conducting a public auction sale*

Plaintiffs claim that the management group controlled, 48% of RA's voting stock and represented six of the eleven RA board members. They allege that, notwithstanding the management group's apparently controlling position, the special committee had an obligation under *Revlon v. MacAndrews & Forbes, Inc.,* Del.Supr., 506 **1473 A.2d 173 (1986) to shop the company in response to the management group's $14 offer. Plaintiffs are, however, incorrect in their assumption that *Revlon* imposed an obligation to shop. The special committee had an obligation only to make an informed and reasonable business judgment in the best interests of the shareholders and to act reasonably in attempting to obtain the best deal for the shareholders. *Mills Acquisition Co. v. Macmillan,* Del.Supr., 559 A.2d 1261, 1286-87 (1988). Although a board of directors may fulfill its obligation to make an informed and reasonable business judgment in a sale context by conducting an auction sale, *e.g., RJR Nabisco,* and that may often be the most prudent way to proceed, an auction is not always necessary. *Barkan v. Amsted Industries, Inc.,* Del.Supr., 567 A.2d 1279, 1286 (1989) ("*Revlon* does not demand that every change in control of a Delaware corporation be preceded by a heated bidding contest"); *In re Fort Howard Corp. Shareholders Litigation,* Del.Ch., C.A. No. 9991, Allen, C. (Aug. 8, 1988); *In re Formica Shareholders Litig.,* Del.Ch., C.A. No. 10598, Jacobs, V.C. (Mar. 22, 1989).

*6 The obligation of the directors where a

transaction is a non-conflict one, is to exercise due care in the good faith pursuit of legitimate goals. *Barkan,* 567 A.2d at 1286. When that transaction is a sale of the enterprise an additional level of inquiry--reasonableness--is required. *Mills Acquisition Co. v. Macmillan,* Del.Supr., 559 A.2d at 1286 (1988). This test will be applicable to the outside directors in this instance (accepting the allegations of the complaint as true). They had no obligation to auction the company. Plaintiffs have chosen to cast one claim of their complaint precisely in terms of such a duty. That claim does not assert a matter upon which relief can be given. It shall therefore be dismissed.

*3. The claims that the management group's actions in response to Soliman's proposals breached fiduciary duties*

According to plaintiffs, the members of the management group breached their fiduciary duties by refusing to sell their shares to Soliman. It is readily apparent that this is not the law in Delaware. *See Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840 (1987). As the Supreme Court explained in *Bershad:*

Clearly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority.

535 A.2d at 845. Thus, a shareholder, even a majority shareholder, has discretion as to when to sell his stock and to whom, and I find **1474 no basis for holding the management group liable to plaintiffs for exercising that discretion *qua* shareholder.

Plaintiffs also allege that the management group members breached their fiduciary duties as directors by rejecting the dilution option. This claim is quite different then the previous matter because the rejection of the dilution option was accomplished by the management group as directors in aid of a transaction in which they were personally interested. Directors have fiduciary obligations to act in the best interests of the corporation. When voting, they are required to put aside their personal interests and instead consider only the benefit of the company (and in a cash-out sale contest of all shareholders as a class). Directors who are also shareholders

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d

(Cite as: 1990 WL 135923, *6 (Del.Ch.), 16 Del. J. Corp. L. 1462, **1474)

usually have interests as shareholders that coincide with the best interests of the company. Occasionally, however, a director's interests as a shareholder conflict with the company's interests. When such a conflict arises, the director must ignore her personal interests as a shareholder and attend to the corporation's interests. *Cf. Judah v. Delaware Trust Co.,* Del.Supr., 378 A.2d 624, 628 (1977).

Technically perhaps, the board's rejection of the dilution option did not involve self-dealing because it did not involve a transaction between the interested directors and the company. The rejection of the dilution option was rather a refusal to have the company engage in a transaction with an outsider, Soliman. Nonetheless, only a wooden understanding of the law of self-dealing would deny that the concerns underlying that law are present here, where the directors who are also controlling shareholders and officers are seeking to buy the company. The fate of the interested directors' bid depended heavily on the board's decision with respect to the dilution option. The rejection of the dilution option, in effect, made the management deal possible. I, thus, analyze the management directors' action under section 144 of the Delaware Corporation Code.

*7 Section 144 states that a self-dealing transaction is not void by virtue of self-dealing if the transaction is approved by vote of the shareholders, or if the transaction was fair when authorized. 8 *Del.C.* § 144. The dilution option was not rejected by the disinterested directors or by the shareholders. Thus, the board's decision will be upheld only if it was fair. Further, the defendants bear the burden of proving fairness. *See Guth v. Loft,* Del.Ch., 5 A.2d 503 (1939), *aff'd,* Del.Supr., 19 A.2d 721 (1941); *Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218 (1976). Plaintiffs, thus, state a cause of action on this score.

**1475 4. *The claims arising from the recommendation and approval of the management group's $18 per share offer*

Plaintiffs also claim that both the management group defendants and the special committee defendants breached their fiduciary duties in connection with the board's acceptance of the $18 per share proposal. I conclude, however, that these claims arising out of the $18 per share transactions

are moot. While the facts surrounding this transaction may be quite relevant to an assessment of the claims of liability arising from the transaction that was accomplished, they state no independent claim upon which relief may be granted. In short, plaintiffs have suffered no injury from any alleged breach of duty in recommending or approving the $18 per share transaction because that deal was never consummated.

5. *The claims arising from the revised $14.25 management group offer*

Because the management group is alleged to constitute a controlling group and is composed of directors of the corporation, these directors would (apart from the effect of the special committee) bear the burden of proving at trial the entire fairness of the transaction that was consummated. The special committee, is a device, however, that when fully and effectively implemented can lift this burden. *Citron v. E.I. duPont de Nemours & Co., Inc.,* Del.Ch., C.A. No. 6219, Jacobs, V.C. (June 29, 1990). Nevertheless, this will only be the case where there is a fully functional special committee. *See In re TWA Shareholders Litig.,* Del.Ch., C.A. No. 9844, Allen, C. (Oct. 21, 1988), slip op. at 16-17. Where a special committee is passive or its charter from the board unduly restricts it, the work of the committee may be accorded no effect.

In this instance, facts are alleged that would establish that this special committee was not given the opportunity to select from among the range of alternatives that an independent, disinterested board would have had available to it; it was, in effect, "hemmed in" by the management group's actions. Under these circumstances, where, according to the allegations contained in the amended complaint, the management group could (and did) veto any action of the special committee that was not agreeable to the conflicted interests of the management directors it would be formalistically perverse to afford the special committee's action the effect of burden shifting of which that device is capable. Thus, I conclude that the complaint alleges in effect, a self-interested transaction that will require the interested directors **1476 to prove the entire fairness of that transaction to the minority shareholders.

*8 The outside directors stand in a different relation to the transaction. As they appear to have been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Page    7

Not Reported in A.2d
(Cite as: 1990 WL 135923, *8 (Del.Ch.), 16 Del. J. Corp. L. 1462, **1476)

financially disinterested in the sale transaction, the scope of their duty is that referred to in *Mills Acquisition Co. v. Macmillan,* 559 A.2d at 1288. While the special committee has no *per se* duty to shop the company, it did have a duty to proceed reasonably to maximize shareholder value. The plaintiffs, in alleging that the special committee did not shop the company and agreed to the sale of the company at a point in time, immediately following the October 1987 market break, when its stock price was particularly depressed (and given what preceded that agreement) have alleged circumstances that, if true, might support a conclusion that the special committee did not act reasonably. These allegations, therefore, may not be dismissed at this time.

### 6. *The disclosure claims*

Plaintiffs also allege that the Supplement sent to the shareholders in connection with the revised offer was materially misleading in disclosing management's motivation in revising the offer. The Supplement indicated that the management bid was being lowered because financing for an offer at $18 per share could not be obtained "on acceptable terms" after the crash. Plaintiffs, on the other hand, contend that the management group was not really concerned with the availability of financing, but rather was taking advantage of the market crash to get more equity in the company for a lower price.

Although management may have no general obligation to disclose its purposes or motivation, once it undertook to disclose its purpose in revising the offer, it had an obligation to do so truthfully and candidly. *Rubenstein v. IU International Corp.,* 506 F.Supp. at 315. Just what, in fact, was the motivation of the management group is a question that must await later testimony, and thus, it is inappropriate to dispose of this disclosure claim in a motion to dismiss. The circumstances alleged, taken together, render this allegation more than 'mere conclusions' in my opinion.

I cannot agree with defendants in their assertion that plaintiffs have no standing to bring the disclosure claims because they did not tender. In my opinion a nontendering shareholder may suffer an injury, and therefore may state a claim upon which relief will be granted, when, as alleged, "false information and omissions ... led others to

tender their shares." *Plaine v. McCabe,* 790 F.2d 742, **1477 746 (9th Cir.1986). [FN4] This is surely true when a change in control occurs in the tender offer. A realistic evaluation of the difference between owning stock in a widely held firm and owning a part of a small public minority position must recognize the real differences that those circumstances create. *See, e.g., Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 946 (2d Cir.1969) (Friendly, J.). Thus, fraudulent or incorrect statements made in such a tender offer will have an effect upon a non-tendering shareholder, if relied upon by other shareholders. Whether it is true that a non-tendering shareholder may be injured by misrepresentations in a tender offer made by an offeror who already has control is a different matter. Here, however, while the management defendants plainly (as alleged) had a blocking position and (as alleged) actual control over the board, at 48% they did not have the voting power to cash plaintiffs out of the corporation. They needed to acquire more votes to cash-out plaintiffs and did so in the tender offer. Thus, in this circumstance, the reasoning of *Electronic Specialty* and other federal securities cases that confer standing on non-tendering shareholder should be followed here as well.

**\*9** The parties shall confer with respect to an implementing form of order. Failing agreement, each party may submit a proposed form of order.

FN1. Three of the five disinterested directors, Siegler, Silverman, and Schecter, were appointed to the special committee.

FN2. The management group acquired the 48% block as part of a recapitalization effected two years earlier which increased the management group's equity position in the company by 11%, from 37% to 48%. Plaintiffs apparently assert that the recapitalization was fraudulently effected based on material misrepresentations or that the equity block given the management group was fraudulently used for purposes not envisioned by the shareholders when they approved the recapitalization.

FN3. Defendant Martin Brody was Chairman of the Board and Chief Executive Officer of Restaurant. He owned 15.6% of the company's Class A stock and approximately 24% of its Class B stock. Defendant Max Pine was President, Chief Operating

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 1990 WL 135923, \*9 (Del.Ch.), 16 Del. J. Corp. L. 1462, \*\*1477)**

Officer and a director of Restaurant.  He owned approximately 5% of the company's Class A stock and approximately 8% of its Class B stock. Defendant Sidney Lester Klepper was an Executive Vice President and a director of Restaurant.  He owned 1.95% of its Class A common stock and 2.67% of Restaurant's Class B common stock. Defendant Renee Brody Levow, the daughter of defendant Martin Brody, had been a director of Restaurant since 1984.    Defendant Darwin C. Dornbush, a director of Restaurant, was a member of the law firm which acted as general counsel to Restaurant.  Defendant Allan Goldring, a director of Restaurant, had expressed a desire to become a member of the buyout group.

The individual director defendants who were not members of the management group were Leonard Schecter, Morton Siegler, Alan Silverman, Robert Wechsler, and Stephen Greyser.

FN4. *See also Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 596 (5th Cir.1974); *cert. denied,* 419 U.S. 873 (1974); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937 946 (2d Cir.1969); *Hundahl v. United Benefit Life Ins. Co.,* 465 F.Supp. 1349, 1368 (N.D.Tex.1979); *In re Commonwealth Oil/Tesoro Corp. Securities Litig.,* 467 F.Supp. 227, 242 (W.D.Tex.1979); *Blanchette v. Providence & Worcester Co.,* 428 F.Supp. 347, 353 (D.Del.1977); *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149, 160 (W.D.Mo.1977); *McCloskey v. Epko Shores, Inc.,* 391 F.Supp. 1279, 1282-83 (E.D.Pa.1975); *Gerste v. Gamble-Skogmo, Inc.,* 298 F.Supp. 66, 96 (E.D.N.Y.1969).

Not Reported in A.2d, 1990 WL 135923 (Del.Ch.), Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



