IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------x
                                        :
IN RE MBNA CORPORATION                  :
DERIVATIVE AND CLASS                    :     Lead Case No. 1:05-CV-00327-
LITIGATION                              :     GMS
                                        :
                                        :
This Document Relates To:               :
ALL ACTIONS.                            :     CLASS AND DERIVATIVE
                                        :     ACTION
                                        :
--------------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
OPENING BRIEF IN SUPPORT OF THE MBNA OUTSIDE
DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
4 Times Square
New York, New York  10036-6522
(212) 735-3000

DATED: January 20, 2006

# INDEX

CASES                                                                    TAB NO.

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati,
    Inc., C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) ...................................... 1

In re Citigroup Inc. S'holders Litig.,
    C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ......................................... 2

Criden v. Steinberg,
    C.A. No. 17082, 2000 WL 354390 (D. Del. Mar. 23, 2000) ............................................. 3

In re Encore Computer Corp. S'holders Litig.,
    C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) .......................................... 4

Ercole v. Conectiv & Coventry Health Care of Del., Inc.,
    C.A. No. 03-186 GMS, 2003 WL 21104926 (D. Del. May 15, 2003) .............................. 5

In re Frederick's of Hollywood, Inc. S'holders Litig.,
    C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ........................................... 6

Freedman v. Rest. Assocs. Indus.,
    C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990) ............................................ 7

In re Freeport-McMoran Sulphur, Inc. S'holders Litig.,
    C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) ............................................. 8

Herd v. Major Realty Corp.,
    C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21,1990) ............................................ 9

Hudson v. Prime Retail, Inc.,
    C.A. No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 10

Jacobs v. Yang,
    C.A. No. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ............................................ 11

Jasinover v. Rouse Co.,
    C.A. No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) ................... 12

Jolly Roger Fund LP v. Sizeler Property Investors, Inc.,
    C.A. No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ......................... 13

Knox v. Rosenberg,
     No. H-99-0123 (S.D. Tex. Sept. 28, 1999) ...................................................... 14

Lewis v. Leaseway Transp. Corp.,
     C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ............................................. 15

Litt v. Wycoff,
     C.A. No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ................................. 16

Manzo v. Rite Aid Corp.,
     C.A. No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ............................... 17

Nebenzahl v. Miller,
     C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) ........................................... 18

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v.
     Elkins, C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........................... 19

Pogostin v. Rice,
     C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983) ............................................. 20

Porter v. Texas Commerce Bancshares, Inc.,
     C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ............................................. 21

Rattner v. Bidzos,
     C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................................ 22

Seibert v. Harper & Row, Publishers, Inc.,
     C.A. No. 6639, 1984 WL 21874 (Del. Ch. Dec. 5, 1984) ............................................... 23

Sekuk Global Enters. Profit Sharing Plan v. Kevenides,
     C.A. No. 24-C-03-007496, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................. 24

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
     C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999) ............................ 25

In re Walt Disney Co. Derivative Litig.,
     C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ........................................ 26

In re Wheelabrator Tech. Inc. S'holders Litig.,
     C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) .......................................... 27

ii

# TAB 8

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 50203 (Del.Ch.), 27 Del. J. Corp. L. 672

**(Cite as: 2001 WL 50203 (Del.Ch.))**

**H**

Page   1

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**In re FREEPORT-MCMORAN SULPHUR, INC. SHAREHOLDERS LITIGATION,**
No. C.A. 16729.

Date Submitted Sept. 26, 2000.
Date Decided Jan. 5, 2001.
Date Revised Jan. 11, 2001.

Pamela S. Tikellis, Robert J. Kriner, Jr., and Timothy R. Dudderar, Chimicles & Tikellis, Wilmington, Delaware and Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, and Goodkind Labaton, Rudoff & Sucharow LLP, New York, New York, for Plaintiffs.

Henry N. Herndon, Jr., and Lewis H. Lazarus, Morris, James, Hitchens & Williams, Wilmington, Delaware, and Robert B. Bieck, Jr., David G. Radlauer and Amy L. Landry, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., for Defendant McMoRan Oil & Gas Company.

A. Gilchrist Sparks, III, Alan J. Stone and Christopher F. Carlton, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, and Dennis E. Glazer and John J. Clarke, Jr., Davis Polk & Wardwell, New York, New York, for Defendants James R. Moffett, Rene L. Latiolais, B.M. Rankin, Jr., Richard C. Adkerson, Robert M. Wohleber and Freeport-McMoRan Sulphur Inc.

Allen M. Terrell, Jr. and Peter B. Ladig, Richards, Layton & Finger, Wilmington, Delaware, and Terrence M. Murphy and James P. Karen, Jones, Day, Reavis & Pogue, Dallas, Texas, for Defendants Terrell J. Brown and Thomas D. Clark, Jr.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

**\*1** The plaintiffs in this shareholder class action challenge a stock-for-stock merger on the basis that the interestedness of the directors of the subject corporation resulted in its stockholders receiving an unfair price for their shares. It is claimed that those directors breached their fiduciary duty of loyalty and that the other constituent corporation aided and abetted that breach. All defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6). The director-defendants have moved to dismiss on the additional ground that any monetary recovery is barred by the exculpatory clause of the corporation's certificate of incorporation. This Opinion decides those motions.

### I. FACTS [FN1]

> FN1. The pertinent facts are as alleged in the complaint and documents incorporated therein by reference, including the Joint Proxy Statement/ Prospectus ("the Proxy Statement"). Recited at this point are certain background facts. Other facts are set forth in the Analysis of the issues. See Part III, *infra.*, of this Opinion.

On August 3, 1998, Freeport-McMoRan Sulphur Inc. ("FSC") announced that it had entered into an agreement to merge with McMoRan Oil & Gas Co. (MOXY). That transaction took the form of FSC and MOXY being merged into McMoRan Exploration Co. ("MEC"), a new holding company specially created for purposes of the Merger. The shareholders of FSC and MOXY would receive, as consideration, stock of MEC in exchange for their shares in FSC and MOXY. The MEC stock they would receive would be allocated among FSC's and MOXY's shareholders on the basis of .625 MEC shares for each share of FSC and .2 MEC shares for each share of MOXY.

The merger was negotiated on behalf of FSC by a special committee of directors, none of whom (it appears) were employed by FSC or MOXY. On October 9, 1998, the Proxy Statement was mailed to the shareholders of both companies, soliciting their approval of the Merger. The Proxy Statement disclosed MOXY shareholders would receive approximately 61%, and that FSC shareholders would receive approximately 39%, of the MEC stock being distributed in the Merger. Both the FSC and MOXY shareholders approved the Merger on November 17, 1998.

The Amended Consolidated Complaint (the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2001 WL 50203, *1 (Del.Ch.))

"complaint") was filed as both an individual and as a class action on February 18, 2000. That complaint alleges that the FSC board of directors (the "FSC Defendants") breached their fiduciary duty of loyalty in connection with the Merger, by permitting MOXY shareholders to receive a disproportionate share of the Merger consideration. It is also claimed that MOXY aided and abetted those fiduciary breaches. The defendants have challenged the legal sufficiency of all these claims . [FN2]

> FN2. The original complaint, captioned *Krasner v. Moffett, et al.,* C.A. No. 16792, was consolidated with *Sheffield & Katz v. Adkerson, et al.,* C.A. No. 16845. Defendants moved to dismiss the complaint on December 17 & 18, 1998 and filed briefs in support of that motion on January 29, 1999. On February 18, 2000, plaintiffs filed the Consolidated Amended Complaint, which is the subject of the current motion to dismiss.

## II. THE LEGAL STANDARD AND THE PARTIES' CONTENTIONS
### A. The Legal Standard

On a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court must assume the truthfulness of all well-pled allegations of the complaint and draw all reasonable inferences therefrom. [FN3] A complaint will not be dismissed unless it can be determined with reasonable certainty that the plaintiff could not prevail on any set of facts that are reasonably inferable from the complaint's allegations. [FN4] These standards govern the Court's analysis of the issues presented.

> FN3. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988); *see also In re USA Cafes, L.P. Litig.,* Del. Ch., 600 A.2d 43, 47 (1991).

> FN4. *Solomon v. Pathe Comm. Corp.,* Del.Supr., 672 A.2d 35, 39 (1996).

### B. The Contentions

*2 The FSC defendants' position is that the complaint must be dismissed for failure to state a cognizable legal claim. The premise of that position is that the applicable standard under which the Merger will be reviewed is the business judgment rule. Under that standard of review, the defendants urge, the complaint states no claim because it fails to allege that the FSC directors acted in a manner that was either grossly negligent or disloyal. The director defendants additionally argue that the plaintiff's claims for money damages are barred by the exculpatory provision in FSC's certificate of incorporation which tracks 8 *Del. C.* § 102(b)(7) of the Delaware General Corporation Law.

Defendant MOXY argues that the complaint must be dismissed as against it, for failure to state a cognizable claim for aiding and abetting.

In defense of its complaint, the plaintiffs argue that because the complaint alleges that a majority of the FSC directors were interested in the Merger transaction, the applicable standard of review is entire fairness. Under that standard, the plaintiffs contend, the complaint states a cognizable claim because it alleges that the Merger resulted in unfair consideration being paid to FSC and MOXY shareholders, and also was the product of an unfair decision making process. Those allegations, plaintiffs maintain, are sufficient to state a claim for breach of the FSC directors' fiduciary duty of loyalty, which cannot be exculpated under § 102(b)(7). The plaintiffs further argue that the complaint sufficiently charges MOXY with having aided and abetted that fiduciary breach.

## III. ANALYSIS
### A. The Standard of Review

The parties agree that the critical issue on this motion is what standard of review-business judgment or entire fairness-governs the Merger. That issue is critical because it is outcome-determinative: if the standard is entire fairness, the motion must be denied because the complaint adequately states a claim that the Merger consideration was unfair. If, however, the applicable standard of review is business judgment, the complaint states no cognizable claim because (a) the plaintiffs have not adequately pled that the FSC defendants acted disloyally or in a grossly negligent manner, and (b) even if the Merger consideration paid to FSC shareholders was unfair, to overcome the business judgment rule presumption the plaintiff must allege that the price was so low as to constitute waste or fraud. [FN5] Neither claim is alleged here.

> FN5. *See Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 889 (1985) (stating that in order for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d

**Page   3**

(Cite as: 2001 WL 50203, *2 (Del.Ch.))

plaintiff to overcome the presumption of the business judgment rule, they "have the heavy burden of proving that the Merger price was so grossly inadequate as to display itself as a badge of fraud.").

I turn to the determinative issue: which of the standards of review applies?

B. The Special Committee

In determining what review standard applies, the Court is constrained to address a threshold matter-the legal consequence of the fact that the FSC special committee negotiated the Merger terms on behalf of FSC. Under Delaware law, where a transaction is negotiated and approved by an independent committee of directors and is subsequently approved by the stockholders of the company in an uncoerced, fully informed vote, the transaction is normally reviewed under the business judgment standard. [FN6] In this case it appears undisputed that the two FSC board members who made up the special committee were disinterested and independent. [FN7] I say "appears," because the role of the committee is barely alluded to, let alone developed, in the briefs. Yet, the Proxy Statement, which is incorporated into the complaint by reference, [FN8] is replete with disclosures-not disputed by the plaintiffs-that the FSC special committee retained independent legal and financial advisors, met on several occasions, and recommended the Merger to the full board, which approved the Merger terms as recommended. [FN9] If true, those disclosures would establish that the Merger terms were negotiated by directors who had acted "on an informed basis, in good faith and in the honest belief that their actions [were] in the corporation's best interest." [FN10] In that case the business judgment review standard would govern, and the result would be the dismissal of the complaint for failure to state a claim upon which relief could be granted.

FN6. *See In re Western Nat'l Corp. Shareholders Litig.*, Del. Ch., C.A. No. 15927, Chandler, C, Mem. Op. at 67-68 (May 22, 2000).

FN7. The plaintiffs do not specifically allege that the FSC special committee members were interested or lacked independence. Instead, they advance the argument that because the MOXY independent committee members held significantly more shares of

MOXY than the FSC committee members held stock of FSC, the MOXY committee had an "overwhelmingly greater personal financial interest in obtaining the most advantageous exchange ratio for MOXY." Complaint, at ¶ 21. That argument, while creative, is not supported by any legal authority in the plaintiff's brief and, moreover, would be unwieldy and uncertain in its application. Under that rule, a board would not only have to decide each candidate's independence when appointing a special committee, but also it would have to measure each candidate's stockholdings against the stockholdings of each of the other candidates for appointment to the special committee, and then speculate whether the special committee collectively has a stronger interest in protecting its corporation's shareholders than would the counterpart special committee on the other side of the bargaining table.

FN8. Complaint, at ¶ 16.

FN9. Proxy Statement at 28-29.

FN10. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988).

*3 Because the parties nowhere address in a reasoned or developed way the legal import of a relevant reality-that the Merger appears to have been negotiated by a special committee of independent, disinterested FSC directors-the briefs on the instant motion have an unreal quality. Instead, the parties ignore that subject and frame the issues in terms of whether a majority of the *full* FSC board that approved the Merger was (or was not) disinterested or independent. [FN11] But even under that approach, the complaint fails to allege facts that would establish that the Merger was approved by a majority of interested directors. My reasons for this conclusion next follow.

FN11. One reason for the defendants' failure to raise that issue may be that the facts pertaining to the special committee were disclosed in the Proxy Statement but not in the complaint. If the plaintiffs were challenging the Proxy disclosures, then the truth of those disclosures could not be assumed for purposes of a dismissal motion. *In re Santa Fe Pacific Corp. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 70 (1995). But, the Proxy Statement is incorporated by reference into the complaint and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d                                    **Page  4**
(Cite as: 2001 WL 50203, *3 (Del.Ch.))

plaintiffs do not claim that the disclosures in the Proxy Statement were materially false or misleading. Thus, the reason for the defendants' failure to raise this issue remains mysterious.

C. The Interestedness of the FSC Board of Directors

A transaction will be reviewed under the entire fairness standard "where actual self-interest is present and affects a majority of the directors approving a transaction." [FN12] That exacting standard is also applied where a minority of interested directors exercises a dominating influence over a sufficient number of board members to constitute a majority. [FN13] A director is "interested" in a transaction if he or she appears on both sides of the transaction or expects to derive a "personal financial benefit from [the transaction] in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [FN14]

> FN12. *Paramount Comm., Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 42 n. 9 (1994).

> FN13. *In re Frederick's of Hollywood, Inc. Shareholders Litig.,* C.A. No. 15944, Jacobs, V.C. (Jan. 31, 2000), Mem. Op. at 17.

> FN14. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

These standards govern the Court's inquiry into the disinterest and independence of each of the FSC directors who approved the Merger.

1. *Directors Moffett, Adkerson and Rankin*

These three gentlemen were directors of both MOXY and FSC at the time of the Merger. Defendant James R. Moffett was co-chairman of the boards of both FSC and MOXY. Mr. Moffett was also the board chairman and the chief executive officer of Freeport-MOXY Copper and Gold, Inc. ("Freeport Copper"), an affiliate of FSC and MOXY. Mr. Moffett held 1,774,359 shares of MOXY stock and 130,670 shares of FSC stock. [FN15]

> FN15. Complaint ¶ 18.

Defendant Richard C. Adkerson was vice chairman of the board of FSC and also co-chairman of the board and chief executive officer of MOXY. In addition, he was the president and chief operating officer of Freeport Copper. [FN16] Mr. Adkerson held 492,892 shares of MOXY stock and 28,186 shares of FSC. [FN17]

> FN16. *Id.,* at ¶ 5.

> FN17. *Id.,* at ¶ 18.

Defendant B.M. Rankin, Jr. served as a director of FSC, MOXY and Freeport Copper. [FN18] Mr. Rankin held 1,109,290 shares of MOXY stock and 37,736 shares of FSC stock. [FN19]

> FN18. *Id.,* at ¶ 7.

> FN19. *Id.,* at ¶ 18.

By virtue of being directors and officers of both FSC and MOXY, these three directors stood on both sides of the Merger, and accordingly, must be deemed to have had a conflicting interest in that transaction. [FN20] Being thus conflicted, these three directors could not independently and disinterestedly consider the Merger on behalf of the FSC public shareholders.

> FN20. See note 15 *supra.*

Because three of FSC's seven board members were clearly interested, it follows that if even one of the four remaining directors was either interested or not independent, then the entire fairness standard of review would apply.

*4 Of the remaining four directors, the plaintiff concedes that two were independent and disinterested. These two directors, Terrell J. Brown and Thomas D. Clark, were directors of only FSC. Neither held any MOXY stock, Brown held no FSC stock, and Clark held only 500 FSC shares. Thus, only the disinterest and independence of the two remaining directors-Richard M. Wohleber ("Wohleber") and Rene L. Latiolais ("Latiolais")-are disputed and need be addressed.

2. *Wohleber*

Mr. Wohleber was FSC's chief executive officer,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2001 WL 50203, *4 (Del.Ch.))

president and a director.    [FN21] He was also a
senior vice president of Freeport Copper. [FN22]
The complaint alleges that in connection with the
Merger, Mr. Wohleber was promised that he would
become the executive vice president, chief financial
officer and a director of MEC. [FN23] That promise
allegedly was made before Wohleber voted in favor
of the Merger. [FN24] In 1998, Wohleber received
a bonus of $250,000 in addition to his salary of
$225,000. [FN25] Finally, it is alleged that
Wohleber served as senior vice president of Freeport
Copper, and that Mr. Moffett served as chairman
and CEO of the same entity. The plaintiffs argue
that it is reasonable to assume that in those
capacities; Mr. Wohleber was subordinate to Mr.
Moffett and that Mr. Moffett was in a position to
influence, if not determine, Mr. Wohleber's
continued employment at Freeport Copper.

FN21. Complaint ¶ 6.

FN22. *Id.*

FN23. *Id.,* at ¶ 17.

FN24. *Id.,* at ¶ 22.

FN25. *Id.,* at ¶ 19.

I conclude that the foregoing facts, even if taken as
true, do not establish that Mr. Wohleber lacked
independence. The plaintiffs' position appears to
rest on the supposition that Wohleber's position as
senior vice president of Freeport Copper made him
vulnerable to pressure from Mr. Moffett to vote (as
a director of FSC) in favor of the Merger. This
supposition is nowhere straightforwardly pled, let
alone supported by any factual allegations in the
poorly drafted complaint. Moreover, the complaint
alleges no facts that shed any light on the
relationship between FSC (and/or MOXY) and
Freeport Copper. Nor are any facts alleged from
which one might infer that Moffett had the authority
either to fire Mr. Wohleber or significantly to
influence a decision by others to fire him, or that
Wohleber had a substantial financial stake in
maintaining his job at Freeport Copper. [FN26]
These woeful deficiencies in the complaint preclude
any determination that Mr. Wohleber was either
interested or lacked the independence to consider the
Merger transaction impartially.

FN26. *See Rales v. Blasband,* Del.Supr., 634 A.2d
927 (1993); *Benerofe v. Cha,* Del. Ch., C.A. No.
14614, Chandler, V.C ., Mem. Op. (Sept. 12,
1996).

3. *Latiolais*

Mr. Latiolais was both a director of FSC and the
vice chairman of the board of Freeport Copper. In
addition, he provided consulting services to FSC
before the Merger, and thereafter will continue to
provide such services to MEC. After the Merger,
the consulting fee Mr. Latiolais received for those
services was increased from $230,000 to $330,000-a
nearly 43% increase.

The FSC defendants argue that the increase in
Latiolais' consulting fees is not material and,
moreover, that there is no allegation that Latiolais
knew his fees would be increased at the time he
voted on the Merger. The plaintiff rejoins that (1) a
$100,000 (or 43%) increase is inherently material,
(2) a $230,000 consulting contract, in and of itself,
is a material financial interest regardless of whether
the fee was increased, (3) Latiolais had a conflicting
interest in continuing to render the consulting
services for a fee to MEC after the Merger.

*5 In support of their position, the defendants rely
upon *In re Walt Disney Co. Derivative Litigation,*
[FN27] where Chancellor Chandler, in granting a
motion to dismiss the complaint, found that a
director who received consulting fees could not be
deemed interested where the complaint did not
allege facts that would establish that those fees were
material to *that* director. [FN28] The plaintiff has
failed to allege such facts in this case. Accordingly,
here, as in *Disney,* the Court is unable to conclude
that the current pleading sufficiently alleges that
Latiolais lacked independence or had a conflicting
self-interest in the Merger.

FN27. *In re Walt Disney Co. Derivative Litig.,* Del.
Ch., 731 A.2d 342 (1999) *aff'd in part, rev'd in part
on other grounds sub nom Brehm v. Eisner,*
Del.Supr., 746 A.2d 244 (2000).

FN28. In discussing consulting fees paid to Senator
George Mitchell, the Court stated that the "plaintiffs
have not alleged that the ... consulting fees [were]
even material to [defendant]." *Id.* at 360.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2001 WL 50203, *5 (Del.Ch.))

Because neither Wohleber or Latiolais can be deemed interested or to lack independence on the facts alleged, the pled facts do not establish that entire fairness is the applicable standard of review. Because (on the current pleading) the Merger would be reviewed under the business judgment standard, and because no facts are alleged that would establish that the Merger consideration was so low as to constitute fraud or waste, the complaint fails to state a cognizable claim that the FSC directors breached any fiduciary duty owed to the corporation. [FN29]

> FN29. Because the complaint cannot survive the FSC defendants' motion to dismiss, I need not address MOXY's motion to dismiss the aiding and abetting claim against it, because an underlying breach of fiduciary duty an essential element of a claim for aiding and abetting. *See In re Santa Fe Pac. Corp, Litig.,* 669 A.2d 59, 72 (1995) (citing *Weinberger v. Rio Grande Indus., Inc.,* Del. Ch ., 519 A.2d 116, 131 (1986)).

### IV. CONCLUSION

For the foregoing reasons, the FSC defendants motion to dismiss is granted, with leave to amend the complaint within 30 days of this Opinion to add nonconclusory factual allegations that would establish that the Merger is not governed by the business judgment standard, either because (a) the FSC independent committee process did not merit business judgment rule protection, or (b) a majority of the FSC directors who approved the Merger were interested and were not independent. If no further amended complaint is filed within that 30 day period, the dismissal of this action shall be final.

IT IS SO ORDERED.

Not Reported in A.2d, 2001 WL 50203 (Del.Ch.), 27 Del. J. Corp. L. 672

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 9

Not Reported in A.2d
Not Reported in A.2d, 1990 WL 212307 (Del.Ch.), Fed. Sec. L. Rep. P 95,772
**(Cite as: 1990 WL 212307 (Del.Ch.))**

**Page   1**

н

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
**Joseph HERD, Plaintiff,**
v.
**MAJOR REALTY CORP., Alvin L. Lawing, Jr., Warren M. Cason, Jeffrey P. Jorissen, Stanley Weintraub, Charles L. Knight, Thomas E. Weaver, Garry K. Stolicker, Randon A. Samelson, Samelson Real Estate Partners, Inc., Major Acquisition Corp., and Stoneridge Resources, Inc., Defendants.**
Civ.A. No. 10707.

Submitted: July 16, 1990.
Decided: Dec. 21, 1990.

Joseph A. Rosenthal of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, and Stephen D. Oestreich, and Chet B. Waldman, of Wolf Popper Ross Wolf & Jones, New York City, for plaintiff.

Michael D. Goldman, and Stephen C. Norman, of Potter Anderson & Corroon, Wilmington, and Gallop, Johnson & Neuman, St. Louis, Mo., for defendant Alvin L. Lawing, Jr.

Charles F. Richards, Jr., William J. Wade, Daniel A. Dreisbach, and Frederick L. Cottrell, III of Richards, Layton & Finger, Wilmington, and Steven B. Feirson, Arthur S. Gabinet, and James P. Weygandt, of Dechert Price & Rhoades, Philadelphia, Pa., for Major Realty Corporation, Stoneridge Resources, Inc., Samelson Real Estate Partners, Inc., Major Acquisition Corporation, Randon A. Samelson, Jeffrey P. Jorissen and Garry K. Stolicker.

Randolph K. Herndon, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Warren M. Cason, Charles L. Knight and Thomas E. Weaver.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.

*1 Pending are defendants' motions to dismiss pursuant to Chancery Court Rule 12(b)(6). The underlying complaint of plaintiff Joseph Herd ("Herd") alleges that the various defendants breached their fiduciary duties of loyalty, care and candor in relation to the now consummated merger of defendant Major Realty Corporation ("Major Realty" or "Major") with Major Acquisition Corporation ("Major Acquisition") an affiliate of defendant Stoneridge Resources, Inc. ("Stoneridge").

Herd commenced the underlying action on March 22, 1989, shortly after Major announced that its board of directors had approved and entered into an agreement concerning the challenged merger. On June 23, 1989, Herd, along with Central Realty Investors, Inc. ("Central Realty"), a suitor for Major, requested a temporary restraining order to prohibit Major's planned sale of certain of its real estate. Following a hearing, this Court denied the temporary restraining order and granted plaintiff leave to file his first amended complaint. *Herd v. Major Realty Corp.*, Del. Ch., C.A. No. 10707, Chandler, V.C. (June 27, 1989). Next, on October 2, 1989, Herd requested a temporary restraining order to enjoin an October 6, 1989, special stockholders meeting called to approve the challenged merger. Herd's application, however, was withdrawn before a hearing date was set. Finally, on October 25, 1989, Herd sought leave to file his second amended complaint as well as a motion for a preliminary injunction seeking an order prohibiting Major from selling any of its assets by sale or otherwise outside the ordinary course of business. Herd's request to file his second amended complaint was unopposed. Concerning Herd's motion for preliminary relief, the Court found that the circumstances at that time--primarily that the motion did not identify any impending transactions-- did not justify scheduling a hearing. This is the Court's decision on the present motions to dismiss. As required on a motion of this kind, the following factual recitation emanates from Herd's second amended complaint (the "complaint").

I.

Major was a Delaware corporation with its principal executive offices in Orlando, Florida. Major developed, owned, leased and sold developed and undeveloped real estate directly and through joint ventures and partnerships. Shortly before the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 1990 WL 212307, *1 (Del.Ch.))

challenged transaction, Major had approximately 7.3 million shares of common stock outstanding, held by approximately 8,200 record holders. Major's common stock principally traded on the over-the-counter market where it was listed for trading on the NASDAQ National Market System.

Major's properties were in areas where residential, commercial or light industrial development was underway or contemplated. On March 1, 1989, Major owned approximately 378.5 acres of land in Orlando, Florida, in an area known as "Florida Center" as well as a 2,700 acre planned community which contained the new MCA Universal Studios/ Florida studio complex and tourist attraction. Through various joint ventures and partnerships, Major held interests in approximately 269.6 additional acres located in Florida Center and approximately 11 acres located on the waterfront in downtown Tampa, Florida.

*2 Defendant Alvin L. Lawing, Jr. ("Lawing") was the president and co-chief executive officer of Major and was a director since 1978. On October 5, 1989, Lawing beneficially owned or controlled 1.6% of Major's outstanding common stock. Defendant Stanley Weintraub [FN1] ("Weintraub") was co-chairman of the board of directors and had served as a director of Major since 1960. On October 5, 1989, Weintraub beneficially owned 4.2% of Major's outstanding common stock. Defendant Warren M. Cason ("Cason") was co-chairman of Major's board and was a director since 1972. Cason owned, on October 5, 1989, 1.5% of Major's outstanding common stock. Defendants Charles L. Knight ("Knight") and Thomas E. Weaver ("Weaver") were directors of Major since 1986 and 1971 respectively.

Defendant Randon A. Samelson ("Samelson") is a director of Major, as well as the chairman of the board of directors and chief executive officer of defendant Stoneridge. On October 5, 1989, Samelson owned or controlled 25.3% of Major's outstanding common stock. Defendants Jeffrey P. Jorissen ("Jorissen") and Garry K. Stolicker ("Stolicker") were also directors of Major as well as officers of Stoneridge or Stoneridge affiliates. Herd has labeled Samelson, Jorissen and Stolicker as interested directors.

In June and September of 1989, representatives of Major are alleged to have met with representatives of Stoneridge to discuss general information about the respective companies as well as the possibility of engaging in business transactions. Exchanges of informal telephone calls and correspondence allegedly followed these meetings. In addition, Herd maintains that Major confidentially provided Stoneridge with certain information. During this same period, Stoneridge, through its affiliates, began purchasing Major common stock.

On June 30, 1987, defendant Samelson Real Estate Partners, Inc. ("SREPI"), a Stoneridge affiliate, acquired 505,000 shares of Major common stock. In SREPI's Schedule 13D filed in connection with the acquisition, it stated, among other things, that it would request a meeting with Major and might seek control of Major. SREPI continued to acquire Major common stock and purportedly, on August 17, 1987, owned 1,209,000 shares of such stock.

In October 1987, the Major board adopted a rights plan. The rights distributed to the stockholders gave each stockholder (with the exception of the triggering stockholder) the right to purchase, under certain circumstances, common stock or possibly other assets of Major having a value twice the right's exercise price. With the adoption of the rights plan, Major commenced litigation against SREPI and Stoneridge in Florida Federal District Court seeking a declaration that the plan was valid.

On February 4, 1988, SREPI demanded the right to inspect approximately 17% of the common stock of Major. Representatives from Stoneridge and Major met and discussed the proposal.

These discussions purportedly resulted in Major entering into a standstill agreement with Stoneridge. In the standstill agreement Stoneridge agreed, among other things, not to engage in a proxy contest for the election of directors at Major's 1988 annual meeting. Stoneridge also agreed to not own more than 21% of Major's common stock. Major agreed to certain modifications to its defensive maneuvers (poison pill) that were favorable to Stoneridge. And, in addition, the agreement calls for changes to the composition of the Major board resulting in the placement of three Stoneridge nominees on the Major board (Samelson, Jorissen and Albert A. Savill).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 

Not Reported in A.2d
**(Cite as: 1990 WL 212307, \*3 (Del.Ch.))**

**\*3** On around November 21, 1988, Major received an offer from a Florida real estate developer, Gulfstream Development Corporation ("Gulfstream"). Gulfstream offered to purchase all of Major's outstanding common shares for $12.50 or at the option of Major's board, $10 in cash and $3.50 in 14% subordinated debentures of the surviving corporation.    After some deliberation, Major's board announced on November 30, 1988, that it had rejected Gulfstream's offer.

After rejecting the Gulfstream offer, Major considered alternative methods of achieving value for its stockholders and developing the companies properties. In this regard, in early January, 1989, Major formed a special independent committee to study the possibility of converting Major into a real estate investment trust ("REIT").

On January 25, 1989, Gulfstream made a second offer, this time for $13 cash per share.   The next day Major announced that its board instructed its advisers to begin negotiation of a definitive merger agreement with Gulfstream's advisers and called a special board meeting to consider Gulfstream's offer.    In addition, the special committee recommended against electing REIT status.   The board endorsed the committee's report.

Major announced on February 21, 1989, that Stoneridge was prepared to offer Major an alternative transaction.    The transaction contemplated Stoneridge offering Major stockholders $13 per share or the opportunity to remain a shareholder of the entity resulting from a merger of Major and Stoneridge.    The Major announcement stated that the Major board had directed its financial and legal advisers to continue negotiations with Gulfstream and to commence discussions with Stoneridge.    The board also appointed a special committee to oversee the process.    The special committee was chaired by Weaver and included Weintraub, Cason and Knight.

On March 14, 1989, Richard Collier ("Collier") of Peers & Co. ("Peers") informed defendant Knight that he was interested in purchasing Major. Apparently, Collier had previously been in contact with Major and had executed a confidentiality agreement.    Concerning consideration, Collier allegedly indicated that his offer would be higher than Gulfstream's latest $13 per share offer.   At its

March 15, 1989, meeting the special committee considered the Peers' offer.

Thereafter, defendant Major Acquisition, a corporation formed by Stoneridge to accomplish the proposed merger, offered to increase the cash consideration to be paid in the proposed transaction from $13 to $13.40 per share if the proposed transaction were consummated after July 21, 1989. Major Acquisition also offered to obtain a written commitment from Stoneridge concerning financing. All negotiations and discussions were concluded prior to the March 15, 1989, special committee meeting.

At its meeting the special committee decided that the proposed merger with Major Acquisition was in the best interest of the Major shareholders.   In that regard, the special committee recommended that the board authorize and approve the proposed merger agreement with Major Acquisition.   The board subsequently determined that the proposed merger transaction with Major Acquisition was in the best interest of the shareholders.   In addition, the board resolved to redeem Major's poison pill immediately prior to the consummation of the transaction with Major Acquisition.

**\*4** Under the merger agreement, Major Acquisition was to merge with and into Major Realty.   Major Realty would be the surviving company.    The directors of Major Acquisition, selected by Stoneridge, were to become Major Realty's initial board of directors following completion of the merger.    In essence, Major was to remain a publicly-held    company    only    under    new management.   In addition, of course, Stoneridge-- through Major Acquisition--had the opportunity to increase its holding in Major Realty.   Major's stockholders were given the option to receive either $13.40 (or $13.50 if the transaction closed by a certain date) in cash for each Major common share or, alternatively, one share of common stock in the continuing corporation.   The agreement contained fairly typical financing conditions, termination rights as well as provisions for expense payments. The agreement also contained a no-shop provision prohibiting Major and its officers, employees and agents from directly or indirectly encouraging, soliciting or initiating discussions or negotiations with any other entity or group concerning any possible acquisition of Major.   The agreement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 1990 WL 212307, *4 (Del.Ch.))

additionally calls for the redemption of Major's poison pill rights plan as well as the termination of the standstill agreement between Major and the Stoneridge entities.   The agreement does contain a modified standstill agreement much like the previous agreement except it includes no restriction on the ability of the Stoneridge entities to acquire additional common stock of Major.

In connection with the merger agreement, Herd alleges that Major made a series of material misrepresentations and omissions.   These omissions and misrepresentations were allegedly made, among other places, in the press release announcing the merger, the 10K filed with the Securities and Exchange Commission as well as the merger agreement itself.     The alleged misrepresentations included, among other things, the Stoneridge entities, through Major Acquisition, problems delivering a financing commitment.

On May 23, 1989, Peers, acting as a representative of Central Realty Investors, Inc. ("Central Realty"), requested through the special committee's advisers the opportunity to present a letter to the special committee regarding the possibility of an acquisition of Major by Central Realty.     The letter allegedly represented that Central Realty was willing to offer a merger proposal in which the shareholders would receive a higher dollar amount than the Stoneridge $13.40 offer and would not be subject to financing.

Next, on May 30, 1989, Herd sent what he characterizes as a "shareholder demand letter" to the Major board.     The gist of the letter is that Major should terminate its merger agreement with Major Acquisition because Major Acquisition had not yet procured the necessary financing commitments in the time allotted.   Herd maintained, in the letter, that the agreement was deterring interested third parties from making offers for Major.   Terminating the merger, Herd's letter asserts, would free Major, its directors and its financial advisers to solicit, receive and negotiate with interested third parties. Worth noting is the fact that Herd now maintains that this letter qualifies as a Rule 23.1 demand letter.

*5 Shortly thereafter, on June 1, 1989, Major Acquisition purportedly advised Major that it had withdrawn its $13.40 offer and was unwilling to proceed without a reduction in consideration.   Herd

maintains that Major Acquisition was interested in proceeding with a recapitalization transaction in which stockholders of Major would be given the opportunity to receive either $12.75 in cash per share or their common equity in Major.     Major appears to have announced this development and that negotiations were ongoing.     In regard to this development, the special committee is alleged to have determined that if satisfactory progress with Major Acquisition was not made, it would recommend that Major exercise its right to terminate the merger agreement.

At about the same time, Central Realty made their proposal.     The proposal, subject to completion of due diligence and approval of another party, was purported to have a value of $13.50 per share.   The special committee allegedly did not respond to or consider this proposal.     Major did, however, publicly announce the proposal on June 7, 1989.

On June 13, 1989, after some discussion and negotiation, the special committee approved and recommended to the Major board the so-called interim operating plan, the acceptance by Major of Major Acquisition's financing arrangements and the waiver by Major of its right to terminate the then existing merger agreement with Stoneridge.   At its June 14 meeting, the Major board approved all of the above.     Herd also maintains that the board decided not to respond to the Central Realty proposal.     In addition, Herd alleges that the press release announcing the action taken was false and misleading.

The Major board, also at the June 14, 1989 meeting, approved the sale of various Major real estate holdings.     These holdings included Major's interest in the Republic Square Shopping Center, the Major Park Plaza Office Building and approximately seven acres of land located in the International/ Republic Drive area of the Florida center.     Herd alleges that these properties were sold for $21.5 million (allegedly $2 million less than the fair market value of the properties) to assist Stoneridge's financing of the merger.     In this regard, Herd maintains that defendant Lawing dissented to the sale due to this alleged purpose and because the consideration received for the property was inadequate.

Next, Major issued its registration statement and





Not Reported in A.2d

(Cite as: 1990 WL 212307, *5 (Del.Ch.))

proxy dated September 9, 1989.    With the registration statement and proxy, Major sent a letter to its stockholders inviting them to a special meeting scheduled to take place on October 6, 1989.    At the special meeting the stockholders were to be asked to approve and adopt the merger agreement.    Herd claims that many of the stockholders did not receive the registration statement and proxy until September 25, 1989, and later.    In addition, Herd claims that the proxy contained material omissions and misleading statements.

On September 13, 1989, Central Realty delivered what Herd characterizes as the "second Central Realty proposal," in which Central Realty offered to acquire all of the outstanding shares in a merger transaction.    Each Major Realty share would be converted into the right to receive $7 in cash and convertible exchangeable preferred stock having a purported value of $7.50 making the total acquisition price $14.50 per share.    It is undisputed that the special committee considered and recommended that Major Realty's board reject the proposal.    The board, thereafter, rejected the second Central Realty proposal.

*6 Major supplemented its proxy statement on September 28 and again on September 29, 1989. The supplemental proxies included disclosures concerning:    (1) the second Central Realty proposal;    (2) the Major-Pru joint venture/Universal Studios Florida Area properties;    (3) certain litigation in which the company was involved;    and    (4) a revision of certain financial information.    Herd maintains, however, that many, if not most, of Major Realty's shareholders did not receive the supplemental proxies until after the October 6 special meeting.    Moreover, Herd alleges that the supplemental proxies contained material misrepresentations.

On October 5, 1989, Herd sent what he characterizes as his "second shareholder demand letter."    The letter demands that Major Realty postpone its special shareholders meeting, for two or three weeks, to give the shareholders time to receive and digest the information contained in the second supplemental proxy. Herd maintains that this letter, along with his earlier letter, qualifies as a 23.1 demand letter.

The special meeting was held on October 6, 1989,

where the shareholders overwhelmingly approved the merger 5,389,627 to 619,084.    The companies subsequently consummated the merger and announced its completion on October 12, 1989. Major Realty remains basically the same as it did before the merger. The total number of shares of Major Realty common stock outstanding decreased from 7,345,910 to 6,927,655.    Stoneridge's percentage ownership increased from 25.3% to 26.8% as a result of the merger.

II.

Each named defendant (some in groups of similarly situated defendants) has moved to dismiss Herd's second amended class action complaint (the "complaint") for failure to state a claim upon which relief can be granted pursuant to Chancery Court Rule 12(b)(6).    To grant a motion to dismiss for failure to state a claim, the Court must conclude, with reasonable certainty, that a plaintiff would not be entitled to relief under any set of facts that could be proven under the allegations made. *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985);    *Porter v. Texas Commerce Bancshares, Inc.,* Del. Ch., C.A. No. 9114, slip op. at 9, Allen, C. (Oct. 12, 1989).

If a complaint could be dismissed for being an incomprehensible jumble of allegations, the complaint at issue would be dismissed without further comment.    Unfortunately this Court is charged with trying to determine whether a given plaintiff would be entitled to relief under any set of facts that could be proven under the allegations made.    Herd's 92 pages of allegations, however, make this task especially difficult.    It is with this caveat that I proceed.

Herd appears to make four substantive allegations. The first allegation, stated in counts I and II, is that the defendants (or various subgroups of them) breached their fiduciary duties of loyalty (count I) and care (count II) by engineering a merger designed to divest Major's public stockholders of the full value of their stock in order to deliver the company to Stoneridge cheaply (the unfair merger claim). The second allegation, also contained within counts I and II, is that defendants usurped corporate opportunities and committed various acts of waste and mismanagement at the expense of and to the detriment of the public shareholders (the derivative claims).    The third allegation, sprinkled throughout

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 1990 WL 212307, \*6 (Del.Ch.))**

the complaint, is that defendants failed to conduct an auction or at least engage in a meaningful market check in carrying out their duty to maximize shareholder value once it was determined that the company was up for sale (the "*Revlon* and market check claim").    And finally, Herd's fourth allegation, stated in count III, is that certain of the defendants breached their duty of candor by providing the stockholders inadequate and inaccurate information in connection with the merger (the "disclosure claim").

## \*7 A. *The Unfair Merger Claim*

The central thrust of Herd's unfair merger claim is that defendants engaged in a plan to allow Stoneridge to acquire, or at least increase its ownership of, Major Realty by unfairly depriving the Major Realty shareholders of their equity investment.    In furtherance of this plan, Herd alleges that defendants acted to conceal the true value of Major Realty so as to justify an unconscionable, unfair and grossly inadequate offer. In addition, defendants are alleged to have discouraged interested parties other than Stoneridge.

Defendants contend that Herd's unfair merger claim boils down to an allegation that defendants' conduct, including the failure to provide adequate disclosure, injured the class members by divesting them of their stock at an inadequate price. In support, defendants point to paragraph 202 of the complaint, which states:

As a result of defendants' unlawful actions, plaintiff and the other members of the Class have not received their fair proportion of the value of Major Realty's assets and business and have been prevented from obtaining the real value of their common stock as well as being deprived of the opportunity to make an informed judgment as to the issues contained in the Registration/Proxy Statement of the Supplemental Proxies.

There is no getting around the fact that Herd's unfair merger claim amounts to the allegation that certain of Major Realty's shareholders were cashed out unfairly through the merger transaction.

Defendants seek dismissal on the ground that Herd lacks standing to assert a cause of action based on his being unfairly deprived of his holding in Major

Realty.    The sole, and quite obvious, reason for this ground is that Herd elected to retain his Major Realty stock and therefore was not deprived of his holding.    Thus, the argument goes, Herd did not suffer the actionable injury of being unfairly deprived of his holding.    That an actionable injury exist, of course, is a necessary prerequisite of any valid cause of action.    *See* 12B C. Van Swearingen, *Fletcher Cyclopedia of the Law of Private Corporations,* § 5909 (1984 rev. ed.) (for a court to entertain a stockholder suit, there must "be an actionable injury damnatory of plaintiff's rights"). For this reason, I agree that Herd lacks standing to assert his unfair merger claim.

## B. *The Derivative Claims*

Although the complaint is entitled "Second Amended Class Action Complaint," Herd maintains, in his brief in opposition to defendants' motion to dismiss, that his complaint asserts several derivative causes of action.    The problem for the Court is that Herd has been rather coy in identifying which claims he considers derivative.    Again, I will do my best to flesh out the purported derivative claims.

Of the "number of derivative claims" allegedly asserted in the complaint, Herd does identify two. The first purported derivative claim is for waste of corporate assets in connection with certain fees to be paid to Stoneridge. These fees are for certain services performed by Stoneridge affiliates in connection with the merger transaction. Although these fees are actually an obligation incurred by Major Acquisition, Herd claims that Major Realty will really pay by operation of the merger.    Herd's second purported derivative claim is for bypassing corporate opportunities.    There appears to be two allegations underlying this claim.    The first allegation is that Major Realty's consideration of adopting REIT status caused Major to lose opportunities in the market place.    The second allegation is that as part of the interim operating plan, Major Realty's operations were dismantled.

\*8 While these purported derivative claims are not well developed and therefore difficult to follow, it is unnecessary to speak to their assumed substance for the simple reason that the complaint contains none of the allegations required under Chancery Court Rule 23.1, *i.e.,* a derivative complaint must allege with particularity the efforts made by the plaintiff to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d

(Cite as: 1990 WL 212307, *8 (Del.Ch.))

Page   7

obtain the action desired and the reasons for failing to obtain the action or for not making the effort. Herd, of course, maintains that he fully complied with Rule 23.1.

First, Herd claims that he made demand upon the Major Realty directors, to pursue the purported derivative claims, in two letters he sent the directors. The first so-called demand letter is dated May 30, 1989. This letter, as it appears in the complaint, does not demand that the directors pursue any cause of action on behalf of Major Realty. The letter merely argued that Major Acquisition was in breach of the merger agreement. The letter concludes as follows:

Thus, on behalf of our client, we hereby demand that the Board of Directors of Major, pursuant to section 6.1(d) of the Merger Agreement, terminate the Merger Agreement by furnishing MAC the required five (days) written notice of such action.

The second letter, dated October 5, 1989, is similar except it demands that the board postpone the stockholders' meeting at which the merger was to be considered.

While Herd clearly demanded corporate action in both instances, he did not demand that the directors take action to remedy the alleged corporate injury for which derivative relief is now sought. See Pogostin v. Rice, Del.Supr., 480 A.2d 619, 624 (1984). Requests that the merger agreement be terminated and that the stockholders' meeting be postponed are different from Herd's purported derivative claims relating to the sale of real estate at less than fair market value, the payment of undeserved and excessive fees and the bypassing of corporate opportunities.

Herd's argument that demand would have been futile--and thus excused--also fails. It is well established that when a derivative plaintiff asserts futility of demand, Rule 23.1 requires that the derivative plaintiff demonstrate "with particularity ... the reasons" why demand would have been futile. See Aronson v. Lewis, Del.Supr., 473 A.2d 805, 808 (1984). Herd fails to do this and, in fact, makes allegations that seem to indicate that a majority of Major's board was disinterested. Any derivative claims are therefore dismissed pursuant to Chancery Court Rule 23.1.

## C. The Revlon and Market Check Claim

Herd maintains that the complaint clearly alleges that the director defendants and Stoneridge failed to: (a) conduct an unbiased auction between the Samelson entities (Major Acquisition) and Gulfstream; (b) conduct an auction between Central Realty and Major Acquisition after Major Acquisition's $13.40 offer had been withdrawn; and (c) engage in a meaningful market check both before the Gulfstream offer was rejected and after the Samelson entities withdrew their $13.40 offer.

*9 Defendants first challenge whether Herd has even plead a Revlon and market check claim. Indeed, after a careful reading of the complaint it is hard to tell. Whether the claim has been plead is, however, not terribly important in light of the fact that the complaint's allegations do not assert a claim upon which relief can be granted.

While directors undoubtedly have duties in the context of the merger transaction at issue, they have no duty to employ a specific device such as the auction or market check mechanism. See Freedman v. Restaurant Associates Industries, Inc., Del. Ch., C.A. No. 9212, Allen, C., slip op. at 12, 13 (Sept. 21, 1990). The so-called Revlon duty to conduct an auction appears to arise in a very limited situation not present here. This Court has held that Revlon duties arise when it is inevitable that the company will be sold and stockholders' interests terminated. City Capital Associates v. Interco, Del. Ch., 551 A.2d 787, 802-3 (1988). A recent case has stated that the duty arises in the more narrow context where "the dissolution or break-up of the corporate entity [is] inevitable." Paramount Communications, Inc. v. Time Incorporated, Del.Supr., 571 A.2d 1147, 1150 (1990). Indeed, in the case from which the duty emanates the company was to be sold, and the stockholders' interests converted into cash or otherwise terminated. Revlon, Inc. v. MacAndrews & Forbes Holding, Del.Supr., 506 A.2d 173 (1986). Revlon certainly does not, as Herd seems to argue, require that every change of control of a Delaware corporation be preceded by a heated bidding contest, some type of market check or any other prescribed format. Barkan v. Amsted Industries, Inc., Del.Supr., 567 A.2d 1279, 1286 (1989). Herd's Revlon and market check allegations therefore do not assert a claim upon which relief can be granted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 1990 WL 212307, *9 (Del.Ch.))

#### D. *The Disclosure Claims*

Finally, Herd alleges (count III of the complaint) that the director defendants and Major Realty have breached their duty of candor by disseminating various statements, press releases and documents which contained material misrepresentations and omissions. It is not clear, however, in what way Herd was injured by these purported violations of the duty of candor. The only clue is found in ¶ 202 which reads in whole:

#### As To All Counts

202. As a result of defendants' unlawful actions, plaintiff and the other members of the Class have been damaged in that they have not received their fair proportion of the value of Major Realty's assets and business and have been prevented from obtaining the real value of their common stock as well as being deprived of the opportunity to make an informed judgment as to the issues contained in the Registration/Proxy Statement or the Supplemental Proxies.

Directors of Delaware corporations clearly have a duty of candor when disclosing information to shareholders. Breach of the duty results in uninformed decisions on the part of shareholders. Herd intimates that the alleged breach by defendants caused him to be deprived of his equity investment in Major Realty. The problem, of course, is that Herd was not deprived of his equity investment because he elected to retain his Major Realty common stock. In other words, defendants argue, Herd lacks standing to raise this claim. For this reason, the argument goes, the Court need not address whether the relevant disclosures were accurate and timely. Defendants, however, fail to point out that Herd also alleges that the challenged disclosures "deprived [him] of the opportunity to make an informed judgment as to the issues contained in the Registration/Proxy Statement or the Supplemental Proxies." Compl. at ¶ 202. As a shareholder at the time of the transaction, Herd does have standing to complain about the accuracy of information afforded in connection with a shareholder vote.

Defendants' fiduciary obligation to disclose all material facts in an atmosphere of complete candor is well established. *Sealy Mattress Co. of N.J. v. Sealy, Inc.,* Del. Ch., 532 A.2d 1324, 1338 (1987)

(citing *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985)). The appropriate legal test as articulated in *Rosenblatt, supra,* requires disclosure of those facts deemed material. A fact is material if there is a "substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt, supra* (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1979)).

**\*10** Herd's candor claim has three parts. First, Herd alleges that the proxy statement itself is misleading. Second, plaintiff alleges that the supplemental proxy statements were misleading and were not mailed in a timely fashion. Third, plaintiff alleges that three of Major's press releases and its 1988 Form 10k were misleading. [FN2]

The alleged misrepresentations and omissions within the proxy statement are broken into five specific allegations. The first such allegation, found at ¶ 165(a) of the complaint, is as follows:

The Proxy fails to state that there has been no formal approval or discussion of the over $2.1 million in fees to be paid to defendant Stoneridge and related entities in connection with the Merger by either the Board or the Special Committee, and that these payments represent solely the unilateral intent of Stoneridge.

I agree with defendants that there is no factual basis for this allegation. Indeed, the following excerpt from page 5 of the proxy statement illustrates this point:

While the obligation to make the above-described payments is an obligation incurred by [MAC] and will become an obligation of the Company [Major] by operation of the Merger, stockholders should be aware that the current Board of Directors of the Company has not specifically considered and has neither approved nor disapproved the above-described payments.

In addition, I do not accept Herd's argument that even if the disclosure is not wrong it is nevertheless misleading. The proxy is adequate in its disclosure of the fees paid to Stoneridge and related entities. Furthermore, I have serious doubts as to whether the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 1990 WL 212307, *10 (Del.Ch.))

information at issue would significantly alter the total mix of information in any regard.

Herd's second allegation that the proxy contains omissions and misleading statements, found at ¶ 165(b) of the complaint, is as follows:

The Proxy fails to state that the sale of the three properties, approved by the Board on June 14, 1989 (discussed *supra* ), was done to facilitate the financing of the Merger by MAC.

This allegation, as I understand it, is that the proxy statement is false because defendants did not disclose their actual motive in selling Major Park Plaza, Republic Square and some associated vacant land.    The motive, according to Herd, was the allegedly improper motive of aiding Stoneridge's financing of the merger.    Defendants hotly dispute the allegation that the properties were sold in order to facilitate MAC's financing.        Nevertheless, defendants point out, disclosure of improper motives is not required under Delaware law.    *See Nomad Acquisition Corp. v. Damon Corp.,* [1988-89 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94, 040 at 90, 874 (Del. Ch.1988).

While conceding that the general rule is that alleged motives need not be disclosed, Herd argues that the present situation falls within the exception to the rule.        In support of this argument, Herd cites *Eisenberg v. Chicago Milwaukee Corp.,* [1987-1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93, 544 at 92, 444-45 (Del.Ch.1987).        Herd's present allegation of omission, however, is wholly distinguishable from the alleged false disclosure at issue in *Eisenberg.*        Presently Herd argues that defendants failed to disclose the motive underlying the sale of certain assets.    This is in sharp contrast to *Eisenberg* that involved the alleged false disclosure of the purpose of the transaction on which the stockholders were voting.    The rationale behind making an exception for the false disclosure in *Eisenberg* is not hard to fathom.

**\*11** Defendants' alleged nondisclosure in the present situation, however, is quite the opposite. For one, the transaction presently at issue is one typically in the ordinary course of Major's business. In addition, the transaction is not even subject to a stockholder vote and occurred several months before the merger.    For these and other reasons I do not

find the present situation worthy of an exception to the general rule against requiring directors to disclose alleged improper motives.

Herd's third allegation that the proxy contains omissions and misleading statements, found at ¶ 165(c) of the complaint, is as follows:

The Background of the Merger section of the Proxy is distorted in many ways.

Such an allegation, devoid of allegations of specific fact to support its conclusion, is a conclusory allegation.          Unable to comment further, the allegation must be dismissed.

Next, Herd complains that the proxy contains omissions and misleading statements concerning the value of the Superblock.        The specific allegation, found at ¶ 165(d) of the complaint alleges:

The Superblock has 'substantially' increased in value since 1987 when such property was last appraised while the Proxy states that it 'is possible' the development of that asset will have a significant impact.

In addition, Herd alleges that at least one director believed that the superblock has increased in value since the 1987 appraisal.    After careful review of the proxy materials, I am convinced that there is no basis in fact for Herd's allegation.    The proxy fully discloses that Mr. Lawing (the former director referred to by Herd) believed that the superblock had significantly increased in value and that additional disclosures to that effect should have been made.          In fact, the proxy contains several disclosures concerning the significant development activity adjoining the superblock.    What the proxy does not contain and what it appears Herd wants, is an updated appraisal or other opinion as to the present day value of the superblock.    The problem with such an opinion, defendants point out, is that it is as likely to be misleading as it is helpful. Disclosing all of the relevant facts, on the other hand, allows a shareholder to form his own opinion without directing that opinion. Following this latter course in no way makes the proxy materials misleading.

Herd's final assertion concerning the proxy statement, found at ¶ 165(e), alleges:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 

The Proxy, on page 34, incorrectly states that 1.07 acre parcel that the City has agreed to purchase was included in the property that was the subject of the Tampa appraisal.

I agree with defendants that, in light of the fact that Major's real estate assets have a total appraisal value of close to $190 million, the inclusion or exclusion of 1.07 acres is immaterial as a matter of law. In other words, it would not significantly alter the "total mix" of information relevant to the merger.

Herd next claims that defendants breached their duty of candor by way of the alleged untimely and inaccurate supplemental proxies. The supplemental proxies, dated September 28 and 29, 1989, include disclosures concerning: (1) the second Central Realty proposal; (2) the Major-Pru joint venture/ Universal Studios Florida Area properties; (3) certain litigation in which the company was involved; and (4) a revision of certain financial information.

*12 After reviewing the supplemental proxies, and the attendant facts, I am troubled by both the accuracy and timeliness of these disclosures. Concerning accuracy, I am especially troubled by defendants' characterization of the consideration offered in Central Realty's second proposal. Defendants characterized the stock component of the Central offer to have a purported value of $7.50. Defendants go on to state that the actual value of the stock component is probably under $6.50 and could be in the range from $3.27 to $7.43, with $5.00 being the most reasonable estimate. This is troubling because Central's proposal states that the financial advisers of Major were to participate in the determination of the final terms of the stock component so that both Major and its financial advisers will be satisfied that the stock component have a value of $7.50.

Of equal concern is the timeliness of the supplemental proxies. Herd alleges that the supplemental proxies were in fact useless because they reached shareholders shortly before or after the October 6 shareholder meeting. The record seems to indicate that the supplements were mailed no longer than a week before the October 6, 1989, shareholder meeting. The record does not indicate, however, any reason for such a last minute mailing. All of the information disclosed in the supplements,

including the Central offer, was known well before the October 6 shareholder meeting. I am left wondering why the defendants waited until one week before the shareholders meeting to disclose information they felt was worthy of a supplemental proxy. With such concerns, I am unable to dismiss Herd's disclosure claim concerning the supplemental proxies. All other disclosure claims are dismissed for the reasons stated.

III.

Defendants' motion to dismiss pursuant to Chancery Court Rule 12(b)(6) is granted in part. Defendants' motion to dismiss those duty of candor claims concerning the supplemental proxies is denied.

IT IS SO ORDERED.

FN1. Defendant Weintraub's dismissal has been stipulated to by the parties pursuant to Chancery Court Rules 23(a) and 41(a).

FN2. Plaintiff appears to have dropped the candor claims involving the press releases and Form 10K. If not, I find such claims inadequate because the duty of candor requires disclosure of all material facts only in connection with a transaction on which shareholders are asked to vote. *See Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278, 279 (1977).

Not Reported in A.2d, 1990 WL 212307 (Del.Ch.), Fed. Sec. L. Rep. P 95,772

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




# TAB 10

Not Reported in A.2d

Page    1

Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: 2004 WL 1982383 (Md.Cir.Ct.))

c

Circuit Court of Maryland,
Baltimore City, Part 20.
**Gabrielle Katz HUDSON, et al., Plaintiffs,**
v.
**PRIME RETAIL, INC., et al., Defendants.**
No. 24-C-03-5806.

April 1, 2004.
Michael A. Stodghill, Esq., Rubin & Rubin, Chartered, Rockville, Charles P. Scheeler, Esq., Piper Rudnick, LLP, Baltimore, Emily Komlossy, Esq., Goodkind, Labaton, Rudoff & Sucharow, LLP, Ft. Lauderdale, FL, Andrew J. Graham, Esq., Kramon & Graham, P.A., Baltimore.

***ORDER***

ALBERT J. MATRICCIANI, JR., Judge.

*\*1 Upon consideration of all defendants' motions to dismiss and plaintiffs' oppositions thereto, arguments of counsel having been heard on March 25, 2004, it is this *1st day of April, 2004,* by the Circuit Court for Baltimore City, Part 20, **ORDERED,** for the reasons set forth in the accompanying Memorandum Decision of this date, that dismissal is **GRANTED** as to each and every count of the third amended complaint, and it is further **ORDERED** that the motions to enforce the Court's bench decision are **DENIED** as moot.

***MEMORANDUM DECISION***

This purported class action litigation arises from the opposition mounted by several minority stockholders to the cash-out merger of Prime Retail, Inc. ("PRI"), a Maryland corporation, into Prime Outlets Acquisition Company, LLC, a New Jersey company affiliated with The Lightstone Group, LLC ("Lightstone"). Broadly stated, the plaintiffs [FN1] allege that in arranging and voting for the merger, various PRI directors [FN2] breached the duties they owed to the corporation and its stockholders. Plaintiffs also named Lightstone as an aiding and abetting defendant. Both Prime Retail and Lightstone have filed motions to dismiss the Third Amended Complaint under Maryland Rule 2-322(b).

FN1. References to "plaintiffs" in this memorandum decision include Gabrielle Katz Hudson, Thomas R. Hudson, Jolly Roger Fund LP, and Jolly Roger

Offshore Fund, Ltd.

FN2. Defendant-directors are Glenn D. Reschke, Howard Amster, James R. Thompson, Gary Skoien, Kenneth A. Randall, Sharon Sharp, and Marvin S. Traub. References to "Prime Retail" include these directors, along with PRI (which no longer exists) and Prime Outlets Acquisition Company, LLC, successor in interest to PRI.

**I. Factual Background Summary and Procedural History**

The facts set forth here are as alleged in the Third Amended Complaint. [FN3] The purpose of this background statement is to provide a context for the analysis of the pending motions. The Court makes no findings of fact in this decision. *Morris v. Osmose Wood Preserving,* 99 Md.App. 646 (1994), *rev'd in part on other grounds,* 340 Md. 519 (1995). In considering the pending motions, of course, the Court assumes the truth of the well-pleaded allegations of the Third Amended Complaint, and fair inferences to be drawn therefrom, but inconsistencies and ambiguities in the complaint must be construed against the plaintiffs. *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 344-45 (2000); *Faya v. Almaraz,* 329 Md. 435, 443-44 (1993); *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 192 (1985).

FN3. This background summary includes material from PRI's proxy statement, but only to the extent the proxy is undisputed and consistent with the well-pleaded allegations of the Third Amended Complaint.

**A. PRI and the Fortress proposal.**

PRI was a Maryland corporation that owned and operated outlet shopping centers. The company had three types of stock, Series A preferred, Series B preferred, and common stock, but due to the poor performance of its shopping centers, obligations to creditors, and lack of liquidity, the company had not paid dividends to its stockholders since January 2000. Among other financial recovery (or survival) measures, in December 2000 the company sold four of its outlet centers and obtained a $90 million loan from an affiliate of Fortress Investment Group, LLC

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 1982383, *1 (Md.Cir.Ct.))

("Fortress").

Fortress submitted an unsolicited proposal to PRI's board of directors on June 4, 2002, proposing that Fortress buy out all the company's outstanding stock for $48 million. Two days later the board appointed directors Kenneth A. Randall, Sharon Sharp, James R. Thompson, and Marvin Traub to serve on a Special Committee formed to evaluate the Fortress offer, as well as other recapitalization options. That same day the Special Committee selected Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") to serve as the Committee's financial advisor. Representatives from Houlihan Lokey, along with PRI director Howard Amster (participating in his capacity as stockholder only), met with Fortress on June 21, 2002, to discuss the proposal. Five days later Fortress increased its proposed offer to a total of $66 million.

*2 At a Special Committee meeting on August 12, 2002, Houlihan Lokey presented its assessments of PRI's financial condition and value, and an analysis of the restructuring and other strategic alternatives the company might pursue. The next day Houlihan Lokey made a presentation to the entire board on essentially the same issues. The board decided it could not accept Fortress's $66 million proposal, but the board directed Houlihan Lokey to continue negotiations with Fortress while simultaneously pursuing other recovery options.

### B. PRI's continued efforts to find an acceptable proposal.

On August 28, 2002, the Special Committee retained Granite Partners, LLC ("Granite"), as a second financial advisor to assist with raising capital, and from September through November 2002 Granite, Houlihan Lokey, and PRI representatives compiled information packages and an offering memorandum with financial projections. Granite contacted approximately one hundred potential investors seeking capital contributions. Meanwhile, Fortress filed a disclosure with the SEC on September 26, 2002, stating that it had purchased 10% of PRI's Series A stock from Merrill Lynch. At the conclusion of Granite's search, it reported to PRI that capital investment without a change in control was not an option, but that Lightstone, among other investors, expressed strong interest in a strategic transaction with the company, conditioned

upon the investor obtaining control.

After Granite narrowed the field to twenty prospective investors, thirteen of them executed confidentiality agreements and were given an offering memorandum. On November 15, 2002, those who remained interested were instructed to submit detailed proposals. PRI, with the assistance of its financial advisors, conducted presentations for four potential buyers from late November through December 4, 2002. Those efforts attracted six written expressions of interest, four buyout bids, and two bids for all or most of PRI's assets. The buyout bids ranged from $80 million to $120 million, and Houlihan Lokey went to work evaluating the various bids during the second week of December 2002.

The Special Committee, and then the full board, met with legal and financial advisors on December 13, 2002, and the board further winnowed the field to three buyout bidders, whom the board (through Houlihan Lokey) invited to submit best final bids. Those final bids came in on December 19, 2002, and they ranged from $125 million to $138.5 million. Houlihan Lokey advised the Special Committee to pursue the highest bidder, (whose identity does not appear in the record), and the Special Committee in turn made the same recommendation to the board. On December 23, 2002, the board directed PRI's management to pursue the $138.5 million bidder, and a week later PRI and the bidder entered into an exclusivity agreement giving the bidder sufficient time to complete its due diligence investigation.

At this point $138.5 million looked like the approximate merger consideration, so the next logical step was to devise a plan to allocate that sum among the various classes of stock. To that end the Special Committee directed Houlihan Lokey to seek input from Series A and Series B stockholders. Nearly 25% of PRI's Series A stock, and just over 20% of PRI's Series B stock was represented in these initial allocation discussions. Defendant Howard Amster, along with other individuals, participated as a holder of both classes of stock. The group assumed a net merger consideration of $133 million, and based on that figure a subgroup of the stockholders arrived at a consensus on allocations of $18.50 per Series A share, and $10.25 per Series B share, with $10 million to be divided among holders

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 1982383, *2 (Md.Cir.Ct.))

of common stock.

**\*3** In mid-February, however, the bidder backed out of the deal because of information gathered during its due diligence investigation. PRI was back to square one, and the board directed Houlihan Lokey to resume courting one of the other two serious bidders.

### C. Lightstone's bid.

On March 1, 2003, one of those bidders (whose identity is also unknown) submitted a $117.5 million buyout proposal, which the Special Committee and the board considered at meetings two days later. Upon Houlihan Lokey's advising that it could not easily assess the value of the bid because of certain features of the deal's structure, the Special Committee recommended that the board not pursue the bid exclusively, and the board accepted the recommendation. Consequently, Houlihan Lokey invited further proposals from other interested investors.

By March 13, 2003, PRI's board had three new buyout bids in hand, the highest of them being Lightstone's $121 million bid (which, after transaction costs, would net PRI $118 million). On that date, based on the Special Committee's recommendation, PRI opted to pursue the Lightstone deal exclusively, and the parties entered into an exclusivity agreement on March 19, 2003. Lightstone reduced its bid to $113 million (net $111.5 million) on April 15, 2003, based on its due diligence investigation.

On April 18, 2003, the Special Committee met for two purposes: first, to receive Houlihan Lokey's presentation on PRI's value (including a breakdown of its various stocks), and second, to consider director Michael Reschke's proposed alternative to the Lightstone deal. Director M. Reschke [FN4] proposed that PRI stay in business and not merge. His plan entailed selling PRI's majority interests in six shopping centers (some of which were performing well), selling five under-performing shopping centers, and a rights offering to stockholders. Director M. Reschke projected this would provide PRI $70 to $90 million more than the Lightstone deal. The Special Committee recommended that the board follow two parallel paths: (1) continue pursuing the Lightstone deal,

and (2) further explore director M. Reschke's proposal.

> FN4. Two Reschke's served on PRI's board, Michael and Glenn, so first initials are used to distinguish between them.

Later in April 2003, Lightstone increased its bid to a figure that would net PRI $113 million. On April 29, 2003, Lightstone's president and chief executive officer David Lichtenstein met with PRI's board to discuss the proposed merger. At the same meeting director M. Reschke presented further details to the board on his alternative proposal, director Amster presented details on a possible rights offering, and director G. Reschke (with management members) presented PRI's latest five-year business plan. Regarding the five-year plan, PRI's management advised that the plan's success depended on a reversal of several lackluster trends in PRI's operations. Three directors (Amster, M. Reschke, and Skoien) expressed concerns that Lightstone's offer was too low, that a stockholder vote would be unsuccessful if based on the current allocation figures, and that the alternative proposals could be better options for PRI.

**\*4** These proposals and concerns were considered at a subsequent Special Committee meeting, at which it was decided that the Special Committee would meet with Mr. Lichtenstein in an effort to improve the Lightstone proposal. The Special Committee also directed its financial advisors to further evaluate director M. Reschke's alternative proposal.

Mr. Lichtenstein met with Houlihan Lokey and PRI's preferred board members prior to May 2, 2003, to discuss Lightstone's offer. Based on a total purchase price of $115 million, the preferred directors indicated their support for (or acquiescence to) an allocation of $16.04 for Series A shares, $8.93 for Series B shares, and $0.15 for shares of common stock. The preferred directors reported these figures, and Mr. Lichtenstein's unwillingness to increase the $115 million offer, to the Special Committee on May 2, 2003. The preferred directors exited that meeting and the Committee considered this report and PRI's lawyers' report on the Lightstone negotiations. The Special Committee also considered its financial advisors' reports on their evaluation of director M. Reschke's alternative proposal. Later that day the board met and, based on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





the Special Committee's recommendations, the board decided not to pursue director M. Reschke's alternative proposal, but to persevere with the Lightstone deal.

Subsequently, Houlihan Lokey met again with preferred stockholders to discuss how Lightstone's merger consideration could be allocated among the various classes of stock. Houlihan Lokey asked the preferred stockholders to consider an allocation of $15.90 per Series A share, $8.80 per Series B share, and $0.17 per share of common stock. At a May 14, 2003 Special Committee meeting Houlihan Lokey advised the Committee of its opinion that $115 million was a fair price for PRI's stockholders generally, and Houlihan Lokey also presented its estimation of fair values for each class of stock. Houlihan Lokey specified that its valuation of each class was independent of its valuation of each other class; that is, Houlihan Lokey was not giving a fairness opinion on any particular allocation arrangement. The estimated ranges of values were $16.00 to $18.60 for Series A shares, $6.10 to $7.20 for Series B shares, and $0.13 to $0.14 for shares of common stock. Houlihan Lokey advised the Special Committee that, in its view, a cash-out merger with Lightstone would be better for PRI than continuing to operate as a stand-alone business.

Allocation was again discussed at a May 9, 2003 Special Committee meeting. Director G. Reschke told the board that the preferred directors would support an allocation of $16.25 for Series A shares, $8.66 for Series B shares, and $0.18 for shares of common stock. On June 2, 2003 the Special Committee directed Houlihan Lokey to seek other preferred stockholders' input on the allocation, and the Committee asked the preferred directors to be prepared to explain the basis for their proposal at the next Special Committee meeting.

*5 That next meeting was held on June 5, 2003. At the meeting the Special Committee informed the preferred directors that "their proposed allocation was problematic for the Special Committee because, under such proposal, the series A stockholders will receive an amount per share at the lower end of Houlihan Lokey's valuation range while the series B stockholders would receive an amount per share above Houlihan Lokey's valuation range." [FN5] The preferred directors stood their ground; they were excused from the rest of the meeting during

which the Committee discussed the allocation proposals.

FN5. September 30, 2003 Definitive Schedule 14(a) Proxy Statement at 24.

The Special Committee's deliberations continued to a June 9, 2003 meeting, at which Houlihan Lokey reported to the committee that nearly all of PRI's preferred stockholders had expressed their desire for liquidity, at a reasonable allocation. Merrill Lynch, owner of 22% of PRI's Series A stock, would not commit to a particular allocation range, but Merrill's counsel stated that $16.00 was too low. Fortress (the company that had earlier purchased 10% of PRI's Series A stock from Merrill) stated it would consider a Series A allocation between $16.00 and $20.00 per share. The Special Committee decided to recommend to the board that PRI enter into the merger agreement with Lightstone at $115 million, and that the merger consideration be allocated at $16.25 for Series A shares, $8.66 for Series B shares, and $0.18 for common stock. Included with the recommendation was an explanation that the Special Committee factored the preferred directors' preferences into the allocation decision because of the stockholders' push for liquidity. That is to say, without the preferred directors' support the merger would probably fail, and PRI would be left with no one receiving any liquidation of their shares. The board adopted the Special Committee's recommendation on June 9, 2003.

Houlihan Lokey updated its range of estimates on July 1, 2003, and based on its most recent analysis provided ranges of $16.11 to $18.61 for Series A shares, $6.15 to $7.24 for Series B shares, and $0.14 to $0.15 for shares of common stock. The Special Committee recommended to the board no changes in the allocation. PRI and Prime Outlets Acquisition Company, LLC, executed the merger agreement on July 8, 2003. Houlihan Lokey updated its fairness opinions on that date, which included no changes.

**D. Stockholder objections, and the ongoing allocation dialogue .**

The following week PRI received objections from Merrill Lynch and Fortress, both arguing that the allocation of $16.25 for Series A shares was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




inadequate. PRI held a teleconference moderated by Granite on August 11, 2003, at which 50% of the Series A stock, and 47% of the Series B stock were represented. The meeting did not resolve the disagreements.

Based on information provided by Granite, the Special Committee and the board found themselves in a quandary. Fortress and Merrill both appeared to need at least $20.00 per Series A share to support the merger (which obviously would require concomitant decreases elsewhere), but ROI Capital Management, a significant holder of PRI's Series B stock, would withdraw its support if the Series B allocation dipped below $8.30. Director Amster stated he could tolerate a Series B allocation as low as $8.46, but only with significant cuts in the common stock allocation and in transaction costs to PRI's management and its financial and legal advisors. Despite repeated efforts at persuading Lightstone to increase its offer beyond $115 million, PRI simply did not have enough merger consideration to satisfy everyone's demands.

*6 PRI's financial advisors tried to iron out a solution between August 13 and August 21, 2003, but were unable to bring the different stock classes to a consensus. This was reported at an August 21, 2003 Special Committee meeting, where it was also reported that director Amster could support allocations of $18.40 for Series A shares, $8.169 for Series B shares, and $0.17 for shares of common stock, but with a $0.514 million cut in transactional fees. On the Special Committee's recommendation, the board adopted this allocation the same date.

### E. The plaintiffs file suit.

Just prior to those August 21 allocation decisions, the plaintiffs filed this action on August 12, 2003, seeking to enjoin the stockholders' vote on the merger. Prime Retail and Lightstone moved to dismiss the Complaint, but before any action was taken on those motions, the plaintiffs filed their First Amended Complaint on October 8, 2003, along with motions for preliminary injunction and expedited discovery. The Court held a scheduling conference with the parties on October 20, 2003, at which plaintiffs stated their intention to convert their motion for preliminary injunction into a motion for a temporary restraining order, and at which the Court set a hearing on the motions for October 24,

2003. PRI and Lightstone moved to dismiss the First Amended Complaint on October 23, 2003. The stockholders' vote was scheduled for October 30, 2003.

At the conclusion of the October 24, 2003 hearing the Court rendered a decision from the bench. The parties dispute the legal effect of the Court's bench decision, and the Court resolves this dispute by clarifying what actually happened in section II.B., below. At this point, it suffices to say (and the parties agree) that the Court's bench decision dismissed all but one of the plaintiffs' claims. The Court reserved ruling on the motion for temporary restraining order to allow plaintiffs to conduct limited discovery. On October 27, 2003, plaintiffs deposed PRI director Kenneth A. Randall, who chaired the Special Committee, and plaintiffs withdrew their motion for a temporary restraining order a day later.

### F. Merger efforts continue.

PRI's stockholders did not approve the merger on October 30, 2003. A vote to merge would have required approval of at least two-thirds of each of the two preferred classes, and more than half of the common stockholders. Only 57.96% of the Series A shares were voted for the merger (both the other classes would have approved the merger). The meeting was adjourned and rescheduled for November 4, 2003. At that meeting 63.59% of the Series A shares were voted for the merger, and the meeting was adjourned and rescheduled for November 18, 2003.

On November 13, 2003, David Lichtenstein and PRI both disclosed that Lightstone might try purchasing PRI stock. (Lichtenstein filed a disclosure with the SEC, while PRI issued a press release.) On November 18, 2003, before the stockholder vote, Lightstone contracted to purchase shares of PRI Series A stock at $22 per share from Deephaven Capital Management. The purchase contract also obligated Deephaven to vote for merger. All three classes of stockholders approved the merger later that day.

### G. The pending motions.

*7 Plaintiffs filed their Second Amended Complaint on December 3, 2003, and Prime Retail and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2004 WL 1982383, *7 (Md.Cir.Ct.))

Page 6

Lightstone filed corresponding motions to dismiss on January 9, 2003. Before any action was taken on those motions, plaintiffs filed their Third Amended Complaint on February 4, 2004, and the defendants filed their corresponding dismissal motions on February 23, 2004. [FN6] Prime Retail's motion argues that all but one of the plaintiffs' claims are precluded by virtue of the prior bench decision, and that the entirety of the Third Amended Complaint fails to state a cause of action for which relief can be granted. Lightstone adopts Prime Retail's arguments, and also moves for dismissal arguing that the Third Amended Complaint fails to state a cause of action for aiding and abetting. The Court heard arguments of counsel on March 25, 2004.

> FN6. The defendants also filed motions to enforce the October 24 bench decision, which plaintiffs opposed, but those motions become moot upon resolution of the present motions.

## II. Analysis

To analyze the defendants' motions it must first be determined, in procedural terms, how to treat the motions appropriately under the Maryland Rules and in the context within which they were presented to the Court. Then it is necessary to resolve the parties' dispute over the legal effect of the Court's late-October bench decision, before finally moving to the merits of the motions.

### A. Motions to dismiss--with exhibits.

The defendants submitted motions styled "Motion to Dismiss," and all parties have presented to the Court and relied upon various documentary exhibits including Prime Retail's filings with the SEC. However, in ruling on motions to dismiss the Court may only consider matters presented within the plaintiffs' Third Amended Complaint, and the Court assumes the truth of the well-pleaded facts and inferences fairly drawn therefrom. *Bennett Heating v. NationsBank,* 342 Md. 169, 174 (1996).

Prime Retail argues, "Even on a motion to dismiss, the Court may properly consider documents integral to the complaint, relied upon in the complaint, incorporated into the complaint, or that the plaintiff had knowledge of in framing the complaint, as well as public documents filed with the SEC," citing *In re Merrill Lynch & Co.,* 273 F.Supp.2d 351, 355

(S.D.N.Y.2003). Essentially the same rule applies in Delaware. *E.g., Orman v. Cullman,* 794 A.2d 5, 15-17 (Del. Ch.2002) (Chandler, C.). Although one portion of Prime Retail's proposed rule applies in Maryland, *see* Md. R. 2-303(d) ("any written instrument that is an exhibit to a pleading is a part thereof"), the rest of the proposed rule runs counter to Maryland law. *See Muthukumarana v. Montgomery County,* 370 Md. 447, 474-75 (2002); *Hrehorovich v. Harbor Hosp.,* 93 Md.App. 772, 779-89 (1992); *see also Faya,* 329 Md. at 444 (taking judicial notice on motion to dismiss).

At the March 25 argument, however, plaintiffs' counsel joined in the defendants' position that the Court could, on a motion to dismiss, consider PRI's SEC filings as incorporated into the Third Amended Complaint. The Court accepts plaintiffs' counsel's statement as an oral amendment to the pleadings, incorporating into the complaint those documents on which it relies. *See Nichols v. Wilson,* 296 Md. 154, 156 n. 3 (1983); *RTKL Assocs, Inc. v. Four Villages Ltd. P'ship,* 95 Md.App. 135, 138 (1993); *Hoffman v. Hoffman,* 93 Md.App. 704, 709 (1992). The Court excludes from its consideration all other documents the parties submitted, and consequently will treat the pending motions as motions to dismiss.

### B. The effect of the bench decision on the Third Amended Complaint.

*8 The plaintiffs' initial complaint did not set forth causes of action in separately numbered counts, and thus it was improper in form and not in compliance with the pleading requirements of Maryland Rule 2-303(a). [FN7] At the October 24 hearing the Court stated:

> FN7. *See* Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 178-79 (3d ed. 2003) ("When separate causes of action are not pleaded in separate counts ... the appropriate response to the pleading is a preliminary motion under Rule 2-322(b)(2)."); Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 1.4 (2d ed. 1998) ("The failure to state separate causes of action in separate counts ... subject[s] [the complaint] to a motion to dismiss for failure to state a claim upon which relief can be granted.").

[T]he complaint itself is not set forth in counts, at least they aren't delineated in the traditional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





fashion, and I am going to say that it appears to me to attempt to set forth causes of action for both a breach of fiduciary duty and a breach of, to the extent that these are different, the duty of candor with respect to the material nondisclosures, the first issue going, I suppose, to the independence of the special committee and the second going to, whether they were independent or not, whether there is sufficient material and information contained in the proxy materials to allow the shareholders in the mix of it all to make reasoned decisions about the vote that they are to undertake next Thursday....
Am I missing something?

Plaintiffs' counsel then confirmed that the Court's understanding was correct. In part because of the lack of enumerated counts, the Court rendered an ambiguous bench decision:

[D]efendants' motion [to dismiss] ... should be denied with respect to this aspect of the complaint [i.e., the nondisclosure of allocation analysis] with, I think, leave to amend because I don't know that the complaint actually clearly sets forth the appropriate cause of action, but granted as to all other aspects and claims of material nondisclosure.

The Court's denial of the motion to dismiss the allocation nondisclosure claim, with leave to amend that claim, is inconsistent on its face. Although not articulated precisely this way from the bench, what the Court intended in that statement was to grant the motions to dismiss with leave to amend on the nondisclosure of allocation analysis count and to grant the motions to dismiss as to the remaining counts. The plaintiffs did amend their complaint, and in the Third Amended Complaint the plaintiffs have re-alleged causes of action which were dismissed at the October hearing.

Prime Retail argues that the doctrine of res judicata bars the plaintiffs from re-alleging in the Third Amended Complaint those claims which were previously dismissed. The sum total of legal authority cited by Prime Retail in support of that argument is *Poteet v. Sauter,* 136 Md.App. 383 (2001). In *Poteet,* Judge Hollander wrote for the Court of Special Appeals:

In determining whether res judicata is applicable, a court must consider:
(1) whether the parties are the same as, or in privity with, the parties to the earlier dispute;
(2) whether the cause of action presented is identical to the one determined in the prior

adjudication; and,
(3) whether there was a final judgment on the merits in the initial action.

*Id.* at 411. *Poteet,* like every other res judicata case reviewed by this Court, spoke in terms of "final judgments" in "initial actions" as barring relitigation in a "subsequent action ." *Poteet* provides no support for the proposition that res judicata bars a plaintiff from re-alleging in an amended complaint, within a single civil action, claims which were previously disposed of on preliminary motions attacking the initial complaint.

**\*9** Because the bench decision left at least one claim in the case, that decision "is not a final judgment," it did not "*terminate* the action as to any of the claims or any of the parties," and it is "subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties." Md. R. 2-602(a) (emphasis added). Also, in addition to the three res judicata requirements described by Judge Hollander in *Poteet,* the doctrine presumes an additional element: two distinct lawsuits. In this case we have only one civil action, in which the Court has rendered a non-final decision on less than all the claims; res judicata has no application here.

As explained in section II.A., above, generally motions to dismiss which present additional materials not contained in the complaint require the Court to treat the motions as motions for summary judgment. All the parties assume (as did the Court, at the time), that the October 24 bench decision granted dismissal, but because the Court considered additional materials submitted by both parties, the Court was actually granting defense motions for summary judgment on all but one of the plaintiffs' claims. [FN8] *See, e.g., Fairfax Sav., F.S.B. v. Kris Jen Ltd. P'ship,* 338 Md. 1, 9-10 (1995); *Hrehorvich,* 93 Md.App. at 783. Therefore, the rules governing plaintiffs' latest amendments would be rules governing amendments after a court grants defense motions for partial summary judgment, not dismissal.

> FN8. Although the present motions came before the Court in the identical posture, the record has now been clarified as to which materials are being considered by the Court and which are not. See pages 13 to 14, above. Thus, the Maryland Rules compel different treatment of the pending motions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 1982383, *9 (Md.Cir.Ct.))

Plaintiffs' memorandum in opposition to the defense motions posits that "dismissal is without prejudice, unless otherwise specified," citing *Williams v. Snyder,* 221 Md. 262, 267 (1960), and plaintiffs conclude that because "the Court's dismissal was unspecified," their amended pleading is proper. *Williams,* however, was a voluntary dismissal case where the Court applied the predecessor to current Rule 2-506(c). Unlike *Williams,* the plaintiffs here have not voluntarily dismissed their case. *Williams* and Rule 2- 506(c) have no application here.

Plaintiffs also invoke Maryland Rule 2-341, the general rule governing amending pleadings. Under subparagraph (a) of that rule, "A party may file an amendment to a pleading at any time prior to 15 days of a scheduled trial date." Subparagraph (c) limits the scope of permissible amendments:

An amendment may seek to (1) change the nature of the action or defense, (2) set forth a better statement of facts concerning any matter already raised in a pleading, (3) set forth transactions or events that have occurred since the filing of the pleading sought to be amended, (4) correct misnomer of a party, (5) correct misjoinder or nonjoinder of a party so long as one of the original plaintiffs and one of the original defendants remain as parties to the action, (6) add a party or parties, (7) make any other appropriate change. Amendments shall be freely allowed when justice so permits. Errors or defects in a pleading not corrected by an amendment shall be disregarded unless they affect the substantial rights of the parties.

*10 Before applying Rule 2-341 to this case, the Court must inquire whether this general rule, and not a more specific rule, controls whether plaintiffs may resubmit by amendment claims on which the Court previously granted defense motions for summary judgment. For example, had this Court actually been granting defense motions to dismiss at the October 24 hearing, then under Rule 2-322(c) the plaintiffs could not file an amended complaint on all counts because the Court did not expressly grant leave to amend any claim other than the count for nondisclosure of merger allocation analysis. [FN9] Thus, in the context of a motion to dismiss, Rule 2-322(c) takes away the broad freedom to amend generally granted by Rule 2-341.

FN9. The third sentence of Rule 2-322(c) states, "If

the court orders dismissal, an amended complaint may be filed only if the court expressly grants leave to amend."

In legal terms, however, the Court granted defense motions for partial summary judgment under Rule 2-501, and that rule contains no corollary to Rule 2-322(c)'s amendment provision. [FN10] Unlike Rule 2-322(c), Rule 2-501 on summary judgments contains no specific restriction to limit the liberal amendment provisions of Rule 2-341. Even so, under the general amendment rule a plaintiff may not re-allege the very same claims on which summary judgment has already been granted, because such an amendment does not fall within one of the seven types of amendments in Rule 2-341(c). Although amendments "shall be freely allowed when justice so permits," for the same policy reasons underlying the doctrines of res judicata, collateral estoppel, and law of the case, justice does not permit a plaintiff to beset the Court and defendants with duplicitous, meritless claims. *See generally* John A. Lynch & Richard W. Bourne, *Modern Maryland Civil Procedure* §§ 12.1--12.3 (1993 & Supp.2003).

FN10. *But compare Davis v. DiPino,* 337 Md. 642, 648-49 (1995) (Chasanow, J.) ("When a trial court grants a motion to dismiss ... the court has the discretionary authority to grant the plaintiff leave to amend the complaint ... [but there] is no such discretionary authority to permit the amendment of the complaint subsequent to the grant of summary judgment."), *with Fairfax Sav., F.S.B.,* 338 Md. at 9-10 (Rodowsky, J.) (describing without criticism trial court's grant of partial summary judgment with leave to amend); *Kee v. State Highway Admin.,* 313 Md. 445, 452-55, 459-60 (1988) (Eldridge, J.) (sanctioning filing of amended complaint after grant of partial summary judgment as proper under Rule 2-341); *Preissman v. Harmatz,* 264 Md. 715, 718-20 (1972) (same).

To determine whether the plaintiffs' Third Amended Complaint falls within the scope of Rule 4-341(c), the Court must compare the First Amended Complaint with the Third, and to the extent that the comparison reveals that plaintiffs have re-alleged in the Third Amended Complaint causes of action on which summary judgment has already been granted for the defendants, the Court could strike those amendments on its own initiative under Rule 2-322(e) as being "improper" and "not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 1982383, *10 (Md.Cir.Ct.))

in compliance with" Rule 2-341. The Court would then consider the defendants' motions to dismiss whatever remains after that comparison. But perhaps due to the lack of clarity in the Court's bench decision, the defendants have not moved to strike the amended complaint under Rule 2-341(a), (c), and Rule 2-322(e), and, of course, plaintiffs have not confronted such a motion. Although Rule 2-322(e) empowers the Court to strike pleadings on its own initiative, under the circumstances, here the Court declines to do so. To cleanse the record of further confusion stemming from the Court's October 24 decision, the Court will proceed to address here the viability of each of the Third Amended Complaint's counts.

### C. Third Amended Complaint.

Plaintiffs' Third Amended Complaint alleges that the director-defendants breached the duties of good faith, loyalty, and care, which they owed to the corporation and its stockholders. The plaintiffs allege that various directors' decisions were not independent, that directors were interested in transactions they were addressing, and that the directors failed to disclose material facts to the stockholders who were to vote on the merger. Before addressing each count, it will be helpful to review generally the duties imposed upon directors, and the standards by which courts review director actions.

### 1. Corporate directors' duties and the business judgment rule.

**\*11** In Maryland, corporate directors must perform their duties (1) in good faith, (2) in a manner [the director] reasonably believes to be in the best interests of the corporation, and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances. Md.Code Ann. Corps. & Ass'ns § 2-405.1(a) (1999). [FN11] Under section 2-405.1(c), directors who fulfill these duties enjoy the immunity from liability defined in section 5-417 of the Courts and Judicial Proceedings Article. [FN12] Maryland has codified the "business judgment rule" at section 2-405.1(e), which provides, "An act of a director of a corporation is presumed to satisfy the standards" imposed by section 2-405.1(a). In the context of mergers Delaware law imposes upon directors what have become known as "*Revlon* duties," after *Revlon v.*

*MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182, (Del.1985), requiring directors to try to secure the best merger terms available for stockholders. Maryland law appears to impose the same duty, *Wittman v. Crooke,* 120 Md.App. 369, 376-77 (1998), but the business judgment rule presumes that directors satisfied this duty. [FN13] *See* § 2- 405.1(f).

> FN11. Unless otherwise stated, all statutory citations are to the Corporations and Associations Article.

> FN12. Section 5-417 states, "A person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."

> FN13. Delaware courts reviewing certain change-in-control transactions preliminarily disregard the business judgment rule and employ a heightened level of scrutiny. *See, e.g., Orman,* 794 A.2d at 20-23. Unlike Delaware law, in Maryland the business judgment rule applies even to directors' change-in-control decisions. *See* Hanks, *Maryland Corporation Law* § 6.6[b], 176.1 (Supp.2003) ("[T]he decisions of the Supreme Court of Delaware in *Unocal v. Mesa Petroleum Co.,* 493 A.2d 946 (1985), and *Weinberger v. UOP, Inc.,* 457 A.2d 701 (1983), should not be applied in Maryland.").

The business judgment rule's presumption that directors fulfilled their duties does not render directors impervious to a plaintiff's claims. *See NAACP v. Golding,* 342 Md. 663, 673 (1996). Rather, the business judgment rule merely places upon plaintiffs the burden of rebutting the presumption. *Id.* To survive the motions to dismiss, therefore, the Third Amended Complaint must allege facts showing a failure of the directors to adhere to their duties.

Finally, in performing their duties directors may rely on information from (1) officers or employees of the corporation, to the extent the director reasonably believes the person is reliable and competent in the matter presented; (2) lawyers, CPAs, or other persons on matters the director reasonably believes to be within the person's professional or expert competence; and (3) a subcommittee of the board on which the director did

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





not serve, as to a matter within the subcommittee's authority, to the extent the director reasonably believes the committee to merit confidence. Corps. & Ass'ns § 2-405.1(b).

### 2. Duty of Loyalty.

Directors' obligations to perform their duties "in good faith" and in a manner reasonably believed to be "in the best interests of the corporation" impose a duty of loyalty to the corporation. *United Wire, Metal & Machine Health & Welfare Fund v. Bd. of Sav. & Loan,* 316 Md. 236, 245 (1989); Hanks, *supra,* 6.6[c], at 177. The duty of loyalty embodies two related but distinct requirements relevant to this case: first, in exercising their judgment directors must decide matters independently, and second, directors generally may not have a material personal interest in the transaction. *See Orman,* 794 A.2d at 19-25 & n. 50; *see also Shapiro v. Greenfield,* 136 Md.App. 1, 13-15 (2000); *Wittman,* 120 Md.App. at 377-78 (1998).

**\*12** A director's "independent" exercise of the director's judgment "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Orman,* 794 A.2d at 24. Chancellor Chandler, of Delaware's Court of Chancery, has explained,

Such extraneous considerations or influences may exist when the challenged director is controlled by another. To raise a question concerning the independence of a particular board member, a plaintiff asserting the control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling. The shorthand shibboleth of "dominated and controlled directors" is insufficient.

*Id.* (most internal quotation marks omitted); *see also* Corps. & Ass'ns § 2-401(b); *Wharton v. Fidelity-Baltimore Nat'l Bank,* 222 Md. 177, 185 (1960); *Warren v. Fitzgerald,* 189 Md. 476, 488-89 (1948); *Martin Marietta Corp. v. Bendix,* 549 F.Supp. 623, 633 n. 5 (D.Md.1982). Under Maryland law,

[W]hen a director does not personally benefit from the transaction but, because of that director's relationship to a party interested in the transaction,

it would reasonably be expected that the director's exercise of independent judgment would be compromised, that director will be deemed an interested director within the meaning of the statute.

*Shapiro,* 136 Md.App. at 24.

Related, but distinct loyalty issues arise in cases where directors stand to receive benefits from a transaction that are not generally enjoyed by the stockholders, or where a director stands on both sides of a corporate transaction. *Orman,* 794 A.2d at 23; *Shapiro,* 136 Md.App. at 15. By implication of section 2-419(a), the benefit must be "material" to the director to render the director even arguably interested in the transaction. The requirement of materiality imposes upon plaintiffs the burden of pleading facts to show that "the alleged benefit was significant enough *in the context of the director's economic circumstances,* as to have made it improbable that the director could perform [the director's] fiduciary duties to the ... shareholders without being influenced by [the] overriding personal interest." *Orman,* 794 A.2d at 23 & n. 44 (internal quotation marks omitted); *In re General Motors Class H Shareholders Litigation,* 734 A.2d 611, 617-18 (Del. Ch.1999). The duty of loyalty imposes only a general prohibition of such transactions, but section 2-419 establishes procedures by which such transactions may be validly accomplished.

Section 2-419 "provides that an interested director transaction is not void or voidable solely because of the conflict of interest and creates a 'safe harbor' for certain transactions which satisfy the statute." *Id.* at 14. Section 2-419 clearly applies to protect transactions in which directors were materially interested, and the Court of Special Appeals has held section 2-419 applicable to transactions in which extraneous forces influence a director's decision, rendering the director "non-independent." *Shapiro,* 136 Md.App. at 18-24. To qualify for the statute's protections, "an interested director could inform the shareholders or directors of [the director's] conflicting interests and give the board of directors or shareholders an opportunity to approve or ratify the transaction." [FN14] *Id.* at 15.

FN14. Alternatively, a director who did not comply with the disclosure provisions may attempt to show that the transaction was "fair and reasonable to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





corporation" under section 2-419(b)(2). *Shapiro,* 136 Md.App. at 15. The parties to this litigation have not raised that provision.

### 3. Duty to disclose.

**\*13** Directors also owe a duty to disclose to stockholders material information within the directors' control regarding transactions on which the stockholders will vote. Contemporary Maryland caselaw has not had occasion to develop this duty of candor, but none of the parties to this action dispute that some such duty exists under Maryland law. *See Parish v. Milk Producers Ass'n,* 250 Md. 24, 72-74 (1968); *Homer v. Crown Cork & Seal Co.,* 155 Md. 66 (1928); *Paskowitz v. Wohlstadter,* 151 Md.App. 1, 10-11 (2003) (applying Delaware law); *Wilcom v. Wilcom,* 66 Md.App. 84, 95 (1986) (assuming a duty to inform existed, no breach found). [FN15] Because of the paucity of Maryland law on the subject the parties direct the Court's attention to Delaware's well-developed corporate law, so the Court will rely primarily on that body of law to resolve the nondisclosure allegations in this action.

> FN15. The leading Maryland corporations law treatise grounds the duty of disclosure in directors' duty to act in good faith, Hanks, *supra,* § 6.6 [b], at 165, whereas Delaware law views this duty as underlying the duties of good faith, loyalty, and care, *Orman,* 794 A.2d at 41.

The current state of Delaware's disclosure requirements can be gleaned from a trio of decisions authored by the Delaware Supreme Court's Chief Justice Veasey: *Malpiede v. Townson,* 780 A.2d 1075 (Del.2001); *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135 (Del.1997); and *Arnold v. Society for Savings Bancorp, Inc.,* 650 A.2d 1270 (Del.1994). Under those decisions, information is material and must be disclosed if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Malpiede,* 780 A.2d at 1086. The disclosure duty has its limits:

The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing.... [A] board is not required to engage in selfflagellation and draw legal conclusions implicating itself in a breach of

fiduciary duty from surrounding facts and circumstances prior to a formal adjudication on the matter.

*Loudon,* 700 A.2d at 143. Also, because directors' roles differ significantly from the roles of stockholders, *Werbowsky v. Collomb,* 362 Md. 581, 599 (2001), the disclosure duty does not entitle stockholders to so much information as to enable them to replicate the directors' efforts, *see In re Staples, Inc. Shareholders Litigation,* 792 A.2d 934, 953-54 (Del. Ch.2001). Rather, directors must disclose sufficient information to enable a "reasonable investor" to make an informed decision on the matter presented. *Arnold,* 650 A.2d 1277. Chief Justice Veasey has had occasion to clarify that disclosure duties do not rise and fall with the level of sophistication of the individual investors; rather, the standard remains an objective "reasonable investor" standard. *Hubbard v. Hibbard Brown & Co.,* 633 A.2d 345, 352-53 (Del.1993).

Finally, Delaware law provides plaintiffs with a useful analytical framework for pleading causes of action for nondisclosure, requiring plaintiffs to:
(1) "allege that facts are missing from the proxy statement,"
**\*14** (2) "identify those facts,"
(3) "state why they meet the materiality standard," and
(4) "how the omission caused injury."
*Loudon,* 700 A.2d at 141. This Court would add one additional pleading requirement: The plaintiff must allege that the information was known to the directors, or within the directors' control. *Id.* at 143.

### 4. Stockholder ratification.

As explained in section II.C.2., above, section 2-419 provides a procedure for informed stockholder ratification of interested and non-independent director transactions. In addition to that specialized statutory ratification provision, Maryland common law provides that generally directors cannot be held liable for acts which were ratified by informed stockholders. *Coffman v. Md. Pub'g Co.,* 167 Md. 275, 289 (1934); *Wittman,* 120 Md.App. at 377-78. Stockholder ratification is only as good as the disclosure which preceded it, *id.,* and such disclosures must comply with the standards described in section II.C.3., above.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 

Not Reported in A.2d
(Cite as: 2004 WL 1982383, *14 (Md.Cir.Ct.))

### 5. The allegations.

#### a. Count 1: "Improper Diversion of Merger Consideration."

The plaintiffs entitled count 1, "Breach of Fiduciary Duty (Improper Diversion of Merger Consideration)," and the plaintiffs' memorandum in opposition to dismissal illuminates the theories underlying this count:

> [I]t is not simply attacking the allocation of merger consideration.... It challenges the manner by which the negotiations were handled by interested defendants, *not* the Special Committee, and the diversion of money from the public stockholders to executives and advisors through extremely lucrative change of control agreements and exorbitant fees to advisors.

The defendants argue that count one must be dismissed because, assuming its allegations amount to a breach of the directors' duties, PRI's stockholders ratified the directors' actions after full disclosure.

The bulk of the facts alleged in count 1 were fully disclosed in the September 30 proxy statement. Paragraph 99 of the Third Amended Complaint contains no allegations of fact; rather, it contains only conclusory characterizations. Md. R. 2-303(b); *Read Drug & Chem. Co. v. Colwill Constr. Co.,* 250 Md. 406, 412- 16 (1968). To the extent paragraphs 101-104 contain *facts* rather than plaintiffs' conclusory characterizations of fact, those facts were also disclosed in the proxy materials at pages 15 through 28 ("Background to the Merger"), 66 through 69 ("Interests of Certain Persons in the Merger"), and 77 ("Security Ownership of Management and Certain Beneficial Owners"). Thus, even assuming those facts were actionable, the informed stockholders' vote for the merger to which those allegations relate ratified the board's actions and extinguished the prospect of director liability for those acts. *Wittman,* 120 Md.App. at 377-78.

The remaining, undisclosed allegation is that, "The Deephaven transaction was improper and the Individual Defendants turned a blind eye to Lightstone's actions." [FN16] Paragraphs 71 through 81 of the Third Amended Complaint describe the Deephaven stock sale. Plaintiffs allege that Lichtenstein paid $22 per share for Deephaven's Series A stock, and the agreement also bound Deephaven to vote in favor of the merger at the stockholder's meeting. [FN17] In support of their contention that the transaction was improper, plaintiffs cite *Schreiber v. Carney,* 447 A.2d 17 (Del. Ch.1982) and *Hewlett v. Hewlett-Packard Co.,* C.A. No. 19513-NC, 2002 WL 549137 (Del. Ch. Apr. 8, 2002). However, for the same reasons explained in the Chancery Court's decision in *In re IXC Communications, Inc. Shareholders Litigation,* C.A. No. 17324, 1999 WL 1009174 (Del. Ch. Oct. 27, 1999) (permitting acquiring corporation's purchase of a minority of target's shares, with votes, in a "side deal"), the Deephaven sale was not improper under *Schreiber.* [FN18] Despite the "discordant ring" of the term "vote-buying," Maryland stockholders have the right "to cast [their] votes, or to grant a proxy or otherwise transfer [their] right to vote, in any way [they] decide[ ] and for any reason or no reason." Hanks, *supra,* § 7.15, at 253. Lightstone purchased from Deephaven only 3.9% of PRI's Series A stock, and thus the acquiring company did not "lock up" the vote, and the transaction did not disenfranchise plaintiffs.

> FN16. Plaintiffs also alleged in paragraph 68 that the directors owed a duty "to ascertain Lightstone's intentions regarding its announcement of purchases of PRI securities," but neither plaintiffs' memorandum, nor the law, provides any support for that contention.

> FN17. Under Section 2-507(b)(3), "if a person is the record holder on the record date but subsequently transfers the stock to another person prior to the time of voting, the transferee is entitled to require the transferor to issue a proxy to the transferee." Hanks, *supra,* § 7.09, at 242. Here, according to plaintiffs' complaint, it appears that Lichtenstein declined to require Deephaven to transfer its proxy, and opted to have Deephaven vote at the meeting instead.

> FN18. Interestingly, while Maryland Rule 1-104 generally prohibits citation to unreported decisions of Maryland's appellate courts, the rule is silent on whether extra-jurisdictional unreported decisions may be cited. In *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners,* No. 2818, Sept. Term, 2002, slip op. at 45 n. 4 (Md.Ct.Spec.App. Mar. 3, 2004), Judge Moylan decided not to consider an unreported Fourth Circuit decision cited by a party because such citations are "disfavored" under the Fourth Circuit's rules. Upon





reviewing Delaware's procedural rules and caselaw, it appears that Delaware courts do not disfavor, much less prohibit citation to unreported decisions, as long as counsel submits hard copies to the court. *See* Chancery Ct. R. 171(h) (this same provision appears in the rules of Delaware's Supreme Court [R. 14], Superior Court [R. 107], Court of Common Pleas [R. 107], and Family Court [R. 107], as well as the United States District Court for the District of Delaware [R. 7.1.3] ). In any event, the Court gives no weight to the unreported Delaware decisions "beyond the weight merited by the persuasive force of the reasoning employed." *Cf. E. Outdoor Adver. Co. v. Mayor of Balt* ., 128 Md.App. 494, 515 (1999) (Harrell, J.).

### b. Count 2: "Failure to Offer Fair Price."

**\*15** The second count proceeds on a theory that the defendant-directors failed to offer a fair price to Series A stockholders because (1) the committee and board arrived at a merger allocation based in part on internal corporate politics rather than a purely economic analysis; (2) conflicts among board members rendered them incapable of independently exercising their judgment; (3) the directors failed to obtain the highest value reasonably available for Series A shares; (4) the merger price includes a "wrongful diversion of consideration;" and (5) the merger price is based on "an analysis of fair value that does not comply with applicable law." The facts underlying these characterizations fail to state a claim for relief. *Wittman,* 120 Md.App. at 377-78.

The proxy disclosed at least six times that Houlihan Lokey's fairness opinion did not include an opinion as to any particular allocation of the aggregate consideration among the various stock classes or series. September 30 Proxy at 6, 23, 44-45, 46-47, 49, and C-3. Nevertheless, the proxy included an allocation arrangement. Pages 18 through 28 of the proxy describe the Special Committee's ongoing dialogue among its advisors, Lightstone, the stockholders, and the board regarding an acceptable allocation. The most poignant of these discussions appears on page 24, where Houlihan Lokey reported to the Special Committee and the board that "substantially all of the series A and series B preferred stockholders ... expressed a desire for liquidity at a reasonable allocation," and the Special Committee reported to the board that it factored the preferred directors' allocation preferences into its

recommendation because,

> given the size of Mr. Amster's holdings and the likely influence that a "no" vote by the preferred board representatives would have over the other preferred stockholders, it believed that the support of the preferred board representatives was crucial to having the transaction approved by the Company's preferred stockholders.

The proxy thus fully disclosed what did, and did not form the basis for the allocation, and, assuming plaintiffs' alleged a breach of duty, under *Wittman* the subsequent informed stockholder vote ratified this methodology. [FN19]

> FN19. If count 2 is read as a claim that the aggregate merger consideration, or the board's analysis and evaluation of the aggregate price were actionable, the same conclusion would obtain. The Court has made every effort to understand the precise nature of each count but, as Delaware's Chancellor Chandler has said, "it is not for the Court to divine the claims being made. A plaintiff must make clear to the Court the bases upon which his claims rest." *Orman,* 794 A.2d at 24 n. 47.

The first sentence of the Third Amended Complaint's paragraph 108 merely recapitulates in slightly modified language allegations contained in paragraphs 101 and 103, which the Court has already disposed of in analyzing count 1. The second sentence alleges that "a majority of the Individual Defendants" suffered from disabling conflicts of interest. Relying on Delaware law, plaintiffs' opposition memorandum erroneously stated that "while alleged breaches of the duty of care may be extinguished by a fully-informed vote, breaches of the duty of loyalty cannot." On the contrary, Maryland's Court of Special Appeals has held that stockholders can ratify alleged breaches of the duty of loyalty. *Wittman,* 120 Md.App. at 378. Therefore, the facts supporting the plaintiffs' conflict of interest claims cannot state a claim if they appear in the proxy because they were ratified. [FN20]

> FN20. The following facts were disclosed in the September 30 proxy: (1) director G. Reschke's change-in-control payments (at 66); (2) director Amster's PRI stock ownership (at 77-80); (3) director Amster's stock in Horizon Group Properties, Inc. (at 68-69); (4) director Skoien's position within PRI and Horizon, and Horizon's relationship to PRI





(at 68-69); (5) director Thompson's relationship with Winston and Strawn, and that law firm's relationship to PRI (at 68); (6) director Traub's consulting arrangement with PRI (at 69); (7) details regarding Fine Furniture Direct, Inc. (at 69).

**\*16** The facts which the Court has not located in the proxy disclosures, which must be evaluated on the merits, are as follows:

. Amster nominated Skoien to PRI's board.
. Skoien served as an aide to director Thompson when Thompson was governor of Illinois (from 1977 through 1991), "thus Skoien and Thompson have enjoyed a relationship spanning over 24 years."
. Thompson is also a director in Prime Group Realty Trust, an entity which is affiliated with "the Reschke family."
. Thompson, as governor, appointed Skoien and Sharp to state government positions, and has had long-standing relationships spanning over twenty years with both individuals.
. Sharp served as the director of Illinois's lottery in Thompson's administration.
. Director Randall was a PRI director for more than ten years.

As to all of these facts the Court can say with certainty that, as a matter of law, they do not give rise to a reasonable expectation that these directors' independent judgment was compromised. *See Shapiro,* 136 Md.App. at 24; *cf. Orman,* 794 A.2d at 27 ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

The plaintiffs allege, in paragraph 109, that they "lost their Series A shares without the defendants discharging their duty to obtain the highest value reasonably available for those shares." The short answer to this allegation is that the directors had no such duty. The language of this allegation demonstrates a misunderstanding of the duties imposed by § 2-405.1(a). As observed in Hanks, *supra,* § 6.6[b], at 164.1, the director's duties "are directed solely at the manner, or process, by which a director makes decisions rather than at the results of those decisions." In *Wittman,* the Court of Special Appeals quoted with approval from the trial judge's decision:

[The stockholder] argues that [the corporation] could have gotten a better deal. But that is really not a cause of action. Maybe they could have.

Maybe they couldn't have. But that doesn't constitute a cause of action. That's something stockholders can decide. What would get the court to intervene would be evidence of facts of the board and/or management violating its duty of loyalty and duty of care.

*Wittman,* 120 Md.App. at 378. Here, the processes by which the directors arrived at the merger consideration and allocation were disclosed in the proxy materials, were ratified by the informed stockholders, and therefore are not actionable. *Id.* at 377-78.

Paragraph 109 included redundant allegations of a "wrongful diversion of consideration," which the Court has already dealt with, and an allegation that "the merger price is the result of … an analysis of fair value that does not comply with applicable law." Again, where economic valuation analyses were performed, those analyses were sufficiently disclosed in the proxy materials, and the stockholders' subsequent ratification extinguished any liability arising from these facts. *Id.*

**c. Count 3: "Duty of Loyalty Resulting in Unfair Process."**

**\*17** Count 3 purports to allege that the directors breached their duty of loyalty based on (1) the mere occurrence of the Deephaven-Lightstone stock sale; (2) the alleged conflicts between the Special Committee and Series B-owning directors; (3) G. Reschke's change-in-control payments; (4) "the complete failure of the Special Committee to attempt to negotiate on price or the allocations demanded by Amster;" and (5) Houlihan Lokey's "success fee." As explained above, the Deephaven-Lightstone transaction was not improper, and the board informed the stockholders of the board's stock holdings and any change-in-control payments, so none of those facts can give rise to a cause of action under *Wittman.*

The plaintiffs allege a "complete failure of the Special Committee to attempt to negotiate," but the plaintiffs fail to allege well-pleaded facts supporting that conclusory characterization. The Third Amended Complaint closely tracks the chronology included in the proxy statement, and that chronology details the ongoing dialogue among the Special Committee, its advisors, and various interested parties. Notwithstanding plaintiffs' characterizations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





of those events, the Third Amended Complaint fails to allege supporting facts giving rise to a cause of action.

For example, paragraph 21 merely alleges that the allocations approved by the Special Committee and board coincided with the allocations proposed by director Amster, but paragraph 21 does not allege that Amster *"dictated"* the Special Committee's or the board's decisions. Nor are there any well-pleaded factual allegations of Amster's "strong-arming" other directors in paragraphs 34, 36, 40, 52, 101, and 108. In reality, as described in the proxy materials incorporated within plaintiffs' complaint, Amster played a significant role throughout the process in his capacity as an interested holder of preferred stock. September 30 proxy at 18, 21, 22, 23, 24, 25, 26, and 27. The proxy disclosed the Special Committee's belief that (1) the proposed merger presented the best route to the liquidity desired by nearly all of PRI's stockholders, and (2) without Amster's support, the merger probably would not happen. Director Amster's actions, as well as those of the Special Committee, were made plain to the stockholders, who in turn ratified those actions and extinguished any possible director liability. *Wittman,* 120 Md.App. at 377-78.

Finally, the Court need only briefly address plaintiffs' allegation regarding Houlihan Lokey's fee. Paragraph 24 alleges that PRI was to pay Houlihan Lokey $900,000 for its services, and if a merger were consummated, Houlihan would also receive approximately $2 million as a "success fee," to be paid by the acquisition company. Plaintiffs do not allege that these terms were not disclosed to the stockholders, and because they were disclosed, the informed stockholder vote ratified these acts under *Wittman.* In any event, without more these fees do not give rise to a cause of action. *Wittman,* 120 Md.App. at 378.

### d. Count 4: "Breach of Duty of Disclosure"

**\*18**    Plaintiffs    present    four    nondisclosure allegations: (1) "Deephaven was paid $22 per share while the rest of the Series A stockholders received $18.40 per share; (2) the Deephaven stock sale was not disclosed; (3) Amster's role in allocation negotiations was never disclosed; and (4) the board did not disclose that HLHZ's analysis "had virtually

no relevance in the deliberations of the Special Committee or the Board."

The plaintiffs' first alleged nondisclosure simply misstates the plaintiffs' own allegations. Plaintiffs suggest in paragraphs 73, 74 and 75, 82, and 116, that as a result of the merger, Deephaven would receive $22 per Series A share, while all other Series A stockholders would receive only $18.40. That characterization of the Deephaven-Lightstone sale conflicts with the plaintiffs' own statement of the facts. Upon execution of the November 18 Deephaven-Lightstone contract, Deephaven became entitled to $22 for each share sold under that transaction; upon completion of the merger, Deephaven became entitled to $18.40 per Series A share that it then held, just like every other Series A stockholder. These were two distinct transactions. Plaintiffs' characterizations to the contrary do not qualify as well-pleaded allegations of fact, and do not state a claim upon which relief can be granted.

The second nondisclosure allegation fails because plaintiffs' never allege that information regarding the stock sale was known to or within the directors' control. *Loudon,* 700 A.2d at 143. The plaintiffs' implicitly concede this point by alleging that the directors breached their duties by not knowing about the Deephaven sale. *See* Third Amended Complaint ¶¶ 68, 100. As for the viability of that claimed duty, see footnote 16, above.

In count 3, analyzed above, plaintiffs argued that the board violated its duties by allowing director Amster to control the merger negotiations, and the Court's analysis showed that plaintiffs' conclusory characterizations did not amount to well-pleaded facts stating a cause of action. Essentially, the plaintiffs failed to plead facts (as opposed to characterizations) showing what role Amster played in addition to, or apart from, what is described in the proxy incorporated into plaintiffs' complaint. Here, count 4 alleges that the board breached its disclosure duty by failing to disclose that Amster's role in the negotiations was as described in plaintiffs' paragraph 112. However, as explained in the Court's analysis on count 3, the Third Amended Complaint fails to present well-pleaded allegations showing Amster's role (or the Special Committee's) to have been anything other than that described in the proxy on which the Complaint relies. The board fulfilled its disclosure obligations, and plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
**(Cite as: 2004 WL 1982383, \*18 (Md.Cir.Ct.))**

have not pleaded facts showing omission or misrepresentation.

Similarly, the plaintiffs' final nondisclosure allegation recapitulates a claim already resolved in count 2. Plaintiffs argued in count 2 that the board breached its duties by approving an allocation based in part on whether it would garner enough votes for the merger, rather than on the basis of a purely economic analysis. The Court's resolution of that count explained that the nondisclosure alleged here (i.e., that no advisor expressed a financial opinion on the relative fairness of the allocation arrangement), actually was fully disclosed in the proxy materials incorporated into the complaint. Accordingly, this part of count 4 fails to state a nondisclosure claim.

### e. Count 5: Aiding and Abetting by Lightstone and Acquisition

\*19 Pleading this aiding and abetting theory as a separate count may be improper in form. *See Manikhi,* 360 Md. at 360 n. 6. At any rate, count five fails because the underlying counts fail. *See Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.,* 340 Md. 176, 200-201 (1995).

### III. Conclusion

For the reasons set forth in detail above, defendants' motions to dismiss the Third Amended Complaint will be granted.

Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



