IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
IN RE MBNA CORPORATION            :
DERIVATIVE AND CLASS              :        Lead Case No. 1:05-CV-00327-
LITIGATION                        :        GMS
                                  :
_____   :
This Document Relates To:         :
ALL ACTIONS.                      :        CLASS AND DERIVATIVE
                                  :        ACTION
                                  :
-------------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
OPENING BRIEF IN SUPPORT OF THE MBNA OUTSIDE
DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036-6522
(212) 735-3000

DATED: January 20, 2006

## INDEX

CASES                                                                          TAB NO.

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati,
    Inc., C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) ...................................... 1

In re Citigroup Inc. S'holders Litig.,
    C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ......................................... 2

Criden v. Steinberg,
    C.A. No. 17082, 2000 WL 354390 (D. Del. Mar. 23, 2000) ............................................. 3

In re Encore Computer Corp. S'holders Litig.,
    C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) ........................................... 4

Ercole v. Conectiv & Coventry Health Care of Del., Inc.,
    C.A. No. 03-186 GMS, 2003 WL 21104926 (D. Del. May 15, 2003) .............................. 5

In re Frederick's of Hollywood, Inc. S'holders Litig.,
    C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ........................................... 6

Freedman v. Rest. Assocs. Indus.,
    C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990) ............................................. 7

In re Freeport-McMoran Sulphur, Inc. S'holders Litig.,
    C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) ............................................. 8

Herd v. Major Realty Corp.,
    C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21,1990) ............................................ 9

Hudson v. Prime Retail, Inc.,
    C.A. No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 10

Jacobs v. Yang,
    C.A. No. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ............................................. 11

Jasinover v. Rouse Co.,
    C.A. No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) ................... 12

Jolly Roger Fund LP v. Sizeler Property Investors, Inc.,
    C.A. No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ........................ 13

Knox v. Rosenberg,
    No. H-99-0123 (S.D. Tex. Sept. 28, 1999) ...................................................... 14

Lewis v. Leaseway Transp. Corp.,
    C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ............................................ 15

Litt v. Wycoff,
    C.A. No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ................................ 16

Manzo v. Rite Aid Corp.,
    C.A. No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ............................... 17

Nebenzahl v. Miller,
    C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) ............................................ 18

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v.
    Elkins, C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........................... 19

Pogostin v. Rice,
    C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983) ............................................ 20

Porter v. Texas Commerce Bancshares, Inc.,
    C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ............................................ 21

Rattner v. Bidzos,
    C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................................ 22

Seibert v. Harper & Row, Publishers, Inc.,
    C.A. No. 6639, 1984 WL 21874 (Del. Ch. Dec. 5, 1984) ................................................ 23

Sekuk Global Enters. Profit Sharing Plan v. Kevenides,
    C.A. No. 24-C-03-007496, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................. 24

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
    C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999) ............................ 25

In re Walt Disney Co. Derivative Litig.,
    C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ........................................ 26

In re Wheelabrator Tech. Inc. S'holders Litig.,
    C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ........................................... 27

ii

# TAB 11

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 1728521 (Del.Ch.)
(Cite as: 2004 WL 1728521 (Del.Ch.))

**Page 1**

н

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**Judith JACOBS, derivatively on behalf of Yahoo!
Inc., Plaintiff,**
v.
**Jerry YANG, David Filo, Gary Valenzuela,
Timothy Koogle, Eric Hippeau, Arthur
H. Kern, Michael Moritz, Jeffrey Mallett,
Edward R. Kozel, Defendants,
and
YAHOO! INC., Nominal Defendant.**
No. Civ.A. 206-N.

Submitted May 26, 2004.
Decided Aug. 2, 2004.

Carmella P. Keener, Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, Delaware; Harnes
Keller LLP, New York, New York, for the
Plaintiff.

Arthur G. Connolly, Jr., Arthur G. Connolly, III,
Brian M. Gottesman, Connolly Bove Lodge & Hutz
LLP, Wilmington, Delaware; Brendan V. Sullivan,
Jr., George A. Borden, Lynda, Schuler, Christian
A. Weideman, Williams & Connolly LLP,
Washington, D.C., for Defendants Jerry Yang,
David Filo and Gary Valenzuela.

Alan J. Stone, Natalie J. Watson, Morris Nichols
Arsht & Tunnell, Wilmington, Delaware; Norman
J. Blears, Michael L. Charlson, Matthew A.
Carvalho, Maren J. Clouse, Heller Ehrman White &
McAuliffe LLP, Menlo Park, California, for the
Director Defendants.

David C. McBride, Bruce L. Silverstein, Rolin P.
Bissell, Danielle Gibbs, Young, Conaway, Stargatt
& Taylor LLP, Wilmington, Delaware; Jordan D.
Eth, Judson E. Lobdel, Anna Erickson White,
Morrison & Foerster LLP, San Francisco,
California, for Nominal Defendant Yahoo! Inc.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

## I.

*1 The plaintiff, a shareholder of Yahoo!, Inc.,
brings this derivative action against all the current
directors and certain former directors and officers of
Yahoo!, and against Yahoo! as a nominal defendant.
The defendants have filed two separate motions
seeking (1) to dismiss the entire complaint under
Court of Chancery Rule 23.1 for failure to
adequately plead demand excusal; and (2) to dismiss
Count II under Court of Chancery Rule 12(b)(6) for
failure to state a claim upon which relief can be
granted. For the following reasons, the motion to
dismiss the entire complaint for failure to make
demand on the Yahoo! board of directors is granted.
In light of that dismissal, the court declines to
resolve the separate motion to dismiss Count II.

## II. [FN1]

FN1. All facts in this opinion, unless otherwise
noted, are taken from the well-pleaded allegations in
the complaint.

The plaintiff, Judith Jacobs, is a shareholder of
Yahoo!. Defendant Yahoo! is a Delaware
corporation. Yahoo! provides Internet products and
services to consumers around the world. Defendants
Timothy Koogle, Michael Moritz and Jeffrey Mallet
are former Yahoo! directors. Defendants Eric
Hippeau, Arthur H. Kern and Edward R. Kozel are
current Yahoo! directors (collectively, with Koogle,
Moritz and Mallet, the "Director Defendants").

Defendants Jerry Yang and David Filo founded
Yahoo! in 1994. Yang is a current Yahoo! director
and officer. Filo is a current Yahoo! officer but not
a director. Both Yang and Filo are designated within
the company as "Chief Yahoo." The complaint
states that Filo "serves as a key technologist,
directing the technical operations behind the
company's global network of web properties."
[FN2] The complaint does not describe Yang's
duties as "Chief Yahoo," Yang owns approximately
6.7% of Yahoo! common stock. Filo owns
approximately 7.9% of Yahoo! common stock.

FN2. Compl. ¶ 6.

Defendant Gary Valenzuela (collectively with Yang
and Filo, the "Insider Defendants") served as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d

(Cite as: 2004 WL 1728521, *1 (Del.Ch.))

Yahoo!'s Senior Vice President of Finance and Administration and CFO from 1996 to 2000. Valenzuela never served on Yahoo!'s board.

In 1996, Yahoo! retained The Goldman Sachs Group, Inc. to act as the managing underwriter in its initial public offering. Yahoo! raised $32.5 million through the IPO and paid Goldman approximately $1 million in fees.

Goldman's relationship with Yahoo! continued after the IPO. Yahoo! retained Goldman's services in connection with its October 1997 acquisition of the Four11 Corporation (a common stock exchange valued at $92 million), its July 1999 acquisition of broadcast.com (a common stock exchange valued at $5.7 billion), and its January 2002 acquisition of HotJobs.com (valued at $436 million). Goldman received over $10 million in underwriting, investment banking and advisory fees from Yahoo! over the course of the relationship.

During this time period, Goldman allegedly "rewarded" the Insider Defendants with allocations of thousands of shares in dozens of Goldman-managed IPOs at initial offering prices. Yang and Valenzuela were allocated shares in over 100 Goldman-managed IPOs. Filo was allocated shares in over 40 Goldman-managed IPO. The Insider Defendants allegedly reaped enormous, nearly risk-free profits as a result because the demand for IPO shares often caused the shares to double or triple in value in the first days of trading. The complaint alleges that Goldman allocated these shares to the Insider Defendants as incentive for Yahoo! to continue doing business with Goldman.

*2 The plaintiff brings this derivative action on behalf of nominal defendant Yahoo! pursuant to Court of Chancery Rule 23.1. Count I alleges that the Insider Defendants breached their fiduciary duty of loyalty by misappropriating a financial benefit that rightfully belonged to Yahoo!, the receipt of IPO allocations, by virtue of their relationship with Goldman. Count II alleges that the Director Defendants acted disloyally and in bad faith when they "acquiesced in" or "approved of" the IPO allocations that the Insider Defendants received.

At the time the complaint was filed, Yahoo!'s board of directors had nine members: five non-party directors, Terry S. Semel, Roy J. Bostock, Ronald

W. Burkle, Robert A. Kotick, Gary L. Wilson, and four defendants, Hippeau, Kern, Kozel, and Yang (collectively the "current board"). The plaintiff has not made a demand upon the current board to pursue legal action against the Director Defendants or the Insider Defendants.

The Director Defendants move to dismiss under Court of Chancery Rule 23.1 for failure to make a demand on Yahoo!'s board and for failure to adequately plead why demand should be excused, and move to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for which relief can be granted. The Insider Defendants move to dismiss under Court of Chancery Rule 23.1 for failure to make a demand on Yahoo!'s board and for failure to adequately plead why demand should be excused. Nominal defendant Yahoo! moves to dismiss under Court of Chancery Rule 23.1 for failure to make a demand on Yahoo!'s board and for failure to adequately plead why demand should be excused.

For the reasons discussed *infra,* the complaint will be dismissed for failure to comply with the demand requirement of Rule 23.1. The court does not reach the motion to dismiss Count II.

III.

A. *Demand Futility*

Court of Chancery Rule 23.1 requires that a plaintiff shareholder make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf. The demand requirement of Rule 23.1 allows for demand to be excused in two instances. First, demand is excused if a shareholder pleads *with particularity* facts that establish that demand would be futile because the directors are not independent or disinterested. [FN3] Second, demand is excused if a shareholder establishes a "reasonable doubt as to ... whether the directors exercised proper business judgment in approving the challenged transactions." [FN4] "Demand futility analysis is conducted on a claim-by-claim basis." [FN5]

> FN3. In considering whether demand is rightfully excused, the court will accept the well-pleaded allegations in the plaintiff's complaint as true,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





drawing reasonable inferences in favor of the plaintiff. *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at *8 (Del.Ch. Jan.10, 2003); *see also Kaufman v. Belmont,* 479 A.2d 282, 285 (Del.Ch.1984) ("All well-plead facts must be assumed to be true. Allegations, however, will not be assumed to be true unless there exists specific facts which are sufficient to support the conclusions.") (citations omitted). The court, however, will not accept conclusory allegations of law or fact. *Grobow v. Perot,* 539 A.2d 180, 188 n. 6 (Del.1988).

FN4. *Steiner v. Meyerson,* 1995 WL 441999, at *9 (Del.Ch. July 19, 1995). Referring to the second basis for excusing demand, former Chancellor Allen states that "the same directors [must] continue at the time of suit to constitute a majority of the board." *Id.* It follows that demand will be excused under the second prong of the demand futility analysis if a majority of the current board (those who should consider a demand) were the directors who failed to exercise proper business judgment in approving the challenged transaction.

FN5. *Beam v. Stewart,* 833 A.2d 961, 977 (Del.Ch.2003), *aff'd,* 845 A.2d 1040 (Del.2003).

A director is deemed interested "whenever divided loyalties are present, or a director has received, or is entitled to receive, a personal benefit from the challenged transaction which is not equally shared by the stockholders." [FN6] A director is deemed independent if his or her "decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." [FN7]

FN6. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

FN7. *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984).

**\*3** The plaintiff's demand futility claims are based on four theories. First, the plaintiff contends that the current board is disqualified from considering a demand because of the current board's desire to avoid taking "an adversarial position to defendants Yang and Filo," two individuals that the plaintiff asserts are of paramount importance to Yahoo!. [FN8] Second, the plaintiff argues that the directors'

compensation, coupled with their desire to retain their positions as Yahoo! directors, taints their ability to consider a demand independently and free from extraneous influences. Third, the plaintiff contends that as a result of certain business ties between Yahoo! and its directors, these directors are unable to consider a demand to pursue litigation against the defendants. Fourth, the plaintiff asserts that certain directors "acquiesced in" or "approved of" the IPO allocations at issue and, for that reason, they are deemed interested for purposes of a demand. [FN9]

FN8. Compl. ¶ 35.

FN9. The plaintiff asserts that directors Hippeau, Kern, and Kozel are interested for purposes of considering a demand to pursue Count II because they allegedly acquiesced in the receipt of the IPO allocations.

Since Yahoo!'s current board is composed of nine directors, the plaintiff has the burden of establishing that at least five directors are either interested or not independent. Yang is interested for purposes of demand because he is involved in the transactions at issue. For the reasons set forth below, the plaintiff has not met her burden with respect to the remaining directors, as the court concludes that Semel, Bostock, Burkel, Kotick, and Wilson are independent and disinterested for purposes of Rule 23.1.

*1. Adversarial Position*

The plaintiff asserts that Yahoo!'s current board is disqualified from considering a demand because of the current board's desire to avoid taking "an adversarial position to defendants Yang and Filo." [FN10] The plaintiff's argument boils down to an assertion that if the current board were to pursue litigation against the Insider Defendants, Filo and Yang would leave the company. In support of this argument, the plaintiff points to Yahoo!'s filings with the SEC that state that Yahoo! is "substantially dependent on [the] two founders." [FN11] This, according to the plaintiff, illustrates that Yahoo!'s current board would avoid taking an adversarial position to the Insider Defendants.

FN10. Compl. ¶ 35.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





FN11. *Id.*

This argument must be rejected. Simply because Yahoo! is alleged to be "substantially dependent" on Filo and Yang it does not follow that directors investigating allegations of misconduct by Filo and Yang would fail to fulfill their fiduciary duties to the corporation. [FN12] On the contrary, managing the relations of the corporation and its founders is an important aspect of the duties owed by the directors to Yahoo! and its stockholders. As this court has recognized in the past, "[p]otential negative side-effects from bringing a lawsuit ... do not constitute a personally disqualifying interest that might prevent the directors from freely assessing the benefits and detriments of bringing the suit in the first place." [FN13] Negative effects to the corporation might make the directors' discussion more difficult, but, without more, it hardly gives rise to a disqualifying interest.

> FN12. *See Apple Computer, Inc. v. Exponential Tech., Inc.,* 1999 WL 39547 (Del.Ch. Jan.21, 1999) (one co-founder capable of considering a demand to sue another).

> FN13. *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at \*7 (Del.Ch. June 21, 2000).

2. *Directors' Compensation And Continued Employment*

\*4 Yahoo!'s directors are compensated through the Directors Stock Option Plan (the "DSOP"). [FN14] To retain the benefits under the DSOP, a director must remain on Yahoo!'s board, as the options vest only while a director serves on Yahoo!'s board. The plaintiff argues that the directors' compensation, coupled with their desire to retain their positions as Yahoo! directors, taints their ability to consider a demand to pursue litigation independently and free from extraneous influences.

> FN14. Upon the commencement of their directorships, each nonemployee director receives nonqualified stock options to purchase 100,000 shares of Yahoo! common stock. These options vest ratably over a period of 48 months. At each annual meeting, the nonemployee directors receive an additional 50,000 options to purchase Yahoo! common stock. 25% of these options vest after the first anniversary of the date of grant, while the remaining options become exercisable monthly over a period of 36 months after the anniversary of the date of grant. The exercise price of all stock options granted to nonemployee directors is the closing price of a share of Yahoo!'s common stock on the date of grant of the option.

As this court has stated, "[a]llegations as to one's position as a director and the receipt of director's fees, without more ... are not enough for purposes of pleading demand futility." [FN15] The weakness in the plaintiff's argument is that she offers no relevant facts to support her claim of demand futility aside from the fact that the directors receive substantial remuneration in return for their service on Yahoo!'s board. The plaintiff relies on *In re eBay Shareholders Litigation,* [FN16] but that decision is inapposite. She argues the directors' ability to enjoy the lucrative compensation they have received (and will continue to receive) is dependant upon their continued service as directors and that, as in *eBay,* the targets of an inquiry into the merits of a derivative action have the power to deprive them of that compensation by terminating their board service. While it is true that, if it were to happen, the Director Defendants would face a significant loss, the non-party directors constitute a majority of the current board, and the facts properly before the court show that Yang and Filo do not control the nomination process. On the contrary, a nominating committee of independent directors, Kern and Burkle, controls that process. [FN17] Kern is named as a Director Defendant while Burkle is not. Simply being named as a defendant does not destroy Kern's independence.

> FN15. *In re Ltd., Inc., S'holders Litig.,* 2002 WL 537692, at \*4 (Del.Ch. Mar.27, 2002).

> FN16. 2004 WL 253521 (Del.Ch. Jan.23, 2004).

> FN17. Gibbs Decl. Ex. E, May 15, 2003 (Yahoo! Definitive Form 14A) ("[t]he Nominating Committee consists of the Company's nonemployee directors: Messrs. Kern (Chair) and Burkle ... The Nominating Committee has authority (i) to review the size and composition of the board of directors and to recommend changes thereto; and (ii) to evaluate and recommend candidates for election of directors."). *See In re Wheelabrator Techs., Inc. S'holders Litig.,* 1992 WL 212595, at \*12 (Del.Ch. Sept.1, 1992) ("On a motion to dismiss the Court is free to take

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered.") (quotations and internal citations omitted).

The record illustrates clearly that the Insider Defendants are not in a position to control the other directors' tenure on the board, as was the case in *eBay.* [FN18] For example, the company conceded in its filings with the SEC that the *defendants controlled* eBay. [FN19] In the present case, the Insider Defendants own approximately 14.7% of Yahoo!'s common stock, which is obviously insufficient to control an election of Yahoo!'s directors. [FN20] Moreover, Yahoo!'s public filings do not state, as was true in *eBay,* that the Insider Defendants control the company. In addition, the board has a nominating committee comprised of nonemployee directors who recommend board candidates. The nominating committee ensures that the Insider Defendants (particularly Yang) are incapable of controlling a director's nomination, election and continued tenure on Yahoo!'s board.

FN18. 2004 WL 253521, at * 3.

FN19. *Id.* ("eBay's form 10-K ... notes that eBay's executive officers and directors Whitman, Omidyar, Kagle and Skoll (and their affiliates) own about one-half of eBay's outstanding common stock. As a result, these eBay officers and directors effectively have the ability to control eBay and direct its affairs and business, including the election of directors and the approval of significant corporate transactions.").

FN20. *Cf. Zimmerman v. Braddock,* 2002 WL 31926608, at *11 (Del.Ch. Dec.20, 2002) ("[A]n interest of less than 12% in [a] company, without more, fails to create a record from which one may conclude that he dominates the business affairs of [a company] or the employment of that company's employees."); *In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192, at * 6 (Del.Ch. May 22, 2000) ("Substantial non-majority stock ownership, without more, does not indicate control.").

The court notes that Semel, Yahoo!'s chairman and CEO, is not compensated through the DSOP. [FN21] Rather, Semel's compensation is based on his status as Yahoo!'s CEO and is a combination of cash and stock options with a vesting scheme similar to that of the DSOP. The plaintiff alleges that Semel

is beholden to Yang because Yang was responsible for Semel's employment (and continued employment); and, therefore, because of this "powerful economic incentive," Semel is incapable of making an independent decision as to whether Yahoo! should pursue legal action against Yang and the other Insider Defendants. Specifically, the plaintiff points to the fact that Semel would lose at least $17,342,500 in options if his employment were terminated. [FN22] The plaintiff further asserts that Yang personally negotiated Semel's compensation package and, for that reason, Semel is beholden to Yang. Finally, as evidence of Yang's importance and power, the plaintiff points to the fact that he was the sole signatory on Semel's employment contract. For these reasons, the plaintiff argues that Semel is incapable of making an independent decision as to whether Yahoo! should pursue legal action against Yang, and, as a consequence, cannot consider a demand against the remaining Insider Defendants.

FN21. As part of Semel's compensation as CEO, he has received millions of dollars of unvested options that only vest while Semel remains an employee of Yahoo!.

FN22. Compl. ¶ 55.

*5 The facts alleged in the complaint fail to raise a reasonable doubt as to Semel's independence. Although Semel stands to lose a significant amount of money in the form of unvested options if his employment is terminated, the complaint fails to allege facts from which the court could infer that any of the Insider Defendants, in particular Yang, control Semel's continued employment as CEO. Semel is Yahoo!'s highest-ranking officer and reports to the entire board, not Yang. [FN23] Moreover, Yang and the other Insider Defendants are not in a position to control Semel's reelection to the board, as was the case in *eBay.* [FN24] Likewise, the fact that Yang personally negotiated Semel's compensation package and is the sole signatory on Semel's employment contract does not establish that Semel is dominated or controlled by Yang.

FN23. Gibbs Decl. Ex. K, Semel Letter Agreement at ¶ 2 ("You [Semel] shall report directly and solely to the Board of Directors."). *See In re Wheelabrator,* 1992 WL 212595, at *12 ("On a motion to dismiss

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered.") (quotations and internal citations omitted).

FN24. 2004 WL 253521, at *3.

The plaintiff also contends that under *Steiner v. Meyerson,* stock ownership is not the only way the Insider Defendants could "exert considerable influence" over a director to raise a reasonable doubt as to a director's independence. [FN25] In *Steiner,* however, the employee/director was the president and chief operating officer and was asked to consider a demand to sue his superior, the company's board Chairman and CEO. Here, Semel (or any of the five directors who could consider a demand) does not report to the Insider Defendants. Instead, Semel reports to Yahoo!'s entire board.

FN25. 1995 WL 441999, at *9.

For these reasons, the court finds that the assertion that Yahoo!'s current board members are not independent for purposes of considering a demand free from "extraneous considerations or influences" resulting from their compensation arrangements is not adequate grounds to excuse demand.

3. *Business Relationships*

The plaintiff next argues that, as a result of certain business relationships between Yahoo! and companies affiliated with directors Bostock, Burkle and Kotick, there exists a reasonable doubt as to the ability of Bostock, Burkle and Kotick to consider a demand independently and free from extraneous influences. The court disagrees.

Bostock was elected to Yahoo!'s board in May 2003. He also serves on the board of Unicast, Inc., a small technology company that entered into an advertising agreement with Yahoo! in 2002 whereby Yahoo! paid Unicast $206,000. The plaintiff argues that "[a]s a result of Bostock's position with Unicast and Unicast's dependence on Yahoo!, Bostock cannot exercise business judgment with respect to any determination to proceed or not to proceed with this action against Yang" [FN26] and the other Insider Defendants.

FN26. Compl. ¶ 39.

Burkle has served on Yahoo!'s board since November 2001. Burkle is the managing partner of The Yucaipa Companies, an investment firm that holds a majority stake in Alliance Entertainment Corp. Burkle serves as Alliance's chairman of the board. Alliance owns All Media Group ("AMG"), which entered into an undisclosed licensing agreement with Yahoo!. The plaintiff contends that the AMG-Yahoo! licensing agreement is "crucial to AMG's continued viability" and, as a result, Burkle cannot act independently to determine whether Yahoo! should proceed in litigation against the Insider Defendants. [FN27]

FN27. Compl. ¶ 40.

*6 Kotick has served as a director of Yahoo! since March 2003. Kotick is the chairman and CEO of Activision, Inc., an entertainment software publisher and controls 6.4% of Activision's common stock. In July 2002, Yahoo! and Activision executed a licensing and distribution agreement whereby Yahoo! paid Activision $100,000. Kotick also owns 21,668 shares of Macromedia, Inc. and serves as a director. In September 2002, Yahoo! and Macromedia entered into an advertising services agreement valued at $75,000. Additionally, Yahoo! and Macromedia entered into an agreement to integrate Macromedia's streaming video services to Yahoo!.

Taken together, these factual allegations do not raise a reasonable doubt that the business ties between Yahoo! and companies that Burkle, Bostock, and Kotick are affiliated with would prevent them from considering a demand independently and "free from extraneous influences." This is so because the complaint fails to establish that Filo and Yang (the only two Insider Defendants still employed at Yahoo!) exercise control over Yahoo! or Yahoo!'s relationship with Unicast, AMG, Activision or Macromedia. Thus, the complaint does not allege sufficient facts to support the inference that Yang or Filo have the authority or ability to cause Yahoo! to terminate its relationships with the companies with which Burkle, Bostock, and Kotick are affiliated. Simply labeling Filo and Yang each "Chief Yahoo" is not enough. Similarly, merely asserting that the agreements were entered into at Filo and Yang's behest without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
**(Cite as: 2004 WL 1728521, \*6 (Del.Ch.))**

factual support is insufficient to meet the particularity requirements of Rule 23.1. [FN28] Moreover, the existence of contractual relationships with companies that directors are affiliated with potentially makes the board's decision more difficult, "but it does not sterilize the board's ability to decide ." [FN29]

> FN28. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) ("Rule 23.1 is not satisfied by conclusory statements or mere *notice pleading* .... What the pleader must set forth are *particularized* factual *statements* that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates."). (emphasis added).

> FN29. *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at \*7 (Del.Ch. June 21, 2000). *See also Beam v. Stewart,* 845 A.2d 1040, 1051 (Del.2003) ("Mere allegations that they [the directors and Insider Defendants] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes.").

The plaintiff also does not assert particularized facts establishing that the business relationships are material to Unicast, AMG, Activision or Macromedia. Merely stating that the agreements between Yahoo! and AMG are "crucial to AMG's continued viability" is not enough. There is no description of the terms of the AMG-Yahoo! agreement. Similarly, the facts alleged do not give rise to the inference that the value of these contracts was material to Activision or Macromedia. Moreover, simply asserting that the contracts increased the value of Kotick's holdings in these companies is insufficient to conclude that Kotick is incapable of considering a demand to pursue litigation against the Insider Defendants or Director Defendants.

### 4. "Acquiescence In" Or "Approval Of" The IPO Allocations

Finally, relying on the second prong of *Aronson,* the plaintiff argues that because the Director Defendants selected Goldman as Yahoo!'s investment banker, certain current board members "knew of and either specifically approved [or acquiesced in] the share allotments of IPOs."

[FN30] This, according to the plaintiff, creates a reasonable doubt that the challenged transactions (the retention of Goldman and receipt of IPOs) are the product of a valid exercise of business judgment. [FN31]

> FN30. Compl. ¶ 27. The plaintiff asserts that because of this, Hippeau, Kern, and Kozel (the only Director Defendants who are still on Yahoo!'s board) are interested for purposes of considering a demand to pursue Count II.

> FN31. The court pauses here to address an issue raised in the plaintiff's complaint that was not addressed in their reply brief. The plaintiff asserts that the allegations of spinning were documented throughout the press since December 2002. *Id.* ¶ 30. The plaintiff asserts that because the current board had knowledge of the IPO allocations and failed to "recover on behalf of Yahoo! for any wrongdoing," the board "has breached its fiduciary duty by acquiescing to the wrongful conduct of the" Insider Defendants. *Id.* In the complaint, the plaintiff asserts that this is a basis to excuse demand as futile. The court disagrees. Demand is not *per se* futile merely because directors would be suing themselves. *Richardson v. Graves,* 1983 WL 21109, at \*3 (Del.Ch. Mar.7, 1983) ("Merely naming all the members of the board is not in and of itself sufficient to excuse demand."). To hold so would eviscerate the demand requirement of Rule 23.1.

**\*7** Assuming *arguendo* that Kern, Hippeau and Kozel, the three Director Defendants who remain on Yahoo!'s current board, are interested and incapable of considering a demand, the remaining five directors (who together constitute a majority) are capable of considering a demand. Directors Semel, Bostock, Burkle, Kotick and Wilson, for example, all joined Yahoo!'s board *after* the Director Defendants allegedly "acquiesced in" or "approved of" the IPO allocations at issue. [FN32] As discussed in greater detail *supra,* directors Semel, Bostock, Burkle, Kotick and Wilson are deemed independent and disinterested for purposes of a demand. The fact that these directors would be asked to consider a demand to pursue litigation against fellow directors does not, standing alone, give rise to a lack of independence, as it is well settled that social and business ties alone do not give rise to a lack of independence. [FN33]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
**(Cite as: 2004 WL 1728521, \*7 (Del.Ch.))**

FN32. Directors Burkle and Wilson joined Yahoo!'s board in November 2001. The complaint does not allege that Burkle or Wilson approved Goldman's retention. Because of this, it is reasonable to infer that the board approved of Goldman's retention for the January 2002 acquisition of HotJobs.com before Burkle and Wilson joined Yahoo!'s board. The remaining three directors all joined Yahoo!'s board in 2003.

FN33. *Orman v. Cullman,* 794 A.2d 5, 27 (Del.Ch.2002) ("The naked assertion of previous business relationships is not enough to overcome the presumption of a director's independence."), *Cal. Pub. Employees Ret. Sys. v. Coulter,* 2002 WL 31888343, at \*9 (Del.Ch. Dec.18, 2002) ("Our cases have determined that personal friendships, without more; outside business relationships, without more; *and approving of or acquiescing in the challenged transactions, without more,* are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment.") (emphasis added).

For these reasons, defendants' motion to dismiss pursuant to Rule 23.1 must be granted.

B. *Motion To Dismiss Count II*

Because the entire complaint is dismissed under Rule 23.1 for failure to comply with the demand pleading requirements, the court does not reach the merits of the separate motion to dismiss Count II of the complaint.

## IV.

For the foregoing reasons, the court finds that the plaintiff does not have standing to pursue this derivative action, as she has not pleaded particularized facts that raise a reasonable doubt as to a majority of the current board's independence and disinterestedness. Therefore, the complaint is DISMISSED. IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 1728521 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 12

**Page   1**

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: 2004 WL 3135516 (Md.Cir.Ct.))

**H**

Maryland Circuit Court,
Howard County.
**David JASINOVER, Plaintiff**
v.
**The ROUSE COMPANY, et al., Defendants.**
No. 13-C-04-59594.

Nov. 4, 2004.

Patrick C. Smith, Esq., Siobhan R. Keenan, Esq., Rubin & Rubin, Chtd., Towson, Matthew M. Houston, Esq., Wechsler Harwood LLP, New York, New York, David Clarke, Esq., Edward S. Scheideman, Esq., Piper Rudnick, Washington, DC.

*MEMORANDUM AND ORDER*

DENNIS M. SWEENEY, Judge.

**I. Introduction**

*1 Before the Court is the Motion of Plaintiff David Jasinover ("Plaintiff") seeking a preliminary injunction enjoining the Defendants from holding a special stockholder meeting on November 9, 2004, where the common stockholders of The Rouse Company ("Rouse") are to vote on a merger agreed to between Rouse and General Growth Properties, Inc. ("GGP"). The parties have fully briefed the issues on an expedited basis, and a hearing was held. This constitutes the Court's ruling.

**II. Statement of the Case**

On August 25, 2004, Plaintiff David Jasinover filed his complaint against Rouse, ten members of its Board of Directors, and GGP. On October 18, 2004, Plaintiff filed what he styled as a First Amended Class Complaint ("Amended Complaint"). In the Amended Complaint, Plaintiff accused the individual Defendants of breaching their fiduciary duties in approving and recommending the merger of Rouse with GGP. Rouse and GGP are cited in the complaint as being either co-conspirators in the breaches or aiding and abetting the breaches. On that same date, Plaintiff also filed a Motion for Temporary Restraining Order or Preliminary Injunction and a Motion for Expedited Discovery.

At a hearing on October 22, 2004, Plaintiff

withdrew his request for a temporary restraining order, and the Court subsequently denied the request for expedited discovery. A briefing schedule was established for the preliminary injunction hearing, and the hearing was held on November 3, 2004. [FN1]

> FN1. Defendants have also moved to dismiss the Amended Complaint. The Court reserves ruling on that. This memorandum is limited to a ruling on an expedited basis on the motion for a preliminary injunction.

**III. Statement of the Facts**

A. Background of the Merger

In early June 2004, Defendant Anthony W. Deering ("Deering")--Rouse's chairman, president and CEO--was approached by the CEO of a company referred to in the Proxy as "Company A"   [FN2], who proposed to Deering that Rouse should consider being acquired by Company A. The CEO of Company A indicated a price range for an acquisition of Rouse. Deering determined that Company A's offer was "unacceptable," and decided to not pursue further discussions with Company A.

> FN2. Potential bidders are referred to in the Proxy Statement by alphabet letters and their actual identities are not publicly disclosed. The parties have not objected to continuing this device in the current litigation.

Later that month, Company A's CEO again approached Defendant Deering, on two separate occasions, and brought up the possibility of a sale transaction between Company A and Rouse. However, in light of the fact that Company A would not increase its price range for the purchase of Rouse, Deering turned down Company A.

Following these discussions with Company A, Rouse engaged two financial advisors, Deutsche Bank and Goldman Sachs, and a legal advisor to assist and advise the Board on "potential strategies for approaching the market and pricing and valuation issues." After these advisors were retained, Defendant Deering, along with other members of Rouse's senior management, instructed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2004 WL 3135516, *1 (Md.Cir.Ct.))

**Page 2**

the Board's financial advisors to contact two possible bidders for the Company--GGP and a company referred to in the Proxy as "Company B". These companies are described as leading publicly traded companies in the retail shopping mall industry. Company A was not contacted to participate in the bidding process. The Proxy statement states that the Board believed that "GGP and Company B were the companies most likely to consummate a transaction within a price range acceptable to Rouse." Rouse also cites the familiarity that these companies had with Rouse which allowed the discussions to proceed quickly and confidentially.

*2 Between July and August 2004, both GGP and Company B conducted limited due diligence and had multiple conversations with Rouse's management team about the possible price range for the Company. During these conversations, Deering indicated that he believed a fair price for Rouse was in the range of $70-$75 per share. Meanwhile, Company B's CEO informed Deering that Company B may be interested in paying as much as $70 per share for Rouse. GGP, on the other hand, informed Deering that GGP's price range for Rouse was $65-$70 per share.

In late July 2004, the Rouse Board resolved to continue exclusive negotiations with GGP and Company B. Company A was not added to the process. In addition, Deering and other members of Rouse's management team determined that August 16, 2004 should be a target date for the completion of the sale process.

In early August 2004, confidentiality agreements were negotiated between Rouse and both GGP and Company B. During the negotiation process, Defendant Deering not only reiterated that $70-$75 per share was indicative of the range of values Rouse might find acceptable, but also informed the bidders that an offer of $75 per share would be considered "preemptive."

On August 12, 2004, Company B's CEO met with Defendant Deering about his concerns over management's August 16, 2004 deadline for the completion of the sale process. Specifically, Company B's CEO advised Deering that, given the size of the transaction and the requirement that the bidder have fully committed financing in place at the

time of executing the acquisition agreement, Company B would not be in a position to enter into a definitive agreement until August 23 or August 24.

Also on August 12, 2004, Deering spoke with GGP's CFO, who advised that GGP could be ready to submit a definitive acquisition proposal as early as August 16, but would not do so without a commitment that Rouse's board would be in a position to respond to its proposal within 12 hours. In addition, GGP's CFO stated that GGP would not submit a mark-up of the draft merger agreement until GGP was informed of the deadline for the submission of bids.

That same evening, counsel for Rouse spoke with Company B's outside counsel to clarify Company B's position concerning timing. Counsel to Company B confirmed that Company B would be in a better position to make an unconditional bid if the bid process were extended for an additional week.

On August 13, 2004, Deering received a telephone call from the CEO of Company A, who evidently had learned that Rouse was considering bids for the purchase of the Company. In the course of that call, Company A's CEO reiterated that Company A remained interested in a possible sale transaction but did not make any proposal with respect to a price range.

That day, counsel to Company B again indicated that Company B would need additional time to be in a position to meet Rouse's price expectations and to deliver an all-cash proposal that was firmly committed with respect to financing. In addition, GGP agreed to deliver a mark-up of the merger agreement to counsel for Rouse on August 15, and further confirmed that GGP could be ready to submit a definitive acquisition proposal as early as August 16, but would not do so without a commitment that the Board would be in a position to respond to its proposal within 12 hours.

*3 In the evening of August 13, 2004, Deering again spoke to the CEO of Company B, who indicated that Company B now believed that it could submit a bid by the morning of August 18, but would not be in a position to execute a definitive agreement until it had completed certain related financing arrangements.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




On August 16, 2004, members of Rouse management had a teleconference with representatives of Rouse's legal and financial team to review the status of discussions with GGP and Company B. Following this discussion, Rouse scheduled a board meeting for August 19, 2004 to discuss proposals from Company B and GGP. In addition, Deering also had a teleconference with the CEO of Company B who informed him that Company B now believed it could be in a position to sign a binding agreement with no financing contingency on August 20.

On August 17, 2004, Deering and other members of his team set a final bid deadline of August 19, and had Rouse's counsel distribute a bid procedures letter to Company B and GGP, which stated that final drafts of their respective merger agreements would be due no later than 4:30 p.m. on August 18 and that bid proposals would be due by 4:30 p.m. on August 19.

On August 18, the chairman of Company B informed Defendant Deering that Company B intended to withdraw from the sale process.

In the afternoon of August 18, the CEO of Company A called Deering, informed him that he was aware that Rouse was in discussions concerning a possible sale of the Company, and again reiterated Company A's interest in acquiring Rouse. Deering offered to provide Company A with drafts of a proposed merger agreement and offered to make management of Rouse available for a meeting with Company A on August 19--the deadline for submission of final bids pursuant to Rouse's bid procedures letter. Company A's CEO also informed one of Rouse's financial advisors that it desired to participate in any process for the sale of Rouse, and indicated that, if Company A were given the same access to information and time for evaluation as other bidders, he believed that Company A might be able to offer a price within the range of approximately $65 to $70 per share.

Also in the afternoon of August 18, counsel to Company B called Rouse's counsel and advised that, although Company B did not intend to submit a bid on August 19, Company B intended to submit a revised draft merger agreement, and further stated that Company B remained firmly committed to a transaction with Rouse.

On August 19, the deadline for submission of final bids, Rouse's counsel distributed forms of draft merger agreements to Company A. In addition, Company B's chairman sent a letter to Deering explaining that Company B would not be submitting a proposal on August 19. The letter read, in part, as follows:

I wanted to call you today to tell you where we are in the offer process but I understand that given the formalities of the process I am required to submit this letter to you....Rouse has developed an impressive portfolio of premier shopping centers and our review over the past weeks has reconfirmed our view that an acquisition of your shopping center business would be an excellent addition to our business ... However, in the short time available to us, we have not been able to get completely comfortable with the land business or how to appropriately value it for purposes of making our offer. It is simply not a business with which we are familiar or which we can properly evaluate on an accelerated time frame.

* * *

**\*4** We have worked day and night over the past several weeks to try to meet your schedule. We told you at the beginning of the process that we were concerned about how short the evaluation period was. Despite our best efforts, the compressed time period for the process and the restriction on talking to investors did not give us the opportunity to get comfortable enough to make an unconditional all cash offer for Rouse today.

I want you and your Board to know that we are still prepared to move forward with an unconditional all cash offer for Rouse after further discussions and, with your approval, the ability to talk to potential investors. We are working with prominent financial institutions and are confident that if we are provided another week, we would be able to make an all cash offer that would deliver a substantial premium to your shareholders.

* * *

Tony, you know that our interest is sincere and that we are very serious. You know that while I have important obligations ... I am prepared to come to New York to meet with you. I hope you and your Board will give us the opportunity we are requesting.

Also on August 19, the CEO of Company A informed Deering and Rouse's counsel that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2004 WL 3135516, *4 (Md.Cir.Ct.))

Company A was interested in making a proposal but could not submit a bid on that day, and needed a range of time, from a few days to a few weeks, to be in a position to submit a bid. Company A requested that Rouse delay the sale process or, at a minimum, limit any termination fee payable under a merger agreement so that Company A would have an opportunity to make an intervening bid.

At approximately 5:00 p.m. on August 19, Defendant Deering informed GGP than, "if GGP had an aggressive and attractive price, Rouse's board would be prepared to act quickly."

Fifteen minutes later, at approximately 5:15 p.m., Company A's CEO sent a letter to Deering indicating that Company A would be willing to work toward a firm proposal to acquire Rouse. The letter read, in part, as follows:

I enjoyed our dinner in June where we discussed our interest in a possible acquisition of The Rouse Company by [Company A]. Unfortunately, as we discussed that evening, your expectations then were, candidly, too high. I now understand that you are conducting an auction for the possible sale of the company. I am sure you agree that it is in your interests and those of your shareholders to obtain the best possible price for the company. To that end, [Company A] should be given a full and fair opportunity to participate. I believe that it would be inappropriate for this auction to not include [Company A].... During our conversation last evening, you mentioned that [Company A] was free to enter a bid for Rouse but that final bids were due this Friday and that any [Company A] bid was required to be fully financed and all cash. We will not be able to, nor do we believe it is reasonable to expect us to be able to, make a bid for Rouse in less than 48 hours, especially when we have not had the opportunity to conduct any financial or legal due diligence, and be on a level playing field with the other participants. However, we are willing to commit immediately to commence due diligence and would expect to be in a position to submit a bid promptly after completion of our work.

*5 We urge that you do not enter into a sale agreement with a third party prior to [Company A] being provided a reasonable opportunity to submit a bid, particularly if, prior to completion of a full auction process, this sale agreement were to provide for a termination or a break-up fee. We

anticipate that any offer made by [Company A] would be all cash, and we are prepared to promptly negotiate a definitive agreement without a financial contingency.

\* \* \*

We believe that a transaction between [Company A] and Rouse is compelling, and most importantly, should produce substantial and immediate value for your shareholders....We have a team in place that is prepared immediately to begin due diligence. I look forward to hearing from you.

At approximately 11:00 p.m. on August 19, GGP delivered a formal bid for Rouse, offering to purchase each outstanding share of Rouse common stock for $67.50 in cash. After being advised by their financial advisors that GGP's offer was fair, from a financial point of view, to the Rouse shareholders, Rouse and GGP executed the merger agreement.

B. The Merger Is Announced

The Rouse/GGP merger was announced on August 20, 2004, when it was reported that Rouse had agreed to merge with GGP in a transaction then valued at $7.22 billion. Pursuant to the merger, Rouse common stockholders will receive $67.50 for each share of Rouse common stock they own.

Subsequent to the announcement of the merger, three lawsuits were filed challenging the fairness of the merger--two in Illinois Chancery Court, where GGP is headquartered, and the present action. All of these actions sought, *inter alia*, to enjoin the merger and require the Rouse Board to uphold their fiduciary duties under Maryland law to the Company's shareholders.

On September 7, 2004, Rouse filed a preliminary proxy statement with the SEC (the "Preliminary Proxy"), where the Company and its Board first disclosed to the public the background of the merger, including the process employed by the Rouse Board that culminated in the execution of the Agreement and Plan of Merger between and among Rouse and GGP dated August 19, 2004 (the "Merger Agreement").

C. Proposed Vote on the Merger

As required by Maryland Law, the merger is being

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
**(Cite as: 2004 WL 3135516, \*5 (Md.Cir.Ct.))**

put to a stockholder vote. Approval of the merger requires the affirmative vote of the holders of at least two-thirds of the outstanding shares of Rouse common stock entitled to vote on the merger. A failure to vote has the same effect as a vote against the merger. The vote is set for the morning of November 9, 2004, in New York. As required by federal law, a Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 ("Proxy" or "Proxy Statement") has been prepared and submitted to the stockholders. It was dated October 8 and mailed to the stockholders on or about October 9,2004. The Rouse Board informed the stockholders that, in the Board's view, the merger is advisable and fair to, and in the best interests of, Rouse and its stockholders, and recommended that stockholders vote for approval of the merger.

**\*6** In the Proxy Statement, the Board summarized its reasons for accepting the GGP proposals as follows:

Our board considered the fact that, of the three companies deemed most likely to be capable of consummating a transaction on terms acceptable to Rouse, only GGP had submitted a firm proposal, while Company A had previously provided price indications below the price proposed by GGP, and Company B had declined to submit a proposal despite having had access to all information furnished to GGP and despite having substantial familiarity with Rouse's retail mall portfolio. Although each of Company A and Company B had requested additional time to evaluate Rouse and to present its best proposal, our board considered that there were significant risks in extending the sale process, including that there was no assurance that Company A or Company B would ultimately present a proposal that was more favorable than GGP's proposal, that GGP could withdraw or reduce its proposal, and that potential bidders might seek to bid jointly, notwithstanding the terms of the confidentiality agreements executed by GGP and Company B, which by their terms precluded joint bids without Rouse's consent.
Proxy Statement, p. 29.

### IV. Standards for a Preliminary Injunction

Maryland courts apply the following four-part test in determining whether to grant a motion for a preliminary injunction:

1. the likelihood that plaintiff will succeed on the merits;

2. whether plaintiff has an adequate remedy at law or will be irreparably harmed if the injunction is not issued;

3. the "balance of convenience," determined by whether the harm to the plaintiff if the injunction is not granted outweighs the harm to the defendant if the injunction is granted; and,

4. the injunction will not harm the public interest.
*Fogle v. H & G Restaurant,* 337 Md. 441, 455-56 (1995) (quoting *DOT., Motor Vehicle Admin. v. Armacost,* 299 Md. 392, 404-05 (1984)); *State Dep't of Health & Mental Hygiene v. Baltimore Cty.,* 281 Md. 548, 554-57 (1977).

As the Court of Appeals made clear in *Lerner v. Lerner,* 306 Md. 771 (1986), a court, when evaluating the above factors, should not view each of them in isolation and require a plaintiff to prove each of them like "a plaintiff in a tort action [must] prove each of the elements of a tort." *Id.* at 776-777. Rather, the court weighs all factors together in deciding whether to grant injunctive relief. Thus, for example, the "importance of probability of success increases as the probability of irreparable injury diminishes." *Id.* at 784. The *Lerner* court termed this test the "balance of hardship test," stating:

Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted.
**\*7** *Id.* at 783.

### V. Likelihood of Success on the Merits

An important factor in calculating whether a preliminary injunction should be granted is whether plaintiff is ultimately likely to succeed on the merits of the claims presented. While there has been no discovery in this case and the complex issues presented deserve a full analysis and consideration on another day, the Court still must make an early prediction as to the likelihood that Plaintiff's legal claims will prevail at the end of the process.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




It is important to focus on precisely what Plaintiff has asserted. Plaintiff "has alleged a breach of fiduciary duty claim that is based, first, in the obligation of candor and, second, in due care, good faith and loyalty." Plaintiff's Renewed Motion, p. 15. Plaintiff divides up the core concerns about lack of candor into three groupings.

**First.** Plaintiff asserts that the Board "ceded all control over the bidding process to Deering and permitted Deering to ensure that his favored bidder, GGP, won the bidding war with Company B". Plaintiff also asserts that the Board does not explain why they did not permit Company B to have additional time to make a firm offer or why Company A was not invited to participate in the final bidding process. The Plaintiff believes that these "failures" to explain violate the Board's duty of candor.

**Second.** Plaintiff also asserts that the Defendants' failure to include in the proxy statement "critical financial information utilized by their financial advisors in their valuation analyses" also violates the duty of candor. The missing information is said to include the "back up" information utilized by Deutsche Bank and Goldman Sachs in reaching their conclusions that the merger was fair to the stockholders from a financial point of view. Plaintiff asserts that the lack of Rouse management's financial projections and forecasts are of specific concern.

**Third.** Plaintiff asserts that there is no explanation as to why two financial advisors were needed, why they were paid what Plaintiff asserts were "high sums", and why the advisor fees were made contingent on the consummation of the merger.

As to Plaintiff's assertion regarding a lack of due care, good faith and loyalty, Plaintiff alleges that the Board ceded decision-making to its Chairman, Deering, that certain Board members had "conflicting loyalties", and that six out of ten directors cannot be considered independent. Plaintiff alleges that the Board "breached its obligations under Maryland law actively to seek and secure the best price reasonably available for the stockholders." Plaintiff's particular assertions revolve around what he sees as the Board ceding to Deering control over the negotiations, the failure to encourage and facilitate bids from Companies A and B, and

informing GGP that as long as its bid was "aggressive and attractive", the Rouse Board would quickly act on it.

At this point, it appears to the Court that Plaintiff will have a very difficult time establishing any omissions of disclosure that will be considered material in the overall context of the actual disclosures made to the stockholders in the Proxy Statement. Each stockholder was sent a 135-page document that contains detailed statements on the background of the merger, the reasons for the merger, the recommendations of the Board, opinions of the financial advisors, interests of certain persons in the merger, merger financing, and litigation relating to the merger. In the section relating to the reasons for the merger, there is an extensive discussion of the general factors relating to the transaction, another section on factors relating to the specific terms of the merger agreement with GGP, and finally a section on potential negative factors relating to the transaction. Among the "negative" factors listed was the following:

**\*8** Two leading publicly traded companies in the retail mall industry asked us to extend the bid process in order to provide them additional time to evaluate Rouse and to submit bids. For the reasons noted above, however, our board believed that there were significant risks with regard to price, certainty and confidentiality in extending the sale process and that to do so would not be in the best interests of our stockholders.
Proxy Statement, p. 31.

Against this background, it is incumbent on the Plaintiff to affirmatively make:
[a] showing of a substantial likelihood that, under all of the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.
*Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (internal citations omitted). See also, *Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170 (Del.2000); *Hudson v. Prime Retail, Inc.,* No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct., Baltimore City, April, 2004).



 

Plaintiff focuses on the fact that the Rouse Board did not obtain bids from Companies A and B prior to reaching an agreement with GGP, and in Plaintiff's view, the Proxy Statement does not adequately explain why this happened. It is this central allegation that permeates all of Plaintiff's other assertions.

Plaintiff's perceptions of the Rouse Board's actions or omissions are colored by his attempts to import selected principles gleaned from Delaware case law and then fashioning them into a template to impose upon Rouse, a Maryland corporation.

Plaintiffs assert that *Revlon v. MacAndrews & Forbes Holdings, Inc,* 506 A.2d 173 (Del.1986) imposes certain so-called "Revlon duties" that require directors to attempt to secure the "best" merger terms available for stockholders after determining that a company will be sold. "The directors must focus on one primary objective, which is to secure the transaction offering the best value reasonably available for the stockholders--and they must exercise their fiduciary duties to further that end." *Paramount Comm. Inc. V. QVC Network,* 637 A.2d 34, 44 (Del.1994). Plaintiff asserts that the Board must act in a neutral manner to encourage the highest possible price for shareholders. *Barkan v. Amsted Indus.,* 567 A.2d 1279, 1286 (Del.1989). In Plaintiff's view, cases such as *Revlon* and *Mills Acquisition Co. v. MacMillian, Inc.,* 559 A.2d 1261 (Del.1989) demand that the Court conduct "rigorous scrutiny" of "disparate treatment" of potential bidders. Plaintiff's Renewed Motion, p. 21. Adopting this view, Plaintiff can find no justification for proceeding to close the transaction with GGP prior to obtaining firm bids from Companies A and B and perhaps shopping Rouse to other potential bidders.

*9 Regardless of whether Plaintiff's rendition of Delaware law is accurate, the fact remains that it is Maryland law that governs a Maryland corporation like Rouse and its Board.

Under Maryland law, the conduct of a company's directors is governed by Section 2-405.1 of the Corporations and Associations Article of the Annotated Code of Maryland. Section 2-405.1(a) states:
A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner he reasonably believes to be in the best interest of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.
Section 2-405.1(b)(1) provides:
In performing his duties, a director is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by ... (ii) a lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence.
"Under the business judgment rule, there is a presumption that directors of a corporation acted in good faith and in the best interest of the corporation." *Wittman v. Crooke,* 120 Md.App. 369, 376 (1998).

A leading commentator on Maryland Corporate Law describes the corporate director's obligation as follows:
In seeking to maximize stockholder value, whether because of a Revlon obligation or not, the directors' actions will be governed by the standard of Section 2-405.1(a). Thus, the board has reasonable latitude in determining how to go about maximizing shareholder value. Even in a change of control, it may be reasonable for a board to enter into an agreement after arm's-length negotiations, rather than "shopping" the company if the board, in good faith and with a reasonable basis, concludes that that process is likely to yield the best price and other terms reasonably available. Indeed a board may favor one bidder over another in various respects if it can be shown that the stockholders' interests would be advanced. However, in a change of control, any process that does not involve some demonstrable market check, even post agreement, may be difficult to uphold.
A director's acts in connection with the foregoing are "presumed to satisfy the standards" established by Section 2-405.1(a), and "may not be subject to a higher duty of greater scrutiny than is applied to any other act of a director." [quoting Section 2-405.1(f) ]
James J. Hanks, Jr., Maryland Corporation Law Sec.6.6(b) (2003 Supplement) (footnotes omitted).

Maryland law is less restrictive than the view of Delaware law that Plaintiff espouses. Maryland does

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 3135516, *9 (Md.Cir.Ct.))

Page 8

not require an auction when the decision is made to sell a corporation. There is no requirement that the Board fully shop the company to multiple bidders and have a so-called "level playing field" for all bidders. There will be a need to market-check or test the Board's decision, but the Board is free to lock up an attractive deal and use post-agreement methods to do so.

*10 It should also be noted that a more nuanced reading of Delaware law than Plaintiff has presented would show that this transaction is within the range of the types of transactions that would likely be approved, even for a Delaware corporation. While *Revlon* requires a board to get the best short-term price for stockholders in a sale of control, *Revlon,* 506 A.2d at 182, it "does not demand that every change in control of a Delaware corporation be preceded by a heated bidding contest." [FN3] *Barkan v. Amsted Indus., Inc.* 567 A.2d 1279, 1286 (Del.1989). The Delaware Supreme Court has held that a board can fulfill its duty to obtain the best transaction reasonably available by entering into a merger agreement with a single bidder, establishing a "floor" for the transaction, and then testing the transaction with a post-agreement market check. *Id.* at 1287; see also *In re MONY Group Inc. Shareholder Litigation,* 852 A.2d 9, 19(Del Ch.2004).

> FN3. There can be many compelling reasons why a company would choose not to pursue a public auction or active solicitation process. *In re MONY Group, Inc. Shareholder Litigation,* 852 A.2d 9, 19 (De. Ch.2004) presents a cautionary tale about the failed public auction of Allmerica Financial that would give pause to any board considering such a process.

Even applying the so-called enhanced judicial scrutiny test, the Delaware courts have acknowledged that there are many business and financial considerations implicated in investigating and selecting the best value reasonably available and that the board, the corporate decision-making body, is best equipped to make these judgments. *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 45 (Del.1994).

Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made **a reasonable** decision, not **a perfect** decision. If a board selected one of several

reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination.

*Id.* (emphasis in original). See also, *In re MONY Group Inc.,* 852 A.2d at 20.

It appears that the Rouse Board or its agents made a decision to talk at various points to Company A, Company B and GGP before consummating a deal with GGP. It did not treat them all the same, but there is no indication that the actions taken were not reasonable. At some point, the Board made the decision to tell GGP that the Board could act quickly if GGP could present an "aggressive and attractive" price. It was the Board's determination that GGP had met the mark set, and it agreed to consummate the deal. This may not have been the "perfect deal" or even the "best deal", but there is no indication of record that it was not a "reasonable deal". Under Maryland law, no more is demanded, and this Court should not second-guess the determination by interposing an injunction that prevents the stockholders from rendering their own verdict on the Board's methods and ultimate judgment.

There can be no complaint that Rouse did not market-check the deal. Its negotiations with Companies A and B, although not pushed to final bids, gave it a realistic sense of where the market was. It confirmed this with the opinions of its financial advisors that are fully set out in the Proxy Statement. As noted below in Part VI, the market response after the announcement of the deal also gave some sense of how on-target the deal was. Finally, the deal was consummated with a "fiduciary out" provision which allows Rouse to terminate the agreement and accept a superior bid from another suitor. A "break up" or termination fee of up to $155 million and up to $25 million in expense reimbursement would have to be paid to GGP in that instance. The Board received advice from both its financial and legal advisors that the size of the fee, given the size of the overall transaction, should not preclude another party from making a competing proposal. Counsel for Defendants calculates that the size of the fee in this case to be 2.5 percent and "is squarely within the range [2% to 4%] that has been approved by the courts", even those applying "heightened scrutiny" under *Revlon* . Counsel for Defendants also represented at argument before the Court that there have not been other bidders coming

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 3135516, *10 (Md.Cir.Ct.))

forward with new proposals or bids since the August announcement of the deal. The Court has no reason upon this record to conclude that this post-agreement market check, together with the other steps taken, is not sufficient to satisfy Maryland law requirements.

**\*11** With an understanding of the legal standard that applies to a sale of a corporation in Maryland, it becomes easier to assess what is required to be disclosed to the stockholders so that they are able to make an informed decision. The focus is on what the Board has recommended, not what is the "best" theoretical deal or whether other possible bidders were treated differentially from the successful bidder. Stated another way, the emphasis is on what the Board actually did, not what it could have done had it traveled a different road.

Such "why" questions about decisions not to pursue other possible options are generally not material, even under Delaware's enhanced scrutiny standard. *In re Lukens, Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del. Ch.1999). With this understood, it becomes clear under the less restrictive Maryland law that the answers to the "why" questions posed by the Plaintiff about not providing a "level playing field" to Companies A and B are not material to the issue of whether the stockholders should vote "yes" or "no" on November 9 on the GGP/Rouse merger.

Plaintiff makes a stab at asserting that the Rouse Board ceded decision-making to Deering, that some Board members had conflicting loyalties, and that some directors should not be viewed as independent. Again, Plaintiff relies on the Proxy Statement itself to support the allegations, and alleges no new facts not disclosed that show any abdication or lack of loyalty. To enter an injunction at this stage, it should be clear to the Court that the conflicts are "of a sufficiently material importance" that it is "improbable that the director could perform her fiduciary duties." *In re General Motors Class H Shareholders Litigation*, 734 A.2d 611, 617 (Del. Ch.1999). The Court has not found that to be the case here, based on the facts currently before the Court.

As Defendants point out, this is not a case where the board members are entrenching themselves against a hostile take-over and where one can be reasonably suspicious of their motives for clinging

to their positions or benefits. Here, they are putting themselves out of jobs, and while they will profit handsomely from their ownership of stocks, this profit will be of the kind experienced by other stockholders. To the extent there is any variance, it has been adequately disclosed in the Proxy Statement, particularly in the section dealing with potential conflicts. On the record before this Court, there is no disabling conflict or shift of loyalty shown that at this stage would cause the Court to halt the stockholders from expressing their views on the Board's recommendation.

Plaintiff has also asserted that the Defendants have failed to provide sufficient financial detail utilized by the financial advisors. Defendants have demonstrated that the "discounted cash flow" analysis done by Deutsche Bank (pp.35-36 of the Proxy Statement) and by Goldman Sachs (p.41 of the Proxy Statement) disclose the time period used, the range of capitalization rates used to calculate the "terminal value" at the end of the period, the range of "discount rates" used to calculate the range of "present values" and, most importantly, the range of "present values" derived from the analysis ($51.06 to $70.26 per share in Deutsche Bank's analysis and $50.42 to $62.63 in Goldman Sach's analysis).

**\*12** Additionally, in the analysis done by each advisor, they compare Rouse to a number of similar companies and the proposed transaction between Rouse and GGP to a number of similar transactions. See pp. 33-35, 38-39 and 40-41 of the Proxy Statement. All of the companies deemed similar are identified by name; all transactions deemed similar are identified by both name of acquirer and name of target; the ranges of various financial characteristics of the similar companies are presented; and finally, the ranges of premiums paid in similar transactions are presented. Labeling these analyses as inadequate to meet minimum disclosure standards is a hard task, and Plaintiff retreats to asserting that the "discounted cash flows" are defective in that they do not contain the confidential internal Rouse projections upon which they are based. In the context of what was disclosed, the Court does not find this to be a sufficient basis to say that the Proxy Statement does not meet the disclosure requirements. *MacMillian v. Intercargo Corp.*, 1999 WL 288128 at \*6 (Del Ch. May 3, 1999).

Plaintiff has submitted the affidavits of two experts,





Not Reported in A.2d
(Cite as: 2004 WL 3135516, *12 (Md.Cir.Ct.))

M. Travis Keath and Candace Preston, to support his allegation that additional financial data should be disclosed to allow a fair evaluation. These experts have examined the proxy statement and the opinions of Deutsche Bank and Goldman Sachs. They are critical of the methodology used by the advisors and assert that there are "errors" in certain statements made in their analyses. While it is true that certain minor errors were made, such as a misstatement of dates, none of these appear at this time to be ones that materially alter the financial advisors' conclusions or affect their opinions. Plaintiff's experts are free to be critical of the financial advisors and provide their own opinion and perspective. However, at this stage, the Keath and Preston affidavits do not convince this Court that fuller disclosure of financial information is required to adequately advise the stockholders prior to a vote.

Finally, Plaintiff is critical of the Defendants for employing two financial advisors, paying them "high sums", and having part of their compensation contingent on the deal closing. Plaintiff wants to know "why" this happened. It is hard to see how Defendants have not been candid about this, since the information Plaintiff relies on was gleaned from the Proxy Statement itself, a sign certainly that the information was adequately disclosed and is fairly before the stockholders for a vote.

Plaintiff presents no credible basis for this Court to conclude that the size of the fee and its contingent nature are out of normal bounds and a ground for finding that Defendants breached their duty of care. In *Wittman v. Crooke,* 120 Md.App. 369 (1998), the Court of Special Appeals was undisturbed by Goldman Sachs & Co., the financial advisor to Baltimore Gas and Electric Company, receiving $8,500,000.00 more by recommending a merger to a board than by advising against it. *Id.* at 378.

*13 It is ironic that Plaintiff chastises Defendants for employing two financial advisors instead of one. Had Defendants employed only one advisor and obtained only a single fairness opinion, it can be fairly assumed that Plaintiff would then have viewed that effort as insufficient and a dereliction of Defendants' duties for failing to obtain a second opinion.

At this juncture, it appears to the Court that Plaintiff has a low probability of being able to

prevail on the merits of the claims he presses in his preliminary injunction motion. This conclusion would require Plaintiff, in the preliminary injunction calculus, to make a very strong showing that he will experience harm that will outweigh any harm to the Defendants or public interest concerns.

## VI. Harm to the Plaintiff

Plaintiff articulates three types of harm that he will experience if the preliminary injunction is not granted. First, Plaintiff states that he will be prevented from casting a "fully informed vote" at the shareholder meeting, a right he characterizes as the "most powerful right that a shareholder possesses". Second, Plaintiff asserts that he will be prejudiced if the vote proceeds since he will not receive the maximum shareholder value if the merger is approved because other bidders, Companies A and B, were not allowed to bid on a "level playing field". Finally, Plaintiff asserts that without a preliminary injunction, he "will forever lose [his] ability to participate in the growth of Rouse as a private company."

Plaintiff's personal ability to vote in an informed manner hardly seems at genuine issue. He and his experts have deconstructed and mined the Proxy Statement to expose what they believe are the inadequacies of the deal and what they believe to be the derelictions of the Board. It is hard to believe that any further disclosure will change or alter the vote Plaintiff will cast on the present proposal.

Plaintiff also claims that he will not receive "maximum shareholder value" because other companies such as A and B did not have a "level playing field". As demonstrated above, there is no "level playing field" test in Maryland and no requirement to conduct an auction. In any event, Plaintiff's logic deserts him here since it is mere speculation that "A" or "B" or any other entity will present a bid that is superior to that of GGP if an injunction is granted. The record before the Court discloses no company that has stepped forward since the August announcement to challenge the value or make another offer. Defendants note that the first trading day after the transaction was announced, the stock of GGP lost almost five percent of its value, a clear indicator to them that the market believed that GGP was paying full value to Rouse stockholders. Defendants also note that Rouse stock has been





Not Reported in A.2d                                                    **Page 11**
(Cite as: 2004 WL 3135516, *13 (Md.Cir.Ct.))

trading at approximately a dollar per share below the $67.50, which Defendants read as a further indicator that the market thinks that Rouse was appropriately valued. While one can argue with Defendants' conclusions, they are based on some factual predicate which distinguishes them from Plaintiff's assertions that unknown bidders are eagerly waiting in the wings to offer more money on similar or better terms. Simply put, the Court can put no weight on Plaintiff's assertion that if an injunction is granted, he and the other stockholders will be assured of a bigger payoff.

**\*14** Plaintiff's assertion that he will not be allowed to continue in the future growth of Rouse also makes factual assumptions that are simply missing from this record. While Plaintiff's ability to continue as a Rouse stockholder and avoid the currently-set vote may be something he has a personal interest in, it has only the weight of a feather in the weighing process that this Court must conduct.

Plaintiff attempts in his motion to bootstrap the harm he alleges to himself to also apply to the entire class of stockholders of Rouse. However, Plaintiff has not requested by motion that the class be certified under Rule 2-231(c), and at this stage, he represents only his personal interest.

To the extent that Plaintiff raises issues that would be important and serious regarding deprivation of the stockholder rights of others, the Court could more appropriately factor those concerns into its consideration of the overall public interest, another factor to consider in whether to grant or deny a preliminary injunction. The Court will do so below.

### VII. Balance of Convenience and Equities

Plaintiff's personal interests as described above must be balanced against those that may be suffered by Defendants if an injunction is granted. Enjoining the vote will at a minimum cause delay and disruption in the completion of the transaction. There are obvious transactional costs in re-doing the stockholder vote that are clearly substantial in a publicly-traded company with a great number of stockholders. As Defendants note, on the premium alone, each day of delay in closing the transaction costs the stockholders of Rouse approximately $50,000.00 for each percentage point of interest

they could be earning if they had the money. Finally, Defendants assert that under the terms of the deal with GGP, entry of a court order may provide an opening, if other contingencies occur, for GGP to withdraw from the transaction, which would deprive Rouse and its stockholders of the premium altogether.

If Plaintiff's demonstrable immediate harm were more certain and less nebulous, the Court would have something to add to the balance that might begin to move the scales. At this point, the Court discerns little weight this Plaintiff can provide. The balance is decisively in Defendants' favor.

### VIII. Public Interest

This is the place, in this Court's view, where the interest of the stockholders of this publicly-held corporation who are not parties should be considered. They obviously have an interest at stake in the Court's determination. Plaintiff clearly sees himself as pursuing the interest of all shareholders even though the Court has not established the case as a class action. Regardless, the Court should factor into its consideration how its decision would affect the other stockholders not represented in the action.

While the Proxy Statement may not be perfect or as detailed as the Plaintiff would like, it appears at this stage to put before the stockholders the salient issues they should consider when they vote on November 9th. If the merger is approved, they would become entitled to receive the 32% premium. There is no guarantee that the adverse contingencies that could come about from delay will not occur.

**\*15** While the Court must protect stockholder rights from illegal actions by an unfaithful or less than diligent Board, the Court must also carefully weigh whether judicial intervention into corporate affairs is wise. The admonition that applies to physicians deciding to treat a patient is perhaps also appropriate here: "First, do no harm." The Court is not at all convinced that Plaintiff has demonstrated that judicial intervention here would advance the interests espoused by Maryland corporate law or serve the best interests of Rouse stockholders.

A similar sentiment was articulated in an opinion by the Court of Chancery of Delaware in denying a preliminary injunction to prevent the closing of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




tender offer:
[T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of a untoward financial result from the stockholders' point of view is small. Repeatedly the plaintiffs' class action bar exhorts the court to bravely risk the consequences in circumstances such as these, asserting that more money to the shareholders, not less, will probably result. At least on facts such as these, a due respect for the interests of the class on whose behalf these exhortations are made, requires, in my judgment, that this invitation be declined.
*Solash v. Telex Corporation,* 1988 WL 3587 at *13 (Del. Ch), 13 Del.J.Corp.L. 1250, 1269 (January 19, 1988).

For the same reasons, the Court will for now decline Plaintiff's suggestion that judicial intervention would be in the public interest.

### IX. Plaintiff's Ability to Post a Bond

Plaintiff acknowledges that a bond by the moving party is envisioned if a preliminary injunction is granted, Maryland Rule 15-503, but Plaintiff asserts that the Court may in the appropriate case either dispense with requiring any bond or require at most a nominal bond. An affidavit from the Plaintiff asserts that a bond in excess of $10,000.00 would not be able to be posted. Jasinover Affidavit, paragraph 4. While acknowledging that the Court has considerable discretion in the matter of bond, Maryland Rule 15-503(c), Defendants vehemently argue that a substantial bond should be required if injunctive relief is granted, since delaying the stockholders' vote and the closing of the transaction could cost significant economic harm to the Defendants and to other non-party stockholders, and could in fact in some circumstances allow Defendant GGP to withdraw from the transaction under the terms of the merger agreement. Defendants assert that in a worst case scenario, the harm could reach the amount of $12.6 Billion Dollars, the total value of the transaction or, alternatively, at least the value of the premium offered by GGP, $1.8 billion. Were the Court otherwise persuaded to enter the relief

suggested by Plaintiff, the Court believes some substantial bond would be necessary to be posted to protect the Defendants in the event Plaintiff is not ultimately able to prevail. While Defendants' suggestion of a multi-billion dollar bond may be excessive and inflated by hyperbole, a bond in some lesser amount, but certainly in the millions of dollars, would likely be in order. Since Plaintiff has candidly indicated the upper limits of his ability to post bond and since that limit is patently inadequate, this factor alone becomes another reason why Plaintiff cannot prevail on the motion.

### X. Conclusion

*16 Plaintiff has suggested that an injunction should be granted now before it is "impossible to unscramble the eggs" after the vote, citing *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 728 (Del. Ch.1999). While this sentiment is on target in some cases, it is not on the facts currently before the Court. On these facts, the Rouse stockholders should be given the "eggs", and they can be trusted to make a sufficiently-informed decision whether to scramble them now or put them safely back in the refrigerator for another day.

Weighing and balancing the factors applicable to granting a preliminary judgment, this Court is firmly convinced that a preliminary injunction should not be granted. For these reasons, it is, this *4th* day of November, 2004,

ORDERED, that Plaintiff's Motion for Preliminary Injunction is denied.

Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




# TAB 13

Slip Copy
Slip Copy, 2005 WL 2989343 (D.Md.)
**(Cite as: 2005 WL 2989343 (D.Md.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Maryland.
**JOLLY ROGER FUND LP, et. al, Plaintiffs,**
v.
**SIZELER PROPERTY INVESTORS, INC., et
al., Defendants.
No. Civ. RDB 05-841.**

Nov. 3, 2005.
Glenn Edward Mintzer, H. Russell Smouse, Law
Offices of Peter G. Angelos, Baltimore, MD, for
Plaintiffs.

Mark D. Gately, Mark Spencer Saudek, Hogan and
Hartson LLP, Baltimore, MD, for Defendants.

*MEMORANDUM OPINION*

BENNETT, J.

*1 Pending before the Court is the Motion to
Dismiss filed by Defendants Sizeler Property
Investors ("Sizeler") and its nine directors [FN1]
("Directors") (collectively the "Defendants").
Defendants move to dismiss the Complaint filed, on
March 28, 2005, by Plaintiffs Jolly Roger Fund LP
and Jolly Roger Offshore Fund, Ltd., on behalf of a
proposed class of all Sizeler common stockholders,
(collectively the "Plaintiffs") based on Rule 12(b)(6)
of the Federal Rules of Civil Procedure.

> FN1. These Directors are: J. Terrell Brown; William
> G. Byrnes; Harold B. Judell; Sidney W. Lassen;
> Thomas A. Masilla Jr.; James W. McFarland;
> Richard L. Pearlstone; James Robert Peltier; and
> Theodore Strauss. (Com pl.¶¶ 10-18.)

Sizeler is a self-managed real estate investment trust
("REIT") incorporated in Maryland with its
principal place of business in Kenner, Louisiana.
(Compl.¶ 9.) Sizeler, which is publically traded on
the New York Stock Exchange ("NYSE") under the
symbol "SIZ", owns and manages income-producing
apartment and shopping center properties in the
southeastern United States. (Compl.¶ 9.) Plaintiffs
were holders of Sizeler common stock as of the
close of trading on March 14, 2005. [FN2] (Compl.

¶ 8.) It is unclear whether Plaintiffs were Sizeler
shareholders at the time this lawsuit was filed.

> FN2. Although Plaintiffs do not specifically allege in
> which state they reside, they allege that this dispute
> is between citizens of different states and that the
> amount in controversy exceeds $75,000. (Compl.¶
> 5.)

Plaintiffs allege, in a one count Complaint, a direct
suit against Sizeler and its Directors for breach of
their fiduciary duties "to Sizeler's outside common
shareholders." (Compl.¶ 1.) Specifically, Plaintiffs
allege that their stock holdings were diluted when
Defendants sold 2.69 million newly issued Sizeler
shares to four institutional investors [FN3] at a
discounted price. Defendants assert that this claim
must be dismissed, as it cannot be a direct action
[FN4] by the shareholders against the Directors, but
instead must be a derivative action [FN5] brought
by the shareholders on Sizeler's behalf. Defendants,
however, contend that Plaintiffs have failed to
satisfy the legal prerequisites necessary to pursue a
derivative action and, therefore, any derivative
claim must also be dismissed.

> FN3. The institutional investors included TIAA-
> CREF Investment Management, LLC, Heitman Real
> Estate Securities, Inc., RREEF America, L.L.C.,
> and Palisade Capital management LLC.

> FN4. "A 'direct' action is a claim asserted by a
> shareholder, individually, against a corporate
> fiduciary, such as a director, to redress an injury
> personal to the shareholder." *Paskowitz v.
> Wohlstadter,* 151 Md.App. 1, 9, 822 A.2d 1272,
> 1276 (2003) (applying Delaware law).

> FN5. "A 'derivative' action is a claim asserted by a
> shareholder plaintiff on behalf of the corporation to
> redress a wrong against the corporation." *See id.*

The issues have been fully briefed and no hearing is
necessary on this motion. *See* Local Rule 105.6
(D.Md.2004). For the reasons stated below, the
Defendants' Motion to Dismiss is GRANTED.

*BACKGROUND*
For the purposes of this Rule 12(b)(6) motion, the
Court accepts all well-pleaded allegations contained
in Plaintiffs' Complaint as true and construes them

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





in the light most favorable to the Plaintiffs. *See Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). Plaintiffs allege that Sizeler's Board of Directors implemented a plan to entrench themselves in anticipation of a proxy contest after First Union Real Estate Equity & Mortgage Investments ("First Union") [FN6] began to solicit proxies. (Compl.¶ 3.) First Union is the single largest stockholder of Sizeler, having acquired a substantial amount of its shares starting in the Fall of 2004 as detailed below. (Compl.¶ 26.) On September 8, 2004, First Union filed with the United States Securities and Exchange Commission ("SEC"), on Form 13D, a general statement of acquisition of beneficial ownership as notification that it had become a beneficial owner of 5.07% of Sizeler stock. (Compl.¶ 27.) On November 16, 2004, and December 6, 2004, First Union amended its 13D filing to disclose that it has increased its ownership interest to 7.7% and 8.46%, respectively. (Compl. ¶¶ 28 & 29.) On or about December 21, 2004, First Union notified Sizeler of its intention to nominate Michael L. Ashner and Peter Braveman, both directors and trustees of First Union, as well as Steven Zalkind to Sizeler's Board of Directors. (Compl. ¶ 30.) First Union continued to acquire additional shares of Sizeler and filed a series of amended Form 13D disclosures with the SEC. (Compl. ¶¶ 31 & 32.) In its February 23, 2005 SEC filing, First Union disclosed that it had sent a letter to Sizeler shareholders proposing a slate of directors, and indicating that if its slate was elected, it intended to have Mr. Lassen removed as Chairman and Chief Executive Officer ("CEO") of Sizeler. (Compl.¶ 33.) First Union's last amended Form 13D filing was made on March 9, 2005 and it disclosed that First Union had a 9.9% ownership interest in Sizeler. (Compl. ¶ 34.)

FN6. In a related suit, on March 15, 2005, Sizeler and its Directors filed a Complaint in this Court against its largest shareholder, First Union. *See Sizeler Property Investors, Inc., et. al v. First Union Real Estate Equity & Mortgage Investments,* RDB 05-718. In its Complaint, Sizeler asked for a declaratory judgment that, pursuant to Maryland law, Sizeler's Directors did not breach their fiduciary duties with respect to the placement of additional Sizeler shares, which was allegedly part of a longstanding corporate plan. This action, which also alleged a violation of the federal securities laws and contained a counter-claim, was resolved by the parties and an Order approving a stipulation of

dismissal with prejudice was entered by this Court on September 13, 2005.

*2 As indicated above, *supra* at n. 1, Sizeler has nine directors. All but two of Sizeler's directors are outside directors, meaning that they are not Sizeler executives or employees. In addition to acting as directors, Mr. Lassen is Sizeler's CEO and Mr. Masilla is Sizeler's President and Chief Operating Officer. (Compl. ¶¶ 13 & 14.) On March 14, 2005, after the NYSE closed at 4:00 p.m. and without prior disclosure to the public, [FN7] Defendants entered into a transaction to sell 2.649 million shares of newly issued Sizeler common stock to four large institutional investors at $10.75 per share. (Compl.¶ 36.) Sizeler's stock closed at $12.10 that day, but the sale price used for the transaction with the institutional investors was discounted by $1.35 a share. (Compl.¶ 36.) Plaintiffs' Complaint does not specify which Directors voted in favor of this transaction. On March 15, 2005, Sizeler issued a press release announcing the sale and, on March 17, 2005, it filed an amended 10-K disclosing the transaction. (Compl.¶ 37.) On the day Sizeler announced the stock sale, First Union sent a letter to Sizeler offering to purchase all of the offered shares for $11.25 per share. (Compl.¶ 38.)

FN7. A 10-K filed by Sizeler earlier the same day did not mention a new stock offering. (Compl.¶ 35.)

Plaintiffs allege that the Directors violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. [FN8] by violating their duty of good faith. (Compl.¶ 49.) Furthermore, Plaintiffs allege that the Directors acted in their own self-interest because the stock sale was an effort to entrench themselves as Directors in response to First Union's proxy battle. (Compl.¶ 50.) Plaintiffs allege that "Defendants' violations of law set forth herein adversely affected Plaintiffs and the Class' ownership interest in Sizeler by diluting the respective proportions of equity." (Compl.¶ 54.) The Complaint does not allege that Plaintiffs had a controlling interest in Sizeler that was negatively impacted by the dilution caused by the stock sale. Nor does the Complaint specifically state whether the alleged injury caused by the "dilution" was to the Class' voting rights or to the value of its Sizeler shares, or an injury for both.

FN8. Section 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. states:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

### STANDARD OF REVIEW

Defendants seek to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As the legal sufficiency of the complaint is challenged under a Rule 12(b)(6) motion, the court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ). A Rule 12(b)(6) motion to dismiss "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325 (4th Cir.2001). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal,* 248 F.3d at 325-26; *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

**\*3** In reviewing the complaint, the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra,* 120 F.3d at 473; *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969). However, in considering a motion to dismiss, the court "need not accept as true

unwarranted inferences, unreasonable conclusions, or arguments" nor "the legal conclusions drawn from the facts." *Eastern Shore Mkts., Inc.,* 213 F.3d at 180; *see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,* 329 F.Supp.2d 574, 578 (D.Md.2004).

### DISCUSSION

This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. As the source of this Court's jurisdiction over this case is based on diversity, the principles set forth in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) require application of the law of Maryland to questions of substantive law. [FN9] With respect to corporate governance issues, Maryland courts often look to Delaware caselaw. [FN10] Accordingly, this Court's analysis must be guided by Maryland law, but will make reference to Delaware law in the absence of applicable Maryland law.

> FN9. Sizeler is a Maryland corporation and the parties both apply Maryland law in their submissions to this Court.

> FN10. Delaware courts are frequently recognized for their expertise on corporate law issues. *See generally Werbowsky,* 362 Md. at 618, 766 A.2d at 143 (noting respect properly accorded Delaware decisions on corporate law); Lisa M. Fairfax, *Spare the Rod, Spoil the Director? Revitalizing Director's Fiduciary Duty Through Legal Liability,* 42 Hous. L.Rev. 393, 405 n. 63 (2005); E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004, A Retrospective on Some Key Developments,* 153 U. Pa. L.Rev. 1399, 1403 (2005) ; Patty M. DeGaetano, Comment, *The Shareholder Direct Access Teeter-Totter: Will Increased Shareholder Voice in the Director Nomination Process Protect Investors?,* 41 Cal. W.L.Rev. 361, 376 (2005) ( "Delaware is well known as the most important state for purposes of corporate law because not only are a majority of public companies incorporated there, other states look to Delaware corporate law for guidance.").

"The decision whether a suit is direct or derivative may be outcome-determinative." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1036 (Del.2004) (noting that the distinction between

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




a direct suit and a derivative one is sometimes difficult, but has many legal consequences). For example, if a suit is derivative the shareholder must make demand on the company's board of directors, absent a showing of demand futility, requesting that the board pursue the suit on behalf of the company, before the shareholder is permitted to pursue the cause of action. *See id.* (discussing Delaware law); *Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (Md.2001) (recognizing demand requirement under Maryland law); Fed. R. Civ. Pro. 23.1. Even when a stockholder can properly pursue a derivative action on behalf of a corporation, any damages recovered must go to the corporation and not the stockholder plaintiff. This result is because a derivative action is brought by the shareholder *on behalf of the corporation* to redress a wrong against the corporation. *See Paskowitz v. Wohlstadter,* 151 Md.App. 1, 10, 822 A.2d 1272, 1276 (Md.Ct.Spec.App.2003) (applying Delaware law). "The defendant in a derivative action may be a corporate fiduciary, such as a director, who committed a wrong against the corporation." *Id.* In contrast, a " 'direct action' is a claim asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an injury personal to the shareholder." *Id.* Damages recovered in a direct action are payable individually to the shareholder, not to the corporation, because the claimed injury is to the shareholder, and therefore the remedy must address this individual injury. *See id.*

### A. *Whether Plaintiffs' Complaint is Properly a Direct Suit*

**\*4** The Plaintiffs assert that this action is brought directly by shareholders against Sizeler and its Directors for breach of fiduciary duty. Defendants assert that the allegations in Plaintiffs' Complaint cannot be brought as a direct claim. "Whether a claim is derivative or direct is not a function of the label the plaintiff gives it." *Paskowitz,* 151 Md.App. at 10, 822 A.2d at 1277. A court must generally look to the nature of the action, as it is stated in the complaint, to determine whether a cause of action is derivative or direct. *See id.* (internal citations omitted); *see also Tooley,* 845 A.2d at 1039. Unlike the neighboring Supreme Court of Delaware, which recently established a new test to examine this issue, the Maryland Court of Appeals has not recently had the opportunity to

clearly articulate what test should be applied to determine whether a shareholder claim is direct or derivative. *But see Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (Md.1946) (discussed in detail below).

In *Tooley,* the Supreme Court of Delaware held that to determine whether a stockholder's claim is derivative or direct the "issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley,* 845 A.2d at 1033. To bring a direct suit, "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id.* at 1039; *see also Tafflin v. Levitt,* 92 Md.App. 375, 381, 608 A.2d 817, 820 (Md.Ct.Spec.App.1992) (finding that individual action by depositor was not permissible where the injury was incidental and not distinct from injury to institution). To show such an injury, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* The framework outlined in *Tooley* is instructive on the issues presented to this Court.

### 1. *Maryland Fiduciary Duty Obligations*

The parties take opposite views on what both characterize as "well-settled" Maryland law outlining the fiduciary duties owed by directors of a corporation and the resulting causes of actions that can stem from a possible breach of these duties. Plaintiffs state that, under Maryland law, a director owes fiduciary duties, not only to the corporation, but also to the corporation's shareholders. As a result, Plaintiffs argue, that breaches of these fiduciary duties may result in a direct action by the corporation's shareholders. Defendants assert that, pursuant to Maryland law, a stockholder may only pursue a derivative cause of action on behalf of the corporation for breach of fiduciary duty.

As noted above, Plaintiffs allege that Defendants violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. Recently, the Maryland Court of Appeals conducted a detailed discussion of derivative shareholder actions in *Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (Md.2001). In doing so, the court explained that § 2-405.1(a) of Md. Corp.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Slip Copy
(Cite as: 2005 WL 2989343, *4 (D.Md.))

Page   5

& Ass'ns Code Ann., the very provision that
Plaintiffs in this case claim was violated, acts as a
check to the directors' managerial authority by
requiring them to perform their duties in good faith.
*Werbowsky,* 362 Md. at 598-99, 766 A.2d at 133.
The court specifically stated that the directors'
obligations under this provision "run[ ], however, to
the corporation and *not, at least directly, to the
shareholders.*" *Id.* (emphasis added).

*5 In *Waller,* the Maryland Court of Appeals
stated: "It is generally stated that directors occupy a
fiduciary relation to the corporation and all its
stockholders, but they are not trustees for the
individual stockholders." *Waller,* 187 Md. at 194,
49 A.2d at 454. [FN11] The Court further noted
that "[t]he reason for this distinction is that in law
the corporation has a separate existence as a distinct
person, in which all the corporate property is vested
and to which the directors are responsible for a strict
and faithful discharge of their duty, *but there is no
legal privity or immediate connection between the
directors and the individual stockholders.*" *Id.*
(emphasis added). The court went onto hold that
"[w]here directors commit a breach of trust, they are
liable to the corporation, not to its creditors or
stockholders, and any damages recovered are assets
of the corporation, and the equities of the creditors
and stockholders are sought and obtained through
the medium of the corporate entity." *Waller,* 187
Md. at 190, 49 A.2d at 452.

FN11. The Maryland Court of Appeals made a
similar statement in *Toner v. Baltimore Envelope
Co.,* 304 Md. 256, 498 A.2d 642 (Md.1985), which
dealt with a dispute involving a closely held
corporation, not a publicly, exchange-traded one like
Sizeler. *Toner,* 304 Md. at 268, 498 A.2d at 648.
Furthermore, *Toner* focused on the relationship
between majority and minority shareholders, not
directors and shareholders. *Toner,* 304 Md. at 273,
498 A.2d at 650.

In *Waller* the plaintiff claimed that several officers
and directors were conspiring to obtain control of
the company and destroy the value of his stock. In
that case, the Court of Appeals held that "an action
at law to recover damages for an injury to a
corporation can be brought only in the name of the
corporation itself acting through its directors, and
not by an individual stockholder though the injury
may incidentally result in *diminishing or destroying*

*the value of the stock.*" *Waller,* 187 Md. at 189, 49
A.2d at 452 (emphasis added). This holding in
*Waller* is "applicable even when the wrongful acts
were done maliciously with intent to injure a
particular stockholder." *Danielewicz v. Arnold,* 137
Md.App. 601, 617, 769 A.2d 274, 283 (2001).
[FN12]

FN12. *Waller* does recognize that certain types of
actions may be brought by a shareholder directly.
"[U]nquestionably[,] a stockholder may bring suit in
his own name to recover damages from an officer of
a corporation for acts which are violations of a duty
arising from contract or otherwise and owing directly
from the officer to the injured stockholder, though
such acts are also violations of duty owing to the
corporation." *Waller,* 187 Md. at 192, 49 A.2d at
453. For example, a suit alleging corporate
malfeasance that directly results in the impairment of
a common stockholder's right to vote is likely a
direct suit. *See e.g., Lipton v. News Intl.,* 514 A.2d
1075, 1079 (Del.1986), *overruled on other grounds
by Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845
A.2d 1031 (Del.2004) (explaining that the right to
vote is a contractual right possessed by a
shareholder); *Lapidus v. Hecht,* 232 F.3d 679, 683
(9th Cir.2000).

Plaintiffs cite a decision issued by the United States
Court of Appeals for the Second Circuit, *Strougo v.
Bassini,* 282 F.3d 162 (2d Cir.2002), which found
that Maryland law recognizes fiduciary duties owed
by directors, not only to the corporation, but also
directly to shareholders. *Id.* at 173 (citing *Toner v.
Baltimore Envelope Co.,* 304 Md. 256, 268-69, 498
A.2d 642, 648 (Md.1985); *Waller,* 187 Md. at 194,
49 A.2d at 454). In reaching this conclusion,
however, *Strougo* did not discuss the 2001
Maryland Court of Appeal's decision in *Werbowsky.*
*See Werbowsky,* 362 Md. at 598-99, 766 A.2d at
133. Instead the Second Circuit relied exclusively on
*Waller* and *Toner. See Strougo,* 282 F.3d at 173.

*2. The Claims in Jolly Roger's Complaint*

Based on the facts presented by this case, however,
this Court need not determine whether Maryland law
recognizes a fiduciary duty owed by a corporation's
directors directly to shareholders, nor whether
shareholders are prohibited from pursuing derivative
claims based on breaches of fiduciary duty. Both
parties accept that directors owe fiduciary duties to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the corporation. *See generally Werbowsky,* 362 Md. at 598-99, 766 A.2d at 133 (noting that under § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. a director's obligations "run [ ], however, to the corporation and not, at least directly, to the shareholders."). Although it is difficult to discern precisely what injury Jolly Roger claims in its Complaint, what is clear is that there was an alleged injury suffered by Sizeler, the corporation, as a result of the stock issuance on March 14, 2005. The Complaint contends that the Sizeler Directors wrongfully sold the newly issued shares for a discounted price in the private sale to the four institutional investors to entrench themselves as Directors and, in some cases, officers of the company. If true, the resulting injury would clearly be one to the corporation, as it would have received inadequate consideration for its shares because of the Directors' allegedly disingenuous motive of entrenchment.

\*6 The Complaint also characterizes the Plaintiffs' injury as one of dilution. The Complaint, however, does not specify whether the dilution claim relates to dilution of voting power or dilution of share value. Assuming for a moment that a reasonable inference from the Plaintiffs' Complaint is that it contains a claim for dilution of voting power and share/asset value, the Maryland Court of Special Appeals rejected the suggestion that a similar contention could support a direct suit in *Danielewicz.* *Danielewicz,* 137 Md.App. at 616, 769 A.2d at 283 . In *Danielewicz* the plaintiff argued that she had a cause of action as an individual because the alleged wrongful conduct resulted in "the dilution of her majority interest" in the company. *Id.* The court rejected this position. Under *Waller* any dilution in the price or value of the stockholders' shares is not an actionable direct injury. *See Waller,* 187 Md. at 189, 49 A.2d at 452 (explaining that an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action).

Pre-*Tooley,* Delaware courts determined that dilution claims were individual in nature only where a significant stockholder's interest was increased at the sole expense of the minority. *See In re Paxson Communication Corp. Shareholders Litigation,* 2001 WL 812028, \*5 (Del.Ch.2001). This holding was recognized post-*Tooley,* in *In re J.P. Morgan Chase & Co.,* 2005 WL 1076069 (Del.Ch. April 29, 2005), which stated "to the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares ... results from the issuance of new equity to a third party ..., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed." *Id.* at \*6 (quoting *In re Paxson Communication Corp. Shareholders Litigation,* 2001 WL 812028 at \*5) (rejecting that dilution claim was direct).

Certainly not every issuance of stock by a corporation can constitute a direct claim for dilution by the corporation's stockholders. Here, the Plaintiffs' dilution claim is dependent on the alleged fiduciary duty breach to Sizeler, which claims that the Directors, to entrench themselves, accepted inadequate consideration for the shares sold to the institutional investors. Therefore, in this case, any dilution claim is incidental to the alleged fiduciary duty breach to the corporation. *See Waller,* 187 Md. at 189, 49 A.2d at 452 (explaining that an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action); *Tooley,* 845 A.2d at 1039 (holding that to bring a direct suit "[t]he stockholder's claimed direct injury must be independent of *any alleged injury to the corporation"* and to show such an injury, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation."* ) (emphasis added). As a result, Defendants' Motion to Dismiss is granted to the extent that any purported direct cause of action asserted by the Plaintiffs must be dismissed with prejudice.

### B. *Whether Plaintiffs May Assert a Derivative Claim*

\*7 Although not addressed by either party, nowhere in Plaintiffs' Complaint does it state that Jolly Roger was a shareholder at the time the instant suit was filed. A plaintiff that ceases to be a shareholder loses standing to continue a derivative suit. *See Lewis v. Anderson,* 477 A.2d 1040, 1047 (Del.1984); *Lewis v. Ward,* 852 A.2d 896 (Del.2004). [FN13] Even though it would appear from the face of the Complaint that Plaintiff Jolly Roger cannot bring a derivative suit because it failed to state that it was a shareholder at the time the suit was filed, this Court will consider whether Plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Slip Copy
(Cite as: 2005 WL 2989343, *7 (D.Md.))

meet the prerequisites necessary to bring a derivative suit.

> FN13. *Snyder v. Pleasant Valley Finishing Co., Inc.,* 756 F.Supp. 725, 730 (S.D.N.Y.1990) (citing *Tenney v. Rosenthal,* 6 N.Y.2d 204, 189 N.Y.S.2d 158, 163, 160 N.E.2d 463 (1959)) ("A corporation's dissolution or liquidation, without more, will not defeat a shareholder's right to prosecute an action on the corporation's behalf.... Where a plaintiff, however, voluntarily disposes of her shares, her rights as a shareholder cease, and her interest in the derivative action is terminated."); *Schilling v. Belcher,* 582 F.2d 995, 996 (5th Cir.1978) (applying federal and Florida law) ("[A] shareholder who sells his stock pending appeal of a favorable judgment in a shareholder's derivative suit against the corporation, loses standing to further prosecute or defend the case" unless its judgment is personally in his favor.); *Heckmann v. Ahmanson,* 168 Cal.App.3d 119, 130, 214 Cal.Rptr. 177 (1985) ("Once a derivative plaintiff sells its stock, it no longer has standing to prosecute the derivative claims on behalf of the remaining shareholders.").

Both Maryland law and Rule 23.1 of the Federal Rules of Civil Procedure require that a stockholder make demand on a corporation before bringing suit. Since the cause of action belongs to the corporation in a derivative suit, "a shareholder [must] first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed." *Werbowsky,* 362 Md. at 600, 766 A.2d at 133. Rule 23.1 requires that a complaint in a derivative action "shall also allege with *particularity the efforts,* if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and *the reasons for the plaintiff's failure to obtain the action or for not making the effort."* Fed. R. Civ. Pro. 23.1 (emphasis added). Plaintiffs' Complaint does not meet these requirements, likely because Plaintiffs sought to bring a direct action.

In addition to requesting leave to re-plead its cause of action as derivative, Plaintiffs argue that demand on the corporation would have been futile. The Maryland Court of Appeals has specifically addressed the issue of demand futility in its recent opinion *Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (Md.2001). For demand to be futile, the allegations or evidence must clearly demonstrate, "in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *See Werbowsky,* 362 Md. at 620, 766 A.2d at 144. This futility exception is very limited. *See id.*

Plaintiffs contend that demand is excused under the second exception because the Directors were personally conflicted, as they want to keep their positions as directors and officers of the corporation. Plaintiffs' Complaint does not even specify which Directors voted for the challenged transaction--the stock issuance to the four institutional investors. In addition, all but two of the Directors are outside directors. The Maryland Court of Appeals specifically noted that demand will not be excused "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen at the behest of controlling stockholders, or would be hostile to the action." *Werbowsky,* 362 Md. at 618, 766 A.2d at 143-44. Applying this standard, the allegations in Plaintiffs' Complaint are insufficient to excuse demand. Therefore, Defendants' Motion to Dismiss is granted and any derivative claims alleged by Plaintiffs must be dismissed without prejudice.

### CONCLUSION

**\*8** For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. A

Slip Copy, 2005 WL 2989343 (D.Md.)

**Motions, Pleadings and Filings (Back to top)**

. **2005 WL 917757 (Trial Pleading)** Class Action Complaint (Mar. 28, 2005)

. **1:05cv00841 (Docket)** (Mar. 28, 2005)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


