IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                         :
IN RE MBNA CORPORATION                   :
DERIVATIVE AND CLASS                     :     Lead Case No. 1:05-CV-00327-
LITIGATION                               :     GMS
                                         :
This Document Relates To:                :
ALL ACTIONS.                             :     CLASS AND DERIVATIVE
                                         :     ACTION
                                         :
-------------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
OPENING BRIEF IN SUPPORT OF THE MBNA OUTSIDE
DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
4 Times Square
New York, New York 10036-6522
(212) 735-3000

DATED: January 20, 2006

## INDEX

CASES                                                                                          TAB NO.

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati,
    Inc., C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) ...................................... 1

In re Citigroup Inc. S'holders Litig.,
    C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ......................................... 2

Criden v. Steinberg,
    C.A. No. 17082, 2000 WL 354390 (D. Del. Mar. 23, 2000) ............................................ 3

In re Encore Computer Corp. S'holders Litig.,
    C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) .......................................... 4

Ercole v. Conectiv & Coventry Health Care of Del., Inc.,
    C.A. No. 03-186 GMS, 2003 WL 21104926 (D. Del. May 15, 2003) .............................. 5

In re Frederick's of Hollywood, Inc. S'holders Litig.,
    C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ........................................... 6

Freedman v. Rest. Assocs. Indus.,
    C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990) ............................................ 7

In re Freeport-McMoran Sulphur, Inc. S'holders Litig.,
    C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) ............................................. 8

Herd v. Major Realty Corp.,
    C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21,1990) ............................................ 9

Hudson v. Prime Retail, Inc.,
    C.A. No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 10

Jacobs v. Yang,
    C.A. No. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ............................................ 11

Jasinover v. Rouse Co.,
    C.A. No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) .................... 12

Jolly Roger Fund LP v. Sizeler Property Investors, Inc.,
    C.A. No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ......................... 13

Knox v. Rosenberg,
     No. H-99-0123 (S.D. Tex. Sept. 28, 1999) ....................................................... 14

Lewis v. Leaseway Transp. Corp.,
     C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ............................. 15

Litt v. Wycoff,
     C.A. No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ................ 16

Manzo v. Rite Aid Corp.,
     C.A. No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) .............. 17

Nebenzahl v. Miller,
     C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) ........................... 18

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v.
     Elkins, C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........... 19

Pogostin v. Rice,
     C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983) ............................. 20

Porter v. Texas Commerce Bancshares, Inc.,
     C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ............................ 21

Rattner v. Bidzos,
     C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................ 22

Seibert v. Harper & Row, Publishers, Inc.,
     C.A. No. 6639, 1984 WL 21874 (Del. Ch. Dec. 5, 1984) ............................... 23

Sekuk Global Enters. Profit Sharing Plan v. Kevenides,
     C.A. No. 24-C-03-007496, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................ 24

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
     C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999) ............................ 25

In re Walt Disney Co. Derivative Litig.,
     C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ......................... 26

In re Wheelabrator Tech. Inc. S'holders Litig.,
     C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ........................... 27

# TAB 14

Case 1:99-cv-00123   Document 46   Filed 09/27/1999   Page 1 of 39

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

<table>
<tr><td>

LESTER KNOX, ALVIN FREEMAN,<br>
EARNEST GILCHREST, WILLIAM<br>
SEEFELDT, and RONALD PAUL,<br>
Derivatively on Behalf of<br>
CROWN CENTRAL PETROLEUM<br>
CORPORATION,<br><br>
     Plaintiffs,<br><br>
vs.<br><br>
HENRY A. ROSENBERG, JR.,<br>
EDWARD L. ROSENBERG, FRANK B.<br>
ROSENBERG, JACK AFRICK,<br>
GEORGE L. BUNTING, JR., MICHAEL F.<br>
DACEY, THOMAS M. GIBBONS,<br>
PATRICIA A. GOLDMAN, WILLIAM L.<br>
JEWS, REV. HAROLD RIDLEY, JR., S.J.,<br>
and SANFORD V. SCHMIDT,<br><br>
     Defendants,<br><br>
- AND -<br><br>
CROWN CENTRAL PETROLEUM CORP.,<br>
a Maryland Corporation,<br><br>
     Nominal Defendant.

</td><td>

§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§

</td><td>

<br><br><br><br><br><br><br><br><br>
CIVIL ACTION NO. H-99-0123

</td></tr>
</table>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

**SEP 2 8 1999**

Michael N. Milby, Clerk of Court

## MEMORANDUM AND ORDER

Crown Central Petroleum Corporation ("Crown"), the nominal defendant

in this shareholder's derivative action, moves to dismiss under Rule 23.1 of the Federal

Rules of Civil Procedure for failure to make presuit demand on the Board of Directors.

(Docket Entry No. 9). Plaintiffs, shareholders of Crown, assert that the facts alleged

in the first amended complaint excuse presuit demand as futile. (Docket Entry No. 38).

Plaintiffs alternatively ask this court to grant them leave to amend if this court finds that

their complaint fails to satisfy Rule 23.1. (Docket Entry No. 38, p. 20).

Based on the pleadings, the relevant motions, the parties' submissions, and

the applicable law, this court GRANTS Crown's motion to dismiss plaintiffs' first

amended complaint under Rule 23.1, with leave to amend. Plaintiffs must replead

within 30 days from the date this memorandum and order is filed. The reasons for this

ruling are stated below.

## I.    Background: The Allegations in the First Amended Petition

Crown is a Maryland corporation with its principal place of business in

Baltimore, Maryland. (Docket Entry No. 1, Affidavit of John F. Wheeler, Jr., ¶ 3).

Crown is an independent marketer of gasoline. It operates two refineries in Texas and

more than 325 retail stores, gas stations, and other marketing outlets in eleven states.

(*Id.*, ¶¶ 4,6). Plaintiffs Lester Knox, Alvin Freeman, Earnest Gilchrest, William

Seefeldt, and Ronald Paul own stock in Crown. (Docket Entry No. 1, Plaintiffs' First

Amended Petition, ¶ 28).[1]  Plaintiffs allege that the individual defendants, current and

---

[1]     Plaintiffs are also associated with the Oil Chemical & Atomic Workers Union Local
4-227 ("Local 4-227"). The Local 4-227 and Crown are involved in a protracted labor dispute at the
Pasadena, Texas refinery that is central to the allegations in this derivative suit. In 1996, Crown
management locked out union employees from that refinery. (Docket Entry No. 1, Plaintiff's First
Amended Petition, ¶ 3). Plaintiffs William Seefeldt and Ronald Paul are Local 4-227 members who

former Crown officers and the current Board of Directors, committed acts of malfeasance and mismanagement that resulted in a decline in Crown's stock price. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶¶ 37-99).

Most of plaintiffs' allegations focus on Henry A. Rosenberg, Jr. and his two sons, Edward Rosenberg and Frank Rosenberg. Henry Rosenberg is Crown's chief executive officer and chairman of the board. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 30(a)). Edward Rosenberg was Crown's executive vice president in charge of supply and transportation until he resigned this position in November 1998. (*Id.*, ¶ 30(b)). Frank Rosenberg is Crown's executive vice president in charge of marketing. (*Id.*, ¶ 30(c)). The other named defendants are all current members of Crown's Board of Directors. (*Id.*, ¶ 30(e)-(l)). Although the focus of the first amended complaint is on the Rosenberg defendants' conduct, the complaint does contain allegations directed against *"the defendants"* generally. The motion to dismiss, and the response, focus on these allegations.

In the first amended complaint, plaintiffs allege that Henry Rosenberg "has run Crown as a family business, acting as an unaccountable autocrat." (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 7). Henry Rosenberg insisted on the

---

worked at the Pasadena refinery before the lockout. Plaintiffs Lester Knox and Earnest Gilchrest are retired Local 4-227 members. Plaintiff Alvin Freeman represented the Local 4-227 in pre-lockout negotiations as a member of the union bargaining committee. (Docket Entry No. 22, Ex. D, ¶ 6).

appointment of his sons, Edward and Frank, to executive positions "even though neither of them are competent." (*Id.*, ¶¶ 6, 38). The Rosenbergs have, "through a combination of nepotism, arrogance, gross negligence, and dishonesty," severely damaged Crown's corporate performance and caused loss of shareholder value "while, at the same time, misusing corporate assets for their personal benefit, stuffing millions of dollars in unjustified and excessive compensation into their own pockets and accruing millions in unjustified retirement benefits." (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶¶ 5, 73–75). Plaintiffs allege that Henry and Edward Rosenberg "have caused Crown to engage in reckless crude oil futures transactions and other forward purchase contract activities which have repeatedly resulted in disastrous losses for Crown over the years, including 1994, 1996, and 1998." (*Id.*, ¶¶ 14, 42).

Plaintiffs allege that *"the defendants"* ordered the 1996 lockout of Local 4-227 employees from the Pasadena, Texas refinery "[i]n an effort to shift the blame for Crown's miserable financial performance away from themselves onto the [refinery employees]." (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶¶ 3, 41, 47-54). Plaintiffs blame the lockout for a damaging boycott of Crown by labor and civil rights organizations and for making it necessary for management to use "inexperienced and untrained contract labor," which in turn caused increased operational inefficiencies and illegal environmental discharges at the Pasadena refinery. (*Id.*, ¶ 3, 61). Crown paid

a $1.1 million fine under the Texas Air Quality Act and faces a lawsuit brought by a class of persons living near the Pasadena refinery. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 3, 67-69).

Plaintiffs allege that "the Rosenbergs' arrogant disregard for their own legal and fiduciary obligations has . . . bred a climate of disregard for legal compliance throughout Crown's top management ranks." (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶¶ 4, 56 , 71). Crown faces a civil rights class action brought on behalf of Crown's African-American and female employees. (*Id.*, ¶ 4, 71). Plaintiffs allege that the potential legal exposure and cost of defending the environmental and civil rights suits have damaged Crown's financial position and stock price. (*Id.*).

Plaintiffs allege that *"the defendants,"* through their gross negligence, have "wasted millions in corporate monies on ineffective environmental control expenditures. . . ." (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶¶ 11, 55). Plaintiffs also allege that *"the defendants'"* gross negligence has prevented Crown from developing "a large or competitively successful chain of gas stations" to effectively market the product of its crude oil refinery operations. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶¶ 15, 43). Because of these problems, "[w]hile the oil refining industry has generally posted large gains in shareholder value

throughout the [1990's], Crown's stockholder equity, book value, and common stock have plunged." (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 16).

Plaintiffs allege that *"the defendants . . . have falsely assured Crown's public shareholders that Crown's business was well-managed"* in Crown Annual Reports issued from 1988 to 1996. (Docket Entry No. 45). Plaintiffs also allege that "[d]espite Crown's huge losses over the past several years, *defendants* have used their control of Crown to pay themselves millions in excessive salaries, bonuses and other benefits while accumulating millions in unjustified retirement benefits for themselves." (*Id.*, ¶ 73). Plaintiffs allege that "[w]hile Crown has nosedived, H. Rosenberg, his family and *other of the defendants* have been flying high in Crown's corporate jet, which costs shareholders about $ 1,000 per hour." (*Id.*, ¶ 75).

Crown contends that under Federal Rule of Civil Procedure 23.1, plaintiffs' failure to make presuit demand on the corporation's directors requires dismissal of the complaint.[2] (Docket Entry No. 9). Plaintiffs concede that they did not make presuit demand on Crown's directors. They assert, however, that the complaint pleads with particularity facts sufficient to show that demand was excused as futile under the applicable law because: (1) the members of Crown's current Board of Directors are named as defendants and face liability in this action; (2) the directors

---

[2]     On August 26, 1999, Crown requested that this court stay discovery pending this court's ruling on the Rule 23.1 motion. On September 15, 1999, this court ordered a stay of discovery pending this ruling.

have acquiesced in the Rosenbergs' misconduct; and (3) the primary wrongdoer, Henry

A. Rosenberg, dominates and controls a majority of the current Board of Directors.

(Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 36; Docket Entry No. 38, p.

1).

## II.    The Demand Requirement in a Shareholder's Derivative Action

Rule 23.1 of the Federal Rules of Civil Procedure provides:

> In a derivative action brought by one or more shareholders
> . . . to enforce a right of a corporation, . . . . the complaint
> shall [] allege with particularity the efforts, if any, made by
> the plaintiff to obtain the action the plaintiff desires from the
> directors or comparable authority . . . and the reasons for the
> plaintiff's failure to obtain the action or for not making the
> effort.

"[A]lthough Rule 23.1 clearly contemplates both the demand requirement and the

possibility that demand may be excused, it does not create a demand requirement of

any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the

shareholder representative's pleadings." *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S.

90, 96 (1991) (*Kamen I*). Rule 23.1 provides the procedural standard for the demand

requirement in a shareholder's derivative complaint in federal court. The law of the

nominal defendant's state of incorporation determines the substantive elements of the

demand requirement. *Kamen I*, 500 U.S. at 100 n. 6, 108-109. Rule 23.1 requires that

the plaintiff plead with particularity facts sufficient to satisfy the applicable demand

requirement.

Crown is incorporated in Maryland. Maryland law requires that a shareholder make demand on a corporation's board of directors before bringing a derivative action. *Parish v. Maryland & Virginia Milk Producers Ass'n*, 242 A. 2d 512, 544 (Md. 1968); *Waller v. Waller*, 49 A. 2d 449, 453-454 (Md. 1946). Presuit demand is excused as futile if the corporate board is incapable of making an independent, disinterested decision on a demand. *Parish*, 242 A. 2d at 545; *see also Eisler v. Eastern States Corp.*, 35 A. 2d 118, 119 (Md. 1943). A shareholder plaintiff's failure to make presuit demand on the corporation's board can be excused as futile if a majority of the current board consists of "defendants charged, *prima facie*, with the wrongful conduct" for which the shareholders sue. *Parish*, 242 A. 2d at 545. If a majority of the board faces liability for participating in such conduct, the corporation "under [the] management [of the board] could not effectively or properly prosecute [the] litigation." *Id.*

Maryland case law discussing the futility exception to the demand requirement is sparse. *Parish* is the most recent reported case and its discussion of demand futility is relatively brief. Significant doctrinal development in this area has occurred since *Parish* was decided. *See* 2 DENNIS J. BLOCK ET AL., THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 1467–1593 (5th ed. 1998) (discussing the development of demand futility doctrine). In addition to

examining the Maryland cases applying the demand futility exception, a review of cases from other jurisdictions is necessary.

*Parish* holds that demand is excused when a shareholder plaintiff alleges that a majority of the present board faces liability for participating in the conduct challenged as wrongful. *Parish* does not expressly consider presuit demand excused on the basis of allegations that the alleged wrongdoer dominates and controls a majority of the board.    *See Kamen v. Kemper Fin. Serv., Inc.*, 939 F. 2d 458, 461(7th Cir. 1991) (*Kamen II*) (assuming, but not deciding, that Maryland law would recognize a claim of demand futility based on the wrongdoer's control over the board), *on remand from* 500 U.S. 90 (1991).  Cases in other jurisdictions have held that presuit demand can be excused when the complaint alleges that one or more of the defendants facing liability in the action dominates and controls the current corporate board. *See, e.g., Marx v. Akers*, 666 N.E. 2d 1034, 1041 (N.Y. 1996) (New York law); *Rales v. Blasband*, 634 A. 2d 927, 936 (Del. 1993) (Delaware law); *Grobow v. Perot*, 539 A. 2d 180, 188 (Del. 1988) (Delaware law).  In deciding this motion, this court interprets Maryland law to excuse presuit demand if either (1) a majority of the current board of directors faces liability for participation in the alleged wrongdoing, or (2) a majority of the current board of directors is dominated and controlled by the alleged wrongdoer.

The substantive elements of the demand futility claim are one facet of the Rule 23.1 inquiry.  Rule 23.1 requires a plaintiff to plead with particularity facts

sufficient to excuse demand under the applicable state law. "Conclusory allegations will not satisfy the plaintiffs' burden under Rule 23.1." *Stepak v. Addison*, 20 F. 3d 398, 403 (11th Cir. 1994); *see also Starrels v. First Nat'l Bank*, 870 F. 2d 1168, 1172 (7th Cir. 1989); *Levner v. Saud*, 903 F. Supp. 452, 456 (S.D.N.Y. 1994); *Garber v. Lego*, 1992 WL 554239 at * 3 (W.D. Pa. 1992), *aff'd* 11 F. 3d 1197 (3d Cir. 1993). In deciding a motion to dismiss under Rule 23.1, the court may accept as true only the facts pleaded with particularity. *Miller v. Loucks*, 1992 WL 329313 at *4 (N.D. Ill. 1992). It is not enough for a shareholder plaintiff to allege that a majority of the current board participated in the wrongdoing or is dominated and controlled by the wrongdoer. The complaint must allege with particularity facts that support these conclusions.

Plaintiffs cite *Liboff v. Wolfson*, 437 F. 2d 121 (5th Cir. 1971), to support their contention that the complaint adequately pleads demand futility. In *Liboff*, the Fifth Circuit held that a complaint complied with Rule 23.1 by alleging:

> "Demand by plaintiff that the Board of Directors of the Corporation bring this action would have been futile. The majority of said directors, participated, approved of and acquiesced in said transaction and are liable therefor. The directors of the Corporation would not and could not diligently prosecute this action because they would have to bring it against themselves which would prevent its effective prosecution."

*Id.* at 122. After the Fifth Circuit decided *Liboff*, the Supreme Court decided *Kamen I* and clarified that Rule 23.1 does not provide the substantive law of presuit demand.

Instead, Rule 23.1 is a procedural means for testing "the adequacy of the shareholder representative's pleadings" against the applicable substantive demand requirement. *Id.*, 500 U.S. at 96; *see also Starrels v. First Nat'l Bank*, 870 F. 2d 1168, 1170–1171 (7th Cir. 1989) (noting, before the Supreme Court decided *Kamen I*, that some courts and commentators assumed that federal law controlled the underlying substantive elements of presuit demand requirement as well as the pleading requirement).[3] If Rule 23.1 is read neither to establish a substantive demand requirement nor to require particularized pleading, it is superfluous and meaningless. Courts have consistently held that Rule 23.1 requires more particularized pleading than the *Liboff* decision approved. Notably, *Liboff* has not been cited in a reported case since the Supreme Court's decision in *Kamen I*.

When a shareholder plaintiff argues that presuit demand is excused because a majority of the board of directors face liability in a derivative action, courts have held that the complaint does not satisfy Rule 23.1 merely by naming the majority of the corporation's directors as defendants or by conclusorily alleging that a majority of the directors is liable for participating in the challenged conduct. *In re Westinghouse Sec. Litig.*, 832 F. Supp. 989, 996 (W.D. Pa. 1993); *Aronson v. Lewis*, 473 A. 2d 805, 817 (Del. 1984). Similarly, demand is not excused by a general, conclusory allegation

---

[2]    Indeed, even when *Liboff* was decided, other courts criticized the decision for "confus[ing] Rule 23.1 with notice pleading." *In re Kauffman Mutual Fund Actions*, 479 F. 2d 257, 266 n. 6 (1st Cir. 1973).

that the defendant directors acted without due care or even with gross negligence. *Citron ex rel. United Tech. Corp. v. Daniell*, 796 F. Supp. 649, 652 (D. Conn. 1992); *Andreae v. Andreae*, 1992 WL 43924 at * 7–8 (Del. Ch. 1992). Rather, the shareholder plaintiff must allege facts that, if true, would present a substantial likelihood that a majority of the current directors face liability in the derivative suit. *See Aronson*, 473 A. 2d at 815 (holding that more than a mere threat of director liability is necessary to excuse demand).

When a shareholder plaintiff argues that the board lacks independence because it is dominated and controlled by an alleged wrongdoer, the plaintiff cannot merely allege that the wrongdoer owns a majority of the corporation's stock. *Aronson v. Lewis*, 473 A. 2d 805, 815 (Del. 1984). Nor is demand excused on the basis of domination and control because the alleged wrongdoer selected a majority of the directors or because corporate officers or directors who allegedly benefitted from the challenged conduct picked the directors. *Kamen II*, 939 F. 2d 458, 460 ("If allegations of this kind sufficed, the demand rule would be negated–for almost all . . . independent directors come to a board after being slated by corporate insiders."). "It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." *Aronson*, 473 A. 2d at 816.

This court examines the first amended complaint in the context of these cases and the standard of particularity they require to determine whether the allegations excuse presuit demand on the Crown Board of Directors as futile. This court examines each claim in this lawsuit to determine whether demand on Crown's directors would be futile as to that claim. *Yaw v. Talley*, 1994 WL 89019 at *9 (Del. Ch. 1994). If the facts alleged with particularity do not show that demand would be futile with regard to a claim, that claim must be dismissed. *See, e.g., Starrels v. First Nat'l Bank*, 870 F. 2d 1168, 1172 (7th Cir. 1989) (affirming the district court's dismissal of the complaint in a shareholder's derivative action for failure to comply with Rule 23.1); *In re Kauffman Mutual Fund Actions*, 479 F. 2d 257, 267 (1st Cir. 1973) (same).

Rule 23.1 motions to dismiss for failure to make presuit demand, like Rule 12(b)(6) motions, are decided on the face of the complaint, accepting all well-pleaded facts as true. *See Gonzalez Turul v. Rogatol Distrib., Inc.*, 951 F. 2d 1, 3 (1st Cir. 1991); *Levner v. Saud*, 903 F. Supp. 452, 455 (S.D.N.Y. 1994); *Miller v. Loucks*, 1992 WL 329313 at * 3–4 (N.D. Ill. 1992). Defendant asks this court to take judicial notice of Crown's corporate charter, which contains provisions that limit the directors' liability to the corporation and shareholders. Defendant argues that these provisions eliminate any likelihood of director liability on many of the claims plaintiffs assert. Plaintiffs contend that this court must assess demand futility on the face of the

complaint and may not consider the corporate charter in deciding this motion. (Docket Entry No. 38, p. 7).

In the Rule 12(b)(6) context, a court may consider judicially noticeable facts and need not accept the allegations of a complaint as true to the extent that the allegations conflict with such facts. *See Lovelace v. Software Spectrum Inc.*, 78 F. 3d 1015, 1017-1018 (5th Cir. 1996) (holding that courts may consider matters as to which they may take judicial notice in deciding a Rule 12(b)(6) motion); 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1363 (2d ed. 1990 & 1998 Supp.) ("Courts will not accept as true allegations that are contradicted by facts that can be judicially noticed" in deciding a Rule 12(b)(6) motion.); *see also* FED. R. EVID. 201(f) ("Judicial notice may be taken at any stage in the proceedings.").

Courts have held that the procedural treatment of Rule 23.1 motions tracks that of Rule 12(b)(6) motions. *Grafman v. Century Broadcasting* Corp., 743 F. Supp. 544, 547 (N.D. Ill. 1990) (holding that the procedures of Rule 12(b)(6) apply when courts determine the adequacy of demand); *Burghart v. Landau*, 821 F. Supp. 173, 179 (S.D.N.Y. 1993) ("[A] rule 23.1 defense is usually pleaded or waived like a rule 12(b)(6) defense."). One court has specifically held that a court may take judicial notice of a certificate of incorporation in deciding a motion to dismiss under Chancery Rule 23.1, which is very similar to federal Rule 23.1. *In re Baxter Int'l, Inc. Shareholders Litig.*, 654 A. 2d 1268, 1270 (Del. Ch. 1995). The plaintiffs do not cite,

99928 9 56P:\CASES\99\99-0123\99-0123.e10

14

and this court has not found, any case holding that a court may not consider judicially noticeable facts in deciding a Rule 23.1 motion to dismiss for failure to make presuit demand.

This court concludes that it may take judicial notice of appropriate facts in deciding this Rule 23.1 motion. Courts have consistently found the contents of corporate charters to be appropriate objects of judicial notice. *See Baxter Int'l*, 654 A. 2d at 1270 (taking judicial notice of a certificate of incorporation in deciding a Rule 23.1 motion); *see also In re Teledyne Defense Contracting Derivative Litig.*, 849 F. Supp. 1369, 1383 (C.D. Cal. 1993) (taking judicial notice of a certificate of incorporation in deciding a Rule 12(b)(6) motion); *FDIC. v. Caledonia Inv. Corp.*, 725 F. Supp. 90, 93 (D. Puerto Rico 1989) (taking judicial notice of a certificate of incorporation in deciding a Rule 12(c) motion for judgment on the pleadings). This court will consider the relevant provisions of Crown's corporate charter, as well as the allegations in the complaint, in deciding this motion.

## III. Disinterested Directors: The Allegations of Wrongdoing by a Majority of the Current Crown Board

Plaintiffs contend that they have pleaded with particularity facts that present a substantial likelihood that a majority of Crown's Board of Directors is liable for participating in all, or some, of the claims alleged in this derivative action. (Docket Entry No. 38, pp. 9–14). If a majority of the Board is exposed to liability on a claim,

presuit demand is excused with regard to that claim. *Parish*, 242 A. 2d at 545; *see also*
*Marx*, 666 N.E. 2d at 1039–1041.

Plaintiffs name all the current members of Crown's Board as defendants.
A complaint does not, however, satisfy Rule 23.1 simply by naming all the current
corporate directors as defendants. *In re Westinghouse Securities Litigation*, 832 F.
Supp. 989, 996 (W.D. Pa. 1993). Rule 23.1 requires that the allegations in a derivative
suit distinguish among the director defendants' roles in the alleged acts or omissions,
in pleading the facts showing that a majority of the board faces liability. The first
amended complaint fails to meet this requirement.

The only director plaintiffs mention by name in the substantive allegations
of the complaint is Henry Rosenberg, Crown's chairman of the board and chief
executive officer. The complaint devotes pages to allegations of Rosenberg's conduct.
However, the complaint refers specifically to action by the Crown Board of Directors
as a body only twice in the substantive allegations. Paragraph 70 includes the
following allegation:

> [B]ecause of the *Crown Board's* failure to take timely and
> prudent steps to cause Crown's Pasadena facility to comply
> with environmental regulations, Crown currently faces
> expenditures in excess of $ 50 million to bring that facility
> into compliance – a fact Crown's insiders have concealed
> from its shareholders and one that will further harm Crown's
> financial condition.

Paragraph 9 of the plaintiffs' first amended complaint contains a similar allegation:

> Because of the Rosenbergs' absolute control of Crown and their resulting lack of accountability to its shareholder community, they have not only run Crown like a family business with the abuses and unfavorable consequences outlined above, but they have also created throughout Crown's management ranks a culture of disregard for legal responsibility and accountability. As a result of H. Rosenberg's and *Crown's Board* not requiring Crown to comply with the law in its operations, Crown has been named a defendant in two large class action suits.

Crown's corporate charter, of which this court takes judicial notice, contains provisions that specifically eliminate director liability to the corporation and shareholders absent self-dealing or "active and deliberate dishonesty." "When the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption." *Baxter Int'l*, 654 A. 2d at 1270.

Crown's corporate charter provides in pertinent part as follows:

> No person who is or formerly was a Director or Officer of the Corporation shall have any liability to the Corporation or to any Stockholder for money damages in connection with any action, or failure to act, subsequent to February 18, 1988, in his or her capacity as a Director or Officer; provided, however, that nothing contained herein shall restrict or limit the ability of any person:

Case 4:99-cv-00123   Document 46   Filed 09/27/1999   Page 18 of 50

    d.    to the extent that it is proved that such person actually received an improper benefit or profit in money, property or services, for the amount of the benefit or profit in money, property or services received; or

    e.    to the extent that a judgment or other final adjudication adverse to such person is entered in a proceeding based on a finding in the proceeding that such person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding.

These charter provisions limit the directors' liability to Crown and its shareholders to the full extent permitted by Maryland law. *See* MD. CODE ANN. CTS. & JUD. PROC. § 5-418(a) (1999). A defendant director of Crown faces liability to the corporation for an act or omission occurring after February 18, 1988 only if facts are alleged showing that: (1) the director received an improper benefit in the form of money, property or services in connection with an act, or (2) the director's action, or failure to act, resulted from active and deliberate dishonesty.[4]

---

[4]    Plaintiffs argue that the terms of the Crown director and officer liability policy support its argument that demand would be futile. This policy contains an "insured vs. insured exclusion," under which the policy does not provide coverage for any action brought against the directors by the corporation. The policy does cover director liability in shareholder's derivative actions. Courts consistently reject the presence of an "insured vs. insured exclusion" as a reason to excuse presuit demand in a derivative action. *See Stepak v. Addison,* 20 F. 3d 398, 411 (11th Cir. 1994); *In re Westinghouse Securities Litig.,* 832 F. Supp. 989, 997 (W.D. Pa. 1993); *In re Prudential Ins. Co. Derivative Litig.,* 659 A. 2d 961, 972-973 (N.J. Super. 1995); *Caruana v. Saligman,* 1990 WL 212304 at *4 (Del. Ch. 1990); *Decker v. Clausen,* 15 Del. J. Corp. L. 1022, 1028 (Del. Ch. 1989). Such clauses are standard in director and officer policies. "As a practical matter, . . . routine excuse of demand based on the existence of such standard exclusions would eviscerate the demand requirement." *Prudential Ins.,* 659 A. 2d at 973.

Neither Paragraph 9 nor Paragraph 70 alleges that any of the Crown directors received an improper benefit or a profit in connection with their failure to require Crown to comply with civil rights laws or to require Crown's Pasadena refinery to comply with environmental regulations. Nor does either paragraph allege that the directors' failure to act was the result of "active and deliberate dishonesty." The corporate charter eliminates director liability to the corporation or shareholders for the type of conduct plaintiffs allege in these paragraphs.[5]

The complaint contains no other substantive allegations that refer to the Crown Board collectively or to any of the directors (other than Henry Rosenberg) individually. The allegations focus on the activities of Henry, Frank, and Edward Rosenberg: most of the complaint involves only their actions. (*See* Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶¶ 4, 6–10, 13–14, 16, 18–20, 22–23, 25, 37–39, 56, 74, 77, 83, 98-99).

---

[5]    The quoted passage from Paragraph 70 of the complaint does allege that "Crown's insiders [] concealed" the corporation's lack of compliance with environmental regulations from shareholders. Such concealment could involve "active and deliberate dishonesty" and fall outside the protection of the charter provisions. However, the allegation of concealment fails to satisfy Rule 23.1 in several ways. The allegation of concealment refers generally to "Crown's insiders," not to the current Board of Directors specifically. The allegation of concealment is not particularized, but conclusory. The only specific misrepresentations about environmental compliance that plaintiffs allege occurred in the 1991 Annual Report. (Docket Entry No.1, Plaintiffs' First Amended Petition, ¶ 70). A majority of Crown's current Directors became directors in 1992 or later. Only conduct occurring after 1992 presents a likelihood that a majority of the current board faces liability. *See infra*, pp. 22–23.

In several places, the complaint does allege that *"the defendants"* committed acts that damaged Crown. Plaintiffs contend that these allegations are sufficient to implicate the director defendants in wrongdoing and excuse presuit demand. Plaintiffs ask this court to read the allegations against *"the defendants"* to refer to all of the defendants, including the current Crown Board of Directors, and to find these allegations sufficiently particularized to satisfy Rule 23.1.

Plaintiffs' general allegations of wrongdoing by *"the defendants"* do not meet the particularity requirement of Rule 23.1. The "complaint does not single out, among current or past directors, which directors participated in the alleged wrongdoing .... [I]n fact, many allegations do not differentiate among the directors and the other defendants." *In re Prudential Ins. Co. Derivative Litig.*, 659 A. 2d 961, 971 (N.J. Super. Ct. Ch. Div. 1995) (dismissing the complaint for failure to plead demand futility with particularity); *see also Grill v. Hoblitzell*, 771 F. Supp. 709, 711 (D. Md. 1991) (holding that the complaint failed to satisfy Rule 23.1 where "[i]t contain[ed] boilerplate allegations and [did] not distinguish among the directors and the roles which they allegedly played in the alleged wrongdoing"); *Citron ex rel. United Tech. Corp. v. Daniell*, 796 F. Supp. 649, 652–653 (D. Conn. 1992) (holding that allegations of demand futility were insufficient where "[a]ll of the allegations of serious misconduct on the part of the directors [were] stated conclusorily, without specification of particular personal acts or conduct to sustain the asserted conclusions.").

Like other complaints that courts have found inadequate to excuse presuit demand, the first amended complaint does not distinguish among the directors and the roles they played, except for Henry Rosenberg himself. *Grill*, 771 F. Supp. at 711; *Citron*, 796 F. Supp. at 652–653; *In re Prudential*, 659 A. 2d at 971. The complaint does not allege misconduct by any specific director other than Henry A. Rosenberg.

Plaintiffs argue that the complaint need not allege a specific director's acts or omissions because all the directors face liability for their failure to stop the Rosenbergs' alleged misconduct. (Docket Entry No. 38, p. 14-15). This argument does not respond to defendant's point that such allegations do not expose any of the directors to liability because of the corporate charter provisions. Claims based on director inaction are charges of negligent oversight, and Crown's charter eliminates director liability based on negligence. Nor do the plaintiffs respond to the argument that a majority of the directors joined the Board after many of the challenged acts and cannot be liable for those acts. The complaint does not plead with particularity facts showing that a majority of directors face liability on the claims so as to excuse demand on that basis.

Plaintiffs attempt to connect *"the defendants"* and liability for the substantive allegations through Paragraphs 31 and 32 of the complaint:

> 31. By virtue of their positions as directors and/or officers of Crown, *the defendants* have had the power to control and influence, and did control and influence, and cause Crown to engage in the practices complained of herein. *Each defendant* owed Crown and its public shareholders'

fiduciary obligations and were required to: (I) use their ability to control and manage Crown in a fair, just and equitable manner, (ii) act in furtherance of the best interests of Crown and its public stockholders; (iii) act to maximize stockholder value in connection with any change of ownership and control; (iv) govern Crown in such a manner as to heed the expressed views of its public shareholders; (v) refrain from abusing their positions of control, and (vi) not to favor their own interests at the expense of Crown and its public stockholders.  By reason of their fiduciary relationships, *these defendants* owed and owe Crown, plaintiffs and the public shareholders of Crown the highest obligations of good faith, fair dealing, loyalty and due care. *These defendants* specifically owe Crown a duty to cause Crown's operations to comply with federal and state law, including environmental and civil rights laws, to avoid suits against and damage to the Company, and to conduct Crown's labor relations in a way to avoid boycotts and other retaliatory action harmful to the Company.

32.    *Each defendant* is sued individually as a conspirator and aider and abettor, as well as in their capacity as present officers and directors of Crown, and the liability of each arises from the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

These paragraphs do not differentiate among the director defendants and their roles in the alleged misconduct. Paragraph 31 states that "[b]y virtue of their positions as directors and/or officers of Crown, *the defendants* have had the power to control and influence, and did control and influence, and cause Crown to engage in the practices complained of herein." The paragraph merely asserts the fiduciary obligations the defendants owed to Crown as officers and directors. Paragraph 32 asserts that "the

liability of each [defendant] arises from the fact that they [sic] have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein." Paragraphs 31 and 32 are conclusory. The allegations do not distinguish among the acts allegedly committed by individual officer defendants, those committed by individual director defendants, or those committed by some combination of individual officers and directors. The allegation that *"the defendants"* "engaged in all or part" of the alleged misconduct is scarcely more particularized than merely naming all the directors as defendants in the action, which courts have consistently held insufficient to excuse demand. *See, e.g., Lewis v. Graves*, 701 F. 2d 245, 249 (2d Cir. 1983) ("The single fact that the plaintiff named as defendants [all] serving directors . . . falls short of excusing demand."); *Westinghouse* at 996 ("Demand will not be excused merely because a majority of directors are named in the complaint, or because the directors would have to sue themselves.").

This complaint demonstrates why courts require shareholder plaintiffs to distinguish among the directors' roles in alleged misconduct to show demand futility. Plaintiffs name all current directors as defendants and then accuse *"the defendants"* of misconduct ranging over years. However, the members of the Crown Board of Directors joined the Board at different times. Several of the current Crown directors assumed their positions only after much of the alleged misconduct occurred. A defendant director faces no prospect of liability for corporate acts that occurred before

that individual became a director.[6] *See Harris v. Carter*, 582 A. 2d 222, 229 (Del. Ch. 1990). The complaint alleges that five of Crown's nine directors[7] assumed their posts after some time in 1992 or later: (1) George Bunting–1992; (2) William Jews–1992; (3) Rev. Harold Ridley–1995; (4) Thomas Gibbons–1995; and (5) Sanford Schmidt–1997. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 30). Only those allegations that assert misconduct occurring after these directors assumed office present a likelihood of liability to a majority of the current Board.

The complaint specifically alleges that some of the conduct challenged as wrongful occurred in 1992 or before. (*Id.*, Plaintiffs' First Amended Petition, ¶¶ 37, 39, 43, 45–46, 55, 64– 65,70, 73–74, 77–79, 84). Still other paragraphs of the complaint are not expressly limited in scope to conduct occurring after 1992. (*Id.*, Plaintiffs' First Amended Petition, ¶¶ 38, 40, 42, 44, 56–57, 63, 68–69, 71, 75–76, 80, 83). As to the alleged misconduct occurring in or before 1992, a majority of the Board does not face likely liability and is not presumed incapable of making a disinterested decision on a demand.

---

[6]     In some cases, a corporate director who was otherwise affiliated with the corporation before becoming a director might face liability to the corporation for acts taken in the previous capacity. If so, that director would be presumed incapable of making an independent decision as a director whether to initiate suit on behalf of the corporation. In this case, plaintiffs have not alleged that any of Crown's current directors other than Henry A. Rosenberg, Jr. had any connection with the corporation before becoming directors.

[7]     Crown's corporate charter provides that Crown has eight directors. The complaint, however, identifies nine defendants as current Crown directors. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 30).

Plaintiffs' lack of particular allegations as to the defendants other than the Rosenbergs also makes the complaint deficient because of the limitation of liability provisions in Crown's corporate charter.    In order to avoid the limitation of liability provisions in Crown's charter, plaintiffs must allege with particularity facts showing that a majority of the current directors were involved in acts of self-dealing or "active and deliberate dishonesty." None of the allegations in the complaint meets these criteria.[8] No allegations in the complaint state a claim of self-dealing against any directors other than Henry Rosenberg. The only allegations that suggest director self-dealing are those that address excessive compensation and misuse of the corporate plane.

Paragraph 73 of the complaint, alleging excessive compensation, states:

Despite Crown's huge losses over the past several years, defendants have used their control of Crown to pay themselves millions in excessive salaries, bonuses and other benefits while accumulating millions in unjustified retirement benefits for themselves. Crown's five highest paid executive officers have generally received substantial increases in compensation every year since 1990 and 1997. For example, the base salary of H. Rosenberg rose from $463,340 in 1990 to $591,668 in 1997, and he is entitled to retirement pay of over $600,000 per year. E. Rosenberg's base salary jumped from $88,757 to $176,676. Furthermore, since 1994, Crown's executives have been provided with several performance-based incentive plans

---

[8]    Because a majority of the Board faces no liability for conduct occurring before 1993, the provisions limiting director liability for acts or omission occurring after February 18, 1988 apply to all conduct for which a majority of the Board could be liable.

> under which they receive cash bonuses and stock options
> upon the attainment of certain Company performance goals.
> Despite the Company's posting of severe operating losses
> and the lack of cash dividends to Crown's common
> shareholders, several executives, including H. Rosenberg,
> have received cash bonuses and options pursuant to these
> plans.

The specific allegations in this paragraph involve the compensation of Crown executive

officers, not directors. These allegations do not assert director self-dealing.

Paragraph 75 of the complaint alleges misuse of the Crown corporate jet:

> While Crown has nosedived, H. Rosenberg, his family and
> other of the defendants have been flying high in Crown's
> corporate jet, which costs shareholders about $1,000 per
> hour. The Rosenbergs utilize this corporate asset – called
> the "royal barge" – for transporting themselves and friends
> around to racetracks and other sporting events – <u>personal
> use of a corporate asset.</u>

These allegations focus on misconduct by the Rosenbergs. Plaintiffs do not allege that

all of the defendants misused the jet, or that the Board collectively misused the jet.

They allege that the Rosenbergs *"and other of the defendants"* misused it. Plaintiffs

do not specify who the *"other of the defendants"* are. This paragraph does not allege

specific facts that present a likelihood that a majority of the current Board was involved

in self-dealing.

No allegations in the complaint specifically state a claim against the non-

Rosenberg defendants for "active and deliberate dishonesty." Plaintiffs allege in

Paragraph 41 of the complaint that "as a result of *the defendants'* attempt to evade

responsibility and accountability for their own management errors and mistakes by shifting the blame for Crown's poor performance in recent years to its organized workforce at Crown's Pasadena refinery and locking those workers out of the refinery for almost three years, they have plunged Crown into a public relations crisis." This passage alleges that *"the defendants"* acted to serve selfish concerns rather than the corporation's best interests. However, speculation about director motives is not sufficient to satisfy the pleading requirement of Rule 23.1. *See Grobow v. Perot,* 539 A. 2d 180, 188 (Del. 1988); *In re Walt Disney Co. Derivative Litig.,* 731 A. 2d 342, 356 (Del. Ch. 1998). Plaintiffs do not plead facts with particularity to support their claim of improper motive or to allow the claim to be read as alleging active and deliberate dishonesty. The allegation that the lockout was a ploy to direct blame for poor financial results away from management and onto union workers is not sufficient to meet the Rule 23.1 pleading requirement.

Plaintiffs allege that *"the defendants"* misrepresented Crown's performance in Crown Central Annual Reports:

> Over the past several years, while defendants have been running Crown into the ground and causing it to suffer over $100 million dollars in losses while violating the environmental and civil rights laws, they have repeatedly assured Crown's public shareholders [in Crown's Annual Reports] that Crown was well managed, its business and management systems were modern and that under their stewardship, Crown was well positioned to achieve profitable growth going forward.

(Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 45). The complaint reprints excerpts from Annual Reports for years ranging from 1988 to 1996 that allegedly contain misrepresentations. However, plaintiffs do not allege that any specific individual directors, or the Board collectively, prepared or approved Crown's Annual Reports. Nor do plaintiffs allege that particular directors, or the Board, knew the statements were false when issued. Nor does the complaint specify the facts that conflict with the misrepresentations alleged. Plaintiffs allege generally that *"the defendants"* mismanaged Crown and that the corporation performed poorly. These allegations state no particular facts showing that the directors face liability for making intentional misrepresentations in the Annual Reports that are sufficient to satisfy Rule 23.1.

Plaintiffs contend that this court should relax the Rule 23.1 requirement that a complaint distinguish among the defendants' roles in the alleged wrongdoing. Plaintiffs essentially ask this court to apply in the Rule 23.1 context an approach that some courts have applied in the Rule 9(b) context. Rule 9(b) of the Federal Rules of Civil Procedure requires that allegations of fraud be pleaded with particularity. Some courts have "relaxed the [Rule 9(b) pleading requirement] when factual information is peculiarly within the defendant's knowledge or control." *Craftmatic Securities Litig. v. Kraftsow*, 890 F. 2d 628, 645 (3d Cir.1989); *see also Schwartz v. Celestial Seasonings, Inc.*, 124 F. 3d 1246 (10th Cir. 1997); *Cobb v. Monarch Fin. Corp.*, 913

F. Supp. 1164 (N.D. Ill. 1995). "For example, the complaining stockholders in a derivative suit usually have little information about the manner in which the corporation's internal affairs are conducted and are rarely able to provide details as to the alleged fraud." WRIGHT ET AL., § 1298. Consequently, "where 'corporate insiders are involved and the role of each insider defendant is solely within their knowledge,' the plaintiff need not specify the role of each defendant" in order to comply with Rule 9(b). *Cobb*, 913 F. Supp. at 1180 (quoting *Marc Dev., Inc. v. Wolin*, 845 F. Supp. 547, 556 (N.D. Ill. 1993)). Plaintiffs argue that this approach should also apply to Rule 23.1 and that courts should not require as much particularity in pleading the specific roles of the defendant directors in the alleged misconduct when the shareholder plaintiffs allege wrongdoing by corporate insiders.

The Fifth Circuit, however, has not followed the cases relaxing the Rule 9(b) pleading requirement in suits alleging fraud by corporate insiders. *See Unimobil 84, Inc. v. Spurney*, 797 F. 2d 214, 217 (1986) (dismissing a fraud claim against corporate officers for failure to comply with Rule 9(b) because the complaint did "not state with particularity what representations each defendant made"), *see also Tuchman v. DSC Communications Corp.*, 818 F. Supp. 971, 977 (N.D. Tex. 1993) (same), *aff'd* 14 F. 3d 1061 (5th Cir. 1994). Even if the Fifth Circuit had adopted this "relaxed" approach to Rule 9(b), it has not extended it to the Rule 23.1 demand context. Indeed, plaintiffs cite no case that expressly extends this "relaxed" approach

to the Rule 23.1 demand context. The demand requirement in shareholder derivative actions "is not 'a mere formalit[y] of litigation,' but rather an 'important stricture[ ] of substantive law.'" *Levine v. Smith*, 591 A. 2d 194, 207 (Del. 1991) (quoting *Tandycrafts, Inc. v. Initio Partners*, 562 A. 2d 1162, 1166 (Del. 1989)) (alterations in original). The demand requirement

> affords [corporate] directors an opportunity to exercise their reasonable business judgment and "waive [the right to initiate suit that is] vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. They may regard the expense of enforcing the right or the furtherance of the general business of the corporation in determining whether to waive or insist upon the right."

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 532-533 (1984) (quoting *Corbus v. Alaska Treadwell Gold Mining Co.*, 187 U.S. 455, 463 (1903)). The purpose of the demand requirement is to protect, absent exceptional circumstances, the corporate directors' prerogative to weigh the costs and benefits of litigation to the corporation, and to decide on that basis whether to pursue a lawsuit. *See Burks v. Lasker*, 441 U.S. 471, 485 (1979). The pleading requirement of Rule 23.1 is a procedural mechanism to achieve this substantive purpose.

Rule 23.1 requires the shareholder plaintiff, in the initial pleading, to allege with particularity either the plaintiff's efforts to make demand on the corporation's directors or the reasons why such a demand would be futile. It would frustrate the purpose of the demand requirement to relax the Rule 23.1 pleading

Case 4:99-cv-00123    Document 46    Filed 09/27/1999    Page 31 of 38

standard because the complaining shareholders need discovery to learn information solely within the knowledge of corporate insiders. The cases emphasize a shareholder plaintiff cannot take discovery first in order to permit particularized pleading that might show demand futility cannot be discovered first in order to permit sufficient pleading later. "It is clear that the 'particularity' [required by Rule 23.1] must appear in the pleading itself; the stockholder may not plead in general terms, hoping that, by discovery or otherwise, [s]he can later establish a case. Indeed, if the requirement could be met otherwise, it would be meaningless." *Gonzalez Turul v. Rogatol Distrib., Inc.*, 951 F. 2d. 1, 3 (1st Cir. 1991) (quoting *In re Kauffman Mut. Fund Actions*, 479 F. 2d 257, 263 (1st Cir. 1973)) (second alteration in original); *see also Cramer v. General Telephone & Electronics Corp.*, 582 F. 2d 259, 277 (3d Cir. 1978) (stating that the court "fail[ed] to see how additional discovery could have cured [the] insufficiencies" of plaintiffs' allegations of demand futility); *Grimes v. Donald*, 673 A. 2d 1207, 1218 (Del.1996) (restating the Delaware rule that, under Chancery Rule 23.1, discovery is "not available to a stockholder to uncover the basis for a claim [of demand futility] not yet stated with particularity"); Dennis J. Block et al., *Derivative Shareholder Litigation: Current Law Versus the American Law Institute*, 48 Bus. Law 1443, 1456 (1993) ("Courts both in and out of Delaware consistently have held that a shareholder plaintiff is not entitled to discovery regarding demand futility prior to a

ruling on a motion to dismiss contending that a demand was not made and is not excused.").

Demand futility is a narrow exception to the demand requirement in shareholder's derivative actions. "[D]emand is the norm." *Kamen II*, 939 F. 2d at 463. Relaxing the Rule 23.1 pleading requirement, as plaintiffs ask in this case, would reverse the relationship between the demand requirement and the futility exception. A plaintiff would no longer be required to plead specific facts showing that presuit demand would be futile; rather, the plaintiff would be permitted to bring suit against corporate insiders whenever the relevant available facts did not exclude the possibility that demand might be futile. Under such a rule, even if discovery showed that a majority of the current directors were not exposed to liability as participants in the wrongdoing or were not dominated and controlled by the wrongdoer, the directors would have been denied an opportunity to exercise their business judgment to decide whether to initiate litigation on behalf of the corporation. A relaxation of Rule 23.1 in such cases would cause the demand futility exception to swallow the rule requiring presuit demand on corporate directors.[9]

---

[9]      Even if this court were to "relax" the Rule 23.1 pleading requirement and approve the allegations of wrongdoing by *"the defendants"* generally, plaintiffs' allegations would fail to satisfy Rule 23.1 because they do not state specific facts that place the directors' conduct outside the protections of the corporate charter. *See supra*, pp. 26–30. Many of the allegations would also be deficient because a majority of the current directors were not directors at the time of the alleged misconduct. *See supra*, pp. 25–26.

Case 4:99-cv-00123   Document 48   Filed 09/27/1999   Page 33 of 39

The allegations in the first amended complaint do not plead with particularity facts showing that a majority of the current Crown Board is interested because of exposure to liability for participating in the acts plaintiffs challenge. Presuit demand is not excused as to any of plaintiffs' claims on this basis.

## IV.    The Allegations as to the Directors' Acquiescence in the Rosenbergs' Misconduct

Plaintiffs argue that demand would be futile because the directors "have failed to seek to recover on behalf of Crown for any of the wrongdoings alleged," despite their knowledge of the underlying misconduct. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 36).  However, "[a] board's failure to take [corrective] action, even if it is aware of wrongdoing, does not demonstrate demand futility." *Blasband v. Rales*, 971 F. 2d 1034, 1052 (3d Cir. 1992) (citing *Cramer v. General Tel. & Elec. Corp.*, 582 F. 2d 259, 276 (3d Cir. 1978)); *see also Mozes ex rel. General Elec. Co. v. Welch*, 638 F. Supp. 215, 219 (D. Conn. 1986) ("mere knowledge of wrongs and failure to immediately institute suit, without additional factors being present, are inadequate reasons for a plaintiff to assume the futility of demand"). The allegations that the Crown Board failed to pursue corrective action on its own initiative does not excuse presuit demand.

## V.    The Board's Independence: The Allegations of Board Control and Domination by the Wrongdoers

Plaintiffs' third principal argument to support their allegations of demand futility is that a majority of the Crown Board is dominated and controlled by Henry A. Rosenberg, Jr., Crown's chief executive officer and chairman of the board. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 36). Plaintiffs argue that "[t]he Petition clearly alleges that H. Rosenberg orchestrated and participated in all of the questionable activities forming the basis of plaintiffs' allegations of wrongdoing." (Docket Entry No. 38, p. 15). Because Henry Rosenberg faces liability in this action and because he dominates and controls a majority of Crown's Board of Directors, plaintiffs argue, the Board is unable to determine independently and objectively whether to initiate litigation. Plaintiffs argue that these allegations are sufficient to excuse presuit demand as futile.

The first component of a claim of demand futility based on domination and control is the particularized allegations showing that the controlling party faces liability in the proposed action. *Rales v. Blasband*, 634 A. 2d 927, 936 (Del. 1993). Crown does not challenge plaintiffs' assertion that they have alleged with particularity facts stating a basis for liability as to Henry Rosenberg. In order to satisfy Rule 23.1, plaintiffs must also allege with particularity facts showing that Henry Rosenberg so

dominates a majority of the Board that the Board would be unable to exercise independent judgment in deciding whether to file and pursue litigation against him. *International Equity Capital Growth Fund, L.P. v. Clegg*, 23 Del. J. Corp. L. 259, 267–268 (Del. Ch. 1997).

Plaintiffs allege that members of the Rosenberg family control the American Trading and Production Company (ATAPCO), which owns 51.3% of Crown's outstanding shares of Class A common stock and 16% of Crown's outstanding shares of Class B common stock. (Docket Entry No. 1, Plaintiffs' First Amended Petition, ¶ 30(a)). Shareholders of Class A stock elect all but two of Crown's directors: shareholders of Class B stock elect the remaining two. (*Id.*). Plaintiffs allege that Henry Rosenberg used the power derived from his family's holdings to "hand-pick" Crown's current directors. (*Id.*, ¶ 30(e)–(l)).

Plaintiffs do not allege that Henry Rosenberg himself owns 51% of Crown's Class A and 16% of Crown's Class B stock. Rather, they allege that members of the Rosenberg family collectively control ATAPCO, which in turn owns the cited percentages of Crown stock. Plaintiffs conclusorily allege that Henry Rosenberg "controls, directly or indirectly" the votes associated with the ATAPCO shares. Even if this court were to accept plaintiffs' allegations on this point, Henry Rosenberg's control of a majority of shareholder voting power is not sufficient to show

that he dominates and controls the Board of Directors. *See Aronson,* 473 A. 2d at 815.

Nor does the allegation that Henry Rosenberg hand-picked the current directors suffice

to excuse demand. *Kamen II,* 939 F. 2d at 460; *Aronson,* 473 A. 2d at 816. Plaintiffs

must allege with particularity facts showing that Henry Rosenberg controls the

directors' performance, as well as their election.

The cases that excuse demand on the basis of domination and control

require particularized allegations that show that the Board is incapable of exercising

independent judgment. In *Heineman v. Datapoint Corp.,* 611 A. 2d 950, 955-956

(Del. 1992), the shareholder plaintiffs alleged that the directors of the corporation held

their positions at the pleasure of the principal wrongdoer, that six of the directors

occupied board positions in other entities controlled by the principal wrongdoer, and

that the same six directors had substantial business dealings with the principal

wrongdoer through investments in entities controlled by the wrongdoer. The Delaware

Supreme Court held that these allegations presented "a close question" of domination

and control and remanded the case for further proceedings on the issue. In *Clegg,* 23

Del. J. Corp. L. at 267–268, the court excused demand where a controlling shareholder

accused of wrongdoing had previously used his voting power three times to remove

directors who exercised independent judgment. In *Rales,* 634 A. 2d at 936–937, the

Delaware Supreme Court excused demand because plaintiffs made a sufficient showing

that two brothers dominated and controlled a seven-person board. The two brothers were current directors of the corporation, had previously been officers of the corporation, and together owned 47% of the corporation's stock. Two other directors received salaries of $300,000 and $1 million from corporations controlled by the brothers, and might jeopardize these substantial salaries by defying the brothers' wishes. *See also Friedman v. Benningson*, 1995 WL 716762 at *5 (Del. Ch. 1995) (holding that a complaint satisfied Chancery Rule 23.1 by alleging that a wrongdoer dominated and controlled a three-person board because he owned 36% of the corporation's outstanding stock and served as the corporation's Chairman, Chief Executive Officer, and President; and another director received $48,000 in annual consulting fees from the corporation).

Plaintiffs do not allege with particularity facts showing that Crown's outside directors do not exercise independent judgment in making corporate decisions. Plaintiffs do not allege that Henry Rosenberg removed past directors for exercising independent judgment. *See Clegg*, 23 Del. J. Corp. L. at 267–268. Plaintiffs do not allege with particularity that the directors have very close personal and business relationships with Henry Rosenberg that impair their independence.[10] *See Heineman*,

---

[10]    Plaintiffs do allege that defendant Sanford V. Schmidt, a director of Crown since 1997, is also senior vice president and chief administrative officer of the ATAPCO. Plaintiffs allege that ATAPCO is "the vehicle by which the Rosenberg family controls Crown." (Docket Entry No.

611 A. 2d at 955-956. Plaintiffs do not allege with particularity that the defendant directors receive substantial income, compensation, or other financial benefits that depend upon Henry Rosenberg's approval of their actions as Crown directors. *See Rales*, 634 A. 2d at 936–937.

Plaintiffs argue that the pattern of misconduct alleged in their complaint demonstrates the directors' lack of independence. In their opposition to Crown's Rule 23.1. motion, plaintiffs argue that "[y]ielding to H. Rosenberg's will, the directors agreed to the appointment of Rosenberg's two sons, Edward and Frank, who had participated in much of the alleged wrongdoing as senior officers and granted them and others who showed him loyalty and deference, millions in wasteful benefits or payments." (Docket Entry No. 38, p. 16–17) (citation omitted). Plaintiffs also contend that "the Crown directors allowed H. Rosenberg to foist his decision upon the Board and railroad through a Board approval of the [1996] lock-out – a true indication of H. Rosenberg's dominance and the Board's lack of independence." (*Id.*, p. 16).

This court cannot properly infer a lack of independence of a majority of the board from such conclusory statements.[11] *See Aronson*, 473 A. 2d at 816 (holding that the mere directors' approval of an employment agreement benefitting the

---

1, Plaintiffs' First Amended Petition, ¶ 30(j)). Assuming that this relationship is sufficient to show that Schmidt is not disinterested, *see Kahn v. Tremont Corp.*, 1994 WL 162613 at *2 (Del. Ch. 1994), plaintiffs still would not have shown that a majority of the board lacks independence .

[11]    It is notable that plaintiffs make these specific allegations of Board action in their opposition to Crown's Rule 23.1. motion, not in their complaint.

controlling stockholder did not evidence domination and control); *cf. Heineman* at 954–955; *Rales* at 936-937. Plaintiffs do not allege facts showing that a majority of the current Board of Directors routinely vote in accordance with Henry Rosenberg's wishes without making an independent and informed decision. *See Andreae v. Andreae*, 1992 WL 43924 at *5 (Del. Ch. 1992). Plaintiffs do not specifically allege that a majority of the current Board of Directors approved transactions that benefitted Henry Rosenberg and were, on their face, so unfair to the corporation as to raise serious doubts about the directors' independence. *See Kells-Murphy v. McNiff*, 1991 WL 137143 at *2 (Del. Ch. 1991); *see also Aronson*, 473 A. 2d at 816 n. 10. Plaintiffs' allegations are insufficient under Rule 23.1 to show that a majority of the current Crown Board is dominated and controlled by Henry Rosenberg. Plaintiffs have failed to allege demand futility with sufficient particularity to survive Crown's motion to dismiss.

## VI. Order

This court GRANTS Crown's motion to dismiss plaintiffs' first amended complaint under Rule 23.1, with leave to amend. Plaintiffs must replead within 30 days from the date this memorandum and order is filed.

SIGNED on September 27, 1999, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

# TAB 15

Not Reported in A.2d                                                          **Page 1**

Not Reported in A.2d, 1990 WL 67383 (Del.Ch.), Fed. Sec. L. Rep. P 95,275, 16 Del. J. Corp. L. 815
(Cite as: 1990 WL 67383 (Del.Ch.), 16 Del. J. Corp. L. 815)

H

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
**Harry LEWIS, et al., Plaintiffs,**
v.
**LEASEWAY TRANSPORTATION CORPORATION, Gerald C. McDonough, John C. Dannemiller, Edward F. Bell, Harry J. Bolwell, Robert A. Burgin, J. Andrew Kundtz, Terry Lautenbach, A. William Reynolds, Wilbert E. Schauer, Paul G. Schloemer, James R. Stover, Dale W. Turnbull, Richard M. Cashin, Jr., Citicorp Capital Investors, Ltd., LTC Holdings, Inc., LTC Acquisition Corp. and Drexel Burnham Lambert, Inc., Defendants.**
**CIV. A. No. 8720.**

Submitted: April 16, 1990.
Decided: May 16, 1990.

**\*\*818** Norman M. Monhait, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, Wolf, Popper, Ross, Wolf & Jones, Abbey & Ellis, Goodkind, Wechsler, Labaton & Rudoff, and Greenfield & Chimicles, P.C., New York City, for plaintiffs.

Charles F. Richards, Jr., and Kevin G. Abrams, of Richards, Layton & Finger, Wilmington, **\*\*819** and Laurence A. Silverman, William M. Murphy, and John G. Hutchinson, of Cahill, Gordon & Reindel, New York City, for defendant Drexel Burnham Lambert Incorporated.

*MEMORANDUM OPINION*

CHANDLER, Vice Chancellor.

**\*1** This is my decision on defendants' motion to dismiss a purported class action that was precipitated by the leveraged buy out ("LBO") of Leaseway Transportation Corporation ("Leaseway"). The second amended consolidated and supplemental class action complaint ("complaint") was filed on June 1, 1987, by Leaseway common shareholders who were cashed out as a result of the now challenged LBO transaction. They challenge the fairness of the transaction. Leaseway and its directors, together with Richard M. Cashin, Jr., Citicorp Capital Investors, Ltd. and its affiliates, and Drexel Burnham Lambert, are named as defendants.

On June 11, 1987, plaintiffs sought a preliminary injunction enjoining the consummation of the challenged transaction. This Court denied plaintiffs' motion after finding, *inter alia,* that they had not met their burden of showing a reasonable probability of success on the merits. *Lewis v. Leaseway Transportation Corp.,* Del. Ch., C.A. No. 8720, Hartnett, V.C. (June 12, 1987).

I.

This case is now before the Court on defendants' motion to dismiss for failure to state a claim under Chancery Court Rule 12(b)(6). On such a motion "it must appear with a reasonable certainty that a plaintiff would not be entitled to the relief sought under any set of facts which could be proven to support the action." *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985) (*citing Harman v. Masoneilan International, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982)). All well-pleaded factual allegations (as distinguished from legal conclusions) are accepted as true and deemed admitted, and all well-supported inferences are construed in favor of the non-moving party. *Siegman v. Tri-Star Pictures, Inc.,* Del. Ch., C.A. No. 9477, slip op. at 2, Jacobs, V.C. (May 5, 1989); *Harman v. Masoneilan International Inc., supra.* Because only general notice of **\*\*820** the asserted claims is required, a complaint will not be dismissed unless it is clearly without legal or factual merit. *Rabkin v. Philip A. Hunt Chemical Corp., supra* (*citing Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 217 (1979); *Delaware State Troopers Lodge v. O'Rourke,* Del. Ch., 403 A.2d 1109, 1110 (1979). As is necessary on a motion to dismiss, the relevant facts, taken as true, are gleaned from the complaint. *Delaware State Troopers Lodge v. O'Rourke, supra.* In addition, as is the practice of this Court, uncontroverted facts from the proxy statement that are incorporated in the complaint by reference will also be considered. *See Patents Management Corp. v. O'Connor,* Del. Ch., C.A. No. 7110, Walsh, V.C., slip op. at 2 (June 10, 1985); *Greenfield v. National Medical Care, Inc.,* Del. Ch., C.A. Nos. 7720 and 7765, slip op. at 1,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d

(Cite as: 1990 WL 67383, *1 (Del.Ch.), 16 Del. J. Corp. L. 815, **820)

Page   2

Berger, V.C. (June 6, 1986);  *Porter v. Texas Commerce Bancshares, Inc.,* Del. Ch., C.A. No. 9114, slip op. at 2 n. 2, Allen, C. (Oct. 12, 1989).

## II.

Before the challenged transaction, Leaseway was a full service franchising company incorporated in Delaware and principally located in Ohio.    As of September 30, 1986, Leaseway had  11,819,000 shares of common stock outstanding that traded on the New York Stock Exchange.

**\*2**    According  to  plaintiffs,  the  challenged transaction is a direct result of the O'Neill family expressing their dissatisfaction with Leaseway management during the spring of 1986.        The O'Neills, who are relatives of Leaseway's founders, controlled, at that time, 30% of Leaseway's stock. There are no allegations, however, that they in anyway controlled Leaseway. [FN1]  In furtherance of their dissatisfaction, the O'Neills formed the "Committee to Revitalize Leaseway Transportation Corporation."    This committee served as the vehicle by which the O'Neills launched a proxy battle to replace the incumbent Leaseway directors.  During the proxy battle, which commenced in April or May of 1986, the O'Neills stated that they would, if they gained control, attempt to sell Leaseway.        In response, Leaseway management announced that it was in a better position to sell the **\*\*821** company and proceeded to fight the O'Neill group with its own slate of directors.

Before the eventual reelection of the management slate, management put into place a process to solicit and   consider   offers   to   purchase   Leaseway. Salomon Brothers Inc. ("Salomon") was retained to assist the board and then the Evaluation Committee ("special committee"), which was established on August 14, 1986.      There are no allegations that Salomon answered to anyone other than the special committee after the special committee was formed. The special committee, which appears to have retained independent legal counsel, consisted of Leaseway directors  who  were not  otherwise employed or affiliated with Leaseway or the soon to be established acquisition group.      The complaint contains no indication that the members of the special committee were interested in the challenged transaction.

Shortly after the management slate was reelected,

plaintiffs assert, the incumbent board adopted certain amendments to the company's bylaw that made it more difficult for shareholders to replace management.    Plaintiffs also point to a September 9, 1986, letter from the O'Neills that criticizes the bylaw and demands its repeal.      In addition, the O'Neills sought information about Leaseway's dealings with potential acquirers.    These actions by the O'Neills, plaintiffs contend, demonstrate that the O'Neills, at least in the minds of Leaseway's management, were a potential threat to any future transaction.

While   the   complaint   makes   no   allegations concerning how the special committee solicited and received offers to purchase Leaseway, the proxy statement contains a detailed description of the process.      There are also no allegations of offers other than the offer that Leaseway eventually accepted.

At some point during the fall of 1986, the special committee started to concentrate on a potential LBO by an acquisition group (the "buy out group") in which Leaseway management (the "management group")  would  participate  as  substantial  (20%) equity owners.      Leaseway director, Gerald C. McDonough ("McDonough"), chairman of the board and chief executive officer was part of the group.    Other members of the management group are not specifically identified in the complaint.    In furtherance of the contemplated LBO, plaintiffs say that Leaseway expanded a profitable operation and sold another to facilitate financing.

**\*3** It is unclear from the complaint whether the management group contacted Citicorp Capital Investors, Ltd. ("Citicorp") or if Citicorp contacted the  management  group.        Regardless,  Citicorp started making **\*\*822** arrangements for a LBO in which the management group would participate. Citicorp was represented by one of its vice presidents, Richard M. Cashin, Jr. ("Cashin") who was the sole officer and director of its affiliate LTC Holdings and its wholly owned subsidiary LTC Acquisition (collectively "Citicorp"), the latter of which was created solely to effectuate the LBO. Citicorp brought in Drexel Burnham Lambert ("Drexel") to participate by assisting in financing the  transaction.      Citicorp  and  Cashin  agreed  to arrange the transaction and act as the principal spokesman for the buy out group that consisted of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d                                    Page   3
(Cite as: 1990 WL 67383, *3 (Del.Ch.), 16 Del. J. Corp. L. 815, **822)

members of Leaseway management, Drexel and
itself.   The management group, as mentioned, was
to have a 20% interest after the purchase, with
Citicorp and Drexel having the remaining 8%
interest.

On November 13, 1986, Leaseway announced that
its directors had approved a leveraged buy out of
Leaseway.      The terms of the acquisition were
embodied in an agreement of merger dated
November 13, 1986 ("merger agreement").        The
merger agreement provided, subject to adoption by
Leaseway's stockholders, for a tender offer and
merger in which public holders of Leaseway
common stock would receive $51 per share.       The
merger agreement contained a $15 million "break
up" fee that would be paid to Citicorp if the
transaction was not consummated.     It also required
Leaseway to advance $5,000,000 to Citicorp
towards contingent expenses.       In addition, the
merger agreement contained a "no shop" provision
that restricted Leaseway's ability to encourage,
solicit or initiate further discussion with potential
acquirers.    Finally, Leaseway granted Citicorp a
"lock up" option to purchase up to 2,150,000
common shares (18% of Leaseway's outstanding
shares) at $51 per share.

After announcement of the buy out, the complaint
states that the O'Neill family expressed their
dissatisfaction with the transaction.      Plaintiffs
allege that the defendants were concerned about the
O'Neill's dissatisfaction since the O'Neills were
Leaseway's largest stockholder group.         To
eliminate this concern plaintiffs contend that
Leaseway, with the approval of Cashin, Citicorp and
Drexel, entered into stock purchase agreements with
the O'Neills.    Leaseway agreed to purchase up to
2.2 million shares of Leaseway common stock
owned by the O'Neill family at a price of $48.125
per share.      On December 22 and 23, 1986,
Leaseway purchased a total of 2,199,988 shares.
This purchase, plaintiffs maintain, was entirely
beneficial to the O'Neills, since it allowed them to
take advantage of lower tax rates about to expire.
Plaintiffs further allege that the buy back violated
Leaseway's charter.      This last allegation deserves
illumination.

**823 In May of 1983, Leaseway shareholders
approved article thirteen of Leaseway's restated
certificate of incorporation.      Article thirteen

provides, among other things, that an "interested
stockholder,", *i.e.,* any person who, together with
affiliates and associates, owns 20% or more of
Leaseway's outstanding stock, cannot receive special
benefits as a result of the sale of shares to Leaseway
without the authorization or approval of the holders
of 80% of Leaseway shares.      The complaint states
that the Leaseway directors were required "to make
diligent inquiry to determine compliance with article
thirteen" and that it could have been determined that
the O'Neill family constituted an "interested
stockholder" as defined by article thirteen.      From
this the complaint concludes that the board breached
its fiduciary duties by failing to make such a
determination.

*4 The complaint alleges that the buy out price was
grossly inadequate and that the buy out was
permeated with unfair dealing.      The unfair dealing
allegations include:   failing to properly negotiate
with prospective bidders, subjecting Leaseway to an
excessive "breakup" fee, a "no shop" clause and
"lock up" option, bestowing a substantial benefit on
the O'Neill family not available to other
shareholders, taking advantage of Leaseway's
expected increase in revenues, offering a price to
shareholders not the result of arm's length
negotiations and adequate evaluation of Leaseway.
The complaint also includes claims that the proxy
statement used to solicit shareholder approval was
false and misleading in the following respects:   (1)
by failing to state or set forth differences between
material facts assumed by Salomon when it
performed its August 26, 1986, feasibility study and
when the buy out was approved or when the proxy
statement was released;   (2) by failing to update the
directors' November 13, 1986, recommendation that
the buy out was fair;   (3) by failing to update
Salomon's November 19, 1986, fairness opinion;
(4) by failing to inform shareholders that Salomon
had not updated its fairness opinion and;   (5) for
failing to inform the shareholders that the directors
had not reconsidered the fairness of the transaction
since November 13, 1986.

Defendants Cashin and Citicorp are alleged to have
knowingly participated in the buy out transaction
notwithstanding their knowledge of the claimed
unfair dealing and unfair price.      Defendant Drexel
is alleged to have conspired with or aided and
abetted the director defendants' breaches of
fiduciary duty by knowingly giving substantial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Page 4

Not Reported in A.2d
(Cite as: 1990 WL 67383, *4 (Del.Ch.), 16 Del. J. Corp. L. 815, **823)

assistance.

Plaintiffs seek class action status, a declaration that the buy out is unfair and inequitable, rescission and rescissory damages.

**824 III.

The issue before me is whether the complaint should be dismissed for failure to state a claim. Before reaching this issue, however, the underlying claim must be accurately characterized. Plaintiffs' complaint alleges an entire fairness claim. *See Weinberger v. UOP*, Del.Supr., 457 A.2d 701 (1983); *Rabkin v. Philip A. Hunt Chemical Corp., supra.* Defendants, to some extent, acknowledge plaintiffs' characterization by arguing, under *Weinberger v. UOP, supra*, that plaintiffs have not adequately alleged unfair dealing and are thereby relegated to an appraisal. These allegations and defendants' argument miss the point that the complaint provides no basis to invoke the entire fairness standard--the special scrutiny given to transactions effectuated by stockholders or directors who have divided loyalties. *Rand v. Western Airlines, Inc.*, Del. Ch., C.A. No. 8632, Berger, V.C., slip op. at 5,6 (Sept. 11, 1989) (citing *David J. Greene & Co. v. Dunhill Int'l, Inc.*, Del. Ch., 249 A.2d 427, 430-31 (1968). If the standard is not invoked, the obligation to pay a fair price does not arise. *Porter v. Texas Commerce Bancshares, Inc.*, Del. Ch., C.A. No. 9114, Allen, J., slip op. at 12-13 (Oct. 12, 1989). In this situation, the shareholders have the legal right to vote on the transaction or to dissent and demand appraisal under 8 *Del.C.* § 262, and to require directors, in equity, to act in the good faith pursuit of corporate or shareholder interest. *Id.* Whether plaintiffs have stated a claim as to this latter equitable right will be addressed below. But first, the inapplicability of the entire fairness standard deserves a brief additional comment.

*5 In *Dunhill Int'l, Inc., supra*, this Court recognized the settled law that a majority stockholder who stands in a fiduciary position to the minority and also stands on both sides of a transaction, bears the burden of establishing the entire fairness of the transaction, and must pass the test of careful scrutiny by the courts. *Dunhill Int'l, Inc., supra*, citing *Sterling v. Mayflower Hotel Corp.*, Del. Ch., 89 A.2d 862 (1952). Those characteristics of a transaction that implicate the

entire fairness standard are conspicuously absent in this case. To begin with, the Leaseway transaction did not involve a majority stockholder. The vast majority of Leaseway's outstanding stock was held by individuals with no interest in the LBO transaction. Citicorp and Drexel are not alleged to have held any Leaseway stock (although the buy out group did eventually exercise its option to purchase 18% of Leaseway's outstanding stock). The director defendants are alleged to have, as a group, owned or controlled approximately 8% of **825 Leaseway's total outstanding stock. It therefore goes without saying that the challenged transaction was not the type in which a majority stockholder had its way with the minority stockholders, *i.e.*, a freeze-out merger. There was no helpless minority, the transaction depended on the affirmative vote of Leaseway's stockholders. (The informed nature of this vote is addressed in section IV of this Opinion).

Not only was this transaction absent a majority stockholder, it was also absent directors with divided loyalties. *See David J. Greene & Co. v. Dunhill Int'l, Inc., supra*. The complaint contains no non-conclusory allegations that a majority of the Leaseway directors were interested or lacked independence. Indeed, ten out of twelve directors were outside directors with no interest whatsoever in the challenged transaction. Without divided interests, "the judgment of the majority stockholders and/or the board of directors ... is presumed made in good faith and inspired by a bona fides of purpose." *Rand v. Western Airlines Inc., supra* (citing *David J. Greene & Co. v. Dunhill Int'l, Inc., supra*). This presumption of sound business judgment fails only where the stockholders or directors, who control the transaction, stand on both sides of that transaction.

The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). The presumption, which protects a board-approved transaction, can be overturned, at this stage, if a plaintiff adequately alleges that a majority of directors expected to derive personal financial benefit from the transaction, that they lacked independence or that they were grossly negligent in failing to inform themselves. *Id.* at 812. As





Not Reported in A.2d
(Cite as: 1990 WL 67383, *5 (Del.Ch.), 16 Del. J. Corp. L. 815, **825)

defendants point out, accepting the well-pleaded allegations of plaintiffs' complaint as true, they do not adequately allege self-dealing, lack of independence, or failure, on the part of the Leaseway board, to adequately inform itself. Having failed to meet the *Aronson* pleading requirements, plaintiffs' claims challenging the merger transaction must be dismissed.

**\*6** With respect to plaintiffs' disclosure claims, however, the business judgment rule has no applicability to the question whether shareholders have been provided with appropriate information to make an informed choice because the underlying duty (candor) does not concern the management of business and the affairs of the corporation. *In Re Anderson, Clayton Litigation,* Del. Ch., 519 A.2d 669, 675 (1986).   I must therefore examine plaintiffs' disclosure claims **\*\*826** without affording defendants the presumption of the business judgment rule.

### IV.

The parties do not dispute that the Leaseway directors owed a duty, in relation to the challenged transaction, of complete candor to the Leaseway stockholders.    This duty requires the disclosure of all material facts.   *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985).   "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976).   Put another way, for a fact to be material, "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*   Approval of a transaction by public shareholders who have been denied material information is given little, if any, weight. *See Weinberger,* 457 A.2d at 712.   On the other hand, attack on a transaction ratified by a majority of fully informed shareholders must normally fail. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 890 (1985). The complaint alleges that Leaseway's proxy statement soliciting shareholder approval for the challenged transaction was false and misleading in three respects.    All three instances involve alleged omissions of material fact.

The first alleged material nondisclosure involves the feasibility study performed by Salomon on August 26, 1986.   Plaintiffs contend that the proxy statement is materially false and misleading because it does not state or set forth the purported important differences between material facts assumed by Salomon initially and those existing at the time of the issuance of the proxy statement.    Plaintiffs contend that differences relating to the sale of Leaseway assets, the cost of repurchase by Leaseway of minority stock interest, different interest rate assumptions, and different revenue projections should have been disclosed in this regard.    In other words, it seems to me, plaintiffs argue that Leaseway should have commissioned a new feasibility study that would account for the various changed circumstances.    This argument fails on several grounds.

First, it is important to note that plaintiffs do not allege that Leaseway's proxy statement was materially misleading because it failed to disclose the "changed circumstances."    This is so for the simple reason that the proxy statement goes out of its way to include information regarding changed circumstances--both between the time of Salomon's August 26, 1986, feasibility analysis and its November **\*\*827** 19, 1986, fairness opinion, and between the November fairness opinion and the May 12, 1987, proxy statement.    Plaintiffs point to no material facts that were not disclosed.

**\*7** In addition, plaintiffs have nowhere alleged how incorporating the disclosed changed circumstances into a new feasibility study would significantly alter the total mix of information already provided. *See Weinberger v. Rio Grande Industries, Inc.,* Del. Ch., 519 A.2d 116, 122 (1986); *Lewis v. Charan Industries, Inc.,* Del. Ch., C.A. No. 7738, Berger, V.C., slip op. at 7-8 (Sept. 20, 1984).   For these reasons, plaintiffs' first disclosure claim is without merit.

Plaintiffs' second and third disclosure claims can be treated as one because they are similar in nature and must be rejected for the same reason.   Both are claims that the proxy statement is materially false and misleading because certain documents within the proxy statement were not updated and the shareholders were not informed of this failure.   The documents are:   the November 13, 1986, recommendation of the Leaseway directors that the buy out was fair and the November 19, 1986, fairness opinion of Salomon.   Both documents are





Not Reported in A.2d
(Cite as: 1990 WL 67383, *7 (Del.Ch.), 16 Del. J. Corp. L. 815, **827)

purported to be materially false and misleading solely because they were not updated and because the shareholders were not informed that the documents had not been updated (one can assume, however, that the shareholders were on notice that the documents had not been updated since each clearly stated the date of its execution).

Plaintiffs appear to be alleging, in the same fashion as the previous allegation, that the proxy statement was materially false and misleading because Leaseway did not commission a new fairness opinion and did not get an updated fairness recommendation of the directors. Plaintiffs are not alleging nondisclosure of changes in the facts and circumstances of Leaseway, up until the proxy was released. Indeed, the proxy statement disclosed changes. These claims, as with the first, fail because they do not allege how updating the fairness opinion and the director recommendation would have altered the total mix of information provided. *See Weinberger v. Rio Grande Industries, Inc., supra.* I am not aware of a *per se* rule that such documents must be updated after a certain time. If there were such a rule, I doubt it would include documents, such as those before me, that are only six months old. I am therefore left without a choice but to dismiss these conclusory allegations.

### V.

Defendants Citicorp and Drexel are charged with aiding and abetting the director defendants in their breaches of fiduciary **828 duty. Plaintiffs do not claim, nor could they, that Citicorp or Drexel owed a fiduciary duty to Leaseway shareholders. To state a claim for aiding and abetting the breach of a fiduciary's duties, plaintiffs must allege: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) a "knowing participation" in that breach by the defendants who are not fiduciaries. *Gilbert v. El Paso Co.,* Del. Ch., 490 A.2d 1050, 1057 (1984); *In re Sea-Land Corporation Shareholders Litigation,* Del. Ch., C.A. No. 8453, Jacobs, V.C., slip op. at 9 (Jan. 6, 1989). Plaintiffs have adequately alleged a fiduciary relationship between the director defendants and plaintiff shareholders. The plaintiffs have not, however, adequately alleged a breach of that fiduciary's duty.

*8 Had such a breach been adequately alleged, plaintiffs claim against Citicorp and Drexel would

be dismissed nevertheless. The complaint alleges no facts to support plaintiffs' conclusions that either defendant aided and abetted the purported breaches by the Leaseway directors. While courts will infer knowledge, this Court refuses to infer knowledge of a breach of fiduciary duty unless the action comprising the purported breach is "inherently wrongful." *Greenfield v. National Medical Care Inc.,* Del. Ch., C.A. Nos. 7720, 7765, Berger, V.C., slip op. at 10 (June 6, 1986). There is nothing inherently wrongful about any of the purported breaches of the Leaseway directors.

### VI.

Plaintiffs have failed to allege facts from which I may infer that the proxy disclosures were materially misleading. In addition, there are no allegations that justify a conclusion that the board acted improperly or that the business judgment rule does not protect the board from further judicial scrutiny. The allegations that Citicorp and Drexel aided and abetted the breach of the fiduciary duties of the director defendants necessarily fail. For the reasons stated, the complaint is dismissed.

IT IS SO ORDERED.

> FN1. In Delaware a stockholder is not deemed controlling unless it owns a majority of the stock, *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815 (1984), or has exercised actual domination and control in directing the corporation's business affairs. *Gilbert v. El Paso Co.,* Del. Ch., 490 A.2d 1040, 1055 (1984). Neither is alleged here.

Not Reported in A.2d, 1990 WL 67383 (Del.Ch.), Fed. Sec. L. Rep. P 95,275, 16 Del. J. Corp. L. 815

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



