IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
                                              :
IN RE MBNA CORPORATION                        :
DERIVATIVE AND CLASS                          :     Lead Case No. 1:05-CV-00327-
LITIGATION                                    :     GMS
                                              :
This Document Relates To:                     :
ALL ACTIONS.                                  :     CLASS AND DERIVATIVE
                                              :     ACTION
                                              :
-------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
OPENING BRIEF IN SUPPORT OF THE MBNA OUTSIDE
DIRECTOR DEFENDANTS' MOTION TO DISMISS


Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
4 Times Square
New York, New York  10036-6522
(212) 735-3000

DATED:  January 20, 2006

# INDEX

CASES                                                                          TAB NO.

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati,
  Inc., C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) ..................................... 1

In re Citigroup Inc. S'holders Litig.,
  C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ......................................... 2

Criden v. Steinberg,
  C.A. No. 17082, 2000 WL 354390 (D. Del. Mar. 23, 2000) ............................................. 3

In re Encore Computer Corp. S'holders Litig.,
  C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) .......................................... 4

Ercole v. Conectiv & Coventry Health Care of Del., Inc.,
  C.A. No. 03-186 GMS, 2003 WL 21104926 (D. Del. May 15, 2003) .............................. 5

In re Frederick's of Hollywood, Inc. S'holders Litig.,
  C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ........................................... 6

Freedman v. Rest. Assocs. Indus.,
  C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990) ............................................ 7

In re Freeport-McMoran Sulphur, Inc. S'holders Litig.,
  C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) ............................................. 8

Herd v. Major Realty Corp.,
  C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21,1990) ............................................ 9

Hudson v. Prime Retail, Inc.,
  C.A. No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 10

Jacobs v. Yang,
  C.A. No. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ............................................ 11

Jasinover v. Rouse Co.,
  C.A. No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) .................... 12

Jolly Roger Fund LP v. Sizeler Property Investors, Inc.,
  C.A. No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ......................... 13

i

Knox v. Rosenberg,
      No. H-99-0123 (S.D. Tex. Sept. 28, 1999) ...................................................................... 14

Lewis v. Leaseway Transp. Corp.,
      C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16,  1990) ............................................ 15

Litt v. Wycoff,
      C.A. No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ................................ 16

Manzo v. Rite Aid Corp.,
      C.A. No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ............................... 17

Nebenzahl v. Miller,
      C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) ........................................... 18

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v.
      Elkins, C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........................... 19

Pogostin v. Rice,
      C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983) ............................................. 20

Porter v. Texas Commerce Bancshares, Inc.,
      C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ............................................ 21

Rattner v. Bidzos,
      C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................................ 22

Seibert v. Harper & Row, Publishers, Inc.,
      C.A. No. 6639, 1984 WL 21874 (Del. Ch. Dec. 5, 1984) ............................................... 23

Sekuk Global Enters. Profit Sharing Plan v. Kevenides,
      C.A. No. 24-C-03-007496, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................. 24

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
      C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999) ............................ 25

In re Walt Disney Co. Derivative Litig.,
      C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ......................................... 26

In re Wheelabrator Tech. Inc. S'holders Litig.,
      C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ........................................... 27

# TAB 16

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**
c

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**H. Allen LITT, Trustee of the H. Allen Litt,
Esq., P.C. Pension Fund, Dated
September 1, 1984, Derivatively on Behalf of
Nominal Defendant, Progress
Financial Corporation, Plaintiff,
v.
W. Kirk WYCOFF, Stephen T. Zarrilli, Joseph
R. Klinger, Charles J. Tornetta, A.
John May, Kevin J. Silverang, William O.
Daggett, William L. Mueller, Paul M.
Lanoce, G. Daniel Jones, and John E.F. Corson,
Defendants,
and
PROGRESS FINANCIAL CORPORATION, a
Delaware corporation, Nominal Defendant.
No. Civ.A. 19083-NC.**

Submitted April 24, 2002.
Decided March 28, 2003.

Norman M. Monhait, of Rosenthal, Monhait,
Gross & Goddess, P.A., Wilmington, Delaware,
Sherrie R. Savett, Carole A. Broderick, Michael T.
Fantini, and Christopher L. Nelson, of Berger &
Montague, P.C., Philadelphia, Pennsylvania, for
Plaintiff.

Kenneth J. Nachbar, and William M. Lafferty, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware, for Defendants W. Kirk Wycoff, Stephen
T. Zarrilli, Joseph R. Klinger, Charles J. Tornetta,
A. John May, Kevin J. Silverang, William O.
Daggett, William L. Mueller, Paul M. Lanoce, G.
Daniel Jones, and John E.F. Corson.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

### I. INTRODUCTION

**\*1** Plaintiff H. Allen Litt brings this derivative
action, in his capacity as trustee of the H. Allen
Litt, Esq. P.C. Pension Fund, [FN1] on behalf of
nominal defendant, Progress Financial Corporation,
a Delaware corporation and thrift holding company
("Progress Financial" or the "Company"). Progress
Financial, in turn, is the sole shareholder of

Progress Bank, a federally chartered savings bank
(the "Bank"). [FN2] The boards of directors of the
Company and the Bank are identical in composition.
The Plaintiff alleges that the directors of Progress
Financial breached their fiduciary duties to the
Company and its shareholders by conducting lending
activities, which the Plaintiff contends were
inappropriate for a thrift entity, through the
TechBanc division: [FN3] by paying bonuses to
officers, in the form of warrants received from
lending customers, for securing business for the
TechBanc division (the "Incentive Compensation
Plan"); and by paying certain other fees and
commissions to officers and directors.

FN1. The caption lists Mr. Litt as the trustee of the
pension fund. The Complaint alleges that "Plaintiff
H. Allen Litt is, and was at all relevant times, a
shareholder of nominal defendant Progress
Financial." Compl. ¶ 2. Throughout this opinion, I
presume standing of the Plaintiff, either personally or
as trustee of the pension fund, on the basis of this
allegation.

FN2. The Complaint is often ambiguous about which
entity, the Company or the Bank, took specific
actions. For the purposes of this Memorandum
Opinion, however, the differences are not material to
my analysis. Therefore, I refer to the entities
nonspecifically throughout this opinion as "Progress"
wherever distinction is unnecessary or impossible.

FN3. It is unclear whether TechBanc is a division of
the Company or of the Bank. The Complaint refers
to TechBanc as "the Bank's soon to be defunct
division," Compl. ¶ 4(e), and as "the Company's
'Special Lending Division." ' *Id.* ¶ 19.

The Defendants have moved to dismiss the action
because the Plaintiff failed to make demand upon
Progress' board of directors as required by Court of
Chancery Rule 23.1. For reasons discussed below,
the motion to dismiss is granted.

### II. FACTUAL BACKGROUND [FN4]

FN4. The facts upon which I base this decision and,
unless otherwise specified, all facts discussed in this
opinion are taken from the well-pled allegations of
the Complaint and any documents incorporated by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




reference. *See White v. Panic,* 783 A.2d 543, 547-48 n. 5 (Del.2001).

The Defendants, who are directors of Progress Financial and the Bank, are W. Kirk Wycoff ("Wycoff"), Joseph R. Klinger ("Klinger"), Stephen T. Zarrilli ("Zarrilli"), Charles J. Tornetta ("Tornetta"), A. John May [FN5] ("May"), Kevin J. Silverang [FN6] ("Silverang"), William O. Daggett, Jr. ("Daggett"), William L. Mueller ("Mueller"), Paul M. LaNoce ("LaNoce"), G. Daniel Jones ("Jones"), and John E.F. Corson ("Corson"). Wycoff is, in addition, the President and Chief Executive Officer of both the Company and the Bank and is the Chairman of the Board of the Company. Klinger also serves as Executive Vice President of the Bank. [FN7]

> FN5. May is a partner at the law firm of Pepper, Hamilton LLP, which provides legal services to the Company.

> FN6. Silverang is a partner at the law firm of Buchanan Ingersoll, which provides legal services to the Company.

> FN7. Klinger may be an officer of the Company as well. *See* Compl. ¶ 28 (discussing the Company's award of compensation to its executive officers, including Klinger).

Tornetta's family members are partners in 436 Plymouth Road Associates, L.P. ("Plymouth Road"). Progress Financial has a fifteen-year lease on property owned by Plymouth Road on which Progress Financial makes lease payments totaling $85,000 annually.

Zarrilli was Chief Executive Officer and Chief Financial Officer of U.S. Interactive, Inc. ("USIT"). USIT, under Zarrilli's leadership, was a significant borrower from Progress. During that time, Wycoff and Zarrilli developed a "significant and longstanding relationship." [FN8] Zarrilli became a director of Progress in June 2000 and left his position at USIT on September 15, 2000. USIT filed for bankruptcy in January 2001. Zarrilli is a major shareholder of USIT; USIT's May 1, 2000, proxy statement disclosed that Zarrilli owned nearly 600,000 shares of USIT common stock.

> FN8. *Id.* ¶ 5.

The Complaint is primarily focused on the TechBanc division's business. Over time, the lending activities conducted through the TechBanc division had the effect of changing the allocation of Progress' lending and leasing portfolio by increasing the percentage of Progress' assets allocated to commercial loans. [FN9] TechBanc specialized in lending to start-up Internet and technology companies. Following a review and examination of the Bank, the Office of Thrift Supervision ("OTS") issued a directive requiring the Bank to:

> FN9. This impact on the portfolio allocation is alleged to have caused the Bank to violate the Home Owners' Loan Act's ("HOLA") qualified thrift lender test, which requires thrift institutions, such as the Bank, to maintain a certain percentage of their portfolio in housing, small business and consumer-related assets. *See* 12 U.S.C. § 1467a(m) (codifying the qualified thrift lender test). The Complaint also asserts that the TechBanc lending activities have resulted in large losses to the Bank. The only specifics given are that as a result of making more loans with higher risks, Progress was required to increase its loss reserves, which resulted in the Company reporting a loss of $1.4 million in the second quarter of 2001. This allegation, however, is amplified by the allegation that the losses reported in 2001 were caused by the need to reverse a $2.6 million gain (reported in 2000) on USIT warrants which had subsequently declined in value.

**\*2** "(i) reduce its lending to early stage companies; (ii) increase its leverage capital ratio ...; and (iii) increase its valuation allowance and implement improved credit review and monitoring programs." [FN10]

> FN10. Compl. ¶ 35 (quoting Progress Financial Corp. Press Release of July 12, 2001).

Progress issued a press release announcing that the directors had approved a resolution to bring the Bank into compliance with the directive. In addition, Progress announced its intention to "wind down [its] technology-based portfolio of loans to pre-profit clients," [FN11] apparently a decision to discontinue or to change radically the lending activities of the TechBanc division.

> FN11. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2003 WL 1794724, *2 (Del.Ch.))

Progress received warrants from borrowers on loans made through TechBanc. In 1999, Progress initiated the Incentive Compensation Plan through which officers and employees received a portion of the warrants that were issued to Progress. The grant of warrants was tied to the making of the loan and was not based on the repayment performance of the borrower. The employees to whom these warrants were transferred could liquidate them 180 days after receipt either in the open market or by having Progress cash out the warrants. Through this plan, Wycoff received warrants to acquire shares in five companies in 1999. [FN12] In 2000, Progress cashed out Wycoff's warrants in three companies for $78,255. The Complaint states, in addition, that it is believed that Klinger also received warrants through the Incentive Compensation Plan.

FN12. *See infra* note 14.

USIT was a lending customer of the TechBanc division and Progress received USIT warrants in conjunction with the loans. [FN13] In 2000 Progress Financial reported a gain of $2.6 million due to a market value adjustment on these warrants. Then, after USIT filed for bankruptcy in January 2001, the Company had to reverse the adjustment and report a loss in the first quarter of 2001. As a result, the financial picture of Progress Financial, as reflected in the 2000 financial statement, was somewhat rosier than would prove to be true. Both Klinger and Wycoff received bonuses and the Compensation Committee determined executive compensation based on the inflated 2000 financial statement. [FN14]

FN13. Some of these warrants were transferred to Wycoff through the Incentive Compensation Plan. The Complaint specifically states that in 1999 Wycoff received warrants to acquire 7,000 shares of USIT at $3.50 per share. The August 1999 initial public offering price of USIT was made at $10.00 per share.

FN14. The Complaint sets forth Wycoff's compensation in some detail. "For the period 1998-2000, Wycoff received base salary from the Company of $1,098.035. In 2000, Wycoff received options to purchase 42,000 shares of Progress Financial stock as part of his compensation.... These options ... have a potential realizable value of almost $800,000. Wycoff further received for the period

1998-2000 ... incentive payments and bonuses totaling $831,040. All of the above does not include the warrants he received personally for making high risk loans to preprofit companies as set forth in ¶ 19." Compl. ¶ 4(a). Wycoff also "receive[d] from the Company perquisites worth $50,000 per year." *Id.* ¶ 4(e).

Wycoff was also rewarded with ten percent of any warrants that were received by the Bank as part of the loan transaction. The warrants Wycoff received in 1999 are described by the Plaintiff as follows:
(a) 12,490 shares of VerticalNet, Inc. at $2.79 per share, which had the first public offering of its stock in February 1999 at a price of $8.00 per share;
(b) 6,001 shares of IQEplc at $4.16 per share, which had the first public offering of its stock in May 1999 at a price of $12.50 per share;
(c) 3,400 shares of Internet Capital Group, Inc. at $5.00 per share, which had the first public offering in August 1999 at a price of $6.00 per share;
(d) 6,250 shares of Ravisent Technologies, Inc. at $3.56 per share, which had the first public offering of its stock in July, 1999 at a price of $12.00 per share;
(e) 7,000 shares of U.S. Interactive, Inc. at $3.50 per share, which had the first public offering of its stock in August 1999 at a price of $10.00 per share.
*Id.* ¶ 19.

Progress also utilized bonuses to reward employees and, in one case, an outside director for their efforts to accomplish certain goals of the business in areas outside the scope of the Incentive Compensation Plan. For example, Progress paid Wycoff bonuses for efforts to raise capital for limited partnerships-Ben Franklin/Progress Capital Fund, L.P. and NewSpring Ventures, L.P. [FN15]-as well as an incentive payment of over $150,000 on the sale of Procall Teleservices, Inc. ("Procall"), a teleservices subsidiary of the Company. Daggett, a director who is not alleged to have been an employee of Progress, also received a payment of more than $150,000 in connection with the sale of Procall. In addition to bonuses and incentive payments, Progress made loans to executive officers, directors, and their affiliates. [FN16]

FN15. The Complaint alleges that Wycoff is a partner of both limited partnerships but does not give any more information regarding the nature, extent, or origin of the interest.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




FN16. The Company's 2001 proxy materials disclosed that such loans totaled $4.2 million. The 1999 proxy materials disclosed that such loans totaled $6.2 million. The 2000 proxy materials disclosed loans to directors at preferred rates, noting that no individual director had received more than $60,000 in preferred-rate loans. Compl. ¶ 34.

## III. ANALYSIS

*3 Defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for the Plaintiff's failure to make demand on Progress Financial's board of directors (the "Board") or to plead demand futility sufficiently. The Plaintiff admits that demand was not made and instead argues that demand should be excused as futile. Under the two-pronged *Aronson* test, [FN17] demand will be excused as futile where the "particularized facts alleged in the complaint create a reasonable doubt ( *i.e.,* reason to doubt) that (1) the directors upon whom the demand would be made were disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN18] Therefore, the Court must determine whether the Complaint includes allegations of "particularized facts creating a reasonable doubt that the actions of the defendants were protected by the business judgment rule." [FN19] The Plaintiff is entitled to the benefit of reasonable inferences that may be drawn from the particularized facts alleged but may not rely upon conclusory allegations. [FN20]

FN17. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984); *see Brehm v. Eisner,* 746 A.2d 244, 256 (Del.2000).

FN18. *Zupnick v. Goizueta,* 698 A.2d 384, 386 (Del.Ch.1997); *see also Aronson,* 473 A.2d at 814.

FN19. *Brehm,* 746 A.2d at 255.

FN20. *Id.*

The Board, as comprised on August 29, 2001, the date the Complaint was filed, is the board for purposes of evaluating whether demand is required or excused. [FN21] The Complaint names eleven directors as defendants. It is not clear whether these eleven constitute the entire Progress Financial board. For purposes of evaluating the demand requirement, I draw the inference that the eleven

individual defendants named in the Complaint were the only directors of Progress Financial as of August 29, 2001.

FN21. *See, e.g., Haseotes v. Bentas,* 2002 Del. Ch. LEXIS 106, at * 14 (Del. Ch.); *Needham v. Cruver,* 1993 Del. Ch. LEXIS 76, at *8-9 (Del. Ch.); *Harris v. Carter,* 582 A.2d 222, 229-32 (Del.Ch.1990).

### A. *Disinterest and Independence: First Prong of the Aronson Test*

In order to excuse demand under the first prong of *Aronson,* a plaintiff must plead particularized facts that raise a reasonable doubt whether a majority of the board upon which demand would be made was disinterested in the challenged transaction or was able to exercise independent business judgment with respect to it. [FN22] A director is "interested" when he or she appears on both sides of the challenged transaction or expects to derive a personal benefit from it, such as in a self-dealing transaction. [FN23] Where self-dealing is not alleged, the benefit accruing to the allegedly interested director must be shown to be material to that director. [FN24] A benefit is material when its importance to the director, in the opinion of the Court, is such that the director probably could not fulfill his or her fiduciary duties to the corporation "without being influenced by [an] overriding personal interest." [FN25] A director is considered "independent" unless the complaint alleges particularized facts to show that the director is unable to base his or her decisions on the corporate merits of the issue before the board. [FN26] For example, the complaint may demonstrate a "direction of corporate conduct in such a way as to comport with the wishes or interests of" the controlling person [FN27] or may plead facts that indicate the director is so "beholden to" or influenced by the controlling person that the director is unable to exercise discretion with respect to corporate decisions. [FN28]

FN22. *Aronson,* 473 A.2d, at 814.

FN23. *Id.* at 812; *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch.2002). *See also Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 362 (Del.1993).

FN24. *Orman,* 794 A.2d at 23, 25 n. 50.

FN25. *In re GM Class H S'holders Litig.,* 734 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





611, 617 (Del. Ch.1999).

FN26. *Aronson,* 473 A.2d at 816.

FN27. *Kaplan v. Centex Corp.,* 284 A.2d 119, 123 (Del. Ch.1971); *see also Aronson,* 473 A.2d at 816; *Orman,* 794 A.2d at 24.

FN28. *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993); *see also Aronson,* 473 A.2d at 815; *Orman,* 794 A.2d at 24.

**\*4** The Complaint makes no allegation that Mueller, Jones, Corson, or LaNoce are unable to consider demand disinterestedly and independently. On the other hand, the Defendants concede that Wycoff and Klinger may be considered interested for the purposes of evaluating the Rule 23.1 demand requirement. Thus, demand would not be excused under the first prong of *Aronson* unless the allegations of the Complaint raise a reasonable doubt about the disinterest or independence of at least four of the remaining five directors (Zarrilli, Tornetta, Daggett, May, or Silverang). [FN29]

> FN29. The Plaintiff has not attempted to allege that anyone other than Wycoff dominated the other directors' independent judgment regarding Progress' affairs.

*1. Stephen T. Zarrilli*

Zarrilli was the Chief Executive Officer of USIT until September 15, 2000. He left that position approximately three months after becoming a member of Progress' board in June 2000. While Zarrilli was CEO of USIT, but apparently prior to his service as a director of Progress, USIT received loans from Progress. After Zarrilli left USIT, it filed for bankruptcy-necessitating, for purposes of Progress' financial statement, a readjustment of the valuation of the USIT warrants received in connection with the loans. Zarrilli holds nearly 600,000 shares of USIT common stock. While Zarrilli was at USIT, he developed a "significant" relationship with Wycoff because Zarrilli controlled USIT's decision to become a lending customer of Progress.

Construing these facts in the light most favorable to the Plaintiff, Zarrilli, in his capacity as an officer of USIT, caused USIT to apply for loans-loans that the Plaintiff alleges turned out to be detrimental to Progress. The Complaint notes ominously that Zarrilli's service on the Board overlapped his employment at USIT for about three months. The pertinent question is not whether a director has been employed by a customer of the corporation. The critical issue, instead, is whether the director was conflicted in his loyalties with respect to challenged board actions. The Complaint contains no allegations of this sort. Significantly missing is any indication that Zarrilli had conflicting loyalties or made any decision based upon conflicting loyalties-that after Zarrilli became a director, for example, Progress made any loans to USIT or that USIT received any preferential treatment in the servicing of its loans. Furthermore, there is no suggestion that any of the actions taken after he became a director of Progress benefited Zarrilli directly or benefited USIT, thereby assisting Zarrilli indirectly as a USIT shareholder. Thus, the Complaint fails to plead particularized facts that raise a reasonable doubt of Zarrilli's disinterest in the challenged transactions.

In addition, the allegation that Zarrilli and Wycoff developed a "relationship" while Zarrilli was at USIT is insufficient to raise a reasonable doubt as to Zarrilli's independence from Wycoff. Neither mere personal friendship alone, [FN30] nor mere outside business relationships alone, [FN31] are sufficient to raise a reasonable doubt regarding a director's independence. Also, the Plaintiff has not made any cognizable allegation that Zarrilli developed a sense of "owingness" to Wycoff as the result of the loans that Progress may have made to USIT before Zarrilli joined the Board.

> FN30. *See, e.g., Crescent/Mach I Partners, L.P. v. Turner,* 2000 Del. Ch. LEXIS 145, at *40-41 (Del. Ch.).

> FN31. *See, e.g., Goldman v. Pogo.com, Inc.,* 2002 Del. Ch. LEXIS 71, at *14 (Del. Ch.); *Orman,* 794 A.2d at 26-27; *Crescent/Mach I Partners, L.P.,* 2000 Del. Ch. LEXIS 145, at *40-41.

**\*5** Thus, I find that the Complaint fails to raise a reasonable doubt that Zarrilli is disinterested in the challenged transactions or capable of exercising business judgment independently of Wycoff.

*2. Charles J. Tornetta*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




The Complaint alleges that Progress leases property from a limited partnership and that Tornetta's "family members" are the partners. The lease is for fifteen years and the lease payments amount to slightly over $7,000 per month to the limited partnership. The particularized factual allegations end there. From this, the Plaintiff would have the Court infer that Tornetta is beholden to Wycoff who may be in a position at the end of the lease to elect not to renew it. [FN32] Again, the factual allegations fall far short of providing a basis for the Court to do so. First, the relationship between Tornetta and the "family members" who are partners of the limited partnership is unspecified. Second, there are no facts supplied from which the Court may infer that the amount of the lease payment represents a significant departure from fair market value or is material to Tornetta or to any of Tornetta's family members. In some circumstances, this Court has determined that material financial interests of close family members may factor into the disinterest and independence analysis under the *Aronson* test. [FN33] Here, however, the failure to allege with particularity both close familial relationship and materiality amounts to a failure to raise a reasonable doubt regarding Tornetta's disinterest and independence. [FN34]

> FN32. The Plaintiff may also be suggesting somewhat obliquely that Wycoff would be in a position to cause Progress to breach the lease prior to its expiration and, consequently, Tornetta must stay in Wycoff's good graces to ensure the uninterrupted income to the partnership. When stated directly, the implausibility of the suggestion-that for this reason Tornetta has no choice but to keep Wycoff happy-becomes obvious since the limited partnership would doubtless have a remedy at law for breach of the lease.

> FN33. *See, e.g., Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 Del. Ch. LEXIS 144, at *28-29 (Del. Ch.2002) (considering a director's son's primary employment with the corporation as one of several factors supporting a reasonable doubt whether the director could consider demand impartially where such demand was adverse to the interests of the corporate CEO); *Mizel v. Connelly,* 1999 Del. Ch. LEXIS 157, at *11-14 (Del. Ch.) (discussing why one of the directors may be unable to consider demand impartially where such demand was adverse to his grandfather's interests).

FN34. The Complaint does not support any contention that Wycoff, as Chief Executive Officer, is vested with unilateral non-reviewable authority to breach contracts on behalf of Progress, was the unilateral decision-maker for leasing the property in question, or could be expected to be the unilateral decision-maker with respect to renewal of the fifteen-year lease upon its expiration.

I also question whether the renewal or non-renewal of a single fifteen-year lease of property, which is not alleged to be at a rate substantially above market value, could suffice to raise a reasonable doubt of a director's independence or disinterest even if the quantum of income derived from the lease were material to Tornetta or his close family members. Finally, the Complaint alleges that "Tornetta and his family own substantial tracts of real estate that Defendant Wycoff has caused and will continue to cause to be leased by Progress Financial, in exchange for Tornetta's acquiescence to Wycoff's decisions." Compl. ¶ 7. This allegation, especially when contrasted with the allegations regarding the Plymouth Road lease, lacks the particularity required by Rule 23.1.

### 3. William O. Daggett

The Complaint alleges only one fact with regard to the disinterest or independence of Daggett: that Progress paid Daggett and Wycoff over $150,000 each as a commission for their respective roles in the sale of Procall. The payments are described as "excessive" by the Plaintiff, but there are no allegations related to the value or sale price of Procall or to how Wycoff and Daggett participated in its sale. It is therefore impossible to determine whether the payments were excessive, and it would be unreasonable to infer that they were. Furthermore, there are no allegations that either Wycoff or Daggett stood on both sides of the transaction or that either the Procall transaction as a whole or the commission payments specifically were unfair to Progress Financial or its shareholders. I cannot, therefore, ascertain how this single commission earned on a one-time sale of a subsidiary would render Daggett beholden to anyone and thus unable to exercise his independent business judgment. Moreover, this allegation does not call into question Daggett's disinterest in any of the other challenged transactions.

Nonetheless, it is clear that Daggett does have a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 

Not Reported in A.2d
(Cite as: 2003 WL 1794724, *5 (Del.Ch.))

personal financial interest in this sizeable fee that he received from Progress. In addition, I accept that a single fee of $150,000 for unspecified services may be material to Daggett. Thus, I conclude that the Plaintiff has raised a reasonable doubt as to whether Daggett was disinterested in the commissions paid in connection with the sale of Procall. For all other challenged transactions, however, the Plaintiff has failed to raise a reasonable doubt that Daggett is disinterested and independent.

**\*6** Thus, I have determined that the Complaint does not raise a reasonable doubt as to the independence or disinterest of Zarrilli, Tornetta, or, for all transactions other than the bonuses paid on the sale of Procall, Daggett. I need not consider, therefore, whether the other directors, May or Silverang, are disinterested and independent. For the reasons stated above, I find that, under the first prong of *Aronson*, demand would not be excused under Court of Chancery Rule 23.1 because at least six of the eleven directors (Zarrilli, Tornetta, Mueller, LaNoce, Jones, and Corson and, for all but one transaction, Daggett, as well) are disinterested and independent and, thus, able to review fairly any demand made pursuant to Rule 23.1.

**B.** *Valid Exercise of Business Judgment: Second Prong of the* Aronson *Test*

Even though a majority of the board is determined to be disinterested and independent, demand may be excused under the second prong of the *Aronson* test. In order for demand to be so excused, the plaintiff must allege particularized facts that give rise to a reasonable doubt whether the challenged transaction is entitled to the protection of the business judgment rule. [FN35] A plaintiff may rebut the presumption that the board's decision is entitled to deference by raising a reasonable doubt whether the action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation. [FN36] Thus, in order to excuse demand when a majority of the board at the time of demand is found to be disinterested and independent, the plaintiff must plead particularized facts sufficient to raise a reasonable doubt that the action was taken in good faith or a reasonable doubt that the board was adequately informed in making the decision. The Complaint fails to do so.

FN35. *Aronson,* 473 A.2d at 814-15.

FN36. *Id.* at 812.

The Complaint does not allege any particularized facts regarding the process by which the Board initiated or approved the challenged actions, notably approval of the Incentive Compensation Plan. Similarly, the Complaint does not allege that the Board failed to obtain appropriate legal advice or other professional guidance before implementing either the TechBanc program or the Incentive Compensation Plan.

The decision to offer bonuses to employees who bring in business that a company is seeking to attract would normally be within the ambit of a board's business judgment. Indeed, the Complaint fails to allege any specific reasons, except for the possible violation of state and federal banking requirements, why the Board should have been concerned about the propriety of the Incentive Compensation Plan [FN37]-no warnings from banking regulators and no investigation or enforcement activity conducted or contemplated. The Court will not infer that the Board acted recklessly or in bad faith, absent specific particularized allegations of fact giving rise to such an inference. [FN38] Here, read in the light most favorable to the Plaintiff's position, the allegations are that the directors approved an incentive compensation program by which certain officers and employees would receive bonuses for procuring new business in a market niche in which the Board had decided to seek to expand Progress' participation-loans to fledgling technology companies. As it has turned out, this may have been a poor (or poorly timed) decision, but employee compensation decisions made by a fully informed, disinterested, and independent board of directors are usually entitled to the protection of the business judgment rule. [FN39]

FN37. The Complaint does allege that the changes to the Bank's loan and lease portfolio structure, due to the loans made through the TechBanc division, caused banking regulators to issue a directive that Progress reduce lending through the TechBanc division, increase loss reserves, and take various other actions. This, however, does not call into question the Board's exercise of business judgment and does not help the Plaintiff's case for excusing demand because the Complaint also alleges that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Board cooperated and fully complied with the only negative response received from banking regulators with regard to the challenged actions. I refrain, however, from relying upon this allegation to draw an inference that the OTS reviewed and did not find fault with the Incentive Compensation Plan.

FN38. *See Aronson,* 473 A.2d at 814.

FN39. *See* 8 *Del. C.* § 122(5) (officer and agent compensation); *id.* § 141(h) (director compensation); *White,* 783 A.2d at 553 n. 35 (noting the board's discretion in setting executive compensation); *Brehm,* 746 A.2d at 262 & n. 56 (indicating that when setting executive compensation, the outer limit of the discretion of the board is defined by unconscionable conduct, waste, or fraud); *Grimes v. Donald,* 673 A.2d 1207, 1215 (Del.1996) (observing that when "an independent and informed board, acting in good faith, determines that the services of a particular individual warrant large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment. That judgment normally will receive the protection of the business judgment rule unless the facts show that such amounts, compared with the services to be received in exchange, constitute waste or could not otherwise be the product of a valid exercise of business judgment."); *Lewis v. Hirsch,* 1994 Del. Ch. LEXIS 68, at *10-11 (Del. Ch.) (stating that executive compensation is "ordinarily left to the business judgment of a company's board of directors"); *Tate & Lyle PLC v. Staley Cont'l, Inc.,* 1988 Del. Ch. LEXIS 61, at *19-22 (Del. Ch.) (finding business judgment rule did protect disinterested directors' approval of compensation packages for other directors); *see also Telxon Corp. v. Meyerson,* 802 A.2d 257, 265-66 (Del.2002); *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 Del. Ch. LEXIS 5, at *50-55 (Del. Ch.).

*7 In his brief opposing the motion to dismiss, the Plaintiff defends his failure to allege particularized facts in the Complaint on the basis that the corporate records of Progress Financial, which could provide factual detail for particularized allegations, are in the exclusive possession and control of the Defendants. Because 8 *Del. C.* § 220 provides shareholders reasonable access to corporate records, this argument is both inaccurate and unavailing. Both this Court and the Supreme Court have admonished plaintiffs to make use of the "tools at

hand" on many occasions. [FN40] Plaintiffs who fail to do so act at their own hazard. [FN41]

FN40. Specifically, plaintiffs are encouraged to invoke 8 *Del. C.* § 220 in order to establish whether the records of the corporation support or refute the suspicion of wrongdoing prior to filing a derivative action. *See, e.g., White,* 783 A.2d at 549 n. 15; *Brehm,* 746 A.2d at 262 n. 57, 266; *Rales,* 634 A.2d at 934-35 n. 10; *Ash v. McCall,* 2000 Del. Ch. LEXIS 144, at *56 n. 56 (Del. Ch.).

FN41. *See White,* 783 A.2d at 555-57 & n. 54; *Mizel,* 2000 Del. Ch. LEXIS 157, at *16 n. 5.

The allegation that the Board's decision to implement the compensation program was illegal and, thus, not entitled to the benefits of the presumptions of the business judgment rule, is more troubling. The Complaint alleges that the Incentive Compensation Plan violated the banking laws of the United States, 18 U.S.C. § 215, and the Commonwealth of Pennsylvania, 7 P.S. § 1413. In addition, it is alleged that the Incentive Compensation Plan transgressed federal banking regulations, specifically 12 C.F.R. § 570 and OTS Regulatory Bulletin 27b. Defendants' alleged violation of these statutory and regulatory provisions, according to the Plaintiff, requires application of a per se rule that illegal conduct authorized by the Board excuses the Plaintiff from any duty to make pre-suit demand upon the Board.

*1. Bribery Statutes: 18 U.S.C. § 215 and 7 P.S. § 1413*

In order to plead that demand is excused because the challenged corporate act was illegal and not within the scope of the business judgment rule, the Plaintiff must at least plead particularized facts that raise a reasonable doubt about the legality of the corporate act in question. [FN42] However, the allegations in the Complaint fail to support a reasonable inference that adoption of the Incentive Compensation Plan constituted criminal conduct. [FN43]

FN42. For examples of the use of the criminal law to support fiduciary duty claims against corporate directors, see *In re Caremark Int'l Derivative Litig.,* 698 A.2d 959, 970-72 (Del. Ch.1996); *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1270-71

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2003 WL 1794724, *7 (Del.Ch.))

(Del. Ch.1995). Both of these cases address a board's supervisory responsibilities; they do not directly address the directors' liability for their own actions as directors. In *Gagliardi v. Trifoods Int'l, Inc.,* 1996 Del. Ch. LEXIS 87 (Del. Ch.), *published in part,* 683 A.2d 1049 (Del. Ch.1996), this Court observed that "[t]he business outcome of an investment project that is unaffected by director self-interest or bad faith cannot itself be an occasion for director liability. That is the hard core of the business judgment doctrine." *Id.* at * *10-11 (footnote omitted). The Court further explained:

"By 'bad faith' is meant a transaction that is authorized for some purpose other than a genuine attempt to advance corporate welfare *or is known to constitute a violation of applicable positive law.* There can be no personal liability of a director for losses arising from 'illegal' transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction."

*Id.* at * *11 n. 2 (citation omitted) (emphasis added). The Complaint does not allege whether the Board had the benefit of advice of counsel when it approved the Incentive Compensation Plan.

FN43. For purposes of ruling on this motion to dismiss, I consider the text of the pertinent statutes, regulations, and OTS Regulatory Bulletin 27b, which are integral to the Complaint and incorporated by reference therein. *See In re Santa Fe Pac. Corp. S'holders Litig.,* 669 A.2d 59, 69-70 (Del.1995).

Violation of either 18 U.S.C. § 215 or 7 P.S. § 1413 constitutes criminal conduct. [FN44] The plain language of these statutes is designed to prohibit bribery of banking personnel. [FN45] It does not appear to apply in the situation where a bank pays either salary or bonuses to its own employees for doing their jobs. In fact, 18 U.S.C. § 215(c) reads, "This section shall not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Furthermore, the Plaintiff fails to direct the Court to any precedent for enforcing either statute in the context of bonuses paid by a bank to its own employees, nor to any past, present, or contemplated enforcement actions or investigations of Progress on the basis that the Incentive Compensation Plan violated any applicable law. Thus, the Complaint fails to raise a reasonable doubt that the directors, by adopting and implementing the

Incentive Compensation Plan, violated (or facilitated the violation of) either statute and, therefore, does not raise a reasonable doubt whether the decision to implement the plan was not illegal. [FN46]

FN44. 18 U.S.C. § 215(a) provides in pertinent part: Whoever (1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution; or (2) as an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution; shall be [punished in accordance with the statute].

Violation of 18 U.S.C. § 215 is a felony punishable by a fine of up to $1 million or three times the value of the consideration offered and up to thirty years in prison, unless the amount offered is less than $1,000. 18 U.S.C. § 215(a).

7 P.S. § 1413(a) provides in pertinent part:

No director, trustee, officer, employee or attorney of an institution or of an affiliate of the institution shall: (i) receive anything of value for procuring or attempting to procure any loan from or investment by the institution.

Violation of 7 P.S. § 1413 is a misdemeanor punishable by a fine of not more than $1,000 plus the amount received and no more than one-year imprisonment. 7 P.S. § 2102(a) (specifying penalty for violation of 7 P.S. § 1413 and other provisions of the Commonwealth's banking code).

FN45. Violation of § 215 is commonly referred to as "bank bribery." *See, e.g., United States v. Kenrick,* 221 F.3d 19, 26 (1st Cir.2000); *United States v. Haese,* 162 F.3d 359, 363 (5th Cir.1998); *United States v. Jennings,* 160 F.3d 1006, 1015 (4th Cir.1998); *United States v. Cohen,* 152 F.3d 321, 323 (4th Cir.1998).

FN46. In this case, there is no allegation that any criminal prosecution or regulatory enforcement action has ever been initiated under either of these statutory provisions. I note that when a plaintiff seeks to invoke a statute, regulation, or regulatory guidance to define the standard against which a corporate board's actions are to be measured and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





when those actions, in the absence of such a statute, regulation, or guideline, would not otherwise implicate fiduciary duty considerations, there are two factors which, while not precluding judicial intervention here, counsel for caution. First, the absence of any enforcement action, particularly where the regulators are alleged to have been aware of the conduct, suggests that the regulators, who are presumed to have expertise in their particular field, did not consider the conduct worthy of further enforcement proceedings. Second, the Court is being asked to construe statutes and regulations of the federal government and a statute of another state in ways that the Plaintiff does not allege they have ever been interpreted or applied in the past.

### 2. Banking Regulations and Guidelines: 12 C.F.R. § 570 and OTS Regulatory Bulletin 27b

**\*8** In order for the Plaintiff to demonstrate that demand should be excused under the second prong of *Aronson,* he must demonstrate that the decision to adopt the Incentive Compensation Plan was not entitled to the protection of the business judgment rule at the time the board made the decision. Although it is possible that the Incentive Compensation Plan (or other programs approved by the Board) may have ultimately run afoul of the banking regulations cited by the Plaintiff, the particularized allegations of the Complaint fail to provide a basis for doubting whether the Board's actions, when measured against the relevant regulatory requirements as of the time of the actions, were the product of a valid exercise of business judgment.

Through 12 C.F.R. Part 570, the OTS has adopted safety and soundness standards for savings associations. [FN47] When a thrift institution fails to meet these standards, OTS may require the development and implementation of a compliance plan to address its concerns. The OTS' concerns for excessive executive compensation are addressed, first, in the context of "Operational and Managerial Standards," which, *inter alia,* require thrift institutions to "maintain safeguards to prevent the payment of compensation, fees, and benefits that are excessive or that could lead to material financial loss to the institution." [FN48] Second, and somewhat more specifically, the safety and soundness standards contain a "Prohibition on Compensation That Constitutes an Unsafe and Unsound Practice"

which provides:

> FN47. OTS promulgated the regulations under the authority of the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1831p-1. The Interagency Guidelines Establishing Standards for Safety and Soundness are set forth in Appendix A to 12 C.F.R. Part 570.

> FN48. 12 C.F.R. § 570, app. A.II.I.

Excessive compensation is prohibited as an unsafe and unsound practice. Compensation shall be considered excessive when amounts paid are unreasonable or disproportionate to the services performed by an executive officer, employee, director, or principal shareholder considering the following:
1. The combined value of all cash and non-cash benefits provided to the individual;
2. The compensation history of the individual and other individuals with comparable expertise at the institution;
3. The financial condition of the institution;
4. Comparable compensation practices at comparable institutions, based on factors such as asset size, geographic location, and the complexity of the loan portfolio or other assets;

                        \* \* \*

6. Any connection between the individual and any fraudulent act or omission, breach of trust or fiduciary duty, or inside or abuse with regard to the institution; and
7. Any other factors the agencies determine to be relevant. [FN49]

> FN49. 12 C.F.R. § 570, app. A.III.A.

Furthermore, "[c]ompensation that could lead to material financial loss to an institution is prohibited as an unsafe and unsound practice." [FN50]

> FN50. 12 C.F.R. § 570 app. A.III.B.

By Regulatory Bulletin 27b, the OTS provides guidance to its examiners regarding reasonable compensation arrangements and to the directors of thrift institutions regarding the performance of their responsibilities in overseeing executive compensation. OTS has specifically addressed the issue of incentive pay for thrift executives:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




**\*9** An increasing number of businesses today rely on incentive pay to motivate managers and employees to excel. OTS encourages incentive-based compensation but prohibits arrangements that provide incentives contrary to the safe and sound operation of the association. For example, compensation based primarily on short-term operating results may encourage unreasonable risk-taking to achieve short-term profits. The board of directors should closely monitor compensation tied to current operating results. [FN51]

FN51. Regulatory Bulletin 27(b).

The Board's decision to pursue an aggressive plan for making loans to startup technology companies through TechBanc did not turn out well. The problems arising from Progress' loans to pre-profit companies resulted in a directive from OTS which required Progress, *inter alia*, to: (i) reduce its lending to early stage technology companies; (ii) increase its leverage capital ratio ... and its total risk-based capital ratio ...; and (iii) increase its valuation allowance and implement approved credit review and monitoring programs. [FN52]

FN52. Compl. ¶ 35 (quoting Progress Financial Corp. Press Release of July 12, 2001).

The Board approved a resolution in July 2001, that implemented the terms of the OTS directive. At that time, Progress announced that it had suspended payment of its quarterly dividend and that it would "exit the business of lending to pre-profit companies and ... wind down [its] technology-based portfolio of loans to pre-profit clients ." [FN53] The Plaintiff does not allege that OTS then, or at any other time, either questioned or challenged the Incentive Compensation Plan. [FN54]

FN53. *Id.*

FN54. The OTS directive that resulted in the July 2001 resolution restricted the granting of "[h]igh risk loans," which were defined to include "certain commercial business loans and other credit relationships that (i) the Bank originates through its Tech-Banc/Specialized Lending Division, (ii) involve the receipt by the Bank or an affiliate of warrants [or] other equity interest, (iii) are made to a pre-profit company or a company reliant on venture

capital funding, or (iv) are otherwise determined by the OTS to have a higher than ordinary degree of credit risk." Compl. ¶ 36.

Determining whether the Board's adoption of the Incentive Compensation Plan to stimulate TechBanc loans to pre-profit technology companies was the result of the exercise of its business judgment requires an evaluation of the Board's actions as of the time of that decision. The Plaintiff frames the Complaint as a challenge to the Incentive Compensation Plan and not as a direct attack on the TechBanc lending program. According to the Plaintiff, the Incentive Compensation Plan was imprudent, in part, because it was too successful in achieving its goals: it resulted in too many loans having been made by TechBanc to pre-profit companies. The Plaintiff has not alleged with particularity facts evidencing that the compensation received by Progress executives was "excessive" when the amount is measured in the context of an enterprise of the Progress' scope. Instead, he alleges that the Incentive Compensation Plan created too great an incentive to make the loans that the Board wanted Progress to make. As a result, these loans ultimately turned out to have been unduly risky and, therefore, caused financial harm to Progress. The Plaintiff argues that the Incentive Compensation Plan, which induced Progress executives to make these loans, violated the regulatory prohibition upon excessive compensation because it "[led] to material financial loss." [FN55] In substance, the Plaintiff asks that the conduct of the Board be measured by the results of the TechBanc pre-profit loan program.

FN55. *See* 12 C.F.R. § 570 app. A.II.I.; *id.* § 570 app. A.III . B. It is not altogether clear that the Plaintiff has successfully alleged that the TechBanc program, in fact, resulted in "material financial loss." Part of the Plaintiff's criticism is that warrants which resulted in a paper profit in one year had to be reversed as an accounting matter when their value plunged. While that caused a loss in the second year, the cumulative effect on income over the two-year period does not appear to have been material. Furthermore, that OTS required Progress to increase its loss reserves because of the TechBanc operations does not necessarily mean that losses, in fact, resulted. It may be that the increase in reserves resulted from perceived risk instead of actual loss. Nevertheless, for purposes of this Memorandum Opinion, the Court will accept the Plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





allegation that the TechBanc program caused "material financial loss."

*10 The exercise of business judgment cannot be evaluated, as the Plaintiff seems to suggest, merely by looking at the results of that business judgment. While challenges are seldom, if ever, made to business judgments that turn out well, the simple fact that the business decision caused significant loss does not dictate how that decision should be classified or evaluated. The Plaintiff's allegations regarding the Board's authorization of the Incentive Compensation Plan (or the TechBanc loan program) are paltry. There are, for example, no particularized allegations about "comparable compensation at comparable institutions" or that Wycoff's compensation (or the compensation of other executives) was "disproportionate to the services rendered." [FN56]

> FN56. Furthermore, if the focus is on financial losses attributable to the TechBanc loan program, there are few objective factors set forth in the Complaint by which the conduct of the Board, at the time of decision, can be measured. Loans were made to pre-profit technology companies, a concept which, with the hindsight of 2003, may be easy to criticize. At the time of the loans, however, the eventual failure of many of those ventures was not as apparent. In addition, one may wonder, particularly in light of the policies reflected in HOLA, whether it was a wise decision for the directors of a savings institution to view the start-up technology sector as a promising target for new business. Nonetheless, these factors do not support the argument that the decision to implement the TechBanc loan program was beyond the scope of the Board's business judgment.

It may be fair to charge the Board with knowledge that the TechBanc loan program *could* have resulted in material financial loss to Progress because, in the most simplistic sense, any new major venture entails risk and that risk carries potential adverse consequences. [FN57] The decision to run the risks of that loan program, when evaluated as of the time of the Board's decision, was not such an improvident decision as to deny the directors the presumption of the business judgment rule. Thus, the decision of the Board to pay Progress executives incentive compensation to implement the TechBanc loan program does not, even though the incentive

pay may have encouraged the executives to make the loans that caused material financial loss to Progress, constitute conduct beyond the scope of the business judgment rule. [FN58]

> FN57. The Plaintiff also focuses on the "short-term" nature of the incentive compensation program because the warrants were awarded to the executives responsible for making the loans without any assurance that the loans would, in fact, turn out to be "profitable ." Although I accept for purposes of this motion to dismiss that the Incentive Compensation Plan awarded "compensation based on short-term operating results," that conclusion is not as self-evident as the Plaintiff argues. First, one can read "operating results" to refer to short-term profits, thus reflecting a concern that accounting judgments might be affected by the potential for additional compensation. The Plaintiff alludes to this possibility when he questions the profits resulting from the increase in value (during USIT's better times) of the USIT warrants. Compl. ¶ 28. Second, warrants, or their value to Progress' executives, have a time-delayed aspect: not only must Progress' executives wait 180 days to cash out but also the value must be sustained for that period. In theory, at least, warrants may be viewed as a means of affording the opportunity to participate in long-term appreciation in value. Moreover, the guidelines set forth in Regulatory Bulletin 27(b) direct boards to "closely monitor compensation tied to current operating results." Significantly, Regulatory Bulletin 27(b) does not expressly to bar compensation tied to short-term results.

> FN58. The Plaintiff relies on several cases from other jurisdictions in support of his claim. None, however, is helpful to his cause. For example, in *Reilly Mortgage Group, Inc. v. Mount Vernon Savings & Loan Ass'n,* 568 F.Supp. 1067 (E.D.Va.1983), demand on a bank's board of directors was excused because of the cumulative effect of many shortcomings in the directors' conduct including the allegation that the board approved a course of conduct in violation of federal and state regulations, continued to approve the allegedly illegal practices after repeated warnings from state and federal regulators, failed to hold stockholder meetings, and personally profited from the allegedly wrongful conduct. In this case, the TechBanc loan program was halted promptly after regulatory concern was expressed and a large majority of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2003 WL 1794724, *10 (Del.Ch.))

directors has not been alleged with particularity to have personal or financial interest in the Incentive Compensation Program or the TechBanc loan program. Other cases relied upon by the Plaintiff, such as *Amerifirst Bank v. Bomar*, 757 F.Supp. 1365 (S.D.Fla.1991), emphasize that the analysis was under a Rule 12(b)(6) standard and did not reflect a requirement that allegations be made with particularity. In *Federal Deposit Ins. Corp. v. Schreiner*, 892 F.Supp. 869 (W.D.Tex.1995), alleged violations of a federal banking regulation were evaluated in the context of specific examples of objective violations of the regulation as of when the bank's board made the challenged decision (*e.g.*, loans to insiders made on terms not substantially similar to loans to persons not associated with the bank; loans violated bank's own loan policy).

The Plaintiff also cites *Joy v. North*, 692 F.2d 880 (2d Cir.1982), *cert. denied*, 460 U.S. 1051 (1983), as providing a yardstick for measuring the Board's conduct. In *Joy*, however, the challenged loan put the bank in "a classic 'no win' situation." *Id.* at 896. Here, the Board was focused, as it appeared possible at the time, on the significant upside potential of loans to startup technology companies. Moreover, the Complaint does not allege that the Board could not reasonably have concluded that these loans (or the portfolio of these loan evaluated as a whole) would be profitable or that the Board did not consider the potential risks that could be recognized at the time. While it is apparent with the benefit of hindsight that the Board did not give sufficient weight to the risks associated with the TechBanc loan portfolio, the decision to implement the TechBanc loan program, with the aid of the Incentive Compensation Plan, does not allow a challenge by the Plaintiff to the Board's conduct without a prior demand under *Aronson's* second prong.

The Complaint may also be read as seeking to allege that the Board failed to exercise appropriate supervision over the TechBanc loan program and the Incentive Compensation Program as they were implemented. Compl. ¶ 55(ii). The particularized facts of the Complaint demonstrate that promptly following the directive issued by the OTS which required that the TechBanc loan program be modified (a directive with no alleged mention of the Incentive Compensation Plan), the Board called off the TechBanc loan program and commenced efforts to reduce Progress' exposure to the adverse affects of that program. Thus, there are no particularized

allegations that the directors failed to exercise supervision over the TechBanc loan program or the Incentive Compensation Plan (as opposed to their authorization of those programs) that would implicate the standards of *In re Caremark Int'l Deriv. Litig.*, or *In re Baxter Int'l, Inc. S'holders Litig.*

The Plaintiff's theory ultimately proves too much. He looks to the unhappy results of the TechBanc program approved by the directors and implemented with the inducements provided through the Incentive Compensation Plan. With his allegation of material financial harm, he then invokes federal banking regulations which require directors to avoid executive compensation plans that result in "material financial loss." Because the TechBanc program resulted in material financial loss, the directors, in the view of the Plaintiff, are personally liable; that is, in this instance, they are the functional equivalent of guarantors. That, however, is not the province of corporate directors. To adopt the Plaintiff's analytical methodology would discourage risk-taking and would unduly restrict the exercise of the business decision-making process which is contemplated by Section 141 of the Delaware General Corporation Law. Indeed, the Plaintiff's analysis turns on whether the business decision was successful, but such a post-hoc analysis of director conduct is not sponsored by the second prong of *Aronson*. [FN59] In sum, the Plaintiff's allegations about the Incentive Compensation Plan do not excuse demand under *Aronson's* second prong. [FN60]

> FN59. As explained in *Gagliardi:*
> But directors will tend to deviate from [the] rational acceptance of corporate risk *if* in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims of derivative liability for any resulting corporate loss.
> Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky!- you supply the adverb), their liability would be joint





and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects.
683 A.2d at 1052.

Moreover, although the Plaintiff argues that "the Board knowingly approved corporate action in violation of law," Pl.'s Opp'n to Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Compl. at 26, the Complaint does not allege with particularity that the Board, when it approved the Incentive Compensation Plan or the TechBanc loan program, knew that its actions were illegal.

FN60. It is not clear that the Plaintiff relies upon an alleged violation of HOLA to excuse demand under the second prong of *Aronson*. According to the Plaintiff, the Board failed to meet the "qualified thrift leader" test when it failed to maintain 65% of its "portfolio assets" in housing, small business, and consumer related assets. Compl. ¶¶ 3, 33. The Plaintiff alleges that Progress failed that test when only 62.35% of its assets were invested in "qualified thrift investments." *Id.* ¶ 33. There is, however, no allegation that the Board was aware that its lending practices would lead to this result; moreover, there is no allegation that the Board failed to take remedial measures when it learned of the status of the Bank's portfolio.

The Plaintiff does not allege that demand is excused because of other challenged conduct, such as the commissions paid in the Procall sale or the participation in the limited partnerships with which Wycoff was affiliated.

### IV. CONCLUSION
The Complaint, when read in the light most favorable to the Plaintiff's position, has failed to allege with particularity facts sufficient to raise a reasonable doubt whether a majority of the board was disinterested and independent or whether the challenged actions were the product of the exercise of the board's business judgment. Demand is therefore not excused and, because demand was not made, the Complaint is dismissed.

**\*11** IT IS SO ORDERED.

Not Reported in A.2d, 2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 17

Not Reported in A.2d                                     **Page   1**

Not Reported in A.2d, 2002 WL 31926606 (Del.Ch.), 28 Del. J. Corp. L. 819

**(Cite as: 2002 WL 31926606 (Del.Ch.))**
▷

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**Stacey Feinglass MANZO on behalf of herself and all others similarly situated, Plaintiff,**

v.

**RITE AID CORPORATION, a Delaware corporation, Martin L. Grass, Timothy J. Noonan, Franklin C. Brown, Nancy A Lieberman, Leonard Stern, Preston R. Tisch, William J. Bratton, and KPMG LLP, Defendants.**
**No. Civ.A. 18451-NC.**

Submitted Sept. 6, 2002.
Decided Dec. 19, 2002.

Ronald A. Brown, Jr., of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Stewart M. Weltman, of Stewart M. Weltman, P.C. , Chicago, Illinois, and Lawrence Walner, of Lawrence Walner & Associates, Chicago, Illinois, for Plaintiff, of counsel.

Steven J. Rothschild, Karen L. Valihura, Paul J. Lockwood, Edward B. Micheletti, Kara R. Yancey and Katherine J. Neikirk, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, for Defendant Rite Aid Corporation.

Steven J. Rothschild, Karen L. Valihura, Paul J. Lockwood, Edward B. Micheletti, Kara R. Yancey and Katherine J. Neikirk, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Bernard W. Nussbaum, Allan A. Martin, and George T. Conway, III, of Wachtell, Lipton, Rosen & Katz, New York, New York, for Defendants Nancy A. Lieberman, Leonard Stern, Preston R. Tisch and William J. Bratton, of counsel.

Michael D. Goldman and Peter J. Walsh, Jr., of Potter Anderson & Corroon LLP, Wilmington, Delaware; Herbert J. Stern and Joel M. Silverstein, of Stern, Greenberg & Kilcullen, Roseland, New Jersey, for Defendant Franklin C. Brown, of counsel.

John H. Newcomer, Jr., of Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, Delaware; John W. Frazier, IV and John E. Caruso, of Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, Pennsylvania, for Defendant KPMG LLP, of counsel.

### MEMORANDUM OPINION

CHANDLER, J.

*1 Stacey Feinglass Manzo, shareholder of Rite Aid Corporation ("Rite Aid"), brings this purported class action on behalf of herself and other shareholders of Rite Aid who neither bought nor sold Rite Aid stock between March 1, 1997, and October 18, 1999. Ms. Manzo has been a shareholder of Rite Aid since the early 1970s.

Defendants are Rite Aid, a Delaware Corporation that owns and operates several thousand retail drug stores in thirty-eight states; Martin L. Grass, former Chairman of the Board and former CEO of Rite Aid; Timothy J. Noonan, a former officer and director; Franklin C. Brown, Vice Chairman of the Rite Aid board and a former officer (Grass, Noonan, and Brown are collectively "inside directors"); Nancy A. Leiberman, Leonard Stern, Preston R. Tisch, and William J. Bratton, all outside directors and audit committee members (Leiberman, Stern, Tisch, and Bratton are collectively "audit committee directors"); and KPMG, LLP, formerly Rite Aid's independent auditing firm.

Plaintiff brings claims of common law fraud and equitable fraud against all defendants; a claim for breach of fiduciary duty against all the inside directors and audit committee directors, and a claim for aiding and abetting breach of fiduciary duty against KPMG.

Defendants have moved to dismiss all claims under Court of Chancery Rule 12(b)(6) for failure to state a claim. Within the context of the motion to dismiss under 12(b)(6), defendants assert that plaintiff has failed to state direct claims, as opposed to derivative ones, which raises issues of whether demand is required under Rule 23.1. Furthermore, defendants assert that, under Delaware law, no claim of fraud can be pursued as a class action. Defendants also raise several issues of inadequate pleading specificity as to the fraud claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d

**Page 2**

(Cite as: 2002 WL 31926606, *1 (Del.Ch.))

## I. FACTUAL BACKGROUND

The 145-page amended complaint alleges that Rite Aid, the inside directors, and the audit committee directors made material omissions and affirmative misrepresentations, falsely overstating earnings and the value of assets while understating expenses, in virtually every single piece of financial information released by Rite Aid for over three years, from March 1, 1997 to October 18, 1999. [FN1] Due to the alleged misstatements and misrepresentations, Rite Aid's earnings for the three years required downward restatement by about 50% or approximately $1.6 billion.

> FN1. The amended complaint alleges material false and misleading statements and omissions in annual reports for the years 1997-99; SEC filings (10-Qs and 10-Ks) throughout the period; audit opinions and auditor's letters from this time period; press releases and interviews in trade journals; verbal statements by management at shareholders meetings; management statements to analysts; responses to SEC comment letters; statements made when reporting invoice "write-downs" to product suppliers; financial projections provided to banks; and other statements regarding financial information of Rite Aid.

It is also alleged, that because they served as outside auditors of Rite Aid, KPMG knew or should have known of these financial misrepresentations since they had access to documentation and records that would demonstrate the inaccuracies and underlying improprieties. In addition, KPMG had an obligation as Rite Aid's auditors to evaluate these materials and investigate any departures from Generally Accepted Accounting Principles ("GAAP"). Therefore, by issuing "clean" or unqualified audit opinions, KPMG assisted in the falsifications until at least early 1999.

**\*2** The amended complaint further alleges that Rite Aid knowingly and deliberately engaged in a number of improper and illegal business practices that (1) skewed reported financial results; (2) exposed Rite Aid to severe legal liabilities; and (3) reduced consumer confidence. Specific examples include:

Cash registers at Rite Aid pharmacies were programmed to facilitate charging uninsured customers higher prices than insured customers for prescription drugs;

Rather than writing off outdated over-the-counter products (including pharmaceuticals for adults and children), Rite Aid sold these products to unwary customers;

Rite Aid used store managers to perform construction and other non-managerial work after hours, violating state employment laws, in order to reduce expenses related to store renovations; and

Stores were routinely understaffed-frequently there was no licensed pharmacist on duty during operating hours as required by state pharmacy board regulations.

One result of the alleged mismanagement and persistent overstatement of Rite Aid's financial picture was to artificially inflate the price at which Rite Aid stock traded. As of January 1999, the stock traded as high as $50.94 per share. Ultimately, in 1999, a series of events exposed the nature and scope of the wrongdoing, and Rite Aid's share price plummeted. The SEC announced an investigation into Rite Aid's accounting practices. The attorney general of Florida filed a $2 billion racketeering lawsuit against the company in connection with Rite Aid's practice of differential pricing of prescription drugs for insured and uninsured customers. Rite Aid restated its 1997-99 pre-tax earnings downward by $500 million. Grass resigned as Chairman and CEO of Rite Aid. KPMG resigned as Rite Aid's auditors. Following an audit by Deloitte & Touche LLP, Rite Aid again restated its 1997-99 earnings downward for a total reduction of $1.6 billion or approximately 50% less than originally reported. These, and other events and revelations about the management and practices of Rite Aid, were greeted by plunging share prices. By the time the original complaint in this case was filed in October 2000, Rite Aid had been trading in the $2-3 per share range.

The amended complaint asserts that management bonuses were tied to the share price averaging above $49.50 per share over a thirty-day period, and this motivated the inside directors to falsely inflate earnings to drive up the price at which Rite Aid shares traded. In addition, Rite Aid had made a $1.5 billion acquisition of another large drugstore chain, PCS Health Systems, Inc. ("PCS"). This acquisition was financed by short-term debt with the intent of refinancing the debt through a secondary offering of Rite Aid stock. The need to refinance this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d                                                      **Page   3**
**(Cite as: 2002 WL 31926606, \*2 (Del.Ch.))**

acquisition placed additional pressure on the management and directors of Rite Aid to promote and maintain Rite Aid's inflated share price. In the wake of revelations throughout 1999 of Rite Aid's financial misdeeds, however, it appears that the secondary offering never occurred.

## II. ANALYSIS

*A. Standard of Review*

**\*3** In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court must assume the truthfulness of all well-pleaded facts contained in the complaint and view those facts and all reasonable inferences drawn from them in the light most favorable to the plaintiff. [FN2] Conclusory allegations unsupported by facts contained in the complaint, however, will not be accepted as true. [FN3] Dismissal is appropriate under Rule 12(b)(6) only where it appears with a reasonable certainty that the plaintiff would not be entitled to the relief sought under any reasonable set of facts properly supported by the complaint. [FN4]

> FN2. *See Grobow v. Perot*, 539 A.2d 180, 187 (Del.1988) (stating that "upon a motion to dismiss, only well-pleaded allegations of fact must be accepted as true" and that the Court "need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences").

> FN3. *Id.* (stating that "conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true").

> FN4. *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del.1985).

*B. Common Law and Equitable Fraud Claims Against All Defendants*

Plaintiff's fraud claims on behalf of the proposed class are dismissed with prejudice because individual issues of justifiable reliance predominate over issues common to the members of the class. Plaintiff's fraud claims on behalf of herself as an individual are dismissed without prejudice because the amended complaint fails to adequately allege justifiable reliance and cognizable damages.

Plaintiff alleges that the various misrepresentations

made by Rite Aid over the course of the three years in question constitute both common law and equitable fraud. The elements of common law fraud are: (1) a false representation of fact by the defendant; (2) the defendant knows or believes the representation to be false or acts with reckless indifference to its truth or falsity; (3) the defendant intends to induce the plaintiff to rely on the representation; (4) the plaintiff actually and justifiably relies on the false representation; and (5) the plaintiff incurs damages as a result of such reliance. [FN5] For the purposes of ruling on this motion to dismiss, the only difference between common law and equitable fraud is that the second element, scienter, need not be proven to make out a claim of equitable fraud because "equity provides a remedy for negligent or innocent misrepresentations." [FN6] Because I find the pleadings are sufficient to constitute a well-pleaded allegation of scienter as to all defendants, the analyses of the common law fraud and equitable fraud claims are identical for the purposes of this ruling.

> FN5. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del.1992).

> FN6. *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061 (Del.1996).

*1. Making False Representations*

As to the first element, plaintiff more than adequately alleges that false representations were made by the company, through the director defendants, [FN7] and with the assistance of KPMG.

> FN7. The audit committee directors assert that plaintiff failed sufficiently to allege that they "made" any of the misleading statements. The allegations are adequate to support an inference that the audit committee members' participation in the review and approval of the financial statements in question could constitute "making" such statements for the purposes of plaintiff's prima facie claim of fraud.
> The audit committee directors also assert a defense of good faith reliance on the reports of corporate advisors and officers as permitted under 8 *Del. C.* § 141(e). As the complaint does not include allegations regarding the reports of experts (other than co-defendant KPMG-allegedly an aider and abettor in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d

(Cite as: 2002 WL 31926606, *3 (Del.Ch.))

Page   4

the directors breaches of fiduciary duties), the protections of § 141(e) would constitute an affirmative defense for which evidence may be brought at trial. It cannot affect the ruling on a motion to dismiss because at this stage, the plaintiff's allegations must be taken as true, notwithstanding any defenses that may be raised in a trial on the merits.

## 2. *Knowledge, Belief, or Reckless Disregard As to the Truth or Falsity*

Plaintiff's amended complaint also adequately alleges scienter in that the magnitude and scope of the misrepresentations alleged support a reasonable inference that each and all of the defendants acted with at least reckless disregard for the truth or falsity of at least some of the various financial statements, press releases, and other public disclosures alleged to be materially false and misleading.

## 3. *Intent That Plaintiff Rely*

**\*4** Plaintiff alleges that false and misleading disclosures were made in financial statements, annual reports, various SEC filings, public statements to analysts, to major shareholders, and to the press regarding the financial performance of the company and regarding the company's explanations for variations from anticipated financial performance. Due to the nature of these disclosures, the Court can draw the reasonable inference that plaintiff would be able to prove that Rite Aid, the director defendants, and KPMG intended that shareholders rely on their truth.

## 4. *Actual and Reasonable Reliance*

The requirement that plaintiff plead and prove actual and reasonable reliance on the false representations made by the defendants is fatal to a class action claim of either common law or equitable fraud. Delaware law is clear that neither equitable nor common law fraud claims may be maintained as class actions because (1) certification of a class requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" [FN8] and (2) in a common law or equitable fraud case the individual question of "justifiable reliance[ ] will inevitably predominate over common questions."

[FN9] Plaintiff cannot rely on a presumption of reliance based on a type of "fraud on the market" theory because the Supreme Court has determined that Delaware does not recognize such a claim. [FN10]

  FN8. Court of Chancery Rule 23(b)(3).

  FN9. *Gaffin*, 611 A.2d at 474.

  FN10. *See Malone v. Brincat*, 722 A.2d 5, 12-13 (Del.1998).

Plaintiff points out that *Gaffin* proscribes class certification only "in a *purely* common law or equitable fraud case." [FN11] Plaintiff asserts that the class may be certified in this case because they have also stated a claim for breach of fiduciary duty. This argument is unavailing because, as discussed below, the breach of fiduciary duty claim is dismissed on other grounds.

  FN11. Pl.'s Answering Br. at 50 (emphasis in original) (quoting *Gaffin*, 611 A.2d at 474).

Finally, plaintiff contends that class certification issues need not be decided at this stage in the proceedings. It is true that the Court need not reach all the issues relevant to class certification on this motion to dismiss. Nonetheless, where the claim stated cannot *by its nature* form the basis of a class action, no class could be entitled to relief under any set of facts and it is appropriate to dismiss the claim as to the purported class under Rule 12(b)(6).

The inability to certify a class for a fraud claim, however, is not dispositive of defendants' liability to plaintiff as an individual for frauds alleged. Thus it is necessary to examine whether plaintiff adequately pleads that *she* actually and justifiably relied on misrepresentations by defendants. The amended complaint fails to allege reliance except in the most conclusory fashion. [FN12] Only one factual statement from the amended complaint is relevant to an evaluation of whether plaintiff did in fact rely on defendants' misrepresentations when deciding to hold her stock in Rite Aid. The amended complaint states, "Plaintiff Stacey Feinglass Manzo has owned Rite Aid stock since the early 1970's and continues to own it today." [FN13] This assertion is made in the context of establishing standing to bring this claim. Nonetheless, the fact that plaintiff has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2002 WL 31926606, *4 (Del.Ch.))

decided to hold her Rite Aid stock continuously over some thirty years undercuts, to some extent, any later assertions that between March 1, 1997, and October 18, 1999, that decision was based on the inaccurately positive picture presented in the company's financial disclosures. Perhaps plaintiff did rely on defendants' misrepresentations, but so far she has failed to allege any facts to support such an inference.

FN12. Pl.'s Am. Compl. ¶ 2 (stating that plaintiff's injuries resulted from the "defendants' wrongful conduct (and, to the extent required, plaintiff's and class members' reliance on that conduct)"), id. ¶ 274 (stating that plaintiff and class members "received and relied" on various communications of the company), id. ¶ 279 (same).

FN13. Pl.'s Am. Compl. ¶ 6.

5. *Damages*

**\*5** Similarly, plaintiff's fraud claims are dismissed without prejudice because she has failed to allege legally cognizable damages suffered as a result of reliance on any false representations. In order to survive a motion to dismiss a fraud claim, plaintiff must allege damages. [FN14] Plaintiff makes two attempts to articulate a damages theory; neither is successful.

FN14. See *Gaffin,* 611 A.2d at 472.

Plaintiff alleges "investment opportunity losses," yet fails to cite a single case to support such a theory of damages. Under this theory, the Court is asked to presume that plaintiff's investment in Rite Aid stock would have been deployed in other more successful investments had plaintiff been privy to accurate information concerning Rite Aid's financial performance. First, this presupposes reliance by plaintiff upon false representations about Rite Aid's financial condition, which, as discussed above, is unsupported in the amended complaint. Second, awarding money damages to compensate plaintiff for the return she *could* have earned had she invested elsewhere-as she was free to do, but didn't do-amounts to speculation founded upon uncertainty. As plaintiff has failed to direct this Court to any precedent or policy to support such an award, plaintiff's assertion of "investment opportunity losses" does not, in my opinion, state a cognizable

injury.

In addition, plaintiff asserts that she is entitled to "benefit of the bargain damages." The amended complaint fails to articulate any specific bargain from which these benefits purportedly flow and, therefore, does not state a cognizable injury. [FN15]

FN15. The Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss similarly neglects to identify a bargain under which plaintiff could claim "benefit" and, even if the brief were to specify the particulars of any bargain, this Court would be bound to rely solely upon the allegations contained in the amended complaint. See *Orman v. Cullman,* 794 A.2d 5, 28 n. 59 (Del. Ch.2002).

*C. Breach of Loyalty Claim Against Director Defendants*

Plaintiff's breach of fiduciary duty claims are dismissed with prejudice because they are derivative in nature, and plaintiff has (1) failed to make demand on the board of directors, (2) failed to allege facts to support excusing demand under Court of Chancery Rule 23.1, and (3) disavowed in the amended complaint any intention to bring a derivative action. *Malone* contemplates that intentional misrepresentations to "holders" of stock when, as alleged in this case, the board is not seeking shareholder action could give rise to *either* a direct or a derivative claim. [FN16] It leaves unchanged, however, the method of distinguishing a direct claim from a derivative one. [FN17]

FN16. *Malone,* 722 A.2d at 16-17.

FN17. *Id.* at 17 n. 45.

In order to determine whether a claim is direct or derivative, the Court looks to the nature of the harm and the relief available upon success of the suit. [FN18] To state a direct claim, the shareholder must allege either an injury that is different from what is suffered by other shareholders or one that involves a contractual right of shareholders that is independent of the corporation's rights. [FN19] As discussed above, the specific injury asserted by plaintiff is unclear. To the extent that plaintiff was deprived of accurate information upon which to base investment decisions and, as a result, received a poor rate of return on her Rite Aid shares, she experienced an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2002 WL 31926606, *5 (Del.Ch.))

injury suffered by all Rite Aid shareholders in proportion to their pro rata share ownership. This would state a derivative claim. Although plaintiff seeks to remedy the injury on behalf of only "holders" of Rite Aid, who neither bought nor sold their stock between March 1, 1997, and October 18, 1999, this does not indicate that "holders" suffered an injury that is distinct from that suffered by buyers or sellers. Rather, holders who neither bought nor sold would have suffered any injury for the entire period during which misrepresentations are alleged to have occurred. Injury to purchasers would have begun later (at the time of purchase) and injury to sellers would have terminated earlier (at the time of sale). The temporal duration is different, but the substance of the injury is the same.

FN18. *Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 352 (Del.1988).

FN19. *Moran v. Household Int'l, Inc.,* 490 A.2d 1059, 1070 (Del. Ch.1985).

**\*6**  Plaintiff's amended complaint and brief obliquely assert some sort of contractual right of shareholders to accurate information from the company and from its officers, directors, and advisors. Indeed it is true, as recognized in *Malone,* that directors are obligated to be truthful in all communications with shareholders. [FN20] This obligation exists even, as in this case, with regard to statements that do not seek shareholder action and those that are general public statements. [FN21] This obligation arises from the fiduciary duties that directors of Delaware corporations owe *both* to the shareholders and to the corporation itself. [FN22] Even if such a legal duty may in some context be properly characterized as a contractual right, [FN23] such a right cannot be characterized as belonging *solely* to the shareholders because it is also a right of the corporation. Therefore, any breach of fiduciary duty claim based upon the *mere fact* of knowing misrepresentation is necessarily derivative. To state a *direct* claim on that basis, plaintiff must identify some resultant injury that either affects shareholders disproportionately to their pro rata stock ownership, or affects those rights of shareholders that are traditionally regarded as "incidents" of stock ownership. [FN24] Plaintiff has failed to state such an injury.

FN20. *Malone,* 722 A.2d at 10-11.

FN21. *Id.*

FN22. *Id.*

FN23. I question whether in any context such a characterization would be appropriate.

FN24. *See In re Digex, Inc. S'holder Litig.,* 789 A.2d 1176, 1189- 90 (Del. Ch.2000) (quoting DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9- 2(a), at 517-18 (1998)).

*D. Aiding and Abetting Breach of Fiduciary Duty Claim Against KPMG*

Because the breach of fiduciary claims are dismissed with prejudice, the claim against KPMG for aiding and abetting breach of fiduciary duty is similarly dismissed with prejudice.

### III. CONCLUSION

The class action claims for both common law and equitable fraud are dismissed with prejudice because the individual question of justifiable reliance will inevitably predominate over questions common to the class. Plaintiff's individual common law and equitable fraud claims are dismissed without prejudice because the amended complaint fails to adequately allege reliance and damages. The breach of fiduciary duty claim against the director defendants is dismissed with prejudice because the amended complaint does not state a direct claim and disavows any derivative claim. Furthermore, even were a derivative claim intended, plaintiff has not made demand on the board of directors and has not plead facts sufficient to show why demand should be excused. Finally, for the same reasons that require dismissal of the underlying breach of fiduciary duty claim, the claim against KPMG for aiding and abetting a breach of fiduciary duty is similarly dismissed with prejudice.

IT IS SO ORDERED.

Not Reported in A.2d, 2002 WL 31926606 (Del.Ch.), 28 Del. J. Corp. L. 819

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




# TAB 18

Not Reported in A.2d                                                                    **Page   1**

Not Reported in A.2d, 1993 WL 488284 (Del.Ch.), 19 Del. J. Corp. L. 834
(Cite as: 1993 WL 488284 (Del.Ch.), 19 Del. J. Corp. L. 834)

H

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**NEBENZAHL**
v.
**MILLER, et al.**
Civ. A. No. 13206.

Submitted: Nov. 4, 1993.
Decided: Nov. 8, 1993.

On Plaintiff's Motion for a Preliminary Injunction:
Denied.

**\*\*836** Irving Morris, Morris and Morris,
Wilmington.

Edward P. Welch, Skadden Arps Slate Meagher &
Flom, Wilmington.

R. Franklin Balotti, Richards, Layton & Finger,
Wilmington.

HARTNETT, Vice-Chancellor.

**\*1 \*\*837** Plaintiff, a stockholder in defendant
Athlone Industries, Inc. (Athlone), has moved for a
preliminary injunction seeking to enjoin
consummation of a merger between Athlone and
defendant Allegheny Ludlum Corporation
(Allegheny). The shareholders of Athlone are
scheduled to vote on the proposed merger on
November 8, 1993. Because plaintiff has failed to
establish the prerequisites for the granting of a
preliminary injunction, the motion must be denied.

The short time that the Court has to decide the
motion precludes an in-depth review of all the facts.
Most of the facts are not disputed and have been
gleaned from the Proxy Statement issued by Athlone
in connection with the merger or the limited
expedited discovery.

## I

Athlone is a Delaware corporation. Its subsidiary,
Jessop Steel Company (Jessop), is its largest and
most profitable subsidiary. Its other two
subsidiaries, Green River Steel Corporation (Green
River) and Reynolds Fasteners, Inc. (Reynolds),
appear from the limited record to be unprofitable.

Beginning in 1990, the senior management of
Athlone began looking into possible business
transactions, including business combinations with
other complementary steel-making companies, that
would serve to strengthen Athlone's position in the
specialty steel industry. The investment firm of
Morgan Stanley was engaged in June of 1991 to
assist in this effort. A total of 37 potential buyers,
including Allegheny, were contacted in late 1991
and 1992. Six companies held meetings with senior
representatives of Athlone but no real interest was
shown other than by Allegheny. Athlone
determined that it would only consider selling all
three of its subsidiaries together rather than selling
the profitable Jessop by itself and then trying to sell
the apparently unprofitable Green River and
Reynolds.

Allegheny made an initial offer of a stock-for-stock
exchange at a price of $15.50 per share of Athlone
common stock on November 8, 1991. This offer
was rejected by Athlone and further negotiations
ensued. Allegheny increased its offer to $17 per
share on May 20, 1992 but Athlone rejected it on
June 2, 1992 and no further contact between them
occurred until January 1993. On February 24,
1993, a price of $17.50 was discussed and finally,
on March 12, 1993, a letter of intent was executed
to reflect a merger transaction at $17.50 for each
share of Athlone common stock. The letter of
intent allowed for the final price to increase if the
average price of Allegheny stock **\*\*838** used to
calculate the exchange ratio rose above a specified
price. As of Thursday, November 4, 1993, the
exchange ratio applicable to the merger has
apparently risen to $18.43 per share.

The investment firm of Morgan Stanley performed
multiple economic analyses of the agreed upon price
of $17.50 per share and issued a fairness opinion
concluding that the transaction was fair from a
financial point of view. Following extensive
discussions and presentations relating to the specific
terms of the merger agreement, the full eight
member board of Athlone voted unanimously to
approve the merger on June 7, 1993.

**\*2** The merger agreement requires that the merger

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d                                                                    Page   2
(Cite as: 1993 WL 488284, *2 (Del.Ch.), 19 Del. J. Corp. L. 834, **838)

be approved by holders of over 50% of the outstanding shares of Athlone's common stock. If each Athlone director and executive officer who owns shares of Athlone stock votes in favor of the merger, holders of approximately 37% of the outstanding shares must also vote in favor of the merger for it to be approved.

Although the transaction had been publicly announced in June of 1993, plaintiff filed her complaint on October 21, 1993. In it she alleges that the director defendants (all 8 members of Athlone's board) breached their fiduciary duties in connection with the transaction. In particular, it is alleged that four of the directors (Messrs. Miller, Lyons, Shaw, and Moulton) will improperly receive a "special benefits" package to the detriment of the other Athlone shareholders if the merger is consummated.

If the transaction goes forward, Messrs. Miller, Lyons, and Shaw will receive lump-sum payments stemming from the termination of their employment agreements with Athlone (in effect since 1975 for Miller and Lyons and 1978 for Shaw), the termination of Athlone's Head Office Plan, and the termination of Athlone's Supplemental Retirement Plan (SERP). Moulton will receive an accelerated payment from Athlone's Incentive Option and Performance Award Plan (IOPA) and will be able to exercise options on securities. The "special benefits" package to be received by the four interested directors amounts to over $11,500,000. It is not disputed that all of the above benefits are disclosed in the Proxy Statement sent to the stockholders of Athlone relating to the merger vote.

Plaintiff also alleges that the value of Green River and Reynolds was not taken into consideration when Morgan Stanley performed its fairness analysis of the $17.50 price. Plaintiff claims that the $34 million combined value of the two subsidiaries was ignored and, therefore, that the final price agreed upon is too low. Defendant counters by asserting that the values of the two subsidiaries were **839 taken into account and asserts that the two subsidiaries had a negative value of $8 million dollars after subtracting liabilities from assets.

Stockholders will not be entitled to, nor given, appraisal rights following the merger. The merger agreement contains a clause allowing Allegheny to cancel the transaction if the merger is not consummated by November 15, 1993.

Plaintiff seeks a preliminary injunction because she alleges that all the defendants (except Allegheny) have breached their fiduciary duties to the stockholders of Athlone and that Allegheny has been guilty of aiding and abetting the breach.

## II

A preliminary injunction is an extraordinary remedy which is granted only to prevent truly irreparable injury. *McConnell v. Emory,* Del.Ch., C.A. No. 10678, Hartnett, V.C. (September 28, 1989), *appeal denied mem.,* Del.Supr., 567 A.2d 420 (1989). To succeed upon a motion for a preliminary injunction, the moving party must demonstrate: (1) that there is a reasonable probability of ultimate success on the merits at a final hearing; (2) that the failure to issue the preliminary injunction will result in imminent and irreparable injury prior to a final hearing; and (3) that the harm to the plaintiff if relief is denied outweighs the harm to defendants if relief is granted. *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Ch., 533 A.2d 585, 600, *aff'd,* Del.Supr., 535 A.2d 1334, 1341 (1987).

## III

*3 Plaintiff first alleges that Allegheny has been guilty of aiding and abetting the breach of fiduciary duty by the other defendants. To succeed on a claim of aiding and abetting, a plaintiff must prove: (1) the existence of a fiduciary relationship (2) a breach of duty by the fiduciary (3) knowing participation in the breach by a defendant who is not a fiduciary and (4) damages to the plaintiff resulting from the concerted action of the fiduciary and the non-fiduciary. *Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1057 (1984), *aff'd,* Del.Supr., 575 A.2d 1131 (1990); *Endervelt v. The Nostalgia Newwork, Inc.,* Del.Ch., C.A. No. 11,415-NC, Chandler, V.C., slip op. at 10 (July 23, 1991) (citations omitted).

Plaintiff has not adduced any creditable evidence that Allegheny knowingly participated in any breach of fiduciary duty by the other defendants (if any such breach occurred). There is, therefore, no basis for any claim against Allegheny.

**840 IV

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d                                                                Page    3
(Cite as: 1993 WL 488284, *3 (Del.Ch.), 19 Del. J. Corp. L. 834, **840)

Plaintiff has also not shown the reasonable probability that the other defendants have breached any fiduciary duty in connection with the challenged transaction.

Extensive, arms-length negotiations took place between Athlone and Allegheny over a period of one-and-a-half years; there was an active shopping of Athlone to all interested parties; the directors relied upon a favorable fairness opinion issued by Morgan Stanley, and the directors considered all facets of the proposed merger before approving the merger.

Plaintiff has therefore not shown a reasonable probability that the directors of Athlone were not fully informed.

### V

A breach of the duty of loyalty is established when the evidence demonstrates that a director was on both sides of the transaction or the director "derived any personal financial benefit from it in the sense of *self-dealing,* as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Cede & Co. v. Technicolor, Inc.,* Del.Supr., --- A.2d ----, No. 336-1991, Horsey, J. (Oct. 22, 1993). "A director who receives a substantial benefit from supporting a transaction cannot be objectively viewed as disinterested or independent." *Cede* at 41. A finding that an individual director is interested in the transaction, however, does not automatically deprive the board of the protection of the business judgment rule. *Cede* at 46. Whether or not the self-interest of an individual director results in a finding of board disloyalty is a question of fact to be determined on a case-by-case basis. *Id.* at 47.

Plaintiff, in effect, argues that the mere inclusion in the merger agreement of the provision guaranteeing the payment of the special benefits package for four of the directors shows the reasonable probability that a breach of the duty of loyalty occurred.    I disagree.

The Proxy Statement reveals that the employment agreements of Miller, Lyons, and Shaw have been in existence since 1975 for Miller and Lyons and 1978 in the case of Shaw.    Upon a termination of employment (a removal from office without cause), the three executives will receive lump sum payments equal to their salaries for the remainder of the terms of their contracts.    These termination clauses will apparently be activated in the event of *any* merger that results in the loss of their jobs, not simply this particular merger. (Proxy Statement at 32).    The merger agreement provides for payments **841 amounting to four-and-a-half years of employment, one-half year less than the defendants are actually entitled to receive under their contracts with Athlone.    Similarly, the payments to the defendants under the SERP Plans and Head Office Plans are made pursuant to contracts entered into by the defendants with Athlone long before the merger was ever seriously considered.

*4 The merger agreement also contemplates fulfillment of the contracts entered into by Moulton and Athlone.    The options for 20,000 shares of Athlone common stock granted to him under the Incentive Option and Performance Award (IOPA) Plan are fully exercisable without regard to the merger. (Proxy Statement at 9).    Plaintiff, therefore, has not borne her burden of showing the reasonable probability that a breach of the duty of loyalty has occurred because of this provision in the merger agreement.

### VI

Moulton also holds performance awards granted under the IOPA for 40,000 shares--the merger agreement apparently provides that the terms of those awards may be amended prior to the effective time of the merger to provide that they will vest and become payable upon stockholder approval of the merger.    This information, however, is fully disclosed in the Proxy Statement sent to shareholders. (Proxy Statement at 9).

8 *Del.C.* § 144(a)(2), therefore, precludes the granting of a preliminary injunction.    This section provides in pertinent part:
(a) No contract or transaction ... between a corporation and any other corporation ... in which one or more of its directors or officers ... have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:
(2) the material facts as to his relationship or interest and as to the contract or transaction are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d

(Cite as: 1993 WL 488284, *4 (Del.Ch.), 19 Del. J. Corp. L. 834, **841)

**Page 4**

disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders;

Even assuming that the present case involves a transaction in which the directors of Athlone have a disqualifying financial interest, **842 Section 144(a)(2) would protect the merger in the event of the required shareholder approval. It has not been alleged that the Proxy Statement failed to disclose the material facts of the merger, including the information about the contested "special benefits" package.

### VII

Plaintiff also argues that the values of Green River and Reynolds were not taken into account when the final share price of $17.50 was agreed upon. The inference suggested is that the directors approved a sweetheart deal with Allegheny in order to obtain the benefits packages for themselves. Defendants respond that the two subsidiaries were taken into account and they in fact, had a negative value to Allegheny. Plaintiff has adduced no real evidence that her version is true. Plaintiff has, therefore, not borne her burden of showing the reasonable probability that her allegations (or "suspicions") are true. *Joseph v. Shell Oil Co.,* Del.Ch., 482 A.2d 335 (1984).

### VIII

Even if plaintiff had been able to show the reasonable probability of success on her breach of fiduciary duty claims, she has not shown that she or the other stockholders will suffer any irreparable harm if the motion is denied.

*5 She can still proceed with her claim that the interested director defendants breached their fiduciary duty in intentionally structuring the transaction so as to provide themselves with a benefit they otherwise would not be entitled to. *Cede.*

### IX

Plaintiff has also failed to prove that any harm the stockholders will suffer in the event of a denial of the injunction outweighs the harm they will suffer if the injunction is granted.

The stockholders will likely suffer substantial harm

if the injunction is granted because Allegheny may exercise its contractual right and choose to terminate the deal if the injunction is granted. *See Rosman v. Shoe-Town,* Del.Ch., C.A. No. 9483, Hartnett, V.C. (January 18, 1988). This possibility is potentially very damaging to the stockholders of Athlone because Athlone has not received any other bona fide offer during the entire time it has been actively seeking buyers.

If the plaintiff, on the other hand, is not granted a preliminary injunction, she can still proceed with this suit and obtain adequate **843 relief if she can prove her claims on the merits. The balance of the equities therefore tilts heavily in favor of not granting the preliminary injunction.

### X

Plaintiff has failed to satisfy any of the prerequisites for the granting of a preliminary injunction. Plaintiff's motion for a preliminary injunction, therefore, is denied.

IT IS SO ORDERED.

Not Reported in A.2d, 1993 WL 488284 (Del.Ch.), 19 Del. J. Corp. L. 834

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


