IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
                                        :
IN RE MBNA CORPORATION                  :
DERIVATIVE AND CLASS                    :      Lead Case No. 1:05-CV-00327-
LITIGATION                              :      GMS
                                        :
This Document Relates To:               :
ALL ACTIONS.                            :      CLASS AND DERIVATIVE
                                        :      ACTION
                                        :
------------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
OPENING BRIEF IN SUPPORT OF THE MBNA OUTSIDE
DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
4 Times Square
New York, New York  10036-6522
(212) 735-3000

DATED: January 20, 2006

# INDEX

<u>CASES</u>                                                                                                          <u>TAB NO.</u>

<u>Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati,</u>
    <u>Inc.</u>, C.A. No. 13389, 1996 WL 506906 (Del. Ch. Sept. 3, 1996) ...................................... 1

<u>In re Citigroup Inc. S'holders Litig.</u>,
    C.A. No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ......................................... 2

<u>Criden v. Steinberg</u>,
    C.A. No. 17082, 2000 WL 354390 (D. Del. Mar. 23, 2000) ............................................. 3

<u>In re Encore Computer Corp. S'holders Litig.</u>,
    C.A. No. 16044, 2000 WL 823373 (Del. Ch. June 16, 2000) ........................................... 4

<u>Ercole v. Conectiv & Coventry Health Care of Del., Inc.</u>,
    C.A. No. 03-186 GMS, 2003 WL 21104926 (D. Del. May 15, 2003) ............................... 5

<u>In re Frederick's of Hollywood, Inc. S'holders Litig.</u>,
    C.A. No. 15944, 2000 WL 130630 (Del. Ch. Jan. 31, 2000) ........................................... 6

<u>Freedman v. Rest. Assocs. Indus.</u>,
    C.A. No. 9212, 1990 WL 135923 (Del. Ch. Sept. 19, 1990) ........................................... 7

<u>In re Freeport-McMoran Sulphur, Inc. S'holders Litig.</u>,
    C.A. No. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) ............................................. 8

<u>Herd v. Major Realty Corp.</u>,
    C.A. No. 10707, 1990 WL 212307 (Del. Ch. Dec. 21,1990) ........................................... 9

<u>Hudson v. Prime Retail, Inc.</u>,
    C.A. No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 10

<u>Jacobs v. Yang</u>,
    C.A. No. 206, 2004 WL 1728521 (Del. Ch. Aug. 2, 2004) ............................................ 11

<u>Jasinover v. Rouse Co.</u>,
    C.A. No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) ................... 12

<u>Jolly Roger Fund LP v. Sizeler Property Investors, Inc.</u>,
    C.A. No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ........................ 13

i

Knox v. Rosenberg,
    No. H-99-0123 (S.D. Tex. Sept. 28, 1999) ...................................................... 14

Lewis v. Leaseway Transp. Corp.,
    C.A. No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ............................ 15

Litt v. Wycoff,
    C.A. No. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ................................ 16

Manzo v. Rite Aid Corp.,
    C.A. No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ................................ 17

Nebenzahl v. Miller,
    C.A. No. 13206, 1993 WL 488284 (Del. Ch. Nov. 8, 1993) ........................... 18

Official Committee of Unsecured Creditors of Integrated Health Servs., Inc. v.
    Elkins, C.A. No. 20228, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ........................... 19

Pogostin v. Rice,
    C.A. No. 6235, 1983 WL 17985 (Del. Ch. Aug. 12, 1983) ............................ 20

Porter v. Texas Commerce Bancshares, Inc.,
    C.A. No. 9114, 1989 WL 120358 (Del. Ch. Oct. 12, 1989) ........................... 21

Rattner v. Bidzos,
    C.A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ........................ 22

Seibert v. Harper & Row, Publishers, Inc.,
    C.A. No. 6639, 1984 WL 21874 (Del. Ch. Dec. 5, 1984) ............................... 23

Sekuk Global Enters. Profit Sharing Plan v. Kevenides,
    C.A. No. 24-C-03-007496, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004) ................ 24

Sussex County Senior Servs., Inc. v. Carl J. Williams & Sons, Inc.,
    C.A. No. 99-473-GMS, 1999 WL 33220035 (D. Del. Dec. 29, 1999) ........................... 25

In re Walt Disney Co. Derivative Litig.,
    C.A. No. 15452, 2005 WL 2056651 (Del. Ch. Aug. 9, 2005) ......................... 26

In re Wheelabrator Tech. Inc. S'holders Litig.,
    C.A. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) .......................... 27

# TAB 22

Not Reported in A.2d                                              **Page  1**

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612

**(Cite as: 2003 WL 22284323 (Del.Ch.))**

c

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**Barbie RATTNER, Plaintiff,**
v.
**D. James BIDZOS, Stratton D. Sclavos, Timothy Tomlison, Roger H. Moore, David J. Cowan, Anil H.P. Pereira, Douglas L. Wolford, Robert J. Korzeniewski, James M. Ulam, Quentin P. Gallivan, Dana L. Evan, Kevin R. Compton, William L. Chenevich, Gregory L. Reyes and Scott G. Kriens, Defendants,**
and
**VERISIGN, INC., a Delaware corporation, Nominal Defendant.**
**No. Civ.A. 19700.**

Submitted April 7, 2003.
Decided Sept. 30, 2003.
As Revised Oct. 7, 2003.

James S. Green, and Kevin A. Guerke, of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Peter D. Bull, and Joshua M. Lifshitz, of Bull & Lifshitz, LLP, New York, New York, for Plaintiff, of counsel.

David C. McBride, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Furbush, and Noah D. Boyens, of O'Melveny & Myers LLP, Menlo Park, California, for Defendants, of counsel.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

*1 Plaintiff Barbie Rattner ("Rattner") brings this derivative action on behalf of Nominal Defendant VeriSign, Inc. ("VeriSign" or the "Company") alleging that Defendants James D. Bidzos ("Bidzos"), Stratton D. Sclavos ("Sclavos"), Timothy Tomlinson ("Tomlinson"), Roger H. Moore ("Moore"), David J. Cowan ("Cowan"), Anil H.P. Pereira ("Pereira"), Douglas L. Wolford ("Wolford"), Robert J. Korzeniewski ("Korzeniewski"), James M. Ulam ("Ulam"), Quentin P. Gallivan ("Gallivan"), Dana L. Evan ("Evan"), Kevin R. Compton ("Compton"), William L. Chenevich ("Chenevich"), Gregory L. Reyes ("Reyes") and Scott G. Kriens ("Kriens") (collectively, the "Individual Defendants") breached their fiduciary duties owed to the Company and its shareholders. Specifically, Rattner asserts that the Individual Defendants breached their fiduciary duty of care by inadequately maintaining accounting controls and utilizing improper accounting and audit practices. Rattner also contends that certain Individual Defendants sold securities while in possession of material inside information, thereby breaching their fiduciary duties, and that the remaining Individual Defendants have committed waste. In addition, Rattner seeks contribution and indemnification from the Individual Defendants for claims that have been or may be pursued against the Company based upon the Individual Defendants' alleged misconduct.

Defendants have moved to dismiss each of Rattner's claims under Court of Chancery Rule 23.1 for failure to make a demand upon the VeriSign board of directors (the "Board"). They argue that the conclusory allegations of the Stockholder's Amended Derivative Complaint (the "Amended Complaint") fail to create a reasonable doubt as to whether a majority of the Board is capable of rendering an impartial decision regarding the pursuit of this derivative litigation. Defendants have also moved to dismiss, under Court of Chancery Rule 12(b)(6), Rattner's claims for breach of fiduciary duty and waste.

For the reasons that follow, I conclude that, because demand is not excused under Court of Chancery Rule 23.1, this action must be dismissed.

I. BACKGROUND [FN1]

FN1. This background is taken from the allegations of the Amended Complaint. *White v. Panic,* 783 A.2d 543, 547 n. 5 (Del.2001).

A. *The Parties*

Rattner is, and has been at all relevant times, a common stock shareholder of VeriSign. VeriSign, a Delaware corporation, was founded in April 1995. It is a leading provider of digital trust services, enabling various Internet users to engage in secure

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2003 WL 22284323, *1 (Del.Ch.))

digital   commercial   transactions   and
communications.

The Individual Defendants are the current directors
and the senior officers of the Company. Sclavos is
the Chairman of the Board and Bidzos is the Vice
Chairman of the Board. The remaining directors on
the eight member Board are Moore, Cowan,
Compton, Chenevich, Reyes and Kriens
(collectively, along with Sclavos and Bidzos, the
"Director Defendants"). Of the current Board
members, the only director who held a senior
management position at the time this action was
filed [FN2] is Sclavos, who is also VeriSign's
President and Chief Executive Officer. [FN3]
Bidzos served as Chairman of the Board (April 1995
through March 12, 2002) and Chief Executive
Officer (April 1995 through July 1995). Prior to
becoming a VeriSign director in February 2002,
Moore had been President and Chief Executive
Officer of Illuminet Holdings, Inc. ("Illuminet")
from December 1995 until December 2001, when
VeriSign acquired Illuminet.

> FN2. This action was filed on June 12, 2002;
> Rattner lodge her Amended Complaint on October 4,
> 2002.

> FN3. Sclavos has served as the Company's President
> and Chief Executive Officer since April 1995.

*2 The remaining Individual Defendants, with the
exception of Tomlinson, [FN4] are senior officers
of the Company. Pereira is VeriSign's Executive
Vice President and General Manager, Enterprise and
Service Provider Division, who formerly, from
October 2000 to January 2001, served as VeriSign's
Senior Vice President and Group General Manager
of the Enterprise and Service Provider Division.
Wolford serves as VeriSign's Senior Vice President
and Group General Manager of Web Presence
Services. Korzeniewski is the Executive Vice
President of Corporate and Business Development,
and has held that position since June 2000. Ulam,
since October 2001, has been Senior Vice President,
General Counsel of the Company; previously he
served as Vice President, General Counsel of
VeriSign from the time of his joining the Company
in June 2000. Gallivan is VeriSign's Executive Vice
President, Worldwide Sales and Services, a position
he has held since April 1, 1999. Finally, Evan has
served, since January 1, 2001, as the Company's

Executive Vice President of Finance and
Administration and Chief Financial Officer.

> FN4. Tomlinson served as a director (April 1995
> until May 2002) and as the Company's Secretary
> (April 1995 through October 2000). Tomlinson is
> also a partner in the law firm of Tomlinson, Zisko &
> Master LLP (the "Tomlinson Firm"). In 2000,
> VeriSign paid approximately $900,000 to the
> Tomlinson Firm.

### B. The Misstatements

Rattner principally complains of alleged insider
trading and a failure to oversee properly the
accounting practices at VeriSign. Common to both
allegations is a series of allegedly misleading
statements made over a twelve-month period from
January 2001 through January 2002 (the "Relevant
Period"). On January 24, 2001, VeriSign released
its fourth quarter and fiscal 2000 financial results
(the "January 24 Release"). The release noted that
during the fourth quarter, the Company earned
revenues of $197.4 million, representing a 613%
increase over the previous year's fourth quarter
results. For fiscal 2000, VeriSign reported revenues
of $474.8 million, amounting to a 460% increase
over revenues in the previous fiscal year. These
revenues resulted in pro forma net income for the
quarter, excluding the amortization of goodwill and
intangible assets and acquisition-related charges of
$45.5 million, equivalent to $0.21 diluted earnings
per share; pro forma net income for fiscal 2000 was
$129.1 million. However, after including the
charges for amortization of goodwill and intangible
assets and other acquisition related charges, the
fiscal 2000 net loss was $3.1 billion. [FN5] The
release also highlighted the international expansion
undertaken by the Company in fiscal year 2001.
However, Rattner alleges that the picture was not as
rosy as was portrayed.

> FN5. Amended Compl. ¶ 48.

In the Amended Complaint, Rattner asserts that,
because of a failure to maintain and oversee properly
the accounting practices at VeriSign, the statements
contained in the January 24 Release conveyed
inaccurate information. Specifically, VeriSign
improperly recorded "round trip revenue" and barter
transactions, thus artificially inflating the
Company's reported revenues for fiscal 2000.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





VeriSign also failed to record impairments in the value of certain investments it made in other companies during a round of private equity financing that commenced in the third quarter of 2000 . [FN6] Thus, Rattner concludes that because the Company failed to record revenues accurately and write down impaired asset values on a timely basis, in violation of Generally Accepted Accounting Principles ("GAAP"), the earnings projections and financial statements contained in the January 24 Release were overly optimistic and materially misleading.

> FN6. Charges related to these investments were $74 million in fiscal 2001 and $94.8 million in the first half of fiscal 2002. *Id.* ¶ 49.

**\*3** Other undisclosed accounting practices of the Company also are claimed to have contributed to an inflated market price for VeriSign common stock. Rattner alleges that the Individual Defendants either "were manipulating" [FN7] or "should have been aware of the manipulation" [FN8] of the reported days sales outstanding (DSO) by including the deferred revenue, and excluding the accounts receivable, of companies acquired by VeriSign. Furthermore, Rattner also contends that there were other material misstatements made during the Relevant Period. Rattner notes that:

> FN7. *Id.* ¶ 47; *cf. id.* ¶ 62 (noting that "VeriSign" engaged in manipulation).

> FN8. *Id.* ¶ 70.

[t]he Company also failed to disclose that (i) the integration of Illuminet and H.O. Systems failed as the number of enterprise clients declined after the acquisitions; (ii) the Company would incur almost $80 million in charges, engage a[sic] massive restructuring and layoff a substantial portion of its workforce as a result of the acquisitions of Illuminet and H.O. Systems; [and] (iii) the Company would need to massively increase its allowance for doubtful accounts. [FN9]

> FN9. *Id.* ¶ 47. The Amended Complaint only informs that the acquisition of H.O. Systems, Inc. ("H.O.Systems") closed on February 8, 2002. *Id.* ¶ 76.

These allegedly improper accounting practices and material misstatements reappeared in numerous financial statements, releases and public statements during the Relevant Period, rendering each materially misleading for the reasons previously noted. To this end, the Amended Complaint quotes extensively from myriad sources publicly disseminated by the Company during the Relevant Period, each allegedly materially misleading, including: statements made by Sclavos at a February 1, 2001, analysts' meeting, the Company's 10K report for fiscal year 2000 issued on March 28, 2001; an April 26, 2001, press release; a July 26, 2001, press release; a September 24, 2001, article in *Bloomberg;* an October 25, 2001, press release; and a January 24, 2002, press release. [FN10] The alleged effect of these numerous material misstatements was to inflate artificially the stock price of VeriSign over the course of the Relevant Period.

> FN10. *See id.* ¶¶ 50-55, 57, 58, 60, 64-69.

### C. *Alleged Wrongdoing by the Individual Defendants*

With the knowledge that the market price of VeriSign stock was artificially inflated, and while in possession of other material non-public information, during the Relevant Period "certain defendants" sold over 875,000 shares of VeriSign stock for proceeds in excess of $47 million, and Moore sold approximately 995,000 shares of Illuminet stock for over $37 million. [FN11] Specifically:

> FN11. A central problem with the Amended Complaint is that one is never certain who is selling how much and which sales are being challenged. As with questions surrounding which Director Defendants have been implicated in certain federal securities class action lawsuits, *see infra* text accompanying note 79, this defect stems from the inconsistent use of defined terms and a failure to use defined terms. Often in the Amended Complaint, Rattner notes that "certain defendants" engaged in allegedly illicit transactions, but nowhere are these ambiguous assertions clarified. Particularly unhelpful is the definition provided in the Third Cause of Action, well after the discussion of the underlying facts of this dispute:
> 108. Certain defendants (the "Insider Trading Defendants"), at all relevant times, occupied fiduciary positions with VeriSign and were privy to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2003 WL 22284323, *3 (Del.Ch.))

confidential material inside information concerning VeriSign and its operations.
Amended Compl. ¶ 108.

I draw the inference that the challenged sales include all of the sales by Individual Defendants during the Relevant Period. Therefore, at issue are the sales of VeriSign common stock and Illuminet options by Bidzos, Cowan, Evan, Gallivan, Korzeniewski, Pereira, Sclavos, Tomlinson, Ulam, Wolford, and Moore (collectively, the "Selling Defendants") so noted. See id. ¶ 37.

a) Bidzos sold 15,000 shares of VeriSign common stock on May 22, 2001, for net proceeds of $991,890;

b) Cowan sold 20,800 shares on February 1, 2001; 53,125 shares during the period of May 1-2, 2001; and 22,000 shares on November 13, 2001 (a total of 95,925 shares), of VeriSign common stock for total net proceeds of $5,132,773;

c) Evan sold 500 shares on January 31, 2001; 6,500 shares during the period of February 1-28, 2001; 3,000 shares on March 1, 2001; 60,100 shares during the period of May 1-31, 2001; 4,000 shares during the period of May 17-21, 2001; 12,500 shares during the period of August 1-29, 2001; and 10,000 shares during the period of November 13-14, 2001 (a total of 96,600 shares), of VeriSign common stock for total net proceeds of $5,025,988;

*4 d) Gallivan sold 37,000 shares during the period of February 6-28, 2001; 3,000 shares on March 1, 2001; and 82,994 shares during the period of May 2-8, 2001 (a total of 122,994 shares), of VeriSign common stock for total net proceeds of $7,164,007;

e) Korzeniewski sold 15,000 shares on February 2, 2001; 25,000 shares on May 3, 2001; 74,626 shares during the period of May 3-31, 2001; 15,000 shares on August 27, 2001; and 33,700 shares during the period of November 2-13, 2001 (a total of 163,326 shares), of VeriSign common stock for total net proceeds of $8,442,775;

f) Pereira sold 800 shares on January 31, 2001; 9,700 shares during the period of February 6-28, 2001; 2,500 shares on March 1, 2001; 47,600 shares during the period of May 2-31, 2001; 11,000 shares during the period of August 3-31, 2001; and 15,000 shares during the period of November 7-30, 2001 (a total of 86,600 shares), of VeriSign common stock for total net proceeds of $4,676,900;

g) Sclavos sold 50,000 shares on February 28, 2001; 135,000 shares during the period of May 7-31, 2001; and 60,375 shares during the period of August 3-29, 2001 (a total of 245,375 shares), of VeriSign common stock for total net proceeds of $13,229,650;

h) Tomlinson sold 875 shares on January 30, 2001; 1,875 shares on February 26, 2001; 1,875 shares during the period of May 1-21, 2001; 1,775 shares on August 1, 2001; and 2,400 shares during the period of November 7-13, 2001 (a total of 8,800 shares), of VeriSign common stock for total net proceeds of $476,827;

i) Ulam sold 8,000 shares on March 1, 2001; 2,711 shares during the period of May 22-31, 2001; and 2,500 shares on August 3, 2001 (a total of 13,211 shares), of VeriSign common stock for total net proceeds of $697,925; and

j) Wolford sold 5,000 shares on January 31, 2001, and 12,900 shares on May 8, 2001 (a total of 17,900 shares), of VeriSign common stock for total net proceeds of $1,174,000. [FN12]

FN12. Amended Compl. ¶ 37.

Thus, during the Relevant Period, the Selling Defendants (except Moore) sold a total of 875,731 shares of VeriSign common stock for aggregate net proceeds of $47,512,615. Moore disposed of 995,000 in-the-money, unexercised Illuminet stock options at some point between March 26, 2001 and April 3, 2002, earning net proceeds of $37,113,500. [FN13]

FN13. Id. The per option value received by Moore was estimated by Rattner based upon the market value of Illuminet common stock as of December 12, 2001, the closing date of the merger between Illuminet and VeriSign, less the per share exercise price.

Moreover, the material misstatements which opened the door for the Selling Defendants to engage in improper insider trading were allegedly the products of the Individual Defendants' breaches of fiduciary duty in failing to oversee adequately the Company's accounting procedures. The Amended Complaint maintains that the Individual Defendants "knew, or were reckless in not knowing, the facts which indicated that the fiscal 2000 and 2001 Form 10-Ks and all of the Company's interim financial statements, press releases, public statements, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2003 WL 22284323, *4 (Del.Ch.))

filings with the SEC" were misleading. [FN14] Moreover, it is alleged, the Individual Defendants systematically failed to assure VeriSign's compliance with applicable federal and state laws, SEC rules and regulations, FASB Statements of Concepts and GAAP.

FN14. *Id.* ¶ 94.

D. *Subsequent Events*

**\*5** In February 2002, rumors began circulating as to the accounting practices employed by VeriSign. [FN15] On March 19, 2002, the Company, in its 10-K for 2002, disclosed that 10% of its 2001 revenues were derived from reciprocal deals with either its customers or other companies in which it had invested. That day, the price of VeriSign shares fell by more than 9%, closing down $2.61 to $26.42. [FN16] On April 25, 2002, a VeriSign press release noted, in addition to its financial and operating results for the first quarter of 2002, that DSO had increased to 81 days, and that the Company was restructuring its operations in order to best accommodate the recently acquired companies of Illuminet and H.O. Systems. Upon this news, the price of VeriSign shares tumbled from $18.24 to $9.89. [FN17] A July 25, 2002 press release noted that the Company had recorded a $4.6 billion charge in connection with a non-cash charge relating to a portion of the Company's goodwill and intangible assets, as directed by FASB Statement No. 142. [FN18] On August 7, 2002, VeriSign announced that its marketing practices were under investigation by the Federal Trade Commission, regarding allegedly misleading direct-mail advertising campaigns. The Company is also the target of several securities fraud class action lawsuits filed in the Northern District of California.

FN15. *Id.* ¶ 71.

FN16. *Id.* ¶¶ 72-73.

FN17. When the Amended Complaint was filed, VeriSign traded at $4 per share.

FN18. Amended Compl. ¶ 79.

## II. CONTENTIONS

In the Amended Complaint, Rattner primarily advances two theories of wrongdoing by the Individual Defendants. First, Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock (or, in the case of Moore, selling Illuminet options) while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price. [FN19] In support of this claim, Rattner notes several aspects of the challenged stock sales executed during the Relevant Period. First, the Individual Defendants, by virtue of their positions, were privy to material, undisclosed information concerning the alleged accounting improprieties. Second, the timing of the sales, in that many of the Individual Defendants sold their holdings simultaneously and on days immediately following the release of allegedly misleading information or, in the case of Moore, after the announcement of the acquisition of Illuminet yet before that acquisition's closing, raises suspicions that the sales were part of an overall scheme of insider trading. Third, Rattner alleges that the sales of VeriSign stock (or Illuminet options) by the Selling Defendants during the Relevant Period were not consistent with the Individual Defendants' previous trading activity. Finally, Rattner notes that many of the Individual Defendants sold substantial portions of their VeriSign (or Illuminet) holdings for millions of dollars. Rattner further contends that all of the Director Defendants committed waste by allowing the Selling Defendants to misappropriate a valuable asset, in the form of proprietary information, of the Company. [FN20]

FN19. Rattner also alleges that some of the Individual Defendants participated in or encouraged the improper accounting practices. *Id.* ¶ 47.

FN20. These claims will be referred to collectively as the "Insider Trading Claims."

**\*6** Rattner also presses a second set of claims concerning the alleged dissemination of misleading statements to the market and the improper oversight exercised in failing to assure the accuracy of VeriSign's accounting systems. Rattner charges the Individual Defendants with inadvertent, if not knowing, misdeeds in maintaining accurate financial reporting and recording systems, conduct which ultimately permitted the Selling Defendants to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 2003 WL 22284323, \*6 (Del.Ch.))**

engage in insider trading and resulted in damages to the Company. [FN21] More pertinently, in the demand excusal context, and in essence, Rattner alleges that the Director Defendants "have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that VeriSign complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting." [FN22] Thus, by failing to oversee adequately the Company's financial reporting and recording systems, the Director Defendants breached their fiduciary duties. [FN23]

FN21. Amended Compl. ¶¶ 98, 101.

FN22. *Id.* ¶ 100.

FN23. Collectively, these claims will be referred to as the "Accounting Oversight Claims."

Because of the Individual Defendants' misdeeds, Rattner claims that the Company has suffered harm in that VeriSign's goodwill and integrity in the market have been impugned. Furthermore, the Company has been injured by bearing the cost of defense and being subjected to potential liability stemming from the pending class actions in federal court. Rattner thus requests that the following relief be granted: (1) that the Individual Defendants account to VeriSign for all damages and costs sustained now or in the future; (2) that the Individual Defendants return to VeriSign all salaries and remuneration of any kind received while the Individual Defendants were in breach of their fiduciary duties; (3) that a constructive trust be imposed on all profits derived from insider trading by the Selling Defendants; and (4) a declaration that VeriSign is entitled to contribution and indemnification for any claims that have been, or may be, asserted against it in connection with the Individual Defendants' alleged misconduct.

In response to the Amended Complaint, Defendants have moved to dismiss this action for failure to comply with Court of Chancery Rule 23.1. [FN24] Defendants argue that Rattner has not pled with particularity in the Amended Complaint facts which demonstrate that demand is futile. They contend that Rattner, in the Amended Complaint, does not allege with particularity facts that would constitute insider trading, and thus a disabling interest, by a majority of the Board. Similarly, Rattner fails to allege with particularity that the Board failed to exercise proper oversight regarding the Company's financial recording and reporting systems. Moreover, Defendants note that merely because the Director Defendants would be asked to authorize suit against themselves does not necessarily prevent a majority of the Board from exercising disinterested and independent business judgment in deciding the merits of, and whether to pursue, Rattner's claims. Therefore, Defendants request that this action be dismissed.

FN24. The Defendants have also moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). However, given my disposition of the Defendants' motions to dismiss under Court of Chancery Rule 23.1, the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6) will not be addressed. Similarly, I do not address Defendants' contention that this action should be dismissed because "prosecution of this amended action is not in the best interests of the Company." Op. Br. in Supp. of Defs.' Mot. to Dismiss at 13.

### III. ANALYSIS

**\*7** Court of Chancery Rule 23.1 requires that, in derivative actions, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement embodied in Court of Chancery Rule 23.1 is an acknowledgement that a shareholder's prosecution of a derivative action necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation, including whether or not to pursue a cause of action belonging to the corporation. [FN25] The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit. [FN26]

FN25. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

FN26. *Spiegel,* 571 A.2d at 773; *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at \*5 (Del.Ch. June 21, 2000).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2003 WL 22284323, *7 (Del.Ch.))

Page 7

A critical requirement of Court of Chancery Rule 23.1 is that the complaint must allege *with particularity* the reasons for demand excusal.
> Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.... What the pleader must set forth are particularized factual statements that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates. [FN27]

> FN27. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (footnotes omitted).

In considering whether a derivative plaintiff has satisfied Court of Chancery Rule 23.1, I am confined to reviewing the well-pled allegations of the complaint. [FN28] While I am unable to accept cursory contentions of wrongdoing in light of the obligation to plead facts with particularity, I must accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff. [FN29] With these principles in mind, I turn to the question of whether Rattner has pleaded with particularity that demand upon the Board would be futile and, thus, is excused.

> FN28. *White,* 783 A.2d at 547 n. 5; *Zimmerman v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002); *Ash v. McCall,* 2000 WL 1370341, at *6 (Del.Ch. Sept.15, 2000).

> FN29. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

The business judgment rule and demand excusal are "inextricably bound." [FN30] When a derivative suit challenges decisions made by directors in accordance with their managerial authority, "stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." [FN31] However, it is also recognized that the business judgment rule only operates in instances of action by the board of directors or a conscious decision to refrain from acting. [FN32] The business judgment rule has no role in the case of inaction by

the board of directors. [FN33] From this dichotomy, two overlapping yet different tests have been developed to determine whether demand is excused.

> FN30. *Aronson,* 473 A.2d at 812.

> FN31. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

> FN32. *Aroson,* 473 A.2d at 813.

> FN33. *Id.; Guttman v. Huang,* 823 A.2d 492, 499-500 (Del.Ch.2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *14 n. 39 (Del.Ch. Dec.18, 2002).

*8 If a derivative suit challenges a decision made by a board of directors, then demand futility is properly evaluated under that test announced in *Aronson v. Lewis.* [FN34] Under the *Aronson* test, "[t]o determine whether demand would be futile, the Court must determine whether the particular facts, as alleged, create a reason to doubt that: '(1) the directors are disinterested and independent' or '(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." ' [FN35] Thus, *Aronson* adopted a two-pronged analysis for determining whether demand is futile: the first prong inquires into the independence and disinterestedness of the directors, and the second prong focuses on the substantive nature of the challenged transaction and the directors' approval thereof. [FN36]

> FN34. *Rales,* 634 A.2d at 933 ("The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."); *Haseotes v. Bentas,* 2002 WL 31058540, at *4 (Del.Ch. Sept.3, 2002).

> FN35. *In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 285 (Del.Ch.2003) (quoting *Aronson,* 473 A.2d at 814).

> FN36. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Aronson,* 473 A.2d at 814.

The parties, however, agree that, here, because Rattner does not challenge any particular action undertaken by the Board as a whole, the standard established in *Rales v. Blasband* governs the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





determination of demand futility. Thus, under the *Rales* test,

a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile. [FN37]

> FN37. *Rales,* 634 A.2d at 934.

Because there has been no action or decision by a board of directors, a premise of the *Aronson* test, that of the application of the business judgment rule, is lacking, and accordingly it is under the *Rales* test that the fundamental right of boards of directors to manage the affairs of corporations is recognized. [FN38] Thus, in examining "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations," [FN39] the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand.

> FN38. *In re Fuqua Indus., Inc. S'holders Litig.,* 1997 WL 257460, at *13 (Del.Ch. May 13, 1997); *Kohls v. Duthie,* 791 A.2d 772, 780 (Del.Ch.2000); *see also Rales,* 634 A.2d at 933 ("[t]he absence of board action ... makes it impossible to perform the essential inquiry contemplated by *Aronson*--whether the directors have acted in conformity with the business judgment rule [in consciously deciding to act or refrain from acting]").

> FN39. *Rales,* 634 A.2d at 934.

Under the *Rales* test, demand is excused if the particularized facts of the Amended Complaint create a reasonable doubt that, at the time the original complaint was filed, a majority of the Board could have exercised disinterested and independent business judgment in responding to Rattner's demand. Rattner does not challenge the independence of any Director Defendant; thus, the inquiry turns to the disinterestedness of the Director Defendants at the time this action was filed. Directors are considered disinterested for purposes of determining demand futility when they "appear

on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [FN40] Directorial interest may also be said to exist when " 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." ' [FN41]

> FN40. *Aronson,* 473 A.2d at 812; *see also Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002).

> FN41. *Orman,* 794 A.2d at 23 (quoting *Rales,* 634 A.2d at 936).

*9 Often, as is the case here, a derivative suit essentially asks the directors to authorize a suit against themselves and, thus, to act against their own personal interests.

The conundrum for the law in this area is well understood. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak. [FN42]

> FN42. *Guttman,* 823 A.2d at 500.

Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand. [FN43] "[H]owever, a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." [FN44] It is this difference, between a "mere threat" of personal liability and (i) "a substantial likelihood" of personal liability or (ii) a "mere threat" in "egregious circumstances," as addressed in the context of the first prong of *Aronson* [FN45] and the test established in *Rales,* [FN46] that accommodates and balances the competing policy concerns of adequately policing boards of directors while guarding against strike suits. With this framework in mind, I turn to determining whether, at the time this action was originally filed, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
**(Cite as: 2003 WL 22284323, \*9 (Del.Ch.))**

majority of the Board could have impartially considered a demand made upon the Board and, thus, whether demand is excused. [FN47]

> FN43. *H-M Wexford LLC v. Encorp, Inc.,* 2003 WL 21254843, at \*14 (Del.Ch. May 27, 2003) (citing *Aronson,* 473 A.2d at 815; *Malpiede v. Towson,* 780 A.2d 1075, 1085 (Del.2001)).

> FN44. *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995) (quoting *Rales,* 634 A.2d at 936); *see also Benerofe v. Cha,* 1996 WL 535405, at \*6 (Del.Ch. Sept.12, 1996).

> FN45. *See, e.g., Malpiede,* 780 A.2d at 1085; *Kohls,* 791 A.2d at 782 n. 36 (noting that "[i]n a way, this inquiry [into whether a defendant director was interested in the decision to bring litigation because of a substantial threat of personal liability] is *related* to the second prong of the *Aronson* test." ) (emphasis added); *Katz v. Halperin,* 1996 WL 66006, at \*8–\*9 (Del.Ch. Feb.5, 1996).

> FN46. *See, e.g., Rales,* 634 A.2d at 936; *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).

> FN47. Accordingly, for purposes of determining demand futility, the Individual Defendants who are not Director Defendants are largely irrelevant.

For demand to be excused, the particularized facts of the Amended Complaint must create a reasonable doubt that, at the time this action was filed, four of the eight directors on the Board could have exercised their disinterested business judgment in considering a demand. [FN48] Rattner argues that demand is excused for both the Insider Trading Claims and the Accounting Oversight Claims for several reasons. Rattner asserts that demand would have been futile because "[c]ertain defendants personally profited from the wrongful activities alleged by selling VeriSign stock at artificially inflated prices." [FN49] While this allegation carries some uncertainty, [FN50] I understand Rattner to contend that because four of the eight directors are alleged to have traded VeriSign (or Illuminet) securities on the basis of non-public and material knowledge, a majority of the Board is not disinterested and, thus, is incapable of impartially considering a demand. Next, Rattner claims that demand would have been futile because all of the

Director Defendants are accused of breaching their fiduciary duties by having failed to exercise adequate oversight over the Company's financial recording and reporting systems, thereby leading to the wrongful conduct complained of in this action. Finally, Rattner notes that "[c]ertain of the Individual Defendants are defendants in the federal securities class action suits described [in the Complaint], and face a substantial likelihood of liability given the misstatements" made during the Relevant Period. [FN51]

> FN48. *See In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at \*7 (Del.Ch. Mar.27, 2002); *Beneville v. York,* 769 A.2d 80, 85-87 (Del.Ch.2000). Again, because Rattner never seriously argues that any member of the Board lacks independence, the sole focus of my inquiry is into the disinterestedness of a majority of the Board.

> FN49. Amended Compl. ¶ 102(a). The Defendants argue that the allegation that "certain defendants" are incapable of considering a demand is itself plead with insufficient particularity. However, I will presume that, in the context of an effort to justify a failure to make demand upon the Board, Rattner is referring to those Defendants who are directors and who sold shares of VeriSign.

> FN50. *See supra* note 11.

> FN51. Amended Compl. ¶ 102(d)

### A. *The Insider Trading Claims*

**\*10** In order for demand to be excused with respect to the Insider Trading Claims, a reasonable doubt must exist that four of the eight VeriSign directors are incapable of exercising their disinterested business judgment in considering a demand. Rattner contends that this requirement for demand futility is satisfied as "[f]our of the directors who sold their shares on the basis of inside information are interested because each of them received a personal financial benefit from those transactions." [FN52] With respect to the Insider Trading Claims, Rattner does not challenge the disinterestedness of four (Compton, Chenevich, Reyes, and Kriens) of the directors. Therefore, were Rattner's attack upon any of the remaining four directors (Bidzos, Sclavos, Moore and Cowan) unsuccessful, a "majority" of the Board would not be implicated and demand would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





not be excused.

FN52. Pl.'s Answering Br. at 10.

Before I begin my analysis of demand excusal with respect to the Insider Trading Claims, it is important to note what facts, in connection with the Insider Trading Claims, are *not* alleged, at all or with particularity, in the Amended Complaint. Rattner merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements. [FN53] Thus, absent from the particularized allegations of the Amended Complaint are the "precise roles that [the Director Defendants] played at the [C]ompany [and] the information that would have come to their attention in those roles." [FN54] The Amended Complaint is also devoid of any particularized facts that could lead to the inference that the timing of the trades reflected the Selling Defendants' impermissible insider trading. The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods; while the pattern observed does reflect trading activity on behalf of the Director Defendants after the release of allegedly misleading statements, no particularized allegation of the Amended Complaint answers whether this temporal proximity was in fact part of the Company's practice to prevent Company insiders from improperly benefiting from informational asymmetries. [FN55] Moreover, although Rattner cursorily alleges that there were differences between prior years and the Relevant Period, [FN56] the Amended Complaint does not shed light upon the trading practices of the Director Defendants prior to the Relevant Period. [FN57] Finally, the Amended Complaint often refers to allegedly improper sales by the Director Defendants as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements.

FN53. Rattner's best effort toward alleging with particularity the Director Defendants' knowledge, and how they acquired such knowledge, is set forth in Paragraph 33 of the Amended Complaint:
33. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors['] meetings and committees thereof and via reports and other information provided to them in connection therewith.
Although Rattner may have sought to satisfy the requirement to plead facts with particularity, Paragraph 33 of the Amended Complaint charges directors, solely upon the basis of their status as directors, with knowledge of alleged corporate activity. The conclusory assertions contained in Paragraph 33 fail to allege with particularity what information the directors knew and how they acquired such knowledge. The conclusory nature of Rattner's allegations is perhaps most obvious in Paragraph 34 of the Amended Complaint which provides in part:
34. It is appropriate to treat the Individual Defendants as a group for pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases as alleged herein are the collective actions of the narrowly defined group of defendants identified above .... (emphasis added).

FN54. *Guttman,* 823 A.2d at 503.

FN55. *See id.* at 503-04.

FN56. Amended Compl. ¶ 85(c).

FN57. *See Guttman,* 823 A.2d at 498.

Rattner argues that, with respect to the Insider Trading Claims, demand is excused because four of the eight directors have been implicated in alleged insider trading. Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their stock. [FN58] Recently, however, this Court noted the differences between archetypical claims of self-dealing and insider trading claims, concluding:

FN58. *Brophy v. Cities Serv. Co.,* 70 A.2d 5, 8

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




(Del.Ch.1949).

**\*11** As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces--including the criminal laws--to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information. [FN59]

> FN59. *Guttman,* 823 A.2d at 502. The Court further explained:
> This would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition. *Id.*

Thus, critically, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." [FN60]

> FN60. *Stepak v. Ross,* 1985 WL 21137, at \*5 (Del.Ch. Sept.5, 1985); *see also Guttman,* 823 A.2d at 505 ("Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Rosenberg v. Oolie,* 1989 WL 122084, at \*3 (Del.Ch. Oct.16, 1989) ("[I]f 'a person "in a confidential or fiduciary position, in breach of his duty, *uses his knowledge* to make a profit for himself, he is accountable for such profit' " ') (quoting *Brophy,* 70 A.2d at 8).

After reviewing the Amended Complaint, I conclude that Rattner has not pleaded facts with particularity that create a reasonable doubt that a majority of the Board is disinterested with respect to the Insider Trading Claims. It is important to note that only one Director Defendant is a senior manager of the Company; that is, only Sclavos held a senior management position with VeriSign at the time this action was filed. The Amended Complaint alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities. Thus, even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board. [FN61]

> FN61. As noted above, Rattner has not questioned the independence from Sclavos of the seven other directors.

The Amended Complaint's allegations implicating Moore's sale of unexercised Illuminet options also fail to taint the disinterestedness of Moore in considering a demand made upon the Board. On September 23, 2001, VeriSign and Illuminet entered into a merger agreement. As consideration, VeriSign would exchange 0.93 shares of VeriSign common stock for each outstanding share of Illuminet and, thus, would issue 30.4 million shares for the outstanding shares of Illuminet, as well as assume Illuminet's outstanding employee stock options. [FN62] Rattner complains that "[a]t some point after announcement of the Illuminet acquisition, but prior to being elected to the [Board], Moore exercised Illuminet options (or VeriSign options exchanged in the Merger) and sold the underlying stock." [FN63] The Complaint fails to allege with any specificity when the sales were made or whether the shares were all sold at one time. [FN64] Moreover, if trading resulting from the Illuminet options is assumed to be relevant to the purpose of determining demand futility with respect to the Insider Trading Claims, the Amended Complaint still fails to allege particularized facts that compromise Moore's impartiality. Not one particularized allegation in the Amended Complaint explains what inside knowledge Moore traded upon or how he gleaned such information. [FN65] Therefore, I conclude that the Amended Complaint fails to allege the particularized facts necessary to raise a reasonable doubt as to Moore's ability to exercise his disinterested business judgment.

> FN62. Amended Compl. ¶ 63.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2003 WL 22284323, *11 (Del.Ch.))

FN63. *Id.* ¶ 20. The Illuminet acquisition was announced in September 2001; Moore became a director of VeriSign in February 2002. Rattner also alleges that "rather than convert his Illuminet options into VeriSign options, defendant Moore exercised and sold off his Illuminet options." *Id.* ¶ 63. Rattner also contends that Moore's disposition of his Illuminet interest was "unusual in nature and timing," *id.* ¶ 85, because the "sales occurred after announcement of the acquisition of Illuminet by VeriSign and prior to closing of that transaction." *Id.* ¶ 85(e).

FN64. Rattner alleges that, in March 2001, Moore held 995,000 "in the money" options and by April 2002 had disposed of them. *Id.* ¶ 37 n. 1.

FN65. Rattner asserts that "Moore, while in possession of other material adverse non-public information, sold approximately 995,000 of his privately-held Illuminet stock." *Id.* ¶ 82. Rattner does not identify that "material adverse non-public information" to which she refers.

**\*12** Additionally, I note that the Amended Complaint fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information. Much is made about the timing and size of the sales. However, as has been noted, [FN66] the Amended Complaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices. Additionally, while several Individual Defendants disposed of large percentages of their stock holdings, of the four Director Defendants, only two (Cowan and Moore) can be characterized as having disposed of a "large" percentage of their holdings. [FN67] Essentially, Rattner seeks to impose liability and excuse demand on the basis that the Director Defendants sold VeriSign stock (or Illuminet options) during the Relevant Period. If accepted, Rattner's theory would take a step toward the implementation of the very common law rule warned of in *Guttman*. It is a step which I decline to take. Thus, I conclude that, with respect to the Insider Trading Claims, Rattner has failed to plead with particularity factual allegations which, at the time this action was filed, create a reasonable doubt

that a majority of the Board was disinterested and therefore incapable of impartially considering a demand.

FN66. *See supra* notes 53-55 and accompanying text.

FN67. In determining whether demand is excused, I am confined to the controlling complaint and may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference. *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at \*4-\*6 (Del.Ch. Jan.11, 2001). Rattner, in her brief, argues that the large percentages disposed of by the Individual Defendants support her alleged theory of insider trading. *See* Pl.'s Answering Br. at 12 n. 7 (citing "2002 Proxy"). However, nowhere in the Amended Complaint did Rattner allege the total personal holdings of the individual Director Defendants. Here, the "2002 Proxy," a citation subject to uncertainty, was not referred to in the Amended Complaint. Also, the document is not integral to Rattner's claim.

## B. *The Accounting Oversight Claims*

Rattner also claims that demand is excused with respect to the Accounting Oversight Claims because all of the members of the Board are potentially liable for failure to exercise proper supervision over VeriSign's financial recording and reporting systems. In this situation, the *Rales* test, in examining the "interest" of the challenged directors, asks whether "the directors face a 'substantial likelihood' of personal liability, [and thus whether] their ability to consider a demand impartially is compromised ..., excusing demand." [FN68]

FN68. *Guttman*, 823 A.2d at 501.

Rattner's Accounting Oversight Claims are best described as a type of *Caremark* [FN69] claim. As was noted in *In re Caremark International Derivative Litigation*, a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail. [FN70] In the typical *Caremark* case, "[i]n order to hold the directors liable, [a] plaintiff will have to demonstrate that they were grossly negligent in failing to supervise these subordinates." [FN71]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2003 WL 22284323, *12 (Del.Ch.))

Here, once again, it is instructive to review not what facts the Amended Complaint alleges, but what facts the Amended Complaint fails to allege, with particularity.

> FN69. *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959 (Del.Ch.1996).

> FN70. *Id.* at 967; *see also Guttman*, 823 A.2d at 505-06.

> FN71. *Seminaris*, 662 A.2d at 1355.

The Amended Complaint sets forth vast tracts of quoted materials from public sources, detailing wrongdoings in the form of alleged misstatements. The Amended Complaint also summarizes numerous SEC rules and regulations, and FASB and GAAP standards. However, conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee. [FN72] The Amended Complaint also is similarly wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial information to the market.

> FN72. As has been noted, relevant facts include "whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." *Guttman*, 823 A.2d at 498.

**\*13** Rattner calls attention to what she suggests should have been a "red flag" to the Director Defendants, placing them on notice of the systematic failure of the Company's internal controls. The Amended Complaint, relatively briefly, attempts to explain that the Defendant Directors should have been on notice of certain alleged misstatements, noting that "VeriSign" purchased companies with large amounts of deferred revenues, allegedly in order to manipulate its DSO by increasing its deferred revenue and excluding its accounts receivables, thereby creating the false impression of growth. [FN73] Specifically, the Amended Complaint alleges that DSO were steadily rising from the second quarter of 2000 (DSO of 32)

through the first quarter of 2002 (when DSO peaked at 81), which should have signaled to the VeriSign directors that something was amiss, given that VeriSign's revenue stream is "mainly derived from subscription based products and services (over 85% of revenue) which are recognized ratably and ordinarily should carry a low DSO of 45--50 days or less." [FN74] However, it is again important to recall the structure of the Board, in that only one Director Defendant is alleged to have been a senior manager of the Company at the time this action was filed. There is nothing alleged with particularity in the Amended Complaint that would either demonstrate or permit me to draw the reasonable inference that the Director Defendants were aware of a possibly onerous elevation in a single financial statistic. [FN75] As has been noted, claimed red flags "are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer." [FN76] Thus, the Amended Complaint, in the one instance it alleges a reason why the Director Defendants could somehow have been aware of alleged misdoings at the Company, still falls short of pleading with particularity facts that would excuse demand.

> FN73. Amended Compl. ¶ 62.

> FN74. *Id.* ¶ 70.

> FN75. *See In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del.Ch. June 5, 2003).

> FN76. *Id.*

None of these allegations contained in the Amended Complaint (individually or collectively) pleads with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence. While the Amended Complaint is quick to prattle off numerous alleged infractions of laws, rules and principles, Rattner never notes the accounting procedures employed by the Company or the Board's involvement in VeriSign's financial recording and reporting systems. The only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated. Equally as important, I am unable, from the face of the Amended Complaint, to determine what role, if any, the Board or its members played in the internal




processes of collecting and disseminating financial information. The most I can safely admit knowledge of is that Compton, Chenevich and Kriens were members of the Audit Committee during the Relevant Period and, thus, that the Company had an Audit Committee. [FN77] Therefore, I am unable to conclude that a majority of the Board faces a substantial likelihood of liability for failing to oversee VeriSign's compliance with required accounting and disclosure standards. [FN78]

FN77. Ironically, these Director Defendants are three of the four directors who were not alleged to have engaged in insider trading.

FN78. To the extent that Rattner alleges intentional wrongdoing by the Director Defendants, I note that, for the same reasons set forth above, the Amended Complaint does not allege with particularity facts that at all show knowing participation by any of the Director Defendants (with the possible exception of Sclavos as the only management director). I also observe that, in contrast to Rattner's alternative theories of wrongdoing, the issue of demand futility with respect to claims of intentional wrongdoing would be judged under the two-pronged *Aronson* standard. *See supra* text accompanying note 35. However, given the highly conclusory nature of the Amended Complaint, the Amended Complaint fails to plead with particularity demand futility under either prong

**\*14** Finally, Rattner asserts another theory as to why demand is excused: because "[c]ertain of the Individual Defendants are defendants in ... federal securities class action suits ... and face a substantial likelihood of liability given the misstatements of VeriSign' [sic] earnings and the trading in VeriSign stock during the stated class period in those actions." [FN79] Here, too, the Amended Complaint leaves far too much to the imagination. The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits. These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements of Court of Chancery Rule 23.1.

FN79. Amended Compl. ¶ 102(d).

Thus, a symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. Here, the cause of this systematic failure is left to supposition, although one suspects that the "first to file custom" and the resulting "unseemly race to the court house" may be at fault. [FN80] In her brief, Rattner noted:

FN80. *Rales,* 634 A.2d at 934-35 n. 10; *see also In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1.

[I]t is unclear from a review of public filings how exactly Moore's Illuminet options were disposed. Indeed, prior to filing the Amended Complaint, plaintiff's counsel requested an explanation from defendants' counsel regarding Moore's disposition since it is critical to the demand futility analysis. After taking the matter under advisement, defendants' counsel refused to provide any information. [FN81]

FN81. Pl.'s Answering Br. at 12 (citation omitted).

Our cases have consistently advised would-be derivative plaintiffs to utilize the "tools at hand" before filing complaints. [FN82] In particular, the books and records provisions of 8 *Del. C.* § 220 may be quite helpful for derivative plaintiffs confronted with the need to satisfy the pleading requirements of Court of Chancery Rule 23.1 [FN83] They might have been helpful here; Rattner has never stated whether she availed herself of the tools at hand before embarking upon what is now discovered to have been an ultimately--at least in this venue--unsuccessful journey. Thus, both the causes of the Amended Complaint's deficiencies and whether an often overlooked tool for plaintiffs could have been useful remain a mystery. What is clear is that the Amended Complaint fails to set forth particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Board at the time this action was filed so as to excuse demand.

FN82. *See Brehm,* 746 A.2d at 266-67; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1; *Guttman,* 823 A.2d at 504.

FN83. *See e.g., In re The Walt Disney Co. Deriv.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2003 WL 22284323, *14 (Del.Ch.))

*Litig.,* 825 A.2d 275, 279 (Del.Ch.2003).

### IV. CONCLUSION

For the foregoing reasons, the Amended Complaint will be dismissed. [FN84] An order will be entered in accordance with this Memorandum Opinion.

> FN84. The dismissal as to Rattner will be with prejudice. *See* Court of Chancery Rule 15(aaa).

### ORDER

AND NOW, this *30th* day of September, 2003, for the reasons set forth in the Court's Memorandum Opinion of even date,

**\*15** IT IS HEREBY ORDERED that the above-entitled action be, and the same hereby is, dismissed. This dismissal is with prejudice as to Plaintiff Bobbie Rattner.

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




# TAB 23

Not Reported in A.2d
Not Reported in A.2d, 1984 WL 21874 (Del.Ch.), 10 Del. J. Corp. L. 645
(Cite as: 1984 WL 21874 (Del.Ch.), 10 Del. J. Corp. L. 645)

**Page 1**

▷

UNPLUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
**Jo V. SEIBERT**
v.
**HARPER & ROW, PUBLISHERS, INC., et al.**
CIV. A. No. 6639.

Dec. 5, 1984.
**\*\*648** Joseph A. Rosenthal, Morris & Rosenthal, P.A., Wilmington.

Lewis S. Black, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington.

Jacob B. Jacobs, Young, Conaway, Stargatt & Taylor, Wilmington.

E. Norman Veasey, Richards, Layton & Finger, Wilmington.

BERGER, Vice Chancellor.

**\*1** This is a class and derivative action attacking the 1981 repurchase by Harper & Row, Publishers, Inc. ("Harper & Row") of approximately one-third of its outstanding stock from Minneapolis Star & **\*\*649** Tribune Company ("MST") (the "Buy Back"). The complaint, brought by a Harper & Row stockholder, names as defendants the nine directors of Harper & Row, two MST executives who were Harper & Row directors at relevant times, MST and Harper & Row.

Defendants moved to dismiss shortly after the complaint was filed and renewed their motion after plaintiff amended her complaint in May, 1982. Following briefing on defendants' motion, plaintiff moved for leave to amend in September, 1983 and again in August, 1984. Defendants oppose plaintiff's motions although they argued their motion to dismiss on the assumption that the amendments would be allowed. They correctly anticipated the Court's ruling on plaintiff's motions to amend.

Motions to amend normally will be denied only on a showing of prejudice, undue delay or legal insufficiency. *Stotland v. GAF Corporation,*

Del.Ch., C.A. 6876, Longobardi, V.C. (March 24, 1983). Defendants do not contend that they are prejudiced by the amendments, which add some factual detail and raise an additional proxy statement non-disclosure claim. Although defendants do argue that the newly alleged non-disclosure claim is subject to dismissal for the same reasons advanced in support of their motion to dismiss, it seems more appropriate to include all of plaintiff's current claims in deciding the motion to dismiss. *See Good v. Texaco, Inc.,* Del.Ch., C.A. 7501, Brown, C. (May 14, 1984).

The details of the Buy Back, as alleged in the amended complaint, may be summarized as follows. Prior to the Buy Back, MST had been Harper & Row's largest stockholder--owning approximately 33% of its 3,068,323 shares outstanding. On August 4, 1981, Harper & Row announced that it had agreed to repurchase the stock held by MST (the "MST shares") for $20 per share. On that date Harper & Row stock was trading at slightly over $12 per share in the over-the-counter market. Kidder, Peabody & Co., Inc. ("Kidder, Peabody") opined that the $20 Buy Back price represents a fair value for the MST shares.

The announcement explained that most of the stock acquired in the Buy Back would be transferred to a new Harper & Row Employee Stock Plan ("ESP") that would replace the existing Retirement Plan. The remaining MST shares were to be sold to Harper & Row's Profit Sharing Plan ("PSP"). The stock to be held by the ESP and PSP were to be voted at the direction of Harper & Row's directors.

**\*\*650** Harper & Row issued a proxy statement dated November 10, 1981 seeking stockholder approval of the Buy Back, creation of the ESP and amendment of the PSP. The proxy statement allegedly was materially misleading in that it:

(1) Falsely suggests that the creation of the ESP was dependent on the Buy Back when, in fact, the stock needed for the ESP could have been obtained through a tender offer or open market purchases;

**\*2** (2) Fails to explain that "implicit" in the Kidder, Peabody fairness opinion was the value of the control factor associated with the block of MST

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 1984 WL 21874, *2 (Del.Ch.), 10 Del. J. Corp. L. 645, **650)

stock and that the increment representing the control factor has "no particular value" to Harper & Row;

(3) Fails to state that the termination of the Retirement Plan served no proper purpose, was necessary to finance the ESP and Buy Back, and would "most likely" impair Harper & Row's ability to attract management and employees;

(4) Fails to disclose the opposition of Harper & Row's stockholders, such as plaintiff, to the Buy Back; and

(5) Fails to disclose that the bank that had been trustee for the PSP resigned because it feared that it might be charged with breach of fiduciary duty in litigation over the Buy Back.

The amended complaint also alleges, as a derivative claim, that MST and the individual defendants breached their fiduciary duties by approving the Buy Back at an excessive price for the primary purpose of entrenching management and by replacing the Retirement Plan, which had been funded with a diversified portfolio of investments, with the ESP, which plaintiff alleges is a less attractive retirement plan because the ESP's sole investment is Harper & Row common stock.

Defendants moved to dismiss the derivative claim for failure to make a demand prior to instituting suit and for failure to allege facts sufficient to establish that demand would have been futile. On this point, the amended complaint alleges, alternatively, that demand was made and refused by correspondence dated August 10 and August 14, 1981 or that demand was excused. The allegations as to the futility of demand are that (1) the individual defendants failed to take any action following the August, 1981 correspondence, thereby demonstrating their "conclusive bias" against instituting this litigation; (2) the entire Harper & Row board of directors is interested because, pursuant to the ESP and PSP, the board has the power to direct the vote of the MST shares which constitute the controlling block of Harper & Row common stock; (3) a majority of the board members are interested in entrenching themselves in management **651 through the voting control mentioned above; and (4) a majority of the board members participated in and approved the wrongs alleged and thus are "biased against the interests of

the company, its shareholders and this lawsuit."

Turning first to the "demand refused" allegation, I find that the August 10, 1981 letter from plaintiff's co-counsel to the Harper & Row board of directors does not constitute a demand under Chancery Court Rule 23.1. The letter, written by counsel as a stockholder and a representative of other Harper & Row stockholders, states that:

Based on the facts known to us, we believe the announced agreement in principle to purchase the block of shares owned by the Minneapolis Star is not in the best interest of the shareholders or the employees of Harper & Row.

*3 It goes on to identify four "areas of concern" and requests the opportunity to meet with the board of directors to discuss the matter. Although the letter does express some opposition to the proposed Buy Back, its stated purpose was not to demand that specific corrective action be taken. Rather, as noted, the letter asks that counsel be given the opportunity to discuss the matter in person with the entire board of directors. Harper & Row's written response attempted to allay the concerns expressed by plaintiff's counsel and stated that it would be impracticable to hold the requested meeting with the board of directors.

The timing of counsel's letter also supports the conclusion that it was not a "demand" letter under Rule 23.1. Counsel's concerns were based upon facts then known--presumably from the August 4, 1981 announcement of the agreement in principle with MST. The final agreement was not executed until approximately one month later and the proxy statement was not disseminated until almost three months after counsel's correspondence. There is no evidence that the purported demand was renewed after plaintiff's counsel had the opportunity to review the details of the proposed transaction as set forth in the proxy statement. Accordingly, Harper & Row's directors had no notice that counsel's concerns about the transaction had not been satisfied after more complete information was provided.

Finally, several of the claims in plaintiff's amended complaint were not addressed in the August letter and two of the four "areas **652 of concern" enumerated in the letter were not included as claims in this litigation. Specifically, the claim that the Buy





Case 1:05-cv-00327-GMS    Document 44-9    Filed 01/20/2006    Page 23 of 40

Not Reported in A.2d                                                                                    **Page    3**
(Cite as: 1984 WL 21874, *3 (Del.Ch.), 10 Del. J. Corp. L. 645, **652)

Back price was excessive and that the Buy Back was designed for the primary purpose of entrenching management were not contained in counsel's letter. Conversely, the concern that a pension fund investment in Harper & Row stock will yield insufficient return and that certain real estate should not be sold because of poor market conditions is not included in the amended complaint. One of the purposes of the demand requirement is to provide an opportunity for the board of directors to correct any purported wrongs and thus avoid the expense of litigation. *See Bergstein v. Texas International Company,* Del.Ch., 453 A.2d 467 (1982). Counsel's August, 1981 letter did not provide such an opportunity and, thus, is insufficient.

In reviewing the "demand excused" allegations, the standard to be applied is whether the facts alleged create a reasonable doubt that "(1) the directors are disinterested and independent; and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984). Three of the four "demand excused" allegations are without merit. The fact that the directors failed to act in response to the August, 1981 letter from plaintiff's counsel does not create a reasonable doubt as to their disinterestedness or independence for the reasons set forth above. Nor do the allegations in the amended complaint provide a basis for concluding that a majority of the Harper & Row board was interested by virtue of their executive positions with the company. Only four of the nine directors allegedly hold management positions. The fifth director's alleged "interest" stems from the fact he is the cousin of the director who heads a subsidiary of Harper & Row. This fact, without more, is insufficient to demonstrate domination and control by the interested director. *Aronson v. Lewis, supra* at 816. Finally, the allegation that a majority of the directors participated in and approved the alleged wrongs has been flatly rejected as a basis for excusing demand. *Pogostin v. Rice,* Del.Supr., 480 A.2d 619 (1984).

**\*4** The remaining "demand excused" allegation, however, has merit, following the analysis in *Good v. Texaco, Inc., supra.* Plaintiff alleges that the entire board of directors is interested in that the Buy Back and related transactions enabled the board to obtain voting control over approximately 30% of Harper & Row's stock. Under the Buy Back, the

MST shares were placed in the ESP and PSP and those shares are required to be voted at the direction of the defendant directors except to the extent that the stock in the ESP **653 is attributable to employees whose benefits are vested. The amended complaint alleges that only 3% of the MST shares now held by the ESP were attributable to such vested benefits as of June 30, 1982 and that the vested percentage will increase somewhat from year to year.

The relevant facts in *Good* parallel those alleged here. In *Good,* the defendant directors of Texaco, Inc. ("Texaco") agreed to purchase 9.7% of Texaco's common stock accumulated by the Bass defendants at a premium of 12% over market. Pursuant to the purchase agreement, Texaco was obligated to pay for a portion of the stock at issue in cash and to issue voting preferred stock to the Bass defendants in exchange for the remaining Texaco shares. The agreement required that the Bass defendants vote the preferred stock as instructed by Texaco's board of directors, thereby giving the board voting control over approximately 5% of Texaco's outstanding shares. In addition, at an annual meeting scheduled shortly after the stock purchase, Texaco's stockholders were being asked to approve an amendment to its Certificate of Incorporation whereby an 80% vote would be necessary to approve certain business combinations. The *Good* complaint alleged that the stock purchase constituted a waste of corporate assets by using corporate funds to acquire 5% of the stockholder voting power for Texaco's board of directors. Chancellor Brown found that these facts were sufficient to excuse demand:

The interestedness charged to the directors is that they have benefited personally from the transaction complained of by acquiring at corporate expense the right to control the vote of corporate shares which they do not own.

* * *

Since this power to vote the shares of the Bass defendants hereafter is alleged to be a power acquired for the board of directors itself, it follows that all board members are necessarily interested personally in the transaction they are alleged to have wrongfully approved. Under these circumstances, it seems without question that the defendant directors have such an interest as would deprive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 1984 WL 21874, *4 (Del.Ch.), 10 Del. J. Corp. L. 645, **653)

**Page  4**

them of the protection of the business judgment rule at this threshold stage of the proceedings.  As such, as I view the factual allegations of the complaint, and as indicated by *Aronson,* futility of demand has been established.  *Good v. Texaco, Inc., supra,* Slip Op. at 10- 11.

**\*\*654**  Defendants argue that *Good* is distinguishable on two grounds.  First, they note that the *Good* complaint alleged that all of the Texaco directors received compensation for serving as directors whereas the amended complaint here does not allege that the non-management directors of Harper & Row obtained any monetary benefit from their positions.  Second, defendants point out that the Texaco directors obtained an unfettered right to vote the repurchased shares whereas Harper & Row's directors must vote the ESP and PSP shares as fiduciaries for the Harper & Row employees.

**\*5** These distinctions do not appear to be critical to the holding in *Good.*  The Texaco directors' interest was based upon the benefit they derived from obtaining voting control over a substantial block of Texaco's stock at the corporation's expense.  The *Good* analysis did not focus on the Texaco directors' financial interest in remaining directors but rather on the benefit conferred by the voting power they acquired.  Nor does the fact that the Harper & Row directors must vote the MST shares as fiduciaries negate the voting benefits they obtained.  The defendant directors' exercise of their voting rights may be limited by their fiduciary responsibilities but those voting rights continue to be valuable rights sufficient to establish a reasonable doubt that the directors are interested for purposes of the demand requirement.

Defendants also moved to dismiss or for summary judgment with respect to plaintiff's proxy claims which were brought as a class action.  Defendants argue that the alleged deficiencies in the proxy statement fail as a matter of law and that they are derivative claims in any event because the Buy Back, if wrongful, caused harm to the corporation as a whole and only indirectly injured the stockholders.  The parties agree that the proxy claims must be measured against the standard requiring disclosure of all germane facts--those which a reasonable stockholder would consider important in deciding how to vote on the transaction.  *See Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278

(1977); *T.S.C. Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976).

Plaintiff first claims that the reference in the proxy statement to the "integral relationship" between the Buy Back and the creation of the ESP is misleading because it falsely suggests that the ESP could not have been set up without the repurchased MST shares.  In fact, Harper & Row could have obtained the stock necessary for the ESP through open market purchases or a tender offer.  This claim fails for two reasons.  First, although the Buy Back and creation of the ESP were submitted to the stockholders together for approval **\*\*655** as a single item, the provisions of the Buy Back and the ESP were detailed separately and the operative documents (the Stock Purchase Agreement dated September 15, 1981 and the Harper & Row, Publishers, Inc. Employee Stock Plan effective May 1, 1981) were attached to the proxy statement.  Nowhere in the proxy statement or in the attached underlying documents are the two transactions made in any way dependent on each other.  Thus, I find no merit to plaintiff's characterization of the implications to be drawn from the fact that the two proposals were presented to the stockholders for approval as a single item.  To the extent that plaintiff's claim rests on the fact that alternative methods of funding the ESP were not disclosed, his claim fails as a matter of law.  "[M]anagement is not required to discuss the panoply of possible alternatives to the course of action it is proposing...."  *Umbriac v. Kaiser,* 467 F.Supp. 548, 553 (D.Nev.1979).

**\*6**  Plaintiff's second claim is that the proxy statement fails to explain that Kidder, Peabody considered the value of the control premium associated with the MST shares in rendering its fairness opinion and that the control premium was of no value to Harper & Row.  However, a proxy statement need not disclose facts known or reasonably available to the stockholders.  *Rodman v. Grant Foundation,* 608 F.2d 64, 70 (2nd Cir.1979).  It is generally known that a substantial block of stock often will command a "control premium" above current market rates and it is reasonable to expect that a purchaser would have to pay the "control premium" regardless of whether that premium has any value to the purchaser in question.  *See Cheff v. Mathes,* Del.Supr., 199 A.2d 548, 555 (1964).  Thus, I find that the second alleged proxy





Not Reported in A.2d
(Cite as: 1984 WL 21874, *6 (Del.Ch.), 10 Del. J. Corp. L. 645, **655)

claim is without merit.

Plaintiff's next two claims are that the proxy statement fails to disclose stockholder opposition to the Buy Back and that the termination of the Retirement Plan served no proper purpose and likely would impair Harper & Row's ability to attract management. Proxy materials are only required to disclose all germane *facts*. They need not include opinions or possibilities, legal theories or plaintiff's characterization of the facts. *Umbriac v. Kaiser, supra; Bertoglio v. Texas International Company,* 488 F.Supp. 630 (D.Del.1980). Corporate officials are not required to draw inferences, engage in "self-flagellation" or speculate as to alleged improper motives. *Fisher v. United Technologies Corp.,* Del.Ch., C.A. 5847, Hartnett, V.C. (May 12, 1981). The proxy deficiencies alleged here all fall into one or more of these categories and thus fail as a matter of law.

Finally, plaintiff charges that the failure to disclose that the **656 PSP's trustee resigned because of potential litigation over the Buy Back is a material omission. This claim cannot be decided on the present record. Plaintiff alleges that the trustee feared that it would be charged with breach of fiduciary duty. Until the evidence as to the reasons for the trustee's resignation is more fully developed, I cannot conclude that the Harper & Row stockholders would not have considered this information important in deciding how to vote. Accordingly, defendant's motion as to this proxy claim is denied.

Finally, defendants argue that the proxy claims may only be brought derivatively. Their argument was premised upon the assumption that the derivative claims would be dismissed for failure to satisfy the demand requirements of Chancery Court Rule 23.1. Inasmuch as I have found that demand was excused, the remaining proxy claim would be viable even if it were brought derivatively. However, based upon the holding in *J.I. Case Co. v. Borak,* 377 U.S. 426 (1964), I am satisfied that a stockholder is entitled to bring a direct action for proxy violations notwithstanding the fact that the underlying transaction involved a claimed injury to the corporation. *See Yamamoto v. Omiya,* 564 F.2d 1319 (9th Cir.1977). However, in the context of the pending motions this Court was not asked and is not deciding whether this plaintiff has standing to

assert the proxy violation claim as a class claim. *See e.g. Gaines v. Haughton,* 645 F.2d 761 (9th Cir.1981).

**\*7 IT IS SO ORDERED.**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 24

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1982508 (Md.Cir.Ct.), 2004 MDBT 4

**(Cite as: 2004 WL 1982508 (Md.Cir.Ct.))**

**Page 1**

C

Circuit Court of Maryland,
Baltimore City.
**SEKUK GLOBAL ENTERPRISES PROFIT
SHARING PLAN, Plaintiff,**
v.
**Herve A. KEVENIDES, et al., Defendants.
Charles D. Hoffman, et al., Plaintiffs,**
v.
**Donald J. Rechler, et al., Defendants.
Robeta Chirko, Plaintiff,**
v.
**Reckson Associates Reality Corp., et al.,
Defendants.
Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-
008010.**

May 25, 2004.

*MEMORANDUM OPINION*

EVELYN OMEGA CANNON, Judge.

*\*1* This is a shareholder derivative action challenging the business judgment of the Independent Directors in approving a series of transactions involving the sale of a New York industrial portfolio to members of the Rechler family (herein referred to as the "Transaction"). The action is the consolidation of three lawsuits brought on behalf of shareholders of Reckson Associates Reality Corp. ("Reckson Associates") alleging substantially the same facts and claims. [FN1] On October 29, 2003, Plaintiff Sekuk Global Enterprises Profit Sharing Plan ("Sekuk"), which brought the first of these actions, moved for a temporary restraining order or preliminary injunction to enjoin the Transaction but decided not to forward on the motion.

> FN1. On October 16, 2003, Plaintiff Sekuk Global Enterprises Profit Sharing Plan filed a complaint. On October 27, 2003, Charles D. Hoffman and Lydia J. Hoffman filed a complaint and on October 30, 2003, Roberta Chirko filed her complaint. On October 31, 2003, the cases were designated for the Business and Technology Case Management Program.

On January 20, 2004, Plaintiffs in all the actions filed a Consolidated Amended Complaint ("Complaint") alleging that Defendants breached

their fiduciary duties of care, reasonable inquiry, oversight, good faith, supervision and loyalty. [FN2] The Independent Directors, Chairman of the Board Emeritus Walter Gross, and nominal defendant Reckson Associates Realty Corp. have filed Motions to Dismiss alleging that all of the claims are derivative and that Plaintiffs failed to make a demand on the Board to take remedial action before filing suit and failed to allege facts to show that making a demand would have been futile.

> FN2. The first of several shareholder derivative suits in response to the sale of certain industrial properties to the Rechlers was filed in the Supreme Court of New York, County of Nassau, on September 16, 2003. *Lowinger v. Rechler, et al.,* Index No. 03-014162 (Warshawsky, J.). Two additional suits were filed in Supreme Court of New York, County of Suffolk, on October 2 and 3, 2003. There are three consolidated actions pending in the United States District Court for the Eastern District of New York, the first of which was filed on September 26, 2003. *Tucker, et al. v. Rechler, et al.,* Case Nos. 03-CV-4917, 03-CV-4917, 03-CV-5008 and 03- CV-5718 (Platt, J.).

*STATEMENT OF FACTS*

Reckson Associates, along with Reckson Operating Partnership, L.P. and its affiliates, operates as a real estate investment trust that owns, develops and manages offices and industrial properties in New York Tri-State area. The Rechler family founded Reckson Associates which is a Maryland Corporation. Plaintiffs Sekuk, Charles D. and Lydia J. Hoffman, and Roberta Chirko have owned equity securities in Reckson Associates at all times relevant to this action.

As of September 10, 2003, Reckson Associates had eleven voting directors. Five of those directors-- Donald Rechler, Gregg Rechler, Roger Rechler, Mitchell Rechler, and Scott Rechler (the "Rechler Defendants")--were part of the Rechler family and served as executive officers of Reckson Associates. The Independent Directors, who were not members of the Rechler family, included Ronald H. Manaker ("Menaker"), Peter Quick ("Quick"), Herve A. Kevenides ("Kevenides"), Conrad D. Stephenson ("Stephenson"), Lewis S. Ranieri ("Ranieri"), and John V.N. Klein ("Klein"), and Walter Gross

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 2004 WL 1982508, \*1 (Md.Cir.Ct.))**

("Gross"), who has served as Chairman of the Board Emeritus since the formation of Reckson Associates. Thus the Independent Directors made up a majority of the eleven-member Board of Directors.

On September 10, 2003, Reckson Associates announced a strategic plan that involved the sale of certain industrial properties to the Rechler family, the resignation of several Rechler family members from executive management and board positions, and various other corporate governance changes. In connection with this strategic plan, the Reckson Operating Partnership agreed to sell 95 industrial properties on Long Island (the "industrial properties") to the Rechler family for approximately $315.5 million--roughly $225.1 million in cash and debt assumption and $90.4 million in Reckson Operating Partnership units (3,932,111 units, valued by Citigroup at $23,00. per unit). The Transaction provided that the Rechler family would no longer own any Reckson Operating Partnership units. In addition, Gregg, Roger, and Mitchell Rechler were to resign as officers and directors, and Donald Rechler was to resign from management but still serve as non-executive Chairman of the Board. Reckson Associates was to settle some pre-existing financial obligations to the four resigning Rechlers.

**\*2** The Transaction was reviewed by the Independent Directors, who, in turn, engaged Citigroup to provide a detailed fairness opinion for a special committee of the Board. All of the Directors voted to approve the Transaction.

### DISCUSSION

"In reviewing the grant of a motion to dismiss pursuant to Maryland Rule 2- 322(b)," the Court must assume "the truth of all well pleaded facts and all inferences that can reasonably be drawn from [them]." *Bennett Heating & Air Conditioning, Inc. v. Nations Bank,* **103 Md.App.** **749 (1995),** *rev'd in part on other grounds,* **342 Md. 169 (1996).** "Any ambiguity or want of certainty in [the] allegations must be construed against the pleader," *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 345 (2000) (internal citations omitted) because in "moving to dismiss, a defendant is asserting that, even if the allegations of the complaint are true, the plaintiff is not entitled to relief as a matter of law." *Hrehorovich v. Harbor Hosp. Ctr.,* 93 Md.App. 772, 784 (1992). "Thus, in considering a motion to dismiss for

failure to state a claim, the circuit court examines only the sufficiency of the pleading." *Id.* "The complaint should not be dismissed unless it appears that no set of facts can be proven in support of the claim set forth therein." *Bennett,* 103 Md.App. at 749. Thus, all of the facts considered in this Opinion are drawn from the Complaint and the Court did not consider any of the documents or affidavits filed by any of the parties.

It is well-established that courts will not ordinarily consider a derivative action by a shareholder on behalf of a corporation "until it appears that the intra corporate remedies have been unsuccessfully pursued by the complaining stockholder," which means that "generally speaking, the complaining stockholder must make a demand upon the corporation itself to commence the action, and show that this demand has been refused or ignored." *Parish v. Milk Producers Assn.,* 250 Md. 24, 81-82 (1968). Because no such demand was made by Plaintiffs, Defendants urge that the complaint must be dismissed.

Noting that a shareholder derivative suit "necessarily intrudes upon the managerial prerogatives ordinarily vested in the directors," and because such actions may be abused by "disgruntled shareholders," the Court of Appeals recently adopted a strict pre-suit demand requirement for derivative actions. *Werbowsky v. Collomb,* 362 Md. 581, 600 (2001). The Court noted that in most instances, the pre-suit demand "is not an onerous requirement" and explained that the demand requirement provides an opportunity for the directors--"even interested, non-independent directors" to consider, or reconsider the disputed issue. *Id.* at 619. After receiving a demand, the Directors may decide "to seek the advice of a special litigation committee of independent directors ... or they may decide ... to accede to the demand rather than risk embarrassing litigation." *Id.* at 619.

**\*3** The Court noted that a futility exception often "assures extensive and expensive judicial wrangling over a peripheral issue that may result in preliminary determinations regarding director culpability that, after trial on the merits, turn out to be unsupportable," *id.* at 600-02, whereas if a demand is made and refused, it can be reviewed under the business judgment rule standard. *Id.* In recognition of this fact, the Court crafted a "very

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d

**Page 3**

(Cite as: 2004 WL 1982508, *3 (Md.Cir.Ct.))

limited" exception, *id.,* and held that a demand is futile only when the allegations "clearly demonstrate, in a very particular manner" that:
> (1) making a demand, or the delay in waiting for a response to the demand, "would cause *irreparable harm to the corporation;* " or
> (2) a majority of the directors are *so personally and directly conflicted or committed* to the disputed decision that they cannot reasonably be expected to respond to a demand in good faith and in accordance with the business judgment rule.
> *Id.* at 620. (emphasis added).

In *Werbowsky,* the Court affirmed the trial court's grant of summary judgment on the basis that a demand was not excused. Although *Werbowsky* involved a summary judgment, the Court made clear that the same standard applies to a motion to dismiss: "[o]bviously, if the complaint fails to allege sufficient facts which, if true, would demonstrate the futility of a demand, it is entirely appropriate to terminate the action on a motion to dismiss." *Id.* at 620-21.

Thus in determining whether to grant the motion to dismiss, the Court must determine whether Plaintiffs have alleged facts that "clearly demonstrate, in a very particular manner" that: (1) the issuance of a demand, or the delay in waiting for a response to the demand would have caused irreparable harm to Reckson Associates, or (2) a majority of the directors were "so personally and directly conflicted or committed to the decision ... that they could not have reasonably been expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id.* at 620.

1. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT MAKING A DEMAND OR AWAITING THE BOARD'S RESPONSE WOULD HAVE CAUSED IRREPARABLE HARM.

It is unclear whether Plaintiffs contend that making a demand, or awaiting the Board's response would have caused irreparable harm, but it is clear that the Complaint fails to clearly demonstrate "irreparable harm." Parties may not create their own irreparable harm. *See, e.g., Quince Orchard Valley Citizens Ass'n v. Hodel,* 872 F.2d 75,79 (4th Cir.1989) (affirming district court's denial of a preliminary injunction because "much of [plaintiffs'] potential

harm was a product of its own delay in pursuing this action."). *See also, e.g., Vantico Holdings S.A. v. Apollo Mgmt,* 247 F.Supp.2d 437, 454 (S.D.N.Y.2003) (asserting that "[plaintiff] cannot rely on its own actions to create the risk of irreparable injury which it then seeks to avoid by the issuance of a preliminary injunction."); *Minzer v. Keegan,* 1997 U.S. Dist LEXIS 16445, at *18 (E.D.N.Y. Sept. 22, 1997) ("Because preliminary injunctions are predicated upon 'urgent need for speedy action,' delay in seeking the remedy suggests that the remedy is not really needed or that the harm is not really irreparable.") (citations omitted).

*\*4* The sale of the industrial properties was announced on September 10, 2003, with an expected closing date in the fourth quarter of 2003. Plaintiffs could have made a demand on the Board on September 11th or shortly thereafter. Instead Plaintiffs filed the first of these consolidated cases on October 16th, over five weeks later and over four weeks after another Reckson Associates shareholder brought virtually the same derivative suit in New York (*see* note 2.). When Plaintiffs decided to not go forward on their request for injunctive relief, they effectively conceded that there was no irreparable harm.

Finally, "irreparable injury is suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate," and Plaintiffs have failed to allege that they could not be adequately compensated for any breach through an award of money damages. *Chestnut Real Estate P'ship v. Huber,* 148 Md.App. 190, 205 (2002) (citation omitted). *See also Coster v. Department of Personnel,* 36 Md.App. 523, 526 (1977) ("an injury is irreparable ... where ... it cannot be readily, adequately, and completely compensated for with money") (citation omitted).

In sum, Plaintiffs have failed to "clearly demonstrate, in any particular manner" that "a demand, or a delay in awaiting a response to a demand, would [have] cause[d] irreparable harm to the corporation." *Werbowsky,* 362 Md. at 620.

2. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT A MAJORITY OF THE DIRECTORS ARE SO PERSONALLY AND DIRECTLY CONFLICTED THAT THEY COULD NOT HAVE REASONABLY BEEN EXPECTED TO

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 2004 WL 1982508, \*4 (Md.Cir.Ct.))**

RESPOND TO A DEMAND IN GOOD FAITH AND WITHIN THE AMBIT OF THE BUSINESS JUDGMENT RULE.

In support of their argument that Defendants were conflicted, Plaintiffs allege that Defendants were hand picked to sit on the Board by the Rechlers; had social and business relationships with the Rechlers; had a history of taking steps to protect the interests of the Rechlers at the expense Reckson Associates; and that after approval of the Transaction, the Board instituted a number of corporate governance changes to protect the Company from these alleged conflicts.

*Werbowsky* makes clear that a demand will not be excused lightly. Thus a conflict is not shown simply by alleging that the directors "were chosen ... at the behest of controlling stockholders." 362 Md. at 618. Nor will it be excused because "a majority of the directors approved or participated in some way in the challenged transaction or decision," or based on "allegations that [the directors] are conflicted or are controlled by other conflicted persons." *Id.* In fact a simple allegation that the directors will be "hostile to the action" is not sufficient to excuse a demand. *Id.* Because "[d]irectors are presumed to act properly and in the best interest of the corporation," *id.* at 618-19, a conflict will not be found based on "non-specific or speculative allegations of wrongdoing." *Id.* at 619.

**\*5** As the Court noted in *Danielewicz v. Arnold,* 137 Md.App. 601, 631 (2001), *Werbowsky* requires that a complaint "demonstrate, [any alleged conflict by the directors] ... *'in a very particular manner.'* " (emphasis added). In *Danielewicz,* the directors were the plaintiff's husband, a director the Court assumed *arguendo* was conflicted, and the alleged conflicted director's son. *Id.* at 629. The Court held that the allegations of a conflict were "conjecture and speculation ." *Id.* at 631. The Court assumed the plaintiff's husband would have responded to her demand, and in reference to the conflicted director's son held that the plaintiff "has not presented sufficient evidence indicating that he would not have responded to [the plaintiff's] demand." *Id.* at 631. Thus evidence of familial relations, without more, is not sufficient to excuse a demand.

Nor is "[e]vidence of personal and/or business relationships" sufficient to excuse a demand even under the more permissive Delaware standard.

[FN3] *Kohls v. Duthie,* 765 A.2d 1274, 1284 (Del.Ch.2000) (citation omitted). There the Court held that the fact that the company's president, CEO, and inside director provided a summer job to an outside director when he was in business school and also played a role in his board appointment, did not show that the outside director lacked independence. *Id.* Nor was a conflict shown by alleging that a director had previously voted in favor of a generous cash severance payment that was paid to the CEO, despite the fact that the latter did not leave or change his job with the company. *Kohls v. Duthie,* 765 A.2d 772, 781 (Del. Ch.2000). *See also Orman v. Cullman,* 794 A.2d 5, 28 (Del. Ch.2002) (holding that outside director's former affiliation with the underwriter of a company's initial public offering and its present investment bank did not render director non-independent).

FN3. Because the requirement for pleading and proving demand futility articulated in *Werbowsky* is so recent, there are few Maryland cases applying it. The Delaware cases holding that a demand was not futile are helpful because the Delaware standard is more permissive and excuses a demand where Maryland would not. Delaware looks to determine if the facts alleged create a reasonable doubt that "(1) the directors are disinterested and independent, and (2) the challenged transaction was the product of a valid exercise of business judgment." *Werbowsky,* 362 Md. at 593 *citing Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984).

The requirement of specific evidence of an actual conflict was recently reiterated in *Beam v. Stewart,* 845 A.2d 1040 (Del.2004). In rejecting the plaintiff's argument that a demand was futile because of an alleged conflict the Court stated that "to render a director unable to consider a demand, a relationship *must be of a bias-producing nature.* Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Id.* at 1050 (emphasis added). One of the allegations in *Beam* was that one of the directors (i) was a long-standing personal friend of the controlling stockholder and the president and chief operating officer; (ii) had a prior business relationship with the company (through his position at Sears, which marketed a substantial volume of the company's products); and (iii) was recruited for the board by a longtime personal friend

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





of the controlling director. *Id.* at 1045. The Court held that "[a]llegations that Stewart [the controlling stockholder] and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power," failed to rebut the presumption of independence. *Id.* at 1051. The Court made clear that an inference of a conflict that excuses a demand must be such that "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Id.* at 1052.

PLAINTIFFS' ALLEGATIONS OF ALLEGED CONFLICT

**\*6** Plaintiffs allege that four of the seven Independent Directors had specific conflicts and that all seven were conflicted because they had a history of approving financial deals and payments to the Rechlers that favored the Rechlers and harmed Reckson Associates.

MENAKER

Plaintiffs allege that Menaker worked for JP Morgan & Co. Inc. ("JP Morgan") from 1966-99 holding various positions, including president, and that when he retired in 1999 he was managing director and head of Corporate Services of JP Morgan & Co. Inc. of New York. J.P. Morgan is the administrative agent that oversees the group of 14 banks that provides Reckson Associates a $500 million line of credit. A portion of the proceeds of the sale of the industrial properties was earmarked by Reckson Associates to pay down a portion of that outstanding credit facility. Assuming that J.P. Morgan benefitted from the Transaction because of a pay down of the credit facility, these facts do not show that Menaker had a conflict.

QUICK

Plaintiffs allege that Quick worked for Quick and Reilly, Inc. from 1982 to 2000, and that Quick and Reilly is now an affiliate of Fleet Boston Financial which does mortgage and financial business with Reckson Associates. This past and indirect business relationship fails to establish a conflict.

RANIERI

Plaintiffs allege that Ranieri was a former vice president of Salomon Brothers, Inc., which was one of the underwriters of Reckson Associates' 1996 public offering, and that Salomon Smith Barney (Salomon Brothers' successor), later merged into Citgroup, which participated in the valuation of the industrial properties. Plaintiffs also allege that a company related to Ranieri is a tenant in one of Reckson Associates' 178 properties. There are no allegations that the terms of the lease were unfair or not at arm's length. Plaintiffs also allege that Ranieri was "hand-picked" by the Rechlers. None of these allegations provide a factual basis of a conflict that would excuse a demand.

KLEIN

Plaintiffs allege that Klein assisted the late William Rechler and Defendant Gross in developing the first industrial park on Long Island when Klein was Smithtown's Supervisor in the 1960s, and that from 1988 Klein served as counsel to the Association for a Better Long Island (the "Association"), an organization founded by Donald Rechler, of which he was a former president and chairman of the board. The fact that 40 years ago, Mr. Klein, in his capacity as a town administrator, may have helped another Rechler family member--who is now deceased--and defendant Gross--in their pursuit of a successful business venture is not evidence of a conflict. Nor does the fact that he is or was counsel to an organization founded by Donald Rechler. [FN4]

> FN4. Plaintiffs allegation that "from at least 1988, Klein acted" as counsel, makes it impossible to determine if Plaintiffs are alleging that he is still counsel. Thus, for purposes of this motion, the Court assumes that he still is counsel.

GROSS

As discussed in the proceeding paragraph, Plaintiffs allege that in 1961, Gross together with the late William Rechler, and Defendant Klein, conceived and developed Vanderbilt Industrial Park on Long Island. This allegation is not sufficient to show a conflict

HAND-PICKED BY THE RECHLERS AND

 

## HISTORY OF APPROVING FINANCIAL TRANSACTIONS

**\*7** Plaintiffs allege Gross, Klein, Kevenides, Stephenson and Ranieri were "hand-picked" by the Rechlers. For the reasons discussed above, that allegation does not show that there was a conflict. Plaintiffs also allege that Gross, Kevenides, Stephenson and Ranieri had a history of consistently approving financial deals, and the payment of millions of dollars in employment benefits to the Rechlers, which served no legitimate business and hurt the company. These allegations do not show a conflict under the cases discussed above and are simply an indirect way to attack the business judgment of these Directors, which is not properly considered in determining demand futility. *See* discussion below at **page 14.**

## NO ALLEGATIONS OF A CONFLICT

In sum, Plaintiffs have failed to "clearly demonstrate, in a very particular manner" that the Directors were "so personally and directly conflicted" that they could not have been reasonably "expected to respond to a demand in good faith." *Werbowsky,* 362 Md. at 620.

## 3. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT A MAJORITY OF THE DIRECTORS WERE SO COMMITTED TO THE DECISION THAT THEY COULD NOT HAVE REASONABLY BEEN EXPECTED TO RESPOND TO A DEMAND IN GOOD FAITH AND WITHIN THE AMBIT OF THE BUSINESS JUDGMENT RULE.

Plaintiffs argue that the Directors were "so ... committed to the decision ... that they could not have reasonably been expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky,* 362 Md. at 620. In support of their arguments, Plaintiffs allege that the Defendants acted in bad faith and outside the ambit of the business judgment rule; that they had already committed the proceeds of the Transaction; and that the Directors would have been subject to personal liability if they did not go forward on the Transaction.

## BAD FAITH AND OUTSIDE BUSINESS JUDGMENT RULE

The *Werbowsky* Court held that in determining if a demand was futile, a court should not address "issues that go to the merits of the complaint B whether there was, in fact, self dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack." 362 Md. at 620. Thus a demand is not excused by allegations that the "[d]efendants' approval of the [t]ransaction constitutes a breach of both their common law and statutory duties." Therefore, Plaintiffs' allegations that the Transaction was "facially inadequate, and unfair to Reckson" is not properly considered in determining the narrow issue of demand futility.

## THE PROCEEDS WERE ALREADY COMMITTED

Plaintiffs argue that a demand was too late once the decision was announced because Reckson Associates was committed at the time of the September 10th announcement to use the funds received to purchase 1185. According to Plaintiffs, "Defendants are asking the Court to find that the decision and subsequent negotiations to purchase 1185 occurred only after the September 10th announcement of the Transaction, and therefore, reflected a wholesale change in Reckson's business strategy concerning use of the Transaction's proceeds." To the contrary, Plaintiffs argue that the decision to buy 1185 was "irretrievably" made before the proposed Transaction.

**\*8** Because this is a Motion to Dismiss, the Court is not basing its decision upon either of those suppositions but only on the allegations in the Complaint. In Paragraph 15, Plaintiffs allege that an agreement to purchase 1185 was made on November 10th:

On November 10, 2003, Defendants entered into an agreement to purchase the office building at 1185 Avenue of the Americas in New York ("1185"), which it could not otherwise close upon without the proceeds from the sale of the Industrial Portfolio, which were used as a contract deposit for the purchase of that property.

Arguing that in order to sign a contract on November 10th for property in Manhattan, the deal had to have been negotiated long before then, Plaintiffs ask this Court to ignore the allegation in Paragraph 15 of the Complaint. As further evidence that the deal was complete at the time of the September 10th announcement, Plaintiffs point to an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 1982508, *8 (Md.Cir.Ct.))

alleged representation made on November 4, 2003 by one of Defendants' attorneys at a scheduling conference. [FN5]

> FN5. Plaintiffs claim that one of the Defendants' attorneys represented to the Court at the November 4, 2003 scheduling conference that absent an injunction, the Transaction was scheduled to close immediately due to the necessity to use the funds to purchase 1185. Defendants dispute this allegation. Because this was not a hearing, and no request was made, the scheduling conference was not recorded. For the reasons discussed above, the Court finds it unnecessary to decide what was or was not said.

However, neither the facts alleged in the Complaint nor the facts that Plaintiffs ask the Court to assume show that Defendants were so committed to the decision that they could not respond to a demand in good faith and within the ambit of the business judgment rule. Under the facts alleged in the Complaint, which the Court must accept as true for purposes of ruling on a motion to dismiss, the contract to purchase 1185 was entered into on November 10th, which was *after* the suit was filed and 2 months after the announcement of the Transaction. Under the facts Plaintiffs ask the Court to assume that negotiations to purchase property is not an "irretrievable commitment." Defendants may well have decided to purchase 1185 with the proceeds of the Transaction but that "decision" would not have prevented the Board from responding to a demand in good faith and within the ambit of the business judgment rule. [FN6] Finally, Plaintiffs fail to explain how they were excused from making a demand on September 11th based on facts they learned on November 4th.

> FN6. Frankly it would be difficult to conclude that Defendants were "irretrievably committed" even if there had been a contract to purchase 1185 signed simultaneously with the contract to enter into the Transaction. Contracts are broken regularly.

The *Werbowsky* Court noted that "a pre-suit demand on the directors is not an onerous requirement." 362 Md. at 619. In fact, the making of such a demand is far less onerous than the preparation and filing of a shareholder derivative complaint B a task that lawyers for nine different plaintiffs, including the three Plaintiffs before this Court, managed to accomplish in far less than two months.

## LACK OF FIDUCIARY OUT CLAUSE

Plaintiffs point out that the Transaction with the Rechlors had no fiduciary out clause that would allow the Directors to exit the contract if faced with a challenge to the Director Defendants' decision to approve the sale. If the Directors subsequently terminated the contract, the beneficiaries of the contract, in particular the Rechler family members who were not directors of Reckson Associates, could have brought suit against Reckson Associates for breach of contract. And if such a suit was filed and won, Plaintiffs contend that Reckson Associates would in turn sue the Independent Directors for contribution and the Directors' and Officers' ("D & O") insurance coverage would probably not cover any judgement against the directors and officers because D & O policies commonly contain an "insured versus insured" exclusion. That exclusion would preclude the insurance carrier from paying for any breach of contract claim by Reckson Associates against its own directors. Thus, such a suit would expose the Independent Directors to "ruinous personal liability," and thus they would not respond to any demand in good faith and within the ambit of the business judgment rule.

*9 In *Werbowky* one of the allegations was that "it was likely that, by reason of language in the corporation's directors' and officers' liability insurance policies, the corporation would be precluded from bringing an action against the directors." 362 Md. at 590. *See also id.* at 592. Although the issue was not directly addressed by the appellate court, that Court noted that the trial court had "rejected the notion, drawn from *Edge Partners, L .P. v. Dockser,* 944 F.Supp. 438 (D.Md.1996), that a lack of insurance coverage for named directors can excuse a demand." 362 Md. at 594. Based on the rationale of *Werbowsky,* this Court concludes that that when it does directly address the issue, the Court of Appeals will most likely follow the lead of other courts which have held that an insured-versus-insured provision does not excuse a pre-suit demand. *See, e.g., In re Prudential Ins.Co. Derivative Litig.,* 659 A.2d 961, 973 (N.J. Ch. Ct.1995) ("routine excuse of demand based on the existence of such standard exclusions would eviscerate the demand requirement"); *Stoner v. Walsh,* 772 F.Supp. 790, 805 (S.D.N.Y.1991)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 2004 WL 1982508, \*9 (Md.Cir.Ct.))**

(rejecting argument that liability insurance policy exclusion rendered board "interested").

 Plaintiffs' reliance on *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993) does not suggest a different result. First, as discussed previously Delaware excuses a demand where one would be required by Maryland. *See* note 3. Second, even the *Rales* Court recognized that the "mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors...." *Id.* at 936 (citing *Aronson v. Lewis,* 473 A.2d 805, 815 (1984). Third, the Plaintiffs do not include allegations concerning the lack of a fiduciary out clause and the inclusion of an insured-versus-insured provision.

 Finally this argument is based on a lot of "ifs," "ands,' and "buts." It assumes that *if* a demand had been made, the Outside Directors would have decided to delay or terminate the contract with the Family Group    [FN7]; if the contract with the Family Group was delayed or terminated, the Family Group would not renegotiate the contract, but file suit to enforce the contract; *if* suit were filed, Reckson Associates would be found liable for the contract damages; *if* Reckson Associates were found liable, it would sue the directors for contribution; *if* Recskon Associates sued the Directors for contribution, the suit would be successful; and *if* it is successful the Directors would not be covered by insurance. And finally and most importantly based on that potential liability, the Directors would not have considered a demand in good faith and within the ambit of the business judgment rule. Well as my mother often said, "if 'if' were a skiff, we'd all drown."

> FN7. The Family Group is members of the Rechler family who, according to the allegations in the Complaint, "controlled" Reckson Associates' Board.

### CONCLUSION

 For all the reasons stated above, the Court will enter an order granting the Independent Director Defendants' and Walter Gross's Motion to Dismiss and Reckson Associates Realty Corporation's Motion to Dismiss.

 Not Reported in A.2d, 2004 WL 1982508 (Md.Cir.Ct.), 2004 MDBT 4

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





# TAB 25

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33220035 (D.Del.)
(Cite as: 1999 WL 33220035 (D.Del.))

**Page 1**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
**SUSSEX COUNTY SENIOR SERVICES, INC.,**
**Plaintiff,**
**v.**
**CARL J. WILLIAMS & SONS, INC.,**
**Defendant.**
**No. CIV.A. 99-473-GMS.**

Dec. 29, 1999.

David R. Hackett, Esquire of Griffin & Hackett, P.A., Wilmington, Delaware. Attorney for Plaintiff Sussex County Senior Services.

Kevin Gross, Esquire of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware. Of Counsel: Anthony L. Meagher, Esquire and Tashina Gauhar, Esquire of Piper & Marbury LLP, Baltimore Maryland. Attorneys for Defendant Carl J. Williams & Sons, Inc.

OPINION

SLEET, District J.

I. INTRODUCTION.

**\*1** This matter was first filed in the Delaware Court of Chancery by Sussex County Senior Services, Inc. ("Senior Services") on June 15, 1999. It was subsequently removed to federal court on July 23, 1999 by Carl J. Williams & Sons, Inc. ("Williams & Sons") on the basis of diversity. *See* 28 U.S.C. § 1441 (1994).

The complaint itself requests primarily injunctive relief to prevent Williams & Sons from arbitrating a number of disputes arising out of a construction contract between the parties. In essence, Senior Services contends that by failing to file a timely demand for arbitration, Williams & Sons is prohibited from arbitrating its claims. Recently, Williams & Sons filed a motion to dismiss the complaint, arguing that an arbitrator, not the court, should determine whether its demand was timely and, therefore, whether these disputes can be submitted to arbitration. The court agrees and will,

therefore, grant the motion. The following sections set forth the basis for the court's decision in greater detail.

II. THE STANDARD OF REVIEW.

On a motion to dismiss, the court must take the factual allegations of the complaint as being true and draw all reasonable inference from these allegations in favor of the plaintiff. *See Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir.1986); *Toner v. Allstate Ins. Co.,* 821 F.Supp. 276, 279 (D.Del.1993). As a result, the court cannot grant a motion to dismiss unless it is "beyond a doubt" that the plaintiff can prove no set of facts consistent with its allegations which would entitle it to relief. *See Melikian v. Corradetti,* 791 F.2d at 277; *Huss v. Green Spring Health Servs., Inc.,* 18 F.Supp.2d 400, 401 (D.Del.1998).

Of course, when undertaking this analysis, the court need not accept legal conclusions plead in the guise of factual allegations as being true. *See Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997). In fact, these types of conclusory allegations, which often "masquerad[e] as factual conclusions[,] will not suffice to prevent a motion to dismiss." *See Fernandez-Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993) (cited with approval in *Morse,* 132 F.3d at 906 n. 8).

In addition, while the court generally cannot consider material outside of the pleadings when ruling on a motion to dismiss, the court may examine materials which were attached to the complaint. *See Huss,* 18 F.Supp.2d at 401-02. Here, Senior Services has attached to the complaint its contract with Williams & Sons in addition to several items of correspondence which relate to the architect's rejection of the contractor's first six claims. Therefore, the court will consider these items when ruling on the pending motion.

With these standards in mind, the court turns to a summary of the events giving rise to this lawsuit and, consequently, the pending motion to dismiss.

III. BACKGROUND.

Senior Services is a non-profit Delaware

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in F.Supp.2d

**(Cite as: 1999 WL 33220035, \*1 (D.Del.))**

corporation with its principal place of business in Georgetown, Delaware. Williams & Sons is a Maryland corporation with its principal place of business in Delmar, Maryland.

**\*2** On February 17, 1998, Senior Services and Williams & Sons entered into a contract for the construction of the Cheer Community Center. Pursuant to the terms of this contract, the parties were required to submit any claims for adjusting or interpreting the terms of the contract to the construction project's architect for review and, then, to an arbitrator for resolution.

Between August and December of 1998, Williams & Sons submitted six separate disputes to the architect for resolution. In general, these disputes concerned whether Senior Services had failed to timely resolve numerous problems with various plans and drawings. In addition, Williams & Sons sought to recover for the increased costs it incurred due to various problems with the water main and sewer connections and as a result of clearing debris from the parking lot and road way.

On January 21, 1999, the architect provided his preliminary ruling on these claims, denying each one of them. On February 4, 1999, the architect sent Williams & Sons a letter which stated that "no further consideration will be given to these items" since the contractor had not challenged the preliminary ruling within the ten-day period set forth in the contract.

On May 21, 1999, over one hundred days later, Williams & Sons filed a demand for arbitration with the American Arbitration Association ("AAA") located in Washington, D.C. In its demand, Williams & Sons sought to arbitrate the six claims that related to the additional costs and delays it had incurred (*i.e.,* the claims which the architect had denied). Together, these six disputes totaled $164,620.10 in claimed damages. Williams & Sons also sought to arbitrate a seventh claim for $12,750.00 in liquidated damages.

On June 15, 1999, Senior Services filed a verified petition for preliminary and permanent injunctive relief against Williams & Sons in state court. By way of this petition, Senior Services sought to enjoin Williams & Sons from arbitrating its first six claims before AAA. [FN1] According to Senior

Services, Williams & Sons had failed to file a written demand for arbitration within thirty days of the architect's decision. As a result, Senior Services claimed, the architect's preliminary rulings on the construction company's claims were final and binding pursuant to the terms of the contract.

> FN1. Senior Services did not seek to enjoin the arbitration of Williams & Sons' seventh claim for liquidated damages.

Williams & Sons then removed the case to federal court on the basis of diversity and subsequently moved to dismiss. *See* 28 U.S .C. § 1441; Fed.R.Civ.P. 12(b)(6) (1998). In its motion, Williams & Sons argues that an arbitrator, not the court, should decide whether its demand for arbitration was a timely one and, thus, whether its claims are barred because this type of "procedural" issue is generally resolved in the arbitral, as opposed to the judicial, forum. In response, Senior Services contends that this issue is "substantive" in nature because, in the absence of a timely demand for arbitration, the architect's decision became final and binding on the parties. Therefore, Senior Services claims, it could not have agreed to arbitrate these six disputes and, as a consequence, Williams & Sons has no claims to arbitrate.

**\*3** For the reasons discussed below, the court disagrees and will, therefore, grant the motion to dismiss filed by Williams & Sons.

IV. DISCUSSION.

By its complaint, Senior Services seeks, *inter alia,* an injunction to prevent the arbitration of six claims submitted by Williams & Sons. Although the complaint does not set forth the legal basis for this relief, it would appear that Senior Services is relying, at least in part, on the Federal Arbitration Act ("FAA"), 9 U.S.C. § *et seq.* 1 (1994), which "allows a district court to compel or enjoin arbitration as the circumstances may dictate." *See John Hancock Mut. Life Ins. Co. v. Olick,* 151 F.3d 132, 136 (3d Cir.1998). As a result, the court must look to the substantial body federal law to determine whether the issue presented by the pending motion is a substantive one for judicial resolution or a procedural one which is properly resolved in the arbitral forum. *Cf. AT & T Technologies v. Communication Workers of Am.,* 475 U.S. 643,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in F.Supp.2d
(Cite as: 1999 WL 33220035, *3 (D.Del.))

Page 3

648-50 (1986).

As the Third Circuit has explained, "the district court [generally] determines the timeliness of the petition to compel [or enjoin] arbitration, while the arbitrator determines the timeliness of the demand for arbitration and of the underlying claims." *See National Iranian Oil Co. v. MAPCO Intn'l, Inc.,* 983 F.2d 485, 491 & n. 4 (3d Cir.1992); *accord Local 132, Intn'l Longshoremen's Ass'n v. South Carolina Stevedore's Ass'n,* 170 F.3d 407, 409 (4th Cir.1999) ( "[A]n arbitrator, rather than a court, determines whether a demand for arbitration is untimely."); *Schweizer Aircraft Cor. v. Local 1752, Intn'l Union, United Automobile, Aerospace & Agricultural Implement Workers of Am.,* 29 F.3d 83, 87-88 (2d Cir.1994) ("We decide only that the Union timely presented, for judicial determination, its case to compel arbitration. The question whether the time requirements in the [collective bargaining agreement] were met, as well as the substantive interpretation of th[is agreement], must be determined by the arbitrator."); *cf. Goss Golden West Sheet Metal, Inc. v. Sheet Metal Workers Intn'l Union, Local 104,* 933 F.2d 759, 763-64 (9th Cir.1991) (concluding that the issue of whether the Union filed a timely demand for arbitration was a procedural issue for the arbitration even though the collective bargaining agreement stated that a failure to file a timely demand would conclusively end the dispute).

However, in *Iranian Oil,* the Third Circuit went on to explain that "[i]f ... the arbitration clause provides a substantive timeliness limitation on claims to be submitted to arbitration, in contrast to a statute of limitations, the timeliness of the demand for arbitration of the underlying claims is a question for the district court because it concerns what claims the parties have contractually agreed to submit to arbitration." 983 F.2d at 491 n. 4 (relying on *Paine Webber, Inc. v. Hartman,* 921 F.2d 507, 514 (3d Cir.1990)); *cf. Oil, Chemical & Atomic Workers' Intn'l Union, Local 4-447 v. Chevron Chemical Co.,* 815 F.2d 338, 341-42 (5th Cir.1987) (holding that, even though a claim may be "strictly procedural," when it would "operate to bar arbitration altogether," a district court could still deny a motion to compel arbitration and rule on the pending dispute) (citing *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557-58 (1964)).

*4 Here, Senior Services claims that, given the terms of the arbitration clause, any failure to demand arbitration within thirty days of the architect's ruling renders that decision final and binding. As a result, Senior Services contends, it could not have contractually agreed to arbitrate these claims and, consequently, Williams & Sons' motion to dismiss should be denied. In other words, Senior Services argues that the arbitration clause at issue in this case provides a " substantive timeliness limitation on claims to be submitted to arbitration" and, therefore, "the timeliness of the demand for arbitration of the underlying claims is a question for the district court because it concerns what claims the parties have contractually agreed to submit to arbitration." *See Iranian Oil,* 983 F.2d at 491 n. 4.

In advancing this argument, Senior Services relies solely upon the language of subparagraph 4.5.4.1 of the general conditions of the contract, which provides that:
When a written decision of the Architect states that (1) the decision is final but subject to arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 day[ ] period shall result in the Architect's decision becoming final and binding upon the Owner and the Contractor.

In fact, as Senior Services argues in its brief, Subparagraph 4.5.4.1 ... provides that if a Demand for Arbitration of a claim covered by a decision of the Architect is not made within thirty days of the receipt of the Architect's decision, then the Architect's decision becomes final and binding upon the parties ....

For this reason and this reason alone, Senior Services contends, Williams & Sons is barred from arbitrating its six claims, totaling $164,620.10 in damages. According to Senior Services, this issue is a substantive one which serves as a bar to arbitration since it results in the architect's decision becoming "final and binding" and, thus, non-arbitrable.

However, in advancing this argument, [FN2] Senior Services overlooks the language of the architect's actual decision which, as Williams & Sons points out, failed to inform the parties that "a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




demand for arbitration ... must be made within 30 days after the date on which the party making the demand receive [d] the final written decision." Because the architect's letter did not conform to the requirements of clause 4.5.4.1, Senior Services' reliance on this provision is misplaced.

> FN2. Furthermore, although paragraph 17 of the complaint alleges that clause 4.5.4.1 applies, the court notes that this is a legal conclusion which need not be accepted as true for the purposes of resolving the pending motion. *See Morse,* 132 F.3d at 906 & n. 8 (citing, *inter alia, Fernandez-Montes,* 987 F.2d at 284).

Instead, the relevant clause is subparagraph 4.5.4.2 of the general conditions of the contract, which provides that:
A demand for arbitration shall be made within the time limits specified in Subparagraphs 4.5.1 and 4.5.4 and Clause 4.5.4.1 *as applicable,* and in other cases within a reasonable time after the Claim has arisen, and in no event, shall it be made after the date when institution of legal proceedings based on such Claim would be barred by the applicable statute of limitations ....
*5 (emphasis added).

As this language makes clear, there are at least four separate time limits placed on the submission of claims to arbitration; [FN3] only one of which is the thirty-day provision which Senior Services invokes. Of course, by the very terms of the contract, this thirty-day provision only governs to the extent that it is "applicable," *i.e.,* only when the "written decision of the Architect states that (1) the decision is final but subject to arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision ...." However, as the documents attached to the complaint make clear, the architect's written decision did not inform the parties that a demand for arbitration must be made within thirty days after receiving the decision. Thus, the terms of clause 4.5.4.1 do not apply. Instead, Williams & Sons was only obligated to file its demand for arbitration within the time period set forth in subparagraph 4.5.1, subparagraph 4.5.4, or "within a reasonable time" after its claim had arisen, depending upon the nature of its dispute. Because these provisions do not set forth substantive

timeliness limitations on the arbitration of claims but, instead, provide only procedural limitations on when a party can file a demand for arbitration, [FN4] the court will grant Williams & Sons' motion to dismiss.

> FN3. In actuality, there are at least eleven separate time limits governing the arbitration of a claim since subparagraph 4.5.1 sets forth one time limit, subparagraph 4.5.4 provides seven more, subparagraph 4.5.4.1 (which is not applicable) sets forth an additional one, and subparagraph 4.5.4.2 provides two more.

> FN4. For example, subparagraph 4.5.4, which seems to be the most relevant contractual provision to the dispute between the parties, states that "[d]emand for arbitration of any Claim may not be made until ... the date on which the Architect has rendered a final written decision on the Claim ...." Here, Williams & Sons filed a demand for arbitration approximately one hundred days after the architect issued his final written decision. While this delay might render Williams & Sons' claims untimely, the court believes that this issue is best resolved in the arbitral, not the judicial, forum. *See, e.g., Hartman,* 921 F.2d at 512 ("[T]here is abundant precedent holding that time bar clauses in arbitration agreements are essentially procedural in nature and, thus, should not be interpreted by courts as substantive bars to arbitration."); *see also Independent Ass'n of Continental Pilots v. Continental Airlines,* 155 F.3d 685, 694 (3d Cir.1998) (citing *Hartman* ).

### III. CONCLUSION.

In short, the court is not reaching the issue of whether the thirty-day provision should be interpreted as a substantive limitation which prohibits the arbitration of Williams & Sons' claims since this provision simply does not apply in this case, despite Senior Services allegations and arguments to the contrary. Because the remaining provisions in the contract only set forth procedural limitations on the timeliness of a demand for arbitration, Williams & Sons' motion to dismiss will be granted. The court will issue an order to this effect in conjunction with this opinion.

Not Reported in F.Supp.2d, 1999 WL 33220035 (D.Del.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in F.Supp.2d
(Cite as: 1999 WL 33220035, *5 (D.Del.))

Motions, Pleadings and Filings (Back to top)

. 1:99cv00473 (Docket) (Jul. 23, 1999)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



