Not Reported in A.2d
(Cite as: 2005 WL 2056651, *24 (Del.Ch.))

[FN314] Ovitz's termination was memorialized the following day in a letter signed by Litvack and dated December 12. [FN315] Litvack testified that Russell negotiated the terms in the letter, but Litvack signed this document on Eisner's instructions. [FN316] The board was not shown the December 12 letter, [FN317] nor did it meet to approve its terms. [FN318]

FN311. Tr. 4402:8-4403:8.

FN312. Eisner did give some testimony that by December 11 he still intended to give Ovitz some sort of consulting arrangement separate from and unrelated to the OEA. The overwhelming weight of the evidence, however, demonstrates that this was not in fact the case, and it certainly did not happen. *See* Tr. 4601:6-23.

FN313. Tr. 4592:18-4593:6.

FN314. Eisner 654:16-655:16; *see also* Tr. 4601:8-18.

FN315. PTE 13. The letter reads:
This will confirm the terms of our mutual agreement as follows:
1. The term of your employment under your existing Employment Agreement with Disney will end on January 31, 1997.
2. This letter will for all purposes of the Employment Agreement be given the same effect as though there had been a "Non-Fault Termination," and the Company will pay you, on or before February 5, 1997, all amounts due you under the Employment Agreement, including those under Section 11(c) thereof. In addition, the stock options granted pursuant to Option A, will vest as of January 31, 1997 and will expire in accordance with their terms on September 30, 2002.

FN316. Tr. 6157:11-6159:8.

FN317. Bowers 335:3-14; Gold 207:13-18; Roy Disney 189:20-190:10.

FN318. Tr. 3933:8-20 (Gold); 4102:23-4103:11 (Eisner); 5772:18- 5773:4 (Mitchell); 5881:24-5882:23 (Nunis); 5990:21-5991:10 (Bowers); 7248:3-7249:6 (Poitier); 7615:19-7616:16 (Murphy); 7758:2-7759:22 (Lozano).

Also on December 12, Disney issued the press release announcing Ovitz's termination. [FN319] The press release stated that "Michael S. Ovitz, will leave the company by mutual agreement effective January 31, 1997. He will continue to serve as an advisor and consultant to the company and the Board of Directors." [FN320] Although I am puzzled by the use of the phrase "mutual agreement," I am nonetheless convinced, based upon Ovitz's constant self-denial and difficult behavior during the months leading up to his termination, and Eisner's commitment that he would handle the termination gracefully for Ovitz's benefit (and likely to prevent Ovitz from defaming him and Disney in the press), [FN321] that the termination was anything but a mutual agreement. [FN322] Additionally, although I am troubled by the statement in the press release that Ovitz would continue to serve as an advisor and consultant to the board, because this was either a deliberate untruth or an incredibly irresponsible and sloppy error on Disney's part, it is ultimately immaterial to the issues to be resolved in this case. Therefore, I do not believe that the statement in the press release regarding Ovitz continuing as an advisor and consultant to the Disney board is reflective of any agreement or understanding that Disney and Ovitz had at the time. [FN323] The Court believes that both of these untrue statements were likely made as part of an effort by Disney to make Ovitz's departure seem as amicable as possible so that Ovitz's reputation would not be publicly tarnished any more than could be avoided. In any event, once Ovitz left Eisner's mother's apartment, he never again returned to Disney. [FN324]

FN319. PTE 390.

FN320. *Id.*

FN321. PTE 19 at WD4000. *See also* Tr.2088:1-5 (Ovitz) (stating "what we agreed on that they tried to handle this with some dignity for me and some grace and were very generous in their press release, which was very nice for them to do.").

FN322. *See also* Tr.2087:6-2088:5 (Ovitz) (stating that "I wouldn't leave by mutual agreement and I wasn't going to serve as an advisor and consultant. I wanted to [serve in those positions.]"); 2573:11-21 (Foster: "[Ovitz's] departure was not voluntary, is that correct?" Russell: "No way, no way."); 4525:12-16 (Schulman: "You were trying to work

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





out getting Mr. Ovitz's consent; correct?" Eisner: "I was not trying to get his consent on being fired. I was trying to get his consent of leaving the company in a graceful way.").

FN323. Tr.2087:6-2088:5. What makes it even clearer that Disney was simply trying to mislead the public is that no such representation was made in Ovitz's termination letter. PTE 13.

FN324. Tr. 1382:22-1383:1.

That same day, Eisner at least attempted to contact each of the Board members by phone before the issuance of the press release in order to notify them that Ovitz had been officially terminated. [FN325] None of the board members at that time, or at any other time before or during trial, ever objected to Ovitz's termination; in fact, most if not all thought it was the appropriate move for Eisner to make. [FN326] Also on December 12, copies of the press release along with a letter from Eisner were sent to each of the directors. [FN327] The letters contained no more information regarding the termination than was contained in the press release.

FN325. DTE 413 (Eisner's incoming and outgoing phone log from December 12 through December 14 listing calls placed to Nunis, Roy Disney, Russell, O'Donovan, Wilson, Murphy, Gold, Stern, Bowers, Poitier and Walker); see also Tr. 3802:6-2223 (Gold) (testifying that Eisner notified him by phone, and asked him to pass the news on to Roy Disney); 5810:19- 5811:20 (Nunis) (testifying that Eisner notified him by phone); 5932:7- 5833:3 (Bowers) (testifying that Eisner notified her by phone); 7556:1-7557:15 (T. Murphy) (testifying that Eisner notified him by phone); 7642:21-7643:9 (Lozano) (testifying that Eisner notified him by phone); 8159:19-8160:24 (Stern) (testifying that Eisner notified him by phone). Eisner also notified Bass and Warren Buffett. Tr. 4405:18-4406:14.

FN326. Tr. 3778:1-23 (Gold) (stating that as of the November 25 executive session, he concurred with Eisner's decision to terminate Ovitz despite what it would cost Disney); 4026:13-4028:5 (Roy Disney) (stating that he supported the decision to terminate Ovitz despite the cost involved because of the significant problems Ovitz was causing within Disney); 4405:18-4409:10 (Eisner) (stating that he received no objection from any board member after

placing phone calls to notify them of Ovitz's termination or after they received copies of the press release and accompanying letter); 5810:19-5811:20 (Nunis) (stating that as of the press release he supported Eisner's decision to terminate Ovitz because "turmoil at the top of the company" was dangerous for everyone); 5933:22-5935:15 (Bowers) (stating that she supported Eisner's decision to terminate Ovitz as of the press release because it was clear that Ovitz was not a team player); 6720:11-6720:23 (O'Donovan) (stating that he supported Eisner's decision to terminate Ovitz because it is important to have harmony at the top of a large organization); 7144:3-7146:13 (Poitier) (stating that he believed Ovitz had to be terminated according to the terms of the OEA because it was a "clear mismatch"); 7556:3-7557:7 (Murphy) (stating that he supported Eisner's decision to terminate Ovitz despite the cost because it was the best thing for Disney and its shareholders); 7642:15-7643:24 (Lozano) (stating that he supported Eisner's decision to terminate Ovitz despite the cost to Disney); 8158:5-8160:24 (Stern) (stating that he supported Eisner's decision to terminate Ovitz because it was a bad relationship, and the amount Disney would save would outweigh the cost of the termination).

FN327. PTE 13.

*25 Thus, as of December 12, Ovitz was officially terminated without cause. Up to this point, however, the Disney board had never met in order to vote on, or even discuss, the termination at a full session, and few if any directors did an independent investigation of whether Ovitz could be terminated for cause. As a result, the Disney directors had been taken for a wild ride, and most of it was in the dark. Additionally neither the EPPC nor the compensation committee had a vote on the matter, and it seems as though they had yet to have a substantive discussion of whether Ovitz could be terminated for cause. Many directors believed that Eisner had the power to fire Ovitz on his own and that he did not need to convene a board meeting to do so. [FN328] Other directors believed that if a meeting was required to terminate Ovitz, that Litvack, serving as corporate counsel, would have advised them that was the case and he would have made sure one was called. [FN329] Litvack believed that Eisner had the power to fire Ovitz on his own accord and, therefore, did not believe it was necessary to convene a meeting. [FN330] Litvack also stated that he did not call a




Not Reported in A.2d
(Cite as: 2005 WL 2056651, *25 (Del.Ch.))

Page 41

meeting because not only did he believe that Eisner was empowered to fire Ovitz on his own, but Litvack believed that all the directors were up to speed and in agreement that Ovitz should be terminated. [FN331] Although there was no meeting called to vote on or even discuss Ovitz's termination, it is clear that most, if not all, directors trusted Eisner's and Litvack's conclusion that there was no cause and that Ovitz should still be terminated without cause even though this entailed making the costly NFT payment. [FN332]

FN328. Tr. 2587:1-7 (Russell); 5733:3-5734:17 (Mitchell); 6721:8-21 (O'Donovan); 7067:21-7069:8 (Wilson); 7561:9-13 (Murphy); 8233:5-16 (Stern).

FN329. Tr. 2889:10-2892:3 (Russell); 6720:21-6721:7, 6785:1118- 6786:15 (O'Donovan); 7227:2-7 (Poitier); 7561:14-17 (Murphy); 7466:11- 7467:2 (Lozano).

FN330. Tr. 6149:4-6151:11.

FN331. *Id.*

FN332. Tr. 2574:5-2576:21 (Russell) (stating that he believed that Eisner and Litvack had done sufficient research and trusted their judgment that there was no cause to terminate Ovitz, that he was unaware of anything that would constitute cause to fire Ovitz, and that he was aware that Ovitz would receive the NFT payment); 3775:12-3778:18 (Gold) (stating that he was aware of the size of the NFT payment, that after asking Litvack about his conclusions concerning cause he believed that Litvack had done and was continuing to do sufficient research and Gold trusted his and Eisner's conclusions, and that Gold also had no knowledge of any act that would have constituted cause to fire Ovitz); 5597:18-5598:13 (Mitchell) (stating that he relied on and trusted Litvack's determination that there was no cause and Mitchell knew of nothing that would have constituted cause); 5813:2-24 (Nunis) (stating that he believed that if Eisner and Litvack could have avoided paying the NFT that they would have done so); 5933:4-5934:24 (Bowers) (agreeing with Eisner's decision, that Disney would honor the terms of the OEA and make a large payment to Ovitz including a large cash payment and acceleration of the options); 6781:18-6782:9 (O'Donovan) (stating that he was not aware of the value of Ovitz's payment and relied on Litvack entirely to make the

cause determination); 7557:2-15 (Murphy) (stating that he believed that if there was a way that Eisner could have avoided paying Ovitz he would have and he therefore trusted Eisner's judgment on the issue of cause); 7867:2-7868:2 (Watson) (stating that he did not believe that Ovitz was grossly negligent or malfeasant and that therefore he could not be fired for cause); 8160:2-8161:16 (Stern) (stating that he believed that Ovitz never lied to him, and that Stern trusted Eisner's judgment because he had a reputation for being "a tough buck," and if Eisner could have avoided paying Ovitz he would have).

During the week that Ovitz was terminated (December 11-16), articles began appearing in the press with quotes from Ovitz or his representatives describing why Ovitz left Disney and detailing to some extent the size of his severance package. [FN333] For example, a December 14 article in the Baltimore Sun reported that "Resigning Disney President Michael Ovitz said yesterday through a representative that Disney is giving him a $90 million severance package." [FN334] Other articles describing Ovitz's frustrations at Disney stated that Ovitz "wasn't game to struggle against a bad situation," [FN335] and that "Ovitz was frustrated by his poorly defined role, Eisner's reluctance to share power and repeated clashes with other senior Disney executives ... notably [Litvack] and [Bollenbach]," [FN336] and that "the reality was that Eisner did not let go ... [and that] Eisner thwarted [Ovitz] by not giving him detailed responsibilities or the power to manage the various Disney divisions." [FN337] The articles also stated that Ovitz's departure was mutual, [FN338] and some went so far as to state that Ovitz's departure was his own idea. [FN339] Additionally, it was reported that Ovitz had hired a public relations consultant named Steven Rivers to put a positive spin on the termination for Ovitz. [FN340] Ovitz, however, testified that he did not employ Rivers or any other PR firm at this time. [FN341] Eisner believed that he had been generous in his treatment of Ovitz, as well as his agreement to make the termination seem mutual, and felt that these articles were:

FN333. DTE 243.

FN334. DTE 243 at 13-14; *see also id.* at DD002077, DD002068.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *25 (Del.Ch.))
Page 42

FN335. *Id.* at DD002075.

FN336. *Id.* at DD002077.

FN337. *Id.* at DD002068.

FN338. *Id.* at DD002075.

FN339. *Id.* at DD002084.

FN340. Tr. 4432:20-4433:1 (Eisner) (testifying that, when he confronted Ovitz about these articles, Ovitz admitted to hiring Rivers); *see also* DTE 243 at DD002076, DD002084, DTE 243 at 12, 14.

FN341. Tr.2090:17-2091:6.

*26 an incredible betrayal not of a contract, not of any kind of written agreement, but that I had bent over backwards, and not because he was my friend. I would do it with anybody that was leaving under these circumstances, and he just, you know, threw it right in the company's face. And I was reading every single day about what idiots we were, the Disney Company, and how he had done this enormous feat. [FN342]

FN342. Tr. 4433:2-4433:14.

On December 16, Eisner reacted to these stories by sending an e-mail to John Dreyer, Disney's communications chief, which among other things stated that Ovitz was a "psychopath" and "totally incompetent." [FN343] Eisner described the letter as his effort at "venting" and that "although [he] didn't know what the words meant, [he] was just so angry." [FN344]

FN343. PTE 20.

FN344. Tr. 4433:15-21.

Following the official termination, the EPPC met on December 20 with the sole purpose of rescinding Ovitz's $7.5 million bonus. Litvack stated that after the December 10 EPPC meeting, he had questioned Russell as to whether the bonus was mandatory, and that Russell had sent Litvack a memo (which had been drafted almost a year earlier as an introduction to the OEA) on December 18, and in that document it became apparent that the bonus was not in fact mandatory. [FN345] Russell also had a discussion

with Gold on December 18 during which he told Gold that his recommendation that Ovitz be paid a bonus was stupid and that he was worried that members of the EPPC were under the mistaken belief that the bonus was contractual. [FN346] Gold testified that within a week of the December 10 meeting, Litvack and Russell came to him "sheepishly, and said 'we've made a mistake." ' [FN347] On December 20 a special telephonic meeting of the EPPC was convened with the purpose of rescinding Ovitz's $7.5 million bonus, which the EPPC had voted in favor of just ten days earlier. [FN348] Gold, Lozano, Russell, Watson, Eisner and Litvack attended the meeting. [FN349]

FN345. PTE 180; *see also* Tr. 6159:20-6161:5.

FN346. Tr. 2589:12-2591:1; *see also* PTE 384 (Russell's notes of his meeting with Gold).

FN347. Tr. 3799:15-3800:7.

FN348. PTE 53.

FN349. *Id.*

Russell's self-prepared agenda for the meeting outlines what was discussed before revoking Ovitz's bonus, including that it would be "illogical and impossible to justify any bonus one day and fire him the next, [and that] Committee members [could not] be asked to try to justify it based on good performance." [FN350] The EPPC then revoked Ovitz's bonus. After the revocation, Gold questioned Litvack if he had not also made a mistake as to whether Ovitz could be terminated for cause and Litvack told Gold that he was sure that he had not. Gold also contends that Litvack said his view was supported by outside counsel. [FN351] Litvack denies ever having made this representation.

FN350. PTE 93; *see also* Tr. 2591:15-2592:2; 3797:14-3799:14.

FN351. Tr. 3796:1-18; 6167:20-6168:14.

After Ovitz's bonus was rescinded, Eisner, in a December 27 letter, accelerated Ovitz's departure date from January 31, 1997, to December 27, 1996, and Ovitz's tenure as both an executive and director of Disney ended on that date. [FN352] Similar to the December 12 letter, this letter states that Ovitz's



Not Reported in A.2d
(Cite as: 2005 WL 2056651, \*26 (Del.Ch.))

termination "will for all purposes of the Employment Agreement be treated as a 'Non-Fault Termination.' " There was no mention in this letter of Ovitz serving as a consultant to the board, however. [FN353] The letter, unlike the December 12 letter, contained specific details of Ovitz's payout and stated Ovitz would immediately receive roughly $38 million in cash and that the first tranche of three million options would vest immediately. [FN354] Litvack is the signatory on this letter and Ovitz cosigned. Litvack, however, testified that he signed the letter agreement because no one else was available to do so during the holidays and that he had no role in drafting it. [FN355]

FN352. PTE 14.

FN353. *Id.*

FN354. *Id.*

FN355. Tr. 6170:14-19; 6586:18-6587:5.

**\*27** As previously mentioned, Disney also chose to withhold $1,000,000 of Ovitz's NFT payment "pending final settlement of [Ovitz's] accounts." [FN356] Ovitz has stated that his agreement to the holdback was a condition to "Disney honoring its contractual obligations." [FN357] Eisner, however, testified that it was common for executives at Disney to be behind on their expenses up to six months, so it made sense to holdback $1 million in case of lingering expenses. [FN358] Besides Eisner, Litvack, and perhaps Russell, no defendant even saw the December 27 letter before it was signed. [FN359] Additionally, neither the full board nor any committee thereof met to discuss the acceleration of Ovitz's departure or the $1 million holdback. [FN360] Shortly after Disney paid Ovitz what he was owed under the OEA for an NFT (minus the $1 million holdback), plaintiffs filed the current action.

FN356. *Id.* At the time that Eisner ordered the holdback, he did not know that Price Waterhouse would be called in to do a full audit of Ovitz's expenses. Tr. 5147:15-5150:11.

FN357. Ovitz Post Trial Br. at 13.

FN358. Tr. 4400:21-4402:4.

FN359. *See, e.g.,* Bowers 336:20-24; Lozano

213:19-214:2; Mitchell 40:13-23; T. Murphy 106:14-21; Nunis 80:3-5; O'Donovan 119:23-120:4; Poitier 176:24-177:18; Stern 192:9-23; Watson 442:16-19; Wilson 125:25- 126:8; Roy Disney 190:11-24.

FN360. Tr. 3943:19-3944:22.

The full board next met on January 27, 1997. By this time, the board was aware of the negative publicity that the Ovitz termination and NFT payment had received. There was an extensive discussion of Ovitz's termination at this meeting and the pending lawsuit. Litvack, addressing the full board for the first time concerning the cause issue, notified the board that in his opinion there had been no gross negligence or malfeasance and, thus, Ovitz could not be terminated for cause. [FN361] Litvack stood by his decision at trial, stating he had learned nothing since 1996 that made him reconsider his original advice to the board that Disney could not fire Ovitz for cause. [FN362]

FN361. Tr. 2599:10-2600:9 (Russell) (stating that Litvack had explained about the lawsuit and that he stated that "we had acted properly and that there would not have been a basis to claim that there was good cause under the employment agreement ... with respect to the discharge of Michael Ovitz."); 4444:8-4446:12 (Eisner) (stating that the board was fully informed of all the details of Ovitz's termination and that Litvack explained the cause question "to the point that everybody was getting tired of me saying, 'Okay, Sandy, say it once again. Who did you talk to? Are you sure? Did we do the right thing?'"); 5936:13-5939:15 (Bowers) (stating that Litvack advised the board that there was no gross negligence or malfeasance to terminate Ovitz and that they had to pay him and that she also recalls Litvack stating that he had received outside counsel at this point); 6181:11-6183:11 (Litvack) (stating that he set out the whole Ovitz situation for the board and that he told the board that he did not believe there was gross negligence or malfeasance and hence no way to terminate Ovitz for cause) Litvack also stated that he did not recall saying that he had the advice of outside counsel, but that if he was asked he would have responded that he did. *Id.; see also* PTE 799.

FN362. Tr. 6693:1-12.

### D. Expert Witnesses

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *27 (Del.Ch.))

Six expert witnesses testified over the course of the trial. [FN363] In general, their reports and testimony, while meeting the minimum standards for admissibility, were not of as much help to the Court as they could have been because of the polarized nature of their opinions, especially their interpretations of the factual questions that are of central importance in this trial. I shall discuss each expert *seriatim*. To the extent that my conclusions about an expert are decidedly negative, that characterization is based upon an objective evaluation of the witness and the strength and relevance of the evidence presented both in the report and at trial.

> FN363. A seventh expert, Alan Johnson, prepared a report on behalf of the defendants and was deposed, but he did not testify at trial. *See* Tr. 771:24-772:16. His amended report dated August 6, 2004, is part of the trial record. DTE 181. Professor Murphy spent a significant amount of time at trial disputing certain elements of Johnson's report. Tr. 833:21-857:19.

### 1. *Professor Deborah DeMott*

Plaintiffs offered Professor DeMott, the David F. Cavers Professor of Law at Duke Law School, as an expert on "the custom and practice with regard to corporate governance in Delaware public companies in the time period relevant to this case." [FN364] Professor DeMott was subject to an earlier motion *in limine*, whereby plaintiffs sought to exclude her testimony. That motion was granted on the grounds that her report and proposed testimony did not comply with D.R.E. 702 and improperly opined on the application of Delaware law to the facts of this case. [FN365] Professor DeMott rewrote her report, [FN366] and her testimony was received at trial over defendants' objections. [FN367]

> FN364. Tr. 23:20-24.

> FN365. *See In re The Walt Disney Co. Derivative Litig.*, 2004 WL 550750 (Del.Ch. Mar.9, 2004).

> FN366. PTE 462.

> FN367. Tr. 24:1-38:6.

**\*28** Professor DeMott opined on the "custom and practice of corporate governance in publicly traded Delaware corporations as of the times relevant to the transactions in this case," and also on "whether the conduct of the board of directors of [the Company] complied with or departed from those customs and those practices." [FN368] Despite plaintiffs' and Professor DeMott's efforts to couch her opinion in terms of custom and practice of Delaware corporations, it was clear to all that her report and testimony were still directed to the core issues in this case--whether the defendants breached their fiduciary duties as they exist under Delaware law. [FN369]

> FN368. Tr. 40:9-18.

> FN369. For example, instead of using the term "custom and practice" in her report, Professor DeMott states that good corporate goverance "requires," "includes" and "envisions" certain actions. Tr. 98:24-101:10; *see also* Tr. 161:22-166:3 (plaintiffs' counsel objects to a question on cross-examination on the grounds that defense counsel was "just inserting the phrase 'custom and practice,' " and that these questions were "not going to what is the custom and practice in the particular time frame with respect to public Delaware companies, but what are the legal requirements [imposed upon fiduciaries of Delaware corporations]").

In addition to opining on the core issues in this case, [FN370] another key area of Professor DeMott's report (and the corresponding testimony) that is of no value to the Court is her interpretation of the Company's certificate of incorporation, bylaws, and board committee charters. [FN371] Interpretation of the Company's internal governing documents is a matter exclusively for the Court. [FN372] Thus, there is very little, if any, of Professor DeMott's report that is of benefit to the Court, especially because the relevant question is not whether the defendants complied with the custom and practice of other Delaware corporations during the relevant time frame, but whether they complied with their fiduciary duties. [FN373]

> FN370. *See* PTE 462 at ¶ 14 ("Neither Disney's Board nor its Compensation Committee gave careful consideration to the implications of the terms of Disney's employment agreement with Mr. [Ovitz]."); *see also id.* at ¶ 17 ("The record leaves no doubt that both the decision to terminate Mr. Ovitz's employment and the decision to characterize the termination as a non-fault termination were made by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Mr. Eisner without consideration by Disney's
Board.").

FN371. PTE 462 at ¶¶ 9, 12, 17; Tr. 172:6-175:5.

FN372. *See Itek Corp. v. Chicago Aerial Indus.,
Inc.,* 274 A.2d 141, 143 (Del.1971).

FN373. Professor DeMott's testimony was useful,
however, in the sense that it drew in stark relief the
contrast between ideal corporate governance
practices and the unwholesome boardroom culture at
Disney--that is, her testimony clarified how
ornamental, passive directors contribute to
sycophantic tendencies among directors and how
imperial CEOs can exploit this condition for their
own benefit, especially in the executive
compensation and severance area. *See* Tr. 43:4-
46:15 (individualized one-on-one discussions
between management and directors can lead to
directors who are "unequally or unevenly informed
with regard to significant matters" and "have the
effect of vitiating, sapping the board's ability as an
institution to function together collectively and
collegially and deliberatively"); 83:12-84:6.

### 2. *Professor John Donohue*

Professor Donohue, the William H. Neukom
Professor of Law at Stanford Law School, came to
the witness stand on behalf of plaintiffs three
different times during the course of the trial. His
report and testimony were directed to the issue of
whether Ovitz could (and should) have been
terminated for cause as opposed to the NFT he
received. The fatal flaw in Donohue's opinion is
that it is based upon his factual determinations--
determinations with which I, after weighing all of
the evidence, do not agree. [FN374] For example,
in the summary of his conclusions, Donohue states
that Ovitz committed gross negligence or
malfeasance because of his dishonesty, and because
of eight other categories of bad acts. [FN375] As
demonstrated above, in the lengthy and detailed
recitation of the facts, I conclude that those
determinations are simply not supported by a fair
and neutral evaluation of the record.

FN374. *See* Tr. 636:16-637:6; 702:4-7.

FN375. PTE 404 at 4.

Donohue's opinion outlined an array of legal
standards that might cover Ovitz's termination.
[FN376] In his zeal to crucify Ovitz, Donohue
concluded that Ovitz's conduct would meet any of
the multiplicity of standards he discusses for gross
negligence or malfeasance, and his report contains
very little guidance in terms of which standard
might be the most appropriate or most likely to be
applied by a California court. [FN377] As a result,
Donohue's report and testimony are of little value to
the Court in evaluating defendants' conduct as it
relates to Ovitz's termination.

FN376. *Id.* at 7-34.

FN377. *See id.* at 4.

Donohue was permitted to file a supplemental
report based upon his review of certain documents,
which were produced by defendants shortly before
trial. [FN378] The supplemental report made no
substantive changes to Donohue's opinions and
conclusions. [FN379]

FN378. PTE 826.

FN379. *Id.*

### 3. *Professor Kevin Murphy*

**\*29** Professor Murphy (to whom I will refer as
"Professor Murphy" in order to avoid any potential
confusion with defendant Thomas Murphy), the E.
Morgan Stanley Chair in Business Administration at
the Marshall School of Business at the University of
Southern California, presented expert testimony for
plaintiffs on the issue of damages together with an
economic and reasonableness evaluation of Ovitz's
compensation package. [FN380] Professor Murphy
concluded that Ovitz's compensation package was
unreasonably excessive and orders of magnitude
larger than the compensation awarded to executives
with arguably equivalent responsibilities. [FN381]
In determining the reasonableness of Ovitz's
compensation, Professor Murphy chose not to
consider Ovitz's past income at CAA and the effect
that income would have on the remuneration he
would expect from any future employment. [FN382]
As would be expected, Professor Murphy concluded
that the most reasonable and appropriate
assumptions are those that would maximize the
value of the OEA and corresponding cost of the





NFT. [FN383] Perhaps Professor Murphy's most pointed criticism of the OEA is that the Company was unable to reduce its potential financial exposure because the OEA did not contain any provisions for mitigation or non-compete restrictions, [FN384] but that criticism is not supported by the language of the OEA. [FN385]

FN380. *See* PTE 426 (Professor Murphy report).

FN381. *See, e.g.,* Tr. 748:22-749:13.

FN382. Tr. 868:17-870:16; 1061:5-19; *see also* Tr. 1010:21-1020:18; 1036:12-1037:9; 1043:1-21.

FN383. *See* Tr. 901:6-919:14; 925:2-939:4; 980:4-989:7; 1072:11- 1077:13; 1081:19-1085:17; PTE 426 at 24-31 (Professor Murphy's discussion of the cost to the Company of Ovitz's severance where he concludes that the Black-Scholes value (as opposed to intrinsic or realized cost) of Ovitz's options (by far the highest of the three) is the appropriate way to measure that cost).

FN384. Tr. 803:3-805:5.

FN385. *See* PTE 7 ¶ 9 at WD00209-10.

Professor Murphy's report did not include an event study, but at trial Professor Murphy gave a very brief and unpersuasive critique of Dunbar's event study, which as discussed below, concluded that the Company's market capitalization increased by more than $1 billion as a result of the announcement of Ovitz's hiring. The record does not reflect that Professor Murphy's qualifications as an expert extend to performing and interpreting event studies, and I therefore reject Professor Murphy's critique of Dunbar's conclusion with respect to the market's reaction to the announcement of Ovitz's hiring. [FN386] The remainder of his report, however, is of use to the Court in determining the economic consequences facing the defendants when the decisions at issue in this case were made.

FN386. Notwithstanding the statements in the text above, Professor Murphy does make a very good point that the press release announcing Ovitz's hiring (PTE 3) does not disclose any economic terms of Ovitz's employment with the Company, and therefore, as a matter of common sense, the market cannot be said to have "approved" the economic

terms of the OEA. *See* 859:7-860:3. One might intuit, however, that the $1 billion increase in the Company's market capitalization as a result of Ovitz's hiring would reflect the assumptions of the market as to the potential cost of Ovitz's employment contract, even if the market was unaware of the actual cost. Dunbar testified to this effect, outlining the public reports of Ovitz's compensation before the text of the OEA was filed publicly in December 1995 and concluding that the lack of statistically significant market reaction at that time was due to the market's correct assumptions of the size of the compensation package on August 14, 1995. Tr. 7296:8-7297:20; 7414:19- 7416:3; DTE 428 at 3-9.

### 4. *Larry R. Feldman*

Ovitz's expert with respect to whether he could have been terminated for cause was Larry Feldman. Feldman is a renowned litigator in southern California and is currently employed at Kaye Scholer LLP. [FN387] Feldman opined that the Company had no grounds upon which to terminate Ovitz for cause, and that had the Company done so, that Ovitz would have been able to pursue meritorious claims for breach of contract, fraud and defamation, with damages far in excess of the value of the NFT. [FN388]

FN387. *See* DTE 408 at 1-2.

FN388. DTE 408 at 47.

Upon comparing Feldman's report to the factual determinations I have made, I conclude that the evidence presented at trial is generally consistent with Feldman's view of the relevant facts. Feldman's legal analysis, however, is more troublesome. For example, I am not persuaded in the least that the legal standard used by Feldman in his report to define gross negligence or malfeasance--criminal misconduct or its equivalent--is the correct standard. [FN389] Additionally, his opinion with respect to potential claims for defamation and fraud in the inducement is thinly supported and fails to adequately address potentially meritorious defenses that the Company could have asserted to such causes of action. [FN390] In sum, therefore, Feldman's report and testimony are of some value to the Court, but not substantial value.

FN389. DTE 408 at 10-16. *But see* PTE 404 at 17-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.






18 (Donohue's opinion that gross negligence is not exclusively a criminal standard); DTE 430 at 8-11 (Fox concurring with Donohue); *cf.* Tr. 8333:24-8334:10 (Feldman) (stating at trial that gross negligence does not require actual criminal misconduct).

FN390. *See* DTE 408 at 36-44; Tr. 8403:19-8411:3; 8455:21-8467:3; 8552:18-8577:21.

5. *John C. Fox*

*30 John Fox, a partner of Fenwick & West LLP, testified on behalf of all defendants about Ovitz as an expert with respect to whether Ovitz could have been terminated for cause. Fox's report and testimony were very thorough, well reasoned and informed by Fox's extensive practical experience as an employment law litigator and advisor. [FN391]

FN391. *See* DTE 430 (Fox report); DTE 248 (Fox's supplemental report).

The overwhelming majority of Fox's factual determinations are consonant with the conclusions I have reached above based upon the evidence presented at trial. His legal conclusions based upon those facts, therefore, are of far greater weight and persuasive value than the conclusions reached by Donohue. Similar to Feldman, Fox gives short shrift in his report to analyzing Ovitz's potential claims for fraud in the inducement and defamation. [FN392] Unlike Feldman, however, Fox was able to clearly articulate at trial the reasoning behind his conclusion with respect to the viability of these tort claims, bolstering the value of his report in those areas. [FN393] Fox also testified in great detail regarding the definition of gross negligence and malfeasance. [FN394] He also opined that, regardless of how gross negligence and malfeasance might be defined in a hypothetical *Ovitz v. The Walt Disney Company* suit had Ovitz been terminated for cause, after reviewing the evidence, Ovitz's conduct (or misconduct) did not even come close to that high standard. [FN395] In summary, Fox's report is of significant value to the Court, and I will weigh his conclusions accordingly in making my determinations regarding the ultimate issues in this case.

FN392. DTE 430 at 27-28; *see* DTE 430 at 28; DTE 408 at 36-43.

FN393. *See* Tr. 8838:1-19; 8866:3-17; 8905:20-8908:1; 8948:20-8951:13; 8956:6-8960:9; 9207:14-9213:23; 9222:23-9231:19; 9244:21-9246:8.

FN394. Tr. 8739:15-8748:4; 8999:20-9039:22; 9084:5-20.

FN395. Tr. 8758:1-8837:3; 8844:10-8860:6; 8922:3-8925:18; 8947:5- 8951:13; 8955:10-8961:24; 9025:22-9026:15; 9039:23-9040:12; 9048:3-9195:7.

6. *Frederick C. Dunbar*

The remaining expert was Frederick Dunbar, Senior Vice President of National Economic Research Associates, Inc., who testified on behalf of the defendants as to the market reaction to the hiring of Ovitz and also critiqued Professor Murphy's report as it related to the valuation of Ovitz's options and the present value calculation of the cash portion of the NFT payment. [FN396] Dunbar's conclusion with respect to the market's overwhelmingly positive reaction to Ovitz's hiring is not unassailable, but is nonetheless well-supported by the evidence and based upon accepted methods of analysis. [FN397] With respect to his opinion that a reduced or discounted option expiration date is appropriate when performing a Black-Scholes valuation of the options, Dunbar's testimony at trial was thorough and convincing. [FN398] Accordingly, Dunbar's Black-Scholes calculations are more valuable and persuasive than those performed by Professor Murphy and will be useful in evaluating the defendants' actions.

FN396. *See* DTE 428 (Dunbar report). I have omitted any discussion regarding Professor Murphy's opinion regarding the appropriate discount rate (together with Dunbar's response thereto) because there is no evidence in the record that would indicate that any of the defendants in this action exercised any discretion whatsoever in determining the discount rate applied to the cash payment received by Ovitz as a result of the NFT. Without that evidence connecting a defendant to that decision, I fail to see the current relevance of why other discount rates might have been appropriate. Whichever Disney employees made the decision as to which discount rate to use, were they before the Court, would receive the protections of the business judgment rule. There is no evidence in the record that would impugn in any way the presumptions of





Not Reported in A.2d
**(Cite as: 2005 WL 2056651, \*30 (Del.Ch.))**

care, loyalty, or good faith used by those employees in the business judgment of determining the appropriate discount rate. For that reason, an analysis of why a particular discount rate might have been more appropriate than the one selected is not germane to the issues to be decided herein. *See* Santaniello 149:16-154:14 (stating that he was unaware of how the discount rate was determined); PTE 130 (memo from the Company's Controller's office to Santaniello enclosing present value calculations at 6.5% and 6.75%); PTE 131 (demonstrating that the 6.5% discount rate was actually used in paying Ovitz).

FN397. DTE 428 at 3-9; Tr. 7287:6-7300:3; 7365:6-7448:16.

FN398. Tr. 7306:11-7333:16; 7448:17-7506:6. In contrast, Professor Murphy's explanation for using the latest possible termination date when valuing the options upon termination, based upon the fact that the exercisability of those options was extended, (in exchange for dropping the $50 million guarantee), and based upon an array of possible hedges, is not nearly as persuasive. *See* Tr. 823:18-830:20; 964:19-972:20.

## II. LEGAL STANDARDS

The outcome of this case is determined by whether the defendants complied with their fiduciary duties in connection with the hiring and termination of Michael Ovitz. At the outset, the Court emphasizes that the best practices of corporate governance include compliance with fiduciary duties. [FN399] Compliance with fiduciary duties, however, is not always enough to meet or to satisfy what is expected by the best practices of corporate governance.

FN399. All good corporate governance practices include compliance with statutory law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability. But they are not required by the corporation law and do not define standards of liability.

*Brehm v. Eisner*, 746 A.2d 244, 256 (Del.2000).

**\*31** The fiduciary duties owed by directors of a Delaware corporation are the duties of due care and loyalty. [FN400] Of late, much discussion among the bench, bar, and academics alike, has surrounded a so-called third fiduciary duty, that of good faith. Of primary importance in this case are the fiduciary duty of due care and the duty of a director to act in good faith. Other than to the extent that the duty of loyalty is implicated by a lack of good faith, the only remaining issues to be decided herein with respect to the duty of loyalty are those relating to Ovitz's actions in connection with his own termination. [FN401] These considerations will be addressed *seriatim,* although issues of good faith are (to a certain degree) inseparably and necessarily intertwined with the duties of care and loyalty, as well as a principal reason the distinctness of these duties make a difference--namely § 102(b)(7) of the Delaware General Corporation Law. [FN402]

FN400. The Delaware Supreme Court has been clear that outside the recognized fiduciary duties of care and loyalty (and perhaps good faith), there are not other fiduciary duties. In certain circumstances, however, specific applications of the duties of care and loyalty are called for, such as so-called "*Revlon* " duties and the duty of candor or disclosure. *See Malpiede v. Townson,* 780 A.2d 1075, 1083, 1086 (Del.2001); *Paramount Communications Inc. v. QVC Network, Inc.,* 637 A.2d 34, 43 (Del.1994). ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, 'the directors must act in accordance with their fundamental duties of care and loyalty.' ") (citation omitted)).

FN401. *See In re The Walt Disney Co. Derivative Litig.* ("*Disney III*"), 2004 WL 2050138, at \*7 (Del.Ch. Sept.10, 2004); *Brehm,* 746 A.2d at 257-58 .

FN402. Perhaps these categories of care and loyalty, so rigidly defined and categorized in Delaware for many years, are really just different ways of analyzing the same issue. Professor Sean Griffith said it best when he recently wrote:
At first glance, the duties of care and loyalty appear quite distinctive....
A bit of digging beneath these surface differences, however, reveals the richly interconnected roots of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2005 WL 2056651, *31 (Del.Ch.))

the two doctrinal paradigms. Start with the duty of care: directors must conduct themselves as ordinarily prudent persons managing their own affairs. So far so good, but a moment's reflection reveals that an ordinarily prudent person becomes an ordinarily prudent director only once we assume an element of loyalty. How do ordinarily prudent directors conduct their affairs? A decision is taken with due care, when from an array of alternatives, the directors employ a procedure to pick the one that best advances *the interests of the corporation.* Now pause for a moment to consider what a funny way this is of conceiving what an ordinarily prudent person would do *in the conduct of her own affairs.* We might typically assume that an ordinarily prudent person, in evaluating a set of alternatives, picks the one that provides the most benefit and least cost to *herself.* A director's decision-making process, however, can be evaluated only by changing the referent from herself to the corporation. The question of prudence, in other words, is framed with a tacit element of loyalty. ....

... [Shareholders and courts] are worried about the directors' loyalty because we are concerned that their disloyalty will result in a poor bargain for the corporation. We are concerned, in other words, that conflicted directors will strike bargains for the corporation that an ordinarily prudent person would not strike for herself. This can be seen most clearly if the non-arms-length transactions that raise duty of loyalty concerns are imagined as arms-length transactions with third parties. Would an ordinarily prudent person lease a corporate asset to a third party on exceedingly generous terms? Would an ordinarily prudent person lavish compensation on a third party and permit the third party to divert investment opportunities that would otherwise come her way? These are duty of loyalty concerns framed as duty of care questions. The phrasing is natural because, at its core, the duty of loyalty is just a bet that some situations are likely to lead to careless or imprudent transactions for the corporation, which is to say that the duty of care is a motivating concern for the duty of loyalty. Here again the duties overlap.

Sean J. Griffith, *Good Faith Business Judgment: A Theory of Rhetoric in Corporate Law Jurisprudence,* 55 DUKE L.J. (forthcoming 2005) (manuscript of May 25, 2005 at 39-42 available at http:// papers.ssrn.com/sol3/papers.cfm? abstract_id=728431) (emphasis in original, citations omitted).

## A. The Business Judgment Rule

A comprehensive review of the history of the business judgment rule is not necessary here, but a brief discussion of its boundaries and proper use is appropriate. Delaware law is clear that the business and affairs of a corporation are managed by or under the direction of its board of directors. [FN403] The business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation. [FN404] Because courts are ill equipped to engage in *post hoc* substantive review of business decisions, the business judgment rule "operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." [FN405]

FN403. 8 *Del. C.* § 141(a).

FN404. *See Zapata Corp. v. Maldonado,* 430 A.2d 779, 782 (Del.1981).

FN405. *Cede & Co. v. Technicolor, Inc.* ("*Cede III*"), 634 A.2d 345, 360 (Del.1993) (citing *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del.1988)).

The business judgment rule is not actually a substantive rule of law, [FN406] but instead it is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, ... and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." [FN407] This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on the part of the directors. [FN408] In the absence of this evidence, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose." [FN409] When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste. [FN410]

FN406. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995) (citing *Cede III,* 634 A.2d at 360); *see Emerald Partners v. Berlin,* 787 A.2d 85, 90-91 (Del.2001); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1374 (Del.1995).

FN407. *Aronson v. Lewis,* 473 A.2d 805, 812

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2005 WL 2056651, *31 (Del.Ch.))

(Del.1984). In *Smith v. Van Gorkom,* the Delaware Supreme Court clarified that "the presumption that the directors acted in good faith [is] irrelevant in determining the threshold issue of whether the directors as a Board exercised an informed business judgment." 488 A.2d 858, 889 (Del.1985). In *In re Holly Farms Corp. S'holders Litig.,* the Court of Chancery denied the protections of the business judgment rule to a board of directors' agreement to a lock up because it was "the product of a fundamentally flawed process and cannot be in the interests of the stockholders." 1988 WL 143010, at *6 (Del.Ch. Dec.30, 1988).

FN408. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988); *Cede III,* 634 A.2d at 360. In *Gagliardi,* Chancellor Allen described the policy rationale for the business judgment rule in the paragraph quoted below. Although this statement, made in 1996, may at first appear to be undercut by the increased incentive compensation of the dot-com era, the rationale still applies because of the relatively small percentages of stock held by officers and directors of public companies.

Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky---you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects. Given this disjunction, only a very small probability of director liability based on "negligence", "inattention", "waste", etc. could induce a board to avoid authorizing risky investment projects to any extent! Obviously, it is in the shareholders' economic interest to offer sufficient protection to directors from liability for negligence, etc., to allow directors to conclude that, as a practical matter, there is no risk that, if they act in good faith and meet minimalist proceduralist standards of attention, they can face liability as a result of a business loss.
*Gagliardi v. TriFoods Int'l Inc.,* 683 A.2d 1049,

1052 (Del.Ch.1996).

FN409. *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971); *see also Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985).

FN410. *In re J.P. Stevens & Co., Inc. S'holders Litig.,* 542 A.2d 770, 780 (Del.Ch.1988).

This presumption can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction. [FN411] In that event, the burden shifts to the director defendants to demonstrate that the challenged transaction was "entirely fair" to the corporation and its shareholders. [FN412]

FN411. *Emerald Partners,* 787 A.2d at 91.

FN412. *Id.* In certain circumstances, the burden can shift back to the plaintiffs in the event of ratification by disinterested directors or shareholders. *See Solomon v. Armstrong,* 747 A.2d 1098, 1111, 1113-17 (Del.Ch.1999), *aff'd,* 746 A.2d 277 (Del.2000).

In *Van Gorkom,* the Delaware Supreme Court analyzed the Trans Union board of directors *as a whole* in determining whether the protections of the business judgment rule applied. [FN413] More recent cases understand that liability determinations must be on a director-by-director basis. In *Emerging Communications,* Justice Jacobs wrote (while sitting as a Vice Chancellor) that the "liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." [FN414] There is a not significant degree of tension between these two positions, notwithstanding the procedural differences between the two cases.

FN413. *Van Gorkom,* 488 A.2d at 889.

FN414. *In re Emerging Communications Inc. S'holders Litig.,* 2004 WL 1305745, at *38 (Del.Ch. Jun.4, 2004).

*32 Even if the directors have exercised their business judgment, the protections of the business judgment rule will not apply if the directors have made an "unintelligent or unadvised judgment." [FN415] Furthermore, in instances where directors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




have not exercised business judgment, that is, in the event of director inaction, the protections of the business judgment rule do not apply. [FN416] Under those circumstances, the appropriate standard for determining liability is widely believed to be gross negligence, [FN417] but a single Delaware case has held that ordinary negligence would be the appropriate standard. [FN418]

FN415. *Mitchell v. Highland-Western Glass,* 167 A. 831, 833 (Del.Ch.1933); *Van Gorkom,* 488 A.2d at 872.

FN416. *Aronson,* 473 A.2d at 813. This is not to say that all director inaction is not subject to the business judgment rule. As the *Aronson* Court noted, *"a conscious decision to refrain from acting* may nonetheless be a valid exercise of business judgment." *Id.* (emphasis added).

FN417. *See Seminaris v. Landa,* 662 A.2d 1350 (Del.Ch.1995); *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268 (Del.Ch.1995).

FN418. *Rabkin v. Philip A. Hunt Chem. Corp.,* 1987 WL 28436, at *1- 3 (Del.Ch. Dec.17, 1987). *See Graham v. Allis-Chalmers Mfg. Co.,* 188 A.2d 125, 130 (Del.1963). I confess to being mystified why plaintiffs did not cite *Rabkin* and its lower standard of liability when they did cite *Aronson* for the proposition that the business judgment rule does not apply to director inaction, as well as a bankruptcy decision that heavily relied upon *Rabkin. See Pereira v. Cogan,* 294 B.R. 449 (S.D.N.Y.2003), *vacated and remanded sub nom. Pereira v. Farace,* 413 F.3d 330, 2005 WL 1532318 (2d Cir. June 30, 2005). A similar mystery confronted then-Vice Chancellor Berger in *Rabkin,* where she wrote: Both parties agree that liability must be predicated upon a finding of gross negligence. As a result, the Court did not have the benefit of what it assumed would be plaintiffs' arguments in support of the Court's original ruling [that ordinary negligence was the appropriate standard] and the Court is left in the unenviable position of deciding against both parties. 1987 WL 28436, at *2. It also bears noting that no Delaware decision (until this one) has cited *Rabkin,* decided roughly eighteen years ago, and it would appear that *Seminaris, In re Baxter Int'l,* and *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959 (Del.Ch.1996), have since eclipsed *Rabkin* by implicitly accepting that gross negligence is the

appropriate standard even in cases of alleged director inaction and lack of oversight.

### B. Waste

Corporate waste is very rarely found in Delaware courts because the applicable test imposes such an onerous burden upon a plaintiff--proving "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." [FN419] In other words, waste is a rare, "unconscionable case[ ] where directors irrationally squander or give away corporate assets." [FN420]

FN419. *Brehm,* 746 A.2d at 263; *In re The Walt Disney Co. Derivative Litig.* (*"Disney I"* ), 731 A.2d 342, 362 (Del.Ch.1998) (quoting *Glazer v. Zapata Corp.,* 658 A.2d 176, 183 (Del.Ch.1993)).

FN420. *Brehm,* 746 A.2d at 263.

The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith. [FN421] It is not necessarily true, however, that every act of bad faith by a director constitutes waste. For example, if a director acts in bad faith (for whatever reason), but the transaction is one in which a businessperson of ordinary, sound judgment concludes that the corporation received adequate consideration, the transaction would not constitute waste. [FN422]

FN421. *See White v. Panic,* 783 A.2d 543, 553-55 (Del.2001) (citing *J.P. Stevens,* 542 A.2d at 780-81).

FN422. Nevertheless, if the director acted in bad faith, it would be extraordinarily difficult for the defendant directors to prove that the transaction was entirely fair to the corporation because it would be difficult to demonstrate fair process. *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983).

### C. The Fiduciary Duty of Due Care

The fiduciary duty of due care requires that directors of a Delaware corporation "use that amount of care which ordinarily careful and prudent men would use in similar circumstances," [FN423] and "consider all material information reasonably available" in making business decisions, and that deficiencies in the directors' process are actionable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *32 (Del.Ch.))

only if the directors' actions are grossly negligent. [FN424] Chancellor Allen described the two contexts in which liability for a breach of the duty of care can arise:

> FN423. *Graham,* 188 A.2d at 130.

> FN424. *Brehm,* 746 A.2d at 259; *Official Comm. Of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins, et al. ("IHS"* ), 2004 WL 1949290, at *9 n. 37 (Del.Ch. Aug.24, 2004); *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 WL 139768, at *12 (Del.Ch. Jan.10, 2003). In *Cede III,* the Supreme Court affirmed and adopted Chancellor Allen's "presumed findings" that the directors of Technicolor "were grossly negligent in failing to reach an informed decision when they approved the agreement of merger, and … thereby breached their duty of care." 634 A.2d at 366. By way of example, a board of directors need not read *in haec verba* every contract or legal document that it approves, but if it is successfully absolve itself from charges of [violations of the duty of care], there must be some credible evidence that the directors knew what they were doing, and ensured that their purported action was given effect." *Van Gorkom,* 488 A.2d 858, 883 n. 25 (Del.1985).

First, such liability may be said to follow *from a board decision* that results in a loss because that decision was ill advised or "negligent". Second, liability to the corporation for a loss may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due attention would, arguably, have prevented the loss. [FN425]

> FN425. *Caremark,* 698 A.2d at 967 (emphasis in original).

Chancellor Allen then explained with respect to board decisions:

… [These] cases will typically be subject to review under the director-protective business judgment rule, assuming the decision made was the product of *a process* that was *either* deliberately considered in good faith or was otherwise rational. What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a

corporate loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a *good faith* effort to advance corporate interests. To employ a different rule--one that permitted an "objective" evaluation of the decision--would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions.
*33 Indeed, one wonders on what moral basis might shareholders attack a *good faith* business decision of a director as "unreasonable" or "irrational". Where a director *in fact exercises a good faith effort to be informed and to exercise appropriate judgment,* he or she should be deemed to satisfy fully the duty of attention. [FN426]

> FN426. *Id.* at 967-68 (internal citations and footnotes omitted, emphasis in original).

With respect to liability for director inaction, Chancellor Allen wrote that in order for the inaction to be so great as to constitute a breach of the director's duty of care, a plaintiff must show a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight."    [FN427] The Chancellor rationalized this extremely high standard of liability for violations of the duty of care through inaction by concluding that:

> FN427. *Id.* at 971.

[A] demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors. [FN428]

> FN428. *Id.* (emphasis in original).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a " 'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.' " [FN429] Because duty of care violations are actionable only if the directors acted with gross negligence, [FN430] and because in most instances money damages are unavailable to a plaintiff who could theoretically prove a duty of care violation, [FN431] duty of care violations are rarely found.

FN429. *Tomczak v. Morton Thiokol, Inc.,* 1990 WL 42607, at *12 (Del.Ch. Apr.5, 1990) (quoting *Allaun v. Consol. Oil Co.,* 147 A. 257, 261 (Del.Ch.1929), and citing *Gimbel v. Signal Cos., Inc.,* 316 A.2d 599, 615 (Del.Ch.), *aff'd,* 316 A.2d 619 (Del.1974) ). For example, on a motion to dismiss, in order for a plaintiff to successfully plead that the directors acted with gross negligence (as opposed to regular negligence), the plaintiff should articulate "facts that suggest a *wide* disparity between the process the directors used ... and that which would have been rational." *Guttman v. Huang,* 823 A.2d 492, 507 n. 39 (Del.Ch.2003) (emphasis in original).

FN430. *Brehm,* 746 A.2d at 259.

FN431. *See* 8 *Del. C.* § 102(b)(7).

### D. The Fiduciary Duty of Loyalty

The fiduciary duty of loyalty was described in the seminal case of *Guth v. Loft, Inc.,* in these strict and unyielding terms:

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest. [FN432]

FN432. 5 A.2d 503, 510 (Del.1939).

More recently, the Delaware Supreme Court stated that there is no safe-harbor for divided loyalties in Delaware, [FN433] and that the duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take[ ] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." [FN434] The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders. [FN435]

FN433. *Weinberger,* 457 A.2d at 710.

FN434. *Cede III,* 634 A.2d at 361 (citing *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984)).

FN435. *Id.* at 362 (citing *Nixon v. Blackwell,* 626 A.2d 1366, 1375 (Del.1993)).

**\*34** In the specific context at issue here with respect to a classic duty of loyalty claim, Ovitz, as a fiduciary of Disney, was required to act in an "adversarial and arms-length manner" when negotiating his termination and not abuse or manipulate the corporate process by which that termination was granted. [FN436] He was obligated to act in good faith and "not advantage himself at the expense of the Disney shareholders." [FN437]

FN436. *In re The Walt Disney Co. Derivative Litig.* ( *"Disney II"* ), 825 A.2d 275, 290 (Del.Ch.2003); *Disney III,* 2004 WL 2050138, at *7.

FN437. *Disney II,* 825 A.2d at 290; *see IHS,* 2004 WL 1949290, at *16.

### E. Section 102(b)(7)

Following the Delaware Supreme Court's landmark decision in *Van Gorkom,* [FN438] the Delaware General Assembly acted swiftly to enact 8 *Del. C.* § 102(b)(7). [FN439] Section 102(b)(7) states that a corporation may include in its certificate of incorporation:

FN438. 488 A.2d 858.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





FN439. 65 DEL. LAWS, c. 289 (1986).

(7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective. All references in this paragraph to a director shall also be deemed to refer (x) to a member of the governing body of a corporation which is not authorized to issue capital stock, and (y) to such other person or persons, if any, who, pursuant to a provision of the certificate of incorporation in accordance with § 141(a) of this title, exercise or perform any of the powers or duties otherwise conferred or imposed upon the board of directors by this title.

The purpose of Section 102(b)(7) was explained by the Delaware Supreme Court in this manner:

The purpose of Section 102(b)(7) was to *permit shareholders*--who are entitled to rely upon directors to discharge their fiduciary duties at all times--to adopt a provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations and certain other conduct. [FN440]

FN440. *Emerald Partners,* 787 A.2d at 90 (emphasis in original); *see Malpiede,* 780 A.2d at 1095.

Recently, Vice Chancellor Strine wrote that, "[o]ne of the primary purposes of § 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith." [FN441] Or in other words, § 102(b)(7) is most useful "when, despite the directors' good intentions, [the challenged transaction] did not generate financial success and ... the possibility of hindsight bias about the directors' prior ability to foresee that their

business plans would not pan out" could improperly influence a *post hoc* judicial evaluation of the directors' actions. [FN442]

FN441. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 777 (Del.Ch.2004).

FN442. *Id.*

**\*35** The vast majority of Delaware corporations have a provision in their certificate of incorporation that permits exculpation to the extent provided for by § 102(b)(7). This provision prohibits recovery of monetary damages from directors for a successful shareholder claim, either direct or derivative, that is exclusively based upon establishing a violation of the duty of due care. [FN443] The existence of an exculpation provision authorized by § 102(b)(7) does not, however, eliminate a director's fiduciary duty of care, because a court may still grant injunctive relief for violations of that duty. [FN444]

FN443. *Emerald Partners,* 787 A.2d at 91.

FN444. *Malpiede,* 780 A.2d at 1095; E. Norman Veasey, et al., *Delaware Supports Directors With a Three-Legged Stool of Limited Liability, Indemnification, and Insurance,* 42 BUS. LAW. 399, 403 (1987) ( "[S]ection 102(b)(7) does not eliminate the duty of care that is properly imposed upon directors. Directors continue to be charged under Delaware law with a duty of care in the decisionmaking process and in their oversight responsibilities. The duty of care continues to have vitality in remedial contexts as opposed to actions for personal monetary damages against directors as individuals."). *Cf. Strassburger v. Earley,* 752 A.2d 557, 581 (Del.Ch.2000) (holding that rescissory damages, although an equitable remedy, is not appropriate for breaches solely of the duty of care).

An exculpation provision such as that authorized by § 102(b)(7) is in the nature of an affirmative defense. [FN445] As a result, it is the burden of the director defendants to demonstrate that they are entitled to the protections of the relevant charter provision. [FN446]

FN445. *Emerald Partners,* 787 A.2d at 91-92.

FN446. *See id.; Emerging Communications,* 2004

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *35 (Del.Ch.))

WL 1305745, at * 42.

*F. Acting in Good Faith*

Decisions from the Delaware Supreme Court and the Court of Chancery are far from clear with respect to whether there is a separate fiduciary duty of good faith. [FN447] Good faith has been said to require an "honesty of purpose," and a genuine care for the fiduciary's constituents, [FN448] but, at least in the corporate fiduciary context, it is probably easier to define bad faith rather than good faith. [FN449] This may be so because Delaware law presumes that directors act in good faith when making business judgments. [FN450] Bad faith has been defined as authorizing a transaction "for some purpose *other than* a genuine attempt to advance corporate welfare or [when the transaction] is *known to constitute* a violation of applicable positive law." [FN451] In other words, an action taken with the intent to harm the corporation is a disloyal act in bad faith. A similar definition was used seven years earlier, when Chancellor Allen wrote that bad faith (or lack of good faith) is when a director acts in a manner "unrelated to a pursuit of the corporation's best interests." [FN452] It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation. [FN453]

FN447. It does no service to our law's clarity to continue to separate the duty of loyalty from its essence; nor does the recognition that good faith is essential to loyalty demean or subordinate that essential requirement. There might be situations when a director acts in subjective good faith and is yet not loyal (*e.g.*, if the director is interested in a transaction subject to the entire fairness standard and cannot prove financial fairness), but there is no case in which a director can act in subjective bad faith towards the corporation and act loyally.... For example, one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey.
*Guttman*, 823 A.2d at 506 n. 34. *See In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 475 n. 41 (Del.Ch.2000); *In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, at *4 n. 20 (Del.Ch. Dec.21, 1999); *Barkan v. Amsted Indus. Inc.*, 567 A.2d 1279, 1286 (Del.1989); *Blasius Indus. Inc. v. Atlas Corp.*, 564 A.2d 651, 663 (Del.1988) (holding that because the acts taken by the directors thwarted the shareholder franchise,

even if the directors acted in good faith, those actions "constituted an unintended violation of the duty of loyalty that the board owed to the shareholders."); *cf. IHS*, 2004 WL 1949290, at *9 (analyzing good faith claims under the rubrics of care and loyalty, as appropriate, instead of as a separate duty).

FN448. E. Norman Veasey, *Reflections on Key Issues of the Professional Responsibilities of Corporate Lawyers in the Twenty-First Century*, 12 WASH. U.J.L. & POL'Y 1, 9 (2003).

FN449. Despite the existence of significant jurisprudence with respect to good faith in the contractual context of the covenant of good faith and fair dealing, *see, e.g., Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199 (Del.1993), Delaware decisions have shown a reluctance to importing these contractual standards into the corporate fiduciary realm.

FN450. *See Allaun*, 147 A. 257; *Van Gorkom*, 488 A.2d at 873.

FN451. *Gagliardi*, 683 A.2d at 1051 n. 2 (citing *Miller v. AT & T*, 507 F.2d 759 (3d Cir.1974), emphasis in original). Chancellor Allen then explained that "[t]here can be no personal liability of a director for losses arising from 'illegal' transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction." *Id.* In *Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at *15 (Del.Ch. June 24, 1991), Chancellor Allen to a certain extent equated good faith with loyalty when he stated that there was "persuasive evidence" of bad faith on the part of one of the Technicolor directors (Sullivan) because he had met and cooperated with the acquiror before the acquiror had met with the CEO. Sullivan also received a $150,000 "finder's fee" for his assistance from the post-merger Technicolor. *Id.* at *7. This portion of the decision was not appealed because Cinerama abandoned its claims that the directors acted in bad faith. *Cede III*, 634 A.2d at 359. *See also* Veasey, *infra* n.457 at 448 (noting that intentional violations of law implicate good faith by stating that "the utter failure to follow the minimum expectations of Sarbanes-Oxley, or the NYSE or NASDAQ Rules ... might ... raise. a good faith issue").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





FN452. *In re RJR Nabisco, Inc. S'holder Litig.*, 1989 WL 7036, at * 15 (Del.Ch. Jan.31, 1989); *cf. Strassburger*, 752 A.2d at 581 (holding that certain directors breached their duty of loyalty by "indifference to their duty to protect the interests of the corporation and its minority shareholders," because their primary loyalty was instead given to the interests of their employer).

FN453. *See Guttman* 823 A.2d at 506 n. 34 ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious actions not in the corporation's best interest does not make it faithful, as opposed to faithless."); *Nagy v. Bistricer*, 770 A.2d 43, 48 n. 2 (Del.Ch.2000) (The duty of good faith, "[i]f it is useful at all as an independent concept, [good faith's] utility may rest in its constant reminder ... that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.") *Emerging Communications*, 2004 WL 1305745, at *38 (holding that certain defendants violated their duty of "loyalty and/or good faith" because of the uncertainty in defining those terms).

Bad faith can be the result of "any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, ... shame or pride." [FN454] Sloth could certainly be an appropriate addition to that incomplete list if it constitutes a systematic or sustained shirking of duty. [FN455] Ignorance, in and of itself, probably does not belong on the list, but ignorance attributable to any of the moral failings previously listed could constitute bad faith. It is unclear, based upon existing jurisprudence, whether motive is a necessary element for a successful claim that a director has acted in bad faith, [FN456] and, if so, whether that motive must be shown explicitly or whether it can be inferred from the directors' conduct. [FN457]

FN454. *Guttman*, 823 A.2d at 506 n. 34; *cf. Malpiede*, 780 A.2d at 1085 n. 29 (holding that plaintiffs did not adequately allege a breach of the "duty of loyalty and good faith" merely by pleading conclusory statements that the target's board rejected

an offer based upon "(1) the interested director's desire to consummate [the deal proposed by the other bidder], (2) a desire to benefit [the majority shareholders] with a quick deal, (3) 'dislike' of [the spurned bidder], or (4) a personal desire to complete the sale process.").

FN455. *See* Hillary A. Sale, *Delaware's Good Faith*, 89 CORNELL L.REV. 456, 488-91 (2004) (advocating application of federal scienter standards from the Rule 10b-5 context to an analysis of whether directors have satisfied their duty of acting in good faith when the allegations stem from directors' deliberate indifference).

FN456. *Compare Van Gorkom*, 488 A.2d at 873, *with Zirn v. VLI Corp.*, 681 A.2d 1050, 1061-62 (Del.1996) (discussing good faith motives with respect to proxy disclosures) *and Johnson v. Shapiro*, 2002 WL 31438477 (Del.Ch. Oct.18, 2002) (same).

FN457. *See* E. Norman Veasey, *State-Federal Tension in Corporate Governance and the Professional Responsibilities of Advisors*, 28 J. CORP. L. 441, 447 (2003).

Shrouded in the fog of this hazy jurisprudence, the defendants' motion to dismiss this action was denied because I concluded that the complaint, together with all reasonable inferences drawn from the well-plead allegations contained therein, could be held to state a non-exculpated breach of fiduciary duty claim, insofar as it alleged that Disney's directors *"consciously and intentionally disregarded their responsibilities,* adopting a 'we don't care about the risks' attitude concerning a material corporate decision." [FN458]

FN458. *Disney II*, 825 A.2d at 289 (emphasis in original); *see Gagliardi*, 683 A.2d at 1051 ("[I]n the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.").

**\*36** Upon long and careful consideration, I am of the opinion that the concept of *intentional dereliction of duty, a conscious disregard for one's responsibilities,* is an appropriate (although not the only) standard for determining whether fiduciaries

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *36 (Del.Ch.))

have acted in good faith. [FN459] Deliberate
indifference and inaction *in the face of a duty to act*
is, in my mind, conduct that is clearly disloyal to
the corporation. [FN460] It is the epitome of
faithless conduct.

> FN459. Indeed, § 102(b)(7) on its face seems to
> equate bad faith with intentional misconduct. *See* 8
> *Del. C.* § 102(b)(7)(ii).

> FN460. This is, in my opinion, what the Supreme
> Court was trying to communicate in *Van Gorkom*
> when it wrote:
> In the specific context of a proposed merger of
> domestic corporations, *a director has a duty under 8*
> Del. C. § *251(b),* along with his fellow directors, to
> act in an informed manner in determining whether to
> approve an agreement of merger before submitting
> the proposal to the stockholders. *Certainly in the*
> *merger context, a director may not abdicate that duty*
> by leaving to the shareholders alone the decision to
> approve or disapprove the agreement. Only an
> agreement of merger satisfying the requirements of 8
> *Del. C.* § 251(b) may be submitted to the
> shareholders under § 251(c).
> *It is against those standards that the conduct of the*
> *directors of Trans Union must be tested,* as a matter
> of law and as a matter of fact, regarding their
> exercise of an informed business judgment in voting
> to approve the Pritzker proposal.
> 488 A.2d at 873 (citations and footnotes omitted;
> emphases added). In other words, in *Van Gorkom,*
> the directors were under a statutory duty to act. That
> duty, by law, could not be abdicated to the
> shareholders, much less to the officers of the
> corporation.

To act in good faith, a director must act at all times
with an honesty of purpose and in the best interests
and welfare of the corporation. The presumption of
the business judgment rule creates a presumption
that a director acted in good faith. In order to
overcome that presumption, a plaintiff must prove
an act of bad faith by a preponderance of the
evidence. To create a definitive and categorical
definition of the universe of acts that would
constitute bad faith would be difficult, if not
impossible. And it would misconceive how, in my
judgment, the concept of good faith operates in our
common law of corporations. Fundamentally, the
duties traditionally analyzed as belonging to
corporate fiduciaries, loyalty and care, are but

constituent elements of the overarching concepts of
allegiance, devotion and faithfulness that must guide
the conduct of every fiduciary. The good faith
required of a corporate fiduciary includes not simply
the duties of care and loyalty, in the narrow sense
that I have discussed them above, but all actions
required by a true faithfulness and devotion to the
interests of the corporation and its shareholders. A
failure to act in good faith may be shown, for
instance, where the fiduciary intentionally acts with
a purpose other than that of advancing the best
interests of the corporation, [FN461] where the
fiduciary acts with the intent to violate applicable
positive law, [FN462] or where the fiduciary
intentionally fails to act in the face of a known duty
to act, demonstrating a conscious disregard for his
duties. [FN463] There may be other examples of
bad faith yet to be proven or alleged, [FN464] but
these three are the most salient. As evidenced by
previous rulings in this case both from this Court
and the Delaware Supreme Court, issues of the
Disney directors' good faith (or lack thereof) are
central to the outcome of this action. With this
background, I now turn to applying the appropriate
standards to defendants' conduct.

> FN461. *Gagliardi,* 683 A.2d at 1051 n. 2.

> FN462. *Id.*

> FN463. *Disney II,* 825 A.2d at 289-90; *see Allaun,*
> 147 A. at 261 (further judicial scrutiny is warranted
> if the transaction is a result of directors' "reckless
> indifference to or a deliberate disregard of the
> interests of the whole body of stockholders.");
> *Gimbel,* 316 A.2d at 604 (motion for a preliminary
> injunction denied, *inter alia,* because there was
> "[n]othing in the record [that] would justify a finding
> ... that the directors acted ... out of improper motive
> or *intentional disregard of shareholder interests."* )
> (emphasis added); *see also Caremark,* 698 A.2d at
> 289-90 (where the fiduciaries' failure to act was
> allegedly "sustained or systematic"). The first two of
> these examples seem to sound in the fiduciary duty
> of loyalty, whereas the last appears to be an
> extension, or rather, an example of, severe violations
> of the fiduciary duty of care. In the end, so long as
> the role of good faith is understood, it makes no
> difference whether the words "fiduciary duty of" are
> placed in front of "good faith," because acts not in
> good faith (regardless of whether they might fall
> under the loyalty or care aspects of good faith) are in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




any event non-exculpable because they are disloyal to the corporation. See 8 Del. C. § 102(b)(7).

FN464. Another example of how the concept of good faith may operate in a situation where ensuring director compliance with the fiduciary duties of care and loyalty (as we have traditionally defined those duties) may be insufficient to protect shareholders' interests, is found in 8 Del. C. § 144(a). Under § 144(a), a transaction between a corporation and its directors or officers will be deemed valid if approved by a majority of the independent directors, assuming three criteria are met: 1) the approving directors were aware of the conflict inherent in the transaction; 2) the approving directors were aware of all facts material to the transaction; and 3) the approving directors acted in good faith. In other words, the inside transaction is valid where the independent and disinterested (loyal) directors understood that the transaction would benefit a colleague (factor 1), but they considered the transaction in light of the material facts (factor 2--due care) mindful of their duty to act in the interests of the corporation, unswayed by loyalty to the interests of their colleagues or cronies (factor 3--good faith). On the other hand, where the evidence shows that a majority of the independent directors were aware of the conflict and all material facts, in satisfaction of factors 1 and 2 (as well as the duties of loyalty and care), but acted to reward a colleague rather than for the benefit of the shareholders, the Court will find that the directors failed to act in good faith and, thus, that the transaction is voidable. In such a case, the duties of care and loyalty, as traditionally defined, might be insufficient to protect the equitable interests of the shareholders, and the matter would turn on the good faith of the directors.

### III. ANALYSIS

Stripped of the presumptions in their favor that have carried them to trial, [FN465] plaintiffs must now rely on the evidence presented at trial to demonstrate by a preponderance of the evidence that the defendants violated their fiduciary duties and/or committed waste. More specifically, in the area of director action, plaintiffs must prove by a preponderance of the evidence that the presumption of the business judgment rule does not apply either because the directors breached their fiduciary duties, acted in bad faith or that the directors made an "unintelligent or unadvised judgment," [FN466] by failing to inform themselves of all material

information reasonably available to them before making a business decision. [FN467]

FN465. See Disney II, 825 A.2d at 279; Disney III, 2004 WL 2050138, at *3.

FN466. Mitchell, 167 A. at 833; Van Gorkom, 488 A.2d at 872.

FN467. Brehm, 746 A.2d at 259; Van Gorkom, 488 A.2d at 872; Kaplan v. Centex Corp., 284 A.2d 119, 124 (Del.1971).

*37 If plaintiffs cannot rebut the presumption of the business judgment rule, the defendants will prevail. If plaintiffs succeed in rebutting the presumption of the business judgment rule, the burden then shifts to the defendants to prove by a preponderance of the evidence that the challenged transactions were entirely fair to the corporation. [FN468]

FN468. Cede III, 663 A.2d at 1162; Emerald Partners, 787 A.2d at 91.

As it relates to director inaction, plaintiffs will prevail upon proving by a preponderance of the evidence that the defendants breached their fiduciary duties by not acting. In order to invoke the protections of the provision in the Company's certificate of incorporation authorized by 8 Del. C. § 102(b)(7), the defendants must prove by a preponderance of the evidence that they are entitled to the protections of that provision. [FN469]

FN469. Emerald Partners, 787 A.2d at 95.

### A. Ovitz Did Not Breach His Duty of Loyalty

[1] As previously mentioned, the only issue remaining in this case with respect to the traditional duty of loyalty (aside from whether there is an overlap between loyalty and good faith) is whether Ovitz breached his fiduciary duty of loyalty in the course of his termination. [FN470] Before trial, Ovitz moved for summary judgment on this claim, a motion I denied on the ground that genuine issues of material fact existed which prevented entry of summary judgment in favor of Ovitz at that time. [FN471] More specifically, I recognized:

FN470. The Court notes that plaintiffs' statement of issues of law and fact to be litigated contained in the




Pre-Trial Stipulation and Order repeatedly uses the phrase "fiduciary duties of due care, good faith, and/or loyalty" regardless of the challenged conduct. To the extent plaintiffs are still pursuing pure duty of loyalty claims other than this claim related to Ovitz's actions in receiving his NFT, as to those claims, plaintiffs have failed to demonstrate by a preponderance of the evidence that the defendants breached their fiduciary duty of loyalty.

FN471. *Disney III,* 2004 WL 2050138, at *6-8.

... *if* Ovitz received a[n] NFT, [then] he had a contractual right to receive the payout he did receive. But Ovitz did not have a contractual right to receive a[n] NFT.... Instead, Ovitz's receipt of a[n] NFT was conditioned upon a one-time determination (to be made by [the Company] ) that was not guaranteed by his contract, and Ovitz appears to have actively engaged in negotiations and decisionmaking that affected [the Company]'s determination to grant the NFT.
Ovitz negotiated his exit from [the Company] with Eisner, Russell, and others. He made a conscious decision not to resign and to seek the benefits that his contract made available to him only under certain prescribed circumstances. Ovitz allegedly colluded with those on the other side of the bargaining table ... in bringing about the circumstances that would entitle him to his NFT benefits. In so doing, he allegedly manipulated corporate processes and thereby violated his fiduciary duties to [the Company]. [FN472]

FN472. *Id.* at *7.

Now, upon consideration of the evidence presented at trial, and based upon the findings of fact made above, it is clear that plaintiffs have failed to demonstrate by a preponderance of the evidence that Ovitz breached his duty of loyalty.

Ovitz did not breach his fiduciary duty of loyalty by receiving the NFT payment because he played no part in the decisions: [FN473] (1) to be terminated and (2) that the termination would not be for cause under the OEA. [FN474] Ovitz did possess fiduciary duties as a director and officer while these decisions were made, but by not improperly interjecting himself into the corporation's decisionmaking process nor manipulating that process, he did not breach the fiduciary duties he

possessed in that unique circumstance. Furthermore, Ovitz did not "engage" in a transaction with the corporation-- rather, the corporation imposed an unwanted transaction upon him. [FN475]

FN473. I ignore the subtlety that at the moment Ovitz received the monetary payout for the NFT he was no longer a fiduciary, his directorship and status as an officer having ended in no event later than December 27, 1996. *See* PTE 14.

FN474. *See supra* text "Ovitz's Bonus and His Termination" at 80.

FN475. For this reason, a discussion of the application of 8 *Del. C.* § 144 is not necessary. Such discussion was appropriate, however, at the summary judgment stage when I inferred (to plaintiffs' benefit) that Ovitz involved himself in the Company's decision ("manipulated corporate processes") to grant him an NFT. *See Disney III,* 2004 WL 2050138, at *7.

**\*38** Once Ovitz was terminated without cause (as a result of decisions made entirely without input or influence from Ovitz), he was contractually entitled, without any negotiation or action on his part, to receive the benefits provided by the OEA for a termination without cause, benefits for which he negotiated at arms-length *before* becoming a fiduciary. [FN476] No reasonably prudent fiduciary in Ovitz's position would have unilaterally determined to call a board meeting to force the corporation's chief executive officer to reconsider his termination and the terms thereof, [FN477] with that reconsideration for the benefit of shareholders and potentially to Ovitz's detriment. [FN478]

FN476. *See Disney III,* 2004 WL 2050138, at *3-6.

FN477. Ovitz, as President, did have the authority to call a special board meeting by himself. *See* PTE 498 at Article III, Section 5.

FN478. Indeed, if Ovitz had called a special meeting of the board in order to force Eisner to reconsider the issues regarding his termination, that act would, in my mind, raise greater issues relating to a potential breach of Ovitz's duty of loyalty than not calling a meeting.

Furthermore, having just been terminated, no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




reasonably prudent fiduciary in Ovitz's shoes would have insisted on a board meeting to discuss and ratify his termination after being terminated by the corporation's *chief executive officer* (with guidance and assistance from the Company's general counsel). Just as Delaware law does not require directors-to-be to comply with their fiduciary duties, [FN479] former directors owe no fiduciary duties, and after December 27, 1996, Ovitz could not breach a duty he no longer had.

> FN479. *Disney III,* 2004 WL 2050138, at *3-4.

Having found that Ovitz did not play a part in the decision to terminate himself, and that ordinary officers and directors of reasonable prudence in the same position would not have acted with more care, I conclude that Ovitz did not breach his fiduciary duty of loyalty in connection with his termination.

*B. Defendants Did Not Commit Waste*

[2] Plaintiffs pursued a claim for waste at trial and argued in their briefs that they have proven this claim. [FN480] As stated above, the standard for waste is a very high one that is difficult to meet. [FN481] Plaintiffs refer to Professor Murphy's opinion that the OEA improperly incentivized Ovitz to leave the Company and receive an NFT, rather than complete the term of the OEA, to support their argument for waste. [FN482] Of course, Professor Murphy's opinion relies on the assumptions that either Ovitz would be able to procure for himself an NFT, or that Eisner had agreed to terminate him even before Ovitz was hired.

> FN480. Ovitz had moved for summary judgment on the waste claim, but neither party addressed it in the summary judgment briefing or at oral argument, and the motion for summary judgment was therefore denied. *Disney III,* 2004 WL 2050138, at *6.

> FN481. *See supra* notes 419-420 and accompanying text.

> FN482. PTE 426 at 22-23.

The record does not support these assertions in any conceivable way. Apart from his job performance, Ovitz was never in a position to determine if he would be terminated, and if so, whether it would be with or without cause. As it relates to job performance, I find it patently unreasonable to assume that Ovitz intended to perform just poorly enough to be fired quickly, but not so poorly that he could be terminated for cause. First, based upon my personal observations of Ovitz, he possesses such an ego, and enjoyed such a towering reputation before his employment at the Company, that he is not the type of person that would intentionally perform poorly. Ovitz did not build Hollywood's premier talent agency by performing poorly. Second, nothing in the trial record indicates to me that Ovitz intended to bring anything less than his best efforts to the Company. Additionally, I have found and concluded above that Eisner believed Ovitz would be an excellent addition to the company throughout 1995, [FN483] a far cry from plaintiffs' accusations of deciding to hire him for the purpose of firing him shortly thereafter with a spectacular severance payoff.

> FN483. *See supra* text "Ovitz's Early Performance" at 32.

*39 More importantly, however, I conclude that given his performance, Ovitz could not have been fired for cause under the OEA. Any early termination of his employment, therefore, had to be in the form of an NFT. In reaching this conclusion, I rely on the expert reports of both Feldman and Fox, whose factual assumptions are generally consonant with my factual findings above. Nevertheless, by applying the myriad of definitions for gross negligence and malfeasance discussed by Donohue, Feldman and Fox, I also independently conclude, based upon the facts as I have found them, that Ovitz did not commit gross negligence or malfeasance while serving as the Company's President.

As a result, terminating Ovitz and paying the NFT did not constitute waste because he could not be terminated for cause and because many of the defendants gave credible testimony that the Company would be better off without Ovitz, [FN484] meaning that it would be impossible for me to conclude that the termination and receipt of NFT benefits resulted in "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration," [FN485] or a situation where the defendants have "irrationally squander[ed] or give[n] away corporate assets." [FN486] In other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




words, defendants did not commit waste.

FN484. *See supra* note 326.

FN485. *Brehm,* 746 A.2d at 263; *Disney I,* 731 A.2d at 362 (quoting *Glazer,* 658 A.2d at 183.)

FN486. *Brehm,* 746 A.2d at 263.

*C. The Old Board's Decision to Hire Ovitz and the Compensation Committee's Approval of the OEA Was Not Grossly Negligent and Not in Bad Faith*

The members of the "Old Board" (Eisner, Bollenbach, Litvack, Russell, Roy Disney, Gold, Nunis, Poitier, Stern, Walker, Watson, Wilson, Bowers, Lozano and Mitchell) were required to comply with their fiduciary duties on behalf of the Company's shareholders while taking the actions that brought Ovitz to the Company. For the future, many lessons of what not to do can be learned from defendants' conduct here. Nevertheless, I conclude that the only reasonable application of the law to the facts as I have found them, is that the defendants did not act in bad faith, and were at most ordinarily negligent, in connection with the hiring of Ovitz and the approval of the OEA. In accordance with the business judgment rule (because, as it turns out, business judgment *was* exercised), ordinary negligence is insufficient to constitute a violation of the fiduciary duty of care. I shall elaborate upon this conclusion as to each defendant.

*1. Eisner*

[3] Eisner was clearly the person most heavily involved in bringing Ovitz to the Company and negotiating the OEA. He was a long-time friend of Ovitz and the instigator and mastermind behind the machinations that resulted in Ovitz's hiring and the concomitant approval of the OEA. In that aspect, Eisner is the most culpable of the defendants. He was pulling the strings; he knew what was going on. On the other hand, at least as the duty of care is typically defined in the context of a business judgment (such as a decision to select and hire a corporate president), of all the defendants, he was certainly the most informed of all reasonably available material information, making him the least culpable in that regard.

**\*40** This dichotomy places the Court in a somewhat

awkward position. By virtue of his Machiavellian (and imperial) nature as CEO, and his control over Ovitz's hiring in particular, Eisner to a large extent is responsible for the failings in process that infected and handicapped the board's decisionmaking abilities. [FN487] Eisner stacked his (and I intentionally write "his" as opposed to "the Company's") board of directors with friends and other acquaintances who, though not necessarily beholden to him in a legal sense, were certainly more willing to accede to his wishes and support him unconditionally than truly independent directors. [FN488] On the other hand, I do not believe that the evidence, considered fairly, demonstrates that Eisner actively took steps to defeat or short-circuit a decisionmaking process that would otherwise have occurred.

FN487. It is precisely in this context--an imperial CEO or controlling shareholder with a supine or passive board--that the concept of good faith may prove highly meaningful. The fiduciary duties of care and loyalty, as traditionally defined, may not be aggressive enough to protect shareholder interests when the board is well advised, is not legally beholden to the management or a controlling shareholder and when the board does not suffer from other disabling conflicts of interest, such as a patently self-dealing transaction. Good faith may serve to fill this gap and ensure that the persons entrusted *by shareholders* to govern Delaware corporations do so with an honesty of purpose and with an understanding of whose interests they are there to protect. In a thoughtful article, Professor Lyman Johnson has written about the richer historical and literary understanding of loyalty and care, beyond their more narrow "non-betrayal" and "process" uses in contemporary jurisprudence. Professor Johnson's description of a more expansive duty of loyalty to encompass affirmative attention and devotion may, in my opinion, fit comfortably within the concept of good faith (or vice versa) as a constituent element of the overarching concept of faithfulness. *See* Lyman P.Q. Johnson, *After Enron: Remembering Loyalty Discourse in Corporate Law,* 28 DEL. J. CORP. LAW 27 (2003).

FN488. Some of this deference may be due, at least in part, to Eisner's success at the Company's helm in the eleven years preceding these events. Tr. 4131:20-4133:1. Nevertheless, the board's collective kowtowing in regard to Ovitz's hiring is also due to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Eisner's desire to surround himself with yes men. *See* 3845:20-3847:3 (Gold) (testifying that he believes that Bowers, Poitier, Stern, Watson and Mitchell were not competent as board members). As examples of Eisner's success at surrounding himself with non-employee directors who would have sycophantic tendencies: Russell was Eisner's personal attorney, Tr. 2650:10-2651:7; Mitchell was hand-selected by Eisner to serve on the board, Tr. 5627:18-5628:2, and now serves as chairman, a position which provides Mitchell with substantial remuneration worth about $500,000 annually, Tr. 5629:9-24; Reveta Bowers is an administrator of a private school in West Hollywood, California, Tr. 5901:11-5903:9, that was attended by three of Eisner's children, Tr. 5944:24-5945:8, and to which Eisner and entities related to the Company have made substantial contributions, Tr. 5945:9-5947:16; O'Donovan was president of Georgetown University from 1989 to 2001, Tr. 6710:7-6711:15, (Eisner served on Georgetown University's board of directors from 1985 to 1991, Tr. 6712:16-24) where Eisner's son attended college until 1992, Tr. 6712:16-6713:3, and to which Eisner made a $1 million donation in 1996 at O'Donovan's request, Tr. 6713:4-16.

Eisner had demonstrated a desire to bring Ovitz to the Company before mid-1995. His efforts to actually hire Ovitz became more intense in the summer of 1995, culminating in the signing of the OLA on August 14 of that year, together with the press release issued that same day. Eisner obtained no consent or authorization from the board before agreeing to hire Ovitz, before agreeing to the substantive terms of the OLA, or before issuing the press release. [FN489] Indeed, outside of his small circle of confidantes, it appears that Eisner made no effort to inform the board of his discussions with Ovitz until after they were essentially completed and an agreement in principle had been reached.

> FN489. Nevertheless, I do not doubt that Eisner was entirely convinced that the board would support him in this decision.

As a general rule, a CEO has no obligation to continuously inform the board of his actions as CEO, or to receive prior authorization for those actions. [FN490] Nevertheless, a reasonably prudent CEO (that is to say, a reasonably prudent CEO with a board willing to think for itself and

assert itself against the CEO when necessary) would not have acted in as unilateral a manner as did Eisner when essentially committing the corporation to hire a second-in-command, appoint that person to the board, and provide him with one of the largest and richest employment contracts ever enjoyed by a non-CEO. I write, "essentially committing," because although I conclude that legally, Ovitz's hiring was not a "done deal" as of the August 14 OLA, [FN491] it was clear to Eisner, Ovitz, and the directors who were informed, that as a practical matter, it certainly was a "done deal." [FN492]

> FN490. In a corporation of the Company's size and scope, the only logical way for the corporation to operate is that the everyday governance should be "under the direction" of the board of directors rather than "by" the board. More than twenty years ago, this Court wrote (and it is even more true today):
>
> A fundamental precept of Delaware corporation law is that it is the board of directors, and neither shareholders nor managers, that has ultimate responsibility for the management of the enterprise. Of course, given the large, complex organizations though which modern multi-function business corporations often operate, the law recognizes that corporate boards, comprised as they traditionally have been of persons dedicating less than all of their attention to that role, cannot themselves manage the operations of the firm, but may satisfy their obligations by thoughtfully appointing officers, establishing or approving goals and plans and monitoring performance. Thus Section 141(a) of DGCL expressly permits a board of directors to delegate managerial duties to officers of the corporation, except to the extent that the corporation's certificate of incorporation or bylaws may limit or prohibit such a delegation.
>
> *Grimes v. Donald*, 402 A.2d 1205, 1211 (Del.Ch.1979) (quoting *Abercrombie v. Davies*, 123 A.2d 893, 899 (Del.Ch.1956)), *aff'd sub nom. Harrison v. Chapin*, 415 A.2d 1068 (Del.1980).

> FN491. The OLA's opening paragraph stated, "This will confirm our arrangement under which you will become employed by [the Company]. *Subject to the formal approval of the Company's Board of Directors and its Compensation Committee*, we have agreed that...." PTE 60 at DD002932 (emphasis added). The footnote in the summary judgment opinion in this case, *Disney III*, 2004 WL 2050138, at *6 n. 54, that Ovitz was likely legally bound by





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *40 (Del.Ch.))

the OLA as of October 1, 1995, is not contradicted by my conclusion here that the Company was not legally bound until at least September 26, 1995.

FN492. Tr. 2807:13-23; 3572:3-23; 3708:7-17; 6827:8-19; 7693:24- 7694:6; 8198:5-21.

After August 14, the record seems to indicate that Eisner's role in Ovitz's hiring lessened, as Russell continued the substantive negotiations with Ovitz while Santaniello worked on drafting the OEA. Eisner did not attend the portion of the compensation committee meeting on September 26 where Ovitz's hiring and the key terms of the OEA were discussed and voted upon, [FN493] but he did lead the discussion in the full board meeting that same day with respect to Ovitz's election as President of the Company. [FN494] Eisner's involvement in the final stages of drafting and executing the OEA were minimal.

FN493. PTE 39 at WD01170.

FN494. PTE 29 at WD01196.

**\*41** Because considerations of improper motive are no longer present in this case, [FN495] the decision to hire Ovitz and enter into the OEA is one of business judgment, to which the presumptions of the business judgment rule apply. In order to prevail, therefore, plaintiffs must demonstrate by a preponderance of the evidence that Eisner was either grossly negligent or acted in bad faith in connection with Ovitz's hiring and the approval of the OEA.

FN495. *See Brehm,* 746 A.2d at 257-58 & n. 42 (holding "that the Complaint fails to create a reasonable doubt that Eisner was disinterested in the [OEA]," and concluding that further inquiry into the independence of the other directors would be unnecessary, and that plaintiffs would not be permitted to relitigate this claim after amending the complaint).

As I mentioned earlier, Eisner was very much aware of what was going on as the situation developed. In the limited instances where he was not the primary source of information relating to Ovitz, Russell kept Eisner informed of negotiations with Ovitz. Eisner knew Ovitz; he was familiar with the career Ovitz had built at CAA and he knew that the Company was in need of a senior executive,

especially in light of the upcoming CapCities/ABC merger. In light of this knowledge, I cannot find that plaintiffs have demonstrated by a preponderance of the evidence that Eisner failed to inform himself of all material information reasonably available or that he acted in a grossly negligent manner.

Notwithstanding the foregoing, Eisner's actions in connection with Ovitz's hiring should not serve as a model for fellow executives and fiduciaries to follow. His lapses were many. He failed to keep the board as informed as he should have. He stretched the outer boundaries of his authority as CEO by acting without specific board direction or involvement. He prematurely issued a press release that placed significant pressure on the board to accept Ovitz and approve his compensation package in accordance with the press release. To my mind, these actions fall far short of what shareholders expect and demand from those entrusted with a fiduciary position. Eisner's failure to better involve the board in the process of Ovitz's hiring, usurping that role for himself, although not in violation of law, [FN496] does not comport with how fiduciaries of Delaware corporations are expected to act.

FN496. Eisner's authority to take these actions was not restricted in any way by statute, the Company's certificate of incorporation, bylaws, or a board resolution.

Despite all of the legitimate criticisms that may be leveled at Eisner, especially at having enthroned himself as the omnipotent and infallible monarch of his personal Magic Kingdom, I nonetheless conclude, after carefully considering and weighing all the evidence, that Eisner's actions were taken in good faith. That is, Eisner's actions were taken with the subjective belief that those actions were in the best interests of the Company--he believed that his taking charge and acting swiftly and decisively to hire Ovitz would serve the best interests of the Company notwithstanding the high cost of Ovitz's hiring and notwithstanding that two experienced executives who had arguably been passed over for the position (Litvack and Bollenbach) were not completely supportive. [FN497] Those actions do not represent a knowing violation of law or evidence a conscious and intentional disregard of duty. In conclusion, Eisner acted in good faith and did not breach his fiduciary duty of care because he was not grossly negligent.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *41 (Del.Ch.))

FN497. Eisner's stellar track record as the Company's Chairman and CEO over the preceding eleven years (from 1984 to 1995) bolsters his belief that his decisions generally benefit the Company and its shareholders.

## 2. Russell

***42** [4] Apart from Eisner, Russell, who was familiar with the Company's compensation policies and practices from his service as chairman of the Company's compensation committee, was the next most heavily involved director in hiring Ovitz, as he was the main negotiator on behalf of the Company. [FN498] Russell was also closely involved with Watson and Crystal in shaping and extensively analyzing Ovitz's proposed compensation. [FN499] Russell spoke to Poitier on two occasions in mid-August 1995 to discuss the terms of Ovitz's compensation, and he knew that Watson would speak with Lozano. [FN500] Additionally, on September 26, 1995, Russell led the discussion at the compensation committee meeting regarding the proposed terms for the OEA, and then reported on that meeting during the full board meeting shortly thereafter. [FN501]

FN498. Tr. 2314:20-2384:13; 2391:9-2516:8.

FN499. Tr. 2425:14-2435:4; 2441:10-2445:16; 2453:5-2476:14; 2485:22- 2502:17.

FN500. Tr. 2445:12-2451:19; 2453:5-18.

FN501. PTE 39 at WD01170; PTE 29 at WD01197; Tr. 2517:7-2536:23.

The compensation committee's charter indicates that the committee has the power to "establish the salaries" of the Company's CEO and COO/ President, together with benefits and incentive compensation, including stock options, for those same individuals. [FN502] In addition to this power, the committee's charter charges it with the duty to "approve employment contracts, or contracts at will," for "all corporate officers who are members of the Board of Directors regardless of salary." [FN503]

FN502. PTE 187 (charter as of May 1, 1993); PTE 465 (essentially duplicative of PTE 187); PTE 47 (charter as of Jan. 19, 1996).

FN503. PTE 187; PTE 47.

Plaintiffs have argued that Russell exceeded the scope of his authority as chairman of the compensation committee by negotiating with Ovitz on behalf of the Company. [FN504] Although it is true that nothing in the compensation committee's charter specifically grants authority to the committee to negotiate (as opposed to simply approve) employment contracts, there is no language in the charter that would indicate that the committee does not have this power. Indeed, the contrary appears to be the case. The charter distinguishes between "establish[ing]" salaries for the CEO and COO/ President and "approv[ing]" salaries for those individuals, together with many others. [FN505]

FN504. See Tr. 2676:11-2678:19. Although it would have been ideal if the other members of the compensation committee were more substantively involved in those negotiations, it would certainly be unwieldy as a practical matter to require the entire committee, together and as a whole, to negotiate on the Company's behalf.

FN505. PTE 187; PTE 47. The very definition of "establish" contemplates some form of negotiation or molding where "approve" does not. Black's defines establish as including the following definitions:
... To make or form; ... To found, to create, to regulate....
....
To bring into being; to build; to constitute; to create; to erect; to form; to found; to found and regulate, to institute, to locate, to make; to model; to organize; to originate; to prepare; to set up.
BLACK'S LAW DICTIONARY 642-43 (Rev. 4th ed.1968). Approve is defined as "[t]o be satisfied with; to confirm, ratify, sanction, or consent to some act or thing done by another; to sanction officially; to ratify; to confirm...." Id. at 132. These definitions lead me to believe that it would be perfectly reasonable for Russell and others to believe that it was appropriate for the compensation committee to negotiate with Ovitz the terms of his employment. Nevertheless, Russell did testify that it was not normally the compensation committee's role to negotiate. Tr. 2906:6- 2907:10.

In negotiating with Ovitz, Russell became privy to a great deal of information with respect to Ovitz. Ovitz's representatives relayed some of that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2005 WL 2056651, *42 (Del.Ch.))

information to Russell. General information about Ovitz also was common knowledge to those in the entertainment industry. Russell did not independently and objectively verify the representations made by Ovitz's negotiators that his income from CAA was $20 to $25 million annually because Russell, based upon his pre-existing knowledge, believed that representation to be accurate. [FN506] Nonetheless, I conclude that Russell negotiated with Ovitz at arms' length.

> FN506. Tr. 2352:3-2363:13; 2402:6-21; 2755:2-2757:10.

Would the better course of action have been for Russell to have objectively verified Ovitz's income from CAA? Undoubtedly, yes. Would it have been better if Russell had more rigorously investigated Ovitz's background in order to uncover his past troubles with the Department of Labor? [FN507] Yes. Would the better course of action have been for someone other than Eisner's personal attorney to represent the Company in the negotiations with Ovitz? Again, yes. Have plaintiffs shown by a preponderance of the evidence that Russell's actions on behalf of the Company were *grossly* negligent (in that he failed to inform himself of all material information *reasonably* available in making decisions) or that he acted in bad faith? No. I conclude that Russell for the most part knew what he needed to know, did for the most part what he was required to do, and that he was doing the best he thought he could to advance the interests of the Company by facilitating a transaction that would provide a legitimate potential successor to Eisner and provide the Company with one of the entertainment industry's most influential individuals.

> FN507. *See* PTE 151 at DD000460. This article reports that the news of Ovitz's problems with the Department of Labor, although reported publicly, was swept under the rug by the press, essentially making that information less reasonably available to Russell. *See also* PTE 8 at DD002131.

3. *Watson*

*43 [5] Watson's main role in Ovitz's hiring and his election as President of the Company was helping Russell evaluate the financial ramifications of the OEA. [FN508] Watson is a past Chairman of the Company's board, and served in that position when Eisner and Wells were hired in 1984. [FN509] Watson was familiar with Crystal, having worked with him on Eisner's and Wells' contracts in 1984 and again in 1989. [FN510]

> FN508. Tr. 7822:1-7823:7. Russell phoned Watson on several occasions beginning on August 2, 1995. *See* DTE 120 at WD07493-95.

> FN509. Tr. 7803:8-7813:6.

> FN510. Tr. 7825:18-7827:8.

Watson conducted extensive analyses of Ovitz's proposed compensation package, sharing those analyses with Crystal and Russell at their meeting on August 10, and in their later discussions stemming from that meeting. [FN511] He was also involved in determining how to replace the proposed option guarantee with the extended exercisability of Ovitz's options (together with other features). [FN512] He also spoke with Lozano (although the date is unclear) sometime before the September 26, 1995 compensation committee meeting in order to inform him somewhat of his and Russell's analyses and discussions. [FN513] Watson attended the September 26, 1995 compensation committee meeting and voted in favor of the resolution approving the terms of the OEA. [FN514]

> FN511. Tr. 7827:17-7829:15.

> FN512. Tr. 7836:5-7846:2.

> FN513. Tr. 7833:11-7834:2; 8082:12-8088:9.

> FN514. PTE 39 at WD01170.

Watson was familiar with making executive compensation decisions at the Company. Nothing in his conduct leads me to believe that he took an "ostrich-like" approach to considering and approving the OEA. Nothing in his conduct leads me to believe that Watson consciously and intentionally disregarded his duties to the Company. Nothing in his conduct leads me to believe that Watson had anything in mind other than the best interests of the Company when evaluating and consenting to Ovitz's compensation package. Finally, nothing in his conduct leads me to believe that Watson failed to inform himself of all material

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information reasonably available before making these decisions. In short, I conclude that plaintiffs have not demonstrated by a preponderance of the evidence that Watson either breached his fiduciary duty of care or acted in anything other than good faith in connection with the hiring of Ovitz and the approval of the economic terms of the OEA.

### 4. *Poitier and Lozano*

[6] Poitier and Lozano were the remaining members of the compensation committee that considered the economic terms of the OEA. It is not disputed that they were far less involved in the genesis of the OEA than were Russell, and to a lesser extent, Watson. The question in dispute is whether their level of involvement in the OEA was so low as to constitute gross negligence and, therefore, a breach of their fiduciary duty of care, or whether their actions evidence a lack of good faith. As will be shown, I conclude that neither of these men acted in a grossly negligent manner or in bad faith.

Poitier is a man celebrated for his work both within and outside the entertainment industry. [FN515] Poitier was elected to the Company's board of directors in 1994, and attended his first board meeting during January of 1995. [FN516] Lozano was the publisher of the nation's largest Spanish language daily newspaper, is the former chairman of the board of that entity, and also served as the United States' ambassador to El Salvador. [FN517] Lozano had a long tenure on the Company's board of directors, serving from the early 1980s until 2001. [FN518] Lozano also has experience on the compensation committees of other corporations. [FN519]

FN515. *See* Tr. 7101:19-7116:20; 7118:8-7119:8; 7122:1-7123:5.

FN516. Tr. 7123:6-7124:15.

FN517. *See* Tr. 7623:5-7624:14.

FN518. Tr. 7624:15-7625:3; 7628:3-7.

FN519. Tr. 7628:11-15.

*44 There is no question that Poitier and Lozano's involvement in the process of Ovitz's hiring came very late in the game. As found above, Poitier

received a call from Russell on August 13 (and another the next day), during which they discussed the terms of the proposed OLA. [FN520] Lozano spoke with Watson regarding this same subject. It appears that neither Poitier nor Lozano had any further involvement with the hiring process, apart from these phone calls, until the September 26, 1995 compensation committee meeting.

FN520. *See* Tr. 2445:22-2447:13.

At that meeting, both Poitier and Lozano received the term sheet that explained the key terms of Ovitz's contract, and they were present for and participated in the discussion that occurred. Both then voted to approve the terms of the OEA, and both credibly testified that they believed they possessed sufficient information at that time to make an informed decision. [FN521] Plaintiffs largely point to two perceived inadequacies in this meeting (and in Poitier and Lozano's business judgment) [FN522]--first, that insufficient time was spent reviewing the terms of Ovitz's contract and, second, that Poitier and Lozano were not provided with sufficient documentation, including Crystal's correspondence, Watson's calculations, and a draft of the OEA. [FN523] These arguments understandably hearken back to *Van Gorkom,* where the Supreme Court condemned the Trans Union board for agreeing to a material transaction after a board meeting of about two hours and without so much as a term sheet of the transaction as contemplated. [FN524] Although the parallels between *Van Gorkom* and this case at first appear striking, a more careful consideration will reveal several important distinctions between the two.

FN521. Tr. 7136:23-7137:3; 7634:18-23; 7636:2-10.

FN522. Because I have rejected plaintiffs' argument that Ovitz's hiring was legally a "done deal" as of August 14, 1995 because the OLA was expressly subject to the approval of the board and compensation committee, the amount of contact that Poitier and Lozano did or did not have with Russell and Watson before September 26, 1995, is immaterial. *But see Van Gorkom,* 488 A.2d at 884 (concluding that Trans Union's press release of October 9, *together with* the amendments to the merger agreement executed October 10, "had the clear effect of locking Trans Union's Board into the Pritzker Agreement"). Poitier and Lozano made a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2005 WL 2056651, *44 (Del.Ch.))

decision on September 26, 1995 when they voted to approve the terms of his contract. As a result, their level of knowledge or involvement before that date is only relevant insofar as it informs the Court as to their accumulated knowledge on September 26, 1995, when the business judgment was made. For this reason, it is also irrelevant that Poitier and Lozano did not attend the meeting between Russell, Watson and Crystal on August 10; nor is their failure to attend the meeting (or even be invited) evidence that Russell or Watson were shirking their duties by working by themselves without the other two members of the committee. Certainly the more ideal scenario would have been for Poitier and Lozano to have been both better qualified and more involved, but again, defendants' conduct is not measured against the best practices of corporate governance.

FN523. The upcoming discussion would apply with equal force to Russell and Watson, and the conclusions made herein are implicit in the conclusions reached above with regard to their actions.

FN524. 488 A.2d at 868-69 (the board meeting lasted "about two hours," the board's decision was solely based upon oral statements and presentations, and copies of the proposed merger agreement were not available). Those oral representations and presentations were materially misleading and not consistent with the executed merger agreement. *Id.* at 870, 875, 879-80.

First and foremost, the nature of the transaction in *Van Gorkom* is fundamentally different, and orders of magnitude more important, than the transaction at issue here. In *Van Gorkom,* the Trans Union board was called into a special meeting on less than a day's notice, without notice of the reason for the meeting, to consider a merger agreement that would result in the sale of the entire company. [FN525] As footnoted above, [FN526] Delaware law, *as a matter of statute,* requires directors to take certain actions in connection with a merger of the corporation, as was being contemplated by Trans Union. [FN527] No statute required the Company's board to take action in connection with Ovitz's hiring. The Company's governing documents provide that the officers of the corporation will be selected by the board of directors, [FN528] and the charter of the compensation committee states that the committee is responsible for establishing and

approving the salary of the Company's President. [FN529] That is exactly what happened. [FN530] The board meeting was not called on short notice, and the directors were well aware that Ovitz's hiring would be discussed at the meeting as a result of the August 14 press release more than a month before. [FN531] Furthermore, analyzing the transactions in terms of monetary value, and even accepting plaintiffs' experts' bloated valuations for comparison purposes, it is beyond question that the $734 million sale [FN532] of Trans Union was material and significantly larger than the financial ramifications to the Company of Ovitz's hiring. [FN533]

FN525. *Id.* at 867.

FN526. *See supra* note 460.

FN527. *See* 8 *Del. C.* § 251(b).

FN528. DTE 184 at Article Tenth; PTE 1 at Article Tenth; DTE 185 at Article Tenth.

FN529. PTE 187; PTE 47.

FN530. PTE 39 at WD01170; PTE 29 at WD01196.

FN531. The directors were also aware generally that, for some time, the Company had been looking for an executive to replace Wells.

FN532. 13,357,758 shares outstanding, multiplied by $55 per share. 488 A.2d at 864, 869. The reader should bear in mind that the $734 million figure is a nominal one almost twenty-five years old--expressed in 1995 dollars, that number would be higher.

FN533. Eisner's decision to enter into the OLA with Ovitz, and the compensation committee's later decision to approve the economic terms of the OEA on September 26, 1995, have to be understood in context. In fiscal 1996, the Company had almost $19 billion in revenues, and more than $3 billion in operating income. PTE 442 at WD02085. Roth, below both Eisner and Ovitz in the chain of command, had authority to budget the development and marketing of feature films, apparently without prior authorization from Eisner, Ovitz or the board. *See supra* note 149. According to a contemporary memorandum written by Eisner, an average live-action feature film cost $33 million to develop and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





another $19 million to market and distribute, for a total cost of $52 million per film. PTE 558 at WD08652. Disney had budgeted thirty such live-action feature films for fiscal 1996, though Eisner expected that number to decline by one-third in the coming years. *Id.;* PTE 587 at WD10772. Eisner also believed that Roth was responsible for losses of $60 million attributable only to three films, and that his expenditures were $90 million "more than what was prudent." PTE 67 at DD002980; *see* PTE 587 at WD10767 (two box office failures alone resulted in a $45 million negative variance to profit forecasts). The big-budget summer blockbuster, *The Rock,* was expected to cost $122.9 million ($67 million in development, and another $55.9 million in distribution and marketing), and *Ransom,* to be released just two weeks after *The Rock,* was expected to cost $126 million ($68.6 million in production, and $57.4 in distribution and marketing). *Id.* at WD10772. Between these two motion pictures alone, Roth had the authority to spend almost $250 million, with an expected profit of ten percent. *Id.* If Roth had this much authority, the proposition that Eisner, the Company's chief executive officer, entered into the OLA without prior board authorization, or that the compensation committee approved Ovitz's contract based upon a term sheet and upon less than an hour of discussion, seems eminently reasonable given the OEA's (relatively small) economic size.

**\*45** Second, the Trans Union board met for about two hours to discuss and deliberate on this monumental transaction in the life of Trans Union. A precise amount of time for the length of the compensation committee meeting, and more specifically, the length of the discussion regarding the OEA, is difficult to establish. The minutes of the compensation committee's meeting and the full board's meeting indicate that the compensation committee meeting convened at 9:00 a.m., and that the full board's meeting convened at 10:00 a.m., leaving no more than an hour for the compensation committee to meet. [FN534] Lozano, although he had little recollection of the meeting, believed that the compensation committee meeting ran long--until 10:30 a.m. [FN535] As I found above, the meeting lasted about an hour. Russell testified that the discussion of the OEA took about 25-30 minutes, [FN536] significantly more time than the brief discussion reflected in the minutes would seem to indicate. [FN537] Lozano believed that the

committee spent "perhaps four times as much time on Mr. Ovitz's contract than we did on Mr. Russell's compensation." [FN538]

FN534. PTE 29 at WD01194; PTE 39 at WD01167; Tr. 7188:17-7211:3.

FN535. Tr. 7641:16-7642:2; 7714:12-24.

FN536. Tr. 2857:10-2863:18.

FN537. Tr. 2535:10-2536:23; 2838:8-2851:2; 2854:16-2857:4.

FN538. Tr. 7638:13-22.

I am persuaded by Russell and Lozano's recollection that the OEA was discussed for a not insignificant length of time. [FN539] Is that length of time markedly less than the attention given by the Trans Union board to the merger agreement they were statutorily charged with approving or rejecting? Yes. Is that difference probative on the issue of whether the compensation committee adequately discussed the OEA? Not in the least. When the Trans Union board met for those two hours, it was the very first time any of those directors had discussed a sale of the company. [FN540] Here, all the members of the committee were aware in advance that Ovitz's hiring would be discussed, and the members of the committee had also previously had more than minimal informal discussions amongst themselves as to the *bona fides* of the OEA before the meeting ever occurred. Furthermore, as mentioned above, the nature and scope of the transactions are fundamentally different.

FN539. It would have been extremely helpful to the Court if the minutes had indicated in any fashion that the discussion relating to the OEA was longer and more substantial than the discussion relating to the myriad of other issues brought before the compensation committee that morning.

FN540. *See* 488 A.2d at 875.

Third, the Trans Union board had absolutely no documentation before it when it considered the merger agreement. [FN541] The board was completely reliant on the misleading and uninformed presentations given by Trans Union's officers (Van





Gorkom and Romans). [FN542] In contrast, the compensation committee was provided with a term sheet of the key terms of the OEA and a presentation was made by Russell (assisted by Watson), who had personal knowledge of the relevant information by virtue of his negotiations with Ovitz and discussions with Crystal. Additionally, the testimony and documentary evidence support this conclusion. [FN543] It is true that the compensation committee did not review and discuss the then-existing draft of the full text of the OEA. This, however, is not required. [FN544] Nor is it necessary for an expert to make a formal presentation at the committee meeting in order for the board to rely on that expert's analysis, although that certainly would have been the better course of action. [FN545] Furthermore, the Company's compensation committee reasonably and wisely left the task of negotiating and drafting the actual text of the OEA in the hands of the Company's counsel. [FN546]

FN541. *Id.*

FN542. *Id.* at 874-78.

FN543. *But see id.* at 878-80 (defendants' testimony that the availability of a "market test" had been discussed was negated by their inability to produce and identify the original merger agreement and that the minutes of the meeting contained no reference to a discussion of Trans Union's right to a market test; defendants' testimony that they relied on counsel was negated by the failure of that counsel to testify, even though his firm participated in the defense).

FN544. *See id.* at 883 n. 25.

FN545. In *Van Gorkom,* the Trans Union board did not invite the company's investment banker, Salomon Brothers, to attend the board meeting, and Van Gorkom instead had Trans Union's chief financial officer state that the $55 per share figure was " 'in the range of a fair price' " but also that "his studies did not indicate either a fair price for the stock or a valuation of the Company [and] that he did not see his role as directly addressing the fairness issue." *Id.* at 867-68.

FN546. *See* Tr. 2530:16-2531:14; 7847:9-7848:15.

**\*46** Fourth, Trans Union's senior management completely opposed the merger.    [FN547] In

contrast, the Company's senior management generally saw Ovitz's hiring as a boon for the Company, notwithstanding Litvack and Bollenbach's initial personal feelings. [FN548] In sum, although Poitier and Lozano did very little in connection with Ovitz's hiring and the compensation committee's approval of the OEA, they did not breach their fiduciary duties. I conclude that they were informed by Russell and Watson of all *material* information reasonably available, even though they were not privy to every conversation or document exchanged amongst Russell, Watson, Crystal and Ovitz's representatives.

FN547. *Van Gorkom,* 488 A.2d at 867-68.

FN548. *See* Tr. 5276:3-5277:12 (Bollenbach); 5802:14-5804:12 (Nunis); 6040:20-6041:21 (Litvack); 6051:4-6052:9 (Litvack).

Much has been made throughout the various procedural iterations of this case about Crystal's involvement (or lack thereof) in the compensation committee's deliberations and decisionmaking. [FN549] Although there are many criticisms that could and have been made (including by Crystal himself) regarding Crystal's failure to calculate *ex ante* the cost of a potential NFT, nothing in the record leads me to conclude that any member of the compensation committee had actual knowledge that would lead them to believe (as to Poitier and Lozano, their understanding of Crystal's advice was based on information relayed by Russell and Watson) that Crystal's analysis was inaccurate or incomplete. Without that knowledge, I conclude that the compensation committee acted in good faith and relied on Crystal in good faith, and that the fault for errors or omissions in Crystal's analysis must be laid at his feet, and not upon the compensation committee.

FN549. *See Brehm,* 746 A.2d at 259-62.

The compensation committee reasonably believed that the analysis of the terms of the OEA was within Crystal's professional or expert competence, and together with Russell and Watson's professional competence in those same areas, the committee relied on the information, opinions, reports and statements made by Crystal, even if Crystal did not relay the information, opinions, reports and statements in person to the committee as a whole.




Crystal's analysis was not so deficient that the compensation committee would have reason to question it. [FN550] Furthermore, Crystal appears to have been selected with reasonable care, especially in light of his previous engagements with the Company in connection with past executive compensation contracts that were structurally, at least, similar to the OEA. For all these reasons, the compensation committee also is entitled to the protections of 8 *Del. C.* § 141(e) in relying upon Crystal.

> FN550. Although Crystal testified that he viewed his role as nothing more than a "high-priced calculator," nothing in the record suggests the compensation committee placed such a restriction on Crystal's work or analysis of the OEA. *See* Tr. 3581:12-3582:11; PTE 214 at DD001388. In the parts of the record just cited, Crystal laments that the compensation committee did not follow his recommendations. I believe it is important to understand that the compensation committee relied in good faith on Crystal's report and analysis even though they chose not to follow Crystal's recommendations to the letter. The role of experts under § 141(e) is to assist the board's decisionmaking--not supplant it. An interpretation of § 141(e) that would require boards to follow the advice of experts (substantially? completely? in part?) before being able to claim reliance on those experts would be in conflict with the mandate in § 141(a) that the corporation is to be managed "by or under the direction of a board of directors."

Viewed objectively, the compensation committee was asked to make a decision knowing that: [FN551] 1) Ovitz was a third party with whom Russell negotiated at arms' length; [FN552] 2) regardless of whether Ovitz truly was "the most powerful man in Hollywood," he was a highly-regarded industry figure; [FN553] 3) Ovitz was widely believed to possess skills and experience that would be very valuable to the Company, especially in light of the CapCities/ABC acquisition, Wells' death, and Eisner's medical problems; [FN554] 4) in order to accept the Company's presidency, Ovitz was leaving and giving up his very successful business, [FN555] which would lead a reasonable person to believe that he would likely be highly successful in similar pursuits elsewhere in the industry; [FN556] 5) the CEO and others in senior management were supporting the hiring; [FN557]

and 6) the potential compensation was not economically material to the Company. [FN558]

> FN551. These factors were also known to the board generally when they elected Ovitz to the Company's presidency.

> FN552. Tr. 7638:23-7639:20.

> FN553. Tr. 7127:4-20.

> FN554. Tr. 7628:19-7630:23.

> FN555. Tr. 7639:21-7640:3.

> FN556. Tr. 7127:21-7129:18.

> FN557. *See supra* note 548.

> FN558. *See* Tr. 6828:15-6829:23.

**\*47** Poitier and Lozano did not intentionally disregard a duty to act, nor did they bury their heads in the sand knowing a decision had to be made. They acted in a manner that they believed was in the best interests of the corporation. Delaware law does not require (nor does it prohibit) directors to take as active a role as Russell and Watson took in connection with Ovitz's hiring. There is no question that in comparison to those two, the actions of Poitier and Lozano may appear casual or uninformed, but I conclude that they did not breach their fiduciary duties and that they acted in good faith in connection with Ovitz's hiring. [FN559]

> FN559. Furthermore, the compensation committee did not commit a later breach of fiduciary duty nor act in bad faith (or fail to act in good faith) when the final version of the OEA was executed without their approval. The resolution passed on September 26, 1995 clearly contemplated that some details had yet to be decided, *see* PTE 39 at WD01170, and as I concluded on Ovitz's motion for summary judgment, no material changes to the OEA were made during Ovitz's tenure as President. *See Disney III,* 2004 WL 2050138, at *4-6; *cf. Van Gorkom,* 488 A.2d at 883-84 (Van Gorkom executed the amendment to the merger agreement in a manner both inconsistent with the authorization given him by the board and detrimental to Trans Union's interests).

5. *The Remaining Members of the Old Board*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 2005 WL 2056651, \*47 (Del.Ch.))**

[FN560]

FN560. The remaining members of the Old Board
are: Bollenbach, Litvack, Roy Disney, Nunis, Stern,
Walker, O'Donovan, Murphy, Gold, Bowers,
Wilson and Mitchell. Even though Bollenbach,
Litvack and seemingly Roy Disney were officers of
the Company, in electing Ovitz to be President, they
were acting in a function that was exclusively
directoral according to the Company's certificate of
incorporation and, as such, their status as officers is
irrelevant. *See* DTE 69 at Article IV, Section 1
(bylaws as of April 26, 1993); PTE 497 at Article
IV, Section 1 (bylaws as of April 25, 1994); PTE 2
at Article IV, Section 1 (bylaws as of September 20,
1995); PTE 46 at WD00415 (exhibit to resolution
electing officers of the Company on January 22,
1996); PTE 498 at Article IV, Section 1 (bylaws as
of April 22, 1996).

[7] In accordance with the compensation
committee's charter, it was that committee's
responsibility to establish and approve Ovitz's
compensation arrangements. [FN561] In accordance
with the OLA and the Company's certificate of
incorporation, [FN562] it was the full board's
responsibility to elect (or reject) Ovitz as President
of the Company. [FN563] Plaintiffs' argument that
the full board had a duty and responsibility to
independently analyze and approve the OEA is
simply not supported by the record. As a result, the
directors' actions must be analyzed in the context of
whether they properly exercised their business
judgment and acted in accordance with their
fiduciary duties when they elected Ovitz to the
Company's presidency.

FN561. *See supra* note 529.

FN562. *See* PTE 33; *supra* note 528.

FN563. Plaintiffs argue that the nominating
committee (Gold, Bowers, Wilson and Mitchell)
shirked their duties related to that committee in
connection with the OEA approval. The nominating
committee's duties and powers include the duty to
"[d]evelop and review background information about
candidates for director and make recommendations
with respect thereto to the Board." PTE 563 at
WD08721 (charter as of January 1996, but the
charter of that date expressly states that it is "based
upon the existing Charter of The Walt Disney

Company's Nominating Committee"). *See* DTE 182
at 13 (containing similar language); PTE 47 at
WD01212-13 (board minutes approving the charter
found in PTE 563 although the charter is not part of
PTE 47). This argument is irrelevant for three
reasons. First, the August 14 press release indicates
that Ovitz would be nominated to the Company's
board, but the OLA does not bind the Company to
nominate Ovitz or guarantee him a seat on the board.
*See* PTE 3; PTE 33; *see also* PTE 7 at ¶ 2 (OEA
requires the Company to nominate Ovitz), ¶ 12(a)
(Ovitz allowed to terminate the OEA if not retained
as President and a director). Second, Ovitz was not
actually nominated to the board on September 26,
1995 (nor were the directors under a duty to do so)
and, therefore, any failure on the committee's part to
meet or for the members of that committee to inform
themselves of Ovitz's credentials for being
nominated as a director before that date is irrelevant.
*See* PTE 29; PTE 39. Third, even if I were to give
credence to this argument, and even if it were to
prevail, the damages relating to this breach would be
zero. Any harm the Company suffered as a result of
the OEA stems from Ovitz as an employee/officer.
As an insider, Ovitz received no compensation for
attending board meetings. Plaintiffs have pointed to
nothing relating to Ovitz's status as a director that
would allow them to recover based on his actions
*qua* director. For these reasons, the nominating
committee's actions (or inaction) are not relevant to
the instant inquiry. *See* Pre-Trial Stipulation and
Order at 7-8 (Plaintiffs' Statement of Issues of Law
and Fact to be Litigated is limited to "OEA Approval
Violations" and "Ovitz's Receipt of a Full NFT
Payout" and is silent as to Ovitz as a director or the
nominating committee's role in his becoming a
director).

The record gives adequate support to my conclusion
that the directors, before voting, were informed of
who Ovitz was, the reporting structure that Ovitz
had agreed to and the key terms of the OEA. Again,
plaintiffs have failed to meet their burden to
demonstrate that the directors acted in a grossly
negligent manner or that they failed to inform
themselves of all material information reasonably
available when making a decision. They did not
intentionally shirk or ignore their duty, but acted in
good faith, believing they were acting in the best
interests of the Company.

Are there many aspects of Ovitz's hiring that reflect

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *47 (Del.Ch.))

the absence of ideal corporate governance? Certainly, and I hope that this case will serve to inform stockholders, directors and officers of how the Company's fiduciaries underperformed. As I stated earlier, however, the standards used to measure the conduct of fiduciaries under Delaware law are not the same standards used in determining good corporate governance. For all the foregoing reasons, I conclude that none of the defendants breached their fiduciary duties or acted in anything other than good faith in connection with Ovitz's hiring, the approval of the OEA, or his election to the Company's presidency.

*D. Eisner and Litvack Did Not Act in Bad Faith in Connection With Ovitz's Termination, and the Remainder of the New Board Had No Duties in Connection Therewith*

The New Board [FN564] was likewise charged with complying with their fiduciary duties in connection with any actions taken, or required to be taken, in connection with Ovitz's termination. The key question here becomes whether the board was under a duty to act in connection with Ovitz's termination, because if the directors were under no duty to act, then they could not have acted in bad faith by not acting, nor would they have failed to inform themselves of all material information reasonably available before making a decision, because no decision was required to be made. Furthermore, the actions taken by the Company's officers (namely Eisner and Litvack) in connection with Ovitz's termination must be viewed through the lens of whether the board was under a duty to act. If the board was under no such duty, then the officers are justified in acting alone. If the board was under a duty to act and the officers improperly usurped that authority, the analysis would obviously be different.

FN564. The New Board consisted of Eisner, Ovitz, Roy Disney, Gold, Litvack, Nunis, Poitier, Russell, Stern, Walker, Watson, Wilson, Bowers, Lozano, Mitchell, O'Donovan and Murphy.

1. *The New Board Was Not Under a Duty to Act*

*48 [8] Determining whether the New Board was required to discuss and approve Ovitz's termination requires careful consideration of the Company's governing instruments. The parties largely agree on

the relevant language from the Company's certificate of incorporation and bylaws, but as would be expected, they disagree as to the meaning of that language. [FN565] Article Tenth of the Company's certificate of incorporation states:

> FN565. The parties are also in agreement as to the particular versions of the certificate of incorporation (DTE 185) and bylaws (PTE 498) that were in effect at the time of Ovitz's termination.

The officers of the Corporation shall be chosen in such a manner, shall hold their offices for such terms and shall carry out such duties as are determined solely by the Board of Directors, subject to the right of the Board of Directors to remove any officer or officers at any time with or without cause. [FN566]

> FN566. DTE 185 at Article Tenth; *see* 8 *Del. C.* § 142.

The Company's bylaws state at Article IV:
*Section 1. General.* The officers of the Corporation shall be chosen by the Board of Directors and shall be a Chairman of the Board of Directors (who must be a director), a President, a Secretary and a Treasurer.
....
*Section 2. Election.* The Board of Directors at its first meeting held after each Annual Meeting of stockholders shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time solely by the Board of Directors, which determination may be by resolution of the Board of Directors or in any bylaw provision duly adopted or approved by the Board of Directors; and all officers of the Corporation shall hold office until their successors are chosen and qualified, or until their earlier resignation or removal. Any officer elected by the Board of Directors may be removed at any time by the Board of Directors with or without cause. Any vacancy occurring in any office of the Corporation may be filled only by the Board of Directors.
*Section 3. Chairman of the Board of Directors.* The Chairman of the Board of Directors shall be the Chief Executive Officer of the Corporation, shall preside at all meetings of the Board of Directors and of stockholders and shall, subject to the




provisions of the Bylaws and the control of the Board of Directors, have general and active management, direction, and supervision over the business of the Corporation and over its officers.... He shall perform all duties incident to the office of chief executive and such other duties as from time to time may be assigned to him by the Board of Directors. He shall have the right to delegate any of his powers to any other officer or employee. *Section 4. President.* The President shall report and be responsible to the Chairman of the Board. The President shall have such powers and perform such duties as from time to time may be assigned or delegated to him by the Board of Directors or are incident to the office [of] President. [FN567]

FN567. PTE 498 at WD07100-01.

Other relevant language comes from the board resolution that elected Ovitz as President, which states: "RESOLVED, that Michael S. Ovitz be, and hereby is, elected President of the Corporation, effective October 1, 1995, to serve in such capacity at the pleasure of this Board of Directors." [FN568]

FN568. PTE 29 at WD01196.

**\*49** Having considered these documents, I come to the following conclusions: 1) the board of directors has the sole power to elect the officers of the Company; 2) the board of directors has the sole power to determine the "duties" of the officers of the Company (either through board resolutions or bylaws); 3) the Chairman/CEO has "general and active management, direction, and supervision over the business of the Corporation and over its officers," [FN569] and that such management, direction and supervision is subject to the control of the board of directors; 4) the Chairman/CEO has the power to manage, direct and supervise the lesser officers and employees of the Company; 5) the board has the *right,* but not the *duty* to remove the officers of the Company with or without cause, and that right is non-exclusive; and 6) because that right is non-exclusive, and because the Chairman/CEO is affirmatively charged with the management, direction and supervision of the officers of the Company, together with the powers and duties incident to the office of chief executive, the Chairman/CEO, subject to the control of the board of directors, [FN570] also possesses the *right* to remove the inferior officers and employees of the

corporation. [FN571]

FN569. PTE 498 at WD07101.

FN570. Care should be taken to not read too much into the phrase, "subject to the control of the board of directors," as this "restriction" is simply a reflection of basic agency principles, and not a limitation on the powers and authority that would otherwise be incident to the office of chief executive. A chief executive officer has authority to govern the corporation subject to the control of the board of directors--that is, the chief executive officer may act as a general agent for the benefit of the corporation and in the manner in which the chief executive officer believes the board of directors desires him to act, but may not act in a manner contrary to the express desires of the board of directors. *See* Restatement (Second) of Agency §§ 33, 39, 73 (1958). More generally, the rule has been stated thusly:

Implied authority (including 'incidental' and 'inferred' authority) of the agent to act is a natural consequence of the express authority granted. It is implied from what is actually manifested to the agent by the principal. It is obvious that implied authority cannot, by its very nature, be inconsistent with express authority because any expression of actual authority must control.

WILLIAM A. GREGORY, THE LAW OF AGENCY AND PARTNERSHIP § 15 (3d ed.2001). For example, as it would apply to this case, the chief executive officer possesses the authority to remove inferior employees (including officers) so long as the board of directors does not expressly limit or negate the chief executive officer's implied or inherent authority to do so. No member of the New Board expressed, either contemporaneously or at trial, any objection to Ovitz's termination. Tr. 2586:3-14 (Russell); 3778:1-23 (Gold); 4026:2-7 (Roy Disney); 4096:14-18 (Roy Disney); 5785:17-5786:9 (Mitchell); 5810:19-5812:12 (Nunis); 5934:4-5935:15 (Bowers); 6128:12- 6129:1 (Litvack); 6720:11-20 (O'Donovan); 6843:23-6844:22 (Wilson); 7144:3- 7146:8 (Poitier); 7556:3-7557:15 (T. Murphy); 7642:21-7643:24 (Lozano); 7857:17-7858:20 (Watson); 8158:5-8159:9 (Stern); 8160:15-24 (Stern).

FN571. These conclusions conform to the Company's custom and practice. *See* Tr. 6150:6-16 (Litvack) (testifying that "loads" of Company officers

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




were terminated during his tenure as general counsel and that the board never once took action in connection with their terminations). The chief executive officer's non-exclusive (because it is shared with the board) right to employ and terminate inferior officers and employees extends to employees who are also directors. *See* 2 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 499 (perm ed. rev. vol.1998). The power to terminate inferior officers may be delegated by the board to an officer/agent even though the decision may require "the highest degree of judgment and discretion." *Id.* § 495. Fletcher's treatise also contains language that would indicate that, *under certain circumstances,* the removal of officers must occur by the directors:

The removal [of directors, other officers and agents] must *ordinarily* be by the body or officer authorized to elect or appoint.... Absent express authority, the [presiding officer] of a corporation has no power to remove an officer appointed by the board of directors *where the power of removal is in the board,* but a managing agent of a corporation may be removed from that position, when the term of employment has expired, by the [presiding officer] of the company by whom that agent was appointed.

*Id.* at § 357 (emphases added and citations omitted). Nevertheless, this same section also indicates that provisions in any particular corporation's governing documents would supercede this general rule: "If the statutes, charter or bylaws place the power of removal in the directors *or other officers,* as is usually the case as to offices that are not directorships, they are the ones to exercise it." *Id.* (emphasis added and citations omitted). The most applicable statement in any of the leading Delaware treatises with respect to the removal of officers comes from Folk's treatise, where conceding a lack of positive law on the issue, it is stated that "[p]resumably, the removal of officers is governed by the same provisions that regulate their election." RODMAN WARD, JR. ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 142.4 (4th ed.2004). My conclusion here does not contravene the general rule (to the extent it is a recognized rule of Delaware law), but is simply an application of the more specific requirements, guidelines and governance contained in the Company's governing documents.

The New Board unanimously believed that Eisner, as Chairman and CEO, possessed the power to

terminate Ovitz without board approval or intervention. [FN572] Nonetheless, the board was informed of and supported Eisner's decision. [FN573] The board's simultaneous power to terminate Ovitz, reserved to the board by the certificate of incorporation, did not divest Eisner of the authority to do so, or vice-versa. [FN574] Eisner used that authority, and terminated Ovitz--a decision, coupled with the decision to honor the OEA, that resulted in the Company's obligation to pay the NFT. [FN575] Because Eisner unilaterally terminated Ovitz, as was his right, [FN576] the New Board was not required to act in connection with Ovitz's termination.

FN572.  Tr. 2890:3-2891:15 (Russell); 5598:18-22 (Mitchell); 5813:2- 17 (Nunis); 6149:4-6151:11 (Litvack); 6339:22-6343:19 (Litvack); 6720:21-6721:21 (O'Donovan); 6785:15-6793:22 (O'Donovan); 7067:21-7069:8 (Wilson); 7226:7-7227:7 (Poitier); 7560:21-7561:17 (T. Murphy); 7646:11-7647:2 (Lozano). *See id.* at 6126:9-13 (Litvack) (testifying that Pierce did not advise him that a board meeting would be necessary to terminate Ovitz); 8233:5-11 (Stern) (stating that he relied on Litvack to determine the appropriate procedures for Ovitz's termination).

FN573. *See supra* note 570.

FN574. The delegation of authority by a board to an officer "does not mean that the board has completely abdicated its authority; moreover, the duties and powers of an officer or general manager do not deprive the directors of all stated authority and responsibilities." Fletcher, § 495, *supra* note 571.

FN575. *See* Tr. 4524:11-4526:24; 4584:3-9; 4919:8-4926:17.

FN576. That is, Eisner possessed that right unless and until he received contrary instructions from the board, which he did not. *See supra* note 570.

Therefore, the fact that no formal board action was taken with respect to Ovitz's termination is of no import. This is true regardless of the fact that Ovitz received a large cash payment and the vesting of three million options in connection with his termination. [FN577] The board had delegated to the compensation committee *ex ante* the responsibility to establish and approve compensation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





for Eisner, Ovitz and other applicable Company executives and high-paid employees. [FN578] The approval of Ovitz's compensation arrangements by the compensation committee on September 26, 1995 included approval for the termination provisions of the OEA, obviating any need to meet and approve the payment of the NFT upon Ovitz's termination. [FN579] Because the board was under no duty to act, they did not violate their fiduciary duty of care, and they also individually acted in good faith. [FN580] For these reasons, the members of the New Board (other than Eisner and Litvack, who will be discussed individually below) did not breach their fiduciary duties and did not act in bad faith in connection with Ovitz's termination and his receipt of the NFT benefits included in the OEA.

> FN577. Notwithstanding earlier statements by this Court (*Disney III*, 2004 WL 2050138, at *7 n. 64) and the Delaware Supreme Court (*Brehm*, 746 A.2d at 259), I conclude that the NFT was not economically material to the Company. *See supra* notes 533, 558. Those previous judicial statements regarding materiality cannot properly be considered "law of the case" because those statements were made in the context of motions where plaintiffs were afforded all reasonable inferences in support of their arguments and without any factual basis. Now, upon a full factual record, and in my discretion as fact-finder (materiality is a question of fact), I conclude that the NFT payout, even at the inflated valuation calculated by Professor Murphy, was not material to the Company.

> FN578. *See* PTE 187.

> FN579. *See* PTE 39 at WD01186-87A.

> FN580. The New Board could not have acted collectively in good faith because there was no meeting. Nonetheless, after weighing all the evidence in the case, I am not persuaded that the members of the New Board acted in bad faith in connection with Ovitz's termination. Had, for example, they been aware that the Company did have grounds upon which to terminate Ovitz for cause, and still not acted, the calculus would be much different, but based upon this record, I conclude that their non-action was in good faith.

2. *Litvack*

*50 [9] Litvack, as an officer of the corporation and as its general counsel, consulted with, and gave advice to, Eisner, on two questions relevant to Ovitz's termination. They are, first, whether Ovitz could or should have been terminated for cause and, second, whether a board meeting was required to ratify or effectuate Ovitz's termination or the payment of his NFT benefits. For the reasons I have already stated, Litvack properly concluded that the Company did not have good cause under the OEA to terminate Ovitz. [FN581] He also properly concluded that no board action was necessary in connection with the termination. [FN582] Litvack was familiar with the relevant factual information and legal standards regarding these decisions. [FN583] Litvack made a determination in good faith that a formal opinion from outside counsel would not be helpful and that involving more people in the termination process increased the potential for news of the impending termination to leak out. [FN584]

> FN581. *See supra* text "Defendants Did Not Commit Waste" at 131.

> FN582. *See supra* text "The New Board Was Not Under a Duty to Act" at 162.

> FN583. Tr.  6112:17-6115:21;  6117:5-6121:8; 6131:6-6151:11.

> FN584. Tr.  6115:22-6116:14;  6130:4-6131:5; 6413:20-6417:1.

I do not intend to imply by these conclusions that Litvack was an infallible source of legal knowledge. Nevertheless, Litvack's less astute moments as a legal counsel do not impugn his good faith or preparedness in reaching his conclusions with respect to whether Ovitz could have been terminated for cause and whether board action was necessary to effectuate Ovitz's termination, as I have independently analyzed the record and conclude that Litvack's decisions as to those questions were correct. First, Litvack's silence at the December 10, 1996 EPPC meeting, when Russell informed the committee that Ovitz's bonus was contractually required, was unquestionably curious, and some might even call it irresponsible. [FN585] His excuse that he did not want to embarrass Russell in front of the committee is, in a word, pathetic. Litvack should have exercised better judgment than to allow Russell to convince the committee that a $7.5





Not Reported in A.2d
(Cite as: 2005 WL 2056651, *50 (Del.Ch.))

million bonus was contractually required. Luckily for Litvack, no harm was done because in the end Ovitz's bonus was rescinded.

FN585. Tr. 6153:18-6156:9.

Second, Litvack's (and Santaniello's) conclusion regarding the potential conflict between the OEA and the terms of the 1990 Plan is certainly questionable, but reasonable in light of the circumstances and not the product of an uninformed decision or bad faith. [FN586] The language in the 1990 Plan is sufficiently ambiguous--as to whether action by the compensation committee is required in all terminations (both with and without cause) of employees who possess options--to, in my opinion, absolve Litvack and Santaniello for their advice, and the compensation committee for not acting with respect to Ovitz's termination. [FN587]

FN586. See Tr. 6126:14-6127:17; 6149:15-6150:5; 6658:5-6675:3. Compare PTE 7 at ¶ 5(e) with PTE 41 at WD00125, WD00134.

FN587. Again, my conclusion as to the propriety of the defendants' conduct in regard to Ovitz is informed by their custom and practice in other circumstances. Nothing in the record leads me to believe that the compensation committee ever made a determination as to whether a particular termination was with or without cause under any of the Company's stock option plans that would put them on notice that action would be necessary as part of Ovitz's termination. See PTE 39; PTE 41; PTE 153.

In conclusion, Litvack gave the proper advice and came to the proper conclusions when it was necessary. He was adequately informed in his decisions, and he acted in good faith for what he believed were the best interests of the Company.

### 3. Eisner

[10] Having concluded that Eisner alone possessed the authority to terminate Ovitz and grant him the NFT, I turn to whether Eisner acted in accordance with his fiduciary duties and in good faith when he terminated Ovitz. [FN588] As will be shown hereafter, I conclude that Eisner did not breach his fiduciary duties and did act in good faith in connection with Ovitz's termination and concomitant receipt of the NFT.

FN588. The parties essentially treat both officers and directors as comparable fiduciaries, that is, subject to the same fiduciary duties and standards of substantive review. Thus, for purposes of this case, theories of liability against corporate directors apply equally to corporate officers, making further distinctions unnecessary. For a discussion of the duties and liabilities of non-director corporate officers and how they may differ from those of directors, see Lyman P.Q. Johnson, Corporate Officers and the Business Judgment Rule, 60 BUS. LAW. 439 (2005); Lawrence A. Hamermesh and A. Gilchrist Sparks, III, Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson, 60 BUS. LAW. 865 (2005).

*51 When Eisner hired Ovitz in 1995, he did so with an eye to preparing the Company for the challenges that lay ahead, especially in light of the CapCities/ABC acquisition and the need for a legitimate potential successor to Eisner. To everyone's regret, including Ovitz, [FN589] things did not work out as blissfully as anticipated. Eisner was unable to work well with Ovitz, and Eisner refused to let Ovitz work without close and constant supervision. Faced with that situation, Eisner essentially had three options: 1) keep Ovitz as President and continue trying to make things work; 2) keep Ovitz at Disney, but in a role other than President; or 3) terminate Ovitz.

FN589. See PTE 341; Tr. 1757:15-1758:21.

In deciding which route to take, Eisner, consistent with his discretion as CEO, considered keeping Ovitz as the Company's President an unacceptable solution. Shunting Ovitz to a different role within the Company would have almost certainly entitled Ovitz to the NFT, or at the very least, a costly lawsuit to determine whether Ovitz was so entitled. [FN590] Eisner would have also rightly questioned whether there was another position within the Company where Ovitz could be of use. Eisner was then left with the only alternative he considered feasible--termination. Faced with the knowledge that termination was the best alternative and knowing that Ovitz had not performed to the high expectations placed upon him when he was hired, Eisner inquired of Litvack on several occasions as to whether a for-cause termination was possible such that the NFT payment could be avoided, and then relied in good faith on the opinion of the Company's







Not Reported in A.2d
**(Cite as: 2005 WL 2056651, \*51 (Del.Ch.))**

general counsel. [FN591] Eisner also considered the novel alternative of whether a "trade" of Ovitz to Sony would solve the problem by both getting rid of Ovitz and simultaneously relieving the Company of the financial obligations of the OEA. In the end, however, he bit the bullet and decided that the best decision would be to terminate Ovitz and pay the NFT.

FN590. *See* PTE 7 at ¶¶ 10, 11(c), 12(b).

FN591. Tr. 4379:23-4381:15; 4419:11-4422:2; 4476:11-4483:7. There being no indication in the record that Eisner was aware that Litvack did not consult with outside counsel in regard to Ovitz's termination, Eisner is entitled to rely on Litvack's assertion that he consulted with outside counsel even though, as explained above, I am not convinced that Litvack did indeed speak with Pierce regarding the cause issue.

After reflection on the more than ample record in this case, I conclude that Eisner's actions in connection with the termination are, for the most part, consistent with what is expected of a faithful fiduciary. Eisner unexpectedly found himself confronted with a situation that did not have an easy solution. He weighed the alternatives, received advice from counsel and then exercised his business judgment in the manner he thought best for the corporation. Eisner knew all the material information reasonably available when making the decision, he did not neglect an affirmative duty to act (or fail to cause the board to act) and he acted in what he believed were the best interests of the Company, taking into account the cost to the Company of the decision and the potential alternatives. Eisner was not personally interested in the transaction in any way that would make him incapable of exercising business judgment, and I conclude that plaintiffs have not demonstrated by a preponderance of the evidence that Eisner breached his fiduciary duties or acted in bad faith in connection with Ovitz's termination and receipt of the NFT.

### IV. CONCLUSION

**\*52** Based on the findings of fact and conclusions of law made herein, judgment is hereby entered in favor of the defendants on all counts.

### *ORDER*

For the reasons set forth in the Court's Opinion of this date, judgment is hereby entered in the above captioned action against plaintiffs and in favor of defendants on all counts. The parties shall bear their own costs.

IT IS SO ORDERED.

Not Reported in A.2d, 2005 WL 2056651 (Del.Ch.), 35 Employee Benefits Cas. 1705

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


