## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE MBNA CORPORATION DERIVATIVE ) Lead Case No. 1:05-cv-00327(GMS)
AND CLASS LITIGATION )
)
)
_____ )
)
This Document Relates To: )
)
ALL ACTIONS. )

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

CHIMICLES & TIKELLIS, LLP
PAMELA S. TIKELLIS (#2172)
ROBERT R. DAVIS (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: 302/656-2500
Facsimile: 302/656-9053

Liaison Counsel for Plaintiffs

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK
STEVEN R. WEDEKING
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

and

PASKOWITZ & ASSOCIATES
LAURENCE PASKOWITZ
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: 212/685-0969
Facsimile: 212/685-2306

Dated: March 6, 2006

Co-Lead Counsel for Plaintiffs

## TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ......................................................................................... iv

I.    NATURE AND STAGE OF THE PROCEEDINGS ...............................................1

II.   SUMMARY OF ARGUMENT ..............................................................................4

III.  STATEMENT OF FACTS ....................................................................................8

     A.    History of Excessive Compensation at MBNA ...........................................8

     B.    MBNA's Individual Defendants Artificially Inflate the Value of MBNA's Stock Price Allowing MBNA's Insider Defendants to Cash in on Illegal Stock Sales....................................................................................8

     C.    MBNA's Merger with BAC ......................................................................11

IV.   LEGAL STANDARDS ........................................................................................15

     A.    The Internal Affairs Doctrine Controls.....................................................15

     B.    Under Third Circuit Authority, Plaintiffs May Set Forth a State Law Breach of Fiduciary Duty Claim Through "Simple and Brief" Allegations, and Need Not Supply the Factual Detail Sometimes Required by State Courts ..........................................................................15

V.    THE COMPLAINT SUFFICIENTLY ALLEGES *DIRECT* CLAIMS FOR BREACHES OF FIDUCIARY DUTY AGAINST DEFENDANT HAMMONDS AND THE OTHER MBNA DIRECTORS IN CONNECTION WITH BOTH THE NEGOTIATION OF THE MERGER AND THE DISSEMINATION OF THE FALSE AND MISLEADING PROXY STATEMENT ........................................................................................19

     A.    The MBNA Directors Owed Fiduciary Duties to MBNA Shareholders Under Maryland Law in Connection with the Merger...............................21

     B.    The Actions of Defendant Hammonds and the Other MBNA Officers and Directors in Connection with the Merger Violated Their Fiduciary Duties ........................................................................................................26

     C.    The MBNA Director Defendants Violated Their *Revlon* Duties...............30

     D.    Defendant Hammonds and the Other MBNA Fiduciaries Are Adequately Alleged to Have Obtained Improper Benefits or Engaged in Deliberate Wrongdoing.......................................................................35

- i -

1.    The Complaint Alleges that Hammonds and Others Received Improper Personal Benefits and Acted in a Dishonest Fashion.....37

2.    The MBNA Directors Other than Hammonds are Adequately Alleged to Have Engaged in Deliberate Misconduct....................38

E.    Plaintiffs Have Stated a Direct Claim for Redress Relating to the Dissemination of a False and Misleading Proxy Statement ......................42

1.    The Duty to Disclose All Material Facts .......................................44

2.    Defendants Failed to Disclose the Highly Material Fact that the Merger Was Hastily Negotiated in One Day by Defendant Hammonds and Banker Perella with No Involvement by the Board After a Deal with Wachovia Fell Through..........................45

3.    The Proxy Omits to Disclose Hammonds' False Denial that MBNA Was for Sale, and the Potential This Statement Had to Depress the Pre-Merger Market Price...........................................48

4.    The Proxy Failed to Disclose the Analysis Underlying UBS' Fairness Opinion and the Assumptions and Data Provided to UBS by MBNA Management.......................................................49

F.    Defendants Cannot Establish Shareholder Ratification on These Motions ......................................................................................................52

VI.    PLAINTIFFS HAVE STANDING TO PURSUE DERIVATIVE CLAIMS ON BEHALF OF BAC AND HAD NO OBLIGATION TO MAKE A FUTILE DEMAND ON THE BOARD OF DIRECTORS ...................................57

A.    The Merger Has Not Deprived Plaintiffs of Standing as They Have Retained a Direct Equity Interest in the Entity on Whose Behalf a Recovery Is Sought....................................................................................57

B.    Demand upon the BAC Board of Directors Would Be Futile ...................60

C.    Whether Plaintiff Was Required to Make Demand upon the MBNA Board Is No Longer Relevant as BAC Has Inherited the Derivative Claims .........................................................................................................62

D.    The Conduct Underlying the Derivative Claims is Sufficiently Alleged to Have Involved Improper Personal Benefits or Deliberate Wrongdoing ...............................................................................................63

VII.    PLAINTIFFS' HOLDER CLASS CLAIMS ARE ADEQUATELY ALLEGED ............................................................................................................65

VIII.  PLAINTIFFS HAVE ADEQUATELY ALLEGED AN AIDING AND
       ABETTING BREACH OF FIDUCIARY DUTY CLAIM AGAINST
       DEFENDANT LEWIS .......................................................................................66

IX.    CONCLUSION...................................................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acierno v. Haggerty*,
  No. 04-1376-KAJ, 2005 WL 3134060 (D. Del. Nov. 23, 2005) ......................... 12

*Alabama By-Prods Corp. v. Cede & Co.*,
  657 A.2d 254 (Del. 1995) ................................................................................ 58

*Alidina v. Internet.com Corp.*,
  No. 17235-NC, 2002 Del. Ch. LEXIS 156 (Del. Ch. Nov. 6, 2002) ............. passim

*Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.*,
  639 A.2d 173 (Md. App. 1994)......................................................................... 66

*Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.*,
  665 A.2d 1038 (Md. App. 1995).................................................................. 67, 68

*Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*,
  604 F. Supp. 1106 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir. 1985)...................... 62

*Arnold v. Soc'y for Savings Bancorp, Inc.*,
  650 A.2d 1270 (Del. 1994) .............................................................................. 46

*Barkan v. Amsted Indus., Inc.*
  567 A.2d 1279 (Del. 1989) ......................................................................... 30, 31

*Bayberry Assocs. v. Jones*,
  783 S.W.2d 553 (Tenn. 1990)........................................................................... 23

*Biondi v. Scrushy*,
  820 A.2d 1148 (Del. Ch. 2003).......................................................................... 61

*Bradfisch v. Templeton Funds, Inc.*,
  319 F. Supp. 2d 897 (S.D. Ill. 2004).................................................................. 23

*Brody v. Hankin*,
  145 Fed. Appx. 768 (3d Cir. 2005).................................................................... 52

*Burns v. Friedli*,
  241 F. Supp. 2d 519 (D. Md. 2003) ....................................................... 27, 30, 39

*Buxbaum v. Deutsche Bank, A.G.*,
  No. 98 Civ. 8460 (JGK), 2000 U.S. Dist. LEXIS 5838 (S.D.N.Y. Mar.
  7, 2000) ..................................................................................................... 29, 48

*Caven v. Miller (In re Paracelsus Corp. Sec. Litig.)*,
No. H-96-4291, 1998 U.S. Dist. LEXIS 5484 (S.D. Tex. Mar. 1998) ........... 57, 59

*Clements v. Rogers*,
790 A.2d 1222 (Del. Ch. 2001) ............................................................................ 47

*Crawford v. Mindel*,
469 A.2d 454 (Md. App. 1984) ............................................................................. 65

*Crescent/Mach I Partners, L.P. v. Turner*,
846 A.2d 963 (Del. Ch. 2000) ...................................................................... passim

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987) ............................................................................................... 15

*David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*,
532 A.2d 694 (Md. 1987) ..................................................................................... 66

*Decker v. Clausen*,
No. 10, 684, 1989 Del. Ch. LEXIS 143 (Del. Ch. Nov. 6, 1989) ......................... 62

*Deephaven Risk Arb Trading, LTD. v. UnitedGlobalCom, Inc.*,
No. 379-N, 2005 Del. Ch. LEXIS 107 (Del. Ch. July 13, 2005) .......................... 24

*Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*,
218 F. Supp. 2d 729 (D. Md. 2002) ..................................................................... 23

*Duke v. Feldman*,
226 A.2d 345 (Md. 1967) ..................................................................................... 67

*Edge Partners, L.P. v. Dockser*,
944 F. Supp. 438 (D. Md. 1996) .......................................................................... 44

*Fanucchi & Limi Farms v. United Agri Prods.*,
414 F.3d 1075 (9th Cir. 2005) ............................................................................. 18

*Felker v. Anderson*, No. 04-0372-CV-W-ODS, 2005 WL 602974 (W.D. Mo.
Feb. 11, 2005) ................................................................................. 23, 39, 61, 64

*Fradkin v. Ernst,*
571 F. Supp. 829 (N.D. Ohio 1983) ..................................................................... 55

*Gatz v. Ponsoldt*,
No. 174-N, 2004 Del. Ch. LEXIS 203 (Del. Ch. Nov. 8, 2004) ........................... 25

*Gentile v. Rossette*,
No. 20213-NC, 2005 Del. Ch. LEXIS 160 (Del. Ch. Oct. 20, 2005) ................... 38

*Goldstein v. Lincoln Nat'l Convertible Secs. Fund, Inc.,*
    140 F. Supp. 2d 424 (E.D. Pa. 2001), *vacated in part by* 2003 WL
    1846095 (3rd Cir. Apr. 02, 2003)............................................................................ 16

*Golt v. Phillips,*
    517 A.2d 328 (Md. 1986) (citing Restatement (Second) of Torts, 538
    (1977)...................................................................................................................... 44

*Gutman v. Howard Sav. Bank,*
    748 F. Supp. 254 (D.N.J. 1990) ..................................................................... 65, 66

*Hammond v. Lyon Realty Co.,*
    163 A. 480 (Md. 1932) ........................................................................................ 26

*Hartford Accident & Indem. Co. v. First Pennsylvania Bank, N.A.,*
    859 F.2d 295 (3d Cir. 1988)................................................................................. 36

*Herring v. Offutt,*
    295 A.2d 876 (Md. 1972) ..................................................................................... 28

*Homa v. Friendly Mobile Manor, Inc.,*
    612 A.2d 322 (Md. App. 1992)............................................................................. 28

*Hudson v. Prime Retail, Inc.,*
    No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Apr. 1, 2004) ................... passim

*In re 3COM Corp. S'holders Litig.,*
    No. 16721, 1999 Del. Ch. LEXIS 215 (Del Ch. Oct. 25, 1999) ........................... 52

*In re Emerging Commc'ns, Inc. S'holders Litig.,*
    No. 16415, 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004) ............................. 52

*In re First Interstate Bancorp Consol. S'holder Litig.,*
    729 A.2d 851 (Del. Ch. 1998)........................................................................ 59, 63

*In re Gen. Motors (Hughes) S'holder Litig.,*
    No. 20269, 2005 WL 1089021 (Del. Ch. May 4, 2005)................................. 62, 68

*In re IT Group Inc.,*
    No. 02-10118, 2005 WL 3050611 (D. Del. Nov. 15, 2005)................................. 18

*In re LNR Prop. Corp. S'holders Litig.,* No. 674-N, 2005 Del. Ch. LEXIS 171
    (Del. Ch. Nov. 4, 2005) (rev'd Dec. 14, 2005)...................................................... 40

*In re MCI Worldcom Secs. Litig.,*
    No. 99-CV-3136 (ILG), 2000 U.S. Dist. LEXIS 7230 (E.D.N.Y. Apr.
    11, 2000) .......................................................................................................... 29, 48

*In re MONY Group Inc. S'holder Litig.*,
　　852 A.2d 9 (Del. Ch. 2004).................................................................................. 34

*In re Ply Gem Indus., S'holders Litig.*,
　　No. 15779-NC, 2001 Del. Ch. LEXIS 84 (Del. Ch. June 26, 2001).................... 24

*In re Pure Res., Inc., S'holders Litig.*,
　　808 A.2d 421 (Del. Ch. 2002).............................................................................. 51

*In re Reliance Sec. Litig.*,
　　91 F. Supp. 2d 706 (D. Del. 2000)................................................................... 40, 64

*In re Santa Fe Pac. Corp. S'holder Litig.*,
　　669 A.2d 59 (Del. 1995) ...................................................................................... 54

*In re Staples, Inc. S'holders Litig.*
　　792 A.2d 934 (Del. Ch. 2001).............................................................................. 52

*In re Tower Air, Inc.*,
　　416 F.3d 229 (3d Cir. 2005)........................................................................... passim

*In re Walt Disney Co. Derivative Litig.*,
　　No. 15452, 2005 Del. Ch. LEXIS 113 (Del. Ch. Aug. 9, 2005) .......................... 36

*Indurated Concrete Corp. v. Abbott*,
　　74 A.2d 17 (Md. 1950) ........................................................................................ 21

*Jasinover v. Rouse*,
　　No. 13-C-04-49594, No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir.
　　Ct. Nov. 4, 2004)............................................................................................. passim

*Johnson v. Shapiro*,
　　No. 17651, 2002 Del. Ch. LEXIS 122 (Del. Ch. Oct. 18, 2002) .................... 38, 64

*Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*,
　　No. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005)........................ 22, 57

*Kessler v. Sinclair*,
　　578, 641 N.E.2d 135 (Mass. App. 1994) ................................................. 57, 58, 59

*Lewis v. Anderson*,
　　477 A.2d 1040 (Del. 1984) ............................................................................ 57, 58

*Lewis v. Ward*,
　　852 A.2d 896 (Del. 2004) .................................................................................... 58

*Llewellyn v. Queen City Dairy*,
　　48 A.2d 322 (Md. App. 1946)............................................................................... 44

*Loudon v. Archer-Daniels-Midland Co.,*
  700 A.2d 135 (Del. 1997) ....................................................................................... 48

*M & R Contractors & Builders, Inc. v. Michael,*
  138 A.2d 350 (Md. 1958) ....................................................................................... 65

*Macgill v. Macgill,*
  135 Md. 384, 109 A. 72 (Md. App. 1919) ............................................................. 44

*Malone v. Brincat,*
  722 A.2d 5 (Del. 1999) ........................................................................................... 28

*Marcoux v. Prim,*
  No. 04CVS920, 2004 NCBC LEXIS 4 (N.C. Super. Apr. 16, 2004) .................... 25

*Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.,*
  729 A.2d 280 (Del. Ch. 1998) ............................................................................... 46

*McDermott Inc. v. Lewis,*
  531 A.2d 206 (Del. 1987) ....................................................................................... 15

*McMullin v. Beran,*
  765 A.2d 910 (Del. 2000) ....................................................................................... 52

*McSparran v. Larson,*
  2006 U.S. Dist. LEXIS 3787 (N.D. Ill. Jan. 27, 2006) ......................................... 65

*Miller v. U.S. Foodservice, Inc.,*
  361 F. Supp. 2d 470 (D. Md. 2005) ....................................................................... 37

*Morris v. Bush,*
  No. 3:98-CV-2452-G, 1999 U.S. Dist. LEXIS 9994 (N.D. Tex. June
  23, 1999) ................................................................................................................. 53

*N.A.A.C.P. v. Golding,*
  679 A.2d 554 (Md. 1996) ....................................................................................... 16

*ODS Techs., L.P. v. Marshall,*
  832 A.2d 1254 (Del. Ch. 2003) ........................................................................ 23, 54

*O'Malley v. Boris,*
  742 A.2d 845 (Del. 1999) ....................................................................................... 44

*Omnicare, Inc. v. NCS Healthcare, Inc.,*
  818 A.2d 914 (Del. 2003) ................................................................................ 20, 42, 56

*Parish v. Maryland & Virginia Milk Producers Ass'n,*
  242 A.2d 512 (Md. 1968) ................................................................................. 44, 54

*Parnes v. Bally Entm't Corp.*,
  722 A.2d 1243 (Del. 1999) ................................................................ 27, 30, 37, 39

*Pereira v. Farace*,
  413 F.3d 330 (2d Cir. 2005)................................................................................ 37

*Pittiglio v. Michigan Nat'l Corp.*,
  906 F. Supp. 1145 (E.D. Mich. 1995)........................................................ 28, 30, 48

*Pittsburgh Terminal Corp. v. Baltimore & Ohio. R. Co.*,
  680 F.2d 933 (3d Cir. 1982)................................................................................ 23

*Porter v. Texas Commerce Bancshares, Inc.*,
  No. 9114, 1989 Del. Ch. LEXIS 130 (Del. Ch. Oct. 12, 1989) ...................... 59, 60

*Primavera Familienstiftung v. Askin*,
  130 F. Supp. 2d 450 (S.D.N.Y. 2001).................................................................. 66

*Prof'l Mgmt. Assocs., Inc. v. Coss*,
  598 N.W.2d 406 (Minn. App. 1999)...................................................................... 63

*Purdum v. Edwards*,
  141 A. 550 (Md. 1928) ........................................................................................ 67

*Rozen v. Greenberg*,
  886 A.2d 924 (Md. App. 2005)............................................................................. 44

*S.E.C. v. Dorchester Gas Corp.*,
  No. 10255, 1984 WL 2369 (D.D.C. Jan. 9, 1984)................................................ 54

*S.E.C. v. Lehman Bros., Inc.*,
  157 F.3d 2, (1st Cir. 1998)................................................................................... 36

*Saadeh v. Saadeh, Inc.*,
  819 A.2d 1158 (Md. App. 2003)...................................................................... 67, 68

*Saito v. McCall*,
  No. 17132-NC, 2004 Del. Ch. LEXIS 205 (Del. Ch. Dec. 20, 2004) .................. 63

*Schnader v. Brooks*,
  132 A. 381 (Md. 1926) ........................................................................................ 28

*See In re Toys "R" Us, Inc., S'holder Litig.*,
  877 A.2d 975 (Del. Ch. 2005)............................................................................... 42

*Sellman v. Wheeler*,
  54 A. 512 (Md. 1902) .......................................................................................... 67

*Shaev v. Saper,*
  320 F.3d 373 (3d Cir. 2003)................................................................. 45, 47, 53, 56

*Shapiro v. UJB Fin. Corp.,*
  964 F.2d 272 (3d Cir. 1992).......................................................................... 38, 45

*Shepard v. Humke,*
  No. IP 01-1103-CH/K, 2002 U.S. Dist. LEXIS 14731 (S.D. Ind. July
  9, 2002) ...................................................................................................................... 29

*Small v. Fritz Cos., Inc.,*
  30 Cal. 4th 167 (2003) .......................................................................................... 66

*Sonet v. Plum Creek Timber Co.,*
  No. 16931, 1999 WL 160174 (Del. Ch. Mar. 18, 1999)........................................ 47

*Spatola v. Novastar Fin., Inc.,*
  No. 24-C-04-007513, Memorandum Decision at 4 (Cir. Ct. for
  Baltimore City, Feb. 16, 2006) .............................................................................. 24

*Stanziale v. Nachtomi,*
  330 B.R. 56 (D. Del. 2004)............................................................................... 17, 18

*Stargatt v. Avenell,*
  434 F. Supp. 234 (D. Del. 1977)............................................................................ 25

*Strougo v. Bassini,*
  282 F.3d 162 (2d Cir. 2003)...................................................................... 23, 25, 26

*Tafflin v. Levitt,*
  608 A.2d 817 (Md. App. 1992)............................................................................... 21

*Texas Partners v. Conrock Co.,*
  685 F.2d 1116 (9th Cir. 1982) ............................................................................... 55

*Thorn v. Reliance Van Co., Inc.,*
  No 84-1740, 1985 U.S. App. LEXIS 25929 (3d Cir. App. Dec. 6,
  1985) ........................................................................................................................ 28

*Toner v. Baltimore Envelope Co.,*
  498 A.2d 642 (Md. 1985) ....................................................................................... 21

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,*
  845 A.2d 1031 (Del. 2004) ..................................................................................... 26

*Univ. of Md. at Baltimore v. Peat Marwick Main & Co.,*
  923 F.2d 265 (3d Cir. 1991).................................................................................... 21

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
   871 A.2d 1108 (Del. 2005) ................................................................. 16

*Virginia Bankshares Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ........................................................................... 56

*Warner Commc'n, Inc. v. Murdoch*,
   581 F. Supp. 1482 (D. Del. 1984) ........................................................ 48

*Werbowsky v. Collomb*,
   766 A.2d 123 (Md. 2001) ................................................................... 60

*Wittman v. Crooke*,
   707 A.2d 422 (Md. App. 1998) ........................................... 26, 30, 35, 53

*Zachair, Ltd. v. Driggs*,
   762 A.2d 991 (Md. App. 2000) *(citing Alleco*, 665 A.2d at 1049) ...................... 67

## STATUTES, RULES AND REGULATIONS

Md. Courts & Jud. Proc. Code Ann.
   §5-418(a)(2) ......................................................................................... 33

Md. Corps. & Ass'ns Code Ann.
   §§2-405.1(a) ........................................................................................ 28
   2-405.1(b) ............................................................................................. 31
   2-405.1(b)(2) ........................................................................................ 31
   2-405.1(e) ............................................................................................. 28

## SECONDARY AUTHORITIES

James J. Hanks,
   Maryland Corporation Law, §6.9 (2005) ............................................. 18
   Maryland Corporation Law, §6.6(b) (2003 Supp.) ............................... 38

Black's Law Dict.
   134 (7th ed. 1999) ............................................................................... 34

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This Brief is respectfully submitted in opposition to two motions to dismiss Plaintiffs' Consolidated Amended Shareholders' Class and Derivative Complaint (the "Complaint"), filed on November 20, 2005. The Complaint sets forth claims relating to wrongdoing by MBNA Corp.'s ("MBNA" or the "Company") officers and directors beginning with a scheme to commit securities fraud in early 2005, and culminating with a merger (the "Merger") between MBNA and Bank of America Corp. ("BAC"), which is alleged to have unfairly benefited MBNA insiders at the expense of public shareholders. The vote to approve the Merger was procured through a false and misleading Joint Proxy Statement (the "Proxy").

As recounted in the Complaint, defendant Bruce Hammonds ("Hammonds"), MBNA's CEO, long presided over a fiefdom at MBNA in a manner which drew sharp criticism from investors, ranging from allegations of improper corporate governance, to criticism of grossly excessive and unwarranted compensation. Facing a shareholder revolt, Hammonds appeared to scale back his remuneration, and embrace corporate reform. Soon, however, he (and other insiders focused on their own personal enrichment) turned to securities fraud, which netted them new substantial benefits, including insider trading proceeds through the sale of their shares of MBNA stock at inflated prices. When these machinations were revealed, and MBNA's stock price declined, Hammonds and his team turned to secret merger negotiations whose focus was to allow Hammonds to receive benefits valued at approximately $125 million, including a lucrative new job with acquirer BAC, $22.7 million in severance or retention payments, and a valuable agreement by BAC to pay any judgment that might be personally rendered against him in

- 1 -

the pending securities fraud class action. Other insiders also received similar handsome benefits. The Merger price was grossly below the true value of MBNA's public shares, but the benefits rendered to Hammonds and the other insiders, and not shared by the MBNA public shareholders, more than made up for that from their personal perspective.

The Merger negotiations were rife with irregularities which were never brought to the attention of MBNA shareholders prior to the Merger vote.  Hammonds, though completely conflicted, was the sole negotiator of the Merger deal, unchecked by any independent committee of the MBNA Board.  When rumors circulated that MBNA might be a takeover candidate during Hammonds' secret efforts to sell the Company, Hammonds lied to the business press, and denied that MBNA was for sale. This false denial served to prevent the price of MBNA's public shares from increasing, which eased the path to a quick deal with a willing buyer (BAC) who would accommodate Hammonds' personal demands. Although false denials of merger intentions have repeatedly been held to constitute both fraud and a breach of fiduciary duty, the MBNA Directors consciously elected not to issue a correction.

The actual "negotiation" of the Merger involved a two-hour dinner between Hammonds and BAC CEO Kenneth Lewis ("Lewis").  The Board then rubber-stamped the resultant Merger Agreement, which included a "lock-up" provision by which BAC was given the right to buy approximately 249 million MBNA shares at a $1.4 billion discount.  Such a purchase would require any new bidder who wanted to acquire the whole company to pay $6 *billion* more than BAC was paying to take over MBNA.[1] This

---

[1]    This is calculated by taking 249 million newly issued shares that would be placed in the hands of BAC upon the exercise of the option, and multiplying this number by the

- 2 -

type of "show stopper" option was in conscious violation of the MBNA director defendants' duties to maximize shareholder value. Such a device--which makes a competing offer next to impossible--has been universally condemned as unlawful because it coerces the shareholders to accept the deal placed before them, precludes new and better bids, and forecloses any "market check" aimed at determining if the best and fairest deal has been obtained. Such a market check is required by applicable Maryland law. What the lock-up option did accomplish, however, was to ensure that the benefits to Hammonds and the other MBNA insiders would not be challenged by any new bidder who might wish to pay more for the public's MBNA shares, but might *not* wish to either employ Hammonds, or compensate him at the levels he demanded. The purpose and true effect of the lock-up option (as well as the financial hurdles it would present to other bidders) were not accurately disclosed in the Proxy.

The MBNA Board members consciously and deliberately ignored their mandate to protect the public shareholders from Hammonds' self-dealing, and were rewarded for this in the Merger Agreement, as Hammonds negotiated special benefits for them as well. The Merger Agreement provides that BAC will now pick up the tab for any liabilities these directors face from pending securities fraud lawsuits, either directly or by way of contribution. This is not insignificant, as the securities class action threatens damages estimated in the hundreds of millions of dollars. Thus, all of the MBNA Board members had a personal financial interest in procuring the Merger that was not shared by the public stockholders.

---

$27.50 per share Merger price. The figure reached, which was never revealed in the Proxy, is $6.85 billion.

Plaintiffs therefore respectfully oppose: (1) the motion to dismiss by nominal defendant MBNA's former non-executive directors, denominated the "MBNA Outside Directors Motion to Dismiss;" and (2) the motion to dismiss by nominal defendants MBNA Corp. and Bank of America Corp., the MBNA "Insider Defendants" and Defendants Randolph D. Lerner and Kenneth L. Lewis.[2]

## II.    SUMMARY OF ARGUMENT

Defendants are not entitled to dismissal of the any of the claims set forth in the Complaint:

*FIRST*—The MBNA Insider Defendants consciously violated their fiduciary duties. Accordingly, these defendants are not entitled to dismissal of the Merger related claims set forth in the Complaint. The Defendants' Briefs almost entirely ignore the highly particularized  allegations of misconduct alleged in the Complaint against the central wrongdoer in this case, former MBNA CEO Hammonds and his compatriots, where it is set forth in great detail that Hammonds manipulated the Merger process to obtain benefits for himself and the other defendants not shared by the public shareholders, agreed to a show-stopper option to BAC which served to prevent any other offer,  and in doing so failed to obtain the best price for the public shareholders in the Merger.

*SECOND*—The MBNA Director Defendants are similarly not entitled to dismissal.   The MBNA Board intentionally allowed defendant Hammonds to have complete control over the negotiations of the Merger, allowed Hammonds to obtain huge

---

[2]    The brief in support of the former motion shall be referred to herein as the "Outside Defs. Br. at ___," while the brief in support of the latter motion shall be referred to as the "Insider Defs. Br. at ___."

personal benefits for himself and his colleagues, and approved the grant of a show-stopper lock-up option to BAC, ending any market-check of the Merger. While defendants assert their good faith, the well-pled allegations of the Complaint, which are binding on these motions, contend otherwise.

*THIRD*—Defendants are properly charged with conscious violation of their fiduciary duties. Numerous decisions uphold similar complaints which (like the Complaint here) allege conscious wrongdoing by conflicted fiduciaries and deceptive conduct. Defendants' legal arguments to the contrary are completely off the mark since they focus on decisions which exonerate Boards of Directors and CEOs who were found, based on facts totally different from those alleged here, to be unconflicted, vigorous in their representation of shareholder interests, and frank and candid throughout the merger process.

*FOURTH*—Plaintiffs' detailed allegations of the defendants' conscious wrongdoing and omissions to act, preclude any dismissal based on Md. Courts & Jud. Proc. Code §5-418, which in any event is an affirmative defense not properly raised on these motions.

*FIFTH*—Defendants are not entitled to dismissal based on the assertion that the Complaint is conclusory. First, the Complaint is highly detailed, and fully sets forth the factual bases of the claims alleged. Second, the governing pleading standard embodied in Federal Rule 8 requires nothing more than a short and plain statement of the claim. State law pleading requirements which might require more do not apply here.

*SIXTH*—Plaintiffs allege substantial violations of the defendants' duty to ensure full disclosure in the Proxy. The claimed Proxy violations are factually detailed and

supported. Defendants' claim that the Court can dismiss them as a matter of law is contrary to controlling Third Circuit precedent which holds, on a motion to dismiss, that alleged misrepresentations and omissions are deemed material unless they are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.

*SEVENTH*—Defendants are not entitled to dismissal based on shareholder ratification by reason of the Merger vote. Once again, defendants have raised an affirmative defense not properly before the Court on these motions. Second, ratification requires full and fair disclosure, and the Proxy at issue was materially false and misleading. Nor did the Proxy ask shareholders to ratify the misconduct alleged at bar, including the unlawful lock-up option granted to BAC. Finally, the BAC lock up option rendered any vote of no effect: the deal presented was coercive in that MBNA shareholders had no real choice; and the lock up precluded any other deal from materializing. For this reason, too, there was no ratification.

*EIGHTH*--Defendants are not entitled to dismissal of the derivative claims based on their view that the Merger eliminated Plaintiffs' status as shareholders, and thus their interest in the derivative recovery was eliminated. Because Plaintiffs are now BAC shareholders and have both asserted the derivative claims on behalf of BAC (MBNA's successor-in-interest), and alleged that demand on BAC's Board would be futile, they retain standing to pursue their claims derivatively. This is because Plaintiffs still have a direct equity interest in the corporation which would benefit from a derivative recovery, BAC, and the law makes clear that Plaintiffs therefore retain their standing to pursue these claims. Defendants' authorities all concern situations in which the derivative

plaintiff did not retain a direct equity interest in the entity that would receive the recovery, or where such plaintiff (unlike plaintiffs here) violated procedure by not asserted the derivative claims on behalf of the successor-in-interest, and explaining why demand on that successor's Board would be futile. Here, plaintiffs have scrupulously done what they needed to do procedurally to preserve their standing.

*NINTH*—Since the Complaint demonstrates that pre-suit demand is futile, defendants are not entitled to dismissal. Since the derivative claims have passed to BAC, any demand would have to be made on the BAC Board, unless such a demand would be futile. In connection with the Merger, BAC agreed not only to defend the MBNA defendants, but also agreed to cooperate with them and use its best efforts to defeat the claims. Thus, the BAC Board is contractually committed to be *forever hostile* to the bringing of the derivative claims set forth in the Complaint.

*TENTH*—Plaintiff's "holder claims" should be upheld. Although Maryland has not yet dealt with whether shareholders misled into retaining shares can pursue a cause of action (and states differ on this issue), such claims have been upheld in other states which follow legal principles similar to those applied in Maryland. It is fair to conclude that Maryland would join those jurisdictions which recognize this type of claim.

*ELEVENTH*—Plaintiffs have adequately pled an aiding and abetting claim against Defendant Kenneth Lewis, BAC's Chairman and CEO.

For all of these reasons and as set forth more fully below, the motions should be denied.

- 7 -

## III.    STATEMENT OF FACTS

### A.    History of Excessive Compensation at MBNA

MBNA has historically been run by a closely knit group of officers and directors. ¶54.[3] Throughout MBNA's history, its executives have grown all too accustomed to receiving absurd levels of executive compensation. *Id.* During 2001 to 2003, the Company's top five most highly paid officers, defendants Hammonds, John R. Cochran ("Cochran"), Lance L. Weaver ("Weaver"), Richard K. Struthers ("Struthers") and Kenneth A. Vecchione ("Vecchione"), received well over $60 million in cash compensation – not counting the tens of thousands of stock options and shares of restricted stock they also received. *Id.* In the wake of the passage of the Sarbanes-Oxley Act of 2002, which tightened standards for corporate governance, MBNA and its Board came under a blistering attack for this pervasive pattern of excessive compensation awarded to its executives, a history of nepotism, and a cozy relationship between its executives and its purportedly independent directors. ¶¶8, 56, 58. Preceding the Company's annual meeting of shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence. ¶58. Under such pressure, MBNA undertook some measures to remedy these abuses, which resulted in cuts to its traditionally overly generous compensation packages. ¶¶8, 60.

### B.    MBNA's Individual Defendants Artifically Inflate the Value of MBNA's Stock Price Allowing MBNA's Insider Defendants to Cash in on Illegal Stock Sales

As a result of the 2004 compensation cuts at MBNA, the Company's senior executives faced massive reductions in their compensation levels to which they had grown accustomed to receiving. ¶61. At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which would expire if not exercised by the

---

[3]  All paragraph ("¶___") references are to the Complaint.

expiration date. *Id.* The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. *Id.* Some of these stock options would have expired in 2005 if not exercised. *Id.*

In order to once again obtain the lavish compensation that the Individual Defendants had become accustomed to, they turned to deceptive misstatements to the public designed to inflate the Company's stock price. ¶¶8, 63-81. From January 2005 to April 2005, defendants Hammonds, Cochran, Weaver, Struthers, Vecchione, Charles C. Krulak ("Krulak"), Michael G. Rhodes ("Rhodes") and John W. Scheflen ("Scheflen") (the "Insider Defendants") failed to disclose and/or misrepresented the following adverse facts, which were known to the MBNA Individual Defendants, or recklessly disregarded by them, at all relevant times: (a) the Company had been experiencing unexpectedly high payment volumes from U.S. credit card customers during Q1:05, reducing managed loans in the quarter more than in prior years, and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1:05 from $33.8 billion reported at the end of Q1:04; (b) with regards to credit card pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the pre-pays having a more adverse impact on the Company's yield on managed loans; (c) MBNA was suffering from an unseasonably sharp contraction in loans during Q1:05 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1:04; (d) the Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures; (e) MBNA was experiencing higher-than-expected delinquencies during Q1:05, increasing to 4.17% from 4.13% at the end of Q4:04; (f) the Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, would significantly reduce future earnings; (g) losses on loan receivables and managed loans had increased to 3.98%

- 9 -

and 4.48%, respectively, up from 3.74% and 4.43% respectively in Q4:04; (h) approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased; (i) due to the increase in pre-pays, the interest-only securitization strip securities were overvalued on the Company's books; and (j) the Company's previously announced Q1:05 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005. ¶¶9, 77.

While MBNA's market price climbed to artificially high levels due to the Insider Defendants' misrepresentations and omissions from January 2005 to April 2005, the Insider Defendants, took advantage of the price inflation and sold over $75 million worth of their own MBNA stock. ¶¶11, 82. Defendant Hammonds sold over $9 million worth of MBNA stock in January 2005 alone. *Id.* They knew that the value of their options and shares would rapidly decline if they disclosed the true status of the Company's operations and business environment. ¶61. Instead, the Insider Defendants' false statements and omissions allowed MBNA's stock to trade at artificially high prices. *Id.*

During the same time period as the improper statements made to the investing public, the Insider Defendants also caused the Company to repurchase $250 million worth of its own stock which supported the stock's high price. ¶¶10, 64. The MBNA officers and directors (the "MBNA Individual Defendants") also used the Company's purportedly stellar performance to justify the payment of millions of dollars in bonuses to themselves in January 2005. ¶¶10, 62. Indeed, although MBNA's stock price had been essentially stagnant throughout 2004, Hammonds was handed a paycheck at the beginning of 2005 worth over $9 million, including salary, bonus, and restricted shares. ¶10.

The Insider Defendants' scheme to inflate the Company's value, however, could not be hidden from the public forever. On April 21, 2005, MBNA shocked the market by disclosing that the Company had earned only $0.02 cents per share in 1Q:05 – a 94% decline from the $0.59 per share reported in Q4:04 – and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate.   ¶¶11, 78. Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. ¶¶11, 80. MBNA's value *declined by over $5.8 billion in one trading session*. *Id.* As a consequence of this wrongdoing, MBNA and successor-in-interest BAC stand to lose many millions of dollars, including defense costs, and potential payments made in settlement, or as a consequences of an adverse jury verdict in a pending federal suit filed against the Insider Defendants for violations of the Securities Exchange Act of 1934 (the "Securities Class Action"). ¶¶14, 103(i).

### C.    MBNA's Merger with BAC

In the spring of 2005 following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, MBNA's share price was languishing at about $20 per share and shareholder dissatisfaction was growing. ¶15. According to the Proxy dated September 19, 2005 in early June 2005 the MBNA Board met with MBNA management and the Company's outside advisors, including representatives of UBS Securities LLC ("UBS") and Wachtell, Lipton, Rosen & Katz, to discuss MBNA's recent financial performance and prospects, consolidation activity in the credit card industry and the general environment, long-term trends and other developments in the markets in which MBNA

conducts business. ¶83.[4] Possible strategic alternatives were summarized, including hypothetical scenarios involving a business combination. *Id.* Wachovia, Inc. was identified at the MBNA Board meeting as potentially having the greatest interest in a possible transaction. ¶¶3, 86. Even though Wachovia, Inc. decided not to make a bid for MBNA after being contacted by the Company, there was no doubt that MBNA was in fact for sale and the MBNA Insider Defendants were desperate to find a buyer for the Company. ¶¶1-3, 15, 84. To effect a sale of the Company, Hammonds then had MBNA retain Joseph Perella ("Perella"), a noted investment banker and agreed to pay him $40 million, in addition to the mammoth fees already being paid to UBS as MBNA's investment advisor. ¶3. Perella was retained to do one thing: find a buyer. *Id.* None of this information was publicly disclosed at the time; thus no other potential bidder for MBNA was made aware of the Insider Defendants' plan to sell the Company and secure their own futures. Indeed, the Proxy never mentions Perella, or his huge fee, an omission which serves to conceal the fact that an extraordinary effort was underway in June 2005 to sell MBNA and sell it quickly. Perella's mission was to serve as Hammonds' special envoy to bidders who were willing to accede to Hammonds' personal demands. *See Id.*

Despite the highly secret ongoing efforts to sell MBNA, on June 13, 2005 an article entitled "One Tough Card Game; MBNA's Stock Is Down 25% This Year, and it's Suddenly a Takeover Candidate" authored by Amy Barrett and Mike McNamee was published in *Business Week's* June 20, 2005 edition wherein defendant Hammonds was quoted as saying *"[t]here's no 'For Sale' sign on MBNA's Wilmington (Del.) headquarters."* ¶¶15, 86. Hammonds comments were highly deceptive and had the

---

[4]  This Proxy was attached as Exhibit C to the Affidavit of Richard C. Pepperman, II, dated January 20, 2006 in connection with the motions to dismiss. The Court may take judicial notice of its contents on a motion to dismiss, without converting the pending motions into ones for summary judgment. *See Acierno v. Haggerty*, No. 04-1376-KAJ, 2005 WL 3134060, at *5-*6 (D. Del. Nov. 23, 2005).

purpose and effect of artificially deflating MBNA's stock price, which gave him the opportunity to offer the Company at attractively low prices. *Id.*

Barely one week after the publishing of Hammonds' sales denial, representatives of MBNA contacted the management of BAC to gauge the level of BAC's interest in a possible transaction with MBNA. *Id.* From this point merger talks moved rapidly forward, but were fatally infected by Hammonds' unfair dealing. ¶¶3, 89. Hammonds negotiated the deal himself over a two hour dinner with BAC's President and CEO, defendant Lewis, even though he and Lewis had never even met before. *Id.* Incredibly, the MBNA Board had no role in the negotiation of MBNA's transaction with BAC and no special committee was appointed to negotiate or evaluate the deal. ¶¶4-5, 16, 89. The Board instead chose to rubber stamp the merger that was negotiated in its entirety by Hammonds, the Company's conflicted CEO. Hammonds, for his part concentrated mainly on what compensation he and his compatriots would receive in return for agreeing to do the Merger. *Id.*

The Insider Defendants received significant personal benefits as a result of MBNA's merger with BAC. First, defendants Cochran, Hammonds, Struthers, Vecchione and Weaver all received high executive positions with BAC. ¶94. Second, upon completion of the merger on January 1, 2006, defendants Cochran, Hammonds, Struthers, Vecchione and Weaver, respectively, received approximately $22.7 million, $23 million, $17 million, $5.8 million and $17 million pursuant to their retention agreements with BAC. *Id.* Third, the vesting of the Insider Defendants' stock options was accelerated to permit immediate vesting because of the change of control initiated by the merger with BAC. ¶¶2, 84, 92. Fourth, and quite importantly, the Defendants extracted an agreement from BAC as part of the Merger, to indemnify all securities class action and derivative suit defendants from liability (including the MBNA Director Defendants) and cooperate with them and to use BAC's best efforts to defend and defeat these claims. ¶¶2, 84, 90, 95.

- 13 -

In order to ensure that the Merger Agreement with BAC went through and provided MBNA's Insider Defendants with the substantial compensation that flowed from its completion, MBNA agreed to "no shop" provisions which limited MBNA's ability to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of the company. ¶¶5, 16, 87. But MBNA also went further than this, granting BAC an option to acquire up to approximately 249.8 million shares of MBNA common stock under the stock option agreement at a low price, amounting to a discount of approximately $1.4 billion. *Id.* As discussed above (*see supra* at 1) this provision effectively ended any chance that anyone would make a competing bid for MBNA. These provisions had the purpose and effect of ensuring that no auction of the Company would ever take place and discouraged any potential competing bidder who might have an interest in acquiring all or a significant part of MBNA from considering or proposing that acquisition. *Id.*

Defendants then filed the Proxy soliciting shareholder approval of the deal. ¶¶5, 7, 42, 83, 89. Along with their recommendation that shareholders vote for the Merger, the MBNA director defendants included in the Proxy an assortment of facts and figures about the terms and the process leading to the Merger that superficially appeared to furnish investors with adequate information with which to evaluate the fairness of the transaction. *Id.* The Proxy included a purported (but misleading) chronology of the process leading up the announcement of the merger, the process by which UBS evaluated the fairness of the Merger transaction, and the factors that led to UBS's opinion that the transaction was fair to MBNA shareholders from a financial point of view. *Id.* Ultimately, on November 3, 2005 MBNA's shareholders approved the Merger between MBNA and BAC based upon the deceptive Proxy, which concealed Hammonds' misconduct in negotiating the deal, the true purpose and effect of the BAC option, and other material facts. *Id.*

## IV.    LEGAL STANDARDS

### A.    The Internal Affairs Doctrine Controls

The United States Supreme Court has stated that, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). "The internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs." *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987). [5] "Stockholders ... have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs." *Id.* at 217. Thus, both plaintiffs and defendants agree that the law of the relevant state of incorporation shall be applied to all of the Plaintiffs' substantive allegations. Insider Defs.' Br. at 11-12; Outside Defs.' Br. at 10-11. MBNA was a Maryland corporation, while BAC is a Delaware corporation. As will be discussed below, most issues relating these motions are governed by Maryland law, while one issue (whether a demand to bring derivative claims inherited by BAC needs to be made on BAC's Board of Directors) is governed by the law of Delaware.

### B.    Under Third Circuit Authority, Plaintiffs May Set Forth a State Law Breach of Fiduciary Duty Claim Through "Simple and Brief" Allegations, and Need Not Supply the Factual Detail Sometimes Required by State Courts

Plaintiffs assert four types of claims in the Complaint: (a) direct claims against the former directors and officers of MBNA under Maryland law for breaches of fiduciary duty in connection with the Merger between MBNA and BAC; (b) a direct claim under Maryland law against a BAC executive, Lewis, for aiding and abetting breaches of fiduciary duty by MBNA's fiduciaries; (c) state law derivative claims brought on behalf of BAC as successor in interest to MBNA for damages inflicted upon MBNA by certain

---

[5] Here, as throughout, all citations are deemed omitted and all emphasis is deemed added unless otherwise stated.

of MBNA's officers and directors prior to the Merger; and (d) derivative claims for contribution brought under federal law pursuant to the provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Almost all of Plaintiffs' state law claims are governed by Maryland law since MBNA was a Maryland corporation prior to its merger with BAC.[6] On the other hand, plaintiffs were required to make a demand on BAC's Board of Directors prior to filing their Complaint because BAC is a Delaware corporation and therefore demand futility is based on Delaware law. *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 112-13 (Del. 2005).[7]

Where a state law breach of fiduciary duty claim is asserted in a federal pleading, Fed. R. Civ. P. 8 requires only a short and plain statement of how the defendant corporate directors and officers breached their fiduciary obligations. This holds true even where a state court considering that same claim would require the assertion of evidence or factual detail regarding the fiduciaries' misconduct before such a claim would be upheld. The rule that more relaxed notice pleading standards are applied in federal court to state law breach of fiduciary duty claims that would be applied by some state courts was recently applied in *In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005) (reversing district court's dismissal of several breach of fiduciary duty claims pled under Delaware law). Like plaintiffs here, the plaintiff in *Tower* alleged that the defendants (officers and directors of Tower Air, Inc.) breached their fiduciary duties in several ways, including consciously

---

[6] *See N.A.A.C.P. v. Golding*, 679 A.2d 554, 559 (Md. 1996). Although Maryland courts have rendered a number of decisions relevant to the issues raised by the motions to dismiss, its body of corporate law is not as well-developed as that of Delaware. Maryland often looks to Delaware decisions for guidance where no Maryland precedents exist addressing a particular point. *See* Insider Defs.' Br. at 13 n.7. *See also Goldstein v. Lincoln Nat'l Convertible Secs. Fund, Inc.*, 140 F. Supp. 2d 424, 439 n.12 (E.D. Pa. 2001), *vacated in part by* 2003 WL 1846095 (3rd Cir. Apr. 02, 2003) ("With respect to issues on which the Maryland courts have not spoken, this Court looks primarily to the state law of Delaware for guidance. In the area of corporate law, the Maryland Court of Appeals has noted the respect due Delaware decisions.").

[7] Plaintiffs' contribution claim under the PSLRA is, of course, governed by federal law.

and intentionally disregarding their responsibilities, delegating important decisions to conflicted executives without appropriate oversight or intervention, and rubber stamping major corporate decisions made in haste or without appropriate deliberation. *See Stanziale v. Nachtomi,* 330 B.R. 56, 63-66 (D. Del. 2004). The district court found that plaintiff, under Delaware pleading standards, was obligated to plead "***facts*** that show that the directors 'consciously and intentionally' disregarded their responsibilities" in order to set forth a cause of action, and held plaintiff's pleading to be too "conclusory" to state a breach of fiduciary duty claim under Delaware law. *Id.* at 65. As to certain officer fiduciaries, the district court likewise found that plaintiff had failed in what the court perceived to be its obligation to set forth "facts" showing that the fiduciaries' decisions were "unintelligent, unadvised or reckless." *Id.* at 66. Plaintiff appealed, arguing that strict Delaware pleading standards do not apply in federal court. The Third Circuit agreed.

In reversing the dismissal of Counts II-V of plaintiff's complaint, the Third Circuit noted that Delaware's Chancery Rule 8, while patterned after Fed. R. Civ. P. 8, is applied differently by Delaware courts. Delaware, contrary to federal pleading standards, requires plaintiffs to set forth specific facts supporting allegations that corporate directors consciously and deliberately disregarded their duties, that they blindly approved managerial decisions, or that they recklessly neglected their duty to rein in executive abuses. *Tower,* 416 F.3d at 236 ("The problem is that Delaware courts interpret Chancery Rule 8 to require pleading facts with specificity. That is not the federal notice pleading standard."). As Circuit Judge Smith observed:

> Delaware courts consider Chancery Rule 8 specificity requirements as consonant with notice pleading, *see, e.g., Solomon v. Pathe Communications Corp.,* 672 A.2d 35, 39 (Del. 1996), but such notice pleading bears scant resemblance to the federal species. For example, we recently rejected an appellee's argument that a complaint "lacked sufficient factual support" with the terse declaration that "a plaintiff need not plead facts." *Alston v. Parker,* 363 F.3d 229, 233 n.6 (3d Cir. 2004). We

- 17 -

explained that instead "a plaintiff need only make out a claim upon which relief can be granted. If more facts are necessary to resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery mechanisms under the Federal Rules." *Id.* We held that the District Court erred by mandating fact-pleading under Rule 12(b)(6), and we vacated and remanded its decision. As we explained, we merely submitted to the Supreme Court's reminder in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993), the essence of which it recently reiterated in *Swierkiewicz v. Sorema*, 534 U.S. 506, 512, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002), that the Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." 507 U.S. at 168 (*quoting Conley v. Gibson*, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

The District Court erred by assuming that Delaware's notice pleading cases are interchangeable with federal notice pleading cases. They are not. By requiring Stanziale to allege specific facts, the District Court erroneously preempted discovery on certain claims by imposing a heightened pleading standard not required by Federal Rule of Civil Procedure 8.

*Id.* 236-37 (footnote omitted).

Based on a proper application of Fed. R. Civ. P. 8, the Third Circuit held that claims very similar in nature to those asserted at bar should go forward into discovery. Indeed, the claims alleged here are supported with much greater factual specificity than those asserted in *Tower,* and *a fortiori* suffice to withstand defendants' motions to dismiss. *See also In re IT Group Inc.*, No. 02-10118, 2005 WL 3050611, at *8 (D. Del. Nov. 15, 2005) (upholding breach of fiduciary duty claims, and assertion that majority of directors were not independent based on notice pleading, and noting that in *Tower* "the Third Circuit has emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff to plead detailed facts to make out a claim for breach of fiduciary duties under Delaware law"); *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1082 (9th Cir. 2005) (notice pleading under Fed. R. Civ. P. 8 applied to claim brought in diversity under California law, in contrast to California courts which would subject that same claim to satisfy highly particularized "code" pleading).

*Tower's* reasoning as to breach of fiduciary duty claims brought under Delaware law applies with equal force to claims brought under Maryland law. Accordingly, the present claims should be upheld, as they are pled with more than sufficient factual detail than is required under Third Circuit law.

## V.    THE COMPLAINT SUFFICIENTLY ALLEGES *DIRECT* CLAIMS FOR BREACHES OF FIDUCIARY DUTY AGAINST DEFENDANT HAMMONDS AND THE OTHER MBNA DIRECTORS IN CONNECTION WITH BOTH THE NEGOTIATION OF THE MERGER AND THE DISSEMINATION OF THE FALSE AND MISLEADING PROXY STATEMENT

Although facts and evidence need not be pled to support a claim for breach of fiduciary duty, the Complaint at bar is nonetheless replete with factual detail supporting a claim of wrongful misconduct by defendant Hammonds, MBNA's former Chairman and CEO, and the other MBNA directors and officers. Having milked MBNA for exorbitant compensation for years, Hammonds is alleged to have further feathered his nest by resorting to securities fraud and insider trading. Then, having exhausted that means of self-enrichment, Hammonds orchestrated a merger which deprived MBNA shareholders of billions of dollars in value, while providing a windfall to Hammonds of tens of millions of dollars (plus a lucrative new job with BAC and protection against securities fraud liabilities). Hammonds' aggravated misconduct included the dissemination of a false public statement that MBNA was not for sale, which was designed to depress the stock price, and further Hammonds' personal agenda: the sale of MBNA to a hand-picked acquirer who would provide him the benefits he desired, including an attractive post-Merger position. ¶¶15, 86, 94. Toward this end, Hammonds engaged in secret and unduly hurried negotiations to sell MBNA at a sweetheart price, and presented the self-interested deal he negotiated to the MBNA Board as a *fait accompli*, which its members duly rubber-stamped. ¶¶4-5, 16, 89. To add insult to injury, Hammonds agreed to a "show stopper" option which prevented the emergence of a competing bidder who might not have been as generous to Hammonds personally as was accommodating "bidder"

- 19 -

BAC. ¶¶5, 16, 87. This type of option, which effectively eliminates the possibility of the emergence of a competing bidder, has been held to be unlawful because it is "preclusive" of other competing deals, and coerces shareholders into accepting the only possible deal that could emerge under the circumstances. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 934-36 (Del. 2003). MBNA's supine and compliant Board consciously turned a blind eye toward Hammonds' misleading public statements (no director ever corrected his misstatement that MBNA was not up for sale). ¶¶5, 86. *See Radol v. Thomas*, 772 F.2d 244, 258 (6th Cir. 1985) ("The law is clear that directors and officers of a corporation are jointly and severally liable if they jointly participate in a breach of fiduciary duty or approve, acquiesce in, or conceal a breach by fellow officer or director."). The Board knowingly allowed Hammonds to control all of the Merger negotiations, despite his history of self-dealing and blatant conflicts of interest. The Board appointed no Special Committee to neutralize Hammonds' influence. ¶¶5, 7, 42, 83, 89. Most egregiously, the Board, composed of sophisticated business and professional persons, approved the unlawful lock-up option to BAC despite knowledge that it would make the BAC transaction *a fait acompli.* ¶¶5, 16, 87. To effect the transaction, this Board approved the dissemination of a materially misleading Proxy. ¶¶5, 7, 42, 83, 89. As will be discussed further below, all of these facts overwhelmingly support the causes of action against Hammonds and the other MBNA fiduciaries under applicable law, and comply with the pleading standards set forth by the Third Circuit in *Tower*.[8]

---

[8] Some of the defendants herein argue that Maryland statutory law requires an allegation of "fraud" to make out a claim for breach of fiduciary duty. *See* Outside Defs.' Br. at 32, discussing Md. Courts & Jud. Proc. Code Ann. §5-418. Defendants cite to no Maryland decisional or statutory law supporting such a high pleading standard. Defendants infer this "fraud" requirement from a brief passage in a treatise on Maryland corporate law written by a practicing attorney who is a law partner of one of the defendants in this case. That passage, however, *never* refers to any obligation by a plaintiff to plead or prove fraud, but rather opines that a director may be held liable for deliberate wrongful action

**A.    The MBNA Directors Owed Fiduciary Duties to MBNA Shareholders Under Maryland Law in Connection with the Merger**

The MBNA Directors attempt to evade direct liability for their numerous breaches of fiduciary duty by claiming that they owed a fiduciary duty only to MBNA in connection with the negotiation of the Merger, and owed *no fiduciary duty* to the very shareholders whose stock they allowed to be exchanged for BAC shares at an unfairly low price. Insider Defs.' Br. at 22; Outside Defs.' Br. at 12. Defendants not only fail to advance any cogent argument as to how such conduct would hurt MBNA as a corporate entity, rather than its shareholders directly, but they misstate Maryland law regarding fiduciary obligations.[9]

As early as *Indurated Concrete Corp. v. Abbott*, 74 A.2d 17, 20 (Md. 1950), the Maryland Court of Appeals affirmed that corporate directors have an "inherent obligation" to use their best efforts to promote the interests of the company's shareholders. This bedrock principle of Maryland law was reaffirmed in *Toner v. Baltimore Envelope Co.*, 498 A.2d 642, 648 (Md. 1985) ("From the standpoint of Charles Jr. and Murphy as directors, it is well settled in Maryland that they owe a fiduciary duty to Envelope Co. *and* its shareholders.")(emphasis added).

---

or inaction which produces an "improper result." *See* James J. Hanks, Maryland Corporation Law, §6.9, at 187 (2005). Maryland's Section 5-418 is discussed in greater detail *infra* at 31-33.

[9] Defendants must concede that MBNA as a corporate entity was not harmed by the negotiation by Hammonds of an unfair "exchange ratio" of BAC shares for MBNA shares since MBNA itself did not exchange any shares in the Merger. Only the individual class members exchanged shares, and received less consideration than they should have for their property. The claim for damages to the shareholders thus could not be asserted by MBNA. *See Tafflin v. Levitt*, 608 A.2d 817, 820 (Md. App. 1992) (distinguishing direct and derivative suits, and noting that a suit is direct if the allegations are not "premised on conduct that had injured the institution," and derivative if the claims are assertible by the corporation itself). In addressing this issue the *Tafflin* court relied upon, *inter alia,* the Third Circuit's analysis of a similar question in *Univ. of Md. at Baltimore v. Peat Marwick Main & Co.*, 923 F.2d 265, 273-74 (3d Cir. 1991).

In fact, even defendants' own authority recognizes that directors owe fiduciary duties to shareholders and that a violation of those duties gives rise to a direct claim. *See* Outside Defs.' Br. at 27, 29-30 and Insider Defs.' Br. at 28-29, 34 (both citing *Jasinover v. Rouse*, No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004)). In *Jasinover*, a shareholder of The Rouse Company ("Rouse") brought a direct action against the directors of Rouse alleging that they breached their fiduciary duties in approving and recommending the sale of Rouse. *Id.* at *1. The plaintiff then brought a motion to enjoin the consummation of the merger. *Id.* In ruling on the motion for a preliminary injunction, the court evaluated plaintiff's likelihood of success on the merits. *Id.* at *7-*13. Had no direct action against directors for breach of fiduciary duty existed, the court would have simply found that there was no likelihood of success on the merits because no cause of action existed. Instead, the court partook in a six page discussion and evaluation of plaintiff's claims based on the facts before the court. *Id.* Clearly, a direct cause of action against directors of a corporation exists under Maryland law.

Indeed, outside of *dictum* in one recent federal decision that admittedly never decides the issue,[10] federal courts and state courts construing Maryland law have

---

[10]    *Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.,* No. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005). Indeed, even *Jolly Roger* recognizes that:

> [C]ertain types of actions may be brought by a shareholder directly. *"[U]nquestionably[,] a stockholder may bring suit in his own name* to recover damages from an officer of a corporation for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation." *Waller*, 187 Md. at 192, 49 A.2d at 453. For example, a suit alleging corporate malfeasance that directly results in the impairment of a common stockholder's right to vote is likely a direct suit.

*Id.* at *5 n.12. Undoubtedly, a merger accomplished by improper means directly impairs both a common stockholder's right to vote, and his right to obtain the highest value for his shares, which shares are *personal* property, not corporate property.

- 22 -

overwhelmingly recognized that Maryland directors owe fiduciary duties to the shareholders of the corporations they serve, and that breach of these duties can give rise to *direct* claims against those directors where the harm was done to the investors, rather than to the corporation. *See, e.g., Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2003) (where all shareholders are equally harmed by fiduciary misconduct which does not likewise harm the corporation, shareholders have a direct claim under Maryland law against the fiduciaries who caused that harm); *Pittsburgh Terminal Corp. v. Baltimore & Ohio. R. Co.*, 680 F.2d 933, 941 (3d Cir. 1982) ("Maryland directors must act as fiduciaries to all equity participants") (collecting cases); *Bradfisch v. Templeton Funds, Inc.*, 319 F. Supp. 2d 897, 900 (S.D. Ill. 2004) (under Maryland law, harm to mutual fund investor was direct where harm did not derive from "a reduction in fund assets"); *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 563 (Tenn. 1990) (upholding direct claim against directors of Comdata Network, Inc. under Maryland law relating to unfair merger, and noting that: "It is not Comdata which would benefit from a recovery against the defendants. Comdata is to be merged out of existence. It is the shareholders alone who have been damaged and would benefit from the recovery."). *See also Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 734 (D. Md. 2002) (finding that, under Maryland law, "the shareholder plaintiffs have alleged a claim separate and distinct from the claims of Delmarva").

Plaintiffs also point the Court to two recent decisions discussing the level of detail in pleading necessary for plaintiffs to allege breaches of fiduciary duty to survive a motion to dismiss under Maryland law. In a recent federal court decision, *Felker v. Anderson*, No. 04-0372-CV-W-ODS, 2005 WL 602974, at *3-*4 (W.D. Mo. Feb. 11, 2005) (applying Maryland law), the court found that the plaintiffs had sufficiently plead a breach of fiduciary duty for failure to monitor. The court in *Felker* stated:

> Plaintiff has pled that Defendants actively participated in the wrongdoing and/or permitted such activity through gross negligence or willful

- 23 -

inattention to the duties owed the corporation. Defendants were directly involved with the day-to-day operations of NovaStar and directly participated in its management. Pl.'s Am. Compl. ¶ 18. Plaintiff further alleged that Defendants "were involved in the drafting, producing reviewing, disseminating, approving, ratifying and/or recklessly permitting the dissemination of the false and misleading statements and information alleged herein." Pl.'s Am. Compl. ¶ 18. Additionally, Plaintiff claims that Defendants concealed information from the public and shareholders concerning NovaStar's growth. Pl.'s Am. Compl. ¶ 29. Reviewing these facts in the light most favorable to Plaintiff, the Court finds that if these facts were proven Plaintiff would be entitled to relief.

2005 WL 602974, at *4. Similarly, a recent Maryland state court decision denied

defendants' motion to dismiss stating:

Defendants characterize the plaintiffs' cause of action as a mere "failure to monitor" corporate activities which they claim is insufficient, as a matter of law, to constitute a breach of fiduciary duty. This may be accurate, but the Court cannot determine at this point in the proceedings the extent of the defendants' knowledge of improper conduct or involvement therewith. Although the defendants are correct that Maryland law allows directors to rely on information from officers and employees, directors are liable if they had knowledge of the wrongful conduct. MD. CODE ANN., CORPS. & ASS'NS §2-405.1(b)(1)(1999), *compare* §2-405.1(b)(2). Accordingly, these allegations contained in the complaint are sufficient to state a cause of action for defendants.

*Spatola v. Novastar Fin., Inc.*, No. 24-C-04-007513, Memorandum Decision at 4 (Cir. Ct.

Baltimore, Feb. 16, 2006).

These Maryland precedents are consonant with the law of Delaware, to which Maryland courts often look for guidance, and Delaware would reach the same result. *See, e.g.*, *In re Ply Gem Indus., S'holders Litig.*, No. 15779-NC, 2001 Del. Ch. LEXIS 84, at *18-*19 (Del. Ch. June 26, 2001) (direct claim exists where a corporate CEO placed his interests above those of shareholders when negotiating a merger, and the "alleged breaches of fiduciary duties resulted in unfair price and/or unfair process"); *Deephaven Risk Arb Trading, LTD. v. UnitedGlobalCom, Inc.*, No. 379-N, 2005 Del. Ch. LEXIS 107, at *30, *31 n.41 (Del. Ch. July 13, 2005) (where actions were taken to favor certain shareholders to the detriment of others, but the corporation itself was unaffected

- 24 -

financially, claim would be considered direct); *Gatz v. Ponsoldt*, No. 174-N, 2004 Del. Ch. LEXIS 203, at *30, *31 n.54 (Del. Ch. Nov. 8, 2004) (where a particular transaction hurt disfavored class of public shareholders, but had not affected the overall value of the corporate entity, claim to reverse the wrongful transaction was direct and not derivative); *Marcoux v. Prim*, No. 04CVS920, 2004 NCBC LEXIS 4, at *35 (N.C. Super. Apr. 16, 2004) (construing recent Delaware authorities and holding that claim is direct whenever by reason of the wrongful acts: "The treasury of the shareholder is depleted, not the treasury of the corporation.").

In *Strougo*, *supra*, the Second Circuit extensively surveyed Maryland law, and concluded that claims against corporate directors for breach of fiduciary duty may be brought directly where the reduction in value complained of was suffered by the shareholders and not by the company in which they invested:

> It is clear, however, that the claims of the shareholders generally cannot be dismissed for failure to state a direct, as opposed to derivative, claim, as the district court did. The alleged injuries resulting from the coercive nature of the rights offering *do not derive from a reduction in the value of the Fund's assets or any other injury to the Fund's business*. ...
>
> Thus, in the case of both the participating and non-participating shareholders, it would appear that the alleged injuries were to the shareholders alone and not to the Fund. These harms therefore constitute "distinct" injuries supporting direct shareholder claims under Maryland law. *The corporation cannot bring the action seeking compensation for these injuries because they were suffered by its shareholders, not itself*.[11]

282 F.3d at 175.

---

[11] The Second Circuit also rejected an argument that the shares are property of the fund, and that the fund therefore suffered an injury by diminution of the share value: "A corporation, as the plaintiff correctly argued, cannot have an equity interest in itself." *Strougo*, 282 F.3d at 175 n.10. *Accord, Stargatt v. Avenell*, 434 F. Supp. 234, 248 (D. Del. 1977).

The *Strougo* court was also unimpressed by the illogical argument that if harm is inflicted on all *shareholders* equally this must mean that the harm was also suffered by the corporation:

> We thus reject the "undifferentiated effect on shareholders" standard, which the district court articulated in *Scudder* and relied upon in its decision in this case. ... To sue directly under Maryland law, a shareholder must allege an injury distinct from an injury to the corporation, not from that of other shareholders.[12]

*Id.* at 171.

Thus, the claims asserted in this case relating to damages caused by the negotiation of an unfair merger ratio, breach of *Revlon* duties and the false and misleading Proxy plainly state direct claims under Maryland law, as no harm is alleged to MBNA as a corporate entity.

## B.   The Actions of Defendant Hammonds and the Other MBNA Officers and Directors in Connection with the Merger Violated Their Fiduciary Duties

It is well-established in Maryland law that fiduciaries such as Hammonds may not place their personal interests above those to whom they owe a fiduciary duty. *See Hammond v. Lyon Realty Co.*, 163 A. 480, 484 (Md. 1932) (persons occupying a fiduciary position "cannot innocently sacrifice the interest of those who trust them to their own personal advantage").

Maryland courts have apparently not yet had an opportunity to apply these general principles in a case involving a merger negotiated by a seriously conflicted CEO.[13]

---

[12] Subsequent to *Strougo*, the Delaware Supreme Court likewise rejected the notion that claims must be considered derivative if all shareholders were equally harmed by the wrongful acts: "For purposes of distinguishing between derivative and direct claims, we expressly disapprove both the concept of 'special injury' and the concept that a claim is necessarily derivative if it affects all stockholders equally." *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).

[13] In two cases cited by defendants, *Jasinover*, 2004 WL 3135516 and *Wittman v. Crooke*, 707 A.2d 422, 425 (Md. App. 1998), the record before the Court demonstrated that the CEOs exerted prolonged and exhaustive efforts to get the best merger price, and

- 26 -

Numerous decisions in Delaware and elsewhere have upheld claims similar to those at bar against both corporate CEOs who engage in self-dealing in the course of negotiating a merger, and corporate directors who exhibit a deliberate indifference to their fiduciary obligation to protect public shareholders from the machinations of such a self-interested executive. *See, e.g., Burns v. Friedli*, 241 F. Supp. 2d 519, 522 (D. Md. 2003) ("At this stage … plaintiffs have adequately pled that directors Friedli and Link breached their fiduciary duties, resulting in both unfair dealing and unfair price with respect to the merger, which is sufficient to sustain class claims as distinguished from derivative ones."); *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246-47 (Del. 1999) (where CEO extracted special concessions for himself when negotiating a merger to the detriment of public shareholders, class claims were adequately stated against both the CEO and the members of Bally's Board of Directors, for consciously permitting such misconduct); *Alidina v. Internet.com Corp.*, No. 17235-NC, 2002 Del. Ch. LEXIS 156, at \*19-\*20 (Del. Ch. Nov. 6, 2002) (direct claim for breach of fiduciary duty upheld against all directors where plaintiffs alleged that "the board members knew [CEO] Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself"); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 982-83 (Del. Ch. 2000) (claim against directors upheld where board members deliberately allowed CEO to negotiate "side deals" for himself during merger process, and failed in their duty to take measures to ensure a fair price).

---

extracted no extraordinary benefits for themselves. In a third case, *Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at \*1-\*5 (Md. Cir. Apr. 1, 2004), extraordinarily thorough efforts to obtain numerous bids were conducted by independent investment bankers and a Special Committee of independent directors over more than a one year period, and the Special Committee negotiated the ultimate transaction. The situation at bar presents the opposite case, where the fiduciaries negotiated for themselves at the expense of the MBNA shareholders.

The common thread among these decisions is a pattern of self-dealing by the CEO, which culminates in an unfair merger process tainted by the CEO's negotiation of special (usually exorbitant) benefits for himself which are not shared equally by public stockholders. This very thing is alleged to have occurred here, to the detriment of MBNA's public investors. Hammonds, MBNA's CEO, completely controlled the Merger negotiation process. ¶¶5, 181. The MBNA Board members are alleged to have known of his conflict of interest in doing so, yet they appointed no Special Committee to neutralize this influence. ¶¶4-5, 16, 89. Nor did the directors fulfill their well-known duty of disclosure when Hammonds lied to the press about whether MBNA was for sale, thus depressing the stock price, and scaring off potential bidders.[14] ¶¶15, 86.

Statements by corporate executives denying that a company is for sale when it is actively looking to find a merger partner have repeatedly been held to constitute fiduciary wrongdoing. Thus, Hammonds' misleading statement to *Business Week* to the effect that MBNA was not for sale during the time he was engaged in active efforts to sell the Company "his way," is fully actionable. *Id.* A similar breach of fiduciary duty claim was upheld in *Pittiglio v. Michigan Nat'l Corp.,* 906 F. Supp. 1145 (E.D. Mich. 1995), in which it was alleged that management members misrepresented that the company was not

---

[14]    The directors' duty of disclosure compels them to ensure that shareholders and the market are not misled about material matters relevant to the corporation's affairs. The directors must fulfill this duty at all times -- "even in the absence of a request for shareholder action." *Malone v. Brincat,* 722 A.2d 5, 14 (Del. 1999). *See Herring v. Offutt,* 295 A.2d 876, 879 (Md. 1972) (recognizing duty of fiduciary "to make full disclosure of all known information that is significant and material to the affairs" of the fiduciary relationship); *Homa v. Friendly Mobile Manor, Inc.,* 612 A.2d 322, 326-27 (Md. App. 1992) ("Where there is a fiduciary relationship, a duty of disclosure is imposed."); *Schnader v. Brooks,* 132 A. 381, 383 (Md. 1926) ("Where there is an obligation to speak a failure to speak will constitute the suppression of a fact...") *See also Thorn v. Reliance Van Co., Inc.,* No 84-1740, 1985 U.S. App. LEXIS 25929, at *6 (3d Cir. App. Dec. 6, 1985) ("directors who are aware of a breach of fiduciary duty committed by a fellow officer or director, but remain silent, are jointly and severally liable for the breach") (interpreting Pennsylvania law).

for sale so that they could secretly negotiate a sweetheart merger and "reap a financial windfall in excess of $32 million." *Id.* at 1148-49.

> Also in furtherance of the fraudulent scheme, it is alleged that Defendants issued false and misleading statements, in order to convince the market and potential bidders for MNC that MNC planned to remain independent. By concealing their actual plan to sell the company, Defendants would be able to artificially depress the price of MNC stock, so that NAB's offer price would provide a substantial premium over the market price. Further, such a deception would inhibit other entities from pursuing acquisition of MNC, which might put MNC "in play" or cause the stock price to rise, and jeopardize the merger agreement with NAB. ...

*Id.*

> The Court finds that Plaintiffs have pled a sufficient basis for their individual breach of fiduciary duty claims, and Defendants' motion to dismiss is denied.

*Id.* at 1154. *See also In re MCI Worldcom Secs. Litig.*, No. 99-CV-3136 (ILG), 2000 U.S. Dist. LEXIS 7230, at *14-*15 (E.D.N.Y. Apr. 11, 2000) (shareholder claim for fraud upheld where evasive comments by corporate spokesperson misled investors into believing no corporate transaction was being contemplated); *Buxbaum v. Deutsche Bank, A.G.*, No. 98 Civ. 8460 (JGK), 2000 U.S. Dist. LEXIS 5838 (S.D.N.Y. Mar. 7, 2000) (false denial of merger negotiations held actionable under federal law); *Shepard v. Humke*, No. IP 01-1103-CH/K, 2002 U.S. Dist. LEXIS 14731, at *25-*26 (S.D. Ind. July 9, 2002) ("Shepard's allegations regarding the directors' misrepresentations and the break-up fee are the sort of allegations that could sustain a breach of fiduciary claim if supported with evidence that the directors deliberately chose not to act in the best interests of the corporation's multiple constituencies or were indifferent to the interests of those constituencies. The court reserves its analysis of Shepard's multiple breach of fiduciary duty theories until later stages of the proceedings, when a record of actual evidence will be available.")

Further, the MBNA Board members acquiesced in an unduly hurried process which involved Hammonds negotiating special benefits for himself, and no true merger

premium for the MBNA shareholders. ¶¶4-5, 16, 89, 96(a). The directors then approved an unlawful lock-up agreement which would make a better and competing bid (and one which might not favor Hammonds' interests) effectively impossible. ¶¶5, 16, 87. Finally, the Merger vote was procured by a materially misleading Proxy. ¶¶5, 7, 42, 83, 89.

These allegations are more than sufficient to set forth a breach of fiduciary duty claims against Hammonds and all Board members under precedents such as *Burns*, *Parnes*, *Alidina*, *Crescent/Mach* and *Pittiglio*, *supra*. As defendants herein are fully apprised of the basic facts underpinning what they are alleged to have done to breach their fiduciary obligations, plaintiffs have met the pleading standards set down by the Third Circuit in *Tower*, and the Complaint must be upheld.

## C.    The MBNA Director Defendants Violated Their *Revlon* Duties

Despite defendants' arguments to the contrary, it is established law in Maryland that in the context of mergers, directors "have a duty of loyalty to [the company] and [its] shareholders to do their *very best* for them in [the] merger." *Wittman,* 707 A.2d at 425. *See also Hudson*, 2004 WL 1982383, at *11 (citing *Wittman* and noting that Maryland, like Delaware, appears to impose "*Revlon* duties" upon directors in the merger context that require directors to "to try to secure the best merger terms available for stockholders").[15] Despite the clear language of these two decisions, defendants assert that "Plaintiffs' 'Revlon' theory is not viable under Maryland law." Insider Defs.' Br. at

---

[15]    The duties of directors in a change of control situation, such as negotiation of a merger, were most famously set down by the Delaware Supreme Court in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1985). While "*Revlon* does not demand that every change in the control of a Delaware corporation be preceded by a heated bidding contest," it does demand "that directors act with scrupulous concern for fairness to shareholders." *Barkan v. Amsted Indus., Inc.* 567 A.2d 1279, 1286 (Del. 1989). While defendants attempt to paint plaintiffs' claims as merely alleging that the defendants failed to conduct an auction and is therefore insufficient to state a claim, Outside Defs.' Br. at 28, plaintiffs have actually alleged much more which demonstrates that defendants failed to act with that scrupulous concern for the fairness to shareholders required of fiduciaries. ¶¶3-5, 83-95, 169-185.

27. Defendants are clearly wrong. The only difference between Delaware law and Maryland law in relation to "*Revlon* duties" is that Delaware courts employ a heightened level of scrutiny to evaluate claims based on those duties, whereas in Maryland, the business judgment rule provides a presumption that the directors satisfied those duties. *Hudson*, 2004 WL 1982383, at *11 n.13.[16] The presumption, however, does not "render directors impervious to plaintiff[s]['] claims." *Id.* Instead, plaintiffs merely have the burden of rebutting the presumption. *Id.* Thus, under Maryland law, to survive a motion to dismiss, plaintiff need only "allege facts showing a failure of the directors to adhere to their [*Revlon*] duties," *id.*, and the pleading burden in federal court does not require that this be done with particularity, as noted in *Tower, supra*. Here, plaintiffs have clearly set forth actionable claims under any standard.

In the merger context, the inquiry is "'directed solely at the manner, or process, by which a director makes decisions.'" *Id.* *See* Md. Corps. & Ass'ns Code Ann. §§2-405.1(a), 2-405.1(e). Here, plaintiffs have adequately alleged that the MBNA Director Defendants failed to engage in a process that sought to maximize shareholder value. ¶¶85-86, 176-185.

First, the MBNA Director Defendants agreed to show stopper provisions designed to *prevent* the emergence of any other potential bidder that might better maximize shareholder value. ¶¶87, 183. Specifically, the MBNA Director Defendants agreed to a no show shop provision and granted to Bank of America an option to acquire up to approximately 249.8 million shares of MBNA common stock at a discount of approximately $1.4 billion. *Id.* This option gave BAC the right to purchase up to 19.9% of MBNA's common stock. ¶183. Agreeing to this provision effectively guaranteed that

---

[16] Even this distinction is illusory as the Delaware Supreme Court has said that in change of control situations "a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule." *Barkan*, 567 A.2d at 1286.

shareholder value would not be maximized beyond what BAC had offered. This show-stopper was not provided to BAC to provide it some reasonable protection from a competitor seeking to acquire MBNA at a marginally higher price, and to secure a favorable offer for the MBNA shareholders. Rather it was agreed to so that the Insider Defendants would be assured that the very deal they wanted would be effected, since no other entity was going to come forward in the face of the BAC option. Given their duty to attempt to maximize shareholder value, an agreement that effectively stifles the process and prevents the maximization of shareholder value cannot be a valid exercise of business judgment in carrying out the MBNA Director Defendants' *Revlon* duties.

Defendants, relying on *Jasinover*, attempt to justify the show stopper provisions by arguing that they were allowed to lock up an agreement. Insider Defs.' Br. at 29; Outside Defs.' Br. at 29. *Jasinover*, however, provides no support for the option granted to BAC as being an acceptable lock up agreement in attempting to maximize shareholder value. In *Jasinover*, the court was entertaining a motion for a preliminary injunction and was therefore evaluating the likelihood that plaintiffs would succeed on the merits of their claims, not whether they had adequately pled a claim. 2004 WL 3135516, at *7. More importantly, the court in *Jasinover* made clear that the locking up the merger in that case was acceptable because that the size of the breakup fee "[would] not preclude another party from making a competing proposal." *Id.* at *10. The exact opposite is the case here. The option granted to BAC would effectively preclude another party from making a competing proposal. Thus, *Jasinover* supports plaintiffs' allegations that the option granted to MBNA is not protected by the business judgment rule because it was a breach of the directors' *Revlon* duties.

The BAC option agreement was also in violation of the MBNA Director Defendants' *Revlon* duties because it guaranteed that there would be no effective market check after the deal was locked up as required under Maryland law. *Jasinover*, 2004 WL 3135516, at *9. Defendants' argument that a market check took place before the

defendants locked up the deal with BAC misses the point. Outside Defs.' Br. at 30. As an initial matter, the negotiations with Wachovia were not a valid market check given that Hammonds and other officers were seeking a deal beneficial to them and not to MBNA. Thus, any value indicators provided by the Wachovia negotiations are skewed to the personal terms Hammond sought. More importantly, when a board locks up a deal, a post-agreement market check is required. *Jasinover*, 2004 WL 3135516, at \*9. Here, there was no post-agreement public market test/check. Accordingly, agreeing to the lock up provision in this case was a breach of the MBNA Director Defendants' *Revlon* duties.

Second, while the above allegations are more than sufficient to overcome the presumption provided by the business judgment rule on a motion to dismiss, the MBNA Director Defendants are also not protected by the business judgment rule because they failed to correct defendant Hammonds' statement that MBNA was not for sale. ¶¶15, 86. Hammonds' statement deflated the stock value of MBNA. *Id.* Allowing MBNA's stock to remain artificially depressed resulted in a lower price for MBNA shareholders and cannot be seen as anything but a deliberate abrogation of the MBNA Director Defendants' duty to maximize shareholder value.

Third, the presumption afforded by the business judgment rule is rebutted if the facts alleged show that the directors' decision was based on extraneous influences rather than the corporate merits. *Hudson*, 2004 WL 1982383, at \*12. Here, the MBNA Director Defendants acquiesced to an unfair deal orchestrated by the self-interested Hammonds. ¶¶4-5, 16, 85, 89; *supra* §IVB. Defendant Hammonds and others in MBNA's management, sought out a company that would (i) buy MBNA; (ii) keep Hammonds on at the new company in an executive position of influence; (iii) offer Hammonds' close friends employment with the new entity; and (iv) agree that the liability arising out of the Securities Class Action and this derivative action, in which Hammonds and the other Defendants were personally named as defendants, would be effectively

made to disappear through the extraction of broad indemnification from acquirer.[17] ¶¶2, 84.

While a financial institution, likely Wachovia, was identified as having the greatest interest in MBNA and thus the best likely result for MBNA shareholders, with Hammonds' requirements for a merger partner in mind, a deal could not be negotiated with management. ¶¶3, 86. Instead, BAC was contacted. As defendant Lewis of BAC was willing to agree to Hammonds' requirements in a merger partner, Hammonds and Lewis negotiated and agreed to a deal in two hours. *Id.* Clearly, this process was initiated and undertaken to further the interests of Hammonds instead of attempting to maximize shareholder value. Thus, the MBNA Director Defendants' actions are not protected by the business judgment rule because these directors failed to adhere to their duty to maximize shareholder value, and their actions in approving or permitting the conduct alleged in the Complaint were facially unreasonable.

Fourth, the MBNA Director Defendants are not protected by the business judgment rule because these defendants put their own interests ahead of the interests of the Company instead of complying with their *Revlon* Duties. ¶90. Specifically, plaintiffs allege that the MBNA Director Defendants sold MBNA, in large part, in order to escape liability for plaintiffs' shareholder derivative claims, and the class claims. *See Id.*

---

[17] The Outside Defendants' citations to Md. Corps. & Ass'ns Code Ann. §2-405.1(b) and *In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9 (Del. Ch. 2004) for the proposition that the directors are free from liability because they were allowed to rely on defendant Hammonds, like much of their motion, misses the point. Outside Defs.' Br. at 31. While directors are allowed to rely on officers to conduct negotiations, a "director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted." Md. Corps. & Ass'ns Code Ann. §2-405.1(b)(2). In *MONY*, the court found that the board's reliance on its CEO to conduct merger negotiations was reasonable because the board actively supervised his negotiations and even rejected one proposal. 852 A.2d at 20. In stark contrast, the two hour negotiation of the deal, the terms of the deal, and Hammonds' obvious self dealing demonstrate that the MBNA Director Defendants clearly had knowledge that it was not reasonable to rely solely on defendant Hammonds to maximize shareholder value.

Indeed, BAC promised in the Merger Agreement that it would not pursue plaintiffs' derivative claims, would "use their best efforts" to "defend" against and defeat the derivative claims (and the class claims). ¶107.[18] Under Maryland law, these allegations of self interest are sufficient to rebut the presumption of the business judgment rule. *Hudson*, 2004 WL 1982383, at *11.

In sum, plaintiffs have alleged that the MBNA Director Defendants engaged in "self dealing or unconscionable conduct" instead of acting in the best interests of MBNA's shareholders in fulfilling their *Revlon* duties. Under Maryland law, such allegations are sufficient to rebut the business judgment of the Board. *Wittman*, 707 A.2d at 425. Accordingly, plaintiffs' claim regarding defendants' breach of their *Revlon* duties must not be dismissed.

### D. Defendant Hammonds and the Other MBNA Fiduciaries Are Adequately Alleged to Have Obtained Improper Benefits or Engaged in Deliberate Wrongdoing

Defendants maintain that Hammonds and the other MBNA officers and directors are exempt from liability under an exculpatory clause inserted in MBNA's Certificate of Incorporation, which was adopted pursuant to authority granted by Md. Courts & Jud. Proc. Code Ann. §5-418. Section 5-418(a)(1) limits the liability of corporate officers and directors to cases where it is "proved" that the fiduciary received an "improper benefit [in property] or money" or where a "judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding ...." Md. Courts & Jud.

---

[18] Indeed, plaintiffs' allegations are supported by defendants' current argument that plaintiffs lack standing to pursue their derivative claims because the Merger purportedly eliminated their exposure to derivative claims by eliminating plaintiffs' "contemporaneous ownership." Outside Defs.' Br. at 12-13. *See also* Insider Defs.' Br. at 12-13.

Proc. Code Ann. §5-418(a)(2). On its face, Section 5-418 is not a pleading statute; it confines itself to what a *jury* or other trier of fact must find if a fiduciary is ultimately to be held liable. While this statute may have some relevance to the type of evidence that must be presented at trial, it is erroneous for defendants to argue that it heightens the pleading standard on a motion to dismiss. In *Tower*, the Third Circuit, without deciding the issue, intimated that a similar Delaware corporate charter provision that exculpated the fiduciaries from liability unless it was proved they engaged in certain types of misconduct probably would not support a motion to dismiss, "the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense. As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)." 416 F.3d at 242.

Assuming *arguendo* that Section 5-418 does affect what a plaintiff must plead to set forth a claim under Maryland law, guidance as to what exactly must be pled may be drawn (in the absence of Maryland precedent) from Delaware precedents construing an analogous exculpatory statute adopted by the Delaware legislature, 8 Del. Code §102(b)(7). Delaware courts have ruled that Section 102(b)(7) requires a plaintiff to establish "bad faith" to support a cause of action, and this requirement can be satisfied by alleging, as to a fiduciary, an "intentional dereliction of duty, a *conscious disregard for one's responsibilities*," or a "[d]eliberate indifference ... in the face of a duty to act." *In re Walt Disney Co. Derivative Litig*., No. 15452, 2005 Del. Ch. LEXIS 113, at *175, *175 n.459-60 (Del. Ch. Aug. 9, 2005). While Maryland's statute uses the word "dishonesty" and Delaware courts employ the term bad faith, "dishonesty," "bad faith" and "intentional dereliction of duty" are interchangeable legal concepts. *See, e.g., Hartford Accident & Indem. Co. v. First Pennsylvania Bank, N.A*., 859 F.2d 295, 297 (3d Cir. 1988) ("a finding of bad faith must be predicated on a showing of dishonesty"); *S.E.C. v. Lehman Bros., Inc*., 157 F.3d 2, 7 (1st Cir. 1998) ("The SEC points to cases that forbid someone from deliberately averting his eyes from evident misconduct. We agree

- 36 -

that such conduct, even if literally short of actual knowledge, could fairly be equated with dishonesty or bad faith.").[19] Thus Delaware precedents under Section 102(b)(7) may be viewed as persuasive as to how Maryland would decide similar pleading issues that may arise under Section 5-418.[20] *See Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005) (Section 102 (b)(7) permits liability only for "deliberate wrongdoing").

Subsequent to the enactment of Section 102(b)(7) many courts have upheld Delaware breach of fiduciary duty claims based on pleadings that are strikingly similar to the Complaint at bar. Given their somewhat different roles in the Merger, we will discuss the application of these precedents separately as to defendant Hammonds and the remainder of the MBNA officers and directors.

### 1. The Complaint Alleges that Hammonds and Others Received Improper Personal Benefits and Acted in a Dishonest Fashion

The many ways in which defendant Hammonds breached his fiduciary duty in connection with the negotiation and consummation of the Merger are detailed in the Complaint. Through subterfuge and other unlawful acts, Hammonds secured substantial personal benefits unavailable to the public shareholders.    ¶¶22, 95.    Hammonds' deliberate misconduct and his receipt of improper pecuniary benefits satisfies any possible pleading obligation under Maryland's Section 5-418. *See Miller v. U.S. Foodservice, Inc.*, 361 F. Supp. 2d 470, 480 (D. Md. 2005) (Delaware exculpatory clause did not aid former CEO on motion to dismiss where it was alleged he abused his corporate office to gain unfair personal benefits); *Parnes*, 722 A.2d at 1246-47 (claim upheld against self-dealing CEO in connection with corporate merger); *Gentile v.*

---

[19]    Indeed, Black's Law Dictionary defines "bad faith" as "*dishonesty* of belief or purpose." Black's Law Dict. 134 (7th ed. 1999). Maryland's Section 5-418(a)(2), which explicitly permits liability for a "failure to act," comports with Section 102(b)(7) which has been interpreted, as noted above, to apply to conscious derelictions of duty.

[20]    Like Section 5-418, Section 102(b)(7)(iv) provides for liability for "any transaction from which the director derived an improper personal benefit."

*Rossette*, No. 20213-NC, 2005 Del. Ch. LEXIS 160, at \*26-\*39 (Del. Ch. Oct. 20, 2005) (summary judgment denied as to claims against CEO where CEO negotiated special "inducements" for himself in conjunction with negotiating merger); *Alidina*, 2002 Del. Ch. LEXIS 156, at \*19-\*20 (motion denied where CEO used his influence to select merger partner, dictated the terms of the deal, and procured special benefits for himself); *Crescent/Mach*, 846 A.2d at 982-83 (claim stated where CEO negotiated "side deals" for himself during merger process).

In addition to receiving improper personal benefits, Hammonds is alleged to have engaged in other acts which deliberately disadvantaged the public shareholders, including arranging for the unfair lock-up agreement, the no-shop clause, lying to the media about MBNA's status as a takeover candidate and issuance of the misleading Proxy. These acts constitute bad faith and dishonest dealing. *See, e.g.*, *Johnson v. Shapiro*, No. 17651, 2002 Del. Ch. LEXIS 122, at \*31 (Del. Ch. Oct. 18, 2002) (similar deceptive conduct sufficiently alleged to overcome effects of exculpatory clause).

Thus, there can be no doubt that plaintiffs' claims are well-pled against Hammonds and all others who received improper benefits by reason of the unfair Merger.

### 2. The MBNA Directors Other than Hammonds are Adequately Alleged to Have Engaged in Deliberate Misconduct

The Complaint is replete with allegations concerning the MBNA Board members' *intentional derelictions of duty*, their conscious disregard for their responsibilities, and their deliberate indifference in the face of a duty to act. Thus, it is averred *inter alia* that the MBNA Board: (a) rubber-stamped a Merger deal negotiated by a self-interested CEO which provided exorbitant and unjustified benefits to that CEO but no true merger premium to the shareholders, thus depriving them of billions of dollars in value, ¶¶4-5, 16, 89; (b) knew they had a duty to ensure that only accurate information regarding corporate affairs was disseminated to the public, but stood mute when Hammonds misrepresented to the press that MBNA was not for sale, thus depressing the potential

sale price of the shares held by unaffiliated shareholders, ¶¶15, 86; (c) approved a lock-up option which provided that BAC could purchase a block of MBNA shares at a $1.4 billion discount, ensuring that no higher bid could emerge as such a bid would be prohibitively expensive, ¶¶5, 16, 87; and (d) approved a Proxy solicitation which omitted facts material to a shareholder vote, ¶¶5, 7, 42, 83, 89.[21]

As noted, courts have time and again recognized that such actions by Board members in connection with a corporate merger can constitute deliberate, bad faith misconduct. *See, e.g., Burns*, 241 F. Supp. 2d at 522; *Parnes*, 722 A.2d at 1246-47; *Alidina*, 2002 Del. Ch. LEXIS 156, at *19-*20; *Crescent/Mach*, 846 A.2d at 982-83.

In upholding claims similar to those asserted here in *Alidina*, Chancellor Chandler of the Delaware Chancery Court observed:

> Further, if the board members acquiesced in such unfair dealing to the detriment of the Mecklermedia shareholders, they too may have breached their fiduciary duty of loyalty. Plaintiffs allege that the board members knew Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself. With these allegations, the plaintiffs have sufficiently pled that the directors' acquiescence to this process, passive or otherwise, was beyond the bounds of reasonableness. Just as the CEOs' conduct in both *Parnes* and *Crescent/Mach* "tainted the entire process," if plaintiffs' assertions in this case are accepted as true, Meckler's conduct would have been so egregious that the Mecklermedia board likely could not have approved the Transactions in good faith. Thus, I conclude that plaintiffs have sufficiently alleged that the directors may have breached their duty of loyalty. Defendants' motion to dismiss the duty of loyalty claim is denied.

2002 Del. Ch. LEXIS 156, at *19-*20.

Furthermore, directors who are alleged to have knowingly permitted misstatements to be made, either to the press or in SEC-filed documents like proxies, can gain no shelter from exculpatory provisions like Section 5-418. *See Felker*, 2005 WL

---

[21] As set forth above, these actions also rebut the presumption of the business judgment rule.

602974, at *4 (applying Maryland law and refusing to dismiss disclosure claims under Section 5-418). *See also In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 732 (D. Del. 2000) ("Plaintiffs have averred sufficient circumstantial evidence to permit the inference that one or more defendants may have knowingly withheld material information from the Company's shareholders. Such conduct may rise to a violation of the directors' duty of loyalty to the Company's shareholders, and thus would not warrant immunity under the exculpatory clause of the Company's corporate charter."); *In re LNR Prop. Corp. S'holders Litig.,* No. 674-N, 2005 Del. Ch. LEXIS 171, at *24-*26 (Del. Ch. Nov. 4, 2005), *rev'd* Dec. 14, 2005, (court refused to employ exculpatory clause to dismiss complaint against purportedly "independent" Board members who allowed self-interested fiduciary to negotiate merger, and voted to foreclose the consideration of other bids, as circumstances could support claim that directors made no honest effort to protect minority shareholders).

Finally, the MBNA directors were in plain dereliction of their duties in approving the "lock-up" option with BAC which granted BAC an option to buy shares at up to a $1.4 *billion* discount. The Proxy asserts that "[t]he option could have the effect of discouraging a company from trying to acquire MBNA prior to completion of the merger or termination of the merger agreement." Proxy, at 5.

In truth, as alleged in the Complaint, this option was a complete "show stopper" which *would* chill any new bidder from making an attempt to acquire MBNA. ¶¶5, 16, 87. Indeed, it may be fairly inferred from the mere enormity of this $1.4 billion penalty and the more than $6 billion increase in price a competing bidder would have to pay, that Hammonds and BAC had a real and palpable fear that some other company would bid higher for MBNA unless they took extreme measures to prevent this. But to foreclose potential higher bids is an unlawful act, amounting to a purposeful breach of fiduciary duty. Defendants cite *Jasinover,* 2004 WL 3135516, to justify their conduct, but this decision does not help them. Not only does *Jasinover* require that a Board act in a

- 40 -

vigorous and well-informed manner in protecting the interests of all shareholders, but the decision makes plain that Maryland directors must engage in a "post-agreement market check," which here was precluded by the onerous stock option granted to BAC. *Id.* at *10. Although a Board may use reasonable means to lock up a deal, there is still "a need to market check or test the Board's decision." *Id.* at *9. Moreover, *Jasinover* cites with approval the handbook on Maryland law written by defense attorney James J. Hanks, Jr. to the effect that Maryland directors satisfy their fiduciary duties by entering into an agreement only after *the board* (as opposed to a self-dealing executive) has conducted "arm's-length negotiations" with the bidder. *Id.* Attorney Hanks, as quoted in *Jasinover*, goes on to caution that the end result of the Board's arm's-length negotiations should be an agreement which does not completely stifle competitive bids: "However, in a change of control, *any process that does not involve some demonstrable market check, even post agreement, may be difficult to uphold.*" *Id.* (quoting Hanks, Maryland Corporation Law, §6.6(b) (2003 Supp.).

As detailed *supra*, *Revlon* duties are consistent with Maryland fiduciary principles[22] and the MBNA directors here fell far short of fulfilling their obligations.

---

[22] Attorney Hanks agrees with plaintiffs on this point, and confirms in his treatise that *Revlon* does apply to Maryland corporations. Hanks, Maryland Corporation Law, §6.6(b), at 176. Indeed, this treatise discusses a Maryland Board's *Revlon* duties at considerable length:

> The process followed by the board in performing its *Revlon* duties ... should include some opportunity for a market check, either before or after signing of an agreement and announcement of the transaction. A pre-agreement market check may involve a survey of possible buyers and the advice of independent experts. A post-agreement market check may be advantageous to the corporation -- and its stockholders -- because it nails down the bidder while leaving the corporation open to pursuing higher offers, which may be attracted by announcement of the transaction. *However, to be valid, a post-agreement market check must allow a fair opportunity for higher offers.*

*Id.* at 176-77.

Potential bidders for MBNA were hand-picked by Hammonds without any "demonstrable market check." ¶¶3, 87. Once Hammonds located his preferred buyer, he agreed immediately to the Merger price, the BAC lock-up option, and (prior to the shareholder vote, and very shortly after the Merger Agreement was signed) a $22.7 million retention payment. ¶¶5, 16, 22, 87, 94. The type of onerous lock-up option the MBNA Board rubber-stamped at Hammonds' behest is no more acceptable in Maryland than it is in Delaware, as it makes any post-agreement market check effectively impossible, and does not allow a fair opportunity for higher offers. *Revlon,* 506 A.2d at 176-77. An agreement having a similar chilling affect was enjoined by the Delaware Supreme Court in *Omnicare,* 818 A.2d at 936:

> The deal protection devices adopted by the NCS board were designed to coerce the consummation of the Genesis merger and preclude the consideration of any superior transaction. The NCS directors' defensive devices are not within a reasonable range of responses to the perceived threat of losing the Genesis offer because they are preclusive and coercive. Accordingly, we hold that those deal protection devices are unenforceable.[23]

*Id.*

Given the myriad knowing and deliberate breaches of fiduciary duty alleged in the Complaint against the MBNA officers and directors, defendants' motion to dismiss these claims based on MBNA's exculpatory clause must be denied.

### E.    Plaintiffs Have Stated a Direct Claim for Redress Relating to the Dissemination of a False and Misleading Proxy Statement

Defendants approved and filed the Proxy soliciting shareholder approval of the Merger with BAC. ¶¶5, 7, 42, 83, 89. Along with their recommendation that shareholders vote for the Merger, the MBNA Director Defendants included in the Proxy

---

[23]    Thus, this case presents a classic *Revlon* claim in which "a supine board under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price." *See In re Toys "R" Us, Inc., S'holder Litig.,* 877 A.2d 975, 1002 (Del. Ch. 2005).

an assortment of facts and figures about the terms and the process leading to the Merger that superficially appeared to furnish investors with adequate information with which to evaluate the fairness of the transaction. *Id.* The Proxy included purported explanations of the process leading up to the announcement of the Merger, the process by which UBS evaluated the fairness of the Merger transaction, and the factors that led to UBS' opinion that the transaction was fair to MBNA shareholders from a financial point of view. *Id.*

Unfortunately for MBNA shareholders, this skillfully applied patina of detail obscured substantial flaws in the Proxy that, individually and as a group, rendered the Proxy misleading. As the Complaint alleges, specifically, the Proxy glossed over and obscured the following:

(a)    The fact that defendant Hammonds had hastily patched together the Merger transaction over a two hour dinner with defendant Lewis the day after a potential deal with Wachovia fell through, with no involvement on the part of MBNA's board, ¶¶3, 89;

(b)    The fact that defendant Hammonds, in a desperate effort to sell MBNA on terms which favored him, retained investment banker Perella for the sole purpose of finding a buyer for MBNA, and had MBNA pay Perella a $40 million fee over and above the investment banking fees paid to UBS that were disclosed in the proxy, ¶3; and

(c)    The fact that defendant Hammonds had materially depressed the price of MBNA shares by falsely denying to the business press that MBNA was for sale, paving the way for a quick deal with BAC at a price which ensured handsome benefits for Hammonds, and no true premium for MBNA's public shareholders, ¶¶15, 86.

Additionally, the Proxy was incomplete and misleading in that it failed to disclose the basis for UBS' fairness opinion, the information provided by MBNA management to UBS in connection with the fairness opinion, and the estimated 2005 and 2006 earnings

upon which UBS based its evaluation of the merger consideration vis-à-vis price-to-earnings ratios of purportedly comparable companies. ¶¶5, 7, 42, 83, 89.

As argued below, these and other misstatements and omissions deceived MBNA shareholders, rendered the Proxy false and misleading, and breached defendants' duties under Maryland law, which requires directors of a corporation to fully disclose all material facts in connection with solicitation of proxies for a shareholder vote to approve a merger.

### 1.    The Duty to Disclose All Material Facts

As defendants must acknowledge (Insider Defs.' Br. at 31) directors of Maryland corporations have a duty to disclose all material facts to shareholders in connection with solicitation of a shareholder vote to approve a transaction. *See Parish v. Maryland & Virginia Milk Producers Ass'n*, 242 A.2d 512, 539 (Md. 1968) ("It is clear that officers and directors of a corporation stand in a sufficiently confidential relation to the corporation's stockholders to impose a duty upon them to reveal all facts material to the corporate transactions."); *Macgill v. Macgill*, 109 A. 72 (Md. App. 1919); *cf. Llewellyn v. Queen City Dairy*, 48 A.2d 322 (Md. App. 1946).

As the Court of Special Appeals of Maryland has put it: "To be actionable, misrepresentations must be material to the transaction at issue, either because it would be material to reasonable people generally or because it was material to the plaintiff." *Rozen v. Greenberg*, 886 A.2d 924, 930 (Md. App. 2005).

A fact is deemed material if a reasonable person would attach importance to its existence in determining his choice of action. *Golt v. Phillips*, 517 A.2d 328, 332-33 (Md. 1986) (citing Restatement (Second) of Torts, 538 (1977)). "The determination of materiality is a mixed question of fact and law that generally can not be resolved on the pleadings." *O'Malley v. Boris*, 742 A.2d 845, 850 (Del. 1999); *see also Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 441 (D. Md. 1996) (court should be careful in

considering whether materiality should be decided on a summary judgment motion). As the Third Circuit has observed, on a motion to dismiss, alleged misrepresentations and omissions are deemed material "unless the alleged misrepresentations and omissions were 'so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality.'" *Shaev v. Saper,* 320 F.3d 373, 384 (3d Cir. 2003) (quoting *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 280-81 n.11 (3d Cir. 1992)).[24]

As set forth below, plaintiffs have plead several highly material misstatements and omissions of facts in the Proxy that rendered the vote of MBNA shareholders uninformed, and that demand the denial of the instant motions to dismiss.

> **2.    Defendants Failed to Disclose the Highly Material Fact that the Merger Was Hastily Negotiated in One Day by Defendant Hammonds and Banker Perella with No Involvement by the Board After a Deal with Wachovia Fell Through**

The Proxy contains a narrative description of the facts surrounding the negotiation of the Merger that characterizes the process by which MBNA and BAC ultimately merged as an appropriately circumspect and careful month-long search by MBNA's Board and management for a suitable merger partner that could provide advantages of scale and ameliorate MBNA's dependence on its core business of issuing credit cards. Proxy, at 21-22.

To read the Proxy, a shareholder would never know that defendant Hammonds, in a desperate attempt to effect a friendly transaction, had retained as his own "shadow" investment banker Perella and had caused MBNA pay Perella $40 million to find a buyer for MBNA. ¶3. In fact, Perella and his fee are nowhere mentioned in the Proxy, leading the reader to believe that UBS was the only investment banking advisor to MBNA on the

---

[24] The Third Circuit stated in *Shapiro* that: "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." 946 F.2d at 281 n.11.

BAC Merger and that UBS' advisory fee of approximately $37,620,000 (less than undisclosed investment banker Perella was paid) was the only investment banking fee paid by MBNA. *See* Proxy at 29-30. This omission as material because, if shareholders were told of this, they would have wondered: (1) what emergency prompted Hammonds to recruit Perella at such a princely sum when MBNA already was being served by one well-compensated investment banker, UBS; and (2) whether Perella was employed as Hammonds' personal envoy to arrange for Hammonds' own personal benefits, rather that someone who was looking out for all of the Company's shareholders.

Contrary to the Proxy, with the help of Perella, defendant Hammonds desperately marketed MBNA to a buyer who would meet Hammonds' demands for personal benefits for himself and MBNA's other top managers in connection with a sale of MBNA. ¶¶3-5, 94-95. Hammonds' and Perella's efforts to secure a sale of the Company became frenzied after the first potential buyer identified by Perella, Wachovia, indicated (only after high-level meetings between top MBNA and Wachovia executives) on June 22, 2005 that it would not make a bid for MBNA. ¶3. So intent were Hammonds and Perella to sell the Company before it became public that MBNA up for sale that by June 23, 2005 -- *the very next day* after Wachovia said that it would not make a bid for MBNA -- defendant Hammonds and defendant Kenneth Lewis were meeting secretly at a private Wilmington club hammering out all of the major terms of an acquisition of MBNA by BAC over a two-hour dinner. *See* ¶3.

Misleading disclosures in documents soliciting shareholder action are actionable. *See Arnold v. Soc'y for Savings Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994). Where as here a company's overall disclosure of the process leading to a transaction does not give a full and accurate picture of what actually occurred, courts have recognized a disclosure violation. *See Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998) (where Schedule 14D-9 disclosure failed to reveal facts that bore significantly on an understanding of the process leading to a transaction, including

the personal financial interest that the CEO and chief negotiator for defendant, had in completing a transaction that he himself arranged, preliminary injunction requiring disclosure of additional facts granted); *Sonet v. Plum Creek Timber Co.*, No. 16931, 1999 WL 160174, at *7-*8 (Del. Ch. Mar. 18, 1999) (transaction enjoined pending additional disclosure where proxy statement gave overall false impression that an independent negotiating committee actually negotiated terms of conversion of limited partnership into REIT, when in fact the special committee did not negotiate with general partner but merely rejected one offer, and then accepted a second offer); *Alidina*, 2002 Del. Ch. LEXIS 156, at *28-*33 (disclosure claim stated where details of previous offer to purchase company, including failure of deal because counter party wanted to change terms of side deal providing financial benefits to largest shareholder and CEO of target company, were not revealed).

Contrary to the picture painted by the Proxy, Hammonds lurched toward the first merger partner that appeared after Wachovia withdrew, hastily hashed out the major terms including price over a two-hour dinner, and then let UBS and the Board paper over the deal with the fairness opinion and the descriptions of the merger process in the Proxy. This reality does not line up with the description of the process in the Proxy, which falsely depicts the process as reasoned, orderly, and procedurally fair. *See Clements v. Rogers*, 790 A.2d 1222, 1242 (Del. Ch. 2001) (description of special negotiating committee's efforts as diligent was misleading where the record indicated that neither the committee nor the investment bank advising it arrived at a range of fair values for the company before evaluating fairness of consideration offered). Although defendants may argue that Perella's role was revealed in the business press prior to the Proxy vote, they cannot establish that all or most Proxy voters saw these articles, and thus this does not excuse the omission of this material information from the Proxy. *See*, *Shaev*, 320 F.3d at 381 ("Material not include in the proxy statement is generally not charged to the knowledge of the stockholder.").

Based on the general thrust of the Proxy's disclosures concerning the process by which the BAC/MBNA Merger came to pass, together with the key omissions to disclose the haste with which the negotiations were conducted and Perella's role as Hammonds' "shadow" investment banker, the Proxy's discussion of the merger process was false and misleading, and plaintiffs have stated a claim against the MBNA Director Defendants.

### 3. The Proxy Omits to Disclose Hammonds' False Denial that MBNA Was for Sale, and the Potential This Statement Had to Depress the Pre-Merger Market Price

It would be highly material to voting shareholders to know that Hammonds, who was the chief negotiator and proponent of the Merger, stated that MBNA was not for sale during a period when he was frenetically attempting to secretly market the Company. ¶¶15, 86. Such information would cause a reasonable shareholder to view with skepticism claims that management was devoted to getting the highest price for his MBNA shares, and even lead him to doubt the credibility of any assertion in the Proxy endorsed by Hammonds. As noted, actions such as those alleged here against Hammonds have been held not only to support claims of breach of fiduciary duty, but also of securities fraud. *See Pittiglio*, 906 F. Supp. at 1154; *MCI*, 2000 U.S. Dist. LEXIS 7230, at *14-*15; *Buxbaum*, 2000 U.S. Dist. LEXIS 5838.

While defendants may argue that a fiduciary need not engage in "self-flagellation" in a proxy, this means only that they need not directly accuse themselves of fraud or breach of fiduciary duty; it does not excuse disclosure of basic facts material to investors. *See, e.g., Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 n.34 (Del. 1997) ("The rule [excusing fiduciaries from self-flagellation] limits only the duty to publicly admit to misconduct; it does not limit a party's duty to disclose all material facts relating to the party's actions, including those that might relate to misconduct.") (citation omitted)

Thus, the basic facts concerning Hammonds' conduct were required to have been included in the Proxy. In this regard, as well as others, the Proxy was grossly omissive.

### 4.    The Proxy Failed to Disclose the Analysis Underlying UBS' Fairness Opinion and the Assumptions and Data Provided to UBS by MBNA Management

Like much of the rest of the Proxy, the purported disclosures concerning UBS' methodology in reaching its opinion that the Merger was fair to MBNA shareholders from a financial point of view does more to gloss over the true facts than it does to assist the reader in evaluating the fairness of the transaction.

First, the sketchy explanation of the methodology by which UBS reached this conclusion (*see* Proxy, at 25-29) only confuses matters. The Proxy states that UBS compared MBNA's implied earnings multiple based on the merger consideration with the implied earnings multiples of seven other companies based on the companies' share prices as of June 28, 2005, ignoring the fact that five of the seven comparator companies (BAC, Citigroup, JP Morgan Chase, U.S. Bancorp and Wells Fargo) are not primarily credit card issuers, but rather are diversified commercial banks that have historically traded at much lower earnings multiples than stand-alone credit card issuers such as MBNA and American Express.   The individual implied earnings multiples of the purported comparator companies are not revealed, obscuring the fact that the only truly comparable company among the purported comparators, stand-alone credit card issuer American Express, trades at a forward earnings multiple of over 16 times earnings.

Also unexplained is what UBS' estimate of MBNA's earnings for each of 2005 and 2006 was, and whether MBNA's estimated 2005 and 2006 earnings, on which the entire comparison with other companies is based, included the mammoth $767.6 million one-time restructuring charge announced on April 21, 2005. This huge one-time charge, which basically wiped out an entire quarter's earnings, artificially lowered MBNA's overall 2005 earnings, in the sense that there is no indication that a charge of this magnitude is likely to be repeated. The fact that MBNA took a huge one-time charge should have little to do with MBNA's likely future earnings, as evidenced by the $717.9

million that MBNA earned in 3Q 2005, which annualizes to earnings of over $2.8 billion. *See* Proxy, at 10.

The Proxy claims that UBS valued the merger consideration to be given to MBNA shareholders at 14.4 times MBNA's projected 2005 earnings (Proxy, at 26), but a back-of-the-envelope comparison annualizing MBNA's earnings to $2.8 billion based on MBNA's actual 3Q 2005 earnings of $717.9 million would yield a valuation for MBNA of $40.3 billion, or over *$6 billion* more than the $34.2 billion in consideration that BAC actually furnished to MBNA shareholders upon completion of the Merger.

UBS said that the Merger consideration proposed by BAC was "fair," but it was not. Even MBNA's actual 2004 earnings of $2.677 billion would value the Company at over $38.5 billion -- over $4 billion more than what BAC actually paid and UBS said was fair -- based on a 14.4 price-to-earnings multiple. The numbers suggest that UBS was basing its purported price-to-earnings valuation comparison on an artificially low earnings estimate for 2005 that was based in part on a huge one-time charge against earnings, rather than on a multiple of a reasonable estimate of MBNA's future earnings. The MBNA Director Defendants had a duty to attempt to obtain the highest possible consideration for MBNA shareholders in connection with the Merger, and the Proxy only obscures the insufficiency of the consideration and the method by which UBS evaluated the Merger's fairness and frustrates the reader's ability to independently evaluate the sufficiency of the Merger consideration.

This complete lack of transparency concerning UBS' methodology could have been cured by simply disclosing the management estimates and assumptions upon which UBS based its estimated 2005 and 2006 earnings and the actual estimated earnings that UBS came up with.[25] As written, the Proxy contains just as much mumbo jumbo about

---

[25] The same can be said for BAC's failure to disclose a fairness opinion using the best available estimates of its future financial performance in the Proxy and the Proxy's failure to disclose the basis for the assumed discount and growth rates utilized by UBS. *See* ¶¶188(b) and (g).

multiples and comparators as is necessary to create the appearance of thoroughness while simultaneously obscuring that fact that the merger consideration is inadequate.

It is just this type of opacity in conclusory fairness opinions that has inspired a growing trend toward requiring disclosure of the data and assumptions underlying fairness opinions. As Vice Chancellor Strine of the Delaware Chancery Court has written concerning the traditional disinclination of courts to require disclosure of data and assumptions underlying fairness opinions:

> In my view, it is time that this ambivalence be resolved in favor of a firm statement that stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely. I agree that our law should not encourage needless prolixity, but that concern cannot reasonably apply to investment bankers' analyses, which usually address the most important issue to stockholders -- the sufficiency of the consideration being offered to them for their shares in a merger or tender offer. Moreover, courts must be candid in acknowledging that the disclosure of the banker's "fairness opinion" alone and without more, provides stockholders with nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability.
>
> The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result. This proposition is illustrated by the work of the judiciary itself, which closely examines the underlying analyses performed by the investment bankers when determining whether a transaction price is fair or a board reasonably relied on the banker's advice. Like a court would in making an after-the-fact fairness determination, a Pure minority stockholder engaging in the before-the-fact decision whether to tender would find it material to know the basic valuation exercises that First Boston and Petrie Parkman undertook, the key assumptions that they used in performing them, and the range of values that were thereby generated.

*In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002).

Other Delaware courts have likewise required disclosure of more than the inadequately-supported conclusion of investment bankers that a transaction price is fair. *See Crescent/Mach*, 846 A.2d at 987 (allegations of failure to disclose, *inter alia*, details of fairness opinion and terms of CEO's employment contract stated claim for breach of

duty of disclosure); *In re Staples, Inc. S'holders Litig.* 792 A.2d 934, 956 (Del. Ch. 2001) (declining to reach issue of whether omission of management projections relied upon by bankers in issuing fairness opinion was material because issue was not raised by plaintiff until reply brief, but urging defendants to "consider including the actual projections that formed the basis for the management and banker" in the revised proxy); *see also McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000) (allegations that Schedule 14D-9 disseminated in connection with tender offer was misleading because it omitted, *inter alia*, the information provided to the investment bank that issued a fairness opinion and the valuation methodologies utilized by the investment bank in reaching the fairness opinion should not have been dismissed on the pleadings; judgment of dismissal reversed).

## F.    Defendants Cannot Establish Shareholder Ratification on These Motions

Defendants claim that the MBNA shareholders "ratified" the misconduct alleged in the Complaint. Defendants' ratification argument is an affirmative defense as to which they have the burden of proof, and which cannot (except in rare circumstances not present here) be properly raised on a motion to dismiss. *See Brody v. Hankin*, 145 Fed. Appx. 768, 771 (3d Cir. 2005) (affirmative defense was improperly asserted on motion to dismiss); *In re 3COM Corp. S'holders Litig.*, No. 16721, 1999 Del. Ch. LEXIS 215, at *10 (Del Ch. Oct. 25, 1999) (shareholder ratification is "an *affirmative defense that can only be raised in defendants' answer and on which defendants' bear the burden of proof*").

Even if ratification could be raised at this stage, ratification requires full disclosure of the exact misconduct alleged in the Complaint, a standard defendants cannot possibly satisfy on this motion. *See In re Emerging Commc'ns., Inc. S'holders Litig.*, No. 16415, 2004 Del. Ch. LEXIS 70, at *114 (Del. Ch. May 3, 2004) ("Shareholders cannot be deemed to have ratified board action unless they are afforded

- 52 -

the opportunity to express their approval of *the precise conduct being challenged*.")
(footnote omitted).

Defendants argue with the Complaint, assert that the Proxy was not misleading,
and that the actions of the MBNA officers and directors were not wrongful. Plaintiffs, by
contrast, assert a plethora of misrepresentations, omissions, and undisclosed fiduciary
breaches. *See supra*, at 6-12. In such a case, "the precise conduct" alleged to be unlawful
was never made known to or approved by the shareholders, and any defense of
ratification at this stage must fail. *See Morris v. Bush*, No. 3:98-CV-2452-G, 1999 U.S.
Dist. LEXIS 9994, at *14 (N.D. Tex. June 23, 1999) ("The plaintiffs contend that the
defendants have never disclosed to shareholders, as required by the federal securities
laws, the information concerning the improper and potentially unlawful conduct by
[Chairman of the Board] Sterritt and other persons acting in concert with him. Without
such disclosure, the shareholder consents cannot validate the actions taken at the October
15, 1998 meeting.").[26]

In addition to the above, the MBNA shareholders cannot have ratified the grant of
the BAC "show stopper" BAC option because: (1) they were never asked to approve it or
disapprove it, as the MBNA Board had already approved it; and (2) they were misled as
to its nature and effect. First, the Proxy never seeks shareholder approval of the lock-up
option. Therefore, MBNA shareholders could not possibly have ratified this illegal

---

[26]  Defendants cite both *Wittman, supra,* and *Hudson, supra,* as supporting their
ratification argument, but in both of those cases the issue was not non-disclosure of all
pertinent facts to shareholders (as the courts found that full disclosure had indeed been
provided), but rather whether the *disclosed* conduct constituted a breach of fiduciary
duty. *Wittman*, 707 A.2d at 426; *Hudson,* 2004 WL 1982383, at *18. In *Wittman* and
*Hudson*, the precise conduct alleged to be wrongful was fully and fairly disclosed, and no
credible claim was made of shareholder coercion, or preclusion of superior deals. 707
A.2d at 426. By contrast, the issue of full disclosure in the case at bar is hotly disputed,
and plaintiffs here have presented viable disclosure claims, including claims that facts
relating to the process and conduct which led to the Merger were misrepresented, and
omitted. *See Shaev,* 320 F.3d at 384. Plaintiff also presents viable coercion and
preclusion claims, rendering any vote taken of no effect.

- 53 -

device. As was observed in similar circumstances in *In re Santa Fe Pac. Corp. S'holder*

*Litig.*, 669 A.2d 59, 68 (Del. 1995) (footnotes omitted):

> In voting to approve the Santa Fe-Burlington merger, the Santa Fe
> stockholders were not asked to ratify the Board's unilateral decision to
> erect defensive measures against the Union Pacific offer. The stockholders
> were merely offered a choice between the Burlington Merger and doing
> nothing. The Santa Fe stockholders did not vote in favor of the precise
> measures under challenge in the complaint. Here, the defensive measures
> had allegedly already worked their effect before the stockholders had a
> chance to vote. In voting on the merger, the Santa Fe stockholders did not
> specifically vote in favor of the Rights Plan, the Joint Tender or the
> Termination Fee. ... Since the stockholders of Santa Fe merely voted in
> favor of the merger and not the defensive measures, we decline to find
> ratification in this instance.[27]

*Id.*

Second, even if the Proxy could somehow be construed as seeking stockholder

ratification of the lock-up option (which it cannot), the discussion of the purpose and

effect of this option was misleading. A Proxy is required to be completely frank about the

purpose and effect of anti-takeover measures adopted by the Board. If the Board intends a

particular measure to quell other bids -- it must candidly admit its motivations. *ODS*

*Techs., L.P. v. Marshall*, 832 A.2d 1254, 1261 (Del. Ch. 2003) ("The Board is required

to disclose its motivations candidly, a proposition that 'hardly needs citation of authority.'

Delaware does not stand alone on this point, however. The Securities and Exchange

Commission has for some time recognized that full disclosure of the purposes and effects

of defensive measures is of actual significance to shareholders.") *See also S.E.C. v.*

*Dorchester Gas Corp.*, No. 10255, 1984 WL 2369, at *3 (D.D.C. Jan. 9, 1984)

---

[27] In a similar vein, MBNA shareholders were never asked specifically to approve the
improper actions of Hammonds that were not discussed in the Proxy, such as his
misrepresentation to the press, which had the effect of unlawfully depressing the pre-
merger stock price. Under Maryland law, fraudulent actions cannot not be ratified. *See
Parish*, 242 A.2d at 546 ("Nor may a majority of the membership ratify the fraudulent
action of the directors.").

("Companies must disclose all the material effects of anti-takeover measures, including their impact on any proposed corporate transaction, whether hostile or friendly. It is also important that management's interest in the corporate transaction (including the existence of any actual or potential conflicts of interests) and the ultimate effect of the anti-takeover measures on shareholders be disclosed. Absent such disclosure, shareholders will be unable to make informed voting decisions on the matters being proposed.").

> The Proxy asserts as to the lock-up option that: "[t]he option could have the effect of discouraging a company from trying to acquire MBNA prior to completion of the merger or termination of the merger agreement." Proxy, at 5.

In truth and in fact, the BAC lock-up option was intended to block other bidders, and it was reasonably *certain* to discourage other bidders given its enormity. As noted, any new bidder would have to pay up to $6 *billion* more than BAC if the option were exercised, a colossal figure which never appears in the Proxy. The Proxy presents this "show stopper" as raising a mere possibility that superior bids would be discouraged by using the word "could." This is false and misleading. The lock-up *would* discourage other bids, and shareholders were entitled to know this. *See Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1120-21 (9th Cir. 1982) (where the proxy statement stated that an anti-takeover measure "might" or "could" make a takeover more difficult, whereas the true purpose and effect went beyond this, summary judgment for defendants was reversed as plaintiff had validly stated a claim that the proxy "in this context did not adequately disclose the extent to which the anti-takeover proposal insulated [the company]").

Nor would ordinary shareholders have realized that the lock-up option would present a potential bidder with an additional $6 billion cost. This figure (and its chilling effect on a potential bidder) was neither disclosed, nor obvious, and its omission precludes any finding on this motion that MBNA shareholders were fully informed of all material facts. *See, e.g., Fradkin v. Ernst,* 571 F. Supp. 829, 851 (N.D. Ohio 1983) (proxy was misleading where it did not set out amounts that would be paid to insiders upon a

- 55 -

reorganization transaction, even though general formula was available: "At no point in the proxy statement, however, is there any disclosure of this amount or any indication that the value of the surrendered options and SARs would be of this magnitude. A reasonable investor would not otherwise assume that the options and SARs would have such a high surrender value. While the formula for calculating this value is disclosed in the proxy statement, its presentation does not give the reasonable investor any signal that it is important to perform these rather detailed calculations."). *See also Shaev,* 320 F.3d at 382 ("A proxy statement should inform, not challenge a shareholder's critical wits.") (citing *Virginia Bankshares Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).[28]

Finally, even if defendants argue that the MBNA shareholders did appreciate the chilling effect of the BAC lock-up option, there still can be no ratification because the lock-up option served to coerce MBNA shareholders to approve the Merger put before them, or see their shares materially decline in price. When a Proxy vote is infected by coercion, or all alternative deals have been precluded, defendants cannot win dismissal by asserting "ratification" as to any matter. *Cf. Omnicare,* 818 A.2d at 936 ("[T]he record reflects that any stockholder vote would have been robbed of its effectiveness by the impermissible coercion that predetermined the outcome of the merger without regard to the merits of the Genesis transaction at the time the vote was scheduled to be taken. ... Although the minority stockholders were not forced to vote for the Genesis merger, they were required to accept it because it was *a fait accompli*").

---

[28]    Plaintiffs respectfully submit that, under *Tower*, *supra*, these particular legal arguments concerning the BAC lock-up option need not have been set forth in the Complaint, which needed only to provide a "simple and brief" statement of the claim. Should the Court disagree, plaintiffs respectfully seek leave to either submit a conforming pleading, or to re-plead.

## VI. PLAINTIFFS HAVE STANDING TO PURSUE DERIVATIVE CLAIMS ON BEHALF OF BAC AND HAD NO OBLIGATION TO MAKE A FUTILE DEMAND ON THE BOARD OF DIRECTORS

### A. The Merger Has Not Deprived Plaintiffs of Standing as They Have Retained a Direct Equity Interest in the Entity on Whose Behalf a Recovery Is Sought

The parties agree that plaintiffs' derivative claims have passed to BAC as a result of the Merger. The defendants err, however, in insisting that this straightforward stock-for-stock merger deprives plaintiffs of standing to continue their derivative claims.

When these claims were first brought, plaintiffs were MBNA shareholders, with a direct equity interest in the corporation that would benefit from a derivative recovery, MBNA. Plaintiffs held their shares through the Merger, and still hold their shares. Thus, nothing substantive has changed: as BAC shareholders, they still have a direct equity interest in the corporation that would benefit from the derivative recovery. In such circumstances, plaintiffs satisfy the continuous ownership rule, and retain standing to press their derivative claims. *See Caven v. Miller (In re Paracelsus Corp. Sec. Litig.)*, No. H-96-4291, 1998 U.S. Dist. LEXIS 5484, at *12 (S.D. Tex. Mar. 76, 1998) (where plaintiff received shares in resultant corporation following a merger, and continued to hold those shares, he still had standing under Delaware and federal law to prosecute his derivative claims). *Accord, Kessler v. Sinclair*, 641 N.E.2d 135, 138 (Mass. App. 1994) (applying Delaware law).

Defendants' contention that plaintiffs have lost standing due to the Merger stems from a misreading of both *Jolly Roger*, 2005 U.S. Dist. LEXIS 26837 and *Lewis v. Anderson*, 477 A.2d 1040, 1047 (Del. 1984). *See* Outside Defs.' Br. at 13; Insider Defs.' Br. at 12-13. In *Jolly Roger*, the Court merely held that a shareholder who sells his shares during the pendency of a lawsuit loses standing to pursue a derivative claim on behalf of the corporation, as he then lacks any possible financial interest in a recovery. 2005 U.S. Dist. LEXIS 26837, at *23-*24, *24 n.13. Here, plaintiffs have not sold their shares.

The *Lewis* decision similarly focused on the question of whether a plaintiff continued to have a sufficient financial interest in the corporation to maintain derivative standing. There, the corporation in which the plaintiff owned shares and on whose behalf he brought a derivative claim, Conoco, later merged with a subsidiary of E.I. Du Pont. As a result of this merger, Du Pont "became the sole stockholder" of Conoco. 477 A.2d at 1042. Because he was no longer a stockholder of the entity on whose behalf the claim was asserted (Conoco), plaintiff lost standing. *Id.* at 1049. This differs from the situation at bar, *as plaintiffs here are direct shareholders of the exact entity on whose behalf the claim is brought, BAC.*[29] This distinction also applies to *Lewis v. Ward*, 852 A.2d 896 (Del. 2004), another case in which, as a result of a complex "reverse triangular merger," *id.* at 906, plaintiff lost standing because at the end of the day he was not a shareholder of the corporation on whose behalf he had asserted derivative claims. *Id.* at 903 (a "stockholder-plaintiff may not continue to pursue derivative claims following a merger that eliminates the plaintiff's shareholder status...").[30]

The purpose of the continuous ownership requirement is to "to assure that the plaintiff remains financially interested in the result of the suit and thus a fair representative of other shareholders." *Kessler,* 641 N.E.2d at 137. As the Delaware Supreme Court explained in *Alabama By-Prods Corp. v. Cede & Co.*, 657 A.2d 254, 265 (Del. 1995):

> Essentially, a shareholder is permitted to intrude upon the authority of the board by means of a derivative suit only because his status as a shareholder provides an interest and incentive to obtain legal redress for the benefit of the corporation. Once the derivative plaintiff ceases to be a stockholder in the corporation on whose behalf the suit was brought, he no

---

[29] Significantly, unlike the case at bar, plaintiff Lewis never challenged "the propriety of the Du Pont-Conoco merger." *Id.* at 1042.

[30] Here, unlike *Lewis v. Anderson* and *Lewis v. Ward,* which involved *indirect* mergers, the BAC/MBNA Merger was done in a more traditional way -- the two companies were directly merged together. Proxy, at 3.

longer has a financial interest in any recovery pursued for the benefit of
the corporation.

*Id.*

In this simple stock-for-stock merger, there can be no doubt that plaintiffs will
financially benefit if they achieve a recovery on behalf of BAC, as they are holders of
BAC shares. This type of merger and its legal implications for a pending derivative suit
were addressed in *Kessler, supra.* After thorough consideration, the court concluded that
the derivative plaintiff continued to have standing. *Kessler*, 641 N.E.2d at 138 ("in the
present case we have a simple stock-for-stock exchange with clear continuity of interest.
... We conclude that the plaintiff will have standing despite the merger to press the
alleged claim..."). The same result was reached by the federal district court in *Caven,
supra.*

Defendants' authorities are inapposite. The plaintiff in *In re First Interstate
Bancorp Consol. S'holder Litig.*, 729 A.2d 851 (Del. Ch. 1998), was a First Interstate
shareholder who, by reason of a merger, became a Wells Fargo shareholder. The court
instructed that the proper course for such a plaintiff, if he wished to continue his claim,
was to assert it on behalf of Wells Fargo, and explain why demand on the Wells Fargo
Board would be futile. This is exactly what plaintiffs have done in the case at bar.
Plaintiff's failure in *First Interstate* to follow this correct procedure led to his dismissal
for lack of standing:

> [P]laintiff Bradley contends that his ownership of pre-merger First
> Interstate and post-merger Wells Fargo common stock meet the *Lewis*
> requirement of continuous ownership, since any claims belonging to First
> Interstate passed to Wells Fargo at the consummation of the merger, and
> plaintiff Bradley can now assert those claims derivatively as a stockholder
> of Wells Fargo. *But Bradley has never purported to satisfy the demand
> requirements for a derivative suit on behalf of Wells Fargo.*

*Id.* at 868.

Defendants also rely upon *dictum* in *Porter v. Texas Commerce Bancshares, Inc.*,
No. 9114, 1989 Del. Ch. LEXIS 130 (Del. Ch. Oct. 12, 1989). But in *Porter*, there was

- 59 -

no simple stock-for-stock exchange, but rather an indirect merger employing a subsidiary of the acquirer. As the court noted: "Pursuant to the merger, all common shares of Texas Commerce were acquired by a wholly owned subsidiary of Chemical." *Id*. at *7. Thus, unlike here, the plaintiff in *Porter* did not retain a direct ownership interest in the entity that would benefit from the derivative recovery. Nor is there any indication in *Porter* that plaintiff attempted to assert the claim on behalf of Chemical, the inheritor of the derivative claims, or explain why demand on the Chemical Board would be futile. *Porter*, therefore, has no application here.

For all the reasons stated above, plaintiffs continue to have a financial interest in a derivative recovery on behalf of the corporation in which they directly own shares, and thus continue to have derivative standing.

## B.    Demand upon the BAC Board of Directors Would Be Futile

Defendants ask that the present Complaint be dismissed, so that the relevant Board might consider a demand to bring legal action. Insofar as the derivative claims have now passed to BAC, a demand would now have to be made on the BAC Board of Directors. Such a demand would be futile because that Board and BAC promised in the Merger Agreement that they would not pursue these very claims, and indeed would "use their best efforts" to "defend" against and defeat the derivative claims set forth by plaintiffs. ¶107.

Defendants cite no case in which it has been held that a demand must be made on a Board of Directors that has pledged in writing to oppose and defend the very claims plaintiffs have asserted. The BAC directors were aware of the derivative claims at the time they approved the Merger Agreement. Making a demand in such circumstances would truly be an exercise in futility, as the BAC directors have committed themselves to defend the claims at bar, not prosecute them. *See Werbowsky v. Collomb*, 766 A.2d 123, 144 (Md. 2001) (demand is excused where the directors are so "committed to the decision

- 60 -

in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule."). *Cf. Felker*, 2005 WL 602974, at *3 (holding demand excused under Maryland law where, *inter alia*, the directors "have not sought to recover any part of the damages suffered by NovaStar...").

The case most closely on point appears to be *Biondi v. Scrushy*, 820 A.2d 1148 (Del. Ch. 2003), where the question at bar was the independence of a "special committee" of directors convened to review a shareholder's derivative suit. The Chairman of that committee made an **oral** statement to the effect that he believed a previous investigation of the company's CEO by a law firm had exonerated the CEO from any wrongdoing, but later denied that such statement evidenced his inability to independently judge the merits of the derivative claim based on his own investigation. *Id.* at 1165. The Court held that a committee of directors, headed up by a director who had already made up his mind that the claims should not be asserted, did not meet the definition of an independent-minded Board -- *i.e.*, "one that is not compromised in its ability to act impartially." *Id.* at 1166. The Court reasoned:

> How can the court and the company's stockholders reasonably repose confidence in an SLC whose Chairman has publicly and prematurely issued statements exculpating one of the key company insiders whose conduct is supposed to be impartially investigated by the SLC? The answer is that they cannot. Even if the SLC later issues a report in favor of dismissal that reads well and that appears to be factually supported, there will always linger a reasonable doubt that its investigation was designed to paper a decision that had already been made.

*Id.*

As in *Biondi*, can there be any doubt here that the BAC Board, being contractually bound to defend against these derivative claims, would do anything other than "paper a decision that had already be made?" There cannot. Accordingly, this Court should not order plaintiffs to go through the legal charade of a demand upon the BAC Board.

Defendants' authorities to the contrary are inapposite as none addresses a situation in which a Board has legally committed itself to oppose and defend the very derivative claims plaintiffs have asserted. For example, in *Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1113 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir. 1985), there was no agreement by the corporate Board to use their best efforts to defend the claims brought against the individual derivative defendants, and therefore plaintiff could not offer any reason as to why "the GM Board would be unwilling to have GM sue the individual defendants." *Id.* Here, there is ample reason pled as to why the BAC Board would not initiate the suit -- it has already agreed to oppose it. Defendants' reliance on *Decker v. Clausen*, No. 10, 684, 1989 Del. Ch. LEXIS 143 (Del. Ch. Nov. 6, 1989) is also misplaced. There, the directors may have been defending "*related* litigation," but were considered independent enough to consider commencing the distinct litigation plaintiff sought to advance. *Id.* at *8-*9. Unlike here, they had not contractually barred themselves from doing so, or pledged to actively cooperate in the defense of the very claims they would be asked to prosecute.

It is plain that in these peculiar circumstances requiring demand on the BAC Board would be a futile and useless act, and is not required.

## C. Whether Plaintiff Was Required to Make Demand upon the MBNA Board Is No Longer Relevant as BAC Has Inherited the Derivative Claims

At the time the Complaint herein was filed on November 21, 2005, the MBNA/BAC Merger had not yet been consummated, and MBNA's Board was still in existence. Plaintiffs therefore pled that demand on the existing MBNA Board would be futile. Although defendants devote considerable effort to debating whether demand was futile as to the MBNA Board, the Merger was consummated on January 1, 2006, and the MBNA Board no longer exists, having been supplanted by the BAC Board. Thus, whether demand should be made on the MBNA Board is a moot question.

Once a merger has been completed, the proper procedural focus is whether: (a) the plaintiff has claimed derivatively on behalf of the merged entity (here, BAC); and (b) whether plaintiff has adequately alleged that demand on the BAC Board of Directors is excused. *See First Interstate*, 729 A.2d at 868. *See also Saito v. McCall*, No. 17132-NC, 2004 Del. Ch. LEXIS 205, at \*41 (Del. Ch. Dec. 20, 2004) (noting that, following merger, plaintiff in derivative case "could bring an action for failure to assert a claim" on behalf of the merged company); *Prof'l Mgmt. Assocs., Inc. v. Coss*, 598 N.W.2d 406, 413 (Minn. App. 1999) (following a merger, plaintiff did not lose standing to pursue derivative claims, and as to demand the question would be whether demand was futile *as to merged company's Board of Directors*, not as to previous Board of Directors that no longer existed). Plaintiffs have scrupulously followed the proper procedure in this case.

Thus, the Merger has mooted the question of whether plaintiffs need to make demand upon MBNA's Board. The relevant question is whether plaintiffs have asserted the claim on behalf of BAC (they have), and whether demand would be futile if made upon BAC's Board. Plaintiffs have shown convincingly that such a demand would indeed be futile.

## D. The Conduct Underlying the Derivative Claims is Sufficiently Alleged to Have Involved Improper Personal Benefits or Deliberate Wrongdoing

Plaintiffs' derivative claims seek contribution under the PSLRA and state law for alleged securities fraud liabilities, as well as disgorgement of insider trading profits, and damages relating to the directors' bad faith failure to ensure that corporate pronouncements were accurate and complete.[31] ¶¶114-154. To the extent Maryland's Section 5-418 creates a pleading requirement, these claims are adequately pled to have

---

[31] The Complaint also alleges that the Insider Defendants caused the Company to misuse \$250 million in Company funds to buy back shares at inflated prices so that these same insiders could sell \$75 million worth of their own shares at inflated prices. Defendant Hammonds sold \$9 million worth of his own stock in January 2005 alone. ¶¶10-12.

- 63 -

involved dishonest motives, improper pecuniary benefits or deliberate failure to ensure adequate financial controls and reporting.

Thus, as to Hammonds and the other Insider Defendants the Complaint alleges great detail regarding the wrongful misstatements they caused to be made, ¶¶63-81, and the pecuniary benefits they realized thereby, ¶¶22-29, 83, 103. This satisfies Section 5-418. *See Felker*, 2005 WL 602974, at *3.:

> Plaintiff alleges that most Defendants sold their stock at artificially inflated prices during the relevant period of time, reaping proceeds of at least $75,000 to more than $5 million, thereby receiving an improper benefit. Additionally, Plaintiff claims that Defendants acted dishonestly in concealing facts from the public concerning NovaStar's growth through branch office expansions and the actual existence of branch offices, and by overstating NovaStar's interest income and expense. If these facts were proven, Plaintiff would be entitled to relief. Defendants' Motion to Dismiss is denied with regard to their argument that NovaStar's corporate charter and Maryland law preclude liability.

*Id.*

The MBNA directors who were not insiders are well-alleged to have been deliberately indifferent to their responsibilities. ¶¶30-38, 45-53, 63-81. At the pleading stage, this suffices to state a claim for intentional breach of fiduciary duty. *See, e.g.*, *Felker*, 2005 WL 602974, at *4 (derivative claim properly pled against directors under Maryland law where: "Plaintiff has pled that Defendants actively participated in the wrongdoing and/or permitted such activity through gross negligence or willful inattention to the duties owed the corporation."); *Reliance*, 91 F. Supp. 2d at 732 ("Plaintiffs have averred sufficient circumstantial evidence to permit the inference that one or more defendants may have knowingly withheld material information from the Company's shareholders. Such conduct may rise to a violation of the directors' duty of loyalty to the Company's shareholders, and thus would not warrant immunity under the exculpatory clause of the Company's corporate charter."); *Johnson*, 2002 Del. Ch. LEXIS 122, at *29-*30 (same). *See also McSparran v. Larson*, No. 04C0041, 2006 U.S. Dist. LEXIS 3787,

- 64 -

at *15-*18 (N.D. Ill. Jan. 27, 2006) (upholding derivative claims based on allegations that directors failed to exercise the oversight needed to prevent corporate fraud).

## VII.    PLAINTIFFS' HOLDER CLASS CLAIMS ARE ADEQUATELY ALLEGED

Plaintiffs aver that, had they known defendants were inflating MBNA's stock price through false and misleading statements, they would not have continued to hold their shares. *See* ¶¶7(a), 108(a), 155-68. Defendants ask that this claim be dismissed, contending that plaintiffs have not adequately alleged reliance, and cannot establish damages. Insider Defs.' Br. at 24-25.[32]

States differ regarding whether investors who assert they refrained from selling stock have cognizable claims. Such a claim was recognized as viable under New Jersey law in *Gutman v. Howard Sav. Bank*, 748 F. Supp. 254 (D.N.J. 1990). The *Gutman* court concluded that "when a person breaches a duty to another, the law will not inquire into the form of plaintiff's reliance." *Id.* at 264. Moreover, it rejected defendants' argument that "difficulties of proof open the door to speculative and abusive claims." *Id.* at 264-65.

Although Maryland has not dealt directly with this issue, the same principles that led the *Gutman* court to conclude that New Jersey would recognize a holder cause of action are echoed in Maryland precedents. Like New Jersey, Maryland does not require proof of reliance in a case alleging deception by a fiduciary. *Crawford v. Mindel*, 469 A.2d 454, 458 (Md. App. 1984) ("Where a fiduciary relationship exists, fraud may be presumed."). Nor does Maryland require certainty in proving damages. *M & R Contractors & Builders, Inc. v. Michael*, 138 A.2d 350, 355 (Md. 1958) ("where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of

---

[32] Defendants appear to confuse the question of whether plaintiffs themselves have sufficiently pled these claims with whether, at some later stage, a class of holders should be certified under Fed. R. Civ. P. 23. Class certification issues are not presently before this Court.

the resulting uncertainty..."). *Accord, David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 532 A.2d 694, 696 (Md. 1987). Thus, it may be fairly concluded that Maryland courts would reach the same result that was reached in *Gutman*.

In addition to New Jersey, New York recognizes a cause of action for retaining shares rather than selling them, as does California. *See Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 494 (S.D.N.Y. 2001); *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 175 (2003) ("California has not yet applied this principle to lawsuits involving misrepresentations affecting corporate stock, but, as we shall explain, we should not make an exception for such cases. Most other states that have confronted this issue have concluded that forbearance from selling stock is sufficient reliance to support a cause of action.").

On this motion, upholding plaintiffs' holder claim best comports with Maryland law, and the contrary views of other jurisdictions should be disregarded.

## VIII. PLAINTIFFS HAVE ADEQUATELY ALLEGED AN AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIM AGAINST DEFENDANT LEWIS

Maryland recognizes a separate cause of action for aiding and abetting a breach of fiduciary duty. Defendants have mistakenly asserted otherwise. They cite to *Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.*, 639 A.2d 173 (Md. App. 1994), to support their assertion that Maryland does not support a cause of action for aiding and abetting the commission of a tort. Insider Defs.' Br. at 37. Defendants, however, fail to take note of the subsequent appeal in the same case decided by the Maryland Court of Appeals in October 1995. Instead, defendants erroneously rely on and present to this Court *dicta* from the Court of Special Appeals of Maryland 1994 decision in the *Alleco* case. The *Alleco* action did, however, not end with the 1994 ruling.

Instead, plaintiffs in the *Alleco* case filed a writ of certiorari, which was granted by the Court of Appeals of Maryland. *Alleco, Inc. v. Harry & Jeannette Weinberg*

*Found., Inc.*, 665 A.2d 1038 (Md. App. 1995) Although the Court of Appeals ultimately affirmed the judgment of the Court of Special Appeals, the court went out of its way to explain that *"both the circuit court and the [Maryland] Court of Special Appeals erred in holding that [Maryland] has never recognized tort liability for aidors and abettors."* *Id.* at 1049. As the court explained, not only were the circuit court and the Court of Special Appeals incorrect in their assertions, "Maryland has expressly recognized aider and abettor tort liability." *Id.*; *Zachair, Ltd. v. Driggs*, 762 A.2d 991, 1006-07 (Md. App. 2000) (citing *Alleco,* 665 A.2d at 1049); *Saadeh v. Saadeh, Inc.*, 819 A.2d 1158, 1170 (Md. App. 2003) (same). *See, e.g.*, *Duke v. Feldman*, 226 A.2d 345, 347 (Md. 1967); *Purdum v. Edwards*, 141 A. 550, 554 (Md. 1928); *Sellman v. Wheeler*, 54 A. 512, 515 (Md. 1902).[33]

Clearly, the 1995 *Alleco* decision supports not just a claim for aiding and abetting, but more precisely, a claim for aiding and abetting a breach of fiduciary duty. Specifically, one of the alleged underlying tort actions in *Alleco* was the breach of an attorney's fiduciary duties to his clients. *Alleco*, 665 A.2d at 1039-40. If a cause of action for aiding and abetting breach of fiduciary duty were not a sound claim to allege in a complaint, it logically follows that the Maryland Court of Appeals would not have "granted the plaintiffs' petition for writ of certiorari in order to consider the holdings of both courts below concerning aider and abettor tort liability and civil conspiracy tort liability." *Alleco*, 665 A.2d at 1040. Thus, it is clearly sound Maryland law to bring a separate cause of action for aiding and abetting a breach of fiduciary duty.

In Maryland, "aider and abettor tort liability is predicated upon the wrongdoer's engaging in acts of encouragement or assistance to the person actually committing the wrongful act." *Saadeh*, 819 A.2d at 328. That is, "[t]o be liable in tort, the aider or

---

[33] Based on the facts of the *Alleco* action, the court then affirmed the Maryland Court of Special Appeals' judgment that plaintiffs had failed to adequately allege a breach of fiduciary duty which then damaged the plaintiffs. *Alleco*, 665 A.2d at 1050.

- 67 -

abettor must have engaged in assistive conduct that he would know would contribute to the happening of that act." *Id.* That is clearly the case here.

As set forth herein, plaintiffs have adequately alleged that there is underlying tortuous activity (disclosure violations arising from breach of fiduciary duty of full disclosure in issuing the BAC and MBNA Proxy), ¶¶5, 7, 42, 83, 89, 186-190, and that as a result plaintiffs and the Merger class were substantially damaged, ¶¶186-190. Plaintiffs also allege that defendant Lewis aided and abetted in that tortuous activity. ¶¶3, 39, 42, 86, 89, 186-90. Specifically, plaintiffs alleged that defendant Lewis possessed the power and authority to control the contents of BAC and MBNA Proxy. *Id.* Clearly, by allowing the improper proxy to be disseminated despite his ability to control its contents and distribution, defendant Lewis assisted in the tortuous activity. Likewise, there is no doubt that defendant Lewis knew that the Proxy failed to disclose all material information. Defendant Lewis knew about the dilutive impact of the option given to BAC given that he personally made the deal with defendant Hammonds to acquire MBNA. *Id.* That is all that is required to state a cause of action for aiding and abetting breach of fiduciary duty under Maryland. *Alleco*, 665 A.2d at 1050; *Saadeh*, 819 A.2d at 328.

Defendants next cite to Delaware law to argue that plaintiffs failed to allege adequately a claim against defendant Lewis. Insider Defs.' Br. at 38. Plaintiffs have adequately pled a claim against defendants Lewis under Delaware law, assuming its applicability. As the Insider's Defendant brief makes clear, Delaware law only requires that a person "'knowingly participate[]'" in the breach to be liable. Insider Defs.' Br. at 38 (citing *In re Gen. Motors (Hughes) S'holder Litig.*, No. 20269, 2005 WL 1089021, at *23 (Del. Ch. May 4, 2005)). As set forth above, defendant Lewis actively participated in the dissemination of the Proxy that contained material omissions.

These allegations clearly put defendant Lewis on notice as a valid Maryland claim asserted against him. Accordingly, defendants' motion to dismiss plaintiffs' aiding and abetting claim against defendant Lewis should be denied.

## IX..  CONCLUSION

For all of the foregoing reasons, the Complaint should be upheld in full. Should the Court find any portion of the Complaint lacking, however, plaintiffs respectfully request leave to re-plead.

DATED: March 6, 2006

Respectfully submitted,

CHIMICLES & TIKELLIS, LLP

_____
PAMELA S. TIKELLIS (#2172)
ROBERT R. DAVIS (#4536)

One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: 302/656-2500
Facsimile: 302/656-9053

Liaison Counsel for Plaintiffs

ROBBINS UMEDA & FINK, LLP
JEFFREY P. FINK
STEVEN R. WEDEKING
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

and

PASKOWITZ & ASSOCIATES
LAURENCE PASKOWITZ
ROY L. JACOBS
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: 212/685-0969
Facsimile: 212/685-2306

Co-Lead Counsel for Plaintiffs