UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE MBNA CORPORATION DERIVATIVE    )    Lead Case No. 1:05-cv-00327(GMS)
AND CLASS LITIGATION                 )
                                     )
                                     )
_____     )
                                     )
This Document Relates To:            )
                                     )
    ALL ACTIONS.                     )

## COMPENDIUM OF UNREPORTED
## OPINIONS CITED IN PLAINTIFFS' BRIEF
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

CHIMICLES & TIKELLIS, LLP
PAMELA S. TIKELLIS
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: 302/656-2500
Facsimile: 302/656-9053

Liaison Counsel for Plaintiffs

PASKOWITZ & ASSOCIATES          ROBBINS UMEDA & FINK, LLP
LAURENCE PASKOWITZ              BRIAN J. ROBBINS
60 East 42nd Street, 46th Floor    JEFFREY P. FINK
New York, NY 10165             610 West Ash Street, Suite 1800
Telephone: 212/685-0969        San Diego, CA 92101
Facsimile: 212/685-2306        Telephone: 619/525-3990
                               Facsimile: 619/525-3991

Co-Lead Counsel for Plaintiffs

Dated: March 6, 2006

**CASE**                                                                        **TAB**

*In re 3COM Corp. Shareholders Litig.*,
1999 Del. Ch. LEXIS 215 (Del Ch. Oct. 25, 1999) ........................................................................1

*Acierno v. Haggerty*,
2005 U.S. Dist. LEXIS 30353 (D. Del. Nov. 23, 2005) ................................................................2

*Alidina v. Internet.com Corp.*,
2002 Del. Ch. LEXIS 156 (Del. Ch. Nov. 8, 2002) ......................................................................3

*Buxbaum v. Deutsche Bank*,
2000 U.S. Dist. LEXIS 5838 (S.D.N.Y. Mar. 7, 2000) ................................................................4

*Caven v. Miller ( In re Paracelsus Corp. Sec. Litig.)*,
1998 U.S. Dist. LEXIS 5484 (S.D. Tex. 1998) .............................................................................5

*Decker v. Clausen* ,
1989 Del. Ch. LEXIS 143 (Del. Ch. Nov. 6, 1989) ......................................................................6

*Deephaven Risk Arb Trading, LTD. v. UnitedGlobalCom, Inc.*,
2005 Del. Ch. LEXIS 107 (Del. Ch. July 13, 2005)......................................................................7

*In re Emerging Communs., Inc. S'Holders Litig.*,
2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004) .........................................................................8

*Felker v. Anderson*,
2005 U.S. Dist. LEXIS 4236 (W.D. Mo. Feb. 11, 2005) ..............................................................9

*Frazer v. Worldwide Energy Corp.*,
1990 WL 61192 (Del. Ch. May 3, 1990)......................................................................................10

*Gatz v. Ponsoldt*,
2004 Del. Ch. LEXIS 203 (Del. Ch. Nov. 8, 2004)......................................................................11

*In re General Motors (Hughes) S'holders Litig.*,
2005 WL 1089021 (Del. Ch. May 4, 2005)..................................................................................12

*Gentile v. Rossette*,
2005 Del. Ch. LEXIS 160 (Del. Ch. Oct. 20, 2005)....................................................................13

*Goldman v. Pogo.com Inc.*,
2002 Del. Ch. LEXIS 88 (Del. Ch. July 16, 2002).......................................................................14

*Hudson v. Prime Retail, Inc.*,
2004 WL 1982383 (Md. Cir. Ct. April 1, 2004)...........................................................................15

*IT Group, Inc. v. D'Aniello*,
2005 U.S. Dist. LEXIS 27869 (D. Del. Nov. 15, 2005) ..............................................................16

*Jasinover v. Rouse*,
2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004) ..........................................................................17

*Johnson v. Shapiro*,
2002 Del. Ch. LEXIS 122 (Del. Ch. Oct. 18, 2002)....................................................................18

*Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*,
2005 U.S. Dist. LEXIS 26837 (D. Md. Nov. 3, 2005). ...............................................................19

*In re LNR Prop. Corp. S'holders Litig.*,
2005 Del. Ch. LEXIS 171 (Del. Ch. Dec. 14, 2005) ...................................................................20

*Marcoux v. Prim*,
2004 NCBC LEXIS 4 (N.C. Super. Ct. April 16, 2004) ..............................................................21

*In re MCI Worldcom Secs. Litig*,
2000 U.S. Dist. LEXIS 7230 (S.D.N.Y. April 11, 2000) .............................................................22

*McSparran v. Larson*,
2006 U.S. Dist. LEXIS 3787 (N.D. Ill. Jan. 27, 2006)................................................................23

*Morris v. Bush*,
1999 U.S. Dist. LEXIS 9994 (S.D.N.Y June 23, 1999) ..............................................................24

*In re Ply Gem Indus., S'holders Litig.*,
2001 Del. Ch. LEXIS 84 (Del. Ch. June 26, 2001) .....................................................................25

*Porter v. Texas Commerce Bancshares, Inc.*,
1989 Del. Ch. LEXIS 130 (Del. Ch. Oct. 12, 1989)....................................................................26

*Rosser v. New Valley Corp.*,
2000 WL 1206677 (Del. Ch. Aug. 15, 2000) ..............................................................................27

*Saito v. McCall*,
2004 Del. Ch. LEXIS 205 (Del. Ch. Dec. 20, 2004) ...................................................................28

*S.E.C. v. Dorchester Gas Corp.*,
1984 WL 2369 (SEC Jan. 9, 1984)..............................................................................................29

*Shepard v. Humke*,
2002 U.S. Dist. LEXIS 14731 (S.D. Ind. July 9, 2002) ................................................................30

S*onet v. Plum Creek Timber Co., L.P.*,
1999 WL 160174 (Del. Ch. March 18, 1999)..............................................................................31

*Stanziale v. Nachtomi,*
2004 U.S. Dist. LEXIS 7375 (D. Del. Apr. 20, 2004)..................................................................32

*Spatola v. Novastar Fin., Inc.,*
(Cir. Ct. Baltimore City Feb. 16, 2006) [Memorandum Opinion].................................................33

*Thorn v. Reliance Van Co., Inc.,*
1985 U.S. App. LEXIS 25929 (3rd Cir. App. Dec, 6, 1985)........................................................34

*In re Walt Disney Co. Derivative Litig.,*
2005 Del. Ch. LEXIS 113 (Del. Ch. Aug. 9, 2005)......................................................................35

1

## IN RE 3COM CORPORATION SHAREHOLDERS LITIGATION

### C.A. NO. 16721

### COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1999 Del. Ch. LEXIS 215*

**July 27, 1999, Submitted**
**October 25, 1999, Decided**

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court November 9, 1999.

**DISPOSITION:**

Defendants' motion to dismiss is granted as to both counts.

**COUNSEL:** Norman M. Monhait, of Rosenthal Monhait Gross & Goddess, Wilmington, Delaware, OF COUNSEL: A. Arnold Gershon, New York, New York; Wechsler Harwood Halebian & Feffer, New York, New York, Attorneys for Plaintiffs.

Bruce M. Stargatt and James P. Hughes, Jr., of Young Conaway Stargatt & Taylor, Wilmington, Delaware, OF COUNSEL: Boris Feldman and Keith E. Eggleton, of Wilson Sonsini Goodrich & Rosati, Palo Alto, California; Lowell E. Sachnoff and Sarah R. Wolff, of Sachnoff & Sweaver, Chicago, Illinois, Attorneys for Defendants.

**JUDGES:** Myron T. Steele, Vice Chancellor

**OPINIONBY:** Myron T. Steele

**OPINION:**

*MEMORANDUM OPINION*

STEELE, V.C.

Issues Presented

ISSUE 1

Do a corporation's directors commit waste and breach their fiduciary duty of loyalty when they receive stock options approved under a plan endorsed in advance by shareholder vote?

No. Decisions of directors who administer a stockholder approved director stock option plan are entitled to the protection of the business judgment rule, and, in the absence of waste, a total failure of consideration, they [*2] do not breach their duty of loyalty by acting consistently with the terms of the stockholder approved plan.

ISSUE 2

When the directors of a corporation disclose the material terms of a stock option plan for compensating these same directors, the plan has already been approved by the shareholders, and the directors seek shareholder approval of an amendment to expand the pool of shares available for administering this plan, do the directors commit disclosure violations by omitting from the proxy statement 1) the present value of the options as determined by the Black-Scholes Option Pricing Model and 2) that the directors may realize present cash by selling options identical to those received under the plan?

No. When the directors of a corporation seek to amend an existing director stock option plan and they have disclosed the plan's material terms and the material terms of the amendment, they are not required to disclose the option values under the Black-Scholes model. They do not mislead shareholders when they fail to state that the directors may choose to receive cash by selling these options.

I. Background

Plaintiff is a shareholder of 3COM, a Delaware corporation that produces [*3] computer-related products. The individual defendants are the 10 members of the 3COM board of directors and the nominal defendant is 3COM itself. n1 Plaintiff sues 1) derivatively for corporate waste and breach of fiduciary duty of loyalty and 2) in a class action, on behalf of all 3COM shareholders, for breach of the "duty of candor." n2

n1 All but one of the defendants, Mr. Eric A. Benhamou, are outside directors, i.e. not employed by 3COM. Mr. Benhamou is the Chief Executive Officer and Chairman of the Board of Directors of 3COM.

n2 plaintiff uses this phrase to describe the disclosure violations which allegedly constitute breaches of the fiduciary duty of loyalty.

The Plaintiff's claims flow from 3COM stock options granted to members of the board under the company's Director Stock Option Plan (the "Plan"), adopted in 1988 and later amended from time to time. On July 22, 1998 the board amended the Plan to expand the pool of shares available for grants by 1 million (from 2 million to 3 million [*4] total shares). n3 The amendment required shareholder approval in order to take effect. n4 On August 20, 1998 the board distributed proxy materials for the upcoming annual shareholders' meeting in which it solicited shareholder approval of the Amendment. Those proxy materials are alleged to contain material disclosure violations. No options have been granted or received from the 1 million share possible increase ultimately approved by the shareholders at the 1998 annual meeting.

n3 In fiscal year 1998 (ending May 31, 1998) the defendant directors received options ranging between 22,500 and 45,000 each. At the time of the proposed amendment 167,000 shares remained in the pool of shares available for granting options to directors.

n4 The Plan may be amended, suspended, or terminated by the Board unilaterally except that to expand the reserve of shares available for director options or to expand the class of persons receiving such options shareholder approval is required. At the time of the amendment 167,000 shares remained in the pool of shares available for granting options to directors.

[*5]

III. Contentions

In Count I the plaintiff alleges that the members of the board wasted 3COM's assets and breached their fiduciary duty of loyalty to the 3COM shareholders when they approved the grant of and received stock options under the Plan. Specifically the plaintiff suggests that these stock options constitute lavish and excessive compensation tantamount to a waste of corporate assets.

In Count II the plaintiff alleges that defendants failed to disclose fully the value of the stock options granted by: (1) omitting material information about the options' value; and, (2) mischaracterizing material information about the options' value. In the omission claim, the plaintiff alleges that the proxy statement should have included the present values of these options under the Black-Scholes Option Pricing Model. In the mischaracterization claim, the plaintiff alleges that language in the proxy statement describing the value of options masks the potential for the recipients to realize immediate cash from the options. Plaintiff claims that the Board's description of the value of options did not inform shareholders of the possibility that the directors could make money by selling option [*6] contracts on 3COM stock, which would be backed by their own 3COM options. The plaintiff believes these allegations of omission and mischaracterization show that the board breached its fiduciary "duty of candor."

The defendants move to dismiss this action on all counts for failure to state a claim upon which relief can be granted, under Court of Chancery Rule 12(b)6. Defendants maintain that the plaintiff offers nothing more than conclusory statements to support the elements of his claims.

IV. Standard For A Motion to Dismiss

The standard for a motion to dismiss is a basic, well-settled mantra under Delaware law: that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. n5 Further, allegations which are merely conclusory and lacking factual basis in the complaint will not survive a motion to dismiss. n6 In examining the complaint, I must accept all well-pleaded facts as true and construe any inferences from these facts in the light most favorable to the non-moving party. n7

n5 *Lewis v. Austen, 1999 Del. Ch. LEXIS 125,* *12, Del. Ch., C.A. No. 12937, mem. op. at 4, Jacobs, V.C. (June 2, 1999) ("a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted.").

[*7]

n6 *In re The Walt Disney Company Shareholders' Litigation, Del. Ch., 731 A.2d 342, 353 (1998).*
n7 *O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 911,* Steele, V.C. (August 20, 1999).

## V. Count I - Breach Of The Duty Of Loyalty By Waste Of Corporate Assets

### A. The Standard of Review

A clear example of an 'interested' transaction is one in which the fiduciary directly pays or otherwise benefits himself using corporate assets. The plaintiff contends that the directors granted themselves options under the Director Stock Plan, creating just such a self-interested transaction. Because the transaction presents a conflict between the self-interest of the directors and the best interests of the Corporation and its shareholders, the plaintiff seeks to have his claim reviewed under the entire fairness standard. If the plaintiff were correct, heightened scrutiny would be applied to the transaction and the burden of proof would shift to the defendants to show that the transactions were entirely fair to the corporation and its shareholders. [*8]

Though plaintiff correctly points out that these option grants appear to be self-interested transactions, he cannot overcome the indisputable fact that the directors authorized grants made within the limitations of a plan *already approved by the shareholders*. This crucial distinction leads me to conclude that the board's actions are entitled to the protection of the business judgment rule.

### 1. Prior Shareholder Approval of the Plan

Directors' decisions administering a shareholder approved Plan consistently with that Plan are entitled to the protection of the business judgment rule. The plaintiff argues that because he never pleaded that shareholders approved the Plan that I may not consider this fact when I evaluate his claims.

Although I must evaluate the plaintiff's claims within the bounds of his Complaint and draw all inferences in his favor, I can not blind myself to plaintiff's clear statement in his Complaint that the directors received the stock options "pursuant to the Company's Director Stock Option Plan." n8 I need not look beyond the 1998 Proxy Statement (incorporated by reference into the Complaint) to find that the Plan resulted from shareholder action. Since [*9] plaintiff's claims arise in the context of a board proposal for the shareholders to amend the Plan I can only logically infer that the Plan must be the result of prior shareholder action - a result fully supported by the facts pleaded.

n8 Complaint, P 8.

The plaintiff's argument that I can not consider the effect of this prior shareholder approval merely because he has not raised this fact in his Complaint is too clever by half. After pleading that the directors granted options according to the Plan and that the Board then sought to have the shareholders amend the Plan to increase the amount of options to be available in the future, plaintiff cannot now escape the only obvious conclusion from these alleged facts. Certainly the plaintiff could have challenged the validity of the Director Stock Option Plan itself or whether the board's conduct falls within the strictures of this Plan. n9 However, his Complaint does not do so here.

n9 The strictures of this plan include (at minimum) specific ceilings on the awarding of options each year. These ceilings differ based on specific categories of service such as service on a committee, position as a lead director, and chairing the Board. It is implicit that the Board may only exercise discretion within these parameters and is free to award as many options as the Plan permits or as few as zero options. The plaintiff does not allege that the Board ever acted outside the set terms of this plan, nor that the Board ever exceeded limitations of the Plan. *See* Notice of Annual Meeting of Stockholders of 3COM Corporation to be held September 24, 1998, p. 17. This document is incorporated into the Complaint by reference.

[*10]

### 2. The Business Judgment Rule is the Proper Standard

Since prior shareholder action approved the Plan, I must examine whether the directors' actions taken to administer the Plan are entitled to the protection of the business judgment rule or whether they should be subject to heightened scrutiny. Plaintiff argues that the business judgment rule does not apply here, since shareholder approval of the Plan amounts to ratification - an affirmative defense that can only be raised in defendants' answer and on which defendants' bear the burden of proof. The facts do not support the argument that the defendants raise an ordinary ratification defense.

Ratification, in the usual sense, involves shareholders' affirmatively sanctioning earlier *board action*, the effect of which is to validate that action. Neither the facts pleaded here nor the defendants' arguments suggest such a circumstance. These options clearly flow from a plan created by *previous* shareholder action. To suggest that

this undisputed fact supports a shareholder ratification defense is absurd. The notion of "advance ratification" is oxymoronic. The undisputed facts support only one rational conclusion: That valid [*11] shareholder action instituted a stock option plan and that the Board's administration of the Plan within its approved limits needed no further stockholder approval. I do not see this as a case of directors independently or unilaterally granting themselves stock options, but instead a case where stock options accrued to these directors under the terms of an established option plan with sufficiently defined terms. One cannot plausibly contend that the directors structured and implemented a self-interested transaction inconsistent with the interests of the corporation and its shareholders when the shareholders knowingly set the parameters of the Plan, approved it in advance, and the directors implemented the Plan according to its terms. Precedent in this Court clearly establishes that "self-interested" director transactions made under a stock option plan approved by the corporation's shareholders are entitled to the benefit of the business judgment rule. n10

n10 *See Steiner v. Meyerson, 1995 Del. Ch. LEXIS 95, * 21, Del. Ch., C.A. No. 13139, Allen, C. (July 18, 1995).* ("Unlike the other self-interested transactions challenged by plaintiff, the stock option plan was presented to the Telxon shareholders at the 1991 annual meeting and approved by a majority of the stockholders. The Supreme Court held in *Kerbs v. California Eastern Airways, Inc., Del. Ch. Supr., 33 Del. Ch. 69, 90 A.2d 652, 655 (1952)* that "stockholders' ratification of voidable acts of directors is effective for all purposes unless the action of the directors constituted a gift of corporate assets to themselves or was ultra vires, illegal, or fraudulent.") (reviewing the stock option grants pursuant to this plan, granting them the benefit of the business judgment rule and finding no cognizable cause of action).

[*12]

## B. The Plaintiff's Waste Claim

Since the Board's administration of the plan is entitled to the protection of the business judgment rule, the plaintiff must allege waste of corporate assets in order to state a cause of action under these circumstances. n11 I find he has not done so.

n11 *In re The Walt Disney Company Shareholders' Litigation, 731 A.2d at 369.*

- - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

The standard for a waste claim is high and the test is "extreme...very rarely satisfied by a shareholder plaintiff." n12 To state a claim for waste the plaintiff must allege facts to establish that the Delaware directors "authorize[d] an exchange that [was] so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration". n13 The transfer must either serve no corporate purpose or be so completely bereft of consideration that "such transfer is in effect a gift." n14

n12 *Steiner v. Meyerson, 1995 Del. Ch. LEXIS 95, * 3.*

[*13]

n13 *Glazer v. Zapata Corp., Del. Ch., 658 A.2d 176, 183 (1993).*
n14 *Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 336 (1997).*

Further, to find the plaintiff's claim sufficient I must be satisfied that the alleged facts establish a complete *failure* of consideration, and not merely the insufficiency of the consideration received. n15 A complete failure of consideration is difficult to show since the acts alleged have to be so blatant that *no* ordinary business person would ever consider the transaction to be fair to the corporation. The company would literally have to get nothing whatsoever for what it gave. Under this standard I am *not* to examine the allegations to see whether consideration, once received, was excessive or lopsided, was proportional or not, or even whether it was a 'bad deal' from a business standpoint. n16 If I were to do so I would not be deferring to the board's business judgment, as I am required to do here.

n15 *See Id at 338,* ("The Court of Chancery has interpreted the waste standard in the ratified option context as invoking not a proportionality or reasonableness test a la *Kerbs* but the traditional waste standard referred to in *Michelson.*"). The *Vogelstein* Court noted that this standard pertains

to the "ratified option context," which I find to be the case here in that the "ratified options" include those approved under a company's stock option plan. As plaintiff alleges in his Complaint: the directors "receive stock options pursuant to the Company's Director Stock Option Plan."

[*14]

> n16 In *Lewis v. Vogelstein* this Court found that the waste standard for options granted under plans such as here has gradually evolved from a proportionality test, which required examining the sufficiency of the consideration, to a traditional waste standard, which requires showing an absence of consideration or an effective gift of corporate assets.

The plaintiff only alleges (in a conclusory manner) that inadequate consideration is given for the benefit 3COM receives, not that 3COM received *no* benefit from these options. Plaintiff's only factual allegation about the options is that the dollar values on these options were quite large (at least $ 650,000 per director). n17 But his legal allegations flowing from these facts, specifically that the compensation is "grossly excessive" and that "no reasonable person not acting under compulsion and in good faith would have done it," are wholly conclusory. n18 Although "the consideration typically involved in stock options, i.e. continued and greater efforts by employees, is ephemeral and not susceptible to identification and valuation [*15] in dollar terms," the plaintiff must still allege some bare minimum facts showing that 3COM failed to receive *any* benefit from issuing these options. Plaintiff simply has not done so.

> n17 It does not help plaintiff that he calculated his alleged values under the Black-Scholes option pricing formula. This Court has consistently taken a rather jaundiced view of these valuations and their reliability. *See Rovner v. Health-Chem Corp., 1998 Del. Ch. LEXIS 65, * 17*, Del. Ch., C.A. No. 15007, Chandler, C. (April 23, 1998); *Lewis v. Vogelstein, 699 A.2d at 331.*
> n18 Complaint, P 18.

The plaintiff further argues that "the alleged value of the option grants alone is sufficient to raise an inference of inadequate consideration" and this is the "ineluctable result of this Court's holding in *Vogelstein.*" n19 I disagree. As plaintiff himself states, my review of his allegation of waste is an inherently fact-intensive inquiry

and so I will evaluate his claim strictly within the context of the facts he actually [*16] alleges, and not by way of a side-by-side factual comparison with the holding in *Vogelstein.* The plaintiff suggests by comparing the alleged values of the 3COM options (at least $ 650,000 per director) to the values of the options the *Vogelstein* Court found wasteful ($ 180,000) one must infer that he has established the minimum factual support for his waste claim.

> n19 Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, p. 11.

But this suggestion simply does not jibe with plaintiff's correct assertion that an allegation of waste "is inherently factual." n20 I can only draw inferences in his favor from the facts he alleges in his Complaint, not from facts found in another case. That the options here are at least threefold the amount of those which Chancellor Allen found to constitute waste in *Vogelstein* is not a fact which can salvage the plaintiff's otherwise facially insufficient claim. For my purposes in deciding these motions, the facts in *Vogelstein* only help me discern [*17] the legal standard to be applied and are not, as plaintiff argues, a benchmark for what specific dollar amounts may constitute excessive director compensation. n21 Even if I were to use the *Vogelstein* comparison in order to determine the sufficiency of plaintiffs' claims, I still could not find that he states a claim here since, as stated above, the standard is whether plaintiff sufficiency alleges a complete *failure* of consideration, not whether he sufficiently alleges that the consideration is "inadequate" (which is all that plaintiff himself says this comparison would show).

> n20 *Id* (citing *Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 339 (1997).).*
> n21 *See Steiner v. Meyerson, 1995 Del. Ch. LEXIS 95, * 19* ("There is, of course, no single template for how corporations should be governed and no single compensation scheme for corporate directors...").

In sum, plaintiff alleges only that certain amounts of compensation were given to the director defendants and then concludes that [*18] these amounts are excessive. Plaintiff has not alleged facts, either directly or by even the most strained inference, to indicate why 3COM did not benefit from these grants, and that they, therefore,

amounted to a gratuity and corporate waste. Bare allegations that the alleged option values are excessive or even lavish, as pleaded here, are insufficient as a matter of law to meet the standard required for a claim of waste. Because the Board's alleged actions are protected by the business judgment rule and the plaintiff has failed to make out a case of waste, there can be no underlying breach of the fiduciary duty of loyalty. I grant the defendant's motion to dismiss Count I's claims of waste and breach of the fiduciary duty of loyalty for failure to state a claim upon which relief can be granted.

VI. Count II - Breach Of The Fiduciary Duty Of "Candor"

In his second Count the plaintiff alleges that the Board:

1. Omitted from the proxy statement the value of the options as calculated under the Black-Scholes Option Pricing Model and that shareholders would have found that information material to the decision-making process; and,

2. Mischaracterized the value of these options by stating [*19] that:

> No gain to an optionee is possible without an increase in stock price, which will benefit all stockholders commensurately. A zero percent gain in the stock price will result in zero dollars for the optionee.

Corporate fiduciaries have an obligation to disclose all material facts when seeking shareholder action. n22 Material facts are those for which "there is a substantial likelihood that a reasonable person would consider them important in deciding how to vote." n23 The board sought shareholder approval of an amendment to 3COM's existing Director Stock Option Plan which expanded the pool of shares available for administering this plan. It is the board's actions surrounding this decision that form the basis for plaintiff's disclosure violation claims. It follows from this that the disclosure violation allegations here must then relate to the details of this Amendment. As a threshold matter, I find generally that basic details concerning the value of these options would be material to a reasonable shareholder's decision whether to vote for or against an expansion of the share pool available under the Plan. The question then remains whether the Board provided sufficiently [*20] detailed and accurate information.

n22 *O'Reilly v. Transworld Healthcare, Inc., 745 A.2d 902, 916* (citing *Malone v. Brincat, Del. Supr., 722 A.2d 5, 11 (1998)).*

n23 *Rosenblatt v. Getty Oil Co., Del. Supr., 493 A.2d 929, 944 (1985).*

A. Failure To Include Option Values Derived Under The Black-Scholes Model (Omission Allegation)

I find, as this Court has consistently found, that the Black-Scholes Option Pricing Model is neither sufficiently reliable nor necessary to apprise shareholders of the value of the options in question. I am rather surprised that the plaintiff has chosen to pursue this claim vigorously, knowing, as he must, that both the current Chancellor and his predecessor have questioned, if not outright rejected, the proposition that values derived from this model must be disclosed to shareholders. n24 I see nothing in the facts pleaded here which would lead me to believe that this case is so different that the Board should have disclosed [*21] these values to the shareholders. If anything, I find even less cause here for the disclosure than Chancellor Allen did in *Lewis v. Vogelstein* where he concluded that the exclusion of the Black-Scholes Model from proxy materials rendered them neither incomplete nor misleading. In that case, the shareholder action contemplated was the wholesale adoption of a stock option plan. n24 Here, the action sought is merely approval of an amendment to a plan already in existence. Further, the amendment here just makes more shares available so that it is possible to carry out the existing plan, and does not seek to do more than raise the ceiling on the number of options available to each individual director.

n24 *See Lewis v. Vogelstein, 699 A.2d at 331* ("The directors' fiduciary duty of disclosure does not mandate that the board disclose one or more estimates of present value of options that may be granted under the plan."); *Rovner v. Health-Chem Corp., 1998 Del. Ch. LEXIS 65,* * 17 ("This Court has always accepted such valuations with a healthy dose of skepticism.").

[*22]

The plaintiff has established the usefulness of the Black-Scholes model in other contexts and established its merit generally as a tool for pricing options. However, he

has failed to plead any facts to indicate that this model would be of such material importance to shareholders that it would alter the total mix of information needed to properly inform shareholders. I find no facts in the Complaint demonstrating a substantial likelihood that a reasonable person would consider this information important in deciding how to vote on the Amendment here.

> B. Misleading Statement About The Potential Realizable Value of the Options (Mischaracterization Allegation)

Plaintiff also complains that the proxy materials contained a misleading statement about the potential realizable value of these options:

> No gain to an optionee is possible without an increase in stock price, which will benefit all stockholders commensurately. A zero percent gain in the stock price will result in zero dollars for the optionee.

It is appropriate here to point out, as defendants have, that this language has been extracted from a footnote to a table entitled "OPTION GRANTS IN FISCAL YEAR 1998" which [*23] falls under the section of the Proxy Statement on *Executive Compensation.* Considering that the plaintiff has raised issue with only with the director options, his claim that this statement misled shareholders in deciding how to vote on the Amendment requires a rather tortured version of the facts.

However, even taking it out of its proper context and reading it as favorably as possible in light of the plaintiff's claims, I still find it to be accurate and a reasonable presentation of the information it seeks to convey, and not, as alleged, an attempt to mask some obscure, underlying truth. In the Proxy Statement the above-quoted language appears as follows (it is describing a table which shows the gains possible from the options granted to the company's officers, if the stock price were to rise by 5% and 10%, respectively):

> (4) Potential realizable values are net of exercise price, but before deduction of taxes associated with exercise. These amounts represent certain assumed rates of appreciation only, based on Securities and Exchange Commission rules, and do not represent the company's estimate of future stock prices. No gain to an optionee is possible without an increase [*24] in stock price, which will benefit all stockholders commensurately. A zero percent

> gain in stock price will result in zero dollars for the optionee. Actual realizable values, if any, on stock option exercises are dependent on the future performance of the Common Stock, overall market conditions and the option holders' continued employment through the vesting period.

The truth of the questioned statement may be evaluated 1) on its face and 2) in its context in the Proxy Statement. I find that the statement, at a minimum, is true on its face, even standing alone. Under no set of facts or interpretation of the facts contained in this statement could I find that it was misleading or somehow mischaracterized how gains may be derived from options. Placing the statement in its context in the Proxy Statement makes its veracity even less questionable in my estimation. The statement is simply a note which explains a chart on "Potential Realizable Value" for option grants *given to executive officers* and can hardly appear to mischaracterize director compensation from option grants. But as stated above, even if I inferred that this statement would be cross-read by the shareholders into the [*25] context of an amendment to the plan on *director* compensation, no facts support the claim that these disclosures were somehow misleading.

However, plaintiff's substantive argument bears examination. The plaintiff argues that it is possible for the Board members to derive cash value from these options by simply selling identical options, backed by those options they received as compensation. Even if the value of the option is eventually nothing (because the stock price is at or below the option's strike price) the director may still keep the cash. Plaintiff claims that the statement above masks this possibility, and thus is a mischaracterization of the compensation scheme.

The plaintiff's claims do not take into account the downside of this type of transaction, namely that selling such an option also creates a risk of economic loss for the director and thus the value gained is not a guaranteed form of compensation, but more akin to an investment risk the director may choose to take. Certainly a director can sell an option contract (a short call) for the amount of shares over which he simultaneously holds an option (a long call), and may do so at equal exercise prices, giving him [*26] net present cash for options which may or may not be worth anything as of their exercise date. But by doing this, the director has merely cashed in his own future options for present money and not received any form of additional compensation at the expense of 3COM shareholders. No reasonable 3COM shareholder would find this scenario material in deciding how to vote on expanding the pool of shares available under the Plan.

Collapsing this purported transaction shows that really all that the plaintiff alleges is that a director can sell his options to another party. Plaintiff, however, does not point out that in doing so a director forgoes *any* potential future gain in the share price in order to receive present cash for the option contract. If at the time of exercise the net gain on his options exceeds the cash amount the director had received for selling identical options, the director must still deliver his shares to his optionee at the strike price, and simply stand by, watching the optionee take all of the gain. It is quite possible that the gain on these shares may be far more than he received in cash for selling the option contract (3COM is likely susceptible to the same rapid [*27] upswings and downturns common among technology stocks).

The transaction the plaintiff uses to illustrate the point is simply one involving a director's choice to place a personal asset at risk. Must the proxy statement point out that any director might be able to borrow money against his future pay and bet it at a racetrack, reaping a windfall if he wins? Put simply, the fact that an informational statement on compensation does not contain every possibility lying behind that compensation does not render it misleading or incomplete, particularly where that possibility is one which may only come about through the personal discretion of the individual being compen-

sated, based on his or her own predilection for risk taking.

I find that the mere possibility of such a transaction is one about which the average investor need not be explicitly apprised. To mix metaphors: my holding otherwise would open Pandora's Box such that we would slide down a slippery slope towards mandating excessive detail in disclosures. I find on the facts before me that the statement questioned, even ignoring how far out of context the plaintiff has taken it, is accurate, and would not mislead a reasonable investor [*28] in a way which masks true compensation. Further, the compensation about which plaintiff seeks disclosure would not, if realized, come at the economic detriment of 3COM's shareholders. I find that the plaintiff has failed to plead facts sufficient to support a claim upon which this Court could grant relief.

VII. Conclusion

Defendants' motion to dismiss is granted as to both counts.

IT IS SO ORDERED.

Myron T. Steele

Vice Chancellor

2

FRANK E. ACIERNO, CHRISTIANA TOWN CENTER, LLC, a Delaware limited liability company, 395 ASSOCIATES, LLC, a Delaware limited liability company, ESTATE HOMES, INC., a Delaware corporation, Plaintiffs, v. GEORGE O. HAGGERTY, individually and in his official capacity as Assistant General Manager of the New Castle County Department of Land Use, TIMOTHY P. MULLANEY, individually and in his capacity as New Castle County Attorney, CHARLES L. BAKER, individually and in hi capacity as General Manager of the New Castle County Department of Land Use, JAMES H. EDWARDS, individually and in his capacity as Inspections Manager and Licensing Division Manager of the New Castle County Department of Land Use, and SHERRY L. FREEBERY, in her individual capacity as Chief Administrative Office of New Castle County and NEW CASTLE COUNTY, a political subdivision of the State of Delaware, Defendants.

Civil Action No. 04-1376-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2005 U.S. Dist. LEXIS 30353*

**November 23, 2005, Decided**

**PRIOR HISTORY:** null*Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65 (Del. Ch., May 6, 2004)*
*Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 576 (Del., Dec. 16, 2004)*
*Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 26 (Del., Jan. 16, 2004)*
*New Castle County v. Sterling Properties, Inc., 379 A.2d 1125, 1977 Del. LEXIS 528 (Del., 1977)*
*Acierno v. Mitchell, 6 F.3d 970, 1993 U.S. App. LEXIS 25126 (3d Cir. Del., 1993)*

**COUNSEL:** [*1] Richard L. Abbott, Esq., Abbott Law Firm, LLC, Hockessin, DE, Counsel for Plaintiffs.

Dennis J. Siebold, Esq., New Castle County Department of Law, New Castle, Delaware, Counsel for Defendant New Castle County, Of Counsel; Hamilton P. Fox, III, Esq., Gregory S. Smith, Esq., Carter L. Williams, Esq., Sutherland Asbill & Brennan LLP, Washington, D.C.

Collins J. Seitz, Jr., Esq., Matthew F. Boyer, Esq., Max B. Walton, Esq., Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, Counsel for Defendant Scott G. Wilcox.

Michael P. Kelly, Esq., Paul A. Bradley, Esq., McCarter & English, Wilmington, Delaware, Counsel for Defendant Charles L. Baker.

Claire M. DeMatteis, Esq., Stradley, Ronon, Stevens & Young, LLP, Wilmington, Delaware, Counsel for Defendant Sherry L. Freebery, Of Counsel: C. Clark Hodgson, Jr., Esq., Sean R. Adams, Esq., Stradley, Ronon, Stevens & Young, LLP, Philadelphia, Pennsylvania.

Joseph R. Biden, III, Esq., Ian Connor Bifferato, Esq., Joseph K. Koury, Esq., Bifferato, Gentilotti Biden & Balick P.A., Wilmington, Delaware, Counsel for Defendant Timothy P. Mullaney.

David A. Felice, Esq., Cozen O'Connor, Chase Manhattan Center, Wilmington, Delaware, [*2] Counsel for Defendants George O. Haggerty and James H. Edwards, Of Counsel: Jeffery I. Pasek, Esq., Cozen O'Connor, Philadelphia, Pennsylvania.

**JUDGES:** Kent Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent Jordan

**OPINION:**

**MEMORANDUM OPINION**

**JORDAN, District Judge**

**I. INTRODUCTION**

The Amended Complaint (Docket Item ["D.I."] 9) filed in this case by plaintiffs Frank E. Acierno, Christi-

ana Town Center, LLC ("CTC"), 395 Associates, LLC ("395"), and Estate Homes, Inc. ("EHI") (collectively, "Acierno") alleges that the defendants violated Acierno's constitutional rights and the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1961 et. seq.* ("RICO"), through various actions affecting the commercial development of Acierno's land. (D.I. 9 at PP51-71.) Acierno also alleges state law claims denominated as "civil conspiracy" and "tortious aiding and abetting." (*Id.* at PP72-82.)

Before me now is a Motion to Dismiss the Amended Complaint (D.I. 37) filed by defendant New Castle County (the "County"). Also before me is a Motion to Dismiss the Amended Complaint or Stay the Proceedings (D.I. 40) filed by defendants George O. Haggerty [*3] ("Haggerty"), Scott G. Wilcox ("Wilcox"), Timothy P. Mullaney ("Mullaney"), Charles L. Baker ("Baker"), James H. Edwards ("Edwards") and Sherry L. Freebery ("Freebery") (collectively, the "Individual Defendants"). In addition to those motions, I also have before me a Motion for Leave to File a Second Amended Complaint (D.I. 50), filed by Acierno. The County and the Individual Defendants (collectively, "Defendants") countered with a jointly submitted Motion for Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint. (D.I. 61.)

Jurisdiction over this case exists under *28 U.S.C. § 1331* and *§ 1367.* For the reasons that follow, the Motions to Dismiss filed by the County and the Individual Defendants will be granted to the extent that the Amended Complaint will be dismissed without prejudice. Acierno's Motion for Leave to Amend and the joint Motion for Briefing Schedule on the Motion for Leave to Amend will be denied as moot.

## II. BACKGROUND n1

> n1 The following information is drawn from the parties' submissions and is viewed in the light most favorable to the plaintiffs. Materials beyond the pleadings are being considered in accordance with my determination that I may take judicial notice of prior judicial and administrative proceedings. *See infra* at 11-12.

[*4]

Frank E. Acierno owns CTC, 395, and EHI. (D.I. 9 at PP2-4.) Acierno alleges that starting in 2002, defendants Freebery, Haggerty, and Wilcox, n2 acting in their positions in the government of New Castle County, "decided to act in concert to plan and carry out a scheme and conspiracy to deny Acierno his legal right to use and develop properties owned by him" in New Castle

County. (*Id.* at P19.) In his Complaint, Acierno sets out seven different land development disputes between Acierno and the County, disputes which have led to numerous proceedings in the Delaware state courts and local administrative agencies. (*Id.* at PP20-49.) Acierno also alleges additional wrongs beyond those seven disputes, which have also led to proceedings in Delaware state courts. (*Id.*)

> n2 Freebery served as Chief Administrative Officer of New Castle County in the administration of County Executive Thomas P. Gordon (Mr. Gordon individually is referred to as "Gordon," and his administration as the "Gordon Administration"). (D.I. 9 at P10.) Haggerty was employed by the Gordon Administration as the Assistant General Manager of the New Castle County Department of Land Use. (*Id.* at P5.) Wilcox acted during the time in question either as First Assistant County Attorney or as private counsel on behalf of the County in dealing with legal issues between the County and Acierno. (*Id.* at P6.)

[*5]

1. Dispute over Red Lion Village by Sterling Properties

Acierno alleges that on December 31, 2002, Haggerty and Wilcox n3 cancelled a pre-construction meeting regarding a property known as Red Lion Village, which was owned by another Acierno company, Sterling Property Holdings, Inc. (D.I. 9 at P20.) Wilcox sent letters to Acierno on December 31, 2002 and January 2, 2003, stating that the County could not grant any application to Acierno because he was not in good standing with the County based on unresolved violations at other sites. (*Id.* at P21, D.I. 42 at A377, A379.) On February 4, 2003, Baker n4 sent a letter on behalf of the New Castle County Department of Land Use (the "Department of Land Use" or the "Department") to Acierno stating that, because Acierno had not started building on Red Lion Village within five years of adoption of the Unified Development Code (the "Sunsetting Provision"), his plan had to be resubmitted before he would be permitted to begin building. (D.I. 42 at A387.)

> n3 Acierno alleges that Baker and Mullaney, as supervisors of Haggerty and Wilcox, respectively, are liable for violations of Acierno's rights committed by their subordinates. (D.I. 9 at PP44-45.) Furthermore, Acierno claims that Freebery, as supervisor of Baker and Mullaney, is liable

both for her failure to supervise and for directing the "unconstitutional actions . . . taken against Acierno." (*Id.* at P46.)

[*6]

n4 Baker was employed as the General Manager of the New Castle County Department of Land Use, and was Haggerty's direct supervisor. (D.I. 9 at P8.)

Acierno appealed the February 4th decision to the New Castle County Planning Board (the "Planning Board"), which affirmed the decision of the Department of Land Use in cancelling the meeting, finding that the Department had properly interpreted the provisions at issue. (D.I. 42 at A436-38.) Acierno, through Sterling, filed a Complaint in the Delaware Court of Chancery, No. 20408NC, against the County, the Department of Land Use, and the Planning Board. (D.I. 42 at A361-75.) The Court of Chancery granted judgment on the pleadings to the County as to the challenge to the legality of the Sunsetting Provision, but allegations as to the unconstitutional conduct of the Individual Defendants in cancelling the December 31 meeting are still pending in the Court of Chancery. *Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004).*

2. Drainage Violation Notice to Christiana Town [*7] Center

Acierno next alleges that on January 15, 2003, Haggerty and Wilcox issued a Violation Notice under the County Drainage Code to CTC. (D.I. 9 at P23.) Acierno claims that certain Plaintiffs were given less that 24 hours notice of the hearing, which was scheduled by Haggerty and Wilcox. (*Id.*) Acierno alleges that at the hearing, Haggerty and Wilcox found CTC to be in violation of "numerous non-existent provisions of the County Drainage Code." (*Id.*) CTC appealed this decision to the County Board of License Inspection & Review (the "Review Board"), which affirmed on April 17, 2003 the decision made at the hearing. (D.I. 42 at A109-10.) CTC filed a petition for a writ of certiorari in the Superior Court; that court denied the writ and dismissed the action, noting that CTC had waived normal service by failing to object to the timing at the hearing. *Christiana Town Ctr. v. New Castle County, 2004 Del. Super. LEXIS 209, C.A. 03A-07-008 (RSG), 2004 WL 1551457, at *1-4 (Del. Super. Ct. July 7, 2004).* Acierno and CTC appealed to the Delaware Supreme Court, which affirmed the judgment. *Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 576, C.A. No. 3342004, 2004 WL 2921830* [*8] *(Del. Dec. 16, 2004).*

3. Christiana Town Center Buildings 4 and 5

Acierno next alleges that Defendants issued a "factually incorrect and legally unsupported Violation Notice [to CTC] regarding the alleged failure to obtain a Certificate of Occupancy for Building Nos. 4 and 5." (D.I. 9 at P24.) Acierno alleges that CTC had Certificates of Occupancy for the occupied buildings, and was in full compliance with the County Code. (*Id.*) After a decision against him at a Rule to Show Cause hearing before the Department of Land Use, Acierno appealed to the Review Board, which affirmed the decision below. (D.I. 42 at A286-87; A104-06.) Acierno again filed a petition for a writ of certiorari in the Superior Court (D.I. 42 at A95-103), and that court entered a stipulation of dismissal on March 8, 2004. (D.I. 44 at A942.)

4. Christiana Town Center Bertucci's

Acierno alleges that Haggerty and Wilcox next deprived him of his constitutional rights "by improperly and unlawfully denying Christiana and one of its tenants, Bertucci's Restaurant Corp., the ability to obtain building permits." (D.I. 9 at P25.) Acierno asserts that Wilcox acted outside his role as First Assistant County [*9] Attorney and acted as an administrative decision maker. (*Id.*) Acierno filed an action in the Court of Chancery contesting the denial, but that court found that Acierno had an adequate remedy at law and had failed to exhaust all administrative remedies. *Christiana Town Ctr. LLC v. New Castle County, 2003 Del. Ch. LEXIS 60, C.A. No. 20214, 2003 WL 21314499, at *4 (Del. Ch. June 6, 2003).* After the Supreme Court affirmed the decision of the Court of Chancery, *2004 Del. LEXIS 26, No. 3182003, 2004 WL 77868 (Del. Jan. 16, 2004),* Acierno filed a complaint in the Superior Court on the same issues. (D.I. 42 at A251-58.) A stipulation of dismissal was entered in that action on February 20, 2004. (D.I. 44 at A941.)

5. Home Warranties

Acierno next claims that Haggerty and Wilcox deprived him of his constitutional rights by refusing to issue Letters of Compliance after Acierno had submitted documentation showing that he had cured prior home warranty violations. (D.I. 9 at P27.) Acierno filed an action in the Delaware Superior Court for New Castle County seeking a writ of mandamus to force the issuance of the Letters of Compliance. (*Id.*) When that court indicated that it would likely issue the [*10] writ, the Letters of Compliance were issued. (*Id.* at P28.)

6. Christiana Town Center Drainage Code Violation

According to Acierno, on June 11, 2003, Wilcox and Haggerty issued "a Violation Notice . . . regarding certain bogus charges under the County Drainage Code" to CTC. (D.I. 9 at P29.) A Rule to Show Cause Hearing

was held on July 8, 2003, during which, Acierno alleges, Haggerty and Wilcox committed "half a dozen or more violations of Acierno's Constitutional Due Process Rights" at a "'kangaroo court' session." (*Id.* at P30.) After a decision against him at the hearing, and after Acierno's petition for a writ of certiorari in the Superior Court was dismissed as premature, *2003 Del. Super. LEXIS 318, Civ. A. No. 03A-08-007 (RSG), 2003 WL 22120857, at \*1 (Del. Super. Ct. Sept. 10, 2003)*, CTC appealed to the Review Board, which affirmed the decision made at the hearing. (D.I. 44 at A878-83.) Acierno then filed another action in the Delaware Superior Court, challenging the actions of the Department of Land Use and the Review Board, and alleging that CTC's due process rights were violated by the failure to provide sufficient notice of the violations. (D.I. 44 at A822-34.) That action [\*11] is currently pending.

7. Denial of Phase 4 Building Permit at Christiana Town Center

Acierno also alleges that Haggerty and Wilcox, in August 2003, ordered County personnel not to issue a building permit for Phase Four of CTC. (D.I. 9 at P33.) Acierno alleges that one of the reasons cited by Haggerty and Wilcox for denying the permit, namely the failure to receive a letter from DelDOT regarding road improvements, was impossible to comply with because "DelDOT had refused to permit the road work and had dubbed it unnecessary in June of 2002." (*Id.*) Acierno further alleges that all of the other reasons cited for denying the permit were either not required by the County Building Code or were manufactured by Haggerty and Wilcox. (*Id.*)

Acierno sought a writ of mandamus in the Delaware Superior Court to overturn the action of the Department of Land Use. (D.I. 43 at A463-70.) The Superior Court denied relief, finding that a writ of mandamus was not appropriate based on the facts presented. *Christiana Town Ctr. v. New Castle County, 2004 Del. Super. LEXIS 302, No. Civ. A. 03M-08-072 (RSG), 2004 WL 2088032, at \*1 (Del.Super. 2004)*. Acierno then filed a Complaint in the Delaware Court [\*12] of Chancery based on the same dispute. (D.I. 44 at A969-77.) That case is still pending.

8. Other Alleged Wrongs n5

n5 The Individual Defendants allege that these remaining allegations relate to five separate proceedings arising out of a dispute over so-called "stop work" orders issued to address violations at CTC. With respect to the first stop work order, the proceedings include a petition for a writ of certiorari to the Delaware Superior Court

filed by Acierno that was dismissed for failure to appeal to the Review Board, *Christiana Town Center, LLC v. New Castle County, 2003 Del. Super. LEXIS 318, 2003 WL 22120857 (Del. Super. Sept. 10, 2003)*, and a complaint filed by the County in the Court of Chancery that was dismissed by stipulation without prejudice (D.I. 44 at A943). A second stop work order was issued, and three proceedings followed: an appeal to the Review Board by Acierno, in which the Board upheld the stop work order (D.I. 44 at A929-33); a suit filed by the County in the Court of Chancery, in which the County alleged that CTC had violated the stop work order (D.I. 43 at A510-32) and Acierno claimed that the Code provisions at issue were unconstitutional (*id.* at A897-99); and a petition for a writ of certiorari filed by Acierno alleging that the stop work order violated his federal and state due process rights. (D.I. 44 at A902-08.) The latter two actions remain pending.

[\*13]

In addition to the seven disputes outlined above, Acierno also alleges various additional wrongs committed against him by the County and the Individual Defendants. Acierno alleges that in 2003 and 2004, Freebery used County resources to "issue multiple inaccurate press releases or written statements[,] falsely painting Acierno as a lawbreaking developer." (D.I. 9 at P34.) Furthermore, Acierno alleges that, through "uneven and selective application of the law," the Individual Defendants treated him differently than other developers who were similarly situated. (*Id.* at P35.) Acierno alleges that this unequal treatment is evidenced by Baker's personal visits to two development projects owned by another developer, which projects were then placed on the public hearing agenda despite having been "submitted late and/or incomplete." (*Id.* at PP36-37.) Acierno also notes that "Freebery for County Executive" signs were displayed on the property at those two projects. (*Id.* at P37.) Acierno claims that Gordon and Freebery gave preferential treatment to developer Verino Pettinaro, in return for favorable business deals for Gordon and Freebery. (*Id.* at PP40-41.) Furthermore, Acierno [\*14] claims that developer Louis Capano has also received preferential treatment from the Individual Defendants. (*Id.* at P42.)

Acierno further alleges that he was treated unfairly by Edwards. He alleges that Edwards held a Rule to Show Cause hearing, which was improperly convened, and that Edwards issued a decision adverse to Acierno six months after the hearing. (D.I. 9 at P38.) Acierno claims that when dealing with another developer on another project, Edwards found the developer in violation

but fined him only $ 200 and refused to require him to fix the problem that led to the fine. (*Id.* at P39.)

## III. STANDARD OF REVIEW

A. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under 12(b)(1)

Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000)*. Under *Rule 12(b)(1)*, the court's jurisdiction may be challenged either facially, based on the legal sufficiency of the claim, or factually, based on the sufficiency of jurisdictional facts. *See* 2 James W. Moore, *Moore's Federal Practice § 12.30* [*15] [4] (3d ed. 1997). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408-1409 (3d Cir. 1991) (quoting Bell v. Hood, 327 U.S. 678, 682, 66 S. Ct. 773, 90 L. Ed. 939 (1946))*.

Under a factual attack, however, the court is not "confined to allegations in the . . . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha. v. United States, 115 F.3d 176, 179, 36 V.I. 392 (3d Cir. 1997). See also Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891-892 (3d Cir. 1977)*. In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group, 227 F.3d at 69* [*16] (quoting *Mortensen, 549 F.2d at 891)*. Although the court should determine subject matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not always be determined with finality at the threshold of litigation." *Moore at § 12.30[1]*. Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 537-38, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995)* (citations omitted).

B. Motion to Dismiss Under 12(b)(6)

In analyzing a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept as true all material allega-

tions of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should [*17] be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

## IV. DISCUSSION

As a threshold issue, Acierno and Defendants dispute what material may be considered in deciding a motion to dismiss under *Federal Rule of Civil Procedure 12(b)*. Along with their motion to dismiss, the Individual Defendants submitted extensive appendices containing violation notices, decisions of County administrative boards, Delaware state court complaints and attachments, answers to those complaints, decisions of Delaware state courts, and stipulations of dismissal of Delaware state court actions. (D.I. 42, 43, and 44.) Acierno claims that these materials cannot be considered at this stage because only the pleadings and materials attached to the Complaint may be considered in the context of a 12(b) motion to dismiss. [*18] n6 (D.I. 53 at 15.) The Defendants, on the other hand, contend that I can take judicial notice of prior proceedings and public records when considering a 12(b) motion. (D.I. 59 at 2.)

> n6 Acierno correctly cites the law stating that different materials can be considered in a facial and a factual attack on subject matter jurisdiction under *Federal Rule of Civil Procedure 12(b)(1)*. (D.I. 53 at 16.) However, because I determine here that the materials submitted by the Individual Defendants fall within the categories of information of which I may take judicial notice, that distinction is irrelevant here.

In the Third Circuit, "on a motion . . . to dismiss pursuant to *Rule 12(b)*, the Court is not strictly limited to the facts addressed in the pleadings; the Court may take judicial notice of additional facts where appropriate." *Southmark Prime Plus, L.P. v. Falzone, 776 F. Supp. 888, 892 (D. Del. 1991)* (finding that a court could take judicial notice of proceedings [*19] in other courts, and the contents of court records); *see also In re NAHC Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002)* (taking judicial notice of SEC filings).

Therefore, to the extent that the documents submitted by the Individual Defendants are public documents or

the decisions of other courts, I take judicial notice of those documents and will consider them here in deciding this motion to dismiss. Contrary to Acierno's assertions, this does not turn the pending motions into ones for summary judgment.

## A. The Rooker-Feldman Doctrine

Defendants first argue that the Rooker-Feldman doctrine prevents this court from hearing this action and, therefore, that this action should be dismissed under *Federal Rule of Civil Procedure 12(b)(1)*. Until recently, the Rooker-Feldman doctrine had been given a relatively expansive reading. *See, e.g., Exxon Mobil Corp. v. Saudi Basic Industries Corp., 364 F.3d 102 (3d Cir. 2004), rev'd, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005).* However, a recent decision of the Supreme Court limited the Rooker-Feldman doctrine, stating that it is "confined to . . . cases brought by state-court [*20] losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp., 125 S. Ct. at 1521-22.* The court went on to add that a federal court is not precluded by Rooker-Feldman from exercising subject matter jurisdiction "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id. at 1527.* "If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id. at 1527* (internal quotations and citations omitted).

Here, several state court decisions reviewed administrative board decisions and decided issues of county zoning and land use law. *See, e.g., Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004); Christiana Town Ctr. v. New Castle County, 2004 Del. Super. LEXIS 209, C.* [*21] *A. 03A-07-008 (RSG), 2004 WL 1551457, at *1-4 (Del. Super. Ct. July 7, 2004); Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 26, C.A. No. 3342004, 2004 WL 2921830 (Del. Dec. 16, 2004).* Acierno challenges not the state court decisions themselves but the behavior of county officials in allegedly treating him unfairly and violating various constitutional rights. (D.I. 9 at PP21-49.) This case therefore does not fit within the paradigm of *Rooker* and *Feldman,* as explained by the Supreme Court. Accordingly, Defendants' challenge to subject matter jurisdiction fails, and principles of preclusion under Delaware state law will apply to determine whether this court can hear this action under *12(b)(6).*

## B. Claim Preclusion and Issue Preclusion

Defendants argue that this court lacks jurisdiction to hear this case because prior litigation in state court and in administrative agencies must result in claim preclusion or issue preclusion. (D.I. 41 at 19-25.) Again, as a preliminary matter, principles of preclusion may operate to bar a claim or issue from being relitigated, but they do not deprive the court of jurisdiction. *See Exxon, 125 S. Ct. at 1527* [*22] ("Preclusion, of course, is not a jurisdictional matter."). The question, then, becomes what preclusive effect, if any, the state cases have on this case.

With respect to both claim and issue preclusion, it is clear that the decisions of state courts are given preclusive effect in later actions in federal court. n7 *See 28 U.S.C. § 1738* ("Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."). Whether a final judgment by a state court precludes federal court adjudication under either res judicata or collateral estoppel n8 is a question of state law. *Migra v. Warren City School District Board of Education, 465 U.S. 75, 81, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984).*

> n7 Although there are many decisions by administrative agencies on the disputes that Acierno attempts to litigate here, only the decisions of state courts are given preclusive effect here.

[*23]

> n8 "Res judicata" is simply another name for the doctrine of claim preclusion; similarly, "collateral estoppel" is synonymous with issue preclusion. BLACK'S LAW DICTIONARY 1312, 256 (7th Ed. 1999).

When a state court has entered final judgment in a proceeding, res judicata operates to bar a federal claim that could have been brought in that state court proceeding. *Migra, 465 U.S. at 84-85.* Under Delaware law, a party claiming preclusion under res judicata must show:

> (1) the court making the prior adjudication had jurisdiction, (2) the parties in the present action are either the same parties or in privity with the parties from the prior adjudication, (3) the cause of action must be the same in both cases or the issues decided in the prior action must be

the same as those raised in the present case, (4) the issues in the prior action must be decided adversely to the plaintiff's contentions in the instant case, and (5) the prior adjudication must be final

*Bailey v. City of Wilmington, 766 A.2d 477, 481 (Del. 2001).* n9 The determination of whether [*24] claim preclusion operates to bar a claim is "based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily a transaction gives rise to only one claim regardless of the number of ways that the claim can be asserted." *Maldonado v. Flynn, 417 A.2d 378, 381 (Del. Ch. 1980).*

> n9 In neither his complaint nor his briefs does Acierno challenge the jurisdiction of the Delaware courts or local administrative agencies that decided the relevant disputes before them. (D.I. 9, 52, 53). Furthermore, it is clear that the County, a party in all of the state court and administrative actions, is in privity with the Individual Defendants, as the Individual Defendants were employees of the County and acting within the scope of their employment in committing the alleged violations. They are therefore bound by any prior judgments against the County for actions taken in their official capacities. *See, e.g. Fox v. Christina Square Assoc., L.P., 1994 Del. Super. LEXIS 267, 1994 WL 146023, at *3 (Del.Super. 1994)* ("The concept of privity pertains to the relationship between a party to a suit and a person who was not a party but whose interest in the action was such that he or she will be bound by the final judgment as if he or she were a party.")

[*25]

Collateral estoppel, or issue preclusion, operates to bar parties from relitigating the factual issues litigated in a prior case. *Columbia Cas. Co. v. Playtex FP, Inc., 584 A.2d 1214, 1216 (Del. 1991)* ("where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action"). A party alleging that a particular issue is barred by collateral estoppel must show that "(1) a question of fact essential to the judgment, (2) [was] litigated and (3) determined (4) by a valid and final judgment." *Messick v. Star Enterprise, 655 A.2d 1209, 1211 (Del. 1995)* (internal citations and quotations omitted).

Here, Acierno has essentially attempted to repackage the same claims that he has already pursued in state courts and before local administrative agencies. He seeks, in short, a second bite at the apple. Actually, given the number of lawsuits he has brought on these disputes, that metaphor significantly understates the apple's reach. Under the factors outlined above, it is clear that many of Acierno's claims are barred [*26] by res judicata and collateral estoppel, as those claims spring from disputes that have already been finally resolved in state courts.

First, with respect to the dispute over Red Lion Village by Sterling Properties, the New Castle County Planning Board found that the pre-construction meeting on that property had been properly cancelled. (D.I. 42 at A436-38.) Acierno attempts to assert here, again, that this cancellation was improper. (D.I. 9 at PP19-22.) Although the Planning Board decided the same issues that are presented here, and its decision was adverse to Acierno, its decision was not final. (D.I. 42 at A436-38). Acierno brought a case in the Court of Chancery challenging those same actions by the County. (D.I. 42 at A361-75.) The Court of Chancery granted judgment on the pleadings to the County as to the legality of the Sunsetting Provision. *Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004).* That decision precludes Acierno, under principles of collateral estoppel, from challenging the legality of the Sunsetting Provision here. However, the case in the Court of Chancery is still pending regarding [*27] constitutional claims brought by Acierno against the County, and those claims are not precluded.

Second, with respect to the dispute over the drainage violation notice to CTC, Acierno's claims against the County and the Individual Defendants are barred by the doctrine of res judicata. In his complaint, Acierno claims that he was denied procedural due process through improper notice of the Rule to Show Cause hearing regarding that violation. (D.I. 9 at P23.) However, the Supreme Court of Delaware found that "the record shows that Christiana voluntarily, knowing and intelligently waived its due process rights to adequate notice of the RTC [Rule to Show Cause] hearing by failing to object to the inadequate notice at the actual hearing." *Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 576, No. 3342004, 2004 WL 2921830, at *3 (Del. Dec. 16, 2004).* That judicial decision was final and adverse to Acierno, and therefore the claims involving those facts are precluded.

Third, Acierno brings claims against the County and the Individual Defendants based on a dispute over a violation notice issued to CTC for failure to obtain a Certificate of Occupancy for Buildings 4 and 5. (D. [*28] I. 9 at P24.) Acierno's claims based on this dispute are also

precluded by res judicata. Acierno challenged the decision of the Review Board, affirming a decision of the Department of Land Use against Acierno, by filing a petition for a writ of certiorari in the Superior Court. (D.I. 42 at A95-103.) The Review Board's decision found that CTC was not in compliance with the County Code at the time that the Violation Notice was issued. (D.I. 42 at A104-06.) The Superior Court entered a stipulation of dismissal with prejudice in that action on March 8, 2004. (D.I. 44 at A942.) That final resolution by the Delaware Superior Court precludes Acierno from bringing this claim here.

Fourth, Acierno makes claims based on the denial of building permits to CTC and its tenant, Bertucci's Restaurant Corp. (D.I. 9 at P25.) The Delaware Court of Chancery previously dismissed a case over that dispute, based partially on a finding that CTC had not exhausted all of its administrative remedies. *Christiana Town Ctr. LLC v. New Castle County, 2003 Del. Ch. LEXIS 60, C.A. No. 20214, 2003 WL 21314499, at *4 (Del.Ch. 2003)* ("appeals to a court of law cannot occur until after the Planning Board has rendered a decision. [*29] Therefore, a statutory remedy at law exists by which Christiana can appeal the County's decision to deny its application to the Planning Board, and thereafter, to a court of law.") That decision was affirmed by the Delaware Supreme Court. *Christiana Town Ctr. LLC v. New Castle County, 841 A.2d 307, 2004 WL 77868, at *1 (Del. 2004)*. Acierno then filed a complaint in the Superior Court on the same issues (D.I. 42 at A251-58), but a stipulation of dismissal with prejudice of that case was entered on February 20, 2004. (D.I. 44 at A941.) As a result, Acierno cannot now assert these claims, as the final rulings of the Delaware courts requiring Acierno to exhaust his administrative remedies bar his bringing them.

Fifth, Acierno filed an action in the Delaware Superior Court, seeking a writ of mandamus that would force the County to issue Letters of Compliance in connection with home warranty violations. (D.I. 9 at P27.) Those letters were ultimately issued by the County. (*Id.* at P28.) Acierno now asserts claims for attorneys' fees and litigation costs, as well as losses based on the loss of use of his land. (*Id.*) However, as was stated above, res judicata bars [*30] not only claims that were brought in prior proceedings, but also claims that could have been brought. *See, e.g., Migra, 465 U.S. at 84-85.* Acierno's claims of violations of his constitutional rights, as well as his claims for attorney's fees, costs, and losses could have been brought in front of the Delaware Superior Court in connection with his motion for a writ of mandamus. *See, e.g, New Castle County v. Sterling Properties, Inc., 379 A.2d 1125, 1129 (Del. 1977)* ("The County is barred, in our opinion, by rules of privity and res judi-

cata from litigating in this action an issue which the members of the County Council could have litigated on behalf of the County in the mandamus action."). Therefore, these claims are now barred by principles of claim preclusion.

Sixth, Acierno alleges that the County and the Individual Defendants violated his constitutional rights by issuing a "bogus" violation notice of charges under the County Drainage Code. (D.I. 9 at P29.) An action regarding this violation is currently pending in the Superior Court, and there has yet to be a final decision. (D.I. 44 at A822-34.) Therefore, the principles of res judicata and collateral [*31] estoppel do not apply to this dispute.

Seventh, Acierno claims that the County and the Individual Defendants violated his rights by refusing to issue a building permit for Phase 4 of CTC. (D.I. 9 at P33.) Acierno has brought suit alleging this violation in the Court of Chancery, but there has not been a final decision. (D.I. 44 at A969-77.) Therefore, this claim too is not precluded.

Finally, two cases, one in the Court of Chancery and one in the Superior Court, remain pending based on two separate stop work orders issued to CTC by the County. Acierno bases his claims here in part on the issuance of these stop work orders. (D.I. 9 at P35.) Because there is no final decision in the pending state cases, the underlying disputes are not barred by principles of res judicata or collateral estoppel.

### C. Abstention

As was described earlier, there are five pending state court proceedings that arise out of the same factual scenarios that Acierno alleges here. Four of those were filed by Acierno, and in them he has alleged violations of his constitutional rights. (See, e.g., D.I. 42 at A373, PP50-51; D.I. 44 at A824, P9; D.I. 44 at A972, P14; D.I. 44 at A904, P12). In the fifth proceeding, [*32] which was filed by the County in the Court of Chancery, (D.I. 43 at A510-32), Acierno alleged constitutional violations in his counterclaim and answer. (D.I. 44 at A897-98, PP111-112.) Where an action in federal court essentially duplicates an action currently pending in state court, the federal court may abstain from exercising jurisdiction, as explained in *Colorado River Water Conservation District v. United States. 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976).* While the Supreme Court held in *Colorado River* that abstention is warranted only in exceptional, limited circumstances, *id. at 813,* such circumstances exist here.

When determining whether to abstain under *Colorado River,* a court should consider six factors: "(1) which court first assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirabil-

ity of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties." n10 *Spring City Corp. v. American Bldgs. Co., 193 F.3d 165, 171 (3d Cir. 1999).* Here, as to the first [*33] factor, although no specific piece of property is at issue, Acierno is litigating his right to use and develop land in New Castle County in five separate proceedings in the Delaware courts. Even though this does not directly fit into the first *Colorado River* factor, it is clear that the Delaware state courts and local administrative agencies are the desired fora for addressing land use rights. *Acierno v. Mitchell, 6 F.3d 970, 975 (3d Cir. 1993)* ("land-use regulation generally affects a broad spectrum of persons and social interests, and ... local political bodies are better able than federal courts to assess the benefits and burdens of such legislation") (citation omitted). Therefore, because the state courts in Delaware first assumed jurisdiction over Acierno's land use disputes, the first factor of *Colorado River* weighs in favor of abstention.

> n10 The Supreme Court originally delineated only the first four factors. *Colorado River Water Conservation Dist. v. U. S., 424 U.S. 800, 818, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)* ("the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts . . . [and] may also consider such factors as the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums") (internal citations omitted). The final two factors were articulated by the Supreme Court in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp. 460 U.S. 1, 23, 26, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)* ("Besides the four factors expressly discussed in Colorado River, there is another that emerges . . . the fact that federal law provides the rule of decision on the merits"; "an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights").

[*34]

The second factor of *Colorado River* weighs against abstention; the state court is no more convenient than the federal court, as the two courts are located just blocks from one another. However, the third factor, avoiding piecemeal litigation, weighs heavily in favor of abstention. As has been stated several times, Acierno already has five different suits pending in Delaware courts. (*See, e.g.,* D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at

A902-08; D.I. 44 at A969-77; D.I. 43 at A510-32.) All five of these suits contain claims that the actions of the Individual Defendants and the County violated his constitutional rights. (*See* D.I. 42 at A373, PP50-51; D.I. 44 at A824, P9; D.I. 44 at A972, P14; D.I. 44 at A904, P12; D.I. 44 at A897-98, PP111-112.) Adding a sixth case would only further fragment the dispute resolution processes that are underway.

The fourth *Colorado River* factor also weighs in favor of abstention. The five state court proceedings that are currently pending are at different stages of completion. The present case was filed on October 21, 2004. Four of the five state court proceedings were filed in 2003, and the fifth was filed by Acierno in early [*35] October of 2004. (*See* D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D.I. 43 at A510-32.) Moreover, each of those state court cases is based on administrative proceedings that began long before this case was filed. Therefore, under the fourth *Colorado River* factor, this court should abstain and allow cases first filed in the state courts to run their course.

The next factor to be considered, whether federal or state law controls, weighs somewhat in favor of abstention. Acierno here attempts to assert claims under *§ 1983* and RICO, both of which are vehicles for vindicating federal rights. (D.I. 9 at PP51-71.) However, the outcome of those claims depends in large measure on the determination of whether the County and the Individual Defendants properly followed state law and regulations in their dealings with Acierno.

The final factor, whether the state court will adequately protect the interests of the parties, clearly weighs in favor of abstention. Each of the pending state proceedings presents one or more of the constitutional claims presented here. (*See* D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D. [*36] I. 44 at A897-899.) Because the Delaware courts are fully capable of addressing those claims, abstention under *Colorado River* is appropriate.

Having determined that abstention is appropriate, the next question is whether this case should be stayed or dismissed. The United States Courts of Appeal for the First, Second, Seventh, and Ninth Circuits have found that a plaintiff's decision to file overlapping suits in both state and federal court is a relevant factor to consider when determining whether a district court should dismiss the federal case. *See, e.g., American Int'l Underwriters (Philippines), Inc. v. Continental Ins. Co., 843 F.2d 1253, 1260-61 (9th Cir. 1988); Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 915 F.2d 7, (1st Cir. 1990); La-Duke v. Burlington Northern R.R. Co., 879 F.2d 1556, 1561 (7th Cir. 1989); Telesco v. Telesco Fuel and Ma-*

*sons, 765 F.2d 356, 363 (2d Cir. 1985)*. As the Ninth Circuit stated, "it is clear that the rationale that prohibits plaintiffs from removing cases to federal court under *28 U.S.C. § 1441* also bars [a plaintiff] from bringing . . . [a] repetitive [*37] lawsuit in federal court." *American Int'l Underwriters, 843 F.2d at 1260*. "The district court was justified in dismissing [the plaintiff's] complaint for this reason as well as for abstention reasons." *Id. at 1261*.

Acierno has filed four of the five Delaware state suits that overlap this suit. He now recasts his state court claims in an attempt to get this court to examine what he has already litigated or is already litigating elsewhere. Acierno's claims will be dismissed without prejudice as opposed to being stayed, because the claims he brings here overlap totally with factual scenarios that he is litigating in Delaware state courts, such that, after the state cases are finally decided, it is unlikely that there will be issues left to litigate. n11 *See, e.g., Lui v. Comm'n on Adult Entm't Establishments, 369 F.3d 319, 327 (3d Cir. 2004)* ("where 'a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; [then] the state court's judgment on the issue would be res judicata ... [and the] stay order amounts to a dismissal of the suit.'" *(quoting Moses H. Cone Mem. Hosp., 460 U.S. at 10)*). [*38] However, in the unlikely event that some claims remain, the dismissal is without prejudice, so that Acierno may refile claims if appropriate at a later time.

> n11 Whether or not state law would provide a remedy for Acierno's alleged state law claims, denominated as "civil conspiracy" and "tortious aiding and abetting," they too are subject to res judicata and abstention. As was stated above, "ordinarily a transaction gives rise to only one claim regardless of the number of ways that the claim can be asserted." *Maldonado v. Flynn, 417 A.2d 378, 381 (Del. Ch. 1980)*. Therefore, Acierno's state law claims are subject to the same preclusion as his constitutional claims and claims under RICO. Furthermore, as to those disputes which have not yet been resolved in the Delaware courts, it appears that they will turn on questions of state law, and that is yet another reason for this court to abstain. *Spring City Corp., 193 F.3d at 171 (3d Cir. 1999)* (stating that the fifth factor under the Colorado River analysis is "whether federal or state law controls").

[*39]

D. Motion for Leave to Amend

Because I have here determined that all of the claims at issue are either barred by res judicata and collateral estoppel, or should be dismissed on grounds of abstention, I decline to reach any of the other arguments made by the parties. The current motion for leave to file a Second Amended Complaint (D.I. 50) will be denied as moot, and the joint motion filed by the County and the Individual Defendants for a Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint (D.I. 61) will also be denied as moot.

V. CONCLUSION

Accordingly, the County's Motion to Dismiss the Amended Complaint (D.I. 37) and the Individual Defendants' Motion to Dismiss the Amended Complaint or Stay the Proceedings (D.I. 40) are granted to the extent that this case is dismissed without prejudice. Acierno's Motion for Leave to File a Second Amended Complaint (D.I. 50) and Defendants' Motion for a Briefing Schedule on the Motion for Leave to File a Second Amended Compliant (D.I. 61) are denied as moot. An appropriate order will follow.

ORDER

For the reasons set forth in the Memorandum Opinion of today's date in this matter,

IT IS HEREBY [*40] ORDERED that Motions to Dismiss the Amended Complaint filed by the County (Docket Item ["D.I."] 37), and by defendants George O. Haggerty, Scott G. Wilcox, Timothy P. Mullaney, Charles L. Baker, James H. Edwards, and Sherry L. Freebery (D.I. 40) are GRANTED to the extent that the Amended Complaint is dismissed without prejudice. Acierno's Motion for Leave to Amend the Complaint (D.I. 50) is DENIED as moot. Furthermore, the collective Defendants' Motion for Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint (D.I. 61) is DENIED as moot.

Kent Jordan

UNITED STATES DISTRICT JUDGE

November 23, 2005
Wilmington, Delaware

3

ARIFF ALIDINA, DAVID SWART, MOHAMED ALIDINA, and MARION JACK RICKARD, Plaintiffs, v. INTERNET.COM CORPORATION, ALAN MECKLER, CHRISTOPHER S. CARDELL, WAYNE A. MARTINO, WALTER H. LIPPINCOTT, GILBERT F. BACH, BEVERLY C. CHELL, MICHAEL J. DAVIES and CHARLES R. ELLIS, Defendants.

Civil Action No. 17235-NC

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2002 Del. Ch. LEXIS 156*

October 3, 2002, Submitted
November 6, 2002, Decided
November 8, 2002, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss complaint denied.

**COUNSEL:** Norman M. Monhait, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Sanford P. Dumain, Samuel H. Rudman and Susan M. Greenwood, of MILBERG WEISS BERSHAD HYNES & LERACH LLP, New York, New York, Attorneys for Plaintiffs.

Allen M. Terrell, Jr. and Dominick Gattuso, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Stephen Greiner, Albert M. Myers III and Barbara B. Farley, of WILLKIE FARR & GALLAGHER, New York, New York, Attorneys for Defendants.

**JUDGES:** Chandler, Chancellor.

**OPINIONBY:** Chandler

**OPINION:**

### MEMORANDUM OPINION

Chandler, Chancellor

This class action arises out of a tender offer for shares of a Delaware corporation followed by a merger between it and the acquiring company. Certain shareholders who tendered their stock filed this lawsuit, challenging the two-step transaction. They charge the directors who approved and recommended the transaction with breaches of their fiduciary duties of care, loyalty and candor. Similar to other recent cases in this Court, the challenged transactions involve a chief executive officer/director who negotiated most of the terms of the transaction, [*2] including one aspect in which the officer/director was clearly self-interested. The defendants have moved to dismiss all of the asserted claims, which I deny for the reasons set forth below.

### I. INTRODUCTION

In late 1998, Penton Media, Inc. ("Penton") purchased Mecklermedia Corporation ("Mecklermedia" or the "Company"). This two-step transaction ("Transaction") was accomplished by way of a tender offer followed by a merger, pursuant to an Agreement and Plan of Merger among Mecklermedia, Penton and Internet World Media Inc., dated October 7, 1998.

The plaintiff shareholders of Mecklermedia brought this class action challenging the fairness of the Transaction, alleging that the individual board members breached their fiduciary duties. They allege that these breaches resulted in merger consideration that was "grossly unfair," largely due to the concurrent sale of an 80.1% interest in Internet.com (the "iWorld transaction"), Mecklermedia's wholly owned subsidiary, at an allegedly unfair price to Alan Meckler ("Meckler"), who was a 26% shareholder, board member, and the CEO of Mecklermedia. Plaintiffs allege that Meckler demanded this sale in exchange for his approval of the Transaction [*3] and that this sale diverted funds from the Company to Meckler. Because of this, plaintiffs contend that the board members could not have approved and recommended the Transaction and iWorld transaction (collectively, the "Transactions") in good faith. Last, plaintiffs allege that the board members were grossly negligent in the negotiation and approval of the Transactions and in failing to disclose all material facts to the shareholders.

In short, plaintiffs' complaint alleges breaches of the directors' fiduciary duties of loyalty, care, and disclosure.

## II. STATEMENT OF FACTS

Mecklermedia was an internet media company providing internet information to industry professionals via trade shows, conferences and print publications. Internet.com was its wholly owned subsidiary that disseminated internet information electronically through a network of web sites.

Penton, the acquiror, is also a company that specializes in internet industry trade shows and print publications and maintains web sites for the purpose of advertising these trade shows and print publications. The Transactions combining Penton and Mecklermedia came about after Mecklermedia had explored business combinations with at [*4]    least three other suitors throughout 1998.

Mecklermedia began exploring potential business combinations in early 1998 with the assistance of its investment banker, Allen & Company ("Allen & Co."). Mecklermedia first discussed a potential combination with Advanstar Holdings, Inc. ("Advanstar"). In June, after approximately three months of negotiations, Advanstar proposed a transaction in which it would conduct a cash tender offer for all Mecklermedia stock and then sell the publishing and internet assets to a newly-formed entity that would be majority-owned by Meckler. Allen & Co. consulted Deloitte & Touche LLP ("D&T") regarding the tax consequences of the various acquisition scenarios proposed. D&T provided this tax information and at the same time valued Internet.com at $ 50 million. Negotiations with Advanstar did not result in a letter of intent.

Mecklermedia concurrently explored a potential transaction with Miller Freeman, the United States division of United News & Media ("United News") in June. Shortly after Miller Freeman's overtures, United News approached Meckler to propose its potential acquisition of Mecklermedia. United News eventually offered to purchase all Mecklermedia [*5]    shares for $ 270 million. n1 The last offer United News delivered to Mecklermedia included an agreement for Meckler to purchase a 50% interest in Internet.com for $ 17.5 million.

> n1 Plaintiffs provide different figures representing United News' offer to Mecklermedia without accounting for the discrepancy in the figures. Although more than one offer was received, it is difficult to determine from the pleadings the value of the highest offer. The $ 270 million offer is the only offer that refers to a purchase of all Mecklermedia shares, and is the offer that plaintiffs contend should have been disclosed to the

shareholders. Thus, this is the figure I employ throughout the opinion.

After negotiations failed with each prior suitor, Mecklermedia found its match. On September 21, 1998, Thomas L. Kemp, Penton's Chairman and CEO, contacted Meckler regarding Penton's acquisition of Mecklermedia. During this conversation, plaintiffs contend that Meckler emphasized the importance of the iWorld transaction and insinuated [*6]    that prior negotiations had fallen through because the terms of this side deal had not been favorable.

Penton then presented a draft letter of intent to Meckler on September 24, 1998, offering to purchase Mecklermedia. For unexplained reasons, this initial draft letter did not include the iWorld transaction. The next day, the two parties executed a letter of intent that provided for Penton to acquire the Company for $ 29 per share (or $ 274 million for all shares). This new letter additionally agreed to sell a 50% interest in Internet.com to Meckler for $ 15 million. Continuing negotiations resulted in an increase in Meckler's share of Internet.com at a lower price per share (from 50% at $ 15 million to 80.1% at $ 18 million) while there was no increase in the per share purchase price of Mecklermedia.

As a result, the parties agreed to value Internet.com at $ 22.5 million in the sale, as compared to the earlier value of $ 30 million. The lower value allegedly was a function of the amount Meckler was willing to pay for his equity interest (80.1% at $ 18 million = 100% at $ 22.5 million). According to the tender offer materials, this amount was significantly higher than Internet.com's [*7]    value based upon its historical accounting, and represented six times the company's revenue and three times its tangible assets.

The Transactions were subjected to various evaluations by advisors to both Mecklermedia and Penton. Mecklermedia's investment bankers, Allen & Co., determined that the merger consideration in the Transactions as structured was fair to the shareholders of Mecklermedia from a financial point of view. Penton and Penton's advisor, Donaldson, Lufkin & Jenrette ("DLJ"), analyzed the purchase price and concluded it was a fair price for Mecklermedia's trade show and publishing assets alone, excluding Internet.com. n2 Plaintiffs emphasize that Penton was earlier cautioned by PriceWaterhouseCoopers LLC ("PwC") to further analyze Meckler's purchase of Internet.com from an economic and legal standpoint to determine whether the transaction treated Mecklermedia's shareholders equally and whether Internet.com was being sold at a fair price. There is no allegation in the complaint as to whether such further analysis was ever undertaken by either Penton or Mecklermedia. Plaintiffs

also stress that the Mecklermedia board specifically considered forming, and declined to form, [*8] a special committee to review the Transactions.

> n2 DLJ gave Penton an oral opinion regarding the $ 30 million valuation of Internet.com. Plaintiffs fail to disclose the result of this verbal report, although it carries little relevance since the final valuation of Internet.com agreed upon was $ 22.5 million, not $ 30 million. Regardless, plaintiffs do not assert that DLJ orally opined that a $ 30 million valuation was unfair.

After three meetings of the Mecklermedia board, one of which included a presentation to the board by Allen & Co., the board unanimously approved the Transactions on October 7, 1998. At the same time, Meckler signed a Tender, Voting and Option Agreement, which obligated him to tender his Mecklermedia shares to Penton. The next day, Penton issued a press release announcing the tender offer. Penton then filed a Schedule 14D-1 (the "14D-1") with the SEC on October 15, which formally commenced the tender offer. Attached as exhibits to the 14-D-1 were the Offer to Purchase, the Merger Agreement, [*9] the Tender, Voting and Option Agreement, as well as a Services Agreement.

The same day Penton filed its 14D-1, Mecklermedia filed its Schedule 14D-9 Solicitation/Recommendation Statement (the "14D-9") with the SEC. This statement announced that Mecklermedia's board had unanimously approved the tender offer and Merger Agreement, had determined that the Transactions were fair, and recommended that the shareholders accept the offer to tender their shares. This 14D-9 attached the fairness opinion of Allen & Co. Mecklermedia filed an amended Schedule 14D-9 (the "Amended 14D-9") on Nov. 12, 1998, to provide more information regarding the iWorld transaction, which extended the tender offer period and included Meckler's opinion that the iWorld transaction (and his purchase of 80.1% of Internet.com at $ 18 million) was fair to the shareholders of Mecklermedia.

On November 24, 1998, the tender offer ended and 97.9% of the shares were tendered and not withdrawn. The Transaction and iWorld transaction were completed, and Internet.com was spun-off and renamed internet.com ("New internet.com").

Five months later, New internet.com announced its intent to go public. On June 25, 1999, New internet. [*10] com completed its initial public offering and sold 3,400,000 shares of common stock at $ 14 per share. This action was filed that same month and was amended on November 7, 2000, and again on November 9, 2001.

Defendants have now moved to dismiss the entire complaint on the basis that it fails to state a claim.

### III. ANALYSIS

Defendants' motion to dismiss is based upon two main theories: 1) the board did not breach any fiduciary duties; and 2) in any event, plaintiffs acquiesced in any alleged misconduct by tendering their shares. Plaintiffs counter these theories by reaffirming allegations that the board breached its fiduciary duties of loyalty, care, and disclosure, and that they could not have acquiesced by tendering their shares because they were not fully informed.

#### A. Standard of Review on a Motion to Dismiss

Defendants have moved to dismiss plaintiffs' complaint pursuant to Court of Chancery Rule 12(b)(6), asserting that the complaint fails to state a claim upon which relief can be granted. In deciding a motion to dismiss, a trial court must assume the truth of all well-pled, non-conclusory allegations in the complaint. n3 The court must additionally extend the benefit of [*11] all reasonable inferences that can be drawn from those allegations to the non-moving party, the plaintiffs here. n4 The court may, however, exclude allegations that are conclusory and lack factual support. n5 Thus, a court will dismiss the claim only when the plaintiffs fail to plead facts supporting an element of the claim, or when the facts pled could not support a claim for relief under any reasonable interpretation of those facts. n6 Defendants also move to dismiss New internet.com as a defendant.

> n3 *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 140 (Del. 1997).
>
> n4 *Id.*
>
> n5 *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 353 (Del. Ch. 1998).
>
> n6 *Del. State Troopers Lodge v. O'Rourke,* 403 A.2d 1109, 1110 (Del. Ch. 1979).

#### B. Did the Board Breach Its Fiduciary Duties?

The plaintiffs allege that the Mecklermedia Board breached its fiduciary duties of loyalty, care, and disclosure in considering, approving and recommending the [*12] Transaction and the iWorld transaction.

##### 1. Duty of Loyalty

Defendants argue that the plaintiffs' duty of loyalty claim should be dismissed for two reasons. First, defendants stress that plaintiffs failed to allege facts sufficient to indicate that the Mecklermedia board was self-

interested or lacked independence. Second, defendants assert that plaintiffs failed to allege facts sufficient to indicate that the board acted in bad faith or had no rational basis for its decision to approve or recommend the transaction.

Plaintiffs have effectively conceded that the board was not *apparently* self-interested or lacking independence. n7 They counter, however, by alleging that this independent, disinterested board nevertheless must have acted in bad faith because it approved a transaction that was so far beyond the bounds of reasonable judgment that it was inexplicable on any other ground.

> n7    "Defendants'    arguments    concerning whether the directors were interested in the transaction or lacked independence are beside the point." (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. at 24 n.4.)

[*13]

Although the business judgment rule normally prevents a court from reviewing the decisions of an independent, disinterested board that are made in good faith and in the exercise of due care, there is one narrow "escape hatch." n8 The business judgment rule may be rebutted "in those *rare* cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'" n9 The decision must be "egregious," lack "any rational business purpose," constitute a "gross abuse of discretion," or be so thoroughly defective that it carries a "badge of fraud." n10

> n8 *In re J.P. Stevens & Co., 542 A.2d 770, 780-81 & n.5 (Del. Ch. 1988)* ("This 'escape hatch' language has been variously stated in the Delaware opinions: 'egregious' decisions are said to be beyond the protections of the business judgment rule, as are decisions that cannot 'be attributed to any rational business purpose', or decisions that constitute 'a gross abuse of discretion.'") (internal citations omitted).

> n9 *Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del. 1999)* (quoting *In re J.P. Stevens & Co., 542 A.2d at 780-81*) (emphasis added).

[*14]

> n10 *In re J.P. Stevens & Co., 542 A.2d at 781 n.5.*

The Court's responsibility at this stage is to determine whether any reasonable interpretation of the facts in plaintiffs' complaint could support a claim for relief. Thus, plaintiffs must allege sufficient facts that could reasonably lead to an inference that the board's act was so egregious that it must have been the product of disloyalty or bad faith. Here, the complaint alleges facts that, if proven, could support a claim that Meckler and the Mecklermedia board members breached their fiduciary duty of loyalty. n11

> n11 Many of these allegations border upon conclusory statements, yet I am reluctant to summarily dismiss them at this stage, as I must assume the truth of all well-pled facts and give plaintiff the benefit of all reasonable inferences. I would stress, however, that plaintiffs must meet their burdensome task of supporting these allegations (such as the bald assertion that Meckler demanded and received a "bribe") with more specific facts to survive the summary judgment stage. Although I have assumed the truth of most of the facts in plaintiffs' complaint, I have disregarded an allegation that Meckler was provided with a vehicle to induce four other affiliates to approve or facilitate the transaction. Even though Meckler had the option to provide four others with a small equity interest in New internet.com, plaintiffs have failed to allege any facts that even remotely indicate that Meckler employed or even considered using this method to facilitate the approval of the transaction.

[*15]

Similar to the plaintiffs in *Parnes v. Bally Entm't Corp.* n12 and *Crescent/Mach I Partners, L.P. v. Turner*, n13 the plaintiffs here have alleged that this disinterested, independent board approved of an unfairly negotiated transaction that benefited Meckler at the expense of the other Mecklermedia shareholders. In *Parnes*, the plaintiffs alleged that the company's CEO, Mr. Goldberg, controlled the merger negotiations and extracted substantial cash payments and assets that lacked consideration and were conditioned upon completion of the merger. n14 These benefits were offered in exchange for his consent, which he claimed was mandatory to the sale. n15 Further, it was alleged that he discouraged other bidders who would not consent to these bribes and who may have paid a higher price for the company otherwise. n16 These allegations of bribery and unfair dealing by the CEO who negotiated the transaction, even in the context of an independent, non-conflicted board, provided

enough substance to persuade the Supreme Court to overturn this Court's earlier dismissal of the *Parnes* complaint.

n12 *722 A.2d 1243 (Del. 1999)*.

[*16]

n13 C.A. No. 17455, *2000 Del. Ch. LEXIS 145 (Sept. 29, 2000)* [hereinafter *Crescent/Mach*].

n14 These payments and asset transfers included: (1) a termination payment of $ 21 million (which exceeded the amount arguably due to Goldberg by approximately $ 14.4 million); (2) a transfer to Goldberg for $ 250,000 of a warrant worth $ 5 million for the purchase of 20% of Bally Total Fitness Holding Corporation's common stock and the forgiveness of $ 15.2 million of Bally Fitness indebtedness to Bally; (3) the merger of Bally's Casino Holdings, Inc., a shell corporation, into Bally and the conversion of the Casino Holdings preferred stock, all owned by Goldberg, into Bally and Bally Total Fitness stock worth approximately $ 43 million; (4) the transfer to Goldberg of 20% of Bally's interest in a Maryland race track project; and (5) the transfer to Goldberg of 40% of Bally's interest in a proposed Mexican gaming venture. *Parnes, 722 A.2d at 1246*.

n15 *Id. at 1245*.

n16 *Id. at 1246*.

In *Crescent/Mach*, this Court found [*17] that Mr. Turner, CEO, controlling shareholder and Chairman of the Board, secured "a substantial transfer of . . . assets and substantial financial remuneration" for himself that were not made available to the minority shareholders, similar to the benefits obtained in *Parnes*. n17 Even though the board received a fairness opinion based upon three different valuation methods, the court denied the defendants' motion to dismiss because Mr. Turner's alleged breach of his fiduciary duties was so egregious that they tainted the entire merger process. n18 Thus, the board's approval of the transaction alone was enough to rebut the business judgment rule because the board "failed to protect the interests of the corporation and the minority stockholders." n19

n17 *Crescent/Mach, 2000 Del. Ch. LEXIS 145 at *43* & n.47. The import of these "side-deals" is that Turner stood to gain a substantial

equity interest in Bottling Group while Holdings and ABC would become wholly owned subsidiaries of Bottling Group. For example, these alleged "side-deals" included: 1) the Turner Family Partnership contracting with Bottling Group to contribute one million shares of Holdings' stock, owned and controlled by Turner, to Bottling Group in exchange for 250,000 shares of Bottling Group thereby securing for Turner a substantial equity interest in the surviving entity; 2) CAI and Carlyle Bottling contracting for a stock exchange with Bottling Group in which they agreed to exchange their stock in ABC for stock in Bottling Group; 3) Holdings redeeming approximately 6 million shares of its stock owned or controlled by Turner or the Turner Family Partnership for $ 25 per share thereby securing for Turner certain tax advantages not offered to other stockholders; 4) making the merger contingent on the sale of JLT Beverages' claimed brand name Deja Blue and franchise rights in Snapple brand products for $ 15 million to Bottling Group; 5) CSI and Carlyle Bottling agreeing to each purchase $ 75 million of Bottling Group's stock after the consummation of the merger; 6) Cadbury Schweppes agreeing to purchase $ 150 million of Bottling Group's subordinated debt; 7) Turner, Bottling Group, CSI, Carlyle Bottling, and the Turner Family Partnership entering into an agreement to retain Turner on the board of directors of the surviving entity for so long as he is employed by the Bottling Group at a base salary of $ 900,000 including bonuses and stock options; 8) Turner receiving shares in the surviving entity which would 'facilitate realization of a profit by the Turner interests through an initial public offering of Bottling Group's stock--an opportunity not afforded to other stockholders; 9) Carlyle Bottling and the Turner Family Partnership agreeing that the Bottling Group stock acquired in the transactions by the Turner Family Partnership, CSI and Carlyle Bottling would be treated as a tax free exchange; 10) CSI and Carlyle Bottling agreeing to purchase the Holdings' stock that Turner and the Turner Family Partnership were to have redeemed in the event the Merger was enjoined. *2000 Del. Ch. LEXIS 145 at *8-10*.

[*18]

n18 *2000 Del. Ch. LEXIS 145 at *45*.

n19 *2000 Del. Ch. LEXIS 145 at *37, 2000 Del. Ch. LEXIS 145 at *45*.

Similar to the allegations of asset transfers in these cases, the allegations here charge Meckler with receiving Internet.com at a grossly unfair price in exchange for his presentation, recommendation, and approval of the Transaction. n20 The asset transfers in *Parnes* and *Crescent/Mach* allegedly lacked *any* consideration. In this case, Meckler paid $ 18 million for his share of Internet.com. Nevertheless, it follows that a *grossly inadequate* purchase price for Internet.com should lead to the same result as an agreement wholly lacking consideration. A grossly inadequate purchase price would still wrongly divert Company funds to Meckler. Thus, the complaint adequately asserts that Meckler violated his fiduciary duties by unfairly demanding that Penton sell Internet.com to him "on the cheap." This allegedly coercive purchase may have diverted Company funds to Meckler, resulting in the shareholders receiving a grossly unfair price.

> n20 The complaint also alleges that Meckler's receipt of a $ 100,000 consulting agreement and Penton's provision of a Services Agreement to New internet.com amounted to a "windfall" to Meckler. These may be additional circumstances that will provide fuel for the fire of a suspicious mind. I note, however, that the complaint indicates the Services Agreement was a customary agreement between Penton and its business affiliates. *See* Second Amended Class Action Compl. P51 ("As part of our agreement, we will sign a service agreement between the trade shows/magazines and Internet.com to maintain the mutual benefit and support of all three product lines. The services agreement will be similar to our Index and Findlay agreement, which is largely based on barter.").

[*19]

Contrary to defendants' assertion, the fact that $ 274 million was the highest offer entertained does not lead to the conclusion that Internet.com was sold at a fair price. Although the total merger consideration of $ 274 million was higher than the $ 270 million offered by United News, both offers included the sale of Internet.com to Meckler for a similar price. If this price was grossly inadequate as plaintiffs allege, both offers would have diverted significant funds from the Company to Meckler and both prices would have been unfair to the shareholders. Because I must give plaintiffs the benefit of all reasonable inferences in their complaint, I must accept plaintiffs' assertion that Internet.com was grossly undervalued when it was sold to Meckler. n21

n21 Additionally, plaintiffs allege that several other sources indicated that Internet.com should have commanded a much higher value, such as the earlier $ 50 million estimate provided by D&T.

Further, if the board members acquiesced in such unfair dealing [*20] to the detriment of the Mecklermedia shareholders, they too may have breached their fiduciary duty of loyalty. Plaintiffs allege that the board members knew Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself. With these allegations, the plaintiffs have sufficiently pled that the directors' acquiescence to this process, passive or otherwise, was beyond the bounds of reasonableness. Just as the CEOs' conduct in both *Parnes* and *Crescent/Mach* "tainted the entire process," if plaintiffs' assertions in this case are accepted as true, Meckler's conduct would have been so egregious that the Mecklermedia board likely could not have approved the Transactions in good faith. Thus, I conclude that plaintiffs have sufficiently alleged that the directors may have breached their duty of loyalty. Defendants' motion to dismiss the duty of loyalty claim is denied.

## 2. Duty of Care

Defendants argue that plaintiffs failed to allege any facts that would establish that the directors breached their duty of care. And, even if a duty [*21] of care claim were established, it should be dismissed because Mecklermedia's charter contained an exculpatory § 102(b)(7) provision.

Plaintiffs counter by enumerating several instances in which they believe the board members failed to use due care in the negotiation and approval of the transactions. Additionally, plaintiffs contend that the § 102(b)(7) exculpatory provision may not be used to dismiss the duty of care claims at this stage because of the presence of an adequately pled duty of loyalty claim.

### a. Breach of the Duty of Care

Plaintiffs have alleged sufficient facts to show the Mecklermedia board breached its duty of care to the Mecklermedia shareholders. Delaware law provides that the "business and affairs of every corporation ... shall be managed by or under the direction of a board of directors." n22 When the board of a corporation acts, Delaware courts ordinarily review that act under the presumption of the business judgment rule. n23 The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interests of the [*22] company." n24 Thus, as long as the board was informed and not self-interested, this presumption will not be disturbed if the board's business decision can be attributed to "any rational business purpose." n25

n22 *8 Del. C. § 141(a).*

n23 *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).*

n24 *Id.*

n25 *Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971).*

Plaintiffs contend that the board breached its duty of care by yielding to Meckler's negotiations, by not using a special committee, and by not appropriately educating itself on the value of Internet.com. Here, the board was admittedly not self-interested. It was within the board's business judgment to delegate the negotiation of the Transactions to its CEO. There is nothing inherently wrong with allowing an interested CEO to negotiate a transaction. n26 What does matter is whether the directors sufficiently oversee such negotiations by scrutinizing the resulting transaction in [*23] order to assure themselves that it is fair to the shareholders and to the company. There is no automatic requirement that the board employ a special committee to perform this evaluation, especially when a majority of the board is disinterested and independent. Here, the board considered whether a special committee was needed and explicitly found that one was not. This is a valid exercise of the board's business judgment. Therefore, the only questions remaining are whether the board was informed and whether its decision was based on a rational business purpose.

n26 *In re Ply Gem Indus., S'holders Litig., 2001 Del. Ch. LEXIS 84,* at *28 (Del. Ch. June 26, 2001).*

In evaluating the Transactions, the board informed itself through several rounds of board deliberations, reports by experts and by conducting a market "survey." As noted in the complaint, the board met several times to discuss the proposed Transactions. It retained investment bankers to assist in structuring and evaluating a business [*24] combination strategy. It received written and oral reports from this investment banker regarding the overall combination.

These evaluative measures, however, were all flawed to some degree according to the complaint. Although the board had no duty to engage a special committee, the board did have a duty to scrutinize the Transactions more closely to ensure that the shareholders were being treated fairly. Here, plaintiffs allege, the board failed to ensure that the shareholders were receiving adequate consideration for Internet.com. The board was aware of the amount of the earlier United News offer, but this offer may not have sufficiently reflected the value of the Company and Internet.com. Because the prior offer also included a sale of Internet.com at a similar (and allegedly discounted) price to Meckler, this market "survey" would have resulted in a similarly depressed price. Thus, according to the plaintiffs, the market "survey" may not have been a sufficient indication of the value of the shares of Mecklermedia.

Although no other bidders came forward after the Penton negotiations were underway, such potential bidders may have shied away from bidding because of the conflicts [*25] of interest involved. Plaintiffs allege that Meckler made it clear that he would not sell the Company without retaining a majority interest in Internet.com. Consequently, the fact that there were no other bidders for the Company does not establish that it was sold at a fair price.

Additionally, the board received no fairness opinion regarding the iWorld transaction. Even though Allen & Co. opined upon the overall fairness of the Transactions, it did not separately consider the fairness of the iWorld transaction. n27 The only possible way for the board to have known whether the shareholders were receiving a fair price for their shares in Mecklermedia was to have had some assurance that Meckler was paying a fair price for his equity interest in Internet.com. According to the complaint, the expert advice the board relied upon failed to provide this assurance.

n27 *Cf. Levco Alternative Fund Ltd. v. Readers Digest Ass'n, 803 A.2d 428 (Del. 2002).*

Plaintiffs' complaint also alleges that [*26] the board had no information about the value of Internet.com to enable it to make an informed decision. The facts in the complaint suggest that the board had every reason to doubt the adequacy of the price Meckler paid for his interest in Internet.com. The board knew that its CEO had retained complete control over the negotiation of a self-dealing transaction. The board knew that Allen & Co. did not separately opine on the fairness of the iWorld transaction. The board knew the "agreed upon" value of Internet.com dropped from $ 30 million to $ 22.5 million during negotiations (a 25% decrease in value) because

Meckler could afford to pay no more than $ 18 million for his 80.1% interest. At the same time, there was no corresponding increase in the per share purchase price of Mecklermedia. Presumably, the board would also have known that PwC warned Penton to take a closer look at the iWorld transaction from an economic and legal standpoint and that D&T valued Internet.com at $ 50 million when consulted by Allen & Co. All of this information arguably should have compelled the board, at a minimum, to further scrutinize the iWorld transaction's fairness independently. Otherwise, the board [*27] assertedly would have had no reasonable basis upon which to conclude that the Mecklermedia shareholders were being treated fairly.

Because the complaint arguably alleges that the directors were not fully informed when they approved the Transactions, I do not need to address whether the board had a rational business purpose. n28 Thus, at this juncture, I conclude that the plaintiffs have sufficiently alleged that the Mecklermedia directors were not fully informed when evaluating and approving the Transactions.

> n28 Several rational business purposes have been given for the business combination and the resulting ownership structure of New internet.com. It seems irreconcilable, however, to find that the approval of the transactions arguably exceeded all bounds of rational decisionmaking for the purposes of the duty of loyalty, but also find that the very same decision was rational for the purposes of evaluating the board's duty of care.

b. *Section 102(b)(7)*

At this stage, I cannot dismiss plaintiffs' duty of care [*28] claim based upon an exculpatory provision contained in the Mecklermedia charter. As *Malpiede*, n29 and *Emerald Partners* n30 instruct, when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision. n31 Because the duty of loyalty is implicated in this case, the § 102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss.

> n29 *Malpiede v. Townson, 780 A.2d 1075 (Del. 2001).*

> n30 *Emerald Partners v. Berlin, 787 A.2d 85 (Del. 2001).*

> n31 *Id. at 91* ("Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with *Section*

*102(b)(7),* bars the recovery of monetary damages from directors for a successful shareholder claim that is based *exclusively* upon establishing a violation of the duty of care.") (emphasis added).

3. Duty to Disclose

Plaintiffs contend that defendants failed to disclose all [*29] material information to the shareholders in the 14D-9 and Amended 14D-9. Defendants assert that all relevant information was disclosed and that the claim should therefore be dismissed.

A fact is material if "there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." n32 The plaintiff must demonstrate there was a substantial likelihood that the omitted fact would have "significantly altered the 'total mix' of information made available" to the stockholders. n33 In order to state a claim for relief, plaintiff must: 1) allege that there are facts missing from the disclosure; 2) identify specific facts that were omitted or misleading; 3) state why those facts were material; and 4) demonstrate how the omitted or missing fact caused injury. n34

> n32 *Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 143 (Del. 1997).*

> N33 *Id. at 143; Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1985).*

> n34 *Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170, 1173 (Del. 2000).*

[*30]

Plaintiffs assert that Mecklermedia's 14D-9 and Amended 14D-9 were materially false and misleading and that this information would have altered the total mix of information available to the shareholders if disclosed accurately. Plaintiffs contest four main portions of the tender offer materials: 1) the failure to disclose the source of the $ 22.5 million valuation of Internet.com; 2) the failure to disclose details about the United News negotiation; 3) the failure to disclose the "true reason" for the iWorld transaction; and 4) the allegedly false characterization of the merger consideration as "fair." The contents of the challenged tender offer materials will be considered on this motion to dismiss because they were incorporated by reference in the complaint. n35

> n35 *In re Santa Fe Pac. Corp. S'holder Litig., 669 A.2d 59, 69-70 (Del. 1995).*

### a. Internet.com Valuation

Plaintiffs successfully contend that the tender offer materials did not adequately disclose the source of the $ 22.5 million [*31]   valuation of Internet.com. The Amended 14D-9 parenthetically explains that the agreed valuation of iWorld was "based upon [Meckler's] payment of $ 18 million for an 80.1% equity interest in iWorld." n36 This statement--which was buried in a subpart of multiple factors Meckler considered when opining upon the fairness of the iWorld transaction--fails to point out the fact that no independent valuation of iWorld was ever attempted. Instead, the Amended 14D-9 compared this agreed-upon value to other factors, such as historical accounting data, revenues, tangible assets, and the value per page viewed on the web site. Although shareholders are generally able to draw their own conclusions about valuations when given the valuation method and results, here there was no attempt to provide the shareholders with a valuation of Internet.com, leaving them with no basis, other than Meckler's own self-serving fairness opinion, to determine whether they were receiving adequate value for their stake in Internet.com. Thus, it seems reasonable that further disclosure regarding the $ 22.5 million valuation of Internet.com may have altered the total mix of information available to the shareholders.

n36 Amended Schedule 14D-9, item 8(d).

[*32]

### b. United News Negotiation

Plaintiffs assert that defendants should have disclosed more details regarding the United News negotiation, even though United News' $ 270 million offer was lower than Penton's $ 274 million offer. The information disclosed in the Schedule 14D-9 was limited to a statement that "the Company reached an oral understanding regarding an approximate three week period of exclusivity with one of the companies interested in a potential strategic combination; however, the period of exclusivity expired prior to a letter of intent being executed with such company."

Plaintiffs allege that the board should have further disclosed that it was United News making the bid, that the oral offer was to purchase all shares of the company for $ 270 million and included a similar side transaction to sell Internet.com to Meckler, and that negotiations failed due to United News' attempt to change the terms of the side deal. Because the United News negotiation never progressed to the letter of intent stage, it would not have been material for a stockholder to know the identity of one potential buyer. Nor have plaintiffs explained how

this additional information would have altered [*33]   the total mix of information available to the Mecklermedia stockholders. If the negotiation terminated over the terms of the iWorld transaction, however, this information likely would have been material to Mecklermedia's shareholders because it would imply that the Company's value was somehow tied to the successful negotiation of a side deal with Meckler for iWorld. Thus, plaintiffs have alleged a claim based on the partial disclosure regarding the United News negotiation.

### c. The "True Reason" for the iWorld Transaction

Plaintiffs assert that the tender offer materials omitted the "true reason" for the iWorld transaction, which they allege was to provide a windfall to Meckler. Besides having no basis for this assertion, a board is only required to present the material facts of the transaction; it is not required to cast those facts in a negative light. n37 Thus, the board would not have been required to engage in "self-flagellation" of this sort. n38

> n37 *Loudon, 700 A.2d at 143*; *In re GM Class H S'holders Litig., 734 A.2d 611, 628 (Del. Ch. 1999)*.
>
> n38 *Loudon, 700 A.2d at 143*.

[*34]

### d. Board Representation Regarding Fairness

Plaintiffs assert that the board members' representation regarding the fairness of the Transaction and iWorld transaction was false and misleading and that the board members lacked a reasonable basis for this opinion. Plaintiffs contend that the terms were in fact *unfair* to the Company's shareholders for four reasons: 1) the shareholders did not receive any consideration for Internet.com; 2) Meckler participated in unfair dealing when negotiating the iWorld transaction; 3) the board approved the transaction to provide an "economic windfall" to Meckler; and 4) the board lacked a reasonable basis for opining that the Transaction was fair.

I conclude that some of these allegations cannot withstand scrutiny on a motion to dismiss, as the board does not have to cast its decisionmaking in a negative light, and because they are refuted by the information contained in the tender offering documents. First, contrary to plaintiffs' allegations, the Mecklermedia shareholders were not deprived of their interest in Internet.com without *any* consideration. The shareholders were informed of the amount Meckler paid for his interest in Internet.com [*35]   in the 14D-9 before deciding whether to accept or reject the tender offer. To the extent that the shareholders may have received *inadequate* con-

sideration for their interest in Internet.com, however, the transaction may have been unfair. This conclusion, obviously, is one that cannot be drawn at this juncture because Internet.com was not separately valued and thus there is not enough information to determine whether the shareholders were improperly deprived of their interest in Internet.com. Thus, plaintiffs have adequately alleged that the transaction may have been unfair and that the Mecklermedia board members' fairness opinion was false or misleading.

Second, if the transaction (and the negotiations leading up to it) were in fact unfair to the shareholders, the Mecklermedia board was not required to *characterize* it as illegal or wrong. As discussed above, a board is not required to engage in self-flagellation in its disclosure materials. Thus, both allegations, including the board's alleged desire to bestow a "windfall" upon Meckler and the negative characterization of Meckler's negotiation tactics, were not required disclosures in the tender offer materials. What was required [*36] of the board was already disclosed. The tender offer materials fully described the material portions of the negotiation and its resulting terms as well as Meckler's self-interest. Having failed to allege how further disclosure of Meckler's self-interest is more than redundant or how a shareholder would consider it material in deciding whether to tender her shares, this aspect of plaintiffs' disclosure claim fails as a matter of law.

Last, the fairness opinion may have been misleading if the board members in fact lacked a reasonable basis for their fairness statement. Although the board was entitled to rely upon the fairness opinion of Allen & Co., n39 the board arguably should have evaluated the fairness of the iWorld transaction separately as noted above. A reasonable stockholder may have been misled by the Allen & Co. fairness opinion to believe that Internet.com *itself* was being sold for a fair price when it may not have been. A board does not necessarily need to disclose specific details regarding the analysis underlying the report, n40 but a stockholder would likely have found the inadequacies of, or limitation on, the fairness opinion material to her decision whether to [*37] tender her shares. This Court has held that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely." n41 Although the material terms of the Transactions were disclosed, as well as Meckler's self-interest and resulting equity in Internet.com, a reasonable shareholder may have been misled to believe that Allen & Co.'s opinion regarding the Transactions encompassed the fairness of these factors without having received the underlying data the investment banker relied upon. Further, if the board itself was not fully informed (allegedly)

regarding the iWorld transaction, it can hardly be argued that it adequately informed the stockholders regarding the fairness of this very same transaction. Therefore, plaintiffs have stated a claim for breach of the board's duty of disclosure in this respect.

n39 *McMillan v. Intercargo Corp., 768 A.2d 492, 505 n.55 (Del. Ch. 2000)*.

n40 *Skeen, 750 A.2d at 1174; In re Best Lock Corp. S'holder Litig., 2001 Del. Ch. LEXIS 134, *35 (Oct. 29, 2001)*.

[*38]

n41 *In re Pure Resources, Inc., 808 A.2d 421, 2002 Del. Ch. LEXIS 112, at *80-81 (Del. Ch. 2002)* (finding that disclosure of a banker's fairness opinion provided stockholders with "nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability").

## C. Did the Shareholders Acquiesce in the Board's Conduct by Tendering Their Shares?

Last, defendants assert that all of plaintiffs' claims should be dismissed because all material facts were disclosed to plaintiffs before they tendered their shares. Thus, they argue, the act of tendering their shares shows that the plaintiffs thereby acquiesced in the Transaction and iWorld transaction and cannot now challenge it. Plaintiffs counter by alleging that they could not have acquiesced by tendering their shares because they were not fully informed.

I pause a moment to consider what plaintiffs do not allege in this instance. Plaintiffs do not assert that they were "under protest" when they tendered their shares, which would negate a finding of acquiescence. n42 Additionally, [*39] plaintiffs do not allege that the tender offer was in any way coercive, which would have prevented meaningful choice and similarly negated a finding of acquiescence. Plaintiffs rely solely upon the allegation that the shareholders were not sufficiently informed. This entire argument relies upon their earlier assertion that the board breached its duty to disclose all material information to the shareholders. If the board did not breach its duty to disclose all material information regarding the transaction to the shareholders, then the shareholders were fully informed when they tendered.

n42 *Kahn v. Household Acquisition Corp., 1982 Del. Ch. LEXIS 580,* at *6 (Jan. 19, 1982).

Because plaintiffs have adequately alleged that the board breached its duty of disclosure, I cannot, at this stage, conclude as a matter of law that the shareholders were fully informed when they tendered their shares. Although the material terms of the Transactions were disclosed, as well as Meckler's conflict of interest [*40] and resulting equity interest in Internet.com, the shareholders may have been misled into believing that the iWorld transaction was independently evaluated as "fair" when it had not been. Neither the board nor Allen & Co. separately opined upon the fairness of the iWorld transaction. Instead, both Transactions were categorically lumped into a single fairness opinion that plaintiffs contend did not fully inform the shareholders of the value of Internet.com. In addition, plaintiffs insist they were not provided with full and complete information regarding how the $ 22.5 million valuation for iWorld was determined. Accordingly, because plaintiffs have adequately pled disclosure claims, I cannot conclude that their complaint is barred by the doctrine of acquiescence.

### D. Should the Court Impose a Constructive Trust over Internet.com?

Plaintiffs cite *O'Malley v. Boris* n43 for their assertion that a constructive trust should be imposed upon New internet.com. Although it is debatable whether such a remedy would be advisable, as in *O'Malley* I am reluctant to dismiss New internet.com from the case at this point. The company is majority owned by Meckler and this ownership arose [*41] from the transactions in dispute. Thus, if this ownership was "ill-gotten," it follows that a constructive trust may be placed upon Meckler's equity interest in New internet.com so that he is not unjustly enriched at the expense of the Mecklermedia shareholders. For this reason, I decline to dismiss New internet.com as a defendant.

n43 *2002 Del. Ch. LEXIS 33 (March 18, 2002)*.

### IV. CONCLUSION

In sum, defendants' motion to dismiss the complaint is denied. Plaintiffs have stated a claim for a breach of the duties of loyalty, care and disclosure against the Mecklermedia board. The § 102(b)(7) provision cannot operate to immunize the duty of care claim at this juncture. The affirmative defense of acquiescence fails because plaintiffs adequately alleged that the board did not fully inform the shareholders before they tendered their shares. Further, New internet.com is not dismissed as a defendant at this time as it may be a necessary party in connection with a potential remedy.

IT IS SO ORDERED.