4

HADASSA Y. BUXBAUM, et al., Plaintiffs, v. DEUTSCHE BANK, A.G., et al., Defendants.

98 Civ. 8460 (JGK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 5838; Fed. Sec. L. Rep. (CCH) P90,969*

March 6, 2000, Decided
March 7, 2000, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss denied.

**COUNSEL:** For Plaintiff: STANLEY BERNSTEIN, ABRAHAM KATSMAN, BERNSTEIN, LIEBHARD & LIFSHITZ, LLP.

For Plaintiffs: LESTER LEVY, MICHAEL SCHWARTZ, WOLF POPPER, LLP.

For Defendants: JEFFREY BARIST, THOMAS ARENA, MITCHELL EPNER, MILBANK TWEED HADLEY & McCLOY, LLP.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINIONBY:** John G. Koeltl

**OPINION:**

March 6, 2000

Before:

HON. JOHN G. KOELTL,

District Judge

(Case called)

MR. BERNSTEIN: Stanley Bernstein and Abe Katsman on my far right.

MR: LEVY: Lester Levy and Michael Schwartz of the Wolf Popper firm for the plaintiff.

MR. BARIST: Jeffrey Barist, Milbank Tweed for the defendant Dr. Rolf-Ernst Breuer. With me are my colleagues Thomas Arena and Mitchell Epner.

THE COURT: This is a motion to dismiss by the defendant. I will listen to argument. I have read the papers.

MR. BARIST: Thank you, your Honor.

Do you wish me to use the podium?

THE COURT: Whichever you prefer.

MR. BARIST: Let me at least begin at the podium.

The plaintiffs' claims in this case in our view rely entirely on exaggeration taking out of context of a single comment by Dr. Breuer during the course of a extensive interview he gave [*2] in the German language in Germany with Der Spiegel. According to the complaint, the article was published on October 25, 1998.

According to the complaint, Deutsche Bank and Bankers Trust announced that they were in advanced stage of merger negotiations. Approximately one month later, on November 23, 1998, and according to the complaint, Deutsche Bank and Bankers Trust announced that they had a offer to merge on November 29, 1998.

It is our view, your Honor, that the complaint must be dismissed because there is no misrepresentation that has been properly pleaded under the PSLRA. There is no material misrepresentation and there is no facts of scienter, as required, again, by the PSLRA.

I would like if I could, your Honor, to turn to the Breuer interview. It is an exhibit to our moving papers with a certified translation. There is also a certified translation from defendants. I will point out to your Honor as I go through this with some emphasis if I could on the textual detail, the differences between the translations which are not material --

THE COURT: I really have to accept the plaintiff's translation because it's a motion to dismiss the plaintiff's complaint and I have got to [*3] draw all factual inferences in favor of the plaintiff as to the nonmoving party. And there's a certified translation as the plaintiff has put in.

MR. BARIST: I think, your Honor, where there are the differences that your Honor could literally compare the German and see that the translation that we are proposing is, in fact, correct, but I don't think that there's a material difference here. It is the Breuer interview as given in Der Spiegel that controls, not what English or American or Asian journalists said about the entire interview several days later or several hours later. I do not believe we have an argument on that from the plaintiffs. They contend that it's the Breuer interview that is the substance of their complaint. So, let's turn to it.

First of all, the aspect of the Breuer interview that is of interest to this complaint is a very small portion of the entire article. It begins with a question by Der Spiegel: Is Deutsche Bank pressured to move in Europe acquisitions? Breuer then responds by pointing to the difficulty of purchasing a French bank. Der Spiegel then turns to the problems that Deutsche Bank seems to encounter as it wants to make an acquisition abroad.

I point [*4] this out because we're moving into a context where what we're talking about are potential acquisitions, not ordinary business transactions. Der Spiegel: "Are you interested in the American investment bank, Bankers Trust, as the papers were saying it this week?" Dr. Breuer did not deny interest. Instead, he said, "There's nothing I could tell our shareholders." Note: There's again no denial of talks or preliminary discussions.

Der Spiegel goes on:

"Q. But you did have discussions?"

Our translation says "discussions." Their translation says "talks," not a material difference -- "with the Americans?"

Breuer: "In this industry, everybody talks to everybody."

Now, again there's no denial of discussions or talks. Now, plaintiffs have asserted that "everybody talks to everybody" is a reference to the conduct of normal trading transactions, foreign exchange, etc. I submit that this is nonsense in the context of an interview that is talking about acquisitions and the problems of acquisitions. Breuer then goes on to say. "What has become the source of this lawsuit."

The plaintiff's translation is: But there was no talk of a takeover." Our translation: "But there were no takeover discussions. [*5] " I don't think it's material for purposes of this motion.

Der Spiegel then goes on to put flesh on what that statement meant. That is, there was no talk of a takeover.

Der Spiegel: "But Bankers Trust is letting you have a look at their books." But that's their translation.

Our translation is: "But you had a look at their books." The reverse, their translation: "But you had a look at their books." Our translation is: "But Bankers Trust is letting you have a look at their books."

Regardless of which translation we look at, it is clear that the interviewer understood that Breuer had not denied prior talks with Bankers Trust or that Deutsche Bank had some kind of preliminary discussions with Bankers Trust. There's no reason for the interviewer to ask if Bankers Trust was letting Deutsche Bank look at Bankers Trust's books if there had not been discussions.

Breuer then went on, in their translation, they say: "No, that would be too far." In our translation, it says: "That would really be pillow talk."

The literal German, I will represent to your Honor, is: "That would really be feasible pillow talk." There is a loose translation from the plaintiff of "That would be too far."

I submit [*6] to your Honor what in context is being said here is absolutely clear. The word "takeover talks" has been given flesh by Dr. Breuer. He has said there have been discussions. He has not denied that there have been discussions. But when asked whether there had been takeover talks, he said: "In this business, everybody talks to everybody else."

THE COURT: But he says, but there were not takeover discussions.

MR. BARIST: That's correct. And he is now putting flesh on what that means. He's saying "takeover discussions" means that there has been some kind of release of confidential nonpublic information that there have not been takeover talks, but that would really be pillow talk, i.e., if Deutsche Bank had gained access to Bankers Trust's books as the questioner asked, that would have been the kind of discussions which Dr. Breuer and the interviewer understood to be takeover discussions.

Going further in the article, Dr. Breuer makes it clear that Deutsche Bank is continuing to have interest in and looking at an American venture. Dr. Breuer notes that: "The main competition is on the other side of the Atlantic. At the moment, we are hard at work looking for opportunities to compensate [*7] for our weakness."

Der Spiegel: "In plain language, you are hunting for a bargain." Breuer: "We are doing our homework and we are having discussions." I'm sure that in time one discussion or another will hit the target.

I submit to your Honor, read in context, we have the following things: We have Dr. Breuer being asked if

there were talks and in saying there is nothing I can tell our shareholders, we have him being confronted with --

THE COURT: But it's more than there is nothing we could tell our shareholders. He said there was no talk of a takeover.

MR. BARIST: He says that in the context of in this industry, everybody talks to everybody, but there was no talk of a takeover. And he then goes on in the next question and answers, as I say, to put flesh on what he meant by that when he says that there was no disclosure by Bankers Trust of its books to Deutsche Bank.

THE COURT: If on the day of the Der Spiegel interview, Dr. Breuer had told his wife to buy Bankers Trust stock, would that have been a violation of the securities laws?

MR. BARIST: I think Dr. Breuer -- I would not like to answer that kind of hypothetical not knowing Mrs. Breuer's purchases.

THE COURT: I have told [*8] a third party --

MR. BARIST: I'm sorry for being flip, but let me try and respond this way: I think that given Dr. Breuer's central knowledge of what his plans might or might not be vis-a-vis Bankers Trust, for him to give a tip to somebody would run very close to running afoul of the securities laws, assuming it was within our jurisdiction.

THE COURT: But doesn't that then concede that the information that was there with respect to the date of the discussions was material information?

MR. BARIST: No, your Honor, because the, first of all, I think there's a very different duty here. The duty that is incumbent upon you when you are buying stock on inside --

THE COURT: Disclose or abstain. Disclose or abstain. In this situation, if you make a statement -- here, the duty is if you make a statement, the statement cannot be materially misleading. What we're saying here is this: You cannot take the snippet "but there were no takeover discussions" out of context that appears in the context of an interview in which he says he does not deny interest.

He says, "There's nothing I could tell our shareholders." He says, "In this industry, everybody talks to everybody." He says, "Takeover discussions [*9] means disclosure of nonpublic confidential information." And at the end of the interview, he goes back and says: "We're doing our homework. We're having discussions. I'm sure one discussion or another will hit the target."

Now, if I could, your Honor, let's take that and put that up in terms of what Dr. Breuer has said and let's look

at what plaintiffs allege in the complaint was the state of May at the time. Because this I think is the critical thing.

To begin with, the complaint refers to all the allegations as being on information and belief and they give us a source of information and belief which are newspaper articles, the Bankers Trust Company proxy, etc.

I would respectfully refer the Court to a decision that I was reviewing this afternoon and did not cite in the brief. It's Judge Schwartz's decision in a case called Novack -- and I will give the cite for your law secretary -- 997 F. Supp. 425 at 428. It came down a couple of years ago where Judge Schwartz, I think with characteristic intelligence takes on the conflict between the notice pleading which governs most cases and the philosophy enacted in the PSLRA which is a statutory mandate that we are not going [*10] to allow litigation in the hope of discovery proving it out, but instead as a mandate that there must be specific facts before we allow the litigation to go forward.

I would if I could go through the allegations of the complaint. Paragraph 20 from time to time beginning in the early summer of 1998, Newman and senior executives of Deutsche Bank had discussions as to products, markets and clients served by Bankers Trust and Deutsche Bank.

During these discussions, the parties spoke about the company's complementary strengths and the possibility of a cooperative venture, nothing about merger negotiations, no less takeover discussions.

Paragraph 23 goes on to say, the talks -- that's referring to the talks about paragraph 20 -- there were no talks referenced before then which are again talks about the possibility of a cooperative venture. The talks intensified as the summer of 1998 progressed when Bankers Trust stock fell from 120 in July to mid-60s during September 1998. Again, no mention of who talked, where, when, what subject. No allegation that these were merger negotiations.

Also, please note that there is no foundation for the factual allegations. The plaintiffs' attorneys obviously [*11] weren't there. They don't reference a newspaper article. They don't reference the proxy statement. It is a statement utterly without foundation.

When we go back to the proxy statement, we find that the proxy statement says that at page 9 where it makes reference to generalized talks during the summer of 1998, it says: These discussions were explanatory and did not result during this time in any negotiations.

We go on to the next paragraph, paragraph 25, now we have an allegation that in late September of 1998, at the time of IMF meetings in Washington, Dr. Schmidt, a

senior Deutsche Bank executive, met with Newman in the District of Columbia and Breuer and Newman met in the District of Columbia during the IMF meetings.

And it goes on to say, Bankers Trust and Deutsche Bank discussed acquisition of Bankers Trust by Deutsche Bank, no allegation as to who said what to whom, no allegation as to the commitment by either party, no allegation as to terms, no allegation as to involvement in investment bankers, no allegation as to exchange of non-public information. All we have here is a series of allegations, again, without any foundation.

The last, the very last factual allegation dealing [*12] with supposedly what went on between Deutsche Bank and Bankers Trust is in paragraph 47, which purports to refer to a "New York Times" article from I think December 1, which was after the merger was announced. The only new fact in there is an assertion in the article that Newman met with Breuer at Breuer's Frankfurt home in October. There is no assertion as to that, this meeting being before the Der Spiegel article.

Remember the Der Spiegel article is published on October 25. The calendar shows that to be a Sunday. At the very latest, the last business day on which that article could have been taken would have been Friday, October 23, and I don't think that that's correct, but that would be the very earliest.

The article on which they rely leaves another week in October for Breuer and Newman to have met. This is the sum and substance of what the facts that they plead in the complaint as to why what Dr. Breuer said was not true.

When we look at the other allegations of the complaint, we look first at what they allege as to the internal Deutsche Bank activity. Paragraph 21. They say: In July 1998, someone named Mitchell who I will represent is a senior Deutsche Bank executive called [*13] Breuer and urged that Breuer consider having Deutsche Bank buy Bankers Trust.

There's no foundation for it, but my real answer to that is: So what? It's not a fact as to anything.

The next paragraph goes on to say that in July 1998, Deutsche Bank hired Goldman Sachs to advise Deutsche Bank, among other things, on a possible purchase of Bankers Trust. Note that this is a virtual admission that Deutsche Bank was considering other U.S. partners besides Bankers Trust because that's what Goldman Sachs was supposed to consider, among other things.

This lack of focus by Deutsche Bank on Bankers Trust is continued in paragraph 24 where the complaint pleads that in mid-to-late September, the board of directors of Deutsche Bank determined that acquisition of a

U.S. bank was critical to Deutsche Bank, again, not focused on Bankers Trust.

The last sentence of paragraph 26 is symptomatic of the advice of the complaint under the PSLRA. Both sides had the feeling it could work, said Ackerman, Deutsche Bank's board member in charge of investment bank. "There's no allegations as to when this comment was made. It could have occurred many months after the Breuer interview. They do not have the right [*14] under the PSLRA to come in here and make an allegation of fact such as what they've done with Ackerman, which is without any foundation, any specificity as to time, and then ask as they do in their brief that your Honor draw inferences that this was made before the Breuer interview.

This is exactly the kind of pleading that I submit the PSLRA was intended to prohibit. The same sort of thing goes on in paragraph 33. Following Bankers Trust report of a huge quarterly loss, approximately $ 500 million on October 22, 1998, Deutsche Bank decided -- excuse me -- the comma is in the wrong place -- following Bankers Trust report on October 22 of $ 500 million loss, Deutsche Bank thought the timing was appropriate to close the deal, again, no allegation as to when Deutsche Bank is supposed to have made -- come to that conclusion.

Again, October 22 is the Thursday before the last day on which the interview could have been given. Again, we have an allegation without any foundation for it in the complaint.

The final paragraph or sentence I refer to is in paragraph 33 where it says that Goldman Sachs along with Bankers Trust in-house investment bankers began finalizing the terms of the takeover. [*15] There's no allegation as to when those meetings between investment bankers took place and, again, what the PSLRA prohibits is an inference that these meetings between investment bankers took place before the Breuer interview.

As to the internal Bankers Trust allegations, they're even more sparse. Paragraph 26 asserts that Bankers Trust hired Morgan Stanley. There's no allegation as to when this was done. There's no allegation as to when Morgan Stanley began working with Goldman Sachs. There's no foundation for the factual allegation.

Paragraph 28 says that on October 20, Newman reviewed this discussion with Deutsche Bank with the board of directors of Bankers Trust and said that he and Deutsche Bank believed that a combination of the two banks would be mutually advantageous. Bankers Trust board of directors supposedly encouraged Newman to continue discussions.

This is in itself a statement that things were preparatory at this point in time. There is no foundation for this allegation. What is missing from these allegations are the things, the points that you would expect to see if you were going to be contradicting Dr. Breuer's statement, not as to one snippet, as to there was no [*16] takeover discussions, but as to the entire article with everything that he was saying.

There are no allegations that prior to the Breuer interview there was any agreement on any terms, price, shares, etc. There's not even an allegation that prior to the Breuer interview, there was an agreement in principal, even on structure.

There's no allegation of meetings between investment bankers before the Breuer interview. There's no allegation of disclosure of nonpublic information by Bankers Trust to Deutsche Bank and there's not even an allegation that the parties had taken the first step to a friendly transaction which is the signing of a confidentiality agreement and, in fact, we find out that the proxy statement which is referenced in the complaint on page 10 reveals that the parties did not even execute a confidentiality agreement until November 6, 1998, approximately two weeks after the publication of the Der Spiegel article.

Now, that is not, as I understood, disputed by the plaintiffs. We are saying here that when you take the Breuer statement, you take them in context, you read them fairly as you must and you then take what the plaintiffs say and say, this is why they weren't [*17] true, this is why they weren't true doesn't state a cause of action under the standards enunciated by the PSLRA.

Now, if I can anticipate what I think is going to be the response, what I'm going to hear is what I usually have heard in securities cases, which is, well, after all, these facts are within the knowledge of the defendant and if we could only take discovery, we can find these things out.

What's more, they didn't give us a lot of information in the proxy statement and this is why I want to go back to Judge Schwartz's decision because this is a contention between notice, pleading and PSLRA which has been statutorily determined is by the PSLRA. There are two public goods at issue.

One is the desire of every plaintiff to find the facts necessary to prove is wrong. The other is a defendant's right to be free of harassing litigation and litigation that is brought to harass settlements -- force settlements.

Congress in the PSLRA resolved that contention in favor of the rights of defendants which is why in a PSLRA case, we cannot be heard to hear from the plaintiffs, no, I want to prove these allegations, these conclu-

sory allegations out of the papers or mouths of the defendants [*18] if they don't have the facts.

Now, congress has said they can't bring the case. I would very briefly like to go to the issue of materiality. The cases are discussed in both sides' briefs. I would essentially refer your Honor to two cases. The first one being Glazer in the Second Circuit. There was a press release there in which the defendants put out a statement, "Formica believes the best thing for the company and its stockholders is to remain independent."

That was held not to be a material misstatement, notwithstanding the fact that the defendant corporation had scheduled a meeting with Dill & Reed to discuss the feasibility of an LBO.

Again, like in Glazer, Dr. Breuer allegedly -- the information he did not disclose must be weighed against what he did disclose. He acknowledged talks with Bankers Trust. He acknowledged that Deutsche Bank was looking for opportunities. More recently, the Fourth Circuit in a case called Phillips v. LCI, affirmed a decision by the District Court dismissing under Rule 12(b)(6) the complaint where the allegation was made that an officer of defendant had issued a public statement that LCI was "not for sale" when, in fact, LCI had recently [*19] participated in merger negotiations with Quest Communications, which it later wound up merging with.

The Court noted much in the way that we've noted in the context of Dr. Breuer's statement that the reported statement that LCI was "not for sale" also informed investors that LCI was "not foreclosing further mergers," gone on to say that the company believed it was more of a buyer than a seller.

In other words, in neither one of these three cases, Glazer, LCI or our case do we have a flat statement. We do not have in this case. We are not going to pursue a merger with -- we are not pursuing any merger with Bankers Trust.

We have here a statement that read in context said what I've been trying to say it said and like in LCI and Glazer, we have to look at the materiality of what was not disclosed in the context.

I realize that this is a factual examination. I take comfort from the fact that the Fourth Circuit did affirm a dismissal on 12(b)(6) because I think that the materiality is there for the Court to determine as a matter of law and we submit this falls down on the side of these cases where the omitted statement is not material.

Scienter. The theory of scienter used [*20] by the plaintiff is illogical and unsupported. The first mistake they make is that they ignore the fact that in seeking to acquire Bankers Trust, this was a friendly deal. It was

Case 1:05-cv-00327-GMS    Document 48-2    Filed 03/06/2006    Page 7 of 39

2000 U.S. Dist. LEXIS 5838, *; Fed. Sec. L. Rep. (CCH) P90,969

always a friendly deal and Deutsche Bank was conducting negotiations with the Bankers Trust board of directors, not with the Bankers Trust shareholders.

So that if, in fact, there had been some kind of public misstatement by Breuer which said, we're not conducting discussions, the error of that statement would have been known to the other people on the other side of the table, that is, the Bankers Trust board of directors.

There can't be fraud when the person who is supposedly being defrauded knows all the facts. There can't be a motive for fraud from something as palpably insufficient as trying to deceive the board of directors when they have to know the facts and this is, of course, the difference.

THE COURT: The allegation is not that it worked a fraud on the board of directors of Bankers Trust, but that it worked a fraud on the shareholders who sold their shares. And the question then becomes whether even in negotiations between the two boards of directors the fact that the price of the stock has been [*21] driven down, as opposed to driven up would affect at all the discussions between two boards of directors as what the price of the acquisition would be and whether Dr. Breuer would be so clairvoyant at the time of the making of the statement that he would know in detail exactly what the pricing formula would be a month later, as opposed to thinking that it would be more expensive to acquire Bankers Trust if the shares were very highly priced than lowly priced.

MR. BARIST: If I could, your Honor, I think that the issue as to the deception of the market as a whole were driving down the price of the stock is relevant, not on the kinds of cases, I think the Vento case which your Honor had was an example.

THE COURT: Still have.

MR. BARIST: Still have; stand corrected -- where there is an allegation that someone was trying to buy -- was buying in a market, was buying from the person who was allegedly deceived. If Deutsche Bank had been out in the market secretly acquiring shares or not secretly acquiring shares, this theory might make some sense, but there's no such allegation.

Now, what you have to assume here is this: The complaint has very specifically pleaded that prior to Dr. [*22] Breuer's interview, which was released on October 25 in the preceding week, there had been leaks from newspapers, again nothing supported as to who said what to whom. There was leaks from different newspapers saying Deutsche Bank is talking to Bankers Trust and this had raised the price of the stock.

In other words, the stock had already moved from what I'll call its normal price, whatever that may be, to a price that reflected some form of merger or takeover premium. Dr. Breuer did not have to be clairvoyant to know a month later Morgan Stanley is not going to use as the base for determining what is the price of Bankers Trust.

Bankers Trust was affected by rumors because you're going to pay a takeover premium once. You're not going to pay a takeover premium on top of a stock that's been inflated by rumors so that part of the takeover premium has already been met.

This is what did not make sense here and this is why the theory of scienter falls apart because it did not make logical sense for Dr. Breuer to believe that because -- think for a moment, Dr. Breuer has to be thinking the stock has gone up in the last week because of these rumors of the takeover. I'm not going to drive [*23] the price of the stock back down to pre-takeover because -- pre-takeover rumors because that's going to give me a chance to do what in the same takeover premium is going to have to be applied.

THE COURT: All he has to do is to say to himself, if I answer this question accurately, I will drive up the price of the stock that I'm trying to acquire.

MR. BARIST: As far as we're concerned, from the allegations of the complaint, he did answer the --

THE COURT: Yes, I know that, but this is a separate -- you are on to the argument of scienter now.

MR. BARIST: Of scienter.

If I understand your Honor's question, it would now be that Dr. Breuer is so prescient that for him to say, yes, we're having takeover discussions, we'll drive up the price of the stock.

THE COURT: Would that require oppressions?

MR. BARIST: I've seen stocks recently fall on takeover discussions being announced, as we all have. I saw Procter & Gamble announce a takeover for Pfizer and I saw the price of both stocks fall out of bed. I think that one has to eliminate the question of guessing how the market would react, your Honor, and look at basic forms of corporate finance and economics.

THE COURT: But here the allegations [*24] are that the day after the report of the interview, the stock drops significantly.

MR. BARIST: And, your Honor, the record also shows, and your Honor can take judicial notice of this as we said in our brief, I think it's within six days of the interview without there being any intervening "correc-

tive" statement that stock was back to its pre-interview price.

I don't believe that, again, under the PSLRA plaintiffs have the ability to prove -- to allege scienter to compel protracted litigation on the basis of saying, well, this was the stock movement and, therefore, it had to be tied to this.

You and I both know that the movement of stock is something that -- is sometimes one of the mysteries of men. So, I don't think that they are relieved of their pleading burden so easily.

I submit to your Honor that what is logical is what Morgan Stanley articulated in the proxy when it came out, which was that when it came time for Morgan Stanley to give its fairness opinion, it looked at the ultimate $ 93 per share, which by the way, was considerably higher than any price that had been reached in this period.

When it looked at that $ 93, it looked at the price of Bankers Trust stock prior [*25] to there being any rumors in the marketplace because that's what gives you a base once you look at the stock of the potential target as affected by rumors in the marketplace. You're giving the acquisition credit for a takeover premium and it's the takeover premium which is what is supposed to be represented in the $ 93.

In any event, if your Honor did not have any further questions of me, that concludes my argument.

THE COURT: Thank you, Mr. Barist.

Plaintiff?

MR. BERNSTEIN: Thank you, your Honor. There was no talk of a takeover. I agree with Mr. Barist. It's plain English. It's very clear. It's a blanket statement.

Now, if there's a question of context, if there's a question of what does that mean, the law is very clear in this jurisdiction. Your Honor iterated it in Vento. The context would be a question of law and facts.

We have a factual question, but this is really not a question of whether I interpret it one way and Mr. Barist interprets it another way. It's what's in the complaint. There was no talk to a takeover. To the extent it needs interpretation did not shock the corporate that we've alleged that Bloomberg, the Wall Street Journal, Dow Jones -- and this is all [*26] alleged in our complaint in paragraphs 38, 40, 41, and 42, all interpreted the statement in Der Spiegel to say what it said.

The chairman of Deutsche Bank denied there were any takeover talks to Bankers Trust. This is none of this adding flesh on the bones, none of this admission. It was

as plain as can be. That's not how I interpret it or it's irrelevant how I interpret it.

It may be relevant how a jury interprets it, but for pleading purposes right now, a more than reasonable inference would be the inference put on this plain English by the leading financial journals in the world.

The second evidence that this is pretty clear, your Honor alluded to the stock dropped 10 percent the next day. And in the Blanchard case, which we cite, that pretty well is indicative that the stock is reacting to the news. Dow Jones said it's reacting to the news. Bloomberg's headline said it's reacting to the news. It's crystal clear that the statement was made. And what the statement meant, there were no talks of a takeover.

Does that make me a case? Not necessarily. So, I'll respond. But with respect to the context, to the extent there was any question whatsoever, I think, your Honor, even [*27] I believe in the Credit Suisse and Vento both said in the context, it would be a question of law and facts.

But with respect to what do we allege as to how that statement is false, we have to allege a reasonable basis for a reasonable inference that this statement was false both for falsity and materiality.

And I don't mean to take your Honor's entire evening with this, so let me pick up the highlights because Mr. Barist answered and chose things in the complaint and I don't necessarily think he exactly gave the complete picture.

Let me outline the reasonable inferences we're entitled to. We claim in December of '98, a Deutsche board member in paragraph 47 named Schmidt, met with the CEO of Bankers Trust, Mr. Newman, at the St. Regis Hotel in New York City to discuss a takeover. That's in December of '98.

We alleged that Deutsche Bank in December of '98 hired an investment banker, Goldman Sachs, and gave code names to the possible acquisition of Bankers Trust. This is now on the radar screen at the board level and I think that your Honor could take judicial notice that Goldman Sachs is no fly-by-night. If you're hiring Goldman Sachs, you're serious about this.

Come September [*28] of 1998, the board at Deutsche Bank, and Mr. Barist is correct, decides we need to make an acquisition in the United States of a bank, and a week or two later, there are high-level meetings of board members with Mr. Newman in Washington. Mr. Schmidt and Mr. Newman in paragraph 25 met in Washington to discuss a takeover and Dr. Breuer and Mr. Newman met in late September at the IMF meetings in the District of Columbia to discuss a takeover.

Case 1:05-cv-00327-GMS   Document 48-2   Filed 03/06/2006   Page 9 of 39

2006 U.S. Dist. LEXIS 5838; ; Fed. Sec. L. Rep. (CCH) P90,969   Page 8

Paragraph 25 of the complaint. Now, we get to the mid-October, your Honor, on October 20th in our complaint, we alleged in paragraph 28 in great detail on October 20th whether it's three days or five days before the denial of any takeover talks, the Bankers Trust board meets, we allege, and this allegation is based on news reports and the proxy itself, though the proxy won't give the date of the board meetings, your Honor.

The proxy suddenly says there was a board meeting in the fall of '98, but we've alleged based on a good-faith basis that the meeting took place on the 20th, that Mr. Newman was encouraged by the board to continue the takeover discussions with Deutsche Bank. He reported to them and his board said, continue the takeover discussions. [*29]

And what did Mr. Newman report to his board? He said, things are going well. It is his view that both sides feel the combination is mutually advantageous. Now, I don't believe Mr. Newman made up these words out of thin air. We've alleged they had meetings going on for the summer. We're now at October 20th.

We have allegations about the board of Deutsche Bank discussing this and board members meeting with Mr. Newman and the CEO meeting with Mr. Newman and the Bankers Trust board meeting and reviewing the ongoing conversation with Deutsche Bank.

On October 22, we allege in paragraph 33 and 34 that there were news reports that Deutsche Bank was so far along in this process that its financing arrangements are "well advanced" and this was based on a newspaper report in London. So, we have the basis to make a reasonable inference forgetting the temporal closeness between the denial and the deal later.

We have the who, what, when, where and why. Who met, when they met, what they discussed to give the bid and the ask in these negotiations, I don't think I need them. I'm not going to stand here and say I need that discovery. He said, Dr. Breuer, there were no talks of a takeover. I say [*30] there were talks of a takeover, who, what, when, where, and why. I don't believe I have to do anymore.

Mr. Barist says that I did not allege that they had reached an agreement in principal by the time of the Der Spiegel article. I admit that they reached an agreement in principal. That's not what he denied. He denied that there were talks of a takeover. I think we made it very clear there were talks of a takeover at the board level and with investment banks.

Now, the Der Spiegel article says there were no talks of a takeover. The whole world, not only was this news, your Honor, when we get to materiality, not only was it something that Der Spiegel was interested in, when there were talks of a takeover which establishes, but when the Der Spiegel article came out worldwide, the Dow Jones, Wall Street Journal, Bloomberg all picked up this piece of the Der Spiegel article to emphasize how important this was to the world giving the rampant rumors that there was a takeover of the seventh largest bank in the world is news when the stock drops 10 percent. That's news.

When the Wall Street Journal, Dow Jones and Bloomberg pick it up, this is news. That is material, your Honor. In Vento [*31] is set forth the standard of what a reasonable investor might consider important. I don't know if I'm a reasonable --

THE COURT: The Supreme Court set it out before I did.

MR. BERNSTEIN: If I may, your Honor, your Honor said it even better. Not that I'm -- but your Honor had perhaps even a more akin case to this one.

Now, oddly enough, after the interview, what does Deutsche Bank say about the interview? In paragraph 38, what do we say that confirms that the interview was accurate. So, they had their opportunity and they said it again. The interview was accurate. There were no talks of a takeover.

The market reacts. The stock drops 10 percent. So, we think the chronology is very clear as to falsity. We think the context of the statement is very clear. It's crystal clear. It's plain English. There's no flesh on this and the market read it without the flesh.

Every newspaper article around the world, the news service was picking this up without the flesh that we hear about in the briefs and today.

Now, with respect to the materiality, your Honor, the Supreme Court basically in TSC, we have picked up by every major news service, stock price reaction and we have negotiations at the [*32] highest level, CEOs and the board involvement at both sides do allege the negotiations taking place between the two banks.

And Mr. Barist made a big point of that. No, I don't have the time, date, place of what the bankers said to the bankers. So, I didn't put it in my complaint. I put it in my complaint what I can prove and what I can plead with specificity.

I know that they hired Goldman Sachs on one side and Morgan Stanley on the other. What I pleaded with great specificity was that the chairman and the CEOs of the two companies talking to each other. I think that's a little more probative than perhaps a couple of bankers meeting.

Now, I believe your Honor alluded to the fact that the extent there's any question about these issues of materiality, the standard on a motion to dismiss is to whether a statement is material, your Honor. Your Honor wrote in Credit Suisse following the Second Circuit in Goldman that it can't dismiss on materiality unless the statement is obviously unimportant to reasonable investors.

I don't want to beat a dead horse, but I believe Bloomberg, Dow Jones and the Wall Street Journal constitute a good surrogate for reasonable investors. They all [*33] picked this up as headline news and the market reacted. So, I don't believe that we can find that this matter is dismissible on materiality grounds on a motion to dismiss.

The statements we believe are clear to be false because there were takeover talks, we've alleged that, and we've briefed that, and it's a statutory violation of 10(b).

We've also, your Honor, had our brief allege to the extent that Dr. Breuer decided to speak and said there were no talks of a takeover, if he wanted to add flesh to the story, as my colleague suggests, the flesh has to be the whole truth, not some type of convoluted interpretation that no financial press reporter in the world understood.

But under Glazer, defendant's case, and Credit Suisse, the case your Honor wrote that we cite, once you make a statement, you have a duty to speak the whole truth. I submit that it's crystal clear that the statement was false and it was a misrepresentation of fact to the extent you want to say that flesh was necessary to be added on here, the flesh that was added in the article under either translation is not the flesh of what happened of the meetings in October.

The pleadings in December, the intention [*34] of the bankers, that's not the flesh that was put on here.

With respect to scienter, your Honor, I think your Honor picked up on the fact that Dr. Breuer must be a very, very sophisticated businessman running one of the world's largest banks. There were rampant rumors, the stock prices going up in the article that we sent to your Honor after the briefing from the Wall Street Journal where they refer to the practice of denying takeover talks because you know, if you don't deny them, that's admitting them.

He knew. He knew what he was doing. If he didn't blanket deny, he had the impression, notwithstanding that the United States laws are a little bit different and that he now says they will comply with United States laws, the Deutsche Bank spokesman -- and they won't lie in the future -- every businessman knows this would be insulting to say anything different that if you admit that

if you're in the midst of negotiations and there were rampant rumors that the merger is taking place and the stock is being driven up, that stock is going to go up and I'm going to have to pay more money.

It's just obvious, and if it's not obvious, it's certainly not dismissible on a motion to dismiss [*35] and we'll bring in an expert to establish that.

Now, the savings here by keeping the price depressed could be $ 700 million. It was a big incentive here, but it doesn't matter how many hundreds of millions or if you admit that you're engaged in merger negotiations, stock prices go up.

Now, it's quite interesting though that my colleague suggests that the stock price during this time period is irrelevant to the purchase price that's going to be paid ultimately a month later because in the proxy statement, when Bankers Trust is trying to convince its shareholders that this is a good deal, it makes reference to the stock prices trading during the class period.

Our one-month class period during October and November on the one hand, I hear it doesn't matter what the price is, but on the other hand, when it came to convincing people that this is a good deal comparing it to the lower prices that we allege took place during this class period, then Bankers Trust in the proxy that's in the record was willing to rely on these situations.

We also have several very good cases that we try to bring to your Honor's attention, but if your Honor said, give me two, give me two to read tonight, I [*36] suggest that this is very close to the Vento situation that your Honor still has and to the Columbia Securities litigation that Judge Sand just had.

All those issues are addressed; materiality, duty, scienter, someone who's buying a company, as opposed to the cases cited by the defendant in LCI, which I'll get to in a moment, a buyer of a company, if he thinks he can save money by lying has all the motive and the opportunity.

He had the information. He had the opportunity to lie in this particular case. He actually knew what he was doing because he was in possession of the information. So, the Vento case where your Honor held that an impending transaction was material, that it wasn't the takeover of the whole company, as I understand the case, it was a cash infusion of only 25 percent of the company.

This is a takeover of one of the world's largest banks. That would be as your Honor wrote in Vento a relevant decision on whether to sell.

The LCI opinion that defendants rely on, I happen to have been marginally involved in that situation. LCI, if you read the opinion, it's very clear. The denial of the

talks was true at the time the statement was made. [*37] There were no talks. There was nothing alive. They had terminated the talks. That was ground one for dismissing the case.

Ground two was completely different in this case. The statement was made by the seller that there were no talks, they were not for sale. The seller had no incentive to keep the price down. The seller wants a higher price. So, this case is exactly 180 degrees opposite the situation of Quest LCI.

Curiously, today Quest announced that it may be the subject of a takeover.

Glazer, very quickly, defendants didn't deny merger talks in that case. They said they're willing to entertain proposals. If you read the case, the Second Circuit said that negotiations could not be ruled immaterial as a matter of law. This case is not what the PSLRA was intended to stifle.

We've alleged who, what, when, where and why, materiality, falsity, scienter. And there's a lot of damages here, your Honor.

I've tried to cover all the issues. It's clear, your Honor read the briefs and both sides obviously worked very hard. This is an important case.

THE COURT: Every case is important.

MR. BERNSTEIN: You're right, your Honor.

THE COURT: All right.

MR. BARIST: Could I have one [*38] minute?

THE COURT: Yes.

MR. BARIST: I want to, if I could, do something that litigators I think are generally trained not to do, which is to take the issue as phrased by my adversary and see if I could explain why I disagree with it so seriously.

What the plaintiffs' counsel has said here in substance is this: Take this out of context. We don't care about the context. He said there were no takeover discussions. Give them that. Put that up on the board.

Breuer said there were no takeover discussions. You've heard me on this, but I'm giving you their case now. They say, we under the PSLRA can make a case because we issued a conclusory allegation that top executives of Deutsche Bank and Bankers Trust engaged in takeover discussions contrary to what we said Dr. Breuer said and at an IMF meeting.

They say, look, we've given you the place. Everyone knows that the IMF meetings are attended by the top executives in the banking industry. They have not told us

anything other than a conclusory allegation. This is what I've heard Mr. Bernstein go back and back and say, look, we have the CEOs talking to each other.

No, what we have here is a conclusory allegation based on newspaper speculation [*39] that the two CEOs "had takeover discussions" before the time Dr. Breuer issued the statement on which they relied. My point is taking their case at its strongest, this is not enough under the PSLRA because otherwise any corporation that has ever denied discussions and then later goes forward can be forced to the vexation and expense of defending the inevitable lawsuit. If a plaintiff comes into court and says, look, I have newspaper theorization, I have my own theorization that prior to the time that discussions were denied that top executives, in fact, are having discussions.

This is exactly what, I submit, the PSLRA was trying to prevent. Indeed, it is not I think accidental that the authority on which plaintiffs most rely, which is the Columbia Securities litigation case decided by Judge Sand is markedly a pre-PSLRA case. That case allowed the complaint to go forward on the basis of newspaper speculation cited in the complaint.

I submit to Your honor that in this post-PSLRA case, the complaint cannot go forward on the basis of newspaper speculation cited in the complaint on information and belief.

Thank you, your Honor.

THE COURT: All right. I'm prepared to rule.

This is [*40] a proposed class action arising under the Sections 10(b) and 20(a) of the Securities Exchange Act of 1934; *15 U.S.C. Section 78j*(b) and 78t(a); purportedly brought on behalf of all persons who sold Bankers Trust Corporation common stock, sold Bankers Trust Corporation call options; urchased Bankers Trust put options on the open market between October 26, 1998 and November 20, 1998.

The defendant Deutsche Bank A.G., ("Deutsche Bank") acquired Bankers Trust Corporation, ("Bankers Trust") in a transaction approved by the respective boards on November 29, 1998. The defendant Rolf-Ernst Breuer ("Breuer") is and was at all relevant times CEO of the Deutsche Bank.

Currently pending before the Court is a motion to dismiss the First Amended Class Action Complaint.

On a motion to dismiss, the allegations in the complaint are accepted as true, see *Cohen v. Koenig, 25 F.3d 1168, 1172-73 (2d Cir. 1994),* although a Court may consider certain materials outside the pleadings which are integral to the allegations. See *Paulemon v. Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994); Allen v. Westpoint*

*Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).* [*41] In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. See *Gant v. Wallingford Board of Education, 69 F.3d 669, 673,* (2d Cir. 1995); *Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).* The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial, but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).* Therefore, the defendant's motion should only be granted if it appears that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994);* see also *Goldman, 754 F.2d at 1065.*

In this case it is undisputed that the defendant Mr. Breuer gave an interview to the German newsmagazine Der Spiegel in which he discussed, among other things, reports that Deutsche Bank was interested in acquiring Bankers Trust. The interview was published in the October 26, 1998 edition of [*42] Der Spiegel. Each side has provided the Court with an English translation of the published interview. The translations differ somewhat and the Court will, for the purpose of this motion, rely on the translation provided by the plaintiffs, the nonmoving party. According to that translation, Mr. Breuer, when asked whether Deutsche Bank was interested in acquiring Bankers Trust, responded: "There's nothing I could tell our shareholders." When the reporter then asked if there hadn't been talks with Bankers Trust, Mr. Breuer stated: "In this business, everybody talks to everybody. But there was no talk of a takeover." It is this latter statement that forms the basis of the current action. See First Amended Class Action Complaint (hereinafter. "Amended Complaint"), paragraph 37, certified translation, attached as Exhibit G to Affidavit of Michael A. Schwartz, dated June 29, 1999, at 6.

The following allegations are assumed to be true for the purposes of this motion:

Frank Newman ("Newman") -- the Chairman, President and Chief Executive Officer of Bankers Trust -- and senior Deutsche Bank executives began discussing the two banks' "products, markets and clients" in the early summer [*43] of 1998. During those discussions, the participants spoke about the banks' complementary strengths and the possibility of a cooperative venture. In the middle of July 1998, the head of Deutsche Bank's bonds and currencies group called the defendant Mr. Breuer and urged Mr. Breuer to consider having Deutsche Bank purchase Bankers Trust. In or about July 1998, Deutsche Bank hired the investment bank Goldman Sachs & Company to advise Deutsche Bank on, among other things, a possible purchase of Bankers

Trust. Goldman Sachs gave the talks between Deutsche Bank and Bankers Trust a code name, and those talks intensified as the price of the Bankers Trust stock fell by nearly one-half between July and September 1998. Amended Complaint paragraphs 20 to 23. In or about mid-to late September 1998, the board of directors of Deutsche Bank determined that the acquisition of a United States bank was of critical importance to Deutsche Bank. Amended Complaint, paragraph 24.

In late September 1998, Ronaldo H. Schmitz, the Deutsche Bank board member responsible for the Americas, met with Mr. Newman, the Bankers Trust chairman, in Washington, D.C. At some time between September 29 and October 8, 1998, Mr. [*44] Newman met with Mr. Breuer. During those meetings, the participants discussed the possible acquisition of Bankers Trust by Deutsche Bank. At some point not specified in the Amended Complaint, Bankers Trust hired the investment bank Morgan Stanley Dean Witter to act as its investment advisor for the proposed transaction. On October 20, 1998, at a Bankers Trust board meeting, Mr. Newman reviewed his discussions with the Deutsche Bank and said that he and Deutsche Bank believed that a combination of the two banks would be mutually advantageous. The Bankers Trust board encouraged Mr. Newman to continue the discussions with Deutsche Bank (Id., paragraphs 25-26, 28.)

After Bankers Trust reported a quarterly loss of approximately $ 500 million on October 22, 1998, Deutsche Bank decided that the time was right to go ahead with the acquisition of Bankers Trust. Goldman Sachs, Deutsche Bank's investment banker, and Bankers Trust in-house investment bankers, then began finalizing the terms of the deal. (Id., paragraph 33.)

As early as October 19, 1998, newspapers and online news services had begun to report that Deutsche Bank and Bankers Trust were discussing a possible takeover. On [*45] the strength of those reports, the price of Bankers Trust shares rose from $ 52 per share on October 19, 1998 to nearly $ 69 per share on October 23, 1998 (Id., paragraphs 27, 29-32, 34-35.)

On October 25, 1998, Mr. Breuer gave the interview in which he stated that "there was no talk of a takeover." Mr. Breuer's statement denying the existence of takeover discussions was released by Der Spiegel that same day. The next day it appeared verbatim in Der Spiegel itself, and was widely reported, often in translated paraphrase, in the global financial media. After publication of Mr. Breuer's denial, the closing price of Bankers Trust common stock, which had been $ 66 7/8 on October 23, 1998, the last day of trading before the release of Mr. Breuer's interview, fell to $ 59 13/16 on October 28, 1998. (Id., paragraphs 37-43.)

On November 23, 1998, Deutsche Bank and Bankers Trust issued a joint press release announcing that they were in "advanced stages of negotiations concerning a potential cash merger combination at a proposed price of $ 93" per Bankers Trust share. On November 30, 1998, Deutsche Bank announced that it was acquiring Bankers Trust for $ 93 a share. (Id., paragraphs [*46] 46, 48.)

The plaintiffs allege that Mr. Breuer's October 25, 1998 statement denying the existence of takeover talks was false at the time it was made. The plaintiffs further allege that the statement was intended to, and had the effect of, driving down the price of Bankers Trust stock. According to the amended complaint, "by causing nearly a $ 7 drop in the price of [Bankers Trust] common stock, Deutsche Bank was able to save approximately $ 667 million in the cost of purchasing [Bankers Trust]." (Id., paragraph 44.)

"To state a cause of action under Section 10(b) or Rule 10b-5 plaintiffs must prove that the defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In Re International Business Machines Corporate Secs. Litigation, 163 F.3d 102, 106 (2d Cir. 1998)* (citing *In Re Time Warner, Inc. Securities Litigation, 9 F.3d 259, 264,* (2d Cir. 1993)). The defendants contend that the plaintiffs have failed to state a claim under Section 10(b) and have [*47] therefore also failed to state a claim under Session 20(a) for control personal liability because there is no underlying violation.

The defendants argue that the Amended Complaint fails to allege a misstatement of a material fact because the discussions that had occurred between Deutsche Bank and Bankers Trust at the time of Mr. Breuer's denial were not sufficiently advanced to have been material. A misrepresentation or omission is material within the meaning of Section 10(b) if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson, 485 U.S. 224, 231, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* (quoting *TSC Industries, Inc. v. Northway, Inc. 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)).* See also *SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1466 (2d Cir. 1996).* With respect to contingent events, materiality depends on a balancing of the indicated probability that the event will occur and the anticipated magnitude of the event in light of the [*48] totality of the corporate activity. *Basic, 485 U.S. at 238.* "Whether merger discussions in any particular case are material depends on the facts." *Basic, 485 U.S. at 239.* Given the magnitude of a merger in which a corporation bought out; information can be-

come material at an earlier stage than would be the case for lesser transactions. *Id., at 238.* When evaluating whether particular merger discussions are material, a Court must "look to indicia of interest in the transaction at the highest corporate levels." Id. Among the indicia that a Court may consider are "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." Id.

Here, the Amended Complaint alleges sufficient indicia to reasonably infer that the discussions that had already occurred prior to Mr. Breuer's October 25, 1998 statement were material within the meaning of 10(b). For example, it is alleged that prior to the date of Mr. Breuer's denial, both Deutsche Bank and Bankers Trust had hired outside investment bankers to assist in an acquisition of Bankers Trust by Deutsche Bank. It is also alleged that [*49] the CEOs of the two banks had met and discussed a possible takeover in late September or early October. Similarly, it is alleged that on October 20, 1998, the board of Bankers Trust encouraged its chairman, Mr. Newman, to continue his discussions with Deutsche Bank, and that on October 22, 1998, Deutsche Bank decided that it was time to go ahead with the acquisition. These allegations are, at this stage of the proceedings, sufficient to establish the materiality of the discussions that had occurred prior to Mr. Breuer's denial of such discussions.

The defendants argue that there is insufficient allegations of the false statements and the bases for alleging that the statement is false or misleading. However, for the reasons explained above, there is ample disclosure of the alleged false statement and the reasons why the statement is false or misleading. The defendants also argue that the Amended Complaint fails to adequately plead scienter. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at *15 U.S.C. Section 78u-4,* "plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the [*50] required state of mind. " *Press v. Chemical Investment Services Corporation, 166 F.3d 529, 537-38 (2d Cir. 1999)* (quoting *15 U.S.C. Section 78u-4(b)(2)).* "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128,* (2d Cir. 1994), quoted by *Press, 166 F.3d at 538.*

Here, the plaintiffs have alleged facts that show that the defendants had both motive and opportunity to commit fraud as well as facts that constitute strong circumstantial evidence of conscious misbehavior. On the facts alleged, Mr. Breuer obviously had the opportunity to

misrepresent a material fact upon which the plaintiffs could reasonably have relied: Mr. Breuer had the opportunity to falsely deny the existence of takeover discussions. Similarly, on the facts alleged, the plaintiffs have sufficiently alleged that Mr. Breuer, as CEO of the Deutsche Bank, had an incentive to [*51] depress the price of Bankers Trust stock. Whatever the exact basis for calculating the ultimate purchase price, it was clearly in a purchaser's interest that the quoted public price of the asset to be acquired was as low as possible. The facts alleged also provide strong circumstantial evidence of conscious misbehavior. The facts alleged clearly suggest that takeover talks were well under way by October 25, 1998, that Mr. Breuer was personally involved in those talks, and that he falsely and knowingly denied the existence of those talks. Thus, the Amended Complaint adequately alleges scienter.

In sum, the Amended Complaint, which complies with the pleading requirements established by the PSLRA, states a claim under Section 10(b). The defendants' motion to dismiss the plaintiffs' claim under Section 10(b) is therefore denied. Because the only ground argued for dismissing the plaintiffs' claim under Section 20(a) was the absence of a predicate violation of Section 10(b), the motion to dismiss that claim is also denied.

So ordered.

Let me talk to you about schedule. I am prepared to do it in the robing room.

(Robing room discussion off the record)

(Proceedings adjourned)

**ORDER** [*52]

**JOHN G. KOELTL, District Judge:**

For the reasons stated on the record today, the defendants' motion to dismiss is denied.

The parties are advised that Magistrate Judge Francis has been designated in this case.

**SO ORDERED.**

Dated: New York, New York

**March 6, 2000**

**John G. Koeltl**

**United States District Judge**

5

IN RE PARACELSUS CORP. SECURITIES LITIGATION; JAMES G. CAVEN,
derivatively on behalf of Champion Healthcare Corporation, a Delaware Corp., and
alternatively on behalf of himself and all others similarly situated, Plaintiff, VS.
CHARLES R. MILLER, JAMES G. VANDEVENDER, RONALD R. PATTERSON,
MANFRED GEORGE KRUKEMEYER, R.J. MESSENGER, JAMES T RUSH,
ROBERT C. JOYNER, PARACELSUS HEALTHCARE CORPORATION, a Cali-
fornia Corporation, PARK HOSPITAL GmbH, a German Corporation, ERNST &
YOUNG, and DONALDSON, LUFKIN & JENRETTE, INC., Defendants, and
PARACELSUS HEALTHCARE CORPORATION, a California Corporation,
CHAMPION HEALTHCARE CORPORATION, a Delaware Corporation, Nominal
Defendants.

CIVIL ACTION H-96-4291

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION

*1998 U.S. Dist. LEXIS 5484*

**March 6, 1998, Decided**
**March 9, 1998, Entered**

**DISPOSITION:** [*1] Defendants' Motion to Dismiss
the First Amended Derivative Complaint (Document No.
31) DENIED.

**COUNSEL:** For JAMES G CAVEN plaintiff: Kenneth
G Gilman, David Pastor, Gilman and Pastor, Boston,
MA. Larry Richard Veselka, Smyser Kaplan & Veselka,
Houston, TX. Daniel C Girard, Girard and Green, San
Francisco, CA. Peter A. Lagorio, Gilman and Pastor,
Boston, MA. Katherine M Ginzburg, Susman Godfrey,
Houston, TX.

For ROBERT OROVITZ, consolidated plaintiff: Roger
Farrell Claxton, Kilgore & Kilgore, Dallas, TX.

For CHARLES R MILLER, JAMES G
VANDEVENDER, RONALD R PATTERSON, defen-
dants: Robert F Watson, Law Snakard and Gambill, Fort
Worth, TX.

For MANFRED GEORGE KRUKEMEYER, defendant:
Robert Roy Burford, Gibbs & Burns, Houston, TX. Jean
C Frizzell, Gibbs & Bruns, Houston, TX.

For R J MESSENGER, defendant: Joseph Paul Esposito,
Akin Gump Strauss Hauer and Feld, Washington, DC.

For JAMES T RUSH, defendant: Richard H Borow, Irell
and Manella, Los Angeles, CA.

For PARACELSUS HEALTH, defendant: Richard P.
Keeton, Mayor Day Caldwell & Keeton, Houston, TX.
Andrew B Weissman, Wilmer Cutler and Pickering,
Washington, DC.

**JUDGES:** EWING WERLEIN, JR., UNITED STATES
DISTRICT JUDGE.

**OPINIONBY:** EWING [*2] WERLEIN, JR.

**OPINION:**

### MEMORANDUM AND ORDER

Pending is Defendants Paracelsus Healthcare Corpo-
ration's, Manfred G. Krukemeyer's, R. J. Messenger's,
James T. Rush's, Charles R. Miller's, James G. VanDe-
vender's, and Ronald R. Patterson's Motion to Dismiss
the First Amended Derivative Complaint. (Document
No. 31). After having considered the motion, the submis-
sions of the parties, and the applicable law, the Court
finds, for the reasons set forth below, that the motion
should be denied.

#### I. Background

The instant shareholder derivative action arises from
the August 13, 1996, Merger of Champion Healthcare
Corporation ("Champion") and Paracelsus Healthcare
Corporation ("Paracelsus") whereby Champion became a
wholly owned subsidiary of Paracelsus. Plaintiff James

G. Caven ("Caven") owned stock in Champion and, pursuant to the terms of the Merger, exchanged his shares of Champion common and preferred stock for shares of Paracelsus common stock.

As more fully set forth in Plaintiff's First Amended Derivative Complaint, (Document No. 26), Caven alleges that Paracelsus and the Paracelsus Defendants n1 breached representations and warranties in the Merger contract by providing [*3] materially false or misleading financial information that induced Champion to consummate the Merger. Caven, as a shareholder of Champion who received Paracelsus common stock in the Merger, brings the instant derivative action pursuant to *Rule 23.1 of the Federal Rules of Civil Procedure* "for the benefit of Paracelsus on behalf of its subsidiary Champion to redress injuries to Champion. . . ." (Document No. 26 at 7). Specifically, Caven claims that, in causing Champion to consummate the Merger, the Champion Defendants n2 aided and abetted by the Paracelsus Defendants, breached their fiduciary duties to Champion by failing to act on an informed, good-faith and honest basis. (Document No. 26 at PP 4-5, 81-94). Caven further alleges that the Merger was detrimental to Champion and constitutes corporate waste. (Document No. 26 at P 91). n3

> n1 The Paracelsus Defendants, as alleged by Caven, include Manfred George Krukemeyer, Park Hospital GmbH, R.J. Messenger, James T. Rush, and Robert C. Joyner.

> n2 The Champion Defendants, as alleged by Caven, include Charles R. Miller, James G. Van-Devender, and Ronald R. Patterson.

[*4]

> n3 Caven also asserted claims against Ernst & Young and Donaldson, Lufkin & Jenrette. However, by Orders dated July 14, 1997, and October 14, 1997, the Court granted Plaintiff's Motion for Voluntary Dismissal Without Prejudice as to Defendant Ernst & Young (Document No. 41), and Plaintiff's Motion for Voluntary Dismissal Without Prejudice as to Defendant Donaldson, Lufkin & Jenrette, Inc. (Document No. 56). Accordingly, Caven's claims against Defendant Ernst & Young, Donaldson, Lufkin & Jenrette, Inc. are not addressed herein.

**II. Summary of the parties' arguments**

Generally, the prerequisite for filing a derivative action is that such a suit be initiated only on behalf of a company that is itself able to bring the action directly. To the extent that Caven brings the instant suit on behalf of post-merger Champion, Defendants contend that post-Merger Champion, as a wholly-owned subsidiary of Paracelsus, is unable to assert any of the claims recited in Plaintiff's Amended Derivative Complaint. (Memorandum of Law in Support of Defendants' Motion to Dismiss, Document No. 32 at 6-8). [*5] According to the Defendants, such a suit, if allowed, would be the equivalent of a corporation suing itself for its own benefit, which is not permitted under Delaware law (Document No. 32 at 8-9). Similarly, to the extent that Caven seeks to assert claims on behalf of pre-merger Champion, Defendants maintain that Caven is not the proper party entitled to assert the instant claims on behalf of post-merger Champion because the right to pursue any such claims passed to Paracelsus as a result of the Merger. (Document No. 32 at 9-11). Additionally, Defendants contend that Caven fails to meet the personal standing requirements to bring this action. According to Defendants, Caven did not own pre-merger Champion stock at the time the suit was filed, and likewise, did not own Paracelsus stock at the time of the alleged wrongdoing. (Document No. 32 at 12-16).

Additionally and alternatively, Defendants maintain that dismissal is proper as to the breach of contract claim because the express language of the Merger Agreement precludes a post-Merger claim for breach of representations, warranties, and agreements (Document No. 32 at 17-19). With regard to Caven's claim that the Paracelsus Defendants [*6] aided and abetted in Champion's alleged breach of a fiduciary duty, Defendants contend that such a claim is without any legal foundation. (Document No. 32 at 19-21).

In response to Defendants' Motion to Dismiss, Caven contends that the Merger was a "reverse triangular" merger, in which a Paracelsus subsidiary, PC Merger Sub, Inc., merged into Champion thereby retaining Champion as a corporate entity distinct from Paracelsus. (Plaintiff's Memorandum in Response to Defendants' Motion to Dismiss, Document No. 45 at 6). As a result, Champion's claims did not pass to Paracelsus as a result of the Merger, but stayed with Champion. Moreover, the harm Caven complains of in the instant suit arose when the Merger was consummated, not at a time prior to the Merger. According to Caven, the "contemporaneous ownership" rule applicable in derivative actions does not preclude Caven from proceeding on the allegation that he owned Paracelsus stock when the harm to Champion occurred because the Champion stock owned by Caven was converted to Paracelsus stock when the Merger took effect. (Document No. 45 at 8-13). Furthermore, Caven

argues that he has properly invoked "double derivative" standing by his [*7] allegation that he sues "in the right of and for the benefit of Paracelsus on behalf of its subsidiary Champion to redress injuries to Champion" and by joining both Champion and Paracelsus as defendants as required by Delaware law. (Document No. 45 at 13-15).

As to the claims for breach of contract, Caven maintains that the allegations in the First Amended Derivative Complaint are sufficient to overcome Defendants' Rule 12(b)(6) Motion to Dismiss. Additionally, Caven maintains that dismissal of the breach of contract claim is improper in light of the substantial questions regarding the terms and provisions of the Merger contract. (Document No. 45 at 18). With regard to Caven's claim for aiding and abetting breach of a fiduciary duty, Caven claims that the allegations are well supported in law. (Document No. 45 at 21-24).

## III. FED. R. CIV. P. 12(b)(6) dismissal standard

*Fed. R. Civ. P. 12(b)(6)* provides for dismissal of an action for "failure to state a claim upon which relief can be granted." When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. *Scheuer v. Rhodes,* [*8] *416 U.S. 232, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974).* The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims. Id.

In considering a motion to dismiss under Rule 12(b)(6), the district court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts in the complaint. *La Porte Construction Co. v. Bayshore Nat'l Bank of La Porte, Tex., 805 F.2d 1254, 1255 (5th Cir. 1986); Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982), cert. denied 459 U.S. 1105, 103 S. Ct. 729, 74 L. Ed. 2d 953 (1983); Mann v. Adams Realty Co., 556 F.2d 288, 293 (5th Cir. 1977).* Dismissal of a claim is improper unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173, 176, 66 L. Ed. 2d 163 (1980); Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957); Kaiser Aluminum, 677 F.2d at 1050; Mann, 556 F.2d at 293.* "The plaintiff need not set forth [*9] all the facts upon which the claim is based; rather, a short and plain statement is sufficient if it gives the defendant fair notice of what the claim is and the grounds upon which it rests." *Mann, 556 F.2d at 293.* Therefore, in challenging the sufficiency of the complaint under Rule 12(b)(6), the defendant bears the burden of proving that no relief could be granted under

any set of facts that could be proved consistent with the allegations in the complaint. *Hishon v. King & Spalding, 467 U.S. 69, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984).*

### A. Plaintiff has standing to assert the claims in the First Amended Complaint

*Rule 23.1 of the Federal Rules of Civil Procedure* requires a plaintiff in a derivative action to allege that he or she was a shareholder at the time of the challenged transaction, and to set forth "with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . ., and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *FED. R. CIV. P. 23.1.*

Under Delaware law, which the parties agree is applicable to the instant case, a plaintiff must have been [*10] a shareholder at the time of the challenged transaction to have standing to maintain a shareholder derivative suit. Delaware General Corporation Law §  327, *DEL. CODE ANN. Title 8 §  327* (1983). n4 In addition, Delaware courts require that the plaintiff remain a shareholder at the time of the filing of the suit and throughout the litigation. *Blasband v. M. Rales, 971 F.2d 1034 (3d. Cir. 1992); Alabama By-Products Corp. v. Cede & Co., 657 A.2d 254, 264 (Del. 1995); Kramer v. Western Pacific Indus., Inc., 546 A.2d 348, 354 (Del. 1988).* n5 "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Lewis v. Anderson, 477 A.2d 1040, 1049 (Del. 1984).* Delaware courts, however, recognize two exceptions to the general rule that a plaintiff loses shareholder standing where the shareholder loses stock as a result of a merger. These exceptions apply (1) where the merger itself is the subject of a claim of fraud; *see, e.g., Cede & Co. v. Technicolor, Inc., 542 A.2d 1182, 1188-89 (Del. 1988);* or (2) where the merger is in reality a reorganization not affecting the plaintiff's ownership in the business [*11] enterprise. *See, e.g., Schreiber v. Carney, 447 A.2d 17, 22 (Del.Ch. 1982).*

n4 Section 327 of the Delaware General Corporation Law provides:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law.

The sole purpose of Section 327 is "to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action designed to attack a transaction which occurred prior to the purchase of the stock." *Rosenthal v. Burry Biscuit Corp., 30 Del. Ch. 299, 60 A.2d 106, 111 (Del. Ch. 1948).*

n5 This requirement is to ensure that the plaintiff has sufficient incentive to represent adequately the corporation's interests during the litigation. *Blasband, 971 F.2d at 1041.* In addition, the continuing ownership requirement is intended to prevent abuses associated with derivative actions. *Lewis v. Anderson, 477 A.2d 1040, 1046 (Del. 1984).*

[*12]

In the instant case, Caven alleges that Paracelsus and the Paracelsus Defendants breached representations and warranties in the Merger contract by providing materially false or misleading financial information that induced Champion to consummate the Merger. Thus, the transaction complained of is, essentially, the Merger itself. It is undisputed that Caven owned Champion stock at the time of the Merger, and that Caven exercised his right to convert that stock to Paracelsus stock when the Merger took effect. Thus, to the extent that Defendants challenge Plaintiff's compliance with the pleading requirements of *FED. R. CIV. P. 23.1* and *DEL CODE ANN. Title 8 § 327* (1983), the Court finds that Caven has specifically alleged ownership of the Champion stock at the time of the wrongdoing complained of, and alleged that he received Paracelsus stock pursuant to the Merger. Moreover, Caven's allegations place this derivative action within the two recognized exceptions to the general rule that a shareholder who loses his stock by virtue of a merger has no standing to maintain a derivative suit on behalf of the pre-merger company. Because Delaware law recognizes the type of double derivative [*13] action alleged in this case, *see Blasband, 971 F.2d at 1046,* and because Caven has alleged sufficient facts in the First Amended Derivative Complaint to satisfy the standing requirements of *FED. R. CIV. P. 23.1* and applicable Delaware law, this action is not subject to dismissal under Rule 12(b)(6).

**B. Plaintiff has stated claims for breach of contract and for aiding and abetting breaches of fiduciary duty**

Plaintiff has alleged that Paracelsus and the Paracelsus Defendants breached the provisions of Sections 5.6

and 5.8 of the Merger Agreement with pre-Merger Champion. Document No. 26 PP 67, 68, and 78). Plaintiff also alleges that the Paracelsus Defendants aided and abetted in the alleged breach of a fiduciary duty. In response and in their Motion to Dismiss, Defendants argue that, pursuant to Section 10.1 of the Merger Agreement, the complained of representations, warranties and agreements, with limited exceptions, did not survive the "Effective Time" of the Merger contract, and therefore Caven cannot maintain a cause of action for breach of contract. In addition, Defendants argue that Caven's claim for aiding and abetting is without any legal foundation.

With [*14] respect to the foregoing claims, Caven alleges in the First Amended Derivative Complaint:

53. Pursuant to Section 5.6 of the Merger Agreement, Paracelsus represented and warranted that, since December 31, 1995, there had not occurred or arisen any event which had or would have a material adverse effect on Paracelsus.

54. Pursuant to Section 5.8 of the Merger Agreement, Paracelsus represented and warranted that information supplied by Paracelsus or its subsidiaries for inclusion in certain documents disseminated in connection with the Merger (a registration statement and proxy statement) would not contain any untrue statements of material fact or omit to state material facts.

Caven further alleges that two months after the Merger, Paracelsus announced that it would report lower than expected earnings in the third quarter of 1996, and that it would restate its financial results and amend its Forms 10-Q for the period ending December 31, 1995, March 31, 1996 and June 30, 1996. Following this announcement, Caven avers that Paracelsus filed its Form 10-K with the Securities and Exchange Commission wherein Paracelsus announced that it would "restate both its audited [*15] and unaudited financial results for periods commencing with January 1, 1992, through the nine months ending September 30, 1996 due to 'adjustments' and 'reclassifications'. . . . In short, Paracelsus' previously reported financial results had been materially misstated by tens of millions of dollars." (Document No. 26 at PP 60, 64).

A careful review of Plaintiff's First Amended Derivative Complaint reflects that Caven has stated a claim for breach of contract. The complaint clearly alleges that

the representations and warranties made by Paracelsus were false when made. *(See* Document No. 26 at PP 67-68). In addition, Caven specifically alleges that Paracelsus's representations and warranties were made in violation of Sections 5.6 and 5.8 of the Merger Agreement. *(See* Document No. 26 at P 68). Defendants have failed to demonstrate that Caven can prove no set of facts in support of his claims for breach of contract that would entitle him to relief. *See Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173, 176, 66 L. Ed. 2d 163 (1980); Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957).* Accordingly, Defendants' request for dismissal of Plaintiff's claim of [*16] breach of contract is denied.

As to the claim for aiding and abetting breach of fiduciary duty, Caven alleges that the Champion Defendants breached their fiduciary duties to Champion and its shareholders by failing to act on an informed basis, in good faith, and in the honest belief that the Merger was in the best interest of Champion, and by failing to exercise candor in recommending the Merger. (Document No. 26 at PP 83-89). In so alleging, Caven maintains that the Paracelsus Defendants aided and abetted in the breach of fiduciary duty by providing false financial information to effectuate the proposed merger.

Caven has set forth facts which, if true, would permit a reasonable inference that Champion was aware or should have been aware that the proposed merger transaction, if in fact unfair, would benefit the fiduciaries at the expense of the public shareholders. *(See* Document No. 26 at PP 85-89). Those allegations and inferences preclude dismissal of the aiding and abetting breach of fiduciary duty claim under Rule 12(b)(6).

Because the First Amended Derivative Complaint contains sufficient allegations to withstand a Rule 12(b)(6) motion to dismiss, it is

ORDERED that Defendants' [*17] Motion to Dismiss the First Amended Derivative Complaint (Document No. 31) is DENIED.

Signed at Houston, Texas, on this the 6th day of March, 1998.

EWING WERLEIN, JR.

UNITED STATES DISTRICT JUDGE



JOHN PAUL DECKER and INTERNATIONAL APPAREL ASSOCIATES,
Plaintiffs, v. A. W. CLAUSEN, et al., Defendants. and BANKAMERICA
CORPORATION, Nominal Defendant. WILLIAM STEINER, Plaintiff, v. A. W.
CLAUSEN, et al., Defendants. and BANKAMERICA CORPORATION, Nominal
Defendant

Civil Action Nos. 10,684, 10,685

Court of Chancery of Delaware, New Castle

*1989 Del. Ch. LEXIS 143*

Date Submitted: September 8, 1989
November 6, 1989, Decided

**NOTICE:** THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

**DISPOSITION:** [*1]

IT IS SO ORDERED.

**COUNSEL:**

R. Bruce McNew, Esquire, Pamela Tikellis, Esquire
and Carolyn Mack, Esquire of GREENFIELD &
CHIMICLES, Wilmington, Delaware, Kenneth A.
Jacobsen, Esquire, of GREENFIELD & CHIMICLES,
Haverford, Pennsylvania and Patrick J. Grannan, Esquire
of GREENFIELD & CHIMICLES, Los Angeles, Cali-
fornia, Attorneys for Plaintiffs Decker and International
Apparel Associates

Joseph A. Rosenthal, Esquire of MORRIS,
ROSENTHAL, MONHAIT & GROSS, P.A., Wilming-
ton, Delaware; Of Counsel: GOODKIND LABATON &
RUDOFF, New York, New York, Attorneys for Plaintiff
Steiner

Martin P. Tully, Esquire of MORRIS, NICHOLS,
ARSHT & TUNNELL, Wilmington, Delaware, Attor-
neys for Individual Defendants

R. Franklin Balotti, Esquire of RICHARDS,
LAYTON & FINGER, Wilmington, Delaware, Attor-
neys for Defendant United Education Software

Bruce M. Stargatt, Esquire of YOUNG,
CONAWAY, STARGATT & TAYLOR, Wilmington,
Delaware, and Jack W. Londen, Esquire of MORRISON

& FOERSTER, San Francisco, California, Attorneys for
BankAmerica Corporation

**JUDGES:**

Before BERGER, VICE CHANCELLOR

**OPINIONBY:**

BERGER

**OPINION:**

MEMORANDUM OPINION

BERGER, VICE CHANCELLOR

In the spring of 1989, several derivative actions
were filed by stockholders of BankAmerica Corporation
[*2] ("BAC") seeking recovery for alleged mismanage-
ment of student loans by BAC's subsidiary, Bank of
America National Trust & Savings Association (the
"Bank"). Several actions were filed in various state
courts in California and at least one remains pending in
the Superior Court for the County of Los Angeles (the
"California action"). Two Delaware actions, one brought
by John Paul Decker and International Apparel Associ-
ates (collectively, "Decker") and one by William Steiner
("Steiner"), were filed at about the same time as the ear-
liest of the California actions.

Steiner has essentially abandoned his Delaware ac-
tion in favor of the California action (in which he is one
of the named plaintiffs), whereas Decker, who is not a
party to the California action, has been pursuing his
claim in this jurisdiction. Specifically, on June 6, 1989,
Decker filed an amended complaint that purports to al-
lege three derivative causes of action against the BAC

directors, one derivative cause of action against United Education & Software, Inc. ("United") and one individual cause of action against the BAC directors. This is the decision, after briefing and argument, on BAC and the defendant directors' motion [*3] to dismiss the derivative allegations in the Decker action n1.

> n1 After this motion to dismiss had been briefed and argument had been scheduled, Steiner filed a motion to consolidate his action with Decker's and a motion to stay the consolidated actions. Both of those motions were opposed not only by defendants but also by Decker. The thrust of Steiner's argument was that, as a matter of judicial economy and comity, the same claims should not be litigated in two different jurisdictions. These, of course, are compelling considerations. However, in light of my disposition of the pending motion to dismiss all of the derivative claims in the Decker amended complaint, I conclude that the motions to consolidate and to stay are mooted.

The claims at issue center on the Bank's involvement in a student loan program. The Bank, allegedly, is the largest student loan lender in California and, for several years, has been acting as trustee in connection with more than $ 1 billion in student loans issued by California Student Loan Finance Corp. ("CSLFC"), a non-profit corporation in the business of packaging student loans as securities for sale to institutional investors. The student loans, [*4] which allegedly have a very high default rate, were guaranteed by the U. S. Department of Education. That guarantee formed a substantial part of the value of the student loans, and was effective only if the lender complied with federal regulations and procedures relating to the servicing of the loans.

The Bank used United to service the student loans and to perform the functions necessary for maintaining the federal guarantees. However, an alleged computer breakdown at United in 1987 left United unable to satisfy the federal loan servicing requirements. Both the Bank and United allegedly failed to rectify this problem and, as a result, the federal guarantees were withdrawn. The Bank has recognized that this series of events (which precipitated lawsuits against the Bank by other banks that had backed the student loans with letters of credit) has caused or is likely to cause substantial losses. In the fourth quarter of 1988, the Bank allegedly set aside a $ 98 million reserve in connection with the student loan program, and an additional undisclosed amount was reserved in the first quarter of 1989.

Based upon these facts (which are set out in greater detail in the amended complaint), [*5] Decker asserts

three derivative causes of action against the BAC directors: (1) willful failure to control and manage BAC and the Bank, amounting to a fraud upon BAC and its stockholders; (2) negligent failure to exercise ordinary care; and (3) constructive fraud based upon the BAC directors' alleged concealment and misrepresentation of material facts. Decker's fourth cause of action charges that United breached its contractual obligations by failing to service the student loans properly, and that United fraudulently induced BAC and the Bank to enter into the loan servicing agreement by representing that United was ready, willing and able to service the loans when it knew that it was unable to fulfill those commitments.

The amended complaint includes seven pages of reasons why Decker's failure to make presuit demand on the BAC directors would have been futile and should, therefore, be excused. Those reasons may be grouped into the following general categories: (1) the BAC directors participated in and/or approved the alleged wrongdoing; (2) the directors have taken no action in response to demands made by other stockholders, and the board's handling of other derivative claims has [*6] been inadequate; (3) the directors are actively defending law suits brought by other banks concerning the wrongs alleged in the Decker complaint; (4) the directors receive substantial salaries as directors and, thus, have benefitted from the wrongs alleged; and (5) the directors would not sue themselves.

Under Delaware law, the "demand requirement . . . is a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson v. Lewis, Del. Supr., 473 A.2d 805, 809 (1984).* It is "inextricably bound to issues of business judgment," and is "a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Id. at 812.* Demand is excused where the complaint alleges, with particularity, facts that "raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." *Grobow v. Perot, Del. Supr., 539 A.2d 180, 186 (1988).*

To succeed on the first prong of the demand futility test, [*7] Decker must show that the BAC directors may not have been disinterested or independent. The directors' independence could be challenged by alleging, with particularity, facts showing that they "were dominated or otherwise controlled by an individual or entity interested in the transaction." *Id. at 189.* As to disinterest, the Decker complaint must include particularized factual allegations showing entrenchment or a financial interest on the part of the BAC directors. See *id. at 188.*

None of the allegations in the amended complaint raises a reasonable doubt that the BAC directors were disinterested or independent. There is nothing in the nature of the loan servicing problems that would suggest either an entrenchment motive or any interest, in the sense of self-dealing, on the part of the directors. The amended complaint alleges that the BAC directors participated in and/or approved the alleged wrongs. However, such allegations, like the claim that demand would be futile because the directors would have to sue themselves, have been rejected consistently by our courts. See *Aronson v. Lewis, 473 A.2d at 817;* see also *Pogostin v. Rice, Del. Supr., 480 A.2d 619, 625 (1984);* [*8] *Good v. Getty Oil Co., Del. Ch., 514 A.2d 1104, 1107-08 (1986).*

Decker's allegation that BAC's liability insurance would not cover an action brought by the company against its own directors and the allegation that the directors recommended a charter amendment limiting their liability are but variations on the "directors suing themselves" and "participating in the wrongs" refrain. They provide no particularized facts creating a reasonable doubt that the directors are disinterested or independent. The fact that they receive salaries for serving as directors, likewise, is insufficient to excuse demand. *Grobow v. Perot, 539 A.2d at 188.* Finally, the suggestion that demand is excused because the directors did not respond to another stockholder's demand or because they are defending related litigation is without merit. See *Kaplan v. Peat, Marwick, Mitchell & Co., Del. Supr., 540 A.2d 726, 731 n.2 (1988); Allison v. General Motors Corp., 604 F. Supp. 1106, 1113 (D. Del.) aff'd mem., 782 F.2d 1026 (3d Cir. 1985).*

Decker seems to recognize that the list of reasons for demand futility contained [*9] in his amended complaint is insufficient. Instead, he argues that the directors are interested because the prospect is very good that they will be found liable. This argument draws on language in Aronson suggesting that directors may be interested for purposes of the demand requirement "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson v. Lewis, 473 A.2d at 815.* However, since a finding of director interest on this ground would require a finding that the second prong of the demand futility test had been satisfied, it seems more appropriate to address the question of the applicability of the business judgment rule directly.

To satisfy the second prong of the demand futility test, the factual allegations of the amended complaint must create a reasonable doubt that the BAC directors exercised proper business judgment. This analysis includes the question of whether the directors fulfilled their duty of procedural due care, by becoming fully informed, and their duty of substantive due care, by not engaging [*10] in, e.g., a waste of corporate assets. See *Grobow v. Perot, 539 A.2d at 189.* The amended complaint includes many allegations detailing United's failure to perform its student loan servicing tasks. It also details at least one method by which the Bank should have become aware of United's problems long before it did. As early as the spring of 1987, the Bank allegedly received monthly reports indicating that a substantial number of claims made with respect to the student loans were being denied by the agencies responsible for the federal guarantees. This high denial rate should have alerted the Bank that United was not carrying out its loan servicing functions correctly. Other more specific aspects of United's operations also allegedly should have been known to the Bank. For example, for a five month period in 1988, more than 200,000 change-of-status notices were left unprocessed by United while that company was undergoing a computer conversion. The prompt processing of such status code changes is critical to the successful operation of the student loan program and the Bank allegedly knew of this problem or made no effort to discover it.

Whether these allegations [*11] would excuse demand if the defendants were the Bank and its directors would be a close question. The amended complaint alleges that serious problems existed with the student loan program and that the Bank either ignored those problems or was unaware of them for as much as a year. These allegations could possibly be enough to create a reasonable doubt that the directors of the Bank exercised due care in overseeing the student loan program.

That question need not be resolved, however, as neither the Bank nor the Bank's directors are defendants in this action. Rather, the defendants are the directors of the Bank's parent company, BAC. There are no allegations that the parent and subsidiary have the same or interlocking boards, and it appears from Decker's identification of the individual defendants that none of them is, in fact, a director of the Bank. Thus, it does not follow that any of the problems United was having, even if known to the Bank, were or should have been known to the directors of BAC. Under normal circumstances, a board of directors ought to be able to rely on its subsidiary's directors to oversee that subsidiary's management and attend to any problems that may arise. [*12] The amended complaint includes no factual allegations suggesting that the individual defendants here should not have relied upon the Bank's directors. Decker's conclusory allegations that the BAC directors "should have known" about problems with United and the student loans are unsupported and, therefore, do not create a reasonable doubt that the BAC directors neglected their duties or were grossly negligent in attempting to carry them out.

1989 Del. Ch. LEXIS 143, *

Based upon the foregoing, I find that the amended complaint fails to allege facts which, if true, would create a reasonable doubt as to the BAC directors' disinterest, independence or proper exercise of business judgment. Accordingly, the motion to dismiss Counts 1-4 of the amended complaint is granted.

7

**DEEPHAVEN RISK ARB TRADING LTD., Plaintiff, v. UNITEDGLOBALCOM, INC., Defendant.**

Civil Action No. 379-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 107*

**July 8, 2005, Submitted**
**July 13, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc., 2004 Del. Ch. LEXIS 130 (Del. Ch., Aug. 30, 2004)*

**DISPOSITION:** Deephaven's demand granted in part.

**COUNSEL:** John L. Reed, Esquire, John H. Newcomer, Jr., Esquire, Matt Neiderman, Esquire, DUANE MORRIS LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Michael Hanrahan, Esquire, Tanya P. Jefferis, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware, Attorneys for Defendant.

**JUDGES:** PARSONS, Vice Chancellor.

**OPINIONBY:** PARSONS

**OPINION:**

### MEMORANDUM OPINION

**PARSONS, Vice Chancellor.**

Plaintiff, Deephaven Risk Arb Trading, Ltd. ("Deephaven"), is an investment fund and claims to have brought this action as a stockholder of UnitedGlobal-Com, Inc., a Delaware corporation ("UGC"). n1 Deephaven's Complaint seeks to compel inspection of UGC's books and records pursuant to *8 Del. C. § 220*.

n1 Deephaven has never been a stockholder of record, but instead, claims it was a beneficial owner within the meaning of *8 Del. C. § 220(a)* at all relevant times.

[*2]

This matter was tried on September 24, 2004, and argued on March 14, 2005. UGC was merged into another entity on June 15, 2005. Thereafter, the parties filed supplemental briefs addressing the impact of the merger on Deephaven's claims. This Memorandum Opinion reflects the Court's post-trial findings of fact and conclusions of law. For the reasons discussed below, I find that Deephaven was a beneficial owner of UGC stock and is entitled to a limited inspection, notwithstanding the recent merger. I therefore grant Deephaven's demand in part.

### I. FACTS

Deephaven is an investment fund that utilizes market-neutral investment strategies designed to deliver risk-adjusted returns with low volatility. n2 Market-neutral strategies seek to capture mispricings or spreads between related capital instruments without being exposed to absolute price movements. These objectives are often achieved by combining long and short positions.

n2 Trial Transcript ("Tr.") at 7. All cites to the Trial Transcript refer to the testimony of David Halbower, the only witness presented at trial.

[*3]

UGC is a large international broadband communications provider. On January 12, 2004, UGC announced a $ 1 billion rights offering (the "Rights Offering"). On the record date of the Rights Offering, UGC had outstanding

293,107,030 shares of Class A common stock ("Class A" or "Stock"), 8,198,016 shares of Class B common stock ("Class B") and 303,123,542 shares of Class C common stock ("Class C"). The Class A stock was publicly traded on the NASDAQ National Market and widely held. Liberty Media Corporation owned all of the Class B and Class C shares, giving it approximately 55% of the outstanding common stock and 92% of the cumulative voting power.

## A. Deephaven's Dealings in UGC Stock and Rights

Following the announcement of the Rights Offering on January 12, 2004, Deephaven began actively trading UGC Stock. To do so, Deephaven utilized at least five brokerage accounts, at Barclays, Deutsche Bank, Goldman Sachs, Morgan Stanley and Salomon Smith Barney. It was often Deephaven's practice to borrow UGC shares in one of its accounts with the intention of short-selling them to itself in another Deephaven account. n3 The result of that type of transaction is that Deephaven's purchase [*4] and sale prices are identical and no economic interest in UGC Stock is created--that is, Deephaven is not exposed to fluctuations in the value of UGC shares.

> n3 A short-sale is "any sale of a security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller." *In re Digex Inc. S'holders Litig., 2002 Del. Ch. LEXIS 40, 2002 WL 749184, at *2 (Del. Ch. Apr. 16, 2002)* (quoting 17 *C.F.R.* § 240.3b-3) (internal quotations omitted).

Not all of Deephaven's UGC trades, however, were matched short-sales and purchases. Beginning January 13, 2004, and in earnest on January 22, Deephaven amassed a substantial net short position across its accounts. For example, on February 18, 2004, just two days before the final results of the Rights Offering were released, Deephaven was net short 4,615,071 shares of UGC.

Throughout that period, however, Deephaven's Barclays account consistently held a long position in UGC Stock. On January 13, 2004, Deephaven [*5] established a position of 2,050,000 shares in the Barclays account and that figure swelled to a high of 9,338,592 on March 3. n4 In fact, aside from a three day period between March 5 and March 8, following the liquidation of the UGC position in its Barclays account, Deephaven held UGC shares long in the Barclays account at all times between January 13 and August 23, 2004. n5

n4 Joint Trial Exhibit ("JX") 5; Deephaven's Demonstrative Exhibit ("DDX") 1.

n5 Between March 5 and 8, 2004, Deephaven was long UGC stock in a Goldman Sachs account. JX 7; DDX 1.

In addition to buying and selling UGC shares, Deephaven also actively participated in the market for rights, purchasing millions of rights on the open market.

## B. The Rights Offering

The Rights Offering prospectus identified Mellon Investment Services LLC ("Mellon") as the subscription agent. Mellon was to receive all correspondence relating to the subscriptions on behalf of UGC. UGC retained the discretion to determine the timeliness, validity, [*6] form and eligibility of all exercises of rights. In addition, UGC retained the right to extend the offering period for any reason, at least up until the most recently announced expiration time.

The rights were distributed on January 21, 2004, and were freely tradable on the NASDAQ. Under the terms of the Rights Offering, each right entitled its holder to a basic subscription privilege and an oversubscription privilege. Each share of Class A stock entitled stockholders to receive .28 rights and approximately 83 million Class A rights were distributed.

The basic subscription privilege of each full Class A right allowed the holder to purchase one share of Class A stock at a price of $ 6.00--a 40% discount to the then-current market price of approximately $ 10.00. The oversubscription privilege also entitled rightsholders who had exercised their basic subscription privilege in full to purchase additional shares of Stock. The number of shares available for oversubscription was to be equal to the number of shares made available by rightsholders that failed to exercise their basic subscription privileges. In other words, UGC sought to sell all of the Stock offered in the rights offering [*7] either through basic subscriptions or a combination of basic and oversubscriptions.

To subscribe to the Rights Offering, stockholders were required to take certain steps. They had to deliver a rights certificate together with payment of the full subscription price before the expiration date. Stockholders wishing to exercise their rights, but who were unable to deliver rights certificates by the expiration date were required to provide full payment and a notice of guaranteed delivery before expiration. The corresponding rights certificates were due within three business days thereaf-

ter. Foreign holders were required to take additional steps in order to exercise their rights. n6

n6 The Rights Offering provided that:

> To exercise or transfer their rights, foreign holders must notify the subscription agent before 11:00 a.m., New York City time, on Friday, January 30, 2004, five business days prior to the expiration time and must establish to our satisfaction that such exercise or transfer is permitted under applicable law. In the case of Class A rights, if a foreign holder does not establish to our satisfaction that such exercise or transfer is permitted under applicable law, and notify, and provide acceptable instructions to, the subscription agent by such time (and if no contrary instructions have been received by such time), the subscription agent will seek to sell the foreign holder's Class A rights, subject to the subscription agent's ability to find a purchaser. JX 1 at 43.

[*8]

The Rights Offering originally was set to expire on February 6, 2004, but on January 23 UGC announced that it had extended the expiration date to February 12. The Rights Offering deadline apparently was not extended again, and February 12 was the final deadline for submission of all rights certificates and notices of guaranteed delivery. In addition, rightsholders that submitted notices of guaranteed delivery were to provide the completed subscription certificates by February 18.

Before the expiration date, Deephaven submitted 5,190,700 rights certificates, a request for 1 million oversubscription rights, and full payment for the requested shares.

## C. Preliminary Results from the Rights Offering

The subscription period for the Rights Offering expired at 5:00 pm on February 12. At 6:19 that evening, Mellon emailed its "PRELIMINARY FINAL Report as of February 12, 2004" to counsel for UGC. n7 The report showed 63,668,383 shares subscribed pursuant to basic rights and 66,820,883 subscribed pursuant to oversubscription rights. In addition, the body of the email stated:

> Please note: We have 25,500,477 Protected Rights
> 20,298,886 Protected Oversubscription Rights

The next [*9] morning at 10:26 am, Mellon emailed its "Final Report as of February 12, 2004" to counsel for UGC. n8 This report included the exact same figures for subscriptions and oversubscriptions as the Preliminary Final Report from the previous day. The email did not include, however, any reference to Protected Rights.

n7 JX 44.
n8 JX 45.

On February 13, 2004, UGC issued a press release announcing preliminary results of the Rights Offering. The press release stated:

> The subscription agent for the Class A Rights Offering has informed UGC that Class A rightsholders have subscribed for approximately 63.7 million shares of UGC Class A common stock pursuant to the basic subscription privilege and approximately 66.8 million shares of UGC Class A common stock pursuant to the oversubscription privilege. Due to the substantial oversubscription, UGC will issue 100% of the approximately 83.0 million shares of the UGC Class A common stock offered in the rights offering.
>
> * * *
>
> Shares of UGC Class A common [*10] stock requested pursuant to the oversubscription privilege will be allocated among the approximately 19.3 million shares of UGC Class A common stock available to satisfy oversubscription requests in accordance with the proration procedures described in the prospectus for the rights offering. n9

n9 JX 3.

Deephaven's portfolio manager overseeing its trades in UGC stock and rights was Matthew Halbower. Based on the preliminary figures, Deephaven stood to receive the entire 1 million shares it requested from oversubscription rights. Halbower was surprised, however, by the large number of rights apparently left unexercised and made a series of phone calls to confirm the figures in the press release. On February 17, 2004, the first business day after the press release, Halbower called Mellon's Ed Eismont to confirm that the figures remained accurate. Eismont verified that 19 million rights still appeared available for oversubscription and that the numbers were accurate "in light of notice[s] of guaranteed [*11] delivery as well." n10 That same day, Halbower telephoned UGC's Rich Abbott, who also confirmed the press release's numbers. n11

n10 Tr. at 69-70.

n11 Tr. at 72-73. It is unclear from Halbower's testimony whether Abbott told him that the figures included notices of guaranteed delivery or that notices of guaranteed delivery were going to be immaterial. Regardless, Halbower testified that he was led to believe that 19.3 million shares would be available for oversubscription notwithstanding notices of guaranteed delivery. Tr. at 164-65.

On February 19, 2004, Halbower again contacted Eismont to confirm the continued accuracy of the press release's numbers. In particular, Halbower wanted to confirm that over 19 million rights were unsubscribed for and available for oversubscription requests. Eismont did confirm the numbers, but explained: "we are trying to run through all the numbers to make sure that we're in line with what they're showing before we come out with the numbers." n12 According to Halbower, [*12] Eismont also communicated to him

that a large number of rights failed to exercise the oversubscription privilege because those rights were held by foreign holders; that rights held by foreign holders in this rights offering had to jump through additional hoops, which are very atypical. . . . And there were lots of discussions going on with their internal legal folks about the fact that these foreign holders weren't going to be allowed to exercise their rights. And that created, in my

[Halbower's] mind, a great deal of suspicion. n13

n12 JX 16.

n13 Tr. at 76.

Halbower's suspicions led him to begin recording the call. n14 During the recorded portion of the conversation, Eismont explained: "Logic would dictate that's the logical answer. That a lot of the foreign holders couldn't participate due to not providing the appropriate paperwork." n15 Moreover, Eismont noted that the deadline to exercise rights came a number of days after it would have been too late to sell the rights on the open [*13] market, implying that foreign holders who intended to exercise their rights but were unable to in the end, would not have had the opportunity to then sell their rights.

n14 JX 16. Halbower recorded approximately the second half of the phone call.

n15 Id.

## D. The Final Results of the Rights Offering are Released

On February 20, 2004, UGC issued a final press release stating that it had received subscriptions for approximately 82 million of the 83 million rights, leaving only about 1 million shares available for oversubscription. This news represented a substantial departure from the figures disclosed in the February 13 press release and later confirmed by Mellon and UGC. The February 20 press release explained the discrepancy by stating that the February 13 press release had excluded shares subscribed pursuant to guaranteed delivery procedures.

Halbower immediately contacted both Eismont and Abbott for an explanation, recording both calls. Eismont explained that the February 13 press release's [*14] exclusion of shares subscribed pursuant to guaranteed delivery was due to a mistake by UGC and its attorneys. Halbower asked Eismont about the foreign holders explanation he previously had used to account for the large number of unsubscribed rights. Eismont described that explanation as merely the most logical explanation at the time because he had been informed by UGC's counsel that the figures included notices of guaranteed delivery.

That same day, Eismont also called Abbott. Abbott's explanation was that Mellon had mistakenly informed UGC that the notices of guaranteed delivery number "wasn't going to be material." n16

n16 JX 18.

The rights were exchanged for Stock on February 25, 2004; shortly thereafter, the proration for oversubscription requests was announced. Deephaven received just 34,603 oversubscription shares based on its exercised position of 5,190,700 basic rights and its request for 1,000,000 oversubscription rights.

### E. Deephaven's Books and Records Request

On February 24, 2004, Deephaven's [*15] counsel wrote to UGC to express its concern over the sudden change in available rights and to request that all relevant files, documents, and other information be preserved. UGC responded on March 1, 2004, and denied any "wrongful actions after the delivery deadline." n17 Subsequently, on March 24, Deephaven wrote to UGC demanding inspection of certain categories of UGC's books and records pursuant to 8 Del. C. § 220 (Deephaven's "Demand Letter"). n18 Specifically, the Demand Letter requested eleven categories of documents relating to various aspects of the Rights Offering and the manner in which it was executed. n19

n17 JX 27.
n18 JX 29.
n19 The categories of documents requested are:

1. All records including copies of taped phone conversations reflecting or referring to all elections of oversubscription rights in the Rights Offering;

2. All records reflecting or referring to all notices of guaranteed delivery received by the Company or its agents in connection with the Rights Offering;

3. All records reflecting or referring to the extension of the subscription period for the Rights Offering;

4. All records reflecting or referring to the subscriptions and notices of guaranteed delivery received by the Company or its agents in connection with the Rights Offering, including, without limitation, all records reflecting or referring to the date and time at which all such subscriptions and notices of guaranteed delivery were received by the Company or its agents;

5. All records reflecting or referring to communications concerning the receipt by the Company or its agents of subscriptions and/or notices of guaranteed delivery in connection with the Rights Offering, including, without limitation, any requests or demands that subscriptions or notices of guaranteed delivery be accepted or honored by the Company or its agents after the subscription deadline;

6. All memoranda, publications, manuals or other documents reflecting or referring to the Company's policies, procedures or guidelines concerning the 2004 Rights Offering, including, without limitation, all policies, procedures, or guidelines concerning the receipt of subscriptions after the deadline;

7. All records reflecting or referring to Rights Offering subscriptions received after the subscription deadline;

8. All records reflecting or referring to Rights Offering notices of guaranteed delivery received after the deadline for such notices;

9. All records reflecting or referring to the number of Rights Offering subscriptions received at all times during the Rights Offering subscription period, including, without limitation, all calculations, tabulations, charts, running totals, spreadsheets, and raw data; and

10. All documents and other information provided by the subscription agent for the Company's

class A shares concerning the number of Rights Offering subscriptions received and/or the number of oversubscription rights available at all times during the Rights Offering.

11. All records, including recorded phone conversation logs between the Company, its subscription agent, and any individual referencing or relating to the oversubscription rights.

[*16]

Deephaven stated four purposes for its demand: (1) to investigate possible corporate wrongdoing or mismanagement, including breaches of fiduciary duty, misuses of corporate assets, misuses of corporate information and/or other wrongdoing in connection with the handling of the Rights Offering; (2) to investigate and assess the veracity and legality of UGC's public and private disclosures made in connection with the Rights Offering; (3) to determine whether the rights of Deephaven and other similarly situated stockholders of UGC were impermissibly interfered with or denied by UGC or its agents in connection with the Rights Offering; and (4) to determine whether Deephaven and other similarly situated stockholders are in fact entitled to additional oversubscription privileges in connection with the Rights Offering.

Following UGC's receipt of the Demand Letter, Deephaven and UGC engaged in discussions in an attempt to resolve Deephaven's demand. When Deephaven concluded the discussions would not be fruitful, it filed its Complaint. UGC moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6), raising issues related to Deephaven's technical compliance with *§ 220*, its status [*17] as a beneficial holder and the purpose for its demand. The Court denied UGC's motion, n20 and the case later was tried.

n20 *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc., 2004 Del. Ch. LEXIS 130, 2004 WL 1945546 (Del. Ch. Aug. 30, 2004)*.

On June 15, 2005, UGC and Liberty Media International consummated a business combination whereby they combined their businesses under a newly formed parent corporation, Liberty Global, Inc. (the "Merger"). Each share of UGC Stock was converted into the right to receive either $ 9.58 in cash or .2155 shares of Liberty Global stock. UGC contends that the Merger mooted this action because Deephaven no longer is a stockholder and no longer has a proper purpose to seek inspection. Deephaven disputes that contention.

## II. ANALYSIS

### A. Standing

*Section 220* provides inspection rights of a corporation's books and records to all of its stockholders. n21 As amended (effective August 1, 2003), the statute defines the term "stockholder" to include "a person who is the [*18] beneficial owner of shares of such stock held . . . by a nominee on behalf of such person." n22 A stockholder is required only to provide "documentary evidence of beneficial ownership" and to state that such documentary evidence is "a true and correct copy of what it purports to be." n23

n21 *8 Del. C. § 220(b)*.

n22 *8 Del. C. § 220(a)(2)*. Before amendment, *§ 220* rights were available only to stockholders of record, and as a result, beneficial owners whose stock was held on their behalf were required to either have shares re-issued in their names before issuing a demand letter or request that the action be prosecuted on their behalf by the record holder. The 2003 amendment to *§ 220* liberalized the statute in order to obviate such technical hurdles. *See* Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 8-6[b] (2004).

n23 *8 Del. C. § 220(b)*.

[*19]

### 1. Is ownership of individual shares of stock negated by a net short position?

Deephaven asserts that it has owned UGC Stock since January 13, 2004 in its Barclays account. It argues that any short positions in UGC Stock are immaterial to determining whether it beneficially held the UGC shares in its Barclays account. UGC challenges Deephaven's beneficial ownership on two primary grounds. First, UGC argues that at the time of the Rights Offering, "as a short seller, Deephaven was not a beneficial owner of UGC stock." n24 Thus, UGC effectively contends that the Court must analyze Deephaven's UGC holdings in the aggregate to determine beneficial ownership. Second, UGC argues that borrowing shares does not give rise to beneficial ownership and that the act of selling borrowed

shares to one's self does not change the shares' status as borrowed.

n24 UGC's Post-trial Br. ("UPB") at 23.

At the time of the Rights Offering, Deephaven held over 4 million UGC shares long in its Barclays account. At the same [*20] time, Deephaven's *net* position across all of its brokerage accounts was more than 4 million shares short. According to UGC, because Deephaven was net short, "Deephaven did not own any UGC stock; it owed over 4 million shares to others." n25 In other words, UGC contends that if an investor simultaneously holds a long position in a security and a larger short position in the same security, the investor does not "own" the shares held long. UGC offers no authority for this proposition, however, and it is unsupported by either the statute or practical considerations.

n25 *Id.* (emphasis in original).

As Halbower explained at trial, the simultaneous ownership of long and short positions is akin to an individual who has an outstanding loan for $ 1 million, while at the same time maintaining $ 1 million in cash in a bank account. While both positions may be relevant when calculating the person's net worth, the fact of the loan does not negate her "ownership" of the $ 1 million in cash, which she owns [*21] and may dispose of as she wishes. n26

n26 This example assumes the cash has not been pledged as collateral against the loan. In this case, there is no evidence that the shares held in Deephaven's Barclays account were in any way directly encumbered by obligations in other accounts.

*Section 220* is a summary proceeding. n27 Historically, only record holders had standing to seek inspection rights. Proof that the plaintiff was a stockholder of record generally ended that portion of the analysis. n28 For example, it has been held that "*§ 220* does not require that a shareholder have a 'direct' economic interest in the stock she owns of record to be entitled to enforce the inspection right." n29 In addition, record holders have

inspection rights "even though the possibility exists that a stockholder may later be divested of this stock in some other proceeding or be declared in some future proceeding to be holding his stock contrary to law or private agreement." n30

n27 *8 Del. C. § 220(d).*

[*22]

n28 *See Holtzman v. Gruen Holding Corp., 1994 Del. Ch. LEXIS 136, 1994 WL 444756, at *3 (Del. Ch. Aug. 5, 1994)* ("A current stockholder of record in a Delaware corporation has standing to seek inspection rights under *§ 220,* provided a proper purpose is stated.").

n29 *Macklowe v. Planet Hollywood, Inc., 1994 Del. Ch. LEXIS 182, 1994 WL 560804, at *3 (Del. Ch. Sept. 29, 1994).*

n30 *See Holtzman, 1994 Del. Ch. LEXIS 136, 1994 WL 444756, at *3.*

The statute was amended in 2003 to, among other things, extend inspection rights to beneficial owners of stock. In describing the pertinent portion of the legislation, the bill explains: "inspection rights are extended to a person who beneficially owns stock through either a voting trustee or a nominee who holds the stock of record on behalf of such person." n31 Importantly, neither the newly-amended statute nor the legislation itself indicates an intent to create two classes of inspection rights: one for record holders and one for beneficial holders. I interpret the 2003 amendment to afford to beneficial holders *all § 220* rights previously held by record [*23] holders. Therefore, established law that record holders need not have an economic interest in stock to have inspection rights applies with equal force to beneficial holders such as Deephaven.

n31 S.B. 127, 142d Gen. Assem. (Del. 2003).

Practically, requiring an analysis of why and under what circumstances a *§ 220* plaintiff came to hold a company's shares could significantly complicate the nature of this summary and often expedited proceeding. To give effect to UGC's position potentially would force courts to undertake a complex analysis to determine the plaintiff's financial position net of stock, options and other derivatives. One can imagine cases in which finan-

cial experts might be necessary to make such a determination. Moreover, the specter of being forced to disclose sophisticated and proprietary trading techniques could have a chilling effect on the use of *§ 220* by a substantial segment of stockholders. Finally, unlike in other situations such as voting, the *§ 220* analysis includes its own safeguard [*24] against plaintiffs with economic incentives that are not aligned with other stockholders: the proper purpose analysis. For all of these reasons, I see no grounds to discount Deephaven's beneficial ownership of UGC shares held at Barclays because it also held off-setting short positions.

**2. Is a purchaser of one's own short sales a beneficial owner?**

UGC argues that "as a short seller, Deephaven was not a beneficial owner of UGC stock" n32 and that "Deephaven's transfer of shares and cash from one pocket to the other pocket does not alter its status as a short seller and does not establish beneficial ownership." n33 UGC's argument has two components. First, UGC argues that because a short sale involves borrowing shares in order to sell them, the short seller never "owns" the shares and never becomes a "beneficial owner." UGC then argues that Deephaven's transfer of borrowed shares to another of its brokerage accounts did not change their status as borrowed shares.

> n32 UPB at 23.
> n33 *Id.* at 26.

[*25]

The first component of UGC's argument raises the interesting question of whether one who merely borrows shares, and does not sell them, becomes a beneficial owner. One would think not, but for present purposes the Court need not answer that question. It is sufficient to note that under Delaware law a purchaser of shares from a short seller is a beneficial owner. n34 This result enables short selling in modern markets without necessitating quasi-title searches in connection with each stock purchase.

> n34 *In re Digex*, 2002 Del. Ch. LEXIS 40, 2002 WL 749184, at *2 ("With regard to the share borrowed, both the shareholder from whom it was borrowed and the third party to whom the share was sold are beneficial owners.").

The remaining question is whether Deephaven's short-sales to itself constitute normal sales or, as UGC argues, some other type of transfer. UGC's position is without merit. All transfers of Stock into Deephaven's Barclays account involved an exchange of cash for Stock. More importantly, once in the Barclays [*26] account, the shares were not linked to, or otherwise encumbered by, the short positions in the other Deephaven accounts. Once Deephaven paid for the shares in its Barclays account, it had all of the rights of ownership, including the right to dispose of them and to receive the corresponding subscription rights. UGC's interpretation would differentiate between stockholders that purchased shorted shares on the open market and those that purchased such shares from themselves. I question the wisdom of treating those two situations differently in determining beneficial ownership. Therefore, I hold that regardless of the method Deephaven used to finance the shares in its Barclays account, having paid for and held them, Deephaven beneficially owned the shares and had the necessary standing to bring this action. n35

> n35 UGC attacks Deephaven's beneficial ownership on two other grounds. UGC argues that Deephaven has not proven that it maintained beneficial ownership at all relevant times, such as when it made its demand and filed the Complaint. UGC bases this argument on two premises, neither of which is persuasive. First, UGC argues that Deephaven has not proven it was a stockholder at the time of its demand because some of the shares in its Barclays account were obtained as a result of the Rights Offering and were actually owed to other stockholders as a result of related short sales. As discussed *supra*, however, concurrent short obligations do not alter the beneficially owned status of shares held long.
>
> UGC also argues that Deephaven did not beneficially own any shares until after June 15, 2004. This argument rests on admittedly mistaken Deephaven interrogatory answers. Deephaven's account records, now in evidence, show near continuous beneficial ownership in its Barclays account from January 13, 2004 through August 23, 2004 and a net long position since March 1, 2004. The only break of continuous ownership in the Barclays account occurred between March 5 and 8, and is immaterial because at that time Deephaven owned shares in its Goldman Sachs account and was net long across all of its accounts.

[*27]

## B. Effect of the Merger

UGC contends that the Merger on June 15, 2005 has mooted this action for two reasons. First, UGC argues that as a result of the Merger Deephaven is no longer a UGC stockholder and thus is not entitled to UGC's books and records pursuant to § 220. This position, however, is contrary to a previous decision of this Court. In *Cutlip v. CBA Int'l, Inc.,* the court unequivocally rejected the notion that a merger after commencement of a § 220 action nullifies the plaintiff's standing. n36 Like the situation in *Cutlip,* Deephaven has established that it was a stockholder at the time of its demand and therefore has standing to maintain this action. Just as the subsequent merger in *Cutlip* did not divest the plaintiffs of standing in that case, the recent Merger here has no bearing on Deephaven's standing in this case.

n36 *1995 Del. Ch. LEXIS 136, 1995 WL 694422, at \*2 (Del. Ch. Oct. 27, 1995)* (Steele, V.C.).

Second, UGC argues that Deephaven's purposes for inspection are moot because [*28] Deephaven is no longer a UGC stockholder. Specifically, UGC relies on *Grimes v. DSC Communications Corp.,* for the proposition that a purpose of investigating claims of waste and mismanagement do not survive a merger because only stockholders have standing to pursue derivative actions. n37 The situation in *Grimes* is distinguishable, however, because in *Grimes* the stated purpose of the requested inspection was to investigate whether a pre-suit demand was wrongfully refused and, if so, to assist the plaintiff in meeting the particularized pleading requirement for a derivative action under Court of Chancery Rule 23.1. Therefore, by obviating the possibility of a derivative suit, the merger mooted Grimes' proper purpose.

n37 C.A. No. 16145-NC, letter op. at 2-3 (Del. Ch. Nov. 6, 1998).

In this case an active dispute remains notwithstanding the Merger. UGC incorrectly attempts to portray Deephaven's demand as primarily seeking to investigate claims of waste and mismanagement to determine whether or [*29] not it wanted to continue to own UGC stock. n38 To the contrary, the primary purposes for Deephaven's investigation also have included "determining whether the rights of Deephaven and other, similarly-

situated stockholders of the Company were impermissibly interfered with or denied by the Company or its agents in connection with the 2004 Rights Offering" and "determining whether Deephaven and other, similarly-situated stockholders are in fact entitled to additional oversubscription privileges in connection with the 2004 Rights Offering." n39

n38 Even if this were considered a primary purpose of Deephaven's demand, it still might support a continuing proper purpose in the circumstances of this case. As a result of the Merger, Deephaven received 28,946 shares of the resulting entity, Liberty Global, of which UGC is now a wholly-owned subsidiary and asset. *See* Korn Aff. PP3-4. Thus, according to Deephaven, the value of its investment in the surviving entity still will be affected by the suspected pre-Merger mismanagement or wrongdoing of UGC. Because Deephaven has asserted other proper purposes, however, I need not address this argument further.

[*30]

n39 Deephaven's Demand Letter. JX 29.

Under Delaware law, the essential inquiry when distinguishing between direct and derivative claims is: "Who suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?" n40 The harm to Deephaven and similarly situated stockholders from misallocation of shares during the Rights Offering was suffered only by the affected stockholders and not by UGC, which stood to receive equal proceeds regardless of the distribution. Further, any relief obtained in a future suit would benefit Deephaven or a class of similarly situated stockholders, and not UGC. n41 Thus, although the Merger may have removed the possibility of derivative claims stemming from the Rights Offering, the potential still exists for Deephaven to assert a class action claim or individual claims based on a misallocation of shares in the Rights Offering. I turn now to whether Deephaven has demonstrated a proper purpose for its § 220 demand, taking into account the recent Merger.

n40 *Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1035 (Del. 2004).*

[*31]

n41 Causes of action for the misallocation of shares among competing stockholders or for discrimination against specific stockholders have often been found to be direct and not derivative in nature. *See Acker v. Transurgical, Inc., 2004 Del. Ch. LEXIS 49, 2004 WL 1230945, at *1 (Del. Ch. Apr. 22, 2004)* (reorganization of a corporation's capital structure to the benefit of one shareholder and the detriment of another gave rise to a direct claim); *Gatz v. Ponsoldt, 2004 Del. Ch. LEXIS 203, 2004 WL 3029868, at 8 (Del. Ch. Nov. 5, 2004)* (claim that transaction favored certain preferred stockholders to the detriment of other classes of stockholders was direct).

## C. Proper Purpose

*Section 220* requires that a stockholder seeking inspection of books and records state a proper purpose for the inspection. *Section 220(b)* defines a "proper purpose" as one "reasonably related to such person's interest as a stockholder."

To demonstrate a proper purpose when seeking to investigate possible mismanagement, a stockholder must "present some credible basis from which the Court can infer that waste or mismanagement may [*32] have occurred." n42 "The threshold for a plaintiff in a *Section 220* case is not insubstantial." n43 Stockholders are not required to show actual mismanagement, but they must show, by a preponderance of the evidence, that there is a "credible basis to find probable corporate wrongdoing." n44 Stockholders cannot satisfy this burden merely by expressing a suspicion of wrongdoing n45 or a disagreement with a business decision. n46

n42 *Thomas & Betts Corp. v. Leviton Mfg. Co., 681 A.2d 1026, 1031 (Del. 1996).*
n43 *Sec. First Corp. v. U.S. Die Casting & Dev. Co., 687 A.2d 563, 568 (Del. 1997).*
n44 *Id. at 565.*
n45 *See Weiland v. Cent. S.W. Corp., 1989 Del. Ch. LEXIS 48, 1989 WL 48740, at *2 (Del. Ch. May 9, 1989)* (dismissing § 220 action for failure to provide the necessary factual basis for plaintiff's suspicions of wrongdoing).
n46 *See Everett v. Hollywood Park, Inc., 1996 Del. Ch. LEXIS 2, 1996 WL 32171, at *5-6 (Del.*

*Ch. Jan. 19, 1996)* (rejecting challenges to business judgments without a credible basis from which the Court could infer self-dealing or failure to exercise due care).

[*33]

Deephaven suggests that UGC may have issued false or misleading information in connection with either or both of the February 13 and 20, 2004 press releases. Deephaven also alleges that UGC may have treated certain foreign or other stockholders preferentially during the Rights Offering. The preferential treatment could have included granting extensions of applicable deadlines for exercising rights or waiving technical requirements to which foreign stockholders or rightsholders were subject. I find that the two press releases are sufficiently inconsistent to raise questions regarding what actually happened. As explained below, the press releases together with other evidence adduced by Deephaven constitute credible evidence from which the Court can infer that wrongdoing may have occurred. Therefore, Deephaven is entitled to a limited production of what is essential and sufficient to evaluate the timing of receipt of rights certificates, notices of guaranteed delivery and payment, and thereby determine what occurred.

The February 13 press release stated that the preliminary numbers showed rightsholders had subscribed for only 64 million of a possible 83 million shares. Although the [*34] February 13 press release did not specifically mention notices of guaranteed delivery, it did imply that notices of guaranteed delivery had been included in the figures by estimating that 19.3 million shares would be available to satisfy oversubscription requests. In contrast, the February 20 press release substantially revised the number of basic subscription requests to 82 million and reported a reduction in the number of shares available for oversubscription to 1 million. The only explanation for the reduction provided in the press release was that notices of guaranteed delivery had *not* been included in the preliminary figures. Specifically, the February 20 press release stated:

> As previously reported on February 13, 2004, the subscription agent for the Class A rights offering had informed UGC of the preliminary results whereby Class A rights holders had subscribed for approximately 63.7 million shares of UGC Class A common stock pursuant to the basic subscription privileged and approximately 66.8 million shares of UGC Class A common stock pursuant to the oversub-

scription privilege. These figures ex-
cluded shares unsubscribed pursuant to
guaranteed delivery procedures.    [*35]
n47

n47 JX 4.

The reported omission may have occurred as stated
and been the result of a relatively benign mistake. For
example, there may have been a miscommunication be-
tween Mellon and UGC on or about February 12 that
caused UGC to publish the preliminary numbers as it
did. n48 By February 20, UGC realized the preliminary
figures did not include the notices of guaranteed delivery
and explicitly stated that fact. If this were all that oc-
curred, Deephaven admits that it might not even be inter-
ested in investigating further.

n48 A February 12 email from Mellon to UGC
attaching the preliminary numbers later reported
in the February 13 press release arguably sup-
ports this explanation. JX 44. The body of the
email, but not the attached report, includes a
cryptic reference to having received 25 million
"Protected Rights." It is not entirely clear, how-
ever, what the email reference means, and UGC
did not offer any testimony explaining it.

[*36]

Several facts, however, provide a credible basis to
infer that that is not the whole story and that wrongdoing
may have occurred. First, the magnitude of the change
itself is significant--from approximately 19 million
shares reportedly available for oversubscription rights
according to the February 13 press release to about 1
million shares as of February 20. The initial report that
the rightsholders of more than twenty percent of the
available shares failed to exercise their basic subscription
privileges immediately surprised experienced market
participants such as Halbower and Eismont. Between
February 13 and 19, a skeptical Halbower questioned
both Eismont and Abbott about the figures and whether
they included notices of guaranteed delivery. Eismont
himself asked UGC's counsel the same question. Both
were told the preliminary figures *did include* notices of
guaranteed delivery.

Furthermore, the apparently low subscription rate
caused Eismont and, perhaps, others to wonder whether

foreign holders of rights had difficulty complying with
the requirements for exercising them. Based on Eis-
mont's comments Deephaven alleges that UGC may have
treated certain foreign or other stockholders [*37] pref-
erentially during the Rights Offering. Deephaven focuses
on a conversation Halbower had with Mellon's Eismont
on February 19. Eismont offered a possible explanation
for the low subscription rate, stating: "logic would dic-
tate . . . that a lot of the foreign holders couldn't partici-
pate due to not providing the appropriate paperwork."
n49 Deephaven contends that such foreign holders could
have pressured UGC and Mellon to allow subscriptions
that were submitted after the expiration date or that oth-
erwise failed to meet the applicable requirements.

n49 JX 16. According to Halbower, Eismont said
that foreigners who held rights had to jump
through additional hoops, which were atypical.
Eismont also allegedly said that "there were lots
of discussions going on with internal legal folks
about the fact that those foreign holders weren't
going to be allowed to exercise their rights." Tr.
at 76.

Collectively, the foregoing facts reasonably create
suspicion when one considers that all subscription re-
quests, including [*38] notices of guaranteed delivery,
were due by 5:00 pm on February 12. Therefore, as of
February 13, UGC and Mellon should have had all the
information they needed to give accurate preliminary
results. At a minimum, it is reasonable to expect that
UGC or Mellon would have discovered the mistake in
the week between the February 13 and 20 press releases,
especially in the face of specific questions about whether
or not notices of guaranteed delivery were included. In
the context of a transaction affecting a large number of
shares and, presumably, numerous shareholders, their
failure to do so is sufficiently troubling to justify further
inquiry. Eismont's remarks concerning foreign holders of
rights, although inconclusive standing alone, provide
further support for a limited investigation.

For these reasons I find Deephaven has proven by a
preponderance of the evidence a credible basis from
which the Court can infer that mismanagement or other
wrongdoing may have occurred in connection with the
Rights Offering and that it is possible that Deephaven
and similarly situated stockholders may have been enti-
tled to additional shares in connection with the Rights
Offering. Thus, Deephaven has [*39] presented a proper
purpose for investigating when UGC and Mellon re-
ceived the subscriptions and notices of guaranteed deliv-
ery and any written or electronic communications be-

tween Mellon and UGC on that subject. This should enable Deephaven to determine what happened. Because of its limited showing, however, Deephaven's investigation does not need to encompass all communications between stockholders and rightsholders on the one hand and UGC and Mellon on the other relating to the Rights Offering or the exercise of rights under it.

### D. Scope

A § 220 plaintiff is entitled to those records that are "essential and sufficient" to the shareholder's purpose. n50 A stockholder is not entitled to the wide ranging discovery that would be available in support of litigation, and the records available are those within the "corporation's possession, custody or control." n51

> n50 *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc., 525 A.2d 160, 167 (Del. Ch. 1987)*.
> n51 *Saito v. McKesson HBOC, Inc., 806 A.2d 113, 115 (Del. 2001)*.

[*40]

In its Demand Letter and this action, Deephaven seeks to inspect 11 categories of corporate books and records that relate to the Rights Offering. Many of the requests are overlapping and too broad for the limited investigation warranted. Based on a review of the requests, I find the documents Deephaven is entitled to receive are those called for in categories 4 and 9, subject to the following modifications. n52 First, the language "or referring to" should be deleted from both categories, because it is too broad. In addition, in connection with category 9, UGC need only produce those documents and records actually in its possession. In conformance with this ruling, UGC is required to produce all of the rights certificates, notices of guaranteed delivery and any related documentation delivered to UGC or Mellon by rightsholders in connection with the Rights Offering. To the extent the dates those documents were received by UGC or Mellon are not self-evident, UGC shall also produce sufficient additional records to show the dates and times at which such subscriptions and notices of guaranteed delivery were received. As to the remaining categories of documents requested, Deephaven has failed [*41] to demonstrate a proper purpose for their production. Accordingly, I deny Deephaven's request with respect to all other categories.

> n52 The two categories to be produced (4 and 9), as modified, subsume the portions of requests 1, 2, 5, 7, 8, and 10 supported by a proper purpose.

Because Mellon acted as Deephaven's transfer agent for the Rights Offering, all rights certificates, related documentation and payments of the subscription price were to be delivered directly to Mellon. Presumably many, if not all, of those documents remain in Mellon's possession. UGC resists production of those documents, however, on the ground that they are not within UGC's "control."

*Section 220* contemplates production by a subject corporation of documents within its "possession, custody or control" in generally the same sense that language is used in *Rule 34 of the Federal Rules of Civil Procedure* and Court of Chancery Rule 34. In the Rule 34 context, "control has been defined to include [*42] 'the legal right to obtain the documents requested upon demand.'" n53 Thus, the key inquiry is whether the company has the power, unaided by the court, to force production of the documents. n54

> n53 *7 Moore's Federal Practice § 34.14[2][b]* (3d ed. 2005).
> n54 *See Weinstein v. Orloff, 870 A.2d 499, 510 (Del. 2005)* (holding that even in the context of a subsidiary, the company must have actual power to cause the subsidiary to produce the documents); *see also Dobler v. Montgomery, 2001 Del. Ch. LEXIS 126, 2001 WL 1334182, at *10 (Del. Ch. Oct. 19, 2001)* ("rights of shareholders secured by § 220 cannot be defeated simply by having another entity hold the records").

Mellon acted as UGC's agent for the Rights Offering. In that capacity, Mellon was to receive all of the rights certificates, related documentation and payments for the shares. It is logical to conclude, therefore, that those documents are under UGC's control. The same is true for any additional [*43] documents that might be necessary to show the date of receipt of those documents.

### III. CONCLUSION

Deephaven has established that it has standing to prosecute this action as a beneficial owner of UGC Stock. I find that Deephaven has presented a credible basis for the Court to infer that mismanagement or wrongdoing may have occurred in connection with the implementation of the Rights Offering. Therefore, Deephaven is entitled to the limited production discussed

above of the documents sought by its requests 4 and 9, as modified in this Memorandum Opinion.

**IT IS SO ORDERED.**