9

**KEN FELKER, Derivatively on Behalf of Nominal Defendant, NOVASTAR FINANCIAL, INC., Plaintiff, v. W. LANCE ANDERSON, SCOTT F. HARTMAN; RODNEY E. SCHWATKEN; GREGORY T. BARMORE; ART N. BURTSCHER; and EDWARD W. MEHRER, Defendants, and NOVASTAR FINANCIAL, INC., Nominal Defendant.**

### Case No. 04-0372-CV-W-ODS

### UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION

### 2005 U.S. Dist. LEXIS 4236

### February 11, 2005, Decided

**DISPOSITION:** [*1] Defendants' Motion to Dismiss denied. Defendants' Motion to Stay granted.

**COUNSEL:** For Ken Felker, Derivatively on behalf of nominal defendant, Novastar Financial, Inc., Plaintiff: Rex A Sharp, Gunderson Sharp & Walke, LLP, Prairie Village, KS; William B. Federman, Federman & Sherwood, Oklahoma City, OK.

For W. Lance Anderson, Scott F. Hartman, Rodney E. Schwatken, Gregory T. Barmore, Art N. Burtscher, Edward W Mehrer, Novastar Financial, Inc., Defendants: Erin Bansal, Stephen M. Knaster, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA; Brian D. Martin, Michael Thompson, Blackwell, Sanders, Peper, Martin, LLP-KCMO, Kansas City, MO.

**JUDGES:** ORTRIE D. SMITH, JUDGE, UNITED STATES DISTRICT COURT.

**OPINIONBY:** ORTRIE D. SMITH

**OPINION:**

ORDER (1) GRANTING DEFENDANTS' MOTION TO STAY ACTION, AND (2) DENYING DEFENDANTS' MOTION TO DISMISS

Pending are Defendants' Motion to Stay Action (Doc. # 21) and Defendants' Motion to Dismiss (Doc. # 33). For the following reasons, Defendants' Motion to Stay is granted, but Defendants' Motion to Dismiss is denied.

### I. BACKGROUND

The above-captioned matter is a shareholder derivative action brought by Plaintiff Ken Felker [*2] for the benefit of Nominal Defendant NovaStar Financial, Inc. ("NovaStar") against Defendants W. Lance Anderson, Scott F. Hartman, Rodney E. Schwatken, Gregory T. Barmore, Art N. Burtscher and Edward W. Mehrer (officers or directors of NovaStar Financial, Inc.) for breaches of their fiduciary duties owed to NovaStar between October 29, 2003, and April 8, 2004. Defendants filed a Motion to Dismiss arguing that Plaintiff's derivative complaint should be dismissed (1) for failure to make a pre-suit demand or demonstrate demand futility, (2) because NovaStar's corporate charter and Maryland law preclude liability, and (3) because Plaintiff's allegations concerning duty to monitor cannot form the basis of a breach of care claim.

### II. STANDARD

A motion to dismiss for failure to state a claim should be granted when it appears that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993)* (citing *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*. In ruling on a motion to dismiss, the Court is required to view the facts alleged in the complaint in the light most favorable [*3] to the Plaintiff.

### III. DISCUSSION

A. Demand Requirement

Before being allowed to proceed with a derivative action, "a shareholder must first make a good faith effort to have the corporation act directly and explain to the court why such an effort was not made or did not succeed." *Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123, 133 (Md. 2001)*. n1 Plaintiff did not make a pre-suit demand; instead, he argues that the futility exception applies. The futility exception is "very limited" and shall

only be applied in two instances: "(1) a demand, or dely in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id. at 144.*

n1 It is undisputed that Maryland's law applies because NovaStar is incorporated there.

[*4]

*Rule 23.1 of the Federal Rules of Civil Procedure* requires that a derivative action complaint "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *Fed. R. Civ. P. 23.1.* In his Amended Complaint, Plaintiff claimed that a demand on the NovaStar Board of Directors would have been futile for the following reasons:

> (a) A majority of the Directors of NovaStar, as detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from NovaStar stockholders and investors and are, therefore, not disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;
>
> (b) A majority of the Directors had a responsibility and obligation to assure that all press releases and filings of SEC reports, including all financial reports, were accurate and that all internal controls and other oversight [*5] procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;
>
> (c) In order to bring this suit, a majority of the Directors of NovaStar would be forced to sue themselves and/or persons with whom they have extensive business and/or personal entanglements, which they will not do, thereby excusing demand;

> (d) The acts complained of constitute violations of state law and the fiduciary duties owed to NovaStar's officers and directors and are incapable of ratification;
>
> (e) The actions of the Directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;
>
> (f) Defendants Hartman and Anderson are currently defendants in numerous securities class action lawsuits arising out of the wrongdoing alleged herein and a suit by them to remedy the wrongs alleged herein would likely expose them to liability in the securities class actions; thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves [*6] and the other Defendant Directors;
>
> (g) NovaStar has been and will continue to be exposed to significant losses due to the wrongdoing complained herein; yet, the Director Defendants have not filed any lawsuits against themselves or other who were responsible for that wrongful conduct, nor have they attempted to recover any part of the damages NovaStar suffered and will suffer thereby or any of the illegal profits received by the insider seller Defendants;
>
> (h) If the Defendant Directors were to bring this derivative action against themselves, they would thereby expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities laws. Such admissions would impair the Company's and their defense of the Class Actions and greatly increase the probability of their personal liability in the Class Actions in an amount likely to be in excess of any insurance coverage to the Director Defendants;
>
> (i) The Director Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Director [*7] Defendants initiated action against any of the other Director Defendants named herein. Therefore, the NovaStar board, and any committee thereof, is ef-

fectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

Pl.'s Am. Compl. P59.

The Maryland Court of Appeals has stated that it is not willing to excuse the failure to make a demand "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision." *Werbowsky, 766 at 143.* In addition, generalized or speculative allegations that the directors are conflicted or controlled by conflicted persons would not excuse the failure to make a pre-suit demand. Id. Plaintiff does generally allege that Defendants approved or participated in the alleged wrongs; however, Plaintiff also *particularly* alleges, among other things, that Defendants permitted and/or approved of the dissemination of false or misleading press releases, they violated state law and the fiduciary duties owed to NovaStar, they have not sought to recover any part of the damages [*8] suffered by NovaStar, and they concealed information from the public. Thus, Plaintiff has met the particularity requirement of *Rule 23.1* and has properly pled why a pre-suit demand would have been futile. Defendants' Motion to Dismiss is denied with regard to Plaintiff's failure to make a pre-suit demand or demonstrate demand futility.

B. Corporate Charter

Second, Defendants argue that NovaStar's corporate charter and Maryland law preclude liability and, therefore, Plaintiff's Complaint should be dismissed. Specifically, NovaStar's charter states that "no director or officer of this Corporation shall be personally liable to the corporation or its stockholders for money damages." Maryland law permits a corporate charter to limit the liability of directors for money damages except when directors actually receive an improper benefit or engaged in active or deliberate dishonesty. *Md. Code Ann. Cts. & Jud. Proc. § 5-418.*

Plaintiff alleges that most Defendants sold their stock at artificially inflated prices during the relevant period of time, reaping proceeds of at least $ 75,000 to more than $ 5 million, thereby receiving an improper benefit. ·Pl.'s Am. Compl. PP45-49. Additionally, [*9] Plaintiff claims that Defendants acted dishonestly in concealing facts from the public concerning NovaStar's growth through branch office expansions and the actual existence of branch offices, and by overstating NovaStar's interest income and expense. Pl.'s Am. Compl. PP3, 18, 25-30, 38-40. If these facts were proven, Plaintiff would be entitled to relief. Defendants' Motion to Dis-

miss is denied with regard to their argument that NovaStar's corporate charter and Maryland law preclude liability.

C. Duty to Monitor

Finally, Defendants argue that Plaintiff's allegations that Defendants failed to monitor the activities of NovaStar, thereby breaching their duty of care, should be dismissed. The applicable Maryland statute reads:

> (a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
>
>> (1) In good faith;
>> (2) In a manner he reasonably believes to be in the best interests of the corporation; and
>> (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

> (b) (1) In performing his duties, a director is entitled to rely on any information, [*10] opinion, report, or statement, including any financial statement or other financial data, prepared or presented by:
>
>> (i) An officer or employee of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;
>>
>> (ii) A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence; or
>>
>> (iii) A committee of the board on which the director does not serve, as to a matter within its desig-

nated authority, if the director reasonably believes the committee to merit confidence.

(2) A director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted.

(c) A person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability described under § 5- 417 of the Courts and Judicial Proceedings Article.

*Md. Code Ann. Corps. & Ass'ns § 2-405.1.*

Plaintiff has pled that Defendants actively participated in the wrongdoing and/or permitted such activity through gross negligence or willful [*11] inattention to the duties owed the corporation. Defendants were directly involved with the day-to-day operations of NovaStar and directly participated in its management. Pl.'s Am. Compl. P18. Plaintiff further alleged that Defendants "were involved in the drafting, producing reviewing, disseminating, approving, ratifying and/or recklessly permitting the dissemination of the false and misleading statements and information alleged herein." Pl.'s Am. Compl. P18. Additionally, Plaintiff claims that Defendants concealed information from the public and shareholders concerning NovaStar's growth. Pl.'s Am. Compl. P29. Reviewing these facts in the light most favorable to Plaintiff, the Court finds that if these facts were proven Plaintiff would be entitled to relief. Defendants' Motion to Dismiss is denied with regard to Plaintiff's concerning a duty to monitor.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is denied. Without opposition from Plaintiff, Defendants' Motion to Stay is granted. The above-captioned matter is hereby stayed pending the resolution of the parallel class action (In re NovaStar Financial Securities Litigation, Case No. 04-0330-CV-ODS). [*12]

IT IS SO ORDERED.

DATE: February 11, 2005

ORTRIE D. SMITH, JUDGE

UNITED STATES DISTRICT COURT

10

Westlaw.

Not Reported in A.2d                                                      Page 1
Not Reported in A.2d, 1990 WL 61192 (Del.Ch.),   Fed. Sec. L. Rep. P 95,274,
16 Del. J. Corp. L. 732
(Cite as: Not Reported in A.2d)


H

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
                Court of Chancery of Delaware, New Castle County.
                Harry F. FRAZER and T.C. Griffiths, Plaintiffs,
                                        v.
   WORLDWIDE ENERGY CORPORATION, Triton Energy Corporation, Triton Worldwide, Inc.,
    Robert B. Tenison, Arthur R. Smith, Gerald T. Raydon, Ronald J. Cargo, W. Paul
              Blair, James B. Owen and Paul M. Whitman, Defendants.
                             CIV. A. No. 8822.

                               May 3, 1990.


**734 Wayne N. Elliott, Michael Hanrahan and Chandlee Johnson Kuhn of Prickett,
Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiffs.
A. Gilchrist Sparks, III, and Robert J. Valihura, Jr. of Morris, Nichols, Arsht &
Tunnell, Wilmington, **735 and Marc C. Hill and Len A. Wade of Haynes and Boone,
Fort Worth, Tex., for defendants Worldwide Energy Corporation, Triton Energy
Corporation, and Triton Worldwide, Inc.
Robert K. Payson and Richard L. Horwitz of Potter Anderson & Corroon, Wilmington,
and Harold S. Bloomenthal of Holme, Roberts & Owen, Denver, Colo., for Individual
Director Defendants.
JACOBS, Vice Chancellor.

                             *MEMORANDUM OPINION*

*1 Pending are two motions: (1) the plaintiffs' motion for class certification and
(2) the plaintiffs' motion for partial summary judgment.   For the reasons now
discussed, the class certification motion will be granted, and the motion for
partial summary judgment will be denied.


                        I. THE CLASS CERTIFICATION MOTION

The plaintiffs bring this action on behalf of a purported class of all common and
preferred stockholders of Worldwide Energy Corporation ("Worldwide"), challenging
the validity of a merger of Worldwide into a subsidiary of Triton Energy
Corporation ("Triton") on November 18, 1986.   The plaintiffs ask this Court to
certify a class consisting of all holders of Worldwide preferred and common stock
as of November 18, 1986.

The plaintiffs are former owners of Worldwide preferred stock.   They have never
owned Worldwide common stock, nor has any former owner of common stock ever come
forward and sought to represent the interests of former common stockholders.
These circumstances form the basis of the defendants' attack upon the certification
of the proposed class.   Essentially, the defendants argue that class certification
is unwarranted, because (a) the plaintiffs' claims are not typical of those of the
proposed class (at least insofar as the class includes common stockholders) and
(ii) the plaintiffs will not fairly and adequately represent the common
stockholders' interests.   Finally, and in the alternative, the defendants argue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS    Document 48-4    Filed 03/06/2006    Page 8 of 25
Not Reported in A.2d, 1990 WL 61192 (Del.Ch.),    Fed. Sec. L. Rep. P 95,274,
16 Del. J. Corp. L. 732
(Cite as: Not Reported in A.2d)

that class certification, if found to be appropriate, should be pursuant to the
"damage" class provisions of <u>Court of Chancery Rule 23(b)(3)</u>.

**\*\*736 A.**

For an action to merit certification as a class action, the requirements of <u>Court
of Chancery Rule 23(a)</u>, and of at least one of the subsections of <u>Rule 23(b)</u>, must
be satisfied.    As for <u>Rule 23(a)</u>, there is little serious dispute (and in any
event I am persuaded) that (1) the class is so numerous that joinder of all of its
members is impracticable, and that (2) there are questions of law and fact common
to the class.    The issue under <u>Rule 23(a)</u> is whether the last two requirements are
satisfied;    that is, (3) whether the claims or defenses of the representative
parties are typical of the claims or defenses of the class, and (4) whether the
representative parties will fairly and adequately protect the interests of the
class.

The defendants argue that those latter requirements have not been satisfied,
because there are inherent economic conflicts between the preferred and the common,
which require that the holders of each security be separately represented.
Defendants also contend that the plaintiffs' deposition testimony establishes that
their loyalty is solely to the preferred, and not to the common, stock.

As for adequacy of representation, the plaintiffs recognize that they have a
fiduciary responsibility to the common shareholders, and they have solemnly
affirmed that they intend to fulfill those responsibilities.    Also, the plaintiffs
are represented by experienced, sophisticated counsel who are fully mindful of the
fiduciary obligations of shareholder class plaintiffs.    Counsel's conduct of this
litigation on behalf of the class has been highly diligent and appropriately
zealous.    With respect to the "typicality" issue, the claims being asserted here
are (with certain minor exceptions) as equally applicable to the common as to the
preferred.    If the plaintiffs have failed to meet the "typicality" or "adequacy of
representation" requirements of <u>Rule 23(a)</u>, it can only be because inherent
economic conflicts exist between the two classes of stock that, by their nature,
mandate that the former common and preferred shareholders be separately
represented.

\*2 Counsel have not brought to the Court's attention, nor has the Court discovered,
any rule of law that would categorically, in all circumstances, proscribe preferred
shareholders from representing the interests of common shareholders.    In some
cases distinct classes of securities have been found to have interests so distinct
as to prevent their inclusion within the same <u>Rule 23</u> class.    *See, e.g., <u>Simon v.
Westinghouse Elec. Corp., 73 F.R.D. 480, 484 (E.D.Pa.1977)</u>* (excluding holders of
debentures and preferred stock from class represented by common shareholders in
large, complex securities class \*\*737 litigation).    In other cases the result has
been different.    *See, e.g., Handwerger v. Ginsberg*, CCH Fed.Sec.L.Rep. ¶ 94,934
at 97,239 (S.D.N.Y.1975) (permitting debenture holders to represent the interests
of common shareholders in antifraud securities class action).    The determination
is fact specific and necessarily will depend upon the circumstances of each case.

In this case the defendants argue that both the claims and the economic interests
of the two classes of securities are in fatal conflict.    However, as noted
earlier, the claims being advanced here are equally applicable to the common and
the preferred.    Even if (as defendants argue) rescission of the merger would be

©    2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

more detrimental to the common than to the preferred, the plaintiffs concede in
their briefs and at oral argument that rescission is now impracticable.

Moreover, any economic antagonisms between the two classes of securities would
necessarily be based upon the fact that (1) the preferred is entitled to a dividend
and liquidation preference, and (ii) the preferred shares were treated differently
(*i.e.*, were allocated different per share consideration than the common) in the
merger.    Those differences between these two classes of securities do exist, and I
am mindful of them.    However, at this stage I am not persuaded that those features
will generate antagonisms of the kind that inevitably would render the claims of
the class representatives atypical of the claims of the common, or that would
render the plaintiffs incapable of fairly and adequately protecting the interests
of the class, including the common stockholders.    At best, what has been shown is
that at some later stage a conflict theoretically could arise.    That theoretical
possibility alone is not sufficient to defeat the plaintiffs' ability to satisfy
the requirements of Rule 23(a).    If at a later stage a conflict should develop
that requires revisiting the certification issue, Rule 23(c)(4) permits the Court
to amend its definition of the class and/or designate appropriate subclasses.
*Handwerger v. Ginsberg, supra*, at p. 97,241.

Accordingly, I conclude that the proposed class meets the requirements of Rule
23(a).

B.

The second question is under what provision of Rule 23(b) is the class to be
certified?    The plaintiffs contend that the class should be certified pursuant to
Rule 23(b)(2), which governs actions seeking primarily injunctive or other
equitable relief.    *Nottingham Partners v. Dana,* Del.Supr., 564 A.2d 1089, 1096-97
(1989).    Subdivision (b)(2) applies when:

*3 **738 "[t]he party opposing the class has acted or refused to act on grounds
generally applicable to the class, thereby making appropriate final injunctive
relief or corresponding declaratory relief with respect to the class as a
whole...."

The defendants argue that class certification should be pursuant to Rule 23(b)(3),
which governs actions seeking primarily damage relief.    *Nottingham Partners,* 564
A.2d at 1096.    Subdivision (b)(3) applies when:

[t]he court finds that the questions of law or fact common to the members of the
class predominate over any questions affecting only individual members, and that a
class action is superior to other available methods for the fair and efficient
adjudication of the controversy.    The matter pertinent to the findings include:
(A) The interest of members of the class in individually controlling the
prosecution or defense of separate actions;   (B) The extent and nature of any
litigation concerning the controversy already commenced by or against members of
the class;   (C) The desirability or undesirability of concentrating the litigation
of the claims in the particular forum;   (D) The difficulties likely to be
encountered in the management of a class action.

Whether the class will be certified under subdivision b(2) or under b(3) depends
upon whether this action is *primarily* one for equitable or for damage relief.

That is the pivotal question.   At the time this action was commenced, the relief
being sought was primarily equitable, namely, rescission.   At this stage, however,
rescission is concededly impractical and the plaintiff's primary objective appears
to be an award of damages, including rescissory damages. [FN1]  In my view, the class
certification question must be determined based upon the posture of the case as it
realistically exists at the time of the certification.   That approach is inherent
in the Rule itself, which provides that any class certification order "may be
conditional, and may be altered or amended before the decision on the merits."
Rule 23(c)(1).

**739 Because this action is now primarily one for damage relief, the class will be
certified pursuant to Rule 23(b)(3).   Because the members of a Rule 23(b)(3) class
have a right to "opt out" of the class, the notice to the class shall clearly
inform the class members of their opt out rights.   The notice shall also disclose
that the class representatives are former holders of Worldwide preferred stock, but
have never been holders of Worldwide common stock.

## II. THE MOTION FOR PARTIAL SUMMARY JUDGMENT

The plaintiffs have also moved for partial summary judgment as to Counts I (except
paragraph 66) and II of the Second Amended Complaint.   The balance of the claims
in that Complaint are thus being left for trial.   In Count I, plaintiffs contend
that the merger is void for lack of informed shareholder approval.   They urge that
the material facts necessary for Worldwide stockholders to make an informed
decision were either misstated or omitted from the Joint Proxy Statement ("Proxy
Statement"), which Worldwide and Triton mailed to Worldwide stockholders on October
16, 1986.   In that Proxy Statement, Triton and Triton's directors described the
terms of the merger and recommended its approval by shareholders.   In Count II,
plaintiffs contend that the merger was invalid, because the defendants failed to
comply with the requirements of both 8 Del.C. § 251 and the Worldwide-Triton
Reorganization Agreement.   Those claims are now addressed.

### A. Count I:   The Disclosure Claims

*4 In Count I the plaintiffs allege no less than twelve disclosure violations.
Specifically, the plaintiffs contend that the Proxy Statement was materially false
and misleading, because:  (1) it failed to disclose the financial information
contained in Triton's Form 10Q for the quarter ended August 31, 1986, which form
had been filed with the Security and Exchange Commission one day before the Proxy
Statement was mailed;  (2) the Proxy Statement disclosed that the Triton common
stock to be received in the merger had a specified value as of the date the merger
was announced, but did not disclose that value had not been adjusted for the
dilutive effect of a 3% Triton stock dividend announced after the merger;  (3)
although the Proxy Statement disclosed equivalent Worldwide and Triton share values
as of June 11, 1986 (the day before the public announcement of the merger), it did
not disclose equivalent per share values for the post-June 11, 1986 period;  (4)
the Proxy Statement failed to **740 disclose that Triton's oil and gas writedowns
(totaling about $50 million) were not announced until after June 11, 1986, while
Worldwide's reserve writedowns (totalling $18 million) had been announced before
that date;  (5) the Proxy Statement failed to disclose that the decline in the
price of the Worldwide preferred stock resulted from the omission of the preferred
dividend, and that the June 11 price ($6.75) represented a 30-day historical low
for the preferred stock;  (6) the Proxy Statement failed to disclose E.F. Hutton's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alternative valuations of Worldwide, including relative appraised values presented
to Worldwide's Board, E.F. Hutton's earlier presentations regarding higher
valuations, and liquidation values;    (7) the Proxy Statement falsely stated that
Worldwide had not declared a $.45 per share preferred stock dividend, whereas in
fact that dividend had been declared;    (8) the Proxy Statement failed to disclose
the record and payment dates for the 2 1/2 ¢  Triton common stock dividends
declared on September 9, 1986, and that Triton had declared another such dividend
on November 6, 1986;    (9) the Proxy Statement failed to disclose that Triton was
planning a public offering of its own common stock after the merger;    (10) the
Proxy Statement incorrectly disclosed that preferred stockholders would be entitled
to an appraisal, pursuant to 8 _Del.C._ § _262_;    (11) the Proxy Statement understated
the aggregate vote of common and preferred shares required to approve the merger;
and (12) the Proxy Statement disclosure of Triton's intent to amend Worldwide's
Certificate of Incorporation "to limit the liability of Worldwide's officers and
directors to the maximum extent permitted by the Delaware General Corporation Law"
was misleading, because situations existed under Delaware law in which Worldwide's
officers and directors would not be protected against liability.

Summary judgment will be granted only where the moving party demonstrates that
there is no issue of material fact and that the moving party is entitled to
judgment as a matter of law. _Empire of America Relocation Service, Inc. v._
_Commercial Credit Co._, Del.Supr. 551 A.2d 433, 435 (1988); _Bershad v. Curtiss-_
_Wright Corp._, Del.Supr., 535 A.2d 840, 844 (1987).    The party moving for summary
judgment has the burden to prove clearly the absence of any genuine issue of fact
that would affect the result, and any doubt should be resolved against the moving
party. _Brown v. Ocean Drilling & Exploration Co._, Del.Supr., 403 A.2d 1114, 1115
_(1979)_; _Tomczak v. Morton Thiokol, Inc._, Del.Ch., C.A.No. 7861, Hartnett,
V.C.Mem.Op. at 18 (Apr. 5, 1990).

*5 Even where there is no dispute of material fact, the Court may, in its
discretion, deny summary judgment in cases where a **741 fuller development of the
facts may serve to clarify the law or help the Court determine the application of
the law to the case.    _McCabe v. Wilson_, Del.Super., C.A. No. 38, 1977, Chandler,
J. (June 26, 1986); _see also Robert Johnson Grain Co. v. Chemical Interchange Co._,
541 F.2d 207 (8th Cir.1976); 10A Wright and Miller, _Federal Practice and_
_Procedure_, § 2725 (1983).    As Vice Chancellor (then Superior Court Judge)
Chandler has so aptly stated:

Before a court can apply the law, it must have an adequate factual basis for doing
so.    And in some situations a fuller development of the facts may serve to clarify
the law or help the Court determine its application to the case....    In other
words, summary judgment, with ever-lurking issues of fact, is a treacherous
shortcut.    Such relief is always discretionary and in cases posing a complex
mosaic of factual issues and questions of law, sound judicial administration may
dictate withholding judgment until the whole factual structure stands upon a solid
foundation following a plenary trial where proof can be fully developed, questions
answered and issues clearly focused....

_McCabe_, Mem.Op. at 5, (citations omitted).

In this case, several factors militate against deciding these multitudinous (and,
in many instances, highly intricate) disclosure issues at this stage.    To begin
with, certain of the claims (e.g., claims (6) and (7), described _supra_ ) involve
disputed questions of material fact that, by definition, can be resolved only after
a trial.    But more fundamentally, even as to those claims that do not involve

Not Reported 1:05-cv-00327-GMS    Document 48-4    Filed 03/06/2006    Page 12 of 25
Not Reported in A.2d, 1990 WL 61192 (Del.Ch.),    Fed. Sec. L. Rep. P 95,274,
16 Del. J. Corp. L. 732
(Cite as: Not Reported in A.2d)

disputed issues, summary judgment would be singularly inappropriate, because in these peculiar circumstances, a fuller development of the facts is required to clarify the application of the law to the case, and a legal determination of these disclosure issues at this stage would not further the interests of sound judicial administration.

*First*, a legal resolution of these complex issues will not avoid a trial.    Only two of the several Counts of the complaint are the subject of the pending summary judgment motion;  the remainder must be tried in all events.    Moreover, the claims to be tried will include both the disclosure claims that involve issues of material fact, and possibly also those claims that the plaintiffs chose not to include within the scope of their pending motion.    [FN2]

**\*\*742** *Second,* many of the disclosure claims present not only difficult, and in some cases novel, legal issues, but also they do so largely in a factual vacuum.    Those claims have an abstract, other-worldly aspect that leads one to question by what process the decision to disclose (or not to disclose) the challenged matters was arrived at, and what competing factors were considered in arriving at that decision.    Stated differently, the claims, as presented, cry out for further development of background and context, so that the nature and subtlety of those claims can be more clearly grasped.    In addition, the sheer number of the disclosure claims also raises concerns.    If, as the plaintiffs charge, the Proxy Statement violates the defendants' fiduciary duties in twelve discrete respects, a most likely explanation would be that those persons responsible for the Proxy Statement were guilty of either systematic fraud or profound negligence.    That possibility would also give rise to a need for additional development, to ascertain whether such conduct occurred and, if so, how.    The point is that if this one disclosure document (the Proxy Statement) was so pervasively false and misleading, that circumstance suggests the need for additional context and factual background than has been developed thus far.

**\*6** The Court, therefore, declines to decide the disclosure claims on the present summary judgment record.    A trial will likely yield a far more reliable merits decision on these questions, and certainly one that the Court can make with a higher degree of confidence.    By the same token, a a trial of these disclosure issues need not be unduly protracted.    The pre-trial stipulation procedure (see Court of Chancery Rule 16) will narrow and clarify the factual issues, and the benefits of the summary judgment legal briefing could be preserved and utilized in the parties' post trial briefs.

### B. Count II:  The Claim of Non-Compliance with 8 Del.C. § 251

The plaintiffs also seek summary judgment with respect to Count II of their complaint.    That Count alleges, in essence, that **\*\*743** the defendants failed to comply with the requirements of 8 *Del.C.* § 251(b) and (c).    Those statutory provisions pertinently require that there be an "agreement of merger" that was (i) adopted by resolution of the boards of directors of each corporation, (ii) executed and acknowledged in accordance with 8 *Del.C.* § 103, (iii) submitted to the stockholders of each constituent corporation at an annual or special meeting for the purpose of acting on the agreement.    Moreover, (iv) following adoption of the agreement of merger by shareholders, the fact of shareholder approval must be certified on the agreement by the secretary or assistant secretary of each corporation, after which (v) the agreement of merger must be filed with the Secretary of State.    The plaintiffs contend that the defendants failed to comply

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 48-4   Filed 03/06/2006   Page 13 of 25

Fed. Sec. L. Rep. P 95,274,

with most of these requirements.

The argument runs as follows: the "agreement of merger" for § 251 purposes was not the Reorganization Agreement (as defendants assert) but, rather, a document entitled "Merger Agreement" that was attached as Exhibit "A" to the Reorganization Agreement. That "Merger Agreement" was not executed or acknowledged prior to the Worldwide shareholder vote, because it was not physically attached to the Reorganization Agreement at the time that latter agreement was approved by Worldwide's directors. Nor was the "Merger Agreement" "submitted" to Worldwide's stockholders for their approval within the meaning of § 251(c), because it was neither included in the Proxy Statement nor made available to shareholders at the stockholders' meeting. The Merger Agreement also was not "certified" in the manner required by § 251(c), because it contained no certification by Worldwide's Secretary or Assistant Secretary that it had been approved by Worldwide's shareholders. Finally, plaintiffs argue that the Reorganization Agreement is not a valid "agreement of merger" under § 251, because the appropriate Worldwide and Triton officers never duly attested to it until months after the Worldwide stockholders' meeting.

The defendants counter that the foregoing arguments are based on an incorrect premise, are otherwise legally misconceived, and violate all accepted notions of equity and common sense. The incorrect premise, defendants argue, is the plaintiffs' contention that the Merger Agreement was the § 251 "agreement of merger." In fact, defendants insist, the § 251 "agreement of merger" was the Reorganization Agreement, together with all its exhibits and amendments. The defendants also argue that the Reorganization Agreement fully complied with the "execution" and "acknowledgment" requirements of § 251(b), and also was "submitted" to shareholders **744 as required by § 251(c), because (i) the terms of the Reorganization Agreement were summarized in the Proxy Statement, (ii) a copy of that agreement was made available at the shareholders' meeting, and (iii) the Proxy Statement advised shareholders that a copy of the Reorganization Agreement would be furnished to them upon request. Finally, defendants do concede that the Reorganization Agreement did not contain the attestation of the secretaries of the constituent corporations until those attestations (in the form of affidavits) were made in February 4, 1987. However, defendants argue, that circumstance affords no basis to invalidate the merger, because the absence of the attestations was, at worst, a technical defect that harmed no one and that was fully cured by the later execution of the secretaries' certificates.

*7 Having considered these conflicting contentions, I conclude that they are not amenable to resolution by summary judgment. Critical to any such resolution is the factual question of whether Worldwide and Triton intended the Merger Agreement or the Reorganization Agreement to be the § 251 "agreement of merger". That factual issue is heavily disputed. While both sides proclaim that the "undisputed facts" support their diametrically opposed points of view, the evidence arrayed by the plaintiffs is clearly sufficient to raise a triable question of fact. Depending upon how that threshold factual issue is resolved, two different sets of legal questions would be defined and presented. Because the very legal issues to be decided depend upon how that factual question is resolved, summary judgment at this stage is not appropriate.

To summarize the rulings made herein: (1) the plaintiffs' motion for class certification is granted, and a class will be certified pursuant to Rule 23(b)(3);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1990 WL 61192 (Del.Ch.),    Fed. Sec. L. Rep. P 95,274,
16 Del. J. Corp. L. 732
(Cite as: Not Reported in A.2d)

and (2) the plaintiffs' motion for partial summary judgment is denied.    Counsel
shall submit a form of order implementing these rulings.

> FN1. Plaintiffs have identified other forms of equitable relief (such as an
> injunction directing Triton to issue to the class additional shares of its
> stock) that might flow from an adjudication that the merger is invalid.
> While the Court is mindful that such remedies are theoretically possible,
> that fact does not discharge the plaintiffs' burden, which is to show that
> this action is *primarily* one for equitable relief.

> FN2. Plaintiffs' Amended Complaint also contains disclosure claims relating
> to (i) voting by proxy and by ballot (¶  49-50), (ii) what restriction the
> Triton-Worldwide Agreement in Principle placed on Worldwide seeking other
> merger or asset purchase bidders (¶  40), and (iii) the summary of the
> Reorganization Agreement and the Merger Agreement.    Defendants argue that
> because summary judgment was sought as to the entirety of Count I (other than
> ¶  66) and because plaintiffs did not press these three claims, they have
> been abandoned.    That may be so, but if that contention is found not to be
> not valid, then these claims will also have to be tried.

Del.Ch.,1990.
Frazer v. Worldwide Energy Corp.
Not Reported in A.2d, 1990 WL 61192 (Del.Ch.),    Fed. Sec. L. Rep. P 95,274, 16
Del. J. Corp. L. 732

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11

EDWARD E. GATZ and DONALD D. GRAHAM, individually and on behalf of
those similarly situated, and derivatively on behalf of Regency Affiliates, Inc., Plain-
tiffs, v. WILLIAM R. PONSOLDT, SR., STATESMAN GROUP, INC., WILLIAM
R. PONSOLDT, JR., MARC H. BALDINGER, STEPHANIE CAREY, MARTIN J.
CRAFFEY, ROYALTY HOLDINGS, L.L.C., ROYALTY MANAGEMENT, INC.,
LAURENCE LEVY, NEIL N. HASSON, STANLEY FLEISHMAN, ERROL
GLASSER and REGENCY AFFILIATES, INC., Defendants.

Civil Action No. 174-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2004 Del. Ch. LEXIS 203*

August 12, 2004, Submitted
November 5, 2004, Decided
November 8, 2004, Filed

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

**PRIOR HISTORY:** *Gatz v. Ponsoldt, 297 F. Supp. 2d
719, 2003 U.S. Dist. LEXIS 23581 (D. Del., 2003)*

**COUNSEL:** Attorneys for Plaintiffs: Alan J. Stone, R.
Judson Scaggs, Jr., James G. McMillan, III, and Jerry C.
Harris, Jr., of MORRIS, NICHOLS, ARSHT &
TUNNELL, Wilmington, Delaware; OF COUNSEL:
Thomas H. Dahlk, Michael S. Degan, and Trenten P.
Bausch, of BLACKWELL SANDERS PEPER
MARTIN, Omaha, Nebraska.

Attorneys for the Former Regency Directors: John L.
Reed, Daniel V. Folt, Gary W. Lipkin, and Matt Neider-
man, of DUANE MORRIS LLP, Wilmington, Delaware.

Attorneys for Defendant Statesman Group, Inc.: Kevin
R. Shannon, Brian C. Ralston, and Catherine A. Strick-
ler, of POTTER ANDERSON & CORROON LLP,
Wilmington, Delaware.

For Attorneys for Defendants Royalty Holdings, L.L.C.,
Royalty Management, Inc., Laurence Levy, Neil N. Has-
son, Stanley Fleishman and Errol Glasser: Gregory P.
Williams, Peter B. Ladig, and Steven L. Brinker, of
RICHARDS, LAYTON & FINGER, P.A., Wilmington,
Delaware.

**OPINION:**

**MEMORANDUM OPINION**

CHANDLER, Chancellor

Plaintiffs, Edward Gatz and Donald Graham, bring
this action alleging that defendants, a sundry cast of
characters associated with [*2] Regency Affiliates, Inc.
("Regency" or the "Company"), committed various
transgressions in their long-running campaign to "loot"
the Company for their personal benefit. The complaint
challenges several discrete transactions over the course
of two years. For the reasons below, I dismiss plaintiffs
claims with respect to all but one of these transactions.

**I. BACKGROUND** n1

> n1 The background section is drawn from al-
> legations in the complaint. If the reader finds the
> background section somewhat disjointed, he or
> she can take solace in the fact that the complaint
> is much worse.

Nominal defendant Regency, a publicly traded
Delaware corporation, was, in 1992, a company emerg-
ing from bankruptcy with little assets other than consid-
erable net operating loss carry forwards ("NOLs"). Be-
ginning in 1992, Regency began a restructuring which
culminated in a transaction in the summer of 1993 with
defendant Statesman Group, Inc. ("Statesman"), a Baha-
mian corporation. Statesman was led by defendant Wil-
liam Ponsoldt. In that [*3] transaction, Regency ac-
quired Statesman's interest in 75 million tons of rock
("the Aggregate") in exchange for 28.73% of Regency's

common stock, irrevocable proxies over approximately an additional 5% of the common stock, and 100% of Regency's Series C Preferred Stock. n2 The Series C Preferred Stock carried redemption and liquidations rights tied to the value of the Aggregate. The Aggregate, as of the summer of 1993, was valued at $ 15 million for financial statement purposes, but, according to the complaint, Ponsoldt knew that the Aggregate was not very marketable. n3

n2 The transaction was more involved than described, but the description will suffice for purposes of this Opinion.

n3 In conjunction with the transaction, Statesman was able to designate persons to fill vacancies on Regency's board. Among those designees were defendants William Ponsoldt, Jr. ("Ponsoldt, Jr."), Stephanie Carey, and Martin Craffey. Ponsoldt, Jr. is the adult son of Ponsoldt and a beneficiary of the Statesman Irrevocable Trust. The Statesman Irrevocable Trust, settled by Ponsoldt, allegedly controls Statesman. Ponsoldt, Jr., Carey, and Craffey all received shares of Regency stock from Statesman or options to purchase Regency's Series C Preferred Shares from Statesman. Later, in August 1999, Marc Baldinger became a member of the Regency board and served as CFO.

[*4]

In late 1994, a little more than a year after the Statesman/Regency transaction, Regency acquired a partnership interest in Security Land & Development Company L.P. ("Security Land"). Security Land owns a large office building in Maryland leased by the United States Social Security Administration ("SSA"). In exchange for, among other things, 95% of Security Land's profits through 2003 and 50% thereafter, Regency provided Security Land with $ 300,000 in capital and over $ 60 million in NOLs. Regency's NOLs effectively sheltered the over $ 12 million annual rent of the SSA from income tax.

In August of 1996, two years after the Security Land transaction, Ponsoldt was elected chairman of the Regency board. Ponsoldt fired the existing CEO and president and a search for a new chief executive began. On June 3, 1997, the Regency board, without looking far, hired Ponsoldt as CEO and president. Ponsoldt's base compensation was $ 250,000 per year with annual cost of living increases. Furthermore, Ponsoldt received additional salary based on the overall net worth of Regency. According to the complaint, the Security Land transaction was structured in such a way as to continually in-

crease Regency's [*5] asset value, i.e., Ponsoldt's salary increased as time progressed. On the same day that Ponsoldt was hired as CEO and president (June 3, 1997), the Regency board issued an option to Statesman allowing Statesman to acquire 6.1 million shares of the common stock of Regency. Ponsoldt represented at the time that the option would only be used to prevent a hostile takeover of Regency.

Four years later, in the summer of 2001, Ponsoldt began negotiations with Laurence Levy, sole director, sole stockholder, and president of Royalty Management, Inc., a Delaware corporation. Royalty Management is the managing member of Royalty Holdings, L.L.C. ("Royalty"), a Delaware limited liability company. The negotiations between Ponsoldt and Levy related to a transaction involving Statesman, Regency, and Royalty that was eventually consummated on October 17, 2002. Levy, Royalty, and Royalty Management are defendants in this litigation.

On October 15, 2001, Statesman exercised its option to acquire 6.1 million shares of Regency stock. Statesman paid the exercise price by delivering a promissory note to Regency with a principal amount of approximately $ 2.44 million. Statesman's exercise of its option [*6] reduced the percentage ownership of the class plaintiffs purport to represent (all shareholders except defendants and their affiliates) n4 from 89.1% to 61.1%. On the next day, Ponsoldt allegedly directed Regency to divest the Company's controlling interest in a subsidiary, Glas-Aire Industries Group Limited, in exchange for 4,040,375 shares of Regency common stock owned by Glas-Aire and $ 2.5 million in cash. The complaint alleges that $ 1.3 million of the cash obtained in the transaction was used to pay Ponsoldt compensation that was accrued and unpaid.

n4 Hereinafter the "Public Shareholders."

Two months later, during December 2001, one Regency subsidiary sold the Aggregate to another Regency subsidiary for $ 18.2 million, payable with interest at 2.46% in 96 equal payments commencing December 2003. The complaint alleges that this sale was intended to artificially increase the value of Statesman's Series C Preferred Stock-the value of such stock being tied to the value of the Aggregate. A month later, on January 16, 2002, Ponsoldt [*7] allegedly orchestrated the adoption of a 1-for-10 reverse split and the reduction of the par value of the common stock of Regency from $ .40 to $ .01. Plaintiffs allege this caused immediate and substantial dilution of the Public Shareholders and facilitated further dilution of the liquidation value and voting power of the Public Shareholders.

In April of 2002, the sale of the Aggregate was publicly disclosed by Regency. Shortly thereafter, plaintiffs brought suit in a Nebraska federal court against Ponsoldt, Regency's other directors, and Statesman. The federal action sought relief under the RICO statute and asserted various claims based on state law, including breach of fiduciary duty.

In June of 2002, Regency attempted to restructure its partnership interest in Security Land. Specifically, the restructuring would have included: (1) a $ 2 million loan from the other partners of Security Land to Regency; n5 (2) an amendment to the partnership agreement providing that Regency would receive proportionately less of the proceeds of a sale or refinancing of the office building owned by Security Land; and (3) an option in favor of the non-Regency partners to purchase Regency's partnership [*8] interest for a price between $ 36 million and $ 38.5 million. Shortly after the attempted restructuring, plaintiffs sought and obtained an order from a federal magistrate judge that prevented Regency from entering into a transaction that would "monetize," *i.e.*, cashout, Regency's interest in Security Land. Upon defendants representation that a monetization of Regency's interest in Security Land was necessary to the Company's continued financial health, that order was modified on September 11, 2002 to allow such a transaction to move forward on certain conditions.

n5 Allegedly, the loan would have been used to pay Ponsoldt's accrued compensation.

After the federal order preventing a monetization was modified, plaintiffs made a commitment to provide Regency with $ 17 million or more in credit on favorable terms. The complaint alleges that this offer was an effort to avoid forfeiting Regency's rights to share in the proceeds of a sale or refinancing of the office building owned by Security Land and to prevent [*9] further dilution of the Public Shareholders. On September 30, 2002, almost immediately after plaintiffs financing offer, and following months of private negotiations, Levy forwarded a recapitalization proposal to Regency. n6 On that same day, the Regency board appointed a three-member special committee, consisting of defendants Baldinger, Carey and Craffey, to analyze Levy's proposal.

n6 The complaint details numerous e-mails between Levy and Ponsoldt. *See* Compl. PP 44-46, 49, & 52.

The special committee process was, according to plaintiffs allegations, a "sham." The complaint charges four specific factors, which impugn the independence of the special committee. (1) The special committee members had ties to Ponsoldt that rendered them unable to appropriately consider the recapitalization proposal, (2) the special committee did not conduct reasonable due diligence into the proposed recapitalization, (3) defendants Baldinger and Ponsoldt did not provide the special committee with all of the material information [*10] necessary to analyze the transaction, n7 and (4) the special committee was biased against plaintiffs alternative proposal. Notwithstanding these problems (or perhaps because of them), the Regency board went forward with the recapitalization. n8

n7 In particular, Ponsoldt and Baldinger allegedly knew that a monetization of Regency's interest in Security Land was imminent and that this impending monetization rendered the recapitalization unnecessary. Nonetheless, Ponsoldt and Baldinger allegedly did not share this information with Carey and Craffey.

n8 Shortly after the recapitalization, defendant and board member Craffey received a $ 100,000 wire transfer from Statesman.

The recapitalization, once completed, included the following elements: (1) redemption of 754,950 shares of Regency common stock owned by Statesman; (2) payment of $ 1,020,000 to Statesman for the redeemed shares; (3) payment of an additional $ 2,730,000 "fee" to Statesman; (4) payment of $ 250,000 to Statesman in exchange for an option granting [*11] Regency the right to purchase Statesman's interest in one of Regency's subsidiaries; (5) transfer of office equipment and furniture to Statesman; and (6) modification of the promissory note Statesman delivered to Regency in October of 2001 when Statesman exercised its option to acquire 6.1 million shares of Regency stock. Royalty provided the money distributed to Statesman to Regency. Specifically, Royalty provided Regency with $ 4,750,000 in exchange for a $ 3,500,000, 5% convertible promissory note and a $ 1,250,000, 9% promissory note. The convertible note gave Royalty the right to acquire 1,750,000 shares of Regency common stock at $ 2.00 per share.

As part of the recapitalization, the members of Regency's board of directors resigned and were replaced by persons of Royalty's choosing. Defendants Levy, Neil Hasson, Stanley Fleishman, and Errol Glasser n9 became Regency directors on October 28, 2002. Levy replaced Ponsoldt as president and CEO. Hasson replaced Baldinger as CFO. n10

n9 Glasser is alleged to have had significant prior business dealings with Levy. What those dealings were is left unspecified.

[*12]

n10 Baldinger still serves as a consultant to the Company.

On November 8, 2002, Regency announced that Royalty partially exercised the convertible note and obtained 750,000 shares of common stock or approximately 38.45% of the outstanding shares. On the same day, plaintiff Graham sent a letter to the new Regency board requesting that Regency "seek a court order preventing the payment of any further compensation to William R. Ponsoldt, Sr.'" n11 On November 12, 2002, the Regency board formed an independent committee consisting of defendants Glasser and Fleishman to evaluate Graham's request. The independent committee interviewed Levy and Baldinger in connection with its investigation. However, to date, the independent committee has not issued a report of any sort.

n11 Compl. P 92.

On July 3, 2003, Royalty converted the balance of the convertible note into Regency common stock and now holds approximately 59.31% of the outstanding [*13] common stock of Regency. The aggregate ownership interest of the Public Shareholders went from a majority interest of 62% to a combined minority interest of only about 40%.

On November 25, 2003, after the lifting of a procedurally defective order (arising out of the plaintiffs federal action) barring the distribution of compensation to Ponsoldt, the Regency board paid Ponsoldt $ 820,105.32 (plus income tax withheld) to satisfy his claims for unpaid, accrued compensation. The federal action was dismissed on December 18, 2003 n12 and plaintiffs initiated this proceeding shortly thereafter.

n12 See Gatz v. Ponsoldt, 297 F. Supp. 2d 719 (D. Del. Nov. 7, 2003). The federal action was transferred from Nebraska to Delaware during those proceedings.

## II. ANALYSIS

Plaintiffs have enumerated three counts in their complaint. In Count I, plaintiffs derivatively challenge what the complaint describes as "excessive compensation paid to Ponsoldt." n13 In Count II, plaintiffs purport to directly challenge [*14] a series of transactions, including: (1) Statesman's exercise of its option to acquire 6.1 million shares of the common stock of Regency; (2) the sale of the Aggregate from one Regency subsidiary to another for $ 18,200,000; (3) the failure to disclose the timing of the monetization of Regency's interest in Security Land to the special committee; and (4) the recapitalization between Regency and Royalty. In Count III, plaintiffs charge Royalty, Royalty Management, and Levy with knowing participation in breaches of fiduciary duty relating to the recapitalization. I will address each count in turn.

n13 Compl. P 97.

### A. Count I

Although labeled as a single count related to Ponsoldt's compensation, this claim actually involves two discrete acts-two years apart and authorized by two different Regency boards. The first payment for accrued compensation was made to Ponsoldt in October 2001 during the tenure of the old Regency board, i.e., the pre-recapitalization board. The second payment for accrued compensation [*15] was made to Ponsoldt in November 2003-after plaintiff Graham sent a letter to the current, post-recapitalization board asking it to seek a court order preventing the payment of any further compensation to Ponsoldt. Plaintiffs Rule 23.1 argument, as it appears to the Court, is that: (a) demand wrongfully was refused regarding the 2003 payment; and (b) demand was futile regarding the 2001 payment.

#### 1. 2003 Payment

On November 8, 2002, Graham sent a letter self-styled as a "demand" to the current Regency board stating that Regency should "'seek a court order preventing the payment of any further compensation to William R. Ponsoldt, Sr.'" n14 The complaint does not reveal any other contents of the demand letter. n15 Four days later, on November 12, Levy wrote to Graham and stated that the current Regency board created an independent committee, consisting of Glasser and Fleishman, to investigate the demand. The independent committee interviewed Levy and Baldinger. The independent committee has not issued, according to the complaint, a report regarding Graham's demand. The current Regency board, however, never sought the court order Graham requested and, on November 25, 2003 (over [*16] a year after the formation of the independent committee), authorized

payment of over $ 800,000 to Ponsoldt to satisfy his claims for accrued compensation.

n14 *Id. P 92.*

n15 It seems clear, however, that Graham's letter only requested action as to future payments, as the letter refers to "further compensation."

Under Rule 23.1, plaintiffs "must demonstrate either that no pre-suit demand was made because it would have been futile, or that a demand was made but wrongfully refused." n16 As noted, plaintiffs argue that the Graham letter was a "demand" and that the demand wrongfully was refused. Plaintiffs are incorrect on both points.

n16 *Yaw v. Talley, 1994 Del. Ch. LEXIS 35, *19 (Del. Ch. Mar. 2, 1994).* Rule 23.1 pertinently provides: "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort." CH. CT. R. 23.1.

[*17]

Former Vice Chancellor, now Justice, Jacobs, in reviewing the relevant precedents on the question of what constitutes a demand, stated:

It is possible to distill three elements essential to a determination that a demand has been made. To constitute a demand, a communication must specifically state: (i) the identity of the alleged wrongdoers, (ii) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation, and (iii) the legal action the shareholder wants the board to take on the corporation's behalf. n17

n17 *Yaw, 1994 Del. Ch. LEXIS 35 at *22-*23.*

Without these three elements, a board cannot "perform its duty to make a good faith investigation of claims of alleged wrongdoing." n18 Here, the Graham letter fails to provide the first two elements.

n18 *Yaw, 1994 Del. Ch. LEXIS 35 at *23.*

The current Regency [*18] board was asked to "'seek a court order preventing the payment of any further compensation to William R. Ponsoldt, Sr.'" n19 This is terminally vague for two reasons. First, the letter does not identify who was in the wrong. Second, the letter does not identify what the unspecified wrongdoers did. Given "the severe procedural consequences to a plaintiff found to have made a pre-suit demand," "ambiguous communications" are "construed against a finding of a demand." n20

n19 Compl. P 92.

n20 *Yaw, 1994 Del. Ch. LEXIS 35 at *24.*

Even if I were to find that the one sentence request by Graham was a demand, plaintiffs have not adequately alleged that the demand wrongfully was refused. Plaintiffs, if they made a valid demand, "concede[] the independence of a majority of the board to respond." n21 "The only issues to be examined are the good faith and reasonableness of the investigation." n22 Plaintiffs complaint fails to plead with particularity that the investigation was done in bad faith or [*19] was unreasonable.

n21 *Spiegel v. Buntrock, 571 A.2d 767, 777 (Del. 1990).*

n22 *Id.*

Plaintiffs point to three items as demonstrating the bad faith and unreasonableness of the independent committee's investigation. First, the complaint alleges that the independent committed "interviewed only Levy and Baldinger." n23 This allegation falls short because "in any investigation, the choice of people to interview or documents to review is one on which reasonable minds may differ." n24 Second, the complaint alleges that the independent committee "never learned of the $ 100,000 payment made by Statesman to Craffey following the Recapitalization . . . ." n25 The complaint fails to allege why this fact was material to an investigation into whether to seek an order preventing payment of accrued compensation due Ponsoldt. How can one fault an investigator for not being aware of irrelevant facts? Third, the complaint alleges that the independent committee "has not issued a report." n26 But there is [*20] no authority that suggests that Delaware law requires a formal "report" as a matter of law–"there is obviously no prescribed

procedure." n27 And the complaint contains no allega-
tions to suggest that the failure to draft a report in this
circumstance rendered the investigation inadequate. n28
In short, plaintiffs have not pled particularized facts that
create a reasonable doubt that the independent committee
conducted its investigation reasonably and in good faith.

n23 Compl. P 94.

n24 *Mt. Moriah Cemetery v. Moritz, 1991
Del. Ch. LEXIS 68, *10-11 (Del. Ch. Apr. 4,
1991).*

n25 Compl. P 94.

n26 *Id. P* 95.

n27 *Levine v. Smith, 591 A.2d 194, 214
(Del. 1991).*

Given that the plaintiffs complaint is framed around
the assumption that the November 8, 2003, letter by Gra-
ham constituted a demand and that Graham's "demand"
was wrongfully refused, it is unsurprising that the com-
plaint will not support a reading that that demand is fu-
tile. The complaint [*21] simply does not "allege with
particularity" n29 that the current Regency board is "in-
capable of making an impartial decision regarding" n30
Ponsoldt's compensation. Although the complaint alleges
that one of the members of the independent committee,
Glasser, has had "significant prior business dealings with
Levy," n31 such a conclusory allegation does not dem-
onstrate that Glasser has an inability to consider impar-
tially issues related to potential transgressions involving
Levy, n32 let alone Ponsoldt.

n28 The independent committee could have
easily concluded that the issue raised by Graham
was so without merit that it did not justify a for-
mal report, especially given the imprecise nature
of Graham's letter. In addition, there is no indica-
tion that the findings of the independent commit-
tee were not communicated to the relevant per-
sons even though not memorialized in a formal
report.

n29 Ch. Ct. R. 23.1.

n30 *Beam v. Stewart, 845 A.2d 1040, 1048
(Del. 2004).*

n31 Compl. P 94.

n32 *See Stein v. Orloff, 1985 Del. Ch.
LEXIS 418, 1985 WL 11561, *4 (Del. Ch. May
30, 1985)* (naked allegation of business ties be-

tween board members does not rebut the pre-
sumption of independence).

[*22]

2. 2001 Payment

Even if one were to consider the Graham letter a
demand regarding "'further compensation,'" n33 it clearly
is not a demand regarding the $ 1.3 million payment
made to Ponsoldt in 2001 during the old Regency board's
reign. Rather, plaintiffs argue that demand was futile *vis-
a-vis* the old Regency board and that the present lawsuit,
initiated on January 20, 2004, should relate back to the
federal litigation initiated in 2001 before the current Re-
gency board undertook its duties. Support for this re-
markable proposition supposedly is found in *Harris v.
Carter.* n34 Nothing in *Harris* supports plaintiffs posi-
tion, however.

n33 Compl. P 92.

n34 *582 A.2d 222 (Del. Ch. 1990).*

*Harris* held that a plaintiff does not need to make
demand before amending a complaint where an inde-
pendent board comes into power after the time of the
"challenged transaction" *if* the derivative claims relating
to the challenged transaction were "validly in litigation"
before the new board [*23] assumed control. n35 Here,
plaintiffs are not seeking to amend their complaint sim-
ply to add or to change claims that were currently pend-
ing in litigation. The federal litigation initiated by plain-
tiffs was dismissed in its entirety, n36 after which there
were no claims "validly in litigation." *Harris* is therefore
inapplicable and the appropriate demand board is the
current Regency board. n37 As noted above, there are no
particularized allegations creating a reasonable doubt as
to the current Regency board's ability to make an impar-
tial decision regarding Ponsoldt's compensation. n38

n35 *Id. at 230.*

n36 *Gatz v. Ponsoldt, 297 F. Supp. 2d 719
(D. Del. 2003).*

n37 *See In re Fuqua Indus. Shareholder
Litig., 1997 Del. Ch. LEXIS 72, *51-52 (Del. Ch.
May 13, 1997)* ("When the majority of the board
is replaced between the challenged transaction
and the filings of the first complaint, the appro-
priate demand board . . . is the board in existence
when the first complaint is filed.").

n38 Reading *Harris* as broadly as plaintiffs suggest would also undermine the policy reasons behind Rule 23.1-protecting the right of a corporation to manage its own business and affairs.

[*24]

### B. Count II

Although grouped into a single count, Count II challenges four discrete transactions. Specifically, Count II challenges: (1) Statesman's exercise of its option to acquire 6.1 million shares of the common stock of Regency; (2) the sale of the Aggregate from one Regency subsidiary to another for $ 18,200,000; (3) the failure of Ponsoldt and Baldinger to disclose the timing of the monetization of Regency's interest in Security Land to the special committee; and (4) the recapitalization. Because Count II does not contain the demand futility allegations necessary for claims brought derivatively, n39 the issue with respect to these transactions is whether plaintiffs may challenge them directly pursuant to *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* n40 and *Agostino v. Hicks.* n41 I will address each transaction in turn.

n39 See CT. CH. R. 23.1.

n40 *845 A.2d 1031 (Del. 2004).*

n41 *845 A.2d 1110 (Del. Ch. 2004).*

#### 1. 2001 Option Exercise

The complaint alleges [*25] "Ponsoldt and Statesman breached their fiduciary duties . . . by fraudulently exercising the option that allowed Statesman to acquire 6.1 million shares of the common stock of Regency." n42 Supposedly, "the exercise of the option was in direct contravention of Ponsoldt's representations that it would only be exercised to avoid a hostile takeover" n43 and, as a result of the option exercise, the ownership interest of the Public Shareholders fell from 89.1% to 61.1%. n44

n42 Compl. P 101.

n43 *Id.*

n44 Plaintiffs do not challenge the granting of the option.

The Supreme Court's *Tooley* decision simplified the analysis required to distinguish between direct and derivative actions, discarding the old "special injury" test. The analysis now focuses on the following questions: "Who suffered the alleged harm-the corporation or the

suing stockholder individually-and who would receive the benefit of the recovery or other remedy?" n45 This inquiry requires the Court to look: "at the body of the complaint [*26] and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" n46

n45 *Tooley, 845 A.2d at 1035.*

n46 *Agostino, 845 A.2d at 1122.* Under *Tooley*, the quoted language from *Agostino* "is helpful in analyzing the first prong of the analysis: what person or entity has suffered the alleged harm." *Tooley, 845 A.2d at 1036. Tooley* also found that "the second prong of the analysis [who would benefit from the recovery] should logically follow." *Id.*

Thus, the relevant inquiry is "the nature of the wrong alleged, not merely . . . the form of words used in the complaint." n47 "As this court recently said, even after *Tooley*, a claim is not direct' simply because it is pleaded that way . . . . Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.'" n48

n47 *In re Syncor Int'l Corp. S Holders Litig., 857 A.2d 994 (Del. Ch. 2004)* (citing *Dieterich v. Harrer, 857 A.2d 1017 (Del. 2004)*).

[*27]

n48 Id.

Mere claims of dilution, without more, cannot convert a claim, traditionally understood as derivative, into a direct one. n49 Clearly, a corporation is free to enter into (in good faith) numerous transactions, all of which may result legitimately in the dilution of the public float. Such dilution is a natural and necessary consequence of investing in a corporation. Once the options at issue in this case were granted, any restrictions on their exercise were created either by the terms of the option contract, or by the fiduciary duties the holder of the option may have to the corporation. n50 The only cognizable injuries, if any, would be a failure to act in the best interest of Regency or the breach of the promise to Regency not to exercise the options. In either event, these alleged harms were inflicted upon the corporation itself and could be asserted only by or on behalf of the corporation. Naturally, any damages, rescissory or otherwise, would flow to the cor-

poration as the aggrieved party, not the Public Share-holders. Applying the teaching of *Tooley,* I conclude that this portion [*28] of Count II states a derivative claim that must be dismissed for failure to comply with Rule 23.1.

> n49 *See  Tooley 845 A.2d at 1036-37* (citing with approval  *Elster v. American Airlines, Inc., 34 Del. Ch. 94, 100 A.2d 219, 222 (Del. Ch. 1953)).*

> n50 Because I ultimately concluded that this portion of Count II states a derivative claim and that plaintiffs fail to comply with Rule 23.1, I do not conclude here that Statesman in fact owed fi-duciary duties to Regency.

### 2. The Aggregate Sale

The complaint alleges that the old Regency board and Statesman "breached their fiduciary duties . . . by effectuating a plan to sell the Aggregate to increase the Redemption Price and Liquidation Preference of the Se-ries C Preferred Stock . . . to $ 18,200,000, thereby enti-tling the Series C Preferred Stock to preferential liquida-tion status over the shares owned by the Class." n51 De-fendants argue that any harm to plaintiffs would be a result of an improper book transaction between two Re-gency subsidiaries [*29] and that the remedy, *i.e.,* non-recognition of the book transaction, would flow through Regency. Defendants arguments are unpersuasive.

> n51 Compl. P 103.

Generally, the value of the Public Shareholders stock is determined by the projected net present value of the cash streams Regency produces. The Series C Pre-ferred Stock therefore directly connects the value of the public shares to the value of the liquidation rights pre-scribed, which in this case is useful to think of as a liabil-ity of Regency. When the Aggregate transaction was consummated, the overall value of Regency remained unaffected; it was, as the defendants contend, merely a book transaction. n52 Thus, in light of *Tooley,* the corpo-ration has suffered no harm. That is not to say, however, that no harm occurred. Because of Regency's Series C Preferred, the Public Shareholders are subrogated and the holders of the Series take first-the residual then accruing to the Public Shareholders. Whatever the Public Share-holders were entitled to take after [*30]  the Series C holders, that amount was reduced by the increase to the Series C Preference, an amount affected by the Aggre-gate sale.

> n52  *Acker v. Transurgical, Inc., 2004 Del. Ch. LEXIS 49, *5 (Del. Ch. April 22, 2004)* is in-structive here. Decided after *Agostino, Acker* held that plaintiffs had stated a direct claim. *Acker* in-volved the reorganization of a corporation's capi-tal structure to the benefit of one shareholder and the detriment of another. Two aspects of *Acker* should be noted. First, the reorganization was "a net wash from the Company's perspective." Sec-ond, the harm to the plaintiff flowed "from an al-leged bias between . . . classes of stock." *2004 Del. Ch. LEXIS 49 at *5 n.6.* These two factors were important to the Court's determination that plaintiff had stated a direct claim.

At this stage of litigation it is not necessary to delve into the factors influencing the Aggregate sale. Suffice it to say, the insiders of Regency approved a transaction to the benefit of those insiders and [*31]  to the detriment of the Public Shareholders. This inflicted harm upon the Public Shareholders directly and it is the Public Share-holders *"who would receive the benefit of the . . . rem-edy," n53 i.e.,* an unwinding of the transaction. n54 Therefore, this portion of Count II states a direct claim.

> n53   *Tooley, 845 A.2d at 1035* (emphasis added).

> n54 Appropriate to this conclusion is the fact that an unwinding of the transaction would not benefit the corporation, as the overall value of Regency would remain unchanged.

### 3. Non-disclosure of the "Monetization"

Plaintiffs next assert that "Ponsoldt and Baldinger breached their fiduciary duties by failing to disclose their beliefs regarding the timing of the monetization of the Security Land asset to the non-management members of the Regency Board, instead allowing the Board to pro-ceed with its consideration of the Recapitalization." n55 The only harm alleged to have flowed from the non-disclosure is that defendant Carey "had she known about [*32]  the imminent monetization' . . . would not have approved the Recapitalization." n56 Based on this allega-tion, the injury suffered is indistinguishable from any alleged harm resulting from the recapitalization itself. As such, I will not analyze this alleged breach separately.

> n55 Compl. P 105.

> n56 *Id. P* 70.

## 4. The Recapitalization

The complaint alleges that the recapitalization was a transfer of control of Regency and that the Public Shareholders were "deprived of control of Regency without the payment of a control premium." n57 The complaint also alleges that the purported class "was harmed because its ownership interest was diluted . . . from a majority of approximately 62% to a minority interest of only about 40% resulting in a "non-control position." n58 The ensuing "cash-value of the harm" is estimated in plaintiffs complaint "to be in excess of $ 20 million." n59 From these allegations one can extract two harms: (1) the loss of a control premium and (2) share dilution. The first alleged [*33] injury is wholly illusory. The second is derivative.

> n57 Shortly after the October 2002 recapitalization, Royalty partially exercised its conversion rights and acquired 750,000 shares of Regency. Several months later, on July 3, 2003, Royalty fully exercised those rights and owned almost 60% of Regency's outstanding common stock. See Compl. P 106.
>
> n58 Id. P 107-08.
>
> n59 Id.

One of the few things that the complaint makes clear is that the ostensible class did not exercise control over Regency. For example, the second paragraph of the complaint alleges that Ponsoldt "used his power to control the affairs of Regency. . . ." n60 Two paragraphs later, the old Regency board is described as "handpicked" and "beholden" to Ponsoldt. n61 Further averments describe Ponsoldt as "causing" Regency to enter into various transactions. n62 Allegedly, even the special committee investigating the recapitalization is purported to have had "extensive ties to Ponsoldt." n63 Count II quite literally acknowledges that [*34] Ponsoldt and Statesman had "de facto control over Regency." n64

> n60 Id. P 2.
>
> n61 Id. P 4. See also id. P 7 (describing payments made by Statesman to members of the old board).
>
> n62 Id. PP 33 & 37.
>
> n63 Id. P 66.
>
> n64 Id. P 100.

Notwithstanding plaintiffs own allegations, they argue that before Royalty's exercise of the convertible note the Public Shareholders held a majority of Regency's outstanding common stock. This argument is flawed. Unless the majority actually exercises "the consequent privilege of exerting the powers of majority ownership," n65 an aggregate of outstanding shares held by the public does not translate into a right to a control premium. Here, because of the restructuring, control shifted from Ponsoldt to Royalty. That is not the same as a shift from a fluid aggregate of public shares to a unitary holder. Thus, the Public Shareholders are not entitled to a control premium n66 -- they never controlled Regency. n67

> n65 Paramount Communications, Inc. v. QVC Network, Inc., 637 A.2d 34, 43 (Del. 1994).
> [*35]
>
> n66 Agostino 845 A.2d at 1124.
>
> n67 What I have said here disposes of plaintiffs argument that they have stated a claim under Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1986). In In re Paxson Commun. Corp. S Holders Litig., 2001 Del. Ch. LEXIS 95, *22 (Del. Ch. July 10, 2001) this Court held that "Revlon does not apply where the plaintiffs cannot allege that a sale or change of control has taken place or necessarily will take place such that the Public Shareholders of a corporation have been or will be deprived of a control premium." There, as here, after the transaction at issue, "the only difference would be the identity of [the] controlling shareholder." Id. Hence, Revlon is inapplicable.

Moving beyond the control premium question, plaintiffs allege that the exercise of the conversion rights prescribed in the note resulted in the dilution of the Public Shareholders position in Regency. As averred by plaintiffs, the restructuring included a loan (secured by a convertible note) from Royalty to [*36] Regency. In turn, Regency paid certain proceeds from that loan to Statesman. These interrelated transactions are characterized best as a financing transaction-one where Royalty, before lending money, required Regency to procure certain concessions from Statesman and the consideration demanded by Statesman to give those concessions.

Under the facts presented here, plaintiffs stock devaluation, which resulted from the exercise of Royalty's conversion rights, "was the natural and expected conse-

quence of the [alleged] injury initially borne by the company" n68 and is not a direct shareholder harm. Therefore, without a viable dilution claim, it is appropriate to look beyond plaintiffs pleading to discern the true nature of the harm allegedly caused by the restructuring. Clearly, this question turns on the following: What harm occurred from the exercise of the rights flowing from the convertible note. To answer quite simply, any resulting harm occurred only if the stock issued upon conversion did not represent the fair value of the loan to Regency. n69 In this circumstance, Regency would be harmed by a bad bargain entered into on its behalf by the Regency board. n70 To the extent that [*37] a bad bargain warrants relief, Regency would receive the benefit as a party to the contract. Count II, as it relates to the restructuring, pleads a derivative claim that must be dismissed for failure to comply with Rule 23.1.

n68 *Agostino, 845 A.2d at 1124.*

n69 *See id.* (questioning the adequacy of the consideration the Company received . . . [is] undoubtedly a derivative claim); *see* also *id. at 1124*n.66 ("Mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders") (internal citation omitted).

n70 Important to this conclusion is the distinction I draw between the facts presented here and the decision reached in *Acker. See supra* note 52.

## C. Count III

Count III is directed towards Levy, Royalty, and Royalty Management (the "Levy defendants"). The Levy defendants are alleged to have aided and abetted the old Regency board and Statesman's breaches of fiduciary [*38] duty in connection with the recapitalization. As noted above, plaintiffs claim with respect to the recapitalization is derivative and fails to comply with Rule 23.1. As a consequence, the antecedent aiding and abetting claim alleged in Count III necessarily fails. n71

n71 *See Manzo v. Rite Aid Corp., 2002 Del. Ch. LEXIS 147, *21 (Del. Ch. Dec. 19, 2002), af-f'd, Manzo v. Rite Aid Corp., 825 A.2d 239 (Del. 2003)* (dismissing aiding and abetting fiduciary duty claim when underlying fiduciary duty claim was dismissed under Rule 23.1); *In re Rexene Corp. S holders Litig., 1991 Del. Ch. LEXIS 81, *12-13 (Del. Ch. May 8, 1991)* (same).

## III. CONCLUSION

For the reasons stated above, Count I is dismissed for failure to comply with Rule 23.1. Plaintiffs claim regarding the 2001 sale of the aggregate may proceed as a direct claim, but Count II otherwise is dismissed for failure to comply with Rule 23.1. Count III is dismissed since its underpinning is the also [*39] dismissed breach of fiduciary duty claims regarding the recapitalization.

IT IS SO ORDERED.