12

Not Reported in A.2d                                              Page 1
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)


UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
In re GENERAL MOTORS (HUGHES) SHAREHOLDER LITIGATION
No. Civ.A. 20269.

Submitted March 7, 2005.
May 4, 2005.

Jay W. Eisenhofer, Geoffrey C. Jarvis and P. Brad deLeeuw, of Grant & Eisenhofer
P.A., Wilmington, Delaware; Michael Hanrahan, Thomas A. Mullen, Paul A. Fioravanti,
Jr. and Tanya P. Jefferis, of Prickett, Jones & Elliott, P.A., Wilmington,
Delaware; Marc A. Topaz, of Schiffrin & Barroway, LLP, of Bala Cynwyd,
Pennsylvania; Richard B. Brualdi and Kevin T. O'Brien, of the Brualdi Law Firm, New
York, New York, for Plaintiffs, of counsel.
R. Franklin Balotti, Lisa A. Schmidt and Srinivas M. Raju, of Richards, Layton &
Finger, Wilmington, Delaware; Robert J. Kopecky and Timothy A. Duffy, of Kirkland &
Ellis LLP, Chicago, Illinois; Greg A. Danilow and Stephen A. Radin, of Weil
Gotschal & Manges LLP, New York, New York, for Defendants Percy N. Barnevik, John
H. Bryan, Armando M. Codina, George M.C. Fisher, Nobuyuki Idei, Karen Katen, Alan
G. Lafley, Phillip A. Laskaway, E. Stanley O'Neal, Eckhard Pfeiffer, John S. Smith,
Jr., G. Richard Wagoner, Jr., Lloyd D. Ward, and General Motors Corporation, of
counsel.
Edward P. Welch, Edward B. Micheletti, Seth M. Beausang, James A. Whitney and T.
Victor Clark, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware,
for Defendant The News Corporation Limited.

*OPINION*

CHANDLER, J.
*1 Plaintiffs instituted this lawsuit against defendant General Motors Corporation
("GM") and defendant The News Corporation Limited ("News" or "News Corp."), [FN1]
challenging a series of transactions by which News acquired a significant interest
in Hughes Electronics Corporation ("Hughes"). [FN2] Hughes was previously a wholly-
owned subsidiary of GM. The individuals who were directors of GM at the relevant
times have also been named as defendants (the "Individual" or "Director"
defendants). [FN3] Plaintiffs were at all relevant times holders of GM's Class H Common
Stock ("GMH"), which was a "tracking stock" representing the financial performance
of Hughes while Hughes was wholly-owned by GM. For the reasons set forth in more
detail later, I grant the motion to dismiss brought by GM and the Individual
defendants. The complaint fails to state a claim upon which relief can be granted
as to GM and the Individual defendants. I also grant News' motion to dismiss for
the same reason.


FN1. News is a South Australian corporation. Rev. Am. Consol. Class Action
Compl. ("Compl.") ¶ 17. Letter of Edward P. Welch, Esq. to the Court of
January 26, 2005.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. Hughes was renamed The DIRECTV Group, Inc. on March 16, 2004. *Id.* ¶ 10. I, as did plaintiffs in their Complaint, shall refer to the entity as "Hughes" for purposes of clarity.

FN3. The Individual or Director defendants are: G. Richard Wagoner, Jr. ("Wagoner"), John F. Smith, Jr. ("Smith"), Percy N. Barnevik ("Barnevik"), John H. Bryan ("Bryan"), Armando M. Codina ("Codina"), George M.C. Fisher ("Fisher"), E. Stanley O'Neal ("O'Neal"), Eckhard Pfeiffer ("Pfeiffer"), Alan G. Lafley ("Lafley"), Karen Katen ("Katen"), Philip A. Laskaway ("Laskaway"), Nobuyki Idei ("Idei"), and Lloyd D. Ward ("Ward"). *Id.* ¶ ¶ 18-21.

### I. INTRODUCTION

The operative complaint in this action is the Revised Amended Consolidated Class Action Complaint ("Complaint"), filed on May 7, 2004. It is a "door-stop" weight 97-page tome that purports to state seven claims. The Complaint contains some facts, but also offers a rich stew of conclusory allegations and legal arguments. Counts I, II, III, and IV are against GM and the Individual defendants for breaches of the duty of loyalty. Counts V and VI are against GM and the Individual defendants for breach of GM's Restated Certificate of Incorporation. Count VII is against News for aiding and abetting the Individual defendants' breaches of fiduciary duty. It is necessary that I briefly outline the Complaint's key elements and factual allegations.

#### A. *Director Defendants Were Not Disinterested and Independent*

Plaintiffs allege that the Director defendants are not disinterested and independent in connection with the transactions at issue in this case because their loyalties were to GM in order to preserve their directorships there, with the accompanying compensation and perquisites, and that the Director defendants were thus in conflict with the soon to be spun-off GMH shareholders. [FN4] Plaintiffs argue that the non-employee GM directors are excessively compensated for their services as directors, and that similar excess is present in the compensation of the Hughes directors. [FN5] Plaintiffs further attempt to impugn the independence of the directors by outlining professional connections that certain of the directors have that may relate to GM or Hughes. [FN6] Nevertheless, there are no allegations in the Complaint that any of the compensation paid to the non-employee GM directors is material to them, [FN7] with the exception that allegations of materiality are addressed toward defendant Smith, who was formerly the Chief Executive Officer of GM. [FN8]

FN4. Compl. ¶ ¶ 22-27.

FN5. For example, the non-employee GM directors receive an annual retainer of $200,000 per year, reimbursement for travel expenses, and other compensation valued by plaintiffs at $17,000 per year. Non-employee Hughes directors received an annual retainer of $140,000 per year. The Chair of GM's Audit Committee receives an annual retainer of $30,000 per year, and the committee's members receive an annual retainer of $20,000 per year. The Chairs of GM's Capital Stock Committee, Executive Compensation Committee, Investment Funds Committee, Directors and Corporate Governance Committee, and Public Policy Committee each receive annual retainers of $5,000 per year. *Id.* ¶ ¶ 22-26.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 105-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 4 of 46
Page 3
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

FN6. For example, Pfeiffer was also a director of Hughes. Bryan also serves on the board of Goldman Sachs Group, Inc., which provides investment banking services for GM. O'Neal is the CEO and a board member of Merrill Lynch & Co., which also provides financial services for GM and News. Bryan, Barnevik, Lafley, and Wagoner are members of The Business Council, and Lafley and Wagoner are members of The Business Round Table. Ward was CEO of the U.S. Olympic Committee, which receives substantial donations from GM. *Id.* ¶ ¶ 23-26.

FN7. The Complaint does allege that Pfeiffer and Bryan are "professional directors" and that they derive "substantial income" from serving on various boards of directors, but the Complaint does not allege that the income received from GM is material to them. *Id.* ¶ ¶ 23-24.

FN8. "Because of his many years of employment at GM and the pension and other benefits, compensation and perquisites he derives from GM, the financial health, credit rating and security of GM and GM's Pension Plans and Benefit Plans are of material significance to Smith." *Id.* ¶ 20. Other than defendant Wagoner, who is currently GM's Chairman, CEO, and President, none of the other Individual defendants are employees of GM. *Id.* ¶ 19.

### B. GM's Pension Crisis

Plaintiffs further allege that GM and its directors were not independent because GM had a "pension crisis." [FN9] This conflict extended to the Investment Funds Committee of GM's Board of Directors, [FN10] which is a named fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA") for certain of GM's pension plans. [FN11] Plaintiffs allege that because GM's pension funds were underfunded by $19.3 billion by the end of 2002, and GM's debt rating had been downgraded by Standard and Poor's to BBB, the directors on the Investment Funds Committee faced a direct conflict of interest between their fiduciary responsibilities over the pension plans and their fiduciary duties as directors of GM owed to the GMH shareholders. [FN12]

FN9. *Id.* ¶ ¶ 28-36.

FN10. The Investment Funds Committee was made up of defendants Barnevik, Codina, Fisher, Idei, O'Neal, and Smith. *Id.* ¶ 37.

FN11. *Id.* ¶ ¶ 37-39.

FN12. *Id.* ¶ ¶ 32, 39.

### C. The Transactions

*2 The split-off of Hughes was accomplished via a series of transactions detailed below, and announced to the public for the first time on April 9, 2003. [FN13] Five days before the announcement, GM, as the 100% shareholder, caused Hughes to amend its certificate of incorporation to increase the number of authorized shares of Hughes common stock and Hughes Class B common stock from 1 million shares to 2.5 billion shares. [FN14] An "excess shares" provision was added to the certificate of incorporation and Hughes' board was staggered, among other amendments. [FN15]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 5 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

FN13. *Id.* ¶ 2.

FN14. *Id.* ¶ 4.

FN15. *Id.*

Just before the split-off of Hughes was accomplished, Hughes paid a special dividend to its sole shareholder, GM, of $275 million in cash. [FN16] The split-off occurred by GM's redemption of each GMH share in exchange for one share of Hughes' common stock, shares which Hughes had previously issued to GM. [FN17] GM sold its economic interest in Hughes to News Corp. in the form of Hughes Class B common stock. [FN18] GM received a combination of cash ($3.1 billion) and stock (28.6 million News Corp. Preferred American Depository Shares ("News ADSs")) from News. [FN19] The News ADSs were valued at approximately $1.0 billion, bringing the total compensation from News to GM to $4.1 billion. [FN20] Including the $275 million dividend, GM received a total of $4.375 billion in compensation for divesting itself of Hughes, with $3.375 billion of that amount in cash. [FN21]

FN16. *Id.* ¶ ¶ 6, 66-89.

FN17. According to the Complaint, GM voted those 1.4 billion Hughes shares in favor of the merger between Hughes and the News Corp. subsidiary before distributing them to the GMH shareholders. *Id.* ¶ ¶ 7, 13.

FN18. *Id.* ¶ 8.

FN19. *Id.*

FN20. *Id.*

FN21. *Id.* ¶ 12.

Immediately following the above-described transactions, News acquired an additional interest in Hughes via the merger of a subsidiary of News into Hughes (the "Merger"), leaving News with approximately a 34% interest in Hughes. [FN22] The former GMH shareholders therefore received a combination of Hughes common stock and News ADSs in exchange for their GMH shares. [FN23] News later transferred its interest in Hughes to another subsidiary of News Corp., Fox Entertainment. [FN24]

FN22. Via the merger, News exchanged News ADSs for 17.5% of the Hughes common stock held by the former GMH shareholders. *Id.* ¶ ¶ 9-10.

FN23. *Id.* ¶ 11.

FN24. *Id.* ¶ 10.

### D. Rights and Terms of (and Policies Regarding) the GMH Shares

The rights and terms of the GMH shares were defined in Article FOURTH of GM's Restated Certificate of Incorporation. [FN25] Dividends paid to the GMH shareholders were paid out of the "Available Separate Consolidated Net Income of Hughes," as opposed to the dividends to GM's common shareholders, which were paid out of other available funds not including the "Available Separate Consolidated Net Income of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS     Document 48-5     Filed 03/06/2006     Page 6 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

Hughes." [FN26] When the GM shareholders voted, the GMH shareholders voted with the other GM common shareholders (the "GM $1 2/3" holders), but each GMH share was treated as 0.2 GM $1 2/3 shares. [FN27] Similarly, in the unlikely event that GM were to be liquidated, the GMH shareholders would receive distributions from the same pool as the GM $1 2/3 shareholders, but with each GMH share again representing 0.2 GM $1 2/3 shares. [FN28] The GMH shares, therefore, did not have a direct interest in Hughes' assets (or GM's) except through a liquidation of GM. In the event of a liquidation of Hughes, GMH shareholders would not receive the proceeds of that liquidation, but would receive GM $1 2/3 stock, as detailed below.

FN25. *Id.* ¶ 41.

FN26. *Id.*

FN27. *Id.*

FN28. *Id.*

*3 GM's Restated Certificate of Incorporation provided certain protections for the GMH shareholders in the event that GM should "sell, liquidate, or otherwise dispose of 80% or more of the business of Hughes...." [FN29] If one of those triggering events were to take place, each GMH share would be converted into GM $1 2/3 stock at a value equal to 120% of the value of the GMH stock on the date one of those transactions occurred. [FN30] Such a result could be avoided if the GM shareholders (both the GM $1 2/3 and the GMH) approved the transaction separately as individual classes. [FN31]

FN29. *Id.* ¶ 42.

FN30. *Id.*

FN31. *Id.*

Recognizing that the interests of the GM $1 2/3 and GMH shareholders may not always coincide, GM created a board committee called the Capital Stock Committee to determine the terms of any material transaction between GM and Hughes and ensure fairness to all shareholders. [FN32] The Capital Stock Committee was chaired by Pfeiffer, with Barnevik and Bryan as members of the committee. [FN33] The GM board also adopted a Board Policy Statement Regarding Certain Capital Stock Matters ("Policy Statement") setting forth procedures to be followed in the event of a material transaction between GM and Hughes. [FN34]

FN32. *See id.* ¶ 23; *Solomon v. Armstrong, 747 A.2d 1098, 1106-07 (Del.Ch.1999)*.

FN33. Compl. ¶ ¶ 21, 23-24.

FN34. *Id.* ¶ 43. As opposed to the rights of the GMH shareholders set out in GM's Restated Certificate of Incorporation, which is binding upon the GM board, there is no information in the Complaint with respect to the extent to which the GM board was bound to protect the rights of the GMH shareholders granted by the Policy Statement. If the Policy Statement had the effect of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 7 of 46

   resolution adopted by the board, it presumably could be rescinded or amended by nothing more than another board resolution. The Complaint unreasonably implies that the Policy Statement was binding because the GM board chose to seek shareholder consent for the Hughes transactions. *Id.* ¶ 45.

This Policy Statement required that in the event of a transfer of material assets from Hughes to GM, GM's board would be required to declare and pay a corresponding dividend to the GMH shareholders. [FN35] The corresponding dividend would not be required if one of two exceptions were met: (1) Hughes receives "fair compensation" for the transfer; or (2) the transfer is approved by a majority of the GM $1 2/3 and GMH shareholders, voting as separate classes. [FN36] GM chose the second option for approving the special dividend by receiving consent for the dividend from the GM $1 2/3 and GMH shareholders. [FN37]

   FN35. *Id.* ¶ 44.

   FN36. *Id.*

   FN37. *Id.* ¶ 45.

### E. Allegations of Unfair Price and Process

Plaintiffs make several allegations in an attempt to impugn the fairness of the consideration received by the GMH shareholders in the Hughes transactions as well as the process by which those transactions were negotiated and structured. At the time the Merger was announced on April 9, 2003, the approximately $14 per share consideration represented a twenty-two percent premium over the then-market price of a GMH share. [FN38] Plaintiffs allege that this premium was not as large as GM represented it to be because the merger announcement was strategically timed before two announcements that would substantially raise the market price for GMH shares. [FN39] Those two announcements were the announcement on April 11, 2003, that PanAm Sat Corporation ("PanAm Sat"), an eighty-one percent subsidiary of Hughes, announced higher than expected earnings, and the April 14, 2003 announcement of Hughes' 2003 first quarter financial results, which were also favorable. [FN40] Plaintiffs also note Hughes' announced and projected financial results for the second and third quarters of 2003, as well as the price of PanAm Sat's public shares for the remainder of 2003. [FN41]

   FN38. *Id.* ¶ 49.

   FN39. *Id.*

   FN40. *Id.* ¶¶ 50-51. Plaintiffs further allege that it was unreasonable to rely on News to pay a fair price for the Hughes stock because News allegedly has a pattern of obtaining a minority, yet controlling interest in companies without paying a "control premium." *Id.* ¶¶ 63, 128-133.

   FN41. *Id.* ¶¶ 52-53, 61-62.

*4 Plaintiffs allege that the process by which the Hughes transactions were negotiated was flawed because the GM Directors delegated to management of GM and the management and board of directors of Hughes the responsibility to negotiate both with News and between themselves. [FN42] The GMH shareholders were represented by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hughes' management and board. [FN43] Plaintiffs next speculate that an extra dollar per
share was added to the special dividend paid by Hughes to GM as a result of News'
agreement to reduce the amount of Hughes stock it would acquire from 36 percent to
34 percent, and that this reduction resulted in a material reduction of
compensation to be paid to the GMH shareholders. [FN44]

FN42. *Id.* ¶ 56.

FN43. *Id.* ¶ 57. In an example of inartful and confusing pleading, plaintiffs
later allege that GMH was not represented in negotiating and structuring the
Hughes transactions. *Contra id.* ¶ 65.

FN44. *Id.* ¶ ¶ 59-60. In addition to process and price, plaintiffs argue that
the structure of the transactions was unfair to the GMH shareholders because
GM wanted cash for its Hughes holdings and the GMH shareholders ended up as
minority stockholders of News and Hughes. *Id.* ¶ ¶ 64-65.

### F. Fairness Opinions

No fewer than four fairness opinions were obtained by GM and Hughes in connection
with the Hughes transactions. These opinions were rendered by Merrill Lynch, Bear
Stearns, Credit Suisse First Boston ("CSFB") and Goldman Sachs. [FN45] Reading the
Complaint in the manner most favorable to the plaintiffs, it appears that Merrill
Lynch and Bear Stearns gave an opinion to GM that the transactions were fair to GM.
[FN46] Similarly, it seems that CSFB and Goldman Sachs opined that the transactions
were fair to Hughes. [FN47] Plaintiffs complain that no financial advisor was
retained to determine the fairness of the transactions specifically to the GMH
shareholders. [FN48]

FN45. *Id.* ¶ 90.

FN46. *Id.*

FN47. *Id.*

FN48. *Id.* Here is another example of inconsistencies in the Complaint:
Plaintiffs later note that Merrill Lynch and Bear Stearns opined as to the
fairness of the transactions "to each class," presumably the GM common and
the GMH shareholders. *Id.* ¶ 94. Along those same lines, CSFB and Goldman
Sachs opined that "what the post-Split-Off holders of Hughes common stock"
would receive as compensation in the Merger was fair to the Hughes common
shareholders other than News, or in other words, the former GMH shareholders.
*Id.*

Before attacking the fairness opinions substantively, plaintiffs allege that the
financial advisors were conflicted because: (1) a large portion of their
compensation for the fairness opinion was contingent upon the transactions being
consummated, and (2) each of the four advisors has had and continues to have a
business relationship with GM, Hughes, and/or News. [FN49] Plaintiffs also allege that
the fairness opinions were inadequate because the four advisors collaborated with
each other instead of working independently, purportedly in order to develop the
opinion desired by GM. [FN50] The fairness opinions were also allegedly inadequate
because Hughes' stake in its eighty-one percent subsidiary, PanAm Sat, was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dramatically undervalued, and because the updated fairness opinions of August 5, 2003 did not provide a complete and accurate description of the updated analyses performed by the advisors in reaching the updated opinions. [FN51]

> FN49. *Id.* ¶ ¶ 91-92.
>
> FN50. *Id.* ¶ 93.
>
> FN51. *Id.* ¶ ¶ 95-97.

### G. Manipulation of the GMH Vote

As mentioned above, the GM $1 2/3 and GMH shareholders voted to approve the Hughes transactions. Almost 20 percent of the outstanding GMH shares were held by pension funds associated with GM after a June 2000 contribution. [FN52] Later, on March 12, 2003, GM contributed another 149.2 million newly-issued GMH shares to its pension plans. [FN53] The Complaint then insinuates that GM had an ulterior motive in issuing these shares to its pension plans instead of selling the shares publicly and then contributing the cash to the plans. [FN54] The GM pension plans and other employee benefit plans held approximately 35 percent of the outstanding GMH stock at the time of the shareholder vote on the Hughes transactions. [FN55] The Complaint further states that GM's retained economic interest in Hughes decreased from 30.7 percent to 19.8 percent and that the pension plans' voting power was roughly doubled, and that after the Hughes transactions were consummated, the pension plans held approximately 19.8 percent of the outstanding Hughes common stock and 5.2 percent of the News ADSs. [FN56]

> FN52. *Id.* ¶ 98.
>
> FN53. *Id.* ¶ 100.
>
> FN54. *Id.*
>
> FN55. *Id.* ¶ 104. Nevertheless, plaintiffs make no further allegations with respect to how the remaining 65% of GMH shareholders voted in order to fairly and accurately represent to the Court the effect of the pension plans on the shareholder vote totals.
>
> FN56. *Id.* ¶ ¶ 101, 103. I note as an aside that GM may have had perfectly valid, and even compelling tax reasons for reducing its retained interest in Hughes below 20 percent in anticipation of the Hughes transactions. In fact, this reason for the reduction was specifically contemplated by GM and discussed in the Consent Solicitation ("CS"). *See id.* ¶ 105.

*5 Plaintiffs then complain of certain accounting improprieties in valuing the GMH shares contributed to the pension plans which had the effect of increasing the pension plans' holdings to a greater extent and also, among other reasons, ostensibly gave the plans an incentive to vote for the Hughes transactions that was not shared by other GMH shareholders. [FN57] According to the Consent Solicitation, the pension and benefit plans' GMH shares were voted by the plans' trustee, the United States Trust Company ("U.S.Trust"). [FN58] As trustee of the plans, U.S. Trust had a fiduciary duty under ERISA to act on behalf of the plans' beneficiaries, even if the interests of the plans' beneficiaries diverged from those of the other GMH

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS   Document 48-5   Filed 03/06/2006   Page 10 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

shareholders.   [FN59]

    FN57. *Id.* ¶ ¶  106-12.

    FN58. *Id.* ¶  113.

    FN59. *Id.* ¶ ¶  113-14.

In preparing and mailing the Consent Solicitation, GM did so before receipt of a letter ruling by the Internal Revenue Service, purportedly in order to obtain shareholder approval before the inadequacy of the consideration to be received by the GMH shareholders became clear, even though the transaction would not close for some time due to required regulatory approvals. [FN60] Advance copies of the Consent Solicitation were sent by GM to certain GMH shareholders before the official mailing to all GM $1 2/3 (and presumably GMH) shareholders. [FN61] The Consent Solicitation was sent to GMH shareholders of record as of August 1, 2003. [FN62] That decision was allegedly communicated to ADP on or about July 25, 2003. [FN63] In addition, plaintiffs construe the Consent Solicitation to indicate that the GM board of directors did not meet between June 5, 2003 and August 5, 2003. [FN64] GM also communicated with GM and Hughes employees on more than one occasion with respect to the upcoming vote.   [FN65]

    FN60. *Id.* ¶ ¶  116-19.

    FN61. *Id.* ¶  122.

    FN62. *Id.* ¶  120.

    FN63. *Id.* ¶  121. It appears that ADP was the entity chosen by GM to mail the Consent Solicitation.

    FN64. *Id.*

    FN65. *Id.* ¶ ¶  123-24.

The Complaint also alleges that the Consent Solicitation is materially misleading and incomplete with respect to the following four broad categories: [FN66] (1) the "value enhancement" to the GMH shareholders of Hughes as a stand-alone company that was used as a justification for the $275 million dividend; [FN67] (2) the bases for the updated fairness opinions were not fully and fairly disclosed; (3) the effect of shareholder ratification of the transactions; and (4) GM's contribution of GMH stock to its pension and benefit plans.

    FN66. *Id.* ¶  126.

    FN67. *Id.* ¶ ¶  127, 134-147.

The Complaint is rounded out by allegations that the defendants did not act in good faith. Essentially, plaintiffs merely rehash each allegation in the Complaint and say that such actions evidence a lack of good faith without adding additional facts or substance. The specific allegations are that the defendants did not act in good faith because they: (1) manipulated the GMH shareholder vote; (2) did not comply

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

with the requirements of GM's certificate of incorporation in obtaining shareholder
approval of the transactions; (3) caused Hughes to pay GM the special dividend; (4)
made inadequate disclosures about the proposed transactions; 5) relied upon
conflicted financial advisors for fairness opinions; 6) engaged in a flawed
negotiating process; 7) eliminated appraisal rights the GMH shareholders might have
otherwise had in the transactions; and 8) took these actions to benefit GM and its
pension and benefit plans by adopting a "we don't care" attitude toward the public
GMH shareholders. [FN68]

> FN68. *Id.* ¶ ¶ 148-49.

### H. Claims Alleged in the Complaint

*6 As previously stated, the Complaint purports to state seven claims. All of the
claims except for Count VII are alleged against GM and the Individual Defendants.
Count I is for breach of the duty of loyalty and unjust enrichment in the payment
of the special dividend. Count II is for breach of the duty of loyalty in failing
to deal fairly with the GMH shareholders and compensate them fairly in the
transactions. Count III is for breach of the duty of loyalty in manipulating the
shareholder vote. Count IV is for breach of the duty of disclosure. Count V is for
breach of GM's Restated Certificate of Incorporation, Article Seventh. Count VI is
for breach of GM's Restated Certificate of Incorporation, Article Fourth. Count VII
is alleged against News for aiding and abetting a breach of fiduciary duty.

### II. ANALYSIS

### A. Standard on a Motion to Dismiss

When considering a motion to dismiss under Rule 12(b)(6), I am required to assume
the truthfulness of all well-pleaded allegations of the Complaint. In addition, I
am required to extend to plaintiffs the benefit of all reasonable inferences that
can be drawn from the Complaint. "Conclusory statements, [however], without
supporting factual averments will not be accepted as true for purposes of a motion
to dismiss." [FN69] Under this analysis, I cannot order a dismissal unless it is
reasonably certain that the plaintiffs could not prevail under any set of facts
that can be inferred from the Complaint. Consistent with these requirements, I
accept as true all of the plaintiffs' properly pled allegations and have made every
reasonable inference in their favor. [FN70]

> FN69. *Grimes v. Donald*, 673 A.2d 1207, 1214 (Del.1996).

> FN70. *Solomon*, 747 A.2d at 1110-11.

### B. Does the GM Defendants' Motion to Dismiss Improperly Rely on Matters Outside the Pleadings?

As a threshold matter, I must address plaintiffs' contention that I may not
consider matters outside the pleadings and that to the extent defendants base their
motion on such matters to establish facts, dismissal is precluded. [FN71] From the
outset, plaintiffs understood the possibility that a fully informed, shareholder
vote may, as a matter of law, preclude recovery on Counts I and II of their seven-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS  Document 48-5  Filed 03/06/2006  Page 12 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

count Complaint. Many of their allegations, therefore, attack the adequacy of the disclosures made to GM's shareholders and rest squarely on the contents of the Consent Solicitation. Therefore, the Court may consider the contents of a disclosure document and look for itself to see what the documents actually says and discloses. There would be no other way for a court to determine whether plaintiffs state a claim that the document was materially misleading or omitted a material fact. [FN71]

> FN71. Pls.' Answering Br. In Opp'n To GM Defs.' Mot. To Dismiss ("Pls.' GM Br.") at 11-13.

> FN72. See *In re Santa Fe Pac. Corp. S'holders Litig.*, 669 A.2d 59, 69-70 (Del.1995) (finding it appropriate on 12(b)(6) motion to consider a document plaintiffs have made integral to a claim and have incorporated the document into the complaint).

Plaintiffs attempt to distinguish this rationale by arguing a wholly unpersuasive point that they do not challenge the Courts' ability to consider the Consent Solicitation, but rather contend that the Court cannot look behind the words and assume the matters asserted in the solicitation are true. The Court finds this distinction unpersuasive because the defendants have not attempted to submit the Consent Solicitation to prove the truth of the matter asserted. [FN73] Rather, defendants have referred to the omitted sections of the Consent Solicitation when doing so fairly represents the selective portions the plaintiffs have submitted into the record. Surely plaintiffs do not contend that the Court is not entitled to consider the full context of a document once the plaintiffs have relied on particular segments in their Complaint? The Court, therefore, considers the Consent Solicitation to the extent the plaintiffs have incorporated the document into their complaint, and the portions necessary for the Court to discern a complete and accurate context of what was disclosed. In this regard, the Court's consideration of the Consent Solicitation is consistent with Delaware law. [FN74]

> FN73. *Id.* at 70 (relying on disclosure document for purposes other than disclosure issues or perhaps to establish formal, uncontested matters is not appropriate on a motion to dismiss).

> FN74. See *id.*

*7 Plaintiffs also take issue with the Court's ability to consider publicly available facts that show that both classes of GM stockholders voted to approve the Hughes transactions. Because there are no allegations in the Complaint that challenge whether the conditions necessary to consummate the transaction were actually met (*i.e.*, a majority vote of holders of each class of GM stock), those facts are not subject to reasonable dispute, and it is appropriate to take judicial notice of the voting percentages of each class of GM stock. [FN75]

> FN75. See, *e.g.*, *Solomon*, 747 A.2d at 1109-10 & n. 20.

Finally, there is no basis to deny defendants' motion simply because of their reference to GM's Form 8-K. The defendants have cited this publicly available document to demonstrate when the IRS had issued the private letter ruling that confirmed that the redemption of GMH stock, and the subsequent distribution of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

Hughes stock, would be a tax-free exchange. Plaintiffs do not challenge the veracity of the letter and defendants' motion does not rely on the substance of the letter. The Court will therefore consider the date of the letter for what it is worth.

### C. Does the Complaint Contain Well-Pled Facts That Show There Was No Majority of Independent and Disinterested Directors

Counts I and II of the Complaint allege that no majority of disinterested and independent directors approved a transaction that: (1) secured liquidity for GM's Pension and Benefit plans through a special $275 million dividend; and (2) unfairly allocated the transaction consideration in a manner that favored GM and the GM $1 2/3 holders interests over the interests of the GMH holders. The Complaint alleges that the directors breached their fiduciary duty of loyalty to the GMH holders because of their own pecuniary interests in director compensation or as beneficiaries of the GM plans, [FN76] or through professional relationships, [FN77] or because six members of the GM board were also members of the Investment Funds Committee. [FN78]

FN76. Compl. ¶ ¶ 22-27.

FN77. Id. ¶ 25.

FN78. Id. ¶ ¶ 37-39.

Notwithstanding the plaintiffs' kitchen sink approach to pleading, their allegations were distilled in paragraph 160 of the Complaint where it is stated that:

[T]he individual defendants were not disinterested and independent with respect to the challenged transaction [because] they would continue as directors of GM and, as a result of that relationship, their interests favored GM and its continuing shareholders and not the GMH shareholders, who would become subject to the dominion of News Corp.... [FN79]

FN79. Id. ¶ 160.

From this, the Court surmises that the plaintiffs' theory concerning the GM directors' alleged breach is two-fold. Either the GM defendants' are conflicted due to their own self-interests, which make them beholden to the remaining GM shareholders and GM's management for their livelihood as "professional directors," [FN80] or absent any self-interests, the split-off necessarily favored GM, and the GM $1 2/3 holders at the expense of the GMH holders. I address the issues concerning the directors' self-interests below; structural challenges to the directors' interests are addressed in Section D: The Effect of Shareholder Ratification.

FN80. Id. ¶ 24.

#### 1. Allegations of Pecuniary or Professional Self-Interests

*8 As to the allegations of pecuniary or professional interests, I conclude that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Complaint fails to make well-pled allegations sufficient to rebut the presumption that the GM directors acted loyally. First, it is well settled that plaintiffs' allegations of pecuniary self-interest must allow the Court to infer that the interest was of "a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest." [FN81]

FN81. *In re GM Class H S'holders Litig., 734 A.2d 611, 617-18 (Del.Ch.1999)*.

The Complaint begins with a list of directors who served on GM's board at the time the Hughes transaction was approved. Then, the Complaint merely outlines the respective salaries of each director and the annual retainers paid for service on particular committees. Absent from the Complaint, however, are any allegations that the compensation of any of these non-employee directors was in anyway contingent on the decision to approve the Hughes transaction. Similarly, nothing is alleged that suggests that the amount the directors had vested in the pension plans was material to each director. In short, there are no allegations (other than the conclusory allegations concerning Wagoner) that relate a given director's salary and benefits to that director's own economic circumstance. Without allegations to somehow link the accretion of a material benefit to the decision to approve the Hughes transactions, the allegations of pecuniary self-interest are merely conclusory and not well pled. [FN82]

FN82. *See Solomon, 747 A.2d at 1126* ("It would be a novel result under present law to hold that the potential "self-interest" that the directors might have in ingratiating themselves to continuing GM shareholders is a proper basis to rebut the business judgment rule.").

The Complaint is equally devoid of allegations that would allow the Court to infer that the professional relationships of four of the outside directors created a debilitating conflict for the majority. Delaware law has held that a director may have a disabling conflict if a particular relationship would cause that director to make a corporate decision that materially benefits the director at the expense of the corporation or shareholders. [FN83] Still, if the Court draws an inference in favor of a plaintiff, and that inference suggests that one director is conflicted by reason of some outside business relationship, the plaintiff is not relieved of his burden of pleading domination over the remaining directors.

FN83. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1049 (Del.2004)* ("The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences."); *Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 363-364 (Del.1993)* (subsequent history omitted) ("to rebut presumption of business judgment rule, plaintiff must proffer evidence that members of the board had a material self-interest suggesting disloyalty); *Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1167-1169 (Del.1995)*; *Malpiede v. Townson, 780 A.2d 1075, 1084-85 (Del.2001)* (affirming Chancery Court's conclusion that majority of directors were disinterested when the complaint failed to allege that the one interested director dominated the other directors who approved the transaction).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Complaint alleges, for example, that Ward's position as CEO of the U.S. Olympic Committee made him beholden to GM's management because Ward would not oppose a transaction that was strongly supported by one of the U.S.O.C.'s major sponsors. [FN84] According to the Complaint, GM contributed a total of $23.25 million in cash and vehicles to the U.S.O.C. for the 2002 Salt Lake City Olympic Games. [FN85] Missing, however, is any allegation that this contribution conferred a material benefit on Ward at the expense of the Corporation or its Shareholders. In addition, there is no well-pled allegation that the donation itself was significant in relationship to the other donations the U.S.O.C. received from other sponsors, or that a similar contribution could not have been obtained from another automobile sponsor. In fact, GM's contribution to the U.S.O.C. occurred at least a year before the split-off was approved and as of June 2003, Ward no longer served on GM's board. [FN86] Simply stated, there is absolutely nothing in this Complaint that would suggest that this professional relationship provided GM with any leverage over Ward so that Ward's decision to approve the split-off was tainted by his desire to receive a material benefit that only GM could bestow.

FN84. Compl. ¶ 25.

FN85. *Id.*

FN86. *Id.* ¶ 21.

*9 The allegations concerning defendants Pfeiffer, Bryan and O'Neal are equally unremarkable and cannot rebut the business judgment rule. Pfeiffer was a board member of both Hughes and GM at the time the split-off was approved. Bryan served on the boards of both GM and Goldman Sachs-one of Hughes' financial advisors in this transaction. O'Neal served on both GM's board and was CEO of Merrill Lynch & Co.-one of GM's financial advisors.

Allegations concerning Pfeiffer's dual board membership are of little help to the plaintiffs' claims. As a director of Hughes (GM's wholly owned subsidiary), Pfeiffer is charged to act in the best interests of GM and GM's shareholders. [FN87] Clearly, being a director of Hughes did nothing to misalign the fiduciary duties Pfeiffer already owed to the GMH holders. As to Bryan and O'Neal, there is no allegation in the Complaint that either Bryan or O'Neal could have controlled or dominated the GM board even if a material conflict existed. Without such an allegation, plaintiffs cannot impugn the entire GM board with any putative conflicts Bryan and O'Neal may have had. [FN88]

FN87. *See Solomon,* 747 A.2d at 1123 (citing *Anadarko Petroleum Corp. v. Panhandle E. Corp.,* 545 A.2d 1171, 1174 (Del.1988)).

FN88. This is not to suggest that the Court finds these relationships conflicting or material. But, even if I extend to the plaintiffs all reasonable inferences, as I am required to do, the plaintiffs still have failed to make well-pled allegations that suggest a conflicted director dominated an otherwise independent majority of GM's board.

2. *Conflicts of the Investment Fund Committee*

Plaintiffs have alleged that six members of GM's board were not disinterested

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because they served on the Investment Fund Committee of the Board-a named fiduciary to GM's pension plans. [FN89] In particular, the Complaint alleges that the payment of the \$275 million dividend, as a means of reducing the various pension plans' underfunding, gave these directors a personal interest in the Hughes transactions. [FN90]

> FN89. *See* Compl. ¶ 37 (naming Barnevik, Codina, Fisher, Idei, O'Neal, and Smith).

> FN90. *Id.* ¶ 39.

These contentions fail to show a conflict of sufficiently material importance, in the context of the directors' economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest. First, if the proceeds from the Hughes transactions were used to fund the pension plans, then irrespective of the Special Dividend, the Investment Fund Committee, along with every other GM director, had every incentive to get the maximum value for the Hughes shares. Second, to the extent part of that consideration was allocated differently among the GM classes of Stock (*i.e.*, through the Special Dividend) it is often the case that directors must make difficult decisions that affect the allocation of value between various classes of stock. This fact alone does not necessarily implicate the director's good faith or loyalty. [FN91] Finally, as stated above, an allegation of a director's personal interest must show materiality as to that director. The Complaint alleges that by the end of 2002, the underfunding of GM's pensions approximated \$19.3 billion. [FN92] In relation to this amount, the Special Dividend represented less than two percent of the total underfunding-this amount is not material and does not suggest it was probable that an overriding personal interest was influencing the investment fund committee directors.

> FN91. *Solomon,* 747 A.2d at 1118 (citations omitted).

> FN92. Compl. ¶ 32.

\*10 The failure to set forth any well-pled allegation that would allow the Court to infer that a majority of the GM directors were self-interested is an independent reason to conclude that the Complaint has not rebutted the presumptions of the business judgment rule.

### D. The Effect of Shareholder Ratification

Aside from the plaintiffs' direct attacks on the GM directors, plaintiffs also allege that the process of splitting off Hughes was inherently conflicted. [FN93] In *Solomon v. Armstrong,* [FN94] this very same issue was addressed and resolved. There, the Court held that both the form and substance of the transaction compelled the Court to reject the notion that the Court should conceptualize the split-off transaction as akin to a minority freeze-out. [FN95] The same considerations that were present in *Solomon* are also present here. [FN96] Therefore, the split-off of Hughes, alone, will not trigger an entire fairness review; plaintiffs' reliance on *Kahn v. Tremont* [FN97] is inapposite here [FN98] and because I find that the Hughes split-off does not implicate entire fairness review, I conclude that shareholder ratification will have the effect of maintaining the business judgment rule's presumptions. [FN99]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported Case 1:05-cv-00327-GMS   Document 48-5   Filed 03/06/2006   Page 17 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

FN93. *Id.* ¶ 168.

FN94. 747 A.2d 1098.

FN95. *Id.* at 1123.

FN96. Specifically, the Court in *Solomon* held that:
To the extent that in a given transaction different shareholder classes have mutually exclusive interests, the ability of the board to act in all of the shareholders' best interests is seriously complicated.... [Nevertheless, when future conflicts of interest are anticipated and appropriate provisions to deal with them are drafted under the certificate of incorporation] [t]his is clearly a more efficient method of coping with potential divergences of interest between shareholder groups than having courts adapt procedural mechanisms (e.g., special committees, burden shifts, etc.) that are unnecessary or poorly adapted to new contexts.
*Id.* at 1124; *see also In re GM Class H S'holders Litig.,* 734 A.2d at 617 (finding that the structure of GM's ownership interest in Hughes did not give rise to concerns about "implied coercion" such as have been found to exist where a controlling stockholder dominates the corporation).

FN97. 694 A.2d 422 (Del.1997).

FN98. *But see Lewis v. Great W. United Corp.,* 1977 Del. Ch. LEXIS 171 (recapitalization, benefiting controlling shareholders who could have forced the transaction, reviewed under entire fairness standard).

FN99. *See Solomon,* 747 A.2d at 1124 (finding that to the extent aspects of the process may have been flawed, if all shareholders are sufficiently informed about the details of the process and empowered to make an independent decision on the substantive terms of the transaction then the business judgment rule's presumptions must remain in effect); *In re GM Class H S'holders Litig.,* 734 A.2d at 616 (applying business judgment rule when shareholders were afforded the opportunity to decide for themselves on accurate disclosures and in a non-coercive atmosphere).

## 1. *Plaintiffs' Vote Manipulation Claims*

Plaintiffs' first attack on the sufficiency of the shareholder ratification is that GM "rigged" and "manipulated" the vote. [FN100] This allegation, according to the plaintiffs, is sufficient to rebut the business judgment rule as to Counts I and II, and is sufficient to state a separate claim under Count III. Plaintiffs' manipulation claim is predicated upon: (1) GM's contribution of 149 million shares of GMH stock to the pension plans; (2) timing the announcement a few days before Hughes had reported favorable results for the first quarter of 2003; (3) using an allegedly improper record date; and (4) making special solicitations to persons likely to support the transaction. [FN101] These allegations fall short of their intended mark.

FN100. Compl. ¶ ¶ 173-77.

FN101. *Id.* ¶ 176.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported d1:05-cv-00327-GMS   Document 48-5   Filed 03/06/2006   Page 18 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

To state a claim of vote manipulation, plaintiffs must allege well-pled facts that would allow the Court to infer that the primary purpose of the fiduciary's conduct was to thwart the exercise of a shareholder vote. [FN102] Pejorative rhetoric and conclusory allegations are insufficient to state a claim; and without a threshold showing, the defendant directors' actions are entitled to the protection of the business judgment rule. [FN103] If on the other hand plaintiffs meet their burden, defendants would have the opportunity to show a compelling justification, but it is unlikely, if not impossible, for a defendant to meet this burden on a motion to dismiss.

> FN102. *Blasius Indus., Inc. v. Atlas Corp., 564 A.2d 651, 660 (Del.Ch.1988)*.
>
> FN103. *Williams v. Geier, 671 A.2d 1368, 1376 (Del.1996)*; *SWIB v. Peerless Sys. Corp.*, 2000 Del. Ch. LEXIS 170, at *29.

  a. GM's Contribution of 149 Million Shares of GMH stock to the Pension Plans

Plaintiffs allege that an "extensive factual [record] support[s] that the issuance of the shares to the pension plans was intended to thwart a fair shareholder vote." [FN104] The plaintiffs also contend that the Court should infer that the GM directors' primary purpose was to impede the shareholder franchise because the directors "knew" that the GM pension plans would vote their shares in favor of the Hughes transactions. [FN105] To make this existential leap, plaintiffs ask the Court to consider three facts. First, the GM directors contributed the GMH shares to the pension plans at a "steep discount from the[ir] market value." [FN106] Second, the pension plans would be able to sell the shares after the transaction because the stock restrictions would cease after the deal. [FN107] And third, GM would satisfy a portion of its underfunding by contributing to the pension plans over $3 billion of the transaction's proceeds. [FN108]

> FN104. Pls.' GM Br. at 24 (citing Compl. ¶ ¶ 100, 103, 104).
>
> FN105. *Id.*
>
> FN106. *Id.* at 25.
>
> FN107. *Id.*
>
> FN108. *Id.* at 25-26.

*11 These conclusory statements fail to state a claim. U.S. Trust serves as the GM pension plans' trustees. This trust has the unilateral authority to vote all shares contributed to the pension plans. The Complaint makes no allegation that GM exerted power, or for that matter even possessed the power, to direct how U.S. Trust would vote the GMH shares. The Complaint also fails to allege that the Hughes transactions were a condition precedent to GM contributing funds to the pension plans, and by the Complaint's own assertion, GM had other means available to resolve the pension plans' underfunding. [FN109] At best, these allegations allow the Court to infer that the pension plans had their own, unique, economic incentive to vote for a transaction that would maximize the value of their GMH holdings, a self-interest that does not necessarily equate to approving the Hughes transactions. Moreover, this interest is totally aligned with the non-affiliated shares and,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

without an allegation of inequitable conduct, a shareholder is entitled to vote its shares in its own economic interests. [FN110]

> FN109. The Complaint alleges that GM eliminated $13.5 billion in benefit underfunding, in 2003, by using its ability to borrow cash. *See* Compl. ¶ 85.

> FN110. *Williams v. Geier*, 671 A.2d at 1381. The Complaint does not allege that the pension plans owed any particular duty to the other GMH holders.

Even if I were to accept that the GM directors "knew" the pension plans would vote for the transaction, this does not, by itself, satisfy the *Blasius* standard. By its terms, *Blasius* set forth a conjunctive test: a plaintiff must show both a primary purpose and the thwarting of the franchise. The Complaint, however, fails to allege that there was any shareholder that the GM directors sought to oppose, or that the percentage of shares held by the pension plans was material in affecting the outcome of the vote. From all indications, it is clear that a majority of the non-affiliated shares approved this transaction. [FN111] In this context (*i.e.*, no management motivation), plaintiffs' allegations that the shareholder franchise was thwarted (or that there was a reason to thwart the vote) are particularly hollow.

> FN111. Approximately seventy-nine percent of the outstanding GMH shares voted to approve the transaction-the non-affiliated GMH shares represented over half of the outstanding shares that voted. Of all outstanding shares that actually voted on the transaction, approximately ninety-five percent voted in favor. *See* GM SEC Form 10-Q (Nov. 13, 2003), at 35-37. Plaintiffs make no allegation that challenges the accuracy of these disclosures or that GM did not obtain the votes it required to consummate the transactions.

### b. The Timing of Announcement

The next allegation is that the defendants manipulated the vote by strategically timing the announcement of the Hughes transactions and by rushing the vote. According to the Complaint, the GM directors announced the transaction a few days before the release of PanAm Sat's (Hughes' eighty-one percent subsidiary) favorable financial results for that quarter. According to the Complaint, the timing of the announcement allowed the directors to tout a 22 percent premium over market price-a premium that would have "evaporated" had the announcements been reversed. [FN112] The context in which these announcements were made, however, does not support the inference that the directors' primary purpose of announcing the transaction when they did was to thwart the franchise. The Consent Solicitation was mailed five months after the PanAm Sat results were publicly announced-more than enough time for the public to absorb the information. Moreover, the solicitation, advised the shareholders that GM did not advocate the transaction based on any premium and that the current market prices only reflected a 1.4 percent premium. The Complaint does not allege that the PanAm Sat results were not fully disclosed by the time the Consent Solicitation was mailed or that the defendants had ignored a viable reason to delay the announcement. Without such allegations, there is no nexus between the timing of the announcement and the effect, if any, that the announcement had on the vote. In other words, the conclusory allegations of the Complaint offer to the Court no plausible inferences of vote manipulation.

> FN112. Compl. ¶ 51.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 20 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

*12 The attendant claim to the timing of PanAm Sat's announcement is plaintiffs' contention that GM rushed and, thereby, manipulated the vote by timing the vote to occur before Hughes released its third-quarter earnings.    [FN113] Plaintiffs cite two facts that support this ostensible manipulation claim. The first is that after the third-quarter announcement, Hughes stock rose "well above $15 per share."    [FN114] The second is that the Defendant directors caused the solicitations to be mailed before they were contractually required. [FN115] Plaintiffs, therefore, rest their rushing-the-vote claim on the directors' ability to foresee that a material increase in stock price was likely and a that five day difference between the date the directors chose to mail the solicitation and the date they had to mail the solicitation, made a difference in the vote outcome.

   FN113. _Id._ ¶  118.

   FN114. _Id._

   FN115. _Id._ ¶  116.

The recited facts, however, cannot support a reasonable inference of conduct that violates the _Blasius_ standard. According to the Complaint, the process of securing the vote began in early August. [FN116] There is no allegation that the Defendant directors could have known, with any degree of certainty, the results for the third-quarter at that time. Moreover, the plaintiffs want this Court to infer that the five-day head start somehow provided the defendants the edge they needed to close the transaction before the release of the third-quarter results. I cannot, however, reasonably make this inference in light of the fact that there is no allegation that suggests the directors knew or had any control over when the requisite percentage of votes would be reached. Indeed, the transaction could have easily continued into November, a month after the Hughes third-quarter results. [FN117] Therefore, plaintiffs' theory is plausible only if I assume that the directors not only had the ability to predict the increase in stock price, but also the voting responses of a disaggregated public. Although the procedural posture of this case requires that I make all reasonable inferences in favor of plaintiffs, it would be unreasonable (in my opinion) to weave these allegations into a viable _Blasius_ claim.

   FN116. _Id._ ¶ ¶  120-21.

   FN117. _See_ CS at 9 (reporting that GM had 60 days to secure the vote).

                  c. Allegations of the Improper Record Date

Moving to the next allegation of manipulation, the plaintiffs contend that "upon information and belief" the record date "was not properly set." [FN118] This bald allegation seemingly arises from two facts contained in the Consent Solicitation: that the record date was August 1, 2003, and that it appears that the GM board did not meet between June 5 and August 5, 2003. [FN119] This allegation does not come close to stating a vote manipulation claim. There is no allegation that the actual setting of the record date had affected, in any way, the vote, or that the nondisclosure of when the record date was set had any influence. Recognizing this deficiency, plaintiffs shifted gears and have suggested that the vote was void _ab initio_ under 8 _Del. C._ § 213(c). [FN120] This claim must also fail. The suggestion

              ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 05-cv-00327-GMS   Document 48-5   Filed 03/06/2006   Page 21 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

that it "appears" that the GM board did not meet between June 5 and August 5
cannot, by itself, support an inference of vote manipulation. The GM directors can
avail themselves of several modes of setting a record date-a board meeting is only
one of those possibilities. [FN121] Without a non-conclusory allegation that the board
improperly set the record date, and that the allegedly flawed process somehow met
their threshold burden under *Blasius,* plaintiffs' allegations are rank speculation
and will not suffice to state a claim.

> FN118. Compl. ¶ ¶ 120-21.
>
> FN119. *Id.* ¶ 121.
>
> FN120. Pls.' GM Br. at 27.
>
> FN121. *See* 8 *Del. C.* § 141(f) (authorizing board action by consent without a
> meeting of the board).

### d. Allegations Concerning Special Solicitations to Persons Likely to Support the Hughes Transactions

*13 The final vote manipulation claim focuses on GM's decision to send certain
shareholders and employees an advance copy of the Consent Solicitation. [FN122] Again,
plaintiffs fail to connect a naked assertion with any facts that would support the
inference that GM's primary purpose in disseminating advance copies of the
solicitation was to thwart the franchise. The Complaint, for example, is devoid of
any allegation that these advance copies contained information not contained in the
solicitations that were already publicly available from the SEC or that the receipt
of the advanced copies had any effect on the non-affiliated shareholders.

> FN122. Compl. ¶ ¶ 122-25.

Ultimately, Count III must fail because the Complaint, despite its prolix attempts,
has failed to state a claim that the GM defendants acted with the primary purpose
of thwarting the shareholders' vote. This conclusion is predicated on the fact that
Count III fails to put forth well-pled allegations that would allow the Court to
infer that the will of the shareholders was somehow frustrated.

### 2. *Plaintiffs' Disclosure Claims*

Plaintiffs' final attack on the sufficiency of the vote focuses on the adequacy of
disclosures contained in the Consent Solicitation. As with the vote manipulation
claim, plaintiffs contend that they have stated a separate claim in Count IV which
precludes a ratification defense as to Counts I and II. To begin, there is a
dispute as to who possesses the burden on this motion. Quite simply, both parties
do. To state a separate claim for failing to disclose material information,
plaintiffs must bear that burden. [FN123] Still, the complexity of the issues here adds
a familiar twist: defendants assert that ratification acts as a complete defense to
Counts I and II. In this regard, the law is equally clear-it is the defendants'
burden. [FN124] Because plaintiffs have failed to state a claim that the defendant
directors breached their duty of disclosure, I conclude that plaintiffs have not
met their burden as applied to Count IV and defendants have necessarily satisfied
their burden as to their ratification defense. [FN125]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN123. *See Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135, 140-41 (Del.1997)*; *Klang v. Smith's Food & Drug Ctrs., Inc.*, 1997 Del. Ch. LEXIS 73, at *18, ("The burden of demonstrating that omissions were material rests with the plaintiff,"), *aff'd, 702 A.2d 150 (Del.1997)*.

FN124. *Solomon, 747 A.2d at 1117* (quoting *Citron v. E.I. Du Pont de Nemours & Co., 584 A.2d 490, 502 (Del.Ch.1990)* ("The parties who assert the defense of shareholder ratification have the burden to establish that they fully disclosed all material facts in their proxy disclosures.")). *See also Yiannatsis v. Stephanis, 653 A.2d 275, 280 (Del.1995)*.

FN125. *See Harbor Fin. Partners v. Huizenga, 751 A.2d 879, 890 (Del.Ch.1999)* ("In and of itself, the fact that a defendant has proven that a Proxy Statement's disclosures are adequate to justify a Rule 12(b)(6) dismissal should ordinarily be sufficient to meet [their] burden. The substantial difficulty of winning such a motion (the plaintiff is given the benefit of every doubt), the illogic of requiring the court and defendants to identify disclosure deficiencies not complained of by experienced plaintiffs' lawyers, and the interests of judicial economy support that conclusion.").

Plaintiffs' challenges to the Consent Solicitation are based on seven grounds: [FN126] (1) the incomplete and misleading disclosure concerning the value enhancement effect of the special dividend; [FN127] (2) the accuracy of the financial advisors' analysis; [FN128] (3) the lack of financial forecasts and projections prepared by Hughes management; [FN129] (4) the inadequacy of the PanAm Sat valuation; [FN130] (5) the misstatement of the legal effect of ratification; [FN131] (6) the incomplete and misleading disclosure concerning GM's contribution of GMH stock to the pension plans; [FN132] and (7) the failure to disclose material provisions of GM's Restated Certificate of Incorporation. [FN133]

FN126. Because plaintiffs rely exclusively on the Consent Solicitation in making their disclosure claims, it is appropriate for the Court to incorporate the document into the Complaint and use it in deciding this 12(b)(6) motion. *See supra* discussion Section II, Part B.

FN127. Compl. ¶ ¶ 180-81.

FN128. *Id.* ¶ ¶ 182-84.

FN129. *Id.* ¶ 185.

FN130. *Id.* ¶ ¶ 186-87.

FN131. *Id.* ¶ ¶ 188-89.

FN132. *Id.* ¶ ¶ 190-91.

FN133. *Id.* ¶ ¶ 192-94.

Whether shareholders are fully informed necessarily asks the question of whether the directors have complied with their fiduciary duty to "disclose all material information." [FN134] Information is material when there is a "substantial likelihood

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

that a reasonable stockholder would consider it important in deciding how to vote," [FN135] and that "under all circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholders." [FN136] It is not enough that the information might render a communication to shareholders "somewhat more informative." Rather, the determination of the materiality of an alleged omission or misstatement "requires a careful balancing of the potential benefits of disclosure against the resultant harm." [FN137] Delaware law does not require "directors to bury the shareholders in an avalanche of trivial information. Otherwise, shareholder solicitations would become so detailed and voluminous that they will no longer serve their purpose." [FN138]

FN134. *Solomon, 747 A.2d at 1128* (citations omitted).

FN135. *Id.*

FN136. *Id.*

FN137. *Id.*

FN138. *Id.* at 1130.

e. The Incomplete and Misleading Disclosure Concerning the Value Enhancement Effect of the Special Dividend

*14 Plaintiffs first disclosure claim attacks the adequacy of the explanation provided to the shareholders for the $275 million special dividend because it "[f]ailed to disclose any analysis of, much less quantify, the value enhancement ... that allegedly justified ... the difference in value" [FN139] between Hughes as a GM subsidiary and as a stand-alone company. On pages 97 through 98, however, the Consent Solicitation begins its detailed disclosure of how the amount of the dividend was decided.

FN139. Compl. ¶ 180(a)-(f).

In calculating the dividend, the Consent Solicitation discloses that GM's management believed a $400 to $500 million (or 3 to 5 percent of the current market price of Hughes) dividend was appropriate. GM's basis for this assumption was disclosed: (1) The 1996 EDS special dividend served as an appropriate benchmark; (2) the estimation that a one-to-one exchange of Hughes stock for GMH stock increased value to GMH holders because the derivative nature (*i.e.* the tracking) of the GMH stock was removed; and (3) the belief that Hughes, as a stand-alone company, would enjoy strategic benefits not currently available. [FN140] Hughes' management responded to GM's valuation and believed that a lower dividend was justified. The rationale disclosed was that the split-off offered GM unique benefits and that the current constraints on Hughes' financial capacity precluded the amount GM sought. The solicitation then discloses that both GM and Hughes considered the fact that they would need the concurrence of News Corp. in approving any dividend. Finally, the Consent Solicitation concedes that although the split-off to Hughes "was considered to constitute a transfer of value," to the GMH holders, [FN141] that value was difficult to measure. [FN142] Further negotiations then culminated in setting the special dividend at $275 million.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1.05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 24 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

FN140. CS at 83.

FN141. *Id*. at 112.

FN142. *Id*.

Importantly, the disclosures did not stop there. The reliability of this admittedly imperfect negotiation process was buttressed when the Consent Solicitation disclosed both GM's and Hughes' financial advisors' opinion letters and analyses summaries. [FN143] These disclosures identified a range of reasonable "differential consideration" paid in similar transactions and concluded, separate from GM's and Hughes' own assertions, that a shift from GMH tracking stock to Hughes asset-based stock generated value for the Hughes holders. [FN144]

> FN143. The Court pauses to mention that the Complaint failed to allege facts that raise concerns as to the independence of the financial advisors. The fee arrangement was unremarkable in terms of the overall value of the transaction and the alleged conflicts arising from the business relations with two of the GM directors do not create a material conflict.

FN144. CS at 126, 136-37.

Thus, the Consent Solicitation informs the shareholders of the assumptions each management team brought to the table and the active process the two teams used to arrive at the size of the special dividend. It also disclosed that both GM and Hughes believed that, despite the need for a dividend, the value was going to be "difficult to measure." [FN145] In addition, the shareholders were not asked to rest on managements' assumptions alone; they were provided a range of values from similar transactions, and it is made clear that the financial advisors believed that the special dividend fit within those ranges. It is not clear why I should infer that the shareholders needed more information.

FN145. *Id*. at 112.

**\*15** Still, plaintiffs contend that an informed decision concerning the value enhancement aspect of the exchange was obfuscated because: (1) it was not disclosed that the special dividend would be used to fund GM's pension plans, (2) it was misleading to state that the GMH stock was exchanged on a one-for-one basis with an "independent" Hughes Stock when GMH stock was already an asset-based stock, and (3) the EDS comparison was not an apples-to-apples comparison. In all respects, these allegations fail.

The Consent Solicitation clearly indicated that 149 million GMH shares were contributed to GM's pension plans. Any reasonable investor would know that any value derived from the transaction flowed to all holders of the GMH stock, including GM and the pension plans. Therefore, the solicitation is not deficient in this regard.

The details concerning the structure of the split-off are equally plain. Beginning on the first page of the solicitation, it is explained that the GMH shareholders would have their stock redeemed and exchanged for Hughes shares on a one-to-one basis, that is, each GMH holder received one Hughes share for each GMH share. There is no allegation that this did not occur. Rather, plaintiffs contend that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS   Document 48-5   Filed 03/06/2006   Page 25 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

exchange was momentary and transitory because, immediately after the exchange, seventeen percent of the Hughes stock was swapped for News ADSs and, therefore, the portion of the Hughes stock that was exchanged for News ADSs could not represent any enhanced value. [FN146] Clearly, the first step in splitting off Hughes required GM and Hughes to put a price tag on the entity as a stand-alone company. Then the two teams needed to negotiate what this value was in comparison to what the GMH holders already had. This produced the one-to-one exchange less the special dividend and the procedures and valuations used to arrive at this value were disclosed. It was only after this value was determined that News Corp. and GM could fix the subsequent exchange ratio. Thus, the solicitation is accurate when it stated that the GMH holders would exchange their GMH stock, one-for-one, for Hughes stock and that the subsequent merger would result in the new Hughes shareholders receiving News ADSs in exchange for seventeen percent of their Hughes stock. Therefore, on this point, plaintiffs' claim is not a disclosure claim, but rather, a matter of dissatisfaction with the News ADSs exchange ratio.

FN146. Pls.' GM Br. at 30 & n. 49.

Plaintiffs' next contention deserves little attention. The fact that News Corp would ultimately own 34 percent of Hughes did not change the fact that Hughes was no longer GM's subsidiary. The first page of the Consent Solicitation states: "As a result of the Hughes split-off and GM/News stock sale, Hughes will become an independent public company, separate from and no longer owned by GM." Indeed, the title of the document in bold and large font states: "The Separation of Hughes from GM and the Acquisition by News Corporation of 34% of Hughes." [FN147]

FN147. Any glossary reading of the Consent Solicitation would make clear that before the Hughes transaction the GMH stock was secured by the assets of GM but with dividends payable on Hughes' performance; and that after the transaction, Hughes stock was secured by the assets of Hughes. Therefore, the solicitation is not misleading when it stated a tracking stock would be exchanged for an asset-based stock. Looking at the entire solicitation, not selective portions, cured any confusion.

*16 Finally, the disclosures concerning the EDS transaction were not misleading. The solicitation simply disclosed that the EDS split-off produced a differential between the value of the tracking stock and the value of the stand-alone stock. This amount was determined to be worth approximately "3% to 5% of the market value of the outstanding" [FN148] tracking stock and served as GM's starting point in formulating the Hughes dividend. It is clear from the context of the entire solicitation that the reference to the EDS transaction was but one of several factors disclosed which justified the payment of the special dividend. In light of these other factors, including the summary of the financial analyses, and the relative weight the solicitation placed on the comparison, the GMH shareholders were not duped into blindly relying on comparisons between the EDS and Hughes split-offs; disclosures of all possible divergences between the two transactions would not have altered the total mix of information already available.

FN148. CS at 9.

f. The Accuracy of the Financial Advisors' Analysis

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported: 05-cv-00327-GMS   Document 48-5    Filed 03/06/2006    Page 26 of 46
Page 25
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

Plaintiffs contend that the solicitation is, at worst, false or, at best, materially misleading and incomplete. [FN149] According to the plaintiffs, the solicitation contains "only summaries of the analyses the financial advisors performed in connection with their April 9, 2003 opinions" [FN150] and fails to disclose the four updated analyses the financial advisors performed in the August 5, 2003 fairness opinions. Because the April 9 opinions became stale, and because the GM board disclosed that they had relied on the updated opinions, the updated information took on vital importance. [FN151]

FN149. Compl. ¶ 183.

FN150. Id. ¶ 182.

FN151. Id. ¶ 182.

The solicitation discloses over 35 pages of text and figures that describe the financial analyses employed, and the opinions that accompany those analyses. [FN152] From that it is clear the financial advisors made detailed presentations of their April 9, 2003 analyses to the board. [FN153] Then, the solicitation describes what the various bankers did to update their opinions [FN154] including an updated presentation to the board. [FN155] In light of all that was disclosed, plaintiffs seem to argue for the inclusion of the raw data behind the advisors' updated summaries. Moreover, since the updated opinions were, in part, based upon amendments to the merger agreement and stock purchase agreements, plaintiffs would see that a list of the actual amendments considered were also included. [FN156]

FN152. CS at 114-53 & App. E.

FN153. Id. at 101-02.

FN154. Id. at 118, 127-30, 139-40, 142-43.

FN155. Id. at 104-05.

FN156. See Pls.' GM Br. at 34; Compl. ¶ 184.

A disclosure that does not include all financial data needed to make an independent determination of fair value is not, however, per se misleading or omitting a material fact. [FN157] The fact that the financial advisors may have considered certain non-disclosed information does not alter this analysis. The summary of factors the advisors considered in their updated review was disclosed, along with the opinion that no material changes occurred between the April and August analyses. [FN158] Without allegations that there was any material change in the conditions underlying the decision the board made in April, I cannot conclude that the information disclosed was materially incomplete-there is simply no reason to think that the board had access to any information not already disclosed or that there was sufficient ground for the board to inquire into the updated opinions. [FN159]

FN157. Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170, 1174 (Del.2000). I extend this rationale to plaintiffs' claims for the inclusion of managements' projections.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported :05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 27 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

FN158. *See, e.g.,* CS at 118.

FN159. *See Behrens v. United Investors Mgmt. Co.,* 1993 Del. Ch. LEXIS 217, at *42 ("The disclosure obligation ... is said to be one that requires the disclosure of all material information within the knowledge of the corporation and thus available to the directors.") (citing *Rosenblatt v. Getty Oil Co., 493 A.2d 929 (Del.1985)*). This duty may extend to factors the board should have known, but this determination cannot be made absent well-pled allegations to support such an inference. *See id.,* at *44.

### g. The Inadequacy of the PanAm Sat Valuation

*17 Like so many of the plaintiffs' claims, the allegations here move away from honest disputes concerning the adequacy of the disclosures, but instead challenge the consideration Hughes received in the deal. For example, plaintiffs allege that the PanAm Sat valuation was misleading and grossly incomplete because the financial advisors updated their April opinions without adjusting the "grossly inadequate $1.8 billion value ascribed to Hughes' interests in PanAm Sat." [FN160] This allegation seems, in large part, to be predicated upon a $1.40 per share increase in PanAm Sat's stock price between the date of the announcement and the updated fairness opinions. [FN161]

FN160. Compl. ¶ 187.

FN161. *Id.* ¶ 95.

The Consent Solicitation discloses that the financial advisors relied on three separate methodologies to value PanAm Sat: (1) PanAm Sat's share price; (2) discounted cash flow analyses; and (3) comparable company analyses. [FN162] It was also disclosed that the advisors believed no material changes had occurred between the April and August opinions. In this context, the rise in the stock price is of little consequence. First, PanAm Sat's current stock price was information publicly available-a fact making it unlikely that additional disclosures would have altered the total mix of information already available. Second, I cannot infer that this market change was such as to impose upon the directors a duty of additional inquiry that would compel them to look beyond what the financial advisors had already provided. Clearly then, the duty of disclosure did not extend beyond the information the board had (or should have had) in its possession. [FN163] In light of these factors, the portion of the Consent Solicitation concerning the PanAm Sat valuation is neither misleading nor grossly inadequate. Plaintiffs simply think the bankers got it wrong-this alone does not state a disclosure claim. [FN164]

FN162. CS at 120-21, 132-33; 147-48.

FN163. *Behrens,* 1993 Del. Ch. LEXIS, at *42.

FN164. *See In re JCC Holding Co. Inc., S'holders Litig., 843 A.2d 713, 721-22 (Del.Ch.2003)* (finding that disclosures are not inaccurate simply because plaintiffs subjective judgment of the advisors work is that the work is wrong).

### h. The Misstatement of the Legal Effect of Ratification

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

Plaintiffs take issue with GM's disclosed belief concerning the effect shareholder ratification would have on the deal. [FN165] The specific point of contention is that it was misleading to state that a majority vote of the shareholders would extinguish any claims relating to fairness. [FN166] A reading of what was disclosed shows that GM set forth, in general terms, and subject to qualifying language, a brief summary of the effects of shareholder ratification and their belief of how it should apply to the proposed transaction. Plaintiffs' theory of disclosure would require the directors to presuppose they were breaching their fiduciary duties, and then disclose the effect of such conduct. Delaware law, however, does not require directors to assume they are acting improperly and then advise shareholders of the consequences of the hypothetically wrongful conduct. [FN167] In light of Delaware precedent, I cannot conclude that this disclosure was misleading or incomplete. [FN168]

FN165. Compl. ¶ 188.

FN166. *Id.* ¶ 189.

FN167. *See Stroud v. Grace, 606 A.2d 75, 84 n. 1* (holding that directors need not engage in self-flagellation by implicating themselves in a breach of fiduciary duty).

FN168. *See, e.g., In re GM Class H, 734 A.2d at 625-26* (holding that statements of belief are not actionable absent an allegation of fact that the belief was falsely stated).

i. The Incomplete and Misleading Disclosure Concerning GM's Contribution of GMH Stock to the Pension Plans

*18 Plaintiffs complain that the disclosures concerning the contribution to the pension plans was materially misleading and incomplete because it failed to disclose: (1) how the contribution would facilitate a tax-free split-off; (2) that the pension plan interests and the public GMH holder interests diverged and that the contribution made approval of the transaction more likely; (3) that GM would benefit from an increase in value resulting from the proposed transaction; and (4) that GM's pension expense would be reduced if the value of the contributed shares increased.

In sum, these allegations fail to meet the materiality test in light of what was actually disclosed in the Consent Solicitation. The material tax consequences of the transaction are disclosed on pages 163 to 169 of the solicitation. In that disclosure, it is clear that the shareholders are told the general tax consequences of the deal, that those consequences may not apply to each shareholder under all circumstances, and that the shareholder's own tax advisor should be consulted. It is also clear that the most important detail, in terms of tax, was disclosed-*i.e.,* the transaction was tax-free. The Complaint fails to allege that this information was false or that the transaction was not tax-free. Absent these allegations, I cannot infer that additional disclosures that detail the particular nuances of the Internal Revenue Code would have assumed actual significance in the deliberations of a reasonable stockholder.

The remaining disclosure allegations are nonsensical. The solicitation discloses the amount of stock contributed to the pension plans, the relative valuation of the stock by the pension plans, the terms under which the stock was held, and the fact that the contribution was designed to reduce GM's pension expense and further

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-sv2-00327-GMS    Document 48-5    Filed 03/06/2006    Page 29 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

benefit GM's balance sheet. [FN169] From this information, any reasonable shareholder would be able to determine what the pension plans' interests were, and could compare those interests to their own. Moreover, it was plain that the pension plans received 149 million GMH shares in addition to the GHM shares they already held. Finally, it is disclosed that these shares represent approximately one-third of the outstanding GMH shares.    [FN170] Any reasonable shareholder could see that this holding would make any vote subject to the GMH shareholders more or less likely to be ratified depending on how the pension plans voted and that any accretion in value that was attributable to the proposed transaction would, in part, benefit the pension plans directly and GM indirectly . [FN171] This observation is so obvious that any additional point not already mentioned could not possibly be material.

> FN169. CS at 52, 95, 265-66, 282-83.

> FN170. *Id.* at 282-83.

> FN171. The Consent Solicitation described the contribution as a means of decreasing GM's pension expense and strengthening its balance sheet. *See id.* at 95.

> j. The Failure to Disclose Material Provisions of GM's Restated Certificate of Incorporation

Plaintiffs contend that the split-off was subject to GM's Article Seventh of its certificate of incorporation (requiring a two-thirds supermajority vote) and that it was a material omission not to advise the shareholders of this provision. Because I ultimately conclude that Count V fails to state a claim, I cannot find that this allegation is sufficient to state a disclosure claim.

*19 Ultimately, I have reviewed the Consent Solicitation's disclosures and the allegations plaintiffs have made concerning material misstatements or omissions. In total, I conclude that plaintiffs have not made well-pled allegations that would allow the Court to infer that the Consent Solicitation was materially deficient in any respect. I therefore conclude that Count IV of the Complaint fails to state a claim.

Reaching this conclusion, I must now address plaintiffs' contention that the effect of shareholder ratification does not extend to extinguish their unjust enrichment claim or the impropriety of the contribution to the pension plans (i.e., the contribution was not part of the transaction voted on and approved by the shareholders).

As to the unjust enrichment claim, plaintiffs have failed to allege facts that show the claims arising from the payment of the special dividend were independent of the fiduciary duty claims. The Court finds plaintiffs' reliance on *Hill Stores Co. v. Bozic* [FN173] unpersuasive. *Hills Stores* held that plaintiffs' claim would survive a motion for summary judgment under two independent theories of relief-either that the recipients of certain severance payments obtained those payments in breach of their fiduciary duties, or in violation of their employment agreements. Thus, even if the defendants successfully showed that no breach of fiduciary duty had occurred, the plaintiffs could still recover. Importantly, Vice Chancellor Strine found that recovery would be proper absent a breach of fiduciary duty because the clear and unambiguous language of the employment agreements precluded the excess payments that were at issue. Thus, the Court in *Hill Stores* found that the existing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 05-cv-00327-GMS   Document 48-5   Filed 03/06/2006   Page 30 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

and enforceable employment contracts would permit recovery if indeed the director-employees were paid in excess of the amount due under their contracts. Here, plaintiffs have not set forth any allegation which would allow this Court to infer that plaintiffs could recover under any independent contract theory (*e.g.*, breach of GM's certificate of incorporation). Thus, plaintiffs' challenge to the special dividend cannot, unlike the severance payments in *Hills Store*, be viewed mutually exclusive from their alleged breach of fiduciary duty claims.

> FN172. 769 A.2d 88 (Del.Ch.2000).

The claims concerning the contribution suffer from a similar defect. The Complaint contains no allegations that the actual contribution of the GMH shares to the pension plans was wrongful; rather, its effect was to "rig" the vote. This is quite different from the argument that the contribution was in violation of a statute (*e.g.*, 8 *Del. C.* § 160(c)). For that reason, I can find no claim concerning the contribution independent from those alleged in Count III of the Complaint. [FN173]

> FN173. *Cf. Aquila, Inc., v. Quanta Servs., Inc.*, 805 A.2d 196 (Del.Ch.2002)
> (analyzing contribution to stock employee trust plan under two separate
> rationales when plaintiffs pled both statutory and equitable reasons for
> attacking the contribution). I pause to note that this is not a situation
> akin to what was considered in *In re Santa Fe*. There, the Court held that
> shareholder ratification could not extinguish claims concerning the defensive
> measures the directors took to fend off a bid when the defensive measures
> themselves were challenged under independent theories of inequitable conduct
> and the shareholders did not vote in favor of the precise measures under
> challenge in the complaint. *See In re Santa Fe*, 669 A.2d at 68. Here the
> contribution was not challenged separately from Count III, the vote
> manipulation claim, and that claim is dismissed on the grounds set forth
> above.

Based on this analysis, I conclude that a valid shareholder vote has occurred and that the effect of that vote is to maintain the presumptions of the business judgment rule. Under this unfortunately lengthy analysis, I have also concluded that the complaint fails to allege conduct that would suggest the directors' decision to split-off Hughes was grossly negligent. As such, the complaint fails to state a claim for breach of the duty of care. Shareholder ratification is also sufficient to bar any claim for breach of the duty of care and serves as an independent basis to grant defendants' motion. Finally, GM's exculpatory charter provision is a third and independent basis to dismiss any duty of care claim. Plaintiffs' good faith claims are merely a rehash of their duty of loyalty claims. For all the reasons stated herein, plaintiffs fail to state a claim that the Defendant directors' actions were predicated on bad faith. Therefore, because the Complaint contains no allegations that would allow the Court to infer that the Hughes split-off was an irrational business decision or a transaction that amounted to waste, Counts I through IV are hereby dismissed in their entirety.

### *E. Does Article Seventh Require a Supermajority Vote As Applied to the Hughes Transactions*

*20 Plaintiffs have failed to state a claim that the Hughes transactions violated Article Seventh of GM's Restated Certificate of Incorporation. Count VI of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint alleges that the Hughes transactions required a vote of two-thirds of the outstanding stock of all classes of General Motors, [FN174] but in breach of Article Seventh, GM only sought a majority vote of all classes voting together and a majority vote of each class voting separately. [FN175]

> FN174. Compl. ¶ 196.

> FN175. *Id.*

A corporate charter is a contract between a corporation and its shareholders, [FN176] and the Court will therefore apply standard rules of contract interpretation to determine the parties' intentions. Article Seventh is a permissive (as opposed to a mandatory) charter provision, which expressly authorizes GM's board of directors to take a variety of actions with the assent of two-thirds of all classes of GM stockholders. From the plain language of the provision, it is clear that the permissive powers conferred by Article Seventh are "[i]n furtherance, and not in limitation of the powers conferred by law." Both parties have urged the Court to look behind the contractual language for the meaning of this Article. This task is unnecessary as I conclude that Article Seventh, by its own unambiguous terms, is not in conflict with Delaware law. Delaware law clearly provides that a corporation may dispose of property, amounting to less than all or substantially all its assets, without a shareholder vote. [FN177] Because Article Seventh is to be read in furtherance and not in limitation of Delaware law, the article did not mandate a shareholder vote, much less a super-majority voting requirement.

> FN176. *Aquila,* 805 A.2d at 192 n. 13.

> FN177. 8 *Del. C.* § 271(a).

### F. Did the Hughes Transactions Violate Article Fourth

Plaintiffs have failed to state a claim that the Hughes transactions violated Article Fourth of GM's Restated Certificate of Incorporation. That article ensures that all GM $1 2/3 holders and all GMH holders will be, subject to the provisions set forth in Article Fourth, treated identically in all respects and enjoy equal rights and privileges. [FN178] Plaintiffs contend that the payment of the special dividend to some GMH holders and not others was in clear violation of this provision.

> FN178. Compl. ¶ 199.

This claim fails because the contractual rights vested in corporate stockholders by a certificate of incorporation are subject to amendment by vote of those stockholders. [FN179] Thus, even if the special dividend ran afoul of the protections provided under Article Fourth, those protections were eliminated when the shareholders themselves voted to amend GM certificate and allowed the dividend to be paid. [FN180] Accordingly, Count VI is dismissed.

> FN179. *See In re GM Class H S'holders Litig.,* 734 A.2d at 615-16.

> FN180. It is worth noting that plaintiffs failed to address the glaring

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

defect in their argument. Hughes paid the special dividend to its sole shareholder GM. In this circumstance, the provisions of Article Fourth were never implicated. Nevertheless, because the GMH holders voted on the amendments to GM's certificate of incorporation plaintiffs cannot recovery on Count VI under any conceivable postulation.

## III. NEWS' MOTION TO DISMISS

News has moved to dismiss the Complaint on three grounds: first, that service of process was not properly made upon News; [FN181] second, that this Court lacks jurisdiction over News; [FN182] and third, that the Complaint fails to state a claim upon which relief can be granted. [FN183]

FN181. *See* Ct. Ch. R. 12(b)(4).

FN182. *See* Ct. Ch. R. 12(b)(2).

FN183. *See* Ct. Ch. R. 12(b)(6).

### A. News' 12(b)(4) Argument

*21 News argues that the Complaint should be dismissed as to News because News was not properly served with process in accordance with the requirements of Delaware law. After defendants filed their opening brief in support of their motion to dismiss, plaintiffs apparently became apprehensive that their personal service upon News' Australian offices would be held to be insufficient. Therefore, they served the Delaware Secretary of State with process on behalf of News Corp. on October 6, 2004, and they thereafter mailed a summons and Complaint to News' Australian offices by registered mail, return receipt requested, in accordance with the requirements of 10 *Del. C.* § 3104(d). [FN184] Because there is no reason why this albeit belated service should be invalidated by the prior personal service by process server, I therefore conclude that service of process was properly made in accordance with an applicable statute, and also with Court of Chancery Rule 4(d)(4). [FN185] News' motion to dismiss on the grounds of insufficiency of process is denied.

FN184. *See* Ex. 5 to Aff. of Geoffrey C. Jarvis in Supp. Of Pls.' Memo. Of Law In Opp. To The News Corp. Ltd.'s Mot. To Dismiss ("Jarvis Aff."). It is worth nothing that the operative Complaint naming News as a defendant was filed roughly five months earlier-a significant delay. Because the Court of Chancery Rules do not provide an express period of time in which the defendant must be served, however, I cannot conclude that this delay was unreasonable, especially given the fact that News had previously received actual notice of the suit by the personal service via process server in Australia. *See Hovde Acquisition, LLC v. Thomas,* 2002 WL 1271681, at *6 (Del.Ch.) (noting that many other courts have a 120-day limit within which to serve process, but the Court of Chancery does not).

FN185. By concluding that process was properly served, I choose not to address plaintiffs' argument that News is estopped from moving to dismiss on the grounds of improper service because it negotiated a briefing schedule on the motion to dismiss pursuant to this Court's instructions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

### B. News' 12(b)(2) Argument

Because News has challenged whether personal jurisdiction over it is proper, plaintiffs bear the burden of making a showing that jurisdiction is proper. [FN186] The Court will then engage in a two-step analysis, first determining whether an applicable statute permits the exercise of jurisdiction, and then whether exercising jurisdiction over a particular defendant violates the due process clause of the Fourteenth Amendment of the United States Constitution . [FN187] Plaintiffs argue that this Court has personal jurisdiction over News pursuant to _10 Del. C. §_ _3104_ and _10 Del. C. § 365_ based on Delaware as the _situs_ of Hughes' stock. Because plaintiffs did not comply with the service requirements set forth in _§ 365_, personal jurisdiction thereunder is not proper, and as a result, personal jurisdiction over News will only be found if permitted by _§ 3104_ and the requirements of due process. [FN188]

> FN186. _See_ _Werner v. Miller Tech. Mgmt., L.P., 831 A.2d 318, 326_ _(Del.Ch.2003); Wright v. Am. Home Prods. Corp., 768 A.2d 518, 526_ _(Del.Super.2000); Harmon v. Eudaily, 407 A.2d 232, 233 (Del.Super.1979)_, _aff'd, 420 A.2d 1175, (Del.1980)_.

> FN187. _See_ _Hercules, Inc. v. Leu Trust and Banking (Bahamas) Ltd., 611 A.2d_ _476, 480-81 (Del.1992), cert. dismissed, 507 U.S. 1025, 113 S.Ct. 1836, 123_ _L.Ed.2d 463 (1993); LaNuova D & B, S.p.A. v. Bowe Co., 513 A.2d 764, 768_ _(Del.1986)_.

> FN188. Even if plaintiffs had followed the proper procedure for service under _§ 365_, jurisdiction under that statute is only proper in certain circumstances. I need not enter into a discussion of whether the circumstances here meet that standard.

_Section 3104(c)_ sets forth a series of acts, which if taken either personally or by an agent, constitute legal presence in the state of Delaware, such that the actor or principal consents to submit to the jurisdiction of the Delaware courts. [FN189] Plaintiffs argue that jurisdiction is proper under three of the six paragraphs found in _§ 3104(c)_. Because jurisdiction is proper under _§ 3104(c)(1)_, I need not address plaintiffs' arguments as to (c)(3) or (4).

> FN189. _See_ _10 Del. C. § 3104(b)_.

_Section 3104(c)(1)_ allows personal jurisdiction when the defendant "[t]ransacts any business or performs any character of work or service in the State." The provisions of _§ 3104(c)_ are to be broadly construed such that jurisdiction is permitted to the fullest extent of the due process clause of the Fourteenth Amendment . [FN190] In determining the scope of _§ 3104(c)_, and which acts suffice to create jurisdiction in Delaware, it is important to understand that paragraph (c)(1) grants "specific," "transactional," or "single-act" jurisdiction, as opposed to the "general" jurisdiction created by paragraph (c)(4). [FN191] When establishing jurisdiction under paragraph (c)(1), the plaintiff must show that the cause of action arises from the defendants' specific activities within Delaware. [FN192]

> FN190. _See_ _Hercules, 611 A.2d at 480_ (citing _LaNuova, 513 A.2d at 768_).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN191. *See Computer People, Inc. v. Best Int'l Group, Inc.*, 1999 WL 288119, at *5 (Del.Ch.); *Macklowe v. Planet Hollywood, Inc.*, 1994 WL 586838, at *3 (Del.Ch.).

> FN192. *See Computer People*, 1999 WL 288119, at *5; *Macklowe*, 1994 WL 586838, at *3 (explaining that there must be an "affiliation" between the forum state and the controversy between the parties).

*22 One of the difficulties of plaintiffs' argument with respect to § 3104(c)(1) is that the actions of various entities in which News has a controlling interest, including News Publishing Australia Limited ("NPAL"), GMH Merger Sub, and Fox Entertainment Group, Inc. ("Fox"), all three of which are Delaware corporations, are attributed to News. The Complaint is not clear as to whether News itself or one of its subsidiaries engaged in certain conduct. [FN193] Delaware law is clear that if the only link between the parent corporation and the alleged wrong is the parent's ownership of stock in the subsidiary, that is insufficient to establish personal jurisdiction under § 3104(c)(1). [FN194] If the parent corporation of the Delaware subsidiary, however, actively engages in the negotiations and consummation of the transaction, it has transacted business within the meaning of § 3104(c)(1), and may be haled into a Delaware court to defend a cause of action that arises from that transaction. [FN195]

> FN193. The lack of clarity can be excused at this stage because the Consent Solicitation speaks of News as having engaged in the transactions and negotiations at issue. *See* nn. 201-206.

> FN194. *See Kahn v. Lynch Comm. Sys., Inc.*, 1989 WL 99800, at *3 (Del.Ch.) (CGB's (the grandparent) only connection to the indirect Delaware subsidiary was its ownership of the subsidiary; there were also no allegations that the subsidiary was a mere agent, instrumentality, or alter ego of the parent to suggest that the separate corporate forms should be disregarded).

> FN195. *Id.* at *4; *but cf. Ace & Co., Inc. v. Balfour Beatty PLC*, 148 F.Supp.2d 418, 424-25 (D.Del.2001) (holding that because the Delaware subsidiary (BICC) did not negotiate or consummate the transaction involving its subsidiary within Delaware, there was no jurisdictional conduct to attribute to BICC's parent, Balfour).

NPAL was incorporated in Delaware in 1984. [FN196] As such, it is clear that NPAL was not created for the purpose of consummating the Hughes transactions. It then necessarily follows that the cause of action in this case does not and cannot arise from the act of filing the certificate of incorporation within Delaware that created NPAL. Therefore, this alone does not suffice to establish personal jurisdiction over NPAL's parent, News. [FN197] In addition, personal jurisdiction over News does not exist merely because it wholly owns NPAL. [FN198]

> FN196. *See* Micheletti Aff., Ex. A.

> FN197. *See Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.*, 1991 WL 129174, at *1-2 (Del.Ch.); *IM2 Merch. & Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168, at *4 (Del.Ch.).

> FN198. *See IM2*, 2000 WL 1664168, at *4 n. 15.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nor does personal jurisdiction arise from News' purchase of stock in Hughes (a Delaware corporation), [FN199] the subsequent transfer of that stock to a News subsidiary, or from merely providing that Delaware law should govern the various agreements relating to the Hughes transactions. [FN200] NPAL did not actively engage in negotiating and structuring the Hughes transactions; News negotiated the transactions on behalf of itself and its subsidiaries. [FN201] The Consent Solicitation is replete with references to GM and Hughes' negotiations with News (not NPAL). [FN202] Furthermore, NPAL is not a party to the Merger Agreement. [FN203] Hughes, News, and GMH Merger Sub are the parties to the Merger Agreement. [FN204] It was News' board of directors that approved and adopted the Merger Agreement. [FN205] Although Hughes did file the Certificate of Merger on behalf of itself and GMH Merger Sub, the filing of the Certificate of Merger was pursuant to the Merger Agreement, and a necessary act in Delaware to achieve the purpose of the Merger Agreement. [FN206] As the claim asserted against News in this action stems from and relates to the Hughes transactions and the Merger Agreement, and the actions News took in negotiating and structuring those transactions, personal jurisdiction under § 3104(c)(1) is proper because News transacted business in Delaware in furtherance of the Hughes transactions. [FN207]

FN199. *Abajian v. Kennedy*, 1992 WL 8794, at *10 (Del.Ch.); *see also Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (ownership of stock in Delaware corporation is not sufficient contact with Delaware to satisfy Constitutional due process standards); *8 Del. C. § 169* (legal situs of stock of Delaware corporations is within Delaware).

FN200. *See Summit Investors II, L.P. v. Sechrist Indus., Inc.*, 2002 WL 31260989, at *4 (Del.Ch.) (holding that a Delaware choice of law provision is insufficient to satisfy the Constitutional minimum contacts test).

FN201. *See* CS at 4.

FN202. *Id.* at 4, 91-98, 100, 107, 110, 112.

FN203. The merger agreement, dated April 9, 2003, is Ex. 2.3 to Amendment No. 2 to Form F-4, SEC File No. 333-105853, included as part of Ex. 8 to the Jarvis Aff. ("Merger Agreement").

FN204. Merger Agreement at 1.

FN205. *Id.* at 2.

FN206. *Id.* at 3.

FN207. *See Kahn*, 1989 WL 99800, at *4; *Friedman v. Alcatel Alsthom*, 752 A.2d 544, 550 (Del.Ch.1999). Because the record in this case makes clear that News, not NPAL, engaged in these activities and transactions, I need not reach the issue of whether NPAL is News' agent or an alter ego of News. *See IM2*, 2000 WL 1664168, at *4; *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729-30 (Del.Super.1996); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 265-69 (D.Del.1989).

The last step in the personal jurisdiction analysis is to determine whether exercising jurisdiction over News pursuant to § 3104(c)(1) would violate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

Constitutional standards of due process. [FN208] The parties' submissions contain a heated discussion of *Sternberg v. O'Neil*, [FN209] and whether that case is dispositive on the issue of whether owning a Delaware subsidiary is a minimum contact sufficient to support an exercise of specific jurisdiction. I conclude that *Sternberg* is not controlling in this case because the rationale in *Sternberg* for exercising personal jurisdiction was explicitly based on the unique nature of the suit as double derivative, and that the suit could not be brought in another jurisdiction because both the parent and the subsidiary were indispensable parties. [FN210]

FN208. *See generally* Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

FN209. 550 A.2d 1105, 1125 (Del.1988).

FN210. *Id.* at 1125-26.

*23 This, however, is not a double derivative suit, and News, for the reasons that specific jurisdiction exists under § 3104(c)(1), has sufficient minimum contacts with Delaware that it would not violate "traditional notions of fair play and substantial justice" [FN211] if it were forced to litigate in Delaware. By negotiating and engaging in a transaction between itself, an indirect Delaware subsidiary (GMH Merger Sub), and another Delaware corporation (Hughes), in which Delaware law was to be applied, [FN212] and necessary acts by the parties in furtherance of that transaction would be taken in Delaware, [FN213] News has "purposefully availed" itself of the laws of Delaware and should have reasonably anticipated being haled into a Delaware court for a cause of action related to that transaction. [FN214] As such, it is neither unfair nor unreasonable to require News to defend this action here. Furthermore, Delaware has an interest in ensuring that boards of directors of Delaware corporations fulfill their fiduciary duties, an interest that would be undermined if entities that allegedly aid and abet breaches of fiduciary duties of Delaware corporations could not be held accountable in Delaware courts. For the foregoing reasons, News has minimum contacts with Delaware, and it would not violate traditional notions of fair play and substantial justice to assert jurisdiction over News in this case.

FN211. *Id.* at 1118.

FN212. Merger Agreement at 13.

FN213. That act was the filing of the Certificate of Merger.

FN214. *See* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Because § 3104(c)(1) does provide a specific basis for this Court to exercise jurisdiction over News, and because asserting personal jurisdiction over News comports with due process, News' motion to dismiss under Court of Chancery Rule 12(b)(2) is denied.

*C. News' 12(b)(6) Argument*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

News has also moved to dismiss the Complaint on the ground that it fails to state a claim against News. As previously stated, only one claim is directed against News-Count VII for aiding and abetting a breach of fiduciary duty.   [FN215] Under Delaware law, in order to state a valid claim for aiding and abetting a breach of fiduciary duty, plaintiffs must allege: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."   [FN216] In most cases, as here, the second and third prongs of the test are the most relevant in the context of a motion to dismiss. I have concluded above that the Individual Defendants did not breach any fiduciary duty and, therefore, on that ground alone, Count VII must fail as a matter of law. In the alternative, even if plaintiffs had stated a claim that the Individual Defendants breached their fiduciary duties, the aiding and abetting claim against News would still fail because the Complaint does not adequately allege in a non-conclusory fashion that News knowingly participated in a breach of fiduciary duty.

   FN215. Compl. ¶ ¶ 202-207.

   FN216. *Jackson Nat'l Life. Ins. Co. v. Kennedy,* 741 A.2d 377, 386
   (Del.Ch.1999).

      1. *Plaintiffs' Allegations of Knowing Participation are Inadequate*

\*24 Even if plaintiffs had pled an adequate claim for breach of fiduciary duty by the individual defendants, Count VII would still fail as a matter of law because plaintiffs have not adequately alleged that News knowingly participated in a breach of fiduciary duty. "A claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred."   [FN217] If such facts are not pled, then in order to infer knowing participation, the plaintiff must have alleged that the fiduciary breached its duty in an "inherently wrongful manner." [FN218] This has also been stated as requiring the plaintiff to allege that the act taken by the fiduciary was *per se* illegal.   [FN219] Conclusory statements of knowing participation will not suffice.   [FN220] News has argued that plaintiffs have failed to adequately allege "knowing participation" for three reasons: (1) plaintiffs' allegations are conclusory; (2) News only engaged in arms-length negotiations with GM; and (3) plaintiffs have not alleged any inherently wrongful conduct that would put News on notice that GM's directors were violating their fiduciary duties.

      FN217. *In re Shoe-Town, Inc. S'holders Litig.,* 1990 WL 13475, at \*8
      (Del.Ch.); *Weinberger v. RIO Grande Indus. Inc.,* 519 A.2d 116, 131
      (Del.Ch.1986).

      FN218. *McGowan v. Ferro,* 2002 WL 77712, at \*2 (Del.Ch.); *Nebenzahl v. Miller,*
      1996 WL 494913, at \*7 (Del.Ch.).

      FN219. *Rand v. Western Airlines, Inc.,* 1989 WL 104933, at \*5 (Del.Ch.)
      (concluding that aiding and abetting claim failed as a matter of law because
      knowing participation was not adequately pled and that if "any of the actions
      taken by the Western directors were illegal *per se,* plaintiffs' argument
      *would be more compelling,*" (emphasis added) implying that even *per se*

      ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 38 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

illegality of the fiduciary's actions may, in certain circumstances, be
insufficient to infer knowing participation).

FN220. *In re Santa Fe*, 669 A.2d at 72.

In responding to News' arguments that their allegations are conclusory, plaintiffs
argue that: (1) News knowingly went along with a "diversion of money," [FN221] and
benefited from the breach of fiduciary duty; [FN222] and (2) News was able to acquire
Hughes without payment of a control premium. Plaintiffs' argument regarding a
"diversion of money" is somewhat misleading. This Court has made clear that in
order for allegations of a diversion of money to be sufficient to infer knowing
participation, the diversion must have been "granted by the non-fiduciary acquiror
*to the fiduciary directors* ... [such] that the court could reasonably infer that
the payments were made specifically to induce the fiduciaries to breach their
duties." [FN223] In other words, the diversion of money caused by the alleged
aider/abetter becomes an incentive for the directors to "ignore their fiduciary
obligations." [FN224]

FN221. *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 990
(Del.Ch.2000), *citing In re USACafes, L.P. Litig.*, 600 A.2d 43, 55-56
(Del.Ch.1991).

FN222. *In re Summit Metals, Inc.*, 2004 WL 1812700 (D.Del.).

FN223. *McGowan*, 2002 WL 77712, at *3 (emphasis added) (distinguishing
*Crescent/Mach I Partners, Jackson* and *USACafes* ).

FN224. *USACafes,* 600 A.2d at 56; *McGowan,* 2002 WL 77712, at *3.

Plaintiffs argue that the diversion of money was an extra dollar per share from
Hughes to GM as a special dividend, and that News agreed to this additional payment
only upon GM allowing News to purchase 34 rather than 36 percent of Hughes. [FN225]
Unfortunately for plaintiffs, this is not only a conclusory allegation, but also
misstates the record to which they refer. [FN226] The relevant portion of the Consent
Solicitation recites the history of the transaction, and states as follows:

FN225. Compl. ¶ 59.

FN226. Plaintiffs also gloss over the fact that the dividend was paid to GM,
not the fiduciary directors.

During the days preceding News Corporation's submission of the financial terms of
its offer, GM and News Corporation engaged in discussions regarding the size of the
interest in Hughes that News Corporation would acquire and the value to be provided
by News Corporation for such acquisition. GM and Hughes had previously indicated to
News Corporation that the maximum percentage interest in Hughes that would be
available for acquisition by News Corporation would be 36%, based on certain tax-
related constraints and the desire of GM and Hughes to ensure that after the
completion of the transactions Hughes would have sufficient flexibility to issue a
reasonable amount of equity without violating anticipated agreements with GM
designed to preserve the tax-free status of the separation of Hughes from GM.
Negotiations between GM and Hughes and News Corporation regarding the price to be
provided for Hughes stock resulted in News Corporation's determination that it was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported Case 1:05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 39 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

interested in acquiring only 34% of Hughes. [FN227]

> FN227. CS at 97.

**\*25** Paragraph fifty-nine of the Complaint refers directly to this passage from the Consent Solicitation to establish its allegations. A fair reading of the Consent Solicitation, in my opinion, does not result in the same interpretation of the above language. Before the time that News allegedly "reduced" the interest in Hughes it would be interested in purchasing, there was no indication that News had made a concrete offer for a specific portion of Hughes, so therefore, there was no offer on the table for News to reduce. Instead, the Consent Solicitation indicates that the thirty-six percent figure originated not from News, but from GM and Hughes, due to GM's and Hughes' tax needs. The Consent Solicitation is clear that News was simultaneously negotiating both the price to be paid and the size of the interest purchased, and that at no time did News "reduce" the stake in Hughes that it was willing to purchase.

Furthermore, even if plaintiffs' allegations did not contradict the clear language of the Consent Solicitation as to how News arrived at the decision to purchase thirty-four percent of Hughes, page ninety-eight of the Consent Solicitation also contradicts plaintiffs' allegations that the "reduction" in the size of interest in Hughes that News would purchase was related to the special dividend. In relevant part, the Consent Solicitation states:
Hughes believed that if a special dividend were to be paid a lesser amount [than the 3 to 5 percent of market value paid in the EDS transaction] would be appropriate. Taking into account these factors and the need to obtain News Corporation's concurrence with the special dividend, GM management and Hughes management [*without News* ] agreed after further discussion that the transaction terms would include a special cash dividend from Hughes to GM in the amount of $275 million. It was recognized that the payment of the special dividend by Hughes to GM could be viewed as increasing the value per notional share to GM for its retained interest in Hughes from $14.00 to $15.00. On that basis, the two managements [*GM and Hughes* ] proceeded to meet with News Corporation and its advisors and, with assistance from their respective advisors, negotiated the definitive terms of the transactions as reflected in the transaction agreements described in this document. These terms included News Corporation's agreement that the $275 million special dividend distribution would be paid by Hughes to GM. [FN228]

> FN228. CS at 98.

This portion of the Consent Solicitation makes it clear that GM and Hughes: (1) had agreed on the $275 million dividend *after* News had decided to acquire thirty-four percent of Hughes; and (2) GM and Hughes determined the amount of the dividend themselves *before* GM and Hughes met with News to seek approval for the dividend. Because of the foregoing, I conclude that there was not a diversion of money agreed to by News upon which plaintiffs may rely for the Court to infer News' knowing participation in a breach of a fiduciary duty by the GM directors, and to the extent that plaintiffs allege otherwise, those allegations are conclusory and not well-founded in the documents upon which they purportedly rely. [FN229] In other words, plaintiffs' allegation that the "timing and context of News' determination and the disclosure regarding it indicate that the decrease in the amount of Hughes stock News would buy was related to GM's insistence on another $275 million for its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

interest in Hughes," is wholly conclusory and an unreasonable inference to draw from the Consent Solicitation. [FN230]

> FN229. The Complaint itself is consistent with this interpretation of the Consent Solicitation, as paragraphs 70-71 refer to GM and Hughes management together, but without News, as determining the amount of the $275 million special dividend.

> FN230. Compl. ¶ 59.

*26 Because the special dividend, in any event, did not constitute a diversion of money to a fiduciary, perhaps plaintiffs wish to rely on the alleged excessive compensation paid to the GM directors as the diversion of money. Yet, this argument is equally unavailing. There are no allegations that News altered the amounts that the GM directors were already entitled to receive or even that those amounts are material to the non-employee director defendants. [FN231]

> FN231. See In re Lukens Inc. S'holders Litig., 757 A.2d 720, 735 (Del.Ch.1999) (holding that acquiror's payment of golden parachutes did not constitute a diversion of money to a fiduciary because those parachutes were previously valid obligations of the target).

Plaintiffs' second argument that News knowingly participated in a breach of fiduciary duty is that News was able to acquire Hughes without payment of a control premium, and that this created a benefit to News because of the GM directors' alleged breach of fiduciary duty. [FN232] This argument is wholly without basis in the law of Delaware, and on that basis alone, it can be inferred that News could *not* have knowingly participated in a breach of fiduciary duty by not paying, at least in plaintiffs' opinion, a "control premium." Furthermore, plaintiffs' own Complaint repeatedly argues that the GMH shareholders should have received a control premium, but they also concede, as they must, that a control premium is generally only available to a stockholder "in an independent, stand-alone company" without a controlling shareholder . [FN233] The GMH shareholders were not in that situation. Instead, they held an economic interest in a wholly-owned corporation. In any event, there is no *per se* obligation under Delaware law that an entity acquiring 34 percent of the stock of a corporation must pay a control premium. Furthermore, it makes no difference that News may or may not have a "pattern" of acquiring controlling, but minority, interests in other companies, because, as outlined below, the Complaint describes that News and GM/Hughes engaged in an arms-length bargaining process.

> FN232. Plaintiffs' citation to two appraisal cases that awarded control premiums are completely inapposite in this context. See Doft & Co. v. Travelocity.com Inc., 2004 WL 1152338 (Del.Ch.); Borruso v. Communications Telesystems Int'l, 753 A.2d 451 (Del.Ch.1999). Furthermore, there was no change of control in this case; before the transactions Hughes was wholly-owned by GM, a controlling shareholder, and after the transactions Hughes still had a controlling shareholder (if plaintiffs' arguments are taken at face value) in News. When the controlling shareholder merely sells its interest to another controlling shareholder, it is not a change of control. See In re Digex Inc. S'holders Litig., 789 A.2d 1176, 1196 (Del.Ch.2000) (holding that the sale of a controlling interest in Digex from Intermedia to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported Case 1:05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 41 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

WorldCom was not a change of control under _Revlon, Inc. v. MacAndrews &_
_Forbes Holdings, Inc., 506 A.2d 173 (Del.1986)_).

FN233. Compl. ¶ 73.

Plaintiffs have failed to plead facts sufficient for this Court to infer knowing
participation on the part of News with respect to the alleged breach of fiduciary
duty by the GM directors because the allegations of the Complaint with respect to
News' acquisition of its stake in Hughes without a control premium are conclusory,
unsupported by the Consent Solicitation, and based on both novel and incorrect
theories of law.

### 2. The Complaint Describes Arms-Length Negotiations

The Complaint makes clear that News engaged in arms-length negotiations with GM and
Hughes. This Court has consistently held that "evidence of arm's-length negotiation
with fiduciaries negated a claim of aiding and abetting, because such evidence
precludes a showing that the defendants knowingly participated in the breach by the
fiduciaries."   FN234

FN234. _In re Frederick's of Hollywood, Inc. S'holders Litig., 1998 WL 398244,_
_at *3 n. 8 (Del.Ch.)_; _Shoe-Town, 1990 WL 13475, at *8_ (concluding that the
motion to dismiss as to the acquiror, GECC, would be granted because GECC's
"involvement in the challenged transaction," was entirely consistent with
"GECC as a party engaged in an arms-length negotiation of a business
transaction"). Cf. _Shoe-Town, 1990 WL 13475, at *8_ (holding that claim for
aiding and abetting against Shearson Lehman Hutton, Inc., the target
company's financial advisor, could go forward because Shearson "was closely
involved with the management group, the special committee and the Shoe-Town
board," and used that involvement to influence the decisions made by the
fiduciaries); _USACafes, 600 A.2d at 56_ (holding that the acquiror engaged in
more than arms-length negotiations and denying the motion to dismiss because
the Complaint contained factual details that the acquiror "offer[ed]
financial incentives to the [fiduciaries] to induce them to ignore fiduciary
obligations...."); _Jackson, 741 A.2d at 393_.

Plaintiffs argue that News engaged in more than arms-length negotiations with
Hughes and GM by: (1) "actively participating in the negotiations, structuring and
disclosures concerning the Hughes transactions;" (2) having "offered financial
incentives to GM and the Individual Defendants and induced them to ignore their
fiduciary obligations," including preferring the GM $1 2/3 stockholders over the
GMH shareholders, permitting Hughes to pay the $275 million dividend, and paying GM
largely in cash for its interest in Hughes; and (3) mischaracterizing the Hughes
transactions in the Consent Solicitation, especially "the nature and degree of
News' control over Hughes resulting from the Stock Sale and Merger," which was
jointly issued by Hughes, GM and News.   FN235

FN235. Pls.' Memo. Of Law In Opp. To The News Corp. Ltd.'s Mot. To Dismiss
("Pls.' News Corp. Br.") at 37-38.

*27 As to the first point, it was clearly necessary for News to actively
participate in the negotiation and structuring of the Hughes transactions, as it

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: Not Reported in A.2d)

was a party to those transactions. But that alone does not imply knowing participation on News' part in a breach of fiduciary duty by GM's directors. There are no properly pled allegations that News representatives participated in meetings of the GM board of directors or otherwise interjected themselves into the process by which the GM and Hughes boards of directors approved the Hughes transactions in any manner other than as an arms-length bidder.   FN236 In fact, the Complaint contains the following allegations with respect to the negotiations and structuring of the Hughes transactions that indicate that those negotiations occurred at arms-length, which necessarily negates any allegations of knowing participation in a breach of fiduciary duty:

> FN236. Plaintiffs' brief argues that News "was closely involved with the management group of the primary Defendants, and was present and active at meetings at which it was decided to formulate the Hughes transactions offer in terms that constituted a breach of the primary defendants' fiduciary duties of loyalty and care." Pls.' News Corp. Br. at 38 n. 23. Unfortunately for plaintiffs, the Complaint does not contain those allegations, nor can that conclusion be reasonably drawn from the facts pled in the Complaint. Furthermore, this argument does not specify at what kinds of meetings News was present and active. Clearly News was present and active at meetings between News and GM representatives while negotiating the Hughes transactions, but that is entirely different from being present and active at a meeting of the board of directors of Hughes or GM, unlike the situation in *Shoe-Town* to which plaintiffs cite.

• News negotiated with GM and Hughes management;   FN237

> FN237. Compl. ¶ 56.

• News agreed to purchase thirty-four percent of Hughes even though GM was willing to permit News to purchase up to 36 percent;   FN238

> FN238. *Id.* ¶ 59.

• News agreed to permit Hughes to pay the $275 million special dividend to GM after GM rebuffed News' initial offer at $14.00 per share;   FN239

> FN239. *Id.* ¶ ¶ 59, 67, 71, 80.

• News negotiated to have Hughes' amended certificate of incorporation contain certain anti-takeover provisions;   FN240

> FN240. *Id.* ¶ ¶ 60, 146.

• News agreed that most of the consideration for the Hughes transactions would be cash, even though News wanted to decrease the amount of cash necessary to consummate the transaction;   FN241

> FN241. *Id.* ¶ ¶ 63, 67, 79.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• News knew that GM and Hughes were being advised by prominent investment banks (Merrill Lynch, Bear Stearns, Credit Suisse First Boston, and Goldman Sachs) with respect to the transactions; [FN242]

> FN242. *Id.* ¶ ¶ 71, 90

• All decisions regarding the structure and timing of the GMH and GM $1 2/3 vote was taken unilaterally by the GM directors without involvement from News; [FN243]

> FN243. *Id.* ¶ ¶ 116-25.

• GM, Hughes, and News agreed to "extensive" concessions demanded by the Federal Communications Commission ("FCC") in order to obtain approval from the FCC for the transactions. [FN244]

> FN244. *Id.* ¶ 145.

These allegations indicate, contrary to plaintiffs' assertions, that the negotiations and structuring of the Hughes transactions were made at arms-length between News and GM. Reasonable inferences cannot be made from these allegations that News was improperly involved in the negotiations of the Hughes transactions. In addition, the Consent Solicitation confirms the allegations found in the Complaint that describe arms-length negotiations between News and GM/Hughes. [FN245]

> FN245. CS at 90-114 (describing negotiations with News, and how GM had also negotiated with potential acquirors other than News). The Consent Solicitation does not indicate that News negotiated with GM in any way other than at arms-length.

I have already concluded above that News did not knowingly accede to a diversion of money, negating plaintiffs' second argument. [FN246] Therefore, the only way that plaintiffs' argument against arms-length negotiations can prevail is if News' joint issuance of the Consent Solicitation constituted knowing participation in a breach of fiduciary duty by the GM directors. [FN247]

> FN246. I also note that plaintiffs' arguments on this point continue to refer in a conclusory manner to payments from News to the GM directors, despite the lack of factual allegations on this point that would give rise to a reasonable inference that such payment had occurred. Therefore, I give no weight nor credit to this allegation.

> FN247. It should be further noted that it would make little sense for a plaintiff to be able to establish, by virtue of later disclosure deficiencies in a joint proxy statement or prospectus, a claim for aiding and abetting a breach of fiduciary duty when the alleged breach of duty occurred during the negotiation, structuring, and approval of a transaction but before the joint proxy was prepared. If the material terms of the transaction do not change after the transaction is approved by the necessary board(s) of directors, and if up until that point the negotiations between the parties have been at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS Document 48-5 Filed 03/06/2006 Page 44 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

> arms-length, and if a plaintiff alleges that a breach of fiduciary duty
> occurred by that point in time, it strikes me as unreasonable for a later
> disclosure violation to open up an acquiror to liability for aiding and
> abetting a breach of fiduciary duty that occurred while that acquiror was
> still acting at arms-length.

\*28 Again, both the Complaint and the Consent Solicitation are clear in disproving
plaintiffs' argument that the Consent Solicitation "repeatedly mischaracteriz[ed]
the transactions, including the nature and degree of News Corp.'s control over
Hughes resulting from the Stock Sale and Merger." [FN248] The Complaint states that
since "the announcement of the proposed Hughes transactions, General Motors, Hughes
and News Corp. have all made it plain that Hughes and its businesses, such as
DIRECTV, will be controlled by News Corp. after the consummation of the
transactions." [FN249] The Complaint also references a roadshow made by a News
executive in support of the transaction who "confirmed that News would be running
Hughes," [FN250] and that the anti-takeover provisions that News wanted in Hughes'
certificate of incorporation were designed to "cement News' control." [FN251] The
Consent Solicitation repeatedly states that, following the Hughes transactions,
News will own thirty-four percent of Hughes and the remaining sixty-six percent of
Hughes will be owned by the former GMH shareholders. [FN252] Also contained in the
Consent Solicitation is a statement that:

FN248. Compl. ¶ 205.

FN249. *Id.* ¶ 141. Before the Hughes transactions had closed, the FCC had
also determined that News would control Hughes despite not owning a majority
interest. *Id.* ¶ ¶ 127, 135-36.

FN250. *Id.* ¶ ¶ 142-44.

FN251. *Id.* ¶ 146.

FN252. CS at Introduction, 1, 4, 5, 11-13, 20-21, 27, 69, 74-75, 78.

*Hughes' Principal Stockholder Will Have Significant Influence Over the Management
of Hughes and Over Actions Requiring Stockholder Approval.* Upon the completion of
the transactions, News Corporation, through its subsidiary Fox Entertainment, will
hold 34% of the issued and outstanding shares of Hughes common stock. Mr. Murdoch,
Chairman and Chief Executive of News Corporation, will become Chairman of Hughes,
and Mr. Carey, who is currently a director of, and is serving as an advisor to,
News Corporation will become a director and President and Chief Executive Officer
of Hughes. Additionally, two current News Corporation executives will also be
directors of Hughes. As a result, News Corporation will have significant influence
relating to the management of Hughes and to actions of Hughes that require
stockholder approval. You should understand, however, that the interests of News
Corporation may differ from the interests of other holders of Hughes common stock.
The extent of News Corporation's stock ownership of Hughes also may have the effect
of discouraging offers to acquire control of Hughes and may preclude holders of
Hughes common stock from receiving any premium above market price for their shares
that may be offered in connection with any attempt to acquire control of Hughes.
[FN253]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS Document 48-5 Filed 03/06/2006 Page 45 of 46
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas.
2188
(Cite as: Not Reported in A.2d)

 FN253. *Id.* at 51.

News made no attempt to conceal that it would own a significant stake in Hughes
following the Hughes transactions, or that Mr. Murdoch controlled News.  [FN254] The
Consent Solicitation also contains information regarding the Hughes board of
directors following the Hughes transactions, and the extent to which those
directors are affiliated with News. [FN255] Therefore, the Consent Solicitation does
not "mischaracterize" the transactions that occurred, and plaintiffs' claim of
knowing participation in a breach of fiduciary duty by the GM directors with
respect to the disclosures contained in the Consent Solicitation must fail because
News acted at arms-length. [FN256]

 FN254. *Id.* at 65.

 FN255. *Id.* at 204-05.

 FN256. To the extent that plaintiffs argue that News was complicit in other
 decisions with respect to the content of the Consent Solicitation beyond the
 characterization of the transactions at issue, plaintiffs have failed to
 adequately plead facts such that this Court could reasonably infer that News
 was actively involved in deciding what information would be disclosed through
 the Consent Solicitation and how. *See Weinberger*, 519 A.2d at 131;
 *Repairman's Serv. Corp. v. Nat'l Intergroup, Inc.*, 1985 WL 11540, at *9
 (Del.Ch.).

 3. *Nothing About the Hughes Transactions Was Inherently Wrongful*

*29 The other way for a plaintiff to establish that knowing participation in a
breach of fiduciary duty occurred is if some part of the transactions at issue was
inherently wrongful. [FN257] Plaintiffs' arguments seem to focus on the $275 million
special dividend paid by Hughes to GM, and News' agreeing to use large amounts of
cash consideration in the transaction as being inherently wrongful. In *Solomon v.
Armstrong*, this Court granted the defendants' motion to dismiss in a suit
challenging the split-off of Electronic Data Systems Holding Corp. ("EDS") from GM
and the large special dividend paid from EDS to GM as part of that split-off . [FN258]
Although there are material differences between the EDS split-off and the Hughes
split-off, namely the presence of News and how it would become a controlling
shareholder without a majority interest, those differences are not so great as to
put News on notice that a special dividend, even of $275 million, was inherently
wrongful in this situation.

 FN257. *See Greenfield v. Nat'l Med. Care, Inc.*, 1986 WL 6505, at *4
 (Del.Ch.); *Nebenzahl*, 1996 WL 494913, at *7. *See also Rand*, 1989 WL 104933,
 at *5.

 FN258. 747 A.2d 1098 (Del.Ch.1999).

Plaintiffs also rehash their other arguments again (a knowing diversion of money to
a fiduciary, misleading disclosures in the Consent Solicitation) in an attempt to
convince the Court that those actions were inherently wrongful. If those
allegations were borne out, certainly such actions could be considered inherently
wrongful. As discussed above, however, those allegations are contradicted by other
portions of the Complaint and are not consistent with the language of the portions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 48-5    Filed 03/06/2006    Page 46 of 46

of the Consent Solicitation referenced by the Complaint or the Consent Solicitation as a whole. [FN259] Therefore, at best they are merely conclusory allegations, and are entitled to no weight in my analysis. Plaintiffs have failed to allege that News participated in a transaction that was inherently wrongful, and therefore, in addition to the conclusions reached above, have failed to adequately plead a claim for aiding and abetting a breach of fiduciary duty by News. As such, Count VII of the Complaint fails to state a claim for which relief can be granted, and it is hereby dismissed with prejudice.

> FN259. The Complaint contains a footnote that purportedly prevents the Court from analyzing the Consent Solicitation as a whole by stating that "[t]he references to certain portions of the August 21, 2003 Consent Solicitation ... are not intended to incorporate by reference other portions of [that document]." Compl. ¶ 4. It is absurd to argue that the Consent Solicitation is incomplete or misleading by quoting selected passages and then attempt to prevent the Court from considering the document in its entirety. The Consent Solicitation is integral to the Complaint, and I therefore may properly consider it in its entirety in analyzing the legal sufficiency of plaintiffs' disclosure claims on the motions to dismiss. *See supra* discussion Section II Part B.

## IV. CONCLUSION

Plaintiffs have failed to state claims of vote manipulation and breach of fiduciary duty of disclosure. Counts III and IV are therefore dismissed. Since the facts alleged do not overcome the presumptions of the business judgment rule and since I do not find a breach of GM certificate of incorporation, Counts I, II, V, and VI are dismissed. Finally, for the reasons stated above, the aiding and abetting claim of Count VII is dismissed.

Counsel shall confer and agree upon a form of Order to implement this decision.

Del.Ch.,2005.
In re General Motors (Hughes) Shareholder Litigation
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.