13

JOHN A. GENTILE, VICTORIA S. CASHMAN, BRADLEY T. MARTIN, JOHN
KNIGHT, and DYAD PARTNERS, LLC, Plaintiffs, v. PASQUALE DAVID
ROSSETTE, DOUGLAS W. BACHELOR, and LEASENET GROUP, INC., an
Ohio corporation, as successor by merger to LeaseNet Group, Inc., a Delaware cor-
poration, Defendants.

## C.A. No. 20213-NC

## COURT OF CHANCERY OF DELAWARE, NEW CASTLE

### 2005 Del. Ch. LEXIS 160

### June 2, 2005, Submitted
### October 20, 2005, Decided

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Later proceeding at *Gentile v. Rossette, 2005 Del. Ch. LEXIS 186 (Del. Ch., Nov. 21, 2005)*

**COUNSEL:** Attorneys for Plaintiffs: David A. Jenkins, Esquire and Joelle E. Polesky, Esquire of Smith Katzenstein & Furlow LLP, Wilmington, Delaware, and John L. Reed, Esquire of Edwards & Angell, Wilmington, Delaware.

Attorneys for Defendants: Jesse A. Finkelstein, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, J. Travis Laster, Esquire of Abrams & Laster, LLP, Wilmington, Delaware, and Shawn T. Carnathan, Esquire and Alan J. Langton, Esquire of Quigley, O'Connor & Carnathan LLC, Burlington, Massachusetts.

**JUDGES:** NOBLE, Vice Chancellor.

**OPINIONBY:** NOBLE

**OPINION:**

### MEMORANDUM OPINION

SinglePoint Financial, Inc. ("SinglePoint" or the "Company") was a software development company that never produced a commercially viable product and never generated a sustained revenue stream. n1 It survived only because Defendant Pasquale David Rossette ("Rossette"), its majority shareholder, regularly provided desperately needed infusions of cash to meet operating obli-

gations. n2 The Plaintiffs, former shareholders of SinglePoint, n3 which merged into a subsidiary of Cofiniti, Inc. in [*2] 2000, n4 bring this action for breach of fiduciary duty against its two directors, Rossette and Defendant Douglas W. Bachelor ("Bachelor"). They challenge, as an unwarranted dilution of their equity interests and voting power in SinglePoint, the conversion of some of the debt held by Rossette into SinglePoint common stock at an unfairly and unreasonably low conversion rate. They also challenge special benefits that Rossette received as part of the merger-additional consideration upon which he conditioned his approval of the merger.

n1 Affidavit of Douglas Bachelor ("Bachelor Aff.") PP 3, 8.

n2 *Id.* P 3.

n3 The Plaintiffs are John A. Gentile, Victoria S. Cashman, Bradley T. Martin, John Knight, and Dyad Partners, LLC (collectively, the "Plaintiffs").

n4 Affidavit of James B. Radebaugh ("Radebaugh Aff.") Ex. 23 (Agreement and Plan of Reorganization by and among MarketKnowledge, Inc. Cosmo Merger Corp., and SinglePoint Financial, Inc., Sept. 15, 2000 (the "Merger Agreement")). MarketKnowledge adopted the Cofiniti name shortly before consummation of the merger.

[*3]

Rossette and Bachelor now seek summary judgment. First, they claim that the Plaintiffs' claims are all derivative in nature and, thus, the Plaintiffs lost standing to

pursue their claims upon completion of the merger. Second, they assert that they are entitled to judgment as a matter of law on the merits of the Plaintiffs' substantive claims as well. For the reasons set forth below, the Plaintiffs' claims of dilution are derivative in nature and must be dismissed. Whether the claims premised upon the separate consideration received by Rossette as part of the merger are direct claims cannot be resolved on the current record, and the Defendants have not demonstrated that, on the undisputed facts, they are entitled to judgment as a matter of law.

## I. BACKGROUND

### A. The Company

In 1995, Plaintiff Gentile and Defendant Bachelor, who were acquaintances and co-workers, discussed forming a new software company together. n5 Later that year, Gentile and Bachelor presented their idea to Rossette, a childhood friend of Gentile, who agreed to provide an initial investment. n6 As a result of their agreement, on March 19, 1996, Gentile, Rossette, and Bachelor formed the company that [*4] would come to be known as SinglePoint, n7 a "high technology financial services company" that "supported financial advisors and their clients with the ability to manage assets online." n8 The Company failed to develop a commercially viable product and to produce significant revenues. n9 Faced with tremendous financial difficulties throughout its existence (1996-2000), the Company turned to Rossette -- who was SinglePoint's sole source of additional funds -- several times for financial assistance. n10

n5 Bachelor Aff. P 4.

n6 Id. P 5; Deposition of David Pasquale Rossette ("Rossette Dep.") at 17.

n7 Bachelor Aff. P 6. The Company, a Delaware corporation originally called New Horizons Technology, changed its name to OpTeamaSoft in June 1997, and finally in 1999, to SinglePoint Financial, Inc. Id.; Bachelor Dep. at 7-8; Radebaugh Aff., Ex. 14 (Board Minutes, July 26, 1999).

n8 Affidavit of Joelle E. Polesky ("Polesky Aff."), Ex. 16 (SinglePoint Financial, Inc. Information Statement, Oct. 13, 2000 (the "Information Statement")) at 2.

n9 Bachelor Aff. P 3.

[*5]

n10 Id.

Gentile, Rossette, and Bachelor served as the initial directors of the Company. n11 Gentile was the first President and Chief Executive Officer ("CEO") and Bachelor was the Chief Technology Officer. n12 When the Company encountered difficulties, it relied, as was its practice, upon Rossette for more funding. n13 After having to make several additional cash infusions in 1998, Rossette insisted that Gentile be replaced as President before Rossette would make any more funds available. n14 Gentile's replacement, Christopher McGrath, resigned less than one year later, and Bachelor became the new CEO. n15 The Company continued to struggle though, and in April 1999, Rossette decided to take over as CEO, a position that he held throughout the balance of SinglePoint's existence. n16

n11 Id. P 7; Rossette Dep. at 19-20.

n12 Bachelor Aff. P 7. Bachelor initially served in a part-time capacity. Id. He was named Chief Technology Officer in June 1997. Id. P 2.

n13 Id. P 3.

[*6]

n14 Bachelor Aff. PP 11-13. During the months of June and July 1999, Gentile was terminated as an officer and removed from the Board of Directors. Id. P 25. With Gentile gone, Rossette and Bachelor comprised the Board in its entirety. See Radebaugh Aff., Ex. 14 (Board Minutes, July 26, 1999).

n15 Affidavit of Christopher McGrath ("McGrath Aff.") P 1; Bachelor Aff. P 19.

n16 Bachelor Aff. P 21; Rossette Dep. at 23.

### B. The Debt Conversion

As of March 2000, Rossette had advanced more than $ 3 million to the Company. n17 In consideration of this financing, Rossette had received promissory notes that were convertible into shares of SinglePoint common stock. n18 The initial conversion rate was $ 1.33 per share. n19 On November 1, 1997, the rate was dropped to $ 0.75 per share, n20 and, on October 23, 1999, the rate was lowered once more to $ 0.50 per share. n21

n17 Radebaugh Aff., Ex. 18 (Board Minutes, Mar. 27, 2000).

n18 Poleksy Aff. Ex. 1 (Stock Purchase Agreement, June 7, 1997).

[*7]

n19 *Id.*

n20 Poleksy Aff., Ex. 2 (Stock Purchase Agreement, Nov. 1, 1997). In 1999, SinglePoint converted $ 460,620 of the debt owed to Rossette at a rate of $ 0.75 per share. Radebaugh Aff., Ex. 11 (Debt Conversion Agreement, Jan. 13, 1999) at A 0843-46.

n21 Polesky Aff., Ex. 4 (Amended Loan Agreement, Oct. 23, 1999).

SinglePoint's capital structure, before March 27, 2000, principally consisted of almost 6,000,000 outstanding shares of common stock and debt payable to Rossette. Rossette believed that the large amount of debt owed SinglePoint deterred investment by third parties. n22 To ameliorate this problem, Rossette decided to exercise his option under the promissory notes to convert a substantial portion of his debt holdings into equity holdings in the Company. n23 Instead of employing the contractually agreed upon conversion rate of $ 0.50 per share, Rossette and Bachelor agreed to a substantially lower rate of $ 0.05 per share. n24

n22 Bachelor Aff. P 40.

n23 *Id.*; Rossette Dep. at 128-29.

[*8]

n24 Rossette Dep. at 128-33; Bachelor Aff. P 42. Rossette personally retained The Harman Group Corporate Finance, Inc. (the "Harman Group") to render a fairness opinion regarding whether the new debt conversion ratio was fair to SinglePoint. Rossette Dep. at 157. The Harman Group concluded that the fair value of SinglePoint common stock was $ 0.04 per share. Polesky Aff., Ex. 10 (The Harman Group Fairness Opinion, Mar. 27, 2000) at 3. Plaintiffs challenge the independence of the experts chosen by Rossette and put forth facts that call into question the accuracy of such a conclusion. For example, Rossette and Bachelor voted to increase the exercise price of employee stock options from $ 0.50 per share to $ 0.75 per share just 17 days before approving the $ 0.05 per share rate for Rossette's debt conversion. Rossette Dep. at 110-11 and Ex. 11 (Board Minutes, Mar 10, 2000). The employee stock option plan re-

quired that the exercise price for certain options be priced at fair market value. Polesky Aff., Ex. 5 (1997 Stock Option Plan § VII, P 6.1). Thus, the inference is that Rossette and Bachelor believed that the fair market value per share of SinglePoint common stock was $ 0.75.

[*9]

Rossette and Bachelor, the sole directors at that time, n25 convened a meeting of the Board at which it was agreed that more than $ 2.2 million of Rossette's debt would be converted into SinglePoint equity at a conversion rate of $ 0.05 per share. n26 As a result, the debt would be exchanged for 44,419,020 shares of SinglePoint common stock, instead of the approximately 4.4 million shares that Rossette would have received at the $ 0.50 per share conversion rate. n27

n25 Radebaugh Aff., Ex. 14.

n26 Polesky Aff., Ex. 8 (Board Minutes, Mar. 27, 2000).

n27 *Id.* Later, there would be a 1-for-10 reverse stock split.

Rossette's debt holdings, however, would convert into more shares of common stock than were then authorized; thus, an amendment to the SinglePoint certificate of incorporation was needed. n28 Accordingly, at a Special Shareholders Meeting on March 27, 2000, the number of authorized shares was increased from 10,000,000 to 60,000,000. n29 Thereafter, under a new Debt Conversion Agreement, [*10] all but $ 1 million in principal of Rossette's debt holdings were converted into shares of common stock at a rate of one common share for every $ 0.05 of debt. n30 Before the conversion, Rossette held approximately 61.19% of SinglePoint's equity; after the conversion, he held 93.49% of SinglePoint's then issued and outstanding stock. n31

n28 Rossette Dep., Ex. 9 (Board Minutes, Mar. 10, 2000).

n29 *Id.* Plaintiffs challenge the validity of this meeting and subsequent vote. Plaintiffs contend that the shareholders "received no notice of the dilution" because, although the shareholders were asked to vote on the authorization of additional shares, the underlying purpose of the authorization -- the debt conversion -- was not disclosed. Pls.' Answering Br. at 16.

n30 Radebaugh Aff., Ex. 18. As a result of the Debt Conversion Agreement, SinglePoint further restructured its remaining obligations to Rossette and negotiated an additional $ 500,000 in credit with him. *Id.* The Board also executed a contract to provide Rossette $ 327,450 in compensation, should the Company experience a change in control. *Id.*

[*11]

n31 Radebaugh Aff., Ex. 19 (Board of Directors' Stock Analysis, Mar. 10, 2000 and Mar. 27, 2000).

## C. *The Merger*

After the conversion, SinglePoint began looking for a possible acquiror. n32 As the result of negotiations with Rossette, n33 Cofiniti, SinglePoint's only direct competitor, n34 offered approximately $ 14 million of its stock for the Company's stock. n35 On September 15, 2000, SinglePoint entered into an Agreement and Plan of Reorganization pursuant to which Cosmo Merger Corp., a Delaware corporation wholly-owned by Cofiniti, was to merge into SinglePoint, with SinglePoint, the surviving entity, thus becoming a wholly-owned subsidiary of Cofiniti. n36 As consideration, SinglePoint shareholders would receive approximately 0.49 shares of Cofiniti common stock for each share of SinglePoint common stock. n37

n32 Rossette Aff. P 3.
n33 Bachelor Aff. P 49.
n34 Affidavit of Thomas Loch ("Loch Aff.") P 10.
n35 Bachelor played a minimal role in the negotion process between Cofiniti and SinglePoint; Rossette stated that he handled all of the "material" negotiations himself. Rossette Dep. at 177-78.

[*12]

n36 Merger Agreement at A1312.
n37 *Id.* This had an approximate value of $ 2.46 per share, based on Cofiniti's apparent market value of $ 5 per share. Information Statement at C-02364.

In order to secure Rosette's approval of the Merger, Cofiniti offered Rossette benefits that were not shared with the other shareholders. These benefits included a "put," whereby Cofiniti, *inter alia*, was required to repurchase, in no later than one year, 360,000 shares of the Cofiniti stock Rossette received in the merger at a price of $ 5 per share, for a total of $ 1.8 million. n38 Because Cofiniti shares were not publicly traded, n39 thereby making it difficult for the minority shareholders to liquidate their shares, the put was a substantial benefit to Rossette.

n38 Rossette Dep., Ex. 30 (Agreement for the Sale and Purchase of Stock, Sept. 15, 2000, the "Repurchase Agreement").
n39 Information Statement at C-02364.

[*13]

On October 13, 2000, SinglePoint issued an Information Statement regarding the Merger to its shareholders. The shareholders were told that, "approval of the merger is assumed because several of [the] large stockholders, representing in the aggregate approximately 96.8% of [the] outstanding common stock, have agreed to vote their shares in favor of the merger." n40 The Information Statement explained that Rossette had obtained certain benefits not shared with the other stockholders as a result of the Merger. The Information Statement, however, failed to disclose specifically that Rossette had conditioned his approval of the Merger on his receipt of the put agreement with Cofiniti, which entitled Rossette to receive $ 1.8 million in one year. It also failed to disclose that Rossette had obtained the put agreement. The Merger was approved by a majority of the minority shareholders. n41 The Plaintiffs neither consented to, nor voted their shares in favor of, the Merger.

n40 *Id.*
n41 Bachelor Aff. P 53.

[*14]

## D. *Post-Merger Events*

After the Merger, Cofiniti encountered many of the same problems that had thwarted SinglePoint's efforts. Within 18 months, Cofiniti had filed for bankruptcy and was later liquidated. n42 Rossette's put agreement, upon which the Plaintiffs have focused, was canceled. As a

result of his efforts to support SinglePoint and Cofiniti, Rossette may have lost as much as $ 6 million. n43

n42 On March 11, 2002, Cofiniti filed a Chapter 7 bankruptcy petition. Rossette Aff. P 8. n43 *Id.* P 6.

## II. CONTENTIONS

The Defendants' motion for summary judgment attacks Plaintiffs' claims for breach of fiduciary duties in connection with the Debt Conversion (Count I) and the Merger (Count II). Defendants assert that these claims are derivative in nature and, because of the Cofiniti merger, Plaintiffs lost standing to pursue them on behalf of SinglePoint. If either Count I or Count II is properly viewed as derivative in nature, it must be dismissed as a matter of law.

Defendants [*15] also assert that, regardless of whether the claims are derivative or direct, they are nonetheless entitled to summary judgment because the Plaintiffs have not advanced any viable claim for breach of fiduciary duty. Additionally, Defendants argue that an exculpation provision in SinglePoint's charter bars recovery for any breach of the duty of care. Finally, Defendants contend that they are entitled to summary judgment because the Plaintiffs have suffered no cognizable damages.

## III. APPLICABLE STANDARD

Under Court of Chancery Rule 56, summary judgment may be granted only when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. n44 The Court must view the facts in the "light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that no material question of fact exists." n45 A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of [his] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial. If [he] does not so respond, summary judgment, if appropriate, shall be entered against [him]." n46 The [*16] Court "also maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application." n47

n44 Del. Ch. Ct. R. 56(c); *Motorola, Inc. v. Amkor Tech., Inc., 849 A.2d 931, 935 (Del. 2004)*.

n45 *Cochran v. Stifel Fin. Corp., 2000 WL 1847676, at *4 (Del. Ch. Dec. 13, 2000), aff'd in part, rev'd in part on other grounds, 809 A.2d 555 (Del. 2002)*.
n46 Del. Ch. Ct. R. 56(e).
n47 *Cooke v. Oolie*, 2000 WL 710199, at *11 (Del. Ch. May 24, 2000).

## IV. ANALYSIS

A. *Distinguishing Between Direct and Derivative Claims*

The direct/derivative distinction is critical because, by reason of the Merger with Cofiniti, the Plaintiffs are no longer SinglePoint shareholders. Thus, they lack standing to bring a derivative claim on behalf of the Company. n48 On the other hand,

[a] direct action may be brought in the name and right of a holder [*17] to redress an injury sustained by, or enforce a duty owed to, the holder [of stock in the company at the time of the transaction]. An action in which the holder can prevail without showing an injury or breach of duty to the corporation . . . may be maintained by the holder in an individual capacity. n49

n48 *See, e.g., In re Syncor Int'l Corp. S'holders Litig., 857 A.2d 994, 998 (Del. Ch. 2004)* ("[A] merger which eliminates a shareholder's ownership of stock in a corporation also eliminates his or her status to bring a derivative suit on behalf of the corporation, on the theory that upon the merger the derivative rights pass to the surviving corporation which then has the sole right or standing to prosecute the action.") (citing *Lewis v. Anderson, 477 A.2d 1040, 1045-46 (Del. 1984))*.

n49 *Syncor, 857 A.2d at 997* (quoting 2 A.L.I., PRINCIPLES OF CORPORATE GOVERNANCE, ANALYSIS & RECOMMENDATIONS § 7.02(b) at 17).

Whether a claim is derivative [*18] or direct depends *"solely"* on the following questions: (1) who suffered the alleged harm (the corporation or the suing

stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" n50 In answering these questions, the Court is to look beyond the words of complaint, into the "nature of the wrong alleged," n51 and after considering all of the facts, "determine for itself whether a direct claim exists." n52

> n50 *Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004)* (emphasis in original).
> n51 *In re J.P. Morgan Chase & Co. S'holders Litig.*, 2005 WL 1076069, at *5 (Del. Ch. Apr. 29, 2005) (quoting *Syncor, 857 A.2d at 997*).
> n52 *In re J.P. Morgan Chase*, 2005 WL 1076069, at *5 (quoting *Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004))*.

1. The Debt Conversion and Share Dilution

Plaintiffs [*19] allege that the Debt Conversion, by which the SinglePoint board authorized the issuance of additional shares of the Company's common stock in order to convert into equity part of the debt owed to Rossette, "resulted in a massive dilution of the minority stockholders' interests." n53 Plaintiffs argue that the conversion rate ($ 0.05 per share) was inadequate and caused SinglePoint to issue "vastly more stock than it should have." n54

> n53 Pls.' Opening Br. at 12.
> n54 *Id.* at 33.

The Plaintiffs' contention that they were directly harmed by the alleged dilution fails as a matter of law. When a "board of directors authorizes the issuance of stock for no or grossly inadequate consideration, the corporation is directly injured and shareholders are injured derivatively . . . [and] mere claims of dilution, *without more*, cannot convert a claim traditionally understood as derivative, into a direct one." n55 A dilution claim may be direct, however, if voting rights are harmed. n56 Stock dilution may [*20] produce a direct claim:

> where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a

decrease (or dilution') of the asset value *and* voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder. n57

Here, however, the minority shareholders' voting power was not materially decreased. n58 Rossette owned a controlling interest both before (61%), and after (93%), the challenged Debt Conversion. n59 As minority shareholders to begin with, Plaintiffs' voting power was not materially changed. n60

> n55 *J.P. Morgan Chase*, 2005 WL 1076069, at *6 (internal quotations and citations omitted) (emphasis added). *See also Gatz v. Ponsoldt*, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004).
> n56 *See, e.g., Oliver v. Boston Univ.*, 2000 WL 1091480 (Del. Ch. July 18, 2000).

> n57 *In re Paxson Commc'n. Corp. S'holders Litig.*, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001) (emphasis added).

[*21]

> n58 In contrast, dilution claims emphasizing the diminishment of voting power have been categorized as direct claims. *See, e.g., Oliver*, 2000 WL 1091480, at *6.
> n59 The Plaintiffs have not argued that the Debt Conversion impacted voting rights because a corporate parent (of course, not the circumstances here at the time) controlling at least 90% of shares can use a short-form merger to divest the minority shareholders of their equity interest without any shareholder vote. *See 8 Del.C. § 253.*
> n60 *See, e.g., Agostino v. Hicks, 845 A.2d 1110, 1124 (Del. Ch. 2004)* (finding no cognizable loss of voting power where the plaintiffs held only a minority interest before the challenged transaction).

The issuance of additional stock necessarily reduces the proportional voting power of those shareholders who do not maintain their same percentage of the total number of outstanding shares. Thus, dilution typically is a consequence of any effort to raise funds through the issuance of new shares. It may be done for good purposes [*22] or for bad purposes. Here, by selling its shares too

cheaply -- the core of Plaintiffs' attack -- SinglePoint lost -- perhaps only theoretically in light of its unhappy fiscal condition -- the ability to sell those shares for a better price. That loss, while hurting the shareholders in the sense that any corporate loss hurts shareholders, was the Company's loss; the remedy would be either to cancel the shares (thereby affording the Company the opportunity to sell the shares for fair value) or to require the acquirer to pay fair value (thereby conferring a financial benefit on the Company). Thus, this is an instance where the Company suffered the harm and any remedy would be for the benefit of the Company. As such, under *Tooley*, the claim is derivative. n61

> n61 The Plaintiffs view the exchange of debt for stock as a recapitalization. After all, they argue, stock was issued, but no cash was received. Pls.' Answering Br. at 33. There are, of course, instances where a recapitalization can give rise to direct claims. *See, e.g., Acker v. Transurgical, Inc.*, 2004 WL 1230945 (Del. Ch. Apr. 22, 2004), because it will reallocate rights among shareholders without causing any consequences to the corporation. The debt conversion in this instance, if one accepts Plaintiffs' allegations, did cause harm to the Company and, if the Company sold those share too cheaply, whether payment was through debt cancellation or the receipt of cash makes no difference for these purposes.

[*23]

Because the Plaintiffs' challenge to the Debt Conversion may only be brought derivatively by the Company's shareholders, the Plaintiffs lost standing to pursue that claim upon completion of the Merger. Accordingly, the Defendants are entitled to summary judgment dismissing Count I of the Complaint.

2. The Merger

The Plaintiffs also challenge the stock-for-stock merger of SinglePoint and Cofiniti. They contend that Rossette conditioned his approval of the Merger on receipt of special benefits, not available to the other shareholders, and that, because of his conduct, the Merger process was unfair and the consideration which they received from the Merger was also unfair. The focus is on the put provided by the Repurchase Agreement. n62 The Plaintiffs point out that a reallocation of the Merger proceeds would benefit them directly. The parties' debate revolves around *Parnes* n63 and *Kramer*. n64 In both *Kramer* and *Parnes*, the shareholders alleged that they suffered a direct injury as a result of unfair transactions

that occurred in connection with a merger. n65 The cases had strikingly different outcomes.

> n62 The Plaintiffs also complain about the handling of SinglePoint's indebtedness to Rossette. For example, Rossette, with consummation of the Merger, was repaid some $ 355,000 for sums which he advanced to SinglePoint after the Merger Agreement had been executed. Merger Agreement at A1362, A1371; Rossette Dep. at 198. Without these funds, SinglePoint could not have continued in business through closing. SinglePoint's other debt to Rossette was assumed by Cofiniti. The Plaintiffs do not dispute that Rossette's loans to SinglePoint were critical to its survival and they offer no viable reason for why Rossette, simply because of his status as a director and majority shareholder of SinglePoint, should have been expected to forego a commitment for repayment of duly incurred indebtedness.

[*24]

> n63 *Parnes v. Bally Entm't Corp., 722 A.2d 1243 (Del. 1999)* (applying motion to dismiss standard).

> n64 *Kramer v. W. Pac. Indus., Inc., 546 A.2d 348 (Del. 1988). Tooley* confirms that the conclusions in both *Parnes* and *Kramer* resulted from the proper analysis. *845 A.2d at 1039*. The Defendants, perhaps recognizing the similarities between this case and *Parnes*, contend that the *Tooley* Court, although it approved the test applied in *Parnes*, did not necessarily approve the result in *Parnes*. Defs.' Reply Br. at 8 n.4.
> n65 *See Kramer, 546 A.2d at 349; Parnes, 722 A.2d at 1244*.

In *Kramer*, the stockholders challenged the decision by the board of directors to grant stock options and golden parachutes to management six months before a merger. The stockholders argued that the claim was direct because their share of the merger proceeds was reduced by the cost of the options and golden parachutes. The Court concluded that the claim was essentially for "waste of corporate assets" [*25] n66 and, therefore, derivative in nature because it did not "allege something other than an injury resulting from a wrong to the corporation." n67

pects of the issue must be examined in whole since the question is one of entire fairness.").

n78 Alternatively, this is one of those instances where the Court may deny summary judgment in the expectation that the factual record will be enhanced and provide a more solid foundation for its analysis. *See, e.g., Cooke*, 2000 WL 710199, at *11.

## B. *Defendants' Fiduciary Duties and the Merger*

The Court [*34]  in its review of the Defendants' summary judgment challenge to the Plaintiffs' claims under the Merger now turns to whether, assuming for these purposes that those claims are direct, they would nonetheless fail as a matter of law based on the undisputed material facts. The Defendants' arguments can be grouped as follows: (1) the Plaintiffs have not brought an action that requires evaluation of the Defendants' conduct under the entire fairness standard; (2) the Merger was approved by a disinterested and independent Bachelor, who constituted one-half of the Board, and ratified by a majority of the minority shareholders; (3) even if Rossette is unsuccessful in his effort to earn summary judgment, Bachelor, because of his limited, independent and disinterested role, is entitled to summary judgment; (4) the exculpatory clause in SinglePoint's charter, adopted under *8 Del.C. § 102(b)(7)*, relieves the Defendants of any liability for the monetary damages now sought by the Plaintiffs; and (5) the Plaintiffs have not shown that the Defendants' actions caused them cognizable and calculable damages.

### 1. Entire Fairness Standard

Rossette received a personal benefit,  [*35]  the put agreement, that was not available to the other shareholders. Although there are substantial questions as to the value of the put, one cannot conclude as a matter of undisputed fact, that it was not material either to Rossette or to the other shareholders. Thus, for Rossette, the Merger was a self-interested transaction. n79 Unless otherwise relieved of the burden, it falls upon the Defendants to show that the transaction was "entirely fair." The Defendants, however, cannot "demonstrate that the record evidence, viewed in the light most favorable to the Plaintiffs, including all reasonable inferences, compels a conclusion that the transaction was entirely fair." n80

n79 *See  Orman v. Cullman, 794 A.2d 5, 29 (Del. Ch. 2002)*. "[A] director is considered interested where he or she will receive a personal financial

benefit from a transaction that is not equally shared by the stockholders.") (internal quotations and citations omitted); *Chaffin v. GNI Group, Inc.*, 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) ("To be considered disinterested, the director's decision must be based entirely on the corporate merits of the transaction and not be influenced by personal or extraneous considerations. Thus, a director who stands to receive a substantial benefit in a transaction that he votes to approve, cannot objectively be viewed as disinterested.") (internal citations and quotations omitted)

[*36]

n80 *Seagraves v. Urstadt Prop. Co., Inc.*, 1996 WL 159026, at *4 (Del. Ch. Apr. 1, 1996) (stating that when a "merger [is] a self-dealing transaction, the burden of proving entire fairness rests on the defendants.").

### 2. Approval of the Merger by Bachelor and the Minority Shareholders

Defendants insist that, because the Merger was approved by án independent director, Bachelor, and a majority of the minority shareholders, they need not demonstrate that the Merger was entirely fair. At the time of the Merger, SinglePoint's board consisted only of Rossette and Bachelor. Assuming, as is reasonable, that Bachelor was independent and disinterested, he was only one half of an evenly divided board -- not a majority. His approval of the Merger is insufficient to validate Rossette's self-interested transaction. n81

n81 *See  In re Oracle Corp., Deriv. Litig., 824 A.2d 917, 944 (Del. Ch. 2003)*; *Chaffin*, 1999 WL 712569 at *4-6. In addition, Bachelor apparently had no independent sources of assistance (legal or financial) to assist him. Because of Rossette's status-controlling shareholder, director, creditor - - the ability of Bachelor alone to preserve the interests of the minority shareholders was limited. Moreover, even if Rossette extracted unfair consideration from the Merger, Bachelor might have readily concluded that the Merger was nonetheless in the best interests of the minority shareholders. Without a combination with another entity or a substantial infusion of capital, Single-Point could have failed and then the shareholders would have had nothing. Indeed, SinglePoint's ability to stay in business until consummation of

the Merger appears to have been in doubt. That the merger with Cofiniti was in the best interests of the shareholders may have explained Bachelor's support for the Merger even though the allocation of consideration from the Merger may have been both inequitable and actionable.

[*37]

Nor does the shareholder vote ratify the interested transaction because the Information Statement failed to provide adequate disclosure to the shareholders. Rossette's approval of the Merger was conditioned upon his receipt of the certain "inducements," which included the put agreement with Cofiniti. Omission of the fact that Rossette was to receive this benefit in connection to the Merger "raise[s] a question as to the judgment and care of the defendant directors regarding their . . . disclosure decisions connected with the merger." n82 Moreover, if the put agreement conferred a material benefit upon Rossette, n83 the failure to disclose it to the shareholders leads to the conclusion that they were not fully informed. Shareholder ratification of an interested transaction can only occur if the shareholders are fully informed. n84

n82 *Emerald Partners v. Berlin, 726 A.2d 1215, 1221 (Del. 1999)* (internal quotations omited).
n83 As addressed above, whether it was material cannot be determined from the record for summary judgment purposes.
n84 *See, e.g., In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *36 (Del. Ch. May 3, 2004).

[*38]

3. Bachelor's Role

Bachelor seeks to extricate himself from this litigation by pointing out that the Plaintiffs have made no significant effort to demonstrate that he was beholden to Rossette or that he was interested in the Merger. n85 Bachelor approved the Merger as one of two directors, but he did so without ever inquiring of either Rossette or Cofiniti whether Rossette was receiving any special consideration even though Rossette negotiated the terms of the Merger with Cofiniti. n86 In the context of a motion for summary judgment, it is a reasonable inference that the Court may draw, for these purposes, that Bachelor failed to discharge his duties with due care and loyalty (or in good faith). The shareholders had every right to expect him to ascertain (or at least attempt to ascertain) whether Rossette had negotiated any significant specific favorable terms for his exclusive benefit. Bachelor's ab-

ject failure to take any steps to meet this expectation precludes summary judgment. n87

n85 Bachelor did secure employment with Cofiniti following the Merger, but the Plaintiffs have not suggested that his employment alone, in this context, would compromise the exercise of his business judgment.

[*39]

n86 Bachelor Dep. at 58-59.
n87 *See, e.g., Emerald Partners, 726 A.2d at 1222-24.*

4. Exculpation Provision in SinglePoint's Charter

SinglePoint's certificate of incorporation contained a typical exculpation provision adopted in accordance with *8 Del. C. § 102(b)(7)*. Under *Section 102(b)(7)*, directors may be exculpated from personal liability for monetary damages arising out of their breach of their duty of care. If the loyalty or good faith of a director is in doubt, however, the protection of *Section 102(b)(7)* is not available.

Based upon the current record, Rossette's loyalty (because of his interest in the put agreement) and Bachelor's good faith are at issue, and, thus, the Court can conclude that only a duty of care claim remains. n88 Therefore, consideration of the effect of the exculpatory provision, at this point, is premature. n89

n88 *See, e.g., Orman, 794 A.2d at 41.*
n89 *See Emerald Partners v. Berlin, 787 A.2d 85, 95 (Del. 2000)* (stating that "[a] judicial determination on the issue of entire fairness is a condition precedent to any consideration of damages" and, therefore, any consideration of an affirmative *Section 102(b)(7)* defense).

[*40]

5. Damages

Finally, Defendants argue that the Plaintiffs' claims fail because they have no cognizable damages. In light of Cofiniti's financial demise after the Merger, Defendants assert that even if "Plaintiffs would have received more shares of Cofiniti stock in the merger but for the purported wrongdoing by Rossette, those shares would have been valueless." n90 The Court's calculation of any damages must be based on conditions as of the merger date,

i.e., what the "shares would have been worth at the time of the Merger if [Rossette and Bachelor] had not breached [their] fiduciary duties." n91 That the shares and the put agreement may have *eventually* become worthless does not change this analysis. In addition, as set forth above, the questions of material fact concerning the value of the put agreement preclude summary judgment on this basis as well.

n90 Defs.' Opening Br. at 47.
n91 *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440-441 (Del. 2000)

## V. CONCLUSION [*41]

For the foregoing reasons, summary judgment will be granted to the Defendants with respect to Count I (Debt Conversion and Share Dilution) of the Complaint. The Court concludes that Count I states a derivative, and not a direct, claim. Defendants' motion for summary judgment will be denied with respect to Count II (Merger) of the Complaint. Rossette undertook a self-interested transaction in which he received benefits not shared with those to whom he owed fiduciary duties. Based on the record, whether Plaintiffs' claim is direct or derivative cannot be resolved on summary judgment. Similarly, the record does allow for the conclusion, at this stage, that the Merger was entirely fair or that any of the Defendants' other contentions prevail.

An order will be entered to implement this memorandum opinion.



14

Goldman v. Pogo.com Inc., et al.

C.A. No. 18532-NC

COURT OF CHANCERY OF DELAWARE, KENT

*2002 Del. Ch. LEXIS 88*

June 27, 2002, Submitted
July 16, 2002, Decided

**PRIOR HISTORY:**

*Goldman v. Pogo.com, Inc., 2002 Del. Ch. LEXIS 71* (Del. Ch. June 14, 2002).

**DISPOSITION:** [*1] Defendants' motion for reargument denied.

**COUNSEL:** John L. Reed, Esquire, Duane Morris, LLP, Wilmington, DE.

William M. Lafferty, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** JOHN W. NOBLE, VICE CHANCELLOR.

**OPINIONBY:** JOHN W. NOBLE

**OPINION:**

Pogo.com Inc. (the "Company") and its directors (the "Director Defendants") (together with the Company, the "Defendants") have moved pursuant to Court of Chancery Rule 59(f) for reargument of a portion of this Court's June 14, 2002 letter opinion and order. n1 At issue is my conclusion that the allegations in Plaintiff's Second Amended Complaint (the "Complaint") state a disclosure claim that survives a motion to dismiss under Court of Chancery Rule 12(b)(6). For the reasons set forth below, Defendants' motion for reargument is denied.

> n1 *Goldman v. Pogo.com Inc., 2002 Del. Ch. LEXIS 71,* Del. Ch., C.A. No. 18532, let. op. at 29, Noble, V.C. (June 14, 2002). A motion for reargument under Court of Chancery Rule 59(f) is governed by the familiar standard requiring the moving party to demonstrate that the Court's decision was predicated upon a misunderstanding of

a material fact or misapplication of law. See *In re ML/EQ Real Estate P'ship Litig., 2000 Del. Ch. LEXIS 47,* Del. Ch., C.A. No. 15741, mem. op. at 31, Strine, V.C. (Mar. 22, 2000); *Miles, Inc. v. Cookson America, Inc., 677 A.2d 505, 506 (Del. Ch. 1995);* Defendants' motion does not argue that this Court misapplied the law.

[*2]

Count V of the Complaint alleges that "at the time the Company solicited Daniel Goldman ("Plaintiff") to participate in the First Bridge Loan financing, the Director Defendants were aware [yet failed to disclose] that the ultimate conversion of the Bridge Loans would take place only following a major restructuring of the Company, the effect of which would be to effectively eliminate Plaintiff's shareholdings." n2 As noted in the June 14, 2002 letter opinion, "in substance, Plaintiff claims that he was not fairly apprised of the extent to which his equity position in the Company would likely be diluted" n3 and that he "was not informed of the magnitude of the potential dilution." n4

> n2 Compl. P95. This case is not about the sufficiency of the disclosures as to the First Bridge Loan as if the First Bridge Loan were the only transaction. Instead, this case is about the sufficiency of the disclosures in light of a series of related transactions implementing Defendants' calculated scheme to "effectively eliminate" (not merely dilute) Plaintiff's interest.

> n3 *Goldman v. Pogo.com Inc., 2002 Del. Ch. LEXIS 71,* let. op. at 29.

[*3]

> n4 *Id.* at 30.

Defendants argue in this motion, as they did in support of their motion to dismiss, that the magnitude of the dilution was disclosed to Plaintiff through the representations of Company executives to Plaintiff stating that his ownership in the Company would be reduced to 1% following the contemplated financing and restructuring. n5 Defendants, in addition, argue that the Court failed to address their argument that Plaintiff was as fully and fairly informed as he could have been, given the uncertain and speculative nature of the subsequent bridge loan and restructuring transactions.

> n5 As support for this assertion, Defendants cite Paragraph 37 of the Complaint in which Plaintiff acknowledges a June 4, 1997 letter sent to him from one of the Company's executives urging him to "agree to vote his shares in favor of the restructuring, following which Plaintiff's ownership would be reduced to 1% of the Company." Defendants also cite the June 17, 1997 letter to Plaintiff's attorney from a Company representative stating that "Goldman's Common Stock position after the exchange and after the contemplated financing would be reduced to 1% of the Company." Compl., at Ex. G.

[*4]

I begin with Defendants' argument regarding the sufficiency of the disclosures relating to the consequences accompanying Plaintiff's failure to invest in the First Bridge Loan. I concluded that the Complaint adequately alleged that, while informed of the general, indeed significant potential, consequences of the First Bridge Loan, Plaintiff was not fully advised of the extent to which his equity interest in the Company would be diluted through the series of transactions planned by his adversaries and that such failure was material. n6

> n6 Materiality involves an inquiry into the importance of an omitted fact to a given decision when viewed in light of the "total mix" of information made available to a plaintiff. *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1985).*

Plaintiff was provided with notice that his interest in the Company might be significantly diluted. Indeed, the correspondence of June 4, 1997 and June 17, 1997 informed Plaintiff that his interest in the Company might be diluted [*5] to 1%. This alone, however, is not dispositive of the issue of whether Plaintiff was apprised of the magnitude of the Defendants alleged plan to dilute his interest. As carried out, Defendants' scheme, or so the

Complaint alleges, was successful in diluting Plaintiff's equity interest to 0.1%, n7 an interest that is one-tenth of the remaining interest communicated to Plaintiff by the Company. Moreover, according to the Complaint, the bridge loans and restructuring were part of a well-planned undertaking to deprive Plaintiff of his interest. Accepting, because I must, that the allegations of the Complaint are true, the June 4, 1997 letter was part of a series of efforts to pressure Plaintiff into forfeiting substantial portions of his interest in the Company. The wording of that letter, as set forth in Paragraph 37 of the Complaint, encouraged Plaintiff to vote in favor of a restructuring which would dilute his stake in the Company to 1% (not 0.1%). Similarly, the June 17, 1997 letter stated that Plaintiff's shares would be diluted to 1% upon the occurrence of the exchange and the contemplated financing regardless of whether he chose to participate in another proposal by the Company [*6] to exchange his shares. In short, when the Complaint is viewed in light of the plaintiff-friendly pleading standard of Rule 12(b)(6), I was, and remain, unable to conclude that Plaintiff was fully apprised of the material facts necessary for comprehending the full extent of the alleged dilutive scheme (not simply the First Bridge Loan, but the series of planned transactions) to wipe out his holdings.

n7 Compl. P43.

I now turn to Defendants' argument that that Plaintiff was as fully enlightened about the transactions and their dilutive effects as he could have been in light of their uncertain status. My opinion noted Plaintiff's allegation that the bridge loan transactions and restructuring were part of an overall scheme orchestrated to eviscerate his equity holdings in the Company. After taking those allegations as true and reading them in context with the Complaint's other factual assertions, I was unable to conclude that the dilution of Plaintiff's holdings was a mere collateral consequence of the restructuring. [*7] While I understand, as I did before issuing my opinion last month, Defendants' argument as to the speculative nature of the subsequent transactions also challenged by Plaintiff as they relate to the disclosure issue, I must assume, for present purposes, the truthfulness of Plaintiff's allegations that the transactions were not prospective and uncertain but, instead, were reasonably known to Defendants at the time of the disclosures and were calculated to drive Plaintiff out of the Company. n8

> n8 Because of the Complaint's factual allegations in this case, Defendants' reliance on *In re Encore Computer Corp. S'holders Litig., 2000*

*Del. Ch. LEXIS 93,* Del. Ch., C.A. No. 16044, mem. op., Jacobs, V.C. (June 16, 2000), is misplaced. While this Court has held that the duty of disclosure does not carry a duty to disseminate speculative or uncertain information, Plaintiff here has specifically alleged a conscious scheme on the part of the Defendants to eviscerate his equity interest in the Company. *See* Compl. PP2-4. Taking this as true, as I must for the purposes of a motion to dismiss pursuant to Rule 12(b)(6), I accept that such a scheme did exist and that details of the projected undertakings necessary to effectuate that effort were known by the Defendants at the time of the disclosures.

[*8]

Because Defendants' arguments in support of their motion for reargument on Plaintiff's disclosure claim revisit ones understood by the Court prior to the issuance of its June 14, 2002 letter opinion and because I remain of the view that I did not misunderstand the "facts" as I must accept them for these purposes from the well-pled allegations of the Complaint, Defendants' Rule 59(f) motion is denied.

**IT IS SO ORDERED.**

JOHN W. NOBLE

15

Not Reported in A.2d                                                        Page 1
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)


Gabrielle Katz HUDSON, et al., Plaintiffs,
v.
PRIME RETAIL, INC., et al., Defendants.
**No. 24-C-03-5806.**

April 1, 2004.


Michael A. Stodghill, Esq., Rubin & Rubin, Chartered, Rockville, Charles P.
Scheeler, Esq., Piper Rudnick, LLP, Baltimore, Emily Komlossy, Esq., Goodkind,
Labaton, Rudoff & Sucharow, LLP, Ft. Lauderdale, FL, Andrew J. Graham, Esq., Kramon
& Graham, P.A., Baltimore.

### *ORDER*

ALBERT J. MATRICCIANI, JR., Judge.

*1 Upon consideration of all defendants' motions to dismiss and plaintiffs'
oppositions thereto, arguments of counsel having been heard on March 25, 2004, it
is this *1st day of April, 2004,* by the Circuit Court for Baltimore City, Part 20,
**ORDERED,** for the reasons set forth in the accompanying Memorandum Decision of this
date, that dismissal is **GRANTED** as to each and every count of the third amended
complaint, and it is further **ORDERED** that the motions to enforce the Court's bench
decision are **DENIED** as moot.


### *MEMORANDUM DECISION*

This purported class action litigation arises from the opposition mounted by
several minority stockholders to the cash-out merger of Prime Retail, Inc.
("PRI"), a Maryland corporation, into Prime Outlets Acquisition Company, LLC, a New
Jersey company affiliated with The Lightstone Group, LLC ("Lightstone"). Broadly
stated, the plaintiffs [FN1] allege that in arranging and voting for the merger,
various PRI directors [FN2] breached the duties they owed to the corporation and its
stockholders. Plaintiffs also named Lightstone as an aiding and abetting defendant.
Both Prime Retail and Lightstone have filed motions to dismiss the Third Amended
Complaint under Maryland Rule 2-322(b).


> FN1. References to "plaintiffs" in this memorandum decision include Gabrielle
> Katz Hudson, Thomas R. Hudson, Jolly Roger Fund LP, and Jolly Roger Offshore
> Fund, Ltd.

> FN2. Defendant-directors are Glenn D. Reschke, Howard Amster, James R.
> Thompson, Gary Skoien, Kenneth A. Randall, Sharon Sharp, and Marvin S. Traub.
> References to "Prime Retail" include these directors, along with PRI (which
> no longer exists) and Prime Outlets Acquisition Company, LLC, successor in
> interest to PRI.

### I. Factual Background Summary and Procedural History

The facts set forth here are as alleged in the Third Amended Complaint. [FN3] The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

purpose of this background statement is to provide a context for the analysis of
the pending motions. The Court makes no findings of fact in this decision. _Morris
v. Osmose Wood Preserving, 99 Md.App. 646 (1994)_, _rev'd in part on other grounds_,
340 Md. 519 (1995). In considering the pending motions, of course, the Court
assumes the truth of the well-pleaded allegations of the Third Amended Complaint,
and fair inferences to be drawn therefrom, but inconsistencies and ambiguities in
the complaint must be construed against the plaintiffs. _Manikhi v. Mass Transit
Admin., 360 Md. 333, 344-45 (2000)_; _Faya v. Almaraz, 329 Md. 435, 443-44 (1993)_;
_Young v. Hartford Accident & Indem. Co., 303 Md. 182, 192 (1985)._

> FN3. This background summary includes material from PRI's proxy statement,
> but only to the extent the proxy is undisputed and consistent with the well-
> pleaded allegations of the Third Amended Complaint.

#### A. PRI and the Fortress proposal.

PRI was a Maryland corporation that owned and operated outlet shopping centers. The
company had three types of stock, Series A preferred, Series B preferred, and
common stock, but due to the poor performance of its shopping centers, obligations
to creditors, and lack of liquidity, the company had not paid dividends to its
stockholders since January 2000. Among other financial recovery (or survival)
measures, in December 2000 the company sold four of its outlet centers and obtained
a $90 million loan from an affiliate of Fortress Investment Group, LLC
("Fortress").

Fortress submitted an unsolicited proposal to PRI's board of directors on June 4,
2002, proposing that Fortress buy out all the company's outstanding stock for $48
million. Two days later the board appointed directors Kenneth A. Randall, Sharon
Sharp, James R. Thompson, and Marvin Traub to serve on a Special Committee formed
to evaluate the Fortress offer, as well as other recapitalization options. That
same day the Special Committee selected Houlihan Lokey Howard & Zukin Capital
("Houlihan Lokey") to serve as the Committee's financial advisor. Representatives
from Houlihan Lokey, along with PRI director Howard Amster (participating in his
capacity as stockholder only), met with Fortress on June 21, 2002, to discuss the
proposal. Five days later Fortress increased its proposed offer to a total of $66
million.

*2 At a Special Committee meeting on August 12, 2002, Houlihan Lokey presented its
assessments of PRI's financial condition and value, and an analysis of the
restructuring and other strategic alternatives the company might pursue. The next
day Houlihan Lokey made a presentation to the entire board on essentially the same
issues. The board decided it could not accept Fortress's $66 million proposal, but
the board directed Houlihan Lokey to continue negotiations with Fortress while
simultaneously pursuing other recovery options.

#### B. PRI's continued efforts to find an acceptable proposal.

On August 28, 2002, the Special Committee retained Granite Partners, LLC
("Granite"), as a second financial advisor to assist with raising capital, and from
September through November 2002 Granite, Houlihan Lokey, and PRI representatives
compiled information packages and an offering memorandum with financial
projections. Granite contacted approximately one hundred potential investors
seeking capital contributions. Meanwhile, Fortress filed a disclosure with the SEC
on September 26, 2002, stating that it had purchased 10% of PRI's Series A stock

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from Merrill Lynch. At the conclusion of Granite's search, it reported to PRI that
capital investment without a change in control was not an option, but that
Lightstone, among other investors, expressed strong interest in a strategic
transaction with the company, conditioned upon the investor obtaining control.

After Granite narrowed the field to twenty prospective investors, thirteen of them
executed confidentiality agreements and were given an offering memorandum. On
November 15, 2002, those who remained interested were instructed to submit detailed
proposals. PRI, with the assistance of its financial advisors, conducted
presentations for four potential buyers from late November through December 4,
2002. Those efforts attracted six written expressions of interest, four buyout
bids, and two bids for all or most of PRI's assets. The buyout bids ranged from $80
million to $120 million, and Houlihan Lokey went to work evaluating the various
bids during the second week of December 2002.

The Special Committee, and then the full board, met with legal and financial
advisors on December 13, 2002, and the board further winnowed the field to three
buyout bidders, whom the board (through Houlihan Lokey) invited to submit best
final bids. Those final bids came in on December 19, 2002, and they ranged from
$125 million to $138.5 million. Houlihan Lokey advised the Special Committee to
pursue the highest bidder, (whose identity does not appear in the record), and the
Special Committee in turn made the same recommendation to the board. On December
23, 2002, the board directed PRI's management to pursue the $138.5 million bidder,
and a week later PRI and the bidder entered into an exclusivity agreement giving
the bidder sufficient time to complete its due diligence investigation.

At this point $138.5 million looked like the approximate merger consideration, so
the next logical step was to devise a plan to allocate that sum among the various
classes of stock. To that end the Special Committee directed Houlihan Lokey to seek
input from Series A and Series B stockholders. Nearly 25% of PRI's Series A stock,
and just over 20% of PRI's Series B stock was represented in these initial
allocation discussions. Defendant Howard Amster, along with other individuals,
participated as a holder of both classes of stock. The group assumed a net merger
consideration of $133 million, and based on that figure a subgroup of the
stockholders arrived at a consensus on allocations of $18.50 per Series A share,
and $10.25 per Series B share, with $10 million to be divided among holders of
common stock.

*3 In mid-February, however, the bidder backed out of the deal because of
information gathered during its due diligence investigation. PRI was back to square
one, and the board directed Houlihan Lokey to resume courting one of the other two
serious bidders.

### C. Lightstone's bid.

On March 1, 2003, one of those bidders (whose identity is also unknown) submitted a
$117.5 million buyout proposal, which the Special Committee and the board
considered at meetings two days later. Upon Houlihan Lokey's advising that it could
not easily assess the value of the bid because of certain features of the deal's
structure, the Special Committee recommended that the board not pursue the bid
exclusively, and the board accepted the recommendation. Consequently, Houlihan
Lokey invited further proposals from other interested investors.

By March 13, 2003, PRI's board had three new buyout bids in hand, the highest of
them being Lightstone's $121 million bid (which, after transaction costs, would net

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 20 of 36

PRI $118 million). On that date, based on the Special Committee's recommendation, PRI opted to pursue the Lightstone deal exclusively, and the parties entered into an exclusivity agreement on March 19, 2003. Lightstone reduced its bid to $113 million (net $111.5 million) on April 15, 2003, based on its due diligence investigation.

On April 18, 2003, the Special Committee met for two purposes: first, to receive Houlihan Lokey's presentation on PRI's value (including a breakdown of its various stocks), and second, to consider director Michael Reschke's proposed alternative to the Lightstone deal. Director M. Reschke [FN4] proposed that PRI stay in business and not merge. His plan entailed selling PRI's majority interests in six shopping centers (some of which were performing well), selling five under-performing shopping centers, and a rights offering to stockholders. Director M. Reschke projected this would provide PRI $70 to $90 million more than the Lightstone deal. The Special Committee recommended that the board follow two parallel paths: (1) continue pursuing the Lightstone deal, and (2) further explore director M. Reschke's proposal.

    FN4. Two Reschke's served on PRI's board, Michael and Glenn, so first initials are used to distinguish between them.

Later in April 2003, Lightstone increased its bid to a figure that would net PRI $113 million. On April 29, 2003, Lightstone's president and chief executive officer David Lichtenstein met with PRI's board to discuss the proposed merger. At the same meeting director M. Reschke presented further details to the board on his alternative proposal, director Amster presented details on a possible rights offering, and director G. Reschke (with management members) presented PRI's latest five-year business plan. Regarding the five-year plan, PRI's management advised that the plan's success depended on a reversal of several lackluster trends in PRI's operations. Three directors (Amster, M. Reschke, and Skoien) expressed concerns that Lightstone's offer was too low, that a stockholder vote would be unsuccessful if based on the current allocation figures, and that the alternative proposals could be better options for PRI.

*4 These proposals and concerns were considered at a subsequent Special Committee meeting, at which it was decided that the Special Committee would meet with Mr. Lichtenstein in an effort to improve the Lightstone proposal. The Special Committee also directed its financial advisors to further evaluate director M. Reschke's alternative proposal.

Mr. Lichtenstein met with Houlihan Lokey and PRI's preferred board members prior to May 2, 2003, to discuss Lightstone's offer. Based on a total purchase price of $115 million, the preferred directors indicated their support for (or acquiescence to) an allocation of $16.04 for Series A shares, $8.93 for Series B shares, and $0.15 for shares of common stock. The preferred directors reported these figures, and Mr. Lichtenstein's unwillingness to increase the $115 million offer, to the Special Committee on May 2, 2003. The preferred directors exited that meeting and the Committee considered this report and PRI's lawyers' report on the Lightstone negotiations. The Special Committee also considered its financial advisors' reports on their evaluation of director M. Reschke's alternative proposal. Later that day the board met and, based on the Special Committee's recommendations, the board decided not to pursue director M. Reschke's alternative proposal, but to persevere with the Lightstone deal.

Subsequently, Houlihan Lokey met again with preferred stockholders to discuss how

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported Case 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 21 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

Lightstone's merger consideration could be allocated among the various classes of
stock. Houlihan Lokey asked the preferred stockholders to consider an allocation of
$15.90 per Series A share, $8.80 per Series B share, and $0.17 per share of common
stock. At a May 14, 2003 Special Committee meeting Houlihan Lokey advised the
Committee of its opinion that $115 million was a fair price for PRI's stockholders
generally, and Houlihan Lokey also presented its estimation of fair values for each
class of stock. Houlihan Lokey specified that its valuation of each class was
independent of its valuation of each other class; that is, Houlihan Lokey was not
giving a fairness opinion on any particular allocation arrangement. The estimated
ranges of values were $16.00 to $18.60 for Series A shares, $6.10 to $7.20 for
Series B shares, and $0.13 to $0.14 for shares of common stock. Houlihan Lokey
advised the Special Committee that, in its view, a cash-out merger with Lightstone
would be better for PRI than continuing to operate as a stand-alone business.

Allocation was again discussed at a May 9, 2003 Special Committee meeting. Director
G. Reschke told the board that the preferred directors would support an allocation
of $16.25 for Series A shares, $8.66 for Series B shares, and $0.18 for shares of
common stock. On June 2, 2003 the Special Committee directed Houlihan Lokey to seek
other preferred stockholders' input on the allocation, and the Committee asked the
preferred directors to be prepared to explain the basis for their proposal at the
next Special Committee meeting.

**5** That next meeting was held on June 5, 2003. At the meeting the Special Committee
informed the preferred directors that "their proposed allocation was problematic
for the Special Committee because, under such proposal, the series A stockholders
will receive an amount per share at the lower end of Houlihan Lokey's valuation
range while the series B stockholders would receive an amount per share above
Houlihan Lokey's valuation range." [FN5] The preferred directors stood their ground;
they were excused from the rest of the meeting during which the Committee discussed
the allocation proposals.

    FN5. September 30, 2003 Definitive Schedule 14(a) Proxy Statement at 24.

The Special Committee's deliberations continued to a June 9, 2003 meeting, at which
Houlihan Lokey reported to the committee that nearly all of PRI's preferred
stockholders had expressed their desire for liquidity, at a reasonable allocation.
Merrill Lynch, owner of 22% of PRI's Series A stock, would not commit to a
particular allocation range, but Merrill's counsel stated that $16.00 was too low.
Fortress (the company that had earlier purchased 10% of PRI's Series A stock from
Merrill) stated it would consider a Series A allocation between $16.00 and $20.00
per share. The Special Committee decided to recommend to the board that PRI enter
into the merger agreement with Lightstone at $115 million, and that the merger
consideration be allocated at $16.25 for Series A shares, $8.66 for Series B
shares, and $0.18 for common stock. Included with the recommendation was an
explanation that the Special Committee factored the preferred directors'
preferences into the allocation decision because of the stockholders' push for
liquidity. That is to say, without the preferred directors' support the merger
would probably fail, and PRI would be left with no one receiving any liquidation of
their shares. The board adopted the Special Committee's recommendation on June 9,
2003.

Houlihan Lokey updated its range of estimates on July 1, 2003, and based on its
most recent analysis provided ranges of $16.11 to $18.61 for Series A shares, $6.15
to $7.24 for Series B shares, and $0.14 to $0.15 for shares of common stock. The
Special Committee recommended to the board no changes in the allocation. PRI and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  Document 48-6   Filed 03/06/2006   Page 22 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

Prime Outlets Acquisition Company, LLC, executed the merger agreement on July 8, 2003. Houlihan Lokey updated its fairness opinions on that date, which included no changes.

### D. Stockholder objections, and the ongoing allocation dialogue .

The following week PRI received objections from Merrill Lynch and Fortress, both arguing that the allocation of $16.25 for Series A shares was inadequate. PRI held a teleconference moderated by Granite on August 11, 2003, at which 50% of the Series A stock, and 47% of the Series B stock were represented. The meeting did not resolve the disagreements.

Based on information provided by Granite, the Special Committee and the board found themselves in a quandary. Fortress and Merrill both appeared to need at least $20.00 per Series A share to support the merger (which obviously would require concomitant decreases elsewhere), but ROI Capital Management, a significant holder of PRI's Series B stock, would withdraw its support if the Series B allocation dipped below $8.30. Director Amster stated he could tolerate a Series B allocation as low as $8.46, but only with significant cuts in the common stock allocation and in transaction costs to PRI's management and its financial and legal advisors. Despite repeated efforts at persuading Lightstone to increase its offer beyond $115 million, PRI simply did not have enough merger consideration to satisfy everyone's demands.

*6 PRI's financial advisors tried to iron out a solution between August 13 and August 21, 2003, but were unable to bring the different stock classes to a consensus. This was reported at an August 21, 2003 Special Committee meeting, where it was also reported that director Amster could support allocations of $18.40 for Series A shares, $8.169 for Series B shares, and $0.17 for shares of common stock, but with a $0.514 million cut in transactional fees. On the Special Committee's recommendation, the board adopted this allocation the same date.

### E. The plaintiffs file suit.

Just prior to those August 21 allocation decisions, the plaintiffs filed this action on August 12, 2003, seeking to enjoin the stockholders' vote on the merger. Prime Retail and Lightstone moved to dismiss the Complaint, but before any action was taken on those motions, the plaintiffs filed their First Amended Complaint on October 8, 2003, along with motions for preliminary injunction and expedited discovery. The Court held a scheduling conference with the parties on October 20, 2003, at which plaintiffs stated their intention to convert their motion for preliminary injunction into a motion for a temporary restraining order, and at which the Court set a hearing on the motions for October 24, 2003. PRI and Lightstone moved to dismiss the First Amended Complaint on October 23, 2003. The stockholders' vote was scheduled for October 30, 2003.

At the conclusion of the October 24, 2003 hearing the Court rendered a decision from the bench. The parties dispute the legal effect of the Court's bench decision, and the Court resolves this dispute by clarifying what actually happened in section II.B., below. At this point, it suffices to say (and the parties agree) that the Court's bench decision dismissed all but one of the plaintiffs' claims. The Court reserved ruling on the motion for temporary restraining order to allow plaintiffs to conduct limited discovery. On October 27, 2003, plaintiffs deposed PRI director Kenneth A. Randall, who chaired the Special Committee, and plaintiffs withdrew

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS    Document 48-6    Filed 03/06/2006    Page 23 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

their motion for a temporary restraining order a day later.

## F. Merger efforts continue.

PRI's stockholders did not approve the merger on October 30, 2003. A vote to merge
would have required approval of at least two-thirds of each of the two preferred
classes, and more than half of the common stockholders. Only 57.96% of the Series A
shares were voted for the merger (both the other classes would have approved the
merger). The meeting was adjourned and rescheduled for November 4, 2003. At that
meeting 63.59% of the Series A shares were voted for the merger, and the meeting
was adjourned and rescheduled for November 18, 2003.

On November 13, 2003, David Lichtenstein and PRI both disclosed that Lightstone
might try purchasing PRI stock. (Lichtenstein filed a disclosure with the SEC,
while PRI issued a press release.) On November 18, 2003, before the stockholder
vote, Lightstone contracted to purchase shares of PRI Series A stock at $22 per
share from Deephaven Capital Management. The purchase contract also obligated
Deephaven to vote for merger. All three classes of stockholders approved the merger
later that day.

## G. The pending motions.

*7 Plaintiffs filed their Second Amended Complaint on December 3, 2003, and Prime
Retail and Lightstone filed corresponding motions to dismiss on January 9, 2003.
Before any action was taken on those motions, plaintiffs filed their Third Amended
Complaint on February 4, 2004, and the defendants filed their corresponding
dismissal motions on February 23, 2004. ᴼᴺᴱ Prime Retail's motion argues that all but
one of the plaintiffs' claims are precluded by virtue of the prior bench decision,
and that the entirety of the Third Amended Complaint fails to state a cause of
action for which relief can be granted. Lightstone adopts Prime Retail's arguments,
and also moves for dismissal arguing that the Third Amended Complaint fails to
state a cause of action for aiding and abetting. The Court heard arguments of
counsel on March 25, 2004.

   FN6. The defendants also filed motions to enforce the October 24 bench
   decision, which plaintiffs opposed, but those motions become moot upon
   resolution of the present motions.

## II. Analysis

To analyze the defendants' motions it must first be determined, in procedural
terms, how to treat the motions appropriately under the Maryland Rules and in the
context within which they were presented to the Court. Then it is necessary to
resolve the parties' dispute over the legal effect of the Court's late-October
bench decision, before finally moving to the merits of the motions.

## A. Motions to dismiss-with exhibits.

The defendants submitted motions styled "Motion to Dismiss," and all parties have
presented to the Court and relied upon various documentary exhibits including Prime
Retail's filings with the SEC. However, in ruling on motions to dismiss the Court
may only consider matters presented within the plaintiffs' Third Amended Complaint,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Document 48-6 Filed 03/06/2006 Page 24 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

and the Court assumes the truth of the well-pleaded facts and inferences fairly drawn therefrom. *Bennett Heating v. NationsBank,* 342 Md. 169, 174 (1996).

Prime Retail argues, "Even on a motion to dismiss, the Court may properly consider documents integral to the complaint, relied upon in the complaint, incorporated into the complaint, or that the plaintiff had knowledge of in framing the complaint, as well as public documents filed with the SEC," citing *In re Merrill Lynch & Co.,* 273 F.Supp.2d 351, 355 (S.D.N.Y.2003). Essentially the same rule applies in Delaware. *E.g., Orman v. Cullman,* 794 A.2d 5, 15-17 (Del. Ch.2002) (Chandler, C.). Although one portion of Prime Retail's proposed rule applies in Maryland, *see* Md. R. 2-303(d) ("any written instrument that is an exhibit to a pleading is a part thereof"), the rest of the proposed rule runs counter to Maryland law. *See Muthukumarana v. Montgomery County,* 370 Md. 447, 474-75 (2002); *Hrehorovich v. Harbor Hosp.,* 93 Md.App. 772, 779-89 (1992); *see also Faya,* 329 Md. at 444 (taking judicial notice on motion to dismiss).

At the March 25 argument, however, plaintiffs' counsel joined in the defendants' position that the Court could, on a motion to dismiss, consider PRI's SEC filings as incorporated into the Third Amended Complaint. The Court accepts plaintiffs' counsel's statement as an oral amendment to the pleadings, incorporating into the complaint those documents on which it relies. *See Nichols v. Wilson,* 296 Md. 154, 156 n. 3 (1983); *RTKL Assocs, Inc. v. Four Villages Ltd. P'ship,* 95 Md.App. 135, 138 (1993); *Hoffman v. Hoffman,* 93 Md.App. 704, 709 (1992). The Court excludes from its consideration all other documents the parties submitted, and consequently will treat the pending motions as motions to dismiss.

## B. The effect of the bench decision on the Third Amended Complaint.

*8 The plaintiffs' initial complaint did not set forth causes of action in separately numbered counts, and thus it was improper in form and not in compliance with the pleading requirements of Maryland Rule 2-303(a). [FN7] At the October 24 hearing the Court stated:

> FN7. *See* Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 178-79 (3d ed. 2003) ("When separate causes of action are not pleaded in separate counts ... the appropriate response to the pleading is a preliminary motion under Rule 2-322(b)(2)."); Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 1.4 (2d ed. 1998) ("The failure to state separate causes of action in separate counts ... subject[s] [the complaint] to a motion to dismiss for failure to state a claim upon which relief can be granted.").

[T]he complaint itself is not set forth in counts, at least they aren't delineated in the traditional fashion, and I am going to say that it appears to me to attempt to set forth causes of action for both a breach of fiduciary duty and a breach of, to the extent that these are different, the duty of candor with respect to the material nondisclosures, the first issue going, I suppose, to the independence of the special committee and the second going to, whether they were independent or not, whether there is sufficient material and information contained in the proxy materials to allow the shareholders in the mix of it all to make reasoned decisions about the vote that they are to undertake next Thursday.... Am I missing something? Plaintiffs' counsel then confirmed that the Court's understanding was correct. In part because of the lack of enumerated counts, the Court rendered an ambiguous bench decision:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 25 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

[D]efendants' motion [to dismiss] ... should be denied with respect to this aspect of the complaint [i.e., the nondisclosure of allocation analysis] with, I think, leave to amend because I don't know that the complaint actually clearly sets forth the appropriate cause of action, but granted as to all other aspects and claims of material nondisclosure.

The Court's denial of the motion to dismiss the allocation nondisclosure claim, with leave to amend that claim, is inconsistent on its face. Although not articulated precisely this way from the bench, what the Court intended in that statement was to grant the motions to dismiss with leave to amend on the nondisclosure of allocation analysis count and to grant the motions to dismiss as to the remaining counts. The plaintiffs did amend their complaint, and in the Third Amended Complaint the plaintiffs have re-alleged causes of action which were dismissed at the October hearing.

Prime Retail argues that the doctrine of res judicata bars the plaintiffs from re-alleging in the Third Amended Complaint those claims which were previously dismissed. The sum total of legal authority cited by Prime Retail in support of that argument is _Poteet v. Sauter,_ 136 Md.App. 383 (2001). In _Poteet,_ Judge Hollander wrote for the Court of Special Appeals:

In determining whether res judicata is applicable, a court must consider:
(1) whether the parties are the same as, or in privity with, the parties to the earlier dispute;
(2) whether the cause of action presented is identical to the one determined in the prior adjudication; and,
(3) whether there was a final judgment on the merits in the initial action.

_Id._ at 411. _Poteet,_ like every other res judicata case reviewed by this Court, spoke in terms of "final judgments" in "initial actions" as barring relitigation in a "subsequent action ." _Poteet_ provides no support for the proposition that res judicata bars a plaintiff from re-alleging in an amended complaint, within a single civil action, claims which were previously disposed of on preliminary motions attacking the initial complaint.

*9 Because the bench decision left at least one claim in the case, that decision "is not a final judgment," it did not "_terminate_ the action as to any of the claims or any of the parties," and it is "subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties." Md. R. 2-602(a) (emphasis added). Also, in addition to the three res judicata requirements described by Judge Hollander in _Poteet,_ the doctrine presumes an additional element: two distinct lawsuits. In this case we have only one civil action, in which the Court has rendered a non-final decision on less than all the claims; res judicata has no application here.

As explained in section II.A., above, generally motions to dismiss which present additional materials not contained in the complaint require the Court to treat the motions as motions for summary judgment. All the parties assume (as did the Court, at the time), that the October 24 bench decision granted dismissal, but because the Court considered additional materials submitted by both parties, the Court was actually granting defense motions for summary judgment on all but one of the plaintiffs' claims. [FN8] _See, e.g., Fairfax Sav., F.S.B. v. Kris Jen Ltd. P'ship,_ 338 Md. 1, 9-10 (1995); _Hrehorvich,_ 93 Md.App. at 783. Therefore, the rules governing plaintiffs' latest amendments would be rules governing amendments after a court grants defense motions for partial summary judgment, not dismissal.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN8. Although the present motions came before the Court in the identical
> posture, the record has now been clarified as to which materials are being
> considered by the Court and which are not. See pages 13 to 14, above. Thus,
> the Maryland Rules compel different treatment of the pending motions.

Plaintiffs' memorandum in opposition to the defense motions posits that "dismissal
is without prejudice, unless otherwise specified," citing _Williams v. Snyder, 221
Md. 262, 267 (1960)_, and plaintiffs conclude that because "the Court's dismissal
was unspecified," their amended pleading is proper. _Williams,_ however, was a
voluntary dismissal case where the Court applied the predecessor to current Rule 2-
506(c). Unlike _Williams,_ the plaintiffs here have not voluntarily dismissed their
case. _Williams_ and Rule 2-506(c) have no application here.

Plaintiffs also invoke _Maryland Rule 2-341_, the general rule governing amending
pleadings. Under subparagraph (a) of that rule, "A party may file an amendment to a
pleading at any time prior to 15 days of a scheduled trial date." Subparagraph (c)
limits the scope of permissible amendments:
An amendment may seek to (1) change the nature of the action or defense, (2) set
forth a better statement of facts concerning any matter already raised in a
pleading, (3) set forth transactions or events that have occurred since the filing
of the pleading sought to be amended, (4) correct misnomer of a party, (5) correct
misjoinder or nonjoinder of a party so long as one of the original plaintiffs and
one of the original defendants remain as parties to the action, (6) add a party or
parties, (7) make any other appropriate change. Amendments shall be freely allowed
when justice so permits. Errors or defects in a pleading not corrected by an
amendment shall be disregarded unless they affect the substantial rights of the
parties.

*10 Before applying _Rule 2-341_ to this case, the Court must inquire whether this
general rule, and not a more specific rule, controls whether plaintiffs may
resubmit by amendment claims on which the Court previously granted defense motions
for summary judgment. For example, had this Court actually been granting defense
motions to dismiss at the October 24 hearing, then under _Rule 2-322(c)_ the
plaintiffs could not file an amended complaint on all counts because the Court did
not expressly grant leave to amend any claim other the count for nondisclosure of
merger allocation analysis. [FN9] Thus, in the context of a motion to dismiss, _Rule 2-
322(c)_ takes away the broad freedom to amend generally granted by _Rule 2-341_.

> FN9. The third sentence of _Rule 2-322(c)_ states, "If the court orders
> dismissal, an amended complaint may be filed only if the court expressly
> grants leave to amend."

In legal terms, however, the Court granted defense motions for partial summary
judgment under Rule 2-501, and that rule contains no corollary to _Rule 2-322(c)_'s
amendment provision. [FN10] Unlike _Rule 2-322(c)_, _Rule 2-501_ on summary judgments
contains no specific restriction to limit the liberal amendment provisions of _Rule
2-341_. Even so, under the general amendment rule a plaintiff may not re-allege the
very same claims on which summary judgment has already been granted, because such
an amendment does not fall within one of the seven types of amendments in _Rule 2-
341(c)_. Although amendments "shall be freely allowed when justice so permits," for
the same policy reasons underlying the doctrines of res judicata, collateral
estoppel, and law of the case, justice does not permit a plaintiff to beset the
Court and defendants with duplicitous, meritless claims. _See generally_ John A.
Lynch & Richard W. Bourne, _Modern Maryland Civil Procedure_ § § 12.1-12.3 (1993 &

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 27 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

Supp.2003).

> FN10. But compare Davis v. DiPino, 337 Md. 642, 648-49 (1995) (Chasanow, J.)
> ("When a trial court grants a motion to dismiss ... the court has the
> discretionary authority to grant the plaintiff leave to amend the complaint
> ... [but there] is no such discretionary authority to permit the amendment of
> the complaint subsequent to the grant of summary judgment."), with Fairfax
> Sav., F.S.B., 338 Md. at 9-10 (Rodowsky, J.)  (describing without criticism
> trial court's grant of partial summary judgment with leave to amend); Kee v.
> State Highway Admin., 313 Md. 445, 452-55, 459-60 (1988) (Eldridge, J.)
> (sanctioning filing of amended complaint after grant of partial summary
> judgment as proper under Rule 2-341); Preissman v. Harmatz, 264 Md. 715, 718-
> 20 (1972) (same).

To determine whether the plaintiffs' Third Amended Complaint falls within the scope
of Rule 4-341(c), the Court must compare the First Amended Complaint with the
Third, and to the extent that the comparison reveals that plaintiffs have re-
alleged in the Third Amended Complaint causes of action on which summary judgment
has already been granted for the defendants, the Court could strike those
amendments on its own initiative under Rule 2-322(e) as being "improper" and "not
in compliance with" Rule 2-341. The Court would then consider the defendants'
motions to dismiss whatever remains after that comparison. But perhaps due to the
lack of clarity in the Court's bench decision, the defendants have not moved to
strike the amended complaint under Rule 2-341(a), (c), and Rule 2-322(e), and, of
course, plaintiffs have not confronted such a motion. Although Rule 2-322(e)
empowers the Court to strike pleadings on its own initiative, under the
circumstances, here the Court declines to do so. To cleanse the record of further
confusion stemming from the Court's October 24 decision, the Court will proceed to
address here the viability of each of the Third Amended Complaint's counts.

### C. Third Amended Complaint.

Plaintiffs' Third Amended Complaint alleges that the director-defendants breached
the duties of good faith, loyalty, and care, which they owed to the corporation and
its stockholders. The plaintiffs allege that various directors' decisions were not
independent, that directors were interested in transactions they were addressing,
and that the directors failed to disclose material facts to the stockholders who
were to vote on the merger. Before addressing each count, it will be helpful to
review generally the duties imposed upon directors, and the standards by which
courts review director actions.

### 1. Corporate directors' duties and the business judgment rule.

*11 In Maryland, corporate directors must perform their duties (1) in good faith,
(2) in a manner [the director] reasonably believes to be in the best interests of
the corporation, and (3) with the care that an ordinarily prudent person in a like
position would use under similar circumstances. Md.Code Ann. Corps. & Ass'ns § 2-
405.1(a) (1999). FN11 Under section 2-405.1(c), directors who fulfill these duties
enjoy the immunity from liability defined in section 5-417 of the Courts and
Judicial Proceedings Article. FN12 Maryland has codified the "business judgment rule"
at section 2-405.1(e), which provides, "An act of a director of a corporation is
presumed to satisfy the standards" imposed by section 2-405.1(a). In the context of
mergers Delaware law imposes upon directors what have become known as "Revlon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 28 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

duties," after *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182, (Del.1985), requiring directors to try to secure the best merger terms available for stockholders. Maryland law appears to impose the same duty, *Wittman v. Crooke*, 120 Md.App. 369, 376-77 (1998), but the business judgment rule presumes that directors satisfied this duty. [FN11] *See* § 2-405.1(f).

> FN11. Unless otherwise stated, all statutory citations are to the Corporations and Associations Article.

> FN12. Section 5-417 states, "A person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."

> FN13. Delaware courts reviewing certain change-in-control transactions preliminarily disregard the business judgment rule and employ a heightened level of scrutiny. *See, e.g.*, *Orman*, 794 A.2d at 20-23. Unlike Delaware law, in Maryland the business judgment rule applies even to directors' change-in-control decisions. *See* Hanks, *Maryland Corporation Law* § 6.6[b], 176.1 (Supp.2003) ("[T]he decisions of the Supreme Court of Delaware in *Unocal v. Mesa Petroleum Co.*, 493 A.2d 946 (1985), and *Weinberger v. UOP, Inc.*, 457 A.2d 701 (1983), should not be applied in Maryland.").

The business judgment rule's presumption that directors fulfilled their duties does not render directors impervious to a plaintiff's claims. *See* *NAACP v. Golding*, 342 Md. 663, 673 (1996). Rather, the business judgment rule merely places upon plaintiffs the burden of rebutting the presumption. *Id*. To survive the motions to dismiss, therefore, the Third Amended Complaint must allege facts showing a failure of the directors to adhere to their duties.

Finally, in performing their duties directors may rely on information from (1) officers or employees of the corporation, to the extent the director reasonably believes the person is reliable and competent in the matter presented; (2) lawyers, CPAs, or other persons on matters the director reasonably believes to be within the person's professional or expert competence; and (3) a subcommittee of the board on which the director did not serve, as to a matter within the subcommittee's authority, to the extent the director reasonably believes the committee to merit confidence. Corps. & Ass'ns § 2-405.1(b).

## 2. Duty of Loyalty.

Directors' obligations to perform their duties "in good faith" and in a manner reasonably believed to be "in the best interests of the corporation" impose a duty of loyalty to the corporation. *United Wire, Metal & Machine Health & Welfare Fund v. Bd. of Sav. & Loan*, 316 Md. 236, 245 (1989); Hanks, *supra*, 6.6[c], at 177. The duty of loyalty embodies two related but distinct requirements relevant to this case: first, in exercising their judgment directors must decide matters independently, and second, directors generally may not have a material personal interest in the transaction. *See* *Orman*, 794 A.2d at 19-25 & n. 50; *see also* *Shapiro v. Greenfield*, 136 Md.App. 1, 13-15 (2000); *Wittman*, 120 Md.App. at 377-78 (1998).

**\*12** A director's "independent" exercise of the director's judgment "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Orman*, 794 A.2d at 24.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 29 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

Chancellor Chandler, of Delaware's Court of Chancery, has explained,
Such extraneous considerations or influences may exist when the challenged director
is controlled by another. To raise a question concerning the independence of a
particular board member, a plaintiff asserting the control of one or more directors
must allege particularized facts manifesting a direction of corporate conduct in
such a way as to comport with the wishes or interests of the corporation (or
persons) doing the controlling. The shorthand shibboleth of "dominated and
controlled directors" is insufficient.

*Id.* (most internal quotation marks omitted); *see also* <u>Corps. & Ass'ns § 2-401(b)</u>;
<u>Wharton v. Fidelity-Baltimore Nat'l Bank,</u> 222 Md. 177, 185 (1960); <u>Warren v.
Fitzgerald,</u> 189 Md. 476, 488-89 (1948); <u>Martin Marietta Corp. v. Bendix,</u> 549
F.Supp. 623, 633 n. 5 (D.Md.1982). Under Maryland law,[W]hen a director does not
personally benefit from the transaction but, because of that director's
relationship to a party interested in the transaction, it would reasonably be
expected that the director's exercise of independent judgment would be compromised,
that director will be deemed an interested director within the meaning of the
statute.

<u>Shapiro, 136 Md.App. at 24</u>.

Related, but distinct loyalty issues arise in cases where directors stand to
receive benefits from a transaction that are not generally enjoyed by the
stockholders, or where a director stands on both sides of a corporate transaction.
<u>Orman, 794 A.2d at 23; Shapiro, 136 Md.App. at 15</u>. By implication of section 2-
419(a), the benefit must be "material" to the director to render the director even
arguably interested in the transaction. The requirement of materiality imposes upon
plaintiffs the burden of pleading facts to show that "the alleged benefit was
significant enough *in the context of the director's economic circumstances,* as to
have made it improbable that the director could perform [the director's] fiduciary
duties to the ... shareholders without being influenced by [the] overriding
personal interest." <u>Orman, 794 A.2d at 23 & n. 44</u> (internal quotation marks
omitted); <u>In re General Motors Class H Shareholders Litigation, 734 A.2d 611, 617-
18 (Del. Ch.1999)</u>. The duty of loyalty imposes only a general prohibition of such
transactions, but section 2-419 establishes procedures by which such transactions
may be validly accomplished.

Section 2-419 "provides that an interested director transaction is not void or
voidable solely because of the conflict of interest and creates a 'safe harbor' for
certain transactions which satisfy the statute." *Id.* at 14. Section 2-419 clearly
applies to protect transactions in which directors were materially interested, and
the Court of Special Appeals has held section 2-419 applicable to transactions in
which extraneous forces influence a director's decision, rendering the director
"non-independent." <u>Shapiro, 136 Md.App. at 18-24</u>. To qualify for the statute's
protections, "an interested director could inform the shareholders or directors of
[the director's] conflicting interests and give the board of directors or
shareholders an opportunity to approve or ratify the transaction." [FN14] <u>Id. at 15.</u>

FN14. Alternatively, a director who did not comply with the disclosure
provisions may attempt to show that the transaction was "fair and reasonable
to the corporation" under section 2-419(b)(2). <u>Shapiro, 136 Md.App. at 15</u>.
The parties to this litigation have not raised that provision.

### 3. Duty to disclose.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1105 cv 00327-GMS    Document 48-6    Filed 03/06/2006    Page 30 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

**\*13** Directors also owe a duty to disclose to stockholders material information within the directors' control regarding transactions on which the stockholders will vote. Contemporary Maryland caselaw has not had occasion to develop this duty of candor, but none of the parties to this action dispute that some such duty exists under <u>Maryland law. See Parish v. Milk Producers Ass'n, 250 Md. 24, 72-74 (1968)</u>; <u>Homer v. Crown Cork & Seal Co., 155 Md. 66 (1928)</u>; <u>Paskowitz v. Wohlstadter, 151 Md.App. 1, 10-11 (2003)</u> (applying Delaware law); <u>Wilcom v. Wilcom, 66 Md.App. 84, 95 (1986)</u> (assuming a duty to inform existed, no breach found). <u>FN15</u> Because of the paucity of Maryland law on the subject the parties direct the Court's attention to Delaware's well-developed corporate law, so the Court will rely primarily on that body of law to resolve the nondisclosure allegations in this action.

> <u>FN15.</u> The leading Maryland corporations law treatise grounds the duty of disclosure in directors' duty to act in good faith, Hanks, *supra,* § 6.6 [b], at 165, whereas Delaware law views this duty as underlying the duties of good faith, loyalty, and care, <u>Orman, 794 A.2d at 41</u>.

The current state of Delaware's disclosure requirements can be gleaned from a trio of decisions authored by the Delaware Supreme Court's Chief Justice Veasey: <u>Malpiede v. Townson, 780 A.2d 1075 (Del.2001)</u>; <u>Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135 (Del.1997)</u>; and <u>Arnold v. Society for Savings Bancorp, Inc., 650 A.2d 1270 (Del.1994)</u>. Under those decisions, information is material and must be disclosed if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Malpiede, 780 A.2d at 1086</u>. The disclosure duty has its limits:
The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing.... [A] board is not required to engage in selfflagellation and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication on the matter.

<u>Loudon, 700 A.2d at 143</u>. Also, because directors' roles differ significantly from the roles of stockholders, <u>Werbowsky v. Collomb, 362 Md. 581, 599 (2001)</u>, the disclosure duty does not entitle stockholders to so much information as to enable them to replicate the directors' efforts, *see* <u>In re Staples, Inc. Shareholders Litigation, 792 A.2d 934, 953-54 (Del. Ch.2001)</u>. Rather, directors must disclose sufficient information to enable a "reasonable investor" to make an informed decision on the matter presented. *Arnold,* 650 A.2d 1277. Chief Justice Veasey has had occasion to clarify that disclosure duties do not rise and fall with the level of sophistication of the individual investors; rather, the standard remains an objective "reasonable investor" standard. <u>Hubbard v. Hibbard Brown & Co., 633 A.2d 345, 352-53 (Del.1993)</u>.

Finally, Delaware law provides plaintiffs with a useful analytical framework for pleading causes of action for nondisclosure, requiring plaintiffs to:
(1) "allege that facts are missing from the proxy statement,"
**\*14** (2) "identify those facts,"
(3) "state why they meet the materiality standard," and
(4) "how the omission caused injury."

<u>Loudon, 700 A.2d at 141</u>. This Court would add one additional pleading requirement: The plaintiff must allege that the information was known to the directors, or within the directors' control. <u>Id. at 143.</u>

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 31 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

#### 4. Stockholder ratification.

As explained in section II.C.2., above, section 2-419 provides a procedure for informed stockholder ratification of interested and non-independent director transactions. In addition to that specialized statutory ratification provision, Maryland common law provides that generally directors cannot be held liable for acts which were ratified by informed stockholders. _Coffman v. Md. Pub'g Co., 167 Md. 275, 289 (1934)_; _Wittman, 120 Md.App. at 377-78_. Stockholder ratification is only as good as the disclosure which preceded it, _id._, and such disclosures must comply with the standards described in section II.C.3., above.

#### 5. The allegations.

##### a. Count 1: "Improper Diversion of Merger Consideration."

The plaintiffs entitled count 1, "Breach of Fiduciary Duty (Improper Diversion of Merger Consideration)," and the plaintiffs' memorandum in opposition to dismissal illuminates the theories underlying this count:
[I]t is not simply attacking the allocation of merger consideration.... It challenges the manner by which the negotiations were handled by interested defendants, _not_ the Special Committee, and the diversion of money from the public stockholders to executives and advisors through extremely lucrative change of control agreements and exorbitant fees to advisors.

The defendants argue that count one must be dismissed because, assuming its allegations amount to a breach of the directors' duties, PRI's stockholders ratified the directors' actions after full disclosure.

The bulk of the facts alleged in count 1 were fully disclosed in the September 30 proxy statement. Paragraph 99 of the Third Amended Complaint contains no allegations of fact; rather, it contains only conclusory characterizations. Md. R. 2-303(b); _Read Drug & Chem. Co. v. Colwill Constr. Co., 250 Md. 406, 412-16 (1968)_. To the extent paragraphs 101-104 contain _facts_ rather than plaintiffs' conclusory characterizations of fact, those facts were also disclosed in the proxy materials at pages 15 through 28 ("Background to the Merger"), 66 through 69 ("Interests of Certain Persons in the Merger"), and 77 ("Security Ownership of Management and Certain Beneficial Owners"). Thus, even assuming those facts were actionable, the informed stockholders' vote for the merger to which those allegations relate ratified the board's actions and extinguished the prospect of director liability for those acts. _Wittman, 120 Md.App. at 377-78_.

The remaining, undisclosed allegation is that, "The Deephaven transaction was improper and the Individual Defendants turned a blind eye to Lightstone's actions." [FN16] Paragraphs 71 through 81 of the Third Amended Complaint describe the Deephaven stock sale. Plaintiffs allege that Lichtenstein paid $22 per share for Deephaven's Series A stock, and the agreement also bound Deephaven to vote in favor of the merger at the stockholder's meeting.   [FN17] In support of their contention that the transaction was improper, plaintiffs cite _Schreiber v. Carney, 447 A.2d 17 (Del. Ch.1982)_ and _Hewlett v. Hewlett-Packard Co., C.A. No. 19513-NC, 2002 WL 549137 (Del. Ch. Apr. 8, 2002)_. However, for the same reasons explained in the Chancery Court's decision in _In re IXC Communications, Inc. Shareholders Litigation, C.A. No. 17324, 1999 WL 1009174 (Del. Ch. Oct. 27, 1999)_ (permitting acquiring corporation's purchase of a minority of target's shares, with votes, in a "side

Not Reported 105-cv-00327-GMS  Document 48-6  Filed 03/06/2006  Page 32 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

deal"), the Deephaven sale was not improper under *Schreiber*. [FN18] Despite the
"discordant ring" of the term "vote-buying," Maryland stockholders have the right
"to cast [their] votes, or to grant a proxy or otherwise transfer [their] right to
vote, in any way [they] decide[ ] and for any reason or no reason." Hanks, *supra*, §
7.15, at 253. Lightstone purchased from Deephaven only 3.9% of PRI's Series A
stock, and thus the acquiring company did not "lock up" the vote, and the
transaction did not disenfranchise plaintiffs.

   FN16. Plaintiffs also alleged in paragraph 68 that the directors owed a duty
   "to ascertain Lightstone's intentions regarding its announcement of purchases
   of PRI securities," but neither plaintiffs' memorandum, nor the law, provides
   any support for that contention.

   FN17. Under Section 2-507(b)(3), "if a person is the record holder on the
   record date but subsequently transfers the stock to another person prior to
   the time of voting, the transferee is entitled to require the transferor to
   issue a proxy to the transferee." Hanks, *supra*, § 7.09, at 242. Here,
   according to plaintiffs' complaint, it appears that Lichtenstein declined to
   require Deephaven to transfer its proxy, and opted to have Deephaven vote at
   the meeting instead.

   FN18. Interestingly, while Maryland Rule 1-104 generally prohibits citation
   to unreported decisions of Maryland's appellate courts, the rule is silent on
   whether extra-jurisdictional unreported decisions may be cited. In
   *Alternatives Unlimited, Inc. v. New Baltimore City Board of School
   Commissioners*, No. 2818, Sept. Term, 2002, slip op. at 45 n. 4
   (Md.Ct.Spec.App. Mar. 3, 2004), Judge Moylan decided not to consider an
   unreported Fourth Circuit decision cited by a party because such citations
   are "disfavored" under the Fourth Circuit's rules. Upon reviewing Delaware's
   procedural rules and caselaw, it appears that Delaware courts do not
   disfavor, much less prohibit citation to unreported decisions, as long as
   counsel submits hard copies to the court. *See* Chancery Ct. R. 171(h) (this
   same provision appears in the rules of Delaware's Supreme Court [R. 14],
   Superior Court [R. 107], Court of Common Pleas [R. 107], and Family Court [R.
   107], as well as the United States District Court for the District of
   Delaware [R. 7.1.3] ). In any event, the Court gives no weight to the
   unreported Delaware decisions "beyond the weight merited by the persuasive
   force of the reasoning employed." *Cf. E. Outdoor Adver. Co. v. Mayor of Balt
   ., 128 Md.App. 494, 515 (1999)* (Harrell, J.).

### b. Count 2: "Failure to Offer Fair Price."

*15 The second count proceeds on a theory that the defendant-directors failed to
offer a fair price to Series A stockholders because (1) the committee and board
arrived at a merger allocation based in part on internal corporate politics rather
than a purely economic analysis; (2) conflicts among board members rendered them
incapable of independently exercising their judgment; (3) the directors failed to
obtain the highest value reasonably available for Series A shares; (4) the merger
price includes a "wrongful diversion of consideration;" and (5) the merger price is
based on "an analysis of fair value that does not comply with applicable law." The
facts underlying these characterizations fail to state a claim for relief. *Wittman,
120 Md.App. at 377-78*.

The proxy disclosed at least six times that Houlihan Lokey's fairness opinion did
not include an opinion as to any particular allocation of the aggregate

Not Reported in A.2d Document 48-6 Filed 03/06/2006 Page 33 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

consideration among the various stock classes or series. September 30 Proxy at 6, 23, 44-45, 46-47, 49, and C-3. Nevertheless, the proxy included an allocation arrangement. Pages 18 through 28 of the proxy describe the Special Committee's ongoing dialogue among its advisors, Lightstone, the stockholders, and the board regarding an acceptable allocation. The most poignant of these discussions appears on page 24, where Houlihan Lokey reported to the Special Committee and the board that "substantially all of the series A and series B preferred stockholders ... expressed a desire for liquidity at a reasonable allocation," and the Special Committee reported to the board that it factored the preferred directors' allocation preferences into its recommendation because,

given the size of Mr. Amster's holdings and the likely influence that a "no" vote by the preferred board representatives would have over the other preferred stockholders, it believed that the support of the preferred board representatives was crucial to having the transaction approved by the Company's preferred stockholders.

The proxy thus fully disclosed what did, and did not form the basis for the allocation, and, assuming plaintiffs' alleged a breach of duty, under *Wittman* the subsequent informed stockholder vote ratified this methodology. [FN19]

> FN19. If count 2 is read as a claim that the aggregate merger consideration, or the board's analysis and evaluation of the aggregate price were actionable, the same conclusion would obtain. The Court has made every effort to understand the precise nature of each count but, as Delaware's Chancellor Chandler has said, "it is not for the Court to divine the claims being made. A plaintiff must make clear to the Court the bases upon which his claims rest." *Orman, 794 A.2d at 24 n. 47*.

The first sentence of the Third Amended Complaint's paragraph 108 merely recapitulates in slightly modified language allegations contained in paragraphs 101 and 103, which the Court has already disposed of in analyzing count 1. The second sentence alleges that "a majority of the Individual Defendants" suffered from disabling conflicts of interest. Relying on Delaware law, plaintiffs' opposition memorandum erroneously stated that "while alleged breaches of the duty of care may be extinguished by a fully-informed vote, breaches of the duty of loyalty cannot." On the contrary, Maryland's Court of Special Appeals has held that stockholders can ratify alleged breaches of the duty of loyalty. *Wittman, 120 Md.App. at 378*. Therefore, the facts supporting the plaintiffs' conflict of interest claims cannot state a claim if they appear in the proxy because they were ratified. [FN20]

> FN20. The following facts were disclosed in the September 30 proxy: (1) director G. Reschke's change-in-control payments (at 66); (2) director Amster's PRI stock ownership (at 77-80); (3) director Amster's stock in Horizon Group Properties, Inc. (at 68-69); (4) director Skoien's position within PRI and Horizon, and Horizon's relationship to PRI (at 68-69); (5) director Thompson's relationship with Winston and Strawn, and that law firm's relationship to PRI (at 68); (6) director Traub's consulting arrangement with PRI (at 69); (7) details regarding Fine Furniture Direct, Inc. (at 69).

*16 The facts which the Court has not located in the proxy disclosures, which must be evaluated on the merits, are as follows:
• Amster nominated Skoien to PRI's board.
• Skoien served as an aide to director Thompson when Thompson was governor of Illinois (from 1977 through 1991), "thus Skoien and Thompson have enjoyed a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relationship spanning over 24 years."
• Thompson is also a director in Prime Group Realty Trust, an entity which is affiliated with "the Reschke family."
• Thompson, as governor, appointed Skoien and Sharp to state government positions, and has had long-standing relationships spanning over twenty years with both individuals.
• Sharp served as the director of Illinois's lottery in Thompson's administration.
• Director Randall was a PRI director for more than ten years.

As to all of these facts the Court can say with certainty that, as a matter of law, they do not give rise to a reasonable expectation that these directors' independent judgment was compromised. *See* Shapiro, 136 Md.App. at 24; *cf.* Orman, 794 A.2d at 27 ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

The plaintiffs allege, in paragraph 109, that they "lost their Series A shares without the defendants discharging their duty to obtain the highest value reasonably available for those shares." The short answer to this allegation is that the directors had no such duty. The language of this allegation demonstrates a misunderstanding of the duties imposed by § 2-405.1(a). As observed in Hanks, *supra*, § 6.6[b], at 164.1, the director's duties "are directed solely at the manner, or process, by which a director makes decisions rather than at the results of those decisions." In *Wittman*, the Court of Special Appeals quoted with approval from the trial judge's decision:
[The stockholder] argues that [the corporation] could have gotten a better deal. But that is really not a cause of action. Maybe they could have. Maybe they couldn't have. But that doesn't constitute a cause of action. That's something stockholders can decide. What would get the court to intervene would be evidence of facts of the board and/or management violating its duty of loyalty and duty of care.

Wittman, 120 Md.App. at 378. Here, the processes by which the directors arrived at the merger consideration and allocation were disclosed in the proxy materials, were ratified by the informed stockholders, and therefore are not actionable. Id. at 377-78.

Paragraph 109 included redundant allegations of a "wrongful diversion of consideration," which the Court has already dealt with, and an allegation that "the merger price is the result of ... an analysis of fair value that does not comply with applicable law." Again, where economic valuation analyses were performed, those analyses were sufficiently disclosed in the proxy materials, and the stockholders' subsequent ratification extinguished any liability arising from these facts. Id.

### c. Count 3: "Duty of Loyalty Resulting in Unfair Process."

*17 Count 3 purports to allege that the directors breached their duty of loyalty based on (1) the mere occurrence of the Deephaven-Lightstone stock sale; (2) the alleged conflicts between the Special Committee and Series B-owning directors; (3) G. Reschke's change-in-control payments; (4) "the complete failure of the Special Committee to attempt to negotiate on price or the allocations demanded by Amster;" and (5) Houlihan Lokey's "success fee." As explained above, the Deephaven-Lightstone transaction was not improper, and the board informed the stockholders of the board's stock holdings and any change-in-control payments, so none of those facts can give rise to a cause of action under *Wittman*.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The plaintiffs allege a "complete failure of the Special Committee to attempt to negotiate," but the plaintiffs fail to allege well-pleaded facts supporting that conclusory characterization. The Third Amended Complaint closely tracks the chronology included in the proxy statement, and that chronology details the ongoing dialogue among the Special Committee, its advisors, and various interested parties. Notwithstanding plaintiffs' characterizations of those events, the Third Amended Complaint fails to allege supporting facts giving rise to a cause of action.

For example, paragraph 21 merely alleges that the allocations approved by the Special Committee and board coincided with the allocations proposed by director Amster, but paragraph 21 does not allege that Amster "*dictated*" the Special Committee's or the board's decisions. Nor are there any well-pleaded factual allegations of Amster's "strong-arming" other directors in paragraphs 34, 36, 40, 52, 101, and 108. In reality, as described in the proxy materials incorporated within plaintiffs' complaint, Amster played a significant role throughout the process in his capacity as an interested holder of preferred stock. September 30 proxy at 18, 21, 22, 23, 24, 25, 26, and 27. The proxy disclosed the Special Committee's belief that (1) the proposed merger presented the best route to the liquidity desired by nearly all of PRI's stockholders, and (2) without Amster's support, the merger probably would not happen. Director Amster's actions, as well as those of the Special Committee, were made plain to the stockholders, who in turn ratified those actions and extinguished any possible director liability. *Wittman*, 120 Md.App. at 377-78.

Finally, the Court need only briefly address plaintiffs' allegation regarding Houlihan Lokey's fee. Paragraph 24 alleges that PRI was to pay Houlihan Lokey $900,000 for its services, and if a merger were consummated, Houlihan would also receive approximately $2 million as a "success fee," to be paid by the acquisition company. Plaintiffs do not allege that these terms were not disclosed to the stockholders, and because they were disclosed, the informed stockholder vote ratified these acts under *Wittman*. In any event, without more these fees do not give rise to a cause of action. *Wittman,* 120 Md.App. at 378.

### d. Count 4: "Breach of Duty of Disclosure"

**\*18** Plaintiffs present four nondisclosure allegations: (1) "Deephaven was paid $22 per share while the rest of the Series A stockholders received $18.40 per share; (2) the Deephaven stock sale was not disclosed; (3) Amster's role in allocation negotiations was never disclosed; and (4) the board did not disclose that HLHZ's analysis "had virtually no relevance in the deliberations of the Special Committee or the Board."

The plaintiffs' first alleged nondisclosure simply misstates the plaintiffs' own allegations. Plaintiffs suggest in paragraphs 73, 74 and 75, 82, and 116, that as a result of the merger, Deephaven would receive $22 per Series A share, while all other Series A stockholders would receive only $18.40. That characterization of the Deephaven-Lightstone sale conflicts with the plaintiffs' own statement of the facts. Upon execution of the November 18 Deephaven-Lightstone contract, Deephaven became entitled to $22 for each share sold under that transaction; upon completion of the merger, Deephaven became entitled to $18.40 per Series A share that it then held, just like every other Series A stockholder. These were two distinct transactions. Plaintiffs' characterizations to the contrary do not qualify as well-pleaded allegations of fact, and do not state a claim upon which relief can be granted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS   Document 48-6   Filed 03/06/2006   Page 36 of 36
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)

The second nondisclosure allegation fails because plaintiffs' never allege that information regarding the stock sale was known to or within the directors' control. _Loudon, 700 A.2d at 143_. The plaintiffs' implicitly concede this point by alleging that the directors breached their duties by not knowing about the Deephaven sale. _See_ Third Amended Complaint ¶ ¶ 68, 100. As for the viability of that claimed duty, see footnote 16, above.

In count 3, analyzed above, plaintiffs argued that the board violated its duties by allowing director Amster to control the merger negotiations, and the Court's analysis showed that plaintiffs' conclusory characterizations did not amount to well-pleaded facts stating a cause of action. Essentially, the plaintiffs failed to plead facts (as opposed to characterizations) showing what role Amster played in addition to, or apart from, what is described in the proxy incorporated into plaintiffs' complaint. Here, count 4 alleges that the board breached its disclosure duty by failing to disclose that Amster's role in the negotiations was as described in plaintiffs' paragraph 112. However, as explained in the Court's analysis on count 3, the Third Amended Complaint fails to present well-pleaded allegations showing Amster's role (or the Special Committee's) to have been anything other than that described in the proxy on which the Complaint relies. The board fulfilled its disclosure obligations, and plaintiffs have not pleaded facts showing omission or misrepresentation.

Similarly, the plaintiffs' final nondisclosure allegation recapitulates a claim already resolved in count 2. Plaintiffs argued in count 2 that the board breached its duties by approving an allocation based in part on whether it would garner enough votes for the merger, rather than on the basis of a purely economic analysis. The Court's resolution of that count explained that the nondisclosure alleged here (i.e., that no advisor expressed a financial opinion on the relative fairness of the allocation arrangement), actually was fully disclosed in the proxy materials incorporated into the complaint. Accordingly, this part of count 4 fails to state a nondisclosure claim.

### e. Count 5: Aiding and Abetting by Lightstone and Acquisition

*19 Pleading this aiding and abetting theory as a separate count may be improper in form. _See Manikhi, 360 Md. at 360 n. 6_. At any rate, count five fails because the underlying counts fail. _See Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc., 340 Md. 176, 200-201 (1995)_.

### III. Conclusion

For the reasons set forth in detail above, defendants' motions to dismiss the Third Amended Complaint will be granted.

Md.Cir.Ct.,2004.
Hudson v. Prime Retail, Inc.
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.