16

IT GROUP INC., et al., Debtor. IT LITIGATION TRUST, Plaintiff, v. DANIEL A. D'ANIELLO, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, PHILIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, CHARLES W. SCHMIDT, JAMES DAVID WATKINS, ANTHONY J. DELUCA, HARRY J. SOOSE, THE CARLYLE GROUP, THE CARLYLE GROUP L.L.C., CARLYLE PARTNERS II, L.P., CARLYLE SBC PARTNERS, II, L.P., CARLYLE INTERNATIONAL PARTNERS II, L.P., CARLYLE INTERNATIONAL PARTNERS III, L.P., C/S INTERNATIONAL PARTNERS, CARLYLE INVESTMENT GROUP, L.P. CARLYLE-IT INTERNATIONAL PARTNERS, L.P., CARLYLE-IT INTERNATIONAL PARTNERS II, L.P., CARLYLE-IT PARTNERS L.P., and T.C. GROUP, L.L.C., Defendants.

### Civil Action No. 04-1268-KAJ

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2005 U.S. Dist. LEXIS 27869*

**November 15, 2005, Decided**

**SUBSEQUENT HISTORY:** Reconsideration denied by, Motion denied by *IT Group, Inc. v. D'Aniello, 2006 U.S. Dist. LEXIS 5035 (D. Del., Feb. 9, 2006)*

**PRIOR HISTORY:** [*1] Chapter 11. Case No. 02-10118 Jointly Administered.

**COUNSEL:** Jeffrey M. Schlerf, Thomas H. Kovach, Eric M. Sutty, The Bayard Firm, Wilmington, Delaware, for Plaintiff. Of Counsel: Richard S. Wayne, Thomas P. Glass, John M. Levy, Strauss & Troy, Cincinnati, Ohio; Mark D. Collins, Marcos A. Ramos, Richards, Layton & Finger, P.A., Wilmington, Delaware; Roger D. Anderson, Smith, Katzenstein & Furlow LLP, Wilmington, Delaware.

Ronald S. Gellert, Eckert, Seamans, Cherin & Mellott, LLC, Wilmington, Delaware, for Defendants. Of Counsel: Thomas L. Patten, David A. Becker, Latham & Watkins, LLP, Washington, D.C.; Laurie B. Smilan, Latham & Watkins, LLP, Reston, Virginia; Charles A. De Monaco, Kimberly L. Haddox, Dickie McCamey & Chilcote, P.C., Pittsburgh, Pennsylvania; Mark A. Willard, Paul D. Steinman, F. Timothy Grieco, Eckert, Seamans, Cherin & Mellot, LLC, Pittsburgh, Pennsylvania.

**JUDGES:** JORDAN, District Judge.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

### MEMORANDUM OPINION

November 15, 2005
Wilmington, Delaware

Kent A. Jordan

**JORDAN, District Judge**

### I. INTRODUCTION

Before me are Motions to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item ["D.I."] 35) and for [*2] Failure to State a Claim (D.I. 37) filed by defendants Daniel A. D'Aniello ("D'Aniello"), Francis J. Harvey ("Harvey"), James C. McGill ("McGill"), Richard W. Pogue ("Pogue"), Phillip B. Dolan ("Dolan"), E. Martin Gibson ("Gibson"), Robert F. Pugliese ("Pugliese"), Charles W. Schmidt ("Schmidt"), James David Watkins ("Watkins"), Anthony J. DeLuca ("DeLuca"), Harry J. Soose ("Soose"), and the following parties (collectively referred to as the "Carlyle Defendants"): The Carlyle Group, The Carlyle Group, L.L.C., Carlyle Partners II, L.P., Carlyle SBC Partners, II, L.P., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle Investment Group, L.P., Carlyle-IT International Partners, L.P., Carlyle-IT International Partners II, L.P., Carlyle-IT Partners L.P., and T.C. Group, L.L.C. n1

n1 All of the defendants are referred to collectively as the "Defendants."

The First Amended Complaint (D.I. 30, the "Complaint"), filed by IT Litigation Trust ("Plaintiff") [*3] alleges in Counts I-V n2 that Defendants, as directors, officers, and controlling shareholders of the IT Group, Inc. (the "IT Group" or the "Company"), breached their corporate fiduciary duties, that their acts constituted waste of corporate assets, and that the Carlyle Defendants aided and abetted the other Defendants' breach of fiduciary duties. (D.I. 30 at PP 58-79.) Plaintiff also alleges, in Counts VI-VIII, that payments made by the IT Group to certain Defendants are avoidable preferences or fraudulent transfers under the Bankruptcy Code and Delaware state law. (Id. at PP 80-115.) Finally, Plaintiff alleges in Count IX that the directors unlawfully paid dividends to the Carlyle Defendants. (Id. at PP 116-18.)

n2 The Complaint sets forth nine theories of recovery, which are denominated as "claims for relief and, for convenience, are herein designated as "Counts." Count I alleges that the IT Group directors and officers breached their corporate fiduciary duties. Count II makes the same allegations against the directors and officers under the "Trust Fund" doctrine, explained *infra* note 8. Count III alleges that the directors and officers wasted corporate assets. Count IV alleges that the Carlyle Defendants breached their corporate fiduciary duties. Count V alleges that the Carlyle Defendants aided and abetted the breaches committed by the directors and officers. Count VI seeks, under the Bankruptcy Code, to avoid certain preferential transfers. Count VII alleges that payments made to the Carlyle Defendants were constructively fraudulent transfers. Count VIII alleges that payments made to the Carlyle Defendants and certain individual defendants were actual fraudulent transfers. Count IX alleges that dividends were paid unlawfully to the Carlyle Defendants.

[*4]

Defendants contend that the claims based exclusively on Delaware state law, Counts I-V and IX, do not fall within the subject matter jurisdiction of this court, either under the statute providing for original jurisdiction over bankruptcy cases, *28 U.S.C. § 1334*, or under that providing for supplemental jurisdiction, *28 U.S.C. § 1367*. Defendants also contend that Counts I-VI and IX must be dismissed in their entirety, and that Counts VII and VIII must be dismissed in part, for failure to state a claim upon which relief can be granted. For the reasons

that follow, I will deny Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, and I will grant in part and deny in part Defendants' Motion to Dismiss for Failure to State a Claim.

## II. BACKGROUND n3

n3 The following background information is drawn from the parties' submissions and does not constitute findings of fact.

A. The Carlyle Defendants' Investment in the IT Group

The IT Group was [*5] a Delaware corporation with its principal office in Monroeville, Pennsylvania, which provided services in "consulting, engineering, construction, environmental remediation, and facilities and waste management." (Complaint, D.I. 30 at P 30.) These services "included the identification of contaminants in soil, air, and water, as well as the subsequent design and execution of remedial solutions." (Id.)

The Carlyle Group is a private merchant bank headquartered in Washington D.C. that invested in the IT Group "through a number of entities that it owns or controls." (Id. at P 14.) Specifically, in or around November 1996, the Carlyle Defendants collectively invested $ 45 million in the IT Group. (Id. at P 31.) That sum included investments by several Cayman Islands limited partnerships, i.e., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle-IT International Partners, L.P., and Carlyle-IT International Partners II, L.P., made through their general partner, T.C. Group, L.L.C. (Id. at PP 18-20, PP 22-23, P 31.) In return for the $ 45 million in investments, the Carlyle Defendants received 45,000 shares [*6] of 6% Cumulative Convertible Participating Preferred Stock and detachable warrants to purchase 1.25 million shares of the IT Group's common stock. (Id. at P 31.)

"The Carlyle Defendants also received approximately 25% of the IT Group's voting power and obtained the right to elect a majority of IT Group's board of directors ... ." (Id.) The IT Group Proxy Statement n4 dated May 20, 1999 shows that, prior to 1999, the Carlyle Defendants elected five of the nine members of the IT Group's board. (D.I. 39, Ex. D at A-0024.) More particularly, from 1996 to 1999, the Carlyle Defendants filled five of nine IT Group board positions by electing defendants D'Aniello, Dolan, Gibson, Pugliese, and Watkins. (Id. at A-0025.) Those directors remained on the IT Group board through 2002. (Complaint, D.I. 30 at P 3, PP 7-9, P 11.)

n4 In reviewing a *12(b)* motion to dismiss in a case such as this, the court may consider a company's SEC filings, as well as other public records. *See In re Delmarva Sec. Litig., 794 F. Supp. 1293, 1299 (D. Del. 1992).*

[*7]

As of May 14, 1999, the IT Group increased the size of its board to eleven directors. (D.I. 39, Ex. D at A-0024.) The board nominated defendant Harvey to fill one of the two new board seats (*id.*), and he was promptly elected. (Complaint, D.I. 30 at P 4.) He too remained on the board through 2002. (*Id.*) The Carlyle Defendants declined to exercise their right to elect the eleventh director, thus leaving the board with ten members, five of whom were elected by the Carlyle Defendants. n5 (D.I. 39, Ex. D at A-0024.)

> n5 In addition to the election rights associated with their investment, "the Carlyle Defendants procured a consulting agreement ... pursuant to which they were paid $ 100,000.00 per year and $ 10,000.00 per month." (Complaint, D.I. 30 at P 31.)

Four of those ten directors had additional connections to the Carlyle Defendants. D'Aniello "has been a Managing Director of The Carlyle Group since at least 1987" and was also the Managing Director of TCG Holdings, L.L.C. and a Managing Member of TC Group, [*8] L.L.C. (*Id.* at P 3.) Dolan "has been employed by The Carlyle Group since at least 1989." (*Id.* at P 7.) "In 1998, Dolan became a Principal of The Carlyle Group, and in February 2001, he became a Managing Director of The Carlyle Group." (*Id.*) Harvey, along with D'Aniello, served on the boards of directors of other companies that are owned or controlled by The Carlyle Group. (*Id.* at PP 3-4.) Finally, Watkins "served as director of Duratek, Inc. of which the Carlyle Defendants are the majority shareholder." (*Id.* at P 11.)

Plaintiff alleges that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (*id.* at P 31), and that "at all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at P 14).

### B. The Roll-Up Strategy

According to Plaintiff, "as of 1998, the IT Group had experienced consecutive fiscal years in which it had lost money." (*Id.* at P 42.) The Carlyle Defendants, "through [their] control of the board of directors of the IT

Group, adopted and implemented a purported 'Roll-Up Strategy' to grow the company by acquiring companies engaged in the same or similar lines of business. [*9] " (*Id.* at P 32.) From 1998 to 2000, the IT Group "acquired at least eleven companies" as part of this strategy. (*Id.*) In five of those acquisitions, the IT Group paid approximately $ 526 million and booked goodwill n6 of approximately $ 515.5 million. (*See id.* at PP 33-37.) In a sixth acquisition, the IT Group paid approximately $ 1 million, along with contingent consideration of up to $ 8 million, and booked goodwill of approximately $ 5.5 million. (*Id.* at P 38.) "By or about the end of 2000, the IT Group had booked aggregate [goodwill] of approximately $ 539 million, representing 41 percent of the IT Group's total assets." (*Id.* at P 39.) Plaintiff asserts that the goodwill booked in those transactions was "of no value to the IT Group," and that consequently, "the value of the IT Group's assets was substantially less than the values reflected on its books." (*Id.* at P 41.)

> n6 "Goodwill" is defined in the Complaint as the "Cost in excess of net assets of the acquired businesses." (Complaint, D.I. 30 at P 39.)

[*10]

### C. The IT Group's Insolvency

The Roll-Up acquisitions between 1998 and 2000 "were funded largely by debt financing ... including approximately $ 500 million in secured loans and credit facilities ... and approximately $ 255 million in subordinated bond debt issued in 1999." (*Id.* at P 43.) This financing "increased the Company's leverage, increased its interest payments, and strained [its] liquidity." (*Id.* at P 44.) To deal with this lack of liquidity, the IT Group obtained an additional $ 100 million term loan in March 2000. (*Id.* at P 45.) Its "average debt outstanding during 2000 was approximately $ 650 million." (*Id.*)

"In March 1997, the Company reported approximately $ 360 million in revenues and total liabilities of approximately $ 172 million ... ." (*Id.* at P 44.) "By December 2000, [it] reported approximately $ 1.4 billion in revenues, while total liabilities had ballooned to approximately $ 1 billion ... ." (*Id.*) "For the period ended [sic] March 28, 1997", the IT Group had a tangible net worth of approximately $ 160 million. By the period end of December 2000, the IT Group had a tangible net worth of approximately negative $ 277 million. [*11] " (*Id.* at P 46.) Plaintiff alleges that, "beginning as early as March 1998, the IT Group was insolvent or within the vicinity of insolvency." (*Id.* at P 47.)

Finally, on January 16, 2002, the IT Group filed for bankruptcy protection. (*Id.* at P 57.) "Thereafter, the IT Group was liquidated." (*Id.*)

D. Allegations Regarding the Board's Actions and Failures to Act

Plaintiff alleges that, in addition to following the unwise Roll-Up Strategy, the IT Group directors and officers also "failed to take prompt and prudent actions to preserve and maximize [the IT Group's] assets and to restructure its debts" (*id.* at P 50), "failed to retain financial asset divestiture consultants, financial consultants, turnaround and restructuring consultants, or bankruptcy and legal counsel" (*id.* at P 51), and "failed to inform themselves of all material information available to them concerning financial restructuring" (*id.* at P 52). According to Plaintiff, those failures "caused or deepened [the IT Group's] insolvency, and sealed [its] financial doom." (*Id.* at P 55.) Because, Plaintiff says, the IT Group board was under the control of the Carlyle Defendants (see [*12] *id.* at P 14, P 31), those failures are also the Carlyle Defendants' failures (*see id.* at P 1). In Counts I-IV, Plaintiff alleges that those failures amount to waste of corporate assets and to breaches of the Defendants' fiduciary duties to the IT Group and its creditors. (*Id.* at PP 58-75.) Count V alleges that the Carlyle Defendants also aided and abetted the other Defendants' breaches. (*Id.* at PP 76-79.)

Plaintiff further asserts that, while controlling the IT Group, the Carlyle Defendants were paid in excess of $ 850,000 from consulting agreements with the Company and in excess of $ 8.9 million in dividends from their preferred stock in the Company. (*Id.* at P 1.) Plaintiff particularly describes dividend payments to the Carlyle Defendants of $ 1,362,254 in 1998 (*id.* at P 99), $ 2,765,700 in 1999 (*id.* at P 101), $ 2,765,700 in 2000 (*id.* at P 102), and $ 2,074,275 in 2001 (*id.* at P 103), all of which are alleged in Counts VII and VIII to be fraudulent transfers (*id.* at PP 97-115) and, in Count IX, to be unlawful payments of dividends (*id.* at PP 116-18). Plaintiff also lists other payments made to particular Defendants, including the Carlyle [*13] Defendants, within the year before the bankruptcy petition (*id.* at PP 82-88) and which are alleged, in Count VI, to be avoidable preferential transfers (*id.* at PP 80-96) and, in Count VIII, to be fraudulent transfers (*id.* at PP 109-115).

Plaintiff alleges, again in Counts I-IV, that those payments to insiders, made while the IT Group was insolvent or in the vicinity of insolvency, are additional instances of corporate waste and breach of fiduciary duties. (*Id.* at P 61(g), P 65(g), P 69(f), P 74(g).) Also, those payments and the increased debt burden were allegedly part of a strategy to "artificially extend[] the life of the insolvent Company to obtain a return on the Car-

lyle Defendants' equity investment." (*Id.* at P 61(h), P 65(h), P 69(g), P 74(h).) Count V alleges that the Carlyle Defendants aided and abetted those breaches as well. (*Id.* at PP 76-79.)

The claims in this case were originally asserted by the Official Committee of Unsecured Creditors in the IT Group bankruptcy proceeding. (D.I. 36 at 1.) By stipulation of the parties and pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, which was confirmed on April 5, 2004 (D.I. 52 at [*14] 6, D.I. 53 at A003-A062), the IT Litigation Trust was substituted as Plaintiff in this action.

## III. STANDARD OF REVIEW

A challenge to subject matter jurisdiction under *Fed. R. Civ. P. 12(b)(1)* requires a court to ask "whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction." *FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996)*.

*Fed. R. Civ. P. 12(b)(6)* requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

A complaint [*15] must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)*. The Federal Rules "do not require a claimant to set out in detail the facts upon which he bases his claim," *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993)*, and "a plaintiff will not be thrown out of court on a *Rule 12(b)(6)* motion for lack of detailed facts." *Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 237 (3d Cir. 2005)*. Still, a plaintiff must allege the supporting facts "necessary to provide the defendant fair notice of the plaintiff's claim and the 'grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*).

## IV. DISCUSSION

A. The Motion Challenging Subject Matter Jurisdiction

The federal district courts have subject matter jurisdiction over bankruptcy cases pursuant to *28 U.S.C. §*

*1334*. That statute provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11," and "original but not [*16] exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." *§ 1334(a), (b)*. "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 162 (3d Cir. 2004)*. It is conceded that none of the state law claims in Counts I-V and IX qualify as core proceedings. The motion to dismiss for lack of subject matter jurisdiction thus centers on the question of whether these claims are non-core claims falling within the category of "related to" jurisdiction.

"With 'related to' jurisdiction, Congress intended to grant bankruptcy courts comprehensive jurisdiction so that they could deal efficiently and expeditiously with matters connected with the bankruptcy estate." *Id. at 163-64* (internal citations omitted). Prior to the confirmation of a bankruptcy plan, a proceeding will fall under "related to" jurisdiction if "the outcome of that proceeding [*17] could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)*. But the test must be formulated somewhat differently for proceedings that arise post-confirmation, because "at the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute." *Resorts, 372 F.3d at 165*. After plan confirmation, a proceeding will be within the "related to" jurisdiction if it has a "close nexus to the bankruptcy plan." *Id. at 166*. "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id. at 167*.

Here, Defendants argue that, for two reasons, the state law claims do not have a close nexus to the confirmed IT Group plan. First, they say, because the IT Group estate no longer exists after plan confirmation, this lawsuit can have no effect on the estate. (D.I. 36 at 11.) Instead, any proceeds will be distributed by Plaintiff to the beneficiaries of the Litigation Trust. Second, Defendants argue that [*18] resolving the state law claims requires no construction, interpretation, or implementation of the plan. (*Id.* at 11-12.) Rather, the only connection to the bankruptcy "is that a recovery by the Plaintiff might increase the assets of the Litigation Trust and its beneficiaries," and that connection, on its own, is insufficient to support "related to" jurisdiction. (*Id.* at 13 (citing *Resorts, 372 F.3d at 170*).) Thus, Defendants conclude,

this court does not have subject matter jurisdiction over Counts I-V and IX.

The Defendants' reasoning, however, depends upon an overstatement of the Third Circuit's conclusions in *Resorts*. First, no one disputes that the IT Group estate no longer exists, but that fact alone is not determinative. Indeed, the "close nexus" test was formulated to address jurisdiction over claims arising post-confirmation, recognizing that a literal interpretation of the *Pacor* test would end the court's jurisdiction when the plan was confirmed. *Id. at 165-67*. Thus, jurisdiction may be proper, even after confirmation of the bankruptcy plan.

Second, unlike the cause of action in *Resorts*, which arose nearly seven years [*19] after confirmation and was a malpractice claim by the litigation trust against its accountant, Plaintiff's cause of action in this case arose before the filing of the bankruptcy petition, and the losses claimed by Plaintiff on behalf of unsecured creditors are logically connected to the IT Group insolvency and subsequent bankruptcy. Furthermore, this cause of action was assigned to Plaintiff by Section 7.16 of the IT Group bankruptcy plan. (D.I. 53 at A034.) The assignment in a confirmed plan of a prepetition cause of action "could well establish the 'close nexus to the bankruptcy plan or proceeding' which the Third Circuit requires." *Michaels v. World Color Press, Inc. (In re LGI, Inc.), 322 B.R. 95, 102 (Bankr. D.N.J. 2005)*. While resolving Plaintiff's state law claims may not require construction or interpretation of the plan, this proceeding "plainly serves the plan through the implementation, consummation, and execution which typify many post-confirmation matters." *Id.* Exhibit 1 of the confirmed plan includes within the listing of claims assigned to Plaintiff "any claims for acts or omissions of [the IT Group's] . . . present and former officers, directors, [*20] insiders and accountants." (D.I. 53 at A052.) The present claims are within that category, and their pursuit was therefore contemplated by the plan itself.

Thus, contrary to Defendants' position, the possible increase in Plaintiff's assets is not the only connection to the IT Group bankruptcy. Because this matter affects the implementation, consummation, and execution of the bankruptcy plan, there is a close nexus to the bankruptcy sufficient to satisfy the standard set in *Resorts. 372 F.3d at 166-67*. I therefore conclude that the state law claims in Counts I-V and IX are properly within the "related to" jurisdiction granted under *§ 1334*. n7

> n7 Because of that conclusion, I need not address the parties' arguments concerning supplemental jurisdiction under *28 U.S.C. § 1367*.

B. The *12(b)(6)* Motion to Dismiss

1. Counts I, II, and IV - Breach of Corporate Fiduciary Duty Claims Against the Directors, Officers, and Carlyle Defendants

As earlier noted, *supra* note [*21] 2, Plaintiff alleges in Count I that the IT Group directors and officers breached their duties of loyalty and due care to the Company and its creditors. In Count II, Plaintiff makes the same allegations against the directors and officers under the "Trust Fund" doctrine, n8 based on the IT Group's alleged insolvency. In Count IV, Plaintiff alleges that the Carlyle Defendants breached duties of loyalty and due care that they owed because of their alleged control over the IT Group board. Defendants attack the sufficiency of the pleading of all of those counts. Since the allegations in Counts I, II, and IV are nearly identical, I treat them as a group in the following discussion, dealing first with the duty of loyalty claims and then with the duty of care claims. I conclude that the Complaint adequately states claims for breaches of the duty of loyalty by the directors and Carlyle Defendants, but that all other claims for breach of fiduciary duties must be dismissed.

> n8 Under the Trust Fund doctrine, "the directors [of an insolvent corporation] become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets." *Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 791 (Del. Ch. 2004)*.

[*22]

a. Duty of Loyalty

Two of the ten separate breaches alleged in each of Counts I, II, and IV are identifiable as breaches of the duty of loyalty. First, the Defendants allegedly made "transfers for the benefits [sic] of insiders." (Complaint, D.I. 30 at P61(g), P65(g), P74(g).) Second, the Defendants "artificially extended the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id.* at P61(h), P65(h), P74(h).) These claims are apparently based on the payments made to Defendants, including the dividends paid to the Carlyle Defendants, while the IT Group was losing money and unable to service its debt. I will discuss in turn the claims against the directors, the officers, and the Carlyle Defendants.

i. Directors

Under Delaware law, a director's duty of loyalty "imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation." *Belcom, Inc. v. Robb, 1998 Del. Ch. LEXIS 58, No. CIV.A. 14663, 1998 WL 229527, at *3 (Del. Ch. 1998)* (citing *Guth v. Loft, 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939)*). While each [*23] director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company," *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)*, n9 unless the plaintiff shows that the presumption does not apply. A plaintiff can avoid the presumption for a particular transaction by showing "that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman, 794 A.2d 5, 23 (Del. Ch. 2002)*. A director is interested when appearing on both sides of a transaction or when deriving a personal benefit from a transaction that is not received by stockholders generally. *See Aronson, 473 A.2d at 812; Orman, 794 A.2d at 23.* "Independence means that a director's decision is based on the corporate merits of the subject ... rather than extraneous considerations or influences." *Aronson, 473 A.2d at 816*. A lack of independence arises when "directors are 'beholden' to [the controlling [*24] person] or so under their influence that their discretion would be sterilized." *Orman, 794 A.2d at 24* (quoting *Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993)*).

> n9 While *Aronson* was a "classic Delaware derivative case," *Tower Air, 416 F.3d at 236 n.10,* citing it, along with other derivative cases, for propositions of substantive Delaware law concerning the business judgment rule is proper. *Cf. id. at 238* (citing *Aronson* for definition of the business judgment rule).

Here, Plaintiff's claims are based on payments made to insiders, and the Complaint describes payments made both to the Carlyle Defendants and to individual defendants. The board allegedly made payments to the Carlyle Defendants pursuant to a consulting agreement and as dividends arising from the preferred stock. (*Id.* at Pl, PP99-103.) The directors were not interested in those payments because no director is alleged to have received a personal benefit. However, Plaintiff [*25] appears to allege that the directors lacked independence concerning those payments, because of the Carlyle Defendants' influence. To successfully avoid the business judgment rule presumption, Plaintiff will have to show that directors were "beholden to [the Carlyle Defendants] or so under their influence that their discretion would be sterilized." *Orman, 794 A.2d at 24.* For the allegations to sur-

vive this Motion, Plaintiff must allege the supporting facts "necessary to provide the [Defendants] fair notice of the [Plaintiff's] claim and the 'grounds upon which it rests.'" *Tower Air, 416 F.3d at 237* (quoting *Conley, 355 U.S. at 47*).

Four of the ten directors in place between 1999 and 2002, defendants D'Aniello, Dolan, Harvey, and Watkins, had other connections to the Carlyle Defendants, and two of those, D'Aniello and Dolan, were Managing Directors of The Carlyle Group. (*Id.* at PP3-4, P7, P11.) Two other directors, defendants Gibson and Pugliese, were elected by the Carlyle Defendants. (D.I. 39, Ex. D at A-0025.) Thus, before 1999, five of nine directors were elected by the Carlyle Defendants. (*See id.*) After 1999, five [*26] of ten directors were elected by the Carlyle Defendants (*see id.*), and a sixth director, Harvey, allegedly had other connections to the Carlyle Defendants (Complaint, D.I. 30 at P4). These alleged connections would not be sufficient on their own to prove that these six directors lacked independence. *See Aronson, 473 A.2d at 816* ("It is not enough to charge that a director was nominated or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director.") Nor do they show anything about the remaining director defendants, McGill, Pogue, Schmidt, and DeLuca.

Thus, the claim of a lack of independence is based largely on the allegations that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (Complaint, D.I. 30 at P31), and that "at all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at P 14). Actual control of the IT Group's operations by the Carlyle Defendants, if proved, would support a conclusion that some or all of the directors lacked independence concerning payments made to the Carlyle Defendants. Thus, while [*27] I seriously doubt that the conclusory allegations of control in the Complaint would survive a *12(b)(6)* motion in the Delaware Court of Chancery, they do put Defendants on notice that the claim here is based on the Carlyle Defendants' actual control of the IT Group and the lack of independence of the directors concerning payments to this controlling group. Given that the Third Circuit has emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff to plead detailed facts to make out a claim for breach of fiduciary duties under Delaware law, *Tower Air, 416 F.3d at 236-39*, I am bound to hold that the Plaintiff's allegations are sufficient in this case. n10

> n10 A lengthy digression here will, I hope, be excused. The Third Circuit noted in *Tower*

*Air, 416 F.3d at 236-37* & n.11, that when a state procedural rule conflicts with an on-point Federal Rule of Civil Procedure, a federal court should apply the Federal Rule. *See Hanna v. Plumer, 380 U.S. 460, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)* (applying the federal standard for service of process). That proposition is beyond dispute. However, the Delaware requirement that there be more than conclusory allegations to support fiduciary duty claims does not appear to me to be simply a matter of procedure. Rather, the pleading requirements shape the substance of fiduciary duty claims by enforcing the business judgment rule, which is fundamental to Delaware corporate law.

[*28]

The business judgment rule reflects the understanding that the directors of a corporation are entrusted with that corporation's management, and that directors cannot guarantee the success of their decisions. Thus, "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1051 (Del. Ch. 1996)*.

This rule is a matter of substantive corporate law. *See Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 64 (Del. 1989)* ("The [business judgment] rule operates as both a procedural guide for litigants and a substantive rule of law.") First, it prevents the courts from second-guessing the decisions of directors and officers based on results of those decisions rather than on the care, loyalty, and good faith of the directors making the decision. Thus, the rule keeps courts from "injecting themselves into a management role for which they were neither trained nor competent." *Weiss v. Temporary Inv. Fund, 692 F.2d 928, 941 (3d Cir. 1982)*. Second, the business judgment rule protects "against a threat of suboptimal risk acceptance." *Gagliardi, 683 A.2d at 1052*. As a policy matter, directors should not be overly risk averse. "Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital." *Id.* Imposing li-

ability for corporate losses on directors and officers will tend to deter them from seeking this optimum level of risk.

[*29]

To implement the business judgment rule, the substance of Delaware corporate law induces a presumption that, absent self-interest or lack of independence, "the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).* The plaintiff "may prevent the application of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest," and "in order to overcome the presumption of the business judgment rule [the plaintiff] must allege with particularity facts which establish that the 'contested decision was not a product of valid business judgment." *In re General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1132 (D. Del. 1988)* (citing *Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988); Aronson, 473 A.2d at 812); see also Crescent/Mach 1 Partners L.P. v. Turner, 846 A.2d 963, 984 (Del. Ch. 2000)* ("In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule."); *Ash v. McCall, 2000 Del. Ch. LEXIS 144, No. CIV.A.17132, 2000 WL 1370341, at \*10 (Del. Ch. Sept. 15, 2000)* ("This Court has stated on several occasions that mere allegations that directors made a poor decision ... [do] not state a cause of action ... .").

[*30]

Having been taken to task once for citing derivative suit precedents in a direct action, *Tower Air, 416 F.3d at 236* ("The District Court (mistakenly) cited derivative suit pleading cases ... ."), I hasten to note that, as on that earlier occasion, I cite the foregoing cases not under some confusion that this is a derivative suit but for the specific point they make about the protections of the business judgment rule. Those protections are a substantive point of law that, I believe, stands largely independent both of the procedural distinction between direct and derivative actions, *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449,*

*457 & n.6 (D. Del. 2004),* and of the notice purpose inherent in procedural rules of pleading, *Stanziale v. Nachtomi, 2004 U.S. Dist. LEXIS 15664, No. CIV.A.01-403, 2004 WL 1812705, at \*2 (D. Del. Aug. 6, 2004).* In sum, though the Third Circuit apparently views the requirement for pleading facts in a context like this as a peculiarity of Delaware procedural law, *see Tower Air, 416 F.3d at 236-37* ("Delaware courts consider Chancery Rule 8 specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species.") (citation omitted), it appears to me to be instead an implementation of the substantive presumption of the business judgment rule. This is true even though the standard of pleading "particularized" facts may be more stringent in a derivative action, governed by *Rule 23.1,* than in a direct action being challenged under *Rule 12(b)(6). Cf. Telxon Corp. v. Bogomolny, 792 A.2d 964, 974 (Del. Ch. 2001)* (stating that the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under *Rule 23.1* "is somewhat lower" under *Rule 12(b)(6)).* My understanding is that, even in the latter circumstance, sufficient factual specificity must be included in the complaint to raise a rational inference that the duty in question has been breached. The Third Circuit may be correct that this approach bears "scant resemblance" to simple notice pleading, but the difference is an entirely deliberate decision of substantive Delaware law, not a procedural peccadillo.

[*31]

The *Tower Air* holding requires directors to face greater expense and risk in a federal court than they would in state court, because plaintiffs in a bankruptcy adversary proceeding can now more easily survive a *Rule 12(b)(6)* motion and therefore will have easier access to litigation and the opportunity to impose the burdens of litigation on corporate officials. This result is troubling for at least three reasons. First, and most fundamentally, if I am correct that we are dealing with substantive law here, the *Tower Air* approach creates a disparity between state and federal courts of the type condemned in *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).* The outcome of an application of Delaware corporate law ought not turn on whether one is appearing in the Delaware Court of Chancery or a federal district court.

Second, as a matter of public policy, it makes little sense to expand the risk of directors and officers simply because a corporation is insolvent. This case is brought as a direct rather than a derivative action solely because the IT Group became insolvent and its board was displaced by a bankruptcy trustee. As the Delaware Chancery Court has rightly noted, "it would be puzzling if, in insolvency, the equitable law of corporations expanded the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions." *Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 794 (Del. Ch. 2004)*.

[*32]

Third, the approach dictated by the Third Circuit in *Tower Air* does not merely make particularized pleading unnecessary; it actively penalizes it and, instead, rewards obscurity. Calling the business judgment rule presumption an affirmative defense, the Court of Appeals stated, "generally speaking, we will not rely on an affirmative defense . . . to trigger dismissal of a complaint under *Rule 12(b)(6)*." *Tower Air, 416 F.3d at 238.* It went on to say, however, that where the plaintiff mentions an affirmative defense in the complaint, that defense can be a basis of dismissal. *Id.* Thus, plaintiffs are given a powerful and perverse incentive to "dummy-up" about the obvious implications of the business judgment rule when drafting their complaints in the first instance. Any plaintiff unwise enough to actually allude to the rule "must plead that he overcomes the presumption created by that rule." *Id.* Since the standard to be applied is the notice pleading standard of *Federal Rule of Civil Procedure 8*, a pleading will not be insufficient for failure to include particularized facts. But it can be "self-defeating" by giving such facts, if they offer "an ostensibly legitimate business purpose for an allegedly egregious decision."*Id. at 239.* In short, because the Third Circuit sees a problem not when facts are omitted but only when they are presented, *see id.* ("The problem ... is not the facts that are not pleaded, but the facts that are."), the predictable and unfortunate result will be deliberately obtuse allegations. That is an outcome that truly bears scant resemblance to the operation of the business judgment rule in Delaware courts.

[*33]

To conclude, the business judgment rule's presumption is a matter of substantive Delaware law. The *Tower Air* opinion requires me to apply a pleading standard far weaker than what I believe to be the Delaware requirement for pleading facts to overcome that presumption. I am uncomfortable changing the scope of Delaware fiduciary duty claims by weakening a substantive presumption, but, given the ruling in *Tower Air* and the lack of any Delaware authority directly stating that the *Tower Air* approach contravenes Delaware law, I must yield to the Third Circuit's interpretation.

In Count VI, discussed below in Section IV.B.4, Plaintiff also describes payments made to individual directors. (Complaint, D.I. 30 at PP81-87.) None of the fiduciary duty counts point specifically to those payments, which are only mentioned later in Count VI, and Plaintiff may not have intended them to form the basis for fiduciary duty claims. But even if Plaintiff intended to include them in the "transfers to insiders" alleged in Counts I and II, the allegations concerning those payments are insufficient to meet [*34] even notice pleading requirements. Plaintiff alleges nothing other than the amounts and that the payments were made in satisfaction of antecedent debts and are avoidable preferences under Bankruptcy Code. (*See id.* at PP81-87, P92.) No other information is given about the nature of the payments or the antecedent debts. Importantly for any fiduciary duty claims, the board is not alleged to have made any decision or acted in any way concerning those payments. And again, Plaintiff does not give notice in the Complaint that the payments to individual directors, mentioned only in Count VI, were intended to be the basis for claims in Counts I and II. Thus, even though particularized fact pleading is not required, the Complaint fails to give any satisfactory notice of a fiduciary duty claim based on those payments to individual directors.

Therefore, the Complaint states a claim against the directors for breach of their duty of loyalty in approving payments to the Carlyle Defendants and artificially extending the life of the Company to continue making those payments. Those two aspects of Counts I and II, as asserted against the directors, survive this Motion.

ii. Officers

Counts [*35] I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. Defendant Soose is the only officer named in the Complaint who was not also a director, but the Complaint alleges

nothing about Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at P13.) Soose is not alleged to have benefitted from any payments or to have been involved in the decisions to make payments. Therefore, the duty of loyalty claims in Counts I and II must be dismissed as to Soose.

The only other officer mentioned in the Complaint, DeLuca, was also a director during the alleged events. (*See id.* at P12.) Since no allegations are made against DeLuca based on his actions as an officer separate from those he supposedly took as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1.a.i.

### iii. Carlyle Defendants

Under Delaware law, a shareholder will owe fiduciary duties to a corporation, including the duty of loyalty, "only if [that shareholder] owns a majority [*36] interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp. (In re Newmont Mining Corp. S'holders Litig.), 535 A.2d 1334, 1344 (Del. 1987).* A dominating shareholder may, therefore, be subject to a claim for breach of a duty of loyalty, if that shareholder stands on both sides of a transaction.

Here, the issue is not whether the Carlyle Defendants were interested in the transactions that resulted in payments made to them. Obviously, they were; they derived a personal benefit that was not received by stockholders generally. *Aronson, 473 A.2d at 812.* The issue as to the Carlyle Defendants is whether they owed any fiduciary duties to the Company at all, i.e., whether they were controlling shareholders of the IT Group. As for the claims against the directors concerning the payments to the Carlyle Defendants, those claims depend on the allegations of actual control by the Carlyle Defendants over the IT Group directors. (*See* Complaint, D.I. 30 at P14, P31.) If Plaintiff can prove that the Carlyle Defendants exercised such control, then they owed fiduciary duties to the Company, and, as interested [*37] fiducianes, may be liable on a duty of loyalty claim.

As discussed regarding the claims against the directors, *supra* Section IV.B.1.a.i, the allegations of control and self-interest put Defendants, including the Carlyle Defendants, on notice of Plaintiff's claim, satisfying the pleading standard set forth in *Tower Air*. The duty of loyalty claims set forth against the Carlyle Defendants in sections (g) and (h) of Count IV therefore survive the Motion to Dismiss for failure to state a claim. n11

> n11 Count IV actually alleges that the directors and officers breached various fiduciary du-

ties, revealing that the allegations from Counts I and II were simply pasted into a count against the Carlyle Defendants. (*See* Complaint, D.I. 30 at P74.) However, the title indicates that Count IV is intended to make allegations against the Carlyle Defendants, and so I treat the Complaint as fairly making those allegations.

### b. Duty of Care

The remaining eight breaches alleged in Counts I, II, and IV are breaches [*38] of the duty of care. Plaintiff alleges that Defendants: first, "failed to inform themselves of all material information readily available to them," (Complaint, D.I. 30 at P61 (a), P65(a), P74(a)); second, "incurred Acquisitions for more than the fair value of such Acquisitions and increased the Company's debts through such Acquisitions," (*id.* at P61(b), P65(b), P74(b)); third, "deepened the Company's insolvency," (*id.* at P61(c), P165(c), P74(c)); fourth, "failed to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors." (*id.* at P61(d), P65(d), P74(d)); fifth, "knowingly or recklessly ignored facts of, [sic] the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized," (*id.* at P61(e), P65(e), P74(e)); sixth, "pursued a 'Roll-Up Strategy' long after they knew or should have known it was a failure," (*id.* at P61(f), P65(f), P74(f)); seventh, "failed to timely retain restructuring advisors in order to fully inform themselves of their duties and to take steps necessary and appropriate to maximize the value of the Company for its creditors," (*id.* at P61(1), P65(i), P74(1)); and [*39] eighth, "wasted corporate assets," (*id.* at P61(j), P65(j), P(74(j)). Again, the claims against the directors, the officers, and the Carlyle Defendants are discussed in turn.

### i. Directors

Directors must "inform themselves ... of all material information available to them [and] ... must then act with requisite care in the discharge of their duties." *Aronson, 473 A.2d at 812.* The duty of care claims n12 must be dismissed, however, because the IT Group's Certificate of Incorporation contains an exculpation provision that states:

> A director of this Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such limitation of liability is prohibited by the Delaware General Corporation Law as the same exists or may hereafter be amended.

(D.I. 39 at A-0028.) This provision was adopted pursuant to *§ 102(b)(7)* of Delaware's General Corporation Law, *8 Del. Code § 102(b)(7)*, which provides:

> The certificate of incorporation may ... contain ... (7) A provision eliminating or limiting the personal liability [*40] of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders: (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under *§ 174* of this title: or (iv) for any transaction from which the director derived an improper personal benefit.

The exculpatory provisions of *§ 102(b)(7)* apply to claims brought by creditors of an insolvent corporation. *Prod. Res. Group, L.L.C: v. NCT Group, Inc., 863 A.2d 772, 793-95 (Del. Ch. 2004)*. Once the *§ 102(b)(7)* provision is raised against duty of care claims, that is "the end of the case." *Malpiede v. Townson, 780 A.2d 1075, 1095 (Del. 2001)*. n13

> n12 To the extent that these allegations relate to the payments to insiders or to the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, Section IV.B.1.a. Read in the light most favorable to Plaintiff, the remaining duty of care claims allege, in parts (b)-(d), (f), and (j), poor decision-making concerning the Roll-Up acquisitions, and, in parts (a), (e), and (i), a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt.

[*41]

> n13 The Third Circuit declined to address an exculpatory charter provision in *Tower Air,* because the provision was raised for the first time on appeal. *416 F.3d at 242*. The Delaware Supreme Court held in reviewing a *12(b)(6)* motion

that, white a *§ 102(b)(7)* clause provides an affirmative defense, "proving the existence of a valid exculpatory provision ... entitles directors to dismissal of any claims ... against them that are based solely on alleged breaches of the board's duty of care." *Malpiede v. Townson, 780 A.2d 1075, 1095-96 n.71 (Del. 2001)*.

Thus, while the duty of loyalty claims are unaffected, the directors are protected by *§ 102(b)(7)* against liability for breaching the duty of care. Counts I and II against the directors, to the extent that those counts allege breaches of the duty of care, must therefore be dismissed.

### ii. Officers

Again, Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were [*42] made against the directors. And again, the Complaint alleges nothing about defendant Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at P13.) Because he is not alleged to have taken part in the decisions that form the basis of Plaintiff's complaint, the duty of care claims against Soose in Counts I and II must be dismissed. Therefore, these two counts are dismissed in their entirety as to Soose.

As discussed above, Section IV.B.1.a.ii, defendant DeLuca was a director and an officer. (*See id.* at P12.) Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1 .b.i. n14

> n14 Even if the Complaint alleged a breach of the duty of care by DeLuca in his capacity as officer, which it does not, such an allegation, like the duty of care allegations against the Carlyle Defendants, would fail to overcome the business judgment rule. *See infra* Section IV.B.1.b.iii.

[*43]

### iii. Carlyle Defendants

In Count IV, Plaintiff alleges that the Carlyle Defendants have committed the same breaches of fiduciary duties as have the directors and officers, the duties of the Carlyle Defendants arising from control over the IT Group directors. As I noted in the discussion about the directors' alleged breaches, *supra* Section IV.B.1.b.i, these allegations against the Carlyle Defendants, read in

the light most favorable to Plaintiff, concern poor decision-making about the Roll-Up acquisitions, and a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt. Again, to the extent that these claims are made concerning the payments to insiders or concerning the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, *supra* Section IV.B.1.a.iii. The remaining claims, therefore, center on the failed Roll-Up strategy.

While the *§ 102(b)(7)* charter provision protects only directors from duty of care claims, to the extent that Plaintiff is seeking to hold the Carlyle Defendants responsible for those [*44] alleged breaches, the Complaint fails to state a claim. Plaintiff is not required to plead detailed facts, but must still "plead around the business judgment rule." *Tower Air, 416 F.3d at 238*. Thus, even at the pleading stage, if facts alleged in a complaint show "an ostensibly legitimate business purpose for an allegedly egregious decision," then the complaint fails to state a claim for which relief can be granted. *Id. at 239*.

Here, Plaintiff alleges that the Roll-Up Strategy was implemented "to grow the company by acquiring companies engaged in the same or similar lines of business." (Complaint, D.I. 30 at P32.) Further, while the IT Group's debt increased during this time, the Roll-Up Strategy increased revenues from approximately $ 360 million in 1997 to approximately $ 1.4 billion in 2000. (*Id.* at P44.) While the strategy "did not provide the Company with the desired benefits," (*id.* at P48), the fact that the strategy was implemented to achieve benefits for the Company shows that it had a legitimate business purpose. Thus, the Complaint is "self-defeating," *see Tower Air, 416 F.3d at 239* ("[A] complaint is self-defeating [*45] when it states an ostensibly legitimate business purpose for an allegedly egregious decision"), to the extent that it claims that implementing the Roll-Up Strategy was a breach of the duty of care. Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule.

Therefore, to the extent that Count IV alleges that the Carlyle Defendants breached their duty of care, it fails to state a claim and is dismissed.

### 2. Count III - Waste of Corporate Assets

In Count III, Plaintiff alleges that the directors and officers have wasted corporate assets through the same actions that are alleged to constitute breaches of their fiduciary duties. (Complaint, D.I. 30 at P69(a)-(h).) For a transaction to amount to waste, it must be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received ade

quate consideration." *In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 362 (Del. Ch. 1998)*.

#### a. Directors

Because Plaintiff's allegations of waste mirror those concerning breach of fiduciary duties, they concern two sets of transactions. The first set of transactions [*46] involves payments made to some of the Defendants, including the Carlyle Defendants. Defendants argue that the pleadings are insufficient. As discussed above, *supra* Section IV.B.1.a.i, the Complaint sufficiently alleges that payments were made to the Carlyle Defendants in violation of the directors' duties of loyalty, and the Company is alleged to have received no consideration in return for those multimillion dollar payments. Thus, for claims of waste based on those payments, Defendants have not shown that Count III fails to state a claim.

However, as discussed *supra* Section IV.B.1.a.i, the Complaint fails to state a claim for breach of fiduciary duty based on payments made to individual defendants. Since Count III provides no additional information, the Complaint similarly fails to state a claim for waste based on those payments.

The second set of transactions involves the Roll-Up acquisitions, for which the IT Group allegedly received inadequate consideration. While those acquisitions may appear unwise in retrospect, they do not raise a duty of loyalty question, and so, like the duty of care claims in Counts I and II, the *§ 102(b)(7)* provision protects the directors from [*47] liability for those transactions. *See Green v. Phillips, 1996 Del. Ch. LEXIS 76, C.A. No. 14436, 1996 WL 342093, at *6-*7 (Del. Ch. June 19, 1996)*(holding that a *§ 102(b)(7)* provision protected directors from corporate waste claims based on transactions that did not "bring the directors' loyalty and good faith into question").

Therefore, the claims of corporate waste against the directors based on the payments to the Carlyle Defendants (Complaint, D.I. 30 at P69(f)-(g)) survive the Defendants' *12(b)(6)* motion, while the other claims of corporate waste (*id.* at P69(a)-(e), (h)) must be dismissed.

#### b. Officers

The allegations in Count III mirror those in Counts I and II. And just as Counts I and II make no allegations against defendant Soose, *see supra* Sections IV.B.1.a.ii, IV.B.1.b.ii, Count III likewise makes none, and that count against Soose will be dismissed as well.

Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his

alleged culpability is covered by the discussion above, Section IV.B.2.a.

3. Count [*48]    V - Aiding and Abetting Claim Against the Carlyle Defendants

In Count V, Plaintiff alleges that the Carlyle Defendants aided and abetted the other Defendants' breaches of fiduciary duties. To succeed in this claim, Plaintiff must show: "(1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach." *Crescent/Mach I Partners, L.P. v. Turner, 846 A.2d 963, 989 (Del. Ch. 2000)*. While the parties agree that a fiduciary relationship existed between the IT Group directors and officers and the Company, Defendants argue that Plaintiff has failed to allege a breach or the knowing participation in that breach by the Carlyle Defendants. As with the duty of loyalty claims already discussed, Defendants' argument fails.

First, as discussed above, Section IV.B.1.a.i, Plaintiff has adequately alleged a breach of the duty of loyalty by the IT Group directors concerning the payments made to the Carlyle Defendants and artificially extending the life of the IT Group to keep those payments going. Second, again as earlier discussed, Section IV.B.1.a.iii, the allegations of the Carlyle Defendants' [*49] actual control of the IT Group board are sufficient to survive the *12(b)(6)* motion, and knowing participation could be inferred from that alleged control. Thus, contrary to Defendants' argument, Plaintiff has alleged a breach and the knowing participation in the breach by the Carlyle Defendants, and so Count V adequately alleges that the Carlyle Defendants aided and abetted the directors' breach of their duty of loyalty. By contrast, the duty of care claims in Counts I and II cannot succeed, *see supra* Sections IV.B.1.b.i-ii, and so to the extent that Count V alleges aiding and abetting of those supposed breaches, it too must be dismissed.

4. Count VI - Avoidance Claims Under *11 U.S.C. § 547*

In Count VI, Plaintiff sets out payments made to Gibson, Pogue, Harvey, Pugliese, Schmidt, Watkins, and the Carlyle Defendants that the Plaintiff seeks to avoid as preferential transfers pursuant to *11 U.S.C. § § 547(b), 550*. The Complaint lists specific amounts transferred to the mentioned individual defendants and $ 2,076,000 transferred to the Carlyle Defendants. (D.I. 30 at PP82-88.) The Complaint further alleges that the payments were made [*50] within one year of the bankruptcy petition date (*id.* at P81) to creditors (*id.* at P89) who are also insiders (*id.* at P90), that the payments were made on account of antecedent debt (*id.* at P92), were made while the IT Group was insolvent (*id.* at P93), and enabled the listed Defendants to receive more than they would in the

circumstances set forth in *11 U.S.C. § 547(b)(5)* (*id.* at P94). Defendants argue that those allegations, which mostly mirror the statutory language in *§ 547(b)*, are insufficient and that Count VI must be dismissed.

Defendants base their argument on pleading requirements set out in *TWA, Inc. v. Marsh USA Inc. (In re TWA Inc.), 305 B.R. 228, 232 (Bankr. D. Del. 2004)*, and *Valley Media, Inc. v. Borders, Inc. (In re Valley Media), 288 B.R. 189, 192 (Bankr. D. Del. 2003)*. Those cases require that, "to survive a motion to dismiss," a complaint must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the [*51] transfer." *TWA, 305 B.R. at 232; Valley Media, 288 B.R. at 192*. Because such information is lacking in the present Complaint, in which the only specific information is the amounts transferred, Defendants conclude that the pleading is inadequate. Further, according to Defendants, the listing of the payment made to the Carlyle Defendants as a group rather than to each individual entity reduces to guesswork any effort to understand which payments were made to whom.

The pleading standard described in *TWA* and *Valley Media* has sometimes been viewed as inconsistent with the liberal pleading requirements of *Federal Rule of Civil Procedure 8. See Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apartments (In re The IT Group, Inc.), 313 B.R. 370, 373 (Bankr. D. Del. 2004), Neilson v. Cor Karaffa (In re Webvan Group, Inc.), 2004 Bankr. LEXIS 270, Adv. Proc. No. 03-54365, 2004 WL 483580, at *2 (Bankr. D. Del. Mar. 9, 2004)*. It has been rightly observed that, "while plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them [*52] to do so in their initial pleading in all cases . . . [is] inappropriate and unnecessarily harsh." *IT Group, 313 B.R. at 373*. Even though the information listed in *TWA* will eventually need to be proved, "it does not follow that it must be pleaded on pain of dismissal." n15 *Id.* (quoting *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.), 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003)*).

> n15 Notably, in *TWA*, the court gave the plaintiff leave to amend and agreed that the articulated standard might need to be relaxed in that case to allow the plaintiff to pursue details in discovery. *305 B.R. at 233-34*.

Here, Plaintiff has described specific amounts paid to specific Defendants in the Complaint (D.I, 30 at PP82-88), providing more information than did the complaint

discussed in *TWA, see 305 B.R. at 232* ("Within 90 days prior to the Petition Date, Marsh received payments from Debtors of approximately two million [*53] dollars."). Also, even though the Carlyle Defendants are grouped together as receiving a payment of $ 2,076,000 (D.I. 30 at P88), the information is sufficient to give the Defendants notice of the basis of the avoidance claim, given the relationship alleged between the Carlyle Defendants. That is all that *Rule 8* requires. *Conley, 355 U.S. at 47.*

Accordingly, I decline to hold the Complaint to the pleading standard set forth in *TWA* and *Valley Media.* Count VI is sufficient to withstand the motion to dismiss.

5. Counts VII and VIII - Fraudulent Transfer Claims

In Count VII, Plaintiff alleges that the dividend payments made to the Carlyle Defendants were constructively fraudulent transfers that Plaintiff can recover pursuant to *11 U.S.C. § § 544* and *548.* In Count VIII, Plaintiff alleges that both the dividend payments in Count VII and the payments described in Count VI were actual fraudulent conveyances in violation of *11 U.S.C. § 544* and the Delaware Uniform Fraudulent Transfer Act. Defendants attack both the sufficiency of the pleadings and their timeliness.

First, Defendants argue that Count VII fails to give [*54] fair notice of the basis for alleging a violation of *§ 544.* According to Defendants, the claim (1) lists payments made to the Carlyle Defendants as a group rather than individually; (2) fails to specify the relevant state law; (3) fails to specify an "actual creditor" as required by *§ 544(b)*; and (4) fails to disclose how the IT Group received less than reasonably equivalent value or fair consideration for those payments.

Reading the Complaint in the light most favorable to Plaintiff, these arguments must fail. First, because the payments were dividends associated with the Carlyle Defendants' preferred stock, grouping the payments together does not force the Defendants to guess about which payments are described or who received them. Second, when read with the allegations in Count VIII, the relevant state law is identified as that of Delaware. Third, "for purposes of *Rule 12(b)(6)*, courts do not generally require a trustee to plead the existence of an unsecured creditor by name." *Pardo v. Avanti Corporate Health Sys. (In re APF Co.), 274 B.R. 634, 639 (Bankr. D. Del. 2001).* In any case, Plaintiff represents the interests of the unsecured creditors that are [*55] beneficiaries of the Litigation Trust. Finally, as discussed above concerning the corporate waste claims, Plaintiff alleges that the IT Group received no consideration for those payments. Thus, Defendants are given fair notice of the basis of the *§ 544* claim in Count VII.

Next, Defendants argue that the *§ 548* claim of Count VII is untimely because it seeks to recover payments made more than one year prior to the bankruptcy petition date. The Bankruptcy Code allows the trustee to "avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the [debtor's] petition." *11 U.S.C. § 548(a)(1).* The IT Group filed its petition on January 16, 2002, so any transfers made before January 16, 2001 are outside the scope of *§ 548.* Therefore, the *§ 548* claim for the dividends paid from 1998 to 2000 must be dismissed (*see* Complaint, D.I. 30 at PP99-102), while the claim for payments made on or after January 16, 2001 (*see id. at P103*) may continue.

As to Count VIII, Defendants argue that the claims for fraudulent conveyances are untimely to the extent that they seek to recover transfers [*56] made before January 28, 2001. Delaware's Uniform Fraudulent Transfer Act provides that:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought . . . within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.

*6 Del. Code § 1309(1).* Since the Complaint was filed on January 28, 2005, Defendants argue that any claim for a payment made prior to January 28, 2001 is extinguished. But Plaintiff correctly points out that there is a factual issue concerning when the payments were or could reasonably have been discovered. Therefore, dismissal is inappropriate at the pleading stage.

Accordingly, Counts VII and VIII survive this *12(b)(6)* motion, except for the *§ 548* claims under Count VII for payments made prior to January 16, 2001, which must be dismissed.

6. Count IX - Unlawful Payment of Dividends Claim

In Count IX, Plaintiff alleges that the directors violated *§ 174* of the Delaware General Corporation Law, *8 Del. Code § 174* [*57] , by paying dividends to the Carlyle Defendants from 1998 to 2001 while the IT Group was insolvent. *See EBS Litig. LLC v. Barclays Global Investors, N.A., 304 F.3d 302, 305 (3d Cir. 2002)* ("If the stock dividend occurred when [the company] was insolvent, or rendered [it] insolvent, it was illegal under

Delaware law."). Defendants argue that the pleadings insufficiently allege both the IT Group's insolvency during the time when the dividends were paid and the directors' knowledge of the insolvency. However, those arguments are not well-founded. The Complaint alleges that the IT Group was insolvent or in the vicinity of insolvency as early as March 1998. (D.I. 30 at P47.) Further, the booked goodwill associated with the Roll-Up acquisitions is alleged to have inflated the IT Group's assets. (*Id.* at P41.) Finally, Defendants are alleged to have artificially extended the life of the insolvent IT Group in order to keep making payments to the Carlyle Defendants (*id.* at P61, P65, P69, P74), which is relevant for both the allegations of insolvency and of the directors' knowledge. Again, Defendants have notice of the basis of Plaintiff's claims, and Count IX therefore [*58] survives the *12(b)(6)* motion.

## V. CONCLUSION

Accordingly, I will deny the Motion to Dismiss for Lack of Subject Matter Jurisdiction. I will grant the Motion to Dismiss for Failure to State a Claim as to the following:

> (1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care;
>
> (2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI;
>
> (3) Counts I, II, and III to the extent that they are brought against Defendant Soose;
>
> (4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under *11 U.S.C. § 548.*

I will deny the Motion to Dismiss for Failure to State a Claim in all other respects. An appropriate order will issue.

## ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS [*59] HEREBY ORDERED that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item ["D.I."] 35) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss for Failure to State a Claim (D.I. 37) is GRANTED as to:

> (1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care;
>
> (2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI;
>
> (3) Counts I, II, and III to the extent that they are brought against Defendant Soose;
>
> (4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under *11 U.S.C. § 548.*
>
> IT IS FURTHER ORDERED that Defendants' Motion to Dismiss for Failure to State a Claim (D.I. 37) is DENIED in all other respects.
>
> UNITED    STATES    DISTRICT JUDGE
>
> November 15, 2005
> Wilmington, Delaware

17

Not Reported in A.2d                                          Page 1
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: Not Reported in A.2d)

David JASINOVER, Plaintiff
v.
The ROUSE COMPANY, et al., Defendants.
No. 13-C-04-59594.

Nov. 4, 2004.

Patrick C. Smith, Esq., Siobhan R. Keenan, Esq., Rubin & Rubin, Chtd., Towson, Matthew M. Houston, Esq., Wechsler Harwood LLP, New York, New York, David Clarke, Esq., Edward S. Scheideman, Esq., Piper Rudnick, Washington, DC.

*MEMORANDUM AND ORDER*

DENNIS M. SWEENEY, Judge.

### I. Introduction

*1 Before the Court is the Motion of Plaintiff David Jasinover ("Plaintiff") seeking a preliminary injunction enjoining the Defendants from holding a special stockholder meeting on November 9, 2004, where the common stockholders of The Rouse Company ("Rouse") are to vote on a merger agreed to between Rouse and General Growth Properties, Inc. ("GGP"). The parties have fully briefed the issues on an expedited basis, and a hearing was held. This constitutes the Court's ruling.

### II. Statement of the Case

On August 25, 2004, Plaintiff David Jasinover filed his complaint against Rouse, ten members of its Board of Directors, and GGP. On October 18, 2004, Plaintiff filed what he styled as a First Amended Class Complaint ("Amended Complaint"). In the Amended Complaint, Plaintiff accused the individual Defendants of breaching their fiduciary duties in approving and recommending the merger of Rouse with GGP. Rouse and GGP are cited in the complaint as being either co-conspirators in the breaches or aiding and abetting the breaches. On that same date, Plaintiff also filed a Motion for Temporary Restraining Order or Preliminary Injunction and a Motion for Expedited Discovery.

At a hearing on October 22, 2004, Plaintiff withdrew his request for a temporary restraining order, and the Court subsequently denied the request for expedited discovery. A briefing schedule was established for the preliminary injunction hearing, and the hearing was held on November 3, 2004. [FN1]

> FN1. Defendants have also moved to dismiss the Amended Complaint. The Court reserves ruling on that. This memorandum is limited to a ruling on an expedited basis on the motion for a preliminary injunction.

### III. Statement of the Facts

#### A. Background of the Merger

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In early June 2004, Defendant Anthony W. Deering ("Deering")-Rouse's chairman, president and CEO-was approached by the CEO of a company referred to in the Proxy as "Company A" [FN2], who proposed to Deering that Rouse should consider being acquired by Company A. The CEO of Company A indicated a price range for an acquisition of Rouse. Deering determined that Company A's offer was "unacceptable," and decided to not pursue further discussions with Company A.

> FN2. Potential bidders are referred to in the Proxy Statement by alphabet letters and their actual identities are not publicly disclosed. The parties have not objected to continuing this device in the current litigation.

Later that month, Company A's CEO again approached Defendant Deering, on two separate occasions, and brought up the possibility of a sale transaction between Company A and Rouse. However, in light of the fact that Company A would not increase its price range for the purchase of Rouse, Deering turned down Company A.

Following these discussions with Company A, Rouse engaged two financial advisors, Deutsche Bank and Goldman Sachs, and a legal advisor to assist and advise the Board on "potential strategies for approaching the market and pricing and valuation issues." After these advisors were retained, Defendant Deering, along with other members of Rouse's senior management, instructed the Board's financial advisors to contact two possible bidders for the Company-GGP and a company referred to in the Proxy as "Company B". These companies are described as leading publicly traded companies in the retail shopping mall industry. Company A was not contacted to participate in the bidding process. The Proxy statement states that the Board believed that "GGP and Company B were the companies most likely to consummate a transaction within a price range acceptable to Rouse." Rouse also cites the familiarity that these companies had with Rouse which allowed the discussions to proceed quickly and confidentially.

*2 Between July and August 2004, both GGP and Company B conducted limited due diligence and had multiple conversations with Rouse's management team about the possible price range for the Company. During these conversations, Deering indicated that he believed a fair price for Rouse was in the range of $70-$75 per share. Meanwhile, Company B's CEO informed Deering that Company B may be interested in paying as much as $70 per share for Rouse. GGP, on the other hand, informed Deering that GGP's price range for Rouse was $65-$70 per share.

In late July 2004, the Rouse Board resolved to continue exclusive negotiations with GGP and Company B. Company A was not added to the process. In addition, Deering and other members of Rouse's management team determined that August 16, 2004 should be a target date for the completion of the sale process.

In early August 2004, confidentiality agreements were negotiated between Rouse and both GGP and Company B. During the negotiation process, Defendant Deering not only reiterated that $70-$75 per share was indicative of the range of values Rouse might find acceptable, but also informed the bidders that an offer of $75 per share would be considered "preemptive."

On August 12, 2004, Company B's CEO met with Defendant Deering about his concerns over management's August 16, 2004 deadline for the completion of the sale process. Specifically, Company B's CEO advised Deering that, given the size of the transaction and the requirement that the bidder have fully committed financing in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

place at the time of executing the acquisition agreement, Company B would not be in a position to enter into a definitive agreement until August 23 or August 24.

Also on August 12, 2004, Deering spoke with GGP's CFO, who advised that GGP could be ready to submit a definitive acquisition proposal as early as August 16, but would not do so without a commitment that Rouse's board would be in a position to respond to its proposal within 12 hours. In addition, GGP's CFO stated that GGP would not submit a mark-up of the draft merger agreement until GGP was informed of the deadline for the submission of bids.

That same evening, counsel for Rouse spoke with Company B's outside counsel to clarify Company B's position concerning timing. Counsel to Company B confirmed that Company B would be in a better position to make an unconditional bid if the bid process were extended for an additional week.

On August 13, 2004, Deering received a telephone call from the CEO of Company A, who evidently had learned that Rouse was considering bids for the purchase of the Company. In the course of that call, Company A's CEO reiterated that Company A remained interested in a possible sale transaction but did not make any proposal with respect to a price range.

That day, counsel to Company B again indicated that Company B would need additional time to be in a position to meet Rouse's price expectations and to deliver an all-cash proposal that was firmly committed with respect to financing. In addition, GGP agreed to deliver a mark-up of the merger agreement to counsel for Rouse on August 15, and further confirmed that GGP could be ready to submit a definitive acquisition proposal as early as August 16, but would not do so without a commitment that the Board would be in a position to respond to its proposal within 12 hours.

*3 In the evening of August 13, 2004, Deering again spoke to the CEO of Company B, who indicated that Company B now believed that it could submit a bid by the morning of August 18, but would not be in a position to execute a definitive agreement until it had completed certain related financing arrangements.

On August 16, 2004, members of Rouse management had a teleconference with representatives of Rouse's legal and financial team to review the status of discussions with GGP and Company B. Following this discussion, Rouse scheduled a board meeting for August 19, 2004 to discuss proposals from Company B and GGP. In addition, Deering also had a teleconference with the CEO of Company B who informed him that Company B now believed it could be in a position to sign a binding agreement with no financing contingency on August 20.

On August 17, 2004, Deering and other members of his team set a final bid deadline of August 19, and had Rouse's counsel distribute a bid procedures letter to Company B and GGP, which stated that final drafts of their respective merger agreements would be due no later than 4:30 p.m. on August 18 and that bid proposals would be due by 4:30 p.m. on August 19.

On August 18, the chairman of Company B informed Defendant Deering that Company B intended to withdraw from the sale process.

In the afternoon of August 18, the CEO of Company A called Deering, informed him that he was aware that Rouse was in discussions concerning a possible sale of the Company, and again reiterated Company A's interest in acquiring Rouse. Deering offered to provide Company A with drafts of a proposed merger agreement and offered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12    Page 21 of 33
(Cite as: Not Reported in A.2d)

to make management of Rouse available for a meeting with Company A on August 19-the deadline for submission of final bids pursuant to Rouse's bid procedures letter. Company A's CEO also informed one of Rouse's financial advisors that it desired to participate in any process for the sale of Rouse, and indicated that, if Company A were given the same access to information and time for evaluation as other bidders, he believed that Company A might be able to offer a price within the range of approximately $65 to $70 per share.

Also in the afternoon of August 18, counsel to Company B called Rouse's counsel and advised that, although Company B did not intend to submit a bid on August 19, Company B intended to submit a revised draft merger agreement, and further stated that Company B remained firmly committed to a transaction with Rouse.

On August 19, the deadline for submission of final bids, Rouse's counsel distributed forms of draft merger agreements to Company A. In addition, Company B's chairman sent a letter to Deering explaining that Company B would not be submitting a proposal on August 19. The letter read, in part, as follows:
I wanted to call you today to tell you where we are in the offer process but I understand that given the formalities of the process I am required to submit this letter to you....Rouse has developed an impressive portfolio of premier shopping centers and our review over the past weeks has reconfirmed our view that an acquisition of your shopping center business would be an excellent addition to our business ... However, in the short time available to us, we have not been able to get completely comfortable with the land business or how to appropriately value it for purposes of making our offer. It is simply not a business with which we are familiar or which we can properly evaluate on an accelerated time frame.

* * *

*4 We have worked day and night over the past several weeks to try to meet your schedule. We told you at the beginning of the process that we were concerned about how short the evaluation period was. Despite our best efforts, the compressed time period for the process and the restriction on talking to investors did not give us the opportunity to get comfortable enough to make an unconditional all cash offer for Rouse today.
I want you and your Board to know that we are still prepared to move forward with an unconditional all cash offer for Rouse after further discussions and, with your approval, the ability to talk to potential investors. We are working with prominent financial institutions and are confident that if we are provided another week, we would be able to make an all cash offer that would deliver a substantial premium to your shareholders.

* * *

Tony, you know that our interest is sincere and that we are very serious. You know that while I have important obligations ... I am prepared to come to New York to meet with you. I hope you and your Board will give us the opportunity we are requesting.
Also on August 19, the CEO of Company A informed Deering and Rouse's counsel that Company A was interested in making a proposal but could not submit a bid on that day, and needed a range of time, from a few days to a few weeks, to be in a position to submit a bid. Company A requested that Rouse delay the sale process or,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at a minimum, limit any termination fee payable under a merger agreement so that Company A would have an opportunity to make an intervening bid.

At approximately 5:00 p.m. on August 19, Defendant Deering informed GGP that, "if GGP had an aggressive and attractive price, Rouse's board would be prepared to act quickly."

Fifteen minutes later, at approximately 5:15 p.m., Company A's CEO sent a letter to Deering indicating that Company A would be willing to work toward a firm proposal to acquire Rouse. The letter read, in part, as follows:
I enjoyed our dinner in June where we discussed our interest in a possible acquisition of The Rouse Company by [Company A]. Unfortunately, as we discussed that evening, your expectations then were, candidly, too high. I now understand that you are conducting an auction for the possible sale of the company. I am sure you agree that it is in your interests and those of your shareholders to obtain the best possible price for the company. To that end, [Company A] should be given a full and fair opportunity to participate. I believe that it would be inappropriate for this auction to not include [Company A].... During our conversation last evening, you mentioned that [Company A] was free to enter a bid for Rouse but that final bids were due this Friday and that any [Company A] bid was required to be fully financed and all cash.
We will not be able to, nor do we believe it is reasonable to expect us to be able to, make a bid for Rouse in less than 48 hours, especially when we have not had the opportunity to conduct any financial or legal due diligence, and be on a level playing field with the other participants. However, we are willing to commit immediately to commence due diligence and would expect to be in a position to submit a bid promptly after completion of our work.
*5 We urge that you do not enter into a sale agreement with a third party prior to [Company A] being provided a reasonable opportunity to submit a bid, particularly if, prior to completion of a full auction process, this sale agreement were to provide for a termination or a break-up fee. We anticipate that any offer made by [Company A] would be all cash, and we are prepared to promptly negotiate a definitive agreement without a financial contingency.

* * *

We believe that a transaction between [Company A] and Rouse is compelling, and most importantly, should produce substantial and immediate value for your shareholders....We have a team in place that is prepared immediately to begin due diligence. I look forward to hearing from you.
At approximately 11:00 p.m. on August 19, GGP delivered a formal bid for Rouse, offering to purchase each outstanding share of Rouse common stock for $67.50 in cash. After being advised by their financial advisors that GGP's offer was fair, from a financial point of view, to the Rouse shareholders, Rouse and GGP executed the merger agreement.

### B. The Merger Is Announced

The Rouse/GGP merger was announced on August 20, 2004, when it was reported that Rouse had agreed to merge with GGP in a transaction then valued at $7.22 billion. Pursuant to the merger, Rouse common stockholders will receive $67.50 for each share of Rouse common stock they own.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Case 1:05-cv-00327-GMS    Document 48-7    Filed 03/06/2006    Page 23 of 33
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: Not Reported in A.2d)

Subsequent to the announcement of the merger, three lawsuits were filed challenging the fairness of the merger-two in Illinois Chancery Court, where GGP is headquartered, and the present action. All of these actions sought, *inter alia*, to enjoin the merger and require the Rouse Board to uphold their fiduciary duties under Maryland law to the Company's shareholders.

On September 7, 2004, Rouse filed a preliminary proxy statement with the SEC (the "Preliminary Proxy"), where the Company and its Board first disclosed to the public the background of the merger, including the process employed by the Rouse Board that culminated in the execution of the Agreement and Plan of Merger between and among Rouse and GGP dated August 19, 2004 (the "Merger Agreement").

### C. Proposed Vote on the Merger

As required by Maryland Law, the merger is being put to a stockholder vote. Approval of the merger requires the affirmative vote of the holders of at least two-thirds of the outstanding shares of Rouse common stock entitled to vote on the merger. A failure to vote has the same effect as a vote against the merger. The vote is set for the morning of November 9, 2004, in New York. As required by federal law, a Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 ("Proxy" or "Proxy Statement") has been prepared and submitted to the stockholders. It was dated October 8 and mailed to the stockholders on or about October 9,2004. The Rouse Board informed the stockholders that, in the Board's view, the merger is advisable and fair to, and in the best interests of, Rouse and its stockholders, and recommended that stockholders vote for approval of the merger.

\*6 In the Proxy Statement, the Board summarized its reasons for accepting the GGP proposals as follows:
Our board considered the fact that, of the three companies deemed most likely to be capable of consummating a transaction on terms acceptable to Rouse, only GGP had submitted a firm proposal, while Company A had previously provided price indications below the price proposed by GGP, and Company B had declined to submit a proposal despite having had access to all information furnished to GGP and despite having substantial familiarity with Rouse's retail mall portfolio. Although each of Company A and Company B had requested additional time to evaluate Rouse and to present its best proposal, our board considered that there were significant risks in extending the sale process, including that there was no assurance that Company A or Company B would ultimately present a proposal that was more favorable than GGP's proposal, that GGP could withdraw or reduce its proposal, and that potential bidders might seek to bid jointly, notwithstanding the terms of the confidentiality agreements executed by GGP and Company B, which by their terms precluded joint bids without Rouse's consent.

Proxy Statement, p. 29.

### IV. Standards for a Preliminary Injunction

Maryland courts apply the following four-part test in determining whether to grant a motion for a preliminary injunction:
1. the likelihood that plaintiff will succeed on the merits;
2. whether plaintiff has an adequate remedy at law or will be irreparably harmed if the injunction is not issued;
3. the "balance of convenience," determined by whether the harm to the plaintiff if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Case 1:05-cv-00327-GMS   Document 48-7   Filed 03/06/2006   Page 24 of 33
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: Not Reported in A.2d)

the injunction is not granted outweighs the harm to the defendant if the injunction is granted; and,

4. the injunction will not harm the public interest.

*Fogle v. H & G Restaurant,* 337 Md. 441, 455-56 (1995) (quoting *DOT., Motor Vehicle Admin. v. Armacost,* 299 Md. 392, 404-05 (1984)); *State Dep't of Health & Mental Hygiene v. Baltimore Cty.,* 281 Md. 548, 554-57 (1977).

As the Court of Appeals made clear in *Lerner v. Lerner,* 306 Md. 771 (1986), a court, when evaluating the above factors, should not view each of them in isolation and require a plaintiff to prove each of them like "a plaintiff in a tort action [must] prove each of the elements of a tort." *Id. at 776-777.* Rather, the court weighs all factors together in deciding whether to grant injunctive relief. Thus, for example, the "importance of probability of success increases as the probability of irreparable injury diminishes." *Id. at 784.* The *Lerner* court termed this test the "balance of hardship test," stating:

Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted.

*7 *Id.* at 783.

## V. Likelihood of Success on the Merits

An important factor in calculating whether a preliminary injunction should be granted is whether plaintiff is ultimately likely to succeed on the merits of the claims presented. While there has been no discovery in this case and the complex issues presented deserve a full analysis and consideration on another day, the Court still must make an early prediction as to the likelihood that Plaintiff's legal claims will prevail at the end of the process.

It is important to focus on precisely what Plaintiff has asserted. Plaintiff "has alleged a breach of fiduciary duty claim that is based, first, in the obligation of candor and, second, in due care, good faith and loyalty." Plaintiff's Renewed Motion, p. 15. Plaintiff divides up the core concerns about lack of candor into three groupings.

**First.** Plaintiff asserts that the Board "ceded all control over the bidding process to Deering and permitted Deering to ensure that his favored bidder, GGP, won the bidding war with Company B". Plaintiff also asserts that the Board does not explain why they did not permit Company B to have additional time to make a firm offer or why Company A was not invited to participate in the final bidding process. The Plaintiff believes that these "failures" to explain violate the Board's duty of candor.

**Second.** Plaintiff also asserts that the Defendants' failure to include in the proxy statement "critical financial information utilized by their financial advisors in their valuation analyses" also violates the duty of candor. The missing information is said to include the "back up" information utilized by Deutsche Bank and Goldman Sachs in reaching their conclusions that the merger was fair to the stockholders from a financial point of view. Plaintiff asserts that the lack of Rouse management's financial projections and forecasts are of specific concern.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Third.** Plaintiff asserts that there is no explanation as to why two financial advisors were needed, why they were paid what Plaintiff asserts were "high sums", and why the advisor fees were made contingent on the consummation of the merger.

As to Plaintiff's assertion regarding a lack of due care, good faith and loyalty, Plaintiff alleges that the Board ceded decision-making to its Chairman, Deering, that certain Board members had "conflicting loyalties", and that six out of ten directors cannot be considered independent. Plaintiff alleges that the Board "breached its obligations under Maryland law actively to seek and secure the best price reasonably available for the stockholders." Plaintiff's particular assertions revolve around what he sees as the Board ceding to Deering control over the negotiations, the failure to encourage and facilitate bids from Companies A and B, and informing GGP that as long as its bid was "aggressive and attractive", the Rouse Board would quickly act on it.

At this point, it appears to the Court that Plaintiff will have a very difficult time establishing any omissions of disclosure that will be considered material in the overall context of the actual disclosures made to the stockholders in the Proxy Statement. Each stockholder was sent a 135-page document that contains detailed statements on the background of the merger, the reasons for the merger, the recommendations of the Board, opinions of the financial advisors, interests of certain persons in the merger, merger financing, and litigation relating to the merger. In the section relating to the reasons for the merger, there is an extensive discussion of the general factors relating to the transaction, another section on factors relating to the specific terms of the merger agreement with GGP, and finally a section on potential negative factors relating to the transaction. Among the "negative" factors listed was the following:

**\*8** Two leading publicly traded companies in the retail mall industry asked us to extend the bid process in order to provide them additional time to evaluate Rouse and to submit bids. For the reasons noted above, however, our board believed that there were significant risks with regard to price, certainty and confidentiality in extending the sale process and that to do so would not be in the best interests of our stockholders.

Proxy Statement, p. 31.

Against this background, it is incumbent on the Plaintiff to affirmatively make: [a] showing of a substantial likelihood that, under all of the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.

_Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del.1985)_ (internal citations omitted). See also, _Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170 (Del.2000)_; _Hudson v. Prime Retail, Inc., No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct., Baltimore City, April, 2004)_.

Plaintiff focuses on the fact that the Rouse Board did not obtain bids from Companies A and B prior to reaching an agreement with GGP, and in Plaintiff's view, the Proxy Statement does not adequately explain why this happened. It is this central allegation that permeates all of Plaintiff's other assertions.

Plaintiff's perceptions of the Rouse Board's actions or omissions are colored by his attempts to import selected principles gleaned from Delaware case law and then

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS Document 48-7 Filed 03/06/2006 Page 26 of 33
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: Not Reported in A.2d)

fashioning them into a template to impose upon Rouse, a Maryland corporation.

Plaintiffs assert that _Revlon v. MacAndrews & Forbes Holdings, Inc, 506 A.2d 173
(Del.1986)_ imposes certain so-called "Revlon duties" that require directors to
attempt to secure the "best" merger terms available for stockholders after
determining that a company will be sold. "The directors must focus on one primary
objective, which is to secure the transaction offering the best value reasonably
available for the stockholders-and they must exercise their fiduciary duties to
further that end." _Paramount Comm. Inc. V. QVC Network_, 637 A.2d 34, 44 (Del.1994).
Plaintiff asserts that the Board must act in a neutral manner to encourage the
highest possible price for shareholders. _Barkan v. Amsted Indus._, 567 A.2d 1279,
1286 (Del.1989). In Plaintiff's view, cases such as _Revlon_ and _Mills Acquisition
Co. v. MacMillian, Inc._, 559 A.2d 1261 (Del.1989) demand that the Court conduct
"rigorous scrutiny" of "disparate treatment" of potential bidders. Plaintiff's
Renewed Motion, p. 21. Adopting this view, Plaintiff can find no justification for
proceeding to close the transaction with GGP prior to obtaining firm bids from
Companies A and B and perhaps shopping Rouse to other potential bidders.

*9 Regardless of whether Plaintiff's rendition of Delaware law is accurate, the
fact remains that it is Maryland law that governs a Maryland corporation like Rouse
and its Board.

Under Maryland law, the conduct of a company's directors is governed by Section 2-
405.1 of the Corporations and Associations Article of the Annotated Code of
Maryland. Section 2-405.1(a) states:
A director shall perform his duties as a director, including his duties as a member
of a committee of the board on which he serves: (1) In good faith; (2) In a manner
he reasonably believes to be in the best interest of the corporation; and (3) With
the care that an ordinarily prudent person in a like position would use under
similar circumstances.

Section 2-405.1(b)(1) provides:In performing his duties, a director is entitled to
rely on any information, opinion, report, or statement, including any financial
statement or other financial data, prepared or presented by ... (ii) a lawyer,
certified public accountant, or other person, as to a matter which the director
reasonably believes to be within the person's professional or expert competence.

"Under the business judgment rule, there is a presumption that directors of a
corporation acted in good faith and in the best interest of the corporation."
_Wittman v. Crooke_, 120 Md.App. 369, 376 (1998).

A leading commentator on Maryland Corporate Law describes the corporate director's
obligation as follows:
In seeking to maximize stockholder value, whether because of a Revlon obligation or
not, the directors' actions will be governed by the standard of Section 2-405.1(a).
Thus, the board has reasonable latitude in determining how to go about maximizing
shareholder value. Even in a change of control, it may be reasonable for a board to
enter into an agreement after arm's-length negotiations, rather than "shopping" the
company if the board, in good faith and with a reasonable basis, concludes that
that process is likely to yield the best price and other terms reasonably
available. Indeed a board may favor one bidder over another in various respects if
it can be shown that the stockholders' interests would be advanced. However, in a
change of control, any process that does not involve some demonstrable market
check, even post agreement, may be difficult to uphold.
A director's acts in connection with the foregoing are "presumed to satisfy the
standards" established by Section 2-405.1(a), and "may not be subject to a higher

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duty of greater scrutiny than is applied to any other act of a director." [quoting Section 2-405.1(f) ]

James J. Hanks, Jr., Maryland Corporation Law Sec.6.6(b) (2003 Supplement) (footnotes omitted).

Maryland law is less restrictive than the view of Delaware law that Plaintiff espouses. Maryland does not require an auction when the decision is made to sell a corporation. There is no requirement that the Board fully shop the company to multiple bidders and have a so-called "level playing field" for all bidders. There will be a need to market-check or test the Board's decision, but the Board is free to lock up an attractive deal and use post-agreement methods to do so.

**\*10** It should also be noted that a more nuanced reading of Delaware law than Plaintiff has presented would show that this transaction is within the range of the types of transactions that would likely be approved, even for a Delaware corporation. While *Revlon* requires a board to get the best short-term price for stockholders in a sale of control, *Revlon, 506 A.2d at 182,* it "does not demand that every change in control of a Delaware corporation be preceded by a heated bidding contest." <u>FN3</u> *Barkan v. Amsted Indus., Inc. 567 A.2d 1279, 1286 (Del.1989).* The Delaware Supreme Court has held that a board can fulfill its duty to obtain the best transaction reasonably available by entering into a merger agreement with a single bidder, establishing a "floor" for the transaction, and then testing the transaction with a post-agreement market check. *Id. at 1287;* see also *In re MONY Group Inc. Shareholder Litigation, 852 A.2d 9, 19(Del Ch.2004).*

> <u>FN3.</u> There can be many compelling reasons why a company would choose not to pursue a public auction or active solicitation process. *In re MONY Group, Inc. Shareholder Litigation, 852 A.2d 9, 19 (De. Ch.2004)* presents a cautionary tale about the failed public auction of Allmerica Financial that would give pause to any board considering such a process.

Even applying the so-called enhanced judicial scrutiny test, the Delaware courts have acknowledged that there are many business and financial considerations implicated in investigating and selecting the best value reasonably available and that the board, the corporate decision-making body, is best equipped to make these judgments. *Paramount Communications, Inc. v. QVC Network, Inc., 637 A.2d 34, 45 (Del.1994).*

Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made **a reasonable** decision, not **a perfect** decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination.

*Id.* (emphasis in original). See also, *In re MONY Group Inc., 852 A.2d at 20.*

It appears that the Rouse Board or its agents made a decision to talk at various points to Company A, Company B and GGP before consummating a deal with GGP. It did not treat them all the same, but there is no indication that the actions taken were not reasonable. At some point, the Board made the decision to tell GGP that the Board could act quickly if GGP could present an "aggressive and attractive" price. It was the Board's determination that GGP had met the mark set, and it agreed to consummate the deal. This may not have been the "perfect deal" or even the "best deal", but there is no indication of record that it was not a "reasonable deal". Under Maryland law, no more is demanded, and this Court should not second-guess the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

determination by interposing an injunction that prevents the stockholders from rendering their own verdict on the Board's methods and ultimate judgment.

There can be no complaint that Rouse did not market-check the deal. Its negotiations with Companies A and B, although not pushed to final bids, gave it a realistic sense of where the market was. It confirmed this with the opinions of its financial advisors that are fully set out in the Proxy Statement. As noted below in Part VI, the market response after the announcement of the deal also gave some sense of how on-target the deal was. Finally, the deal was consummated with a "fiduciary out" provision which allows Rouse to terminate the agreement and accept a superior bid from another suitor. A "break up" or termination fee of up to $155 million and up to $25 million in expense reimbursement would have to be paid to GGP in that instance. The Board received advice from both its financial and legal advisors that the size of the fee, given the size of the overall transaction, should not preclude another party from making a competing proposal. Counsel for Defendants calculates that the size of the fee in this case to be 2.5 percent and "is squarely within the range [2% to 4%] that has been approved by the courts", even those applying "heightened scrutiny" under _Revlon_ . Counsel for Defendants also represented at argument before the Court that there have not been other bidders coming forward with new proposals or bids since the August announcement of the deal. The Court has no reason upon this record to conclude that this post-agreement market check, together with the other steps taken, is not sufficient to satisfy Maryland law requirements.

*11 With an understanding of the legal standard that applies to a sale of a corporation in Maryland, it becomes easier to assess what is required to be disclosed to the stockholders so that they are able to make an informed decision. The focus is on what the Board has recommended, not what is the "best" theoretical deal or whether other possible bidders were treated differentially from the successful bidder. Stated another way, the emphasis is on what the Board actually did, not what it could have done had it traveled a different road.

Such "why" questions about decisions not to pursue other possible options are generally not material, even under Delaware's enhanced scrutiny standard. _In re Lukens, Inc. S'holders Litig., 757 A.2d 720, 736 (Del. Ch.1999)_. With this understood, it becomes clear under the less restrictive Maryland law that the answers to the "why" questions posed by the Plaintiff about not providing a "level playing field" to Companies A and B are not material to the issue of whether the stockholders should vote "yes" or "no" on November 9 on the GGP/Rouse merger.

Plaintiff makes a stab at asserting that the Rouse Board ceded decision-making to Deering, that some Board members had conflicting loyalties, and that some directors should not be viewed as independent. Again, Plaintiff relies on the Proxy Statement itself to support the allegations, and alleges no new facts not disclosed that show any abdication or lack of loyalty. To enter an injunction at this stage, it should be clear to the Court that the conflicts are "of a sufficiently material importance" that it is "improbable that the director could perform her fiduciary duties." _In re General Motors Class H Shareholders Litigation, 734 A.2d 611, 617 (Del. Ch.1999)_. The Court has not found that to be the case here, based on the facts currently before the Court.

As Defendants point out, this is not a case where the board members are entrenching themselves against a hostile take-over and where one can be reasonably suspicious of their motives for clinging to their positions or benefits. Here, they are putting themselves out of jobs, and while they will profit handsomely from their ownership of stocks, this profit will be of the kind experienced by other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stockholders. To the extent there is any variance, it has been adequately disclosed in the Proxy Statement, particularly in the section dealing with potential conflicts. On the record before this Court, there is no disabling conflict or shift of loyalty shown that at this stage would cause the Court to halt the stockholders from expressing their views on the Board's recommendation.

Plaintiff has also asserted that the Defendants have failed to provide sufficient financial detail utilized by the financial advisors. Defendants have demonstrated that the "discounted cash flow" analysis done by Deutsche Bank (pp.35-36 of the Proxy Statement) and by Goldman Sachs (p.41 of the Proxy Statement) disclose the time period used, the range of capitalization rates used to calculate the "terminal value" at the end of the period, the range of "discount rates" used to calculate the range of "present values" and, most importantly, the range of "present values" derived from the analysis ($51.06 to $70.26 per share in Deutsche Bank's analysis and $50.42 to $62.63 in Goldman Sach's analysis).

*12 Additionally, in the analysis done by each advisor, they compare Rouse to a number of similar companies and the proposed transaction between Rouse and GGP to a number of similar transactions. See pp. 33-35, 38-39 and 40-41 of the Proxy Statement. All of the companies deemed similar are identified by name; all transactions deemed similar are identified by both name of acquirer and name of target; the ranges of various financial characteristics of the similar companies are presented; and finally, the ranges of premiums paid in similar transactions are presented. Labeling these analyses as inadequate to meet minimum disclosure standards is a hard task, and Plaintiff retreats to asserting that the "discounted cash flows" are defective in that they do not contain the confidential internal Rouse projections upon which they are based. In the context of what was disclosed, the Court does not find this to be a sufficient basis to say that the Proxy Statement does not meet the disclosure requirements. *MacMillian v. Intercargo Corp.*, 1999 WL 288128 at *6 (Del Ch. May 3, 1999).

Plaintiff has submitted the affidavits of two experts, M. Travis Keath and Candace Preston, to support his allegation that additional financial data should be disclosed to allow for a fair evaluation. These experts have examined the proxy statement and the opinions of Deutsche Bank and Goldman Sachs. They are critical of the methodology used by the advisors and assert that there are "errors" in certain statements made in their analyses. While it is true that certain minor errors were made, such as a misstatement of dates, none of these appear at this time to be ones that materially alter the financial advisors' conclusions or affect their opinions. Plaintiff's experts are free to be critical of the financial advisors and provide their own opinion and perspective. However, at this stage, the Keath and Preston affidavits do not convince this Court that fuller disclosure of financial information is required to adequately advise the stockholders prior to a vote.

Finally, Plaintiff is critical of the Defendants for employing two financial advisors, paying them "high sums", and having part of their compensation contingent on the deal closing. Plaintiff wants to know "why" this happened. It is hard to see how Defendants have not been candid about this, since the information Plaintiff relies on was gleaned from the Proxy Statement itself, a sign certainly that the information was adequately disclosed and is fairly before the stockholders for a vote.

Plaintiff presents no credible basis for this Court to conclude that the size of the fee and its contingent nature are out of normal bounds and a ground for finding that Defendants breached their duty of care. In *Wittman v. Crooke*, 120 Md.App. 369 (1998), the Court of Special Appeals was undisturbed by Goldman Sachs & Co., the

Not Reported in A.2d Document 48-7 Filed 03/06/2006 Page 30 of 33
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: Not Reported in A.2d)

financial advisor to Baltimore Gas and Electric Company, receiving $8,500,000.00 more by recommending a merger to a board than by advising against it. *Id.* at 378.

**\*13** It is ironic that Plaintiff chastises Defendants for employing two financial advisors instead of one. Had Defendants employed only one advisor and obtained only a single fairness opinion, it can be fairly assumed that Plaintiff would then have viewed that effort as insufficient and a dereliction of Defendants' duties for failing to obtain a second opinion.

At this juncture, it appears to the Court that Plaintiff has a low probability of being able to prevail on the merits of the claims he presses in his preliminary injunction motion. This conclusion would require Plaintiff, in the preliminary injunction calculus, to make a very strong showing that he will experience harm that will outweigh any harm to the Defendants or public interest concerns.

## VI. Harm to the Plaintiff

Plaintiff articulates three types of harm that he will experience if the preliminary injunction is not granted. First, Plaintiff states that he will be prevented from casting a "fully informed vote" at the shareholder meeting, a right he characterizes as the "most powerful right that a shareholder possesses". Second, Plaintiff asserts that he will be prejudiced if the vote proceeds since he will not receive the maximum shareholder value if the merger is approved because other bidders, Companies A and B, were not allowed to bid on a "level playing field". Finally, Plaintiff asserts that without a preliminary injunction, he "will forever lose [his] ability to participate in the growth of Rouse as a private company."

Plaintiff's personal ability to vote in an informed manner hardly seems at genuine issue. He and his experts have deconstructed and mined the Proxy Statement to expose what they believe are the inadequacies of the deal and what they believe to be the derelictions of the Board. It is hard to believe that any further disclosure will change or alter the vote Plaintiff will cast on the present proposal.

Plaintiff also claims that he will not receive "maximum shareholder value" because other companies such as A and B did not have a "level playing field". As demonstrated above, there is no "level playing field" test in Maryland and no requirement to conduct an auction. In any event, Plaintiff's logic deserts him here since it is mere speculation that "A" or "B" or any other entity will present a bid that is superior to that of GGP if an injunction is granted. The record before the Court discloses no company that has stepped forward since the August announcement to challenge the value or make another offer. Defendants note that the first trading day after the transaction was announced, the stock of GGP lost almost five percent of its value, a clear indicator to them that the market believed that GGP was paying full value to Rouse stockholders. Defendants also note that Rouse stock has been trading at approximately a dollar per share below the $67.50, which Defendants read as a further indicator that the market thinks that Rouse was appropriately valued. While one can argue with Defendants' conclusions, they are based on some factual predicate which distinguishes them from Plaintiff's assertions that unknown bidders are eagerly waiting in the wings to offer more money on similar or better terms. Simply put, the Court can put no weight on Plaintiff's assertion that if an injunction is granted, he and the other stockholders will be assured of a bigger payoff.

**\*14** Plaintiff's assertion that he will not be allowed to continue in the future growth of Rouse also makes factual assumptions that are simply missing from this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS   Document 48-7   Filed 03/06/2006   Page 31 of 33
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: Not Reported in A.2d)

record. While Plaintiff's ability to continue as a Rouse stockholder and avoid the currently-set vote may be something he has a personal interest in, it has only the weight of a feather in the weighing process that this Court must conduct.

Plaintiff attempts in his motion to bootstrap the harm he alleges to himself to also apply to the entire class of stockholders of Rouse. However, Plaintiff has not requested by motion that the class be certified under Rule 2-231(c), and at this stage, he represents only his personal interest.

To the extent that Plaintiff raises issues that would be important and serious regarding deprivation of the stockholder rights of others, the Court could more appropriately factor those concerns into its consideration of the overall public interest, another factor to consider in whether to grant or deny a preliminary injunction. The Court will do so below.

### VII. Balance of Convenience and Equities

Plaintiff's personal interests as described above must be balanced against those that may be suffered by Defendants if an injunction is granted. Enjoining the vote will at a minimum cause delay and disruption in the completion of the transaction. There are obvious transactional costs in re-doing the stockholder vote that are clearly substantial in a publicly-traded company with a great number of stockholders. As Defendants note, on the premium alone, each day of delay in closing the transaction costs the stockholders of Rouse approximately $50,000.00 for each percentage point of interest they could be earning if they had the money. Finally, Defendants assert that under the terms of the deal with GGP, entry of a court order may provide an opening, if other contingencies occur, for GGP to withdraw from the transaction, which would deprive Rouse and its stockholders of the premium altogether.

If Plaintiff's demonstrable immediate harm were more certain and less nebulous, the Court would have something to add to the balance that might begin to move the scales. At this point, the Court discerns little weight this Plaintiff can provide. The balance is decisively in Defendants' favor.

### VIII. Public Interest

This is the place, in this Court's view, where the interest of the stockholders of this publicly-held corporation who are not parties should be considered. They obviously have an interest at stake in the Court's determination. Plaintiff clearly sees himself as pursuing the interest of all shareholders even though the Court has not established the case as a class action. Regardless, the Court should factor into its consideration how its decision would affect the other stockholders not represented in the action.

While the Proxy Statement may not be perfect or as detailed as the Plaintiff would like, it appears at this stage to put before the stockholders the salient issues they should consider when they vote on November 9th. If the merger is approved, they would become entitled to receive the 32% premium. There is no guarantee that the adverse contingencies that could come about from delay will not occur.

*15 While the Court must protect stockholder rights from illegal actions by an unfaithful or less than diligent Board, the Court must also carefully weigh whether judicial intervention into corporate affairs is wise. The admonition that applies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to physicians deciding to treat a patient is perhaps also appropriate here: "First, do no harm." The Court is not at all convinced that Plaintiff has demonstrated that judicial intervention here would advance the interests espoused by Maryland corporate law or serve the best interests of Rouse stockholders.

A similar sentiment was articulated in an opinion by the Court of Chancery of Delaware in denying a preliminary injunction to prevent the closing of a tender offer:
[T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of a untoward financial result from the stockholders' point of view is small. Repeatedly the plaintiffs' class action bar exhorts the court to bravely risk the consequences in circumstances such as these, asserting that more money to the shareholders, not less, will probably result. At least on facts such as these, a due respect for the interests of the class on whose behalf these exhortations are made, requires, in my judgment, that this invitation be declined.

_Solash v. Telex Corporation,_ 1988 WL 3587 at *13 (Del. Ch), 13 Del.J.Corp.L. 1250, 1269 (January 19, 1988).

For the same reasons, the Court will for now decline Plaintiff's suggestion that judicial intervention would be in the public interest.


## IX. Plaintiff's Ability to Post a Bond

Plaintiff acknowledges that a bond by the moving party is envisioned if a preliminary injunction is granted, Maryland Rule 15-503, but Plaintiff asserts that the Court may in the appropriate case either dispense with requiring any bond or require at most a nominal bond. An affidavit from the Plaintiff asserts that a bond in excess of $10,000.00 would not be able to be posted. Jasinover Affidavit, paragraph 4. While acknowledging that the Court has considerable discretion in the matter of bond, Maryland Rule 15-503(c), Defendants vehemently argue that a substantial bond should be required if injunctive relief is granted, since delaying the stockholders' vote and the closing of the transaction could cost significant economic harm to the Defendants and to other non-party stockholders, and could in fact in some circumstances allow Defendant GGP to withdraw from the transaction under the terms of the merger agreement. Defendants assert that in a worst case scenario, the harm could reach the amount of $12.6 Billion Dollars, the total value of the transaction or, alternatively, at least the value of the premium offered by GGP, $1.8 billion. Were the Court otherwise persuaded to enter the relief suggested by Plaintiff, the Court believes some substantial bond would be necessary to be posted to protect the Defendants in the event Plaintiff is not ultimately able to prevail. While Defendants' suggestion of a multi-billion dollar bond may be excessive and inflated by hyperbole, a bond in some lesser amount, but certainly in the millions of dollars, would likely be in order. Since Plaintiff has candidly indicated the upper limits of his ability to post bond and since that limit is patently inadequate, this factor alone becomes another reason why Plaintiff cannot prevail on the motion.


## X. Conclusion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS    Document 48-7    Filed 03/06/2006    Page 33 of 33
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12
(Cite as: Not Reported in A.2d)

**\*16** Plaintiff has suggested that an injunction should be granted now before it is "impossible to unscramble the eggs" after the vote, citing *In re Lukens Inc. S'holders Litig., 757 A.2d 720, 728 (Del. Ch.1999)*. While this sentiment is on target in some cases, it is not on the facts currently before the Court. On these facts, the Rouse stockholders should be given the "eggs", and they can be trusted to make a sufficiently-informed decision whether to scramble them now or put them safely back in the refrigerator for another day.

Weighing and balancing the factors applicable to granting a preliminary judgment, this Court is firmly convinced that a preliminary injunction should not be granted. For these reasons, it is, this *4th* day of November, 2004,

ORDERED, that Plaintiff's Motion for Preliminary Injunction is denied.

Md.Cir.Ct.,2004.
Jasinover v. Rouse Co.
Not Reported in A.2d, 2004 WL 3135516 (Md.Cir.Ct.), 2004 MDBT 12

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.