18

**DENNIS JOHNSON, on behalf of himself and others similarly situated, Plaintiff, v. ARMAND SHAPIRO, SAM J. SUSSER, and H. WHITNEY WAGNER, Defendants.**

C.A. No. 17651

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2002 Del. Ch. LEXIS 122*

September 17, 2002, Submitted
October 18, 2002, Decided

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted in part and denied in part.

**COUNSEL:** Carmella P. Keener, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Robert M. Kornreich, Esquire, Patricia I. Avery, Esquire, Kent A. Bronson, Esquire, WOLF POPPER LLP, New York, New York, Attorneys for the Plaintiff and the Class.

P. Clarkson Collins, Jr., Esquire, Lewis H. Lazarus, Esquire, Elizabeth A. Brown, Esquire, MORRIS, JAMES, HITCHENS & WILLIAMS LLP, Wilmington, Delaware; Cornelius P. McCarthy, Esquire, ALLEGAERT BERGER & VOGEL LLP, New York, New York, Attorneys for the Defendants.

**JUDGES:** Stephen P. Lamb, Vice Chancellor.

**OPINIONBY:** Stephen P. Lamb

**OPINION:**

### MEMORANDUM OPINION

LAMB, Vice Chancellor

I.

This class action arises out of a self-tender offer for a Delaware corporation's shares followed shortly thereafter by a transaction taking the corporation private. The named plaintiff, who represents a class of stockholders who tendered their shares in that self-tender, sued the corporation and its directors for damages. The complaint alleges that the defendant directors breached their duty of disclosure [*2] owed to the class by failing to inform them that a proposal for taking the corporation private was under consideration during the life of the self-tender offer.

The defendants have moved for summary judgment for two reasons. First, the defendants argue they did not breach any fiduciary duty of disclosure because none of them had any knowledge of material information that needed to be disclosed during the relevant time period. Second, the defendants argue that, even if they did have such knowledge, they cannot be held liable because the corporation had an exculpation clause in its corporate charter.

Summary judgment must be granted in two of the defendants' favor because there is a lack of evidence supporting the proposition that they had any knowledge of the going private proposal before the close of the self-tender offer. Summary judgment cannot be granted in favor of the third director defendant because there is a genuine issue of material fact relating to when that director actually obtained knowledge of the going private proposal. Furthermore, the corporation's exculpation provision does not shield this defendant from liability because a failure to disclose information pertaining [*3] to the going private transaction, if proven, could implicate his duty of loyalty or amount to bad faith.

II.

A. Background

Garden Ridge Corporation ("Garden Ridge" or the "Company") is a Delaware corporation that sells specialty home products throughout the southeastern United States. At the time of the matters at issue in this litigation, its board of directors consisted of seven members, as follows: Armand Shapiro, Chairman, Terry S. Boyce, Alyson Hennings, Ira Neimark, Sam J. Susser, Barbara S. Tapp, and H. Whitney Wagner. Together with the Company, each of these persons was named as a defendant in this suit.

In 1995, the Company sold stock through an initial public offering. During 1996, its common stock traded as

high as $ 30 per share. By the spring of 1999, however, the price had fallen to roughly $ 5 per share.

Due to the depressed stock price, Garden Ridge's board of directors authorized the Company to engage in two open market share repurchase programs in March and July 1999. In the first program, Garden Ridge purchased one million shares at an average price of $ 5.67 per share. In the second program, the Company sought to repurchase three million shares, [*4] but only succeeded in buying 90,000. Thereafter, the shares traded in the area of $ 6 per share.

## B. The Self-Tender

On August 26, 1999, Garden Ridge began a self-tender offer for up to three million shares at a price of $ 7 per share (the "Self-Tender"). As disclosed in the Offer to Purchase (the "Prospectus"), the closing date of the offer was September 23, 1999. Any tendering stockholder's withdrawal rights terminated as of 5:00 p.m. September 23 "unless extended by the company." n1 However, the Prospectus also stated that a binding agreement did not arise between tendering shareholders and the Company until the Company accepted the shares for payment. n2

> n1 The Prospectus stated that Garden Ridge reserved the right to terminate, amend or postpone the Self-Tender under a variety of circumstances, including the issuance or proposal of a tender offer or exchange offer, merger, business combination or any "similar transaction." Keener Aff., Exh. H, § 6, p. 10-12.

> n2 Section 3 of the Prospectus, in a sub-paragraph titled "Tendering Shareholder's Representation and Warranty; Company's Acceptance Constitutes an Agreement," provides that "the Company's acceptance for payment of Shares tendered pursuant to the Offer will constitute a binding agreement between the tendering stockholder and the Company upon the terms and conditions of the Offer." Keener Aff., Exh. H, § 3, p. 9.

> Under the terms of the Prospectus, Garden Ridge was "deemed to have accepted, and therefore purchased, Shares that are validly tendered and not withdrawn ... only when and if it gives written notice to the Depositary of its acceptance of the Shares for payment pursuant to the Offer." Keener Aff., Exh. H, § 5, p. 10. Garden Ridge did not fax the requisite written notice to its depositary until September 27, 1999.

[*5]

The Prospectus disclosed that Garden Ridge knew of no plans or proposals to take the Company private. n3 In addition, it warned tendering stockholders that "in determining whether to tender Shares pursuant to the Offer, stockholders should consider the possibility that they may be able to sell their Shares in the future on Nasdaq [sic] or otherwise at a net price higher than the Purchase Price." n4 Finally, the Prospectus informed stockholders that Garden Ridge's directors would not be tendering any of their individual holdings. n5

> n3 In particular, the Prospectus stated:

>> Except as disclosed in this Offer to Purchase, the Company currently has no plans or proposals that relate to or would result in: (a) the acquisition by any person of additional securities of the Company or the disposition of securities of the Company; (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the Company or any of its subsidiaries; (c) any change in the present Board of Directors or management of the Company; (d) any material change in the present dividend rate or policy, or indebtedness or capitalization of the Company; [or] (e) any other material change in the Company's corporate structure or business[.]

> Keener Aff., Exh. H, § 2, p. 5-6.

[*6]

> n4 Keener Aff., Exh. H, p. 2.

> n5 The Prospectus stated in two separate places:

>> THE BOARD OF DIRECTORS OF THE COMPANY HAS APPROVED THE OFFER. HOWEVER, NONE OF THE COMPANY, ITS BOARD OF DIRECTORS OR THE DEALER

MANAGER MAKES ANY RECOMMENDATION TO STOCKHOLDERS AS TO WHETHER TO TENDER OR REFRAIN FROM TENDERING THEIR SHARES. STOCKHOLDERS MUST INDIVIDUALLY MAKE THE DECISION WHETHER TO TENDER THEIR SHARES AND, IF SO, HOW MANY SHARES TO TENDER. THE COMPANY HAS BEEN ADVISED THAT NONE OF ITS DIRECTORS, EXECUTIVE OFFICERS OR AFFILIATES CONTROLLED BY SUCH PERSONS INTENDS TO TENDER SHARES PURSUANT TO THE OFFER.

Keener Aff., Exh. H, at face page & 1.

Named plaintiff Dennis Johnson ("Johnson") tendered 6,000 shares, his entire stake in Garden Ridge. Johnson bought his shares at prices ranging from $ 5-7/8 to $ 6-7/16, and made a profit of approximately $ 4,500 by selling his shares in the Self-Tender.

The Self-Tender terminated on September 23, 1999, having attracted tenders of only 1,189,411 shares. Garden Ridge appears to have accepted those shares for payment on September 27, 1999 n6 [*7] and paid for them on September 28, 1999.

n6 A letter, although dated September 28, 1999, evidently was faxed to Garden Ridge's depositary on September 27, 1999 accepting the shares for payment. *See* Def. 9/27/02 Letter, Ex. B.

C. The Buyout Proposal

Three Cities Research, Inc. ("TCR") was a financial advisor with close ties to Garden Ridge. In early September 1999, John William Uhrig, one of TCR's managing directors, began thinking about a proposal to take Garden Ridge private.

On September 16, 1999, Uhrig asked TCR's lawyers, Clifford Chance Rogers & Wells, LLP (then "Rogers & Wells") to begin work on such a proposal. By September 24, 1999, Rogers & Wells had drafted a letter proposing

a going private transaction addressed to Paul Davies ("Davies"), the President and CEO of Garden Ridge. This appears to be the first draft of such letter.

TCR's managing directors held regular Monday morning meetings ("MMMs") at which, among other things, they discussed new deals they were working on. At the MMM [*8] for September 13, 1999, the agenda listed Garden Ridge as one of TCR's "New Deals in [the] Pipeline." That meeting appears to have been attended by, among others, Uhrig and H. Whitney Wagner, a managing director of TCR and also a director of Garden Ridge. Garden Ridge again appeared on a MMM agenda as a "New Deal[] in [the] Pipeline" on September 27, 1999. Uhrig and Wagner attended this meeting as well. Garden Ridge was next discussed at the MMM at TCR on October 12. n7 Garden Ridge was again discussed at the MMM of October 27 under the code name "Daisy." This was the first time a code name was used in this transaction. Code names are frequently used by TCR to maintain the confidentiality of potential transactions.

n7 The actual agenda for this meeting was overwritten and is no longer available. Plaintiff admits the going private transaction was probably discussed, but there is no evidence indicating whether a code name was used when discussing the transaction.

On September 28, 1999, at Uhrig's request, [*9] Willem de Vogel, another TCR managing director, called Davies and arranged a breakfast meeting with him for the following morning in Dallas, Texas. At that meeting, on September 29, De Vogel told Davies that TCR was planning to send him a written proposal to take Garden Ridge private and discussed the issues involved in such a proposal with him. On September 30, Uhrig sent a letter (the "September 30 Letter") to Davies and the Garden Ridge board of directors proposing the going private transaction at a price of $ 9.50 per share.

On October 6, 1999, Garden Ridge's board of directors met to consider Uhrig's September 30 Letter. Davies, who was not a board member, and Garden Ridge's outside counsel attended the meeting. At the meeting, the board established a special committee of persons who at the time had no affiliation or connection with TCR to make a recommendation to the board about the buyout proposal. The members were Davies, Terry Boyce, Sam Susser and Barbara Tapp. n8 The special committee met six times over the next two months. It hired The Robinson-Humphrey Company to act as its financial advisor.

n8 Davies is not and never has been a defendant in this case.

[*10]

A meeting was held on November 1, 1999 to discuss the buyout proposal. It was attended by Robinson-Humphrey's representative, Uhrig, Jeanette Welsh from TCR, lawyers from Rogers & Wells, and Garden Ridge's outside counsel. Speaking for the special committee, Robinson-Humphrey rejected Uhrig's offer due to the inadequacy of the price. Three days later, Uhrig made an $ 11 per share offer. That offer was also rejected.

After additional negotiations, TCR offered $ 11.50 per share and, on November 22, 1999, the special committee voted to recommend that the board accept that offer. The board voted to accept the offer the same day. No Garden Ridge board member with an affiliation to TCR cast a vote.

**III.**

The plaintiff began this litigation on December 10, 1999. The complaint named Garden Ridge and its directors as defendants. Essentially, all the claims alleged depend on the allegation that the directors of Garden Ridge knew about Uhrig's proposal before the end of the Self-Tender. n9 The complaint purports to state claims for breach of the defendants' duty of loyalty and also alleges that they engaged in intentional or bad faith misconduct or knowing violations of the law.

n9 There is an issue about whether the closing date of the Self-Tender was on September 23, 1999 (when withdrawal rights expired), or September 27, 1999 (when notice was provided to Garden Ridge's depositary), or on September 28, 1999 (when the Company actually paid for the shares). This argument is addressed in Section V, *infra.*

[*11]

In the course of briefing the pending motion for summary judgment, the plaintiff agreed to dismiss the complaint as to Terry Boyce, Alyson Henning, Ira Niemark, Barbara Tapp, and Garden Ridge. Thus, the only the defendants still party to this litigation are Garden Ridge directors Shapiro, Susser, and Wagner. These three continue to press their motion for summary judgment.

**IV.**

A. Summary Judgment Standard

Pursuant to Court of Chancery Rule 56, summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. n10 In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists. n11 "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment." n12 When multiple defendants move for summary judgment, the plaintiff must submit evidence with respect to each defendant in order to meet this burden. n13

n10 *See Williams v. Geier, 671 A.2d 1368, 1375 (Del. 1996).*

[*12]

n11 *See Tanzer v. International General Industries, Inc., 402 A.2d 382, 385 (Del. 1979)* (citing *Judah v. Delaware Trust Co., 378 A.2d 624, 632 (Del. 1977)).*

n12 *Id.;* Ch. Ct. R. 56(e).

n13 *See In re Western National Corp. Shareholders Litig., 2000 Del. Ch. LEXIS 82, 2000 WL 710192* at *12 (Del. Ch. May 22, 2000); *Cole v. Delaware League of Planned Parenthood, 530 A.2d 1119, 1121 (Del. 1987).*

Arguments about the credibility of witnesses are often encountered on motions for summary judgment. When the court concludes that there are litigable issues of credibility that bear on material factual disputes, summary judgment is not appropriate. n14 Also, "when state of mind or 'consciousness and conscious' is involved, credibility--a [fact-finder] determination--is often central to the case." n15 In such cases, the court should evaluate the demeanor of the witnesses whose states of mind are at issue during examination at trial. n16

n14 *See Cerberus Intern. Ltd. v. Apollo Mgmt. L.P., 794 A.2d 1141, 1150 (Del. 2002).*

[*13]

n15 *Scott v. Bosari, 1994 Del. Super. LEXIS 501, 1994 WL 682615* at *8 (Del. Super. Oct. 26, 1994).

n16 *See Darnell v. Myers, 1997 Del. Ch. LEXIS 93, 1997 WL 382984,* at *1 (Del. Ch. June 24, 1997); *Webb v. Davis, 1999 Del. Ch. LEXIS 139. 1999 WL 504777,* at *1 (Del. Ch. July 6, 1999) (citing *Croley v. Matson Navigation Co., 434 F.2d 73, 77 (5th Cir. 1970)).*

## B. Duty of Disclosure Standard

Delaware law clearly establishes that "directors owe the corporation's stockholders a fiduciary duty to disclose all facts germane to a transaction involving stockholder action, in an atmosphere of complete candor." n17 This duty applies whenever a corporate board seeks shareholder action. n18 Furthermore, the duties of loyalty and good faith require directors to disclose all material information even where no stockholder action is required, if information has already been disseminated to stockholders, in order to make the previously disclosed information not materially misleading. n19 Omitted information is considered material if there is "a substantial likelihood that, under all the circumstances, the omitted [*14] fact would have assumed actual significance in the deliberations of a reasonable shareholder" or, in other words, it would have "significantly altered the 'total mix' of information made available" to the shareholder. n20

n17 *Weinberger v. Rio Grande Industries, Inc., 519 A.2d 116, 121 (Del. Ch. 1986); see also Lynch v. Vickers Energy Corporation, 383 A.2d 278, 281 (Del. 1977).*

n18 *See Zirn v. VLI Corp., 681 A.2d 1050, 1056 (Del. 1996).*

n19 *See, e.g., Malone v. Brincat, 722 A.2d 5, 10-11 (Del. 1998).*

n20 *Zirn, 681 A.2d at 1056* (citations omitted).

When a corporation is engaged in a self-tender offer, "the exacting duty of disclosure is even 'more onerous' than in a contested offer" because "the disclosures are unilateral and not counterbalanced by opposing points of view." n21 However, corporate directors are not required to disclose information that is "speculative" or "confusing." n22 There is also, generally, [*15] "no requirement that intentions be disclosed." n23 Furthermore, potentially misleading "soft information" such as forward-looking valuation data or estimates, may be properly withheld. n24

n21 *Eisenberg v. Chicago Milwaukee Corp., 537 A.2d 1051, 1057 (Del. 1987).*

n22 *See Arnold v. Society for Savings Bancorp, Inc., 650 A.2d 1270, 1280 (Del. 1994).*

n23 *In re Rexene Corp. Shareholders Litig., 1991 Del. Ch. LEXIS 81, 1991 WL 77529,* at *5 (Del. Ch. May 8, 1991) .

n24 *See Weinberger, 519 A.2d at 128.*

## V.

### A. The Relevant Dates

This case essentially comes down to deciding what each of Susser, Shapiro and Wagner knew of Uhrig's proposal, and when he knew it. If a director knew of a proposal to take Garden Ridge private at a time relevant to the Self-Tender, then the information would be deemed material for two separate reasons. First, it would have "significantly altered the 'total mix' of information made available" to the stockholder. n25 By holding out, a stockholder may have been able to reap greater gains when selling pursuant to a going private transaction rather than the Self-Tender. Second, disclosure would be necessary, even if it is not considered "material" in the traditional sense, because it would be the only way to make the previously disclosed information in the Prospectus not materially misleading. n26 The Prospectus specifically stated that Garden Ridge knew of no plans or proposals to take the Company private. n27 Necessarily, this statement means that none of the Company's directors had such knowledge either, because such knowledge would be imputed to the corporation for these purposes. Therefore, to say that Garden Ridge did not know of *any* proposal, when any of its directors did know of such proposal, would be misleading.

n25 *Zirn, 681 A.2d at 1056* (citations omitted).

n26 *See Malone, 722 A.2d at 10-11.*

n27 *See* note 3, *supra.*

[*17]

Of course, there came a time when all of the directors learned of Uhrig's proposal. The question is whether any of them came by this information at a time that was relevant to the Self-Tender. Thus, the question is posed as follows: when was the business of the Self-Tender so concluded that subsequent developments were no longer relevant to it? This question may be answered by refer-

ence to the fiduciary relationship between the tendering stockholders and the directors. Alternatively, it may be answered by an analysis of the contractual relationship arising out of the Self-Tender.

For example, the plaintiff argues that September 28 must be the cutoff date because that is when Garden Ridge actually paid for tendered shares, thus terminating any fiduciary relationship between the parties. The defendants argue for September 23, the date on which the right to withdraw tendered shares terminated and all tenders became irrevocable. Another possible cutoff date is September 27, the date that Garden Ridge sent notice to its depositary of its decision to accept all tendered shares. Depending on how one reads the Prospectus disseminated in connection with the Self-Tender, this may be the earliest [*18] date that the Company became bound to purchase the tendered shares, making the contract mutually enforceable.

Disregarding, for a moment, fiduciary duty issues and focusing only on principles derived from the federal securities law, it would appear that disclosure obligations ended on September 23. n28 Sections 6 and 14 of the Prospectus govern amendment, termination, extension and postponement of the Self-Tender. Section 6 provides that Garden Ridge could refuse to accept for payment, purchase or pay for any shares tendered, terminate or amend the offer, or postpone the acceptance for payment of tendered shares, if it learned of a subsequent tender offer, exchange offer, merger, business combination or "similar transaction" "at any time on or after August 25, 1999 and prior to the Expiration Date." n29 The Expiration Date is defined as "September 23, 1999 at 5 p.m., Eastern Daylight Savings Time, unless extended by the Company." n30

> n28 See  Gulf Oil/Cities Service Tender Offer Litigation, 725 F. Supp. 712 (S.D.N.Y. 1989). In Gulf Oil, the court rejected essentially the same argument plaintiff makes here. The court held that "tendering shareholders" could not "sue directly for alleged post-July 13 material misrepresentations" where tendering stockholders "could not withdraw their shares after July 13. Id. at 749. See also  Newmont Mining Corp. v. Pickens, 831 F.2d 1448 (9th Cir. 1987). In Newmont Mining, the court discussed the circumstances in which a tender offer might be extended due to new information. It held that an extension might be necessary where "the new information is disclosed at or near the end of the period when the tender offer was originally set to expire" ( id. at 1452), not when information is discovered after the expiration of the tender offer. However, both

of these federal cases involve suits against a third party making a tender offer. The current dispute is distinguishable because it involves a company making a self-tender for its own shares. That situation gives rise to fiduciary duty obligations not found in the case of third party tender offers.

[*19]

> n29 Keener Aff., Ex. H, § 6 at 10.
>
> n30 Id. at ii.

Section 14 provided that, regardless of the requirements of Section 6, Garden Ridge could "extend" the Self-Tender and delay acceptance for payment; terminate the Self-Tender and not accept stock for payment; amend the Self-Tender; or "postpone payment" (but, in this last case, only "upon the occurrence of any of the conditions specified in Section 6"). n31 However, any extensions of the Self-Tender had to comply with Rule 14e-1 of theSecurities Exchange Act of 1934. n32 This rule precludes extensions unless the company making the offer issues a "notice of such extension by press release or other public announcement" no later than 9:00 a.m. on the next business day following the scheduled expiration of the offer, or, if that corporation is publicly traded on a national securities exchange, the next business day on which that exchange is open. n33

> n31 Id. § 14 at 19.
>
> n32 17 C.F.R. § 240.14e-1 (1999).
>
> n33 Id.

[*20]

Therefore, in accordance with the contract terms set forth in the Prospectus and the federal securities laws, the Self-Tender expired and tenders of shares became irrevocable at 5:00 p.m. September 23. After that time, the federal securities laws did not require Garden Ridge to amend its tender offer materials to reflect changes in information previously disclosed.

Notwithstanding the foregoing, the fiduciary relationship between Garden Ridge and its tendering stockholders continued in existence at least until a mutually binding contract for the purchase and sale of the tendered shares arose. n34 Here, a binding contract to tender one's shares was not formed until Garden Ridge notified its depositary, apparently on September 27, that Garden Ridge had accepted the tendered shares for payment. When it gave that notice, Garden Ridge became abso-

lutely obligated to accept and pay for the tendered shares.

> n34 *Cf. Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1177 (Del. 1988)* (holding that no fiduciary relationship existed between a parent corporation and potential stockholders of a soon to be spun-off subsidiary, because the court concluded that the passing of the record date of the stock dividend and preparation of a stock ledger did not provide a valid basis to impose fiduciary duties on the parent corporation and the former directors. Such a relationship arose only when the shares were actually issued.).

[*21]

Even the existence of a mutually binding contract does not, however, conclusively mark the end of the fiduciary relationship with tendering stockholders. And, while the court sees no reason to decide the issue in the context of the pending motion, it does acknowledge the substantial probability that the fiduciary relationship is only terminated when payment is actually made for tendered shares. In this case, that would mean that the relevant date is September 28. n35

> n35 *See Anadarko Petroleum Corp., 545 A.2d at 1176* (stating, "The concept of 'beneficial ownership' of stock, though somewhat inexact, is contextually defined, and has become a term of art for purposes of establishing fiduciary duties under Delaware law"); *see also Sundlun v. Executive Jet Aviation, Inc., 273 A.2d 282, 285 (Del. Ch. 1970).*

**B. Shapiro And Susser Were Unaware Of Any Material Information On Or Before September 28**

Although the plaintiff argues that Shapiro and Susser had knowledge of the plan [*22] to take the Company private on or before September 28, the record is clear that they did not. The plaintiff asserts that "the record suggests substantial uncertainty regarding when Shapiro and Susser actually learned of TCR's buyout proposal, and clearly implicates the possibility that this knowledge could have been obtained on or before September 28." n36 The court disagrees. Mr. Shapiro unambiguously testified that, at the earliest, he first learned of the proposal on September 29th. n37 In fact, Shapiro's admission is more limited than that, conceding only that on September 29, he knew Uhrig would be "sending a

communication" to Davies. There is no evidence that Shapiro knew what the communication said until it was received at Garden Ridge on September 30.

> n36 Pl. Br. at 24.

> n37 The following questions were asked an answered at Shapiro's deposition:

A. (Shapiro) I received a call from Bill Uhrig just prior to September 30th informing me that he was sending a communication to the board to actually Paul Davies, but for communication to the Board, and wanted me to be on the lookout for that communication.

Q. (By Ms. Avery) When you say "just prior to September 30th," what do you mean?

A. *The day before.*

Q. Are you sure it was on the 29th?

A. No, ma'am.

Q. Was it on the 28th?

A. I don't recall.

Q. 26th?

A. I don't recall.

Q. What about was it on the 25th?

A. I don't recall.

Q. Was it on the 24th?

A. I believe it was just prior to September 30th is my recollection.

Q. But sitting here today, you don't recall when it was?

A. I can't recall a time, but I know it was just before because that was the content of the conversation. It was sending a communication to Paul that would arrive *I believe the next day*, and he wanted to make sure that I was available to look at it.

Q. But sitting here today, you don't recall whether you had that conversation with him on the 28th or the 29th?

MR. ALLEGAERT: Objection to form. Asked and answered.

A. *From my remembrance of the content of the call, I believe it was the day before.* Shapiro Dep. at 57-58 (emphasis added).

[*23]

The evidence that Susser knew of the buyout proposal on or before September 28 is even more tenuous. Susser first saw Uhrig's September 30 letter "in early October." n38 Susser never saw any drafts of Uhrig's letter. n39 Susser admits that he learned of the buyout proposal in a conversation with Shapiro that occurred either "just after" or "just prior" to Susser receiving the proposal. n40 It is clear that Shapiro did not learn of the buyout proposal until, at the earliest, September 29. It follows, therefore, that Susser could not have learned about the proposal until at least September 29 since he learned about it either from Shapiro or from Uhrig's September 30 letter. This is enough to grant summary judgment in favor of Shapiro and Susser.

n38 Susser Dep. at 114.

n39 *Id.* at 116.

n40 *Id.* at 115.

C. Wagner May Have Known About The Proposal As Early As September 13

Wagner presents a different and more difficult case because (i) he and Uhrig are in business together and work out of [*24] the same offices, (ii) there is some evidence (i.e., the September 13 and 27 MMM agendas) that supports an inference that Wagner was aware of Uhrig's activities during the relevant time period, and (iii) his defense depends substantially on his and Uhrig's testimony denying Wagner's knowledge. Not surprisingly, the plaintiff argues that issues about the credibility of Wagner's and Uhrig's denial can only be resolved at trial.

First, the plaintiff points out that Jane Arbuthnot, Garden Ridge's Chief Financial Officer, testified that Uhrig told her that the buyout proposal had not been planned, or even conceived of, until after September 23, 1999. n41 But, Uhrig has now admitted that he began considering the buyout proposal in the beginning of September 1999. n42 He spoke with Rogers & Wells about the proposal on September 16, and received a written draft of a proposal letter by September 24. n43

n41 *See* Arbuthnot Dep. at 143-45.

n42 *See* Uhrig Dep. at 179

n43 *See id.* at 44-45, 149. The attorneys' time records and correspondence confirm this as well. *See* Keener Aff., Exs. K and L.

[*25]

Second, the plaintiff argues Uhrig's and Wagner's testimony is further questioned by the entries of "Garden Ridge" under the heading "New Deals in [the] Pipeline" on TCR's MMM agendas for September 13 and 27, 1999. n44 There are differing accounts of what these notations stood for, but none of the explanation is, as yet, fully satisfactory. Although believing these references were for the Self-Tender, Uhrig and Wagner themselves were both uncertain about what "New Deal" those listings referred to. n45 Moreover, the way that Uhrig described what "deals" are placed in the "New Deals in [the] Pipeline" agendas casts some doubt on whether the notation related to the Self-Tender as opposed to the buyout proposal. n46

n44 Both Wagner and Uhrig attended these meetings.

n45 For example, Wagner can only "presume" that the reference in the September 13 agenda is to the Self-Tender. Wagner Dep. at 179-80. Uhrig testified that he "d[idn't] think" that the entry on the September 27 MMM agenda referred to the buyout proposal, and stated that it was "probably [a reference to] the Self-Tender. I don't know." Uhrig Dep. at 134-37.

[*26]

n46 Uhrig testified that the word "pipeline" as used in these meeting agendas referred to "transactions that are being worked on that may or may not come." Uhrig Dep. at 137. However, according to Uhrig, TCR was not involved with the Self-Tender. *See* Uhrig Dep. at 118-24; *see also* Wagner Dep. 195-97. Furthermore, by September 13, there was no question that the Self-Tender was not a transaction that "may or may not come," because it had already begun on August 26. Moreover, by the time the September 27 MMM agenda (in which Garden Ridge was still listed as a "New Deal in [the] Pipeline") the Self-Tender had officially been closed for four days.

The defendants respond that Garden Ridge listed as "New Deals in [the] Pipeline" must refer to the Self-Tender and not the proposed buyout because a "code name" is typically used in buyout-type transactions, and because Garden Ridge was subsequently given code name "Daisy" in later MMM agendas. n47 However, previous MMM agendas contradict the idea that any time a public company is engaged in a buyout-type transaction, a code name is issued. [*27] In fact, TCR's MMM agenda lists a non-public potential deal involving a public company that was negotiated just a few months before the Garden Ridge buyout in which no code names were used. n48

> n47 Uhrig stated, "If there was a buy-out, it's a public company and *any time* we do any internal TCR transaction, like the buy-out with a public company, you get a code name. You would never use the company's name." Uhrig Dep. 135-36, emphasis added.

> n48 TCR began negotiating in early April 1999 with Leslie Faye Company, Inc. regarding a possible transaction between Leslie Fay and funds advised by TCR. However, agendas for the MMMs on April 20, 1999 and May 3, 1999 list Leslie Faye as one of TCR's "New Deals in [the] Pipeline" by name, without using any code name. Keener Aff., Ex. B.

The defendants also respond that because the references to Garden Ridge on the September 13 and September 27 MMM agendas do not contain the initials of the TCR managing director responsible for the transaction, it could only refer [*28] to the Self-Tender. This is due to the fact that new "deals" are always assigned a managing director. This may prove to be so. But, as Wagner himself testified, the "agendas changed all the time. Thus, the format of the agendas changed all the time." n49 The fact that initials are missing is not enough for the court to draw a definitive inference that the reference to Garden Ridge in the September 13 and September 27 MMM agendas relates to the Self-Tender and not the proposed buyout.

> n49 Wagner Dep. at 177.

Taking all of this into account, and also considering the close nature of the working relationship between Wagner and Uhrig, the court concludes that it is neces-

sary to conduct a trial on the claims against Wagner in order to resolve the issues of credibility presented.

C. Section 102(b)(7) Does Not Preclude Liability Of Wagner

Finally, Wagner argues that, even if a duty of disclosure violation is found, the finding would not implicate the duty of loyalty, and the claims should be dismissed because Garden [*29] Ridge had an exculpation provision in its corporate charter pursuant to *8 Del. C. § 102(b)(7)*. n50 The court disagrees.

> n50 The pertinent part of *8 Del. C. § 102(b)(7)* reads as follows:
>
>> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title [which provides for liability for unlawful dividend or unlawful stock purchase or redemption]; or (iv) for any transaction from which the director derived an improper personal benefit.
>
> *8 Del. C. § 102(b)(7)* (2001).

The fiduciary [*30] duty of disclosure is not an independent or separate duty apart from the duties of due care and loyalty. n51 Under § 102(b)(7), a claim for damages for breach of fiduciary duty that only represents a breach of the duty of care not involving bad faith is barred. n52 Furthermore, when a party has "averred sufficient evidence to permit the inference that one or more defendants may have knowingly withheld material information from the company's shareholders," then such allegations may be deemed to implicate a "violation of the directors' duty of loyalty ..., and this would not warrant immunity under the exculpatory clause of the company's corporate charter." n53

n51 *Malpiede v. Townson, 780 A.2d 1075, 1086 (Del. 2001).*

n52 *See id. at 1093; see also In re Lukens Inc. Shareholders Litig., 757 A.2d 720, 732-35 (Del. Ch. 1999)*

n53 *In re Reliance Sec. Litig., 91 F. Supp.2d 706, 731-32 (D. Del. 2000).*

If Wagner intentionally failed to disclose, [*31] or was reckless in his failure not to disclose, material information known on or before September 28, 1999 about the buyout proposal to Garden Ridge stockholders, then § 102(b)(7) does not save him as a matter of law. At this stage of the proceeding, there remains a material question of fact as to whether Wagner violated his duty of loyalty to tendering stockholders by engaging in bad faith or intentional misconduct, or committing a knowing violation of the law.

**VI.**

For the foregoing reasons, the motion for summary judgment is granted as to Armand Shapiro and Sam Susser. The motion for summary judgment is denied as to H. Whitney Wagner. **IT IS SO ORDERED.**

Stephen P. Lamb

Vice Chancellor

19

JOLLY ROGER FUND LP, et. al, Plaintiffs, v. SIZELER PROPERTY INVESTORS, INC., et al., Defendants.

### Civil Case No. RDB 05-841

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

### *2005 U.S. Dist. LEXIS 26837*

### November 3, 2005, Decided

**COUNSEL:** [*1] For Jolly Roger Fund LP, Plaintiff: Glenn Edward Mintzer, Law Offices of Peter G Angelos, Baltimore, MD.

For Jolly Roger Offshore Fund, Ltd., individually and on behalf of all others similarly situated, Plaintiff: H Russell Smouse, Glenn Edward Mintzer, Law Offices of Peter G Angelos, Baltimore, MD.

For Sizeler Property Investors, Inc., J. Terell Brown, William G. Byrnes, Harold B. Judell, Sidney W. Lassen, Thomas A. Masilla, James W. McFarland, Richard L. Pearlstone, James Robert Peltier, Theodore H. Strauss, Defendants: Mark D Gately, Mark Spencer Saudek, Hogan and Hartson LLP, Baltimore, MD.

**JUDGES:** Richard D. Bennett, United States District Judge.

**OPINIONBY:** Richard D. Bennett

**OPINION:**

MEMORANDUM OPINION

Pending before the Court is the Motion to Dismiss filed by Defendants Sizeler Property Investors ("Sizeler") and its nine directors n1 ("Directors") (collectively the "Defendants"). Defendants move to dismiss the Complaint filed, on March 28, 2005, by Plaintiffs Jolly Roger Fund LP and Jolly Roger Offshore Fund, Ltd., on behalf of a proposed class of all Sizeler common stockholders, (collectively the "Plaintiffs") based on *Rule 12(b)(6) of the Federal Rules of Civil Procedure.* [*2]

> n1 These Directors are: J. Terrell Brown; William G. Byrnes; Harold B. Judell; Sidney W. Lassen; Thomas A. Masilla Jr.; James W. McFarland; Richard L. Pearlstone; James Robert

Peltier; and Theodore Strauss. (Compl. PP 10-18.)

Sizeler is a self-managed real estate investment trust ("REIT") incorporated in Maryland with its principal place of business in Kenner, Louisiana. (Compl. P 9.) Sizeler, which is publically traded on the New York Stock Exchange ("NYSE") under the symbol "SIZ", owns and manages income-producing apartment and shopping center properties in the southeastern United States. (Compl. P 9.) Plaintiffs were holders of Sizeler common stock as of the close of trading on March 14, 2005. n2 (Compl. P 8.) It is unclear whether Plaintiffs were Sizeler shareholders at the time this lawsuit was filed.

> n2 Although Plaintiffs do not specifically allege in which state they reside, they allege that this dispute is between citizens of different states and that the amount in controversy exceeds $ 75,000. (Compl. P 5.)

[*3]

Plaintiffs allege, in a one count Complaint, a direct suit against Sizeler and its Directors for breach of their fiduciary duties "to Sizeler's outside common shareholders." (Compl. P 1.) Specifically, Plaintiffs allege that their stock holdings were diluted when Defendants sold 2.69 million newly issued Sizeler shares to four institutional investors n3 at a discounted price. Defendants assert that this claim must be dismissed, as it cannot be a direct action n4 by the shareholders against the Directors, but instead must be a derivative action n5 brought by the shareholders on Sizeler's behalf. Defendants, however, contend that Plaintiffs have failed to satisfy the legal prerequisites necessary to pursue a derivative action and, therefore, any derivative claim must also be dismissed.

n3 The institutional investors included TIAA-CREF Investment Management, LLC, Heitman Real Estate Securities, Inc., RREEF America, L.L.C., and Palisade Capital management LLC.

n4 "A direct' action is a claim asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an injury personal to the shareholder." *Paskowitz v. Wohlstadter, 151 Md. App. 1, 9, 822 A.2d 1272, 1276 (2003)* (applying Delaware law).

[*4]

n5 "A derivative' action is a claim asserted by a shareholder plaintiff on behalf of the corporation to redress a wrong against the corporation." *See id.*

The issues have been fully briefed and no hearing is necessary on this motion. *See* Local Rule 105.6 (D. Md. 2004). For the reasons stated below, the Defendants' Motion to Dismiss is GRANTED.

## BACKGROUND

For the purposes of this *Rule 12(b)(6)* motion, the Court accepts all well-pleaded allegations contained in Plaintiffs' Complaint as true and construes them in the light most favorable to the Plaintiffs. *See Ibarra v. United States, 120 F.3d 472, 473 (4th Cir. 1997).* Plaintiffs allege that Sizeler's Board of Directors implemented a plan to entrench themselves in anticipation of a proxy contest after First Union Real Estate Equity & Mortgage Investments ("First Union") n6 began to solicit proxies. (Compl. P 3.) First Union is the single largest stockholder of Sizeler, having acquired a substantial amount of its shares starting in the Fall of 2004 as detailed below. (Compl. P 26.) On September 8, 2004, First Union [*5] filed with the United States Securities and Exchange Commission ("SEC"), on Form 13D, a general statement of acquisition of beneficial ownership as notification that it had become a beneficial owner of 5.07% of Sizeler stock. (Compl. P 27.) On November 16, 2004, and December 6, 2004, First Union amended its 13D filing to disclose that it has increased its ownership interest to 7.7% and 8.46%, respectively. (Compl. PP 28 & 29.) On or about December 21, 2004, First Union notified Sizeler of its intention to nominate Michael L. Ashner and Peter Braveman, both directors and trustees of First Union, as well as Steven Zalkind to Sizeler's Board of Directors. (Compl. P 30.) First Union continued to acquire additional shares of Sizeler and filed a series of amended Form 13D disclosures with the SEC. (Compl. PP 31 & 32.) In its February 23, 2005 SEC filing, First

Union disclosed that it had sent a letter to Sizeler shareholders proposing a slate of directors, and indicating that if its slate was elected, it intended to have Mr. Lassen removed as Chairman and Chief Executive Officer ("CEO") of Sizeler. (Compl. P 33.) First Union's last amended Form 13D filing was made on March 9, 2005 and it [*6] disclosed that First Union had a 9.9% ownership interest in Sizeler. (Compl. P 34.)

n6 In a related suit, on March 15, 2005, Sizeler and its Directors filed a Complaint in this Court against its largest shareholder, First Union. *See Sizeler Property Investors, Inc., et. al v. First Union Real Estate Equity & Mortgage Investments*, RDB 05-718. In its Complaint, Sizeler asked for a declaratory judgment that, pursuant to Maryland law, Sizeler's Directors did not breach their fiduciary duties with respect to the placement of additional Sizeler shares, which was allegedly part of a longstanding corporate plan. This action, which also alleged a violation of the federal securities laws and contained a counterclaim, was resolved by the parties and an Order approving a stipulation of dismissal with prejudice was entered by this Court on September 13, 2005.

As indicated above, *supra* at n.1, Sizeler has nine directors. All but two of Sizeler's directors are outside directors, meaning that they are not Sizeler executives [*7] or employees. In addition to acting as directors, Mr. Lassen is Sizeler's CEO and Mr. Masilla is Sizeler's President and Chief Operating Officer. (Compl. PP 13 & 14.) On March 14, 2005, after the NYSE closed at 4:00 p.m. and without prior disclosure to the public, n7 Defendants entered into a transaction to sell 2.649 million shares of newly issued Sizeler common stock to four large institutional investors at $ 10.75 per share. (Compl. P 36.) Sizeler's stock closed at $ 12.10 that day, but the sale price used for the transaction with the institutional investors was discounted by $ 1.35 a share. (Compl. P 36.) Plaintiffs' Complaint does not specify which Directors voted in favor of this transaction. On March 15, 2005, Sizeler issued a press release announcing the sale and, on March 17, 2005, it filed an amended 10-K disclosing the transaction. (Compl. P 37.) On the day Sizeler announced the stock sale, First Union sent a letter to Sizeler offering to purchase all of the offered shares for $ 11.25 per share. (Compl. P 38.)

n7 A 10-K filed by Sizeler earlier the same day did not mention a new stock offering. (Compl. P 35.)

2005 U.S. Dist. LEXIS 26837, *

[*8]

Plaintiffs allege that the Directors violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. n8 by violating their duty of good faith. (Compl. P 49.) Furthermore, Plaintiffs allege that the Directors acted in their own self-interest because the stock sale was an effort to entrench themselves as Directors in response to First Union's proxy battle. (Compl. P 50.) Plaintiffs allege that "Defendants' violations of law set forth herein adversely affected Plaintiffs and the Class' ownership interest in Sizeler by diluting the respective proportions of equity." (Compl. P 54.) The Complaint does not allege that Plaintiffs had a controlling interest in Sizeler that was negatively impacted by the dilution caused by the stock sale. Nor does the Complaint specifically state whether the alleged injury caused by the "dilution" was to the Class' voting rights or to the value of its Sizeler shares, or an injury for both.

n8 *Section 2-405.1(a)* of Md. Corp. & Ass'ns Code Ann. states:

A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

[*9]

STANDARD OF REVIEW

Defendants seek to dismiss Plaintiffs' Complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure.* As the legal sufficiency of the complaint is challenged under a *Rule 12(b)(6)* motion, the court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000)* (citing *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)).* A *Rule 12(b)(6)* motion to dismiss "should only be granted if,

after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Migdal v. Rowe Price-Fleming Int'l Inc., 248 F.3d 321, 325 (4th Cir. 2001).* Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure* [*10] requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal, 248 F.3d at 325-26; see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (stating that a complaint need only satisfy the "simplified pleading standard" of *Rule 8(a)*).

In reviewing the complaint, the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra, 120 F.3d at 473; Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).* The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell, 412 F.2d 712, 715 (4th Cir. 1969).* However, in considering a motion to dismiss, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments" nor "the legal conclusions drawn from the facts." *Eastern Shore Mkts., Inc., 213 F.3d at 180; see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp., 329 F. Supp. 2d 574, 578 (D. Md. 2004).*

DISCUSSION [*11]

This Court has diversity jurisdiction over this matter pursuant to *28 U.S.C. § 1332.* As the source of this Court's jurisdiction over this case is based on diversity, the principles set forth in *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)* require application of the law of Maryland to questions of substantive law. n9 With respect to corporate governance issues, Maryland courts often look to Delaware case law. n10 Accordingly, this Court's analysis must be guided by Maryland law, but will make reference to Delaware law in the absence of applicable Maryland law.

N9 Sizeler is a Maryland corporation and the parties both apply Maryland law in their submissions to this Court.

n10 Delaware courts are frequently recognized for their expertise on corporate law issues. *See generally Werbowsky, 362 Md. at 618, 766 A.2d at 143* (noting respect properly accorded Delaware decisions on corporate law); Lisa M.

Fairfax, *Spare the Rod, Spoil the Director? Revitalizing Director's Fiduciary Duty Through Legal Liability*, 42 Hous. L. Rev. 393, 405 n.63 (2005); E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004, A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1403 (2005); Patty M. DeGaetano, Comment, *The Shareholder Direct Access Teeter-Totter: Will Increased Shareholder Voice in the Director Nomination Process Protect Investors?*, 41 Cal. W. L. Rev. 361, 376 (2005) ("Delaware is well known as the most important state for purposes of corporate law because not only are a majority of public companies incorporated there, other states look to Delaware corporate law for guidance.").

[*12]

"The decision whether a suit is direct or derivative may be outcome-determinative." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) (noting that the distinction between a direct suit and a derivative one is sometimes difficult, but has many legal consequences). For example, if a suit is derivative the shareholder must make demand on the company's board of directors, absent a showing of demand futility, requesting that the board pursue the suit on behalf of the company, before the shareholder is permitted to pursue the cause of action. *See id.* (discussing Delaware law); *Werbowsky v. Collomb*, 362 Md. 581, 766 A.2d 123 (Md. 2001) (recognizing demand requirement under Maryland law); *Fed. R. Civ. Pro. 23.1*. Even when a stockholder can properly pursue a derivative action on behalf of a corporation, any damages recovered must go to the corporation and not the stockholder plaintiff. This result is because a derivative action is brought by the shareholder *on behalf of the corporation* to redress a wrong against the corporation. *See Paskowitz v. Wohlstadter*, 151 Md. App. 1, 10, 822 A.2d 1272, 1276 (Md. Ct. Spec. App. 2003) [*13] (applying Delaware law). "The defendant in a derivative action may be a corporate fiduciary, such as a director, who committed a wrong against the corporation." *Id.* In contrast, a "'direct action' is a claim asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an injury personal to the shareholder." *Id.* Damages recovered in a direct action are payable individually to the shareholder, not to the corporation, because the claimed injury is to the shareholder, and therefore the remedy must address this individual injury. *See id.*

A. Whether Plaintiffs' Complaint is Properly a Direct Suit

The Plaintiffs assert that this action is brought directly by shareholders against Sizeler and its Directors for breach of fiduciary duty. Defendants assert that the allegations in Plaintiffs' Complaint cannot be brought as a direct claim. "Whether a claim is derivative or direct is not a function of the label the plaintiff gives it." *Paskowitz*, 151 Md. App. at 10, 822 A.2d at 1277. A court must generally look to the nature of the action, as it is stated in the complaint, to determine whether a cause of action is derivative [*14] or direct. *See id.* (internal citations omitted); *see also Tooley*, 845 A.2d at 1039. Unlike the neighboring Supreme Court of Delaware, which recently established a new test to examine this issue, the Maryland Court of Appeals has not recently had the opportunity to clearly articulate what test should be applied to determine whether a shareholder claim is direct or derivative. *But see Waller v. Waller*, 187 Md. 185, 49 A.2d 449 (Md. 1946) (discussed in detail below).

In *Tooley*, the Supreme Court of Delaware held that to determine whether a stockholder's claim is derivative or direct the "issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley*, 845 A.2d at 1033. To bring a direct suit, "the stockholder's claimed direct injury must be independent of any alleged injury to the corporation." *Id. at 1039*; *see also Tafflin v. Levitt*, 92 Md. App. 375, 381, 608 A.2d 817, 820 (Md. Ct. Spec. App. 1992) [*15] (finding that individual action by depositor was not permissible where the injury was incidental and not distinct from injury to institution). To show such an injury, "the stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Id.* The framework outlined in *Tooley* is instructive on the issues presented to this Court.

1. Maryland Fiduciary Duty Obligations

The parties take opposite views on what both characterize as "well-settled" Maryland law outlining the fiduciary duties owed by directors of a corporation and the resulting causes of actions that can stem from a possible breach of these duties. Plaintiffs state that, under Maryland law, a director owes fiduciary duties, not only to the corporation, but also to the corporation's shareholders. As a result, Plaintiffs argue, that breaches of these fiduciary duties may result in a direct action by the corporation's shareholders. Defendants assert that, pursuant to Maryland law, a stockholder may only pursue a derivative cause of action on behalf of the corporation for breach of fiduciary duty.

As noted above, Plaintiffs [*16] allege that Defendants violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. Recently, the Maryland Court of Appeals conducted a detailed discussion of derivative shareholder actions in *Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123 (Md. 2001)*. In doing so, the court explained that § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann., the very provision that Plaintiffs in this case claim was violated, acts as a check to the directors' managerial authority by requiring them to perform their duties in good faith. *Werbowsky, 362 Md. at 598-99, 766 A.2d at 133*. The court specifically stated that the directors' obligations under this provision "run, however, to the corporation and *not, at least directly, to the shareholders.*" *Id.* (emphasis added).

In *Waller*, the Maryland Court of Appeals stated: "It is generally stated that directors occupy a fiduciary relation to the corporation and all its stockholders, but they are not trustees for the individual stockholders." *Waller, 187 Md. at 194, 49 A.2d at 454*. n11 The Court further noted that "the reason for this distinction is that in law the corporation has a separate existence as a [*17] distinct person, in which all the corporate property is vested and to which the directors are responsible for a strict and faithful discharge of their duty, *but there is no legal privity or immediate connection between the directors and the individual stockholders.*" *Id.* (emphasis added). The court went onto hold that "where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity." *Waller, 187 Md. at 190, 49 A.2d at 452*.

n11 The Maryland Court of Appeals made a similar statement in *Toner v. Baltimore Envelope Co., 304 Md. 256, 498 A.2d 642 (Md. 1985)*, which dealt with a dispute involving a closely held corporation, not a publicly, exchange-traded one like Sizeler. *Toner, 304 Md. at 268, 498 A.2d at 648*. Furthermore, *Toner* focused on the relationship between majority and minority shareholders, not directors and shareholders. *Toner, 304 Md. at 273, 498 A.2d at 650*.

[*18]

In *Waller* the plaintiff claimed that several officers and directors were conspiring to obtain control of the company and destroy the value of his stock. In that case, the Court of Appeals held that "an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder though the injury may incidentally result in *diminishing or destroying the value of the stock.*" *Waller, 187 Md. at 189, 49 A.2d at 452* (emphasis added). This holding in *Waller* is "applicable even when the wrongful acts were done maliciously with intent to injure a particular stockholder." *Danielewicz v. Arnold, 137 Md. App. 601, 617, 769 A.2d 274, 283 (2001)*. n12

n12 *Waller* does recognize that certain types of actions may be brought by a shareholder directly. "Unquestionably, a stockholder may bring suit in his own name to recover damages from an officer of a corporation for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation." *Waller, 187 Md. at 192, 49 A.2d at 453*. For example, a suit alleging corporate malfeasance that directly results in the impairment of a common stockholder's right to vote is likely a direct suit. *See e.g., Lipton v. News Intl., 514 A.2d 1075, 1079 (Del. 1986), overruled on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031 (Del. 2004)* (explaining that the right to vote is a contractual right possessed by a shareholder); *Lapidus v. Hecht, 232 F.3d 679, 683 (9th Cir. 2000)*.

[*19]

Plaintiffs cite a decision issued by the United States Court of Appeals for the Second Circuit, *Strougo v. Bassini, 282 F.3d 162 (2d Cir. 2002)*, which found that Maryland law recognizes fiduciary duties owed by directors, not only to the corporation, but also directly to shareholders. *Id. at 173* (citing *Toner v. Baltimore Envelope Co., 304 Md. 256, 268-69, 498 A.2d 642, 648 (Md. 1985)*; *Waller, 187 Md. at 194, 49 A.2d at 454*). In reaching this conclusion, however, *Strougo* did not discuss the 2001 Maryland Court of Appeal's decision in *Werbowsky. See Werbowsky, 362 Md. at 598-99, 766 A.2d at 133*. Instead the Second Circuit relied exclusively on *Waller* and *Toner. See Strougo, 282 F.3d at 173*.

2. The Claims in Jolly Roger's Complaint

Based on the facts presented by this case, however, this Court need not determine whether Maryland law recognizes a fiduciary duty owed by a corporation's directors directly to shareholders, nor whether shareholders are prohibited from pursuing derivative claims based on breaches of fiduciary duty. Both parties accept that directors owe fiduciary [*20] duties to the corporation. *See generally Werbowsky, 362 Md. at 598-99, 766 A.2d at*

*133* (noting that under § *2-405.1(a)* of Md. Corp. & Ass'ns Code Ann. a director's obligations "run, however, to the corporation and not, at least directly, to the shareholders."). Although it is difficult to discern precisely what injury Jolly Roger claims in its Complaint, what is clear is that there was an alleged injury suffered by Sizeler, the corporation, as a result of the stock issuance on March 14, 2005. The Complaint contends that the Sizeler Directors wrongfully sold the newly issued shares for a discounted price in the private sale to the four institutional investors to entrench themselves as Directors and, in some cases, officers of the company. If true, the resulting injury would clearly be one to the corporation, as it would have received inadequate consideration for its shares because of the Directors' allegedly disingenuous motive of entrenchment.

The Complaint also characterizes the Plaintiffs' injury as one of dilution. The Complaint, however, does not specify whether the dilution claim relates to dilution of voting power or dilution of share value. Assuming for [*21] a moment that a reasonable inference from the Plaintiffs' Complaint is that it contains a claim for dilution of voting power and share/asset value, the Maryland Court of Special Appeals rejected the suggestion that a similar contention could support a direct suit in *Danielewicz. Danielewicz, 137 Md. App. at 616, 769 A.2d at 283*. In *Danielewicz* the plaintiff argued that she had a cause of action as an individual because the alleged wrongful conduct resulted in "the dilution of her majority interest" in the company. *Id.* The court rejected this position. Under *Waller* any dilution in the price or value of the stockholders' shares is not an actionable direct injury. *See Waller, 187 Md. at 189, 49 A.2d at 452* (explaining that an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action).

Pre-*Tooley*, Delaware courts determined that dilution claims were individual in nature only where a significant stockholder's interest was increased at the sole expense of the minority. *See In re Paxson Commun. Corp. S'holders Litig., 2001 Del. Ch. LEXIS 95, 2001 WL 812028,* [*22] *\*5 (Del. Ch. 2001)*. This holding was recognized *post-Tooley*, in *In re J.P. Morgan Chase & Co. S'holder Litig., 2005 Del. Ch. LEXIS 51, 2005 WL 1076069 (Del. Ch. April 29, 2005)*, which stated "to the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares . . . results from the issuance of new equity to a third party . . ., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed." *2005 Del. Ch. LEXIS 51, [WL] at \*6* (quoting *In re Paxson Communication Corp. Shareholders Litigation, 2001 Del. Ch. LEXIS 95, 2001 WL 812028 at \*5*) (rejecting that dilution claim was direct).

Certainly not every issuance of stock by a corporation can constitute a direct claim for dilution by the corporation's stockholders. Here, the Plaintiffs' dilution claim is dependent on the alleged fiduciary duty breach to Sizeler, which claims that the Directors, to entrench themselves, accepted inadequate consideration for the shares sold to the institutional investors. Therefore, in this case, any dilution claim is incidental to the alleged fiduciary duty breach to the corporation. *See Waller, 187 Md. at 189, 49 A.2d at 452* (explaining that an action [*23] that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action); *Tooley, 845 A.2d at 1039* (holding that to bring a direct suit "the stockholder's claimed direct injury must be independent of *any alleged injury to the corporation"* and to show such an injury, "the stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation*.") (emphasis added). As a result, Defendants' Motion to Dismiss is granted to the extent that any purported direct cause of action asserted by the Plaintiffs must be dismissed with prejudice.

**B. Whether Plaintiffs May Assert a Derivative Claim**

Although not addressed by either party, nowhere in Plaintiffs' Complaint does it state that Jolly Roger was a shareholder at the time the instant suit was filed. A plaintiff that ceases to be a shareholder loses standing to continue a derivative suit. *See Lewis v. Anderson, 477 A.2d 1040, 1047 (Del. 1984); Lewis v. Ward, 852 A.2d 896 (Del. 2004)*. n13 Even though it would appear from [*24] the face of the Complaint that Plaintiff Jolly Roger cannot bring a derivative suit because it failed to state that it was a shareholder at the time the suit was filed, this Court will consider whether Plaintiffs meet the prerequisites necessary to bring a derivative suit.

> n13 *Snyder v. Pleasant Valley Finishing Co., Inc., 756 F. Supp. 725, 730 (S.D.N.Y. 1990)* (citing *Tenney v. Rosenthal, 6 N.Y.2d 204, 160 N.E.2d 463, 189 N.Y.S.2d 158, 163 (1959))* ("A corporation's dissolution or liquidation, without more, will not defeat a shareholder's right to prosecute an action on the corporation's behalf. . . . Where a plaintiff, however, voluntarily disposes of her shares, her rights as a shareholder cease, and her interest in the derivative action is terminated."); *Schilling v. Belcher, 582 F.2d 995, 996 (5th Cir. 1978)* (applying federal and Florida law) ("A shareholder who sells his stock pending appeal of a favorable judgment in a shareholder's derivative suit against the corporation, loses standing to further prosecute or defend the case"

unless its judgment is personally in his favor.); *Heckmann v. Ahmanson, 168 Cal. App. 3d 119, 130, 214 Cal. Rptr. 177 (1985)* ("Once a derivative plaintiff sells its stock, it no longer has standing to prosecute the derivative claims on behalf of the remaining shareholders.").

[*25]

Both Maryland law and *Rule 23.1 of the Federal Rules of Civil Procedure* require that a stockholder make demand on a corporation before bringing suit. Since the cause of action belongs to the corporation in a derivative suit, "a shareholder must first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed." *Werbowsky, 362 Md. at 600, 766 A.2d at 133.* *Rule 23.1* requires that a complaint in a derivative action "shall also allege *with particularity the efforts,* if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and *the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. Pro. 23.1* (emphasis added). Plaintiffs' Complaint does not meet these requirements, likely because Plaintiffs sought to bring a direct action.

In addition to requesting leave to re-plead its cause of action as derivative, Plaintiffs argue that demand on the [*26] corporation would have been futile. The Maryland Court of Appeals has specifically addressed the issue of demand futility in its recent opinion *Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123 (Md. 2001).* For demand to be futile, the allegations or evidence must clearly demonstrate, "in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *See Werbowsky, 362 Md. at 620, 766 A.2d at 144.* This futility exception is very limited. *See id.*

Plaintiffs contend that demand is excused under the second exception because the Directors were personally conflicted, as they want to keep their positions as directors and officers of the corporation. Plaintiffs' Complaint does not even specify which Directors voted for the challenged transaction -- the stock issuance to the four institutional investors. In addition, all but two [*27] of the Directors are outside directors. The Maryland Court of Appeals specifically noted that demand will not be excused "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action." *Werbowsky, 362 Md. at 618, 766 A.2d at 143-44.* Applying this standard, the allegations in Plaintiffs' Complaint are insufficient to excuse demand. Therefore, Defendants' Motion to Dismiss is granted and any derivative claims alleged by Plaintiffs must be dismissed without prejudice.

CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. A

Date: November 3, 2005

Richard D. Bennett

United States District Judge

20

IN RE LNR PROPERTY CORP. SHAREHOLDERS LITIGATION

Consolidated C.A. No. 674-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 171*

**October 11, 2005, Submitted**
**November 4, 2005, Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** As Revised December 14, 2005.

**COUNSEL:** Norman M. Monhait, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Pamela S. Tikellis, Esquire, CHIMICLES & TIKELLIS LLP, Wilmington, Delaware; Merrill G. Davidoff, Esquire, Glen L. Abramson, Esquire, Michael C. Dell' Angelo, Esquire, BERGER & MONTAGUE, P.C., Philadelphia, Pennsylvania; Jeffrey G. Smith, Esquire, Demet Basar, Esquire, Gustavo Bruckner, Esquire, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, New York; Richard Brualdi, Esquire, Sue Lee, Esquire, THE BRUALDI LAW FIRM, New York, New York; Attorneys for the Plaintiffs.

Kenneth J. Nachbar, Esquire, MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware; Marty Steinberg, Esquire, Jeffrey W. Gutchess, Esquire, HUNTON & WILLIAMS LLP, Miami, Florida; Michael D. Goldman, Esquire, Stephen C. Norman, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Howard G. Kristol, Esquire, Matt Neiderman, Esquire, DUANE MORRIS LLP, Wilmington, Delaware; James B. Weidner, Esquire, CLIFFORD CHANCE US LLP, New York, New York; John R. Roellke, Esquire, Jeffrey [*2] H. Drichta, Esquire, CLIFFORD CHANCE US LLP, Washington, D.C.; Attorneys for the Defendants.

**JUDGES:** LAMB, Vice Chancellor.

**OPINIONBY:** LAMB

**OPINION:**

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.

I. n1

n1 The facts recited in this opinion are taken from the well pleaded allegations of the complaint, unless otherwise noted, and are presumed to be true for the purpose of this motion. The court notes that the complaint selectively adopts facts from the company's proxy statement while leaving out many others that may prove to be determinative on a motion for summary judgment. For example, the court notes suggestions in the complaint that the challenged transaction arose in the context of a broader process undertaken by the defendant directors to seek a buyer for the company. Yet, the complaint portrays the challenged transaction as occurring in isolation. Of course, the facts relating to such broader sale process could well color the court's understanding of the issues raised by the complaint.

This is a purported class action against a Delaware corporation, [*3] its former directors, and its former controlling shareholder, alleging breach of fiduciary duty in connection with a cash-out merger pursuant to which the controlling stockholder and other members of management exercised the right to purchase a 25% equity stake in the surviving entity. Specifically, the complaint alleges that the directors breached their fiduciary duties when they allowed the purportedly conflicted controlling shareholder to negotiate (and later vote to authorize) the merger on terms that were inadequate and unfair to the public stockholders.

All defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The principal issue raised by the individual defendants' motion is whether the standard of the court's review in examining the complaint is the deferential standard of the business judgment rule or the more intrusive standard of entire fairness. Because the complaint (although strikingly bare-boned in character) adequately alleges facts that, if true, could support a reasonable inference that the controlling stockholder had a disabling conflict and, in essence, stood on both sides of the transaction, the court concludes [*4] that the entire fairness standard may apply. Because the court is required, when ruling on a motion made pursuant to Court of Chancery Rule 12(b)(6), to ignore most sources of information other than the complaint, the motion of the individual defendants to dismiss is denied.

A. The Parties

LNR Property Corporation is a Delaware corporation with its corporate headquarters located in Miami Beach, Florida. LNR is a real estate investment, finance, and management company which owns and manages properties. n2 As of May 30, 2004, LNR had 20,024,436 shares of common stock and 9,770,298 shares of Class B common stock outstanding. n3 The common stock had one vote per share while the Class B common stock, convertible share-for-share into common stock, had ten votes per share. LNR had a nine-member board of directors consisting of defendants Stuart A. Miller, Jeffrey P. Krasnoff, Brian L. Bilzen, Steven J. Saiontz, James M. Can, Charles E. Cobb, Jr., Edward Thaddeus Foote, II, Stephen E. Frank, and Connie Mack. The complaint makes factual allegations attacking the independence of only four of the nine LNR directors. The other five (Carr, Cobb, Foote, Frank, and Mack) were presumably [*5] both disinterested and independent with respect to the challenged transaction.

n2 LNR owns and manages shopping centers, office buildings, industrial properties, hotels, apartment complexes, and undeveloped land zoned for commercial use.
n3 Pl.'s Am. and Supp. Class Action Comp. ("Compl.") P 9.

Miller, LNR's controlling shareholder, was the chairman of the LNR board and beneficial owner of approximately 99.64% of LNR's outstanding Class B common stock and 2.71% of the company's common stock. n4 Miller beneficially owned 31% of the LNR

equity and held 77.35% of the company's voting power. Krasnoff was the president and CEO of LNR.

n4 Compl. P 10. Miller and his sister are trustees and beneficiaries of trusts that directly and indirectly owned the limited partnership interests in limited partnerships that owned 99.64% of the Class B common stock. Miller is the sole officer and director of the corporation that owns the general partner interests in those limited partnerships.

[*6]

The plaintiffs, George Caton, Aaron Brody, and Eastside Investors, LLP, are former owners of LNR common stock who were cashed out in the merger.

B. The Sale Of LNR

The complaint alleges that Miller and Krasnoff negotiated to sell LNR to Cerberus Capital Management L.P., a private investment firm, for $ 63.10 per share in cash. n5 As part of that same arrangement, Miller agreed to invest $ 150 million (approximately 25% of his cash proceeds) to acquire a 20.4% interest in the vehicle formed by Cerberus to effect that transaction. Similarly, Krasnoff and other members of LNR management agreed to invest approximately $ 34 million to acquire a 4.6% stake in that entity.

n5 Compl. PP 1, 49.

According to the complaint, the LNR board, which the plaintiffs allege was dominated and controlled by Miller, formed a Special Committee to evaluate the transaction, n6 but that committee

did not have authority either to engage in independent negotiations with Cerberus or Miller, or to pursue alternative [*7] transactions. Instead, the Special Committee was only permitted to review and approve [or disapprove] the merger on the terms negotiated by Miller and Krasnoff. n7

The Special Committee retained its own counsel but chose Greenhill & Co., which had worked with Miller

and Krasnoff in negotiating the terms of the deal, as its financial advisor. n8

> n6 Compl. P47.
> n7 Compl. P48.
> n8 Compl. P 51.

On August 29, 2004, LNR announced that its board of directors had unanimously agreed, upon the recommendation of the Special Committee, to the proposed $ 63.10 per share cash merger involving LNR, Cerberus, and the acquisition vehicle, Riley Property Holdings LLC. n9 The merger was valued at $ 3.8 billion including equity and debt. n10 The merger agreement contained a no-shop provision, prohibiting the LNR board from soliciting any other bids. n11 In addition, "Miller and partnerships and trusts he and his family control entered into a voting agreement under which he agreed to vote their shares [*8] in favor of the merger as long as the LNR board or Special Committee continued to recommend the transaction." n12 On January 31, 2005, the stockholders (with Miller casting 77% of the voting power in favor) approved the transaction, which was consummated on February 3, 2005. n13

> n9 Compl. P23.
> n10 Compl. P30.
> n11 Compl. P23. "The Merger Agreement prohibited LNR from soliciting any other bids, and permitted LNR to consider only unsolicited bids."
> n12 Compl. P2.
> n13 Compl. P52.

As a result of the merger, Miller sold his 31% interest in the company for $ 586 million and then reinvested $ 150 million to purchase a 20.4% interest in Riley Property. n14 According to the complaint, "in effect, therefore, Miller sold 10.6% of his stock for a significant sum yet still retained the ability to participate in the Company's future profits and growth." n15 Miller also received $ 6.4 million for his options, a $ 4 million change in control premium payment, and $ 2.5 million in tax [*9] reimbursement payments. Family trusts affiliated with Miller received an additional $ 42.1 million in cash. In sum, the complaint alleges, Miller and entities affiliated with him received $ 491 million in cash and a 20.4% stake in Riley Property. n16

> n14 Compl. PP 1, 24.
> n15 Id.
> n16 Compl. PP25-26.

In addition to their 4.6% equity stake in Riley Property, Krasnoff and other members of management allegedly received significant increases in their salaries and five-year employment contracts with Riley Property. n17 The complaint further alleges that, under the terms of the agreement, Krasnoff was to become CEO of Riley Property and receive a 150% increase in salary, from $ 500,000 to $ 1.25 million per year. n18

> n17 Compl. PP 27-28. According to the complaint, Krasnoff and the management investors also received payments for options, significant control payments, and tax reimbursement payments. The complaint alleges that these individuals did not previously have employment contracts with LNR.

[*10]

> n18 Compl. P50.

## C. The Complaint

Within days of the announcement of the proposed transaction, three lawsuits were filed and were later consolidated. The defendants all answered, and the parties engaged in document and interrogatory discovery. The plaintiffs filed an amended and supplemental complaint in June 2005. That complaint makes bare-boned allegations about the negotiation of the transaction already described herein. It then contains extensive factual allegations intended to show the inadequacy or unfairness of the $ 63.10 price. n19 In fairly conclusory allegations, the complaint claims that Miller and LNR's other managers who invested in Riley Property acted in bad faith in pursuing a self-dealing transaction that "benefitted themselves at the expense of LNR's shareholders." n20 Using the obviously baseless assumption that Riley Property's equity value was equal to the value ascribed to LNR in the transaction, the complaint erroneously alleges that "Miller received for his LNR shares almost two-and-a-half times what the unaffiliated stockholders received for their shares. [*11] " n21

n19 Compl. PP 3142. The complaint alleges, among other things, that during the merger negotiations, LNR announced record earnings for its second quarter of 2004. "LNR's earnings per share were up 87% to $ 1.57, an all time high." In addition, the complaint alleges that the sale of a comparable company received a 33% market premium for its shares, which is greater than the 6.8% market premium received by LNR shareholders. Lastly, the plaintiffs allege that a financial analyst who followed LNR for three years stated publicly, "I don't like the price. I think the company is conservatively worth at least $ 70 a share."

n20 Compl. P44.

n21 Compl. P26.

The complaint goes on to allege that the board of directors breached its fiduciary duties when it allowed "Miller and Krasnoff, parties with obvious and disabling conflicts of interest, to negotiate the Cerberus deal." n22 Similarly, the directors are charged with a breach of fiduciary duty in creating the Special Committee that was powerless [*12] and "did not have the authority either to engage in independent negotiations with Cerberus or Miller, or to pursue alternative transactions." n23

n22 Compl. P49.

n23 Compl. P48.

Allegedly, the Special Committee and the board were dominated and controlled by Miller, resulting in a complete failure to protect the LNR shareholders. n24 Moreover, the plaintiffs allege that the Special Committee failed to get an independent evaluation of the value of the company, but instead relied on Greenhill & Co., which had worked with Miller and Krasnoff to negotiate the deal with Cerberus, and whose "$ 11 million compensation was based entirely on occurrence of a transaction, giving it an incentive to support the merger." n25

n24 Compl. PP47-48.

n25 Compl. P51.

The complaint also attacks the "lock-up" provisions in the merger [*13] agreement that allegedly prevented the LNR board from accepting other third-party competing bids. n26 The plaintiffs allege that (1) Miller entered

into a voting agreement with Cerberus under which he agreed to vote his shares in favor of the merger, n27 and that (2) the merger agreement had a no-shop clause which prevented LNR from soliciting other bids. n28 The complaint does not allege that any other bidders emerged after the merger agreement was approved; nor does it allege that any such bidders were, in fact, discouraged by the lock-ups from entering the competition.

n26 Compl. P46.

n27 Compl. P2.

n28 Compl. P46.

D. Motions To Dismiss

On July 15, 2005, the defendants filed their opening brief in support of their motion to dismiss the amended and supplemental complaint in its entirety, arguing that the decision of the Special Committee and the LNR board to authorize the merger is protected by the business judgment rule. In large measure, the motion to dismiss is premised [*14] on the argument that Miller (and, less importantly, Krasnoff) had no disabling conflict of interest in the merger because, they argue, his incentive "was to obtain the highest possible price for his LNR shares, and he received the same $ 63.10 per share as did all LNR shareholders." n29 In this regard, the defendants debunk the fallacious allegation that Miller's LNR shares sold for two and a half times the amount paid for the publicly held shares. Because this allegation is "demonstrably false" the defendants urge the court to conclude that there is no well pleaded basis on which to find that Miller was, in fact, a conflicted controller. n30 This conclusion is supported, they argue, by the fact that a clear majority of the directors were both disinterested and independent of Miller.

n29 Def's Reply Br. at 12.

n30 Id.

In their brief and at argument, the plaintiffs chose not to argue that this case is one in which the entire fairness standard applies *ab initio* as a result of Miller having [*15] stood on both sides of the deal. Rather, they argue that, although "the entire fairness standard does not apply automatically," n31 entire fairness review will ultimately be necessary since the complaint adequately

alleges that the directors breached their fiduciary duties of loyalty and care, thus implicating that harsh standard.

> n31 Pl's Answering Br. in Opp. to Def's Mot. to Dis. at 14.

## II.

The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. A motion to dismiss will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading. n32 That determination is generally limited to the factual allegations contained in the complaint. In considering this motion, the court is required to assume the truthfulness of all well pleaded allegations of fact in the complaint. n33 All facts of the pleadings and inferences that can reasonably be drawn [*16] therefrom are accepted as true. n34 However, with that said, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences. n35

> n32 Kohls v. Kenetech Corp., 791 A.2d 763, 767 (Del. Ch. 2000).
> n33 Grobow v. Perot, 539 A.2d 180, 188 n.6 (Del. 1988).
> n34 Id.
> n35 In re Lukens Inc. S'holders Litig., 757 A.2d 720, 727 (Del. Ch. 1999).

## III.

A well settled precept of Delaware corporate law is that a fiduciary is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. n36 This is founded on the belief that a fiduciary cannot be expected to exercise his or her independent business judgment without being influenced by the personal benefits resulting from the transaction. n37 "The rule that requires an undivided and unselfish loyalty to [*17] the corporation demands that there shall be no conflict between duty and self-interest." n38

> n36 Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993); Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) (Directors are interested if they "appear on both sides of a transaction or expect to derive any personal financial benefit from it in the sense of self-dealing as opposed to a benefit which devolves upon the corporation or all stockholders generally.").
> n37 Id.
> n38 Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939).

Particularly, when a controlling shareholder stands on both sides of a transaction, he or she is required to "demonstrate [his or her] utmost good faith and most scrupulous inherent fairness of the bargain." n39 Accordingly, in an interested cash-out merger transaction where the controlling shareholder is as much a buyer as a seller, "no court could be certain whether the transaction terms fully approximate what truly independent [*18] parties would have achieved in arm's length negotiation." n40 Therefore, the court adheres to a more exacting entire fairness standard of judicial review to protect the minority shareholders, n41 premised on the inapplicability of the business judgment rule "where self-interest may have colored directors' actions." n42

> n39 Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983).
> n40 Kahn v. Lynch Comm. Sys., 638 A.2d 1110, 1116 (Del. 1994); Jedwab v. MGM Grand Hotels, Inc., 509 A.2d 584, 594-95 (Del. Ch. 1986) (holding that the heightened judicial scrutiny called for by the test of intrinsic or entire fairness is applied when a controller has an interest with respect to the transaction that conflicts with the interest of the minority).
> n41 Kahn, 638 A.2d at 1115 ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness."); Weinberger, 457 A.2d at 710 (holding that when directors of a corporation are on both sides of the transaction, they must demonstrate the fairness of the bargain); Kahn v. Tremont Corp., 694 A.2d 422, 428 (Del. 1997) ("Ordinarily, in a challenged transaction involving self-dealing by a controlling shareholder the substantive legal standard is that of entire fairness."); Emerald Partners v. Berlin, 787 A.2d 85, 94 (Del. 2001) ("Hall's stance on both sides as a corporate fiduciary, alone, is sufficient to require the demon-

stration of entire fairness."); *Sterling v. May-flower Hotel Corp., 33 Del. Ch. 293, 93 A.2d 107, 109-110 (Del. 1952)* (holding that since the majority stockholder stood on both sides of the transaction, the directors bear the burden of establishing entire fairness); *Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1279 n.27 (Del. 1989) citing AC Acquisitions v. Anderson, Clayton & Co., 519 A.2d 103, 111 (Del. 1986)* ("where a self-interested corporate fiduciary has set the terms of a transaction and caused its effectuation, it will be required to establish the entire fairness of the transaction to a reviewing court's satisfaction.").

[*19]

n42 *Thorpe v. CERBCO, 676 A.2d 436, 443 n.9 (Del. 1996)*.

The complaint can be read to allege that the board improperly allowed Miller, owning 77% of the voting power of the company and acting as a buyer and seller in the transaction, to control the negotiations with Cerberus, as well as the outcome of the vote, resulting in an unfair and inadequate price for the stock in the cash-out. According to the complaint,

> Miller personally negotiated a one-sided deal that allowed him and select members of management to continue to reap the benefits of LNR's future growth while cutting out plaintiff and the class. Miller exchanged his 31% interest in LNR shares for a 20.4% interest in the new company, thus enabling Miller to participate in the significant growth prospects of the Company going forward while selling only a fraction of his LNR shares and forcing out the public stockholders. n43

Despite Miller's conflicts of interest, the complaint alleges, the board permitted Miller and Krasnoff to negotiate the terms of the merger. n44 Additionally, the complaint alleges [*20] that the board formed a "sham" Special Committee which "did not have the authority to engage in independent negotiations with Cerebrus or Miller, or to pursue alternative transactions." n45 The Special Committee was "only permitted to review and approve the merger as negotiated by Miller and Krasnoff." n46 Allegedly, Miller dominated and controlled the board and the Special Committee and coerced

them into approving the deal even though the sale price was well below LNR's fair value. n47

> n43 Compl. P3.
> n44 Compl. PP4, 49.
> n45 Compl. P48.
> n46 *Id.*
> n47 Compl. PP31-42.

The defendants dispute in their briefs that this is a circumstance where a controlling shareholder stood on both sides of the transaction. They contend that Miller was not predominantly a buyer in the transaction, but rather a "net seller" of LNR shares, such that his interests were directly aligned with those of the other shareholders. n48 In effect, the defendants maintain that during the negotiations [*21] with Cerberus, Miller endeavored to secure the highest value reasonably attainable for the stockholders. Moreover, the defendants argue that, while the Special Committee's powers may have been limited, the transaction was approved by a majority of independent and disinterested board members.

> n48 The defendants contend, and the court agrees, that the following allegation is demonstrably false:
>
> > Miller received for his LNR shares almost two-and-a-half times what the unaffiliated stockholders received for their shares. In effect, Miller received proceeds of $ 491 million for selling a 10.6% ownership stake, which thus values the entire company at approximately $ 4.6 billion and each share at approximately $ 155. Compl. P 26.
>
> The fallacy in this allegation lies in its equation of what Miller sold (LNR stock) and what he bought (shares in Riley Property). There is no reason to assume that the capital structure of Riley Property, immediately after the closing of the transaction, looked anything like that of LNR immediately before. Thus, it would be illogical to draw any comparison between the value paid by Miller for 20.4% of Riley Property and the value obtained by him for selling 31% of LNR. The

two are "apples and oranges," and nothing about one can be inferred from the other.

[*22]

The defendants are correct that the complaint does not adequately allege either self-interest or a lack of independence on the part of a majority of the LNR directors. Nevertheless, as already discussed, the business judgment rule does not protect the board's decision to approve a merger (even where a majority of the directors are independent and disinterested) where a controlling shareholder has a conflicting self-interest. n49 Instead, Delaware law imposes an entire fairness burden when the fiduciary charged with protecting the minority in a sale of the company does not have an undivided interest to extract the highest value for the shareholders. n50

> n49 *Weinberger, 457 A.2d at 710*.
> n50 *In re RJR Nabisco, Inc. S'holders Litig., 1989 Del. Ch. LEXIS 9 at \*40 n.12 (Del. Ch. 1989)* (explaining that the entire fairness test is applied when a financially interested party sets the terms of a transaction and compels its effectuation).

There is authority for the proposition [*23] that the mere fact that a controller has or may be acquiring some interest in the buyer does not automatically trigger entire fairness review. For example, in *Orman v. Cullman*, the court found that a controller who sold a portion of his interest to a third party while maintaining a controlling stake in the resulting corporation was sufficiently unconflicted so as to permit business judgment rule review of the transaction, where there was both an active special board committee with full bargaining power that actually negotiated the final terms of the transaction, and the merger agreement contained a majority of the minority vote condition. n51

> n51 *794 A.2d 5, 21-22, n.36 (Del. Ch. 2002); see also In re Budget Rent A Car Corp. S'holders Litig., 1991 Del. Ch. LEXIS 29 at \*10 (Del. Ch. 1991)*.

Here, Miller allegedly negotiated the merger transaction with Cerberus while also agreeing to acquire a substantial (20.4%) stake in the resulting company. Looking at only the bare bones [*24] of the complaint, the court cannot reasonably conclude from the facts alleged that Miller's interests were aligned with those of

the stockholders. Instead, the well pleaded allegations in the complaint, if true, could support a reasonable inference that Miller was sufficiently conflicted at the time he negotiated the sale that he would rationally agree to a lower sale price in order to secure a greater profit from his investment in Riley Property. If this is shown to be the case, the transaction will be subject to entire fairness review. n52

> n52 *Weinberger, 457 A.2d at 711; Kahn, 638 A.2d at 1117; Tremont, 694 A.2d at 430-431*. The test of fairness has two aspects: fair dealing and fair price. The element of fair dealing focuses on the conduct of the corporate fiduciaries in effectuating the transaction. The court looks to how the purchase was initiated, negotiated, structured, and the manner in which director approval was obtained. The price element relates to the economic and financial considerations relied on when valuing the purchase price. While the initial burden of establishing entire fairness rests on the defendant party, an approval of the transaction by an independent and disinterested board or Special Committee, as well as an informed majority of minority vote, shifts the burden of proof on the issue of fairness to the challenging shareholder plaintiffs.

[*25]

Of course, the defendants may be able to show at the summary judgment stage that Miller, as they argue, negotiated this transaction as a seller, not a buyer, and that the board and the Special Committee were entitled to repose confidence in his unconflicted motivation to obtain the maximum price for all LNR stockholders. In that case, the court may well be able to conclude that the measures taken by the board and the Special Committee to protect the interests of the minority were adequate in the circumstances to invoke the business judgment standard of review. Nonetheless, those facts and circumstances do not appear in the well pleaded allegations of the complaint.

### IV.

The defendants contend that the court should dismiss the plaintiffs' claims against the individual directors, arguing that those claims are barred by the exculpatory provisions of Section 102(b)(7). Such a charter provision bars any claim for monetary damages against director defendants based solely on the board's alleged breach of its duty of care, but does not provide protection against claims based on, *inter alia*, acts or omissions not

in good faith and violations of the fiduciary duty of loyalty. n53 [*26] While the independent director defendants may ultimately be able to rely upon the Section 102(b)(7) charter provision, it is premature to dismiss the claims against them on this basis. First, the entire fairness standard of review may be applicable, and, thus, "the inherently interested nature of those transactions [may be] inextricably intertwined with issues of loyalty." n54 Second, the plaintiffs allege that the directors breached the duty of loyalty and acted in bad faith when they approved the merger. While the insubstantial nature of the complaint's allegations challenging the independence of a majority of the directors undermines this claim, the court need not resolve the issue at this time, given the unresolved standard of review. Accordingly, the individual defendants' motion to dismiss on the basis of LNR's exculpatory charter provision must be denied without prejudice.

n53 *Malpiede v. Townson, 780 A.2d 1075, 1095 (Del. 2001).*

n54 *Emerald Partners, 787 A.2d at 93-98.* (explaining that the court should address the Section 102(b)(7) charter provision only after it makes a determination that the challenged transaction was not entirely fair).

[*27]

Lastly, the defendants argue that LNR is not a proper defendant in this case. The complaint does not allege any wrongdoing by LNR but only breaches of fiduciary duties against the individual director defendants. n55 Nor does the complaint seek any reasonable form of relief, such as an injunction or rescission, which requires LNR to be joined as a defendant. Having allowed the merger to close without seeking an injunction, the plaintiffs cannot now seek, and they do not argue to the contrary, to rescind and set aside the merger. n56 Therefore, the claims against LNR are dismissed.

n55 *Arnold v. Society for Sav. Bancorp, 678 A.2d 533, 539 (Del. 1996)* ("Holding the corporation vicariously liable for the directors' breach of a fiduciary duty would be flatly inconsistent with the rationale of vicarious liability since it would shift the cost of the directors' breach from the directors to the corporation and hence to the shareholders, the class harmed by the breach."); *In re Dataproducts Corp. S'holders Litig., 1991 Del. Ch. LEXIS 149 at *19 (Del. Ch. 1991)* ("a corporation qua corporate entity is not a fiduciary of, and thus cannot owe a fiduciary duty to, its shareholders.").

[*28]

n56 *Winston v. Mandor, 710 A.2d 831 (Del. Ch. 1996)* (holding that where the circumstances of a challenged transaction make rescission infeasible, and where the plaintiff is not unfairly prejudiced, a motion to dismiss that remedy may be granted).

**V.**

For the foregoing reasons, LNR's motion to dismiss pursuant to Rule 12(b)(6) is GRANTED and the motion of the individual defendants to dismiss is DENIED. IT IS SO ORDERED.