# 21

RICHARD MARCOUX, on behalf of himself and all others similarly situated, Plaintiff v. BILLY D. PRIM, ANDREW J. FILIPOWSKI, MARK CASTANEDA, DAVID L. WARNOCK, RICHARD A. BRENNER, STEVEN D. DEVICK, ROBERT J. LUNN and JOHN H. MUEHLSTEIN, Defendants

### 04 CVS 920

### NORTH CAROLINA SUPERIOR COURT, FORSYTH COUNTY

### *2004 NCBC 5; 2004 NCBC LEXIS 4*

### April 16, 2004, Decided

COUNSEL: [**1] McDaniel & Anderson, L.L.P. by L. Bruce McDaniel; Milberg Weiss Bershad Hynes & Lerach, L.L.P. by William S. Lerach, Darren J. Robbins, Stephen J. Oddo, A. Rick Atwood, Jr., Randall J. Baron and Shaun L. Grove; and Robbins Umeda & Fink, L.L.P. by Marc M. Umeda and Jeffrey P. Fink for Plaintiff.

Bell, Davis & Pitt, P.A. by William K. Davis and Edward B. Davis for Defendants Billy D. Prim, Andrew J. Filipowski and Mark Castaneda.

Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. by James T. Williams, Jr. and Mack Sperling for Defendants David L. Warnock, Richard A. Brenner, Steven D. Devick, Robert J. Lunn and John H. Muehlstein.

**OPINION:**

### ORDER AND OPINION

[*P1] This case arises out of Plaintiff Richard Marcoux's ("Marcoux") claim that Defendants Billy D. Prim, Andrew J. Filipowski, Mark Castaneda, David L. Warnock, Richard A. Brenner, Steven D. Devick, Robert J. Lunn and John H. Muehlstein (collectively the "Individual Defendants"), in their capacities as members of Blue Rhino Corporation's Board of Directors, violated their fiduciary duties by approving a merger with Ferrellgas Partners, L.P. Plaintiff specifically asserts that defendants violated the fiduciary duties [**2] of loyalty and due care that directors owe to shareholders. The corporation is not a party to this lawsuit. This matter comes before the Court on plaintiff's motion for a preliminary injunction to prevent the shareholders from voting on the Merger as well as defendants' motion to dismiss. The shareholders are scheduled to vote on April 20, 2004.

[*P2] After considering the briefs and oral arguments, the Court denies defendants' motion to dismiss and denies plaintiff's motion for preliminary injunction.

### PROCEDURAL BACKGROUND

[*P3] This matter was designated a complex business case and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated March 25, 2004. A telephonic conference involving counsel for all parties was held on Tuesday evening, March 30, 2004. Although the class action complaint filed February 12, 2004 involved challenges to the proposed merger, and the shareholders' vote on the merger was set for April 20, 2004, at the time of the telephonic conference neither a motion for preliminary injunction nor motion for expedited discovery had been filed, nor had any [**3] deposition been noticed. Defendants' counsel had previously filed a motion to dismiss in conjunction with their answer to the complaint. Plaintiff's counsel moved orally at the telephone conference for expedited discovery, while defendants' counsel opposed any discovery, asserting that the complaint is deficient on its face and discovery a mere fishing expedition.

[*P4] Given the short history of the case and under these importunate time considerations, the Court established the following schedule by order dated April 1, 2004: opening briefs on plaintiff's motion for a preliminary injunction and defendants' motion to dismiss were to be filed by April 9, 2004; opposition briefs to plaintiff's motion for a preliminary injunction and defendants' motion to dismiss were due on April 13, 2004; and, because the presiding judge is concurrently in trial in another county, a hearing on plaintiff's motion for a preliminary injunction and defendants' motion to dismiss was held on April 15, 2004 at 7 p.m. and concluded at 10 p.m. A motion to amend the complaint was filed on April 13, 2004.

[*P5] The Court is placed in a procedural box. Plaintiff filed his complaint three days after [**4] the merger was announced. Marcoux has few, if any, facts upon which to base a claim. Hence his allegations are conclusory in nature. The Delaware courts have repeatedly urged plaintiffs to use the tools available under Delaware law before filing shareholder suits. Plaintiff did not avail himself of that opportunity or wait for the proxy statement to be filed, but rushed to the courthouse in North Carolina. He did not avail himself of the case management benefits of the North Carolina Business Court until March 23, 2004.

[*P6] After having the benefit of the proxy statement and limited discovery, plaintiff has shifted his theory of the case in his motion for preliminary injunction to one of a failure to disclose and has moved to amend the complaint. While the Court is not inclined to condone or encourage the filing of complaints without investigation supporting their basis, the Court is also cognizant of its duty to protect shareholders. Accordingly the Court has addressed both the motion to dismiss and the motion for preliminary injunction. Because plaintiff filed the motion to amend the complaint just days before the hearing, the Court has based its decision on the motion to [**5] dismiss on the original complaint ("Complaint").

## I. FACTUAL BACKGROUND

### A. THE MERGER

[*P7] On February 9, 2004, Blue Rhino Corporation ("Blue Rhino") announced that it had entered into a merger agreement (the "Merger Agreement") with Ferrellgas Partners, L.P. ("Ferrellgas"). Blue Rhino is a Delaware corporation with its principal offices located in Winston-Salem, North Carolina. The company is publicly traded on the NASDAQ, and institutional investors and mutual funds own 41% of Blue Rhino's outstanding common stock. The primary business of Blue Rhino is exchanging propane cylinders and providing propane-related products.

[*P8] Ferrellgas, a Delaware master limited partnership whose common units trade on the New York Stock Exchange, is a Fortune 1000 company as well as one of the nation's largest and fastest growing marketers of retail propane. Ferrell Companies, Inc. ("Ferrell") is a Kansas corporation that owns the general partner of Ferrellgas, as well as approximately 45% of the outstanding common units of Ferrellgas.

[*P9] In addition to Ferrell's ownership interest in Ferrellgas, it also owns FCI Trading Corporation ("FCI") and Diesel Acquisition, LLC ("Diesel"). [**6] FCI Trading is a Delaware corporation and a Ferrell subsidiary established to purchase and sell energy commodities. Diesel is a Delaware limited liability company and a

wholly owned subsidiary of FCI recently formed solely to effect the Merger with Blue Rhino.

[*P10] The Merger Agreement provides for shareholders of Blue Rhino to receive $ 17 in cash for each share of common stock owned, an amount representing a 22% premium over the closing price the day before the Merger announcement. n1 The Merger Agreement also includes a $ 10 million termination fee which is approximately 2.9% of the $ 340 million value of the Merger. It also contains a "fiduciary out" provision. Blue Rhino will hold a shareholders meeting on April 20, 2004, at which time its shareholders may vote to approve or block the Merger with Ferrellgas. If the shareholders approve the transaction, Blue Rhino will merge into Diesel and become a wholly owned subsidiary of FCI and thus part of the Ferrellgas organization.

n1 Since the merger announcement Blue Rhino stock has traded in the range of $ 16.72 to 16.97.

[**7]

### B. THE PLAINTIFF

[*P11] Marcoux owns 100 shares of Blue Rhino, which he purchased about a year ago for $ 10 per share. Plaintiff will make a $ 700 profit on his $ 1,000 investment if the proposed Merger goes through. Marcoux is also the plaintiff in a shareholder derivative action in California in which the Blue Rhino directors are defendants. No other shareholder has joined Marcoux in this suit or filed similar claims.

### C. THE BOARD OF DIRECTORS

[*P12] Plaintiff Marcoux filed this case as a class action, on behalf of the shareholders of Blue Rhino against the Individual Defendants, on February 12, 2004 in Forsyth County. Plaintiff seeks to enjoin the Merger, asserting that each member of Blue Rhino's Board of Directors (the "Board") violated his fiduciary duties of loyalty and due care by pursuing and agreeing to the Merger with Ferrellgas. Plaintiff named the following three persons, who constitute the inside directors on the Board, as defendants:

. Billy D. Prim ("Prim") serves as the chairman of the Board and chief executive officer of Blue Rhino. Prim was the co-founder of Blue Rhino and has served in the above capacities since establishing the company in [**8] March 1994. Prim owns 8.9% of Blue Rhino's common stock. Prim is credited with creating the

business concept which made Blue Rhino successful.

. Andrew J. Filipowski ("Filipowski") is the vice chairman of the Board and was a Blue Rhino co-founder. Filipowski owns 11.5% of Blue Rhino's common stock.

. Mark Castaneda ("Castaneda") is Blue Rhino's chief financial officer and a member of the Board. Castaneda owns 1.2% of Blue Rhino's common stock.

[*P13] Plaintiff also named five other persons, who constitute the outside directors on the Board, as defendants in the Complaint:

. David L. Warnock ("Warnock") is a director of Blue Rhino since 2000. Warnock is the managing partner of the private investment firm Camden Partners, L.P. ("Camden Partners"). Warnock owns 20,007 shares of Blue Rhino, which accounts for less than 1% of the company's common stock. An affiliated entity of Camden Partners, Camden Strategic Partners II, LLC, owns 8.5% of Blue Rhino's common stock.

. Richard A. Brenner ("Brenner") is a director of Blue Rhino since 1998. Brenner is the chief executive officer of Ammar Garage Doors, a manufacturer and distributor of garage doors. Brenner owns [**9] 62,646 shares of Blue Rhino, which account for less than 1% of the company's common stock.

. Steven D. Devick ("Devick") is a director of Blue Rhino since 1994. Devick is the chief executive officer of DDE, Inc., a management services company. Devick owns 41,194 shares of Blue Rhino, which account for less than 1% of the company's common stock.

. Robert J. Lunn ("Lunn") is a director of Blue Rhino since 1999. Lunn is the managing partner of the private investment firm Lunn Partners, LLC. Lunn owns 24,341 shares of Blue Rhino, which account for less than 1% of the company's common stock.

. John H. Muehlstein ("Muehlstein") is a director of Blue Rhino since 1995. Muehlstein is the managing partner of the law firm Pederson & Houpt, P.C. Muehlstein owns 40,546 shares of Blue Rhino, which account for less than 1% of the company's common stock.

[*P14] In connection with the Merger, the parties entered into a voting agreement that provided for several Blue Rhino shareholders to vote in favor of the Merger and in opposition to any measure adverse to the Merger. Prim, Filipowski, Camden Partners and Malcolm R. McQuilkin (the CEO of Blue Rhino Global Sourcing) agreed [**10] to the terms of the voting agreement. The combined common stock of these shareholders represents approximately 26.5% of the outstanding stock of Blue Rhino.

D.   MERGER  NEGOTIATIONS  AND  THE SPECIAL COMMITTEE

[*P15] Blue Rhino employed several precautionary corporate governance and analytical measures before entering into the Merger agreement. First, the Board considered several other merger opportunities before electing to pursue the deal with Ferrellgas. For example, in November 2003 Blue Rhino entered into a confidentiality agreement with a Fortune 500 company (the "Fortune 500 company") to facilitate the exchange of information necessary to evaluate a potential acquisition by this entity. The Fortune 500 company, however, later decided that it could not acquire Blue Rhino and declined to make an offer.

[*P16] The impetus for the search for strategic alternatives was the entry of AmeriGas Partners, L.P. ("AmeriGas") into the market. As a direct competitor to Blue Rhino, AmeriGas had the power to drive down prices and margins in order to grab market share, an accomplishment made easier given the industry customer concentration in big box retailers. In the view of the directors, [**11] AmeriGas posed a threat which warranted the search for a larger partner. Awareness of that threat is a far more plausible reason for the merger than plaintiff's assertion that it was done to eliminate his derivative claim.

[*P17] After the Fortune 500 company declined to make an offer for Blue Rhino because of various business considerations, the Board authorized management to engage Banc of America Securities to find potential acquirers and explore other strategic alternatives. Shortly thereafter, Prim contacted Ferrell to gauge if there was any interest on their part to acquire Blue Rhino. In late December 2003, Blue Rhino and Ferrell executed confidentiality agreements and resolved to commence negotiations in the New Year. The parties commenced nego-

tiations in January 2004, holding several meetings in Winston-Salem. On January 27 Ferrell offered to acquire Blue Rhino for $ 17 per share, which is the same price as the proposed transaction that is the subject of this dispute.

[*P18] Banc of America Securities, at the request of Blue Rhino management, continued, however, to evaluate other potential acquirers. On January 21 investment bankers from Banc of America Securities [**12] met with representatives of a foreign multinational corporation (the "foreign company") to determine if that organization had any interest in acquiring Blue Rhino. The foreign company informed Banc of America Securities that it had no interest. The foreign company believed that Blue Rhino was fully valued at $ 13.50 per share. No entity other than Ferrellgas offered to merge with Blue Rhino.

[*P19] Second, the Board formed a special committee (the "Special Committee") consisting of independent directors to evaluate and negotiate the Merger. The Board formed the Special Committee on January 28, and the newly appointed members held their initial meeting that same day. Defendants point out that the Special Committee met seventeen times before the announcement of the Merger. The Board authorized the Special Committee to handle all aspects of the potential acquisition, including entertaining competing offers, and to ultimately recommend a course of action to the Board. The Special Committee members selected by the Board were four independent directors: Brenner, Devick, Muehlstein and Warnock. None of these independent directors had an interest beyond that of a shareholder or as the [**13] holder of options or warrants with their intrinsic value linked to Blue Rhino stock.

[*P20] On January 29 the Special Committee met, hired the law firm of Womble Carlyle Sandridge & Rice ("Womble Carlyle") to serve as its legal counsel, and engaged Banc of America Securities to prepare a fairness opinion evaluating the potential transaction with Ferrell. Following these first two meetings, the Special Commit-

tee held fifteen telephonic meetings in which Womble Carlyle apprised them of the negotiations and legal matters. During this same period, Banc of America Securities prepared their fairness opinion of the Merger.

[*P21] On February 7 the Special Committee met with Womble Carlyle and Banc of America Securities to consider the proposed Merger and the related documents, including the Merger Agreement, Plan of Merger, and Prim's employment agreement. The full Board was not present initially at this meeting and only joined the Special Committee when Banc of America Securities presented an updated financial analysis and its fairness opinion of the proposed transaction. After the financial presentation, the Special Committee again met without the other members of the Board. [**14] The Special Committee then considered the advantages and disadvantages of the Merger before unanimously concluding that the Merger was in the best interests of Blue Rhino shareholders and subsequently recommending that the Board approve the Merger.

[*P22] The Special Committee provided a report to the Board that included its reasoning for recommending the approval of the Merger with Ferrell. The Board considered the Special Committee's report and unanimously approved the Merger Agreement, Plan of Merger and related documents.

[*P23] Third, the Board obtained a detailed fairness opinion from Banc of America Securities that evaluated the merits of the Merger. Banc of America Securities arrived at its opinion after reviewing the financial statements, forecasts and stock performance of both Blue Rhino and other publicly traded companies. There is no company comparable to Blue Rhino. The bankers also examined this data in the context of the offer made by Ferrell to acquire Blue Rhino.

[*P24] Banc of Securities performed six analyses of selected transactions to arrive at the implied range of equity values for Blue Rhino common stock. The analyses produced the following [**15] results:

| Analysis Performed | Implied Range of Value for Blue Rhino Common Stock |
| --- | --- |
| Selected Publicly Traded Propane Companies | $ 16.00-19.00 per share |
| Selected Publicly Traded Consumer Companies | $ 10.00-14.00 per share |
| Selected Propane Acquisitions | $ 10.00-14.00 per share |
| Selected Consumer Company Acquisitions | $ 10.00-13.00 per share |
| Discounted Cash Flow Analysis | $ 13.50-18.50 per share |
| Leveraged Buyout Analysis | $ 11.00-14.00 per share |

The analyses, aside from the upper end of two, all produced an implied value well below the $ 17 per share offered by Ferrell. Thus, the bankers opined that from a financial standpoint the proposed Merger was fair to the shareholders of Blue Rhino common stock.

## E. PRIM'S EMPLOYMENT AGREEMENT

[*P25]  The parties amended Prim's employment agreement because under the former agreement the Merger qualified as change of control, a qualification which triggered a potential payout to Prim. The Special Committee examined Prim's amended employment agreement with Ferrellgas and analyzed and compared the terms of both the existing and amended agreements.

[*P26]  Under a change of control scenario, Prim had the option to terminate [**16] his employment within the twelve months following the closure of the merger. The termination of Prim's existing employment agreement entitled him to several benefits, including:

> . Blue Rhino's would continue to pay his base salary of $ 600,000 per annum plus cost of living adjustments.

> . Following the cessation of the base salary, Prim would receive cash retirement payments of $ 778,000 per annum for ten years.

> . Ferrellgas would provide Prim health care coverage for fifteen years.

The Special Committee requested and received a comparison of the original employment agreement and Prim's contract that would take effect if the merger were consummated. The Special Committee determined the present value of the original agreement to be approximately $ 9.7 million in a change of control merger.

[*P27]  The amended employment agreement retained Prim and prevented the Merger from qualifying as a change of control. The amended employment agreement includes the following key terms:

> . Most notably, Prim would continue to work for the Blue Rhino following the merger. Prim would assume the position of executive vice president of Ferrellgas, Inc. and chief executive [**17] officer of the Blue Rhino Division of Ferrellgas Partners. Prim would also be nominated and recommended for election to the Board of Directors of Ferrellgas, Inc.

> . Prim would receive an annual base salary of $ 600,000 for his service in the above capacity. If Ferrellgas terminates Prim "without cause" or Prim resigns for a "good reason" then Prim would continue to receive the base salary for one year.

> . The agreement provides Prim with a three-year term and automatic one-year extensions if Ferrellgas does not terminate Prim 60 days before the end of any term.

> . Prim is eligible for bonuses that do not exceed 100% of the above base salary. The agreement evenly splits the bonuses between discretionary and incentive based bonuses.

> . Ferrellgas would make a one-time payment of $ 2.5 million to Prim in exchange for his agreeing to noncompetition and nonsolicitation clauses during the first three years of his employment with Ferrellgas.

> . Prim may receive stock options to purchase 250,000 shares of Ferrell stock. The stock options are on a twelve-year vesting schedule. The Board of Ferrellgas shall determine the exercise price.

> . A retention payment to Prim [**18] would be made on either the three-year anniversary of the Merger, or Mr. Prim's termination of the amended employment agreement with good reason, or Ferrellgas' termination of Prim without cause. The retention payments consist of the difference between the $ 17 per share and the applicable exercise price for Prim's unvested Ferrellgas stock options. The projected retention payment is $ 1,882,240.

## F. PURCHASE OF PRIM'S REAL PROPERTY

[*P28]  Prim entered into an agreement to sell a five-acre parcel of property that he owns to Ferrellgas. The property had been in Prim's family for five generations. Prim did not want to sell the property, but Ferrellgas made it a condition of the transaction. Blue Rhino currently uses the property for propane storage, as a warehouse facility and for other operating purposes. Prim will receive $ 3.15 million of common units in limited partnership interest of Ferrellgas in exchange for his

contributing the property. At least two directors thought Ferrellgas was paying more than fair market value but were convinced that overall no shareholder value had been diverted to Prim. Prim is the only witness to testify as to the value, and he stated that [**19] the purchase price equaled the replacement value of the manufacturing facility. He also testified that he did not wish to sell the property.

## G. REINVESTMENT BY KEY MANAGEMENT

[*P29]    Ferrellgas made Prim, Filipowski and McQuilkin agree to reinvest their net proceeds after taxes from the transaction as a condition to the Merger. The reinvestment reduced the amount of capital that Ferrellgas had to borrow to finance the transaction and was a condition to Ferrellgas consummating the merger.

## H. PLAINTIFF'S CONTENTIONS

[*P30]  Plaintiff, however, claims that several provisions in the Merger Agreement undermine the effectiveness of the aforementioned corporate governance and analytical measures. First, plaintiff claims that Prim's employment agreement with Ferrellgas, which names Prim as an executive vice president following the Merger, is suspect. Plaintiff cites several ordinary provisions in the agreement as questionable, including a $ 2.5 million lump sum payment and a $ 600,000 annual salary.

Plaintiff, moreover, particularly focuses on two clauses addressing Prim's assistance in litigation and confidential information. The clauses in Prim's employment agreement that plaintiff [**20] takes issue with are as follows:

> 11.1 ASSISTANCE IN LITIGATION.
> The Executive shall, upon reasonable notice, furnish such information and assistance to the Company as may reasonably be required by the Company in connection with any litigation in which it is, or may become, a party, and which arises out of facts and circumstances known to the Executive. The Company shall promptly reimburse the Executive for his out-of-pocket expenses incurred in connection with the fulfillment of his obligations under this Section.
>
> 11.2 CONFIDENTIAL INFORMATION.
> The Executive acknowledges that all Confidential Information has a commercial value in the Companies' Business and is the sole property of the Companies. The Executive agrees that he shall not disclose

> or reveal, directly or indirectly, to any unauthorized person any Confidential Information, and the Executive confirms that such information constitutes the exclusive properties of the Companies; provided, however, that the foregoing shall not prohibit the Executive from disclosing such information to third parties or governmental agencies in furtherance of the interests of the Companies or as may be required by law.

[*P31]  [**21] The alleged effect of these clauses is to stifle both a federal securities class action and a state shareholder derivative claim pending against the directors in California. Plaintiff furthermore asserts that defendants sought a purchaser that would provide them with continued employment as well as protect them from potential liability in the other shareholder actions. The result, according to plaintiff, was that the directors accepted a discounted share price from Ferrellgas in exchange for protecting their personal interests. The Complaint, however, does not cite an employment agreement with Ferrellgas entered into by a Board member other than Prim. More importantly, the proxy fully disclosed Prim's employment agreement with Ferrellgas.

[*P32]  Second, plaintiff claims the Board members possess private information that provides insight into the future value of Blue Rhino. This information allegedly concerns the financial condition and prospects of Blue Rhino. Plaintiff asserts that this information supports the proposition that the Ferrellgas offer does not adequately compensate Blue Rhino's shareholders for the company's present or future value.

[*P33]  Third, plaintiff [**22]  claims that the Board failed to study the merger and acquisition market to obtain the highest bid possible for Blue Rhino's shareholders. Defendants, however, claim that the Board considered many strategic alternatives before pursuing the transaction with Ferrellgas.

[*P34]  Fourth, plaintiff claims that Devick and Muehlstein did not qualify as outside directors and hence tainted the evaluation of the Merger. The Complaint asserts that Devick had extensive business and personal relationships with Prim and Filipowski. Plaintiff also claims that Muehlstein's law firm received legal fees in the past for its work on behalf of Blue Rhino as well as for the outside ventures of Prim and Filipowski. Thus, plaintiff claims that Muehlstein does not qualify as an independent director. Muehlstein and his firm ceased doing work for Blue Rhino after the passage of Sarbanes-Oxley.

[*P35]  Plaintiff seeks to enjoin the Merger with Ferrellgas and have the Court determine that the Board

breached its fiduciary duties. The prayer for relief also seeks to enjoin Blue Rhino from combining with any third party until the Board implements a procedure to obtain the highest possible price. In addition, [**23] plaintiff seeks to tax defendants for cost and disbursements of this action, including reasonable attorney and expert fees.

## II. ANALYSIS OF MOTION TO DISMISS

### A. THE REQUIREMENTS OF MAINTAINING A DERIVATIVE ACTION

[*P36] If this is a derivative action rather than a direct action, the plaintiff made three crucial mistakes as to the Complaint filed in this action.

> First, North Carolina law requires verification of the complaint in a derivative action:
> In an action brought to enforce a secondary right on the part of one or more shareholders or members of a corporation or an unincorporated association because the corporation or association refuses to enforce the rights which may properly be asserted by it, *the complaint should be verified by oath.*

N.C. Gen. Stat. § 1A-1, Rule 23 (b) (2003)(emphasis added). Plaintiff simply did not verify the Complaint, which alone provides this Court the grounds for dismissal if this is a derivative action. The verification requirement is not simply a technicality. It is required for a reason and plaintiff must fulfill the requirement.

[*P37] Second, plaintiff did not comply with Delaware [**24] law because he did not join the corporation as a party. *See Agostino v. Hicks, 845 A.2d 1110, 2004 WL 569353 (Del. Ch. 2004).*

[*P38] Third, the amended complaint does not contain allegations with respect to demand futility required by Delaware law. If this is a derivative action, it is subject to dismissal.

### B. ENJOINING THE NON-PARTY CORPORATION

[*P39] Plaintiff seeks relief that clearly affects the corporation, which is not a named party to this action. The Complaint's prayer for relief included only the following:

> A. Declaring that this action is properly maintainable as a class action;

> B. Declaring and decreeing that the Ferrellgas Merger agreement was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

> C. Enjoining defendants from proceeding with the Ferrellgas Merger agreement and tender offer;

> D. Enjoining defendants from consummating the Merger, or a business combination with a third party, unless and until the Company adopts and implements a procedure or process, such as an auction, to obtain the highest possible price for the Company;

> E. Directing the Individual [**25] Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of shareholders until the process for the sale or auction the Company is completed and the highest possible price is obtained;

> F. Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

> G. Granting such other and further relief as this Court may deem just and proper.

[*P40] There is no claim for monetary damages on behalf of the shareholder or corporation in the Complaint. Plaintiff requests that the Court enjoin the directors from taking action to consummate the merger with Ferrellgas and require the corporation to use a different process to obtain the highest possible merger price. Clearly, this relief requires that the corporation halt its impending merger with Ferrellgas and then subsequently auction itself to the highest bidder. The Court cannot enjoin a corporation from merging with another entity if the corporation is not a party to this action. For that reason the Court would decline to enter an injunction against the non-party corporation.

### C. DERIVATIVE OR DIRECT ACTION?

[*P41] This Court [**26] must determine if plaintiff's claims are direct or derivative under Delaware law. Plaintiff asserts his claims are direct. Defendants, however, argue they are derivative and thus subject to dismissal for failing to follow the required procedures for derivative actions. In *Tooley v. Donaldson, Lufkin, & Jenrette, Inc., 845 A.2d 1031, 2004 WL 728354 (Del.*

*2004)*, the Supreme Court of Delaware set forth a new standard to determine if a shareholder action was direct or derivative. n2

> n2 In *Tooley,* the Supreme Court of Delaware also upheld the *Kramer* and *Agostino* decisions issued by the Chancery Court. *845 A.2d 1031, 2004 WL 728354 at *3, 5.*

> With respect to the difference between a direct and a derivative claim the court stated as follows:
> That issue must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, [**27] individually)?

> [A] court should look to the nature of the wrong and to whom the relief should go. The stockholders claimed *direct injury must be independent of any alleged injury to the corporation.* The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing injury to the corporation.

*Id. 845 A.2d 1031, [WL] at *6* (emphasis added).

[*P42] This Court has elected to address the direct/derivative issue in two ways. First, the Court has looked to determine whether the claims fall under a line of case typified by *Parnes v. Bally Entertainment, Corp., 722 A.2d 1243 (Del. 1999). See also In re Ply Gem Indus. S'holders Litig., 2001 Del. Ch. LEXIS 84 (Del. Ch. 2001)*; *Golaine v. Edwards, 1999 Del. Ch. LEXIS 237 (Del. Ch. 1999).* That line of cases essentially holds that a shareholder may assert a direct claim based upon allegations that the merger price received by the shareholders of a target corporation is the product of a breach of the duty of loyalty by a fiduciary in which the directors acquiesced as a result of (a) being conflicted or (b) acting in bad [**28] faith. If plaintiff has adequately pled a *Parnes* claim he has a viable direct claim. *Tooley* approved the Parnes decision. This Court will address the adequacy of the pleading of a *Parnes* claim at the same time it addresses the likelihood of success on such a claim.

[*P43] Second, the Court approached the claims as pure *Revlon* claims. n3 This analysis is appropriate because the original complaint asserts *Revlon* claims and plaintiff did not change this approach with the filing of the amended complaint.

> n3 *See Revlon, Inc. v. MacAndrews & Forbes, 506 A.2d 173 (Del. 1986).* "The duty of the board . . . changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit . . . . The whole question of defensive measures was moot. The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price from the stockholders at a sale of the company." *506 A.2d at 181.*

[**29]

[*P44] *Tooley* simplified the test to be applied and eliminated previously applied criteria such as "special injury." That case, however, did not address the specific issues raised by this motion to dismiss. This is a pure *Revlon* claim. Plaintiff does challenge the deal protection devices.

[*P45] The question of whether claims that directors breached their *Revlon* duties are direct or derivative claims remains undecided under Delaware case law. The primary reason that the Delaware courts have to yet to resolve this issue is that most plaintiffs in Delaware file a derivative action to challenge the fulfillment of *Revlon* duties. Delaware courts usually excuse demand when *Revlon* complaints are properly pled. As a result, Delaware courts have not had the opportunity to tackle the issue of whether or not plaintiffs can file these claims as a direct action.

[*P46] This Court must determine what the Delaware courts would decide on a motion to dismiss challenges to a pending merger wherein a plaintiff filed direct claims alleging breaches of *Revlon* fiduciary duties that prevent shareholders from receiving a fair price for stock. Two cases demonstrate [**30] the divergent views held by the Chancery Court.

[*P47] In *Agostino,* the Delaware Court of Chancery advanced the argument that a plaintiff may not maintain a direct action solely because a transaction did not maximize return. The directors in *Agostino* issued warrants that transferred voting control of the company to another entity without compensating the shareholders. *845 A.2d 1110, 2004 WL 569353 at *2.* The plaintiff claimed the issuance of the warrants and the change in control prevented the corporation from pursuing other

"value-maximizing transactions." *Id. 845 A.2d 1110, [WL] at *2.* The plaintiff named the individual directors as defendants but did not join the corporation as a defendant. *Id. 845 A.2d 1110, [WL] at *1.*

[*P48] The *Agostino* court set forth the following test to determine whether an action is direct or derivative: "Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" *Id. 845 A.2d 1110, [WL] at *7.* The court found that the plaintiff offered no argument that precluding a value maximizing transaction would harm the shareholders differently [**31] than the company. The court held that the claim was derivative because the shareholder did not suffer an injury independent of the company. *Id. 845 A.2d 1110, [WL] at *10.* The court also dismissed the complaint because the plaintiff did not join the corporation as a party. Thus, the mere decrease in the value of a business does not suffice to maintain a direct cause of action against directors.

[*P49] Under *Agostino,* Chancellor Chandler views the injury to the corporation and all the shareholders to be identical, thus producing no "individual" injury to the shareholders. n4 Applying his reasoning to the case at hand supports a holding that Marcoux's *Revlon* claims are derivative.

> n4 The Supreme Court of Delaware's decision in *Kramer v. Western Pacific Industries, Inc., 546 A.2d 348 (Del. 1988),* explicitly illustrates the type of injury in which a shareholder may seek redress using a derivative action. In *Kramer,* the plaintiff alleged that two of the defendant directors of the target corporation negotiated and obtained compensation that decreased the value paid by the acquirer. *Id. at 350.* The court found that if the compensation directly resulted in a discount to the price paid by the acquirer for the target corporation, then the plaintiff should bring these claims as a derivative action. *Id. at 353.* The *Kramer* court reasoned that the claims are derivative in nature because the plaintiff based the claims on the diminished share value and stated:

> > Where a plaintiff shareholder claims that the value of his stock will deteriorate and that the *value of his proportionate share of the stock will be decreased as a result of alleged director mismanage-*

> *ment, his cause of action is derivative* in nature. (citation omitted).
> A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any *devaluation of stock is shared collectively by all the shareholders,* rather than independently by the plaintiff or any other individual shareholder. Thus, the *wrong alleged is entirely derivative.*

> *Id.* (emphasis added).

[**32]

[*P50] The case of *In re Gaylord Container Corp. S'holder Litig., 747 A.2d 71 (Del. 1999)* takes a different approach. In *Gaylord,* the plaintiffs alleged that the defendant's board of directors caused the plaintiffs special injury by restructuring the corporation and adopting a shareholder rights plan that entrenched the directors in office. The corporation adopted the shareholders rights plan in response to an acquisition proposal. The plan created a substantial obstacle for a potential acquirer. The plaintiffs sought to employ a direct action rather than pursuing derivative claims.

[*P51] Vice Chancellor Leo Strine held that the complaint included direct claims because the plaintiffs alleged they suffered an injury distinct from the injury to the corporation. The court reasoned so because the shareholder rights plan was in response to an acquisition, and the action of the board prevented the shareholders from maximizing the value of their shares. The proceeds from the sale of the corporation affect the shareholders, not the corporate balance sheet.

[*P52] Under the *Gaylord* reasoning, Vice Chancellor Strine would find that the "injury" in a *Revlon* [**33] claim is to the shareholders since the diminished value received in a merger flows to the shareholders. Although *Gaylord* involved deal protection devices, which directly impacted the shareholders' right to vote on the merger, thus making it a more individual injury to the shareholder, the focus clearly is on the injury, as in *Parnes.* The *Parnes* line of cases typically addressed claims for monetary damages.

[*P53] Similarly the *Ply Gem* court, relying on the *Golaine* decision, decided that the allegations did support a direct action. The court used *Golaine* to apply the following reasoning:

As Golaine frames it, "the real question underlying the teaching of Parnes [is] whether the Complaint states that the side transactions caused legally compensable harm to the target's shareholders by improperly diverting consideration from them to their fiduciaries." (footnote omitted).

In short, the Complaint can be read fairly to allege that, as the result of the unfair process orchestrated by Silverman, Nortek reduced the per share price that it was willing to pay to the Ply Gem shareholders in order to increase the amount that it was willing to pay Silverman [**34] on his side transaction. (footnote omitted). Parnes teaches that such conduct will serve as the basis for individual or direct claims.

*Id. 2001 Del. Ch. LEXIS 84 at \*19-20.*

[\*P54]   Plaintiff cites *Ply Gem* to support the proposition that a party may maintain a direct action that challenges the process of considering a merger as unfair. In *Ply Gem,* the plaintiff alleged that the acquirer reduced its offer by $ 0.75 per share to satisfy the demands of the target company's chief executive office and chairman of the board (the "CEO"). *Id. 2001 Del. Ch. LEXIS 84 at \*13-14.* The CEO allegedly manipulated the merger process to obtain an extravagant personal compensation package at the direct expense of the shareholders. The plaintiff contended that benefits received by the CEO constituted over 10% of the total value of the merger.

[\*P55]   The contrary argument to Vice Chancellor Strine's position holds that the corporation is being sold as a result of this merger agreement. Thus, if the price at which the corporation sells is unfair, then both the corporation and the shareholder suffer an identical injury. Where the corporation and shareholder interests do not diverge, then the claim is derivative and [**35] not direct.

[\*P56]   While this Court might enjoy the opportunity to explore this issue in greater detail, the time constraints involved require a quick judgment as to the outcome if, by chance, the issue were to arise in Delaware.

[\*P57]   The Court concludes that the focus of the Supreme Court in *Tooley* on the "injury" involved leads to the conclusion that a plaintiff may bring a pure *Revlon* claim as a direct claim. The "injury" results from the diminished value that a shareholder would receive from a

merger process that prevents the shareholders from achieving the highest value for their shares in a change of control merger. The treasury of the shareholder is depleted, not the treasury of the corporation.

[\*P58]   If Marcoux adequately alleged that Ferrellgas reduced its price to Blue Rhino shareholders to increase the amount paid to Prim in response to Prim's demands, then Marcoux adequately stated a direct claim. For example, if plaintiff alleges that Prim refused to support the merger unless Ferrellgas diverted funds from the transaction to Prim, then a direct claim exists and the Complaint is not subject to dismissal.

[\*P59]   The Court will deal with [**36] the sufficiency of the pleading to assert both *Parnes* and *Revlon* claims along with plaintiff's likelihood of success on the merits in the preliminary injunction section of the order.

[\*P60]   Similarly, if plaintiff has adequately alleged failure to disclose in the Proxy Statement, then he has asserted a proper direct claim. That, however, is not the claim asserted in the Complaint.

III.    ANALYSIS    OF    PRELIMINARY INJUNCTION

A.    THE    PRELIMINARY    INJUNCTION STANDARD

[\*P61]   The Delaware courts often address the issue of whether to enjoin a shareholder vote on a merger and the risks associated with the resultant delay of the proposed business combination. The Court turns to the expertise of the Delaware Court of Chancery to establish the appropriate standard for evaluating the motion for preliminary injunction in this matter. This Court must balance protecting shareholder rights with preserving the freedom of shareholders to approve or block a proposed merger according to their own economic interests. A standard that is too lenient in either direction can have adverse repercussions on both shareholder rights and maximizing shareholder value.

[\*P62]   In *Phelps Dodge Corp. v. Cyprus Amax Minerals Corp., 2003 Del. Ch. LEXIS 210* [**37] (Del. Ch. Oct. 27, 1999), Chancellor William B. Chandler set forth a preliminary injunction standard requiring the moving party to demonstrate three elements. First, the moving party must show a reasonable likelihood of success on the merits. Second, the moving party must demonstrate a reasonable threat of irreparable injury if the court does not issue an injunction. Third, Chancellor Chandler outlines "the balancing of the equities part of the test." The balancing part of the test requires the moving party to show that the threat of injury from not issuing the injunction outweighs the possible injury from issuing the injunction.

[*P63] In *Phelps,* the court concluded that it should not enjoin the shareholder vote on the merger at issue. Chancellor Chandler reasoned that the shareholders could simply vote down the merger if they wished to avail themselves of another transaction that provided a premium. Furthermore, the shareholders in *Phelps* also had the necessary information to render a fully informed vote. The court therefore found that "the risk to the transaction already on the table . . . outweighs the de minimus harm that Phelps Dodge and shareholder plaintiffs have [**38] asserted credibly here today."

[*P64] Delaware law is clear that in the absence of a competing offer a plaintiff must make a particularly strong showing on the merits to obtain a preliminary injunction because an injunction in such circumstances risks significant injury to shareholders. *In re The MONY Group, Inc. S'Holder Litig., 852 A.2d 9, 2004 Del. Ch LEXIS 16 (Del. Ch. 2004); In re Aquila, Inc. S'holders Litig., 805 A.2d 184, 187, 189 (Del. Ch. 2002).* There is no competing offer here.

## B. REASONABLE LIKELIHOOD OF SUCCESS ON MERITS

[*P65] Plaintiff's Complaint is rife with conclusory allegations. The Court will examine both the adequacy of the pleading in the Complaint and the likelihood of success on the merits at the same time.

> *1. Has plaintiff sufficiently alleged and is he likely to prevail on the merits in establishing a Parnes claim? Prim's Employment Agreement*

[*P66] Plaintiff is particularly critical of Prim's amended employment agreement that he entered into with Ferrellgas. The Court must compare the amended employment with the terms of Prim's existing employment agreement in order to understand the ramification [**39] of the amendments.

[*P67] The parties structured the amended agreement to retain Prim following the merger. The consideration that Prim provides Ferrellgas in exchange for the added compensation is his continued service, or at least the assurance that he will not compete with the newly merged entity. For example, the vesting for the stock options is on a twelve-year schedule. The $ 2.5 million payment, moreover, is in exchange for Prim signing restrictive covenants that prevent him from working in the industry to the detriment of Ferrellgas. On the other hand, the former employment agreement merely provided Prim compensation for his services at Blue Rhino.

[*P68] The failure to amend the employment agreement would have resulted in a change of control

that would have allowed Prim to terminate his employment following the closing of the Merger. The result under the prior agreement is that Prim would receive a total package of $ 3 million in salary and approximately $ 7.8 million in cash retirement payments from the new entity. Prim would not have to render any additional services and would receive these funds without providing any additional consideration. In contrast, the [**40] amended agreement prevents a change of control scenario and prohibits Prim from both receiving consideration without rendering services and potentially competing with Ferrellgas. The analysis presented to the Special Committee concluded that the future payments in the buyout package would total $ 11.2 million, not including the upfront golden parachute payment. n5 *See* Exhibits R and S to Affidavit of Richard A. Brenner.

> n5 The analysis also found that the total buyout, the present value of the future payment plus the upfront payment, would cost $ 9.6 million. *See* Exhibit R to Affidavit of Richard A. Brenner

[*P69] The amended employment agreement provides the new entity with the tangible benefit of preventing Prim from leaving and potentially siphoning business away from Ferrellgas in a new venture. The existing employment agreement would have allowed Prim to leave Ferrellgas following the Merger and to reap gains without providing further consideration. Therefore, allegations that the amended agreement [**41] unjustly enriches Prim have little basis.

[*P70] The Court is convinced, upon a thorough review of the evidence of record, that the benefits to Mr. Prim from his individual contractual arrangements with Ferrellgas are no greater than, and in all probability less than, the benefits he would have received under his employment agreement with Blue Rhino in a change in control situation. The Court is further convinced that the Special Committee made a good faith judgment to that effect. The Court believes that defendants will ultimately prove that the share price was determined before any negotiation of Mr. Prim's employment agreement and that the terms of his agreement did not prevent an increased offer.

[*P71] Mr. Prim did not condition his support of the Ferrellgas offer on any agreement on his individual benefits. Rather, the completion of Merger and receipt by the shareholders of $ 17 per share depended upon Mr. Prim (and Mr. Filipowski) agreeing to certain conditions imposed by Ferrellgas which restricted their economic freedom. There was no bribe and no "extraordinary" or "obscene" benefit to either Mr. Prim or Mr. Filipowski,

and the proxy materials adequately disclosed [**42] the arrangement between them and Ferrellgas.

[*P72] Plaintiff also has trouble fitting within the precise confines of *Parnes* because he failed to show that the Merger price reflects any differences in the value of Prim's contractual benefits with Blue Rhino and his benefits under the employment agreement with the purchaser. Plaintiff offers no pricing rationale as to how the allegedly diverted benefits affect the share price. In fact, plaintiff seeks no monetary recovery based upon diversion of benefits as was claimed in *Parnes*.

[*P73] Plaintiff will be unable to demonstrate a breach of the duty of loyalty by Prim. Plaintiff arguably sufficiently pled the claim but will not prevail on the merits because he cannot show that part of the merger value was diverted to Prim.

> ### 2. Has plaintiff sufficiently alleged and is he likely to prevail on the merits of his pure Revlon claim? a. Revlon duties of Special Committee

[*P74] Plaintiff may have adequately stated a claim for the violation of *Revlon* duties in a conclusory fashion. However, plaintiff will be unable to show that the Special Committee did not fulfill its *Revlon* duties. [**43] The claim that the Special Committee failed to fulfill its *Revlon* duties, when it had only one offer to entertain and that offer was at a 22% premium, is a difficult proposition because the Revlon duties revolve around the Board obtaining the highest value possible for its shareholders. n6

n6 *See Revlon, supra* note 3, at 181.

### a. Independence of Special Committee

[*P75] In *Aronson v. Lewis, 473 A2d 805 (1984)*, the Supreme Court of Delaware set forth a test as to the independence and disinterestedness of directors. In Aronson, the court found that a director qualifies as interested when he will obtain a personal financial benefit from the transaction at issue. *In re Western National Corp. S'holder Litig., 2000 Del. Ch. LEXIS 82, at *37-38 (2000)*. Such a benefit disqualifies a director as independent when stockholders do not equally share that benefit. A director is also not independent if the transaction will adversely affect him, but not [**44] the corporation or other shareholders. *Id.*

[*P76] The *Aronson* court defined independence as deciding a corporate matter based on the merits presented to the board as opposed to extraneous considerations or influences. *473 A.2d 805 at (1984)*. The *Western National* court established the plaintiff's burden in proving that a director does not qualify as independent by stating: "To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their decision is sterilized." *2000 Del. Ch. LEXIS 82, at *37-38 (2000)*.

[*P77] The *Ply Gem* case specified the allegations that a plaintiff must assert to overcome the presumption of independence as follows:

> Plaintiffs are confronted with the challenge of pleading facts that create, at a minimum, a reasonable doubt that the board members could not honestly and objectively evaluate the Nortek merger, with its related Silverman agreement, because of their relationship with Silverman. "Speculation on the motive for undertaking the corporate action" will not satisfy Plaintiffs' burden. [**45] *Grobow v. Perot, 539 A.2d 180, 188 (Del. 1988)*. Similarly, the mere assertion of personal and business relationships will not defeat the presumption of independence. (footnote omitted).

*2001 Del. Ch. LEXIS 84, at * 26.*

[*P78] Plaintiff's allegations questioning the independence of Devick and Muehlstein are merely assertions of personal and business relationships. These relationships alone do not suffice to defeat the presumption of independence. n7 Plaintiff alleges that Devick, Prim and Filipowski serve on the boards of each other's companies, belong to the same club and socialize frequently. The Complaint asserts that Devick and Filipowski often vacation together with their families in Maui to celebrate Christmas. Plaintiff speculates that these relationships motivated Devick to approve the merger.

> n7 "Allegations of a mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about the director's independence." *Beam ex rel Martha Stewart Omnimedia v. Stewart, 845 A.2d*

*1040, 2004 Del. LEXIS 162, at \*22 (Del. Ch. 2004).*

[\*\*46]

[\*P79]  Under the standard set forth in *Aronson* and *Western National,* these allegations do not demonstrate that Devick did not qualify as an independent director. Plaintiff alleges that these relationships exist but does not demonstrate that these relationships made Devick beholden to either Prim or Filipowski. The allegations only advance that the relationships exist, not that the relationship influenced or caused Devick's decision regarding the merger.

[\*P80]  The evidence of record contains nothing to indicate that Mr. Prim possessed or exerted any leverage on Mr. Devick that caused him to divert benefits from the shareholders to Prim. A more colorable claim may be made for a lack of independence of Devick as to Filipowski, but that claim fails as well. Devick and Filipowski are friends and have invested in companies together. They also have sat on boards together and even served on each other's compensation committees in the past. The assumption that Devick was beholden to Filipowski, yet sacrificed the premium that he would receive from Ferrellgas' merger with Blue Rhino to benefit Prim, defies logic. Any reduction in price per share diverted to Prim would affect [\*\*47] Devick and Filipowski dearly. Plaintiff's speculation that Devick worked for a lower merger price so Filipowski could later benefit from his Ferrellgas purchase after paying taxes on the sale of his Blue Rhino stock defies logic and has no support in the record.

[\*P81]  Plaintiff alleges that Muehlstein did not qualify as an independent director because in the past his law firm represented Blue Rhino as well as various ventures of Prim and Filipowski. The receipt of legal fees by a director's law firm does not, by itself, demonstrate that director's lack of independence. *In re Ply Gem, 2001 Del. Ch. LEXIS 84, at \* 31; McMillan v. Intercargo Corp., 768 A.2d 492, 503 (Del. Ch. 2000).* Legal fees from the corporation must be substantial in proportion to the size of the firm to rebut the presumption that a director is independent. *See In re Ply Gem, 2001 Del. Ch. LEXIS 84, at \* 31.* Blue Rhino, however, at the time of the merger no longer employed Muehlstein and his firm. Moreover, the merger would likely extinguish a great deal of business for Muehlstein and his firm if Blue Rhino still engaged his firm at the time of the merger. If [\*\*48] his firm had hopes of receiving more legal work from Blue Rhino, then Muehlstein had an incentive to reject the proposed merger.

[\*P82]  The independence of Warnock and Brenner are not seriously challenged. There is no evidence that they were conflicted in anyway other than the existence of the shareholder derivative action. Plaintiff has not sufficiently alleged nor is he likely to prove at trial that the members of Special Committee had conflicts that compromised their independence.

[\*P83]  Plaintiff's allegations fail to offer any proof that Devick or Muehlstein were subject to any significant leverage from Prim. That they would sacrifice their own financial interests, their board seats and tens of millions of shareholder dollars so Prim could sell property he did not want to sell at greater than fair market value defies all logic and common sense.

[\*P84]  Time constraints prevent the Court from dealing with each of the allegations made with respect to the independence of Devick and Muehlstein. Likewise, those time constraints do not permit a thorough recitation of the applicable law. The Court is cognizant of the need to scrutinize carefully any allegations of director [\*\*49] conflict of interest. The Court has done so here and is satisfied that the members of the Special Committee not only were independent for those purposes but also acted independently. There is no showing that any of the Special Committee members were beholden to or under the control of Prim or Filipowski or that either of them controlled the activities of the Special Committee. Mr. Brenner's independence is unchallenged, and he was the chairman of the Committee. There is no evidence of record that Mr. Prim directed the Committee's work in any way. There is evidence Mr. Brenner d*Id.*

### a. The Board's Activities

[\*P85]  The Board was not required to conduct an auction. *Barker v. Amsted Ind., 567 A.2d 1279 (Del. 1989).* The Board tested the market before executing the Merger Agreement. The Merger Agreement allowed the Board to pursue other offers by providing a termination fee. In fact, the Board met with a Fortune 500 company, and its investment bankers met with a foreign multinational company. Neither of these parties decided to make an offer.

[\*P86]  After two months no other entity has expressed interest, and the market price reflects the reaction [\*\*50]  that the proposed transaction will occur without the substantial prospect of a competing bid. n8 The Board did not reject other offers or improperly favor the Ferrellgas proposal because the Board did not have any other options.

n8 *See supra* note 1.

[\*P87]  Blue Rhino was facing for the first time a much larger competitor with the ability to drive down

profit margins in order to take market share. That posed a particularly dangerous scenario in the circumstances where Blue Rhino's customer base was heavily concentrated in four huge retailers. The Board's decision to look at strategic alternative was prudent given the alternatives.

[*P88] Moreover, the Board and Special Committee consisted of shareholders who would suffer an economic loss just as the ordinary shareholder would if this proved to be a bad deal. Warnock's affiliates held 8.5% of Blue Rhino stock. The Board had no incentive in this case to act improperly, and the plaintiff does not offer evidence to the contrary. Plaintiff has not alleged [**51] nor is he likely to prevail on the merits at trial on a claim that the Board acted in bad faith.

[*P89] Plaintiff is unlikely to prevail on the merits because the Special Committee was independent and made a good faith business judgment that the process chosen was in the best interests of shareholders.

> 3. Is plaintiff likely to prevail on the merits on the claim that shareholders are being misled or denied material information?

[*P90] When the proxy statement disclosures are challenged in a motion such as this, it becomes the Court's duty to see that shareholders have the information that they need to make a rational business judgment about whether to sell their shares for the merger price. An alleged omission is material if the fact is one "that would have assumed actual significance in the deliberations of a reasonable shareholder." *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1985).* Plaintiff advances instances in which he claims the proxy was deficient. The Court will address each in turn.

### a. Sale of the Prim Property to Ferrellgas

[*P91] The proxy statement adequately discloses the Real Property Contribution Agreement. [**52] Plaintiff faults the proxy statement for not disclosing (a) that the property had a fair market value less than the amount Prim was receiving and (b) his proceeds might be tax deferred. Prim's tax situation is unresolved, and there was no need to speculate about it in the proxy. *See Mendell v. Greenberg, 927 F.2d 667, 676 (2d Cir. 1991).* His tax treatment would not be material. If this were a case in which any excess above the fair market value he received were funds diverted from shareholders, disclosure would be required. Here, the Special Committee concluded that in totality Mr. Prim's benefits received from Ferrellgas were (a) no more than he would received under his current agreement and (b) did not cause any diversion of funds from the shareholders to Prim. The Court also notes that Ferrellgas insisted in the transfer,

and the property had a personal value to Mr. Prim over and above its fair market value.

[*P92] As in other instances there is no quantification by plaintiff by which the Court can judge the materiality of the alleged omission. Mr. Prim testified that it would cost about the same to build an equivalent facility. Lacking a measure of materiality, [**53] the Court is hard pressed to find an omission which would have been important to a shareholder.

[*P93] The real property transaction was adequately disclosed. It might have been preferable for the proxy to articulate the Board's decision-making process, but the necessary facts were disclosed.

### a. Merger Synergies

[*P94] Plaintiff faults the directors for failing to disclose the benefits of merger synergies. Plaintiff speculates that the shareholders might hold out for more if they thought Ferrellgas could afford to pay more. Such speculation is just that. Ferrellgas had made an offer substantially greater that than the market test indicated and had not budged on the price.

[*P95] The Special Committee had no quantifiable information on the synergistic benefit to Ferrellgas and would have been guessing in this regard. To make such a guess could well have misled shareholders into thinking that they could get more when there was no indication they could do so. Under Delaware law, Blue Rhino was under no obligation to create information to make subjective projections about potential synergies. *See In re Siliconix Inc. S'holders Litig., 2001 Del. Ch. LEXIS 83, 2001 WL 716787,* [**54] *at *10 (Del Ch. 2001); In re Data Prod. Corp. S'holder Litig., 1991 WL 165301,* at *8 (Del, Ch. 1991).

[*P96] The fact that the initial press release by both companies announcing the merger touted the synergies between the two companies did not obligate them to produce a study that quantified the synergies. A reasonable investor could infer from the premium paid that Ferrellgas expected some benefits from the merger. Blue Rhino was not required to disclose what it guessed Ferrellgas thought the synergies were worth. Given the premium paid for the shares and the lack of any quantifiable evidence of what synergies were worth, the Court is again hard pressed to find that the omission was one which would be material to a shareholder deciding how to vote.

### a. Shareholder derivative suits

[*P97] Plaintiff faults defendants for failing to disclose in the proxy statement the existence of his shareholder derivative action in California and the fact that Delaware law would operate to extinguish those claims upon consummation of the merger. Similarly, six federal

securities law cases and a federal shareholder derivative action were pending in which the directors [**55] were defendants. Significantly those other actions were all dismissed this week. n9 Those dismissals highlight the speculative nature of derivative lawsuits, and it is unlikely that a reasonable investor would be influenced in this vote by the prospect of a speculative recovery by the corporation in a shareholder derivative action sometime in the future.

> n9 *See* Order of Dismissal, *Gish v. Prim, 2004 U.S. Dist. LEXIS 27929, CVO 3-04680-NM (AJWx) (U.S.D.C. Central District of Cal.)* dated April 13, 2004, and Order Granting Motion To Dismiss Consolidated Complaint, *In Re Blue Rhino Corp. Securities Litigation, 2004 U.S. Dist. LEXIS 27941, CV 03-3495 NM et seq. (U.S.D.C. Central District of Cal.)* dated April 12, 2004.

[*P98]   The Court is further hampered by the fact that plaintiff's complaint in the California action has never been made a part of this record so the Court can make a judgment as to its materiality to a reasonable shareholder in any event. Undoubtedly there have been and will be occasions on which the existence of shareholder derivative suits [**56] are material.

[*P99]   There is no showing on this record that this is one of them. For all the Court knows, Marcoux's claim may be subject to the same basis of dismissal as the Gish shareholders derivative action. This issue is controlled by *In re Siliconix Inc. S'holder Litig., 2001 Del. Ch. LEXIS 83, 2001 WL 716787, at *10* and *In re JCC Holding Co. Inc., 843 A.2d 713, 2003 WL 22246591, at *5 (Del. Ch. 2003).*

### a. Director's independence

[*P100]   The Court has already determined that plaintiff is unlikely to prove that the members of the Special Committee were not independent. Therefore a claim that they failed to disclose a lack of independence would fail as well.

### a. Banc of America's Fairness Opinion

[*P101]   After examining the depositions and reports, the Court finds that Banc of America's fairness opinion has more substance and proves more reliable than Dr. Hakala's (plaintiff's expert) position. Several problems existed with Hakala's declaration. First, Hakala's declaration advocated that Banc of America's fairness opinion was flawed because it did not include an accretion analysis. Hakala later agreed an accretion analysis was not a useful tool in a cash out [**57]

merger such as the Blue Rhino and Ferrellgas transaction.

[*P102]   Second, Hakala maintained in his declaration that the fairness opinion should have included an evaluation of Blue Rhino compared to other propane companies. It is difficult to contest the proposition that Blue Rhino is a unique company that does not lend itself to a study wit h comparable companies. Hakala conceded that even Ferrellgas and Blue Rhino have little in common beyond dealing with the same product.

[*P103]   Third, Hakala asserted that Blue Rhino failed to disclose synergies from the merger with Ferrellgas in regards to the fairness opinion. However, Hakala did not perform an independent analysis of the synergies and admits that attempting to value synergies is speculative.

[*P104]   Fourth, Hakala challenges in his declaration Banc of America's failure to account for a control premium and their use of a small stock premium. As admitted by Hakala in his deposition, the central premium in acquisitions is sometimes less than his suggested 30% and sometimes not a factor at all. He also conceded that the small stock premium is a judgment call and that the disclosure in the proxy resolves any problem [**58] with its use.

[*P105]   The Court therefore finds that Dr. Hakala's major points lack merit and would not support a finding that the Banc of America Securities valuation was fraught with error or required material disclosures that were not made.

### B. IRREPARABLE HARM

[*P106]   The harm that could result if the Court enjoins the shareholder vote is the loss of the 22% premium that Ferrellgas offered for Blue Rhino. Plaintiff offers no evidence that another suitor will pay more or even the same amount per share for Blue Rhino. The marketplace affirms this conclusion in that Blue Rhino shares have yet to close above $ 17 since the merger announcement. An injunction threatens to leave the shareholders empty handed without either the offer from Ferrellgas or a replacement offer. The end result would likely be that Blue Rhino shares will begin to trade around the same $ 13 per share range as before the merger announcement.

### C. BALANCING OF THE EQUITIES

[*P107]   The Court finds that plaintiff has not established a likelihood of success on the merits and that the balance of harm tilts in favor of letting the shareholder vote proceed next week. The potential damage to the shareholders [**59] from an injunction prohibiting the shareholder vote far outweighs the benefit associated with an injunction. The Court is convinced that the

shareholders have adequate information to make an informed decision on whether or not to accept $ 17 per share for their stock and that the absence of another bidder increases the prospect for irreparable injury from the Court enjoining the merger.

### CONCLUSION

[*P108]  Although this has been an expedited process, the Court is convinced that plaintiff is not likely to prevail on the merits in the claims asserted in the Complaint or the issues raised in the preliminary injunction motion. He will be unable to prove a *Parnes* claim because he cannot show any diversion of the merger consideration to Prim or others. He also will be unable to establish a *Revlon* claim. Rather, it appears to the Court that the directors secured the highest value possible for the shareholders in a change of control situation. The members of the Special Committee were independent for the purposes for which they were acting and acted to insure that the shareholders received full value and made a good faith judgment that no value was diverted to Prim or others [**60]  in the process.

[*P109]  Most importantly, where, as here, there are no other bidders, plaintiff must make a strong showing of likelihood of success on the merits to overcome the harm that could befall the shareholders if the merger is enjoined. Marcoux has not done so.

[*P110]  The Court is less certain about its conclusion that this is a direct and not a derivative claim under Delaware law, but has made its best judgment in that regard. The alleged injury in the pure Revlon claim depletes the treasury of the shareholder and the Court believes that *Tooley* requires the Court to focus on that injury.

> The motion to dismiss is denied.
> The motion for preliminary injunction is denied.
> Defendants have twenty days from today to respond to the motion to amend the Complaint.
>
> SO ORDERED, this 16th day of April 2004.

22

In re MCI WORLDCOM, INC. SECURITIES LITIGATION

99-CV-3136 (ILG)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 7230*

**April 11, 2000, Decided**

**DISPOSITION:** [*1] Defendant's motion to dismiss denied.

**COUNSEL:** For MARSHALL GREENFIELD, plaintiff: Robert J. Berg, Stanley Bernstein, Bernstein, Liebhard & Lifshitz, LLP, New York, NY.

For MCI WORLDCOM, INC., defendant: Paul C. Curnin, Simpson, Thacher & Bartlett, New York, NY.

**JUDGES:** I. Leo Glasser, U.S.D.J.

**OPINIONBY:** I. Leo Glasser

**OPINION:**

MEMORANDUM AND ORDER

GLASSER, United States District Judge:

Plaintiffs, purchasers of securities of SkyTel Communications, Inc. ("SkyTel") have brought suit against MCI Worldcom, Inc. ("MCI") asserting securities fraud claims in violation of Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j*(b), and SEC Rule 10b-5, *17 C.F.R. § 240.10b-5*. Plaintiffs contend that misleading statements by MCI artificially deflated the share price of SkyTel, which MCI acquired soon after those statements were made. SkyTel is not named as a defendant in this case.

The first complaint was on June 3, 1999, and four substantially similar complaints followed. See Affidavit of Paul C. Curnin dated December 30, 1999 ("Curnin Aff."), PP 2-6. The pending First Consolidated and Amended Class Action Complaint was filed on November 15, 1999. Id [*2] . P 9 ("Compl.").

Defendant MCI moves to dismiss the Complaint pursuant to *Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure*, and the Private Securities Litigation Reform Act ("PSLRA"). For the reasons stated below, defendant's motion is denied.

FACTS AS ALLEGED IN THE COMPLAINT

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all of the well-pleaded facts as true and draw all reasonable inferences from those allegations in favor of plaintiffs. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683,* (1974); *Cohen v. Koenig, 25 F.3d 1168, 1171-72 (2d Cir. 1994); Gant v. Wallingford Board of Education, 69 F.3d 669, 673 (2d Cir. 1995).* The Court's function is "not to weigh the evidence that might be presented at trial, but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)*. Therefore, dismissal is appropriate only if the plaintiffs can prove no set of facts that would entitle them to relief. *Id. at 1065; In re Computer Associates Class Action Securities Litigation, 75 F. Supp. 2d 68, 72 (E.D.N.Y. 1999).* [*3] The facts as alleged by the plaintiffs are as follows:

In early 1999, SkyTel, then a leading provider of wireless messaging services in the United States, had been the subject of takeover rumors for several months. Compl. PP 14, 15. When SkyTel announced its first quarter 1999 results on April 20, 1999, it also announced that subscriber growth was significantly below expectations and that the investment bank Warburg Dillion Read LLC had been retained to assist the company in evaluating its strategic alternatives. Id. P 15. This caused more takeover speculation, as an announcement of this type often signals that a company is seeking to be acquired. Id. PP 15, 16. Dow Jones News Service reported that the price of SkyTel shares rose 12% due to these rumors. Id. P 16. An analyst for Bear Sterns & Co. named MCI, one of the largest telecommunications companies in the United States, as a potential suitor for SkyTel. Id.

The takeover rumors subsided over the next few weeks. But during the morning of May 25, 1999, an Internet news service, the Company Sleuth, reported that

MCI had registered "skytelworldcom.com" as an Internet domain name. Id. P 17. It has become common [*4] practice for corporations to register domain names prior to their actual use in order to protect companies from "cyber-squatters," individuals who register domain names perceived to have value in order to sell the names at high prices to companies for whom the names are valuable. Id.

On May 25, 1999, shares in SkyTel opened at $ 18.875. When news of the new Internet address was reported sometime that morning, takeover rumors again flourished, sending SkyTel shares to as high as $ 21.875 around noontime, a gain of 16% from its close the previous day. Id. PP 18, 19.

According to plaintiffs, in order to quell the market rumors and deflate the price of SkyTel stock, sometime shortly after noon, MCI sent Barbara Gibson to address reporters. At that time, Ms. Gibson was an official MCI corporate spokesperson and Senior Manager of Corporate Communication. When asked about the significance of the registration of the "skytelworldcom.com" name, she responded:

> From time to time, MCI Worldcom employees, sometimes acting on their own initiatives, register domain names they believe may be potential targets of domain-name squatters. In this case, the action is not an indication [*5] of official company intention.

Id. P 20. Later, in the same session with reporters, Ms. Gibson, was questioned about a possible merger and replied, "No comment." See Curnin Aff. Ex. A, New York Times Article.

The market interpreted MCI's statements as a denial that it had any interest in acquiring SkyTel and immediately following Ms. Gibson's statement, SkyTel's stock price fell below the previous day's close to as low as $ 18.6875. Shares of SkyTel closed on May 25, 1999 at $ 20.125 per share on volume of 7.5 million shares, three times the stock's recent average daily volume. Compl. P 21.

Plaintiffs allege that MCI's statements were materially misleading because SkyTel and MCI had in fact been negotiating a merger since early February 1999. n1 During the last three weeks of April 1999, SkyTel, MCI and their advisors were negotiating specific terms for the merger and conducting further due diligence. By May 25, 1999, nearly all the significant terms of the agreement had been negotiated, including the exchange price

ratio for the stock. At that time, the agreement was awaiting finalization of the last details and final approval by the companies' boards of directors.  [*6] P 19.

> n1 Plaintiffs allege, in the alternative, that even if the challenged statement was literally true, defendant had an obligation to correct the false impression the statement created, as evidenced by the reports in the media. Because this Court finds that plaintiffs have stated a cause of action and they have pleaded materially misleading statements with sufficient particularity to satisfy Fed. R. Civ. P. 9(b), it is not necessary to pass on the merits of plaintiffs' alternative legal theory.

On May 28, 1999, MCI announced an agreement to buy SkyTel for $ 1.3 billion in stock, or approximately $ 21.50 per SkyTel share. Id. P 22. The agreement provided that SkyTel shareholders were to receive .25 shares of MCI stock for each share of SkyTel stock they owned. Id. The merger was completed October 1, 1999. In June of 1999, the SEC launched an investigation into MCI's denial of plans to acquire SkyTel, and requested all documents related to the SkyTel negotiations. P 24.

According to plaintiffs, MCI's [*7] motive for the false denial on May 25, 1999 of its intention to takeover SkyTel was to deflate SkyTel's share price and to avoid having to pay more if SkyTel's stock price rose prior to the announcement of the merger.

## ARGUMENT

### I. Violation of Section 10(b)

#### A. The Legal Standards

Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), provides: "It shall be unlawful for any person . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." To state a prima facie case under Section 10(b), plaintiffs must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) upon which plaintiffs relied; and (5) which proximately caused plaintiffs' injuries. See Wright v. Ernst & Young LLP, 152 F.3d 169, 177 (2d Cir. 1998), cert. denied, 525 U.S. 1104, 119 S. Ct. 870, 142 L. Ed. 2d 772 (1999); Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995).

#### B. False [*8] or Misleading Statements

Absent a specific duty to disclose, companies are not under any obligation to publicly report ongoing merger negotiations and may remain silent. See *Basic v. Levinson*, 485 U.S. 224 at 239 n.17, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988); *Chiarella v. United States*, 445 U.S. 222, 63 L. Ed. 2d 348, 100 S. Ct. 1108 (1980). The Supreme Court has held that "'no comment' statements are generally the functional equivalent of silence," and that "silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17; *Glazer v. Formica Corp.*, 964 F.2d 149, 156-57 (2d Cir. 1992). Had MCI replied "no comment" to questions about the merger, and said nothing more, the Complaint would not state a cause of action for securities fraud. However, MCI said more than "no comment." In response to a question regarding the significance of the registration of the "skytelworldcom.com" MCI's spokesperson stated "in this case, the action is not an indication of official company intention." The question is whether this statement could entitle the plaintiffs to relief under 10(b)(5).

Defendant [*9] first argues that Gibson's statement was not false and says nothing about MCI's intent with respect to SkyTel, and therefore cannot be the basis of a claim for securities fraud. Def.'s Mem. at 6. According to the defendant, the "action" Gibson was referring to was registration. Her statement in effect was that registration "is not an indication of official company intention," rather than a statement denying "official company intention" to acquire SkyTel.

Upon reviewing the Complaint, this Court finds that Plaintiffs' claims that MCI's statements were false or misleading have been pleaded with sufficient particularity to satisfy the PSLRA's heightened pleading requirements and Rule 9(b). The Complaint alleges the specific statement, the reasons why they believe the statement is misleading, and the facts on which that belief is formed. See *15 U.S.C. § 78u-4*(b)(1). At the time the statements were made, ongoing merger discussion were clearly taking place. These statements were reasonably interpreted to mean that MCI had no plans to acquire SkyTel. Ms. Gibson spoke to the press specifically to address the question of whether a merger was in the offing. She [*10] could have said "no comment" and nothing more. But, when she said "the action is not an indication of official company intention," she suggested that MCI had no intention to acquire SkyTel. This is how a number of sophisticated news organizations interpreted her answer, notwithstanding the "no comment" statement made later. See Curnin Aff. Ex. A, New York Times article ("MCI Worldcom . . . issued what many investors took to be a firm denial that it might acquire SkyTel . . ."); May 26, 1999 Associated Press Newswires story, "Internet domain address sparks Skytel-MCI WorldCom merger talk" ("While this week's online report reignited merger

rumors and sent SkyTel's stock up $ 2.94 per share to $ 21.88 in a 15-minute span on Tuesday, MCI WorldCom officials say such a union is not to be.") n2 Moreover, immediately following that announcement, the price of SkyTel shares fell sharply, a further indication that the public viewed the statement as a denial of merger rumors.

> n2 The Court may consider documents incorporated by reference in the pleadings and matters of which judicial notice may be taken. See *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *In re Health Management, Inc. Sec. Litig.*, 970 F. Supp. 192, 199 (E.D.N.Y. 1997). The Court also should consider documents that, while not explicitly incorporated in the complaint, are "integral" to plaintiffs' claim or are relied on by them. See *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991); see also *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (1996); *Brass v. American Film Techs.*, 987 F.2d 142, 150 (2d Cir. 1993).

[*11]

Defendant also argues that MCI cannot be liable for statements relied upon by the shareholders of a different company. Def. Mem at 7 n.2; Reply. Br. at 8 n.4. This argument is without merit, as there is no such limitation on the scope of the defendant's Section 10(b) duty. "Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentation, therefore, may be presumed for the purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247 (emphasis added); see also *In re Columbia Securities Litigation*, 747 F. Supp. 237 (S.D.N.Y. 1990)(denying motion to dismiss securities action brought by former shareholders of target company against acquiring company for falsely denying existence of merger negotiations); *Buxbaum v. Deutsche Bank, A.G.*, 2000 U.S. Dist. LEXIS 5838, 98 Civ. 8460 (S.D.N.Y. March 6, 2000)(same).

Defendant urges the Court to follow the Fourth Circuit's decision in *Phillips v. LCI International, Inc.*, 190 F.3d 609 (4th Cir. 1999), and dismiss the Complaint. The Phillips plaintiffs alleged that LCI violated Section 10(b) when its CEO told a reporter "we're not a company that's [*12] for sale" on February 17, 1998. *Id. at 612*. The plaintiffs contended that the CEO's statement was a false denial of the ongoing negotiations. *Id. at 616*.

The Fourth Circuit, recognizing that "this is a close question," affirmed the dismissal of a securities fraud complaint. But Phillips is distinguishable from the pre-

sent case. First, unlike the SkyTel situation, at the time LCI's Thompson made the statement that "we're not a company that's for sale," no merger talks were ongoing. The Fourth Circuit opinion notes that while LCI and Qwest had held merger negotiations in the Fall of 1997, the LCI Board rejected Qwest's offer on December 15, 1997, and on December 16, 1997, LCI sent Qwest's chief executive a letter advising him that "LCI was not for sale." *Phillips, 190 F.3d at 615-16.* That situation had not changed at the time of Thompson's February 17, 1998 statement that "we're not a company that's for sale." Based on the facts of the case, the Fourth Circuit concluded that, in context, Thompson's statement was not a misrepresentation of a material fact. *Id. at 619.*

The present case is more akin to *Buxbaum v.* [*13] *Deutsche Bank, A.G., 2000 U.S. Dist. LEXIS 5838, 98* Civ. 8460 (S.D.N.Y. March 6, 2000), recently decided by Judge Koeltl. In Buxbaum, plaintiffs were a class of persons who had sold Bankers Trust stock. The defendant, Deutsche Bank, acquired Bankers Trust. While merger discussions were ongoing, Rolf-Ernst Breuer, the CEO of Deutsche Bank, gave an interview to a German newsmagazine. When asked whether Deutsche Bank was interested in acquiring Bankers Trust, he responded: "There is nothing I could tell our shareholders." When the reporter then asked if there hadn't been talks with Bankers Trust, Mr. Breuer stated: "In this business, everybody talks to everybody. But there was no talk of a takeover." The price of shares in Bankers Trust fell sharply following the publication of the interview. A month later, Deutsche Bank announced it was acquiring Bankers Trust. In denying defendants' motion to dismiss, the court in Buxbaum found that Breuer's statement was false or misleading, and that it was material.

C. Materiality

Defendant argues that even if its statement amounts to a false denial of the impending merger, it is not actionable because it was immaterial. Def.'s Mem. at 9 n. 4. Information is [*14] material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, 485 U.S. at 231-32* (quoting *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 448-49, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)).* Moreover, a complaint may not be dismissed pursuant to Rule 12(b)(6) on the grounds that the alleged misstatements are not material unless they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999); *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).*

The allegations in the Complaint support plaintiffs' claims that defendant's statement was misleading and material. The omitted information -- the fact that final merger negotiations between MCI and SkyTel were almost completed when defendant issued its denial of any official merger intention -- "might have given a reasonable investor pause" in deciding whether to sell or hold their SkyTel shares. [*15] See *Kaplan v. Rose, 49 F.3d 1363, 1374 (9th Cir. 1994),* cert. denied, *516 U.S. 810 (1995).* That non-disclosure of the omitted information would have been viewed by the reasonable investor as having altered the "total mix" of information made available by defendant.

There was a drop in the price of SkyTel common stock immediately following MCI's statement, which also supports plaintiffs' allegations of materiality. See e.g., *Blanchard v. Edgemark Financial Corp., 1999 U.S. Dist. LEXIS 1096, *34-35,* No. 94 C 1890, *1999 WL 59994* at *12 (N.D. Ill. Feb. 3, 1999) ("we cannot conclude at this stage of the litigation that the pre-merger negotiations were immaterial as a matter of law . . . It is clear that the merger had a dramatic impact on the value of the stock. . . . This fact alone demonstrates that the merger was an event of significant magnitude.").

In *In re Columbia Sec. Litig., 747 F. Supp. 237 (S.D.N.Y. 1990),* Judge Sand upheld a complaint's 10b-5 allegations where defendant falsely denied in press accounts the existence of merger negotiations. In fact, early-stage negotiations had been ongoing between executives of the respective companies. The [*16] court held:

> In view of the allegations demonstrating substantial indicia of interest, and the importance of the transaction in the life of Columbia, this Court concludes that a reasonable Columbia stockholder might have viewed disclosure of the alleged merger negotiations as altering the total mix of information available at the time the press statements were made."

*Id. at 243-244.*

II. Scienter

In 1995, Congress enacted the PSLRA which provides that plaintiffs must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4*(b)(2). The "required state of mind" for a

Section 10(b) or Rule 10b-5 violation is scienter, "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).*

In this Circuit, a plaintiff can plead fraudulent intent in one of two ways: (1) by identifying circumstances indicating conscious or reckless behavior by the defendant, or (2) by alleging facts showing [*17] a motive to commit fraud and a clear opportunity to do so. *Press v. Chemical Investment Services Corp., 166 F.3d 529, 537-38 (2d Cir. 1999); In re Computer Associates Class Action Securities Litigation, 75 F. Supp. 2d 68, 72 (E.D.N.Y. 1999).* To meet this standard, plaintiffs must do more than offer "claims of fraud on speculation and conclusory allegations." See *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)* (explaining that Rule 9(b) is intended to "safeguard a defendant's reputation from improvident charges of wrongdoing" and to protect a defendant from strike suits). In this case, plaintiffs have properly alleged scienter through motive and opportunity. They have also alleged facts from which an inference of conscious misbehavior or recklessness may properly be drawn.

## A. Defendant's Motive

To show motive, plaintiffs must show "concrete benefits [to a defendant] that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Chill v. General Electric Co., 101 F.3d 263, 268 (2d Cir. 1996).* Plaintiffs' allegations of motive, as set forth in the [*18] Complaint, have met this standard. Plaintiffs assert that MCI was motivated to artificially deflate the price of SkyTel stock in order to help ensure that the acquisition price would not have to be increased. It also did so to make the intended takeover more attractive and at a higher premium than if SkyTel's stock price had remained higher because of the merger rumors reignited by the news stories reporting on the registration of the skytelworldcom.com domain name. PP 20, 23, 29.

### 1. Gibson's knowledge of the merger

In response, defendant asserts that plaintiffs fail to allege that Gibson had any knowledge of the confidential merger negotiations, and that such knowledge cannot be assumed or conclusorily asserted. See *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999).* MCI argues that if Gibson is not alleged to have had any knowledge of the confidential merger negotiations, opportunity has not been sufficiently alleged. Def.'s Mem. at 15. Gibson's knowledge of the merger is a matter of factual dispute for discovery. At this stage, the Court finds that it is reasonable to assume the official MCI spokesperson, the Senior Manager of Corporation Com-

munications [*19] at MCI, did know of an impending merger which was announced three days later.

### 2. The setting of the price

When assessing motive, the Second Circuit assumes "that the defendant is acting in his or her informed economic self-interest." *Shields, 25 F.3d at 1130;* see also *Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990).* Therefore, it is not sufficient for plaintiffs to allege an economically irrational motive. Defendant argues that its alleged motive is insufficient as a matter of law because the alleged fraud did not entail any "concrete" economic benefit to MCI and, therefore, it was not in MCI's economic interests to deflate the price of SkyTel shares.

First, being able to acquire a company for a significantly reduced price is a sufficient economic benefit to satisfy the motive requirement for scienter. In Buxbaum, the court found that plaintiffs sufficiently alleged that defendants had a motive to depress the stock price of the target company:

> Mr. Breuer, as CEO of the Deutsche Bank, had incentive to depress the price of Bankers Trust stock. Whatever the exact basis for calculating the ultimate purchase [*20] price, it was clearly in a purchaser's interest that the quoted public price of the asset to be acquired was as low as possible.

Defendant argues that it had no incentive to deflate the value of SkyTel's stock. The price for the acquisition had already been set at the time of the May 25, 1999 press conference, and therefore MCI was without a motive to defraud. Def.'s Mem. at 13, 14. This assertion is not persuasive for the reason that follows.

MCI was acquiring SkyTel for stock. The purchase price was determined by the number of MCI shares to be exchanged for each SkyTel share, which was set by the "exchange ratio." Curnin Aff. P 11. That ratio depended on the value of MCI's stock as measured by an objective formula. However, although the Complaint states that the exchange ratio had been negotiated by May 25, it does not allege that it had been finalized. PP 19, 20. In fact, the exchange ratio had not been precisely fixed at the time of MCI's public statement. SkyTel Proxy at 18. n3 On May 25, 1999, MCI proposed, among other things, adjusting the exchange ratio upward in the event that trading prices for MCI shares declined. Id.

> n3 The Court can consider the full text of documents filed with the SEC, such as SkyTel's

Proxy Statement, without converting defendant's motion into one for summary judgment. See *Kramer, 937 F.2d at 773-74.*

[*21]

Plaintiffs and defendant disagree on the effect of a drop in SkyTel's share price on MCI's economic position during the time leading up to the merger. Plaintiffs argue that an increase in SkyTel's price may have compromised the deal or at least caused MCI to renegotiate the terms of the acquisition. To support this assertion, plaintiffs point out that the Class Period's artificially low level of SkyTel stock is referenced in SkyTel's Proxy statement, which was sent to its shareholders to encourage them to approve the merger. Under both the headings "Market Price and Dividend Information" and "Comparative Stock Price and Dividends," the closing price of SkyTel on May 27, 1999 -- in the middle of the Class Period -- is set forth as a reference point for shareholders. Proxy Statement at 5, 32.

Defendant argues that SkyTel's stock price was irrelevant to the deal. If MCI's stock price went down, SkyTel shareholders would receive more MCI shares, and if MCI's price rose, SkyTel shareholders would receive less -- regardless of where SkyTel stock was trading. What effect a drop in SkyTel's share price may have had on the merger is likely to be the subject of expert analysis and should not [*22] be resolved at this stage. It is sufficient that plaintiffs have alleged facts in the Complaint that support a plausible motive for MCI to make false statements in order to deflate SkyTel's stock price.

This is in sharp contrast to Phillips, again relied on by defendant, Def.'s Mem. a 14, where the Fourth Circuit discussed at length why the allegations of motive were implausible. Among the reasons noted by that court was that LCI's chief executive initially voted against the merger. In addition, as the chief executive of the target company, there was no financial gain for Thompson to achieve by falsely denying that the company was for sale. Here, as the acquirer, MCI may have been motived by potential economic gains to falsely deny merger talks.

B. Opportunity

To demonstrate "opportunity," plaintiffs must show that a defendant had both the means and likely prospect of achieving those concrete benefits. *Chill, 101 F.3d at 267 n.4* (citing *Shields, 25 F.3d at 1130*). Defendant argues that plaintiffs do not allege any facts illustrating that MCI had the prospect of benefitting from the allegedly fraudulent statement because depressing SkyTel's [*23] stock price on May 25 could not impact the acquisition price. Further, defendant asserts that there is no allegation that Ms. Gibson had the means to accomplish the alleged fraud because plaintiffs do not claim that she

knew about the merger negotiations. For the same reasons as discussed above, these arguments are not persuasive.

C. Conscious Misbehavior

Plaintiffs have also alleged "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness" by MCI. *Press, 166 F.3d at 537-38.* The Complaint alleges that three days prior to the announcement of the merger, MCI's official corporate spokesperson falsely denied any "official company intention" regarding the registration of a domain name that was an obvious combination of MCI's and SkyTel's names. PP 17, 20-22. The market understood the denial to mean there would be no takeover, as evidenced by the drop in SkyTel's price. P 21. The New York Times article appended to defense counsel's affidavit indicates that it was MCI itself that registered the domain name, and not, as Ms. Gibson suggested, an MCI employee acting alone. Curnin Aff. Ex. A. These facts demonstrate conscious misbehavior [*24] or recklessness on the part of MCI sufficient to plead scienter.

III. Loss Causation

To survive this motion, plaintiffs must properly plead "loss causation." See *Bennett v. United States Trust Co., 770 F.2d 308, 313 (2d Cir. 1985).* To do so, "the plaintiff must demonstrate that 'the damages complained of [were] a foreseeable result of the plaintiff's reliance on the fraudulent misrepresentation.'" *Vento & Co. v. Metromedia Fiber Network, Inc., 1999 U.S. Dist. LEXIS 3020, *22, 97 Civ. 7751 (JGK), 1999 WL 147732* at *8 (S.D.N.Y. Mar. 18, 1999) (quoting *Weiss v. Wittcoff, 966 F.2d 109, 111 (2d Cir. 1992)).*

The Complaint sets out a causal connection between movement in SkyTel's stock price and Gibson's statement. As alleged by plaintiffs, SkyTel's stock opened on May 25, 1999 at $ 18.875 per share. When news services reported that MCI had obtained the new internet address, the stock price increased to $ 21.875. Shortly after noon, Ms. Gibson made the material misleading statement and soon after, the share price fell of MCI to as low as $ 18.6875. Shares closed that day at $ 20.125, on three times the normal daily volume for that stock. n4

> n4 The court can take judicial notice of SkyTel's historical stock prices. *Fed. R. Evid. 201; Kramer, 937 F.2d at 773.*

[*25]

Defendant argues that SkyTel's stock had dipped below its high for the day before Gibson's statement was released, which it claims occurred at or about 1:45 p.m.

Such a factual dispute over the time of the announcement, highly relevant to plaintiffs' allegations, is inappropriate for resolution at this stage in the proceedings. *Weiss, 966 F.2d at 112* (reversing district court's dismissal on loss causation and reminding that "although it remains to be seen whether Weiss can prove his allegations, the court's task on a Rule 12(b)(6) motion is not to rule on the merits of plaintiffs' claims, but to decide whether, presuming all factual allegations of the complaint to be true, and drawing all reasonable inferences in the plaintiff's favor, the plaintiff could prove any set of facts which would entitle him to relief."). Plaintiffs' allegations of loss causation are sufficient to survive a motion to dismiss.

## CONCLUSION

For the foregoing reasons, this Court denies defendant's motion to dismiss.

SO ORDERED.

I. Leo Glasser, U.S.D.J.

Dated: Brooklyn, New York

April 11th, 2000