23

SCOTT MCSPARRAN and LAURA ULRICH, Derivatively On Behalf of CAREER EDUCATION CORPORATION, Plaintiffs, v. JOHN M. LARSON, PATRICK K. PESCH, WALLACE O. LAUB, KEITH K. OGATA, DENNIS H. CHOOKASZIAN, ROBERT E. DOWDELL, THOMAS B. LALLY, NICK FLUGE, JACOB P. GRUVER, and TODD H. STEELE, Defendants, -and- CAREER EDUCATION CORPORATION, a Delaware Corporation, Nominal Defendant.

### No. 04 C 0041 (Consolidated with 04 C 4778)

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### *2006 U.S. Dist. LEXIS 3787*

### January 27, 2006, Decided

**COUNSEL:** [*1] For Scott McSparran, Derivatively on behalf of Career Education Corporation, Plaintiff: Brian O O'Mara, Travis E Downs, III, William S Lerach, Lerach Coughlin Stoia Geller, Rudman & Robbins, San Diego, CA; Brian J Robbins, Marc M Umeda, Robbins Umeda & Fink, LLP., San Diego, CA; George Barrett, Barrett, Johnston & Parsley, Nashville, TN; Patrick J. Sherlock, Attorney at Law, Chicago, IL.

For John M Larson, Wallace O Laub, Keith K Ogata, Dennis H Chookaszian, Robert E Dowdell, Thomas B Lally, Nick Fluge, Jacob P Gruver, Todd H Steele, Defendants: David H. Kistenbroker, Karl Richard Barnickol, Mary Ellen Hennessy, Katten Muchin Rosenman LLP, Chicago, IL.

For Patrick K Pesch, Defendant: Daniel E. Reidy, Alicia Marie Hawley, James Cordray Dunlop, Jones Day, Chicago, IL.

For Career Education Corporation, a Delaware corporation, Defendant: Walter C. Carlson, Courtney Ann Rosen, Richard Bradshaw Kapnick, Tara Kocheran Charnes, Sidley Austin LLP, Chicago, IL.

**JUDGES:** Wayne R. Andersen, United States District Judge.

**OPINIONBY:** Wayne R. Andersen

**OPINION:**

### MEMORANDUM OPINION AND ORDER

This matter is before the court on the defendants' motion to dismiss. For the reasons stated below, [*2] defendants' motion to dismiss is denied.

### BACKGROUND

Scott McSparran and Laura Ulrich (hereinafter collectively "plaintiffs") filed a Verified Shareholders' Consolidated Derivative Complaint ("Complaint") on behalf of Career Education Corporation ("CEC"), suing every member of CEC's Board of Directors and certain key officers. The facts set forth herein are those alleged in the Complaint. We take the allegations set forth in the plaintiffs' Complaint as true, as we must in addressing a motion to dismiss. Much of plaintiffs' 75-page, 164-paragraph Complaint contains allegations we need not analyze at this stage in the litigation. However, we will discuss those allegations that allow plaintiffs' Complaint to survive the motion to dismiss.

CEC is a provider of private, for-profit post secondary education, with 51 campuses located throughout the United States, Canada, France, the United Kingdom, and the United Arab Emirates. In addition to its physical locations, CEC maintains an on-line presence through its e-learning division, American InterContinental University-Online. While CEC

is formally incorporated in Delaware, plaintiffs maintain that CEC is headquartered in this [*3] District, which is also where a significant portion of the alleged wrongs and transactions the plaintiffs set forth in the Complaint occurred.

Plaintiffs claim that defendants violated their fiduciary duty and other laws resulting in damages to CEC of several million dollars in legal and other fees and a significantly diminished business reputation. The gravamen of plaintiffs' Complaint is that defendants artificially inflated CEC's stock price so that they could sell their holdings of CEC's stock at a higher price than the true value of the company would warrant. In an effort to accomplish this, the defendants are alleged to have caused CEC to take several actions that were not in the company's best interests, including enrolling students without complete financial aid, enrolling students that did not actually attend classes, and claiming inflated job-placement rates for CEC graduates.

The Complaint dedicates a significant amount of attention to the regulatory regime in which CEC operated. Many CEC students receive federal loans and funding administered under Title IV of the Federal Higher Education Act ("HEA"), *20 U.S.C. § 1070 et. seq.* This receipt [*4] of federal funds subjects CEC to the regulations of the Department of Education. On July 1, 2003, CEC announced that it had acquired Whitman Education Group ("Whitman"). As the defendants were supposedly aware, this acquisition would trigger a review of both Whitman and CEC by the Department of Education to decide CEC's eligibility for continued participation in HEA programs. In spite of increased scrutiny from the Department of Education and the grave results such a review could visit upon CEC, plaintiffs claim that the defendants caused CEC to falsify records and receive federal student loan funds to which it was not entitled. Additionally, plaintiffs recite numerous other statistics closely monitored by the Department of Education and investors alike that plaintiffs claim the defendants caused CEC to manipulate, such as job placement rates and enrollment figures.

Moreover, the Complaint identifies specific information the defendants supposedly had in their possession that should have alerted them to the problems at CEC. Much of this information was public, such as newspaper articles, court papers, SEC filings, and analyst reports. Other information was allegedly in the hands of [*5] certain defendants, such as the comparisons between accurate "non-scrubbed" data about financial packaging for each and every enrolled student and inaccurate "scrubbed" data that was reported to the public. The Complaint also quotes from CEC polices that plaintiffs contend should have brought this information to the attention to Audit Committee of CEC's Board of Directors, if not the entire CEC Board of Directors.

If the allegations in the Complaint are believed, this false accounting was not the result of lax oversight; it was intentional. All defendants save one are alleged to have sold significant stock holdings while CEC's stock was artificially inflated by the false numbers reported by CEC. The Complaint lists the proceeds gained from each stock sale by individual defendants. According to the plaintiffs, defendants' scheme enabled them to dispose of 2.8 million shares of CEC stock for proceeds of over $ 136 million.

The Complaint posits that the defendants knew exactly what was happening at CEC and lied about the extent of the problems CEC faced even after the accounting irregularities came to light, all so that they could continue to sell stock at high prices. After setting [*6] forth numerous instances of defendants attempting to conceal accounting irregularities, the Complaint says the defendants caused CEC to violate Generally Accepted Accounting Principles and its own Audit Committee Charter "by failing to, among other things, properly implement, review, and oversee: (i) the Company's financial statements and its financial reporting process; and (ii) the systems of internal accounting and financial control."

Also detailed in the Complaint are the ties between CEC's CEO and Chairman of the Board, and each and every other member of CEC's Board of Directors. While CEC's CEO and Chairman of the Board unquestionably had some degree of control over the compensation of officers of CEC, the Complaint does not allege other business relationships that would allow him to control the compensation of outside directors. Instead, the Complaint refers to general social and business ties and mentions fees paid to the directors for their services.

## DISCUSSION

Before the Court is a shareholder derivative complaint. A derivative action is brought by individual shareholders on behalf of a corporation. However, a hallmark of corporation law is that directors, rather [*7] than shareholders, manage the business affairs of the corporation. *See, e.g., 8 Del. C. § 141(a)*("The business and affairs of a corporation organized under this chapter shall be managed by or under the direction of a board of directors except as may otherwise [be provided].") Derivative actions "impinge on the managerial freedom of directors. Hence, the [the requirement that a plaintiff demand that a company's board of directors bring suit prior to initiating their own action on behalf of the company] . . exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies and then to provide a safeguard against strike suits." *Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled on other grounds by Brehm*

*v. Eisner, 746 A.2d 244, 253 (Del. 2000)*. Nevertheless, the requirement that a plaintiff pleading a derivative complaint must make a demand upon a corporation's board is excused when such a demand would be futile. *Heineman v. Datapoint Corp., 611 A.2d 950, 952 (Del. 1992)* ("Equity will not require a useless act" and thus "where demand upon the board would be 'futile, [*8] ' the demand requirement will be excused.")

In determining the plaintiffs' pleading requirements we will follow the Federal Rules of Civil Procedure. Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, when deciding a motion to dismiss, the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. General Electric Co., 87 F.3d 209, 211 (7th Cir. 1996)*; *Wilson v. Formigoni, 42 F.3d 1060, 1062 (7th Cir. 1994)*. However, the normally liberal pleading standards of the Federal Rules of Civil Procedure are heightened in this case by *Rule 23.1*, which requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *Fed. R. Civ. P. 23.1*. Pleading with particularity means that a plaintiff must include [*9] "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)*.

## I. Demand Futility

Because CEC was incorporated under the laws of Delaware, we will apply Delaware law in determining whether plaintiffs are excused from making a demand upon CEC's Board of Directors prior to initiating a suit. We note that, although plaintiffs claim Illinois law applies, they correctly recognize Illinois case law follows Delaware case law in determining the proper tests for demand futility. *In re Abbott Laboratories Derivative Shareholders Litigation, 325 F.3d 795, 803 (7th Cir. 2001)*("*In Re Abbott Labs*"). The Supreme Court of Delaware created a two-part test for demand futility in *Aronson v. Lewis*. Under this test, we ask whether "a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgement." *Aronson, 473 A.2d at 814*. Plaintiffs assert two main grounds for demand futility: (i) the Board of Directors is dominated and controlled [*10] by CEC's CEO and Chairman of the Board; and (ii) a majority of the Board of Directors are interested in the outcome of this litigation because they face a substantial likelihood of liability for claims predicated on the fact their decisions were not protected by the business judgement rule. As such, the two-part test laid out in *Aronson* is distilled in the present case into questions of independence and interest.

### A. Independence of Directors

Delaware courts have noted that "at bottom, the question of independence turns on whether a director is, for any substantial reason, incapable of making a decision with only the best interests of the corporation in mind. That is, the Supreme Court cases ultimately focus on impartiality and objectivity." *In re Oracle Corp. Derivative Litigation, 824 A.2d 917, 938 (Del.Ch.2003)*, quoting *Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1232 (Del.Ch.2001)*, *rev'd in part on other grounds, 817 A.2d l49 (Del.2002)*, *cert. denied, 538 U.S. 1032, 123 S.Ct.2076, 155 L.Ed.2d 1061 (2003)*(emphasis in original). However, "neither mere personal friendships alone, nor mere outside [*11] business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence." *Litt v. Wycoff, No. 19083-NC, 2003 Del. Ch. LEXIS 23, *16 (Del. Ch. Mar. 25, 2003)*. Nor does the fact that directors receive directorial fees destroy their independence. *Grobow v. Perot, 539 A.2d 180, 188 (Del.1988)*, *overruled on the grounds by Brehm, 746 A.2d at 253-54*; *see also White v. Panic, 793 A.2d 356, 366 (Del.Ch.2000)* ("The fact that each [director] is paid an annual retainer of $ 30,000 plus a fee of $ 1000 for each meeting attended and annual grants of stock options does not make them beholden to [the company's CEO].").

There is no substantial reason to question the independence of a majority of CEC's Board of Directors. Plaintiff has not put forth any allegations outside directors have their salary set by any board member, or are otherwise financially dependent upon other directors. If mere social acquaintances and prior business relationships with other board members coupled with the receipt of directorial fees destroyed a board member's independence, few boards would have any independent members. Moreover, [*12] every reason plaintiff sets forth to question the independence of CEC's Board of Directors runs contrary to Delaware law.

### B. Interest of Directors

In determining whether the defendants have an interest in the litigation that would render a demand upon them futile we look to whether the factual allegations in the Complaint "create a reasonable doubt as to the disinterestedness of the directors at the time the Complaint was filed." *Blasband v. Rales, 971 F.2d 1034, 1048 (3rd Cir. 1992)* (applying Delaware law). A reasonable doubt regarding a director's interest is raised when a corporate decision "will have a mate-

rially detrimental impact on a director, but not on the corporation or the stockholders." *Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993)*. As such, if plaintiffs' Complaint pleads facts that indicate a majority of CEC's Board of Directors face a "substantial likelihood" of personal liability, a demand upon the Board of Directors is futile. *Aronson, 473 A.2d at 815*.

Generally, board members are protected from individual liability by the business judgment rule, which provides a "presumption that in making a business [*13] decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts." *Aronson, 473 A.2d at 812*. Nevertheless, individual liability for directors can result from two possible contexts: (i) such liability can "follow from a board decision that results in a loss because that decision was ill advised [,] 'negligent,'" or intentionally adverse to the best interests of the company and (ii) that liability may "arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." *In re Caremark International Inc. Derivative Litigation, 698 A.2d 959, 964 (Del.Ch. 1996)*.

*In re Abbott Labs* was a case initially dismissed for failure to adequately plead demand futility. *325 F.3d 795*. The Seventh Circuit Court of Appeals reversed that dismissal and found that:

> given the extensive paper trail. . . concerning the violations [giving rise the derivative complaint] and the inferred awareness of [*14] the problems, the facts support a reasonable assumption that there was a 'sustained and systematic failure of the board to exercise oversight,' in this case intentional in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for [six years] resulted in substantial corporate losses.
> ...

*Id. at 809.*

The Seventh Circuit then stressed that "the totality of the complaint's allegations need only support a reasonable doubt of business judgment protection, not a judicial finding that the directors' actions are not protected by the business judgment rule." *Id. at 808.*

The Seventh Circuit is not alone in recognizing that a board's extreme indifference or failure to act may create individual liability for board members. *In re Caremark, 698 A.2d at 970* ("a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses [*15] caused by non-compliance with applicable legal standards.") Moreover, it is beyond dispute that a director who profits from confidential corporate information and takes actions adverse to the corporation's best interest is personally liable to the corporation. *Brophy v. Cities Service Co., 31 Del. Ch. 241, 70 A.2d 5, 8 (Del. Ch. 1949)* (If "a person in a confidential or fiduciary position, in breach of his duty, uses that knowledge to make a profit from himself, he is accountable for such profit. . . .").

Plaintiffs' Complaint contains two alternative allegations. Defendants were allegedly either active participants in a scheme to report false accounting of revenues and enrollment figures so that they could sell their holdings of CEC stock at inflated prices, or they failed to act in the face of evidence that should have prompted remedial measures. Either of these two scenarios could result in personal liability for the defendants. In support of these allegations, the Complaint details company policy that should have brought CEC's false accounting to the attention of the defendants, quotes from news articles, court filings, and analyst reports that discussed allegations of false accounting, [*16] and names of two defendants who supposedly received comparisons of accurate information versus the inaccurate information that was provided to the public and the federal government. Additionally, the Complaint alleges that all defendants except for one sold sizable stock holdings while they knew, or should have known, of significant, non-public, problems with CEC's reported financial and enrollment figures. In fact, the plaintiffs contend that the reason CEC was engaged in the reporting of false figures was primarily to allow defendants to profit from selling their holdings of CEC stock. The Complaint also explains that the reporting of false figures to the federal government was extremely adverse to the interests of CEC due to the dire consequences a revocation of HEA loan eligibility would visit upon the company.

The alleged lack of oversight provided by the CEC Board of Directors mirrors that discussed in the Seventh Circuit's *In re Abbot Labs* opinion. While *In re Abbott Labs* involved six years in which the board had actual knowledge of correspondence from government officials warning of legal violations, which is longer than the relevant time period set forth in plaintiffs' [*17] Complaint, the period of time oversight failed to meet the board's obligations is not determinative. Moreover, *In re Cendant* stressed that corporate boards have an obligation to undertake a good faith obligation to ensure that reporting systems are in place that alert board members to significant risks faced by the company. As such, it is not only the public pronouncements by newspapers, analysts, and litigants that arguably created a duty for the board to act. Instead, if the allegations in the Complaint are true, the public pronouncements were merely a symptom of the ills brought upon CEC by massive oversight failures or intentional manipulation of financial and enrollment figures.

At this stage in the litigation plaintiffs have met their burden of pleading with particularly their reasons for demand futility. The plaintiffs have told us the "who, what, when, where, and how" of a story that a raises a reasonable doubt about the defendants' personal liability. Since the defendants may have personal liability, they are interested parties to any demand upon the Board of Directors to institute litigation. As such, plaintiffs are excused from making a demand upon the Board of Directors [*18] based on the doctrine of demand futility. Moreover, we note that defendants do not contend that they have taken any actions to pursue the rights asserted in the Complaint, despite the two-year pendency of this litigation.

We will not parse the language of the Complaint to determine whether it states a claim for securities fraud, which would raise substantial questions concerning scienter, materiality, and pleading requirements. While properly plead allegations of securities fraud would certainly place the defendants at great personal risk, we have already determined that plaintiffs failure to make a demand upon the Board of Directors is excused under the doctrine of demand futility. As such, we need not make any further inquires at this juncture.

**III. Damages**

Defendants also argue for dismissal on the grounds that no damages were pled. It is axiomatic that a plaintiff must set forth a theory of damages. Plaintiffs have done so in the present Complaint. Plaintiffs allege that CEC spent several million dollars in legal and other fees and suffered a substantially diminished business reputation as a result of defendants' actions. If true, this has ramifications for everything [*19] from CEC's stock price and borrowing ability to student retention and enrollment rates. As such, the defendants have pled damages. *See, e.g., In re Cendant Corporation Derivative Action Litigation, 189 F.R.D. 117, 134-5 (D.N.J. 1999)*.

**CONCLUSION**

For all the foregoing reasons, defendants' motion to dismiss [265] is denied. It is so ordered.

Wayne R. Andersen

United States District Judge

Dated: January 27, 2006

24

JERRY B. MORRIS, ET AL., Plaintiffs, VS. SCOTT BUSH, ET AL., Defendants.

### CIVIL ACTION NO. 3:98-CV-2452-G

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

*1999 U.S. Dist. LEXIS 9994; Fed. Sec. L. Rep. (CCH) P90,521*

**June 22, 1999, Decided**
**June 22, 1999, Filed; June 23, 1999, Entered on Docket**

**DISPOSITION:** [*1] Motions of Sterritt and Larry Sterritt to dismiss plaintiffs' claims against them DENIED.

**COUNSEL:** For JERRY B MORRIS, MARTIN G BLAHITKA, ROBERT D LUNA, plaintiffs: Karen L Hirschman, Attorney at Law, Vinson & Elkins, F Michael Prince, Attorney at Law, Carrington Coleman Sloman & Blumenthal, Dallas, TX USA.

For CONTINENTAL INVESTMENT CORPORATION, defendant: David Carroll Mattka, Attorney at Law, Munsch Hardt Kopf & Harr, Dallas, TX USA.

For SUSAN HILL, movant: Bill C Hunter, Attorney at Law, Dallas, TX USA.

For WILMA GRAHAM, movant: Ernest W Leonard, Attorney at Law, Friedman Driegert & Hsueh, Dallas, TX USA.

For SECURITIES TRANSFER CORPORATION, KEVIN HALTER, JR, movants: Jack M Kuykendall, Attorney at Law, Law Office of Jack M Kuykendall, Dallas, TX USA.

For EDWARD ROUSH, JR, movant: Emil Lippe, Jr, Attorney at Law, Lippe & Associates, D Mark Elliston, Attorney at Law, Elliston & Ormesher, Dallas, TX USA.

Edward Roush, Jr, movant, Pro se, Dallas, TX USA.

For WASTEMASTERS INC, movant: Robert J Mottern, Mottern Fisher & Rosenthal PC, Tucker, GA USA.

MALCOLM M KELSO, movant, Pro se, Dallas, TX.

For JOHN MARSHALL LAW SCHOOL, movant: Michael Lewis [*2] Geller, Attorney at Law, Law Office of Michael Geller, Dallas, TX.

For JOHN MARSHALL LAW SCHOOL, movant: E Michael Moran, Attorney at Law, Law Office of E Michael Moran, Atlanta, GA USA.

ROBERT J D'AGOSTINO, movant, Pro se, Atlanta, GA USA.

D MARK ELLISTON, movant, Pro se, Dallas, TX USA.

For STEWART RAHR, intervenor-plaintiff: Bill Sims, Attorney at Law, Vinson & Elkins, Dallas, TX USA.

For STEWART RAHR, intervenor-plaintiff: Hank L Goldsmith, Steven M Kayman, Mark E Davidson, John W Ritchie, Simon Block, Proskauer Rose, New York, NY USA.

**JUDGES:** A. JOE FISH, United States District Judge.

**OPINIONBY:** A. JOE FISH

**OPINION:**

### MEMORANDUM ORDER

Before the court are the motions of the defendants R. Dale Sterritt and Larry Sterritt (collectively, "defendants") to dismiss, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the plaintiffs' claims against them. For the following reasons, the defendants' motions are denied.

#### I. BACKGROUND

Continental Investment Corporation ("CIC") is a publicly traded Georgia corporation. *See* Plaintiffs' Original Complaint; Application for Temporary Restraining Order, Temporary Injunction, and Permanent

Case 1:05-cv-00327-GMS   Document 48-10   Filed 03/06/2006   Page 9 of 25

Page 2

1999 U.S. Dist. LEXIS 9994, *; Fed. Sec. L. Rep. (CCH) P90,521

Injunction; [*3] and Brief in Support Thereof ("Original Complaint") P 10; Complaint in Intervention P 8. CIC's shares of common stock are registered under Section 12(g) of the Securities Exchange Act of 1934, *15 U.S.C. § 78l*(g). See *id.* In the early fall of 1998, the elected members of CIC's board of directors (the "Board") were plaintiffs Jerry B. Morris ("Morris"), Martin G. Blahitka ("Blahitka"), Robert D. Luna ("Luna"), and defendant R. Dale Sterritt, Jr. ("Sterritt"). See *id.* Sterritt served as Chairman of the Board. See Original Complaint P 16; Complaint in Intervention P 13. On September 24, 1998, however, the CIC Board removed Sterritt from his position as Chairman. See *id.* The plaintiffs allege that the Board took such action after receiving information concerning improper and potentially unlawful conduct by Sterritt and other persons acting in concert with him. See *id.*

According to the plaintiffs, after Sterritt had been removed as Chairman of the Board and after his authority to transact business on behalf of the company had been suspended, he sent or caused to be sent to CIC shareholders a notice of a special meeting of CIC shareholders to be held in Dallas, Texas [*4] on October 15, 1998. The stated purpose of the meeting was to remove plaintiffs Morris, Blahitka, and Luna from the CIC Board and to elect three new directors "from the floor." See Original Complaint P 17; Complaint in Intervention P 14. The plaintiffs allege that, at the October 15, 1998 meeting, Sterritt exercised proxies obtained from CIC shareholders n1 and illegally removed Morris, Blahitka, and Luna from the CIC Board, replacing them with defendants Scott Bush ("Bush"), Larry Sterritt ("Larry Sterritt"), and Greg Wiggins ("Wiggins"). n2 See *id.* P 24.

n1 The plaintiffs maintain that, "according to the 1997 Annual Report on Form 10-KSB/A . . . that was filed with the SEC on June 24, 1998 ("Form 10-K"), as of May 28, 1998, Defendant Sterritt owned of record no shares of Common Stock of CIC and hence would not have been entitled to cast any votes at the unlawful shareholders' meeting on October 15, 1998. . . . Accordingly, in order to take any action at the illegal shareholders' meeting, Dale Sterritt would have been required to solicit proxies from the holders of at least 50% of CIC's outstanding shares of Common Stock plus one additional share." Original Complaint P 18; *see also* Complaint in Intervention P 16.

[*5]

n2 Larry Sterritt is Sterritt's brother; Wiggins is his cousin; and Bush is Sterritt's close friend. *See* Complaint P 24; Complaint in Intervention P 20.

On October 19, 1998, the plaintiffs filed the instant case, claiming that the defendants' actions violated Section 14(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), *15 U.S.C. § 78n*(a), and provisions of Rule 14a, 17 C.F.R. § 240.14a, promulgated thereunder. See *id.* PP 28-34. Specifically, the plaintiffs complain that the defendants, before soliciting the proxies voted at the October 15, 1998 meeting, failed to disclose, as required by federal securities law, the information concerning the improper and potentially unlawful conduct by Sterritt and other persons acting in concert with him. They maintain that no documentation, other than the notice, was ever sent to any shareholders of CIC or to the SEC in connection with the solicitation of the proxies. See *id.* P 19.

In response to the plaintiffs' complaint, Sterritt and Larry Sterritt filed separate motions to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules* [*6] *of Civil Procedure.* n3 Both defendants argue (1) that plaintiffs Morris and Luna do not own shares of stock in CIC and therefore lack standing to bring this case, (2) that plaintiff Blahitka has waived his claims by failing to object to the October 15, 1998 shareholders' meeting, (3) that plaintiff Blahitka has suffered no legally cognizable injury and thus cannot support his request for relief, and (4) that the actions taken by the shareholders at the October 15, 1998 meeting have been ratified. Larry Sterritt further argues that the plaintiffs have failed to allege facts supporting their claims that proxies were solicited and have failed to allege fraud against him with the specificity required by *Rule 9(b) of the Federal Rules of Civil Procedure.*

n3 Dale Sterritt filed his motion on November 12, 1998. *See* Amended Motion to Dismiss and Brief in Support Thereof. Larry Sterritt filed his motion on December 24, 1998. *See* L. Sterritt's Motion to Dismiss and Memorandum in Support.

## II. ANALYSIS

A. [*7] Standard for Dismissal Under Rule 12(b)(6)

*Federal Rule of Civil Procedure 12(b)(6)* authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." A motion under Rule 12(b)(6) should be granted only if it appears beyond

Case 1:05-cv-00327-GMS   Document 48-10   Filed 03/06/2006   Page 10 of 25

1999 U.S. Dist. LEXIS 9994, *; Fed. Sec. L. Rep. (CCH) P90,521

doubt that the plaintiffs could prove no set of facts in support of their claims that would entitle them to relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Leffall v. Dallas Independent School District, 28 F.3d 521, 524 (5th Cir. 1994);* see also *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982), cert. denied, 459 U.S. 1105, 74 L. Ed. 2d 953, 103 S. Ct. 729 (1983)* (citing Wright & Miller, Federal Practice and Procedure: Civil § 1357 at 598 (1969) for the proposition that "the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.").

In determining whether dismissal should be granted, the court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiffs. *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc., 30 F.3d 627,* [*8] *629 (5th Cir. 1994); Norman v. Apache Corporation, 19 F.3d 1017, 1021 (5th Cir. 1994); Chrissy F. by Medley v. Mississippi Department of Public Welfare, 925 F.2d 844, 846 (5th Cir. 1991).*

B. The Standing of Plaintiffs Morris and Luna

The defendants argue that Morris and Luna, who own no stock in CIC n4 and thus have no voting rights, lack standing to complain of any alleged violations of § 14(a) of the Exchange Act. *See* Amended Motion to Dismiss and Brief in Support Thereof ("Sterritt's Motion") at 5; L. Sterritt's Motion to Dismiss and Memorandum in Support ("Larry Sterritt's Motion") at 6. They contend that such lack of standing requires the court to dismiss the plaintiffs' complaint in its entirety. The defendants are wrong.

n4 In their original complaint, plaintiffs admit that Morris and Luna own no shares of CIC common stock. *See* Complaint P 12.

First, while the defendants are correct in arguing that § 14(a) of the Exchange Act only protects interest-holders with voting rights and [*9] that a person who is not entitled to vote lacks standing to maintain an action under § 14(a), see *7547 Corporation v. Parker & Parsley Development Partners, L.P., 38 F.3d 211, 229-30 (5th Cir. 1994),* their argument ignores the plaintiffs' allegations that Blahitka and intervenor-plaintiff Stewart Rahr ("Rahr") were at all relevant times, and still are, shareholders with voting rights. *See* Complaint P 12; Complaint in Intervention P 21. Blahitka and Rahr thus have standing to sue for relief under § 14(a), and there is no legal basis to dismiss their § 14(a) claims against the defendants.

Second, the plaintiffs seek, among other relief, a declaration, under the Declaratory Judgment Act, *28 U.S.C. § 2201,* that Morris, Luna, and Blahitka are the rightful directors of CIC. *See* Complaint PP 35-36. The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." n5 *28 U.S.C. § 2201*(a). The Fifth Circuit has long held that parties with legal interests threatened in an actual controversy have standing to sue under the Declaratory Judgment [*10] Act. See, *e.g., Collin County, Texas v. Homeowners Association for Values Essential to Neighborhoods (HAVEN), 915 F.2d 167, 170 (5th Cir. 1990).* In the instant suit, Morris and Luna allege that they have been illegally removed from their offices as directors of CIC and, as a result, they are unable to perform the duties and obligations which they owe to CIC and its shareholders. Morris and Luna thus have legal interests which are threatened in an actual controversy and have standing to seek declaratory relief under *28 U.S.C. § 2201.*

n5 The same act permits courts to order injunctive relief based on a declaratory judgment. *See 28 U.S.C. § 2202* ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.").

C. Waiver of Claims by Plaintiff Blahitka

As a second basis for dismissal under Rule 12(b)(6), the defendants argue that the plaintiffs' claims are [*11] barred by the doctrine of waiver. Specifically, the defendants contend that, under Georgia law, n6 Blahitka's attendance at the October 15, 1998 shareholders' meeting waived any objection to lack of notice or defective notice with respect to that meeting. *See* Sterritt's Motion at 5-6; Larry Sterritt's Motion at 6. Waiver, however, is an affirmative defense. *See FED. R. CIV. PRO. 8(c).* A court may dismiss a case pursuant to Rule 12(b)(6) only if an affirmative defense appears on the face of the complaint. See *Garrett v. Commonwealth Mortgage Corporation of America, 938 F.2d 591, 594 (5th Cir. 1991);* see also *Clark v. Amoco Production Company, 794 F.2d 967, 970 (5th Cir. 1986).* Here, the facts as alleged by the plaintiffs do not raise the issue of waiver. n7 Because the waiver issue does not appear on the face of the plaintiffs' complaint, the court cannot, at this point, dismiss the claims against the defendants on that basis.

Case 1:05-cv-00327-GMS   Document 48-10   Filed 03/06/2006   Page 11 of 25

1999 U.S. Dist. LEXIS 9994, *; Fed. Sec. L. Rep. (CCH) P90,521

n6 The defendants rely on the Georgia Business Corporations Act § 14-2-706(b)(1), which provides that "[a] shareholder's attendance at a meeting . . . waives objection to lack of notice or defective notice of the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting." *See* Sterritt's Motion at 6; Larry Sterritt's Motion at 6.

[*12]

n7 Moreover, plaintiffs have presented evidence that negates the defendants' assertion that the claims against them are barred by waiver. For example, in connection with a hearing on the plaintiffs' application for a preliminary injunction held on January 20, 1999, the plaintiffs offered *uncontroverted* evidence that Blahitka attended the October 15, 1998 meeting and attempted, through Morris, to make an objection on the record but was cut off by Larry Sterritt.

Furthermore, the plaintiffs bring their claims under federal, not state, law. Therefore, even if the defendants are correct in asserting that, under Georgia law, the plaintiffs waived their objections to the notice of the October 15, 1998 shareholders' meeting, such a waiver would have no bearing on the plaintiffs' contentions that the defendants violated § 14(a) of the Exchange Act.

## D. Plaintiff Blahitka's Injury

The defendants also argue that the plaintiffs' complaint should be dismissed in its entirety because "Blahitka has alleged no injury for which he can sustain a cause of action based on any alleged violation of § 14(a)." [*13] *See* Sterritt's Motion at 6-7; Larry Sterritt's Motion at 6-7. This argument, however, also fails to support dismissal.

The plaintiffs' complaint alleges that the defendants solicited proxies from CIC shareholders in connection with the October 15, 1998 meeting without disclosing all material information required by § 14(a) of the Exchange Act. *See* Plaintiffs' Response to L. Sterritt's Motion to Dismiss and Supplement at 7 (incorporating by reference arguments presented in their Memorandum in Support of Plaintiff's Motion for Preliminary Injunction at 16-24). The Supreme Court has recognized that material omissions in the solicitation of proxies can visit irreparable harm upon shareholders. See *Mills v. Electric Auto-Lite Company, 396 U.S. 375, 383, 24 L. Ed. 2d 593, 90 S. Ct. 616 (1970)*. Therefore, the plaintiffs have alleged an injury which can sustain a cause of action under § 14(a).

## E. Ratification by CIC shareholders of the October 15, 1998 Meeting

The defendants also maintain that "since the October 15, 1998 shareholder meeting, holders of a majority of shares have executed written consents authorizing the same actions taken at the meeting." Sterritt's Motion [*14] at 4. This fact does not provide a basis for dismissal under Rule 12(b)(6), however.

Under § 14(a) of the Exchange Act, shareholder consents cannot be procured without appropriate disclosure to the shareholders. *See* § 14(a), *15 U.S.C. § 78n*(a) (applying to "any proxy or consent"); 17 C.F.R. § 240.14(a)-1(f) ("The term 'proxy' includes every proxy, consent or authorization within the meaning of Section 14(a) of the Act."); 17 C.F.R. § 240.14c(2)(a) (applying requirement of sending information statement "to every security holder of the class that is entitled to vote or give an authorization or consent in regard to any matter to be acted upon"). The plaintiffs contend that the defendants have never disclosed to shareholders, as required by the federal securities laws, the information concerning the improper and potentially unlawful conduct by Sterritt and other persons acting in concert with him. Without such disclosure, the shareholder consents cannot validate the actions taken at the October 15, 1998 meeting.

## F. Sufficiency of Factual Allegations

### 1. *Facts Regarding Proxy Solicitation*

Next, Larry Sterritt argues that the plaintiffs' complaint should be dismissed [*15] because it fails to allege facts which support the plaintiffs' claims that proxies were solicited. *See* Larry Sterritt's Motion at 6. This argument, however, is without merit. Both the original complaint and the complaint in intervention contain detailed allegations regarding the solicitation of proxies and discuss the information that the plaintiffs contend should have been included with the proxies in order for the defendants to have complied with § 14(a) of the Exchange Act. *See* Complaint PP 17-19, 29-33; Complaint in Intervention PP 16-17, 23-30.

### 2. *Rule 9(b)*

Finally, in a supplement to his motion to dismiss, Larry Sterritt argues that the plaintiffs have failed to plead fraud with the specificity required by *Rule 9(b) of the Federal Rules of Civil Procedure. See* Supplement to L. Sterritt's Motion to Dismiss and Brief at 1-2. Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *FED. R. CIV. PRO. 9(b)*. In this case, the plaintiffs have satisfied this requirement. Their pleadings, including the original complaint, the complaint in intervention, and the application for [*16] preliminary injunction, set forth the material facts which,

Case 1:05-cv-00327-GMS    Document 48-10    Filed 03/06/2006    Page 12 of 25

1999 U.S. Dist. LEXIS 9994, *; Fed. Sec. L. Rep. (CCH) P90,521

the plaintiffs contend, were not disclosed. These documents also detail the various ways in which certain SEC filings made by the defendants were false and misleading. The court concludes that the plaintiffs' allegations of fraud are stated with sufficient particularity to enable Larry Sterritt to adequately respond to the complaint. See *Guidry v. Bank of LaPlace, 740 F. Supp. 1208, 1216 (E.D. La. 1990)* (stating that one of the purposes of Rule 9(b) is "to provide adequate notice to defendants so that they can respond to the plaintiff's claims"), *aff'd, 954 F.2d 278 (5th Cir. 1992)*. The court further concludes that there would be no benefit in having the plaintiffs replead their allegations. See *Frith v. Guardian Life Insurance Company, 9 F. Supp. 2d 734, 743 (S.D. Tex. 1998)* ("When a party has failed to plead fraud with suf-

ficient particularity, the Court will generally permit leave to amend to bring the complaint into compliance with the requirements of Rule 9(b).").

III. CONCLUSION

For the reasons given above, the motions of Sterritt and Larry Sterritt to dismiss plaintiffs' claims against them are [*17] **DENIED.**

**SO ORDERED.**

June 22, 1999.

A. JOE FISH

United States District Judge

25

IN RE: PLY GEM INDUSTRIES, INC., SHAREHOLDERS LITIGATION

CONSOLIDATED C.A. No. 15779-NC

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2001 Del. Ch. LEXIS 84*

**December 28, 2000, Submitted**
**June 26, 2001, Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1] Motion to Dismiss granted as to Lilley, but it denied in all other respects. Order entered in accordance with this Memorandum Opinion.

**COUNSEL:** Joseph A. Rosenthal, Esquire, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of counsel: Judith L. Spanier, Esquire, of Abbey, Gardy & Squitieri, LLP, New York, New York, and Stull, Stull & Brody, New York, New York, Attorneys for Plaintiffs.

A. Gilchrist Sparks, III, Esquire, Alan J. Stone, Esquire and Stephanie L. Nagel, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of counsel: Mitchell A. Lowenthal, Esquire, and Dylan D. Smith, Esquire, of Cleary, Gottlieb, Steen & Hamilton, New York, New York, Attorneys for Defendants, Herbert P. Dooskin, Joseph M. Goldenberg, Albert Hersh, William Lilley III, Elihu H. Modlin, Dana R. Snyder, and Jeffrey S. Silverman.

Kevin G. Abrams, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; of counsel: John D. Donovan, Jr., Esquire, Michael P. Allen, Esquire, and Christopher G. Green, Esquire, of Ropes & Gray, Boston, Massachusetts, Attorneys for Defendant, Ply Gem Industries, Inc.

**JUDGES:** JOHN W. NOBLE, Vice Chancellor.

**OPINIONBY:** JOHN W. NOBLE

**OPINION:**

**MEMORANDUM** [*2] **OPINION**

**NOBLE, Vice Chancellor**

Plaintiffs, former shareholders of Ply Gem Industries, Inc. ("Ply Gem" or the "Company"), bring their Consolidated Amended Class Action Complaint (the "Complaint") asserting, on behalf of themselves and their fellow former shareholders, that the merger of Ply Gem into a subsidiary of Nortek, Inc. ("Nortek"), pursuant to an agreement entered on July 24, 1997, was the product of breaches by the then-directors of Ply Gem of their fiduciary duties of loyalty and due care. Defendants have moved to dismiss. They contend that (1) Plaintiffs lack standing to pursue their claims, which can be asserted, if at all, only in a derivative action and not through an individual action and (2) in any event, the allegations of the Complaint do not, under Court of Chancery Rule 12(b)(6), state a claim upon which relief can be granted.

I conclude that the claims which Plaintiffs seek to assert are individual in nature and that Plaintiffs have alleged sufficiently that the merger was not approved by a disinterested and independent majority of the directors. I also find that one director defendant is entitled to dismissal of all claims against him because Plaintiffs' [*3] allegations do not raise sufficient doubt as to his loyalty and because Plaintiffs' duty of care claims against him are barred by the exculpatory provision in Ply Gem's certificate of incorporation. Accordingly, I grant in part and deny in part Defendants' motion to dismiss.

**I. PARTIES**

Plaintiffs, Herman Smilow, Adele Brody and Andrew Klotz, allege that they were shareholders of Ply Gem at all times relevant to this action.

The individual defendants were directors of Ply Gem:

1. Defendant Jeffrey S. Silverman ("Silverman"), who owned more than one-quarter of the outstanding Ply Gem stock, was the Chief Executive Officer and Chair-

man of the Board, positions that he had held for more than a decade.

2. Defendant Dana R. Snyder ("Snyder") was the President and Chief Operating Officer of Ply Gem. He held approximately 6% of the Ply Gem stock. Snyder's 1996 compensation included a salary of $ 440,000, a bonus of $ 890,000, and a long-term compensation award of options. With the Nortek merger, Snyder received more than $ 3.6 million for all of his options.

3. Defendant Herbert P. Dooskin ("Dooskin") was Ply Gem's Executive Vice President and owned more than 3% of its stock. [*4]

4. Defendant Elihu H. Modlin ("Modlin") had been General Counsel of Ply Gem for more than three decades. He was a partner in a law firm with his son, Charles M. Modlin, who was the Secretary of Ply Gem. During 1996, Ply Gem paid Modlin's law firm almost one million dollars for professional services.

5. Defendant Joseph M. Goldenberg ("Goldenberg") was a co-founder of a wholly-owned subsidiary of the Company and served as a consultant to the Company, for which he was paid approximately $ 287,000 in 1996.

6. Defendant Albert Hersh ("Hersh") was a co-founder of the Company and provided consulting services to the Company. In 1996, he was paid approximately $ 90,000 for those consulting services.

7. Defendant William Lilley III ("Lilley") was the President of Policy Communications, Inc., a business consulting firm, that received $ 25,000 from Ply Gem in 1996 for its consulting services.

Ply Gem was a manufacturer and distributor of building materials.

## II. BACKGROUND n1

> n1 The factual background is taken from the Complaint, the well-pleaded allegations of which, for present purposes, must be taken as true. *Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc., Del. Supr., 691 A.2d 609, 612-13 (1996).*

[*5]

In August 1995, Ply Gem announced that it had hired an investment banking firm to explore various strategic alternatives, one of which was the sale of Ply Gem. During the next several months, Ply Gem discussed a potential acquisition with several parties. Some of these parties entered into confidentiality and standstill agreements; some also received non-public information about

the Company. Nortek was one of those parties that received confidential information and entered into a standstill agreement with Ply Gem.

In February 1996, Ply Gem received an indication of interest in purchasing the Company at a price of $ 17 per share from an unidentified third party. Nortek at that time also raised the possibility of a merger with Ply Gem. Although Silverman and Snyder discussed a stock-for-stock merger with Nortek for several months, nothing came of the discussions; and, in July 1996, the Ply Gem board announced that it had decided not to sell the Company but, instead, to move forward with the development of Ply Gem's business.

Silverman and Snyder, however, had not given up on finding a buyer. They even considered a recapitalization of Ply Gem that would result in the termination of [*6] Silverman's employment relationship and in the appointment of Snyder as Ply Gem's new chief executive officer.

In March 1997, Silverman, without informing the board, retained another investment banking firm to explore the possibility of a leveraged buyout of Ply Gem and to identify potential partners for Silverman if he elected to participate in such an effort. The investment banker approached six leveraged buyout firms. All six committed to a two-year standstill provision which required, at Silverman's insistence, that they would not propose to acquire Ply Gem except with Silverman's, or the Ply Gem board's, prior approval.

Silverman's employment with Ply Gem was governed by an employment contract extending to 2007. Silverman informed the potential buyout firms that he did not want to continue in his position after any buyout and that they should assume that he would receive termination compensation of $ 25 million, $ 2 million per year for a non-compete covenant spanning five years, and cancellation of his indebtedness ($ 17.4 million plus accrued interest) to Ply Gem. Unless these demands were met, there would be no transaction. Silverman's existing agreement with Ply Gem contained [*7] a non-compete covenant that would not survive both a change in corporate control and Silverman's termination as a result thereof.

Silverman and Snyder (who wanted to become the chief executive officer of the surviving entity) selected Hicks, Muse, Tate & Furst ("Hicks, Muse") for negotiations from among the many potential buyout firms. Hicks, Muse was discussing a price range of $ 17-19 per share in May 1997. One of the possibilities was that Silverman would retain an equity position in the venture. While discussions were ongoing with Hicks, Muse, Silverman and Snyder continued to discuss the possibility of a combination with Nortek, which was floating a

price of $ 17 per share. Hicks, Muse, however, was prepared to offer to Silverman $ 10 million more than was Nortek to resolve the issues posed by Silverman's employment agreement and non-competition agreement.

On or about June 10, 1997, the Ply Gem board was told about the Hicks, Muse and the Nortek expressions of interest in acquiring the Company. The board designated Silverman and Lilley to meet with and select an investment banking firm to advise the board. Silverman identified the firms to be considered, and Lilley and he chose [*8] Furman Selz & Co. ("Furman Selz").

The board, notwithstanding Silverman's extensive personal financial interest in any transaction, did not appoint a special committee. Instead, it allowed Silverman to continue as Ply Gem's negotiator with both Hicks, Muse and Nortek.

On June 16, 1997, Nortek advised Silverman that it was willing to pay $ 20 per share, but was not prepared to enhance its proposal to Silverman for his personal contractual requirements.

On June 20, 1997, Furman Selz met with the Ply Gem board and indicated that it would provide a favorable fairness opinion at that time on the Hicks, Muse offer of $ 18 per share, which, unlike the Nortek offer, also satisfied Silverman's demands. Two days later, Hicks, Muse increased its offer to $ 18.75 per share while Nortek remained interested at $ 20 per share or perhaps slightly more.

On June 24, 1997, Silverman provided Nortek with copies of the proposed agreements with Hicks, Muse, including those dealing with his personal employment arrangements. Silverman, in essence, was attempting to induce Nortek to meet his personal demands while also securing a better price for the Ply Gem shares. Silverman informed the Ply Gem board [*9] that he anticipated a proposal from Nortek at up to $ 21 per share in definitive form by June 25, 1997. The board, however, on June 24, 1997, chose to accept the Hicks, Muse offer (through an affiliate, Atrium Acquisition Holdings Inc.) of $ 18.75 per share. Later the same day, Nortek submitted an offer to purchase Ply Gem at $ 20.25 per share, but it withdrew that offer the next day when the Hicks, Muse agreement was announced.

On July 14, 1997, Nortek offered $ 19.50 per share to acquire Ply Gem. Its offer also satisfied Silverman's personal demands concerning the termination of his employment agreement, his non-competition agreement, and the forgiveness of his debt to the Company. Nortek's offer, accordingly, was $ 0.75 per share less than its offer of two weeks earlier, allegedly reflecting the cost to Ply Gem's shareholders of Nortek's meeting Silverman's specific demands. n2

n2 Complaint, P42.

Later in July 1997, the Ply Gem board approved a merger agreement with Nortek and terminated the Hicks, Muse agreement, [*10] paying Hicks, Muse (or its affiliate) $ 12 million as a termination fee and for reimbursement of its expenses. The board also received a fairness opinion from Furman Selz. Plaintiffs allege that the fairness opinion was inadequate because it failed to consider the consequences of Silverman's "side" deal.

Nortek, Ply Gem, and Silverman executed, concurrently with the merger agreement, an agreement providing for the termination of Silverman's employment, a non-competition covenant, payment to Silverman of more than $ 22 million (reduced by amounts paid to Silverman before his termination as a bonus for 1997) and forgiveness of Silverman's over $ 17 million debt to the Company, plus any accrued interest on the debt.

The merger of Ply Gem with a Nortek subsidiary was consummated thereafter.

## III. THE CONTENTIONS

Plaintiffs allege that Silverman used his status as chief executive officer and director and as the principal, if not sole, negotiator to enrich himself at the expense of the other Ply Gem shareholders. They contend that Silverman's conduct tainted the merger process and denied Ply Gem's shareholders a fair price for their stock. Plaintiffs further allege that by acquiescing [*11] in Silverman's conduct, the directors breached their duties of loyalty and due care to the Company and its shareholders. At oral argument and in correspondence following oral argument, Plaintiffs also invoked McMullin v. Beran n3 to advance the contention that the board improperly delegated responsibility for the negotiation process to Silverman.

n3 McMullin v. Beran, Del Supr., 765 A.2d 910 (2000).

In response, Defendants first argue that the claims asserted by Plaintiffs are derivative in nature. They contend that if the claims are derivative, then Plaintiffs lost standing to assert those claims when their status as shareholders of Ply Gem was terminated as a result of the merger. n4 Second, Defendants maintain that the merger was approved by an informed and independent board and that as a result the directors' actions are to be evaluated under the business judgment rule. The Defendants also seek to invoke an exculpatory charter provision that protects the directors from monetary liability

[*12] for breaches of their duty of care. Finally, they contest Plaintiffs' characterization of McMullin v. Beran as establishing a prohibition against merger negotiations conducted by an interested corporate officer who has a substantial personal financial interest, independent of his interest as a shareholder, in the merger agreement. n5

> n4 See *Lewis v. Anderson, Del. Supr., 477 A.2d 1040, 1049 (1984).*

> n5 Defendants, at p. 16, n. 6 of Defendant's Joint Brief in Support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, invite the Court to dismiss the Complaint because Plaintiffs lost standing when they tendered their shares or accepted the benefit of the cash out merger. See *Bershad v. Curtiss-Wright Corp., Del. Supr., 535 A.2d 840, 848 (1987).* In addition to relying upon facts not alleged in the Complaint, Defendants have failed to demonstrate that those who accepted the merger benefits (under either format) did so knowingly. See *Norberg v. Security Storage Co. of Washington, 2000 Del. Ch. LEXIS 142,* Del. Ch., C.A. No. 12885, Steele, J. (Sept. 19, 2000).

[*13]

## IV. ANALYSIS

### A. Applicable Standard.

A motion to dismiss under Court of Chancery Rule 12(b)(6) requires the Court "to take the facts alleged as true and view all inferences from those facts in the light most favorable to plaintiff" and "to determine with reasonable certainty, under any set of facts that could be proved" that the Plaintiffs would not be entitled to relief. n6 If Defendants do not meet this rigorous standard, then the Court must deny their motion to dismiss.

> n6 *McMullin v. Beran, 765 A.2d at 916; Wagner v. Selinger, 2000 Del. Ch. LEXIS 1,* Del. Ch., C.A. No. 16740, Steele. V.C. (Jan. 18, 2000).

### B. Individual or Derivative Claims.

The line that separates an individual action from a derivative action is sometimes difficult to discern. n7 When the challenged conduct is part of the merger process, characterization of the claim as derivative is fatal to the prosecution of the claim. n8 Here, Plaintiffs allege that Silverman manipulated the merger process to favor his own personal purposes. [*14] They assert that

Silverman used his position to assure himself an extravagant personal compensation package to the detriment of the shareholders' best interests. Examples cited by Plaintiffs as evidence of Silverman's self-dealing and the unfairness of the merger process include his exercising full control over all negotiations, pursuing negotiations despite the board's decision that Ply Gem was not for sale, failing to advise the board of his efforts to negotiate a sale, and insisting that his unjustified personal demands be met as a condition to any agreement.

> n7 *Parnes v. Bally Entertainment Corp., Del. Supr., 722 A.2d 1243 (1999); Behrens v. Aerial Communications, Inc., 2001 Del. Ch. LEXIS 80,* *8, Del. Ch., C.A. No. 17436, Jacobs, V.C. (May 18, 2001); Turner v. Bernstein, 1999 Del. Ch. LEXIS 18,* *37, Del. Ch., C.A. No. 16190, Jacobs, V.C. (Feb. 9, 1999); Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery, P9-2(a) at 9-4-5 (2000).

> n8 See n. 4, supra, and accompanying text.

[*15]

Although Plaintiffs allege in conclusory fashion that the price paid to them for their shares was "unfair," n9 the specific factual allegation in the Complaint is that Nortek reduced its offer by $ 0.75 per share in order to satisfy Silverman's unjustified personal demands. n10

> n9 Complaint, P47. See *Parnes v. Bally Entertainment Corp., 722 A.2d at 1246-47,* for its discussion of "unfair" price in a similar context.

> n10 Complaint, P42. A fundamental difficulty with Plaintiffs' case is that it is likely that some substantial payment could properly have been made to Silverman and they have not articulated clearly their split on how much was appropriate and how much was not appropriate. They rely upon the $ 0.75 reduction in the Nortek offer to accommodate Silverman's side deal, but it is conceivable, on further proof, that the side arrangement was reasonable and fair to the shareholders. That, however, is a question for another day because, based on the allegations of the Complaint, the Court must draw the inference in favor of Plaintiffs that Silverman was not entitled to insist upon a termination of his employment agreement on his own initiative and, further, to receive substantial payments for the termination. The record before the Court does not support any contention that Nortek (or Hicks, Muse for that

matter) insisted that Silverman leave the business. If Silverman was going to exit because he wanted to exit, the basis for his right to demand termination compensation cannot be gleaned from the Complaint, and Plaintiffs have alleged that he was not entitled to such payments.

[*16]

Parnes v. Bally Entertainment Corp. teaches that, in the merger context, the presentation of a direct claim requires that the "stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price." n11 The attack on Silverman's conduct during the course of the merger negotiations, and the board's acquiescence in it, is a challenge by Plaintiffs to the fairness of the merger process. Accordingly, Parnes dictates that Plaintiffs' claims must be treated as individual claims and not as derivative claims. n12

    n11 *Parnes v. Bally Entertainment Corp., 722 A.2d at 1245.*

    n12 See also *Crescent/Mach I Partners, L.P. v. Turner, 2000 Del. Ch. LEXIS 145,* Del. Ch., C.A. No. 17455, Steele, J. (Sept. 29, 2000); *Chaffin v. GNI Group, Inc., 1999 Del. Ch. LEXIS 182,* Del. Ch., C.A. No. 16211, Jacobs, V.C. (Sept. 3, 1999).

Defendants rely extensively upon Golaine v. Edwards, n13 but that case does not dictate a different result. In [*17] Golaine, this Court commented on Parnes' analysis of what a plaintiff must allege about the merger process in order to plead an individual claim, as follows:

    "It is not quite clear whether the door is open for a plaintiff to state an individual claim by alleging that the negotiation of side transactions tainted the merger negotiations by unfairly diverting merger consideration that would have otherwise gone to the target stockholders into the pockets of target company fiduciaries." n14

    n13 *Golaine v. Edwards, 1999 Del. Ch. LEXIS 237,* Del. Ch., C.A. No. 15404, Strine, V.C. (Dec. 21, 1999).

    n14 *Id., 1999 Del. Ch. LEXIS 237,* *20-21.

The Golaine Court then posited the following circumstances, remarkably similar to those alleged here:

    1. The CEO of the target company learned that the acquirer would pay $ 10,000,000 more.
    2. The CEO agreed to this proposal but on the condition that $ 2,000,000 of the additional payment would be diverted to him.
    3. The final consideration was fair, but the shareholders would have [*18] received an additional $ 2,000,000 if the CEO had not negotiated for his own account.

The Golaine Court's conclusion was that, in these hypothetical circumstances, it was probable that under Parnes the $ 2 million payment could be attacked individually as the product of unfair dealing that tainted the final merger terms. n15 The issue became whether an individual claim could exist only if the process were so unfair as to have resulted in an unfair price, or whether an individual claim could exist where the unfair process resulted in a less than the best reasonably available, but not unfair, price. Parnes makes clear that the test is whether the alleged breaches of fiduciary duties resulted in unfair price and/or unfair process. n16 Thus, given the disjunctive nature of the standard, it is difficult to imprint an unfair price concept on the process side of the Parnes evaluation. n17 As Golaine frames it, "the real question underlying the teaching of Parnes [is] whether the Complaint states a claim that the side transactions caused legally compensable harm to the target's stockholders by improperly diverting consideration from them to their fiduciaries." [*19] n18

    n15 Id.

    n16 *Parnes v. Bally Entertainment Corp., 722 A.2d at 1245* (emphasis added).

    n17 Fairness considerations of price and process are not necessarily considered separately. See *Weinberger v. UOP, Inc., Del. Supr., 457 A.2d 701, 711 (1983).*

    n18 *Golaine v. Edwards, 1999 Del. Ch. LEXIS 237,* *22. In Golaine, the payment to KKR of $ 20 million was deemed immaterial when measured against the $ 8.3 billion transaction. Here, the benefits flowing to Silverman, to some of which he may well have been entitled, constituted in excess of 10% of the total transactional

value (i.e., approximately $ 37 million out of a transaction valued at roughly $ 275 million).

In short, the Complaint can be read fairly to allege that, as the result of the unfair process orchestrated by Silverman, Nortek reduced the per share price that it was willing to pay to the Ply Gem shareholders in order to increase the amount that it was willing to pay Silverman on his side transaction. n19 [*20] Parnes teaches that such conduct will serve as the basis for individual or direct claims.

n19 Complaint, P42.

Although the Complaint may directly challenge the merger, "it does not necessarily follow that the Complaint adequately states a claim for relief" under Court of Chancery Rule 12(b)(6). n20 Thus, by putting fairly before the Court the contention that they are challenging the fairness of the merger price or the merger process, Plaintiffs can survive the derivative-individual obstacle yet still fail to assert a claim that would allow them to move beyond a Rule 12(b)(6) confrontation. With this in mind, I now turn to the issue of whether Plaintiffs' claims are legally sufficient.

n20 *Parnes v. Bally Entertainment Corp., 722 A.2d at 1246.*

C. The Duty of Loyalty Claims.

The Ply Gem directors, became obligated [*21] to seek "the best value reasonably available for all stockholders when they joined the process for a complete sale of the Company." n21

n21 *McMullin v. Beran, 765 A.2d at 918; Paramount Communications, Inc. v. QVC Network, Inc., Del. Supr., 637 A.2d 34, 44 (1994).*

Plaintiffs assert that the Ply Gem board breached its duty of loyalty to the shareholders and that, as a consequence of that breach, Silverman received the benefits of an "exorbitant" and improper "side" deal at the expense of the Ply Gem shareholders. n22 Because Ply Gem's directors are presumed to have exercised disinterested and independent business judgment in approving the Nortek merger, n23 the Plaintiffs must allege facts sufficient to overcome that presumption. As this Court has held:

"The Delaware Supreme Court broadly set forth the inquiry for questions regarding director disinterest and independence in Aronson v. Lewis[, *473 A.2d 805 (1984)]*. There, the Court held that a director is considered interested when he will [*22] receive a personal financial benefit from a transaction that is not equally shared by the stockholders or when a corporate decision will have a materially detrimental impact on a director, but not the corporation or its stockholders. Independence, the Aronson Court held, means that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influences. To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized." n24

n22 Complaint, P44.

n23 *Chaffin v. GNI Group, 1999 Del. Ch. LEXIS 182,* *13.

n24 *In re Western National Corp. Shareholders Litig., 2000 Del. Ch. LEXIS 82,* *37-38, Del. Ch., C.A. No. 15927, Chandler, C. (May 22, 2000) (footnotes omitted).

Thus, unless the Nortek merger was approved by a majority of disinterested and independent directors, the Defendants must bear the burden of proving [*23] that the transaction was entirely fair to Ply Gem's shareholders. n25

n25 *Cinerama, Inc. v. Technicolor, Inc., Del. Ch., 663 A.2d 1134 (1994),* aff'd, *Del. Supr., 663 A.2d 1156 (1995).*

1. Interested in the Transaction.

A director is considered interested in a transaction if he receives "a personal benefit from a transaction that is not equally shared by the shareholders." n26 Here, Plaintiffs allege, Silverman received payment for the termination of his employment contract and his non-competition agreement and the forgiveness of his debt to Ply Gem.

All of these benefits were unique to him and were not shared with the other stockholders. Thus, for purposes of this motion, Silverman must be considered "interested."

> n26 *Rales v. Blasband, Del. Supr., 634 A.2d 927, 936 (1993); Aronson v. Lewis, Del. Supr., 473 A.2d 805, 812 (1984).*

[*24]

There is no allegation that any of the remaining directors obtained any improper benefit whatsoever from the merger other than from their entitlement, as shareholders, to receive the merger consideration. They received the merger consideration on the same terms as any other shareholder. n27 Thus, the Complaint does not allege that any of the other six directors were "interested" in the Nortek merger transaction.

> n27 Although Snyder received significant compensation for his options, I do not read the Complaint to allege any impropriety with respect to such payment.

2. Independence from Silverman's Alleged Domination.

Plaintiffs' challenge to the independence of the other directors from Silverman's domination presents a more difficult question. n28

> n28 "In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran, 765 A.2d at 923.*

[*25]

The focus of Plaintiffs' attack on the loyalty of the directors is directed to Silverman's status both as the holder of 25% of the Ply Gem stock and as Ply Gem's Chairman and Chief Executive Officer. The inference, which Plaintiffs seek the Court to draw in their favor under the pleading standards of Court of Chancery Rule 12(b)(6), is that Silverman, by virtue of his position, was able to induce the directors to place Silverman's personal interests ahead of the stockholders' interests in approving the Nortek merger and the related Silverman agreement.

In Friedman v. Beningson, the chairman, chief executive officer and president held 36% of the outstanding stock. The Court observed that "from a practical perspective, this confluence of voting control with directorial and official decision making authority, while not itself sufficient under the cases to support a conclusion of reasonable doubt [citing Aronson], is nevertheless itself quite consistent with control of the board." n29 That Silverman's status is consistent with an ability to override fellow director independence may well be an accurate assessment, but, as noted in Friedman, Silverman's status alone is not [*26] sufficient to overcome the presumption that the other directors, in fact, performed their duties loyally. Indeed, in Aronson, the Supreme Court acknowledged that a 47% shareholder would not be presumed to dominate the corporation's board of directors. n30

> n29 *Friedman v. Beningson, 1995 Del. Ch. LEXIS 154,* *13, Del. Ch., C.A. No. 12232, Allen, C. (Dec. 4, 1995), appeal refused, *Del. Supr., 676 A.2d 900 (1996)* (TABLE).
>
> n30 *Aronson v. Lewis, 473 A.2d at 815.*

Plaintiffs are confronted with the challenge of pleading facts that create, at a minimum, a reasonable doubt that the board members could not honestly and objectively evaluate the Nortek merger, with its related Silverman agreement, because of their relationship with Silverman. "Speculation on the motives for undertaking corporate action" will not satisfy Plaintiffs' burden. n31 Similarly, the mere assertion of personal or business relationships will not defeat the presumption of independence. n32

> n31 *Grobow v. Perot, Del. Supr., 539 A.2d 180, 188 (1988).*

[*27]

> n32 *In re Walt Disney Co. Derivative Litig., Del. Ch., 731 A.2d 342, 355 (1998),* aff'd in part and rev'd in part sub nom. *Brehm v. Eisner, Del. Supr., 746 A.2d 244 (2000); In re Grace Energy Corp. Shareholders Litig., 1992 Del. Ch. LEXIS 134,* Del. Ch., C.A. No. 12,464, Hartnett, V.C. (June 26, 1992).

Although Plaintiffs' allegations of lack of independence may be far from compelling, the facts alleged in the Complaint supply the Court with a basis for a reasonable doubt as to whether five of the other six directors were independent. n33 Although discovery and development

of the factual record may well prove that the directors discharged their duties with absolute propriety and free of any control by Silverman, at this stage, "the existence of [the other directors' interests and relationships with Silverman] is enough to defeat a motion to dismiss and warrant further inquiry. n34

n33 The Complaint does not allege how many directors voted for the merger. Plaintiffs must allege sufficiently that the merger would not have been approved without the vote of the directors who were interested or disqualified. See *Beneville v. York, Del. Ch., 769 A.2d 80,* Strine, V.C. (2000); *Aronson v. Lewis, 473 A.2d at 815.*

[*28]

n34 *In re Valley Corp. Derivative, 2001 Del. Ch. LEXIS 13, *26,* Del. Ch., C.A. No. 17649, Chandler, C. (Jan. 11, 2001).

A review of the status of each of the other directors follows.

a. The Employee Directors.

(i) Dooskin. In addition to having been a director of Ply Gem since 1986, Dooskin was also its Executive Vice President. However, his status as an officer does not necessarily support the inference that he was under the control of Silverman, and his ownership of more than 3% of the then-outstanding Ply Gem stock would suggest a high level of personal self-interest in maximizing the merger value of Ply Gem. On the other hand, not only was Silverman Dooskin's supervisor, but also he was the largest stockholder in Ply Gem. n35 As such, Silverman was "in a position to exercise considerable influence" n36 over Dooskin, and, therefore, Plaintiffs, under the pleading standards of Chancery Rule 12(b)(6), have created a reasonable doubt as to Dooskin's capacity to consider impartially the Nortek merger agreement and the related Silverman agreement.

n35 See *Mizel v. Connelly, 1999 Del. Ch. LEXIS 157, *8,* Del. Ch., C.A. No. 16638, Strine, V.C. (July 22, 1999).

[*29]

n36 See *Rales v. Blasband, 634 A.2d at 937.* I acknowledge that Dooskin had an employment contract extending into 2000 and that Plaintiffs do not allege that Dooskin received "substantial

remuneration" for his position. See *In re Walt Disney Co. Derivative Litig., 731 A.2d at 357* ("reasonable possibility that they are more beholden to").

(ii) Snyder. Snyder was also both President and Chief Operating Officer of Ply Gem. He had joined the Company in 1995 and had acquired approximately 6% of its common stock. In addition to a long-term compensation award consisting of options, Snyder, in 1996, received a salary of $ 440,000 and a bonus of $ 890,000. Plaintiffs allege that Snyder received substantial compensation for his services to Ply Gem, and, thus, Silverman, as with Dooskin, was "in a position to exercise considerable influence" over Snyder. Accordingly, the Complaint has raised a reasonable doubt as to Snyder's capacity to consider impartially the Nortek transaction with its benefits for Silverman. n37

n37 But see text accompanying n. 46, infra. (Defendants assert that Snyder abstained from voting on the Nortek transaction.)

[*30]

b. The Outside Directors. n38

n38 Although three of these directors were not employees of Ply Gem, they were intimately connected to the Company. Modlin had been the Company's lawyer for years and Goldenberg and Hersh had been Company executives.

(i) Modlin. Modlin had been general counsel for Ply Gem for almost four decades, apparently predating Silverman's arrival. In 1996, his law firm received almost $ 1 million in fees from Ply Gem. That a director's law firm receives fees from the corporation does not, by itself, demonstrate a lack of independence. n39 However, the Complaint alleges that Modlin "was a partner in the firm of Messrs. Elihu H. Modlin and Charles M. Modlin," n40 from which it can be inferred that his was a small law firm. The Chancellor's analysis of a case involving comparable facts is instructive:

Director Goodman is an attorney employed by a law firm, not Telxon itself. Defendants characterize him as an outside independent director, beyond the influence of Telxon's CEO. [*31] According to the complaint, Goodman's law firm, however, received nearly $ 1 million in

1993 for services provided to Telxon. Goodman's firm is a small one. Realism of the kind signaled by Rales requires one to acknowledge the possibility that a partner at a small law firm bringing in close to $ 1 million in revenues from a single client in one year may be sufficiently beholden to, or at least significantly influenced by, that client as to affect the independence of his judgment. . . . As Myerson is Telxon's chief executive officer, he undoubtedly possesses the authority to hire and fire the corporation's legal counsel. For this reason, the pleadings raise a reasonable doubt concerning Goodman's independence in assessing the merits of a demand letter attacking the [subject] agreements. n41

n39 See *McMillan v. Intercargo Corp., Del. Ch., 768 A.2d 492, 503 (2000)* (as to interestedness).

n40 Complaint, P6.

n41 *Steiner v. Meyerson, 1995 Del. Ch. LEXIS 95,* *28-29, Del. Ch., C.A. No. 13139, Allen, C. (July 18, 1995).

[*32]

Thus, Modlin's firm's receipt of substantial fees over a period of years for professional services raises a reasonable doubt as to the independence of his judgment. n42

n42 See *In re Walt Disney Co. Derivative Litig., 731 A.2d at 357-58* (architectural services); but see *Tabas v. Mullane, D.N.J., 608 F. Supp. 759, 768 (1985)* (legal services). Although lawyers are subject to unique and demanding professional standards, see e.g., The Delaware Lawyers' Rules of Professional Conduct, I am not persuaded that, for present purposes, the nature of professional fees (e.g., architectural, medical, or legal) supports a differential analysis based on the specific profession.

I also note that Modlin's son was Ply Gem's corporate secretary. Whether the position of corporate secretary carried any material benefit or whether it was simply an accommodation provided as part of his firm's legal services to Ply Gem is not clear from the Complaint. Thus, I in-

fer nothing from the son's status. See *Chaffin v. GNI Group, Inc., supra; Mizel v. Connelly, supra.*

[*33]

(ii) Goldenberg. Goldenberg served as a consultant to Ply Gem from 1994, after he ceased serving as its chairman. In 1996, he received consulting fees of almost of $ 300,000. The receipt of substantial consulting fees, in the context where Silverman was the largest shareholder and the chief executive officer provides a sufficient factual basis to create a reasonable doubt as to whether Goldenberg was independent of Silverman. n43

n43 See *In re Walt Disney Co. Derivative Litig., 731 A.2d at 357-58;* See *Kahn v. Dairy Mart Convenience Stores, Inc., 1996 Del. Ch. LEXIS 38,* *19, Del. Ch., C.A. No. 12489, Jacobs, V.C. (Mar. 29, 1996).

(iii) Hersh. Hersh, a co-founder of the corporation and a director since 1954, is alleged to have received $ 91,000 in consulting fees during 1996 from Ply Gem. Although the allegations against Hersh may fairly be characterized as skimpy, given my disposition as to other directors against whom the allegations are not compelling and the Chancellor's conclusion in Friedman [*34] v. Beningson that consulting fees of $ 48,000 in one year could provide the basis for the finding of impairment of ability to exercise non-conflicted business judgment, I conclude that the Complaint does state a reasonable basis to question Hersh's independence. n44

n44 See *Friedman v. Beningson, supra.* Although the Chancellor in *In re Walt Disney Co. Derivative Litig., 731 A.2d at 360,* concluded that allegations of payment of a consulting fee of $ 50,000 in one year to Senator Mitchell did not justify a reasonable doubt as to his independence, the Court, in so ruling, focused on his status as "a nationally known legal and political figure," which seemingly reduced the potential that such a payment might affect his judgment.

(iv) Lilley. The only allegation regarding Lilley, who had been a director for less than three years, was that his firm was paid $ 25,000 for consulting services. In the absence of some allegation that this was material to Lilley, I am satisfied that the Plaintiffs [*35] have not stated any basis to doubt Lilley's independence.

Because, Plaintiffs have been successful in alleging the necessary factual basis for a reasonable doubt as to

the disinterestedness or independence of six of the seven directors, Defendants' Motion to Dismiss the Complaint, except as to Lilley, on the duty of loyalty claims must be denied. This result does not reflect any judgment on the ultimate merits of these claims. It is the product solely of their status and their relationships with both the Company and Silverman. At this stage of the proceedings, the Court is required to afford Plaintiffs every reasonable inference from their well-pled factual allegations. The Court's scope of inquiry is also limited because, subject to certain exceptions not relevant here, it may not look beyond the Complaint. n45 For example, I cannot consider Defendants' assertions that Snyder abstained from voting on the Nortek transaction n46 and that the outside directors all lost their legal or consulting fees as a result of the Nortek merger. n47 These issues, and others, can all be addressed on a more complete factual record and must wait for another day. n48

n45 *In re Santa Fe Pacific Corp. Shareholder Litig., Del. Supr., 669 A.2d 59, 68 (1995).*

[*36]

n46 Affidavit of Mitchell A. Lowenthal in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("Lowenthal Aff."), Ex. A, Schedule 14D-9 at 19, 25-26.

n47 See Defendants' Joint Reply Brief in Support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, at 2 (also chastising Plaintiffs for their "apparent decision to avoid reference to publicly disclosed (but inconvenient) facts."). In addition, Defendants have apprised the Court that one of the Plaintiffs in this action filed an action in New York against Furman Selz in which he alleged that an independent Ply Gem board relied upon, a fairness opinion negligently prepared by Furman Selz in approving the Nortek merger. The plaintiff in the New York proceedings suggested that the five directors (other than Silverman and Snyder) operated independently as an ad hoc special committee:

"Lilley and the rest of the Ply Gem board (other than Silverman and Snyder who had conflicting interests) occupied a role substantially equivalent to that of a special committee."

Letter from A. Gilchrist Sparks, III, Esquire, dated Dec. 5, 2000, quoting at 2, Plaintiffs' Memorandum of Law in Opposition to Defendant Furman Selz LLC'C (sic) Motion to Dismiss or, in the Alternative, to Stay this Action. Exhibit at p 19, as filed in the New York proceedings.

[*37]

n48 See *McMullin v. Beran, 765 A.2d at 924-25; In re Western National Corp. Shareholders Litig., supra.; In re Valley Corp. Derivative, supra; Parnes v. Bally Entertainment Corp., 2001 Del. Ch. LEXIS 59,* Del. Ch., C.A. No. 15192, Chandler, C. (Feb. 20, 2001).

## D. The Duty of Care Claims.

The breach of duty of care claims, alleged by Plaintiffs without preciseness or enthusiasm, seem to be a combination of two considerations: (i) that the directors agreed to a payment to Silverman that was substantially more than any amount to which he was entitled, and (ii) that the directors were not appropriately involved in the negotiations and failed to acquire adequate information regarding the merger agreement, including the side benefits to Silverman.

Article VIII of Ply Gem's Certificate of Incorporation provides in part:

A director of this corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the [*38] corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. n49

This provision, authorized by *8 Del. C. § 102(b)(7),* generally shields directors from monetary liability for a breach of their duty of due care. n50

n49 Lowenthal Aff., Ex. D.

n50 Section 102(b)(7), of course, does not shield directors from personal liability for breach of their duty of loyalty. See, e.g., *McMullin v. Beran, 765 A.2d at 926.*

Because the Section 102(b)(7) provision cannot be found in the Complaint, there may be doubt as to whether the Court may consider the exculpatory provision in the Certificate of Incorporation in the context of a motion to dismiss. n51 The established Chancery practice, which I will follow [*39] until instructed otherwise, is to address the Section 102(b)(7) defense in resolving motions to dismiss through the taking of judicial notice of the applicable provision in the certificate of incorporation. I do so because it promotes the efficient allocation of the Court's and the parties' resources. n52

n51 *Id. at 926; Emerald Partners v. Berlin, Del. Supr., 726 A.2d 1215, 1223-24 (1999)* (§ 102(b)(7) provision "is in the nature of an affirmative defense.").

N52 *In Re Frederick's of Hollywood, Inc. Shareholders Litigation, 2000 Del. Ch. LEXIS 19,* Del. Ch., C.A. No. 15944, Jacobs, V.C. (Jan. 31, 2000), appeal pending sub nom. *Malpiede v. Townson, Del. Supr., 780 A.2d 1075; McMillan v. Intercargo Corp., 768 A.2d at 501 n. 40; In Re Lukens, Inc. Shareholders Litig., Del. Ch., 757 A.2d 720, 724 n. 1 & 732-34 (1999);* see *In re BHC Communications, Inc. Shareholder Litig., 2001 Del. Ch. LEXIS 78,* *8 n.4, Del. Ch., Consol. 18209, Lamb, V.C. (June 4, 2001).

Accordingly, [*40] because Lilley is entitled to the shield of Section 102(b)(7) and because the Complaint fails to state a claim as to any breach of his duty of loyalty, he is entitled to dismissal of the action against him.

Plaintiffs' allegations of disloyalty as to the other directors, however, have survived the motion to dismiss. "If a complaint adequately alleges. . . disloyalty . . . or if the nature of the alleged breach of duty is unclear, the complaint will not be dismissed on a motion made under Rule 12(b)(6) on the basis of an exculpatory charter provision." n53 Thus, I need not determine if the imprecise allegations of breaches of the duty of care would, if they stood alone, be dismissed under Section 102(b)(7).

n53 *In re Lukens, Inc. Shareholders Litig., 757 A.2d at 734.* "Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly con-

sider exculpatory provisions. The defendants will have the opportunity to present their affirmative defenses as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness." *Sanders v. Wang, 1999 Del. Ch. LEXIS 203,* *35, Del. Ch., C.A. No. 16640, Steele, V.C. (Nov. 8, 1999).

[*41]

E. Delegation of Authority to Negotiate.

At oral argument, and in correspondence following oral argument, Plaintiffs attempted to make the claim that the directors improperly delegated to Silverman the responsibility for negotiating the merger transaction. n54 There is nothing inherently wrong with an interested chief executive officer negotiating a merger transaction. In most instances, the chief executive officer is the person most knowledgeable about the company, its value, and the industry in which it operates. Moreover, because Silverman was Ply Gem's largest shareholder, he also had a significant personal incentive to maximize the value of his shares. n55 As noted in McMullin, the Ply Gem board "could properly rely on the majority shareholder to conduct preliminary negotiations." n56 Plaintiffs, however, contend that Silverman did more than "conduct preliminary negotiations." Even if that is true, the issue becomes whether the Ply Gem board satisfied its "ultimate statutory duty and fiduciary responsibility to make an informed and independent decision" on whether to enter into the Nortek merger transaction. n57

n54 This contention is addressed separately, not because it is not to be analyzed under the triad of the duty of care, the duty of loyalty, and the duty of good faith, but because the parties have addressed it separately.

[*42]

n55 *McMillan v. Intercargo Corp., 768 A.2d at 503.*

n56 *McMullin v. Beran, 765 A.2d at 924.*

n57 Id:

If an informed and disinterested majority of the board had duly approved the Nortek merger and the related Silverman agreement, Silverman's interest in the transaction and his involvement in the negotiations would not have provided the basis for a challenge. Here,

however, the Plaintiffs' Complaint sufficiently alleges that a majority of the board approving the merger was not independent of Silverman's domination. Thus, Plaintiffs' loyalty claims survive, not so much because negotiation authority was delegated to a conflicted officer and director, but because it is sufficiently alleged that the directors who ultimately reviewed and approved the transaction were not independent of that interested officer and director.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted as to Lilley, but it is denied in all other respects.

An Order will be entered in accordance with this Memorandum Opinion.

IN RE: PLY GEM [*43]    INDUSTRIES, INC. SHAREHOLDERS LITIGATION

CONSOLIDATED C.A. No. 15779-NC

**ORDER**

NOW, this 26th day of June, 2001, for the reasons set forth in the Court's Memorandum Opinion of this date,

**IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint is granted, without prejudice, as to Defendant William Lilley III.

2. Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint is otherwise denied.

John W. Noble

Vice Chancellor