26

RONALD PORTER and ROBERT A. FANEUIL, Plaintiffs, v. TEXAS COMMERCE BANCSHARES, INC., BEN F. LOVE, HENRY L. HILLMAN, J. RUDNEY ATALLA, THOMAS D. BARROW, EMIL MOSBACHER, ROBERT MOSBACHER, RICHARD PIVIROTTO, R.W. MONCRIEF, MELVIN R. GOODES, LAWRENCE G. RAWL, TRAVIS H. PETTY, JAMES L. POWELL, DONALD C. PLATTEN, HARLAN R. CROW, JOHN H. DUNCAN, BERRY R. COX, DONALD L. BENTSEN, DONALD R. KEOUGH, JACK S. BLANTON, C.C. BUTT, CHEMICAL NEW YORK CORPORATION, ROBERT J. CALLANDER, JON P. NEWTON, JOHN D. BYRAM, HAROLD S. HOOK, EDWARD G. JEFFERSON, HENRY H. KING, J.B. GOODSON, THOMAS S. JOHNSON, TERRY A. KIRKLEY, PAUL R. HAAS, WILLIAM A. MARQUARD, A.S. SIGLER, P.H. CREEKMORE, BARBARA JORDAN, R.B. LABOON, DON D. JORDAN, RICHARD D. WOOD, W.M. BLUMENTHAL, F.E. HOGLUND, KENNETH L. LAY, J.J. ROFF, CHARLES SAPP, JAMES R. LESCH, F.D. SCHNEIDER, GEORGE V. GRUNE, F.H. WILLIAMS, K.W. REESE, CYRIL WAGNER, WILLIAM C. HARVIN, ROBERT G. GOELET, CHARLES L. BROWN, EUGENIO GARZA LAGUERA, M.R. WALLACE, MARC J. SHAPIRO, RAWLEIGH WARNER, GEORGE WEISSMAN, A. FUNKHOUSER, M.I. SOVERN, WALTER V. SHIPLEY, C.S. NICANDROS and RICHARD S. SIMMONS, Defendants

Civil Action No. 9114

Court of Chancery of Delaware, New Castle

*1989 Del. Ch. LEXIS 130*

Date Submitted: September 27, 1988
October 12, 1989, Decided

COUNSEL: [*1]

R. Bruce McNew, Esquire, and Lisa J. Rodriguez, Esquire, of GREENFIELD & CHIMICLES, Wilmington, Delaware, and Haverford, Pennsylvania, Attorneys for Plaintiffs.

Richard L. Sutton, Esquire, Thomas C. Grimm, Esquire, and Mary B. Graham, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, and CRAVATH, SWAINE & MOORE, New York, New York, Attorneys for Defendants Chemical New York Corporation and Walter V. Shipley.

R. Franklin Balotti, Esquire, and Jesse A. Finkelstein, Esquire, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware, and BAKER & BOTTS, Houston, Texas, Attorneys for Defendants Texas Commerce Bancshares, Inc. and Ben F. Love.

JUDGES:

BEFORE WILLIAM T. ALLEN, CHANCELLOR

OPINIONBY:

ALLEN

OPINION:

MEMORANDUM OPINION

WILLIAM T. ALLEN, CHANCELLOR

Plaintiffs Ronald Porter and Robert A. Faneuil owned common stock of Texas Commerce Bancshares, Inc. ("Texas Commerce"), a bank holding company incorporated in this State, when, on May 1, 1987, pursuant to a merger approved by a vote of the Texas Commerce shareholders, their stock was converted into a right to receive an amalgam of cash and securities. In the merger, Texas Commerce ceased to exist as an independent bank holding company and became [*2] a subsidiary of Chemical New York Corporation ("Chemical"), one of

the largest U.S. bank holding companies. In the merger, Chemical increased its assets from less than $ 57.9 billion to $ 79 billion.

Messrs. Porter and Faneuil felt aggrieved by the merger. On July 16, 1987, they filed a complaint in this court naming both corporations and the members of both boards of directors as defendants. Their suit seeks rescission of the merger or in the alternative, damages. Defendants rather promptly moved to dismiss Counts I and III of the complaint on the ground that neither of those counts state a claim upon which relief may be granted. n1 Specifically, defendants contend that those counts essentially alleged only that the price paid in the merger did not reflect the fair value of plaintiffs' stock. The exclusive forum in which plaintiffs could litigate a claim that their Texas Commerce stock was worth more than the consideration paid in the merger, however, is said to be an appraisal action under Section 262 of our corporation law.

> n1 Count II of the complaint purports to state a claim under the Securities Act of 1933, *15 USC § 77a*, et seq. It is not involved in the pending motion.

[*3]

While plaintiffs admit that the fairness or adequacy of the price is a central concern of theirs, they actively resist the notion that their complaint entails nothing more. Rather, they assert that their complaint includes valid claims of breach of duties of loyalty and care which, when proven, will entitle them to relief unavailable in an appraisal form of action.

For the reasons that follow, I conclude that plaintiffs are in some respects correct, but that important aspects of their complaint are nothing more than charges that the merger price was inadequate, for which the exclusive remedy is provided by Section 262 of our corporation law. Before turning to a statement of the reasons for this conclusion, it will be helpful to set forth the facts as alleged. n2

> n2 In some respects, the complaint cannot be understood without reference to the Joint Proxy Statement/Prospectus/Offering Circular and the supplement to that document (see, e.g., Cplt. Count III) which have been submitted only as exhibits to defendants' brief. Where the complaint does repeatedly refer to the proxy statement but neglects to attach a copy of it, and where there can be no dispute concerning the authenticity of the proxy statement, it should, in my opinion, be permissible on a motion to dismiss to refer to that

document, although not appended to the complaint, to set forth uncontroversial facts such as the terms of the merger or the precise disclosures made.

[*4]

I.

According to the complaint, as of December 31, 1986, Texas Commerce was the 29th largest banking organization in the United States measured by assets. Messrs. Porter and Faneuil were among its 20,000 shareholders. Defendant Ben F. Love is chairman and chief executive officer of Texas Commerce. Numerous other individual defendants were, at all relevant times, directors of Texas Commerce. n3

> n3 These include J. Rudney Atalla, Thomas D. Barrow, Donald L. Bentsen, Jack S. Blanton, Charles C. Butt, John D. Byram, Berry R. Cox, Jr., H. Creekmore, Harlan R. Crow, John H. Duncan, Eugenio Garza Laguera, James B. Goodson, Paul R. Haas, William C. Harvin, Forest E. Hoglund, Harold S. Hook, Barbara Jordan, Don D. Jordan, Donald R. Keough, Henry H. King, Terry A. Kirkle, R. Bruce LaBoon, Kenneth L. Lay, James R. Lesch, R.W. Moncrief, Robert Mosbacher, Jon P. Newton, Constantine S. Nicandros, Travis H. Petty, James L. Powell, Kenneth W. Reese, J. Hugh Roff, Jr., Charles Sapp, Fred D. Schneider, Marc J. Shapiro and Cyril Wagner, Jr.

Chemical is a bank holding company incorporated in Delaware. It conducts a worldwide financial services business through its subsidiaries. Numerous individual [*5] defendants were, at all relevant times, directors of Chemical and Chemical Bank, a New York chartered bank which is Chemical's principal subsidiary bank. n4

> n4 These include Robert G. Goelet, Henry L. Hillman, Donald C. Platten, Rawleigh Warner, Jr., Richard D. Wood, Charles L. Brown, Franklin H. Williams, Emil Mosbacher, Jr., Martha Redfield Wallace, Richard R. Pivirotto, William A. Marquard, George Weissman, Andrew C. Sigler, W. Michael Blumenthal, Edward G. Jefferson, Michael I. Sovern, Walter V. Shipley, A. Paul Funkhouser, Robert J. Callander, Thomas S. Johnson, Lawrence G. Rawl, Richard S. Simmons, George V. Grune and Melvin R. Goodes.

Pre-Merger Activities

The complaint attempts to outline a story of directorial mismanagement and corporate decline. During the years immediately preceding the merger, Texas Commerce acquired numerous banks in Texas. Many of these banks, plaintiffs allege, had poor controls and minimal lending standards. By the fall of 1984, about 55% of Texas Commerce's $ 3.5 billion real estate loan portfolio was concentrated in Houston and the surrounding area. The value of these investments declined, along with the rest of the Texas economy. Many of [*6] these loans were, say plaintiffs, in "high-risk" construction and land development projects not covered by third party commitments to pay when construction was to be completed. On December 31, 1985, Texas Commerce's reserve for possible loan losses was $ 316 million, almost double that of a year earlier. As of December 31, 1986, the loan loss reserve was $ 271 million. Texas Commerce's earnings declined $ 130 million between 1984 and 1985.

Large portions of Texas Commerce's losses were caused, according to plaintiffs, by the negligent operation of Texas Commerce and its subsidiaries. The Texas Commerce directors and officers approved high-risk or questionable loans with inadequate prospects of timely repayment and with insufficient collateral. Further, plaintiffs say, the directors and officers recklessly relied upon "excessive" appraisals.

Certain subsidiaries of Texas Commerce made or maintained "questionable loans" to certain Texas Commerce directors, members of their families, or affiliates. Loans to two directors or affiliated persons are specified in the complaint. According to the complaint, Texas Commerce holds claims against the Texas Commerce directors worth in excess [*7] of $ 100 million.

## The Merger

The merger challenged here was the largest interstate banking merger in United States history, plaintiffs say, creating a bank holding company with assets of $ 79 billion and equity capital of almost $ 4 billion.

Defendants announced the proposed merger on or before December 15, 1986; it was effectuated on May 1, 1987. Pursuant to the merger, all common shares of Texas Commerce were acquired by a wholly owned subsidiary of Chemical. According to paragraph 28 of the complaint, Texas Commerce shareholders received consideration consisting of (i) Chemical common stock, (ii) Chemical Class B common stock, (iii) an elective portion consisting of cash and/or Chemical Series C Preferred stock, and (iv) National Loan Bank n5 stock. (But see Cplt. para. 16 for a different formulation). In a supplement to the prospectus, Texas Commerce suggested, according to plaintiffs, that the value of the package at the time of the merger was $ 36, utilizing a "hypothetical" fair market value. (See Cplt. para. 16, but see Cplt. para. 17 ("price per share paid by Chemical . . . was purportedly $ 65")).

> n5 $ 300 million book value of Texas Commerce's non-performing assets were transferred to a newly organized national bank, National Loan Bank, whose stock was distributed to Texas Commerce shareholders in the merger.

[*8]

Further, according to plaintiffs, Texas Commerce represented on March 29, 1987 that, prior to the effective date of the merger and the distribution of the merger consideration to the Texas Commerce shareholders, there would not be a public market for the National Loan Bank stock and other newly-issued shares. It is alleged however that Goldman Sachs & Co. did maintain a "when-issued" market in such securities prior to their distribution. Texas Commerce knew, plaintiffs aver, that the market was being made and that the securities to be issued were traded at prices substantially less than defendants' estimated values for such shares.

The value paid by Chemical for each Texas Commerce share is, according to plaintiffs, a great deal less than these shares were worth. It is alleged that Texas Commerce owns claims against its directors for mismanagement, and because of malpractice claims against appraisers, accountants and lawyers. It is implied that the value of such claims was not reflected in the price paid. Moreover, the consideration paid is alleged not to have been worth what plaintiffs were led to believe because, it is alleged, Chemical's reported assets, earnings and net worth [*9] as of December 31, 1986 were overstated.

Plaintiffs allege that the merger was designed solely to eliminate members of the plaintiff class from continued equity participation in Texas Commerce at a price which defendants knew or should have known was unfair and inadequate. The acquisition was, plaintiffs say, designed to transfer from plaintiffs to Chemical the financial benefits of Texas Commerce's projected growth and ultimate recovery.

Further, it is said that the Texas Commerce directors agreed to the merger terms without conducting a thorough due diligence investigation of Chemical. In particular, according to plaintiffs, the directors failed to satisfy themselves fully that Chemical's financial statements accurately reflected its true assets, earnings and net worth as of December 31, 1986 and thereafter.

The Texas Commerce directors approved the merger, according to plaintiffs, in order to protect themselves against derivative litigation which would assert claims for reckless mismanagement and insider loans.

In Count III, plaintiffs allege claims relating to the supplement to the prospectus. In particular, plaintiffs assert that certain information should have been disclosed [*10] in the supplement's discussion of Proposal (3). That proposal sought a vote by Texas Commerce shareholders to amend Texas Commerce's restated certificate of incorporation in connection with the merger. The amendment would eliminate monetary liability of directors for any breach of their duty of care. In that connection, plaintiffs claim that Texas Commerce and its directors failed to disclose the extent to which their acts caused Texas Commerce to sustain losses, failed to respond to shareholder demands, and did not pursue legal claims against themselves, as well as certain lawyers, appraisers and accountants who caused damage to Texas Commerce.

Plaintiffs purport to bring this action in behalf of a class consisting of all owners of shares of common stock of Texas Commerce on May 1, 1987, the effective date of the merger, except for defendants and their affiliates, officers, directors and members of their immediate families.

II.

In order to grant a motion to dismiss for failure to state a claim, the court must conclude, with reasonable certainty, that a plaintiff would not be entitled to relief under any set of facts that could be proven under the allegations she has made. *Rabkin v. Philip A. Hunt Chemical Corp., Del. Supr., 498 A.2d 1099, 1104 (1985);* [*11] *Harman v. Masoneilan International, Inc., Del. Supr., 442 A.2d 487, 502 (1982).* Here, defendants move to dismiss on the ground that appraisal is the correct and exclusive proceeding in which plaintiffs' claims could be judicially addressed. In *Weinberger v. UOP, Inc., Del. Supr., 457 A.2d 701 (1983),* the Delaware Supreme Court outlined principles relating to the exclusivity of appraisal. In Rabkin, the Court applied those principles and found adequate a complaint which averred "specific acts of unfair dealing constituting breaches of fiduciary duties which if true may have substantially affected the offering price." *Rabkin, supra, at 1100; see Weinberger, supra, at 703.* The Supreme Court nonetheless made it clear that henceforth it would be as it had been (see *Stauffer v. Standard Brands Incorporated, Del. Supr., 187 A.2d 78 (1962))* -- shareholder complaints that the price offered in a merger is inadequate are to be adjudicated in an appraisal proceeding absent litigable claims of unfair dealing affecting price.

III.

It is not a technical defect in the complaint that it does not [*12] lucidly set forth theories of legal liability. It is sufficient for purposes of a motion to dismiss if the complaint sets forth facts which, if true, would entitle plaintiff to relief. Analysis of a motion of this kind is made considerably easier, however, if the complaint does make plain the legal theories that the pleader has in mind. Otherwise -- as here -- the court is required to attempt to apply arguably pertinent theories and to rule upon the sufficiency of the pleaded facts in light of the requisites of such theories. The agglomeration of facts presented here necessitates this course.

As I read the complaint, it may arguably allege several possible theories of liability.

First: the merger price "did not reflect the intrinsic value" of the shares (Cplt. para. 20) because it failed to reflect the value of claims held by the Company against its directors and agents. These purported claims allegedly have arisen from losses (realized or yet to be realized) suffered by the bank because of alleged mismanagement and negligence. See Cplt. paras. 17, 18, 20, 22.

Second: the merger served no purpose of Texas Commerce but was accomplished simply to protect the directors from [*13] possible future derivative claims that would attempt to establish liability for past losses or lost opportunities. (". . . a merger at this time will frustrate the Company's shareholders' ability to commence and maintain derivative litigation and minimize the possibility of any claims being asserted . . . ). Cplt. para. 21.

Third: the proxy materials pursuant to which shareholder approval was given were untrue or misleading in an important respect -- they failed to inform the shareholders that a "when-issued" market was being made by Goldman Sachs in the securities to be distributed as merger consideration, and that the value reflected in the when-issued market of the package of securities to be received was substantially less than the value suggested by a "hypothetical" example apparently contained in the Supplement to the Prospectus. Cplt. para. 16.

Fourth: the directors did not adequately investigate the value of the consideration offered in the merger to the Texas Commerce shareholders. Cplt. para. 18.

Fifth: the proxy supplement which discussed a proposal to amend Texas Commerce's certificate of incorporation (which amendment was proposed to be effectuated in the [*14] merger) to eliminate potential director liability for future breaches of the duty to exercise care was materially incomplete. It is asserted that a correct disclosure would have included a description of prior breaches by the Texas Commerce directors of that duty, specifically referring to at least those matters pleaded elsewhere in the complaint. Cplt. paras. 45-46.

I turn then to an evaluation of the legal adequacy of these pleadings.

IV.

A.

Plaintiffs attempt to plead a claim premised on allegations that the merger consideration was less than the "intrinsic value" of the Texas Commerce stock or was unfair, inadequate or words to that effect. These allegations may be disposed of summarily. Accepting the well-pleaded allegations of the complaint as true, it is plainly the case that the merger complained of was a negotiated, arms'-length transaction. The obligation to pay a "fair price" in such a merger does not arise. The rights of the Texas Commerce shareholders in such a setting are legal n6 and equitable, n7 but they do not include a right to a price in the merger that is "adequate" or "fair," etc. If a shareholder does not find the merger consideration appealing, she is provided [*15] with a statutory alternative designed to substitute "fair value" for the merger consideration. n8 Thus, while a stockholder has a statutory right designed to assure that "fair value" is afforded, there is no right to a fair price in the merger itself and thus no right to enjoin an arms'-length merger on the ground that an ex post facto judicial review would conclude that the negotiated price did not represent a "fair" or "adequate" price. The appraisal remedy creates the only right there is, in the context of an arms'-length merger, to examine the value of the shares in the merging corporation.

> n6 Most importantly, the right to vote on a merger, or to dissent and demand appraisal.
>
> n7 The right in equity to require directors to act in an informed manner in the good faith pursuit of corporate or shareholder interests.
>
> n8 That is, more precisely, the "fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with a fair rate of interest, if any . . . ." *8 Del. C. § 262(h).*

Having this view of the law, I am constrained to conclude that plaintiffs' repeated allegations of the inadequacy [*16] of the merger price do not themselves create a claim, in the context of an arms'-length transaction, upon which relief may be granted. Where there is no right, there can be no remedy.

B.

With respect to the allegations concerning the purpose of the board of Texas Commerce (see para. "Second," supra), I conclude that the relevant, well-pleaded facts fail to state a claim. It has, of course, been established in the context of a self-dealing merger that there is no independent, "business purpose" test that a merger must satisfy in order that the fiduciary duty of a control-ling shareholder be respected. *Weinberger, supra.* In this aspect of its holding, Weinberger may be seen simply as a generalization of the holding of *Tanzer v. International General Industries, Inc., Del. Supr., 379 A.2d 1121 (1977).* Tanzer held that a self-dealing merger does not constitute a breach of a controlling shareholder's fiduciary duty by reason of the fact that it is effectuated for a business purpose of the parent and for no purpose distinctive to the subsidiary. Under Weinberger, rather than a focused obligation regarding purpose, the board's duty [*17] of "entire fairness" defines the obligations of the fiduciary in a self-dealing merger.

A negotiated, arms'-length merger is, in some respects, different. In such a context, the existence of a business purpose requirement is implied by the root obligation of a director to authorize corporate action only in the good faith pursuit of corporate interests. n9 Plainly, for example, a merger that served a private interest of directors, but no corporate or shareholder interest, would constitute or reflect a violation of duty.

> n9 In some instances, "corporate interests" will include interests of all of the corporation's shareholders even where the corporation itself is not affected by the action, and indeed the holdings of Tanzer and Weinberger on this point may be interpreted to mean that where there is a controlling shareholder, for these purposes "corporate interests" include the interests of such person.

This is the principle that plaintiffs seek to call upon when they allege that the Chemical merger served no purpose of Texas Commerce, but did serve directors' interests by frustrating "the Company's shareholders' ability to commence and maintain derivative litigation . . [*18] . ." This claim does not state facts that are legally significant. A merger in which a corporation's shareholders received stock in another corporation, other securities or cash, will always n10 result in termination of the right of the pre-merger shareholders to sue on behalf of the company. That fact does not mean that either those shareholders or the company may be injured as a consequence. If the company has substantial and valuable derivative claims, they, like any asset of the company, may be valued in an appraisal. See, e.g., *Harnett v. Cavalier Oil Co., Del. Supr., 1989 Del. LEXIS 325,* Walsh, J. (September 5, 1989). Thus, shareholders are not, in theory, exposed to risk that they will be injured by the timing of a merger with respect to the possible filing of derivative claims. Nor from the company's point of view does the occurrence of the merger affect the ability of the surviving or resulting corporation to bring suit against

CASE 1:05-cv-00327-GMS

those who previously had been directors of a constituent corporation. See *8 Del. C. § 259.* n11

> n10 Excepting the arguable possibility of so-called double derivative claims.
>
> n11 Where the merger is a self-dealing one, and where there is pending derivative litigation that will, as a practical matter, be left by the merger without a plaintiff, a claim that such an effect was the principal purpose of the merger might constitute a claim of unfair dealing upon which relief could be granted. See *Merritt v. Colonial Foods, Inc., Del. Ch., 505 A.2d 757 (1986).*

[*19]

Here, the complaint does not plead that the directors of Texas Commerce will control Chemical after the merger. Nor does it claim that an agreement was reached in which Chemical agreed that no claim would be brought against former Texas Commerce directors for alleged mismanagement. Thus, all that is pleaded is that prior to the merger, there may have been grounds to bring a derivative claim for mismanagement (but no one apparently had attempted to do so), and after the merger, there still may be a basis to do so. In these circumstances, I cannot conclude that facts have been pleaded which, if true, would constitute the approval of this largest banking merger in our history as a breach of the Texas Commerce directors' duty to act in good faith in pursuit of corporate, rather than personal, interests. If there is any value to the corporation of the claims of mismanagement alluded to (rather than stated) in the complaint, that value would be reflected in an appraisal award.

C.

I turn now to the third theory that can be distilled from the complaint which relates to the alleged existence of a "when-issued" market for the securities offered as part of the consideration in the merger. [*20] See para. "Third," supra. The claim purports to be one for breach of a duty of candor. Such a claim requires the allegation of an omission to state (or the misstatement of) a material fact which the directors knew or, by the exercise of their duty to be appropriately informed relevant to the transaction, ought to have known. *Lynch v. Vickers Energy Corp., Del. Supr., 383 A.2d 278 (1977); Rosenblatt v. Getty Oil Co., Del. Supr., 493 A.2d 929 (1985).*

Here, it is alleged that the Texas Commerce directors knew that a "when-issued" market was being made by a major investment banking firm in securities to be issued, and it is further alleged that defendants knew that in that "when-issued" market, those securities traded at values substantially less than the value allegedly implied by defendants. Cplt. para. 16.

Defendants assert that the existence of a "when-issued" market does not make incorrect the proxy material's statement that no trading market was expected to exist in the securities until their issuance -- which was, they say, true. The "when-issued" market is not, they imply, a market "in the securities," but in certain rights respecting [*21] those securities. They further imply that what may occur in that market has no pertinence. While factually, the specific characteristics of the "when-issued" market might be such that it would not be material to one asked to authorize the merger or to act on a right to dissent from it (see *Rosenblatt v. Getty Oil, supra; TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976)),* I cannot say on this motion that the existence of a "when-issued" market and the specific characteristics of that market (size, prices, etc.) would not have been material. Application of the relevant legal test is highly contextual; it will rarely be an appropriate issue for resolution on a motion to dismiss. E.g., Glassman v. Wometco Cable TV, Inc., Del. Ch., C.A. No. 7307, Hartnett, V.C. (June 19, 1985). Here, while the complaint offers little from which one could conclude that the existence and particulars of a "when-issued" market would have been material, it does plead enough, in my opinion, to survive a motion to dismiss when it alleges that prices in the when-issued market were substantially less than values that the shareholders had allegedly been [*22] led to believe were applicable. What "substantially" means in this setting may perhaps be established beyond contest by affidavit or discovery. If so, perhaps judicial resolution of this issue may be reached before trial. But for present purposes, I am satisfied that the complaint does state a claim upon which relief may be granted with respect to the claimed non-disclosure of the "when-issued" market in the circumstances alleged.

D.

The fourth theory that appears from the complaint involves a claim that the Texas Commerce directors failed to exercise due care in investigating Chemical before recommending the merger in which the Texas Commerce shareholders received Chemical securities. Defendants' motion in this instance, as in others, is directed entirely to the exclusivity of the appraisal remedy. It is, therefore, that argument upon which I principally have focused.

Defendants' specific argument is hardly more textured than the statement that if the directors were negligent (or grossly so) and the shareholders were injured, this injury may be compensated in an appraisal action. Therefore, they conclude that that remedy is fully suffi-

cient and is the exclusive remedy. I cannot accept [*23] this argument.

A claim that a proxy statement is false or misleading in a material way is not a claim for which appraisal provides an exclusive remedy. n12 By a parity of reasoning, a claim that directors were actionably negligent in valuing securities to be received in a merger also will not generally be relegated to appraisal. In both instances, shareholders presumably rely upon the directors meeting their obligations (of candor in one instance, of care in the other) in electing to accept the merger consideration and eschew appraisal. Cf. *Sealy Mattress Co. of N.J. v. Sealy, Inc., Del. Ch., 532 A.2d 1324 (1987)*. It would be anomalous, a Catch-22, to hold that a non-dissenting shareholder who relied upon a reasonable assumption that the directors negotiated and recommended the proposed merger with appropriate care and deliberation, should be foreclosed, by the existence of an unavailable appraisal remedy, from suing the directors for their (assumed) breach of duty to exercise care and deliberation. Whether this complaint does allege a claim of this type has not been presented -- defendants opting to prevent only the exclusivity of the appraisal remedy as a basis [*24] for their motion. In denying the motion, I reject defendants' argument but intend to go no further.

> n12 This is the case because the alleged wrong, if proven, will establish both that the vote authorizing the merger was flawed and the election to accept the merger or to dissent from it was

similarly taken on information that was incorrect in a material respect.

E.

Plaintiffs' allegations in Count III boil down to an assertion that the proxy supplement's discussion of a proposal to eliminate liability for future breaches of due care should have disclosed prior directorial acts of wrongdoing. It is settled law in Delaware, however, that a proxy statement need not be a forum for directorial confessions of past mismanagement. The failure to make such admissions is not a material omission in a proxy statement. Margolies v. Pope & Talbot, Inc., Del. Ch., C.A. No. 8244, Hartnett, V.C. (December 23, 1986); Columbia Pictures Industries, Inc. v. Kirk Kerkorian, MGM Grand Hotels, Inc., Del. Ch., C.A. No. 6394, Marvel, C. (December 16, 1980); Williams v. Geier, Del. Ch., C.A. No. 8456, Berger, V.C. (May 20, 1987).

V.

The motion is to dismiss the complaint as one upon which no [*25] relief may be afforded. So long as one claim is properly asserted, the complaint may not be dismissed. Therefore, the motion will be denied. Nevertheless, the foregoing does include rulings with respect to some aspects (theories) of the complaint and such rulings will constitute the law of this case, unless reversed on appeal. In some cases, this court has spoken of a motion to dismiss being granted in part and denied in part. This locution is not helpful here where the complaint does not set forth separate claims in separate counts.

27

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2000 WL 1206677 (Del.Ch.)
(Cite as: Not Reported in A.2d)


Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
                    Court of Chancery of Delaware.
    Mae Jean ROSSER, individually and on behalf of all other similarly situated,
                                Plaintiff,
                                    v.
    NEW VALLEY CORPORATION, Brooke Group, Ltd., Bennett's. Lebow, Howard M. Lorber,
Richard J. Lampen, J. Bryant Kirkland, III, Henry C. Beintein, Barry W. Ridings and
                       Arnold I. Burns, Defendants.
                              No. 17272.

                         Submitted May 1, 2000.
                         Decided Aug. 15, 2000.


R. Bruce McNew of Taylor & McNew LLP, Greenville, Delaware, Francis J. Farina of
Devon, Pennsylvania; Peter A. Lennon of Broomall, Pennsylvania; and, Frederic S.
Fox of Kaplan, Kilsheimer & Fox LLP, New York, New York, for Plaintiff, of counsel.
Michael D. Goldman, Peter J. Walsh, Jr. and Brian C. Ralston of Potter Anderson &
Corroon LLP, Wilmington, Delaware, Michael L. Hirshfeld, Teresa A. Gonsalves, Anne
Kerr DeSimone and David Mollow of Milbank, Tweed, Hadley & McCloy LLP, New York,
New York, for Defendants, of counsel.

                          *MEMORANDUM OPINION*

STEELE, Vice Chancellor.
*1 Before 1999, New Valley Corporation had three separate classes of stock. In
early 1999, New Valley's Board of Directors proposed a recapitalization plan
("Plan") that would merge all New Valley shares into a single class of common
stock. Defendants maintain that the Board proposed the Plan in order to simplify
New Valley's capital structure. The purported plaintiff class (former holders of
New Valley's Class B Preferred Shares) argues that the Board intended to use the
Plan to shift Class B holders' equity to the self-interested defendant directors
and controlling shareholders.

Bennett Lebow, a named defendant, apparently controls New Valley. Lebow, however,
did not control a majority of Class B shares. In fact, he and other defendants are
only alleged to have controlled 11 .3% of the Class B votes. The Plan was put to a
vote which required that a simple majority of all three classes approve it. The
vote attracted approval by a majority of all three classes of shares. Even if the
defendants' Class B votes are not counted, a majority of Class B shares still voted
in favor of the Plan.

Plaintiffs contend that defendants breached their fiduciary duties of loyalty and
care by formulating and promoting the Plan. They also contend that the alleged
ratifying class vote on the Plan could not have been fully informed because the
Proxy Statement urging Plan approval contained numerous material omissions and
misstatements.

This opinion addresses defendants' recently submitted Motion to Dismiss which
suggests that plaintiffs' complaint fails to state any claim upon which relief

            ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

could be granted. I find that plaintiffs have stated a proper claim regarding several of the alleged disclosure violations. If plaintiff can eventually show that the vote was not fully informed, defendants are *not* entitled to the protection of the business judgment rule. If it turns out that the New Valley shareholders voted while possessing all material facts, the defendants' actions proposing the Plan *will* receive the benefit of the business judgment rule because the defendants controlled only a small percentage of the Class B votes and the vote on the proposed Plan could not have been considered a foregone conclusion.

### I. Parties

The purported plaintiff class consists of holders of New Valley Class B Preferred shares. New Valley and the directors who allegedly control New Valley are named defendants. Brooke Group Ltd., the controlling shareholder of New Valley, is also named as a defendant. Defendant Bennett S. Lebow is Chairman of the Board of Directors and Chief Executive Officer of New Valley, and also allegedly controls Brooke Group. Plaintiffs contend that New Valley's officers, directors and Brooke Group beneficially own 43.1% of the Company's common shares, 61.1% of the Class A Senior Preferred shares and 11.3% of the Class B Preferred shares.

### II. Facts

For many years, New Valley operated under the name "Western Union Corporation." In 1991, an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against what was then called Western Union. A bankruptcy plan was eventually devised, and on November 1, 1994, the bankruptcy court entered an order confirming that plan. Certain assets were sold under the bankruptcy plan, most notably the money transfer business that continues to operate under the Western Union name.

*2 Lebow and entities controlled by him have operated New Valley since its emergence from bankruptcy in 1995. On May 21, 1999, New Valley announced a proposed recapitalization plan ("Plan"). The Board of Directors purportedly believed the recapitalization would make it easier for market analysts to discern New Valley's true value. The implied hope was that recapitalization would boost New Valley's stock price making it possible for New Valley to use its stock to effect acquisitions or to raise capital.

When the Plan was proposed, New Valley had three classes of shares-Class A Preferred, Class B Preferred, and Common. On February 2, 1999, New Valley filed a preliminary proxy statement with the SEC that outlined the Plan. Under the Plan, each Class A share would be reclassified and changed into 20 common shares and one warrant to purchase an additional share, each Class B share would be reclassified and changed into one-third of a common share and warrants to purchase five additional shares, and each common share would be converted to one-tenth of a common share and three-tenths of a warrant.

Under the Plan, Class A and Class B shares also lost their dividend and liquidation preferences. This was particularly significant for the Class A holders because Class A had a liquidation preference four times that of Class B and because the unpaid dividend arrearage "owed" to Class A holders was $234.6 million (compared to $172.9 million in dividend arrearage "owed" to Class B holders). The warrants have an exercise price of $12.50 and are exercisable for five years. Post-recapitalization, New Valley's common stock has consistently traded for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 1206677 (Del.Ch.)
(Cite as: Not Reported in A.2d)

substantially less than the exercise price of the warrants.

Class A shares traded up drastically while Class B shares lost half of their value immediately after the Plan was made public through the SEC filing. Plaintiffs cite the market reaction as evidence that the Plan unfairly favored Class A holders over Class B holders. Plaintiffs state that defendants structured the recapitalization to favor Class A holders because the Brooke Group and Lebow own more than 60% of the Class A shares.

After the proposed Plan was publicly announced, New Valley prepared a Proxy statement urging all New Valley shareholders to vote for the Plan. The Proxy Statement stated that a special committee of directors not associated with Lebow recommended the Plan. At a special shareholders meeting held on May 21, 1999, each voting class approved the Plan. Specifically, 82.7% of the outstanding Class A shares, 68.6% of the outstanding Class B shares, and 53.2% of the old common shares voted in favor of the Plan.

### III. Parties Contentions

Plaintiffs contend that defendants orchestrated a fundamentally unfair and self-dealing recapitalization of New Valley. Specifically, plaintiffs allege the Plan stripped much of the value and voting rights of the Class B shares, and wiped out $172.9 million of accrued and unpaid dividends and $69.8 million of fixed liquidation value. Plaintiffs also contend that the warrants that the Class B shareholders received are essentially worthless, leaving Class B holders worse off relative to Class A holders after the recapitalization than they were before. Although the Plan was approved by a majority of the Class B shareholders, plaintiffs allege this vote was tainted because the defendants failed to disclose all material information regarding the plan and its effect. Moreover, other unexplored alternatives were available that could have simplified New Valley's capital structure without unfair harm to the Class B shareholders, according to plaintiffs.

\*3 Defendants counter by claiming that the recapitalization was fair to the Class B holders, and that the warrants are potentially very valuable. Defendants contend that, in any event, the Class B holders approved the Plan in a fully informed vote. They assert that plaintiffs' allegation that the Proxy Statement contained material omissions and misstatements is unfounded.

### IV. Analysis

#### A. Standard of Review for Motion to Dismiss

In considering this motion to dismiss under Court of Chancery Rule 12(b)(6), I must assume the truthfulness of all well-pleaded allegations of the complaint. [FN1] In doing so, I am required to extend to plaintiffs the benefit of all reasonable inferences that can be drawn from the complaint. [FN2] Plaintiffs' complaint "need only give general notice of the claim asserted and will not be dismissed unless it is clearly without merit, either as a matter of law or fact." [FN3] Notwithstanding Delaware's permissive pleading standard, I am free to disregard mere conclusory allegations made without specific allegations of fact to support them. [FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN1. *Weinberger v. UOP, Inc.*, Del. Ch., 409 A.2d 1262, 1264 (1979).

FN2. *In re USA Cafes*, *L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991).

FN3. *Rabkin v. Phillip A. Hunt Chemical Corp.*, Del.Supr., 498 A .2d 1099, 1104 (1985).

FN4. *Wolf v. Assaf,* Del. Ch., C.A. No. 15339, mem. op., 1998 Del. Ch. LEXIS 101, at ˙3-4, Steele, V.C. (June 16, 1998),.

B. The debate over how to compute "before" and "after" recapitalization figures

Plaintiff contends the warrants are "essentially worthless." [FN5] In contrast, defendants point out that in the 45-day period following their issuance, the warrants traded at an average price of $.50 a warrant. [FN6] Defendants then present calculations that purport to show that the Class A/Class B ratio is essentially the same after recapitalization as it was before. Defendants contend that the stock-plus-warrants structure was implemented to best duplicate the effects of the dividend and liquidation preferences that favored Class A before the recapitalization. Perhaps there is some sense in defendants' explanation. But, I now view this case in the context of a motion to dismiss. Therefore, I need not evaluate the merits of the competing valuations. Expert testimony, unavailable at this point, may eventually be needed in order for the Court to separate the well founded from the incorrect position. But for now, I must accept plaintiffs' plausible calculations to be true for the purposes of this motion.

FN5. Compl., ¶ 2.

FN6. Defs.' Reply Br. at 5. Since this argument was first made in defendants' reply brief plaintiffs have not had the opportunity to respond to it.

C. Were the shareholders adequately informed when they purportedly "ratified" the challenged Board action?

Whether shareholders are "fully informed" turns upon whether directors have complied with their duty "[w]hen seeking the affirmative vote of stockholders ... to disclose all material information." [FN7] A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." [FN8] Therefore, in order to allege a proper breach of a duty of disclosure claim, plaintiffs must establish "a substantial likelihood, that under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder." [FN9]

FN7. *In re Santa Fe Pacific Shareholder Litig.*, Del.Supr., 669 A.2d 59, 66 (1995).

FN8. *Loudon v. Archer-Daniels-Midland, Co.*, Del.Supr., 700 A.2d 135, 143 (1997); *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985).

FN9. *Loudon,* 700 A.2d at 144.

Plaintiffs have alleged that the relevant Proxy Statement contained the following material omissions or misrepresentations:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported:05-cv-00327-GMS   Document 48-11   Filed 03/06/2006   Page 14 of 35
Not Reported in A.2d, 2000 WL 1206677 (Del.Ch.)
(Cite as: Not Reported in A.2d)

*4 1. it failed to disclose the projected value of the new common stock despite the
fact that the Board had that projection;
2. it failed to estimate the value of the warrants, despite the fact that the Board
had that estimate;
3. it failed to disclose the increased equity interest given to the controlling
shareholders under the proposed Plan;
4. it failed to disclose that the investment banker's fairness opinion did not
compare the fairness of the Plan as it related to each individual class;
5. it failed to disclose that the investment banker who gave the fairness opinion
anticipates getting further work from Lebow-related entities;
6. it claimed that members of the "special committee" were "not associated with New
Valley's controlling shareholder" despite the fact that each has long-standing
business relations with Lebow;
7. it failed to disclose the identity of the shareholders whose suggestion
initiated the Plan;
8. it failed to disclose the current status of the controlling shareholders'
ongoing effort to engage in extraordinary transactions involving RJR Nabisco;
9. It failed to disclose the value of New Valley's assets or lines of business.


                        Dismissed disclosure claims

While the complaint alleges a duty to disclose post-recapitalization price
estimates for the stock and warrants, "Delaware law does not require disclosure of
inherently unreliable or speculative information."  FN10 The proxy statement armed
plaintiffs with the information needed to make their own estimates, however. The
proxy materials disclosed the liquidation preferences of the Class A Shares and
Class B shares, and explained how the recapitalization would cause the surrender of
dividend arrearages and liquidation preferences of both classes. It is quite
likely, however, that a reasonable shareholder would consider management's
estimates very important in deciding how to vote on the Plan. Nonetheless,
corporate management need not disclose ruminations regarding uncertain future value
because their estimates could be as misleading as helpful.  FN11

    FN10. _Arnold v. Society for Sav. Bancorp._, Del.Supr., 650 A.2d 1270, 1282
    (1994). _See also_ _Goodwin v. Live Enter., Inc._, Del. Ch., C.A. No. 15765, 1999
    WL 64265, at *12, Strine, V.C. (Jan. 25, 1999).

    FN11. _See_ _Van de Walle v. Unimation, Inc._, Del. Ch., C.A. No. 7046, 1991 WL
    29303, at *17, Jacobs, V.C. (March 6, 1991) ("To be the subject of a
    disclosure obligation, information relating to value must be considered
    reliable").

Plaintiffs also allege that while the Proxy Statement noted that New Valley
"believes the Common Shares will trade as a minimum bid price sufficient to meet
the requirements to be quoted on the NASDAQ Small Cap Market or the NASDAQ National
Market System," it fails to state what that minimum bid price is.  FN12 The
information plaintiffs seek is publicly available since it is set forth in NASDAQ
Rule 4310(c)(4) filed with the SEC. A proxy statement need not disclose facts that
are generally known.  FN13

    FN12. Compl., ¶ 31; Proxy Statement at 19.

          © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 48-11    Filed 03/06/2006    Page 15 of 35

   FN13. *Kahn v. Lynch Communications Sys., Inc.,* Del.Supr., 669 A .2d 79, 89
   (1995).

Likewise, the Complaint fails to state a claim that the Proxy Statement
inadequately disclosed that the Brooke Group's increased equity interest will allow
it to control New Valley. The Proxy Statement states that "[a]s holder of an
absolute majority of the Common Shares, [Brooke Group] will be able to elect all of
the [New Valley's] directors and control the management of [New Valley]." [FN14] It
further adds "the increase in [Brooke Group's] ownership of Common Shares will make
it impossible for a third party to acquire control of [New Valley] without the
consent of [Brooke Group]." [FN15] There are other references to Brooke Group's equity
interests post-recapitalization in the Proxy Statement, but the quoted language by
itself was sufficient to inform plaintiffs of the additional leverage Brooke Group
stood to gain if they approved the Plan.


   FN14. Proxy Statement at 6, 22.

   FN15. *Id.* at 6.

*5 Plaintiffs make much of the disparate values of the former Class A and former
Class B shares after recapitalization. They maintain this end-result should have
been disclosed. But how could defendants have known the eventual actual price to be
set by the marketplace? Apparently, the marketplace does not highly value the
warrants (at least according to plaintiffs' calculations). But, if plaintiffs knew
what they were getting when they voted, they can not reasonably ask to have the
recapitalization undone solely because defendants did not tell them that the
marketplace would not regard their equity interest as highly as it had before.

Plaintiffs argue that PMG's potential conflict of interest was not disclosed. The
Proxy Statement explained that PMG "may have a conflict of interest because certain
associated persons and customers of Pennsylvania Merchant Group hold a substantial
number of Class A Senior Preferred Shares and Class B Preferred Shares." [FN16]
Plaintiffs note the reason for the conflict was undisclosed, and apparently contend
that they were owed a more detailed explanation. I find the conflict to be as
obvious as it was stated in the Proxy Statement, and that any reasonable
shareholder needed no further explanation in order to evaluate its significance.
Plaintiffs also complain that the Proxy Statement should have explained that PMG
expects to do future work for Lebow-related entities. This is mere speculation.
Plaintiffs offer no specific nonconclusory facts to support that naked allegation.
But even if true, that fact would hardly be noteworthy since investment bankers,
like most rational business people, seek repeat business. Because shareholders can
reasonably be expected to possess basic common business sense, plaintiffs fail to
state a claim on this issue.


   FN16. Proxy Statement at 6-7, 22.

Plaintiffs also contend that the assertion in the Proxy Statement that the members
of the special committee were not associated with Lebow or the Brooke Group is
untrue. Plaintiff alleges that the Proxy Statement should have disclosed that three
members of the special committee were former partners at the Proskauer Rose LLP law
firm. Defendants contend that plaintiffs' allegation is patently false because only
one of three members is even an attorney. In any event, plaintiffs fail to explain
in the Complaint why affiliation with Proskauer Rose is relevant. In other words,
plaintiffs fail to explain why affiliation with Proskauer Rose equates to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

association with Lebow or the Brooke Group. This allegation therefore fails to state a claim.

Plaintiffs also contend that disclosure should have been made regarding New Valley's efforts to "engage in extraordinary transactions involving RJR Nabisco." [FN17] Plaintiffs allege that two of the director-defendants "have served as Brooke [Group] nominees at at least one recent stockholders meeting of RJR Nabisco." [FN18] The Complaint never explains why any of this would have mattered to a reasonable New Valley shareholder asked to vote on the recapitalization Plan. A careful reading of plaintiffs' answering brief makes it clear that plaintiffs themselves have abandoned this particular claim. Accordingly, it is dismissed.

FN17. Compl., ¶ 45(i).

FN18. Compl., ¶ 35.

Disclosure claims that survive the Motion to Dismiss

*6 Plaintiffs allege that the fact that the fairness opinion did not cover fairness to each individual class should have been expressly disclosed. The fairness opinion from New Valley's financial advisor, Pennsylvania Merchant Group ("PMG"), states only that the Plan "is fair from a financial point of view to the current holders of the Company's shares." [FN19] Plaintiffs argue that is that disclosure is insufficient and misleading.

FN19. Compl., ¶ 32.

Defendants respond by noting that the opinion did not purport to compute the "relative fairness" of the Plan as applied to each class. If that is true, of what possible relevance is the fairness opinion? This was a recapitalization, involving only *internal* equity realignment. It was not a case where a third party bought-out New Valley shareholders for a sum certain. In that hypothetical case, a fairness opinion regarding the consideration to be paid as a whole could be relevant even if it failed to examine how the consideration was to be allocated among the three classes. But here, if the fairness opinion failed to distinguish between the classes, it is likely irrelevant and perhaps even misleading. Plaintiffs have adequately stated a claim on this issue.

The Proxy Statement asserted that the Plan was initiated in late 1996 when "[New Valley] was approached by certain holders of Preferred Shares who asked [New Valley] to consider a recapitalization." The identity of the shareholders who suggested recapitalization and their respective holdings broken down by share class was not disclosed. Plaintiffs allege this was a material omission. It is true that "mere mention" in a proxy statement does not necessarily require disclosure of the "details of the Board's decision making process or the factual or legal basis behind the determination." [FN20] In this case, however, the identity of shareholders whose suggestion initiated the Plan could be significant. The Proxy Statement told New Valley's shareholders that it was some of their own who first suggested the idea—implying that the recapitalization must be good for the shareholders. Once a reasonable shareholder thinks more deeply, however, that shareholder could plausibly want to know: whether those shareholders were also directors, what class of shares those shareholders owned and how much, and why those shareholders thought recapitalization was a good idea (at least for them). Presumably, plaintiffs will attempt to argue that this partial disclosure was materially misleading. They are

entitled to the opportunity to do so as they have adequately stated a claim for breach of the duty of disclosure on this issue.

> FN20. *In re Walt Disney Co. Derivative Litig.*, Del. Ch., 731 A.2d 342, 378 (1998), *aff'd in part, rev'd in part, and remanded by Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000).

Finally, plaintiffs allege that the disclosure in the Proxy Statement was inadequate because it did not reveal the value of New Valley's lines of business or its assets. Neither party has presented much argument on this issue. But, if plaintiffs are claiming, which they appear to be, that the Board intentionally or carelessly omitted financial information about New Valley's worth as an entity, they state a plausible claim. In the absence of any truly substantive opposing argument, the motion to dismiss this disclosure claim is denied.

### D. Effect of fully informed shareholder ratification

\*7 Plaintiffs have adequately pleaded that defendants breached their duty of disclosure. Therefore, their claim, at least in part, survives defendants' motion to dismiss. But if plaintiffs ultimately fail to prove that they were not fully informed when asked to vote on the Plan, their claim is very likely to fail. The "settled rule is that where a majority of fully informed stockholders ratify an action of even interested directors, an attack on the ratified transaction normally must fail." [FN21]

> FN21. *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 890 (1985) (making this statement as an aside while resolving a different issue).

This Court has previously cited that same language in dismissing a claim that alleged that directors breached their duty of loyalty by submitting a proposed charter amendment for shareholder approval that shifted voting control to a corporate savings plan controlled by defendants notwithstanding the fact that the majority of the shareholders approved the proposal. [FN22] In that case, Vice Chancellor Jacobs stated that "the only claim that may properly be considered on this motion concerns the validity of the ratification itself, i.e., the alleged proxy disclosures." [FN23]

> FN22. *Weiss v. Rockwell Int'l Corp.*, Del. Ch., C.A. No. 8811, 15 Del. J. Corp. L. 777, 1989 WL 80345, at \*3, Jacobs, V.C. (July 19, 1989), *aff'd per curiam,* Del.Supr., 574 A.2d 264 (1990).

> FN23. *Id.* at \*3.

It is my belief that these early decisions were well reasoned, but since 1990 the law in this area has changed, albeit only slightly. "Not only has the Delaware Supreme Court never endorsed the view adopted in those cases," their later decisions "persuasively indicate that the Supreme Court would not hold that shareholder approval of board action claimed to violate the fiduciary duty of loyalty would operate automatically to extinguish a duty of loyalty claim." [FN24] In practice, however, the difference between the pre-1990 and the post-1990 cases is quite minor. The current law provides that fully informed majority shareholder ratification revives the powerful business judgment rule presumptions. [FN25] So while

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS   Document 48-11   Filed 03/06/2006   Page 18 of 35
Not Reported in A.2d, 2000 WL 1206677 (Del.Ch.)
(Cite as: Not Reported in A.2d)

fully informed shareholder ratification may not be tantamount to the death penalty for breach of fiduciary duty claims, application of the business judgment rule will lead to the same end result in virtually every case. [FN26]

> FN24. *In re Wheelabrator Tech. Shareholders Litig., Del. Ch., 663 A.2d 1194, 1201 (1995).* The intervening Supreme Court decisions to which Vice Chancellor Jacobs referred are *Kahn v. Lynch Communications Sys., Del.Supr., 638 A.2d 1110 (1994),* and *Stroud v. Grace, Del.Supr., 606 A.2d 75 (1992).*

> FN25. *In re Wheelabrator Tech. Shareholders Litig., Del. Ch., 663 A.2d at 1205.*

> FN26. One commentator has suggested that "[b]usiness judgment rule protection should have no role in describing the effect of shareholder ratification, as defined. Rather, that action should be described as valid in the absence of waste." Charles Hansen, *Solomon v. Armstrong: Is It the Last Word on Shareholder Ratification?,* Corporation (Aspen Law & Business), Vol. 70, No. 23, Sec. 2, (Dec. 1, 1999). That suggestion may be a baleful siren song particularly in Delaware where substantial judicial deference is given to the shareholder franchise.

It is also important to distinguish the facts of this case from cases in which shareholder approval is a foregone conclusion by virtue of the controlling shareholder's dominance. Here, even plaintiffs acknowledge that the Class B class vote was not a foregone conclusion. At most, defendants controlled only 11.3% of the Class B votes. Without Class B approval the Plan could not have been implemented. Also significant is the fact that a majority of the disinterested Class B shares voted for the Plan. Of course, the vote itself may be rendered meaningless if plaintiffs ultimately show that it resulted from the exercise of a franchise tainted by misdisclosures.

On the other hand, if the Class B vote was indeed a foregone conclusion by reason of defendants' control of each class, the business judgment rule could never apply. An informed vote in that situation would only shift the burden to plaintiffs to show the transaction was not entirely fair. [FN27] Here, however, the Class B shareholders had blocking power. This case therefore turns on whether the Class B shareholders were fully informed when they gave their consent and opted not to block the Plan. If they were fully informed, should not the Court conclude that they fully understood the Plan, were content with the Plan as it applied to them and never expected the Court to step in and save them from themselves?

> FN27. *Weinberger v. UOP, Inc., Del.Supr., 457 A.2d 701, 703 (1983)* (stating that when directors are on both sides of a transaction, and "where corporate action has been approved by an informed vote of a majority of the minority shareholders, we conclude that the burden entirely shifts to the plaintiff to show that the transaction was unfair to the minority").

### E. Effect of 102(b)(7) provision in New Valley's Charter

*8 A charter provision pursuant to 8 Del. C. § 102(b)(7) can eliminate or limit personal liability of a corporate director for breaches of the duty of care. Liability for duty of loyalty breaches can not be eliminated or limited, however. Therefore, if plaintiffs adequately plead "that the alleged misrepresentations and omissions were the product of self dealing, not good faith errors in judgment," a §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS   Document 48-11   Filed 03/06/2006   Page 19 of 35
Not Reported in A.2d, 2000 WL 1206677 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

102(b)(7) provision will not protect its directors. [FN28]

> FN28. *Oliver v. Boston University,* Del. Ch., C.A. No. 16570, 2000 WL 1038197, at *8, Steele, V.C. (July 18, 2000); *See also O'Reilly v. Transworld Healthcare, Inc.,* Del. Ch., 745 A.2d 902, 915 (1999) (stating that if alleged disclosure violations implicated the duty of loyalty, as opposed to the duty of care, a § 102(b)(7) charter provision is not grounds for dismissal of the complaint).

Plaintiffs have adequately alleged that the defendants proposed the recapitalization in order to shift equity from the former Class B holders, thereby diluting the value of their investment and to funnel that equity to the former Class A holders. Plaintiffs allege that the misleading partial disclosures and omissions in the Proxy Statement were intended to effectuate defendants' self-interested objectives. Accordingly, New Valley's § 102(b)(7) charter provision will not protect defendants against plaintiffs' remaining disclosure claims if plaintiffs can continue to tie those allegations to a claim that defendants' breached their duty of loyalty.

## V. Conclusion

For the foregoing reasons, defendants' Motion to Dismiss is denied as to plaintiffs' allegations that the defendants breached their duty to disclose: (1) that PMG's fairness opinion was not class specific, (2) the identity of the shareholders who suggested the Plan, and (c) the value of New Valley's assets and lines of business. The motion to dismiss plaintiffs' other disclosure allegations is granted. Plaintiffs' fiduciary duty claims survive pending resolution of the breach of duty of disclosure claims.

IT IS SO ORDERED.

Del.Ch.,2000.
Rosser v. New Valley Corp.
Not Reported in A.2d, 2000 WL 1206677 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



28

NOEL SAITO, KIMBERLY MADAJCZYK, and SYDNEY H. DALMAN, Plaintiffs,
v. CHARLES W. McCALL, MARK A. PULIDO, RICHARD H. HAWKINS, HEIDI
E. YODOWITZ, ALFRED E. ECKERT III, TULLY M. FRIEDMAN, ALTON F.
IRBY III, M. CHRISTINE JACOBS, GERALD E. MAYO, JAMES V. NAPIER,
DAVID S. POTTRUCK, CARL E. REICHARDT, ALAN SEELENFREUND, JANE
E. SHAW, PHILLIP A. INCARNATI, DONALD C. WEGMILLER, ARTHUR
ANDERSEN LLP, BEAR STEARNS & CO., and DELOITTE & TOUCHE LLP,
Defendants, and McKESSON HBOC, INC., and HBOC & COMPANY aka
HEALTH CARE INFORMATION TECHNOLOGY BUSINESS UNIT, a wholly-
owned subsidiary of McKESSON HBOC, INC., Nominal Defendants.

Civil Action No. 17132-NC

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2004 Del. Ch. LEXIS 205*

August 18, 2004, Submitted
December 20, 2004, Decided

**SUBSEQUENT HISTORY:** Subsequent appeal at *Saito v. McKesson HBOC, Inc., 2005 Del. LEXIS 106 (Del., Mar. 8, 2005)*

**PRIOR HISTORY:** *McKesson Corp. v. Saito, 818 A.2d 970, 2003 Del. LEXIS 121 (Del., 2003)*

**COUNSEL:** [*1] Pamela S. Tikellis, Robert J. Kriner, Jr., Brian D. Long, A. Zachary Naylor, and Mary Fran Torpey, of CHIMICLES & TIKELLIS LLP, Wilmington, Delaware; OF COUNSEL: Robert S. Green and Robert A. Jigarjian, of GREEN & JIGARJIAN LLP, San Francisco, California; LAW OFFICES OF RICHARD B. BRUALDI, New York, New York; Thomas G. Shapiro and Theodore M. Hess-Mahan, of SHAPIRO HABER & URMY LLP, Boston, Massachusetts, Attorneys for Plaintiff.

Alan J. Stone, James G. McMillan, III, and Thomas W. Briggs, Jr., of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Moses Silverman, of PAUL WEISS RIFKIND WHARTON & GARRISON LLP, New York, New York, Attorneys for Defendant Charles W. McCall.

Michael D. Goldman and Stephen C. Norman, of POTTER ANDERSON.& CORROON LLP, Wilmington, Delaware, Attorneys for Defendant Mark Pulido.

Kurt M. Heyman and Patricia L. Enerio, of THE BAYARD FIRM, Wilmington, Delaware; OF

COUNSEL: Douglas R. Young, C. Brandon Wisoff, and Thomas B. Mayhew, of FARELLA BRAUN & MARTEL LLP, San Francisco, California, Attorneys for Defendant Heidi E. Yodowitz.

Edward M. McNally, Linda D. Martin, and Elizabeth L. Beyer, of MORRIS, JAMES, HITCHENS & WILLIAMS [*2] LLP, Wilmington, Delaware; OF COUNSEL: Melvin R. Goldman, Paul Flum, and Dorothy L. Fernandez, of MORRISON & FOERSTER LLP, San Francisco, California, Attorneys for Defendants Tully M. Friedman, David S. Pottruck, Carl E. Reichardt, Alan Seelenfreund, and Jane E. Shaw.

Andre G. Bouchard, Joel Friedlander, and John M. Seaman, of BOUCHARD MARGULES & FRIEDLANDER, P.A., Wilmington, Delaware; OF COUNSEL: Samuel R. Miller, of FOLGER LEVIN & KAHN LLP, San Francisco, California, Attorneys for the Former HBOC Outside Directors.

Steven T. Margolin and Richard L. Renck, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Marshall Grossman, Gwyn Quillen, Scott Vick, and Jeremy Pendrey, of ALSCHULER GROSSMAN STEIN & KAHAN LLP, Santa Monica, California, Attorneys for Defendant Arthur Andersen LLP.

Josy W. Ingersoll and Danielle Gibbs, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Jonathan M. Hoff and Jackie Friedman, of CADWALADER, WICKERSHAM

& TAFT LLP, New York, New York, Attorneys for Defendant Bear, Stearns & Co. Inc.

Allen M. Terrell, Jr., Daniel A. Dreisbach, Thad J. Bracegirdle, and David A. Felice, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, [*3] Delaware; OF COUNSEL: Robert A. Meyer, of LOEB & LOEB LLP, Los Angeles, California, Attorneys for Defendant Deloitte & Touche LLP.

Anthony W. Clark and Paul J. Lockwood, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Jonathan J. Lerner, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, and James E. Lyons, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, San Francisco, California, Attorneys for Nominal Defendant McKesson HBOC, Inc. and HBO & Company.

**JUDGES:** CHANDLER, Chancellor.

**OPINIONBY:** CHANDLER

**OPINION:** CHANDLER, Chancellor

Plaintiffs Noel Saito, Kimberly Madajczyk and Sydney Dalman bring this action to recover damages allegedly inflicted on the former HBO & Company ("HBOC"), McKesson Corporation ("McKesson") and, following the merger of those two companies in January 1999 (the "Merger"), on McKesson HBOC, Inc. ("McKesson HBOC" or the "Company") by their directors, senior officers, Merger advisors and outside accountants. The central allegations are: (1) that HBOC's directors and senior officers presided over a fraudulent accounting scheme; (2) that McKesson's officers, directors, and advisors learned of HBOC's fraudulent scheme during [*4] their due diligence into the proposed Merger, but nonetheless McKesson's board approved the Merger; and (3) that the McKesson HBOC board acted too slowly in rectifying the accounting problems at HBOC after the Merger was completed. The fourth amended complaint n1 enumerates thirteen counts of alleged wrongdoing. n2 Defendants move to dismiss all counts. For the reasons detailed herein, I dismiss most but not all of the claims asserted.

n1 I refer to the fourth amended complaint simply as "the complaint."

n2 The complaint includes 220 paragraphs and stretches 65 pages. The problems spawned by unnecessarily verbose pleadings were magnified

when several of the defendants filed separate briefs in support of their respective motions to dismiss. Briefing on the motions to dismiss in this case, *exclusive of exhibits,* exceeded 500 pages and oral argument approached four hours in length.

**I. PROCEDURAL HISTORY**

At issue today is the fifth iteration of the plaintiffs' complaint. The original complaint [*5] was the product of a race to the courthouse, hastily filed just two days after McKesson HBOC announced it had uncovered the accounting irregularities that form the basis of the complaint. Unfortunately, the first and second amended complaint improved only marginally upon the original complaint. The second amended complaint did not enumerate specific counts, failed to present claims in a readily discernable manner or connect the facts with specific claims of wrongdoing, and was generously laden with conclusory allegations. n3 From what I could gather, the second amended complaint purported to assert four claims: a due care claim, a waste claim, and two oversight claims. n4 I dismissed the due care and waste claims, with prejudice, for failure to make demand pursuant to Chancery Rule 23.1. n5 I dismissed the two oversight claims without prejudice, and encouraged plaintiffs to use "the tools at hand" to "develop additional particularized facts in order to allege properly an oversight claim that will meet the demand futility standard and to avoid the standing requirement of Delaware's continuing ownership rule." n6

n3 *See Ash v. McCall, 2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at *1 (Del. Ch. Sept. 15, 2000).*

[*6]

n4 *Id.*
n5 *2000 Del. Ch. LEXIS 144, [WL] at *16.*
n6 *2000 DEl. Ch. LEXIS 144, [WL] at *58.*

On January 22, 2001, a few months after I dismissed the second amended complaint, plaintiffs filed their Third Amended Complaint. This complaint added three new defendants: Bear Stearns & Company ("Bear Stearns"), Arthur Andersen ("Andersen"), and, as a nominal defendant, HBOC. Bear Stearns rendered a fairness opinion on the Merger to McKesson's directors. Arthur Andersen was HBOC's auditor. HBOC, now a wholly-owned subsidiary of McKesson HBOC, was added as a nominal defendant so that plaintiffs could

bring double derivative claims. In 2001, the parties also engaged in a highly-contentious battle over access to the Company's books and records--litigation that prompted several reported decisions. n7 After that battle subsided, plaintiffs filed the instant, fourth amended complaint. n8 The latest complaint adds another new defendant, Deloitte & Touche LLP ("Deloitte"). Deloitte served as McKesson's auditor and also conducted due diligence on the Merger for McKesson.

n7 *Saito v. McKesson HBOC, Inc., 2002 Del. Ch. LEXIS 139 (Del. Ch. Nov. 13, 2002); Saito v. McKesson HBOC, Inc., 2002 Del. Ch. LEXIS 125 (Del. Ch. Oct 25, 2002); Saito v. McKesson HBOC, Inc., 806 A.2d 113 (Del. 2002); Saito v. McKesson HBOC, Inc., 2001 Del. Ch. LEXIS 96 (Del. Ch. July 10, 2001).*

[*7]

n8 Plaintiff Saito filed a motion under Chancery Rule 60 to obtain relief from judgment in the 220 case *after oral argument on the pending motions to dismiss.* Saito's motion was denied. *Saito v. McKesson HBOC, 2004 Del. Ch. LEXIS 204, C.A. No. 18553, Let. Op., Chandler, C. (Del. Ch. Aug. 18, 2004).*

## II. BACKGROUND n9

n9 The background is taken from the allegations in the complaint and documents integral to plaintiffs' claims and incorporated in the complaint. *See In re Santa Fe Pac. Corp. S'holder Litig., 669 A.2d 59, 69-70 (Del. 1995).* Plaintiffs attached numerous documents to their Answering Brief ("AB") encouraging the Court to consider them at oral argument on the motions to dismiss. All exhibits were incorporated by reference in the complaint and may, therefore, be considered by the Court in ruling on the pending motion to dismiss.

This story begins in early 1998 with HBOC, a provider of healthcare [*8] computer software. The HBOC board's audit committee, consisting of defendants James Napier, Phillip Incarnati, and Donald Wegmiller, met with HBOC's auditor, Andersen, to discuss HBOC's

1997 audit. n10 During its meeting with Andersen, at which HBOC management was present, the audit committee was informed that the 1997 audit was "high risk." Andersen and the committee discussed inherent accounting-related risks facing software companies, and specifically discussed the risks arising from certain HBOC sales practices. The audit committee also discussed audit adjustments proposed by Andersen, but that HBOC management had passed upon. According to a 2002 SEC administrative proceeding initiated against the Andersen partner that oversaw the 1997 audit, Andersen did not inform the audit committee that HBOC was misapplying GAAP. n11 Instead, Andersen reported "no significant problems or exceptions and that Andersen enjoyed the full cooperation of HBOC management." n12

n10 The full HBOC board included Napier, Incarnati, Wegmiller, Charles McCall, Alfred Eckert, Alton Irby, and Christine Jacobs. McCall served as CEO and chairman of the board. All of these individuals, and Andersen, are defendants in this action.

[*9]

n11 SEC Administrative Proceeding, No. 3-10998, 2002 SEC LEXIS 3299, at *25 (Dec. 23, 2002). This proceeding is cited in the complaint at paragraphs 41 and 42.
n12 *Id.*

During June-July 1998, HBOC and McKesson, a healthcare supply management company, held discussions and conducted due diligence in connection with a possible business combination. McKesson's board n13 was assisted by Deloitte and Bear Stearns in connection with the Merger. The board also received input from defendant Richard Hawkins, McKesson's CFO, and defendant Heidi Yodowitz, McKesson's Controller. At a meeting on July 10, 1998, the McKesson board was briefed on the financial due diligence that had been performed on HBOC. At this meeting, HBOC's problematic accounting practices were brought to the McKesson board's attention. Thereafter, the McKesson board considered information they received outlining likely scenarios should HBOC's accounting practices result in SEC review. n14 There is no indication, however, that any of HBOC's material accounting violations came to the McKesson's board's attention, [*10] and there was no indication that what the McKesson board did know presented a reason not to proceed with the Merger. In fact, Yodowitz informed the McKesson board that "she was

generally impressed with [HBOC's] finance department and system of internal controls." n15

> n13 The McKesson board included the following individuals: Mark Pulido, Tully Friedman, David Pottruck, Alan Seelenfreund, Jane Shaw, and Carl Reichardt. All are named defendants. Pulido served as McKesson's CEO. Seelenfreund chaired the board. McKesson directors Pottruck, Shaw, and Reichardt served on the audit committee.
>
> n14 Hawkins and Yodowitz briefed the McKesson board on this issue. A document apparently drafted by Yodowitz identified the suspect accounting practices as relating to revenue recognition and acquisition reserves/costs and indicated that there could be a potential SEC issue given that, at the time, the SEC was requiring restatements for items below normal materiality thresholds. It is unclear what portion, if any, of this document was shared with the McKesson board. Of note, the document states: "Overall, [HBOC] appear[s] to have [a] strong finance department, good information systems and management reports." AB, Ex. D (emphasis in original).

[*11]

> n15 AB, Ex. E.

Two days after the July 10 McKesson board meeting, Hawkins, Bear Stearns, and Deloitte had a conference call to discuss HBOC due diligence. Deloitte identified three areas of questionable accounting practices, and identified two of these areas (HBOC's acquisition reserves and revenue recognition) as GAAP violations. n16 At a McKesson board meeting the following day (July 13), Hawkins reviewed the accounting issues raised by the board at the July 10 board meeting and steps taken by HBOC or plans in place to address them.

> n16 A file memo, dated July 13, 1998, from the lead Bear Stearns bankers describes these accounting problems as violating GAAP. Ex. K. But a file memo, dated July 31, 1998, from the lead Deloitte accountant states "accounting issues had been misapplied" and does not mention GAAP. AB, Ex. B.

While in negotiations, word of the deal leaked causing HBOC's share price to decrease. McKesson, [*12] in turn, wanted to change the exchange ratio to reflect the drop in HBOC's shares. HBOC balked at the new offer and the deal stalled for several months. In October, negotiations resumed. During October 14-15, McKesson and HBOC's negotiators agreed to a form of transaction by which McKesson would acquire HBOC through an acquisition subsidiary, McKesson would be renamed McKesson HBOC and HBOC would survive as a wholly owned McKesson HBOC subsidiary. n17 During the renewed negotiations, Bear Stearns and Deloitte learned that the accounting problems identified in July were still an issue and communicated this information to the McKesson board. n18 Plaintiffs allege that during the October 1998 period, HBOC's accounting problems totaled between $ 40 to $ 55 million. Nonetheless, on October 16, 1998, the McKesson board, with knowledge of the accounting issues raised by Hawkins, Yodowitz, Bear Stearns, and Deloitte, approved the Merger and agreed to pay $ 14 billion in McKesson stock for HBOC. The Merger was announced shortly thereafter.

> n17 Under the terms of the Merger, McKesson paid HBOC shareholders 0.37 of a share in McKesson stock for each share of HBOC common stock.

[*13]

> n18 At this time, an HBOC senior sales executive resigned because HBOC's co-president Albert Bergonzi, was allegedly "out of control" and because the sales staff was suffering an apparent "revenue hangover." This executive informed McCall of his reasons for departure, but there is no indication McCall relayed this information contemporaneously to the HBOC board or later to the combined McKesson HBOC board.

The McKesson board met on October 28, 1998. At this meeting, the board members authorized the proxy statement in connection with the Merger. This proxy statement included statements of income for HBOC that reflected violations of GAAP. The proxy statement described the due diligence efforts of Deloitte n19 and included a fairness opinion of Bear Stearns, n20 but did not disclose the irregular accounting practices identified to McKesson's board before their approval of the Merger. On November 20, 1998, the board met again to discuss follow-up items related to the Merger. Shortly before the meeting, Pulido learned that HBOC terminated its CFO,

Jay Gilberston. Pulido alerted the McKesson [*14] board to Gilberston's termination and they discussed the issue. At that same meeting, Hawkins, McKesson's CFO, briefed the board on continuing financial due diligence and informed the board that he believed in "the strength of [HBOC's] financial organization." n21

> n19 Deloitte consented to the inclusion of its prior reports on McKesson's financial statements in the proxy statement.
> n20 An internal Bear Stearns memo dated January 28, 1999 (well after the fairness opinion was issued), states that Bear Stearns was instructed to rely upon information provided by McKesson and HBOC and not to adjust that information based on questions raised by Deloitte. AB, Ex. A.
> n21 AB, Ex. N.

On November 10, 1998, Andersen (despite knowledge of HBOC's questionable accounting practices) indicated to HBOC's audit committee that Andersen would issue an unqualified opinion of HBOC's financial statements. n22 Moreover, in accord with the terms of the Merger, Andersen delivered two comfort letters to McKesson [*15] before closing. n23 On January 12, 1999, the shareholders of McKesson and HBOC approved the merger and the deal closed.

> n22 Some of the problems were probably unknown to Andersen. The SEC has alleged that HBOC managers hid information from HBOC's own accounting staff. *SEC v. Gilbertson, Bergonzi & DeRosa,* No. C 00-3570 (N.D. Cal. Sept. 27, 2000). The SEC complaint is incorporated at paragraph 138 of the complaint.
> n23 Andersen's endorsement of HBOC was qualified, however. On January 5, 1999, before the shareholder vote regarding the Merger, Andersen informed McKesson that it had not audited HBOC's 1998 financial statements and expressed no opinion on their accuracy. Andersen also told McKesson that it had not audited HBOC's 1997 financial statement for merger-related purposes.

The new company, McKesson HBOC, took six directors from HBOC and six directors from McKesson. This combined board included McCall, Pulido, Eckert, Friedman, Irby, Jacobs, Pottruck, Seelenfreund, Shaw, Mayo, Napier, and [*16] Reichardt. McCall, the former

HBOC CEO, served as chairman and Pulido served as CEO. The six person McKesson HBOC audit committee included Eckert, Seelenfreund, Shaw, Mayo, Napier, and Reichardt. Napier previously served on HBOC's audit committee. Shaw and Reichardt had served on McKesson's audit committee.

On January 27, 1999, the combined McKesson HBOC audit committee met with its advisors to discuss the Merger. Yodowitz discussed accounting adjustments made to HBOC's financial statements. The adjustments were in areas identified by Deloitte as problematic. Yodowitz and the audit committee allegedly knew, however, that these adjustments would not account for the full amounts identified by Deloitte as needing alteration. n24 In addition, on January 27, McKesson HBOC issued a Form 8-K that reflected the pro forma financial statements of the combined McKesson HBOC. The Form 8-K included the adjustments brought to the audit committee's attention by Yodowitz.

> n24 The complaint does not allege how or why Yodowitz and the audit committee had such knowledge.

[*17]

After the end of the first quarter of 1999, Albert Bergonzi, HBOC's former co-president, negotiated a $ 20 million sale of software to Data General. The transaction was a gimmick because (1) it was backdated as first quarter revenue; and (2) it required McKesson HBOC to pay a refund to Data General if it did not sell the software. Defendant McCall allegedly participated in the Data General transaction and defendants Pulido and Yodowitz allegedly knew about the transaction's material elements. Notwithstanding the improper elements of the Data General transaction, McKesson HBOC issued a press release on April 22, 1999, that included revenue from the transaction as part of first quarter earnings. Although the McKesson HBOC board was aware of the press release, there is no indication that the board (other than possibly McCall and Pulido) knew of the impropriety of the Data General transaction.

On April 28, 1999, McKesson HBOC announced that it would restate its earnings from previous quarters. n25 The Company announced on May 25, 1999, that it would further revise its results downward. On June 21, 1999, McKesson HBOC announced that Hawkins and Pulido had resigned and that it stripped [*18] McCall of his Chairman position. On July 14, 1999, the Company announced that its previously reported restatements would be larger than originally revealed. On July 16, the

Company submitted an SEC filing in which it conceded that HBOC's financial statements were inaccurate because of improper accounting. Predictably, McKesson HBOC's stock price declined significantly.

n25 The original complaint was filed two days after the announcement.

### III. ANALYSIS

Considering defendants' various motions to dismiss two pleading standards are implicated. To the extent the claims are direct, Chancery Rule 12(b)(6) implicates the pleading standard of Chancery Rule 8(a). These claims must be pled pursuant to *Solomon v. Pathe Communications Corp.,* n26 and need only set forth "a short and plain statement of the claim." n27 On the other hand, derivative claims must meet the higher standard required by Chancery Rule 23.1. To survive a motion to dismiss, a derivative plaintiff

shall allege that the plaintiff [*19] was a shareholder ... at the time of the transaction of which the plaintiff complains or that the plaintiffs share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiffs failure to obtain the action or for not making the effort. n28

In considering a motion to dismiss the Court of Chancery assumes the truth of well-pleaded allegations, giving to the plaintiff "the benefit of all reasonable inferences that can be drawn from . . . [the] pleading." n29 Conclusory statements without supporting factual averments will not be accepted as true for purposes of a motion to dismiss. n30 As noted, the complaint identifies thirteen counts of alleged wrongdoing. I will address each in turn.

.

n26 *672 A.2d 35 (Del. 1996).*
n27 CT. CH. R. 8(a).
n28 CT. CH. R. 23.1.
n29 *In re USA Cafes, L.P. Litig., 600 A.2d 43, 47 (Del. Ch. 1991); see also In re Santa Fe Pacific*

*Corp. S'holder Litig., 669 A.2d 59, 65-66 (Del. 1995).*

[*20]

n30 *In re Tri-Star Pictures, Inc. Litig., 634 A.2d 319, 326 (Del. 1995).*

### *A. Count I*

The first count is a fiduciary duty claim, which alleges that the pre-merger, McKesson Directors breached their duties of good faith and loyalty. n31 According to the complaint:

The Former McKesson Director Defendants knew, before approving and closing the Merger, of HBOC's improper accounting practices and that they posed a 'high risk' of an SEC restatement. Despite their knowledge, the Former McKesson Director Defendants authorized Pulido [McKesson's CEO and a director] to negotiate the Merger, took affirmative steps to execute and disseminate the false and misleading Form S-4 and Joint Proxy Statement/Prospectus and then to close and consummate the Merger in violation of their fiduciary duties. n32

Even if I were to accept plaintiffs' allegations as true, this conduct occurred *before* plaintiffs owned stock in McKesson. Both Madajczyk and Dalman became McKesson stockholders when they exchanged their HBOC stock in the stock-for-stock merger with McKesson. Saito [*21] purchased McKesson stock after the terms of the merger agreement were agreed to.

n31 Compl. P150.
n32 Compl. P151.

Standing to bring a derivative claim requires plaintiffs to be stockholders of the corporation: (1) "at the time of the transaction of which [they] complain[];" n33 (2) when the suit commences; and (3) throughout the course of the litigation. n34

.

n33 *8 Del. C. § 327.*

n34 *See Lewis v. Anderson, 477 A.2d 1040 (Del. 1984).*

Madajczyk and Dalman's claims fail because they did not own McKesson shares at the time the conduct alleged in Count I occurred. n35 Saito's claims under Count I require a more piecemeal analysis. On October 20, 1998, Saito purchased his McKesson stock. n36 Importantly, this purchase is after both the McKesson board's approval of the Merger n37 [*22] and its grant of authority to Pulido to negotiate the Merger on the board's behalf. n38

n35 *Id.*
n36 Compl. P5.
n37 The Merger was approved on October 16, 1998.
n38 Compl. P69.

In *In re Beatrice Companies, Inc. Litigation,* n39 the Delaware Supreme Court stated that a plaintiff "must have been a stockholder at the time the terms of the merger were agreed upon because it is the terms of the merger, rather than the technicality of its consummation, which are challenged." n40 In other words, the alleged wrong occurred, if at all, when the Merger agreement was approved not when the deal was consummated. Because Saito acquired his stock in McKesson after the approval of the Merger terms, he lacks standing to challenge these actions. n41

n39 *1987 Del. LEXIS 1036, 1987 WL 36708 (Del. Feb. 20, 1987)* (ORDER).
n40 *1987 Del. LEXIS 1036, [WL] at *3.*
n41 The reason was not addressed in *Ash* because previous complaints did not allege the precise date that Saito acquired stock in McKesson.

[*23]

I am, however, unwilling to dismiss Saito's Count I in its entirety. The allegations concerning the dissemination of an allegedly false proxy statement does not predate Saito's stock ownership. Moreover, the duties of a board when disseminating proxy materials are distinct from a board's responsibilities when considering and approving a transaction. As such, the allegations in Count I, as they relate to false and misleading proxy statements state a separate and actionable harm.

Still I must determine what to do with this aspect of Count I. Defendants do not challenge Saito's standing to bring a disclosure claim relating to the proxy statement, but instead argue that the disclosure claim is direct. n42 Because the disclosure claim, as alleged, states a distinct and separable shareholder harm, I conclude that Saito has stated a direct claim in Count I as it relates to the alleged false or misleading proxy statement. In the interests of judicial economy, however, I will *sua sponte* stay Saito's disclosure claim. Currently, there are two Delaware state court actions arising out of McKesson's proxy statement and asserting disclosure claims. Both of those courts have stayed the actions [*24] in favor of an ongoing California federal class action. n43

n42 *See* Tr. of Oral Arg. at 20.
n43 *Derdiger v. Tallman, 773 A.2d 1005, 2000 WL 1041216 (Del. Ch. July 20, 2000); Caravetta v. McKesson HBOC, Inc., 846 A.2d 240, 2000 WL 1611101 (Del. Super. Sept. 7, 2000).*

*B. Count II*

Court II alleges that the "McKesson HBOC Director Defendants"--the combined, post-merger directors--"breached their fiduciary duties by failing to pursue claims for monetary redress against the former HBOC directors, Bear Stearns, Arthur Andersen, Deloitte and HBOC [the 'Third Parties']." n44 Count II is deficient on grounds of ripeness because plaintiffs fail to allege that the McKesson HBOC Director Defendants have made a

n44 Compl. P156.

definitive decision whether to sue any of the Third Parties. Moreover, plaintiffs fail [*25] to allege that the remedies against the Third Parties are lost or time barred. Absent these allegations, Count II pleads facts that "[have] not yet matured to a point where judicial action is appropriate" n45 and, therefore, is premature and fails to allege any harm for which this Court at present could hold the McKesson HBOC directors accountable. n46

n45 *Stroud v. Milliken Enters., Inc., 552 A.2d 476, 480 (Del. 1989).*
n46 Plaintiffs assert in the complaint that "Defendants' inaction has made it more difficult or

impossible for McKesson HBOC (or HBOC) to make a significant recovery from Andersen, relative to damages inflicted on those companies." Compl. P157. Andersen, however, has appeared in this action and is actively defending the allegations against it, suggesting that recovery may be available from it.

### C. Count III

Count III alleges that Richard Hawkins n47 and Heidi Yodowitz n48 breached their fiduciary duties by taking "affirmative steps" toward closing the Merger. [*26] These steps included finding ways to "camouflage accounting adjustments" despite their knowledge of HBOC's improper accounting practices. n49 In addition, plaintiffs allege that Hawkins and Yodowitz "signed a Power of Attorney form authorizing the Form S-4 Registration Statement to be signed on their behalf, despite the fact that they had actual knowledge of materially false and misleading representations and omissions in that document. n50

> n47 During the relevant period, Hawkins served as McKesson's Vice President and CFO. Compl. P11.
> n48 During the relevant period, Yodowitz served as McKesson's Controller and Chief Accounting Officer. *Id.* P13.
> n49 *Id.* P162.
> n50 *Id.*

Plaintiffs lack standing to bring Count III. As discussed above, n51 neither Madajczyk nor Dalman owned McKesson stock at the time these alleged breaches of duty occurred. n52 Saito, also, did not own stock in McKesson before October 20, 1998, and these allegations point to conduct arising from the Merger [*27] negotiations. n53

> n51 *See* discussion *supra* § III, Part A (discussing contemporaneous ownership requirement).
> n52 The complaint alleges that the relevant acts taken by Hawkins and Yodowitz occurred between July 10 through July 12, 1998 and October 16, 1998. *See* Compl. PP53, 59-62, 69.
> n53 *Id.; see also supra* notes 34-35 (focusing on the time frame in which the terms of the Merger were set and not the consummation date as the

latter is immaterial for establishing the contemporaneous ownership requirement).

### D. Count IV

Count IV is styled as a "breach of contract [claim] brought on behalf of McKesson against HBOC based on the Merger Agreement." n54 Allegedly, "under the terms of the Merger Agreement, HBOC represented and warranted that information supplied by HBOC or its subsidiaries for inclusion in the Joint Proxy Statement would not contain any untrue statements of material fact or omit to state material facts." n55 HBOC therefore breached the Merger [*28] Agreement when it provided financial statements that were materially false and misleading.

> n54 Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss at 50. In *Ash, 2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at *16 (Del. Ch. Sept. 15, 2000)*, 1 suggested that this claim was potentially viable. The facts, as now presented, dictate a different result. Still, despite dismissing Count IV on issues of standing, another point merits mention. HBOC is a nominal defendant, not a named defendant. This Court sought clarification regarding this procedural oddity but plaintiffs have not, to this Court's satisfaction, addressed the issue. Plaintiffs' prayer for relief does not seek relief from HBOC in the form of rescission (the form of relief I suggested in *Ash)* or monetary damages. Thus, even if plaintiffs sought rescission, it would be impractical given that it has been five years since the Merger was consummated. In addition, awarding monetary damages against HBOC would be a pointless endeavor as it is now a wholly owned subsidiary of McKesson HBOC. n55 Compl. P167.

[*29]

Plaintiffs cannot proceed on Count IV. The alleged breach of contract claim seeks relief from harm occurring before the effective date of the merger (e.g., false statements inducing McKesson to enter into the Merger) and, therefore, those claims must be brought on behalf of McKesson. n56 For the reasons discussed above, all three plaintiffs were not McKesson stockholders at the time the terms of the Merger Agreement were negotiated. n57

n56 As I discussed in *Ash, 2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at *16*:

> If HBOC directors possessed knowledge of suspect accounting practices at HBOC before the merger, one would think such knowledge might give rise to colorable claims that McKesson, as an acquiror, could assert against HBOC under fraud-based theories or perhaps for breaches of provisions in the parties' merger agreement ... Such facts could give rise to claims that McKesson might bring directly attacking the merger seeking rescission or rescissory damages; or, if McKesson HBOC was unwilling to assert contract-based claims, shareholders might endeavor to bring those claims derivatively on behalf of McKesson HBOC.

[*30]

n57 *See* discussion *supra §* III, Part A (discussing contemporaneous ownership requirement); *see also supra* note 61.

### E. Count V

Count V seeks redress against the McKesson HBOC Director Defendants for "failing to timely correct HBOC's false financial statements, monitor the accounting practices of McKesson HBOC following the merger, implement sufficient internal controls to guard against the wrongful practices they knew about before the Merger and disclose HBOC's false financial statements." n58 In *Ash v. McCall,* n59 I dismissed, without prejudice, this oversight claim because it failed to meet the high liability standards set forth in *In re Caremark International, Inc. Derivative Litigation.* n60 Here, after using the "tools at hand," the complaint appears-barely-to state a claim under *Caremark.*

n58 Compl. P 178.
n59 *2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at *16.*
n60 *698 A.2d 959 (Del. Ch. 1996).*

[*31]

Under Chancellor Allen's formulation in *Caremark,* "the theory here advanced is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." n61 A derivative plaintiff must allege facts constituting "a sustained or systematic failure of the board to exercise oversight - such as an utter failure to attempt to assure a reasonable information and reporting system exists." n62 In other words, liability is premised "on a showing that the directors were conscious of the fact that they were not doing their jobs." n63 As plaintiffs admit, in order to state a claim under *Caremark* in this context, they must show that the McKesson HBOC board: (1) should have known that unlawful accounting improprieties were occurring or had occurred; and (2) made no good faith effort to remedy the unlawful accounting improprieties. n64 Giving plaintiffs "the benefit of all reasonable inferences that may be drawn from the facts," n65 I conclude that the *Caremark* standard is implicated in these circumstances. n66

n61 *Id. at 967. See also Rattner v. Bidzos, 2003 Del. Ch. LEXIS 103 (Del. Ch. Sept. 30, 2003)* ("a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail").

[*32]

n62 *Caremark,* 698 A.2d at 971.
n63 *Guttman v. Jen-Hsun Huang, 823 A.2d 492, 506 (Del. Ch. 2003).*
n64 AB at 56 (citing *Caremark, 698 A.2d at 971).*
n65 *In re Walt Disney Co. Deriv. Litig., 825 A.2d 275, 285 (Del. Ch. 2003)* (citing *Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)).*
n66 Although *a Caremark* claim is difficult to advance, on a motion to dismiss I must find "that the plaintiff would not be entitled to relief under *any set of facts that could be proven* to support the claim." *Id.* (emphasis added) (citing *Rabkin v. Philip A. Hunt Chem. Corp., 498 A.2d 1099, 1104 (Del. 1985)).*

To proceed further, plaintiffs must jump two hurdles. Defendants challenge the oversight claim on both Chancery Rules 12(b)(6) and 23.1 grounds. The following analysis answers both because the facts plaintiffs allege present a colorable claim and excuse demand. n67

n67 Chancery Rule 23.1 is a heightened pleading standard requiring plaintiffs to comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a).

[*33]

Plaintiffs allege well-pled facts sufficient to infer that separately, both the HBOC and McKesson boards were aware (or should have been) of accounting irregularities at HBOC. To the extent that knowledge proves material to the problems McKesson HBOC faced during the three months following the Merger, those issues will be resolved on a more fully developed record. At this stage of litigation, the following allegations are sufficient. The HBOC audit committee knew that the 1997 audit was "high risk." The audit committee discussed the accounting risks facing software companies in general and specifically discussed the risks arising from HBOC's sales practices. n68 At a meeting on July 10, 1998, the McKesson board came to know that certain HBOC accounting practices were a problem. Yodowitz apparently informed the board that there could be a potential SEC issue given that the SEC was requiring restatements for items below normal materiality thresholds. Later that fall, when negotiations revived, the McKesson board knew that the issues identified in July remained and that HBOC's accounting practices were at least a $ 40 to $ 55 million problem. n69

n68 Nominal defendant, McKesson HBOC, indicated in its briefs and at oral argument that even if HBOC's audit committee knew of accounting irregularities such knowledge could not be imputed to the McKesson HBOC board because four of the six original HBOC directors were outside directors and not on the HBOC audit committee. The Court declines to accept this head in the sand argument. In *Ash* the Court was not willing to impute knowledge to the non-audit committee members despite the Court finding that HBOC "at some organizational level, knew of and responded to public criticism of its accounting practices." *Ash, 2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at *15*. Here, unlike *Ash*, the allegations of knowledge stem beyond articles in trade magazines and newspapers. Plaintiffs have alleged well-pled facts that indicated at least four members knew of HBOC accounting problems--the three members of the audit committee and McCall. A reasonable inference, which the Court is entitled to draw at this procedural stage,

is that that information was communicated to the other HBOC board members who later served on McKesson HBOC's board.

[*34]

n69 Accepting plaintiffs' allegations as true is not an invitation to revisit the Court's earlier finding that the plaintiffs have not alleged facts sufficient to rebut the business judgment rule which attached to the former McKesson directors decision to approve the merger. See *Ash, 2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at *15*. Nevertheless, the facts alleged, concerning the knowledge the McKesson board had, combined with the knowledge the new HBOC directors brought with them, is sufficient to raise a colorable claim of bad faith for the delay in making the July 1999 restatements and the firing of those responsible for the accounting problems infecting HBOC.

After the McKesson board approved the merger, they learned that HBOC terminated its CFO, Jay Gilbertson. On January 27, 1999, after consummation of the merger, the combined McKesson HBOC audit committee met with its advisors to discuss the transaction. n70 Yodowitz discussed accounting adjustments made to HBOC's financial statements, adjustments in the same areas identified by Deloitte as problematic. Importantly, Yodowitz and the audit committee [*35] allegedly knew that these adjustments would not account sufficiently for the problems identified by Deloitte as needing alteration. Thus, viewing the above facts in a light most favorable to plaintiffs, it can be argued that the McKesson HBOC board, a board comprised of directors from both sides of the transaction, knew or should have known that the HBOC accounting problems were unlawful. At a minimum, the new board's audit committee was comprised of directors from McKesson who should have known HBOC accounting practices were problematic. Those directors, regardless of their pre-Merger knowledge of the accounting problems, now had the benefit of serving with former HBOC directors who also should have known not only the existence of those problems but the extent of the problems.

n70 Napier, who had access to the Andersen reports, served on both HBOC's and McKesson HBOC's audit committees.

Paramount to plaintiffs' timeliness assertion is the allegation that the combined board had the requisite knowledge either [*36] when the merger was consummated or shortly thereafter. Yet, despite McKesson HBOC's knowledge of substantial accounting problems at HBOC, it appears that nothing was done for several months. McKesson HBOC did not issue its first restatement of earnings until the end of April, and an additional two months elapsed before the senior management responsible for the whole debacle was terminated. Perhaps symbolic of the McKesson HBOC board's failure to perform its duties is the Data General transaction. Despite the board's knowledge of accounting problems, Bergonzi, HBOC's co-president at the time, was able to negotiate a $ 20 million gimmick transaction--a transaction that board members McCall and Pulido were allegedly aware of. Although the facts later adduced may prove otherwise, the procedural posture of the case requires me to focus on the plaintiffs' complaint and read it generously. Viewed in that manner, Count V survives defendants' motion to dismiss. n71

n71 In *Ash,* I suggested that well-pled facts alleging a lack of good faith might excuse demand. See *Ash, 2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at * 15.* A committee of the board, acting in good faith, would have openly communicated with each other concerning the accounting problems Andersen disclosed and would have shared the information with the entire McKesson HBOC board. In addressing the demand futility issue the relevant question for this Court is whether the plaintiffs can refute the presumption that McKesson HBOC's board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. See *Rales v. Blasband, 634 A.2d 927, 933-934 (Del. 1993)* ("Where there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application. The absence of board action, therefore, makes it impossible to perform the essential inquiry contemplated by *Aronson.").* I conclude that the combined McKesson HBOC had enough indicators and enough resources (namely each other) to discover the existence and extent of HBOC accounting problems once the merger was consummated. I also conclude that a demand on the April 1999 board to address these issues would directly call into question the good faith of McKesson HBOC's audit committee. The substantial likelihood of liability these directors faced for a breach of their duty of good faith disabled the entire McKesson HBOC board from mustering an independent and disinterested majority.

[*37]

### F. Count VI

*Count VI* asserts a fiduciary duty claim against the former directors of HBOC for allegedly "failing to monitor HBOC's internal accounting practices before the Merger and disclose HBOC's false financial statements and (as to McCall, Eckert and Mayo) using HBOC's nonpublic information for their "own financial benefit." n72 Count VI asserts a double derivative claim on behalf of McKesson HBOC and in turn on HBOC, now a wholly-owned subsidiary of McKesson HBOC.

n72 Compl. P183.

In *Ash,* I dismissed, without prejudice, this oversight claim for failure to comply with the continuous ownership requirement. None of the plaintiffs are presently, or were at the time of filing the complaint, shareholders of HBOC. In *Ash,* I stated:

As presently drafted, the amended complaint does not implicate either of the two exceptions to the standing requirement in the merger context. Nor have plaintiffs argued that the merger was perpetrated merely to deprive the shareholders of standing to [*38] bring a derivative action or that the merger was in reality merely a reorganization. Nevertheless, it is conceivable that the plaintiffs might be able to allege, consistent with Rule 11, that the merger was designed in part to thwart shareholder derivative claims arising out of the HBOC board's failure to monitor the company's internal accounting practices. n73

Despite this invitation, plaintiffs have failed to allege adequately that the merger was designed to thwart shareholder derivative claims.

n73 *2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at *13.* The two exceptions are "(i) if

the merger itself is subject of a claim of fraud or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise." *Id.* at * 12.

In conclusory and prolix averments, the complaint alleges that the Merger was restructured in October of 1998 "to fraudulently hinder or eliminate the ability of HBOC shareholders to assert claims on behalf of HBOC, and the Merger is [*39] the subject of claims by McKesson HBOC asserting fraudulent conduct in connection with the Merger." n74 Here, lacking facts to support these legal conclusions, plaintiffs simply insert the names of certain defendants into the relevant legal standard.

n74 Compl. P185.

Indeed, the transaction appeared restructured. n75 Notwithstanding this change, allegations in the complaint suggest that once word of the deal leaked, the McKesson board would not proceed "until the companies agreed to adjust the exchange ratio to reflect the decline in HBOC's share price." n76 A restructuring of this type is a logical outcome following a decline in HBOC's share price and does not support an inference that the transaction was altered purposefully as a ruse designed to eliminate plaintiff's derivative claims. To find otherwise would vitiate *8 Del. C. § 327* by allowing a plaintiff to avoid the statute's requirements simply by pointing to an unfavorable modification of the terms of a merger.

n75 *Id.* PP65, 70.
[*40]

n76 *Id.* P63.

Separately, plaintiffs argue that Count VI is a double derivative claim, and therefore § 327 is satisfied. Despite this argument's appeal, n77 I must conclude that plaintiffs lack standing to pursue Count VI. I begin with *In re First Interstate Bancorp Shareholder Litigation.* n78 There, the plaintiff contended that his ownership of pre-merger First Interstate and post-merger

n77 *See Ash, 2000 Del. Ch. LEXIS 144, 2000 WL 1370341, at * 13 n.47.*

n78 *729 A.2d 851, 867-68 (Del. Ch. 1998), aff'd sub nom. Bradley v. First Interstate, 748 A.2d 913,* Walsh, J. (Del. Mar. 21, 2000) (ORDER). *See also Lewis v. Ward, 2003 Del. Ch. LEXIS 111, at *13 n.15 (Del. Ch. Oct. 29, 2003)* (commenting on *Blasband's* incompatibility with *Lewis v. Anderson).*

Wells Fargo common stock met the *Lewis* requirement of continuous ownership, since any claims belonging [*41] to First Interstate passed to Wells Fargo at the consummation of the merger. As a stockholder of Wells Fargo, plaintiff was then entitled to assert those claims (the subsidiary's cause of action) derivatively. That assertion, as well as plaintiffs' claims, was found to be inconsistent with *Lewis v. Anderson.* n79

n79 *477 A.2d 1040 (Del. 1984).*

In this case, plaintiffs' effort to circumvent *Lewis v. Anderson* by casting Count VI in terms of a double derivative action must fail. It remains the the law of Delaware that "a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at the time of commencement of suit but that he must also maintain shareholder status throughout the litigation." n80 Here, plaintiffs Madajczyk and Dalman n81 were not McKesson HBOC shareholders before January 12, 1999, so they cannot bring a derivative suit, double or otherwise. n82

n80 *Id.* at 1046. Plaintiffs' policy argument that, without standing, Count VI will be left unasserted and without remedy, was addressed in *Lewis. Id. at 1050.* McKesson HBOC inherited HBOC's choses in action, including Count VI. If McKesson HBOC fails to pursue Count VI (assuming it states a claim), McKesson HBOC's shareholders could bring an action for failure to assert a claim, which they have already done in Count 11.

[*42]

n81 Clearly, Saito cannot pursue this claim as he was never a shareholder of HBOC.

n82 This claim must also fail because plaintiffs have failed to allege that McKesson HBOC was a shareholder of HBOC at the time the alleged harm occurred.

## G. Count VII

Count VII alleges that the "Former HBOC Director Defendants provided substantial assistance to the Former McKesson Director Defendants' breaches of fiduciary duty by knowingly assisting and participating in their representations and omissions, and their breaches of fiduciary duty." n83 The complaint does not specify when the aiding and abetting occurred. As explained in Count I, all three plaintiffs lack standing to challenge the HBOC directors' conduct before October 20, 1998. Saito, alone, however, does have standing to challenge the events connected to the dissemination of an allegedly false proxy statement. Nevertheless, because the complaint contains only conclusory allegations of knowing participation in the former McKesson directors' breaches of fiduciary duty, it does not plead facts sufficient to meet the stringent standard [*43] required for an aiding and abetting claim. n84

n83 Compl. P192.

n84 The complaint merely recites the legal standard with the names of certain defendants inserted and the standard for "knowing participation" is stringent. "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes a breach." *Malpiede v. Townson, 780 A.2d 1075, 1097-98 (Del. 2001).*

## H. Count VIII

Count VIII alleges "Bear Stearns breached its duties of professional care in that they [sic] failed to plan, structure, and perform its work in a professional manner and failed to use the degree of care normally expected of reasonably prudent financial advisors." n85 Plaintiffs did not assert a claim against Bear Stearns until they filed the third amended complaint on January 22, 2001 almost two years after the filing of the original complaint. A derivative plaintiff must make a new demand for all new claims that are not [*44] "validly in litigation" n86 at the time the amended complaint is filed. Plaintiffs make no effort to identify the directors who would have received the demand for this new claim and, therefore, the claim

is dismissed pursuant to Rule 23.1. Plaintiffs argue that any claim related to the Merger was "validly in litigation" as of April 30, 1999, when plaintiffs filed their original complaint. This argument, however, does not adequately consider the fact that they have sued new parties.

n85 Compl. P197.
n86 *Harris v. Carter, 582 A.2d 222 (Del. Ch. 1990).*

The leading Delaware case on this subject, *Harris v. Carter,* does not support plaintiffs' position that claims against new parties can be treated as "validly in litigation." In *Harris,* no new defendants were brought into the case. The Court in *Harris* actually suggested that claims against new defendants should not be treated as "validly in litigation" when it stated that the "power to amend or supplement a well-instituted [*45] derivative suit without recourse to Rule 23.1, does not acknowledge a shareholder right to institute *new* corporate 'claims' against an *existing defendant* . . . after a disinterested board takes control of the corporation." n87 Implicit here is the assumption that claims against new defendants will require a new demand with respect to the new defendants.

n87 *Id. at 231* (emphasis added).

The rationale employed by former Chancellor Allen in *Harris* buttresses this conclusion. In *Harris,* the Chancellor used a definition of "claims" from the Restatement (Second) of Judgments when describing the contours of the "validly in litigation" standard. Chancellor Allen described a claim under Rule 23.1 as any legal theory grounded upon "the acts and transactions alleged in the original complaint." n88 The Restatement (Second) of Judgments does not consider causes of action against different defendants as a single claim, even though such defendants may be sued to recover for a single injury. [*46] n89 Commentary to *Section 49 of the Restatement* states that a "claim against others who are liable for the same harm is regarded as separate." n90

n88 *Id.*
n89 *RESTATEMENT (SECOND) OF JUDGMENTS § 49.*

n90 *Id. cmt. a.*

Adhering to the reasoning in *Harris* serves the ultimate purpose of Rule 23.1. A board of directors, unless legally disabled, should be presented with the opportunity to manage litigation that seeks to redress harm inflicted upon the corporation. The identity of the defendant certainly influences a board's decision as to whether to initiate litigation and, consequently, the demand futility analysis. Given these considerations, I see no reason to allow plaintiffs to assert demand futility against the McKesson HBOC board as of April 30, 1999, when no claim was asserted against Bear Stearns until 2001. n91

> n91 I must also note that this case is unique because of the large gap of time between the original complaint and the filing of the third and fourth amended complaints. Given the large gaps in the conduct of this litigation, requiring the plaintiffs to have made a demand on the Company with respect to the claims against the new defendants would not have been particularly disruptive to the flow of litigation. The circumstances of the instant litigation actually counsel strongly in favor of making a demand on the McKesson HBOC board. The original complaint in this action was filed hastily following the Company's restatement announcement. Allowing plaintiffs to assert all manner of claims against defendants not named in that document would, in my opinion, reward their race to the courthouse at the expense of the orderly administration of justice.

[*47]

*I. Count IX*

Count IX is asserted against Bear Stearns for breach of contract. Plaintiffs did not assert a claim against Bear Stearns until they filed the third amended complaint on January 22, 2001. This claim was not "validly in litigation" on April 30, 1999. Like Count VIII, plaintiffs make no effort to identify the directors who would have received the demand for this new claim and, therefore, it must be dismissed pursuant to Rule 23.1.

*J. Count X*

Count X is asserted against Bear Stearns for aiding and abetting breach of fiduciary duty. Plaintiffs did not assert a claim against Bear Stearns until they filed the third amended complaint on January 22, 2001. This claim was not "validly in litigation" on April 30, 1999.

Like Counts VIII and IX, plaintiffs make no effort to identify the directors who would have received the demand for this new claim and, therefore, it must be dismissed pursuant to Rule 23.1.

*K. Count XI*

Count XI is asserted against Deloitte. Plaintiffs did not assert a claim against Deloitte until they filed the instant complaint. This claim was not "validly in litigation" on April 30, 1999. Like Counts VIII, IX, and X, plaintiffs make no effort to [*48] identify the directors who would have received the demand for this new claim and, therefore, it must be dismissed pursuant to Rule 23.1.

*L. Count XII*

Count XII is asserted against Andersen for aiding and abetting the McKesson HBOC directors' alleged breaches of fiduciary duty. Plaintiffs did not assert a claim against Andersen until they filed the third amended complaint on January 22, 2001. This claim was not "validly in litigation" on April 30, 1999. Like Counts VIII through XI, plaintiffs make no effort to identify the directors who would have received the demand for this new claim and, therefore, it must be dismissed pursuant to Rule 23.1.

*M. Count XIII*

Count XIII relates to pre-Merger breaches of fiduciary duty of the former directors of HBOC. As such, plaintiffs lack standing to assert this claim for the reasons described in Count VI. Additionally, Count XIII is asserted against Andersen for aiding and abetting the HBOC Directors' alleged breaches of fiduciary duty. Plaintiffs did not assert a claim against Andersen until they filed the third amended complaint on January 22, 2001. This claim was not "validly in litigation" on April 30, 1999. Like Counts VIII to [*49] XII, plaintiffs make no effort to identify the directors who would have received the demand for this new claim and, therefore, it is dismissed pursuant to Rule 23.1.

**IV. CONCLUSION**

Count I, except Saito's post-October 20, 1998, claim regarding the inaccurate disclosures in the McKesson proxy statement, is dismissed on standing grounds pursuant to *8 Del. C. § 327* and Rule 23.1. Count II is dismissed on ripeness grounds. Count III is dismissed on standing grounds pursuant to *8 Del. C. § 327* and Rule 23.1. Count IV is dismissed on standing grounds pursuant to *8 Del. C. § 327* and Rule 23.1. Defendants' motion to dismiss Count V is denied. Count VI is dismissed on standing grounds pursuant to *8 Del. C. § 327* and Rule 23.1. Count VII is dismissed for failure to state a claim under Rule 12(b)(6). Counts VIII through XII are dis-

missed for failure to adequately plead demand futility pursuant to Rule 23.1. Count XIII is dismissed on standing grounds pursuant to *8 Del. C. § 327* and for failure to adequately [*50] plead demand futility pursuant to Rule 23.1.

IT IS SO ORDERED.