29

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1984 WL 2369 (D.D.C.), Fed. Sec. L. Rep. P 99,613
(Cite as: Not Reported in F.Supp.)


United States District Court; District of Columbia.
Securities and Exchange Commission
v.
Dorchester Gas Corporation.
Litigation Release No. 10255

10255

January 9, 1984

*1 The Securities and Exchange Commission today announced the filing of a civil
action in the United States District Court for the District of Columbia against
Dorchester Gas Corporation ("Dorchester") alleging violations of Section 14(a) of
the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 14a-3 and 14a-9
promulgated thereunder.   Dorchester is a diversified energy company with its
executive offices in Dallas, Texas.   Simultaneous with the filing of the
Complaint, Dorchester, without admitting or denying the allegations in the
Complaint, consented to the entry of an Order prohibiting Dorchester from
soliciting any proxy or consent or authoriziation or using any proxy statement,
form of proxy, notice of meeting or other communication which concerns or relates
to any proposal of defensive or anti-takeover measures or any proposal having any
defensive or anti-take-over effect unless each is complete and accurate in all
respects and contains all of the information required by the Commission's rules and
regulations and certain other relief.


*The Complaint*

The Commission's Complaint alleges that in mid-August certain of Dorchester's
senior management discussed first among themselves and then with an investment
banking firm the possibility of a leveraged buy-out.   The Complaint further
alleges that Dorchester's management authorized the investment banking firm to
explore the possibility of a leveraged buy-out and agreed to furnish the investment
banking firm with information concerning Dorchester as requested.   With
information provided by Dorchester, the investment banking firm prepared a
memorandum concerning Dorchester to be used in connection with efforts to obtain
financing of the leveraged buy-out transaction.

The Complaint further alleges that on or about October 14, 1983 the investment
banking firm sent to Dorchester a proposed fee agreement.   Certain revisions in
the fee agreement were made on November 2, 1983, Dorchester executed the fee
agreement.   The agreement provided among other things that the investment banking
firm would receive the lesser of 1% of the transaction value or $4,000,000 if the
transaction were consummated.   On December 2, 1983 the investment banking firm
proposed to Dorchester a leveraged buy-out at a price of $22.50 per share.   Also
on December 2, 1983 Dorchester announced that the Board of Directors accepted the
leveraged buy-out offer subject to, among other things the negotiation of a
definitive agreement and shareholder approval.

According to the Complaint, on October 6, 1983, Dorchester filed with the
Commission preliminary proxy soliciting materials relating to the Annual Meeting of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Shareholders of Dorochester scheduled to be held on December 14, 1983.  At the
annual meeting shareholders were to vote on, among other things, three antitakeover
measures in the form of amendments to Dorchester's articles of incorporation.   In
its proxy materials, Dorchester stated that the purpose of these measures was to
deter certain takeover bids, including "two-tier" takeover bids that the Company
viewed as coercive.   On or about November 15, 1983, Dorchester filed definitive
proxy materials with the Commission, and mailed or otherwise furnished the revised
proxy materials to Dorchester's shareholders soliciting proxies in support of the
anti-takeover proposals.

*2 The Complaint alleges that Dorchester's definitive proxy materials stated that
certain practices including the accumulation of stock prior to a takeover, proxy
fights, partial tender offers and two tier pricing tactics have become common and
can be highly disruptive to a company and can result in dissimilar and unfair
treatment of a company's stockholders.   The definitive proxy materials then stated
that Dorochester had in the past been approached by certain third parties seeking
to pursue a possible business combination and that Dorchester had entered into
preliminary discussions with certain of such parties, but that no discussions
proceeded beyond a preliminary stage.   The revised proxy materials dated November
15, 1983 further stated:   "The Board of Directors has no knowledge at the present
time of any specific effort to accumulate the company's securities or to obtain
control of the Company."

The Complaint alleges that the proxy materials did not disclose the facts and
circumstances concerning a leveraged buy-out including but not limited to the fact
that Dorchester had authorized its investment banker to explore the feasibility of
a leveraged buy-out of Dorchester and, in that connection, had provided its
investment banker with information concerning Dorchester, had authorized the
investment banking firm to pursue the development of a leveraged buy-out
transaction on a confidential basis or that Dorchester had entered into a written
fee agreement on November 2, 1983 with its investment banking firm concerning the
leveraged buy-out.   The Complaint also alleges that the annual meeting of
Dorchester shareholders scheduled for December 14, 1983 has been postponed.   In
connection with that postponement, Dorchester's proxy solicitation efforts
terminated and no corporate action was taken with respect to any matter that was
the subject of Dorchester's proxy material.

#### Other Relief

In addition to the prohibiting order discussed above, Dorchester consented to the
entry of an order directing it to comply with its undertakings that it will not
utilize any proxies or consents or authorizations received in connection with the
proxy materials sent or otherwise furnished to shareholders on or about November
15, 1983 and that in connection with the solicitation of any proxy or consent or
authorization following the entry of the Order in this matter, Dorchester will
disclose all material facts relating to the leveraged buy-out of Dorchester and
will summarize the allegations contained in the Complaint and the settlement of
this matter.

#### Statement of the Commission

The Commission again wishes to emphasize the need for adequate and accurate
disclosure with respect to anti-takeover and other defensive measures ("anti-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

takeover measures"). [FN1] Such measures are designed to deter contests for control or unfriendly takeovers, by making the subject company unattractive as a potential target and by making it more difficult to change a majority of the board of directors or to remove management. The anti-takeover measures also may help management to insulate a proposed corporate transaction, such as a merger or acquisition, from unwanted competition. [FN2]

> FN1 *See* Disclosures in Proxy and Information Statements: Anti-takeover or Similar Proposals, <u>Securities Exchange Act Release No. 15230 (October 13, 1978)</u>; *Statement of American Investment Company pursuant to Section 21(a) of the Securities Exchange Act of 1934,* <u>Securities Exchange Act Release No. 17004 (July 24, 1980)</u>.

> FN2 *Cf. SEC v. Wej-It Corporation,* C.A. No. 79-3299 (D.D.C. December 7, 1979) (corporate decision to reject any acquisition proposals for the company by third parties in the context of a going private transaction by the company).

*3 Companies must disclose all the material effects of anti-takeover measures, including their impact on any proposed corporate transaction, whether hostile or friendly. It is also important that management's interest in the corporate transaction (including the existence of any actual or potential conflicts of interests) and the ultimate effect of the anti-takeover measures on shareholders be disclosed. Absent such disclosure, shareholders will be unable to make informed voting decisions on the matters being proposed. It is especially important, when management is considering or pursuing a leveraged buy-out with its attandant serious conflicts of interest, [FN3] that full and fair disclosure of the impact of the anti-takeover measures on the proposed transaction be made.

> FN3 *See* <u>Securities Exchange Act Release No. 15572 (February 15, 1979)</u>; *In the Matter of Woods <u>Corporation,</u>* <u>Securities Exchange Act Release No. 15334 (November 16, 1978)</u>; *In the Matter of Spartek Corporation,* Securities Exchange Act Release No. 15567 (February 14, 1979).

D.D.C. 1984.
S.E.C. v. Dorchester Gas Corp.
Not Reported in F.Supp., 1984 WL 2369 (D.D.C.), Fed. Sec. L. Rep. P 99,613

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

30

GREGORY M. SHEPARD and AMERICAN UNION INSURANCE COMPANY, Plaintiffs, v. RAMON L. HUMKE, NORMA J. OMAN, JOSEPH D. BARNETTE, JR., THOMAS H. SAMS, JAMES D. PRICE, SARAH W. ROWLAND, DAVID M. KIRR, and JOHN T. HACKETT, STATE AUTOMOBILE MUTUAL INSURANCE COMPANY, STATE AUTO FINANCIAL CORPORATION, and MERIDIAN INSURANCE GROUP, INC., Defendants.

CAUSE NO. IP 01-1103-C H/K

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION

*2002 U.S. Dist. LEXIS 14731*

**July 9, 2002, Decided**

**NOTICE:**    [*1]    NOT INTENDED FOR PUBLICATION IN PRINT

**SUBSEQUENT HISTORY:** Later proceeding at *Shepard v. Humke, 2003 U.S. Dist. LEXIS 5280* (S.D. Ind., Mar. 28, 2003)

**PRIOR HISTORY:** *Am. Union Ins. Co. v. Meridian Ins. Group, Inc., 137 F. Supp. 2d 1096, 2001 U.S. Dist. LEXIS 4369* (S.D. Ind., 2001)

**DISPOSITION:** Defendants' motion under to dismiss plaintiffs' complaint for failure to state a claim denied.

**COUNSEL:** For Plaintiffs: Bryce H Bennett Jr, Riley Bennett & Egloff, Indianapolis, IN.

For Plaintiffs: John J Soroko, Duane Morris & Heckscher LLP, Philadelphia, PA.

Arthur P Kalleres, Ice Miller, Indianapolis, IN.

**JUDGES:** DAVID F. HAMILTON, JUDGE, United States District Court, Southern District of Indiana.

**OPINIONBY:** DAVID F. HAMILTON

**OPINION:**

ENTRY ON DEFENDANTS' MOTION TO DISMISS

This diversity action is the second attempt by plaintiff Gregory M. Shepard to challenge the merger of Meridian Insurance Group, Inc. ("MIGI") and a wholly owned subsidiary of State Automobile Mutual Insurance Company ("State Auto"). The merger was consummated on or about June 1, 2001. It left MIGI as the surviving entity, as a subsidiary of State Auto.

Prior to the MIGI-State Auto merger, Shepard owned about 20 percent of MIGI common stock. He had made repeated attempts to acquire MIGI through plaintiff American Union Insurance Company, which he controlled. Shepard first brought an action to enjoin the merger between MIGI and State Auto [*2] in *Shepard v. Meridian Insurance Group, Inc. et al.,* Cause No. IP00-1360-C H/G. The court dismissed that action on April 10, 2001 on the grounds that the "dissenters' rights" provisions of the Indiana Business Corporation Law, *Indiana Code § 23-1-44-8(c),* foreclosed the injunctive relief Shepard sought. *Am. Union Ins. Co. v. Meridian Insurance Group, Inc., 137 F. Supp. 2d 1096 (S.D. Ind. 2001).* The court also concluded that any claim Shepard had for damages arising from the merger was not ripe before the merger's consummation. *Id. at 1113-14.*

Now that the merger has been completed, plaintiff Shepard has returned to court seeking monetary relief. His amended complaint asserts three claims. Count I, against the directors of MIGI, alleges violations of the directors' fiduciary duties in negotiating and approving the State Auto merger. Count II, against State Auto Mutual and State Auto Financial alleges breach of a confidentiality agreement governing the exchange of certain business information regarding possible acquisition of MIGI. n1 Count III against MIGI itself and director and officer Norma J. Oman alleges tortious interference with contract based on [*3] State Auto's alleged breach of the confidentiality agreement. Plaintiff American Union has joined the tortious interference claim. Defendants have moved to dismiss all of plaintiffs' claims under *Rule 12(b)(6) of the Federal Rules of Civil Procedure* for fail-

ure to state a claim upon which relief could be granted. As explained below, the defendants' motion is denied.

n1 Although identified as separate entities, the defendants have not treated the two State Auto entities differently for purposes of their motion to dismiss. In the pleadings and briefs, the parties sometimes referred to "State Auto" without distinguishing between State Auto Mutual and State Auto Financial.

*Dismissal Standard*

In deciding a motion to dismiss under Rule 12(b)(6), the court reviews all facts alleged in the complaint and any inferences reasonably drawn from the alleged facts in the light most favorable to the plaintiff. *E.g., Gould v. Artisoft, Inc., 1 F.3d 544, 548 (7th Cir.1993)* (reversing dismissal). Dismissal [*4] is warranted only if the plaintiff can prove no set of facts consistent with the complaint that would entitle her to relief. *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* Detailed allegations of facts, legal theories, or their elements are not required in the complaint. Under *Rule 8(a) of the Federal Rules of Civil Procedure*, all that is needed is "a short and plain statement of the claim showing that the pleader is entitled to relief." "A complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing." *Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998)* (reversing dismissal of employment discrimination complaint).

Plaintiffs have attached several exhibits to their amended complaint. The court may consider these documents in evaluating the defendants' motion to dismiss. See *Fed. R. Civ. P. 10(c)* (a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes); see also *Menominee Indian Tribe v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998)* [*5] (in deciding motion to dismiss, district court could properly rely on documents referred to in complaint but not attached to complaint). Thus, "[a] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Matter of Wade, 969 F.2d 241, 249 (7th Cir. 1992)* (citation omitted).

*Background*

The facts stated here are taken from the amended complaint or are not inconsistent with it. Many of these same facts also were summarized in *Am. Union Ins. Co., 137 F. Supp. 2d at 1097 - 99.*

Defendant Meridian Insurance Group, Inc. ("MIGI"), is an Indiana corporation that has its principal place of business in Indianapolis, Indiana. MIGI is an insurance holding company. At the time of the events alleged in the complaint, defendants Ramon L. Humke, Norma L. Oman, Joseph D. Barnette, Jr., Thomas H. Sams, James D. Price, Sarah W. Rowland, David M. Kirr, and John T. Hackett were all directors of MIGI. Humke also served as chairman of the board and Oman was MIGI's president and CEO.

Defendants State Automobile Mutual Insurance Company and State Auto Financial Corporation are Ohio corporations [*6] with their principal place of business in Columbus, Ohio.

Effective on or about June 1, 2001, MIGI was merged with a wholly owned subsidiary of State Auto, with MIGI being the surviving corporation. As a result of the merger, MIGI is now a wholly owned subsidiary of State Auto.

Plaintiff Gregory M. Shepard owned about 20 percent of MIGI shares prior to the merger. Shepard is a 50% shareholder as well as the President and Chairman of American Union Insurance Company, an Illinois stock insurance company. Both plaintiffs are citizens of Illinois; no defendant is a citizen of Illinois for purposes of the court's diversity jurisdiction.

On August 30, 2000 and September 18, 2000, Shepard made tender offers for the control of MIGI through American Union. The MIGI directors recommended that MIGI shareholders turn down Shepard's offers. They later recommended that the shareholders accept a tender offer from State Auto, which resulted in the June 1, 2001 merger described above. Shepard's and American Union's claims are based on actions taken by MIGI and its directors in response to the Shepard's and State Auto's attempts to acquire MIGI.

On August 29, 2000, MIGI stock traded for $ 12.75 [*7] per share. On August 30, 2000, Shepard announced his intention to commence a tender offer for 100 percent of MIGI shares for a price of $ 20 per share.

On September 8, 2000, MIGI's board of directors met and decided to recommend to MIGI shareholders that they reject Shepard's tender offer. The board followed that decision with a September 11, 2000 letter to all shareholders asserting that the offer price was inadequate and did not reflect the inherent value of the company. The board also wrote in its letter:

Based on Shepard's past history and experience in the insurance industry, it would not be in the best interests of the

Company or its shareholders, employees, agents and policyholders and would be detrimental to the long-term viability of the Company for Shepard to obtain control. Specifically, the Board is concerned with Shepard's involvement in the recent insolvency of Illinois HealthCare Insurance Company, as noted above.

Am. Cplt. P 46, Ex. 5.

On September 18, 2000, Shepard announced that he was amending his tender offer. Instead of seeking all MIGI shares, his September tender offer sought only 50.1 percent of the shares, but he increased the offered price [*8] to $ 25 per share.

The MIGI board met and decided to recommend that shareholders also reject Shepard's September tender offer. On September 22, 2000, the board again wrote to shareholders with that recommendation, emphasizing again Shepard's "past history and experience in the insurance industry." Am. Cplt. P 51, Ex. 7. That factor, said the board, took on greater significance for shareholders because the tender for only 50.1 percent of shares would leave 49.9 percent of shares held by minority shareholders in a company controlled by Shepard. The board also advised shareholders that holders of more than 50 percent of MIGI shares had indicated they would reject the tender offer. Am. Cplt., Ex. 7. (Nearly 50 percent of MIGI shares were held by Meridian Mutual Insurance Company, which was well-represented on the MIGI board.)

On September 25, 2000, the Indiana Securities Commissioner held a hearing to evaluate the disclosures related to Shepard's tender offers. On October 4, 2000, the Commissioner issued a decision requiring Shepard to make additional disclosures of financial and accounting information. The Commissioner did not, however, issue a cease-and-desist order.

The next day, [*9] after learning that the Securities Commissioner would not block Shepard's tender offer, the MIGI board issued a press release announcing that the board had directed management "to explore strategic alternatives to enhance shareholder value." Am. Cplt. P 70. The alternatives included a variety of transactions, including possible mergers with third parties. The press release added: "The Board reconfirmed that the Company has no interest in engaging in any transaction with American Union Insurance Company, Gregory M. Shepard or any of their respective affiliates."

On October 2, 2000, Shepard met with Robert Bailey, chairman of State Auto, to discuss matters relating to Shepard's interest in MIGI. Am. Cplt. P 57. On behalf of State Auto, Bailey entered a confidentiality agreement regarding the confidential information he and Shepard discussed. Am. Cplt. P 58, Ex. 8. Among other things, the agreement prohibited State Auto from disclosing confidential information it obtained from Shepard and from trading in MIGI stock as a result of the disclosure of confidential information.

On October 6, 2000, Shepard responded to the MIGI press release with his own announcement stating his intention [*10] to press forward with his tender offer despite the MIGI board's rejection of his efforts.

Also on October 6, 2000, MIGI and State Auto entered into an agreement for the exchange of confidential business information as a precursor to negotiating a merger or combination. Less than three weeks later, on October 25, 2000, MIGI announced that it had entered into a merger agreement with State Auto and a wholly owned subsidiary of State Auto known as "MIGI Acquisition." This is the merger that was consummated effective June 1, 2001.

Under the merger agreement, public shareholders of MIGI were paid $ 30 per share, for a total payment of more than $ 100 million. MIGI survived the merger as a wholly owned subsidiary of State Auto.

The State Auto merger agreement included a so-called "break-up fee" of $ 25 million plus State Auto's expenses related to the deal. In addition, the agreement contained a "no solicitation" provision that Shepard contends sharply restricted the MIGI board's ability to entertain any competing offers for the company. Shepard has alleged that any competing bidder would have had to pay at least $ 35 per share before it could even match the value of the State Auto bid [*11] as protected by the break-up fee.

The merger deal also included a voting agreement under which Meridian Mutual agreed to vote its 48.6 percent of MIGI shares in favor of the State Auto merger and against approval of any other merger or business combination, except under certain conditions. State Auto also owned shares of MIGI, and State Auto's Schedule 13D filed with the SEC indicates it controlled 54.6 percent of MIGI shares, including the Meridian Mutual shares.

In *Shepard I*, defendants had projected that Shepard would receive $ 47,652,000 in cash for his MIGI shares under the State Auto merger. Those same shares had a market value of just $ 20,252,100 the day before Shepard announced his first tender offer on August 30, 2000.

Additional facts (or allegations of fact) are included below, keeping in mind the standard for deciding a motion to dismiss.

## Discussion

MIGI is an Indiana corporation, so its internal affairs are governed by Indian a law. See *CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 89, 95 L. Ed. 2d 67, 107 S. Ct. 1637 (1987)* ("No principle of corporation law and practice is more firmly established than a State's authority to regulate [*12] domestic corporations, including the authority to define the voting rights of shareholders."), citing *Restatement (Second) of Conflict of Laws § 304* (1971). n2

> n2 As an initial matter, defendants have argued, as they did in *Shepard I,* that plaintiffs' action should be dismissed because their claims could be brought, if at all, as a derivative action. The argument certainly has respectable support, but the court rejected this argument in *Am. Union Ins. Co., 137 F. Supp. 2d at 1109-12.* The court's view on the issue has not changed.

### I. Breach of Fiduciary Duty

Plaintiff Shepard alleges that the MIGI directors and officers breached their fiduciary duty to shareholders by opposing Shepard's tender offers in favor of State Auto's. Defendants contend that plaintiffs' allegations cannot survive a motion to dismiss because (a) the allegations are barred by the doctrine of judicial estoppel; (b) the allegations do not support a breach of fiduciary duty claim; and (c) the allegations do not support [*13] an inference that the directors acted with a state of mind sufficient to defeat the business judgment rule.

### A. Judicial Estoppel & Shepard I

The court begins its analysis of the breach of fiduciary claim by considering both parties' arguments that the resolution of defendants' motion is a foregone conclusion based on the prior actions of the plaintiff or of this court. Defendants invoke judicial estoppel, while plaintiffs invoke the law of the case. Both arguments fail. The breach of fiduciary duty claim stands or falls on its own in this case.

#### 1. Judicial Estoppel

Defendants contend that plaintiffs are judicially estopped from claiming that $ 30 per share (the price State Auto paid) was not an adequate price for MIGI shares because plaintiffs previously took the position before this court that $ 20 per share (the price Shepard offered initially) was such a good price that the MIGI directors could not oppose plaintiffs' tender offer without breaching their fiduciary duties. Defendants also contend that

judicial estoppel precludes plaintiffs' current action because the Indiana Securities Commissioner did not block plaintiffs' offer. Defendants' judicial estoppel argument [*14] fails because Shepard never persuaded this court or the Commissioner to adopt a position that is inconsistent with his position here.

The Supreme Court discussed judicial estoppel in *New Hampshire v. Maine, 532 U.S. 742, 149 L. Ed. 2d 968, 121 S. Ct. 1808 (2001):*

> Courts have observed that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *Allen [v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982)];* accord *Lowery v. Stovall, 92 F.3d 219, 223 (C.A.4 1996); Patriot Cinemas, Inc. v. General Cinema Corp., 834 F.2d 208, 212 (C.A.1 1987).* Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. *United States v. Hook, 195 F.3d 299, 306 (C.A.7 1999); In re Coastal Plains, Inc., 179 F.3d 197, 206 (C.A.5 1999); Hossaini v. Western Mo. Medical Center, 140 F.3d 1140, 1143 (C.A.8 1998); Maharaj v. Bankamerica Corp., 128 F.3d 94, 98 (C.A.2 1997).* [*15] Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," *Edwards [v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982)].* Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," *United States v. C.I.T. Constr. Inc., 944 F.2d 253, 259 (C.A.5 1991),* and thus poses little threat to judicial integrity. See *Hook, 195 F.3d at 306; Maharaj, 128 F.3d at 98; Konstantinidis [v. Chen, 200 U.S. App. D.C. 69, 626 F.2d 933, 939 (D.C. Cir. 1980)].* A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. See *Davis [v. Wakelee, 156 U.S. 680, 689, 15 S. Ct.*

555, 39 L. Ed. 578 (1895)]; *Philadelphia, W., & B.R. Co. v. Howard*, 54 U.S. 307, 13 HOW 307, 335-337, 14 L. Ed. 157 (1851); [*16] *Scarano [v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953)]* (judicial estoppel forbids use of "intentional self-contradiction . . . as a means of obtaining unfair advantage"); see also 18 Wright § 4477, p. 782.

In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts.

*532 U.S. at 750-51.*

Indiana courts generally have followed the same judicial estoppel principles, including the need for prior success with the inconsistent position. In *Meridian Ins. Co. v. Zepeda,* the Indiana Court of Appeals described the doctrine:

> Judicial estoppel "prevents a party from asserting a position in a legal proceeding inconsistent with one previously asserted." *Wabash Grain, Inc. v. Smith, 700 N.E.2d 234, 237 (Ind. Ct. App.1998).* Litigants are prohibited from taking advantage of the judicial process by prevailing twice under different theories. *GEICO Ins. Co. v. Rowell, 705 N.E.2d 476, 481 (Ind. Ct. App.1999),* [*17] *reh'g denied.* Judicial estoppel prevents a party who has successfully maintained a position in the first proceeding from subsequently asserting an inconsistent position. *The key to the doctrine is that it prohibits a party from presenting a position contrary to one upon which he previously prevailed.* See 31 C.J.S. Estoppel and Waiver § 139(b)(1996).

*734 N.E.2d 1126, 1132 (Ind. App. 2000)* (emphasis added). See also *Allstate Ins. Co. v. Dana Corp., 737 N.E.2d 1177, 1193-94 (Ind. App. 2001)* (reversing trial court's application of judicial estoppel because, although plaintiff changed positions in subsequent litigation, it had not prevailed on different position in earlier litigation),

aff'd in relevant part, 759 N.E.2d 1049, 1063 (Ind. 2001); *Cooper v. Eagle River Memorial Hosp., Inc.*, 270 F.3d 456, 462-63 (7th Cir. 2001) (applying Wisconsin law: "To invoke judicial estoppel, a court must identify three elements (1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first [*18] court to adopt its position); *DeVito v. Chicago Park Dist., 270 F.3d 532, 535 (7th Cir. 2001)* (judicial estoppel "forbids a party who has won a case on one ground to turn around in a subsequent case and repudiate that ground in an effort to win a second victory."). The doctrine applies to administrative as well as judicial proceedings. See *Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1427 (7th Cir. 1993)* ("Though called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding.").

Defendants base their judicial estoppel argument in part on allegations in Shepard's original complaint in *Shepard I.* In that complaint, Shepard alleged that the MIGI directors breached their fiduciary duty by rejecting his tender offer. Shepard asked the court to enjoin the MIGI directors from rejecting his offer. See *Shepard I,* Cplt., PP 51-56, 106-107, and prayer for relief. Shepard filed his original complaint in *Shepard I* on August 30, 2000, the same day he made his original tender offer. [*19] Shepard amended his complaint in *Shepard I* on December 8, 2000, after MIGI had rejected his second tender offer and entered an agreement with State Auto. The amended complaint in *Shepard I* did not allege that the directors breached their fiduciary duty by rejecting Shepard's offer. Nor did it seek injunctive relief to enforce his tender offer. Instead, Shepard sought an injunction to block the consummation of MIGI's merger with State Auto.

The fact that Shepard once took a position in *Shepard I* that seems inconsistent with the position he asserts here may provide ample fuel for arguments and cross-examination at later stages, but it does not provide a basis for invoking judicial estoppel. Shepard never prevailed on the theory that the MIGI directors violated their fiduciary duty by rejecting his tender offer at $ 20.

Defendants also contend that the proceedings before the Indiana Securities Commissioner provide a basis for judicial estoppel. The defendants' premise is that Shepard "prevailed" before the Commissioner because the Commissioner did not issue a cease and desist order to block his tender offer. Instead, the Commissioner only ordered Shepard to supplement his [*20] financial disclosures. This result is not tantamount to Shepard persuading the Commissioner to adopt a position that is inconsistent

with his position here. The Commissioner ordered Shepard to disclose more information about his ability to pay the price offered but did not pass judgment on the adequacy of the price per share in the tender offer.

The defendants make much out of the fact that Shepard provided his press releases about the tender offer to the Commissioner and that those press releases represented that Shepard's $ 20 per share offer was in the MIGI shareholders' "interest." But there is no indication that the Commissioner's action requiring additional financial disclosures had anything to do with the price Shepard offered. The Securities Commissioner's Findings of Fact, Conclusion of Law, and Final Order stated that the "sole purpose of the hearing [before the Securities Division] was to determine, by a preponderance of the evidence, whether the takeover statement fails to provide full and fair disclosure to the offerees of all material information concerning the takeover offer . . ." Findings of Fact P 13 (internal quotation and citation omitted). The Commissioner emphasized [*21] that he was considering only whether the takeover statement made a full and fair disclosure. See Conclusions of Law P 7 ("Simply stated, given the evidence presented at the hearing, and the parties' above-described stipulations, the Securities Commissioner must determine whether the takeover statement filed by offerors fully and fairly discloses to the offerees all material information concerning the offer."). Thus, the Securities Commissioner's actions do not provide a basis for judicial estoppel against Shepard based on his $ 20 per share offer because the Commissioner never agreed with Shepard about the price offered.

### 2. Shepard I

Plaintiff Shepard contends that the defendants' motion to dismiss his fiduciary duty claim must be denied because this court already decided in *Shepard I* that Shepard's allegations state a claim on which relief can be granted. Plaintiffs rely on the following language from the court's earlier decision:

> This substantive protection [of the business judgment rule] for directors is extensive, but not absolute. In deciding defendants' motion to dismiss under Rule 12(b)(6), therefore, *the court must assume that plaintiff Shepard would be* [*22] *able to prove that the defendant directors willfully or recklessly breached their duties in deciding to approve the State Auto merger.*

*Am. Union Ins. Co., 137 F. Supp. 2d at 1103* (emphasis added). The court also stated:

> If and when the merger is completed, Shepard might be able to pursue a direct action against the directors for monetary relief for an alleged breach of their duty to shareholders, though his claim would confront the highly deferential business judgment rule under Indiana law, see generally *Ind. Code § 23-1-35-1* (business judgment rule), *and it is not clear whether Indiana law would recognize such claims even then.*

*Id. at 1097*(emphasis added).

As the language in the second passage makes clear, the language from *Shepard I* in the first passage quoted above does not establish as the "law of the case," issue preclusion, or on any other basis that Shepard can state a claim for damages against the directors based on an alleged breach of fiduciary duty. The issue presented in *Shepard I* was whether injunctive relief was available to block the proposed merger transaction, or whether the dissenters' rights provisions of the [*23] Indiana Business Corporation Law foreclosed such injunctive relief. The defendants' position against such relief was built upon arguments that would apply even to egregious cases of director misconduct. In light of the broad sweep of the arguments presented, the court assumed, for purposes of analyzing the issue of relief, that a breach of directors' fiduciary duty could be shown. Nothing more should be inferred from the quoted statement. In this action, the substance of Shepard's claim is at issue, not the appropriate remedy. The court simply did not reach the merits of the breach of fiduciary claim in *Shepard I.*

### B. *Breach of Fiduciary Duty -- Shepard's Allegations*

Turning to the substance of Shepard's breach of fiduciary duty claim, the defendants contend that Shepard's allegations do not state a claim because he has not alleged conduct that constitutes a breach or violates the business judgment rule. The court denies the defendants' motion to dismiss the breach of fiduciary duty claim because, drawing all reasonable inferences in plaintiff's favor, his allegations state a claim upon which relief could be granted.

As this court discussed in *Shepard I,* Indiana has adopted [*24] by statute "a strongly pro-management

version of the business judgment rule." See *G&N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 238 (Ind. 2001)* (describing *Ind. Code § 23-1-35-1(e)*). A director has a duty under the law to act in good faith, with ordinary care under the circumstances, and in a manner the director believes to be in the best interests of the corporation. *Ind. Code § 23-1-35-1(a)*. Individual director liability requires proof that a director not only breached a duty of good faith and ordinary care, but that the breach or failure to perform constituted "willful misconduct or recklessness." *Ind. Code § 23-1-35-1(e)*; *G&N Aircraft, 743 N.E.2d at 238; Am. Union Ins. Co., 137 F. Supp. 2d at 1103*. The official study commission comment on the business judgment statute states that director liability for damages requires proof of, "at a minimum, conscious disregard or indifference to the consequences of a risky act." *Ind. Code § 23-1-35-1(e)*. n3

> n3 The Supreme Court of Indiana has recognized the commission's commentary as authoritative. *Fleming v. International Pizza Supply Corp., 676 N.E.2d 1051, 1054 n.5 (Ind. 1997)*. The commentary to subsection (e) further explains:
>
>> Subsection (e)'s liability standard is a conscious response to the serious problems that have arisen in recent years due to the increasing amount of litigation against directors, the increasing expense of defending such claims, and the increasing cost (and decreasing availability and scope) of director and officer liability insurance. These developments have in turn made it increasingly difficult for corporations to persuade qualified individuals to serve on boards of directors. Narrowing the bases for imposition of personal liability on directors was recommended by the Commission, and adopted by the General Assembly, as a crucial part of Indiana's efforts to reverse that trend. Subsection (e) reflects the public policy of Indiana that personal liability should be imposed on directors only in limited circumstances, and should be construed in furtherance of that objective.

[*25]

While this substantive protection for directors is extensive, it is not absolute. Shepard alleges that the MIGI directors breached their fiduciary duty because they: (1) had unwarranted "antipathy" towards Shepard; (2) wanted to ensure that Oman and Steven Hazelbaker would obtain the positions of Vice Chairman and President, respectively, following the merger with State Auto; (3) made misrepresentations about their decisions regarding merger negotiations; (4) failed to obtain the highest possible price for MIGI shares, including by establishing a break-up fee that would dissuade other potential purchasers; and (5) improperly relied on confidential information that plaintiffs had disclosed to State Auto, giving State Auto an unfair advantage over plaintiffs.

Although one may be skeptical about the merits of Shepard's breach of fiduciary claim in light of the broad protections of the business judgment statute, taken as a whole, his allegations are sufficient to survive a motion to dismiss. For example, Shepard's allegations regarding the directors' misrepresentations and the break-up fee are the sort of allegations that could sustain a breach of fiduciary claim if supported with evidence [*26] that the directors deliberately chose not to act in the best interests of the corporation's multiple constituencies or were indifferent to the interests of those constituencies. The court reserves its analysis of Shepard's multiple breach of fiduciary duty theories until later stages of the proceedings, when a record of actual evidence will be available. The court cannot say at this stage that there is no possible set of facts consistent with the allegations in Shepard's complaint that would permit him to prove a breach of fiduciary duty. Shepard is entitled to attempt to develop this claim in discovery, keeping in mind his obligations under *Rule 11 of the Federal Rules of Civil Procedure*. As the Supreme Court explained recently: "Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. 'Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.'" *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 122 S. Ct. 992, 999, 152 L. Ed. 2d 1 (2002)*, quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683, 71 Ohio Op. 2d 474 (1974)*.

II. *Breach of Contract* [*27]

Plaintiffs Shepard and American Union allege that defendants State Auto Mutual and State Auto Financial breached a confidentiality agreement with them in negotiating and consummating the MIGI merger. The agreement is contained in a letter written by Shepard on American Union letterhead. See Am. Cplt., Ex. 8. Robert Bailey signed the letter agreement for State Auto Finan-

cial. The agreement provided that State Auto Financial would not disclose "Confidential Information" obtained from American Union, which was defined as information that was "non-public, confidential and/or proprietary." The letter agreement limited the definition of "Confidential Information" with the following language:

> The restrictions set forth in this letter shall not apply to any part of the Confidential Information (a) in the public domain not as a result of the violation of Recipient's [State Auto's] undertaking herein, (b) available to Recipient prior to disclosure of it to Recipient, (c) hereafter made available to Recipient from another source, provided that such source in so acting is not to Recipient's knowledge violating any duty or agreement of confidentiality, (d) required to be disclosed pursuant [*28] to any law, legal process, or judicial or governmental circumstances or stock exchange rule, (e) independently developed by Recipient without the use of the Confidential Information, or (f) disclosed to others on an unrestricted or non-confidential basis.

In addition to prohibiting the disclosure of Confidential Information, the agreement also provided:

> Recipient [State Auto] hereby agrees not to trade in any securities of MIGI as a result of disclosure of the Confidential Information, or any other information disclosed by the Company, until forty-eight (48) hours after the public disclosure of such Confidential Information or other information was made by the Company.

Defendants argue that plaintiffs cannot state a claim for breach of contract because (1) plaintiffs have not alleged the disclosure of "Confidential Information" as that term is defined in the agreement; and (2) the agreement's prohibition against "trading" MIGI securities did not apply to prohibit the MIGI merger.

The complaint alleges that Shepard met with Bailey on October 2, 2000 and discussed his analysis of the value of MIGI. Shepard told Bailey that he believed the value was significantly [*29] more than $ 44.59 per share. Am. Cplt. P 63. Shepard also told Bailey that he did not alone have the resources to offer significantly more than the $ 25.00 per share for 50.1 percent of

MIGI's outstanding shares of common stock that he had already offered to buy. Shepard proposed a joint venture in which Shepard would acquire shares of MIGI at $ 27 per share with State Auto's help with financing. In exchange, State Auto would have the option to acquire MIGI in one year at a price of $ 40 per share. In addition, Shepard showed Bailey documents that Shepard had created and labeled "CONFIDENTIAL." The documents included data supporting Shepard's analysis of the value of MIGI, a document noting the alternatives available to MIGI, and a document outlining the proposal made to Shepard regarding State Auto acquiring an option to purchase Shepard's shares of MIGI common stock at $ 40. Am. Cplt. PP 63-64.

Defendants contend that none of the information allegedly disclosed was confidential under the agreement. Specifically, defendants assert that Shepard's valuation of MIGI stock was not confidential because it was based on publicly available financial information. In addition, the alternatives [*30] Shepard outlined -- such as MIGI finding a "white knight" -- were generally known as alternatives in many merger scenarios. Defendants also discount Shepard's disclosure of information about his financial situation because he was required by the SEC to make certain financial disclosures with his tender offer and amended tender offer. With respect to the prohibition against trading MIGI stocks based on Confidential Information, defendants argue that MIGI stocks were not "traded" under the State Auto merger agreement because the sale of shares was not voluntary -- under the agreement, stockholders were forced to sell.

The court denies the defendants' motion to dismiss plaintiffs' breach of contract claim. The defendants' arguments go the merits of the plaintiffs' claim and they may be appropriate for consideration on summary judgment. The court cannot say that the claim fails based on the face of the complaint and the letter agreement attached to the complaint. The plaintiffs are entitled to attempt to develop their theory that Shepard disclosed information to State Auto that was confidential under the agreement, the existence of which defendants do not dispute, at least for purposes [*31] of their motion to dismiss.

### III. *Tortious Interference with Contract*

Plaintiffs Shepard and American Union base their tortious interference claim against MIGI and Oman on alleged interference with the confidentiality agreement between plaintiffs the State Auto defendants, discussed above. To prove tortious interference with contract under Indiana law, a party must show: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of that contract; (3) the defendant's intentional inducement to breach that contract; (4) the absence

of justification; and (5) damages resulting from the breach. *National City Bank, Indiana v. Shortridge, 689 N.E.2d 1248, 1252 (Ind. 1997); McLinden v. Coco, 765 N.E.2d 606, 617 (Ind. App. 2002).*

Defendants argue first that the plaintiffs' tortious interference claim is preempted by the Indiana Trade Secrets Act ("ITSA"), *Ind. Code § 24-2-3-1 et seq. The parties have not cited any decisions on this issue under Indiana law. Defendants rely on the ITSA provision stating that the statute "displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, except* [*32] *contract law and criminal law," Ind. Code § 24-2-3-1(c), and on decisions from the Northern District of Illinois holding that similar tort claims were preempted by the parallel Illinois trade secret statute. See Automed Technologies, Inc. v. Eller, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001); Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 132 F. Supp. 2d 643, 648-49 (N.D. Ill. 2001), aff'd in part and rev'd in part on other grounds, 285 F.3d 1353 (Fed. Cir. 2002); Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 968, 974 (N.D. Ill. 2000).* The Illinois cases reason that, because the trade secret statute defines misappropriation of a trade secret to include inducing another person to breach a duty to maintain secrecy of trade secrets, the preemption provision means that the statutory remedy for such inducement displaces any common law tort remedy. (Contract remedies are left intact under this approach.)

The premise for invoking preemption under *Ind. Code § 24-2-3-1(c)* must be a showing that the tort claim in question deals with "trade secrets" within the meaning of the ITSA. The preemption provision does not [*33] purport to apply to all claims for relief for inducing breaches of obligations to maintain secrecy. (Consider, for example, possible claims for inducing an attorney, physician, clergy, or accountant to violate professional obligations of confidentiality. Such claims would not fall within the ITSA preemption provision.) This preemption theory does not necessarily apply to plaintiffs' claim for tortious interference because plaintiffs have not tried to allege that the information they provided to State Auto qualified as trade secrets under the ITSA.

The Indiana preemption provision is limited to "conflicting law of this state pertaining to the misappropriation of trade secrets. . . ." *Ind. Code § 24-2-3-1(c).* The ITSA defines "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Ind. Code* [*34] *§ 24-2-3-2.* The

statutory standard does not draw sharp lines, and it has generated litigation over whether particular types of information are protected by the statute. See, *e.g., Amoco Production Co. v. Laird, 622 N.E.2d 912, 919 (Ind. 1993)* (results of microwave radar search for potential oilfields were protected as trade secrets), reversing *Laird v. Amoco Production Co., 604 N.E.2d 1249, 1254 (Ind. App. 1992)* (holding such results were not trade secrets protected from misappropriation because competitors could conduct their own surveys); *Ackerman v. Kimball Int'l, Inc., 634 N.E.2d 778 (Ind. App. 1994)* (customer and supplier lists and pricing information were protected as trade secrets), *aff'd in relevant part, 652 N.E.2d 507 (Ind. 1995).* n4

> n4 Parties who wish to avoid such uncertainty have the option of contracting for confidentiality protections that go beyond the statute. Moreover, when a party has genuine trade secrets to protect, it can be vital for such a party to obtain contractual promises of confidentiality before disclosing such information to someone with whom it wants to do business. Compare, *e.g., Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 664 (4th Cir. 1993)* (jury could reasonably find that secrecy was not lost where plaintiff's only disclosures of secret object-code version of software were made in confidence under licensing agreements or in licensing negotiations); with *Flotec, Inc. v. Southern Research, Inc., 16 F. Supp. 2d 992, 1004-05 (S.D. Ind. 1998)* (plaintiff held not entitled to trade secret protection for information it disclosed without securing contractual protection).

[*35]

Further, even if it were later determined that the plaintiffs' tortious interference claim applied to genuine trade secrets, then the alleged claim could fall within the ITSA as a claim for misappropriation of trade secrets by inducing a breach of a duty to maintain secrecy.

Defendants also argue that dismissal of the tortious interference claim is appropriate because plaintiffs cannot prove that the defendants caused any of their alleged damages. This issue simply cannot be resolved on defendants' motion to dismiss.

### Conclusion

For the reasons explained above, defendants' motion under *Federal Rule of Civil Procedure 12(b)(6)* to dismiss plaintiffs' complaint for failure to state a claim is denied. Defendants shall answer the amended complaint no later than August 8, 2002.

So ordered.

Date: July 9, 2002

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana

.

31

Not Reported in A.2d                                                        Page 1
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)


Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
                    Court of Chancery of Delaware.
                     Jerrold M. SONET, Plaintiff,
                                   v.
     PLUM CREEK TIMBER COMPANY, L.P., Plum Creek Management Company, L.P., and PC
                        Advisory Corp. I, Defendants.
                              No. 16931.

                            March 18, 1999.


Joseph A. Rosenthal and Carmella P. Keener, Esquires, of Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, Delaware; and Sidney B. Silverman, Esquire, of
Silverman, Harnes, Harnes, Prussin & Keller, New York, New York, Attorneys for
Plaintiff.
Edward P. Welch, Andrew J. Turezyn and Stephen D. Dargitz, Esquires, of Skadden,
Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware, Attorneys for Defendant
Plum Creek Timber Co., L.P.
Jesse A. Finkelstein and Srinivas M. Ragu, Esquire, of Richards, Layton & Finger,
P.A., Wilmington, Delaware; and Robert A. Sacks and Steven W. Thomas, Esquires, of
Sullivan & Cromwell, Los Angeles, California, Attorneys for Defendants Plum Creek
Management Company, L.P. and P.C. Advisory Corp. I.

                            MEMORANDUM OPINION

JACOBS, Vice Chancellor.
*1 At issue on this motion for a preliminary injunction are the proxy disclosures
made by the general partner of a publicly traded Delaware limited partnership,
seeking Unitholder approval of a proposed conversion of the limited partnership
into a real estate investment trust (the "REIT Conversion"). The partnership is
Plum Creek Timber Company, L.P. ("Plum Creek"), the plaintiff is a Unitholder of
Plum Creek, and the defendants are Plum Creek's general partners: Plum Creek
Management Company, L.P. ("PCMC") and PC Advisory Corp. I. ("PC"), which is the
general partner of PCMC. [FN1]

     FN1. The entity that ultimately controls the GP is SPO Partners & Co. ("SPO")
     a San Francisco, California-based investment firm. PC and PCMC will be
     referred to collectively in this Opinion as "GP".

This is the second lawsuit challenging the proposed REIT Conversion. The first
action, Sonet v. Plum Creek Management Co., L.P. ("Sonet I "), [FN2] attacked the
transaction on grounds of substantive fairness, alleging that it was the product of
contractual and breach of fiduciary duty violations. Chancellor Chandler dismissed
Sonet I on the ground that the Partnership Agreement supersedes any fiduciary or
other common law obligation the GP had to assure that the REIT Conversion is fair
to the Unitholders. [FN3] Because the transaction was found not to violate any express
term of the Partnership Agreement, and the GP was found not to have assumed any
common law fiduciary duty by appointing a Special Committee to assist in the
negotiations, the Court held that no cognizable claim was stated. [FN4] Critical to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d 05-cv-00327-GMS Document 48-12 Filed 03/06/2006 Page 18 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Court's *Sonet I* decision was the fact that the REIT Conversion could not occur
unless the Unitholders first approve it by a 66 2/3% vote.

FN2. Del. Ch., C.A. No. 16639, Chandler, C. (1998).

FN3. *Id.* at 17.

FN4. *See id.* at 17-19.

After *Sonet I* was decided, the defendants issued a proxy statement soliciting
Unitholder approval of the REIT Conversion (the "Proxy Statement"). The Proxy
Statement was issued on January 28, 1999, and was accompanied by a letter to
Unitholders from Mr. Rick Holley, the GP's President and CEO (the "Holley Letter").
This lawsuit, which attacks the disclosures in the Proxy Statement and the Holley
Letter, was commenced on February 8, 1999.

The issue on this motion for preliminary injunctive relief is whether the Proxy
Statement and the Holley Letter fully and fairly disclose the material facts
necessary for the Unitholders to make an informed decision whether to approve the
REIT Conversion. The plaintiff claims that these disclosure documents are deficient
because they misrepresent three material aspects of the proposed REIT Conversion:
(i) the process by which the transaction was negotiated and agreed upon (the
"Process" claim); (ii) the facts material to assessing the fairness of the
transaction (the "Fairness" claim); and (iii) the risks in converting the limited
partnership to a REIT (the "Risk" claim).

For the following reasons, I conclude that the Process and Fairness claims warrant
preliminarily enjoining the Unitholder vote until appropriate corrective
disclosures are made and properly disseminated. I further conclude that the Risk
claim is without merit, and does not warrant any grant of relief.

## I. BACKGROUND

*2 Many of the background facts are undisputed. Where there are disputes, the facts
narrated below are what, in this Court's opinion, would likely be found as fact at
a final hearing.

### A. The Parties

Since June 26, 1997, the plaintiff has been a limited partner and record owner of
depository units ("Units") that represent limited partnership interests in Plum
Creek. The partnership, Plum Creek, is registered with the Securities and Exchange
Commission ("SEC") and its Units are publicly traded on the New York Stock
Exchange. There are 46,323,300 Units outstanding, all but 4% of which are owned by
members of the investing public (the "Unitholders"). Plum Creek (through certain
corporate subsidiaries) owns, manages, and operates approximately 3.3 million acres
of timberland and eleven wood products conversion facilities in the Northwestern
and Southeastern United States.

As previously noted, PCMC, a Delaware limited partnership, is the general partner
of Plum Creek, and PC is the ultimate general partner of PCMC and therefore the
indirect general partner of Plum Creek. SPO, a San Francisco based investment
banking firm that acts on behalf of an investment group, in turn controls PC and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported Case 1:05-cv-00327-GMS    Document 48-12    Filed 03/06/2006    Page 19 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

PCMC (collectively, the "GP").

The three SPO principals-John Scully, William Patterson, and William Oberndorf-serve as GP directors. SPO does not participate in the day-to-day management of Plum Creek or in acquisition or strategic planning-it retains professional managers to perform those functions. Those managers include Mr. Holley, [FN5] Diane M. Irvine, the GP's Vice President and CFO; and James A. Kraft, the GP's Vice President and General Counsel (collectively referred to as "Management"). These Management personnel report to SPO, which pays their bonuses and incentive compensation. Consequently, for present purposes, Management is beholden to SPO and is controlled by it.

> FN5. Mr. Holley receives a $454,000 a year salary from Plum Creek, and was awarded 300,000 partnership units as part of a management incentive plan that had not yet vested, and might not vest if Holley was terminated by year-end 1998.

The GP has a seven-member board of directors. In addition to the three SPO representatives (Messrs. Scully, Patterson, and Oberndorf), the other directors are Messrs. Holley, Ian B. Davidson, David Leland, and George M. Dennison. Plaintiff contends that Davidson, Leland, and Dennison all have financial ties to the GP which negative any claim that they are independent. [FN6] Davidson, Leland, and Dennison also have an inherent conflict of interest: each owes a fiduciary duty both to the GP's stockholders (*i.e.*, SPO), and to the Unitholders as well.

> FN6. Messrs. Davidson and Leland are not conflict free. Mr. Davidson is the Chairman and CEO of a broker-dealer firm that was selected by the GP to co-manage several public offerings of Units for the benefit of the GP's employees who participate in employee incentive plans. The firm receives a commission for every executed trade, and Davidson has admitted that his firm is interested in having a continued business relationship with the GP. *See* Davidson Dep. at 7, 20. Mr. Leland was the GP's former CEO and presently serves as the GP's chairman of the board, for which he receives compensation. Mr. Leland also receives an annual $24,000 allowance from the GP to maintain an automobile for his personal use. *See* Pls. Ex. 20 (Plum Creek's Form 10-K/AOO, 3/25/98). As for Mr. Dennison, however, the plaintiff has not shown that he has any direct, significant financial tie to the GP.

### B. The Partnership Agreement

The Plum Creek partnership agreement requires Plum Creek to make quarterly cash distributions of 100% of Available Cash. [FN7] Under the partnership agreement, the GP has a 2% interest in all Plum Creek distributions, plus a percentage interest in all quarterly distributions made by Plum Creek in excess of $0.21 2/3 per unit ("incentive" distributions). On distributions between $0.21 2/3 to $0.23 1/3 per unit, the GP receives 12%; on distributions between $0 .23 1/3 and $0.25, the GP receives 22%; on distributions between $0.25 and $0.28 1/3, the GP receives 32%; and on quarterly distributions made to Unitholders above $.28 1/3, the GP's share is 37%. The GP is also entitled to receive incentive distributions upon any issuance of new equity by Plum Creek. Solely as a shorthand reference, the GP's right to participate in these incentive distributions is referred to as the "Promote."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN7. *See* Partnership Agreement, ¶ 5.3. "Available Cash" is defined as the Partnership's net income (excluding gain on the side of any capital asset), plus depletion and depreciation, less capital expenditures, plus or minus certain reserves, which include certain required reserves, for interest and principal payments on the Partnership's debt, and certain discretionary reserves, for future capital expenditures and future distribution payments. Partnership Agreement, ¶ 1.3. The GP determines the size of the reserves and whether and when to reverse them. *Id.* In this manner the GP effectively has the power to control the amount of Available Cash upward or downward and, as a consequence, controls the amount of distributions made to Unitholders.

### C. Plum Creek's Business

**\*3** Plum Creek is involved in the timber industry, and the demand for its products-logs and manufactured wood products-fluctuates with international and domestic market conditions, [FN8] including changes in economic conditions, tariffs, interest rates, and demographic and environmental factors. From 1995 to 1996, the timber industry enjoyed a favorable business cycle. [FN9] Plum Creek's operating results reflected those robust market conditions: during this period its earnings peaked at $4.71 per share. Beginning in 1997, however, sales began to decline as a result of a Japanese economic slump that worsened in 1998. In 1997, Plum Creek earned just $1.72 per Unit; in 1998, Plum Creek earned only $0.90 per Unit.

> FN8. Specifically, the demand for logs, lumber, and other products is affected by residential and industrial construction, and repair and remodeling activity.

> FN9. This was largely because of the strength of the domestic housing, repair, and remodeling markets, as well as a trade agreement between the United States and Canada, whereby Canadian timber producers were effectively unable to increase their output to take advantage of the United States market.

### D. The REIT Conversion Plan

The GP became concerned with this economic downturn and the prospect that for the foreseeable future Plum Creek would generate little internal growth from its existing operations. In its 1997 Strategic Plan, the GP projected a further decline in Plum Creek's earnings for 1999 from year end 1998, and from 1999 through 2007, it projected a flat net income and flat distributions. [FN10] The import of this was that Plum Creek would likely be unable to maintain its current high level of distributions.

> FN10. *See* Pls. Ex. 16 (1997 Plan). In the 1998 Plan, prepared at about the same time the REIT Conversion agreement was approved, the GP projected that income from current operations would be even lower than what was projected in the 1997 Plan. *See* Pls. Ex. 17 (1998 Plan).

Eventually the GP concluded that Plum Creek's only source of growth would be through acquisitions. The problem was that competition for acquisition target companies was very intense, and the partnership was handicapped by its structure which was designed to produce steady income, not growth. [FN11] Aware of the limited prospect of increasing (or even maintaining) the Promote at its current level given the existing structure, the GP began considering ways to change the structure to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

one that would provide the GP with equivalent benefits. [FN12]

> FN11. The current structure requires Plum Creek to make increased cash
> distributions to the GP whenever the partnership issued new units, in order
> to maintain the GP's pro rata share of total distributions (the "Step Up").
> The Step Up effectively increases Plum Creek's incremental cost of equity
> capital, which reduces its ability to compete effectively for large
> acquisitions against other bidders which have a lower cost of capital.

> FN12. According to the complaint, the GP first considered (but did not
> pursue) the possibility of exchanging the Promote for limited partnership
> units. Plaintiff alleges that SPO wanted 23.3% of the Partnership Units. The
> GP's Management, and Messrs. Leland, Davidson, and Dennison, dropped the idea
> because they believed that they would never obtain Unitholder approval for an
> exchange at that high level. *See* Holley Dep. At 53-55, and Complaint, ¶ 23.

In late June 1997, the GP's management explored the possibility of converting the
Partnership into a real estate investment trust ("REIT"). In June and July 1997,
the GP met with Goldman, Sachs & Co. ("Goldman Sachs"), its investment banking
firm, to develop a REIT Conversion plan. [FN13] The plaintiff contends that during
these meetings the GP decided that the level of distributions it received,
including the Promote, should determine the magnitude of the equity interest it
would receive in the REIT Conversion. Plaintiff contends that this was why, despite
the decline in earnings in 1997 and 1998, the GP increased the distributions during
each of those years by depleting reserves that included borrowed funds. [FN14]

> FN13. *See* Pls. Ex. 21.

> FN14. Def. Br. at 28. In 1997, earnings declined more than 60%, but the GP
> increased the dividend from $0.505 per quarter per unit to $0 .55. In 1998,
> the dividend was increased to $0.57, which exceeded cash flow from operations
> by approximately 40%.

By January 20, 1998, after having conferred with Goldman Sachs, Morgan, Stanley &
Co., Inc. ("Morgan Stanley"), and Merrill Lynch, Pierce, Fenner & Smith ("Merrill
Lynch") the GP formulated a REIT Conversion proposal and presented it to all of the
GP's directors. The directors approved the concept, and on March 4, 1998, the GP
appointed a Special Committee (the "Committee") "to negotiate on behalf of the
Unitholders the consideration to be received by the [PC and its Management]...in
the REIT Conversion." [FN15] The members of the Committee were Messrs. Davidson,
Leland, and Dennison.

> FN15. Pls. Ex. 1, Proxy Statement at 35.

    E. The Committee's Deliberations and Purported "Negotiations"

*4 On March 17, 1998, the Committee met for the first time and retained legal and
financial advisors. At the Committee's request, the GP sent the Committee a list
(not intended as exhaustive) of law firms and investment bankers that did not have
"inappropriate ties" or conflicts with the GP or Plum Creek. [FN16] The Committee
ultimately selected Morgan, Lewis & Bockius ("Morgan Lewis") as its legal counsel,
and Salomon Smith Barney ("Salomon") as its financial advisor. [FN17]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS    Document 48-12    Filed 03/06/2006    Page 22 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN16. *See* Pls. Ex. 10.

FN17. The plaintiff contends that Salomon was not independent, because it acted as an underwriter for Plum Creek's 1996 public offering, where it earned approximately $1.16 million in fees. Not surprisingly, Salomon admitted to having a desire to continue to do business with Plum Creek in the future. Martin Dep. at 17-18, 20-21; Pls. Ex. 1, Proxy Statement at 45.

Also at this meeting, Goldman Sachs (on behalf of SPO) submitted an outline of the proposed transaction where Plum Creek would be converted from a partnership to a REIT, and the GP's interest (including the Promote), would be exchanged for equity in the REIT. The transaction was designed to ensure that SPO would retain control of the REIT's board of directors. Using as a benchmark Plum Creek's recent distribution history as well as future projections based on those figures, SPO demanded a 30% equity share in the REIT. [FN18] To support that percentage, Goldman Sachs used highly favorable projections of future earnings and acquisitions. [FN19]

FN18. *See* Pls. Ex. 1, Proxy Statement at 31.

FN19. As for earnings, Goldman Sachs characterized Management's forecast in the 1997 Plan as too conservative, and increased Plum Creek's projected earnings from 5% to (in one analysis) an annual growth rate above 10%. As for acquisitions, Goldman Sachs assumed that Plum Creek would acquire as many as 10 timber companies, one each year for the next ten years, at a cost of $5 billion, on terms that would earn a return on equity in excess of 17%. Plum Creek's current asset value, however, is less than $2 billion, and Plum Creek earns approximately 9% on its equity. Goldman Sachs also assumed that acquisitions would be made using 65% debt and 35% equity (even though Plum Creek's most recent acquisition was made entirely with debt), thereby increasing the equity base (and benefiting the GP) with every assumed acquisition. *See* Pls. Ex. 13.

The Committee and its advisors found this proposal unacceptable, because the distributions to the GP were subject to more volatility than were the distributions to the Unitholders, and because the 30% proposal did not adequately take into account the (negative) value of the illiquidity of the GP's interest in the partnership that would be converted into REIT shares. [FN20]

FN20. The GP, which can only sell its *entire* interest with a 2/3 approving vote of the Unitholders (it cannot sell a portion of its interest) *see* partnership agreement, ¶ 11.2, would receive a substantial economic advantage if its illiquid partnership interest were exchanged for marketable shares of the REIT, particularly because that exchange would not be a taxable event. Merrill Lynch found a 5% to 10% discount to be appropriate. Holley Dep. at 56-57. Other empirical studies have shown that at least a 20% illiquidity discount rate would be appropriate. *See* William L. Silber, *Discounts in Restricted Stock: The Impact of Liquidity on Stock Prices*, Financial Analysts Journal, July/August 1991, p. 60-64.

The Committee ultimately rejected this initial offer, but did not attempt to negotiate better terms with the GP or SPO, and it made no counteroffer. Mr. Leland, the Committee chairman, explained that the Committee was not involved in a negotiation process; [FN21] instead, its role was to accept or reject offers, and none

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS Document 48-12 Filed 03/06/2006 Page 23 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

of its members ever had any face-to-face meetings with SPO. [FN22] All relevant exchanges of information between the Committee and SPO were communicated by Mr. Holley and Merrill Lynch at the insistence of SPO. [FN23] Mr. Holley and other members of Management attended and participated in every Special Committee meeting and were privy to its deliberations. [FN24]

> FN21. Leland Dep. at 51.
>
> FN22. Leland Dep. at 51; Patterson Dep. at 107-08; Martin Dep. at 92. The evidence also supports a finding that Salomon did not participate in any face-to-face meetings with the SPO Group either.
>
> FN23. Holley Dep. at 111; Martin Dep. at 92-93; Weingart Dep. at 36 (Merrill Lynch representative). The May 5, 1998 Committee meeting minutes pertinently state that: "SPO wanted for the Special Committee to authorize Mr. Holley to present transaction proposals to SPO on behalf of the Special Committee." *See* Pls. Ex. 9 (May 6, 1998 Committee meeting minutes).
>
> FN24. *See* Pls. Ex. 9 (Committee meeting minutes). In fact, Kraft (the GP's Vice President and General Counsel), kept the minutes of a majority of the Committee meetings.

On May 15, 1998, SPO (through Goldman Sachs) submitted a second proposal, in which the GP's interest would be converted into 27% equity in the REIT Conversion. Many of the same assumptions underlying the first proposal were used to formulate the second. Both Salomon and Merrill Lynch based their cash flow calculations on the assumption that Plum Creek would make up to six acquisitions worth $500 million each. [FN25] Salomon's fairness opinion assumed that Plum Creek would engage in at least one $500 million acquisition that generated a return of 17%. Salomon and Merrill Lynch used the same discount rate to value the Promote and the limited partners' interests. In determining the exchange ratio for converting the GP's partnership interest into an interest in the REIT, neither the Committee nor its advisors applied any illiquidity discount in computing the value of the GP's interest in Plum Creek.

> FN25. Pls. Ex. 1, Proxy Statement at 44, 47.

*5 On June 5, 1998, the Committee agreed to accept the second proposal. Its terms were as follows: the partnership would be merged into a wholly owned subsidiary of the REIT, and the GP (i) would receive a 27% equity interest in the REIT, represented by 16,498,709 REIT shares and 634,566 shares of special voting stock that is convertible to common stock; (ii) would be entitled to nominate a majority of the REIT directors, the remainder to be nominated by a committee that the GP also controlled; and (iii) would be entitled to a veto, by virtue of its special voting stock, over specified transactions including mergers and asset sales. [FN26] Salomon and Merrill Lynch rendered fairness opinions that the transaction would be fair to the Unitholders from a financial point of view. Those opinions relied principally upon discounted cash flow analyses based upon projections of the REIT's future operations and income. [FN27]

> FN26. On July 14, 1998, the Special Committee agreed to a change in terms of the REIT Conversion (the "July Modification"). Under the original June 5, 1998 agreement, the GP's interest would be exchanged for units of an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

operating partnership that would be wholly owned by the REIT and would be exchangeable into REIT shares only after one year had passed (the "Lock Up"). The July Modification eliminated the Lock Up to provide immediate liquidity for the GP, which would immediately receive REIT shares.

FN27. Pls. Ex. 1, Proxy Statement at 42-48, Annex III and Annex IV.

From that point on, all that remained to be done was to obtain the 2/3 supermajority approval of the Unitholders.

## F. The Litigation

On September 11, 1998, the plaintiff commenced *Sonet I,* claiming that the terms of the REIT Conversion were substantively unfair to the Unitholders and that in negotiating and approving that transaction, the GP had breached its fiduciary duties to the partnership and the limited partners. As earlier noted, the Chancellor dismissed that action on the ground that the governing instrument-the partnership agreement-defined the duties that the GP owed to the limited partners. The Chancellor found that the GP had not violated those duties. [FN28] He held that the plain language of the partnership agreement authorized the GP to "propose a merger on *any* terms, and that if the Unitholders are displeased with those terms they are free to reject it." [FN29] The Chancellor also held that the GP did not voluntarily import common law fiduciary duties into its relationship with the Unitholders by having appointed the Committee to oversee the transaction. [FN30]

FN28. *Sonet I, supra* note 1, at 5 (holding that "principles of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain.").

FN29. *Id.* at 19.

FN30. *Id.*

On January 26, 1999, Plum Creek released its financial results for 1998, [FN31] disclosing that (i) fourth quarter earnings were $0.29 cents per Unit, a decline from the $0.35 cents per Unit for the same period in 1997; and (ii) earnings for the entire year were $0.90 cents per Unit, compared to $1.72 for the previous year. These figures fell short of the 1998 earnings ($1.45 per Unit) projected in Plum Creek's 1997 Plan. Despite that, Plum Creek announced that it was distributing $0.57 cents per unit to Unitholders for the fourth quarter. When this amount is added to the distribution made to the GP, the total distribution was $0.73 per Unit-almost three times earnings.

FN31. *See* Pls. Ex. 18.

On January 28, 1999, the defendants issued their Proxy Statement soliciting Unitholder approval of the REIT Conversion at a special meeting noticed for March 22, 1999. This action followed.

## II. THE CONTENTIONS

The thrust of the plaintiff's claims in this action is that the Proxy Statement and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d 105-cv-00327-GMS    Document 48-12    Filed 03/06/2006    Page 25 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

the accompanying Holley Letter are misleading in three material respects. *First,* plaintiff argues that the Proxy Statement falsely represents that the transaction was negotiated on behalf of the Unitholders by the "independent" Committee, assisted by its advisors (the "Process" claim). In fact, plaintiff contends, neither the Committee nor its advisors were independent of the GP, and the Committee did not engage in any negotiations at all.

\*6 *Second,* plaintiff contends that the Proxy Statement creates the misleading impression that the GP's proposed 27% equity interest in the REIT is fair because it is commensurate with the increasing share of distributions the GP would be expected to receive under the Promote (the "Fairness" claim). In fact, plaintiff urges, Plum Creek's earnings, cash flow, and business prospects have been in a free fall decline since late 1996, and are unlikely to rebound for several years due largely to the depressed Japanese economy. As a result, the current distribution levels are unlikely to rise and are unsustainable at their present levels. Importantly, the plaintiff claims that the GP manipulated the distributions for years 1997 and 1998 in order to increase the value of its interest in Plum Creek, to justify awarding itself a larger interest in the REIT. These facts, the plaintiff claims, were not honestly and straightforwardly disclosed to the Unitholders.

*Third,* the plaintiff maintains that the Proxy Statement misrepresents the nature and extent of the risks to Unitholders if the REIT Conversion is approved (the "Risk" claim). Specifically, the plaintiff contends that in the Proxy Statement and Holley Letter the GP prominently (and misleadingly) touted the benefits of the REIT Conversion, but downplayed the "risks" by burying them deep within those documents. The result was to create the misleading impression that approving the REIT Conversion would involve little or no risk.

The defendants respond by arguing that the disclosures in the Proxy Statement were truthful and complete. For the reasons next discussed, I am persuaded that the Process and Fairness claims have merit and warrant enjoining the Unitholder vote until such time as corrective disclosures are made. The Risk claim, however, I find to be without merit.

### III. APPLICABLE LEGAL STANDARDS

To succeed on a motion for a preliminary injunction, the plaintiff must show a reasonable probability of success on the merits, irreparable harm, and a balance of equities in the plaintiffs' favor. [FN32] In this case the defendants do not dispute that if they are found to have committed disclosure violations, the irreparable harm and "balance of equities" criteria are satisfied. Therefore, the sole focus is upon whether the plaintiff has shown a probability of success on the merits.

FN32. *SI Management L.P. v. Wininger,* Del.Supr., 707 A.2d 37, 40 (1998); *Kaiser Aluminum Corp. v. Matheson,* Del.Supr., 681 A.2d 392, 394 (1996); *Allen v. Prime Computer, Inc.,* Del.Supr., 540 A.2d 417, 419 (1998).

The relevant merits analysis is governed by well established principles. When controlling persons seek shareholder approval of a transaction, they have a fiduciary duty to honestly provide full and fair disclosure of all material facts relating to that transaction. [FN33] That proposition is equally applicable to fiduciaries of limited partnerships. The burden is on the fiduciary to demonstrate that all material facts were disclosed. [FN34] Where, as here, the lone source of the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
Case 1:05-cv-00327-GMS    Document 48-12    Filed 03/06/2006    Page 26 of 33

disclosure is a fiduciary having a conflicting interest, "a more compelling case for the application of the recognized disclosure standards" is presented. [FN35] In that context, the materiality standard remains unchanged, but the scrutiny of the disclosures made in that context is more exacting. Where a party is found to have disseminated materially misleading information to stockholders (or in this case, Unitholders), preliminary injunctive relief requiring curative disclosure may be awarded. [FN36]

FN33. *Malone v. Brincat,* Del.Supr., 722 A.2d 5 (1998) (holding that "when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty."); *Stroud v.. Grace,* Del.Supr., 606 A.2d 75 (1992); *Weinberger v. U.O.P., Inc.,* Del.Supr., 457 A.2d 701 (1983).

FN34. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 937 (1985).

FN35. *Wacht v. Continental Hosts, Ltd.,* Del. Ch., C.A. No. 7954, mem. op. at 7, Berger, V.C. (Apr. 11, 1986) (involving a cash-out merger); *see also In re Radiology Assoc., Inc. Litig,* Del. Ch., C.A. No. 9001, Chandler, V.C. (May 16, 1990) (involving cash-out merger); *Blanchette v. Providence & Worcester Co.,* D.Del., 428 F .Supp. 347, 354-356 (1997) (Exchange offer); *Barkan v. Amsted Indus ., Inc.,* Del. Ch., 567 A.2d 1279 (1989) (Management buyout); *Eisenberg v. Chicago Milwaukee Corp.,* Del. Ch., 537 A.2d 1051, 1057 (1987) (Self-tender offer).

FN36. *See Eisenberg,* 537 A.2d at 1062 ("An injunction is the remedy most likely to achieve disclosure of the information necessary to achieve an informed decision..."); *Sealy Mattress Co. of N.J. v. Sealy, Inc.,* Del. Ch., 532 A.2d 1324, 1340-41 (1987) ("[P]laintiffs have not received sufficient information to make an informed decision among the available alternatives.... In this case the inability to make that choice constitutes irreparable harm.").

\*7 A fact is material if (i) "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote"; (ii) "would have assumed actual significance in the deliberations of the reasonable shareholder"; or (iii) would have "significantly altered the 'total mix' of information made available." [FN37] Misleading partial disclosures may also constitute a material omission or misstatement. [FN38] As analogous federal securities cases recognize, in certain contexts even literally true statements in a disclosure document may be misleading. [FN39]

FN37. *Arnold v. Society For Savings Bancorp.,* 650 A.2d 1270, 1276 (1994).

FN38. *Id.* at 1280.

FN39. *Lucia v. Prospect Street High Income Portfolio, Inc.,* 1st Cir., 36 F.3d 170, 175 (1994) ("[e]mphasis and gloss can, in the right circumstances, create liability"); *McMahon v. Wherehouse Entertainment, Inc.,* 2d Cir., 900 F.2d 576, 579 (1990), *cert. denied,* U.S.Supr., 501 U.S. 1249 (1991); *Isquith v. Middle South Utilities, Inc.,* 5th Cir., 847 F.2d 186, 201-03, *cert. denied,* U.S.Supr., 488 U.S. 926 (1988).

Applying these well-established standards, the Court turns to the plaintiff's three

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported :05-cv-00327-GMS    Document 48-12    Filed 03/06/2006    Page 27 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

disclosure claims.

#### IV. ANALYSIS

##### A. The "Risk" Claim

The plaintiff first contends that although the benefits of the REIT conversion were prominently described in the Holley Letter, the risks inherent in the REIT Conversion were "buried" deep within the Proxy Statement, thereby misleading the Unitholders on a material issue. It is the case that if material information facts are buried in a lengthy disclosure document so that the true import of that information is lost, such "buried fact" disclosure may be deemed misleading. [FN40] In this case, however, the argument is unpersuasive, because the facts do not fit the principle.

    FN40. *Blanchette,* 428 F.Supp. at 353.

On the very first page of the Proxy Statement the following language appears in large bold-faced type: "Unitholders should consider each of the factors described under 'Risk Factors,' starting on page 17, when deciding how to vote on the Conversion Transaction." [FN41] On pages 17-21, there follows a detailed disclosure of various risks inherent in the REIT Conversion, including transaction risks, tax risks, and other risks inherent in the partnership and the corporation's ongoing business. [FN42] A further discussion of tax related issues and risks is found at pages 57-68. These risk disclosures in the Proxy Statement, though complex and intricate, are not materially misleading to a Unitholder, nor are they "buried" in a way that a Unitholder in search of explanations of the risks would be unable to find them.

    FN41. Pls. Ex. 1, Proxy Statement at 1.

    FN42. The list of disclosed risks includes: (i) the conflict of interest in determining the GP's appropriate percentage of equity in the REIT; (ii) the benefits that would belong solely to the GP's partners; (iii) the *Sonet I* Court of Chancery litigation, and the resulting appeal; (iv) the absence of appraisal rights for dissenters; (v) the potential limits on third party changes in control; (vi) the potential limits on the current acquisition strategy; (vii) the substitution of trading of common stock for Units; (viii) potential future dilution due to future share sales; (ix) the difference in investment risks for this corporation as opposed to typical REIT investments; (x) the chance that the corporation will not qualify as a REIT, and the attendant tax consequences; (xi) lender consents; (xii) the potential disadvantages to conducting business as a REIT; (xiii) other potential tax risks; and (xiv) risks specific to the timber industry.

Nor does the Holley Letter omit to disclose or emphasize the risks inherent in the REIT Conversion. [FN43] The letter specifically admonishes the Unitholders that "the conversion is not without risks, and all factors-positive and negative-should be weighed carefully...." [FN44] On this record, I am unable to find (as plaintiff contends) that the Proxy Statement or the Holley Letter omits to disclose, or imposes a misleading "spin" on, the risks that inhere in the REIT Conversion.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d: 05-cv-00327-GMS   Document 48-12   Filed 03/06/2006   Page 28 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN43. Pls. Ex.1, Holley Letter at 3.

FN44. Pls. Ex. 1, Holley Letter at 4.

B. The "Process" Claim

The plaintiff next claims that the Proxy Statement and Holley Letter misdisclose, in several respects, the process leading to the decision to proceed with the REIT Conversion. In essence, the claim is that the Proxy Statement creates a false impression that an independent negotiating committee was established to-and did-negotiate a fair transaction on behalf of the Unitholders. That impression is said to be materially false and misleading because: (i) in fact, the Committee did not "negotiate" any of the terms of the Conversion; (ii) in fact, the Committee members were not independent; (iii) in fact, the Committee's advisors were selected by the GP's management, were not independent, and played only a minimal role in the transaction; and (iv) in fact, SPO, not Plum Creek, originally proposed the REIT Conversion. I conclude that the first two of these arguments are meritorious, and that the latter two are not.

\*8 *First,* the impression that the interests of the Unitholders were adequately represented is created throughout the Holley Letter and the Proxy Statement. The Holley Letter discloses that: "This [27% equity of the REIT] amount was *negotiated* by a special committee of members of the PCMC Board who are not employees of, and do not own an interest in, PCMC (the "PCMC Special Committee")." [FN45] The Letter also states that "the PCMC Special Committee was charged by the PCMC Board with the responsibility to *negotiate solely on behalf of the Unitholders in order to mitigate the conflict of interest* between the PCMC Board as a whole and the Unitholders." [FN46]

FN45. Pls. Ex. 1, Holley Letter at 2 (emphasis added).

FN46. *Id.* (emphasis added).

The Proxy Statement disclosures are to the same effect. For example, the Unitholders are told that the Committee was appointed to "*negotiate* the amount of such consideration [to be paid to the GP] on behalf of the Unitholders" and "was charged by the PCMC Board with the responsibility to *negotiate solely* on behalf of the Unitholders." [FN47] Elsewhere, after informing the Unitholders that the Committee members owed fiduciary duties to both the Unitholders and the PCMC stockholders, the Proxy Statement discloses that "the...Committee was charged by the PCMC Board with the responsibility to *negotiate solely on behalf of the Unitholders in order to mitigate the conflict of interest* between the PCMC Board as a whole and the Unitholders." [FN48]

FN47. Pls. Ex. 1, Proxy Statement at 6 (emphasis added). The Proxy Statement contains nearly identical statements on pages 7, 17, 32, 35, 37, 43, and 45.

FN48. Pls. Ex. 1, Proxy Statement at 35 (emphasis added); *see also* Proxy Statement at 29 (noting that the Committee was created in order to "mitigate the potential conflict of interest that might exist between PCMC and the Unitholders.").

What actually did occur, however, was not negotiation. [FN49] Mr. Leland, the Committee chairman, viewed his job not as negotiation, but as "accepting or rejecting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported 1:05-cv-00327-GMS    Document 48-12    Filed 03/06/2006    Page 29 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

offers." Mr. Davidson, another Committee member, testified that he never had face-to-face negotiations with the GP. Mr. Patterson, a GP representative, confirmed that no representative of the GP had negotiated the conversion directly with the Committee. Smith Barney, the Committee's financial advisor, played no role in the negotiations. Indeed, the only persons who had any face-to-face contact with members of the GP during the negotiation process were Mr. Holley and Merrill Lynch. But Mr. Holley was the CEO of the *GP*, and Merrill Lynch was the financial advisor for the *GP*. These facts should have been, but were not, clearly disclosed to the Unitholders.

> FN49. Negotiation on the part of a special committee involves more than simply rejecting proposals that are deemed unacceptable. *See Kahn v. Lynch Communications Sys., Inc.,* Del.Supr., 638 A.2d 1110, 1121 (1994) (holding that a special committee must replicate a process involving arm's length bargaining); *Rabkin v. Philip A. Hunt Chemical Corp,* Del.Supr., 498 A.2d 1099, 1106 1985 (refusing to dismiss complaint challenging fairness of transaction where special committee failed to conduct meaningful negotiations as to price); *In re Trans World Airlines, Inc. Shareholder Litig.,* Del. Ch., C.A. No. 9844, mem. op. at 12, 21-22, Allen, C. (Oct. 21, 1988) (finding that special committee "did not adequately understand its function-to aggressively seek to promote and protect minority interests," did not "strive to negotiate the highest or best available transaction for the shareholders," and failed to engage in "energetic, informed and aggressive negotiation that one would reasonably expect from an arm's-length adversary."); *In re Maxxam, Inc. Federated Development Shareholders Litig.,* Del. Ch., C.A. No. 12111, mem. op. at 69, Jacobs, V.C. (Apr. 4, 1997) (refusing to give deference to special committee's determination because of lack of evidence that members "aggressively negotiated on Maxxam's behalf).

Thus, the repeated disclosures that the Committee had negotiated the terms of the REIT Conversion on behalf of the Unitholders created a materially misleading impression that the Committee had engaged in "energetic, informed, and aggressive" negotiations to "mitigate" the conflict of interest between the PCMC Board and the Unitholders. That impression was, if not false, highly misleading.

*Second,* the Proxy Statement discloses, in twenty different places, that the Committee members were independent of the GP. That disclosure is also misleading. [FN50] The record shows that (i) Mr. Davidson owns a brokerage firm that does business with the GP and wishes to continue that business relationship; (ii) Mr. Leland receives compensation for serving as board chairman of the GP, plus $24,000 annually for the maintenance of a car supplied for his personal benefit. [FN51] Salomon, the Committee's financial advisor, was an underwriter for Plum Creek's 1996 public offering and, with commendable candor, admitted that it desired to continue its business relationship with the GP in the future. And although he was not a Committee member, Holley (the Committee's emissary to the GP) was the GP's President and CEO, and received a $450,000 salary from Plum Creek at the discretion of the GP. Given these facts, it was misleading to portray the Committee as "independent" of the GP.

> FN50. *See e.g.,* Pls. Ex. 1, Proxy Statement, at 29 (stating that Davidson, Leland, and Dennison were "not employees of and do not own any interest in" the GP).

> FN51. The evidence does not support the plaintiffs' contention that Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Case 1:05-cv-00327-GMS    Document 48-12    Filed 03/06/2006    Page 30 of 33
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Dennison had significant financial ties to the GP. All that the plaintiff
established is the possibility that the GP might make a contribution to the
University of Montana of which Mr. Dennison is President. That is not
sufficient to establish that Mr. Dennison is conflicted.

*9 For these reasons, and in these respects, I find that the disclosure documents
were materially misleading to the Unitholders. [FN52]

> FN52. The plaintiff's other Process claims are without merit. Management's
> involvement with the Committee's activities were sufficiently disclosed in
> the Proxy Statement. *See* Pls. Ex. 1, Proxy Statement at 30. Management did
> not select the Committee's advisors; Salomon and Morgan Lewis were selected
> by the Committee after the GP (at the *Committee's* request) furnished the
> Committee with a list of financial and legal advisors that would not have
> conflicts or "inappropriate ties" with the GP or Plum Creek. The roles of the
> various financial and legal advisors were also adequately described in the
> Proxy Statement. As for the argument concerning the origin of the of the REIT
> Conversion proposal, although the Proxy Statement is not a model of clarity
> on this point, it is not materially misleading. *See* Pls. Ex. 1, Proxy
> Statement at 29-30 ("In September 1997, *Management* began to focus on the
> possibility of converting the Partnership to a REIT...based on preliminary
> research conducted *by and on behalf* of the Partnership that commenced in July
> 1997.") (emphasis added).

### C. The "Fairness" Claim

Lastly, the plaintiff claims that the Proxy Statement omitted to disclose, and also
disclosed in a misleading manner, material facts relating to the fairness of the
REIT Conversion. To understand the precise claim being advanced here, some
background is helpful.

In *Sonet I,* the plaintiff claimed that the proposed REIT Conversion is
substantively unfair and represents a breach of fiduciary duty to the Unitholders
to the extent that it would enlarge the GP's interest in the partnership from 2%
(plus the Promote) to 27% of the equity of the REIT. That proposed allocation was
claimed to be substantively unfair, because the partnership's historical (and
likely future) economic performance did not justify a valuation of the GP's
partnership interest that translates to a 27% ownership interest in the counterpart
REIT. As earlier noted, the Chancellor found that this claim was not cognizable
because the issue was governed by contract law, not fiduciary law, and because the
partnership agreement permitted a transaction of this kind provided that it is
approved by two-thirds of the outstanding Units.

In this action the plaintiff contends that the same facts that underlie the
substantive fairness claim also give rise to a disclosure violation. The Proxy
Statement, it is argued, omits to disclose certain material facts, and obscures
other material facts, that if disclosed, would likely cause Unitholders to question
the fairness of the 27% allocation of REIT equity to the GP that they are being
asked to approve. That allocation was based in part upon the value of a future
stream of distributions that the GP would receive under its current contractual
arrangements. That value, in turn, was predicated upon the level of distributions
the GP had received in the past, particularly during the past two years.

Those past distributions are the root of the disclosure problem. As plaintiff
contends, the 1997 and 1998 distributions were not only at a record high, but also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were increasing at the same time that the partnership's earnings were plummeting. If distributions depended solely upon the level of partnership earnings, those distribution levels would also have declined, yet instead they increased. This was possible only because the distributions are payable out of "Available Cash," which the partnership agreement allows to be augmented by cash drawn down from reserves. That, the plaintiff claims, is what occurred here. The high distribution levels of 1997 and 1998-which were inverse to the earnings levels in those same years-occurred only because of a manipulation, namely, depleting reserves (including a reserve for working capital) and treating the resulting proceeds as "Available Cash" available for distributions.

The plaintiff contends that those actions, although permitted by the partnership agreement, must be fully and fairly disclosed to the Unitholders. Otherwise the Unitholders will be left with the impression that the earlier distributions were reflective of the partnership's economic performance and, thus, a valid basis to project high distribution levels in the future. That impression is false and materially misleading, plaintiff argues, because the decline in the demand for the partnership's forestry products due to the depressed Japanese market is a long term reality that points to a lower, not higher, level of projected earnings and distributions. Because the GP's 27% interest in the proposed REIT was tied to the higher, more aggressive projections, it was vital that the Unitholders be told that the 1997 and 1998 distributions that formed the basis for those projections were artificially high to the extent they included cash depleted from reserves that were created in earlier years when earnings levels were higher. [FN53]

> FN53. The plaintiff also claims that the Proxy Statement is misleading because (i) it fails to disclose that the recommendation by GP management and the Special Committee that the REIT Conversion is fair, relies upon stale, i.e., six month old, fairness opinions by Salomon and Merrill Lynch, and (ii) the valuation supporting the 27% allocation of equity to the GP relies upon aggressive and unrealistic assumptions about the number and dollar level of acquisitions that the REIT will make in the future. I find these arguments lacking in merit, because they are essentially substantive fairness, not disclosure, claims. The Proxy Statement attaches the full text of the fairness opinions, which show the dates on which they were submitted. Plaintiff's argument, in truth, is that the GP had a fiduciary duty to obtain updated fairness opinions, especially given the further decline in the partnership's earnings after the June 1998 fairness opinions were delivered. That contention, whatever its substantive merit may be, is not a disclosure claim and, hence, is not cognizable under Sonet I. As for the acquisition assumptions underlying the fairness opinions, they were disclosed in the Proxy Statement at pages 44, 47. That disclosure, in these circumstances, was sufficient.

*10 The defendants' response is that all the facts material to the prior distributions were fully disclosed. They point to the following language in the Proxy Statement:
The Partnership makes distributions to Unitholders and PCMC with respect to each calendar quarter in an amount equal to 100% of its Available Cash (as defined below) from operations for each quarter. Available Cash generally means, with respect to any quarter, the net income of the Partnership for such quarter plus certain non-cash items plus reductions to reserves less certain capital expenditures, principal payments on indebtedness and additions to reserves. PCMC's decisions regarding amounts to be placed in or released from reserves have a direct and significant impact on the amount of Available Cash because increases and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decreases in reserves are taken into account in computing Available Cash. [FN54]

FN54. Pls. Ex. 1, Proxy Statement at 12.

The defendants also point to the Proxy disclosure (at page 13) that "[t]he Partnership has been able to increase and maintain its current level of distributions notwithstanding a reduction in its level of profitability during the past four quarters..."; and to disclosure (at page 19), that:
Finally, Unitholders should be aware that the Partnership's earnings and earnings per Unit for the quarter and year ended December 31, 1998 were each lower than the corresponding periods in 1997. See "Summary-Recent Developments-Results of the Quarter and Year Ended December 31, 1998." Despite this decline in earnings and the anticipated continued adverse impact of current economic conditions on the Partnership's business, Management anticipates that the current quarterly cash distribution level is sustainable; however, future distribution levels by the Partnership and, following the [REIT] Conversion..., future dividends by the [REIT] will depend on results of operations, cash flow and capital requirements, economic factors and other factors. See"-Risks Inherent in the Partnership's and the Corporation's Ongoing Business-Cash Distributions Are Not Guaranteed and May Fluctuate."

The above disclosures do set forth material facts concerning the distributions, and certainly go a long way. Unfortunately, in these circumstances, they do not go far enough. It is true, and the Proxy Statement does disclose, that (i) the level of reserves are within the GP's control and will impact the Available Cash from which distributions are made, and (ii) during the period that the partnership's earnings were declining, the level of distributions for those years did not. But what the Proxy Statement should have disclosed (but did not) was the reason why those distributions ran in a direction counter to its earnings-the distributions included cash derived from depleting reserves that had been created and augmented in earlier, higher earning, years.

Given the direct relationship between these distribution levels and the valuation that formed the basis of the GP's proposed 27% equity interest that the Proxy Statement proclaims is fair to the Unitholders, it is vital that the Unitholders be told that those distributions were, in this manner, kept artificially high. Disclosing this material information would provide an important piece of an otherwise incomplete picture. The Unitholders need this information to assess whether the proposed 27% equity allocation to the GP is, in fact, fair.

*11 This Court takes no pleasure in holding up a transaction to require further disclosure, especially where a finely crafted Proxy Statement otherwise sets forth at great length many facts that are material to the REIT Conversion. This result is, however, a logical consequence of the ruling in *Sonet I* and the defendants' litigating position which prompted that ruling. The result is also compelled by sound policy.

In *Sonet I*, the Chancellor held that in this specific partnership agreement, the Unitholders had contracted away their right to seek judicial review of the REIT Conversion based upon substantive fiduciary duty principles. In its place, the parties' contract substituted the protection of a required two-thirds supermajority

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unitholder approval of the transaction. The result was to shift the fiduciary duty focus from the domain of substantive fairness to the realm of full, honest, and complete disclosure.

In these circumstances, and given the nature of this transaction, those disclosure duties are and should be exacting. As was the case in *Blanchette* and *Eisenberg,* [FN55] the REIT Conversion is a transaction where the fiduciaries responsible for the disclosures have an economic interest that is adverse to the interests of their beneficiary investors, the Unitholders. The GP and Management, who conceived and initiated the transaction and controlled the process by which it came to be recommended to the Unitholders, have an interest in maximizing their percentage ownership of the new REIT entity. That can only occur at the expense of the Unitholders, whose interest is in minimizing the percentage ownership of the GP. Because (under *Sonet I* ) the Unitholders have no judicial review remedy, their sole protection is their right to vote the proposal up or down. And because the only source of the facts that will inform that vote are conflicted fiduciaries (the GP), only a most stringent disclosure standard, enforced by careful judicial scrutiny, can assure that the Unitholders' right to vote will have meaning. In this case the disclosures fell short of that standard and, as a consequence, the Unitholders are entitled to injunctive relief that will cure the informational gap.

FN55. *See supra* note 35.

## V. CONCLUSION

In a transaction of this kind, the appropriate form of relief is to enjoin the forthcoming vote on the proposed REIT Conversion until the defendants have cured the disclosure deficiencies of the Proxy Statement and Holley Letter, by issuing a supplemental disclosure that is consistent with the rulings in this Opinion. [FN56] Counsel shall promptly confer and submit an appropriate form of order.

FN56. *Eisenberg,* 537 A.2d at 1062-63.
Del.Ch.,1999.
Sonet v. Plum Creek Timber Co.
Not Reported in A.2d, 1999 WL 160174 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.