32

**CHARLES STANZIALE, Plaintiff, v. MORRIS NACHTOMI, et al., Defendants.**

**Civil Action No. 01-403 KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*330 B.R. 56; 2004 U.S. Dist. LEXIS 7375*

**April 20, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Stanziale v. Nachtomi, 2004 U.S. Dist. LEXIS 15664 (D. Del., Aug. 6, 2004)*
Affirmed in part and reversed in part by *Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 2005 U.S. App. LEXIS 15942 (3d Cir. Del., Aug. 3, 2005)*

**DISPOSITION:** [**1] Defendants' Motion granted.

**COUNSEL:** John L. Reed, Esq., Duane Morris LLP, Wilmington, Delaware, Counsel for Plaintiff.

Bruce E. Jameson, Esq., Prickett Jones & Elliott, Wilmington, Delaware. James E. Tolan, Esq., Rodney M. Zerbe, Esq., Dechert Price & Rhoads, New York, New York. P. Gregory Schwed, Esq., Loeb & Loeb LLP, New York, New York. Robert M. Kaplan, Esq., Robson Ferber Frost Chan & Eisner, New York, New York, Counsel for Defendants.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

[*58] **MEMORANDUM OPINION**

DATE: April 20, 2004
Wilmington, Delaware

**JORDAN, District Judge**

**I. Introduction**

Presently before the court is a motion (Docket Item ["D.I."] 22; the "Motion") filed by defendants Morris K. Nachtomi ("Nachtomi"), Stephen L. Gelband ("Gelband"), Stephen A. Osborn ("Osborn"), Henry P. Baer ("Baer"), Leo-Arthur Kelmenso ("Kelmenso"), Eli J. Segal ("Segal"), and Terry v. Hallcom ("Hallcom") (collectively the "Defendants"), seeking to dismiss this action pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief may be granted.

The Complaint filed by Charles [**2] A. Stanziale, Jr. (the "Plaintiff"), in his capacity as Chapter 7 Trustee of Tower Air, Inc. (the "Debtor"), alleges that the Defendants, as directors and officers of the Debtor, breached their fiduciary duties of loyalty, care, and good faith, and that their acts or omissions to act constituted gross [*59] negligence, mismanagement and corporate waste. (D.I. 19.) The Plaintiff seeks compensatory damages, consequential damages, punitive damages, interest, and costs. (*Id.*)

The court has jurisdiction over this case pursuant to *28 U.S.C. § 1334*. For the reasons set forth herein, the Motion will be granted.

**II. Background** n1

n1 The following rendition of the background information for my decision is cast in the light most favorable to the non-moving party, the Plaintiff.

Nachtomi founded the Debtor in 1982. (D.I. P18.) The Debtor began operations primarily as a charter airline offering chartered international flights for private, government, and military customers. (*Id.* at P19.) [**3] Eventually, the Debtor offered scheduled passenger service, and by 1998, scheduled passenger service accounted for approximately two-thirds of the Debtor's total revenue. (*Id.* at P20.) By 1999, the Debtor maintained and operated a fleet of jet airliners consisting of 14 passenger aircraft and three cargo aircraft, and had more than 1,700 employees worldwide. (*Id.* at PP23-24.)

On February 29, 2000, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, *11 U.S.C. § 1101 et seq.*, in the Bankruptcy Court for the District of Delaware. (*Id.* at P7.) Plaintiff was

Case 1:05-cv-00327-GMS    Document 48-13    Filed 03/06/2006    Page 3 of 50

Page 2

330 B.R. 56, *; 2004 U.S. Dist. LEXIS 7375, **

appointed as the Chapter 11 Trustee for the Debtor's bankruptcy estate on or about May 5, 2000. (*Id.* at P10.) On December 20, 2000, the case was converted to a proceeding under Chapter 7 of the Bankruptcy Code, *11 U.S.C. § 701 et seq.* (*Id.* at P7), and the Plaintiff was appointed as Chapter 7 Trustee for the Debtor's bankruptcy estate.

Nachtomi has been a director of the Debtor since 1982, the Debtor's President from 1986 until January 1998 and again since July 1998, and Chairman of the Board of Directors and Chief Executive [**4] Officer of the Debtor since 1989. (*Id.* at P11.) n2 Nachtomi and members of his family owned a majority of the outstanding common stock and a controlling interest in the Debtor at all times relevant to Plaintiff's Complaint. (*Id.*) Defendants Osborn, Baer, Kelmenson, and Segal were at all times directors of the Debtor. (*Id.* at PP13-16.) Osborn was a director from May 1993 until the bankruptcy; Baer was a director from 1997 until the bankruptcy; Kelmenson was a director from 1997 until the bankruptcy; and Segal was a director from 1998 until the bankruptcy. (*Id.*) Gelband was a director of the Debtor from 1985 until bankruptcy, as well as the Debtor's Secretary and General Counsel from 1988 until bankruptcy. (*Id.* at P12.) Hallcom was the Debtor's President and Executive Vice President for Operations and a director from January through July 1998. (*Id.* at P17.)

n2 There is no indication in the record of when Nachtomi's service as an officer and director may have ended.

Plaintiff "brings this [**5] action in his capacity as the representative of the Debtor and of its estate and for the benefit of creditors of the Debtor and any other parties in interest." (*Id.* at P10.) In Count I, Plaintiff alleges that the Defendants, as directors of the debtor (collectively the "Directors"), breached their "fiduciary duties of loyalty, good faith and due care" by "leasing and/or financing the purchase of new jet engines rather than repairing and properly maintaining the Debtor's older engines." (*Id.* at P75.) In Count II, Plaintiff alleges that Nachtomi, Gelband, and Hallcom, as officers of the Debtor [**60] (collectively "the Officers"), breached their "fiduciary duties of loyalty, good faith and due care" by failing to fully inform the Board of Directors concerning the condition of the engines, the long-term financial ramifications of the failure to properly maintain the Debtor's older engines, the decision to lease and/or finance the purchase of new jet engines, and the problems with the Debtor's maintenance division, and by failing to maintain the engines and physical assets in good repair and condition. (*Id.* at P87.)

In Count III, Plaintiff claims that the Directors breached their [**6] "fiduciary duties of loyalty, good faith, and due care" by failing to adequately oversee and control the management and by failing to keep themselves informed. (*Id.* at P97.) In Count IV, Plaintiff contends that the Officers breached their fiduciary duties of "loyalty, good faith, and due care" by, among other things, failing to process used airline tickets for payment, failing to implement and maintain the proper oversight and control of ticket processing and operations, reducing fairs to unprofitable levels, expanding the Debtor's international routes during financial hardships, and ceding all management responsibility to Nachtomi. (*Id.* at P107.) In Count V, Plaintiff asserts that the Officers' acts and omissions caused "significant losses," and constitute "gross mismanagement of the Debtor's business, gross negligence, and a gross violation of Defendants' duties of due care to the Debtor." (*Id.* at PP117-118.) In Counts VI and VII, Plaintiff alleges that the Directors and Officers "wasted corporate assets to the financial loss and detriment of the Debtor's estate." (*Id.* at PP125-132.) n3

n3 Plaintiff does not state what specific actions by the Defendants constitute corporate waste. Presumably, the Plaintiff is relying on allegations in Counts I-V regarding the purchase and lease of new jet engines and the failure to repair old jet engines, the expansion of the Debtor's international routes, the reduction of fares, and the failure to process some of the airline tickets.

[**7]

### III. Standard of Review

In analyzing a motion to dismiss pursuant to *Fed. R. Civ. P. 12 (b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).* "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).*

### IV. Discussion

The Defendants argue that the Plaintiff's claims should be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* because "Plaintiff has failed to plead any basis for overcoming the protections" of the business judgment rule.

Case 1:05-cv-00327-GMS    Document 48-13    Filed 03/06/2006    Page 4 of 50

Page 3

330 B.R. 56, *; 2004 U.S. Dist. LEXIS 7375, **

(D.I. 23 at 18.) Under Delaware law, the business judgment rule operates as a presumption "that [**8] directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988).* "[A] Plaintiff[] may prevent the application of the business judgment rule within well-pleaded facts establishing that the directors acted out of self-interest." *In re General Motors Class E Stock Buyout Sec. Litig., 694 F. Supp. 1119, 1132 (D. Del. 1988)* (citing *Aronson v. [*61] Lewis, 473 A.2d 805, 812 (Del. 1984)).* Directors act in self-interest if they appear on "both sides of the transaction, or ... [derive] any personal financial benefit from it which did not devolve upon the corporation and the shareholders generally." *In re General Motors, 694 F. Supp. at 1132.*

In the Amended Complaint, Plaintiff alleges that the Defendants have acted in self-interest and engaged in self-dealing (D.I. 19 at PP97, 108), but has not alleged any facts to support this assertion. "Given that self-interest was not sufficiently alleged, in order to overcome the presumption of the business judgment [**9] rule, plaintiffs must allege with particularity facts which establish that the contested decision was not a product of valid business judgment." *In re General Motors, 694 F. Supp. at 1132. See also Brehm v. Eisner, 746 A.2d 244, 255 (Del. 2000)* (stating that "the issue is whether plaintiffs have alleged particularized facts creating a reasonable doubt that the actions of the defendants were protected by the business judgment rule").

**A. Count I**

In Count I of the Amended Complaint, Plaintiff has alleged that the business judgment rule is inapplicable because the Directors breached their fiduciary duties of loyalty, good faith, and due care by causing significant losses to the Debtor and to its estate through the decision to lease or purchase new jet engines rather than repair and properly maintain the Debtor's older jet engines. (D.I. 19 at PP75, 78-79). "In the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible ... for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1051 (Del. Ch. 1996).* [**10] As previously mentioned, Plaintiff does not sufficiently allege that the directors' decision was the product of self dealing or improper motive. A "theoretical exception" to the above-mention rule "holds that some decisions may be so 'egregious' that liability for losses they cause may follow even in the absence of proof of conflict of interest or improper motivation." *Id. at 1051-1052.* n4

n4 The court went on to say that the "exception, however, has resulted in no awards of money judgments against corporate officers or directors in this jurisdiction." *Gagliardi, 683 A.2d at 1052.*

Plaintiff alleges that the Directors resolved to borrow millions of dollars for the purchase of new jet engines and authorized the lease of new jet engines, while the Debtor still had debt associated with its older engines, and at the same time that Nachtomi reported that the Debtor was suffering a severe cash flow problem. (D.I. 19 at PP61-68.) Plaintiff also asserts that because the older engines [**11] were not repaired, a "significant diminution in their value as assets of Debtor" resulted. (*Id.*) According to Plaintiff, these decisions caused the Debtor to incur "substantial additional debt" and led to "significant losses" (*Id.; see also id.* at P81). While the directors' may, indeed, have exercised poor business judgment in borrowing and authorizing the purchase and lease of new jet engines, the facts that Plaintiff alleges, taken in the light most favorable to the Plaintiff, do not constitute such egregiously bad decisions as to abrogate the business judgment rule. *See Aronson, 473 A.2d at 812* (stating that an egregious, patently frivolous, or capricious act is one which "no person of ordinary sound business judgment would believe" to be rational and is an "abuse of discretion" not protected by the business judgment rule). A [*62] person of sound business judgment could have believed the decision to purchase or lease new engines was rational. Nor does that decision show that the directors did not act in good faith. n5 Therefore, Plaintiff's allegations do not fall into any exceptions to the general statement that an officer or director, absent self-dealing or [**12] improper motive, is not liable for business decisions made in good faith.

n5 *See In re J.P. Stevens & Co. S'holders Litig., 542 A.2d 770, 780-81 (Del. 1998)* ("A court may ... review the substance of a business decision made by an apparently well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith"). Here, the decision to purchase or lease new engines is not "so far beyond the bounds of reasonable judgment" that bad faith is the only explanation.

The Delaware Supreme Court has also stated that "to allege that a corporation has suffered a loss as a result of

Case 1:05-cv-00327-GMS    Document 48-13    Filed 03/06/2006    Page 5 of 50

Page 4

330 B.R. 56, *; 2004 U.S. Dist. LEXIS 7375, **

a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the [the decision] may appear in retrospect." *Gagliardi, 683 A.2d at 1052.* [**13] Plaintiff has not alleged that the decision to lease or finance new engines instead of repair old engines was not the result of a lawful transaction, not within the Debtor's powers, and not made in a good faith pursuit of corporate purposes. Therefore, Plaintiff's claims in Count I of the Amended Complaint do not rebut the presumption that the Directors' decisions were the product of valid business judgment.

**B. Count II**

Plaintiff alleges in Count II of the Amended Complaint that the Officers "breached their fiduciary duties of loyalty, good faith and due care, and acted recklessly" by neglecting to repair and properly maintain the Debtor's older jet engines and by leasing or financing the purchase of new jet engines. (D.I. 19 at P86.) Furthermore, Plaintiff alleges that the Officers breached their fiduciary duties by failing to inform the Directors concerning the jet engines. (*Id.* at P87.) Specifically, Plaintiff states that the Director of Safety reported to "management ... at least as early as June 1998" that there were a lack of spare part for repairs, deficient quality assurance on repairs that were performed, deficient record keeping regarding needed repairs and the [**14] absence of any type of maintenance program. (D.I. 19 at P55; D.I. 26 at 27.) Plaintiff asserts that the Director of Safety called for additional staffing for the maintenance department as well as changes to the Debtor's management structure to address these and other deficiencies in the Debtor's maintenance department. (*Id.*) Plaintiff claims that the Officers "took no actions or steps to evaluate and/or remedy or to provide any substantive resolution" to those problems with the maintenance division and did not inform the directors of such problems because minutes of the Debtor's Board of Director meetings held after June 1998 "do not discuss, address and/or give any consideration" to them. (*Id.* at P56.) Plaintiff alleges that the Officers' breaches of their fiduciary duties "caused significant losses" and that "the business judgment rule provides no protection and/or no defense" to his claims. (*Id.* at PP90-91.)

As previously discussed, even if the Officers' decision to lease or purchase new jet engines rather than repair older jet engines, or the Officers' decision to "cannibalize[] its own planes and older engines by taking them out of service and using them as sources [**15] of spare parts for other planes and engines" (*Id.* at PP58-60), [*63] caused loss to the Debtor, a corporate officer is not legally responsible to the corporation for losses that are the result of a good faith decision. *Gagliardi v. Tri-*

*Foods Int'l, Inc., 683 A.2d at 1051.* Plaintiff has not alleged any facts that the Officers' acted in bad faith, nor any facts that would characterize their actions as egregious. *See id. at 1052.* Plaintiff has merely alleged that the Officers acted in bad faith, and "conclusory allegations are not considered as expressly pleaded facts or factual inferences," sufficient to rebut the presumption of good faith inherent in the business judgment rule. *Brehm v. Eisner, 746 A.2d 244, 255 (Del. 2000).*

With respect to Plaintiff's claims that the Officers' failure to "inform and advise" the Directors concerning the jet engines was a breach of their fiduciary duties, and is therefore not protected by the judgment rule (D.I. 19 at PP87-88, 91), Plaintiff does not explain how this alleged failure by the Officers violates any of their fiduciary duties, nor does Plaintiff cite any legal authority is support of that theory. [**16] (*See* D.I. 26.) Plaintiff's claims are merely conclusory, and, once again, Plaintiff's conclusory allegations do not overcome the presumption that the Officers' acted in good faith and in the best interest of the Debtor. *See Brehm, 746 A.2d at 255.*

**C. Count III**

In Count III of the Amended Complaint, Plaintiff alleges that the directors breached their fiduciary duties of loyalty, good faith, and due care by:

> allowing the mismanagement of the Debtor to continue and to persist to the detriment of the Debtor and its best interests, and ... failing adequately to oversee and to control the management of the Debtor and thereby allowing the specific instances of mismanagement set forth in Count II to occur. ... [and] failing to keep themselves fully and adequately informed concerning the daily management of the Debtor and thereby making or failing to make decisions on a fully informed basis.

(*Id.* at P97.)

Specifically, Plaintiff asserts that the Directors, other than Nachtomi, "abdicated their responsibility over the management and business affairs of the Debtor" because the minutes of the special meeting in April 1998, at which the Directors [**17] resolved to borrow $ 50 million and authorized the purchase of eight new jet engines, "do not reflect that the Board engaged in any discussion concerning, or gave any consideration to, the need for such new engines, the status and/or state of repair of the older engines already owned or under lease by the Debtor, and/or the long term financial impact on the

Case 1:05-cv-00327-GMS    Document 48-13    Filed 03/06/2006    Page 6 of 50

Page 5

330 B.R. 56, *; 2004 U.S. Dist. LEXIS 7375, **

Debtor of the decision to incur additional debt to purchase such new engines." (*Id.* at P61.) Plaintiff also asserts that the minutes of the October 1998 meeting, at which the Directors authorized Nachtomi to negotiate the leasing of four new jet engines, did not "give any consideration to the need for the four ... new engines, the status and/or state of repair of the older engines already owned or under lease by the Debtor, and/or the long term financial impact on the Debtor." (*Id.* at P62.) Plaintiff further claims that the minutes of each Board meeting subsequent to June 1998 show that nothing was done by any of the Directors to address any of the issues identified the Debtor's Director of Safety, *supra*, which "is at best evidence of the Boards' failure to erect systems to gather such information and at worst evidence [**18] of the Board's reckless disregard of such deficiencies if they were, in fact, aware of any of the conditions covered by the Director of Safety's June 1990 report." (*Id.* at P56; D.I. 26 at 27-28.)

[*64] Plaintiff also claims that the Board, "completely abandoned its duties to monitor [the Debtor's] overall business" because the directors permitted Nachtomi to operate the Debtor's office in Tel Aviv n6 "independently of the Debtor's other offices and without any oversite or control." (D.I. 26 at 30; D.I. 19 at P43.) As evidence of this assertion, Plaintiff alleges that the Tel Aviv office maintained its financial records separate from the rest of the company, and opened its own bank account in Israel that only Nachtomi and two other members of management in that office had access to. (D.I. 19 at P44.) Plaintiff alleges that despite the large revenues of the Tel Aviv operation, the Debtor was eventually forced into liquidation proceedings in Israel. (*Id.* at P46.)

n6 Plaintiff claims that the Debtor's 1998 Annual Report stated that the Tel Aviv service was "the largest United States carrier and second only to El Al, Israel's national flag carrier" in the passenger airline market between the United States and Israel. (D.I. 19 at P28.)

[**19]

Plaintiff further claims that the Board abdicated its responsibility for the business affairs of the Debtor by not conducting a feasibility, profitability, or other similar study, and by not seeking the advice of an outside consultant prior to opening the Santo Domingo route, a route that, according to Plaintiff, was never profitable. (*Id.* at PP34-35.) Plaintiff also alleges that there "was an absolute lack of any management controls or procedures to ensure that used passenger tickets were processed for payment," the value of which was at least one million

dollars. (D.I. 26 at 32; D.I. 19 at PP40-41.) Finally, Plaintiff alleges that the directors failed to oversee the Debtor's operations department. (*Id.* at PP50-53.)

Plaintiff asserts that the business judgment rule does not apply to those alleged actions or omissions by the Directors because "unconsidered inaction," or the "failure of the Board to consider, or even be aware of conditions or activities within the corporation that cause the corporation harm," is an independent basis for liability. (D.I. 26 at 22-23.) In support of this theory, Plaintiff cites *In re Caremark Int'l, Inc. Deriv. Litig., 698 A.2d 959 (Del. Ch. 1996).* [**20] In *Caremark,* the claim was that "the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." *Id. at 967.* Like the case at bar, the complaint in *Caremark* did not charge either director self-dealing or loyalty-type problems arising from cases of suspect director motivation. *Id.* The complaint asserted a theory of liability against the defendant directors based on their inaction, which Chancellor William T. Allen said "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* Chancellor Allen went on to explain the theoretical basis for such liability, saying, "a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses cause by non-compliance with applicable legal standards." *Id. at 970.*

*Caremark* is inapposite [**21] to the present case because there is no claim, nor evidence, that the directors' alleged failure to assure an adequate reporting system resulted in a violation of the law. However, Plaintiff's theory of "unconsidered inaction" does find some support in *In re Walt Disney Co. Deriv. Litig., 825 A.2d 275* [*65] *(Del. Ch. 2003).* In that case, the plaintiffs alleged that the defendant directors breached their fiduciary duties by blindly approving an employment agreement with the company's president and then, again without any review or deliberation, ignored the chief executive officer's dealings with that officer regarding his termination. *Id. at 277.* Similar to Plaintiff in the case at bar, the plaintiffs alleged that the directors "failed to exercise *any* business judgment and failed to make *any* good faith attempt to fulfill their fiduciary duties" to the corporation. *Id. at 278* (emphasis in the original). "In short, that ... complaint," like this complaint "alleged facts implying that the ... directors failed to 'act in good faith and meet minimal proceduralist standards of attention." *Id.* (citing *Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1052 (Del. Ch. 1996).* [**22]

Case 1:05-cv-00327-GMS    Document 48-13    Filed 03/06/2006    Page 7 of 50

Page 6

330 B.R. 56, *; 2004 U.S. Dist. LEXIS 7375, **

In holding that the business judgment rule didn't apply, the court in *In re Walt Disney Co.* stated that "the facts alleged ... suggest that the defendant directors consciously and intentionally disregarded their responsibilities, adopting a 'we don't care about the risks' attitude concerning a material corporate decision." *Id. at 289.* "Put differently, all of the alleged facts, if true, imply that the defendant directors knew that they were making material decisions without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss." *Id.* While Plaintiff asserts in the Amended Complaint that the directors "blindly" approved Nachtomi's decision to purchase or lease new jet engines, this case is distinguishable from *In re Walt Disney Co.,* because Plaintiff has not alleged facts that show that the directors "consciously and intentionally" disregarded their responsibilities, nor do they show that the directors didn't care about the effect their decision would have on the Debtor. The Plaintiff has only alleged that minutes of various board meetings do not reflect a discussion about the need [**23] for new engines or the repair of the old engines.

With respect to the Tel Aviv office, Plaintiff argues that the directors "ceded all responsibility" to Nachtomi, and that the office eventually was forced into liquidation proceedings (D.I. 26 at 30-31), but once again, the facts that Plaintiff has alleged do not show deliberate indifference on the part of the directors. Moreover, Plaintiff does not allege facts that show the deliberate indifference with respect to the Santo Domingo route, the processing of tickets, the operations department of the Debtor, or the report by the Director of Safety. Accordingly, Plaintiff has not alleged facts with sufficient particularity to overcome the protections of the business judgment rule.

### D. Count IV

Plaintiff alleges in Count IV of the Amended Complaint that the Officers breached their fiduciary duties of loyalty, good faith and due care by failing to process used airline tickets for payment, failing to implement and maintain the proper oversight and control of ticket processing and operations, reducing fairs to unprofitable levels, expanding the Debtor's international routes during financial hardships, failing to implement and maintain [**24] the proper oversight and control over the Debtor's Tel Aviv operations, establishing and continuing to service the New York to Santo Domingo routes when there was no evidence that such route could be profitable, ceding all responsibility to manage and control the affairs of the Debtor to Nachtomi, failing to address problems with the debtor's operations department and maintenance division, failing to maintain the Debtor's jet engines in good repair, [*66] and failing to inform the Directors of mismanagement and the financial ramifications of such acts or omissions. (*Id.* at P107.)

Plaintiff asserts that the Officers' breaches of their fiduciary duties "caused significant losses to the Debtor and to its estate."

As previously discussed, a corporate officer is not legally responsible for losses that result from a good faith decision if there are not any facts showing self-dealing or improper motive. See *Gagliardi, 683 A.2d at 1051.* In Count IV, Plaintiff has not alleged self-dealing or improper motive, and the allegations Plaintiff has made are not supported by facts showing that the Officers acted in bad faith or that there was an abuse of discretion that would void the [**25] protections of the business judgment rule. *See id. at 1052, Aronson, 473 A.2d at 812.* Finally, to the extent that Plaintiff alleges Officer liability for "unconsidered inaction" in this Court, Plaintiff has not cited any authority that the Delaware courts have applied this theory to corporate officers.

### E. Count V

In Count V, Plaintiff claims that the Officers' acts and omissions, as previously stated, "constitute gross mismanagement of the Debtor's business, gross negligence, and a gross violation of Defendants' duties of due care to the Debtor," and that the Debtor and its estate has suffered significant losses as a result. (D.I. 19 at PP117-118.) "To state a claim of gross negligence, plaintiffs must allege facts to support the conclusion that the Board acted with so little information that their decision was 'unintelligent and unadvised,' or outside of the 'bounds of reason and reckless[].'" *In re General Motors, 694 F. Supp. at 1133.* Gross negligence also applies to the decisions made by corporate officers. *See Kaufman v. Beal, 1983 Del. Ch. LEXIS 391, CIV. A. Nos. 6485, 6526, 1983 WL 20295 at *3 (Del. Ch. Feb. 25, 1983).* As [**26] discussed, other than to allege that the minutes of various Board meetings in 1998 do not reflect any discussion about the purchase or lease of new jet engines, or the repair of old jet engines, which, by itself, does not support a conclusion that the decisions of any of the Officers or Directors were unintelligent, unadvised, or reckless, Plaintiff does not allege any facts that any of the other decisions, acts, or omissions of the Officers were unintelligent, unadvised, or reckless. Accordingly, Plaintiff's conclusory allegations of gross negligence do not overcome the protections of the business judgment rule. *See Brehm, 746 A.2d at 255.*

### F. Counts VI and VII

Plaintiff alleges in Counts VI and VII that the Directors and Officers "wasted corporate assets to the financial loss and detriment of the debtor's estate." (D.I. 19 at PP125, 132. The Delaware law standard for pleading waste is stringent. "Directors are only liable for waste when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could

Case 1:05-cv-00327-GMS    Document 48-13    Filed 03/06/2006    Page 8 of 50

Page 7

330 B.R. 56, *; 2004 U.S. Dist. LEXIS 7375, **

conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig. 731 A.2d 342, 362.* [**27] Here, the Debtor has not alleged facts that the Debtor did not receive adequate consideration for the transactions entered into and approved by the Officers and Directors, such as the decision to purchase or lease new engines and not repair the older engines, the decision to reduce fares, the decision to expand the Debtor's international routes, and the failure to process some airline tickets. Therefore, Plaintiff's corporate waste claim is conclusory, and conclusory allegations are not sufficient to overcome the protections of the business judgment rule. *See Brehm, 746 A.2d at 255.*

[*67] **V. Conclusion**

For the reasons set forth herein, the Defendants' Motion will be granted. An appropriate order will issue.

**ORDER**

For the reasons stated in the Memorandum Opinion issued today,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (D.I. 22) is GRANTED.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

April 20, 2004
Wilmington, Delaware

33

RECEIVED

FEB 16 AM 8:22

CIRCUIT COURT
BALTIMORE CITY
CIVIL DIVISION

| | | |
|---|---|---|
| TINO SPATOLA, et ux. | * | IN THE |
|     Plaintiffs | * | CIRCUIT COURT |
| v. | * | FOR |
| NOVASTAR FINANCIAL, INC., et al. | * | BALTIMORE CITY |
|     Defendants | * | Part 20 |
| | * | Case No.: 24-C-04-007513 |
| | * | |

**************************************************************************

## MEMORANDUM DECISION

Only a brief overview of the facts is necessary to address the defendants' motions. It is sufficient to say that the publication of an article by the Wall Street Journal on April 12th of 2004 marked the beginning of a series of unfortunate events for NovaStar Financial, Inc.[1] The article detailed non-compliance, fines, and orders to cease the operation of NovaStar branch offices. On April 13th, NovaStar's stock dropped dramatically, and on April 14th, the first of 18 securities class actions were filed in the U.S. District Court for the Western District of Missouri. One week after the appearance of the Wall Street Journal article, NovaStar announced that its business practices were the subject of an informal inquiry by the U.S. Securities and Exchange Commission. Derivative suits soon followed. In Missouri, one derivative suit was filed in the U.S. district court and two suits were filed in the Circuit Court of Jackson County.

---

[1] NovaStar invests in and services residential nonconforming loans through its three components – mortgage lending and loan servicing, mortgage portfolio management, and branch operations.

1

NovaStar shareholders Tino and Frances Spatola submitted a demand letter on July 1, 2004. The letter asked the board to bring an action against the officers for breach of fiduciary duty by either knowingly allowing the branch offices to operate in violation of state and federal laws and regulations, or by failing to ensure in good faith that the offices complied with all laws and regulations. When NovaStar did not respond to the demand letter, the Spatolas filed suit against the defendants[2] in Baltimore City Circuit Court. This Court's jurisdiction arises from the incorporation of NovaStar in Maryland. MD. CODE ANN., CTS. & JUD. PROC. § 6-102 (2002).

Defendants seek to dismiss the plaintiffs' complaint on three grounds, 1) that the corporate charter prohibits the suit; 2) that the plaintiffs failed adequately to plead breach of fiduciary duty because they did not specify what each defendant allegedly did to breach his fiduciary duty; and 3) that the plaintiffs' claims for damages fail to connect the defendants to the alleged harm. In considering the motion to dismiss, the Court assumes the truth of all well-pleaded facts and draws all reasonable inferences in favor of the plaintiffs. *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 344-45, 758 A.2d 95, 101 (2000). Dismissal is appropriate when no relief can be granted as a matter of law. *Lubore v. RPM Assocs. Inc.*, 109 Md. App. 312, 322-23, 674 A.2d 547, 552 (1996).

At this stage of the lawsuit, the Court cannot determine whether NovaStar's corporate charter bars the plaintiffs' claims. The charter protects directors and officers from personal

---

[2] Defendants are composed of NovaStar Financial Inc., Scott F. Hartman, Lance Anderson, Rodney E. Schwatken, Edward W. Mehrer, Gregory T. Barmore, Art N. Burtscher. NovaStar Financial Inc. is a nominal defendant. "Officer Defendants" are Mr. Hartman, Mr. Anderson and Mr. Schwatken. "Audit Committee Defendants" are Mr. Mehrer, Mr. Barmore, and Mr. Burtscher. "Individual Defendants" are Mr. Hartman, Mr. Anderston, Mr. Schwatken, Mr. Mehrer, Mr. Barmore, and Mr. Burtscher.

liability for money damages "to the fullest extent permitted by the Maryland statutory or decisional law." (Def. Mem. in Supp. of Mot. to Dis. at 3.) Maryland law, however, does not limit liability:

> 1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services . . . [and/or]
> 2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding;

MD. CODE ANN., CTS. & JUD. PROC. §5-418(a) (2002). Both of the exceptions to officer and director immunity from liability present fact questions, as yet unexplored in discovery or trial.

At the hearing, defendants' counsel emphasized that *Kline v. Knight*, 2000 WL 33799690 *47-49 (Md. Ct. Spec. App. Dec. 21, 2000)[3] is analogous to this case because, similar to allegations of the NovaStar defendants, the *Kline* defendant lacked diligence and was ignorant of a local law or regulation. Despite this, the Maryland Court of Special Appeals held that the defendant's behavior did not fall outside the protection of the exculpatory clause. The *Kline* exculpatory clause, however, protected the defendant except in cases of fraud, gross negligence, or dishonesty. *Id.* The exceptions in this case require more factual development and do not lend themselves to early disposition.

The Court does not find convincing the next argument or the out-of-state cases cited by the defendants. *See Pittsburg Terminal Corp. v. Baltimore & Ohio R.R.*, 875 F.2d 549 (6th Cir. 1989); *Graham v. AllisChambers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963). In Maryland, complaints need not contain all the details of the circumstances that give rise to the action

---

[3] This decision, being unreported, is of no precedential value, although its legal analysis is of interest to the Court.

3

because giving notice of the claims is the main goal. Instead, complaints must contain sufficient information to apprise the defendants of the nature of the claims. *Campbell v. Welsh*, 54 Md. App. 614, 631, 460 A.2d 76, 86 (1983); *Fischer v. Longest*, 99 Md. App. 368, 380, 637 A.2d 517, 523 (1994).

Here, the plaintiffs' complaint apprises the defendants of the nature of their claims by adequately pleading breach of fiduciary duty. Plaintiffs have identified a fiduciary relationship between directors and shareholders and have claimed a breach of duty owed when defendants failed to ensure compliance with state and federal laws and regulations. (Compl. ¶¶ 24, 25, 33, 34.) Under these circumstances, the only appropriate remedy is an action in tort for the breach of fiduciary duty. *Kann v. Kann*, 344 Md. 689, 713, 680 A.2d 509, 521(1997); *See Werbowsky v. Collomb*, 562 Md. 581, 590, 766 A.2d 123, 128 (2001)(describing the complaint as generally alleging that the defendants breached their fiduciary duty, without alleging who did what).

Defendants characterize the plaintiffs' cause of action as a mere "failure to monitor" corporate activities which they claim is insufficient, as a matter of law, to constitute a breach of fiduciary duty. This may be accurate, but the Court cannot determine at this point in the proceedings the extent of the defendants' knowledge of improper conduct or involvement therewith. Although the defendants are correct that Maryland law allows directors to rely on information from officers and employees, directors are liable if they had knowledge of the wrongful conduct. MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(b)(1)(1999), *compare* § 2-405.1(b)(2). Accordingly, the allegations contained in the complaint are sufficient to state a cause of action against defendants. (Compl. ¶¶ 17, 24, 25.)

Lastly, the defendants seek to dismiss the complaint because it does not sufficiently plead

4

damages. As explained above, the main goal of pleadings is notice. Pleading damages is no different in that the pleading should contain sufficient information to notify the defendants what damages are sought. *See Scott v. Jenkins*, 107 Md. App. 440, 444, 668 A.2d 958, 960 (1995) (explaining that damages should be pleaded to give notice to the defendants), *rev'd on other grounds*, 345 Md. 21, 690 A.2d 1000 (1997). In this case, the complaint states defendants' conduct caused NovaStar to incur "damages associated with the Company's internal investigation, the SEC investigation of the Company, and loss of credibility in the market." (Compl. at ¶26.) Further, the plaintiffs seek "appropriate equitable relief to remedy the defendants' breaches of fiduciary duty." (Compl. at ¶35(B).) At oral argument, the plaintiffs were not entirely convincing that they had a firm understanding of what equitable relief they were seeking here. But, for the purposes of the motion to dismiss, the Court finds plaintiffs' claims for relief adequate in alleging definitive corporate harm and in putting the defendants on notice as to what types of damages the plaintiffs are seeking. Plaintiffs did articulate some bases for actual damages due to corporate costs incurred to date, although the Court is skeptical that their claim for "loss of credibility in the market" alone would survive the present motion. Moreover, plaintiffs assert that this lawsuit is not dependant on damages that might be awarded in the on-going federal securities class action in Missouri. The current complaint seeks only damages "NovaStar has *already incurred* as a result of, *inter alia*, the Company's internal investigation and the SEC investigation," not possible future fines related to securities law violations. (Pls. Resp. to Defs. Mot. to Dismiss at 9.) Consequently, the motion to dismiss is denied.

As an alternative to the motion to dismiss, the defendants ask for a stay of the proceedings. Although the Court has discretion to stay the action, the Court will reserve on this

issue to permit the Missouri courts an opportunity to determine whether demand was excused or futile in the Missouri derivative cases. *Waters v. Smith*, 27 Md. App. 642, 651-53, 342 A.2d 8, 13 (1975), *aff'd*, 277 Md. 189, 352 A.2d 793 (1976). If the Missouri courts do not, however, reach a decision within ninety days of this order, the Court will revisit the issue. Discovery shall proceed in accordance with the Court's Scheduling Order to be entered following a conference with counsel.

**ALBERT J. MATRICCIANI, JUDGE**

Judge's Signature on Original Document only

ALBERT J. MATRICCIANI, JR.
Judge

cc:     All Counsel of record via e-mail

TRUE COPY
TEST

FRANK M. CONAWAY, CLERK

6

RECEIVED

2006 FEB 16 AM 9:22

CIRCUIT COURT
BALTIMORE CITY
CIVIL DIVISION

TINO SPATOLA, et ux.                *        IN THE

    Plaintiffs                      *        CIRCUIT COURT

v.                                  *        FOR

NOVASTAR FINANCIAL, INC., et al.    *        BALTIMORE CITY

    Defendants                      *        Part 20

                                    *        Case No.: 24-C-04-007513

                                    *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## O R D E R

    The Court having considered the defendants' motion to dismiss and motion to stay the

proceedings, the exhibits, plaintiffs' oppositions thereto, and arguments of counsel having been

heard February 4, 2005, it is this 15th day of February, 2005, by the Circuit Court for Baltimore

City, Part 20, for reasons set forth in the accompanying memorandum decision,

    **ORDERED** that the motion to dismiss is **DENIED** and the motion to stay is

**RESERVED**.  Counsel shall contact the Court within five (5) days to arrange a scheduling

conference.

                    **ALBERT J. MATRICCIANI, JUDGE**

               **Judge's Signature on Original Document only**

               ALBERT J. MATRICCIANI, JR.
               Judge

               **TRUE COPY**
               TEST

cc:    All Counsel of record via e-mail

               FRANK M. CONAWAY, CLERK

34

PHILIP A. THORN, Appellant v. RELIANCE VAN COMPANY, INC.,
THOMAS WELSH, CHARLES A. WEATHERLEY, EMMA M. BAILEY and N.A.
MICHAEL O'NEAL, JR. Appellees

No. 84-1740

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*782 F.2d 1031; 1985 U.S. App. LEXIS 25929*

September 10, 1985
December 6, 1985

**PRIOR HISTORY:** [*1]

On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civil No. 82-4898)

**COUNSEL:**

DONALD K. JOSEPH (Argued), WILLIAM P. THORN, Wolf, Block, Schurr & Solis-Cohen, 12th Floor Packard Bldg., Philadelphia, PA 19102; Attorneys for Appellant

NELSON J. SACK (Argued), 200 West Front Street, Media, PA 19063; Attorneys for Appellee

**OPINION:**

PER CURIAM

This appeal presents an issue of officers' and directors' liability under Pennsylvania law. After hearing evidence that a director and officer of a corporation had knowledge of a plan to injure the corporation, and took no action to prevent the plan from going into effect, the district court directed a verdict in the officer's favor because there was no evidence that she actively participated in the plan. Because Pennsylvania law imposes an affirmative obligation on officers and directors to protect the interest of the corporation, we reverse and remand for a new trial on the charge of breach of a fiduciary duty.

I

Appellant Philip A. Thorn commenced this action in the district court for the Eastern District of Pennsylvania to recover damages for false advertising under Section 43(a) of the Lanham [*2] Trademark Act of 1946, *15 U.S.C. § 1125*(a0(1982), against defendants Reliance Van Co. ("Reliance") and its officers and directors,

Thomas Welsh, Charles A. Weatherley, and appellee Emma M. Bailey. n1 Thorn also asserted pendent state claims for breach of contract and breach of the officers' and directors' fiduciary duty to the corporation. The facts adduced at trial were as follows. In January 1979, Thorn entered into a contract with defendants Welsh and WEatherley for the formation of Florida-Eastern Van Lines, Inc. ("Florida-Eastern"), a now bankrupt motor carrier business that transported household goods between Philadelphia and FLorida. Thorn was the president, chief executive officer, a director, and 45% shareholder of Florida-Eastern; Bailey was a director and treasurer. In October 1981, directors Welsh, Weatherley and Bailey removed Thorn from office. Thereafter, competing motor carrier company, Reliance, of which Welsh was the sole owner. Bailey was also the treasurer and an employee of Reliance.

> n1 This matter is before this court for the second time. It first came before us when the district court dismissed the complaint on the grounds that plaintiff lacked standing to sue. We held that the plaintiff had standing to due and thus remanded the matter for trial. *Thorn v. Reliance Van Co., 736 F.2d 929 (1984).*

[*3]

Thomas Day, an employee of Rueben H. Donnelly, Inc., and a sales representative of the Bell Telephone Yellow Pages, testified that a meeting in late October, 1981, defendants instructed him to reduce the size of, and remove the red highlighting from, Florida-Eastern's advertisements in the Philadelphia phone book. Day testified further that defendants said that they planned to change the location of Florida-Eastern's advertisements by replacing them with advertisements for Reliance. Day testified that Welsh and WEatherley did most of the talk-

ing and that, "basically Emma [Bailey] didn't say much, if anything."

Thomas Day, an employee of Reuben H. Donelly, Inc., and a sales representative of the Bell Telephone Yellow Pages, testified that a meeting in late October, 1981, defendants instructed him to reduce the size of, and remove the red highlighting from, Florida-Eastern's advertisements in the Philadelphia phone book. Day testified further that defendants said that they planned to change the location of Florida-Eastern's advertisements by replacing them with advertisements for Reliance. Day testified that Welsh and Weatherley did most of the talking and that, "basically Emma [*4] [Bailey] didn't say much, if anything."

Walter Hilliard, Thorn's replacement at Florida-EAstern, testified about the activities and plans of the defendants to transfer Florida-Eastern's business to Reliance and to permit Florida-Eastern to "go down and drain." Hilliard stated that after Thorn was fired, Florida-Eastern mishandled its customers, shipped its deliveries late, and paid its bills late. Hilliard also described the many different occasions on which comments had been made by welsh and Weatherley, with Bailey present, about "getting rid of the Thorns."

At the conclusion of plaintiff's case, the district court directed a verdict in favor of Bailey on all claims. The jury eventually found that Welsh and Weatherley had breached their fiduciary duty to the shareholders, and were jointly and severally liable for $20,400 in damages. The jury also found that Reliance and Welsh, but not Weatherly, violated the Lanham Act, 15 U.S.C. § 1125 (1982), and awarded Thorn $45,000 in damages. The jury found no breach of contract.

II.

This appeal concerns only the propriety of the district court's directed verdict in favor of Bailey. n2 A verdict may be directed [*5] "only where there is insufficient evidence from which a jury could reasonably hold for the opponents, the court receiving the evidence in the light most favorable to the opponent, and giving him the advantage of every fair and reasonable inference." *Laskaris v. Thornburgh, 733 F.2d 260, 264 (3d Cir. 1984).* The court must determine as a matter of law whether "the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978).*

n2 Because the evidence adduced at trial was insufficient for a jury to infer that Bailey violated the Lanham Act, we affirm the district court's directed verdict with respect to that claim. Thorn

does not appeal with respect to the breach of contract claim.

The question, then, is whether a jury could reasonable have found Bailey to have breached her fiduciary duty under Pennsylvania law. It is well settled under Pennsylvania law that officers and directors stand in a fiduciary relation to the corporation and "must act in the utmost good faith, and cannot deal with the funds and property of the corporation, nor utilize [*6] the influence and advantage of their offices for any but the common interest." *Rivoli Theatre Co. v. Allison, 396 Pa. 343, 345, 152 A.2d 449, 451 (1959),* quoting *Howell v. McCloskey, 375 Pa. 100, 106, 99 A.2d 610, 613 (1953).* An officer or director owes a corporation his or her undivided loyalty. *Seaboard Industries, INc. v. Monaco, 442 Pa. 256, 262, 276 A.2d 305, 308-09 (1971).* Officers and directors "must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders," *Id. at 261-62, 276 A.2d at 309,* quoting *Lutherland, Inc. v. Dahlen, 357 Pa. 143, 151, 53 A.2d 143, 147 (1947).* See also 3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1029 (perm. ed. 1975).

The Pennsylvania Supreme Court has noted that directors who are aware of a breach of the fiduciary duty committed by a fellow officer or director, but remain silent, are jointly and severally liable for [*7] that breach. The Court in Seaboard Industries stated, "It is axiomatic that directors and officers of a corporation are jonitly as well as severally liable for mismanagement, willful neglect or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director. *442 Pa. at 263, 276 A.2d at 309* (emphasis added). See also *Higgins v. Shenango Pottery Co., 279 F.2d 46 (3d Cir. 1960).*

Quite clearly, under this legal standard, a jury could have reached the conclusion that Emma Bailey breached her fiduciary duty to Florida-Eastern. The testimony of Day and Hilliard demonstrates that Bailey was aware of the plan to change Florida-Eastern's yellow page advertisements, to "get rid of the Thorns," To mishandle customers and to send late shipments. Emma Bailey was a director and officer of Florida-Eastern and owed a fiduciary duty to the corporation's shareholders. Bailey had a duty not to sit idly by while Florida-Eastern folded, and there was sufficient evidence, as a matter of law, that she did just that. Moreover, there was sufficient evidence for [*8] a jury reasonably to infer that BAiley, by virtue of he position as a director and employee of Reliance, stood to profit from the plan to siphon business from Florida-Eastern to Reliance. The jury could have found that Bai-

782 F.2d 1031; 1985 U.S. App. LEXIS 25929, *

ley furthered her own interests at the expense of the corporation's shareholders. n3

> n3 The parties disagree as to whether Bailey's testimony, given subsequent to the directed verdict, should be considered in our determination of whether the directed verdict was proper. Because we find that the jury could reasonably have reached a verdict against BAiley on the basis of the other evidence, we do not address that question.

We therefore hold that the district court improperly directed a verdict in defendant Bailey's favor with respect to the claim that she breached her fiduciary duty to Florida-Eastern. Hence, we will affirm the district court's judgment on the Lanham Act claim, and will reverse and remand for a new trial on the claim of breach of fiduciary duty.

# 35
# Part One

IN RE THE WALT DISNEY COMPANY DERIVATIVE LITIGATION

CONSOLIDATED C. A. No. 15452

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 113; 35 Employee Benefits Cas. (BNA) 1705*

April 28, 2005, Submitted
August 9, 2005, Decided
August 9, 2005, Filed

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** *In re Walt Disney Co. Derivative Litig, 2005 Del. Ch. LEXIS 28 (Del. Ch., Feb. 4, 2005)*

**COUNSEL:** Attorneys for Plaintiffs: Joseph A. Rosenthal, Norman M. Monhait and Carmella P. Keener of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Seth D. Rigrodsky, of MILBERG WEISS BERSHAD & SCHULMAN LLP, Wilmington, Delaware; OF COUNSEL: Steven G. Schulman, Joshua H. Vinik, Jennifer K. Hirsh and John B. Rediker, of MILBERG WEISS BERSHAD & SCHULMAN LLP, New York, New York.

Attorneys for Defendant Michael S. Ovitz: David C. McBride and Christian Douglas Wright, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Mark H. Epstein and Jason L. Haas, of MUNGER, TOLLES & OLSON LLP, Los Angeles, California.

Attorneys for Nominal Defendant The Walt Disney Company: Andre G. Bouchard and Joel Friedlander, of BOUCHARD, MARGULES & FRIEDLANDER, P.A., Wilmington, Delaware.

Attorneys for Defendant Sanford M. Litvack: Robert K. Payson, Stephen C. Norman and Kevin R. Shannon, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Defendants Stephen F. Bollenbach, Reveta F. Bowers, Ignacio E. Lozano, Jr., George J. Mitchell, [*2] Thomas S. Murphy, Richard A. Nunis, Leo J. O'Donovan, S.J., Sidney Poitier, Irwin E. Russell, Robert A. M. Stern, E. Cardon Walker, Raymond L. Watson and Gary L. Wilson: Jesse A. Finkelstein, Gregory P. Williams, Anne C. Foster, Lisa A. Schmidt, Evan O. Williford and Michael R. Robinson, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware.

Attorneys for Defendants Roy Disney and Stanley P. Gold: A. Gilchrist Sparks, III and S. Mark Hurd, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Stephen D. Alexander and Fred L. Wilks, formerly of FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, Los Angeles, California.

Attorneys for Defendant Michael Eisner: Lawrence C. Ashby and Richard D. Heins, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Gary P. Naftalis, Michael S. Oberman, Paul F. Schoeman and Shoshana Menu, of KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York.

**JUDGES:** William B. Chandler, Chancellor.

**OPINIONBY:** William B. Chandler

**OPINION:**

**OPINION AND ORDER**

TABLE OF CONTENTS

| | | |
|---|---|---|
| | Introduction | 1 |
| I. | FACTS | 6 |

| | Introduction | 1 |
|---|---|---|
| A. | Michael Ovitz Joins The Walt Disney Company | 6 |
| 1. | Background | 6 |
| 2. | Ovitz First Contemplates Leaving CAA But His Negotiations With MCA Fail | 10 |
| 3. | Ovitz Seriously Considers Joining The Walt Disney Company | 12 |
| 4. | Ovitz's Contract With Disney Begins to Take Form | 15 |
| 5. | Crystal is Retained to Assist Russell and Watson in Evaluating the OEA | 17 |
| 6. | Ovitz Accepts Eisner's Offer | 22 |
| 7. | Disney's Board of Directors Hires Michael Ovitz | 26 |
| 8. | The October 16, 1995 Compensation Committee Meeting | 30 |
| B. | Ovitz's Performance as President of the Walt Disney Company | 32 |
| 1. | Ovitz's Early Performance | 32 |
| 2. | A Mismatch of Cultures and Styles | 36 |
| 3. | Approaching the Endgame | 38 |
| 4. | Specific Examples of Ovitz's Performance as President of The Walt Disney Company | 38 |
| 5. | Veracity and "Agenting" | 49 |
| 6. | Gifts and Expenses | 54 |
| C. | Ovitz's Termination | 59 |
| 1. | The Beginning of the End | 59 |
| 2. | The September 30, 1996 Board Meeting | 63 |
| 3. | Options for Ovitz's Termination | 68 |
| 4. | The November 25, 1996 Board Meeting | 72 |
| 5. | The Illusion Dispelled | 76 |
| 6. | Ovitz's Bonus and His Termination | 80 |
| D. | Expert Witnesses | 94 |
| 1. | Professor Deborah DeMott | 94 |
| 2. | Professor John Donohue | 97 |
| 3. | Professor Kevin Murphy | 98 |
| 4. | Larry R. Feldman | 100 |
| 5. | John C. Fox | 101 |
| 6. | Frederick C. Dunbar | 103 |
| II. | LEGAL STANDARDS | 104 |
| A. | The Business Judgment Rule | 107 |
| B. | Waste | 111 |
| C. | The Fiduciary Duty of Due Care | 112 |
| D. | The Fiduciary Duty of Loyalty | 115 |
| E. | Section 102(b)(7) | 117 |
| F. | Acting in Good Faith | 119 |
| III. | ANALYSIS | 126 |
| A. | Ovitz Did Not Breach His Duty of Loyalty | 127 |
| B. | Defendants Did Not Commit Waste | 131 |
| C. | The Old Board's Decision to Hire Ovitz and the Compensation Committee's Approval of the OEA Was Not Grossly Negligent and Not in Bad Faith | 133 |
| 1. | Eisner | 134 |
| 2. | Russell | 141 |
| 3. | Watson | 145 |
| 4. | Poitier and Lozano | 147 |
| 5. | The Remaining Members of the Old Board | 159 |
| D. | Eisner and Litvack Did Not Act in Bad Faith in Connection With Ovitz's Termination, and the Remainder of the New Board Had No Duties in Connection Therewith | 161 |

|      | Introduction                              | 1   |
| 1.   | The New Board Was Not Under a Duty to Act | 162 |
| 2.   | Litvack                                   | 169 |
| 3.   | Eisner                                    | 171 |
| IV.  | CONCLUSION                                | 174 |

[*3]

### INTRODUCTION

This is the Court's decision after trial in this long running dispute over an executive compensation and severance package. The stockholder plaintiffs have alleged that the director defendants breached their fiduciary duties in connection with the 1995 hiring and 1996 termination of Michael Ovitz as President of The Walt Disney Company. The trial consumed thirty-seven days (between October 20, 2004 and January 19, 2005) and generated 9,360 pages of transcript from twenty-four witnesses. The Court also reviewed thousands of pages of deposition transcripts and 1,033 trial exhibits that filled more than twenty-two 31/2-inch binders. Extensive post-trial memoranda also were submitted and considered. After carefully considering all of the evidence and arguments, and for the reasons set forth in this Opinion, I conclude that the director defendants did not breach their fiduciary duties or commit waste. Therefore, I will enter judgment in favor of the defendants as to all claims in the amended complaint.

As I will explain in painful detail hereafter, there are many aspects of defendants' conduct that fell significantly short of the best practices of ideal corporate governance. [*4] Recognizing the protean nature of ideal corporate governance practices, particularly over an era that has included the Enron and WorldCom debacles, and the resulting legislative focus on corporate governance, it is perhaps worth pointing out that the actions (and the failures to act) of the Disney board that gave rise to this lawsuit took place ten years ago, and that applying 21<st> century notions of best practices in analyzing whether those decisions were actionable would be misplaced.

Unlike ideals of corporate governance, a fiduciary's duties do not change over time. How we understand those duties may evolve and become refined, but the duties themselves have not changed, except to the extent that fulfilling a fiduciary duty requires obedience to other positive law. This Court strongly encourages directors and officers to employ best practices, as those practices are understood at the time a corporate decision is taken. But Delaware law does not -- indeed, the common law cannot -- hold fiduciaries liable for a failure to comply with the aspirational ideal of best practices, any more than a common-law court deciding a medical malpractice dispute can impose a standard of liability [*5] based on ideal -- rather than competent or standard-medical treatment practices, lest the average medical practitioner be found inevitably derelict.

Fiduciaries are held by the common law to a high standard in fulfilling their stewardship over the assets of others, a standard that (depending on the circumstances) may not be the same as that contemplated by ideal corporate governance. Yet therein lies perhaps the greatest strength of Delaware's corporation law. Fiduciaries who act faithfully and honestly on behalf of those whose interests they represent are indeed granted wide latitude in their efforts to maximize shareholders' investment. Times may change, but fiduciary duties do not. Indeed, other institutions may develop, pronounce and urge adherence to ideals of corporate best practices. But the development of aspirational ideals, however worthy as goals for human behavior, should not work to distort the legal requirements by which human behavior is actually measured. Nor should the common law of fiduciary duties become a prisoner of narrow definitions or formulaic expressions. It is thus both the province and special duty of this Court to measure, in light of all the facts and [*6] circumstances of a particular case, whether an individual who has accepted a position of responsibility over the assets of another has been unremittingly faithful to his or her charge.

Because this matter, by its very nature, has become something of a public spectacle -- commencing as it did with the spectacular hiring of one of the entertainment industry's best-known personalities to help run one of its iconic businesses, and ending with a spectacular failure of that union, with breathtaking amounts of severance pay the consequence -- it is, I think, worth noting what the role of this Court must be in evaluating decision-makers' performance with respect to decisions gone awry, spectacularly or otherwise. It is easy, of course, to fault a decision that ends in a failure, once hindsight makes the result of that decision plain to see. But the essence of business is risk -- the application of informed belief to contingencies whose outcomes can sometimes be predicted, but never known. The decision-makers entrusted by shareholders must act out of loyalty to those shareholders. They must in good faith act to make informed decisions on behalf of the shareholders, untainted by self-interest. [*7] Where they fail to do so, this Court stands ready to remedy breaches of fiduciary duty.

Even where decision-makers act as faithful servants, however, their ability and the wisdom of their judgments will vary. The redress for failures that arise from faithful management must come from the markets, through the action of shareholders and the free flow of capital, and not from this Court. Should the Court apportion liability based on the ultimate outcome of decisions taken in good faith by faithful directors or officers, those decision-makers would necessarily take decisions that minimize risk, not maximize value. The entire advantage of the risk-taking, innovative, wealth-creating engine that is the Delaware corporation would cease to exist, with disastrous results for shareholders and society alike. That is why, under our corporate law, corporate decision-makers are held strictly to their fiduciary duties, but within the boundaries of those duties are free to act as their judgment and abilities dictate, free of *post hoc* penalties from a reviewing court using perfect hindsight. Corporate decisions are made, risks are taken, the results become apparent, capital flows accordingly, [*8] and shareholder value is increased.

Because of these considerations, I have tried to outline carefully the relevant facts and law, in a detailed manner and with abundant citations to the voluminous record. I do this, in part, because of the possibility that the Opinion may serve as guidance for future officers and directors -- not only of The Walt Disney Company, but of other Delaware corporations. And, in part, it is an effort to ensure meaningful appellate review. Ultimately, however, it is for others to judge whether my effort here offers reasonable guidance to corporate directors, in general, on the subject of executive compensation and severance payments. n1 What follows is my judgment on whether each director of The Walt Disney Company fulfilled his or her obligation to act in good faith and with honesty of purpose under the unusual facts of this case.

---

n1 The subject of executive compensation itself has recently produced much thoughtful analysis and comment. *See, e.g.,* Lucian Bebchuk and Jesse Fried, PAY WITHOUT PERFORMANCE: THE UNFULFILLED PROMISE OF EXECUTIVE COMPENSATION (2004) (describing how management influence distorts the compensation process); Stephen M. Bainbridge, *Executive Compensation: Who Decides, 83 TEX. L. REV. 1615 (2005)* (reviewing and critiquing Bebchuk and Fried's *Pay Without Performance*).

[*9]

**I. FACTS** n2

---

n2 To be consistent with the parties' submissions, the trial transcript will be cited as "Tr. # # # #," and at relevant times will indicate the particular witness by including that witness' name in parentheses. Deposition testimony will be cited as "[Deponent] # # # #." Plaintiffs' trial exhibits will be cited as "PTE" and Defendants' trial exhibits will be cited as "DTE." Finally, for the sake of clarity, the Court will refer to Roy Disney as such.

*A. Michael Ovitz Joins The Walt Disney Company*

1. Background

The story of Michael Ovitz's rise and fall at The Walt Disney Company ("Disney" or the "Company") begins with the unfortunate and untimely demise of Frank Wells. Before his death, Wells served as Disney's President and Chief Operating Officer, and both he and Michael Eisner, Disney's Chairman and CEO, enjoyed ten years of remarkable success at the Company's helm. In April 1994, a fatal helicopter crash ended Wells' tenure at Disney and forced the company to consider a decision [*10] it was not properly prepared or ready to make. n3

---

n3 *See* Tr. 4148:11-4150:5.

---

Disney's short list of potential internal successors produced, for one reason or another, no viable candidates. n4 Instead, Eisner assumed Disney's presidency, and for a brief moment, the Company was able to stave off the need to replace Wells. Within three months, however, misfortune again struck the Company when Eisner was unexpectedly diagnosed with heart disease and underwent quadruple bypass surgery. The unfortunate timing of Eisner's illness and operation set off an "enormous amount of speculation" concerning Eisner's health and convinced Eisner of the need to "protect[] the company and get[] help." n5 Over the next year, Eisner and Disney's board of directors discussed the need to identify Eisner's successor. These events were the springboard from which Eisner intensified his longstanding desire to bring Michael Ovitz within the Disney fold. n6

---

n4 Tr. 3997:24-3999:4; *see also* 6025:7-19.

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

[*11]

n5 *see* Tr. 4150:20-4152:8.

n6 Eisner never called a board meeting for the specific purpose of discussing the possibility of hiring Ovitz, but at various times Eisner did contact board members on an individual basis. *See* Tr. 3665:1-3676:20 (Gold); 3997:6-3999:4 (Roy Disney); 4699:19-4700:24 (Eisner); 5913:23-5914:10 (Bowers); 7125:2-18 (Poitier); 7628:19-7629:2 (Lozano); 8142:2-8 (Stern); *see also* Bowers 183:13-185:6; 192:8-25; Lozano 54:13-56:14; Mitchell 17:23-19:14; Wilson 44:22-45:23; 48:14-49:2.

By the summer of 1995, Michael Ovitz and Michael Eisner had been friends for nearly twenty-five years. These men were very well acquainted, both socially and professionally. Over time, this relationship engendered numerous overtures, by which Eisner and Ovitz flirted with the idea of joining ranks and doing something together. n7 As Eisner put it: "I had been trying to hire him forever. . . . I couldn't do business with him . . . he was too tough, so I thought he would be better . . . on our side." n8 But until Eisner had offered Ovitz Disney's presidency, Ovitz had never [*12] seriously considered any of Eisner's offers and, according to Ovitz, there was good reason.

n7 Tr. 1105:12-1106:13 (Ovitz) ("Over the years, he had asked me, and we had talked many times about doing something together from the time he [Eisner] was with ABC, then at Paramount and then when he went to Disney.").

n8 Eisner 111:3-112:2.

Michael Ovitz's interest in the entertainment industry was kindled during his high school years and, from that time through college, Ovitz held different posts at Universal Studios and Twentieth Century Fox. After graduating college, Ovitz left the studios and gained employment in the mailroom of the William Morris Agency. At that time, William Morris was well regarded as the oldest and largest theatrical talent agency in the world. n9 Ovitz worked for William Morris for six years, and had worked his way up to become a talent agent within the agency's television department. Here, Ovitz began to question the company's direction and its approach to representing its clients. [*13] Despite several colleagues' attempts to address their discontent with management, their efforts were not well received and,

eventually, these philosophical disagreements led to an impasse. Ovitz and four other William Morris agents left, and Creative Artist Agency ("CAA") was born.

n9 Tr. 1091:6-10.

CAA had a modest beginning and, from 1974 to 1979, the company's revenues were barely sufficient to meet its expenses. n10 During this period, most of CAA's business focused on the television industry, because CAA was self-financed and television revenues were more certain than revenues from feature films. n11 It was not until late 1979 that CAA branched off into the motion picture industry, and another four or five years later, the company moved into the music and consulting businesses. Ovitz attributes CAA's rise, in part, to a business model that he dubbed: "packaging." n12 As Ovitz explained, before CAA, it was Hollywood studios, distributors or networks that controlled the talent "either contractually or [*14] by virtue of the fact that they had all of the distribution capability." n13 CAA revolutionized this system by grouping various talents, whether they were actors, directors or writers. These "packaged" talents could then coordinate their efforts to best exploit their leverage and maximize the economics of any given deal. n14 The effect of Ovitz's business model was clear. By 1995, CAA had reshaped an entire industry and had grown from five men sitting around a card table to the premier Hollywood talent agency. When Ovitz joined Disney, he left behind 550 employees and an impressive roster of about 1400 of Hollywood's top actors, directors, writers and musicians -- a roster that earned CAA approximately $ 150 million in annual revenues. In turn, this success translated into an annual income of $ 20 million for Ovitz and, for his part, he was regarded as one of the most powerful figures in Hollywood.

n10 CAA's beginnings were so modest that the wives of the five founding partners were needed on a rotating basis to answer the company's phones. Tr. 1093:1-5.

n11 Tr. 1094:20-1095:16.

n12 *Id.*

[*15]

n13 Tr. 1093:8-24.

n14 During trial, Ovitz best explained the concept of packaging by way of example. After Warner Brothers had rejected the screenplay for the mo-

tion picture *Rain Man*, the screenwriter, using CAA as a conduit, was able to pass his work on to Dustin Hoffman, who teamed up with Tom Cruise, another CAA client, and Barry Levinson, to produce a picture that went on to win 1989's Academy Award for Best Picture. Tr. 1094:2-19.

**2. Ovitz First Contemplates Leaving CAA But His Negotiations With MCA Fail**

In the spring of 1995, CAA was retained to facilitate negotiations between the Seagram Company and Matsushita where Seagram was to purchase eighty percent of Matsushita's holdings in Music Corporation of America ("MCA," now known as Universal Studios). During those negotiations, Edgar Bronfman Jr., Seagram's Chairman and CEO, who had known Michael Ovitz for a number of years, began to discuss with Ovitz the possibility of leaving CAA and joining MCA.

Bronfman's deal contemplated MCA purchasing CAA's consulting business from Ovitz, Ron Meyer and Bill Haber (the three [*16] remaining CAA founders and its only shareholders) in exchange for MCA stock. Ovitz, Meyer, and Haber would then sell their remaining CAA interest to a third party and use the proceeds to purchase more MCA stock. n15 If the deal were consummated, Ovitz would take MCA's reins as Chairman and CEO and would be paid handsomely for the job, including options for an additional 3.5 percent of CAA, $ 1.5 million in Seagram shares, and a seven-year contract (with a three-year renewal option) that paid a seven-figure salary with performance-based cash bonuses that could reach three to five times the base salary. n16

n15 If the fair market value of CAA's non-consulting business was less than $ 50 million, Ovitz, Meyer and Haber would be required to invest their personal assets to bring their collective investment in MCA up to $ 50 million. In return, MCA would provide Ovitz, personally, with ninety percent of the quantity of MCA restricted stock needed to bring the three CAA shareholders' collective stake in MCA equity up to six and a half percent. PTE 793.
n16 *Id.*

[*17]

By June 1995, it was apparent that Ovitz's deal with MCA would never materialize. Ovitz attributed this failure to his rising skepticism over his ability to improve "a company that had been flat for five [or more] years" in a culture unlikely "to support the effort of expansion, capi-

tal expenses, and changing overhead" that Ovitz perceived was needed. n17 Fueling Ovitz's skepticism was his perception that sudden changes to the terms of the CAA/MCA deal were not coming from Bronfman, but, in fact, were instigated at the behest of Bronfman's father and uncle, who were controlling shareholders in the Seagram Company. In the end, Ovitz remained unconvinced that Bronfman could deliver the things that he was promising to deliver. n18

n17 Tr. 1280:14-1281:22.
n18 *Id.*

With the MCA deal falling apart, Ovitz returned to CAA and business continued as usual until Ovitz discovered that his close friend and number two at CAA, Ron Meyer, was leaving for MCA. This revelation devastated Ovitz, who had no idea [*18] Meyer was interested in leaving CAA, let alone leaving without Ovitz. Suddenly, the prospect of Ovitz remaining with the company he and Meyer built no longer seemed palatable, and Ovitz became receptive to the idea of joining Disney.

**3. Ovitz Seriously Considers Joining The Walt Disney Company**

Michael Eisner had been following Ovitz's talks with MCA closely and believed that now was the time to either talk to Ovitz seriously about joining Disney or face the possibility of having Ovitz at the helm of a major Disney competitor. n19 Thus, the informal overtures that had spanned the last two decades intensified and Eisner was "on a hunt" n20 to bring Ovitz to Disney.

n19 *See* Tr. 4173:24-4175:12 (Eisner) ("I saw a parade of horribles in front of me, which were resolved in a fairly, averagely managed company coming back to America. I saw a company that spent money pretty freely, wanting maybe to get Michael Ovitz to come manage it. And I was getting a little nervous about the prospect of . . . having Michael Ovitz work for us be usurped by MCA, and not only have him not work for us but be a competitor.").

[*19]

n20 *Id.*

Eisner's renewed efforts to recruit Ovitz received support from Sid Bass and Roy Disney (Roy Disney was also a director of the Company), two of the company's largest individual shareholders. n21 Hoping not to be outdone by MCA, Eisner and Irwin Russell (the chairman of Disney's compensation committee) reached out to Ovitz and attempted to convince him to join Disney. Both Eisner and Russell knew the basic terms and economics of MCA's offer and both knew that Disney would not match or exceed those terms. n22 For this reason, the initial talks with Ovitz were unproductive and ended in short order. Eisner could not compete with the rich terms MCA was offering and he settled on the notion that Disney would have "to live with [Ovitz going to] a competitor because [Disney] could not match [MCA's terms]." n23 Within a few weeks, however, the tides changed and Eisner learned that Meyer was leaving CAA to join MCA. For the first time, Eisner's desire to hire Ovitz was aligned with Ovitz's desire to leave CAA.

> n21 From the beginning, Bass made clear that he would support Ovitz's hiring but that he would not support Ovitz sharing equal power with Eisner. *See* PTE 778 at MDE 000053.

[*20]

> n22 *See, e.g.*, Tr. 4175:13-4177:3.
> n23 *Id.*

Eisner's efforts to hire Ovitz were in full swing by mid-July 1995. Russell, per Eisner's direction, assumed the lead role in negotiating the financial terms of the contract. These efforts took on significant import in the face of Disney's recent announcement of the acquisition of CapCities/ABC, a transaction that would double the size of Disney, place even greater demands on Eisner, and exacerbate the need for someone else to shoulder some of the load. Russell, in his negotiations with Bob Goldman, Ovitz's attorney, learned that Ovitz was making approximately $ 20 to $ 25 million a year from CAA and owned fifty-five percent of the company. n24 From the start, Ovitz made it clear that he would not give up his fifty-five percent interest in CAA without downside protection. n25

> n24 Plaintiffs have contended that the compensation committee had no informed discussions concerning Ovitz's earnings while with CAA and attribute this failure to Russell. *See* Pls.' Post Trial

Open. Br. at 20; Tr. 2755:1-22. Russell did, however, have a basic understanding of what MCA was willing to pay Ovitz. *See* Tr. 2630:8-2631:10; *see also* DTE 76 at DD001991. Russell also testified that Goldman had represented to him that Ovitz was earning approximately $ 20 to $ 25 million a year from CAA and that he had no reason to question Goldman's veracity. Tr. 2755:1-22.

[*21]

> n25 Ovitz repeated several times throughout his testimony that he had learned during his years of experience representing talent always to negotiate for upside participation and downside protection, and that when it came to negotiating for his own interests, he wanted no less. *See, e.g.*, Tr. 1277:9-1278:5; 2175:2-2177:7.

While Russell and Goldman were in the preliminary stages of negotiating the financial terms of Ovitz's contract, Eisner and Ovitz continued their talks as well. From these talks, Ovitz gathered that it was his skills and experience that would be brought to bear on Disney's current weaknesses, which he identified as poor talent relationships and stagnant foreign growth. n26 Remaining cautious, Ovitz wanted assurances from Eisner that Ovitz's vision was shared and that Eisner was sincere in his desire to re-invent Disney. Apparently, Eisner was able to assuage Ovitz's concerns, because at some point during these negotiations, Ovitz came to the understanding that he and Eisner would run Disney as partners. Ovitz did recognize that Eisner was Chairman and would be his superior, [*22] but he believed that the two would work in unison -- in a relationship akin to the one that exists between senior and junior partners. n27 As it would turn out, Ovitz was mistaken, for Eisner had a radically different perception of their respective roles at Disney.

> n26 Tr. 1108:5-1113:5.
> n27 Tr. 1113:21-1115:4; 1116:7-1119:2.

**4. Ovitz's Contract With Disney Begins to Take Form**

By the beginning of August 1995, the non-contentious terms of Ovitz's employment agreement (the "OEA") were $ 1 million in annual salary and a performance-based, discretionary bonus. n28 The remaining terms were not as easily agreed to and related primarily

to stock options and Ovitz's insistence for downside protection. n29 Ovitz, using Eisner's contract as a yardstick, was asking for options on eight million shares of Disney's stock. Both Russell and Eisner, however, refused to offer eight million options and believed that no options should be offered within the first five years of Ovitz's contract. n30 This was a non-starter, [*23] since Ovitz would not leave CAA without downside protection and Disney had a policy against front-loading contracts with signing bonuses. Using both Eisner's and Wells' original employment contracts as a template, the parties reached a compromise. n31 Under the proposed OEA, Ovitz would receive a five-year contract with two tranches of options. The first tranche consisted of three million options vesting in equal parts in the third, fourth and fifth years, and if the value of those options at the end of the five years had not appreciated to $ 50 million, Disney would make up the difference. The second tranche consisted of two million options that would vest immediately if Disney and Ovitz opted to renew the contract.

n28 See PTE 386 at DD001925; see also Tr. 2415:2-14.

n29 After the MCA negotiations fell apart, and Ovitz decided to go to Disney, Ovitz, Meyer, and Haber transferred their interests in CAA to nine agents in exchange for seventy-five percent of revenues over the next four years on deals consummated before Ovitz left. See PTE 204. These payments were conditioned upon the new CAA first attaining certain financial benchmarks. See id. At the time this transfer occurred, no up-front cash was paid and it was uncertain whether new CAA would be profitable. See, e.g., Tr. 1274:13-24. The record demonstrates that the compensation committee did not consider this arrangement when they determined Ovitz's level of compensation. See Tr. 2761:9-15 (Russell); 7206:22-7207:20 (Poitier); 7698:24-7699:2 (Lozano); 8096:1-10 (Watson).

[*24]

n30 See Tr. 2415:4-2421:13; 4203:22-4204:6.

n31 See DTE 40 at DD001942; see also Tr. 2391:14-2392:18.

The proposed OEA sought to protect both parties in the event that Ovitz's employment ended prematurely and provided that absent defined causes, neither party could terminate the agreement without penalty. If Ovitz, for example, walked away, for any reason other than those permitted under the OEA, he would forfeit any benefits remaining under the OEA and could be enjoined from working for a competitor. n32 Likewise, if Disney fired Ovitz for any reason other than gross negligence or malfeasance, Ovitz would be entitled to a non-fault payment (Non-Fault Termination or "NFT"), which consisted of his remaining salary, $ 7.5 million a year for any unaccrued bonuses, the immediate vesting of his first tranche of options and a $ 10 million cash out payment for the second tranche of options. n33

n32 See PTE 7 P 9 at WD00209. But see Tr. 804:18-805:5 (Murphy) (opining that the OEA did not contain a mitigation or non-compete clause and that Ovitz "would be perfectly free to go accept additional alternative employment").

[*25]

n33 See PTE 33 at DD001768-69.

5. Crystal is Retained to Assist Russell and Watson in Evaluating the OEA

As the basic terms of the OEA were coming together, Russell authored and provided Eisner and Ovitz with a "Case Study" outlining the OEA parameters and Russell's commentary on what he believed was an extraordinary level of executive compensation. n34 Specifically, Russell noted that it was appropriate to provide Ovitz with "downside protection and upside opportunity" and to assist Ovitz with "the adjustment in life style resulting from the lower level of cash compensation from a public company in contrast to the availability of cash distributions and perquisites from a privately held enterprise." n35 According to Russell, Ovitz was an "exceptional corporate executive" n36 who was a "highly successful and unique entrepreneur." n37 Nevertheless, Russell cautioned that Ovitz's salary under the OEA was at the top level for any corporate officer and significantly above that of the CEO and that the number of stock options granted under the OEA was far beyond the standards applied within [*26] Disney and corporate America "and will raise very strong criticism." n38 Russell rounded out his analysis by recommending an additional study so that he and Eisner could answer questions should they arise. Russell did not provide this Case Study to any other member of Disney's board of directors. n39

n34 PTE 64 at DD001935.
n35 *Id.*
n36 *Id.*
n37 *Id.*
n38 *Id.* at DD001936.
n39 Tr. 2765:2-5.

With the various financial terms of the OEA sufficiently concrete, Russell enlisted the aid of two people who could help with the final financial analysis: Raymond Watson, a current member of Disney's compensation committee and the past chairman of Disney's board of directors (and one of the men who designed the original pay structure behind Wells' and Eisner's compensation packages); n40 and Graef Crystal, an executive compensation consultant, who is particularly well known within the industry for lambasting the extravagant compensation paid to America's top executives. [*27] n41 The three men were set to meet on August 10. Before the meeting, Crystal prepared, on a laptop computer, a comprehensive executive compensation database that would accept various inputs and run Black-Scholes n42 analyses to output a range of values for the options. n43 At the meeting, the three men worked with various assumptions and manipulated inputs in order to generate a series of values that could be attributed to the OEA. n44 In addition to Crystal's work, Watson had prepared several spreadsheets presenting similar assessments, but these spreadsheets did not use the Black-Scholes valuation method. At the end of the day, the men made their conclusions, discussed them, and agreed that Crystal would memorialize his findings and fax the report to Russell.

n40 This was the first instance where a board member other than Russell or Eisner was brought into the Ovitz negotiation process. *See, e.g.*, Tr. 7167:5-13 (Poitier) (testifying that before August 13, 1995 he did not discuss Ovitz's compensation package); 7658:4-21 (Lozano) (testifying that before the August 1995 press release, he did not speak to any board member, aside from Eisner, concerning Ovitz's employment); 2425:18-2427:15 (Russell) (testifying that it was his intention to inform Watson of the negotiations only after there was a good possibility of a deal).

[*28]

n41 Crystal, who had previously headed Towers Perrin's compensation practice, has consulted on behalf of Disney for many years and is actively

engaged in both teaching and publishing in the field. *See* Tr. 2714:5-2715:5; 3243:2-3261:15.

n42 The Black-Scholes' method is a formula for option valuation, widely used and accepted by industry figures and regulators, that determines option value based upon a complex calculation involving the exercise price and term of the options, the price of the underlying stock, its dividend history and volatility, and the risk-free interest rate. Tr. 764:20-765:13.

n43 Tr. 3268:13-3269:11.

n44 The various inputs accounted for different numbers of options, vesting periods, and potential proceeds of option exercises at various times and prices. *See, e.g., id.*; *see also* DTE 12; DTE 28; DTE 32; DTE 56.

Two days later, Crystal faxed his memorandum to Russell. In the memo, Crystal concluded that the OEA would provide Ovitz with approximately $ 23.6 million per year for the first five years of the deal. n45 Crystal estimated that [*29] the contract was worth $ 23.9 million a year, over a seven-year period, if Disney and Ovitz exercised the two-year renewal option. n46 Crystal opined that those figures would approximate Ovitz's present compensation with CAA. That evening, Russell, Watson and Crystal phoned each other and further discussed Crystal's conclusions and the assumptions underlying those conclusions. n47 During those discussions some questions surfaced, and Russell asked Crystal to revise his memo to resolve the ambiguities Russell believed existed in the current draft. Instead of addressing the points Russell highlighted, Crystal faxed a new letter to Russell expressing Crystal's concern over the portion of the OEA that created the $ 50 million option appreciation guarantee. n48 Crystal contended that the current language of the OEA, if he was reading it correctly, would allow Ovitz to hold the first tranche of options, wait until his five-year term was up, collect the $ 50 million guarantee and then exercise in-then-money options for an additional windfall. n49 In light of this, Crystal was philosophically opposed to a pay package that would give Ovitz the best of both worlds -- *i.e.*, low risk and high [*30] return. n50 Crystal's letter was never circulated to any board member other than Eisner. n51 Rather, Russell addressed Crystal's concerns and clarified that the guarantee would not function in the manner Crystal believed n52 and, on August 18, Crystal augmented his August 12 memo and faxed Russell the revised copy. Again, Crystal opined that the OEA, during the first five years, was, as he originally estimated, worth $ 23.6 million, but as to the value of the OEA's renewal option, Crystal revised his estimation and believed that the two additional years would increase the value of the entire OEA to $ 24.1 million per year. n53 Up until this point,

only three members of Disney's board of directors were in the know concerning the status of the negotiations with Ovitz or the particulars of the OEA -- Eisner, Russell and Watson.

n45 PTE 365.

n46 *Id.*

n47 Plaintiffs have questioned whether this conversation actually occurred. *See* Pls.' Post Trial Opening Br. at 11. Based on the testimony adduced at trial the Court is satisfied that Crystal, Watson and Russell did indeed speak by phone to discuss their findings. *See* Tr. 2444:13-2445:4; 2452:10-16; *see also* DTE 120 at WD07502; PTE 215.

[*31]

n48 *See* PTE 59.

n49 *Id.* at DD001391.

n50 *Id.*

n51 *see* Tr. 2790:11-21; 7707:8-7708:3.

n52 *See* PTE 214 at DD001385; *see also* Tr. 2458:3-2460:11.

n53 *See* PTE 366.

### 6. Ovitz Accepts Eisner's Offer

While Russell, Watson and Crystal were finalizing their analysis of the OEA, Eisner and Ovitz were coming to terms of their own. Eisner, having recently conferred with Russell concerning his ongoing research, gave Ovitz a take-it-or-leave-it offer: If Ovitz joined Disney as its new President, he would not assume the duties or title of COO. n54 After short deliberation, Ovitz accepted Eisner's terms, and that evening he, Eisner and Sid Bass (and their families) celebrated Ovitz's decision.

n54 While vacationing together, Eisner told Ovitz that Sid Bass was flying into Aspen for dinner and that "either we're going to have a deal by the time he lands . . . or we're not, . . . [and] the deal will be gone." Ovitz was then given until 6:00 p.m. that night to concede on a number of issues; the two largest concessions were: 1) the reduction in the number of options from a single grant of five million to two separate grants, -- the first grant being three million options for the first five years, and the second grant consisting of an additional two million options if the contract was re-

newed; and 2) Ovitz abandoning the idea of joining the Company as a Co-CEO. *See* Tr. 4196:10-4198:3.

[*32]

As it would turn out, the celebratory mood was short lived. The next day, August 13, Eisner called a meeting at his home in Los Angeles to discuss his decision and, in addition to Ovitz and Russell, Sanford Litvack (Disney's General Counsel) n55 and Stephen Bollenbach (Disney's Chief Financial Officer) were invited to attend. At the meeting, Litvack and Bollenbach, who had just found out the day before that Eisner was negotiating with Ovitz, n56 were not happy with the decision. Their discontent "officially" stemmed from the perception that Ovitz would disrupt the cohesion that existed between Eisner, Litvack and Bollenbach, n57 and both Litvack and Bollenbach made it clear that they would not agree to report to Ovitz but would continue to report to Eisner. n58 At trial, the Court was left with the perception that Litvack harbored resentment that he was not selected to be Disney's President and that this fueled, to some extent, Litvack's resistance to Ovitz assuming the post he coveted. n59 Bollenbach's resistance was more curious. Indeed, Bollenbach had been hired before Ovitz and, at the time, his expectation was that he would report only to Eisner. Still, his testimony seemed disingenuous [*33] to the Court when he pinned his resistance on the fact that he had been part of a cohesive trio (*i.e.*, Bollenbach, Litvack, and Eisner). After all, Bollenbach had been with the Company for a total of three months before he was informed of the negotiations with Ovitz. n60 Despite this mutiny, Eisner was able to assuage Ovitz's concern about his shrinking authority in the Company, and Ovitz, with his back against the wall, acceded to Litvack and Bollenbach's terms.

n55 Litvack was also Disney's Chief of Corporate Operations and Executive Vice President for Law and Human Resources.

n56 *See* Tr. 6040:20-23; 6045:15-6047:11.

n57 *See id.*

n58 Tr. 5274:4-5276:2; 6048:1-6049:13.

n59 *See, e.g.*, Tr. 6027:13-6028:22.

n60 *See* Tr. 5271:22-5272:11.

The next day, August 14, Ovitz and Eisner signed the letter agreement ("OLA") that outlined the basic terms of Ovitz's employment. n61 The OLA specified that Ovitz's hiring was subject to approval of Disney's compensation [*34] committee n62 and board of directors. n63 That same day, Russell contacted Sidney Poit-

ier (for a second time) to inform him that Eisner and Ovitz reached an agreement. n64 At trial, Poitier failed to recount with any specificity his conversation with Russell. He made clear that he was never faxed Crystal's analysis or the draft of the OLA (which Litvack had prepared for Russell on August 12). n65 Nevertheless, Poitier did testify that Russell had "mentioned the terms" of the OEA and that Russell promised to stay in touch with any developments. n66 Poitier believed that hiring Ovitz was a good idea because he knew Ovitz's reputation in the entertainment business and considered him an innovator who understood the movie business. n67 Poitier also expressed the opinion that Ovitz would adequately adapt to running a public company such as Disney. n68 Watson also contacted Ignacio "Nacho" Lozano by phone. n69 The record is unclear as to exactly when Lozano was called. n70 As with Poitier, relatively little of Lozano's phone conversation was recounted at trial, except to say that Lozano testified that he felt comfortable with Ovitz's ability to make the transition from a private company culture [*35] to that of a public company. n71 As for communications with the other board members, Eisner contacted each of them by phone to inform them of the impending deal. During these calls, Eisner described his friendship with Ovitz, and Ovitz's background and qualifications. n72

n61 *See* PTE 60.

n62 The compensation committee was comprised of Russell, Watson, Ignacio Lozano and Sidney Poitier.

n63 *See* PTE 60 at DD002932.

n64 In his prior deposition, Poitier testified that the first contact concerning the Ovitz contract occurred at the compensation committee meeting on September 26, 1995. *See* Poitier 117:19-118:5. At trial, the witness revised his testimony to reflect that the first contact actually occurred via a phone call from Russell on Sunday August 13. Tr. 7125:19-7126:13; 7167:5-13. Russell testified that he had called Poitier twice. The first call occurred on August 13, and the second call was made the next day before the press release on August 14. *See* Tr. 2445:17-2446:20. I am satisfied that both calls did in fact occur and that at the time of the calls, Poitier was on his yacht vacationing in Sardinia.

[*36]

n65 Tr. 7167:14-17.
n66 Tr. 7126:10-13.
n67 Tr. 7127:4-17.

n68 Tr. 7129:13-18.
n69 Tr. 7637:14-7638:3.
n70 Lozano could not recall when the call occurred, but in an August 18, 1995 memo, Russell notes that "all the members of the Compensation Committee heartily endorse this pay package. Watson had a long discussion with Ignacio Lozano and I had two long conversations with Sidney Poitier in which all the details were reviewed and discussed before the deal was signed." PTE 215 at DD001636.
n71 Tr. 7631:18-7632:1.
n72 *See, e.g.,* Tr. 4215:12-4216:14 (Eisner); 3704:3-23 (Gold) (testifying that he received a call from Eisner and also spoke with Roy Disney); 5388:9-23 (Bollenbach); 5582:15-5583:8 (Mitchell); 5802:14-23 (Nunis); 7658:4-21 (Lozano); 8141:23-8143:3 (Stern); *see also* DTE 413 (Eisner's phone log).

On the same day that Eisner and Ovitz signed the OLA, the news of Ovitz's hiring was made public via a press release. Public reaction was extremely positive. Disney was applauded for the decision, and Disney's stock price [*37] increased 4.4 percent in a single day -- increasing Disney's market capitalization by more than $1 billion. n73

n73 *See* DTE 92; DTE 428 Ex. 4a.

### 7. Disney's Board of Directors Hires Michael Ovitz

Once the OLA was signed, Joseph Santaniello, who was an in-house attorney within Disney's legal department, took charge of embodying the terms Russell and Goldman had agreed upon and which were memorialized in the OLA. n74 To that end, Santaniello concluded that the $50 million guarantee presented negative tax implications for the Company, as it might not have been deductible. n75 Concluding that the provision must be eliminated, Russell initiated discussions on how to compensate Ovitz for this change-from this, an amalgamation of amendments to certain terms of the OEA arose in order to replace the back-end guarantee. n76 Russell again worked with Watson and Crystal to consider the possible consequences of the proposed changes. n77 Russell and Crystal applied the Black-Scholes methodology to [*38] assess the value of the extended exercisability features of the options and Watson generated his own analysis to the same end. n78

n74 Tr. 6055:16-6056:14.

n75 Santaniello 48:23-49:19.

n76 *See id.* at 50:7-19; *see also* PTE 348 (Russell's letter to Eisner suggesting the elimination of the $ 50 million guarantee and replacing it with: (1) the reduction in the option strike price from 115% to 100% of the Company's stock price on the day of the grant for the two million options that would become exercisable in the sixth and seventh year after commencement of employment; (2) Payment of $ 10 million in severance if the Company chose not to renew Ovitz's contract; and (3) alteration of the renewal option to provide for a five year extension, $ 1.25 million per year in salary, the same bonus structure as the first five years of the contract, and the grant of three million additional options).

n77 Tr. 2485:22-2486:16.

n78 *See, e.g.*, Tr. 2489:7-21.

On September 26, 1995, the [*39] compensation committee met *for one hour* to consider (1) the proposed terms of the OEA, (2) the compensation packages for various Disney employees, (3) 121 stock option grants, (4) Iger's CapCities/ABC employment agreement and (5) Russell's compensation for negotiating, the Ovitz deal. n79 The discussion concerning the OEA focused on a term sheet (the actual draft of the OEA was not distributed), from which Russell and Watson outlined the process they had followed back in August and described Crystal's analysis. Russell testified that the topics discussed were historical comparables such as Eisner's and Wells' option grants, n80 and the factors that he, Watson and Crystal had considered in setting the size of the option grants and the termination provisions of the contract. n81 Watson testified that he provided the committee with the spreadsheet analysis he had performed back in August and discussed his findings. n82 Crystal, however, did not attend the meeting and his work product was not distributed to the Committee. At trial, Crystal testified that he was available via telephone to respond to questions if needed, but no one from the committee in fact called. n83 After Russell's [*40] and Watson's presentations, Litvack responded to various questions but the substance of those questions was not recounted in any detail at trial. n84 Poitier and Lozano testified that they believed they had received sufficient information from Russell's and Watson's presentations n85 to enable them to exercise their judgment in the best interest of the Company. n86 When the discussions concluded, the Committee unanimously voted to approve the terms of the OEA subject to "reasonable further negotiations within the framework of the terms and conditions" n87 described in the OEA. n88

n79 PTE 39.

n80 Tr. 2521:8-2522:19. Although Russell used Wells' and Eisner's contracts as benchmarks for Ovitz's pay package, neither Poitier nor Lozano were able to recall any discussion concerning Crystal's observation that there were no comparables of non-CEO presidents of public companies that could justify Ovitz's pay package. *See* Tr. 7181:21-7182:1; 7701:4-10.

n81 *See, e.g.*, Tr. 2522:11-2523:4. Although the term sheet did highlight the term "wrongful termination," no one on the committee recalled any discussion concerning the meaning of gross negligence or malfeasance. *See* Tr. 2903:8-16; 7198:14-20; 7701:23-7702:2; 7716:22-7717:3. Despite this omission, the terms gross negligence or malfeasance were not foreign to the board of directors, as the language was standard, and could be found, for example, in Eisner's, Wells', Katzenberg's and Roth's employment contracts. *See* Tr. 6081:1-9.

[*41]

n82 Tr. 7848:16-21. Poitier could not recall whether Watson had actually distributed copies of his spreadsheets, but he did recall that "figures and numbers" were passed around and discussed. *See* Tr. 7222:20-7223:8. Lozano also had no recollection at trial that these spreadsheets were actually distributed. Tr. 7702:3-6. I attribute this lack of recollection to the nine years that have passed between that meeting and the trial and do not attribute any lack of veracity to Watson's testimony because of it.

n83 Tr. 3602:2-21.

n84 Plaintiffs contend that since Litvack had no responsibility in the actual negotiations of the Ovitz contract, the question session, which followed Russell's and Watson's presentations, and was memorialized in the committee minutes, could not have been of any substance. *See* Pls.' Post Trial Opening Br. at 21. The Court does not agree with this contention. Litvack testified that he knew what the deal was. *See* Litvack 384:18-385:4. He could therefore speak intelligently to questions from the committee. Whatever personal animosity Litvack harbored for Ovitz, not actually negotiating the deal did not prevent him from answering the committee's questions with "substance."

[*42]

n85 Plaintiffs have demonstrated that at no point were the following matters discussed in the committee meeting: (1) the purchase of Ovitz's private jet for $ 187,000 over the appraised value; (2) the purchase of Ovitz's BMW at acquisition cost and not the depreciated market value; (3) the purchase of Ovitz's computers at replacement value instead of their lower book value; (4) any specific list of perquisites, despite Eisner already agreeing to provide Ovitz with numerous such benefits; and (5) that despite Ovitz's bonus being payable completely on a discretionary basis, Russell's memorandum to Ovitz indicating that the bonus would likely approximate $ 7.5 million annually. Although I have concluded that plaintiffs have established these facts, they are ultimately immaterial to my decision.

n86 See Tr. 7136:23-7137:3; 7140:12-19; 7636:2-10; 7639:21-7640:3.

n87 PTE 39 at WD01170.

n88 At the behest of Watson, the committee discussed the time and energy Russell had placed into the negotiations and suggested that the committee recommend to the full board that Russell be compensated $ 250,000. The compensation committee voted to recommend this fee and the full board, while in executive session, approved it. See PTE 39 at WD01171; PTE 29 at WD01195-96. Russell abstained from voting on the issue.

[*43]

An executive meeting of Disney's board immediately followed the compensation committee's meeting. n89 In executive session, the board was informed of the reporting structure that Eisner and Ovitz agreed to, but no discussion of the discontent Litvack or Bollenbach expressed at Eisner's home was recounted. n90 Eisner led the discussion regarding Ovitz, and Watson then explained his analysis and both he and Russell responded to questions by the board. n91 Upon resuming the regular session, the board deliberated further, then voted unanimously to elect Ovitz as President. n92

n89 PTE 29 at WD01195-96.

n90 Neither Litvack nor Bollenbach attended the executive session. Id.

n91 Tr. 2537:11-2540:16 (Russell); 3733:1-3735:16 (Gold); 4014:7-4017:24 (Roy Disney); 4872:4-4879:4 (Eisner); 5585:12-5588:11

(Mitchell); 5919:7-5925:2 (Bowers); 7851:5-7853:9 (Watson); 8145:13-8146:8 (Stern).

n92 PTE 29 at WD01196.

8. The October 16, 1995 Compensation Committee Meeting

In accordance with [*44] the compensation committee's resolution roughly three weeks before, n93 the compensation committee convened again on October 16, 1995, in a special meeting to discuss several issues relating to stock options. n94 After a presentation by Litvack, during which he responded to questions from the members of the committee, the compensation committee unanimously approved amendments to The Walt Disney Company 1990 Stock Incentive Plan, thereafter titled The Walt Disney Company Amended and Restated 1990 Stock Incentive Plan (the "1990 Plan"), and also approved a new plan, known as The Walt Disney Company 1995 Stock Incentive Plan (the "1995 Plan"). n95 Both plans were subject to further approval by the full board of directors and by shareholders. n96

n93 PTE 39 at WD01170 (mentioning that Ovitz's stock option grant would be delayed until further details were worked out between Ovitz and the Company), WD01186-88 (term sheet outlining vesting schedule, other special terms of Ovitz's options, and that Ovitz's options would be formally granted at a later date).

n94 PTE 41 at WD00118; Tr. 2546:1-2547:24; 2971:3-2972:10; 7228:18-7229:1. Although not members of the compensation committee, Litvack, Schultz (Vice President-Corporate Compensation) and Santaniello attended this meeting. PTE 41 at WD00118; Tr. 6076:22-6077:2; Schultz 86:10-15; Santaniello 102:12-19. Poitier and Russell attended by telephone from the Company's New York office, but Lozano and Watson were present in person. PTE 41 at WD00118; see also PTE 372 (Russell's notes of the October 16, 1995 meeting).

[*45]

n95 PTE 41 at WD00119-21, WD00123-141; Tr. 6077:3-6078:17. But see Tr. 7732:12-17 (Lozano has no independent recollection of the October 16, 1995 meeting).

n96 PTE 41 at WD00120; see PTE 30 (memo requesting the board's unanimous consent to the amendments to the 1990 Plan and adoption of the 1995 Plan and explaining the differences between

the old 1990 Plan and the new Plans, including the potential for exercisability beyond twenty-four months following termination); PTE 265 (unanimous written consent of the Company's board of directors approving the amendments to the 1990 Plan and adoption of the 1995 Plan); DTE 142 (proxy statement dated November 13, 1995 requesting shareholder approval of the amendments to the 1990 Plan and adoption of the 1995 Plan); Tr. 2548:1-2549:9.

Following approval of these plans, Litvack reviewed the terms of the proposed OEA with the compensation committee, n97 after which the committee unanimously approved the terms of the OEA and the award of Ovitz's options pursuant to the 1990 Plan. n98 Ovitz's options were priced at market as of the date of [*46] the meeting. n99 As a final wrap-up before adjourning, the compensation committee passed a resolution "that all of the actions heretofore taken by the officers of the Corporation in connection with the foregoing resolutions [relating to the OEA] be, and they hereby are, confirmed and ratified." n100

n97 Discussion of the *bona fides* of the OEA was minimal because that discussion had occurred at the compensation committee meeting on September 26, 1995. *See* Tr. 2976:17-2977:3; 6648:9-6649:1.

n98 PTE 41 at WD00121-22; Tr. 2979:7-10; 6078:21-6080:4; *see* PTE 43 (memo from Marsha Reed to Donna Scanlon confirming the grant of Ovitz's options and their key terms); PTE 44 (PTE 43 with marginalia); PTE 48 (Ovitz's Stock Option Agreement); PTE 339 (same). *But see* Tr. 7230:4-7231:10 (Poitier) (testifying that he does not independently recall Litvack's discussion of the OEA).

n99 PTE 41 at WD00122; Tr. 2979:11-16; 2980:18-2981:4; 6083:7-24; *see* PTE 43; PTE 44; PTE 48; PTE 339.

n100 PTE 41 at WD00122. A similar resolution was also part of the resolutions approving the amendments to the 1990 Plan and adoption of the 1995 Plan. *Id.* at WD00121.

[*47]

The amendment to the 1990 Plan (consistent with the provisions of the new 1995 Plan), together with the terms of the Stock Option Agreement, n101 provided that, in the event of an NFT, Ovitz's options would be exercisable until the later of September 30, 2002, or twenty-four months after termination, but in no event later than October 16, 2005 (ten years from the date of grant). n102

n101 PTE 48; PTE 339.

n102 PTE 48 at DD002785; *see* PTE 41 at WD00142-43.

*B. Ovitz s Performance as President of The Walt Disney Company*

1. Ovitz's Early Performance

Ovitz's tenure as President of The Walt Disney Company officially began on October 1, 1995. n103 Eisner authored three documents shortly after Ovitz began work that shed light on his early performance on the job. The first is a letter written to Ovitz dated October 10, 1995. n104 Eisner lauded Ovitz's initial performance, n105 and also provided Ovitz with some written guidance with respect to Eisner's management philosophies. n106 Ovitz testified [*48] that this letter was a continuation of conversations he already had with Eisner, and that the letter was "incredibly helpful and very supportive," n107 especially in light of the fact that Ovitz was adjusting to working at a publicly-traded company. n108

n103 *See* PTE 3 at DD002012.

n104 PTE 267 (Eisner faxed a copy of the letter to Watson on October 11, 1995); Tr. 4251:7-18.

n105 Some examples of Eisner's compliments to Ovitz: "I have noticed how quickly and brilliantly you have taken to the company and the company to you. . . ." PTE 267 at DD002287. "Your instincts were right in coming to The Walt Disney Company and mine were right in suggesting it." *Id.* "Our partnership is born in corporate heaven. . . ." *Id.* at DD002290. "This is basically your first week on the job and I can already see how well it is all going to work." *Id.* at DD002291.

n106 Eisner wrote that PTE 267 "is a practical letter." *Id.* at DD002288. Some examples of Eisner's teachings: "There is no need to tell you how unique this company is. . . ." *Id.* at DD002287. "We generally stay away from partnership and joint ventures. . . . We recognize that business control is creative control." *Id.* at DD002287-88. "We must concentrate on the operations. We must concentrate on continuing to lead creatively. We must throw out mediocrity." *Id.* at DD002288. Eisner told Ovitz that public com-

pany executives should "act like Caesar's wife'." *Id.* "I feel about acquisitions exactly as I feel about everything else. We don't need them. . . . Most companies create the fiction that they can run anything better than the management of a target company. Often that is not true." *Id.* at DD002289. Eisner also provided a list of ten questions to ask before making an acquisition. *Id.* at DD002290.

[*49]

    n107 Ovitz 211:21-22.
    n108 *Id.* at 212:2-9.

    The second document is a letter Eisner wrote to the board of directors, the Bass family, and his wife on October 20, 1995. n109 In it, Eisner called Ovitz's hiring "a great coup for us and a saving grace for me. . . . Everybody is excited being with him, doing business with him. . . . He has already run a private company, and being a quick study, has quickly adapted to the public institution." n110 Eisner testified that the October 20 letter accurately reflected his views of Ovitz at the time it was written. n111 Eisner also used the October 20 letter to reiterate his views regarding the appropriateness of acquisitions for the Company. n112

    n109 PTE 313; Tr. 4263:5-18.
    n110 PTE 313 at MDE000041; *see also* Tr. 3746:13-3747:14 (Gold) (testifying that "very early on" in Ovitz's tenure, Eisner's communications to him about Ovitz "were relatively complimentary"); 3750:20-3751:10. *But see* Tr. 4018:9-4021:6 (Roy Disney) (testifying that Ovitz was known by October 1995 as being habitually late to meetings); 6088:12-6092:23 (Litvack) (testifying to an argument between himself and Ovitz in October 1995 regarding Disney characters appearing on the David Letterman Show and explaining how this was an example of how Litvack and Ovitz could not get along, but that the fault belonged to both of them).

[*50]

    n111 Tr. 4265:7-4266:7.
    n112 PTE 313 at MDE000042-44.

    The third document is dated November 10, 1995, and is a memo addressed to Tony Schwartz, Eisner's biographer. n113 In it, Eisner says that Ovitz has had a

difficult time accepting Bollenbach and Litvack as his equals, but that Ovitz was adjusting, realizing that he need not "prove to himself, to the group, to the world, that he is in charge." n114 Eisner also reaffirmed that "Michael Ovitz is the right choice. He will, in short order, be up to speed in the areas we have discussed endlessly -- brand management, corporate direction, moral compass and all those difficult areas, especially for Disney, to define." n115 Eisner described the already-existing tension between Ovitz and Litvack as attributable to Litvack by saying, "Sandy Litvack may never settle in because of his basic annoyance with the style of Michael Ovitz, but he may. Time may make it work, if he will let it." n116

    n113 PTE 316. Eisner testified that his statements contained in PTE 316 were "honest and candid" when they were written. Tr. 4273:13-19; 4274:15-20.

[*51]

    n114 PTE 316 at MDE000035.
    n115 *Id.* at MDE000036. If these areas were difficult for Disney to define, it is understandable that Ovitz would have a difficult time making the necessary adjustments.
    n116 *Id.* at MDE000037.

    As late as the end of 1995, Eisner's attitude with respect to Ovitz was positive. n117 Eisner wrote, "1996 is going to be a great year -- We are going to be a great team -- We every day are working better together -- Time will be on our side -- We will be strong, smart, and unstoppable!!!" n118 Eisner opined that Ovitz performed well during 1995, n119 notwithstanding the difficulties Ovitz was experiencing assimilating to Disney's culture. n120

    n117 PTE 331; Tr. 4277:8-4278:15.
    n118 PTE331 at DD002275.
    n119 Tr. 4278:18-4279:2. Especially after seeing the project come to fruition, Eisner is thankful for Ovitz's advice during late 1995 to place the gate to Disney's California Adventure theme park directly across from the main gate to Disneyland. Tr. 4278:18-4279:23; *see* Tr. 5302:19-5304:10 (Bollenbach) (testifying that he believed that notwithstanding Ovitz's difficulties, Ovitz could

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

still be "valuable" and "a contributor to the company").

[*52]

n120 Tr. 4279:24-4280:6. These positive, but still realistic, evaluations of Ovitz's performance stand in contrast to statements that Bass claims Eisner made at a dinner in early November 1995. *See* Bass 88:15-90:16. In my discretion as fact-finder, I do not find Bass' statements on this subject credible, and I conclude instead that the contemporaneous documents authored by Eisner, together with his trial testimony in regards to them, are credible and probative. At his deposition, Bass said that only after having his recollection refreshed was he able to recall that his meeting in Aspen with Ovitz occurred in August 1995, Bass 40:18-23, and when asked the "approximate date" of Ovitz's hiring, Bass could only reply "Fall 95." Bass 76:3-5. Because the time at which Eisner made the statements attributed to him is of paramount importance, I do not credit Bass' deposition testimony for that reason, but not that reason alone. *See* Tr. 4274:21-4276:12 (Eisner) (testifying that Bass was mistaken with respect to when certain events occurred). Bass' testimony is also vague as to the problems attributed to Ovitz -- that Eisner "was having no success in dealing with Ovitz," that Ovitz "didn't care about money," "never looked at economics," and had "continuous problems of veracity." Bass 88:25-89:8. Furthermore, Eisner may not have been completely truthful with Bass or may have exaggerated the extent of the problems with Ovitz due to the stresses of that day or any other reason. *See* Tr. 4372:13-16; 4373:11-17; 4431:6-4433:21. Had I had the opportunity to observe Bass at trial, I might have reached a different conclusion as to the weight of his testimony, but based upon the record presented to me and my personal determinations as to the credibility of the testimony presented at trial, I find Eisner's account of Ovitz's performance together with the contemporaneous documents credible, and Bass' deposition testimony not credible. As a totally separate matter, Bass' statements would be of little worth even if I were to credit them, because they are hearsay and, therefore, inadmissible against all defendants other than Eisner. D.R.E. 801.

[*53]

2. A Mismatch of Cultures and Styles

In 1996, however, the tenor of the comments surrounding Ovitz's performance and his transition to The Walt Disney Company changed. n121 In January 1996, a corporate retreat was held at Walt Disney World in Orlando, Florida. n122 At that retreat, Ovitz failed to integrate himself in the group of executives by declining to participate in group activities, insisting on a limousine when the other executives, including Eisner, were taking a bus, and making inappropriate demands of the park employees. n123 In short, Ovitz "was a little elitist for the egalitarian Walt Disney World cast members [employees]," n124 and a poor fit with his fellow executives. n125

n121 *See* Tr. 6970:21-6971:11; 7141:2-22. *Compare* Tr. 2567:7-16, 3746:17-3747:14, 3750:20-3751:6, 4010:10-4011:1, 5591:20-5593:1, 5806:12-5808:7, 5925:3-5926:10, 6086:5-17 *and* 7640:9-12 *with* 2567:17-2568:2, 3751:11-3751:18, 4021:7-4022:9, 4280:7-13, 5291:24-5292:16, 5593:2-11, 5808:8-20, 5926:11-24, 7241:14-7243:20, 7552:2-16, 7640:13-22, 7854:24-7857:12 *and* 8146:9-8147:2 (comparing the directors' views of Ovitz in 1995 and 1996).

[*54]

n122 Tr. 4280:14-4282:22.
n123 Tr. 4281:4-4282:1.
n124 Tr. 4281:23-24; *see also* Tr. 4282:2-22.
n125 Tr. 5291:24-5295:7; 5307:2-18; *see also* Tr. 3751:11-3754:16 (Gold) (testifying to a lunch meeting with Eisner on January 26, 1996, where Gold was "shocked" to hear of these problems with Ovitz); 3754:17-3755:7 (Gold) (testifying that he spoke to Roy Disney about this conversation, and Roy Disney was less surprised to hear of these difficulties than Gold because of his personal interactions with Ovitz).

As 1996 wore on, it became apparent that the difficulties Ovitz was having at the Company were less and less likely to be resolved. By the summer of 1996, Eisner had spoken with several directors about Ovitz's failure to adapt to the Company's culture. n126 In June 1996, Eisner, Ovitz, and Wilson were in France for a cycling trip during which "it became clear [to Wilson] that what [he] had been hearing was not just idle gossip," but that "there was a problem of Mr. Ovitz being accepted into the organization." n127

n126  Tr.  2567:17-2571:18;  4021:7-4022:12;
4294:4-4295:20 (between January and May 1996,
Eisner spoke with Gold, Bollenbach, Litvack,
Watson, Wilson and Russell about the increasing
difficulties with Ovitz); 4733:7-4734:2; 5593:2-
11;  5810:8-12;  5851:10-5854:12;  6095:19-
6099:17; 7855:20-7857:12; 8147:3-8148:24; PTE
67 (note from Eisner to Watson and Russell en-
closing an email from Eisner to Bass on May 26,
1996, discussing a conversation they had a few
weeks earlier); see also Tr. 4297:2-4304:5 (Eis-
ner) (testifying that he was aware in May 1996
that Iger, Bollenbach and Litvack were having
problems with Ovitz); 6099:18-6100:9 (Litvack)
(testifying that he was also aware of the problems
between Ovitz and Iger).

[*55]

n127 Tr. 6836:15-6838:9; 4734:3-4735:12.

3. Approaching the Endgame

By the fall of 1996, directors began discussing that
the disconnect between Ovitz and the Company was
likely irreparable, and that Ovitz would have to be termi-
nated. n128 Additionally, the industry and popular press
were beginning to publish an increasing number of arti-
cles describing dissension within The Walt Disney Com-
pany's executive suite. n129 One of the more prominent
of these articles was an article published in Vanity Fair
based on an interview given by Bollenbach, n130 which
many of the directors discussed while present for the
November 25, 1996 board meeting. n131

n128  See  Tr.  4345:17-4346:4;  4354:3-4355:6;
4368:1-18; 7555:22-7556:2; 8153:10-8154:5.
n129 PTE 8; PTE 21; PTE 22; PTE 166; PTE
171; PTE 300; PTE 304; PTE 321; PTE 507; PTE
508; PTE 509.
n130 PTE 8.
n131 Tr. 5930:2-13; see PTE 89 (fax from Gold
to Roy Disney on November 6, 1996, attaching
the text of the article); see also Tr. 5199:20-
5200:23 (Eisner) (recalling having read the arti-
cle); 6580:13-15 (Litvack) (testifying he is "sure"
all the directors saw the article); 7574:10-14
(Tom Murphy read it). But see also Tr. 6757:14-
21 (O'Donovan) (failing to recall reading the arti-
cle); 7916:23-7917:3 (Watson) (recalling the arti-
cle's existence, but not reading it).

[*56]

4. Specific Examples of Ovitz's Performance as
President of The Walt Disney Company

Throughout this litigation, plaintiffs have argued
that Ovitz acted improperly while in office. The specific
examples discussed below demonstrate that the record
created at trial does not support those allegations.

Plaintiffs have alleged that even before Ovitz was
formally elected as President and employed by Disney,
that he exercised Presidential authority in connection
with the construction or renovation of his office. n132
The record does provide support for the benign assertion
that Ovitz performed some work for the Company before
his hiring was official. n133 In addition to the fact that
the documents plaintiffs rely on evidence no effort by
Ovitz to direct the office work or authorize expenditures
for it, n134 the testimony of both Ovitz and Eisner was
that Ovitz's involvement in the project was limited. Fur-
thermore, Ovitz's authority over the project both before
and after October 1, 1995, was minimal at best, yet at the
same time consistent with the input that would be ex-
pected from an executive when a new office is built for
him or her. n135

n132 Ovitz 183:21-187:5; PTE 476; DTE 110;
see Tr. 1927:6-1940:24; PTE 24 at DD002451.

[*57]

n133 Ovitz 162:16-163:7; Tr. 5289:14-5291:23
(Bollenbach) (testifying that he thought it was a
"very good practice" to provide information to an
officer coming to a senior position at the com-
pany before that person officially begins work);
6074:22-6075:8 (Litvack testified that: "It was
not unusual at all," for someone to begin work
before their employment agreement was exe-
cuted). See generally Tr. 2222:9-2223:8; PTE
545 (presentation regarding the CapCities/ABC
acquisition that was forwarded to Ovitz before he
arrived at the Company, but there is nothing in
the record to suggest that Ovitz received this
document before mid-August 1995); PTE 622;
PTE 742; DTE 190; DTE 192; DTE 193; DTE
224. Eisner also applauds Ovitz's attendance on a
trip to Jackson Hole, Wyoming to meet the Com-
pany's Consumer Products division before his
employment officially began. PTE 316 at
MDE000037. Because Ovitz was performing
work either on behalf of the Company, or in
preparation for his tenure there, his request for re-

imbursement of expenses related to The Walt Disney Company during that period of time are therefore appropriate and reasonable. *See* DTE 59 at WD6601. The. appropriate persons in both management and auditing approved those September 1995 expenses. *Id.*

[*58]

n134 PTE 476; DTE 110; *cf.* Tr. 1934:11-1935:24; PTE 475 (memo dated January 15, 1995 addressed to Ovitz with respect to millwork expenditures in Ovitz's office, though the context makes it clear that if January 15 is the correct date, that the memo must have intended to be dated January 15, 1996, as DTE 144, DTE 152 and DTE 153 all indicate that there were outstanding issues regarding the millwork in Ovitz's office from December 1995 until at least February 1996).

n135 Tr. 4389:10-4391:11; 6075:12-6076:16; 6141:9-24; *see also* Tr. 1318:13-1326:1; 1927:6-1940:24; DTE 144; PTE 654. Furthermore, the work that may have occurred on Ovitz's office between mid-August 1995 and the formal commencement of his employment on October 1 of that year is consistent with what would be anticipated when a company prepares for a new employee before their expected arrival.

In addition to allegations that Ovitz overstepped his authority with respect to his office, plaintiffs contend that Ovitz acted improperly in connection with discussions he had, either personally, or on behalf of the Company, [*59] with representatives from the National Football League ("NFL") with respect to bringing a team to the Los Angeles area. n136 First and foremost, contemporary documents indicate that Disney, under Eisner's direction, was considering bringing an NFL franchise to Los Angeles before Ovitz's hiring was even announced, much less completed. n137 Second, any work Ovitz may have done on behalf of the Company in regards to the NFL before his employment formally began is, in my mind, evidence of Ovitz's good faith efforts to benefit the Company and bring himself up to speed -- not evidence of malfeasance or other ulterior motives. n138 Third, it is clear from the record that, as soon as Eisner instructed Ovitz to cease discussions with the NFL, Ovitz complied with Eisner's directive. n139 Again, the record fails to support allegations of misconduct by Ovitz in this regard either before or after October 1, 1995.

n136 *see* Tr. 1128:5-1133:18.

n137 DTE 188 (memo to Eisner dated August 14, 1995 summarizing the status of the Company's prior discussions with the NFL; Ovitz was copied on the memo).

[*60]

n138 *See* PTE 621; PTE 631; DTE 189; DTE 191 (duplicative of PTE 631); Tr. 5159:12-5166:18. There are no allegations, nor any factual support in the record, for the proposition (which plaintiffs have not put forward) that Ovitz received a salary from the Company for work performed before October 1, 1995.

n139 Tr. 1133:19-1134:2; 5164:7-16. The deposition testimony cited by plaintiffs (Bass 76:9-77:25; Eisner 330:3-331:6), which they argue supports the contrary proposition that Ovitz continued pursuing a deal with the NFL after Eisner instructed him to cease such discussions, is too vague to contradict the trial testimony previously cited. *See also* Tr. 4283:19-21 (Eisner) (testifying that Ovitz "walked away from" deals that made no economic sense).

Plaintiffs argue that Ovitz is responsible, at least in part, for Bollenbach's decision to leave the Company, n140 and the controversy surrounding the hiring of Jamie Tarses to ABC. Bollenbach's trial testimony, however, contradicts the assertion that he left because of Ovitz. n141 Instead, he left the Company to pursue a better [*61] opportunity with Hilton Hotels. n142

n140 *See* PTE 8 at DD002123, DD002125.

n141 Tr. 5308:10-5310:10. Bollenbach did, however, reaffirm at trial that certain portions of PTE 8 were accurate. *See* Tr. 5399:7-5401:4; 5412:18-5413:9; 5471:22-5472:6.

n142 Tr. 5308:10-5310:10.

In mid-1996, ABC hired Jamie Tarses. n143 It was reported in the press that Ovitz "orchestrated" Tarses' hiring even though she was under contract at NBC for roughly fifteen more months. n144 Eisner testified that Ovitz was not at fault for the perceived negative repercussions of Tarses' hiring, saying that he "was convinced that [Ovitz] was brought into something he did not instigate." n145 In fact, Tarses' hiring was championed by Iger and approved by Litvack. n146

n143 Ms. Tarses was a television executive and is sometimes referred to as Jamie McDermott. Tr. 1698:7-8; 1713:7-8.

n144 PTE 85; PTE 303; *see* PTE 435.

[*62]

n145 Tr. 4385:3-4386:16; DTE 194; *see* Tr. 1700:5-22. *But see* Ovitz 450:14-451:3.

n146 Iger 97:21-99:8; *see* Tr. 6136:23-6138:1. *But see* Bass 123:7-125:5 (Bass' opinion on the Tarses situation is that it was Ovitz's fault based upon statements made by Eisner that are inadmissible hearsay against all defendants but Eisner).

Another "failure" plaintiffs have attempted to pin on Ovitz, but which is in reality more attributable to Iger, revolves around the film *Kundun*, directed by Martin Scorsese. n147 The film was not well received by the Chinese government and, at least initially, may have caused the Company some setbacks in that rapidly expanding market. n148 Once again, however, the testimony was clear that Ovitz did not have authority to approve the movie; instead, that authority (and the concomitant responsibility) rested wholly with Roth and Eisner. n149

n147 Tr. 1217:14-19; 4386:17-23.

n148 Tr. 1218:19-1220:4; 6138:10-15.

n149 Tr. 1217:20-1218:12; 4386:24-4389:3; 6138:2-15. Because Ovitz had no authority over the motion picture studio, Eisner's attempt to blame him for losses in that area was unwarranted. *See* PTE 755 at WD09868. Indeed, Eisner had recognized in his May 26, 1996, email to Bass that the cost overruns in the motion picture studio were due to Roth's decision to dramatically increase marketing costs on unsuccessful movies. PTE 67 at DD002980-81.

[*63]

Although the general consensus on Ovitz's tenure is largely negative, Ovitz did make some valuable contributions while President of the Company. As previously mentioned, n150 Ovitz made a key recommendation with respect to the location of the gate to Disney's California Adventure theme park, built on part of the Disneyland parking lot. n151 He was instrumental in recruiting Geraldine Laybourne, founder of the children's cable channel Nickelodeon, and overhauling ABC's Saturday

morning lineup. n152 Ovitz was successful in bringing Tim Allen back to work after he walked off the set of Home Improvement due to a disagreement. n153 He also helped retain several animators that Katzenberg was trying to bring over to Dreamworks. n154 Ovitz also assisted Roth in handling relationships with "talent." n155 Ultimately, however, Ovitz's time as President was marked by more "woulda, coulda, shoulda" than actual success.

n150 *See supra* note 119.

n151 Tr. 1204:11-1208:2; 4278:18-4279:23.

n152 Tr. 1233:8-1238:5.

n153 Tr. 1249:7-1255:14; 5034:5-5038:13; *see also* Tr. 6539:6-6542:6.

[*64]

n154 Tr. 1229:16-1231:9.

n155 Tr. 1208:3-1209:18; Roth 9:22-10:18. In the end, Ovitz and Roth had different and wholly incompatible perspectives on the use of talent. *See* Roth 34:9-38:15.

As an example, Jeffrey Katzenberg was formerly the head of Walt Disney Studios. n156 After his contract with Disney was not renewed, he founded Dreamworks and embroiled the Company in a very costly lawsuit. n157 Ovitz testified that after some discussions with Katzenberg, he could have settled that dispute before the lawsuit was filed for roughly $ 90 million, and although the actual amount of the settlement remains confidential, Ovitz believes that it was in excess of $ 250 million. n158 Ovitz, however, was not given authority to settle that suit on behalf of the Company. n159 The litigation, therefore, was filed and continued until the confidential settlement in 1999. n160

n156 Tr. 1153:18-24; 4053:8-16.

n157 Tr. 4690:1-6; *see also* Tr. 3824:1-3829:22.

n158 Tr. 1153:18-1160:12.

[*65]

n159 Tr. 1159:18-1160:5.

n160 Litvack testified that "no one could settle the Jeffrey Katzenberg case for $ 90 million." Tr. 6132:22-23. *See supra* note 157.

Ovitz was assigned to oversee Disney Interactive, which created interactive video games. n161 Eisner testified that Disney Interactive was "doing very badly, actually," but he hoped that Ovitz might be able to turn it around. n162 Ovitz was unable to do so. n163 In the face of Eisner's critical view of Ovitz's performance with respect to Disney Interactive, Ovitz testified that he had several ideas for Disney Interactive which could have potentially helped Disney Interactive, n164 including a joint venture with Sony, n165 and a purchase of part of Yahoo!(R), n166 all of which Eisner rejected. Ovitz also pursued, together with Roth, a deal intended to benefit Disney's motion picture studio with Beacon Communications, a company run by Armyan Bernstein, a writer and director. Again Eisner instructed Ovitz not to close the deal. n167

n161 Tr. 1164:7-1165:12; 5168:12-24.

[*66]

n162 Tr. 5168:20-5169:6; see PTE 744 at WD09336-37.
n163 Tr. 5170:5-10.
n164 see Tr. 1180:14-1181:8.
n165 Tr. 1165:13-1171:18.
n166 Tr. 1171:19-1179:17; see also Tr. 1179:18-1180:13.
n167 Tr. 1210:23-1213:6; PTE 322; PTE 747; PTE 749.

Ovitz wanted the Company to purchase Putnam Publishing in order to acquire the rights to author Tom Clancy. He also wanted to place other prominent authors (and former clients) such as Michael Crichton and Stephen King under contract with Disney's publishing division. n168 Eisner rejected these efforts as ill conceived. n169

n168 Tr. 1160:18-1163:19.
n169 Tr. 1163:21-1164:9; see also Tr. 4286:8-12.

A similar story emerges of Ovitz's leadership over Hollywood Records. n170 Ovitz wanted to place Janet Jackson under contract with Hollywood Records, n171 acquire EMI (a Hollywood Records competitor) or enter into a joint [*67] venture with Sony. n172 Once again, however, Eisner rejected all of these suggestions. n173 Eisner and others were also critical of what they per-

ceived to be a lack of attention paid by Ovitz to Hollywood Records, n174 though Ovitz's files belie the assertion that Ovitz ignored his oversight of Hollywood Records. n175

n170 See Tr. 1134:7-1137:24. Hollywood Records, according to Litvack, was from its creation to that time, "a spectacular failure." Tr. 6146:23-6147:5; see also DTE 207; PTE 638.
n171 Tr. 1138:1-1139:10.
n172 Tr. 1139:18-1147:2.
n173 Tr. 1139:11-17; 1147:3-9.
n174 See PTE 24 at DD002452-53; PTE 626; PTE 780 at WD13842.
n175 See PTE 606; PTE 622; PTE 629; PTE 768; DTE 190. Donohue's predictable opinion that "Ovitz could have been in a coma and still collecting these empty documents" is of no benefit to the Court and, indeed, documents such as PTE 606 and PTE 622 contain marginalia with Ovitz's handwriting, which would refute Donohue's opinion that there is no indication that the files were ever read by Ovitz. See Tr. 9282:15-9284:16. Furthermore, plaintiffs' attempt to use Ovitz's statement on the Larry King Live show -- that after a year on the job he knew "about one percent of what I need to know" -- to demonstrate that Ovitz failed to apply himself on the job, is specious and wholly unpersuasive. PTE 323 at 7.

[*68]

There are three competing theories as to why Ovitz was not successful. First, plaintiffs argue that Ovitz failed to follow Eisner's directives, especially in regard to acquisitions, n176 and that generally, Ovitz did very little. Second, Ovitz contends that Eisner's micromanaging prevented Ovitz from having the authority necessary to make the changes that Ovitz thought were appropriate. n177 In addition, Ovitz believes he was not given enough time for his efforts to bear fruit. n178 Third, the remaining defendants simply posit that Ovitz failed to transition from a private to public company, from the "sell side to the buy side," and otherwise did not adapt to the Company culture or fit in with other executives. In the end, however, it makes no difference why Ovitz was not as successful as his reputation would have led many to expect, so long as he was not grossly negligent or malfeasant.

n176 Plaintiffs' authority for this argument comes from the letter Eisner dated October 10, 1995. PTE 267. Plaintiffs often quote the letter in this way: "Acquisitions are something we should . . . almost never do." *Id.* at DD002290. The sentence actually reads: "Acquisitions are something *we should look at* and almost never do." *Id.* (emphasis added). It is obvious that this letter, therefore, can provide no support for the proposition that Ovitz intentionally disobeyed an order or directive from Eisner to not pursue acquisitions under any circumstances. As discussed above, the record does not bear out the assertion that Ovitz continued pursuing specific acquisitions after being instructed by Eisner to no longer pursue them.

[*69]

n177 Ironically, Ovitz testified that Eisner advised him not to take the job at MCA because Eisner believed that Ovitz would not have enough autonomy to turn the company around. Tr. 1275:14-1276:14.

n178 *See, e.g.,* Tr. 1171:14-18.

Many of Ovitz's efforts failed to produce results, often because his efforts reflected an opposite philosophy than that held by Eisner, Iger, and Roth. n179 This does not mean that Ovitz intentionally failed to follow Eisner's directives or that he was insubordinate. To the contrary, it demonstrates that Ovitz was attempting to use his knowledge and experience, which (by virtue of his experience on the "sell side" as opposed to the "buy side" of the entertainment industry) was fundamentally different from Eisner's, Iger's, and Roth's, to benefit the Company. n180 But different does not mean wrong. Total agreement within an organization is often a far greater threat than diversity of opinion. n181 Unfortunately, the philosophical divide between Eisner and Ovitz was greater than both believed, and as two proud and stubborn individuals, neither of them [*70] was willing to consider the possibility that their point of view might be incorrect, leading to their inevitable falling out. n182

n179 *See* Roth 29:16-30:20.

n180 *see* Tr. 4284:9-4285:10.

n181 I note that Judge Posner eloquently emphasized this point in his critique of the 9/11 Commission Report by saying that:

> Much more troublesome [than the public relations effort by the

commission, especially the participation of victims' relatives] are the inclusion in the report of recommendations (rather than just investigative findings) *and the commissioners' misplaced, though successful, quest for unanimity. . . . And pressure for unanimity encourages just the kind of herd thinking now being blamed for that other recent intelligence failure -- the belief that Saddam Hussein possessed weapons of mass destruction.*

At least the commission was consistent. It believes in centralizing intelligence, and people who prefer centralized, pyramidal governance structures to diversity and competition deprecate dissent. *But insistence on unanimity . . . deprives decision makers of a full range of alternatives. For all one knows, the price of unanimity was adopting recommendations that were the second choice of many of the commission's members or were consequences of horse trading. The premium placed on unanimity undermines the commission's conclusion. . . .*

Richard A. Posner, *The 9/11 Report: A Dissent,* N.Y. TIMES, August 29, 2004 (emphasis added). Judge Posner's critique also warns against the dangers of judging past actions with the benefit of perfect hindsight, saying that, "The commission's statement that Clinton and Bush had been offered only a narrow and unimaginative menu of options for action' [in response to al Qaeda] is hindsight wisdom at its most fatuous," by outlining several of the available options. *Id.*

[*71]

n182 *See* Tr. 3811:3-3814:15.

5. Veracity and "Agenting"

At trial, plaintiffs, together with their expert on these issues, Donohue, spent a great deal of effort attempting to persuade the Court that Ovitz was a habitual liar, and that his lack of veracity would constitute good cause to terminate him without paying the NFT. n183 Defendants

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

respond that the purported veracity problems attributable to Ovitz do not involve material falsehoods, but instead were caused by Ovitz's tendency to "handle" or "agent" others.

n183 As with many of their other allegations, plaintiffs heavily rely on PTE 20, PTE 24, PTE 67, PTE 79, and the hearsay statements of Bass. In attempting to bolster their position, plaintiffs point to part of Ovitz's trial testimony to argue that his "self-serving" testimony was contradicted by other witnesses. See, e.g., Tr. 1220:14-1228:1. In that passage, Ovitz recalls meetings in New York with Bollenbach, Litvack and Iger, followed by a meeting with Eisner in Los Angeles. Id. Eisner's testimony indicates a lack of specific recollection of that meeting, but basic familiarity with the issues purportedly discussed there. Tr. 5081:8-5084:5. Bollenbach could not specifically recall the meeting either, but does remember at least one meeting in New York with Ovitz. Tr. 5488:10-5493:11. Litvack's testimony was unclear on whether he remembered the meeting to which Ovitz was referring, at one point saying "I am sure that we met with Mr. Eisner after these meetings, yes," with the very next words out of his mouth being, "I don't recall." Tr. 6555:5-6556:16. Needless to say, the contradiction is, at most, minimal and a natural consequence of the many years that have passed since these events transpired rather than evidence of a lack of honesty on the part of Ovitz.

[*72]

Eisner testified that, with respect to Iger's statement that Iger did not trust Ovitz, n184 the lack of trust was related to Ovitz's failure to communicate with Iger, and that Ovitz "wasn't doing anything wrong." n185 Eisner also expressed that he personally did not trust Ovitz. n186 From both the tenor of the document (written shortly after the stress of his mother's death) and from Eisner's more emotionally detached trial testimony, n187 however, it is clear that Eisner was not referring to any material falsehoods, but instead to Ovitz's salesmanship n188 or, in other words, his "agenting." n189

n184 PTE 67 at DD002981; Tr. 4298:6-4302:7.
n185 Tr. 4300:7-4301:22. This testimony demonstrates that there could be any number of reasons

for which Iger would no longer trust Ovitz. Lack of veracity is but one.
n186 Eisner wrote:

Michael [Ovitz] does not have the trust of anybody. I do not trust him. None of the people he works with feels comfortable with his directness and honesty. Like an athlete who has lost his way, Michael is pressing, is confused, [is] ineffective. His heart may be in the right place, but his ego never allows it to pump. His creative instincts may be in the right place, but his insecurity and existential drive never allows a real functioning process. . . . He would be a great salesman, but his corporate disingenuous nature undermines him. And his lack of interests in long-term outcomes affects his judgment on short-term deals. The biggest problem is that nobody trusts him, for he cannot tell the truth. He says whatever comes to mind, no matter what the reality. Because of all the above his executives, outside business associates, and the Press have turned against him.

PTE 79 at DD002624.

[*73]

n187 Tr. 4434:1-4439:22; see also Tr. 3763:11-23; 6386:24-6388:4.
n188 Tr. 4438:10-4439:22.
n189 Tr. 6373:18-6374:13. But cf. Bass 44:17-46:5; 102:24-103:5 (Bass' opinion that Ovitz was not honest was not based upon first hand experience and personal knowledge, but was based instead on the hearsay statements of Eisner and other unnamed declarants). Eisner's credible trial testimony on this subject significantly undermines the probative value of Bass' testimony, which again, the Court was not able to observe personally. See, e.g., Tr. 4434:1-4439:22.

Litvack felt the same way, saying that he did not trust Ovitz's judgment and that he did not trust Ovitz generally because Ovitz would "handle" Litvack and "put his spin on things." n190 Litvack also said that the

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

"worst that I could remember in terms of lies was -- and I use the word lies'-was I was on the phone with someone important and couldn't be on time for the meeting.'" n191 Other executives and directors made similar comments that they could recall no material falsehoods told to them by Ovitz. n192

n190 Tr. 6132:11-19; *see also* Tr. 6088:12-6092:23; 6374:18-6378:17.

[*74]

n191 Tr. 6135:1-4. Clearly, these statements, even if construed as lies, would not constitute gross negligence or malfeasance.

n192 *See* Tr. 2621:15-2622:13 (Russell); 3755:8-3756:9 (Gold); 4012:14-4013:8 (Roy Disney); 5307:17-5308:9 (Bollenbach); 5809:3-7 (Nunis); 5940:20-23 (Bowers); 6724:7-15 (O'Donovan); 6847:10-16 (Wilson); 7148:8-12 (Poitier); 7552:23-7553:1 (T. Murphy); 7649:10-16 (Lozano); 7867:6-9 (Watson); 8161:6-7 (Stern); Roth 118:20-119:13.

In the absence of any concrete evidence that Ovitz told a material falsehood during his tenure at Disney, plaintiffs fall back on alleging that Ovitz's disclosures regarding his earn-out with, and past income from, CAA, were false or materially misleading. n193 As a neutral fact-finder, I find that the evidence simply does not support either of those assertions. n194 The allegedly false or misleading disclosure regarding Ovitz's earn-out rights is contained in the copy of the Company's "Statement of Policy Regarding Conflicts of Interest and Business Ethics and Questionnaire Regarding Compliance" that Ovitz signed on October 24, 1995. n195 [*75]

n193 At trial, when asked to give specific instances of lies by Ovitz, Donohue could only provide two concrete examples of Ovitz's lying, one with respect to a deal Ovitz apparently made to sell an airplane to one of his prior business partners, *see* PTE 404 at 45 n.48, and the other relating to breaking the purported mutual non-disparagement agreement that Ovitz agreed to when he left the Company. Tr. 655:24-658:12. Donohue's report indicates that even he did not consider the alleged deception with respect to the airplane grounds for a for-cause termination because it did not occur in the course of Ovitz's du-

ties for Disney. PTE 404 at 45 n.48. Any statements Ovitz may have made that violated a mutual non-disparagement agreement would similarly not constitute cause for termination because they occurred after his termination was publicly announced, and were not made in the course of his duties for the Company.

n194 *See* PTE 200 (W-2 for 1995 representing Ovitz's income at CAA from January 1, 1995 to the end of September 1995 for almost $ 18 million). This W-2 is consistent with Ovitz's testimony. Tr. 1099:5-15.

[*76]

n195 PTE 314; PTE 127 (transmission of the signature page of the document by Adler to Santaniello). Ovitz's statement reads as follows:

I beneficially own a majority interest in my prior employer ("Prior Employer"), a franchised talent agency. My ownership interest is held by an independent trustee. The talent agency business of the Prior Employer is being continued by Creative Artists Agency LLC ("CAA"), in which I have no direct or indirect ownership interest. The Prior Employer will continue to receive commissions from contracts entered into by its former talent agency clients on or before September 30, 1995 and will also lease certain real and personal property to CAA.

Except for ownership interests of less than 5% in publicly traded companies, either I or my Prior Employer may be deemed to beneficially have ownership interests in the following entities that are engaged in the media, entertainment, communications or publishing businesses; Diamond Cable Communications PLC [&] Ziff-Davis Holdings Corp.

PTE 314 at DD000292.

Plaintiffs attack this disclosure on several grounds. [*77] First, they argue that Ovitz was entitled to a majority of some unknown list of booked commissions that allegedly changed over time. The disclosure by Ovitz

makes clear that he owned a majority interest in his prior employer, which would lead any reasonable person to believe that he would receive a majority of the income from that entity. n196 The disclosure also clearly spells out that Ovitz would be entitled to receive commissions from contracts entered into on or before September 30, 1995. n197 Ovitz's testimony that it is common practice in the industry for some of these contracts to be oral is not contradicted. n198 Plaintiffs' assertion that the commissions list evolved over time is consistent with the parties' agreement, but there is no support in the record for the assertion that the *definition* of those commissions changed during any time relevant to this suit. n199

n196 Oldco's (also known as CAA, Inc. or "Prior Employer") receipt of revenues from booked talent commissions were based upon Newco's (also known as CAA, LLC) financial success. *See* PTE 203 at MTO 1660; Tr. 1450:5-1452:5; 1533:2-1535:4. To alleviate any potential conflicts relating to this symbiotic relationship between Oldco and Newco, Disney created a process by which conflicts of interest between Ovitz and CAA were to be avoided through approval of transactions greater than $ 100,000 involving a CAA client by any two of (1) Eisner, (2) Litvack, or (3) Gerry Swider. PTE 148; PTE 374; Tr. 1298:11-1299:22; 1610:20-1613:2; 6457:15-6469:20; 6696:5-6697:1. Plaintiffs attempt to use PTE 581 to demonstrate that this process was not followed, but Litvack's memory of these deals is hazy, and with respect to many of the deals, Litvack testified that he believed the projects related to many of those deals were not completed. Tr. 6494:11-6508:7. Given the sparsity of this record, I cannot conclude first, that the conflict of interest avoidance procedure was not used, or second (and more importantly), that if the procedure was not used, such failure was attributable to Ovitz, or that Ovitz used his position as President to facilitate deals with CAA clients in order to advance his personal financial interests. *See* Tr. 8844:10-8851:19.

[*78]

n197 *See* PTE 202 at MTO 582, PTE 206 at MTO 611-12; PTE 208.
n198 Ovitz 561:22-562:6; *see also* PTE 206 at MTO 610-11.
n199 It appears that the definition of booked commissions may have been altered in 1999, long after Ovitz left Disney, making such change ir-

relevant to this case. PTE 209 at MTO 2161-63. This alteration may have been necessitated by Newco's arrearages in paying Oldco, arrearages which were substantial as of October 1997. PTE 205. Eventually, Newco and Oldco reached a settlement in full accord and satisfaction of their respective obligations. PTE 209.

Second, plaintiffs contend that Ovitz held a security interest in Newco that contradicts his disclosure that he had no direct or indirect ownership interest in Newco. n200 The form used to perfect the security interest is clear on its face that it relates to a debt instrument, hence Oldco is referred to as the "Secured Party" and Newco is referred to as the "Debtor." n201 As plaintiffs' counsel no doubt understands, a security interest based upon a debt instrument is *not* an ownership interest. Upon [*79] considering the documentary evidence and testimony, I find that Ovitz's disclosures were neither false nor misleading. n202

n200 *See* PTE 203 (creation of interest); PTE 254 (perfection of interest).
n201 PTE 254.
n202 Plaintiffs' allegations that Ovitz *again* lied in relation to the Statement of Policy Regarding Conflicts of Interest and Business Ethics and Questionnaire Regarding Compliance when he left the Company, *see* PTE 70, must also fail in light of my findings below that Ovitz was in compliance with the Company's policies regarding gifts.

6. Gifts and Expenses

In moving from the talent agency he founded to a public company, Ovitz was faced with an array of new policies and rules relating to gifts and expenses. Eisner had asked Russell to speak to Ovitz about his expenses, n203 and on January 17, 1996, Russell and Ovitz met for breakfast to discuss the topic. n204 To follow up on their meeting, Ovitz sent a memo to Russell in January 1996 asking for help in handling [*80] his expenses. n205 According to Ovitz, Russell was "fantastic" in helping Ovitz's assistant meet and confer with a knowledgeable Disney employee so that Ovitz's expenses could be properly handled. n206

n203 *See* PTE 378; Tr. 3046:6-3049:17; 4393:1-4394:4.

n204 Tr. 2560:3-2563:18.
n205 PTE 318; Tr. 1315:8-1318:12.
n206 Tr. 1317:11-1318:12.

The only evidence in the record that is admissible to prove that Ovitz did not comply with Disney's policies regarding expenses is (1) the statements by Eisner that Ovitz may not have been in compliance with those policies, and (2) the undisputed fact that Disney withheld $ 1 million from the cash payment of Ovitz's NFT, but ultimately returned all but roughly $ 140,000 of that amount. n207

n207 At trial and in the post-trial briefing, plaintiffs have relied extensively on PTE 147, a draft report by Price Waterhouse which purportedly uncovers numerous examples of Ovitz' expense reimbursement requests not complying with Company policy. I have previously ruled that the report is hearsay, and therefore inadmissible when offered to prove the truth of the matters asserted in the report. *See In re The Walt Disney Co. Derivative Litig., 2005 Del. Ch. LEXIS 28, 2005 WL 407220, at *1 (Del. Ch. Feb. 4, 2005).* Plaintiffs also cite to DTE 59, a collection of expense reports submitted by Ovitz in an effort to show that Ovitz requested reimbursement for non-Disney expenses. The documents in DTE 59 on their face do not demonstrate that the expenses were not related to Disney, and there is no testimony in the record to lead me to believe otherwise. In fact, each and every expense report in DTE 59 has been countersigned in the box for "Audit Approval," with the overwhelming majority (but not all) of the forms also having been countersigned in the box for "Management Approval." In the absence of further evidence, this can lead me to no other conclusion than that all of the expenses detailed in DTE 59 were properly reimbursable under appropriate Company guidelines, including those incurred in late December 1996. DTE 59 at WD04935, WD05159.

[*81]

The record contains several examples of statements by Eisner where he believed that Ovitz's compliance with Company expense policies was questionable. n208 The trial testimony of Eisner, Russell, and especially Litvack (whom Eisner had assigned to oversee Ovitz's expenses), however, was credible and coherent in stating that Ovitz was in compliance with the Company's expense policies. n209

n208 *See* PTE 24 at DD002451; PTE 378; Tr. 3049:18-3051:20.
n209 *See* Tr. 2632:21-2633:23; 2892:4-14; 4578:9-4580:20; 6145:20-6146:6; 6171:8-. 6178:11; 6362:5-23; 6533:4-20; 6604:5-16; 6692:12-6693:12; *cf.* Tr. 2883:24-2885:21; 3041:2-22.

With respect to the eventual holdback of $ 139,184 from Ovitz's severance, n210 only $ 70,212 was attributed to potential expense policy violations. n211 The remaining $ 68,972 related to the unamortized cost of capital improvements to Ovitz's home, n212 and Litvack clearly testified at trial that the Company had no contractual right to recoup those costs from Ovitz. [*82] n213

n210 *See* PTE 385; PTE 403.
n211 DTE 178.
n212 *Id.*
n213 Tr. 6174:17-6176:16.

The record provides no support for, and indeed often contradicts, two key assertions made by plaintiffs regarding the holdback. First, plaintiffs' assertions that the holdback itself is evidence that the defendants were on notice at the time of Ovitz's termination that grounds to terminate him for cause may have existed cannot stand in light of the testimony that many executives at the Company were at least six months behind in billing their expenses. n214 The holdback, then, was simply a way to avoid having to collect that money back from Ovitz after termination if there was insufficient justification for the billings. n215 Second, the $ 70,212 ultimately withheld from Ovitz is not *prima facie* evidence that Ovitz "stole" from Disney. As to both of these points, Litvack testified that insufficient justification and documentation was the reason for the final holdback -- not a determination [*83] that Ovitz had "stolen" from or otherwise intentionally defrauded the Company. n216

n214 Tr. 4579:4-4580:20; 4400:21-4402:4; 5044:16-5045:19; 6423:19-6424:19.
n215 Tr. 4579:4-4580:20; 4400:21-4402:4; 5044:16-5045:19; 6423:19-6424:19.

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

n216 Tr. 6174:8-6175:23;   6178:7-11;   6604:5-6605:23;  *see also* Tr. 6273:9-6275:9; 6533:4-20; 6691:16-6692:24.

Plaintiffs have repeatedly criticized Ovitz's gift giving as self-serving and not in accordance with Company policies. Furthermore, they argue that he failed to properly report gifts that he received while serving as President of Disney. n217 Once more, the record fails to support these assertions. As with Ovitz's expenses, Eisner asked Russell to assist Ovitz in complying with Disney's policies with respect to gifts. n218 Litvack was also told of Eisner's concerns, and following an investigation, he found that Ovitz was in compliance with Disney's gift policies. n219 At trial, plaintiffs' counsel asked Litvack whether he was aware of several questionable [*84] gifts, but Litvack unambiguously testified that either he had approved those gifts, or that, had he been asked, he would have approved those gifts because they related to the business of the Company. n220 In sum, finding Litvack's and Eisner's trial testimony credible as cited above, I find that Ovitz was not in violation of The Walt Disney Company's policies relating to expenses or giving and receiving gifts.

n217 *See* PTE 24 at DD002451-52; PTE 148; PTE 374. Plaintiffs attempt to use DTE 61 to impugn Ovitz's handling of gifts. The document on its face, however, supports the conclusion that Ovitz was complying with Company policies by demonstrating that three of those four gifts were retained by Ovitz in exchange for a charitable contribution, and that the fourth was used as a prize at a Company event. In my mind, the simple fact that two of the gifts were not received by Disney until January 7, 1997 is unremarkable and not probative in any way detrimental to Ovitz, especially in light of the holiday season during which Ovitz was terminated and that the gifts were submitted to Disney shortly after the new year began.

[*85]

n218 *See* PTE 17; PTE 378; DTE 151.
n219 Tr. 6139:10-6141:8; 6146:7-9; *see* PTE 406 (all gifts reported by Ovitz were turned over to the appropriate department within the Company); DTE 61.
n220 Tr. 6437:21-6445:22;   6518:11-6530:4; 6533:1-20;   *see*   Tr.   5023:4-5029:18;   5034:5-5038:13; 5039:9-5042:22; *see also* Tr. 2201:15-

2210:21 (Ovitz) (describing the reasons for some of his gifts); *cf.* Tr. 3049:18-3066:16 (Russell unable to give useful testimony expounding upon PTE 378 and PTE 17 due to lack of recall).

### C. Ovitz's Termination

#### 1. The Beginning of the End

Ovitz's relationship with Eisner, and with other Disney executives and directors, continued to deteriorate through September 1996. In mid-September, Litvack, with Eisner's approval, spoke with, or more accurately cornered Ovitz. Litvack told Ovitz that he thought it was clear that Ovitz was not working out at Disney and that he should start looking for both a graceful way out of Disney and a new job. n221 After Litvack reported this conversation to Eisner, Eisner, hoping to make Ovitz realize that [*86] there was no future for him at Disney, sent Litvack back to Ovitz and asked Litvack to make it clear that Eisner no longer wanted Ovitz at Disney and that Ovitz should seriously consider other employment opportunities, including the opportunity at Sony. n222 It seems that Ovitz brought up the possibility of moving to Sony with Eisner during a flight in June 1996 to New Orleans. n223 Eisner believed that Ovitz meant it as a threat, but Eisner welcomed the idea of Ovitz leaving the Company. Litvack conveyed Eisner's sentiments, and Ovitz responded by telling Litvack that he was "going to have to pull me out of here . . . I'm not leaving," and that if Eisner wanted him to leave Disney, Eisner could tell him so to his face. n224 At trial, Ovitz testified that he felt that "as far as [he] was concerned, [he] was chained to that desk and that company. [That he] wasn't going to leave there a loser," that the guy that hired him or the full board would have to fire him, and that he hoped he could still make it work and make all these problems just disappear. n225

n221 Tr. 6101:2-6102:18; 6562:7-13.
[*87]

n222 Tr.   4354:19-4355:6;   4731:13-4732:16; 6102:21-6103:14.
n223 Tr. 4319:10-23. Eisner testified that when Ovitz first brought the Sony option up that Eisner believed that it would provide him a graceful way out of the Ovitz problem. *See id.*
n224 Ovitz 537:24-25;  Tr.  1350:5-13552:9; 6103:15-6103:24.
n225 Tr. 1352:14-1353:20.

Following up on the discussions between Litvack and Ovitz, Eisner and Ovitz had several meetings on or around September 21, 1996, during which they discussed Ovitz's future (or lack thereof) at Disney, and the possibility that Ovitz would seek employment at Sony. n226 Eisner believed that Sony would be both willing and excited to take Ovitz in "trade" from Disney because Ovitz had a very positive longstanding relationship with many of Sony's top executives. Eisner favored the Sony "trade" because, not only would it remove Ovitz and his personality from the halls of Disney, but it would also relieve Disney of having to pay Ovitz under the OEA and would hopefully bring a valuable return to Disney in the form of licensing rights for *The Young* [*88] *and the Restless.* n227

n226 PTE 18.
n227 Tr. 4351:23-4354:2. Eisner was hoping to obtain the licensing rights to *The Young and the Restless*, which would help Disney with its new Soap Opera Channel. Eisner also believed that if he did not ask for something in return for Ovitz, that Sony would think that Disney did not want Ovitz and then Sony may not have wanted him either.

The Sony discussions continued on October 8 when Ovitz wrote Eisner a note asking for formal permission to begin negotiations with Sony. n228 After stating that he was still shocked that Eisner wanted him out, Ovitz wrote that he had resolved to look at other employment possibilities, and he wanted to make sure that he did not leave himself or Sony open to a lawsuit because his departure from Disney would leave Ovitz in breach of the OEA. n229 On October 9 Eisner responded by letter, telling Ovitz that neither he nor anyone else at Disney had any objections to Ovitz working out a deal and eventually going to work for Sony. [*89] In fact, Eisner thought it was best that Ovitz and Disney work together to ensure a smooth departure. n230 Additionally, Eisner wrote a letter to Mr. Idei, Sony's Chairman, trumpeting Ovitz and notifying Mr. Idei that Disney had given permission for Ovitz to enter into negotiations for a possible move to Sony. n231 Apparently, however, only a limited number of directors knew that Ovitz was given permission to negotiate with Sony, including Litvack, n232 Watson, n233 Russell, n234 Gold, n235 and Roy Disney, n236 and that the board as a whole was never approached about the possible Sony "trade." Of these directors, only Litvack and Russell were ever asked for their opinions on the matter.

n228 PTE 18.
n229 *Id.*
n230 PTE 19 at WD00399-401.
n231 *Id.* at WD00402. Eisner also forwarded this letter to Ovitz.
n232 Tr. 6104:8-6107:6.
n233 Tr. 7858:21-7859:22.
n234 Tr. 2571:23-2572:14.
n235 Tr. 3766:2-3767:6.
n236 Tr. 4022:10-4023:8.

On November [*90] 1, Ovitz wrote a letter to Eisner notifying Eisner that things had failed to work out with Sony and that Ovitz had instead decided to recommit himself to Disney with "an even greater commitment of [his] own energies" than he, had before and an "increased appreciation" of the Disney organization. n237 There are varying accounts of why Ovitz did not end up employed at Sony, but the important fact is that Ovitz remained at Disney. n238

n237 PTE 19 at WD00404.
n238 *See* Tr. 1363:17-1365:2 (Ovitz) (stating that he did not continue negotiations with Sony because there were, in his view, severe conflicts within Sony's upper management); 4362:1-9 (Eisner) (stating that he was told that Ovitz did not get an offer at Sony because Ovitz was being unreasonable in his demands and that he was asking for "the sun and the moon" from Sony).

2. The September 30, 1996 Board Meeting

During the course of the Sony discussions the Disney board convened a meeting on September 30, 1996, while attending a Disney [*91] anniversary at the Walt Disney World Resort in Orlando, Florida. Ovitz was in attendance at the board meeting, and it is undisputed that neither Ovitz's future with Disney nor his conversations to date with Eisner and Litvack were discussed at the general board meeting. n239 Eisner, however, testified that he spoke with various directors either during an executive session held that same day at which Ovitz was not present, or in small groups during the weekend, to notify them that there were continuing problems with Ovitz's performance. n240 Additionally, other directors testified that Eisner apprised them of the developing situation with Ovitz either during or prior to September 1996. n241 Although Eisner never sat down at a full board meeting to discuss the persistent and growing

Ovitz problem, it is clear that he made an effort to notify and talk with a large majority, if not all of the directors.

> n239 Tr. 6677:2-11; 7592:8-10.
> n240 Tr. 4349:13-4350:5; 4728:17-4729:12.
> n241  Tr.  3087:7-3088:16  (Russell);  3818:9-21 (Gold);  4021:7-4022:9  (Roy  Disney);  5593:2-5594:12,  5725:6-5726:2  (Mitchell);  5810:8-12 (Nunis); 6836:5-6837:19 (Wilson).

[*92]

On the night of September 30, Eisner and Ovitz made their now-famous appearance on *The Larry King Live Show* in which Eisner refuted the then current Hollywood gossip that there was a growing rift between himself and Ovitz and emphatically stated that if given the chance, he would hire Ovitz again. n242 It is clear now that this entire interview was a shameless public relations move during which both Eisner and Ovitz did not candidly answer Larry King's questions with the goal of deflating the negative rumors surrounding their failed partnership.

> n242 PTE 323, PTE 505.

On October 1, the day after the Larry King interview, Eisner sent a letter that he had been working on since the summer, to Russell and Watson detailing Eisner's mounting difficulties with Ovitz, including Ovitz's failure to adapt to Disney's corporate culture in even the slightest fashion, Eisner's lack of trust for Ovitz, and Ovitz's complete failure to alleviate Eisner's workload. n243 Apparently, an incident at Eisner's mother's funeral, [*93] which involved Ovitz getting into an argument on a New York City street over a parking space, spurred Eisner to finally send this letter. The letter stated that:

> If I should be hit by a truck, the company simply cannot make [Ovitz] CEO or leave him as president with a figurehead CEO. It would be catastrophic. I hate saying it, but his strength of personality together with his erratic behavior and pathological problems, and I hate saying that, is a mixture leading to disaster for this company. n244

> n243 PTE 79; *see also supra* text "Veracity and Agenting'" at 49. Although I have found that Ovitz was not a liar, Eisner's persistently-vocalized reservations about Ovitz's veracity are not inconsistent with that finding. I conclude that while Ovitz gave this Court no reason to believe that he lied, that it is entirely possible that his actions while at Disney and his general character led Eisner to believe that Ovitz was not completely honest. Eisner, however, was unable to point to specific instances where Ovitz was untruthful.
> n244 *Id.* at DD002623.

[*94]

Eisner stated that his goal in writing the letter was to keep Ovitz from succeeding him at Disney should the opportunity arise. Because of that purpose, the letter contained a good deal of hyperbole to help Eisner better "unsell" Ovitz as his successor. n245 Neither Russell nor Watson divulged at any time the contents of the letter with other members of the board. n246

> n245 Tr. 4436:14-4439:6.
> n246 Tr. 3078:17-3079:15; 7881:10-7887:3.

Eisner was informed on November 1 that Ovitz's negotiations with Sony had failed to result in Ovitz leaving Disney. Once Eisner discovered that the Sony negotiations had failed to produce the desired result, Eisner decided that Ovitz must be gone by the end of the year. n247 To facilitate Ovitz's departure, Eisner asked Wilson to take a Thanksgiving trip on the yacht that Ovitz and Wilson jointly owned, the Illusion. n248 It was Eisner's hope that Wilson, a confidant of Ovitz's, could help Ovitz finally understand not only that Ovitz had to leave Disney, but that [*95] everyone, including Ovitz, would be better off if he left.

> n247 Tr. 4368:9-4369:3.
> n248 Tr. 4369:4-4370:2; 6838:18-6839:11.

Still struggling to make Ovitz understand that he had to leave Disney, Eisner wrote a letter to Ovitz on November 11 (which was never sent), in which he again

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

tried to put Ovitz on notice that he was no longer welcome at Disney. n249 Eisner characterized this letter as:

> [A] shot at trying to conjure up every argument, every issue exaggerated to the point of extreme nature so that [Ovitz] could see how deadly serious [Eisner] was. . . . However, [Eisner] realized it was . . . not accurate, way exaggerated, silly, hyperbole, insensitive, and it read like . . . a Vanity Fair article. n250

n249 PTE 24.
n250 Tr. 4372:5-19.

Eisner also stated that:

> One of the reasons [*96] Litvack didn't want me to send the memo is there were so many things in the memo . . . which just weren't true, but I was trying to create a case that [Ovitz] could not argue with. n251

n251 Tr. 5028:13-19.

In this letter, Eisner told Ovitz that:

> I think we should part ways professionally. I believe you should resign (this is not a legal suggestion but a cosmetic one), and we should put the best possible face on it. When we talked last Friday, I told you again that my biggest problem was that you played the angles too much. I told you 98% of the problem was that I did not know when you were telling the truth, about big things, about small things. . . . We are beyond the curing stage. We are now in salvation. I would like to remain friends, to end this so it looks like

> you decided it, and to be positive and supportive . . . I hope we can work together now to accomplish what has to be done. I am ready to work as hard as necessary and as long. n252

n252 PTE 24 at DD002454-002455.

[*97]

Eisner sent this document to Bass and Russell for their review. n253 Eisner also believed that he may have shown the letter to Litvack, but Litvack did not recall having seen this letter before trial. n254 For my purposes, Russell was the only director to receive this document and he did not share it or the matters it concerned with anyone else on the board. n255 Instead of sending this letter to Ovitz, Eisner met with Ovitz personally on November 13 and they discussed much of what was contained in the letter, especially Ovitz's alleged management and ethics problems. n256 Notes taken by Eisner following this meeting stated that the meeting was "2 hours and 15 minutes of [Eisner] telling [Ovitz] that it was not going to work." n257 Eisner believed that Ovitz just would not listen to what he was trying to tell him and instead, Ovitz insisted that he would stay at Disney, going so far as to state that he would chain himself to his desk. n258

n253 Eisner 606:4-7.
n254 Tr. 6143:3-20.
n255 Tr. 3090:9-3091:8; 3095:20-3096:3.
n256 Eisner 606:8-607:14; *see also* Tr. 5199:14-19; 2017:17-2018:15.
[*98]

n257 PTE 325 at DD002549.
n258 Tr. 4370:3-19. The threat of chaining himself to his desk, although obviously metaphorical, demonstrates exactly how unwilling Ovitz was to even consider leaving Disney at that point.

### 3. Options for Ovitz's Termination

Since the Sony option was discussed in early September, Eisner and Litvack had also been discussing whether Ovitz could be terminated, and more importantly, whether he could be terminated for cause. n259 Eisner hoped to obtain a termination for cause because