# 35
# Part Two

he believed that although Ovitz "had not done the job that would warrant [the NFT] payment" Disney was obliged to honor the OEA. n260 Honoring the OEA meant that if Ovitz was terminated without cause, he would receive the NFT payment that the OEA called for, which consisted of the balance of Ovitz's salary, an imputed amount of bonuses, a $ 10 million termination fee and the immediate vesting of his three million stock options at the time. Litvack advised Eisner from the very beginning that he did not believe that there was cause to terminate Ovitz under the OEA.

n259 Tr. 4379:23-4380:19; 6110:12-6111:3.
[*99]

n260 Tr. 4380:22-4381:15.

As the end of November approached, Eisner again asked Litvack if Disney had cause to fire Ovitz and avoid the costly NFT payment. n261 Litvack proceeded to examine more carefully the issue of whether cause existed under the OEA. Litvack reviewed the OEA, refreshed himself on the meaning of gross negligence and malfeasance and reviewed all of the facts concerning Ovitz's performance of which he was aware. n262 Litvack freely admits that he did not do any legal research in answering the cause question; n263 nor did he order an outside investigation to be undertaken or an outside opinion to be authored. n264 Litvack did state that in December he consulted with Morton Pierce, a senior partner at Dewey Ballantine, and that Pierce agreed that there was no cause. n265 Pierce, however, was not admitted to the California Bar (California law governed the OEA), was not an expert in employment law, n266 and could not recall speaking with Litvack regarding Ovitz. n267 Furthermore, Pierce's bills to Disney do not clearly reflect that any such conversation took place regarding [*100] whether Ovitz could be terminated for cause. n268 After taking these steps, Litvack, for the second time, concluded that there was no cause to terminate Ovitz. In fact, despite Ovitz's poor performance and concerns about his honesty, Litvack believed that the question of whether Ovitz could be terminated for cause was not a close question and, in fact, Litvack described it as "a no-brainer." n269 Litvack, however, produced no written work product or notes to show to the board that would explain or defend his conclusion, and because he did not ask for an outside opinion to be authored, there was no written work product at all. When Litvack notified Eisner that he did not believe cause existed, Eisner testified that he "checked with almost anybody that [he] could find

that had a legal degree, and there was just no light in that possibility. It was a total dead end from day one." n270

n261 Tr. 6110:15-6111:3.
n262 Tr. 6113:21-6114:19.
n263 Tr. 6114:20-10 (Litvack) (stating that he did not do any case research because he "didn't believe that there were going to be any cases that were going to answer the question for [him]. [He] had been dealing with contracts and litigation all [his] life. . . . [He] felt he knew the facts as to what the man had done and not done.").
[*101]

n264 Tr. 6115:22-6116:14 (Litvack) (stating that he did not order an outside investigation because he believed he knew the facts and an outsider would have gone to him to get the facts, and also because he believed that the firing of Ovitz was a sensitive matter and he wanted to involve as few people as possible); 6130:5-24 (Litvack) (explaining that he did not order an outside written opinion because it would have been expensive, and he believed it was a "CYA tactic done by general counsels to cover themselves" and he didn't believe he needed that). Litvack consulted Val Cohen, co-head of the Disney litigation group, and possibly Santaniello, and to the extent he met with them, he stated that they both agreed with his conclusion that there was no cause, although there is no record of their having met or discussed the existence of cause. See Tr. 6119:22-6121:8. Litvack admits, however, that all the information Val Cohen knew about Ovitz, she would have learned from Litvack. See Tr. 6401:2-6405:4.
n265 Tr. 6121:9-6126:8.
n266 Tr. 6222:22-6225:13.
n267 Tr. 6398:3-11.
n268 PTE 391; PTE 392 (bill contains charge of $ 25,500 for consultation in the Ovitz matter which included advice regarding proxy disclosure and tax considerations relating to Ovitz's termination).
[*102]

n269 Tr. 6114:24-10. In light of the hostile relationship between Litvack and Ovitz, I believe if Litvack thought it were possible to avoid paying Ovitz the NFT payment, that out of pure ill-will, Litvack would have tried almost anything to

avoid the payment. *See* Tr. 6115:9-21 ("If there was a way not to pay him, I would have loved not to pay him. . . . I didn't like him, and he didn't like me. I didn't feel he had done the job.").
n270 Tr. 4380:10-21.

In a perfect, more responsible world, both Litvack and Eisner would have had sufficient documentation not only to back up their conclusion that Ovitz could not be terminated for cause, but they would have also had sufficient evidence of the research and legwork they did to arrive at that conclusion. Despite the paucity of evidence, it is clear to the Court that both Eisner and Litvack wanted to fire Ovitz for cause to avoid the costly NFT payment, and perhaps out of personal motivations. The Court is convinced, based upon these two factors, that Eisner and Litvack did in fact make a concerted effort to determine if Ovitz could [*103] be terminated for cause, and that despite these efforts, they were unable to manufacture the desired result.

In addition to determining that there was no cause to fire Ovitz as defined in the OEA, Litvack also testified that it would be inappropriate and unethical for Disney to try to bluff Ovitz into accepting an amount less than agreed to in the OEA in case of an NFT. n271 Litvack believed that it would be a bad idea to attempt to coerce Ovitz (by threatening a for-cause termination) into negotiating for a smaller NFT package than was provided for in the OEA because Disney, when pressed by Ovitz's attorneys, would have to admit that there in fact was no cause and possibly subject Disney to a wrongful termination suit. n272 Litvack also believed that a failed attempt to bluff Ovitz out of the NFT could be quite harmful to Disney's reputation because it would appear as if Disney was trying to get out of contractual obligations (which it would have been), and that would make it difficult for Disney to do business and be viewed as an honest business partner. n273

n271 Tr. 6128:6-11.
n272 Tr. 6118:16-6119:13; 6129:2-6130:3.
[*104]

n273 *Id.* Litvack also believed that attempting to relocate Ovitz within Disney would not improve the situation as Ovitz just was not a good match for Disney, although he conceded that that was up to Eisner. *See* Tr. 6128:12-6129:1.

4. The November 25, 1996 Board Meeting

The Disney board held its next meeting on November 25, and Ovitz was present. The minutes of this meeting contain no record that the board engaged in any discussion concerning Ovitz's termination, or that they were informed of the actions that Eisner and Litvack had taken to this point concerning Ovitz. n274 The only action recorded in the minutes concerning Ovitz is his unanimous renomination to a new three-year term to the board. n275 Gold testified, however, that by this time the board knew that Ovitz would be fired, but because Ovitz was present at the meeting it would have been akin to a "public hanging" to fail to re-nominate him. n276

n274 PTE 91.
n275 *Id.* at WD01561A.
n276 Tr. 3771:21-3772:16 (Because the proxy was not due for some time, Gold stated that the board chose to renominate Ovitz and then change the slate after he was fired instead of embarrassing Ovitz at the meeting.).

[*105]

Although there was no mention of Ovitz's impending termination at the board meeting, it is apparent, despite the lack of a written record, that directly following the board meeting, there was some discussion concerning Ovitz at the executive session which was held at Disney Imagineering in a glass-walled room (according to those in attendance who remember this event). n277 One of the more striking images of this trial is that apparently Ovitz was directly outside the glass walls -- looking in at this meeting -- while his fate at Disney was being discussed. There are no minutes to show who attended the executive session, but I am reasonably certain that at least Eisner, Gold, Bowers, Watson and Stern were in attendance. n278 In the absence of further evidence, I must conclude that no other directors attended this session. It is also clear that Eisner notified the directors in attendance at the executive session that it was his intention to fire Ovitz by year's end and that he had asked Wilson to speak with Ovitz while they were onboard the Illusion during the upcoming Thanksgiving holiday. n279

n277 I recognize that certain portions of the deposition testimony concerning this executive session, whether it occurred, and what was said at it, are to some degree in conflict with the trial testimony. *See* Gold 357:20-361:24 (stating that he does not independently recall when the executive session occurred, but that there was an executive

session during which Ovitz's termination was discussed); Litvack 573:7-574:9 (stating that he was unaware of an executive session, however if there was such a meeting, he would have been excluded); Russell 731:18-732:7 (stating that he does not recall an executive session after the November 1996 board meeting); Stern 163:14-164:2 (stating that he has no recollection of an executive session of the board after the November 1996 meeting). Although he later testified that after reviewing Gold's trial testimony that he vividly recalled the meeting, *see* Tr. 8155:13-8158:4, Eisner himself testified that this was not an *official* executive session, but instead he gathered the non-management directors in a room to discuss Ovitz. *See* Tr. 4425:7-4426:10. Despite these conflicts, I am convinced that such a meeting took place. What was discussed at that meeting, however, is an entirely separate question that I will deal with shortly.

[*106]

n278 Mitchell was called after the meeting by Eisner and was told that there was some discussion of Ovitz's performance. Tr. 5758:21-5759:10. Mitchell, however, was not told anything concerning the NFT. *See* Tr. 5782:8-18.
n279 Tr. 4551:17-4552:21 (Eisner); 3772:17-3773:18, 3785:3-9 ("You couldn't have left the November . . . executive session without knowing where Mr. Eisner was going [as concerned Ovitz].") (Gold); 5950:20-5952:13 (Bowers); 7859:23-7862:5 (Watson); 8155:13-8158:4 (Stern).

Beyond Ovitz's impending doom and Wilson's upcoming boat trip, there is some controversy as to whether any details of the NFT and the cause question were discussed at this meeting. Eisner testified that, in addition to the other items, he informed those in attendance of what the NFT would cost Disney. n280 Gold tells a somewhat more elaborate (and certainly more self-serving) version of the meeting in which Gold asks Eisner whether Ovitz's termination would be for cause, and Eisner assures Gold, in the presence of the other directors, that Litvack had advised them that there were no grounds [*107] for a "for cause" termination. n281 After the executive session adjourned, Gold testified that Litvack came into the room and Eisner told Gold to ask Litvack about cause, and that Litvack then told Gold that there was no cause to terminate Ovitz. n282 Stern, noting at trial that he had failed to recall anything at all concerning this meeting during his deposition, echoed Gold's version, stating that after

the meeting, Litvack said that there was "no other way to go" besides an NFT. n283

n280 Tr. 4425:7-4426:10.
n281 Tr. 3773:15-3774:16.
n282 Tr. 3774:17-3776:7; 3906:17-3908:4. Gold told a slightly different story at his deposition which had Litvack in the room during the entire executive session and did not have Gold asking Litvack questions about outside counsel. *See* Gold 348:12-351:15.
n283 Tr. 8155:13-8158:4.

Outside of Gold and Stern, nobody else present at the executive session recalled Gold raising the issue of fault with Eisner or having witnessed Gold speak with Litvack. [*108] Litvack recalls speaking with Gold sometime before December, 12, and he recalls in substance a similar conversation to what Gold and Stern recall, that is, Eisner telling Gold to ask Litvack about cause. Litvack, however, cannot place that conversation in time, believes it took place in the boardroom and believes that the only people present were Eisner, Gold and himself. n284 Because of these numerous discrepancies, I cannot conclude that Gold questioned Eisner during this meeting regarding cause, nor can I conclude that the conversation that took place between Gold and Litvack occurred after the executive session in the presence of those who were in attendance.

n284 Tr. 6343:20-6346:5.

5. The Illusion Dispelled

Shortly after the November 25 board meeting and executive session, the Ovitz and Wilson families left on the Illusion for a Thanksgiving trip to the British Virgin Islands. Ovitz embarked on this trip with the hope that if he could figure out a way to make it to Christmas, he could fix everything [*109] with Disney and make his problems go away. n285 Wilson, however, had other plans. n286 Ovitz recalled the conversations between him and Wilson quite well. Ovitz recalled that Wilson told him that "it wasn't going to work and that [Eisner] wanted [Ovitz] out of the company." n287 Ovitz said that after speaking with Wilson he began to realize how serious the situation with Disney had become and that he needed to talk to his attorneys and get some perspective on the situation. n288 Wilson was unable to recall the details of what he and Ovitz spoke about, n289 but Wil-

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

son does recall that Ovitz was quite "emotionally concerned" with his situation at Disney. n290

n285 Tr. 2050:1-10.
n286 Wilson also testified that Eisner informed him that Ovitz would be entitled to a payment under the OEA if he was terminated without fault, and that Wilson knew what the approximate value of that payment was. *See* Tr. 7031:10-7032:4.
n287 Tr. 2051:7-11.
n288 *Id.*
n289 Tr. 7016:16-22.
n290 Tr. 7017:24-7018:5.

[*110]

At some point during the trip, Eisner contacted Wilson by phone and Wilson related the situation and the progress he had made with Ovitz. n291 Wilson was unable to remember the specifics of his conversation with Eisner, but his recollection was refreshed after viewing notes, dated December 1, taken by Eisner following the conversation. n292 Wilson recalled describing Ovitz as a "wounded animal . . . in a corner," and stated that by this he meant that Ovitz could become dangerous to the organization if the relationship with Disney continued. n293 Wilson also recalled stating that Ovitz was a "loyal friend and devastating enemy," n294 and advising that Eisner should be reasonable and magnanimous, both financially and publicly, so Ovitz could save face. n295

n291 Tr. 7016:23-7017:9.
n292 PTE 25.
n293 Tr. 7026:22-7027:23; *see also* PTE 25.
n294 Tr. 7028:2-7029:1.
n295 Tr. 7030:6-7031:9.

On December 3, having returned from his Thanksgiving trip, Ovitz, armed with his newfound [*111] understanding that his time at Disney was rapidly coming to an end, met with Eisner to discuss the terms of his departure. Eisner memorialized this meeting in a note to Russell which read "I met with Michael Ovitz today who wants to bring our discussions to a conclusion this week, wants you and Bob Goldman to settle out his contract immediately and sign it by weeks end." n296 Essentially, this note asked Russell to take charge of managing the Ovitz departure. Ovitz asked that he not have to deal personally with Litvack during the termination process,

although he had no qualms about Litvack being involved. n297 Ovitz also asked for several concessions from Disney, including keeping his seat on the board, obtaining a consulting/advising arrangement with Disney, the continued use of an office and staff (but not on the Disney lot), continued health insurance and home security, continued use of the company car and the repurchase of his plane. n298

n296 PTE 326 DD002539.
n297 *Id.* at DD002540; *see also* Tr. 2060:19-2061:9.
n298 PTE 326.

[*112]

Although Eisner and Ovitz did not see eye to eye on Ovitz's requests, Eisner initially objected only to Ovitz's continued use of the company car, telling Russell, "I don't want to nit pick here, but we are paying him a fortune." n299 The memo to Russell does not reflect Eisner's objections to Ovitz's other requests. Eisner, however, testified that "by the time I got from number one to number five [of listing Ovitz's requests] I had already realized it was a bad idea, and the next day I called him and told him that . . . it would be impossible." n300 Eisner also told Russell that:

> Any deal we make that is one cent more than the contract should include a non raid clause with teeth, a non compete in areas he advises us in, and a non disclose or bad mouth me or the company for five years at least. It would be great if you paid some of his money out over time which he would lose if he broke that deal. n301

n299 *Id.* at DD002539.
n300 Tr. 4397:20-24.
n301 PTE 326 at DD002540; *see also* PTE 379.

[*113]

Shortly after this meeting, Ovitz spoke with Russell on the phone, and Russell described the conversation as "a very, very troubling and unusual conversation." n302 Russell stated that during their conversation, Ovitz made clear that he understood that the door to Disney was closed, but he was still "pleading his heart out . . . [with] tears in his voice." n303 Over the next week, Disney, and

more accurately, Eisner, rejected every request that Ovitz had made, informing him that all he would receive is what he had contracted for in the OEA and nothing more. n304 Other than the extra benefits which Ovitz requested and Disney summarily denied, there seems to have been no negotiation between anyone in Ovitz's camp and anyone at Disney concerning whether there would be a for cause termination or an NFT, and nobody seems to have even mentioned to Ovitz or his representatives the possibility of a for cause termination. n305

n302 Tr. 2577:3-2578:1.

n303 *Id.*

n304 Tr. 1379:21-1380:5, 3228:9-3229:19 (denial of continuing seat on board); 1379:1-20, 2098:5-13, 3227:8-18 (denial of consulting agreement); 3224:7-21 (denial of use of office and staff); 2063:21-2064:10, 3225:10-13 (denial of opportunity to repurchase plane); 6178:15-6179:23 (denial of repurchase or continued use of car).

[*114]

n305 Tr. 1378:6-14 (Ovitz) (stating that Eisner never mentioned to him the possibility that he would be fired for cause); 4455:3-19 (Eisner) (stating that at no time did he mention to Ovitz the possibility that he could be fired for cause, and denying that any negotiations took place between the two parties); 2640:17-2641:21 (Russell) (stating that he had never mentioned anything concerning a for cause termination to Ovitz or anyone working for Ovitz); 6186:15-6187:4 (Litvack) (stating that to the best of his knowledge, neither he nor anyone else at Disney ever mentioned to Ovitz or one of his representatives that he could be fired for cause).

### 6. Ovitz's Bonus and His Termination

On December 10, the Executive Performance Plan Committee ("EPPC") met to consider annual bonuses for Disney's most highly-compensated executive officers. The EPPC was chaired by Gold, its other members Lozano, Poitier and Russell, attended, although Poitier and Lozano attended by phone. n306 Also in attendance were Eisner, Watson, Litvack, Santaniello, and Marsha Reed. n307 Russell informed all those in attendance [*115] of his conversations with Ovitz's representatives and that Ovitz was going to be terminated, but that he was not going to be terminated for cause. n308 At this meeting, Russell recommended that Ovitz, despite his poor performance and imminent termination, should re-

ceive a $ 7.5 million bonus for his services during the 1996 fiscal year because Disney had done so well during the fiscal year and because Disney had a large bonus pool. n309 The EPPC approved this recommendation and it appears that Russell may have even advised the EPPC (despite the *clear* language in the OEA stating that the *bonus was discretionary*) that Disney was contractually obligated to pay Ovitz his bonus. n310 Despite the fact that all of those in attendance should have known better, nobody spoke up to correct the mistaken perception that Ovitz had to receive a bonus, let alone a $ 7.5 million bonus.

n306 PTE 51.

n307 *Id.* Watson attended by phone.

n308 Tr. 2581:23-2582:17; 3785:3-3786:11; 4429:7-4430:4; *see also* DTE 163.

n309 PTE51 at WD01229; *see also* 2582:18-2583:12.

n310 Tr. 3926:11-15 (Gold) (stating that Russell stated that the bonus was mandatory); 7752:1-7754:22 (Lozano) (stating that although he could not recall Russell advising the EPPC that the bonus was mandatory, that he believed that they were contractually obligated to grant Ovitz a $ 7.5 million bonus); 6154:15-6156:16 (Litvack) (stating that Russell told the EPPC that the bonus was mandatory, and that Litvack did not say anything because he was not sure what Russell was referring to and he did not want to embarrass Russell). Planning to correct Russell's mistake when he spoke with him later on, Litvack nonetheless ordered that Ovitz's bonus be paid. *See* PTE 175; Tr. 6156:16-6157:10.

[*116]

The following evening, Eisner met with Ovitz at Eisner's mother's apartment in New York City. n311 By the time this meeting occurred, it had already been decided that Ovitz was being terminated, without cause, and would be receiving his contractual NFT payment, and that he would not be receiving any of the additional items that he asked for. n312 The purpose of this meeting was to agree to a press release to announce the termination, let Ovitz know that he would not receive any additional items, and as Eisner described it, it served as "the final parting." n313 Eisner and Ovitz apparently came to some understanding that neither Ovitz nor Disney was to defame each other in the press, and that the separation was to be undertaken with dignity and respect for both sides. n314 Ovitz's termination was memorialized the following day in a letter signed by Litvack and dated

December 12. n315 Litvack testified that Russell negotiated the terms in the letter, but Litvack signed this document on Eisner's instructions. n316 The board was not shown the December 12 letter, n317 nor did it meet to approve its terms. n318

n311 Tr. 4402:8-4403:8.

[*117]

n312 Eisner did give some testimony that by December 11 he still intended to give Ovitz some sort of consulting arrangement separate from and unrelated to the OEA. The overwhelming weight of the evidence, however, demonstrates that this was not in fact the case, and it certainly did not happen. *See* Tr. 4601:6-23.

n313 Tr. 4592:18-4593:6.

n314 Eisner 654:16-655:16; *see also* Tr. 4601:8-18.

n315 PTE 13. The letter reads:

This will confirm the terms of our mutual agreement as follows:

> 1. The term of your employment under your existing Employment Agreement with Disney will end on January 31, 1997.
>
> 2. This letter will for all purposes of the Employment Agreement be given the same effect as though there had been a "Non-Fault Termination," and the Company will pay you, on or before February 5, 1997, all amounts due you under the Employment Agreement, including those under Section 11 (c) thereof. In addition, the stock options granted pursuant to Option A, will vest as of January 31, 1997 and will expire in accordance with their terms on September 30, 2002.

n316 Tr. 6157:11-6159:8.

n317 Bowers 335:3-14; Gold 207:13-18; Roy Disney 189:20-190:10.

[*118]

n318 Tr. 3933:8-20 (Gold); 4102:23-4103:11 (Eisner); 5772:18-5773:4 (Mitchell); 5881:24-5882:23 (Nunis); 5990:21-5991:10 (Bowers); 7248:3-7249:6 (Poitier); 7615:19-7616:16 (Murphy); 7758:2-7759:22 (Lozano).

Also on December 12, Disney issued the press release announcing Ovitz's termination. n319 The press release stated that "Michael S. Ovitz, will leave the company by mutual agreement effective January 31, 1997. He will continue to serve as an advisor and consultant to the company and the Board of Directors." n320 Although I am puzzled by the use of the phrase "mutual agreement," I am nonetheless convinced, based upon Ovitz's constant self-denial and difficult behavior during the months leading up to his termination, and Eisner's commitment that he would handle the termination gracefully for Ovitz's benefit (and likely to prevent Ovitz from defaming him and Disney in the press), n321 that the termination was anything but a mutual agreement. n322 Additionally, although I am troubled by the statement in the press release that Ovitz would continue to serve as an advisor and consultant to the [*119] board, because this was either a deliberate untruth or an incredibly irresponsible and sloppy error on Disney's part, it is ultimately immaterial to the issues to be resolved in this case. Therefore, I do not believe that the statement in the press release regarding Ovitz continuing as an advisor and consultant to the Disney board is reflective of any agreement or understanding that Disney and Ovitz had at the time. n323 The Court believes that both of these untrue statements were likely made as part of an effort by Disney to make Ovitz's departure seem as amicable as possible so that Ovitz's reputation would not be publicly tarnished any more than could be avoided. In any event, once Ovitz left Eisner's mother's apartment, he never again returned to Disney. n324

n319 PTE 390.

n320 *Id.*

n321 PTE 19 at WD4000. *See also* Tr. 2088:1-5 (Ovitz) (stating "what we agreed on that they tried to handle this with some dignity for me and some grace and were very generous in their press release, which was very nice for them to do.").

n322 *See also* Tr. 2087:6-2088:5 (Ovitz) (stating that "I wouldn't leave by mutual agreement and I wasn't going to serve as an advisor and consultant. I wanted to [serve in those positions.]"); 2573:11-21 (Foster: "[Ovitz's] departure was not voluntary, is that correct?" Russell: "No way, no way."); 4525:12-16 (Schulman: "You were trying

to work out getting Mr. Ovitz's consent; correct?" Eisner: "I was not trying to get his consent on being fired. I was trying to get his consent of leaving the company in a graceful way.").

[*120]

n323 Tr. 2087:6-2088:5. What makes it even clearer that Disney was simply trying to mislead the public is that no such representation was made in Ovitz's termination letter. PTE 13.
n324 Tr. 1382:22-1383:1.

That same day, Eisner at least attempted to contact each of the Board members by phone before the issuance of the press release in order to notify them that Ovitz had been officially terminated. n325 None of the board members at that time, or at any other time before or during trial, ever objected to Ovitz's termination; in fact, most if not all thought it was the appropriate move for Eisner to make. n326 Also on December 12, copies of the press release along with a letter from Eisner were sent to each of the directors. n327 The letters contained no more information regarding the termination than was contained in the press release.

n325 DTE 413 (Eisner's incoming and outgoing phone log from December 12 through December 14 listing calls placed to Nunis, Roy Disney, Russell, O'Donovan, Wilson, Murphy, Gold, Stern, Bowers, Poitier and Walker); see also Tr. 3802:6-2223 (Gold) (testifying that Eisner notified him by phone, and asked him to pass the news on to Roy Disney); 5810:19-5811:20 (Nunis) (testifying that Eisner notified him by phone); 5932:7-5833:3 (Bowers) (testifying that Eisner notified her by phone); 7556:1-7557:15 (T. Murphy) (testifying that Eisner notified him by phone); 7642:21-7643:9 (Lozano) (testifying that Eisner notified him by phone); 8159:19-8160:24 (Stern) (testifying that Eisner notified him by phone). Eisner also notified Bass and Warren Buffett. Tr. 4405:18-4406:14.

[*121]

n326 Tr. 3778:1-23 (Gold) (stating that as of the November 25 executive session, he concurred with Eisner's decision to terminate Ovitz despite what it would cost Disney); 4026:13-4028:5 (Roy Disney) (stating that he supported the decision to terminate Ovitz despite the cost involved because

of the significant problems Ovitz was causing within Disney); 4405:18-4409:10 (Eisner) (stating that he received no objection from any board member after placing phone calls to notify them of Ovitz's termination or after they received copies of the press release and accompanying letter); 5810:19-5811:20 (Nunis) (stating that as of the press release he supported Eisner's decision to terminate Ovitz because "turmoil at the top of the company" was dangerous for everyone); 5933:22-5935:15 (Bowers) (stating that she supported Eisner's decision to terminate Ovitz as of the press release because it was clear that Ovitz was not a team player); 6720:11-6720:23 (O'Donovan) (stating that he supported Eisner's decision to terminate Ovitz because it is important to have harmony at the top of a large organization); 7144:3-7146:13 (Poitier) (stating that he believed Ovitz had to be terminated according to the terms of the OEA because it was a "clear mismatch"); 7556:3-7557:7 (Murphy) (stating that he supported Eisner's decision to terminate Ovitz despite the cost because it was the best thing for Disney and its shareholders); 7642:21-7643:24 (Lozano) (stating that he supported Eisner's decision to terminate Ovitz despite the cost to Disney); 8158:5-8160:24 (Stern) (stating that he supported Eisner's decision to terminate Ovitz because it was a bad relationship, and the amount Disney would save would outweigh the cost of the termination).

[*122]

n327 PTE 13.

Thus, as of December 12, Ovitz was officially terminated without cause. Up to this point, however, the Disney board had never met in order to vote on, or even discuss, the termination at a full session, and few if any directors did an independent investigation of whether Ovitz could be terminated for cause. As a result, the Disney directors had been taken for a wild ride, and most of it was in the dark. Additionally neither the EPPC nor the compensation committee had a vote on the matter, and it seems as though they had yet to have a substantive discussion of whether Ovitz could be terminated for cause. Many directors believed that Eisner had the power to fire Ovitz on his own and that he did not need to convene a board meeting to do so. n328 Other directors believed that if a meeting was required to terminate Ovitz, that Litvack, serving as corporate counsel, would have advised them that was the case and he would have made sure one was called. n329 Litvack believed that Eisner had the power to fire Ovitz on his own accord and, there-

fore, did not believe it was necessary to convene [*123] a meeting. n330 Litvack also stated that he did not call a meeting because not only did he believe that Eisner was empowered to fire Ovitz on his own, but Litvack believed that all the directors were up to speed and in agreement that Ovitz should be terminated. n331 Although there was no meeting called to vote on or even discuss Ovitz's termination, it is clear that most, if not all, directors trusted Eisner's and Litvack's conclusion that there was no cause and that Ovitz should still be terminated without cause even though this entailed making the costly NFT payment. n332

n328 Tr. 2587:1-7 (Russell); 5733:3-5734:17 (Mitchell); 6721:8-21 (O'Donovan); 7067:21-7069:8 (Wilson); 7561:9-13 (Murphy); 8233:5-16 (Stern).

n329 Tr. 2889:10-2892:3 (Russell); 6720:21-6721:7, 6785:1118-6786:15 (O'Donovan); 7227:2-7 (Poitier); 7561:14-17 (Murphy); 7466:11-7467:2 (Lozano).

n330 Tr. 6149:4-6151:11.

n331 Id.

n332 Tr. 2574:5-2576:21 (Russell) (stating that he believed that Eisner and Litvack had done sufficient research and trusted their judgment that there was no cause to terminate Ovitz, that he was unaware of anything that would constitute cause to fire Ovitz, and that he was aware that Ovitz would receive the NFT payment); 3775:12-3778:18 (Gold) (stating that he was aware of the size of the NFT payment, that after asking Litvack about his conclusions concerning cause he believed that Litvack had done and was continuing to do sufficient research and Gold trusted his and Eisner's conclusions, and that Gold also had no knowledge of any act that would have constituted cause to fire Ovitz); 5597:18-5598:13 (Mitchell) (stating that he relied on and trusted Litvack's determination that there was no cause and Mitchell knew of nothing that would have constituted cause); 5813:2-24 (Nunis) (stating that he believed that if Eisner and Litvack could have avoided paying the NFT that they would have done so); 5933:4-5934:24 (Bowers) (agreeing with Eisner's decision, that Disney would honor the terms of the OEA and make a large payment to Ovitz including a large cash payment and acceleration of the options); 6781:18-6782:9 (O'Donovan) (stating that he was not aware of the value of Ovitz's payment and relied on Litvack entirely to make the cause determination); 7557:2-15 (Murphy) (stating that he believed that if there was a way that Eisner could have avoided paying Ovitz he would have and he therefore trusted Eisner's judgment on the issue of cause); 7867:2-7868:2 (Watson) (stating that he did not believe that Ovitz was grossly negligent or malfeasant and that therefore he could not be fired for cause); 8160:2-8161:16 (Stern) (stating that he believed that Ovitz never lied to him, and that Stern trusted Eisner's judgment because he had a reputation for being "a tough buck," and if Eisner could have avoided paying Ovitz he would have).

[*124]

During the week that Ovitz was terminated (December 11-16), articles began appearing in the press with quotes from Ovitz or his representatives describing why Ovitz left Disney and detailing to some extent the size of his severance package. n333 For example, a December 14 article in the Baltimore Sun reported that "Resigning Disney President Michael Ovitz said yesterday through a representative that Disney is giving him a $ 90 million severance package." n334 Other articles describing Ovitz's frustrations at Disney stated that Ovitz "wasn't game to struggle against a bad situation," n335 and that "Ovitz was frustrated by his poorly defined role, Eisner's reluctance to share power and repeated clashes with other senior Disney executives . . . notably [Litvack] and [Bollenbach]," n336 and that "the reality was that Eisner did not let go . . . [and that] Eisner thwarted [Ovitz] by not giving him detailed responsibilities or the power to manage the various Disney divisions." n337 The articles also stated that Ovitz's departure was mutual, n338 and some went so far as to state that Ovitz's departure was his own idea. n339 Additionally, it was reported that Ovitz had hired a public [*125] relations consultant named Steven Rivers to put a positive spin on the termination for Ovitz. n340 Ovitz, however, testified that he did not employ Rivers or any other PR firm at this time. n341 Eisner believed that he had been generous in his treatment of Ovitz, as well as his agreement to make the termination seem mutual, and felt that these articles were:

an incredible betrayal not of a contract, not of any kind of written agreement, but that I had bent over backwards, and not because he was my friend. I would do it with anybody that was leaving under these circumstances, and he just, you know, threw it right in the company's face. And I was reading every single day about what idiots we were, the Disney Company, and how he had done this enormous feat. n342

On December 16, Eisner reacted to these stories by sending an e-mail to John Dreyer, Disney's communications chief, which among other things stated that Ovitz was a "psychopath" and "totally incompetent." n343 Eisner described the letter as his effort at "venting" and that "although [he] didn't know what the words meant, [he] was just so angry." n344

n333 DTE 243.

[*126]

n334 DTE 243 at 13-14; *see also id.* at DD002077, DD002068.

n335 *Id.* at DD002075.

n336 *Id.* at DD002077.

n337 *Id.* at DD002068.

n338 *Id.* at DD002075.

n339 *Id.* at DD002084.

n340 Tr. 4432:20-4433:1 (Eisner) (testifying that, when he confronted Ovitz about these articles, Ovitz admitted to hiring Rivers); *see also* DTE 243 at DD002076, DD002084, DTE 243 at 12, 14.

n341 Tr. 2090:17-2091:6.

n342 Tr. 4433:2-4433:14.

n343 PTE 20.

n344 Tr. 4433:15-21.

Following the official termination, the EPPC met on December 20 with the sole purpose of rescinding Ovitz's $ 7.5 million bonus. Litvack stated that after the December 10 EPPC meeting, he had questioned Russell as to whether the bonus was mandatory, and that Russell had sent Litvack a memo (which had been drafted almost a year earlier as an introduction to the OEA) on December 18, and in that document it became apparent that the bonus was not in fact mandatory. n345 Russell also had a discussion with Gold on December 18 during which he told [*127] Gold that his recommendation that Ovitz be paid a bonus was stupid and that he was worried that members of the EPPC were under the mistaken belief that the bonus was contractual. n346 Gold testified that within a week of the December 10 meeting, Litvack and Russell came to him "sheepishly, and said we've made a mistake.'" n347 On December 20 a special telephonic meeting of the EPPC was convened with the purpose of rescinding Ovitz's $ 7.5 million bonus, which the EPPC had voted in favor of just ten days earlier. n348 Gold, Lozano, Russell, Watson, Eisner and Litvack attended the meeting. n349

n345 PTE 180; *see also* Tr. 6159:20-6161:5.

n346 Tr. 2589:12-2591:1; *see also* PTE 384 (Russell's notes of his meeting with Gold).

n347 Tr. 3799:15-3800:7.

n348 PTE 53.

n349 *Id.*

Russell's self-prepared agenda for the meeting outlines what was discussed before revoking Ovitz's bonus, including that it would be "illogical and impossible to justify any bonus one day and fire [*128] him the next, [and that] Committee members [could not] be asked to try to justify it based on good performance." n350 The EPPC then revoked Ovitz's bonus. After the revocation, Gold questioned Litvack if he had not also made a mistake as to whether Ovitz could be terminated for cause and Litvack told Gold that he was sure that he had not. Gold also contends that Litvack said his view was supported by outside counsel. n351 Litvack denies ever having made this representation.

n350 PTE 93; *see also* Tr. 2591:15-2592:2; 3797:14-3799:14.

n351 Tr. 3796:1-18; 6167:20-6168:14.

After Ovitz's bonus was rescinded, Eisner, in a December 27 letter, accelerated Ovitz's departure date from January 31, 1997, to December 27, 1996, and Ovitz's tenure as both an executive and director of Disney ended on that date. n352 Similar to the December 12 letter, this letter states that Ovitz's termination "will for all purposes of the Employment Agreement be treated as a Non-Fault Termination.'" There was no mention [*129] in this letter of Ovitz serving as a consultant to the board, however. n353 The letter, unlike the December 12 letter, contained specific details of Ovitz's payout and stated Ovitz would immediately receive roughly $ 38 million in cash and that the first tranche of three million options would vest immediately. n354 Litvack is the signatory on this letter and Ovitz cosigned. Litvack, however, testified that he signed the letter agreement because no one else was available to do so during the holidays and that he had no role in drafting it. n355

n352 PTE 14.

n353 *Id.*

n354 *Id.*
n355 Tr. 6170:14-19; 6586:18-6587:5.

As previously mentioned, Disney also chose to withhold $ 1,000,000 of Ovitz's NFT payment "pending final settlement of [Ovitz's] accounts." n356 Ovitz has stated that his agreement to the holdback was a condition to "Disney honoring its contractual obligations." n357 Eisner, however, testified that it was common for executives at Disney to be behind on their expenses [*130] up to six months, so it made sense to holdback $ 1 million in case of lingering expenses. n358 Besides Eisner, Litvack, and perhaps Russell, no defendant even saw the December 27 letter before it was signed. n359 Additionally, neither the full board nor any committee thereof met to discuss the acceleration of Ovitz's departure or the $ 1 million holdback. n360 Shortly after Disney paid Ovitz what he was owed under the OEA for an NFT (minus the $ 1 million holdback), plaintiffs filed the current action.

n356 *Id.* At the time that Eisner ordered the holdback, he did not know that Price Waterhouse would be called in to do a full audit of Ovitz's expenses. Tr. 5147:15-5150:11.
n357 Ovitz Post Trial Br. at 13.
n358 Tr. 4400:21-4402:4.
n359 *See, e.g.,* Bowers 336:20-24; Lozano 213:19-214:2; Mitchell 40:13-23; T. Murphy 106:14-21; Nunis 80:3-5; O'Donovan 119:23-120:4; Poitier 176:24-177:18; Stern 192:9-23; Watson 442:16-19; Wilson 125:25-126:8; Roy Disney 190:11-24.
n360 Tr. 3943:19-3944:22.

[*131]

The full board next met on January 27, 1997. By this time, the board was aware of the negative publicity that the Ovitz termination and NFT payment had received. There was an extensive discussion of Ovitz's termination at this meeting and the pending lawsuit. Litvack, addressing the full board for the first time concerning the cause issue, notified the board that in his opinion there had been no gross negligence or malfeasance and, thus, Ovitz could not be terminated for cause. n361 Litvack stood by his decision at trial, stating he had learned nothing since 1996 that made him reconsider his original advice to the board that Disney could not fire Ovitz for cause. n362

n361 Tr. 2599:10-2600:9 (Russell) (stating that Litvack had explained about the lawsuit and that he stated that "we had acted properly and that there would not have been a basis to claim that there was good cause under the employment agreement . . . with respect to the discharge of Michael Ovitz."); 4444:8-4446:12 (Eisner) (stating that the board was fully informed of all the details of Ovitz's termination and that Litvack explained the cause question "to the point that everybody was getting tired of me saying, "Okay, Sandy, say it once again. Who did you talk to? Are you sure? Did we do the right thing?"); 5936:13-5939:15 (Bowers) (stating that Litvack advised the board that there was no gross negligence or malfeasance to terminate Ovitz and that they had to pay him and that she also recalls Litvack stating that he had received outside counsel at this point); 6181:11-6183:11 (Litvack) (stating that he set out the whole Ovitz situation for the board and that he told the board that he did not believe there was gross negligence or malfeasance and hence no way to terminate Ovitz for cause) Litvack also stated that he did not recall saying that he had the advice of outside counsel, but that if he was asked he would have responded that he did. *Id.*; *see also* PTE 799.

[*132]

n362 Tr. 6693:1-12.

*D. Expert Witnesses*

Six expert witnesses testified over the course of the trial. n363 In general, their reports and testimony, while meeting the minimum standards for admissibility, were not of as much help to the Court as they could have been because of the polarized nature of their opinions, especially their interpretations of the factual questions that are of central importance in this trial. I shall discuss each expert *seriatim.* To the extent that my conclusions about an expert are decidedly negative, that characterization is based upon an objective evaluation of the witness and the strength and relevance of the evidence presented both in the report and at trial.

n363 A seventh expert, Alan Johnson, prepared a report on behalf of the defendants and was deposed, but he did not testify at trial. *See* Tr. 771:24-772:16. His amended report dated August 6, 2004, is part of the trial record. DTE 181. Professor Murphy spent a significant amount of time

at trial disputing certain elements of Johnson's report. Tr. 833:21-857:19.

[*133]

1. Professor Deborah DeMott

Plaintiffs offered Professor DeMott, the David F. Cavers Professor of Law at Duke Law School, as an expert on "the custom and practice with regard to corporate governance in Delaware public companies in the time period relevant to this case." n364 Professor DeMott was subject to an earlier motion *in limine*, whereby defendants sought to exclude her testimony. That motion was granted on the grounds that her report and proposed testimony did not comply with D.R.E. 702 and improperly opined on the application of Delaware law to the facts of this case. n365 Professor DeMott rewrote her report, n366 and her testimony was received at trial over defendants' objections. n367

n364 Tr. 23:20-24.
n365 *See In re The Walt Disney Co. Derivative Litig.*, 2004 Del. Ch. LEXIS 27, 2004 WL 550750 *(Del. Ch. Mar. 9, 2004).*
n366 PTE 462.
n367 Tr. 24:1-38:6.

Professor DeMott opined on the "custom and practice of corporate governance in publicly traded Delaware corporations [*134] as of the times relevant to the transactions in this case," and also on "whether the conduct of the board of directors of [the Company] complied with or departed from those customs and those practices." n368 Despite plaintiffs' and Professor DeMott's efforts to couch her opinion in terms of custom and practice of Delaware corporations, it was clear to all that her report and testimony were still directed to the core issues in this case -- whether the defendants breached their fiduciary duties as they exist under Delaware law. n369

n368 Tr. 40:9-18.
n369 For example, instead of using the term "custom and practice" in her report, Professor DeMott states that good corporate goverance "requires," "includes" and "envisions" certain actions. Tr. 98:24-101:10; *see also* Tr. 161:22-166:3 (plaintiffs' counsel objects to a question on cross-examination on the grounds that defense counsel was "just inserting the phrase custom and practice,'" and that these questions were "not going to

what is the custom and practice in the particular time frame with respect to public Delaware companies, but what are the legal requirements [imposed upon fiduciaries of Delaware corporations]").

[*135]

In addition to opining on the core issues in this case, n370 another key area of Professor DeMott's report (and the corresponding testimony) that is of no value to the Court is her interpretation of the Company's certificate of incorporation, bylaws, and board committee charters. n371 Interpretation of the Company's internal governing documents is a matter exclusively for the Court. n372 Thus, there is very little, if any, of Professor DeMott's report that is of benefit to the Court, especially because the relevant question is not whether the defendants complied with the custom and practice of other Delaware corporations during the relevant time frame, but whether they complied with their fiduciary duties. n373

n370 *See* PTE 462 at P 14 ("Neither Disney's Board nor its Compensation Committee gave careful consideration to the implications of the terms of Disney's employment agreement with Mr. [Ovitz]."); *see also id.* at P 17 ("The record leaves no doubt that both the decision to terminate Mr. Ovitz's employment and the decision to characterize the termination as a non-fault termination were made by Mr. Eisner without consideration by Disney's Board.").

[*136]

n371 PTE 462 at PP 9, 12, 17; Tr. 172:6-175:5.
n372 *See Itek Corp. v. Chicago Aerial Indus., Inc.*, 274 A.2d 141, 143 (Del. 1971).
n373 Professor DeMott's testimony was useful, however, in the sense that it drew in stark relief the contrast between ideal corporate governance practices and the unwholesome boardroom culture at Disney -- that is, her testimony clarified how ornamental, passive directors contribute to sycophantic tendencies among directors and how imperial CEOs can exploit this condition for their own benefit, especially in the executive compensation and severance area. *See* Tr. 43:4-46:15 (individualized one-on-one discussions between management and directors can lead to directors who are "unequally or unevenly informed with regard to significant matters" and "have the effect of vitiating, sapping the board's ability as an insti-

tution to function together collectively and collegially and deliberatively"); 83:12-84:6.

### 2. Professor John Donohue

Professor Donohue, the William H. Neukom Professor of Law at Stanford Law School, came to the [*137] witness stand on behalf of plaintiffs three different times during the course of the trial. His report and testimony were directed to the issue of whether Ovitz could (and should) have been terminated for cause as opposed to the NFT he received. The fatal flaw in Donohue's opinion is that it is based upon his factual determinations -- determinations with which I, after weighing all of the evidence, do not agree. n374 For example, in the summary of his conclusions, Donohue states that Ovitz committed gross negligence or malfeasance because of his dishonesty, and because of eight other categories of bad acts. n375 As demonstrated above, in the lengthy and detailed recitation of the facts, I conclude that those determinations are simply not supported by a fair and neutral evaluation of the record.

n374 *See* Tr. 636:16-637:6; 702:4-7.
n375 PTE 404 at 4.

Donohue's opinion outlined an array of legal standards that might cover Ovitz's termination. n376 In his zeal to crucify Ovitz, Donohue concluded [*138] that Ovitz's conduct would meet any of the multiplicity of standards he discusses for gross negligence or malfeasance, and his report contains very little guidance in terms of which standard might be the most appropriate or most likely to be applied by a California court. n377 As a result, Donohue's report and testimony are of little value to the Court in evaluating defendants' conduct as it relates to Ovitz's termination.

n376 *Id.* at 7-34.
n377 *See id.* at 4.

Donohue was permitted to file a supplemental report based upon his review of certain documents, which were produced by defendants shortly before trial. n378 The supplemental report made no substantive changes to Donohue's opinions and conclusions. n379

n378 PTE 826.
n379 *Id.*

### 3. Professor Kevin Murphy

Professor Murphy (to whom I will refer [*139] as "Professor Murphy" in order to avoid any potential confusion with defendant Thomas Murphy), the E. Morgan Stanley Chair in Business Administration at the Marshall School of Business at the University of Southern California, presented expert testimony for plaintiffs on the issue of damages together with an economic and reasonableness evaluation of Ovitz's compensation package. n380 Professor Murphy concluded that Ovitz's compensation package was unreasonably excessive and orders of magnitude larger than the compensation awarded to executives with arguably equivalent responsibilities. n381 In determining the reasonableness of Ovitz's compensation, Professor Murphy chose not to consider Ovitz's past income at CAA and the effect that income would have on the remuneration he would expect from any future employment. n382 As would be expected, Professor Murphy concluded that the most reasonable and appropriate assumptions are those that would maximize the value of the OEA and corresponding cost of the NFT. n383 Perhaps Professor Murphy's most pointed criticism of the OEA is that the Company was unable to reduce its potential financial exposure because the OEA did not contain any provisions [*140] for mitigation or noncompete restrictions, n384 but that criticism is not supported by the language of the OEA. n385

n380 *See* PTE 426 (Professor Murphy report).
n381 *See, e.g.,* Tr. 748:22-749:13.
n382 Tr. 868:17-870:16; 1061:5-19; *see also* Tr. 1010:21-1020:18; 1036:12-1037:9; 1043:1-21.
n383 *See* Tr. 901:6-919:14; 925:2-939:4; 980:4-989:7; 1072:11-1077:13; 1081:19-1085:17; PTE 426 at 24-31 (Professor Murphy's discussion of the cost to the Company of Ovitz's severance where he concludes that the Black-Scholes value (as opposed to intrinsic or realized cost) of Ovitz's options (by far the highest of the three) is the appropriate way to measure that cost).
n384 Tr. 803:3-805:5.

n385 *See* PTE 7 P 9 at WD00209-10.

Professor Murphy's report did not include an event study, but at trial Professor Murphy gave a very brief and unpersuasive critique of Dunbar's event study, which as

discussed below, concluded that the Company's market capitalization [*141] increased by more than $ 1 billion as a result of the announcement of Ovitz's hiring. The record does not reflect that Professor Murphy's qualifications as an expert extend to performing and interpreting event studies, and I therefore reject Professor Murphy's critique of Dunbar's conclusion with respect to the market's reaction to the announcement of Ovitz's hiring. n386 The remainder of his report, however, is of use to the Court in determining the economic consequences facing the defendants when the decisions at issue in this case were made.

n386 Notwithstanding the statements in the text above, Professor Murphy does make a very good point that the press release announcing Ovitz's hiring (PTE 3) does not disclose any economic terms of Ovitz's employment with the Company, and therefore, as a matter of common sense, the market cannot be said to have "approved" the economic terms of the OEA. See 859:7-860:3. One might intuit, however, that the $ 1 billion increase in the Company's market capitalization as a result of Ovitz's hiring would reflect the assumptions of the market as to the potential cost of Ovitz's employment contract, even if the market was unaware of the actual cost. Dunbar testified to this effect, outlining the public reports of Ovitz's compensation before the text of the OEA was filed publicly in December 1995 and concluding that the lack of statistically significant market reaction at that time was due to the market's correct assumptions of the size of the compensation package on August 14, 1995. Tr. 7296:8-7297:20; 7414:19-7416:3; DTE 428 at 3-9.

[*142]

#### 4. Larry R. Feldman

Ovitz's expert with respect to whether he could have been terminated for cause was Larry Feldman. Feldman is a renowned litigator in southern California and is currently employed at Kaye Scholer LLP. n387 Feldman opined that the Company had no grounds upon which to terminate Ovitz for cause, and that had the Company done so, that Ovitz would have been able to pursue meritorious claims for breach of contract, fraud and defamation, with damages far in excess of the value of the NFT. n388

n387 See DTE 408 at 1-2.
n388 DTE 408 at 47.

Upon comparing Feldman's report to the factual determinations I have made, I conclude that the evidence presented at trial is generally consistent with Feldman's view of the relevant facts. Feldman's legal analysis, however, is more troublesome. For example, I am not persuaded in the least that the legal standard used by Feldman in his report to define gross negligence or malfeasance -- criminal misconduct or its equivalent -- is the correct [*143] standard. n389 Additionally, his opinion with respect to potential claims for defamation and fraud in the inducement is thinly supported and fails to adequately address potentially meritorious defenses that the Company could have asserted to such causes of action. n390 In sum, therefore, Feldman's report and testimony are of some value to the Court, but not substantial value.

n389 DTE 408 at 10-16. But see PTE 404 at 17-18 (Donohue's opinion that gross negligence is not exclusively a criminal standard); DTE 430 at 8-11 (Fox concurring with Donohue); cf. Tr. 8333:24-8334:10 (Feldman) (stating at trial that gross negligence does not require actual criminal misconduct).
n390 See DTE 408 at 36-44; Tr. 8403:19-8411:3; 8455:21-8467:3; 8552:18-8577:21.

#### 5. John C. Fox

John Fox, a partner of Fenwick & West LLP, testified on behalf of all defendants but Ovitz as an expert with respect to whether Ovitz could have been terminated for cause. Fox's report and testimony were very thorough, well [*144] reasoned and informed by Fox's extensive practical experience as an employment law litigator and advisor. n391

n391 See DTE 430 (Fox report); DTE 248 (Fox's supplemental report).

The overwhelming majority of Fox's factual determinations are consonant with the conclusions I have reached above based upon the evidence presented at trial. His legal conclusions based upon those facts, therefore, are of far greater weight and persuasive value than the conclusions reached by Donohue. Similar to Feldman,

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

Fox gives short shrift in his report to analyzing Ovitz's potential claims for fraud in the inducement and defamation. n392 Unlike Feldman, however, Fox was able to clearly articulate at trial the reasoning behind his conclusion with respect to the viability of these tort claims, bolstering the value of his report in those areas. n393 Fox also testified in great detail regarding the definition of gross negligence and malfeasance. n394 He also opined that, regardless of how gross negligence and malfeasance might [*145] be defined in a hypothetical *Ovitz v. The Walt Disney Company* suit had Ovitz been terminated for cause, after reviewing the evidence, Ovitz's conduct (or misconduct) did not even come close to that high standard. n395 In summary, Fox's report is of significant value to the Court, and I will weigh his conclusions accordingly in making my determinations regarding the ultimate issues in this case.

n392 DTE 430 at 27-28; *see* DTE 430 at 28; DTE 408 at 36-43.

n393 *See* Tr. 8838:1-19; 8866:3-17; 8905:20-8908:1; 8948:20-8951:13; 8956:6-8960:9; 9207:14-9213:23; 9222:23-9231:19; 9244:21-9246:8.

n394 Tr. 8739:15-8748:4; 8999:20-9039:22; 9084:5-20.

n395 Tr. 8758:1-8837:3; 8844:10-8860:6; 8922:3-8925:18; 8947:5-8951:13; 8955:10-8961:24; 9025:22-9026:15; 9039:23-9040:12; 9048:3-9195:7.

### 6. Frederick C. Dunbar

The remaining expert was Frederick Dunbar, Senior Vice President of National Economic Research Associates, Inc., who testified on behalf of the defendants as to the market [*146] reaction to the hiring of Ovitz and also critiqued Professor Murphy's report as it related to the valuation of Ovitz's options and the present value calculation of the cash portion of the NFT payment. n396 Dunbar's conclusion with respect to the market's overwhelmingly positive reaction to Ovitz's hiring is not unassailable, but is nonetheless well-supported by the evidence and based upon accepted methods of analysis. n397 With respect to his opinion that a reduced or discounted option expiration date is appropriate when performing a Black-Scholes valuation of the options, Dunbar's testimony at trial was thorough and convincing. n398 Accordingly, Dunbar's Black-Scholes calculations are more valuable and persuasive than those performed by Professor Murphy and will be useful in evaluating the defendants' actions.

n396 *See* DTE 428 (Dunbar report). I have omitted any discussion regarding Professor Murphy's opinion regarding the appropriate discount rate (together with Dunbar's response thereto) because there is no evidence in the record that would indicate that any of the defendants in this action exercised any discretion whatsoever in determining the discount rate applied to the cash payment received by Ovitz as a result of the NFT. Without that evidence connecting a defendant to that decision, I fail to see the current relevance of why other discount rates might have been appropriate. Whichever Disney employees made the decision as to which discount rate to use, were they before the Court, would receive the protections of the business judgment rule. There is no evidence in the record that would impugn in any way the presumptions of care, loyalty, or good faith used by those employees in the business judgment of determining the appropriate discount rate. For that reason, an analysis of why a particular discount rate might have been more appropriate than the one selected is not germane to the issues to be decided herein. *See* Santaniello 149:16-154:14 (stating that he was unaware of how the discount rate was determined); PTE 130 (memo from the Company's Controller's office to Santaniello enclosing present value calculations at 6.5% and 6.75%); PTE 131 (demonstrating that the 6.5% discount rate was actually used in paying Ovitz).

[*147]

n397 DTE 428 at 3-9; Tr. 7287:6-7300:3; 7365:6-7448:16.

n398 Tr. 7306:11-7333:16; 7448:17-7506:6. In contrast, Professor Murphy's explanation for using the latest possible termination date when valuing the options upon termination, based upon the fact that the exercisability of those options was extended, (in exchange for dropping the $ 50 million guarantee), and based upon an array of possible hedges, is not nearly as persuasive. *See* Tr. 823:18-830:20; 964:19-972:20.

## II. LEGAL STANDARDS

The outcome of this case is determined by whether the defendants complied with their fiduciary duties in connection with the hiring and termination of Michael Ovitz. At the outset, the Court emphasizes that the best practices of corporate governance include compliance

with fiduciary duties. n399 Compliance with fiduciary duties, however, is not always enough to meet or to satisfy what is expected by the best practices of corporate governance.

n399

> All good corporate governance practices include compliance with statutory law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability. But they are not required by the corporation law and do not define standards of liability.

*Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000).*

[*148]

The fiduciary duties owed by directors of a Delaware corporation are the duties of due care and loyalty. n400 Of late, much discussion among the bench, bar, and academics alike, has surrounded a so-called third fiduciary duty, that of good faith. Of primary importance in this case are the fiduciary duty of due care and the duty of a director to act in good faith. Other than to the extent that the duty of loyalty is implicated by a lack of good faith, the only remaining issues to be decided herein with respect to the duty of loyalty are those relating to Ovitz's actions in connection with his own termination. n401 These considerations will be addressed *seriatim*, although issues of good faith are (to a certain degree) inseparably and necessarily intertwined with the duties of care and loyalty, as well as a principal reason the distinctness of these duties make a difference-namely *§ 102(b)(7) of the Delaware General Corporation Law.* n402

n400 The Delaware Supreme Court has been clear that outside the recognized fiduciary duties of care and loyalty (and perhaps good faith), there are no other fiduciary duties. In certain circumstances, however, specific applications of the duties of care and loyalty are called for, such as so-called "*Revlon*" duties and the duty of candor or disclosure. *See Malpiede v. Townson, 780 A.2d 1075, 1083, 1086 (Del. 2001); Paramount Communications Inc. v. QVC Network, Inc., 637 A.2d 34, 43 (Del. 1994)* ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, the directors must act in accordance with their fundamental duties of care and loyalty.'") (citation omitted)).

[*149]

n401 *See In re The Walt Disney Co. Derivative Litig. ("Disney III"), 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at *7 (Del. Ch. Sept. 10, 2004); Brehm, 746 A.2d at 257-58.*

n402 Perhaps these categories of care and loyalty, so rigidly defined and categorized in Delaware for many years, are really just different ways of analyzing the same issue. Professor Sean Griffith said it best when he recently wrote:

> At first glance, the duties of care and loyalty appear quite distinctive. . . .
>
> A bit of digging beneath these surface differences, however, reveals the richly interconnected roots of the two doctrinal paradigms. Start with the duty of care: directors must conduct themselves as ordinarily prudent persons managing their own affairs. So far so good, but a moment's reflection reveals that an ordinarily prudent person becomes an ordinarily prudent director only once we assume an element of loyalty. How do ordinarily prudent directors conduct their affairs? A decision is taken with due care, when from an array of alternatives, the directors employ a procedure to pick the one that best advances *the interests of the corporation.* Now pause for a moment to consider what a funny way this is of conceiving what an ordinarily prudent person would

do *in the conduct of her own affairs.* We might typically assume that an ordinarily prudent person, in evaluating a set of alternatives, picks the one that provides the most benefit and least cost to *herself.* A director's decision-making process, however, can be evaluated only by changing the referent from herself to the corporation. The question of prudence, in other words, is framed with a tacit element of loyalty.

. . .

. . . [Shareholders and courts] are worried about the directors' loyalty because we are concerned that their disloyalty will result in a poor bargain for the corporation. We are concerned, in other words, that conflicted directors will strike bargains for the corporation that an ordinarily prudent person would not strike for herself. This can be seen most clearly if the non-arms-length transactions that raise duty of loyalty concerns are imagined as arms-length transactions with third parties. Would an ordinarily prudent person lease a corporate asset to a third party on exceedingly generous terms? Would an ordinarily prudent person lavish compensation on a third party and permit the third party to divert investment opportunities that would otherwise come her way? These are duty of loyalty concerns framed as duty of care questions. The phrasing is natural because, at its core, the duty of loyalty is just a bet that some situations are likely to lead to careless or imprudent transactions for the corporation, which is to say that the duty of care is a motivating concern for the duty of loyalty. Here again the duties overlap.

Sean J. Griffith, *Good Faith Business Judgment: A Theory of Rhetoric in Corporate Law Jurisprudence,* 55 DUKE L. J. (forthcoming 2005) (manuscript of May 25, 2005 at 39-42 available

at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=728431) (emphasis in original, citations omitted).

[*150]

*A. The Business Judgment Rule*

A comprehensive review of the history of the business judgment rule is not necessary here, but a brief discussion of its boundaries and proper use is appropriate. Delaware law is clear that the business and affairs of a corporation are managed by or under the direction of its board of directors. n403 The business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation. n404 Because courts are ill equipped to engage in *post hoc* substantive review of business decisions, the business judgment rule "operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." n405

n403 *8 Del. C. § 141(a).*

n404 *See Zapata Corp. v. Maldonado, 430 A.2d 779, 782 (Del. 1981).*

n405 *Cede & Co. v. Technicolor, Inc. ("Cede III"), 634 A.2d 345, 360 (Del. 1993)* (citing *Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1988)).*

[*151]

The business judgment rule is not actually a substantive rule of law, n406 but instead is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, . . . and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." n407 This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on the part of the directors. n408 In the absence of this evidence, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose." n409 When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste. n410

n406 *Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1162 (Del. 1995)* (citing *Cede III, 634 A.2d at 360*); *see Emerald Partners v. Berlin, 787*

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

*A.2d 85, 90-91 (Del. 2001); Unitrin, Inc. v. Am. Gen. Corp., 651 A.2d 1361, 1374 (Del. 1995).*

[*152]

n407 *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).* In *Smith v. Van Gorkom*, the Delaware Supreme Court clarified that "the presumption that the directors acted in good faith [is] irrelevant in determining the threshold issue of whether the directors as a Board exercised an informed business judgment." *488 A.2d 858, 889 (Del. 1985).* In *In re Holly Farms Corp. S'holders Litig.*, the Court of Chancery denied the protections of the business judgment rule to a board of directors' agreement to a lock up because it was "the product of a fundamentally flawed process and cannot be in the interests of the stockholders." *1988 Del. Ch. LEXIS 164, 1988 WL 143010, at *6 (Del. Ch. Dec. 30, 1988).*

n408 *Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988); Cede III, 634 A.2d at 360.* In *Gagliardi*, Chancellor Allen described the policy rationale for the business judgment rule in the paragraph quoted below. Although this statement, made in 1996, may at first appear to be undercut by the increased incentive compensation of the dot-com era, the rationale still applies because of the relatively small percentages of stock held by officers and directors of public companies.

> Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky!-you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects. Given this disjunction, only a very small probability of director liability based on "negligence", "inattention", "waste", etc. could induce a board to avoid authorizing risky investment projects to any extent! Obviously, it is in the shareholders' economic interest to offer sufficient protection to directors from liability for negligence, etc., to allow directors to conclude that, as a practical matter, there is no risk that, if they act in good faith and meet minimalist proceduralist standards of attention, they can face liability as a result of a business loss.

*Gagliardi v. TriFoods Int'l Inc., 683 A.2d 1049, 1052 (Del. Ch. 1996).*

[*153]

n409 *Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971); see also Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 954 (Del. 1985).*
n410 *In re J.P. Stevens & Co., Inc. S'holders Litig., 542 A.2d 770, 780 (Del. Ch. 1988).*

This presumption can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction. n411 In that event, the burden shifts to the director defendants to demonstrate that the challenged transaction was "entirely fair" to the corporation and its shareholders. n412

n411 *Emerald Partners, 787 A.2d at 91.*
n412 *Id.* In certain circumstances, the burden can shift back to the plaintiffs in the event of ratification by disinterested directors or shareholders. *See Solomon v. Armstrong, 747 A.2d 1098, 1111, 1113-17 (Del. Ch. 1999), aff'd, 746 A.2d 277 (Del. 2000).*

[*154]

In *Van Gorkom*, the Delaware Supreme Court analyzed the Trans Union board of directors *as a whole* in

determining whether the protections of the business judgment rule applied. n413 More recent cases understand that liability determinations must be on a director-by-director basis. In *Emerging Communications*, Justice Jacobs wrote (while sitting as a Vice Chancellor) that the "liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." n414 There is a not insignificant degree of tension between these two positions, notwithstanding the procedural differences between the two cases.

> n413 *Van Gorkom, 488 A.2d at 889.*
> n414 *In re Emerging Communications Inc. S'holders Litig., 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at *38 (Del. Ch. Jun. 4, 2004).*

Even if the directors have exercised their business judgment, the protections of the [*155] business judgment rule will not apply if the directors have made an "unintelligent or unadvised judgment." n415 Furthermore, in instances where directors have not exercised business judgment, that is, in the event of director inaction, the protections of the business judgment rule do not apply. n416 Under those circumstances, the appropriate standard for determining liability is widely believed to be gross negligence, n417 but a single Delaware case has held that ordinary negligence would be the appropriate standard. n418

> n415 *Mitchell v. Highland-Western Glass, 19 Del. Ch. 326, 167 A. 831, 833 (Del. Ch. 1933); Van Gorkom, 488 A.2d at 872.*

> n416 *Aronson, 473 A.2d at 813.* This is not to say that all director inaction is not subject to the business judgment rule. As the *Aronson* Court noted, "*a conscious decision to refrain from acting* may nonetheless be a valid exercise of business judgment." *Id.* (emphasis added).
> n417 *See Seminaris v. Landa, 662 A.2d 1350 (Del. Ch. 1995); In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268 (Del. Ch. 1995).*

[*156]

n418 *Rabkin v. Philip A. Hunt Chem. Corp., 1987 Del. Ch. LEXIS 522, 1987 WL 28436, at *1-3 (Del. Ch. Dec. 17, 1987).* See *Graham v. Allis-Chalmers Mfg. Co., 188 A.2d 125, 130, 41 Del. Ch. 78 (Del. 1963).* I confess to being mystified why plaintiffs did not cite *Rabkin* and its lower standard of liability when they did cite *Aronson* for the proposition that the business judgment rule does not apply to director inaction, as well as a bankruptcy decision that heavily relied upon *Rabkin.* See *Pereira v. Cogan, 294 B.R. 449 (S.D.N.Y. 2003), vacated and remanded sub nom. Pereira v. Farace, 413 F.3d 330 (2d Cir. 2005).* A similar mystery confronted then-Vice Chancellor Berger in *Rabkin*, where she wrote:

> Both parties agree that liability must be predicated upon a finding of gross negligence. As a result, the Court did not have the benefit of what it assumed would be plaintiffs' arguments in support of the Court's original ruling [that ordinary negligence was the appropriate standard] and the Court is left in the unenviable position of deciding against both parties.

*1987 Del. Ch. LEXIS 522, at *4.* It also bears noting that no Delaware decision (until this one) has cited *Rabkin*, decided roughly eighteen years ago, and it would appear that *Seminaris, In re Baxter Int'l*, and *In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996)*, have since eclipsed *Rabkin* by implicitly accepting that gross negligence is the appropriate standard even in cases of alleged director inaction and lack of oversight.

[*157]

### B. Waste

Corporate waste is very rarely found in Delaware courts because the applicable test imposes such an onerous burden upon a plaintiff -- proving "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." n419 In other words, waste is a rare, "unconscionable case[] where directors irrationally squander or give away corporate assets." n420

n419 *Brehm, 746 A.2d at 263; In re The Walt Disney Co. Derivative Litig. ("Disney I"), 731 A.2d 342, 362 (Del. Ch. 1998)* (quoting *Glazer v. Zapata Corp., 658 A.2d 176, 183 (Del. Ch. 1993))*.
n420 *Brehm, 746 A.2d at 263.*

The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith. n421 It is not necessarily true, however, that every act of bad faith by a director constitutes waste. For example, if a director acts in bad faith (for whatever reason), [*158] but the transaction is one in which a businessperson of ordinary, sound judgment concludes that the corporation received adequate consideration, the transaction would not constitute waste. n422

n421 *See White v. Panic, 783 A.2d 543, 553-55 (Del. 2001)* (citing *J.P. Stevens, 542 A.2d at 780-81).*

n422 Nevertheless, if the director acted in bad faith, it would be extraordinarily difficult for the defendant directors to prove that the transaction was entirely fair to the corporation because it would be difficult to demonstrate fair process. *See Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983).*

*C. The Fiduciary Duty of Due Care*

The fiduciary duty of due care requires that directors of a Delaware corporation "use that amount of care which ordinarily careful and prudent men would use in similar circumstances," n423 and -- "consider all material information reasonably available" in making business decisions, and that deficiencies in the directors' [*159] process are actionable only if the directors' actions are grossly negligent. n424 Chancellor Allen described the two contexts in which liability for a breach of the duty of care can arise:

First, such liability may be said to follow *from a board decision* that results in a loss because that decision was ill advised or "negligent". Second, liability to the corporation for a loss may be said to arise from an *unconsidered failure of the board to act* in circumstances in which due atten-

tion would, arguably, have prevented the loss. n425

Chancellor Allen then explained with respect to board decisions:

. . . [These] cases will typically be subject to review under the director-protective business judgment rule, assuming the decision made was the product of *a process* that was *either* deliberately considered in good faith or was otherwise rational. What should be understood, but may not widely be understood by courts or commentators who are not often required to face such questions, is that compliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board decision* that leads to a corporate [*160] loss, apart from consideration of the good faith or rationality of the process employed. That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through "stupid" to "egregious" or "irrational", provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests. To employ a different rule-one that permitted an "objective" evaluation of the decision-would expose directors to substantive second guessing by ill-equipped judges or juries, which would, in the long-run, be injurious to investor interests. Thus, the business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions.

Indeed, one wonders on what moral basis might shareholders attack a *good faith* business decision of a director as "unreasonable" or "irrational". Where a director *in fact exercises a good faith effort to be informed and to exercise appropriate judgment*, he or she should be deemed to satisfy fully the duty of attention. n426

With respect to liability [*161] for director inaction, Chancellor Allen wrote that in order for the inaction to

be so great as to constitute a breach of the director's duty of care, a plaintiff must show a "lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight." n427 The Chancellor rationalized this extremely high standard of liability for violations of the duty of care through inaction by concluding that:

> [A] demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors. n428

n423 *Graham, 188 A.2d at 130.*

n424 *Brehm, 746 A.2d at 259; Official Comm. Of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins, et al. ("IHS"), 2004 Del. Ch. LEXIS 122, 2004 WL 1949290, at \*9 n.37 (Del. Ch. Aug. 24, 2004); In re Nat'l Auto Credit, Inc. S'holders Litig., 2003 Del. Ch. LEXIS 5, 2003 WL 139768, at \*12 (Del. Ch. Jan. 10, 2003).* In *Cede III*, the Supreme Court affirmed and adopted Chancellor Allen's "presumed findings" that the directors of Technicolor "were grossly negligent in failing to reach an informed decision when they approved the agreement of merger, and . . . thereby breached their duty of care." *634 A.2d at 366.* By way of example, a board of directors need not read "*in haec verba* every contract or legal document that it approves, but if it is to successfully absolve itself from charges of [violations of the duty of care], there must be some credible evidence that the directors knew what they were doing, and ensured that their purported action was given effect." *Van Gorkom, 488 A.2d 858, 883 n.25 (Del. 1985).*

[*162]

n425 *Caremark, 698 A.2d at 967* (emphasis in original).
n426 *Id. at 967-68* (internal citations and footnotes omitted, emphasis in original).

n427 *Id. at 971.*
n428 *Id.* (emphasis in original).

In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a "reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are without the bounds of reason.'" n429 Because duty of care violations are actionable only if the directors acted with gross negligence, n430 and because in most instances money damages are unavailable to a plaintiff who could theoretically prove a duty of care violation, n431 duty of care violations are rarely found.

n429 *Tomczak v. Morton Thiokol, Inc., 1990 Del. Ch. LEXIS 47, 1990 WL 42607, at \*12 (Del. Ch. Apr. 5, 1990)* (quoting *Allaun v. Consol. Oil Co., 16 Del. Ch. 318, 147 A. 257, 261 (Del. Ch. 1929),* and citing *Gimbel v. Signal Cos., Inc., 316 A.2d 599, 615 (Del. Ch.), aff'd, 316 A.2d 619 (Del. 1974)).* For example, on a motion to dismiss, in order for a plaintiff to successfully plead that the directors acted with gross negligence (as opposed to regular negligence), the plaintiff should articulate "facts that suggest a *wide* disparity between the process the directors used . . . and that which would have been rational." *Guttman v. Huang, 823 A.2d 492, 507 n.39 (Del. 2003)* (emphasis in original).

[*163]

n430 *Brehm, 746 A.2d at 259.*
n431 *See 8 Del. C. § 102(b)(7).*

### D. The Fiduciary Duty of Loyalty

The fiduciary duty of loyalty was described in the seminal case of *Guth v. Loft, Inc.*, in these strict and unyielding terms:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. . . . A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands [*164] that there be no conflict between duty and self-interest. n432

n432 *23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939).*

More recently, the Delaware Supreme Court stated that there is no safe-harbor for divided loyalties in Delaware, n433 and that the duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take[] precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." n434 The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders. n435

n433 *Weinberger, 457 A.2d at 710.*
n434 *Cede III, 634 A.2d at 361* (citing *Pogostin v. Rice, 480 A.2d 619, 624 (Del. 1984)*).
n435 *Id. at 362* (citing *Nixon v. Blackwell, 626 A.2d 1366, 1375 (Del. 1993)*).

[*165]

In the specific context at issue here with respect to a classic duty of loyalty claim, Ovitz, as a fiduciary of Disney, was required to act in an "adversarial and arms-length manner" when negotiating his termination and not abuse or manipulate the corporate process by which that termination was granted. n436 He was obligated to act in good faith and "not advantage himself at the expense of the Disney shareholders." n437

n436 *In re The Walt Disney Co. Derivative Litig. ("Disney II"), 825 A.2d 275, 290 (Del. Ch. 2003);*

*Disney III, 2004 Del. Ch. LEXIS 132, *20, 2004 WL 2050138, at *7.*
n437 *Disney II, 825 A.2d at 290; see IHS, 2004 Del. Ch. LEXIS 122, *30, 2004 WL 1949290, at *16.*

### E. Section 102 (b) (7)

Following the Delaware Supreme Court's landmark decision in *Van Gorkom,* n438 the Delaware General Assembly acted swiftly to enact *8 Del. C. § 102(b)(7).* n439 *Section 102(b)(7)* states that a corporation may include in its certificate of incorporation:

(7) A provision eliminating [*166] or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective. All references in this paragraph to a director shall also be deemed to refer (x) to a member of the governing body of a corporation which is not authorized to issue capital stock, and (y) to such other person or persons, if any, who, pursuant to a provision of the certificate of incorporation in accordance with § 141(a) of this title, exercise or perform any of the powers or duties otherwise conferred or imposed upon the board of directors by this title.

The [*167] purpose of *Section 102(b)(7)* was explained by the Delaware Supreme Court in this manner:

The purpose of *Section 102(b)(7)* was *to permit shareholders-* who are entitled to rely upon directors to discharge their fiduciary duties at all times -- to adopt a

provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations and certain other conduct. n440

Recently, Vice Chancellor Strine wrote that, "one of the primary purposes of § 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith." n441 Or in other words, § 102(b)(7) is most useful "when, despite the directors' good intentions, [the challenged transaction] did not generate financial success and . . . the possibility of hindsight bias about the directors' prior ability to foresee that their business plans would not pan out" could improperly influence a *post hoc* judicial evaluation of the directors' actions. n442

n438 *488 A.2d 858.*
[*168]

n439 65 DEL. LAWS, c. 289 (1986).

n440 *Emerald Partners, 787 A.2d at 90* (emphasis in original); *see Malpiede, 780 A.2d at 1095.*
n441 *Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 777 (Del. Ch. 2004).*
n442 *Id.*

The vast majority of Delaware corporations have a provision in their certificate of incorporation that permits exculpation to the extent provided for by § 102(b)(7). This provision prohibits recovery of monetary damages from directors for a successful shareholder claim, either direct or derivative, that is exclusively based upon establishing a violation of the duty of due care. n443 The existence of an exculpation provision authorized by § 102(b)(7) does not, however, eliminate a director's fiduciary duty of care, because a court may still grant injunctive relief for violations of that duty. n444

n443 *Emerald Partners, 787 A.2d at 91.*

n444 *Malpiede, 780 A.2d at 1095*; E. Norman Veasey, et al., *Delaware Supports Directors With a Three-Legged Stool of Limited Liability, Indemnification, and Insurance, 42 BUS. LAW. 399, 403 (1987)* ("*Section 102(b)(7)* does not eliminate the duty of care that is properly imposed upon directors. Directors continue to be charged under Delaware law with a duty of care in the decisionmaking process and in their oversight responsibilities. The duty of care continues to have vitality in remedial contexts as opposed to actions for personal monetary damages against directors as individuals."). *Cf. Strassburger v. Earley, 752 A.2d 557, 581 (Del. Ch. 2000)* (holding that rescissory damages, although an equitable remedy, is not appropriate for breaches solely of the duty of care).

[*169]

An exculpation provision such as that authorized by § 102(b)(7) is in the nature of an affirmative defense. n445 As a result, it is the burden of the director defendants to demonstrate that they are entitled to the protections of the relevant charter provision. n446

n445 *Emerald Partners, 787 A.2d at 91-92.*
n446 *See id.; Emerging Communications, 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at *42.*

### F. Acting in Good Faith

Decisions from the Delaware Supreme Court and the Court of Chancery are far from clear with respect to whether there is a separate fiduciary duty of good faith. n447 Good faith has been said to require an "honesty of purpose," and a genuine care for the fiduciary's constituents, n448 but, at least in the corporate fiduciary context, it is probably easier to define bad faith rather than good faith. n449 This may be so because Delaware law presumes that directors act in good faith when making business judgments. n450 Bad faith has been defined as authorizing a transaction [*170] "for some purpose *other than* a genuine attempt to advance corporate welfare or [when the transaction] is *known to constitute* a violation of applicable positive law." n451 In other words, an action taken with the intent to harm the corporation is a disloyal act in bad faith. A similar definition was used seven years earlier, when Chancellor Allen wrote that bad faith (or lack of good faith) is when a director acts in a manner "unrelated to a pursuit of the corporation's best interests." n452 It makes no difference the reason why

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

the director intentionally fails to pursue the best interests of the corporation. n453

n447

> It does no service to our law's clarity to continue to separate the duty of loyalty from its essence; nor does the recognition that good faith is essential to loyalty demean or subordinate that essential requirement. There might be situations when a director acts in subjective good faith and is yet not loyal (*e.g.*, if the director is interested in a transaction subject to the entire fairness standard and cannot prove financial fairness), but there is no case in which a director can act in subjective bad faith towards the corporation and act loyally. . . . For example, one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey.

*Guttman, 823 A.2d at 506 n.34. See In re Gaylord Container Corp. S'holders Litig., 753 A.2d 462, 475 n.41 (Del. Ch. 2000); In re ML/EQ Real Estate P'ship Litig., 1999 Del. Ch. LEXIS 238, 1999 WL 1271885, at *4 n.20 (Del. Ch. Dec. 21, 1999); Barkan v. Amsted Indus. Inc., 567 A.2d 1279, 1286 (Del. 1989); Blasius Indus. Inc. v. Atlas Corp., 564 A.2d 651, 663 (Del. 1988)* (holding that because the acts taken by the directors thwarted the shareholder franchise, even if the directors acted in good faith, those actions "constituted an unintended violation of the duty of loyalty that the board owed to the shareholders."); *cf. IHS, 2004 Del. Ch. LEXIS 122, *3, 2004 WL 1949290, at *9* (analyzing good faith claims under the rubrics of care and loyalty, as appropriate, instead of as a separate duty).

[*171]

n448 E. Norman Veasey, *Reflections on Key Issues of the Professional Responsibilities of Corporate Lawyers in the Twenty-First Century, 12 WASH. U. J. L. & POL'Y 1, 9 (2003).*

n449 Despite the existence of significant jurisprudence with respect to good faith in the contractual context of the covenant of good faith and fair dealing, *see, e.g., Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P., 624 A.2d 1199 (Del. 1993),* Delaware decisions have shown a reluctance to importing these contractual standards into the corporate fiduciary realm.

n450 *See Allaun, 16 Del. Ch. 318, 147 A. 257; Van Gorkom, 488 A.2d at 873.*

n451 *Gagliardi, 683 A.2d at 1051 n.2* (citing *Miller v. AT&T, 507 F.2d 759 (3d Cir. 1974),* emphasis in original). Chancellor Allen then explained that "there can be no personal liability of a director for losses arising from illegal' transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction." *Id.* In *Cinerama, Inc. v. Technicolor, Inc., 1991 Del. Ch. LEXIS 105, 1991 WL 111134, at *15 (Del. Ch. June 24, 1991),* Chancellor Allen to a certain extent equated good faith with loyalty when he stated that there was "persuasive evidence" of bad faith on the part of one of the Technicolor directors (Sullivan) because he had met and cooperated with the acquiror before the acquiror had met with the CEO. Sullivan also received a $ 150,000 "finder's fee" for his assistance from the post-merger Technicolor. *1991 Del. Ch. LEXIS 105, *23.* This portion of the decision was not appealed because Cinerama abandoned its claims that the directors acted in bad faith. *Cede III, 634 A.2d at 359. See also Veasey, infra n.457 at 448* (noting that intentional violations of law implicate good faith by stating that "the utter failure to follow the minimum expectations of Sarbanes-Oxley, or the NYSE or NASDAQ Rules . . . might . . . raise a good faith issue").

[*172]

n452 *In re RJR Nabisco, Inc. S'holder Litig., 1989 Del. Ch. LEXIS 9, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989); cf. Strassburger, 752 A.2d at 581* (holding that certain directors breached their duty of loyalty by "indifference to their duty to protect the interests of the corporation and its minority shareholders," because their primary loyalty was instead given to the interests of their employer).

n453 *See Guttman 823 A.2d at 506 n.34* ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious actions not in the corporation's best interest does not make it faithful, as opposed to faithless."); *Nagy v. Bistricer, 770 A.2d 43, 48 n.2 (Del. Ch. 2000)* (The duty of good faith, "if it is useful at all as an independent concept, [good faith's] utility may rest in its constant reminder . . . that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.") *Emerging Communications, 2004 Del. Ch. LEXIS 70, *147, 2004 WL 1305745, at *38* (holding that certain defendants violated their duty of "loyalty and/or good faith" because of the uncertainty in defining those terms).

[*173]

Bad faith can be the result of "any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride." n454 Sloth could certainly be an appropriate addition to that incomplete list if it constitutes a systematic or sustained shirking of duty. n455 Ignorance, in and of itself, probably does not belong on the list, but ignorance attributable to any of the moral failings previously listed could constitute bad faith. It is unclear, based upon existing jurisprudence, whether motive is a necessary element for a successful claim that a director has acted in bad faith, n456 and, if so, whether that motive must be shown explicitly or whether it can be inferred from the directors' conduct. n457

n454 *Guttman, 823 A.2d at 506 n.34; cf. Malpiede, 780 A.2d at 1085 n.29* (holding that plaintiffs did not adequately allege a breach of the "duty of loyalty and good faith" merely by pleading conclusory statements that the target's board rejected an offer based upon "(1) the interested director's desire to consummate [the deal proposed by the other bidder], (2) a desire to benefit [the majority shareholders] with a quick deal, (3) dislike' of [the spurned bidder], or (4) a personal desire to complete the sale process."). 455 *See* Hillary A. Sale, *Delaware's Good Faith, 89*

*CORNELL L. REV. 456, 488-91 (2004)* (advocating application of federal scienter standards from the Rule 10b-5 context to an analysis of whether directors have satisfied their duty of acting in good faith when the allegations Stern from directors' deliberate indifference).

[*174]

n456 *Compare Van Gorkom, 488 A.2d at 873, with Zirn v. VLI Corp., 681 A.2d 1050, 1061-62 (Del. 1996)* (discussing good faith motives with respect to proxy disclosures) and *Johnson v. Shapiro, 2002 Del. Ch. LEXIS 122, 2002 WL 31438477 (Del. Ch. Oct. 18, 2002)* (same).
n457 *See E.* Norman Veasey, *State-Federal Tension in Corporate Governance and the Professional Responsibilities of Advisors, 28 J. CORP. L. 441, 447 (2003).*

Shrouded in the fog of this hazy jurisprudence, the defendants' motion to dismiss this action was denied because I concluded that the complaint, together with all reasonable inferences drawn from the well-plead allegations contained therein, could be held to state a nonexculpated breach of fiduciary duty claim, insofar as it alleged that Disney's directors "*consciously and intentionally disregarded their responsibilities*, adopting a we don't care about the risks' attitude concerning a material corporate decision." n458

n458 *Disney II, 825 A.2d at 289* (emphasis in original); *see Gagliardi, 683 A.2d at 1051* ("In the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.").

[*175]

Upon long and careful consideration, I am of the opinion that the concept of *intentional dereliction of duty,* a *conscious disregard for one's responsibilities,* is an appropriate (although not the only) standard for determining whether fiduciaries have acted in good faith. n459 Deliberate indifference and inaction *in the face of a duty to act* is, in my mind, conduct that is clearly disloyal to the corporation. n460 It is the epitome of faithless conduct.

n459 Indeed, *§ 102(b)(7)* on its face seems to equate bad faith with intentional misconduct. *See 8 Del. C. § 102(b)(7)(ii)*.

n460 This is, in my opinion, what the Supreme Court was trying to communicate in *Van Gorkom* when it wrote:

> In the specific context of a proposed merger of domestic corporations, *a director has a duty under 8 Del. C. § 251(b)*, along with his fellow directors, to act in an informed manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. *Certainly in the merger context, a director may not abdicate that duty* by leaving to the shareholders alone the decision to approve or disapprove the agreement. Only an agreement of merger satisfying the requirements of *8 Del. C. § 251(b)* may be submitted to the shareholders under *§ 251(c)*.
>
> *It is against those standards that the conduct of the directors of Trans Union must be tested*, as a matter of law and as a matter of fact, regarding their exercise of an informed business judgment in voting to approve the Pritzker proposal.

*488 A.2d at 873* (citations and footnotes omitted; emphases added). In other words, in *Van Gorkom*, the directors were under a statutory duty to act. That duty, by law, could not be abdicated to the shareholders, much less to the officers of the corporation.

[*176]

To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation. The presumption of the business judgment rule creates a presumption that a director acted in good faith. In order to overcome that presumption, a plaintiff must prove an act of bad faith by a preponderance of the evidence. To create a definitive and categorical definition of the universe of acts that would constitute bad faith would be difficult, if not impossible.

And it would misconceive how, in my judgment, the concept of good faith operates in our common law of corporations. Fundamentally, the duties traditionally analyzed as belonging to corporate fiduciaries, loyalty and care, are but constituent elements of the overarching concepts of allegiance, devotion and faithfulness that must guide the conduct of every fiduciary. The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty, in the narrow sense that I have discussed them above, but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders. A failure to act in good faith may be shown, for [*177] instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, n461 where the fiduciary acts with the intent to violate applicable positive law, n462 or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. n463 There may be other examples of bad faith yet to be proven or alleged, n464 but these three are the most salient. As evidenced by previous rulings in this case both from this Court and the Delaware Supreme Court, issues of the Disney directors' good faith (or lack thereof) are central to the outcome of this action. With this background, I now turn to applying the appropriate standards to defendants' conduct.

n461 *Gagliardi, 683 A.2d at 1051 n.2*.

n462 *Id*.

n463 *Disney II, 825 A.2d at 289-90; see Allaun, 147 A. at 261* (further judicial scrutiny is warranted if the transaction is a result of directors' "reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders."); *Gimbel, 316 A.2d at 604* (motion for a preliminary injunction denied, *inter alia*, because there was "nothing in the record [that] would justify a finding . . . that the directors acted . . . out of improper motive or *intentional disregard of shareholder interests*.") (emphasis added); *see also Caremark, 698 A.2d at 971-72* (where the fiduciaries' failure to act was allegedly "sustained or systematic"). The first two of these examples seem to sound in the fiduciary duty of loyalty, whereas the last appears to be an extension, or rather, an example of, severe violations of the fiduciary duty of care. In the end, so long as the role of good faith is understood, it makes no difference whether the words "fiduciary duty of" are placed in front of "good faith," because acts not

in good faith (regardless of whether they might fall under the loyalty or care aspects of good faith) are in any event non-exculpable because they are disloyal to the corporation. *See 8 Del. C. § 102(b)(7).*

[*178]

n464 Another example of how the concept of good faith may operate in a situation where ensuring director compliance with the fiduciary duties of care and loyalty (as we have traditionally defined those duties) may be insufficient to protect shareholders' interests, is found in *8 Del. C. § 144(a)*. Under *§ 144(a)*, a transaction between a corporation and its directors or officers will be deemed valid if approved by a majority of the independent directors, assuming three criteria are met: 1) the approving directors were aware of the conflict inherent in the transaction; 2) the approving directors were aware of all facts material to the transaction; and 3) the approving directors acted in good faith. In other words, the inside transaction is valid where the independent and disinterested (loyal) directors understood that the transaction would benefit a colleague (factor 1), but they considered the transaction in light of the material facts (factor 2 -- due care) mindful of their duty to act in the interests of the corporation, unswayed by loyalty to the interests of their colleagues or cronies (factor 3 -- good faith). On the other hand, where the evidence shows that a majority of the independent directors were aware of the conflict and all material facts, in satisfaction of factors 1 and 2 (as well as the duties of loyalty and care), but acted to reward a colleague rather than for the benefit of the shareholders, the Court will find that the directors failed to act in good faith and, thus, that the transaction is voidable. In such a case, the duties of care and loyalty, as traditionally defined, might be insufficient to protect the equitable interests of the shareholders, and the matter would turn on the good faith of the directors.

[*179]

### III. ANALYSIS

Stripped of the presumptions in their favor that have carried them to trial, n465 plaintiffs must now rely on the evidence presented at trial to demonstrate by a preponderance of the evidence that the defendants violated their fiduciary duties and/or committed waste. More specifically, in the area of director action, plaintiffs must prove by a preponderance of the evidence that the presumption

of the business judgment rule does not apply either because the directors breached their fiduciary duties, acted in bad faith or that the directors made an "unintelligent or unadvised judgment," n466 by failing to inform themselves of all material information reasonably available to them before making a business decision. n467

n465 *See Disney II, 825 A.2d at 279; Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at *3.*

n466 *Mitchell, 167 A. at 833; Van Gorkom, 488 A.2d at 872.*

n467 *Brehm, 746 A.2d at 259; Van Gorkom, 488 A.2d at 872; Kaplan v. Centex Corp., 284 A.2d 119, 124 (Del. 1971).*

[*180]

If plaintiffs cannot rebut the presumption of the business judgment rule, the defendants will prevail. If plaintiffs succeed in rebutting the presumption of the business judgment rule, the burden then shifts to the defendants to prove by a preponderance of the evidence that the challenged transactions were entirely fair to the corporation. n468

n468 *Technicolor, Inc., 663 A.2d at 1162; Emerald Partners, 787 A.2d at 91.*

As it relates to director inaction, plaintiffs will prevail upon proving by a preponderance of the evidence that the defendants breached their fiduciary duties by not acting. In order to invoke the protections of the provision in the Company's certificate of incorporation authorized by *8 Del. C. § 102(b)(7)*, the defendants must prove by a preponderance of the evidence that they are entitled to the protections of that provision. n469

n469 *Emerald Partners, 787 A.2d at 95.*

[*181]

*A. Ovitz Did Not Breach His Duty of Loyalty*

As previously mentioned, the only issue remaining in this case with respect to the traditional duty of loyalty (aside from whether there is an overlap between loyalty and good faith) is whether Ovitz breached his fiduciary duty of loyalty in the course of his termination. n470

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

Before trial, Ovitz moved for summary judgment on this claim, a motion I denied on the ground that genuine issues of material fact existed which prevented entry of summary judgment in favor of Ovitz at that time. n471 More specifically, I recognized:

. . . if Ovitz received an NFT, [then] he had a contractual right to receive the payout he did receive. But Ovitz did not have a contractual right to receive an NFT. . . . Instead, Ovitz's receipt of an NFT was conditioned upon a one -- time determination (to be made by [the Company]) that was not guaranteed by his contract, and Ovitz appears to have actively engaged in negotiations and decisionmaking that affected [the Company]'s determination to grant the NFT.

Ovitz negotiated his exit from [the Company] with Eisner, Russell, and others. He made a conscious decision not to resign and to seek the [*182] benefits that his contract made, available to him only under certain prescribed circumstances. Ovitz allegedly colluded with those on the other side of the bargaining table . . . in bringing about the circumstances that would entitle him to his NFT benefits. In so doing, he allegedly manipulated corporate processes and thereby violated his fiduciary duties to [the Company]. n472

Now, upon consideration of the evidence presented at trial, and based upon the findings of fact made above, it is clear that plaintiffs have failed to demonstrate by a preponderance of the evidence that Ovitz breached his duty of loyalty.

n470 The Court notes that plaintiffs' statement of issues of law and fact to be litigated contained in the Pre-Trial Stipulation and Order repeatedly uses the phrase "fiduciary duties of due care, good faith, and/or loyalty" regardless of the challenged conduct. To the extent plaintiffs are still pursuing pure duty of loyalty claims other than this claim related to Ovitz's actions in receiving his NFT, as to those claims, plaintiffs have failed to demonstrate by a preponderance of the evidence that the defendants breached their fiduciary duty of loyalty.

[*183]

n471 Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at *6-8.
n472 2004 Del. Ch. LEXIS 132, *34.

Ovitz did not breach his fiduciary duty of loyalty by receiving the NFT payment because he played no part in the decisions: n473 (1) to be terminated and (2) that the termination would not be for cause under the OEA. n474 Ovitz did possess fiduciary duties as a director and officer while these decisions were made, but by not improperly interjecting himself into the corporation's decision-making process nor manipulating that process, he did not breach the fiduciary duties he possessed in that unique circumstance. Furthermore, Ovitz did not "engage" in a transaction with the corporation -- rather, the corporation imposed an unwanted transaction upon him. n475

n473 I ignore the subtlety that at the moment Ovitz received the monetary payout for the NFT he was no longer a fiduciary, his directorship and status as an officer having ended in no event later than December 27, 1996. See PTE 14.
n474 See supra text "Ovitz's Bonus and His Termination" at 80.

[*184]

n475 For this reason, a discussion of the application of 8 Del. C. § 144 is not necessary. Such discussion was appropriate, however, at the summary judgment stage when I inferred (to plaintiffs' benefit) that Ovitz involved himself in the Company's decision ("manipulated corporate processes") to grant him an NFT. See Disney III, 2004 Del. Ch. LEXIS 132, *34.

Once Ovitz was terminated without cause (as a result of decisions made entirely without input or influence from Ovitz), he was contractually entitled, without any negotiation or action on his part, to receive the benefits provided by the OEA for a termination without cause, benefits for which he negotiated at arms-length before becoming a fiduciary. n476 No reasonably prudent fiduciary in Ovitz's position would have unilaterally determined to call a board meeting to force the corporation's chief executive officer to reconsider his termination and the terms thereof, n477 with that reconsideration for the benefit of shareholders and potentially to Ovitz's detriment. n478

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

n476 *See Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at \*3-6.*

[*185]

n477 Ovitz, as President, did have the authority to call a special board meeting by himself. *See* PTE 498 at Article III, Section 5.

n478 Indeed, if Ovitz had called a special meeting of the board in order to force Eisner to reconsider the issues regarding his termination, that act would, in my mind, raise greater issues relating to a potential breach of Ovitz's duty of loyalty than not calling a meeting.

Furthermore, having just been terminated, no reasonably prudent fiduciary in Ovitz's shoes would have insisted on a board meeting to discuss and ratify this claim. As Delaware law does not require directors-to-be to comply with their fiduciary duties, n479 former directors owe no fiduciary duties, and after December 27, 1996, Ovitz could not breach a duty he no longer had.

n479 *Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at \*3-4.*

[*186]

Having found that Ovitz did not play a part in the decision to terminate himself, and that ordinary officers and directors of reasonable prudence in the same position would not have acted with more care, I conclude that Ovitz did not breach his fiduciary duty of loyalty in connection with his termination.

## B. Defendants Did Not Commit Waste

Plaintiffs pursued a claim for waste at trial and argued in their briefs that they have proven this claim. n480 As stated above, the standard for waste is a very high one that is difficult to meet. n481 Plaintiffs refer to Professor Murphy's opinion that the OEA improperly incentivized Ovitz to leave the Company and receive an NFT, rather than complete the term of the OEA, to support their argument for waste. n482 Of course, Professor Murphy's opinion relies on the assumptions that either Ovitz would be able to procure for himself an NFT, or

that Eisner had agreed to terminate him even before Ovitz was hired.

n480 Ovitz had moved for summary judgment on the waste claim, but neither party addressed it in the summary judgment briefing or at oral argument, and the motion for summary judgment was therefore denied. *Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at \*6.*

[*187]

n481 *See supra* notes 419-420 and accompanying text.

n482 PTE 426 at 22-23.

The record does not support these assertions in any conceivable way. Apart from his job performance, Ovitz was never in a position to determine if he would be terminated, and if so, whether it would be with or without cause. As it relates to job performance, I find it patently unreasonable to assume that Ovitz intended to perform just poorly enough to be fired quickly, but not so poorly that he could be terminated for cause. First, based upon my personal observations of Ovitz, he possesses such an ego, and enjoyed such a towering reputation before his employment at the Company, that he is not the type of person that would intentionally perform poorly. Ovitz did not build Hollywood's premier talent agency by performing poorly. Second, nothing in the trial record indicates to me that Ovitz intended to bring anything less than his best efforts to the Company. Additionally, I have found and concluded above that Eisner believed Ovitz would be an excellent addition to the company throughout 1995, n483 a far [*188] cry from plaintiffs' accusations of deciding to hire him for the purpose of firing him shortly thereafter with a spectacular severance payoff.

n483 *See supra* text "Ovitz's Early Performance" at 32.

More importantly, however, I conclude that given his performance, Ovitz could not have been fired for cause under the OEA. Any early termination of his employment, therefore, had to be in the form of an NFT. In reaching this conclusion, I rely on the expert reports of both Feldman and Fox, whose factual assumptions are generally consonant with my factual findings above. Nevertheless, by applying the myriad of definitions for

gross negligence and malfeasance discussed by Donohue, Feldman and Fox, I also independently conclude, based upon the facts I have found them, that Ovitz did not commit gross negligence or malfeasance while serving as the Company's President.

As a result, terminating Ovitz and paying the NFT did not constitute waste because he could not be terminated for cause and because many of the [*189] defendants gave credible testimony that the Company would be better off without Ovitz, n484 meaning that it would be impossible for me to conclude that the termination and receipt of NFT benefits resulted in "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration," n485 or a situation where the defendants have "irrationally squandered or given away corporate assets." n486 In other words, defendants did not commit waste.

n484 *See supra* note 326.

n485 *Brehm*, 746 A.2d at 263; *Disney I*, 731 A.2d at 362 (quoting *Glazer*, 658 A.2d at 183.)

n486 *Brehm*, 746 A.2d at 263.

*C. The Old Board's Decision to Hire Ovitz and the Compensation Committee's Approval of the OEA Was Not Grossly Negligent and Not in Bad Faith*

The members of the "Old Board" (Eisner, Bollenbach, Litvack, Russell, Roy Disney, Gold, Nunis, Poitier, Stern, Walker, [*190] Watson, Wilson, Bowers, Lozano and Mitchell) were required to comply with their fiduciary duties on behalf of the Company's shareholders while taking the actions that brought Ovitz to the Company. For the future, many lessons of what not to do can be learned from defendants' conduct here. Nevertheless, I conclude that the only reasonable application of the law to the facts as I have found them, is that the defendants did not act in bad faith, and were at most ordinarily negligent, in connection with the hiring of Ovitz and the approval of the OEA. In accordance with the business judgment rule (because, as it turns out, business judgment *was* exercised), ordinary negligence is insufficient to constitute a violation of the fiduciary duty of care. I shall elaborate upon this conclusion as to each defendant.

1. Eisner

Eisner was clearly the person most heavily involved in bringing Ovitz to the Company and negotiating the OEA. He was a long-time friend of Ovitz and the instigator and mastermind behind the machinations that resulted in Ovitz's hiring and the concomitant approval of the

OEA. In that aspect, Eisner is the most culpable of the defendants. He was pulling the strings; [*191] he knew what was going on. On the other hand, at least as the duty of care is typically defined in the context of a business judgment (such as a decision to select and hire a corporate president), of all the defendants, he was certainly the most informed of all reasonably available material information, making him the least culpable in that regard.

This dichotomy places the Court in a somewhat awkward position. By virtue of his Machiavellian (and imperial) nature as CEO, and his control over Ovitz's hiring in particular, Eisner to a large extent is responsible for the failings in process that infected and handicapped the board's decisionmaking abilities. n487 Eisner stacked his (and I intentionally write "his" as opposed to "the Company's") board of directors with friends and other acquaintances who, though not necessarily beholden to him in a legal sense, were certainly more willing to accede to his wishes and support him unconditionally than truly independent directors. n488 On the other hand, I do not believe that the evidence, considered fairly, demonstrates that Eisner actively took steps to defeat or short-circuit a decisionmaking process that would otherwise have occurred. [*192]

n487 It is precisely in this context -- an imperial CEO or controlling shareholder with a supine or passive board -- that the concept of good faith may prove highly meaningful. The fiduciary duties of care and loyalty, as traditionally defined, may not be aggressive enough to protect shareholder interests when the board is well advised, is not legally beholden to the management or a controlling shareholder and when the board does not suffer from other disabling conflicts of interest, such as a patently self-dealing transaction. Good faith may serve to fill this gap and ensure that the persons entrusted *by shareholders* to govern Delaware corporations do so with an honesty of purpose and with an understanding of whose interests they are there to protect. In a thoughtful article, Professor Lyman Johnson has written about the richer historical and literary understanding of loyalty and care, beyond their more narrow "non-betrayal" and "process" uses in contemporary jurisprudence. Professor Johnson's description of a more expansive duty of loyalty to encompass affirmative attention and devotion may, in my opinion, fit comfortably within the concept of good faith (or vice versa) as a constituent element of the overarching concept of

faithfulness. *See* Lyman P. Q. Johnson, *After Enron: Remembering Loyalty Discourse in Corporate Law*, 28 *DEL. J. CORP. LAW* 27 (2003).

[*193]

n488 Some of this deference may be due, at least in part, to Eisner's success at the Company's helm in the eleven years preceding these events. Tr. 4131:20-4133:1. Nevertheless, the board's collective kowtowing in regard to Ovitz's hiring is also due to Eisner's desire to surround himself with yes men. *See* 3845:20-3847:3 (Gold) (testifying that he believes that Bowers, Poitier, Stern, Watson and Mitchell are not competent as board members). As examples of Eisner's success at surrounding himself with non-employee directors who would have sycophantic tendencies: Russell was Eisner's personal attorney, Tr. 2650:10-2651:7; Mitchell was hand-selected by Eisner to serve on the board, Tr. 5627:18-5628:2, and now serves as chairman, a position which provides Mitchell with substantial remuneration worth about $ 500,000 annually, Tr. 5629:9-24; Reveta Bowers is an administrator of a private school in West Hollywood, California, Tr. 5901:11-5903:9, that was attended by three of Eisner's children, Tr. 5944:24-5945:8, and to which Eisner and entities related to the Company have made substantial contributions, Tr. 5945:9-5947:16; O'Donovan was president of Georgetown University from 1989 to 2001, Tr. 6710:7-6711:15, (Eisner served on Georgetown University's board of directors from 1985 to 1991, Tr. 6712:16-24) where Eisner's son attended college until 1992, Tr. 6712:16-6713:3, and to which Eisner made a $ 1 million donation in 1996 at O'Donovan's request, Tr. 6713:4-16.

[*194]

Eisner had demonstrated a desire to bring Ovitz to the Company before mid-1995. His efforts to actually hire Ovitz became more intense in the summer of 1995, culminating in the signing of the OLA on August 14 of that year, together with the press release issued that same day. Eisner obtained no consent or authorization from the board before agreeing to hire Ovitz, before agreeing to the substantive terms of the OLA, or before issuing the press release. n489 Indeed, outside of his small circle of confidantes, it appears that Eisner made no effort to inform the board of his discussions with Ovitz until after they were essentially completed and an agreement in principle had been reached.

n489 Nevertheless, I do not doubt that Eisner was entirely convinced that the board would support him in this decision.

As a general rule, a CEO has no obligation to continuously inform the board of his actions as CEO, or to receive prior authorization for those actions. n490 Nevertheless, a reasonably prudent CEO (that is [*195] to say, a reasonably prudent CEO with a board willing to think for itself and assert itself against the CEO when necessary) would not have acted in as unilateral a manner as did Eisner when essentially committing the corporation to hire a second-in-command, appoint that person to the board, and provide him with one of the largest and richest employment contracts ever enjoyed by a non-CEO. I write, "essentially committing," because although I conclude that legally, Ovitz's hiring was not a "done deal" as of the August 14 OLA, n491 it was clear to Eisner, Ovitz, and the directors who were informed, that as a practical matter, it certainly was a "done deal." n492

n490 In a corporation of the Company's size and scope, the only logical way for the corporation to operate is that the everyday governance should be "under the direction" of the board of directors rather than "by" the board. More than twenty years ago, this Court wrote (and it is even more true today):

> A fundamental precept of Delaware corporation law is that it is the board of directors, and neither shareholders nor managers, that has ultimate responsibility for the management of the enterprise. Of course, given the large, complex organizations though which modern multi-function business corporations often operate, the law recognizes that corporate boards, comprised as they traditionally have been of persons dedicating less than all of their attention to that role, cannot themselves manage the operations of the firm, but may satisfy their obligations by thoughtfully appointing officers, establishing or approving goals and plans and monitoring performance. Thus *Section 141 (a) of DGCL* expressly permits a board

of directors to delegate managerial duties to officers of the corporation, except to the extent that the corporation's certificate of incorporation or bylaws may limit or prohibit such a delegation.

*Chapin v. Benwood Foundation, Inc., 402 A.2d 1205, 1211 (Del. Ch. 1979)* (quoting *Abercrombie v. Davies, 35 Del. Ch. 599, 123 A.2d 893, 899 (Del. Ch. 1956)), aff'd sub nom. Harrison v. Chapin, 415 A.2d 1068 (Del. 1980).*
[*196]

n491 The OLA's opening paragraph stated, "This will confirm our arrangement under which you will become employed by [the Company]. *Subject to the formal approval of the Company's Board of Directors and its Compensation Committee, we have agreed that. . . ." PTE 60 at DD002932 (emphasis added). The footnote in the summary judgment opinion in this case, *Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at *6 n.54,* that Ovitz was likely legally bound by the OLA as of October 1, 1995, is not contradicted by my conclusion here that the Company was not legally bound until at least September 26, 1995.
n492 Tr. 2807:13-23; 3572:3-23; 3708:7-17; 6827:8-19; 7693:24-7694:6; 8198:5-21.

After August 14, the record seems to indicate that Eisner's role in Ovitz's hiring lessened, as Russell continued the substantive negotiations with Ovitz while Santaniello worked on drafting the OEA. Eisner did not attend the portion of the compensation committee meeting on September 26 where Ovitz's hiring and the key terms of the OEA were discussed and voted upon, n493 but he did lead the discussion in the [*197] full board meeting that same day with respect to Ovitz's election as President of the Company. n494 Eisner's involvement in the final stages of drafting and executing the OEA were minimal.

n493 PTE 39 at WD01170.
n494 PTE 29 at WD01196.

Because considerations of improper motive are no longer present in this case, n495 the decision to hire Ovitz and enter into the OEA is one of business judgment, to which the presumptions of the business judgment rule apply. In order to prevail, therefore, plaintiffs must demonstrate by a preponderance of the evidence that Eisner was either grossly negligent or acted in bad faith in connection with Ovitz's hiring and the approval of the OEA.

n495 *See Brehm, 746 A.2d at 257-58* & n.42 (holding "that the Complaint fails to create a reasonable doubt that Eisner was disinterested in the [OEA]," and concluding that further inquiry into the independence of the other directors would be unnecessary, and that plaintiffs would not be permitted to relitigate this claim after amending the complaint).

[*198]

As I mentioned earlier, Eisner was very much aware of what was going on as the situation developed. In the limited instances where he was not the primary source of information relating to Ovitz, Russell kept Eisner informed of negotiations with Ovitz. Eisner knew Ovitz; he was familiar with the career Ovitz had built at CAA and he knew that the Company was in need of a senior executive, especially in light of the upcoming Cap-Cities/ABC merger. In light of this knowledge, I cannot find that plaintiffs have demonstrated by a preponderance of the evidence that Eisner failed to inform himself of all material information reasonably available or that he acted in a grossly negligent manner.

Notwithstanding the foregoing, Eisner's actions in connection with Ovitz's hiring should not serve as a model for fellow executives and fiduciaries to follow. His lapses were many. He failed to keep the board as informed as he should have. He stretched the outer boundaries of his authority as CEO by acting without specific board direction or involvement. He prematurely issued a press release that placed significant pressure on the board to accept Ovitz and approve his compensation package in accordance [*199] with the press release. To my mind, these actions fall far short of what shareholders expect and demand from those entrusted with a fiduciary position. Eisner's failure to better involve the board in the process of Ovitz's hiring, usurping that role for himself, although not in violation of law, n496 does not comport with how fiduciaries of Delaware corporations are expected to act.

n496 Eisner's authority to take these actions was not restricted in any way by statute, the Company's certificate of incorporation, bylaws, or a board resolution.

Despite all of the legitimate criticisms that may be leveled at Eisner, especially at having enthroned himself as the omnipotent and infallible monarch of his personal Magic Kingdom, I nonetheless conclude, after carefully considering and weighing all the evidence, that Eisner's actions were taken in good faith. That is, Eisner's actions were taken with the subjective belief that those actions were in the best interests of the Company -- he believed that his taking charge [*200] and acting swiftly and decisively to hire Ovitz would serve the best interests of the Company notwithstanding the high cost of Ovitz's hiring and notwithstanding that two experienced executives who had arguably been passed over for the position (Litvack and Bollenbach) were not completely supportive. n497 Those actions do not represent a knowing violation of law or evidence a conscious and intentional disregard of duty. In conclusion, Eisner acted in good faith and did not breach his fiduciary duty of care because he was not grossly negligent.

n497 Eisner's stellar track record as the Company's Chairman and CEO over the preceding eleven years (from 1984 to 1995) bolsters his belief that his decisions generally benefit the Company and its shareholders.

2. Russell

Apart from Eisner, Russell, who was familiar with the Company's compensation policies and practices from his service as chairman of the Company's compensation committee, was the next most heavily involved director in hiring Ovitz, as he was the [*201] main negotiator on behalf of the Company. n498 Russell was also closely involved with Watson and Crystal in shaping and extensively analyzing Ovitz's proposed compensation. n499 Russell spoke to Poitier on two occasions in mid-August 1995 to discuss the terms of Ovitz's compensation, and he knew that Watson would speak with Lozano. n500 Additionally, on September 26, 1995, Russell led the discussion at the compensation committee meeting regarding the proposed terms for the OEA, and then reported on that meeting during the full board meeting shortly thereafter. n501

n498 Tr. 2314:20-2384:13; 2391:9-2516:8.
n499 Tr. 2425:14-2435:4; 2441:10-2445:16; 2453:5-2476:14; 2485:22-2502:17.
n500 Tr. 2445:12-2451:19; 2453:5-18.
n501 PTE 39 at WD01170; PTE 29 at WD01197; Tr. 2517:7-2536:23.

The compensation committee's charter indicates that the committee has the power to "establish the salaries" of the Company's CEO and COO/President, together with benefits and incentive compensation, including [*202] stock options, for those same individuals. n502 In addition to this power, the committee's charter charges it with the duty to "approve employment contracts, or contracts at will," for "all corporate officers who are members of the Board of Directors regardless of salary." n503

n502 PTE 187 (charter as of May 1, 1993); PTE 465 (essentially duplicative of PTE 187); PTE 47 (charter as of Jan. 19, 1996).
n503 PTE 187; PTE 47.

Plaintiffs have argued that Russell exceeded the scope of his authority as chairman of the compensation committee by negotiating with Ovitz on behalf of the Company. n504 Although it is true that nothing in the compensation committee's charter specifically grants authority to the committee to negotiate (as opposed to simply approve) employment contracts, there is no language in the charter that would indicate that the committee does not have this power. Indeed, the contrary appears to be the case. The charter distinguishes between "establishing" salaries for the CEO and COO/President [*203] and "approving" salaries for those individuals, together with many others. n505

n504 See Tr. 2676:11-2678:19. Although it would have been ideal if the other members of the compensation committee were more substantively involved in those negotiations, it would certainly be unwieldy as a practical matter to require the entire committee, together and as a whole, to negotiate on the Company's behalf.
n505 PTE 187; PTE 47. The very definition of "establish" contemplates some form of negotiation or molding where "approve" does not.

Black's defines establish as including the following definitions:

> . . .To make or form; . . . To found, to create, to regulate. . . .
>
> . . . .
>
> To bring into being; to build; to constitute; to create; to erect; to form; to found and regulate, to institute, to locate, to make; to model; to organize; to originate; to prepare; to set up.

BLACK'S LAW DICTIONARY 642-43 (Rev. 4th ed. 1968). Approve is defined as "to be satisfied with; to confirm, ratify, sanction, or consent to some act or thing done by another; to sanction officially; to ratify; to confirm. . . ." *Id.* at 132. These definitions lead me to believe that it would be perfectly reasonable for Russell and others to believe that it was appropriate for the compensation committee to negotiate with Ovitz the terms of his employment. Nevertheless, Russell did testify that it was not normally the compensation committee's role to negotiate. Tr. 2906:6-2907:10.

[*204]

In negotiating with Ovitz, Russell became privy to a great deal of information with respect to Ovitz. Ovitz's representatives relayed some of that information to Russell. General information about Ovitz also was common knowledge to those in the entertainment industry. Russell did not independently and objectively verify the representations made by Ovitz's negotiators that his income from CAA was $ 20 to $ 25 million annually because Russell, based upon his pre-existing knowledge, believed that representation to be accurate. n506 Nonetheless, I conclude that Russell negotiated with Ovitz at arms' length.

> n506 Tr. 2352:3-2363:13; 2402:6-21; 2755:2-2757:10.

Would the better course of action have been for Russell to have objectively verified Ovitz's income from CAA? Undoubtedly, yes. Would it have been better if Russell had more rigorously investigated Ovitz's background in order to uncover his past troubles with the Department of Labor? n507 Yes. Would the better course of

action have been for someone other [*205] than Eisner's personal attorney to represent the Company in the negotiations with Ovitz? Again, yes. Have plaintiffs shown by a preponderance of the evidence that Russell's actions on behalf of the Company were *grossly* negligent (in that he failed to inform himself of all material information *reasonably* available in making decisions) or that he acted in bad faith? No. I conclude that Russell for the most part knew what he needed to know, did for the most part what he was required to do, and that he was doing the best he thought he could to advance the interests of the Company by facilitating a transaction that would provide a legitimate potential successor to Eisner and provide the Company with one of the entertainment industry's most influential individuals.

> n507 *See* PTE 151 at DD000460. This article reports that the news of Ovitz's problems with the Department of Labor, although reported publicly, was swept under the rug by the press, essentially making that information less reasonably available to Russell. *See also* PTE8 at DD002131.

[*206]

3. Watson

Watson's main role in Ovitz's hiring and his election as President of the Company was helping Russell evaluate the financial ramifications of the OEA. n508 Watson is a past Chairman of the Company's board, and served in that position when Eisner and Wells were hired in 1984. n509 Watson was familiar with Crystal, having worked with him on Eisner's and Wells' contracts in 1984 and again in 1989. n510

> n508 Tr. 7822:1-7823:7. Russell phoned Watson on several occasions beginning on August 2, 1995. *See* DTE 120 at WD07493-95.
> n509 Tr. 7803:8-7813:6.
> n510 Tr. 7825:18-7827:8.

Watson conducted extensive analyses of Ovitz's proposed compensation package, sharing those analyses with Crystal and Russell at their meeting on August 10, and in their later discussions stemming from that meeting. n511 He was also involved in determining how to replace the proposed option guarantee with the extended exercisability of Ovitz's options (together with other features). n512 He also spoke with [*207] Lozano (although the date is unclear) sometime before the Septem-

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

ber 26, 1995 compensation committee meeting in order to inform him somewhat of his and Russell's analyses and discussions. n513 Watson attended the September 26, 1995 compensation committee meeting and voted in favor of the resolution approving the terms of the OEA. n514

n511 Tr. 7827:17-7829:15.
n512 Tr. 7836:5-7846:2.
n513 Tr. 7833:11-7834:2; 8082:12-8088:9.
n514 PTE 39 at WD01170.

Watson was familiar with making executive compensation decisions at the Company. Nothing in his conduct leads me to believe that he took an "ostrich-like" approach to considering and approving the OEA. Nothing in his conduct leads me to believe that Watson consciously and intentionally disregarded his duties to the Company. Nothing in his conduct leads me to believe that Watson had anything in mind other than the best interests of the Company when evaluating and consenting to Ovitz's compensation package. Finally, nothing in his conduct [*208] leads me to believe that Watson failed to inform himself of all material information reasonably available before making these decisions. In short, I conclude that plaintiffs have not demonstrated by a preponderance of the evidence that Watson either breached his fiduciary duty of care or acted in anything other than good faith in connection with the hiring of Ovitz and the approval of the economic terms of the OEA.

4. Poitier and Lozano

Poitier and Lozano were the remaining members of the compensation committee that considered the economic terms of the OEA. It is not disputed that they were far less involved in the genesis of the OEA than were Russell, and to a lesser extent, Watson. The question in dispute is whether their level of involvement in the OEA was so low as to constitute gross negligence and, therefore, a breach of their fiduciary duty of care, or whether their actions evidence a lack of good faith. As will be shown, I conclude that neither of these men acted in a grossly negligent manner or in bad faith.

Poitier is a man celebrated for his work both within and outside the entertainment industry. n515 Poitier was elected to the Company's board of directors in 1994, [*209] and attended his first board meeting during January of 1995. n516 Lozano was the publisher of the nation's largest Spanish language daily newspaper, is the former chairman of the board of that entity, and also served as the United States' ambassador to El Salvador.

n517 Lozano had a long tenure on the Company's board of directors, serving from the early 1980s until 2001. n518 Lozano also has experience on the compensation committees of other corporations. n519

n515 See Tr. 7101:19-7116:20; 7118:8-7119:8; 7122:1-7123:5.
n516 Tr. 7123:6-7124:15.
n517 See Tr. 7623:5-7624:14.
n518 Tr. 7624:15-7625:3; 7628:3-7.
n519 Tr. 7628:11-15.

There is no question that Poitier and Lozano's involvement in the process of Ovitz's hiring came very late in the game. As found above, Poitier received a call from Russell on August 13 (and another the next day), during which they discussed the terms of the proposed OLA. n520 Lozano spoke with Watson regarding this same subject. It appears [*210] that neither Poitier nor Lozano had any further involvement with the hiring process, apart from these phone calls, until the September 26, 1995 compensation committee meeting.

n520 See Tr. 2445:22-2447:13.

At that meeting, both Poitier and Lozano received the term sheet that explained the key terms of Ovitz's contract, and they were present for and participated in the discussion that occurred. Both then voted to approve the terms of the OEA, and both credibly testified that they believed they possessed sufficient information at that time to make an informed decision. n521 Plaintiffs largely point to two perceived inadequacies in this meeting (and in Poitier and Lozano's business judgment) n522 -- first, that insufficient time was spent reviewing the terms of Ovitz's contract and, second, that Poitier and Lozano were not provided with sufficient documentation, including Crystal's correspondence, Watson's calculations, and a draft of the OEA. n523 These arguments understandably hearken back to Van Gorkom [*211] , where the Supreme Court condemned the Trans Union board for agreeing to a material transaction after a board meeting of about two hours and without so much as a term sheet of the transaction as contemplated. n524 Although the parallels between Van Gorkom and this case at first appear striking, a more careful consideration will reveal several important distinctions between the two.

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

n521 Tr. 7136:23-7137:3; 7634:18-23; 7636:2-10.

n522 Because I have rejected plaintiffs' argument that Ovitz's hiring was legally a "done deal" as of August 14, 1995 because the OLA was expressly subject to the approval of the board and compensation committee, the amount of contact that Poitier and Lozano did or did not have with Russell and Watson before September 26, 1995, is immaterial. *But see Van Gorkom*, 488 *A.2d at 884* (concluding that Trans Union's press release of October 9, *together with* the amendments to the merger agreement executed October 10, "had the clear effect of locking Trans Union's Board into the Pritzker Agreement"). Poitier and Lozano made a decision on September 26, 1995 when they voted to approve the terms of his contract. As a result, their level of knowledge or involvement before that date is only relevant insofar as it informs the Court as to their accumulated knowledge on September 26, 1995, when the business judgment was made. For this reason, it is also irrelevant that Poitier and Lozano did not attend the meeting between Russell, Watson and Crystal on August 10; nor is their failure to attend the meeting (or even be invited) evidence that Russell or Watson were shirking their duties by working by themselves without the other two members of the committee. Certainly the more ideal scenario would have been for Poitier and Lozano to have been both better qualified and more involved, but again, defendants' conduct is not measured against the best practices of corporate governance.

[*212]

n523 The upcoming discussion would apply with equal force to Russell and Watson, and the conclusions made herein are implicit in the conclusions reached above with regard to their actions.

n524 *488 A.2d at 868-69* (the board meeting lasted "about two hours," the board's decision was solely based upon oral statements and presentations, and copies of the proposed merger agreement were not available). Those oral representations and presentations were materially misleading and not consistent with the executed merger agreement. *Id. at 870, 875, 879-80*.

First and foremost, the nature of the transaction in *Van Gorkom* is fundamentally different, and orders of magnitude more important, than the transaction at issue here. In *Van Gorkom*, the Trans Union board was called into a special meeting on less than a day's notice, without notice of the reason for the meeting, to consider a merger agreement that would result in the sale of the entire company. n525 As footnoted above, n526 Delaware law, *as a matter of statute*, requires directors to take certain [*213] actions in connection with a merger of the corporation, as was being contemplated by Trans Union. n527 No statute required the Company's board to take action in connection with Ovitz's hiring. The Company's governing documents provide that the officers of the corporation will be selected by the board of directors, n528 and the charter of the compensation committee states that the committee is responsible for establishing and approving the salary of the Company's President. n529 That is exactly what happened. n530 The board meeting was not called on short notice, and the directors were well aware that Ovitz's hiring would be discussed at the meeting as a result of the August 14 press release more than a month before. n531 Furthermore, analyzing the transactions in terms of monetary value, and even accepting plaintiffs' experts' bloated valuations for comparison purposes, it is beyond question that the $ 734 million sale n532 of Trans Union was material and significantly larger than the financial ramifications to the Company of Ovitz's hiring. n533

n525 *Id. at 867.*
n526 *See supra* note 460.

[*214]

n527 *See 8 Del. C. § 251(b).*
n528 DTE 184 at Article Tenth; PTE 1 at Article Tenth; DTE 185 at Article Tenth.
n529 PTE 187; PTE 47.
n530 PTE 39 at WD01170; PTE 29 at WD01196.
n531 The directors were also aware generally that, for some time, the Company had been looking for an executive to replace Wells.

n532 13,357,758 shares outstanding, multiplied by $ 55 per share. *488 A.2d at 864, 869*. The reader should bear in mind that the $ 734 million figure is a nominal one almost twenty-five years old-expressed in 1995 dollars, that number would be higher.
n533 Eisner's decision to enter into the OLA with Ovitz, and the compensation committee's later

decision to approve the economic terms of the OEA on September 26, 1995, have to be understood in context. In fiscal 1996, the Company had almost $ 19 billion in revenues, and more than $ 3 billion in operating income. PTE 442 at WD02085. Roth, below both Eisner and Ovitz in the chain of command, had authority to budget the development and marketing of feature films, apparently without prior authorization from Eisner, Ovitz or the board. *See supra* note 149. According to a contemporary memorandum written by Eisner, an average live-action feature film cost $ 33 million to develop and another $ 19 million to market and distribute, for a total cost of $ 52 million per film. PTE 558 at WD08652. Disney had budgeted thirty such live-action feature films for fiscal 1996, though Eisner expected that number to decline by one-third in the coming years. *Id.;* PTE 587 at WD10772. Eisner also believed that Roth was responsible for losses of $ 60 million attributable only to three films, and that his expenditures were $ 90 million "more than what was prudent." PTE 67 at DD002980; *see* PTE 587 at WD10767 (two box office failures alone resulted in a $ 45 million negative variance to profit forecasts). The big-budget summer blockbuster, *The Rock*, was expected to cost $ 122.9 million ($ 67 million in development, and another $ 55.9 million in distribution and marketing), and *Ransom*, to be released just two weeks after *The Rock*, was expected to cost $ 126 million ($ 68.6 million in production, and $ 57.4 in distribution and marketing). *Id.* at WD 10772. Between these two motion pictures alone, Roth had the authority to spend almost $ 250 million, with an expected profit of ten percent. *Id.* If Roth had this much authority, the proposition that Eisner, the Company's chief executive officer, entered into the OLA without prior board authorization, or that the compensation committee approved Ovitz's contract based upon a term sheet and upon less than an hour of discussion, seems eminently reasonable given the OEA's (relatively small) economic size.

[*215]

Second, the Trans Union board met for about two hours to discuss and deliberate on this monumental transaction in the life of Trans Union. A precise amount of time for the length of the compensation committee meeting, and more specifically, the length of the discussion regarding the OEA, is difficult to establish. The minutes of the compensation committee's meeting and the full board's meeting indicate that the compensation committee meeting convened at 9:00 a.m., and that the

full board's meeting convened at 10:00 a.m., leaving no more than an hour for the compensation committee to meet. n534 Lozano, although he had little recollection of the meeting, believed that the compensation committee meeting ran long-until 10:30 a.m. n535 As I found above, the meeting lasted about an hour. Russell testified that the discussion of the OEA took about 25-30 minutes, n536 significantly more time than the brief discussion reflected in the minutes would seem to indicate. n537 Lozano believed that the committee spent "perhaps four times as much time on Mr. Ovitz's contract than we did on Mr. Russell's compensation." n538

n534 PTE 29 at WD01194; PTE 39 at WD01167; Tr. 7188:17-7211:3.
[*216]

n535 Tr. 7641:16-7642:2; 7714:12-24.
n536 Tr. 2857:10-2863:18.
n537 Tr. 2535:10-2536:23; 2838:8-2851:2; 2854:16-2857:4.
n538 Tr. 7638:13-22.

I am persuaded by Russell and Lozano's recollection that the OEA was discussed for a not insignificant length of time. n539 Is that length of time markedly less than the attention given by the Trans Union board to the merger agreement they were statutorily charged with approving or rejecting? Yes. Is that difference probative on the issue of whether the compensation committee adequately discussed the OEA? Not in the least. When the Trans Union board met for those two hours, it was the very first time any of those directors had discussed a sale of the company. n540 Here, all the members of the committee were aware in advance that Ovitz's hiring would be discussed, and the members of the committee had also previously had more than minimal informal discussions amongst themselves as to the *bona fides* of the OEA before the meeting ever occurred. Furthermore, as mentioned above, the nature and scope of the transactions are fundamentally [*217] different.

n539 It would have been extremely helpful to the Court if the minutes had indicated in any fashion that the discussion relating to the OEA was longer and more substantial than the discussion relating to the myriad of other issues brought before the compensation committee that morning. n540 *See* 488 A.2d at 875.

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

Third, the Trans Union board had absolutely no documentation before it when it considered the merger agreement. n541 The board was completely reliant on the misleading and uninformed presentations given by Trans Union's officers (Van Gorkom and Romans). n542 In contrast, the compensation committee was provided with a term sheet of the key terms of the OEA and a presentation was made by Russell (assisted by Watson), who had personal knowledge of the relevant information by virtue of his negotiations with Ovitz and discussions with Crystal. Additionally, the testimony and documentary evidence support this conclusion. n543 It is true that the compensation committee [*218] did not review and discuss the then-existing draft of the full text of the OEA. This, however, is not required. n544 Nor is it necessary for an expert to make a formal presentation at the committee meeting in order for the board to rely on that expert's analysis, although that certainly would have been the better course of action. n545 Furthermore, the Company's compensation committee reasonably and wisely left the task of negotiating and drafting the actual text of the OEA in the hands of the Company's counsel. n546

n541 Id.
n542 Id. at 874-78.
n543 But see id. at 878-80 (defendants' testimony that the availability of a "market test" had been discussed was negated by their inability to produce and identify the original merger agreement and that the minutes of the meeting contained no reference to a discussion of Trans Union's right to a market test; defendants' testimony that they relied on counsel was negated by the failure of that counsel to testify, even though his firm participated in the defense).
n544 See id. at 883 n.25.

[*219]

n545 In Van Gorkom, the Trans Union board did not invite the company's investment banker, Salomon Brothers, to attend the board meeting, and Van Gorkom instead had Trans Union's chief financial officer state that the $ 55 per share figure was " in the range of a fair price'" but also that "his studies did not indicate either a fair price for the stock or a valuation of the Company [and] that he did not see his role as directly addressing the fairness issue." Id. at 867-68.
n546 See Tr. 2530:16-2531:14; 7847:9-7848:15.

Fourth, Trans Union's senior management completely opposed the merger. n547 In contrast, the Company's senior management generally saw Ovitz's hiring as a boon for the Company, notwithstanding Litvack and Bollenbach's initial personal feelings. n548 In sum, although Poitier and Lozano did very little in connection with Ovitz's hiring and the compensation committee's approval of the OEA, they did not breach their fiduciary duties. I conclude that they were informed by Russell and Watson of all material information reasonably available, [*220] even though they were not privy to every conversation or document exchanged amongst Russell, Watson, Crystal and Ovitz's representatives.

n547 Van Gorkom, 488 A.2d at 867-68.
n548 See Tr. 5276:3-5277:12 (Bollenbach); 5802:14-5804:12 (Nunis); 6040:20-6041:21 (Litvack); 6051:4-6052:9 (Litvack).

Much has been made throughout the various procedural iterations of this case about Crystal's involvement (or lack thereof) in the compensation committee's deliberations and decisionmaking. n549 Although there are many criticisms that could and have been made (including by Crystal himself) regarding Crystal's failure to calculate ex ante the cost of a potential NFT, nothing in the record leads me to conclude that any member of the compensation committee had actual knowledge that would lead them to believe (as to Poitier and Lozano, their understanding of Crystal's advice was based on information relayed by Russell and Watson) that Crystal's analysis was inaccurate or incomplete. Without [*221] that knowledge, I conclude that the compensation committee acted in good faith and relied on Crystal in good faith, and that the fault for errors or omissions in Crystal's analysis must be laid at his feet, and not upon the compensation committee.

n549 See Brehm, 746 A.2d at 259-62.

The compensation committee reasonably believed that the analysis of the terms of the OEA was within Crystal's professional or expert competence, and together with Russell and Watson's professional competence in those same areas, the committee relied on the information, opinions, reports and statements made by Crystal, even if Crystal did not relay the information, opinions, reports and statements in person to the committee as a whole. Crystal's analysis was not so deficient that the

compensation committee would have reason to question it. n550 Furthermore, Crystal appears to have been selected with reasonable care, especially in light of his previous engagements with the Company in connection with past executive [*222] compensation contracts that were structurally, at least, similar to the OEA. For all these reasons, the compensation committee also is entitled to the protections of *8 Del. C. § 141(e)* in relying upon Crystal.

n550 Although Crystal testified that he viewed his role as nothing more than a "high-priced calculator," nothing in the record suggests the compensation committee placed such a restriction on Crystal's work or analysis of the OEA. *See* Tr. 3581:12-3582:11; PTE 214 at DD001388. In the parts of the record just cited, Crystal laments that the compensation committee did not follow his recommendations. I believe it is important to understand that the compensation committee relied in good faith on Crystal's report and analysis even though they chose not to follow Crystal's recommendations to the letter. The role of experts under *§ 141(e)* is to assist the board's decisionmaking -- not supplant it. An interpretation of *§ 141(e)* that would require boards to follow the advice of experts (substantially? completely? in part?) before being able to claim reliance on those experts would be in conflict with the mandate in *§ 141(a)* that the corporation is to be managed "by or under the direction of a board of directors."

[*223]

Viewed objectively, the compensation committee was asked to make a decision knowing that: n551 1) Ovitz was a third party with whom Russell negotiated at arms' length; n552 2) regardless of whether Ovitz truly was "the most powerful man in Hollywood," he was a highly-regarded industry figure; n553 3) Ovitz was widely believed to possess skills and experience that would be very valuable to the Company, especially in light of the CapCities/ABC acquisition, Wells' death, and Eisner's medical problems; n554 4) in order to accept the Company's presidency, Ovitz was leaving and giving up his very successful business, n555 which would lead a reasonable person to believe that he would likely be highly successful in similar pursuits elsewhere in the industry; n556 5) the CEO and others in senior management were supporting the hiring; n557 and 6) the potential compensation was not economically material to the Company. n558

n551 These factors were also known to the board generally when they elected Ovitz to the Company's presidency.
n552 Tr. 7638:23-7639:20.
n553 Tr. 7127:4-20.
n554 Tr. 7628:19-7630:23.

[*224]

n555 Tr. 7639:21-7640:3.
n556 Tr. 7127:21-7129:18.
n557 *See supra* note 548.
n558 *See* Tr. 6828:15-6829:23.

Poitier and Lozano did not intentionally disregard a duty to act, nor did they bury their heads in the sand knowing a decision had to be made. They acted in a manner that they believed was in the best interests of the corporation. Delaware law does not require (nor does it prohibit) directors to take as active a role as Russell and Watson took in connection with Ovitz's hiring. There is no question that in comparison to those two, the actions of Poitier and Lozano may appear casual or uninformed, but I conclude that they did not breach their fiduciary duties and that they acted in good faith in connection with Ovitz's hiring. n559

n559 Furthermore, the compensation committee did not commit a later breach of fiduciary duty nor act in bad faith (or fail to act in good faith) when the final version of the OEA was executed without their approval. The resolution passed on September 26, 1995 clearly contemplated that some details had yet to be decided, *see* PTE 39 at WD01170, and as I concluded on Ovitz's motion for summary judgment, no material changes to the OEA were made during Ovitz's tenure as President. *See Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at *4-6; cf. Van Gorkom, 488 A.2d at 883-84* (Van Gorkom executed the amendment to the merger agreement in a manner both inconsistent with the authorization given him by the board and detrimental to Trans Union's interests).

[*225]

5. The Remaining Members of the Old Board n560

n560 The remaining members of the Old Board are: Bollenbach, Litvack, Roy Disney, Nunis, Stern, Walker, O'Donovan, Murphy, Gold, Bowers, Wilson and Mitchell. Even though Bollenbach, Litvack and seemingly Roy Disney were officers of the Company, in electing Ovitz to be President, they were acting in a function that was exclusively directoral according to the Company's certificate of incorporation and, as such, their status as officers is irrelevant. See DTE 69 at Article IV, Section 1 (bylaws as of April 26, 1993); PTE 497 at Article IV, Section 1 (bylaws as of April 25, 1994); PTE 2 at Article IV, Section 1 (bylaws as of September 20, 1995); PTE 46 at WD00415 (exhibit to resolution electing officers of the Company on January 22, 1996); PTE 498 at Article IV, Section 1 (bylaws as of April 22, 1996).

In accordance with the compensation committee's charter, it was that committee's responsibility to establish and approve Ovitz's compensation arrangements. [*226] n561 In accordance with the OLA and the Company's certificate of incorporation, n562 it was the full board's responsibility to elect (or reject) Ovitz as President of the Company. n563 Plaintiffs' argument that the full board had a duty and responsibility to independently analyze and approve the OEA is simply not supported by the record. As a result, the directors' actions must be analyzed in the context of whether they properly exercised their business judgment and acted in accordance with their fiduciary duties when they elected Ovitz to the Company's presidency.

n561 See supra note 529.

n562 See PTE 33; supra note 528.

n563 Plaintiffs argue that the nominating committee (Gold, Bowers, Wilson and Mitchell) shirked their duties related to that committee in connection with the OEA approval. The nominating committee's duties and powers include the duty to "develop and review background information about candidates for director and make recommendations with respect thereto to the Board." PTE 563 at WD08721 (charter as of January 1996, but the charter of that date expressly states that it is "based upon the existing Charter of The Walt Disney Company's Nominating Committee"). See DTE 182 at 13 (containing similar language); PTE 47 at WD01212-13 (board minutes approving the charter found in PTE 563 although

the charter is not part of PTE 47). This argument is irrelevant for three reasons. First, the August 14 press release indicates that Ovitz would be nominated to the Company's board, but the OLA does not bind the Company to nominate Ovitz or guarantee him a seat on the board. See PTE 3; PTE 33; see also PTE 7 at P 2 (OEA requires the Company to nominate Ovitz), P 12(a) (Ovitz allowed to terminate the OEA if not retained as President and a director). Second, Ovitz was not actually nominated to the board on September 26, 1995 (nor were the directors under a duty to do so) and, therefore, any failure on the committee's part to meet or for the members of that committee to inform themselves of Ovitz's credentials for being nominated as a director before that date is irrelevant. See PTE 29; PTE 39. Third, even if I were to give credence to this argument, and even if it were to prevail, the damages relating to this breach would be zero. Any harm the Company suffered as a result of the OEA stems from Ovitz as an employee/officer. As an insider, Ovitz received no compensation for attending board meetings. Plaintiffs have pointed to nothing relating to Ovitz's status as a director that would allow them to recover based on his actions qua director. For these reasons, the nominating committee's actions (or inaction) are not relevant to the instant inquiry. See Pre-Trial Stipulation and Order at 7-8 (Plaintiffs' Statement of Issues of Law and Fact to be Litigated is limited to "OEA Approval Violations" and "Ovitz's Receipt of a Full NFT Payout" and is silent as to Ovitz as a director or the nominating committee's role in his becoming a director).

[*227]

The record gives adequate support to my conclusion that the directors, before voting, were informed of who Ovitz was, the reporting structure that Ovitz had agreed to and the key terms of the OEA. Again, plaintiffs have failed to meet their burden to demonstrate that the directors acted in a grossly negligent manner or that they failed to inform themselves of all material information reasonably available when making a decision. They did not intentionally shirk or ignore their duty, but acted in good faith, believing they were acting in the best interests of the Company.

Are there many aspects of Ovitz's hiring that reflect the absence of ideal corporate governance? Certainly, and I hope that this case will serve to inform stockholders, directors and officers of how the Company's fiduciaries underperformed. As I stated earlier, however, the standards used to measure the conduct of fiduciaries un-

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

der Delaware law are not the same standards used in determining good corporate governance. For all the foregoing reasons, I conclude that none of the defendants breached their fiduciary duties or acted in anything other than good faith in connection with Ovitz's hiring, the approval of the [*228] OEA, or his election to the Company's presidency.

*D. Eisner and Litvack Did Not Act in Bad Faith in Connection With Ovitz's Termination, and the Remainder of the New Board Had No Duties in Connection Therewith*

The New Board n564 was likewise charged with complying with their fiduciary duties in connection with any actions taken, or required to be taken, in connection with Ovitz's termination. The key question here becomes whether the board was under a duty to act in connection with Ovitz's termination, because if the directors were under no duty to act, then they could not have acted in bad faith by not acting, nor would they have failed to inform themselves of all material information reasonably available before making a decision, because no decision was required to be made. Furthermore, the actions taken by the Company's officers (namely Eisner and Litvack) in connection with Ovitz's termination must be viewed through the lens of whether the board was under a duty to act. If the board was under no such duty, then the officers are justified in acting alone. If the board was under a duty to act and the officers improperly usurped that authority, the analysis would obviously be [*229] different.

n564 The New Board consisted of Eisner, Ovitz, Roy Disney, Gold, Litvack, Nunis, Poitier, Russell, Stern, Walker, Watson, Wilson, Bowers, Lozano, Mitchell, O'Donovan and Murphy.

1. The New Board Was Not Under a Duty to Act

Determining whether the New Board was required to discuss and approve Ovitz's termination requires careful consideration of the Company's governing instruments. The parties largely agree on the relevant language from the Company's certificate of incorporation and bylaws, but as would be expected, they disagree as to the meaning of that language. n565 Article Tenth of the Company's certificate of incorporation states:

The officers of the Corporation shall be chosen in such a manner, shall hold their offices for such terms and shall carry out such duties as are determined solely by

the Board of Directors, subject to the right of the Board of Directors to remove any officer or officers at any time with or without cause. n566

The Company's bylaws state at Article [*230] IV:

Section 1. General. The officers of the Corporation shall be chosen by the Board of Directors and shall be a Chairman of the Board of Directors (who must be a director), a President, a Secretary and a Treasurer.

. . . .

Section 2. Election. The Board of Directors at its first meeting held after each Annual Meeting of stockholders shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time solely by the Board of Directors, which determination may be by resolution of the Board of Directors or in any bylaw provision duly adopted or approved by the Board of Directors; and all officers of the Corporation shall hold office until their successors are chosen and qualified, or until their earlier resignation or removal. Any officer elected by the Board of Directors may be removed at any time by the Board of Directors with or without cause. Any vacancy occurring in any office of the Corporation may be filled only by the Board of Directors.

Section 3. Chairman of the Board of Directors. The Chairman of the Board of Directors shall be the Chief Executive [*231] Officer of the Corporation, shall preside at all meetings of the Board of Directors and of stockholders and shall, subject to the provisions of the Bylaws and the control of the Board of Directors, have general and active management, direction, and supervision over the business of the Corporation and over its officers. . . . He shall perform all duties incident to the office of chief executive and such other duties as from time to time may be assigned to him by the Board of Directors. He shall have the right to delegate any of his powers to any other officer or employee.

Section 4. President. The President shall report and be responsible to the Chairman of the Board. The President shall have such powers and perform such duties as from time to time may be assigned or delegated to him by the Board of Directors or are incident to the office [of] President. n567

Other relevant language comes from the board resolution that elected Ovitz as President, which states: "RESOLVED, that Michael S. Ovitz be, and hereby is, elected President of the Corporation, effective October 1, 1995, to serve in such capacity at the pleasure of this Board of Directors." n568

n565 The parties are also in agreement as to the particular versions of the certificate of incorporation (DTE 185) and bylaws (PTE 498) that were in effect at the time of Ovitz's termination.

[*232]

n566 DTE 185 at Article Tenth; *see 8 Del. C. § 142.*
n567 PTE 498 at WD07100-01.
n568 PTE 29 at WD01196.

Having considered these documents, I come to the following conclusions: 1) the board of directors has the sole power to elect the officers of the Company; 2) the board of directors has the sole power to determine the "duties" of the officers of the Company (either through board resolutions or bylaws); 3) the Chairman/CEO has "general and active management, direction, and supervision over the business of the Corporation and over its officers," n569 and that such management, direction and supervision is subject to the control of the board of directors; 4) the Chairman/CEO has the power to manage, direct and supervise the lesser officers and employees of the Company; 5) the board has the *right*, but not the *duty* to remove the officers of the Company with or without cause, and that right is non-exclusive; and 6) because that right is non-exclusive, and because the Chairman/CEO is affirmatively charged with the management, direction and supervision of the officers [*233] of the Company, together with the powers and duties incident to the office of chief executive, the Chairman/CEO, subject to the control of the board of directors, n570 also possesses the *right* to remove the inferior officers and employees of the corporation. n571

n569 PTE 498 at WD07101.
n570 Care should be taken to not read too much into the phrase, "subject to the control of the board of directors," as this "restriction" is simply a reflection of basic agency principles, and not a limitation on the powers and authority that would otherwise be incident to the office of chief executive. A chief executive officer has authority to govern the corporation subject to the control of the board of directors -- that is, the chief executive officer may act as a general agent for the benefit of the corporation and in the manner in which the chief executive officer believes the board of directors desires him to act, but may not act in a manner contrary to the express desires of the board of directors. *See RESTATEMENT (SECOND) OF AGENCY § § 33, 39, 73 (1958).* More generally, the rule has been stated thusly:

> Implied authority (including incidental' and inferred' authority) of the agent to act is a natural consequence of the express authority granted. It is implied from what is actually manifested to the agent by the principal. It is obvious that implied authority cannot, by its very nature, be inconsistent with express authority because any expression of actual authority must control.

WILLIAM A. GREGORY, THE LAW OF AGENCY AND PARTNERSHIP § 15 (3d ed. 2001). For example, as it would apply to this case, the chief executive officer possesses the authority to remove inferior employees (including officers) so long as the board of directors does not expressly limit or negate the chief executive officer's implied or inherent authority to do so. No member of the New Board expressed, either contemporaneously or at trial, any objection to Ovitz's termination. Tr. 2586:3-14 (Russell); 3778:1-23 (Gold); 4026:2-7 (Roy Disney); 4096:14-18 (Roy Disney); 5785:17-5786:9 (Mitchell); 5810:19-5812:12 (Nunis); 5934:4-5935:15 (Bowers); 6128:12-6129:1 (Litvack); 6720:11-20 (O'Donovan); 6843:23-6844:22 (Wilson); 7144:3-7146:8 (Poitier); 7556:3-7557:15 (T. Murphy); 7642:21-7643:24 (Lozano); 7857:17-7858:20 (Watson); 8158:5-8159:9 (Stern); 8160:15-24 (Stern).

[*234]

n571 These conclusions conform to the Company's custom and practice. *See* Tr. 6150:6-16 (Litvack) (testifying that "loads" of Company officers were terminated during his tenure as general counsel and that the board never once took action in connection with their terminations). The chief executive officer's non-exclusive (because it is shared with the board) right to employ and terminate inferior officers and. employees extends to employees who are also directors. *See* 2 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § § 499 (perm ed. rev. vol. 1998). The power to terminate inferior officers may be delegated by the board to an officer/agent even though the decision may require "the highest degree of judgment and discretion." *Id.* § 495. Fletcher's treatise also contains language that would indicate that, *under certain circumstances,* the removal of officers must occur by the directors:

> The removal [of directors, other officers and agents] must *ordinarily* be by the body or officer authorized to elect or appoint. . . . Absent express authority, the [presiding officer] of a corporation has no power to remove an officer appointed by the board of directors *where the power of removal is in the board,* but a managing agent of a corporation may be removed from that position, when the term of employment has expired, by the [presiding officer] of the company by whom that agent was appointed.

*Id.* at § 357 (emphases added and citations omitted). Nevertheless, this same section also indicates that provisions in any particular corporation's governing documents would supercede this general rule: "If the statutes, charter or bylaws place the power of removal in the directors *or other officers,* as is usually the case as to offices that are not directorships, they are the ones to exercise it." *Id.* (emphasis added and citations omitted). The most applicable statement in any of the leading Delaware treatises with respect to the removal of officers comes from Folk's treatise, where conceding a lack of positive law on the is-

sue, it is stated that "presumably, the removal of officers is governed by the same provisions that regulate their election." RODMAN WARD, JR. ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 142.4 (4th ed. 2004). My conclusion here does not contravene the general rule (to the extent it is a recognized rule of Delaware law), but is simply an application of the more specific requirements, guidelines and governance contained in the Company's governing documents.

[*235]

The New Board unanimously believed that Eisner, as Chairman and CEO, possessed the power to terminate Ovitz without board approval or intervention. n572 Nonetheless, the board was informed of and supported Eisner's decision. n573 The board's simultaneous power to terminate Ovitz, reserved to the board by the certificate of incorporation, did not divest Eisner of the authority to do so, or vice-versa. n574 Eisner used that authority, and terminated Ovitz -- a decision, coupled with the decision to honor the OEA, that resulted in the Company's obligation to pay the NFT. n575 Because Eisner unilaterally terminated Ovitz, as was his right, n576 the New Board was not required to act in connection with Ovitz's termination.

n572 Tr. 2890:3-2891:15 (Russell); 5598:18-22 (Mitchell); 5813:2-17 (Nunis); 6149:4-6151:11 (Litvack); 6339:22-6343:19 (Litvack); 6720:21-6721:21 (O'Donovan); 6785:15-6793:22 (O'Donovan); 7067:21-7069:8 (Wilson); 7226:7-7227:7 (Poitier); 7560:21-7561:17 (T. Murphy); 7646:11-7647:2 (Lozano). *See id.* at 6126:9-13 (Litvack) (testifying that Pierce did not advise him that a board meeting would be necessary to terminate Ovitz); 8233:5-11 (Stern) (stating that he relied on Litvack to determine the appropriate procedures for Ovitz's termination).

[*236]

n573 *See supra* note 570.

n574 The delegation of authority by a board to an officer "does not mean that the board has completely abdicated its authority; moreover, the duties and powers of an officer or general manager do not deprive the directors of all stated authority and responsibilities." FLETCHER, § 495, *supra* note 571.

n575 See Tr. 4524:11-4526:24; 4584:3-9; 4919:8-4926:17.

n576 That is, Eisner possessed that right unless and until he received contrary instructions from the board, which he did not. See supra note 570.

Therefore, the fact that no formal board action was taken with respect to Ovitz's termination is of no import. This is true regardless of the fact that Ovitz received a large cash payment and the vesting of three million options in connection with his termination. n577 The board had delegated to the compensation committee *ex ante* the responsibility to establish and approve compensation for Eisner, Ovitz and other applicable Company executives and high-paid employees. n578 The approval of Ovitz's compensation arrangements [*237] by the compensation committee on September 26, 1995 included approval for the termination provisions of the OEA, obviating any need to meet and approve the payment of the NFT upon Ovitz's termination. n579 Because the board was under no duty to act, they did not violate their fiduciary duty of care, and they also individually acted in good faith. n580 For these reasons, the members of the New Board (other than Eisner and Litvack, who will be discussed individually below) did not breach their fiduciary duties and did not act in bad faith in connection with Ovitz's termination and his receipt of the NFT benefits included in the OEA.

n577 Notwithstanding earlier statements by this Court (Disney III, 2004 Del. Ch. LEXIS 132, 2004 WL 2050138, at *7 n.64) and the *Delaware Supreme Court (Brehm, 746 A.2d at 259)*, I conclude that the NFT was not economically material to the Company. See supra notes 533, 558. Those previous judicial statements regarding materiality cannot properly be considered "law of the case" because those statements were made in the context of motions where plaintiffs were afforded all reasonable inferences in support of their arguments and without any factual basis. Now, upon a full factual record, and in my discretion as fact-finder (materiality is a question of fact), I conclude that the NFT payout, even at the inflated valuation calculated by Professor Murphy, was not material to the Company.
[*238]

n578 See PTE 187.

n579 See PTE 39 at WD01186-87A.

n580 The New Board could not have acted collectively in good faith because there was no meeting. Nonetheless, after weighing all the evidence in the case, I am not persuaded that the members of the New Board acted in bad faith in connection with Ovitz's termination. Had, for example, they been aware that the Company did have grounds upon which to terminate Ovitz for cause, and still not acted, the calculus would be much different, but based upon this record, I conclude that their non-action was in good faith.

2. Litvack

Litvack, as an officer of the corporation and as its general counsel, consulted with, and gave advice to, Eisner, on two questions relevant to Ovitz's termination. They are, first, whether Ovitz could or should have been terminated for cause and, second, whether a board meeting was required to ratify or effectuate Ovitz's termination or the payment of his NFT benefits. For the reasons I have already stated, Litvack properly concluded that the Company did not have good cause under the OEA to terminate [*239] Ovitz. n581 He also properly concluded that no board action was necessary in connection with the termination. n582 Litvack was familiar with the relevant factual information and legal standards regarding these decisions. n583 Litvack made a determination in good faith that a formal opinion from outside counsel would not be helpful and that involving more people in the termination process increased the potential for news of the impending termination to leak out. n584

n581 See supra text "Defendants Did Not Commit Waste" at 131.

n582 See supra text "The New Board Was Not Under a Duty to Act" at 162.

n583 Tr. 6112:17-6115:21; 6117:5-6121:8; 6131:6-6151:11.

n584 Tr. 6115:22-6116:14; 6130:4-6131:5; 6413:20-6417:1.

I do not intend to imply by these conclusions that Litvack was an infallible source of legal knowledge. Nevertheless, Litvack's less astute moments as a legal counsel do not impugn his good faith or preparedness in reaching his conclusions with respect to whether Ovitz [*240] could have been terminated for cause and whether board action was necessary to effectuate Ovitz's termination, as I have independently analyzed the record and conclude that Litvack's decisions as to those questions were correct. First, Litvack's silence at the Decem-

ber 10, 1996 EPPC meeting, when Russell informed the committee that Ovitz's bonus was contractually required, was unquestionably curious, and some might even call it irresponsible. n585 His excuse that he did not want to embarrass Russell in front of the committee is, in a word, pathetic. Litvack should have exercised better judgment than to allow Russell to convince the committee that a $ 7.5 million bonus was contractually required. Luckily for Litvack, no harm was done because in the end Ovitz's bonus was rescinded.

n585 Tr. 6153:18-6156:9.

Second, Litvack's (and Santaniello's) conclusion regarding the potential conflict between the OEA and the terms of the 1990 Plan is certainly questionable, but reasonable in light of the circumstances and [*241] not the product of an uninformed decision or bad faith. n586 The language in the 1990 Plan is sufficiently ambiguous -- as to whether action by the compensation committee is required in all terminations (both with and without cause) of employees who possess options -- to, in my opinion, absolve Litvack and Santaniello for their advice, and the compensation committee for not acting with respect to Ovitz's termination. n587 In conclusion, Litvack gave the proper advice and came to the proper conclusions when it was necessary. He was adequately informed in his decisions, and he acted in good faith for what he believed were the best interests of the Company.

n586 See Tr. 6126:14-6127:17; 6149:15-6150:5; 6658:5-6675:3. Compare PTE 7 at P 5(e) with PTE 41 at WD00125, WD00134.

n587 Again, my conclusion as to the propriety of the defendants' conduct in regard to Ovitz is informed by their custom and practice in other circumstances. Nothing in the record leads me to believe that the compensation committee ever made a determination as to whether a particular termination was with or without cause under any of the Company's stock option plans that would put them on notice that action would be necessary as part of Ovitz's termination. See PTE 39; PTE 41; PTE 153.

[*242]

3. Eisner

Having concluded that Eisner alone possessed the authority to terminate Ovitz and grant him the NFT, I

turn to whether Eisner acted in accordance with his fiduciary duties and in good faith when he terminated Ovitz. n588 As will be shown hereafter, I conclude that Eisner did not breach his fiduciary duties and did act in good faith in connection with Ovitz's termination and concomitant receipt of the NFT.

n588 The parties essentially treat both officers and directors as comparable fiduciaries, that is, subject to the same fiduciary duties and standards of substantive review. Thus, for purposes of this case, theories of liability against corporate directors apply equally to corporate officers, making further distinctions unnecessary. For a discussion of the duties and liabilities of non-director corporate officers and how they may differ from those of directors, see Lyman P. Q. Johnson, Corporate Officers and the Business Judgment Rule, 60 Bus. LAW. 439 (2005); Lawrence A. Hamermesh and A. Gilchrist Sparks, III, Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson, 60 Bus. LAW. 865 (2005).

[*243]

When Eisner hired Ovitz in 1995, he did so with an eye to preparing the Company for the challenges that lay ahead, especially in light of the CapCities/ABC acquisition and the need for a legitimate potential successor to Eisner. To everyone's regret, including Ovitz, n589 things did not work out as blissfully as anticipated. Eisner was unable to work well with Ovitz, and Eisner refused to let Ovitz work without close and constant supervision. Faced with that situation, Eisner essentially had three options: 1) keep Ovitz as President and continue trying to make things work; 2) keep Ovitz at Disney, but in a role other than President; or 3) terminate Ovitz. In deciding which route to take, Eisner, consistent with his discretion as CEO, considered keeping Ovitz as the Company's President an unacceptable solution. Shunting Ovitz to a different role within the Company would have almost certainly entitled Ovitz to the NFT, or at the very least, a costly lawsuit to determine whether Ovitz was so entitled. n590 Eisner would have also rightly questioned whether there was another position within the Company where Ovitz could be of use. Eisner was then left with the only alternative he considered [*244] feasible-termination. Faced with the knowledge that termination was the best alternative and knowing that Ovitz had not performed to the high expectations placed upon him when he was hired, Eisner inquired of Litvack on several occasions as to whether a for-cause termination was possible such that the NFT payment could be avoided, and

2005 Del. Ch. LEXIS 113, *; 35 Employee Benefits Cas. (BNA) 1705

then relied in good faith on the opinion of the Company's general counsel. n591 Eisner also considered the novel alternative of whether a "trade" of Ovitz to Sony would solve the problem by both getting rid of Ovitz and simultaneously relieving the Company of the financial obligations of the OEA. In the end, however, he bit the bullet and decided that the best decision would be to terminate Ovitz and pay the NFT.

n589 *See* PTE 341; Tr. 1757:15-1758:21.

n590 *See* PTE 7 at PP 10, 11(c), 12(b).

n591 Tr. 4379:23-4381:15; 4419:11-4422:2; 4476:11-4483:7. There being no indication in the record that Eisner was aware that Litvack did not consult with outside counsel in regard to Ovitz's termination, Eisner is entitled to rely on Litvack's assertion that he consulted with outside counsel even though, as explained above, I am not convinced that Litvack did indeed speak with Pierce regarding the cause issue.

[*245]

After reflection on the more than ample record in this case, I conclude that Eisner's actions in connection with the termination are, for the most part, consistent with what is expected of a faithful fiduciary. Eisner unexpectedly found himself confronted with a situation that did not have an easy solution. He weighed the alternatives, received advice from counsel and then exercised his business judgment in the manner he thought best for the corporation. Eisner knew all the material information reasonably available when making the decision, he did not neglect an affirmative duty to act (or fail to cause the board to act) and he acted in what he believed were the best interests of the Company, taking into account the cost to the Company of the decision and the potential alternatives. Eisner was not personally interested in the transaction in any way that would make him incapable of exercising business judgment, and I conclude that plaintiffs have not demonstrated by a preponderance of the evidence that Eisner breached his fiduciary duties or acted in bad faith in connection with Ovitz's termination and receipt of the NFT.

## IV. CONCLUSION

Based on the findings of fact and conclusions [*246] of law made herein, judgment is hereby entered in favor of the defendants on all counts.

## ORDER

For the reasons set forth in the Court's Opinion of this date, judgment is hereby entered in the above captioned action against plaintiffs and in favor of defendants on all counts. The parties shall bear their own costs.

IT IS SO ORDERED.

William B. Chandler III

Chancellor

Dated: August 9, 2005