# EXHIBIT A

Ch. 300                              1999 LAWS OF MARYLAND

SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect July 1, 1999. It shall remain effective for a period of ~~1 year~~ 2 years and, at the end of June 30, ~~2000~~ 2001, with no further action required by the General Assembly, this Act shall be abrogated and of no further force and effect.

Approved May 13, 1999.

_____

### CHAPTER 300

#### (Senate Bill 169)

AN ACT concerning

#### Corporations and Real Estate Investment Trusts – Unsolicited Takeovers

FOR the purpose of ~~authorizing a corporation to include certain provisions in its articles of incorporation; authorizing a real estate investment trust to include certain provisions in its declaration of trust~~ clarifying that a corporation may include certain provisions in its charter and bylaws; clarifying that a real estate investment trust may include certain provisions in its declaration of trust or bylaws; providing that the duties of directors of a corporation and the duties of the trustees of a real estate investment trust do not require them to take certain actions; providing that the duties of the directors of certain corporations and the trustees of certain real estate investment trusts do not require them to elect or refrain from electing to be subject to certain provisions of certain laws; providing that ~~the~~ certain provisions of this Act do not apply unless certain corporations or real estate investment trusts elect to be subject to them; providing that the directors of certain corporations and the trustees of certain real estate investment trusts have certain powers; providing that certain directors and trustees may be removed only under certain circumstances; providing that certain special meetings of stockholders or shareholders of real estate investment trusts may be called only under specified circumstances; providing for the effective date of this Act; providing that certain provisions of charters, declarations of trust, and bylaws are not invalid; providing that certain actions and determinations of boards of directors of certain corporations and boards of trustees of certain real estate investment trusts are not invalid; defining certain terms; and generally relating to corporations and real estate investment trusts.

BY adding to

Article – Corporations and Associations

Section 1–101(t–1), 2–104(c), 2–201(c), 2–405.1(d) through (g), inclusive; 3–801 through 3–805, inclusive, to be under the new subtitle "Subtitle 8. Corporations and Real Estate Investment Trusts – Unsolicited Takeovers"; 8–206; and 8–601.1 to be under the amended subtitle "Subtitle 6. Liabilities, Service of Process, and Miscellaneous Provisions"

Annotated Code of Maryland

PARRIS N. GLENDENING, Governor                    Ch. 300

(1993 Replacement Volume and 1998 Supplement)

BY repealing and reenacting, with amendments,

Article – Corporations and Associations

Section 2–104(b), 2–402, 2–404(b)(2), 2–406, 2–502, 2–504, 8–202(b), and 8–205

Annotated Code of Maryland

(1993 Replacement Volume and 1998 Supplement)

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

## Article – Corporations and Associations

1–101.

(T–1) "STOCKHOLDER RIGHTS PLAN" MEANS AN AGREEMENT OR OTHER INSTRUMENT UNDER WHICH A CORPORATION ISSUES RIGHTS TO ITS STOCKHOLDERS THAT:

(1)    MAY BE EXERCISED ~~TO PURCHASE STOCK OR OTHER SECURITIES IF A PERSON ATTEMPTS TO:~~

~~(I)    ACQUIRE A SPECIFIED PERCENTAGE OF THE OUTSTANDING STOCK OR OTHER SECURITIES OF THE CORPORATION; OR~~

~~(II)    OTHERWISE ACQUIRE CONTROL, AS DEFINED IN § 3–801 OF THIS ARTICLE, OF THE CORPORATION~~ UNDER SPECIFIED CIRCUMSTANCES TO PURCHASE STOCK OR OTHER SECURITIES OF A CORPORATION OR ANY OTHER PERSON; AND

(2)    MAY BECOME VOID IF OWNED BY ~~AN ACQUIRING PERSON, AS DEFINED IN § 3–801 OF THIS ARTICLE~~ A DESIGNATED PERSON OR CLASSES OF PERSONS UNDER SPECIFIED CIRCUMSTANCES.

2–104.

(b)    The articles of incorporation may include:

(1)    Any provision not inconsistent with law which defines, limits, or regulates the powers of the corporation, its directors and stockholders, any class of its stockholders, or the holders of any bonds, notes, or other securities which it may issue;

(2)    Any restriction not inconsistent with law on the transferability of stock of any class;

(3)    Any provision authorized by this article to be included in the bylaws;

(4)    Any provision which requires for any purpose the concurrence of a greater proportion of the votes of all classes or of any class of stock than the proportion required by this article for that purpose;

Ch. 300                              1999 LAWS OF MARYLAND

(5)    A provision which requires for any purpose a lesser proportion of the votes of all classes or of any class of stock than the proportion required by this article for that purpose, but this proportion may not be less than a majority of all the votes entitled to be cast on the matter;

(6)    A provision which divides its directors into classes and specifies the term of office of each class;

(7)    A provision for minority representation through cumulative voting in the election of directors and the terms on which cumulative voting rights may be exercised; [and]

(8)    A provision which varies in accordance with § 2–405.2 of this title the standards for liability of the directors and officers of a corporation for money damages; AND

(9)    A PROVISION THAT ALLOWS THE BOARD OF DIRECTORS, IN CONSIDERING A POTENTIAL ACQUISITION OF CONTROL OF A THE CORPORATION, TO CONSIDER THE EFFECT OF THE POTENTIAL ACQUISITION OF CONTROL ON:

(I)    STOCKHOLDERS, EMPLOYEES, SUPPLIERS, CUSTOMERS, AND CREDITORS OF THE CORPORATION; AND

(II)    COMMUNITIES    IN    WHICH    OFFICES    OR    OTHER ESTABLISHMENTS OF THE CORPORATION ARE LOCATED.

(C)    THE INCLUSION OR OMISSION OF A PROVISION IN THE CHARTER THAT ALLOWS THE BOARD OF DIRECTORS TO CONSIDER THE EFFECT OF A POTENTIAL ACQUISITION OF CONTROL ON PERSONS SPECIFIED IN SUBSECTION (B)(9) OF THIS SECTION DOES NOT CREATE AN INFERENCE CONCERNING FACTORS THAT MAY BE CONSIDERED BY THE BOARD OF DIRECTORS REGARDING A POTENTIAL ACQUISITION OF CONTROL.

2–201.

(C)    (1)    THE BOARD OF DIRECTORS OF A CORPORATION MAY, IN ITS SOLE DISCRETION:

(I)    SET THE TERMS AND CONDITIONS OF RIGHTS, OPTIONS, OR WARRANTS UNDER A STOCKHOLDER RIGHTS PLAN; AND

(II)    ISSUE    RIGHTS,    OPTIONS,    OR    WARRANTS    UNDER    A STOCKHOLDER RIGHTS PLAN TO DESIGNATED PERSONS OR CLASSES OF PERSONS.

(2)    THE RIGHTS, OPTIONS, OR WARRANTS UNDER PARAGRAPH (1) OF THIS SUBSECTION MAY, IN THE SOLE DISCRETION OF THE BOARD OF DIRECTORS, INCLUDE ANY LIMITATION, RESTRICTION, OR CONDITION THAT:

(I)    PRECLUDES, LIMITS, INVALIDATES, OR VOIDS THE EXERCISE, TRANSFER, OR RECEIPT OF THE RIGHTS, OPTIONS, OR WARRANTS BY DESIGNATED PERSONS OR CLASSES OF PERSONS IN SPECIFIED CIRCUMSTANCES; OR

– 2224 –

PARRIS N. GLENDENING, Governor                    Ch. 300

(II)    LIMITS FOR A PERIOD NOT TO EXCEED 180 DAYS THE POWER OF A FUTURE DIRECTOR TO ~~REDEEM, MODIFY, OR TERMINATE~~ VOTE FOR THE REDEMPTION, MODIFICATION, OR TERMINATION OF THE RIGHTS, OPTIONS, OR WARRANTS.

2–402.

(a)    Each corporation shall have at least three directors at all times, provided that:

(1)    If there is no stock outstanding the number of directors may be less than three but not less than one; and

(2)    If there is stock outstanding and so long as there are less than three stockholders, the number of directors may be less than three but not less than the number of stockholders.

(b)    Subject to the provisions of subsection (a) of this section AND EXCEPT FOR A CORPORATION THAT HAS ELECTED TO BE SUBJECT TO § 3–804(B) OF THIS ARTICLE, a Maryland corporation shall have the number of directors provided in its charter until changed by the bylaws.

(c)    Subject to the provisions of subsection (a) of this section AND EXCEPT FOR A CORPORATION THAT HAS ELECTED TO BE SUBJECT TO § 3–804(B) OF THIS ARTICLE, the bylaws may:

(1)    Alter the number of directors set by the charter; and

(2)    Authorize a majority of the entire board of directors to alter within specified limits the number of directors set by the charter or the bylaws, but the action may not affect the tenure of office of any director.

2–404.

(b)    (2)    [If] EXCEPT FOR A CORPORATION THAT HAS ELECTED TO BE SUBJECT TO § 3–803 OF THIS ARTICLE, IF the directors are divided into classes, the term of office may be provided in the bylaws, except that:

(i)    The term of office of a director may not be longer than five years or, except in the case of an initial or substitute director, shorter than the period between annual meetings; and

(ii)    The term of office of at least one class shall expire each year.

2–405.1.

(D)    THE DUTY OF THE DIRECTORS OF A CORPORATION DOES NOT REQUIRE THEM TO:

(1)    ACCEPT, RECOMMEND, OR RESPOND ON BEHALF OF THE CORPORATION TO ANY PROPOSAL BY AN ACQUIRING PERSON AS DEFINED IN § 3–801 OF THIS ARTICLE;

– 2225 –

Ch. 300                        1999 LAWS OF MARYLAND

(2)    AUTHORIZE THE CORPORATION TO REDEEM ANY RIGHTS UNDER ~~OR~~, M~~O~~DIFY, OR RENDER INAPPLICABLE, A STOCKHOLDER RIGHTS PLAN;

(3)    ELECT ON BEHALF OF THE CORPORATION TO BE SUBJECT TO OR REFRAIN FROM ELECTING ON BEHALF OF THE CORPORATION TO BE SUBJECT TO ANY OR ALL OF THE PROVISIONS OF TITLE 3, SUBTITLE 8 OF THIS ARTICLE;

(4)    MAKE A DETERMINATION UNDER THE PROVISIONS OF TITLE 3, SUBTITLE 6 OR SUBTITLE 7 OF THIS ARTICLE; OR

(5)    ACT OR FAIL TO ACT SOLELY BECAUSE OF:

(I)    THE EFFECT THE ACT OR FAILURE TO ACT MAY HAVE ON AN ACQUISITION OR POTENTIAL ACQUISITION OR CONTROL OF THE CORPORATION; OR

(II)    THE AMOUNT OR TYPE OF ANY CONSIDERATION THAT MAY BE OFFERED OR PAID TO STOCKHOLDERS IN AN ACQUISITION.

(E)    AN ACT OF ~~THE DIRECTORS~~ A DIRECTOR OF A CORPORATION IS PRESUMED TO SATISFY THE STANDARDS OF SUBSECTION (A) OF THIS SECTION.

(F)    AN ACT OF A DIRECTOR RELATING TO OR AFFECTING AN ACQUISITION OR A POTENTIAL ACQUISITION OF CONTROL OF A CORPORATION MAY NOT BE SUBJECT TO A HIGHER DUTY OR GREATER SCRUTINY THAN IS APPLIED TO ANY OTHER ACT OF A DIRECTOR.

(G)    NOTHING IN THIS SECTION CREATES A DUTY OF ANY DIRECTOR OF A CORPORATION ENFORCEABLE OTHERWISE THAN BY THE CORPORATION OR IN THE RIGHT OF THE CORPORATION.

2–406.

(a)    [Except as provided in subsection (b) of this section and unless the charter of the corporation provides otherwise, the] THE stockholders of a corporation may remove any director, with or without cause, by the affirmative vote of a majority of all the votes entitled to be cast for the election of directors, EXCEPT:

(1)    AS PROVIDED IN SUBSECTION (B) OF THIS SECTION;

(2)    AS OTHERWISE PROVIDED IN THE CHARTER OF THE CORPORATION; OR

(3)    FOR A CORPORATION THAT HAS ELECTED TO BE SUBJECT TO § 3–804(A) OF THIS ARTICLE.

(b)    Unless the charter of the corporation provides otherwise:

(1)    If the stockholders of any class or series are entitled separately to elect one or more directors, a director elected by a class or series may not be removed without cause except by the affirmative vote of a majority of all the votes of that class or series;

(2)    If a corporation has cumulative voting for the election of directors and less than the entire board is to be removed, a director may not be removed without

– 2226 –

cause if the votes cast against his removal would be sufficient to elect him if then cumulatively voted at an election of the entire board of directors, or, if there is more than one class of directors, at an election of the class of directors of which he is a member; and

(3)    If the directors have been divided into classes, a director may not be removed without cause.

2–502.

(a)    A special meeting of the stockholders of a corporation may be called by:

(1)    The president;

(2)    The board of directors; or

(3)    Any other person specified in the charter or the bylaws.

(b)    (1)    Except as provided in subsections (c) and (d) of this section, AND EXCEPT FOR A CORPORATION THAT HAS ELECTED TO BE SUBJECT TO § 3–805 OF THIS ARTICLE, the secretary of a corporation shall call a special meeting of the stockholders on the written request of stockholders entitled to cast at least 25 percent of all the votes entitled to be cast at the meeting.

(2)    A request for a special meeting shall state the purpose of the meeting and the matters proposed to be acted on at it.

(3)    The secretary shall:

(i)    Inform the stockholders who make the request of the reasonably estimated cost of preparing and mailing a notice of the meeting; and

(ii)    On payment of these costs to the corporation, notify each stockholder entitled to notice of the meeting.

(c)    Unless requested by stockholders entitled to cast a majority of all the votes entitled to be cast at the meeting, a special meeting need not be called to consider any matter which is substantially the same as a matter voted on at any special meeting of the stockholders held during the preceding 12 months.

(d)    (1)    Subject to paragraph (2) of this subsection, a corporation may include in its charter or bylaws a provision that requires the written request of stockholders entitled to cast a greater or lesser percentage of all votes entitled to be cast at the meeting than that required by subsection (b)(1) of this section in order to call a special meeting of the stockholders.

(2)    The percentage provided for in the charter or bylaws may not be greater than a majority of all the votes entitled to be cast at the meeting.

(E)    THE BOARD OF DIRECTORS HAS THE SOLE POWER TO FIX:

Ch. 300                         1999 LAWS OF MARYLAND

(1)  THE RECORD DATE FOR DETERMINING STOCKHOLDERS ENTITLED
TO REQUEST A SPECIAL MEETING OF THE STOCKHOLDERS AND THE RECORD DATE
FOR DETERMINING STOCKHOLDERS ENTITLED TO NOTICE OF AND TO VOTE AT THE
SPECIAL MEETING; AND ~~TO SET~~

(2)  THE DATE, TIME, AND PLACE OF THE SPECIAL MEETING.

2–504.

(a)  Not less than ten nor more than 90 days before each stockholders' meeting,
the secretary of the corporation shall give written notice of the meeting to:

(1)  Each stockholder entitled to vote at the meeting; and

(2)  Each other stockholder entitled to notice of the meeting.

(b)  The notice shall state:

(1)  The time and place of the meeting; and

(2)  The purpose of the meeting, if:

(i)  The meeting is a special meeting; or

(ii)  Notice of the purpose is required by any other provision of this
article.

(c)  For purposes of this section, notice is given to a stockholder when it is:

(1)  Personally delivere l to him;

(2)  Left at his residence or usual place of business; or

(3)  Mailed to him at his address as it appears on the records of the
corporation.

(d)  Whenever this article or the charter or bylaws of a corporation require
notice of the time, place, or purpose of a meeting of the stockholders, each person who
is entitled to the notice waives notice if he:

(1)  Before or after the meeting signs a waiver of the notice which is filed
with the records of stockholders meetings; or

(2)  Is present at the meeting in person or by proxy.

(E)  THE CHARTER OR BYLAWS MAY REQUIRE ANY STOCKHOLDER PROPOSING
A NOMINEE FOR ELECTION AS A DIRECTOR OR ANY OTHER MATTER FOR
CONSIDERATION AT A MEETING OF THE STOCKHOLDERS TO PROVIDE ADVANCE
NOTICE OF THE NOMINATION OR PROPOSAL TO THE CORPORATION OF NOT MORE
THAN:

(1)  90 DAYS BEFORE THE DATE OF THE MEETING; OR

(2)  IN THE CASE OF AN ANNUAL MEETING, 90 DAYS BEFORE THE FIRST
ANNIVERSARY OF:

– 2228 –

PARRIS N. GLENDENING, Governor                    Ch. 300

<u>(1)</u>    <u>THE MAILING DATE OF THE NOTICE OF THE PRECEDING YEAR'S ANNUAL MEETING; OR</u>

<u>(II)</u>    <u>THE PRECEDING YEAR'S ANNUAL MEETING; OR</u>

<u>(3)</u>    <u>ANOTHER TIME SPECIFIED IN THE CHARTER OR BYLAWS.</u>

SUBTITLE 8. CORPORATIONS AND REAL ESTATE INVESTMENT TRUSTS – UNSOLICITED TAKEOVERS.

3–801.

(A)    IN THIS SUBTITLE THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(B)    "ACQUIRING PERSON" MEANS A PERSON WHO IS SEEKING TO ACQUIRE CONTROL OF A CORPORATION.

(C)    "ACT" INCLUDES AN OMISSION OR FAILURE TO ACT.

(D)    "AFFILIATE" MEANS A PERSON THAT DIRECTLY, OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES, CONTROLS, IS CONTROLLED BY. OR IS UNDER COMMON CONTROL WITH, A SPECIFIED PERSON.

(E)    "ASSOCIATE", WHEN USED TO INDICATE A RELATIONSHIP WITH ANY PERSON, MEANS:

(1)    ANY CORPORATION OR ORGANIZATION (OTHER THAN THE CORPORATION OR A SUBSIDIARY OF THE CORPORATION) OF WHICH SUCH PERSON IS AN OFFICER, DIRECTOR, OR PARTNER OR IS, DIRECTLY OR INDIRECTLY, THE BENEFICIAL OWNER OF 10 PERCENT OR MORE OF ANY CLASS OF EQUITY SECURITIES;

(2)    ANY TRUST OR OTHER ESTATE IN WHICH SUCH PERSON HAS A SUBSTANTIAL BENEFICIAL INTEREST OR AS TO WHICH SUCH PERSON SERVES AS TRUSTEE OR IN A SIMILAR FIDUCIARY CAPACITY; AND

(3)    ANY RELATIVE OR SPOUSE OF SUCH PERSON, OR ANY RELATIVE OF SUCH SPOUSE, WHO HAS THE SAME ~~HOME~~ PRINCIPAL RESIDENCE AS SUCH PERSON OR WHO IS A DIRECTOR OR OFFICER OF THE CORPORATION OR ANY OF ITS AFFILIATES.

(F)    "BENEFICIAL OWNER", WHEN USED WITH RESPECT TO ANY STOCK, MEANS A PERSON:

(1)    THAT, INDIVIDUALLY OR WITH ANY OF ITS AFFILIATES OR ASSOCIATES, BENEFICIALLY OWNS STOCK, DIRECTLY OR INDIRECTLY; OR

(2)    THAT, INDIVIDUALLY OR WITH ANY OF ITS AFFILIATES OR ASSOCIATES, HAS:

(I)    THE RIGHT TO ACQUIRE STOCK (WHETHER SUCH RIGHT IS EXERCISABLE IMMEDIATELY OR ONLY AFTER THE PASSAGE OF TIME), PURSUANT TO

Ch. 300                    1999 LAWS OF MARYLAND

ANY AGREEMENT, ARRANGEMENT, OR UNDERSTANDING OR UPON THE EXERCISE OF
CONVERSION RIGHTS, EXCHANGE RIGHTS, WARRANTS OR OPTIONS, OR OTHERWISE;
OR

        (II)    THE RIGHT TO VOTE STOCK PURSUANT TO ANY AGREEMENT,
ARRANGEMENT, OR UNDERSTANDING; OR

        (3)    THAT HAS ANY AGREEMENT, ARRANGEMENT, OR UNDERSTANDING
FOR THE PURPOSE OF ACQUIRING, HOLDING, VOTING, OR DISPOSING OF STOCK WITH
ANY OTHER PERSON THAT BENEFICIALLY OWNS, OR WHOSE AFFILIATES OR
ASSOCIATES BENEFICIALLY OWN, DIRECTLY OR INDIRECTLY, SUCH SHARES OF
STOCK.

    (G)    (1)    ~~"CHARTER" HAS THE MEANING STATED IN § 1-101(E) OF THIS~~
~~ARTICLE.~~

        (2)    "CHARTER" INCLUDES THE DECLARATION OF TRUST OF A REAL
ESTATE INVESTMENT TRUST.

    (H)    "CONTROL", INCLUDING THE TERMS "CONTROLLING", "CONTROLLED BY",
AND "UNDER COMMON CONTROL WITH", MEANS THE POSSESSION, DIRECTLY OR
INDIRECTLY, OF THE POWER TO DIRECT OR CAUSE THE DIRECTION OF THE
MANAGEMENT AND POLICIES OF A PERSON, WHETHER THROUGH THE OWNERSHIP
OF VOTING SECURITIES, BY CONTRACT, OR OTHERWISE, AND THE BENEFICIAL
OWNERSHIP OF 10 PERCENT OR MORE OF THE VOTES ENTITLED TO BE CAST BY A
CORPORATION'S STOCK CREATES A PRESUMPTION OF CONTROL.

    (I)    "CORPORATION" INCLUDES A REAL ESTATE INVESTMENT TRUST AS
DEFINED IN TITLE 8 OF THIS ARTICLE.

    (J)    "DIRECTOR" INCLUDES A TRUSTEE OF A REAL ESTATE INVESTMENT
TRUST.

    (K)    "EQUITY SECURITY" MEANS:

        (1)    ANY STOCK OR SIMILAR SECURITY, CERTIFICATE OF INTEREST, OR
PARTICIPATION IN ANY PROFIT SHARING AGREEMENT, VOTING TRUST CERTIFICATE,
OR CERTIFICATE OF DEPOSIT FOR AN EQUITY SECURITY;

        (2)    ANY SECURITY CONVERTIBLE, WITH OR WITHOUT CONSIDERATION,
INTO AN EQUITY SECURITY, OR ANY WARRANT OR OTHER SECURITY CARRYING ANY
RIGHT TO SUBSCRIBE TO OR PURCHASE AN EQUITY SECURITY; OR

        (3)    ANY PUT, CALL, STRADDLE, OR OTHER OPTION OR PRIVILEGE OF
BUYING AN EQUITY SECURITY FROM OR SELLING AN EQUITY SECURITY TO ANOTHER
WITHOUT BEING BOUND TO DO SO.

    (L)    "REAL ESTATE INVESTMENT TRUST" HAS THE MEANING STATED IN TITLE
8 OF THIS ARTICLE.

    (M)    "STOCKHOLDER" INCLUDES A SHAREHOLDER OF A REAL ESTATE
INVESTMENT TRUST.

– 2230 –

PARRIS N. GLENDENING, Governor                     Ch. 300

(N)  "SUBSIDIARY" MEANS ANY CORPORATION OF WHICH STOCK HAVING A MAJORITY OF THE VOTES ENTITLED TO BE CAST IS OWNED, DIRECTLY OR INDIRECTLY, BY THE CORPORATION.

3–802.

(A)  NOTWITHSTANDING ANY OTHER PROVISION IN THIS ARTICLE EXCEPT SUBSECTION (B) OF THIS SECTION, THIS SUBTITLE APPLIES TO EACH CORPORATION THAT:

(1)  HAS A CLASS OF EQUITY SECURITIES REGISTERED UNDER THE FEDERAL SECURITIES EXCHANGE ACT OF 1934; AND

(2)  ELECTS TO BE SUBJECT TO ANY OR ALL PROVISIONS, IN WHOLE OR IN PART, OF THIS SUBTITLE BY PROVISION IN:

(I)  ITS CHARTER OR BYLAWS; OR

(II)  A RESOLUTION OF ITS BOARD OF DIRECTORS; OR

(III)  ARTICLES SUPPLEMENTARY FILED WITH THE DEPARTMENT.

(B)  (1)  THIS SUBTITLE MAY APPLY APPLIES ONLY TO A CORPORATION THAT HAS AT LEAST THREE DIRECTORS EACH OF WHO, AT AT THE TIME OF ANY ACT WHO, AT THE TIME OF ANY ELECTION TO BECOME SUBJECT TO THE PROVISIONS OF THIS SUBTITLE:

(I)  IS NOT AN OFFICER OR EMPLOYEE ARE NOT OFFICERS OR EMPLOYEES OF THE CORPORATION;

(II)  IS NOT AN ACQUIRING PERSON ARE NOT ACQUIRING PERSONS;

(III)  IS NOT A DIRECTOR, OFFICER, AFFILIATE, OR ASSOCIATE ARE NOT DIRECTORS, OFFICERS, AFFILIATES, OR ASSOCIATES OF AN ACQUIRING PERSON; AND

(IV)  WAS WERE NOT NOMINATED OR DESIGNATED AS A DIRECTOR DIRECTORS BY AN ACQUIRING PERSON.

(2)  A DIRECTOR DOES NOT FAIL TO SATISFY PARAGRAPH (1) OF THIS SUBSECTION BECAUSE THE DIRECTOR:

(I)  OWNS SECURITIES ISSUED BY THE CORPORATION;

(II)  IS ENTITLED TO COMPENSATION, RETIREMENT, SEVERANCE, OR OTHER BENEFITS AS A DIRECTOR OF THE CORPORATION; OR

(III)  MIGHT CONTINUE TO SERVE AS A DIRECTOR OF THE CORPORATION OR BECOME A DIRECTOR OF AN ACQUIRING PERSON.

(3)  THIS SUBTITLE DOES NOT APPLY TO A CORPORATION TO THE EXTENT THAT THE CORPORATION ELECTS NOT TO BE SUBJECT TO ANY PROVISION OF THIS SUBTITLE TO WHICH IT HAS PREVIOUSLY ELECTED TO BE SUBJECT, IF THE CORPORATION ELECTS NOT TO BE SUBJECT TO THE PROVISION IN THE SAME

– 2231 –

Ch. 300                              1999 LAWS OF MARYLAND

MANNER IN WHICH IT ELECTED TO BECOME SUBJECT TO THE PROVISION, INCLUDING THE SATISFACTION OF SUBSECTION (D)(1) OF THIS SECTION, IF APPLICABLE.

(C)  ~~NOTHING IN THIS SUBTITLE MAY BE DEEMED TO PRESCRIBE, MODIFY, OR CREATE ANY INFERENCE CONCERNING THE DUTIES OF DIRECTORS TO THE EXTENT THAT THIS SUBTITLE IS IN WHOLE OR IN PART INAPPLICABLE, BECAUSE:~~

(1)  ~~THE CORPORATION FAILS TO ELECT TO BE GOVERNED BY ALL OR PART OF THIS SUBTITLE; OR~~

(2)  ~~THIS SUBTITLE DOES NOT OTHERWISE APPLY.~~

(C)  THE CHARTER OF A CORPORATION MAY CONTAIN A PROVISION OR THE BOARD OF DIRECTORS MAY ADOPT A RESOLUTION THAT PROHIBITS THE CORPORATION FROM ELECTING TO BE SUBJECT TO ANY OR ALL PROVISIONS OF THIS SUBTITLE.

(D)  (1)  A CORPORATION SHALL FILE ARTICLES SUPPLEMENTARY WITH THE DEPARTMENT IF:

(I)  THE CORPORATION ELECTS TO BE SUBJECT TO ANY OR ALL PROVISIONS OF THIS SUBTITLE BY RESOLUTION OF THE BOARD OF DIRECTORS OR BYLAW AMENDMENT; OR

(II)  THE BOARD OF DIRECTORS ADOPTS A RESOLUTION IN ACCORDANCE WITH SUBSECTION (C) OF THIS SECTION THAT PROHIBITS THE CORPORATION FROM ELECTING TO BE SUBJECT TO ANY OR ALL PROVISIONS OF THIS SUBTITLE.

(2)  THE ARTICLES SUPPLEMENTARY SHALL DESCRIBE ANY PROVISION OF THIS SUBTITLE TO WHICH THE CORPORATION:

(I)  HAS ELECTED TO BECOME SUBJECT; OR

(II)  MAY NOT ELECT TO BECOME SUBJECT IN ACCORDANCE WITH THE RESOLUTION OF THE BOARD.

(3)  STOCKHOLDER APPROVAL IS NOT REQUIRED FOR THE FILING OF ARTICLES SUPPLEMENTARY IN ACCORDANCE WITH PARAGRAPH (1) OF THIS SUBSECTION.

3–803.

(A)  (1)  BEFORE THE FIRST ANNUAL MEETING OF STOCKHOLDERS AFTER A CORPORATION ~~BECOMES~~ ELECTS TO BE SUBJECT TO THIS SUBTITLE, THE BOARD OF DIRECTORS SHALL DESIGNATE BY RESOLUTION, FROM AMONG ITS MEMBERS, DIRECTORS TO SERVE AS CLASS I DIRECTORS, CLASS II DIRECTORS, AND CLASS III DIRECTORS.

(2)  TO THE EXTENT POSSIBLE, THE CLASSES SHALL HAVE THE SAME NUMBER OF DIRECTORS.

– 2232 –

PARRIS N. GLENDENING, Governor                    Ch. 300

(B)   THE TERM OF OFFICE OF THE CLASS I DIRECTORS SHALL CONTINUE UNTIL THE FIRST ANNUAL MEETING OF STOCKHOLDERS AFTER THE DATE ON WHICH THE CORPORATION BECOMES SUBJECT TO THIS SUBTITLE AND UNTIL THEIR SUCCESSORS ARE ELECTED AND QUALIFY.

(C)   THE TERM OF OFFICE OF THE CLASS II DIRECTORS SHALL CONTINUE UNTIL THE SECOND ANNUAL MEETING OF STOCKHOLDERS AFTER THE DATE ON WHICH THE CORPORATION BECOMES SUBJECT TO THIS SUBTITLE AND UNTIL THEIR SUCCESSORS ARE ELECTED AND QUALIFY.

(D)   THE TERM OF OFFICE OF THE CLASS III DIRECTORS SHALL CONTINUE UNTIL THE THIRD ANNUAL MEETING OF STOCKHOLDERS FOLLOWING THE DATE ON WHICH THE CORPORATION BECOMES SUBJECT TO THIS SUBTITLE AND UNTIL THEIR SUCCESSORS ARE ELECTED AND QUALIFY.

(E)   AT EACH ANNUAL MEETING OF THE STOCKHOLDERS OF A CORPORATION, THE SUCCESSORS TO THE CLASS OF DIRECTORS WHOSE TERM EXPIRES AT THAT MEETING SHALL BE ELECTED TO HOLD OFFICE FOR A TERM CONTINUING UNTIL:

(1)   THE ANNUAL MEETING OF STOCKHOLDERS HELD IN THE THIRD YEAR FOLLOWING THE YEAR OF THEIR ELECTION; AND

(2)   THEIR SUCCESSORS ARE ELECTED AND QUALIFY.

(F)   THIS SUBTITLE DOES NOT LIMIT THE POWER OF A CORPORATION BY PROVISION IN ITS CHARTER TO:

(1)   CONFER ON THE HOLDERS OF ANY CLASS OR SERIES OF PREFERENCE OR PREFERRED STOCK THE RIGHT TO ELECT ONE OR MORE DIRECTORS; AND

(2)   DESIGNATE THE TERMS AND VOTING POWERS OF THE DIRECTORS, WHICH MAY VARY AMONG THE DIRECTORS.

3-804.

(A)   NOTWITHSTANDING ANY OTHER LESSER PROPORTION OF VOTES REQUIRED BY A PROVISION IN THE CHARTER OR THE BYLAWS, BUT SUBJECT TO § 2-406(B) 2-406(B)(3) OF THIS ARTICLE THE STOCKHOLDERS OF A CORPORATION MAY REMOVE ANY DIRECTOR BY THE AFFIRMATIVE VOTE OF AT LEAST TWO-THIRDS OF ALL THE VOTES ENTITLED TO BE CAST BY THE STOCKHOLDERS GENERALLY IN THE ELECTION OF DIRECTORS.

(B)   SUBJECT TO § 2-402 2-402(A) OF THIS ARTICLE BUT NOTWITHSTANDING ANY PROVISION IN THE CHARTER OR BYLAWS, THE NUMBER OF DIRECTORS OF A CORPORATION SHALL BE FIXED ONLY BY VOTE OF THE BOARD OF DIRECTORS.

(C)   (1)   NOTWITHSTANDING ANY PROVISION IN THE CHARTER OR BYLAWS, THIS SUBSECTION APPLIES TO A VACANCY THAT RESULTS FROM:

(I)   AN INCREASE IN THE SIZE OF THE BOARD OF DIRECTORS; OR

(II)   THE DEATH, RESIGNATION, OR REMOVAL OF A DIRECTOR.

– 2233 –

Ch. 300                          1999 LAWS OF MARYLAND

(2)    EACH VACANCY ON THE BOARD OF DIRECTORS OF A CORPORATION MAY BE FILLED ONLY BY THE AFFIRMATIVE VOTE OF A MAJORITY OF THE REMAINING DIRECTORS IN OFFICE, EVEN IF THE REMAINING DIRECTORS DO NOT CONSTITUTE A QUORUM.

(3)    ANY DIRECTOR ELECTED TO FILL A VACANCY SHALL HOLD OFFICE:

(I)    FOR THE REMAINDER OF THE FULL TERM OF THE CLASS OF DIRECTORS IN WHICH THE VACANCY OCCURRED; AND

(II)    UNTIL A SUCCESSOR IS ELECTED AND QUALIFIES.

3–805.

NOTWITHSTANDING ANY PROVISION IN THE CHARTER OR BYLAWS, THE SECRETARY OF A CORPORATION MAY CALL A SPECIAL MEETING OF STOCKHOLDERS ONLY:

(1)    ON THE WRITTEN REQUEST OF THE STOCKHOLDERS ENTITLED TO CAST AT LEAST A MAJORITY OF ALL THE VOTES ENTITLED TO BE CAST AT THE MEETING; AND

(2)    IN ACCORDANCE WITH THE PROCEDURES SET FORTH UNDER § 2–502 2–502(B)(2) AND (3) AND (E) OF THIS ARTICLE.

8–202.

(b)    (1)    The declaration of trust shall:

[(1)] (I)    Indicate clearly that the trust is a real estate investment trust;

[(2)] (II)    State the name of the trust;

[(3)] (III)    State the total number of shares which the real estate investment trust has authority to issue;

[(4)] (IV)    Provide for an annual meeting of shareholders after the delivery of the annual report, at a convenient location and on proper notice;

[(5)] (V)    Provide for the election of trustees at least every third year at an annual meeting of shareholders;

[(6)] (VI)    State the number of trustees and the names of those persons who will serve as trustees until the first meeting of shareholders and until their successors are elected and qualify or such later time as may be specified in the declaration of trust;

[(7)] (VII)    State the name and address of a resident agent of the real estate investment trust in the State; and

[(8)] (VIII)    If the shares are divided into classes as permitted by § 8–203 of this subtitle, provide a description of each class, including any preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends or distributions, qualifications, and terms and conditions of redemption.

– 2234 –

(2)   A DECLARATION OF TRUST MAY INCLUDE A PROVISION THAT ALLOWS THE TRUSTEES, IN CONSIDERING A POTENTIAL ACQUISITION OF CONTROL OF A THE REAL ESTATE INVESTMENT TRUST, TO CONSIDER THE EFFECT OF THE POTENTIAL ACQUISITION OF CONTROL ON:

(I)   SHAREHOLDERS, EMPLOYEES, SUPPLIERS, CUSTOMERS, AND CREDITORS OF THE TRUST; AND

(II)   COMMUNITIES IN WHICH OFFICES OR OTHER ESTABLISHMENTS OF THE TRUST ARE LOCATED.

(3)   THE INCLUSION OR OMISSION OF A PROVISION IN A DECLARATION OF TRUST THAT ALLOWS THE BOARD OF TRUSTEES TO CONSIDER THE EFFECT OF A POTENTIAL ACQUISITION OF CONTROL ON PERSONS SPECIFIED IN PARAGRAPH (2) OF THIS SUBSECTION DOES NOT CREATE AN INFERENCE CONCERNING FACTORS THAT MAY BE CONSIDERED BY THE BOARD OF TRUSTEES REGARDING A POTENTIAL ACQUISITION OF CONTROL.

8–205.

Unless the declaration of trust provides otherwise OR THE REAL ESTATE INVESTMENT TRUST ELECTS TO BE SUBJECT TO § 3–804(A) OF THIS ARTICLE, the shareholders of a real estate investment trust may remove any trustee, with or without cause, by the affirmative vote of a majority of all the votes entitled to be cast for the election of trustees.

8–206.

THE DECLARATION OF TRUST OR BYLAWS OF A REAL ESTATE INVESTMENT TRUST MAY PROVIDE FOR ONE OR MORE COMMITTEES OF THE BOARD OF TRUSTEES COMPOSED OF ONE OR MORE TRUSTEES AND FOR THE DELEGATION TO THOSE COMMITTEES OF ANY OF THE POWERS OF THE BOARD OF TRUSTEES.

Subtitle 6. Liabilities [and], Service of Process, AND MISCELLANEOUS PROVISIONS.

8–601.1.

SECTIONS 2–201(C), 2–405.1 2–405.1(D) THROUGH (G), 2–502(E), AND 2–504(E) OF THIS ARTICLE SHALL APPLY TO REAL ESTATE INVESTMENT TRUSTS.

SECTION 2. AND BE IF IT FURTHER ENACTED, That the changes made to § 2–104(b) of the Corporations and Associations Article by this Act may not be construed or interpreted to invalidate a provision contained in the charter of a corporation before the effective date of this Act that allows the board of directors of the corporation, in considering a potential acquisition of control of the corporation, to consider the effect of the potential acquisition of control on stockholders, employees, customers, suppliers, and creditors of the corporation, and communities in which offices or other establishments of the corporation are located.

SECTION 3. AND BE IT FURTHER ENACTED, That the changes made to § 8–202(b) of the Corporations and Associations Article by this Act may not be construed or interpreted to invalidate a provision contained in the declaration of trust

Ch. 301                    1999 LAWS OF MARYLAND

of a real estate investment trust before the effective date of this Act that allows the board of trustees of the real estate investment trust, in considering a potential acquisition of control of the real estate investment trust, to consider the effect of the potential acquisition of control on shareholders, employees, customers, suppliers, and creditors of the real estate investment trust, and communities in which offices or other establishments of the real estate investment trust are located.

SECTION 4. AND BE IT FURTHER ENACTED, That the changes made to § 2-504 of the Corporations and Associations Article by this Act may not be construed or interpreted to invalidate a provision contained in the charter or bylaws of a corporation before the effective date of this Act that allows a corporation to require a stockholder to provide advance notice of a nomination or proposal to the corporation before a meeting of the stockholders.

SECTION 5. AND BE IT FURTHER ENACTED, That the addition of §§ 2-201(c), 2-405.1(d) through (g), and 2-502(e) to the Corporation Corporations and Associations Article by this Act may not be construed or interpreted to invalidate an action or determination of the board of directors of a corporation before the effective date of this Act.

SECTION 6. AND BE IT FURTHER ENACTED, That the addition of §§ 8-206 and 8-601.1 to the Corporations and Associations Article by this Act may not be construed or interpreted to invalidate:

(1)   A provision that was contained in the declaration of trust or bylaws of a real estate investment trust before the effective date of this Act and that allows the real estate investment trust to require a shareholder to provide advance notice of a nomination or proposal to the real estate investment trust before a meeting of the shareholders or allows for one or more committees of the board of trustees composed of one or more trustees and for the delegation to those committees of any powers of the board of trustees; or

(2)   An action or determination of the board of trustees or a committee of the board of trustees of a real estate investment trust before the effective date of this Act.

SECTION 2. 7. AND BE IT FURTHER ENACTED, That this Act shall take effect June 1, 1999.

Approved May 13, 1999.

————————

**CHAPTER 301**

**(House Bill 188)**

AN ACT concerning

**Maryland Economic Development Assistance Authority and Fund**

FOR the purpose of creating the Maryland Economic Development Assistance Fund

– 2236 –

# EXHIBIT B

10 of 142 DOCUMENTS

Copyright 2005 The McGraw-Hill Companies, Inc. http://www.mcgrawhill.com
All Rights Reserved
Business Week

June 20, 2005

**SECTION:** Finance: Consumer Finance; Pg. 134 Vol. 3938

**LENGTH:** 1421  words

**HEADLINE:** One Tough Card Game;
MBNA's stock is down 25% this year, and it's suddenly a takeover candidate

**BYLINE:** By Amy Barrett in Wilmington, Del., with Mike McNamee in Washington

**BODY:**

Bruce L. Hammonds knows how to take a hit. The president and chief executive of credit-card giant MBNA was the quarterback for a semi-pro football team in Maryland after college. It was a low-budget affair; former teammate Mike Foley recalls that he and Hammonds shared equipment. On one play, Hammonds snuck into the end zone for a touchdown -- and took such a wallop from an opponent that he broke the helmet he and Foley shared. ``You don't see helmets broken very often,'' Foley recalls.

No doubt Hammonds, 57, is feeling the pain from a different sort of impact these days. MBNA became a Wall Street darling in the 1990s by branding its cards with the names of thousands of partners, from the National Education Association to L.L. Bean. But the onetime hard charger has hit a wall: Because of ferocious competition from banks and MBNA's own missteps, growth has stalled.

As a result, analysts expect MBNA's earnings to fall this year for the first time since it went public in 1991. After suffering a 25% drop in its share price this year, to around $21, MBNA is suddenly seen as a takeover target. Speculation about a buyout grew after Washington Mutual's June 6 deal to buy card issuer Providian Financial for $6.5 billion.

For his part, Hammonds, a 23-year company veteran who took over as CEO 18 months ago, downplays the prospect of a deal. While he says the company always puts shareholders first and he would never rule anything out, he adds: ``There's no 'For Sale' sign'' on MBNA's Wilmington (Del.) headquarters.

Of course, the best defense against a takeover is a high stock price. So Hammonds has an ambitious plan to get MBNA's earnings and stock price moving again. He's cutting costs at a company well known for excessive compensation and lavish perks. And he's pushing to diversify into markets such as home-equity lending and loans to medical and dental practices. While he says he's excited about the future, Hammonds concedes: ``We don't like where we are today in terms of earnings or the stock price.''

At the core of MBNA's woes is a credit-card market that's plagued by slow growth and lowball pricing. For years, MBNA bolstered its growth by acquiring card portfolios, but those opportunities are now few and far between. So last year, Hammonds tried to boost earnings by moving away from the 0% teaser offers that have become common on cards. At the same time, MBNA raised the rates it charged some customers to preserve its margins, as the Fed raised its rates.

Those moves backfired. Instead of pulling back from their own 0% offers, rivals actually got more aggressive, pushing the cheap deals to grab market share. Also, many MBNA customers who were charged the highest rates paid off their balances more quickly when their rates went up. In addition, many consumers are shifting to home-equity loans instead of credit-card borrowing because of the tax benefits and lower rates. The result: MBNA's total loans to customers fell to $116.6 billion in the first quarter, down $1 billion from the year before. And the company had to take a write-off of $206.6 million, partly because of the rapid paydown of balances. ``How did they misread their customers so seriously?'' wonders Sanford C. Bernstein  &  Co. analyst Howard K. Mason.

One Tough Card Game; MBNA's stock is down 25% this year, and it'

## TAKING A HATCHET TO COSTS

This is forcing MBNA to defend its portfolio by revving up its 0% teaser offers again and backing off from raising many customers' rates. And while MBNA forecast as recently as January that earnings per share would be 10% higher this year, excluding a restructuring charge for cost-cutting, in April the company said earnings growth will be ``significantly'' less than that. Mason figures MBNA's earnings, even excluding that charge, will be flat or even down slightly. ``Clearly, a lot of the investment community is frustrated and skeptical,'' says Jason J. Tyler, a portfolio manager at Ariel Capital Management LLC, which holds 10.4 million MBNA shares.

No surprise Hammonds is taking a hatchet to costs. He has cut managerial ranks by more than 1,000 through buyouts and early retirements. And he has done away with some of the trophies of MBNA's go-go days, including two company jets and two boats. It was actually the board that started the cost-cutting back in November, 2003, when it moved to rein in the compensation of top executives -- and Hammonds' predecessor, Charles M. Cawley, suddenly decided to retire. Hammonds' pay has gone from $14.4 million when he was Cawley's No. 2 to $9 million last year.

But while Hammonds' moves should save up to $300 million annually, MBNA is hardly lean and mean. Its huge Wilmington offices are a maze of seemingly endless corridors. One executive jokes that he spent one of his early days on the job getting intentionally lost so he could learn how to navigate the place.

At the same time, Hammonds is trying to fend off his increasingly fierce rivals. As well as matching the 0% offers, MBNA is ramping up its loyalty programs. Since last fall, for example, people who hold cards branded by their favorite National Football League team can trade their points for visits to training camps or even dinner with the head coach.

But the holy grail is to reduce MBNA's reliance on U.S. credit cards. Hammonds is continuing to push into international markets such as Britain and Canada, and speculation persists that he will buy the Internet bank Egg from Prudential PLC. Prudential says it does not comment on market speculation.

Hammonds is also aiming to crack other lending markets. He recently acquired Nexstar Financial Corp., a home-equity lender, and wants to market these loans to members and customers of MBNA's more than 5,000 affinity-card partners. MBNA also bought a company that helps physicians and dentists finance their practices. And he says MBNA is looking at a move into student lending, a natural fit given the hundreds of universities and colleges with which it has card-branding deals. Critics say MBNA waited too long to diversify. ``Could we have done it faster? Yes,'' acknowledges Hammonds.

Coming from behind will be tough. Richard D. Fairbank, CEO at rival Capital One Financial Corp., which began diversifying into auto lending and other businesses back in 1998, warns that new businesses take years to develop. ``If you want to diversify, you have to do it long before you need to,'' he says.

## HARDSCRABBLE START

That's why more analysts and investors figure MBNA will ultimately be sold. Among the leading candidates as buyers: Wachovia Corp. Back in 2000, Wachovia sold its credit-card business to MBNA. But on a recent conference call with Merrill Lynch & Co., Wachovia CEO G. Kennedy Thompson said: ``I think I would like to be in the card business.'' Others on Wall Street say a foreign bank such as HSBC Holdings PLC might also be interested as a way to bulk up its consumer lending. HSBC and Wachovia declined to comment on talk of a deal.

If MBNA does get swallowed up, it might be a painful ending for Hammonds. Raised in a working-class family outside Baltimore -- his father labored as a longshoreman -- Hammonds put himself through the University of Baltimore while working full-time for Sears, Roebuck & Co. as a credit analyst. He even went door-to-door to collect money from customers: ``No knee-breaking,'' he says now with a laugh.

Later, he was lured to the consumer finance business his predecessor Cawley was running for the old Maryland National Bank. He was part of the team that started MBNA in 1982 and helped develop its risk management strategy, which has resulted in some of the lowest loss rates in the industry. Now his biggest risk may be not fixing MBNA fast enough to avoid getting gobbled up.

Work in Progress

MBNA CEO Bruce Hammonds is in the middle of a fix-it plan for the troubled credit-card giant. His strategy:

CUT COSTS

One Tough Card Game; MBNA's stock is down 25% this year, and it'

The company has shed more than 1,000 managers and unloaded assets such as two boats, two planes, and a large training facility in Maine.

DEFEND THE CORE BUSINESS

Rates are rising, but he's no longer hiking rates for many customers. He's again revving up 0% introductory card offers.

DIVERSIFY

He is pushing into home-equity lending, financing of dental and medical practices, and other businesses to reduce reliance on slow-growing U.S. credit cards.

MATCH THE GIANTS

MBNA is expanding its loyalty programs with eye-catching rewards to compete with the likes of Chase and Citibank. One new offer: Cardholders get a trip to watch their favorite NFL team practice.

Data: BusinessWeek

**GRAPHIC:** photograph, Photograph: HAMMONDS ``There's no 'For Sale' sign'' on MBNA, he says PHOTOGRAPH BY BILL CRAMER

**LOAD-DATE:** June 16, 2005