**1**

LEXSEE 1998 U.S. DIST. LEXIS 5484

**IN RE PARACELSUS CORP. SECURITIES LITIGATION; JAMES G. CAVEN, derivatively on behalf of Champion Healthcare Corporation, a Delaware Corp., and alternatively on behalf of himself and all others similarly situated, Plaintiff, VS. CHARLES R. MILLER, JAMES G. VANDEVENDER, RONALD R. PATTERSON, MANFRED GEORGE KRUKEMEYER, R.J. MESSENGER, JAMES T RUSH, ROBERT C. JOYNER, PARACELSUS HEALTHCARE CORPORATION, a California Corporation, PARK HOSPITAL GmbH, a German Corporation, ERNST & YOUNG, and DONALDSON, LUFKIN & JENRETTE, INC., Defendants, and PARACELSUS HEALTHCARE CORPORATION, a California Corporation, CHAMPION HEALTHCARE CORPORATION, a Delaware Corporation, Nominal Defendants.**

**CIVIL ACTION H-96-4291**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*1998 U.S. Dist. LEXIS 5484*

**March 6, 1998, Decided**
**March 9, 1998, Entered**

**DISPOSITION:** [*1] Defendants' Motion to Dismiss the First Amended Derivative Complaint (Document No. 31) DENIED.

**COUNSEL:** For JAMES G CAVEN plaintiff: Kenneth G Gilman, David Pastor, Gilman and Pastor, Boston, MA. Larry Richard Veselka, Smyser Kaplan & Veselka, Houston, TX. Daniel C Girard, Girard and Green, San Francisco, CA. Peter A. Lagorio, Gilman and Pastor, Boston, MA. Katherine M Ginzburg, Susman Godfrey, Houston, TX.

For ROBERT OROVITZ, consolidated plaintiff: Roger Farrell Claxton, Kilgore & Kilgore, Dallas, TX.

For CHARLES R MILLER, JAMES G VANDEVENDER, RONALD R PATTERSON, defendants: Robert F Watson, Law Snakard and Gambill, Fort Worth, TX.

For MANFRED GEORGE KRUKEMEYER, defendant: Robert Roy Burford, Gibbs & Burns, Houston, TX. Jean C Frizzell, Gibbs & Bruns, Houston, TX.

For R J MESSENGER, defendant: Joseph Paul Esposito, Akin Gump Strauss Hauer and Feld, Washington, DC.

For JAMES T RUSH, defendant: Richard H Borow, Irell and Manella, Los Angeles, CA.

For PARACELSUS HEALTH, defendant: Richard P. Keeton, Mayor Day Caldwell & Keeton, Houston, TX. Andrew B Weissman, Wilmer Cutler and Pickering, Washington, DC.

**JUDGES:** EWING WERLEIN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** EWING [*2] WERLEIN, JR.

**OPINION:**

### MEMORANDUM AND ORDER

Pending is Defendants Paracelsus Healthcare Corporation's, Manfred G. Krukemeyer's, R. J. Messenger's, James T. Rush's, Charles R. Miller's, James G. VanDevender's, and Ronald R. Patterson's Motion to Dismiss the First Amended Derivative Complaint. (Document No. 31). After having considered the motion, the submissions of the parties, and the applicable law, the Court finds, for the reasons set forth below, that the motion should be denied.

### I. Background

The instant shareholder derivative action arises from the August 13, 1996, Merger of Champion Healthcare Corporation ("Champion") and Paracelsus Healthcare Corporation ("Paracelsus") whereby Champion became a wholly owned subsidiary of Paracelsus. Plaintiff James

G. Caven ("Caven") owned stock in Champion and, pursuant to the terms of the Merger, exchanged his shares of Champion common and preferred stock for shares of Paracelsus common stock.

As more fully set forth in Plaintiff's First Amended Derivative Complaint, (Document No. 26), Caven alleges that Paracelsus and the Paracelsus Defendants n1 breached representations and warranties in the Merger contract by providing [*3] materially false or misleading financial information that induced Champion to consummate the Merger. Caven, as a shareholder of Champion who received Paracelsus common stock in the Merger, brings the instant derivative action pursuant to *Rule 23.1 of the Federal Rules of Civil Procedure* "for the benefit of Paracelsus on behalf of its subsidiary Champion to redress injuries to Champion. . . ." (Document No. 26 at 7). Specifically, Caven claims that, in causing Champion to consummate the Merger, the Champion Defendants n2 aided and abetted by the Paracelsus Defendants, breached their fiduciary duties to Champion by failing to act on an informed, good-faith and honest basis. (Document No. 26 at PP 4-5, 81-94). Caven further alleges that the Merger was detrimental to Champion and constitutes corporate waste. (Document No. 26 at P 91). n3

> n1 The Paracelsus Defendants, as alleged by Caven, include Manfred George Krukemeyer, Park Hospital GmbH, R.J. Messenger, James T. Rush, and Robert C. Joyner.

> n2 The Champion Defendants, as alleged by Caven, include Charles R. Miller, James G. VanDevender, and Ronald R. Patterson.

[*4]

> n3 Caven also asserted claims against Ernst & Young and Donaldson, Lufkin & Jenrette. However, by Orders dated July 14, 1997, and October 14, 1997, the Court granted Plaintiff's Motion for Voluntary Dismissal Without Prejudice as to Defendant Ernst & Young (Document No. 41), and Plaintiff's Motion for Voluntary Dismissal Without Prejudice as to Defendant Donaldson, Lufkin & Jenrette, Inc. (Document No. 56). Accordingly, Caven's claims against Defendant Ernst & Young, Donaldson, Lufkin & Jenrette, Inc. are not addressed herein.

## II. Summary of the parties' arguments

Generally, the prerequisite for filing a derivative action is that such a suit is initiated only on behalf of a company that is itself able to bring the action directly. To the extent that Caven brings the instant suit on behalf of post-merger Champion, Defendants contend that post-Merger Champion, as a wholly-owned subsidiary of Paracelsus, is unable to assert any of the claims recited in Plaintiff's Amended Derivative Complaint. (Memorandum of Law in Support of Defendants' Motion to Dismiss, Document No. 32 at 6-8). [*5] According to the Defendants, such a suit, if allowed, would be the equivalent of a corporation suing itself for its own benefit, which is not permitted under Delaware law (Document No. 32 at 8-9). Similarly, to the extent that Caven seeks to assert claims on behalf of pre-merger Champion, Defendants maintain that Caven is not the proper party entitled to assert the instant claims on behalf of post-merger Champion because the right to pursue any such claims passed to Paracelsus as a result of the Merger. (Document No. 32 at 9-11). Additionally, Defendants contend that Caven fails to meet the personal standing requirements to bring this action. According to Defendants, Caven did not own pre-merger Champion stock at the time the suit was filed, and likewise, did not own Paracelsus stock at the time of the alleged wrongdoing. (Document No. 32 at 12-16).

Additionally and alternatively, Defendants maintain that dismissal is proper as to the breach of contract claim because the express language of the Merger Agreement precludes a post-Merger claim for breach of representations, warranties, and agreements (Document No. 32 at 17-19). With regard to Caven's claim that the Paracelsus Defendants [*6] aided and abetted in Champion's alleged breach of a fiduciary duty, Defendants contend that such a claim is without any legal foundation. (Document No. 32 at 19-21).

In response to Defendants' Motion to Dismiss, Caven contends that the Merger was a "reverse triangular" merger, in which a Paracelsus subsidiary, PC Merger Sub, Inc., merged into Champion thereby retaining Champion as a corporate entity distinct from Paracelsus. (Plaintiff's Memorandum in Response to Defendants' Motion to Dismiss, Document No. 45 at 6). As a result, Champion's claims did not pass to Paracelsus as a result of the Merger, but stayed with Champion. Moreover, the harm Caven complains of in the instant suit arose when the Merger was consummated, not at a time prior to the Merger. According to Caven, the "contemporaneous ownership" rule applicable in derivative actions does not preclude Caven from proceeding on the allegation that he owned Paracelsus stock when the harm to Champion occurred because the Champion stock owned by Caven was converted to Paracelsus stock when the Merger took effect. (Document No. 45 at 8-13). Furthermore, Caven argues that he has properly invoked "double derivative" standing by his [*7] allegation that he sues "in the right of

and for the benefit of Paracelsus on behalf of its subsidiary Champion to redress injuries to Champion" and by joining both Champion and Paracelsus as defendants as required by Delaware law. (Document No. 45 at 13–15).

As to the claims for breach of contract, Caven maintains that the allegations in the First Amended Derivative Complaint are sufficient to overcome Defendants' Rule 12(b)(6) Motion to Dismiss. Additionally, Caven maintains that dismissal of the breach of contract claim is improper in light of the substantial questions regarding the terms and provisions of the Merger contract. (Document No. 45 at 18). With regard to Caven's claim for aiding and abetting breach of a fiduciary duty, Caven claims that the allegations are well supported in law. (Document No. 45 at 21–24).

### III. FED. R. CIV. P. 12(b)(6) dismissal standard

*Fed. R. Civ. P. 12(b)(6)* provides for dismissal of an action for "failure to state a claim upon which relief can be granted." When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. *Scheuer v. Rhodes,* [*8] *416 U.S. 232, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974).* The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims. Id.

In considering a motion to dismiss under Rule 12(b)(6), the district court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts in the complaint. *La Porte Construction Co. v. Bayshore Nat'l Bank of La Porte, Tex., 805 F.2d 1254, 1255 (5th Cir. 1986); Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982), cert. denied 459 U.S. 1105, 103 S. Ct. 729, 74 L. Ed. 2d 953 (1983); Mann v. Adams Realty Co., 556 F.2d 288, 293 (5th Cir. 1977).* Dismissal of a claim is improper unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173, 176, 66 L. Ed. 2d 163 (1980); Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957); Kaiser Aluminum, 677 F.2d at 1050; Mann, 556 F.2d at 293.* "The plaintiff need not set forth [*9] all the facts upon which the claim is based; rather, a short and plain statement is sufficient if it gives the defendant fair notice of what the claim is and the grounds upon which it rests." *Mann, 556 F.2d at 293.* Therefore, in challenging the sufficiency of the complaint under Rule 12(b)(6), the defendant bears the burden of proving that no relief could be granted under any set of facts that could be proved consistent with the allegations in the complaint. *Hishon v. King & Spalding, 467 U.S. 69, 104 S. Ct. 2229, 2232,*

*81 L. Ed. 2d 59 (1984).*

### A. Plaintiff has standing to assert the claims in the First Amended Complaint

*Rule 23.1 of the Federal Rules of Civil Procedure* requires a plaintiff in a derivative action to allege that he or she was a shareholder at the time of the challenged transaction, and to set forth "with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . ., and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *FED. R. CIV. P. 23.1.*

Under Delaware law, which the parties agree is applicable to the instant case, a plaintiff must have been [*10] a shareholder at the time of the challenged transaction to have standing to maintain a shareholder derivative suit. Delaware General Corporation Law § 327, *DEL. CODE ANN. Title 8 § 327 (1983).* n4 In addition, Delaware courts require that the plaintiff remain a shareholder at the time of the filing of the suit and throughout the litigation. *Blasband v. M. Rales, 971 F.2d 1034 (3d. Cir. 1992); Alabama By-Products Corp. v. Cede & Co., 657 A.2d 254, 264 (Del. 1995); Kramer v. Western Pacific Indus., Inc., 546 A.2d 348, 354 (Del. 1988).* n5 "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Lewis v. Anderson, 477 A.2d 1040, 1049 (Del. 1984).* Delaware courts, however, recognize two exceptions to the general rule that a plaintiff loses standing where the shareholder loses stock as a result of a merger. These exceptions apply (1) where the merger itself is the subject of a claim of fraud; *see, e.g., Cede & Co. v. Technicolor, Inc., 542 A.2d 1182, 1188–89 (Del. 1988);* or (2) where the merger is in reality a reorganization not affecting the plaintiff's ownership in the business [*11] enterprise. *See, e.g., Schreiber v. Carney, 447 A.2d 17, 22 (Del.Ch. 1982).*

n4 Section 327 of the Delaware General Corporation Law provides:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law.

The sole purpose of Section 327 is "to prevent what has been considered an evil, namely, the purchasing of shares in order to maintain a derivative action de-

signed to attack a transaction which occurred prior to the purchase of the stock." *Rosenthal v. Burry Biscuit Corp., 30 Del. Ch. 299, 60 A.2d 106, 111 (Del. Ch. 1948).*

> n5 This requirement is to ensure that the plaintiff has sufficient incentive to represent adequately the corporation's interests during the litigation. *Blasband, 971 F.2d at 1041.* In addition, the continuing ownership requirement is intended to prevent abuses associated with derivative actions. *Lewis v. Anderson, 477 A.2d 1040, 1046 (Del. 1984).*

[*12]

In the instant case, Caven alleges that Paracelsus and the Paracelsus Defendants breached representations and warranties in the Merger contract by providing materially false or misleading financial information that induced Champion to consummate the Merger. Thus, the transaction complained of is, essentially, the Merger itself. It is undisputed that Caven owned Champion stock at the time of the Merger, and that Caven exercised his right to convert that stock to Paracelsus stock when the Merger took effect. Thus, to the extent that Defendants challenge Plaintiff's compliance with the pleading requirements of *FED. R. CIV. P. 23.1* and *DEL CODE ANN. Title 8 § 327* (1983), the Court finds that Caven has specifically alleged ownership of the Champion stock at the time of the wrongdoing complained of, and alleged that he received Paracelsus stock pursuant to the Merger. Moreover, Caven's allegations place this derivative action within the two recognized exceptions to the general rule that a shareholder who loses his stock by virtue of a merger has no standing to maintain a derivative suit on behalf of the premerger company. Because Delaware law recognizes the type of double derivative [*13] action alleged in this case, *see Blasband, 971 F.2d at 1046,* and because Caven has alleged sufficient facts in the First Amended Derivative Complaint to satisfy the standing requirements of *FED. R. CIV. P. 23.1* and applicable Delaware law, this action is not subject to dismissal under Rule 12(b)(6).

**B. Plaintiff has stated claims for breach of contract and for aiding and abetting breaches of fiduciary duty**

Plaintiff has alleged that Paracelsus and the Paracelsus Defendants breached the provisions of Sections 5.6 and 5.8 of the Merger Agreement with pre–Merger Champion. Document No. 26 PP 67, 68, and 78). Plaintiff also alleges that the Paracelsus Defendants aided and abetted in the alleged breach of a fiduciary duty. In response and in their Motion to Dismiss, Defendants argue that, pursuant to Section 10.1 of the Merger Agreement, the complained of representations, warranties and agreements, with lim-

ited exceptions, did not survive the "Effective Time" of the Merger contract, and therefore Caven cannot maintain a cause of action for breach of contract. In addition, Defendants argue that Caven's claim for aiding and abetting is without any legal foundation.

With [*14] respect to the foregoing claims, Caven alleges in the First Amended Derivative Complaint:

> 53. Pursuant to Section 5.6 of the Merger Agreement, Paracelsus represented and warranted that, since December 31, 1995, there had not occurred or arisen any event which had or would have a material adverse effect on Paracelsus.

> 54. Pursuant to Section 5.8 of the Merger Agreement, Paracelsus represented and warranted that information supplied by Paracelsus or its subsidiaries for inclusion in certain documents disseminated in connection with the Merger (a registration statement and proxy statement) would not contain any untrue statements of material fact or omit to state material facts.

Caven further alleges that two months after the Merger, Paracelsus announced that it would report lower than expected earnings in the third quarter of 1996, and that it would restate its financial results and amend its Forms 10–Q for the period ending December 31, 1995, March 31, 1996 and June 30, 1996. Following this announcement, Caven avers that Paracelsus filed its Form 10–K with the Securities and Exchange Commission wherein Paracelsus announced that it would "restate both its audited [*15] and unaudited financial results for periods commencing with January 1, 1992, through the nine months ending September 30, 1996 due to 'adjustments' and 'reclassifications'. . . . In short, Paracelsus' previously reported financial results had been materially misstated by tens of millions of dollars." (Document No. 26 at PP 60, 64).

A careful review of Plaintiff's First Amended Derivative Complaint reflects that Caven has stated a claim for breach of contract. The complaint clearly alleges that the representations and warranties made by Paracelsus were false when made. (See Document No. 26 at PP 67–68). In addition, Caven specifically alleges that Paracelsus's representations and warranties were made in violation of Sections 5.6 and 5.8 of the Merger Agreement. (See Document No. 26 at P 68). Defendants have failed to demonstrate that Caven can prove no set of facts in support of his claims for breach of contract that would entitle him to relief. *See Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173, 176, 66 L. Ed. 2d 163 (1980); Conley*

v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957). Accordingly, Defendants' request for dismissal of Plaintiff's claim of [*16] breach of contract is denied.

As to the claim for aiding and abetting breach of fiduciary duty, Caven alleges that the Champion Defendants breached their fiduciary duties to Champion and its shareholders by failing to act on an informed basis, in good faith, and in the honest belief that the Merger was in the best interest of Champion, and by failing to exercise candor in recommending the Merger. (Document No. 26 at PP 83-89). In so alleging, Caven maintains that the Paracelsus Defendants aided and abetted in the breach of fiduciary duty by providing false financial information to effectuate the proposed merger.

Caven has set forth facts which, if true, would permit a reasonable inference that Champion was aware or should have been aware that the proposed merger transaction, if in fact unfair, would benefit the fiduciaries at the expense of the public shareholders. (See Document No. 26 at PP 85-89). Those allegations and inferences preclude dismissal of the aiding and abetting breach of fiduciary duty claim under Rule 12(b)(6).

Because the First Amended Derivative Complaint contains sufficient allegations to withstand a Rule 12(b)(6) motion to dismiss, it is

ORDERED that Defendants' [*17] Motion to Dismiss the First Amended Derivative Complaint (Document No. 31) is DENIED.

Signed at Houston, Texas, on this the 6th day of March, 1998.

EWING WERLEIN, JR.

UNITED STATES DISTRICT JUDGE

**2**

Westlaw.

2006 WL 694137                                                                    Page 1
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
**(Cite as: 2006 WL 694137 (U.S.))**

**H**

**Briefs and Other Related Documents**

Supreme Court of the United States
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,
Petitioner,
v.
Shadi DABIT.
**No. 04-1371.**

Argued Jan. 18, 2006.
Decided March 21, 2006.

**Background:** Former broker at investment banking firm and former retail customer of firm brought class actions against firm in federal and state court, respectively, alleging biased research and investment recommendations, and asserting only state-law claims including breach of fiduciary duty and breach of contract. After transfer of federal action, and removal and transfer of state-court action, for consolidated pretrial proceedings, the United States District Court for the Southern District of New York, Milton Pollack, Senior District Judge, 2003 WL 1872820, granted firm's motion to dismiss on grounds of preemption by the Securities Litigation Uniform Standards Act (SLUSA). Former broker and customer appealed. The Court of Appeals for the Second Circuit, Sotomayor, Circuit Judge, 395 F.3d 25, affirmed in part and vacated and remanded in part, concluding that, to the extent the complaint alleged that brokers were fraudulently induced to retain or delay selling, it fell outside SLUSA's pre-emptive scope. Certiorari was granted.

**Holding:** The Supreme Court, Justice Stevens, held that SLUSA applies broadly to pre-empt state-law class-action claims brought by holders of securities, as well as by purchasers and sellers of securities, alleging the fraudulent manipulation of stock prices.
Vacated and remanded.

Justice Alito did not participate.

**[1] Securities Regulation** ⚖══60.18

349Bk60.18 Most Cited Cases
Rule 10b-5 broadly prohibits deception, misrepresentation,

and fraud in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

**[2] Securities Regulation** ⚖══278

349Bk278 Most Cited Cases
Congress enacted the Securities Litigation Uniform Standards Act (SLUSA) to stem the shift in private securities class-action litigation from federal to state courts and to prevent certain state private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act. Securities Exchange Act of 1934, §§ 21D, et seq., 28(f), 15 U.S.C.A. §§ 78u-4 et seq., 78bb(f).

**[2] States** ⚖══18.77

360k18.77 Most Cited Cases
Congress enacted the Securities Litigation Uniform Standards Act (SLUSA) to stem the shift in private securities class-action litigation from federal to state courts and to prevent certain state private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act. Securities Exchange Act of 1934, §§ 21D, et seq., 28(f), 15 U.S.C.A. §§ 78u-4 et seq., 78bb(f).

**[3] Securities Regulation** ⚖══278

349Bk278 Most Cited Cases
For purposes of the Securities Litigation Uniform Standards Act's (SLUSA's) class action limitations, a "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. Securities Exchange Act of 1934, § 28(f)(5)(B), 15 U.S.C.A. § 78bb(f)(5)(B).

**[3] States** ⚖══18.77

360k18.77 Most Cited Cases
For purposes of the Securities Litigation Uniform Standards Act's (SLUSA's) class action limitations, a "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. Securities Exchange Act of 1934, § 28(f)(5)(B), 15 U.S.C.A. § 78bb(f)(5)(B).

**[4] Securities Regulation** ⚖══278

349Bk278 Most Cited Cases
For purposes of the Securities Litigation Uniform Standards Act's (SLUSA's) class action limitations, a "covered secur-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

ity" is one traded nationally and listed on a regulated national exchange. Securities Exchange Act of 1934, § 28(f)(5)(E), 15 U.S.C.A. § 78bb(f)(5)(E).

**[5] Securities Regulation ☞278**

349Bk278 Most Cited Cases

Securities Litigation Uniform Standards Act (SLUSA), which provides that no covered class action based on state law and alleging a misrepresentation or omission of a material fact "in connection with the purchase or sale of a covered security" may be maintained in any state or federal court by any private party, applies broadly to pre-empt state-law class-action claims brought by holders of securities, as well as by purchasers and sellers of securities, alleging the fraudulent manipulation of stock prices. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

**[5] States ☞18.77**

360k18.77 Most Cited Cases

Securities Litigation Uniform Standards Act (SLUSA), which provides that no covered class action based on state law and alleging a misrepresentation or omission of a material fact "in connection with the purchase or sale of a covered security" may be maintained in any state or federal court by any private party, applies broadly to pre-empt state-law class-action claims brought by holders of securities, as well as by purchasers and sellers of securities, alleging the fraudulent manipulation of stock prices. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

**[6] Statutes ☞223.5(4)**

361k223.5(4) Most Cited Cases

When judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.

**[7] Statutes ☞212.6**

361k212.6 Most Cited Cases

Identical words used in different parts of the same statute generally are presumed to have the same meaning.

**[8] States ☞18.11**

360k18.11 Most Cited Cases

There is a general presumption that Congress does not cavalierly pre-empt state-law causes of action.

**[9] Securities Regulation ☞278**

349Bk278 Most Cited Cases

Identity of the plaintiffs does not determine whether a complaint alleges fraud "in connection with the purchase or sale" of securities, for purposes of Securities Litigation Uniform Standards Act (SLUSA) pre-emption. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

**[9] States ☞18.77**

360k18.77 Most Cited Cases

Identity of the plaintiffs does not determine whether a complaint alleges fraud "in connection with the purchase or sale" of securities, for purposes of Securities Litigation Uniform Standards Act (SLUSA) pre-emption. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

*Syllabus* [FN*]

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

*1 Respondent Dabit filed a private securities fraud class action in federal court, invoking diversity jurisdiction to advance his state-law claims that petitioner, his former employer, fraudulently manipulated stock prices, causing him and other brokers and their clients to keep their overvalued securities. The District Court dismissed his amended complaint, finding his claims pre-empted by title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA), which provides that no "covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." 15 U.S.C. § 78bb(f)(1)(A). Vacating the judgment, the Second Circuit concluded that, to the extent the complaint alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling, it fell outside SLUSA's pre-emptive scope.

*Held:* The background, text, and purpose of SLUSA's pre-emption provision demonstrate that SLUSA pre-empts state-law holder class-action claims of the kind Dabit alleges. Pp. --- - ----5-17.

(a) The magnitude of the federal interest in protecting the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 694137                                                                                Page 3
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
**(Cite as: 2006 WL 694137 (U.S.))**

integrity and efficiency of the national securities market cannot be overstated. The Securities Act of 1933 and the Securities Exchange Act of 1934 (1934 Act) anchor federal regulation of vital elements of this Nation's economy. Securities and Exchange Commission (SEC) Rule 10b-5, which was promulgated pursuant to § 10(b) of the 1934 Act, is an important part of that regulatory scheme, and, like § 10(b), prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale" of a security. When, in _Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539,_ this Court limited the Rule 10b-5 private right of action to plaintiffs who were themselves purchasers or sellers, it relied on the widespread recognition that suits by nonpurchasers and nonsellers present a special risk of vexatious litigation that could "frustrate or delay normal business activity," _id., at 740, 95 S.Ct. 1917._ Pp. ---- - ----5-8.

(b) Similar policy considerations prompted Congress to adopt legislation (Reform Act) targeted at perceived abuses of class actions--_e.g.,_ nuisance filings and vexatious discovery requests--but this effort prompted members of the plaintiffs' bar to avoid the federal forum altogether. To stem the shift of class actions from federal to state courts, Congress enacted SLUSA. Pp. ---- - ----8-10.

(c) Both the class and the securities here are "covered" within SLUSA's meaning, and the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities. Dabit's narrow reading would pre-empt only those actions in which _Blue Chip Stamps'_ purchaser-seller requirement is met. Insofar as that argument assumes that the _Blue Chip Stamps_ rule stems from Rule 10b-5's text, it must be rejected, for the Court relied on "policy considerations" in adopting that limitation, and it purported to define the scope of a private right of action under Rule 10b-5, not to define "in connection with the purchase or sale." When this Court has sought to give meaning to that phrase in the § 10(b) and Rule 10b-5 context, it has broadly required that the alleged fraud "coincide" with a securities transaction, an interpretation that comports with the SEC's longstanding views. Congress can hardly have been unaware of this broad construction when it imported

the phrase into SLUSA. Where judicial interpretations have settled a statutory provision's meaning, repeating the same language in a new statute indicates the intent to incorporate the judicial interpretations as well. That presumption is particularly apt here, because Congress not only used § 10(b)'s and Rule 10b-5's words, but used them in another provision appearing in the same statute as § 10(b). The presumption that Congress envisioned a broad construction also follows from the particular concerns that culminated in SLUSA's enactment, viz., preventing state private securities class-action suits from frustrating the Reform Act's objectives. A narrow construction also would give rise to wasteful, duplicative litigation in state and federal courts. The presumption that "Congress does not cavalierly pre-empt state-law causes of action," _Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700,_ has less force here because SLUSA does not pre-empt any cause of action. It simply denies the use of the class-action device to vindicate certain claims. Moreover, tailored exceptions to SLUSA's pre-emptive command-- for, _e.g.,_ state agency enforcement proceedings--demonstrate that Congress did not act cavalierly. Finally, federal, not state, law has long been the principal vehicle for asserting class-action securities fraud claims. Pp. ---- - ----10-16.

(d) Dabit's holder class action is distinguishable from a typical Rule 10b-5 class action only in that it is brought by holders rather than sellers or purchasers. That distinction is irrelevant for SLUSA pre-emption purposes. The plaintiffs' identity does not determine whether the complaint alleges the requisite fraud, and the alleged misconduct here--fraudulent manipulation of stock prices--unquestionably qualifies as a fraud "in connection with the purchase or sale" of securities as the phrase is defined in _SEC v. Zandford, 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1,_ and _United States v. O'Hagan, 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724._ Pp. ---- - ----16- 17.

**\*2** 395 F.3d 25, vacated and remanded.

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

Jay B. Kasner, New York, NY, for petitioner.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 694137                                                                                                    Page 4
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
(Cite as: 2006 WL 694137 (U.S.))

Thomas G. Hungar, for United States, as amicus curiae, by special leave of the Court, supporting the petitioner.

David C. Frederick, Washington, D.C., for respondent.

Jay B. Kasner, Counsel of Record, Preeta D. Bansal, Edward J. Yodowitz, Scott D. Musoff, Joanne Gaboriault, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Petitioner.

William B. Federman, Stuart W. Emmons, Federman & Sherwood, Oklahoma City, OK, Clell L. Cunningham. III, Dunn, Swan & Cunningham, P.C., Oklahoma City, OK, David C. Frederick, Counsel of Record, Priya R. Aiyar, Brendan J. Crimmins, Patrick D. Curran, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., for respondent.

Jay B. Kasner, Counsel of Record, Preeta D. Bansal, Edward J. Yodowitz, Scott D. Musoff, Joanne Gaboriault, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Petitioner.

Justice STEVENS delivered the opinion of the Court.

Title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA) provides that "[n]o covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." § 101(b), 112 Stat. 3227 (codified at 15 U.S.C. § 78bb(f)(1)(A)). In this case the Second Circuit held that SLUSA only pre-empts state-law class-action claims brought by plaintiffs who have a private remedy under federal law. 395 F.3d 25 (2005). A few months later, the Seventh Circuit ruled to the contrary, holding that the statute also pre-empts state-law class-action claims for which federal law provides no private remedy. Kircher v. Putnam Funds Trust, 403 F.3d 478 (C.A.7 2005). The background, the text, and the purpose of SLUSA's pre-emption provision all support the broader interpretation adopted by the Seventh Circuit.

I

*3 Petitioner Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), is an investment banking firm that offers

research and brokerage services to investors. Suspicious that the firm's loyalties to its investment banking clients had produced biased investment advice, the New York attorney general in 2002 instituted a formal investigation into Merrill Lynch's practices. The investigation sparked a number of private securities fraud actions, this one among them. [FN1]

> FN1. Merrill Lynch eventually settled its dispute with the New York attorney general.

Respondent, Shadi Dabit, is a former Merrill Lynch broker. He filed this class action in the United States District Court for the Western District of Oklahoma on behalf of himself and all other former or current brokers who, while employed by Merrill Lynch, purchased (for themselves and for their clients) certain stocks between December 1, 1999, and December 31, 2000. See App. 27a–46a. Rather than rely on the federal securities laws, Dabit invoked the District Court's diversity jurisdiction and advanced his claims under Oklahoma state law.

The gist of Dabit's complaint was that Merrill Lynch breached the fiduciary duty and covenant of good faith and fair dealing it owed its brokers by disseminating misleading research and thereby manipulating stock prices. [FN2] Dabit's theory was that Merrill Lynch used its misinformed brokers to enhance the prices of its investment banking clients' stocks: The research analysts, under management's direction, allegedly issued overly optimistic appraisals of the stocks' value; the brokers allegedly relied on the analysts' reports in advising their investor clients and in deciding whether or not to sell their own holdings; and the clients and brokers both continued to hold their stocks long beyond the point when, had the truth been known, they would have sold. The complaint further alleged that when the truth was actually revealed (around the time the New York attorney general instituted his investigation), the stocks' prices plummeted.

> FN2. The complaint alleged, for example, that the prices of the subject stocks were "artificially inflated as a result of the manipulative efforts" of Merrill Lynch, and that Merrill Lynch, "acting as a central nerve center in the manipulation of various stocks ..., perpetrated this stock manipulation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 51-2    Filed 04/05/2006    Page 12 of 23

Westlaw.

2006 WL 694137                                                                                          Page 5
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
(Cite as: 2006 WL 694137 (U.S.))

through a variety of deceptive devices, artifices, and tactics that are the hallmarks of stock manipulation." App. 28a-29a.

Dabit asserted that Merrill Lynch's actions damaged the class members in two ways: The misrepresentations and manipulative tactics caused them to hold onto overvalued securities, and the brokers lost commission fees when their clients, now aware that they had made poor investments, took their business elsewhere.

In July 2002, Merrill Lynch moved to dismiss Dabit's complaint. It argued, first, that SLUSA pre-empted the action and, second, that the claims alleged were not cognizable under Oklahoma law. The District Court indicated that it was "not impressed by" the state-law argument, but agreed that the federal statute pre-empted at least some of Dabit's claims. *Id.,* at 49a-50a. The court noted that the complaint alleged both "claims and damages based on wrongfully-induced purchases" and "claims and damages based on wrongfully-induced holding." *Ibid.* While the "holding" claims, the court suggested, might not be pre-empted, the "purchasing" claims certainly were. The court dismissed the complaint with leave to amend to give Dabit the opportunity to untangle his "hopeless melange of purchase-related and holding-related assertions." *Ibid.* (punctuation added).

Dabit promptly filed an amended complaint that omitted all direct references to purchases. What began as a class of brokers who "purchased" the subject securities during the class period became a class of brokers who "owned and continued to own" those securities. See *id.,* at 52a.

*4 Meanwhile, dozens of other suits, based on allegations similar to Dabit's, had been filed against Merrill Lynch around the country on both federal- and state-law theories of liability. The Judicial Panel on Multidistrict Litigation transferred all of those cases, along with this one, to the United States District Court for the Southern District of New York for consolidated pretrial proceedings. Merrill Lynch then filed its second motion to dismiss Dabit's complaint. Senior Judge Milton Pollack granted the motion on the ground that the claims alleged fell "squarely within SLUSA's ambit." *In re Merrill Lynch & Co., Inc.,* 2003 WL 1872820, *1 (Apr. 10, 2003).

The Court of Appeals for the Second Circuit, however, vacated the judgment and remanded for further proceedings. 395 F.3d, at 51. It concluded that the claims asserted by holders did not allege fraud "in connection with the purchase or sale" of securities under SLUSA. Although the court agreed with Merrill Lynch that that phrase, as used in other federal securities laws, has been defined broadly by this Court, it held that Congress nonetheless intended a narrower meaning here--one that incorporates the "standing" limitation on private federal securities actions adopted in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Under the Second Circuit's analysis, fraud is only "in connection with the purchase or sale" of securities, as used in SLUSA, if it is alleged by a purchaser or seller of securities. Thus, to the extent that the complaint in this action alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling their securities, it fell outside SLUSA's pre-emptive scope. [FN3]

> FN3. The Court of Appeals also concluded that Dabit's lost commission claims escaped pre-emption under SLUSA because they did not "allege fraud that 'coincide[s]' with the sale or purchase of a security." 395 F.3d, at 47 (quoting *SEC v. Zandford,* 535 U.S. 813, 825, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)). That determination is not before this Court for review.

After determining that the class defined in Dabit's amended complaint did not necessarily exclude purchasers, the panel remanded with instructions that the pleading be dismissed without prejudice. The court's order would permit Dabit to file another amended complaint that defines the class to exclude "claimants who purchased in connection with the fraud and who therefore could meet the standing requirement" for a federal damages action, and to include only those "who came to hold [a Merrill Lynch] stock before any relevant misrepresentation." 395 F.3d, at 45-46. Under the Second Circuit's analysis, a class action so limited could be sustained under state law. For the reasons that follow, we disagree.

                                    II

The magnitude of the federal interest in protecting the integ-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 51-2    Filed 04/05/2006    Page 13 of 23

Westlaw.

2006 WL 694137                                                                                      Page 6
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
(Cite as: 2006 WL 694137 (U.S.))

rity and efficient operation of the market for nationally traded securities cannot be overstated. In response to the sudden and disastrous collapse in prices of listed stocks in 1929, and the Great Depression that followed, Congress enacted the Securities Act of 1933 (1933 Act), 48 Stat. 74, and the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 881. Since their enactment, these two statutes have anchored federal regulation of vital elements of our economy.

[1] Securities and Exchange Commission (SEC) Rule 10b-5, 17 CFR § 240.10b-5 (2005), promulgated in 1942 pursuant to § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), is an important part of that regulatory scheme. The Rule, like § 10(b) itself, [FN4] broadly prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale of any security." [FN5] The SEC has express statutory authority to enforce the Rule. See 15 U.S.C. § 78u (2000 ed. and Supp. III). Although no such authority is expressly granted to private individuals injured by securities fraud, in 1946 Judge Kirkpatrick of the United States District Court for the Eastern District of Pennsylvania, relying on "the general purpose" of the Rule, recognized an implied right of action thereunder. Kardon v. National Gypsum Co., 69 F.Supp. 512, 514. His holding was adopted by an "overwhelming consensus of the District Courts and Courts of Appeals," Blue Chip Stamps, 421 U.S., at 730, 95 S.Ct. 1917, and endorsed by this Court in Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

> FN4. Section 10(b) provides as follows:
> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
> "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

> FN5. The text of the Rule is as follows:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> "(a) To employ any device, scheme, or artifice to defraud,
> "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> "in connection with the purchase or sale of any security." 17 CFR § 240.10b-5 (2005).

*5 A few years after Kardon was decided, the Court of Appeals for the Second Circuit limited the reach of the private right of action under Rule 10b-5. In Birnbaum v. Newport Steel Corp., 193 F.2d 461 (C.A.2 1952), a panel composed of Chief Judge Swan and Judges Augustus and Learned Hand upheld the dismissal of a suit brought on behalf of a corporation and a class of its stockholders alleging that fraud "in connection with" a director's sale of his controlling block of stock to third parties violated Rule 10b-5. The court held that the Rule could only be invoked by a purchaser or seller of securities to remedy fraud associated with his or her own sale or purchase of securities, and did not protect those who neither purchased nor sold the securities in question but were instead injured by corporate insiders' sales to third parties. Id., at 464. While the Birnbaum court did not question the plaintiffs' "standing" to enforce Rule 10b-5, later cases treated its holding as a standing requirement. See Eason v. General Motors Acceptance Corp., 490 F.2d 654, 657 (C.A.7 1973).

By the time this Court first confronted the question, literally hundreds of lower court decisions had accepted "Birnbaum's conclusion that the plaintiff class for purposes of § 10(b) and Rule 10b-5 private damages actions is limited to purchasers and sellers." Blue Chip Stamps, 421 U.S., at 731-732, 95 S.Ct. 1917. Meanwhile, however, cases like Bankers Life & Casualty Co. had interpreted the coverage of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Rule more broadly to prohibit, for example, "deceptive practices *touching* [a victim's] sale of securities as an investor." 404 U.S., at 12-13, 92 S.Ct. 165 (emphasis added); see *Eason*, 490 F.2d, at 657 (collecting cases). The "judicial oak which ha[d] grown from little more than a legislative acorn," as then-Justice Rehnquist described the rules governing private Rule 10b-5 actions, *Blue Chip Stamps,* 421 U.S., at 737, 95 S.Ct. 1917, had thus developed differently from the law defining what constituted a substantive violation of Rule 10b-5. Ultimately, the Court had to decide whether to permit private parties to sue for any violation of Rule 10b-5 that caused them harm, or instead to limit the private remedy to plaintiffs who were themselves purchasers or sellers.

Relying principally on "policy considerations" which the Court viewed as appropriate in explicating a judicially crafted remedy, *ibid.,* and following judicial precedent rather than "the many commentators" who had criticized the *Birnbaum* rule as "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages," 421 U.S., at 738, 95 S.Ct. 1917, the Court in *Blue Chip Stamps* chose to limit the private remedy. The main policy consideration tipping the scales in favor of precedent was the widespread recognition that "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Id.,* at 739, 95 S.Ct. 1917. Even weak cases brought under the Rule may have substantial settlement value, the Court explained, because "[t]he very pendency of the lawsuit may frustrate or delay normal business activity." *Id.,* at 740, 95 S.Ct. 1917. Cabining the private cause of action by means of the purchaser-seller limitation would, in the Court's view, minimize these ill effects. The limitation of course had no application in Government enforcement actions brought pursuant to Rule 10b-5. See *id.,* at 751, n. 14, 95 S.Ct. 1917.

### III

**\*6** Policy considerations similar to those that supported the Court's decision in *Blue Chip Stamps* prompted Congress, in 1995, to adopt legislation targeted at perceived abuses of the class-action vehicle in litigation involving nationally traded securities. While acknowledging that private securities litig-

ation was "an indispensable tool with which defrauded investors can recover their losses," the House Conference Report accompanying what would later be enacted as the Private Securities Litigation Reform Act of 1995 (Reform Act), 109 Stat. 737 (codified at 15 U.S.C. §§ 77z-1 and 78u-4), identified ways in which the class action device was being used to injure "the entire U.S. economy." H.R.Rep. No. 104-369, p. 31 (1995). According to the Report, nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and "manipulation by class action lawyers of the clients whom they purportedly represent" had become rampant in recent years. *Ibid.* Proponents of the Reform Act argued that these abuses resulted in extortionate settlements, chilled any discussion of issuers' future prospects, and deterred qualified individuals from serving on boards of directors. *Id.,* at 31-32.

Title I of the Reform Act, captioned "Reduction of Abusive Litigation," represents Congress' effort to curb these perceived abuses. Its provisions limit recoverable damages and attorney's fees, provide a "safe harbor" for forward-looking statements, impose new restrictions on the selection of (and compensation awarded to) lead plaintiffs, mandate imposition of sanctions for frivolous litigation, and authorize a stay of discovery pending resolution of any motion to dismiss. See 15 U.S.C. § 78u-4. Title I also imposes heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5; it "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

[2] The effort to deter or at least quickly dispose of those suits whose nuisance value outweighs their merits placed special burdens on plaintiffs seeking to bring federal securities fraud class actions. But the effort also had an unintended consequence: It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class ac-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 694137                                                                    Page 8
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
**(Cite as: 2006 WL 694137 (U.S.))**

tions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of class actions involving nationally traded securities had previously been rare. See H.R.Rep. No. 105-640, p. 10 (1998); S.Rep. No. 105-182, pp. 3-4 (1998). To stem this "shif[t] from Federal to State courts" and "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of" the Reform Act, SLUSA §§ 2(2), (5), 112 Stat. 3227, Congress enacted SLUSA.

IV

*7 The core provision of SLUSA reads as follows: [FN6]

> FN6. SLUSA amends the 1933 Act and the 1934 Act in substantially identical ways. For convenience and because they are more pertinent here, we quote the amendments to the 1934 Act.

"CLASS ACTION LIMITATIONS.--No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
"(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
"(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." Id., at 3230 (codified as amended at 15 U.S.C. § 78bb(f)(1)). [FN7]

> FN7. Another key provision of the statute makes all "covered class actions" filed in state court removable to federal court. 112 Stat. 3230 (codified at 15 U.S.C. § 78bb(f)(2)).

[3][4][5] A "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. [FN8] A "covered security" is one traded nationally and listed on a regulated national exchange. [FN9] Respondent does not dispute that both the class and the securities at issue in this case are "covered" within the meaning of the statute, or that the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is

whether the alleged wrongdoing was "in connection with the purchase or sale" of securities.

> FN8. "The term 'covered class action' means--
> "(i) any single lawsuit in which--
> "(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or
> "(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or
> "(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--
> "(I) damages are sought on behalf of more than 50 persons; and
> "(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 112 Stat. 3232 (codified at 15 U.S.C. § 78bb(f)(5)(B)).

> FN9. "The term 'covered security' means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred ... ." 112 Stat. 3232 (codified at 15 U.S.C. § 78bb(f)(5)(E)). Section 18(b) of the 1933 Act in turn defines "covered security" to include securities traded on a national exchange. § 77r(b).

Respondent urges that the operative language must be read narrowly to encompass (and therefore pre-empt) only those actions in which the purchaser-seller requirement of *Blue Chip Stamps* is met. Such, too, was the Second Circuit's

Case 1:05-cv-00327-GMS    Document 51-2    Filed 04/05/2006    Page 16 of 23

Westlaw.

2006 WL 694137                                                                                          Page 9
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
(Cite as: 2006 WL 694137 (U.S.))

view. But insofar as the argument assumes that the rule adopted in *Blue Chip Stamps* stems from the text of Rule 10b-5--specifically, the "in connection with" language, it must be rejected. Unlike the *Birnbaum* court, which relied on Rule 10b-5's text in crafting its purchaser-seller limitation, this Court in *Blue Chip Stamps* relied chiefly, and candidly, on "policy considerations" in adopting that limitation. 421 U.S., at 737, 95 S.Ct. 1917. The *Blue Chip Stamps* Court purported to define the scope of a private right of action under Rule 10b-5--not to define the words "in connection with the purchase or sale." *Id.,* at 749, 95 S.Ct. 1917 ("No language in either [§ 10(b) or Rule 10b-5] speaks at all to the contours of a private cause of action for their violation"). Any ambiguity on that score had long been resolved by the time Congress enacted SLUSA. See *United States v. O'Hagan,* 521 U.S. 642, 656, 664, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 285, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring in part and concurring in judgment); *id.,* at 289-290, 112 S.Ct. 1311 (SCALIA, J., concurring in judgment); *United States v. Naftalin,* 441 U.S. 768, 774, n. 6, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); see also 395 F.3d, at 39 (acknowledging that "[t]he limitation on standing to bring [a] private suit for damages for fraud in connection with the purchase or sale of securities is unquestionably a distinct concept from the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities").

Moreover, when this Court *has* sought to give meaning to the phrase in the context of § 10(b) and Rule 10b-5, it has espoused a broad interpretation. A narrow construction would not, as a matter of first impression, have been unreasonable; one might have concluded that an alleged fraud is "in connection with" a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities. After all, that was the interpretation adopted by the panel in the *Birnbaum* case. See 193 F.2d, at 464. But this Court, in early cases like *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), and most recently in *SEC v. Zandford,* 535 U.S. 813, 820, 822, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), has rejected that view. Under our precedents, it is enough that the fraud alleged "coincide" with a

securities transaction-- whether by the plaintiff or by someone else. See *O'Hagan,* 521 U.S., at 651, 117 S.Ct. 2199. The requisite showing, in other words, is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.,* at 658, 117 S.Ct. 2199. Notably, this broader interpretation of the statutory language comports with the longstanding views of the SEC. See *Zandford,* 535 U.S., at 819-820, 122 S.Ct. 1899. [FN10]

> FN10. In *Zandford,* we observed that the SEC has consistently "maintained that a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5." 535 U.S., at 819, 122 S.Ct. 1899. Here, too, the SEC supports a broad reading of the "in connection with" language.

**8 [6][7]** Congress can hardly have been unaware of the broad construction adopted by both this Court and the SEC when it imported the key phrase--"in connection with the purchase or sale"--into SLUSA's core provision. And when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well." *Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); see *Cannon v. University of Chicago,* 441 U.S. 677, 696-699, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Application of that presumption is particularly apt here; not only did Congress use the same words as are used in § 10(b) and Rule 10b-5, but it used them in a provision that appears in the same statute as § 10(b). Generally, "identical words used in different parts of the same statute are ... presumed to have the same meaning." *IBP, Inc. v. Alvarez,* 546 U.S. 1144, ----, 125 S.Ct. 1292, 161 L.Ed.2d 104 (2005) (slip op., at 11).

The presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment. A narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's stated purpose, viz., "to prevent certain State private securities class action law-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 51-2    Filed 04/05/2006    Page 17 of 23

Westlaw.

2006 WL 694137                                                                    Page 10
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
(Cite as: 2006 WL 694137 (U.S.))

suits alleging fraud from being used to frustrate the objectives" of the 1995 Act. SLUSA § 2(5), 112 Stat. 3227. As the *Blue Chip Stamps* Court observed, class actions brought by holders pose a special risk of vexatious litigation. 421 U.S., at 739, 95 S.Ct. 1917. It would be odd, to say the least, if SLUSA exempted that particularly troublesome subset of class actions from its pre-emptive sweep. See *Kircher,* 403 F.3d, at 484.

Respondent's preferred construction also would give rise to wasteful, duplicative litigation. Facts supporting an action by purchasers under Rule 10b-5 (which must proceed in federal court if at all) typically support an action by holders as well, at least in those States that recognize holder claims. The prospect is raised, then, of parallel class actions proceeding in state and federal court, with different standards governing claims asserted on identical facts. That prospect, which exists to some extent in this very case, [FN11] squarely conflicts with the congressional preference for "national standards for securities class action lawsuits involving nationally traded securities." SLUSA § 2(5), 112 Stat. 3227. [FN12]

> FN11. See 2003 WL 1872820, *1 (S.D.N.Y., Apr.10, 2003) (observing that Dabit's holder claims rested "on the very same alleged series of transactions and occurrences asserted in the federal securities actions" filed against Merrill Lynch).

> FN12. See H.R.Rep. No. 105-640, p. 10 (1998) (the "solution" to circumvention of the Reform Act "is to make Federal court the exclusive venue for securities fraud class action litigation"); S.Rep. No. 105- 182, p. 3 (1998) (identifying "the danger of maintaining differing federal and state standards of liability for nationally-traded securities").

*9 [8] In concluding that SLUSA pre-empts state-law holder class-action claims of the kind alleged in Dabit's complaint, we do not lose sight of the general "presum[ption] that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.

Moreover, the tailored exceptions to SLUSA's pre-emptive command demonstrate that Congress did not by any means act "cavalierly" here. The statute carefully exempts from its operation certain class actions based on the law of the State in which the issuer of the covered security is incorporated, actions brought by a state agency or state pension plan, actions under contracts between issuers and indenture trustees, and derivative actions brought by shareholders on behalf of a corporation. 15 U.S.C. §§ 78bb(f)(3)(A)-(C), (f)(5)(C). The statute also expressly preserves state jurisdiction over state agency enforcement proceedings. § 78bb(f)(4). The existence of these carve-outs both evinces congressional sensitivity to state prerogatives in this field and makes it inappropriate for courts to create additional, implied exceptions.

Finally, federal law, not state law, has long been the principal vehicle for asserting class-action securities fraud claims. See, *e.g.,* H.R. Conf. Rep. No. 105-803, p. 14 (1998) ("Prior to the passage of the Reform Act, there was essentially no significant securities class action litigation brought in State court"). [FN13] More importantly, while state-law holder claims were theoretically available both before and after the decision in *Blue Chip Stamps,* the actual assertion of such claims by way of class action was virtually unheard of before SLUSA was enacted; respondent and his *amici* have identified only *one* pre-SLUSA case involving a state-law class action asserting holder claims. [FN14] This is hardly a situation, then, in which a federal statute has eliminated a historically entrenched state-law remedy. Cf. *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (observing that a "long history" of statelaw tort remedy "add[ed] force" to the presumption against pre-emption).

> FN13. Respondent points out that the Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), identified as a factor mitigating any unfairness caused by adoption of the purchaser-seller requirement that "remed-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 694137                                                          Page 11
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
(Cite as: 2006 WL 694137 (U.S.))

ies are available to nonpurchasers and nonsellers under state law." *Id.,* at 738, n. 9, 95 S.Ct. 1917. He argues that this supports a narrow construction of SLUSA's pre-emption provision. But we do not here revisit the *Blue Chip Stamps* Court's understanding of the equities involved in limiting the availability of private remedies under federal law; we are concerned instead with Congress' intent in adopting a pre-emption provision, the evident purpose of which is to limit the availability of remedies under state law.

FN14. See Brief for Respondent 5 (citing *Weinberger v. Kendrick,* 698 F.2d 61, 78 (C.A.2 1982) (approving a settlement that included holder claims brought pursuant to New York law)); see also Tr. of Oral Arg. 34-35.

V

*10 [9] The holder class action that respondent tried to plead, and that the Second Circuit envisioned, is distinguishable from a typical Rule 10b-5 class action in only one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA pre-emption, that distinction is irrelevant; the identity of the plaintiffs does not determine whether the complaint alleges fraud "in connection with the purchase or sale" of securities. The misconduct of which respondent complains here--fraudulent manipulation of stock prices--unquestionably qualifies as fraud "in connection with the purchase or sale" of securities as the phrase is defined in *Zandford,* 535 U.S., at 820, 822, 122 S.Ct. 1899, and *O'Hagan,* 521 U.S., at 651, 117 S.Ct. 2199.

The judgment of the Court of Appeals for the Second Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice ALITO took no part in the consideration or decision of this case.

--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131

**Briefs and Other Related Documents** (Back to top)

• 2006 WL 126648, 74 USLW 3422 (Oral Argument) Oral Argument (Jan. 18, 2006)

• 2006 WL 42052 (Appellate Brief) Reply Brief (Jan. 05, 2006)Original Image of this Document (PDF)

• 2005 WL 3477893 (Appellate Brief) Brief for Respondent (Dec. 19, 2005)Original Image of this Document (PDF)

• 2005 WL 3485822 (Appellate Brief) Brief for Phillip Goldstein and Bulldog Investors as Amici Curiae in Support of Respondent%tc (Dec. 19, 2005)Original Image of this Document (PDF)

• 2005 WL 3543088 (Appellate Brief) Brief of New York, California, Connecticut, Hawaii, Illinois, Iowa, Michigan, Minnesota, Mississippi, Montana, New Jersey, New Mexico, Ohio, Okalhoma, Oregon, South Carolina, Vermont, Washington, Wisconsin as Amici Curiae in Support of Respondent%tc (Dec. 19, 2005)Original Image of this Document (PDF)

• 2005 WL 3533245 (Appellate Brief) Brief of National Association of Shareholder and Consumer Attorneys and AARP as Amici Curiae in Support of Respondents%tc (Dec. 16, 2005)Original Image of this Document (PDF)

• 2005 WL 3543089 (Appellate Brief) Brief for IJG Investments and Irlys Guy as Amicus Curiae Supporting Respondent%tc (Dec. 16, 2005)Original Image of this Document (PDF)

• 2005 WL 3048038 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3067181 (Appellate Brief) Brief of the Chamber of Commerce of the United States of America as Amicus Curiae in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3076071 (Appellate Brief) Brief for the Investment Company Institute as Amicus Curiae in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 WL 694137                                                    Page 12
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
**(Cite as: 2006 WL 694137 (U.S.))**

• 2005 WL 3076072 (Appellate Brief) Brief of Amicus Curiae Washington Legal Foundation in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3076090 (Appellate Brief) Brief of Amici Curiae Lord, Abbett & Co. and Eaton Vance Management in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3076091 (Appellate Brief) Brief Amici Curiae of the Securities Industry Association and the Bond Market Association in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3076092 (Appellate Brief) Brief for Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3087267 (Appellate Brief) Brief of Pacific Life Insurance Company as Amicus Curiae in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3106986 (Joint Appendix) (Nov. 14, 2005)

• 2005 WL 2147599 (Appellate Petition, Motion and Filing) Supplemental Brief of Petitioner in Further Support of the Petition for Certiorari (Sep. 01, 2005)

• 2005 WL 1703139 (Appellate Petition, Motion and Filing) Reply Brief (Jul. 19, 2005)

• 2005 WL 1596478 (Appellate Petition, Motion and Filing) Brief in Opposition (Jul. 05, 2005)

• 2005 WL 1397189 (Appellate Petition, Motion and Filing) Motion for Leave to File a Brief as Amici Curiae and Brief for the Securities Industry Association and the Bond Market Association as Amici Curiae in Support of Petitioners (May. 16, 2005)

• 04-1371 (Docket) (Apr. 14, 2005)

• 2005 WL 879506 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Apr. 11, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Westlaw.

148 Fed.Appx. 249                                                                    Page 1
148 Fed.Appx. 249, 2005 Fed.App. 0594N
**(Cite as: 148 Fed.Appx. 249)**

<u>**Briefs and Other Related Documents**</u>

This case was not selected for publication in the
Federal Reporter.

NOT RECOMMENDED FOR FULL--TEXT
PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific
situations. Please see Rule 28(g) before citing in a
proceeding in a court in the Sixth Circuit. If cited, a
copy must be served on other parties and the Court.

Please use FIND to look at the applicable circuit
court rule before citing this opinion. Sixth Circuit
Rule 28(g). (FIND CTA6 Rule 28.)


United States Court of Appeals,
Sixth Circuit.
Terry PRINCE, Derivatively on behalf of Concord
EFS, Inc.; Stanley
Tseng, Plaintiffs-Appellants,
v.
Dan M. PALMER; Edward A. Labry, III; Ronald V.
Congemi; Richard M. Harter;
Douglas C. Alternbern; Richard Buchignani;
Richard P. Kiphart; Jerry D.
Mooney; Paul L. Whittington; Concord EFS, Inc.,
Defendants-Appellees.
**No. 04-5494.**

July 13, 2005.

**Background:** Shareholders asserted derivative
claims for breaches of fiduciary duty, abuse of
control, corporate waste, and gross mismanagement
against members of corporation's board of directors.
The United States District Court for the Western
District of Tennessee dismissed complaint and before
it issued its opinion, corporation became a wholly
owned subsidiary of another corporation in a stock-
for-stock transaction. Shareholders appealed.

**Holding:** The Court of Appeals, <u>Batchelder</u>, Circuit
Judge, held that shareholders, whose stock was
converted into shares of acquiring corporation, were
not longer shareholders of acquired corporation, as
was required to have standing to assert derivative
claims on behalf of acquired corporation.

Remanded with instructions.

West Headnotes

**Corporations** 💬320(4)
101k320(4) <u>Most Cited Cases</u>
Under Delaware law, shareholders, whose stock was
converted into shares of acquiring corporation, were
no longer shareholders of acquired corporation, as
was required to have standing to assert derivative
claims on behalf of acquired corporation against
directors; shareholders did not allege with
particularity that merger was a fraudulent attempt to
deprive them of standing, and merger between two
unrelated pre-existing corporations, each with their
own directors, officers, substantial assets and
stockholders did not qualify as a mere reorganization.
**\*249** On Appeal from the United States District
Court for the Western District of Tennessee.

<u>Othni J. Lathram</u>, <u>Joe R. Whatley, Jr.</u>, <u>Peter H.
Burke</u>, Whatley Drake, Birmingham, AL, for
Plaintiffs-Appellants.

<u>Nathan A. Bicks</u>, <u>Taylor A. Cates</u>, <u>Jef Feibleman</u>,
Burch, Porter & Johnson, Memphis, TN, <u>Gerard D.
Kelly</u>, <u>David F. Graham</u>, Sidley, Austin, Brown &
Wood, Chicago, IL, for Defendants-Appellees.

Before <u>BATCHELDER</u> and <u>GRIFFIN</u>, Circuit
Judges; GADOLA, <u>[FN*]</u> District Judge.

> <u>FN*</u> The Honorable <u>Paul V. Gadola</u>, United
> States District Judge for the Eastern District
> of Michigan, sitting by designation.


<u>BATCHELDER</u>, Circuit Judge.

Plaintiffs-Appellants Terry Prince and Stanley Tseng
appeal the <u>Fed.R.Civ.P. 12(b)(6)</u> dismissal of their
shareholder derivative claims alleging "breaches of
fiduciary duty, abuse of control, corporate waste and
gross mismanagement" against Defendants-
Appellants, members of the **\*250** Board of Directors
("Board") of Concord EFS, Inc. ("Concord"). The
district court dismissed Plaintiffs' complaint for
failure to make a demand on Concord's Board prior to
suit, and failure to allege particularized facts
sufficient to demonstrate that demand was excused
under Delaware law. Shortly before the district court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 Fed.Appx. 249
148 Fed.Appx. 249, 2005 Fed.App. 0594N
(Cite as: 148 Fed.Appx. 249)

Page 2

issued its opinion, Concord became a wholly owned subsidiary of First Data Corporation ("First Data") in a stock-for-stock transaction that converted Plaintiffs' Concord stock into shares of First Data. Because Plaintiffs are no longer shareholders of Concord, Delaware law requires that their complaint be dismissed for lack of standing.

## BACKGROUND

Plaintiff Terry Prince filed his initial complaint on September 13, 2002. On February 4, 2003, his action was consolidated with an action brought by Plaintiff Stanley Tseng, resulting in a Consolidated Verified Derivative Complaint filed on February 14, 2003. On May 1, 2003, Defendants moved to dismiss Plaintiffs' complaint for, *inter alia,* failure to make demand on Concord's Board as required by Delaware law.

On February 26, 2004, Concord merged with First Data. The merger converted all Concord stock into First Data stock at a rate of 0.365 First Data shares for each Concord share, and resulted in former Concord shareholders' owning 21% of First Data. On March 12, 2004, Defendants filed a supplemental Fed.R.Civ.P. 12(b)(6) motion to dismiss Plaintiffs' case for lack of standing under Delaware law, because Plaintiffs were no longer shareholders of Concord, the corporation on whose behalf they were suing. Plaintiffs filed their response on March 22, 2004. On March 31, 2004, the district court issued its opinion dismissing Plaintiffs' case for failure to allege particularized facts warranting excusal of their failure to make demand. The district court did not mention the standing issue in its opinion.

On appeal, Plaintiffs ignore the standing issue in their initial brief, but Defendants raise standing as a threshold issue in their response, and Plaintiffs address it in their reply.

## ANALYSIS

"Standing is a threshold issue in every case before a federal court." *United States v. Perry,* 360 F.3d 519, 540 (6th Cir.2004) (Gibbons, J., dissenting) (citing *United States v. McVeigh,* 106 F.3d 325, 334 (10th Cir.1997)). Whether Plaintiffs maintain standing to pursue their shareholder derivative action under the Delaware corporation statutes is an issue of statutory standing. *See, e.g., Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602 (6th Cir.2004) (treating the issue of whether the federal RICO statute grants a particular plaintiff a substantive right to sue as one of statutory standing). While Supreme Court precedent does not provide a clear answer as to whether the plaintiff's

lack of statutory standing affects our court's jurisdiction, *see, e.g., Steel Co. v. Citizens For A Better Environment,* 523 U.S. 83, 89, 97, 101-02, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), we need not resolve that issue in this case. Defendants made a timely motion to dismiss for lack of statutory standing in the district court, to which Plaintiffs responded, and we are convinced that the district court should have granted that motion.

In the seminal case of *Lewis v. Anderson,* 477 A.2d 1040 (Del.1984), the Delaware Supreme Court, interpreting relevant statutory provisions of the Delaware Corporation Law, held that in order to maintain standing, "a derivative shareholder must not only be a stockholder at the *251 time of the alleged wrong and at time of commencement of suit but that he must also maintain shareholder status throughout the litigation." *Id.* at 1046. The court further clarified that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Id.* at 1049. The court recognized but two narrow exceptions to this continuing ownership requirement for standing: "(1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise." *Id.* at 1046 n. 10.

Plaintiffs offer three responses to *Anderson.* First, they argue that they fit within the first *Anderson* exception-that the First Data-Concord merger was a fraudulent attempt by Defendants to deprive them of standing. In the district court, Plaintiffs conjectured that the mere timing of the merger (seven months after their lawsuit was instituted) "at least raises the possibility that it was entered into in an attempt to deprive Plaintiff of standing," and then requested discovery to further pursue this theory. The fraud exception, however, requires Plaintiffs to allege "particularized facts" in support of fraud, *Lewis v. Ward,* 852 A.2d 896, 905 (Del.2004), which Plaintiffs are clearly unable to do, as evidenced by the absence of any factual allegations at all and their request for discovery and "leave to amend [their] complaint to assert such a [fraudulent merger] claim if discovery warrants it."

Plaintiffs also try to fit their case under the second *Anderson* exception, characterizing the merger as a mere reorganization that does not affect Plaintiffs' ownership of the business enterprise. Plaintiffs' sole basis for this argument is a press release stating that "[t]he exchange of shares in the merger is expected to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

148 Fed.Appx. 249                                                                                      Page 3
148 Fed.Appx. 249, 2005 Fed.App. 0594N
**(Cite as: 148 Fed.Appx. 249)**

qualify as a tax-free reorganization." This statement, however, refers only to the tax consequences of the merger for Concord shareholders, not the nature of Plaintiffs' post-merger ownership interest. Plaintiffs received only 0.365 First Data shares for each Concord share, and they admit that Concord shareholders will constitute only 21% of the outstanding shares of First Data. Moreover, Plaintiffs do not refute Defendants' assertion that the First Data-Concord merger was a "seven billion dollar [merger] ... between two unrelated pre-existing corporations, each with their own directors, officers, substantial assets and stockholders." This merger clearly does not qualify as a mere reorganization. *See Ward,* 852 A.2d at 904 (refusing to apply reorganization exception to "**two distinct corporations, each with its own board of directors, officers, assets and stockholders,**" whose merger was far more than a "corporate reshuffling," and which resulted in plaintiffs' possessing "**property interests ... distinctly different from that which they held as shareholders of [the old corporation]**"); *Schreiber v. Carney,* 447 A.2d 17, 22 (Del.Ch.1982) (applying reorganization exception, pre-*Anderson,* to a merger which resulted in "the shareholders of the old company owning all the shares of the new holding company").

Finally, Plaintiffs cite *Blasband v. Rales,* 971 F.2d 1034 (3d Cir.1992), a Third Circuit case analogous to the one at bar, for the proposition that a plaintiff can maintain "double derivative" standing based upon his continuing, though diluted, interest in the new corporation that he owns. *Rales,* however, does not require us to find that Plaintiffs maintain standing in this case. First and foremost, *Rales* conflicts with Delaware law. Just last year in *Lewis v. Ward,* **852 A.2d 896 (Del.2004),** the Delaware Supreme Court re-affirmed its **\*252** *Anderson* analysis, and in so doing, noted that the Delaware Chancery Court (in a subsequent *Rales* proceeding) "correctly held" that "[t]he **Third Circuit's decision in** *Blasband [v. Rales* ] **is ... inconsistent with the clear holding of** *Lewis v. Anderson." Id.* at 903-04. Therefore, it is clear to us that the Delaware Supreme Court, whose interpretation of Delaware law binds us, does not recognize the double derivative standing found by the Third Circuit in *Rales.* Furthermore, were we to recognize *Rales'* s double derivative standing, Plaintiffs would still have to amend their complaint to assert such standing. *See Rales,* 971 F.2d at 1043; *Ward,* 852 A.2d at 906. But neither in the district court, nor on appeal, have Plaintiffs expressed any interest in amending their complaint for this purpose.

Because under applicable Delaware law Plaintiffs no longer have standing to pursue their derivative lawsuit on behalf of Concord, we need not address the merits of the district court's opinion in order to affirm its dismissal of Plaintiffs' action.

CONCLUSION
For these reasons, we REMAND this matter to the district court, with instructions that it be DISMISSED for lack of statutory standing.

148 Fed.Appx. 249, 2005 Fed.App. 0594N

**Briefs and Other Related Documents** (Back to top)

• 04-5494 (Docket) (Apr. 30, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.