**4**

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)
**(Cite as: 2005 WL 2050280 (E.D.La.))**

C

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Clodile ROMERO, et al.
v.
US UNWIRED, et al.
**No. Civ.A.04-2312, Civ.A.04-2436.**

Aug. 11, 2005.

Lewis Stephen Kahn, Kahn Gauthier Law Group, LLC, Metairie, LA, Andrew Allen Lemmon, Lemmon Law Firm, New Orleans, LA, for Clodile Romero, et al.

Walter B. Stuart, IV, Vinson & Elkins, LLP, New York, NY, Loretta G. Mince, Correro Fishman Haygood Phelps, Walmsley & Casteix, LLP, New Orleans, LA, James Richard Swanson, for US Unwired, et al.

*ORDER AND REASONS*

AFRICK, J.

*1 Before the Court is the motion of plaintiff, Don Feyler, for a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure. [FN1] Plaintiff, an individual shareholder of the nominal defendant, U.S. Unwired, seeks to enjoin 1) the merger of Sprint Corporation ("Sprint") and U.S. Unwired; 2) Sprint's tender offer of U.S. Unwired's shares; and 3) any additional proxy or tender of shares. Plaintiff's injunction request is based on the alleged failure of the defendant corporate officers and directors [FN2] to disclose all material information that U.S. Unwired shareholders would consider important in deciding whether to tender their shares.

> FN1. Rule 65 provides:
> (a) Preliminary Injunction.
> (1) Notice. No preliminary injunction shall be issued without notice to the adverse party.
> (2) Consolidation of Hearing With Trial on Merits. Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing

of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.
(b) Temporary Restraining Order; Notice; Hearing; Duration. A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order. On 2 days' notice to the party who

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)
(Cite as: 2005 WL 2050280 (E.D.La.))

obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

(c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

FN2. The defendant corporate officers/directors of U.S. Unwired are: Robert W. Piper, president of U.S. Unwired since 1995, and chief executive officer (CEO) since 2000; William L. Henning, Jr., chairman of the board of directors of U.S. Unwired; Jerry E. Vaughn, chief financial officer (CFO) of U.S. Unwired; Lawrence C. Tucker, a director of U.S. Unwired; Thomas G. Henning, secretary, general counsel, and a director of U.S. Unwired; Henry P. Hebert, Jr., a director of U.S. Unwired; Harley Ruppert, a director of U.S. Unwired; Thomas J. Sullivan, a director of U.S. Unwired; Christopher J. Stadler, a director of U.S. Unwired; Charles T. Cannada, a director of U.S. Unwired; Andrew C. Cowen, a director of U.S. Unwired; William L. Henning, a director of U.S. Unwired; John A. Henning, a director of U.S. Unwired. Rec. Doc. No. 1 (Civ.A.04-2436), ¶¶ 11-23.

In his temporary restraining order motion, plaintiff specifically contends that U.S. Unwired's directors and officers failed to disclose: 1) the basis for the zero valuation of the U.S. Unwired-Sprint litigation settlements; 2) the impact of the merger on plaintiff's pending derivative lawsuit and the resulting "interestedness of the U.S. Unwired Director's in the merger;" and 3) information concerning U.S. Unwired's financial projections and analyses relied upon by Evercore

Group, Inc. ("Evercore") in connection with its fairness opinion. [FN3] Through subsequent additional disclosures made by U.S. Unwired to the Securities and Exchange Commission ("SEC"), plaintiff concedes that only the third issue remains. [FN4]

FN3. Plaintiff also claims that U.S. Unwired's directors unlawfully agreed to "no-soliciation" and termination fee provisions and had a conflict of interest based on insurance and indemnification provisions in the merger agreement. Plaintiff does not raise these claims with respect to his temporary restraining order motion or his supplemental memorandum, and the Court construes plaintiff's failure to address these claims as a concession that such claims are inappropriate for injunctive relief.

FN4. Rec. Doc. No. 43, plaintiff's supplemental memorandum. See also id., at exhibits B and D. While defendant's additional disclosures appear to resolve plaintiff's complaints regarding the U.S. Unwired-Sprint litigation settlements and the impact of the merger on the pending derivative lawsuit, plaintiff maintains that a temporary restraining order should issue to allow the tender process to be restarted, allowing shareholders who have already tendered their shares to vote again in a fully informed manner. Id. at 2, 5-6.

*Background*

Feyler's motion for a temporary restraining order arises out of his shareholder derivative action based on, *inter alia,* the settlement of two lawsuits between Sprint and U.S. Unwired. [FN5] US Unwired, a Louisiana corporation with its principle place of business in Lake Charles, Louisiana, is a Sprint PCS affiliate. Between March, 2005, and July 10, 2005, defendants negotiated the sale of U.S. Unwired to Sprint. US Unwired retained Evercore as its financial advisor and Evercore provided a fairness opinion to U.S. Unwired's board.

FN5. Feyler's shareholder derivative lawsuit followed and was subsequently consolidated with the shareholder class action filed by Clodile Romero. Feyler's action contains many of the same allega-

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)
**(Cite as: 2005 WL 2050280 (E.D.La.))**

tions found in the Romero action. *See* Rec. Doc. Nos. 1, 23, and 28 (Civ.A.04- 2312); Rec. Doc. No. 1 (Civ.A.04-2436). The underlying lawsuits between Sprint and U.S. Unwired were filed in the United States District Court for the Western District of Louisiana.

On July 15, 2005, Sprint commenced its tender offer to acquire all of U.S. Unwired's outstanding shares for $6.25 per share, which offer is set to expire at midnight on August 11, 2005. The tender offer document was filed with the SEC and set forth the terms of Sprint's offer to purchase, the conditions for acceptance and payment for the shares, the shareholders' right to withdraw their tender "at any time prior to the applicable scheduled expiration date," and a discussion of the shareholders' right to dissent and demand the fair cash value of their shares through a statutory appraisal process pursuant to Louisiana law. [FN6] Also on July 15, 2005, U.S. Unwired filed its recommendation statement on Schedule 14D-9, which included the fairness opinion provided by Evercore in connection with Sprint's proposed tender offer. [FN7]

> FN6. Rec. Doc. No. 44. *See id.,* exhibit 3.

> FN7. Rec. Doc. No. 44, exhibit 2.

Apparently, in response to plaintiff's motion, on August 1, 2005, U.S. Unwired issued an amendment to the 14D-9, which expanded upon certain disclosures, i.e. the basis for a zero valuation of the Sprint litigation. [FN8] On August 4, 2005, U.S. Unwired filed a second amendment to its 14D-9. [FN9] The second amendment disclosed information related to the value of the U.S. Unwired-Sprint litigation and the possibility, under Delaware law, of Feyler's derivative claims being dismissed upon completion of the merger.

> FN8. Rec. Doc. No. 44, exhibit 4.

> FN9. Rec. Doc. No. 44, exhibit 5.

*Law and Analysis*

**\*2** Before any temporary restraining order issued, defendants received notice of plaintiff's motion. The Court held an adversary hearing on August 10, 2005. In a situation such as this where notice and a hearing have occurred, the Court fol-

lows the same procedure as it would for a preliminary injunction motion. *See Kansas Hosp. Ass'n v. Whiteman,* 835 F.Supp. 1548, 1551 (D.Kan.1993) (citing 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2951 (1973)); *see also Fourco Glass Co. v. Zuckerberg,* 470 F.Supp. 273, 275 (E.D.Tenn.1978).

In order to obtain either a preliminary injunction or a temporary restraining order, the movant bears the burden of proving four substantive requirements. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423, 441, 94 S.Ct. 1113, 1125, 39 L.Ed.2d 435 (1974) (party seeking injunction bears burden of demonstrating factors justifying injunction).

> The four prerequisites to the issuance of a preliminary injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest.

*In re Zale Corp.,* 62 F.3d 746, 765 (5th Cir.1995); *see Enterprise Int'l, Inc. v. Corp. Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 471 (5th Cir.1985); *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). "In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Callaway,* 489 F.2d at 573.

The parties agree that Louisiana law governs plaintiff's claims; however, the parties have also recognized that the Court may need to look to Delaware law. *See* Rec. Doc. No. 45; *see also Armand v. McCall,* 570 So.2d 158, 160 (La.App. 3d Cir.1990) (stating "[t]he state of Delaware is recognized as a leader in the field of corporation law."); *see e.g., A. Copeland Enters., Inc. v. Guste,* Civ. A. No. 88-4706, 1988 WL 129313, at \*4 (E.D.La. Nov.28, 1988) (applying Delaware law and the law of other states in deciding a preliminary injunction motion regarding a merger

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)
(Cite as: 2005 WL 2050280 (E.D.La.))

between a Louisiana corporation and a Texas corporation).

A. Financial Disclosures

Plaintiff's main claim is that defendants breached their fiduciary duties by failing to disclose financial projections (and other unidentified information) considered by Evercore in its fairness opinion. In order to claim a violation of the duty of disclosure, plaintiff must allege facts missing from the disclosure statement, identify those facts, state why they are required or otherwise material, and allege how the omission caused injury. See *Malpiede v. Townson*, 780 A.2d 1075, 1086-87 (Del.2001) (recognizing that the fiduciary duty of disclosure is not an independent duty and that it arises from the general fiduciary duties of care and loyalty). With respect to disclosures vis-a-vis a corporate merger, materiality denotes that, "[t]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id. at 1086* (citing *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del.1994)).

*3 In its tender offer, Sprint provided four years of financial projections (2005-2008) it had received from U.S. Unwired which projected U.S. Unwired's future business and operating performance were it to remain independent. [FN10] Plaintiff does not assert that those projections are different than those relied upon by Evercore. Instead, plaintiff suggests that defendants' failure to disclose all of the projections provided to Evercore, namely the projections for the years 2009-2014, materially affected the shareholders' ability to make a fully informed decision.

FN10. Rec. Doc. No. 44, exhibit 3, at 15-16.

Plaintiff argues that the Delaware Chancery Court's decision in *In re Pure Resources, Inc., Shareholders Litigation* (hereinafter, "*Pure Resources*"), 808 A.2d 421, 452-53 (Del.Ch.2002), unequivocally provides this Court a basis to grant plaintiff's motion. In *Pure Resources*, the court granted plaintiff's preliminary injunction motion based upon the fact that the corporate defendants had failed to disclose to the shareholders certain material information underlying the corporation's investment bankers' fairness opinion.

*Id.* at 448-50. Plaintiff submits that in granting the injunction, the *Pure Resources* court rejected the holdings of two earlier Delaware court decisions that had found such a failure to be immaterial. *Id.* at 449 (discussing *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170 (Del.2000), and *Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280 (Del.Ch.1998)). However, the *Pure Resources* court's holding was not so expansive; rather, it held that a tender offer made by a controlling shareholder, e.g. a shareholder holding a majority of the voting power of the corporation, for minority-held shares requires that the subject company provide a "fair summary of the substantive work performed by the investment bankers." [FN11] *Id.*

> FN11. The court found the basic valuation of the investment bankers' fairness opinion material because, *inter alia*, the tender offer was made by a Pure Resources' majority shareholder who had "large informational advantages." *Id.* The court continued to explain why it found the information material:
>
> When controlling stockholders make tender offers, they have large information advantages that can only be imperfectly overcome by the special committee process, which almost invariably involves directors who are not involved in the day-to-day management of the subsidiary. The retention of financial advisors by special committees is designed to offset some of this asymmetry, and it would seem to be in full keeping with that goal for the minority stockholders to be given a summary of the core analyses of these advisors in circumstances in which the stockholders must protect themselves in the voting or tender process....
> *Id.* at 450.

As defendants cogently detail, *Pure Resources* involved a situation quite different from the one before this Court. *Pure Resources* involved a controlling shareholder's tender for minority shares, which is similar to a "going private" transaction. [FN12] The case before this Court involves a third party tender offer: Sprint's tender offer for U.S. Unwired does not implicate the same concerns that the *Pure Resources* court faced, i.e. protecting minority shareholders, as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)
(Cite as: 2005 WL 2050280 (E.D.La.))

Page 5

this case does not involve a transaction initiated by a controlling shareholder who may be privy to information that others are not. This Court finds *Pure Resources* inapposite and concludes that on the reasoning of *Pure Resources* alone, plaintiff has not maintained his burden. [FN13] *See Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1173- 74 (Del.2000); *In Re Dataproducts Corp. Shareholders Litigation,* Civ. A. No. 11164, 1991 WL 165301, *8 (Del. Ch. Aug 22, 1991).*

FN12. "In going-private transactions, a controlling stockholder typically acquires the shares of the minority stockholders in a public company in exchange for cash, debt or stock, resulting in the delisting of the company." Michael J. McGuinness & Timo Rehbock, *Going-Private Transactions: A Practitioner's Guide,* 30 DEL. J. CORP. L. (2005).

FN13. The only other authority provided to the Court in support of plaintiff's nondisclosure claim is *Alinda v. Internet.com Corp.,* Civ. A. No. 17235-NC, 2002 Del. Ch. LEXIS 156 (Del. Ch. Nov. 6, 2002). Without discussion or analysis of the case, plaintiff asserts that *Alinda* supports a finding that information omitted is material and must be provided to the shareholders. However, in *Alinda,* the court merely found that the plaintiff's allegations were sufficient to survive a motion to dismiss. *Id.* at *37. No other authority to support his claim has been cited.

Furthermore, Sprint's tender offer explains the basis for disclosing some, rather than all, of the financial projections generated by U.S. Unwired and provided to Sprint and Evercore:

*4 [US Unwired] does not, in the ordinary course, make public any specific forecasts or projections as to its future financial performance and these projections were not prepared with a view to public disclosure. They [2005- 2008] are included in this Offer to Purchase only because they were provided to Sprint and the Offeror [UK Acquisition Corp., a wholly owned subsidiary of Sprint Corp.] in connection with Sprint's due diligence. Later years have not been included due to the inherent unreliability of longer term projections. Such later year projections also diverge

substantially from available investment banking analyst estimates.
Rec. Doc. No. 45, exhibit 3 (Tender Offer Statement), p. 15. Plaintiff has made no showing that U.S. Unwired's projections for the years 2009-2014 are material. While plaintiff asserts generally that such information would be helpful to the shareholders so that they could do their own valuation based on U.S. Unwired's projections for these years, information which is helpful is not necessarily *material,* i.e. substantially likely that it would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. As Sprint's tender offer statement makes clear, U.S. Unwired does not typically disclose such information, and Sprint struck a balance by disclosing the projections for 2005-2008, and omitting the information it found to be highly speculative and/or unreliable.

Based on the arguments of the parties made at oral argument and in their memoranda, the Court is not persuaded that plaintiff has shown a substantial likelihood of success with respect to his claim that the failure to disclose U.S. Unwired's financial projections for 2009-2014 was a material breach of defendants' fiduciary duties.

B. Re-issuance or Extension of the Tender Offer and/or Filing a Press Release

Plaintiff also claims that a temporary restraining order is necessary to allow the shareholders to vote again, fully informed. Alternatively, plaintiff requests that the Court order defendants to file a press release, detailing 1) the existence of the two amendments; 2) the projections allegedly used by Evercore for the years 2009-2014; and 3) reiterating the shareholders' right to withdraw the tendering of their shares. [FN14] Plaintiff seeks a twenty-four (24) hour extension of the tender offer in order to allow the shareholders time to digest the contents of the requested press release.

FN14. Plaintiff asserted his request that defendants file a press release for the first time at oral argument.

In support of the proposition that the tender offer should be extended or again disseminated, plaintiff cites *Piper v.*

Not Reported in F.Supp.2d                                                Page 6
Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)
(Cite as: 2005 WL 2050280 (E.D.La.))

*Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). At oral argument and in its supplemental memorandum, plaintiff suggests that the district court in *Piper* ordered that the Bangor Corporation offer rescission to the tendering shareholders. However, *Piper* involved, among other issues, the United State Supreme Court's interpretation of the Securities Exchange Act of 1934. In *Piper,* the respondent, Chris-Craft Industries, an unsuccessful tender offeror in a takeover contest, contended that its failure to procure voting control of Piper Aircraft through cash and exchange tender offers was caused by the appellants' violations of section 14(e) of the Securities and Exchange Act of 1934 and Rule 10b-6 of the Securities and Exchange Commission. Chris-Craft sought damages and injunctive relief against the management of the target corporation, its investment advisor, and the successful tender offeror. The U.S. Supreme Court held that, because tender offerors are not within the class of investors intended to be protected by section 14(e), they have no standing to sue for damages pursuant to that section. The only portion of the *Piper* Court's decision which is arguably relevant is the Court's rendition of the background facts, where the Court noted that the district court, apparently on the SEC's motion, required the corporation to offer rescission to tendering shareholders. 430 U.S. at 12, 97 S.Ct. 934-35. The *Piper* Court's recitation of the procedural history offers no credence to plaintiff's argument. Therefore, the Court finds that the Supreme Court's decision in *Piper* provides no support for plaintiff's request that the tender offer be extended or re-run.

*5 Defendants recognize, however, that pursuant to SEC regulations, they would be required to re-disseminate the amendments to the shareholders if the omitted information is material. *See* 17 C.F.R. §§ 240.14d-4; 240.14d-9; 240.14e-2. As stated, in order for the omissions complained of to be material, "there must be a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the *reasonable investor* as having *significantly* altered the 'total mix' of information made available." *Kapps v. Torch Offshore Inc.,* 379 F.3d 207, 214 (5th Cir.2004) (emphasis in original) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Such an inquiry looks to "whether 'the information allegedly omitted

or misrepresented in the prospectus was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in the prospectus as a whole." *Id.* (quoting *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435 (5th Cir.1993)).

Plaintiff makes no showing that any omission was material such that he is entitled to a temporary restraining order so that the shareholders can decide (or decide again) whether to tender their shares based on the financial projections for 2009-2014 or any other alleged non-disclosure. Furthermore, any shareholder who has tendered his or her shares has not done so irrevocably. Both Sprint's tender offer and U.S. Unwired's 14D-9 statement make clear that the shareholders who have tendered their shares have the right to revoke until midnight on August 11, 2005.

Even assuming that plaintiff had shown a modicum of materiality and thereby established some likelihood that he would prevail on the merits, plaintiff has made no showing that his threatened injury outweighs the threatened harm an injunction may cause U.S. Unwired and its shareholders. *See Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 471 (5th Cir.1985). Should the Court enjoin the merger, the tendering shareholders would be deprived of the timely distribution of cash and an injunction could compromise Sprint's $1.3 billion tender offer. [FN15] Plaintiff suggests that the balance of the equities weighs heavily in his favor because if the defendants are allowed to complete the proposed acquisition, they will have avoided their duties owed to plaintiff, U.S. Unwired, and its shareholders. Given this Court's finding that plaintiff's likelihood of success is minimal, the balance tips in favor of denying the temporary restraining order. *See Canal Auth.,* 489 F.2d at 576-77 (applying sliding scale approach to the factors for a preliminary injunction).

    FN15. Rec. Doc. No. 45, pp. 20-21.

Finally, with respect to plaintiff's request that the Court order defendants to file a press release and enjoin the tender offer for 24 hours, much of the information which plaintiff would like to see included in a press release has already been disclosed to the public by way of Sprint's original tender offer, the subsequent amendments to the 14D-9, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)
**(Cite as: 2005 WL 2050280 (E.D.La.))**

through the SEC and its website. [FN16]

> FN16. Sprint's tender offer statement informed the
> shareholders of their right to withdraw their tender
> before the expiration date, the 14D-9 amendments
> are publicly available through the SEC, and the ex-
> istence of the financial projections is at least intim-
> ated in Sprint's tender offer statement.

*6 Based on the record before the Court and for the above
and foregoing reasons, IT IS ORDERED that plaintiff's mo-
tion for a temporary restraining order is DENIED.

IT IS FURTHER ORDERED that plaintiff's motion for ex-
pedited discovery and to set a preliminary injunction brief-
ing schedule is DENIED.

Not Reported in F.Supp.2d, 2005 WL 2050280 (E.D.La.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 478957 (Del.Ch.)
**(Cite as: 1995 WL 478957 (Del.Ch.))**

Page 1

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BE-
FORE CITING.

Court of Chancery of Delaware, New Castle County.
Diane ABBEY and Pauline Bernstein and Richard Bern-
stein, Trustees Under Deed of
Trust of Barney Bernstein, Dated May 21, 1990, individu-
ally and on behalf of
all others similarly situated, Plaintiffs,
v.
E.W. SCRIPPS CO., Defendant.
Civ. A. No. 13397.

Submitted: May 9, 1995.
Decided: Aug. 9, 1995.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & God-
dess, P.A., Wilmington,; of counsel: Joshua N. Rubin, of
Abbey & Ellis, New York City, Todd S. Collins, and Ivonia
K. Slade, of Berger & Montague, P.C., Philadelphia, PA,
Richard S Wayne, of Strauss & Troy, Cincinnati, OH; for
plaintiffs.

Alan J. Stone, of Morris, Nichols, Arsht & Tunnell, Wilm-
ington,; of counsel: Norman S. Jeavons, and Daniel P. Mas-
caro, of Baker & Hostetler, Cleveland, OH; for defendants.

MEMORANDUM OPINION
ALLEN, Chancellor.

*1 Pending is a motion to dismiss a class action brought by
persons who had been minority shareholders of Scripps
Howard Broadcasting Company ("SHB"), an Ohio corpora-
tion, prior to its stock-for-stock merger into defendant, E.W.
Scripps Company ("Scripps"), a Delaware corporation that
had owned 86% of SHB prior to the merger. Plaintiffs filed
this action alleging that the merger represented a breach by
Scripps of the fiduciary duty that, as controlling sharehold-
er, it owed under Ohio law. Plaintiffs contend that the tim-
ing of the offer, among other alleged manipulations, de-
prived plaintiffs of the true value of their SHB holdings.
Plaintiffs' Second Amended Complaint also alleges that a
number of material facts were omitted from the proxy state-

ment distributed to SHB stockholders in connection with the
stockholder vote approving the merger. Plaintiffs contend
that had defendant disclosed these facts, plaintiffs would
have been aware that the exchange ratio offered for the
minority shares was grossly inadequate, and therefore,
would have sought appraisal.

Scripps has moved to dismiss the complaint as failing to
state a claim upon which relief may be granted. It contends
that Ohio law, which the parties agree controls this suit,
does not recognize claims of fiduciary breach that essen-
tially challenge the amount paid for shares of stock in a
merger, such as that the "[e]xchange [r]atio grossly under-
values" SHB. See Second Amended Class Action Complaint
¶ 12, 13. According to defendant, Ohio law permits dissent-
ing shareholders a judicial appraisal as the exclusive remedy
through which to attain the full and fair value of their stock.
Defendant contends that even if Ohio law did recog-
nize disclosure claims, defendant did make full disclosure of
material facts pertaining to the merger in its proxy statement
and that omissions cited by plaintiffs are not material. De-
fendant, therefore, argues that plaintiff has failed to state a
claim upon which relief may be granted.

* * *

For the reasons set forth below, I conclude, that under Ohio
law, plaintiffs' exclusive remedy for the facts alleged, if any,
is through an appraisal of the fair value of their shares,
which action must be brought in the courts of the State of
Ohio. Therefore, the pending motion will be granted.

I. FACTS
The facts set forth below are those alleged in the complaint,
and are taken as true for purposes of this motion.

SHB operated television, cable, and radio stations. Its con-
trolling shareholder, Scripps, is a diversified media com-
pany owning television, radio, newspapers, wire services,
and cable operations. As of October 15, 1993, Scripps
owned 86% of the approximately 10.3 million shares of
SHB outstanding stock. In turn, Scripps officers and direct-
ors owned approximately 79% (or 59 million of 74.6 million
outstanding shares) of Scripps.

On February 17, 1994, Scripps announced that it had exten-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

ded an offer to SHB to acquire each of the SHB shares that Scripps did not own in exchange for three Scripps' Class A shares. The market price of a share of Scripps immediately prior to the announcement was $28 per share, or $84 for three shares. On the same day, the SHB board of directors appointed a special committee to review the fairness of the proposed merger and to report its conclusion to the full SHB board. The Special Committee hired legal counsel and Lehman Brothers, Inc. ("Lehman Brothers") to act as its financial advisor. [FN1] It negotiated with Scripps. After receiving an opinion from Lehman Brothers that the consideration offered by Scripps (3.45 Scripps A shares for each SHB share) was fair to the SHB shareholders, the Special Committee recommended approval of the merger to the full SHB board. On May 4, 1994, the board unanimously approved the merger, and Scripps and SHB announced that their respective boards had approved the merger at an exchange ratio of one SHB share for 3.45 Scripps Class A shares, subject only to shareholder approval. [FN2] As of the date of the announcement, the value that this exchange ratio assigned to SHB was $953.33 million.

> FN1. Artfully, plaintiff does not allege any facts concerning the existence of the Special Committee. Attached to the affidavit of Alan J. Stone, an attorney for defendant, however, defendant has submitted a copy of the proxy statement distributed to the SHB shareholders that describes the Special Committee's role and actions. Facts concerning the actions of the Special Committee and the SHB board are taken from the proxy statement. In deciding a motion to dismiss under Rule 12(b)(6), the court may judiciously rely on proxy statements not to resolve disputed facts but at least to establish what was disclosed to shareholders. See *Kramer v. Time Warner, Inc.,* 937 F.2d 767 (2d Cir.1991); *Southmark Prime Plus, L.P. v. Falzone,* 776 F.Supp. 888, 892-93 (D.Del.1991); *Gardner v. Federated Dep't Stores, Inc.,* 717 F.Supp. 136, 142 n. 6 (S.D.N.Y.1989), *rev'd in part on other grounds,* 907 F.2d 1348 (2d Cir.1990).

> FN2. Plaintiff alleges that the increase from three Scripps shares to 3.45 shares per SHB share was

not the result of impassioned negotiations by the SHB's Special Committee, but rather that it merely reflected an adjustment for the fact that the market price of Scripps stock had declined between the time of the initial offer and the board agreement.

**\*2** Following the announcement, there were some changes in the television industry (the affiliations of certain stations with particular networks changed) that potentially could have impacted the value of SHB and/or Scripps. In light of this potential, after Lehman Brothers confirmed that the exchange ratio remained fair, the Special Committee voted unanimously to reaffirm its recommendation of the merger and the SHB board unanimously voted to call a Special Meeting of stockholders to vote on the merger.

Scripps and SHB filed a proxy statement with the SEC and distributed it to the SHB stockholders in anticipation of the vote on the merger at the September 14, 1994 stockholders' meeting. That meeting was held and a majority of the outstanding shares voted their proxies approving the merger.

The proxy statement contained a detailed account of the events leading up to the stockholder meeting and a description of the Lehman Brothers' fairness opinion, including a summary of the financial and comparative analyses that Lehman Brothers undertook before rendering its opinion of the merger consideration. Plaintiffs, though, allege that the proxy statement omitted material information about the Lehman Brothers' studies and conclusions.

* * *

This action on behalf of a class of SHB's public shareholders was filed on March 2, 1994. No preliminary injunction against the consummation of the merger was sought. On March 24, 1994, Scripps moved to dismiss the complaint. On June 16, 1994, plaintiff amended the complaint and in August of 1994 Scripps sought to dismiss the Amended Complaint. On December 5, 1994, defendant agreed to permit plaintiff to amend her complaint for a second time, at which time the disclosure claims were added, and finally on January 9, 1995, defendant moved to dismiss the Second Amended Complaint.

II. OHIO LAW

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                          Page 3
Not Reported in A.2d, 1995 WL 478957 (Del.Ch.)
**(Cite as: 1995 WL 478957 (Del.Ch.))**

Ohio law governs the outcome of this action. SHB was incorporated under the laws of Ohio and the internal affairs doctrine has long recognized that the law of the state of incorporation regulates matters involving internal corporate affairs. *See CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69 (1987); *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 621 (1983); *McDermott, Inc. v. Lewis,* Del.Supr., 531 A.2d 206, 217 (1987). A shareholder's right to an appraisal of her stock is unquestionably a matter of internal corporate affairs; the procedural requirements to qualify for judicial appraisal and the method of valuation are dictated by the statutory provisions and common law of the state of incorporation.

As defendant argues, Ohio law is quite explicit that appraisal is the sole remedy available to a dissenting stockholder seeking the full and fair price for her stock following a merger. Ohio Revised Code Section 1 701.85 establishes the procedures for determining the amount to be paid to dissenting shareholders. The Ohio Supreme Court has concluded that R.C. § 1701.85 permits valuation of shares to be based solely on a "willing seller-willing buyer" test (in an actively traded stock, this would amount to the market price, adjusted to eliminate any increase or decrease in the price caused by announcement of the merger transaction itself); other valuation methods, such as net asset value, discounted cash flow, and comparables, are disallowed by the statute. *Armstrong v. Marathon Oil Co.,* 513 N.E.2d 776, 784-790 (Ohio 1987). In *Armstrong,* the Ohio Supreme Court also determined that because the willing seller-willing buyer is the only permitted valuation method, additional causes of action, centering upon such theories as:

> *3 breach of fiduciary duties, lack of proper business purpose in cashing out the minority shareholders, gross inadequacy of price, misrepresentations in the proxy statement, failure to consider the "full value" of the shares, and that by breach of these fiduciary duties, the corporation failed to pay the full, fair value of the shares held[,]

may not be brought under Ohio law because the value of a shareholder's stock may only be examined in terms of the willing seller-willing buyer standard to be accomplished within an appraisal action. *Id.* at 798.

All of plaintiffs' claims essentially challenge the adequacy

of the price that Scripps paid in the merger. Many of plaintiffs' claims are in fact specifically listed among those claims that the Ohio Supreme Court concluded were attacks on price, wrapped in the guise of "entire fairness." For example, plaintiffs claim that the price (or exchange ratio) grossly undervalued SHB. They also contend that the timing of the merger, following a buildup of undistributed earnings, was unfair, which is essentially a claim that the price was unfair given the amount of money reinvested in SHB and the future benefits that could result from the reinvestment.

The omissions from the proxy statement that plaintiffs attack also have arguable pertinence insofar as they might suggest that the exchange ratio was unfairly low to the SHB shareholders. Plaintiff alleges that the proxy statement omitted the following material information:

> a) Lehman Brothers' work product (analyses, assumptions, and results);
>
> b) the range of values derived by Lehman Brothers from each valuation methodology;
>
> c) projections used by Lehman Brothers and the assumptions on which those projections were based;
>
> d) any of SHB's "hidden values";
>
> e) the "magnitude of the operating synergies" between Scripps and SHB;
>
> f) fuller description of the changes in television station affiliations and the resulting benefits that SHB may have experienced; and
>
> g) that Lehman Brothers employed a per share value for Scripps' stock in excess of the stocks' market price when opining on the fairness of the exchange ratio.

Most of these claims of failure to disclose material information relate only to information generated by the investment banker as part of its professional work in preparation for reaching and expressing its professional opinion. Such information has an attenuated claim to materiality under the widely employed standard of *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976). While the role and opinion of a banker may usually be claimed material to a shareholder, all of the work and consideration that enter into the ground leading to that opinion will, in my opinion rarely if ever be material. *See In Re Vitalink Communications Corp. Shareholders Litigation,* Del.Ch., C.A. No. 12085, Chandler, V.C. (Nov. 8, 1991). In all events, even assuming, *ar-*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                              Page 4
Not Reported in A.2d, 1995 WL 478957 (Del.Ch.)
**(Cite as: 1995 WL 478957 (Del.Ch.))**

*guendo,* the materiality of these omitted facts, they are in this context (86% shareholder) material only to the question whether a public shareholder wants to accept the merger consideration or elect to dissent and seek judicial appraisal. Cf. *Virginia Bankshares, Inc. v. Sandberg,* 501 US 1083 (1991). That is plaintiffs cannot contend that if all material facts had been fully disclosed, the merger may not have been approved, since Scripps held sufficient shares to approve the merger. The only benefit to plaintiffs arising from fuller disclosure would have been that they might (presumably) have been alerted that they should seek appraisal.

*4 Although the Supreme Court of Ohio did indicate in *Armstrong* that there may be causes of action arising from a merger in addition to an appraisal action, this subset of claims may not *seek compensation for the dissenters' stock:* The Court stated that its holding did not mean that "causes of action which seek compensation other than the value of a dissenter's shares of stock are not maintainable. Provable injury under whatever theory utilized is compensable so long as it does not seek to overturn or modify the fair cash value determined." *Armstrong,* 513 N.E.2d at 798.

The Supreme Court of Ohio did not enumerate permitted claims, but one may speculate that such claims might include claims of fraud where the value of the stock does not fully compensate for the loss. The action before this court, however, does not allege any facts that differentiate it from a common case of a controlling shareholder who forces out the minority at a price that one or more shareholders think is too cheap. Given the clarity of Ohio law, even on a theory that plaintiffs seek principally to be made whole for being misled in failing to seek their appraisal rights, this language of the Ohio Supreme Court precludes relief here. This court cannot provide a quasi-appraisal remedy under Ohio law. There appears to be no such remedy under Ohio law. Ohio law recognizes that dissenters will receive the full and fair value of their shares in an appraisal, and will thus be fully compensated for their forced relinquishment of their stock.

Plaintiffs remedy, if the Proxy Statement was deceptive, and if Ohio law provides a remedy, is a petition to join in the existing appraisal action (if they are not already parties) on the basis that (if it can be alleged consistent with Rule 11) a

failure to comply with the procedure requirements of the appraisal statute was due to the alleged fiduciary breach of disclosure obligation. If such an allegation will not get a shareholder an appraisal remedy in Ohio, then I conclude that Ohio law provides no remedy to plaintiffs. In all events, under *Armstrong* it does not provide an "entire fairness" remedy on these facts. The amended complaint will therefore be dismissed.

Not Reported in A.2d, 1995 WL 478957 (Del.Ch.)

END OF DOCUMENT

**6**

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Ariff ALIDINA, David Swart, Mohamed Alidina, and Marion Jack Rickard,
Plaintiffs,
v.
INTERNET.COM CORPORATION, Alan Meckler, Christopher S. Cardell, Wayne A.
Martino, Walter H. Lippincott, Gilbert F. Bach, Beverly C. Chell, Michael J.
Davies and Charles R. Ellis, Defendants.
No. Civ.A. 17235-NC.

Submitted Oct. 3, 2002.
Decided Nov. 6, 2002.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Sanford P. Dumain, Samuel H. Rudman and Susan M. Greenwood, of Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York, for Plaintiffs, of counsel.

Allen M. Terrell, Jr. and Dominick Gattuso, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Stephen Greiner, Albert M. Myers III and Barbara B. Farley, of Willkie Farr & Gallagher, New York, New York, for Defendants, of counsel.

*MEMORANDUM OPINION*
CHANDLER, J.

**\*1** This class action arises out of a tender offer for shares of a Delaware corporation followed by a merger between it and the acquiring company. Certain shareholders who tendered their stock filed this lawsuit, challenging the two-step transaction. They charge the directors who approved and recommended the transaction with breaches of their fiduciary duties of care, loyalty and candor. Similar to other recent cases in this Court, the challenged transactions involve a chief executive officer/director who negotiated most of the terms of the transaction, including one aspect in which the officer/

director was clearly self-interested. The defendants have moved to dismiss all of the asserted claims, which I deny for the reasons set forth below.

## I. INTRODUCTION

In late 1998, Penton Media, Inc. ("Penton") purchased Mecklermedia Corporation ("Mecklermedia" or the "Company"). This two-step transaction ("Transaction") was accomplished by way of a tender offer followed by a merger, pursuant to an Agreement and Plan of Merger among Mecklermedia, Penton and Internet World Media Inc., dated October 7, 1998.

The plaintiff shareholders of Mecklermedia brought this class action challenging the fairness of the Transaction, alleging that the individual board members breached their fiduciary duties. They allege that these breaches resulted in merger consideration that was "grossly unfair," largely due to the concurrent sale of an 80.1% interest in Internet.com (the "iWorld transaction"), Mecklermedia's wholly owned subsidiary, at an allegedly unfair price to Alan Meckler ("Meckler"), who was a 26% shareholder, board member, and the CEO of Mecklermedia. Plaintiffs allege that Meckler demanded this sale in exchange for his approval of the Transaction and that this sale diverted funds from the Company to Meckler. Because of this, plaintiffs contend that the board members could not have approved and recommended the Transaction and iWorld transaction (collectively, the "Transactions") in good faith. Last, plaintiffs allege that the board members were grossly negligent in the negotiation and approval of the Transactions and in failing to disclose all material facts to the shareholders. In short, plaintiffs' complaint alleges breaches of the directors' fiduciary duties of loyalty, care, and disclosure.

## II. STATEMENT OF FACTS

Mecklermedia was an internet media company providing internet information to industry professionals via trade shows, conferences and print publications. Internet.com was its wholly owned subsidiary that disseminated internet information electronically through a network of web sites.

Penton, the acquiror, is also a company that specializes in internet industry trade shows and print publications and maintains web sites for the purpose of advertising these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                  Page 2
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

trade shows and print publications. The Transactions combining Penton and Mecklermedia came about after Mecklermedia had explored business combinations with at least three other suitors throughout 1998.

**\*2** Mecklermedia began exploring potential business combinations in early 1998 with the assistance of its investment banker, Allen & Company ("Allen & Co."). Mecklermedia first discussed a potential combination with Advanstar Holdings, Inc. ("Advanstar"). In June, after approximately three months of negotiations, Advanstar proposed a transaction in which it would conduct a cash tender offer for all Mecklermedia stock and then sell the publishing and internet assets to a newly-formed entity that would be majority-owned by Meckler. Allen & Co. consulted Deloitte & Touche LLP ("D & T") regarding the tax consequences of the various acquisition scenarios proposed. D & T provided this tax information and at the same time valued Internet.com at $50 million. Negotiations with Advanstar did not result in a letter of intent.

Mecklermedia concurrently explored a potential transaction with Miller Freeman, the United States division of United News & Media ("United News"). Shortly after Miller Freeman's overtures, United News approached Meckler to propose its potential acquisition of Mecklermedia. United News eventually offered to purchase all Mecklermedia shares for $270 million. [FN1] The last offer United News delivered to Mecklermedia included an agreement for Meckler to purchase a 50% interest in Internet.com for $17.5 million.

> FN1. Plaintiffs provide different figures representing United News' offer to Mecklermedia without accounting for the discrepancy in the figures. Although more than one offer was received, it is difficult to determine from the pleadings the value of the highest offer. The $270 million offer is the only offer that refers to a purchase of all Mecklermedia shares, and is the offer that plaintiffs contend should have been disclosed to the shareholders. Thus, this is the figure I employ throughout the opinion.

After negotiations failed with each prior suitor, Mecklermedia found its match. On September 21, 1998, Thomas L. Kemp, Penton's Chairman and CEO, contacted Meckler regarding Penton's acquisition of Mecklermedia. During this conversation, plaintiffs contend that Meckler emphasized the importance of the iWorld transaction and insinuated that prior negotiations had fallen through because the terms of this side deal had not been favorable.

Penton then presented a draft letter of intent to Meckler on September 24, 1998, offering to purchase Mecklermedia. For unexplained reasons, this initial draft letter did not include the iWorld transaction. The next day, the two parties executed a letter of intent that provided for Penton to acquire the Company for $29 per share (or $274 million for all shares). This new letter additionally agreed to sell a 50% interest in Internet.com to Meckler for $15 million. Continuing negotiations resulted in an increase in Meckler's share of Internet.com at a lower price per share (from 50% at $15 million to 80.1% at $18 million) while there was no increase in the per share purchase price of Mecklermedia.

As a result, the parties agreed to value Internet.com at $22.5 million in the sale, as compared to the earlier value of $30 million. The lower value allegedly was a function of the amount Meckler was willing to pay for his equity interest (80.1% at $18 million = 100% at $22.5 million). According to the tender offer materials, this amount was significantly higher than Internet.com's value based upon its historical accounting, and represented six times the company's revenue and three times its tangible assets.

**\*3** The Transactions were subjected to various evaluations by advisors to both Mecklermedia and Penton. Mecklermedia's investment bankers, Allen & Co., determined that the merger consideration in the Transactions as structured was fair to the shareholders of Mecklermedia from a financial point of view. Penton and Penton's advisor, Donaldson, Lufkin & Jenrette ("DLJ"), analyzed the purchase price and concluded it was a fair price for Mecklermedia's trade show and publishing assets alone, excluding Internet.com. [FN2] Plaintiffs emphasize that Penton was earlier cautioned by PriceWaterhouseCoopers LLC ("PwC") to further analyze Meckler's purchase of Internet.com from an economic and legal standpoint to determine whether the transaction treated Mecklermedia's shareholders equally and whether Inter-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 3
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

net.com was being sold at a fair price. There is no allegation in the complaint as to whether such further analysis was ever undertaken by either Penton or Mecklermedia. Plaintiffs also stress that the Mecklermedia board specifically considered forming, and declined to form, a special committee to review the Transactions.

> FN2. DLJ gave Penton an oral opinion regarding the $30 million valuation of Internet.com. Plaintiffs fail to disclose the result of this verbal report, although it carries little relevance since the final valuation of Internet.com agreed upon was $22.5 million, not $30 million. Regardless, plaintiffs do not assert that DLJ orally opined that a $30 million valuation was unfair.

After three meetings of the Mecklermedia board, one of which included a presentation to the board by Allen & Co., the board unanimously approved the Transactions on October 7, 1998. At the same time, Meckler signed a Tender, Voting and Option Agreement, which obligated him to tender his Mecklermedia shares to Penton. The next day, Penton issued a press release announcing the tender offer. Penton then filed a Schedule 14D-1 (the "14D-1") with the SEC on October 15, which formally commenced the tender offer. Attached as exhibits to the 14-D-1 were the Offer to Purchase, the Merger Agreement, the Tender, Voting and Option Agreement, as well as a Services Agreement.

The same day Penton filed its 14D-1, Mecklermedia filed its Schedule 14D-9 Solicitation/Recommendation Statement (the "14D-9") with the SEC. This statement announced that Mecklermedia's board had unanimously approved the tender offer and Merger Agreement, had determined that the Transactions were fair, and recommended that the shareholders accept the offer to tender their shares. This 14D-9 attached the fairness opinion of Allen & Co. Mecklermedia filed an amended Schedule 14D-9 (the "Amended 14D-9") on Nov. 12, 1998, to provide more information regarding the iWorld transaction, which extended the tender offer period and included Meckler's opinion that the iWorld transaction (and his purchase of 80.1% of Internet.com at $18 million) was fair to the shareholders of Mecklermedia.

On November 24, 1998, the tender offer ended and 97.9%

of the shares were tendered and not withdrawn. The Transaction and iWorld transaction were completed, and Internet.com was spun-off and renamed internet.com ("New internet.com").

Five months later, New internet.com announced its intent to go public. On June 25, 1999, New internet.com completed its initial public offering and sold 3,400,000 shares of common stock at $14 per share. This action was filed that same month and was amended on November 7, 2000, and again on November 9, 2001. Defendants have now moved to dismiss the entire complaint on the basis that it fails to state a claim.

### III. ANALYSIS

*4 Defendants' motion to dismiss is based upon two main theories: 1) the board did not breach any fiduciary duties; and 2) in any event, plaintiffs acquiesced in any alleged misconduct by tendering their shares. Plaintiffs counter these theories by reaffirming allegations that the board breached its fiduciary duties of loyalty, care, and disclosure, and that they could not have acquiesced by tendering their shares because they were not fully informed.

*A. Standard of Review on a Motion to Dismiss*

Defendants have moved to dismiss plaintiffs' complaint pursuant to Court of Chancery Rule 12(b)(6), asserting that the complaint fails to state a claim upon which relief can be granted. In deciding a motion to dismiss, a trial court must assume the truth of all well-pled, non-conclusory allegations in the complaint. [FN3] The court must additionally extend the benefit of all reasonable inferences that can be drawn from those allegations to the non-moving party, the plaintiffs here. [FN4] The court may, however, exclude allegations that are conclusory and lack factual support. [FN5] Thus, a court will dismiss the claim only when the plaintiffs fail to plead facts supporting an element of the claim, or when the facts pled could not support a claim for relief under any reasonable interpretation of those facts. [FN6] Defendants also move to dismiss New internet.com as a defendant.

> FN3. *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 140 (Del.1997).

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
**(Cite as: 2002 WL 31584292 (Del.Ch.))**

FN4. *Id.*

FN5. *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 353 (Del. Ch.1998).

FN6. *Del. State Troopers Lodge v. O'Rourke,* 403 A.2d 1109, 1110 (Del. Ch.1979).

*B. Did the Board Breach Its Fiduciary Duties?*

The plaintiffs allege that the Mecklermedia Board breached its fiduciary duties of loyalty, care, and disclosure in considering, approving and recommending the Transaction and the iWorld transaction.

*1. Duty of Loyalty*

Defendants argue that the plaintiffs' duty of loyalty claim should be dismissed for two reasons. First, defendants stress that plaintiffs failed to allege facts sufficient to indicate that the Mecklermedia board was self-interested or lacked independence. Second, defendants assert that plaintiffs failed to allege facts sufficient to indicate that the board acted in bad faith or had no rational basis for its decision to approve or recommend the transaction.

Plaintiffs have effectively conceded that the board was not *apparently* self-interested or lacking independence. [FN7] They counter, however, by alleging that this independent, disinterested board nevertheless must have acted in bad faith because it approved a transaction that was so far beyond the bounds of reasonable judgment that it was inexplicable on any other ground.

FN7. "Defendants' arguments concerning whether the directors were interested in the transaction or lacked independence are beside the point." (Pls.' Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. at 24 n. 4.)

Although the business judgment rule normally prevents a court from reviewing the decisions of an independent, disinterested board that are made in good faith and in the exercise of due care, there is one narrow "escape hatch." [FN8] The business judgment rule may be rebutted "in those *rare* cases where the decision under attack is 'so far beyond the

bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." ' [FN9] The decision must be "egregious," lack "any rational business purpose," constitute a "gross abuse of discretion," or be so thoroughly defective that it carries a "badge of fraud." [FN10]

FN8. *In re J.P. Stevens & Co.,* 542 A.2d 770, 780-81 & n. 5 (Del. Ch.1988) ("This 'escape hatch' language has been variously stated in the Delaware opinions: 'egregious' decisions are said to be beyond the protections of the business judgment rule, as are decisions that cannot 'be attributed to any rational business purpose', or decisions that constitute 'a gross abuse of discretion." ') (internal citations omitted).

FN9. *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1246 (Del.1999) (quoting *In re J.P. Stevens & Co.,* 542 A.2d at 780-81) (emphasis added).

FN10. *In re J.P. Stevens & Co.,* 542 A.2d at 781 n. 5.

**\*5** The Court's responsibility at this stage is to determine whether any reasonable interpretation of the facts in plaintiffs' complaint could support a claim for relief. Thus, plaintiffs must allege sufficient facts that could reasonably lead to an inference that the board's act was so egregious that it must have been the product of disloyalty or bad faith. Here, the complaint alleges facts that, if proven, could support a claim that Meckler and the Mecklermedia board members breached their fiduciary duty of loyalty. [FN11]

FN11. Many of these allegations border upon conclusory statements, yet I am reluctant to summarily dismiss them at this stage, as I must assume the truth of all well-pled facts and give plaintiff the benefit of all reasonable inferences. I would stress, however, that plaintiffs must meet their burdensome task of supporting these allegations (such as the bald assertion that Meckler demanded and received a "bribe") with more specific facts to survive the summary judgment stage. Although I have assumed the truth of most of the facts in plaintiffs'

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

Page 5

complaint, I have disregarded an allegation that Meckler was provided with a vehicle to induce four other affiliates to approve or facilitate the transaction. Even though Meckler had the option to provide four others with a small equity interest in New internet.com, plaintiffs have failed to allege any facts that even remotely indicate that Meckler employed or even considered using this method to facilitate the approval of the transaction.

Similar to the plaintiffs in *Parnes v. Bally Entm't Corp.* [FN12] and *Crescent/Mach I Partners, L.P. v. Turner,* [FN13] the plaintiffs here have alleged that this disinterested, independent board approved of an unfairly negotiated transaction that benefited Meckler at the expense of the other Mecklermedia shareholders. In *Parnes,* the plaintiffs alleged that the company's CEO, Mr. Goldberg, controlled the merger negotiations and extracted substantial cash payments and assets that lacked consideration and were conditioned upon completion of the merger. [FN14] These benefits were offered in exchange for his consent, which he claimed was mandatory to the sale. [FN15] Further, it was alleged that he discouraged other bidders who would not consent to these bribes and who may have paid a higher price for the company otherwise. [FN16] These allegations of bribery and unfair dealing by the CEO who negotiated the transaction, even in the context of an independent, non-conflicted board, provided enough substance to persuade the Supreme Court to overturn this Court's earlier dismissal of the *Parnes* complaint.

FN12. 722 A.2d 1243 (Del.1999).

FN13. C.A. No. 17455, 2000 Del. Ch. LEXIS 145 (Sept. 29, 2000) [hereinafter *Crescent/Mach* ].

FN14. These payments and asset transfers included: (1) a termination payment of $21 million (which exceeded the amount arguably due to Goldberg by approximately $14.4 million); (2) a transfer to Goldberg for $250,000 of a warrant worth $5 million for the purchase of 20% of Bally Total Fitness Holding Corporation's common stock and the forgiveness of $15.2 million of Bally Fitness indebtedness to Bally; (3) the merger of Bally's

Casino Holdings, Inc., a shell corporation, into Bally and the conversion of the Casino Holdings preferred stock, all owned by Goldberg, into Bally and Bally Total Fitness stock worth approximately $43 million; (4) the transfer to Goldberg of 20% of Bally's interest in a Maryland race track project; and (5) the transfer to Goldberg of 40% of Bally's interest in a proposed Mexican gaming venture. *Parnes,* 722 A.2d at 1246.

FN15. *Id.* at 1245.

FN16. *Id.* at 1246.

In *Crescent/Mach,* this Court found that Mr. Turner, CEO, controlling shareholder and Chairman of the Board, secured "a substantial transfer of ... assets and substantial financial remuneration" for himself that were not made available to the minority shareholders, similar to the benefits obtained in *Parnes.* [FN17] Even though the board received a fairness opinion based upon three different valuation methods, the court denied the defendants' motion to dismiss because Mr. Turner's alleged breach of his fiduciary duties was so egregious that they tainted the entire merger process. [FN18] Thus, the board's approval of the transaction alone was enough to rebut the business judgment rule because the board "fail[ed] to protect the interests of the corporation and the minority stockholders." [FN19]

FN17. *Crescent/Mach,* 2000 Del. Ch. LEXIS 145 at *43 & n. 47. The import of these "side-deals" is that Turner stood to gain a substantial equity interest in Bottling Group while Holdings and ABC would become wholly owned subsidiaries of Bottling Group. For example, these alleged "side-deals" included: 1) the Turner Family Partnership contracting with Bottling Group to contribute one million shares of Holdings' stock, owned and controlled by Turner, to Bottling Group in exchange for 250,000 shares of Bottling Group thereby securing for Turner a substantial equity interest in the surviving entity; 2) CAI and Carlyle Bottling contracting for a stock exchange with Bottling Group in which they agreed to exchange their stock in ABC for stock in Bottling Group; 3) Holdings re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

Page 6

deeming approximately 6 million shares of its stock owned or controlled by Turner or the Turner Family Partnership for $25 per share thereby securing for Turner certain tax advantages not offered to other stockholders; 4) making the merger contingent on the sale of JLT Beverages' claimed brand name Deja Blue and franchise rights in Snapple brand products for $15 million to Bottling Group; 5) CSI and Carlyle Bottling agreeing to each purchase $75 million of Bottling Group's stock after the consummation of the merger; 6) Cadbury Schweppes agreeing to purchase $150 million of Bottling Group's subordinated debt; 7) Turner, Bottling Group, CSI, Carlyle Bottling, and the Turner Family Partnership entering into an agreement to retain Turner on the board of directors of the surviving entity for so long as he is employed by the Bottling Group at a base salary of $900,000 including bonuses and stock options; 8) Turner receiving shares in the surviving entity which would 'facilitate realization of a profit by the Turner interests through an initial public offering of Bottling Group's stock-an opportunity not afforded to other stockholders; 9) Carlyle Bottling and the Turner Family Partnership agreeing that the Bottling Group stock acquired in the transactions by the Turner Family Partnership, CSI and Carlyle Bottling would be treated as a tax free exchange; 10) CSI and Carlyle Bottling agreeing to purchase the Holdings' stock that Turner and the Turner Family Partnership were to have redeemed in the event the Merger was enjoined. *Id.* at *8--*10.

FN18. *Id.* at *45.

FN19. *Id.* at *37, *45.

Similar to the allegations of asset transfers in these cases, the allegations here charge Meckler with receiving Internet.com at a grossly unfair price in exchange for his presentation, recommendation, and approval of the Transaction. [FN20] The asset transfers in *Parnes* and *Crescent/Mach* allegedly lacked *any* consideration. In this case, Meckler paid $18 million for his share of Internet.com. Nevertheless, it follows that a *grossly inadequate* purchase price for Inter-

net.com should lead to the same result as an agreement wholly lacking consideration. A grossly inadequate purchase price would still wrongly divert Company funds to Meckler. Thus, the complaint adequately asserts that Meckler violated his fiduciary duties by unfairly demanding that Penton sell Internet.com to him "on the cheap." This allegedly coercive purchase may have diverted Company funds to Meckler, resulting in the shareholders receiving a grossly unfair price.

> FN20. The complaint also alleges that Meckler's receipt of a $100,000 consulting agreement and Penton's provision of a Services Agreement to New internet.com amounted to a "windfall" to Meckler. These may be additional circumstances that will provide fuel for the fire of a suspicious mind. I note, however, that the complaint indicates the Services Agreement was a customary agreement between Penton and its business affiliates. *See* Second Amended Class Action Compl. ¶ 51 ("As part of our agreement, we will sign a service agreement between the trade shows/magazines and Internet.com to maintain the mutual benefit and support of all three product lines. The services agreement will be similar to our Index and Findlay agreement, which is largely based on barter.").

*6 Contrary to defendants' assertion, the fact that $274 million was the highest offer entertained does not lead to the conclusion that Internet.com was sold at a fair price. Although the total merger consideration of $274 million was higher than the $270 million offered by United News, both offers included the sale of Internet.com to Meckler for a similar price. If this price was grossly inadequate as plaintiffs allege, both offers would have diverted significant funds from the Company to Meckler and both prices would have been unfair to the shareholders. Because I must give plaintiffs the benefit of all reasonable inferences in their complaint, I must accept plaintiffs' assertion that Internet.com was grossly undervalued when it was sold to Meckler. [FN21]

> FN21. Additionally, plaintiffs allege that several other sources indicated that Internet.com should have commanded a much higher value, such as the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                          Page 7
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

earlier $50 million estimate provided by D & T.

Further, if the board members acquiesced in such unfair dealing to the detriment of the Mecklermedia shareholders, they too may have breached their fiduciary duty of loyalty. Plaintiffs allege that the board members knew Meckler allegedly sought out an interested merging partner, dictated the terms of the Transaction, secured a valuable asset of the Company at a grossly unfair price, and diverted funds away from the Company to himself. With these allegations, the plaintiffs have sufficiently pled that the directors' acquiescence to this process, passive or otherwise, was beyond the bounds of reasonableness. Just as the CEOs' conduct in both *Parnes* and *Crescent/Mach* "tainted the entire process," if plaintiffs' assertions in this case are accepted as true, Meckler's conduct would have been so egregious that the Mecklermedia board likely could not have approved the Transactions in good faith. Thus, I conclude that plaintiffs have sufficiently alleged that the directors may have breached their duty of loyalty. Defendants' motion to dismiss the duty of loyalty claim is denied.

2. *Duty of Care*

Defendants argue that plaintiffs failed to allege any facts that would establish that the directors breached their duty of care. And, even if a duty of care claim were established, it should be dismissed because Mecklermedia's charter contained an exculpatory § 102(b)(7) provision.

Plaintiffs counter by enumerating several instances in which they believe the board members failed to use due care in the negotiation and approval of the transactions. Additionally, plaintiffs contend that the § 102(b)(7) exculpatory provision may not be used to dismiss the duty of care claims at this stage because of the presence of an adequately pled duty of loyalty claim.

a. Breach of the Duty of Care

Plaintiffs have alleged sufficient facts to show the Mecklermedia board breached its duty of care to the Mecklermedia shareholders. Delaware law provides that the "business and affairs of every corporation ... shall be managed by or under the direction of a board of directors." [FN22] When the

board of a corporation acts, Delaware courts ordinarily review that act under the presumption of the business judgment rule. [FN23] The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." [FN24] Thus, as long as the board was informed and not self-interested, this presumption will not be disturbed if the board's business decision can be attributed to "any rational business purpose." [FN25]

> FN22. 8 *Del. C.* § 141(a).
>
> FN23. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).
>
> FN24. *Id.*
>
> FN25. *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971).

*7 Plaintiffs contend that the board breached its duty of care by yielding to Meckler's negotiations, by not using a special committee, and by not appropriately educating itself on the value of Internet.com. Here, the board was admittedly not self-interested. It was within the board's business judgment to delegate the negotiation of the Transactions to its CEO. There is nothing inherently wrong with allowing an interested CEO to negotiate a transaction. [FN26] What does matter is whether the directors sufficiently oversee such negotiations by scrutinizing the resulting transaction in order to assure themselves that it is fair to the shareholders and to the company. There is no automatic requirement that the board employ a special committee to perform this evaluation, especially when a majority of the board is disinterested and independent. Here, the board considered whether a special committee was needed and explicitly found that one was not. This is a valid exercise of the board's business judgment. Therefore, the only questions remaining are whether the board was informed and whether its decision was based on a rational business purpose.

> FN26. *In re Ply Gem Indus., Inc. S'holders Litig.,* 2001 Del. Ch. LEXIS 84, at *28 (Del. Ch. June 26, 2001).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 8
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

In evaluating the Transactions, the board informed itself through several rounds of board deliberations, reports by experts and by conducting a market "survey." As noted in the complaint, the board met several times to discuss the proposed Transactions. It retained investment bankers to assist in structuring and evaluating a business combination strategy. It received written and oral reports from this investment banker regarding the overall combination.

These evaluative measures, however, were all flawed to some degree according to the complaint. Although the board had no duty to engage a special committee, the board did have a duty to scrutinize the Transactions more closely to ensure that the shareholders were being treated fairly. Here, plaintiffs allege, the board failed to ensure that the shareholders were receiving adequate consideration for Internet.com. The board was aware of the amount of the earlier United News offer, but this offer may not have sufficiently reflected the value of the Company and Internet.com. Because the prior offer also included a sale of Internet.com at a similar (and allegedly discounted) price to Meckler, this market "survey" would have resulted in a similarly depressed price. Thus, according to the plaintiffs, the market "survey" may not have been a sufficient indication of the value of the shares of Mecklermedia.

Although no other bidders came forward after the Penton negotiations were underway, such potential bidders may have shied away from bidding because of the conflicts of interest involved. Plaintiffs allege that Meckler made it clear that he would not sell the Company without retaining a majority interest in Internet.com. Consequently, the fact that there were no other bidders for the Company does not establish that it was sold at a fair price.

*8 Additionally, the board received no fairness opinion regarding the iWorld transaction. Even though Allen & Co. opined upon the overall fairness of the Transactions, it did not separately consider the fairness of the iWorld transaction. [FN27] The only possible way for the board to have known whether the shareholders were receiving a fair price for their shares in Mecklermedia was to have had some assurance that Meckler was paying a fair price for his equity interest in Internet.com. According to the complaint, the expert advice the board relied upon failed to provide this assurance.

FN27. Cf. *Levco Alternative Fund Ltd. v. The Reader's Digest Assoc ., Inc.,* 803 A.2d 428 (Del.2002).

Plaintiffs' complaint also alleges that the board had no information about the value of Internet.com to enable it to make an informed decision. The facts in the complaint suggest that the board had every reason to doubt the adequacy of the price Meckler paid for his interest in Internet.com. The board knew that its CEO had retained complete control over the negotiation of a self-dealing transaction. The board knew that Allen & Co. did not separately opine on the fairness of the iWorld transaction. The board knew the "agreed upon" value of Internet.com dropped from $30 million to $22.5 million during negotiations (a 25% decrease in value) because Meckler could afford to pay no more than $18 million for his 80.1% interest. At the same time, there was no corresponding increase in the per share purchase price of Mecklermedia. Presumably, the board would also have known that PwC warned Penton to take a closer look at the iWorld transaction from an economic and legal standpoint and that D & T valued Internet.com at $50 million when consulted by Allen & Co. All of this information arguably should have compelled the board, at a minimum, to further scrutinize the iWorld transaction's fairness independently. Otherwise, the board assertedly would have had no reasonable basis upon which to conclude that the Mecklermedia shareholders were being treated fairly.

Because the complaint arguably alleges that the directors were not fully informed when they approved the Transactions, I do not need to address whether the board had a rational business purpose. [FN28] Thus, at this juncture, I conclude that the plaintiffs have sufficiently alleged that the Mecklermedia directors were not fully informed when evaluating and approving the Transactions.

FN28. Several rational business purposes have been given for the business combination and the resulting ownership structure of New internet.com. It seems irreconcilable, however, to find that the approval of the transactions arguably exceeded all bounds of rational decisionmaking for the purposes

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
**(Cite as: 2002 WL 31584292 (Del.Ch.))**

Page 9

of the duty of loyalty, but also find that the very same decision was rational for the purposes of evaluating the board's duty of care.

b. Section 102(b)(7)

At this stage, I cannot dismiss plaintiffs' duty of care claim based upon an exculpatory provision contained in the Mecklermedia charter. As *Malpiede,* [FN29] and *Emerald Partners* [FN30] instruct, when a duty of care breach is not the *exclusive* claim, a court may not dismiss based upon an exculpatory provision. [FN31] Because the duty of loyalty is implicated in this case, the § 102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss.

> FN29. *Malpiede v. Townson,* 780 A.2d 1075 (Del.2001).
>
> FN30. *Emerald Partners v. Berlin,* 787 A.2d 85 (Del.2001).
>
> FN31. *Id.* at 91 ("Since its enactment, Delaware courts have consistently held that the adoption of a charter provision, in accordance with Section 102(b)(7), bars the recovery of monetary damages from directors for a successful shareholder claim that is based *exclusively* upon establishing a violation of the duty of care.") (emphasis added).

3. *Duty to Disclose*

Plaintiffs contend that defendants failed to disclose all material information to the shareholders in the 14D-9 and Amended 14D-9. Defendants assert that all relevant information was disclosed and that the claim should therefore be dismissed.

**\*9** A fact is material if "there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote." [FN32] The plaintiff must demonstrate there was a substantial likelihood that the omitted fact would have "significantly altered the 'total mix' of information made available" to the stockholders. [FN33] In order to state a claim for relief, plaintiff must: 1) allege that there are facts missing from the disclosure; 2) identify specific facts

that were omitted or misleading; 3) state why those facts were material; and 4) demonstrate how the omitted or missing fact caused injury. [FN34]

> FN32. *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 143 (Del.1997).
>
> FN33. *Id.* at 143; *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985).
>
> FN34. *Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1173 (Del.2000).

Plaintiffs assert that Mecklermedia's 14D-9 and Amended 14D-9 were materially false and misleading and that this information would have altered the total mix of information available to the shareholders if disclosed accurately. Plaintiffs contest four main portions of the tender offer materials: 1) the failure to disclose the source of the $22.5 million valuation of Internet.com; 2) the failure to disclose details about the United News negotiation; 3) the failure to disclose the "true reason" for the iWorld transaction; and 4) the allegedly false characterization of the merger consideration as "fair." The contents of the challenged tender offer materials will be considered on this motion to dismiss because they were incorporated by reference in the complaint. [FN35]

> FN35. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 69- 70 (Del.1995).

a. Internet.com Valuation

Plaintiffs successfully contend that the tender offer materials did not adequately disclose the source of the $22.5 million valuation of Internet.com. The Amended 14D-9 parenthetically explains that the agreed valuation of iWorld was "based upon [Meckler's] payment of $18 million for an 80.1% equity interest in iWorld." [FN36] This statement-which was buried in a subpart of multiple factors Meckler considered when opining upon the fairness of the iWorld transaction-fails to point out the fact that no independent valuation of iWorld was ever attempted. Instead, the Amended 14D-9 compared this agreed-upon value to other factors, such as historical accounting data, revenues, tangible assets, and the value per page viewed on the web site.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                    Page 10
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
**(Cite as: 2002 WL 31584292 (Del.Ch.))**

Although shareholders are generally able to draw their own conclusions about valuations when given the valuation method and results, here there was no attempt to provide the shareholders with a valuation of Internet.com, leaving them with no basis, other than Meckler's own self-serving fairness opinion, to determine whether they were receiving adequate value for their stake in Internet.com. Thus, it seems reasonable that further disclosure regarding the $22.5 million valuation of Internet.com may have altered the total mix of information available to the shareholders.

FN36. Amended Schedule 14D-9, item 8(d).

b. United News Negotiation

Plaintiffs assert that defendants should have disclosed more details regarding the United News negotiation, even though United News' $270 million offer was lower than Penton's $274 million offer. The information disclosed in the Schedule 14D-9 was limited to a statement that "the Company reached an oral understanding regarding an approximate three week period of exclusivity with one of the companies interested in a potential strategic combination; however, the period of exclusivity expired prior to a letter of intent being executed with such company."

*10 Plaintiffs allege that the board should have further disclosed that it was United News making the bid, that the oral offer was to purchase all shares of the company for $270 million and included a similar side transaction to sell Internet.com to Meckler, and that negotiations failed due to United News' attempt to change the terms of the side deal. Because the United News negotiation never progressed to the letter of intent stage, it would not have been material for a stockholder to know the identity of one potential buyer. Nor have plaintiffs explained how this additional information would have altered the total mix of information available to the Mecklermedia stockholders. If the negotiation terminated over the terms of the iWorld transaction, however, this information likely would have been material to Mecklermedia's shareholders because it would imply that the Company's value was somehow tied to the successful negotiation of a side deal with Meckler for iWorld. Thus, plaintiffs have alleged a claim based on the partial disclosure regarding the United News negotiation.

c. The "True Reason" for the iWorld Transaction

Plaintiffs assert that the tender offer materials omitted the "true reason" for the iWorld transaction, which they allege was false and misleading. Besides having no basis for this assertion, a board is only required to present the material facts of the transaction; it is not required to cast those facts in a negative light. [FN37] Thus, the board would not have been required to engage in "self-flagellation" of this sort. [FN38]

> FN37. *Loudon,* 700 A.2d at 143; *In re Gen. Motors Class H S'holders Litig.,* 734 A.2d 611, 628 (Del. Ch.1999).
>
> FN38. *Loudon,* 700 A.2d at 143.

d. Board Representation Regarding Fairness

Plaintiffs assert that the board members' representation regarding the fairness of the Transaction and iWorld transaction was false and misleading and that the board members lacked a reasonable basis for this opinion. Plaintiffs contend that the terms were in fact *unfair* to the Company's shareholders for four reasons: 1) the shareholders did not receive any consideration for Internet.com; 2) Meckler participated in unfair dealing when negotiating the iWorld transaction; 3) the board approved the transaction to provide an "economic windfall" to Meckler; and 4) the board lacked a reasonable basis for opining that the Transaction was fair.

I conclude that some of these allegations cannot withstand scrutiny on a motion to dismiss, as the board does not have to cast its decisionmaking in a negative light, and because they are refuted by the information contained in the tender offering documents. First, contrary to plaintiffs' allegations, the Mecklermedia shareholders were not deprived of their interest in Internet.com without *any* consideration. The shareholders were informed of the amount Meckler paid for his interest in Internet.com in the 14D-9 before deciding whether to accept or reject the tender offer. To the extent that the shareholders may have received *inadequate* consideration for their interest in Internet.com, however, the transaction may have been unfair. This conclusion, obviously, is one that cannot be drawn at this juncture because Inter-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

net.com was not separately valued and thus there is not enough information to determine whether the shareholders were improperly deprived of their interest in Internet.com. Thus, plaintiffs have adequately alleged that the transaction may have been unfair and that the Mecklermedia board members' fairness opinion was false or misleading.

*11 Second, if the transaction (and the negotiations leading up to it) were in fact unfair to the shareholders, the Mecklermedia board was not required to *characterize* it as illegal or wrong. As discussed above, a board is not required to engage in self-flagellation in its disclosure materials. Thus, both allegations, including the board's alleged desire to bestow a "windfall" upon Meckler and the negative characterization of Meckler's negotiation tactics, were not required disclosures in the tender offer materials. What was required of the board was already disclosed. The tender offer materials fully described the material portions of the negotiation and its resulting terms as well as Meckler's self-interest. Having failed to allege how further disclosure of Meckler's self-interest is more than redundant or how a shareholder would consider it material in deciding whether to tender her shares, this aspect of plaintiffs' disclosure claim fails as a matter of law.

Last, the fairness opinion may have been misleading if the board members in fact lacked a reasonable basis for their fairness statement. Although the board was entitled to rely upon the fairness opinion of Allen & Co., [FN39] the board arguably should have evaluated the fairness of the iWorld transaction separately as noted above. A reasonable stockholder may have been misled by the Allen & Co. fairness opinion to believe that Internet.com *itself* was being sold for a fair price when it may not have been. A board does not necessarily need to disclose specific details regarding the analysis underlying the report, [FN40] but a stockholder would likely have found the inadequacies of, or limitation on, the fairness opinion material to her decision whether to tender her shares. This Court has held that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely." [FN41] Although the material terms of the Transactions were disclosed, as well as Meckler's self-

interest and resulting equity in Internet.com, a reasonable shareholder may have been misled to believe that Allen & Co.'s opinion regarding the Transactions encompassed the fairness of these factors without having received the underlying data the investment banker relied upon. Further, if the board itself was not fully informed (allegedly) regarding the iWorld transaction, it can hardly be argued that it adequately informed the stockholders regarding the fairness of this very same transaction. Therefore, plaintiffs have stated a claim for breach of the board's duty of disclosure in this respect.

> FN39. *McMillan v. Intercargo Corp.,* 768 A.2d 492, 505 n. 55 (Del. Ch.2000).

> FN40. *Skeen,* 750 A.2d at 1174; *In re Best Lock Corp. S'holder Litig.,* 2001 Del. Ch. LEXIS 134, *35 (Oct. 29, 2001).

> FN41. *In re Pure Resources, Inc.,* 2002 Del. Ch. LEXIS 112 at * 80--*81 (Oct. 1, 2002) (finding that disclosure of a banker's fairness opinion provided stockholders with "nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability").

*C. Did the Shareholders Acquiesce in the Board's Conduct by Tendering Their Shares?*

Last, defendants assert that all of plaintiffs' claims should be dismissed because all material facts were disclosed to plaintiffs before they tendered their shares. Thus, they argue, the act of tendering their shares shows that the plaintiffs thereby acquiesced in the Transaction and iWorld transaction and cannot now challenge it. Plaintiffs counter by alleging that they could not have acquiesced by tendering their shares because they were not fully informed.

*12 I pause a moment to consider what plaintiffs do not allege in this instance. Plaintiffs do not assert that they were "under protest" when they tendered their shares, which would negate a finding of acquiescence. [FN42] Additionally, plaintiffs do not allege that the tender offer was in any way coercive, which would have prevented meaningful choice and similarly negated a finding of acquiescence.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)
(Cite as: 2002 WL 31584292 (Del.Ch.))

Page 12

Plaintiffs rely solely upon the allegation that the shareholders were not sufficiently informed. This entire argument relies upon their earlier assertion that the board breached its duty to disclose all material information to the shareholders. If the board did not breach its duty to disclose all material information regarding the transaction to the shareholders, then the shareholders were fully informed when they tendered.

FN42. *Kahn v. Household Acquisition Corp.,* 1982 Del. Ch. LEXIS 580 at *6 (Jan. 19, 1982).

Because plaintiffs have adequately alleged that the board breached its duty of disclosure, I cannot, at this stage, conclude as a matter of law that the shareholders were fully informed when they tendered their shares. Although the material terms of the Transactions were disclosed, as well as Meckler's conflict of interest and resulting equity interest in Internet.com, the shareholders may have been misled into believing that the iWorld transaction was independently evaluated as "fair" when it had not been. Neither the board nor Allen & Co. separately opined upon the fairness of the iWorld transaction. Instead, both Transactions were categorically lumped into a single fairness opinion that plaintiffs contend did not fully inform the shareholders of the value of Internet.com. In addition, plaintiffs insist they were not provided with full and complete information regarding how the $22.5 million valuation for iWorld was determined. Accordingly, because plaintiffs have adequately pled disclosure claims, I cannot conclude that their complaint is barred by the doctrine of acquiescence.

*D. Should the Court Impose a Constructive Trust over Internet.com?*

Plaintiffs cite *O'Malley v. Boris* [FN43] for their assertion that a constructive trust should be imposed upon New internet.com. Although it is debatable whether such a remedy would be advisable, as in *O'Malley* I am reluctant to dismiss New internet.com from the case at this point. The company is majority owned by Meckler and this ownership arose from the transactions in dispute. Thus, if this ownership was "ill-gotten," it follows that a constructive trust may be placed upon Meckler's equity interest in New internet.com so that he is not unjustly enriched at the expense of the

Mecklermedia shareholders. For this reason, I decline to dismiss New internet.com as a defendant.

FN43. 2002 Del. Ch. LEXIS 33 (March 18, 2002).

IV. CONCLUSION

In sum, defendants' motion to dismiss the complaint is denied. Plaintiffs have stated a claim for a breach of the duties of loyalty, care and disclosure against the Mecklermedia board. The § 102(b)(7) provision cannot operate to immunize the duty of care claim at this juncture. The affirmative defense of acquiescence fails because plaintiffs adequately alleged that the board did not fully inform the shareholders before they tendered their shares. Further, New internet.com is not dismissed as a defendant at this time as it may be a necessary party in connection with a potential remedy.

*13 IT IS SO ORDERED.

Not Reported in A.2d, 2002 WL 31584292 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.