7

Westlaw.

Not Reported in A.2d                                                                   Page 1
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

H

UNPUBLISHED OPINION. CHECK COURT RULES BE-
FORE CITING.

Court of Chancery of Delaware.
Arlene ASH, Noel Saito, Kimberly Madajczyk and Sydney
H. Dalman, Plaintiffs,
v.
Charles W. MCCALL, Mark A. Pulido, Richard H.
Hawkins, Heidi E. Yodowitz,
Alfred E. Eckert III, Tully M. Friedman, Alton F. Irby III,
M. Christine
Jacobs, Gerald E. Mayo, James v. Napier, David S. Pot-
truck, Carl E. Reichardt,
Alan Seelenfreund and Jane E. Shaw, Defendants,
and
MCKESSON HBOC, INC., Nominal Defendant.
**No. Civ.A. 17132.**

Submitted March 15, 2000.
Decided Sept. 15, 2000.

Pamela S. Tikellis, Robert J. Kriner, Jr., and Timothy R.
Dudderar, of Chimicles & Tikellis LLP, Wilmington,
Delaware, for Plaintiffs.

Joel Friedlander, of Bouchard Margules & Friedlander,
Wilmington, Delaware; Samuel R. Miller, of Folger Levin
& Kahn LLP, San Francisco, California, for the Former
HBOC Outside Directors, of counsel.

Anthony W. Clark and Paul J. Lockwood, of Skadden,
ARPS, Slate, Meagher & Flom LLP, Wilmington,
Delaware; Jonathan J. Lerner, of Skadden, Arps, Slate, Mea-
gher & Flom LLP, New York, New York, and James E. Ly-
ons, of Skadden, ARPS, Slate, Meagher & Flom LLP, San
Francisco, California, for McKesson Hboc, Inc., of counsel.

Alan J. Stone and Jessica Zeldin, of Morris, Nichols, Arsht
& Tunnell, Wilmington, Delaware; Karen Steinberg
Kennedy, of Paul, Weiss, Rifkind, Wharton & Garrison,
New York, New York, for Defendant Charles W. McCall, of
counsel.

Grover C. Brown, of Gordon, Fournaris & Mammarella,
P.A., Wilmington, Delaware, for Defendants Tully M.

Friedman, David S. Pottruck, Carl E. Reichardt, Alan
Seelenfreund and Jane E. Shaw, of counsel.

Michael D. Goldman, of Potter Anderson & Corroon LLP,
Wilmington, Delaware, for Defendant Mark A. Pulido.

*MEMORANDUM OPINION*
CHANDLER, J.

*1 Shareholder plaintiffs Arlene Ash, Noel Saito, Kimberly
Madajczyk and Sydney H. Dalman assert derivative claims
on behalf of McKesson HBOC, Inc. ("McKesson HBOC" or
the "Company"), a Delaware corporation, which was formed
through the merger of McKesson Corporation
("McKesson") and HBOC & Co. ("HBOC") on January 12,
1999. Approximately 3 1/2 months after McKesson's ac-
quisition of HBOC became effective, McKesson HBOC is-
sued the first of what appears to be three downward revi-
sions of revenues, earnings, net income, and other financial
information, for financial years 1996-1998. The complaint
generally asserts claims related to these revisions. Pending
before me is defendants' motion to dismiss.

Ordinarily, I would summarize here the complaint's allega-
tions. In this instance, however, plaintiffs have filed a com-
plaint without specifying their causes of action, despite hav-
ing twice amended it. The complaint does not enumerate
specific counts, nor does it present claims in any other read-
ily discernable manner. Although the complaint is gener-
ously laden with conclusory allegations that "the facts de-
scribed herein constitute breaches of directors' duties of
good faith, care and loyalty," plaintiffs decline to connect
the facts of the complaint with specific claims of wrongdo-
ing.

Plaintiffs' answering brief, however, does suggest several
claims, some of which appear to be based on alleged viola-
tions of directors' oversight duties, while others are predic-
ated exclusively on alleged fiduciary breaches in connection
with McKesson's due diligence investigation of HBOC in
the course of the merger process. I will briefly describe
plaintiffs' claims now, restating them later with the spe-
cificity that I believe necessary to rule on the pending mo-
tion.

Westlaw.

Not Reported in A.2d                                                                                         Page 2
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

Generally, plaintiffs allege that the directors of HBOC and McKesson HBOC failed to exercise proper oversight of the companies' financial reporting process so as to prevent accounting improprieties; that the McKesson directors breached their duty of care in the course of investigating HBOC's books and records before the merger; and, finally, that McKesson's acquisition of HBOC constituted an act of corporate waste.

Twelve of the fourteen individual defendants named in this lawsuit comprised McKesson HBOC's full board of directors when plaintiffs filed their first complaint on April 30, 1999, two days after the Company's first publication of earnings restatements. The remaining two individual defendants were senior executive officers. Defendants have moved to dismiss the complaint in part for lack of standing and otherwise for failure to plead particularized facts warranting exception to the pre-suit demand requirement of Chancery Rule 23.1.

For reasons described more fully below, I grant defendants' motion. I will, however, dismiss plaintiffs' complaint without prejudice, thereby affording plaintiffs an opportunity to gather additional facts and to file a complaint that is legally sufficient.

### I. FACTUAL BACKGROUND
*A. The Merger*

**\*2** HBOC, a Delaware corporation headquartered in Atlanta before the merger, provides computer software and technology solutions to the healthcare industry. McKesson, a Delaware corporation headquartered in San Francisco, is primarily engaged in the business of healthcare supply management.

Merger discussions between the two companies began in June 1998 when McKesson solicited HBOC's interest in a business combination in order to enter the fast-growing market of software sales to the medical industry. These discussions ripened into due diligence during the first half of July. Shortly thereafter, however, the parties suspended merger talks.

Three months later, in October 1998, discussions resumed

when McKesson's Chairman and CEO, Mark Pulido, contacted his counterpart at HBOC, Charles McCall, in order to rekindle interest in a deal. On October 16, McKesson and HBOC announced a definitive merger agreement where McKesson would acquire HBOC in a tax-free, stock-for-stock merger then-valued at approximately $14 billion. Under the terms of the agreement, HBOC would merge with a McKesson acquisition subsidiary and HBOC shareholders would receive 0.37 shares of McKesson common stock in exchange for each share of HBOC common stock.

The parties signed the merger agreement on October 18, 1998. On or around November 27, McKesson and HBOC disseminated a joint proxy statement and on January 12, 1999, their shareholders voted to approve the merger, which became effective on that date. McKesson's name was changed to McKesson HBOC and HBOC, now a wholly owned subsidiary of McKesson HBOC, became the combined Company's health care information technology division.

After the merger, six directors from each pre-merger company comprised the combined Company's board of directors. Five of the six former HBOC directors on the combined Company's board were non-executive, outside directors: Alfred E. Eckert III, Alton F. Irby III, M. Christine Jacobs, Gerald E. Mayo, and James V. Napier. The one inside director, Charles W. McCall, was president, CEO, and chairman of HBOC before the merger and chairman of the combined McKesson HBOC, until his removal from the board on June 21, 1999.

Five of the six former McKesson directors on the combined Company's board were also non-executive, outside directors: Tully M. Friedman, David S. Pottruck, Carl E. Reichardt, Alan Seelenfreund, and Jane E. Shaw. Mark A. Pulido, president, CEO, and director of pre-merger McKesson held the same positions at McKesson HBOC after the merger. On June 21, 1999, the Company announced Pulido's resignation.

*B. McKesson HBOC's Accounting Restatements*

On April 28, 1999, McKesson HBOC announced that in connection with its year-end audit, DeLoitte & Touche

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

("DeLoitte"), the Company's auditor, discovered improperly recorded revenue for the financial year ending March 31, 1999. According to Company press releases, DeLoitte discovered the improprieties by mailing surveys to customers that purportedly bought HBOC software products. When DeLoitte compared the results to the Company's books, it became apparent that many sales had been improperly recorded. McKesson HBOC's share price fell by over $31, nearly half of its value, on the afternoon of the announcement.

*3 In May 1999, the Company announced that more revisions would be made to earnings. Two months later, with its internal investigations concluded, the Company announced that it would have to make a further restatement covering the two previous financial years to correct for improperly recorded revenue. In all, McKesson HBOC had to disallow $327.4 million of revenue and $191.5 million of operating income.

All of the earnings overstatements, disclosed by the Company between April and July 1999, are attributable to HBOC. It appears that HBOC began overstating earnings in 1996 and continued to do so until shortly before the board of the combined McKesson HBOC first disclosed such overstatements on April 28, 1999, approximately 3 1/2 months after the McKesson/HBOC merger closed on January 12, 1999.

The bulk of the accounting irregularities, according to the complaint, stem from the decision of HBOC senior executives (and their subordinates) to book contingent sales as final sales, both before and after the merger with McKesson. These sales remained contingent, say plaintiffs, because they were made containing "side letters" providing for rights of return and, thus, not properly booked as revenue under applicable accounting standards. The complaint also alleges that senior HBOC executives (and their subordinates) backdated sales contracts so that revenues could be falsely reported as having occurred in an earlier period.

*C. Lawsuits Mount and House Cleaning Begins*

Shortly after the first round of earnings restatements, over twenty law firms announced that they had been retained by McKesson HBOC shareholders to investigate and file class action lawsuits for violations of federal securities laws against the Company and certain of the individual defendants named in this lawsuit, among others. Defendants report that over seventy-five class action, derivative, and individual lawsuits have been filed in connection with these events at McKesson HBOC. Additionally, the U.S. Attorney for the Northern District of California and the SEC have launched investigations of the Company.

On June 21, 1999, McKesson HBOC announced that its board of directors would fire defendant McCall and remove him as chairman, and that defendant Pulido would tender his resignation as president, director, and CEO. The Company also announced the resignation of defendant Richard H. Hawkins, executive vice president and chief financial officer. Pulido's and Hawkins' resignations became effective July 15, 1999.

The board of directors also fired several senior executives of the Company's information technology subsidiary (formerly HBOC) including Albert Bergonzi (president and chief operating officer), David Held (controller and chief financial officer), Jay Lapine (senior vice president, general counsel, and secretary), and Michael Smeraski (senior vice president of sales). Contemporaneous with these terminations, the board of directors appointed new executive management for McKesson HBOC; John H. Hammergren and David L. Mahoney, previously executive vice presidents of the Company, were appointed co-CEO's and elected to the board.

*D. The "Red Flags"*

*4 Plaintiffs' overarching litigation theory, as articulated in their answering brief, is that "the directors of McKesson, HBOC and McKesson HBOC failed to institute and maintain appropriate financial controls and recommended the merger based upon a recklessly inadequate investigation in the face of clear warnings of accounting improprieties at HBOC." [FN1]

     FN1. Plaintiffs' Brief at 1.

These "clear warnings" or "red flags" are the linchpin of plaintiffs' liability theory. Plaintiffs point to four "red flags"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

that HBOC senior officers and directors, and McKesson's board and management team (presumably in the course of due diligence), allegedly disregarded with some degree of culpability ranging from inattention to actual knowledge.

The first of these "red flags" occurred in January 1997 when *Bloomberg,* a financial news company, published a short article questioning HBOC's accounts receivable and near-term growth. Nothing more is alleged about this article.

The second "red flag" occurred three months later in April 1997 when the Center for Financial Research & Analysis, Inc. ("CFRA"), an organization that researches and publishes reports (primarily for institutional investors) relating to financial and accounting issues of public corporations, issued a report on HBOC observing, among other things, that its balance of receivables had surged upward in recent periods. [FN2] The report was mailed to CFRA clients on or about April 15, 1997.

    FN2. Complaint Ex. A.

On April 17 and 18, 1997, *The Atlanta Constitution* reported that on April 15, HBOC's stock price had declined nearly 8% on market speculation that the CFRA report criticized HBOC's accounting practices. [FN3] *The Atlanta Constitution* also reported that several industry analysts, who publicly commented on the CFRA report, expressed doubt that it had identified any significant problem at HBOC, citing the Company's "strong fundamentals."

    FN3. Complaint Exs. C and D.

Several analysts took the extraordinary step of publishing special reports contesting the CFRA analysis point by point. An HBOC spokesperson stated that the report "doesn't warrant comment." Following these reassurances, HBOC's stock price rebounded to nearly pre-CFRA report levels.

Indefatigable (and apparently correct), on August 19, 1998, CFRA issued a second report critical of HBOC's revenue recognition procedures. CFRA published this report, the third "red flag," approximately sixteen months after the first report and two months before McKesson and HBOC signed their merger agreement. [FN4] Based upon a review of HBOC's public filings, CFRA reported, among other things,

that HBOC's operations "may be deteriorating, as partially evidenced by a high and generally growing level of receivables relative to revenue." CFRA also observed that cash flows from operations trailed significantly behind net income in the first two quarters of calendar year 1998.

    FN4. Complaint Ex. B.

The final alleged "red flag" flew on or around November 13, 1998, when HBOC announced that Jay Gilbertson, chief financial officer, president, and chief operating officer, would leave the company. Plaintiffs argue that "despite this clear signal of financial impropriety neither HBOC, McKesson, nor McKesson HBOC discovered and/or reported the fundamental accounting irregularities that were overstating HBOC's (and thereafter McKesson HBOC's) sales and revenue." [FN5]

    FN5. Complaint at ¶ 40.

II. CONTENTIONS OF THE PARTIES
**\*5** Plaintiffs have not set forth claims, based on the above-summarized facts, with particularity. As noted previously, the complaint does not enumerate specific counts; nor does it present plaintiffs' claims in any other readily discernable manner. Despite its ambiguity, the complaint, read liberally but fairly, seems to raise four claims.

Plaintiffs' first two claims can be distilled into a due care claim and a waste claim. The due care claim alleges that the directors of McKesson and the directors of HBOC breached their duty of care by failing to inform themselves of all reasonably available material information before deciding to enter into, and recommend, the merger. Put another way, plaintiffs contend that the directors breached their duty of care by failing to detect HBOC's accounting irregularities during the course of due diligence investigations performed in connection with the merger. Although this claim more logically applies to the McKesson directors, plaintiffs seem to insist that it is equally applicable to the HBOC directors.

Plaintiffs assert their waste claim against the McKesson directors. They contend that the McKesson directors' decision to enter into and recommend the merger to McKesson's shareholders constituted an act of corporate waste. That is,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                              Page 5
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

plaintiffs contend that the McKesson director's decision to exchange properly valued McKesson shares for overvalued HBOC shares amounts to waste.

Plaintiffs' second set of claims addresses the less often visited issue of a board's oversight duty, a subset of the duty of care, but also potentially raising issues of directors' good faith. Plaintiffs first contend that the directors of HBOC failed to monitor adequately the company's financial reporting in order to ensure compliance with applicable federal laws and regulations for approximately a two-year period preceding the merger (the "First Oversight Claim"). Plaintiffs next maintain that the directors of McKesson HBOC failed to do the same for a three-and-one-half month period after the merger (the "Second Oversight Claim").

Defendants argue that this action must be dismissed for two reasons. First, and primarily, defendants seek dismissal under Chancery Rule 23.1 on the ground that plaintiffs have not made a pre-suit demand on the board of directors and have not alleged particularized facts establishing that demand would be futile. Second, defendants argue that none of the named derivative plaintiffs have proper standing to assert the First Oversight Claim (*i.e.*, the claim that HBOC directors breached fiduciary duties in failing to uncover and cure accounting irregularities before the merger).

### III. ANALYSIS

Though all four of plaintiffs' claims generally assert duty of care breaches, I believe it is sensible to analytically separate the due care and waste claims, brought in connection with the merger transaction, from the two oversight claims, which do not challenge a specific board action or decision. I do so primarily because the demand futility analysis for oversight claims differs from demand futility analysis for due care and waste claims.

*A. Demand Futility Standard for the Due Care and Waste Claims*

**\*6** A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand

would be futile. [FN6] Here, plaintiffs contend demand would be futile and, thus, should be excused.

FN6. Court of Chancery Rule 23.1.

In considering a motion to dismiss under Chancery Rule 23.1, as in the case of a Rule 12(b)(6) motion to dismiss, the Court confines its attention to the face of the complaint and accepts all well-pled allegations of fact as true. To survive a motion to dismiss under Rule 23.1, however, a plaintiff must plead with particularity the reasons why pre-suit demand would have been futile. [FN7]

FN7. *See id; see also* Grimes v. Donald, Del.Supr., 673 A.2d 1207, 1213 (1996).

Plaintiffs' due care and waste claims arise in connection with an affirmative business decision made by a board of directors. Accordingly, I will analyze demand futility under the two-prong test set forth by the Delaware Supreme Court in *Aronson v. Lewis.* [FN8] Under *Aronson,* pre-suit demand is excused if the shareholder alleges, with particularity, facts sufficient to create a reasonable doubt that (1) a majority of the directors are disinterested and independent, or (2) the challenged transaction is otherwise the product of the directors' valid exercise of business judgment. [FN9]

FN8. Del.Supr., 473 A.2d 805, 814 (1984).

FN9. *Id.* at 814.

*1. Are the Director Defendants Disinterested and Independent?*

If a plaintiff can raise a reasonable doubt that a majority of directors was disinterested or capable of exercising independent business judgment with respect to the transaction in question, the pre-suit demand requirement is generally excused. A director is considered interested where he receives a personal financial benefit that is not equally shared by the stockholders. [FN10] A disabling conflict of interest is also said to exist when a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. [FN11]

FN10. *See* Aronson v. Lewis, 473 A.2d at 812.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                          Page 6
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

FN11. *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936 (1993).

In this case, plaintiffs allege that defendants Pulido and Mc-Call, the "masterminds" of the merger, received certain unique benefits upon consummation of the transaction. Specifically, plaintiffs allege Pulido held 1.49 million non-vested options to acquire McKesson common stock as well as 40,000 shares of restricted McKesson common stock. Upon consummation of the merger, these stock options vested and the share restrictions lapsed. Moreover, upon consummation of the merger, defendant McCall became entitled to the maximum amount payable under a McKesson bonus plan-$47,600.

While not conceding that these facts render Pulido or Mc-Call interested in the merger, defendants observe that the absence of any particularized allegations of fact indicating that any of the remaining ten directors were interested in the merger makes Pulido's and McCall's alleged interest legally irrelevant. Not the case, counter plaintiffs, arguing that Pulido and McCall "dominated" the other directors. Specifically, paragraphs 71 and 72 of the complaint provide:

*7 71. "The six former HBOC Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, and domination by, their former Chairman defendant McCall who exerted during his tenure on the Board, and still exerts, such influence and control over these directors."

72. "The six former McKesson Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, and domination by, defendant Pulido and now also defendant McCall who exerts such significant control and influence over them as to render them unobjective."

Nowhere to be found in the pleadings or plaintiffs' opposition brief, however, are particularized facts supporting the conclusory allegations annexed above. Under the very clear guidance of the *Aronson* Court, conclusory allegations of domination and control are insufficient to excuse pre-suit demand:

"in the demand futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a 'direction of corporate con-

duct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' The shorthand shibboleth of 'dominated and controlled directors' is insufficient." [FN12]

FN12. *Aronson v. Lewis* at 816 (quoting *Kaplan v. Centex,* Del. Ch., 284 A.2d 119, 123 (1971)).

Plaintiffs have not made a single factual allegation that ten of twelve board members, all of whom were non-management, outside directors, had any material self-interest in the merger. Nor have they alleged particularized facts that would establish that Pulido or McCall-the two allegedly interested directors-dominated the ten non-management, outside directors, neutralizing their ability to make a good faith judgment with respect to the merger transaction. [FN13]

FN13. *See, e.g., Haber v. Bell,* Del. Ch., 465 A.2d 353, 358 (1983) (dismissing suit for failure to make demand where only two of thirteen directors were alleged to have material interest in decision).

In short, plaintiffs have not alleged a single fact in support of their domination theory and, as Delaware courts have repeatedly observed, such assumptions will not be made in the context of pre-suit demand. Consequently, pre-suit demand is not excused under *Aronson's* first prong based on plaintiffs' unadorned, conclusory allegation that a majority of director defendants' were interested in the merger or not independent of allegedly interested parties. [FN14]

FN14. Although McCall's removal and Pulido's resignation from the McKesson HBOC board post-date the filing of the first derivative complaint, these events surely belie plaintiffs naked assertion that McCall and Pulido dominated the board of either the premerger or post-merger companies.

*2. Is There a Reasonable Doubt that Approval of the Merger was the Product of a Valid Exercise of Business Judgment?*

Under *Aronson's* second prong, the Court must determine whether the complaint raises a reasonable doubt that the "directors exercised proper business judgment in the transaction." [FN15] In this instance, the second prong of the *Aron-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 7
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

son test addresses the waste claim (purchase terms) and due care claim (informed decisions). I will first consider the waste claim leveled against former McKesson directors.

> FN15. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 189 (1988).

### a. The Waste Claim

Although it is indeed axiomatic that a corporate act cannot be a product of sound business judgment and also constitute waste, allegations of waste must nonetheless comply with Rule 23.1 demand requirements. To excuse demand on grounds of corporate waste, plaintiffs must allege "particularized facts that the consideration received by the corporation was 'so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation has paid.' " [FN16] Put another way, plaintiffs must show that the merger in question either served no corporate purpose or was so completely bereft of consideration that it effectively constituted a gift. [FN17]

> FN16. *Benerofe v. Cha*, Del. Ch., C.A. No. 14614, mem. op. at 19, Chandler, V.C. (Sept. 12, 1996) (quoting *Grobow*, 539 A.2d at 189).

> FN17. *See In re 3Com Shareholders Litig.*, Del. Ch., C.A. No. 16721, mem. op. at 11, Steele, V.C. (Oct. 25, 1999) (citing *Lewis v. Vogelstein*, Del. Ch., 699 A.2d 327, 336 (1997)).

*8 Paragraph 32 of the complaint states that McKesson acquired HBOC "to enter the fast-growing business of software sales to the healthcare industry." Evidently, plaintiffs concede that the merger had a perfectly sensible corporate purpose.

It is paragraph 28 of the complaint, however, upon which plaintiffs center their waste claim. There, they quote an analyst from Warburg Dillon Read, an investment bank, who shortly after the Company's first round of corrective disclosures, purportedly stated that '[t]he marketplace is basically valuing HBOC as zero.' [FN18] On the strength of one analyst's hyperbole, made in some undisclosed and uncited medium, plaintiffs argue that McKesson paid $14 billion for something (i.e., HBOC before disclosure of accounting ir-

regularities) that was really worth nothing (i.e., HBOC after disclosure of accounting irregularities). This, argue plaintiffs, constitutes waste. I disagree.

> FN18. Complaint ¶ 28.

When McKesson exchanged approximately $14 billion of its stock for all of HBOC's outstanding stock, the market valued HBOC stock at or around that price. That is, the merger did not appear wasteful when it was entered into, put to a shareholder vote, and approved. The fact that the merger turned out badly or, indeed, abominably for McKesson simply does not and cannot mean that approval of the merger was an act of corporate waste *at the time* the McKesson board entered into it. [FN19] The facts alleged by plaintiffs do not make out a waste claim and do not demonstrate that the merger was other than a good faith effort to advance corporate interests or the product of a valid business judgment, at the time the board approved the transaction.

> FN19. *See, e.g., Gagliardi v. TriFoods Int'l., Inc.*, Del. Ch., 683 A.2d 1049, 1051 (1996) (stating that an "elementary precept of corporation law [holds that] in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith."); *see also Harbor Fin. Partners v. Huizenga*, Del. Ch., C.A. No. 14933, mem. op. at 34, Strine, V.C. (Nov. 11, 1999).

In any event, plaintiffs' argument, in my opinion, fundamentally misapprehends the nature of a waste claim. If Company A exchanges $100 for an asset from Company B that Company A believes is worth $100, it is not "waste" if it later turns out that Company B's asset was worth only $10. Company B may have perpetrated a fraud on Company A or, perhaps, Company A's directors breached their duty of care, but Company A or its directors did not commit "waste."

Plaintiffs are examining a corporate transaction with perfect 20/20 hindsight and declaring that it turned out horribly for McKesson, so horribly that it must be a waste of corporate

Westlaw.

Not Reported in A.2d                                                                                          Page 8
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

assets. But the relevant time to measure whether the McKesson board committed "waste" is at the time they entered into and approved the transaction. To analyze this claim under the waste standard confuses the due care standard with substantive due care-a concept that is foreign to the business judgment rule. [FN20] Due care in the decision making context is process due care-whether the board was reasonably informed of all material information reasonably available at the time it made its decision. That is the true nature of plaintiffs' attack on McKesson's board, to which I turn next.

> FN20. *See Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000).

### b. *The Due Care Claim*
Here lies the heart of the lawsuit against former McKesson directors and, to a lesser extent, former HBOC directors. [FN21] Plaintiffs contend that the directors missed several "red flags" that should have alerted them to the accounting problems, in the course of full-scale due diligence, before they approved the merger. Plaintiffs then allege that the directors failed to identify the accounting defects, with some degree of mental culpability ranging from actual knowledge to gross recklessness, reckless disregard, just plain recklessness and, finally, gross negligence.

> FN21. I characterize this claim as primarily directed against the McKesson directors because the merger represented something of a windfall to the HBOC shareholders to the extent that the losses borne by HBOC shareholders in connection with the accounting irregularities were serendipitously halved (or thereabout) by virtue of the merger. In other words, because HBOC shareholders received properly valued McKesson stock for their own improperly or, rather, overvalued HBOC stock, and held only a 60% interest in the combined company, as opposed to all of it when the irregularities were disclosed and the stock price plummeted, HBOC shareholders bore only 60% of whatever losses accrued from the accounting irregularities, as opposed to 100%. Former McKesson shareholders, undoubtedly to their chagrin, bore the remaining 40% of the losses. Put more simply, by reducing their ownership interest in the company containing

the earnings overstatements from 100% to 60% through the merger, HBOC shareholders reduced their exposure to the overstatements by the same amount.

**\*9** The notion that McKesson directors had actual knowledge of HBOC's earnings overstatements and nonetheless proceeded with the merger finds no support in the amended complaint. Moreover, it is simply illogical to presume that McKesson directors would *knowingly* cause McKesson to acquire a company with significant, undisclosed earnings misstatements. Nothing in the pleadings remotely suggests a reason why McKesson would purposefully buy such a company; nor do the pleadings offer anything by way of explanation-not a single fact or theory that could possibly support such a conclusion. [FN22]

> FN22. Plaintiffs' allegation that HBOC directors proceeded with actual knowledge of accounting irregularities is a more complicated issue. It is more properly addressed in my discussion of plaintiffs' oversight claims, *infra,* at 41-44.

Taking all the facts in the complaint as true, and reading every conceivable inference in plaintiffs' favor, inexorably leads to the conclusion that plaintiffs' claims sound in negligence, at most. The McKesson board determined that it was in McKesson's strategic interests to enter the healthcare information technology business. It then acted on that objective by pursuing a business combination with HBOC-one of the leading companies in the field. It hired expert accounting and financial advisors to perform due diligence on HBOC-DeLoitte & Touche and Bear Stearns, respectively. After DeLoitte and Bear Stearns completed their due diligence reviews, with the participation of McKesson management, they waived "green flags" to the McKesson board, in effect saying, "This merger is financially and strategically sound." The McKesson directors approved the merger.

Defendants characterize the "red flags" that plaintiffs make so much of as "dated," "obscure," and "inconsequential" relative to the prominent "green flags" given to the directors by the accounting and financial experts who conducted due diligence reviews in advance of the merger. When plaintiffs' "red flags" are juxtaposed with the clean bill of health given

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                    Page 9
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

by DeLoitte and Bear Stearns after due diligence reviews, the complaint permits one conclusion: that the McKesson directors' reliance on the views expressed by their advisors was in good faith. What would plaintiffs have the McKesson board do in the course of making an acquisition other than hire a national accounting firm and investment bank to examine the books and records of the target company? Nothing in the pleadings otherwise casts doubt on the good faith of the McKesson directors. [FN23]

> FN23. If these facts demonstrate anything, it is merely that DeLoitte, Bear Stearns, and McKesson management performed shoddy due diligence. Plaintiffs have not brought claims against any of these parties.

Undaunted by the facts alleged in their own complaint, plaintiffs contend that "there is no authority for defendants' argument that the directors here are entitled to abdicate their duties to their experts." [FN24] It is, in reality, plaintiffs' argument that is without basis in fact or law. Directors of Delaware corporations quite properly *delegate* responsibility to qualified experts in a host of circumstances. [FN25] One circumstance is surely due diligence review of a target company's books and records. To delegate this assignment is not an "abdication" of duty. [FN26]

> FN24. Plaintiffs' Brief at 17.

> FN25. 8 *Del. C.* § 141(e).

> FN26. For an excellent description of the due diligence process in the context of a merger, *see generally,* A. Lajoux & C. Elson, *The Art of M & A Due Diligence* (2000). To conduct due diligence, acquirors typically draw from in-house sources of expertise and from retained outside consultants and advisers. *Id.* at 15.

The complaint here, fairly read, alleges that the McKesson directors were advised by their experts (DeLoitte and Bear Stearns) and that they relied on their expertise in conducting due diligence ancillary to the proposed merger. So the question becomes whether such directors are to be "fully protected" on the basis that they relied in good faith on qualified

experts under 8 *Del. C.* § 141(e). The McKesson board is entitled to the presumption that it exercised proper business judgment, including proper reliance on experts. Plaintiffs have not rebutted the presumption with particularized facts creating reason to believe that the McKesson board's conduct was grossly negligent. That is, plaintiffs have not alleged particularized facts (in contrast with conclusions) that, if proved, would show that (1) the directors in fact did not rely on the expert, or (2) that their reliance was not in good faith, or (3) that they did not reasonably believe that the experts' advice was within the experts' professional competence, or (4) that the directors were at fault for not selecting experts with reasonable care, or (5) that the issue (here, alleged accounting deficiencies in HBOC's financial records) was so obvious that the board's failure to detect it was grossly negligent regardless of the experts' advice, or (6) that the board's decision was so unconscionable as to constitute waste or fraud. [FN27] This complaint is devoid of particularized allegations along these lines and is, therefore, incapable of surviving a motion to dismiss.

> FN27. *Brehm v. Eisner,* Del.Supr., 746 A.2d 244, 262 (2000).

*10 More importantly, this Court has stated on several occasions that mere allegations that directors made a poor decision-absent some showing of self-dealing or suspect motivation-does not state a cause of action, much less meet the standard for excusing demand under the second prong of *Aronson.* [FN28] When the challenged transaction was approved by a board composed of a majority of independent, disinterested directors, "a heavy burden falls on [plaintiffs] to avoid pre-suit demand" by challenging the directors' fulfillment of their duty of care. [FN29]

> FN28. *See, e.g., Gagliardi,* 683 A.2d at 1052 (stating that to "allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect.").

> FN29. *Grobow,* 539 A.2d at 190.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                          Page 10
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

In determining whether the complaint creates any doubt that the McKesson directors used due care in approving the merger, the Court considers whether the directors:

(i) inform[ed] themselves of available critical information before approving the transaction; (ii) consider[ed] expert opinion; (iii) provid[ed] all Board members with adequate and timely notice of the [transaction] before the full Board meeting and of its purpose; or (iv) inquir[ed] adequately into the reasons for or terms of [the transaction].... [FN30]

FN30. *Id.* at 191.

Plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors did not act in accordance with any of these guidelines. Plaintiffs' allegations that directors were less than fully informed of reasonably available material information or that they considered the merger in any other procedurally unsound manner relies entirely on the wisdom of hindsight. The complaint fails to create a reasonable doubt that the informational component of the McKesson directors' decision-making process, measured by the concept of gross negligence, included consideration of all material information reasonably available.

Defendants have also directed the Court's attention to exculpatory charter provisions, enacted under 8 *Del. C.* § 102(b)(7), in McKesson's and the combined McKesson HBOC's articles of incorporation. Although the exculpatory provisions serve as adequate independent grounds for dismissing the due care claim, [FN31] I principally rely on plaintiffs' failure to allege particularized facts creating a reasonable doubt that the merger, at the time it was entered into, was other than a valid exercise of business judgment.

FN31. To be precise, the plaintiffs' complaint fails to allege adequately either pre-merger or post-merger bad faith or disloyalty by the McKesson or HBOC boards. Read fairly, this aspect of plaintiffs' complaint, which sounds in negligence and seeks money damages as a remedy, must be dismissed because of the § 102(b)(7) provision. *See In re Frederick's of Hollywood, Inc. Shareholders Litig.,* Del. Ch., Consol. C.A. No. 15944, mem. op. at 14-16, Jacobs, V.C. (Jan. 31, 2000); *In*

*re Lukens Inc. Shareholders Litig .,* Del. Ch., Consol. C.A. No. 16102, mem. op. at 26-27, Lamb, V.C. (Dec. 1, 1999).

*B. Demand Futility and Standing for Oversight Claims*

The oversight claims do not challenge a director's decision or judgment but, rather, assert that directors failed to properly monitor the corporation they managed. The Delaware Supreme Court modified the demand futility analysis for claims that do not challenge a business decision in *Rales v. Blasband.* [FN32] In the oversight context, where the board has not yet made a decision, demand is excused only when the complaint contains particularized facts creating a reasonable doubt that a majority of the directors would have been independent and disinterested when considering the demand. [FN33] Directors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when "the potential for liability is not a mere threat but instead may rise to a substantial likelihood." [FN34]

FN32. Del.Supr., 634 A.2d 927 (1993).

FN33. *Id.* at 934 n. 9 (stating that "where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand. Indeed, requiring demand in such circumstances is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so.").

FN34. *See In re Baxter Int'l., Inc. Shareholders Litig.,* Del. Ch ., 654 A.2d 1268, 1269 (1995) (quoting *Rales v. Blasband,* 634 A.2d at 936 (internal quotations omitted)).

**\*11** The odd procedural posture in which this case arises has caused an awkward bifurcation of plaintiffs' oversight claims. Plaintiffs allege that the directors of McKesson HBOC, the parent, *and* HBOC, now a wholly-owned subsidiary, recklessly disregarded the best interests of the re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 11
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

spective companies by failing to monitor and control their accounting and financial reporting practices. Accordingly, plaintiffs have brought two oversight claims: the first against HBOC's board for pre-merger oversight failures (the "First Oversight Claim") and the second against McKesson HBOC's board for post-merger oversight failures (the "Second Oversight Claim").

1. *The First Oversight Claim*

Plaintiffs' First Oversight Claim targets the HBOC board for pre-merger oversight failures. Although the defendants contest the merits of the First Oversight Claim, they principally argue that the merits need not and should not be reached because none of the named plaintiffs have standing to bring this claim, predicated on alleged pre-merger fiduciary breaches.

Section 327 of Delaware's General Corporation Law requires a shareholder plaintiff asserting derivative claims to allege that he was a stockholder of the corporation at the time of the transaction of which he complains. [FN35] In addition to this statutory requirement, it is also settled law in Delaware that a derivative plaintiff must be a stockholder at the time he commences suit and must maintain such stockholder status throughout the course of the litigation. [FN36] This is known as the continuous ownership requirement.

> FN35. 8 *Del. C.* § 327 provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

> FN36. *See, e.g., Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984).

None of the four plaintiffs who bring this suit are presently, or were at the time of filing the complaint, shareholders of HBOC. As explained earlier, HBOC became a wholly-owned subsidiary of McKesson in connection with the merger, McKesson was renamed McKesson HBOC, and the now wholly-owned HBOC is simply the Company's inform-

ation technology subsidiary. For clarity, I will refer to the post-merger HBOC entity as "HBOC Sub."

Nonetheless, two of the four purported representative plaintiffs in this action, Madajczyk and Dalman, contend that they have maintained standing to bring derivative claims against the HBOC board for alleged pre-merger fiduciary breaches because they were shareholders of HBOC before the merger and became shareholders of McKesson HBOC in connection with the merger. Thus, Madajczyk and Dalman insist that their continuing equity interests meet all the statutory and common law continuous ownership requirements for standing.

It is settled Delaware law, however, that once a plaintiff ceases to be a shareholder, "whether by reason of a merger or for any other reason," he loses standing to continue a derivative suit. [FN37] The Delaware Supreme Court definitively set forth this bright line rule in *Lewis v. Anderson* and recently reaffirmed it in *In re First Interstate Bancorp Consolidated Shareholder Litigation.* [FN38] The plaintiffs have not effectively distinguished either case.

> FN37. *Id.* at 1049; *see also Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 354 (1988).

> FN38. Del. Ch., 729 A.2d 851 (1998), *aff'd sub nom., Bradley v. First Interstate Bancorp,* Del.Supr., No. 445, Walsh, J. (March 21, 2000) (ORDER).

**\*12** Defendants contend that in *First Interstate* this Court held that the derivative "claims" of a First Interstate Bancorp shareholder "were extinguished" as a result of the stock-for-stock merger with Wells Fargo & Company. This characterization of the *First Interstate* holding is well off the mark. *First Interstate* did not hold that a merger "extinguished" derivative "claims." Such a conclusion is utterly incompatible with 8 *Del. C.* § 259(a). [FN39] Rather, the *First Interstate* Court held that barring the applicability of either of two exceptions set forth in *Lewis v. Anderson,* the merger "extinguished" plaintiff's "standing" to assert derivative claims. [FN40]

> FN39. Section 259(a) provides that all rights, priv-

Westlaw.

Not Reported in A.2d                                                                                      Page 12
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

ileges, powers and franchises pass to the surviving corporation in the event of a merger. Derivative claims of the merged corporation constitute choses in action that pass to the surviving corporation by operation of § 259(a). *See Lewis v. Anderson, 477 A.2d at 1044.*

> FN40. *In re First Interstate,* 729 A.2d at 867.

The two exceptions to *Lewis v. Anderson's* apparently iron-clad rule that a shareholder of a merged entity loses standing to assert pre-merger derivative claims are (i) if the merger itself is the subject of a claim of fraud or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise. [FN41] In *First Interstate,* plaintiff Bradley argued under the second exception to the standing rule. The Court rejected this argument holding that "the exception would not apply to mergers with outside or pre-existing corporations with substantial assets." [FN42] Although plaintiffs have not argued under this second exception, it would be unavailing for similar reasons given that (1) the McKesson/HBOC merger involved two free-standing companies with substantial assets, and (2) the new, combined entity comprised a mix of assets distinctly different from that of the pre-merger company. This arm's length stock-for-stock transaction between two independent companies cannot be characterized as a corporate reorganization.

> FN41. *Lewis v. Anderson,* 477 A.2d at 1046 n. 10 (citing *Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246, 249 (1970); *Schreiber v. Carney,* Del. Ch., 447 A.2d 17 (1982)).

> FN42. *In re First Interstate,* 729 A.2d at 867 (internal quotations omitted) (citing *Schreiber v. Carney* at 22; also citing *Bonime v. Biaggini,* Del. Ch., C.A. No. 6925 & 6980, Walsh, V.C. (holding second exception not applicable where merger resulted in a "corporate mix ... distinctly different from that [of pre-merger company]")).

Like the plaintiff Bradley in *First Interstate,* however, plaintiffs in this case ask the Court to follow the Third Circuit's decision in *Blasband v. Rales,* [FN43] which granted

plaintiffs standing under virtually identical circumstances, rather than *Lewis v. Anderson,* which denied standing in circumstances also virtually identical to those here.

> FN43. 971 F.2d 1034 (3 rd Cir.1992).

Plaintiffs have not explained why they believe I am free to follow *Blasband* and not *Lewis.* The *First Interstate* Court rejected the Third Circuit's reasoning in *Blasband v. Rales* in no uncertain terms. Reading *Lewis v. Anderson* expansively, the *First Interstate* Court held that former First Interstate shareholders lost standing to assert pre-merger derivative claims solely by virtue of the merger. In contrast to *Blasband v. Rales,* the fact that the purported merger plaintiff maintained a significant, though diluted, economic interest in the combined (Wells Fargo) company after the stock-for-stock merger had no impact on the *First Interstate* Court's view of the standing issue:

> "Finally, plaintiff Bradley asks the Court to follow the Third Circuit's ruling in *Blasband v. Rales,* 3 rd Cir., 971 F.2d 1034 (1992) (purporting to apply Delaware law), and a case finding post-merger standing under California law. I decline to do so, as the teaching of the Delaware Supreme Court in *Lewis v. Anderson* is both clear and controlling of my decision." [FN44]

> FN44. *In re First Interstate,* 729 A.2d at 868 (footnotes omitted).

*13 In a footnote, the *First Interstate* Court described *Blasband* as being "inconsistent with the clear holding of *Lewis v. Anderson.*" [FN45]

> FN45. *Id.* at 868 n. 18.

During the briefing on this motion, the Delaware Supreme Court's Order affirming *First Interstate* bolstered defendants' reliance on that case and, relatedly, defendants' reliance on their construction of *Lewis v. Anderson* and *Blasband v. Rales.* Importantly, the Supreme Court's Order concluded that the Court of Chancery correctly determined that plaintiff Bradley had pleaded derivative claims and that "[a]ccordingly, [he] lacks standing to assert those claims. *See Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984)." [FN46]

Not Reported in A.2d                                                                              Page 13
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

> FN46. *Bradley v. First Interstate Bancorp,*
> Del.Supr., No. 455, Walsh, J. (March 21, 2000)
> (ORDER) (emphasis added).

*First Interstate* clearly expressed the Delaware Courts' re-
jection of the Third Circuit's holding in *Blasband v. Rales*
that the combination of a direct pre-merger equity interest
(in the subsidiary) and a direct but diluted post-merger
equity interest (in the surviving corporation) is sufficient to
meet the common law continuous ownership requirement
necessary to prosecute pre-merger derivative claims. The
Third Circuit's view-that the plaintiff shareholders' continu-
ing economic interest in the subsidiary and thereafter in the
parent does not give rise to the concern expressed in 8 *Del.*
*C. § 327*-has been characterized by commentators as "per-
suasive." [FN47] Nonetheless, it is not the law in Delaware.
Accordingly, the complaint is dismissed to the extent that it
purports to assert claims on behalf of former HBOC share-
holders (plaintiffs Madajczyck and Dalman) for pre-merger
acts or omissions of the HBOC directors.

> FN47. *See* D. Wolfe & M. Pittenger, *Corporate*
> *and Commercial Practice in the Delaware Court of*
> *Chancery,* § 9-2(b)(2)(ii) at 549 (1999). Quite
> frankly, I also find the Third Circuit's view on this
> issue persuasive. To be sure, it is not consistent
> with the Delaware Supreme Court's holding in
> *Lewis v. Anderson* and, for that reason, I am not
> free to follow it. Nonetheless, I do not think that a
> principled economic argument exists for denying
> standing to a former HBOC shareholder who con-
> tinues to hold an equity interest, albeit diluted, in
> the HBOC subsidiary through the controlling in-
> terest of the combined entity, McKesson HBOC.
> Like the Third Circuit in *Blasband,* I do not under-
> stand how the concerns that animate § 327 are im-
> plicated in stock-for-stock mergers of this kind. In-
> deed, the Court of Chancery has suggested that
> former stockholders of the subsidiary who held
> stock in the parent post-merger should nonetheless
> have standing to assert derivative claims in exactly
> this type of situation. *See In re Caremark Derivat-*
> *ive Litig.,* Del. Ch., 698 A.2d 959, 972 n. 30
> (1996). But if this area of Delaware law is to be

made consistent with basic economic principles, as
well as fundamental principles of equity and fair-
ness, it will have to come from the Delaware Su-
preme Court.

Although the complaint-as pleaded regarding the First Over-
sight Claim-must be dismissed for lack of standing, the dis-
missal order will be without prejudice for three reasons.
First, as presently drafted, the amended complaint does not
implicate either of the two exceptions to the standing re-
quirement in the merger context. Nor have plaintiffs argued
that the merger was perpetrated merely to deprive the share-
holders of standing to bring a derivative action or that the
merger was in reality merely a reorganization. [FN48] Nev-
ertheless, it is conceivable that the plaintiffs might be able
to allege, consistent with Rule 11, that the merger was de-
signed in part to thwart shareholder derivative claims arising
out of the HBOC board's failure to monitor the company's
internal accounting practices. Dismissing the complaint
without prejudice will give plaintiffs that opportunity.

> FN48. *See Kramer v. Western Pac. Indus., Inc.,*
> Del.Supr., 546 A . 2d 348, 354 (1988) (describing
> the two exceptions to the rule that a plaintiff must
> be a shareholder at the time of filing of the suit and
> must remain a shareholder throughout the litiga-
> tion).

Second, plaintiffs have not asserted a double derivative
claim on behalf of the parent corporation (McKesson
HBOC) to enforce a cause of action (the oversight claim
against the directors and management of HBOC) in favor of
a related corporation (HBOC Sub). Plaintiffs' counsel tried,
during oral argument on the motion to dismiss, to recast this
lawsuit as a double derivative action. Plaintiff Bradley, in
*First Interstate,* made a somewhat similar argument, con-
tending that the claims previously held by First Interstate
had passed in the merger to the survivor, Wells Fargo, and
he was therefore free to pursue them derivatively as a new
stockholder of the survivor. The Court of Chancery rejected
this argument on the ground that plaintiff Bradley had never
purported to satisfy the demand requirements for a derivat-
ive suit on behalf of Wells Fargo. The Court did not ad-
dress, however, whether standing would have been found to
exist if such a showing had been made. [FN49] In any

Not Reported in A.2d                                                                                      Page 14
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

event, the plaintiffs have not adequately pled such a claim at this juncture, not having (apparently) made demand on the boards of the subsidiary company (HBOC Sub) and the parent company (McKesson HBOC) . [FN50] Here, plaintiffs appear to contend that demand is futile as to both boards. But the plaintiffs have not identified the members of the HBOC Sub board, much less pled explicitly that making a demand on them would be futile. Furthermore, plaintiffs have not named HBOC Sub as a party, also a prerequisite for asserting a double derivative action. [FN51]

> FN49. *See* D. Wolfe & M. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(b)(3)(iii) at 96 (2000 Supp.).

> FN50. 13 Fletcher Cyclopedia of Corporations, § 5977.

> FN51. *Carlton Invs. v. TLC Beatrice Int'l. Holdings, Inc.,* Del. Ch., C.A. No. 13950, mem. op. at 17, Allen, C. (Apr. 16, 1996) ("[I]t is of course well settled that in a standard double derivative action both the parent and subsidiary corporation are indispensable parties.").

**\*14** Third, and finally, although it is not pleaded in the existing complaint, certain allegations made in the amended complaint and during oral argument on the motion suggest that the current shareholders of the combined McKesson HBOC may be able to assert a claim for breach of fiduciary duty directly against the directors of the combined company as a result of the directors' decision not to pursue a potential claim against the former directors of HBOC for the (alleged) fraud in connection with HBOC's accounting practices. If the directors of the combined company decided not to pursue this potential claim in a manner that is grossly negligent or self-interested, such decision may itself give rise to a potential claim for breach of the fiduciary duties of care or loyalty. That claim would be separate and distinct from a claim based on the failure of HBOC's directors to oversee or monitor properly the accounting practices at HBOC before the merger (*i.e.,* the First Oversight Claim). The claim that I am suggesting might be implicated here arose when the board of the combined company refused, conceivably for reasons related to self-interest or lack of information, to pursue a po-

tential claim or asset of the combined company. In any event, this claim is conceivably implicated by the existing pleadings and, regardless of whether or not it would withstand scrutiny on a motion to dismiss, I think, in the interest of justice, plaintiffs should be afforded an opportunity to amend their existing complaint (if possible) so as to assert it properly. By dismissing the complaint without prejudice, therefore, I afford plaintiffs an opportunity to marshal facts in support of one or more of the alternative theories implicated in the existing pleadings to avoid the impediment of the standing requirements.

*2. The Second Oversight Claim*

With the First Oversight Claim barred on standing grounds, defendants attack the Second Oversight Claim straightforwardly. They argue that the McKesson HBOC board's failure to detect and cure accounting irregularities for a mere 3 1/2 months (from the merger date in January 1999 until the disclosures of accounting irregularities in April 1999) could not possibly constitute oversight violations under the high liability standards set forth in *Graham v. Allis-Chalmers Mfg. Co.* [FN52] or *In re Caremark Int'l Inc. Derivative Litigation,* [FN53] the seminal Delaware cases addressing directors' oversight duties. This argument, no doubt, carries some intuitive appeal. It also, however, exposes the awkward bifurcation of the oversight claims alluded to earlier, which I will now explain in greater detail.

> FN52. Del.Supr., 188 A.2d 125 (1963).

> FN53. Del. Ch., 698 A.2d 959 (1996).

Analysis of the Second Oversight Claim is to a significant extent shaped by my analysis of plaintiffs due care and waste claims brought against the McKesson directors. In analyzing these claims, it is evident that plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors' decision to acquire HBOC was anything other than a valid exercise of business judgment, made for the good faith purpose of advancing a legitimate corporate interest. It is equally evident, despite the complaint's prolixity, that plaintiffs have not alleged facts creating a reasonable doubt that McKesson's directors acted on an informed basis or properly relied on the advice of the expert advisors they

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                    Page 15
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

retained in connection with the due diligence review of HBOC.

*15 Within three months of the McKesson board's recommendation and McKesson shareholders' approval of the merger, the combined Company's auditor, DeLoitte & Touche, informed the board of HBOC Sub's accounting irregularities. The McKesson HBOC board, comprised of six former McKesson directors and six former HBOC directors, responded to this information by initiating an internal investigation that culminated in a series of sweeping earnings restatements. In addition, the board made sweeping management changes, firing several senior managers and creating a new executive management structure.

In light of these facts, drawn directly from plaintiffs' complaint, it seems ineluctable that McKesson directors became aware of the accounting improprieties after the merger was consummated and immediately took decisive steps to disclose and cure them. These actions do not bespeak faithless or imprudent fiduciaries.

The role played by the six former HBOC directors on the combined Company's board in connection with the disclosure of the accounting irregularities remains somewhat unclear. A modicum of well-pled facts, sprinkled throughout the complaint, could lead to an inference that the HBOC directors might have had knowledge of suspect accounting practices and, therefore, *potential* accounting irregularities, in advance of the DeLoitte report. [FN54] If plaintiffs can allege such facts with particularity, which to this point they have not, relief from the demand requirement might be warranted.

> FN54. I emphasize the word "potential" because despite having (inconsistently) pled that every named defendant had "actual" knowledge of accounting irregularities and legal violations, plaintiffs have not asserted a single fact that might reasonably support such an allegation.

As recounted more fully above, plaintiffs have alleged well-pled facts that in April 1997 the CFRA published a report questioning HBOC's revenue recognition practices. This report garnered a fair amount of media attention, was the focus of much analyst commentary, and appeared to have some impact, albeit brief, on HBOC's share price. Although HBOC did not issue an official response, *The Atlanta Constitution* quoted HBOC's director of investor relations as saying "we don't think [the report] warrants comment." [FN55]

> FN55. Complaint at ¶ 21, Ex. D.

These facts indicate that HBOC, at some organizational level, knew of and responded to public criticism of its accounting practices. Plaintiffs have not, however, alleged facts that HBOC's directors had actual knowledge of these events and, therefore, possessed actual knowledge of potential accounting irregularities. Moreover, I do not, at this point, suggest that HBOC's board had constructive knowledge of a statement the company's investor relations department issued. In other words, I do not suggest that the mere existence of a statement from HBOC's investor relations department, made in response to the CFRA report, is sufficient to impute knowledge of such statement to the company's board of directors. [FN56] If plaintiffs can allege particularized facts that might enable this Court to infer that HBOC directors (or perhaps members of HBOC's audit committee) did possess knowledge of facts suggesting potential accounting improprieties (such as knowledge of the CFRA reports) and took no action to respond to them until they were confronted (three months after the merger) with DeLoitte's audit report, one could argue that the HBOC directors (or the audit committee members) failed to act in good faith. [FN57] As a result, demand might in turn be excused.

> FN56. I leave it to plaintiffs to adduce such facts through various pre-discovery fact-gathering methods they have at their disposal. As the Delaware Supreme Court has repeatedly exhorted, shareholders plaintiffs should use the "tools at hand," most prominently § 220 books and records actions, to obtain information necessary to sue derivatively. *See, e.g., Rales v. Blasband,* 634 A.2d at 934-935 n. 10; *Brehm v. Eisner,* 746 A.2d at 249.

> FN57. Plaintiffs allege that HBOC had an audit committee in place. In light of the known facts, one would be hard pressed to say that it performed par-

Not Reported in A.2d                                                                                    Page 16
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

ticularly well. Nevertheless, the existence of an audit committee, together with HBOC's retention of Arthur Anderson as its outside auditor to conduct annual audits of the company's financial reporting, is some evidence that a monitoring and compliance system was in place at HBOC premerger. If a properly framed complaint were filed, the interesting question would be whether one could find directors liable on an oversight claim when those directors have retained a reputable independent, outside auditing firm and when the same directors have appointed an audit committee that is charged with overseeing the internal and external auditors? Would these facts support a finding that the directors had "utterly fail[ed] to attempt to assure a reasonable reporting system exists" or exhibited a "sustained and systematic failure to exercise reasonable oversight [?]" *Caremark* at 971. Or do such facts indicate the malfunction or breakdown of the compliance system, rather than the absence of, or systematic failure to exercise, reasonable oversight? Without an adequately framed complaint, however, these issues are not properly before the Court. But they illustrate the problem of assessing claims, based on accounting irregularities, under the *Caremark* standard.

**\*16** This result presents an awkward circumstance. If HBOC directors possessed knowledge of suspect accounting practices at HBOC *before* the merger, one would think such knowledge might give rise to colorable claims that McKesson, as an acquiror, could assert against HBOC under fraud-based theories or perhaps for breaches of provisions in the parties' merger agreement. McKesson, however, is not asserting such claims.

Although one may speculate as to the reasons behind McKesson's disinclination to take legal action against HBOC and its officers and directors, such speculation is completely idle absent nonconclusory allegations of fact. [FN58] Nonetheless, if plaintiffs can allege with some particularity facts indicating that HBOC directors had actual knowledge of accounting irregularities, or knowledge of facts indicating potential accounting irregularities, and took no action until

confronted with the DeLoitte audit report in early 1999 (after the merger), such facts, to my mind, could possibly excuse demand as to the Second Oversight Claim. In addition, as indicated above, such facts could give rise to claims that McKesson might bring directly attacking the merger seeking rescission or rescissory damages; or, if McKesson HBOC was unwilling to assert contract-based claims, shareholders might endeavor to bring those claims derivatively on behalf of McKesson HBOC.

FN58. Plaintiffs have alleged, in a single conclusory paragraph, that demand was futile because the McKesson HBOC board was faced with an "inherent conflict" that made it unable to respond to the disaster or to bring suit against HBOC for fraud or breach of contract. Second Amended Compl., ¶ 77. According to the amended complaint, the McKesson HBOC board is evenly split-consisting of six former McKesson directors and six former HBOC directors. As a result, when the accounting improprieties came to light, "one half of the Board's blame was the other half of the Board's cover." Pl. Ans. Brief at 9 (Jan. 14, 2000). The notion of a paralyzed board is belied somewhat by the aggressive steps to disclose the problem and to remove certain senior managers. On the other hand, the current board's failure or refusal to pursue potential claims against HBOC's former directors and managers, or against those firms that performed the due diligence, supports the notion of an incapacitated board. But I need not address this issue now, given that plaintiffs will be afforded an opportunity to plead more particular facts about what the HBOC directors knew concerning the accounting improprieties, and when they knew it, in the context of either a direct attack on the current board's failure to pursue the claim or in a double derivative action, as mentioned earlier. Such facts, together with additional facts regarding the board's composition, would assist a court in determining whether the board is structurally unable to make an independent and disinterested judgment regarding the potential claim against HBOC.

Westlaw.

Not Reported in A.2d                                                              Page 17
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
**(Cite as: 2000 WL 1370341 (Del.Ch.))**

Notwithstanding the present inadequacy of the amended complaint, I am convinced that the course of action most consistent with fairness and equity is to dismiss the Second Oversight Claim without prejudice and to grant plaintiffs leave to replead and allege additional, particularized facts that would support a demand futility determination.

### IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, I dismiss plaintiffs' due care and waste claims for failure to make demand under Court of Chancery Rule 23.1. Further, I dismiss the first and second oversight claims, but this dismissal is without prejudice. Using the tools at hand, plaintiffs may seek to develop additional particularized facts in order to allege properly an oversight claim that will meet the demand futility standard and to avoid the standing requirement of Delaware's continuing ownership rule.

An Order has been entered in accordance with this Memorandum Opinion.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that plaintiffs' due care and waste claims are dismissed pursuant to Court of Chancery Rule 23.1, and that plaintiffs' first and second oversight claims are dismissed without prejudice.

Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**8**

Westlaw.

Not Reported in A.2d                                                                                                    Page 1
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: 2005 WL 1089021 (Del.Ch.))

**H**

UNPUBLISHED OPINION. CHECK COURT RULES BE-
FORE CITING.

Court of Chancery of Delaware.
In re GENERAL MOTORS (HUGHES) SHAREHOLDER
LITIGATION
No. Civ.A. 20269.

Submitted March 7, 2005.
May 4, 2005.

Jay W. Eisenhofer, Geoffrey C. Jarvis and P. Brad
deLeeuw, of Grant & Eisenhofer P.A., Wilmington,
Delaware; Michael Hanrahan, Thomas A. Mullen, Paul A.
Fioravanti, Jr. and Tanya P. Jefferis, of Prickett, Jones & El-
liott, P.A., Wilmington, Delaware; Marc A. Topaz, of Schif-
frin & Barroway, LLP, of Bala Cynwyd, Pennsylvania;
Richard B. Brualdi and Kevin T. O'Brien, of the Brualdi
Law Firm, New York, New York, for Plaintiffs, of counsel.

R. Franklin Balotti, Lisa A. Schmidt and Srinivas M. Raju,
of Richards, Layton & Finger, Wilmington, Delaware;
Robert J. Kopecky and Timothy A. Duffy, of Kirkland &
Ellis LLP, Chicago, Illinois; Greg A. Danilow and Stephen
A. Radin, of Weil Gotschal & Manges LLP, New York,
New York, for Defendants Percy N. Barnevik, John H. Bry-
an, Armando M. Codina, George M.C. Fisher, Nobuyuki
Idei, Karen Katen, Alan G. Lafley, Phillip A. Laskaway, E.
Stanley O'Neal, Eckhard Pfeiffer, John S. Smith, Jr., G.
Richard Wagoner, Jr., Lloyd D. Ward, and General Motors
Corporation, of counsel.

Edward P. Welch, Edward B. Micheletti, Seth M. Beausang,
James A. Whitney and T. Victor Clark, of Skadden, Arps,
Slate, Meagher & Flom LLP, Wilmington, Delaware, for
Defendant The News Corporation Limited.

*OPINION*

CHANDLER, J.

*1 Plaintiffs instituted this lawsuit against defendant Gener-
al Motors Corporation ("GM") and defendant The News
Corporation Limited ("News" or "News Corp."), [FN1]
challenging a series of transactions by which News acquired
a significant interest in Hughes Electronics Corporation

("Hughes"). [FN2] Hughes was previously a wholly-owned
subsidiary of GM. The individuals who were directors of
GM at the relevant times have also been named as defend-
ants (the "Individual" or "Director" defendants). [FN3]
Plaintiffs were at all relevant times holders of GM's Class H
Common Stock ("GMH"), which was a "tracking stock"
representing the financial performance of Hughes while
Hughes was wholly-owned by GM. For the reasons set forth
in more detail later, I grant the motion to dismiss brought by
GM and the Individual defendants. The complaint fails to
state a claim upon which relief can be granted as to GM and
the Individual defendants. I also grant News' motion to dis-
miss for the same reason.

> FN1. News is a South Australian corporation. Rev.
> Am. Consol. Class Action Compl. ("Compl.") ¶ 17.
> Letter of Edward P. Welch, Esq. to the Court of
> January 26, 2005.

> FN2. Hughes was renamed The DIRECTV Group,
> Inc. on March 16, 2004. *Id.* ¶ 10. I, as did plaintiffs
> in their Complaint, shall refer to the entity as
> "Hughes" for purposes of clarity.

> FN3. The Individual or Director defendants are: G.
> Richard Wagoner, Jr. ("Wagoner"), John F. Smith,
> Jr. ("Smith"), Percy N. Barnevik ("Barnevik"),
> John H. Bryan ("Bryan"), Armando M. Codina
> ("Codina"), George M.C. Fisher ("Fisher"), E.
> Stanley O'Neal ("O'Neal"), Eckhard Pfeiffer
> ("Pfeiffer"), Alan G. Lafley ("Lafley"), Karen
> Katen     ("Katen"),    Philip    A.    Laskaway
> ("Laskaway"), Nobuyki Idei ("Idei"), and Lloyd D.
> Ward ("Ward"). *Id.* ¶¶ 18-21.

I. INTRODUCTION

The operative complaint in this action is the Revised
Amended    Consolidated    Class    Action    Complaint
("Complaint"), filed on May 7, 2004. It is a "door-stop"
weight 97-page tome that purports to state seven claims.
The Complaint contains some facts, but also offers a rich
stew of conclusory allegations and legal arguments. Counts
I, II, III, and IV are against GM and the Individual defend-
ants for breaches of the duty of loyalty. Counts V and VI are
against GM and the Individual defendants for breach of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                        Page 2
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
**(Cite as: 2005 WL 1089021 (Del.Ch.))**

GM's Restated Certificate of Incorporation. Count VII is against News for aiding and abetting the Individual defendants' breaches of fiduciary duty. It is necessary that I briefly outline the Complaint's key elements and factual allegations.

*A. Director Defendants Were Not Disinterested and Independent*

Plaintiffs allege that the Director defendants are not disinterested and independent in connection with the transactions at issue in this case because their loyalties were to GM in order to preserve their directorships there, with the accompanying compensation and perquisites, and that the Director defendants were thus in conflict with the soon to be spun-off GMH shareholders. [FN4] Plaintiffs argue that the non-employee GM directors are excessively compensated for their services as directors, and that similar excess is present in the compensation of the Hughes directors. [FN5] Plaintiffs further attempt to impugn the independence of the directors by outlining professional connections that certain of the directors have that may relate to GM or Hughes. [FN6] Nevertheless, there are no allegations in the Complaint that any of the compensation paid to the non-employee GM directors is material to them, [FN7] with the exception that allegations of materiality are addressed toward defendant Smith, who was formerly the Chief Executive Officer of GM. [FN8]

FN4. Compl. ¶¶ 22-27.

FN5. For example, the non-employee GM directors receive an annual retainer of $200,000 per year, reimbursement for travel expenses, and other compensation valued by plaintiffs at $17,000 per year. Non-employee Hughes directors received an annual retainer of $140,000 per year. The Chair of GM's Audit Committee receives an annual retainer of $30,000 per year, and the committee's members receive an annual retainer of $20,000 per year. The Chairs of GM's Capital Stock Committee, Executive Compensation Committee, Investment Funds Committee, Directors and Corporate Governance Committee, and Public Policy Committee each receive annual retainers of $5,000 per year. *Id.* ¶¶ 22-26.

FN6. For example, Pfeiffer was also a director of Hughes. Bryan also serves on the board of Goldman Sachs Group, Inc., which provides investment banking services for GM. O'Neal is the CEO and a board member of Merrill Lynch & Co., which also provides financial services for GM and News. Bryan, Barnevik, Lafley, and Wagoner are members of The Business Council, and Lafley and Wagoner are members of The Business Round Table. Ward was CEO of the U.S. Olympic Committee, which receives substantial donations from GM. *Id.* ¶¶ 23-26.

FN7. The Complaint does allege that Pfeiffer and Bryan are "professional directors" and that they derive "substantial income" from serving on various boards of directors, but the Complaint does not allege that the income received from GM is material to them. *Id.* ¶¶ 23-24.

FN8. "Because of his many years of employment at GM and the pension and other benefits, compensation and perquisites he derives from GM, the financial health, credit rating and security of GM and GM's Pension Plans and Benefit Plans are of material significance to Smith." *Id.* ¶ 20. Other than defendant Wagoner, who is currently GM's Chairman, CEO, and President, none of the other Individual defendants are employees of GM. *Id.* ¶ 19.

*B. GM's Pension Crisis*

Plaintiffs further allege that GM and its directors were not independent because GM had a "pension crisis." [FN9] This conflict extended to the Investment Funds Committee of GM's Board of Directors, [FN10] which is a named fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA") for certain of GM's pension plans. [FN11] Plaintiffs allege that because GM's pension funds were underfunded by $19.3 billion by the end of 2002, and GM's debt rating had been downgraded by Standard and Poor's to BBB, the directors on the Investment Funds Committee faced a direct conflict of interest between their fiduciary responsibilities over the pension plans and their fiduciary duties as directors of GM owed to the GMH share-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
**(Cite as: 2005 WL 1089021 (Del.Ch.))**

holders. [FN12]

> FN9. *Id.* ¶¶ 28-36.

> FN10. The Investment Funds Committee was made up of defendants Barnevik, Codina, Fisher, Idei, O'Neal, and Smith. *Id.* ¶ 37.

> FN11. *Id.* ¶¶ 37-39.

> FN12. *Id.* ¶¶ 32, 39.

*C. The Transactions*

*2 The split-off of Hughes was accomplished via a series of transactions detailed below, and announced to the public for the first time on April 9, 2003. [FN13] Five days before the announcement, GM, as the 100% shareholder, caused Hughes to amend its certificate of incorporation to increase the number of authorized shares of Hughes common stock and Hughes Class B common stock from 1 million shares to 2.5 billion shares. [FN14] An "excess shares" provision was added to the certificate of incorporation and Hughes' board was staggered, among other amendments. [FN15]

> FN13. *Id.* ¶ 2.

> FN14. *Id.* ¶ 4.

> FN15. *Id.*

Just before the split-off of Hughes was accomplished, Hughes paid a special dividend to its sole shareholder, GM, of $275 million in cash. [FN16] The split-off occurred by GM's redemption of each GMH share in exchange for one share of Hughes' common stock, shares which Hughes had previously issued to GM. [FN17] GM sold its economic interest in Hughes to News Corp. in the form of Hughes Class B common stock. [FN18] GM received a combination of cash ($3.1 billion) and stock (28.6 million News Corp. Preferred American Depository Shares ("News ADSs")) from News. [FN19] The News ADSs were valued at approximately $1.0 billion, bringing the total compensation from News to GM to $4.1 billion. [FN20] Including the $275 million dividend, GM received a total of $4.375 billion in compensation for divesting itself of Hughes, with $3.375 billion

of that amount in cash. [FN21]

> FN16. *Id.* ¶¶ 6, 66-89.

> FN17. According to the Complaint, GM voted those 1.4 billion Hughes shares in favor of the merger between Hughes and the News Corp. subsidiary before distributing them to the GMH shareholders. *Id.* ¶¶ 7, 13.

> FN18. *Id.* ¶ 8.

> FN19. *Id.*

> FN20. *Id.*

> FN21. *Id.* ¶ 12.

Immediately following the above-described transactions, News acquired an additional interest in Hughes via the merger of a subsidiary of News into Hughes (the "Merger"), leaving News with approximately a 34% interest in Hughes. [FN22] The former GMH shareholders therefore received a combination of Hughes common stock and News ADSs in exchange for their GMH shares. [FN23] News later transferred its interest in Hughes to another subsidiary of News Corp., Fox Entertainment. [FN24]

> FN22. Via the merger, News exchanged News ADSs for 17.5% of the Hughes common stock held by the former GMH shareholders. *Id.* ¶¶ 9-10.

> FN23. *Id.* ¶ 11.

> FN24. *Id.* ¶ 10.

*D. Rights and Terms of (and Policies Regarding) the GMH Shares*

The rights and terms of the GMH shares were defined in Article FOURTH of GM's Restated Certificate of Incorporation. [FN25] Dividends paid to the GMH shareholders were paid out of the "Available Separate Consolidated Net Income of Hughes," as opposed to the dividends to GM's common shareholders, which were paid out of other available funds not including the "Available Separate Consolidated Net Income of Hughes." [FN26] When the GM shareholders

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                          Page 4
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
**(Cite as: 2005 WL 1089021 (Del.Ch.))**

voted, the GMH shareholders voted with the other GM common shareholders (the "GM $1 2/3" holders), but each GMH share was treated as 0.2 GM $1 2/3 shares. [FN27] Similarly, in the unlikely event that GM were to be liquidated, the GMH shareholders would receive distributions from the same pool as the GM $1 2/3 shareholders, but with each GMH share again representing 0.2 GM $1 2/3 shares. [FN28] The GMH shares, therefore, did not have a direct interest in Hughes' assets (or GM's) except through a liquidation of GM. In the event of a liquidation of Hughes, GMH shareholders would not receive the proceeds of that liquidation, but would receive GM $1 2/3 stock, as detailed below.

> FN25. *Id.* ¶ 41.
>
> FN26. *Id.*
>
> FN27. *Id.*
>
> FN28. *Id.*

*3 GM's Restated Certificate of Incorporation provided certain protections for the GMH shareholders in the event that GM should "sell, liquidate, or otherwise dispose of 80% or more of the business of Hughes...." [FN29] If one of those triggering events were to take place, each GMH share would be converted into GM $1 2/3 stock at a value equal to 120% of the value of the GMH stock on the date one of those transactions occurred. [FN30] Such a result could be avoided if the GM shareholders (both the GM $1 2/3 and the GMH) approved the transaction separately as individual classes. [FN31]

> FN29. *Id.* ¶ 42.
>
> FN30. *Id.*
>
> FN31. *Id.*

Recognizing that the interests of the GM $1 2/3 and GMH shareholders may not always coincide, GM created a board committee called the Capital Stock Committee to determine the terms of any material transaction between GM and Hughes and ensure fairness to all shareholders. [FN32] The Capital Stock Committee was chaired by Pfeiffer, with Barnevik and Bryan as members of the committee. [FN33]

The GM board also adopted a Board Policy Statement Regarding Certain Capital Stock Matters ("Policy Statement") setting forth procedures to be followed in the event of a material transaction between GM and Hughes. [FN34]

> FN32. *See id.* ¶ 23; *Solomon v. Armstrong,* 747 A.2d 1098, 1106- 07 (Del.Ch.1999).
>
> FN33. Compl. ¶¶ 21, 23-24.
>
> FN34. *Id.* ¶ 43. As opposed to the rights of the GMH shareholders set out in GM's Restated Certificate of Incorporation, which is binding upon the GM board, there is no information in the Complaint with respect to the extent to which the GM board was bound to protect the rights of the GMH shareholders granted by the Policy Statement. If the Policy Statement had the effect of a resolution adopted by the board, it presumably could be rescinded or amended by nothing more than another board resolution. The Complaint unreasonably implies that the Policy Statement was binding because the GM board chose to seek shareholder consent for the Hughes transactions. *Id.* ¶ 45.

This Policy Statement required that in the event of a transfer of material assets from Hughes to GM, GM's board would be required to declare and pay a corresponding dividend to the GMH shareholders. [FN35] The corresponding dividend would not be required if one of two exceptions were met: (1) Hughes receives "fair compensation" for the transfer; or (2) the transfer is approved by a majority of the GM $1 2/3 and GMH shareholders, voting as separate classes. [FN36] GM chose the second option for approving the special dividend by receiving consent for the dividend from the GM $1 2/3 and GMH shareholders. [FN37]

> FN35. *Id.* ¶ 44.
>
> FN36. *Id.*
>
> FN37. *Id.* ¶ 45.

*E. Allegations of Unfair Price and Process*

Plaintiffs make several allegations in an attempt to impugn

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 5
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
**(Cite as: 2005 WL 1089021 (Del.Ch.))**

the fairness of the consideration received by the GMH shareholders in the Hughes transactions as well as the process by which those transactions were negotiated and structured. At the time the Merger was announced on April 9, 2003, the approximately $14 per share consideration represented a twenty-two percent premium over the then-market price of a GMH share. [FN38] Plaintiffs allege that this premium was not as large as GM represented it to be because the merger announcement was strategically timed before two announcements that would substantially raise the market price for GMH shares. [FN39] Those two announcements were the announcement on April 11, 2003, that PanAm Sat Corporation ("PanAm Sat"), an eighty-one percent subsidiary of Hughes, announced higher than expected earnings, and the April 14, 2003 announcement of Hughes' 2003 first quarter financial results, which were also favorable. [FN40] Plaintiffs also note Hughes' announced and projected financial results for the second and third quarters of 2003, as well as the price of PanAm Sat's public shares for the remainder of 2003. [FN41]

> FN38. *Id.* ¶ 49.

> FN39. *Id.*

> FN40. *Id.* ¶¶ 50-51. Plaintiffs further allege that it was unreasonable to rely on News to pay a fair price for the Hughes stock because News allegedly has a pattern of obtaining a minority, yet controlling interest in companies without paying a "control premium." *Id.* ¶¶ 63, 128-133.

> FN41. *Id.* ¶¶ 52-53, 61-62.

*4 Plaintiffs allege that the process by which the Hughes transactions were negotiated was flawed because the GM Directors delegated to management of GM and the management and board of directors of Hughes the responsibility to negotiate both with News and between themselves. [FN42] The GMH shareholders were represented by Hughes' management and board. [FN43] Plaintiffs next speculate that an extra dollar per share was added to the special dividend paid by Hughes to GM as a result of News' agreement to reduce the amount of Hughes stock it would acquire from 36 percent to 34 percent, and that this reduction resulted in a ma-

terial reduction of compensation to be paid to the GMH shareholders. [FN44]

> FN42. *Id.* ¶ 56.

> FN43. *Id.* ¶ 57. In an example of inartful and confusing pleading, plaintiffs later allege that GMH was not represented in negotiating and structuring the Hughes transactions. *Contra id.* ¶ 65.

> FN44. *Id.* ¶¶ 59-60. In addition to process and price, plaintiffs argue that the structure of the transactions was unfair to the GMH shareholders because GM wanted cash for its Hughes holdings and the GMH shareholders ended up as minority stockholders of News and Hughes. *Id.* ¶¶ 64-65.

*F. Fairness Opinions*

No fewer than four fairness opinions were obtained by GM and Hughes in connection with the Hughes transactions. These opinions were rendered by Merrill Lynch, Bear Stearns, Credit Suisse First Boston ("CSFB") and Goldman Sachs. [FN45] Reading the Complaint in the manner most favorable to the plaintiffs, it appears that Merrill Lynch and Bear Stearns gave an opinion to GM that the transactions were fair to GM. [FN46] Similarly, it seems that CSFB and Goldman Sachs opined that the transactions were fair to Hughes. [FN47] Plaintiffs complain that no financial advisor was retained to determine the fairness of the transactions specifically to the GMH shareholders. [FN48]

> FN45. *Id.* ¶ 90.

> FN46. *Id.*

> FN47. *Id.*

> FN48. *Id.* Here is another example of inconsistencies in the Complaint: Plaintiffs later note that Merrill Lynch and Bear Stearns opined as to the fairness of the transactions "to each class," presumably the GM common and the GMH shareholders. *Id.* ¶ 94. Along those same lines, CSFB and Goldman Sachs opined that "what the post-Split-Off holders of Hughes common stock" would receive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
**(Cite as: 2005 WL 1089021 (Del.Ch.))**

as compensation in the Merger was fair to the Hughes common shareholders other than News, or in other words, the former GMH shareholders. *Id.*

Before attacking the fairness opinions substantively, plaintiffs allege that the financial advisors were conflicted because: (1) a large portion of their compensation for the fairness opinion was contingent upon the transactions being consummated, and (2) each of the four advisors has had and continues to have a business relationship with GM, Hughes, and/or News. [FN49] Plaintiffs also allege that the fairness opinions were inadequate because the four advisors collaborated with each other instead of working independently, purportedly in order to develop the opinion desired by GM. [FN50] The fairness opinions were also allegedly inadequate because Hughes' stake in its eighty-one percent subsidiary, PanAm Sat, was dramatically undervalued, and because the updated fairness opinions of August 5, 2003 did not provide a complete and accurate description of the updated analyses performed by the advisors in reaching the updated opinions. [FN51]

FN49. *Id.* ¶¶ 91-92.

FN50. *Id.* ¶ 93.

FN51. *Id.* ¶¶ 95-97.

*G. Manipulation of the GMH Vote*

As mentioned above, the GM $1 2/3 and GMH shareholders voted to approve the Hughes transactions. Almost 20 percent of the outstanding GMH shares were held by pension funds associated with GM after a June 2000 contribution. [FN52] Later, on March 12, 2003, GM contributed another 149.2 million newly-issued GMH shares to its pension plans. [FN53] The Complaint then insinuates that GM had an ulterior motive in issuing these shares to its pension plans instead of selling the shares publicly and then contributing the cash to the plans. [FN54] The GM pension plans and other employee benefit plans held approximately 35 percent of the outstanding GMH stock at the time of the shareholder vote on the Hughes transactions. [FN55] The Complaint further states that GM's retained economic interest in Hughes decreased from 30.7 percent to 19.8 percent and that the

pension plans' voting power was roughly doubled, and that after the Hughes transactions were consummated, the pension plans held approximately 19.8 percent of the outstanding Hughes common stock and 5.2 percent of the News ADSs. [FN56]

FN52. *Id.* ¶ 98.

FN53. *Id.* ¶ 100.

FN54. *Id.*

FN55. *Id.* ¶ 104. Nevertheless, plaintiffs make no further allegations with respect to how the remaining 65% of GMH shareholders voted in order to fairly and accurately represent to the Court the effect of the pension plans on the shareholder vote totals.

FN56. *Id.* ¶¶ 101, 103. I note as an aside that GM may have had perfectly valid, and even compelling tax reasons for reducing its retained interest in Hughes below 20 percent in anticipation of the Hughes transactions. In fact, this reason for the reduction was specifically contemplated by GM and discussed in the Consent Solicitation ("CS"). *See id.* ¶ 105.

*5 Plaintiffs then complain of certain accounting improprieties in valuing the GMH shares contributed to the pension plans which had the effect of increasing the pension plans' holdings to a greater extent and also, among other reasons, ostensibly gave the plans an incentive to vote for the Hughes transactions that was not shared by other GMH shareholders. [FN57] According to the Consent Solicitation, the pension and benefit plans' GMH shares were voted by the plans' trustee, the United States Trust Company ("U.S.Trust"). [FN58] As trustee of the plans, U.S. Trust had a fiduciary duty under ERISA to act on behalf of the plans' beneficiaries, even if the interests of the plans' beneficiaries diverged from those of the other GMH shareholders. [FN59]

FN57. *Id.* ¶¶ 106-12.

FN58. *Id.* ¶ 113.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
(Cite as: 2005 WL 1089021 (Del.Ch.))

FN59. *Id.* ¶¶ 113-14.

In preparing and mailing the Consent Solicitation, GM did so before receipt of a letter ruling from the Internal Revenue Service, purportedly in order to obtain shareholder approval before the inadequacy of the consideration to be received by the GMH shareholders became clear, even though the transaction would not close for some time due to required regulatory approvals. [FN60] Advance copies of the Consent Solicitation were sent by GM to certain GMH shareholders before the official mailing to all GM $1 2/3 (and presumably GMH) shareholders. [FN61] The Consent Solicitation was sent to GMH shareholders of record as of August 1, 2003. [FN62] That decision was allegedly communicated to ADP on or about July 25, 2003. [FN63] In addition, plaintiffs construe the Consent Solicitation to indicate that the GM board of directors did not meet between June 5, 2003 and August 5, 2003. [FN64] GM also communicated with GM and Hughes employees on more than one occasion with respect to the upcoming vote. [FN65]

> FN60. *Id.* ¶¶ 116-19.

> FN61. *Id.* ¶ 122.

> FN62. *Id.* ¶ 120.

> FN63. *Id.* ¶ 121. It appears that ADP was the entity chosen by GM to mail the Consent Solicitation.

> FN64. *Id.*

> FN65. *Id.* ¶¶ 123-24.

The Complaint also alleges that the Consent Solicitation is materially misleading and incomplete with respect to the following four broad categories: [FN66] (1) the "value enhancement" to the GMH shareholders of Hughes as a stand-alone company that was used as a justification for the $275 million dividend; [FN67] (2) the bases for the updated fairness opinions were not fully and fairly disclosed; (3) the effect of shareholder ratification of the transactions; and (4) GM's contribution of GMH stock to its pension and benefit plans.

> FN66. *Id.* ¶ 126.

FN67. *Id.* ¶¶ 127, 134-147.

The Complaint is rounded out by allegations that the defendants did not act in good faith. Essentially, plaintiffs merely rehash each allegation in the Complaint and say that such actions evidence a lack of good faith without adding additional facts or substance. The specific allegations are that the defendants did not act in good faith because they: (1) manipulated the GMH shareholder vote; (2) did not comply with the requirements of GM's certificate of incorporation in obtaining shareholder approval of the transactions; (3) caused Hughes to pay GM the special dividend; (4) made inadequate disclosures about the proposed transactions; (5) relied upon conflicted financial advisors for fairness opinions; 6) engaged in a flawed negotiating process; 7) eliminated appraisal rights the GMH shareholders might have otherwise had in the transactions; and 8) took these actions to benefit GM and its pension and benefit plans by adopting a "we don't care" attitude toward the public GMH shareholders. [FN68]

> FN68. *Id.* ¶¶ 148-49.

*H. Claims Alleged in the Complaint*

**6** As previously stated, the Complaint purports to state seven claims. All of the claims except for Count VII are alleged against GM and the Individual Defendants. Count I is for breach of the duty of loyalty and unjust enrichment in the payment of the special dividend. Count II is for breach of the duty of loyalty in failing to deal fairly with the GMH shareholders and compensate them fairly in the transactions. Count III is for breach of the duty of loyalty in manipulating the shareholder vote. Count IV is for breach of the duty of disclosure. Count V is for breach of GM's Restated Certificate of Incorporation, Article Seventh. Count VI is for breach of GM's Restated Certificate of Incorporation, Article Fourth. Count VII is alleged against News for aiding and abetting a breach of fiduciary duty.

## II. ANALYSIS

*A. Standard on a Motion to Dismiss*

When considering a motion to dismiss under Rule 12(b)(6), I am required to assume the truthfulness of all well-pleaded

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 8
Not Reported in A.2d, 2005 WL 1089021 (Del.Ch.), 35 Employee Benefits Cas. 2188
**(Cite as: 2005 WL 1089021 (Del.Ch.))**

allegations of the Complaint. In addition, I am required to extend to plaintiffs the benefit of all reasonable inferences that can be drawn from the Complaint. "Conclusory statements, [however], without supporting factual averments will not be accepted as true for purposes of a motion to dismiss." [FN69] Under this analysis, I cannot order a dismissal unless it is reasonably certain that the plaintiffs could not prevail under any set of facts that can be inferred from the Complaint. Consistent with these requirements, I accept as true all of the plaintiffs' properly pled allegations and have made every reasonable inference in their favor. [FN70]

> FN69. *Grimes v. Donald,* 673 A.2d 1207, 1214 (Del.1996).

> FN70. *Solomon,* 747 A.2d at 1110-11.

*B. Does the GM Defendants' Motion to Dismiss Improperly Rely on Matters Outside the Pleadings?*

As a threshold matter, I must address plaintiffs' contention that I may not consider matters outside the pleadings and that to the extent defendants base their motion on such matters to establish facts, dismissal is precluded. [FN71] From the outset, plaintiffs understood the possibility that a fully informed, shareholder vote may, as a matter of law, preclude recovery on Counts I and II of their seven-count Complaint. Many of their allegations, therefore, attack the adequacy of the disclosures made to GM's shareholders and rest squarely on the contents of the Consent Solicitation. Therefore, the Court may consider the contents of a disclosure document and look for itself to see what the documents actually says and discloses. There would be no other way for a court to determine whether plaintiffs state a claim that the document was materially misleading or omitted a material fact. [FN72]

> FN71. Pls.' Answering Br. In Opp'n To GM Defs.' Mot. To Dismiss ("Pls.' GM Br.") at 11-13.

> FN72. See *In re Santa Fe Pac. Corp. S'holders Litig.,* 669 A.2d 59, 69-70 (Del.1995) (finding it appropriate on 12(b)(6) motion to consider a document plaintiffs have made integral to a claim and have incorporated the document into the com-

plaint).

Plaintiffs attempt to distinguish this rationale by arguing a wholly unpersuasive point that they do not challenge the Courts' ability to consider the Consent Solicitation, but rather contend that the Court cannot look behind the words and assume the matters asserted in the solicitation are true. The Court finds this distinction unpersuasive because the defendants have not attempted to submit the Consent Solicitation to prove the truth of the matter asserted. [FN73] Rather, defendants have referred to the omitted sections of the Consent Solicitation when doing so fairly represents the selective portions the plaintiffs have submitted into the record. Surely plaintiffs do not contend that the Court is not entitled to consider the full context of a document once the plaintiffs have relied on particular segments in their Complaint? The Court, therefore, considers the Consent Solicitation to the extent the plaintiffs have incorporated the document into their complaint, and the portions necessary for the Court to discern a complete and accurate context of what was disclosed. In this regard, the Court's consideration of the Consent Solicitation is consistent with Delaware law. [FN74]

> FN73. *Id.* at 70 (relying on disclosure document for purposes other than disclosure issues or perhaps to establish formal, uncontested matters is not appropriate on a motion to dismiss).

> FN74. See *id.*

*7 Plaintiffs also take issue with the Court's ability to consider publicly available facts that show that both classes of GM stockholders voted to approve the Hughes transactions. Because there are no allegations in the Complaint that challenge whether the conditions necessary to consummate the transaction were actually met (*i.e.,* a majority vote of holders of each class of GM stock), those facts are not subject to reasonable dispute, and it is appropriate to take judicial notice of the voting percentages of each class of GM stock. [FN75]

> FN75. See, *e.g., Solomon,* 747 A.2d at 1109-10 & n. 20.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.