**9**

Not Reported in A.2d                                                                                                          Page 1
Not Reported in A.2d, 1994 WL 89006 (Del.Ch.), 19 Del. J. Corp. L. 1292
**(Cite as: 1994 WL 89006 (Del.Ch.))**

H

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County
Frederick RAND, Michael Ceasar and Elizabeth Giros, individually and on behalf
of those similarly situated, Plaintiffs,
v.
WESTERN AIR LINES, INC., Fred Benninger, Archie R. Boe, Jose Carral, Joseph T.
Casey, Gerald Grinstein, Walter J. Hickel, Bert T. Kobayashi, Jr., Lawrence H.
Lee, Charles Levinson, Spencer R. Stuart, Robert H. Volk, and Robert H.H.
Wilson, Defendants.
**Civ. A. No. 8632.**

Submitted: Oct. 21, 1993.
Decided: Feb. 25, 1994.

Joseph A. Rosenthal and Kevin Gross of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, for plaintiffs.

Charles F. Richards, Jr. and Allen M. Terrell, of Richards, Layton & Finger, Wilmington, for defendants.

MEMORANDUM OPINION
BERGER, Vice Chancellor.

*1 This is a class action brought by former stockholders of Western Air Lines, Inc. ("Western") challenging the merger of Western and a wholly-owned subsidiary of Delta Airlines, Inc. ("Delta"). In its earlier decision, *Rand v. Western Air Lines,* Del.Ch., C.A. No. 8632, Berger, V.C. (September 11, 1989) (*Rand I* ), this Court dismissed several of the claims raised in the Amended Complaint. The two remaining claims--that Western's directors breached their fiduciary duties of care and disclosure--are the subject of the pending motion for summary judgment.

I.

The relevant facts, as set forth in the well developed record, may be summarized as follows. In 1985, Western enjoyed its first profitable year since 1979. However, its directors and officers had doubts as to whether this financial turnaround would endure. The airline industry was undergoing a period of consolidation and Western, being a mid-sized airline, found it difficult to compete with either larger or smaller carriers. In addition, Western's favorable results in 1985 were due, in part, to short-term union concessions and a strike against another airline that resulted in increased business for Western. Western's officers and directors decided to take advantage of the company's brief upswing by exploring opportunities for fundamental changes in its business structure, including possible acquisitions by Western, the acquisition of Western by another airline and/or a joint venture that would provide Western with access to a computer reservation system. Gerald Grinstein ("Grinstein"), Western's chairman and chief executive officer, explored possible business combinations with the chief executive officers of numerous airline companies. [FN1] Grinstein was unable to generate any interest until early 1986, when he had separate discussions with the chief executive officers of American Airlines, Inc. ("American") and Delta during an airline industry conference. American had no interest in acquiring Western, but was willing to consider a joint marketing agreement. Delta was willing to discuss a possible acquisition. Grinstein pursued both prospects with the assistance of Dillon Read & Co. ("Dillon Read"), the investment banking firm retained by Western.

> FN1. The list of companies Grinstein contacted included TWA, Northwest, U.S. Air, Piedmont, Republic Airlines, Braniff, Air Cal, Delta and Alaska Air.

During the spring of 1986, representatives from Western and Delta began negotiations. According to Charles Ortel ("Ortel"), a Dillon Read vice president who was working with Western on this matter, Western was in a difficult negotiating posture. It had suffered substantial negative operating cash flows for several years followed by a dramatic turnaround. The Western negotiating team "did not have in hand at that point in time a very detailed rationale for why [they] thought the company would sustain its positive cash flow generation, but [they] didn't want to go into discussions with the other side with nothing." Ortel Deposition at 123. Accordingly, Dillon Read prepared a document dated March 17, 1986, titled "Valuation Materials," for use as a "market-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                              Page 2
Not Reported in A.2d, 1994 WL 89006 (Del.Ch.), 19 Del. J. Corp. L. 1292
(Cite as: 1994 WL 89006 (Del.Ch.))

ing puff piece." Ortel Deposition at 109. This sales document, which did not have Dillon Read's name on it, included values for Western of approximately $25 per share based upon aggressive assumptions with respect to the potential synergies that would result from a merger with Delta. Another Dillon Read document, prepared at about the same time, analyzed the effects on earnings per share of a Western/Delta transaction at prices of $14 to $18 per share. This document, titled "*Academy Awards* Discussion Material," provided an illustrative set of numbers that Dillon Read thought might be useful in negotiations. According to Ortel, the choice of $14 to $18 per share did not represent even a preliminary view on a range of fair value:

> *2 We did not prepare a range of fair values for this company. This is not a range of fair values for the company. At that time we were trying to gauge possible approaches that might be used to argue with Delta that they could afford to pay more.
> That argument is, in my experience, an extremely weak argument. The fact that you have a tremendous amount of money and you can afford to pay more than something is worth for a company sometimes works, but it is not a compelling argument in most cases to a buyer, and that is the stage of the assignment we were in.

Ortel Deposition at 91-92.

During the spring negotiations, the parties discussed possible prices. At one point, David C. Garrett, Jr. ("Garrett"), Delta's chief executive officer, suggested a price of $10 per share and Grinstein countered with $16 per share. Before any agreement on price was reached, Delta circulated a draft merger agreement with the merger consideration left blank. A few days later, Grinstein and Garrett discussed possible merger terms for several hours. They used a number of $13.50 per Western share as one that they would be "willing to take back to [their] boards" if they were able to reach agreement on all other terms. Grinstein Deposition at 43.

Some of those other terms, however, were potential deal breakers. The material adverse change clause in the draft merger agreement was one such provision. It allowed Delta to terminate the merger if any event or development (regardless of whether it was within Western's control) had or might have had a material adverse effect on Western's business. From Western's perspective, this provision was so open ended that it "really meant there was no deal." Stuart Deposition at 26. Delta was equally adamant about the need for the material adverse change provision. As a result, after a meeting in April between Garrett and Grinstein, Garrett called Grinstein and announced that, as far as Delta was concerned, merger discussions were concluded.

Also in April 1986, prior to the break-up of negotiations with Delta, Grinstein received an inquiry from Robert Crandall ("Crandall"), American's chairman and chief executive officer. Crandall suggested a joint marketing agreement and representatives from both companies met regularly for several weeks in the summer of 1986 to formulate an agreement. However, Crandall decided in August 1986 that American was no longer interested in such a venture.

After American terminated discussions over the joint marketing agreement, Western succeeded in renewing negotiations with Delta. During late August and early September, the parties were able to work through the several items that had been stumbling blocks in the past. Delta agreed to significant revisions on the material adverse change clause. The new clause provided:

> [A]ny change in [Western's] or [Delta's] business, financial condition or results of operations subsequent to August 31, 1986 resulting primarily from: (i) lower fares in response to fair reductions by competitors after the date hereof; (ii) union activities; (iii) actions taken or omitted by [Western] with the consent of [Delta] ...; and (iv) events beyond [Western's] or [Delta's] control which affect the airline industry generally (*e.g.*, government-mandated grounding of an aircraft type flown by [Western] or [Delta], as the case may be, and other air carriers, etc.) shall not be deemed to be an event, change or development which is or will be material and adverse.

*3 Defendants Exh. 1 at 70.

In exchange for the certainty that Western obtained through the revised material adverse change provision, Delta demanded certainty in the form of a "no-shop" provision and a "lock-up." The "no-shop" clause stated that Western and its representatives could not "initiate contact with, solicit, encourage or participate in any way in discussions or negotiations with, or provide any information or assistance to, any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 89006 (Del.Ch.), 19 Del. J. Corp. L. 1292
(Cite as: 1994 WL 89006 (Del.Ch.))

Page 3

third party ... concerning any acquisition of ... [Western]." Defendants Exh. 1 at 47-48. The "lock-up" was a separately executed stock option agreement that gave Delta the right, under certain circumstances, to acquire approximately 30% of Western's stock for $10.125--the closing price on the last trading day prior to execution of the merger agreement.

Negotiators for Delta and Western both testified that there was no detailed discussion of price during this second round of negotiations until after a preliminary agreement had been reached on other terms, including those discussed above. In the days that followed, Western met with Dillon Read to determine the price at which the merger would make sense. Also during this period, management teams from both companies, along with their legal and financial advisors, continued to work toward mutually acceptable terms. The price was finalized on September 7, 1993, when Garrett and Grinstein discussed the matter over the phone. After Garrett's initial offer of between $11 and $12 per share was rejected, the two executives agreed to recommend $12.50 to their respective boards.

A special meeting of Western's board of directors was called for September 9, 1993 in New York. The directors arrived a day earlier and received an information packet concerning the proposed merger with Delta. The packet did not, however, contain a price term. During the six hour meeting on September 9, Western's directors received presentations by management, Dillon Read and Western's outside legal counsel. Grinstein informed the board of the search process that preceded Delta's offer. In addition to noting the list of those contacted in an effort to solicit interest, Grinstein described the failed spring negotiations with Delta. As part of Dillon Read's presentation, written materials were handed out and an oral fairness opinion was given to the board. At the conclusion of the meeting, Western's board of directors approved the merger by a vote of 11 to 2. The two dissenting directors were union representatives who voted against the transaction not because of its price, but because of its effect on their unions.

On September 12, 1986, Western and Delta mailed a Joint Proxy Statement/Prospectus (the "Proxy Statement") to their respective stockholders. At a special stockholder meeting held on December 16, 1986, the Western stockholders voted to approve the merger, which was effectuated on December 18, 1986.

II.

For defendants to prevail, they must establish that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Chancery Court Rule 56(c); Nash v. Connell, Del.Ch., 99 A.2d 242 (1953). If defendants provide evidence to rebut the allegations in the complaint, plaintiffs must submit evidence to establish that a controversy exists, or summary judgment will be entered. Feinberg v. Makhson, Del.Supr., 407 A.2d 201, 203 (1979).

*4 In Rand I, this Court held that the Amended Complaint stated a duty of care claim arising under Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., Del.Supr., 506 A.2d 173 (1986), and its progeny. Such a claim requires the Court to apply enhanced scrutiny. Paramount Communications, Inc. v. QVC Network, Inc., Del.Supr., --- A.2d ----, Slip Op. (February 4, 1994). [FN2] Under this form of intermediate review, the Court must determine "if the directors' decision was, on balance, within a range of reasonableness." Id. at 33. In the present context, the enhanced review standard requires the Court to be satisfied that the course of action was reasonably calculated to secure the best value available to the stockholders. Id. at 27-30. Although the Court must apply "enhanced scrutiny," the essential question remains whether a disinterested board has satisfied its duty to act on a fully informed basis. Cede & Co. v. Technicolor, Inc., Del.Supr., --- A.2d ----, Slip Op. at 65 (1993); Barkan v. Amsted Indust., Inc., Del.Supr., 567 A.2d 1279, 1286 (1993).

> FN2. Several cases decided after Rand I, including QVC, supra, raise a question as to whether application of enhanced scrutiny is appropriate under the facts of this case. See QVC, supra at 33-40 (distinguishing Revlon from Time-Warner ). Because I conclude that defendants prevail even under an enhanced scrutiny standard, the use of which they have not seriously challenged, I find it unnecessary to submit this issue to the parties for further briefing.

Plaintiffs argue that Western's directors breached their duty

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 89006 (Del.Ch.), 19 Del. J. Corp. L. 1292
**(Cite as: 1994 WL 89006 (Del.Ch.))**

Page 4

of care in the following respects: (1) they did not establish an independent negotiating committee and those officers who negotiated on behalf of Western were self-interested; (2) they were not adequately informed about the scope of Dillon Read's assignment, its conclusions and its lack of independence; (3) they were not adequately informed about the original negotiations with Delta; and (4) they did not take any steps to encourage competitive bidding and, instead, agreed to a lock-up and no-shop provision. Each of these concerns will be addressed in turn.

Plaintiffs' complaint about the negotiating process is twofold. First, they suggest that an independent negotiating committee was required by statute (8 Del.C. § 141) and case law. However, the statute is permissive and the case law merely recognizes the utility of independent committees in a variety of fact patterns. *See, e.g., In Re Fort Howard Corp. Shareholders Litig.,* Del.Ch., C.A. No. 9991, Allen, C. (August 8, 1988); *In Re KDI Corp. Shareholders Litig.,* Del.Ch., [1990-91 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,727 (1990); *Roberts v. General Instrument Corp.,* Del.Ch., [1990 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,465 (1990). There is simply no support for the proposition that boards of directors must delegate their responsibilities to special committees.

The second part of plaintiffs' argument is that three of Western's chief negotiators (Grinstein, Donald Lloyd-Jones, Western's president, and Thomas J. Roeck, Jr., Western's chief financial officer) were not independent because they had "golden parachutes" in their employment contracts. The three negotiators, thus, knew that they would receive significant financial benefits if Western merged with Delta. Plaintiffs offer no evidence from which one could reasonably infer that the negotiators were motivated by personal interests. Rather, they suggest that the mere existence of these employment benefits [FN3] is enough to taint the negotiating process without reference to what actually transpired.

> FN3. Plaintiffs include in this category an "incentive payment" awarded to Grinstein for his work on the Delta transaction. However, the undisputed evidence establishes that Grinstein was not aware of the possibility of receiving an incentive award, and, in fact, the board did not consider such an award until after the negotiations were completed. Accordingly, this payment cannot properly be used to establish that Grinstein had a conflict of interest.

*5 I cannot agree that these employment contracts with Western's negotiators give rise to a *per se* breach of duty by Western's board, who reviewed the transaction after the negotiations were complete. At this stage in the litigation the "golden parachutes" must be viewed in the context of a developed record. Here, the record establishes that Western's management bargained at arms-length over a period of approximately six months before coming to terms with Delta. Negotiations broke down once and when they resumed, Western's management remained firm in its unwillingness to accept the originally proposed material adverse change provision. There is simply nothing about the course of the negotiations, the positions taken or the terms of the ultimate agreement that supports plaintiffs' position. Accordingly, this challenge to the board's exercise of due care fails.

Plaintiffs have several complaints about Dillon Read's involvement in the negotiations and the board's level of knowledge and oversight. First, plaintiffs say that Dillon Read was not independent since a large portion of its compensation was contingent upon the consummation of a transaction. According to plaintiffs, the board should have been advised of Dillon Read's self-interest. Armed with this knowledge, plaintiffs say that the directors would or should have been skeptical of Dillon Read's advice.

I find this argument to be without merit. I am assuming, for purposes of the present motion, that Western's board was unaware of the terms of Dillon Read's engagement. However, this lack of information does not constitute a breach of the duty of due care for several reasons. First, Dillon Read was entitled to the additional compensation for *any* transaction that Western might have consummated and the amount of Dillon Read's compensation was directly related to the total value of the transaction. Thus, Dillon Read had an interest in obtaining the highest possible price. Second, as in the case of the management team's purported self-interest, plaintiffs offer no evidence indicating that Dillon Read's conduct was influenced by the terms of its engagement. In fact, Dillon Read supported the aggressive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00327-GMS    Document 51-5    Filed 04/05/2006    Page 6 of 14

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 89006 (Del.Ch.), 19 Del. J. Corp. L. 1292
**(Cite as: 1994 WL 89006 (Del.Ch.))**

Page 5

bargaining approach taken by Western's management even when it meant that negotiations broke down altogether. Third, Western's board had a duty to critically evaluate Dillon Read's advice regardless of the nature of its contractual incentives. Again, the record demonstrates that the board fulfilled its obligations through lengthy discussions and questioning of Dillon Read representatives at the September 9 board meeting.

Plaintiffs also argue that Western's directors failed to exercise due care because they did not find out that Dillon Read had valued Western at $14 to $18 per share in the spring of 1986. The problem with this argument is that it is based upon an inaccurate premise--that Dillon Read, in fact, valued Western in that range. Although Dillon Read did prepare a document, described earlier, that used the range $14-$18 per share, the uncontroverted evidence establishes that these numbers were never offered by Dillon Read or anyone else as a range of values for Western. The Dillon Read document in question was prepared to assist Western's negotiating team in its efforts to extract the highest possible price from Delta. Since these figures did not represent a range of fair values, but rather a basis for negotiations, the Western board cannot be faulted for failing to learn about them. Moreover, the record establishes that the board was advised of Dillon Read's synergy analysis, which was the basis for Western's negotiating strategy.

*6 The charge that Dillon Read changed its valuation methodology suffers from a similar flaw. It is based upon plaintiffs' mistaken view that the $14- $18 numbers constituted Dillon Read's original opinion of fair value. Since that premise is unfounded, the claim fails.

Finally, plaintiffs complain that Dillon Read had not been asked to provide the board with a range of values for Western and that the board never learned of this lapse in the scope of Dillon Read's assignment. Here, again, plaintiffs are attempting to transform a permissive element of the negotiating process into a requirement. A range of values may frequently be helpful to a board, but "no single blueprint" controls the board's conduct. *Barkan, supra* at 1286. The board's obligation is to obtain the best value available. The method by which that goal is accomplished may vary.

Next, plaintiffs argue that the Western board failed to exercise due care because it did not learn of Delta's $13.50 "offer" made in the spring of 1986. Plaintiffs acknowledge that the board was given general information about the spring negotiations. However, they contend that the directors could not have fulfilled their fiduciary duties if they did not know that there had been an offer made at $1.00 higher than the amount they approved in September, 1986.

By characterizing $13.50 as an "offer," plaintiffs attempt to give that number special significance. However, there was no offer made in the spring of 1986. There were negotiations over the terms of a possible merger and those negotiations broke down over the material adverse change provision. The $13.50 number was one that the two chief executives would be willing to bring back to their boards if they were able to negotiate a transaction. They were unsuccessful. The Western board was informed that the spring negotiations failed and it was told about the parties' positions with respect to the material adverse change clause. Under these circumstances, I find the failure to learn about the $13.50 number insufficient to establish a breach of the duty of care.

Plaintiffs' final duty of care claim concerns the "no-shop" provision and the "lock-up" agreement. Because such provisions tend to foreclose further bidding, they must be carefully scrutinized. *Mills Acquisition Co. v. MacMillan, Inc., Del.Supr., 559 A.2d 1261, 1284-86 (1989)*. The validity of these provisions turns on whether they assist the board in their "obligation to seek the best value reasonably available" for the stockholders. *QVC, supra* at 47.

The record here satisfies that standard. As noted earlier, Delta originally insisted upon a very broad material adverse change provision. Western found that provision unacceptable because it needed the certainty that a transaction, once agreed upon and announced, would be consummated. During the second round of negotiations, Delta agreed to weaken the material adverse change clause in exchange for Western's agreement to the lock-up agreement and no-shop provision. The two parties viewed these protective clauses as providing "an exchange" of "certaint[ies]." Grinstein Deposition at 57-58, 62, 69; Garrett Deposition at 86-87.

*7 By the time Western agreed to these provisions, the mar-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 89006 (Del.Ch.), 19 Del. J. Corp. L. 1292
(Cite as: 1994 WL 89006 (Del.Ch.))

Page 6

ket of potential acquirors had been fully canvassed. Grinstein had contacted the heads of nine other airlines without success and Dillon Read had concluded that American and Delta were the two most likely suitors. Efforts to negotiate a transaction with American had failed and Delta was the only viable prospect that remained. Thus, Western gained a substantial benefit for its stockholders by keeping the only party expressing any interest at the table while achieving its own assurances that the transaction would be consummated.

Plaintiffs' disclosure claims are based on the same alleged deficiencies that were the subject of their duty of care claim. They focus on the $13.50 "offer" and Dillon Read's $14-$18 per share "valuation," as being material facts that were omitted from the Proxy Statement. As discussed above, however, plaintiffs have mischaracterized the facts. There was no $13.50 offer. There were unsuccessful negotiations during which that number was discussed. Viewed in this perspective, I conclude that the disclosure of the $13.50 number would not have "significantly altered the 'total mix' of information made available," to a reasonable investor. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 449 (1976)).

The same is true with respect to the Dillon Read "puff pieces." At best, they constituted "soft information" as to possible synergy values. In deciding whether such information should be disclosed, the Court considers, among other things, "the purpose for which the information was originally intended." *Flynn v. Bass Bros. Enterp., Inc.*, 744 F.2d 978, 988 (3d Cir.1984). Here, the undisputed evidence establishes that these documents were intended as advocacy pieces prepared solely to induce Delta to make an attractive offer. They were never intended to be relied upon either by management or stockholders for purposes of evaluating the merger. Under these circumstances, there was no need to disclose this information.

Based upon the foregoing, defendants' motion for summary judgment is granted. *IT IS SO ORDERED.*

Not Reported in A.2d, 1994 WL 89006 (Del.Ch.), 19 Del. J. Corp. L. 1292

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10**

Westlaw.

Not Reported in A.2d								Page 1
Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273
**(Cite as: 1988 WL 8772 (Del.Ch.), 13 Del. J. Corp. L. 1273)**

H
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Roger YANOW and Charles Mandelbaum, Plaintiffs,
v.
SCIENTIFIC LEASING, INC. Robert A. Bernhard, W. Barry Tanner, Joseph R.
Herbert, Joseph D. Moore, Samuel H. Howard, Morris H. Shamos, Tucker H. Warner,
Linc Acquisition Corp., and Linc Group, Inc., Defendants.

Submitted: Feb. 2, 1988.
Decided: Feb. 5, 1988.
Revised: Feb. 8, 1988.

**1275 Kevin Gross, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, and Stephen Lowey (argued) and William J. Ban, of Lowey, Dannenberg & Knapp, P.C. and Stull, Stull & Brody, New York City for plaintiffs.

R. Franklin Balotti, Gregory P. Williams, and Nathan B. Ploener, of Richards, Layton & Finger, Wilmington, Delaware, and Dennis J. Block, Nancy E. Barton (argued), H. Adam Prussin, Dushica D. Babich, and David J. Berger, of Weil, Gotshal & Manges, New York City, for defendants Scientific Leasing, Inc., and Its Directors.

A. Gilchrist Sparks, III and Michael Houghton, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Daniel J. Attridge (argued), Jeffrey A. Rosen, and Yosef J. Riemer, of Kirkland & Ellis, Washington, D.C., for defendants Linc Acquisition Corp. and Linc Group, Inc.

*MEMORANDUM OPINION*
JACOBS, Vice Chancellor.

*1 Presently pending is the plaintiffs' motion to preliminarily enjoin an all-cash tender offer by LINC Acquisition Corp., a subsidiary of LINC Group, Inc. (collectively, "LINC") for all of the common stock of Scientific Leasing, Inc. ("SLI"). The offer is scheduled to expire at midnight on February 5, 1988. The plaintiffs, who are shareholders of SLI, filed this action challenging, *inter alia,* the legality of the LINC offer, on January 5, 1988. Following expedited discovery and briefing, the preliminary injunction motion was argued on February 2, 1988. This is the Opinion of the Court on the plaintiffs' motion for a preliminary injunction. For the reasons now discussed, the motion will be denied.

I.

SLI is a Delaware corporation headquartered in Connecticut and engaged principally in providing financial services, and in leasing various medical, scientific data processing, communication and other equipment, to health care providers, including hospitals and medical centers. As of October 30, 1987, SLI had outstanding 3,104,612 shares of common stock that were publicly traded on the American Stock Exchange. Of those shares, 800,000 (approximately **1276 26%) are owned by Hospital Corporation of America ("HCA"), which is SLI's largest single shareholder.

SLI has a seven member Board of Directors, all of whom have been joined as defendants. Three of those directors (Messrs. Bernhard, Tanner and Herbert) are officer-employees [FN1], and the remaining four are independent, "outside" directors. Two of those outside directors (Messrs. Moore and Howard) are nominees of HCA. [FN2]

Beginning in 1984, SLI experienced rapid earnings growth due primarily to the sale of "tax leveraged leases" having certain tax benefits. SLI's earnings increases were reflected in higher stock prices. By 1986, however, certain revisions to the federal tax code eliminated many of the tax benefits from the sale of tax leveraged leases, and SLI's earnings and stock price decreased accordingly. SLI's stock price, which rose as high as $35 per share during the fourth quarter of 1984, fell to a low of $11.50 one year later. Despite market fluctuations in both directions, by the fourth quarter of 1987 SLI's earnings had continued to decrease, and its stock price fell to a low of $7.50 per share. Immediately before the LINC offer, SLI's market price was approximately $10 per share.

Since 1984 SLI had sought out an acquisition partner that could utilize the excess depreciation generated by SLI's equipment leasing portfolio. Donaldson, Lufkin & Jenrette was engaged to contact potential buyers, but their efforts were not fruitful.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273
(Cite as: 1988 WL 8772 (Del.Ch.), 13 Del. J. Corp. L. 1273)

*2 The changed tax and economic environment caused several equipment leasing companies to merge or consolidate during 1986 and 1987. During that same period, several companies contacted SLI and expressed interest in either acquiring, or being acquired by, SLI. Some of those companies expressed interest in buying HCA's 26% stock interest in SLI. Again, none of those contacts resulted in serious negotiations, or in a firm offer for or by SLI. In April 1986, SLI retained PaineWebber, Inc. ("PaineWebber") to provide a range of financial advisory services, including advising SLI's Board of Directors and management in connection with any **1277 offer from a third party to merge with, or to acquire common stock or assets of, SLI.

For at least a year it has been widely known among top executives in the equipment leasing industry that SLI might be available for acquisition. One firm that was interested in acquiring SLI was LINC, which is a Chicago-based, privately held company that provides equipment leasing and financial services to the health care industry. In June, 1987, LINC began purchasing SLI stock on the open market, eventually acquiring 4.8% of SLI's outstanding shares. In November, 1987, LINC approached SLI and proposed a possible acquisition of SLI for about $14 per share, for which (LINC advised) it had the necessary financing commitments. SLI agreed to negotiate with LINC, but not exclusively, because other interested parties had also contacted SLI.

To facilitate its discussions with potential acquirers, SLI had PaineWebber develop a confidential offering memorandum describing SLI's financial condition. Since the memorandum contained confidential, proprietary information, SLI would provide it only to companies willing to sign a confidentiality and standstill agreement. LINC signed such an agreement on November 25, 1987. Three other companies that had an expressed interest in SLI were offered the opportunity to sign the agreement and receive confidential information, but only two of them signed.

On December 17, 1987, the SLI Board held a regularly scheduled meeting at which Mr. Bernhard advised the directors of LINC's interest in SLI, and of the possible interest of the other firms. The transcript of the Board meeting reflects the directors' primary concern that the Board act in the best interests of SLI's stockholders. The Board rejected LINC's request that SLI negotiate exclusively with it, and authorized a negotiating committee, consisting of Messrs. Bernhard, Tanner, and Hastings, to negotiate with LINC and any other party interested in acquiring SLI. The Board was unwilling to make a public announcement that SLI was for sale. Rather, its posture was that SLI would enter into serious negotiations with any party that expressed interest in SLI and was willing to sign a confidentiality agreement. [FN3]

**1278 Although SLI had offered to provide relevant financial information to four companies, LINC was the only firm prepared to enter into serious negotiations. SLI and LINC negotiated throughout the month of December, 1987. The result was an acquisition agreement dated December 31, 1987, which provided, among other things, that LINC would make a cash tender offer for all of SLI's outstanding shares at $15.375 per share. The offer would be followed by a cash merger at the same price.

*3 The negotiation occurred in two stages. The parties first negotiated the acquisition price, starting at $14.50 per share and ending at $15.375, at which point LINC refused to go higher. After agreement was reached on price, the parties negotiated the remaining terms. LINC sought (i) a "break up" fee of $3 million if for any reason the transaction was not consummated, (ii) a "no-shop" clause restricting SLI from negotiating a transaction at a higher price after the agreement with LINC was signed, (iii) a stock option and (iv) reimbursement of LINC's acquisition-related expenses. SLI's representatives were unwilling to pay a break up fee or to agree to a "no-shop" clause. They did, however, reach agreement with LINC on the following provisions:

(a) SLI would be entitled to provide financial information to a higher bidder, if, in the opinion of SLI's financial advisors, the terms of the higher offer were economically superior and if, in the opinion of SLI's counsel, the directors would have a fiduciary duty to provide such information. (That provision is described, in acquisition parlance, as a "window shop" clause).

(b) LINC would receive an option to purchase 620,000 shares of SLI at the $15.375 per share offering price. If exercised, the option would result in LINC owning about

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273
(Cite as: 1988 WL 8772 (Del.Ch.), 13 Del. J. Corp. L. 1273)

16.6% of SLI's shares.

(c) SLI would reimburse LINC's expenses if SLI breached the acquisition agreement or if the LINC offer were not consummated and a third party acquired 50% of SLI's stock, assets, or board representation before January 1, 1989. [FN4]

(d) Finally, because LINC wanted to retain certain members of SLI's senior management as an integral part of its acquisition **1279 of SLI, LINC negotiated certain employment and compensation arrangements with them. [FN5] LINC insisted upon these arrangements on its own initiative to afford SLI's senior managers the same incentives provided to LINC's management, to provide uniform incentives within the combined organization and thereby to induce SLI's senior managers to remain at SLI.

SLI's Board approved the foregoing arrangements at a telephonic meeting specially convened on January 2, 1988. All Board members had previously been sent copies of the acquisition agreement and other documentation of the transaction. In attendance at the meeting were all members of the Board, SLI's outside counsel, and its financial advisors. PaineWebber informed the Board of its opinion (later reduced to writing) that the $15.375 per share cash price was fair from a financial point of view. The critical terms of the acquisition agreement were explained, discussed, and considered at length. Thereafter the directors voted unanimously to approve the acquisition agreement, including the LINC tender offer.

On January 4, 1988, the proposed LINC/SLI acquisition was publicly announced, and on January 8, LINC formally commenced its tender offer. SLI's directors thereafter submitted a Schedule 14D-9 in which they recommended that shareholders accept the LINC offer. For purposes of the instant motion, the plaintiffs do not contend that the relevant offering documents misstate or fail to disclose any material facts.

*4 Since LINC commenced its offer, no higher bids for SLI have emerged, nor has any other potential bidder approached SLI or PaineWebber suggesting the possibility of a higher bid.

II.

This Court has exercised its power to enjoin a corporate tender offer on only the rarest occasions, and even then, only most sparingly. Thus far tender offers have been enjoined only in situations where by reason of the conduct of the fiduciaries responsible **1280 for the offer, the transaction became involuntary, either because the offer was actionably coercive or because it involved materially false or misleading disclosures. *Eisenberg v. Chicago Milwaukee Corp.*, Del.Ch., C.A. No. 9374, Jacobs, V.C. (December 1, 1987) at 10- 12. The plaintiffs do not contend that the LINC offer falls within that description. They concede that the offeror (LINC) is not a fiduciary for SLI's stockholders. Nor, in the present context, do the plaintiffs advance any specific argument that the LINC offer is actionably coercive or involves false or misleading disclosures.

Nonetheless, the plaintiffs contend that the LINC offer must be preliminarily enjoined, arguing that the acquisition agreement is the result of fiduciary duty violations by SLI's directors in which the offeror, LINC, knowingly participated. Specifically, plaintiffs charge SLI's directors with having breached their fiduciary duties of due care and/or loyalty: (i) by negotiating an acquisition agreement with only one bidder (LINC) without having first conducted an auction calculated to elicit bids higher than the "grossly inadequate" agreed-to $15.37 offering price; (ii) by agreeing to terms that effectively "lock up" SLI and chill further competitive bids, *viz.,* the LINC option, the "window shop" clause, the incentive compensation arrangements, and the expense reimbursement agreement; (iii) by delegating the task of negotiating the acquisition agreement to SLI's interested directors, rather than to a committee of disinterested directors, and (iv) by approving the acquisition agreement without full and adequate information. Plaintiffs argue that as a consequence of any or all of the foregoing acts, the consummation of the LINC offer must be preliminarily enjoined for thirty days to enable other potential bidders to submit competitive bids.

To be entitled to preliminary injunctive relief, the plaintiffs must demonstrate a reasonable probability that they will succeed on the merits of their claims, that they will suffer irreparable harm if preliminary injunctive relief is denied, and that the harm to the plaintiffs if an injunction is denied out-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273
(Cite as: 1988 WL 8772 (Del.Ch.), 13 Del. J. Corp. L. 1273)

Page 4

weighs the harm to the defendants if relief is granted. *Revlon, Inc. v. McAndrews & Forbes Holdings Inc.*, Del.Supr., 506 A.2d 173, 179 (1986); *Ivanhoe Partners v. Newmont Mining Company*, Del.Ch., 533 A.2d 585, 600, aff'd, Del.Supr., Nos. 341 and 345, 1987, Moore, J. (November 18, 1987). For the reasons now discussed, the plaintiffs' injunction motion fails in all three respects.

**1281 III.
First, the plaintiffs have failed to establish that they will probably succeed on the ultimate merits of their claims. Plaintiffs' entire injunction claim rests upon the proposition that LINC--a 4.8% stockholder that owed no fiduciary duties to SLI's stockholders--knowingly participated in wrongful conduct by SLI's directors, who did owe such duties. *See, In Re Sea-Land Corp. Shareholders' Litigation*, Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 22, 1987), at 8; *Weinberger v. Rio Grande Industries, Inc.*, Del.Ch., 519 A.2d 116, 131 (1986).

*5 But the record is utterly devoid of evidence that establishes "knowing participation" by LINC in any alleged wrongdoing by SLI's directors. Insofar as the plaintiffs attack the directors' internal decision-making process (*i.e.,* their alleged failure either to appoint a negotiating committee composed of disinterested directors or to approve the acquisition agreement on a fully informed basis), it is undisputed that LINC played no part in that process. Insofar as the directors are charged with wrongfully failing to conduct an auction for SLI, the record shows that SLI's representatives rejected LINC's demand that SLI deal exclusively with LINC. It also discloses that LINC correctly understood that SLI was dealing with other potential purchasers that had signed confidentiality agreements. Finally, LINC and SLI did agree to the LINC option, the "window shop" clause, the expense reimbursement provision, and the management incentive arrangements. However, no showing is made that those arrangements constituted the type of provisions condemned as "lock up" devices that improperly preclude competing bids in an active auction. *See, Revlon, Inc. v. McAndrews & Forbes Holdings, Inc., supra at 183; Hastings-Murtagh v. Texas Air Corp.,* 649 F.Supp. 479, 484 (S.D.Fla., 1986) (applying Delaware law). [FN6]

**1282 On this basis alone--the absence of any showing that LINC aided and abetted a fiduciary violation by SLI's directors--the plaintiffs have failed to establish probable success on the merits of their claims.

The plaintiffs have also failed to establish the predicate for their aiding and abetting claim, *i.e.,* a showing that SLI's directors have breached an underlying fiduciary duty that they owed to SLI's stockholders. No evidence supports the contention that the directors were not fully informed when they approved the acquisition agreement. The plaintiffs' argument that the $15.375 per share acquisition price is unfair is based upon an expert affidavit that has been vigorously challenged by a counter affidavit of the defendants' valuation expert. Moreover, it must be presumed that HCA, SLI's largest stockholder, has the identical self-interest as SLI's other shareholders: to receive the highest price for its shares. HCA presumably has full information by virtue of its representation on the SLI Board. HCA has agreed that unless a higher bid emerges, it will tender its shares to LINC at the $15.375 per share price. HCA's agreement, in these circumstances, is *prima facie* evidence that the offering price is fair.

Similarly unpersuasive are the plaintiffs' arguments that the Board employed improper procedures in arriving at its accord with LINC. The committee that negotiated with LINC consisted of three directors (Bernhard, Tanner and Herbert). These directors now have a personal interest in the transaction. However, the acquisition agreement was considered at length and in depth by the entire Board, a majority of whom were disinterested, outside directors with no personal stake in the outcome. As a result, I attach little **1283 significance to the composition of the negotiating committee in these circumstances, and find no basis to strip the Board's decision of the presumption of validity afforded by the business judgment rule. *See Shingala v. Becor Western, Inc.*, Del.Ch., C.A. Nos. 8858 and 8859, Berger, V.C. (February 3, 1988) at 10.

*6 Finally plaintiffs argue that the directors employed an inadequate auction process in breach of their duties imposed by *Revlon*. They contend that, while it was not necessary to conduct a "firesale" auction directed to the public at large, the directors should have, at the very least, discreetly contacted all companies that had previously expressed an in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273
(Cite as: 1988 WL 8772 (Del.Ch.), 13 Del. J. Corp. L. 1273)

Page 5

terest in SLI and invited them to submit bids. The real dispute boils down to what specific methods corporate directors may use to elicit bids from potential acquirers. That issue would appear to be normally a matter of director judgment that necessarily must vary with each case. The record is not altogether clear that the market was as fully informed as it might have been that SLI was for sale. However the record does contain undisputed evidence is that for the last two years, the relevant "players" in the industry were aware that SLI was willing to (and, indeed, had) entertained acquisition proposals. The record further shows that SLI's directors had valid reasons to proceed discreetly in carrying out their strategy for marketing the company, and that they had no motive to obtain less than the best available price. Finally, HCA's considerable economic self-interest--which in this regard was identical to the economic interest of SLI's other stockholders--strongly suggests that HCA would not have tolerated an acquisition at less than the best price that SLI's Board was able to obtain. On that basis I conclude that the plaintiffs have failed to show that they will likely succeed on the merits of that or their other claims.

IV.

Apart from merit-related considerations, the injunction motion must fail because no likelihood of irreparable harm has been established. No other bidder or higher bid has been shown to be waiting in the wings, nor is there evidence that an injunction is needed to enable a higher bid to materialize. All the plaintiffs have done is to assert that the offering price is "grossly inadequate" and that a higher bid might come forward if the transaction were held up for thirty days. But a theoretical possibility, without more, that an unknown potential offeror might submit a higher offer if an injunction is granted does not constitute irreparable injury. See **1284 *Freedman v. Restaurant Associates Indus.,* Del.Ch., C.A. No. 9212, Allen, C. (October 16, 1987) at 29-30. If plaintiffs are correct in their view that the $15.375 acquisition price is unfair, money damages or an appraisal would be a sufficient remedy. See, *In Re Chromalloy Stockholders' Litigation,* Del.Ch., C.A. No. 8537, Hartnett, V.C. (December 17, 1986) at 5.

Finally, even if threatened irreparable injury had been established, the grant of injunctive relief would risk an injury far greater than the harm that it would likely prevent. The LINC offer is the only opportunity available to SLI's shareholders to receive a significant premium for their stock. Because of the adverse impact of an injunction upon LINC's financing arrangements, there is a significant risk that a preliminary injunction might cause the offer to be withdrawn. Plaintiffs point to no concrete, anticipated benefit from an injunction that outweighs that highly significant risk. These circumstances bring to mind the Chancellor's observation in *Solash v. The Telex Corp., supra,* at 33, that:

*7 [T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of a untoward financial result from the stockholders' point of view is small. Repeatedly the plaintiffs' class action bar exhorts the court to bravely risk the consequences in circumstances such as these, asserting that more money to the shareholders, not less, will probably result. At least on facts such as these, a due respect for the interests of the class on whose behalf these exhortations are made, requires, in my judgment, that this invitation be declined.

That admonition is equally applicable here. For the above reasons, the plaintiffs' motion for a preliminary injunction is denied.

IT IS SO ORDERED.

> FN1. Mr. Bernhard is Chairman of SLI's Board of Directors, Mr. Tanner is President and Chief Executive Officer, and Mr. Herbert is Senior Vice President and Chief Financial Officer.
>
> FN2. The 1984 HCA stock purchase included a standstill agreement pursuant to which HCA would be allowed to nominate two directors of SLI, and SLI had a right of first refusal if HCA decided to sell its stock.
>
> FN3. The Board determined that to disclose prema-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                Page 6
Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273
**(Cite as: 1988 WL 8772 (Del.Ch.), 13 Del. J. Corp. L. 1273)**

turely the fact that SLI might be for sale, could adversely affect SLI's business and decrease, rather than enhance, SLI's value to particular acquirers. The directors were specifically concerned that a "firesale" auction would adversely affect SLI's relationships with its employees, suppliers, and customers. They concluded that in these circumstances, the best way to maximize value for the shareholders was to cooperate fully with any party that expressed an interest in acquiring the company.

FN4. In separate negotiations, HCA, SLI's largest stockholder, agreed to tender its 26% block to LINC at the $15.375 price, unless a higher bid were to materialize.

FN5. The compensation and incentive arrangements included provisions for the maintenance of various health, dental and life insurance benefits for all SLI employees; the opportunity for four senior managers of SLI (including Bernhard and Tanner) to purchase up to 5% of the combined LINC/SLI entity at the book value price of the combined entity; seats on LINC's board of directors for Bernhard and Tanner; the maintenance of SLI's basic employee benefits and severance policies for all employees; and an incentive program involving performance bonuses.

FN6. The LINC option is not a "lock up" option that would operate to preclude higher bids. That option, if exercised, would result in LINC owning only 16% of SLI and would involve only a minimal cost to a higher bidder ($620,000 for each additional $1 per share offering price). The grant of the option was necessary to induce LINC to make an offer at a premium over market price, and, as such, is the type of arrangement that has met with judicial approval. *See, e.g., Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757, 758-9 (2d Cir., 1983), *cert. denied,* 464 U.S. 1018 (1983); *Hecco Ventures v. Sea-Land Corp.,* Del.Ch., C.A. No. 8486, Jacobs, V.C. (May 19, 1986) at 9-12. Similarly, the expense reimbursement provision was necessary to induce LINC to bid, since LINC would otherwise have been unwilling to outlay considerable sums for acquisition-related expenses that would be nonrecoverable if a higher bidder succeeded in acquiring SLI. The reimbursement clause, which becomes applicable only if SLI breaches the agreement or if a third party acquires SLI, is also reasonable. The "window shop" clause of the acquisition agreement expressly allows SLI to cooperate with a *bona fide* higher bidder and, as such, is also consistent with the Board's fiduciary duties. Finally, there is no showing that SLI's directors acted improperly in agreeing to the management incentive and compensation arrangements, which were negotiated after the transaction price had been agreed to, were designed essentially to put SLI officers in the same position as their LINC counterparts, and were initiated by LINC itself to preserve the existing management and personnel incentives that LINC considered desirable. *See Solash v. The Telex Corporation,* Del.Ch., C.A. Nos. 9518, 9525 and 9528, Allen, C. (January 19, 1988) at 25-26.

Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.