IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
IN RE MBNA CORPORATION            :
DERIVATIVE AND CLASS              :      Lead Case No. 1:05-cv-00327-
LITIGATION                        :      GMS
                                  :
This Document Relates To:         :
ALL ACTIONS.                      :      CLASS AND DERIVATIVE
                                  :      ACTION
-----------------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
REPLY BRIEF IN SUPPORT OF THE MBNA
OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS

<div align="right">

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

</div>

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

DATED: April 5, 2006

# INDEX

CASES                                                                    TAB NO.

*Blackmore Partners L.P. v. Link Energy LLC,*
    C.A. No. 454-N, 2005 WL 2709639 (Del. Ch. Oct. 14, 2005) .......................................... 1

*Brayall v. Dart Indus., Inc.,*
    C.A. No. 87-1525-WF, 1988 WL 72766 (D. Mass. Feb. 3, 1988) ................................... 2

*In re General Motors (Hughes) S'holder Litigation,*
    C.A. No. 260, 2005, 2006 WL 722198 (Del. Mar. 20, 2006) ............................................ 3

*Litig. Trust of MDIP, Inc. v. Rapoport,*
    C.A. No. 03-779-GMS, 2005 WL 1242157 (D. Del. May 25, 2005) ................................ 4

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    C.A. No. 04-1371, 2006 WL 694137 (U.S. Mar. 21, 2006) ............................................. 5

*Orman v. Cullman,*
    C.A. No 18039, 2004 WL 2348395 (Del. Ch. Oct. 20, 2004) .......................................... 6

*In re Talley Indus., Inc. S'holders Litig.,*
    C.A. No. 15961, 1998 WL 191939 (Del. Ch. Apr. 13, 1998) ........................................... 7

*Yanow v. Scientific Leasing, Inc.,*
    C.A. Nos. 9536, 9561, 1988 WL 8772 (Del. Ch. Feb. 8, 1988) ....................................... 8

TAB 1

Not Reported in A.2d                                                    **Page  1**
Not Reported in A.2d, 2005 WL 2709639 (Del.Ch.)
**(Cite as: 2005 WL 2709639 (Del.Ch.))**
**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**BLACKMORE PARTNERS, L.P., Plaintiff,**
**v.**
**LINK ENERGY LLC, J. Robert Chambers, Julie**
**H. Edwards, Thomas M. Matthews,**
**Robert E. Ogle, James M. Tidwell, S. Wil**
**Vanloh, Jr., and Daniel J. Zaloudek,**
**Defendants.**
**No. Civ.A. 454-N.**

Submitted Aug. 10, 2005.
Decided Oct. 14, 2005.

Norman M. Monhait, Jessica Zeldin, Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington,
Delaware; Stephen T. Rodd, Stephanie D. Amin-
Giwner, Rebecca A. Scheinberg, Abbey Gardy
LLP, New York, New York, for the Plaintiff.

Srivinas M. Raju, Elizabeth C. Tucker, Richards,
Layton & Finger, P.A., Wilmington, Delaware;
David D. Sterling, Samuel W. Cooper, Rebeca
Aizpuru, Brooke Geren, Baker Botts LLP, Houston,
Texas, for the Defendants.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

*1 Blackmore Partners L.P., instituted this action
against Link Energy LLC and the members of its
board of directors, alleging, *inter alia,* breaches of
the defendants' fiduciary duties, arising out of a
completed sale of Link's operating assets at a price
likely to yield zero value to Link's equity owners.
On November 1, 2004, this court denied the
defendants' motion to dismiss, holding that the
complaint alleged sufficient facts that, if true, would
support a claim of disloyal conduct. [FN1]
Following the conclusion of discovery, the
defendants now move for summary judgment.
Construing all evidence in favor of the plaintiff, the
court nevertheless concludes that there are no
material issues of fact in dispute, and that the
defendants are entitled to the entry of judgment in
their favor.

FN1. *Blackmore Partners, L.P. v. Link Energy LLC,*
864 A.2d 80 (Del. Ch.2004).

I.
A. *Link's Emergence From Bankruptcy*

The facts of this case, as developed in discovery,
are largely uncontested. In October 2002, EOTT
Energy Partners, L.P. filed for bankruptcy
protection pursuant to Chapter 11 of the United
States Bankruptcy Code. [FN2] On March 1, 2003,
Link emerged from that reorganization as successor
in interest to EOTT, planning to engage in the same
business of purchasing, gathering, storing,
transporting, processing and reselling crude oil,
refined petroleum products, natural gas liquids, and
other related products. [FN3]

FN2. Matthews Dep. 13: 5-6, April 1, 2005.

FN3. Matthews Dep. 35-37, April 1, 2005.

As part of the plan of reorganization, Link issued
$104 million in senior unsecured 9% notes
("Notes"), in lieu of $235 million of 11% senior
notes owed to a range of EOTT creditors. [FN4] In
addition, those same creditors received 95% of the
newly issued common equity units in Link
("Units"). [FN5] Three percent of the Units were
distributed to the former holders of EOTT's
common units, one of whom is the plaintiff in this
case. [FN6] While these exchanges resulted in a
reduction in debt, Link remained relatively highly
leveraged when it emerged from bankruptcy. In
addition, Link had access to working capital through
a credit facility with Standard Chartered Bank,
which provided $290 million in funding until
August 2004, subject to liquidity requirements
waivable by that bank in its discretion. [FN7]

FN4. *Id.* at 19.

FN5. *Id.* at 18-20.

FN6. *Id.*

FN7. Defs.' Answering Br. In Opp. To Pl.'s Motion
for Class Action Determination, Ex. 1, 58.

The instrument governing the Notes contained a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




restrictive covenant requiring any purchaser of substantially all of Link's assets to assume the Notes. [FN8] The provision was designed to ensure creditors that any such purchaser would honor the Notes, or at least ensure that the Note holders had a seat at the negotiating table in any post-bankruptcy acquisition of Link. In contrast to this power given to the Note holders, the Link operating agreement empowered the Link board of directors to authorize a sale of all or substantially all of Link's assets without a vote of the Unit holders.

FN8. Defs.' Opening Br., Ex. 13, Section 4.1b.

Link was headed by CEO Thomas Matthews, who was joined on the board of directors by six persons appointed by EOTT's former note holders pursuant to EOTT's Restructuring Plan. [FN9] Of the six additional directors, none except J. Robert Chambers (a managing director at Lehman Brothers, which held the same 19.1% share of both Units and Notes) had any affiliation or connection with any of EOTT's former note holders or with holders of the newly issued Notes . [FN10]

FN9. Matthews Dep. 22, April 1, 2005.

FN10. Ogle Dep., 8-9, April 28, 2005; Tidwell Dep., 10-14, April 7, 2005; Vanloh Dep., 6-13, May 9, 2005; Zaloudek Dep., 4-10, May 13, 2005.

*2 The plan of operations devised by Link management hinged on its ability to attract a $100 million infusion of new equity into the company, which could be used to lower Link's debt levels and reduce its cost of credit. Link therefore entered the capital markets to search for an equity partner. Its efforts, however, were unsuccessful. Despite hiring Lehman Brothers in December 2003 [FN11] to act as its financial adviser to assist the company in searching for new money, discussions failed with one investment group during the summer and early fall of 2003, [FN12] and with another by February 2004. [FN13]

FN11. Defs.' Opening Br., Ex. 21.

FN12. Defs.' Opening Br., Ex.15.

FN13. Defs.' Opening Br., Ex. 26; Matthews Dep. 51: 7-12 April 1, 2005.

Link attempted to improve its financial state by selling some non-strategic assets during its search for equity, disposing of its West Coast natural gas liquids process, transportation, and marketing assets on June 26, 2003; certain crude oil marketing and transportation assets on October 1, 2003; and its remaining natural gas liquids assets on December 31, 2003. [FN14] Link also entered into a Crude Oil Joint Marketing Agreement with ChevronTexaco, effective as of January 1, 2004, allowing the company to reduce its letter of credit cost for oil by leasing a pipeline to ChevronTexaco in return for a fixed margin. [FN15] All these efforts, however, were insufficient to offset losses caused by a worsening business environment. Thus, Link's board of directors determined to explore new ways of reducing the company's debt to the Note holders. [FN16]

FN14. Defs.' Opening Br., Ex. 19.

FN15. Vanloh Dep. 93, May 9, 2005.

FN16. Id. at 93-94.

B. The Plains Transaction

This determination, combined with threats by the provider of Link's credit facility to force the company into bankruptcy, [FN17] caused Link to consider an acquisition offer by Plains All American Pipeline, L.P. of substantially all of the company's assets, first made in December 2003. In January 2004, the Link board of directors formed a Special Committee, consisting of all directors other than Matthews and Chambers to consider potential transactions. Plains initially appeared willing to assume the Notes as required by the bonds' restrictive covenant. If it had done so, the market value of the Notes, which were then trading at a discount, would have increased substantially as a result of Plains's substantially stronger credit rating. [FN18] Plains ultimately made clear, however, that it would only assume the Notes upon a substantial, and probably prohibitive, discount to the purchase price for Link's assets. The company therefore began negotiating conditions under which the Note holders would be willing to waive their veto rights over potential transactions. [FN19]

FN17. Chambers Dep. 167: 1-12, April 6, 2005.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




FN18. Vanloh Dep. 60:1-9, May 8, 2005.

FN19. Rodd Aff., Ex. 33.

In February 2004, Plains made an indication of interest of $310 million for Link's assets. [FN20] At this figure, there might have been some recovery for Unit holders, though such a desirable result was by no means assured. [FN21] That price, however, was not Plains's final offer. Rather, as Plains conducted due diligence on Link, the price that Plains was willing to offer for Link's assets dropped repeatedly. [FN22] The figure finally agreed upon after due diligence and negotiations between Link and Plains was $290 million. [FN23] At the same time, Note holders agreed to waive the restrictive covenant, in return for a commitment by Link to repay the Notes at par plus accrued interest, and to pay the Note holders their proportionate share of up to $25 million from any funds remaining after the company wound up its affairs, but before any distribution to Unit holders. As the press release announcing the finalized deal made clear, the transaction at $290 million was likely to provide no recovery at all for Unit holders, given the demands of Link's debt and the deal struck with the Note holders. [FN24]

FN20. Defs.' Opening Br. Ex. 32.

FN21. Matthews Dep. 141-142, April 1, 2005.

FN22. Id. at 139: 7-12.

FN23. Defs.' Opening Br. 12.

FN24. Id. at Ex. 12.

*3 On March 16, 2004, Link announced that it was in advanced negotiations with a potential buyer, that sale proceeds would be used to retire the company's debt, and that Unit holders were likely to receive a minimal amount after the payment of all Link's liabilities, obligations, and contingencies. [FN25] On the heels of that announcement, the market price of Link Units collapsed, dropping from over $5 to roughly $1. Nonetheless, over the next two weeks, negotiations with Plains progressed to completion, and the deal was ready to close by the beginning of April. With the board of directors' agreement that the sale was the best available option for Link, the company's Special Committee met on March 30,

2004 to consider the Plains transaction. At that meeting, the investment bank Petrie Parkman presented supporting information for its fairness opinion on the Plains transaction. [FN26] The Special Committee also heard an update to the fairness opinion presented by Lehman Brothers to the board of directors on March 29. [FN27] Upon a report by the board's counsel, and a full discussion of the Plains transaction, the Special Committee recommended the sale on March 30, 2004. [FN28] The transaction closed on April 1, 2004, and Link has now begun the process of winding up operations.

FN25. Rodd Aff., Ex. 16.

FN26. Defs.' Opening Br., Ex. 39.

FN27. Id.

FN28. Id., Ex. 39.

C. *Link's Insolvency*

The factual question of whether Link was insolvent or in the zone of insolvency during the contested period is an important one for the court's final disposition in this case, as it controls whether the board of directors owed fiduciary duties to the Note holders. The uncontraverted expert report of M. Freddie Reiss, introduced by defendants during discovery, examined Link's continued viability under three independent tests. [FN29] The first of these techniques, the so-called "balance sheet test," is "concerned with the relative value of a company's equity." [FN30] Under this test, a company's value can be determined either by individual asset valuation, in which each asset is valued on a going concern basis, or by business enterprise valuation, a more commonly used method which assumes that all assets are sold together, along with the business as a whole. [FN31] The second technique used by Reiss is known as the "cash flow test," and examines whether a company can "reasonably meet its anticipated fixed (on-balance sheet and contingent) obligations as they become due." [FN32] Finally, Reiss examined Link under the "unreasonably small capital test," which "relates to whether a company has enough capital to finance its planned future operations." [FN33] If a company's capital is inadequate under the "unreasonably small capital test," then it is insolvent unless it can (1)





Not Reported in A.2d
(Cite as: 2005 WL 2709639, *3 (Del.Ch.))

successfully issue new equity or (2) restructure existing debt. [FN34]

FN29. Defs.' Opening Br., Ex. 28.

FN30. *Id.* at 34.

FN31. *Id.*

FN32. *Id.* at 58.

FN33. *Id.* at 68.

FN34. *Id.*

Reiss came to the conclusion that Link was insolvent during the period relevant to this case under all three of these tests. The fair value of the company's assets on a going concern basis was less than the fair value of the liabilities, which means that Link failed the individual asset valuation prong of the balance sheet test. [FN35] After using two methods of business enterprise valuation, moreover, Reiss came to a negative figure for the value of Link's equity. [FN36] Nor could Link meet its obligations as they became due, suffering from strained liquidity, negative cash flow, and operating losses. [FN37] Finally, Reiss concluded that Link had too little capital to finance its future operations, and could not rely on issuing new equity or refinancing existing debt. [FN38] The plaintiffs have produced no evidence at all contradicting Reiss's report, or presented any evidence of their own suggesting that Link was not insolvent. The Reiss report, therefore, is the only piece of evidence in the record directly on point of Link's insolvency.

FN35. *Id.* at 45.

FN36. *Id.* at 57.

FN37. *Id.* at 61.

FN38. *Id.* at 68.

D. *The Plaintiff's Allegations*

*4 The plaintiff makes three key allegations. First, the plaintiff argues that because the Plains transaction deprived the Unit holders of consideration that would have gone to them but for the actions of the board in agreeing to the demands of the Note holders, the actions of the Link board of directors should be subject to enhanced scrutiny. Second, the plaintiff argues that even if enhanced scrutiny does not apply, the presumption of the business judgment rule should be rebutted in this case due to a litany of deficiencies they ascribe to the process that led to the Plains transaction. Specifically, the plaintiff alleges that Matthews and the board were ill informed, and that no independent financial adviser was hired by the board of directors or the Special Committee to opine on the fairness of the Plains transaction to Unit holders; [FN39] that the Special Committee was tainted by Matthews's and Chambers's presence and participation at most meetings of the Committee; [FN40] that Chambers himself was conflicted because his employer, Lehman Brothers, owns both Units and Notes; that Matthews failed to use the negotiating leverage provided by the threat of bankruptcy to persuade Note holders to accept an arrangement that would provide greater value to Unit holders; [FN41] and that Matthews and the Link board of directors ignored a potentially superior "alternative recapitalization proposal" forwarded by Jeffrey Priest, [FN42] the managing member, president, and sole originator and founder of Amajac (the general partner of the plaintiff Blackmore Partners).

FN39. Hutchinson Dep., 55: 7-11, May 12, 2005.

FN40. Rodd Aff., Ex. 2 at 5-6; Ex. 5; Ex. 6; Ex. 8; Ex. 27.

FN41. Kaelber Dep., 180-81, April 18, 2005.

FN42. Priest Dep. 5-16, March 11, 2005.

According to Priest's deposition, the content of this alternative transaction proposal was essentially as follows: Priest attempted to contact Link first in January, leaving a voice mail with an unidentified person at Link indicating that Amajac would be interested in organizing financing for Link. [FN43] Receiving no immediate response to his voicemail, Priest claims to have called Link again three to five days later, and again received no response. [FN44] Finally, Priest spoke to an analyst who worked with Link in an attempt to make contact with the company's management, but succeeded only in learning that Link would do nothing without consulting Priest. [FN45] No other evidence was presented concerning any alternative transaction

Not Reported in A.2d
(Cite as: 2005 WL 2709639, *4 (Del.Ch.))

Page   5

emanating from Priest.

> FN43. *Id.* at 41-42.

> FN44. *Id.* at 62.

> FN45. *Id.* at 66: 20-25.

Finally, the plaintiff contends that the defendants violated their duty to disclose material facts to the Unit holders by waiting until March 16, 2004 to give any indication that the Plains transaction might leave the Unit holders without recovery. Because this fact was only confirmed in a press release on March 31, 2004, one day before the transaction closed, [FN46] the plaintiff argues that he was not given sufficient time to take action on the provided information.

> FN46. Rodd Aff., Ex. 18.

The defendants deny that they violated any of their fiduciary duties, and argue the lack of any factual basis for the plaintiff's contentions about the handling of negotiations with Note holders, [FN47] and as to the supposed alternative proposal made by Priest. [FN48] The defendants also argue that although Matthews and Chambers were present during many Special Committee meetings, the record shows that they were there only as sources of information, and were asked to leave at crucial moments. [FN49]

> FN47. Matthews Dep., 177:15-24, April 1, 2005.

> FN48. The defendants claim never to have even heard of the plaintiff, Amajac, or Priest until the filing of the law suit. Matthews Dep. 51: 1-2, April 1, 2005; Chambers Dep. 163: 13-18, April 6, 2005. Vanloh Dep., 123: 20-21, May 9, 2005.

> FN49. Chambers Dep., 105:4-15, April 6, 2005; Vanloh Dep., 54:4-12, May 9, 2005.

## II.

*5 Under Court of Chancery Rule 56, summary judgment will be granted when the moving party demonstrates that there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. When determining whether to grant summary judgment, a court must view the facts in the light most favorable

to the nonmoving party. [FN50]

> FN50. *Haas v. Indian River Volunteer Fire Co.,* 2000 Del. Ch. LEXIS 116, *11, *aff'd,* 768 A.2d 469 (Del.2001).

Delaware's business judgment rule operates primarily as a presumption that directors making business decisions act in good faith, on an informed basis, and in the honest belief that their actions are in the corporation's best interest. [FN51] The burden is on the party challenging the decision [FN52] to allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. [FN53] The plaintiff here also alleges that the board's action in depriving the Unit holders of value is subject to a form of enhanced scrutiny. The court will examine this last claim, and then test the board's action against the business judgment rule.

> FN51. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).

> FN52. *Id.* at 812, *citing Puma v. Marriot,* 283 A.2d. 693, 695 (Del. Ch.1971).

> FN53. *Id.* at 815.

## III.

The plaintiff claims that Chancellor Allen's decision in *Orban v. Field* [FN54] requires "that when a board approves a transaction that favors one corporate constituency over another, they lose, at least as an initial matter, the cloak of business judgment protection." [FN55] But the plaintiff's reliance on *Orban* for the proposition that the company owed the Unit holders a higher duty of care in this case is misplaced.

> FN54. 1997 Del. Ch. LEXIS 48.

> FN55. Pl.'s Answering Br. In Opp'n to Defs.' Mot. for Summ. J. 28.

It is doubtless true, as Chancellor Allen noted in *Orban,* that a board deploying corporate power against a class of shareholders must specially demonstrate that it acted reasonably and in good faith. [FN56] But that duty, though important, is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2709639, *5 (Del.Ch.))

limited to circumstances where the board uses the very levers of corporate power against its own shareholders in order to achieve some purportedly higher end. In *Orban* itself, for example, the board did not simply make a business decision that hurt shareholders while repaying creditors, but engaged in an elaborate maneuver in which the defendant company intentionally diluted a major shareholder to a position where he was powerless to stop a merger favored by the directors. [FN57] In the face of such overwhelming force, it was clearly appropriate for the court to require the board to demonstrate the reasonableness and good faith of its action on a full evidentiary record. And even in that case, the court eventually upheld the board's action as necessary in otherwise pressing circumstances. [FN58]

FN56. *Orban,* 1997 Del. Ch. LEXIS at *28-29.

FN57. *Id.* at *32-3.

FN58. *Id.*

This case stands in sharp contrast to *Orban.* The corporate action complained of here, though it did result in Unit holders being left with no residual value, did not involve the use of corporate power against a shareholder class in the sense of *Orban.* The defendants did not act "solely or primarily for the express purpose of depriving a shareholder of effective enjoyment of a right conferred by law." [FN59] Crucially, the Unit holders, by charter, did not even retain the right to vote on the sale of substantially all of Link's assets. Thus, no extraordinary efforts were needed to secure approval, or to stop a vote, for no such approval or vote was necessary. In such a case, it seems plain that *Orban'* s enhanced scrutiny does not apply. [FN60] It is a test designed for different circumstances, ones raising the omnipresent specter of management entrenchment.

FN59. *Phillips v. Insituform,* 1987 Del. Ch. LEXIS 474, *18.

FN60. *See Orban,* 1997 Del. Ch. 48. *See also Insituform,* 1987 Del. Ch. LEXIS at *12.

*6 Even if one were to apply *Orban* to this case, however, the defendants meet the enhanced standard required by that case. Link was insolvent, teetering on the brink of bankruptcy. At any moment, the provider of its chief credit facility could have forced it into default. Business prospects were declining, reducing daily the amount of consideration the company could hope for in any non-bankruptcy alternative. Finally, no better transaction was available. These corporate interests are every bit as compelling as those that were served in *Orban.*

## IV.

### A. *The Company's Fiduciary Duty To Creditors*

The plaintiff claims that the defendants violated their fiduciary duties to Unit holders by concentrating on the interests of creditors to the exclusion of their fiduciary duties to Unit holders. This claim fails on summary judgment. Under Delaware law, directors generally owe no fiduciary duties to creditors. In limited cases, however, such duties do arise. As this court held in *Geyer v. Ingersoll Publications Company,* "directors do not owe creditors duties beyond the relevant contractual terms absent 'special circumstances.' " [FN61] Under long established precedent, one of those circumstances is insolvency, defined not as statutory insolvency but as insolvency in fact, which occurs at the moment when the entity "has liabilities in excess of a reasonable market value of assets held." [FN62] When the insolvency exception arises "it creates fiduciary duties for directors for the benefit of creditors." [FN63] The court, therefore, must first decide whether the company was insolvent at the time of the disputed transaction, and second whether the defendants discharged their duties to Link's Unit holders.

FN61. 624 A.2d 784, 787 (Del. Ch.1992).

FN62. *Geyer,* 621 A.2d at 789.

FN63. *Id.* at 787.

As to the first question, the plaintiff apparently concedes in its brief that the company was indeed insolvent as a matter of fact at the time of the Plains transaction. Even if the court reads the plaintiff's brief as trying to reserve the question of the company's insolvency, [FN64] the plaintiff does not contradict expert testimony introduced by the defendants as to the insolvency of the company in the relevant period. [FN65] The plaintiff is correct, of course, to say that having fiduciary duties to creditors does not excuse violations of fiduciary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2005 WL 2709639, *6 (Del.Ch.))

duty to Unit holders. During insolvency, the directors owe fiduciary duties to both the creditors and the Unit holders. But ultimately, the board of directors of an insolvent company may take into account the interests of creditors at the apparent expense of stockholders if, in doing so, the board meets its fiduciary duties to all relevant constituencies.

> FN64. The plaintiff makes some ambiguous statements as to this point, but does not appear to contest the expert report presented by the defendants. ("[R]egardless of whether Link was insolvent, or in the zone of insolvency." Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summ. J. 35- 36.)

> FN65. Ex. to Defs.' Opening Br. in Supp. of their Mot. for Summ. J. 42.

### B. *The Business Judgment Presumption*

The plaintiff alleges that the business judgment rule's presumption of due care and good faith should be rebutted for two reasons. First, the plaintiff claims that the company's transaction with the Note holders was "wholly flawed" in part because Chambers was conflicted, therefore tainting board determinations. The claim that Chambers was conflicted rests primarily on the fact that Chambers was a managing director of Lehman Brothers, a holder of an equal percentage of both the Notes and the Units. [FN66] To the extent the plaintiff has made a cognizable argument as to conflict, this court's decision in *Cooke v. Oolie* [FN67] is instructive. In that case, the defendants were both shareholders and creditors of a corporation considering an acquisition proposal, although their interests were not in proportion as Lehman's are here. As Chancellor Chandler noted, this left the defendants torn between their fiduciary duty of loyalty to shareholders, which required them to seek the best possible acquisition for that constituency, and their own status as creditors, knowing that "any acquisition of TNN might affect their financial interests." [FN68] The court frankly acknowledged that "the potential for a conflict of interest" was present. [FN69] But even amid that potential, the court granted summary judgment for the defendants, concluding that the plaintiffs bore the burden of showing that an actual conflict existed, and that the deal chosen by the defendants offered superior terms

for creditors and inferior terms for the plaintiff shareholders compared to other proposals available to the defendant corporation. [FN70] Since the plaintiffs in *Cooke* did not present such evidence, their claims failed.

> FN66. It is unclear why Lehman's ownership of equal percentages of Notes and Units created a substantial conflict, at least as to the negotiation over whether to pay the Note holders more than was due to them by contract. Unlike the situation in *Cooke,* Lehman would seem to gain no financial advantage from allocating the residue of the Plains transaction to Notes rather than Units. Because it owns the same percentage of both instruments, Lehman would receive the same amount of consideration no matter how any remaining value after satisfying Link's creditors was divided. At most, therefore, Lehman's dual ownership served to make it indifferent as to whether funds were distributed to the Unit holders or to the Note holders. Hutchinson Dep. 46-49, May 12, 2005. The plaintiff also claims that Chambers was conflicted because Lehman Brothers issued a fairness opinion to the board in connection with the Plains transaction. But as the defendants note, Lehman's fairness opinion had nothing to do with the Note holder transaction. Rather, Lehman issued a fairness opinion relating to the entire Plains transaction. Rodd. Aff., Ex. 10.

> FN67. 2000 Del. Ch. LEXIS 89.

> FN68. *Id.* at *39.

> FN69. *Id.* at *40.

> FN70. *Id.* at *41.

*7 This case differs from *Cooke* on the fundamental basis that the defendants here did, in fact, owe fiduciary duties to creditors because the company was insolvent. The choice between creditors and Unit holders in this case, therefore, does not present the same clear conflict of interest this court perceived in *Cooke.* To the extent that a potential conflict of interest would arise by virtue of Chambers's membership on the board, there is no evidence of any other potential transaction that might have been better for Unit holders than the Plains transaction. The only possibility, Priest's shadowy proposal, remained at all times entirely hypothetical. Indeed, Priest conceded that the




Not Reported in A.2d
(Cite as: 2005 WL 2709639, *7 (Del.Ch.))

entirety of the so-called alternative proposal consisted of an ambiguous voicemail left with an undetermined person at Link to which an answer was never received . [FN71] This was, of course, far short of an alternative proposal.

FN71. Priest Dep. 43:1-24, March 11, 2005.

Nor would the court's determination change if the court were to conclude that Chambers was indeed conflicted. The protections of the business judgment rule may still insulate a board decision from challenge so long as a majority of the directors approving the transaction remain disinterested. [FN72] Aside from the unsubstantiated allegations discussed above as to Chambers, the plaintiff makes no claims that any other directors were interested, and therefore a clearly independent majority of the board made the relevant decisions. [FN73]

FN72. *Aronson,* 473 A.2d at 812.

FN73. Though the plaintiff does not make this argument expressly in its response to the motion for summary judgment, the defendants are correct to note that debt holders may appoint the board majority without necessarily tainting the board's determinations. Absent a showing of personal financial interest, a board of directors is presumed to act in accordance with their fiduciary duties to the corporation. *Aronson,* 473 A.2d at 812.

Second, the defendants do not rely solely on the independent board majority to justify their approval of the Plains transaction. Rather, even though the Link board was not required to delegate its responsibilities to a special committee in this case, [FN74] a special committee made up entirely of independent directors was indeed formed. [FN75]

FN74. *Rand v. Western Air Lines,* 1994 Del. Ch. LEXIS 26, *9.

FN75. *Id.*

The plaintiff claims that the Special Committee was rendered inutile by the presence of Matthews and Chambers during meetings of the Committee. But Delaware law does not require that special committees be segregated from sources of vital information. Moreover, there is no evidence at all that Chambers or Matthews influenced the Special

Committee, or acted as anything more than necessary sources of information. Nor does the record reveal the kind of secret or subversive communications between Chambers and Matthews and others that troubled the court in *In Re Freeport-McMoRan Sulphur Inc.* [FN76] Even taking all the evidence in the light most favorable to the plaintiff, the court concludes that the Special Committee, created to reinforce the independence of a majority independent board, operated with sufficient independence to merit the cloak of business judgment protection.

FN76. 2005 Del. Ch. LEXIS 96, *51.

*C. Due Care*

The plaintiff's claims as to the defendants' alleged breach of the duty of care can be summarized in the following way. First, the plaintiff claims that the directors approved the Plains transaction without sufficient expert information, blindly following the lead of a CEO acting on erroneous information. Second, the plaintiff claims that the defendants violated the business judgment rule by neglecting to use the leverage afforded by a potential bankruptcy filing against the Note holders in order to secure a better settlement for the Unit holders.

*8 To the extent that the plaintiff's claims are based on allegations of insufficient care, their claim is precluded through the operation of Section 6.8 of Link's charter agreement, exculpating directors for all awards of damages for violations of the duty of due care. The plaintiff claims that Link's exculpatory clause is inoperable because of the defendants' bad faith. [FN77] But as the court concludes below, the plaintiff has presented no evidence of bad faith or other circumstance that would render the exculpatory provision inoperable. That being so, the plaintiff's challenge to Link's exculpatory clause falls short. The court nonetheless will briefly address the plaintiff's duty of care claims. The duty of due care requires directors to inform themselves of all material information reasonably available to them before making a corporate decision. [FN78] This duty, however, does not require any particular actions or roadmap. Exactly what procedures the law requires varies according to the nature and importance of the considered transaction. [FN79] The advice of an investment banker or other expert is never required,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: 2005 WL 2709639, *8 (Del.Ch.))

though it may be useful. [FN80]

> FN77. The plaintiff also claims that the exculpatory clause does not apply because the relief requested (purportedly the return of up to $11 million in cash) is equitable in nature, and thus falls outside the clause. But the transaction proceeds that the plaintiff claims can be equitably distributed are already contractually promised to Note holders. This court does not accept that paradigmatically legal damages such as those at issue here can be converted into equitable relief by the simple expedient of labeling them as such.

> FN78. *Aronson,* 473 A.2d at 812.

> FN79. *Citron v. Steego,* 1988 Del. Ch. LEXIS 119, *26 (holding that "there is no ritual in these matters with which thoughtless compliance will assure later judicial approval or from which thoughtful deviation will risk automatic judicial censure").

> FN80. *Kleinhandler v. Borgia,* 1989 Del. Ch. LEXIS 81, *14.

The defendants' actions in this case cannot be said to have reached the level of gross negligence required to find a violation of the duty of due care. The record shows that the Special Committee met repeatedly over months to address the issue of the company's impending insolvency and to consider alternatives. Nor can the court find that the defendants' alleged negligence in not using the leverage generated by the company's potential bankruptcy rises to the level of gross negligence required by Delaware law. [FN81] At its most simple, the Note holders, through the restrictive covenant that effectively allowed them to veto any proposed transaction, had substantial negotiating leverage against the company. They would rationally have stopped any transaction that did not at least promise them something more than their interest and principle. But even more important, the choices made in formulating a negotiating strategy are within the core of what is protected by the business judgment rule. Therefore, while it is regrettable that a solution salvaging some value for Unit holders was not found as a result of the board's efforts, the evidence does not support the plaintiff's claimed violation of due care.

> FN81. It is not even clear that the plaintiff has

alleged any facts at all as to this supposed breach of duty. The evidence on which the plaintiff relies, a statement by Kaelber, confesses only that Kaelber cannot recall whether such threats were made or not. Kaelber Dep., 180-81, April 18, 2005. This is in sharp contrast to Matthews's contention that the bankruptcy possibility was used in his negotiations. Matthews Dep., 182:18- 183:4, April 1, 2005.

The plaintiff alternatively claims that the defendants acted in bad faith in approving the Plains transaction. As this court has previously explained, in cases where the business judgment presumption applies, the subjective bad faith of directors may be inferred from corporate actions which are "so egregious as to be afforded no presumption of business judgment protection." [FN82] After examining the record, however, the court concludes that there is no basis to draw an inference of bad faith or waste in this case. The directors were faced with a pressing situation that was only worsening over time. They acted as they plausibly thought necessary in order to extract value for the corporation. The fact that Unit holders were left with nothing at the end, given a context in which the chief alternative substantiated by evidence was an equally barren bankruptcy proceeding, does not suffice to rebut the presumption that the directors were acting in the good faith exercise of their fiduciary duties, or to establish a claim of waste . [FN83]

> FN82. *Aronson,* 473 A.2d at 815; *Grobow v. Perot,* 539 A.2d 180, 189 (Del.1998).

> FN83. The plaintiff additionally appears to claim in its brief that the defendants violated their duty to disclose material information to shareholders by "delay[ing]] any disclosure of the details of the Plains Transaction to the public or to Unitholders who were not also 9% Noteholders until it was too late for minority Unitholders to take any steps to save their investment." Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summ. J. 9. In cases where the corporation does not require shareholder action, however, a "stockholder must allege he received 'false communications' from directors who were 'deliberately misinforming shareholders about the business of the corporation." ' *Steinman v. Levine,* 2002 Del. Ch. LEXIS 132, * 47-48, *aff'd,* 822 A.2d 397, *quoting Malone v. Brincat,* 722 A .2d 5, 14 (Del.1998). The plaintiff here makes no such





Not Reported in A.2d
**(Cite as: 2005 WL 2709639, \*8 (Del.Ch.))**

accusations of deliberate false communications.

### V.

**\*9** For the foregoing reasons, the defendants'
motion for summary judgment pursuant to Rule 56
is GRANTED. IT IS SO ORDERED.

Not Reported in A.2d, 2005 WL 2709639
(Del.Ch.)

END OF DOCUMENT

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





TAB 2

Not Reported in F.Supp.                                                                                                     **Page   1**
Not Reported in F.Supp., 1988 WL 72766 (D.Mass.), RICO Bus.Disp.Guide 6861
**(Cite as: 1988 WL 72766 (D.Mass.))**

н

United States District Court, D. Massachusetts.
**Valerie A. BRAYALL and Richard M. Brayall,**
v.
**DART INDUSTRIES, INC., David McLean,
Arnold Mathias, Jon Nelson, Thomas M.
Damigella, Ann S. Damigella, Thomas J.
Damigella, Shirley Jacobs, and Martin J.
Jacobs.**
**CIV.A. No. 87-1525-WF.**

Feb. 3, 1988.

Memorandum and Order

WOLF, District Judge.

*1 Plaintiffs Valerie and Richard Brayall are independent distributors of Tupperware products who claim that numerous wrongs, including various misrepresentations and unfair and deceptive business practices, were committed by defendants to induce them to become distributors of Tupperware products. Defendants are Dart Industries, Inc. ("Dart"), the company which manufactures and sells Tupperware products through its Tupperware division, known as Tupperware Home Parties Company ("Tupperware")(not a defendant); David McLean, President and Sales Manager for the northeast region for Tupperware from 1981- 1985; Arnold Mathias, who succeeded to McClean's position in 1985; John Nelson, Executive Vice President--U.S.A. Sales for Tupperware from 1979 through January, 1985; and Thomas M., Ann S. and Thomas J. Damigella (the "Damigellas") and Shirley and Martin Jacobs (the "Jacobs"), also independent distributors of Tupperware products. Now at issue is whether plaintiffs' pendent state law claims should be dismissed without prejudice or remanded to state court, and their claim based on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* temporarily stayed. For the reasons set forth below, the court concludes that remand of the state claims to state court is appropriate. The court further concludes that plaintiffs' RICO claim should be temporarily stayed until May 1, 1988 so that the parties may address in state court the most immediate issue in this case, plaintiffs' request for a preliminary injunction.

*I. Facts and Prior Proceedings*
The original complaint in this action was filed in the Middlesex Superior Court of the Commonwealth of Massachusetts. The case was removed by defendants to federal court. Plaintiffs subsequently filed an amended complaint (the "First Amended Complaint"). They have moved for a preliminary injunction based on certain of their state law claims, but not on their RICO claim. Defendants have moved to dismiss the First Amended Complaint.

The First Amended Complaint contains eight counts--seven based on state law and one based on federal law--and a request for a mandatory preliminary injunction requiring Tupperware to renew the distributorship agreement between Tupperware and plaintiffs. The essence of plaintiffs' claims is that defendants used intensive motivational programs and "cult-like" rituals to indoctrinate plaintiffs with the belief that they should orient their lives toward becoming Tupperware distributors; that defendants misrepresented the financial benefits of being a Tupperware distributor; and that as a result of defendants' indoctrination and misrepresentations plaintiffs quit their jobs, sold their home in Connecticut, and moved to Massachusetts to become Tupperware distributors.

The sole basis of federal jurisdiction in this case is the RICO claim asserted against some, but not all, of the defendants. There is no federal claim asserted against the Damigellas or the Jacobs, who are before this court as pendant parties only.

Plaintiffs' state law claims and the defendants against whom they are asserted are as follows: Count I--Unfair and Deceptive Trade Practices under Mass.Gen.L. ch. 93A (all defendants); Count III--Fraud (all defendants except Mathias); Count IV--Breach of Fiduciary Duty (Dart, Mathias, Nelson, McLean); Count V--Breach of Contract (the Damigellas, the Jacobs); Count VI-- Breach of Implied Covenants of Good Faith and Fair Dealing (Dart, the Damigellas, the Jacobs); Count VII-- Intentional Interference with Contractual and Advantageous Relations (all defendants); Count VIII--Intentional Infliction of Emotional Distress (Dart, McLean, Mathias).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 

Not Reported in F.Supp.                                                    Page   2
(Cite as: 1988 WL 72766, *2 (D.Mass.))

*2 At a scheduling conference the court raised the question of whether because of the apparent predominance of the state law claims it would be appropriate to decline to exercise pendent jurisdiction over those claims. The parties were instructed to submit memoranda addressing this issue.

Plaintiffs favor requiring litigation of the state law claims in state court and staying litigation of the federal RICO claim. Defendants oppose this.

II. *Discussion*
A. *Applicable Law*

A federal district court's decision whether to exercise jurisdiction over state law claims which are appended to one or more federal claims is governed by the principles originally set forth in *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715 (1966), and recently reaffirmed by the Supreme Court in *Carnegie-Mellon Univ. v. Cohill,* --- U.S. ----, 56 U.S.L.W. 4101 (January 20, 1988). Those principles establish that the question "necessitates a two-part inquiry." *Dimond v. District of Columbia,* 792 F.2d 179, 188 (D.C.Cir.1986).

First, the court must have power under Article III to adjudicate the pendent claim. Such power exists when a plaintiff presents a sufficiently substantial federal claim, see *Hagans v. Lavine,* 415 U.S. 528, 538 ... (1974), and the plaintiff's federal and local law claims "derive from a common nucleus of operative fact" and would ordinarily be tried in a single proceeding. See, e.g., *United Mine Workers v. Gibbs,* 383 U.S. [at] 725.... If a district court has power to adjudicate a pendent claim, the court must then engage in a second inquiry to determine whether to exercise its discretion to decide the local claim. See, e.g., *United Mine Workers v. Gibbs,* 383 U.S. at 726.

*Id.* at 188. See also *Carnegie-Mellon Univ.,* 484 U.S. at ----, 56 U.S.L.W. at 4103.

A federal claim is not sufficiently "substantial" under the first prong of the *Gibbs* analysis if it is " 'so attenuated and unsubstantial as to be absolutely devoid of merit,' *Newburyport Water Co. v. Newburyport,* 193 U.S. 561, 579 (1904); 'wholly insubstantial,' *Bailey v. Patterson,* 369 U.S. 31, 33 (1962); 'obviously frivolous,' *Hannis Distilling*

*Co. v. Baltimore,* 216 U.S. 285, 288 (1910); 'plainly unsubstantial,' *Levering and Garrigues Co. v. Morrin,* 289 U.S. 103, 105 (1933); or 'no longer open to discussion,' *McGilvra v. Ross,* 215 U.S. 70, 80 (1909)." *Hagans v. Lavine,* 415 U.S. 528, 536-37 (1974). See also *Ex Parte Poresky,* 290 U.S. 30, 31-32 (1933).

With regard to the second prong, the Court in *Gibbs* set forth a number of factors which should inform a federal court's decision whether to exercise its discretionary jurisdiction over pendent state claims when it has the power to do so. In *Gibbs* the Court stated:

*3 That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins,* 304 U.S. 64. *Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a sure-footed reading of applicable law.* Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. *Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.* There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy, that the argument for exercise of pendent jurisdiction is particularly strong.... Finally, there may be reasons independent of jurisdictional considerations, such as the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial, Fed. Rule Civ.Proc. 42(b). If so jurisdiction should ordinarily be refused.

*Gibbs,* U.S. at 726-27 (footnotes omitted and emphasis added). See also *Carnegie-Mellon Univ.,* 484 U.S. at ----, 56 U.S.L.W. at 4103. In addition, "the same factors that are relevant to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1988 WL 72766, *3 (D.Mass.))

exercise of jurisdiction over pendent claims apply to pendent parties." 13B Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3567.2 at 160 (1984).

The Court in *Gibbs* also cautioned against allowing what is essentially a state law case to be brought in federal court simply because a federal claim is appended to it, stating:

[R]ecognition of a federal court's wide latitude to decide ancillary questions of state law does not imply that it must tolerate a litigant's efforts to impose upon it what is in effect only a state law case. *Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed.* *Gibbs,* 383 U.S. at 727 (emphasis added).

As described below, application of these principles to the facts of this case persuades this court that the state law claims constitute the "real body" of this case and ought to be litigated in state court.

### B. *The Court Has Power to Adjudicate Plaintiffs' State Law Claims*

With regard to the first prong of *Gibbs'* two-step analysis, the court finds that plaintiffs' federal and state law claims derive from a common nucleus of operative facts, and that plaintiffs "would ordinarily be expected to try them all in one judicial proceeding." *Carnegie-Mellon Univ.,* 484 U.S. at -–-, 56 U.S.L.W. at 4103, quoting *Gibbs,* 383 U.S. at 725. Plaintiffs' allegations describe a single scheme or course of conduct, and the same misrepresentations, omissions, and unfair and deceptive business practices underly all of plaintiffs' claims. In addition, plaintiffs' federal RICO claim facially appears sufficiently substantial to provide a basis for federal jurisdiction. Although defendants have moved to dismiss the RICO claim, it cannot be said that that claim "is obviously without merit' or [that] 'its unsoundness so clearly results from previous decisions ... as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy....' " *Ex Parte Poresky,* 290 U.S. at 32, quoting *Levering & Garrigues Co.,* 289 U.S. at 105. See also *Charles D. Bonanno Linen Service, Inc. v. McCarthy,* 708 F.2d 1, 5 (1st Cir.), cert.

denied, 464 U.S. 936 (1983). Thus, the court has the power to adjudicate plaintiffs' pendent state law claims.

*\*4 Similarly, the court has the power to assert pendent party jurisdiction over the Jacobs and the Damigellas because plaintiffs' state law claims against them and plaintiffs RICO claims against other defendants arise from a common nucleus of operative facts. See *Bonanno,* 708 F.2d at 6-7. Thus, unless Congress in the RICO statute intended to remove the usual authority of federal courts to hear certain pendent party claims, this court has the discretion to exercise jurisdiction over the claims against the Jacobs and the Damigellas. *Id.* at 7; *Aldinger v. Howard,* 427 U.S. 1, 18 (1976). The court does not discern such an intent in the RICO statute which, unlike the statute in *Bonanno,* authorizes        actions        against        individuals. Accordingly, it would be permissible for the court to require that the claims against the Damigellas and the Jacobs be litigated in federal court.

### C. *The Pendent Claims Should Be Dismissed*

Although this court has the discretion to adjudicate plaintiffs' state law and pendent party claims, consideration of the factors enumerated in *Gibbs* indicates that exercise of pendent jurisdiction is not warranted.

As discussed earlier, the Court in *Gibbs* stated that a district court should be reluctant to exercise its pendent jurisdiction when "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Gibbs,* 383 U.S. at 726, quoted in *Carnegie-Mellon Univ.,* 484 U.S. at -–-, 56 U.S.L.W. at 4103 n. 7. This is such a case. The First Amended Complaint contains at least eight theories of liability, only one of which is based on federal law. Moreover, at least fifteen unfair or deceptive business practices are alleged in Count I and eight allegedly fraudulent acts are identified in Count III. Thus, consideration of the scope of the theories and issues raised indicates that state law issues predominate numerically.

As to proof, it is clear that evidence and testimony relating to plaintiffs' state law claims will dominate the trial of this action. While there will be some overlap in the evidence pertaining to the federal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in F.Supp.
**(Cite as: 1988 WL 72766, \*4 (D.Mass.))**

Page    4

RICO claim and the state law fraud and Mass.Gen.L. ch. 93A claims, plaintiffs' allegations of breach of fiduciary duty, breach of contract, breach of implied covenant of good faith and fair dealing, intentional interference with contractual and advantageous relations, and intentional infliction of emotional distress, raise factual and legal issues which are distinct from those presented by the RICO claim.

\*5 Finally, state issues predominate with regard to the remedies plaintiffs seek.    Plaintiffs have requested preliminary injunctive relief based only on defendants' alleged breach of the implied covenant of good faith and fair dealing and their alleged violations of Mass.Gen.L. ch. 93A.    Thus, the immediate issues presented by plaintiffs' motion for a preliminary injunction are exclusively matters of state law.

As the foregoing indicates, this is a classic state law case to which a federal claim has been appended. *Gibbs,* 383 U.S. at 727.    In such circumstances, it is appropriate for a federal district court to relinquish jurisdiction over the state law counts. See *Avins v. Hannum,* 497 F.Supp. 930, 947 (E.D.Pa.1980);    *Merritt v. Colonial Foods, Inc.,* 499 F.Supp. 910, 915 (D.Del.1980);    *Hubbard v. Moore,* 537 F.Supp. 126, 131 (W.D.Ark.1982); *Winter v. Three Rivers Motors, Co.,* 312 F.Supp. 962, 964 (W.D.Pa.1970).    But see *Morley v. Cohen,* 610 F.Supp. 798, 821-22 (D.Md.1985) (court exercised pendent jurisdiction over state law claims even though the only federal claim was based on RICO).

The conclusion that the state law claims in this case should be litigated in state court is reinforced by the recognition that at least some of those claims are likely to present uncertain issues of state law. Considerations of comity and clarity indicate that such questions ought to be decided by the courts of the Commonwealth of Massachusetts.    See *Gibbs,* 383 U.S. at 726.    For example, the question of whether particular conduct constitutes an unfair business practice under Mass.Gen.L. ch. 93A "is a definitional problem of longstanding...." *Leving v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 503 (1979).    As the Supreme Judicial Court has stated, "not every unlawful act is automatically an unfair (or deceptive) one under G.L. c. 93A." *Mechanics Nat'l Bank v. Killeen,* 377 Mass. 100, 109 (1979).

The Massachusetts Appeals Court has stated that to be actionable "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings,* 8 Mass.App.Ct. at 504.    Although this court is competent to adjudicate plaintiffs' Mass.Gen.L. ch. 93A claim, a "surer-footed reading of the applicable law," *Gibbs,* 383 U.S. at 727, may be obtained if the question whether defendants' alleged conduct in this case is sufficiently egregious to "raise an eyebrow" is decided initially by a state court with the possibility of an appeal to, and authoritative decision, by the Supreme Judicial Court of Massachusetts.

Similarly, plaintiffs' claims based on defendants' alleged breach of the implied covenant of good faith and fair dealing and intentional infliction of emotional distress raise issues on which the law of Massachusetts is still developing and evolving. See, e.g., *Fortune v. National Cash Register Co.,* 373 Mass. 96 (1977);    *Gram v. Liberty Mutual Ins. Co.,* 384 Mass. 659 (1981);    *Gram v. Liberty Mutual Ins. Co.,* 391 Mass. 333 (1984) (covenant of good faith and fair dealing);    *Foley v. Polaroid Corp.,* 400 Mass. 82, 99- 100 (1987) (intentional infliction of emotional distress).    These issues too are best presented to the Massachusetts courts for ultimate resolution by the Supreme Judicial Court.

\*6 With regard to the other factors mentioned in *Gibbs,* it does not appear that plaintiffs' state law claims are so closely tied to some federal policy that adjudication of all claims in a single proceeding is particularly appropriate.    See *Gibbs,* 383 U.S. at 727.    Indeed, the federal policy at RICO's core-- combatting traditional organized crime--is not implicated at all in this case.

In addition, while judicial economy often is served when all claims arising out of a common nucleus of operative facts are tried together, the potential efficiency to be achieved in this case would not be peculiarly substantial.    Indeed, severance of the federal and state claims may promote efficiency because the relief available under RICO is also available under Mass.Gen.L. ch. 93A;    thus litigation of the state claims ultimately may moot plaintiffs' RICO claim.

Finally, relinquishing jurisdiction over the state

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in F.Supp.
(Cite as: 1988 WL 72766, *6 (D.Mass.))

claims will have the salutory effect of avoiding the necessity to exercise pendent party jurisdiction over the Jacobs and the Damigellas, defendants against whom no federal claim is asserted.

### D. *Remand Is Appropriate*

In *Carnegie-Mellon Univ.,* the Court recently ruled that a federal district court may, under certain circumstances, remand to state court, rather than dismiss, state law claims which are asserted in a removed case and over which the court has decided to relinquish jurisdiction. As the Court explained:

[A] remand will be preferable to a dismissal when the statute of limitations on the plaintiff's state-law claims has expired before the federal court has determined that it should relinquish jurisdiction over the case. In such a case, a dismissal will foreclose the plaintiff from litigating his claims. This consequence may work injustice to the plaintiff: although he has brought his suit in timely manner, he is time-barred from pressing his case. Equally important, and more easily overlooked, the foreclosure of the state-law claims may conflict with the principle of comity to States. The preclusion of valid state-law claims initially brought in timely manner in state court undermines the State's interest in enforcing its law. The operation of state statutes of limitations thus provides a potent reason for giving federal district courts discretion to remand, as well as to dismiss, removed pendent claims.

Even when the applicable statute of limitations has not expired, a remand may best promote the values of economy, convenience, fairness and comity. Both litigants and States have an interest in prompt and efficient resolution of controversies based on state law. Any time a district court dismisses, rather than remands, a removed case involving pendent claims, the parties will have to refile their papers in state court, at some expense of time and money. Moreover, the state court will have to reprocess the case, and this procedure will involve similar costs. Dismissal of the claim therefore will increase both the expense and the time involved in enforcing state law. Under the analysis set forth in *Gibbs,* this consequence, even taken alone, provides good reason to grant federal courts wide discretion to remand cases involving pendent claims when the exercise of pendent jurisdiction over such cases would be inappropriate.

\*7 484 U.S. at ----, 56 U.S.L.W. at 4105 (footnotes omitted).

Although *Carnegie-Mellon Univ.* was a case in which all federal claims were dismissed, the analysis and broad language used by the Court are equally applicable to this case, which involves a continuing RICO claim. Remand, rather than dismissal, is appropriate in this case primarily because remand will expedite the state court's consideration of plaintiffs' request for preliminary injunctive relief. In addition, remand rather than dismissal will avoid the risk of unfair prejudice to plaintiffs if the statutes of limitations on some or all of plaintiffs' state law claims have expired while this action has been pending in federal court. Thus, the court believes that remand rather than dismissal will better "accomodate the values of economy, convenience, fairness, and comity, ... the animating principle behind the pendent jurisdiction doctrine...." *Id.*

### E. *A Temporary Stay of the RICO Claim is Appropriate*

Plaintiffs request that litigation of their RICO claim be stayed pending a resolution of their state claims. Defendants oppose this. Although the court views this as a classic state law case to which a now almost obligatory RICO claim has been appended, it is not appropriate to stay indefinitely litigation of the RICO claim unless "exceptional circumstances" exist. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817 (1976); *Moses H. Cone Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 16 (1982). See also *Bergeron v. Estate of Loeb,* 777 F.2d 792, 798 (1st Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1517 (1986). Such "exceptional circumstances" do not exist in this case. Thus, plaintiffs' request for an indefinite stay must be denied.

As indicated earlier, however, the most urgent matter in this dispute is plaintiffs' request for a preliminary injunction based on some of its state law claims. Accordingly, the court will temporarily stay litigation of the RICO claim until May 1, 1988 so the parties may give their undivided attention to the motion for a preliminary injunction.

### III. *Order*
For the foregoing reasons, it is hereby Orderd that:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in F.Supp.                                                                                           Page   6
**(Cite as: 1988 WL 72766, \*8 (D.Mass.))**

 \*8 1. Plaintiffs' state law claims (Counts I, III-IX) are hereby Remanded to the Superior Court of the Commonwealth of Massachusetts;

 2. Litigation of plaintiffs' federal RICO claim (Count II) is hereby Stayed until May 1, 1988;

 3. Plaintiffs shall inform the court in writing by May 1, 1988 whether they wish to dismiss their RICO claim;

 4. If plaintiffs do not voluntarily dismiss their RICO claim, the defendants may renew their motions to dismiss that claim;

 5. If the RICO claim is not dismissed, all discovery relating to that claim shall be completed by May 1, 1989.

 Not Reported in F.Supp., 1988 WL 72766 (D.Mass.), RICO Bus.Disp.Guide 6861

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





TAB 3

2006 WL 722198
--- A.2d ----, 2006 WL 722198 (Del.Supr.)
**(Cite as: 2006 WL 722198 (Del.Supr.))**
H

**Page   1**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Delaware.
**In re GENERAL MOTORS (HUGHES) SHAREHOLDER LITIGATION,**
No. 260,2005.

Submitted: Dec. 21, 2005.
Decided: March 20, 2006.

**Background:** Shareholders who owned tracking stock of corporation's subsidiary that was converted into common stock brought breach of fiduciary duty and aiding and abetting action against corporation, corporation's directors, and purchaser of corporation's common stock in subsidiary. The Court of Chancery, New Castle County, granted defendants' motions to dismiss for failure to state a claim, and shareholders appealed.

**Holdings:** The Supreme Court, Holland, J., held that:
(1) trial court properly considered the entire contents of consent solicitation for the transaction being challenged, without turning defendants' motions to dismiss into summary judgment motions;

(2) trial court properly took judicial notice of fact that owners of tracking stock and owners of corporation's common stock voted overwhelmingly to approve the transaction, without converting defendants' motions into summary judgment motions; and
(3) trial court properly denied shareholders discovery.
Affirmed.

**[1] Appeal and Error** ☞ 893(1)

30k893(1) Most Cited Cases
Supreme Court reviews de novo the dismissal of a complaint for failure to state a claim upon which

relief can be granted. Chancery Court Rule 12(b)(6).

**[2] Pretrial Procedure** ☞ 679
307Ak679 Most Cited Cases
In deciding a motion to dismiss for failure to state a claim upon which relief can be granted, a trial court must accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor. Chancery Court Rule 12(b)(6).

**[3] Pretrial Procedure** ☞ 679
307Ak679 Most Cited Cases
In deciding a motion to dismiss for failure to state a claim upon which relief can be granted, a trial court is not required to accept as true conclusory allegations without specific supporting factual allegations. Chancery Court Rule 12(b)(6).

**[4] Pretrial Procedure** ☞ 679
307Ak679 Most Cited Cases
In deciding a motion to dismiss for failure to state a claim upon which relief can be granted, a trial court is required to accept only those reasonable inferences that logically flow from the face of the complaint and is not required to accept every strained interpretation of the allegations proposed by the plaintiff. Chancery Court Rule 12(b)(6).

**[5] Pretrial Procedure** ☞ 681
307Ak681 Most Cited Cases
The complaint generally defines the universe of facts that the trial court may consider in ruling on a motion to dismiss for failure to state a claim upon which relief can be granted. Chancery Court Rule 12(b)(6).

**[6] Judgment** ☞ 183
228k183 Most Cited Cases
When the trial court considers matters outside of the complaint, a motion to dismiss is usually converted into a motion for summary judgment and the parties are permitted to expand the record. Chancery Court Rule 12(b).

**[7] Judgment** ☞ 183
228k183 Most Cited Cases
If a party presents documents in support of a motion to dismiss for failure to state a claim and the trial court considers the documents, the trial court generally must treat the motion as one for summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




judgment. Chancery Court Rule 12(b)(6).

**[8] Judgment** ⬥⇒ **186**
228k186 Most Cited Cases
Before a motion for summary judgment is ripe for decision, the non-movant normally should have an opportunity for some discovery.

**[9] Pretrial Procedure** ⬥⇒ **681**
307Ak681 Most Cited Cases
Though the complaint generally defines the universe of facts that may be considered on a motion to dismiss for failure to state a claim, in some instances and for carefully limited purposes, it may be proper for a trial court to decide a motion to dismiss by considering documents referred to in a complaint. Chancery Court Rule 12(b)(6).

**[10] Pretrial Procedure** ⬥⇒ **681**
307Ak681 Most Cited Cases
On a motion to dismiss for failure to state a claim, the trial court may take judicial notice of matters that are not subject to reasonable dispute. Chancery Court Rule 12(b)(6); Delaware Rule of Evidence 201(b).

**[11] Pretrial Procedure** ⬥⇒ **681**
307Ak681 Most Cited Cases
When a complaint partially quotes or characterizes what a disclosure document says, on a motion to dismiss for failure to state a claim a defendant is entitled to show the trial court the actual language or the complete context in which it was used. Chancery Court Rule 12(b)(6).

**[12] Pretrial Procedure** ⬥⇒ **678**
307Ak678 Most Cited Cases
On a motion to dismiss for failure to state a claim, where a complaint alleges the omission of some material fact, a defendant is entitled to show that the disclosure was made in the document. Chancery Court Rule 12(b)(6).

**[13] Judgment** ⬥⇒ **183**
228k183 Most Cited Cases
In breach of fiduciary duty action brought by shareholders who owned tracking stock of corporation's subsidiary, Court of Chancery, on defendants' motions to dismiss for failure to state a claim, properly considered the entire contents of consent solicitation for transaction that converted tracking stock to common stock and sold

corporation's common stock in subsidiary to purchaser, in determining whether allegations in shareholders' complaint stated a claim that the document was materially misleading, without converting the motions into a summary judgment motions; though the complaint only partially quoted and characterized what the consent solicitation said, when a complaint partially quoted or characterized a disclosure document or alleged the document omitted a material fact, a court on a motion to dismiss for failure to state a claim could consider the entire contents of the document. Chancery Court Rule 12(b)(6).

**[13] Pretrial Procedure** ⬥⇒ **681**
307Ak681 Most Cited Cases
In breach of fiduciary duty action brought by shareholders who owned tracking stock of corporation's subsidiary, Court of Chancery, on defendants' motions to dismiss for failure to state a claim, properly considered the entire contents of consent solicitation for transaction that converted tracking stock to common stock and sold corporation's common stock in subsidiary to purchaser, in determining whether allegations in shareholders' complaint stated a claim that the document was materially misleading, without converting the motions into a summary judgment motions; though the complaint only partially quoted and characterized what the consent solicitation said, when a complaint partially quoted or characterized a disclosure document or alleged the document omitted a material fact, a court on a motion to dismiss for failure to state a claim could consider the entire contents of the document. Chancery Court Rule 12(b)(6).

**[14] Pretrial Procedure** ⬥⇒ **622**
307Ak622 Most Cited Cases
A claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law. Chancery Court Rule 12(b)(6).

**[15] Pretrial Procedure** ⬥⇒ **681**
307Ak681 Most Cited Cases
Without the ability to consider the document at issue in its entirety, complaints that quoted only selected and misleading portions of such documents could not be dismissed on a motion to dismiss for failure to state a claim even though they would be doomed to failure. Chancery Court Rule 12(b)(6).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





**[16] Evidence ⬡ 22(1)**
157k22(1) Most Cited Cases
In breach of fiduciary duty action brought by shareholders who owned tracking stock of corporation's subsidiary, Court of Chancery, on defendants' motions to dismiss for failure to state a claim, properly took judicial notice of fact that owners of tracking stock and owners of corporation's common stock voted overwhelmingly to approve transaction that converted tracking stock to common stock and sold corporation's common stock in subsidiary to purchaser, without converting the motions into a summary judgment motions, where vote was a publicly available fact contained in form that corporation filed with Securities and Exchange Commission (SEC), there were no allegations in shareholders' complaint challenging whether the conditions necessary for corporation to consummate the transaction were actually met, and shareholders had no reason to dispute that the SEC disclosures regarding the vote total were correct. Chancery Court Rule 12(b)(6); Delaware Rule of Evidence 201(b).

**[16] Pretrial Procedure ⬡ 681**
307Ak681 Most Cited Cases
In breach of fiduciary duty action brought by shareholders who owned tracking stock of corporation's subsidiary, Court of Chancery, on defendants' motions to
dismiss for failure to state a claim, properly took judicial notice of fact that owners of tracking stock and owners of corporation's common stock voted overwhelmingly to approve transaction that converted tracking stock to common stock and sold corporation's common stock in subsidiary to purchaser, without converting the motions into a summary judgment motions, where vote was a publicly available fact contained in form that corporation filed with Securities and Exchange Commission (SEC), there were no allegations in shareholders' complaint challenging whether the conditions necessary for corporation to consummate the transaction were actually met, and shareholders had no reason to dispute that the SEC disclosures regarding the vote total were correct. Chancery Court Rule 12(b)(6); Delaware Rule of Evidence 201(b).

**[17] Pretrial Procedure ⬡ 36.1**
307Ak36.1 Most Cited Cases
In breach of fiduciary duty action brought by

shareholders who owned tracking stock of corporation's subsidiary, when defendants made motions to dismiss for failure to state a claim, Court of Chancery properly denied shareholders discovery on issue, otherwise subject to judicial notice, of whether a majority of the owners of the tracking stock and owners of corporation's common stock voted to approve transaction that converted tracking stock to common stock and sold corporation's common stock in subsidiary to purchaser, absent a good faith basis for questioning vote totals that were reported by corporation on form filed with the Securities and Exchange Commission (SEC). Chancery Court Rule 12(b)(6); Delaware Rule of Evidence] 201.

**[18] Pretrial Procedure ⬡ 681**
307Ak681 Most Cited Cases
Where a plaintiff has no good faith basis for challenging the authenticity or legitimacy of an extraneous fact, that is otherwise subject to judicial notice, the trial court may properly consider such fact in ruling on a motion to dismiss without affording the plaintiff an opportunity to take discovery. Chancery Court Rule 12(b)(6); Delaware Rule of Evidence] 201.

Court Below--Court of Chancery of the State of Delaware, in and for New Castle County, C.A. No. 20269-NC.

Upon appeal from the Court of Chancery. AFFIRMED.

Michael Hanrahan, Esquire (argued) and Paul A. Fioravanti, Jr., Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware, Jay W. Eisenhofer, Esquire, Geoffrey C. Jarvis, Esquire (argued), James R. Banko, Esquire and Brad deLeeuw, Esquire, Grant & Eisenhofer, P.A ., Wilmington, Delaware, co-counsel for plaintiffs-appellants.

R. Franklin Balotti, Esquire, Lisa A. Schmidt, Esquire, Srinivas M. Raju, Esquire, Richards, Layton & Finger, Wilmington, Delaware, and Robert J. Kopecky, Esquire (argued), Kirkland & Ellis, Chicago, Illinois, for defendant-appellee, General Motors Corporation and individual defendants-appellees.

Edward P. Welch, Esquire (argued), Edward B. Micheletti, Esquire, Seth M. Beausang, Esquire, T. Victor Clark, Esquire and Jenness E. Parker,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




2006 WL 722198
(Cite as: 2006 WL 722198 (Del.Supr.))

Page   4

Esquire, Skadden, Arps, Slate, Meacher & Flom, Wilmington, Delaware, for defendant-appellee/ cross-appellant, The News Corporation Limited.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

HOLLAND, Justice.

*1 In this appeal, we affirm the final judgments that were entered by the Court of Chancery. Wyser-Pratte Management Co., Inc., Robert La Marchi, Ronald Young and George Silverman (the Plaintiffs), instituted this lawsuit against the defendant, General Motors Corporation ("GM") and the defendant, The News Corporation Limited ("TNCL"), [FN1] challenging a series of transactions by which TNCL acquired a significant interest in Hughes Electronics Corporation ("Hughes"). [FN2] Hughes was previously a wholly-owned subsidiary of GM. The individuals who were directors of GM at the relevant times have also been named as defendants (the "Individual" or "Director" defendants). [FN3] The Plaintiffs were at all relevant times holders of GM's Class H Common Stock ("GMH"), which was a "tracking stock" representing the financial performance of Hughes while Hughes was wholly-owned by GM.

The Court of Chancery granted the motions to dismiss brought by GM and the Director defendants. [FN4] The Court of Chancery held that the revised Complaint, as amended, fails to state a claim upon which relief can be granted as to GM and the Director defendants. The Court of Chancery also granted TNCL's motion to dismiss for the same reason. At the same time, however, the Court of Chancery denied TNCL's motion to dismiss for lack of personal jurisdiction and improper service of process.

### Challenged Transactions [FN5]
The split-off of Hughes was accomplished in a series of transactions and announced to the public for the first time on April 9, 2003. Five days before the announcement, GM, as the 100% shareholder, caused Hughes to amend its certificate of incorporation to increase the number of authorized shares of Hughes common stock and Hughes Class B common stock from 1 million shares to 2.5 billion shares. [FN6] Several other amendments were also made, *e.g.,* an "excess shares" provision was added

to the certificate of incorporation and Hughes' board of directors was staggered. [FN7]

Just before the split-off of Hughes was accomplished, Hughes paid a special dividend to its sole shareholder, GM, of $275 million in cash. [FN8] The split-off occurred by GM's redemption of each GMH share in exchange for one share of Hughes' common stock, shares which Hughes had previously issued to GM. [FN9] GM sold its economic interest in Hughes to TNCL in the form of Hughes Class B common stock. [FN10] GM received a combination of cash ($3.1 billion) and stock (28.6 million News Corp. Preferred American Depository Shares ("News ADSs")) from TNCL. [FN11] The News ADSs were valued at approximately $1.0 billion, bringing the total compensation from TNCL to GM to $4.1 billion. [FN12] Including the $275 million dividend, GM received a total of $4.375 billion in compensation for divesting itself of Hughes, with $3.375 billion of that amount in cash. [FN13]

Immediately following the foregoing transactions, TNCL acquired an additional interest in Hughes via the merger of a subsidiary of TNCL into Hughes (the "Merger"), leaving TNCL with approximately a 34% interest in Hughes. [FN14] The former GMH shareholders therefore received a combination of Hughes common stock and News ADSs in exchange for their GMH shares. [FN15] TNCL later transferred its interest in Hughes to another subsidiary of TNCL, Fox Entertainment. [FN16]

### Revised Amended Complaint
*2 The operative complaint in this action is the Revised Amended Consolidated Class Action Complaint ("Complaint"), filed on May 7, 2004. It is ninety-seven pages long and, with more than 200 paragraphs, alleges seven claims. All of the claims except for Count VII are alleged against GM and the Director defendants. Count I is for breach of the duty of loyalty and unjust enrichment in the payment of the special dividend. Count II is for breach of the duty of loyalty in failing to deal fairly with the GMH shareholders and compensate them fairly in the transactions. Count III is for breach of the duty of loyalty in manipulating the shareholder vote. Count IV is for breach of the duty of disclosure. Count V is for breach of GM's Restated Certificate of Incorporation, Article Seventh. Count VI is for breach of GM's Restated Certificate of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 722198
(Cite as: 2006 WL 722198, *2 (Del.Supr.))

Page   5

Incorporation, Article Fourth. Count VII is alleged against TNCL for aiding and abetting a breach of fiduciary duty by GM and the Director defendants.

*Plaintiffs' Contentions*

In this proceeding, the Court of Chancery held that the effect of shareholder ratification was to maintain the business judgment rule's presumptions. [FN17] According to the Plaintiffs, the "lynchpin of the Court of Chancery's opinion dismissing all claims was stockholder ratification." The Plaintiffs argue that the Court of Chancery committed numerous errors in granting dismissal based on ratification, including (i) relying on facts outside of the Complaint, (ii) accepting a manipulated, uninformed vote by interested stockholders, (iii) ignoring claims against GM for breach of fiduciary duty and unjust enrichment, (iv) dismissing duty of loyalty claims based on ratification and (v) failing to apply the two-thirds vote requirement of Article Seventh of GM's Certification of Incorporation. According to the Plaintiffs, the Court of Chancery also misapplied the motion to dismiss standards in considering plaintiffs' claims against TNCL. We have concluded that none of the Plaintiffs' arguments are meritorious.

*TNCL's Cross-Appeal*

TNCL cross-appeals from the Court of Chancery's May 4, 2005 decision denying its motion to dismiss the Amended Complaint for lack of personal jurisdiction and improper service. The Court of Chancery denied TNCL's motion to dismiss the Amended Complaint for lack of personal jurisdiction and improper service pursuant to Court of Chancery Rules 12(b)(2) and 12(b)(4). TNCL argues that this Court should affirm the Court of Chancery's decision to dismiss the Amended Complaint pursuant to Rule 12(b)(6); or, in the alternative, this Court should reverse the Court of Chancery's decision to deny TNCL's motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(4). We have concluded that TNCL's Rule 12(b)(6) motion to dismiss was properly granted. Therefore, we do not reach the merits of its cross-appeal.

*Standard of Review*

[1] This Court reviews *de novo* the dismissal of a complaint pursuant to Rule 12(b)(6). [FN18] This Court recently summarized the criteria applicable to a Rule 12(b)(6) motion:

*3 The standards governing a motion to dismiss for

failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." [FN19]

[2][3][4] In deciding a motion to dismiss under Rule 12(b)(6), a trial court must accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor. [FN20] A trial court is not, however, required to accept as true conclusory allegations "without specific supporting factual allegations." [FN21] Moreover, a trial court is required to accept only those "reasonable inferences that logically flow from the face of the complaint" and "is not required to accept every strained interpretation of the allegations proposed by the plaintiff." [FN22] We hold that the Court of Chancery properly applied these standards in granting all of the defendants' Rule 12(b)(6) motions to dismiss.

*Matters Outside Complaint*

[5][6][7][8] The Plaintiffs argue that the Court of Chancery committed legal error because it relied on matters outside of the Complaint in granting all of the defendants' motions to dismiss. The complaint generally defines the universe of facts that the trial court may consider in ruling on a Rule 12(b)(6) motion to dismiss. [FN23] When the trial court considers matters outside of the complaint, a motion to dismiss is usually converted into a motion for summary judgment and the parties are permitted to expand the record. [FN24] Chancery Rule 12(b) provides:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Accordingly, if a party presents documents in support of its Rule 12(b)(6) motion to dismiss and the trial court considers the documents, it generally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




2006 WL 722198
(Cite as: 2006 WL 722198, *3 (Del.Supr.))

Page   6

must treat the motion as one for summary judgment. [FN25] "Before a motion for summary judgment is ripe for decision, the non-movant normally should have an opportunity for some discovery." [FN26]

[9][10] Nevertheless, in some instances and for carefully limited purposes, it may be proper for a trial court to decide a motion to dismiss by considering documents referred to in a complaint. [FN27] The trial court may also take judicial notice of matters that are not subject to reasonable dispute. [FN28] In this case, the Defendant directors submit that the Court of Chancery's decision properly rested on: the insufficiency of the allegations in the Complaint; the entire contents of the Consent Solicitation alleged in the Complaint to be materially misleading; and facts subject to judicial notice. We have concluded that the Court of Chancery properly applied this Court's prior "motion to dismiss" precedents in considering matters outside of the Complaint. [FN29]

### Entire Consent Solicitation
**\*4** [11][12][13] The Complaint challenged the adequacy of disclosures to GM's stockholders in the Consent Solicitation. When a complaint partially quotes or characterizes what a disclosure document says, a defendant is entitled to show the trial court the actual language or the complete context in which it was used. [FN30] Similarly, where a complaint alleges the omission of some material fact, a defendant is entitled to show that the disclosure was made in the document. [FN31] Therefore, the Court of Chancery properly considered the entire contents of the Consent Solicitation in determining whether the allegations in the Complaint stated a claim that the document was materially misleading. [FN32] The Court of Chancery was not obligated to accept as true allegations that misstated or mischaracterized the entire Consent Solicitation. [FN33]

[14][15] It is well established that "a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law. [FN34] "Without the ability to consider the document at issue in its entirety, 'complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure." ' [FN35] The Court of Chancery properly applied these standards when it considered the entire Consent

Solicitation in this proceeding. [FN36]

### Judicial Notice Proper
[16] In deciding a motion to dismiss, the Court of Chancery acknowledged that it is generally limited to the factual allegations contained in the Complaint. [FN37] The Court of Chancery concluded, however, that it was entitled to take judicial notice of "publicly available facts that show that both classes of GM stockholders voted to approve the Hughes Transactions." Those "publicly available facts" consist of GM's statements in a Form 10-Q that it filed with the Securities and Exchange Commission ("SEC"), asserting what GM claimed were the results of the vote. [FN38] In reaching that conclusion, the Court of Chancery stated:
Because there are no allegations in the Complaint that challenge whether the conditions necessary to consummate the transaction were actually met, (i.e., a majority vote of holders of each class of GM stock), those facts are not subject to reasonable dispute and it is appropriate to take judicial notice of the voting percentages of each class of GM stock.

This Court has recognized that, in acting on a Rule 12(b)(6) motion to dismiss, trial courts may consider hearsay in SEC filings "to ascertain facts appropriate for judicial notice under [Delaware Rule of Evidence] 201." [FN39] The Court of Chancery recognized, however, that it could only take judicial notice of facts "*not* subject to reasonable dispute." [FN40] According to the Plaintiffs, the results of the vote are "subject to reasonable dispute" because GM relies solely on its own "self-serving 10-Q" regarding the vote.

**\*5** [17] The Plaintiffs' argument that there was a "reasonable dispute" about the shareholder vote is contradicted by the Complaint. The Complaint acknowledges that GM could not close the transactions unless it obtained the required approvals by a majority vote of holders of each class of GM stock. The Complaint alleges that the transactions, which were conditioned on those majority approvals, actually closed on December 22, 2003. Consequently, the relevant allegations in the Complaint were a three-fold attack that assumed the majority votes had been cast in favor of the transactions: first, that the majority votes were uninformed; second, that the majority votes were manipulated; and third, that a supermajority vote

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 722198
(Cite as: 2006 WL 722198, *5 (Del.Supr.))

Page    7

rather than a majority vote was actually required.

The record supports the Court of Chancery's determination that there are no allegations in the Complaint that challenge "whether the conditions necessary to consummate the transaction were actually met (i.e., a majority vote of holders of each class of GM stock)." Moreover, at the oral argument in the Court of Chancery, the Plaintiffs' counsel stated that they "have no reason to dispute that [defendants'] disclosures regarding their vote totals are correct." Under these two circumstances, it was proper for the Court of Chancery to take judicial notice of the publicly available fact, reported by GM in a Form 10-Q filed with the SEC, that a majority of both classes of GM stockholders voted to approve the Hughes transactions. [FN41]

### Discovery Properly Denied

In this Court, in a footnote, the Plaintiffs assert they could not contest that a majority of both classes of GM shareholders approved the transaction because they were "denied discovery regarding the vote." This Court has frequently stated that plaintiffs must use the "tools at hand" to develop the necessary facts for pleading purposes. [FN42] In this case, in a letter to the Plaintiffs' attorney, the Court of Chancery noted it had little regard for the Plaintiffs' discovery requests when "they seemed either unable or simply unwilling to use even the most basic means of gathering publicly available information." We quote that letter in its entirety because it reflects the Court of Chancery's concerns about the Plaintiffs' initial efforts to enjoin a "proposed transaction" that had already closed:

Dear [Plaintiffs' counsel]:

I am concerned with the proposed amended complaint. Since the filing of the original complaint in this action, several events relating to this dispute have transpired. First, shareholders appear to have approved the deal. Second, the FCC approved the transaction subject to known conditions. Third, the transaction was consummated. Reading the amended complaint, however, gives one the clear impression that this deal has not closed. In fact, the amended complaint rather bizarrely requests this Court to enjoin the "proposed transaction."

While plaintiffs' reservations regarding the consent solicitation and record date are duly noted, I cannot fathom how other facts could be the subject of dispute. For example, plaintiffs feign ignorance of

the FCC's approval of the Hughes transaction in their reply brief of January 28, 2004, when after only seconds of [I]nternet research I was able to ascertain those conditions. The FCC provided public notice of its conditioned approval on December 19, 2003. On the same web page where the FCC's conditions are provided, there is a notice of "consummation" filed by GM on December 23, 2003.

*6 You stated in a letter to opposing counsel that you were, as of December 30, 2003 (when plaintiffs moved to amend the complaint), "frankly unaware that the transactions had closed." I assume, however, that plaintiffs are now aware of the salient facts. Given this newfound knowledge, is there any good-faith basis for continuing to ignore the fact that this deal has been consummated? How is the integrity of the judicial process enhanced by proceeding with a complaint that is misleading?

[18] The Plaintiffs did not provide the Court of Chancery, and have not provided this Court, with any good faith basis for questioning the vote totals reported by GM in a Form Q-10 filed with the SEC. In *Malpiede v. Townson,* this Court noted that a party may be entitled to discovery when the trial court considers a matter outside of the complaint in ruling on a motion to dismiss and that motion to dismiss will be converted into a motion for summary judgment by "clear force of the pleading rules." [FN43] However, where a plaintiff has no good faith basis for challenging the authenticity or legitimacy of an extraneous fact, *that is otherwise subject to judicial notice,* [FN44] the trial court may properly consider such fact in ruling on a motion to dismiss without affording the plaintiff an opportunity to take discovery.

### Complaint Properly Dismissed

We have concluded that the Court of Chancery properly considered the Consent Solicitation in its entirety and properly took judicial notice of the shareholder votes. We have concluded that the Plaintiffs' discovery request was properly denied. We have also concluded that the Court of Chancery then properly applied well-settled principles of Delaware law to the facts that were properly before it when it decided the other substantive issues that the Plaintiffs challenge in this appeal. Accordingly, we have determined that the final judgments of the Court of Chancery should be affirmed on the basis

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 722198
**(Cite as: 2006 WL 722198, \*6 (Del.Supr.))**

Page   8

of and for the reasons assigned by the Court of Chancery in its well-reasoned decision dated May 4, 2005. [FN45]

*Conclusion*

The final judgments of the Court of Chancery, that granted all of the defendants' Rule 12(b)(6) motions to dismiss, are affirmed.

FN1. TNCL is a South Australian corporation headquartered in New South Wales, Australia.

FN2. Hughes was renamed The DIRECTV Group, Inc. on March 16, 2004. The Court of Chancery and the Complaint referred to the entity as "Hughes." For purposes of consistency, we also use "Hughes" in this opinion.

FN3. The Individual or Director defendants are: G. Richard Wagoner, Jr. ("Wagoner"), John F. Smith, Jr. ("Smith"), Percy N. Barnevik ("Barnevik"), John H. Bryan ("Bryan"), Armando M. Codina ("Codina"), George M.C. Fisher ("Fisher"), E. Stanley O'Neal ("O'Neal"), Echard Pfeiffer ("Pfeiffer"), Alan G. Lafley ("Lafley"), Karen Katen ("Katen"), Philip A. Laskaway ("Laskaway"), Nobuyki Idei ("Idei"), and Lloyd D. Ward ("Ward").

FN4. This brief summary is taken from the Court of Chancery's opinion. *In re General Motors S'holder Litig.,* 2005 WL 1089021 (Del.Ch. May 4, 2005).

FN5. Compl. ¶ 2.

FN6. *Id.* at ¶ 4.

FN7. *Id.*

FN8. *Id.* ¶¶ 6, 66-89.

FN9. According to the Complaint, GM voted those 1.4 billion Hughes shares in favor of the merger between Hughes and the TNCL subsidiary before distributing them to the GMH shareholders. *Id.* 117, 13.

FN10. *Id.* ¶ 18.

FN11. *Id.*

FN12. *Id.*

FN13. *Id.* ¶ 12.

FN14. Via the merger, TNCL exchanged News ADSs for 17.5% of the Hughes common stock held by the former GMH shareholders. *Id.* ¶¶ 9-10.

FN15. *Id.* ¶ 11.

FN16. *Id.* ¶ 10.

FN17. *See also Solomon v. Armstrong,* 747 A.2d 1098, 1124 (Del.Ch.1999); *In re GM Class H S'holders Litig.,* 734 A.2d 611, 616 (Del.Ch.1999).

FN18. *Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del.2001).

FN19. *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-97 (Del.2002) (footnotes omitted).

FN20. *Malpiede v. Townson,* 780 A.2d at 1082.

FN21. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65- 66 (Del.1995); *see also Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996) .

FN22. *Malpiede v. Townson,* 780 A.2d at 1083.

FN23. *Malpiede v. Townson,* 780 A.2d 1075, 1082 (Del.2001); *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65 (Del.1995); *In re Tri-Star Pictures, Inc.,* 634 A.2d 319, 326 (Del.1993).

FN24. *Malpiede v. Townson,* 780 A.2d at 1090.

FN25. *Id.; In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 68-69; *In re Tri-Star Pictures, Inc.,* 634 A.2d 319, 326 (Del.1993).

FN26. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 69; *Malpiede v. Townson,* 780 A.2d at 1090. *See* Ch. Ct. R. 56(e); *Mann v. Oppenheimer & Co.,* 517 A.2d 1056, 1060 (Del.1986).

FN27. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 69.

FN28. Delaware Rule of Evidence 201(b) provides: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial




court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

FN29. *See, e.g., Malpiede v. Townson,* 780 A.2d 1075 (Del.2001); *Brehm v. Eisner,* 746 A.2d 244 (Del.2000); *McMullin v. Beran,* 765 A.2d 910 (Del.2000); *Solomon v. Armstrong,* 747 A.2d 1098 (Del.Ch.1999); *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135 (Del.1997); *Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35 (Del.1996); *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59 (Del.1995).

FN30. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 69- 70 (Del.1995).

FN31. *Malpiede v. Townson,* 780 A.2d 1075, 1091-92 (Del.2001); *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59 (Del.1995).

FN32. *See, e.g., In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 69-70.

FN33. *Malpiede v. Townson,* 780 A.2d 1075 (Del.2001); *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59 (Del.1995).

FN34. *Malpiede v. Townson,* 780 A.2d at 1083.

FN35. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 70 (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

FN36. *Malpiede v. Townson,* 780 A.2d 1075 (Del.2001); *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59 (Del.1995).

FN37. *McMullin v. Beran,* 765 A.2d 910, 916 (Del.2000).

FN38. On October 3, 2003, the holders of a majority of both GM and GMH stock voted overwhelmingly to approve and ratify the Hughes Transactions. *See* GM SEC Form 10-Q, filed 11/13/03. Specifically, 77% of the GMH stockholders voted to ratify the new Hughes certificate of incorporation, including the "excess stock" and staggered board provisions that TNCL had negotiated for, as compared to the 2% that responded to the Consent Solicitation by voting against the transaction or abstaining. *Id.* In addition, 77.1% of the GMH stockholders voted to

ratify the Split-Off, including the $275 million Special Dividend, as compared to the 1.9% that responded to the Consent Solicitation by voting against the transaction or abstaining. *Id.* Moreover, 75.5% of the GMH stockholders voted to ratify the Stock Purchase and the Merger, as compared to the 3.5% that responded to the Consent Solicitation by voting against the transaction or abstaining. *Id.* On December 22, 2003, the Hughes Transactions closed.

FN39. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 70 n. 9 (Del.1995).

FN40. D.R.E. 201 (emphasis added); *see also In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 70.

FN41. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d at 70 n. 9. *See also Solomon v. Armstrong,* 747 A.2d 1098, 1109, 1110 n. 20 (Del.Ch.1999); *In re GM Class H S'holders Litig.,* 734 A.2d 611, 615 (Del.Ch.1999).

FN42. *Brehm v. Eisner,* 746 A.2d 244, 266 (Del.2000).

FN43. *Malpiede v. Townson,* 780 A.2d 1075, 1091-92 (Del.2001).

FN44. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 70 n. 9 (Del.1995).

FN45. *In re General Motors S'holder Litig.,* 2005 WL 1089021 (Del.Ch. May 4, 2005).

--- A.2d ----, 2006 WL 722198 (Del.Supr.)

**Briefs and Other Related Documents (Back to top)**

. **2005 WL 3502081 (Appellate Brief) Appellee/ Cross-Appellant the News Corporation Limited'S Reply Brief On Cross-Appeal (Nov. 14, 2005)**Original Image of this Document (PDF)

. **2005 WL 3445495 (Appellate Brief) Appellants' Reply Brief on Appeal and Cross-Appellees' Answering Brief on Cross-Appeal (Nov. 01, 2005)**Original Image of this Document (PDF)

. **2005 WL 2886266 (Appellate Brief) GM Appellees' Answering Brief (Sep. 15,**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




2006 WL 722198                                                      Page   10
(Cite as: 2006 WL 722198, *6 (Del.Supr.))

2005)Original Image of this Document (PDF)

. 2005 WL 2397211  (Appellate Brief) Opening
Brief of Appellants (Aug. 01, 2005)Original
Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





TAB 4

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: 2005 WL 1242157 (D.Del.))**
**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
**THE LITIGATION TRUST OF MDIP, INC.**
**(formerly known as Mosler, Inc.) and Its**
**Affiliates as Assignee of Certain Claims Pursuant**
**to the Second Amended Joint**
**Plan of Liquidation of MDIP, Inc. and Its**
**Affiliates, Plaintiffs,**
v.
**Michael RAPOPORT, et al., Defendants.**
**No. Civ.A. 03-779GMS.**

May 25, 2005.
Michael F. Bonkowski, Mark Minuti, Saul Ewing
LLP, Wilmington, DE, for Plaintiffs.

Paul J. Lockwood, Eric M. Davis, Skadden, Arps,
Slate, Meagher & Flom, Wilmington, DE, for
Defendants.

*MEMORANDUM*

SLEET, J.

**I. INTRODUCTION**

*\*1* Presently before the court are six motions: a
motion to dismiss Counts I and II of the Amended
Complaint for lack of subject matter jurisdiction
(D.I.67), a motion for partial summary judgment as
to Counts I and II (D.I.84), a motion to strike the
plaintiff's summary judgment affidavits (D.I.114), a
motion to strike the plaintiff's jury demand
(D.I.127), a motion *in limine* requesting the court to
exclude evidence and testimony not disclosed in
plaintiff's responses to contention interrogatories
(D.I.124), and a motion *in limine* requesting the
court to preclude evidence of events that took place
prior to August 6, 1998 (D.I.125). For the
following reasons, the court will grant the motion to
dismiss Counts I and II, and deny the remaining
motions as moot insofar as they pertain to Counts I
or II.

**II. STANDARD OF REVIEW**

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(1) may present either a facial or
factual challenge to subject matter jurisdiction.
*Mortensen v. First Fed. Sav. and Loan Ass'n,* 549
F.2d 884, 891 (3d Cir.1977). The present motion
presents a facial challenge to the complaint because
the jurisdictional facts are not in dispute. Such a
motion requires the court to consider the allegations
of the Amended Complaint as true and to make all
reasonable inferences in the plaintiff's favor. *See id.*

**III. BACKGROUND**

The following facts are alleged in the Amended
Complaint, which the court assumes to be true for
the purpose of deciding this motion. Mosler, Inc.
("Mosler"), a Delaware corporation, traces its roots
back to 1867, when the Mosler-Bahmann Safe
Company was founded by Gustav Mosler. (D.I. 28
¶ 17.) From 1967 to 1990, Mosler went through a
series of buyouts that ultimately resulted in 59% of
Mosler's stock being held by Kelso & Co., Inc.
("Kelso") and a few of Mosler's senior managers.
(Id.¶¶ 21-23.) This permitted Kelso to "install"
defendants William Marquard, Thomas Wall, and
Robert Young (collectively, "the Kelso Directors")
on Mosler's Board of Directors. (Id.¶ 2.) During its
first few years under this ownership structure,
Mosler flourished--its sales increased every year
from 1992 to 1995. (Id.¶ 26.)

Then, in February 1995, Mosler's Chairman and
CEO sent a memo to the Kelso Directors requesting
their "concurrence to" the hiring of Michel
Rapoport as the next CEO, "which [is] consistent
with our succession planning." (Id.¶ 27.) However,
succession planning had not been discussed at either
of the two board meetings prior to February 1995,
and the memo contained minimal information
regarding Rapoport himself. (Id.¶¶ 28-30.)
Although no alternative candidates were considered,
the inexperienced and unqualified Rapoport was
hired as Mosler's CEO. (Id.¶¶ 31-33.) Mosler
subsequently entered a period of decline,
precipitated by "numerous reckless and misinformed
decisions" and mismanagement by Rapoport and the
Kelso Directors. (Id.¶ 35.)

*\*2* For example, in October 1998, Mosler acquired
a security equipment business known as LeFebure.




Not Reported in F.Supp.2d
(Cite as: 2005 WL 1242157, *2 (D.Del.))

Page    2

(Id.¶ 36.) However, during the acquisition process, Rapoport failed to hire outside consultants to assist with due diligence and valuation. Instead, he relied upon numbers provided by LeFebure's parent company, De La Rue, [FN1] and by Mosler's internal personnel. (Id.  ¶  39.) Furthermore, the Kelso Directors did not inform themselves as to the adequacy of Rapoport's due diligence and valuation. (Id.¶ 41.) Then, at a special meeting of Mosler's Board in September 1998, the LeFebure acquisition was approved. This occurred in spite of the fact that no tangible information concerning the acquisition was provided to the Kelso Directors; the minutes of the special meeting merely reflect "extensive discussion" about the acquisition. (Id.¶ 40.) As it turned out, De La Rue overstated LeFebure's financial condition and, as a result, Mosler "grossly overpaid" for LeFebure. (Id.¶ 42.)

> FN1. The precise details of the relationship between LeFebure and De La Rue are not set forth in the complaint, but those details are unimportant here.

The subsequent integration of LeFebure's business did not go well either. Without any objection from the Kelso Directors, Rapoport fired many key LeFebure employees who were essential to the integration process. (Id.¶¶ 43- 44.) Consequently, "many of the former LeFebure accounts were understaffed and poorly serviced, and Mosler had significant difficulty synchronizing LeFebure's business practices with its own, further minimizing the benefits that Mosler recognized from the LeFebure Acquisition." (Id.¶ 43.) Rapoport and the Kelso Directors also failed to heed specific warnings, given to them before the acquisition, pertaining to "systems issues that would arise from the need to integrate LeFebure's systems with Mosler's," resulting in a "serious deterioration of Mosler's liquidity." (Id.¶ 45.)

Then in 1999, Mosler attempted to update the software it used to process orders, collect accounts receivable, etc. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house IT employees, among others, that outside specialists would be required for a project of this type. (Id.¶ 47.) Nevertheless, Rapoport did not hire outside specialists, and without objection from the Kelso Directors, endeavored to complete the project using only Mosler's in-house IT employees. (Id.¶ 48.) But because these employees were not qualified to make

the updates, the project became "a disaster." Thereafter, Mosler was unable to "timely and accurately invoice customers and collect receivables, accurately track its inventory and timely provide needed parts to its customers, and generate the reliable financials required to access its operating credit facilities." (Id.¶ 50.) As a result, Mosler's financial condition further deteriorated. (Id.¶ 51.)

During this time, Rapoport and the Kelso Directors also failed to institute standard business controls. For example, they did not "address sustained and systemic flaws in Mosler's inventory management system," resulting in untimely deliveries to customers, and hence, damage to Mosler's goodwill. (Id.¶ 53.) Mosler's accounts receivable were also rapidly increasing, but neither Rapoport nor the Kelso Directors instituted standard internal control procedures to ensure timely invoicing. (Id.¶ 54.) Moreover, the problems with the accounts receivable were not discussed at either the February or May 1999 Board meetings. (Id.¶¶ 56-57.) Mosler's contemporaneous SEC statements further reflect the financial troubles the company was experiencing. Between 1995 and 1999, Mosler reported an increase in uncollected accounts receivable from $46 million to nearly $100 million. (Id.¶ 55.) Between 1998 and 1999, Mosler saw its net income go from the black to the red, and between 1998 and 2000, its earnings    [FN2] declined while its net sales increased.

> FN2. The earnings referred to here are the earnings before interest, taxation, depreciation, and amortization, commonly known as EBITDA.

*3 The deterioration of Mosler did not go unnoticed. On two occasions, in 1999 and 2000, Mosler's outside auditor advised the Board of "reportable conditions" and "material weaknesses" regarding the company's internal controls. However, neither Rapoport nor the Kelso Directors took any corrective action. (Id.¶¶ 65-73.) Furthermore, in addition to experiencing "unreasonably high turnover of certain officers and key employees" (id.¶ 59), Mosler also suffered from internal unrest. On at least ten occasions between the end of 1997 and the beginning of 2001, certain Kelso Directors were told by senior Mosler employees that the company had "serious business problems" and that Rapoport was mismanaging the company. (Id.¶ 60.) Yet, the Kelso Directors failed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





to investigate these complaints and defended Rapoport after he took retaliatory action against two of the senior employees. (Id.¶¶ 60-61.)

By the end of 2000, Mosler began to default on loans and on interest payments due on its bonds. (Id. ¶ 77.) Although Mosler pursued potential buyers, it ultimately filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the District of Delaware. (Id.¶¶ 78-79.) Mosler, since renamed MDIP, Inc. ("MDIP"), sold its assets at auction for nearly $28 million, but the proceeds were insufficient to pay all of its creditors. (Id.¶¶ 79- 80.) Therefore, pursuant to the approved Chapter 11 plan, the MDIP Litigation Trust, Inc. (the "Trust") was created for the benefit of the unpaid creditors to pursue certain claims. (Id.¶¶ 1, 5.) More specifically, the Trust "is required to prosecute all causes of action assigned to the Trust by Mosler ... for the benefit of holders of Allowed Class 3 and Allowed Class 4 Claims." (Id.¶ 7.) "Moreover, under the Plan, each holder of such a Claim is a Litigation Trust Beneficiary, each of whom has received a beneficial interest in the Litigation Trust Assets in accordance with the Plan." (Id.)

Pursuant to this directive, the Trust, in its own name, brought the present action against the Kelso Directors, Rapoport, and Kelso. Count I, based on the allegations outlined above, seeks to recover damages from the Kelso Directors for breach of the fiduciary duties of due care, good faith, and loyalty. (Id.¶¶ 81-84.) Count II, also based on the allegations outlined above, seeks to recover damages from Rapoport under the same theory. (Id.¶¶ 85-88.) Counts III and IV are avoidance and recovery of constructively fraudulent transfer claims against Kelso, under 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. (Id.¶¶ 89-101.) However, the parties have since stipulated to the dismissal of Count III, and to a reduction in the damages sought in Count IV from $800,000 to $450,000. (D.I.99.)

IV. DISCUSSION

The defendants argue that Counts I and II, which are state law claims, should be dismissed for lack of subject matter jurisdiction because (1) there is incomplete diversity, and (2) the exercise of supplemental jurisdiction would be inappropriate. Each of these arguments is addressed below.

A. Diversity of Citizenship

***4** The diversity jurisdiction statute provides, in relevant part:

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States[.]

28 U.S.C. § 1332(a)(1) (2004). Since *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806), the Supreme Court has "interpreted the diversity statute to require 'complete diversity' of citizenship." *C.T. Carden v. Arkoma Assoc.,* 494 U.S. 185, 187, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). That means the citizenship of every plaintiff must be diverse from the citizenship of every defendant, unless an independent basis for original jurisdiction exists between the non-diverse parties. *See Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 381, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). For an artificial entity, unless that entity is a corporation, its citizenship "depends on the citizenship of ... 'each of its members .'' ' *Id.* at 195-96 (citations omitted). In *C.T. Carden,* the Supreme Court established that this is a bright-line rule only to be modified by Congress, even where strong policy considerations would favor an exception. *See C.T. Carden,* 494 U.S. at 196- 97. [FN3] However, no such statutory modification exists in this case. [FN4]

FN3. Where an artificial entity is the named party whose citizenship is in question, the court may not look to the citizenship of unnamed parties. *C.T. Carden,* 494 U.S. at 187 n. 1. Thus, in the case of a litigation trust, even if application of the "real party to the controversy" test, *see generally Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), would dictate that the citizenship of the trustees should be determinative for the purpose of diversity, the court may not consider their citizenship unless they are named parties, *C.T. Carden,* 494 U.S. at 187 n. 1.

FN4. The Trust argues that *C.T. Carden* is distinguishable because that case involved a partnership rather than a litigation trust. However, as the defendants point out, the Court's broad language leads to the inescapable conclusion that litigation trusts are subject to its holding as well:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw. Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2005 WL 1242157, *4 (D.Del.))

Thus, the course we take today does not so much disregard the policy of accommodating our diversity jurisdiction to the changing realities of commercial organization, as it honors the more important policy of leaving that to the people's elected representatives. Such accommodation is not only performed more legitimately by Congress than by courts, but it is performed more intelligently by legislation than by interpretation of the statutory word "citizen." The 50 States have created, and will continue to create, a wide assortment of artificial entities possessing different powers and characteristics, and composed of various classes of members with varying degrees of interest and control. Which of them is entitled to be considered a "citizen" for diversity purposes, and which of their members' citizenship is to be consulted, are questions more readily resolved by legislative prescription than by legal reasoning, and questions whose complexity is particularly unwelcome at the threshold stage of determining whether a court has jurisdiction. We have long since decided that, having established special treatment for corporations, we will leave the rest to Congress; we adhere to that decision.

*C.T. Carden,* 494 U.S. at 197. Thus, even if the court were inclined to agree with the Trust's policy arguments as to why the citizenship of the Trust itself should control, the Supreme Court has shut down that line of inquiry and left it up to Congress.

Consequently, the court must determine the citizenship of the Trust by looking to the citizenship of its "members," i.e., its beneficiaries. [FN5] *In re A.H. Robins Co., Inc.,* 197 B.R. 575, 579 (Bankr.E.D. Va. June 30, 1995). [FN6] As such, the citizenship of each creditor-beneficiary must be diverse from the citizenship of each of the Kelso Directors. [FN7] *Id.* Based on the court's review of the submitted list of creditors, numerous Class 3 and Class 4 creditors are citizens of the same states as the Kelso Directors. (See D.I. 144 Ex. B.) [FN8] Therefore, as the case is currently captioned, the court does not have diversity jurisdiction over Counts I and II. Moreover, even if the trustees were named plaintiffs and were the "real parties to the controversy," diversity of citizenship would still be lacking because both trustee Julie Dien Ledoux and defendant Wall are residents of New York. (D.I. 28 ¶ 11; D.I. 70 Ex. 1.)

FN5. The court's conclusion that it must look to the

citizenship of the Trust's beneficiaries may rely on the assumption that the Trust has the capacity to sue in its own name. *See Allegis Group, Inc. Contractors Health Plan Trust v. Conn. Gen. Life Ins. Co.,* No. 04-16, 2004 WL 1289862, at *4 n. 3 (D.Md. June 10, 2004). However, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the question of whether there exists a legal basis for making such an assumption, or whether such an assumption is necessary in the first place.

FN6. The Trust argues that *A.H. Robins,* in which the court looked to the citizenship of the defendant-trust's beneficiaries, is distinguishable because that case involved a products liability claimants trust rather than a litigation trust. (D.I. 145 at 3.) Once again, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the Trust's argument.

FN7. The citizenship of Kelso itself is irrelevant because there is an independent basis for original jurisdiction as to Count IV, namely federal question jurisdiction under 28 U.S.C. § 1331 (1993). *Romero,* 358 U.S. at 381.

FN8. Technically speaking, the court's reliance upon "matters outside the pleadings" converts this motion to dismiss into a motion for summary judgment. Fed.R.Civ.P. 12(c). However, if the material facts are not in dispute, then the result is the same regardless of the label attached to the motion. The Trust points out that "there has been no discovery in this action directed specifically to the issue of the citizenship of the beneficiaries," but fails to actually contest the list of creditor-beneficiaries submitted by the defendants. (D.I. 145 at 4.) Since the Trust is presumably in the best position to know the citizenship of its own beneficiaries, and since it does not contest the submitted list, the court has no reason to believe that the material facts are in dispute. Therefore, given the Trust's concession that, based on the list of creditors, "there would not be complete diversity if the citizenship of all beneficiaries were taken into account" (id.), the court is justified in its finding.

The Trust disagrees with this analysis. Instead, it argues, the Trust's status as a litigation trust arising

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in F.Supp.2d                                      Page   5
(Cite as: 2005 WL 1242157, *4 (D.Del.))

from a bankruptcy proceeding qualifies it for a "special rule" that " '[i]t is the citizenship of the bankrupt rather than the citizenship of the trustee in bankruptcy that is determinative for diversity jurisdiction." ' *Carlton v. BAWW, Inc.,* 751 F.2d 781, 787 (5th Cir.1985) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3606). However, the "special rule" extracted from Wright & Miller is based on a 1906 Supreme Court interpretation of a statute that was repealed in 1978. *See Bush v. Elliot,* 202 U.S. 477, 26 S.Ct. 668, 50 L.Ed. 1114 (1906); 11 U.S.C. § 46 (repealed 1978). The court is cognizant of the fact that, in spite of § 46 being repealed nearly twenty seven years ago, the "special rule" appears to have some continued viability in certain jurisdictions. *See, e.g., Carlton,* 751 F.2d at 787; *Pupo v. Chadwick's of Boston, Inc.,* No. 03-564, 2004 WL 2480399 (S.D.N.Y. Nov.4, 2004); *Official Plan Comm. of Omniplex Comm. Group, LLC, v. Lucent Tech., Inc.,* 344 F.Supp.2d 1194 (E.D.Mo. July 9, 2004). *But see Samson v. Allis-Chalmers Prod. Liab. Trust,* No. 90-0139, 1990 WL 87394 (E.D.Pa. June 21, 1990). Nevertheless, it is clear that "the reasoning underlying this rule rests on a shaky foundation," *Lucent,* 344 F.Supp.2d at 1196, so the court is reluctant to apply it. Bearing that in mind, the Trust admits it is not in fact a bankruptcy trustee that would have been subject to the now-repealed § 46 in the first place. (D.I. 78 at 11.) In essence, the Trust is asking the court not only to apply a repealed statute, but also to apply the repealed statute *by analogy.* But if applying a repealed statute is dubious (which it is), then applying a repealed statute by analogy is simply beyond the pale. Furthermore, even if § 46 had not been repealed, the fact that the Trust's *sole purpose is to liquidate and distribute MDIP's assets for the benefit of unsecured creditors* (D.I. 78 at 11) may not have been a sufficient reason to apply the "special rule" by analogy anyway. *Cf. In re Resorts Int'l, Inc.,* 372 F.3d 154, 169 (3d Cir.2004) ("Though the Litigation Trust's assets, the proceeds from the litigation claims, were once assets of the estate, that alone does not create a close nexus to the bankruptcy plan or proceeding sufficient to confer bankruptcy jurisdiction."). Therefore, the court will decline the Trust's invitation to apply the "special rule" in this case.

*5 Thus, diversity jurisdiction is lacking and the court must dismiss Counts I and II unless the

exercise of supplemental jurisdiction is appropriate.

B. Supplemental Jurisdiction

The supplemental jurisdiction statute provides, in relevant part:
(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....
...
(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction[.]
28 U.S.C. § 1367 (1993).

In this case, the court need not determine whether the state law claims "are so related to" the federal law claim "that they form part of the same case or controversy" because it is abundantly clear that the state law claims "substantially predominate[ ] over" the federal law claim. In the fifteen-page section of the Amended Complaint captioned "Allegations Relevant To All Claims," nary a word can be found that relates to the allegedly fraudulent transfers from Mosler to Kelso. (See D.I. 28 ¶¶ 17-80.) In fact, it is not until the twenty-fourth page of the Amended Complaint's twenty-six pages that these transfers are vaguely described in Counts III and IV. (Id.¶¶ 89-101.) Moreover, after the dismissal of Count III, the damages sought in Count IV was reduced from $800,000 to $450,000 (D.I.99), whereas the damage sought in Counts I and II is in the neighborhood of $200,000,000 (D.I. 78 at 2). Clearly, both in terms of the facts alleged and the damages sought, the state law claims substantially predominate over the federal law claims. Thus, the exercise of supplemental jurisdiction in this case would truly permit the tail to wag the dog, and that is something the court will not permit.

V. CONCLUSION

Because the court does not have original jurisdiction over Counts I and II, and because the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in F.Supp.2d
(Cite as: 2005 WL 1242157, *5 (D.Del.))

Page 6

court declines to exercise supplemental jurisdiction, subject matter jurisdiction is lacking and the motion to dismiss must be granted.

*ORDER*

IT IS HEREBY ORDERED THAT:

1. The defendants' motion to dismiss (D.I.67) be GRANTED;

2. Counts I and II of the Amended Complaint (D.I.28) be DISMISSED;

3. The defendants' motion for summary judgment (D.I.84) be DENIED as moot;

4. The defendants' motion to strike the plaintiff's summary judgment affidavits (D.I.114) be DENIED as moot;

5. The defendants' motion to strike the plaintiff's jury demand (D.I.127) be DENIED as moot;

6. The defendants' motion *in limine* requesting the court to exclude evidence and testimony not disclosed in plaintiff's responses to contention interrogatories (D.I.124) be DENIED as moot insofar as it pertains to Counts I or II; and

*6 7. The defendants' motion *in limine* requesting the court to preclude evidence of events that took place prior to August 6, 1998 (D.I.125) be DENIED as moot.

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

. 1:03CV00779 (Docket) (Aug. 05, 2003)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




# TAB 5

2006 WL 694137                                                Page  1
--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131
**(Cite as: 2006 WL 694137 (U.S.))**
H

**Briefs and Other Related Documents**

Supreme Court of the United States
**MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC., Petitioner,**
v.
**Shadi DABIT.**
**No. 04-1371.**

Argued Jan. 18, 2006.
Decided March 21, 2006.

**Background:** Former broker at investment banking
firm and former retail customer of firm brought
class actions against firm in federal and state court,
respectively, alleging biased research and investment
recommendations, and asserting only state-law
claims including breach of fiduciary duty and breach
of contract. After transfer of federal action, and
removal and transfer of state-court action, for
consolidated pretrial proceedings, the United States
District Court for the Southern District of New
York, Milton Pollack, Senior District Judge, 2003
WL 1872820, granted firm's motion to dismiss on
grounds of preemption by the Securities Litigation
Uniform Standards Act (SLUSA). Former broker
and customer appealed. The Court of Appeals for
the Second Circuit, Sotomayor, Circuit Judge, 395
F.3d 25, affirmed in part and vacated and remanded
in part, concluding that, to the extent the complaint
alleged that brokers were fraudulently induced to
retain or delay selling, it fell outside SLUSA's pre-
emptive scope. Certiorari was granted.

**Holding:** The Supreme Court, Justice Stevens,
held that SLUSA applies broadly to pre-empt state-
law class-action claims brought by holders of
securities, as well as by purchasers and sellers of
securities, alleging the fraudulent manipulation of
stock prices.
Vacated and remanded.

Justice Alito did not participate.

**[1] Securities Regulation ⟨⟩= 60.18**

349Bk60.18 Most Cited Cases
Rule 10b-5 broadly prohibits deception,
misrepresentation, and fraud in connection with the
purchase or sale of any security. 17 C.F.R. §
240.10b-5.

**[2] Securities Regulation ⟨⟩= 278**
349Bk278 Most Cited Cases
Congress enacted the Securities Litigation Uniform
Standards Act (SLUSA) to stem the shift in private
securities class-action litigation from federal to state
courts and to prevent certain state private securities
class action lawsuits alleging fraud from being used
to frustrate the objectives of the Private Securities
Litigation Reform Act. Securities Exchange Act of
1934, §§ 21D, et seq., 28(f), 15 U.S.C.A. §§ 78u-4
et seq., 78bb(f).

**[2] States ⟨⟩= 18.77**
360k18.77 Most Cited Cases
Congress enacted the Securities Litigation Uniform
Standards Act (SLUSA) to stem the shift in private
securities class-action litigation from federal to state
courts and to prevent certain state private securities
class action lawsuits alleging fraud from being used
to frustrate the objectives of the Private Securities
Litigation Reform Act. Securities Exchange Act of
1934, §§ 21D, et seq., 28(f), 15 U.S.C.A. §§ 78u-4
et seq., 78bb(f).

**[3] Securities Regulation ⟨⟩= 278**
349Bk278 Most Cited Cases
For purposes of the Securities Litigation Uniform
Standards Act's (SLUSA) class action limitations,
a "covered class action" is a lawsuit in which
damages are sought on behalf of more than 50
people. Securities Exchange Act of 1934, §
28(f)(5)(B), 15 U.S.C.A. § 78bb(f)(5)(B).

**[3] States ⟨⟩= 18.77**
360k18.77 Most Cited Cases
For purposes of the Securities Litigation Uniform
Standards Act's (SLUSA) class action limitations,
a "covered class action" is a lawsuit in which
damages are sought on behalf of more than 50
people. Securities Exchange Act of 1934, §
28(f)(5)(B), 15 U.S.C.A. § 78bb(f)(5)(B).

**[4] Securities Regulation ⟨⟩= 278**
349Bk278 Most Cited Cases
For purposes of the Securities Litigation Uniform
Standards Act's (SLUSA) class action limitations,
a "covered security" is one traded nationally and
listed on a regulated national exchange. Securities



Exchange Act of 1934, § 28(f)(5)(E), 15 U.S.C.A. § 78bb(f)(5)(E).

**[5] Securities Regulation ⬅ 278**
349Bk278 Most Cited Cases
Securities Litigation Uniform Standards Act (SLUSA), which provides that no covered class action based on state law and alleging a misrepresentation or omission of a material fact "in connection with the purchase or sale of a covered security" may be maintained in any state or federal court by any private party, applies broadly to pre-empt state-law class-action claims brought by holders of securities, as well as by purchasers and sellers of securities, alleging the fraudulent manipulation of stock prices. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

**[5] States ⬅ 18.77**
360k18.77 Most Cited Cases
Securities Litigation Uniform Standards Act (SLUSA), which provides that no covered class action based on state law and alleging a misrepresentation or omission of a material fact "in connection with the purchase or sale of a covered security" may be maintained in any state or federal court by any private party, applies broadly to pre-empt state-law class-action claims brought by holders of securities, as well as by purchasers and sellers of securities, alleging the fraudulent manipulation of stock prices. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

**[6] Statutes ⬅ 223.5(4)**
361k223.5(4) Most Cited Cases
When judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.

**[7] Statutes ⬅ 212.6**
361k212.6 Most Cited Cases
Identical words used in different parts of the same statute generally are presumed to have the same meaning.

**[8] States ⬅ 18.11**
360k18.11 Most Cited Cases
There is a general presumption that Congress does not cavalierly pre-empt state-law causes of action.

**[9] Securities Regulation ⬅ 278**
349Bk278 Most Cited Cases
Identity of the plaintiffs does not determine whether a complaint alleges fraud "in connection with the purchase or sale" of securities, for purposes of Securities Litigation Uniform Standards Act (SLUSA) pre-emption. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

**[9] States ⬅ 18.77**
360k18.77 Most Cited Cases
Identity of the plaintiffs does not determine whether a complaint alleges fraud "in connection with the purchase or sale" of securities, for purposes of Securities Litigation Uniform Standards Act (SLUSA) pre-emption. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

*Syllabus* **[FN*]**

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

*1 Respondent Dabit filed a private securities fraud class action in federal court, invoking diversity jurisdiction to advance his state-law claims that petitioner, his former employer, fraudulently manipulated stock prices, causing him and other brokers and their clients to keep their overvalued securities. The District Court dismissed his amended complaint, finding his claims pre-empted by title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA), which provides that no "covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." 15 U.S.C. § 78bb(f)(1)(A). Vacating the judgment, the Second Circuit concluded that, to the extent the complaint alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling, it fell outside SLUSA's pre-emptive scope.

*Held:* The background, text, and purpose of SLUSA's pre-emption provision demonstrate that SLUSA pre-empts state-law holder class-action claims of the kind Dabit alleges. Pp. --- - ----5-17.

(a) The magnitude of the federal interest in protecting the integrity and efficiency of the national

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2006 WL 694137
(Cite as: 2006 WL 694137, *1 (U.S.))

securities market cannot be overstated. The Securities Act of 1933 and the Securities Exchange Act of 1934 (1934 Act) anchor federal regulation of vital elements of this Nation's economy. Securities and Exchange Commission (SEC) Rule 10b-5, which was promulgated pursuant to § 10(b) of the 1934 Act, is an important part of that regulatory scheme, and, like § 10(b), prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale" of a security. When, in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, this Court limited the Rule 10b-5 private right of action to plaintiffs who were themselves purchasers or sellers, it relied on the widespread recognition that suits by nonpurchasers and nonsellers present a special risk of vexatious litigation that could "frustrate or delay normal business activity," *id.,* at 740, 95 S.Ct. 1917. Pp. ---- - ----5-8.

(b) Similar policy considerations prompted Congress to adopt legislation (Reform Act) targeted at perceived abuses of class actions--*e.g.,* nuisance filings and vexatious discovery requests--but this effort prompted members of the plaintiffs' bar to avoid the federal forum altogether. To stem the shift of class actions from federal to state courts, Congress enacted SLUSA. Pp. ---- - ----8-10.

(c) Both the class and the securities here are "covered" within SLUSA's meaning, and the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities. Dabit's narrow reading would pre-empt only those actions in which *Blue Chip Stamps'* purchaser-seller requirement is met. Insofar as that argument assumes that the *Blue Chip Stamps* rule stems from Rule 10b-5's text, it must be rejected, for the Court relied on "policy considerations" in adopting that limitation, and it purported to define the scope of a private right of action under Rule 10b-5, not to define "in connection with the purchase or sale." When this Court has sought to give meaning to that phrase in the § 10(b) and Rule 10b-5 context, it has broadly required that the alleged fraud "coincide" with a securities transaction, an interpretation that comports with the SEC's longstanding views. Congress can hardly have been unaware of this broad construction when it imported the phrase into SLUSA. Where judicial interpretations have settled

a statutory provision's meaning, repeating the same language in a new statute indicates the intent to incorporate the judicial interpretations as well. That presumption is particularly apt here, because Congress not only used § 10(b)'s and Rule 10b-5's words, but used them in another provision appearing in the same statute as § 10(b). The presumption that Congress envisioned a broad construction also follows from the particular concerns that culminated in SLUSA's enactment, viz., preventing state private securities class-action suits from frustrating the Reform Act's objectives. A narrow construction also would give rise to wasteful, duplicative litigation in state and federal courts. The presumption that "Congress does not cavalierly pre-empt state-law causes of action," *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700, has less force here because SLUSA does not pre-empt any cause of action. It simply denies the use of the class-action device to vindicate certain claims. Moreover, tailored exceptions to SLUSA's pre-emptive command-- for, *e.g.,* state agency enforcement proceedings--demonstrate that Congress did not act cavalierly. Finally, federal, not state, law has long been the principal vehicle for asserting class-action securities fraud claims. Pp. ---- - - ----10-16.

(d) Dabit's holder class action is distinguishable from a typical Rule 10b-5 class action only in that it is brought by holders rather than sellers or purchasers. That distinction is irrelevant for SLUSA pre-emption purposes. The plaintiffs' identity does not determine whether the complaint alleges the requisite fraud, and the alleged misconduct here-- fraudulent manipulation of stock prices-- unquestionably qualifies as a fraud "in connection with the purchase or sale" of securities as the phrase is defined in *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1, and *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724. Pp. ---- - ----16- 17.

**\*2** 395 F.3d 25, vacated and remanded.

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

Jay B. Kasner, New York, NY, for petitioner.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





2006 WL 694137
(Cite as: 2006 WL 694137, *2 (U.S.))

Thomas G. Hungar, for United States, as amicus curiae, by special leave of the Court, supporting the petitioner.

David C. Frederick, Washington, D.C., for respondent.

Jay B. Kasner, Counsel of Record, Preeta D. Bansal, Edward J. Yodowitz, Scott D. Musoff, Joanne Gaboriault, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Petitioner.

William B. Federman, Stuart W. Emmons, Federman & Sherwood, Oklahoma City, OK, Clell L. Cunningham, III, Dunn, Swan & Cunningham, P.C., Oklahoma City, OK, David C. Frederick, Counsel of Record, Priya R. Aiyar, Brendan J. Crimmins, Patrick D. Curran, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., for respondent.

Jay B. Kasner, Counsel of Record, Preeta D. Bansal, Edward J. Yodowitz, Scott D. Musoff, Joanne Gaboriault, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Petitioner.

Justice STEVENS delivered the opinion of the Court.

Title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA) provides that "[n]o covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." § 101(b), 112 Stat. 3227 (codified at 15 U.S.C. § 78bb(f)(1)(A)). In this case the Second Circuit held that SLUSA only pre-empts state-law class-action claims brought by plaintiffs who have a private remedy under federal law. 395 F.3d 25 (2005). A few months later, the Seventh Circuit ruled to the contrary, holding that the statute also pre-empts state-law class-action claims for which federal law provides no private remedy. *Kircher v. Putnam Funds Trust*, 403 F.3d 478 (C.A.7 2005). The background, the text, and the purpose of SLUSA's pre-emption provision all support the broader interpretation adopted by the Seventh Circuit.

I

*3 Petitioner Merrill Lynch, Pierce, Fenner &

Smith, Inc. (Merrill Lynch), is an investment banking firm that offers research and brokerage services to investors. Suspicious that the firm's loyalties to its investment banking clients had produced biased investment advice, the New York attorney general in 2002 instituted a formal investigation into Merrill Lynch's practices. The investigation sparked a number of private securities fraud actions, this one among them. [FN1]

> FN1. Merrill Lynch eventually settled its dispute with the New York attorney general.

Respondent, Shadi Dabit is a former Merrill Lynch broker. He filed this class action in the United States District Court for the Western District of Oklahoma on behalf of himself and all other former or current brokers who, while employed by Merrill Lynch, purchased (for themselves and for their clients) certain stocks between December 1, 1999, and December 31, 2000. See App. 27a-46a. Rather than rely on the federal securities laws, Dabit invoked the District Court's diversity jurisdiction and advanced his claims under Oklahoma state law.

The gist of Dabit's complaint was that Merrill Lynch breached the fiduciary duty and covenant of good faith and fair dealing it owed its brokers by disseminating misleading research and thereby manipulating stock prices. [FN2] Dabit's theory was that Merrill Lynch used its misinformed brokers to enhance the prices of its investment banking clients' stocks: The research analysts, under management's direction, allegedly issued overly optimistic appraisals of the stocks' value; the brokers allegedly relied on the analysts' reports in advising their investor clients and in deciding whether or not to sell their own holdings; and the clients and brokers both continued to hold their stocks long beyond the point when, had the truth been known, they would have sold. The complaint further alleged that when the truth was actually revealed (around the time the New York attorney general instituted his investigation), the stocks' prices plummeted.

> FN2. The complaint alleged, for example, that the prices of the subject stocks were "artificially inflated as a result of the manipulative efforts" of Merrill Lynch, and that Merrill Lynch, "acting as a central nerve center in the manipulation of various stocks ..., perpetrated this stock manipulation through a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




2006 WL 694137
(Cite as: 2006 WL 694137, *3 (U.S.))

Page  5

variety of deceptive devices, artifices, and tactics that are the hallmarks of stock manipulation." App. 28a-29a.

Dabit asserted that Merrill Lynch's actions damaged the class members in two ways: The misrepresentations and manipulative tactics caused them to hold onto overvalued securities, and the brokers lost commission fees when their clients, now aware that they had made poor investments, took their business elsewhere.

In July 2002, Merrill Lynch moved to dismiss Dabit's complaint. It argued, first, that SLUSA pre-empted the action and, second, that the claims alleged were not cognizable under Oklahoma law. The District Court indicated that it was "not impressed by" the state-law argument, but agreed that the federal statute pre-empted at least some of Dabit's claims. *Id.,* at 49a-50a. The court noted that the complaint alleged both "claims and damages based on wrongfully-induced purchases" and "claims and damages based on wrongfully-induced holding." *Ibid.* While the "holding" claims, the court suggested, might not be pre-empted, the "purchasing" claims certainly were. The court dismissed the complaint with leave to amend to give Dabit the opportunity to untangle his "hopeless melange of purchase-related and holding-related assertions." *Ibid.* (punctuation added).

Dabit promptly filed an amended complaint that omitted all direct references to purchases. What began as a class of brokers who "purchased" the subject securities during the class period became a class of brokers who "owned and continued to own" those securities. See *id.,* at 52a.

*4 Meanwhile, dozens of other suits, based on allegations similar to Dabit's, had been filed against Merrill Lynch around the country on both federal- and state-law theories of liability. The Judicial Panel on Multidistrict Litigation transferred all of those cases, along with this one, to the United States District Court for the Southern District of New York for consolidated pretrial proceedings. Merrill Lynch then filed its second motion to dismiss Dabit's complaint. Senior Judge Milton Pollack granted the motion on the ground that the claims alleged fell "squarely within SLUSA's ambit." *In re Merrill Lynch & Co., Inc.,* 2003 WL 1872820, *1 (Apr. 10, 2003).

The Court of Appeals for the Second Circuit, however, vacated the judgment and remanded for further proceedings. 395 F.3d, at 51. It concluded that the claims asserted by holders did not allege fraud "in connection with the purchase or sale" of securities under SLUSA. Although the court agreed with Merrill Lynch that that phrase, as used in other federal securities laws, has been defined broadly by this Court, it held that Congress nonetheless intended a narrower meaning here--one that incorporates the "standing" limitation on private federal securities actions adopted in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Under the Second Circuit's analysis, fraud is only "in connection with the purchase or sale" of securities, as used in SLUSA, if it is alleged by a purchaser or seller of securities. Thus, to the extent that the complaint in this action alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling their securities, it fell outside SLUSA's pre-emptive scope. [FN3]

> FN3. The Court of Appeals also concluded that Dabit's lost commission claims escaped pre-emption under SLUSA because they did not "allege fraud that 'coincide[s]' with the sale or purchase of a security." 395 F.3d, at 47 (quoting *SEC v. Zandford,* 535 U.S. 813, 825, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)). That determination is not before this Court for review.

After determining that the class defined in Dabit's amended complaint did not necessarily exclude purchasers, the panel remanded with instructions that the pleading be dismissed without prejudice. The court's order would permit Dabit to file another amended complaint that defines the class to exclude "claimants who purchased in connection with the fraud and who therefore could meet the standing requirement" for a federal damages action, and to include only those "who came to hold [a Merrill Lynch] stock before any relevant misrepresentation." 395 F.3d, at 45-46. Under the Second Circuit's analysis, a class action so limited could be sustained under state law. For the reasons that follow, we disagree.

II

The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




2006 WL 694137
(Cite as: 2006 WL 694137, *4 (U.S.))

Page 6

In response to the sudden and disastrous collapse in prices of listed stocks in 1929, and the Great Depression that followed, Congress enacted the Securities Act of 1933 (1933 Act), 48 Stat. 74, and the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 881. Since their enactment, these two statutes have anchored federal regulation of vital elements of our economy.

[1] Securities and Exchange Commission (SEC) Rule 10b-5, 17 CFR § 240.10b-5 (2005), promulgated in 1942 pursuant to § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), is an important part of that regulatory scheme. The Rule, like § 10(b) itself, [FN4] broadly prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale of any security." [FN5] The SEC has express statutory authority to enforce the Rule. See 15 U.S.C. § 78u (2000 ed. and Supp. III). Although no such authority is expressly granted to private individuals injured by securities fraud, in 1946 Judge Kirkpatrick of the United States District Court for the Eastern District of Pennsylvania, relying on "the general purpose" of the Rule, recognized an implied right of action thereunder. *Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 514. His holding was adopted by an "overwhelming consensus of the District Courts and Courts of Appeals," *Blue Chip Stamps*, 421 U.S., at 730, 95 S.Ct. 1917, and endorsed by this Court in *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

>   FN4. Section 10(b) provides as follows:
>   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
>   "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

>   FN5. The text of the Rule is as follows:
>   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any

facility of any national securities exchange,
>   "(a) To employ any device, scheme, or artifice to defraud,
>   "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>   "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>   "in connection with the purchase or sale of any security." 17 CFR § 240.10b-5 (2005).

*5 A few years after *Kardon* was decided, the Court of Appeals for the Second Circuit limited the reach of the private right of action under Rule 10b-5. In *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (C.A.2 1952), a panel composed of Chief Judge Swan and Judges Augustus and Learned Hand upheld the dismissal of a suit brought on behalf of a corporation and a class of its stockholders alleging that fraud "in connection with" a director's sale of his controlling block of stock to third parties violated Rule 10b-5. The court held that the Rule could only be invoked by a purchaser or seller of securities to remedy fraud associated with his or her own sale or purchase of securities, and did not protect those who neither purchased nor sold the securities in question but were instead injured by corporate insiders' sales to third parties. *Id.*, at 464. While the *Birnbaum* court did not question the plaintiffs' "standing" to enforce Rule 10b-5, later cases treated its holding as a standing requirement. See *Eason v. General Motors Acceptance Corp.*, 490 F.2d 654, 657 (C.A.7 1973).

By the time this Court first confronted the question, literally hundreds of lower court decisions had accepted "*Birnbaum's* conclusion that the plaintiff class for purposes of § 10(b) and Rule 10b-5 private damages actions is limited to purchasers and sellers." *Blue Chip Stamps*, 421 U.S., at 731-732, 95 S.Ct. 1917. Meanwhile, however, cases like *Bankers Life & Casualty Co.* had interpreted the coverage of the Rule more broadly to prohibit, for example, "deceptive practices *touching* [a victim's] sale of securities as an investor." 404 U.S., at 12-13, 92 S.Ct. 165 (emphasis added); see *Eason*, 490 F.2d, at 657 (collecting cases). The "judicial oak which ha[d] grown from little more than a legislative acorn," as then-Justice Rehnquist





described the rules governing private Rule 10b-5 actions, *Blue Chip Stamps,* 421 U.S., at 737, 95 S.Ct. 1917, had thus developed differently from the law defining what constituted a substantive violation of Rule 10b-5. Ultimately, the Court had to decide whether to permit private parties to sue for any violation of Rule 10b-5 that caused them harm, or instead to limit the private remedy to plaintiffs who were themselves purchasers or sellers.

Relying principally on "policy considerations" which the Court viewed as appropriate in explicating a judicially crafted remedy, *ibid.,* and following judicial precedent rather than "the many commentators" who had criticized the *Birnbaum* rule as "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages," 421 U.S., at 738, 95 S.Ct. 1917, the Court in *Blue Chip Stamps* chose to limit the private remedy. The main policy consideration tipping the scales in favor of precedent was the widespread recognition that "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Id.,* at 739, 95 S.Ct. 1917. Even weak cases brought under the Rule may have substantial settlement value, the Court explained, because "[t]he very pendency of the lawsuit may frustrate or delay normal business activity." *Id.,* at 740, 95 S.Ct. 1917. Cabining the private cause of action by means of the purchaser-seller limitation would, in the Court's view, minimize these ill effects. The limitation of course had no application in Government enforcement actions brought pursuant to Rule 10b-5. See *id.,* at 751, n. 14, 95 S.Ct. 1917.

### III

*6 Policy considerations similar to those that supported the Court's decision in *Blue Chip Stamps* prompted Congress, in 1995, to adopt legislation targeted at perceived abuses of the class-action vehicle in litigation involving nationally traded securities. While acknowledging that private securities litigation was "an indispensable tool with which defrauded investors can recover their losses," the House Conference Report accompanying what would later be enacted as the Private Securities Litigation Reform Act of 1995 (Reform Act), 109 Stat. 737 (codified at 15 U.S.C. §§ 77z-1 and 78u-4 ), identified ways in which the class action device was being used to injure "the entire U.S. economy."

H.R.Rep. No. 104-369, p. 31 (1995). According to the Report, nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and "manipulation by class action lawyers of the clients whom they purportedly represent" had become rampant in recent years. *Ibid.* Proponents of the Reform Act argued that these abuses resulted in extortionate settlements, chilled any discussion of issuers' future prospects, and deterred qualified individuals from serving on boards of directors. *Id.,* at 31-32.

Title I of the Reform Act, captioned "Reduction of Abusive Litigation," represents Congress' effort to curb these perceived abuses. Its provisions limit recoverable damages and attorney's fees, provide a "safe harbor" for forward-looking statements, impose new restrictions on the selection of (and compensation awarded to) lead plaintiffs, mandate imposition of sanctions for frivolous litigation, and authorize a stay of discovery pending resolution of any motion to dismiss. See 15 U.S.C. § 78u-4. Title I also imposes heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5; it "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

[2] The effort to deter or at least quickly dispose of those suits whose nuisance value outweighs their merits placed special burdens on plaintiffs seeking to bring federal securities fraud class actions. But the effort also had an unintended consequence: It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of class actions involving nationally traded securities had previously been rare. See H.R.Rep. No. 105-640, p. 10 (1998) ; S.Rep. No. 105-182, pp. 3-4 (1998). To stem this "shif[t] from Federal to State courts" and "prevent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of" the Reform Act, SLUSA §§ 2(2), (5), 112 Stat. 3227, Congress enacted SLUSA.

IV

*7 The core provision of SLUSA reads as follows: [FN6]

> FN6. SLUSA amends the 1933 Act and the 1934 Act in substantially identical ways. For convenience and because they are more pertinent here, we quote the amendments to the 1934 Act.

"CLASS ACTION LIMITATIONS.--No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
"(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
"(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." Id., at 3230 (codified as amended at 15 U.S.C. § 78bb(f)(1)). [FN7]

> FN7. Another key provision of the statute makes all "covered class actions" filed in state court removable to federal court. 112 Stat. 3230 (codified at 15 U.S.C. § 78bb(f)(2)).

[3][4][5] A "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. [FN8] A "covered security" is one traded nationally and listed on a regulated national exchange. [FN9] Respondent does not dispute that both the class and the securities at issue in this case are "covered" within the meaning of the statute, or that the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities.

> FN8. "The term 'covered class action' means--
> "(i) any single lawsuit in which--
> "(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement

or omission, predominate over any questions affecting only individual persons or members; or
"(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or
"(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--
"(I) damages are sought on behalf of more than 50 persons; and
"(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 112 Stat. 3232 (codified at 15 U.S.C. § 78bb(f)(5)(B)).

> FN9. "The term 'covered security' means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred ... ." 112 Stat. 3232 (codified at 15 U.S.C. § 78bb(f)(5)(E) ). Section 18(b) of the 1933 Act in turn defines "covered security" to include securities traded on a national exchange. § 77r(b).

Respondent urges that the operative language must be read narrowly to encompass (and therefore pre-empt) only those actions in which the purchaser-seller requirement of *Blue Chip Stamps* is met. Such, too, was the Second Circuit's view. But insofar as the argument assumes that the rule adopted in *Blue Chip Stamps* stems from the text of Rule 10b-5--specifically, the "in connection with" language, it must be rejected. Unlike the *Birnbaum* court, which relied on Rule 10b-5's text in crafting its purchaser-seller limitation, this Court in *Blue Chip Stamps* relied chiefly, and candidly, on "policy considerations" in adopting that limitation. 421 U.S., at 737, 95 S.Ct. 1917. The *Blue Chip Stamps* Court purported to define the scope of a private right of action under Rule 10b-5--not to define the words "in connection with the purchase or sale." *Id.*, at 749, 95 S.Ct. 1917 ("No language in either [ § 10(b) or Rule 10b-5] speaks at all to the contours of a private cause of action for their violation"). Any ambiguity on that score had long been resolved by the time Congress enacted SLUSA. See *United*




**Page  9**

*States v. O'Hagan,* 521 U.S. 642, 656, 664, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 285, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring in part and concurring in judgment); *id.,* at 289-290, 112 S.Ct. 1311 (SCALIA, J., concurring in judgment); *United States v. Naftalin,* 441 U.S. 768, 774, n. 6, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); see also 395 F.3d, at 39 (acknowledging that "[t]he limitation on standing to bring [a] private suit for damages for fraud in connection with the purchase or sale of securities is unquestionably a distinct concept from the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities").

Moreover, when this Court *has* sought to give meaning to the phrase in the context of § 10(b) and Rule 10b-5, it has espoused a broad interpretation. A narrow construction would not, as a matter of first impression, have been unreasonable; one might have concluded that an alleged fraud is "in connection with" a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities. After all, that was the interpretation adopted by the panel in the *Birnbaum* case. See 193 F.2d, at 464. But this Court, in early cases like *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), and most recently in *SEC v. Zandford,* 535 U.S. 813, 820, 822, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), has rejected that view. Under our precedents, it is enough that the fraud alleged "coincide" with a securities transaction-- whether by the plaintiff or by someone else. See *O'Hagan,* 521 U.S., at 651, 117 S.Ct. 2199. The requisite showing, in other words, is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.,* at 658, 117 S.Ct. 2199. Notably, this broader interpretation of the statutory language comports with the longstanding views of the SEC. See *Zandford,* 535 U.S., at 819-820, 122 S.Ct. 1899. [FN10]

FN10. In *Zandford,* we observed that the SEC has consistently "maintained that a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5." 535 U.S., at 819, 122 S.Ct. 1899.

Here, too, the SEC supports a broad reading of the "in connection with" language.

**\*8** [6][7] Congress can hardly have been unaware of the broad construction adopted by both this Court and the SEC when it imported the key phrase--"in connection with the purchase or sale"--into SLUSA's core provision. And when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well." *Bragdon v. Abbott,* 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); see *Cannon v. University of Chicago,* 441 U.S. 677, 696-699, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Application of that presumption is particularly apt here; not only did Congress use the same words as are used in § 10(b) and Rule 10b-5, but it used them in a provision that appears in the same statute as § 10(b). Generally, "identical words used in different parts of the same statute are ... presumed to have the same meaning." *IBP, Inc. v. Alvarez,* 546 U.S. 1144, ----, 125 S.Ct. 1292, 161 L.Ed.2d 104 (2005) (slip op., at 11).

The presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment. A narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's stated purpose, viz., "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives" of the 1995 Act. SLUSA § 2(5), 112 Stat. 3227. As the *Blue Chip Stamps* Court observed, class actions brought by holders pose a special risk of vexatious litigation. 421 U.S., at 739, 95 S.Ct. 1917. It would be odd, to say the least, if SLUSA exempted that particularly troublesome subset of class actions from its pre-emptive sweep. See *Kircher,* 403 F.3d, at 484.

Respondent's preferred construction also would give rise to wasteful, duplicative litigation. Facts supporting an action by purchasers under Rule 10b-5 (which must proceed in federal court if at all) typically support an action by holders as well, at least in those States that recognize holder claims. The prospect is raised, then, of parallel class actions proceeding in state and federal court, with different





standards governing claims asserted on identical facts. That prospect, which exists to some extent in this very case, [FN11] squarely conflicts with the congressional preference for "national standards for securities class action lawsuits involving nationally traded securities." SLUSA § 2(5), 112 Stat. 3227. [FN12]

> FN11. See 2003 WL 1872820, *1 (S.D.N.Y., Apr.10, 2003) (observing that Dabit's holder claims rested "on the very same alleged series of transactions and occurrences asserted in the federal securities actions" filed against Merrill Lynch).

> FN12. See H.R.Rep. No. 105-640, p. 10 (1998) (the "solution" to circumvention of the Reform Act "is to make Federal court the exclusive venue for securities fraud class action litigation"); S.Rep. No. 105- 182, p. 3 (1998) (identifying "the danger of maintaining differing federal and state standards of liability for nationally-traded securities").

*9 [8] In concluding that SLUSA pre-empts state-law holder class-action claims of the kind alleged in Dabit's complaint, we do not lose sight of the general "presum[ption] that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.

Moreover, the tailored exceptions to SLUSA's pre-emptive command demonstrate that Congress did not by any means act "cavalierly" here. The statute carefully exempts from its operation certain class actions based on the law of the State in which the issuer of the covered security is incorporated, actions brought by a state agency or state pension plan, actions under contracts between issuers and indenture trustees, and derivative actions brought by shareholders on behalf of a corporation. 15 U.S.C. §§ 78bb(f)(3)(A)-(C), (f)(5)(C). The statute also expressly preserves state jurisdiction over state agency enforcement proceedings. § 78bb(f)(4). The existence of these carve-outs both evinces

congressional sensitivity to state prerogatives in this field and makes it inappropriate for courts to create additional, implied exceptions.

Finally, federal law, not state law, has long been the principal vehicle for asserting class-action securities fraud claims. See, *e.g.,* H.R. Conf. Rep. No. 105-803, p. 14 (1998) ("Prior to the passage of the Reform Act, there was essentially no significant securities class action litigation brought in State court"). [FN13] More importantly, while state-law holder claims were theoretically available both before and after the decision in *Blue Chip Stamps,* the actual assertion of such claims by way of class action was virtually unheard of before SLUSA was enacted; respondent and his *amici* have identified only *one* pre-SLUSA case involving a state-law class action asserting holder claims. [FN14] This is hardly a situation, then, in which a federal statute has eliminated a historically entrenched state-law remedy. Cf. *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (observing that a "long history" of state-law tort remedy "add[ed] force" to the presumption against pre-emption).

> FN13. Respondent points out that the Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), identified as a factor mitigating any unfairness caused by adoption of the purchaser-seller requirement that "remedies are available to nonpurchasers and nonsellers under state law." *Id.,* at 738, n. 9, 95 S.Ct. 1917. He argues that this supports a narrow construction of SLUSA's pre-emption provision. But we do not here revisit the *Blue Chip Stamps* Court's understanding of the equities involved in limiting the availability of private remedies under federal law; we are concerned instead with Congress' intent in adopting a pre-emption provision, the evident purpose of which is to limit the availability of remedies under state law.

> FN14. See Brief for Respondent 5 (citing *Weinberger v. Kendrick,* 698 F.2d 61, 78 (C.A.2 1982) (approving a settlement that included holder claims brought pursuant to New York law)); see also Tr. of Oral Arg. 34-35.

V

*10 [9] The holder class action that respondent tried to plead, and that the Second Circuit envisioned, is




distinguishable from a typical Rule 10b-5 class action in only one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA pre-emption, that distinction is irrelevant; the identity of the plaintiffs does not determine whether the complaint alleges fraud "in connection with the purchase or sale" of securities. The misconduct of which respondent complains here-- fraudulent manipulation of stock prices-- unquestionably qualifies as fraud "in connection with the purchase or sale" of securities as the phrase is defined in *Zandford*, 535 U.S., at 820, 822, 122 S.Ct. 1899, and *O'Hagan*, 521 U.S., at 651, 117 S.Ct. 2199.

The judgment of the Court of Appeals for the Second Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice ALITO took no part in the consideration or decision of this case.

--- S.Ct. ----, 2006 WL 694137 (U.S.), 19 Fla. L. Weekly Fed. S 131

**Briefs and Other Related Documents (Back to top)**

. **2006 WL 126648, 74 USLW 3422** (Oral Argument) Oral Argument (Jan. 18, 2006)

. **2006 WL 42052** (Appellate Brief) Reply Brief (Jan. 05, 2006)Original Image of this Document (PDF)

. **2005 WL 3477893** (Appellate Brief) Brief for Respondent (Dec. 19, 2005)Original Image of this Document (PDF)

. **2005 WL 3485822** (Appellate Brief) Brief for Phillip Goldstein and Bulldog Investors as Amici Curiae in Support of Respondent%tc (Dec. 19, 2005)Original Image of this Document (PDF)

. **2005 WL 3543088** (Appellate Brief) Brief of New York, California, Connecticut, Hawaii, Illinois, Iowa, Michigan, Minnesota, Mississippi, Montana, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, South Carolina, Vermont, Washington, Wisconsin as Amici Curiae in

Support of Respondent%tc (Dec. 19, 2005)Original Image of this Document (PDF)

. **2005 WL 3533245** (Appellate Brief) Brief of National Association of Shareholder and Consumer Attorneys and AARP as Amici Curiae in Support of Respondents%tc (Dec. 16, 2005)Original Image of this Document (PDF)

. **2005 WL 3543089** (Appellate Brief) Brief for IJG Investments and Irlys Guy as Amicus Curiae Supporting Respondent%tc (Dec. 16, 2005)Original Image of this Document (PDF)

. **2005 WL 3048038** (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. **2005 WL 3067181** (Appellate Brief) Brief of the Chamber of Commerce of the United States of America as Amicus Curiae in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. **2005 WL 3076071** (Appellate Brief) Brief for the Investment Company Institute as Amicus Curiae in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. **2005 WL 3076072** (Appellate Brief) Brief of Amicus Curiae Washington Legal Foundation in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. **2005 WL 3076090** (Appellate Brief) Brief of Amici Curiae Lord, Abbett & Co. and Eaton Vance Management in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. **2005 WL 3076091** (Appellate Brief) Brief Amici Curiae of the Securities Industry Association and the Bond Market Association in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. **2005 WL 3076092** (Appellate Brief) Brief for Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. **2005 WL 3087267** (Appellate Brief) Brief of




2006 WL 694137
(Cite as: 2006 WL 694137, *10 (U.S.))

Pacific Life Insurance Company as Amicus Curiae in Support of Petitioner%tc (Nov. 14, 2005)Original Image of this Document (PDF)

. 2005 WL 3106986 (Joint Appendix)  (Nov. 14, 2005)

. 2005 WL 2147599 (Appellate Petition, Motion and Filing) Supplemental Brief of Petitioner in Further Support of the Petition for Certiorari (Sep. 01, 2005)

. 2005 WL 1703139 (Appellate Petition, Motion and Filing) Reply Brief (Jul. 19, 2005)

. 2005 WL 1596478 (Appellate Petition, Motion and Filing) Brief in Opposition (Jul. 05, 2005)

. 2005 WL 1397189 (Appellate Petition, Motion and Filing) Motion for Leave to File a Brief as Amici Curiae and Brief for the Securities Industry Association and the Bond Market Association as Amici Curiae in Support of Petitioners (May. 16, 2005)

. 04-1371 (Docket) (Apr. 14, 2005)

. 2005 WL 879506 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Apr. 11, 2005)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



