IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
IN RE MBNA CORPORATION : 
DERIVATIVE AND CLASS : Lead Case No. 1:05-cv-00327-
LITIGATION : GMS

This Document Relates To: :
ALL ACTIONS. : CLASS AND DERIVATIVE
: ACTION
:
------------------------------------------------------------x


COMPENDIUM OF UNREPORTED OPINIONS TO
REPLY BRIEF IN SUPPORT OF THE MBNA
OUTSIDE DIRECTOR DEFENDANTS' MOTION TO DISMISS

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

DATED: April 5, 2006

# INDEX

CASES                                                                 TAB NO.

*Blackmore Partners L.P. v. Link Energy LLC,*
    C.A. No. 454-N, 2005 WL 2709639 (Del. Ch. Oct. 14, 2005) .......................................... 1

*Brayall v. Dart Indus., Inc.,*
    C.A. No. 87-1525-WF, 1988 WL 72766 (D. Mass. Feb. 3, 1988) .................................... 2

*In re General Motors (Hughes) S'holder Litigation,*
    C.A. No. 260, 2005, 2006 WL 722198 (Del. Mar. 20, 2006) ............................................ 3

*Litig. Trust of MDIP, Inc. v. Rapoport,*
    C.A. No. 03-779-GMS, 2005 WL 1242157 (D. Del. May 25, 2005) ................................ 4

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    C.A. No. 04-1371, 2006 WL 694137 (U.S. Mar. 21, 2006) ............................................. 5

*Orman v. Cullman,*
    C.A. No 18039, 2004 WL 2348395 (Del. Ch. Oct. 20, 2004) .......................................... 6

*In re Talley Indus., Inc. S'holders Litig.,*
    C.A. No. 15961, 1998 WL 191939 (Del. Ch. Apr. 13, 1998) .......................................... 7

*Yanow v. Scientific Leasing, Inc.,*
    C.A. Nos. 9536, 9561, 1988 WL 8772 (Del. Ch. Feb. 8, 1988) ....................................... 8

TAB 6

Not Reported in A.2d                                          Page  1
Not Reported in A.2d, 2004 WL 2348395 (Del.Ch.)
(Cite as: 2004 WL 2348395 (Del.Ch.))
H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
**Joseph ORMAN, Plaintiff,**
v.
**Edgar M. CULLMAN, Sr., Edgar M. Cullman,
Jr., Susan R. Cullman, John L. Ernst,
Peter J. Solomon, Bruce A. Barnet, John L.
Bernbach, Thomas C. Israel, Dan W.
Lufkin, Graham V. Sherren, Frances T. Vincent,
Jr. and General Cigar Holdings,
Inc., Defendants.
No. Civ.A. 18039.**

Submitted May 28, 2004.
Decided Oct. 20, 2004.

Joseph A. Rosenthal and Carmella P. Keener, of
Rosenthal, Monhait, Gross & Goddess, P.A.,
Wilmington, Delaware, Stephen A. Whinston and
Elizabeth W. Fox, of Berger & Montague, P.C.,
Philadelphia, Pennsylvania, for Plaintiff, of counsel.

Raymond J. DiCamillo, Becky A. Allen and Titania
R. Mack, of    Richards, Layton & Finger,
Wilmington, Delaware, John J. Kirby, Jr., Blair G.
Connelly and Jennifer C. Meyer, of Latham &
Watkins, New York, New York, for Defendants, of
counsel.

*OPINION*

CHANDLER, J.

**\*1** This case is about a merger transaction in which
one tobacco company, Swedish Match AB,
purchased an equity stake in another tobacco
company, General Cigar Holdings, Inc. Members of
the Cullman family are the controlling shareholders
of General Cigar. Swedish Match did not purchase
control of General Cigar, as it wanted the Cullmans
to continue managing the company after the merger.

Although Swedish Match paid a significant
premium above the market price for the public
shares in General Cigar, plaintiff Joseph Orman
sued the General Cigar board of directors for breach
of their fiduciary duties in negotiating the merger
terms. In earlier stages of this lawsuit, the Court has
dismissed certain claims and has permitted others to
go forward. After an extended period of discovery,
defendants have renewed their motion for summary
judgment on the remaining breach of fiduciary duty
claim. Defendants contend that a fully informed vote
of a majority of the public shareholders in favor of
the merger operates to extinguish plaintiff's claim.
This contention raises the following question: Were
the General Cigar public shareholders impermissibly
coerced to vote for the merger because of a lock-up
provision required by Swedish Match as part of the
transaction?

The answer to this question, in my opinion, is no.
The undisputed facts demonstrate that the lock-up
did not coerce the public shareholders to approve the
merger for reasons unrelated to its merits. Public
shareholders of General Cigar retained full authority
to veto the transaction, the board had negotiated an
effective fiduciary out, and any interested third party
was free to purchase the publicly owned shares of
General Cigar. For these and other reasons set forth
later in this Opinion, I will enter summary judgment
in favor of defendants and against the plaintiff.

## I. BACKGROUND

General Cigar Holdings, Inc. was founded in 1906
by the Cullman family. General Cigar became a
public company through an IPO in February 1997 at
an IPO price of $18.00 per share. The prospectus
issued in connection with the IPO informed potential
investors that certain members of the Cullman and
Ernst families (the "Cullmans") would "have
substantial control over the Company and may have
the power ... to approve any action requiring
stockholder approval, including ... approving
mergers." [FN1] The Cullmans' control over
General Cigar was by virtue of their exclusive
power over the Company's Class B common stock,
which is entitled to ten votes per share. [FN2]
Following the IPO, the Company's stock traded as
high as $33.25 per share. [FN3] Throughout 1998
and 1999, however, the stock traded as low as $5.50
per share. [FN4]

FN1. Affidavit of Becky A. Hartshorn ("Hartshorn
Aff."), Ex. A at 15 ("IPO Prospectus").

FN2. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 2348395, *1 (Del.Ch.))

Page  2

FN3. General Cigar Amended Form 10-K/A filed
March 24, 2000 at 12 ("2000 10-K").

FN4. *Id.*

At the end of April 1999, General Cigar sold part
of its business to Swedish Match AB. [FN5] Later
that year, Swedish Match contacted the Company to
discuss "acquiring a significant stake" in General
Cigar's business. [FN6] In November 1999, the
Company's board authorized management to pursue
discussions with Swedish Match. [FN7] On
December 2, 1999, Edgar Cullman Sr., General
Cigar's chairman, informed the board that he and
Edgar Cullman Jr., the Company's CEO, were
meeting with a representative of Swedish Match in
London to discuss an acquisition. [FN8] At the early
December meeting in London, Swedish Match
expressed a high level of interest in making an
equity investment in General Cigar. [FN9] Swedish
Match also indicated that "they wanted Edgar M.
Cullman, Sr. and Edgar M. Cullman, Jr. to maintain
management responsibility and day-to-day control of
General Cigar." [FN10] Swedish Match's interest,
and desire to have the Cullmans remain in control of
General Cigar, was reaffirmed at meetings in New
York from December 19-21, 1999. [FN11] At these
meetings, General Cigar made their management
available in order to permit Swedish Match to begin
their due diligence process. [FN12]

FN5. *Id.*

FN6. Affidavit of Edgar Cullman, Jr. ("Cullman
Aff.") ¶ 2.

FN7. *Id.;* Hartshorn Aff., Ex. B at 9-10 ("Proxy
Statement").

FN8. Affidavit of Carmella P. Keener ("Keener
Aff."), Ex. 3 ("Dec. 2, 1999 Board Minutes).

FN9. Proxy Statement at 10.

FN10. *Id.*

FN11. *Id.* Dan Lufkin, a member of the General
Cigar board, testified that Swedish Match had "no
interest in buying this company without the
Cullmans." Deposition of Dan W. Lufkin ("Lufkin
Dep.") at 75. The Cullmans also indicated their
desire to retain the majority of their equity in the

Company and to continue controlling day-to-day
operations. Proxy Statement at 10; Cullman Aff. ¶ 4.

FN12. Proxy Statement at 10.

*2 Given the continuing interest of Swedish Match,
General Cigar's board created a special committee to
advise and make recommendations to the full board
concerning any transaction with Swedish Match.
[FN13] The special committee consisted of Dan
Lufkin, Thomas Israel, and Francis Vincent, Jr.
[FN14] The chairman of the special committee,
Lufkin, believed it was the committee's
responsibility to ensure that the public shareholders
[FN15] were "fairly represented." [FN16]
Although the special committee was charged with
advising the board regarding any transaction with
Swedish Match, it was not authorized to solicit
offers by third parties. [FN17] The special
committee also did not negotiate directly with
Swedish Match . [FN18] Instead, the negotiations
were conducted primarily by Peter J. Solomon
Company Limited, an investment company owned
by a member of the Company's board, Peter
Solomon. [FN19] The special committee retained
Wachtell, Lipton, Rosen & Katz ("Wachtell") to
serve as legal counsel to the committee. [FN20] The
special committee also retained Deutsche Bank
Securities Inc. ("Deutsche Bank") to render a
fairness opinion on any proposals made by Swedish
Match. [FN21]

FN13. Cullman Aff. ¶ 3; Proxy Statement at 10.

FN14. Cullman Aff. ¶ 3.

FN15. I use the phrase "public shareholders" to refer
to those shareholders unaffiliated with the Cullmans
or General Cigar. Although not a "minority," the
public shareholders did not exercise voting control
due to the Cullmans' control over the Company's
Class B Common Stock.

FN16. Lufkin Dep. at 27.

FN17. Proxy Statement at 10.

FN18. *Id.*

FN19. Lufkin Dep. at 21.

FN20. Lufkin Dep. at 23; Proxy Statement at 11.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 2004 WL 2348395, *2 (Del.Ch.))

Page    3

FN21. Lufkin Dep. at 61; Proxy Statement at 11.

During the negotiations that led to the merger, Swedish Match required that the Cullmans enter into a stockholders' voting agreement. [FN22] "Under that agreement, the Cullmans agreed not to sell their shares, and to vote their shares against any alternative acquisition proposal for a specified period following any termination of the merger between Swedish Match and General Cigar." [FN23] According to Swedish Match's CFO:

FN22. Declaration of Sven Hindrikes ("Hindrikes Dec.") ¶ 2. *See also* Cullman Aff. ¶ 4 ("Swedish Match insisted upon some form of deal protection"); Lufkin Dep. at 84 ("there would have been no merger without lockup").

FN23. Hindrikes Dec. ¶ 2.

A central purpose of the voting agreement was to protect Swedish Match against the risk that the Cullmans or General Cigar would "shop" Swedish Match's offer to other potential bidders. Because the Cullmans held a controlling interest in General Cigar, the voting agreement would prevent an alternative bidder from acquiring control of General Cigar during the specified period if the merger did not go forward. This protection was particularly important to Swedish Match because the merger agreement did not contain a termination fee or expense reimbursement provision. [FN24]

FN24. *Id.* ¶ 3.

Swedish Match originally asked that the Cullmans agree to a restricted period of three years. This was rejected. [FN25] The restricted period was later negotiated down to one year. [FN26]

FN25. *Id.* ¶¶ 4-5

FN26. *Id.* ¶ 6.

Drafts of the merger agreement and the voting agreement were sent to the Cullmans and the special committee on January 18, 2000. [FN27] These drafts reflected a potential transaction structure in which the Cullmans would sell approximately one third of their equity interest to Swedish Match at a price of $15.00 per share followed by a merger into a Swedish Match subsidiary in which public

shareholders would also receive $15.00 per share. [FN28] The voting agreement circulated on January 18 contained a requirement that the Cullmans not sell their shares, and to vote their shares against any alternative acquisition proposal, for one year following any termination of the merger agreement between Swedish Match and General Cigar. [FN29] Following the merger, General Cigar would be owned 64% by Swedish Match and 36% by the Cullmans. [FN30] The Cullmans, specifically Edgar Cullman Sr. and Edgar Cullman Jr., however, would remain in control of the Company. [FN31]

FN27. *Id.*

FN28. *Id.;* Proxy Statement at 11; Keener Aff., Ex. 8 ("Jan. 19, 2000 Spec. Comm. Mins.").

FN29. *Id.* The transaction also contained put and call arrangements whereby the Cullmans would be able to sell and Swedish Match would be able to buy General Cigar stock after a period of years for prices above $15.00 per share, depending upon sales of the Company. Lufkin Dep. at 28.

FN30. Proxy Statement at 1.

FN31. Proxy Statement at 23-24. This Court has already determined that the transaction did not involve a sale of control. *Orman v. Cullman,* 794 A.2d 5, 42 n. 1441 (Del. Ch.2002).

*3 The special committee met on January 19, 2000. [FN32] Wachtell and Deutsche Bank attended the meeting. At this meeting, Lufkin informed the full committee that Swedish Match agreed to increase the price paid to the public shareholders to $15.25 per share. [FN33] In exchange for this slightly higher offer, Swedish Match required the Cullmans to increase the restricted period under the voting agreement from twelve to eighteen months. [FN34] Deutsche Bank made a presentation at the meeting and opined that from a financial point of view the offer price of $15.25 per share was fair to the public shareholders. [FN35] After Deutsche Bank's presentation, discussion ensued, and the special committee voted unanimously to recommend that the full board approve the merger. [FN36] After the special committee's meeting, the full board met, approved the merger, and the relevant documents were signed by all parties on the evening of January 19, 2000. [FN37] A public announcement was made





the following day. [FN38]

> FN32. Jan. 19, 2000 Spec. Comm. Mins. The
> committee previously met on December 29, 1999.
> Id.

> FN33. Id. The chairman of the special committee,
> Lufkin, testified that he was "totally satisfied" with
> the $15.00 per share offer, but asked for another
> $0.25 because the committee felt it "had to earn [its]
> keep." Lufkin Dep. at 76.

> FN34. Jan. 19, 2000 Spec. Comm. Mins. Plaintiff
> argues that it is an issue of fact whether or not the
> extra $0.25 was a trade off for the extra six months
> of lock-up because Lufkin did not recall the
> connection in his deposition. See Lufkin Dep. at 72.
> Actually, Lufkin's testimony was that he did not
> recall the connection "as being a significant issue."
> Id. Moreover, a failure to remember an event is not
> a specific denial that an event occurred for purposes
> of summary judgment. Hideout Records & Distribs.
> v. El Jay Dee, Inc., 601 F.Supp. 1048, 1053
> (D.Del.1984). Regardless, the record reflects that the
> extra $0.25 and the extra six months were
> connected. See Cullman Aff. ¶ 6 ("In return for the
> increased payment to the unaffiliated shareholders,
> Swedish Match required that the Cullman family
> agree to increase the restricted period under the
> voting agreement from 12 to 18 months.");
> Hindrikes Dec. ¶ 7 ("Swedish Match agreed [to the
> increased payment], but in exchange required that
> the Cullman family agree to increase the restricted
> period under the voting agreement from 12 months
> to 18 months."); Proxy Statement at 11 ("[I]n
> connection [with the increased payment], the Family
> agreed to increase from twelve to eighteen months
> the period they would be prohibited from pursuing
> other transactions.").

> FN35. Jan. 19 2000 Spec. Comm. Mins.

> FN36. Id. Proxy Statement at 8-11 (discussing
> merger background).

> FN37. Proxy Statement at 11.

> FN38. Id.

As noted earlier, the voting agreement between the
Cullmans and Swedish Match required that the
Cullmans vote their Class B shares, constituting a
majority of the voting power of the Company, in
favor of the merger and against any alternative
acquisition of the Company for eighteen months
after termination of the merger agreement. [FN39]
The voting agreement, however, reveals that the
Cullmans were bound only in their capacities as
shareholders and that nothing in the voting
agreement limits or affects their actions as officers
or directors of General Cigar. [FN40] Moreover,
the merger agreement permitted General Cigar's
board to entertain unsolicited acquisition proposals
from potential acquirors if the board, upon
recommendation by the special committee,
concluded that such a proposal was bona fide and
would be more favorable to the public shareholders
than the proposed merger with Swedish Match.
[FN41] The agreement also permitted the board to
withdraw its recommendation of the merger with
Swedish Match if the board concluded, upon
consultation with outside counsel, that its fiduciary
duties so required. [FN42]

> FN39. Proxy Statement, Ex. D ("Voting
> Agreement") at 1.

> FN40. Id. at 4; Cullman Aff. ¶ 5.

> FN41. Proxy Statement, Annex A ("Merger
> Agreement") § 6.4; Cullman Aff. ¶ 5.

> FN42. Merger Agreement § 6.4; Cullman Aff. ¶ 5.

On April 10, 2000, almost three months after the
public announcement of the Swedish Match
transaction, General Cigar filed the proxy statement
relating to the shareholder vote on the proposed
merger. As expected, the proxy statement attached
the merger agreement, the voting agreement, and
contained the background relating to the proposed
merger. The proxy statement also revealed (1) that
the merger could not occur without the approval of
the merger by the Class A shareholders and (2) that
the Cullmans agreed to vote their shares of Class A
common stock held by them pro rata in accordance
with the vote of the Class A public shareholders.
[FN43] In other words, the merger could not
proceed without approval by a "majority of the
minority." [FN44] The shareholder meeting was
held on May 8, 2000. The public shareholders, i.e.,
a majority of the minority, overwhelmingly
approved the merger. [FN45]





Not Reported in A.2d                                                    **Page    5**
**(Cite as: 2004 WL 2348395, \*3 (Del.Ch.))**

FN43. Proxy Statement at 2.

FN44. As noted earlier, the public shareholders were a "minority" in terms of voting power. But the provision in the agreement requiring the Cullmans to vote their Class A shares *pro rata* in accordance with the public shareholders effectively gave the public shareholders a "veto" power over the proposed transaction.

FN45. Affidavit of Joseph Aird, Ex. F (submitted in connection with defendants' original summary judgment motion, D.I. No. 36). The public shareholders approved the transaction by a vote of 10,009,994 shares in favor to 24,686 against, with 9,353 abstaining. *Id.*

## II. ANALYSIS
### A. Summary Judgment Standard

\*4 Defendants are entitled to summary judgment if the evidence, viewed in the light most favorable to plaintiff, shows that there are no genuine issues as to any material fact and that defendants are entitled to judgment as a matter of law. [FN46] The Court "may not weigh qualitatively or quantitatively the evidence adduced on the summary judgment record." [FN47] Here, there are no material factual disputes. The only issue is whether on this record plaintiff has a viable claim.

FN46. Court of Chancery Rule 56(c); *Cerberus Int'l v. Apollo Management, L.P.,* 794 A.2d 1141, 1150 (Del.2002).

FN47. *Cerberus Int'l,* 794 A.2d at 1150.

### B. Defendant's Basis for Summary Judgment

In my March 2002 Opinion in this case, I held that all but one of plaintiff's disclosure claims failed to state a claim under Court of Chancery Rule 12(b)(6) . [FN48] Defendants thereafter moved for summary judgment as to that disclosure claim, arguing that the evidence did not support plaintiff's remaining disclosure claim and that plaintiff's breach of fiduciary duty claims should be dismissed based on the public shareholders' informed approval of the merger. Plaintiff withdrew his remaining disclosure claim and did not contend (then or now) that the proxy statement issued in connection with the merger contained material misrepresentations or

omissions. Therefore, at that time, the only issue was whether the public shareholders' fully-informed approval of the merger was legally sufficient to dispose of plaintiff's fiduciary duty claims. [FN49]

FN48. *Orman,* 794 A.2d at 42. The disclosure claim that survived dismissal related to the purported omission from the proxy statement of the fair market value of General Cigar's corporate headquarters building in New York. *Id.*

FN49. *See Marciano v. Nakash,* 535 A.2d 400, 405 n. 3 (Del.1987) ( "approval by fully-informed ... disinterested stockholders ... permits invocation of the business judgment rule and limits judicial review to issues of gift or waste").

In opposition to defendants' summary judgment motion, however, plaintiff raised the argument that the deal protection devices present here were unreasonably coercive of the shareholder vote and, hence, the vote, although fully-informed, could not extinguish plaintiff's fiduciary duty claims. In my August 2002 Opinion, I denied defendants' motion for summary judgment and stated:
The record at this point reveals little about the purpose of [the 18 month restricted period] or about how it came to be a term of the merger proposal. It is certainly possible that further discovery could show this provision to be a deal protection measure for Swedish Match designed to prevent the Cullman group and General Cigar from shopping Swedish Match's offer. It is also possible, however, that the facts could be less benign. The existence of this factual ambiguity leaves me no choice but to deny this motion. [FN50]

FN50. *Orman v. Cullman,* C.A. No. 18039, slip op. at 3 (Del. Ch. Aug. 16, 2002).

After the parties engaged in additional discovery and developed the record more fully, defendants renewed their summary judgment motion. Accordingly, "the only issue left is whether the vote of the Class A shareholders of General Cigar was tainted by improper coercion." [FN51]

FN51. Pl.'s Answering Brief ("AB") at 9 (*citing Orman,* C.A. No. 18039, slip op. at 2). As noted, there is no validly pleaded disclosure claim.

### C. Plaintiff's Arguments

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d                                                      Page 6
(Cite as: 2004 WL 2348395, *4 (Del.Ch.))

Although plaintiff has stated that the only issue is whether the shareholder vote was tainted by improper coercion, he (somewhat predictably) has raised two arguments ancillary to that issue that must be addressed. I will discuss these two ancillary arguments first, and then turn my attention to the coercion issue.

1. *The Special Committee*

Plaintiff argues that the special committee provided no protection to the Company's public shareholders because (1) the special committee members "had personal motivations ... unlike the motivation of the average stockholder" [FN52] and (2) the committee had a "lackadaisical attitude." [FN53] Both of these points are not well taken.

> FN52. AB at 12.

> FN53. *Id.* at 13.

**\*5** The Court's March 2002 Opinion concluded that plaintiff had not alleged adequately that the special committee members were interested or lacked independence. [FN54] Even if I had not so ruled, "[t]he settled rule in Delaware is that 'where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail.' " [FN55] In addition, the functioning of the special committee, even assuming it operated less than ideally, does not prevent the fully-informed decision by a majority of the Company's public shareholders, in the absence of gift or waste, from invoking the business judgment rule. [FN56] The plaintiff does not argue the merger amounted to gift or waste (because the record, quite obviously, would not support such an argument).

> FN54. *Orman,* 794 A.2d at 26-28. The fact that Lufkin was a shareholder and profited from the merger is not an indictment. On the contrary, it shows that his interests were aligned with the public shareholders. Nor is it sufficient for plaintiff to attack Lufkin's role because of his "friendship" with the Cullmans. Nothing in this record suggests that Lufkin could not exercise judgment in accordance with his fiduciary duties in connection with his membership on the special committee. *See Orman,* 794 A.2d at 27.

> FN55. *Michelson v. Duncan,* 407 A.2d 211, 220 (Del.1979) (quoting *Gerlach v. Gillam,* 139 A.2d 591, 593 (Del. Ch.1958).

> FN56. *Marciano,* 535 A.2d at 405 n. 3. As described herein, however, the special committee comported itself well, retaining skilled advisors and negotiating for an additional $0.25 on behalf of the Company's public shareholders.

2. *The Voting Agreement*

Apart from the coercion issue, plaintiff also argues that members of the Cullman and Ernst families on General Cigar's board breached their fiduciary duties "by entering into the voting agreement." [FN57] Plaintiff's argument, which rests on a misapplication of *Paramount Communications, Inc. v. QVC Network, Inc.* [FN58] and *Omnicare, Inc. v. NCS Healthcare Inc.,* [FN59] is without merit.

> FN57. AB at 10. Edgar Cullman, Sr., Edgar Cullman, Jr., John L. Ernst, and Susan R. Cullman were on the General Cigar board and entered into the voting agreement.

> FN58. 637 A.2d 34 (Del.1994).

> FN59. 818 A.2d 914 (Del.2003).

In *Paramount,* the Supreme Court noted that "[t]o the extent that a contract, or a provision thereof, purports to require a board to act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable." [FN60] In *Omnicare,* the Supreme Court made a similar observation. [FN61] I do not question the general validity of these statements, but they have no application here because in both cases the challenged action was the directors' entering into a contract in their capacity *as directors* . The Cullmans entered into the voting agreement *as shareholders.* Nothing in the voting agreement prevented the Cullmans from exercising their duties *as officers and directors.* For example, the Cullmans could have voted, as directors, to withdraw their recommendation that the public shareholders approve the merger. This factual distinction from *Paramount* and *Omnicare* is meaningful.

> FN60. *Paramount,* 637 A.2d at 51.





Not Reported in A.2d                                                Page 7
(Cite as: 2004 WL 2348395, *5 (Del.Ch.))

FN61. Contract provisions "cannot limit or circumscribe the directors' fiduciary duties." *Omnicare*, 818 A.2d at 938.

In *Bershad v. Curtiss-Wright Corporation*, [FN62] the Supreme Court held that "a majority stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority." [FN63] This principle of Delaware law was more recently recognized in *Peter Schoenfeld Asset Management, LLC v. Shaw*, [FN64] where this Court observed:

FN62. 535 A.2d 840 (Del.1987).

FN63. *Id.* at 845.

FN64. 2003 Del. Ch. LEXIS 79 (Del. July 10, 2003), *aff'd*, 2003 Del. LEXIS 624 (Del. Dec. 17, 2003) (ORDER).

A majority shareholder has discretion as to when to sell his stock and to whom, a discretion that comes from the majority shareholder's rights *qua* shareholder. This is true even when a proposed transaction would result in the minority sharing in a control premium. [FN65]

FN65. *Id.* at *9 (internal punctuation and citations omitted).

Nothing in *Paramount* or *Omnicare* displaces this longstanding principle. In fact, *Omnicare* found that "[t]he stockholders with majority voting power ... had an *absolute right* to sell or exchange their shares with a third party at any price." [FN66]

FN66. 818 A.2d at 938 (emphasis added). *Omnicare* did not address the "general validity" of stockholder voting agreements. *Id.* at 939.

*6 Plaintiff's challenge both to the voting and merger agreement's deal protection mechanisms are more properly analyzed *vis-a-vis* the board's decision to recommend that the Company's public shareholders approve the merger and whether the shareholders' ensuing vote was improperly coerced. This is the task to which I now turn.

3. *The Deal Protection Mechanisms*

Although the parties have framed the Court's

inquiry as relating only to the issue whether the deal protection mechanisms "coerced" the shareholder vote, plaintiff suggests that *Omnicare* requires a more taxing process of judicial review. Whether the deal protection devices were "coercive" now appears to be but one part of a larger analytical framework.

In *Omnicare*, the board of directors with NCS Healthcare, Inc. approved a merger with Genesis Health Ventures, Inc. The deal was "protected" with a three-part defense that included: (1) the inclusion of a Section 251(c) provision in the merger agreement; [FN67] (2) the absence of any effective fiduciary out clause; and (3) a voting agreement between two shareholders and Genesis which ensured that a majority of shareholders voted in favor of the transaction. After the merger was approved by the board another suitor, Omnicare, Inc., forwarded a superior proposal. The NCS board then reversed course, recommending that the NCS shareholders vote against the Genesis merger. The NCS board's change of heart had no practical effect, however, because the three deal protection mechanisms, working in tandem, "guaranteed ... that the transaction proposed by Genesis would obtain NCS stockholder's approval." [FN68] "Because of the structural defenses approved by the NCS board," the Genesis merger was "a *fait accompli.*" [FN69]

FN67. Such a provision requires that a merger agreement be placed before a corporation's stockholders for a vote, even if the corporation's board of directors no longer recommends it. 8 *Del. C.* § 251(c).

FN68. 818 A.2d at 918.

FN69. *Id.* at 936.

A bare majority of the Supreme Court found that the tripartite deal protection mechanism was invalid. The majority concluded that deal protection devices, even when those devices protect a proposed merger that does not result in a change of control, require enhanced scrutiny. [FN70] Specifically, the *Omnicare* majority applied the two-stage analysis of *Unocal Corp. v. Mesa Petroleum Co.* [FN71] The first stage of the *Unocal* analysis requires a board to demonstrate "that they have reasonable grounds for believing that a danger to corporate policy and effectiveness existed" without such measures.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 2004 WL 2348395, *6 (Del.Ch.))

Page    8

[FN72] The second stage of *Unocal* proceeds in two steps: the board must establish that the deal protection devices are (1) not coercive or preclusive and (2) within a range of reasonable responses to the danger to corporate policy and effectiveness. [FN73] The analysis is disjunctive--if the deal protection devices are coercive or preclusive they are not within a range of reasonable responses, but those devices may be outside the range of reasonable responses even if not coercive or preclusive. [FN74]

FN70. *Id.* at 930.

FN71. 493 A.2d 946 (Del.1985). The dissents in *Omnicare* by former Chief Justice Veasey and current Chief Justice Steele argue that *Unocal* should not have applied, but rather the business judgment rule. 818 A.2d at 943 (Veasey, C.J.), at 947 (Steele, J.).

FN72. *Id.* at 935 (quoting *Unocal,* 493 A.2d at 955).

FN73. *Id.*

FN74. *Id.*

In *Omnicare,* the majority found that the NCS board's reasonable grounds for believing there was a danger to corporate policy and effectiveness were "the possibility of losing the Genesis offer and being left with no comparable alternative transaction." [FN75] Nevertheless, the majority held that the deal protection devices were coercive and preclusive because they accomplished a *fait accompli, i.e.,* they "made it 'mathematically impossible' and 'realistically unattainable' for ... any other proposal to succeed, no matter how superior the proposal." [FN76] The *Unocal* inquiry ended there. But the *Omnicare* majority held "alternatively" that the NCS board was required to negotiate a fiduciary out clause into the merger agreement because the voting agreement and the Section 251(c) provision, in the absence of a fiduciary out clause, resulted in an absolute lock-up of the Genesis transaction. [FN77] The Court reasoned that even though a majority of shareholders (via the voting agreement) had agreed to support the merger, the NCS board was nonetheless continually obligated to "exercise its continuing fiduciary responsibilities to the minority stockholders." [FN78]

FN75. *Id.*

FN76. *Id.* at 936.

FN77. *Id.*

FN78. *Id.*

*7 Applying the first stage of the *Unocal* analysis is simple in this case. During the negotiations that led to the merger, Swedish Match "required" some form of deal protection. [FN79] If the special committee and full board had not approved the inclusion of the deal protection devices, they risked losing the Swedish Match transaction and being left with no comparable alternative transaction. As in *Omnicare* itself, this is reasonable grounds for believing that a danger to corporate policy and effectiveness existed.

FN79. Declaration of Sven Hindrikes ("Hindrikes Dec.") ¶ 2. *See also* Cullman Aff. ¶ 4 ("Swedish Match insisted upon some form of deal protection"); Lufkin Dep. at 84 ("there would have been no merger without the lockup").

Applying the second stage of the *Unocal* analysis is also straightforward. *Williams v. Geier* [FN80] provides the standard for determining if deal protection measures are coercive. [FN81] The measures are improper if they "have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction." [FN82] An example of such impermissible coercion was found in *Lacos Land Company v. Arden Group, Inc.* [FN83] In *Lacos Land,* Arden's principal shareholder and CEO made "an explicit threat ... that unless [certain] proposed amendments were approved, he would use his power (and not simply his power *qua* shareholder) to block transactions that may be in the best interests of [Arden]." [FN84] The threat to block transactions in the best interest of Arden was unrelated to the merits of the proposed amendments under consideration by the shareholders and constituted impermissible coercion. The basic teaching of *Lacos Land,* as discussed in *Williams,* is that fiduciaries cannot threaten stockholders so as to cause the vote to turn on factors extrinsic to the merits of the transaction. [FN85]

FN80. 671 A.2d 1368 (Del.1995).

FN81. Plaintiff does not argue that the deal protection measures were "preclusive" under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





*Unocal;* only "coercion" is at issue.

FN82. *Williams v. Geier,* 671 A.2d at 1382-83 (citations omitted).

FN83. 517 A.2d 271 (Del. Ch.1986).

FN84. *Id.* at 276.

FN85. *See Williams,* 671 A.2d at 1383 (explaining and distinguishing *Lacos Land* ). In *Williams,* the Supreme Court found that a shareholder vote was not impermissibly coerced where the shareholders were informed (accurately) that failure to vote for a transaction could lead to the corporation's stock being de-listed from the NYSE. *Id.*

Now, compare *Lacos Land* with *Brazen v. Bell Atlantic Corporation.* [FN86] In *Brazen,* Bell Atlantic and NYNEX Corporation negotiated a merger agreement with a $550 million termination fee provision that could be triggered if Bell Atlantic's shareholders voted not to approve merger. [FN87] The Supreme Court found that the termination fee was "an integral part of the merits of the transaction." [FN88] The Court further stated "although the termination fee provision may have influenced the stockholder vote, there were 'no structurally or situationally coercive factors' that made an otherwise valid fee provision impermissibly coercive in this setting." [FN89]

FN86. 695 A.2d 43 (Del.1997).

FN87. *Id.* at 46.

FN88. *Id.* at 50.

FN89. *Id.* (quoting *Brazen v. Bell Atlantic Corp.,* 1997 Del. Ch. LEXIS 44 (Del. Ch. Mar. 19, 1997) (Chandler, C.)).

Here, like *Brazen,* the deal would not have occurred without the inclusion of deal protection mechanisms, *i.e.,* the deal protection mechanisms were "an integral part of the merits of the transaction." [FN90] But the circumstances here are distinguishable from *Lacos Land* because General Cigar's public shareholders were not encouraged to vote in favor of the Swedish Match transaction for reasons unrelated to the transaction's merits. Instead, the "lock-up" negotiated in this case is

similar to the termination fee found permissible by the Supreme Court in *Brazen.* [FN91] That is, nothing in this record suggests that the lock-up had the effect of causing General Cigar's stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction. Furthermore, unlike the situation in *Omnicare,* the deal protection mechanisms at issue in this case were not tantamount to *"a fait accompli."* The public shareholders were free to reject the proposed deal, even though, permissibly, their vote may have been influenced by the existence of the deal protection measures. [FN92] Because General Cigar's public shareholders retained the power to reject the proposed transaction with Swedish Match, the fiduciary out negotiated by General Cigar's board was a meaningful and effective one--it gave the General Cigar board power to recommend that the shareholders veto the Swedish Match deal. That is to say, had the board determined that it needed to recommend that General Cigar's shareholders reject the transaction, the shareholders were fully empowered to act upon that recommendation because the public shareholders (those not "locked-up" in the voting agreement) retained the power to reject the proposed merger. [FN93] For these reasons, I conclude as a matter of law that the deal protection mechanisms present here were not impermissibly coercive. [FN94]

FN90. *Id.*

FN91. Plaintiff also appears to argue that the board breached its fiduciary duty by failing to negotiate for a break-up fee in lieu of the voting agreement lock-up. First, voting agreements, of course, are perfectly legal. And nothing in the record indicated that Swedish Match would have agreed to a different provision, such as a break-up fee. Second, there is no preference in the law for one form of deal protection device over another. And third, how would a board determine, in advance, that one particular form of defensive device, would be the "least coercive" of any array of devices? Ultimately, this argument, in my opinion, leads nowhere.

FN92. Plaintiff never addresses the deeper question of how it is fair to say that a minority was coerced by a voting and ownership structure that was fully disclosed to the minority before they bought into a corporation whose capital structure was so organized. In fact, the coercion of which plaintiff



complains is more properly understood as the coercion resulting from the fact that the Cullmans owned a controlling interest. Surely it cannot be the case that whenever a controlling stockholder can vote against a sale the out voted minority can assert a coercion claim.

FN93. Moreover, there was nothing in either the merger agreement or the voting agreement to prevent a third party from making a tender offer for the publicly-held shares that Swedish Match sought to acquire.

FN94. The relevant question "is not whether a [proposal] is coercive, but whether it is actionably coercive." *Weiss v. Samsonite Corp.,* 741 A.2d 366, 372 (Del. Ch.), *aff'd,* 746 A.2d 277 (Del.1999) (TABLE). "For the word [coercion] to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept ('inappropriately coercive' or 'wrongfully coercive,' etc.)." *Lacos Land,* 517 A.2d at 277. The line between "coercion" and "actionable coercion" is whether the vote to approve turned on factors extrinsic to the merits of the transaction.

**\*8** The last step of the *Unocal* analysis is a determination of whether the deal protection devices were within a range of reasonable responses to the danger to corporate policy and effectiveness. [FN95] As mentioned, the danger in this case was the risk of losing the Swedish Match transaction and being left with no comparable alternative transaction. In fact, without the deal protection mechanisms "there would have been no merger." [FN96] General Cigar's shareholders could have lost the significant premium that Swedish Match's offer carried, no small concern given the uncertain future of the tobacco business. [FN97] In addition, "[t]he latitude a board will have in either maintaining or using the defensive devices it has adopted to protect the merger it approved will vary according to the degree of benefit or detriment to the stockholders' interests that is presented by the value or terms of the subsequent competing transaction." [FN98] Notably, there was no competing bid for General Cigar; no alternative transaction was available to its shareholders. General Cigar's board should therefore be afforded the maximum latitude regarding its decision to recommend the Swedish Match merger.

FN95. *Omnicare* at 935 (quoting *Unocal* at 955).

FN96. Lufkin Dep. at 83-84.

FN97. *Id.*

FN98. *Omnicare,* 818 A.2d at 933. I pass over the practical difficulty implied by this balancing test: how can a board know, at the time of adopting defensive devices, the terms of a transaction that emerges at a later time? As formulated, the test would appear to result in judicial invalidation of negotiated contractual provisions based on the advantages of hindsight.

In sum, the argument that *Omnicare* applies in the circumstances here is misplaced. The General Cigar board retained a fiduciary out, allowing it to consider superior proposals and recommend against the Swedish Match deal. Importantly, a majority of the nonaffiliated public shareholders could have rejected the deal on its merits. Unlike *Omnicare,* nothing in the merger or stockholder agreements made it "mathematically certain" that the transaction would be approved. If the shareholders believed $15.25 per share (a 75% premium over the market price) did not reflect General Cigar's intrinsic value (and the market also misunderstood that value), they could have said, "no thanks, I would rather make an investment bet on the long term prospects of this company." These shareholders were fully informed about the offer. They knew that no other offer or potential buyer had appeared, although nothing prevented it. They knew that no termination fee would be paid if they rejected the proposal. It is true, as plaintiffs repeatedly point out, that the Cullman vote against any future, hypothetical deal was "locked-up" for 18 months. It was this deal or nothing, at least for that period of time. [FN99] Again, however, no other suitor was waiting in the wings. And, assuming a shareholder believed that General Cigar's long term intrinsic value was greater than $15.25 per share, was an 18 month delay a meaningful "cost" that could be said realistically to "coerce" the shareholders' vote? The Cullman lock-up hardly seems unreasonable, given the absence of other deal protection devices in this particular transaction and given the buyer's understandable concern about transaction costs and market uncertainties. Unless being in a voting minority automatically means that the shareholder is coerced (because the minority shareholder's





Not Reported in A.2d
**(Cite as: 2004 WL 2348395, \*8 (Del.Ch.))**

investment views or hopes have been precluded by a majority), plaintiff's concept of coercion is far more expansive than *Omnicare* or any other decisional authority brought to my attention. As a matter of law, therefore, the approval of the Swedish Match proposal by a fully informed majority of the minority public shareholders was not impermissibly coerced. As a result of that ratifying vote, plaintiff's remaining fiduciary duty claim is extinguished.

> FN99. A third party could nonetheless have made a tender offer for the public shares. In addition, the Cullman's could have waited out the 18 month delay, or the Cullmans could have breached and put Swedish Match in the position of proving its non-speculative damages from a breach of the no-sale clause.

### III. CONCLUSION

**\*9** The vote of General Cigar's shareholders to approve the transaction with Swedish Match was fully informed and not actionably coerced. Given that there are no allegations of gift or waste, the fully informed, ratifying vote of the General Cigar shareholders disposes of plaintiff's fiduciary duty claims. Summary judgment is entered in favor of defendants and against the plaintiff.

IT IS SO ORDERED.

Not Reported in A.2d, 2004 WL 2348395 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





TAB 7

Not Reported in A.2d                                                    **Page    1**
Not Reported in A.2d, 1998 WL 191939 (Del.Ch.), 24 Del. J. Corp. L. 331
**(Cite as: 1998 WL 191939 (Del.Ch.))**
c

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

### Court of Chancery of Delaware.
### In re TALLEY INDUSTRIES, INC.
### SHAREHOLDERS LITIGATION
### No. Civ.A. 15961.

Date Submitted: March 20, 1998
Date Decided: April 9, 1998
April 13, 1998.

Joseph A. Rosenthal, and Norman M. Monhait, of
Rosenthal, Monhait, Gross & Goddess, P.A.,
Wilmington, Delaware, of counsel, Robert I.
Harwood, and Jeffrey M. Haber, of Wechsler
Harwood Halebian & Feffer LLP, New York City,
Stanley D. Bernstein, Sandy A. Liebhard and Mary
U. Hoover, of Bernstein Liebhard & Lifshitz, New
York City, for plaintiff.

Martin P. Tully, Alan J. Stone and David J. Teklits
, of Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware, Jack C. Crim, Alex Stamatakis, Donald
J. Ulrich, Paul L. Foster, Joseph A. Orlando, Fred
Israel, John W. Stodder, David Victor and Talley
Industries, Inc., for defendants.

Wayne N. Elliott and Samuel D. Brickley, II, of
Prickett, Jones, Elliott, Kristol & Schnee,
Wilmington, Delaware, of counsel, James E. Tolan
and Catherine A. Duke, of Dechert Price & Rhoads,
New York City, for Score Acquisition Corporation
and Carpenter Technology Corporation.

Arthur G. Connolly, Jr. and Arthur G. Connolly,
III, of Connolly, Bove, Lodge & Hutz, Wilmington,
Delaware, Matthew J. Ferretti, of Richards, Layton
& Finger, Wilmington, Delaware, of counsel,
Robert M. Krasne, George A. Borden and Stacey
M. Bosshardt, of Williams & Connolly,
Washington, D.C., for Saad A. Alissa and Ralph A.
Rockow.

### MEMORANDUM OPINION

LAMB, Vice Chancellor.

### I. INTRODUCTION

**\*1** This consolidated litigation arises out of the
recently completed two-step acquisition of Talley

Industries, Inc. ("Talley") by Carpenter Technology
Corporation ("Carpenter") and its wholly owned
subsidiary, Score Acquisition Corporation, all
Delaware corporations. In both the tender offer
and the second step merger, the common
stockholders of Talley received $12.00 per share in
cash for their Talley stock.

The initial complaint in this matter was filed on
September 26, 1997, the day the transaction was
announced. During the course of expedited
discovery proceedings undertaken in anticipation of
a motion for preliminary injunction, the parties
reached an agreement in principal to settle the claims
asserted. Following further discovery, that
agreement was incorporated into the January 23,
1998 Stipulation and Agreement of Compromise,
Settlement and Release, which is now before the
Court for approval.

Two large stockholders of Talley, Saad A. Alissa
and Ralph A. Rockow (who was also a director of
Talley) (together "Objectors"), appearing through
counsel, have raised objections to the proposed
settlement, both in writing and orally at the hearing
held March 20, 1998 to consider the settlement
proposed. For the reasons discussed herein, I
conclude that the objections raised are not well-
founded and must be overruled. Moreover, I
conclude that the settlement proposed is fair,
reasonable and adequate and in the best interests of
the class; for these reasons it should be approved in
the form submitted. Finally, I conclude that the
plaintiffs' application for attorneys' fees and costs is
reasonable and appropriate and should be approved.

### II. BACKGROUND

Talley is, or was, a Delaware corporation with its
principal place of business in Phoenix, Arizona.
Talley is a diversified manufacturer of a wide range
of proprietary and other specialized products for
defense, industrial and commercial applications.

#### A. *The 1997 Annual Meeting Contest*

Objector Saad Alissa first began to accumulate
shares of Talley common stock in 1994.
Eventually, his holdings exceeded 5 percent of the
class of common shares; thus, he became obligated
to report his holdings on Schedule 13D. In early

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




1997, Mr. Alissa, as the head of a dissident group of Talley stockholders calling itself the Shareholders' Committee to Remove Entrenched and Arrogant Management ("SCREAM"), announced publicly that it was considering engaging in a proxy contest to elect directors at the Tally 1997 Annual Meeting.    In early February, Mr. Alissa notified Talley that he intended to nominate at least two candidates, including Messrs.    Robert Craig and Ralph Rockow, and further intended to present a series of shareholder proposals recommending that the Talley board take certain actions (including the hiring of an investment banking firm for the purpose of evaluating the Company) designed to weaken or eliminate the Company's antitakeover protections.

The 1997 Annual Meeting was held on May 8, 1997, at which Mr. Alissa's two nominees, Craig and Rockow, were elected.    Their election was certified on May 27, 1997, at which time it was also announced that all of the precatory proposals sponsored by Mr. Alissa and SCREAM had been approved by the stockholders.

### B. The Mallender Settlement

*2 On June 3, 1997, Mr. William Mallender, who had been defeated for reelection, resigned as Chairman and Chief Executive Officer of Talley. Admiral Paul L. Foster, a member of the Board of Directors, was named Chairman and CEO. Thereafter, the Executive Committee of the Talley board undertook to negotiate a settlement of Mr. Mallender's compensation package with him.    The minutes of the June 16, 1997 meeting of that committee, of which Rockow was a member, reflect the wide variety of issues considered by its members.    Ultimately, the Executive Committee recommended a settlement package to the Board of Directors which considered that recommendation at a special meeting held on June 18-19, 1997.    The minutes of the meeting of the Board of Directors also reflect a wide range of subjects considered in regard to the Mallender settlement.    The board voted 8 to 2 to approve the recommendation made by the Executive Committee.    Messrs. Craig and Rockow specifically expressed their agreement with the financial terms of the recommended severance package but voted against the Executive Committee's recommendation solely because "they did not agree that there should be a mutual release between the Company and Mr. Mallender."

### C. The Board's Search for Alternatives

At its meeting on March 4, 1997, the Talley board of directors unanimously determined to retain the services of an investment banking firm for the purpose of providing the company strategic advice. After some investigation, the board retained J.P. Morgan Securities Inc. ("J.P.Morgan") as its banker.    The board specifically instructed J.P. Morgan to investigate all alternatives available to Talley at the time for a new strategic direction, including, *inter alia,* a "sale, merger, consolidation, joint venture, or any other business combination or extraordinary transaction, in one or a series of transactions, involving all or a material portion of the stock, assets, or business of the Company."

On June 19, 1997, J.P. Morgan presented its initial findings to the Board.    J.P. Morgan described various alternatives including a "stay the course" strategy, a sale or spin-off of certain of the Company's businesses, or the sale or liquidation of the Company.    The directors postponed until their next meeting a decision on how best to proceed. Meanwhile, on June 12, 1997, the Company received an indication of interest in the purchase of one of the Company's subsidiaries in the government service and products segment.    The Company responded to the person making the proposal, stating that it would not consider any proposals until it had concluded its strategic review.

The Board of Directors met again on July 22 and 23, 1997 to resume its consideration of strategic alternatives and to hear further from J.P. Morgan about the results of its work.    The Board of Directors unanimously determined to pursue a sale of the Company as a whole and voted to retain J.P. Morgan to explore such a transaction and to advise the directors in connection therewith.    Alternative proposals to sell or spin-off one or more units were rejected because tax and other considerations made them less valuable and attractive than a sale of the Company as a whole.    Craig and Rockow, Alissa's two board designees, participated in these meetings and agreed with the determination that a sale of Talley as a whole was the value maximizing alternative.

*3 On August 1, 1997, Talley received from Carpenter a non-binding indication of interest to purchase all of Talley's outstanding common stock

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d                                                      **Page 3**
**(Cite as: 1998 WL 191939, \*3 (Del.Ch.))**

for $10 per share, including a stated willingness to increase the proposed price after receipt of additional information about one segment of Talley's business. Following consultation with the Board of Directors, J.P. Morgan and senior management, Admiral Foster rejected this offer but agreed to enter into a confidentiality agreement with Carpenter for the purpose of sharing non-public information about Talley. On August 7, 1997, having reviewed additional information, Carpenter raised its offer to $12 per share, subject to further due diligence. Talley agreed to Carpenter's request for a 45 day due diligence period and to a limited form of exclusivity during that time. The confidentiality agreement provided that Talley would not initiate, solicit, or encourage other offers for Talley during this period, but that Talley was free to participate in discussions or negotiations with, and provide confidential information to third parties if Foster determined in good faith, after receiving advice from J.P. Morgan, that such third party had submitted a *bona fide* proposal or indication of interest that was, or could reasonably be expected to lead to, an acquisition proposal that was financially superior to Carpenter's $12 per share proposal.

During the month of August and until the execution of the merger agreement on September 25, 1997, Talley and J.P. Morgan received a number of inquiries from third parties concerning possible transactions involving Talley as a whole, or certain of its businesses. None of these contacts ripened into a proposal superior to the $12 per share Carpenter proposal.

**D.  *The Board of Directors Accepts Carpenter's Merger Proposal***

On September 25, 1997, the Board of Directors met to consider the terms of the proposed transaction with Carpenter. Craig and Rockow made a motion at the meeting to adjourn for two weeks to afford additional time to review and consider the Carpenter proposal. They also delivered a written memorandum to the Board of Directors ("September 25 Memorandum"), setting forth the reasons for their motion and, thus, their opposition to the Carpenter transaction. The motion to adjourn was defeated by a vote of 8 to 2. Thereafter, J.P. Morgan delivered its oral opinion to the Board that the proposed Carpenter transaction was fair to the

stockholders of Talley from a financial point of view. The transaction was then approved by a vote of 8 to 2, Craig and Rockow dissenting.

Craig and Rockow voted against the transaction for the reasons expressed in the September 25 Memorandum. On October 1, 1997, Mr. Rockow's Arizona attorneys wrote to Admiral Foster raising concerns about the disclosures already made in connection with the public announcement of the merger with Carpenter and to be made in a tender offer or proxy soliciting materials. That letter concluded by stating that, if adequate disclosure was made (including the reasons he and Craig dissented on the vote approving the merger) Mr. Rockow "is willing to let the stockholders decide whether to accept the Carpenter terms."

**E.  *The Litigation***

**\*4** The Board's approval of the Carpenter merger proposal was announced on September 26, 1997. Carpenter began its first step, any and all cash tender offer on October 2, 1997. The defendants' Schedules 14D-1 and 14D-9 were disseminated to Talley stockholders at that time.

The first of the six lawsuits to challenge the merger was filed September 26, 1997. After their receipt and review of the tender offer materials, the plaintiffs updated and expanded their allegations of wrongdoing in an amended complaint filed October 8, 1997. Among other things, the amended complaint alleges that the defendant directors failed to fulfill their fiduciary duty to act reasonably to maximize value in the sale of the Company and that the tender offer materials were false and misleading, *inter alia,* in their failure to disclose the reasons given by Craig and Rockow (in the September 25 Memorandum) for voting against the merger.

After filing their amended complaint, the plaintiffs moved for a preliminary injunction and began discovery, obtaining documents from the defendants and J.P. Morgan. According to the March 16, 1998 affidavit of the plaintiffs' lead counsel, Stanley D. Bernstein ("Bernstein Affidavit"), plaintiffs also sought from Alissa, Craig and Rockow any information that would help in prosecuting the case. In a conversation held on October 7, 1997, Robert Krasne, of Williams & Connolly, Alissa's lawyers, told Bernstein that the Board of Directors of Talley

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



had improperly favored a sale of the Company as a whole, rather than a division by division transaction, in order to insulate themselves from liability for past conduct. When Bernstein inquired about the facts supporting this claim, Krasne pointed only to the terms of the merger agreement dealing with the continuation for a period of six years of Talley's directors and officers liability insurance coverage and associated provisions in Talley's charter and bylaws, which he claimed were unusual and suggested an improper motivation on the part of the Talley directors . [FN1] Based on his prior experience, Bernstein told Krasne that such provisions are commonplace and do not suggest any improper motivation on the part of directors.

> FN1. The record before the Court establishes that the merger agreement terms regarding, exculpation, indemnification and insurance are typical of those commonly found in transactions of this type. The Talley Certificate of Incorporation contained a provision exculpating Talley directors from personal liability to Talley or its stockholders to the fullest extent authorized by 8 *Del.C.* § 102(b)(7). The Talley bylaws also contained provisions mandating indemnification of the Talley directors "to the fullest extent permitted or authorized by the General Corporation Law of the State of Delaware." There also existed between Talley and each of its directors, contractual provisions regarding the procedures for claiming a right to indemnification.
> Section 5.5 of the Talley/Carpenter merger agreement requires the surviving corporation to assume the pre-existing exculpation and indemnification obligations of Talley to its officers and directors, to honor those obligations for a period of six years and (subject to a cost limitation) to maintain directors and officers liability insurance on terms and amounts no less favorable than those preexisting the merger.

Bernstein contacted counsel for Rockow in an effort to learn whether or not there were facts to support Alissa's suggestion that a division by division transaction would yield greater value. Rockow's attorney advised Bernstein that Rockow's goal was for Talley's shareholders to be advised of the substance of his opposition to the Carpenter transaction, as set forth in the September 25 Memorandum. [FN2]

> FN2. The September 25 Memorandum is Exhibit B

to the Bernstein Affidavit. In addition to expressing concerns about the timing of the Board's consideration of the Carpenter merger proposal, that memorandum also complained, at page 2, as follows:

> the entire Board has not been advised about, or had the opportunity to evaluate, other inquiries which might result in superior proposals for Talley and the stockholders and we are concerned that the $6 million termination fee could create a significant impediment to other viable proposals.

Craig was interviewed on the record on October 15, 1997. In his interview, he stated that he and Rockow were displeased "with the pace at which [the Board] was proceeding," and felt that it would be better to "stay the course" in order to realize the long term values in the Company. Craig stated, in his interview, that these were the only two objections either he or Rockow had to the merger with Carpenter. Rockow resisted appearing.

**\*5** On October 16, 1997, the plaintiffs entered into a memorandum of understanding providing for substantial additional disclosure by the defendants in connection with the tender offer and merger. Importantly, the supplemental disclosure includes the content of the September 25 Memorandum, together with information concerning other possible bidders for Talley, including the dollar amounts of other proposals, and an analysis of the liquidation value of Talley. Plaintiffs tentatively agreed to settle the action in consideration of this additional disclosure after their initial discovery raised serious questions about the validity of their claims attacking the process followed by the Board of Directors in reaching the agreement to merge with Carpenter.

After the memorandum of understanding was signed, plaintiffs' counsel undertook further, limited discovery to assure themselves that the terms of the proposed settlement were fair, reasonable and adequate. In this regard, they continued to press for Rockow's testimony. On October 29, 1997, Rockow's lawyer rejected a request that Rockow, who resides in Arizona, appear in response to a subpoena issued out of this Court. Rather, Rockow's counsel wrote seeking to delay Rockow's appearance until an arrangement could be made for the payment by Talley of his attorneys' fees and expenses. This same letter acknowledges an awareness that the deposition was needed to confirm

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 1998 WL 191939, *5 (Del.Ch.))

Page    5

the adequacy of the proposed settlement. Finally, on November 11, 1997, Rockow's attorney wrote Bernstein as follows:

> With respect to your request for a telephonic interview or deposition of Ralph Rockow, please be advised that, at this point, *he is disinterested in the lawsuit or perpetuating the litigation.* You should reconsider whether you need his deposition. (emphasis added)

### F. *The Settlement*

Plaintiffs' counsel then concluded their confirmatory discovery and entered into the final stipulation and agreement of settlement on January 23, 1998. The supplemental disclosures, made in accordance with the terms of the memorandum of understanding, form the essence of the consideration flowing to the class as a result of the settlement of the action.   The class is proposed to be certified pursuant to Rules 23(b)(1) and (b)(2), as is usual in actions challenging the exercise of fiduciary responsibility in corporate merger transactions, and does not contemplate the ability of class members to "opt out."   *See Hynson v. Drummond Coal Co.,* Del.Ch., 601 A.2d 570, 575 (1991).   Moreover, as is usual in matters of this sort where no other litigation is pending in any federal or state court, the terms of the settlement provide for the dismissal of the action and the release of all claims which have been or could have been asserted in the action, or which arise from or relate to the events described in the action.   Thus, if the settlement is approved, the proposed judgment would preclude all members of the class from litigating in any other court claims arising out of the merger, including claims arising under the Securities Exchange Act of 1934 ("1934 Act") over which the federal courts have exclusive jurisdiction.   *Matsushita Electrical Indus.    Co., Ltd. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

### III. THE OBJECTION
#### A. *The Threat of Litigation*

*6 Before turning to an analysis of their legal merit, I find it necessary to discuss events leading to the lodging of the objections by Alissa and Rockow. Alissa claims that he is entitled to be reimbursed by Talley for more than $700,000 in fees and expenses incurred by him in connection with the 1997 proxy contest.   The record before me strongly suggests

that the decision to lodge objections to the Settlement was related to Alissa's efforts to force the payment or settlement of that claim.    For the reasons discussed herein, this suggested connection necessarily colors the Court's consideration of the objections.

In accordance with this Court's order of January 26, 1998, directing the giving of notice of the proposed settlement, all objections thereto were to be filed by March 10, 1998.    On February 26, 1998, Mr. Krasne, of Williams & Connolly, Alissa's counsel, wrote to John R. Welty, Vice President, General Counsel and Secretary of Carpenter as follows:

> This firm represents Saad A. Alissa, an individual who has been a shareholder in Talley Industries, Inc. ("Talley").  As you may be aware, Mr. Alissa held discussions with the former management and Board of Talley over an extended period of time concerning a variety of issues that he identified concerning the operations and management of Talley.  After being rebuffed repeatedly by Talley's management, Mr. Alissa took his case to the shareholders of Talley, who, in conjunction with the 1997 Talley Annual Meeting, voted to end the reign of William Mallender as Talley's Chairman and chief executive officer. [FN*]
>
> FN* Indeed, in conjunction with that proxy contest, Mr. Alissa announced his intention to place a number of proposals before the Talley shareholders, including the question of whether Talley should engage an investment banker to review Talley's circumstances.     That announcement prompted Talley to engage J.P. Morgan and began a series of events that ultimately led to the sale of Talley.
>
> Mr. Alissa has repeatedly requested that Talley reimburse him for the expenses he incurred in conjunction with the 1997 Talley proxy contest. Notwithstanding suggestions to the contrary, we are aware of no meaningful action taken by the Talley Board to address his request.   Mr. Alissa believes that the actions he took with respect to the proxy contest inured to the benefit of Talley and its shareholders.   Because no action has been taken concerning his request for reimbursement of his proxy expenses, he feels compelled to file the enclosed draft complaint.
>
> Mr. Alissa also has concerns about the conduct of Talley's Board, and, in particular, its failure to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





disclose adequately a variety of significant issues and decisions of import to the Talley shareholders. The Talley Board's disclosure failures give rise to liability for which we understand the Board is indemnified by Carpenter Technology Corporation ("Carpenter") under the terms of the Talley/Carpenter merger agreement.

Because Carpenter may ultimately be responsible for these matters under the terms of Talley's merger with Carpenter, Mr. Alissa is advising you of his intention to file the two enclosed complaints and to pursue his lawful remedies. [FN**] If Carpenter or Talley are aware of any reason why Mr. Alissa should not File these complaints, please contact me within the next ten days to advise me of the basis for such belief.

> FN** In addition, Mr. Alissa has directed me to advise you of his intention to file with the Delaware Chancery Court objections to the proposed settlement. Mr. Alissa also intends to be represented at the March 20 hearing.

**\*7** Very truly yours,
Robert M. Krasne

Attached to this letter were drafts of the two complaints Alissa was said to "intend" to file, although, at least as of the March 20 hearing, neither complaint had been filed. [FN3] The first of these drafts is captioned in the United States District Court for the District of Arizona and relates only to Alissa's claimed entitlement to reimbursement of his proxy expenses. Talley is the only named defendant. That draft complaint is of relevance to the Court's consideration of the proposed settlement and the objections because it reveals an ulterior motive behind the objection to the settlement and contradicts a fundamental premise of the objection by repeatedly and strenuously alleging that the Talley/Carpenter merger was a substantial benefit to the Talley shareholders. For example, the following is alleged:

> FN3. Only the second of these draft complaints, purporting to allege substantive claims against the Board regarding the Talley/Carpenter merger, is attached to the Notice of Intent to Appear and Object filed by Alissa and Rockow in this Court.

. Alissa's 1997 proxy solicitation "directly led to a change in management and subsequently to the sale

of the Company for the benefit of all shareholders...." (¶ 1)

. Talley "would not have entertained any offers for the sale of its stock, nor entered an agreement to permit the acquisition of the Company if plaintiff had not been successful in his proxy contest." (¶ 34)

. The expenses Alissa incurred "accrued benefit to the shareholders and the Company by directly and/or indirectly causing and/or enabling Carpenter to offer and the Company to accept the merger proposal whereby shareholders were able to surrender their stock for $12.00 per share." (¶ 42)

. Alissa's proxy solicitation activities "provided substantial benefit to the Company and its shareholders by directly and/or indirectly leading to the acquisition of the Company by Carpenter." (¶ 52)

The second draft complaint reflects a rather different view of the Talley/Carpenter merger. This draft is captioned in the United States District Court for the District of Delaware and purports to make claims against Talley directors (other than Craig and Rockow) under the federal securities laws and Delaware fiduciary duty law. The complaint is a hodgepodge of allegations of mismanagement or misconduct by Mallender or the Talley Board. The complaint claims that the Schedule 14D-9 and the merger proxy statement, both of which were issued after Craig and Rockow had been directors for some months, were false and misleading as the result of the omission or misrepresentation of the information about this alleged misconduct and that, as a result, Alissa was "forced to sell his shares at a price substantially below" their true value. (¶ 101)

The gist of this draft complaint is found in a series of allegations that Mallender, during his tenure as Chairman and Chief Executive Officer, engaged in illegal or fraudulent conduct (including alleged insider trading) which, eventually, became known to the Board of Directors and which is said to have violated the terms of Mallender's employment agreement. The draft complaint alleges in conclusory terms that the directors: (i) failed to initiate action against Mallender on account of his misdeeds, but rather authorized the expenditure of corporate funds in opposition to Alissa's proxy contest and in support of Mallender's reelection, (ii) improperly authorized the settlement of Mallender's severance compensation claims when, it is alleged,



Not Reported in A.2d
(Cite as: 1998 WL 191939, *7 (Del.Ch.))

they knew that Mallender was in breach of his employment contract and that no amounts were due thereunder, (iii) failed to disclose either Mallender's misdeeds or their own misconduct in either the Schedule 14D-9 disseminated in connection with the tender offer or the merger proxy statement.    It is alleged that the Board "knew of Mallender's liability (and their own) prior to issuing the Schedule 14D-9 on October 2, 1997." (¶ 98h) And, it is further alleged that "[b]y concealing a cause of action on behalf of Talley of which they knew, and which would be extinguished by ratification of the merger agreement, [the defendant directors] failed to disclose an asset of Talley worth $6,000,000 [roughly the amount of the Mallender severance payment] of which they were aware." (¶ 99)

*8 Surprisingly, in light of Alissa and Rockow's lack of cooperation with the plaintiffs' counsel in this case, the draft complaint (¶¶ 66-67) claims that the charges against Mallender of alleged insider trading were communicated to Admiral Foster on July 7, 1997 by a person acting on behalf of Alissa with an explicit threat "to sue the Board in connection with these allegations." The draft then makes the following conclusory allegations without acknowledging or discussing Rockow and Craig's agreement to the financial terms of the Mallender severance agreement:

68.  Despite this information, the Board did nothing to recover the handsome severance package that had been given to Mallender, or to inform shareholders of Talley that the company had a potential cause of action worth at least $6,000,000.

69. Instead, motivated by the threat of litigation, the Directors negotiated to sell the company whole and to obtain from the purchaser--Carpenter--an indemnification clause in the sales contract that would ensure their own immunity from suits arising from their breaches of their fiduciary duties.

Ultimately, the only claims asserted in the draft complaint are for alleged failures of disclosure variously alleged as violations of Sections 14(a) and 14(e) of the 1934 Act and of the defendants' Delaware law based disclosure duties.

## B. *The Asserted Grounds for Objection*

The nub of the objection to the settlement is the argument, advanced on page 8 of the Objectors'

legal memorandum, and purportedly substantiated by their second draft federal court complaint, as follows:

As established in *In re MCA, Inc. Shareholders Litig.,* Del.Ch., 598 A.2d 687 (1991), a settlement should not be approved where, for minimal consideration, it would cut off meritorious federal-law claims that were not raised in Chancery court. That is precisely the situation here.  The defendants are getting their broad release far too cheaply.

The Objectors also make a series of attacks on the adequacy and thoroughness of the work undertaken by plaintiffs' counsel.    Finally, as previously discussed, the Objectors argue that the Talley directors did not adequately consider a sale of the individual subsidiaries because they wished to obtain some greater right to indemnification and insurance coverage from the sale of the Company to Carpenter as a whole.

### IV. DISCUSSION

Delaware courts have long favored the voluntary settlement of contested issues. *Kahn v. Sullivan,* Del.Supr. 594 A.2d 48 (1991); *Rome v. Archer,* Del.Supr. 197 A.2d 49 (1964).  "However, the settlement of a class action is unique in that, 'because of the fiduciary character of a class action, the Court of Chancery must participate in the consummation of a settlement to the extent of determining its intrinsic fairness.' " *Polk v. Good,* Del.Supr., 507 A.2d 531, 535-36 (1986) (quoting *Rome,* 197 A.2d at 53).    In reviewing a settlement, this Court plays a special role.    As the Delaware Supreme Court said in *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1283 (1989):

*9 The [Court of Chancery] must balance the policy preference for settlement against the need to insure that the interests of the class have been fairly represented. *Rome v. Archer,* Del.Supr., 197 A.2d 49, 53 (1964). Thus, the Court of Chancery must carefully consider all challenges to the fairness of the settlement but without actually trying the issues presented. 'Under *Rome,* the [C]ourt's function is to consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors.' (quoting *Polk,* 507 A.2d at 535).

### A. *Class Certification Issues*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
**(Cite as: 1998 WL 191939, \*9 (Del.Ch.))**

Page   8

Before examining the merits of the proposed settlement, I must first determine whether this action is maintainable as a class action under Chancery Court Rule 23. *Prezant v. De Angelis,* Del.Supr., 636 A.2d 915 (1994). Plaintiffs move for class certification pursuant to Rule 23(b)(1) and (2), thus, in addition to determining whether the requirements of Rule 23(a) have been satisfied, I must also determine whether the plaintiff has satisfied the class certification requirements encompassed in one of these subsections.

Rule 23(a) sets out four general requirements for a class to be certified:    (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy of class representatives.    Alissa and Rockow have raised objections to class certification only with regard to the adequacy of the class representation, and, in particular, the adequacy of the litigation efforts undertaken by class counsel. As I find that the other elements are readily satisfied, the focus of the discussion will be directed toward this element.

### 1. Numerosity, Commonality and Typicality

As of June 30, 1997, Talley had in excess of 14 million shares outstanding, which are owned by hundreds of stockholders. As such, it would not be practical to join all potential plaintiffs before the court. *See Leon N. Weiner & Assoc., Inc. v. Krapf,* Del.Supr., 584 A.2d 1220, 1225 (1991) (stating test is not impossibility of joinder but rather practicality). Accordingly, the plaintiffs satisfy the numerosity requirement of Rule 23(a). As to the commonality requirement, class certification is proper if the plaintiffs have questions of law and fact in common. *Weiner,* 584 A.2d at 1225. The amended complaint alleges that the defendants breached their fiduciary duties in connection with the Talley/Carpenter merger to the detriment of the class and/or aided and abetted in such wrongs. As this question similarly affects each stockholder, the commonality requirement is also satisfied. *See id* . (stating requirement satisfied where question of law linking class members is substantially related to resolution of litigation even though class members are not identically situated). In order to satisfy the typicality requirement, the representative plaintiffs' claims must be the same as those of other Talley stockholders. Because all Class members face the same injury flowing from the defendants' conduct in connection with the merger, the typicality

requirement is satisfied. *See id.* at 1226 (stating representative's claim sufficient if it arises from same event or course of conduct giving rise to claims of other class members and is based on same legal theory).

### 2. Adequacy of Class Plaintiffs

**\*10** The record before the Court contains affidavits of several named plaintiffs establishing that they owned Talley common stock on September 26, 1997 (the same day the merger was announced) and continued to own the stock through the date of the merger. Moreover, the record shows the absence of a conflict of interest between those named plaintiffs and other Class members. For these reasons I find that the representative plaintiffs are adequate Class representatives.

### 3. Adequacy of Class Counsel

The Objectors' argument against class certification seems to be based primarily on two grounds. First, the Objectors assert that the plaintiffs' counsel engaged in grossly inadequate discovery when prosecuting this action, and further, that after entering into the memorandum of understanding with the defendants, class counsel undertook only a small amount of pro forma discovery. Second, the Objectors assert that class counsel ignored certain disclosure violations giving rise to federal and state claims, *viz*, (i) Mallender's misconduct and the defendants' complicity with the wrongful conduct, (ii) the circumstances surrounding Mallender's severance package, and (iii) the board's alleged desire for an indemnification provision, all of which, the Objectors contend, give rise to breach of fiduciary duty claims.

I am satisfied from my review of the record that class counsel diligently and thoroughly prosecuted this action, and that they are adequate class representatives. The record is devoid of any facts evincing a failure on the part of class counsel to either (i) adequately prosecute this action, or (ii) to engage in meaningful discovery. To the contrary, the record, including the Bernstein Affidavit, shows that class counsel undertook appropriate discovery into the claims asserted in the amended complaint and sought information relating to those and other potential claims in evaluating the claims and the proposed settlement terms. Among other things,



Not Reported in A.2d                                                    Page    9
(Cite as: 1998 WL 191939, *10 (Del.Ch.))

class counsel made repeated attempts to obtain testimony from Rockow. These efforts only ceased when Rockow's counsel sent a letter stating "please be advised that, at this point, [Rockow] is disinterested in the lawsuit or perpetuating the litigation." Thus, there is more than a little irony in Rockow's attack on the plaintiffs' litigation efforts.

The adequacy of class counsels' efforts is also evidenced by the fact that the "claims" Objectors now propose to litigate all appear to be makeweight, asserted only to add force to Alissa's demands to be paid his $700,000 in proxy expenses. The substance of these claims will be addressed, *infra*. At this point, I only note in passing that plaintiffs' counsel cannot be faulted for not having addressed these claims earlier in the litigation. The record is replete with evidence demonstrating class counsel's attempts to procure information from Alissa and Rockow giving rise to any potential claims which could be asserted against Talley, or any reasons why the settlement should not proceed. Apart from suggesting implausibly that the indemnification provisions of the merger agreement, by themselves, suggested improper motivation, neither Alissa nor Rockow was forthcoming. [FN4] In the circumstances, their attacks on class counsels' diligence ring hollow.

> FN4. The assertion that the board improperly sought a sale of the company as a whole rather than in parts because of its desire to obtain an indemnification provision in order to protect themselves from liability is particularly jejune. The indemnification provisions evince no sinister motive on the part of the board. Rather, they are of the type normally found in these situations. The mere existence of this provision without substantial additional evidence is insufficient even to raise an inference that the defendants acted with an improper purpose.

### 4. Rule 23(b) Requirements

**\*11** Having concluded that the requirements of Rule 23(a) have been satisfied, I turn to an analysis of whether class certification is proper under Rule 23(b). This Court has held that actions challenging the exercise of fiduciary responsibility in corporate merger transactions are properly certified under Rules 23(b)(1) and (2). *See Hynson,* Del.Ch., 601 A.2d at 575. Because this action challenged the board's action regarding the sale of the company, it

satisfies the requirements of (b)(1) and (2).

                              * * *

The record before me supports the conclusion that this action is maintainable as a class action. Class counsel has established that all of the requirements of Rule 23 have been fully satisfied. Contrary to the assertions of the objectors, class counsel have demonstrated that they are adequate class representatives. Thus, I find that class certification in this action is proper and will be granted. I turn now to an analysis of the settlement terms.

### B. *The Nature of the Claims and Difficulties of the Litigation*

The amended complaint makes two general claims. First, that the defendant directors failed to maximize value in the sale of Talley and did not adequately pursue other value-maximizing alternatives, all in breach of their duties under *Revlon v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986). Second, that the disclosures made in the Schedule 14D-9 and otherwise in connection with the merger were incomplete, false and misleading, in violation of the directors' fiduciary duties.

#### 1. The Revlon Claims

It is clearly the law of Delaware that there "is no single blueprint" that a board authorizing a sale of the corporate enterprise must follow to fulfill its fiduciary duties. *Barkan,* 567 A.2d at 1286. "Rather a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule." *Id.* (citing *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946, 954-55 (1985)).

The record before the Court quite strongly suggests that, even assuming that the Talley/Carpenter merger implicates the duties discussed in *Revlon* and other similar cases, the Board of Directors informed themselves adequately and acted reasonably in connection with the sale of the Company. Thus, they would appear to be entitled to the protection of the business judgment rule. *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34 (1994) (stating that in the context of a change of control directors must act in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
(Cite as: 1998 WL 191939, *11 (Del.Ch.))

Page  10

accordance with their fundamental duties of care and loyalty).

The Board began the process of exploration in March when the directors unanimously voted to retain an investment banker to furnish strategic financial advice to the Company.  J.P. Morgan was chosen for this role by a committee of three outside directors and was instructed to examine all alternatives, including "a sale, merger, consolidation, joint venture, or any other business combination or extraordinary transaction, in one or a series of transactions, involving all or-a material portion of the stock, assets, or business of the Company."

*12 Between March and June, J.P. Morgan performed a detailed review and, at meetings held in June and July, outlined the various available strategic alternatives, including a sale of the Company, in whole or in pieces.  At the July Board meeting, the Talley directors, including Rockow and Craig, considered an offer from Carpenter to purchase only Talley's steel subsidiary.  At the meeting, the Board, with the advice of J.P. Morgan, determined that it was not in the best interests of Talley and its stockholders to sell the steel business alone.   This decision was based, among other things, on the tax liability of approximately $30 million that would have resulted from a sale of the steel subsidiary and the inability of Talley to replace the cash flow that would be lost from the sale of that subsidiary.  At the end of these meetings, the Board of Directors unanimously determined to pursue a sale of the Company as a whole as the best way to maximize shareholder value.

This conclusion was reaffirmed in September, before the Board approved the Carpenter offer, when Admiral Foster asked J.P. Morgan to perform a liquidation analysis of the value, on an after tax basis, to be obtained from a sale of the subsidiaries on an individual basis.   This analysis, which is unchallenged, demonstrated that the Carpenter offer provided greater value.    As Admiral Foster testified:
[A]fter J.P. Morgan's analysis, it was evident that while individually some of these numbers look attractive, when you look at the whole package on an after tax basis it was not an alternative which would maximize shareholder value.  It was considerably less than the $12 per share that was on

the table.
Moreover, discovery showed that the consideration the Board obtained was the highest obtainable in the circumstances.    Carpenter was unwilling to go higher, and no one else came close to meeting the Carpenter offer.  Once the terms of the agreement with Carpenter were announced, no one emerged with a higher offer.  Craig, in his interview, stated that he was unaware of anyone prepared to offer more.    The Objectors offer no evidence of any higher alternative transaction. [FN5]    Indeed, Alissa, in his first draft federal complaint takes full credit for the merger and claims that its terms were very beneficial to the Talley stockholders.

> FN5. Objectors do suggest that a sale of the Company in pieces would have yielded greater value, but this suggestion is made without analysis, is contrary to all the record evidence and would appear to be utterly untenable.

Considering all of the circumstances, it seems likely that the so-called  *Revlon*  claim asserted in the amended complaint was not meritorious, or, to put it differently, that the director defendants would have been entitled to the protection of the business judgment rule and would have succeeded in their defense of that claim.    This conclusion is not altered by any argument advanced by the Objectors. Specifically, I reject as lacking in any foundation in the record the Objectors' arguments that:  (i) the Talley directors solicited and approved the Talley/ Carpenter merger agreement to further their own interest in continued indemnification;  (ii) greater value could have been achieved by selling the Company in pieces;  or (iii) the $12 per share price paid in the merger was improperly diminished by the putative value of claims arising out of the Mallender severance settlement. [FN6]

> FN6. In this last regard, it is noteworthy that Craig and Rockow both expressed their approval of the financial aspects of that settlement and that neither Alissa nor Rockow chose to dissent from the merger or pursue their statutory appraisal remedy.

### 2. The Disclosure Claims

*13 As a result of the litigation and the settlement, substantial supplemental disclosures were made to the Talley stockholders, both in the tender offer and the merger.   The supplemental disclosure includes





the September 25 Memorandum and other information about other possible bidders for Talley, including the dollar amounts of other proposals, together with the J.P. Morgan liquidation analysis of Talley.    The disclosures made as a part of the settlement responded completely to the claims maintained by the plaintiffs in connection with their preliminary injunction application.    Before agreeing to the settlement, the plaintiffs sought assurance from Alissa, Rockow and Craig that there were no other claims to litigate.    Craig assured them there were none.    Rockow avoided giving testimony and, in the end, communicated that he was "disinterested in the lawsuit or perpetuating the litigation."  Alissa's counsel evidently had nothing to contribute beyond their complaint about the indemnification provisions of the merger agreement.

Alissa and Rockow now claim that there are other disclosure issues left to litigate.    Even if these claims are asserted in good faith (and there is ample reason to doubt that they are), they do not appear to raise substantial, litigable issues.    Without deciding the matter, there is at least a serious doubt that the Objectors' purported federal disclosure claims, if ever filed, would or could survive a motion to dismiss.    Those claims appear to be no more than Delaware law based claims of waste or mismanagement dressed up in the language of federal disclosure law, not actionable under federal law.  *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In *Santa Fe,* the Supreme Court made clear that it will not countenance the federalization of state law claims of mismanagement or waste by reference to federal disclosure statutes or rules.    *See also Field v. Trump,* 850 F.2d 938, 946 (2d Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989) (stating that allegation that management should have disclosed its purported failure to take steps to maximize value during the course of a tender offer was merely a state claim for breach of fiduciary duty).

These claims fare no better under Delaware law.    It is well established that corporate directors need not "engage in self-flagellation ... implicating [themselves] in a breach of fiduciary duty from surrounding facts and circumstances prior to formal adjudication of the matter."    *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 81 n. 1 (1992) (citation and internal quotation marks omitted).    *See also*

*Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 145 (1997); *Brody v. Zaucha,* Del.Supr., 697 A.2d 749, 754 (1997).    Objectors' asserted claims about Mallender's misconduct, the directors failure to rectify it and the allegedly improper payment to Mallender of $6 million in severance benefits all fall squarely in the category of "self-flagellation."    None of the underlying allegations of misconduct has been the subject of a formal adjudication.    Indeed, none of it has even been the subject of a filed complaint.    In the circumstances, it seems clear that the plaintiffs' failure to file and prosecute a disclosure claim relating to such alleged misconduct is not a valid ground for objecting to the proposed settlement. [FN7]

FN7. Of course, as Objectors' counsel conceded at the hearing, the accomplishment of the Talley/ Carpenter merger has eliminated the standing of any former Talley stockholder to sue derivatively to recover any of the monies Objectors claim were improperly paid to Mallender.

* * *

*14 For all of the foregoing reasons, and in the exercise of my independent business judgment, I conclude that the terms of the settlement are fair, reasonable and adequate to the Class.    In doing so, I also take into consideration the inherent difficulties the plaintiffs would have faced in proving damages to the Class as a result of the defendants' alleged misconduct in light of the superior nature of the Carpenter proposal.

### 3. Issues of Federal/State Relation

Finally, I will comment briefly on Objectors' efforts to fit themselves into the paradigm discussed in *In re MCA, Inc. Shareholders Litig.,* Del.Ch., 598 A.2d 687 (1991), where claims arising out of the same nucleus of operative facts are pending in both state and federal court and a proposal is made to settle the state court action on terms which would preclude the litigation of the action pending in federal court.    In that case, then Vice Chancellor (now Justice) Hartnett refused to approve a settlement where the state court claims being settled had little or no value, the terms of the settlement provided meager consideration to the class, and the federal claims had "at least arguable merit and therefore ... significant value."    *Id.* at 690.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d
**(Cite as: 1998 WL 191939, \*14 (Del.Ch.))**

There are at least two notable differences between *MCA* and the situation presented here. First, the federal litigation was pending in *MCA* and is merely threatened here. This is a real difference. Because the Objectors have chosen not to initiate suit, there is no other forum available for the assessment of the merits of the federal claim asserted by them. Second, the federal claim asserted in *MCA* was for the alleged violation of a substantive federal tender offer rule having no Delaware state law correlative. Thus, the legal issues presented by that federal claim, while sharing certain factual predicates with the state law claims, were distinctly federal in nature. The "federal" claims the Objectors threaten to file are, by contrast, simple disclosure claims, akin to those alleged in the amended complaint in this matter and routinely considered by this Court. Thus, the exclusive jurisdiction of the federal courts over claims brought under the 1934 Act would not, as a practical matter, preclude litigation of those disclosure claims in this Court.

For these reasons, I have neither occasion nor reason to withhold approval of the proposed settlement or to tailor the scope of the proposed release to preserve the Objectors' ability to proceed in another court. *MCA* does not hold or suggest otherwise. Indeed, in a subsequent decision in that matter, the Court approved a modified version of the same settlement (including a $2 million payment to the class) after it appeared that the federal district court had entered summary judgment in favor of the defendants, notwithstanding that an appeal was pending before the Ninth Circuit. *In Re MCA, Inc. Shareholders Litig.,* Del.Ch., Cons.C.A. No. 11740, Hartnett, V.C. (Feb. 16, 1993). Exercising his business judgment, then Vice Chancellor Hartnett found the terms of the settlement adequate, reasoning that the district court's entry of summary judgment showed that the federal claims "now have minimal economic value" and that, if he rejected the settlement, the $2 million benefit would be lost. *Id.* at 11-12.

### V. THE FEE PETITION

**\*15** Plaintiffs' counsel seek an award of attorneys' fees in the amount of $330,000.00, inclusive of expenses, for their efforts in prosecuting the litigation. They point out that they worked on a fully contingent basis and argue that the settlement achieved by them favorably resolves the issues raised in the amended complaint. Other than Alissa

and Rockow, no member of the class has voiced any objection to the fee request.

The law in Delaware governing the award of attorneys' fees in corporate litigation is well established. Where litigation efforts on behalf of a corporation or its stockholders result in the creation of a common fund or the conferring of a benefit, the Court may, in its discretion, award fees and expenses. *Tandycrafts, Inc. v. Initio Partners,* Del.Supr., 562 A.2d 1162, 1164 (1989).

In determining the amount of fees to award, the courts have generally accorded the greatest weight to the benefit achieved as a result of the litigation. *In the Matter of the Appraisal of Shell Oil Co.,* Del.Ch., C.A. No. 8080, Hartnett, V.C., (Oct. 30, 1992); *In re Maxxam Group, Inc. Stockholders Litig.,* Del.Ch., C.A. No. 8636, Allen, C. (Apr. 16, 1987), slip op. at 31. Other factors considered are the time and effort applied to the matter by the plaintiffs' counsel and the difficulty of the litigation, the contingent nature of the retainer, and the standing of counsel. *Sugarland Indus., Inc. v. Thomas,* Del.Supr., 420 A.2d 142 (1980).

I am satisfied that the terms of the settlement requiring the publication and dissemination of the supplemental disclosure provided a substantial, although nonmonetary and unquantifiable, benefit to the members of the class. Indeed, the timely disclosure of the information in the supplement was presumably of greater value to the class than any potential award of damages based on the failure to disclose the same information, as such information is of the greatest utility when it is available in a timely manner to inform the stockholders' decision making process. Considering all the circumstances presented, I have no difficulty concluding that the disclosures made here constitute adequate consideration for the settlement of the claims asserted and adequately support the fee requested.

While not necessarily unusual for expedited corporate litigation of this type, the services rendered by plaintiffs' counsel were of high quality and, it is fair to say, could not have been rendered by lawyers inexperienced at prosecuting stockholder litigation. The action was prosecuted diligently, in the context of expedited proceedings designed to lead to a hearing on plaintiffs' motion for a preliminary injunction. Plaintiffs counsel, who

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
**(Cite as: 1998 WL 191939, \*15 (Del.Ch.))**

Page 13

together devoted in excess of 700 hours of attorney time to this matter, pursued their case vigorously and engaged in successful efforts to settle those claims which appeared meritorious. Their efforts were undertaken on a purely contingent fee basis, a factor which may justify a higher fee than would be awarded to an attorney who works on an hourly fee or modified hourly fee basis. *See Chrysler Corp. v. Dann,* Del.Supr., 223 A.2d 384, 389 (1966).

**\*16** For all of these reasons, I conclude that the fee sought is a reasonable one and should be allowed. I will also allow an award of expenses in the amount sought.

### VI. CONCLUSION

For all of the foregoing reasons, I will approve the settlement, award fees and overrule the objections. Counsel for plaintiffs should submit a form of order in conformity with this opinion.

Not Reported in A.2d, 1998 WL 191939 (Del.Ch.), 24 Del. J. Corp. L. 331

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




# TAB 8

Not Reported in A.2d                                                    **Page 1**
Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273
(Cite as: 1988 WL 8772 (Del.Ch.), 13 Del. J. Corp. L. 1273)

н

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle
County.
**Roger YANOW and Charles Mandelbaum,
Plaintiffs,**
v.
**SCIENTIFIC LEASING, INC. Robert A.
Bernhard, W. Barry Tanner, Joseph R.
Herbert, Joseph D. Moore, Samuel H. Howard,
Morris H. Shamos, Tucker H. Warner,
Linc Acquisition Corp., and Linc Group, Inc.,
Defendants.**

Submitted: Feb. 2, 1988.
Decided: Feb. 5, 1988.
Revised: Feb. 8, 1988.

**\*\*1275** Kevin Gross, of Morris, Rosenthal,
Monhait & Gross, P.A., Wilmington, and Stephen
Lowey (argued) and William J. Ban, of Lowey,
Dannenberg & Knapp, P.C. and Stull, Stull &
Brody, New York City for plaintiffs.

R. Franklin Balotti, Gregory P. Williams, and
Nathan B. Ploener, of Richards, Layton & Finger,
Wilmington, Delaware, and Dennis J. Block, Nancy
E. Barton (argued), H. Adam Prussin, Dushica D.
Babich, and David J. Berger, of Weil, Gotshal &
Manges, New York City, for defendants Scientific
Leasing, Inc., and Its Directors.

A. Gilchrist Sparks, III and Michael Houghton, of
Morris, Nichols, Arsht & Tunnell, Wilmington, and
Daniel J. Attridge (argued), Jeffrey A. Rosen, and
Yosef J. Riemer, of Kirkland & Ellis, Washington,
D.C., for defendants Linc Acquisition Corp. and
Linc Group, Inc.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

**\*1** Presently pending is the plaintiffs' motion to
preliminarily enjoin an all-cash tender offer by
LINC Acquisition Corp., a subsidiary of LINC
Group, Inc. (collectively, "LINC") for all of the
common stock of Scientific Leasing, Inc. ("SLI").
The offer is scheduled to expire at midnight on
February 5, 1988.    The plaintiffs, who are

shareholders of SLI, filed this action challenging,
*inter alia,* the legality of the LINC offer, on January
5, 1988. Following expedited discovery and
briefing, the preliminary injunction motion was
argued on February 2, 1988.    This is the Opinion
of the Court on the plaintiffs' motion for a
preliminary injunction.    For the reasons now
discussed, the motion will be denied.

I.

SLI is a Delaware corporation headquartered in
Connecticut and engaged principally in providing
financial services, and in leasing various medical,
scientific data processing, communication and other
equipment, to health care providers, including
hospitals and medical centers.    As of October 30,
1987, SLI had outstanding 3,104,612 shares of
common stock that were publicly traded on the
American Stock Exchange.    Of those shares,
800,000 (approximately **\*\*1276** 26%) are owned by
Hospital Corporation of America ("HCA"), which is
SLI's largest single shareholder.

SLI has a seven member Board of Directors, all of
whom have been joined as defendants.    Three of
those directors (Messrs. Bernhard, Tanner and
Herbert) are officer-employees    [FN1], and the
remaining four are independent, "outside" directors.
Two of those outside directors (Messrs. Moore and
Howard) are nominees of HCA. [FN2]

Beginning in 1984, SLI experienced rapid earnings
growth due primarily to the sale of "tax leveraged
leases" having certain tax benefits.    SLI's earnings
increases were reflected in higher stock prices.    By
1986, however, certain revisions to the federal tax
code eliminated many of the tax benefits from the
sale of tax leveraged leases, and SLI's earnings and
stock price decreased accordingly.    SLI's stock
price, which rose as high as $35 per share during the
fourth quarter of 1984, fell to a low of $11.50 one
year later.    Despite market fluctuations in both
directions, by the fourth quarter of 1987 SLI's
earnings had continued to decrease, and its stock
price fell to a low of $7.50 per share.    Immediately
before the LINC offer, SLI's market price was
approximately $10 per share.

Since 1984 SLI had sought out an acquisition
partner that could utilize the excess depreciation




Not Reported in A.2d                                                      Page    2
(Cite as: 1988 WL 8772, *1 (Del.Ch.), 13 Del. J. Corp. L. 1273, **1276)

generated by SLI's equipment leasing portfolio. Donaldson, Lufkin & Jenrette was engaged to contact potential buyers, but their efforts were not fruitful.

**\*2** The changed tax and economic environment caused several equipment leasing companies to merge or consolidate during 1986 and 1987. During that same period, several companies contacted SLI and expressed interest in either acquiring, or being acquired by, SLI.    Some of those companies expressed interest in buying HCA's 26% stock interest in SLI.    Again, none of those contacts resulted in serious negotiations, or in a firm offer for or by SLI.   In April 1986, SLI retained PaineWebber, Inc. ("PaineWebber") to provide a range of financial advisory services, including advising SLI's Board of Directors and management in connection with any **\*\*1277** offer from a third party to merge with, or to acquire common stock or assets of, SLI.

For at least a year it has been widely known among top executives in the equipment leasing industry that SLI might be available for acquisition.   One firm that was interested in acquiring SLI was LINC, which is a Chicago-based, privately held company that provides equipment leasing and financial services to the health care industry.   In June, 1987, LINC began purchasing SLI stock on the open market, eventually acquiring 4.8% of SLI's outstanding shares.   In November, 1987, LINC approached SLI and proposed a possible acquisition of SLI for about $14 per share, for which (LINC advised) it had the necessary financing commitments.   SLI agreed to negotiate with LINC, but not exclusively, because other interested parties had also contacted SLI.

To facilitate its discussions with potential acquirers, SLI had PaineWebber develop a confidential offering memorandum describing SLI's financial condition.      Since the memorandum contained confidential, proprietary information, SLI would provide it only to companies willing to sign a confidentiality and standstill agreement.    LINC signed such an agreement on November 25, 1987. Three other companies that had an expressed interest in SLI were offered the opportunity to sign the agreement and receive confidential information, but only two of them signed.

On December 17, 1987, the SLI Board held a regularly scheduled meeting at which Mr. Bernhard advised the directors of LINC's interest in SLI, and of the possible interest of the other firms.    The transcript of the Board meeting reflects the directors' primary concern that the Board act in the best interests of SLI's stockholders.    The Board rejected LINC's request that SLI negotiate exclusively with it, and authorized a negotiating committee, consisting of Messrs. Bernhard, Tanner, and Hastings, to negotiate with LINC and any other party interested in acquiring SLI.    The Board was unwilling to make a public announcement that SLI was for sale.    Rather, its posture was that SLI would enter into serious negotiations with any party that expressed interest in SLI and was willing to sign a confidentiality agreement. [FN3]

**\*\*1278** Although SLI had offered to provide relevant financial information to four companies, LINC was the only firm prepared to enter into serious negotiations.    SLI and LINC negotiated throughout the month of December, 1987.     The result was an acquisition agreement dated December 31, 1987, which provided, among other things, that LINC would make a cash tender offer for all of SLI's outstanding shares at $15.375 per share.   The offer would be followed by a cash merger at the same price.

**\*3** The negotiation occurred in two stages.    The parties first negotiated the acquisition price, starting at $14.50 per share and ending at $15.375, at which point LINC refused to go higher.   After agreement was reached on price, the parties negotiated the remaining terms.   LINC sought (i) a "break up" fee of $3 million if for any reason the transaction was not consummated, (ii) a "no-shop" clause restricting SLI from negotiating a transaction at a higher price after the agreement with LINC was signed, (iii) a stock option and (iv) reimbursement of LINC's acquisition-related expenses.   SLI's representatives were unwilling to pay a break up fee or to agree to a "no-shop" clause.    They did, however, reach agreement with LINC on the following provisions:

(a) SLI would be entitled to provide financial information to a higher bidder, if, in the opinion of SLI's financial advisors, the terms of the higher offer were economically superior and if, in the opinion of SLI's counsel, the directors would have a fiduciary duty to provide such information.   (That





provision is described, in acquisition parlance, as a "window shop" clause).

(b) LINC would receive an option to purchase 620,000 shares of SLI at the $15.375 per share offering price. If exercised, the option would result in LINC owning about 16.6% of SLI's shares.

(c) SLI would reimburse LINC's expenses if SLI breached the acquisition agreement or if the LINC offer were not consummated and a third party acquired 50% of SLI's stock, assets, or board representation before January 1, 1989. [FN4]

(d) Finally, because LINC wanted to retain certain members of SLI's senior management as an integral part of its acquisition **1279 of SLI, LINC negotiated certain employment and compensation arrangements with them. [FN5] LINC insisted upon these arrangements on its own initiative to afford SLI's senior managers the same incentives provided to LINC's management, to provide uniform incentives within the combined organization and thereby to induce SLI's senior managers to remain at SLI.

SLI's Board approved the foregoing arrangements at a telephonic meeting specially convened on January 2, 1988. All Board members had previously been sent copies of the acquisition agreement and other documentation of the transaction. In attendance at the meeting were all members of the Board, SLI's outside counsel, and its financial advisors. PaineWebber informed the Board of its opinion (later reduced to writing) that the $15.375 per share cash price was fair from a financial point of view. The critical terms of the acquisition agreement were explained, discussed, and considered at length. Thereafter the directors voted unanimously to approve the acquisition agreement, including the LINC tender offer.

On January 4, 1988, the proposed LINC/SLI acquisition was publicly announced, and on January 8, 1988, LINC formally commenced its tender offer. SLI's directors thereafter submitted a Schedule 14D-9 in which they recommended that shareholders accept the LINC offer. For purposes of the instant motion, the plaintiffs do not contend that the relevant offering documents misstate or fail to disclose any material facts.

*4 Since LINC commenced its offer, no higher bids for SLI have emerged, nor has any other potential bidder approached SLI or PaineWebber suggesting the possibility of a higher bid.

II.

This Court has exercised its power to enjoin a corporate tender offer on only the rarest occasions, and even then, only most sparingly. Thus far tender offers have been enjoined only in situations where by reason of the conduct of the fiduciaries responsible **1280 for the offer, the transaction became involuntary, either because the offer was actionably coercive or because it involved materially false or misleading disclosures. *Eisenberg v. Chicago Milwaukee Corp.,* Del.Ch., C.A. No. 9374, Jacobs, V.C. (December 1, 1987) at 10- 12. The plaintiffs do not contend that the LINC offer falls within that description. They concede that the offeror (LINC) is not a fiduciary for SLI's stockholders. Nor, in the present context, do the plaintiffs advance any specific argument that the LINC offer is actionably coercive or involves false or misleading disclosures.

Nonetheless, the plaintiffs contend that the LINC offer must be preliminarily enjoined, arguing that the acquisition agreement is the result of fiduciary duty violations by SLI's directors in which the offeror, LINC, knowingly participated. Specifically, plaintiffs charge SLI's directors with having breached their fiduciary duties of due care and/or loyalty: (i) by negotiating an acquisition agreement with only one bidder (LINC) without having first conducted an auction calculated to elicit bids higher than the "grossly inadequate" agreed-to $15.37 offering price; (ii) by agreeing to terms that effectively "lock up" SLI and chill further competitive bids, *viz.,* the LINC option, the "window shop" clause, the incentive compensation arrangements, and the expense reimbursement agreement; (iii) by delegating the task of negotiating the acquisition agreement to SLI's interested directors, rather than to a committee of disinterested directors, and (iv) by approving the acquisition agreement without full and adequate information. Plaintiffs argue that as a consequence of any or all of the foregoing acts, the consummation of the LINC offer must be preliminarily enjoined for thirty days to enable other potential bidders to submit competitive bids.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d                                                                    Page   4
(Cite as: 1988 WL 8772, *4 (Del.Ch.), 13 Del. J. Corp. L. 1273, **1280)

To be entitled to preliminary injunctive relief, the plaintiffs must demonstrate a reasonable probability that they will succeed on the merits of their claims, that they will suffer irreparable harm if preliminary injunctive relief is denied, and that the harm to the plaintiffs if an injunction is denied outweighs the harm to the defendants if relief is granted. *Revlon, Inc. v. McAndrews & Forbes Holdings Inc.,* Del.Supr., 506 A.2d 173, 179 (1986); *Ivanhoe Partners v. Newmont Mining Company,* Del.Ch., 533 A.2d 585, 600, *aff'd,* Del.Supr., Nos. 341 and 345, 1987, Moore, J. (November 18, 1987). For the reasons now discussed, the plaintiffs' injunction motion fails in all three respects.

**1281 III.

First, the plaintiffs have failed to establish that they will probably succeed on the ultimate merits of their claims. Plaintiffs' entire injunction claim rests upon the proposition that LINC--a 4.8% stockholder that owed no fiduciary duties to SLI's stockholders--knowingly participated in wrongful conduct by SLI's directors, who did owe such duties. *See, In Re Sea-Land Corp. Shareholders' Litigation,* Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 22, 1987), at 8; *Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 131 (1986).

*5 But the record is utterly devoid of evidence that establishes "knowing participation" by LINC in any alleged wrongdoing by SLI's directors. Insofar as the plaintiffs attack the directors' internal decision-making process (*i.e.,* their alleged failure either to appoint a negotiating committee composed of disinterested directors or to approve the acquisition agreement on a fully informed basis), it is undisputed that LINC played no part in that process. Insofar as the directors are charged with wrongfully failing to conduct an auction for SLI, the record shows that SLI's representatives rejected LINC's demand that SLI deal exclusively with LINC. It also discloses that LINC correctly understood that SLI was dealing with other potential purchasers that had signed confidentiality agreements. Finally, LINC and SLI did agree to the LINC option, the "window shop" clause, the expense reimbursement provision, and the management incentive arrangements. However, no showing is made that those arrangements constituted the type of provisions condemned as "lock up" devices that improperly preclude competing bids in an active auction. *See, Revlon, Inc. v. McAndrews & Forbes*

*Holdings, Inc.,* supra at 183; *Hastings-Murtagh v. Texas Air Corp.,* 649 F.Supp. 479, 484 (S.D.Fla., 1986) (applying Delaware law). [FN6]

**1282 On this basis alone--the absence of any showing that LINC aided and abetted a fiduciary violation by SLI's directors--the plaintiffs have failed to establish probable success on the merits of their claims.

The plaintiffs have also failed to establish the predicate for their aiding and abetting claim, *i.e.,* a showing that SLI's directors have breached an underlying fiduciary duty that they owed to SLI's stockholders. No evidence supports the contention that the directors were not fully informed when they approved the acquisition agreement. The plaintiffs' argument that the $15.375 per share acquisition price is unfair is based upon an expert affidavit that has been vigorously challenged by a counter affidavit of the defendants' valuation expert. Moreover, it must be presumed that HCA, SLI's largest stockholder, has the identical self-interest as SLI's other shareholders: to receive the highest price for its shares. HCA presumably has full information by virtue of its representation on the SLI Board. HCA has agreed that unless a higher bid emerges, it will tender its shares to LINC at the $15.375 per share price. HCA's agreement, in these circumstances, is *prima facie* evidence that the offering price is fair.

Similarly unpersuasive are the plaintiffs' arguments that the Board employed improper procedures in arriving at its accord with LINC. The committee that negotiated with LINC consisted of three directors (Bernhard, Tanner and Herbert). These directors now have a personal interest in the transaction. However, the acquisition agreement was considered at length and in depth by the entire Board, a majority of whom were disinterested, outside directors with no personal stake in the outcome. As a result, I attach little **1283 significance to the composition of the negotiating committee in these circumstances, and find no basis to strip the Board's decision of the presumption of validity afforded by the business judgment rule. *See Shingala v. Becor Western, Inc.,* Del.Ch., C.A. Nos. 8858 and 8859, Berger, V.C. (February 3, 1988) at 10.

*6 Finally plaintiffs argue that the directors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in A.2d
(Cite as: 1988 WL 8772, *6 (Del.Ch.), 13 Del. J. Corp. L. 1273, **1283)

employed an inadequate auction process in breach of their duties imposed by *Revlon.* They contend that, while it was not necessary to conduct a "firesale" auction directed to the public at large, the directors should have, at the very least, discreetly contacted all companies that had previously expressed an interest in SLI and invited them to submit bids. The real dispute boils down to what specific methods corporate directors may use to elicit bids from potential acquirers. That issue would appear to be normally a matter of director judgment that necessarily must vary with each case. The record is not altogether clear that the market was as fully informed as it might have been that SLI was for sale. However the record does contain undisputed evidence is that for the last two years, the relevant "players" in the industry were aware that SLI was willing to (and, indeed, had) entertained acquisition proposals. The record further shows that SLI's directors had valid reasons to proceed discreetly in carrying out their strategy for marketing the company, and that they had no motive to obtain less than the best available price. Finally, HCA's considerable economic self-interest--which in this regard was identical to the economic interest of SLI's other stockholders--strongly suggests that HCA would not have tolerated an acquisition at less than the best price that SLI's Board was able to obtain. On that basis I conclude that the plaintiffs have failed to show that they will likely succeed on the merits of that or their other claims.

### IV.

Apart from merit-related considerations, the injunction motion must fail because no likelihood of irreparable harm has been established. No other bidder or higher bid has been shown to be waiting in the wings, nor is there evidence that an injunction is needed to enable a higher bid to materialize. All the plaintiffs have done is to assert that the offering price is "grossly inadequate" and that a higher bid might come forward if the transaction were held up for thirty days. But a theoretical possibility, without more, that an unknown potential offeror might submit a higher offer if an injunction is granted does not constitute irreparable injury. *See **1284 Freedman v. Restaurant Associates Indus.,* Del.Ch., C.A. No. 9212, Allen, C. (October 16, 1987) at 29-30. If plaintiffs are correct in their view that the $15.375 acquisition price is unfair, money damages or an appraisal would be a sufficient remedy. *See, In Re Chromalloy Stockholders'*

*Litigation,* Del.Ch., C.A. No. 8537, Hartnett, V.C. (December 17, 1986) at 5.

Finally, even if threatened irreparable injury had been established, the grant of injunctive relief would risk an injury far greater than the harm that it would likely prevent. The LINC offer is the only opportunity available to SLI's shareholders to receive a significant premium for their stock. Because of the adverse impact of an injunction upon LINC's financing arrangements, there is a significant risk that a preliminary injunction might cause the offer to be withdrawn. Plaintiffs point to no concrete, anticipated benefit from an injunction that outweighs that highly significant risk. These circumstances bring to mind the Chancellor's observation in *Solash v. The Telex Corp., supra,* at 33, that:

*7 [T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of a untoward financial result from the stockholders' point of view is small. Repeatedly the plaintiffs' class action bar exhorts the court to bravely risk the consequences in circumstances such as these, asserting that more money to the shareholders, not less, will probably result. At least on facts such as these, a due respect for the interests of the class on whose behalf these exhortations are made, requires, in my judgment, that this invitation be declined.

That admonition is equally applicable here. For the above reasons, the plaintiffs' motion for a preliminary injunction is denied.

IT IS SO ORDERED.

FN1. Mr. Bernhard is Chairman of SLI's Board of Directors, Mr. Tanner is President and Chief Executive Officer, and Mr. Herbert is Senior Vice President and Chief Financial Officer.

FN2. The 1984 HCA stock purchase included a standstill agreement pursuant to which HCA would be allowed to nominate two directors of SLI, and SLI had a right of first refusal if HCA decided to sell

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.





Not Reported in A.2d

(Cite as: 1988 WL 8772, *7 (Del.Ch.), 13 Del. J. Corp. L. 1273, **1284)

its stock.

FN3. The Board determined that to disclose prematurely the fact that SLI might be for sale, could adversely affect SLI's business and decrease, rather than enhance, SLI's value to particular acquirers. The directors were specifically concerned that a "firesale" auction would adversely affect SLI's relationships with its employees, suppliers, and customers. They concluded that in these circumstances, the best way to maximize value for the shareholders was to cooperate fully with any party that expressed an interest in acquiring the company.

FN4. In separate negotiations, HCA, SLI's largest stockholder, agreed to tender its 26% block to LINC at the $15.375 price, unless a higher bid were to materialize.

FN5. The compensation and incentive arrangements included provisions for the maintenance of various health, dental and life insurance benefits for all SLI employees; the opportunity for four senior managers of SLI (including Bernhard and Tanner) to purchase up to 5% of the combined LINC/SLI entity at the book value price of the combined entity; seats on LINC's board of directors for Bernhard and Tanner; the maintenance of SLI's basic employee benefits and severance policies for all employees; and an incentive program involving performance bonuses.

FN6. The LINC option is not a "lock up" option that would operate to preclude higher bids. That option, if exercised, would result in LINC owning only 16% of SLI and would involve only a minimal cost to a higher bidder ($620,000 for each additional $1 per share offering price). The grant of the option was necessary to induce LINC to make an offer at a premium over market price, and, as such, is the type of arrangement that has met with judicial approval. *See, e.g., Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757, 758-9 (2d Cir., 1983), *cert. denied,* 464 U.S. 1018 (1983); *Hecco Ventures v. Sea-Land Corp.,* Del.Ch., C.A. No. 8486, Jacobs, V.C. (May 19, 1986) at 9-12. Similarly, the expense reimbursement provision was necessary to induce LINC to bid, since LINC would otherwise have been unwilling to outlay considerable sums for acquisition-related expenses that would be nonrecoverable if a higher bidder succeeded in acquiring SLI. The reimbursement clause, which becomes applicable

only if SLI breaches the agreement or if a third party acquires SLI, is also reasonable. The "window shop" clause of the acquisition agreement expressly allows SLI to cooperate with a *bona fide* higher bidder and, as such, is also consistent with the Board's fiduciary duties. Finally, there is no showing that SLI's directors acted improperly in agreeing to the management incentive and compensation arrangements, which were negotiated after the transaction price had been agreed to, were designed essentially to put SLI officers in the same position as their LINC counterparts, and were initiated by LINC itself to preserve the existing management and personnel incentives that LINC considered desirable. *See Solash v. The Telex Corporation,* Del.Ch., C.A. Nos. 9518, 9525 and 9528, Allen, C. (January 19, 1988) at 25-26.

Not Reported in A.2d, 1988 WL 8772 (Del.Ch.), Fed. Sec. L. Rep. P 93,660, 13 Del. J. Corp. L. 1273

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


