UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE MBNA CORPORATION DERIVATIVE AND CLASS LITIGATION | ) Lead Case No. 1:05-cv-00327(GMS) )  )  ) |
| This Document Relates To: | )  )  ) |
| ALL ACTIONS. | ) |

**COMPENDIUM OF UNREPORTED OPINIONS
CITED IN PLAINTIFFS' SUR-REPLY MEMORANDUM
RELATING TO THE ISSUE OF SUBJECT MATTER JURISDICTION**

CHIMICLES & TIKELLIS, LLP
PAMELA S. TIKELLIS (#2172)
DANIEL J. BROWN (#4688)
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
Telephone: 302/656-2500
Facsimile: 302/656-9053

Liaison Counsel for Plaintiffs

PASKOWITZ & ASSOCIATES
LAURENCE PASKOWITZ
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: 212/685-0969
Facsimile: 212/685-2306

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Co-Lead Counsel for Plaintiffs

Dated: December 11, 2006

**CASE**                                                                                          **TAB**

*Christopher v. First Mut. Corp.,*
2006 U.S. Dist. LEXIS 2255 (E.D. Pa.  Jan. 20, 2006) ...................................................1

*Litig. Trust of MDIP, Inc. v. Rapoport,*
2005 WL 1242157 (D. Del. May 25, 2005)....................................................................2

*PNC Bank, N.A. v. PPL Elec. Utils. Corp.,*
2006 U.S. App. LEXIS 15850 (3d Cir. June 23, 2006) ..................................................3

# EXHIBIT 1

LEXSEE

**JOHN J. CHRISTOPHER v. FIRST MUTUAL CORP., RICHARD KELLY,
ASSOCIATES FINANCIAL SERVICES CORP.**

**CIVIL ACTION NO. 05-01149**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 2255*

**January 20, 2006, Decided**

**COUNSEL:** [*1] For JOHN J. CHRISTOPHER, Plaintiff: ANTHONY BERNARD QUINN, PHILA, PA.

For FIRST MUTUAL CORP., RICHARD KELLY, Defendants: COLLEEN A. GARRITY, SMITH GIACOMETTI & CHIKOWSKI LLC, PHILADELPHIA, PA.

For ASSOCIATES FINANCIAL SERVICES COMPANY, INC., Defendant: BARBARA KIELY, REED SMITH, PHILADELPHIA, PA.

**JUDGES:** THOMAS N. O'NEILL, JR., J.

**OPINION BY:** THOMAS N. O'NEILL, JR.

**OPINION:** O'NEILL, J.

MEMORANDUM

Plaintiff John Christopher filed a complaint in the Court of Common Pleas of Philadelphia County on January 28, 2005 against defendants First Mutual Corp., Richard Kelly, and Associates Financial Services Corp. ("Associates"), alleging violations of the Equal Credit Opportunity Act ("ECOA"), the Home Ownership Equity Protection Act ("HOEPA"), the Real Estate Settlement Procedures Act ("RESPA"), and claims under state law. Defendants First Mutual and Kelly removed the action to this Court. Jurisdiction is based on *28 U.S.C. § 1331* and *28 U.S.C. § 1367*. Before me now are Associates' motion to dismiss, plaintiff's response, and Associates' reply thereto.

BACKGROUND

John Christopher owns a row home in north Philadelphia. In 1995, he took out [*2] a home equity loan through East Coast Mortgage to finance home improvements ("1995 Loan"). The principal balance was $ 11,800 and the monthly payment was $ 165.00. The 1995 Loan was reassigned multiple times, ultimately to Money Store.

On November 7, 1997, after receiving a telemarketing call from Kelly, a mortgage broker, Christopher refinanced the 1995 Loan through First Mutual ("1997 Loan"). The mortgage covered the home equity loan and also refinanced Christopher's first mortgage. The principal balance was $ 22,000, with monthly payments of $ 254.63 over fifteen years. Christopher alleges that more than ten percent of the loan was used to pay fees. The 1997 Loan was subsequently assigned to Associates.

On November 30, 1998, after another call from Kelly, Christopher refinanced the 1997 Loan, again through First Mutual ("1998 Loan"). The principal balance of the 1998 loan was $ 31,000, with monthly payments of $ 365.11 over fifteen years. Associates allegedly demanded $ 21,645 to satisfy the $ 22,000 mortgage. The 1998 Loan was later assigned to Associates.

In January 2000, Plaintiff once again agreed to refinance. He refinanced the 1998 Loan through First Mutual ("2000 Loan") [*3] on January 31, 2000. The 2000 Loan had a principal amount of $ 38,250.00, with monthly payments of $ 321.63 over thirty years. Plaintiff alleges that Associates required $ 30,870 to satisfy the 1998 Loan, which had an original principal of $ 31,000. More than nine percent of the loan was used to pay fees. The remainder of the loan paid off plaintiff's real estate taxes and utility bills. The 2000 Loan was subsequently assigned to Homeq Servicing Corporation.

In Christopher's complaint, he seems to assert four different claims against Associates. n1 First, in Count IV, Christopher claims that Associates violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), *73 P.S. § 201-1 et. seq.*, by imposing "credit costs and charges expressly prohibited by Federal and Pennsylvania Law" and engaging in "fraudulent or

deceptive conduct which created a likelihood of confusion or misunderstanding." In Count VI, Christopher asserts that all defendants "made material misrepresentations and omitted material information in order to induce plaintiff to consummate the home equity loan." These misrepresentations included (1) the failure to disclose [*4] that a third-party broker was being used; (2) the representations that the home equity loan was beneficial to him and necessary to finance the home improvements; and (3) failing to explain why some loan proceeds were used to pay tax and utility bills. In Count VII, Christopher alleges a RESPA violation. He claims that "in the course of this transaction the lender gave the loan broker a fee, kickback, or thing of value pursuant to an understanding between the lender and the broker that the broker would refer business to the lender" and that "the fee paid to the lender for recording and other charges was a payment" based on services not actually performed. In Count IX, Christopher asserts a breach of contract claim, arguing that Associates demanded amounts in excess of that due under the mortgage and that the interest and finance charges in the loan held by Associates exceeded permissible amounts. Christopher does not specify which loan gave rise to the breach of contract claim.

> n1 The majority of his claims are asserted against First Mutual and Kelly.

[*5]

STANDARD OF REVIEW

*Federal Rule of Civil Procedure 12(b)(6)* permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)* (2004). In ruling on a *12(b)(6)* motion, I must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in plaintiff's complaint and must determine whether "under any reasonable reading of the pleadings, plaintiffs may be entitled to relief." *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir.1996)* (citations omitted). Nevertheless, in evaluating plaintiff's pleadings I will not credit any "bald assertions." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997)*. Nor will I accept as true legal conclusions or unwarranted factual inferences. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. "The complaint will be deemed to have alleged sufficient facts it it adequately put the defendant on notice of the essential elements of the plaintiff's cause of action." *Nami, 82 F.3d at 65.* [*6] A *Rule 12(b)(6)* motion is proper only if the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley, 355 U.S. at 45-46.*

DISCUSSION

1. Count IV--UTPCPL Violations

In Christopher's UTPCPL claims, he asserts that Associates imposed expressly prohibited credit costs and other charges and otherwise engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. The basis for these claims seems to be Associates' "overcharge of the mortgage." n2

> n2 The overcharge is the only fact attributed to Associates in Christopher's complaint. He does not describe any personal interaction with Associates, only that two loans were ultimately assigned to them and they received more than the outstanding principal when he refinanced.

The Pennsylvania UTPCPL contains twenty specific forms of prohibited conduct and a catchall provision covering other forms of "fraudulent or deceptive conduct which creates a likelihood of [*7] confusion or misunderstanding. *73 Pa. Cons. Stat. § 201-2 (2005).* The UTPCPL is to be liberally construed to effectuate the legislature's goal of consumer protection. *Commonwealth v. Monumental Properties Inc., 459 Pa. 450, 460, 329 A.2d 812, 817 (Pa. 1974); Keller v. Volkswagen of America, Inc., 1999 PA Super 153, 733 A.2d 642, 646 (Pa. Super. Ct. 1999).* Christopher seems to assert his claims against Associates under *73 Pa. Cons. Stat. § 201-2(xxi),* the catchall provision. n3

> n3 In his complaint, Christopher cites three separate parts of *73 Pa. Cons. Stat. § 201-2.* One section follows an allegation addressed specifically to actions by defendant Kelly. Christopher also asserts a violation of *73 Pa. Cons. Stat. § 201-2(v)* against Associates by addressing the claim to "all defendants" in his complaint, but seems to retract this claim in his response to Associates' motion to dismiss. He also alleges no specific facts in either his complaint or his response which would give rise to Associates' liability under that UTPCPL section.

[*8]

The catchall provision originally only covered fraudulent conduct, and courts interpreting the statute required the plaintiff to meet the increased requirements for pleading fraud. See, e.g., *Hammer v. Nikol, 659 A.2d 617, 619-20 (Pa. Super. 1995); Prime Meats, Inc. v. Yochim, 422 Pa. Super. 460, 619 A.2d 769 (Pa. Super. 1993).* In 1996, however, the Pennsylvania legislature amended the catchall provision, expanding it to cover

both fraudulent and deceptive conduct. Since then, courts have divided on whether a plaintiff must meet the heightened fraud pleading requirement. Compare *Skurnowicz v. Lucci, 2002 PA Super 140, 798 A.2d 788, P19 (Pa. Super. 2002)* (plaintiff must plead elements of common law fraud), with *Flores v. Shapiro & Kreisman, 246 F. Supp. 2d 427, 432 (E.D. Pa. 2002)* ("by adding a prohibition on "deceptive" conduct, the 1996 amendment to the CPL eliminated the need to plead all of the elements of common law fraud in actions under the CPL"). The Pennsylvania Supreme Court has not yet addressed this issue.

I review the 1996 changes in the statute with the goals of effectuating the legislature's purpose, [*9] giving meaning to every word in the statute, and making the amendment have meaning. As the Supreme Court has noted, "It is our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche, 348 U.S. 528, 538, 75 S. Ct. 513, 99 L. Ed. 615 (1955)* quoting *Montclair v. Ramsdell, 107 U.S. 147, 152, 2 S. Ct. 391, 27 L. Ed. 431 (1882)*; see also *Flores v. Shapiro & Kreisman, 246 F. Supp. 2d 427, 432 (E.D. Pa. 2002)* ("Under general principles of statutory interpretation, no word should be rendered redundant."). Courts have previously recognized the legislature's broad goal to protect consumers in these transactions. See, e.g., *Keller, 733 A.2d at 646* ("It is to be liberally construed in order to effectuate its purpose."). Further, the legislature must have had a reason for amending the statute to add "deceptive." Considering these factors, I find under the amended statute, the catchall provision extends consumer protection to cover both fraudulent and deceptive conduct. It is no longer necessary for a plaintiff to plead all of the elements of common law fraud to recover under the UTPCPL catchall provision. If a plaintiff alleges [*10] fraud under the UTPCPL, he must still plead all the elements of common law fraud. If a plaintiff alleges deceptive conduct under the UTPCPL, however, he need not meet the traditional heightened pleading standard. I will review Christopher's assertions to see if they fall under either category.

Christopher has failed to assert a fraud claim upon which relief can be granted. The elements of fraud in Pennsylvania are: (1) a representation; (2) which is material to the transaction in question; (3) made falsely, with knowledge of the falsity or reckless disregard for the truth; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) injury proximately caused by the reliance. See *Youndt v. First Nat'l Bank, 2005 PA Super 42, 868 A.2d 539, 545 (Pa. Super 2005)*; see also *Bortz v. Noon, 556 Pa. 489, 729 A.2d 555, 560 (Pa. 1999)*. Christopher has not alleged any contact with Associates, and has also not specified any misrepresentations made by Associates.

Therefore, his claim cannot fall under the "fraudulent" part of the catchall provision.

Christopher's UTPCPL claim against Associates is also [*11] not saved by the "deceptive" part of the catchall provision. Deception, which is very similar to fraud, is defined as "intentional misleading by falsehood spoken or acted." Black's Law Dictionary 406 (6th ed. 1990). An act or a practice is deceptive or unfair if it has the capacity or tendency to deceive. *Commonwealth ex rel. Zimmerman v. Nickel, 26 Pa. D. & C.3d 115, 120 (Pa. D. & C. 1983)* citing *FTC v. Raladam Company, 316 U.S. 149, 152, 62 S. Ct. 966, 86 L. Ed. 1336, 34 F.T.C. 1843*; *316 U.S. 149, 62 S. Ct. 966, 968, 86 L. Ed. 1336, 34 F.T.C. 1843 (1942)*; see also *In re Patterson, 263 B.R. 82, 94 (Bankr. E.D. Pa. 2001)* (defining deceptive act as "act of intentionally giving a false impression or a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it"). Christopher has not asserted any facts which would lead to Associates' liability for deceptive conduct. As stated above, the only specific conduct he attributes to Associates is accepting more than the remaining principal on Christopher's loans when he refinanced. There were no representations and no contact between Christopher and Associates. Therefore, the overcharging [*12] also cannot constitute deception.

Under the UTPCPL heading of his complaint, Christopher also asserts that Associates and the other defendants "imposed credit costs and charges expressly prohibited by Federal and Pennsylvania law, which is a *per se* unfair or deceptive practice." Christopher does not mention which charges by Associates were expressly prohibited. By omitting these facts, he has not adequately put the defendant on notice of the essential elements of the plaintiff's cause of action. I cannot credit his bald assertions of misconduct without any supporting facts. Thus, I will dismiss Christopher's UTPCPL claim with leave to amend if he can assert facts to give Associates notice of their alleged imposition of illegal charges. n4

n4 Because Christopher has not offered any facts describing the charges, I cannot analyze whether his claim properly falls under UPTCPL. Upon cursory review, I doubt that he will be able to survive summary judgment on this claim without asserting any contact with Associates.

[*13]

2. Count VI--Fraud

The heading of Count VI of Christopher's complaint states: "Fraud - All Defendants." In his response to Associates' motion to dismiss, Christopher concedes that he has no fraud claim against Associates. n5 Therefore, I will dismiss the fraud claim against Associates.

n5 He states, "While plaintiff could have been clearer in the proofreading and final draft of the heading, Associates could not believed count VI was directed to it as each of the averments refer specifically to the loan broker."

### 3. Count VII--RESPA

Christopher also seems to assert a RESPA claim against Associates. n6 In this count, however, he only mentions the "lender" (presumably the original lender on each loan) and the loan broker (Kelly). Associates was merely assigned two of the loans; Christopher does not assert that they had any involvement in inducing him to enter into the loans. Therefore, I will dismiss the RESPA claim against Associates, again with leave to amend if Christopher can specify on what basis [*14] he seeks to hold Associates liable.

n6 In his response to Associates' motion to dismiss, he notes that "counts IV, V, and VII are directed to all defendants." Later in his response, however, Christopher argues that this court lacks jurisdiction over his claims against Associates because they are only state law claims. Even later in his response, he notes that subject matter jurisdiction is premised on the viability of the RESPA claim. As I discuss hereinafter, I have jurisdiction regardless of the survival of the RESPA claim because Christopher's claims against Associates form part of the same claim or controversy as his federal claims against First Mutual and Kelly.

### 4. Count IX--Breach of Contract

Christopher bases his breach of contract claim against Associates on his allegations that Associates demanded amounts in excess of that due under the mortgage and that the interest and finance charges in the loan held by Associates exceeded permissible amounts. Associates argues that Christopher's breach of contract [*15] claim is barred by the applicable statute of limitations.

"The failure of a party to a contract to perform in accordance with its terms gives the other party a cause of action for a breach." 1 P.L.E. CONTRACTS 491 (2005). In a contract case, a cause of action accrues when the breach occurs. *Romeo & Sons v. P.C. Yezbak & Son, 539 Pa. 390, 652 A.2d 830. 832 (Pa. 1995)*. Although Christopher does not specify which contract, or mortgage agreement, was breached by Associates, Christopher does assert that to satisfy both loans Associates received more than the principal. There are only two loans and I will give him the benefit of the doubt by assuming that he meant both loans that were eventually assigned to Associates. If Associates demanded more than the amount due to them under the mortgages, as Christopher asserts, then they breached the contracts. In this case, the alleged breach must have occurred at the time of closing, when the mortgage was extinguished. The 1997 loan closed on November 30, 1998. The 1998 loan closed on January 31, 2000.

The general statute of limitations for contract claims is four years. See *42 Pa. Cons. Stat. § 5525(a)(8)* [*16] . Pennsylvania, however, provides a twenty year statute of limitations for contracts under seal. *42 Pa. Cons. Stat. § 5529.* "An instrument containing the word 'seal' or its equivalent is deemed a sealed instrument if the maker adopts the seal." See *Klein v. Reid, 282 Pa. Super. 332, 422 A.2d 1143, 1144 (Pa. Super. 1980)*. This presumption can be rebutted. See id.; see also *Federal Deposit Ins. Corp. v. Barness, 484 F. Supp. 1134, 1149 n.9 (E.D. Pa. 1980)* ("The presence of the printed word "(Seal)" opposite defendant's signature on the promissory note gives rise to only a rebuttable presumption that defendant adopted the seal, therby rendering the note a sealed instrument.").

The 1998 mortgage contains the typed words "IN WITNESS WHEREOF, I hereunto set my hand and official seal." It also contains the word "seal" by each of the witness' signatures. Associates has not yet presented any evidence to rebut the presumption that the contract was not under seal. It was printed on the original documents; it was not later added by Christopher or a agent of First Mutual or Associates. The 1998 mortgage, therefore, was a contract [*17] under seal and subject to the twenty year statute of limitations.

Christopher has not asserted that the 1997 mortgage was a contract under seal, so any contract claims relating to that mortgage are time-barred. Therefore, I will dismiss any claims he has regarding the 1997 mortgage for statute of limitations purposes unless he asserts that they were executed under seal and thus fall under the longer statute of limitations.

In this section of the complaint, Christopher also asserts his rights to three times the amount of the excess

charges paid, plus reasonable attorneys fees and costs, citing *41 Pa. Cons. Stat. § § 502* and *503*. These statutes prohibit usury and provide for a four year statute of limitations. See *41 Pa. Cons. Stat. § 502*. As I discussed above, the date the alleged breach occurred was January 31, 2000. Christopher's cause of action for usury expired four years from that date, on January 31, 2004, and his complaint in this case was not filed until January 28, 2005. Therefore, any cause of action under *41 Pa. Cons. Stat. § § 502* or *503* is dismissed with prejudice.

5. Jurisdiction

In his [*18] response, Christopher seems to contest this court's jurisdiction over his claims against Associates and asks that I remand the case to state court. If I dismiss the RESPA claim against Associates, Christopher argues, I must remand the remaining claims against Associates to state court. As *28 U.S.C. § 1367* provides:

> In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

The key question in these inquiries is whether the state and federal claims form a "common nucleus of operative fact." See *Lyon v. Whisman, 45 F.3d 758, 760 (3d Cir. 1995)*. As to this test, it has been stated that "mere tangential overlap of facts is insufficient, but total congruity between the operative facts . . . is unnecessary." *Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 105 (3d Cir. 1988)*. [*19]

Christopher's state claims meet this threshold. His federal claims against First Mutual and Kelly, under the Equal Credit Opportunity Act ("ECOA"), the Home Ownership Equity Protection Act ("HOEPA"), the Real Estate Settlement Procedures Act ("RESPA"), all surround the four loans issued to Christopher, including their creation, terms, transfers, and satisfaction. Christopher's state claims, against First Mutual, Kelly, and Associates, are based on the same set of facts. Due to this substantial overlap, Christopher should not be expected to litigate and First Mutual and Kelly should not have to defend this action in two separate jurisdictions. The claims against Associates overlap the other claims against First Mutual and Kelly; three of the counts are directed concurrently to First Mutual, Kelly and Associates. Under *§ 1367*, I also have jurisdiction over Christopher's state law claims against Associates. Therefore, I have jurisdiction over all of Christopher's federal and state claims.

An appropriate order follows.

ORDER

AND NOW, this 20th day of January 2006, upon consideration of defendant's motion to dismiss, Plaintiff's response, and defendant's reply thereto, and for [*20] the reasons set forth in the accompanying memorandum, defendant's motions to dismiss are denied as to Christopher's breach of contract claim against Associates based upon satisfaction of the 1998 mortgage. The defendants' motions to dismiss are GRANTED as to all other claims.

Plaintiff is granted leave to amend his Complaint within thirty days regarding his claims against Associates under UTPCPL, RESPA, and his breach of contract claim premised upon the 1997 mortgage. If plaintiff intends to assert a fraud claim under UTPCPL he must plead the elements of common law fraud. All other claims against Associates for which defendant's motions are granted are DISMISSED WITH PREJUDICE.

s/

THOMAS N. O'NEILL, JR., J.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**(Cite as: 2005 WL 1242157 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
THE LITIGATION TRUST OF MDIP, INC.
(formerly known as Mosler, Inc.) and Its
Affiliates as Assignee of Certain Claims Pursuant to
the Second Amended Joint
Plan of Liquidation of MDIP, Inc. and Its Affiliates,
Plaintiffs,
v.
Michael **RAPOPORT**, et al., Defendants.
**No. Civ.A. 03-779GMS.**

May 25, 2005.

Michael F. Bonkowski, Mark Minuti, Saul Ewing
LLP, Wilmington, DE, for Plaintiffs.

Paul J. Lockwood, Eric M. Davis, Skadden, Arps,
Slate, Meagher & Flom, Wilmington, DE, for
Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 Presently before the court are six motions: a
motion to dismiss Counts I and II of the Amended
Complaint for lack of subject matter jurisdiction
(D.I.67), a motion for partial summary judgment as
to Counts I and II (D.I.84), a motion to strike the
plaintiff's summary judgment affidavits (D.I.114), a
motion to strike the plaintiff's jury demand
(D.I.127), a motion *in limine* requesting the court to
exclude evidence and testimony not disclosed in
plaintiff's responses to contention interrogatories

(D.I.124), and a motion *in limine* requesting the
court to preclude evidence of events that took place
prior to August 6, 1998 (D.I.125). For the following
reasons, the court will grant the motion to dismiss
Counts I and II, and deny the remaining motions as
moot insofar as they pertain to Counts I or II.

II. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(1) may present either a facial or
factual challenge to subject matter jurisdiction.
*Mortensen v. First Fed. Sav. and Loan Ass'n,* 549
F.2d 884, 891 (3d Cir.1977). The present motion
presents a facial challenge to the complaint because
the jurisdictional facts are not in dispute. Such a
motion requires the court to consider the allegations
of the Amended Complaint as true and to make all
reasonable inferences in the plaintiff's favor. *See id.*

III. BACKGROUND

The following facts are alleged in the Amended
Complaint, which the court assumes to be true for
the purpose of deciding this motion. Mosler, Inc.
("Mosler"), a Delaware corporation, traces its roots
back to 1867, when the Mosler-Bahmann Safe
Company was founded by Gustav Mosler. (D.I. 28
¶ 17.) From 1967 to 1990, Mosler went through a
series of buyouts that ultimately resulted in 59% of
Mosler's stock being held by Kelso & Co., Inc.
("Kelso") and a few of Mosler's senior managers.
(Id.¶¶ 21-23.) This permitted Kelso to "install"
defendants William Marquard, Thomas Wall, and
Robert Young (collectively, "the Kelso Directors")
on Mosler's Board of Directors. (Id.¶ 2.) During its
first few years under this ownership structure,
Mosler flourished--its sales increased every year
from 1992 to 1995. (Id.¶ 26.)

Then, in February 1995, Mosler's Chairman and
CEO sent a memo to the Kelso Directors requesting
their "concurrence to" the hiring of Michel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**(Cite as: 2005 WL 1242157 (D.Del.))**

Rapoport as the next CEO, "which [is] consistent with our succession planning." (Id.¶ 27.) However, succession planning had not been discussed at either of the two board meetings prior to February 1995, and the memo contained minimal information regarding Rapoport himself. (Id.¶¶ 28-30.) Although no alternative candidates were considered, the inexperienced and unqualified Rapoport was hired as Mosler's CEO. (Id.¶¶ 31-33.) Mosler subsequently entered a period of decline, precipitated by "numerous reckless and misinformed decisions" and mismanagement by Rapoport and the Kelso Directors. (Id.¶ 35.)

**\*2** For example, in October 1998, Mosler acquired a security equipment business known as LeFebure. (Id.¶ 36.) However, during the acquisition process, Rapoport failed to hire outside consultants to assist with due diligence and valuation. Instead, he relied upon numbers provided by LeFebure's parent company, De La Rue, [FN1] and by Mosler's internal personnel. (Id. ¶ 39.) Furthermore, the Kelso Directors did not inform themselves as to the adequacy of Rapoport's due diligence and valuation. (Id.¶ 41.) Then, at a special meeting of Mosler's Board in September 1998, the LeFebure acquisition was approved. This occurred in spite of the fact that no tangible information concerning the acquisition was provided to the Kelso Directors; the minutes of the special meeting merely reflect "extensive discussion" about the acquisition. (Id.¶ 40.) As it turned out, De La Rue overstated LeFebure's financial condition and, as a result, Mosler "grossly overpaid" for LeFebure. (Id.¶ 42.)

> FN1. The precise details of the relationship between LeFebure and De La Rue are not set forth in the complaint, but those details are unimportant here.

The subsequent integration of LeFebure's business did not go well either. Without any objection from the Kelso Directors, Rapoport fired many key LeFebure employees who were essential to the integration process. (Id.¶¶ 43- 44.) Consequently, "many of the former LeFebure accounts were understaffed and poorly serviced, and Mosler had significant difficulty synchronizing LeFebure's

business practices with its own, further minimizing the benefits that Mosler recognized from the LeFebure Acquisition." (Id.¶ 43.) Rapoport and the Kelso Directors also failed to heed specific warnings, given to them before the acquisition, pertaining to "systems issues that would arise from the need to integrate LeFebure's systems with Mosler's," resulting in a "serious deterioration of Mosler's liquidity." (Id.¶ 45.)

Then in 1999, Mosler attempted to update the software it used to process orders, collect accounts receivable, etc. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house IT employees, among others, that outside specialists would be required for a project of this type. (Id.¶ 47.) Nevertheless, Rapoport did not hire outside specialists, and without objection from the Kelso Directors, endeavored to complete the project using only Mosler's in-house IT employees. (Id.¶ 48.) But because these employees were not qualified to make the updates, the project became "a disaster." Thereafter, Mosler was unable to "timely and accurately invoice customers and collect receivables, accurately track its inventory and timely provide needed parts to its customers, and generate the reliable financials required to access its operating credit facilities." (Id.¶ 50.) As a result, Mosler's financial condition further deteriorated. (Id. ¶ 51.)

During this time, Rapoport and the Kelso Directors also failed to institute standard business controls. For example, they did not "address sustained and systemic flaws in Mosler's inventory management system," resulting in untimely deliveries to customers, and hence, damage to Mosler's goodwill. (Id.¶ 53.) Mosler's accounts receivable were also rapidly increasing, but neither Rapoport nor the Kelso Directors instituted standard internal control procedures to ensure timely invoicing. (Id.¶ 54.) Moreover, the problems with the accounts receivable were not discussed at either the February or May 1999 Board meetings. (Id.¶¶ 56-57.) Mosler's contemporaneous SEC statements further reflect the financial troubles the company was experiencing. Between 1995 and 1999, Mosler reported an increase in uncollected accounts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**(Cite as: 2005 WL 1242157 (D.Del.))**

receivable from $46 million to nearly $100 million. (Id.¶ 55.) Between 1998 and 1999, Mosler saw its net income go from the black to the red, and between 1998 and 2000, its earnings [FN2] declined while its net sales increased.

> FN2. The earnings referred to here are the earnings before interest, taxation, depreciation, and amortization, commonly known as EBITDA.

**\*3** The deterioration of Mosler did not go unnoticed. On two occasions, in 1999 and 2000, Mosler's outside auditor advised the Board of "reportable conditions" and "material weaknesses" regarding the company's internal controls. However, neither Rapoport nor the Kelso Directors took any corrective action. (Id.¶¶ 65-73.) Furthermore, in addition to experiencing "unreasonably high turnover of certain officers and key employees" (id. ¶ 59), Mosler also suffered from internal unrest. On at least ten occasions between the end of 1997 and the beginning of 2001, certain Kelso Directors were told by senior Mosler employees that the company had "serious business problems" and that Rapoport was mismanaging the company. (Id.¶ 60.) Yet, the Kelso Directors failed to investigate these complaints and defended Rapoport after he took retaliatory action against two of the senior employees. (Id.¶¶ 60-61.)

By the end of 2000, Mosler began to default on loans and on interest payments due on its bonds. (Id. ¶ 77.) Although Mosler pursued potential buyers, it ultimately filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the District of Delaware. (Id.¶¶ 78-79.) Mosler, since renamed MDIP, Inc. ("MDIP"), sold its assets at auction for nearly $28 million, but the proceeds were insufficient to pay all of its creditors. (Id.¶¶ 79- 80.) Therefore, pursuant to the approved Chapter 11 plan, the MDIP Litigation Trust, Inc. (the "Trust") was created for the benefit of the unpaid creditors to pursue certain claims. (Id.¶¶ 1, 5.) More specifically, the Trust "is required to prosecute all causes of action assigned to the Trust by Mosler ... for the benefit of holders of Allowed Class 3 and Allowed Class 4 Claims." (Id.¶ 7.)

"Moreover, under the Plan, each holder of such a Claim is a Litigation Trust Beneficiary, each of whom has received a beneficial interest in the Litigation Trust Assets in accordance with the Plan." (Id.)

Pursuant to this directive, the Trust, in its own name, brought the present action against the Kelso Directors, Rapoport, and Kelso. Count I, based on the allegations outlined above, seeks to recover damages from the Kelso Directors for breach of the fiduciary duties of due care, good faith, and loyalty. (Id.¶¶ 81-84.) Count II, also based on the allegations outlined above, seeks to recover damages from Rapoport under the same theory. (Id. ¶¶ 85-88.) Counts III and IV are avoidance and recovery of constructively fraudulent transfer claims against Kelso, under 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. (Id.¶¶ 89-101.) However, the parties have since stipulated to the dismissal of Count III, and to a reduction in the damages sought in Count IV from $800,000 to $450,000. (D.I.99.)

IV. DISCUSSION

The defendants argue that Counts I and II, which are state law claims, should be dismissed for lack of subject matter jurisdiction because (1) there is incomplete diversity, and (2) the exercise of supplemental jurisdiction would be inappropriate. Each of these arguments is addressed below.

A. Diversity of Citizenship

**\*4** The diversity jurisdiction statute provides, in relevant part:
> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States[.]

28 U.S.C. § 1332(a)(1) (2004). Since *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806), the Supreme Court has "interpreted the diversity statute to require 'complete diversity' of citizenship." *C.T. Carden v. Arkoma Assoc.,* 494 U.S. 185, 187, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). That means

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                   Page 4

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**(Cite as: 2005 WL 1242157 (D.Del.))**

the citizenship of every plaintiff must be diverse from the citizenship of every defendant, unless an independent basis for original jurisdiction exists between the non-diverse parties. *See Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 381, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). For an artificial entity, unless that entity is a corporation, its citizenship "depends on the citizenship of ... 'each of its members .'" ' *Id.* at 195-96 (citations omitted). In *C.T. Carden,* the Supreme Court established that this is a bright-line rule only to be modified by Congress, even where strong policy considerations would favor an exception. *See C.T. Carden,* 494 U.S. at 196- 97. [FN3] However, no such statutory modification exists in this case. [FN4]

> FN3. Where an artificial entity is the named party whose citizenship is in question, the court may not look to the citizenship of unnamed parties. *C.T. Carden,* 494 U.S. at 187 n. 1. Thus, in the case of a litigation trust, even if application of the "real party to the controversy" test, *see generally Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), would dictate that the citizenship of the trustees should be determinative for the purpose of diversity, the court may not consider their citizenship unless they are named parties, *C.T. Carden,* 494 U.S. at 187 n. 1.

> FN4. The Trust argues that *C.T. Carden* is distinguishable because that case involved a partnership rather than a litigation trust. However, as the defendants point out, the Court's broad language leads to the inescapable conclusion that litigation trusts are subject to its holding as well:
> Thus, the course we take today does not so much disregard the policy of accommodating our diversity jurisdiction to the changing realities of commercial organization, as it honors the more important policy of leaving that to the people's elected representatives. Such accommodation is not only performed more legitimately by Congress than by

courts, but it is performed more intelligently by legislation than by interpretation of the statutory word "citizen." The 50 States have created, and will continue to create, a wide assortment of artificial entities possessing different powers and characteristics, and composed of various classes of members with varying degrees of interest and control. Which of them is entitled to be considered a "citizen" for diversity purposes, and which of their members' citizenship is to be consulted, are questions more readily resolved by legislative prescription than by legal reasoning, and questions whose complexity is particularly unwelcome at the threshold stage of determining whether a court has jurisdiction. We have long since decided that, having established special treatment for corporations, we will leave the rest to Congress; we adhere to that decision.
*C.T. Carden,* 494 U.S. at 197. Thus, even if the court were inclined to agree with the Trust's policy arguments as to why the citizenship of the Trust itself should control, the Supreme Court has shut down that line of inquiry and left it up to Congress.

Consequently, the court must determine the citizenship of the Trust by looking to the citizenship of its "members," i.e., its beneficiaries. [FN5] *In re A.H. Robins Co., Inc.,* 197 B.R. 575, 579 (Bankr.E.D. Va. June 30, 1995). [FN6] As such, the citizenship of each creditor-beneficiary must be diverse from the citizenship of each of the Kelso Directors. [FN7] *Id.* Based on the court's review of the submitted list of creditors, numerous Class 3 and Class 4 creditors are citizens of the same states as the Kelso Directors. (See D.I. 144 Ex. B.) [FN8] Therefore, as the case is currently captioned, the court does not have diversity jurisdiction over Counts I and II. Moreover, even if the trustees were named plaintiffs and were the "real parties to the controversy," diversity of citizenship would still be lacking because both trustee Julie Dien Ledoux and defendant Wall are residents of New York. (D.I. 28

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**(Cite as: 2005 WL 1242157 (D.Del.))**

¶ 11; D.I. 70 Ex. 1.)

FN5. The court's conclusion that it must look to the citizenship of the Trust's beneficiaries may rely on the assumption that the Trust has the capacity to sue in its own name. *See Allegis Group, Inc. Contractors Health Plan Trust v. Conn. Gen. Life Ins. Co.,* No. 04-16, 2004 WL 1289862, at *4 n. 3 (D.Md. June 10, 2004) . However, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the question of whether there exists a legal basis for making such an assumption, or whether such an assumption is necessary in the first place.

FN6. The Trust argues that *A.H. Robins,* in which the court looked to the citizenship of the defendant-trust's beneficiaries, is distinguishable because that case involved a products liability claimants trust rather than a litigation trust. (D.I. 145 at 3.) Once again, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the Trust's argument.

FN7. The citizenship of Kelso itself is irrelevant because there is an independent basis for original jurisdiction as to Count IV, namely federal question jurisdiction under 28 U.S.C. § 1331 (1993). *Romero,* 358 U.S. at 381.

FN8. Technically speaking, the court's reliance upon "matters outside the pleadings" converts this motion to dismiss into a motion for summary judgment. Fed.R.Civ.P. 12(c). However, if the material facts are not in dispute, then the result is the same regardless of the label attached to the motion. The Trust points out that "there has been no discovery in this action directed specifically to the issue

of the citizenship of the beneficiaries," but fails to actually contest the list of creditor-beneficiaries submitted by the defendants. (D.I. 145 at 4.) Since the Trust is presumably in the best position to know the citizenship of its own beneficiaries, and since it does not contest the submitted list, the court has no reason to believe that the material facts are in dispute. Therefore, given the Trust's concession that, based on the list of creditors, "there would not be complete diversity if the citizenship of all beneficiaries were taken into account" (id.), the court is justified in its finding.

The Trust disagrees with this analysis. Instead, it argues, the Trust's status as a litigation trust arising from a bankruptcy proceeding qualifies it for a "special rule" that " '[i]t is the citizenship of the bankrupt rather than the citizenship of the trustee in bankruptcy that is determinative for diversity jurisdiction." ' *Carlton v. BAWW, Inc.,* 751 F.2d 781, 787 (5th Cir.1985) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3606). However, the "special rule" extracted from Wright & Miller is based on a 1906 Supreme Court interpretation of a statute that was repealed in 1978. *See Bush v. Elliot,* 202 U.S. 477, 26 S.Ct. 668, 50 L.Ed. 1114 (1906); 11 U.S.C. § 46 (repealed 1978). The court is cognizant of the fact that, in spite of § 46 being repealed nearly twenty seven years ago, the "special rule" appears to have some continued viability in certain jurisdictions. *See, e.g., Carlton,* 751 F.2d at 787; *Pupo v. Chadwick's of Boston, Inc.,* No. 03-564, 2004 WL 2480399 (S.D.N.Y. Nov.4, 2004) ; *Official Plan Comm. of Omniplex Comm. Group, LLC, v. Lucent Tech., Inc.,* 344 F.Supp.2d 1194 (E.D.Mo. July 9, 2004). *But see Samson v. Allis-Chalmers Prod. Liab. Trust,* No. 90-0139, 1990 WL 87394 (E.D.Pa. June 21, 1990). Nevertheless, it is clear that "the reasoning underlying this rule rests on a shaky foundation," *Lucent,* 344 F.Supp.2d at 1196, so the court is reluctant to apply it. Bearing that in mind, the Trust admits it is not in fact a bankruptcy trustee that would have been subject to the now-repealed § 46 in the first place. (D.I. 78 at 11.) In essence, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**(Cite as: 2005 WL 1242157 (D.Del.))**

Trust is asking the court not only to apply a repealed statute, but also to apply the repealed statute *by analogy*. But if applying a repealed statute is dubious (which it is), then applying a repealed statute by analogy is simply beyond the pale. Furthermore, even if § 46 had not been repealed, the fact that the Trust's *"sole* purpose is to liquidate and distribute MDIP's assets for the benefit of unsecured creditors" (D.I. 78 at 11) may not have been a sufficient reason to apply the "special rule" by analogy anyway. *Cf. In re Resorts Int'l, Inc.,* 372 F.3d 154, 169 (3d Cir.2004) ("Though the Litigation Trust's assets, the proceeds from the litigation claims, were once assets of the estate, that alone does not create a close nexus to the bankruptcy plan or proceeding sufficient to confer bankruptcy jurisdiction."). Therefore, the court will decline the Trust's invitation to apply the "special rule" in this case.

**\*5** Thus, diversity jurisdiction is lacking and the court must dismiss Counts I and II unless the exercise of supplemental jurisdiction is appropriate.

B. Supplemental Jurisdiction

The supplemental jurisdiction statute provides, in relevant part:

  (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....
  ...
  (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction[.]
28 U.S.C. § 1367 (1993).

In this case, the court need not determine whether the state law claims "are so related to" the federal law claim "that they form part of the same case or

controversy" because it is abundantly clear that the state law claims "substantially predominate[ ] over" the federal law claim. In the fifteen-page section of the Amended Complaint captioned "Allegations Relevant To All Claims," nary a word can be found that relates to the allegedly fraudulent transfers from Mosler to Kelso. (See D.I. 28 ¶¶ 17-80.) In fact, it is not until the twenty-fourth page of the Amended Complaint's twenty-six pages that these transfers are vaguely described in Counts III and IV. (Id.¶¶ 89-101.) Moreover, after the dismissal of Count III, the damages sought in Count IV was reduced from $800,000 to $450,000 (D.I.99), whereas the damage sought in Counts I and II is in the neighborhood of $200,000,000 (D.I. 78 at 2). Clearly, both in terms of the facts alleged and the damages sought, the state law claims substantially predominate over the federal law claims. Thus, the exercise of supplemental jurisdiction in this case would truly permit the tail to wag the dog, and that is something the court will not permit.

V. CONCLUSION

Because the court does not have original jurisdiction over Counts I and II, and because the court declines to exercise supplemental jurisdiction, subject matter jurisdiction is lacking and the motion to dismiss must be granted.

*ORDER*
IT IS HEREBY ORDERED THAT:
  1. The defendants' motion to dismiss (D.I.67) be GRANTED;
  2. Counts I and II of the Amended Complaint (D.I.28) be DISMISSED;
  3. The defendants' motion for summary judgment (D.I.84) be DENIED as moot;
  4. The defendants' motion to strike the plaintiff's summary judgment affidavits (D.I.114) be DENIED as moot;
  5. The defendants' motion to strike the plaintiff's jury demand (D.I.127) be DENIED as moot;
  6. The defendants' motion *in limine* requesting the court to exclude evidence and testimony not disclosed in plaintiff's responses to contention interrogatories (D.I.124) be DENIED as moot insofar as it pertains to Counts I or II; and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 7

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**(Cite as: 2005 WL 1242157 (D.Del.))**

*\*6* 7. The defendants' motion *in limine* requesting the court to preclude evidence of events that took place prior to August 6, 1998 (D.I.125) be DENIED as moot.

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00779 (Docket) (Aug. 05, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

LEXSEE

**PNC BANK, N.A., as Trustee for the Tunnelton Mining Company Black Lung Bene-
fit Trust on behalf of and for the benefit of the former employees of the Tunnelton
Mining Company Marion Mine v. PPL ELECTRIC UTILITIES CORPORATION,
f/k/a PENNSYLVANIA POWER & LIGHT COMPANY; PENNSYLVANIA
MINES, LLC, f/k/a PENNSYLVANIA MINES CORPORATION, Appellants**

No. 05-3109

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*189 Fed. Appx. 101; 2006 U.S. App. LEXIS 15850; 2006-2 U.S. Tax Cas. (CCH)
P50,376*

**May 18, 2006, Argued
June 23, 2006, Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT
COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States Dis-
trict Court for the Western District of Pennsylvania.
(D.C.Civil No. 03-cv-01789). District Judge: Honorable
Donetta W. Ambrose.

**COUNSEL:** David J. Laurent, [ARGUED], Babst, Cal-
land, Clements & Zomnir, Pittsburgh, PA, Counsel for
Appellants.

Robert V. Campedel, [ARGUED], Mark A. Willard,
Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA,
Counsel for Appellee.

**JUDGES:** Before: RENDELL and VAN
ANTWERPEN, Circuit Judges, and ACKERMAN *,
District Judge.

* Honorable Harold A. Ackerman, Senior District
Judge for the District of New Jersey, sitting by
designation.

**OPINION:**

OPINION OF THE COURT

RENDELL, Circuit Judge.

I.

This appeal arises from a grant of summary judg-
ment against PPL Electric Utilities Corporation ("PPL")
and Pennsylvania Mines, LLC ("PA Mines") (collec-
tively "Appellants") and in favor of PNC Bank ("PNC").
PNC is Trustee of the Tunnelton Mining Company Black
Lung Benefit Trust ("Tunnelton Trust"). On May 31,
2001, PA Mines demanded a trust distribution of [*2]
"excess assets" of the Tunnelton Trust under *section
501(c)(21) of the Internal Revenue Code*. PNC filed an
action for declaratory judgment in the Court of Common
Pleas for Allegheny County, Pennsylvania, seeking a
declaration that the Tunnelton Trust does not contain
"excess assets" that can be used to pay for retiree health
care benefits under *26 U.S.C. § 501(c)(21)*. PA Mines
removed the case to federal court and filed a two-count
counterclaim for (1) breach of fiduciary duty for failure
to pay the "excess assets" and (2) allegedly taking exces-
sive fees for administration of the Trust assets. n1 PNC
filed a motion for summary judgment, arguing that there
were no "excess assets" in the Tunnelton Trust under *§
501(c)(21)* and, as a consequence, that PNC had not
breached its fiduciary duty by refusing to make pay-
ments. The District Court granted PNC's motion for
summary judgment based upon its determination that the
Tunnelton Trust did not contain excess assets under *§
501(c)(21)*.

n1 After discovery, PA Mines withdrew
Count II of the counterclaim with regard to PNC's
fees.

[*3]

189 Fed. Appx. 101; 2006 U.S. App. LEXIS 15850, *;
2006-2 U.S. Tax Cas. (CCH) P50,376

After the District Court granted summary judgment, PA Mines and PPL filed a motion for leave to amend their counterclaim. Specifically, Appellants sought to amend their counterclaim to add a new claim for breach of fiduciary duty against PNC on behalf of and for the benefit of the former employees of the Tunnelton Mining Company's Marion Mine. The District Court did not exercise its discretion to permit PPL and PA Mines to amend their complaint, finding that they lacked standing to bring their new claim. n2

> n2 Though not reaching the issue, the District Court also noted that it was doubtful that federal subject matter jurisdiction existed over the proposed state-law breach of fiduciary duty claim.

II.

We exercise plenary review over the District Court's grant of summary judgment, and apply the same standard the District Court was required to apply. *Stratton v. E.I. DuPont DeNemours & Co., 363 F.3d 250, 253 (3d Cir. 2004).* Summary judgment is appropriate if there are no genuine issues of material [*4] fact presented and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* We resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004).* We review the District Court's denial of leave to amend for abuse of discretion. *Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 116 (3d Cir. 2003);Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000).*

III.

The Federal Black Lung Benefits Act ("BLBA"), *30 U.S.C. § § 901, et seq.*, obligates coal mine operators to provide certain benefits to their employees who are stricken with pneumoconiosis, also known as black lung disease, due to exposure to coal dust during their employment. PA Mines (an indirect subsidiary of PPL) is subject to the BLBA. Prior to September 25, 1992, PA Mines owned and operated several mining companies, one of which was the Tunnelton Mining Company ("TMC"). During the course of operating its mining [*5] companies, PA Mines provided BLBA benefits for its employees through a Black Lung Benefits Trust entitled PMC Black Lung Benefit Trust ("PMC Trust"). Creating such a trust is one of several options available to mine operators under federal regulations which seek to secure the payment of benefits as a result of the long-term nature of black lung disease and the threat of insolvency in the mining business.

In 1991, PA Mines decided to get out of the mining business and either closed or sold its mines and mining companies, but remains in existence to satisfy certain post-closing liabilities and obligations. On September 25, 1992, as part of its coal mining divestiture, PA Mines entered into a Stock Purchase Agreement with Mon Valley Steel Co., Inc., wherein PA Mines sold and Mon Valley purchased all of the capital stock of TMC. As part of this transaction, PA Mines agreed to continue to pay health and accident insurance benefits for retirees of TMC pursuant to the Coal Industry Retiree Health Benefits Act (commonly known as the Rockefeller Act), *26 U.S.C. § § 9701, et seq.* As part of the sale of all of the stock of TMC to Mon Valley, TMC established the Tunnelton [*6] Trust for purposes of satisfying its BLBA obligations to miners who were employees of TMC prior to the sale and either retired or continued on as employees after the sale and later retired. PNC was made the trustee for the Tunnelton Trust. $ 8,415,000 was transferred from the PMC Trust to the Tunnelton Trust based upon a liability study performed by PA Mines' actuaries, pursuant to the terms of both the Stock Purchase Agreement and the Tunnelton Trust Agreement.

After the September 25, 1992 transaction, Congress amended *section 501(c)(21)* (effective October 24, 1992) to allow the payment of "excess assets" from the assets of black lung benefit trusts to employers for the payment of accident or health benefit premiums of retired miners as required by the Rockefeller Act.

TMC, which was charged with processing the BLBA claims of its employees and replenishing the funds which comprise the assets of the Tunnelton Trust if necessary, eventually terminated its mining operations and filed for bankruptcy in 1994.

On or about May 31, 2001, PA Mines demanded that PNC, as Trustee of the Tunnelton Trust, pay $ 3,157,230 of the Tunnelton Trust assets to PA Mines under *section 501(c)(21)(A)(i)(IV) of the Internal Revenue Code* [*7] for the purpose of reimbursing PA Mines for payments it had made under the Rockefeller Act, with respect to non-black lung health benefits for TMC's and PA Mines' retired miners. PNC refused PA Mines' request on the grounds that *IRC section 501(c)(21)* only permits "excess" trust assets to be used for payment of such benefits. PNC contends that there are no "excess assets" of the Trust available to pay PA Mines' demand.

In light of, among other things, the continuing demand of PA Mines for payment, the bankruptcy of TMC, and the fact that no "Employer" exists to contest PA Mines' demands or to replenish the assets of the Tunnelton Trust in the event of depletion, PNC, as Trustee of

189 Fed. Appx. 101; 2006 U.S. App. LEXIS 15850, *;
2006-2 U.S. Tax Cas. (CCH) P50,376

the Tunnelton Trust, brought an action for declaratory judgment in the Court of Common Pleas for Allegheny County, Pennsylvania. On November 20, 2003, PA Mines and PPL removed the action to federal court and filed counterclaims against PNC. n3

n3 We have subject matter jurisdiction over this claim brought under Pennsylvania's declaratory judgment statute, and originally in Pennsylvania state court, pursuant to *28 U.S.C. § 1331.* We conclude that PNC's state-law action gives rise to federal-question jurisdiction because "it appears from the complaint that the right to relief depends upon the construction or application of federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 125 S. Ct. 2363, 2367, 162 L. Ed. 2d 257 (2005)* (internal brackets and quotation omitted). We find that PNC's state-law declaratory judgment act claim raises a substantial federal question-the interpretation of *section 501(c)(21) of the Internal Revenue Code*-over which the District Court properly exercised removal jurisdiction. Our jurisdiction is "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of *§ 1331.*" *Id.*

[*8]

On October 15, 2004, PNC moved for summary judgment. On February 22, 2005, the District Court granted summary judgment for PNC, declaring that there are no excess assets of the Tunnelton Trust under *section 501(c)(21) of the IRC* and that PNC is not required to pay any portion of the Trust's assets to PA Mines or PPL. The District Court also dismissed the counterclaims against PNC, but afforded PA Mines and PPL leave to file a motion to amend their counterclaim to add a claim under federal law for breach of fiduciary duty. On March 22, 2005, PA Mines and PPL moved for leave to file an amended counterclaim. Specifically, Appellants sought to amend their counterclaim to add a new claim for breach of fiduciary duty against PNC on behalf of and for the benefit of the former employees of the TMC Marion Mine. The District Court denied PA Mines' and PPL's motion, finding that they did not have standing to bring this new claim.

IV.

In granting summary judgment, the District Court first addressed the narrow issue of whether there were any "excess assets" in the Tunnelton Trust under *section 501(c)(21)(C)(ii)* and found that there were not. This was based upon its conclusion [*9] that because the Tunnel-

ton Trust's first taxable year did not end until March 31, 1993-more than five months after the enactment of *section 501(c)(21)(C)*-the calculation of "excess assets" resulted in a finding of *no* excess assets. The District Court reasoned that the Tunnelton Trust did not have any taxable years ending *prior* to the date of enactment and, thus, could not have any excess assets under the *(C)(ii)* calculation. n4 Because the lesser of the *section 501(c)(21)(C)(i)* and *(ii)* amounts is zero, there are no excess assets in the Tunnelton Trust available to PA Mines. The District Court found that PNC was also entitled to summary judgment on PA Mines' counterclaim for breach of fiduciary duty because there could be no breach of fiduciary duty for failure to disburse excess assets since there were no "excess assets" in the Tunnelton Trust for PNC to disburse.

n4 The excess asset calculation relies on the following mathematical calculation:

(ii) the excess (if any) of -

(I) the sum of a similar excess determined *as of the close of the last taxable year ending before the date of the enactment of this subparagraph* plus earnings thereon as of the close of the taxable year preceding the taxable year involved, over

(II) the aggregate payments described in subparagraph (A)(i)(IV) made from the trust during all taxable years beginning after the date of the enactment of this subparagraph.

*26 U.S.C. § 501(c)(21)(C)(ii)* (emphasis added).

[*10]

189 Fed. Appx. 101; 2006 U.S. App. LEXIS 15850, *;
2006-2 U.S. Tax Cas. (CCH) P50,376

Appellants do not challenge this calculation, but urge that the Tunnelton Trust is not a "typical" new trust for purposes of the Act. Unlike typical trusts, the Tunnelton Trust assumed all of the PMC Trust's assets and liabilities with respect to Tunnelton's former employees and should be held to be a *de facto* continuation of the PMC Trust. So, they contend, the *§ 501(c)(21)(C)(ii)* "excess assets" calculation should be made with reference to the status of assets and liabilities in the PMC Trust at the close of the last taxable year that ended before *§ 501(c)(21)(C)* was enacted, 1991.

The District Court rejected this theory and concluded that the Tunnelton Trust and PMC Trusts "are, and always have been, separate and distinct entities." Dist. Ct. Op. at 13, app. 17. "For example," the District Court noted, "each trust has a different tax identification number, and thus, each is a separate taxpayer for purposes of federal tax law. The two trusts also have different taxable years. The Stock Purchase and Trust Agreements further indicate that Defendants intended the Tunnelton Trust to be a new and separate entity." *Id.* (citations omitted). The District Court concluded, "There [*11] is nothing in *section 501(c)(21)* or elsewhere that would even remotely suggest that Congress intended the term "trust" to include any other entity, especially a separate and distinct taxpayer such as the [PMC] Trust. Thus, under the plain language of the statute, only the Tunnelton Trust is relevant." *Id.*

We adopt the thoughtful analysis of the District Court and its legal conclusion on this issue. We will affirm the District Court's rulings as to both PNC's declaratory judgment action and the original counterclaims.

V.

After the District Court granted PNC's motion for summary judgment and simultaneously dismissed Appellants' original counterclaims, Appellants filed a motion for leave to file an amended counterclaim. In their original counterclaim, Appellants alleged breach of fiduciary duty against PNC, as Trustee of the Tunnelton Trust, based upon PNC's refusal to hand over Trust assets to Appellants to cover Appellants' liabilities for non-black lung liabilities. When this counterclaim was rejected, Appellants sought to amend their counterclaim to allege that PNC breached its fiduciary duty to beneficiaries of the Trust by making payments for medical treatments to former [*12] Tunnelton miners which Appellants allege were not related to black lung disease. The District Court denied this motion, finding that Appellants lacked standing to bring the claim. It reasoned that Appellants failed to allege any actual or threatened injury from PNC's alleged breach of fiduciary duty and had not identified any

interest they have in the Trust assets except as potential recipients of "excess assets" for purposes of reimbursing them for accident or health benefits paid for retired miners. Because the District Court had concluded that there were not-and could not be-any such excess assets in the Tunnelton Trust, it found that Appellants had no interest in the Trust assets and could not be harmed by PNC's alleged improper payments. Accordingly, the District Court concluded, Appellants lack Article III standing to bring their proposed amended counterclaim.

The District Court also concluded that, even if Appellants could establish an injury that would satisfy the constitutional standing requirements, they cannot establish prudential standing. The prudential limitations "ensure that only parties who can best pursue a particular claim will gain access to the courts." *Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery County, 271 F.3d 140, 145 (3d Cir. 2001).* [*13] Here, the District Court concluded that Appellants were not the best parties to represent the interests of the former miners who are entitled to Black Lung benefits. n5

n5 The District Court also concluded that Appellants do not have third-party standing to pursue their proposed breach of fiduciary duty claim on behalf of the Trust and/or the former Tunnelton miners who are beneficiaries of the Trust.

On appeal, Appellants devote only a single paragraph (two sentences) to this issue. Appellants essentially concede that, if we find that the Tunnelton Trust has no "excess assets" then they do not have standing. Appellants argue only "if this Court reverses the District Court on the *Section 501(c)(21)(C)(ii)* issue, [Appellants] clearly will be potential beneficiaries of the Tunnelton Trust and, therefore, will have standing to complain about PNC's waste of trust assets." Appellants' Br. at 25.

We find no error in the District Court's analysis and conclude that Appellants, indeed, lack standing to bring their [*14] proposed amended counterclaim.

VI.

Accordingly, for the reasons set forth above, we will affirm the District Court's grant of summary judgment as to both PNC's declaratory judgment action and the original counterclaims. We will also affirm the District Court's denial of Appellants' motion to amend their counterclaim for lack of standing.