# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DONALD F. BENOIT, Derivatively On Behalf of MBNA CORPORATION, ) | Case No. |
| Plaintiff, ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF |
| vs. ) | CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS |
| BRUCE L. HAMMONDS, JOHN R. COCHRAN, III, RICHARD K. STRUTHERS, KENNETH A. VECCHIONE, LANCE L. WEAVER, CHARLES C. KRULAK, MICHAEL G. RHODES, JOHN W. SCHEFLEN, JAMES H. BERICK, MARY M. BOIES, BENJAMIN R. CIVILETTI, WILLIAM L. JEWS, RANDOLPH D. LERNER, STUART L. MARKOWITZ, WILLIAM B. MILSTEAD, LAURA S. UNGER AND THOMAS G. MURDOUGH, ) | UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES AND EXCHANGE ACT OF 1934 |
| Defendants, ) | |
| - and - ) | |
| MBNA CORPORATION, a Maryland corporation, ) | |
| Nominal Defendant. ) | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of MBNA Corporation ("MBNA" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Securities and Exchange Act of 1934 that occurred between January 2005 and the present (the "Relevant Period") and that have caused substantial losses to MBNA and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      This court has jurisdiction over this action pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Securities and Exchange Act of 1934.

4.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to MBNA occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an

effect in this District.

## SUMMARY OF THE ACTION

6.        MBNA is an international financial services company providing lending, deposit and credit insurance products and services to its customers. In addition to being the world's largest independent credit-card company, MBNA makes other consumer loans to individuals and commercial loans primarily to small businesses. MBNA is the No. 3 U.S. credit card issuer and the Company, which went public in 1991, had a stock market value of approximately $35 billion at the start of the Relevant Period.

7.        At the end of FY:04, U.S. credit card issuers began experiencing a slowdown in new loan origination and fierce competition. With the average American now carrying three credit cards, the days of rapid expansion were over for the industry. Consumers could force – and rapidly were forcing – credit card companies to compete by moving credit card balances from card to card based on which company was offering the best terms. Credit card companies – forced to offer no-interest promotional rates and to increasingly extend the no-interest periods in order to lure in new customers – were seeing their profit margins dwindle. In periods of high competition among card issuers, so-called "teaser" no-interest lending is costly for credit card companies because they incur all of the transactional and capital costs of providing free financing to new borrowers during the teaser period, but many borrowers simply choose to move the balance to another lender offering a competing teaser at the end of the promotional period.

8.        MBNA and its executives faced another problem during Q1:05. Shareholder upheaval surrounded the Company's 2004 annual meeting of shareholders, with large institutional investors demanding increased Board of Directors (the "Board") independence and reductions in the extraordinary executive compensation MBNA's Board had been providing to its top executives. (MBNA's CEO had ranked number one in compensation among all U.S. executives in 2003, receiving $45.5 million.) As a result, certain Board members were replaced with ostensibly "independent" directors in 2004 and, by early January 2005, the Company's Chief Executive Officer's ("CEO") salary had been cut 34% and the salaries of its top five highest executives were cut a combined average of

- 2 -

37%.

9.      However, these same executives were each sitting on tens of millions of dollars worth of stock options and shares of restricted stock which had been granted to them – all of which, defendants knew, would rapidly decline in value if the truth about MBNA's market conditions, business operations and financial prospects came to light. As a result, as MBNA's competitors lowered their guidance for 2005 in light of decreasing credit card revenues and increasing advertising expenses, on January 21, 2005, the start of the Relevant Period, MBNA issued the first earnings forecast in the Company's history, projecting an ongoing 12% earnings *increase* – with a 10% increase in 2005 earnings over 2004's. Defendants said MBNA would make this target because the Company had already drastically reduced its own reliance on insidious no-interest loans, rendering its own loan portfolio more profitable than that of its competitors. Defendants also projected a 20%+ increase in Return on Equity. Defendants' EPS estimate for 2005 was $2.36 per share, which was 10% above the Company's 2004 EPS. These projections were being made nearly one-third of the way into Q1:05 and would be repeated and detailed at the Company's January 21, 2005 and February 9, 2005 investor conferences.

10.     Defendants also primed the market by announcing an increase in the Company's dividend to 17% and a $2 billion stock buyback program. Defendants promised "consistent, profitable growth" for MBNA despite the competition in the industry because MBNA would not get sucked into the teaser no-interest rate promotional game.

11.     But on April 21, 2005, defendants shocked the market by disclosing MBNA had earned only $0.02 cents in Q1:05 -- a 94% decline from the $0.59 per share it reported in Q4:04 – and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate.

12.     The true facts which were known or should have been known by each of the defendants, but concealed from the investing public during the Relevant Period, were as follows:

(a)     The Company had been experiencing "unexpectedly high payment volumes from U.S. credit card customers" during Q1:05, reducing managed loans in the quarter "more than in prior years," and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1:05 from

- 3 -

$33.8 billion reported at the end of Q1:04;

      (b)    Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

      (c)    MBNA was suffering from an unseasonably sharp contraction in loans during Q1:05 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1:04;

      (d)    The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

      (e)    MBNA was experiencing higher-than-expected delinquencies during Q1:05, increasing to 4.17% from 4.13% at the end of Q4:04;

      (f)    The Company had reversed its margin-protection strategy of reducing reliance on no-interest loans and teaser promotions and was instead increasing its offering of no-interest loans, which, by defendants' own admissions, will significantly reduce future earnings;

      (g)    Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in Q4:04;

      (h)    Approximately 50% of MBNA's receivables were on variable floating interest rates while approximately 80% of the Company's funding was tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

      (i)    Due to the increase in pre-pays, the interest-only securitization strip securities valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

      (j)    The Company's previously announced Q1:05 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

     13.    As a result of the defendants' false statements, MBNA's stock traded at inflated levels during the Relevant Period which permitted the Company's top officers and directors to sell more than

$75.9 million worth of their own shares.  During the Relevant Period, defendants also caused the Company to repurchase $250 million worth of its own stock at artificially inflated prices.  Defendants also used the Company's purported stellar performance to justify the payment of millions of dollars in bonuses to themselves in January 2005.

14.    Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's value plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization lost over $5.8 billion in one trading session and its credibility with the investment community has been profoundly damaged.

## THE PARTIES

15.    Plaintiff Donald F. Benoit is, and was at times relevant hereto, an owner and holder of MBNA common stock.  Plaintiff is a citizen of Florida.

16.    Nominal defendant MBNA is a corporation organized and existing under the laws of the state of Maryland with its headquarters located at 1100 North King Street, Wilmington, Delaware. MBNA is an international financial services company providing lending, deposit, and credit insurance products and services to its customers.  In addition to being the world's largest independent credit-card company, MBNA makes other consumer loans to individuals and commercial loans primarily to small businesses.  MBNA is the No. 3 U.S. credit card issuer, and the Company, which went public in 1991, had a stock market value of approximately $35 billion at the start of the Relevant Period.  MBNA America Bank, N.A. (the "Bank") is the Company's principal subsidiary.

17.    Defendant Bruce L. Hammonds ("Hammonds") is, and at all times relevant hereto was, President, CEO and a director of MBNA.  Because of Hammonds' positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

- 5 -

During the Relevant Period, Hammonds participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:04, MBNA paid defendant Hammonds $9,165,947 in salary, bonus and other compensation. During the Relevant Period, Hammonds sold 341,409 shares of MBNA stock for proceeds of $9,315,044.35. Hammonds is a citizen of Delaware.

18.     Defendant Randolph D. Lerner ("Lerner") is, and at all times relevant hereto was, Chairman of the Board and a director of MBNA. Because of Lerner's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Lerner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Lerner $500,000 in salary. Lerner is a citizen of New York.

19.     Defendant John R. Cochran, III ("Cochran") is, and at all times relevant hereto was, Chief Operating Officer of MBNA, Chairman, President and CEO of the Bank. Because of Cochran's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Cochran participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Cochran $8,401,696 in salary, bonus and other compensation. Cochran is a citizen of Delaware.

20.     Defendant Richard K. Struthers ("Struthers") is, and at all times relevant hereto was, Vice Chairman of MBNA and Vice Chairman of International and Consumer Lending for the Bank. Because of Struthers' positions, he knew the adverse non public information about the business of

MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Struthers participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Struthers $6,191,403 in salary, bonus and other compensation. During the Relevant Period, Struthers sold 457,464 shares of MBNA stock for proceeds of $12,277,922.04. Struthers is a citizen of Maryland.

21.    Defendant Kenneth A. Vecchione ("Vecchione") is, and at all times relevant hereto was, Vice Chairman and Chief Financial Officer ("CFO") of MBNA and of the Bank. Because of Vecchione's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Vecchione participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, MBNA paid defendant Vecchione $4,947,108 in salary, bonus and other compensation. During the Relevant Period, Vecchione sold 100,462 shares of MBNA stock for proceeds of $2,684,398.70. Vecchione is a citizen of Delaware.

22.    Defendant Lance L. Weaver ("Weaver") is, and at all times relevant hereto was, Vice Chairman of MBNA and Vice Chairman of U.S. Credit Card of the Bank. Because of Weaver's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Weaver participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

For FY:04, MBNA paid defendant Weaver $6,191,403 in salary, bonus and other compensation. During the Relevant Period, Weaver sold 376,835 shares of MBNA stock for proceeds of $10,085,574.26. Weaver is a citizen of Delaware.

23.    Defendant Charles C. Krulak ("Krulak") is, and at all times relevant hereto was, Vice Chairman of MBNA and of the Bank. Because of Krulak's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Krulak participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Krulak sold 497,454 shares of MBNA stock for proceeds of $13,278,375.00. Krulak is a citizen of Delaware.

24.    Defendant Michael G. Rhodes ("Rhodes") is, and at all times relevant hereto was, Group Executive for the U.S. Credit Card Business Development division of MBNA. Because of Rhodes's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Rhodes participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Rhodes sold 406,040 shares of MBNA stock for proceeds of $10,865,346.17. Rhodes is a citizen of Delaware.

25.    Defendant John W. Scheflen ("Scheflen") is, and at all times relevant hereto was, Vice Chairman of MBNA America and Secretary of MBNA and the Bank. Because of Scheflen's positions, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management

- 8 -

meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Scheflen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Scheflen sold 125,810 shares of MBNA stock for proceeds of $3,377,998.50. Scheflen is a citizen of Delaware.

26.     Defendant James H. Berick ("Berick") is, and at all times relevant hereto was, a director of MBNA. Because of Berick's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Berick participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Berick is a citizen of Ohio.

27.     Defendant Mary M. Boies ("Boies") is, and at all times relevant hereto was, a director of MBNA. Because of Boies' position, she knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Boies participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Boies is a citizen of New York.

28.     Defendant Benjamin R. Civiletti ("Civiletti") is, and at all times relevant hereto was, a director of MBNA. Because of Civiletti's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period,

Civiletti participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Civiletti is a citizen of Maryland.

29.   Defendant William L. Jews ("Jews") is, and at all times relevant hereto was, a director of MBNA. Because of Jews' position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Jews participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Jews is a citizen of Maryland.

30.   Defendant Stuart L. Markowitz ("Markowitz") is, and at all times relevant hereto was, a director of MBNA. Because of Markowitz's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Markowitz participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Markowitz is a citizen of Ohio.

31.   Defendant William B. Milstead ("Milstead") is, and at all times relevant hereto was, a director of MBNA. Because of Milstead's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Milstead participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Milstead is a citizen of South Carolina.

32.   Defendant Laura S. Unger ("Unger") is, and at all times relevant hereto was, a director

of MBNA. Because of Unger's position, she knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Unger participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Unger is a citizen of Pennsylvania.

33.    Defendant Thomas G. Murdough ("Murdough") was a director of MBNA at all times relevant hereto, until May 2005. Because of Murdough's position, he knew the adverse non public information about the business of MBNA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Murdough participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Murdough is a citizen of Ohio.

34.    The defendants identified in ¶¶17, 18, 26-33 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17-25 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶17, 20-25 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

35.    By reason of their positions as officers, directors and/or fiduciaries of MBNA and because of their ability to control the business and corporate affairs of MBNA, the Individual Defendants owed MBNA and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage MBNA in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MBNA and its shareholders so as to benefit all shareholders

- 11 -

equally and not in furtherance of their personal interest or benefit.

36.    Each director and officer of the Company owes to MBNA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

37.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of MBNA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with MBNA, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of MBNA.

38.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MBNA, and was at all times acting within the course and scope of such agency.

39.    To discharge their duties, the officers and directors of MBNA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of MBNA were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as

- 12 -

to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       (d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

       (e)     remain informed as to how MBNA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

       (f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

    40.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MBNA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of MBNA's Board during the Relevant Period.

    41.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during

the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, MBNA has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending MBNA and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

42.     Moreover, these actions have irreparably damaged MBNA's corporate image and goodwill. For at least the foreseeable future, MBNA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that MBNA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

44.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at MBNA and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of MBNA, regarding the Individual Defendants' management of MBNA's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance

- 14 -

of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least January 2005 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that MBNA was misrepresenting its financial results. In addition, defendants also made other specific, false statements about MBNA's financial performance and future business prospects, as alleged herein.

46.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of MBNA common stock so they could: (i) dispose of over $75.9 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

47.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

48.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

49.    Having been run by a closely knit group of officers and directors, MBNA's executives

- 15 -

grew all too accustomed over the years to receiving absurd levels of executive compensation. During 2001 to 2003, the Company's top five most highly paid officers alone received well over $60 million in cash compensation -- not counting the tens of thousands of stock options and shares of restricted stock they also received:

| Defendant | Salary | Bonus | Total Cash Compensation |
|---|---|---|---|
| Hammonds | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Cochran | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Weaver | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Struthers | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Vecchione | | | |
| 2003 | $1.6 M | $1.4 M | $2.7 M |
| 2002 | $1.5 M | $1.6 M | $3.1 M |
| 2001 | not disclosed | not disclosed | not disclosed |

50.     As reported by the *Philadelphia Inquirer* on April 25, 2005, it had become an old joke in Wilmington that the "initials in MBNA, the credit-card lender once known as Maryland Bank, National Association, also stood for 'Mothers, Brothers, Nephews and Aunts.'" In fact, under founder Charles M. Cawley ("Cawley"), MBNA had developed a "penchant" for hiring via friendship, blood and marriage -- including Cawley's own relatives and in-laws. MBNA's recent proxy statement filed with the SEC on March 15, 2005 reveals the names and cash compensation of 15 employees who are related to senior managers whom Cawley hired. According to the *Philadelphia Inquirer* article:

Among others, MBNA employs:

Two brothers, three brothers-in-law and a sister-in-law of John R. Cochran, MBNA's chief operating officer. Cochran collected $18 million in cash, stock grants and options profit last year. His brothers, at $370,000 and $293,000, make more than any of his four MBNA-employee in-laws, whose pay ranged from $92,000 to $175,000.

Two brothers and a brother-in-law of vice chairman Lance L. Weaver. Weaver

- 16 -

collected $11 million. His family members' pay ranged from $952,000 for Todd Weaver, head of MBNA's Western Regional Office, to a comparatively modest $63,428 for Drew Weaver.

Since Cawley retired from active management at the end of 2003, his own relatives on the MBNA payroll weren't listed, bank spokesman Jim Donahue said. However, Cawley himself is on the list: He's named as "father-in-law of Michael G. Rhodes," the current group executive for U.S. credit card business development.

Cawley, who made hundreds of millions of dollars from MBNA stock options during his long tenure, has remained senior adviser to the company. He collected $2.5 million in cash for his services in 2004. The company said he will retire from that position in August.

51.    The Company's Board lacked independence as well. In early 2004, the Board

consisted of the following nine directors:

- *James H. Berick, Esq.*: Retired Partner, Squire, Sanders & Dempsey L.L.P. (successor to Berick, Pearlman & Mills Co., L.P.A., of which Mr. Berick was Chairman from July 1986 until January 2000), a law firm which received substantial compensation for legal services provided to the Company. Berick's son is a partner at Squire, Sanders & Dempsey. Berick has ties to the Lerner family going back decades. He was Al Lerner's college roommate and is godfather to Randolph Lerner, who became MBNA's Chairman after his father's death. A member of MBNA's Board since 1991, he was the Lerner family's lawyer and he still provides advice to the Lerner family. He is also a director of the Town and Country Trust, a real estate investment trust with longstanding ties to the Lerner family.

- *Benjamin R. Civiletti, Esq.*: Chairman, Venable LLP, a law firm which has received substantial compensation for legal services provided to the Company. One of Civiletti's sons, also a lawyer, is employed in MBNA's legal department.

- **Bruce L. Hammonds**: President and CEO of MBNA.

- **William L. Jews**.

- **Randolph D. Lerner, Esq.**: Owner of the Cleveland Browns football team. In 1999, the Board approved a 10-year marketing agreement with the Cleveland Browns football team, then owned by Al Lerner and now owned by Randolph D. Lerner, MBNA's Chairman.

- **Stuart L. Markowitz, M.D.**

- **William B. Milstead**: Retired Partner, Ernst & Young LLP, the Company's certified public accountant. Milstead served as the coordinating partner for MBNA at the time of its initial public offering in 1991.

- **Norma Lerner**: Widow of Company co-founder Al Lerner.

- **Michael Rosenthal**: Professor of English at New York's Columbia University, Al Lerner's alma mater.

52.     James Berick was Chairman of MBNA's Compensation Committee, which decided on the pay for Lerner and co-founder Cawley. Cawley, who retired in December 2003, received total compensation of $45.5 million in 2003, *putting him at the top of the U.S. list for CEO pay*, according to a 2004 survey by *Bloomberg News*.

53.     MBNA came under intense pressure from shareholders in advance of the May 2004 annual meeting of shareholders who argued that the directors had become too cozy with the executives they were supposed to watch over. Preceding the Company's annual meeting of shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence. As a result, Norma Lerner and Michael Rosenthal were removed from the Company's Board.

54.     As a result of the lack of independence on the MBNA Board, MBNA's executives had become accustomed to receiving very heady compensation. In fact, the Company now admits it had previously followed what it describes as "a *policy* of providing high levels of compensation." Following the shareholder-led shakeup of the MBNA Board in 2004, the Compensation Committee finally conceded to making significant reductions in executive compensation.

55.     By early 2005 the Compensation Committee had approved reductions of salaries, bonuses and equity awards which would result in a 34% reduction in total direct compensation for MBNA's CEO, defendant Hammonds, and a combined 37% reduction in total direct compensation for defendants Hammonds, Cochran, Struthers, Weaver and Vecchione, the Company's five most highly compensated executive officers.

56.     *As a result of these cuts, at the beginning of the Relevant Period the Company's senior executives faced massive reductions in the level of compensation to which they had grown accustomed to receiving*. At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which will expire if not exercised by the expiration date. The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. Some of these stock options would have expired in 2005 if not exercised. The Individual Defendants knew the value of these

- 18 -

options and shares would rapidly decline if they disclosed the true status of the Company's operations and business environment.

57.    Moreover, despite the attempt to better align MBNA's executive compensation with shareholder interests, the Company's executive compensation program for 2004 still utilized "short term corporate performance" as a primary metric in determining annual compensation to senior executives. As a result of the Individual Defendants' concealment of the Company's true operating and financial status, for 2004 the Individual Defendants determined that the Company had "substantially achieved its net income goal and achieved its performance objectives for new accounts, managed credit losses and operating efficiency," but that it "did not achieve its goal for growth in managed loans or net interest margin." Nonetheless, the Compensation Committee determined that the Company's "overall results for 2004 were strong and the [Company] had a number of significant achievements in 2004 that the Committee and management believe position the [Company] well for the future." As a result, in January 2005 the Compensation Committee awarded a performance bonus to defendant Hammonds equal to 90% of his 2004 salary (as reduced in August 2004) and awarded bonuses to defendants Cochran, Weaver, Struthers and Vecchione equal to 80% of their 2004 salaries (as reduced in August 2004). Based on the Company's purportedly stellar performance, the Individual Defendants bequeathed the Company's top five highest-paid executives alone over $200 million worth of performance bonuses and restricted stock awards (which vest 20% per year over five years and require no payment to exercise):

| Defendant | 2004 Bonus | Value of Restricted Shares Upon Grant | Total 2004 Incentive Compensation Award |
|-----------|-----------|---------------------------------------|-----------------------------------------|
| Hammond | $1.083 million | $1.083 million | $2.17 million |
| Cochran | $943,000 | $943,000 | $1.89 million |
| Weaver | $1.962 million | $1.962 million | $3.92 million |
| Struthers | $1.962 million | $1.962 million | $3.92 million |
| Vecchione | $1.569 million | $1.569 million | $3.14 million |

## IMPROPER STATEMENTS

58.    On January 20, 2005, the Individual Defendants caused MBNA to issue a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.56 Per Common Share." Promising to increase earnings by decreasing the churn associated

with no-interest credit card offerings, in the press release and the earnings conference which followed it the next morning, the Individual Defendants announced that MBNA had then reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. The Individual Defendants also reported a 9% rise in 4Q:04 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the 4Q:04 delinquency rate declined to 4.13% of loans outstanding from 4.39% in Q4 2003, that loans grew 3% to $121.6 billion, that the Company was raising its dividend by over 17% and that its Board had approved a buyback of up to $2 billion in stock (or 6% of the outstanding shares), indicating the Individual Defendants felt MBNA's stock was under-priced. The press release stated in relevant part:

> MBNA Corporation announced today that net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth quarter of 2003. For the full year, net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to $2.34 billion or $1.79 per common share for 2003.
>
> "We grew earnings 15% in a slower industry growth environment and were able to launch several new and exciting programs such as our partnership with American Express and the acquisition of new businesses," said Bruce L. Hammonds, Chief Executive Officer of MBNA Corporation. "We are pleased with the results achieved in 2004."
>
> ***In addition, MBNA's Board of Directors has approved an increase of 17% in the quarterly dividend rate to $.14 per common share, which will increase the annual rate to $.56 per common share. MBNA has increased the dividend every year since it became a public company.*** The cash dividend is payable April 1, 2005 to stockholders of record as of March 15, 2005.
>
> MBNA's Board of Directors has also approved a share repurchase program and authorized the repurchase of up to $2 billion of common stock over the next 2 years. Stock repurchases will be done selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which utilizes share repurchases to offset the impact of stock-based compensation programs.
>
> MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.

- 20 -

*The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006.* Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities. The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation.

"The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives." Some highlights for the year include:

- Hundreds of thousands of Customers activated their American Express-branded cards in the fourth quarter taking advantage of the valuable benefits of an American Express branded card backed by MBNA's top-notch Customer satisfaction.

- Throughout 2004, MBNA reduced its reliance on 0% promotional offers as a driver of receivables growth and introduced a number of value-based products centered upon the WorldPoints rewards platform. MBNA is driving innovative products through its powerful affinity partner distribution network and providing Customers with a wide array of choices, based on their individual needs and interests. Whether Customers choose an NFL Extra Points Visa, a PGA Tour Platinum MasterCard, or one of many professional or alumni programs, MBNA has a credit card to fit each Customer's individual needs and preferences.

- Internationally, MBNA's businesses in the United Kingdom, Canada, and Spain continue to provide additional loan growth opportunities through the same affinity marketing strategy that drove the company's success over the last 20+ years. MBNA has more than 5,000 affinity partners in its U.S. and international businesses.

- MBNA continued to diversify in 2004 with the purchases of Premium Credit Limited (PCL), MBNA's premium financing company in the UK, and Sky Financial, MBNA's professional practice financing business in the U.S.

Loan receivables at December 31, 2004 were $33.8 billion, an increase of $134.8 million over year-end 2003. Total managed loans at December 31, 2004 were $121.6 billion, an increase of $3.1 billion over year-end 2003.

Losses on loan receivables and managed loans for the fourth quarter of 2004 were 3.74% and 4.43%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.29% and 4.13%, respectively, at December 31, 2004.

59.    On January 21, 2005, defendants Hammonds, Vecchione, Cochran and the entire

executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history. These defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package. According to these defendants, the program would result in a Q1:05 charge of $300 million to $350 million *but was expected to save $150 million in 2004 and even more in 2006*.

60.    Set to convince the market that unlike other credit card companies, MBNA would increase earnings by increasing its margins by lowering reliance on the less profitable no-interest card offerings, defendant Hammonds gave what were essentially *pro forma* earnings results backing out their existing no-percent loans:

> Now, *we have been running off our zero rate loans,* as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. *If you add that back in, our growth rate would have been 5 percent*. The last numbers I saw for the industry through November was 2.5 percent, *so we grew at about twice the industry, which is what we normally do*.
>
> * * *
>
> The fact that *we're running off zero loans* means that we don't have to re price as many of our existing customers on the back end ....

61.    Defendant Hammonds also explained that the Company's delinquency and loss rates would decrease:

> Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and *as we look out*, it would seem to us that *delinquency and losses should continue to decrease*.

62.    Concerning growth the Company purported to *then* be experiencing, defendant Hammonds said:

> We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.
>
> As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there,

- 22 -

that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

\* \* \*

***Our 2005 EPS is $2.36, a 10% increase over 2004.*** We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.

Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.

***And we feel confident that we will continue to deliver consistent, profitable growth well into the future.*** Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

63.     Specifically describing how the Company would increase earnings by decreasing its

reliance on no-interest loans, these defendant Hammonds stated:

Growing profitable loans; let me just discuss with you our zero strategy. It's a place that we are happily diverging from our peers. We obviously were into zero in a big way a few years ago. About 12 to 18 months ago, we saw things happening in this area that we didn't like.

We saw surfing activity increasing, so we saw more and more customers open the account just for zero, and pay it off before the rate changed. The duration on zero moved out. When we started doing zero, we were doing it for a four-month duration. Today, you need to be added 15 months or maybe even life. And we still the marketing disappear.

As I said earlier, zero is bad, I think, for the entire industry, but I know it's bad for MBNA. It forces you to re price many of your other customers to pay for it. That's not the way to run a business, to take your long-term customers and re price those to bring in new customers at zero. And just a personal opinion, I think it can make your marketing and advertising areas very lazy. If you can give things away, you sure don't have to be creative.

- 23 -

> ***So we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability, and it's better for the customer.***

> So, it makes no sense for us to continue to do those zero-rate loans, with very few exceptions. The rewards programs give us opportunity to reinforce the affinity relationship. Zero certainly does not leverage affinity marketing.

> Now again, like I said earlier, we decreased $4 billion in zero-rate loans in the U.S. This is what will happen next year. It will continue to come down, as I said earlier, through the second quarter and the early part of the third quarter and then it will normalize. We don't love the impact that that has on our top line, but it is absolutely the right thing to do.

64.    Following the earnings announcement, the *New York Times* reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial."

65.    MBNA's reported Q4:04 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for the 4Q:04 but guiding expectations down, saying that its own FY:05 earnings could be at the low end of Wall Street expectations. Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves. Shares in Citigroup dropped $0.27 to close at $47.77.

66.    MBNA's report also came a day after competitor Capital One Financial Corp. announced that its Q4 earnings had fallen 27% to $ 195 million. Capital One's per-share earnings, $0.77, were $0.22 short of Wall Street expectations. Capital One attributed its own shortfall to $511 million of expenses for marketing and advertising in the quarter. Capital One CEO and Chairman Richard Fairbank told investors that he expected such spending to continue throughout 2005, and that similar outlays by the credit cards units of Citigroup Inc. and J.P. Morgan Chase & Co. made it necessary: "I think you are seeing, at least for the three of us, a sort of structural move toward the national-brand game. I don't really see anybody backing down." ***On this news, Capital One's stock***

- 24 -

*fell by almost 8%, from approximately $83 per share prior to the announcement to below $77*
*per share in the days following the announcement.*

67.     Based upon the Individual Defendants' promises that MBNA's delinquency and losses

rates were improving and its extraordinary Q4:04 results, and buffeted by the increase in MBNA's

dividend, the increase in its stock buyback program, anticipated savings from the employee reduction

program, and, most of all, the end of its own reliance on zero-interest credit card offerings and the

positive net effect that would have on earnings and "Return on Managed Assets" ("ROMA"), MBNA's

stock price closed up $0.24 to $27.44 on the NYSE on January 21, 2005.

68.     On February 9, 2005, the Individual Defendants appeared at a Credit Suisse First

Boston ("CSFB") investor conference to discuss the Company's Q4:04 results and future expectations.

During the conference, the Individual Defendants admitted that the Company was seeing "slowing

growth" in its "core product," credit card interest revenues, but stated that another trend the Company

was then experiencing, growing "ROMA" or "Return on Managed Assets," would counter the lack of

growth and increase the Company's revenues and earnings. Based on the Individual Defendants'

statements concerning the financial results and business environment they said *MBNA was then*

*experiencing*, the Individual Defendants once again stated MBNA would achieve 12% average annual

EPS growth – with 10% in 2005 – and a 20%+ increase on Return of Equity. Further, defendant

Vecchione stated they had "met with and presented both the restructuring plan and stock repurchase

program with rating agencies," stating that the rating agencies had "no major concerns." Defendant

Vecchione also stated that the rating agencies "[r]ecognize[d] MBNA's proven ability to increase

earnings through a variety of economic and competitive cycles."

69.     On April 13, 2005, the Individual Defendants caused MBNA to issue a press release

entitled "MBNA America Bank, N.A. Securitizes $750 Million of Credit Card Receivables from the

MBNA Credit Card Master Note Trust." According to the press release, through the MBNA Credit

- 25 -

Card Master Note Trust, MBNA would issue $750 million in credit card asset backed notes. "The

Class A (2005-1) tranche consists of $750 million fixed rate asset backed notes. The three-year

4.20% Class A (2005-1) notes were priced at 99.97408% to yield 4.246%." According to the press

release, the transaction, which was scheduled to close on April 20, 2005, was joint-lead managed by

CSFB and JP Morgan and co-managed by Banc of America Securities LLC, Barclays Capital,

Citigroup, Merrill Lynch & Co. and Morgan Stanley.

### THE TRUTH IS REVEALED

70.    On April 21, 2005, the Individual Defendants shocked the market by causing MBNA

to issue a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the

Impact of the Previously Announced Restructuring Plan." The press release stated in relevant part

that:

> [N]et income for the first quarter of 2005 was $31.7 million or $.02 per common share
> compared with $519.7 million or $.40 per common share for the first quarter of 2004
> *[and $0.59 per share in Q4:04]*. Net income in the first quarter of 2005 includes a
> restructuring charge of $767.6 million pre-tax *[double the $300-$350 million stated
> on January 21, 2005]*. Without the restructuring charge, net income was $514.1
> million or $.40 per common share.
>
> In addition to the restructuring charge, the Corporation's results were further
> impacted by unexpectedly high payment volumes from U.S. credit card customers. The
> higher payments reduced managed loans in the quarter more than in prior years.
> Additionally, the payment volumes were particularly higher on accounts with higher
> interest rates, which adversely impacted the Corporation's yield on managed loans.
>
> As a result of these recent trends, in the revaluation of its interest-only strip
> receivable, the Corporation projected lower excess spreads and higher payments. This
> reduced the interest-only strip receivable and resulted in a net loss from
> securitization activity of $206.6 million. The net loss from securitization activity is
> included in other operating income and caused the Corporation's first quarter 2005
> other operating income to be lower than its first quarter 2004 other operating income.
>
> The Corporation is implementing programs to offset the higher payment rates
> in the U.S. Card business. "It is a difficult environment right now. However, we've
> made progress on recent product introductions, diversification strategies, and
> improvements in credit quality and operating efficiency," said Bruce L. Hammonds,
> MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significantly below its 10% growth objective.

Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first quarter of 2004 [but a decrease from the $33.8 billion at December 31, 2004]. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0 billion compared to the first quarter of 2004 [down from $121.6 billion at December 31, 2004]. Total volume in the quarter rose to $49.3 billion, an increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3 billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0 billion, which decreased by 5% from the first quarter of 2004.

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and 4.48%, respectively *[up from 3.74% and 4.43% respectively in the Q4:04]*. Delinquency on loan receivables and managed loans was 2.93% and 4.17%, respectively, at March 31, 2005 *[with delinquency on managed loans up from 4.13% in the Q4:04]*. Based on improving asset quality trends, the provision for possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter of 2004.

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%. *In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.*

\* \* \*

As previously reported, MBNA Corporation has made significant progress on its plan to reduce its expense base. In connection with the restructuring plan, the Corporation will incur a charge of approximately $785 million pre-tax, $767.6 million pre-tax of which was recognized in the first quarter of 2005. The charge includes three major components -- staff reductions related to voluntary early retirement and voluntary severance programs, the disposition of fixed assets relating to facilities closings, and contract terminations. Approximately 85% of the charge will result in cash expenditures.

Approximately $500 million of the charge is related to the voluntary early retirement program and voluntary severance program announced in January 2005. The Corporation expects staff reductions from the programs to result in pre-tax expense savings of approximately $210 million in 2005 and approximately $225 million in 2006. This charge is higher than previously announced because more people than anticipated decided to take advantage of the programs' benefits. The success of this

- 27 -

initiative will assist the Corporation in reducing its staff, particularly in management positions, to levels that meet expected future business needs and make MBNA more efficient.

Approximately $115 million of the charge is related to the disposition of fixed assets resulting from the Corporation's previously announced review of its operations. After this review, management decided to consolidate operations and close some facilities. The Corporation expects the disposition of fixed assets to result in pre-tax expense savings of approximately $15 million in 2005 and approximately $25 million in 2006.

In addition, the Corporation terminated a marketing agreement with a third party vendor that marketed the Corporation's products to endorsing organizations and terminated a limited number of other agreements. Management determined that the marketing agreement did not adequately support the Corporation's long-term objectives. Approximately $170 million of the charge is related to these contract terminations. The Corporation expects the contract terminations to result in pre-tax expense savings of approximately $25 million in 2005 and approximately $50 million in 2006.

## REASONS THE STATEMENTS WERE IMPROPER

71.     The true facts, which were known or should have been known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)     The Company had been experiencing "unexpectedly high payment volumes from U.S. credit card customers" during the Q1:05, reducing managed loans in the quarter "more than in prior years," and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1:05 from $33.8 billion reported at the end of Q1:04;

(b)     Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(c)     MBNA was suffering from a unseasonably sharp contraction in loans during 1Q:05 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of 1Q:04;

(d)     The Company had been aggressively recognizing gains on sales of securitized

- 28 -

no-interest loan receivables through off-balance sheet funding structures;

(e)     MBNA was experiencing higher-than-expected delinquencies during the 1Q:05, increasing to 4.17% from 4.13% at the end of Q4:04;

(f)     The Company had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

(g)     Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4:04;

(h)     Approximately 50% of MBNA's receivables were on a variable floating rate while approximately 80% of the Company's funding is tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(i)     Due to the increase in pre-pays, the interest-only securitization strips valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

(j)     The Company's previously announced 1Q:05 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

75.     Following the Company's shocking April 21, 2005 disclosures concerning the true state of its business operations, financial results and 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume.

76.     On April 28, 2005, the Individual Defendants caused the Company to announce that its debt offering would be increased by over one-third – from $500 million to $750 million –

significantly increasing the Company's borrowing costs.

77.    Also on April 28, 2005, Legg Mason issued an analyst report entitled "Consumer Finance – I/O Strip Issue Appears MBNA-Specific." In its report, Legg Mason stated that: "In our view, the weakness at MBNA is more fundamentally-related and company-specific. With [Capital One] already reporting solid 1Q05 results (and no significant I/O strip writedown) and similarly-strong results expected for [Providian Financial Corp.], we doubt either is at risk." Legg Mason also reported that "we believe [Capital One] and [Providian] have taken more conservative approaches to gain on sale recognition in the past, limiting the potential for writedowns on weaker-than-expected trends in the future."

78.    As a result of the Individual Defendants' actions, MBNA's market capitalization has been damaged by over $12.53 billion. Further, the Individual Defendants caused MBNA to buyback a quarter of a billion dollars worth of its own stock at artificially inflated prices. At the same time that the defendants were causing MBNA to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $75,970,088.73 of their personally held stock.

## ILLEGAL INSIDER SELLING

79.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of MBNA stock:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|------|------|--------|-------|----------|
| Bruce L. Hammonds | 1/27/2005 | 351,409 | $ 26.51 | $ 9,315,044.35 |
| Kenneth A. Vecchione | 1/25/2005 | 79,829 | $ 26.70 | $ 2,131,434.30 |
|  | 1/25/2005 | 20,633 | $ 26.80 | $ 552,964.40 |
|  |  | 100,462 |  | $ 2,684,398.70 |
| Richard K. Struthers | 2/3/2005 | 457,464 | $ 26.84 | $ 12,277,922.04 |
| Charles C. Krulak | 2/1/2005 | 224,754 | $ 26.75 | $ 6,012,169.50 |
|  | 2/1/2005 | 50,217 | $ 27.00 | $ 1,355,859.00 |

| | | | | | |
|---|---|---|---|---|---|
| | 1/31/2005 | 92,483 | $ | 26.50 | $ 2,450,799.50 |
| | 1/25/2005 | 130,000 | $ | 26.61 | $ 3,459,547.00 |
| | | **497,454** | | | **$13,278,375.00** |
| John R. Cochran, III | 1/27/2005 | 398,150 | $ | 26.51 | $10,554,040.76 |
| | 1/27/2005 | 133,009 | $ | 26.55 | $ 3,531,388.95 |
| | | **531,159** | | | **$14,085,429.71** |
| Michael G. Rhodes | 1/25/2005 | **406,040** | $ | 26.76 | **$10,865,346.17** |
| Lance L. Weaver | 1/25/2005 | **376,835** | $ | 26.76 | **$10,085,574.26** |
| John W. Scheflen | 1/25/2005 | **125,810** | $ | 26.85 | **$ 3,377,998.50** |
| | **TOTAL** | **2,846,633** | | | **$75,970,088.73** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.    Plaintiff brings this action derivatively in the right and for the benefit of MBNA to redress injuries suffered, and to be suffered, by MBNA as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. MBNA is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

81.    Plaintiff will adequately and fairly represent the interests of MBNA in enforcing and prosecuting its rights.

82.    Plaintiff is and was an owner of the stock of MBNA during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

83.    The current Board of MBNA consists of the following nine individuals: defendants Hammonds, Berick, Boies, Civiletti, Jews, Lerner, Markowitz, Milstead and Unger. Plaintiff has not made any demand on the present Board of MBNA to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)    As a result of their access to and review of internal corporate documents;

- 31 -

conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, defendant Hammonds sold 351,409 shares of MBNA stock for proceeds of $9,315,044.35. Because defendant Hammonds received a personal financial benefit from the challenged insider trading transactions, he is interested and any demand upon him is futile;

(b) The principal professional occupation of defendant Hammonds is his employment with MBNA, pursuant to which he received and continues to receive substantial monetary compensations and other benefits as MBNA's President and CEO. Specifically, for FY:04, MBNA paid defendant Hammonds $9,165,947 in salary, bonus and other compensation. Accordingly, defendant Hammonds lacks independence from defendants Milstead, Berick, Boies, Civiletti, Jews and Markowitz, defendants who are not disinterested and/or independent and who exert influence over defendant Hammonds' compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee reviews and approves corporate goals and objectives relevant to the CEO's compensation, evaluates the CEO's performance in light of those goals and objectives, and either as a committee or together with the other independent directors (as directed by the Board), determines and approves the CEO's compensation based on this evaluation. This lack of independence renders defendant Hammonds incapable of impartially considering a demand to commence and vigorously prosecute this action;

(c) The principal professional occupation of defendant Lerner is his employment with MBNA, pursuant to which he received and continues to receive substantial monetary compensations and other benefits as MBNA's Chairman of the Board. Specifically, for FY:04, MBNA paid defendant Lerner $500,000 in salary. Accordingly, defendant Lerner lacks independence from defendants Milstead, Berick, Boies, Civiletti, Jews and Markowitz, defendants who are not

- 32 -

disinterested and/or independent and who exert influence over defendant Lerner's compensation by virtue of their positions as members of the Compensation Committee. The Compensation Committee makes recommendations to the Board with respect to non-CEO compensation, incentive-compensation plans and equity-based plans. This lack of independence renders defendant Lerner incapable of impartially considering a demand to commence and vigorously prosecute this action;

(d)     According to MBNA's Proxy Statement filed with the SEC on or about March 15, 2005, non-employee directors on the Board each receive an annual retainer of $70,000. Further each Audit Committee member receives $15,000 annually, each Compensation Committee and Governance Committee member receives $5,000 annually and each Committee Chairperson receives $15,000 annually. Non-employee directors are paid $1,500 for each Board, committee or subcommittee meeting attended. Defendants Berick and Civiletti receive an additional $8,000 retainer for serving on the MBNA Europe Audit Committee as well as $2,000 for each MBNA Europe Board or committee meeting held outside of the United States. Each non-employee director also annually receives 5,000 options to purchase MBNA stock that is exercisable immediately. Accordingly, defendants Berick, Boies, Civiletti, Jews, Markowitz, Milstead and Unger are incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in safeguarding their extraordinarily substantial compensation;

(e)     According to MBNA's public website, defendants Jews, Berick, Markowitz, Milstead and Unger were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible by its own charter for assisting the Board's oversight of: (i) the integrity of the Company's and the Bank's financial statements; (ii) the Company's and the Bank's compliance with legal and regulatory requirements; and (iii) the performance of the Company's and the Bank's internal audit function and independent auditors. Specifically, the Audit Committee is responsible for reviewing with management the annual audited financial statements and quarterly financial statements

- 33 -

and other financial reporting matters, including: significant transactions which are not a normal part of the Company's operations; any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; any major issues as to the adequacy of the corporation's internal controls; any special steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting; and disclosures made to the Committee by the Corporation's CEO and CFO during their quarterly certification process about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the corporation's internal controls. The Audit Committee is further responsible for discussing MBNA's earnings press releases, as well as the types of financial information and earnings guidance (if any) provided to analysts and rating agencies. Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in the improper statements described herein. By such actions, defendants Jews, Berick, Markowitz, Milstead and Unger breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(f)     Defendant Milstead, by his specialized financial expertise, was in a unique position to understand the business of MBNA, as well as its finances, markets and present and future business prospects. Specifically, defendant Milstead was a former partner of the accounting firm Ernst & Young LLP ("E&Y"). Milstead worked in public accounting and auditing at E&Y for over 31 years. Defendants Milstead, because of his unique qualifications, had a heightened duty to insure the accuracy and fairness of MBNA's financials. Nonetheless, defendant Milstead breached his duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile;

- 34 -

(g)    Defendant Unger, by her specialized financial expertise, was in a unique position to understand the business of MBNA, as well as its finances, markets and present and future business prospects. Specifically, defendant Unger is an expert in securities regulation and a former Acting Chairman of the SEC. Defendant Unger served as the Commissioner of the SEC between 1997 and 2002. Defendant Unger, because of her unique qualifications, had a heightened duty to insure the accuracy and fairness of MBNA's financials. Nonetheless, defendant Unger breached her duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile;

(h)    The entire MBNA Board and senior management participated in the wrongs complained of herein. MBNA's directors are not disinterested or independent due to the following: defendants Hammonds, Berick, Boies, Civiletti, Jews, Lerner, Markowitz, Milstead and Unger served on the MBNA Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to MBNA and its shareholders in that they failed to prevent and correct the improper financials. Thus, the MBNA Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected MBNA to millions of dollars in liability for possible violations of applicable securities laws;

(i)    The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein *supra*, the majority of the Board, including the

- 35 -

defendants listed below, are subject to the following prejudicial entanglements:

       (i)      ***Berick and Lerner Have a Long-Time Personal Relationship:***

Defendant Berick is defendant Lerner's godfather. Further, defendant Berick was Lerner's father's college roommate. Because of their long-standing and entangling personal relationships, neither defendant Berick nor defendant Lerner will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

       (j)      Defendant Lerner is the owner of the Cleveland Browns football team. In 1999, the Board approved a ten year marketing agreement with the Browns. As defendant Lerner has an interest is safeguarding this agreement, any demand upon him is futile;

       (k)      Defendant Civiletti's son is employed by MBNA's legal department. Were Civiletti to recommend to the Board that plaintiff's action be vigorously prosecuted, his son's occupation would be seriously jeopardized. Accordingly, any demand upon defendant Civiletti is futile;

       (l)      Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein;

       (m)      The Director Defendants of MBNA, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from MBNA's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

       (n)      In order to bring this suit, all of the directors of MBNA would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

       (o)      The acts complained of constitute violations of the fiduciary duties owed by MBNA's officers and directors and these acts are incapable of ratification;

       (p)      Each of the Director Defendants of MBNA authorized and/or permitted the

- 36 -

false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(q)     Any suit by the current directors of MBNA to remedy these wrongs would likely expose the Individual Defendants and MBNA to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(r)     MBNA has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for MBNA any part of the damages MBNA suffered and will suffer thereby;

(s)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

(t)     If MBNA's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to

purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of MBNA. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by MBNA against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of MBNA, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause MBNA to sue them, since they will face a large uninsured liability.

84.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for MBNA for any of the wrongdoing alleged by plaintiff herein.

85.     Plaintiff has not made any demand on shareholders of MBNA to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     MBNA is a publicly held company with over 1,267,661,056 shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

- 38 -

**(Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information)**

86.　Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.　At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold MBNA common stock on the basis of such information.

88.　The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold MBNA common stock.

89.　At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of MBNA common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

90.　Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### (Against All Defendants for Breach of Fiduciary Duty)

91.　Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.　The Individual Defendants owed and owe MBNA fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe MBNA the highest obligation of good faith, fair dealing, loyalty and due care.

93.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

94.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, MBNA has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96.    Plaintiff on behalf of MBNA has no adequate remedy at law.

## COUNT III

### (Against All Defendants for Abuse of Control)

97.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MBNA, for which they are legally responsible.

99.    As a direct and proximate result of the Individual Defendants' abuse of control, MBNA has sustained significant damages.

100.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

101.    Plaintiff on behalf of MBNA has no adequate remedy at law.

## COUNT IV

### (Against All Defendants for Gross Mismanagement)

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MBNA in a manner consistent with the operations of a publicly held corporation.

104.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MBNA has sustained significant damages in excess of hundreds of millions of dollars.

105.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

106.    Plaintiff on behalf of MBNA has no adequate remedy at law.

### COUNT V

### (Against All Defendants for Waste of Corporate Assets)

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused MBNA to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

109.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

110.    Plaintiff on behalf of MBNA has no adequate remedy at law.

- 41 -

## COUNT VI

### (Against All Defendants for Unjust Enrichment)

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of MBNA.

113.    Plaintiff, as a shareholder and representative of MBNA, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VII

### (Derivatively Against All Defendants for Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder)

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    During the Relevant Period, the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

116.    The Insider Selling Defendants also sold over 2,846,633 shares of MBNA's common stock at inflated prices during the Relevant Period, receiving over $75.9 million in proceeds, while in possession of material non-public information. These defendants misappropriated MBNA's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold MBNA stock without disclosing the information alleged to have been

concealed herein.

117.    At the same time the price of the Company's common stock was inflated by the Individual Defendants' misstatements and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing MBNA to repurchase a quarter of a billion dollars worth of its own stock on the open market at inflated prices.

118.    As such, the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon MBNA and others in connection with their purchases of MBNA common stock during the Relevant Period.

119.    As a result of the Individual Defendants' misconduct, MBNA has and will suffer damages in that it paid artificially inflated prices for MBNA common stock purchased on the open market. MBNA would not have purchased MBNA common stock at the prices it paid, had the market been aware that the market price of MBNA's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, MBNA suffered damages in connection with its purchases of MBNA common stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

- 43 -

A.  Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Securities and Exchange Act of 1934;

B.  Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of MBNA has an effective remedy;

C.  Awarding to MBNA restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.  Directing MBNA to take all necessary actions to reform and improve their corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)  a provision to permit the shareholders of MBNA to nominate at least three candidates for election to the Board;

(iii)  appropriately test and then strengthen the internal audit and control functions;

(iv)  control and limit insider stock selling; and

(v)  reform executive compensation.

E.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

- 44 -

F.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 6, 2005                    Respectfully submitted,

                                       /S/ JOSEPH N. GIELATA
                                       _____

                                       JOSEPH N. GIELATA (# 4338)
                                       Attorney at Law
                                       501 Silverside Road, Suite 90
                                       Wilmington, Delaware 19809
                                       Telephone: 302/798-1096
                                       Facsimile: 302/792-0777

                                       ROBBINS UMEDA & FINK, LLP
                                       BRIAN J. ROBBINS
                                       JEFFREY P. FINK
                                       610 West Ash Street, Suite 1800
                                       San Diego, CA  92101
                                       Telephone: 619/525-3990
                                       Facsimile: 619/525-3991

                                       Attorneys for Plaintiff

## VERIFICATION

I, LOUIS KERKHOFF, hereby declare as follows:

1.    I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.    I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 3rd day of June, 2005, at San Diego, California.

_____
LOUIS KERKHOFF