# EXHIBIT B

MALCOLM ROSENWALD, *Derivatively*       *       IN THE
*On Behalf of Nominal Defendant*
*MBNA CORPORATION*,                     *
20 Craig Street                         *       CIRCUIT COURT
Jericho, New York 11753,
                                        *
         Plaintiff,                             FOR
                                        *
    ---*versus*---                      *       BALTIMORE CITY

LAURA S. UNGER,                         *
100 Enterprise Way                      *
Scotts Valley, California 95066
                                        *       Case No. _____
    ---*and*---
                                        *
BENJAMIN R. CIVILETTI,
1800 Mercantile Bank & Trust Building   *
2 Hopkins Plaza
Baltimore, Maryland 21201,              *

    ---*and*---                         *

WILLIAM H. JEWS,                        *       **JURY TRIAL DEMANDED**
10455 Mill Run Circle
Owings Mills, Maryland 21117,           *

    ---*and*---                         *

JAMES H. BERICK, MARY H. BOIES          *
BRUCE L. HAMMONDS, RANDOLPH D.
LERNER, STUART L. MARKOWITZ,            *
WILLIAM H. MILSTEAD, and THOMAS
G. MURDOUGH, JR.,                       *


(Caption continued on next page)


24031

All c/o The Corporation Trust           *
300 East Lombard Street
Baltimore, Maryland 21202,               *

   Defendants,               *

 —and—                               *

MBNA CORPORATION,                        *
300 East Lombard Street
Baltimore, Maryland 21202,               *

   Nominal Defendant.        *

 * * * * * * * * * * *

## SHAREHOLDER DERIVATIVE COMPLAINT

### Nature Of The Action

1. Plaintiff brings this stockholder's derivative action on behalf of MBNA Corp. ("MBNA) to recover against the individual defendants who are directors of MBNA for the failure and abdication of their duties to manage the business and affairs of MBNA and for breach of their fiduciary duties of loyalty, good faith and good care, and for gross mismanagement and for waste, in violation of applicable law.

### The Parties

2. Plaintiff Malcolm Rosenwald is a stockholder of MBNA and has been such since June 1993 and continuously to date.

– 2 –

3.    MBNA is incorporated under the laws of the State of Maryland, and is qualified to do, and is doing business, in Delaware with its principal offices located in Wilmington, Delaware. It is the parent company of MBNA America Bank, N.A. ("Bank"), a national bank. It also has two wholly owned, non- United States bank subsidiaries: MBNA Europe Bank, Limited and MBNA Canada Bank. It is an international financial services company providing lending, deposit, and credit insurance products and services to its customers. In addition to credit card lending, MBNA makes other consumer loans, as well as commercial loans, primarily to small businesses.

4.    Defendant James H. Berick, is an attorney and has been a director of Bank and of MBNA since January 1991. He was a partner and chairman of Squire, Sanders & Dempsey, LLP, the attorneys who acted as attorneys for MBNA and has received substantial compensation therefor. His son is currently a partner in that firm. Mr. Berick receives $70,000 for serving as a member of the board of directors of MBNA and as a member of the audit, compensation, and governance committees for which he receives additional compensation of $25,000 plus $1,500 for each board, committee, or subcommittee meeting attended. Mr. Berick is also a director MBNA Europe and serves as Chairman of its audit committee for which he receives an additional annual retainer of $16,000. If Mr. Berick attends, in person, any

– 3 –

meetings of the MBNA Europe board or its audit committee held outside the U.S., he receives an additional $2,000 fee for each such attendance. He was the college roommate of MBNA's founder, Al Lerner, the father of MBNA's present chairman of the board and, was at one time, the Lerner family lawyer and still provides advice to that family. Mr. Berick is also a director of the Town and Country Trust, a real estate investment trust with long standing ties to the Lerner family. He receives an annual option grant of 5,000 shares, owns 46,573 shares directly and indirectly, and has options to acquire 170,154 additional shares within 60 days of February 4, 2005.

5.      Defendant Mary H. Boies is an attorney and has been a director of MBNA since June 2004 and owns 20,000 shares of MBNA and options to acquire 10,000 additional shares within 60 days of February 4, 2005.  Ms.  Boies is a member of the compensation and governance committees. She receives an annual retainer of $70,000 for serving on the board and additional compensation of $10,000 as a member of the compensation and governance committees plus $1,500 for each board, committee, and subcommittee meeting attended, and she also receives an annual award of 5,000 options.

6.      Defendant Benjamin R. Civiletti is an attorney, partner, and chairman of Venable LLP, a firm of attorneys performing legal services for MBNA and receiving substantial compensation therefor. He has been a director of MBNA and

the Bank since April 1993, and serves on MBNA's compensation and governance committees, and is chairman of the latter. He receives an annual retainer of $70,000, and $25,000 for serving on the compensation and governance committees. One of his sons is employed in MBNA's legal department. Defendant Civiletti is a director of MBNA Europe and its audit committee, for which he receives an annual retainer of $8,000 and an additional $2,000 for each meeting of the board and audit committee that he attends outside the United States. He owns 31,780 shares of MBNA with options to acquire 143,904 additional shares within 60 days of February 4, 2005. He also receives an annual grant of 5,000 options.

7.    Defendant Bruce L. Hammonds is and has been a director since December 2003. He is also president and chief executive officer of MBNA and was previously president and chief executive officer of Bank and a director thereof since 1986. Mr. Hammonds was one of the founders of MBNA in 1982. Hammonds as CEO and President of MBNA for 2004 was paid total cash compensation of $3,544,525 plus restricted shares on which dividends are paid. In the prior year, 2003, he received total cash compensation of $4,625,000 plus restricted shares. He owns 112,609 shares of MBNA, has 2,038,486 restricted shares, with options to acquire 4,826,478 shares, exercisable within 60 days of February 4, 2005.

– 5 –

8.    Defendant Randolph D. Lerner is an attorney, son of Alfred Lerner, the founder of MBNA, and has been chairman of the board of MBNA since November 2002. He is chairman and owner of the Cleveland Browns, a team in the National Football League. Mr. Lerner's team is the beneficiary of a 1999, ten-year marketing agreement between MBNA and the Cleveland Browns when it was owned by his father, Alfred Lerner. As chairman of MBNA he receives a salary of $500,000 per year. His mother, Mrs. Norma Lerner, widow of the MBNA founder, receives significant benefits from MBNA arising out of the death of her husband. Defendant Lerner is a co-trustee and beneficiary of the Alfred Lerner Trust, which beneficially owns 86,125,545 shares of MBNA stock. Mr. Lerner owns in his own right, 170,857 shares of MBNA with options to acquire 275,154 shares within 60 days of February 4, 2005.

9.    Defendant William H. Jews is a director and has been a director of MBNA since June 2000. He is also chairman of the audit committee and owns 1,500 shares of MBNA and has options to acquire 37,500 within 60 days of February 4, 2005. He receives an annual retainer of $70,000 and an annual award of 5,000 options with an additional compensation of $40,000 for serving on the audit, compensation, and governance committees.

10.     Defendant Stuart L. Markowitz is a medical doctor and a director of MBNA since April 1991, for which he receives an annual retainer of $70,000. He is a member of the audit, compensation, and governance committees, for which he receives $25,000. Defendant Markowitz owns 345,218 shares of MBNA with options to acquire an additional 113,202 within 60 days of February 4, 2005. He also receives an annual award of 5,000 options.

11.     Defendant William H. Milstead is a director of MBNA since May 2003 and is also a member of the compensation, audit, and governance committees. He is chairman of the compensation committee. He was the coordinating partner of Ernst & Young during the initial public offerings of MBNA in 1991 and 1993. Mr. Milstead owns 1,000 shares of MBNA with options to acquire 15,000, exercisable within 60 days of February 4, 2005. He receives an annual retainer of $70,000 and an additional $40,000 for serving on the audit, compensation, and governance committees, and an annual award of 5,000 options.

12.     Defendant Thomas G. Murdough, Jr. was a director of MBNA from October 2004 until May 2005, and served as a member of the audit and compensation committees and has options to acquire 10,000 shares of MBNA within 60 days of February 4, 2005. He receives an annual retainer of $70,000 and an additional

– 7 –

$20,000 for serving on the audit and compensation committees, and an annual award of 5,000 options.

13.    Defendant Laura S. Unger is an attorney and has been a director of MBNA since June 2004. She is a member of the audit and governance committees and owns 1,000 shares of MBNA with options to acquire 10,000 additional shares within 60 days of February 4, 2005. She receives an annual retainer of $70,000 and an additional $20,000 for serving on the audit and governance committees, and an annual award of 5,000 options.

### The Facts

14.    During the period commencing January 1, 2005, and ending April 30, 2005, MBNA and defendant Hammonds and other key officers issued a series of public statements. On January 21, 2005 MBNA filed Form 8K with the SEC stating in part:

> MBNA Corporation announced today that management's objective is to increase earnings per share by 10% in 2005 and by an average of 12% per year over the next several years, excluding the impact of a previously announced restructuring charge of approximately $300 million to $350 million pre-tax that the Corporation will take in the first quarter of 2005. Management believes earnings growth in 2005 will primarily be driven by improvements in credit quality and reduced expense growth rates.

– 8 –

> Management anticipates slower average loan growth in the first half of 2005 than in the second half of 2005. Management anticipates this lower growth rate in part because of the overall slower industry growth rate and the Corporation's decision to reduce its marketing of low introductory rate offers in 2004 and focus more on rewards programs. Management believes the reduction in low introductory rate marketing in 2004 will have less of an impact on loan growth in the second half of 2005 than in the first half.

15. On January 21, 2005, a conference call was held for analysts in which defendant Hammonds stated, in pertinent part:

> We expect earnings growth to average about 12% over the next several years. There will be years when it's more than 12% and years when it's less than 12%. And in fact, in 2005 we expect it to be more than 10%. We expect it to be 10% this year primarily because we're starting the year off at a relatively low level of average growth.

16. On March 15, 2005, MBNA filed Form 10-K with the SEC. It stated, with respect to interest-only strips, as follows:

> **OFF-BALANCE SHEET ASSET SECURITIZATION**
>
> The Corporation uses securitization of its loan principal receivables as one source to meet its funding needs. The Corporation accounts for its securitization transactions in accordance with Statement of Financial Accounting Standards No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities – a

– 9 –

Replacement of FASB Statement No. 125" ("Statement No. 140"), issued by the Financial Accounting Standards Board ("FASB"). When the Corporation securities loan principal receivables, the Corporation recognizes a gain on sale and retained beneficial interests, including an interest-only strip receivable. The interest-only strip receivable represents the contractual right to receive interest and other revenue less certain costs from the trust over the estimated life of the securitized loan principal receivables.

\* \* \*

The Corporation estimates the fair value of the interest-only strip receivable based on the present value of expected future net revenue flows. Since quoted market prices for the interest-only strip receivable are not available, management uses certain assumptions and estimates in determining the fair value of the interest-only strip receivable. These assumptions and estimates include projections of interest income, certain fees, recoveries on charged-off securitized loans, gross credit losses on securitized loans, contractual servicing fees, and the interest rate paid to investors in a securitization transaction ("excess spread"). These projections are used to estimate the excess spread to be earned by the Corporation over the estimated life of the securitized loan principal receivables. The other assumptions and estimates used by the Corporation in estimating the fair value of the interest-only strip receivable include projected loan payment rates, which are used to determine the estimated life of the securitized loan principal receivables, and an appropriate discount rate.

The assumptions and estimates used to estimate the fair value of the interest-only strip receivable at December 31, 2004, reflect management's judgment as to the expected excess spread to be earned and projected loan payment rates to be experienced on the securitized loans. These estimates are likely to change in the future, as the individual components of the excess spread and projected loan payment rates are sensitive to market and economic conditions. For example, the rates paid to investors in the Corporation's securitization transactions are primarily variable rates subject to change based on changes in market interest rates. Changes in market interest rates and competitive pressures can also affect the projected interest income on securitized loans, as the Corporation could reprice the managed loan portfolio. Credit loss projections could change in the future based on changes in the credit quality of the securitized loans, the Corporation's account management and collection practices, and general economic conditions. Projected loan payment rates could fluctuate based on general economic conditions and competition. Actual and expected changes in these assumptions may result in future estimates of the excess spread and projected loan payments rates being materially different from the estimates used in the periods covered by this report.

On a quarterly basis, the Corporation reviews prior assumptions and estimates and compares the results to actual trust performance and other factors for the prior period that approximates the average life of the securitized loan receivables. Based on this review and the Corporation's current assumptions and estimates for future periods, the Corporation adjusts as appropriate, the assumptions and estimates used in determining the fair value of the interest-only strip receivable. If the assumptions change, or actual

results differ from projected results, the interest-only
strip receivable and securitization income would be
affected.    If management had made different
assumptions for the periods covered by this report that
raised or lowered the excess spread or projected loan
payments rates, the Corporation's financial condition
and results of operations could have differed
materially. For example, a 20% change in the excess
spread assumption for all securitized loan principal
receivables could have resulted in a change of
approximately $259 million in the value of the total
interest-only strip receivable at December 31, 2004,
and a related change in securitization income.

17.    On April 6, 2005, MBNA filed Form 8-K with the SEC in which it

was stated that job cuts, asset sales, and contract terminations associated with a

restructuring would result in $785 million of pre-tax costs, more than twice the

amount forecast in the January 21, 2005 SEC filings.

18.    On April 21, 2005, MBNA announced that its profits would be

"significantly below" its 10% growth target for 2005 because, it stated, customers

were "unexpectedly" paying off credit card debt in favor of less expensive sources of

credit. It further announced that its first quarter earnings fell 93%, year-over-year to

$0.02 a share before the restructuring charge, from $0.40 a share in the first quarter of

2004, and that the earnings were adversely affected by a $207 million write down of

MBNA's interest-only strip receivables.

19.    MBNA's shares fell to a two-year intra-day low of $18.50 before closing at $19.28, on a day most major bank stocks rose. Thereafter, newspaper published articles in which it was noted that MBNA's management lost major credibility because it gave profits growth forecast in January, and it did not indicate that it would fail to reach its growth target when it updated its restructuring plans on April 6th.

20.    The public statements were materially false and misleading in that

a.    there was no reasonable basis for the statement, when made, that MBNA would achieve annual earnings growth of 10%;

b.    MBNA failed to disclose that increases in interest rates, which had commenced before January 2005 and continued throughout, were driving down the proper carrying value of MBNA's interest-rate only strips, such that the value of the company's reported assets was materially overstated;

c.    MBNA did not adjust as appropriate the assumptions and estimates used in determining the fair value of the interest-only strip receivable; and

d.    MBNA did not prepare its financial disclosures in accordance with Generally Accepted Accounting Principles ("GAAP").

– 13 –

21.    In order to overstate the MBNA's financial results during the Class Period, MBNA misreported its investment in interest-only securities, mortgages servicing rights, and adjustable-rate mortgages. MBNA's assets were overstated by failing to recognize impairment of these assets caused by adverse interest-rate increases. MBNA thereby overstated its income, assets and stockholders' equity in financial statements, press releases, and filings with the SEC during the January-April 2005 period. As a result of MBNA's improper accounting for its portfolio, MBNA presented materially false financial results, in the Form 10-K filed on March 15, 2005, its Annual Report to Shareholders for the year 2004, and in other statements, during January 1, 2005 to April 30, 2005, in violation of GAAP despite the fact that it was repeatedly represented that its financial statements were prepared in accordance with generally accepted accounting principles.

22.    These statements were false and misleading as to the financial results and disclosures released during the said period as such financial information was not prepared in accordance with GAAP; nor did the financial information present fairly MBNA's operations assets and stockholders' equity due to the improper accounting for its interest-only investments and mortgage-servicing rights, which improper accounting caused the earnings, income, assets, and stockholders' equity to be materially overstated in violation of GAAP and SEC rules.

– 14 –

23.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

24.    GAAP, as set forth in FASB Statement of Concepts No. 5, ¶87, states:

> An expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits.

25.    GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, ¶16, states:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary. For example, if it is probable that the investor will be

– 15 –

unable to collect all amounts due according to the
contractual terms of a debt security not impaired at
acquisition, an other-than-temporary impairment shall
be considered to have occurred. If the decline in fair
value is judged to be other than temporary, the cost
basis of the individual security shall be written down
to fair value as a new cost basis and the amount of the
writedown shall be included in earnings (that is,
accounted for as a realized loss).[1]

26.     Due to the aforementioned accounting improprieties, MBNA's

financial statements were presented in a manner which violated GAAP.

27.     Contained in the Annual Report to Shareholders for the year 2004 is

"Management's Report On Internal Control Over Financial Reporting" signed by the

---

[1] According to SFAS No. 125, 14:

> Interest-only strips, loans, other receivables, or retained interests in
> securitization that can contractually be prepaid or otherwise settled in
> such a way that the holder would not recover substantially all of its
> recorded investment shall be subsequently measured like investments
> in debt securities classified as available-for-sale or trading under
> Statement 115, as amended by this Statement (paragraph 233).

defendant Hammonds, as well as the chief financial officer of MBNA and dated

February 17, 2005. This report states, in pertinent part:

> The accompanying consolidated financial statements
> were prepared by management, which is responsible
> for the integrity and objectivity of the information
> presented . . . .
>
> Management is responsible for establishing and
> maintaining adequate internal control over financial
> reporting . . . . The Corporation's internal control over
> financial reporting includes those policies and
> procedures that:
>
> > i) .... pertaining to the maintenance of records
> > that, in reasonable detail, accurately and fairly
> > reflect the trans-actions and dispositions of
> > assets of the Corporations;
> >
> > ii) Provide reasonable assurance that
> > transactions are recorded as necessary to
> > permit preparation of financial statements in
> > accordance with generally accepted
> > accounting principles . . . .

28.     SEC Regulation S-X requires that publicly traded companies present

their annual financial statements in accordance with GAAP. (17 C.F.R. §240.4-

01(a)(1)). In addition, Regulation S-X requires that interim financial statements also

comply with GAAP. Financial statements filed with the SEC that are not prepared in

compliance with GAAP are presumed to be misleading and inaccurate. Management

is responsible for preparing financial statements that conform to GAAP. As noted by

AICPA professional standards:

> financial statements are management's respon-
> sibility.... [M]anagement is responsible for adopting
> sound accounting policies and for establishing and
> maintaining internal control that will, among other
> things, record, process, summarize and report
> transactions as well as events and conditions)
> consistent with management's assertions embodies in
> the financial statements. The entity's transactions ...
> are within the direct knowledge and control of
> management . . . . Thus, the fair presentation of
> financial statements in conformity with Generally
> Accepted Accounting Principles is an implicit and
> integral part of management's responsibility.

29.    Item 7 of Form 10-K and Item 2 of Form 10-Q, Management

discussions and Analysis of financial Condition and Results of Operations ("MD&A")

require the issuer to furnish information required by Item 303 of Regulation S-K (17

C.F.R. §229.303). In discussing results of operations, Item 303 of Regulation S-K

requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the
> registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenue or income from
> continuing operations.

30.    In addition, the SEC in its May 1989 Interpretive Release No. 34-

26831, has indicated that registrants should employ the following two-step analysis in

– 18 –

determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

31.     As a result of the foregoing, class action suits have been commenced in the United States District Court for the District of Delaware alleging violations of the securities laws and seeking millions of dollars of damage. As a consequence, MBNA has lost credibility and damage to its good name and good will, and may be potentially liable for millions of dollars of damage and related costs and expenses of such litigation.

32.     The defendants were aware of the intense public scrutiny being focused on major public corporations, such as MBNA, following the financial debacles and collapse of several major public corporations. They were equally aware that several banks had been involved and extra scrutiny would now be put upon other banks.

33.     The defendants were equally aware that the management of MBNA possessed the power and authority to control the contents of MBNA's public reports, press releases, and presentations to the public and analysts. These very same people

– 19 –

had grown accustomed over the years to receiving extraordinary levels of executive compensation. MBNA had come under pressure from shareholders in 2004 for the need of executive compensation to be reduced and for independent directors to be placed to watch over the compensation.

34.    As a consequence, the compensation levels of the management group were significantly reduced. Thus, the management group received a 34% reduction in total direct compensation to defendant Hammonds and a combined 37% reduction in total direct compensation for others in the management group.

35.    But, these very same individuals also had extremely valuable options which would expire in 2005 if not exercised. Management knew the value of these options and shares would rapidly decline if the true picture concerning MBNA's financial results were reported. The defendants herein were thus under an obligation to ensure that, notwithstanding the foregoing, and the temptations available to management, the true picture of MBNA's financial results would be accurately reported to the public and to the analysts.

36.    In view of the foregoing, the defendant-directors were charged with the responsibility of ensuring that management would accurately report MBNA's financial results to the public and the analysts. Six members of the board, to wit, defendants Jews, Berick, Markowitz, Milstead, Murdough and Unger, were members

– 20 –

of the audit committee and reviewed the financial reports being issued to the public and in light of the Sarbanes-Oxley requirements, also reviewed the SEC filings. These members clearly were aware, due to the reports received by them, that the financial results being reported were untrue and false. Indeed, one defendant, Milstead, a member of the audit committee, was an Ernst & Young partner and familiar with the principles and requirements of GAAP and financial reporting. If they were unaware, they should have requested and received reports either supporting the results being reported or correcting the results being reported. The remaining defendants also should also have received those reports and reviewed the public disclosures. In failing to do so, the violated their duties of loyalty, good faith, and good care.

## DEMAND IS EXCUSED

37.    Plaintiff has not made any demand upon the board to institute this action. Demand is excused because the board is incapable of exercising independent and disinterested judgment as to whether to pursue the claims described herein for the reasons set forth below.

38.    Under the circumstances alleged herein, the board cannot be disinterested and independent concerning any decision to sue themselves for the damage to MBNA as a result of the conduct described in this complaint. The failures

– 21 –

and refusal to act alleged herein have in fact caused harm and damage to MBNA and constitute waste and/or were not the product of any valid exercise of business judgment.

39.    Six members of the board of directors were on the audit committee, and knew or should have known the truth about MBNA's finances by virtue of having received reports reflecting the truth.  They were charged with the responsibility of reviewing the issuance of MBNA's financial results and knew or should have known the truth of the results.  They were charged with the overall responsibility of reviewing the methods by which MBNA's financial results were obtained, released to the public, and filed with the SEC.  They were aware of the intense public scrutiny of public corporations and banks; they were also aware of the temptation for management to "pump up" earnings in order to make their existing options about to expire more valuable.  By virtue of failing to review reports and/or to review the financial results and/or to review releases of such results for filing with the SEC and/or to the public, the board caused harm and damage to MBNA.

– 22 –

40.     One member of the board, defendant Hammonds, is a party-defendant to the class action suits referred to herein and was the one directly responsible for the issuance of the alleged fraudulent and false financial information during the period January 2005 to April 2005. Mr. Hammonds had 4,826,478 options, all of which would significantly decline in value should the truth of MBNA's finances become known in the aforesaid period. As a director, he would not be thus able to exercise valid business judgment and certainly, not sue himself.

41.     Defendant Lerner, the son of Al Lerner, the late founder of MBNA, is a direct beneficiary of the Lerner Family holdings in MBNA and owns 275,154 options which would expire within 60 days of February 4, 2005. The family holdings of which he is a beneficiary and his own options would be worth significantly less if the truth of MBNA's finances became known. Thus, he had a vested interest in keeping the truth from becoming known and in continuing to allow false information to be spread.

42.     Defendants Berick and Civiletti were members of law firms who received significant and substantial legal fees from MBNA, which firms would have to depend upon the grace of management in continuing to award legal services and pay resulting fees to these firms. Moreover, defendant Berick had long standing ties as outlined above to the Lerner Family and, in his own right, had options to acquire

– 23 –

170,154 shares, which options would be worth significantly less should the truth of MBNA's finances became known. This applied as well to defendant Civiletti, who had options to acquire 143,904 shares of MBNA stock.

43.    The allegations of wrongdoing alleged herein arise out of a systematic and sustained failure to act and do not involve actual decisions of the board.  Hence, the protection of the business judgment rule does not apply in determining whether demand is futile, since under applicable law there is "substantial likelihood" of director liability, rather than a "mere threat" of liability against the directors for the acts in omission alleged herein.  The board is too "interested" to consider this demand independently and thus demand is futile.

## Count 1

### Breach of Fiduciary Duty

44.    All other allegations in this Shareholder Derivative Complaint, except as inconsistent with this Count, are adopted by reference in this Count as if set forth fully herein.

45.    Defendants (including as directors and/or officers of Nominal Defendant) owed fiduciary duties, as further detailed herein.

46.    Defendants' acts and/or omissions breached such fiduciary duties, as further detailed herein.

– 24 –

47.    Defendants' said breaches of fiduciary duties proximately caused material financial injury / damage, including to plaintiff and to Nominal Defendant, as further detailed herein.

### Count 2

### Corporate Waste

48.    All other allegations in this Shareholder Derivative Complaint, except as inconsistent with this Count, are adopted by reference in this Count as if set forth fully herein.

49.    Defendants' wrongful conduct, as detailed herein, constitutes the unlawful waste of the corporate assets of the Nominal Defendant.

50.    Plaintiff and the Nominal Defendant have suffered corresponding legal injury, thereby.

### Count 3

### Negligence

51.    All other allegations in this Shareholder Derivative Complaint, except as inconsistent with this Count, are adopted by reference in this Count as if set forth fully herein.

52.    Defendants, including for all reasons stated herein, owed one or more legal duties of care to plaintiff and the Nominal Defendant.

– 25 –

53.     Defendants, including for all reasons stated herein, breached one or more legal duties of care owed to plaintiff and the Nominal Defendant.

54.     Plaintiff and the Nominal Defendant have suffered corresponding legal injury, thereby; such legal injury (and/or damages) being proximately caused by defendants' wrongful conduct.

55.     Defendants' conduct, per the allegations stated herein, constitutes negligence and/or gross negligence under applicable law.

56.     WHEREFORE, plaintiff demands judgment as follows:

A.     Against all defendants, jointly and severally, for the amount of damages proximately caused to the Nominal Defendant as to the matters complained of herein;

B.     Requiring defendants to account to MBNA for all of its present and future damages arising out of the claims alleged herein;

C.     Awarding reasonable attorney's fees and the reimbursement of expenses and expert fees; and

D.     Granting such other and further relief as justice may require.

– 26 –

Dated:  July 11, 2005

                          **LAW OFFICES OF CHARLES J. PIVEN, P.A.**

                          *Marshall M. Perkins*

                          Charles J.  Piven
                          Marshall Perkins
                          The World Trade Center—Baltimore
                          Suite 2525
                          401 East Pratt Street
                          Baltimore, Maryland  21202
                          Tel:  (410) 332-0030
                          Fax:  (410) 685-1300

                          **BALLON STOLL BADER &**
                          **NADLER, P.C.**
                          Irving Bizar, Esq.
                          1450 Broadway – 14th Floor
                          New York, New York
                          Tel:  (212) 575-7900
                          Fax:  (212) 764-5060

                          *Counsel for Plaintiff*

Circuit Court for _Baltimore City_
City or County

## CIVIL—NON-DOMESTIC CASE INFORMATION REPORT

**Directions:**
  *Plaintiff: This Information Report must be completed and attached to the complaint filed with the Clerk of the Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111. A copy must be included for each defendant to be served.*
  *Defendant: You must file an Information Report as required by Rule 2-323(h).*
  **THIS INFORMATION REPORT CANNOT BE ACCEPTED AS AN ANSWER TO RESPONSE.**

FORM FILED BY: ☒ PLAINTIFF ☐ DEFENDANT    CASE NUMBER: _____

CASE NAME: _Malcolm Rosenwald_    v. _Laura S. Unger, et al._
Plaintiff                                    Defendant

JURY DEMAND: ☒ Yes ☐ No    Anticipated length of trial: _____ hours or _14_ days

RELATED CASE PENDING? ☐ Yes ☒ No    If yes, Case #(s), if known: _n/a_

HAS ALTERNATIVE DISPUTE RESOLUTION (ADR):    Been Tried?  ☐ Yes ☒ No
                                              Requested?  ☐ Yes ☒ No

If yes, specify: _____

Special Requirements?  ☐ Interpreter/communication impairment
                       ☐ Other ADA accommodation: _____

| NATURE OF ACTION (CHECK ONE BOX) | | DAMAGES/RELIEF | |
|---|---|---|---|
| **TORTS** | **LABOR** | **A. TORTS** | |
| ☐ Motor Tort | ☐ Workers' Comp. | **Actual Damages** | |
| ☐ Premises Liability | ☐ Wrongful Discharge | ☐ Under $7,500 | ☐ Medical Bills |
| ☐ Assault & battery | ☐ EEO | ☐ $7,500 - $50,000 | $_____ |
| ☐ Product Liability | ☐ Other | ☐ $50,000 - $100,000 | ☐ Property Damages |
| ☐ Professional Malpractice | **CONTRACTS** | ☒ Over $100,000 | $_unliquidated_ |
| ☐ Wrongful Death | ☐ Insurance | | ☐ Wage Loss |
| ☐ Business & Commercial | ☐ Confessed Judgment | | $_____ |
| ☐ Libel & Slander | ☐ Other | | |
| ☐ False Arrest/Imprisonment | **REAL PROPERTY** | **B. CONTRACTS** | **C. NONMONETARY RELIEF** |
| ☐ Nuisance | ☐ Judicial Sale | | |
| ☐ Toxic Torts | ☐ Condemnation | ☐ Under $10,000 | |
| ☐ Fraud | ☐ Landlord/Tenant | ☐ $10,000 - $20,000 | ☐ Declaratory Judgment |
| ☐ Malicious Prosecution | ☐ Other _____ | ☐ Over $20,000 | ☐ Injunction |
| ☐ Lead Paint | **OTHER** | | ☒ Other |
| ☐ Asbestos | ☐ Civil Rights | | _Accounting_ |
| ☒ Other _derivative_ | ☐ Environmental | | |
| | ☐ ADA | | |
| | ☐ Other | | |

## TRACK REQUEST

*With the exception of Baltimore County, Baltimore City, and Prince George's County, please fill in the estimated LENGTH OF TRIAL. THIS CASE WILL THEN BE TRACKED ACCORDINGLY.*

  ☐ ½ day of trial or less          ☐ 3 days of trial time
  ☐ 1 day of trial time             ☐ More than 3 days of trial time
  ☐ 2 days of trial time

**IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE COUNTY, BALTIMORE CITY, OR PRINCE GEORGE'S COUNTY, PLEASE SEE REVERSE SIDE OF FORM FOR INSTRUCTIONS.**

Date: _7/11/05_    Signature: _Marshall M. Fisher_

NDCIR (1/99)                    *Over*

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE COUNTY, BALTIMORE CITY, OR PRINCE GEORGE'S COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

| CIRCUIT COURT FOR BALTIMORE CITY (check only one) | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Standard-Short | Trial seven months from Defendant's response. Includes torts with actual damages up to $7,500; contract claims up to $20,000; condemnations; injunctions and declaratory judgments. |
| ☐ Standard-Medium | Trial 12 months from Defendant's response. Includes torts with actual damages of $7,500 and under $50,000, and contract claims over $20,000. |
| ☒ Standard-Complex | Trial 18 months from Defendant's response. Includes complex cases requiring prolonged discovery with actual damages in excess of $50,000. |
| ☐ Lead Paint | Trial per model order. |
| ☐ Asbestos | Events and deadlines set by individual judge. |
| ☐ Protracted Cases | Complex cases designated by the Administrative Judge. |

| CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY | |
|---|---|
| ☐ TRACK I | Cases having Judicially-assessed values under $25,000. |
| ☐ TRACK II | Cases having Judicially-assessed values greater than $25,000 but not complex litigation. |
| ☐ TRACK III | Non-Jury. |
| ☐ TRACK IV | Statutory Priority Jury Track. |
| ☐ TRACK V | Complex Litigation (Business, Tort, Orphan's Court Appeals). |

| LIABILITY FACTORS | | INJURY FACTORS | |
|---|---|---|---|
| ☐ Rear-end | ☐ Left-hand Turn | ☐ Soft Tissue | ☐ Herniated Disk |
| ☐ Slip and Fall | ☐ Other: | ☐ Broken Bones | ☐ Severe Head Injury |
| ☐ Intersection | | ☐ Joint Damages | ☐ Other: |
| ☐ Changing Lanes | | (knee, ankle, etc.) | |

| CIRCUIT COURT FOR BALTIMORE COUNTY | |
|---|---|
| ☐ Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, Intentional Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |