IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
IN RE MBNA CORPORATION                  :
DERIVATIVE AND CLASS                    :        Lead Case No. 1:05-cv-00327-
LITIGATION                              :        GMS
_____  :
This Document Relates To:               :
ALL ACTIONS.                            :        CLASS AND DERIVATIVE
                                        :        ACTION
-------------------------------------------------------x
```

COMPENDIUM OF UNREPORTED OPINIONS TO
OUTSIDE DIRECTORS' REPLY BRIEF IN RESPONSE TO PLAINTIFFS' SUR-REPLY
MEMORANDUM RELATING TO THE ISSUE OF SUBJECT MATTER JURISDICTION

Edward P. Welch (I.D. # 671)
Edward B. Micheletti (I.D. # 3794)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000
Attorneys for the MBNA
Outside Director Defendants

Of Counsel:
Jay B. Kasner
Susan L. Saltzstein
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036-6522
(212) 735-3000

DATED:  January 16, 2007

## INDEX

**Cases**                                                          **Tab No.**

*Litig. Trust of MDIP, Inc. v. Rapport*,
    C.A. No. 03-779-GMS, 2005 WL 1242157 (D. Del. May 5, 2005) ...................................1

*S. Freedman & Co. v. Raab*,
    C.A. No. 05-1138, 2006 WL 1275922 (3d Cir. May 10, 2006) .........................................2

*In re Telecommunications, Inc.*,
    C.A. No. 16470-NC, 2003 WL 21543427 (Del. Ch. July 7, 2003) ...................................3

# TAB 1



Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
In re Litigation Trust of MDIP, Inc.D.Del.,2005.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
THE LITIGATION TRUST OF MDIP, INC.
(formerly known as Mosler, Inc.) and Its Affiliates as Assignee of Certain Claims Pursuant to the Second Amended Joint Plan of Liquidation of MDIP, Inc. and Its Affiliates, Plaintiffs,
v.
Michael RAPOPORT, et al., Defendants.
**No. Civ.A. 03-779GMS.**

May 25, 2005.

Michael F. Bonkowski, Mark Minuti, Saul Ewing LLP, Wilmington, DE, for Plaintiffs.
Paul J. Lockwood, Eric M. Davis, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

### I. INTRODUCTION

*1 Presently before the court are six motions: a motion to dismiss Counts I and II of the Amended Complaint for lack of subject matter jurisdiction (D.I.67), a motion for partial summary judgment as to Counts I and II (D.I.84), a motion to strike the plaintiff's summary judgment affidavits (D.I.114), a motion to strike the plaintiff's jury demand (D.I.127), a motion *in limine* requesting the court to exclude evidence and testimony not disclosed in plaintiff's responses to contention interrogatories (D.I.124), and a motion *in limine* requesting the court to preclude evidence of events that took place prior to August 6, 1998 (D.I.125). For the following reasons, the court will grant the motion to dismiss Counts I and II, and deny the remaining motions as

moot insofar as they pertain to Counts I or II.

### II. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). The present motion presents a facial challenge to the complaint because the jurisdictional facts are not in dispute. Such a motion requires the court to consider the allegations of the Amended Complaint as true and to make all reasonable inferences in the plaintiff's favor. *See id.*

### III. BACKGROUND

The following facts are alleged in the Amended Complaint, which the court assumes to be true for the purpose of deciding this motion. Mosler, Inc. (" Mosler"), a Delaware corporation, traces its roots back to 1867, when the Mosler-Bahmann Safe Company was founded by Gustav Mosler. (D.I. 28 ¶ 17.) From 1967 to 1990, Mosler went through a series of buyouts that ultimately resulted in 59% of Mosler's stock being held by Kelso & Co., Inc. (" Kelso") and a few of Mosler's senior managers. (Id. ¶¶ 21-23.) This permitted Kelso to "install" defendants William Marquard, Thomas Wall, and Robert Young (collectively, "the Kelso Directors") on Mosler's Board of Directors. (Id.¶ 2.) During its first few years under this ownership structure, Mosler flourished-its sales increased every year from 1992 to 1995. (Id.¶ 26.)

Then, in February 1995, Mosler's Chairman and CEO sent a memo to the Kelso Directors requesting their "concurrence to" the hiring of Michel Rapoport as the next CEO, "which [is] consistent with our succession planning." (Id.¶ 27.) However, succession planning had not been discussed at either of the two board meetings prior to February 1995,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and the memo contained minimal information
regarding Rapoport himself. (Id.¶¶ 28-30.)
Although no alternative candidates were
considered, the inexperienced and unqualified
Rapoport was hired as Mosler's CEO. (Id.¶¶
31-33.) Mosler subsequently entered a period of
decline, precipitated by "numerous reckless and
misinformed decisions" and mismanagement by
Rapoport and the Kelso Directors. (Id.¶ 35.)

**\*2** For example, in October 1998, Mosler acquired
a security equipment business known as LeFebure.
(Id.¶ 36.) However, during the acquisition process,
Rapoport failed to hire outside consultants to assist
with due diligence and valuation. Instead, he relied
upon numbers provided by LeFebure's parent
company, De La Rue,[FN1] and by Mosler's internal
personnel. (Id. ¶ 39.) Furthermore, the Kelso
Directors did not inform themselves as to the
adequacy of Rapoport's due diligence and valuation.
(Id.¶ 41.) Then, at a special meeting of Mosler's
Board in September 1998, the LeFebure acquisition
was approved. This occurred in spite of the fact that
no tangible information concerning the acquisition
was provided to the Kelso Directors; the minutes of
the special meeting merely reflect "extensive
discussion" about the acquisition. (Id.¶ 40.) As it
turned out, De La Rue overstated LeFebure's
financial condition and, as a result, Mosler "grossly
overpaid" for LeFebure. (Id.¶ 42.)

> FN1. The precise details of the relationship
> between LeFebure and De La Rue are not
> set forth in the complaint, but those details
> are unimportant here.

The subsequent integration of LeFebure's business
did not go well either. Without any objection from
the Kelso Directors, Rapoport fired many key
LeFebure employees who were essential to the
integration process. (Id.¶¶ 43-44.) Consequently,
"many of the former LeFebure accounts were
understaffed and poorly serviced, and Mosler had
significant difficulty synchronizing LeFebure's
business practices with its own, further minimizing
the benefits that Mosler recognized from the
LeFebure Acquisition." (Id.¶ 43.) Rapoport and
the Kelso Directors also failed to heed specific

warnings, given to them before the acquisition,
pertaining to "systems issues that would arise from
the need to integrate LeFebure's systems with
Mosler's," resulting in a "serious deterioration of
Mosler's liquidity." (Id.¶ 45.)

Then in 1999, Mosler attempted to update the
software it used to process orders, collect accounts
receivable, etc. (Id.¶ 46.) Rapoport and the Kelso
Directors were advised by Mosler's in-house IT
employees, among others, that outside specialists
would be required for a project of this type. (Id.¶
47.) Nevertheless, Rapoport did not hire outside
specialists, and without objection from the Kelso
Directors, endeavored to complete the project using
only Mosler's in-house IT employees. (Id.¶ 48.)
But because these employees were not qualified to
make the updates, the project became "a disaster."
Thereafter, Mosler was unable to "timely and
accurately invoice customers and collect
receivables, accurately track its inventory and
timely provide needed parts to its customers, and
generate the reliable financials required to access its
operating credit facilities." (Id.¶ 50.) As a result,
Mosler's financial condition further deteriorated. (Id.
¶ 51.)

During this time, Rapoport and the Kelso Directors
also failed to institute standard business controls.
For example, they did not "address sustained and
systemic flaws in Mosler's inventory management
system," resulting in untimely deliveries to
customers, and hence, damage to Mosler's goodwill.
(Id.¶ 53.) Mosler's accounts receivable were also
rapidly increasing, but neither Rapoport nor the
Kelso Directors instituted standard internal control
procedures to ensure timely invoicing. (Id.¶ 54.)
Moreover, the problems with the accounts
receivable were not discussed at either the February
or May 1999 Board meetings. (Id.¶¶ 56-57.)
Mosler's contemporaneous SEC statements further
reflect the financial troubles the company was
experiencing. Between 1995 and 1999, Mosler
reported an increase in uncollected accounts
receivable from $46 million to nearly $100 million.
(Id.¶ 55.) Between 1998 and 1999, Mosler saw its
net income go from the black to the red, and
between 1998 and 2000, its earnings [FN2] declined
while its net sales increased.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 1242102 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

> FN2. The earnings referred to here are the earnings before interest, taxation, depreciation, and amortization, commonly known as EBITDA.

**\*3** The deterioration of Mosler did not go unnoticed. On two occasions, in 1999 and 2000, Mosler's outside auditor advised the Board of " reportable conditions" and "material weaknesses" regarding the company's internal controls. However, neither Rapoport nor the Kelso Directors took any corrective action. (Id.¶¶ 65-73.) Furthermore, in addition to experiencing "unreasonably high turnover of certain officers and key employees" (id. ¶ 59), Mosler also suffered from internal unrest. On at least ten occasions between the end of 1997 and the beginning of 2001, certain Kelso Directors were told by senior Mosler employees that the company had "serious business problems" and that Rapoport was mismanaging the company. (Id.¶ 60.) Yet, the Kelso Directors failed to investigate these complaints and defended Rapoport after he took retaliatory action against two of the senior employees. (Id.¶¶ 60-61.)

By the end of 2000, Mosler began to default on loans and on interest payments due on its bonds. (Id. ¶ 77.) Although Mosler pursued potential buyers, it ultimately filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the District of Delaware. (Id.¶¶ 78-79.) Mosler, since renamed MDIP, Inc. ("MDIP"), sold its assets at auction for nearly \$28 million, but the proceeds were insufficient to pay all of its creditors. (Id.¶¶ 79-80.) Therefore, pursuant to the approved Chapter 11 plan, the MDIP Litigation Trust, Inc. (the "Trust") was created for the benefit of the unpaid creditors to pursue certain claims. (Id.¶¶ 1, 5.) More specifically, the Trust "is required to prosecute all causes of action assigned to the Trust by Mosler ... for the benefit of holders of Allowed Class 3 and Allowed Class 4 Claims." (Id.¶ 7.) " Moreover, under the Plan, each holder of such a Claim is a Litigation Trust Beneficiary, each of whom has received a beneficial interest in the Litigation Trust Assets in accordance with the Plan." (Id.)

Pursuant to this directive, the Trust, in its own name, brought the present action against the Kelso Directors, Rapoport, and Kelso. Count I, based on the allegations outlined above, seeks to recover damages from the Kelso Directors for breach of the fiduciary duties of due care, good faith, and loyalty. (Id.¶¶ 81-84.) Count II, also based on the allegations outlined above, seeks to recover damages from Rapoport under the same theory. (Id. ¶¶ 85-88.) Counts III and IV are avoidance and recovery of constructively fraudulent transfer claims against Kelso, under 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. (Id.¶¶ 89-101.) However, the parties have since stipulated to the dismissal of Count III, and to a reduction in the damages sought in Count IV from \$800,000 to \$450,000. (D.I.99.)

## IV. DISCUSSION

The defendants argue that Counts I and II, which are state law claims, should be dismissed for lack of subject matter jurisdiction because (1) there is incomplete diversity, and (2) the exercise of supplemental jurisdiction would be inappropriate. Each of these arguments is addressed below.

### A. Diversity of Citizenship

**\*4** The diversity jurisdiction statute provides, in relevant part:
The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of \$75,000, exclusive of interest and costs, and is between ... citizens of different States[.]

28 U.S.C. § 1332(a)(1) (2004). Since *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806), the Supreme Court has "interpreted the diversity statute to require 'complete diversity' of citizenship." *C.T. Carden v. Arkoma Assoc.,* 494 U.S. 185, 187, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). That means the citizenship of every plaintiff must be diverse from the citizenship of every defendant, unless an independent basis for original jurisdiction exists between the non-diverse parties. *See Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 381, 79

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

S.Ct. 468, 3 L.Ed.2d 368 (1959). For an artificial entity, unless that entity is a corporation, its citizenship "depends on the citizenship of ... 'each of its members .'' " *Id.* at 195-96 (citations omitted). In *C.T. Carden,* the Supreme Court established that this is a bright-line rule only to be modified by Congress, even where strong policy considerations would favor an exception. *See C.T. Carden,* 494 U.S. at 196-97.[FN3] However, no such statutory modification exists in this case. [FN4]

> FN3. Where an artificial entity is the named party whose citizenship is in question, the court may not look to the citizenship of unnamed parties. *C.T. Carden,* 494 U.S. at 187 n. 1. Thus, in the case of a litigation trust, even if application of the "real party to the controversy" test, *see generally Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), would dictate that the citizenship of the trustees should be determinative for the purpose of diversity, the court may not consider their citizenship unless they are named parties, *C.T. Carden,* 494 U.S. at 187 n. 1.

> FN4. The Trust argues that *C.T. Carden* is distinguishable because that case involved a partnership rather than a litigation trust. However, as the defendants point out, the Court's broad language leads to the inescapable conclusion that litigation trusts are subject to its holding as well:
> Thus, the course we take today does not so much disregard the policy of accommodating our diversity jurisdiction to the changing realities of commercial organization, as it honors the more important policy of leaving that to the people's elected representatives. Such accommodation is not only performed more legitimately by Congress than by courts, but it is performed more intelligently by legislation than by interpretation of the statutory word "citizen. " The 50 States have created, and will continue to create, a wide assortment of

artificial entities possessing different powers and characteristics, and composed of various classes of members with varying degrees of interest and control. Which of them is entitled to be considered a "citizen" for diversity purposes, and which of their members' citizenship is to be consulted, are questions more readily resolved by legislative prescription than by legal reasoning, and questions whose complexity is particularly unwelcome at the threshold stage of determining whether a court has jurisdiction. We have long since decided that, having established special treatment for corporations, we will leave the rest to Congress; we adhere to that decision.
> *C.T. Carden,* 494 U.S. at 197. Thus, even if the court were inclined to agree with the Trust's policy arguments as to why the citizenship of the Trust itself should control, the Supreme Court has shut down that line of inquiry and left it up to Congress.

Consequently, the court must determine the citizenship of the Trust by looking to the citizenship of its "members," i.e., its beneficiaries.[FN5] *In re A.H. Robins Co., Inc.,* 197 B.R. 575, 579 (Bankr.E.D. Va. June 30, 1995). [FN6] As such, the citizenship of each creditor-beneficiary must be diverse from the citizenship of each of the Kelso Directors.[FN7] *Id.* Based on the court's review of the submitted list of creditors, numerous Class 3 and Class 4 creditors are citizens of the same states as the Kelso Directors. (See D.I. 144 Ex. B.) [FN8] Therefore, as the case is currently captioned, the court does not have diversity jurisdiction over Counts I and II. Moreover, even if the trustees were named plaintiffs and were the "real parties to the controversy," diversity of citizenship would still be lacking because both trustee Julie Dien Ledoux and defendant Wall are residents of New York. (D.I. 28 ¶ 11; D.I. 70 Ex. 1.)

> FN5. The court's conclusion that it must look to the citizenship of the Trust's beneficiaries may rely on the assumption that the Trust has the capacity to sue in its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

own name. *See Allegis Group, Inc. Contractors Health Plan Trust v. Conn. Gen. Life Ins. Co.,* No. 04-16, 2004 WL 1289862, at *4 n. 3 (D.Md. June 10, 2004) . However, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the question of whether there exists a legal basis for making such an assumption, or whether such an assumption is necessary in the first place.

FN6. The Trust argues that *A.H. Robins,* in which the court looked to the citizenship of the defendant-trust's beneficiaries, is distinguishable because that case involved a products liability claimants trust rather than a litigation trust. (D.I. 145 at 3.) Once again, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the Trust's argument.

FN7. The citizenship of Kelso itself is irrelevant because there is an independent basis for original jurisdiction as to Count IV, namely federal question jurisdiction under 28 U.S.C. § 1331 (1993). *Romero,* 358 U.S. at 381.

FN8. Technically speaking, the court's reliance upon "matters outside the pleadings" converts this motion to dismiss into a motion for summary judgment. Fed.R.Civ.P. 12(c). However, if the material facts are not in dispute, then the result is the same regardless of the label attached to the motion. The Trust points out that "there has been no discovery in this action directed specifically to the issue of the citizenship of the beneficiaries," but fails to actually contest the list of creditor-beneficiaries submitted by the defendants. (D.I. 145 at 4.) Since the Trust is presumably in the best position to know the citizenship of its own beneficiaries, and since it does not contest the submitted list,

the court has no reason to believe that the material facts are in dispute. Therefore, given the Trust's concession that, based on the list of creditors, "there would not be complete diversity if the citizenship of all beneficiaries were taken into account" (id.), the court is justified in its finding.

The Trust disagrees with this analysis. Instead, it argues, the Trust's status as a litigation trust arising from a bankruptcy proceeding qualifies it for a " special rule" that " '[i]t is the citizenship of the bankrupt rather than the citizenship of the trustee in bankruptcy that is determinative for diversity jurisdiction." ' *Carlton v. BAWW, Inc.,* 751 F.2d 781, 787 (5th Cir.1984) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3606). However, the " special rule" extracted from Wright & Miller is based on a 1906 Supreme Court interpretation of a statute that was repealed in 1978. *See Bush v. Elliot,* 202 U.S. 477, 26 S.Ct. 668, 50 L.Ed. 1114 (1906); 11 U.S.C. § 46 (repealed 1978). The court is cognizant of the fact that, in spite of § 46 being repealed nearly twenty seven years ago, the "special rule" appears to have some continued viability in certain jurisdictions. *See, e.g., Carlton,* 751 F.2d at 787; *Pupo v. Chadwick's of Boston, Inc.,* No. 03-564, 2004 WL 2480399 (S.D.N.Y. Nov.4, 2004) ; *Official Plan Comm. of Omniplex Comm. Group, LLC, v. Lucent Tech., Inc.,* 344 F.Supp.2d 1194 (E.D.Mo. July 9, 2004). *But see Samson v. Allis-Chalmers Prod. Liab. Trust,* No. 90-0139, 1990 WL 87394 (E.D.Pa. June 21, 1990). Nevertheless, it is clear that "the reasoning underlying this rule rests on a shaky foundation," *Lucent,* 344 F.Supp.2d at 1196, so the court is reluctant to apply it. Bearing that in mind, the Trust admits it is not in fact a bankruptcy trustee that would have been subject to the now-repealed § 46 in the first place. (D.I. 78 at 11.) In essence, the Trust is asking the court not only to apply a repealed statute, but also to apply the repealed statute *by analogy.* But if applying a repealed statute is dubious (which it is), then applying a repealed statute by analogy is simply beyond the pale. Furthermore, even if § 46 had not been repealed, the fact that the Trust's *"sole* purpose is to liquidate and distribute MDIP's assets for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

benefit of unsecured creditors" (D.I. 78 at 11) may not have been a sufficient reason to apply the "special rule" by analogy anyway. *Cf. In re Resorts Int'l, Inc.,* 372 F.3d 154, 169 (3d Cir.2004) (" Though the Litigation Trust's assets, the proceeds from the litigation claims, were once assets of the estate, that alone does not create a close nexus to the bankruptcy plan or proceeding sufficient to confer bankruptcy jurisdiction."). Therefore, the court will decline the Trust's invitation to apply the "special rule" in this case.

**\*5** Thus, diversity jurisdiction is lacking and the court must dismiss Counts I and II unless the exercise of supplemental jurisdiction is appropriate.

### B. Supplemental Jurisdiction

The supplemental jurisdiction statute provides, in relevant part:
(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....
...
(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction[.]

28 U.S.C. § 1367 (1993).

In this case, the court need not determine whether the state law claims "are so related to" the federal law claim "that they form part of the same case or controversy" because it is abundantly clear that the state law claims "substantially predominate[ ] over" the federal law claim. In the fifteen-page section of the Amended Complaint captioned "Allegations Relevant To All Claims," nary a word can be found that relates to the allegedly fraudulent transfers from Mosler to Kelso. (See D.I. 28 ¶¶ 17-80.) In

fact, it is not until the twenty-fourth page of the Amended Complaint's twenty-six pages that these transfers are vaguely described in Counts III and IV. (Id.¶¶ 89-101.) Moreover, after the dismissal of Count III, the damages sought in Count IV was reduced from \$800,000 to \$450,000 (D.I.99), whereas the damage sought in Counts I and II is in the neighborhood of \$200,000,000 (D.I. 78 at 2). Clearly, both in terms of the facts alleged and the damages sought, the state law claims substantially predominate over the federal law claims. Thus, the exercise of supplemental jurisdiction in this case would truly permit the tail to wag the dog, and that is something the court will not permit.

### V. CONCLUSION

Because the court does not have original jurisdiction over Counts I and II, and because the court declines to exercise supplemental jurisdiction, subject matter jurisdiction is lacking and the motion to dismiss must be granted.

### *ORDER*

IT IS HEREBY ORDERED THAT:
1. The defendants' motion to dismiss (D.I.67) be GRANTED;
2. Counts I and II of the Amended Complaint (D.I.28) be DISMISSED;
3. The defendants' motion for summary judgment (D.I.84) be DENIED as moot;
4. The defendants' motion to strike the plaintiff's summary judgment affidavits (D.I.114) be DENIED as moot;
5. The defendants' motion to strike the plaintiff's jury demand (D.I.127) be DENIED as moot;
6. The defendants' motion *in limine* requesting the court to exclude evidence and testimony not disclosed in plaintiff's responses to contention interrogatories (D.I.124) be DENIED as moot insofar as it pertains to Counts I or II; and
**\*6** 7. The defendants' motion *in limine* requesting the court to preclude evidence of events that took place prior to August 6, 1998 (D.I.125) be DENIED as moot.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 7

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


D.Del.,2005.
In re Litigation Trust of MDIP, Inc.
Not Reported in F.Supp.2d, 2005 WL 1242157
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00779 (Docket) (Aug. 05, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

180 Fed.Appx. 316                                                                                    Page 1

180 Fed.Appx. 316, 2006 WL 1275922 (C.A.3 (N.J.))
**(Cite as: 180 Fed.Appx. 316)**

**c**
Briefs and Other Related Documents
S. Freedman and Co., Inc. v. RaabC.A.3
(N.J.),2006.This case was not selected for
publication in the Federal Reporter.NOT
PRECEDENTIAL Please use FIND to look at the
applicable circuit court rule before citing this
opinion. Third Circuit Local Appellate Rule 28.3(a)
and Internal Operating Procedure 5.3. (FIND CTA3
Rule 28.0 and CTA3 IOP APP I 5.3.)
    United States Court of Appeals,Third Circuit.
    S. FREEDMAN AND COMPANY, INC., Appellant
                              v.
    Marvin RAAB, Raab Enterprises, Inc. Formerly
        know as Philadelphia Foods, Inc.
                              v.
                   Susan Freedman.
                   **No. 05-1138.**

       Submitted Under Third CircuitLAR 34.1(a) May 9,
                              2006.
                      Filed May 10, 2006.

**Background:** Plaintiff corporation brought civil
action against defendant corporation in federal court
based on diversity jurisdiction. The United States
District Court for the District of New Jersey, Robert
B. Kugler, J., dismissed the action for lack of
subject matter jurisdiction and subsequently denied
two motions for reconsideration. Plaintiff appealed.

**Holdings:** The Court of Appeals, Aldisert, Circuit
Judge, held that:

(1) notice of appeal did not encompass
subsequently-filed motions for reconsideration;

(2) allegations that plaintiff had "a principal place
of business" in Pennsylvania and defendant had "a
place of business" in New Jersey were insufficient
to establish diversity jurisdiction; and

(3) dismissal of complaint for lack of subject matter

jurisdiction was proper.

Affirmed.
West Headnotes
**[1] Federal Courts 170B ⬸668**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(E) Proceedings for Transfer of
Case
            170Bk665 Notice, Writ of Error or
Citation
                170Bk668 k. Time for Filing in
General. Most Cited Cases
Notice of appeal, which was filed after the dismissal
of appellant's complaint for lack of subject matter
jurisdiction but before district court had ruled on its
motion for reconsideration, became effective upon
the adjudication of the motion for reconsideration.
F.R.A.P.Rule 4(a)(4)(B)(i), 28 U.S.C.A.

**[2] Federal Courts 170B ⬸768.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk768 Interlocutory, Collateral and
Supplementary Proceedings and Questions
                    170Bk768.1 k. In General. Most
Cited Cases
Unamended notice of appeal in civil action did not
encompass subsequently filed motions for
reconsideration. F.R.A.P.Rule 4(a)(4)(B)(ii), 28
U.S.C.A.

**[3] Federal Courts 170B ⬸314**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(C) Pleading

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

180 Fed.Appx. 316                                                    Page 2

180 Fed.Appx. 316, 2006 WL 1275922 (C.A.3 (N.J.))
**(Cite as: 180 Fed.Appx. 316)**

170Bk312 Sufficiency of Allegations
    170Bk314 k. Corporations as Parties.
Most Cited Cases
Allegations that plaintiff in civil action had "a
principal place of business" in Pennsylvania and
that defendant had "a place of business" in New
Jersey were insufficient to establish diversity
jurisdiction, even when coupled with plaintiff's
allegations that it was a citizen of Pennsylvania and
defendant was a citizen of New Jersey. 28 U.S.C.A.
§ 1332(a, c).

**[4] Federal Courts 170B ⬤→319**

170B Federal Courts
    170BIV Citizenship, Residence or Character of
Parties, Jurisdiction Dependent on
        170BIV(E)    Objections,    Waiver    and
Determination
            170Bk319 k. In General. Most Cited Cases
Dismissal of civil complaint for lack of subject
matter jurisdiction, after plaintiff failed to respond
to district court order asking it to amend complaint
to state the location of the principal place of
business for each litigant, was proper even though
plaintiff never received that order. 28 U.S.C.A. §
1332;   Fed.Rules   Civ.Proc.Rule   12(h)(3),   28
U.S.C.A.

**\*317** On Appeal from the United States District
Court for the District of New Jersey. D.C. No.
04-cv-01119. District Judge: Honorable Robert B.
Kugler.

Lisanne L. Mikula, Halpern & Levy, Bala Cynwyd,
PA, for S. Freedman and Company, Inc.
Michael D. Homans, Jeffrey A. Cohen, Albert M.
Belmont, III, Flaster Greenberg, Cherry Hill, NJ,
for Marvin Raab and Raab Enterprises, Inc.

Before: BARRY, SMITH and ALDISERT, Circuit
Judges.

OPINION OF THE COURT
ALDISERT, Circuit Judge.
**\*\*1** Appellant S. Freedman & Co., Inc. ("Freedco")
seeks review of the District Court's dismissal of its
complaint under Rule 12(b)(1) of the Federal Rules

of Civil Procedure for lack of subject matter
jurisdiction. It also seeks review of the denial of
two motions for reconsideration. Because we
conclude that the District Court did not err in
determining that Freedco failed to adequately plead
the existence of subject matter jurisdiction, and that
we lack jurisdiction to review the denial of the two
motions for reconsideration, we will affirm.

I.

The parties are familiar with the facts and
proceedings before the District Court, so we will
only briefly revisit them here. Freedco filed a
complaint against Appellees Marvin Raab and Raab
Enterprises, Inc., formerly known as Philadelphia
Foods, Inc. (collectively referred to as **\*318** "Raab"
), in the United States District Court for the District
of New Jersey on March 8, 2004. Jurisdiction was
purportedly based on the diversity of the parties
under 28 U.S.C. § 1332(a).

On November 24, 2004, less than a month before
discovery was scheduled to end, the District Court
*sua sponte* questioned whether diversity jurisdiction
existed. The complaint alleged that:
1. Plaintiff, S. Freedman and Company, Inc. ("
Freedco"), is a corporation organized and existing
under the laws of Pennsylvania with *a principal
place of business* at The Dorchester, Suite 205, 226
West    Rittenhouse    Square,    Philadelphia,
Pennsylvania 19103. Freedco is a citizen of
Pennsylvania.

\* \* \* \* \* \*
3. Defendant Marvin Raab ("Raab") is an
individual with an address of 429 Coolidge Road,
Cherry Hill, New Jersey, 08002. Raab is a citizen
of New Jersey.
4. Defendant, Raab Enterprises, Inc., formerly
known as Philadelphia Foods, Inc. ("Philly Foods")
is a corporation organized and existing under the
laws of the State of New Jersey with *a place of
business* located at 210 Harvard Avenue, Westville,
New Jersey 08083. Philly Foods is a citizen of
New Jersey.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

180 Fed.Appx. 316, 2006 WL 1275922 (C.A.3 (N.J.))
**(Cite as: 180 Fed.Appx. 316)**

\* \* \* \* \* \*

6. This Court has diversity jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(a)(1) because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

(Complaint, app. at 18-20 (emphasis added).)

The Court accordingly issued an order (the " November 24, 2004 Order") directing Freedco to amend its complaint to state the location of "*the* principal place of business," rather than "*a* place of business" or "*a* principal place of business," for each corporate party. *See* 28 U.S.C. § 1332(c). The Order provided seven days for Freedco to make this amendment.

According to an affidavit filed with the District Court and Freedco's representations to this Court, Freedco never received the November 24, 2004 Order and, therefore, did not comply with the Order's directives. On December 10, 2004, the Court issued an order (the "December 10, 2004 Order") dismissing the complaint for lack of jurisdiction. After learning of the dismissal from Raab's counsel on December 15, 2004, Freedco contacted the District Court via both phone and letter to determine the proper course of action. On December 17, the Court responded that it "cannot advise [Freedco's counsel] how to proceed."

**\*\*2** On December 23, 2004, Freedco filed a motion to reconsider and vacate the Court's December 10, 2004 Order ("First Motion for Reconsideration") and moved for leave to file an amended complaint. Attached to the motion was an affidavit from its attorney of record, Robert S. Levy, explaining the non-receipt of the November 24, 2004 Order. Apparently not realizing that a timely motion for reconsideration tolls the 30-day time period for filing a notice of appeal, *see* Rule 4(a)(4), Federal Rules of Appellate Procedure, Freedco also filed a notice of appeal of the District Court's December 10, 2004 Order. In a January 18, 2005 order, this Court stayed the appeal pending disposition of the First Motion for Reconsideration.

By an order dated January 20, 2005 (the "January

20, 2005 Order"), the District Court dismissed, without prejudice, the First Motion for Reconsideration, concluding that the notice of appeal deprived it of **\*319** jurisdiction to decide the motion. Freedco then filed a second motion to reconsider and vacate the District Court's January 20, 2005 Order ("Second Motion for Reconsideration"). On August 2, 2005, the District Court, having reconsidered whether the notice of appeal deprived it of jurisdiction, granted the Second Motion for Reconsideration and vacated its January 20, 2005 Order. It proceeded, however, to deny the First Motion for Reconsideration on the merits, concluding that it "does not present any factual matters or controlling decisions that this Court overlooked in dismissing the Complaint; rather Plaintiff merely presents reasons for why it did not [c]omply with this Court's Order[.]" (App. at 7.) This appeal followed.

II.

The majority of Freedco's arguments are dedicated to whether the District Court exceeded the permissible bounds of discretion in denying the First Motion for Reconsideration on the merits. Freedco contends that it presented a valid excuse for its failure to comply with the November 24, 2004 Order and that the District Court should have permitted it to make the minor amendment to the complaint.

[1] Unfortunately for Freedco, neither the January 20, 2005 Order nor the August 2, 2005 Order are properly before us. Freedco filed its notice of appeal on January 12, 2005, after the dismissal of the complaint but prior to the disposition of the First Motion for Reconsideration. Rule 4(a)(4)(B)(i) of the Federal Rules of Appellate Procedure provides that:
[i]f a party files a notice of appeal after the court announces or enters a judgment-but before it disposes of any motion listed in Rule 4(a)(4)(A)-the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

180 Fed.Appx. 316, 2006 WL 1275922 (C.A.3 (N.J.))
**(Cite as: 180 Fed.Appx. 316)**

[2] Freedco's notice of appeal therefore became effective upon the adjudication of Freedco's motions for reconsideration. Such notice, however, does not encompass the January 20 or August 2 motions for reconsideration. Rather, Freedco was required to file a new notice of appeal or to amend the January 12, 2005 notice of appeal. As stated in Rule 4(a)(4)(B)(ii):

**\*\*3** A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment altered or amended upon such a motion, *must file a notice of appeal, or an amended notice of appeal*-in compliance with Rule 3(c)-within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

Rule 4(a)(4)(B)(ii), Federal Rules of Appellate Procedure (emphasis added).

Here, Freedco never filed an amendment or a new notice of appeal. Our review is therefore confined to the December 10, 2004 Order dismissing the complaint. *See, e.g., United States v. McGlory,* 202 F.3d 664, 668 (3d Cir.2000) (holding that we lack jurisdiction to review the denial of a motion for reconsideration where appellant did not file a new notice of appeal or amend the previously filed notice of appeal); *see also Union Pac. R.R. v. Greentree Transp. Trucking Co.,* 293 F.3d 120, 126 (3d Cir.2002).

### III.

We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's dismissal of the complaint for lack of subject matter jurisdiction. Our review is plenary. *Gould Electronics, Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). A district court has a duty to raise doubts about its jurisdiction at any time, and the party asserting jurisdiction "bears the burden**\*320** of showing that the case is properly before the court at all stages of the litigation." *Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1045 (3d Cir.1993).

[3] We agree with the District Court that Freedco has not met its burden of pleading the diversity of

the parties. Pursuant to 28 U.S.C. § 1332(c), for purposes of diversity jurisdiction, a corporation is a citizen of both the state of its incorporation and the state in which it has its principal place of business. As the District Court observed, Freedco alleged only that Raab Enterprises has "a place of business" in New Jersey, not that New Jersey is the location of its "principal place of business." Freedco also failed to allege that its own principal place of business is in Pennsylvania, asserting only that it has *"a principal place of business"* in Pennsylvania. *See J & R Ice Cream Corp. v. California Smoothie Licensing,* 31 F.3d 1259, 1265 n. 3 (3d Cir.1994) (holding that a complaint stating that defendant had "a" principal place of business in New Jersey left open the possibility that it had "its" principal place of business in Florida, and thus did not properly plead diversity jurisdiction). The basis of diversity jurisdiction was therefore not apparent from the pleadings.

Recognizing these deficiencies, Freedco contends that the last sentence of both Paragraphs One and Four of the complaint-stating that "Freedco is a citizen of Pennsylvania" and "Philly Foods is a citizen of New Jersey"-allege as a necessary implication that Freedco's principal place of business is in Pennsylvania and Philly Foods' principal place of business is in New Jersey. It also argues that the diversity of the parties was " conclusively establishe [d]" by Raab's answer to the complaint, in which it admits the allegations in Paragraph Four.

**\*\*4** We disagree. It is well established that "the basis upon which jurisdiction depends must be alleged affirmatively and distinctly and cannot 'be established argumentatively or by mere inference.' " 5 C. Wright & A. Miller, Federal Practice and Procedure § 1206, at 78-79 (1969 & Supp.2005) (citations omitted); *Thomas v. Board of Trustees,* 195 U.S. 207, 210, 25 S.Ct. 24, 49 L.Ed. 160 (1904) (holding that diversity jurisdiction, "or the facts upon which, in legal intendment, it rests, must be distinctly and positively averred in the pleadings, or should appear affirmatively and with equal distinctness in other parts of the record"); *Joiner v. Diamond M Drilling Co.,* 677 F.2d 1035, 1039 (5th Cir.1982) ("In order to adequately establish

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

180 Fed.Appx. 316                                                    Page 5

180 Fed.Appx. 316, 2006 WL 1275922 (C.A.3 (N.J.))
**(Cite as: 180 Fed.Appx. 316)**

diversity jurisdiction, a complaint must set forth with specificity a corporate party's state of incorporation and its principal place of business."). Freedco's bald allegations that the corporate parties are "citizens" of certain states are insufficient to carry its burden of pleading the diversity of the parties. Nowhere in the complaint is the word " citizen" defined with reference to 28 U.S.C. § 1332, and there is nothing to indicate that it was being used as a term of art. The District Court therefore did not err in concluding that the complaint fails to adequately set forth the requirements of diversity jurisdiction, and it properly ordered Freedco to amend its complaint.

[4] The District Court also did not err in dismissing the complaint. Freedco never responded to the November 24, 2004 Order to amend the complaint. Judging the District Court's actions at the time they were taken-that is, when Freedco failed to respond to the Order and the Court was unaware that Freedco allegedly never received notice-the District Court's dismissal of the complaint was proper. *See* Rule 12(h)(3), Federal Rules of Civil Procedure (" Whenever it appears by suggestion of the parties or otherwise that the **\*321** court lacks jurisdiction of the subject matter, the court shall dismiss the action. ").[FN1]

> FN1. We have repeatedly held that a district court has an obligation to provide the parties with notice and an opportunity to be heard before dismissing a case for lack of jurisdiction. *See, e.g., Neiderhiser v. Borough of Berwick,* 840 F.2d 213, 216 n. 6 (3d Cir.1988). Here, the District Court provided the requisite notice and opportunity to be heard; Freedco only asserts that it did not receive notice. Unlike a district court's failure to *provide* notice, a party's failure to *receive* notice does not affect the propriety of a dismissal.
> That Freedco may have never received notice is a factual matter that should be raised in a motion for reconsideration; it is not a proper basis for attacking the underlying order of dismissal on appeal.

IV.

We have considered all contentions presented by the parties and conclude that no further discussion is necessary. Although we sympathize with Freedco, whose complaint could have been saved by minor editing, we must affirm the District Court's dismissal for lack of subject matter jurisdiction.

C.A.3 (N.J.),2006.
S. Freedman and Co., Inc. v. Raab
180 Fed.Appx. 316, 2006 WL 1275922 (C.A.3 (N.J.))

Briefs and Other Related Documents (Back to top)

• 05-1138 (Docket) (Jan. 18, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3



Not Reported in A.2d                                                                                 Page 1

Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Briefs and Other Related Documents
In re Telecommunications, Inc.Del.Ch.,2003.Only
the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re TELECOMMUNICATIONS, INC.
Shareholders Litigation
**No. Civ.A 16470-NC.**

Submitted May 28, 2003.
Decided July 7, 2003.

Robert J. Kriner, Jr., of Chimicles & Tikellis LLP,
Wilmington, Delaware, and Joseph A. Rosenthal
and Norman M. Monhait, of Rosenthal, Monhait,
Gross & Goddess, P.A., Wilmington, Delaware; for
Plaintiffs, Arthur N. Abbey and Karin E. Fisch, of
Abbey Gardy, LLP, New York, New York, of
counsel.
Kenneth J. Nachbar and Matt Neiderman, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware; for Defendant AT & T Corporation, Paul
K. Rowe, of Wachtell, Lipton, Rosen & Katz, New
York, New York, of counsel.

*MEMORANDUM OPINION*
CHANDLER, J.
**\*1** Plaintiffs in this purported class action are
shareholders of Series A TCI Group Common Stock
("TCOMA"), a tracking stock reflecting the
performance of the TCI Group division of
Tele-Communications, Inc. ("TCI"). The TCOMA
shareholders have brought various civil actions,
which have now been consolidated into this action,
alleging breaches of fiduciary duties by the
directors of TCI [FN1] in relation to a proposed
merger with a subsidiary of AT & T Corp. ("AT &
T"). In addition, the Consolidated Amended
Complaint alleges that AT & T aided and abetted
the individual defendants' breaches of fiduciary
duty. AT & T has filed a motion to dismiss the

aiding & abetting claim under Court of Chancery
Rule 12(b)(6). For the reasons detailed in this
memorandum opinion, I grant AT & T's motion.

> FN1. The individual defendants, directors
> of TCI, are John C. Malone ("Malone"),
> chairman of the board, and chief executive
> officer of TCI; Leo J. Hindrey ("Hindrey"
> ), president and chief operating officer of
> TCI; Donne Fisher ("Fisher"); J.C.
> Sparkman ("Sparkman"), both Fisher and
> Sparkman are consultants and former
> executive vice presidents of TCI; Kim
> Magness; John W. Gallivan; Paul A.
> Gould; Jerome H. Kern, special counsel
> with Baker & Botts, L .L.P., TCI's
> principal outside counsel; and Robert
> Nally.

## I. STANDARD OF REVIEW

In ruling on a motion to dismiss under Rule 12(b)(6)
, the Court considers only the allegations in the
Consolidated Amended Complaint and any
documents incorporated by reference therein.[FN2]
For this purpose, the Court accepts as true all
well-pled factual allegations contained in the
Consolidated Amended Complaint,[FN3] but
conclusory statements-those unsupported by
well-pled factual allegations-are not accepted as
true.[FN4] The Court will draw all inferences
logically flowing from the Consolidated Amended
Complaint in favor of the plaintiffs but only if such
inferences are reasonable.[FN5] The Court will not
dismiss any claim unless it appears to a reasonable
certainty that the plaintiffs cannot prevail on any set
of facts that might be proven to support the
allegations in the Consolidated Amended Complaint.
[FN6]

> FN2. *See Vanderbilt Income & Growth*
> *Assocs. v. Arvida/JMB Managers, Inc.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

691 A.2d 609, 612-13 (Del.1996); *Orman v. Cullman,* 794 A.2d 5, 15-16 (Del. Ch.2002).

FN3. *See Orman,* 794 A.2d at 15.

FN4. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988)(stating that "conclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true").

FN5. *See id.* (stating that the Court "need not ... draw all inferences from [the allegations] in plaintiffs' favor unless they are reasonable inferences").

FN6. *See Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1104 (Del.1985).

## II. FACTUAL BACKGROUND [FN7]

FN7. The facts are derived from the well-pled allegations of the Consolidated Amended Complaint, unless otherwise indicated. Furthermore, this opinion discusses TCI as a separately existing entity comprised of three divisions in the present tense as used in the Consolidated Amended Complaint even though according to briefs on this motion, TCI shareholders approved the merger, which closed on March 9, 1999.

TCI is a Delaware corporation organized into three divisions: TCI Group, TCI Liberty Media Group (" Liberty"), and TCI Ventures Group ("Ventures"). TCI stock is issued in six series of "tracking stocks" with two separate series, designated A and B, tracking the performance of each division. The performance of TCI Group is tracked by TCOMA and TCOMB; the performance of Liberty by LBTYA and LBTYB; and the performance of Ventures by TCIVA and TCIVB. For each division's two series of stock, the A shares are entitled to one vote per share on all matters subject to shareholder vote and the B shares are entitled to ten votes per share. Otherwise the rights of A and B

shareholders for each division are identical.

Defendant John C. Malone ("Malone") is a director of TCI, and its chief executive officer and chairman of the board. Malone and his wife together own approximately 47% of the outstanding TCOMB shares and approximately 45% of the outstanding LBTYB and TCIVB shares. It appears from the Consolidated Amended Complaint that Malone may own some number of A shares,[FN8] but it is not clear the extent (if any) of Malone's ownership of any of the A series shares.

FN8. The Consolidated Amended Complaint alleges that Malone has a right to acquire additional TCOMB shares "in exchange for [TCOMA] shares on a one-for-one basis or for cash." Consol. Am. Compl. ¶ 28. In addition, the Consolidated Amended Complaint excludes from the plaintiff class of TCOMA shareholders all defendants including Malone.

Sometime in May of 1998 the management of TCI and AT & T began to discuss the possibility of a combination between TCI Group's cable business and AT & T's consumer services telecom business. On June 14, 1998, TCI and AT & T began discussing the merger of TCI into a subsidiary of AT & T. The following day, June 15, TCI management informed the board of directors about the merger discussions. The board formed a special committee comprised of John W. Gallivan (" Gallivan") [FN9] and Paul A. Gould ("Gould") [FN10] to evaluate the merger and advise the board whether to recommend it to the shareholders. At the same board meeting, TCI management proposed a combination of Liberty and Ventures to form New Liberty. New Liberty shareholders would be issued new tracking stock after the AT & T-TCI merger. The special committee was also charged with evaluating the exchange ratio in the Liberty-Ventures combination. Also at the June 15 meeting, the TCI board authorized the retention of Donaldson Lufkin & Jenrette Securities Corp. ("DLJ ") to act as financial advisors to TCI and the special committee to evaluate the proposed merger and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3

Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

exchange ratio in the proposed combination of Liberty and Ventures. On June 23, the special committee recommended that the board approve the merger and the combination and the deal was publicly announced the following day.

> FN9. Gallivan's ownership of TCI stock is uncertain from the allegations in the Consolidated Amended Complaint.
>
> FN10. As of December 31, 1997, Gould had owned more TCOMB than TCOMA shares (roughly 2.5:1).

**\*2** Under the terms of the merger agreement, TCOMA shareholders will receive .7757 shares of AT & T common stock for each TCOMA share and TCOMB shareholders will receive .8533 AT & T shares per TCOMB share. Based on the June 22, 1998 trading prices of TCOMA, TCOMB, and AT & T, the exchange rate represents a premium-to-market price of greater than 40% to both TCOMA and TCOMB shareholders. TCOMA and TCOMB apparently trade at similar prices. The June 22, 1998 closing price of TOCMA was $35.69 and of TCOMB was $35.50. The average closing prices of TCOMA and TCOMB for the preceding 30 days were $34.60 and $34.90 respectively. Thus, for shares similarly valued on the open market, TCOMB shareholders would receive approximately 10% more AT & T common stock than would TCOMA shareholders. This difference, representing a premium paid to the TCOMB shareholders for their "supervoting" rights, redounds largely to the benefit of TCI management (collectively the owners of 84.4% of TCOMB shares), while concurrently benefiting the non-management owners of TCOMB shares.

### III. ANALYSIS

In order to state a claim for aiding and abetting a breach of fiduciary duty, the plaintiffs must allege (1) a fiduciary relationship; (2) a breach of that relationship; and (3) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty.[FN11] Defendant AT & T asserts that

the plaintiffs have failed to plead facts from which the Court may infer the third element that it knowingly participated in any breach of fiduciary duty by the directors of TCI.

> FN11. *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del.1995).

Plaintiffs are not required to plead knowing participation with particularity.[FN12] This element is subject to the ordinary notice pleading standard on a motion to dismiss under Court of Chancery Rule 12(b)(6).[FN13] Still, it is necessary that the plaintiffs make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss.[FN14] For example, knowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of side deals is so excessive as to be inherently wrongful.[FN15] In addition, the Court may infer knowing participation if it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations.[FN16] The plaintiff's burden of pleading knowing participation may also be met through direct factual allegations supporting a theory that the defendant sought to induce the breach of fiduciary duty, such as through the offer of side payments intended as incentives for the fiduciaries to ignore their duties.[FN17]

> FN12. *McGowan v. Ferro*, 2002 Del. Ch. LEXIS 3, at \*8 (Del. Ch.); *Jackson Nat'l Life Ins. v. Kennedy*, 741 A.2d 377, 391 (Del. Ch.1999); *L A Partners, L.P. v. Allegis Corp.*, 1987 Del. Ch. LEXIS 501, at \*22 (Del. Ch.).
>
> FN13. *See L A Partners, L.P.*, 1987 Del. Ch. LEXIS 501, at \*22.
>
> FN14. *Id.*
>
> FN15. *See McGowan*, 2002 Del. Ch. LEXIS 3, at \*8-10; *Crescent/Mach 1 Partners v. Turner*, 2000 Del. Ch. LEXIS 145, at \*69-74 (Del. Ch.); *Jackson Nat'l*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4

Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*Life Ins.,* 741 A.2d at 392; *In re USACafes, L.P. Litig.,* 600 A.2d 43, 55-56 (Del. Ch.1991).

FN16. *See Zirn v. VLI Corp.,* 1989 Del Ch. LEXIS 83, at *16-18 (Del. Ch.) (denying motion to dismiss aiding and abetting claim because it was reasonable to infer that a potential acquiror may have used knowledge of the target company's directors exposure to fiduciary duty liability in order to gain some bargaining advantage in negotiations).

FN17. *See McGowan v. Ferro,* 2002 Del. Ch. LEXIS 3, at *9-10; *Crescent/Mach 1 Partners,* 2000 Del. Ch. LEXIS 145, at *69-72; *Jackson Nat'l Life Ins.,* 741 A.2d at 392-93; *In re USACafes, L .P. Litig.,* 600 A.2d 43, 55-56.

The terms of the merger, as alleged, do not seem to be sufficiently troubling that TCI's merger partner could be fairly charged with knowing participation in any breach of fiduciary duty by Malone or TCI's directors simply because AT & T agreed to the terms of the merger. Before I go farther, let me be clear about what I am not saying. I am not saying that the breach of fiduciary duty claim against the director-defendants is unmeritorious. AT & T does not assert for purposes of this motion that the plaintiffs have failed to state a claim for breach of fiduciary duty against the TCI directors. Consequently, this motion does not require such a determination and, thus, it would be inappropriate to opine in any detailed manner on the merits of the underlying claim of breach. That said, the level of egregiousness of the terms of the merger, here alleged to constitute the breach of duty to the TCOMA shareholders, is pertinent to AT & T's assertion that plaintiffs have not alleged that it knowingly participated in a breach of fiduciary duty. When the allegations of breach are based upon the specifics of the terms of the merger agreement, the more outrageous those terms are, the less plausible it becomes for a merger partner accused of aiding and abetting to assert that its participation was not "knowing."

*3 By agreeing to pay a "supervoting premium" whereby the TCOMB shareholders would receive consideration that is 10% higher than that to be received by the TCOMA shareholders, AT & T, according to the plaintiffs, knowingly participated in Malone and the other directors breaching their fiduciary duties to the TCOMA shareholders. Plaintiffs offer two general propositions to support this theory. First, the plaintiffs contend that they will prove at trial that the payment of a higher control premium for supervoting stock is the rare exception in mergers of this sort. In oral argument on this motion, plaintiffs ask the court to accept that by virtue of the counsel of their investment bankers and legal advisors, AT & T would or should have known this to be the case. I accept for purposes of ruling on this motion that the plaintiffs will be able to produce evidence of the rarity of control premiums like the one to be paid to TCOMB shareholders at the appropriate time. I also anticipate that the defendants will seek to introduce evidence to the contrary. Assuming that enhanced premiums for supervoting stock are the rare exception in stock-for-stock mergers, it is not clear that AT & T did know or should have known that this premium was extraordinary.[FN18] In any event, the fact that a particular provision is uncommon does not create a presumption that it was adopted in breach of fiduciary duty. The plaintiffs' second argument is that there is no case in Delaware law addressing the legality of a control premium paid to a class of supervoting shares when the whole company is acquired. At best, this lack of decisional authority provides a basis for suggesting that the *receipt* of such a premium *could* constitute a breach of fiduciary duty. At worst, from the plaintiffs' perspective, it bolsters AT & T's assertion that it had no reason to believe that Malone or the other directors were in breach of any fiduciary duty by accepting or even insisting upon such a premium.

FN18. In at least one case, this Court approved a settlement in which a single controlling block of supervoting B shares would be purchased for $135 per share whereas A shareholders (and any remaining B shareholders who failed to opt out of the class) would receive only $36

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 5

Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

per share. *See In re Resorts Int'l S'holders Litig.,* 1988 Del. Ch. LEXIS 130, at *13-14 (Del. Ch.). In addition, the court specifically permitted B shareholders to opt out of the class because it seemed possible that they "might be entitled to a higher price for their shares than the $36" to be paid under the agreement. *See id.,* at *25-31.

The 10% difference in consideration paid to the TCOMA and TCOMB shareholders is not a "side deal" with Malone and management. The plaintiff alleges that management owns just under 85% of the B shares. Under these terms the managers are treated the same as all B shareholders. In addition, a 10% difference in consideration between two classes of shareholders that are each receiving upwards of a 40% premium on the trading price of their shares, is not so grossly excessive that without more it leads to an inference that the difference was intended as an inducement to ignore fiduciary duties. AT & T's agreement to the terms of the merger is insufficient alone to meet the plaintiffs' burden to plead knowing participation by AT & T in Malone and the TCI board's alleged breach of fiduciary duty.

Nor does the fact that AT & T negotiated with Malone and the TCI management team provide a sufficient basis for inferring that AT & T knowingly participated in any breach of fiduciary duty that may have occurred. It is alleged that on June 14, 1998, the negotiations transformed from AT & T seeking to buy TCI Group's cable business into discussions of a merger of all of TCI into an AT & T subsidiary. It is alleged that the terms of the merger were agreed to that same day. I note that this leaves little time for AT & T and Malone to engage in any extended "wheeling and dealing" to benefit Malone and harm TCOMA shareholders. Nor does it raise the suspicion that AT & T had to work very hard to court Malone's favor because it appears that the first round of negotiations produced a transaction acceptable to both parties. The following day, the directors of TCI formed a special committee to evaluate the terms of the merger and authorized retention of investment bankers to evaluate the merger. Nine days later the merger was

publicly announced under substantially the same terms initially agreed to on June 14. The plaintiffs challenge the qualifications of the special committee members to act in a disinterested and independent manner; challenge the limitations placed on the authority of the special committee; challenge the incentives of the investment bankers; and complain that no one provided a separate analysis of the fairness of the merger to TCOMA shareholders. Assuming the truth of these allegations, as I must in ruling on this motion, I nonetheless see no basis upon which AT & T could be charged with knowledge of (much less participation in) any failures of the internal workings of the TCI board of directors.

IV. CONCLUSION

**\*4** In sum, the plaintiffs fail to allege specifically how AT & T may have aided and abetted the TCI directors' breach of fiduciary duty and fail to allege facts from which the court may infer knowing participation. For this reason the Consolidated Amended Complaint fails to state a claim for aiding and abetting breach of fiduciary duty and AT & T's motion to dismiss is GRANTED.

IT IS SO ORDERED.

Del.Ch.,2003.
In re Telecommunications, Inc.
Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 4806942 (Trial Motion, Memorandum and Affidavit) The Individual Defendants' Reply Brief in Support of their Motion for Summary Judgment (Jun. 6, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.