# EXHIBIT 1

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667863 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

In re Digital Island Securities Litigation
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re DIGITAL ISLAND SECURITIES
LITIGATION
No. Civ.A.02-57-GMS.

Nov. 25, 2002.

*MEMORANDUM AND ORDER*
SLEET, J.

### I. INTRODUCTION

**\*1** This securities class action suit arises from Cable
& Wireless plc's acquisition of Digital Island, Inc.
Individual plaintiffs filed complaints on January 22,
2002, January 31, 2002, and February 22, 2002.
The plaintiffs filed a joint motion for consolidation,
appointment of lead plaintiff, and appointment of
lead counsel on March 25, 2002. The court granted
that motion on April 16, 2002. On May 15, 2002,
the plaintiffs filed their Consolidated Amended
Class Action Complaint. In this complaint, the
plaintiffs contend that the defendants defrauded the
Digital Island shareholders into approving the sale
of the company to Cable & Wireless for less than
fair value .FN1

FN1. The defendants are Ruann F. Ernst, Charlie
Bass, Christos Cotsakos, Mary Cirillo-Goldberg, G.
Bradford Jones, Robert Marbut, Shahan Soghikian,
Graham Wallace, Don Reed, Mike McTighe, Robert
Drolet, Avery Duff, Marc Lefar, Digital Island,
Inc. ("Digital Island"), Dali Acquisition Corp., and
Cable & Wireless plc ("Cable & Wireless").

On July 1, 2002, the defendants filed a motion to
dismiss for failure to state a claim under Federal
Rule of Civil Procedure 12(b)(6) and the Private
Securities Litigation Reform Act of 1995, 15
U.S.C. § 78u-4 (the "PSLRA"). On September 10,
2002, the court issued a Memorandum Opinion
dismissing the plaintiffs' Consolidated Amended
Class Action Complaint in its entirety, with
prejudice.

Presently before the court is the plaintiffs' timely
motion to alter the final judgment and for leave to

file an amended complaint.FN2 For the following
reasons, the court will deny this motion.

FN2. On October 21, 2002, the defendants filed a
motion to strike the plaintiffs' reply brief in support
of their motion to alter judgment. In so moving, the
defendants reasoned that Local Rule 7.1.5 does not
permit the filing of reply briefs in motions for
reargument or reconsideration. However, as the
plaintiffs' motion to replead is neither a motion for
reargument, nor a motion for reconsideration, the
court will deny the defendants' motion to strike.

### II. DISCUSSION

The decision of whether to grant leave to amend
under Rule 15(a) "rest[s] within the sound discretion
of the trial court under [Federal Rule of Civil
Procedure] 15." *Massarsky v. GM Corp.,* 706 F.2d
111, 125 (3d Cir.1983). In exercising this
discretion, courts do not read Rule 15(a) as
providing an unlimited right to amend complaints.
*See e.g. Lorenz v. CSX, Corp.,* 1 F.3d 1406, 1413
(3d Cir.1993). Indeed, a motion to amend may be
denied for any of the following reasons: undue
delay, bad faith, failure to cure previous
deficiencies, dilatory motive, prejudice, or futility.
*See Foman v. Davis,* 371 U.S. 178, 182 (1962).

In the present case, the court is troubled by the
plaintiffs' decision to file this motion not only after
the motion to dismiss had been filed, but *after* the
court had decided this motion and dismissed their
claims. When faced with the defendants' motion to
dismiss, the plaintiffs would have been well within
their rights to request leave to amend. Instead, they
chose to oppose the motion, in its entirety, without
seeking such relief. Such an approach is highly
suspect as the plaintiffs were aware of the facts
which they now seek to add at the time the original
pleading was filed. Thus, there is no excuse for
failure to plead them before the case was dismissed.

Additionally, in their briefs on the present motion,
the plaintiffs essentially concede that their complaint
was deficient, but that they nevertheless did not seek
leave to amend it. *See e.g .,* Plaintiff's Motion to
Alter Judgment at 5 (recognizing that they had failed
to address certain arguments and facts in their
complaint, but that they "believe if such arguments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    **Page   2**
**(Cite as: Not Reported in F.Supp.2d)**

had been considered, the [c]omplaint might have survived the motion to dismiss."); Plaintiffs' Reply Brief at 2 (noting that the proposed amendments "alter substantially the particularity of the [c]omplaint's allegations); Plaintiffs' Reply Brief at 6 (stating that "virtually all," but not all, of the required allegations were contained in the original complaint).

**\*2** The plaintiffs further suggest that "the nature of [their] Opposition Brief [to the Motion to Dismiss] also signaled to this [c]ourt that, in the event it agreed with defendants' argument concerning pleading deficiencies, plaintiffs could adequately and easily replead to cure any such deficiencies." Plaintiffs' Reply Brief at 4. Unfortunately, however, in making this statement, the plaintiffs have apparently forgotten that it is their duty, not the court's, to request leave to amend. Had the plaintiffs been as interested in amending as they claim to have been, the appropriate response would have been a request for leave to amend, *before* the court dismissed their case.FN3 The court does not, and will not, make its decisions based on covert "signals" from counsel.

FN3. This is especially true in light of the fact that, in their motion to dismiss, the defendants requested that any dismissal be with prejudice. Thus, the plaintiffs cannot now argue that they were unaware of the possibility of such a dismissal.

Indeed, the only reason the plaintiffs offer for having not sought to amend their complaint earlier amounts to an argument that the case moved too quickly for them to do so.FN4 *See* Plaintiffs' Reply Brief at 4. To the contrary, however, the plaintiffs filed three individual complaints and then a subsequent consolidated amended complaint. They had time to more carefully craft their complaint at any one of those stages. They chose not to. Moreover, while it is true that the consolidated amended complaint was only filed approximately two months prior to the defendants' motion to dismiss, that motion to dismiss, regardless of whether it was filed two months or two years after the complaint, was enough to put the plaintiffs on notice of the deficiencies. Additionally, the fast pace of this litigation was dictated by the PSLRA's requirement that a motion to dismiss be decided before a case may proceed. Thus, the court looks with great disfavor on the plaintiffs attempt to use

this sensible requirement as a shield to ward off accusations of undue delay.

FN4. In making this argument, the plaintiffs appear not to understand that they could have fully defended their original consolidated amended complaint, as well as alternatively asked for permission to amend. Rather, the plaintiffs argue that, because they could not be certain an amended pleading would be required, they chose to file their "rapidly coming due" opposition brief. This tactical decision was clearly within their discretion. However, having chosen not to ask for alternative relief, they cannot now be heard to complain about the consequences of their actions.

### III. CONCLUSION

The plaintiffs chose to oppose the defendants' motion to dismiss based upon facts and theories not reflected in their consolidated amended complaint. In so doing, they clearly recognized the complaint's deficiencies. Nevertheless, they did not seek the alternative relief of requesting leave to amend prior to the court's extensive ruling on the motion to dismiss. In this way, they apparently assumed that they would be granted another bite at the apple. Unfortunately, they will not have this opportunity.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Plaintiffs' Motion to Alter Judgment (D.I.71) is DENIED.

2. The Defendants' Motion to Strike the Plaintiffs' Reply Brief (D.I.75) is DENIED.

D.Del.,2002.
In re Digital Island Securities Litigation
Not Reported in F.Supp.2d, 2002 WL 31667863
(D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 2

220 Fed.Appx. 97                                                                          Page  1
220 Fed.Appx. 97, 2007 WL 934893 (C.A.3 (N.J.)), Fed. Sec. L. Rep. P 94,186
**(Cite as: 220 Fed.Appx. 97)**

**H**

Galati v. Commerce Bancorp, Inc.
C.A.3 (N.J.),2007.
This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,Third Circuit.
Mary Ann GALATI, Individually and on behalf of all other similarly situated;  E. Miles Senn; Rostislav Semeran;  Shelby Goldgrab;  Robert Morrison;  and Jimmy Grossman
v.
COMMERCE BANCORP, INC.;  Vernon W. Hill, II;  Ronald A. White;  Douglas J. Pauls;  Glen K. Holck;  Stephen M. Umbrell;  George E. Norcross, III (D.C. No. 04-cv-03252).
Rostislav Semeran, Individually and on behalf of all others similarly situated
v.
Commerce Bancorp, Inc.;  Vernon W. Hill, II; Ronald A. White;  Douglas J. Pauls;  Glenn K. Holck;  Stephen M. Umbrell (D.C. No. 04-cv-03465).
Shelby Goldgrab, Individually and on behalf of all others similarly situated
v.
Commerce Bancorp, Inc.;  Vernon W. Hill, II; Ronald A. White;  Douglas J. Pauls;  Glenn K. Holck;  Stephen M. Umbrell (D.C. No. 04-cv-03576).
Robert Morrison, Individually and on behalf of all others similarly situated
v.
Commerce Bancorp, Inc.;  Vernon W. Hill, II (D.C. No. 04-cv-03631).
Jimmy Grossman, Individually and on behalf of all others similarly situated
v.
Commerce Bancorp, Inc.;  Vernon W. Hill, II (D.C. No. 04-cv-05191).
E. Miles Senn, Individually and on behalf of all others similarly situated
v.
Commerce Bancorp, Inc.;  Vernon W. Hill, II; Ronald A. White;  Douglas J. Pauls;  Glen K. Holck;  Stephen M. Umbrell (D.C. No. 04-cv-04113).

Mary Ann Galati;  E. Miles Senn;  Rostislav Semeran;  Shelby Goldgrab;  Robert Morrison; Jimmy Grossman, Appellants.
No. 05-5157.

Submitted Under Third CircuitLAR 34.1(a), Dec. 12, 2006.
Filed: March 29, 2007.

Background:  Investors brought action against corporation and its officers alleging fraud in violation of federal securities laws. The United States District Court for the District of New Jersey, Robert B. Kugler, J., 2005 WL 3797764, dismissed action. Investors appealed.

Holdings:  The Court of Appeals, Fuentes, Circuit Judge, held that:

(1) corporation did not have affirmative duty under Rule 10b-5 to disclose malfeasance of three senior officers employed by subsidiary of corporation regarding bid-rigging and other unlawful practices with government client which allegedly had been committed on behalf of corporation, and

(2) dismissal of complaint with prejudice, without granting investors leave to amend complaint, was not abuse of discretion.

Affirmed.
West Headnotes
[1] Securities Regulation 349B ⟨⟩ 60.28(13)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
               349Bk60.28    Nondisclosure; Insider Trading
                  349Bk60.28(10) Matters to Be Disclosed
                    349Bk60.28(13)    k. Particular Matters. Most Cited Cases
Corporation did not have affirmative duty under Rule 10b-5 to disclose malfeasance of three senior officers employed by subsidiary of corporation regarding bid-rigging and other unlawful practices

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



220 Fed.Appx. 97
**(Cite as: 220 Fed.Appx. 97)**

Page  2

with government client which allegedly had been committed on behalf of corporation; although such information would have been material to investors, statements of corporation had not been rendered misleading by such malfeasance, integrity of corporation's practices with respect to government deposits had not been put into play, corporation's factual recitations of past earnings were accurate, and other statements regarding government deposits constituted nothing more than mere puffery. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

[2] Federal Civil Procedure 170A ⟸ 1837.1

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1837 Effect
                    170Ak1837.1 k. In General. Most Cited Cases

Federal Civil Procedure 170A ⟸ 1838

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1837 Effect
                    170Ak1838 k. Pleading Over. Most Cited Cases
Dismissal of federal securities fraud complaint with prejudice, without granting investors leave to amend complaint, was warranted, where investors inserted footnote requesting leave to amend at end of last sentence of their brief in opposition to commerce corporation's motion to dismiss but they never moved for leave to file amended complaint and they did not submit proposed amended complaint. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**\*99** On Appeal from the United States District Court for the District of New Jersey (D.C. Nos. 04-3252, 04-3465, 04-3576, 04-3631, 04-4113, 04-5191), District Judge: Honorable Robert B. Kugler.

Joseph J. de Palma, Lite, de Palma, Greenberg & Rivas, Newark, NJ, David R. Scott, Scott & Scott, Colchester, CT, Arthur L. Shingler, III, Scott & Scott, San Diego, CA, Geoffrey M. Johnson, Scott & Scott, Chagrin Falls, OH, for Appellants.
Matthew J. Siembieda, Timothy D. Katsiff, Evan H. Lechtman, Blank Rome, Philadelphia, PA, William M. Tambussi, Brown & Connery, Westmont, NJ, Edwin J. Jacobs, Jr., Jacobs & Barbone, Atlantic City, NJ, Kevin H. Marino, John D. Tortorella, Marino & Associates, Chatham, NJ, Lawrence S. Lustberg, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Appellees.

Before: FUENTES and VAN ANTWERPEN, Circuit Judges, and PADOVA, FN\* District Judge.

FN\* The Honorable John R. Padova, United States District Judge, Eastern District of Pennsylvania, sitting by designation.

OPINION OF THE COURT
FUENTES, Circuit Judge.
**\*\*1** Plaintiffs in this securities class action purchased stock in Commerce Bancorp, Inc. ("Commerce Bank" or the "Company") during the period from June 1, 2002 through June 28, 2004. They assert claims against Commerce Bank, three of Commerce Bank's current and/or former officers, and three former officers of Commerce Bank's subsidiary, Commerce Bank/Philadelphia, for violation of § 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, for failure to disclose bid-rigging and other unlawful practices allegedly committed on behalf of the Company between April 2002 and November 2003.FN1 This is an appeal from the District Court's Rule 12(b)(6) dismissal of plaintiffs' consolidated amended complaint. We agree with the District Court that plaintiffs fail to state a claim upon which relief can be granted.FN2 Therefore, we will affirm.

FN1. In the proceedings below, plaintiffs also asserted, and the District Court rejected, a claim pursuant to § 20(a) of the 1934 Act, 15 U.S.C. § 78t, for control person liability. Since plaintiffs do not discuss their § 20(a) claim in their briefs on appeal, we assume they are not challenging the District Court's ruling on this issue.

FN2. We exercise plenary review over a district court's dismissal of a complaint pursuant to Rule 12(b)(6). *Oran v. Stafford*, 226 F.3d 275, 281 n. 2 (3d Cir.2000). We must accept as true the factual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



220 Fed.Appx. 97
**(Cite as: 220 Fed.Appx. 97)**

Page   3

allegations contained in the complaint, and may affirm the dismissal only if it appears certain that plaintiffs can prove no set of facts that would entitle them to relief. *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 279-280 (3d Cir.1992).

### I. Background

On June 29, 2004, federal authorities announced the criminal indictment of three officers of Commerce Bank/Philadelphia-Ronald A. White, Glenn K. Holck, and Stephen M. Umbrell-for their participation in a "pay-to-play scheme" involving then Philadelphia Treasurer, Corey Kemp.FN3 White, Holck, and Umbrell allegedly assisted Kemp in obtaining a number of personal loans for which he was not financially qualified and, in exchange, Kemp channeled municipal business to Commerce Bank/Philadelphia, including a \***100** $1.5 million municipal account, $50 million in municipal deposits, and priority in several municipal bond deals.FN4

FN3. During the relevant time period, White, Holck, and Umbrell respectively served as Director, President, and Regional Vice-President of Commerce Bank/Philadelphia.

FN4. According to plaintiffs, since the commencement of this lawsuit, Holck and Umbrell have been convicted on fraud and corruption charges.

In the wake of the public announcement of the criminal indictment, the value of Commerce Bank's stock declined, including a sixteen percent drop, from $64.98 to $54.44, in the two days immediately following the announcement.    Subsequently, six separate class action lawsuits were filed by Commerce Bank shareholders against White, Holck, and Umbrell, alleging violations of the federal securities laws.  Although neither Commerce Bank, the parent corporation, nor any of Commerce Bank's officers, were charged with criminal conduct at the time the initial complaints were filed, the Company, along with its Chief Executive Officer and Chairman, Vernon W. Hill, II; its Director, George E. Norcross, III; FN5  and its Chief Financial Officer, Douglas J. Pauls, were also named as defendants, based on allegations that they had actual knowledge of the bid-rigging scheme.

FN5. Norcross was not added as a defendant until plaintiffs filed their consolidated amended complaint.

The District Court subsequently consolidated the six class actions and, on January 24, 2005, plaintiffs filed a consolidated amended complaint. Defendants thereafter moved for dismissal pursuant to Rule 12(b)(6), and the District Court granted the motion. This appeal followed.

### II. Discussion

"Section 10(b) prohibits the 'use or employ, in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe....' " *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002) (quoting 15 U.S.C. § 78j(b)). "Section 10(b) is enforced through Rule 10b-5, which creates a private cause of action for investors harmed by false or misleading statements." *In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 147 (3d Cir.2004).  Thus, Rule 10b-5 "makes it unlawful for any person '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading....' " *In re IKON,* 277 F.3d at 666 (quoting 17 C.F.R. § 240.10b-5(b)).

**\*\*2** To state a claim under § 10(b) and Rule 10b-5, a private plaintiff must plead the following elements:    (1) that the defendant made a misrepresentation or omission of (2) a material (3) fact;  (4) that defendant acted with knowledge or recklessness;  and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damages. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999) (quotation marks omitted).   In addition, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.,* also imposes special pleading requirements for Rule 10b-5 claims. *See In re Alpharma,* 372 F.3d at 147. For example, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading...." 15 U.S.C. § 78u-4(b)(1)(B). Federal Rule of Civil Procedure 9(b) sets forth additional pleading requirements, providing, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



220 Fed.Appx. 97
**(Cite as: 220 Fed.Appx. 97)**

relevant part, that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

**\*101** [1] In this case, the District Court found that even though information concerning the conduct of White, Holck, and Umbrell would be material to investors, defendants did not have a duty under Rule 10b-5 to disclose the information.  We agree.

"Material information is information that would be important to a reasonable investor in making his or her investment decision."  *Oran,* 226 F.3d at 282 (quotation marks omitted).    "[U]ndisclosed information is considered material if there is a substantial likelihood that the disclosure would be viewed by the reasonable investor as having significantly altered the total mix of information available to that investor."  *Id.* (quotation marks omitted).

At the same time, non-disclosure of material information "will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information."  *Id.* at 285.  As the Supreme Court has stated:  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).  "[A] duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure."  Oran, 226 F.3d at 285-86.

Here, plaintiffs allege that "[d]efendants made several statements that were rendered false and misleading by virtue of their failure to speak fully and accurately about the illegal bid-rigging and kick-back scheme."    (Appellant's Br. at 13.) Specifically, plaintiffs point to various statements made in Commerce Bank's 2002 through 2004 SEC filings and earnings releases, including the following:
. "dramatic deposit growth continues with total deposits at September 30, 2002 of $13.9 billion, a $4.5 billion increase or 47% over total deposits of $9.4 billion a year ago"
**\*\*3** . "ending government deposits grew to $1,595 million from $1,212 million the previous year"
. "The strong performance of [Commerce Capital Markets] was led by the public finance division."

. "the unique Commerce business model continues to produce strong top-line revenue growth driven by strong deposit growth which significantly increases our net interest income and net income"
. "dramatic deposit growth continues with total deposits at September 30, 2003 of $19.6 billion, a $5.7 billion increase or 41% over total deposits of $13.9 billion a year ago"

(Appellant's Br. at 7-8.)    Plaintiffs contend that "[o]ther filings throughout 2002, 2003 and 2004 likewise contained statements about Commerce Bank's 'dramatic growth' in its deposit base and investment banking fees."  FN6 (*Id.* at 8.)

FN6. The SEC filings were signed by defendants Hill and Pauls.    In its opinion, the District Court noted that plaintiffs' failure to attribute any allegedly misleading statements to the other defendants was likely fatal to their claim against those defendants.    The District Court went on to conclude, however, that "because this Court finds that none of the alleged statements were in fact materially misleading, the Court will dismiss the consolidated complaint in its entirety without addressing Plaintiffs' failure to plead violations by particular Defendants."    In addition, the District Court strongly suggested that plaintiffs' failure to explain in their complaint why the statements were misleading was likely insufficient to satisfy the heightened pleading standards of the PSLRA and Rule 9(b).  (App. at 9-11.)

As plaintiffs state in their consolidated amended complaint, "[w]hen the defendants chose to make positive statements \*102 about growth in Commerce Bank's government and public deposits, they had a duty to tell the whole truth about the unsustainable and illegal manner in which many, if not most, of those deposits were procured."  (App. at 320.) Like the District Court, we do not agree.

"Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)."    *In re Advanta,* 180 F.3d at 538. Moreover, statements concerning the Company's "dramatic deposit growth," "strong performance," and "unique business model," constitute nothing more than mere "puffery," insufficient to sustain a Rule 10b-5 claim.    *See id.* at 538-39.    Indeed, none of the statements recited by plaintiffs "put into play" the integrity of Commerce Bank's practices

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



with respect to government deposits.  *Compare Shapiro,* 964 F.2d at 282 ("where a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play' " for purposes of Rule 10b-5).    Rather, as the District Court concluded, the statements were routine recitations of past financial performance, and general optimistic statements about the Company's future growth that, in and of themselves, did not give rise to a duty to disclose the malfeasance of three senior officers employed by the Company's subsidiary.    Therefore, while we recognize that investors may very well have an interest in knowing about such misconduct, we agree with the District Court that plaintiffs' failure to identify a single statement that was rendered misleading by defendants' non-disclosure is fatal to their Rule 10b-5 claim. FN7

FN7. We are also unpersuaded by plaintiffs' argument that the District Court engaged in improper factfinding when it concluded that the "attendant risks" of the bid-rigging scheme were too speculative to be material for purposes of Rule 10b-5.    *See In re Craftmatic Sec. Litig.,* 890 F.2d 628, 641, 644 (3d Cir.1990) (finding that the risks associated with deceptive and illegal advertising and marketing program were sufficiently speculative and unreliable to be immaterial as a matter of law).

[2] Finally, with respect to plaintiffs' claim that the District Court abused its discretion in dismissing the consolidated amended complaint without granting plaintiffs leave to amend the complaint, defendants point out that plaintiffs never moved before the District Court for leave to file an amended complaint, nor did they ever submit to the District Court a proposed amended complaint.    Rather, according to defendants, "all that Plaintiffs did to request leave to amend was to insert a footnote at the end of the last sentence of their Brief in Opposition to Commerce Defendants' Motion to Dismiss."  (Commerce Bancorp Br. at 34.)

\*\*4 In their briefs on appeal, plaintiffs assert that they did in fact move for leave to amend, but fail to point to anything in the record to support their contention.    Therefore, we conclude that the District Court's dismissal of the complaint with prejudice was not an abuse of discretion.    *See Ramsgate Court Townhome Ass'n v. West Chester Borough,* 313 F.3d 157, 161 (3d Cir.2002)

("Because a motion for leave to amend was never properly before it, the district court did not abuse its discretion in failing to address [plaintiff's] request for leave to cure deficiencies in her pleadings.")

III. Conclusion

For the foregoing reasons, we will affirm the District Court's dismissal of plaintiffs' consolidated amended complaint.

C.A.3 (N.J.),2007.
Galati v. Commerce Bancorp, Inc.
220 Fed.Appx. 97, 2007 WL 934893 (C.A.3 (N.J.)), Fed. Sec. L. Rep. P 94,186

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 3

658 N.W.2d 87                                                                                    Page   1
260 Wis.2d 601, 658 N.W.2d 87, 2003 WL 115323 (Wis.App.), 2003 WI App 42
**(Cite as: 260 Wis.2d 601, 658 N.W.2d 87)**
н

Gorokhovsky v. Edwards
Wis.App.,2003.
NOTICE: UNPUBLISHED OPINION. RULE
809.23(3), RULES OF CIVIL PROCEDURE,
PROVIDE THAT UNPUBLISHED OPINIONS
ARE OF NO PRECEDENTIAL VALUE AND
MAY NOT BE CITED EXCEPT IN LIMITED
INSTANCES.(The decision of the Court is
referenced in the North Western Reporter in a table
captioned "Wisconsin Court of Appeals Table of
Unpublished Opinions".)
        Court of Appeals of Wisconsin.
    Vladimir M. GOROKHOVSKY, Plaintiff-
                Appellant,
                    v.
Jan EDWARDS, Elite Properties, Inc., and Daniel
    J. Miske, Defendants-Respondents.
                No. 02-0836.

                Jan. 14, 2003.

Appeal from a judgment and an order of the circuit
court for Milwaukee County: Thomas P. Donegan,
Judge. Affirmed.

Before WEDEMEYER, P.J., WEDEMEYER, and
CURLEY, JJ.
PER CURIAM.
*1 Vladimir M. Gorokhovsky appeals, *pro se,* from
the judgment of the trial court dismissing all claims
against the defendants, Jan Edwards, Attorney
Daniel J. Miske and Elite Properties, Inc.FN1 He
also appeals from the trial court's award of
$14,151.50 to the defendants in costs and attorney
fees, pursuant to Wis. Stat. § 814.025(1999-2000),
FN2 for commencing and continuing a frivolous
lawsuit. Gorokhovsky contends: (1) the trial court
erred in dismissing his claims; and (2) the trial court
erred in awarding costs and attorney fees. We
disagree with Gorokhovsky and affirm.

FN1. Gorokhovsky filed his lawsuit on September
17, 2001. However, during the pendency of this
appeal, Gorokhovsky graduated from John Marshall
School of Law, located in Chicago, Illinois, in 2001
and was admitted to practice law in Wisconsin on
June 11, 2002.

FN2. All references to the Wisconsin Statutes are to
the 1999-2000 version unless otherwise noted.

                I. Background.

¶ 2 Gorokhovsky owns a condominium in
Cherrywood Village, a condominium association in
Brown Deer, Wisconsin, where he lives with his
mother. The original dispute arose between
Gorokhovsky and his next-door neighbor, Vagran
Gregoryan. Gorokhovsky accused Gregoryan of
smoking cigarettes in front of their unit, aggravating
his mother's asthma, and commandeering the use of
an outdoor water spigot that was intended for their
common use. On September 17, 2001, Gorokhovsky
filed suit against Gregoryan. These and other claims
against Gregoryan were settled and are not a subject
of this appeal.

¶ 3 However, on September 20, 2001, Gorokhovsky
filed a first and second amended complaint joining
Jan Edwards, the condominium association's
president, and Elite Properties, Inc., the
condominium's management company, as
indispensable defendants pursuant to Wis. Stat. §
803.04(1). On September 24, 2001, Gorokhovsky
filed a third amended complaint also joining
Attorney Daniel J. Miske and the law firm of Petrie
& Stocking, S.C., as defendants. FN3 Attorney
Miske and his firm, Petrie & Stocking, S.C,
represented the condominium association. The
complaints against Edwards, Miske and Elite
Properties alleged various claims including
negligence, gross negligence, conspiracy, violations
of both state and federal housing laws,
discrimination, a violation of the Civil Rights Act,
punitive damages, and "the tort of oppression."
However, the third amended complaint failed to
allege any claims against Edwards or Elite
Properties and did not incorporate any of the
previous claims against Edwards or Elite Properties.

FN3. Gorokhovsky incorrectly captioned the third
amended complaint as "Second Amended
Complaint."

¶ 4 On December 10, 2001, the trial court heard the
motion to dismiss filed on behalf of Edwards, Elite
Properties, Miske and Petrie & Stocking, S.C.
Gorokhovsky maintained that all of his claims
against each defendant survived his three amended
complaints. However, because the third amended
complaint failed to incorporate the allegations of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



previous complaints against Edwards and Elite Properties, the trial court dismissed all claims against Edwards and Elite Properties. At the hearing on the defendants' motion to dismiss, Gorokhovsky also agreed to dismiss all claims against Petrie & Stocking, S.C., and any derivative claims against Miske.

¶ 5 Therefore, absent the claims against Edwards and Elite, which were not incorporated by the third amended complaint, as well as the claims against the law firm and the derivative claims against Miske, which were dismissed by stipulation, the following claims remained against Miske, personally: (1) gross and willful negligence; (2) common law conspiracy; (3) punitive damages, Wis. Stat. § 895.85(3); (4) violations of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; (5) violations of the Wisconsin Fair Housing Act, Wis. Stat. § 106.04(2)(g); FN4 and (6) civil rights violations, 42 U.S.C. §§ 1982, 1985(3) and 1986. Gorokhovsky's allegations of discrimination were based on his belief that Miske discriminated against him and denied him equal rights because he was of Russian and Jewish descent.

FN4. Gorokhovsky claimed a violation of Wis. Stat. § 106.04 even though that section had renumbered as Wis. Stat. §§ 106.50 and 106.52, effective May 6, 2000.

*2   ¶ 6 On December 28, 2001, the trial court dismissed these remaining claims against Miske. Additionally, the trial court ordered Gorokhovsky to pay the defendants' costs and reasonable attorney fees.

II. Analysis.

*A. The trial court did not erroneously dismiss the claims against Edwards and Elite Properties.*

¶ 7 "The purpose of a motion to dismiss for failure to state a claim upon which relief can be granted is to test the legal sufficiency of the claim." *Weber v. City of Cedarburg*, 129 Wis.2d 57, 64, 384 N.W.2d 333 (1986). Our review is confined to the face of the pleadings. *Onderdonk v. Lamb*, 79 Wis.2d 241, 245, 255 N.W.2d 507 (1977). We will affirm the dismissal of a complaint for the failure to state a claim only if it appears certain that no relief can be granted under any set of facts that the plaintiff can

prove in support of the allegations. *Watts v. Watts*, 137 Wis.2d 506, 512, 405 N.W.2d 303 (1987). "In determining whether a plaintiff has sufficiently stated a claim for relief, the facts pleaded by the plaintiff and all reasonable inferences arising from the factual allegations made by the plaintiff are accepted as true." *Farr v. Alternative Living Servs., Inc.*, 2002 WI App 88, ¶ 8, 253 Wis.2d 790, 643 N.W.2d 841. Evaluating the legal sufficiency of a complaint presents a question of law, which we review de novo. *Williams v. Security Sav. & Loan Ass'n*, 120 Wis.2d 480, 482, 355 N.W.2d 370 (Ct.App.1984).

¶ 8 "As a general rule, an amended complaint supersedes any prior complaints." *Ness v. Digital Dial Communications, Inc.*, 222 Wis.2d 374, 380, 588 N.W.2d 63 (Ct.App.1998). When an amended complaint supersedes a prior complaint, the amended complaint becomes the only live, operative complaint in the case. *See Holman v. Family Health Plan*, 227 Wis.2d 478, 484, 596 N.W.2d 358 (1999). Moreover, when the amended complaint makes no reference to the original complaint and incorporates by reference no part of the original complaint, no part of the original complaint survives. *See id.* at 487, 596 N.W.2d 358.

¶ 9 In the instant case, the third amended complaint failed to incorporate by reference any part of the previous three complaints. Thus, because the third amended complaint is the only operative complaint and makes no independent claims against Edwards or Elite Properties, the trial court properly dismissed said parties from the lawsuit.

*3 *B. The trial court did not erroneously dismiss the personal claims against Miske.*

¶ 10 "Wisconsin, like the federal system, has 'notice pleading' so that legal disputes are resolved on the merits of the case rather than on the technical niceties of pleading." *See Hlavinka v. Blunt, Ellis & Loewi, Inc.*, 174 Wis.2d 381, 403, 497 N.W.2d 756 (Ct.App.1993) (citation omitted). However, "[i]f 'notice pleading' is to have any efficacy at all, a pleading must give the defending party fair notice of not only the plaintiff's claim but the grounds upon which it rests as well." *Id.* (citation omitted). Therefore, "it is not enough to indicate merely that the plaintiff has a grievance, but sufficient detail must be given so that the defendant, and the court,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



can obtain a fair idea of what the plaintiff is complaining, and can see that there is some basis for recovery." *Id.* at 403-04, 497 N.W.2d 756 (citations omitted). The same standard of "notice pleading" applies to Gorokhovsky's federal law claims. *See* Fed.R.Civ.P. 8(a); *see also Nance v. Vieregge,* 147 F.3d 589, 590-91 (7th Cir.1998).

¶ 11 Review of the third amended complaint filed by Gorokhovsky reveals inadequate pleading to sufficiently notify the respondent of the claims against him. The third amended complaint is best described by the respondents: "Instead of pleading facts, the [p]laintiff invokes an impressive arsenal of adjectives and adverbs which do not modify or describe any act committed by the defendant." For example, Gorokhovsky accused Miske of

acting in bad faith and being motivated by his personal animus and his racial and ethnic hatred of [p]laintiff, the defendant DANIEL J. MISKE was and still is engaged in egregious, extremely adversarial and vindictive course of conduct of harassing, intimidating and oppressing the [p]laintiff, denying him his housing benefits and interfering with his property rights.

In fact, Gorokhovsky's third amended complaint stretches over fifty-seven pages, containing 178 numbered paragraphs, but fails to get past these bald-faced assertions. When asked to clarify his claims at the dismissal hearing, Gorokhovsky was unable to provide relevant factual bases for his claims; leading the trial court to comment:I hear allegations of conspiracy, of racial discrimination, of Fair Housing Act violations, of gross negligence. And, searching through this [c]omplaint, to find one concrete allegation that rises to the level of specificity that would support any of those claims stretches this Court's ability to imagine.
....

*4 To bring in a conspiracy or a discrimination claim when really there is a disagreement among members of a condominium association ... is a distortion of the proper use of the civil system. If every plaintiff acted as you are acting, [the] system would be grinded to a halt. Four complaints, 178 paragraphs average per [c]omplaint, and I have yet to find any fact that I think is worth more than a reasonable discussion at a condominium [a]ssociation meeting to try to resolve something. Period.
And I am not going to allow you to abuse the system

through this Court.

Nor will we allow Gorokhovsky to abuse the appellate process in a shallow attempt to resuscitate his lifeless claims. Accordingly, we affirm the trial court's dismissal of Gorokhovsky's claims against Miske.

*C. The trial court did not erroneously award costs and attorney fees.*

¶ 12 The trial court concluded that Gorokhovsky's lawsuit was "frivolous," as that term is defined by Wis. Stat. § 814.025. Section 814.025 states, in relevant part:
(1) If an action or special proceeding commenced or continued by a plaintiff or a counterclaim, defense or cross complaint commenced, used or continued by a defendant is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.
....
(3) In order to find an action, special proceeding, counterclaim, defense or cross complaint to be frivolous under sub. (1), the court must find one or more of the following:
(a) The action, special proceeding, counterclaim, defense or cross complaint was commenced, used or continued in bad faith, solely for purposes of harassing or maliciously injuring another.
(b) The party or the party's attorney knew, or should have known, that the action, special proceeding, counterclaim, defense or cross complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.
(4) To the extent s. 802.05 is applicable and differs from this section, s. 802.05 applies.

Wisconsin Stat. § 802.05(1)(a) states, in relevant part:The signature of an attorney or party constitutes a certificate that the attorney or party has read the pleading, motion or other paper; that to the best of the attorney's or party's knowledge, information and belief, formed after reasonable inquiry, the pleading, motion or other paper is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



If the court determines that an attorney or party failed to read or make the determinations required under this subsection before signing any petition, motion or other paper, the court may, upon motion, or upon its own initiative, impose an appropriate sanction on the person who signed the pleading, motion or other paper, or on a represented party, or on both. The sanction may include an order to pay the other party the amount of reasonable expenses incurred by that party because of the filing of the pleading, motion or other paper, including reasonable attorney fees.

¶ 13 Because neither the trial court nor any of the defendants raised the issue of bad faith, the question we must resolve is whether Gorokhovsky "knew, or should have known, that the action ... was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law." Wisconsin Stat. § 814.025(3)(b); *see also Stern v. Thompson & Coates, Ltd.*, 185 Wis.2d 220, 244, 517 N.W.2d 658 (1994) ("[A] claim cannot be made reasonably or in good faith ... if there is no set of facts which could satisfy the elements of the claim, or if the party or attorney knows or should know that the needed facts do not exist or cannot be developed."). We must also keep in mind that, pursuant to Wis. Stat. § 802.05, Gorokhovsky certified that the third amended complaint was "well-grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." Section 802.05(1)(a).

*5 ¶ 14 "The question of whether a reasonable attorney and litigant would or should have concluded that a particular claim is without a reasonable basis in law or equity presents a mixed question of law and fact and not a question of fact alone." *State v. State Farm Fire & Cas. Co.*, 100 Wis.2d 582, 601, 302 N.W.2d 827 (1981). "When mixed questions of law and fact are presented to this court, there are really two component questions which must be answered. The first question is what, in fact, actually happened; the second question is whether those facts, as a matter of law, have meaning as a particular legal concept." *DOR v. Exxon Corp.*, 90 Wis.2d 700, 713, 281 N.W.2d 94 (1979).

¶ 15 However, "if the claim was correctly adjudged

to be frivolous in the trial court, it is frivolous *per se* on appeal." *Riley v. Isaacson*, 156 Wis.2d 249, 262, 456 N.W.2d 619 (Ct.App.1990). Here, at the dismissal hearing on December 10, 2001, the trial court found that there were no facts that could satisfy the elements of Gorokhovsky's claims:

I hear on the factual allegations that [Miske] has done things you don't like. He is representing his client. His client disagrees with you. That's what I have heard here. I have heard no other factual allegation.

....

It seems to me that you are using the legal system for a purpose other than which it is intended. The legal system is intended to take legitimate claims by parties who have a reasonable dispute as to the merits of their claim and ask for a court of law to apply the rules of the law to help those parties resolve them.

....

[W]hen you bring a claim, you are putting other people's reputations [on the] line, not only your own. You have labeled people. You have labeled a person ... as a conspirer, as a discriminator, as somebody violating his duty as a lawyer.... Well there's a stop to these things. A stop when you cannot give any reasonable, factual, specific basis in support [of] what ... are wild-eyed claims. Again, I am not going to allow this Court to be used in that way.

The trial court then proceeded to award the defendants their costs and reasonable attorney fees. At the post-judgment hearing held on March 6, 2002, in response to Gorokhovsky's request to vacate the judgment, the trial court commented:*6 [W]hat I did was respond to a motion of [the] defendants and, on that motion, I made a good faith decision incorporating the principles in *Stern v. Thompson*, which refer to the statute at Section 814.025(3)(b), which point out that a party is claimed to be found frivolous if you knew or should have known that the action was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification, or reversal of existing law. And then I went through the factual claims you were making and pointed out that, even though you wanted the Court to find constitutional violations and serious violations of your rights, no reasonable attorney could bring those claims and assert that they were violating the law.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



658 N.W.2d 87
**(Cite as: 260 Wis.2d 601, 658 N.W.2d 87)**

¶ 16 We agree and conclude that Gorokhovsky - whether proceeding as a simple *pro se* litigant (as he presents himself) or as an individual with extensive legal training who was nearing the completion of his legal education and was soon to be admitted to the bar (as is the reality of the situation) - should have known that the facts did not exist and could not have been developed to support his allegations. Accordingly, we affirm the trial court's award of costs and reasonable attorney fees.

¶ 17 Based upon the foregoing, the trial court is affirmed.

*By the Court.*-Judgment and order affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.

Wis.App.,2003.
Gorokhovsky v. Edwards
260 Wis.2d 601, 658 N.W.2d 87, 2003 WL 115323
(Wis.App.), 2003 WI App 42

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 4

Not Reported in A.2d                                                                                    Page    1
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2
(Cite as: Not Reported in A.2d)
c

Hudson v. Prime Retail, Inc.
Md.Cir.Ct.,2004.
    Gabrielle Katz HUDSON, et al., Plaintiffs,
v.
PRIME RETAIL, INC., et al., Defendants.
No. 24-C-03-5806.

April 1, 2004.

Michael A. Stodghill, Esq., Rubin & Rubin, Chartered, Rockville, Charles P. Scheeler, Esq., Piper Rudnick, LLP, Baltimore, Emily Komlossy, Esq., Goodkind, Labaton, Rudoff & Sucharow, LLP, Ft. Lauderdale, FL, Andrew J. Graham, Esq., Kramon & Graham, P.A., Baltimore.

### ORDER

ALBERT J. MATRICCIANI, JR., Judge.
**\*1** Upon consideration of all defendants' motions to dismiss and plaintiffs' oppositions thereto, arguments of counsel having been heard on March 25, 2004, it is this *1st day of April, 2004,* by the Circuit Court for Baltimore City, Part 20, ORDERED, for the reasons set forth in the accompanying Memorandum Decision of this date, that dismissal is GRANTED as to each and every count of the third amended complaint, and it is further ORDERED that the motions to enforce the Court's bench decision are DENIED as moot.

### MEMORANDUM DECISION

This purported class action litigation arises from the opposition mounted by several minority stockholders to the cash-out merger of Prime Retail, Inc. ("PRI"), a Maryland corporation, into Prime Outlets Acquisition Company, LLC, a New Jersey company affiliated with The Lightstone Group, LLC ("Lightstone"). Broadly stated, the plaintiffs FN1 allege that in arranging and voting for the merger, various PRI directors FN2 breached the duties they owed to the corporation and its stockholders. Plaintiffs also named Lightstone as an aiding and abetting defendant. Both Prime Retail and Lightstone have filed motions to dismiss the Third Amended Complaint under Maryland Rule 2-322(b).

FN1. References to "plaintiffs" in this memorandum decision include Gabrielle Katz Hudson, Thomas R. Hudson, Jolly Roger Fund LP, and Jolly Roger

Offshore Fund, Ltd.

FN2. Defendant-directors are Glenn D. Reschke, Howard Amster, James R. Thompson, Gary Skoien, Kenneth A. Randall, Sharon Sharp, and Marvin S. Traub. References to "Prime Retail" include these directors, along with PRI (which no longer exists) and Prime Outlets Acquisition Company, LLC, successor in interest to PRI.

### I. Factual Background Summary and Procedural History

The facts set forth here are as alleged in the Third Amended Complaint. FN3 The purpose of this background statement is to provide a context for the analysis of the pending motions. The Court makes no findings of fact in this decision. *Morris v. Osmose Wood Preserving,* 99 Md.App. 646 (1994), *rev'd in part on other grounds,* 340 Md. 519 (1995) . In considering the pending motions, of course, the Court assumes the truth of the well-pleaded allegations of the Third Amended Complaint, and fair inferences to be drawn therefrom, but inconsistencies and ambiguities in the complaint must be construed against the plaintiffs. *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 344-45 (2000); *Faya v. Almaraz,* 329 Md. 435, 443-44 (1993); *Young v. Hartford Accident & Indem. Co.,* 303 Md. 182, 192 (1985).

FN3. This background summary includes material from PRI's proxy statement, but only to the extent the proxy is undisputed and consistent with the well-pleaded allegations of the Third Amended Complaint.

### A. PRI and the Fortress proposal.

PRI was a Maryland corporation that owned and operated outlet shopping centers. The company had three types of stock, Series A preferred, Series B preferred, and common stock, but due to the poor performance of its shopping centers, obligations to creditors, and lack of liquidity, the company had not paid dividends to its stockholders since January 2000. Among other financial recovery (or survival) measures, in December 2000 the company sold four of its outlet centers and obtained a $90 million loan from an affiliate of Fortress Investment Group, LLC

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                    **Page    2**
**(Cite as: Not Reported in A.2d)**

("Fortress").

Fortress submitted an unsolicited proposal to PRI's board of directors on June 4, 2002, proposing that Fortress buy out all the company's outstanding stock for $48 million. Two days later the board appointed directors Kenneth A. Randall, Sharon Sharp, James R. Thompson, and Marvin Traub to serve on a Special Committee formed to evaluate the Fortress offer, as well as other recapitalization options. That same day the Special Committee selected Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") to serve as the Committee's financial advisor. Representatives from Houlihan Lokey, along with PRI director Howard Amster (participating in his capacity as stockholder only), met with Fortress on June 21, 2002, to discuss the proposal. Five days later Fortress increased its proposed offer to a total of $66 million.

**\*2** At a Special Committee meeting on August 12, 2002, Houlihan Lokey presented its assessments of PRI's financial condition and value, and an analysis of the restructuring and other strategic alternatives the company might pursue. The next day Houlihan Lokey made a presentation to the entire board on essentially the same issues. The board decided it could not accept Fortress's $66 million proposal, but the board directed Houlihan Lokey to continue negotiations with Fortress while simultaneously pursuing other recovery options.

B. PRI's continued efforts to find an acceptable proposal.

On August 28, 2002, the Special Committee retained Granite Partners, LLC ("Granite"), as a second financial advisor to assist with raising capital, and from September through November 2002 Granite, Houlihan Lokey, and PRI representatives compiled information packages and an offering memorandum with financial projections. Granite contacted approximately one hundred potential investors seeking capital contributions. Meanwhile, Fortress filed a disclosure with the SEC on September 26, 2002, stating that it had purchased 10% of PRI's Series A stock from Merrill Lynch. At the conclusion of Granite's search, it reported to PRI that capital investment without a change in control was not an option, but that Lightstone, among other investors, expressed strong interest in a strategic transaction with the company, conditioned

upon the investor obtaining control.

After Granite narrowed the field to twenty prospective investors, thirteen of them executed confidentiality agreements and were given an offering memorandum. On November 15, 2002, those who remained interested were instructed to submit detailed proposals. PRI, with the assistance of its financial advisors, conducted presentations for four potential buyers from late November through December 4, 2002. Those efforts attracted six written expressions of interest, four buyout bids, and two bids for all or most of PRI's assets. The buyout bids ranged from $80 million to $120 million, and Houlihan Lokey went to work evaluating the various bids during the second week of December 2002.

The Special Committee, and then the full board, met with legal and financial advisors on December 13, 2002, and the board further winnowed the field to three buyout bidders, whom the board (through Houlihan Lokey) invited to submit best final bids. Those final bids came in on December 19, 2002, and they ranged from $125 million to $138.5 million. Houlihan Lokey advised the Special Committee to pursue the highest bidder, (whose identity does not appear in the record), and the Special Committee in turn made the same recommendation to the board. On December 23, 2002, the board directed PRI's management to pursue the $138.5 million bidder, and a week later PRI and the bidder entered into an exclusivity agreement giving the bidder sufficient time to complete its due diligence investigation.

At this point $138.5 million looked like the approximate merger consideration, so the next logical step was to devise a plan to allocate that sum among the various classes of stock. To that end the Special Committee directed Houlihan Lokey to seek input from Series A and Series B stockholders. Nearly 25% of PRI's Series A stock, and just over 20% of PRI's Series B stock was represented in these initial allocation discussions. Defendant Howard Amster, along with other individuals, participated as a holder of both classes of stock. The group assumed a net merger consideration of $133 million, and based on that figure a subgroup of the stockholders arrived at a consensus on allocations of $18.50 per Series A share, and $10.25 per Series B share, with $10 million to be divided among holders

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                          **Page  3**
**(Cite as: Not Reported in A.2d)**

of common stock.

**\*3** In mid-February, however, the bidder backed out
of the deal because of information gathered during
its due diligence investigation. PRI was back to
square one, and the board directed Houlihan Lokey
to resume courting one of the other two serious
bidders.

### C. Lightstone's bid.

On March 1, 2003, one of those bidders (whose
identity is also unknown) submitted a $117.5
million buyout proposal, which the Special
Committee and the board considered at meetings two
days later. Upon Houlihan Lokey's advising that it
could not easily assess the value of the bid because
of certain features of the deal's structure, the Special
Committee recommended that the board not pursue
the bid exclusively, and the board accepted the
recommendation. Consequently, Houlihan Lokey
invited further proposals from other interested
investors.

By March 13, 2003, PRI's board had three new
buyout bids in hand, the highest of them being
Lightstone's $121 million bid (which, after
transaction costs, would net PRI $118 million). On
that date, based on the Special Committee's
recommendation, PRI opted to pursue the
Lightstone deal exclusively, and the parties entered
into an exclusivity agreement on March 19, 2003.
Lightstone reduced its bid to $113 million (net
$111.5 million) on April 15, 2003, based on its due
diligence investigation.

On April 18, 2003, the Special Committee met for
two purposes: first, to receive Houlihan Lokey's
presentation on PRI's value (including a breakdown
of its various stocks), and second, to consider
director Michael Reschke's proposed alternative to
the Lightstone deal. Director M. Reschke FN4
proposed that PRI stay in business and not merge.
His plan entailed selling PRI's majority interests in
six shopping centers (some of which were
performing well), selling five under-performing
shopping centers, and a rights offering to
stockholders. Director M. Reschke projected this
would provide PRI $70 to $90 million more than the
Lightstone deal. The Special Committee
recommended that the board follow two parallel
paths: (1) continue pursuing the Lightstone deal,

and (2) further explore director M. Reschke's
proposal.

FN4. Two Reschke's served on PRI's board,
Michael and Glenn, so first initials are used to
distinguish between them.

Later in April 2003, Lightstone increased its bid to a
figure that would net PRI $113 million. On April
29, 2003, Lightstone's president and chief executive
officer David Lichtenstein met with PRI's board to
discuss the proposed merger. At the same meeting
director M. Reschke presented further details to the
board on his alternative proposal, director Amster
presented details on a possible rights offering, and
director G. Reschke (with management members)
presented PRI's latest five-year business plan.
Regarding the five-year plan, PRI's management
advised that the plan's success depended on a
reversal of several lackluster trends in PRI's
operations. Three directors (Amster, M. Reschke,
and Skoien) expressed concerns that Lightstone's
offer was too low, that a stockholder vote would be
unsuccessful if based on the current allocation
figures, and that the alternative proposals could be
better options for PRI.

**\*4** These proposals and concerns were considered at
a subsequent Special Committee meeting, at which it
was decided that the Special Committee would meet
with Mr. Lichtenstein in an effort to improve the
Lightstone proposal. The Special Committee also
directed its financial advisors to further evaluate
director M. Reschke's alternative proposal.

Mr. Lichtenstein met with Houlihan Lokey and
PRI's preferred board members prior to May 2,
2003, to discuss Lightstone's offer. Based on a total
purchase price of $115 million, the preferred
directors indicated their support for (or acquiescence
to) an allocation of $16.04 for Series A shares,
$8.93 for Series B shares, and $0.15 for shares of
common stock. The preferred directors reported
these figures, and Mr. Lichtenstein's unwillingness
to increase the $115 million offer, to the Special
Committee on May 2, 2003. The preferred directors
exited that meeting and the Committee considered
this report and PRI's lawyers' report on the
Lightstone negotiations. The Special Committee also
considered its financial advisors' reports on their
evaluation of director M. Reschke's alternative
proposal. Later that day the board met and, based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                     **Page  4**
**(Cite as: Not Reported in A.2d)**

the Special Committee's recommendations, the
board decided not to pursue director M. Reschke's
alternative proposal, but to persevere with the
Lightstone deal.

Subsequently, Houlihan Lokey met again with
preferred stockholders to discuss how Lightstone's
merger consideration could be allocated among the
various classes of stock. Houlihan Lokey asked the
preferred stockholders to consider an allocation of
$15.90 per Series A share, $8.80 per Series B share,
and $0.17 per share of common stock. At a May 14,
2003 Special Committee meeting Houlihan Lokey
advised the Committee of its opinion that $115
million was a fair price for PRI's stockholders
generally, and Houlihan Lokey also presented its
estimation of fair values for each class of stock.
Houlihan Lokey specified that its valuation of each
class was independent of its valuation of each other
class; that is, Houlihan Lokey was not giving a
fairness opinion on any particular allocation
arrangement. The estimated ranges of values were
$16.00 to $18.60 for Series A shares, $6.10 to
$7.20 for Series B shares, and $0.13 to $0.14 for
shares of common stock. Houlihan Lokey advised
the Special Committee that, in its view, a cash-out
merger with Lightstone would be better for PRI than
continuing to operate as a stand-alone business.

Allocation was again discussed at a May 9, 2003
Special Committee meeting. Director G. Reschke
told the board that the preferred directors would
support an allocation of $16.25 for Series A shares,
$8.66 for Series B shares, and $0.18 for shares of
common stock. On June 2, 2003 the Special
Committee directed Houlihan Lokey to seek other
preferred stockholders' input on the allocation, and
the Committee asked the preferred directors to be
prepared to explain the basis for their proposal at the
next Special Committee meeting.

**\*5** That next meeting was held on June 5, 2003. At
the meeting the Special Committee informed the
preferred directors that "their proposed allocation
was problematic for the Special Committee because,
under such proposal, the series A stockholders will
receive an amount per share at the lower end of
Houlihan Lokey's valuation range while the series B
stockholders would receive an amount per share
above Houlihan Lokey's valuation range." FN5 The
preferred directors stood their ground; they were
excused from the rest of the meeting during which

the Committee discussed the allocation proposals.

FN5. September 30, 2003 Definitive Schedule 14(a)
Proxy Statement at 24.

The Special Committee's deliberations continued to
a June 9, 2003 meeting, at which Houlihan Lokey
reported to the committee that nearly all of PRI's
preferred stockholders had expressed their desire for
liquidity, at a reasonable allocation. Merrill Lynch,
owner of 22% of PRI's Series A stock, would not
commit to a particular allocation range, but
Merrill's counsel stated that $16.00 was too low.
Fortress (the company that had earlier purchased
10% of PRI's Series A stock from Merrill) stated it
would consider a Series A allocation between
$16.00 and $20.00 per share. The Special
Committee decided to recommend to the board that
PRI enter into the merger agreement with Lightstone
at $115 million, and that the merger consideration
be allocated at $16.25 for Series A shares, $8.66 for
Series B shares, and $0.18 for common stock.
Included with the recommendation was an
explanation that the Special Committee factored the
preferred directors' preferences into the allocation
decision because of the stockholders' push for
liquidity. That is to say, without the preferred
directors' support the merger would probably fail,
and PRI would be left with no one receiving any
liquidation of their shares. The board adopted the
Special Committee's recommendation on June 9,
2003.

Houlihan Lokey updated its range of estimates on
July 1, 2003, and based on its most recent analysis
provided ranges of $16.11 to $18.61 for Series A
shares, $6.15 to $7.24 for Series B shares, and
$0.14 to $0.15 for shares of common stock. The
Special Committee recommended to the board no
changes in the allocation. PRI and Prime Outlets
Acquisition Company, LLC, executed the merger
agreement on July 8, 2003. Houlihan Lokey updated
its fairness opinions on that date, which included no
changes.

### D. Stockholder objections, and the ongoing
### allocation dialogue .

The following week PRI received objections from
Merrill Lynch and Fortress, both arguing that the
allocation of $16.25 for Series A shares was
inadequate. PRI held a teleconference moderated by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                    **Page 5**
(Cite as: Not Reported in A.2d)

Granite on August 11, 2003, at which 50% of the Series A stock, and 47% of the Series B stock were represented. The meeting did not resolve the disagreements.

Based on information provided by Granite, the Special Committee and the board found themselves in a quandary. Fortress and Merrill both appeared to need at least $20.00 per Series A share to support the merger (which obviously would require concomitant decreases elsewhere), but ROI Capital Management, a significant holder of PRI's Series B stock, would withdraw its support if the Series B allocation dipped below $8.30. Director Amster stated he could tolerate a Series B allocation as low as $8.46, but only with significant cuts in the common stock allocation and in transaction costs to PRI's management and its financial and legal advisors. Despite repeated efforts at persuading Lightstone to increase its offer beyond $115 million, PRI simply did not have enough merger consideration to satisfy everyone's demands.

\*6 PRI's financial advisors tried to iron out a solution between August 13 and August 21, 2003, but were unable to bring the different stock classes to a consensus. This was reported at an August 21, 2003 Special Committee meeting, where it was also reported that director Amster could support allocations of $18.40 for Series A shares, $8.169 for Series B shares, and $0.17 for shares of common stock, but with a $0.514 million cut in transactional fees. On the Special Committee's recommendation, the board adopted this allocation the same date.

### E. The plaintiffs file suit.

Just prior to those August 21 allocation decisions, the plaintiffs filed this action on August 12, 2003, seeking to enjoin the stockholders' vote on the merger. Prime Retail and Lightstone moved to dismiss the Complaint, but before any action was taken on those motions, the plaintiffs filed their First Amended Complaint on October 8, 2003, along with motions for preliminary injunction and expedited discovery. The Court held a scheduling conference with the parties on October 20, 2003, at which plaintiffs stated their intention to convert their motion for preliminary injunction into a motion for a temporary restraining order, and at which the Court set a hearing on the motions for October 24, 2003. PRI and Lightstone moved to dismiss the

First Amended Complaint on October 23, 2003. The stockholders' vote was scheduled for October 30, 2003.

At the conclusion of the October 24, 2003 hearing the Court rendered a decision from the bench. The parties dispute the legal effect of the Court's bench decision, and the Court resolves this dispute by clarifying what actually happened in section II.B., below. At this point, it suffices to say (and the parties agree) that the Court's bench decision dismissed all but one of the plaintiffs' claims. The Court reserved ruling on the motion for temporary restraining order to allow plaintiffs to conduct limited discovery. On October 27, 2003, plaintiffs deposed PRI director Kenneth A. Randall, who chaired the Special Committee, and plaintiffs withdrew their motion for a temporary restraining order a day later.

### F. Merger efforts continue.

PRI's stockholders did not approve the merger on October 30, 2003. A vote to merge would have required approval of at least two-thirds of each of the two preferred classes, and more than half of the common stockholders. Only 57.96% of the Series A shares were voted for the merger (both the other classes would have approved the merger). The meeting was adjourned and rescheduled for November 4, 2003. At that meeting 63.59% of the Series A shares were voted for the merger, and the meeting was adjourned and rescheduled for November 18, 2003.

On November 13, 2003, David Lichtenstein and PRI both disclosed that Lightstone might try purchasing PRI stock. (Lichtenstein filed a disclosure with the SEC, while PRI issued a press release.) On November 18, 2003, before the stockholder vote, Lightstone contracted to purchase shares of PRI Series A stock at $22 per share from Deephaven Capital Management. The purchase contract also obligated Deephaven to vote for merger. All three classes of stockholders approved the merger later that day.

### G. The pending motions.

\*7 Plaintiffs filed their Second Amended Complaint on December 3, 2003, and Prime Retail and Lightstone filed corresponding motions to dismiss

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



on January 9, 2003. Before any action was taken on those motions, plaintiffs filed their Third Amended Complaint on February 4, 2004, and the defendants filed their corresponding dismissal motions on February 23, 2004.FN6 Prime Retail's motion argues that all but one of the plaintiffs' claims are precluded by virtue of the prior bench decision, and that the entirety of the Third Amended Complaint fails to state a cause of action for which relief can be granted. Lightstone adopts Prime Retail's arguments, and also moves for dismissal arguing that the Third Amended Complaint fails to state a cause of action for aiding and abetting. The Court heard arguments of counsel on March 25, 2004.

FN6. The defendants also filed motions to enforce the October 24 bench decision, which plaintiffs opposed, but those motions become moot upon resolution of the present motions.

## II. Analysis

To analyze the defendants' motions it must first be determined, in procedural terms, how to treat the motions appropriately under the Maryland Rules and in the context within which they were presented to the Court. Then it is necessary to resolve the parties' dispute over the legal effect of the Court's late-October bench decision, before finally moving to the merits of the motions.

### A. Motions to dismiss-with exhibits.

The defendants submitted motions styled "Motion to Dismiss," and all parties have presented to the Court and relied upon various documentary exhibits including Prime Retail's filings with the SEC. However, in ruling on motions to dismiss the Court may only consider matters presented within the plaintiffs' Third Amended Complaint, and the Court assumes the truth of the well-pleaded facts and inferences fairly drawn therefrom. *Bennett Heating v. NationsBank,* 342 Md. 169, 174 (1996).

Prime Retail argues, "Even on a motion to dismiss, the Court may properly consider documents integral to the complaint, relied upon in the complaint, incorporated into the complaint, or that the plaintiff had knowledge of in framing the complaint, as well as public documents filed with the SEC," citing *In re Merrill Lynch & Co.,* 273 F.Supp.2d 351, 355 (S.D.N.Y.2003). Essentially the same rule applies

in Delaware. *E.g., Orman v. Cullman,* 794 A.2d 5, 15-17 (Del. Ch.2002) (Chandler, C.). Although one portion of Prime Retail's proposed rule applies in Maryland, *see* Md. R. 2-303(d) ("any written instrument that is an exhibit to a pleading is a part thereof"), the rest of the proposed rule runs counter to Maryland law. *See Muthukumarana v. Montgomery County,* 370 Md. 447, 474-75 (2002); *Hrehorovich v. Harbor Hosp.,* 93 Md.App. 772, 779-89 (1992); *see also Faya,* 329 Md. at 444 (taking judicial notice on motion to dismiss).

At the March 25 argument, however, plaintiffs' counsel joined in the defendants' position that the Court could, on a motion to dismiss, consider PRI's SEC filings as incorporated into the Third Amended Complaint. The Court accepts plaintiffs' counsel's statement as an oral amendment to the pleadings, incorporating into the complaint those documents on which it relies. *See Nichols v. Wilson,* 296 Md. 154, 156 n. 3 (1983); *RTKL Assocs, Inc. v. Four Villages Ltd. P'ship,* 95 Md.App. 135, 138 (1993); *Hoffman v. Hoffman,* 93 Md.App. 704, 709 (1992). The Court excludes from its consideration all other documents the parties submitted, and consequently will treat the pending motions as motions to dismiss.

### B. The effect of the bench decision on the Third Amended Complaint.

**\*8** The plaintiffs' initial complaint did not set forth causes of action in separately numbered counts, and thus it was improper in form and not in compliance with the pleading requirements of Maryland Rule 2-303(a). FN7 At the October 24 hearing the Court stated:

FN7. *See* Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary* 178-79 (3d ed. 2003) ("When separate causes of action are not pleaded in separate counts ... the appropriate response to the pleading is a preliminary motion under Rule 2-322(b)(2)."); Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 1.4 (2d ed. 1998) ("The failure to state separate causes of action in separate counts ... subject[s] [the complaint] to a motion to dismiss for failure to state a claim upon which relief can be granted.").

[T]he complaint itself is not set forth in counts, at least they aren't delineated in the traditional fashion, and I am going to say that it appears to me to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



attempt to set forth causes of action for both a breach of fiduciary duty and a breach of, to the extent that these are different, the duty of candor with respect to the material nondisclosures, the first issue going, I suppose, to the independence of the special committee and the second going to, whether they were independent or not, whether there is sufficient material and information contained in the proxy materials to allow the shareholders in the mix of it all to make reasoned decisions about the vote that they are to undertake next Thursday.... Am I missing something?

Plaintiffs' counsel then confirmed that the Court's understanding was correct. In part because of the lack of enumerated counts, the Court rendered an ambiguous bench decision:

[D]efendants' motion [to dismiss] ... should be denied with respect to this aspect of the complaint [i.e., the nondisclosure of allocation analysis] with, I think, leave to amend because I don't know that the complaint actually clearly sets forth the appropriate cause of action, but granted as to all other aspects and claims of material nondisclosure.

The Court's denial of the motion to dismiss the allocation nondisclosure claim, with leave to amend that claim, is inconsistent on its face. Although not articulated precisely this way from the bench, what the Court intended in that statement was to grant the motions to dismiss with leave to amend on the nondisclosure of allocation analysis count and to grant the motions to dismiss as to the remaining counts. The plaintiffs did amend their complaint, and in the Third Amended Complaint the plaintiffs have re-alleged causes of action which were dismissed at the October hearing.

Prime Retail argues that the doctrine of res judicata bars the plaintiffs from re-alleging in the Third Amended Complaint those claims which were previously dismissed. The sum total of legal authority cited by Prime Retail in support of that argument is *Poteet v. Sauter,* 136 Md.App. 383 (2001). In *Poteet,* Judge Hollander wrote for the Court of Special Appeals:

In determining whether res judicata is applicable, a court must consider:
(1) whether the parties are the same as, or in privity with, the parties to the earlier dispute;
(2) whether the cause of action presented is identical to the one determined in the prior adjudication; and,

(3) whether there was a final judgment on the merits in the initial action.

*Id.* at 411. *Poteet,* like every other res judicata case reviewed by this Court, spoke in terms of "final judgments" in "initial actions" as barring relitigation in a "subsequent action ." *Poteet* provides no support for the proposition that res judicata bars a plaintiff from re-alleging in an amended complaint, within a single civil action, claims which were previously disposed of on preliminary motions attacking the initial complaint.

*9 Because the bench decision left at least one claim in the case, that decision "is not a final judgment," it did not "*terminate* the action as to any of the claims or any of the parties," and it is "subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties." Md. R. 2-602(a) (emphasis added). Also, in addition to the three res judicata requirements described by Judge Hollander in *Poteet,* the doctrine presumes an additional element: two distinct lawsuits. In this case we have only one civil action, in which the Court has rendered a non-final decision on less than all the claims; res judicata has no application here.

As explained in section II.A., above, generally motions to dismiss which present additional materials not contained in the complaint require the Court to treat the motions as motions for summary judgment. All the parties assume (as did the Court, at the time), that the October 24 bench decision granted dismissal, but because the Court considered additional materials submitted by both parties, the Court was actually granting defense motions for summary judgment on all but one of the plaintiffs' claims.FN8 *See, e.g., Fairfax Sav., F.S.B. v. Kris Jen Ltd. P'ship,* 338 Md. 1, 9-10 (1995); *Hrehorvich,* 93 Md.App. at 783. Therefore, the rules governing plaintiffs' latest amendments would be rules governing amendments after a court grants defense motions for partial summary judgment, not dismissal.

FN8. Although the present motions came before the Court in the identical posture, the record has now been clarified as to which materials are being considered by the Court and which are not. See pages 13 to 14, above. Thus, the Maryland Rules compel different treatment of the pending motions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

Plaintiffs' memorandum in opposition to the defense motions posits that "dismissal is without prejudice, unless otherwise specified," citing *Williams v. Snyder,* 221 Md. 262, 267 (1960), and plaintiffs conclude that because "the Court's dismissal was unspecified," their amended pleading is proper. *Williams,* however, was a voluntary dismissal case where the Court applied the predecessor to current Rule 2-506(c). Unlike *Williams,* the plaintiffs here have not voluntarily dismissed their case. *Williams* and Rule 2-506(c) have no application here.

Plaintiffs also invoke Maryland Rule 2-341, the general rule governing amending pleadings. Under subparagraph (a) of that rule, "A party may file an amendment to a pleading at any time prior to 15 days of a scheduled trial date." Subparagraph (c) limits the scope of permissible amendments:

An amendment may seek to (1) change the nature of the action or defense, (2) set forth a better statement of facts concerning any matter already raised in a pleading, (3) set forth transactions or events that have occurred since the filing of the pleading sought to be amended, (4) correct misnomer of a party, (5) correct misjoinder or nonjoinder of a party so long as one of the original plaintiffs and one of the original defendants remain as parties to the action, (6) add a party or parties, (7) make any other appropriate change. Amendments shall be freely allowed when justice so permits. Errors or defects in a pleading not corrected by an amendment shall be disregarded unless they affect the substantial rights of the parties.

**\*10** Before applying Rule 2-341 to this case, the Court must inquire whether this general rule, and not a more specific rule, controls whether plaintiffs may resubmit by amendment claims on which the Court previously granted defense motions for summary judgment. For example, had this Court actually been granting defense motions to dismiss at the October 24 hearing, then under Rule 2-322(c) the plaintiffs could not file an amended complaint on all counts because the Court did not expressly grant leave to amend any claim other than the count for nondisclosure of merger allocation analysis.FN9 Thus, in the context of a motion to dismiss, Rule 2-322(c) takes away the broad freedom to amend generally granted by Rule 2-341.

FN9. The third sentence of Rule 2-322(c) states, "If the court orders dismissal, an amended complaint

may be filed only if the court expressly grants leave to amend."

In legal terms, however, the Court granted defense motions for partial summary judgment under Rule 2-501, and that rule contains no corollary to Rule 2-322(c)'s amendment provision.FN10 Unlike Rule 2-322(c), Rule 2-501 on summary judgments contains no specific restriction to limit the liberal amendment provisions of Rule 2-341. Even so, under the general amendment rule a plaintiff may not re-allege the very same claims on which summary judgment has already been granted, because such an amendment does not fall within one of the seven types of amendments in Rule 2-341(c). Although amendments "shall be freely allowed when justice so permits," for the same policy reasons underlying the doctrines of res judicata, collateral estoppel, and law of the case, justice does not permit a plaintiff to beset the Court and defendants with duplicitous, meritless claims. *See generally* John A. Lynch & Richard W. Bourne, *Modern Maryland Civil Procedure* §§ 12.1-12.3 (1993 & Supp.2003).

FN10. *But compare Davis v. DiPino,* 337 Md. 642, 648-49 (1995) (Chasanow, J.) ("When a trial court grants a motion to dismiss ... the court has the discretionary authority to grant the plaintiff leave to amend the complaint ... [but there] is no such discretionary authority to permit the amendment of the complaint subsequent to the grant of summary judgment."), *with Fairfax Sav., F.S.B.,* 338 Md. at 9-10 (Rodowsky, J.) (describing without criticism trial court's grant of partial summary judgment with leave to amend); *Kee v. State Highway Admin.,* 313 Md. 445, 452-55, 459-60 (1988) (Eldridge, J.) (sanctioning filing of amended complaint after grant of partial summary judgment as proper under Rule 2-341); *Preissman v. Harmatz,* 264 Md. 715, 718-20 (1972) (same).

To determine whether the plaintiffs' Third Amended Complaint falls within the scope of Rule 4-341(c), the Court must compare the First Amended Complaint with the Third, and to the extent that the comparison reveals that plaintiffs have re-alleged in the Third Amended Complaint causes of action on which summary judgment has already been granted for the defendants, the Court could strike those amendments on its own initiative under Rule 2-322(e) as being "improper" and "not in compliance with" Rule 2-341. The Court would then consider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                     Page    9
(Cite as: Not Reported in A.2d)

the defendants' motions to dismiss whatever remains after that comparison. But perhaps due to the lack of clarity in the Court's bench decision, the defendants have not moved to strike the amended complaint under Rule 2-341(a), (c), and Rule 2-322(e), and, of course, plaintiffs have not confronted such a motion. Although Rule 2-322(e) empowers the Court to strike pleadings on its own initiative, under the circumstances, here the Court declines to do so. To cleanse the record of further confusion stemming from the Court's October 24 decision, the Court will proceed to address here the viability of each of the Third Amended Complaint's counts.

C. Third Amended Complaint.

Plaintiffs' Third Amended Complaint alleges that the director-defendants breached the duties of good faith, loyalty, and care, which they owed to the corporation and its stockholders. The plaintiffs allege that various directors' decisions were not independent, that directors were interested in transactions they were addressing, and that the directors failed to disclose material facts to the stockholders who were to vote on the merger. Before addressing each count, it will be helpful to review generally the duties imposed upon directors, and the standards by which courts review director actions.

1. Corporate directors' duties and the business judgment rule.

*11 In Maryland, corporate directors must perform their duties (1) in good faith, (2) in a manner [the director] reasonably believes to be in the best interests of the corporation, and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances. Md.Code Ann. Corps. & Ass'ns § 2-405.1(a) (1999).FN11 Under section 2-405.1(c), directors who fulfill these duties enjoy the immunity from liability defined in section 5-417 of the Courts and Judicial Proceedings Article.FN12 Maryland has codified the "business judgment rule" at section 2-405.1(e), which provides, "An act of a director of a corporation is presumed to satisfy the standards" imposed by section 2-405.1(a). In the context of mergers Delaware law imposes upon directors what have become known as "*Revlon* duties," after *Revlon v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182, (Del.1985), requiring directors to try to

secure the best merger terms available for stockholders. Maryland law appears to impose the same duty, *Wittman v. Crooke,* 120 Md.App. 369, 376-77 (1998), but the business judgment rule presumes that directors satisfied this duty.FN13 *See* § 2-405.1(f).

FN11. Unless otherwise stated, all statutory citations are to the Corporations and Associations Article.

FN12. Section 5-417 states, "A person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."

FN13. Delaware courts reviewing certain change-in-control transactions preliminarily disregard the business judgment rule and employ a heightened level of scrutiny. *See, e.g., Orman,* 794 A.2d at 20-23. Unlike Delaware law, in Maryland the business judgment rule applies even to directors' change-in-control decisions. *See* Hanks, *Maryland Corporation Law* § 6.6[b], 176.1 (Supp.2003) ("[T]he decisions of the Supreme Court of Delaware in *Unocal v. Mesa Petroleum Co.,* 493 A.2d 946 (1985), and *Weinberger v. UOP, Inc.,* 457 A.2d 701 (1983), should not be applied in Maryland.").

The business judgment rule's presumption that directors fulfilled their duties does not render directors impervious to a plaintiff's claims. *See NAACP v. Golding,* 342 Md. 663, 673 (1996). Rather, the business judgment rule merely places upon plaintiffs the burden of rebutting the presumption. *Id.* To survive the motions to dismiss, therefore, the Third Amended Complaint must allege facts showing a failure of the directors to adhere to their duties.

Finally, in performing their duties directors may rely on information from (1) officers or employees of the corporation, to the extent the director reasonably believes the person is reliable and competent in the matter presented; (2) lawyers, CPAs, or other persons on matters the director reasonably believes to be within the person's professional or expert competence; and (3) a subcommittee of the board on which the director did not serve, as to a matter within the subcommittee's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



authority, to the extent the director reasonably believes the committee to merit confidence. Corps. & Ass'ns § 2-405.1(b).

### 2. Duty of Loyalty.

Directors' obligations to perform their duties "in good faith" and in a manner reasonably believed to be "in the best interests of the corporation" impose a duty of loyalty to the corporation. *United Wire, Metal & Machine Health & Welfare Fund v. Bd. of Sav. & Loan,* 316 Md. 236, 245 (1989); Hanks, *supra,* 6.6[c], at 177. The duty of loyalty embodies two related but distinct requirements relevant to this case: first, in exercising their judgment directors must decide matters independently, and second, directors generally may not have a material personal interest in the transaction. *See Orman,* 794 A.2d at 19-25 & n. 50; *see also Shapiro v. Greenfield,* 136 Md.App. 1, 13-15 (2000); *Wittman,* 120 Md.App. at 377-78 (1998).

*12 A director's "independent" exercise of the director's judgment "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Orman,* 794 A.2d at 24. Chancellor Chandler, of Delaware's Court of Chancery, has explained,

Such extraneous considerations or influences may exist when the challenged director is controlled by another. To raise a question concerning the independence of a particular board member, a plaintiff asserting the control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling. The shorthand shibboleth of "dominated and controlled directors" is insufficient.

*Id.* (most internal quotation marks omitted); *see also* Corps. & Ass'ns § 2-401(b); *Wharton v. Fidelity-Baltimore Nat'l Bank,* 222 Md. 177, 185 (1960); *Warren v. Fitzgerald,* 189 Md. 476, 488-89 (1948); *Martin Marietta Corp. v. Bendix,* 549 F.Supp. 623, 633 n. 5 (D.Md.1982). Under Maryland law,[W]hen a director does not personally benefit from the transaction but, because of that director's relationship to a party interested in the transaction, it would reasonably be expected that the director's exercise of independent judgment would be compromised, that director will be deemed an interested director within the meaning of the statute.

*Shapiro,* 136 Md.App. at 24.

Related, but distinct loyalty issues arise in cases where directors stand to receive benefits from a transaction that are not generally enjoyed by the stockholders, or where a director stands on both sides of a corporate transaction. *Orman,* 794 A.2d at 23; *Shapiro,* 136 Md.App. at 15. By implication of section 2-419(a), the benefit must be "material" to the director to render the director even arguably interested in the transaction. The requirement of materiality imposes upon plaintiffs the burden of pleading facts to show that "the alleged benefit was significant enough *in the context of the director's economic circumstances,* as to have made it improbable that the director could perform [the director's] fiduciary duties to the ... shareholders without being influenced by [the] overriding personal interest." *Orman,* 794 A.2d at 23 & n. 44 (internal quotation marks omitted); *In re General Motors Class H Shareholders Litigation,* 734 A.2d 611, 617-18 (Del. Ch.1999). The duty of loyalty imposes only a general prohibition of such transactions, but section 2-419 establishes procedures by which such transactions may be validly accomplished.

Section 2-419 "provides that an interested director transaction is not void or voidable solely because of the conflict of interest and creates a 'safe harbor' for certain transactions which satisfy the statute." *Id.* at 14. Section 2-419 clearly applies to protect transactions in which directors were materially interested, and the Court of Special Appeals has held section 2-419 applicable to transactions in which extraneous forces influence a director's decision, rendering the director "non-independent." *Shapiro,* 136 Md.App. at 18-24. To qualify for the statute's protections, "an interested director could inform the shareholders or directors of [the director's] conflicting interests and give the board of directors or shareholders an opportunity to approve or ratify the transaction." FN14 *Id.* at 15.

FN14. Alternatively, a director who did not comply with the disclosure provisions may attempt to show that the transaction was "fair and reasonable to the corporation" under section 2-419(b)(2). *Shapiro,* 136 Md.App. at 15. The parties to this litigation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



have not raised that provision.

### 3. Duty to disclose.

*13 Directors also owe a duty to disclose to stockholders material information within the directors' control regarding transactions on which the stockholders will vote. Contemporary Maryland caselaw has not had occasion to develop this duty of candor, but none of the parties to this action dispute that some such duty exists under Maryland law. *See Parish v. Milk Producers Ass'n,* 250 Md. 24, 72-74 (1968); *Homer v. Crown Cork & Seal Co.,* 155 Md. 66 (1928); *Paskowitz v. Wohlstadter,* 151 Md.App. 1, 10-11 (2003) (applying Delaware law); *Wilcom v. Wilcom,* 66 Md.App. 84, 95 (1986) (assuming a duty to inform existed, no breach found).FN15 Because of the paucity of Maryland law on the subject the parties direct the Court's attention to Delaware's well-developed corporate law, so the Court will rely primarily on that body of law to resolve the nondisclosure allegations in this action.

FN15. The leading Maryland corporations law treatise grounds the duty of disclosure in directors' duty to act in good faith, Hanks, *supra,* § 6.6 [b], at 165, whereas Delaware law views this duty as underlying the duties of good faith, loyalty, and care, *Orman,* 794 A.2d at 41.

The current state of Delaware's disclosure requirements can be gleaned from a trio of decisions authored by the Delaware Supreme Court's Chief Justice Veasey: *Malpiede v. Townson,* 780 A.2d 1075 (Del.2001); *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135 (Del.1997); and *Arnold v. Society for Savings Bancorp, Inc.,* 650 A.2d 1270 (Del.1994). Under those decisions, information is material and must be disclosed if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Malpiede,* 780 A.2d at 1086. The disclosure duty has its limits:

The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing.... [A] board is not required to engage in selfflagellation and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication on the matter.

*Loudon,* 700 A.2d at 143. Also, because directors' roles differ significantly from the roles of stockholders, *Werbowsky v. Collomb,* 362 Md. 581, 599 (2001), the disclosure duty does not entitle stockholders to so much information as to enable them to replicate the directors' efforts, *see In re Staples, Inc. Shareholders Litigation,* 792 A.2d 934, 953-54 (Del. Ch.2001). Rather, directors must disclose sufficient information to enable a "reasonable investor" to make an informed decision on the matter presented. *Arnold,* 650 A.2d 1277. Chief Justice Veasey has had occasion to clarify that disclosure duties do not rise and fall with the level of sophistication of the individual investors; rather, the standard remains an objective "reasonable investor" standard. *Hubbard v. Hibbard Brown & Co.,* 633 A.2d 345, 352-53 (Del.1993).

Finally, Delaware law provides plaintiffs with a useful analytical framework for pleading causes of action for nondisclosure, requiring plaintiffs to:
(1) "allege that facts are missing from the proxy statement,"
*14 (2) "identify those facts,"
(3) "state why they meet the materiality standard," and
(4) "how the omission caused injury."

*Loudon,* 700 A.2d at 141. This Court would add one additional pleading requirement: The plaintiff must allege that the information was known to the directors, or within the directors' control. *Id.* at 143.

### 4. Stockholder ratification.

As explained in section II.C.2., above, section 2-419 provides a procedure for informed stockholder ratification of interested and non-independent director transactions. In addition to that specialized statutory ratification provision, Maryland common law provides that generally directors cannot be held liable for acts which were ratified by informed stockholders. *Coffman v. Md. Pub'g Co.,* 167 Md. 275, 289 (1934); *Wittman,* 120 Md.App. at 377-78. Stockholder ratification is only as good as the disclosure which preceded it, *id.,* and such disclosures must comply with the standards described in section II.C.3., above.

### 5. The allegations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



### a. Count 1: "Improper Diversion of Merger Consideration."

The plaintiffs entitled count 1, "Breach of Fiduciary Duty (Improper Diversion of Merger Consideration)," and the plaintiffs' memorandum in opposition to dismissal illuminates the theories underlying this count:

[I]t is not simply attacking the allocation of merger consideration.... It challenges the manner by which the negotiations were handled by interested defendants, *not* the Special Committee, and the diversion of money from the public stockholders to executives and advisors through extremely lucrative change of control agreements and exorbitant fees to advisors.

The defendants argue that count one must be dismissed because, assuming its allegations amount to a breach of the directors' duties, PRI's stockholders ratified the directors' actions after full disclosure.

The bulk of the facts alleged in count 1 were fully disclosed in the September 30 proxy statement. Paragraph 99 of the Third Amended Complaint contains no allegations of fact; rather, it contains only conclusory characterizations. Md. R. 2-303(b); *Read Drug & Chem. Co. v. Colwill Constr. Co.,* 250 Md. 406, 412-16 (1968). To the extent paragraphs 101-104 contain *facts* rather than plaintiffs' conclusory characterizations of fact, those facts were also disclosed in the proxy materials at pages 15 through 28 ("Background to the Merger"), 66 through 69 ("Interests of Certain Persons in the Merger"), and 77 ("Security Ownership of Management and Certain Beneficial Owners"). Thus, even assuming those facts were actionable, the informed stockholders' vote for the merger to which those allegations relate ratified the board's actions and extinguished the prospect of director liability for those acts. *Wittman,* 120 Md.App. at 377-78.

The remaining, undisclosed allegation is that, "The Deephaven transaction was improper and the Individual Defendants turned a blind eye to Lightstone's actions." FN16 Paragraphs 71 through 81 of the Third Amended Complaint describe the Deephaven stock sale. Plaintiffs allege that Lichtenstein paid $22 per share for Deephaven's Series A stock, and the agreement also bound Deephaven to vote in favor of the merger at the

stockholder's meeting. FN17 In support of their contention that the transaction was improper, plaintiffs cite *Schreiber v. Carney,* 447 A.2d 17 (Del. Ch.1982) and *Hewlett v. Hewlett-Packard Co.,* C.A. No. 19513-NC, 2002 WL 549137 (Del. Ch. Apr. 8, 2002). However, for the same reasons explained in the Chancery Court's decision in *In re IXC Communications, Inc. Shareholders Litigation,* C.A. No. 17324, 1999 WL 1009174 (Del. Ch. Oct. 27, 1999) (permitting acquiring corporation's purchase of a minority of target's shares, with votes, in a "side deal"), the Deephaven sale was not improper under *Schreiber.* FN18 Despite the "discordant ring" of the term "vote-buying," Maryland stockholders have the right "to cast [their] votes, or to grant a proxy or otherwise transfer [their] right to vote, in any way [they] decide[ ] and for any reason or no reason." Hanks, *supra,* § 7.15, at 253. Lightstone purchased from Deephaven only 3.9% of PRI's Series A stock, and thus the acquiring company did not "lock up" the vote, and the transaction did not disenfranchise plaintiffs.

FN16. Plaintiffs also alleged in paragraph 68 that the directors owed a duty "to ascertain Lightstone's intentions regarding its announcement of purchases of PRI securities," but neither plaintiffs' memorandum, nor the law, provides any support for that contention.

FN17. Under Section 2-507(b)(3), "if a person is the record holder on the record date but subsequently transfers the stock to another person prior to the time of voting, the transferee is entitled to require the transferor to issue a proxy to the transferee." Hanks, *supra,* § 7.09, at 242. Here, according to plaintiffs' complaint, it appears that Lichtenstein declined to require Deephaven to transfer its proxy, and opted to have Deephaven vote at the meeting instead.

FN18. Interestingly, while Maryland Rule 1-104 generally prohibits citation to unreported decisions of Maryland's appellate courts, the rule is silent on whether extra-jurisdictional unreported decisions may be cited. In *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners,* No. 2818, Sept. Term, 2002, slip op. at 45 n. 4 (Md.Ct.Spec.App. Mar. 3, 2004), Judge Moylan decided not to consider an unreported Fourth Circuit decision cited by a party because such citations are "disfavored" under the Fourth Circuit's rules. Upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

Page  13

reviewing Delaware's procedural rules and caselaw, it appears that Delaware courts do not disfavor, much less prohibit citation to unreported decisions, as long as counsel submits hard copies to the court. *See* Chancery Ct. R. 171(h) (this same provision appears in the rules of Delaware's Supreme Court [R. 14], Superior Court [R. 107], Court of Common Pleas [R. 107], and Family Court [R. 107], as well as the United States District Court for the District of Delaware [R. 7.1.3] ). In any event, the Court gives no weight to the unreported Delaware decisions "beyond the weight merited by the persuasive force of the reasoning employed." *Cf. E. Outdoor Adver. Co. v. Mayor of Balt* ., 128 Md.App. 494, 515 (1999) (Harrell, J.).

### b. Count 2: "Failure to Offer Fair Price."

**\*15** The second count proceeds on a theory that the defendant-directors failed to offer a fair price to Series A stockholders because (1) the committee and board arrived at a merger allocation based in part on internal corporate politics rather than a purely economic analysis; (2) conflicts among board members rendered them incapable of independently exercising their judgment; (3) the directors failed to obtain the highest value reasonably available for Series A shares; (4) the merger price includes a "wrongful diversion of consideration;" and (5) the merger price is based on "an analysis of fair value that does not comply with applicable law." The facts underlying these characterizations fail to state a claim for relief. *Wittman,* 120 Md.App. at 377-78.

The proxy disclosed at least six times that Houlihan Lokey's fairness opinion did not include an opinion as to any particular allocation of the aggregate consideration among the various stock classes or series. September 30 Proxy at 6, 23, 44-45, 46-47, 49, and C-3. Nevertheless, the proxy included an allocation arrangement. Pages 18 through 28 of the proxy describe the Special Committee's ongoing dialogue among its advisors, Lightstone, the stockholders, and the board regarding an acceptable allocation. The most poignant of these discussions appears on page 24, where Houlihan Lokey reported to the Special Committee and the board that "substantially all of the series A and series B preferred stockholders ... expressed a desire for liquidity at a reasonable allocation," and the Special Committee reported to the board that it factored the preferred directors' allocation preferences into its

recommendation because,

given the size of Mr. Amster's holdings and the likely influence that a "no" vote by the preferred board representatives would have over the other preferred stockholders, it believed that the support of the preferred board representatives was crucial to having the transaction approved by the Company's preferred stockholders.

The proxy thus fully disclosed what did, and did not form the basis for the allocation, and, assuming plaintiffs' alleged a breach of duty, under *Wittman* the subsequent informed stockholder vote ratified this methodology. FN19

FN19. If count 2 is read as a claim that the aggregate merger consideration, or the board's analysis and evaluation of the aggregate price were actionable, the same conclusion would obtain. The Court has made every effort to understand the precise nature of each count but, as Delaware's Chancellor Chandler has said, "it is not for the Court to divine the claims being made. A plaintiff must make clear to the Court the bases upon which his claims rest." *Orman,* 794 A.2d at 24 n. 47.

The first sentence of the Third Amended Complaint's paragraph 108 merely recapitulates in slightly modified language allegations contained in paragraphs 101 and 103, which the Court has already disposed of in analyzing count 1. The second sentence alleges that "a majority of the Individual Defendants" suffered from disabling conflicts of interest. Relying on Delaware law, plaintiffs' opposition memorandum erroneously stated that "while alleged breaches of the duty of care may be extinguished by a fully-informed vote, breaches of the duty of loyalty cannot." On the contrary, Maryland's Court of Special Appeals has held that stockholders can ratify alleged breaches of the duty of loyalty. *Wittman,* 120 Md.App. at 378. Therefore, the facts supporting the plaintiffs' conflict of interest claims cannot state a claim if they appear in the proxy because they were ratified.FN20

FN20. The following facts were disclosed in the September 30 proxy: (1) director G. Reschke's change-in-control payments (at 66); (2) director Amster's PRI stock ownership (at 77-80); (3) director Amster's stock in Horizon Group Properties, Inc. (at 68-69); (4) director Skoien's position within PRI and Horizon, and Horizon's



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

relationship to PRI (at 68-69); (5) director Thompson's relationship with Winston and Strawn, and that law firm's relationship to PRI (at 68); (6) director Traub's consulting arrangement with PRI (at 69); (7) details regarding Fine Furniture Direct, Inc. (at 69).

*16 The facts which the Court has not located in the proxy disclosures, which must be evaluated on the merits, are as follows:
. Amster nominated Skoien to PRI's board.
. Skoien served as an aide to director Thompson when Thompson was governor of Illinois (from 1977 through 1991), "thus Skoien and Thompson have enjoyed a relationship spanning over 24 years."
. Thompson is also a director in Prime Group Realty Trust, an entity which is affiliated with "the Reschke family."
. Thompson, as governor, appointed Skoien and Sharp to state government positions, and has had long-standing relationships spanning over twenty years with both individuals.
. Sharp served as the director of Illinois's lottery in Thompson's administration.
. Director Randall was a PRI director for more than ten years.

As to all of these facts the Court can say with certainty that, as a matter of law, they do not give rise to a reasonable expectation that these directors' independent judgment was compromised. *See Shapiro,* 136 Md.App. at 24; *cf. Orman,* 794 A.2d at 27 ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

The plaintiffs allege, in paragraph 109, that they "lost their Series A shares without the defendants discharging their duty to obtain the highest value reasonably available for those shares." The short answer to this allegation is that the directors had no such duty. The language of this allegation demonstrates a misunderstanding of the duties imposed by § 2-405.1(a). As observed in Hanks, *supra,* § 6.6[b], at 164.1, the director's duties "are directed solely at the manner, or process, by which a director makes decisions rather than at the results of those decisions." In *Wittman,* the Court of Special Appeals quoted with approval from the trial judge's decision:
[The stockholder] argues that [the corporation] could have gotten a better deal. But that is really not a

cause of action. Maybe they could have. Maybe they couldn't have. But that doesn't constitute a cause of action. That's something stockholders can decide. What would get the court to intervene would be evidence of facts of the board and/or management violating its duty of loyalty and duty of care.

*Wittman,* 120 Md.App. at 378. Here, the processes by which the directors arrived at the merger consideration and allocation were disclosed in the proxy materials, were ratified by the informed stockholders, and therefore are not actionable. *Id.* at 377-78.

Paragraph 109 included redundant allegations of a "wrongful diversion of consideration," which the Court has already dealt with, and an allegation that "the merger price is the result of … an analysis of fair value that does not comply with applicable law." Again, where economic valuation analyses were performed, those analyses were sufficiently disclosed in the proxy materials, and the stockholders' subsequent ratification extinguished any liability arising from these facts. *Id.*

   c. Count 3: "Duty of Loyalty Resulting in Unfair Process."

*17 Count 3 purports to allege that the directors breached their duty of loyalty based on (1) the mere occurrence of the Deephaven-Lightstone stock sale; (2) the alleged conflicts between the Special Committee and Series B-owning directors; (3) G. Reschke's change-in-control payments; (4) "the complete failure of the Special Committee to attempt to negotiate on price or the allocations demanded by Amster;" and (5) Houlihan Lokey's "success fee." As explained above, the Deephaven-Lightstone transaction was not improper, and the board informed the stockholders of the board's stock holdings and any change-in-control payments, so none of those facts can give rise to a cause of action under *Wittman.*

The plaintiffs allege a "complete failure of the Special Committee to attempt to negotiate," but the plaintiffs fail to allege well-pleaded facts supporting that conclusory characterization. The Third Amended Complaint closely tracks the chronology included in the proxy statement, and that chronology details the ongoing dialogue among the Special Committee, its advisors, and various interested

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                          **Page  15**
**(Cite as: Not Reported in A.2d)**

parties. Notwithstanding plaintiffs' characterizations of those events, the Third Amended Complaint fails to allege supporting facts giving rise to a cause of action.

For example, paragraph 21 merely alleges that the allocations approved by the Special Committee and board coincided with the allocations proposed by director Amster, but paragraph 21 does not allege that Amster *"dictated"* the Special Committee's or the board's decisions. Nor are there any well-pleaded factual allegations of Amster's "strong-arming" other directors in paragraphs 34, 36, 40, 52, 101, and 108. In reality, as described in the proxy materials incorporated within plaintiffs' complaint, Amster played a significant role throughout the process in his capacity as an interested holder of preferred stock. September 30 proxy at 18, 21, 22, 23, 24, 25, 26, and 27. The proxy disclosed the Special Committee's belief that (1) the proposed merger presented the best route to the liquidity desired by nearly all of PRI's stockholders, and (2) without Amster's support, the merger probably would not happen. Director Amster's actions, as well as those of the Special Committee, were made plain to the stockholders, who in turn ratified those actions and extinguished any possible director liability. *Wittman,* 120 Md.App. at 377-78.

Finally, the Court need only briefly address plaintiffs' allegation regarding Houlihan Lokey's fee. Paragraph 24 alleges that PRI was to pay Houlihan Lokey $900,000 for its services, and if a merger were consummated, Houlihan would also receive approximately $2 million as a "success fee," to be paid by the acquisition company. Plaintiffs do not allege that these terms were not disclosed to the stockholders, and because they were disclosed, the informed stockholder vote ratified these acts under *Wittman.* In any event, without more these fees do not give rise to a cause of action. *Wittman,* 120 Md.App. at 378.

d. Count 4: "Breach of Duty of Disclosure"

**\*18** Plaintiffs present four nondisclosure allegations: (1) "Deephaven was paid $22 per share while the rest of the Series A stockholders received $18.40 per share; (2) the Deephaven stock sale was not disclosed; (3) Amster's role in allocation negotiations was never disclosed; and (4) the board

did not disclose that HLHZ's analysis "had virtually no relevance in the deliberations of the Special Committee or the Board."

The plaintiffs' first alleged nondisclosure simply misstates the plaintiffs' own allegations. Plaintiffs suggest in paragraphs 73, 74 and 75, 82, and 116, that as a result of the merger, Deephaven would receive $22 per Series A share, while all other Series A stockholders would receive only $18.40. That characterization of the Deephaven-Lightstone sale conflicts with the plaintiffs' own statement of the facts. Upon execution of the November 18 Deephaven-Lightstone contract, Deephaven became entitled to $22 for each share sold under that transaction; upon completion of the merger, Deephaven became entitled to $18.40 per Series A share that it then held, just like every other Series A stockholder. These were two distinct transactions. Plaintiffs' characterizations to the contrary do not qualify as well-pleaded allegations of fact, and do not state a claim upon which relief can be granted.

The second nondisclosure allegation fails because plaintiffs' never allege that information regarding the stock sale was known to or within the directors' control. *Loudon,* 700 A.2d at 143. The plaintiffs' implicitly concede this point by alleging that the directors breached their duties by not knowing about the Deephaven sale. *See* Third Amended Complaint ¶¶ 68, 100. As for the viability of that claimed duty, see footnote 16, above.

In count 3, analyzed above, plaintiffs argued that the board violated its duties by allowing director Amster to control the merger negotiations, and the Court's analysis showed that plaintiffs' conclusory characterizations did not amount to well-pleaded facts stating a cause of action. Essentially, the plaintiffs failed to plead facts (as opposed to characterizations) showing what role Amster played in addition to, or apart from, what is described in the proxy incorporated into plaintiffs' complaint. Here, count 4 alleges that the board breached its disclosure duty by failing to disclose that Amster's role in the negotiations was as described in plaintiffs' paragraph 112. However, as explained in the Court's analysis on count 3, the Third Amended Complaint fails to present well-pleaded allegations showing Amster's role (or the Special Committee's) to have been anything other than that described in the proxy on which the Complaint relies. The board

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
**(Cite as: Not Reported in A.2d)**

fulfilled its disclosure obligations, and plaintiffs have not pleaded facts showing omission or misrepresentation.

Similarly, the plaintiffs' final nondisclosure allegation recapitulates a claim already resolved in count 2. Plaintiffs argued in count 2 that the board breached its duties by approving an allocation based in part on whether it would garner enough votes for the merger, rather than on the basis of a purely economic analysis. The Court's resolution of that count explained that the nondisclosure alleged here (i.e., that no advisor expressed a financial opinion on the relative fairness of the allocation arrangement), actually was fully disclosed in the proxy materials incorporated into the complaint. Accordingly, this part of count 4 fails to state a nondisclosure claim.

### e. Count 5: Aiding and Abetting by Lightstone and Acquisition

*19 Pleading this aiding and abetting theory as a separate count may be improper in form. *See Manikhi*, 360 Md. at 360 n. 6. At any rate, count five fails because the underlying counts fail. *See Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.,* 340 Md. 176, 200-201 (1995).

### III. Conclusion

For the reasons set forth in detail above, defendants' motions to dismiss the Third Amended Complaint will be granted.

Md.Cir.Ct.,2004.
Hudson v. Prime Retail, Inc.
Not Reported in A.2d, 2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 5

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22939281 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Page 1

Kavanagh v. Keiper Recaro Seating, Inc.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Juanita L. KAVANAGH and Gerald Kavanagh, Jr.,
Plaintiffs,
v.
KEIPER RECARO SEATING, INC., a Corporation
of the State of Michigan, Keiper Enterprises, Inc., a
Corporation of the State of Michigan, Recaro North
America, Inc., a Corporation of the State of
Michigan, Defendants.
No. Civ.A. 98-556-JJF.

July 24, 2003.

Robert Jacobs, of Jacobs & Crumplar, P.A.,
Wilmington, Delaware. for Plaintiffs.
Armand J. Della Porta, Jr., of Kelley Jasons
McGuire & Spinelli, L.L.P., Wilmington,
Delaware. for Defendants.

### MEMORANDUM OPINION
FARNAN, J.
**\*1** Pending before the Court is a Motion For
Reargument (D.I.219) filed by Plaintiffs, Juanita L.
Kavanagh and Gerald Kavanagh, requesting the
Court to reconsider its previously entered Order
(D.I.218) granting partial summary judgment in
favor of Defendants on Plaintiffs' claims for breach
of warranty under Delaware law. For the reasons
discussed, Plaintiffs' Motion For Reargument will
be denied.

### BACKGROUND

The pertinent factual background of this case has
been set forth fully by the Court in its previously
issued Memorandum Opinion. *Kavanagh v. Keiper,*
Civ. Act. No. 98-556-JJF, mem. op. at 1-2 (D.Del.
Sept. 30, 2002) (*"Kavanagh I"* ) (D.I.217). In
*Kavanagh I,* the Court granted summary judgment
in favor of Defendants on the grounds that
Plaintiffs' warranty claims were barred by the
applicable statute of limitations. In addition, the
Court considered Plaintiffs' claim that the alleged
defect was electrical in nature, and thus, covered by
the three year express warranty in effect for
electrical components. With regard to this claim, the
Court concluded that Plaintiffs failed to establish a

genuine issue of material fact as to whether the
alleged defect was electrical in nature. Thereafter,
Plaintiffs filed the instant Motion seeking
reargument of that portion of the Court's decision
pertaining to the warranty for electrical components.

### DISCUSSION

#### I. Legal Standard For Reargument

Although not explicitly provided for in the Federal
Rules of Civil Procedure, Local Rule 7.1.5 provides
for the filing of reargument motions.FN1 *See* D.
Del. L.R. 7.1.5. The decision to grant a motion for
reargument lies within the discretion of the district
court; however, such motions should only be
granted sparingly. *Dentsply Int'l, Inc. v. Kerr Mfg.
Co.,* 42 F.Supp.2d 385, 419 (D.Del.1999).

FN1. Local Rule 7.1.5 provides:
A motion for reargument shall be served and filed
within 10 days after the filing of the Court's opinion
or decision. The motion shall briefly and distinctly
state the grounds therefor. Within 10 days after
service of such motion, the opposing party may
serve and file a brief answer to each ground asserted
in the motion. The Court will determine from the
motion and answer whether reargument will be
granted.

A motion for reargument "should not be used to
rehash arguments already briefed or to allow a
'never-ending polemic between the litigants and the
Court." ' *Id.* (citing *Ogelsby v. Penn Mutual Life
Ins. Co.,* 877 F.Supp. 872, 892 (D.Del.1995)). As
such, a motion for reargument may only be granted
in three narrow circumstances: (1) where the court
has patently misunderstood a party, (2) where the
court has made an error not of reasoning, but of
apprehension, or (3) where the court has made a
decision outside the scope of the issues presented to
the court by the parties. *Id.* (citing *Pirelli Cable
Corp v. Ciena Corp.,* 988 F.Supp. 424, 445
(D.Del.1998)). With this standard in mind, the
Court will address Plaintiffs' Motion For
Reargument.

#### II. Plaintiffs' Motion For Reargument

By their Motion, Plaintiffs contend that the Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

erred in concluding that Plaintiffs did not produce evidence creating a genuine issue of material fact as to whether the three year electrical warranty applied to the alleged defect in this case. Specifically, Plaintiffs contend that the report of Plaintiffs' expert, Frank Johnson, establishes that "a defect was found in the switch for activating the air or pneumatic column, which supports the seat." (D.I. 219 at 2, citing D.I. 160 at 1-2). Because the switch is an electrical component, Plaintiffs maintain that the three year warranty with respect to electrical components is still in effect.

**\*2** Plaintiffs presented this exact argument to the Court in its opposition to Defendants' motion for summary judgment. Plaintiffs also advanced the same expert report, and the Court considered that report in reaching its conclusion that Plaintiffs "failed to provide any documentary or testimonial evidence that the alleged defect was electrical in nature." *Kavanagh I,* Civ. Act. No. 98-556 at 6. As such, Plaintiffs' Motion attempts to relitigate matters already decided by the Court, and therefore, Plaintiffs have not stated a cognizable ground justifying reargument in this case.FN2

FN2. Plaintiffs did not specify whether they were seeking reargument pursuant to Local Rule 7.1.5 or reargument pursuant to Federal Rule of Civil Procedure 59(e). However, a motion for reargument under Rule 7.1.5 that challenges the correctness of a previously entered order is considered the "functional equivalent" of a motion to alter or amend judgment pursuant to Rule 59(e). *See e.g. New Castle County v. Hartford Accident and Indemnity Co.,* 933 F.2d 1162, 1176-1177 (3d Cir.1991). Even if the Court were to consider the standards governing Rule 59(e) motions to alter or amend judgment, the Court would conclude that Plaintiffs are not entitled to relief. Plaintiffs have not presented the Court with a change in controlling law, newly discovered evidence, a clear error of law or fact, or the need to prevent manifest injustice. *Max's Seafood Cafe v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999).

However, even if the Court were to consider the substance of Plaintiffs' argument, the Court would not grant reargument and would reach the same conclusion it reached previously. The warranty for electrical components covers breakage and excessive wear under normal use. Mr. Johnson's expert report

does not allege that any electrical component was broken or worn. At most, Mr. Johnson's report suggests that the location of the pneumatic suspension control switch may have been problematic, but the location of the switch is not an electrical issue covered by the applicable warranty. Accordingly, the Court finds no basis to alter its previous conclusion that Plaintiffs have "failed to provide any documentary or testimonial evidence that the alleged defect was electrical in nature." *Kavanagh,* Civ. Act. No. 98-556 at 6. Because Plaintiffs have failed to create a genuine issue of material fact as to whether the three year express warranty on electrical components applies, the Court concludes that summary judgment was properly granted in favor of Defendants, and therefore, Plaintiffs' Motion For Reargument will be denied.

### CONCLUSION

For the reasons discussed, the Court will deny Plaintiffs' Motion For Reargument.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this 24th day of July 2003, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Plaintiffs' Motion For Reargument (D.I.219) is DENIED.

D.Del.,2003.
Kavanagh v. Keiper Recaro Seating, Inc.
Not Reported in F.Supp.2d, 2003 WL 22939281 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 6

Not Reported in F.Supp.2d                                          Page   1
Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

н

In re Litigation Trust of MDIP, Inc.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
THE LITIGATION TRUST OF MDIP, INC.
(formerly known as Mosler, Inc.) and Its Affiliates
as Assignee of Certain Claims Pursuant to the
Second Amended Joint Plan of Liquidation of
MDIP, Inc. and Its Affiliates, Plaintiffs,
v.
Michael RAPOPORT, et al., Defendants.
No. Civ.A. 03-779GMS.

May 25, 2005.

Michael F. Bonkowski, Mark Minuti, Saul Ewing
LLP, Wilmington, DE, for Plaintiffs.
Paul J. Lockwood, Eric M. Davis, Skadden, Arps,
Slate, Meagher & Flom, Wilmington, DE, for
Defendants.

*MEMORANDUM*

SLEET, J.

## I. INTRODUCTION

*1 Presently before the court are six motions: a
motion to dismiss Counts I and II of the Amended
Complaint for lack of subject matter jurisdiction
(D.I.67), a motion for partial summary judgment as
to Counts I and II (D.I.84), a motion to strike the
plaintiff's summary judgment affidavits (D.I.114), a
motion to strike the plaintiff's jury demand
(D.I.127), a motion *in limine* requesting the court to
exclude evidence and testimony not disclosed in
plaintiff's responses to contention interrogatories
(D.I.124), and a motion *in limine* requesting the
court to preclude evidence of events that took place
prior to August 6, 1998 (D.I.125). For the
following reasons, the court will grant the motion to
dismiss Counts I and II, and deny the remaining
motions as moot insofar as they pertain to Counts I
or II.

## II. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(1) may present either a facial or
factual challenge to subject matter jurisdiction.
*Mortensen v. First Fed. Sav. and Loan Ass'n,* 549

F.2d 884, 891 (3d Cir.1977). The present motion
presents a facial challenge to the complaint because
the jurisdictional facts are not in dispute. Such a
motion requires the court to consider the allegations
of the Amended Complaint as true and to make all
reasonable inferences in the plaintiff's favor. *See id.*

## III. BACKGROUND

The following facts are alleged in the Amended
Complaint, which the court assumes to be true for
the purpose of deciding this motion. Mosler, Inc.
("Mosler"), a Delaware corporation, traces its roots
back to 1867, when the Mosler-Bahmann Safe
Company was founded by Gustav Mosler. (D.I. 28
¶ 17.) From 1967 to 1990, Mosler went through a
series of buyouts that ultimately resulted in 59% of
Mosler's stock being held by Kelso & Co., Inc.
("Kelso") and a few of Mosler's senior managers.
(Id.¶¶ 21-23.) This permitted Kelso to "install"
defendants William Marquard, Thomas Wall, and
Robert Young (collectively, "the Kelso Directors")
on Mosler's Board of Directors. (Id.¶ 2.) During its
first few years under this ownership structure,
Mosler flourished-its sales increased every year
from 1992 to 1995. (Id.¶ 26.)

Then, in February 1995, Mosler's Chairman and
CEO sent a memo to the Kelso Directors requesting
their "concurrence to" the hiring of Michel
Rapoport as the next CEO, "which [is] consistent
with our succession planning." (Id.¶ 27.) However,
succession planning had not been discussed at either
of the two board meetings prior to February 1995,
and the memo contained minimal information
regarding Rapoport himself. (Id.¶¶ 28-30.)
Although no alternative candidates were considered,
the inexperienced and unqualified Rapoport was
hired as Mosler's CEO. (Id.¶¶ 31-33.) Mosler
subsequently entered a period of decline,
precipitated by "numerous reckless and misinformed
decisions" and mismanagement by Rapoport and the
Kelso Directors. (Id.¶ 35.)

*2 For example, in October 1998, Mosler acquired
a security equipment business known as LeFebure.
(Id.¶ 36.) However, during the acquisition process,
Rapoport failed to hire outside consultants to assist
with due diligence and valuation. Instead, he relied
upon numbers provided by LeFebure's parent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

(Cite as: Not Reported in F.Supp.2d)

Page    2

company, De La Rue,FN1 and by Mosler's internal personnel. (Id. ¶ 39.) Furthermore, the Kelso Directors did not inform themselves as to the adequacy of Rapoport's due diligence and valuation. (Id.¶ 41.) Then, at a special meeting of Mosler's Board in September 1998, the LeFebure acquisition was approved. This occurred in spite of the fact that no tangible information concerning the acquisition was provided to the Kelso Directors; the minutes of the special meeting merely reflect "extensive discussion" about the acquisition. (Id.¶ 40.) As it turned out, De La Rue overstated LeFebure's financial condition and, as a result, Mosler "grossly overpaid" for LeFebure. (Id.¶ 42.)

FN1. The precise details of the relationship between LeFebure and De La Rue are not set forth in the complaint, but those details are unimportant here.

The subsequent integration of LeFebure's business did not go well either. Without any objection from the Kelso Directors, Rapoport fired many key LeFebure employees who were essential to the integration process. (Id.¶¶ 43-44.) Consequently, "many of the former LeFebure accounts were understaffed and poorly serviced, and Mosler had significant difficulty synchronizing LeFebure's business practices with its own, further minimizing the benefits that Mosler recognized from the LeFebure Acquisition." (Id.¶ 43.) Rapoport and the Kelso Directors also failed to heed specific warnings, given to them before the acquisition, pertaining to "systems issues that would arise from the need to integrate LeFebure's systems with Mosler's," resulting in a "serious deterioration of Mosler's liquidity." (Id.¶ 45.)

Then in 1999, Mosler attempted to update the software it used to process orders, collect accounts receivable, etc. (Id.¶ 46.) Rapoport and the Kelso Directors were advised by Mosler's in-house IT employees, among others, that outside specialists would be required for a project of this type. (Id.¶ 47.) Nevertheless, Rapoport did not hire outside specialists, and without objection from the Kelso Directors, endeavored to complete the project using only Mosler's in-house IT employees. (Id.¶ 48.) But because these employees were not qualified to make the updates, the project became "a disaster." Thereafter, Mosler was unable to "timely and accurately invoice customers and collect receivables, accurately track its inventory and timely provide needed parts to its customers, and generate the reliable financials required to access its operating credit facilities." (Id.¶ 50.) As a result, Mosler's financial condition further deteriorated. (Id.¶ 51.)

During this time, Rapoport and the Kelso Directors also failed to institute standard business controls. For example, they did not "address sustained and systemic flaws in Mosler's inventory management system," resulting in untimely deliveries to customers, and hence, damage to Mosler's goodwill. (Id.¶ 53.) Mosler's accounts receivable were also rapidly increasing, but neither Rapoport nor the Kelso Directors instituted standard internal control procedures to ensure timely invoicing. (Id.¶ 54.) Moreover, the problems with the accounts receivable were not discussed at either the February or May 1999 Board meetings. (Id.¶¶ 56-57.) Mosler's contemporaneous SEC statements further reflect the financial troubles the company was experiencing. Between 1995 and 1999, Mosler reported an increase in uncollected accounts receivable from $46 million to nearly $100 million. (Id.¶ 55.) Between 1998 and 1999, Mosler saw its net income go from the black to the red, and between 1998 and 2000, its earnings FN2 declined while its net sales increased.

FN2. The earnings referred to here are the earnings before interest, taxation, depreciation, and amortization, commonly known as EBITDA.

*3 The deterioration of Mosler did not go unnoticed. On two occasions, in 1999 and 2000, Mosler's outside auditor advised the Board of "reportable conditions" and "material weaknesses" regarding the company's internal controls. However, neither Rapoport nor the Kelso Directors took any corrective action. (Id.¶¶ 65-73.) Furthermore, in addition to experiencing "unreasonably high turnover of certain officers and key employees" (id.¶ 59), Mosler also suffered from internal unrest. On at least ten occasions between the end of 1997 and the beginning of 2001, certain Kelso Directors were told by senior Mosler employees that the company had "serious business problems" and that Rapoport was mismanaging the company. (Id.¶ 60.) Yet, the Kelso Directors failed to investigate these complaints and defended Rapoport after he took retaliatory action against two of the senior employees. (Id.¶¶ 60-61.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



By the end of 2000, Mosler began to default on loans and on interest payments due on its bonds. (Id. ¶ 77.) Although Mosler pursued potential buyers, it ultimately filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the District of Delaware. (Id.¶¶ 78-79.) Mosler, since renamed MDIP, Inc. ("MDIP"), sold its assets at auction for nearly $28 million, but the proceeds were insufficient to pay all of its creditors. (Id.¶¶ 79-80.) Therefore, pursuant to the approved Chapter 11 plan, the MDIP Litigation Trust, Inc. (the "Trust") was created for the benefit of the unpaid creditors to pursue certain claims. (Id.¶¶ 1, 5.) More specifically, the Trust "is required to prosecute all causes of action assigned to the Trust by Mosler ... for the benefit of holders of Allowed Class 3 and Allowed Class 4 Claims." (Id.¶ 7.) "Moreover, under the Plan, each holder of such a Claim is a Litigation Trust Beneficiary, each of whom has received a beneficial interest in the Litigation Trust Assets in accordance with the Plan." (Id.)

Pursuant to this directive, the Trust, in its own name, brought the present action against the Kelso Directors, Rapoport, and Kelso. Count I, based on the allegations outlined above, seeks to recover damages from the Kelso Directors for breach of the fiduciary duties of due care, good faith, and loyalty. (Id.¶¶ 81-84.) Count II, also based on the allegations outlined above, seeks to recover damages from Rapoport under the same theory. (Id.¶¶ 85-88.) Counts III and IV are avoidance and recovery of constructively fraudulent transfer claims against Kelso, under 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 544(b), respectively. (Id.¶¶ 89-101.) However, the parties have since stipulated to the dismissal of Count III, and to a reduction in the damages sought in Count IV from $800,000 to $450,000. (D.I.99.)

## IV. DISCUSSION

The defendants argue that Counts I and II, which are state law claims, should be dismissed for lack of subject matter jurisdiction because (1) there is incomplete diversity, and (2) the exercise of supplemental jurisdiction would be inappropriate. Each of these arguments is addressed below.

### A. Diversity of Citizenship

**\*4** The diversity jurisdiction statute provides, in relevant part:

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States[.]

28 U.S.C. § 1332(a)(1) (2004). Since *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806), the Supreme Court has "interpreted the diversity statute to require 'complete diversity' of citizenship." *C.T. Carden v. Arkoma Assoc.,* 494 U.S. 185, 187, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990). That means the citizenship of every plaintiff must be diverse from the citizenship of every defendant, unless an independent basis for original jurisdiction exists between the non-diverse parties. *See Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 381, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). For an artificial entity, unless that entity is a corporation, its citizenship "depends on the citizenship of ... 'each of its members .' ' *Id.* at 195-96 (citations omitted). In *C.T. Carden,* the Supreme Court established that this is a bright-line rule only to be modified by Congress, even where strong policy considerations would favor an exception. *See C.T. Carden,* 494 U.S. at 196-97.FN3 However, no such statutory modification exists in this case. FN4

FN3. Where an artificial entity is the named party whose citizenship is in question, the court may not look to the citizenship of unnamed parties. *C.T. Carden,* 494 U.S. at 187 n. 1. Thus, in the case of a litigation trust, even if application of the "real party to the controversy" test, *see generally Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), would dictate that the citizenship of the trustees should be determinative for the purpose of diversity, the court may not consider their citizenship unless they are named parties, *C.T. Carden,* 494 U.S. at 187 n. 1.

FN4. The Trust argues that *C.T. Carden* is distinguishable because that case involved a partnership rather than a litigation trust. However, as the defendants point out, the Court's broad language leads to the inescapable conclusion that litigation trusts are subject to its holding as well:
Thus, the course we take today does not so much disregard the policy of accommodating our diversity jurisdiction to the changing realities of commercial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

organization, as it honors the more important policy of leaving that to the people's elected representatives. Such accommodation is not only performed more legitimately by Congress than by courts, but it is performed more intelligently by legislation than by interpretation of the statutory word "citizen." The 50 States have created, and will continue to create, a wide assortment of artificial entities possessing different powers and characteristics, and composed of various classes of members with varying degrees of interest and control. Which of them is entitled to be considered a "citizen" for diversity purposes, and which of their members' citizenship is to be consulted, are questions more readily resolved by legislative prescription than by legal reasoning, and questions whose complexity is particularly unwelcome at the threshold stage of determining whether a court has jurisdiction. We have long since decided that, having established special treatment for corporations, we will leave the rest to Congress; we adhere to that decision.
*C.T. Carden,* 494 U.S. at 197. Thus, even if the court were inclined to agree with the Trust's policy arguments as to why the citizenship of the Trust itself should control, the Supreme Court has shut down that line of inquiry and left it up to Congress.

Consequently, the court must determine the citizenship of the Trust by looking to the citizenship of its "members," i.e., its beneficiaries.FN5 *In re A.H. Robins Co., Inc.,* 197 B.R. 575, 579 (Bankr.E.D. Va. June 30, 1995). FN6 As such, the citizenship of each creditor-beneficiary must be diverse from the citizenship of each of the Kelso Directors.FN7 *Id.* Based on the court's review of the submitted list of creditors, numerous Class 3 and Class 4 creditors are citizens of the same states as the Kelso Directors. (See D.I. 144 Ex. B.) FN8 Therefore, as the case is currently captioned, the court does not have diversity jurisdiction over Counts I and II. Moreover, even if the trustees were named plaintiffs and were the "real parties to the controversy," diversity of citizenship would still be lacking because both trustee Julie Dien Ledoux and defendant Wall are residents of New York. (D.I. 28 ¶ 11; D.I. 70 Ex. 1.)

FN5. The court's conclusion that it must look to the citizenship of the Trust's beneficiaries may rely on the assumption that the Trust has the capacity to sue in its own name. *See Allegis Group, Inc.*

*Contractors Health Plan Trust v. Conn. Gen. Life Ins. Co.,* No. 04-16, 2004 WL 1289862, at *4 n. 3 (D.Md. June 10, 2004). However, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the question of whether there exists a legal basis for making such an assumption, or whether such an assumption is necessary in the first place.

FN6. The Trust argues that *A.H. Robins,* in which the court looked to the citizenship of the defendant-trust's beneficiaries, is distinguishable because that case involved a products liability claimants trust rather than a litigation trust. (D.I. 145 at 3.) Once again, since diversity is lacking regardless of whether the citizenship of the beneficiaries or the citizenship of the trustees controls, the court need not address the Trust's argument.

FN7. The citizenship of Kelso itself is irrelevant because there is an independent basis for original jurisdiction as to Count IV, namely federal question jurisdiction under 28 U.S.C. § 1331 (1993). *Romero,* 358 U.S. at 381.

FN8. Technically speaking, the court's reliance upon "matters outside the pleadings" converts this motion to dismiss into a motion for summary judgment. Fed.R.Civ.P. 12(c). However, if the material facts are not in dispute, then the result is the same regardless of the label attached to the motion. The Trust points out that "there has been no discovery in this action directed specifically to the issue of the citizenship of the beneficiaries," but fails to actually contest the list of creditor-beneficiaries submitted by the defendants. (D.I. 145 at 4.) Since the Trust is presumably in the best position to know the citizenship of its own beneficiaries, and since it does not contest the submitted list, the court has no reason to believe that the material facts are in dispute. Therefore, given the Trust's concession that, based on the list of creditors, "there would not be complete diversity if the citizenship of all beneficiaries were taken into account" (id.), the court is justified in its finding.

The Trust disagrees with this analysis. Instead, it argues, the Trust's status as a litigation trust arising from a bankruptcy proceeding qualifies it for a "special rule" that " '[i]t is the citizenship of the bankrupt rather than the citizenship of the trustee in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Page 5

bankruptcy that is determinative for diversity jurisdiction." ' *Carlton v. BAWW, Inc.,* 751 F.2d 781, 787 (5th Cir.1985) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3606). However, the "special rule" extracted from Wright & Miller is based on a 1906 Supreme Court interpretation of a statute that was repealed in 1978. *See Bush v. Elliot,* 202 U.S. 477, 26 S.Ct. 668, 50 L.Ed. 1114 (1906); 11 U.S.C. § 46 (repealed 1978). The court is cognizant of the fact that, in spite of § 46 being repealed nearly twenty seven years ago, the "special rule" appears to have some continued viability in certain jurisdictions. *See, e.g., Carlton,* 751 F.2d at 787; *Pupo v. Chadwick's of Boston, Inc.,* No. 03-564, 2004 WL 2480399 (S.D.N.Y. Nov.4, 2004); *Official Plan Comm. of Omniplex Comm. Group, LLC, v. Lucent Tech., Inc.,* 344 F.Supp.2d 1194 (E.D.Mo. July 9, 2004). *But see Samson v. Allis-Chalmers Prod. Liab. Trust,* No. 90-0139, 1990 WL 87394 (E.D.Pa. June 21, 1990). Nevertheless, it is clear that "the reasoning underlying this rule rests on a shaky foundation," *Lucent,* 344 F.Supp.2d at 1196, so the court is reluctant to apply it. Bearing that in mind, the Trust admits it is not in fact a bankruptcy trustee that would have been subject to the now-repealed § 46 in the first place. (D.I. 78 at 11.) In essence, the Trust is asking the court not only to apply a repealed statute, but also to apply the repealed statute *by analogy.* But if applying a repealed statute is dubious (which it is), then applying a repealed statute by analogy is simply beyond the pale. Furthermore, even if § 46 had not been repealed, the fact that the Trust's *"sole purpose* is to liquidate and distribute MDIP's assets for the benefit of unsecured creditors" (D.I. 78 at 11) may not have been a sufficient reason to apply the "special rule" by analogy anyway. *Cf. In re Resorts Int'l, Inc.,* 372 F.3d 154, 169 (3d Cir.2004) ("Though the Litigation Trust's assets, the proceeds from the litigation claims, were once assets of the estate, that alone does not create a close nexus to the bankruptcy plan or proceeding sufficient to confer bankruptcy jurisdiction."). Therefore, the court will decline the Trust's invitation to apply the "special rule" in this case.

**\*5** Thus, diversity jurisdiction is lacking and the court must dismiss Counts I and II unless the exercise of supplemental jurisdiction is appropriate.

### B. Supplemental Jurisdiction

The supplemental jurisdiction statute provides, in relevant part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....

...

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction[.]

28 U.S.C. § 1367 (1993).

In this case, the court need not determine whether the state law claims "are so related to" the federal law claim "that they form part of the same case or controversy" because it is abundantly clear that the state law claims "substantially predominate[ ] over" the federal law claim. In the fifteen-page section of the Amended Complaint captioned "Allegations Relevant To All Claims," nary a word can be found that relates to the allegedly fraudulent transfers from Mosler to Kelso. (See D.I. 28 ¶¶ 17-80.) In fact, it is not until the twenty-fourth page of the Amended Complaint's twenty-six pages that these transfers are vaguely described in Counts III and IV. (Id.¶¶ 89-101.) Moreover, after the dismissal of Count III, the damages sought in Count IV was reduced from $800,000 to $450,000 (D.I.99), whereas the damage sought in Counts I and II is in the neighborhood of $200,000,000 (D.I. 78 at 2). Clearly, both in terms of the facts alleged and the damages sought, the state law claims substantially predominate over the federal law claims. Thus, the exercise of supplemental jurisdiction in this case would truly permit the tail to wag the dog, and that is something the court will not permit.

### V. CONCLUSION

Because the court does not have original jurisdiction over Counts I and II, and because the court declines to exercise supplemental jurisdiction, subject matter jurisdiction is lacking and the motion to dismiss must be granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

*ORDER*

IT IS HEREBY ORDERED THAT:

1. The defendants' motion to dismiss (D.I.67) be GRANTED;

2. Counts I and II of the Amended Complaint (D.I.28) be DISMISSED;

3. The defendants' motion for summary judgment (D.I.84) be DENIED as moot;

4. The defendants' motion to strike the plaintiff's summary judgment affidavits (D.I.114) be DENIED as moot;

5. The defendants' motion to strike the plaintiff's jury demand (D.I.127) be DENIED as moot;

6. The defendants' motion *in limine* requesting the court to exclude evidence and testimony not disclosed in plaintiff's responses to contention interrogatories (D.I.124) be DENIED as moot insofar as it pertains to Counts I or II; and

**\*6** 7. The defendants' motion *in limine* requesting the court to preclude evidence of events that took place prior to August 6, 1998 (D.I.125) be DENIED as moot.

D.Del.,2005.

In re Litigation Trust of MDIP, Inc.

Not Reported in F.Supp.2d, 2005 WL 1242157 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 7

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 574727 (E.D.La.)
(Cite as: Not Reported in F.Supp.2d)

Page  1

C

Menard v. Board of Trustees of Loyola University
E.D.La.,2004.
Only the Westlaw citation is currently available.
United States District Court,E.D. Louisiana.
MENARD
v.
BOARD OF TRUSTEES OF LOYOLA
UNIVERSITY
No. 04-112.

March 22, 2004.

Susan A. Menard, Laplace, LA, pro se.
C. Michael Pfister, Magali Ann Puente Martin,
Duplass, Zwain, Bourgeois & Morton, Metairie,
LA, for Defendant.

### ORDER AND REASONS

VANCE, J.

**\*1** Before the Court is defendant's motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction in this case, Civil Action No. 04-112. For the following reasons, the Court grants defendant's motion and dismisses plaintiff's complaint.

Plaintiff's complaint in this case is the same complaint that she filed in Civil Action No. 03-2936,FN1 except that the new complaint alleges a Fifth Amendment due process violation and asserts claims based on 28 U.S.C. §§ 1331 and 1343. The previous complaint alleged jurisdiction under Sections 1331 and 1343, but the new complaint now alleges a violation of these statutes. The Court dismissed plaintiff's previous complaint for lack of subject matter jurisdiction. The Court found that plaintiff failed to allege facts to support a claim under federal law. After the Court dismissed plaintiff's complaint, she moved to amend her complaint to allege a Fifth Amendment due process violation. On January 30, 2004, the Court considered her motion under Federal Rule of Civil Procedure 60(b) and denied her motion because plaintiff failed to establish any of Rule 60(b)'s grounds for relief. The Court further found that even if it were to consider plaintiff's motion for leave to amend, it would deny her motion because the "complaint alleges no federal action to implicate the due process clause of the Fifth Amendment." FN2 The Court dismissed plaintiff's original

complaint for lack of subject matter jurisdiction, and because plaintiff's proposed amended complaint would still fail to establish federal jurisdiction, the Court concluded that the amendment would be futile.

FN1. The Court had consolidated the previous action, Civil Action No. 03-2936, with related Civil Action No. 03-2199.

FN2. Civ. Act. No. 03-2199, Rec. Doc. 34, at p. 6.

Defendant now moves to dismiss plaintiff's latest complaint for lack of subject matter jurisdiction under Federal Rule of Evidence 12(b)(1). When a party files suit for relief under the Constitution or a federal statute, a federal district court may dismiss the suit for lack of subject matter jurisdiction if it finds "(1) that the federal claim is immaterial and made solely for the purpose of obtaining jurisdiction, or (2) that the federal claim is wholly insubstantial and frivolous." *Fellows v. Universal Restaurants, Inc.,* 701 F.2d 447, 449 (5th Cir.1983) ; *cf. United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 860, 95 S.Ct. 2051, 44 L.Ed.2d 621 (affirming the district court's dismissal for lack of subject matter jurisdiction because, although plaintiffs alleged violations of federal securities laws and the Civil Rights Act, plaintiffs' complaint failed to allege claims based on "securities" within the purview of federal securities laws and contained only conclusory allegation under the Civil Rights Act). A federal claim may be insubstantial either "(1) because it is obviously without merit, or (2) because it is clearly foreclosed by previous decisions of the Supreme Court." *Id.* (citing *Miller v. Stanmore,* 636 F.2d 986, 989 (5th Cir.1981)).

Here, the Court dismisses plaintiff's complaint for lack of subject matter jurisdiction because it finds that plaintiff's federal claims are obviously without merit. The new complaint alleges jurisdiction under and violations of the Fifth Amendment and 28 U.S.C. §§ 1331 and 1343. Sections 1331 and 1343 are jurisdictional statutes and describe types of claims over which this Court has jurisdiction. Section 1331 states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Although plaintiff's complaint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Page    2

mentions the Fifth Amendment, it does not allege any federal action. Consequently, plaintiff's claim under the Fifth Amendment is obviously without merit and fails to confer jurisdiction on this Court under Section 1331. Section 1343 states that

**\*2** [t]he district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person ... [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

Plaintiff's complaint fails to allege any state action. Defendant in this matter is the Board of Trustees of Loyola University, a private institution. Courts have consistently found that private universities are not state actors. *See, e.g., Allen v. Tulane Univ. .,* 1993 WL 459949, at \* 2 (E.D.La.) (noting that courts have quite consistently found no state action based on various degrees of governmental involvement in universities ranging from federal and state grants, student loan guarantees, tax exemptions, licensing of university owned television and radio stations, etc., and citing cases); *see also Blouin v. Loyola Univ.,* 506 F.2d 20, 22 (concluding that Loyola University was not a state actor); *Jones v.. MacInnes,* 1997 WL 795696, at \*2 (E.D.La.) (dismissing student's 42 U.S.C. § 1983 claims against Tulane University, a private university, due to lack of requisite state action). Because plaintiff fails to allege any state action, plaintiff fails to state a claim over which the Court might have jurisdiction under Section 1343.

Plaintiff's complaint in Civil Action No. 03-2936 alleged the *same* facts and alleged the *same* bases for jurisdiction. In that case, the Court found that the complaint failed to state a federal cause of action. In light of the Court's previous ruling, the Court considers the complaint in this case to be frivolous. The Court cautions plaintiff against filing any further complaints based on these same allegations. Any further frivolous filing by this plaintiff will warrant sanctions by this Court.

For the foregoing reasons, the Court grants defendant's motion to dismiss and dismisses plaintiff's complaint with prejudice.

E.D.La.,2004.
Menard v. Board of Trustees of Loyola University
Not Reported in F.Supp.2d, 2004 WL 574727 (E.D.La.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 8

Not Reported in F.Supp.2d                                                                   **Page  1**
Not Reported in F.Supp.2d, 2002 WL 31819638 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**
c

Srein v. National Legal Research Group, Inc.
E.D.Pa.,2002.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Ronald J. SREIN, et al., Plaintiff,
v.
NATIONAL LEGAL RESEARCH GROUP, INC.,
et al., Defendant.
No. CIV.A. 02-1164.

Dec. 16, 2002.
NORMA L. SHAPIRO, S.J.

*MEMORANDUM AND ORDER*

**\*1** Plaintiffs, Ronald J. Srein and Paul J. Haaz filed
this action in the Court of Common Pleas of
Philadelphia County to recover damages for
defamation, negligence, wrongful use of civil
proceedings (42 Pa. Cons.Stat. Ann. § 8351, et
seq.), and abuse of process. Defendants removed the
action to federal court based on complete diversity
of the parties, 28 U.S.C. § 1332. The amount in
controversy is alleged to exceed $75,000 exclusive
of interest and costs.

Defendant has filed a Motion to Dismiss all counts
for failure to state a claim upon which relief can be
granted, and lack of personal jurisdiction. Defendant
also filed a Motion to Strike Plaintiffs'
Memorandum of Law in Opposition to the Motion
to Dismiss ("Plaintiffs' Response").

I. BACKGROUND[FN1]

FN1. Facts are taken from plaintiffs' Complaint.
Exhibit citations refer to the supplementary
documents submitted by plaintiffs as part of their
Complaint.

Plaintiff Ronald J. Srein is a citizen and resident of
the Commonwealth of Pennsylvania. Plaintiff Paul
J. Haaz, Esq., is licensed to practice law in the
Commonwealth, but whether he is a citizen of
Pennsylvania is not alleged.

Defendant National Legal Research Group, Inc.
("NLRG") is a corporation organized under the laws
of Virginia with its principal place of business in
Virginia. NLRG is an incorporated group of over

seventy attorneys who perform legal research for
lawyers throughout the country. Defendant Virginia
Metalcrafters, Inc. ("Virginia Metalcrafters") is a
corporation organized under Virginia law; its
principal place of business is also in Virginia.
Defendant Jeffrey N. Sheehan is a citizen and
resident of Colorado. In the spring of 1990, Srein
retained Haaz to collect a defaulted debt owed by
Robert Welch. Welch granted a mortgage in favor of
Srein on a property located in Philadelphia (the
"Property") as security for his repayment of the
loan. The property was titled in the name of the
Historical Second Street Development Association
("HSSDA"); Welch was the general partner.

As of December 31, 1990, Welch had defaulted on
the repayment of the note and Haaz entered
judgment against Welch and HSSDA on behalf of
Srein. In lieu of foreclosure, HSSDA transferred the
Property to Srein in January, 1991.

In February, 1992, Richard K. Doty, Esq., filed a
civil suit (the "Witkowski litigation") against Srein
and others on behalf of his clients, Dr. and Mrs.
Witkowski. The lawsuit claimed the HSSDA
transfer of the Property to Srein was a fraudulent
conveyance. The United States District Court for the
Eastern District of Pennsylvania entered judgment in
favor of Srein and the decision was affirmed by the
Third Circuit Court of Appeals.

Doty had hired NLRG to perform research in
connection with the Witkowski litigation. Jeffrey N.
Sheehan, Esq. was the NLRG attorney who assisted
Doty. Sheehan wrote legal memoranda, briefs, and
pleadings for Doty and gave him procedural and
tactical advice regarding the prosecution and
continuation of the suit against Srein.

Sheehan prepared a memorandum to Doty in which
he referred to Srein as "the fraudulent transferee"
(Exhibit A, 1). Thereafter, Sheehan sent a draft
Motion for Summary Judgment and supporting legal
documents to Doty (Exhibit B). In the Memorandum
of Law in Support of the Summary Judgment
Motion, Sheehan again described Srein as a
"fraudulent transferee" (Exhibit B, 1). He also
stated, "Srien [sic] was the fraudulent recipient of
property for no consideration" (Exhibit B, 6).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

Page    2

In a cover letter highlighting several of the exhibits attached to the summary judgment motion (Exhibit C), Sheehan referred to the person who:
*2 engineered the preparation and execution of a series of documents, notes, mortgages, and pleadings to fraudulently transfer the property out of the reach of creditors of Historical Second Street and into Srien's [sic] hands. This series of orchestrated events was designed to set up obstacles to untangling the intended fraudulent conveyance. The architect of this scheme, whoever he may be, failed (Exhibit C, 13).

These comments referred to Haaz, Srein's attorney who prepared the documents.

Sheehan twice asserted that Haaz, whom he identified by name, engineered the alleged fraudulent conveyance. In referring to an exhibit, Sheehan stated that it "reveals Haaz fairly clearly as the architect of the fraudulent transfer" (Exhibit C, 1). Sheehan again accused Haaz of being "the architect of this scheme" later in the letter and referred to Srein as a "fraudulent transferee" (Exhibit C, 2).

Sheehan published the above statements by mailing the cover letter and memorandum to Doty, who later read and disseminated them to his clients, expert witnesses, and the court.

## II. DISCUSSION

### A. Standard of Review

The standard of review for a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss is:
In determining whether a claim should be dismissed under Rule 12(b)(6), a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record. Moreover, a case should not be dismissed for failure to state a claim unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations.

*Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Id.*

### B. Jurisdiction

#### 1. Subject Matter

A challenge to subject matter jurisdiction may be made "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction...." Fed.R.Civ.P. 12(h)(3). Although there may be complete diversity among all the parties, it has not been specifically alleged in the Complaint; the Complaint was originally filed in State court where Haaz's citizenship was irrelevant. It is stated that Haaz is licensed to practice law in Pennsylvania but his citizenship is not asserted. The removal petition does not cure the deficiency because it alleges as a legal conclusion that there is complete diversity of citizenship, but not the factual premises on which the legal conclusion is based. The complaint must be dismissed for lack of jurisdiction. Ordinarily, plaintiffs are granted leave to amend the complaint to allege subject matter jurisdiction properly. Therefore, this action will be dismissed without prejudice and leave to amend to assert Counts III and IV. However, leave to amend will not be granted if amendment would be futile.

#### 2. Personal-Virginia Metalcrafters

*3 Defendants assert that there is no personal jurisdiction over Virginia Metalcrafters in the Eastern District of Pennsylvania. The relationship between Virginia Metalcrafters and NLRG and their mutual relationship with Jeffrey Sheehan, allegedly their joint agent, is unclear. It is the plaintiff's burden to show that this court has personal jurisdiction over all defendants; Mr. Srein has failed to provide sufficient information to meet this burden with respect to Virginia Metalcrafters. If an amended complaint is filed against Virginia Metalcrafters, plaintiffs must clarify why there is personal jurisdiction as to this defendant.

### C. Statute of Limitations

Defendants assert that Counts I through VIII are barred by the applicable Pennsylvania statutes of limitations. Pennsylvania law tolls the running of the limitations period when, despite the exercise of due diligence, an injured party is unable to know or is reasonably unaware of the existence or cause of his injury. *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 608 A.2d 1040, 1042-1043

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(Pa.1992). The complaint does not reveal when plaintiffs could have known, through due diligence, of defendants' involvement in the Witkowski litigation, so this claim is premature. If an amended complaint is filed, it will not be dismissed as time barred; unless apparent from the face of the amended complaint, a motion to dismiss will be denied without prejudice to a motion for summary judgment at the end of discovery.

### D. Counts I and II-Defamation

Defendants assert that plaintiffs' defamation claims (Counts I and II) are barred by the doctrines of privilege and/or absolute immunity. It has long been established that statements made in arguing an action are absolutely privileged. *Post v. Mendel,* 510 Pa. 213, 507 A.2d 351, 352 (Pa.1986). But only "those communications which are issued *in the regular course of judicial proceedings* and which are *pertinent and material to the redress or relief sought* " are privileged communications. *Post,* 507 A.2d at 355 (emphasis in original). Because defendants' alleged defamatory statements were submitted to Doty before submission to the court, determination of this issue hinges on the role the statements played in the Witkowski litigation.

In *Post,* a letter written by an attorney accused opposing counsel of improper practices in pending litigation and notified opposing counsel of the writer's intent to report the matter to the Disciplinary Board. The letter was copied to the Disciplinary Board, the presiding judge, and a trial witness. The court ruled this correspondence was not privileged because it was not "issued in the regular course of judicial proceedings as a communication pertinent and material to the redress sought." *Post,* 507 A.2d at 355-356.

The letter in *Post* is not analogous to the correspondence at issue here; the statements involved here were research materials and draft motions issued in the regular course of judicial proceedings and were pertinent and material to the relief sought by the Witkowskis in the underlying litigation. The statements are privileged; Counts I and II if reasserted would be dismissed with prejudice. Therefore, leave to amend to assert Counts I and II will be denied.

### E. Counts V, VI, and VII-Wrongful Use of Civil

Proceedings and Abuse of Process

**\*4** To succeed in an action for wrongful use of civil proceedings, the plaintiff must show: (1) the defendant has procured, initiated or continued the civil proceedings against him; (2) the proceedings were terminated in his favor; (3) the defendant did not have probable cause for his action; (4) the primary purpose for which the proceedings were brought was not to secure the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based; and (5) the plaintiff suffered damages. 42 Pa. Cons.Stat. Ann. § 8354; *Kit v. Mitchell,* 771 A.2d 814, 819 (Pa.Super.Ct.2001).

The elements for a cause of action for abuse of process are that defendant: 1) used legal process against the plaintiff, 2) primarily to accomplish a purpose for which the process was not designed; and 3) harm has been caused to the plaintiff. *Rosin v. American Bank of Rolla,* 426 Pa.Super. 376, 627 A.2d 190, 192 (Pa.Super.Ct.1993).

Plaintiffs failed to allege a valid improper purpose to satisfy the purpose elements of both torts. Counts V, VI, and VII would be dismissed for failure to state a cognizable claim for which relief could be granted. Therefore, no leave to amend will be granted.

### F. Count VIII-Unauthorized Practice of Law

There is no private right of action in Pennsylvania for the unauthorized practice of law. *See* 42 Pa. Cons.Stat. Ann. § 2524. Plaintiffs cite 1 Pa. Cons.Stat. § 1929:
The provision in any statute for a penalty or forfeiture for its violation shall not be construed to deprive an injured person of the right to recover from the offender damages sustained by reason of the violation of such statute.

One Pa. Cons.Stat. § 1929 does not create a civil statutory cause of action where a specific statute authorizing such action does not exist. *Alfred M. Lutheran Distributors, Inc. v. A.P. Weilersbacker, Inc.,* 437 Pa.Super. 391, 650 A.2d 83 (Pa. Super Ct.1994). The only remedy available to a private party to vindicate the unauthorized practice of law is injunctive relief and the recovery of costs, including reasonable attorney's fees, at the discretion of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

court. *See* 42 Pa. Cons.Stat. Ann. § 2524(c); *Haymond v. Lundy,* 205 F.Supp.2d. 403, 407. Count VIII would be dismissed except as it seeks injunctive relief, costs (including attorney's fees). Leave to amend will be granted as to injunctive relief and costs (including attorney's fees) only.

### G. Motion to Strike Plaintiffs' Response

**\*5** Defendants' Motion to Strike Plaintiffs' Response will be denied as moot because the action is dismissed for lack of jurisdiction. But ordinarily on a motion to dismiss, all materials outside the scope of the pleadings will be stricken from the record unless the motion is converted to a motion for summary judgment. Fed.R.Civ.P. 12(b).

### IV. CONCLUSION

After consideration of the parties' submissions and oral argument on August 5, 2002, the court will dismiss the complaint for lack of subject matter jurisdiction without prejudice to file an amended complaint as to Counts III and IV. Leave will not be granted as to the remaining counts except plaintiffs may seek injunctive relief and recovery of costs as to Count VIII. Defendant's Motion to Strike Plaintiffs' Response will be denied as moot.

An appropriate Order follows.

### *ORDER*

AND NOW, this 16th day of December, 2002, upon consideration of Plaintiffs' Complaint, Defendants' Motion to Dismiss (no. 2), portions of Plaintiffs' Response (no. 6), Defendants' Motion to Strike Plaintiffs' Response (no. 9), and for the reasons stated in the foregoing Memorandum, it is hereby ORDERED that:
(1) This action is DISMISSED for lack of jurisdiction with leave to amend as to Counts III and IV by *January 2, 2003.*
(2) No leave to reassert Counts I and II is granted because the counts fail to state a cause of action.
(3) No leave to reassert Counts V, VI and VII is granted because the counts fail to state a cause of action.
(4) Leave to reassert Count VIII is granted as to injunctive relief and costs (including attorney's fees) only.
(5) Defendants' Motion to Strike Plaintiffs'

Response is DENIED as moot.

E.D.Pa.,2002.
Srein v. National Legal Research Group, Inc.
Not Reported in F.Supp.2d, 2002 WL 31819638
(E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1726527 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**

Sussex County Senior Services, Inc. v. Carl J. Williams & Sons, Inc.

D.Del.,2000.

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

**SUSSEX** COUNTY SENIOR SERVICES, INC.,
Plaintiff,

v.

CARL J. **WILLIAMS** & SONS, INC., Defendant.
**No. CIV.A. 99-473-GMS.**

March 31, 2000.

David R. Hackett, Griffin & Hackett, P.A., Georgetown, for Sussex County Senior Services, Inc., plaintiffs.

Kevin Gross, Rosenthal, Monhait, Gross & Goddess, Wilmington, for Carl J. Williams & Sons Inc., defendants.

MEMORANDUM AND ORDER

SLEET, District J.

*1 On December 29, 1999, this court granted a motion to dismiss filed by Carl J. Williams & Sons, Inc. ("Williams & Sons"). As a result, the verified petition for preliminary and permanent injunctive relief filed by Sussex County Senior Services, Inc. ("Senior Services") was dismissed with prejudice. FN1 Senior Services has now asked the court to reconsider its ruling. The court will deny this motion because Senior Services has failed to demonstrate that the court erred in reaching this decision.

> FN1. As the court explained in an earlier ruling, Senior Services originally filed this petition in the Delaware Court of Chancery. Williams & Sons, however, removed the petition on July 23, 1999 on the grounds of diversity. See 28 U.S.C. § 1441 (1994). The court denied a motion to remand which challenged the amount in controversy on October 5, 1999.

I. STANDARD OF REVIEW.

As a general rule, motions for reconsideration should be granted only "sparingly." See Karr v. Castle, 768 F.Supp. 1087, 1090 (D.Del.1991). In fact, in this district, these types of motions are only granted if it appears that the court has patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning but of apprehension. See, e.g., Brambles USA, Inc. v. Blocker, 735 F.Supp. 1239, 1240 (D.Del.1990) (citing Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D.Va.1983)); see also Karr, 768 F.Supp. at 1090 (citing same). Furthermore, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. See Pirelli Cable Corp. v. Ciena Corp., 988 F.Supp. 424, 445 (D.Del.1998).

Finally, as the Brambles court made clear, motions for reconsideration "should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." 735 F.Supp. at 1240. In these situations, such a motion should be denied because any other ruling would effectively encourage parties to engage in an endless debate with the court and, thus, delay the ultimate resolution of the litigation. See Oglesby v. Penn Mut. Life Ins. Co., 877 F.Supp. 872, 892 (D.Del.1994) (noting that motions for reconsideration "should not be abused to allow for a never-ending polemic between the litigants and the [c]ourt"); Brambles, 735 F.Supp. at 1240 ("[T]he procedural mechanism provided by the rule should not be undermined to allow for endless debate between the parties and the [c]ourt.").

II. DISCUSSION.

In its motion for reconsideration, Senior Services raises two points of perceived error which are interrelated. Specifically, Senior Services contends that the court improperly granted Williams & Sons' motion under a Rule 12(b)(6) instead of a Rule 12(b)(1) standard and, thus, reached the merits of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1726527 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the case without affording Senior Services a sufficient opportunity to fully litigate the issues.

## A. Senior Services Did Not Raise Its First Issue In The Earlier Proceedings.

As an initial matter, the court notes that Williams & Sons moved under Rule 12(b)(6) to dismiss the verified petition for preliminary and permanent injunctive relief. In its responsive papers, Senior Services did not argue that a Rule 12(b)(1) standard should apply. In fact, this submission was completely silent on the governing legal standard.

**\*2** Admittedly, on the second-to-the-last page of its brief, Senior Services did argue that, on the motion to dismiss, the court was obligated to "consider all well-pleaded allegations in the [c]omplaint as if they were true." However, in support of this statement, Senior Services cited to two cases which applied the Rule 12(b)(6) standard directly. *See Harris v. Brewington-Carr,* 49 F.Supp.2d 378, 379-80 (D.Del.1999); *see also Resource Ventures, Inc. v. Resources Mgmt. Intn'l,* 42 F.Supp.2d 423, 437-38 (D.Del.1999). Moreover, the third case cited by Senior Services was resolved on a motion for judgment on the pleadings under Rule 12(c) which, incidentally, requires the application of the same Rule 12(b)(6) standard. *See Independent Ass'n of Continental Pilots v. Continental Airlines,* Civ. A. No. 96-389-SLR, 1997 WL 309438, at \*1-2 (D. Del. Apr 29, 1997). Thus, it seems as if Senior Services is now attempting to raise issues in its motion for reconsideration which "were not presented to the court in the matter previously decided." *See Brambles,* 735 F.Supp. at 1240. As the *Brambles* court made clear, on this ground alone, the court would be justified in denying the motion as it relates to the governing legal standard.

## B. Even If The Court Had Applied A Rule 12(b)(1) Standard, Williams & Sons' Motion Still Would Have Been Granted.

Furthermore, even if a Rule 12(b)(1) standard did govern and the court erred in failing to apply it even though the issue was not raised by either one of the parties, Senior Services has failed to demonstrate that the outcome would have been different. Most notably, Senior Services could not have survived the dispositive motion, even one made under Rule 12(b)(1), by relying on bare allegations alone. *See Mortensen v. First Federal Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977); *see also Dow Chemical Co. v. Exxon Corp.,* 30 F.Supp.2d 673, 689-90 (D.Del.1998) (noting the difference between "factual" and "facial" attacks to subject matter jurisdiction); *accord Dalton v. Jefferson Smurfit Corp.,* 979 F.Supp. 1187, 1192-93 (S.D.Ohio 1997) (quoting *RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1134) (6th Cir.1996)). Instead, in the face of Williams & Sons' motion to dismiss, Senior Services would have been required to demonstrate that the court could properly exercise jurisdiction over this matter. *See Mortenson,* 549 F.2d at 891; *accord Davis v. Kenst State Univ.,* 928 F.Supp. 729, 731-32 (N.D.Ohio 1996).

In opposition to the motion, Senior Services attempted to make this showing by arguing that its complaint raised an issue of substantive, as opposed to procedural, arbitrability. For this reason and this reason alone, Senior Services argued, the court was empowered to enjoin the arbitration of six previous disputes which had arisen between the parties. To support this contention, Senior Services pointed to a particular contractual clause in its agreement with Williams & Sons. According to Senior Services, this clause (subparagraph 4.5.4.1) prohibited Williams & Sons from arbitrating the six disputes at issue in this litigation because the architect's prior rulings on these claims had become final and binding on the parties. As Senior Services argued in its brief,

**\*3** [t]here are sufficient facts alleged in the [p]etition and evidenced by the concededly authentic documents attached to the [p]etition to support the legal conclusion ... that the [a]rchitect's decisions were final and binding upon the [parties] pursuant to subparagraph 4.5.4.1 ... and to otherwise support the claim that questions of substantive arbitrability are before this [c]ourt.

Given the nature of this argument, the court is at a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2000 WL 1726527 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

loss to see how it was left with any other choice than to consider the applicability of subparagraph 4.5.4.1 when resolving the motion to dismiss. In short, Senior Services was arguing that the facts, as alleged in the complaint, supported the legal conclusion that subparagraph 4.5.4.1 governed and, thus, barred Williams & Sons' claims.

Under a Rule 12(b)(1) standard, the court would not have been obligated to accept as true any legal conclusions pled in the guise of factual allegations. *See Murphy v. United States,* 45 F.3d 520, 522 (1st Cir.1995) (citing *Washington Legal Found. v. Massachusetts Bar Found.,* 993 F.2d 962, 971 (1st Cir.1993); *accord Michigan Bell Telephone Co. v. Strand,* 26 F.Supp.2d 993, 998 (E.D.Mich.1998). Moreover, under a Rule 12(b)(1) standard, the court would not have even been obligated to accept factual allegations as being true. *See Mortensen,* 549 F.2d at 884; *Dalton,* 979 F.Supp. at 1192-93; *Davis,* 928 F.Supp. at 731-32. Instead, the court would have been required to examine the evidence supporting these factual allegations in order to test their accuracy and, thus, determine whether the court actually had the power to hear this case. *See Mortenson,* 549 F.2d at 891.

Of course, given the nature of Senior Services' argument, the court's power to hear the case depended directly upon whether subparagraph 4.5.4.1 governed. [FN2] In short, if this clause applied, then Senior Services' complaint raised an issue of substantive arbitrability which the court could resolve. *See National Iranian Oil Co. v. MAPCO Intn'l, Inc.,* 983 F.2d 485, 491 & n. 4 (3d Cir.1992). However, if this clause did not apply, then the issue was a procedural one which fell within the purview of the arbitrator, not the court. *See id.*

> FN2. Thus, in the opinion of the court, it did not reach an issue which was outside the adversarial ones presented by the parties. *See Brambles,* 735 F.Supp. at 1240.

In order to come to a conclusion on these matters, the court reviewed the documents which Senior

Services had attached to its complaint. These materials included the contract between the parties and the letters sent by the architect. After examining these documents, the court noted that subparagraph 4.5.4.1 of the contract expressly provides that:

When a written decision of the Architect states that (1) the decision is final but subject to arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 day[ ] period shall result in the Architect's decision becoming final and binding upon the Owner and the Contractor.

**\*4** The language of this clause is clear. It plainly states that a written decision of the architect becomes final and binding on the parties under a specific set of circumstances. First, the decision must inform the parties that the ruling "is final but subject to arbitration." Second, the decision must also inform the parties that they must file a demand for arbitration within thirty days if they want to preserve their claims. Third, and finally, the party must fail to request arbitration within this thirty-day period.

Given the clarity of this language, the court did not require any additional evidence to interpret its meaning. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1128, 1232 (Del.1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity."); *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993) ("If a writing is plain and clear on its face, *i.e.,* its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."). Consequently, the court turned to the content of the architect's letters in order to determine whether they informed Williams & Sons that (1) the decision was final but subject to arbitration and (2) a demand for arbitration had to be filed within thirty days in order to preserve the claim.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                 Page 4
Not Reported in F.Supp.2d, 2000 WL 1726527 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Upon reviewing these letters, the court found that neither one of them conveyed the required information.[FN3] Therefore, they failed to comply with the express terms of subparagraph 4.5.4.1. As a result, the court concluded that this clause did not apply. Consequently, Senior Services' complaint seemed to raise a procedural, as opposed to a substantive, issue which fell within the exclusive province of the arbitrator. For this reason, the court granted Williams & Sons' motion to dismiss. This result would have been the same under either a Rule 12(b)(1) or Rule 12(b)(6) standard.

> FN3. In fact, Williams & Sons made this very observation in its opening brief. Senior Services claims that the court erred because it accepted this contention as being true. At the very least, this argument is disingenuous. The court did not accept as true an "allegation" by Williams & Sons that these letters failed to contain the information mandated by subparagraph 4.5.4.1. Instead, as previously explained, the court examined the letters themselves and found that they did not state that (1) the architect's decision was final but subject to arbitration and (2) any demand for arbitration had to be made within thirty days; otherwise, the decision would become binding on the parties. The court, in other words, was testing the facts upon which Senior Services' legal conclusions were based.
>
> Senior Services also claims that, in its motion, Williams & Sons effectively abandoned its position that subparagraph 4.5.4.1 did not apply. To support this contention, Senior Services points out that the majority of the construction company's legal argument was prefaced by a paragraph which began "[l]eaving aside the merits of [the defendant's] position...." According to Senior Services, this language demonstrates that Williams & Sons conceded (at least for the purposes of its dispositive motion) that subparagraph 4.5.4.1 actually applied. The court does not agree.

First, Williams & Sons began its legal argument by first disputing whether this clause did apply. The construction company then proceeded to argue that even if the clause did apply, it raised a procedural (as opposed to a substantive) issue of arbitrability. Thus, Williams & Sons was arguing in the alternative. It was not conceding an argument which it had just raised.

Second, in apparent response to this very argument, Senior Services claimed that there were "sufficient facts alleged in the [p]etition and evidenced by the concededly authentic documents attached ... to support the legal conclusion ... that the [a]rchitect's decisions were final and binding upon the [parties] pursuant to subparagraph 4.5.4.1 ..." Thus, Senior Services did not even conclude that Williams & Sons had conceded this point. At a minimum, in its opposition, Senior Services did not expressly argue that the point had been conceded.

Finally, as mentioned earlier, by contending that there were "sufficient facts" to support the allegation that subparagraph 4.5 .4.1 operated to bar Williams & Sons' claims, Senior Services placed the applicability of this clause squarely before this court.

### C. Senior Services Has Not Suffered Any Prejudice As A Result Of The Court's Ruling.

Admittedly, there is an important difference between these two standards. Under Rule 12(b)(6), the court's ruling operates in a preclusive manner. *See Dalton, 979 F.Supp. at 1192.* However, as Senior Services concedes, it was aware that Williams & Sons had moved under Rule 12(b)(6). It, therefore, had the opportunity to argue that a Rule 12(b)(1) standard, which would not have resulted in a preclusive ruling, should apply. As mentioned earlier, Senior Services did not advance this argument below. In fact, its opposing brief was completely silent on the governing legal standard. Its failure in this regard was inexcusable. As a consequence, Senior Services cannot now complain that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court's ruling bars it from arguing before the arbitrator that subparagraph 4.5.4.1 actually applies to the six disputes which are the subject of Williams & Sons' demand for arbitration.

**\*5** While Senior Services also appears to be arguing that the prior ruling prevents it from advancing other arguments on the impact of subparagraph 4.5.4.1 before the arbitrator, the court does not agree. For example, Senior Services now contends that even though the architect's letters did comply with the requirements of subparagraph 4.5.4.1, this clause still served to place the construction company on "notice of the finality of the [a]rchitect's decision and of its arbitration rights." As a result, Senior Services claims, Williams & Sons "is now estopped from denying the final and binding nature of those decisions."

However, this specific theory for relief was neither alleged in the complaint nor advanced in opposition to the motion to dismiss. As a result, the court did not address it in its ruling. Thus, the court fails to see how its prior decision could preclude Senior Services from advancing these arguments before the arbitrator.

Although Senior Services further argues that it should be permitted to amend its complaint to assert these new theories, the court is not inclined to accede to this request. Admittedly, the court cannot grant a motion to dismiss unless it appears beyond a doubt that there are no set of facts which would entitle the plaintiff to relief. *See Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). However, if the court were to reconsider its earlier ruling and allow Senior Services to amend its complaint to allege this new theory, a new round of dispositive briefing would certainly ensue.

In order to resolve the new motion, the court would have to explore whether the language of a contractual clause which does not actually apply to the dispute between the parties nevertheless serves to estop Williams & Sons from demanding arbitration on its six claims because this clause somehow

placed the construction company on notice that the architect's decision should have been considered as final and binding after no demand for arbitration had been made within the thirty day period set forth in the clause. As the framing of this issue makes clear, this decision would be an extremely complicated one to make, especially since the court would have to examine all of the events which surrounded the initial demand for arbitration and determine how these events were viewed by the parties and, subsequently, affected their subjective beliefs and intentions. As the Supreme Court has explained,

Doubt [as to] whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration.... It would be a curious rule which required that intertwined issues of 'substance' and 'procedure' growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other. Neither logic nor considerations of policy compel such a result.

**\*6** *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964).

Because Senior Services' new theory for relief would require the court to untangle issues of substance and procedure which are significantly intertwined, these arguments are better addressed by the arbitrator. Thus, even if Senior Services were permitted to amend its complaint to allege this new theory, the complaint itself would still be dismissed, albeit without prejudice, under a Rule 12(b)(1) standard. In other words, Senior Services' proposed amendment is futile. The court, therefore, will not allow it. *See, e.g., Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir.1988) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 125 (3d Cir.1983)).

### III. CONCLUSION.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1726527 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

In opposition to Williams & Sons' motion to dismiss, Senior Services argued that subparagraph 4.5.4.1 operated as a substantive bar to the arbitration of six of the construction company's claims because the architect's decision had become final and binding on the parties. Therefore, according to Senior Services, the complaint raised an issue of substantive arbitrability which the court could decide.

However, under either a Rule 12(b)(6) or a Rule 12(b)(1) standard, Senior Services could not simply allege that subparagraph 4.5.4.1 governed this dispute (at least not if it hoped to survive the dispositive motion). Instead, Senior Services was obligated to provide the court with sufficient facts to support this legal conclusion. Unfortunately, for Senior Services, the facts which it did provide led to the opposite conclusion.

While Senior Services contends that it was error to reach this decision, the court disagrees. As previously explained, the language of subparagraph 4.5.4.1 expressly required three events to occur before the architect's decision could become final and binding on the parties. First, the decision must inform the parties that the ruling "is final but subject to arbitration." Second, the decision must also inform the parties that they must file a demand for arbitration within thirty days. Third, the party must fail to request arbitration within this thirty-day period.

Moreover, Senior Services attached to its complaint the letters from the architect which contained his final decision. None of these letters stated that this decision was "final but subject to arbitration." Nor did they state that a demand for arbitration had to be filed within thirty days. While Senior Services contends that Williams & Sons "should not be allowed to deny the final [ ] and binding nature of the [a]rchitect's decision simply because the [a]rchitect, [who was] not a party to the [c]onstruction [c]ontract, failed to include in his decision certain wording specified in the [c]ontract," the court does not see how it could hold otherwise in light of the literal language of the contract.

The terms of the clause at issue were explicitly clear. And, as Senior Services admits, the architect's letters did not comply with these requirement. Because Senior Services has failed to show that the court's decision would have or should have been different, the motion for reconsideration will be denied. *See Pirelli*, 988 F.Supp. at 445 ("Reargument will only be granted where [it] would alter the previous result reached by the court.").

*7 For these reasons, IT IS HEREBY ORDERED that the Motion for Reconsideration (D.I.26) filed by Senior Services is DENIED.

D.Del.,2000.
Sussex County Senior Services, Inc. v. Carl J. Williams & Sons, Inc.
Not Reported in F.Supp.2d, 2000 WL 1726527 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Not Reported in A.2d                                                                          **Page 1**
Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**
**H**

In re Telecommunications, Inc.
Del.Ch.,2003.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re TELECOMMUNICATIONS, INC.
Shareholders Litigation
No. Civ.A 16470-NC.

Submitted May 28, 2003.
Decided July 7, 2003.

Robert J. Kriner, Jr., of Chimicles & Tikellis LLP,
Wilmington, Delaware, and Joseph A. Rosenthal
and Norman M. Monhait, of Rosenthal, Monhait,
Gross & Goddess, P.A., Wilmington, Delaware; for
Plaintiffs, Arthur N. Abbey and Karin E. Fisch, of
Abbey Gardy, LLP, New York, New York, of
counsel.
Kenneth J. Nachbar and Matt Neiderman, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware; for Defendant AT & T Corporation, Paul
K. Rowe, of Wachtell, Lipton, Rosen & Katz, New
York, New York, of counsel.

*MEMORANDUM OPINION*
CHANDLER, J.
**\*1** Plaintiffs in this purported class action are
shareholders of Series A TCI Group Common Stock
("TCOMA"), a tracking stock reflecting the
performance of the TCI Group division of Tele-
Communications, Inc. ("TCI"). The TCOMA
shareholders have brought various civil actions,
which have now been consolidated into this action,
alleging breaches of fiduciary duties by the directors
of TCI FN1 in relation to a proposed merger with a
subsidiary of AT & T Corp. ("AT & T"). In
addition, the Consolidated Amended Complaint
alleges that AT & T aided and abetted the individual
defendants' breaches of fiduciary duty. AT & T has
filed a motion to dismiss the aiding & abetting claim
under Court of Chancery Rule 12(b)(6). For the
reasons detailed in this memorandum opinion, I
grant AT & T's motion.

FN1. The individual defendants, directors of TCI,
are John C. Malone ("Malone"), chairman of the
board, and chief executive officer of TCI; Leo J.
Hindrey ("Hindrey"), president and chief operating

officer of TCI; Donne Fisher ("Fisher"); J.C.
Sparkman ("Sparkman"), both Fisher and Sparkman
are consultants and former executive vice presidents
of TCI; Kim Magness; John W. Gallivan; Paul A.
Gould; Jerome H. Kern, special counsel with Baker
& Botts, L .L.P., TCI's principal outside counsel;
and Robert Nally.

**I. STANDARD OF REVIEW**

In ruling on a motion to dismiss under Rule 12(b)(6)
, the Court considers only the allegations in the
Consolidated Amended Complaint and any
documents incorporated by reference therein.FN2
For this purpose, the Court accepts as true all well-
pled factual allegations contained in the
Consolidated Amended Complaint,FN3 but
conclusory statements-those unsupported by well-
pled factual allegations-are not accepted as true.FN4
The Court will draw all inferences logically flowing
from the Consolidated Amended Complaint in favor
of the plaintiffs but only if such inferences are
reasonable.FN5 The Court will not dismiss any
claim unless it appears to a reasonable certainty that
the plaintiffs cannot prevail on any set of facts that
might be proven to support the allegations in the
Consolidated Amended Complaint.FN6

FN2. *See Vanderbilt Income & Growth Assocs. v.
Arvida/JMB Managers, Inc.,* 691 A.2d 609, 612-13
(Del.1996); *Orman v. Cullman,* 794 A.2d 5, 15-16
(Del. Ch.2002).

FN3. *See Orman,* 794 A.2d at 15.

FN4. *Grobow v. Perot,* 539 A.2d 180, 187
(Del.1988)(stating that "conclusionary allegations of
fact or law not supported by allegations of specific
fact may not be taken as true").

FN5. *See id.* (stating that the Court "need not ...
draw all inferences from [the allegations] in
plaintiffs' favor unless they are reasonable
inferences").

FN6. *See Rabkin v. Philip A. Hunt Chem. Corp.,*
498 A.2d 1099, 1104 (Del.1985).

**II. FACTUAL BACKGROUND FN7**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
**(Cite as: Not Reported in A.2d)**

FN7. The facts are derived from the well-pled allegations of the Consolidated Amended Complaint, unless otherwise indicated. Furthermore, this opinion discusses TCI as a separately existing entity comprised of three divisions in the present tense as used in the Consolidated Amended Complaint even though according to briefs on this motion, TCI shareholders approved the merger, which closed on March 9, 1999.

TCI is a Delaware corporation organized into three divisions: TCI Group, TCI Liberty Media Group ("Liberty"), and TCI Ventures Group ("Ventures"). TCI stock is issued in six series of "tracking stocks" with two separate series, designated A and B, tracking the performance of each division. The performance of TCI Group is tracked by TCOMA and TCOMB; the performance of Liberty by LBTYA and LBTYB; and the performance of Ventures by TCIVA and TCIVB. For each division's two series of stock, the A shares are entitled to one vote per share on all matters subject to shareholder vote and the B shares are entitled to ten votes per share. Otherwise the rights of A and B shareholders for each division are identical.

Defendant John C. Malone ("Malone") is a director of TCI, and its chief executive officer and chairman of the board. Malone and his wife together own approximately 47% of the outstanding TCOMB shares and approximately 45% of the outstanding LBTYB and TCIVB shares. It appears from the Consolidated Amended Complaint that Malone may own some number of A shares,FN8 but it is not clear the extent (if any) of Malone's ownership of any of the A series shares.

FN8. The Consolidated Amended Complaint alleges that Malone has a right to acquire additional TCOMB shares "in exchange for [TCOMA] shares on a one-for-one basis or for cash." Consol. Am. Compl. ¶ 28. In addition, the Consolidated Amended Complaint excludes from the plaintiff class of TCOMA shareholders all defendants including Malone.

Sometime in May of 1998 the management of TCI and AT & T began to discuss the possibility of a combination between TCI Group's cable business and AT & T's consumer services telecom business. On June 14, 1998, TCI and AT & T began discussing the merger of TCI into a subsidiary of

AT & T. The following day, June 15, TCI management informed the board of directors about the merger discussions. The board formed a special committee comprised of John W. Gallivan ("Gallivan") FN9 and Paul A. Gould ("Gould") FN10 to evaluate the merger and advise the board whether to recommend it to the shareholders. At the same board meeting, TCI management proposed a combination of Liberty and Ventures to form New Liberty. New Liberty shareholders would be issued new tracking stock after the AT & T-TCI merger. The special committee was also charged with evaluating the exchange ratio in the Liberty-Ventures combination. Also at the June 15 meeting, the TCI board authorized the retention of Donaldson Lufkin & Jenrette Securities Corp. ("DLJ") to act as financial advisors to TCI and the special committee to evaluate the proposed merger and the exchange ratio in the proposed combination of Liberty and Ventures. On June 23, the special committee recommended that the board approve the merger and the combination and the deal was publicly announced the following day.

FN9. Gallivan's ownership of TCI stock is uncertain from the allegations in the Consolidated Amended Complaint.

FN10. As of December 31, 1997, Gould had owned more TCOMB than TCOMA shares (roughly 2.5:1).

**\*2** Under the terms of the merger agreement, TCOMA shareholders will receive .7757 shares of AT & T common stock for each TCOMA share and TCOMB shareholders will receive .8533 AT & T shares per TCOMB share. Based on the June 22, 1998 trading prices of TCOMA, TCOMB, and AT & T, the exchange rate represents a premium-to-market price of greater than 40% to both TCOMA and TCOMB shareholders. TCOMA and TCOMB apparently trade at similar prices. The June 22, 1998 closing price of TOCMA was \$35.69 and of TCOMB was \$35.50. The average closing prices of TCOMA and TCOMB for the preceding 30 days were \$34.60 and \$34.90 respectively. Thus, for shares similarly valued on the open market, TCOMB shareholders would receive approximately 10% more AT & T common stock than would TCOMA shareholders. This difference, representing a premium paid to the TCOMB shareholders for their "supervoting" rights, redounds largely to the benefit of TCI management (collectively the owners

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
(Cite as: Not Reported in A.2d)

Page  3

of 84.4% of TCOMB shares), while concurrently benefiting the non-management owners of TCOMB shares.

### III. ANALYSIS

In order to state a claim for aiding and abetting a breach of fiduciary duty, the plaintiffs must allege (1) a fiduciary relationship; (2) a breach of that relationship; and (3) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty.FN11 Defendant AT & T asserts that the plaintiffs have failed to plead facts from which the Court may infer the third element that it knowingly participated in any breach of fiduciary duty by the directors of TCI.

FN11. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 72 (Del.1995).

Plaintiffs are not required to plead knowing participation with particularity. FN12 This element is subject to the ordinary notice pleading standard on a motion to dismiss under Court of Chancery Rule 12(b)(6).FN13 Still, it is necessary that the plaintiffs make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss. FN14 For example, knowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of side deals is so excessive as to be inherently wrongful. FN15 In addition, the Court may infer knowing participation if it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations. FN16 The plaintiff's burden of pleading knowing participation may also be met through direct factual allegations supporting a theory that the defendant sought to induce the breach of fiduciary duty, such as through the offer of side payments intended as incentives for the fiduciaries to ignore their duties.FN17

FN12. *McGowan v. Ferro,* 2002 Del. Ch. LEXIS 3, at *8 (Del. Ch.); *Jackson Nat'l Life Ins. v. Kennedy,* 741 A.2d 377, 391 (Del. Ch.1999); *L A Partners, L.P. v. Allegis Corp.,* 1987 Del. Ch. LEXIS 501, at *22 (Del. Ch.).

FN13. *See L A Partners, L.P.,* 1987 Del. Ch. LEXIS 501, at *22.

FN14. *Id.*

FN15. *See McGowan,* 2002 Del. Ch. LEXIS 3, at *8-10; *Crescent/Mach I Partners v. Turner,* 2000 Del. Ch. LEXIS 145, at *69-74 (Del. Ch.); *Jackson Nat'l Life Ins.,* 741 A.2d at 392; *In re USACafes, L.P. Litig.,* 600 A.2d 43, 55-56 (Del. Ch.1991).

FN16. *See Zirn v. VLI Corp.,* 1989 Del Ch. LEXIS 83, at *16-18 (Del. Ch.) (denying motion to dismiss aiding and abetting claim because it was reasonable to infer that a potential acquiror may have used knowledge of the target company's directors exposure to fiduciary duty liability in order to gain some bargaining advantage in negotiations).

FN17. *See McGowan v. Ferro,* 2002 Del. Ch. LEXIS 3, at *9-10; *Crescent/Mach I Partners,* 2000 Del. Ch. LEXIS 145, at *69-72; *Jackson Nat'l Life Ins.,* 741 A.2d at 392-93; *In re USACafes, L .P. Litig.,* 600 A.2d 43, 55-56.

The terms of the merger, as alleged, do not seem to be sufficiently troubling that TCI's merger partner could be fairly charged with knowing participation in any breach of fiduciary duty by Malone or TCI's directors simply because AT & T agreed to the terms of the merger. Before I go farther, let me be clear about what I am not saying. I am not saying that the breach of fiduciary duty claim against the director-defendants is unmeritorious. AT & T does not assert for purposes of this motion that the plaintiffs have failed to state a claim for breach of fiduciary duty against the TCI directors. Consequently, this motion does not require such a determination and, thus, it would be inappropriate to opine in any detailed manner on the merits of the underlying claim of breach. That said, the level of egregiousness of the terms of the merger, here alleged to constitute the breach of duty to the TCOMA shareholders, is pertinent to AT & T's assertion that plaintiffs have not alleged that it knowingly participated in a breach of fiduciary duty. When the allegations of breach are based upon the specifics of the terms of the merger agreement, the more outrageous those terms are, the less plausible it becomes for a merger partner accused of aiding and abetting to assert that its participation was not "knowing."

*3 By agreeing to pay a "supervoting premium" whereby the TCOMB shareholders would receive consideration that is 10% higher than that to be received by the TCOMA shareholders, AT & T,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



according to the plaintiffs, knowingly participated in Malone and the other directors breaching their fiduciary duties to the TCOMA shareholders. Plaintiffs offer two general propositions to support this theory. First, the plaintiffs contend that they will prove at trial that the payment of a higher control premium for supervoting stock is the rare exception in mergers of this sort. In oral argument on this motion, plaintiffs ask the court to accept that by virtue of the counsel of their investment bankers and legal advisors, AT & T would or should have known this to be the case. I accept for purposes of ruling on this motion that the plaintiffs will be able to produce evidence of the rarity of control premiums like the one to be paid to TCOMB shareholders at the appropriate time. I also anticipate that the defendants will seek to introduce evidence to the contrary. Assuming that enhanced premiums for supervoting stock are the rare exception in stock-for-stock mergers, it is not clear that AT & T did know or should have known that this premium was extraordinary.FN18 In any event, the fact that a particular provision is uncommon does not create a presumption that it was adopted in breach of fiduciary duty. The plaintiffs' second argument is that there is no case in Delaware law addressing the legality of a control premium paid to a class of supervoting shares when the whole company is acquired. At best, this lack of decisional authority provides a basis for suggesting that the *receipt* of such a premium *could* constitute a breach of fiduciary duty. At worst, from the plaintiffs' perspective, it bolsters AT & T's assertion that it had no reason to believe that Malone or the other directors were in breach of any fiduciary duty by accepting or even insisting upon such a premium.

FN18. In at least one case, this Court approved a settlement in which a single controlling block of supervoting B shares would be purchased for $135 per share whereas A shareholders (and any remaining B shareholders who failed to opt out of the class) would receive only $36 per share. *See In re Resorts Int'l S'holders Litig.,* 1988 Del. Ch. LEXIS 130, at *13-14 (Del. Ch.). In addition, the court specifically permitted B shareholders to opt out of the class because it seemed possible that they "might be entitled to a higher price for their shares than the $36" to be paid under the agreement. *See id.,* at *25-31.

The 10% difference in consideration paid to the

TCOMA and TCOMB shareholders is not a "side deal" with Malone and management. The plaintiff alleges that management owns just under 85% of the B shares. Under these terms the managers are treated the same as all B shareholders. In addition, a 10% difference in consideration between two classes of shareholders that are each receiving upwards of a 40% premium on the trading price of their shares, is not so grossly excessive that without more it leads to an inference that the difference was intended as an inducement to ignore fiduciary duties. AT & T's agreement to the terms of the merger is insufficient alone to meet the plaintiffs' burden to plead knowing participation by AT & T in Malone and the TCI board's alleged breach of fiduciary duty.

Nor does the fact that AT & T negotiated with Malone and the TCI management team provide a sufficient basis for inferring that AT & T knowingly participated in any breach of fiduciary duty that may have occurred. It is alleged that on June 14, 1998, the negotiations transformed from AT & T seeking to buy TCI Group's cable business into discussions of a merger of all of TCI into an AT & T subsidiary. It is alleged that the terms of the merger were agreed to that same day. I note that this leaves little time for AT & T and Malone to engage in any extended "wheeling and dealing" to benefit Malone and harm TCOMA shareholders. Nor does it raise the suspicion that AT & T had to work very hard to court Malone's favor because it appears that the first round of negotiations produced a transaction acceptable to both parties. The following day, the directors of TCI formed a special committee to evaluate the terms of the merger and authorized retention of investment bankers to evaluate the merger. Nine days later the merger was publicly announced under substantially the same terms initially agreed to on June 14. The plaintiffs challenge the qualifications of the special committee members to act in a disinterested and independent manner; challenge the limitations placed on the authority of the special committee; challenge the incentives of the investment bankers; and complain that no one provided a separate analysis of the fairness of the merger to TCOMA shareholders. Assuming the truth of these allegations, as I must in ruling on this motion, I nonetheless see no basis upon which AT & T could be charged with knowledge of (much less participation in) any failures of the internal workings of the TCI board of directors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
**(Cite as: Not Reported in A.2d)**

### IV. CONCLUSION

**\*4** In sum, the plaintiffs fail to allege specifically how AT & T may have aided and abetted the TCI directors' breach of fiduciary duty and fail to allege facts from which the court may infer knowing participation. For this reason the Consolidated Amended Complaint fails to state a claim for aiding and abetting breach of fiduciary duty and AT & T's motion to dismiss is GRANTED.

IT IS SO ORDERED.

Del.Ch.,2003.
In re Telecommunications, Inc.
Not Reported in A.2d, 2003 WL 21543427 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

